EXHIBIT C

Exhibit B

Case 3:12-cv-07758-ZNQ-JBD Document 220-5 Filed 10/14/20 Page 3 of 21 PageID:
Case 1:11-cv-00071-PGG Document 280-2 Filed 11/19/18 Page 2 of 20 PageID:
5282

Page 1

1                    VIRGINIA EVANS
2    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
3    ------------------------------------x
     UNITED STATES OF AMERICA; the States :
4    of CALIFORNIA, COLORADO, CONNECTICUT,
     DELAWARE, FLORIDA, GEORGIA, HAWAII,  :  Case No.
5    ILLINOIS, INDIANA, LOUISIANA,
     MARYLAND, MASSACHUSETTS, MICHIGAN,   :  11 Civ. 0071
6    MINNESOTA, MONTANA, NEVADA,
     NEW HAMPSHIRE, NEW JERSEY, NEW       :  (PGG)
7    MEXICO, NEW YORK, NORTH
     CAROLINA, OKLAHOMA, RHODE            :
8    ISLAND, TENNESSEE, TEXAS, VIRGINIA,
     WISCONSIN; the DISTRICT OF COLUMBIA; :
9    the CITY OF CHICAGO, and the CITY OF
     NEW YORK, ex rel. OSWALD BILOTTA,    :
10
                 Plaintiffs and Relator, :
11
                     v.                  :
12
     NOVARTIS PHARMACEUTICALS            :
13   CORPORATION,
                                          :
14           Defendant.
     ------------------------------------x
15   UNITED STATES OF AMERICA,            :
16           Plaintiff,                   :
17           v.                           :
18   NOVARTIS PHARMACEUTICALS CORP.,      :
19           Defendant.                   :
     ------------------------------------x
20      VIDEOTAPED DEPOSITION OF VIRGINIA EVANS
21              New York, New York
22              January 23, 2018
23   Reported by:
24   KATHY S. KLEPFER, RMR, RPR, CRR, CLR
25   JOB NO. 136542

---

Page 10

VIRGINIA EVANS

1
2      A.   Yes.  I have actually published
3  through the American Bar Association Health Law
4  Litigation and Risk Management section a brief
5  article on physician credentialing and the risks
6  that can occur when a physician enters into an
7  agreement with -- with respect to his or her
8  competency and/or other agreement and how that
9  can affect his status under the National
10  Provider Database.
11      Q.   Okay.  We've also put before you DX3,
12  which is the expert report of Heidi Sorensen
13  which was prepared in response to your report.
14      Do you see that?
15      A.   I do.
16      Q.   And have you reviewed that report?
17      A.   I have.
18      Q.   What did you do to prepare for today's
19  deposition?
20      A.   I reviewed the materials that Ms.
21  Sorensen referenced in her report.  I reviewed
22  the materials that I referenced in my report.  I
23  read both of those reports.  I went back and
24  looked at the PhRMA Code and the HHS OIG
25  Guidance for Pharmaceutical Manufacturers.  I

---

Page 11

VIRGINIA EVANS

1
2  also discussed my testimony with counsel, Ms.
3  Jude.
4      Q.   And when did you do that?
5      A.   I discussed my testimony on Friday for
6  about two hours, three hours, and then again
7  yesterday from 1 till about 6, so about five
8  hours.
9      Q.   Okay.  When you say the HHS OIG
10  Guidance, are you referring to the 2003
11  guidance?
12      A.   Yes, sir.  Uh-huh.
13      Q.   And I believe that's in front of you
14  as Defendant's Exhibit 4; is that correct?
15      A.   Yes.
16      Q.   Why don't we open up your report, and
17  to give you a preview of what we're going to do
18  today, for most of the day we're just going to
19  walk through your report, and I'm going to ask
20  you questions.  Okay?
21      A.   Okay.
22      Q.   And then when I'm done with that, I'll
23  likely ask you questions about Ms. Sorensen's
24  report.  Okay?
25      A.   (Witness nods.)

---

Page 12

VIRGINIA EVANS

1
2      Q.   On page 1 of your report, we'll start
3  with the Introduction.  You say that the U.S.
4  Attorney's Office engaged you to perform a
5  review of and offer an opinion on the
6  effectiveness of NPC's compliance program with
7  respect to certain promotional events.
8      Do you see that?
9      A.   Yes, sir.
10      Q.   What do you mean by "effectiveness"?
11      A.   When I talk about effectiveness in the
12  context of this report, I'm referring back to
13  the concept of effectiveness as that is
14  described in the Sentencing Guidelines and as is
15  understood in the compliance industry, not only
16  the Sentencing Guidelines, but also the OIG
17  pharma compliance for -- excuse me, compliance
18  guidance for pharma manufacturers as well as the
19  understanding in the industry as to what a
20  compliance -- an effective compliance program
21  is.
22      Q.   As far as understanding in the
23  industry, is there other -- other written
24  documents that you cite other than the OIG
25  guidance and the Sentencing Guidelines that

---

Page 13

VIRGINIA EVANS

1
2  could help me understand what "effectiveness"
3  means?
4      MS. JUDE:  Objection to form.
5      Q.   You can answer.
6      A.   Okay.  I'm sure that there are other
7  documents that are referenced in these
8  materials.  If you can point me to a particular
9  document, I'd be happy to discuss it.
10      The concept of effectiveness is
11  something that was enumerated, if you will, in
12  the Sentencing Guidelines, outlined in the
13  Sentencing Guidelines, and "effectiveness" has
14  grown to mean since the time of the Sentencing
15  Guidelines, which I think was 1991, to mean
16  the -- whether or not a compliance program does
17  what it's supposed to do in this sense:  That it
18  not only sets forth a framework of standards,
19  but those standards are tested and to see
20  whether or not in fact they work.  So
21  effectiveness is really a function of is the
22  compliance program working.
23      Q.   Okay.  And were you retained by the
24  U.S. Attorney's Office in this matter?
25      A.   Yes, I was.

Case 3:12-cv-07758-ZNQ-JBD Document 295-2 Filed 10/14/20 Page 5 of 21 PageID:
Case 3:17-cv-00075-PGC Document 280-2 Filed 01/19/18 Page 4 of 20 PageID:
5284

Page 14

VIRGINIA EVANS

1
2    Q.   And did you approach you about
3    testifying or did you approach them?
4    A.   No, they approached me.
5    Q.   And when they approached you, was your
6    assignment to opine on the effectiveness of the
7    program?  Is that what the assignment they gave
8    you?
9    A.   My assignment was to review materials
10   and depositions for a ten-year period with
11   respect to speaker program compliance and then
12   to assess whether or not the compliance program
13   was effective; and if there are certain elements
14   of the compliance program that were not
15   effective, when they became ineffective or when,
16   conversely, they became more effective.
17       So that was my engagement.
18   Q.   Okay.  And the period that you looked
19   at was 2002 to 2011; is that correct?
20   A.   Yes, sir.  Although I did go back and
21   look at 2001 because, as I understood it, the
22   compliance guidance, such as there was at
23   Novartis in that -- Novartis Pharmaceuticals in
24   that period dated back to 2001.
25   Q.   And you recognized earlier that the --

Page 15

VIRGINIA EVANS

1
2    the guidance about what it means to be effective
3    has evolved over time; is that correct?
4        MS. JUDE:  Objection.  Misstates
5    testimony.
6    Q.   Is that correct?
7    A.   I can answer?
8        MS. JUDE:  You can answer, yes.
9    A.   Has it evolved over time?  No, I
10   don't -- I think that it's inaccurate to say
11   that it has -- it was not present at the
12   beginning.  The whole idea of having a
13   compliance program -- and by the "beginning," I
14   mean the beginning of this particular time
15   period, which we'll call the review period -- I
16   think the question of whether or not a
17   compliance program was effective is something
18   that was there from the outset.  Because if the
19   compliance program is not effective, there's
20   really no methodology or way to reduce risk
21   within the organization and reduce the risk of
22   misconduct or violations of law or regulations.
23       So effectiveness not only goes to
24   preventing, detecting, and ameliorating any
25   violations of law, regulations, but also any

Page 16

VIRGINIA EVANS

1
2    violations of the company's own policy.
3        So I don't think that it's fair to say
4    that there was no effectiveness in the beginning
5    and it evolved over time.  I think that, over
6    the time period, the review period, the
7    companies became more aware of what the
8    government would be expecting in order for there
9    to be an effective compliance program.
10   Q.   Okay.  I mean, the word "evolved" is a
11   word I believe you used.
12   A.   Right.
13   Q.   So you're saying that, as time
14   progressed, companies became more aware of what
15   they had to do in order for their program to be
16   effective?
17   A.   Yes; I think that they did -- they
18   became more aware of particular instances of
19   misconduct that were getting other companies in
20   the industry into trouble, and that provided
21   information about -- which one would hope would
22   inform the compliance program.
23       So if you know that a particular
24   company has gotten in trouble for speaker
25   programs where there are speakers being paid who

Page 17

VIRGINIA EVANS

1
2    don't show up, let's say, you would want to go
3    back as part of your understanding of what was
4    going on in the pharmaceutical industry as well
5    as the compliance industry and take a look to
6    make sure that that's not happening in your own
7    company.
8    Q.   And --
9    A.   So --
10   Q.   I'm sorry.
11   A.   -- I guess in that sense, you could
12   say that your understanding of what would make
13   an effective speaker program, compliance program
14   would evolve, yeah.
15   Q.   And when was the first published
16   settlement involving a pharmaceutical company
17   relating to speaker programs?
18   A.   I don't know the answer to that
19   question, and but I know that pharmaceutical
20   companies were under investigation, and that was
21   public record back in the late 1990s and as
22   early as 2001.
23   Q.   That related to speaker programs?
24   A.   To speaker programs, yes, or actually,
25   if you -- if you confine the response to speaker

| Page 18 | Page 19 |
|---|---|

**Page 18**

VIRGINIA EVANS

1  
2 programs, that might be misleading, because
3 speaker programs are any sort of -- fall into
4 the general consulting arrangement that a
5 pharmaceutical company would have with a
6 healthcare professional.
7        So any sort of benefit being conferred
8 upon the healthcare professional is being
9 reviewed especially in the area of
10 pharmaceutical manufacturers pretty early on. I
11 would say 1990s to, you know, certainly 2001.
12    Q.   And do you know what companies were
13 under investigation that was public, a matter of
14 public record?
15    A.   Well, I don't -- I don't know that I
16 could remember them offhand. I think Novartis'
17 own materials referenced early on several
18 companies that were either under investigation,
19 in the process of entering into settlements, or
20 were examples that management used to explain
21 what the potential risks and liabilities could
22 be.
23    Q.   So one thing that I noticed a
24 distinction between your report and Ms.
25 Sorensen's report is that she relies very

**Page 19**

VIRGINIA EVANS

1  
2 heavily on settlements in these cases, and I
3 don't believe you reference them.
4        Can you explain why you don't
5 reference them?
6    A.   Well, for two reasons. Basically, I
7 thought it was important to review Novartis' own
8 materials and to determine, in the context of
9 whether or not their speaker program compliance
10 efforts were effective, to go back and look at
11 what they were saying about their own
12 organization.
13        And I did not rely so heavily on
14 settlements unless -- or did not really refer to
15 settlements unless Novartis referenced them
16 themselves, and that was because it seemed to me
17 that it would be maybe unfair to tag them with
18 knowledge about the particulars of a settlement
19 in a case that they were not involved with. So
20 unless it was something that Novartis
21 referenced, I did not find that -- those
22 settlements to be particularly relevant.
23        Now, the second reason that I didn't,
24 as Ms. Sorensen did in her report, go through
25 and itemize all of the different settlements and

| Page 20 | Page 21 |
|---|---|

**Page 20**

VIRGINIA EVANS

1  
2 CIAs is because it's my belief that those are
3 fact-specific to those particular companies, and
4 although CIA can be used as sort of information
5 that can then be folded into a compliance
6 program to give guidance and direction as to
7 what things maybe the company should be looking
8 for, each CIA stands or falls on its own and is
9 the result of a particular settlement with a
10 particular company involving particular facts,
11 and you can see that.
12        Some of them involve, you know, focus
13 arrangement databases. In some CIAs they call
14 it something different. There was a time period
15 when some CIAs, especially in the pharmaceutical
16 manufacturers world, were requiring compliance
17 experts to help the board. That's no longer the
18 case.
19        So I see each of the CIAs as being
20 specific to that particular settlement.
21    Q.   But when you measure -- when you
22 measure the effectiveness of Novartis'
23 compliance program, you had to measure it
24 against a standard, correct?
25    A.   Yes.

**Page 21**

VIRGINIA EVANS

1  
2    Q.   And so are you saying that CIAs and
3 the requirements of CIAs did not inform that
4 standard because you don't refer to them in your
5 report?
6    A.   No, I'm not saying that at all, and I
7 think the CIAs can be used as guidance. I think
8 that the idea that if something is not
9 articulated in a specific CIA which involves a
10 third party and the government and a different
11 set of facts, it doesn't necessarily mean that
12 you -- you are okay, you don't have to do that
13 until -- a particular item until there's a CIA
14 about it.
15        So I would go back and say that the
16 standards are really found in the Anti-Kickbacks
17 Statute and the False Claims Act and the
18 Sentencing Guidelines and the PhRMA Code and
19 Pharma Guidance, HHS OIG 2003 Guidance for
20 Pharmaceutical Manufacturers.
21    Q.   So --
22    A.   So the CIAs might inform your program,
23 it might be a great idea to take a look at a CIA
24 and say, wow, that's something that we could do
25 internally here and prevent further misconduct

6 (Pages 18 to 21)

Page 22

VIRGINIA EVANS

1 
2 or what we perceive to be a risk of fraud waste
3 or abuse, but there's nothing saying that you
4 have to follow what a CIA says.
5 Q. Okay. So, in measuring the
6 effectiveness of this compliance program, you
7 measured it against the sources that you just
8 listed for me: The OIG Guidance, the PhRMA
9 Code, the Anti-Kickback Statute, the False
10 Claims Act, maybe. I didn't --
11 A. False Claims Act.
12 Q. I don't know if there are any others.
13 A. FDA standards in terms of what they
14 require healthcare providers to explain when
15 they are being engaged as consultants or
16 speakers. They require certain information be
17 conveyed to audiences. So I looked at that as
18 well.
19 Q. Let me ask you. I don't recall seeing
20 a citation to FDA guidance in your report, but
21 there are 423 footnotes, so I may have missed
22 one.
23 A. Yes.
24 Q. Did you cite to FDA guidance that I
25 should look at?

Page 23

VIRGINIA EVANS

1 
2 A. Yes, I believe I did. And in fact, I
3 think the PhRMA Code actually refers back to
4 FDA, and certainly Novartis' own policies refer
5 back to FDA requirements that, you know, a
6 speaker should provide a fair, balance and...
7 Q. Got it.
8 A. Yes.
9 Q. So we're, unfortunately, we're still
10 on the first paragraph of your report.
11 A. I'm sorry.
12 Q. No. No. No. That's fine. We have
13 the whole day.
14 But you were asked to offer an opinion
15 on the effectiveness of the compliance program,
16 and what -- is it fair to say that your opinion
17 is that Novartis' compliance program during this
18 period was not effective?
19 MS. JUDE: Objection to form.
20 A. My -- no, my opinion would be that,
21 with respect to speaker programs, speaker
22 program compliance, Novartis' compliance --
23 speaker program compliance efforts were not
24 effective until about September of 2010.
25 Q. Okay. And do you have an

Page 24

VIRGINIA EVANS

1 
2 understanding of how that conclusion bears on
3 Novartis' liability in this case?
4 A. I really did not consider Novartis'
5 liability, or other than briefly reading the
6 complaint, I did not really consider the, if you
7 will, the ultimate conclusion of this civil
8 matter. I was specifically looking at speaker
9 program compliance and whether or not they were
10 effective, as that is -- term is understood in
11 HHS OIG Guidance and...
12 Q. Are you aware of any case where the
13 liability of a pharmaceutical company in a False
14 Claims Act case relies at all on whether the
15 compliance program was or was not effective?
16 A. No. My understanding -- no, I am not
17 aware of any particular pharmaceutical case
18 where the ultimate legal conclusion of the case
19 turned on whether or not the compliance program
20 was effective.
21 I am aware from my time as an
22 assistant U.S. attorney and as chief of the
23 Civil Division that an effective compliance
24 program can be used to show that an organization
25 is less culpable than it might otherwise appear

Page 25

VIRGINIA EVANS

1 
2 under the Sentencing Guidelines, and that can
3 affect HHS's interest in entering into, in the
4 civil realm, in entering into an agreement with
5 them.
6 If there is a good compliance program
7 in place, HHS will sometimes allow companies to
8 use their own compliance measures. For example,
9 might not -- HHS might not wish to have an IRO
10 involved if the company's got a good compliance
11 program.
12 So, but whether or not a company has
13 an effective compliance program I see directly
14 relates to its risks that it will be found
15 culpable and, you know, to what degree it was
16 able to address those risks in a manner that was
17 meaningful in both the civil and criminal
18 context.
19 Q. Okay. And that's in the -- when you
20 say "culpable," you're referring to a decision
21 that the prosecutor will make as to whether to
22 bring an enforcement action?
23 A. Yes; I think that the Sentencing
24 Guidelines are the basis of the seven elements
25 that later were used when the HHS OIG

7 (Pages 22 to 25)

Case 3:12-cv-07758-ZNQ-JBD  Document 200-5  Filed 10/14/20  Page 8 of 20 PageID:
Case 3:17-cv-00078-PGC  Document 280-2  Filed 11/19/18  Page 9 of 20
5287

| Page 26 | Page 27 |
|---|---|

**Page 26**

VIRGINIA EVANS

1
2 Pharmaceutical Guidance was drafted.
3    Q.  Okay.
4      MS. JUDE: I just want to put an
5 objection on the record to the extent that
6 this is using Ms. Evans' expertise in this
7 case to try to prove that certain elements
8 of the case are not met.
9      I mean, she is a lawyer so obviously
10 she can answer these questions. I don't
11 think I need to make them as to form on the
12 record, but she's here purely to offer an
13 opinion about compliance and not about --
14      MR. GRUENSTEIN: I understand that.
15      MS. JUDE: -- this case.
16      MR. GRUENSTEIN: I understand that.
17 BY MR. GRUENSTEIN:
18    Q.  I want to ask a question that I may
19 not have asked clearly before about your
20 methodology of determining whether a company has
21 an effective compliance program.
22      I assume you've considered other
23 companies and whether other companies have
24 effective compliance programs?
25    A.  Yes, I have.

**Page 27**

VIRGINIA EVANS

1
2    Q.  And what is your methodology for that
3 consideration?
4    A.  Well, one of the first things that I
5 would do -- that I do is to take a look at the
6 policies and procedures. The very first element
7 of the -- of an effective compliance program,
8 the first element that's enumerated, I would
9 take a look at those.
10      It would be my practice then, if there
11 were no depositions, to interview individuals in
12 the organization. If there is -- if that's not
13 an option, the next thing I would do is look at
14 statements from the individuals, and based upon
15 those statements, I would then seek to review
16 documents. And those could be e-mails, they
17 could be training materials, the documents could
18 be financial analysis, complaints, responses to
19 the hotline, investigations, and then any
20 remediations that occurred as a result of those
21 complaints and look to determine whether or not
22 the compliance program has an internal ability
23 to use information gleaned from all of these
24 sources in statements about risk, documents,
25 materials, e-mails, complaints, investigations,

| Page 28 | Page 29 |
|---|---|

**Page 28**

VIRGINIA EVANS

1
2 take all of that information and wind it back
3 into their compliance policies and training and
4 education so that you have some ability to state
5 with confidence that there was a problem, the
6 problem -- a compliance problem, the problem was
7 reviewed, corrective action was drafted, and
8 then a testing after the corrective action was
9 determined and implemented to see if it's
10 working, basically.
11    Q.  So I want to take you out of the
12 context where you're doing that review and
13 litigation as an expert witness.
14    A.  Okay.
15    Q.  Because I assume as a consultant you
16 do this analysis for companies?
17    A.  That's correct.
18    Q.  Okay. And when you do that analysis,
19 you typically will interview people?
20    A.  That's correct.
21    Q.  And presumably you interview key
22 people at the company who deal with the
23 compliance program, correct?
24    A.  Yes.
25    Q.  So, for example, you would interview

**Page 29**

VIRGINIA EVANS

1
2 the chief compliance officer?
3    A.  That would -- yes, uh-huh.
4    Q.  And you interview other people in the
5 Compliance Department?
6    A.  Yes.
7    Q.  You interview people in Internal
8 Audit?
9    A.  Sometimes, yes.
10    Q.  And you interview people in Human
11 Resources, perhaps?
12    A.  Sometimes, yes. It really depends on
13 whether or not the compliance program touches
14 those areas, and sometimes it does and sometimes
15 it doesn't. That would be true of both Internal
16 Audit and HR.
17    Q.  And there may be other departments
18 that you would say touch on compliance like, for
19 example, Legal, Finance, maybe others, correct?
20    A.  That's correct.
21    Q.  And there may be times where for you
22 to do a thorough review of a compliance program
23 you have to interview dozens of people, correct?
24    A.  That's correct.
25    Q.  And you review -- you ask -- I'm

8 (Pages 26 to 29)

| Page 30 | Page 31 |
|---|---|

**Page 30**

VIRGINIA EVANS

1
2  sorry. Let me strike that.
3      You ask those people to provide you
4  with all relevant policies, correct?
5      A.  Yes.
6      Q.  And then you review those policies
7  thoroughly, correct?
8      A.  Yes.  Try to.
9      Q.  And you ask for documentation of
10 instances where there were violations of the
11 policies, correct?
12     A.  Sometimes, yes.  Uh-huh.
13     Q.  And you review the investigation
14 reports, if there are investigation reports?
15     A.  Yes.
16     Q.  And that all informs your decision as
17 to whether the company is or is not effective,
18 correct?
19     A.  It helps to -- helps me to come to a
20 conclusion as to whether or not it -- the
21 compliance program is working, yes.
22     Q.  Okay.  Do you ever take proactive
23 steps like issuing a survey to employees?
24     A.  Yes, that is something that I have
25 been involved in with other organizations in the

**Page 31**

VIRGINIA EVANS

1
2  past, uh-huh.
3      Q.  And is that helpful for you to
4  determine whether there is a culture of
5  compliance at the company?
6      A.  Yes.
7      Q.  And whether there's a culture of
8  compliance at the company is certainly something
9  that you consider when you're considering
10 whether there is an overall effective compliance
11 program?
12     A.  Yes, that is something that, although
13 culture of compliance is kind of difficult to --
14 to describe, you know, you --
15     Q.  You know it when you see it?
16     A.  You know it when you see it.
17     Q.  Okay.  I feel that way about a lot of
18 the --
19     A.  Right.
20     Q.  -- a lot of the factors that are
21 involved.
22         And when companies ask you to review
23 their compliance program, at the end of the day,
24 you give them suggestions for improvement?
25     A.  Yes.  Yes.  Or I may suggest to them

| Page 32 | Page 33 |
|---|---|

**Page 32**

VIRGINIA EVANS

1
2  that they need to do a deeper dive into
3  particular areas because there is apparent risk.
4      Q.  And that itself is a suggestion for
5  improvement?
6      A.  Yes, sir.  Uh-huh.
7      Q.  And do you ever say to a company,
8  "Your compliance program is effective.  There's
9  nothing more that you need to do"?
10     A.  I have been involved with companies
11 that have excellent compliance programs that are
12 effective, that need very little adjustment.
13     Q.  Okay.  Unfortunately, those companies
14 never need to hire me because they never get
15 into any trouble, so I haven't encountered them,
16 but okay.
17         But it's fair to say that you also
18 have had clients -- I'm talking about consulting
19 clients, not legal clients -- I don't want to
20 tread on the privilege -- but you have had
21 clients where you would conclude that they had
22 effective compliance programs, but there was
23 still room for improvement?
24     A.  That's correct.
25     Q.  And then you've had other clients

**Page 33**

VIRGINIA EVANS

1
2  that -- well, let me ask you, have you had other
3  clients where you have reached the conclusion
4  you have an ineffective compliance program?
5      A.  Absolutely.
6      Q.  Okay.  And you've given them room for
7  improvement -- you have given them ideas for
8  improvement?
9      A.  Yes, I have.
10     Q.  So it's possible that an effective
11 compliance program has room for improvement as
12 well as an ineffective compliance program,
13 correct?
14     A.  That is possible.
15         MS. JUDE:  Object to the form.
16         THE WITNESS:  I'm sorry.
17         MS. JUDE:  Objection to form.
18         THE WITNESS:  That is possible.
19 BY MR. GRUENSTEIN:
20     Q.  Of course, the ineffective program has
21 more room for improvement --
22     A.  Yes.
23     Q.  -- than the effective, correct?
24     A.  Yes.
25     Q.  How do you draw the line between an

TSG Reporting - Worldwide     877-702-9580

Case 3:12-cv-07758-ZNQ-JBD   Document 300-5   Filed 11/19/18   Page 10 of 21
Case 1:12-cv-07758-ZNQ-JBD   Document 300-5   Filed 11/14/20   Page 10 of 21
PageID: 5289

Page 50

VIRGINIA EVANS

1
2    A.   Right, I think that --
3    Q.   You were your own right-hand man?
4    A.   I think that there's a -- that's an
5    error.  It should be back one year there.
6    Q.   That's fine.
7         During those cases, did you litigate
8    any False Claims Act cases?
9    A.   Yes, we did.
10   Q.   Against who?
11   A.   I'm sorry?
12   Q.   Against who?
13   A.   I believe that Serono was -- I
14   supervised the assistant who was handling that
15   case, Serono, in the District of Maryland.  I
16   had a number of different healthcare fraud cases
17   that ended up settling out in that district.
18        I'd have to -- I can't remember the
19   names of them off the top of my head, but there
20   were...
21   Q.   Did any of them involve promotional
22   practices or speaker programs, to your
23   recollection?
24   A.   Well, Serono did.  I'm just trying to
25   think.  None of them involved speaker programs

Page 51

VIRGINIA EVANS

1
2    per se, but some of them involved benefits to
3    physicians, yeah.
4    Q.   You then worked at KPMG --
5    A.   Right.
6    Q.   -- for a few years, and it says in the
7    first bullet that you did work for
8    pharmaceutical companies.  That's in your list?
9    A.   Yes.
10   Q.   Approximately how many pharmaceutical
11   companies did you work for?
12   A.   At least three that I can recall at
13   this point.
14   Q.   And did you provide guidance for them
15   on speaker programs?
16   A.   Yes, and as well as serving as the
17   Independent Review Organization, reviewing their
18   compliance with their corporate integrity
19   agreements, which involved benefits to
20   physicians.  If not speaker programs, then other
21   benefits involving promotions, so...
22   Q.   And who were you the IRO for?
23   A.   I was the I- -- I was involved in the
24   IRO with -- I don't know if I'm allowed to
25   disclose this.

Page 52

VIRGINIA EVANS

1
2    MS. JUDE:  Yes, I don't know what your
3    confidentiality obligations are, so if you
4    want her to check on that --
5    THE WITNESS:  Right.
6    MS. JUDE:  -- and get back to you, or
7    if there's a way to ask a -- ask it so you
8    can get what you're looking for without the
9    actual name, we can do that.
10   BY MR. GRUENSTEIN:
11   Q.   The company that you were the IRO for
12   was a pharmaceutical company?
13   A.   There were a number of them.  One was
14   a major pharmaceutical retailer.  One was a
15   pharmaceutical wholesaler.  One was a hospital
16   system.  And this would go into my time at
17   Daylight as well.  One was an international,
18   large international pharmaceutical company.  One
19   was a generic -- I was not an IRO.  I drafted
20   the compliance policies for a generic
21   pharmaceutical company, drafted the compliance
22   policies for physician practices and
23   organizations for a number of hospitals and
24   healthcare systems and did compliance reviews of
25   other entities as well.

Page 53

VIRGINIA EVANS

1
2    Q.   Other pharmaceutical companies?
3    A.   I'm trying to think if there were any
4    other pharmaceutical companies.  There were at
5    least three, so...
6    Q.   And did those pharmaceutical
7    companies, including the generic one that you
8    mentioned, did they do speaker programs?
9    A.   One of them did, yeah, uh-huh.
10   Q.   And can you say which one that is?
11   A.   No, I can't.  I don't think it would
12   be appropriate.
13   Q.   And you gave them advice on their
14   speaker program compliance?
15   A.   We gave them advice -- I gave them
16   advice as a compliance expert working with the
17   board and helping the board certify that it had
18   reviewed the compliance policies and programs,
19   very similar to Novartis' corporate integrity
20   agreement that -- so the board could certify and
21   management could certify and the compliance
22   officer could certify that they had reviewed the
23   compliance program and that the compliance
24   program was effective.
25   Q.   And was there a term in that CIA that

14 (Pages 50 to 53)

## Page 74

VIRGINIA EVANS

1
2   A.   Yes, sir, although I believe that
3   other folks participated in the policy drafting
4   later on.  By that I would say after 2005, and I
5   don't know how -- how many years into or past
6   2009, 2010 he remained in the policy-making
7   position.
8   Q.   So if Marty and others thought that
9   these policies were not ambiguous, but then the
10  people you cite thought that the policies were
11  ambiguous, why do you rely on those people and
12  not on Marty?
13       MS. JUDE:  Objection to form.
14       A.   Because when looking at the
15  effectiveness of the policies, it was apparent
16  to me based on subsequent e-mails and other
17  deposition testimony that the sales reps were
18  having a difficult time understanding what was
19  meant by some of the policies.
20       So they had a difficult time
21  understanding what was meant by "occasional" and
22  an "occasional meal."  They had a difficult time
23  understanding who was a legitimate attendee, for
24  example, so -- and then very simple policies
25  like the gifts policy.  No gifts?  Some gifts?

## Page 75

VIRGINIA EVANS

1
2   Gifts under $100?  There were varying
3   interpretations of when it was appropriate to
4   provide gifts, and there were many occasions
5   that I saw in the materials where Mr. Putenis
6   even deferred to Sales and said, you know, let's
7   let Sales make that determination.
8   Q.   You didn't review any depositions of
9   sales reps, did you?
10  A.   I did not.
11  Q.   And if there were depositions of sales
12  reps where they gave the proper interpretation
13  of these policies, how would that influence your
14  analysis, if at all?
15       MS. JUDE:  Objection to form.
16       A.   In my opinion, based upon the policies
17  that I reviewed and the information that the
18  compliance folks had at the time and were
19  discussing and were discussing with senior
20  management, I think that the policies were
21  inadequate, as Mr. Hollasch said.  I think that
22  they could have been clearer.
23  Q.   And how does Mr. Hollasch's opinion
24  inform your opinion?
25       A.   At one point, they were talking about

## Page 76

VIRGINIA EVANS

1
2   coming up with more specific modest meal
3   policies, and Mr. Hollasch in an e-mail, fairly
4   late in the review period, maybe it was 2009,
5   said let's push off this modest meal policy
6   effort because the policies that we have now are
7   clearly inadequate.
8        And that's someone at the time on the
9   scene who's writing about attempting to address
10  a problem that he was aware of because of the
11  earlier internal audit issues that occurred
12  during the 2008 field audit.
13       So, yeah, I -- at that point in time,
14  that slice in time, it looked to me like the
15  compliance officers were having difficulty
16  getting the sales reps to comprehend the
17  policies.
18  Q.   Okay.
19  A.   And maybe that's because the policies
20  were not very clear.
21  Q.   As a -- as a compliance consultant,
22  you are involved in helping companies draft
23  their policies, correct?
24  A.   Yes, sir.
25  Q.   And it's certainly the case that a

## Page 77

VIRGINIA EVANS

1
2   policy cannot prescribe what an employee should
3   do in every situation; some amount is left to
4   the discretion of the employee, correct?
5   A.   That's generally true unless you have
6   an instance where you know that you're putting
7   individuals who are -- are going to be
8   conflicted because of their inherent role in a
9   position where they're making decisions, and
10  what -- it is often helpful in those
11  circumstances to give a couple of examples or to
12  further define what is meant by "occasional."
13  Q.   Okay.  So, in the last sentence of the
14  paragraph, you say, which I think is consistent
15  with what you just said, "In general, leaving
16  room for subjective interpretation of policies
17  designed to prevent fraud is antithetical to an
18  effective compliance program particularly where
19  interpretation is in the hands of sales reps or
20  managers who are compensated based on sales or
21  business goals, and thus are incentivized to
22  interpret policies in a sales-friendly manner."
23       Correct?
24  A.   That's correct.
25  Q.   And is that principle contained in any

Case 3:12-cv-07758-ZNQ-JBD   Document 300-5   Filed 10/14/22   Page 12 of 21
Case 1:11-cv-00071-CBA   Document 2892   Filed 11/19/18   Page 15 of 20
PageID: 5291

| Page 78 | Page 79 |
|---|---|

**Page 78**

VIRGINIA EVANS

1
2  written guidance that was available during the
3  review period?
4         MS. JUDE:  Objection to form.
5         Q.   Yes or no?  That you're aware of.
6         MS. JUDE:  Same objection.
7         A.   Word-for-word --
8         I'm sorry.  Go ahead.
9         MS. JUDE:  Same objection.
10        A.   Word-for-word, it is not -- I don't
11  know that it is in any compliance guidance, but
12  there certainly is a reference in the 2003 HHS
13  OIG Guidance about sales reps being incentivized
14  through their compensation methodology to
15  perform in a particular way, and I think that
16  this would fall under that general risk, so...
17        Q.   Let's look at the next paragraph.
18  "Minimum Number of Legitimate
19  Attendees."  This is a -- this is one of the
20  examples of ambiguity; is that correct?
21        A.   Yes.  Uh-huh.
22        Q.   And is this something that the
23  government pointed you to or that you identified
24  on your own?
25        A.   I'm sorry, go ahead.

**Page 79**

VIRGINIA EVANS

1
2         MS. JUDE:  Objection as to the -- as
3  to the extent to which that's going to
4  reveal attorney information, privileged
5  information under Rule 26.
6         THE WITNESS:  And I -- I actually came
7  upon the number of attendees kind of
8  backwards.  I started out, you know, there
9  was no reference in the original HH -- I'm
10  sorry, Healthcare Compliance Guidance about
11  the number of attendees, I think, or there
12  was discussion about that there was no -- in
13  the depositions there was no number, magic
14  number, until I believe it was Mr. Putenis's
15  first set of compliance guidelines, or maybe
16  it was the -- the early -- it was the
17  earliest guidelines, I think, in 2003 maybe
18  that came up with the number it's got to be
19  three or more.
20         And from there, once I understood that
21  there's got to be three or more healthcare
22  professionals in attendance, I went to what
23  does that mean?  Prescribers?  Legitimate
24  attendees?  And that's when I found the
25  reference to legitimate attendees in

| Page 80 | Page 81 |
|---|---|

**Page 80**

VIRGINIA EVANS

1
2  Novartis' own materials.  So they talk about
3  that --
4         Q.   In the first sentence --
5         A.   -- term.
6         Q.   -- you say, "The number of legitimate
7  attendees (i.e., permitted audience members) at
8  Speaker Programs is relevant to AKS risk."
9         A.   Right.
10        Q.   How is it relevant to AKS risk?
11        A.   Well, if there are no attendees and
12  you're paying the speakers, then you're
13  basically paying the speaker for providing a
14  service which is -- has no business purpose or
15  necessity, and therefore, it is -- it's a
16  remuneration to the speaker or benefit to the
17  speaker that may violate the Anti-Kickback
18  Statute.
19         There is no business reason for it.
20  He's not providing medical or scientific
21  information to healthcare providers or others,
22  not -- you know, so there's no -- there's no
23  meaning for it.
24         The -- if you have three or less, then
25  I think you raise that risk.  It's on that

**Page 81**

VIRGINIA EVANS

1
2  continuum three or -- fewer healthcare providers
3  in attendance makes it look like, you know,
4  you're still just paying the provider -- speaker
5  provider for really minimal services.
6         So that's why I think it becomes
7  important.  It goes to whether or not there's a
8  potential violation, the Anti-Kickback Statute.
9         Q.   Okay.  So in the companies that you
10  consult with, how many of them would you say
11  you're familiar with their speaker program
12  policies?
13        A.   At least two.
14        Q.   Okay.
15        A.   Uh-huh.
16        Q.   And do those two, are you able to name
17  them here?
18        A.   No.  Huh-uh.
19        Q.   And those two, just so I'm clear,
20  those are two -- those are not two current
21  clients?  Because I think you said you don't
22  have any pharma clients.
23        A.   That's correct.
24        Q.   Those two clients, did they have
25  policies on the number of legitimate attendees

21 (Pages 78 to 81)

Case 3:12-cv-07758-ZNQ-JBD   Document 300-5   Filed 10/14/20   Page 13 of 21
Case 1:11-cv-00071-??-??   Document 1800-??   Filed 11/19/19   Page 22 of 20
PageID: 5292

Page 82

VIRGINIA EVANS

1   at speaker programs to your recollection?
2       A.   I know that one did.  I don't know
3   about the other ones.
4       Q.   Do you remember what the number was
5   with that one?
6       A.   No, I don't.
7       Q.   Okay.  Do you think it was higher than
8   three, or you don't recall?
9       A.   I don't recall.
10      Q.   And was there any -- is there any
11  guidance that you can point to that says that
12  the number of legitimate attendees is relevant
13  to AKS risk?
14          MS. JUDE:  Objection to form.
15      A.   Once again, I'd go back to the 2003
16  pharma.
17      Q.   OIG?
18      A.   OIG Guidance.  And also, there was
19  internal information and documents from
20  Novartis, from NPC, where the number 3 was
21  identified as being the target number that put
22  them in a position where they felt the risk was
23  acceptable and that they could legitimately
24  explain the speaker program as being a bona fide

Page 83

VIRGINIA EVANS

1   program where scientific information was
2   imparted to other physicians.
3       Q.   Let me just back up and ask you a --
4   kind of a methodological question.
5           Your overall opinion is that NPC's
6   compliance program was not effective as it
7   related to speaker programs?
8       A.   Uh-huh.
9       Q.   Correct?
10      A.   Right.
11      Q.   And now we're walking through the
12  seven elements of a compliance program, correct?
13      A.   Right.
14      Q.   Do you -- did you draw a conclusion
15  about the effectiveness of each one of those
16  elements?
17      A.   I did, but there's a caveat.  I looked
18  at them sequentially, so I looked -- rather than
19  breaking it down into individual elements at the
20  outset, I looked at the speaker program across
21  time and then went back and looked at the
22  individual elements, speaker program compliance
23  over time.  So, yes.
24      Q.   So the reason I ask is because on page

Page 84

VIRGINIA EVANS

1   10 you say on the first paragraph, the second
2   line, "NPC's minimum attendance policy was
3   deficient," and then you explain why.
4           Is "deficient" just another word for
5   saying "not effective"?
6       A.   Yes, that was just the choice of the
7   word that I used.
8       Q.   Okay.  If we look at the next
9   paragraph you -- you talk about a development or
10  developments in the -- in the policies as it
11  relates to legitimate attendees.
12          Do you see that?
13      A.   No, I -- where are you?
14      Q.   In the next paragraph.
15      A.   Uh-huh.
16      Q.   "Prior to 2003, NPC had no requirement
17  for a minimum number"?
18      A.   Oh, okay.  Uh-huh.
19      Q.   Then, starting in 2003, there had to
20  be at least three healthcare professionals?
21      A.   Yes, sir.
22      Q.   And the interpretation of healthcare
23  professionals was left up to the sales force,
24  you saw that?

Page 85

VIRGINIA EVANS

1       A.   Yes.
2       Q.   And then in 2004, "healthcare
3   professionals" was defined as those with
4   prescribing rights, but the minimum requirement
5   was loosened because -- by permitting speaker
6   programs to proceed without three legitimate
7   attendees if the sales rep had made a good faith
8   effort to ensure minimum attendance.  Do you see
9   that?
10      A.   Yes.
11      Q.   And in your opinion, or are you
12  expressing an opinion that there was something
13  problematic about having that good faith
14  exception?
15      A.   No, I was just pointing out that
16  factually that was what was occurring at that
17  point in time.  So the term "healthcare
18  professionals" was further refined in the
19  policies as those with prescribing rights.  So I
20  thought that was a positive effort.
21          "...the minimum required --
22  requirement was loosened by permitting Speaker
23  Programs to proceed without the three legitimate
24  attendees if the sales rep had made a 'good

Case 3:12-cv-07758-ZNQ-JBD   Document 300-5   Filed 10/14/20   Page 14 of 21
Case 1:11-cv-00071-RC   Document 2805   Filed 11/19/18   Page 14 of 20
PageID: 5293

Page 90

VIRGINIA EVANS

1
2      MS. JUDE:  Objection to form.
3      A.   No, I wouldn't say speaker programs
4   specifically, but certainly promotion, promotion
5   by physicians.
6      Q.   And was there any written guidance
7   that suggested that this was a risk, having, you
8   know, prescribers of -- let me rephrase the
9   question.
10         Was there any sort of written guidance
11   that said, you know, there's a risk that, you
12   know, colorectal surgeons are going to show up
13   at Prozac speaker programs, you better watch
14   out?     MS. JUDE:  Objection.
15      MS. JUDE:  Objection.
16      Q.   Because, you know, there's -- you
17   know, those aren't the types of doctors that
18   prescribe Prozac?
19      MS. JUDE:  Objection to form.
20      Q.   Do you remember any written guidance
21   to that effect?
22      MS. JUDE:  Same objection.
23      Q.   Your counsel has an objection, but you
24   can answer.
25      A.   I don't recall the specific guidance.

Page 91

VIRGINIA EVANS

1
2   I know that at the Healthcare Compliance
3   Association and American Health Law Association
4   meetings that I attended, the idea that speaker
5   programs and other meetings could be padded was
6   very much discussed, and the idea of off-label
7   and sort of benefits to being provided to
8   physician speakers without a business
9   justification was something that a lot of folks
10   were talking about.
11      Q.   Okay.  Let's look at the next page in
12   the final paragraph.  In the last sentence, you
13   say, "Until 2011, NPC's minimum attendance
14   policy for Speaker Programs was not effective at
15   managing the risk that promotional events could
16   be used to provide payments to HCPs for
17   illegitimate purposes."
18         Do you see that?
19      A.   Yes.
20      Q.   Earlier you testified that one of the
21   questions you asked in an effectiveness analysis
22   is, well, ultimately, what happened?
23         And is that what you're getting at
24   here?
25      MS. JUDE:  Objection to form.

Page 92

VIRGINIA EVANS

1
2      A.   One second, please.
3      Q.   Yeah.
4      A.   Yeah, I think that -- I think that it
5   was not an effective policy.  It did not
6   necessarily ensure the idea that speaker
7   programs were going to be legitimate events that
8   were used to educate other physicians about the
9   benefits of a particular product, and so, yes, I
10   don't think that the program was effective.
11      Q.   And did you analyze any data about
12   whether, you know, either non-prescribers of the
13   drugs were showing up to pad numbers or that the
14   minimum three wasn't being met?
15      A.   I actually did, yes, I did look at
16   data and looked at information not only from the
17   third quarter 2008 audit that was conducted by
18   Natalie Nelson-Ling -- Lang -- and David
19   Hollasch, but I also looked at information from
20   Mr. Goldberg, Richard Goldberg, who was another
21   government expert, that showed that the minimum
22   attendance policy was in fact an issue, so...
23      Q.   Do you -- did you do anything to
24   benchmark those data analyses against how other
25   companies were doing at the time?

Page 93

VIRGINIA EVANS

1
2      A.   I did not.
3      Q.   Let's look at the next section,
4   "Policy Regarding Guests"?
5      A.   Excuse me.  I'm sorry.  I didn't mean
6   to interrupt, but I believe that Julie Kane
7   actually had done an analysis, and so I reviewed
8   an e-mail that she provided I believe to the CEO
9   analyzing the different policies that NPC had
10   against other pharmaceutical companies.
11         I don't know what those
12   pharmaceutical -- who those pharmaceutical
13   companies were, and I certainly didn't check her
14   data, but I used Novartis' own materials to that
15   extent.
16      Q.   Okay.  To be clear, in your report you
17   don't draw a conclusion as to whether Novartis'
18   compliance program was more or less effective
19   than other pharmaceutical companies' compliance
20   programs during this time, do you?
21      A.   I did not.
22      Q.   Let's look at the next section,
23   "Policies Regarding Guests."
24      A.   Okay.
25      Q.   You talk about the 2001 and 2003

24 (Pages 90 to 93)

Case 3:12-cv-07758-ZNQ-JBD   Document 300-5   Filed 10/14/20   Page 15 of 21
Case 1:11-cv-00071-RC-CRE   Document 809-5   Filed 11/19/19   Page 16 of 20
PageID: 5294

**Page 94**

VIRGINIA EVANS

1
2 guidelines contain no general prohibition
3 against a guest or a spouse attending a speaker
4 program, and there's evidence that NPC regularly
5 allowed spouses to attend at that time.
6        Was there any guidance in 2001
7 prohibiting the attendance of a guest?
8        MS. JUDE:  Objection to form.
9        Q.   That you're aware of?
10       A.   Yes, but again, I would refer to the
11 HHS OIG 2003 Compliance Guidelines.  I would
12 also point out that the PhRMA Code at this --
13 back in 2002 stated that spouses and guests
14 should not be -- should not attend.
15       Q.   And did that guidance say they should
16 not attend, or if they attend, it should be not
17 be paid for by the company?
18       A.   I don't believe that there's any
19 business reason.  I mean, if the reason that
20 you're paying for the dinner and conferring a
21 benefit on a physician is because it is an
22 accommodation to that individual during the
23 course of a business meeting where he or she is
24 providing information about a particular drug
25 and its benefits and safety issues to other

**Page 95**

VIRGINIA EVANS

1
2 providers, there's no legitimate business reason
3 for a spouse or a guest to be there.  Therefore,
4 I would say that that benefit triggers an
5 anti-kickback violation -- or, sorry,
6 anti-kickback risk.
7        Q.   Okay.  But you're not testifying here
8 as a lawyer, correct?
9        A.   I'm sorry?
10       Q.   You're not testifying here as a
11 lawyer?
12       A.   No, sir.
13       Q.   But my question was not about what you
14 thought, but rather what the Pharma Guidance was
15 in 2002?
16       A.   Well, and --
17       Q.   PhRMA Code guidance.  Sorry.
18       A.   The PhRMA Code guidance, I don't know
19 whether it prohibited.  I believe it prohibited.
20 It said that spouses and guests should not be
21 invited.
22       Q.   Okay.  Let's look at "Repeat
23 Attendance," Section 3.
24       A.   Okay.
25       Q.   In the first sentence, "During the

**Page 96**

VIRGINIA EVANS

1
2 Review Period, NPC's Compliance Policies failed
3 to control for a serious AKS risk," and then you
4 describe repeat attendance.  Do you see that?
5        A.   Yes.
6        Q.   Are you familiar with any written
7 guidance that says that repeat attendance is a
8 serious AKS risk?
9        MS. JUDE:  Objection to form.
10       A.   Again, I would refer to the 2003 HHS
11 OIG pharma manufacturers -- compliance guidance
12 for pharma manufacturers, and also the PhRMA
13 Code.  I believe the 2009 code referred to
14 occasional meals.  And finally, to Novartis' own
15 policy, NPC's own policies, that talked about
16 occasional meals for healthcare providers and
17 occasional dinners in the context of speaker
18 programs.
19       Q.   Did you ever advise your pharma
20 clients about what "occasional" means for
21 purposes of the PhRMA Code guidance?
22       A.   Well, I certainly would not -- I'm
23 sorry.  Strike that.
24        Did I ever advise...
25        I -- I can -- I don't know if I ever

**Page 97**

VIRGINIA EVANS

1
2 used the word "occasional."  Sorry.  I don't
3 know if I ever used the word "occasional," but I
4 can state that I have advised pharma and other
5 entities who were providing -- who were in a
6 position to provide benefits to healthcare
7 providers that this is not something that should
8 be done outside of the context of a business
9 meeting on a regular basis.
10        So --
11       Q.   Okay.
12       A.   -- dinners and things of that nature,
13 repeated events.
14       Q.   Do you recall advising your clients
15 about repeat attendance by doctors at the same
16 program?
17       MS. JUDE:  Objection to form.
18       Q.   If you recall.
19       A.   And I am concerned because I don't
20 want to violate attorney-client privilege with
21 respect to some of my service as a compliance
22 officer and general counsel for Centra, so I'm
23 just thinking about how to answer this question.
24        So, I'm sorry, can you repeat the
25 question maybe?

Case 3:12-cv-07758-ZNQ-JBD   Document 300-5   Filed 10/14/20   Page 16 of 21
Case 1:11-cv-00071-CG   Document 289-2   Filed 11/19/19   Page 15 of 20
PageID: 5295

Page 98

VIRGINIA EVANS

1
2      MR. GRUENSTEIN:  I'm sorry.  Can you
3   read it back?
4      (Record read.)
5      Q.   And I can limit it if it helps you on
6   the attorney-client privilege to your consulting
7   clients.
8      A.   No, I don't recall providing that
9   guidance.
10     Q.   Do you recall the testimony of Natasha
11  Nelson-Ling where she said -- she was asked
12  about repeat attendance and said, you know, I --
13  I wish I had looked into it, but I didn't know
14  that that was a risk until the U.S. Attorney's
15  Office brought this case in 2000 -- whatever it
16  was?
17     MS. JUDE:  Objection.
18     Q.   Do you recall that testimony?
19     A.   Yes, I do.
20     Q.   And what was your reaction to that, to
21  reading that testimony?
22     A.   I -- actually, I believed that Natalie
23  Nelson-Ling and others in the compliance program
24  had minimized this risk, and that was kind of
25  surprising to me because there was a lot of

Page 99

VIRGINIA EVANS

1
2   material in the e-mails and in other documents,
3   complaints, pharma -- CafePharma complaints,
4   where people were talking about these repeated
5   speaker events.
6      There was one particular instance
7   involving a Dr. ███ where the investigation
8   revealed that some of the doctors had gone to
9   a -- small group of doctors had gone to 23,
10  24, 25 events in a year, and that just did not
11  make sense to me from an anti-kickback risk
12  perspective.
13     Q.   But just to be clear, that's based on
14  Novartis internal materials, correct?
15     MS. JUDE:  Objection to form.
16     A.   I'm sorry, what is?
17     Q.   What you just answered is you were
18  surprised that compliance people didn't
19  recognize the risk given all of the internal
20  e-mails and findings that were going around
21  Novartis, correct?
22     A.   That's correct.
23     Q.   But what I'm asking is, were you
24  surprised that she hadn't heard, let's say, in a
25  CIA or in other written guidance that repeat

Page 100

VIRGINIA EVANS

1
2   attendance was a serious AKS risk?
3      MS. JUDE:  Objection.  Misstates
4   testimony.
5      A.   I'm sorry, I have forgotten the
6   question.
7      Q.   I'll ask a -- I'll ask a slightly
8   different question.
9      Was there any written guidance or
10  indication in a CIA during the review period
11  that repeat attendance by doctors at speaker
12  programs was an AKS risk?
13     A.   I don't know the answer to that
14  question.  I have not reviewed all of the CIAs.
15  There were many, many during the time period,
16  so...
17     Q.   Let's look at the next page, 13.
18     A.   Uh-huh.
19     Q.   In the first full paragraph, you say,
20  in the second sentence, "In my opinion, it is
21  also clear from the materials that NPC was aware
22  that repeat attendance prevented ser- --
23  presented serious compliance risks."
24     Do you see that?
25     A.   Yes.

Page 101

VIRGINIA EVANS

1
2      Q.   And what is your opinion there, if you
3   could explain it?
4      A.   Are you asking me to restate my
5   opinion, sir?
6      Q.   Well, I'm asking you to explain what
7   you're saying.  You say that NPC was aware.
8      Are you -- is that a conclusion about
9   the company's knowledge?
10     MS. JUDE:  Objection to form.
11     A.   No, I'm actually -- what I was
12  actually doing there is indicating a reference
13  factually that -- referencing some of the
14  information that I've talked about earlier that
15  not only Natalie Nelson-Ling, but the "do's and
16  don't's" document do not hold meetings on a
17  recurring basis.
18     There was another one.  Yes, it was
19  Maria Woods when she was talking about -- and I
20  think she had conducted an investigation and
21  concluded that there wasn't sufficient
22  information to substantiate the investigation as
23  a compliance violation, but she said it appears
24  that hosting the same individuals repeatedly at
25  the same time at the same presentations may be

26  (Pages 98 to 101)

Case 3:12-cv-07758-ZNQ-JBD   Document 300-5   Filed 10/14/20   Page 17 of 21
Case 1:11-cv-00071-RC   Document 28-2   Filed 11/19/19   Page 18 of 20
PageID: 5296

| Page 102 | Page 103 |
|---|---|

**Page 102**

VIRGINIA EVANS

1
2  problematic because it creates the appearance of
3  providing honoraria to speakers for illegitimate
4  programs, kickback issues. So this was
5  something that came up.
6      Also, they -- they did add to this FLM
7  Dashboard information that, you know, to prevent
8  repeat attendance because that would not comply
9  with the occasional meals policy. So I think
10  the occasional meals policy itself is a
11  recognition that if you have repeated programs,
12  same speakers, same drug, same attendees, then
13  there may be an argument by some regulator or
14  other person looking at the risk that this
15  activity violates the Anti-Kickback Statute.
16      Q.   Okay. But to be clear, I mean, you
17  say, "In my opinion it is clear from the
18  materials that NPC was aware."
19      It sounds like what you're saying now
20  is, in your -- based on your review of all the
21  documents and depositions cited in footnote 50,
22  it seems that people at NPC were aware of this
23  compliance risk; is that correct?
24      MS. JUDE:   Objection to form.
25      A.   I think that's right.

**Page 103**

VIRGINIA EVANS

1
2  I'm sorry.
3      MS. JUDE:   Go ahead.
4      A.   I think that's right, yes.
5      Q.   Let's go to "Venue," which is on page
6  14.
7      A.   Okay.
8      Q.   And this section is called 4, "Venue
9  and Entertainment Policies."
10      A.   Uh-huh.
11      Q.   And what you -- in the first
12  paragraph, you say, "NPC's Speaker Program
13  policies did not properly manage the risk of
14  conferring this benefit," which is -- the
15  benefit that you're referring to is the -- the
16  entertainment?
17      A.   Uh-huh. Yes, sir.
18      Q.   "...because entertainment was
19  permitted for some types of events until 2008
20  and because sales representatives were allowed
21  to apply their own judgment."
22      Do you see that?
23      A.   Yes.
24      Q.   And when you say "did not properly
25  manage the risk," is that another way of saying

| Page 104 | Page 105 |
|---|---|

**Page 104**

VIRGINIA EVANS

1
2  was ineffective?
3      A.   I believe, yes, that is the same thing
4  as saying it's not an effective compliance
5  program.
6      Q.   Okay. And then in the next paragraph,
7  you say at the end of the paragraph that the
8  decision to permit sales reps to exercise their
9  judgment about proper -- about appropriate
10  entertainment when their comp was based on
11  volume of drugs prescribed by attending HCPs was
12  a poor way to control anti-kickback risk.
13      Again, when you say "poor way to
14  control anti-kickback risk," that's another way
15  of saying ineffective, correct?
16      A.   That's correct, uh-huh.
17      Q.   You, in the next paragraph, you talk
18  about how, in 2003, NPC's policy, these
19  healthcare compliance guidelines, incorporated
20  language from the PhRMA Code that promotional
21  events should be held at "venues conducive to an
22  exchange of medical information but also allowed
23  modest entertainment such as golf."
24      Do you see that?
25      A.   Yes.

**Page 105**

VIRGINIA EVANS

1
2      Q.   As you're measuring the effectiveness
3  of the compliance program, does it fall on the
4  positive side of the ledger that Novartis'
5  policies were at least incorporating the
6  language and the guidance from the PhRMA Code?
7      MS. JUDE:   Objection to form.
8      A.   I think it's positive to the extent
9  that NPC was using language from the code and
10  trying to conform its policies to the code, yes.
11      Q.   Okay. And then you say, "Later NPC
12  policies provided modest entertainment may be
13  appropriate if approved by the Events Oversight
14  Committee. The rationale supporting these
15  exceptions to the no-entertainment rule is
16  unclear."
17      Do you see that?
18      A.   Yes.
19      Q.   And when you say the rationale is
20  unclear, do you mean that you weren't able to
21  find anything in the record explaining why there
22  might be exceptions approved?
23      A.   Yes, that's correct. Mr. Putenis
24  seemed to state that, in certain circumstances,
25  entertainment would be appropriate and then in

Case 3:12-cv-07758-ZNQ-JBD   Document 300-5   Filed 10/14/20   Page 18 of 21
Case 1:11-cv-00071-CG   Document 282-5   Filed 11/19/18   Page 19 of 20
PageID: 5297

Page 94

VIRGINIA EVANS

1
2  guidelines contain no general prohibition
3  against a guest or a spouse attending a speaker
4  program, and there's evidence that NPC regularly
5  allowed spouses to attend at that time.
6      Was there any guidance in 2001
7  prohibiting the attendance of a guest?
8      MS. JUDE:  Objection to form.
9      Q.   That you're aware of?
10     A.   Yes, but again, I would refer to the
11 HHS OIG 2003 Compliance Guidelines.  I would
12 also point out that the PhRMA Code at this --
13 back in 2002 stated that spouses and guests
14 should not be -- should not attend.
15     Q.   And did that guidance say they should
16 not attend, or if they attend, it should be not
17 be paid for by the company?
18     A.   I don't believe that there's any
19 business reason.  I mean, if the reason that
20 you're paying for the dinner and conferring a
21 benefit on a physician is because it is an
22 accommodation to that individual during the
23 course of a business meeting where he or she is
24 providing information about a particular drug
25 and its benefits and safety issues to other

Page 95

VIRGINIA EVANS

1
2  providers, there's no legitimate business reason
3  for a spouse or a guest to be there.  Therefore,
4  I would say that that benefit triggers an
5  anti-kickback violation -- or, sorry,
6  anti-kickback risk.
7      Q.   Okay.  But you're not testifying here
8  as a lawyer, correct?
9      A.   I'm sorry?
10     Q.   You're not testifying here as a
11 lawyer?
12     A.   No, sir.
13     Q.   But my question was not about what you
14 thought, but rather what the Pharma Guidance was
15 in 2002?
16     A.   Well, and --
17     Q.   PhRMA Code guidance.  Sorry.
18     A.   The PhRMA Code guidance, I don't know
19 whether it prohibited.  I believe it prohibited.
20 It said that spouses and guests should not be
21 invited.
22     Q.   Okay.  Let's look at "Repeat
23 Attendance," Section 3.
24     A.   Okay.
25     Q.   In the first sentence, "During the

Page 96

VIRGINIA EVANS

1
2  Review Period, NPC's Compliance Policies failed
3  to control for a serious AKS risk," and then you
4  describe repeat attendance.  Do you see that?
5      A.   Yes.
6      Q.   Are you familiar with any written
7  guidance that says that repeat attendance is a
8  serious AKS risk?
9      MS. JUDE:  Objection to form.
10     A.   Again, I would refer to the 2003 HHS
11 OIG pharma manufacturers -- compliance guidance
12 for pharma manufacturers, and also the PhRMA
13 Code.  I believe the 2009 code referred to
14 occasional meals.  And finally, to Novartis' own
15 policy, NPC's own policies, that talked about
16 occasional meals for healthcare providers and
17 occasional dinners in the context of speaker
18 programs.
19     Q.   Did you ever advise your pharma
20 clients about what "occasional" means for
21 purposes of the PhRMA Code guidance?
22     A.   Well, I certainly would not -- I'm
23 sorry.  Strike that.
24     Did I ever advise...
25     I -- I can -- I don't know if I ever

Page 97

VIRGINIA EVANS

1
2  used the word "occasional."  Sorry.  I don't
3  know if I ever used the word "occasional," but I
4  can state that I have advised pharma and other
5  entities who were providing -- who were in a
6  position to provide benefits to healthcare
7  providers that this is not something that should
8  be done outside of the context of a business
9  meeting on a regular basis.
10     So --
11     Q.   Okay.
12     A.   -- dinners and things of that nature,
13 repeated events.
14     Q.   Do you recall advising your clients
15 about repeat attendance by doctors at the same
16 program?
17     MS. JUDE:  Objection to form.
18     Q.   If you recall.
19     A.   And I am concerned because I don't
20 want to violate attorney-client privilege with
21 respect to some of my service as a compliance
22 officer and general counsel for Centra, so I'm
23 just thinking about how to answer this question.
24     So, I'm sorry, can you repeat the
25 question maybe?

25  (Pages 94 to 97)

Case 3:12-cv-07758-ZNQ-JBD   Document 300-5   Filed 10/14/20   Page 19 of 21
Case 1:11-cv-06007-JCB-JRC   Document 2892-5   Filed 11/19/18   Page 19 of 20
PageID: 5298

| Page 114 | Page 115 |
|---|---|

**Page 114**

VIRGINIA EVANS

1
2  A.  Yes.
3  Q.  And is it accurate to say that in 2010
4  Novartis changed the policy to reflect the
5  development in 2009, which you cite in footnote
6  82?
7  MS. JUDE:  Objection to form.
8  A.  Yes, they did change the policy to
9  reflect the fact that they were not counting the
10  compensation paid towards speaker training,
11  which was also to be counted not only, as I
12  understand it, for state law reporting purposes,
13  but also to get a fix internally in terms of
14  compliance and finance on how much they were
15  actually paying the speakers.
16  Q.  Let's talk about the next Section 7,
17  "Speaker Selection and Performance"?
18  A.  Okay.
19  Q.  In the second paragraph, you say, "In
20  the absence of policies, the Compliance
21  Department deferred to Sales on these matters."
22  Which is a reference to speaker
23  selection, correct?
24  A.  Yes, and also speaker performance.
25  Q.  Okay.  And I notice, despite your very

**Page 115**

VIRGINIA EVANS

1
2  impressive number of footnotes, you don't have a
3  footnote for that sentence, so I was wondering
4  what are you relying on for that factual
5  assertion?
6  A.  Well, I would have to go back and go
7  through all of the footnotes, which I don't
8  think we need to do at this point, but to
9  explain the -- the lack of effectiveness, the
10  speaker policies did not address speaker
11  selection until later on, and I think -- well,
12  throughout the sales -- throughout the review
13  period, the sales reps were permitted to
14  nominate healthcare professionals to serve as
15  speakers and that can be and was, in fact, a
16  real benefit to some of the speakers?
17  (Knock on the door.)
18  A.  Continue?
19  Q.  Yes, please.
20  Maybe -- maybe I should ask another
21  question because I think maybe you lost your
22  train of thought, as did I.
23  A.  Okay.
24  Q.  Yeah, go ahead.
25  A.  And also, with respect to performance.

| Page 116 | Page 117 |
|---|---|

**Page 116**

VIRGINIA EVANS

1
2  The speaker performance issues were really left
3  to the sales reps for throughout the bulk of the
4  review period.  They had to deal with speakers
5  who weren't showing, speakers who deviated from
6  the slides, speakers who did ten minutes.
7  It was really left up to them, which
8  is a hard position to put them in given that
9  their compensation is determined in part by how
10  many speaker programs they had as well as the
11  prescriptions.
12  Q.  So then on the top of 20, you say, "In
13  my opinion, sales associates should have been
14  taken out of the speaker program -- speaker
15  selection process entirely.  HCP requests for
16  speaking engagements should have been referred
17  elsewhere in the organization."
18  Do you know whether other companies
19  were doing that at this time?
20  A.  I do not know the answer to that
21  question.
22  Q.  And then in the next paragraph, at the
23  end of the paragraph, you say, "The best way to
24  avoid this risk would have been for someone
25  other than the sales associates to select

**Page 117**

VIRGINIA EVANS

1
2  speakers."
3  When you say "the best way," that's
4  like saying the best practice would have been?
5  A.  Yes, I think so.  It would have been a
6  better practice and maybe the best practice to
7  have an outside group, not necessarily the
8  speakers, selecting -- I'm sorry, not
9  necessarily the sales reps selecting the
10  speakers.
11  That way you would have been able to
12  make sure that you're meeting the criteria
13  enumerated in the PhRMA Code and the HHS OIG
14  Guidance, you know, having someone who is known
15  in the field, someone who is experienced,
16  someone who is a good speaker, who is reliable,
17  who shows up.
18  Q.  Okay.  And do you know of any written
19  guidance that says that that would be the best
20  practice?
21  MS. JUDE:  Objection to form.
22  A.  No, I don't.  Not off the top of my
23  head, I don't.
24  Q.  And going back to a question I've been
25  asking you a lot, which is your opinions about

30 (Pages 114 to 117)

Case 3:21-cv-07758-ZNQ-JBD   Document 300-5   Filed 10/14/20   Page 20 of 21
Case 1:Y1-cv-0007NQ-RG   Document 2800-5 Filed 11/19/18   Page 19 of 20
PageID: 5299

| Page 126 | Page 127 |
|---|---|

**Page 126**

VIRGINIA EVANS

1
2   So, in light of those paragraphs, what
3   did you mean when you said that Mr. Putenis
4   didn't acknowledge this compliance risk?
5       A.   Well, if you go back to page 211, Mr.
6   Putenis also said -- stated that he understood,
7   or, "We understood that the credibility of a
8   speaker is enhanced if they have experience with
9   our product, and that credibility is lost if
10  they stand before an audience that have no
11  experience in prescribing the product.  So that
12  is a relevant measure of the attractiveness of a
13  particular person to serve in a speaker role for
14  Novartis.  It stands to reason that we would
15  consider whether or not a doctor was a
16  prescriber or -- whether a doctor was a
17  prescriber or not when selecting them to serve
18  on our speaker bureau."
19      So -- so then -- and then there were
20  also a series of questions where the attorney
21  who was doing the deposition asks about whether
22  or not, as long as the speaker's reps -- I'm
23  sorry.  Strike that.  As long as the sales reps
24  are not selecting a speaker as an inducement,
25  it's okay for a sales rep to select a speaker

**Page 127**

VIRGINIA EVANS

1
2   simply because the speaker is a high-volume
3   prescriber of Novartis drugs, and Mr. Putenis
4   would not agree with that.
5       And then when they asked is it not
6   okay, and he wouldn't agree with that either.
7   So he also said high prescribing would never be
8   the sole basis on which the person is selected,
9   so -- and then the person who asked the question
10  said:  "Well, if it was, would that be a
11  violation of Novartis' guidelines?"  The answer
12  was, "Not necessarily."  "Under what
13  circumstances would it not be a violation?"  And
14  again, Mr. Putenis said, "Because there are
15  speakers that are preferable for us who have
16  experience with the product, and that is a
17  determination that's based on whether or not
18  they prescribe."
19      Q.   So would you agree with me that, in
20  these five or six pages, he does say that it's
21  okay to rely on the fact that a doctor has
22  prescribed the drug to choose them to be a
23  speaker?
24      A.   Yes, he does say that, that experience
25  with the product is something that they were

**Page 128**

VIRGINIA EVANS

1
2   looking for.
3       Q.   And he also says that people were told
4   that they could not choose the speaker as a way
5   of rewarding people for having been high
6   prescribers, correct?
7       A.   That's correct.
8       Q.   But is what you're saying in the
9   report that, based on your reading, it looks
10  like he did not emphasize the compliance risk
11  associated with rewarding high prescribers for
12  prescribing by choosing them to be speakers?
13      A.   That's correct.  I did not feel like
14  he recognized the risk, or if he recognized it,
15  did not describe it adequately to the sales
16  reps.
17      Q.   Let's look at section B, Julie Kane.
18      A.   Okay.
19      Q.   And as a consultant, are you asked to
20  consider the effectiveness of compliance
21  officers?
22      A.   To the extent that I'm looking at the
23  effectiveness of a particular compliance
24  program, and there are issues with respect to
25  the leadership or competence or enthusiasm of

**Page 129**

VIRGINIA EVANS

1
2   the compliance officer or the manner in which he
3   or she presents the compliance communication
4   message, yes, I do look at -- at the compliance
5   officers and the department in general,
6   departments in general.
7       Q.   And presumably when you do that, you
8   interview the compliance officer?
9       A.   Yes, sir.
10      Q.   And do you presumably interview the --
11  some of the people that report to the compliance
12  officer?
13      A.   Usually.  Uh-huh.
14      Q.   And you try to find out about the
15  background and qualifications of the compliance
16  officer?
17      A.   Yes.  Uh-huh.
18      Q.   And you try to get a sense of how well
19  they understand compliance principles?
20      A.   Yes.  Uh-huh.
21      Q.   Do you have a sense of what Julie
22  Kane's background was before she served in this
23  role?
24      A.   Yes, I did.  I'm not sure that I can
25  recall it at this point.  I remember that she

33 (Pages 126 to 129)

Case 3:12-cv-07758-ZNQ-JBD   Document 300-5   Filed 10/14/20   Page 21 of 21
Case 1:11-cv-05201-CG-GRB   Document 2892   Filed 11/19/18   Page 206 of 20
PageID: 5300

| Page 174 | Page 175 |
|---|---|
| VIRGINIA EVANS | VIRGINIA EVANS |

**Page 174**

1  VIRGINIA EVANS
2  AFTERNOON SESSION
3      THE VIDEOGRAPHER:  The time is 2:14
4  p.m.  We're back on the record, video number
5  4.
6  VIRGINIA EVANS, resumed and
7      testified further as follows:
8  EXAMINATION BY (Cont'd.)
9  MR. GRUENSTEIN:
10     Q.   So let's continue marching through
11 your report, if you don't mind, and we'll look
12 at Section VI, and let's just go to page 44.
13     A.   Uh-huh.  Okay.
14     Q.   Just above B.
15     A.   Yes, sir.
16     Q.   It says, "An effective compliance
17 program would have included an annual Compliance
18 Risk Assessment followed by an annual Audit Work
19 Plan to designed to address identified risks."
20     Do you see that?
21     A.   Yes.
22     Q.   And you've highlighted or you have
23 italicized both instances of "annual" and you
24 cite to the OIG guidance at 23741, do you see
25 that?

**Page 175**

1  VIRGINIA EVANS
2      A.   Yes.
3      Q.   And you recognize that what the
4  guidance says is regular compliance reviews, but
5  in your experience, an annual compliance risk
6  assessment and annual work plan are best
7  practices, do you see that?
8      A.   Yes.
9      Q.   And as we spoke about earlier, just
10 because something is less than best practices
11 doesn't necessarily mean that it constitutes an
12 ineffective control?
13     A.   That's right.
14     Q.   And you say that this is in your
15 experience.
16     Is there any written guidance that I
17 can look to that would say that an annual risk
18 assessment or work plan is a best practice that
19 you know of sitting here today?
20     A.   I believe that there is a -- I'm
21 sorry.  I know that there is a workpaper or work
22 document or guidance document on the HHS OIG
23 website for boards of healthcare compliance of
24 healthcare companies, and I believe that there
25 is some information in that document that

**Page 176**

1  VIRGINIA EVANS
2  relates to the board's duty to understand what
3  the risks are in the company, and so in my
4  experience dealing with boards, it's letting
5  them know on an annual basis what the risks are
6  and what the audit plan is going to be is the
7  best practice.
8      Q.   And do you know when that document was
9  first published?
10     A.   I don't.
11     Q.   When was the last time you saw that
12 document?
13     A.   Maybe four months ago, five months
14 ago.
15     Q.   Okay.  Let's go to the next Section,
16 B.1.
17     A.   Okay.
18     Q.   "Compliance Auditing and Monitoring
19 from 2002 to 2007."
20     In the first sentence you say, "NPC
21 was aware that auditing and monitoring were
22 important parts of an effective compliance
23 program."
24     How do you know that NPC knew this?
25     A.   Because from the very outset of the

**Page 177**

1  VIRGINIA EVANS
2  review period, there were materials that talked
3  about auditing and monitoring being something
4  that NPC wanted to implement or would be
5  implementing or, for example, Mr. Putenis stated
6  that he became aware that it was something that
7  was important sometime around 2003, 2004, but
8  there was -- there was even an earlier -- there
9  were even earlier documents showing that
10 auditing and monitoring were understood to be
11 part of an effective compliance program.
12     Q.   And the fact that NPC was aware of
13 this, how does that affect your opinion?
14     A.   Well, if you don't know that a
15 particular element or a particular behavior is
16 necessary in order to determine whether or not
17 your compliance program is effective, then you
18 have a duty, I would think, as a compliance
19 officer, a member of the Compliance Department,
20 to, when you learn that that's -- that's
21 something that's important, then you have a duty
22 to find out more about it and implement it.
23     But auditing and monitoring was
24 something that was there from the very
25 beginning, and so I know that they were talking

45 (Pages 174 to 177)