1            UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF NEW JERSEY
2

3    _____

     UNITED STATES OF AMERICA, et    CIVIL ACTION NUMBER:
4    al,
          Plaintiffs,                3:12-cv-07758-ZNQ-JBD
5
          v.                         JURY TRIAL - VOLUME 1
6
     JOHNSON & JOHNSON, JANSSEN
7    PRODUCTS, L.P.
          Defendants.
8    _____
                  Clarkson S. Fisher Building & U.S. Courthouse
9                 402 East State Street
                  Trenton, New Jersey  08608
10                May 7, 2024
                  Commencing at 9:00 a.m.
11

12   **B E F O R E:**          THE HONORABLE ZAHID N. QURAISHI,
                               UNITED STATES DISTRICT JUDGE

13   **A P P E A R A N C E S:**

14        REESE MARKETOS
          BY:  PETE MARKETOS, ESQUIRE
15             JOSH RUSS, ESQUIRE
               ANDREW WIRMANI, ESQUIRE
16             ADAM SANDERSON, ESQUIRE
               WHITNEY WENDEL, ESQUIRE
17        750 N. Saint Paul Street, Suite 600
          Dallas, Texas 75201
18        For the Relators

19        SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
          BY:  ALLISON M. BROWN, ESQUIRE
20             GEOFFREY M. WYATT, ESQUIRE
               BRADLEY A. KLEIN, ESQUIRE
21        One Rodney Square
          920 King Street
22        Wilmington, Delaware
          For the Defendants
23
          Megan McKay-Soule, Official Court Reporter
24             Megan_McKay-Soule@njd.uscourts.gov
                         (609) 815-2319
25   Proceedings recorded by mechanical stenography; transcript
          produced by computer-aided transcription.

```
 1                      I N D E X

 2

 3        EXAMINATIONS                          PAGE

 4
          DONNA GRAHAM
 5        DIRECT EXAMINATION BY MR. RUSS          141

 6

 7                    E X H I B I T S

 8

 9   Exhibit No.        Description             Page

10        Plaintiffs' Exhibit 353 in            170

11        evidence.

12        Plaintiffs' Exhibit 89 in             174

13        evidence.

14        Plaintiff's Exhibit RX 183 in         185

15        evidence.

16        Plaintiff's Exhibit RX 73 in          202

17        evidence.

18

19

20

21

22

23

24

25
```

*United States District Court*
*District of New Jersey*

```
 1        (PROCEEDINGS held in open court before The Honorable

 2   ZAHID N. QURAISHI, United States District Judge, on May 7,

 3   2024, at 9:00 a.m.)

 4             THE DEPUTY COURT CLERK:  All rise.

 5             THE COURT:  All right, folks.  You may be seated.

 6        Good morning, everybody.  Let's just have appearances

 7   once this morning.  Like I said, we're going to do that every

 8   morning, just so I have a record of who's who at counsel

 9   table, but let's just have appearances on day two, beginning

10   with Relators.

11             MR. MARKETOS:  Good morning, Your Honor.

12   Pete Marketos for the Relators.

13             MR. RUSS:  Good morning, Your Honor.  Josh Russ for

14   Relators.

15             MR. WIRMANI:  Good morning, Judge.  Andrew Wirmani on

16   behalf of Relators.

17             MS. WENDEL:  Good morning.  Whitney Wendel on behalf of

18   Relators.

19             THE COURT:  All right.  Good morning to you folks.

20             Oh, I'm sorry.  I forget there's a line behind you.

21             MS. SMITH:  Sherry Smith for Relators.

22             MS. CLAIRMONT:  Good morning, Your Honor.

23   Joy Clairmont for Relators.

24        The Relators are here as well.

25             THE COURT:  Okay.  Got it.  I see them.  All right.
```

1    Thank you.

2        Good morning.

3        And for Janssen?

4        MS. BROWN:  Good morning, Your Honor.  Alli Brown for

5    Janssen.

6        MR. WYATT:  Good morning, Your Honor.  Geoff Wyatt

7    for Janssen.

8        MR. KLEIN:  Good morning, Your Honor.  Brad Klein for

9    Janssen.

10        THE COURT:  All right.  Good morning to you all as

11    well.  All right.  So be seated.

12        All right.  Anything we need to chat about this

13    morning?  Are we still on schedule that I'm going to do some

14    very brief preliminary instructions, and then we'll go right

15    into opening statements and then the presentation of evidence?

16    Or anything else we need to chat about this morning?

17        MR. MARKETOS:  I don't think so, Your Honor.  We

18    exchanged openings, and we have no objection to the slides

19    that they're using in their opening.  I'll give Ms. Brown an

20    opportunity to let me know if they have any issues.

21        And then we'll -- I think we'll solve that problem

22    itself.  Then we'll go right into openings and then call our

23    first witness.

24        THE COURT:  Call your first witness.

25        Is that your understanding as well, Ms. Brown?

```
 1              MS. BROWN:  That's right, Your Honor.

 2              THE COURT:  So have you reviewed their -- whatever

 3     they presented to you and there's no objection, or are you

 4     reviewing it currently this morning?

 5              MS. BROWN:  Currently reviewing it right now.

 6              THE COURT:  All right.

 7              MS. BROWN:  So far no objection.  I'm almost done.

 8              THE COURT:  All right.  Well, then, do you want to

 9     let my folks know if there is an issue so I can pop back out

10     here?  I'm not far away.  I can kind of address it before we

11     try to get the jurors ready by 9:30.

12              Look, I'm anticipating they're going to be on time, and

13     if they are, I'm going to put them in the box at 9:30, and

14     we're going to start immediately with preliminary instructions

15     and go right into openings.

16              But if there is an issue that you all need me to

17     resolve, then I would want to know before 9:30.  So you'll let

18     somebody know?

19              MS. BROWN:  Sure.

20              THE COURT:  Okay.

21              MS. BROWN:  Absolutely, Your Honor, and I'm

22     optimistic there will not be an issue.

23              THE COURT:  All right.

24              What else?  Is there anything else we need to discuss

25     this morning?
```

1          MR. MARKETOS:  Not this morning, Your Honor.

2          THE COURT:  What about the stipulation?  Is that

3    still something that you're doing?

4          MR. MARKETOS:  I think -- and I'll talk to Ms. Brown

5    about it, but I think what we'll do is, since we've got

6    opening, opening -- I think what we'll do is we'll just offer

7    the unobjected to, you know, move --

8          THE COURT:  You don't need a stip.  If you move to

9    admit Exhibit 1 through 1000 and there's no objection, I'm

10   going to say so admitted.  Every one of those exhibits is now

11   in evidence.

12         MR. MARKETOS:  That's right, and a lot of documents

13   that each side has on its exhibit list are related to the

14   Government, and each side a year and a half ago said hearsay,

15   and I think we've gotten past that because they're enlarged

16   Government documents.

17       So we'll address that with each other, and then we'll

18   make it simple by moving and not objecting.

19         THE COURT:  All right.  Are there any stipulations in

20   the case or no?  Outside of the exhibits, are there any

21   stipulations of facts or any stipulations of expected

22   testimony?  I don't remember receiving any of that.

23         MS. BROWN:  No, Your Honor.

24         THE COURT:  So I don't remember that being part of

25   the case.

```
 1          MR. MARKETOS:  Not yet, Your Honor.  I mean, we might
 2   at some point.
 3          THE COURT:  Right.
 4          MR. MARKETOS:  But there are none in the pretrial
 5   order, and we can -- that's probably something we can work on.
 6          THE COURT:  All right.  Just keep me posted if that
 7   changes.  For now, I don't remember receiving anything, so I'm
 8   not anticipating anything.  So, obviously, that can change
 9   throughout the course of the trial.
10       All right.  Well, then, anything we need to chat about
11   before we just figure out if the jurors are going to be here
12   on time and will be ready to go?
13          MR. MARKETOS:  Not from -- not from our side,
14   Your Honor.
15          MS. BROWN:  No, Your Honor.  Thank you.
16          THE COURT:  All right.  Well, then, folks, I
17   appreciate you coming in early.  Sometimes we're going to talk
18   for five minutes; sometimes we're going to talk for 30.  I
19   just don't know what it's going to be each morning, but I
20   appreciate you being here at 9:00.
21       So I'm going to put us in recess for the next
22   25 minutes.  If for some reason you need me before then, all
23   you need to is just reach out to my chambers.  I'll pop right
24   back out and find out what's going on, and we'll talk about it
25   before the jurors get here.
```

*United States District Court*
*District of New Jersey*

1    What about the lunch break?  So yesterday I gave a long

2  break because we were selecting the jury.  Normally I don't do

3  an hour lunch.  We do a 30-minute lunch, and everybody can

4  bring their food or go across the street or whatever you plan

5  on doing.

6    But if that's not sufficient, I'd rather ask you now

7  without the jury present.

8    What are your thoughts about how long you want this

9  lunch break to be?

10    MR. MARKETOS:  From my view, Your Honor, 30 to

11  45 minutes is good if we could let you know in advance because

12  we anticipate needing the 45 instead.

13    THE COURT:  You want me to just default to 45, folks?

14    MS. BROWN:  I would.

15    THE COURT:  And then I don't -- because I'd rather

16  not have to go every day and say, Today is 30 minutes,

17  tomorrow is 45, today is this.

18    MS. BROWN:  Yeah.  My view, just from the jury

19  perspective, is, you know, sometimes the elevators, it just

20  takes a little while to get out.  Like, I think, 45 minutes

21  is the standard.

22    THE COURT:  All right.  I'll default to 45 for

23  everybody, and that way we don't have to keep messing around

24  with the time.  There may be a time where I do extend it, but

25  that's only because I may be handling another matter at around

1  12:30 or so, and I need the courtroom, and I don't know how

2  long I'm going to be on that particular case.  It will be

3  unrelated to this case, but I'm going to need some time.

4          So if that comes up, then I'll tell the jurors and all

5  of you, Look, today the Court has a conflict, needs a little

6  extra time during the lunch break.  Normally I won't, but

7  there are things I will squeeze in while you guys are stepping

8  out.

9          Just as a reminder, just so we're clear, we're only

10  going to sit to Thursday this week because I'm not sitting

11  Fridays.  Next week we're only sitting through Wednesday.

12          So I may remind the jurors since they're now coming

13  in -- this is now the jury.  I think I'm going to give them a

14  heads-up this morning just so they can plan ahead that they

15  have a shorter week.  Next week is a three-day trial day.

16          But other than that, I think -- I'm going to look

17  through the calendar, and I'll keep you posted well in advance

18  if there's another conflict.  There may be one other -- Kim, I

19  think there's a -- there's a conflict where I may have to do a

20  half a day.

21          There's a court proceeding that I may have to -- we may

22  have to do half a day, and I'll -- I think what I like to do

23  is look at that date, talk to you all first to see if that

24  makes sense or it makes sense not to sit that day, but I'll

25  give you half my day.

1      We have a court proceeding that I think I'm obligated

2  to attend.

3      It's May 23rd?

4      So why don't you guys -- May 23rd we have a court event

5  that I believe I'm being asked to attend.  There's nothing

6  mandatory for me.

7      I mean, I can say no to anything I want to say no to,

8  but I think this one -- it's strongly -- it's suggested I

9  attend this event in this courthouse.

10      So take a look at that date.  As we get closer, let me

11  know.  I'd like to do half a day and then break during the

12  lunch for the day, but if you think that's really just, Judge,

13  the juice isn't worth the squeeze here, we really just think

14  we can't do much there, then I'll consider it.

15      But I would like to see if we can get some things done

16  that morning, even if the jury gets half a day, so...

17      MS. BROWN:  And, Your Honor, I'm hopeful we will be

18  in our case by the 23rd, and we actually have a doctor who can

19  only come the 23rd, so we would be in favor of even a half a

20  day.

21      THE COURT:  Oh, all right.  So it may just work out

22  by coincidence that particular date.

23      MS. BROWN:  Yeah, that would be terrific.

24      THE COURT:  All right.  So let's see where we are.

25      MS. BROWN:  Okay.

```
 1          THE COURT:  But that makes sense.  Okay.  It just
 2  happens to be on that particular day that we can maybe do that
 3  one --
 4          MS. BROWN:  Yeah.
 5          THE COURT:  -- doctor and be done?
 6          MS. BROWN:  That would be terrific.  That would be
 7  terrific.
 8          THE COURT:  Well, I'll let you guys think about it
 9  and confer on your own.  And like I said, I just want to give
10  you a heads-up.
11      Kim, is there any other -- are there any other dates
12  that hit?
13      I'm going to double-check it.  I'm not going to hold
14  you guys hostage while I check the calendar, but I'm going to
15  double-check when I come off the bench to see if there's any
16  other dates that I want to give you advance notice of that I
17  might have a conflict.
18      And that way you can at least have that today for now,
19  which are -- which are the dates that the judge may not be
20  able to sit for a full day or at all.  There might be one more
21  in June.  And I don't know how long we're going to be pressing
22  into June, but I still want to give you that date just in
23  case.
24          Other than that, though, I'll put you guys in recess.
25          I'm sorry, Ms. Brown, do you have something?
```

1          MS. BROWN:  Yeah.  As we were talking, I kept

2   flipping, and, Your Honor, do you have two objections to two

3   slides that were -- I believe they're not sourced, but I

4   believe these are perhaps other settlements with the

5   Government about other cases involving other products.  It's

6   highly prejudicial.  The 2 billion --

7          MR. MARKETOS:  You want to talk about it first?

8          MS. BROWN:  Yeah, sure.

9          MR. MARKETOS:  I'm sorry to interrupt.

10          THE COURT:  No, no.  Here's my two cents.  Why don't

11   you confer on it.

12          MS. BROWN:  Sure.

13          THE COURT:  But I'd like to know in advance, though,

14   what are the two slides.  One slide is you guys identifying

15   unrelated cases where the United States has settled.

16          MR. MARKETOS:  No.  They're the settlements with

17   Janssen that are already addressed in the motion in limine --

18          THE COURT:  Okay.  And then what's --

19          MR. MARKETOS:  -- the CIAs.

20          THE COURT:  And what's the other slide?

21          MR. MARKETOS:  I don't know what the other --

22          MS. BROWN:  So the first slide, Your Honor, has

23   $81 million Government allegations of off-label marketing, not

24   this case.  $2 billion Government allegations of kickbacks,

25   also not this case.

1          Then Serono's $704 million settlement.  Serono Labs

2   will be excluded from all federal health care programs for at

3   least five years.

4          THE COURT:  All right.  Why don't -- you guys are

5   going to confer?

6          MR. MARKETOS:  Sure.

7          MS. BROWN:  Sure.

8          THE COURT:  Let me know soon though whether I've got

9   to get involved or not.  So do I need to review what I did in

10  the motion in limine?  I mean, it's not like I have all those

11  opinions before me.

12         MR. MARKETOS:  I don't -- at this point, I think a

13  conference might help.

14         THE COURT:  All right.

15         MR. MARKETOS:  I'm not sure if -- you've already

16  ruled on this.

17         THE COURT:  Let's do this.  Yeah.  If I ruled, I can

18  tell you this, I'm not going to change my mind.  So either I

19  have to go back and see what I've said, but why don't you all

20  confer.  Let me know if there's still an issue, and then we'll

21  go from there.

22         Other than that, can I put you guys in recess for a

23  bit?

24         MS. BROWN:  Yes, Your Honor.  Thank you.

25         MR. MARKETOS:  Thank you.

```
 1              THE COURT:  All right.  You guys remain seated.  I'll
 2    be back.
 3              (A short recess occurred.)
 4              THE DEPUTY COURT CLERK:  Please remain seated.
 5              THE COURT:  All right, folks, you need to see me.
 6              MR. RUSS:  Yes, Your Honor.  We have an objection to
 7    two slides, basically for the same reason, in Relators'
 8    opening statement.  So the first --
 9              THE COURT:  I don't have the slides so I can't see
10    them from here.  Is somebody going to give me a copy of the
11    slides?
12              MR. RUSS:  Do you all have a second set?
13              MR. MARKETOS:  Sure.
14              MR. RUSS:  I can bring mine up.  I don't need to look
15    at it.
16              THE COURT:  You may, thank you for asking.
17         By the way, I'm going to remind you folks, when you
18    have witnesses in the witness stand and you want to approach a
19    witness, if it's not something you're doing digitally from the
20    podium, you have to ask to approach the witness.
21         It's not because of me, and it's not because of any
22    ego.  I've got Megan sitting in the well.  I've got a jury
23    sitting there in the first row.  They need to know when people
24    are walking by them.
25         So it's really just to give them some situational
```

1    awareness when you're going to be walking and a person's going

2    to be there, because if you don't ask, nobody should be in

3    that area of the well.

4        So just -- just as a reminder just since we're going to

5    be dealing with witnesses today, make sure you ask.  I'll give

6    you permission, but that alerts the court reporter that you're

7    coming.  It alerts the jurors that you're coming and also for

8    witnesses.

9        Maybe they're on cross-examination.  It alerts them

10   that you're coming to them.  Also, after you approach the

11   witness, bye.  Go back to where you were, whether you're at

12   counsel table or the podium.  I don't want people leaning over

13   there and questioning witnesses in close proximity.  It's

14   unnecessary.  This isn't television.

15       Now, which slides am I looking at?

16       MR. KLEIN:  Slides 28 and 29.

17       THE COURT:  Bear with me.  Let me go to 28.  Okay.

18       MR. KLEIN:  Your Honor, the issue is that these refer

19   to these large dollar amounts, the allegations -- not -- not

20   even the amounts of settlements, but the allegations on

21   Slide 28, $81 million in 2010 with respect to a different

22   product; $2.2 billion in 2013, again with respect to a

23   different product.

24       And then on Slide 29, reference to a $704 million

25   settlement, not even the same company.  And it's obvious what

1    the purpose of these references are, Your Honor.  We just went

2    through a whole day yesterday of talking to folks who objected

3    or who raised concerns about pharmaceutical companies doing

4    everything for profit, large dollar amounts.

5         That's what this is trying to evoke.  It's purely

6    prejudicial, and it should excluded.  There's no need for

7    these numbers to be included to make the points that the

8    Relators want to make with these slides, which is that Janssen

9    was --

10        THE COURT:  I'm sorry.  I just want to make sure I

11   understand the objection, and I'll go back.  I have my

12   opinion, too, because I know we addressed these settlements in

13   the motions in limine, but I don't remember anything about

14   dollar amounts.

15        Let me ask you this:  Is your objection not to the

16   reference to these settlements in 2010 but just the fact that

17   they're writing what the settlement dollar amount is?

18        MR. KLEIN:  That's what this objection is,

19   Your Honor, correct.

20        THE COURT:  Okay.

21        MR. KLEIN:  To your point, if I may just close it

22   out, the ruling did not speak to this issue.  The ruling was

23   about --

24        THE COURT:  I just looked at it, so I agree with you

25   there, that I didn't speak to it.

         1          The ruling was about whether they could address these

         2   settlements at all, right?

         3          MR. KLEIN:  Right.

         4          THE COURT:  And I believe that I said it goes to

         5   intent and certain issues, and there may be a limiting

         6   instruction that you guys are supposed to meet and confer

         7   about a year ago or whatever I decided then, and I still don't

         8   have it.

         9          So I don't even know if you all want to give me a

        10   limiting instruction that you're proposing, but my

        11   understanding is that it had to come under 404, but I

        12   understand the objection.

        13          It's not to them addressing or raising the issue of

        14   these two settlements.  It's the dollar amount they've put in

        15   there.

        16          MR. KLEIN:  That's correct, and especially on the

        17   first slide, Your Honor.  These aren't even settlement

        18   amounts, and the settlement, of course, are not admissions of

        19   liability on any of these slides.

        20          So these dollar amounts don't reflect anything other

        21   than they're really big, and they want the jury to know that.

        22          THE COURT:  All right.  Other than that, though,

        23   you're -- there's no objection to the slides.  It's the

        24   mention of the 81 million, the mention of the over $2 billion

        25   on Slide 28.

```
 1          And then on 29, I guess it's the mention of the
 2   704 million?
 3          MR. KLEIN:  Correct.
 4          THE COURT:  Let me hear -- well, let me hear from
 5   Relators' counsel because I got -- I got it.  Let me hear from
 6   Relators' counsel.
 7          MR. MARKETOS:  Thank you, Your Honor.
 8      So the purpose of these slides, and you're going to
 9   hear it in the opening, is to address exactly the heart of
10   what was addressed in the motion in limine ruling.  The
11   problem is --
12          THE COURT:  I didn't address -- I didn't say anything
13   about dollar amounts.
14          MR. MARKETOS:  No, I understand.
15          THE COURT:  So let's just get to the heart of the
16   issue.  Why should I allow you to put in these dollar amounts?
17          MR. MARKETOS:  Because they're arguing and will
18   continue to argue that this is not material to the Government,
19   and they have continued to argue that -- look at page 25 of
20   their trial brief, 27 of their trial brief.
21      They are continuing to argue that this is not a
22   material type of conduct to the Government.  And these are
23   their documents, their own documents warning them internally,
24   including the second one -- warning their own people
25   internally, Here's what the Government --
```

1          THE COURT:  Again, what does that have to do with the

2     81 million, the 2 million, $200,000 and the 740 million

3     reference?

4          I understand what you're saying.  And by the way, that,

5     I did address in the motion in limine.

6          MR. MARKETOS:  Right, because --

7          THE COURT:  And I said -- I actually ruled in your

8     favor.

9          MR. MARKETOS:  Right.

10         THE COURT:  Obviously, there could be a limiting

11    instruction there --

12         MR. MARKETOS:  Right.

13         THE COURT:  -- because you can't show propensity.

14    You can't say because they did it here, they did it now.

15         MR. MARKETOS:  Correct.

16         THE COURT:  And so I presume that, when this comes

17    out, there will be some proposal by the parties, and you're

18    required to meet and confer on that instruction, which I still

19    haven't received, but focus me here.

20         I will tell you right now that you're not convincing me

21    why Janssen is wrong about why these dollar amounts should be

22    off these slides.

23         I'm not saying you can't reference these slides.  In

24    fact, there's no objection to that.  If they did, I would

25    overrule it.

```
 1            MR. MARKETOS:  Sure.

 2            THE COURT:  But why do you get these dollar amounts

 3    in here?

 4            MR. MARKETOS:  The answer to that is because it goes

 5    to the severity of the conduct.  What they're arguing about is

 6    materiality.  The amount --

 7            THE COURT:  I'm not going to let you -- look, if you

 8    want to address the severity of the conduct, I'm not going to

 9    allow you to demonstrate that in front of this jury by what

10    some unrelated jury did in a different case under different

11    facts with different folks.  I mean --

12            MR. MARKETOS:  Oh, I understand that, Your Honor.

13    Let me be clear what these are.  This is the -- this is their

14    corporate integrity agreement.  It's theirs.  It's Janssen and

15    Johnson & Johnson's for the same conduct entering into with

16    the Government.

17        These are the CIAs that Your Honor admitted into

18    evidence on the motion in limine.  It's not pulling some

19    random case out of left field.  These are the corporate

20    integrity agreements.

21            THE COURT:  But where did I -- where did I say in the

22    motion in limine that these dollar amounts were going to be

23    admissible?

24            MR. MARKETOS:  Well, when you said that --

25            THE COURT:  No, I mean, show me, though.  I just want
```

1    to see it.

2            MR. MARKETOS:  It's the settlements.  So we thought,

3    Oh, okay, it's the settlements.  We briefed it.  We addressed

4    it, and the settlements are -- can be addressed with a

5    limiting instruction.

6            And then they're saying, Okay, but this part of the

7    settlement can't come in.  When we said we can address the

8    settlements and address it with a limiting instruction, it

9    matters, and they're continuing to argue materiality.

10           So -- and for, you know, 404(b), so this is the

11    settlement that is addressing the heart of your ruling.

12    They're saying, Well, yes -- the settlement, yes, but not the

13    amount of the settlement.

14           Does that make sense, Your Honor?  I hope -- and if the

15    answer is, Let's leave it alone, out of opening for now so you

16    can hear how the evidence comes in and see what we're talking

17    about, then that's fine.  They'll keep it out of opening.

18           But we're not going to let them tell the jurors that

19    this is an AIDS drug, which you'll hear in their opening.

20           It's an AIDS drug.  The Government wanted it out there

21    on the market.  This is not the type of conduct that the

22    Government is concerned about when they're telling themselves

23    internally and they're entering into agreements for this type

24    of misconduct to the tune of 81 million and 2.2 billion and

25    704 million.

1          THE COURT:  All right.  Then here's what you've

2    convinced me to do is just kick this can down the road.

3    You're going to pull it from the opening slides, but I'm going

4    to reserve on my decision as to whether it's admissible at the

5    appropriate time because, what you're telling me, and I'm

6    hearing you as well, is that, Look, as this flushes out in the

7    trial, you're going to see why this should be allowed in.

8          That's what you're telling me.  Now, nothing has

9    happened in this trial yet, so it's a little difficult for me

10   to shake my crystal ball to see how that's going to play out.

11          MR. MARKETOS:  Right.

12          THE COURT:  So if you're telling me that the Relators

13   will pull out these numbers out of these slides where I at

14   least sustain the objection for now, but I reserve on the

15   ultimate decision, Counsel, for both sides.

16          So don't say I ruled in the beginning of this trial

17   that this was not coming in.  I want to be very clear in my

18   language.  I haven't ruled on this issue.

19          All I've ruled on, and it sounds like it's with the

20   consent of Relators, that for now this issue will be pulled

21   out of these slides.  You'll do your opening statements at the

22   appropriate time.

23          I presume we're going to have to revisit this issue --

24          MR. MARKETOS:  Yes, Your Honor.

25          THE COURT:  -- unless there's some agreement by the

1    parties.  Agreed?

2            MR. MARKETOS:  Yes, Your Honor.

3            THE COURT:  All right.  So that's resolved for now.

4            MR. KLEIN:  And we, obviously, disagree with

5    everything that was just said, but we'll reserve until the

6    issue is ripe.

7            THE COURT:  I figured as much.  I figured as much.

8    So no, no.  I got it.

9            So we will -- let's just table this issue for now

10   because your objection is sustained with respect to the slides

11   with the opening.  But, again, I haven't ultimately decided

12   the issue, and I'm going to wait and see how this fleshes out.

13           What else?  Anything else I need to resolve before I

14   see if the jurors are ready?

15           MR. MARKETOS:  I think that's it, Your Honor.

16           THE COURT:  All right.  But let me ask you this.  Do

17   you need a few minutes to make whatever corrections you're

18   going to make to these slides?  Because now that --

19           MR. MARKETOS:  Yeah.  Well, yes.  But if it's okay,

20   we're not going to reprint them all.

21           THE COURT:  Well, I'm just saying, I presume you're

22   going to publish these slides electronically for the jury.

23           MR. MARKETOS:  Yeah.  We're going to take out the

24   numbers --

25           THE COURT:  And the rest can remain.

1          MR. MARKETOS:  In Slide 28 and the number in Slide

2     29.

3          THE COURT:  Slide 29.  All right.

4          MR. MARKETOS:  For now.

5          THE COURT:  For now.  Anything additional from

6     Relators at this time?

7          MR. MARKETOS:  No, Your Honor.  Thank you.

8          THE COURT:  Janssen?

9          MR. KLEIN:  No, Your Honor.

10          THE COURT:  All right.  Kim, should we see if -- do

11     we have all ten?

12          THE DEPUTY COURT CLERK:  I know we have nine.

13          THE COURT:  Do you want to just wait and see and let

14     me know?

15          All right, folks.  You can be seated.  Let's wait and

16     see if we have these folks.

17          MS. BROWN:  And, Your Honor, is it the Court's

18     intention to break in between both openings, or will we just

19     go through the morning?

20          THE COURT:  Why don't we see.  I don't mind giving a

21     ten-minute break between it.  Let you guys reboot --

22          MS. BROWN:  That would be great.

23          THE COURT:  -- and the jurors can stretch, because I

24     think they're about an hour each, right?

25          MS. BROWN:  Exactly.

```
 1          THE COURT:  So why don't we try to do preliminary

 2   instructions, Relators' opening, break, and then you all go.

 3          MS. BROWN:  Thank you, Your Honor.

 4          THE COURT:  Any objection to that on the Relators'

 5   side?

 6          MR. MARKETOS:  I didn't hear it, Your Honor, so no

 7   objection.

 8          THE COURT:  That's all right.  I'm just trying to

 9   plan a morning break.

10          What I think I'll do is I'll bang through the

11   preliminary instructions.  You guys will open.  Then I'll give

12   everyone a ten-minute break, and then we'll do the openings

13   for the defense.

14          And then I don't know where we'll be after that.  Let's

15   just see how that plays out.  But if we can get a little bit

16   of witness testimony started, why not?

17          What time are we breaking for lunch?  Is it -- what

18   time is my call?

19          THE DEPUTY COURT CLERK:  12:30.

20          THE COURT:  I need to -- I have a hard break at

21   12:30.  I have a call on an unrelated case that I have to take

22   at that time.  So just plan that we'll likely try to break

23   around 12:30.  And whoever has the witness on the stand at

24   that time, if there's a good place to break, even if it's

25   slightly before 12:30, just let me know if you think that, you
```

 1    know, you're about to switch to a new topic or something like

 2    that, so I'm not trying to interrupt the flow of either of you

 3    guys.

 4         But I do need to have a break at 12:30.

 5              MR. MARKETOS:  Thank you.

 6              THE COURT:  All right.  It sounds like we're waiting

 7    for one juror.

 8         Will you know as soon as they --

 9              THE DEPUTY COURT CLERK:  Yes.  Let me just...

10         (Recess.)

11              THE DEPUTY COURT CLERK:  All rise.

12         (The jury enters the courtroom at 9:42 a.m.)

13              THE COURT:  Folks, you may be seated.

14         Folks, you're going to shift over one.  All right, good

15    to go.

16         Members of the jury, welcome back.  Good morning.

17    Appreciate you guys -- folks trying to get here on time.

18    Continue to do so.  We will maintain to try to be ready every

19    morning by 9:30.  If you guys are here, I'll put you in the

20    box, and we'll start.

21         Just a few things I want to note.

22         First what we're going to be doing today.  I mentioned

23    very late yesterday we were going give -- I was going to give

24    you some preliminary instructions.  There's about 12

25    instructions that I'm going to give you.  These are

1   preliminary instructions at the outset of the case.

2        I don't allow note-taking, but don't worry about that.

3   You don't have to memorize everything I'm going to tell you.

4   At the end of the trial, I promise you, you'll have these

5   instructions plus many more.  And you won't have to memorize

6   them either because in deliberations, I always allow a few

7   written copies of these instructions to go back with the table

8   of contents so that if you're trying to remember, Remember the

9   judge instructed us on this or this or the lawyers directed

10  you to a particular instruction, you'll have some copies of

11  those in writing.

12       So for now, all I'm asking you is to pay attention to

13  these preliminary instructions that I give you.  Don't stress

14  about memorizing every word that I have to say because I

15  promise you, they will be repeated, and you'll get them in

16  writing later in the trial.

17       After I give you those preliminary instructions, we're

18  going to go into opening statements.  You'll first hear

19  opening statements from the Relators.  Probably look to take

20  the ten-minute break after that because the openings are about

21  an hour each, and then you'll hear from the defense opening,

22  and then we'll see where we are with witness testimony or --

23  around lunchtime.

24       I'm going to do a hard break at least by 12:30 because

25  I have another matter I have to address at that time, but

1    we'll see where we stop.

2         The lunch break will be 45 minutes moving forward.  So

3    it's not going to be an hour every day, but I also want to

4    give you a little more than 30 minutes because I don't know if

5    you're bringing lunch or if you're going across the street or

6    what you plan to do.

7         So that's where we are today.

8         One other issue I just want to give you a heads-up just

9    for advance notice for next week.  So we're sitting Monday

10   through Thursday every week unless there's a conflict with the

11   Court.  Next week, I have a conflict.  So we're only sitting

12   Monday, Tuesday and Wednesday.  So I wanted to tell you that

13   now so that you can plan ahead that you will not be here

14   Thursday and Friday of next week.  After that, we're back to

15   Monday through Thursday.

16        If there are any other issues or conflicts that come up

17   during the trial -- and there could be another one where we're

18   only sitting for half a day -- I'm going to give you notice

19   well in advance.  That way you're able to make some plans and

20   say, all right.  I have my life back on Thursday of next week.

21   Or two weeks from now, I've got only a half day that I'm

22   required to be in court.

23        So I'm going to do my best to give you that courtesy,

24   and I just ask you to be patient, that we are going to move

25   Monday through Thursday as much as we can, but there are going

1    to be days where -- you know, five, five and a half weeks is a

2    long time for even the Court to be able to commit to every

3    single day because there's so many other cases that we have to

4    address.

5            So just ask you to be patient there.

6            So with that, let me go through those preliminary

7    instructions.  We'll get moving with the opening statements,

8    and we'll go from there.

9            All right.  Introduction; Role of the Jury.

10           Now that you have been sworn, I have the following

11   preliminary instructions for your guidance as jurors in this

12   case.

13           You will hear the evidence, decide what the facts are,

14   and then apply those facts to the law that I will give to you.

15           You and only you will be the judges of the facts.  You

16   will have to decide what happened.  I play no part in judging

17   the facts.  You should not take anything I may say or do

18   during the trial as indicating what I think of the evidence or

19   what your verdict should be.  My role is to be the judge of

20   the law.  I make whatever legal decisions have to be made

21   during the course of the trial, and I will explain to you the

22   legal principles that must guide you in your decisions.  You

23   mud follow that law whether you agree with it or not.

24           Description of the Case; Summary of Applicable Law.

25           In this case, Relators claim that Defendant violated

1    federal and state False Claims Acts and the Defendant engaged

2    in off-label marketing and kickback schemes relating to two

3    HIV medicines, Prezista and Intelence; Defendant denies those

4    claims.  I will give you detailed instructions on the law at

5    the end of the case, and those instructions will control your

6    deliberations and decision.

7         But in order to help you follow the evidence, I will

8    now give you a brief summary of the elements that Relators

9    must prove to make their case.

10        The elements for a violation of the Anti-Kickback

11   Statute, which Relators must prove by a preponderance of the

12   evidence, are:

13        First, Janssen offered or paid any remuneration,

14   including any kickback or bribe, directly or indirectly,

15   openly or secretly, in cash or in kind;

16        Second, that one purpose of the remuneration offered or

17   paid was to induce or reward prescriptions of Prezista or

18   Intelence;

19        Third, that the claims for payment for those

20   prescriptions were submitted to a Government health care

21   program, and that there was some recorded evidence of a link

22   between the alleged inducement and the claims submitted for

23   reimbursement; and,

24        Fourth, that Janssen acted knowingly and willfully.

25        The elements for a violation of the False Claims Act,

1  which Relators must prove by a preponderance of the evidence,

2  are:

3        First, that the claims submitted or caused to be

4  submitted by Janssen were false;

5        Second, that Janssen caused the claims to be submitted

6  to the federal Government;

7        Third, that Janssen acted knowingly; and,

8        Fourth, that Janssen's alleged Anti-Kickback Statute or

9  off-label marketing violations were material to the

10  Government's payment decision.

11        In addition to the federal False Claims Act, Relators

12  also assert claims on behalf of the States of New Jersey,

13  California, Colorado, Connecticut, Delaware, Florida, Georgia,

14  Hawaii, Illinois, Indiana, Iowa, Louisiana, Massachusetts,

15  Michigan, Minnesota, Montana, Nevada, New Mexico, New York,

16  North Carolina, Oklahoma, Rhode Island, Tennessee, Texas,

17  Virginia, Washington, and the District of Columbia under their

18  versions of the False Claims Act.  These State False Claims

19  Acts allow Relators like Ms. Penelow and Ms. Brancaccio to

20  bring a lawsuit on behalf of a state Government.

21        If you find that Janssen violated the False Claims Act

22  or its State analogues, then you must assess damages.  I will

23  provide you with additional instructions regarding damages at

24  the end of the trial.

25        If you find that Janssen violated the False Claims Act,

1   then you must also identify the number of false or fraudulent

2   claims that were submitted to the United States, the States,

3   and the District of Columbia.  Again, I'll provide you with

4   additional instructions on this point at the end of the trial.

5          Conduct of the Jury.

6          Now, a few words about your conduct as jurors.

7          First, I instruct you that during the trial and until

8   you have heard all of the evidence and retire to the jury room

9   to deliberate, you are not to discuss the case with anyone,

10  not even among yourselves.

11         By the way, just to be clear, when you are dismissed

12  every day or during breaks back to the deliberations room,

13  that is not deliberations.  You are not into deliberations

14  until I tell you that you're in deliberations, and that's at

15  the conclusion of the trial.  So I want to make sure you

16  understand that.  Being in the deliberation room doesn't put

17  you in that process.  That's just the room we give you all to

18  hang out during the trial.  Okay?  Just be clear about that.

19         Now, if anyone should try to talk to you about the

20  case, including a fellow juror, bring it to my attention

21  promptly.  There are good reasons for this ban on discussions,

22  the most important being the need for you to keep an open mind

23  throughout the presentation of evidence.  I know that many of

24  you use cell phones, smart phones, like iPhones -- it says

25  here Blackberries, but I think nobody has a Blackberry, right?

1    I mean, this is a little outdated.

2        But a lot of you have smart phones, like iPhones, and

3    other portable electronic devices; laptops, notebooks, and

4    other computers, both portable and fixed; and other tools of

5    technology, to access the internet and to communicate with

6    others.  You also must not talk to anyone about this case or

7    use these tools to communicate electronically with anyone

8    about the case.  And this includes your family and your

9    friends.  You may not communicate orally with anyone about the

10   case on your cell phone, smart phone, or portable or fixed

11   computer or device of any kind; or use these devices to

12   communicate electronically by messages or postings of any

13   kind, including email, instant messages, text messages, texts

14   or instant messaging services such as Twitter or X or through

15   any blog, website, internet chatroom or by way of any other

16   social networking websites or services such as Facebook or

17   LinkedIn or YouTube.

18       Now, if any lawyer, party, or witness does not speak to

19   you when you pass in the hall or ride the elevator or you see

20   them in the lobby or the like, remember it is because they are

21   not supposed to talk or visit with you either.

22       All right?  They're not being rude.  They're required

23   not to communicate with you during this trial unless they're

24   in the well and in the courtroom and speaking to you in a jury

25   speech.

 1          Second, do not read or listen to anything related to

 2     this case that is not admitted into evidence.  By that I mean,

 3     if there's a newspaper article or radio or television report

 4     relating to this case, do not read the article or watch or

 5     listen to the report.  In addition, do not try to do any

 6     independent research or investigation on your own on matters

 7     relating to the case or this type of case.  Do not do any

 8     research on the internet, for example.  You are to decide the

 9     case upon the evidence presented at trial.  In other words,

10     you should not consult dictionaries or reference material,

11     search the internet, websites, blog or use any other

12     electronic tools to obtain information about this case or to

13     help you decide the case.  Please do not try to find out

14     information from any source outside the confines of this

15     courtroom.

16          Again, do not reach any conclusion on the claims or

17     defenses until all the evidence is in.  Keep an open mind

18     until you start your deliberations at the end of the case.

19          Bench Conferences.

20          During trial, it may be necessary for me to talk with

21     the lawyers out of your hearing by having a bench conference

22     or a sidebar.

23          In fact, you probably saw numerous sidebars yesterday

24     during the jury selection process.  Let me just tell you, I

25     promise that's the most you're ever going to see.  Right?  In

1  the jury selection process, I intentionally do a lot of those

2  sidebars to protect confidential information of prospective

3  jurors so that they're not talking about significant issues in

4  their personal lives in front of a room of a hundred people.

5  So that's the reason for it.

6      But during the trial, there are also times where there

7  may be issues that I have to talk with the lawyers outside of

8  your earshot.  If that happens, all I'm going to ask you to do

9  is please be patient, although it will be significantly less

10 than what you saw yesterday.

11     I also want to be clear:  We're not trying to keep

12 important information from you.  These conferences are

13 necessary for me to fulfill my responsibility, which is to be

14 sure that evidence is presented to you correctly under the

15 law.

16     We will, of course, do what we can to keep the number

17 and length of these conferences to a minimum.

18     I may not always grant an attorney's request for a

19 conference or a sidebar.  Do not consider my granting or

20 denying a request for a conference or sidebar as any

21 indication of my opinion of the case or what your verdict

22 should be.

23     Evidence.

24     The evidence from which you are to find the facts

25 consists of the following:

1          1.   The testimony of the witnesses.

2          2.   Documents and other things received as exhibits;

3    and,

4          3.   Any facts that are stipulated -- that is, formally

5    agreed to by the parties.

6          The following things are not evidence:

7          1.   Statements, arguments, and questions of the lawyers

8    for the parties in this case;

9          2.   Objections by the lawyers;

10         3.   Any testimony that I tell you to disregard; and,

11         4.   Anything you may see or hear about this case

12   outside of the courtroom.

13         You must make your decision based only on the evidence

14   that you see and hear in court.  Do not let rumors,

15   suspicions, or anything else that you may see or hear outside

16   of court influence your decision in any way.

17         You should use your common sense in weighing the

18   evidence.  Consider it in light of your everyday experience

19   with people and events, and give it whatever weight you

20   believe it deserves.  If your experience tells you that

21   certain evidence reasonably leads to a conclusion, you are

22   free to reach that conclusion.

23         There are rules that control what can be received into

24   evidence.  When a lawyer asks a question or offers an exhibit

25   into evidence and a lawyer on the other side thinks that it is

1    not permitted by the rules of evidence, that lawyer may

2    object.  This simply means that the lawyer is requesting that

3    I make a decision on a particular rule of evidence.  You

4    should not be influenced by the fact that an objection is

5    made.  Objections to questions are not evidence.  Lawyers have

6    an obligation to their clients to make objections when they

7    believe that evidence being offered is improper under the

8    rules of evidence.  You should not be influenced by the

9    objection or by the Court's ruling on it.  If the objection is

10   sustained, ignore the question.  If it is overruled, treat the

11   answer like any other.  If you are instructed that some item

12   of evidence is received for a limited purpose only, then you

13   must follow that instruction.

14        Also, certain testimony or other evidence may be

15   ordered struck from the record, and you will be directed to

16   disregard that evidence.  Do not consider any testimony or

17   other evidence that gets struck or excluded.  Do not speculate

18   about what a witness might have said or what an exhibit might

19   have shown.

20        Direct and Circumstantial Evidence.

21        There are two types of evidence that you may use in

22   reaching your verdict.  One type of evidence is called "direct

23   evidence."  An example of "direct evidence" is when a witness

24   testifies about something that the witness knows through his

25   or her own senses -- something the witness has seen, felt,

 1  touched, or heard or did.  If a witness testified that he saw

 2  it raining outside and you believed him, that would be direct

 3  evidence that it was raining.  Another form of direct evidence

 4  is an exhibit where the fact to be proved is its existence or

 5  current condition.

 6          The other type of evidence is circumstantial evidence.

 7  "Circumstantial evidence" is proof of one or more facts from

 8  which you could find another fact.  So if someone walked into

 9  the courtroom wearing a raincoat covered with drops of water

10  and carrying a wet umbrella, that would be circumstantial

11  evidence from which you could conclude that it was raining.

12          And also presume my blinds are closed, right, because

13  you probably could see it.

14          But presume if this room is shut down, if somebody

15  comes in like that, that's circumstantial evidence that it is

16  raining.

17          Now, you should consider both kinds of evidence that

18  are presented to you.  The law makes no distinction in the

19  weight to be given to either direct or circumstantial

20  evidence.  You are to decide how much weight to give any

21  evidence.

22          Credibility of Witnesses.

23          In deciding what the facts are, you may have to decide

24  what testimony you believe and what testimony you do not

25  believe.  You are the sole judges of the credibility of the

1  witnesses.  "Credibility" means whether a witness is worthy of

2  belief.  You may believe everything a witness says or only

3  part of it or none of it.  In deciding what to believe, you

4  may consider a number of factors, including the following:

5  (1) the opportunity and ability of the witness to see

6  or hear or know the things the witness testifies to;

7  (2) the quality of the witness's understanding and

8  memory;

9  (3) the witness's manner while testifying;

10  (4) whether the witness has an interest in the outcome

11  of the case or any motive, bias, or prejudice;

12  (5) whether the witness is contradicted by anything the

13  witness said or wrote before trial or by other evidence;

14  (6) how reasonable the witness's testimony is when

15  considered in the light of other evidence that you believe;

16  and,

17  (7) any other factors that bear on believability.

18  Now, the weight of the evidence to prove a fact does

19  not necessarily depend on the number of witnesses who

20  testified.  What is more important is how believable the

21  witnesses were and how much weight you think their testimony

22  deserves.

23  Jury Questions for Witnesses.

24  Only the lawyers and I are allowed to ask questions of

25  the witnesses.  You are not permitted to ask questions of the

1    witnesses.  If, however, you are unable to hear a witness or a

2    lawyer, please raise your hand, and I'll correct that

3    situation.

4         There may be times where a witness doesn't have the

5    microphone near their mouth, they don't project -- I should be

6    using a microphone, but everyone says I'm loud enough.  So you

7    can hear me, folks, right?  So if you can't hear the witness,

8    the microphone is away, they have a lower way of speaking,

9    raise your hand.

10        Counsel, folks, also let me know, because, for the

11   lawyers, it's important they hear the witnesses as well.  So

12   just alert me if you can't hear.  I can make an adjustment, or

13   if you have a witness in the witness box, you can always alert

14   them to, you know, Sir, ma'am, why don't you put the

15   microphone a little bit closer, we can hear you better.  And

16   I'll also instruct them to do that if for some reason you

17   can't hear.

18        Note-Taking By Jurors.

19        And I referenced this very, very briefly when I was

20   talking about these instructions and how you get them later in

21   the trial.

22        But as you see, we have a court reporter here who will

23   be transcribing the testimony during the course of the trial.

24   But you should not assume that the transcripts will be

25   available for your review during your deliberations.  You must

1    pay close attention to the testimony as it is given.

2        You may not take notes during the course of the trial.

3    There are several reasons for this.  It is difficult to take

4    notes, and at the same time, pay attention to what a witness

5    is saying and the witness's manner while testifying.  One of

6    the reasons for having a number of persons on the jury is to

7    gain the advantage of your individual and collective memories

8    so that you can then deliberate together at the end of the

9    trial and reach agreement on the facts.  While some of you

10   might feel comfortable taking notes, other members of the jury

11   may not feel as comfortable and may not wish to do so.  Notes

12   might be given too much weight over memories, especially the

13   memories of those who do not take notes.  And so for those

14   reasons, I ask that you not take notes during this trial.

15       Preponderance of the Evidence.

16       This is a civil case.  Relators are the parties that

17   brought this lawsuit.  Defendant is the party against which

18   the lawsuit was filed.  Relators have the burden of proving

19   their case by what is called the preponderance of the

20   evidence.  That means Relators have to prove to you, in light

21   of all the evidence, that what they claim is more likely so

22   than not so.  To say it differently:  If you were to put the

23   evidence favorable to Relators and the evidence favorable to

24   Defendant on opposite sides of the scale, Relators would have

25   to make the scales tip somewhat on their side.  If Relators

 1    fail to meet this burden, the verdict must be for the

 2    defendant.  If you find after considering all the evidence

 3    that a claim or fact is more likely so than not so, then the

 4    claim or fact has been proved by a preponderance of the

 5    evidence.

 6          In determining whether any fact has been proved by a

 7    preponderance of the evidence in the case, you may, unless

 8    otherwise instructed, consider the testimony of all witnesses,

 9    regardless of who may have called them, and all exhibits

10    received in evidence, regardless of who may have produced

11    them.

12          You may have heard of the term "proof beyond a

13    reasonable doubt."  That is a stricter standard of proof, and

14    it applies only to criminal cases.  It does not apply in civil

15    cases such as this.  So you should put that higher standard

16    out of your mind.

17          Description of Trial Proceedings.

18          The trial will proceed in the following manner:

19          First, attorneys for Relators will make an opening

20    statement to you.  Next, attorneys for Defendant will make an

21    opening statement.  What is said in the opening statements is

22    not evidence but is simply an outline to help you understand

23    what each party expects the evidence to show.  A party is not

24    required to make an opening statement.

25          After the attorneys have made their opening statements,

1    then each party is given an opportunity to present its

2    evidence.

3         Relators go first because Relators have the burden of

4    proof.  Relators will present witnesses, and counsel for

5    Defendant may cross-examine, and Relators may also present

6    evidence.  Following Relators' case, Defendant may present

7    evidence.  Counsel for Relators may cross-examine those

8    witnesses for the defense.  After the parties' main case is

9    presented, they may be permitted to present what is called

10   rebuttal evidence.

11        Now, after all the evidence has been presented, I will

12   instruct you on the law, and then the attorneys will present

13   to you closing arguments to summarize and interpret the

14   evidence in a way that is helpful to their client's positions.

15   As with opening statements, closing arguments are not

16   evidence.  After that, you will retire to the jury room to

17   deliberate on your verdict in this case.

18        Just one note that's not in this kind of formulated

19   instruction here.  The final instructions that I'm going to

20   give you in detail, first orally and then you'll have in

21   writing, I give those before the closing statements.  There

22   could be two different practices.  There's no right or wrong.

23   But I believe it's better for you all to have the closing

24   statements at the end and then you begin your deliberations so

25   that those arguments are fresh in your mind.

 1          I also -- because I give you the instructions orally

 2    and in writing, I'm not worried about you memorizing every one

 3    of those detailed instructions.

 4          So prior to those closing arguments, I will deliver to

 5    you the final instructions, which are much lengthier than what

 6    I just finished here, and then we'll do the closing arguments

 7    so they're a little bit more fresh in your minds when you

 8    begin to deliberate.

 9          So those are my preliminary instructions.  I appreciate

10    your patience and also I appreciated your attention while I

11    was giving them.  And again, just be mindful that I will

12    repeat these later.

13          With that, folks, are we ready to begin closing

14    arguments on the Relators' side?

15              MR. MARKETOS:  Opening, Your Honor?  Yes.

16              THE COURT:  I'm sorry.  Opening.  Yeah, opening

17    statements.

18              MR. MARKETOS:  Yes, Your Honor.  We're ready.

19              THE COURT:  Yeah, the trial is done, folks.  We're

20    going to head home.

21          So at this point, I'm going to -- why don't you

22    proceed.  We'll begin with statements from the Relators, and

23    then I'm going to take a break, and then we'll hear from the

24    defense.

25              MR. WIRMANI:  Good morning, ladies and gentlemen.

1    May it please the counsel, ladies and gentlemen of the jury.

2        Ladies and gentlemen of the jury, this case is about

3    the greed and the calculated deception of one of the largest,

4    most powerful pharmaceutical companies in the world.  It is

5    about a company that put profits above everything else:  Above

6    the taxpayers, above patients, above its own employees, and

7    certainly above compliance with the law.

8        You will learn that between 2006 and 2014 the

9    defendant, Janssen, engaged in a campaign of illegal influence

10   to get doctors to prescribe two of its drugs.  It did this in

11   two related ways.

12       First, it paid doctors millions and millions of dollars

13   in kickbacks.

14       Second, it marked its drugs for uses that the Food and

15   Drug Administration, the FDA -- this is the Government agency

16   that is responsible for patient safety -- had not determined

17   to be safe and effective.

18       You will learn that doctors were paid over $17 million

19   during this scheme.  Some of the top prescribing doctors

20   individually made hundreds of thousands of dollars with

21   payments from Janssen.

22       Doctors were treated to five-star resorts, the best,

23   most exclusive restaurants in town.  They were wined and

24   dined, free steak dinners, alcohol, top-shelf liquor, all with

25   the goal of influencing their prescribing, getting them to

1    prescribe Janssen's drugs.

2         Janssen used that access.  It used that access to

3    further promote its drugs for unapproved uses, uses that the

4    FDA had not determined to be safe and effective.

5         In total, Janssen made over $8 billion selling these

6    two drugs.  Hundreds of millions of that flowed from the

7    unlawful scheme that we're talking about in this case.  It

8    came at the expense of taxpayers, the United States, various

9    states, including the state of New Jersey.

10         This case was brought to recover that money, right,

11    that taxpayer money for the Government, to make Janssen pay

12    back what they unlawfully obtained or retained from the

13    Government.

14         And at the end of this trial, folks, we're going to

15    come back up here, and we are going to ask you to do that.  We

16    are going to ask you to make Janssen repay what they

17    unlawfully took from the Government.

18         Folks, my name is Andrew Wirmani.  Along with my

19    colleagues, who you met yesterday, we represent Christine

20    Brancaccio and Jessica Penelow.

21         Ms. Brancaccio, Ms. Penelow, they are bringing these

22    claims on behalf of the United States and various states.

23    They're what the law calls whistleblowers.  They are Relators.

24    The judge referred to them earlier.

25         These are former Janssen employees, individuals that

 1   worked at the company for a number of years, who have

 2   firsthand knowledge.  They witnessed Janssen misconduct

 3   firsthand, and they made the brave decision to come forward

 4   and expose that conduct.

 5        Folks, and they did that almost 12 years ago.  They

 6   have been fighting this battle for over a decade.

 7        And you will hear -- you will hear from Ms. Brancaccio.

 8   You will hear from Ms. Penelow from that witness stand, but,

 9   folks, it's not just them.

10        You're going to hear from numerous Janssen insiders,

11   right, folks from the tops of the company down to ground-level

12   salespeople.  Each of those individuals is going to come into

13   this court.  They're going to take an oath, and each of them

14   is going to tell you the same thing.

15        The defendant consistently put sales, profits, making

16   as much money as possible over compliance with the law by

17   paying doctors kickbacks and by marketing their drugs for

18   unapproved uses.

19        Folks, and we know that because their lawyers did not

20   just take their allegations at their word, right?  When these

21   allegations were brought, lawyers went out, they investigated,

22   they talked to other Janssen employees.

23        They obtained sworn declarations under oath, and those

24   individuals are now going to come in this courtroom, and they

25   are going to testify on behalf of Relators, and you will hear

 1     from them.

 2          Now, folks, the Government -- the Government can't

 3     always see what is going on inside of powerful companies like

 4     Janssen, right?

 5          So to encourage whistleblowers to come forward, the law

 6     says that they're entitled.  They are eligible for a portion

 7     of whatever they recover for the governments.

 8          Now, you will learn, you know, that there is a cap on

 9     what they can recover, and ultimately, all of this is up to

10     the discretion of the Government, folks.

11          At the end of the day, these are the Government's

12     claims that are being prosecuted.  So the Government will

13     receive the vast majority of any recovery.  The law says that

14     Ms. Penelow and Ms. Brancaccio, that they stand in the shoes

15     of the Government for purposes of this case.

16          I want to use my time to talk to you guys about three

17     things.  First, I want to give you just a high-level overview

18     of some of the health care rules and the landscape at issue in

19     this case.  That's going to help you understand, put Janssen's

20     scheme in context.

21          Second, I want to walk you through Janssen's scheme

22     step-by-step.  We're going to talk about these insider

23     witnesses that you're going to hear from.  We'll talk about

24     some of the expert testimony you're going to hear, some of the

25     documents that you're going to see that are going to

1    corroborate what these witnesses are saying.

2         And, finally, I want to talk to you just about a few

3    key issues in this case.

4         So let's start with the health care industry.  All

5    right.  I mentioned kickbacks earlier, right, money for

6    influence.  I think when most of us hear those types of terms,

7    right, what's the picture that comes to mind?

8         I think most of us think of something like, you know, a

9    mobster giving a politician a bag of cash in a dark alleyway,

10   right?  That's what we see on TV, but in the real world, these

11   things are far more subtle.

12        They're disguised.  They're concealed.  They're hidden.

13   And what you will learn is that the health care industry is a

14   heavily, heavily regulated industry.  Some of you know that

15   because you're in health care.  Things that you can do in

16   other industries that are perfectly acceptable, those things

17   are highly illegal in the health care context.

18        And what the judge is going to instruct you in this

19   case ultimately is that it is illegal.  It is unlawful to give

20   a doctor anything of value, right, anything of value.  That's

21   money.  It's an opportunity.  It's a job.  It's one purpose of

22   that thing, not the sole purpose.  It's not the primary

23   purpose.

24        The one purpose of that thing is to influence that

25   doctor with respect to patients that have federal insurance,

1    and you will learn that, folks, those are serious rules.  They

2    have serious consequences.  In fact, in some contexts they can

3    have criminal consequences.

4        In this case, the kickbacks took the form of speaker

5    fees, right, speaker fees that were given to these doctors to

6    influence their prescribing, to get them to prescribe

7    Janssen's drugs.

8        And, folks, one thing to note:  Notice how I said what

9    the judge will instruct you.  That's because it's not my job

10   to tell you what the law is.  Only the judge can do that, and

11   Janssen, they should not be telling you what the law is

12   either.

13       The judge will come back at the end of this case, he

14   will instruct you on what the law is.  Our job and your job is

15   to determine what the facts of this case are together.

16       The second thing you guys need to know about the health

17   care industry is that it is regulated by the Food and Drug

18   Administration, the FDA.  The FDA's job is to make sure that

19   before pharmaceutical companies sell their drugs to the

20   general public, that those drugs are safe and effective for

21   the particular uses that they're marketed for, they're being

22   promoted for.

23       Pharmaceutical companies do that by submitting evidence

24   to the FDA.  They have to go to the FDA.  They submit rigorous

25   studies, right, gold standard studies, double blind, placebo

1    controlled.

2        If the FDA is satisfied that that is a drug that is

3    safe and effective, they'll issue something called a "label,"

4    that label for that drug that sets forth the approved uses of

5    the drug.

6        All of us have seen this.  Anyone who has taken a

7    prescription drug, you get that package.  You pull out that

8    packet insert that comes with the drug.  Okay?  That's the

9    label of the drug.

10        So just as an example, right, XYZ drug, it has a label

11    that says it is approved to treat this condition in this age

12    of patient in this type of dosing, and it will list all of the

13    adverse consequences, like the warnings, the potential

14    consequences and side effects that prescribing physicians need

15    to take into consideration.

16        Now, the FDA's job, folks, is to regulate the

17    pharmaceutical companies, the way they market their products,

18    the way they conduct business.  It is not to interfere with

19    the practice of the medicine.  Okay.

20        So once a drug is approved for any use, a doctor,

21    right, under their medical license, in conjunction with their

22    patient, they have discretion, if they think it's in the best

23    interest of their patient, to prescribe a drug for what are

24    known as off-label uses.  Some of you have probably heard that

25    term before, right?

1        But here's what's important.  If a doctor makes that

2    decision, the Government does not pay for that type of drug.

3    In this case, folks, this is not a case about doctors and

4    their discretion to engage in this conduct.  We are not

5    disputing that.

6        This case is about pharmaceutical companies and what

7    they are allowed to market and promote their drug for.  And

8    what you will learn is that pharmaceutical companies are

9    strictly prohibited from promoting their drugs for any

10   off-label use, right?

11       These rules, folks, they are black and white.  What is

12   on that label is clear.  You have it right there.  Janssen was

13   only allowed to market and promote its product for what was on

14   that label and nothing else.

15       Just like with kickbacks, these are serious rules that

16   have serious consequences.  And in this case, you will learn

17   that Janssen consistently, on a nationwide basis, promoted the

18   two drugs at issue in this case for unapproved off-labeling

19   uses throughout the relevant time period, uses the Food and

20   Drug Administration had not determined to be safe and

21   effective.

22       So with that background, let's talk about the evidence.

23   Let's talk about the unlawful scheme.  So we all know, right,

24   if we're a certain age, that at some point in time, HIV -- HIV

25   was a life-ending disease.  Okay?

1    No one disputes that.  But by the time we got to the

2    mid-2000s, HIV was no longer a death sentence.  It was a

3    serious disease, nonetheless, but it had become manageable,

4    right?  And there were a number of effective drugs on the

5    market that would allow these patients to live largely normal

6    lives.

7        And as that shift in medicine, those advances took

8    place, other health concerns of these HIV patients started to

9    become more and more important, right?  Things like heart

10   disease, cardiovascular disease.

11       It is only after this shift in medicine that Janssen

12   decided to jump into the HIV market.  And they did so in 2006

13   with their first drug called Prezista.

14       Then you're going to hear in detail about how

15   Janssen -- Janssen had really, really high hopes for Prezista.

16   The company's top executives, including their president,

17   Glenn Mattes, they projected -- they budgeted for, they

18   expected that drug to net -- to bring in a hundred million

19   dollars in year one.

20       That was the company's expectation.  That is fully what

21   they anticipated.  There was just one problem.  When the FDA

22   actually issued the label for Prezista, they determined that

23   that drug was safe and effective at that time for just a small

24   population of the HIV population, for a small group of HIV

25   patients.

1           And all of the profit and money was over here in

2    unapproved uses that Janssen could not market for, they could

3    not advertise for.

4           There were two reasons for this.  All right?  First --

5    this is the label for Prezista, okay?  See it back there.  See

6    it over here.  The label for Prezista said that it was safe

7    and effective -- it was approved for only what are known as

8    treatment-experienced patients.  It was only a portion for

9    treatment-experienced patients.

10          So what's a -- what is a treatment-experienced patient?

11   Now, you're going to learn during this case the way that these

12   HIV drugs work, they are called antiretroviral.  The way that

13   these drugs work is by suppressing the HIV virus.  It prevents

14   it from attacking the patient's immune system.

15          And virtually all of the drugs on the market at this

16   point in time, they were effective at suppressing the virus.

17   It wasn't until that virus -- that virus developed a

18   resistance.  It mutated and developed a resistance to that

19   drug.

20          You will learn that it was very important at that point

21   that the prescribing doctor, the treating physician, that he

22   can change that patient -- he or she change that patient to a

23   new regime of drugs, right?

24          And this would happen again and again and again down

25   this line.  And at some point -- obviously, there's not an

1  unlimited number of drugs on the market, so at some point in

2  time, there's a legitimate risk to some of these patients

3  might run out of viable treatment options.

4      So patients in that first level, patients that never

5  had one of these antiretroviral drugs before, they were known

6  as treatment-naive patients.  They still are today.

7      That is by far the largest group of HIV patients during

8  this time period, and it's by far and away the most profitable

9  for pharmaceutical companies to sell their product to, amongst

10  other reasons, in addition to the large population, right?

11  These patients aren't already on another drug.

12      In other words, patients that had been on one of these

13  drugs before, they were known as treatment-experienced

14  patients.  It's much a smaller population of HIV patients

15  during this time period, much less money for pharmaceutical

16  companies to make and it's harder to sell, right?

17      It's harder to get doctors to prescribe to these

18  patients.  These patients are already, by definition, on a

19  drug, and most of them are stable at this point in time.

20      In fact -- so Janssen's own internal documents that you

21  will see during this case, they showed that Janssen was fully

22  aware that Prezista could be prescribed for just a small

23  segment of the HIV population.

24      Right over there in Category H, that is the only

25  segment that Prezista was approved for between 2006 and 2008.

1    In all of that space on the left, right, that is the majority

2    of HIV patients, that is where the profit is for that company.

3         The second limitation on this drug is it was in the

4    same class, right, as an equally effective drug that was

5    already on the market and, in fact, had a large market

6    share -- known as Reyataz.

7         Reyataz, in addition to being first, was already

8    approved for treatment in naive patients and it also had an

9    additional big advantage over Prezista.  That drug, Reyataz,

10   was marketed consistent with its FDA approval label as good

11   for patients' lipids and their cholesterol levels.

12        Prezista, on the other hand, right, it had a label that

13   warned that amongst other adverse consequences were

14   hypercholesterolemia and hyperlipemia.

15        In other words, it was bad for patients' cholesterol

16   and their lipids, and "lipids," folks -- you're going to hear

17   that term throughout this case -- lipids is just a broader

18   category of cholesterol.  Cholesterol is triglycerides.

19   Lipids is kind of the overarching -- the overarching word it

20   comes in the industry.

21        And you're going to learn that this was a major problem

22   for Janssen because heart disease, right, heart disease was a

23   major problem for HIV patients during this time period,

24   especially as most of these patients were starting to die of

25   things other than the HIV virus.

1    Heart disease is the number one cause of death in the

2    United States.  You will learn that the HIV virus itself puts

3    these patients at additional risk.  It raises cholesterol and

4    lipid levels, and a lot of the drugs that these patients have

5    to take, they raise cholesterol and lipid levels.

6         So this limitation on Prezista's label, that is a

7    major, major issue.  This puts it in a competitive

8    disadvantage to its principal competitor in the market, which

9    is Reyataz.

10        So what does Janssen do about all this?  Janssen has a

11   budget.  They projected to make a hundred million dollars.

12   They put the money into the research.  But they have a label

13   for their drug where they can only legally market it to a

14   small segment of the HIV population.

15        So what you will learn is they do not go back and

16   revise their projections.  They don't go lower the

17   expectations on salespeople.  They don't go to their

18   stakeholders and say, Hey, look, we're not going to make

19   nearly as much money as we originally told you we were.

20        You know what they do?  They engaged in a systematic,

21   top-down nationwide scheme to sell Prezista for off-label

22   unapproved uses and to get doctors to prescribe that drug

23   through the payment of kickbacks.

24        Between 2006 and 2008, Janssen, despite what the label

25   says, they market Prezista as safe and effective for treatment

1    of naive patients, and they also lie.  They lie.  They

2    represent that Prezista is lipid friendly, lipid neutral, and

3    has a similar impact on patients' lipids as its competitor

4    drug, Reyataz.

5          They basically do the opposite of what the label says

6    with total disregard for patient safety.

7          When their second drug, Intelence -- right, their

8    second HIV drug, Intelence -- comes on the market two years

9    later in 2008, they do the exact same thing.

10         Intelence was approved for even a smaller segment of

11   the treatment of the experienced population.  Janssen's own

12   internal documents show that only 7 percent of the HIV

13   population was eligible to take Intelence on-label.  But just

14   like with Prezista, they market that drug as safe and

15   effective for treatment-naive patients.

16         Folks, you will learn, not only is that an illegal

17   off-label message the company knew it wasn't allowed to

18   promote, but that created legitimate safety risks for

19   patients.

20         Intelence was what is known as a salvage drug.  It was

21   a late-term drug that was intended to be prescribed after

22   other drugs had been gone through by that patient.

23         So you will learn that if Intelence was prescribed too

24   early, right, as it was being promoted for, created the

25   legitimate risks that other drugs that that patient could have

1    took first might lose their effectiveness, right?

2         So it had to be a potential to move that patient more

3    quickly down that line to the point at which they may not have

4    viable treatment options.

5         The second limitation on Intelence was that the label

6    said it had to be taken twice a day, right, and that made it

7    really hard to sell, right?  HIV patients, probably not

8    surprisingly, they have to take a ton of pills a day.

9         So all of those patients, they'd rather take a drug

10   that they only need to take once a day as opposed to twice a

11   day.  And their prescribing doctors, they have the same

12   preference, and those prescribing doctors -- they have the

13   same preference for good reason.

14        Because one of the easiest ways for an HIV patient to

15   develop resistance to a drug is by missing their doses, right?

16   You're going to hear about dosing, how important that is,

17   right, adherence to their treatment regime.

18        And all of the research in this area, years of

19   practical experience and then just common sense says that

20   patients are far more likely to take their pills as prescribed

21   if they only need to take one pill -- remember to take one

22   pill a day as opposed to two.

23        And you will see, folks, that Janssen knew all this,

24   right?  You will see in their internal documents, you will

25   hear from witnesses, Janssen was fully aware of patients'

1  preferences, and they were fully aware of prescribers'

2  preferences.

3       So what do they do?  They market Intelence as a safe

4  and effective for once-daily dosing, even though the FDA to

5  this day has not approved Intelence for that use.

6       This is what you see, folks.  With each of those four

7  off-label messages that I discussed, you see this consistent

8  theme, right, of Janssen putting its profits -- its bottom

9  line over compliance with the law, laws that it knows it has

10 to adhere to, and the safety of patients.

11      And you will learn -- folks, you will learn that

12 Janssen did everything in its power -- everything in its power

13 to spread those four off-label messages to prescribing doctors

14 throughout the country.

15      We are going to bring you that evidence.  We will bring

16 you that evidence directly from the source.  We will bring you

17 the people that you would most want to hear from if you were

18 to ask yourself, Are these allegations true?

19      Folks, Sara Strand was the regional business director

20 for Janssen for the entire eastern United States.  All right.

21      Mark Wilhelm, he was a key account manager.  He was

22 responsible for Janssen's most important doctors, their most

23 important hospitals and facilities and he was in charge of the

24 key accounts for the entire western United States.

25      These are high-level employees within Janssen's

1    organization.  They have access to the top-level executives of

2    the company, including the president, Glenn Mattes.

3         Donna Graham, she's going to be our first witness.

4    You're going to hear from her later this afternoon.  She was a

5    salesperson for a number of years.  Eventually she was

6    promoted to be the company's national -- one of their national

7    training directors.

8         She was responsible for training Janssen's sales force

9    of a hundred people strong, right, across the country.  She

10   was instrumental in pushing down these off-label messages that

11   were coming from the top.

12        Christine Brancaccio, Jessica Penelow, Matthew Grooms

13   and Joseph Holshoe, each of those individuals were

14   salespeople.  They were salespeople that were on the ground,

15   inside doctor's office on a day-to-day basis, selling these

16   drugs in different regions across the country.

17        Folks, each of these witnesses, right, each of these

18   seven witnesses is going to take that witness stand.  They're

19   going to swear to you to tell the truth, and they are going to

20   tell you that Janssen consistently marketed its drugs for

21   unapproved off-label uses, that the company paid doctors

22   kickbacks to get them to prescribe the drug and that that

23   direction, that direction came directly from the top of the

24   company, including from the president, Glenn Mattes.

25        Folks, five of these individuals have no financial

1    stake in this case whatsoever, right, absolutely nothing to

2    gain.  Might have some stuff to lose but nothing to gain.  And

3    these witnesses, they are not just going to talk about other

4    people, right?  They're not going to say, I saw people do

5    this, I was told to do this.

6         They're going to point the finger not just at Janssen.

7    They're going to point the finger at themselves.  They are

8    going to tell you, I personally engaged in this conduct.  I

9    knew it was wrong, but I personally engaged in this conduct

10   because I felt like I had no choice, right?

11        The company -- if people did not do what the company

12   wanted, they were terminated.  And you will hear about that.

13   They felt they had no choice or they were going to lose their

14   jobs.

15        In -- these folks, they are not rookie salespeople.

16   These are experienced salespeople.  They are used to pressure.

17   They are used to goals.  And they're going -- they have never

18   seen an environment like they did at Janssen.  The pressure

19   and the blatant disregard for the law and the sole unseen

20   focus on profits.

21        Folks, Janssen is full of smart people, right?  These

22   guys, they know the rules, right?  They know the rules better

23   than anybody.  They've been down this road before, and you're

24   going to hear about that.  So they know, right?

25        So rarely do they directly tell salespeople to go sell

1    off-label.  Now, as you get kind of to the lower -- you know,

2    lower managerial levels of the company, the instructions start

3    to become more and more explicit.  The people at the top,

4    they're very, very careful, and they certainly don't put it in

5    writing.  All right?

6         Now, Janssen's a massive organization.  This is almost

7    an eight, nine-year scheme.  There's millions and millions of

8    documents exchanged, so some stuff slips through, and we're

9    going to show you those documents, and we have them.

10        But as a matter of policy, they do not put this stuff

11   in writing.  This is a presentation.  All right.  Presentation

12   from their compliance department.  All right.  The department

13   that is supposed to be stopping violations of the law.

14        This is what their compliance department is telling

15   employees, right?  They tell them -- they tell them all

16   communications matter.  They tell them all written

17   communications matter, right?

18        Everything is a document in the eyes of the law.  They

19   tell them, Well, hey, talk in person, talk on the phone,

20   right, versus sending multiple emails, right, versus putting

21   things in writing.

22        Folks, they're not shy about it.  They explicitly tell

23   their employees why they're doing this, right?  Because emails

24   and other written documents, they might end up in the hands of

25   Government regulators, and they specifically say the FDA.

1      So, folks, everything is kind of done with a wink and a

2  nod, right?  Basically, Janssen -- they put absolutely

3  unrealistic expectations on these salespeople, and they

4  threaten to fire them if they don't meet those goals.

5      And then they go hand them, right -- they hand them all

6  of the tools, all of the off-label tools that they would need

7  to promote these drugs into segments they're not supposed to.

8      But then they try to wipe their hands of it, right?

9  They try to cover their tracks.  This is just for internal

10  purposes, right, for educational purposes, knowing full well

11  that these employees are taking this stuff out in the field

12  and selling these drugs off-label.

13      For example, folks, you'll learn that Janssen had

14  national salespeople.  Right?  They gather up the sales force

15  from across the country once or twice a year, and

16  the executives, they have them break out into, you know,

17  groups by region.  Okay?

18      Janssen would actually have these employees -- they

19  would role play; they would practice; they would rehearse

20  selling these drugs off-label.  Right?  I mean, sometimes

21  they'd do it with one of their managers.  Right?

22      You'll hear the name Nancy Bartnett.  She was heavily,

23  heavily involved in the scene.

24      Sometimes Janssen would actually hire outside actors,

25  like doctors, to come in so their salespeople could practice.

1    And people are going to tell you that from the witness stand.

2         Then, of course, Janssen tries to cover its tracks.  It

3    tells them, Well, this is just an educational exercise,

4    knowing full well that they are taking this stuff out into the

5    field into doctors' offices and selling these drugs off-label.

6         Janssen also spends inordinate amounts of time, right,

7    way too much time educating their employees, their sales force

8    on what are known as off-label studies.  You'll hear about

9    these during the case, but basically what they are, these are

10   studies that say, regardless of what the label says, Intelence

11   is actually good for once a day.  Or Prezista is actually okay

12   for patients' lipids.

13        None of this stuff is FDA approved.  All of it, by

14   definition, illegal for these people to use for promotional

15   purposes.  Right?

16        And what you will see is that these studies, they're

17   not worth the paper they're written on.  I mean, this is an

18   example, folks, of one of those studies.  This is a study that

19   they're discussing, comparing Prezista to Reyataz.  I mean,

20   you can probably see what doesn't make sense about that right

21   there.  This is an HIV drug that they're using in a study on

22   healthy patients.  Right?  Patients that don't even have HIV.

23   And they're studying cholesterol and lipid levels; they're

24   doing it for 21 days.

25        I mean, you don't need to be a doctor, right, to know

1   that 21 days isn't going to show you much about whether

2   something impacts your cholesterol or your lipid levels.

3        And you can see that even the company's employees,

4   right, they're asking, I don't understand why the

5   investigators did this other than just trying to improve the

6   results of the study.

7        But Janssen takes off-label, illegal studies like this,

8   and they teach their employees it.  They make them memorize

9   the conclusions of the study.  They actually give them binders

10  of these things to carry around in the field.  And they tell

11  them, they emphasize, Hey, doctors need to know this

12  information.

13       But then they put a little disclaimer -- right -- a

14  little disclaimer, educational purposes only.  Again, knowing

15  full well, full well that stuff is going to be taken out into

16  the field and used to sell these drugs to population segments

17  and for uses that aren't approved by the FDA, the FDA has not

18  found to be safe and effective.

19       You will also learn that Janssen would abuse things

20  called medical information requests, or MIRs.  Okay?  These

21  are basically ways that a doctor, right, in writing could

22  request specific off-label information from a company for a

23  specific patient from the scientists, from the doctors, the

24  medical people within Janssen.  Not the salespeople but the

25  medical people.

1    You'll hear more about these.  All you really need to

2  know right now is that under ordinary circumstances, right,

3  MIRs are pretty rare.  Right?  Salespeople say, Usually I get

4  maybe one a month.  In Janssen's own policies and the law make

5  crystal clear that they have to be requested by the doctor.

6  Right?  They can't be used as a promotional tool.  The

7  doctor's request has to be spontaneous.  Okay?  This is for

8  education, scientific; it's not promotional.

9    What the company does, folks, it takes this; it turns

10  it on its head; it teases their employees to prompt these

11  MIRs.  Sometimes people just offer them.  Sometimes they just

12  take the end result and hand them out to the doctors.  They

13  take something that is supposed to be scientific and

14  spontaneous, the salesperson is supposed to have no control

15  over whatsoever, and they turn it into a sales tool to spread

16  this off-label information throughout the country.  Right?

17    They basically take something that the salespeople or

18  the salesperson should have really no involvement in

19  whatsoever other than passing on the request, and they turn it

20  into a metric by which to judge the salesperson's performance.

21  Right?  Those folks that have high numbers -- and they track

22  all this by salespersons like no other pharmaceutical company

23  does -- people that have high numbers, they're held out as an

24  example.  Those that have low numbers, they're reprimanded.

25  And you'll see this in their documents.  Okay?

1    This is a Janssen document that you will see in this

2  case.  You can see there, in the second bullet point, MIR

3  forms are being widely used to get the 48-week data -- you

4  will learn that that's off-label, illegal information for them

5  to spread -- into the hands of all our customers.  And look

6  where it is.  Right?  I told you these are supposed to be

7  spontaneous.  Janssen should have no control whatsoever when a

8  doctor requests this.  It's in their business plan.  It's a

9  tactic that they implemented to sell the drug.

10    Folks, you will ultimately learn that Janssen used all

11  of these methods I've discussed and more to spread these

12  off-label messages to doctors throughout the country.  Those

13  people on that sales force that embrace these messages, they

14  succeeded.  And those that didn't, they were put on

15  performance improvement plans, and they were ultimately

16  terminated from the company.

17    And, in fact, you're going to hear that at one point

18  the president of the company put 60 percent of the Janssen

19  sales force on a performance improvement plan.  And all of

20  these salespeople are going to talk to you about the toxic

21  environment within Janssen and how everyone was pushed and

22  pushed and how off-label information was disseminated, and at

23  the end of the day, people had no choice:  Either get on board

24  with the company's policy, or get out the door.

25    The second part, right, of Janssen's unlawful scheme

1    was the illegal use of what are known as "speaker programs."

2    This is basically the simplest form.  This is where a

3    pharmaceutical company pays one doctor to go talk to other

4    doctors about their drug.

5         You will learn that speaker programs are highly

6    regulated, they are highly risky, and that Janssen knew all

7    this.  Right?  It knew all this because it had been down this

8    road before.  It had been in trouble for this exact stuff

9    before.  These programs are risky, right, because they cannot

10   be used to spread off-label information to these doctors, and

11   those payments cannot be used as an inducement.  Right?  You

12   cannot give doctors speaker payments to get them to prescribe

13   more of your drug.  You cannot induce them.  It is a kickback.

14   And you will learn that that is exactly what Janssen did.

15        I told you earlier Janssen paid doctors over

16   $17 million in speaker payments.  It generated almost $230

17   million for the company in return -- ROIs.  That's a term

18   you're going to hear in this case, return on investment.

19        Some of these top prescribing doctors, they make 200-,

20   300-, $400,000 a piece.  And all of this is done to influence

21   their prescribing.  Right?  Janssen expected, and they

22   received, prescriptions in exchange for these payments.  These

23   witnesses will tell you, you'll see in the documents these

24   speaker fees were used to get low prescribers, right, that

25   were prescribing other HIV drugs to get their Prezista and

 1   their Intelence prescriptions up; those payments were used to

 2   award high prescribers, keep them prescribing at a similar

 3   level; the more that these speakers were willing -- or excuse

 4   me.  The more that these doctors were willing to prescribe,

 5   right, the more opportunities they got to speak and get paid.

 6   And Janssen tracked all this.  They tracked the number of

 7   prescriptions by speaker.  Right?  And those speakers that

 8   didn't prescribe, they got cut from the program.

 9        And you're going to hear that education, credentials,

10   speaking ability, all of that was second fiddle.  All right?

11   What Janssen really cared about, is this doctor going to

12   prescribe our drug, and is this doctor willing to go speak

13   off-label to other doctors at these promotional events?

14        In fact, see, that was one of the criteria.  Janssen

15   specifically sought out doctors that were willing to promote

16   these illegal, off-label messages.  But, of course, I told

17   you, Janssen is smart.  These guys are sophisticated players.

18   They have a huge compliance department.  They know the rules.

19   Right?  They've been in trouble for this stuff before.

20        So they don't, folks, they don't -- they cannot put on

21   speaker programs that are Janssen-sponsored and just have the

22   doctor speak off-label.  The FDA would come crashing through

23   the doors.  So what do they do?  Well, they had a slide deck

24   they're going to present that they have to send to the FDA for

25   approval.  Right?  They send the slide deck to the FDA.  It's

1    all on-label, perfectly lawful information.  They have the

2    slide deck.  It comes back, a slide backup off-label slides.

3    And then Janssen goes and they put plants, they put plants in

4    the audiences of these events to ask off-label questions.

5    Right?  To make it look like that discourse is completely

6    spontaneous.  Right?  To separate themselves from that

7    conduct, knowing full well their own policies say they can't

8    do this.  They know they can't do it, and they do it

9    nonetheless.

10         And you will hear that these practices were pervasive.

11   Right?  They were using plants spreading off-label, illegal

12   messages in virtually in all of these speaker programs.

13         Finally, you'll hear about the excesses of these

14   programs.  Right?  Now, a lot of these -- a lot of these

15   witnesses, they were salespeople before or after Janssen and

16   other pharmaceutical companies, so they've done these speaker

17   programs before.  And they'll tell you they're supposed to be

18   educational, right, they're supposed to be proportional to a

19   need, and they're supposed to spread on-label information,

20   right, approved uses of the drug.

21         So most of these programs, folks, they have maybe a

22   speech a month, a speech a quarter.  Janssen averaged three

23   speeches every single day during the almost eight-year

24   relevant time period.  They gave almost 9,000 speeches during

25   that time period, right?  many of which are at high-end

1    restaurants -- or at least some of which are at high-end

2    restaurants.  Right?  Doctors are wined and dined, free steak

3    dinner, free alcohol.

4         Most of these programs, they rely on a small group of

5    speakers.  They look at doctors that actually speak to a

6    sitting audience.  Right?  Someone who has particular academic

7    credentials, was involved in the actual research of the drug.

8         Janssen had hundreds and hundreds of different

9    speakers.  Right?  Basically, anybody that would prescribe the

10   drug or speak off-label, they were eligible to get paid by

11   Janssen.  And these salespeople we're going to talk about,

12   sometimes, you know, the salespeople, they were in charge of

13   these speaker programs, and they were responsible for giving

14   the venue together.  And they're going to tell you, Sometimes

15   we struggled just to find people just to put in the audience,

16   right, because there was so little need for another speech.

17   They had to do it, right, because they had to create that

18   facade so they can give the doctor a check.

19        You'll learn that Janssen paid doctors to train other

20   doctors for these speaker programs, who are then trained to

21   listen to the training.  Janssen would fly doctors to

22   five-star resorts to participate in, quote-unquote, marketing

23   surveys, all expenses paid, right, beautiful locations, come

24   in the night before, wined and dined.  Right?  Best

25   restaurants in town, meals, alcohol, all with the goal of

1    influencing their prescribing, in getting them to prescribe

2    the company's drugs.

3          Folks, this, right here, this is an internal Janssen

4    document that we received in discovery.  This is what their

5    speaker programs were about.  Right?  Doctors and dollar

6    figures.  How many dollars has that doctor generated for us?

7          You will see that, folks, during these times when the

8    federal Government was cracking down on these programs because

9    of their excesses, because of their risks, at a time when

10   Janssen itself was in trouble for that same conduct, their

11   outside vendor who they hired told them they had the highest

12   spend per attendee of any company they had seen in the last

13   ten years.

14         Look, these programs, they were about one thing at the

15   end of the day.  Right?  They were about buying the loyalty of

16   these doctors.  Right?  Taking them from being loyal to Abbott

17   or another pharmaceutical company, getting them to be loyal to

18   us so they will prescribe our drug.

19         And you know what, folks, it worked.  It worked.

20   You're going to hear expert testimony -- I'm going to talk

21   about him a little bit more in a second -- from Professor

22   Israel Shaked.  He is a statistician.  Right?  He's looked at

23   the numbers; he's examined the steps.  And you know what he's

24   going to tell you?  He's going it tell you that the statistics

25   bear out, they demonstrate that the more Janssen paid these

1    doctors, the more of the drug they prescribed.  And it went up

2    and up down the line.

3         Folks, in addition to Professor Shaked, who I will talk

4    about in a second, you're also going to hear from other

5    experts.  Dr. Aaron Glatt, up there in the upper left-hand

6    corner, he is an HIV specialist.  He has been treating this

7    disease for nearly 40 years, basically since the inception of

8    the epidemic.

9         He is the chief of medicine and the head of infectious

10   diseases at a prestigious hospital.  Right?  He's a professor,

11   teaches classes, oversees hundreds and hundreds of other

12   doctors.  He's going to tell you that the messages that

13   Janssen was spreading, none of them were supported by the FDA

14   approved label during the relevant time period.  None of them

15   were supported by relevant medical guidelines.  Right?  In

16   other words, that promotion was for uses that weren't

17   medically accepted.  Right?  Uses that weren't reasonable and

18   necessary for patients.

19        Dr. Glatt is also going to talk to you about these

20   off-label studies, and he's going to tell you that these

21   studies -- first of all, they're so many, often funded by

22   Janssen, often conducted by multiple Janssen employees.  He's

23   going to tell you they were fatally flawed.  Right?  It had

24   none of the academic -- or none of the scientific rigor that's

25   required for FDA approval.

1    Virginia Evans.  Virginia Evans was a federal

2    prosecutor for nearly 25 years.  Right?  She investigated

3    health care offenses just like the ones in this case.  She's

4    become a compliance expert.

5    She's going to tell you that Janssen's speaker

6    programs, they violated well-established Government standards

7    for how these programs are supposed to be funded.  They

8    violated Janssen's own internal policies.

9    And Ms. Evans is also going to show you, folks, she is

10   going to show you that a compliance program, all right, no

11   matter how pretty it looks on paper, no matter how many

12   documents a company can have, how many policies they have, it

13   is absolutely worthless if it doesn't actually stop

14   violations.  Right?  The purpose of compliance is to stop

15   violations; it's not to cover your tracks.  And that is a

16   consistent theme that you're going to hear in this case.

17   Janssen puts one thing in writing, and they tell their

18   employees to do the exact opposite.

19   Folks, George Sillup, a prof- -- he is a professor of

20   pharmaceutical advertising, of marketing.  All right?  He

21   actually used to work in sales and marketing for Johnson &

22   Johnson, several years ago.  In fact, he's going to talk to

23   you -- this man, he carries around the Johnson & Johnson

24   credo.  That's how much respect he had at one point for the

25   company.  And this credo talks about -- and this is great.

1   They may show it to you.  It talks about putting your

2   employees first, your customers first, right, patient first.

3   You know what's at the very bottom of their credo?  Profits.

4   And the credo says, We have to pay for our mistakes.

5       And you know what you will learn, ladies and gentlemen?

6   At some point Janssen, right, Janssen took a wrong turn,

7   right?  They flipped the script.  They ripped the credo up.

8   You guys get to decide.  But they went the other direction.

9       Professor Sillup is going to talk to you folks about

10  marketing.  He studied this stuff.  He's going to tell you

11  that pharmaceutical marketing, it works.  Right?  All of the

12  literature, the research, the practical experience over the

13  years, it's a fact the stuff works.

14      He's also reviewed the documents in this particular

15  case, and he's going to tell you that these off-label

16  messages, that they worked, they influenced doctors.

17      He's also going to tell you that he's looked at the

18  broader evidence in this case, right, the internal Janssen

19  documents, the emails.  He's going to tell you that that

20  evidence, not the testimony of these witnesses, but that

21  broader evidence, right, it supports what the Relators are

22  saying in this case, not Janssen.

23      Finally, I mentioned Professor Israel Shaked.  He is a

24  retired professor of finance, economics, and statistics at

25  Boston University.  He's a brilliant, brilliant professor.

1    He's going to show you the damages that the Government

2    suffered, the money that Janssen wrongfully took from the

3    Government and owes back.

4         He's also going to show you, he's a going to

5    demonstrate to you with statistics that Janssen's off-label

6    marketing worked.  He will show you and tell you that those

7    doctors that were exposed to these off-label messages, they

8    prescribed the drug off-label more than those doctors know.

9    And here's the important part, right?  The more they're

10   exposed, the more they prescribe.

11        It's the exact same thing, that Janssen kickback

12   sales-schemer payments.  Right?  The doctors they pay

13   prescribe more than the doctors that don't.  The more they pay

14   the doctors, the more they prescribe.

15        Professor Shaked is going to tell you that the chances

16   of all this just being a coincidence, a statistical

17   coincidence, is one in a billion.  It's like winning the

18   lottery.

19        Finally, I want to end by just talking about a few key

20   issues in this case.  Folks, none of Relators' witnesses are

21   going to take this witness stand and tell you these are bad

22   drugs.  Okay?  That's not what this case is about.  But these

23   drugs were approved for a very, very limited purpose.

24        And none of these witnesses are going to take the stand

25   and tell you it's wrong to make money or wrong for

1     pharmaceutical companies to make money.  Right?  We all need

2     to make money.  There's nothing wrong with that.

3          But what was wrong was Janssen making money by

4     illegally marketing their drugs for uses that the FDA had not

5     approved.  You know what, folks?  They're not going to tell

6     you any different.  They are not going to tell you, because

7     that was illegal.

8          When Janssen would market these drugs for off-label,

9     unapproved uses, they were putting patients -- they were

10    taking them into dangerous territory.  Right?  This is

11    territory where the drug isn't proven, the drug is potentially

12    unsafe, and it's certainly not paid for by the federal

13    Government.

14         Another issue in this case is going to be the

15    credibility of witnesses.  I told you earlier:  Seven Janssen

16    insiders, five of whom have no financial interest in this

17    case, all of whom are going to tell you the same thing.  And

18    you guys are going to get to decide.  Okay?  You get to ask,

19    Are what these witnesses saying, is it consistent with one

20    another?  Do they remember those types of details that I would

21    expect to hear, right, from someone that was telling the

22    truth?  Do they speak with conviction and passion?

23         And you're going to get to compare that to what you

24    hear from Janssen witnesses.  And what you hear from them is

25    going to be a lot less satisfying.  "I don't remember.  I

1    don't recall.  I wasn't there."

2        You guys can decide.

3        Look, we're not going to make you wait until they put

4    on their case, folks, for you to hear from these witnesses.

5    We are going to call Janssen's key witnesses in our case in

6    chief.  And we're going to put them on the witness stand, and

7    we're going to let you hear them for yourselves.  We're going

8    to call their president, Glenn Mattes.  Right?  We're going to

9    call their chief compliance officer for a large portion of

10   this time period, Catherine Kaucher.  We're going to call

11   Nancy Bartnett.  Right?  You're going to hear from them.  You

12   might hear from them on recording.

13       Another issue in this case, folks, is going to be

14   Janssen's compliance program.  And what the evidence will show

15   about Janssen's compliance program is that it does not work.

16   It doesn't work, because it was the same compliance program

17   that was in place in 2010 when Janssen and its affiliates got

18   in trouble and had to settle allegations for this exact same

19   conduct, right?  Off-label marketing, different drugs, same

20   conduct.  Marketing drugs for illegal, off-label uses.

21       It's the same compliance department that was in place

22   in 2013, all right, when Johnson & Johnson and Janssen, right,

23   settled allegations.  Again, same allegations in this case:

24   marketing their drugs for unapproved uses, paying kickbacks to

25   doctors through speaker programs.

1    And in addition to showing their compliance department

2    doesn't work, folks, all of this shows you they know, they

3    know this is wrong, right?  They know they can't do it.  They

4    know the Government cares about it, and they know the

5    Government requires the money to be paid back when they do.

6    This is how Janssen's compliance department worked.

7    These are the types of warnings that the compliance department

8    would give on paper internally.  Right?  False Claims Act,

9    right, largest health care recovery by the United States,

10   laboratories excluded from federal programs.  Right?  You

11   can't offer physicians trips and other benefits in exchange

12   for prescriptions.  This is what the compliance, at least the

13   presentation, is telling them not to do.

14   But, look, what did I just tell you the evidence is

15   going to show, ladies and gentlemen?  They basically take the

16   compliance warnings, and they turn it into their business

17   plan.

18   The final issue I want to talk to you about is some of

19   these doctors.  Right?  There were over 5,000 influenced

20   doctors.  Those doctors received hundreds and hundreds of

21   thousands of marketing contacts from Janssen.  The reason we

22   know that is because they tracked it all.  All right?  So we

23   received that information in discovery.  Over 300 of those

24   doctors are paid speakers.  They are on Janssen's payroll.

25   Folks, out of that universe, out of that universe of

1    doctors, right, a couple of them may show up in this

2    courtroom.  They may testify.  And they might tell you, Hey, I

3    wasn't even paid to -- I didn't change my behavior.  Folks,

4    Janssen itself is saying something different to you during the

5    relevant time period.  Janssen spent hundreds of millions of

6    dollars on its marketing, had a sales force of a hundred

7    strong, 9,000 speaker programs.  Year over year they put more

8    money into the marketing budget.  The whole purpose of that

9    was to influence doctors.

10         Folks, and their own documents show that it worked.

11         Don't listen to what Janssen tells you today.  Listen

12    to what they told you back then, during the relevant time

13    period.  This is what Janssen was saying about its ability to

14    influence doctors during the relevant time period.  We change

15    prescribing behavior, right?  And that's not just empty

16    conjecture.  They have the stats.  In fact, they have the

17    tracking to back it all up.  Janssen paid outside vendors to

18    tell them, How do we influence doctors?  The outside vendors

19    told them speaker programs are an effective way to make a

20    lasting impact on prescribing behavior.

21         And the doctors, right, the doctors told Janssen the

22    same thing.  I mentioned these marketing surveys, right, that

23    would be at these five-star resorts.  This is what the

24    doctors -- this one is in Puerto Rico -- this is what the

25    doctors would tell Janssen.  Right?  The physicians -- the

1    marketing campaign had been impactful in the past.  There is

2    an opportunity to change our current prescribing habits

3    through marketing and education.

4        You know what, folks?  Professor Sillup, he is going to

5    tell you that this marketing worked, and Professor Shaked, he

6    is going to show you that it worked with the statistics.  I

7    guarantee you, Janssen will not have a response to Professor

8    Shaked's statistics, because they haven't had a statistician

9    look at any of this.

10       Folks, by the end of this case, you will have heard

11   from seven, seven Janssen insider witnesses:  top of the

12   company, down to the ground.  Right?  Each of them is going to

13   take that witness stand; they're all going to tell you the

14   same thing.  Janssen paid doctor kickbacks.  They marketed the

15   drugs for unlawful, unapproved uses, and that direction came

16   from the top of the company.

17       You will see documents that corroborate, more documents

18   than I showed you now, that will corroborate what those

19   witnesses are saying.  You will hear expert testimony that

20   shows you that what they're saying is true.  And when you sit

21   back, like the judge told you, right, common sense.  Right?

22   That's really where all of this will end up when you're back

23   there deliberating.  Your common sense.  Your experience.

24   What makes sense to you.

25       When you sit back and you apply your common sense to

1  the weight of the evidence that you see, right, we are

2  confident that you will come to the conclusion that what

3  Ms. Brancaccio and what Ms. Penelow alleged, it happened.

4  Right?  And that is your job as factfinders, to decide did

5  this happen?

6       We will ask you to find Janssen liable, hold them

7  responsible for their conduct, make them return, folks, make

8  them return the over $700 million that they unlawfully,

9  illegally, and wrongfully took from the Government and

10  retained for the last 12 years.

11       Thank you.

12       THE COURT:  All right.  Thank you, Counsel.

13       Folks, I think we'll take a ten-minute break at this

14  point before we do the defense opening.  But I want to -- a

15  quick question for the jurors.  Look, I anticipate that these

16  monitors are going to be used throughout the trial.  I don't

17  know how great my 1950s movie projector screen is out there.

18  I know that jurors on this side usually refer to this monitor.

19  And that monitor seems to be pushed back too far for jurors

20  that are farther away for me to use.

21       Do you want me to make some adjustment during the break

22  to that monitor, folks?  All right.  I'm going to make some

23  adjustments.  We'll figure out the seating where you folks are

24  with the Relator's side.  But I think that monitor has got to

25  be in better usage, I think, moving forward.

1          So with that, let's take a ten-minute break, folks, and

2     then we'll be back.

3               THE DEPUTY COURT CLERK:  All rise.

4          (Jurors exited courtroom.)

5               THE COURT:  Folks, you may be seated.

6          I don't know what to do here, but I want to make some

7     adjustments during the break to that monitor.  It's pushed

8     back too far.  I wasn't going to interrupt the opening.  I

9     don't think it impacted the opening at all.

10         But I think moving forward with documents or other

11    exhibits, in my experience in this courtroom, a lot of jurors

12    on that side always look to that monitor.  All the jurors on

13    this side always look to this monitor.

14         This is pretty far, and based on lighting and all the

15    other things, sometimes it's difficult to see.  Although

16    they're happy to refer to it, and I'll keep it open.

17         So can we take -- can we figure out how we're going to

18    see it over here and how we're going to adjust that monitor?

19         Or, Kim, maybe you can work over there and just figure

20    this out.

21         All right.  I mean, we're in recess, folks, for ten

22    minutes.  Do what you need to do, but I'm going to have to

23    play with this monitor.

24             (A short recess occurred.)

25             THE DEPUTY COURT CLERK:  All rise.

1              THE COURT:  Ms. Brown, are we ready to get the jury?

2              MS. BROWN:  We're ready.  Thank you, Your Honor.

3              THE COURT:  All right.  Let's go.

4              THE DEPUTY COURT CLERK:  All rise.

5              THE COURT:  Folks, everybody be seated.

6         Really quick on this monitor, should we just push it

7    back a little bit?  Is that a little bit in your folks field

8    or is it sufficient where it is?  Keep it?

9         All right.  I'm going to keep it as is for now, and

10   then we'll restructure seating at another time.

11        Ms. Brown, are you all ready for your opening

12   statement?

13             MS. BROWN:  I am, Your Honor.

14             THE COURT:  You may proceed when you're ready.

15             MS. BROWN:  Is my mic on?  Yeah.  Okay.

16        Good morning, everyone.  Thank you all for coming back

17   today.  We met a little bit yesterday at sidebar, but my name

18   is Alli Brown, and I'm here with my colleagues Geoff Wyatt and

19   Brad Klein on behalf of the folks at Janssen.

20        So the lawyer for the Relators just said some real bad

21   things about Janssen, and he made some very serious

22   allegations about the people who work there.

23        And what you just heard is that in this case, the

24   Relators, Ms. Brancaccio and Ms. Penelow, have asserted things

25   like we were liars.  We just heard this morning claims that we

1    lied, that we intentionally misled HIV doctors and that we

2    bribed them to prescribe medicines they otherwise shouldn't

3    have.

4        And Ms. Penelow and Ms. Brancaccio have chosen to raise

5    those allegations for the first time now in a lawsuit for

6    almost a billion dollars of which they stand to gain a

7    significant portion.  And the fact is that's their right.

8        Our great justice system gives them the absolute right

9    to raise for the first time, in a lawsuit for a whole lot of

10   money, the allegations you just heard about.  But the law also

11   places on them a burden.

12       Relators and Relators alone have a burden in this

13   lawsuit of proving to you that all the horrible things we just

14   heard about are true and are supported by the evidence and are

15   supported by the facts.

16       This case is about medicines that were reimbursed by

17   the Government, and the Relators and the Relators alone have

18   the burden of proving to all of you that it is more likely

19   than not, right -- they got to get enough evidence on that

20   scale to lift it up to more than 50 percent.

21       They have the burden of proving to you that it is more

22   likely than not that our Government was defrauded when it paid

23   for HIV medicines that were prescribed to HIV patients, that

24   were used to treat HIV and work.

25       There is no one who's going to come into this courtroom

1    and tell you that these medicines didn't work because that's

2    not the truth.  There's no one who's going to come in here and

3    tell you that these HIV patients didn't need HIV medicines

4    because that's also not the truth.

5         In fact, during the course of the lawsuit, you are

6    going to get to hear from some of the brave men and women who

7    have been doctors on the front lines of treating HIV for

8    decades, doctors who have seen themselves patients stay alive

9    because of the two medicines that are at issue in this

10   lawsuit.

11        These doctors prescribed these medicines.  They met

12   with our sales reps.  They were speakers in our speaker

13   program.  And you're going to get to hear from some of them

14   who are going to come in here and tell you that the

15   allegations that are being made in this lawsuit are not true

16   and are not supported by the evidence and are not supported by

17   the facts.

18        What the evidence in this case is going to show,

19   everyone, is that HIV is a terrible disease and that not that

20   long ago it was a death sentence.

21        HIV, you're going to hear, is -- has taken the lives of

22   almost 40 million people.  86 million people have been

23   affected with HIV since it was first discovered in 1981.  And

24   unfortunately, almost half of those folks have died from the

25   disease.

1    You're going to hear the trajectory of HIV.  So it

2    started actually in California.  There were a group of folks

3    who were diagnosed with a sort of rare cancer that doctors

4    couldn't figure out what it was, but they knew it was

5    compromising these patients' immune systems, and this was

6    1981.  It wasn't even that long ago.

7    And by the end of that year, researchers had officially

8    discovered the disease HIV.  There were about 380 people who

9    were diagnosed with HIV in 1981.  By the end of 1981, almost

10   half of those folks had lost their lives, and in large part,

11   the reason was because we had no idea how to treat this deadly

12   disease when we first discovered it in the 1980s.

13   By the middle of the 1980s, HIV had truly become an

14   epidemic, and by the end of the 1980s and into the 1990s, we

15   were losing the battle of how to figure out to keep these

16   folks alive because we had not discovered a medicine that

17   could fight the virus.

18   We're going to bring you an HIV expert who will come in

19   here and talk about the disease and talk about what medicines

20   like Prezista and Intelence are doing to try and suppress the

21   virus, to try and keep the virus at an undetectable level.

22   But at this time period in the 1980s and the beginning

23   of the 1990s, we didn't have any medicine that could do that.

24   And so one of the things that happened is our Government

25   responded.

1    You're going to hear that in 1992, the FDA created

2    something called the accelerated drug approval process,

3    because something many of you may know is that it takes a very

4    long time to get a medicine approved in our country.

5        You got to do a lot of studies.  The FDA has to review

6    them.  There has to be a label that gets approved, and that's

7    a good thing, but it can take time.  And when it came to HIV,

8    we didn't have time in the 1990s because people were

9    unfortunately passing away.

10       So the Food and Drug Administration came up with this

11   drug approval process that allowed us to get this first wave

12   of HIV medicines to market a lot faster than we normally

13   would.

14       And this HIV expert that we have who's going to come

15   in, Dr. Rosenberg, he sort of helped me learn a little bit

16   about HIV as I was getting ready to talk to all of you, and

17   here's how he described it to me, which I thought was helpful.

18       He said, Alli, HIV is like a train, like, barreling

19   down the tracks to a cliff, and that cliff is AIDS, and he

20   said, What we as doctors are trying to do when we're trying to

21   find the right medicine for these types of patients, we're

22   trying to do two things:  One, we're trying to put the brake

23   on the train.  We are trying to slow down the replication of

24   the virus so that the body can fight infections and so that

25   the body's T-cells, the part of the body that fights

1    infection, can increase.

2        And so he says, You want to slow down the rate of

3    replication, and you want to add track so you can back away

4    from the cliff.  And those were sort of the two focuses of

5    what doctors were looking for in medicines.

6        And by about the mid-1990s, we had the first wave of

7    medicines come to market, and these were called antiretroviral

8    medicines, and they worked okay for the first couple of years.

9        So one of the things you're going to hear about is how

10   HIV spreads and how HIV can sort of outsmart medicines

11   sometimes.  So what happened in the 1990s, we had these

12   first-generation medicines, and they were effective for a

13   short period of time.  They came in, and they were able to

14   block certain mutations and certain variations of HIV.

15       But the problem was the disease was smarter than us.

16   The virus was smarter than these first-generation medicines,

17   and so pretty quickly, the virus just mutated.  It just

18   changed, and it formed in a way that these first-generation

19   medicines didn't work anymore.

20       And the problem with something like that when you have

21   a very -- a disease that transmits quickly through the

22   population is that very quickly we started to have strains of

23   HIV in the population that we had no medicines that would

24   respond to.

25       We had a public health crisis once these

1    first-generation medicines stopped being effective against the

2    virus -- against mutations of the virus.  And that's where

3    these medicines that we're here today about, Prezista and

4    Intelence, come into play.

5         So they are second-generation medicines, and they were

6    developed by two scientists at the time that were in Belgium,

7    Dr. Janssen and Dr. Stoffels.  Dr. Stoffels had actually spent

8    a fair amount of time in Africa learning about HIV and

9    researching HIV.

10        And they had a research center in Belgium, and they

11   were studying and developing new and better HIV medicines that

12   would have what are called high barriers to resistance.  So

13   what that means is while these first-generation medicines were

14   only effective against the green and the yellow and they were

15   unable to help us with the purple, the second-generation

16   medicines, like ours, like Prezista and Intelence, they had

17   high barriers to resistance.

18        They worked against more strains of the virus, and that

19   was critically important, particularly at this time because it

20   prevented a spread in the population of a variant of the

21   disease that we couldn't control.

22        And what you're going to hear is that's why the FDA

23   granted both of these medicines early approval.  That's why in

24   2006 the FDA approved Prezista, and very shortly thereafter,

25   in 2008, the FDA approved Intelence, because these

1    second-generation medicines truly were a safety net for people

2    who had failed on the first-generation medicines.

3        Because before these medicines came to market, if your

4    virus was no longer responding to the first-generation

5    medicines, doctors had no option.  There was nothing we could

6    give patients who had a virus that didn't respond.

7        So these medicines, and nobody's going to dispute it --

8    these medicines were critically important, particularly at the

9    time that they were developed.  And everybody who comes in

10   here -- even Ms. Penelow and Ms. Brancaccio, who are suing us,

11   everybody is going to agree that these were lifesaving

12   medicines.

13       And I thought I heard in counsel's opening Ms. Penelow

14   and Ms. Brancaccio described to you all as former employees of

15   Janssen, but what you're going to hear and what the evidence

16   is going to show is that Ms. Brancaccio is actually still our

17   employee today.

18       Today and for the entire time period in this case and

19   before, Ms. Brancaccio had worked for us as a sales

20   representative.

21       What the evidence is going to show is that our

22   Government mandates access to Prezista and Intelence and all

23   antiretroviral medicines because they are critical to help HIV

24   patients stay alive.

25       You're going to hear and you're not going to be

1  surprised to learn that we have a national strategy to provide

2  easy, unfettered access to HIV medicines.  We have task force

3  and agencies in our country that are devoted to coming up with

4  a plan for how we can best offer patients medicines that will

5  save their lives.

6        And when it comes to HIV, the directive from our

7  Government is that medicines be accessible to people who need

8  them.  And you see here down at the bottom, the national

9  strategy directs the federal Government and the state

10 Government to ensure access to appropriate HIV treatment by

11 promoting unimpeded or unblocked coverage to all HIV medicines

12 that are listed in the HIV treatment guidelines.

13       So the HIV treatment guidelines are something that

14 you'll hear a lot about in this case.  They are put together

15 by a panel of experts every year.  There's about 30 experts

16 from around the country that put together these guidelines.

17       And they include leading top-flight HIV doctors, and

18 they also include doctors from the Government, from the FDA,

19 from the CDC, and they put together recommendations for how

20 doctors who are facing this disease should treat their

21 patients.

22       And what the Government says is we should look to these

23 guidelines when we think about what medicines we want to

24 reimburse.

25       You're going to hear that Intelence and Prezista, our

1    medicines, have been recommended by our Government in these

2    guidelines every single year since they have been approved by

3    the FDA.  Even today, the medicines remain recommended in the

4    guidelines.  You're going to hear not only are they

5    recommended, but Prezista has actually been one of two

6    preferred medicines in its class since 2008.

7         So I want to talk to you a little bit, particularly in

8    light of what we just heard, about what this case is actually

9    about.

10        So the agency of the Government that sets those

11   guidelines is called the Department of Health and Human

12   Services.  And under the Department of Health and Human

13   Services are a number of different Government agencies.  So

14   you all may have heard of the CDC, the Centers for Disease

15   Control.  That's an agency under HHS, or the Department of

16   Health and Human Services.

17        NIH, the National Institutes of Health, they're also

18   under HHS, but the two agencies we're going to talk the most

19   about in this case are the FDA and CMS.

20        The FDA, as we heard a lot about this morning, is in

21   charge of approving medicines to be sold, and when they

22   approve medicines, they also approve what you know to be like

23   the product label, the piece of paper that comes with the

24   medicine or is attached to medicine that you buy at a

25   pharmacy.  That's what the FDA does.

1       And the FDA also has the power to make sure that

2   companies like Janssen are promoting or advertising or

3   marketing medicines in accordance with those labels.

4       Nobody is going to question in this case that we are

5   under an obligation to promote our medicines in accordance

6   with the product label, 100 percent.  And if we don't do that,

7   the FDA has powers to send us letters, to team up with the

8   Department of Justice and investigate us or initiate

9   enforcement actions against us.

10      And none of that is a part of this case.  We heard a

11  lot about marketing and promoting and the FDA and what's in

12  the label.  That's not what this case is about.

13      This case is about the other side of this slide,

14  reimbursement.  This case is about the Government paying for

15  these medicines, and the claims in this case are that the

16  Government shouldn't have paid for these medicines, and if

17  they had only known about the allegations that are being made

18  in this lawsuit, they wouldn't have paid.

19      Those are the claims in the case.

20      What the evidence is going to show is that what's

21  important to the Government is not what's in the product

22  label, is not what the actual package insert looks like.

23      What's important to the Government when it comes to HIV

24  medicines is that HIV medicines are being prescribed for HIV

25  patients in a medically appropriate way, and we'll talk a

1    little bit about how doctors have the ability to determine

2    what way that is.

3         One of the plans that's at issue in this lawsuit is

4    Medicare.  That is a Government program that pays for people's

5    medicines, and under that program, the Relators are seeking to

6    have you award hundreds of millions of dollars.

7         They claim that the Government, Medicare, shouldn't

8    have paid for these medicines.  So let me tell you a little

9    bit what the evidence is going to show about what HIV

10   medicines the Government expects to pay for.

11        The way the Government administers its Medicare program

12   is that it contracts with insurance companies, and those folks

13   are called Plan D sponsors.  They're just like regular

14   insurance companies like you guys know:  Blue Cross, Aetna,

15   companies like that.

16        And they contract with these sponsors to decide and to

17   administer the Medicare program and to submit claims to the

18   Government to be reimbursed.

19        And so this is sort of maybe an easier way to think

20   about how this process works.  A doctor writes a prescription

21   for Prezista, the patient takes the Prezista prescription to

22   the pharmacy and fills it and then the pharmacy sends that

23   prescription to one of these Plan D sponsors, like an Aetna, a

24   Blue Cross, a Blue Shield.

25        And they determine what portion of that should be

1 submitted to the Government to be paid or if it's not

2 appropriate to submit to the Government.  That's their job,

3 the Plan D sponsors.

4        And you're going to hear that Medicare or the

5 Government, they set certain guidelines for what they want to

6 pay for and how they want to do it.  And remember, the

7 Government is carrying out the national policy of making these

8 medicines available to everybody who needs them.  There is a

9 national strategy that everybody have easy access to these

10 medicines.

11       And so the very first thing you're going to hear about

12 when it comes to what medicines the Government wants to pay

13 for, you're going to hear that the Government has put our

14 medicines in a protected class.

15       In fact, the Government has put every antiretroviral

16 medicine in something called a protected class.  They only do

17 that for six types of medicines.  There are six types of

18 medicines that they think are so important to get to

19 vulnerable populations who need them right away that they want

20 to make sure that these plans are being run in a way that

21 makes them accessible.

22       And so the first thing when it comes to whether or not

23 the Government would have paid for these medicines -- the

24 first piece of evidence you're going to consider is that these

25 are in a protected class.  All of these medicines need to be

1    made available.

2         The next thing you're going to see is information from

3    CMS that says they want the Plan D sponsors to accommodate

4    those national guidelines.  Remember those national guidelines

5    that had Prezista and Intelence and how they're one of the

6    preferred medicines?

7         CMS says, when it comes to paying for these medicines,

8    we want these plans to know and accommodate the national

9    guidelines and offer complete treatment options for a variety

10   of medical conditions, and that's HIV.

11        We are one of the diseases that the Government puts in

12   a special class when it comes to making medicines available.

13        One of the things you're going to hear about is that if

14   the Government wants to second-guess doctors when it comes to

15   what they're going to reimburse, there's a lot of ways they

16   can do it.

17        There's something called utilization tools that the

18   Government can have their plan sponsors put in place to

19   double-check that doctors are writing prescriptions in a way

20   that CMS wants to pay for them.  And let me tell you a little

21   bit what I mean by that.

22        For example, the Government can institute something

23   called a prior authorization.  So the Government can say to

24   the sponsors, Before we're going to pay for this antibiotic,

25   you need to make sure that you have a prior authorization from

1    the doctor.  The Government can do that if it wants to

2    double-check that the type of antibiotic that's being written

3    is one that the Government wants to pay for.

4         The Government can also say, I want to see some of this

5    patient information.  Before I reimburse this claim, I want to

6    make sure that this is the right medicine for the right

7    patient, so let me put this utilization tool in place.

8         The Government can also institute something called step

9    therapy.  They can say, Before we pay for antibiotic number 3,

10   we want you to give us evidence that this patient has failed

11   on antibiotic number 1 and antibiotic number 2.  They can do

12   that if they want to make it a little bit harder to get

13   certain medicines approved for reimbursement.

14        And finally, another utilization tool the Government

15   can use is to put limits on the quantity of the medicines it's

16   going to pay for.  So if the Government only wants a medicine

17   to be prescribed twice a day instead of once a day, it can set

18   a quantity limit that requires those prescriptions to be

19   filled in a way that comports with how the Government wants to

20   pay for it.

21        But what you're going to hear about in this lawsuit is

22   that the Government has made clear that none of these tools

23   can be used when it comes to HIV.  None of these utilization

24   tools or efforts to kind of second-guess doctors can be used

25   when it comes to reimbursing HIV medicines.  And that's

1  because HIV medicines are for a vulnerable population that CMS

2  has put in a protected class.

3      You'll see this correspondence actually with our folks

4  at J&J and the Government where the Government makes clear

5  right down there at the bottom, No utilization management tool

6  can be applied to any antiretroviral medicine.

7      And so there are no blockades when it comes to CMS

8  reimbursing for these medicines because CMS is carrying out a

9  national policy to make these medicines available to people

10  who need them.

11      The evidence is going to show that the Government has

12  made an intentional decision not to interfere with HIV

13  treatment by HIV doctors.  You're going to get to see some of

14  the Government documents that talk about that.

15      This is something called a compendium, and it's a

16  resource that the Government points Plan D sponsors to when

17  trying to determine what medicines to pay for.  And you see it

18  talks about the fact that treating HIV is not a

19  one-size-fits-all situation where you can just say, We pay for

20  medicine 1 and not 2, 3 or 4.

21      The Government says, This is an individualized decision

22  that needs to be made by doctors.  The Government defers to

23  doctors when it comes to HIV treatment.  The HIV guidelines

24  make clear that HIV is such a complex disease that it needs to

25  be treated by specialists, and you'll see this part of the

1    guideline.

2        And you're going to hear from the experts about the

3    multiple types of HIV medicines that need to be prescribed in

4    combination in order to be able to properly and effectively

5    treat this virus.

6        There are essentially three different classes, and

7    doctors need to decide how to mix and match those classes of

8    medicines to properly suppress the virus.

9        What you'll hear about is in deciding what medicines

10    are appropriate, doctors can't just do that when a patient

11    comes into the office for the first time.

12        When a patient comes into the office, what you're going

13    to hear is that the first thing the doctor has to do is take

14    blood so that they can run a number of different tests and

15    determine which combination of medicines is going to

16    effectively suppress the virus and help the patient live.

17        And one of the things -- one of the tests that's

18    important when it comes to prescribing a particular medicine

19    is a drug resistance test.  The physician has to know what

20    variant of the virus the patient has and whether or not it's

21    resistant to certain medicines, because if your virus is

22    resistant to Prezista, that doctor can't prescribe you

23    Prezista.  He has to choose another medicine in the class.

24        And so you're going to hear it's a complex decision

25    that the Government wants to be made by highly specialized

1    doctors.  And you're going to hear in the treatment

2    guidelines, in the HIV guidelines itself, the Government talks

3    about how sometimes the very best recommendation for treatment

4    is not going to be that that's approved by the FDA.

5          Counsel talked to you a little bit this morning about

6    something called off-label prescribing.  A lot of times a

7    doctor, in his or her medical judgment, decides that a

8    medicine is right for a patient even though it's not in the

9    FDA label.

10         And we see a lot with medicines for kids.  A lot of

11   time medicines, even like morphine, isn't approved for kids.

12   But if you have a kid who gets in a really serious accident or

13   has an operation or needs pain relief, doctors will sometimes

14   prescribe the appropriate dose of morphine for a kid off-label

15   because it's an appropriate way, in their judgment, to provide

16   pain relief for someone who needs it.

17         Sometimes doctors prescribe baby aspirin to prevent a

18   heart attack as people get a little older, late 40s, early

19   50s.  That's not on-label for baby aspirin, but it's something

20   that doctors, in their medical judgment, sometimes think is

21   appropriate.

22         And nobody in this case is going to take issue with the

23   right of a doctor to do that in his or her medical judgment.

24   We cannot promote to that doctor off the label, but the

25   Government does not want to interfere with a doctor's ability

1    to write prescriptions off-label and have those prescriptions

2    reimbursed by the Government, and they make that clear.

3          You're going to get to see the Government's

4    reimbursement documents that talk about the value of off-label

5    prescribing, how off-label use is critically important,

6    particularly in diseases like HIV.

7          And you're going to see the Government's own documents

8    that, when it comes to reimbursement, CMS doesn't care if it's

9    on-label or off-label.  CMS cares if it's medically

10   appropriate for that patient.

11         Was it an HIV medicine that was prescribed for an HIV

12   patient to treat that HIV?  If yes, the Government pays.  And

13   we went through quite a lot this morning about all of these

14   different types of ways that our medicines can be prescribed

15   and that the Relators in this case take issue with.

16         And all of these different prescribing indications have

17   published data that support their use.

18         Let's just take this treatment-naive category for a

19   second.  So they're claiming in this lawsuit the Government

20   never should have paid for prescriptions that were written for

21   the treatment-naive population.

22         And one sort of factual thing I did want to correct, I

23   thought I heard counsel say that, you know, we had to promote

24   off-label because treatment-naive was the big group of -- big

25   population that we wanted to market to.

1          The facts in the case are going to show quite the

2     opposite.  The treatment-experienced group is the large group

3     of patients.  Treatment-naive is much smaller.

4          But there are some doctors who in their judgment

5     thought treatment-naive was an appropriate patient to give

6     this Prezista to.  And you know what you're going to hear?  So

7     did the FDA.

8          Because after -- less than two years after Prezista was

9     approved, in 2006, it was approved for treatment-naive, and

10    during that two-year period of time where they're claiming

11    hundreds of millions of dollars in damages, during that period

12    of time, data was being published that supported the use of

13    this medicine in the treatment-naive patients.

14         And so you're going to hear for all of these different

15    ways in which doctors could prescribe this HIV medicine, there

16    was scientific data that doctors could use to make their

17    medical judgment about whether it was appropriate, and that's

18    what the Government cares about when they reimburse.

19         Was it an appropriate HIV medicine for the appropriate

20    HIV patient?

21         And some of the best evidence you're going to get on

22    this?  Hundreds of thousands of prescriptions were written by

23    doctors for these complained-about uses who never had anything

24    to do with Janssen.  They weren't visited by a sales rep.

25    They didn't come to a speaker event.  They never talked to us

1    ever.  And they, in their medical judgment, wrote these HIV

2    prescriptions for the ways that the Relators are complaining

3    about in this case.  And those prescriptions were reimbursed

4    by CMS, because CMS only cares that it's the right patient and

5    the right disease.  Everything else, CMS intentionally leaves

6    to the good medical judgment of the physician.

7          CMS has continuously, the evidence will show,

8    reimbursed claims for Prezista and Intelence from the time

9    they first came to the market until today.  Today, early May

10   2024, CMS is reimbursing for these medicines right now.  And

11   the evidence is going to show our Government is well aware of

12   the allegations that are being made in this case.  And they

13   don't make a difference.

14         And CMS has continued to reimburse, despite hearing the

15   allegations that are being made here.  You're actually going

16   to see a detailed memo, like a 20-page memo, that the

17   Relators' lawyers sent to the Government.  You're going to get

18   to see it, and it lays out everything in this case, all of the

19   theories of the case, everything you heard about this morning,

20   their sort of best pitch for why CMS shouldn't be paying for

21   these medicines.

22         And what the evidence is going to show is that memo got

23   sent more than six years ago.  And every single day since

24   then, CMS has continued to pay for these medicines.  And

25   despite the fact that there are nearly 7,000 employees at CMS,

1    not one of them, not one of them is going to come into this

2    courtroom and tell you that they've been defrauded.  No one is

3    going to come in here from the Government and say that they

4    agreed with the claims that are being made in a lawsuit for a

5    lot of money.  And that is going to be enormously telling

6    about the strength of the evidence in this case.

7         What's more, you're going to hear about these sort of

8    tack-on claims, hundreds of millions of dollars that have just

9    sort of been added to the lawsuit, but you're not going to get

10   any evidence about why.

11        There are claims being made for 26, not 50, states --

12   you won't hear why -- claiming that these Medicaid programs

13   shouldn't have reimbursed these medicines.  Nobody from any of

14   these 26 states is going to come in here and tell you they

15   were defrauded.  Nobody from these 26 states is going to come

16   in here and tell you they didn't intend to pay for lifesaving

17   HIV medicine.

18        But wait until you hear how much money they're going to

19   ask you for from the 26 states, with no witnesses and no

20   evidence.  It's going to tell you what's really going on in

21   this lawsuit for a whole lot of money.

22        I want to talk a little bit about our promotion and the

23   work we did to promote medicines that we believe are good

24   medicines and help save people's lives.

25        You're going to get to see extensive policies that

1    Janssen has that prohibit all of the conduct that counsel just

2    complained about.  We have policies about how to interact with

3    doctors, how to interact with the Government, how to run a

4    speaker program, how to promote medicines.  You are going to

5    get to see all of those policies.  And you're going to see

6    that these were not just policies on paper.  We made sure that

7    sales reps like Ms. Brancaccio and Ms. Penelow understood

8    these policies and were monitored to make sure that they were

9    carrying them out.

10        This is the sales rep pledge of ethics, and these are

11   signed by Ms. Penelow and Ms. Brancaccio.  The first day they

12   came to work for us, they pledged they would not do the very

13   things that they're alleging they did for years in this

14   lawsuit.

15        You're going to see -- and this is sort of interesting.

16   Counsel showed you one page of this 50-page compliance

17   training program.  Remember that slide he had about careful

18   communication?  You'll get to see the whole document, and

19   you'll see what the document is is not a message to employees

20   to make sure they cover their tracks.  It's a robust training

21   presentation about all of the company's compliance programs

22   and the way in which the company expects its employees to

23   comply with them.

24        And you're going to hear that in addition to having

25   policies and pledges and training programs, we have programs

 1    that sort of made it interactive.  We made sure that employees

 2    were asking questions when they had compliance issues.

 3         And you're going to get to hear from the

 4    Catherine Kaucher, our compliance officer in this case, and

 5    she's going to talk to you about this program that she

 6    started.  It's called the HCC -- Health Care Compliance -- Red

 7    Bag program.

 8         So Catherine Kaucher, she does a lot of training on

 9    compliance.  She speaks at a lot of these sales force meetings

10    and conferences.  And one time she was at a sales meeting and

11    she said, I think that maybe some of these sales reps are a

12    little hesitant to ask questions in a big room of a lot of

13    people.  So what I'm going to do, she says, is run across the

14    street to CVS, and I'm going to get, you know, one of those

15    gift bags that you use for, like, your kids' parties, and she

16    puts it in the back of the room.

17         And she says, We're going to be here all week.  And so

18    if anybody in this room of more than a hundred sales reps has

19    a question, write it down.  Put it in the red bag, and then

20    I'll send an email around to the entire sales force answering

21    all of your compliance questions.

22         And Ms. Brancaccio and Ms. Penelow, they were at a

23    number of these sales meetings where the red bag was right in

24    the back.  And the evidence is going to show they never raised

25    a question.  They never raised a concern.  They never dropped

1    in the bag their concern that they were being directed to

2    promote off-label.

3        But other people had questions.  Other people asked

4    about some of the things you heard about this morning, like

5    this sales rep who said, Can we get more scientific literature

6    so the sales reps can be more educated?  And you know what

7    Catherine Kaucher says?  Well, maybe we can get it to you for

8    internal or educational use, but it can't be discussed unless

9    it's an approved message.

10        And so had these -- had these events truly happened,

11    the evidence is going to show there were many, many ways that

12    these sales reps could have reported these questions without

13    anyone knowing who they were.  And this red bag program is one

14    of the best examples of that.

15        Every single piece that was used with a physician,

16    you're going to hear, went to the FDA for approval.  So when

17    sales reps go into offices of doctors to give them information

18    about our medicines or talk about things that are in the

19    labels, when it came to two medicines, all of those materials

20    were approved by the FDA.  We have a whole department of

21    regulatory affairs that puts together those pieces, sends them

22    to the FDA for approval, and they don't get used until we hear

23    back from the FDA.  And you're going to get to hear and see

24    some of those messages.

25        There are a number of approved messages that dealt with

1    lipids.  And you heard a lot about lipids this morning.  There

2    was scientific data in our label about how our medicine,

3    Prezista, affected people's lipids and how, in fact, it had a

4    better effect on lipids than some of the other medicines in

5    the class like Kaletra.

6         And so this is a piece, promotional piece that went to

7    the FDA, was approved by the FDA for use with doctors.  And it

8    talks about a proven lipid profile based on scientific data.

9         You're going to hear about a number of different lipid

10   messages that were approved by the FDA during this time.  Low

11   impact on lipids.  That was an approved message.

12        Nobody disputes that our sales reps, as blessed by the

13   FDA, could go into doctors' offices and talk about Prezista

14   having a low impact on lipids.

15        Nobody disputes, approved by the FDA, that they could

16   talk about a minimal impact on lipids based on the data.

17        Nobody disputes, as we just looked at, they could talk

18   about a proven impact on lipids.

19        What this case is about, what hundreds of millions of

20   dollars are going to be asked of all of you for, is this:

21   friendly.  Okay to say low impact.  Okay to say minimal

22   impact.  Okay to say proven lipid profile.

23        But the Relators in this case claim that if you said,

24   "lipid friendly," that was a fraud on the Government to the

25   tune of $430 million.  The evidence is going to show that

1    friendly is not fraud, that the statements that were made

2    about the data and the label and how lipids were affected by

3    Prezista were appropriate and were consistent with all of the

4    approved messages that we just looked at.

5         Finally, I want to talk to you about the speaker

6    claims.  The allegations are that we bribed doctors, that we

7    bribed some of the most experienced HIV doctors in this

8    country.  We paid them to prescribe.  That's what the claims

9    are.  And that's a violation of the Anti-Kickback Statute, and

10   we know it.  And you're going to see our policy.

11        We are well aware of the Anti-Kickback Statute.  You

12   cannot pay a doctor to prescribe medicine.  And you are going

13   to see compliance document and training document after

14   training document that shows that's not what we intended to

15   do.

16        And here's the part.  Speaker programs -- and I had a

17   slide before this -- our speaker programs came in sort of

18   three categories.  We had some programs where doctors did

19   presentations to other doctors, to fellow doctors.  That was

20   about specific medicines.

21        We had some presentations where doctors just talked

22   about HIV.  They just talked about the disease state or issues

23   with the disease.  They didn't even mention a product.

24        And then we had other programs where doctors spoke to

25   patients, where community groups wanted doctors to come in and

1    educate them.

2         These were the three different types of programs that

3    we ran.  And there's no question that speaker programs, in

4    addition to being meant to educate physicians or community

5    members, are meant to promote our medicines.  It's a

6    promotional activity that is highly regulated.

7         But here's the key.  As you sift through the evidence,

8    keep this in mind.  We can pay and compensate doctors for

9    promoting, for talking about our medicine to other doctors.

10   That is -- there is nothing wrong with that.  It is not a

11   violation of the Anti-Kickback Statute.  We absolutely can do

12   it, and we did it appropriately.

13        What we can't do and what we did not do is pay speakers

14   so that the speakers prescribed more.  And what happened today

15   in this opening is what I'm afraid is going to go on during

16   the trial.  It's going to be an effort to sort of mix those

17   two things up and trick you into thinking that we were paying

18   for speakers to prescribe.

19        So this document went up on the screen.  It was, like,

20   a little cut and pasted.  Do you remember the document that

21   said, We change prescribing behavior?  Counsel was suggesting

22   to you that we were paying speakers to prescribe more or to

23   change their prescribing behavior.  That's not what this

24   document talks about at all.  And we're going to get it to you

25   during the course of the trial so you can look at it.

1          What this document talks about is trying to get doctors

2    in the audience to be more educated about our products so they

3    will prescribe it.  And that is the goal of a speaker program,

4    and nobody disputes there is nothing wrong with that.

5          You're going to see our policies about how speakers

6    were selected.  They were not selected based on how many

7    prescriptions they wrote.  They were selected based on a

8    number of different criteria, including experience with the

9    medicine, reputation, ability to speak in front of a crowd.

10          You are going to hear about -- a lot of allegations in

11    this case are going to come to you from these sales reps and

12    from their friends who are going to testify this week, and the

13    evidence is going to show sales reps have nothing to do with

14    selecting speakers.  They can make a recommendation.  They can

15    end an email and say, Oh, I think this doctor would be a good

16    choice.  But there is a robust multidisciplinary process for a

17    speaker to be selected, and it intentionally doesn't include

18    sales reps.

19          So another thing to be thinking about as the evidence

20    comes to you in the case is how is this evidence coming from

21    sales reps who weren't even involved in this process?  The

22    speaker bureau team makes a recommendation to the safety

23    committee that involves the health care compliance team and

24    the medical affairs team, and that's how a speaker is

25    selected.  It's not selected by a sales rep who's hoping to

1    get a doctor to prescribe more medicine.

2        These are some of the folks who were on our speaker

3    board.  They are leading HIV experts.  Dr. Gottlieb was the

4    first to identify AIDS.  He was on our speaker bureau for a

5    period of time.  And you might get to hear from some of these

6    folks.  It was their experience and representation, not the

7    amount of prescriptions they wrote, that put them on the

8    speaker board.

9        We're going to show you some of the data so you can see

10   for yourself that the allegations that are being made here are

11   not true.  This is Dr. Race.  She was on the speaker bureau.

12   And this -- she was on our speaker bureau for this entire time

13   period.  She is nationally recognized, and I hope you get to

14   hear about some of her experience in this trial.  But these

15   are her prescriptions.  And you can see, down here, there's a

16   period of about three years where she almost didn't prescribe

17   any of our medicines.

18       The allegations are that we're bribing speakers to

19   prescribe more medicines, and one of the biggest key speakers

20   on our speakers bureau didn't prescribe any medicines for,

21   like, three years, because -- she wasn't on there because of

22   prescriptions.  She was on there because of her reputation and

23   because of her ability to connect with our colleagues.

24       Speakers signed contracts that said they would remain

25   on-label.  They would not solicit off-label questions.  They

1    would comply with the law.  Speakers went through compliance

2    training before they gave their speeches.  They were

3    compensated at fair market value for their time.

4        You're going to get to hear from some of the speakers

5    in our program in this trial.  And what you're going to hear

6    is that they actually lost money speaking for us because they

7    could make more money in their practice than doing these

8    speaker events for us.

9        You're going to hear from some doctors who are going to

10   tell you, By the time I prepared for the speech two or three

11   hours, by the time I drove or traveled to where the speech

12   was, another one to two hours, by the time I gave the speech

13   and waited for questions and traveled back home, I had spent

14   way more time than the money that I was paid.  But they did it

15   because it was important to them, because talking to their

16   fellow doctors about a disease that they are passionate about,

17   about medicines that they believe in were important to these

18   speakers.

19       These speakers signed and promised that they were not

20   being bribed.  That's the claim in the case.  We bribed these

21   folks.  They signed contracts that said, I'm not being bribed.

22   This is Elizabeth Race, who signed this contract that has a

23   whole section that says, This is not a kickback.  But these

24   are the allegations in the case.

25       Counsel said we had a program three times a day, 9,000

1    programs for, like, ten years.  That's nationwide.  Three

2    programs a day from California to New Jersey is like one per

3    time zone during that time period.  And you're going to hear

4    there were a lot of changes in the science and in the labels

5    and in the guidelines that required these speaking events to

6    get this information out to audiences that we believed and

7    doctors believed wanted and needed this information.

8         The kickback claims in this case, this Anti-Kickback

9    Statute claim, you're going to hear and you're going to see it

10   didn't start with Ms. Brancaccio and Ms. Penelow.  You're

11   going to get to see an email from the lawyers to

12   Ms. Brancaccio and Ms. Penelow, right on the eve of suing us,

13   where they sort of have a second thought, where they kind of

14   come up with an extra idea of how to put a claim for more

15   money in the lawsuit.  And the email says, Let's add a

16   kickback claim.  Years of putting together a complaint to sue

17   us, getting all the evidence ready, and all of a sudden, on

18   the eve of filing a lawsuit, it is the lawyers, not the

19   Relators, who say, Let's add this kickback claim, another half

20   a million -- another half a billion dollars.

21        This lawsuit is not about helping the Government, and

22   that's what the evidence in this case is going to show.  You

23   will see the policies that require these Relators to disclose

24   and report any suspected compliance problems that were going

25   on during the time period that they were there.  You are going

1    to hear about the numerous ways that Relators could have

2    reported these issues on an anonymous basis.  We have a 1-800

3    anonymous hotline that operates 24 hours a day, 7 days a week.

4    You're going to see the training that was given to these

5    Relators where they could have called that at any time.

6        You're going to hear about compliance programs like the

7    red bag program, the hotline, the J&J compliance act, all of

8    the different ways that these Relators could have reported

9    these issues but didn't.

10        If this really happened, why didn't they report it?

11    Why did they wait for years?  And a lawsuit in which they have

12    a ginormous financial interest to raise these issues.

13        The evidence is going to tell you the truth on that.

14        They have alleged a nationwide conspiracy that went on

15    for a decade and involved some of the most top-flight doctors

16    who, you are going to hear -- if this really happened, these

17    doctors had an FDA obligation to report it.

18        In 2010, the FDA came out with guidance that you're

19    going to hear about that would have required every doctor that

20    they claim they were pushing all this off-label info to to

21    report what was happening.  And there is not going to be any

22    evidence in this case that a doctor ever reported what they

23    claim went on across the country for more than ten years.

24        One of the things that is sort of the most -- one of

25    the most important things that you guys have on your plate in

1   your role as jurors is to judge the credibility of the

2   witnesses that come on this stand and allegations that are

3   being made in this case.  And the judge read to you a little

4   instruction about that at the start of today.  But I want to

5   suggest to you, as these witnesses testify this week, to be on

6   the lookout for this.  If what they say happened, really

7   happened, then it should be true in the courtroom and outside

8   the courtroom.  The truth doesn't change.  The truth always

9   stays the same.  If it happened, it happened.  If it didn't,

10  it didn't.

11       But you are going to hear that the allegations made in

12  this courtroom do not measure up with what the documents from

13  the actual time period look like.  And so be on the lookout

14  for changes in stories, for changes in key facts that should

15  stay the same if this really happened.  Be on the lookout for

16  allegations that come to you in the context of a lawsuit for a

17  lot of money that are in direct conflict with what those folks

18  said back in 2006, 2008, and 2010.

19       The evidence is going to show that the Relators knew it

20  was a problem for them, that they didn't have any documents

21  that supported the claims they're making in this lawsuit.  So

22  they set out to secretly tape their co-workers.  And they knew

23  that Johnson & Johnson has a policy that prohibits that.  Some

24  states prohibit it, too, and for some of these recordings, we

25  don't know where they took place.  But we at Johnson &

1    Johnson, we have a policy that prevents our employees from

2    secretly taping our employees.

3         And this is an email from Ms. Brancaccio to herself.

4    So it's coming from her J&J email account to her Gmail

5    account.  And you're going to get to see Ms. Brancaccio, as

6    she started to take our documents and get them to her lawyers,

7    she sent about 650 emails from her work computer to her

8    personal email account, and this was one of them.

9         She sent the taping policy that says clearly, As a J&J

10   employee you're not allowed to secretly tape people.  You're

11   going to get to hear the secret tapes that these Relators made

12   in connection with this lawsuit.

13        And you're going to get to hear some of the things they

14   caught on tape, including our compliance officer, Catherine

15   Kaucher.  One of the secret recordings actually is of a

16   compliance training where Catherine Kaucher, unbeknownst that

17   she's being recorded, is telling everyone about the importance

18   of ensuring that speakers remain on-label, about the

19   importance of reporting any type of noncompliance.

20        She even gives, on the secret recording, the 1-800

21   number so people can report 365 days a year any issues of

22   noncompliance.

23        You're going to hear a doctor caught on a secret tape

24   for purposes of a lawsuit.  He has no idea that one of these

25   Relators was secretly taping him.  They secretly taped a sales

1    rep of ours detailing or talking to this doctor.  What they

2    caught on tape is the truth.  And you're going to hear, if

3    they play you the entire tape -- and if they don't, we will --

4    you get to hear him talk about why doctors prescribe medicines

5    and how they make prescribing decisions.  And the reason they

6    like the tape is because one of our sales reps is talking

7    about lipids and she uses the term "relatively lipid

8    friendly," which is entirely appropriate and consistent with

9    the FDA messages.  The only place the word "friendly" is bad

10   is in these allegations.

11         But you're going to get to hear him talk about why and

12   how he prescribes medicines, and it has nothing to do with

13   sales reps.  He talks about how he prescribes based on what

14   his patients prefer.  He says, Sometimes patients come to me

15   and they have a preference for what medicine they want and I

16   help them.  I help them get the medicine they want.  He says,

17   most importantly, he prescribes on personal experience.  And

18   he talks about running laboratory tests, those resistance

19   tests we were talking about, before he decides to prescribe

20   medicine.

21         So even though they were out to kind of secretly get

22   their co-workers on tape, to make up for the fact that the

23   documents don't say what they alleged in this lawsuit, they

24   actually caught on tape evidence of compliance, evidence of

25   doctors doing the right thing in their medical judgment to get

1    the best medicines they can to their patients.

2        You're going to hear, I think, from most of these folks

3    this week.  These folks are all friends of each other or the

4    Relators.  They all worked together at Janssen for a period of

5    time.  And these are the fact witnesses that you saw on that

6    map that counsel had this morning.

7        What you're going to hear is that all of their

8    testimony was written out by the lawyers.  The lawyers went

9    out with a private investigator and tried to call up a bunch

10   of former employees who might be kind of disgruntled with us,

11   and they came upon all of these folks.  And they typed up all

12   of the things they wanted to say in the lawsuit, and these

13   folks all signed them.

14       And then you're going to see Ms. Brancaccio, she sent

15   an email and said, Please sign this.  Please sign whatever the

16   lawyers wrote because it would really help me in my

17   billion-dollar lawsuit.

18       So listen carefully to the testimony of those folks as

19   they come in here.  Listen to what the lawyers wrote in those

20   declarations and if it's supported by the documents that these

21   witnesses actually wrote at the time period.

22       I want to just briefly before I end -- and, Your Honor,

23   I know I have about five minutes left.

24           THE COURT:  I don't want to rush you.  I can always

25   move that matter a little bit.  I have that power.

1        MS. BROWN:  I'm just about done.

2        I want to leave you all with a couple of things to give

3  you a flavor of what is going on in this lawsuit.  So they're

4  going to ask you guys for almost a billion dollars, and here's

5  kind of some of the claims they're going to tell you were

6  fake, fraudulent, false claims.

7        They want to get money back for the Government and the

8  Relators in this type of a situation.  This is part of their

9  damages model.  So you have a doctor who in 2006 went to a

10  speaker program.  So one of our doctors was talking about

11  Prezista back in 2006 when it was approved, and we have

12  Dr. Smith who attends the program back in 2006.

13        In 2013, Dr. Smith prescribes a totally different

14  medicine, Intelence.  The allegations in this case are that

15  was a false claim.  That prescription of Intelence that took

16  place over a decade later, they're going to try and convince

17  you that was false, that doctor was influenced by what he

18  heard at that speaker program back in 2006 and the Government

19  never would have paid for Intelence in 2013.  That's going to

20  be the claim.

21        You're going to see claims like this one where a doctor

22  in California -- somehow my state is missing.  The doctor in

23  California prescribes a medicine in 2006.  Then the patient

24  moves to New Jersey in 2013 and goes to a different doctor.

25  They're going to claim when this different doctor also

1   prescribes Prezista, that's false.  That different doctor was

2   somehow influenced by the first doctor, who was visited by a

3   sales rep, and, therefore, they want all that money back.

4   False claim.

5        They're going to say every prescription that was

6   written by a speaker -- so we hire these top-flight experts.

7   They speak to their colleagues, and what the claims in this

8   case are, every single prescription of our medicines that they

9   write after that event for the end of time is fraudulent, is a

10  false claim.

11       That's $300 million for 483 false claims.  That's the

12  claim.  And what that means is that these type-flight HIV

13  specialists -- is that none of these people ever should have

14  been able to treat HIV patients with our medicines after they

15  spoke at one of our events.  What that means is the

16  allegations here is that these top-flight specialists are

17  forever tainted and never could have prescribed after us.

18       What it means, what the claims in this case really mean

19  is that they don't want the Government paying for decisions

20  made by top-flight HIV specialists like this.  They don't want

21  those patients to be able to get these medicines reimbursed.

22  Those patients, I presume, should just pay for these out of

23  pocket.  That's the reality about the claims that are being

24  made in this case.  The Relators and the Relators alone have

25  the burden of proving to you all that what they've claimed in

 1    this lawsuit is true.  And I would submit to you all, after

 2    you sit here for five weeks, after you hear from the Relators,

 3    after you hear from their friends, after you hear from experts

 4    that are being paid by the lawyers, they are not going to come

 5    close to proving to you all that the very serious claims they

 6    have made in this lawsuit are supported by the evidence or

 7    supported by the facts.

 8         They have accused hundreds of Janssen employees of

 9    misleading and bribing doctors for decades, and the evidence

10    is not going to support that.  Please be on the lookout for

11    inconsistencies.  Please judge the credibility of the people

12    coming before you, and please wait for us to put on our case.

13         We don't have the burden of proof, so we go second.

14    You're going to hear their whole case first, and then we'll

15    get to stand up and put on some of our witnesses.  So please

16    keep an open mind, listen to the evidence, and we look forward

17    to putting on this case and proving to you that the

18    allegations in this lawsuit are not true.

19         Thank you very much for your time.

20         Thank you, Your Honor.

21          THE COURT:  Thank you, Counsel.

22         Folks, it's about that time, so we're going to break

23    for lunch for 45 minutes.  Why don't we just say have

24    everybody back at quarter after 1:00?

25         Does that work, Kim?

```
 1            Let's do quarter after 1:00.  You get a couple extra

 2   minutes there to walk.  All right.  So let's excuse the

 3   jurors.  Counsel remain.

 4            THE DEPUTY COURT CLERK:  All rise.

 5        (Jury exits courtroom.)

 6            THE COURT:  Folks, have a seat.  Counsel, anything we

 7   need to chat about before lunch?

 8            MR. MARKETOS:  Briefly, Your Honor.  I want to do

 9   this only because it's hot off the heels -- hot off the press.

10   You just heard the opening statement from defense counsel.  So

11   that is why --

12            THE COURT:  Wait.  Hold on.

13            MR. MARKETOS:  Oh, I'm sorry.

14            THE COURT:  Just when that door opens, I worry about

15   how -- where they are before their deliberations.

16        Okay.  Go ahead, Counsel.

17            MR. MARKETOS:  So are we able to pull our -- the two

18   slides up that were objected to by -- the reason I want to

19   address this, Your Honor, is because if we don't address it

20   now after you just heard the opening from --

21            THE COURT:  Counsel, you can sit.  You'll have an

22   opportunity to speak.

23            MR. MARKETOS:  If we don't do it right now, it's

24   going to become stale, and then we re-address it, you're going

25   to forget or we're going to forget --
```

1          THE COURT:  I won't forget.  Let me hear it.

2          MR. MARKETOS:  Yeah, you won't.

3      So the gist of it is this:  We argued in the motions in

4  limine when they tried to exclude that the magnitude of the

5  settlements themselves -- this is at page -- this is our

6  response to their motion in limine.

7      It was the scope, the extent and the magnitude were

8  important because they are downplaying the severity of this

9  misconduct.

10      And those numbers that were put on the screen, over

11  $81 million for prior off-label marketing, over $2.2 billion

12  for kickbacks and off-label marketing against Janssen and

13  Johnson & Johnson is to show that the Government takes the

14  matters very seriously, and they take that type of conduct --

15          THE COURT:  Well, no, but these are all different

16  cases, right?  So what you're going to ask for now is what?  A

17  trial within a trial?

18          MR. MARKETOS:  No --

19          THE COURT:  Don't -- let me finish --

20          MR. MARKETOS:  Okay.

21          THE COURT:  -- then you can speak.

22          MR. MARKETOS:  Yep.

23          THE COURT:  When Janssen comes up, they're going to

24  have to distinguish now all of these cases, right?

25          MR. MARKETOS:  Sure.

1          THE COURT:  They're going to say, Well, that dollar

2    amount just doesn't have to do with off-label marketing.  It

3    was this type of drug, and this was the time period, and this

4    was what was going on.

5          And so these are not the same cases.  You're going

6    to -- you're going to compel a trial within a trial, and, by

7    the way, your only evidence of whether this is material to the

8    Government or important for this jury is if you demonstrate a

9    completely different matter than what the dollar amount was

10   for that case.

11         You don't have any evidence to present to say why this

12   particular -- these allegations are serious to the Government.

13          MR. MARKETOS:  No, Your Honor, not at all.  But it

14   really matters because -- well, if we can turn to the next

15   slide.  Okay.

16         This is what is -- this is what is of concern to us.

17   The number of elements that this evidence touches on, you saw

18   counsel put that big compliance document up in front of the

19   jury.  She was holding on to it.  This slide is from that

20   document.

21         So I'm not trying to convince Your Honor of anything

22   other than this is the information that they, Janssen, was

23   providing to they, Janssen, to say, Don't do this.  This is

24   the type of conduct that could get you into trouble in this

25   field at these amounts.

1      So they're telling themselves this is how serious the

2   Government takes it.  These are the sizes of the settlements.

3          THE COURT:  But that's different.  You're trying to

4   show this to a jury, right?

5          MR. MARKETOS:  Sure.

6          THE COURT:  So you don't see how -- even if I were to

7   agree with you, and I'm not even sure I'm there yet on stage 1

8   of this.  What's the probative value of this, other than

9   saying, Hey, jury, look at this significant dollar amount?

10  That's what this case is, right, which is completely improper.

11      But even if I were to agree with you there, the

12  probative value of this, how is that not substantially

13  outweighed by the prejudice to Janssen when you're basically

14  telling this jury, This case is worth $800 million?

15      By the way, you're making that argument anyway, right?

16  You're demonstrating that, Here are the number of claims in

17  this case.  Forget about those cases in 2013 or 2010.  You're

18  telling the jury, Here's the number of claims, do the math.

19  The math equals 400-and-some thousand dollars for this or it

20  equals this couple hundred thousand dollars for this.

21      I mean, you're doing that.  But how is this not -- how

22  is the prejudicial value of showing these dollar amounts to

23  this jury not -- how does that substantially outweigh any

24  probative value if you can convince me there is any?

25      And showing it to a Janssen -- internally at Janssen is

```
 1   not the same as you publishing it to the jury.  Simply because
 2   a document was disclosed internally within the company,
 3   Defendant, doesn't necessarily mean it's admissible in the
 4   case.
 5        MR. MARKETOS:  Sure.
 6        THE COURT:  So I'm trying -- still trying to
 7   understand why you think these numbers should come in other
 8   than why I think you want them in.  Because you want to show
 9   the jury, Hey, they've been in trouble with other matters, and
10   in those cases, the Government -- you know, there was a
11   settlement for this dollar amount or the Government was
12   reimbursed these hundreds of millions of dollars.
13        And let's spoil this jury now by showing them those
14   numbers.  I could see why it's important for you, but I'm not
15   so sure I'm clear on how it's admissible under any rule.
16        So walk me through it.  I'm not going to cut you off,
17   but if you're asking me to rule, then let me hear from
18   Janssen, but is there anything more you want to put on the
19   record other than why I think you want it before the jury?
20        MR. MARKETOS:  Your Honor, I thought you'd already --
21   we thought you'd already ruled on this.
22        THE COURT:  I did.  Look, I went back on the motion
23   in limine, so I'm not saying that you can't address that --
24   you were talking about scienter.  You were talking about
25   intent.
```

1        MR. MARKETOS:  Scienter, materiality and --

2        THE COURT:  And intent.  And you're saying basically,

3   Look, we want to be able to put some evidence that Janssen was

4   aware of these issues, right?

5        MR. MARKETOS:  Right.

6        THE COURT:  That they had had trouble with these

7   issues before.  I've given you that.  That doesn't necessarily

8   mean -- and there's nothing in the motion in limine decision

9   that I've reviewed, and I wrote it, that says you're going to

10  be able to get before the jury 800-some million dollars for

11  this because here's -- unless I'm mistaken, and I'm going to

12  hear -- I don't know if it's Mr. Wyatt or Ms. Brown, I don't

13  know who's going to speak for Janssen.

14       But if I were on that side, I'd say, Well, that's a

15  whole different matter now.  So why don't we just add five

16  weeks to this trial, because I'm going to now have to

17  demonstrate how this case is absolutely different than what

18  that was.

19       And maybe I'll also have to say why we're at trial here

20  versus why we didn't go to trial there or whatever the other

21  issues are going to be, which drug it was, what was the time

22  period, what were the other factors, was it rainy or sunny on

23  the day that it happened.

24       There's going to be a million different things that

25  they're going to have to distinguish with this jury to

1    convince them why they should not even be slightly moved by

2    those dollar signs that you put before them.

3          How is that not confusing to the jury?

4             MR. MARKETOS:  So I understand, Your Honor.  I think

5    you're addressing specifically the dollar amount only, right?

6             THE COURT:  That's where I am now, and that's my

7    understanding of -- well, let me hear from Janssen.

8          Before you finish, I'll let you continue, but I want to

9    talk to Janssen for a moment.  So one down, one up.

10            MR. MARKETOS:  Okay.  Sure.

11            MR. KLEIN:  Thank you, Your Honor.

12            THE COURT:  The only objection, and correct me if I'm

13   wrong before I hear anything more from you, is you're not

14   objecting to my ruling -- and by the way, if you did, I'm not

15   reconsidering it, right?

16         I believe they have the right to bring in these other

17   matters from 2010 and '13, but my understanding from Janssen,

18   which I'm inclined to agree, is that your objection is they

19   should not be able to put forth these dollar amounts before

20   the jury because that's going to cause a trial within a trial.

21         And maybe there's a prejudicial issue, too, and maybe I

22   said that on my own.  I'm not even sure that's the argument.

23   Why don't you walk me through what your position is before I

24   go back to Mr. Marketos?

25            MR. KLEIN:  So Your Honor is correct about the scope.

1    We're seeking exclusion of the dollar amounts for all the

2    reasons the Court just said.  It would be a trial within a

3    trial.  It absolutely is a different product, different

4    circumstance, different allegations.

5            And we would have to put that in context if those came

6    in, just to sort of distinguish it from the case.  But also

7    it's a settlement, Your Honor.  It's not indicative of the

8    actual value of the case.  It's indicative of a settlement

9    reached to resolve a dispute.

10            THE COURT:  And there are a host of reasons why a

11    matter might settle, none of which we know.

12            MR. KLEIN:  And there are policy reasons not to

13    jeopardize that.  It would deter people from going to

14    settlements in the future if they knew that, once they settle

15    once, every single False Claims Act case that comes

16    thereafter, they then need to litigate that case inside the

17    case and so on and so on, however settlements there may be.

18            The last thing I'll say just to sort of add to what

19    Your Honor said previously is I took the ruling on the slides

20    to be sort of -- if we open the door, maybe there's more to

21    this kind of thing.

22            But Ms. Brown's opening was very circumscribed about

23    materiality.  It was about these drugs.  These are the

24    policies that relate to these HIV drugs in this case.

25            And it's not -- it's not a blanket statement that the

1   Government just doesn't care about off-label marketing or

2   doesn't care about other drugs or what other improper

3   promotions may have been done in other cases.

4        So it's just not true that they need this to show that

5   the Government cares about off-label marketing.  That's not

6   really been disputed.  So I don't think anything has changed

7   from the opening that makes this any more probative than it

8   was when we started, which is not at all.

9        MR. MARKETOS:  Your Honor, I can read the room, and I

10  understand the Court's concern, as it's the whole concept of

11  trying a case within a case.

12       When -- when counsel stands up there and says, quote,

13  CMS doesn't care if it's on-label or off-label, it doesn't

14  care and CMS only cares about the medication for the patient,

15  it's important to us to let the jury know CMS cares because,

16  when they catch you, you get in trouble.  And Janssen knew

17  that because they were telling their own people, Watch out.

18       THE COURT:  But don't you have that by having --

19  being able to address the settlements in the first place,

20  which I granted for you?  You have that ability --

21       MR. MARKETOS:  Yes.

22       THE COURT:  -- to contradict what the defense said if

23  that's, in fact, contradictory of what you said in the

24  opening, and you can put that before the jury.

25       My issue is very limited, and I think it's the issue

 1   that I just clarified with Janssen, that this is about the

 2   dollar amount.

 3           MR. MARKETOS:  Okay.

 4           THE COURT:  So I will tell you that nothing -- here

 5   is where I'm leaving my ruling for now.  Nothing that has

 6   occurred -- by the way, no evidence has even been presented.

 7   I mean, you all told me earlier this morning that, if this

 8   issue arose during the actual presentation of evidence, we may

 9   revisit it, right?  We're revisiting it after opening

10   statements.

11           MR. MARKETOS:  Yes.

12           THE COURT:  So I'm landing here.  Nothing has

13   occurred before me that is going to, at least at this

14   juncture, allow me or allow Relators to present the evidence

15   of those dollar amounts to this jury.

16       Now, if something occurs -- with one caveat, right?

17   This is going to have a little asterisk next to my home run.

18       If something occurs during the trial where you think

19   the issue should be revisited, I'm not going to prohibit the

20   Relators' counsel from raising the issue at that time and

21   saying, Well, now they've -- now they've caused a problem, and

22   now we believe we should be able to raise this.

23       And I don't know in what context that would occur, but

24   I'm going to allow you to revisit it if something happens

25   during the trial that you think they actually have opened the

```
 1   door.

 2          But I don't think Ms. Brown opened the door during the

 3   opening statement, and I think a lot of what you're looking to

 4   do with this information I've given you.

 5          The dollar amount, for me, I will tell you -- and I'm

 6   saying this without ruling on it yet, but right now, from what

 7   I've heard so far, the probative value is limited at best.

 8          The prejudicial value is -- substantially outweighs

 9   that probative value when you look at putting that dollar

10   amount before this jury.

11          And, look, I'm not -- I'm not being naive about this.

12   I completely kit and caboodle before this jury, right?  You

13   want to tell them, Look, this has been done before, look at

14   all the hundreds of millions of dollars.

15          So when Ms. Brown is saying in the opening statement

16   this is about money and they're going to get this, you know,

17   windfall over here, I want to kind of, you know, diminish that

18   a little bit by saying, Ah, this has happened before, and

19   other folks -- you know, we've got money, and this is what has

20   happened in the past.

21          Right now I still think it's unbelievably prejudicial

22   to the Defendant and the purpose in which you are attempting

23   to elicit it or present it to the jury.  I've already given

24   you more than enough evidence, I think, to support those

25   issues.  So for now, it's out.
```

```
 1            MR. MARKETOS:  I understand.

 2            THE COURT:  If you all want to revisit it at some

 3    point because something occurs during the trial, I'm not going

 4    to prohibit that discussion, and we can have it outside of the

 5    earshot of the jury, but why don't we wait and see what that

 6    might be.

 7         Does that make sense?

 8            MR. MARKETOS:  Yes, Your Honor.

 9            THE COURT:  All right.  What else?

10            MR. MARKETOS:  That's it.  I just wanted to touch on

11    it only because it had just happened, and that was --

12            THE COURT:  No, no, that's fine.  Nothing has changed

13    for me.  I'm not knocking you for raising it now.

14            MR. MARKETOS:  Sure.

15            THE COURT:  What I'm saying is if something else

16    occurs during the trial with the actual presentation of

17    evidence that you all think we should be revisiting this

18    issue, I'll entertain it at that time.

19         But where we are right now, I'm going to be very clear,

20    I don't want to hear about those numbers, and I don't want to

21    see them anywhere on these screens unless I made a ruling that

22    permits you to do that.

23         Are we -- are we on the same page?

24            MR. MARKETOS:  Yes, Your Honor.  They -- they are all

25    over Janssen's documents, so we'll -- we'll make sure that --
```

```
 1            THE COURT:  Are those documents that you all agreed

 2   are going to be before the jury, that they're --

 3            MR. MARKETOS:  I believe they -- yeah, I believe they

 4   have said -- agreed to some but objected to others.  I think

 5   where -- I think I've learned that where the number is

 6   involved, they've lodged an objection, so we'll make sure that

 7   we address that by --

 8            THE COURT:  All right.  Is that accurate?

 9            MS. BROWN:  Well --

10            THE COURT:  Only because I feel like you're wasting a

11   lot of my time if you guys haven't -- if you're not objecting

12   to documents in which this information is going to come out

13   anyway, why even bother talking about it?

14            MS. BROWN:  We -- no.  We are -- we are, Your Honor.

15   We are trying to negotiate with them consistent with the

16   Court's ruling where we had originally objected to this coming

17   in at all.  We understand that was overruled, but we are

18   maintaining our objection to the numbers for the reasons we've

19   just gone over.

20            THE COURT:  All right.  Understood.

21        So all right.  Counsel, then you're all going to have

22   to look at those exhibits, right?  I don't want anything

23   popping up before this jury that I've ruled shouldn't be

24   there.

25        But I'll leave it to counsel to work that out, and you
```

1   may even want to meet and confer a little bit with these

2   exhibits just to make sure everybody is on the same page, but

3   this isn't very difficult, right?

4        It's a redaction of some dollar amounts, and I'm not

5   even really going to address the redactions.  I don't see any

6   need to do that unless you all are requesting that I do that.

7   That's different.

8        If you all think that certain documents are going to

9   have redactions that are going to be visible to the jury and

10  you want some type of instruction to clarify that, then why

11  don't you all meet and confer first and then talk to me about

12  it.

13       I'm open to it, but usually I wouldn't say anything

14  unless the parties think it's important or at least one party

15  is advocating for it, so...

16           MR. MARKETOS:  Sure.

17           THE COURT:  What else, Mr. Marketos?

18           MR. MARKETOS:  Nothing, Your Honor.  I took too much

19  time already.

20           THE COURT:  No, no.  That's fine.

21       Janssen, do we have anything further we need to chat

22  about before your break?

23           MS. BROWN:  No, Your Honor.  Thank you.

24           THE COURT:  All right.  If you guys need an extra few

25  minutes, let me know, but for now, we're supposed to be back

1    at 1:15, but if you need extra time, let my staff now.

2            THE DEPUTY COURT CLERK:  All rise.

3            (Luncheon recess was taken from 12:25 p.m. until 1:28

4    p.m.)

5            THE DEPUTY COURT CLERK:  All rise.

6            THE COURT:  Folks, have a seat.  Thank you.

7        Have we got to chat about anything, or should we bring

8    in the jurors?

9            MR. MARKETOS:  We're ready, Your Honor.

10           THE COURT:  Anything from your folks?  No?

11           MS. BROWN:  No.  Thank you, Judge.

12           THE COURT:  All right.  Kim, do you want to --

13           MR. MARKETOS:  Your Honor, excuse me.  We probably

14   need to invoke the rule about that testimony that's going to

15   start.  Witness exclusion, but we would request that experts

16   be excepted.

17           THE COURT:  Oh, you mean as far as sequestration?

18           MR. MARKETOS:  Yes.  Witnesses who are going to

19   testify not be in the courtroom while others are --

20           THE COURT:  All right.  And have you guys talked

21   about this?

22           MS. BROWN:  No, but I don't have an objection.  It's

23   okay.

24           THE COURT:  All right.  Well, then so be it.  You're

25   saying that any witness -- any fact witness will be outside

1    the courtroom and any experts can remain?  Is that what you've

2    all agreed to?

3          MR. MARKETOS:  Yes.

4          MS. BROWN:  That's fine.  I have no problem.

5          THE COURT:  All right.  So, then, are you -- I know

6    you're asking me this, but I want to make sure you understand.

7    It's incumbent upon counsel to ensure that that's going on.  I

8    can't walk around and know where your witnesses are and make

9    sure they're not in the courtroom.

10         So I'm happy to say that's fine, that's the arrangement

11   that we'll keep for the trial, but it's incumbent upon counsel

12   to make sure that your witnesses are aware of that.

13         And, then, do we need to make sure we've got a place to

14   put them when they're being lined up?  Where are they going to

15   be?  If they're not in the courtroom --

16         MR. MARKETOS:  There's a room downstairs.

17         THE COURT:  All right.  So you guys are going to work

18   that out.  All right.  So make sure you're talking to -- well,

19   more so on your side, but witnesses as you're lining them up,

20   Hey, you can't just walk in the courtroom.  We'll come get

21   you.

22         MR. MARKETOS:  It's more of a logistical problem for

23   us, I think.

24         THE COURT:  Yeah.  All right.  But you guys have all

25   agreed to, so that's fine, but you're saying your experts on

1    either side can hang out in the courtroom?

2            MR. MARKETOS:  Yes, Your Honor.

3            THE COURT:  All right.  And, Kim, to the extent we

4    need to assist with anything, feel free to reach out if you

5    guys need some coordination or some logistics or some help

6    with, Hey, we have these four or five witnesses, or if there's

7    a concern there.

8            THE DEPUTY COURT CLERK:  There's only like two people

9    waiting.  There's chairs outside --

10       THE COURT:  So they could probably just hang out there.

11   All right.

12       What else?  Anything else?

13           MR. MARKETOS:  No, Your Honor.  Thank you.

14           THE COURT:  All right.  Ms. Brown, anything?

15           MS. BROWN:  No.  Thank you, Judge.

16           THE COURT:  Let's get the jurors.

17       (Jurors enter the courtroom.)

18           THE DEPUTY COURT CLERK:  All rise.

19           THE COURT:  Folks, everybody be seated.

20       Are you coming up for -- are you calling a witness?

21           MR. RUSS:  Yes, Your Honor.

22           THE COURT:  Oh, all right.  Yeah.  Why don't we start

23   with witnesses.

24       So who is the first witness?

25           MR. MARKETOS:  Your Honor, Relators will call

───GRAHAM - DIRECT - RUSS───

1   Ms. Donna Graham, and Mr. Russ is going to examine her.

2          THE COURT:  All right.

3       Kim, you'll swear in the witness?  All right.

4          She's just going to swear you in, and then you can --

5   no, no, that's okay.  You can get settled, but she's going to

6   swear you in, and then you can get situated.

7          MS. GRAHAM:  I got my glasses.  Thank you.  I wasn't

8   sure if there was water, just in case.

9   (**DONNA GRAHAM**, HAVING BEEN DULY SWORN/AFFIRMED, TESTIFIED AS

10  FOLLOWS:)

11         THE DEPUTY COURT CLERK:  Please state your name and

12  the spelling of your last name for the record.

13         THE WITNESS:  It's Donna Graham, G-R-A-H-A-M.

14  (DIRECT EXAMINATION BY MR. RUSS:)

15  Q.   Good afternoon, Ms. Graham.

16  A.   Hello.

17  Q.   My name is Josh Russ.  I represent the Relators in this

18  case, Jessica Penelow and Christine Brancaccio.

19       Do you understand that?

20  A.   I do.

21  Q.   You and I met a couple months ago.

22  A.   Yes.

23  Q.   Is that right?

24  A.   Yes.

25  Q.   And, in fact, we met in person just a couple of days ago.

GRAHAM - DIRECT - RUSS

1   A.   Correct.

2   Q.   You understand that my clients have brought a False

3   Claims Act case against Janssen in this matter?

4   A.   I do.

5   Q.   And you understand that you are here to testify as to the

6   facts that you witnessed during your employment at Janssen?

7   A.   I do.

8   Q.   When were you employed at Janssen?

9   A.   From 2006 to 2011.

10  Q.   We're going to talk a little bit about the different

11  roles you held, but, first, introduce yourself to the jury.

12  A.   Hi.  My name is Donna Graham.  I am originally from

13  outside of Philadelphia.  I have been in the pharmaceutical

14  industry for 30 years with a couple different companies, and I

15  currently reside in Colorado.

16  Q.   Did you go to college, Ms. Graham?

17  A.   I did.

18  Q.   Where did you go?

19  A.   Penn State.

20  Q.   Did you -- did you go to work in the pharmaceutical

21  industry after graduating from college?

22  A.   Not directly.  Within, like, two years.

23  Q.   So within two years, where did you first start in the

24  pharmaceutical industry?

25  A.   In Hoffmann-La Roche.

GRAHAM - DIRECT - RUSS

1  Q.   Say that one more time?

2  A.    In Hoffmann-La Roche.

3  Q.   What is Hoffmann-La Roche?

4  A.    It is a pharmaceutical company based in Nutley,

5  New Jersey, or they used to be.  I don't think they're there

6  any longer.

7  Q.   What did you for Hoffmann-La Roche?

8  A.    I was a sales representative.

9  Q.   Explain to the jury what a pharmaceutical sale

10  representative does.

11  A.    So what we're hired to do is go into the doctors' offices

12  and talk to them about our product to create brand awareness,

13  to talk about the disease state and why our drugs should be

14  prescribed for particular patients.

15  Q.   When you were at Hoffmann-La Roche, were there particular

16  products that you sold?

17  A.    Yes.

18  Q.   What were those?

19  A.    It was Rocephin.  It was Zantac.  It was Toradol.  It was

20  Versed.  It was Romazicon.  It was Proviron A, Ceftin.  I

21  believe that was it.

22  Q.   Give the jury a sense for the disease states that those

23  drugs were designed for.

24  A.    Sure.  So Rocephin was an injectable antibiotic.  Versed

25  is an anesthesia drug.  Romazicon is the reversal agent for

GRAHAM - DIRECT - RUSS

1    that.  Toradol is an injectable pain reliever.  Ceftin was

2    like an upper respiratory infection antibiotic.  And Zantac,

3    I'm sure everybody knows, is, you know, for GI upset.

4    Q.    Did you sell any drugs or promote any drugs when you were

5    at Hoffmann-La Roche that were HIV drugs?

6    A.    Oh, yes, I did.  I'm sorry.  I sold Hivid, too.  Yes.

7    That second HIV drug that was out on the market.

8    Q.    Around what year was this, Ms. Graham?

9    A.    When it was approved.  I'm going to say probably early

10   2000s, like maybe 2003.

11   Q.    You were selling Hivid?

12   A.    I was.

13   Q.    In the early 2000s or around there?

14   A.    Correct.

15   Q.    Were you familiar with the HIV disease state when you

16   were selling that medicating?

17   A.    Yes.

18   Q.    So let me back up.  What was the -- based on your

19   experience, what was the HIV disease state like in the early

20   to mid-'90s?

21   A.    It was devastating because it was, you know, a death

22   sentence.  I mean, there really wasn't any options out there

23   other than AZT, and Hivid was the next drug to come out.

24          So, you know, at that time, there were only two drugs

25   to be used.

GRAHAM - DIRECT - RUSS

1  Q.  Did that eventually change?

2  A.  Very much so.

3  Q.  And we're going to talk about that.

4       So when you were selling Hivid, were calling on -- when

5  I say calling on, were you meeting with doctors that

6  prescribed these drugs?

7  A.  Yes.

8  Q.  Describe to the jury what the day-to-day looks like

9  with -- for pharmaceutical representatives selling Hivid, for

10 instance.

11 A.  Well, it was -- it was -- I was in Philadelphia at the

12 time; I was not in New York.  You know, I was calling on HIV

13 physicians and trying to talk to them as to why they should

14 use Hivid.  A lot of times it may have been considered a

15 little easier to take than AZT.  I don't know if any of you

16 have seen "Rent," but, you know, if you remember, they had to,

17 like, set their watches every six or eight hours when they had

18 to take the product.

19      You know, people were not surviving HIV.  AZT, taking

20 it that many times was very toxic.  They were very sick from

21 the medications.  You know, it was just -- it was awful,

22 honestly.

23 Q.  You mentioned "Rent."  Is that the reference to that

24 there was a -- sort of a high pill burden for HIV?

25 A.  Yes.

GRAHAM - DIRECT - RUSS

1    Q.   When you were selling Hivid -- and then we'll talk about

2    some other HIV medications that you sold -- did you learn that

3    that pill burden was an important metric that the doctors were

4    looking for for what they were prescribing?

5    A.   Not at that time.  I mean, there was only really two

6    options.  There was AZT and Hivid.  And they were just looking

7    to try and extend people's lives, right?  It wasn't -- as more

8    drugs came out, those things became more important.

9    Q.   Okay.  And we'll talk about that.

10        After your time at Hoffmann-La Roche did you go to

11   another pharmaceutical company?

12   A.   I did.

13   Q.   Explain to the jury where you went after that job.

14   A.   I went to Bristol-Myers Squibb.

15   Q.   Is that sometimes BMS?

16   A.   Yes.

17   Q.   Where did you go to work for BMS?

18   A.   I was in New York.

19   Q.   New York City?

20   A.   Yes.

21   Q.   What were you selling for Bristol-Myers?

22   A.   I sold Zerit.  I sold Videx.  I sold Sustiva, and I sold

23   Reyataz.

24   Q.   What types of drugs were those?

25   A.   So Zerit was a nucleoside inhibitor.  Videx was a

GRAHAM - DIRECT - RUSS

1    non-nucleoside reverse transcriptase inhibitor.  Reyataz was a

2    protease inhibitor, and Sustiva was a -- I can't remember the

3    drug, but I was -- no, that was a non-nucleoside reverse

4    transcriptase inhibitor.  Sorry.

5    Q.   All right.  There's a lot of words there.

6    A.   Yeah.

7    Q.   You said Zerit was what type of drug?

8    A.   It was --

9    Q.   Well, let me back up.  All of these are HIV medications?

10   A.   Yeah.  So, I mean, to make it simple, you know, at that

11   time what they were doing is choosing different drugs from

12   different disease -- or different categories or different

13   mechanisms of actions in order to target the HIV molecule to

14   prevent it from replicating.  So, you know, it became known as

15   a cocktail.

16   Q.   And you were selling four different HIV medications at

17   Bristol-Myers?

18   A.   I was.

19   Q.   And you mentioned one of them was Reyataz.

20   A.   Correct.

21   Q.   What was Reyataz?

22   A.   That was a protease inhibitor.

23   Q.   Explain to the jury what a protease inhibitor is.

24   A.   It's been a minute, but a protease inhibitor, essentially

25   what it does is it cleaves part of the nucleus of the HIV

GRAHAM - DIRECT - RUSS

1  molecule, so it prevents it from escaping and causing

2  virologic replication.

3      So it's preventing the -- helping to prevent the

4  disease from replicating in the body, because it replicates,

5  like, a billion times a day.

6  Q.  So let's go through the medications that you sold to this

7  point.

8      Hivid?

9  A.  Yes.

10 Q.  Is Hivid a good drug?

11 A.  Not particularly.

12 Q.  Okay.  Is Zerit a good drug?

13 A.  Yes.

14 Q.  Was Videx a good drug?

15 A.  It was marginal.

16 Q.  Was Sustiva a good drug?

17 A.  Yes.

18 Q.  And was Reyataz a good drug?

19 A.  Yes.

20 Q.  And, in fact, did Reyataz become one of the more popular

21 drugs that you were selling in the New York area?

22 A.  Yes.  Particularly in treatment-naive patients.

23 Q.  Explain that.  What is a treatment-naive patient?

24 A.  It's somebody that had never taken an antiretroviral

25 before, or they could have been naive to that drug class.

─── GRAHAM - DIRECT - RUSS ───

1   Right?

2        So, like, Sustiva was in a completely different kind of

3   drug class, and generally what they would do is they would

4   choose, like, a Zerit and Videx -- or together, or a Zerit and

5   the 3TC together with either a protease inhibitor, such as

6   Reyataz, or perhaps they would choose Sustiva.

7        So generally you would choose between a protease

8   inhibitor and non-nucleoside reverse transcriptase inhibitor.

9   Q.   Walk us through.  You talked a little about your time at

10  Hoffmann-La Roche.

11       Was your time roughly similar or about similar to what

12  you do day-to-day when you're at Bristol-Myers?

13  A.   Not really, because I sold a lot of drugs at Hoffmann-La

14  Roche that were in various therapeutic classes.  When I went

15  to Bristol-Myers, it was nothing but HIV medications.  So I

16  was really focused on, you know, just the HIV disease state.

17  Q.   And was that in roughly 2003-2004?

18  A.   I joined Bristol-Myers in 2006.  I'm sorry.  I -- that's

19  Janssen.

20       I joined Bristol-Myers -- I think it was 1997.

21  Q.   Okay.  So let me make sure that I understand the

22  timeline, then.

23       Hoffmann-La Roche would have been before that, then?

24  A.   Yes.  I'm sorry, yeah.

25  Q.   Okay.  So when you talk --

GRAHAM - DIRECT - RUSS

1  A.   I kind of don't really think of them as being an HIV that

2  much because the drug was very toxic and caused a lot of

3  pancreatitis, so I kind of forget that one sometimes.

4  Q.   Bristol-Myers was late '90s.

5  A.   Yes.  I think I went there in 1997.

6  Q.   Do you recall roughly how long you stayed at BMS?

7  A.   Nine years.

8  Q.   Nine years.

9       And the whole time you were selling HIV medication?

10 A.   Yes.

11 Q.   Were you -- what does it look like when you're going into

12 a doctor's office to talk to that doctor to try to convince

13 them to prescribe your drug?

14 A.   It was kind of emotional.  Right?  I mean, you know, I

15 felt very compelled to help HIV people because I don't feel

16 like anybody, regardless of their race or their sexuality or

17 whatever their choices are, should die from a terminal

18 disease.

19      You know, I recall going into one doctor's office when

20 I had first moved to New York, and he opened up a closet in

21 his office, and it was filled with nothing but files of people

22 that had died.

23      You know, fortunately, as the years went on, that

24 became less and less so because it became more of a chronic,

25 manageable disease.

GRAHAM - DIRECT - RUSS

1  Q.   Is one of your jobs as a sales representative to

2  establish trust with the prescriber?

3  A.   Yes.

4  Q.   And how would you do that?

5  A.   I mean, I think the best way to do that is a couple

6  different ways.  Right?  You have a very clinical conversation

7  with them about what the drug's efficacy is, what the safety

8  profile is, you know, what they can expect from the drug.  And

9  also helping them along the way -- you know, it was really

10 kind of a total office call.

11       Like, of course we talked to the physicians, but, you

12 know, especially in the HIV clinics in the hospitals, you

13 know, we would talk to the social worker and we would talk to

14 the nurse, and it was trying to get people to be adherent to

15 their medications.

16       So it was very -- there was a lot of different levels.

17 Right?  I mean, it wasn't just the physician, but it was a lot

18 of people in the office.

19       So, yeah, I mean, it was very important to establish

20 trust and also to know that they can rely on you and also to

21 know that, you know, you're kind of part of the treatment team

22 in some respect.

23 Q.   Roughly how many doctors did you call on at

24 Bristol-Myers?

25 A.   Well, I mean, there was four of us in the city, so

GRAHAM - DIRECT - RUSS

1    probably 50, 60.

2    Q.   50 or 60 doctors?

3    A.   Yes.

4    Q.   Or prescribers?

5    A.   Yes.

6    Q.   Does that include nurses?

7    A.   Well, nurses don't prescribe, but nurse practitioners are

8    the physician's assistant.

9    Q.   That's right, nurse practitioners.

10   A.   Yeah, maybe 65.

11   Q.   Ms. Graham, during your time with those two companies,

12   and since then, you've remained in the pharmaceutical industry

13   for some time.

14   A.   Yes.

15   Q.   In fact, if you could just describe some of the

16   pharmaceutical companies that you've worked at since

17   Bristol-Myers Squibb?

18   A.   Well, since Bristol-Myers Squibb, I went to Janssen and

19   continued to sell HIV drugs for five years.

20        When I left Janssen, I went to go work for a company

21   called Monogram Biosciences, which -- they did resistance

22   testing for HIV.

23        You know, I took a couple little stints along the way

24   selling molecular diagnostic testing but, you know, have since

25   gotten back into pharma and have been in pharma for the last

GRAHAM - DIRECT - RUSS

 1   several years.

 2   Q.    During your time in the pharmaceutical industry,

 3   Ms. Graham, did you learn about something called off-label

 4   marketing?

 5   A.    Yes.

 6   Q.    What's your understanding of what that means?

 7   A.    Well, we're very regimented by what is in the package

 8   insert.  So, you know, you cannot speak to or promote the drug

 9   or the product outside of what is in that little white piece

10   of paper that you get with your prescription.

11   Q.    Is there an agency that approves that label?

12   A.    Yes.  The FDA.

13   Q.    Is that the Food and Drug Administration?

14   A.    It is.

15   Q.    Were you trained on off-label marketing before you got to

16   Janssen?

17   A.    Yes.

18   Q.    Was it aspirational or was it black and white?

19   A.    Oh, it was pretty black and white.

20   Q.    And has it been throughout your time in the

21   pharmaceutical industry?

22   A.    Always.

23   Q.    Let's transition now to talk about your time at Janssen.

24   A.    Okay.

25   Q.    Well, before we get there, did you meet Ms. Penelow at

GRAHAM - DIRECT - RUSS

1   Bristol-Myers?

2   A.    I did.

3   Q.    Was she also a salesperson?

4   A.    She was.

5   Q.    And you didn't meet Christine Brancaccio, my client, at

6   Bristol-Myers, did you?

7   A.    I did not.

8   Q.    So when did you go to work for Janssen?

9   A.    In 2006.

10  Q.    Explain why you went to Janssen.

11  A.    So I was working for Bristol-Myers Squibb, and I sold --

12  you know, like, I went through the four products that I sold

13  for.  You know, as time would go on, newer HIV products would

14  come out.  And when I looked at some of the clinical data

15  about Prezista, it made me really excited about it.  I thought

16  the molecule was really good.  It was really going to be a

17  great product.

18        And, you know, after being at -- nine years at BMS, I

19  was a little bored.  I felt like I needed a new challenge, so

20  I went to Janssen.

21  Q.    When -- and how long were you at Janssen?

22  A.    Five years.

23  Q.    In fact, you held various positions at Janssen.

24  A.    I did.

25  Q.    So in 2006, 2007, where did you start?

GRAHAM - DIRECT - RUSS

1    A.   I was a sales rep in Manhattan.

2    Q.   Were you calling on some of the same doctors that you

3    were calling on in your previous job?

4    A.   Exactly.

5    Q.   The exact same doctors?

6    A.   Pretty much, yes.

7    Q.   How long were you a sales rep in New York?

8    A.   From January 2006 until April 2007.

9    Q.   And that was in the -- I think you said Manhattan?

10   A.   The Upper West Side.

11   Q.   Now, I want to come back to your time as a sales rep.

12        But in 2007, did you get a promotion?

13   A.   I did.

14   Q.   What promotion?

15   A.   I was a national sales trainer.

16   Q.   So did you stay in Manhattan?

17   A.   I didn't.  I moved here to New Jersey.

18   Q.   Did you go to the home office?

19   A.   I did.

20   Q.   Is that sort of the same as the headquarters?

21   A.   For that division, yes.

22   Q.   That division of Janssen.

23   A.   Yes, yes.

24   Q.   At the time that you joined Janssen, was it -- did it go

25   under the name -- or use the name Tibotec?

GRAHAM - DIRECT - RUSS

1    A.    Yes.

2    Q.    Explain to the jury what Tibotec was.

3    A.    Tibotec was a division within Johnson & Johnson or

4    Janssen that was dedicated specifically to the HIV meds.

5    Q.    What were your job obligations and duties while you were

6    in the national sales group?

7    A.    Several things.  I would put out a lot of communications

8    to the field about, you know, whatever needed to be trained.

9    I was responsible for training any new hires.  I was also

10   responsible for ongoing training for the current

11   representatives.  I held workshops at national sales meetings.

12   I trained anybody that came in on the disease state.

13        For example, you know, if -- when Mark Gossett came,

14   who was the vice president, I had -- like, I did a training

15   session with him to teach him about HIV and to teach him about

16   the products.

17        So ongoing training and -- as well as trained the

18   trainers.  We had dedicated field trainers that helped me,

19   like out in the field as opposed to just being in the home

20   office, and I would train the trainers, too.

21   Q.    During your time as a national sales trainer, did you

22   work closely with some of the executives of the company?

23   A.    I mean, yes, but not every day.  But I certainly had

24   access to them.  It was not a large office.

25   Q.    Can you describe for the jury some of the people that you

GRAHAM - DIRECT - RUSS

1    worked with at the home office.

2    A.    Sure.  So, I mean, there was Glenn Mattes, who was the

3    president.  There was Mark Gossett, who was the vice

4    president.  There was Mike Yancovitz, who was the national

5    sales director as well as the training director.  I worked

6    with the medical team.  Guy De La Rosa, I think, was the

7    medical director for Prezista.  Jim Witteck, I think, was for

8    Intelence.

9         And it's been a minute.  It's been several years, so

10   I'm hoping that this is all correct.

11        You know, I worked with the marketing department, Ben

12   Kozub for Prezista, Joe Valeriani for Intelence, as well as

13   Candace Long for Intelence.

14        So, you know, it was a very multifunctional kind of

15   group.

16   Q.    We'll talk a little bit more later this afternoon about

17   your time at the home office, but in 2009, did you go back out

18   in the field?

19   A.    I did.

20   Q.    Did you go back to becoming a sales rep?

21   A.    I did.

22   Q.    Did you go back to New York?

23   A.    No, it was here in New Jersey.

24   Q.    Did you do the same job in New Jersey that you were doing

25   in Manhattan?

GRAHAM - DIRECT - RUSS

1    A.    I did.

2    Q.    How long did you do that?

3    A.    For two years.

4    Q.    So you were calling on doctors that were in New Jersey

5    for those two years?

6    A.    Correct.

7    Q.    Or nurse practitioners?

8    A.    Yes, uh-huh.

9    Q.    We mentioned the FDA.  Ms. Graham, at your time in the

10   health care world, have you run across training or experience

11   with something called the Anti-Kickback Statute?

12   A.    Yes.

13   Q.    What is your understanding of what that is?

14   A.    That you can't pay providers or -- yeah, any provider for

15   a prescription.

16   Q.    Ms. Graham, during your time at Janssen, did you

17   experience conduct that you believed was illegal?

18   A.    I did.

19   Q.    Describe for the jury what you saw.

20   A.    I mean, there was illegal marketing practices where we

21   were promoting outside of the package insert to the providers,

22   both were Intelence as well as for Prezista.

23         You know, the speaker programs, we chose the speakers

24   based upon, you know, their potential in order to --

25   particularly when the drug was first approved.  You know,

GRAHAM - DIRECT - RUSS

1  we -- we were being measured on medical information request

2  forms, which are supposed to be unsolicited.

3  Q.   Okay.  Let's talk about some of that.  Let's start in

4  2006.

5       Was Prezista launched in 2006?

6  A.   It was.

7  Q.   And was that also a protease inhibitor?

8  A.   Yes, it was.

9  Q.   The same as Reyataz?

10 A.   Correct.

11 Q.   So is Reyataz one of the competitors for Prezista?

12 A.   Yes.

13 Q.   You had actually sold Reyataz, right?

14 A.   I did.

15 Q.   When did you join?  Was it in the spring of 2006 before

16 the launch of Prezista?

17 A.   I think I joined in, like, January or February of 2006.

18 I don't think the launch was until June.

19 Q.   Did you learn when the launch -- when the label -- or

20 package insert was approved that Prezista was approved for

21 what's called a limited indication?

22 A.   Yes, it was very specific.  It was for

23 treatment-experienced patients who had failed at least one

24 protease inhibitor.

25 Q.   You mentioned earlier -- you described what

GRAHAM - DIRECT - RUSS

1    treatment-naive patients were.

2    A.    Yes.

3    Q.    Is that what treatment-experienced patient is?

4    A.    Yes.  So a treatment-experienced patient, when you're

5    specifically talking about a protease inhibitor, is someone

6    that had previously been on a protease inhibitor.

7    Q.    When you joined Janssen, did you become aware of some of

8    the sales forecasts that Janssen had for Prezista for the

9    first year or two?

10   A.    Yes.

11   Q.    And what were they?

12   A.    What were the numbers?

13   Q.    No, not specifically.  Describe the forecast for the

14   jury.

15   A.    Oh, it was, I thought, completely unrealistic for what

16   the indication for the drug was.

17   Q.    Why did you believe that?

18   A.    Because the treatment-experienced patients that had

19   failed one or more protease inhibitor and was resistant to

20   other protease inhibitors was a relatively small group of

21   patients compared to the entire HIV community.

22   Q.    And you were selling Reyataz for treatment-experienced

23   and treatment-naive patients?

24   A.    Yes.

25   Q.    Was that a -- the treatment-naive patients, was that a

GRAHAM - DIRECT - RUSS

1   larger population of patients?

2   A.   Yes.

3   Q.   Significantly so?

4   A.   Yes.

5   Q.   Did you --

6   A.   But can I clarify that?

7   Q.   Yes, ma'am.

8   A.   So, you know, again, I just want to add this distinction.

9        Like, treatment-naive was that they were naive to a

10  protease inhibitor.  They could have been on something like an

11  NNRTI, which was Sustiva.  So it was specifically, you know,

12  naive to a protease inhibitor.

13  Q.   Were you able to meet your -- let me back up.

14       Were there sales goals for you that were attached to

15  the projections that the company had for the sale of Prezista?

16  A.   Yes.

17  Q.   Describe, generally, what those sales goals were.

18  A.   Again, I just felt that they were not congruent with what

19  the patient population was.  So they were very aggressive.  It

20  felt unattainable.  You know, I just don't think they were

21  realistic for what our indication was.

22  Q.   Based on your experience to that point with HIV patients,

23  did you believe that you could meet your sales goals based on

24  the limited indication that Prezista was approved for?

25  A.   No.

GRAHAM - DIRECT - RUSS

1  Q.   Did other salespeople meet their goals the first year?

2  A.   No.  Not to my knowledge.

3  Q.   Did you talk with other people that you worked with about

4  the sales goals and expectations that the company put on you?

5  A.   Yes.

6  Q.   What were those -- describe to the jury what those

7  discussions consist of.

8  A.   I mean, it was pretty much what I just described.

9  Everybody talked about how unrealistic they were, how

10 unattainable they were.  You know, based upon the indication,

11 there was no way that we were going to attain those lofty

12 goals.

13 Q.   Did they adjust your goal?

14 A.   No.

15 Q.   What did they do instead?

16 A.   They told us that we needed to find a way to meet the

17 goals because -- I mean, not only was -- were those numbers

18 promised to the board of directors, but they were also

19 promised to Wall Street.

20 Q.   Did you change the way that you were selling the drug

21 based on the fact that projections weren't realistic?

22 A.   We did.

23 Q.   What did you do?

24 A.   Well, we instructed that we wanted to say this is not a

25 salvage patient.  Our goal was to move the prescribing of

GRAHAM - DIRECT - RUSS

1    Prezista up in the treatment paradigm.

2         So, you know, do not save it as a last resort.  You

3    know, move it up in the treatment paradigm to include

4    treatment-naive patients.

5    Q.   Were treatment-naive patients on the label at that time?

6    A.   No.

7    Q.   Did they become approved for Prezista in 2008?

8    A.   They did.

9    Q.   Did you and your colleagues sell Prezista as appropriate

10   for treatment-naive patients before 2008?

11   A.   We did.

12   Q.   Was there another concern around selling Prezista related

13   to lipids or cholesterol?

14   A.   Yes.

15   Q.   Explain to the jury what that was about.

16   A.   So Prezista needed to be boosted with another protease

17   inhibitor called ritonavir, and ritonavir in and of itself

18   could increase lipid levels, total cholesterol triglycerides.

19        HIV in and of itself can also cause issues with total

20   cholesterol and triglycerides, LDL, HDL.

21        So to, you know, position the fact that Prezista was

22   something that was lipid neutral or, you know, minimal impact

23   on lipids, it's very different than what we were told to say

24   about it being lipid friendly.

25        To put that in context, when I sold Reyataz, Reyataz

GRAHAM - DIRECT - RUSS

1    for treatment-naive patients, you did not used to -- you did

2    not need to use ritonavir with it.

3           So just by definition, Reyataz was much more lipid

4    friendly than Prezista plus ritonavir.  We didn't really make

5    that distinction.  We just kept saying that it was lipid

6    friendly, which it -- that's incorrect, in my opinion.  Did it

7    have a minimal impact on lipids compared to the drug that it

8    was tried against in the clinical trials, which was Kaletra?

9    It did.

10          But to take it a step further and say that it was lipid

11   friendly is not accurate.

12   Q.   Did you also sell Prezista using the phrase "lipid

13   neutral"?

14   A.   I think that was used, yes.  I can only personally say,

15   you know, lipid friendly was kind of beaten into our heads.

16   Q.   What about -- did you sell Prezista as being the same as

17   Reyataz?

18   A.   Yes.

19   Q.   Is that appropriate?

20   A.   No.

21   Q.   How do you know that?

22   A.   Well, just by definition, because you had to use Prezista

23   with ritonavir; you did not have to use Reyataz with

24   ritonavir.

25   Q.   So you mentioned that there was a study that was on-label

GRAHAM - DIRECT - RUSS

1  comparing Prezista to a drug called Kaletra?

2  A.    Correct.

3  Q.    Was there at any point during your time at Janssen a

4  study on-label comparing Prezista to Reyataz?

5  A.    No.

6  Q.    Was it your understanding that you could promote to

7  doctors in their office that it is the same as Reyataz?

8  A.    No, because you need a head-to-head study within your

9  label to do so, and we did not have one.

10  Q.    So let's talk about the studies for a second.  We're

11  going to look at some of the documents.

12  A.    Okay.

13  Q.    Is there a difference between an FDA-approved study and

14  just a study that a company does --

15  A.    Yes.

16  Q.    -- on a drug?

17  A.    Yes.

18  Q.    Explain to the jury what the difference is.

19  A.    Well, let me qualify that a little bit.  So there's --

20  any -- the critical trials are what are done in order to

21  approve the drug, and that goes into the package insert, into

22  the label of the product.  So we are bound by just talking

23  about the clinical trials that are in the package insert.

24      Now, there's certainly other peer-reviewed trials that

25  go on.  There's other trials that happen that researchers

─GRAHAM - DIRECT - RUSS─

1    decide, Oh, let me take a look at this compared to that, and

2    they do, and the data is published.

3         But we are not allowed to talk about those because it's

4    not in the label.

5    Q.   So the label is sort of your -- your road map.  You've

6    got --

7    A.   It's your compass, yeah.

8    Q.   You have to stay between the lines of the label?

9    A.   Correct.

10        MR. RUSS:  If we could pull up, Ms. Johnson,

11   Relators' 353.

12        MS. BROWN:  Can we have a copy -- I'm sorry.

13        THE COURT:  Has this been admitted?

14        MR. RUSS:  I don't want to publish it, Ms. Johnson.

15        THE COURT:  Yeah.  Let's be careful about that.

16        (Conversation between counsel.)

17        MS. BROWN:  Your Honor, can we approach for a second?

18        THE COURT:  Yes.

19

20

21

22

23

24

25

GRAHAM - DIRECT - RUSS

1          (Sidebar begins at 2:00 p.m.)

2          MS. BROWN:  We need to figure out a way to get a

3   copy.

4          MR. RUSS:  Our copies are electronic, but you have

5   the same copies electronically.

6          MS. BROWN:  I just always do paper copies.  I missed

7   a disconnect.  I'm sorry.  I need -- if that's the case, I

8   just need to take a second to pull them out because I don't

9   have access to it --

10          MR. RUSS:  Absolutely.

11          THE COURT:  You can pull it up electronically?

12          MS. BROWN:  I'm going to see if these guys can.  I

13   don't even have my computer.

14          THE COURT:  Let's find out if you can pull it up.

15   All right.

16          MS. BROWN:  Okay.  Yeah.  Okay.

17          THE COURT:  Is it going to take a minute?

18          MS. BROWN:  I'll make it work.

19          MR. RUSS:  While you're doing that --

20          MS. BROWN:  Yeah.

21          MR. RUSS:  -- we have a list of exhibits that there's

22   no objection to.

23          MS. BROWN:  I'll just have my folks print it.  I just

24   would like a paper copy.  I don't want to hold people up.  I

25   just -- I need a copy.

GRAHAM - DIRECT - RUSS

1          THE COURT:  Got it.  But you have it electronically.

2    You have access to it.

3          MS. BROWN:  I'm going to ask these guys to pull it up

4    for me.

5          THE COURT:  Let's figure that out.  I mean, do you

6    need time, then, to do that?  I mean, they should be able to

7    do that.

8          MS. BROWN:  I don't want to hold people up --

9          THE COURT:  All right.  So we're going to --

10         MS. BROWN:  So if I have an issue, I'll let the Court

11   know, but I don't want to hold us up.

12         THE COURT:  Thank you.

13         MS. BROWN:  Thank you.

14         THE COURT:  Yep.

15         (Sidebar was concluded at 2:00 p.m.)

16

17

18

19

20

21

22

23

24

25

GRAHAM - DIRECT - RUSS

1              (Open court.)

2              THE COURT:  You may proceed, Mr. Russ.

3              MR. RUSS:  Thank you, Your Honor.

4         Your Honor, RX 353 there's no objection to.  We would

5    move to admit it under an agreement with Janssen's counsel.

6              THE COURT:  All right.  There's no objection,

7    Ms. Brown?

8              MS. BROWN:  No, Your Honor.  Thank you.

9              THE COURT:  So it's admitted.

10         Now, I don't care.  Yeah.  I just want to be careful,

11    folks.  If you publish it, it's got to be admitted.

12    (Plaintiffs' Exhibit 353 in evidence.)

13              MR. RUSS:  Permission to publish, Your Honor?

14              THE COURT:  You may.

15    BY MR. RUSS:

16    Q.   Ms. Graham, do you recognize this document?

17    A.   Yes.

18    Q.   Is it a strategy review presentation from July 12, 2006?

19    A.   Yes, it is.

20    Q.   And you were -- you saw these types of documents during

21    your time at Janssen, correct?

22    A.   Correct.

23              MR. RUSS:  Let's take a look, Ms. Johnson, if we

24    could, on Slide 2, under "Key Forecasting Assumptions."

25              THE WITNESS:  Uh-huh.  Oh, that's great.

*United States District Court*
*District of New Jersey*

GRAHAM - DIRECT - RUSS

1    BY MR. RUSS:

2    Q.   Ms. Graham, do you see at the bottom left corner of that

3    document there's a phrase that starts "Prezista has GI lipid

4    advantages"?

5    A.   Yes.

6    Q.   Can you read the rest of that to the jury, please.

7    A.   "Over Kaletra; parity to Reyataz."

8    Q.   Was Prezista the same as Reyataz on lipids?

9    A.   No.

10   Q.   How do you know that?

11   A.   Again, just because Prezista needed to be used with

12   ritonavir and Reyataz did not -- let me clarify that.

13   Ritonavir was used with Reyataz in treatment-experienced

14   patients.  But in treatment-naive patients, you did not used

15   to have -- you did not have to use it with Reyataz.

16          MR. RUSS:  If you could, Ms. Johnson, turn to

17   Slide 4, please.

18   BY MR. RUSS:

19   Q.   Now, Ms. Graham, you talked to the jury a minute ago

20   about the projections for 2006.

21   A.   Uh-huh.

22   Q.   What were the projections for the sale of Prezista in

23   2007?

24   A.   It looks like 262 million.

25   Q.   Was there a peak sales of almost 1.1 billion?

GRAHAM - DIRECT - RUSS

1    A.   Yes.

2    Q.   Was that realistic in your experience?

3    A.   Not for the indication at the time, no.

4         MR. RUSS:  Let's turn to Slide 5, please.

5    BY MR. RUSS:

6    Q.   Ms. Graham, do you see the commercial strategy slide

7    there?

8    A.   I do.

9    Q.   Do you see where it says "aggressively promote Prezista's

10   value proposition"?

11   A.   I do.

12   Q.   And do you see there's an arrow that says "positioning

13   and key claims"?

14   A.   Yes.

15   Q.   The second bullet point, Ms. Graham, will you read that

16   to the jury?

17   A.   "Well tolerated, better GI profile than Kaletra and

18   similar lipids to Reyataz."

19   Q.   Did Prezista have similar lipids to Reyataz?

20   A.   No.

21   Q.   Was there a warning on Prezista's label or an adverse

22   reaction as to hyperlipidemia and hypercholesterolemia?

23   A.   It was listed as adverse events, yes.

24   Q.   Did Reyataz have that same adverse event?

25   A.   I don't recall.  It -- it may have been a class warning.

GRAHAM - DIRECT - RUSS

1   I don't recall.  I have to look at the Reyataz package insert.

2   Q.   You can see it on the Reyataz label?

3   A.   You could, yes.

4   Q.   If we could to --

5        MR. RUSS:  And, Your Honor, I'll move to

6   Relators' RX 89, which I understand there is also no objection

7   to.

8        THE COURT:  Ms. Brown?

9        MS. BROWN:  No objection, Your Honor.  Just subject

10  to foundation with this witness, but the document itself, no

11  objection.

12       THE COURT:  All right.  So you can't just admit it,

13  then.  You have to lay a foundation for it through the

14  witness.

15       MR. RUSS:  Sure.

16  BY MR. RUSS:

17  Q.   Ms. Graham, did you see documentation --

18       MR. RUSS:  Let's just pull it up for the witness

19  only, please, RX 89.

20       THE WITNESS:  Okay.

21  BY MR. RUSS:

22  Q.   Do you recognize RX Relators' 89?

23  A.   You mean the person who wrote it?

24  Q.   No, ma'am.  The document.

25  A.   Oh, yeah.

GRAHAM - DIRECT - RUSS

1    Q.   Is it a business update that was presented by

2    Nancy Bartnett?

3    A.   Yes.

4    Q.   Who is Nancy Bartnett?

5    A.   She was the health science manager at the time.

6    Q.   Did you work with Ms. Bartnett?

7    A.   I did.

8    Q.   Did you see business updates during your time as a sales

9    representative for Prezista in New York when you worked with

10   Ms. Bartnett?

11   A.   Yes.  I'm sure they represented at our, you know,

12   district meetings.

13   Q.   Did you see these frequently?

14   A.   Probably a couple times a year.

15   Q.   Okay.

16          MR. RUSS:  Your Honor, at this point, we'd move to

17   admit RX 89.

18          MS. BROWN:  No objection.

19          THE COURT:  All right.  So admitted.

20   (Plaintiffs' Exhibit 89 in evidence.)

21          MR. RUSS:  Ms. Johnson, if you could turn to Slide 3,

22   please.

23          And if we could publish that for the jury.

24   BY MR. RUSS:

25   Q.   Ms. Graham, do you see where it's "business performance

GRAHAM - DIRECT - RUSS

1    analysis achieved versus goal" on this document?

2    A.   Yes.

3    Q.   Describe for the jury what this document shows for your

4    2006 district sales goals.

5    A.   It shows how much we sold versus how much we were

6    expected to sell.

7    Q.   And were you on target?

8    A.   No.

9    Q.   Were you significantly under target?

10   A.   Yes.

11   Q.   Again, did the leadership of the company change your

12   sales goals based on this data?

13   A.   No.

14        MR. RUSS:  If we could, Ms. Johnson, turn to Slide

15   Number 6.

16   BY MR. RUSS:

17   Q.   Ms. Graham, what is Slide Number 6?

18   A.   That's showing like prescriber data, so, you know, I

19   don't know if that's specific to the district or just

20   somebody's territory.  I don't know because it doesn't

21   designate.  I can't remember.

22        But what it's showing you is how much -- how many

23   dollars were spent for each other drug on the market in the

24   protease inhibitor market, you know, what the percentage of

25   growth was, what the total prescription volume was, the total

GRAHAM - DIRECT - RUSS

1  prescription percentage growth, how many new prescriptions

2  there were and what was the total prescription market share,

3  so it's showing year to date and quarter to date.

4  Q.   Thank you.

5        Did Janssen keep prescription data and track

6  prescription data for prescribers?

7  A.   Yes.

8  Q.   Is this an example of how Janssen tracked that data?

9  A.   Yes.

10 Q.   Was it also --

11 A.   I mean, we bought the data.  I mean, you know, it was --

12 we -- it was like DDD or something was the company at the time

13 where you could buy prescription data.

14 Q.   Did Janssen also track prescription data on a

15 doctor-by-doctor basis?

16 A.   Yes.  We would -- it would be that granular, the data

17 that we would get.

18 Q.   And it would show prescriptions by certain time periods,

19 like maybe the last 13 weeks?

20 A.   If I remember correctly, we got it almost weekly.

21 Q.   So you got -- Janssen got prescription data on a

22 doctor-by-doctor basis almost weekly?

23 A.   Yes.

24 Q.   And that was tracked?

25 A.   Correct.

GRAHAM - DIRECT - RUSS

1  Q.  All right.  What is on the left of that slide,

2  Ms. Graham?

3  A.  It's the name of the drugs on the market.

4  Q.  How do you say the second one?

5  A.  Aptivus.

6  Q.  Is that a competitor drug for Prezista?

7  A.  Yeah.

8  Q.  Same with Reyataz?

9  A.  Correct.

10  Q.  Same with Kaletra?

11  A.  Yes.

12  Q.  All right.  So we talked about the HIV disease state back

13  in the '90s.

14  A.  Uh-huh.

15  Q.  Right?  Now we're in 2006.

16  A.  Correct.

17  Q.  And I told you we were going to revisit that.

18  A.  Uh-huh.

19  Q.  Had the HIV disease state changed by 2006?

20  A.  Very much so.

21  Q.  Explain to the jury how.

22  A.  Again, you know, when I first got in it and I was selling

23  Hivid, it was really -- you know, it was a death sentence.  We

24  only had a couple drugs, and as the drugs came out, they

25  became better tolerated.

─GRAHAM - DIRECT - RUSS─

1        They became less time -- less times a day that you had

2    to take them.  The side effect profile was more important

3    because you had choices.

4        So what we did was track the prescriptions of all the

5    other drugs on -- you know, that were competitors to ours.

6    Q.   So was it -- well, we'll revisit that in a second.

7        Let me ask you this because I want to talk about the

8    other drug, and we'll come back to some of these topics.

9        Was there another drug that Janssen launched in 2008?

10   A.   Yes.

11   Q.   What was that?

12   A.   Intelence.

13   Q.   Same as Prezista, did it also have a limited indication?

14   A.   It did.

15   Q.   What were the things that limited the sale of Intelence?

16   A.   Well, it was for treatment-experienced patients, and it

17   was also twice a day.

18   Q.   So as approved by the FDA, the drug Intelence had to be

19   taken twice a day?

20   A.   Correct.

21   Q.   Is that sometimes referred to as BID?

22   A.   Yes, it is.

23   Q.   Do you know what that stands for?

24   A.   I don't remember.  It's just been so long since I've seen

25   it spelled out, you know.  It's just automatic QD, BID, TID is

GRAHAM - DIRECT - RUSS

1    three times a day.

2    Q.    And what is QD?

3    A.    Once a day.

4    Q.    So QD drug, once a day; BID, twice a day?

5    A.    Correct.

6    Q.    Intelence was only approved for twice a day?

7    A.    That is correct.

8    Q.    Okay.

9          When you first started selling Prezista --

10   A.    Uh-huh.

11   Q.    -- in New York --

12   A.    Yes.

13   Q.    -- did you run into obstacles in getting physicians to

14   switch to Prezista?

15   A.    Yes.  There were a lot of obstacles.

16   Q.    Explain to the jury what obstacles you're talking about.

17   A.    Well, first of all, when the drug was approved, we only

18   had 24-week data, so there was very limited data regarding the

19   safety and efficacy of the product, and as you can see,

20   there's other drugs that were on the market.

21        So there wasn't really this, you know, excitement to go

22   ahead and prescribe something new because what happens is, if

23   a regimen is working for a patient, you want to keep the

24   patient on that because they're adherent.  You want them to

25   take a drug that they're going to be committed to and to take.

GRAHAM - DIRECT - RUSS

1          So there's the 24-week data, which was limited safety

2    as well as efficacy data.  It was a BID drug at the time.  It

3    was, you know, somewhat pigeonholed for a

4    treatment-experienced patient.

5          A lot of physicians thought of it as a last-resort drug

6    because the indication was treatment-experienced patients who

7    had failed at least one protease inhibitor.

8          So there were a lot of obstacles.  I mean, being in

9    New York, which was like the epicenter of HIV, you know,

10   between that and California, you know, the drug, as you can

11   see, is kind of saturated when you look at the numbers of what

12   the competitors were doing, particularly for that patient

13   population.

14   Q.   Sure.  And at this point, when the disease state had

15   changed, was there more focus on the side effects that these

16   drugs were causing patients?

17   A.   Yes.

18   Q.   And which side effects in particular were most important?

19   A.   So, you know, whether it was increasing lipids, whether

20   it was -- so a couple things with lipodystrophy.  It can kind

21   of manifest itself in a bunch of different ways.

22          Like there was something where people got what they

23   called buffalo hump on the back of their neck.  They would get

24   what they refer to as Crix belly, so the belly would be very

25   distended and full of visceral fat.

GRAHAM - DIRECT - RUSS

1    You would have lipoatrophy, so you would have wasting,

2    you know, in your cheeks.  You know, early on, a lot of these

3    drugs were toxic.  I mean, it's like a chemotherapy.  So it

4    was -- they were not pleasant.

5    So as more drugs came out, the goal was to, you know,

6    have them take it fewer times a day as well as cause less side

7    effects.

8    Q.    During your time as a sales representative in Manhattan,

9    Ms. Graham, did you personally sell Prezista as -- the same as

10    Reyataz on lipids?

11    A.    Yeah.  I mean, we said, Yes, when you look at lipids,

12    it's the same as Reyataz.

13    Q.    And it's your understanding that that was all part of a

14    promotion?

15    A.    Well, yes, you can't cross-compare, first of all.  We

16    don't have any head-to-head study with Reyataz.  And at that

17    time, in the treatment-experienced patients, you know, Reyataz

18    was approved for both.

19    And if, you know -- the assumption is if you say it's

20    as good as Reyataz, they're thinking about the lipids and the

21    treatment-naive patients where it was very lipid neutral or

22    friendly.  But we didn't make that distinction between

23    treatment-experienced patient or not.

24    Q.    Did you -- and you were tracking your physicians'

25    prescriptions?

GRAHAM - DIRECT - RUSS

1    A.    Yes.

2    Q.    When you sold Prezista to a -- to physicians in your area

3    as appropriate for treatment-naive patients --

4    A.    Uh-huh.

5    Q.    -- did you track those physicians before and after you

6    provided that message?

7    A.    Yes.  Oh, yeah.  Yes, of course.

8    Q.    And what would happen?

9    A.    I mean, you would see if you were moving the needle or

10   not.

11   Q.    Did it move the needle?

12   A.    Not initially.

13   Q.    So you ran into some -- some barriers?

14   A.    For sure.

15   Q.    Did you -- did you have to take additional steps to move

16   the needle?

17   A.    Yes.

18   Q.    What did you do?

19   A.    Well, that's when we decided that we're trying to move

20   the drug up the treatment paradigm where we're going to, you

21   know, say that it's lipid friendly; that we're going to, you

22   know, kind of put it on par with treating a treatment-naive

23   patient with Reyataz.

24   Q.    So you're meeting in the office of some of these doctors

25   you had called on, right?

GRAHAM - DIRECT - RUSS

1    A.    Yes.

2    Q.    When you were at Bristol Myers?

3    A.    Yes.

4    Q.    Describe for the jury what that looked like when you were

5    trying to sell this new drug to these same doctors?

6    A.    You know, I thought it was going to be easier than it was

7    because I have had, like, a nine-year-long relationship with

8    them.  I mean, I got a lot of pushback.

9          A lot of the doctors said it's -- 24-week -- 24 weeks

10   is not a lot of data.  You know, I don't know that Prezista

11   isn't going to kill somebody if they're on it for longer than,

12   you know, 24 weeks.  I really need 48-week data.  I need

13   96-week data.

14         So, I mean, the data was like the biggest pushback on

15   a -- I mean, that was the number 1 -- and it was also BID,

16   but...

17   Q.    You eventually were able to convince some of these

18   doctors to prescribe Prezista, correct?

19   A.    Eventually, yes.

20   Q.    What was one of the things that you and some of your

21   sales representatives did for those doctors to get them to

22   prescribe?

23   A.    Yeah.  So, I mean, you know, it was pretty strategic

24   about who we chose to be part of the speaker bureau or get

25   invited to ad boards.

GRAHAM - DIRECT - RUSS

1          So, you know, we had a list of the physicians based

2    upon, you know, their prescribing habits, who was a high

3    potential versus perhaps a low potential.

4          So we targeted the highest-potential physicians who had

5    the most patients and that wrote the most protease inhibitors.

6    Q.   Why did you target them?

7    A.   Because they are the ones with all the potential.

8    Q.   Was one of the purposes to get them on the speaker board

9    to get them writing Prezista?

10   A.   Absolutely.

11   Q.   Did it work?

12   A.   For some, yes.

13   Q.   Let's take a look, if we can.

14          MR. RUSS:  Just show the witness RX 183.

15   BY MR. RUSS:

16   Q.   Ms. Graham, do you see the document Relators 183 in front

17   of you?

18   A.   I do.

19   Q.   Is that Tibotec or a Janssen New York launch plan?

20   A.   It is.

21   Q.   Is this a document you had seen while you were working at

22   Janssen or similar types of documents?

23   A.   Yes.

24          MR. RUSS:  Your Honor, we move to admit RX 183.  My

25   understanding is there's no objection.

─GRAHAM - DIRECT - RUSS─

```
 1          THE COURT:  Any objection?

 2          MS. BROWN:  No, Your Honor, thank you.

 3          THE COURT:  So admitted.

 4  (Plaintiff's Exhibit RX 183 in evidence.)

 5          MR. RUSS:  If we could publish that, Ms. Johnson, to

 6  the jury.

 7  BY MR. RUSS:

 8  Q.   Ms. Graham, who was Frank Murphy?

 9  A.   He was my district sales manager.

10  Q.   Was he your direct boss?

11  A.   Yes.

12  Q.   Who is Eric Scherr?

13  A.   He was -- you know, he did access and reimbursement.

14  Q.   What about Nancy Bartnett?

15  A.   Again, I forget those acronyms, but she was a health

16  science manager, but then I think they later called them CAMs.

17  So that's a little deceiving because it says CAM next to

18  Eric's name.  I don't remember what -- who got what acronym at

19  that time.

20          MR. RUSS:  If we could, Ms. Johnson, turn to page 24.

21  BY MR. RUSS:

22  Q.   Ms. Graham, do you see the top of this document, it says

23  SWOT Analysis?

24  A.   Yes.

25  Q.   Do you know what a SWOT Analysis is?
```

GRAHAM - DIRECT - RUSS

1    A.    I do.

2    Q.    Describe it to the jury, what that means.

3    A.    It's strengths, weaknesses, opportunities, and threats.

4    Q.    Now, let's spend a little bit of time on this document,

5    Ms. Graham.  Do you see on the right that Janssen was keeping

6    track of the weaknesses of Prezista?

7    A.    Yes.

8    Q.    And one of those was the providers were not familiar with

9    Tibotec?

10   A.    That is correct.

11   Q.    You see another one that's involved there -- it that

12   says, NY -- New York -- is a takeaway market and not a growth

13   market.

14   A.    Yes, I do.

15   Q.    What did that mean?

16   A.    The market was really saturated, so the only way to get a

17   prescription was to take it away from another drug.  There was

18   not a lot of growth.  There wasn't a lot of potential for

19   growth in that patient population.

20   Q.    Do you also see in the next bullet point, Ms. Graham,

21   that Janssen listed a limited indication as a weakness?

22   A.    Yes.

23   Q.    And then do you see that it also had the 24-week data

24   that you were talking about?

25   A.    Yes.

GRAHAM - DIRECT - RUSS

1  Q.  That was limited data?

2  A.  Yes.

3  Q.  And then "Highly crowded and very competitive DI and ARV

4  markets."

5  A.  Yes.

6  Q.  There were other drugs on the market, Ms. Graham, at this

7  time?

8  A.  Yes.

9      And may I point out something else on this?

10  Q.  Yes.

11  A.  And I forgot to mention this, but where it says "unclear

12  resistance profile," you know, after 24 weeks -- so it was

13  very important that drugs were prescribed in a certain

14  sequence based upon resistant mutation.  Some drugs would not

15  work if they failed one drug.  So it was very important to

16  sequence them.

17      And with 24 weeks' worth of data, the physicians were

18  unclear as to really where to place this product or where to

19  use it in the sequence.

20  Q.  Now, you talked about some of the barriers that you had

21  to selling Prezista in the beginning.  Does this match up with

22  some of the barriers back in 2006?

23  A.  Yeah.  It does, yes.

24  Q.  Okay.

25      On the left, we have the strengths.

GRAHAM - DIRECT - RUSS

1    A.    Yes.

2    Q.    And one of those strengths, Ms. Graham, was strong

3    "marketing and training support."

4         You see that?

5    A.    Yes.

6    Q.    And "experienced CAM with strong relationships"?

7    A.    Uh-huh.

8    Q.    Was one of the strengths the sales team and the

9    experience of sales personnel like you?

10   A.    Yes.

11   Q.    Is that because you had relationships with doctors

12   already?

13   A.    Yes.  I mean, for the most part, all of us had already

14   worked in HIV for many years.  I mean, I myself, by the time I

15   joined Janssen, had, you know, ten-plus years of selling HIV

16   medications.

17        MR. RUSS:  If you could, Ms. Johnson, turn to page 27

18   at this same exhibit.

19   BY MR. RUSS:

20   Q.    Ms. Graham, do you see back in 2006 the same document,

21   there was a customer market analysis done by Janssen?

22   A.    Yes.

23   Q.    And let's go through this.

24        Janssen identified it had the -- New York had the

25   largest amount of Aptivus scrips year-to-date?

GRAHAM - DIRECT - RUSS

1    A.    Yes.

2    Q.    And that was a competitor drug?

3    A.    Correct.

4    Q.    And it was going to "target top Aptivus, Reyataz,

5    Kaletra" -- and how do you say that next one?

6    A.    Fuzeon.

7    Q.    -- "Fuzeon prescribers for the district."

8    A.    Yes.

9    Q.    Why were you targeting those top prescribers of other

10   drugs?

11   A.    Because we had to take away their market share.

12   Q.    And when you eventually sold to them, that wasn't

13   successful.

14   A.    Not initially, no.

15   Q.    And so there were a couple things that we talked about.

16   A.    Uh-huh.  Yes.

17   Q.    You moved it up in the treatment paradigm.

18   A.    Correct.

19   Q.    Off-label.

20   A.    Correct.

21   Q.    You compared it to Reyataz.

22   A.    Correct.

23   Q.    Off-label.

24   A.    Correct.

25   Q.    And then we also talked about how you identified some of

────── GRAHAM - DIRECT - RUSS ──────

1   these prescribers for a speaker bureau.

2   A.    Yes.

3   Q.    You see where it says, "Created A, B, and C lists for

4   speaker potential"?

5   A.    I do.

6   Q.    What were the A, B, and C lists?

7   A.    It was based upon potential and how many prescriptions in

8   the protease inhibitor market they wrote.

9           MR. RUSS:  If we could turn to page 29, Ms. Johnson.

10  BY MR. RUSS:

11  Q.    Did Janssen track the prescriptions of its competitor

12  drugs as the top prescribers for the New York district?

13  A.    We track prescriptions for many HIV -- or any HIV

14  provider, yes.

15  Q.    Does page 29 of this exhibit show the top Aptivus

16  prescribers?

17  A.    Yes.

18  Q.    Do you recognize some of the names of those doctors?

19  A.    Some of them, yes.

20  Q.    Did you call on some of those doctors?

21  A.    I did not.

22  Q.    Okay.

23          MR. RUSS:  Let's look at the next page, please.

24  BY MR. RUSS:

25  Q.    Again, top Fuzeon prescribers?

GRAHAM - DIRECT - RUSS

1   A.   Yes.

2   Q.   Top Reyataz prescribers?

3   A.   Yes.

4   Q.   Do you recognize some of these doctors?

5   A.   I do.

6   Q.   Which ones?

7   A.   I recognize a lot of names, but number 10 in particular

8   was one of my physicians.

9   Q.   Okay.  Is that somebody -- let me back up.

10       Did you recommend any of your physicians to be on the

11  speaker bureau?

12  A.   I did.

13  Q.   And were they top prescribers?

14  A.   Yes.

15  Q.   Were they top prescribers of competitor drugs?

16  A.   Yes.

17       MR. RUSS:  If we could look at the next slide,

18  please, Ms. Johnson.

19  BY MR. RUSS:

20  Q.   Same thing with top prescribers of Kaletra?

21  A.   Yes.

22  Q.   A competitor drug?

23  A.   Yes.

24       MR. RUSS:  Next slide, please.

25       If we could turn to slide 37, please.

GRAHAM - DIRECT - RUSS

1  BY MR. RUSS:

2  Q.   What is slide 37, Ms. Graham?

3  A.   Looks like "Ten key customers to be covered by Frank."

4  That is the district manager.

5  Q.   In the parenthetical, it says, "Decile ten physician" --

6  do you see that?

7  A.   I don't see that -- oh, wait, right there, yes.  Yes, I

8  do.

9  Q.   Were you identifying -- was Janssen identifying the top

10 prescribers of HIV medications?

11 A.   Yes.

12        MR. RUSS:  Next slide, please.

13 BY MR. RUSS:

14 Q.   And were those top prescribers on slide 38 listed and

15 identified here in the top 20 as going on the speaker bureau

16 in the far right?

17 A.   Yes.

18 Q.   Do you see on the far right there's a speaker bureau list

19 of A, B, or C categories?

20 A.   I do.

21 Q.   Did you participate in categorizing potential speakers at

22 Janssen?

23 A.   I don't know if I participated in essentially

24 categorizing them, but I certainly submitted names of whom I

25 thought would be a good candidate.

GRAHAM - DIRECT - RUSS

1   Q.   Were the names that you submitted prescribers that you

2   hoped would increase their prescriptions of Prezista?

3   A.   Yes.

4   Q.   Is that why you submitted them?

5   A.   Yes.

6   Q.   Were they ultimately paid by Janssen?

7   A.   Yes.

8   Q.   I'm going to come back in a little bit to the speaker

9   program.  I want to move on in the timeline of your time at

10  Janssen to the national sales training.

11  A.   Okay.

12  Q.   When you became the national sales trainer, was it your

13  job to train existing Janssen sales reps?

14  A.   Yes.

15  Q.   Did you train them on off-label promotion?

16  A.   Essentially, yes.

17  Q.   When you say "essentially," what do you mean?

18  A.   Well, it was -- it was -- yeah.

19       So when we would do -- you know, I would do trainings

20  at the national -- the plan of action meetings that we would

21  have, you know, generally twice a year.  So, yes, there were

22  some workshops where I was instructed to kind of get them to

23  the point where they would ask -- they would solicit

24  unsolicited questions.

25  Q.   So let's break that down a little bit.

GRAHAM - DIRECT - RUSS

1      What is soliciting unsolicited questions?

2  A.   It's -- it's kind of baiting them, you know.  For

3  example, if somebody's asking for off-label information or

4  more information about something that is not in the label, it

5  should be unsolicited.

6      The workshop was, you know, getting right up to that

7  line and saying, oh, for example, you know, wouldn't it be

8  great to have some more information about how you could use

9  Prezista in treatment -- or treatment-naive patients.  Why

10  sure, Donna, it would be.  Oh, great.  Let me send that

11  information to you.

12      That's an example of soliciting an unsolicited

13  question.

14  Q.   And you were training sales representatives on how to do

15  that?

16  A.   Yes.

17  Q.   Was it your idea?

18  A.   No.

19  Q.   Whose idea was it?

20  A.   I was told by Mark Gossett and Mike Yacovellis that that

21  was the workshop I would be conducting.

22  Q.   Did you push back?

23  A.   I did.

24  Q.   What did you say?

25  A.   I told them I was not comfortable doing that and I

GRAHAM - DIRECT - RUSS

1    wouldn't do it, and I was told that I would.

2    Q.    You were told it was not optional.

3    A.    Correct.

4    Q.    And did you go forward with it?

5    A.    I didn't have a choice.

6    Q.    What do you mean you didn't have a choice?

7    A.    I mean, it was either that or, you know, probably get

8    fired.

9    Q.    Did you need that job?

10   A.    Of course.

11   Q.    Did you also train new sales reps at Janssen?

12   A.    I did.

13   Q.    Was there similar types of training for new sales reps?

14   A.    Yeah.  I mean, the -- yes.  We would, you know, go

15   through the package insert.  We would go through the mechanism

16   of action.  We would go through the disease state.  We would

17   go through, like, the core visual aid, which is what the, you

18   know, materials you could use in talking to a physician or

19   presenting to a physician.

20        But what I would do in the -- in the training breakouts

21   is I would say, you know, Yes, this is what's in the core

22   visual aid, but, you know, this is what's realistic.  Like, we

23   can't pigeonhole Prezista for, you know, highly

24   treatment-experienced patients.  We're not going to make our

25   goal.  We need to move it up in the paradigm in order to

GRAHAM - DIRECT - RUSS

1  increase the number of patients or the type of patients that

2  are going to be prescribed Prezista.

3  Q.  Did you think that training was appropriate at the time?

4  A.  No.

5  Q.  Did you think that training at the time was promoting

6  off-label use and promotion of the drugs?

7  A.  I did.

8  Q.  Were you also training on a drug that we talked about,

9  Intelence?

10  A.  Yes.

11  Q.  And you mentioned the QD, the once a day versus twice a

12  day.

13  A.  Yes.

14  Q.  Did you train sales representatives on how to sell to

15  doctors that the drug be used once a day?

16  A.  Yes.

17  Q.  Describe that to the jury.

18  A.  You know, kind of the same thing.  No documentation about

19  it.  It was in a room, just talking to the sales reps.  And,

20  you know, one of the, I guess, objectives to using Intelence

21  was that it was a BID drug as opposed to a once-a-day drug.

22      So, you know, we would -- or I would talk about how to,

23  again, solicit unsolicited questions in order to get the

24  once-a-day information in their hands.

25  Q.  When you say "their hands," who are you talking about?

GRAHAM - DIRECT - RUSS

1    A.    I'm sorry.  The providers.

2    Q.    So the idea is you ask or prompt the provider to ask you

3    for off-label information?

4    A.    Yes.

5    Q.    Is that off-label promotion if you provide it?

6    A.    I don't know that --

7    Q.    Is that off-label marketing?

8    A.    It is, yes.

9    Q.    And you did that as a sales rep in New York?

10   A.    Yes.

11   Q.    Not for Intelence but for Prezista?

12   A.    Yes.

13   Q.    And then you --

14   A.    I was in -- I was a trainer when Intelence was launched.

15   Q.    Right.

16   A.    Yes.

17   Q.    And then you trained sales reps on off-label promotion

18   while you're at the home office.

19   A.    Yes.

20   Q.    And then you went back to the field, right, in

21   New Jersey?

22   A.    Yes.

23   Q.    And you sold both Prezista and Intelence?

24   A.    That is correct.

25   Q.    Did you continue to sell it to doctors off-label?

GRAHAM - DIRECT - RUSS

1  A.    Yes.  I mean, more so to me at that time in, like, 2009,

2  you know, we had the treatment-naive indication for Prezista,

3  so it was -- it was coming into its own, you know.  But with

4  Intelence, you know, it was -- it was a good drug.  It wasn't

5  a great drug, you know.  But the barrier to writing more of it

6  was because it was a BID drug, or a twice-a-day drug.

7  Q.    Explain to the jury an example of how you would promote

8  to a doctor how to use Intelence once a day rather than twice

9  a day as approved by the label?

10  A.    Yeah.  So, you know, first of all, I would say, you know,

11  wouldn't it be great if it were once a day.  Yes.  And the way

12  that you can do that is with the -- with the Intelence

13  capsules or tablets, you could drop them into water and

14  dissolve them kind of like an Alka-Seltzer, and then what we

15  would say is, you know, just dissolve it in the water, and

16  then the patients can take their other HIV meds with this

17  elixir, you know.

18       So it seems like the pill burden is less, because there

19  were a lot of studies done on adherence for HIV patients, and

20  it wasn't necessarily the pill burden.  It was really more the

21  number of times per day, because what the patient said is the

22  more times they have to take HIV meds each day, that's --

23  that's the more times they're reminded that they have HIV.

24  Right?  So when you're taking your meds, you're reminded that

25  you have it.

─GRAHAM - DIRECT - RUSS─

1          So it was really important to the patients and, you

2    know, ultimately the physicians that the products be once a

3    day.

4    Q.   And you sold it once a day?

5    A.   Yes.

6    Q.   Was it your idea?

7    A.   No.

8    Q.   Why did you do it?

9    A.   I felt that I had to.

10   Q.   Why?

11   A.   Because I felt that my job was on the line.

12   Q.   We talked about studies a minute ago.

13   A.   Yes.

14   Q.   Was it your experience at Janssen that you would use what

15   were called off-label studies with physicians?

16   A.   Yes.

17   Q.   Describe to the jury some of the off-label studies that

18   you would use, or the types of off-label studies.

19   A.   You know, for example, we talked a lot about how you

20   can't cross-compare Prezista to Reyataz.  I mean, there was

21   some independent studies done that actually did that.  We

22   would share those with the physicians.  We would share, you

23   know, very small publications.  I mean, some of the studies

24   were 50 patients, maybe 14 weeks.  It was -- there were

25   congresses or conferences a couple times a year that were

GRAHAM - DIRECT - RUSS

1   specifically for HIV.  And what we would do at Janssen is

2   share all of those posters or those publications to the sales

3   force.

4        So, you know, they would have them in their toolbox if

5   they wanted to use them.

6   Q.   Would you leave those studies behind to doctors?

7   A.   No.

8   Q.   Why not?

9   A.   Because that's a paper trail.

10  Q.   What do you mean by that?

11  A.   I mean, if you left it behind, somebody could say, Hey,

12  the Janssen rep left it here.

13  Q.   What would have been your concern if somebody said, Hey,

14  the Janssen rep left this study here?

15  A.   Because that's illegal, and I didn't want to lose my job.

16  Q.   Were you the only person doing this?

17  A.   No.

18  Q.   How do you know that?

19  A.   I mean, reps talk, right.  I mean, it was common practice

20  throughout the country.  Everybody felt, you know, under the

21  gun to perform.

22  Q.   When you say "perform," to make sales?

23  A.   Yes.

24  Q.   There's a notion out there, Ms. Graham, that doctors make

25  their own independent judgment when it comes to prescribing.

GRAHAM - DIRECT - RUSS

1          Do you think that you can affect prescribers?

2     A.   I do.  I mean, sales reps wouldn't exist if we didn't

3     have some influence over them.

4     Q.   Was another way at Janssen that you got off-label

5     information in the hands of prescribers through the use of

6     something called a Medical Information Request or MIR?

7     A.   Yes.

8     Q.   What is an MIR?

9     A.   So it's something that we would have the physicians sign

10    if they wanted information that was out of the package insert.

11    Q.   So explain how the process is supposed to work with the

12    Medical Information Request.

13    A.   So it is supposed to be in response to an unsolicited

14    request.  We would write down the question on the Medical

15    Information Request form.  We would have the physician or the

16    provider sign it.  It would be faxed in or sent in when it was

17    on the iPad to our medical department, and the medical

18    department would then send them the response.

19    Q.   Did you become familiar with MIRs before your time at

20    Janssen?

21    A.   I mean, yes.  It's commonplace in pharmaceutical

22    companies.

23    Q.   Was there a difference in your time at Janssen as to the

24    Medical Information Request than from any other company that

25    you had been in?

GRAHAM - DIRECT - RUSS

1    A.   Very much so.

2    Q.   How so?

3    A.   Because we were being tracked as to how many Medical

4    Information Request forms we were sending on a weekly basis.

5         I mean, I can only compare it to -- I mean, I sell a

6    drug for a rare kidney disease right now, and it's a drug

7    that's new to class, and I maybe send in three Medical

8    Information Request forms a month.

9         MR. RUSS:  If we could, Ms. Johnson, pull up, just

10   for the witness and opposing counsel, RX 73, please.

11   BY MR. RUSS:

12   Q.   Ms. Graham, do you recognize Relators' 73?

13   A.   I do.

14   Q.   What is it?

15   A.   This is an email that was sent out to our district.

16        MR. RUSS:  Your Honor, there's no objection to this

17   document.  We move to admit RX 73.

18        THE COURT:  Ms. Brown?

19        MS. BROWN:  No objection, Your Honor.

20        THE COURT:  All right.  So admitted.

21   (Plaintiff's Exhibit RX 73 in evidence.)

22        MR. RUSS:  If we could publish to the jury, please,

23   Ms. Johnson.

24   BY MR. RUSS:

25   Q.   Ms. Graham, again, who was Frank Murphy?

GRAHAM - DIRECT - RUSS

1    A.   He was my district manager, my direct manager.

2    Q.   Okay.  I know we're jumping around a little bit at a

3    time --

4    A.   That's okay.

5    Q.   -- right, but I'm trying to stay on top of it.

6    A.   Sure, that's fine.

7    Q.   We're back in 2007, and you're a sales rep in New York.

8    A.   In Man- -- yes.

9    Q.   So Frank Murphy was your boss.

10   A.   Yes.

11   Q.   Describe, if you would, some of the people that this

12   email was sent to.  Do you know who those people are?

13   A.   I do.

14        So it was mostly everyone -- it was everyone in my

15   district, all the other sales reps.  It was Nancy Bartnett,

16   who was -- whatever her title was.  Eric Sherr, who was the

17   access and reimbursement person.  And Michael Valentine, who

18   was the community liaison person.  So community liaisons went

19   and spoke to patients directly.  They had the ability to do

20   that.

21   Q.   Now, we talked earlier that you knew my client,

22   Ms. Penelow, from your time at BMS.

23   A.   Yes.

24   Q.   And Ms. Penelow joined you eventually at Janssen.

25   A.   That is correct.

─GRAHAM - DIRECT - RUSS─

1    Q.    She was a sales rep with you in New York?

2    A.    That is correct.

3    Q.    Her name at the time, Jessica Finkelstein?

4    A.    Yes.

5    Q.    And then you also during that time period met my client,

6    Christine Brancaccio?

7    A.    That is correct.

8    Q.    Did you also sell with her in the New York district?

9    A.    I did.

10   Q.    Okay.  And they're listed there on this email.

11   A.    They are.

12   Q.    You see Mr. Murphy is sending a use of resources.

13         MR. RUSS:  And I want to blow this up for the jury

14   even more if we can, Ms. Johnson.

15   BY MR. RUSS:

16   Q.    I'll start from the beginning.  It says, "New York team."

17         Do you see that?

18   A.    Yes.

19   Q.    If you could read the first sentence of this email.

20   A.    "New York team.  I know that we have discussed what other

21   districts are doing to drive business and share best

22   practices."

23   Q.    So this is an email comparing your district to other

24   districts?

25   A.    Yes.

GRAHAM - DIRECT - RUSS

1  Q.   And discussing best practices in driving business?

2  A.   Correct.

3  Q.   Please continue.

4  A.   "We are always comparing ourselves to the Florida

5  district, wondering how and projecting what they are doing

6  differently than us to move the Prezista business."

7       Continue?

8  Q.   Yes, please.

9  A.   "I think we all believe we are doing the same job as

10  those in Florida, but I have to disagree.  As we have

11  discussed in the past, we need to use the MIR process to

12  answer unsolicited questions on Prezista that are off-label."

13  Q.   Let me stop you there.

14       Is Mr. Murphy describing a problem where the doctors

15  are asking for off-label information but your team is just not

16  doing the MIR request?

17  A.   It appears that way.

18  Q.   All right.  We can keep going.  You can see -- you can

19  see the whole email.

20  A.   Yeah.  "All of those requests are logged in and accounted

21  for by state and by district.  For the month of January, we

22  had 49 requests logged in to Florida's 50, but in February, we

23  had 60 requests compared to Florida's 154.

24       "We are a district of nine salespeople versus seven,

25  and they are outperforming us.  If you break down the numbers,

GRAHAM - DIRECT - RUSS

1  we are averaging 1.5 Medical Information Request forms per

2  territory per week.

3      "That is not what I expect and want all of your

4  commitments to use this resource when asked by your customers.

5  Prezista is a great drug, and we owe it to our patients and

6  yourselves to get the message out about it.

7      "I don't want to end the week on a negative note but

8  feel that we are going to be viewed as the best sales district

9  in the country.  We better start to pick up the pace and

10 control these situations."

11 Q.  Okay.  Let's break that down.

12      This is an email about driving business, right?

13 A.  Yes.

14 Q.  And MIRs, in your experience, deal with off-label

15 information?

16 A.  Yes.

17 Q.  As you just testified -- that they are supposed to be

18 unsolicited?

19 A.  Yes.

20 Q.  Did you solicit MIRs?

21 A.  Yes.

22 Q.  How so?

23 A.  I gave an example earlier, but I'll give another one.

24      Wouldn't it be great if you had some information about

25 how you could use this in a treatment-naive patient?

GRAHAM - DIRECT - RUSS

1  Q.   Was Mr. Murphy breaking down the number of MIRs for

2  comparing to other districts?

3  A.   Yes.  The whole country was.

4  Q.   And he said, "We better start to pick up the pace and

5  control these situations."

6  A.   Yes.

7  Q.   How do you control a situation that's supposed to be

8  unsolicited and spontaneous?

9  A.   That's a great question.  I don't think that you can.

10  Q.   So what did you do?

11  A.   We started sending in forged Medical Information Request

12  forms, and if -- I would say to the doctor, for example, you

13  know, do you -- wouldn't it be great to have some information

14  in using it in treatment-naive patients?  Yes.  Wouldn't it be

15  great if you had some more resistance data?  Yes.

16      So instead of putting that on one form, which is, you

17  know, generally how it's done, everybody was creating like

18  only one question per one form because then it would drive the

19  number of Medical Information Request forms being sent in.

20  Q.   Okay.  And let's explain to the jury what happens when

21  you submit one of these MIRs to Janssen.

22  A.   Yes.  So, you know, it would get sent in either via fax

23  or through the iPad.  I don't think we had the iPads at the

24  time, so through the fax.

25      It would be sent to Janssen's medical department, and

GRAHAM - DIRECT - RUSS

1    then the medical department would send out the response with

2    the information to the provider.

3    Q.   So the off-label information that's being requested in

4    MIR is sent directly to the provider?

5    A.   That is correct.

6    Q.   And you said that they were forged?

7    A.   Some of them, yes.

8    Q.   And so that would result in off-label information being

9    sent directly to a provider who didn't even request it?

10   A.   That is correct.

11   Q.   And how -- you saw that?

12   A.   Yes.

13   Q.   You did?

14   A.   I did.

15   Q.   You know other people did?

16   A.   I did.

17   Q.   And you were actually being told by your boss to pick up

18   the pace and that these were metrics that he was watching?

19   A.   That is correct.

20   Q.   Is that why you did it?

21   A.   Yes.

22   Q.   When you were a sales rep, did you get paid more for more

23   sales?

24   A.   Yes.  Well, you get bonus.

25   Q.   Explain to the jury what a bonus for a sales

GRAHAM - DIRECT - RUSS

1  representative --

2  A.   So you would make a -- you make a salary, but at the end

3  of each quarter, based upon your performance or whether you

4  met your goal or if you exceeded your goal, you would be paid

5  a certain amount as a bonus.

6  Q.   On the MIR requests and submitting them when they weren't

7  requested, was that your idea?

8  A.   No.

9  Q.   Were other people doing it?

10  A.   Yes.  And I didn't feel good about it.

11  Q.   At the time?

12  A.   I still don't feel good about it, and I've never done

13  that at any other pharmaceutical company that I've worked for.

14  Q.   Let me go back, and I want to transition back to the

15  speaker program for a second because I'm trying to work

16  through your chronology at the company.

17  A.   Okay.  Sure.

18  Q.   You mentioned a couple prescribers that you had submitted

19  as a sales rep, right?

20  A.   Yes.

21  Q.   And they became speakers?

22  A.   Yes.

23  Q.   Describe for the jury -- well, first of all, what is a

24  speaker program?

25  A.   A speaker program is an event held at a restaurant where

GRAHAM - DIRECT - RUSS

1    you have a physician come in and address their peers, whether

2    it would be other physicians or nurse practitioners or, you

3    know, physician assistants go over a slide deck.  The speaker

4    would be paid an honorarium, and it was an event in order to

5    create awareness about the product.

6    Q.    What is honorarium?

7    A.    It's -- it's paid -- you know, it's a -- it's a check

8    essentially to pay -- to pay the physician for their time to

9    speak.

10   Q.    Some of the prescribers that you mentioned earlier that

11   we were looking at the top prescribers in New York, they

12   became speakers --

13   A.    Yes.

14   Q.    -- right?  They wrote prescriptions for Prezista?

15   A.    Yes.

16   Q.    Did some of your doctors also write prescriptions for

17   Intelence?

18   A.    Well, I was not in New York in Intel- -- but, yes, in

19   New Jersey, yes.  Yes.  I'm sorry.  Yes.  Okay.

20   Q.    Did you also recommend speakers in New Jersey?

21   A.    I'm sure I did.  It may have already been established

22   because, you know, at that point, Prezista and Intelence were

23   actually out on the market already.  We weren't launching

24   them.

25         So I don't remember submitting too many names in

GRAHAM - DIRECT - RUSS

1    New Jersey.  You know, the speakers that I felt that the

2    previous rep had recruited or, you know, submitted were

3    adequate or they were good.

4         So I don't remember specifically adding anybody in

5    New Jersey.

6    Q.   Did you personally attend some of these speaker events?

7    A.   All of them.  I mean, any one that I coordinated, yes.

8    Q.   So dozens and dozens of them?

9    A.   Yes.

10   Q.   Were they oftentimes or -- at nice restaurants?

11   A.   Yes.

12   Q.   Were there times that you have what was called a

13   roundtable?

14   A.   Sometimes, yes.

15   Q.   What was a roundtable?

16   A.   A roundtable was a little less formal.  So instead of

17   being in, like, a private room with, you know, a screen, it

18   would be maybe the speaker and two or three other doctors at a

19   roundtable with a laptop looking at slides.

20   Q.   And the doctor who was looking at the slides or

21   presenting them would be paid by Janssen?

22   A.   Yes.

23   Q.   On those roundtables, would there be just a handful of

24   people around the table?

25   A.   Yeah.  I mean, you didn't want it too big, right, because

GRAHAM - DIRECT - RUSS

1  you're in a restaurant.  You're not in a private room, so you

2  want to be able to hear.  So it was generally not more than

3  five people.

4  Q.  Did Janssen pay for those meals?

5  A.  Yes.

6  Q.  Was there alcohol at those meals?

7  A.  At that time, I believe that there was.  You can't do it

8  today, but I think at that time, that was still allowable.

9  Q.  I'm glad you brought that up.  At some point in your time

10 as a sales rep back in the 2005 time period, did you learn

11 that the Government was cracking down on providing things of

12 value to physicians?

13 A.  Yes.

14 Q.  Describe to the jury what you learned in your experience.

15 A.  So they instituted something called the Sunshine Act

16 where you couldn't give them any pens or any pads that had the

17 drug's name on it.

18     You know, way back in the day, we would send doctors to

19 like an ad board that would be at, you know, the Phoenician in

20 Scottsdale, a very expensive restaurant, where they golfed,

21 and they would have maybe an hour or two of meetings in the

22 morning but then had the rest of the day off.

23     They would fly them first class.  They could bring

24 their wife or their spouse or their partner.  I mean, yeah, it

25 was pretty excessive.

GRAHAM - DIRECT - RUSS

1   Q.   The Government began cracking down on them?

2   A.   Yes.

3   Q.   You mentioned that you believe one of the purposes of

4   selecting a speaker for Janssen was to get the doctors to

5   prescribe Prezista.

6   A.   Yes.

7   Q.   Same for Intelence?

8   A.   Yes.

9   Q.   Was it also designed to give them more speeches to reward

10  them for their prescriptions?

11  A.   Yes.

12  Q.   Did Janssen track what's called an ROI?

13  A.   Yes.

14  Q.   What does that mean?

15  A.   It's return on investment.

16  Q.   Was that an important metric?

17  A.   Yes.  So what we would do is when physicians would attend

18  a speaker program, we would then closely monitor the

19  prescription volume of the physicians that attended these

20  speaker programs or dinner programs or roundtables.

21  Q.   And you also mentioned earlier that you had the data to

22  monitor the prescriptions of the speakers.

23  A.   Yeah.  I mean, yeah, we could track -- yes, yes.

24  Q.   Did you personally monitor some of the prescription

25  volume of your speakers?

GRAHAM - DIRECT - RUSS

1  A.   Well, yes.  Like I think I mentioned before, we got

2  prescribing data I think weekly.  I don't remember.  We

3  don't -- I don't get it anymore because the drug that I sell

4  now is not prescribed by a prescription.  It's a different

5  process.

6       But, yeah, I think we got them weekly but, you know,

7  frequently enough that you were able to track what was going

8  on and how you were influencing or how, you know, messages

9  were influencing the providers.

10 Q.   Were there times that you had prescribers that you

11 recommended that weren't prescribing Prezista that were on the

12 speaker bureau?

13 A.   Yes.

14 Q.   And what would happen?

15 A.   If they weren't writing, we were told that we had to take

16 them off of the speaker program or the speaker bureau.

17 Q.   You said, "We were told."

18      Who told you that?

19 A.   Frank Murphy.

20 Q.   Is there a specific example that you can tell this jury?

21 A.   Yes.  With one of my providers, Lloyd Bailey, you know,

22 it was an ongoing conversation with Frank where he would say,

23 you know, Lloyd isn't writing.

24      Yes.  I'm painfully aware that he's not writing.

25      And Frank would say, You're going to have to take him

GRAHAM - DIRECT - RUSS

1   off the speaker bureau.

2         And I would say, Yeah, you know, just give me -- let

3   me -- give me a little more time, and, you know, after a month

4   or a month and a half, he's like, He's got to go.

5         So I had to go in and have the conversation with Lloyd

6   and tell him why he was being taken off the speaker bureau.

7   Q.   What was that reason?

8   A.   Because he wasn't writing.

9   Q.   When you say "writing," writing prescriptions?

10  A.   Right, he was not writing for Prezista.

11  Q.   So he wasn't prescribing Prezista to his patients?

12  A.   Correct.

13  Q.   So he wasn't going to be a speaker anymore?

14  A.   Correct.

15  Q.   And he wouldn't be paid anymore by Janssen?

16  A.   That is correct.

17  Q.   Did Janssen have a compliance department?

18  A.   Yes.

19  Q.   At these speaker programs, did you ever see anyone from

20  compliance attend?

21  A.   Never.

22  Q.   Ms. Graham, is it high-risk activity to pay speakers that

23  are also prescribing your drug?

24  A.   Is it a high risk?

25  Q.   Let me ask it this way:  Is it regulated?

GRAHAM - DIRECT - RUSS

1    A.   Yes.

2    Q.   And compliance had policies about what was supposed to

3    happen at these speaker events?

4    A.   Yes.

5    Q.   And you don't recall if compliance ever attended?

6    A.   Never.  And I was kind of in their backyard.  So if they

7    were going to attend speaker programs, I mean, they could have

8    chosen my territory, particularly when I was in New Jersey, to

9    do so.

10   Q.   Was another criteria for being on the speaker bureau a

11   willingness to speak off-label?

12   A.   Yes.

13   Q.   Explain that to the jury.

14            MS. BROWN:  Your Honor, I'm just going to object to

15   this line of questioning as calling for speculation.

16            THE COURT:  Sidebar.

17

18

19

20

21

22

23

24

25

GRAHAM - DIRECT - RUSS

1          (Sidebar begins at 2:51 p.m.)

2          THE COURT:  Let me say something first, Ms. Brown.  I

3    was going to wait for the break because I don't want to say

4    something in front of the jury.

5          But in this district, you stand when you speak.

6          MS. BROWN:  Oh, I apologize, Your Honor.

7          THE COURT:  You've done it numerous times.

8          MS. BROWN:  Oh, I apologize.

9          THE COURT:  Every objection that you've said "no

10   objection," you've sat.

11         MS. BROWN:  I apologize.

12         THE COURT:  You're doing it now.  So I just didn't

13   want to say it in front of the jury.

14         MS. BROWN:  I'm sorry, Your Honor.  I don't mean to

15   be disrespectful.  I apologize.

16         THE COURT:  No, no, I get it, and every district is

17   different.  Like, I think in EDPA, they don't care.  In our

18   district, I've practiced in this court for many years.  So I'm

19   just going to remind you.

20         Okay.  Now --

21         MS. BROWN:  Thank you, Your Honor.  And I apologize.

22         THE COURT:  That's all right.

23         MS. BROWN:  So we filed a motion in limine on this,

24   Your Honor, and you said you would reserve it for the time of

25   trial.

GRAHAM - DIRECT - RUSS

1          She was not involved in the selection for the speaker

2   bureau, and the testimony has kind of gone beyond what she

3   knew about doctors that she worked with.

4          And she's now testifying about how speakers were

5   selected.  She has no personal knowledge of that --

6          THE COURT:  What's the question?  Let me just look at

7   the -- I've got to look at my feed.

8          All right.  So the question was "Was another criteria

9   for the speaker bureau..."

10         Mr. Russ, my understanding is that she makes

11  recommendations but does not choose the speakers, correct?

12         MR. RUSS:  That's right.

13         THE COURT:  So then how is she testifying to this

14  other than through hearsay, somebody telling her what --

15         MR. RUSS:  For her recommendations is what I was

16  intending to elicit.  One of the recommendations that she

17  would select because her --

18         THE COURT:  Oh, what is she -- what is her criteria

19  for recommending a speaker?

20         MR. RUSS:  That's right.

21         THE COURT:  Well, then form the question that way.

22         MS. BROWN:  Okay.

23         THE COURT:  So I agree with you, by the way.  So

24  here's -- I'm just going to make this ruling now, and then

25  I'll monitor -- I'll mind it if there's an objection in real

GRAHAM - DIRECT - RUSS

1    time at sidebar.

2         But if you asked her about what her criteria is for her

3    personally recommending, she can answer that.  If you ask what

4    is the criteria for being selected as a speaker, she's

5    testified that she doesn't select the speakers.

6         MR. RUSS:  Understood.

7         THE COURT:  No, that question is not clear.  I'm

8    going to ask you to rephrase it.  Stay in that lane.

9         Your objection is sustained.

10        You'll rephrase the question, but I'm just letting you

11   know, I'll allow him to ask what her criteria is for

12   recommending a speaker.

13        MS. BROWN:  I understand.

14        Your Honor, just so -- when we object, do you want the

15   basis from out there, or do you want us to just say

16   "objection" and come up?

17        THE COURT:  No, no.  I don't mind just the objection

18   and the basis.

19        MS. BROWN:  Okay.  But I have to stand up.

20        THE COURT:  But you have to stand.  And also, once

21   you get passed one or two words, you're going beyond the

22   basis.  But, yeah, if you can just say "hearsay, objection,

23   beyond the scope," I might address it on the bench, but I

24   might have a sidebar.

25        This is why I wanted a sidebar, because I needed to

GRAHAM - DIRECT - RUSS

1    know exactly what the objection was and I didn't want to do

2    too much in front of the jury.

3            MS. BROWN:  Thank you.

4            THE COURT:  But a lot of times, I can address it on

5    the bench.  All right.  Thank you.

6            MS. BROWN:  Thank you.

7            (Sidebar was concluded at 2:54 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GRAHAM - DIRECT - RUSS

1          (Open court.)

2          THE COURT:  All right.  Mr. Russ, the objection is

3    sustained.  I'm going to just ask you to rephrase the

4    question.

5    BY MR. RUSS:

6    Q.   Ms. Graham, did some of the speakers on your speaker

7    bureau presentation speak off-label?

8    A.   Yes.

9    Q.   And explain the process for the slide deck preparation

10   for these physicians who are speaking about these drugs.

11   A.   Sure.  So there was -- the initial set of slides or the

12   first set of slides that they would present were all on-label

13   within the package insert, and then there was, you know,

14   backup slides that were utilized in order to answer off-label

15   questions.

16   Q.   Would some speakers speak off-label on their own?

17   A.   Yes.

18   Q.   Were there other ways that you at Janssen and other

19   people at Janssen prompted physicians at these speaker events

20   to speak off-label?

21   A.   Yes.

22   Q.   What was that?

23   A.   We would have plants in the audience.

24   Q.   Describe what a plant in the audience means.

25   A.   So before the program happened, you know, we would talk

GRAHAM - DIRECT - RUSS

1  to one of the providers or a PA or MP or somebody that was

2  attending the program to ask an -- ask an off-label question.

3  Q.   Did you personally arrange for plants at these speaker

4  events?

5  A.   A few times, yes.

6  Q.   And how would that -- how would that unfold?

7  A.   So generally, at the end, after we've gotten through the

8  approved slide deck, the speaker would say, Does anybody have

9  any questions or what questions can I answer?

10       And then that's when the plant would stand up and ask a

11  question that then directed the conversation to an off-label

12  conversation.

13  Q.   So at the dozens and dozens of speaker events that you

14  went to, did the on-label slides that were approved change

15  very much?

16  A.   Not -- not too much.  I mean, when the label changed,

17  they would change, but generally not.

18  Q.   What about the backed up off-label slides?

19  A.   Yes.  They -- they changed as more information or more

20  data was gathered.

21  Q.   Why were you putting plants in the audience to solicit

22  off-label discussion from a paid doctor?

23  A.   Because that's the information that we wanted them to

24  have.

25  Q.   Why?

GRAHAM - DIRECT - RUSS

1  A.   Because that was how we were going to increase sales.

2  Q.   And how would that increase sales?

3  A.   Because the hope was that it would, you know, influence

4  on some level for them to prescribe the product or think of a

5  new way to use it or in an new patient type.

6  Q.   Were you the only person at Janssen that put plants in

7  the audience at speaker events?

8  A.   No.

9  Q.   Was it your idea?

10 A.   No.

11 Q.   Did you talk to other sales reps that were doing the same

12 thing?

13 A.   Yes.

14 Q.   And what did you guys discuss about why you were doing

15 it?

16 A.   We knew why we were doing it.  It was to get, you know,

17 off-label information presented at these speaker programs.  We

18 couldn't rely on it happening organically.

19 Q.   Is that similar to the MIR request process that you

20 talked about earlier?

21 A.   Yeah.  There's a similarity there, yes.

22 Q.   Soliciting something that's supposed to be spontaneous?

23 A.   Yes.

24 Q.   Is it fair to say that's gaining the system?

25 A.   Yes.

GRAHAM - DIRECT - RUSS

1  Q.  Were there program evaluations from these speaker events?

2  A.  Yes.

3  Q.  And who was supposed to fill those out?

4  A.  Myself.  Generally, the key account manager was there as

5  well who was the one that worked with the speakers and trained

6  the speakers and then the attendees.

7  Q.  And there was -- was there a question on those speaker

8  evaluations of whether or not the speaker discussed off-label

9  information?

10 A.  Yes.

11 Q.  Would you fill it out?

12 A.  Yes.

13 Q.  Would you fill out truthfully?

14 A.  No.

15 Q.  What would you say?

16 A.  That they didn't speak off-label.

17 Q.  And why did you do that?

18 A.  Because that's what we were told to do.

19 Q.  Who told you to do that?

20 A.  You know, everything was about the appearance of

21 everything being on the up and up, right?  So, you know,

22 checking that there was off-label information presented could

23 cause a red flag.

24      I mean, you know, that's -- that's not fair.  I mean,

25 physicians can speak to their peers about information that's

GRAHAM - DIRECT - RUSS

1    off-label.  It's just not supposed to be, you know, solicited

2    from us.

3    Q.  Were you concerned that somebody would find out that this

4    off-label information was being solicited?

5    A.  Yes.

6    Q.  Were you concerned that your bosses were going to find

7    that out?

8    A.  No.

9    Q.  Why not?

10   A.  Because -- I mean, that's what we were expected to do.

11   Q.  Were you concerned that somebody would find out?

12   A.  I was -- yes.  The Government.

13   Q.  The United States Government?

14   A.  Yes.  The FDA.

15   Q.  Why were you concerned the Government would find that

16   out?

17   A.  Because there could be a lot of sanctions against the

18   company.  I could lose my job.  You know, they could have the

19   drug pulled.  I mean, there was a lot of ramifications of

20   speaking off-label.

21   Q.  I want to turn --

22        MR. RUSS:  And, Your Honor, I want to be respectful,

23   if we need a quick break.

24        THE COURT:  I was about to say, we're about to hit 3

25   o'clock, but I don't know where you are in the direct.  Is

GRAHAM - DIRECT - RUSS

1  this a good place to stop, or do you have a very short amount

2  left?  I just don't know.

3       MR. RUSS:  It is, Your Honor.  I probably have about

4  30 minutes left.

5       THE COURT:  Then I'd like to do the -- is this a good

6  place to break?

7       MR. RUSS:  It is, Your Honor.

8       THE COURT:  Folks, we're going to take a ten-minute

9  break.  Stretch, restroom, whatever you need to do, and even

10  if you need a few more minutes, I'll allow.  But I'm going to

11  have the jurors dictate that.

12       All right.  We're dismissed for ten minutes.

13       THE DEPUTY COURT CLERK:  All rise.

14       (A short recess occurred.)

15       THE DEPUTY COURT CLERK:  All rise.

16       THE COURT:  All right, folks.  You may be seated.

17       Do we need to talk about anything before we get the

18  jurors?

19       MR. RUSS:  No, Your Honor.  I just want to clarify,

20  for cleaning purposes, going back through my outline, it may

21  push beyond 30 minutes, and we'll try to move quickly through

22  the notes --

23       THE COURT:  Yeah, I wasn't rushing you.  It was more

24  about when do I get this break for the jurors and everybody

25  else that might need it.  So if you -- but you think you're

GRAHAM - DIRECT - RUSS

1    going be done in the next, what?

2            MR. RUSS:  We're still trying to scoot -- is it a 4

3    o'clock break?  because I want to try to move to, you know --

4            THE COURT:  I mean, I'm flexible.  I mean, we're

5    beginning cross, right?  I don't know how long the cross is

6    going to be, but, yeah.  Why don't we finish the direct, and

7    then we'll see how much time we have left in the day.  I'd

8    like to begin cross-examination, but I don't know.

9            If we can finish with the witness, let's finish.  I'm

10   not hard on 4 o'clock.  If we can finish Ms. Graham by 4:15 or

11   4:30, I'll do it, but I don't know.

12           MS. BROWN:  Your Honor, my cross will be longer than

13   30 minutes.

14           THE COURT:  All right.  So we'll see where we are.

15           MR. RUSS:  Okay.

16           THE COURT:  All right.  Let's get the jurors out.

17   We'll see where we end on direct, and we may begin the cross

18   and not finish it.

19           THE DEPUTY COURT CLERK:  All rise.

20           THE COURT:  Folks, everyone be seated.

21        And, Mr. Russ, when you're ready, you can continue with

22   direct examination.

23           MR. RUSS:  Thank you, Your Honor.

24   BY MR. RUSS:

25   Q.  Ms. Graham, we left off talking about the speaker program

GRAHAM - DIRECT - RUSS

1  evaluations?

2  A.   Yes.

3  Q.   Were there also events at Janssen called advisory boards?

4  A.   Yes.

5  Q.   What were those?

6  A.   They were -- you know, physicians would be invited to

7  attend an advisory board to hear, you know, medical and

8  marketing talk or messages and the dissemination of off-label

9  information.

10 Q.   Describe a little bit more for the jury what that looked

11 like.  What were these advisory boards?  Where were they?

12 A.   You know, that were at various places throughout the

13 country.  Generally at very nice hotels.  Sometimes over a

14 weekend.  So it was, you know, a chance for the providers to

15 interact, again, like I said, with the marketing team as well

16 as the medical team.

17 Q.   Would the physicians receive an honoraria or a payment

18 for that service?

19 A.   Yes.

20 Q.   Or for that trip?

21 A.   Yes.

22 Q.   Would the trip be paid for by Janssen?

23 A.   Yes.

24 Q.   Was the food covered by Janssen?

25 A.   Yes.

GRAHAM - DIRECT - RUSS

1   Q.   Can you give the jury some examples of some locations

2   that these advisory boards would be held?

3   A.   I mean, I don't remember specific hotels.  I myself, I

4   think, only attended one, and I believe it was in Chicago.

5   Q.   Okay.  Were speakers accommodated as far as where they

6   wanted to travel to to speak at times?

7   A.   At times, yes.

8   Q.   Explain to the jury what would happen there.

9   A.   You know, if a speaker was traveling to, say, you know,

10  Florida they would say, you know, Can you get me a couple of

11  other speaking programs while I'm there.  Or, you know, Hey,

12  my kid goes to Harvard.  Can I talk up in Boston.

13       You know, yes, we tried to accommodate them.

14  Q.   Was it accommodated by Janssen?

15  A.   For the most -- I don't know of a time that it wasn't.

16  I'm sure there may have been a time or two that it didn't work

17  out, but I don't remember -- I remember it working out much

18  more frequently than not.

19  Q.   And so that was a situation where a doctor would actually

20  tell Janssen, Find me another speaker program?

21  A.   Yeah.  I mean, because of the fact that, you know,

22  they're leaving their practice.  They're leaving home.

23  They're traveling.  If they're traveling on a plane for more

24  then a few hours, they want to make it worth their while to do

25  so, not just for one program.

GRAHAM - DIRECT - RUSS

1  Q.  So in those instances where that occurred, was there a

2  needs assessment done by the company to say, Actually, we need

3  two, or is it the doctor prompting another event?

4  A.  I mean, it was the doctor prompting the event, and then

5  we would try and accommodate them.

6  Q.  And then Janssen would pay that doctor.

7  A.  Correct.  I mean, sometimes at a reduced honoraria,

8  right, if there's multiple programs.

9  Q.  But the doctor would get paid.

10 A.  Yes.

11 Q.  Was there something at Janssen called a CRM system?

12 A.  Yes.

13 Q.  What was that?

14 A.  That's the customer management system where, you know,

15 all of the doctors and providers that we called on were logged

16 into that.  And then, you know, we were responsible for

17 talking about -- or checking off that we spent time with them

18 that day.

19 Q.  So I want to make sure that this is clear for the jury.

20 A.  Sure.

21 Q.  I'm not sure I understood it when I came into this case.

22 A.  Yeah.

23 Q.  When you call upon a doctor --

24 A.  Yes.

25 Q.  -- not a phone call.

GRAHAM - DIRECT - RUSS

1   A.   No, face to face.

2   Q.   Face-to-face visit?

3   A.   Yes.

4   Q.   Was the CRM system designed to keep notes on that visit?

5   A.   Yes.

6   Q.   Would you keep your notes?

7   A.   No.

8   Q.   Why not?

9   A.   We were told not to keep notes.

10  Q.   Who told you that?

11  A.   I don't remember specifically.  It was just a well-known

12  thing not to keep notes.  And when I was a sales trainer, I

13  had to tell the reps not to put notes in the CRM system.

14  Q.   Was that your idea?

15  A.   No.

16  Q.   Whose idea was it?

17  A.   I don't specifically remember.  I mean, it was -- I

18  remember it being discussed that that was what we did.  We did

19  not put notes in the CRM system.

20  Q.   Were you instructed to sale -- to instruct and train

21  salespeople on that practice?

22  A.   Yes.

23  Q.   Did you do that?

24  A.   Yes.

25  Q.   And why?

GRAHAM - DIRECT - RUSS

1    A.    Because if we engaged in an off-label conversation, we

2    didn't want any paper trail of that happening.  So, you know,

3    putting in off-label notes in the CRM system, you know, was

4    not good.

5    Q.    Was not good why?

6    A.    Well, again, because, you know, if the Government or the

7    FDA were to find out that we, as sales reps, were having

8    conversations that were off-label and were documenting it, I

9    mean, that is -- that's a red flag.

10   Q.    There was an insinuation made by Janssen that you were --

11   salespeople were doing this and trying to hide it from the

12   company.

13   A.    That's not correct.

14   Q.    What is correct?

15   A.    We were doing it because essentially we -- it was

16   understood not to do it because we were protecting essentially

17   not only ourselves but the organization by not putting them in

18   there.

19   Q.    Did compliance ever come to you and say, You're not

20   filling out your notes?

21   A.    No.

22   Q.    How long were you at Janssen?

23   A.    Five years.

24   Q.    You sold for what, four?

25   A.    Yes.  No, two.  Three.  Three.

GRAHAM - DIRECT - RUSS

1  Q.   Three?

2  A.   Yeah.  Sorry.

3  Q.   Do you recall any instance where compliance visited you

4  and said, You're not filling out your notes from your meetings

5  with these doctors?

6  A.   No.

7       Nor was it ever addressed on a national level.  I mean,

8  it was never at a POA meeting; it was never addressed.  But --

9  I mean, it was never talked about that we were not putting

10 notes in there.

11 Q.   I'm glad you brought that up.  There are different types

12 of meetings.  What's a POA meeting?

13 A.   That's a plan of action meeting, and they occurred

14 generally every quarter.  Sometimes they were national, where

15 everybody got together in one location.  Sometimes -- and that

16 definitely happened once a year.  Sometimes it happened twice

17 a year.

18      If we didn't get together as a nation, perhaps we got

19 together as a region.  And sometimes we just got together as a

20 district.

21 Q.   Ms. Graham, I suspect that Janssen will show you some

22 compliance policies from your time at Janssen.

23      Do you recall there were policies written by

24 compliance?

25 A.   Yes.

GRAHAM - DIRECT - RUSS

1  Q.   Did you follow those policies?

2  A.   No.

3  Q.   Was it a widespread practice from the people that you

4  knew and talked to that they were not being followed?

5  A.   Yes.

6  Q.   Did you come up with a business plan not to follow those

7  policies?

8  A.   No.

9  Q.   Who did?

10  A.   I mean, again, it was understood.  It was -- I can't

11  pinpoint one person.  It was just a general culture at

12  Janssen.

13  Q.   What was the culture like at Janssen?

14  A.   It was not particularly pleasant, you know, because,

15  particularly at the beginning, we were so far behind goal that

16  the president would yell at us on conference calls.  He would

17  yell at us at the national sales meeting.  You know, it was a

18  very high-stress environment.  Just not good.

19  Q.   But you had been in high-stress environments before.

20  A.   Yeah, but not like that.

21  Q.   Why was it different?

22  A.   Because I was never expected to promote off-label.

23  Q.   Were you expected to promote off-label at Bristol-Myers?

24  A.   No.

25  Q.   Any of your jobs since?

GRAHAM - DIRECT - RUSS

1   A.   No.

2   Q.   Ms. Graham, the compliance had a hotline.

3   A.   Yes.

4   Q.   Did you call the hotline?

5   A.   No.

6   Q.   Why not?

7   A.   I didn't feel that it was a safe environment.

8   Q.   Why?

9   A.   I know that they, you know, touted it as being anonymous,

10  but none of us ever thought that it was truly anonymous.

11  Q.   When you say "none of us," who are you referring to?

12  A.   I mean, the entire sales force.  You know, I don't think

13  that anybody had any confidence in the fact that it was

14  anonymous.

15  Q.   Was there another part of the Janssen culture that had to

16  do with something called performance improvement plans?

17  A.   Yes.

18  Q.   Also sometimes referred to as P-I-P or a PIP?

19  A.   That is correct.

20  Q.   What is a PIP?

21  A.   It is a performance improvement plan where if somebody

22  isn't, you know, meeting goal consistently, or, you know, not

23  meeting certain metrics, then you were put on a performance

24  improvement plan.

25        It's like a warning, you know, I mean, essentially.

GRAHAM - DIRECT - RUSS

1    Q.   Was that a common practice at Janssen?

2    A.   Very much so.

3    Q.   Do you know of other people that were put on performance

4    improvement plans?

5    A.   Multiple.

6    Q.   Multiple salespeople?

7    A.   Salespeople, regional directors, directors.

8         And then the other thing that was a pandemic and very

9    widespread there was people going out on medical leave because

10   they were on performance improvement plans.  So people would

11   then, you know, go on medical leave.

12   Q.   Did you hear of anybody put on a performance improvement

13   plan for selling off-label?

14   A.   Never.

15   Q.   Or not being compliant with the company's policies?

16   A.   No.

17   Q.   What were the performance improvement plans focused on?

18   A.   Not meeting goal, not meeting whatever metrics at the

19   time were supposed to be met.

20   Q.   And those were goals for Prezista and Intelence?

21   A.   Correct.

22   Q.   Both of which had, I think you said, a limited

23   indication.

24   A.   Yes.  For a period of time with Prezista.

25   Q.   Well, Prezista for the treatment-naive --

GRAHAM - DIRECT - RUSS

1  A.   Yes.

2  Q.   -- segment, right?

3  A.   Right, exactly.

4  Q.   Did the label ever change to take out the warnings or

5  adverse reactions on Prezista for hyperlipidemia or

6  hypercholesterolemia?

7  A.   No.  And if I remember correctly, the original label, it

8  was listed as an adverse event.  But by the time we got the

9  naive indication, it was then listed as a serious adverse

10 event.

11 Q.   So it started as an adverse event and moved up to serious

12 adverse event?

13 A.   It did.

14 Q.   Did you continue to sell Prezista as lipid neutral or the

15 same as Reyataz on lipids?

16 A.   Yes.

17 Q.   And once Prezista got approved for treatment of naive

18 patients in November 2008, did you sell Prezista off-label as

19 the same as Reyataz --

20 A.   Yes.

21 Q.   -- on lipids?

22 A.   Yes.

23 Q.   Was that true?

24 A.   No.

25 Q.   Why did you do it?

GRAHAM - DIRECT - RUSS

1    A.    Because I didn't feel like I had a choice.

2    Q.    Why did you feel that way?  Explain that to the jury.

3    A.    Well, because the treatment-naive group was the largest

4    population or, you know, significantly -- a significant

5    population.  And Reyataz really had the majority of the market

6    share for treatment-naive patients.

7         So, you know, that was a way for us kind of compare

8    ourselves and put us on par with Reyataz.

9    Q.    When you were -- did you like Bristol-Myers?

10   A.    I did.

11   Q.    Was it a good company?

12   A.    Very much so.

13   Q.    Did you not keep your call notes at BMS?

14   A.    I'm sorry.  Say it again?

15   Q.    Did you not keep call notes while you were at BMS?

16   A.    We did.  I mean, it's so long ago, you know -- yes, I

17   think we did keep call notes at BMS.

18   Q.    Were there other things that you witnessed at Janssen

19   that were different from your other positions in the

20   pharmaceutical industry?

21   A.    Yes.

22   Q.    Explain that to the jury.

23   A.    I never felt the stress or the pressure to promote

24   off-label in any other company that I've ever worked for.  And

25   the environment, I've never been in an environment where

GRAHAM - DIRECT - RUSS

1    people -- so many people were on performance improvement plans

2    and people were out on medical leave.  I have never seen

3    anything like that.

4    Q.   Help us understand, Ms. Graham -- I think it's

5    important -- when you first started having concerns about

6    these practices.

7    A.   When did I first start?

8    Q.   Yes, ma'am.

9    A.   I mean, probably from the get-go.  When we were not

10   making goal and the strategy was to move the drug up -- try

11   and move it up the treatment paradigm to talk about that it

12   was lipid friendly, to, you know, solicit unsolicited

13   questions.  I mean, pretty early on.

14   Q.   So I guess the question would be, Ms. Graham, why did you

15   stay?

16   A.   You know, that's a great question, and I think for a

17   couple reasons.  Right?

18        I had been in HIV for a really long time.  And I'm not

19   a doctor and I'm not a nurse, but I felt very compelled and

20   passionate about people that were HIV positive and living with

21   HIV.  So I felt very committed to the patients.  I mean, you

22   know, a lot of us in our district had spent several years

23   working with the community.

24        And, you know, it was not allowed at that point, but

25   prior to that, meeting with patients and getting to know

GRAHAM - DIRECT - RUSS

1    patients and, you know, being part of a team with these

2    doctors that were treating these patients.  Again, you know,

3    it was my way to help.  I'm not a doctor.  I'm not a nurse.

4    But I felt I was helping these patients.  I was trying to help

5    them extend and enhance their lives.

6         So it was just -- you know, it was kind of a -- I just

7    felt compelled.

8    Q.   Did you eventually leave Janssen?

9    A.   I did.

10   Q.   In 2011?

11   A.   I did.

12   Q.   Why did you leave?

13   A.   I left because I was moving to Colorado.

14   Q.   Okay.

15        At some point, Ms. Graham, after leaving the company,

16   did you have time to reflect on what you had seen during your

17   years there?

18   A.   Yes.

19   Q.   And what did you do?

20   A.   I went to the DOJ.

21   Q.   Explain that to the jury, please.

22   A.   You know, I would -- went through kind of reliving it all

23   and just felt, you know, how bad it was and how -- I kind of

24   felt dirty, and I felt like I needed to do the right thing.

25   Q.   So you live with a gentleman named Mark Wilhelm?

GRAHAM - DIRECT - RUSS

1   A.   I do.

2   Q.   Who is Mark Wilhelm?

3   A.   Who is he?  Like, from at Janssen?

4   Q.   From his position at Janssen.

5   A.   He was the key account director.

6   Q.   And you've been in a long-term relationship with

7   Mr. Wilhelm?

8   A.   I have.

9   Q.   And you met at Janssen?

10  A.   Actually, we met at Roche.

11  Q.   Oh, so you met before Janssen?

12  A.   Yes.

13  Q.   Did Wilhelm join you in reporting this to the Department

14  of Justice?

15  A.   He did.

16  Q.   So there was some argument this morning, Ms. Graham, that

17  you're sort of friends with a series of people.  I want to

18  talk to you about that.

19  A.   Okay.

20  Q.   You're friends with Ms. Penelow.

21  A.   I am.

22  Q.   Okay.

23       You met Christine Brancaccio during your time at

24  Janssen?

25  A.   Correct.

GRAHAM - DIRECT - RUSS

1  Q.   Okay.

2       Let's talk about -- did you learn at some point that

3  Ms. Brancaccio and Ms. Penelow had filed this action with the

4  Department of Justice?

5  A.   Yes, at some point because we were told that we were not

6  the first to file.

7  Q.   Okay.

8       So you and Wilhelm actually filed your own claims.

9  A.   We did.

10 Q.   And that was under seal?

11 A.   Yes, it was.

12 Q.   And Ms. Brancaccio and Ms. Penelow's case was, for a

13 period of time, under seal.

14 A.   That's my understanding.

15 Q.   Did you coordinate with Ms. Penelow and Ms. Brancaccio in

16 the lawsuits?

17 A.   No, I didn't even know that they had it.  I didn't know

18 that they had a case.  I mean, I was calling Jessica.  I was

19 sending her text messages.  I was sending her cards.  I was

20 sending her letters, and I didn't hear back from her.  And I

21 was -- kept thinking, what did I do?  Please tell me what I

22 did.  Like, let me know what I did because I want to make it

23 right.

24      And I just never heard from her, for years.

25 Q.   Is it true, is it fair that you filed your own lawsuit

GRAHAM - DIRECT - RUSS

1  with the Department of Justice not knowing that Ms. Penelow

2  had done the same?

3  A.   That is correct.

4  Q.   At some point, were there attorneys for Ms. Penelow and

5  Ms. Brancaccio that reached out to you in this case?

6  A.   Yes.

7  Q.   And they came and talked to you and asked if you had seen

8  the same information?

9  A.   Yes.

10  Q.   And was there an attorney that asked you questions and

11  wrote down what you told them?

12  A.   That they wrote down the question?

13  Q.   They wrote down the answers to --

14  A.   Yes.  They wrote down the answers, yes.

15  Q.   Were you asked at some point to sign a declaration?

16  A.   Yes.

17  Q.   And was that declaration true?

18  A.   Yes.

19  Q.   Did you have a chance to review it?

20  A.   Yes.

21  Q.   Was it accurate?

22  A.   Yes.

23  Q.   Was it consistent with the lawsuit that you had filed

24  years earlier with the Department of Justice?

25  A.   Yes.

GRAHAM - DIRECT - RUSS

1  Q.   And Ms. Penelow never asked you to file a lawsuit, did

2  she?

3  A.   No.

4  Q.   Ms. Brancaccio never asked you to file a lawsuit?

5  A.   No.

6  Q.   In fact, tell the jury, from the time you left employment

7  at Janssen in 2011, when was the first time that you saw

8  Ms. Penelow in person?

9  A.   I think I've seen her once since 2011 to now, other than

10  yesterday when I saw her for the first time, and I have not

11  seen Christine since I left Janssen.

12  Q.   When was the first time you saw Ms. Brancaccio since you

13  left Janssen?

14  A.   Yesterday.

15  Q.   Do you know a gentleman named Joe Holshoe?

16  A.   I do.

17  Q.   Who is that?

18  A.   He was in, I think -- like, the New England area.  He was

19  a sales rep.

20  Q.   Did you coordinate your testimony in the declaration with

21  Mr. Holshoe?

22  A.   No, I haven't spoken to him since either -- I don't know

23  who left first.  I think it was him.  I think he got fired.  I

24  don't really remember, but I haven't talked to him since one

25  of us left Janssen.

GRAHAM - DIRECT - RUSS

1   Q.   Now, I understand you also know Sara Strand?

2   A.   I do.

3   Q.   And who is she?

4   A.   She was the regional director at Janssen, and I have

5   worked at a couple different companies for her -- with her.

6   Q.   Did you coordinate any testimony with Ms. Strand?

7   A.   I didn't even know that she was a witness until, you

8   know, relatively recently.

9   Q.   Did you talk to Ms. Strand before you went to the

10  Department of Justice with your allegations?

11  A.   No.  I was not in touch with her for a few years.

12  Q.   Did you -- I may not have asked this.  Did you talk to

13  Mr. Holshoe --

14  A.   No.

15  Q.   -- about going to the Department of Justice?

16  A.   No.

17  Q.   Do you know a gentleman named Matthew Grooms?

18  A.   I do.

19  Q.   Who is that?

20  A.   He was a sales rep, I believe, in Kansas City or

21  St. Louis or something like that.

22  Q.   Is he your friend?

23  A.   An acquaintance.  I knew him at -- when I worked at

24  Janssen.

25  Q.   When was the last time you saw Mr. Grooms?

GRAHAM - DIRECT - RUSS

1   A.   The day one of us left Janssen.  Again, I don't remember

2   who left first, but it's not somebody that I keep in touch

3   with.

4   Q.   Have you been in touch with Mr. Grooms about your

5   testimony today?

6   A.   No.

7   Q.   Have you coordinated any testimony in your declaration

8   with Mr. Grooms?

9   A.   No.

10  Q.   Did you contact Mr. Grooms and ask him for advice or tell

11  him you were going to go to the Department of Justice?

12  A.   No.

13  Q.   Ms. Graham, there are emails in this case, and you'll

14  probably see some when counsel for Janssen talks to you, where

15  you had put disclaimers on them saying, Remember we follow the

16  law.

17  A.   Yes.

18  Q.   Explain to the jury what was happening there.

19  A.   Well, it was -- it was essentially a disclaimer.  I mean,

20  it was really -- it was meant as a defense for something

21  exactly like this.  It wasn't meant as a deterrent or to

22  discourage that behavior.

23  Q.   Was there a preference when you were at Janssen for oral

24  conversations or verbal conversations that were putting things

25  in email?

GRAHAM - DIRECT - RUSS

1    A.    Absolutely, yes.

2    Q.    Why?

3    A.    Because then there is no documentation to support it.

4    Q.    Why is that important?

5    A.    Because a lot of those conversations were around illegal

6    marketing practices or, you know, being tracked on MIR forms,

7    you know, taking people off the speaker bureau because they

8    weren't prescribing.  So, I mean, you don't want to have a

9    paper trail of that kind of behavior.

10   Q.    Are the things that you talked about today things that

11   you brought to the attention of the Department of Justice?

12   A.    Yes.

13   Q.    Why did you go there and report them?

14   A.    Actually, Mark and I were moving, and we had found, you

15   know, all his notes and stuff and my notes, and, you know, we

16   had just sat down and talked about it, and I was like, Oh,

17   just throw them away.  I want to forget about it.

18        But then, you know, when we really sat down and talked

19   about it, and it just really brings up a lot -- I'm not trying

20   to be dramatic.  It brings up a lot of emotion about how I

21   felt there and how I felt about it and what -- how I felt like

22   I was asked to compromise my integrity.

23        And I still feel upset about it.  So, you know, we

24   decided that we didn't feel comfortable doing the right thing

25   when we were there, but maybe we could do the right thing now.

GRAHAM - DIRECT - RUSS

1   Q.   Why didn't you feel comfortable doing the right thing

2   when you were there?

3   A.   Because I -- first of all, I don't -- I don't think that

4   the compliance hotline was completely anonymous.  I also -- I

5   knew of an instance where a gentleman in Arizona went to human

6   resources and complained about something, and then he was

7   fired a couple weeks later.

8        You know, what they did was kind of go through his

9   expense reports and try and find red flags and trying to find

10  a reason to get rid of him.

11       So I felt like there was a lot of potential for

12  retaliation, and I didn't want to lose my job.

13  Q.   And so you moved to Colorado, you talked to Mark and then

14  you decide to file with the Department?

15  A.   Yes.

16  Q.   Okay.  So just to make sure this is clear, because I know

17  this timeline gets a little bit confusing, Ms. Penelow and

18  Ms. Brancaccio filed this suit before you did?

19  A.   Yeah.  I don't even know when they filed their suit.

20  Q.   But you found out later that they filed it before you

21  did?

22  A.   I did.

23  Q.   And you didn't know when you filed that they had?

24  A.   That is correct.

25  Q.   Then because they -- under the law they had filed before

GRAHAM - DIRECT - RUSS

1   you, there was something called the first-to-file bar?

2   A.   Yes.

3   Q.   And so you couldn't proceed with your case?

4   A.   Yes.

5   Q.   And your case doesn't exist anymore?

6   A.   No.  It's under seal.

7   Q.   But you had brought that before you knew about this case?

8   A.   That's correct.

9   Q.   Do you have any financial interest in the outcome of this

10  case?

11  A.   No.

12  Q.   Do you stand to make a profit or make any money

13  whatsoever --

14  A.   No.

15  Q.   -- based on how this case turns out?

16  A.   No.

17            MR. RUSS:  If I could have one minute, Your Honor.

18            THE COURT:  You may.

19            (Brief pause.)

20  BY MR. RUSS:

21  Q.   Ms. Graham, thank you so much for your time this

22  afternoon.  I know I had a lot of questions.

23            MR. RUSS:  I'm going to pass the witness at this

24  time, Your Honor.

25            THE COURT:  All right.  Thank you, Mr. Russ.

 1          Ms. Brown, do you want to -- I have an issue I want to

 2   address with counsel.  Do you want me to do that after you

 3   start cross-examination, or do you want to -- do you want me

 4   to address that now?

 5          What is easier for you because I don't know how much

 6   you have on the cross-exam.

 7          MS. BROWN:  I have a fair amount, Your Honor, and I

 8   need to sort of hand out binders, so we could do it now.  It's

 9   just as easy.

10          THE COURT:  So you'd like --

11          MS. BROWN:  If you want to address the issue now,

12   it's just as easy.

13          THE COURT:  All right.  Here's what I'm going to do,

14   then.

15          Ma'am, you're on cross-examination, but it's

16   technically going to begin tomorrow morning.  I'm going to

17   address a legal issue with the attorneys outside of earshot of

18   the jurors, and we'll begin cross-examination in the morning

19   because we only have about 15 minutes anyway.

20          All right.  Let's do this:  Ma'am, I want to instruct

21   you, though, that you're on cross-examination.  You can't be

22   discussing your testimony with Relators' counsel.

23          And, Ms. Brown, you're okay, then, not to just start a

24   few minutes now and proceed in the morning?

25              MS. BROWN:  No problem.

1          THE COURT:  Because I don't want to cut you off if

2     there's some flow here, but you only have about 10 or 15

3     minutes.

4          MS. BROWN:  I'm happy to start in the morning,

5     Your Honor.  Thank you.

6          THE COURT:  All right.  So, jurors, I'm going to

7     dismiss you for the day.  Tomorrow morning, we'll begin,

8     obviously, with the cross-examination of this particular

9     witness, and we'll continue from there.

10         Just be mindful of the time.  If you guys are here, I'm

11    going to do my job to try to ensure we begin by 9:30, but

12    that's really subject to all ten of you being here.

13         So just be mindful of that, and I'll make sure counsel

14    is here well before then so we can address any issues in

15    advance so that we don't hold you up.

16         So with that, let me excuse the jurors.

17         But, Counsel, remain.  I do have an issue that I do

18    want to address with you all.

19         THE DEPUTY COURT CLERK:  All rise.

20         (Jurors exit courtroom.)

21         THE COURT:  All right.  Have a seat.

22         So maybe I'm missing this.  So here is my concern.

23    There was a motion in limine filed by Relators' counsel that

24    precluded the defense from raising any issue about the

25    Government failing to intervene in the case about what their

1    position was going to be on that.

2        And at no time in that briefing did you say, Oh, we're

3    going to put a witness up and talk about the Department of

4    Justice for half an hour.

5        Mr. Russ, that's what you just did on direct exam.  So

6    now you've left this appearance for the jury that Ms. Graham

7    has gone to the Department of Justice.  You've all gone to the

8    Department of Justice, and that's hanging out there.

9        And I don't know if you've read the opinion, but the

10   opinion said, if you open the door, I'm going to revisit this

11   issue.

12       So I want to hear from the Relators' counsel first and

13   then Janssen's counsel:  How did you not open the door now for

14   the defense to be able to get out, either on cross-examination

15   or the defense would say, The Government didn't intervene in

16   this case.  The Department of Justice is doing nothing.

17       That's a concern because it's not like, when you file

18   that motion, you were precluding the defense by saying, Well,

19   we're going to elicit all of it, we're going to put this --

20   this narrative in front of the jury, but we're going to

21   prevent Janssen from answering it.

22       So I don't know who wants to speak to that.  I know,

23   Mr. Russ, it's your witness, but I don't know which counsel

24   wants to speak to it, but I want to hear from you, and I want

25   to have a sense of this before the cross-examination concludes

1    tomorrow, which now we're not starting, so it's even easier.

2          So do you want to address it, Mr. Marketos?

3          MR. MARKETOS:  I can, Your Honor.  Do you mind if we

4    tag team a little bit because it's two -- it's two issues, and

5    so if -- I may high-five Josh in a minute.

6          THE COURT:  All right.  That's fair.  But let's just

7    have one issue at a time, though.

8          MR. MARKETOS:  Yes.  So -- so the point the --

9    they're talking about all of these witnesses, and they've all

10   got some bias, and the point to address on her filing of a

11   different separate DOJ lawsuit is that you have to go to the

12   DOJ lawsuit and that it remains under seal and that she made

13   these allegations years earlier, not knowing about Ms. Penelow

14   and Ms. Brancaccio, not knowing about this case being under

15   seal.

16          They're making these allegations that these are all

17   their friends.  You heard it in opening, right, that it was

18   just brought up.  They were -- they're colluding.  The point

19   about asking those questions about these witnesses is

20   Ms. Graham made these allegations years earlier, not knowing

21   about these --

22          THE COURT:  Well, that may have been the point, but

23   you've also now -- you don't see what narrative you just put

24   before the jury?

25          MR. MARKETOS:  I don't necessarily agree with it,

1    Your Honor, but I know where they're going.  If they want to

2    go there, they can go there.

3         THE COURT:  No.  Because -- I'm not saying that.  I'm

4    saying it's your witness that brought it out.

5         MR. MARKETOS:  Right.

6         THE COURT:  I promise you if Janssen had called a

7    witness and this issue hadn't been brought up and they said,

8    Yeah, the Department of Justice was aware of this case and

9    they said, bye, we don't want to be a part of this, I would

10   have blasted them for doing that because I have an order that

11   says they're precluded from doing that.

12        But I also said in the order that -- I think it

13   literally says it verbatim in my opinion, but it will revisit

14   this issue at trial should Relators present evidence or

15   argument at trial that, quote/unquote, opens the door as to

16   the Government's involvement or lack thereof.

17        And here you are saying -- and by the way, I understand

18   that one purpose might have been, Hey, look, Judge, what we're

19   trying to do is bolster the credibility of this witness, that

20   prior to her testifying, she went to the Department of Justice

21   separate and apart from the Relators in this particular case.

22        MR. MARKETOS:  Right.

23        THE COURT:  But you've done more than that.  I

24   understand that might be the purpose, but you also now have a

25   witness saying, I went to the Department of Justice, these

1  folks went to the Department of Justice and now we'll just cut

2  it off there.  Let the jurors figure out now what the DOJ is

3  doing.

4       Maybe they're investigating Janssen for criminal

5  conduct.  Maybe they're investigating for this.  Maybe that

6  case is still pending.

7       This is the narrative that you guys have now closed out

8  before the jury, and so my question to you all before I hear

9  from somebody on the other side is:  You don't think you

10  opened the door?

11       MR. MARKETOS:  Your Honor, every witness who is a

12  Relator testifies that they took their complaints to the

13  Department of Justice.  They have to in any declined case.

14       If you're standing in the shoes of the federal

15  Government, you don't just file as a plaintiff.

16       So every single Relator has to testify that he or she

17  took their complaints to the Department of Justice.  We don't

18  tell the jurors what the process is thereafter.  That's the

19  issue with respect to a declined case.  But you can't just be

20  a Relator.  You have to tell the jurors that you went to the

21  Department of Justice to be a Relator.

22       THE COURT:  No, that's -- and maybe if the testimony

23  was as specific and as procedural as that of what you just

24  articulated, I might not have the same concern.  But that's

25  not exactly what I heard, although I'll look at the

 1    transcript.

 2         I mean, I have a live feed, so I'm watching it, but I'm

 3    saying, I'll review it this evening to get an exact sense of

 4    all the things that this witness said.

 5         MR. MARKETOS:  Sure.

 6         THE COURT:  So are you telling me that your

 7    recollection -- I'll have to look at it this evening, right?

 8    I'm not making a decision here and now.  I still want to hear

 9    from Janssen's counsel.

10         But is it your opinion that the testimony that was just

11    elicited is solely procedural, that this is what is required

12    of the Relator?  You have to go to the Department of Justice,

13    and, therefore, that's what was done?

14         MR. MARKETOS:  Yeah, go ahead.

15         MR. RUSS:  Yeah.  Your Honor, if I can, I was trying

16    to elicit --

17              (Stenographer clarification.)

18         MR. RUSS:  Your Honor, I was trying to elicit, and I

19    think it came out in the transcript, that Ms. Graham filed and

20    then dismissed the case, right, not that it's pending, that

21    she couldn't proceed.

22         THE COURT:  Well, I thought you also -- and you can

23    correct me if I'm wrong.  Is that the reason why that case no

24    longer exists is because your Relators' case went first?

25         MR. RUSS:  It was filed first.

```
 1            THE COURT:  Right.
 2            MR. RUSS:  Right.  Separate and apart from any
 3   intervention suit or defamation, et cetera.  That's not the
 4   case with hers.  There was no decision.  She dismissed it.
 5            And so most of her discussion was the fact that she
 6   just got beat to the punch, not the Department of Justice
 7   investigating or still investigating or to insinuate anything
 8   other than the fact that they had these concerns and actually
 9   brought them to the Government, not internal compliance.
10            That's it.  Not trying to elicit intervention, decision
11   or investigation, any of that.
12            THE COURT:  All right.  Let me hear from Janssen.
13            MR. WYATT:  Thank you, Your Honor.  Geoff Wyatt for
14   Janssen.
15            We have the same concern that the Court does.  There
16   was a procedural aspect of what was discussed, that's true,
17   but there was definitely also a theme of you went to the
18   Department of Justice.  That was the question.
19            It wasn't speaking about the declarations.  Was it
20   consistent with the lawsuit you had filed years earlier with
21   the Department of Justice, which is clearly indicating that
22   there's some sort of alignment between -- which is exactly
23   what we were concerned about, that they would come in here,
24   that they would try to present this case as though it were on
25   behalf of the Department of Justice.
```

1      And the effect of this testimony that we just heard is

2 that, yes, she was working with the Department of Justice on

3 very similar claims, and this case, which she is not a party

4 in, is a natural continuation of that exact same issue that

5 she raised with the Department.

6      It was also -- it was in opening, and we haven't raised

7 it yet because we wanted to see where this was going to go,

8 but it was said in opening that these are the Government's

9 claims that are being prosecuted, and Relators, quote, stand

10 in the shoes of the Government for purposes of this case.

11      We really are now put in the position of having to

12 defend this as though it is a case either being prosecuted by

13 or investigated by -- to this day by the Department of

14 Justice, and that's not true.

15      And, in fact, one of the things that I believe is the

16 case about the Eastern District of Pennsylvania case that we

17 just heard about for the last half hour is that it was

18 dismissed but only with the permission of the Government.

19      So, again, that part is not in the case, but it seems

20 to me to be as relevant to responsiveness as the fact that the

21 Government has not intervened.

22      So for both of those reasons, for all those reasons, as

23 Your Honor just articulated, we do think the door is opened

24 and that we should be able to --

25          THE COURT:  Is that the language of the opening, by

1    the way?  I know you didn't give the opening, Mr. Russ, but is

2    that the language you used in the opening?

3        Again, I haven't reviewed the transcript.  I've been

4    sitting here with all of you, but I will.  Is that what you

5    said in the opening?

6        MR. WIRMANI:  I think that is the definition of a

7    qui tam lawsuit is that they stand in the shoes of the

8    Government.  They are prosecuting the Government's claim in a

9    declined position.

10       I mean, there's no other way for a private litigant to

11   get to this point unless they're prosecuting the Government's

12   claim.  By definition they suffered no injury here.  This is

13   the Government's injury, and they are prosecuting it.

14       And every time these cases are tried, this issue comes

15   up.  The intervention decision is always off limits because

16   nobody knows why the Government declined the case.  We have

17   not suggested that the Government is somehow in the background

18   investigating.

19       THE COURT:  Well, that's the question, right?

20       MR. RUSS:  And I'm thinking --

21       THE COURT:  And that's what I'm getting to.  And, by

22   the way, I'm not going to be able to decide that now sitting

23   here.  I'm issue spotting it for you all because tomorrow

24   morning I will decide it, right?

25       So that's going to be the issue.  So, by the way, I

 1    appreciate both sides.  I appreciate the arguments.  I'm issue

 2    spotting it.  I'm not saying I've decided whether it's crossed

 3    a line or not, but it's a concern.  It's a red flag that I'm

 4    raising for all of you.

 5         So here's -- here's what I suggest:  I'm going to

 6    review -- well, I'm going to review the opening and the direct

 7    exam now.  I'm going to review both in conjunction, and then

 8    why don't we discuss this in the morning.

 9         That gives you time to just -- to look at it and say,

10    Judge, we've looked at it.  We don't think we crossed any line

11    other than what procedurally is accurate here.  We're not

12    implying or we haven't insinuated in any sort of way that the

13    Government is still in this thing in some way, and I'll hear

14    from Janssen if you feel differently.

15         But why don't we do that after you've all reviewed

16    specifically what has been said because, look, all of

17    recollections may be slightly different, and I'm not convinced

18    my recollection is a hundred percent accurate.

19         But while it was happening, it was raising some red

20    flags for me, so that's -- I'm sorry, go ahead.

21              MR. WIRMANI:  Just one thing along those lines,

22    Your Honor.

23              THE COURT:  Yeah.

24              MR. WIRMANI:  Ms. Brown repeatedly said during her

25    opening that the Government was made aware of this, and they

 1    continued to pay claims.  The Government was made aware of

 2    this and implied they haven't done anything.

 3         So I don't think that we've opened the door.  If

 4    anything, they've pushed.

 5         THE COURT:  I don't know if that's in the same

 6    context.  I'm not even sure those two things -- it's like

 7    apples and bananas, but I'll look at that as well.  If you

 8    think that Janssen has brought up the Government, I think it's

 9    in a completely different context, but I'll also look at the

10    opening from Ms. Brown, if you think that that's somehow

11    relevant.

12         MR. RUSS:  Yeah.  Your Honor, if I may, there was one

13    reference by Ms. Brown in the opening about this memo that was

14    given to the Department of Justice from our clients, opening

15    up this 20-page idea.

16         I didn't even touch that with the screen.  I wasn't

17    talking about what my clients did with the Department of

18    Justice, just that she reported her case.  Hard stop.

19         They brought that up in the opening, but you're going

20    to see this memo with the Department of Justice laying out

21    their claims.  They opened that door.  I certainly wasn't

22    trying to open the door further to any defamation decision,

23    and the case law is pretty clear that we're not trying to

24    mitigate or figure out why the Department what it liked, what

25    they didn't like, why they decided it was resource-based.  We

1    don't have the answer to that.

2            THE COURT:  All right.  I'll take a look -- like I

3    said, I'm going to take a look at the openings and the direct

4    exam of Ms. Graham, and then why don't we revisit this in the

5    morning, but expect that I'm going to want to chat about this

6    tomorrow at 9:00.

7            Ms. Brown?

8            MS. BROWN:  I just want to add one thing, Your Honor.

9    The memo was raised, and this entire discussion took place

10   when the slide was up about continued payment by CMS, and this

11   was a materiality point.  That is one of the elements of their

12   claims.

13           The Government is aware of these allegations, and the

14   agency continues to pay.  It's part of what's in the case.

15   It's totally divorced from what Your Honor excluded, which was

16   that the DOJ declined intervention here.

17           But by putting the EDPA case in, they have now created

18   a whole narrative that behind the scenes the DOJ thinks this

19   case has merit.

20           And so for those reasons, Your Honor, they have kicked

21   open the door on this nonintervention.  They have created this

22   false narrative that somehow there is merit, and the

23   Department of Justice believes so, and that's not true.

24           THE COURT:  All right.  I appreciate that.

25           Is there anything more?  I mean, look, I'm going to

 1    look at it.  There's not much -- you guys can do the rest of

 2    these arguments tomorrow morning.  No?

 3         MS. BROWN:  Yes.

 4         MR. MARKETOS:  Right.  Just -- no.  I will be very,

 5    very brief, Your Honor.

 6         You can see what's happening is each side has an angle

 7    of an element of the case that they want Government-related

 8    matters to be introduced on, and each side is coming at it

 9    from a different angle, and they're saying, You opened the

10    door on this.

11         They brought up the sending of a 20-page letter, memo,

12    by our counsel, by Berger Montague, to the Department of

13    Justice in opening.

14         And now the suggestion is that by virtue of discussing

15    the process of a complaint to the DOJ being under seal, that

16    the Relators have opened the door on something.

17         These are going to go back and forth, but in every

18    qui tam case, the only thing I wanted to reiterate is, in

19    order for the jurors to understand that the Relator is

20    bringing the claims on before of the Government, they must

21    have first gone to the DOJ.  That doesn't open the door for

22    the --

23         THE COURT:  Look, I don't necessarily disagree with

24    that representation if that's all that -- if that's all that's

25    come out so far.

```
 1            MR. WIRMANI:  Sure.

 2            THE COURT:  So let me take a look at it.  I

 3   appreciate the arguments from both sides.  But I'll hear from

 4   you more after I think we've all collectively looked at the

 5   transcript.

 6        Look, I may look at it and say, I don't know if it's

 7   gone too far, or you may look at it and feel differently.  I

 8   don't know the answer to it.  But I'm raising it now.

 9            MR. WIRMANI:  Sure.

10            THE COURT:  And I wanted to raise it before

11   cross-examination or at the very outset -- you know, if you

12   had done 10 or 15 minutes, I would have addressed it, and you

13   would have continued cross tomorrow.

14        But I thought it made more sense to speak -- excuse

15   me -- before we conducted the cross.

16        But all right.  So here's what I would anticipate.

17   Expect that tomorrow morning when we huddle up in the morning

18   that I'm going to want to talk about this issue.  Okay?

19        And then I'll decide whether I think there's been a

20   door opened or not.

21        What else?  Before I adjourn you for the day, folks,

22   anything more from the Relators?  I don't know if there's

23   anything more we need to chat about.

24            MR. MARKETOS:  Not from us.  I'm sorry.

25            (Brief pause.)
```

```
1          MR. MARKETOS:  Do you want any submissions on this,
2   Your Honor?  I know that -- if you -- you might take a look at
3   the briefing on the limine issue.
4          THE COURT:  Yeah, I'll just go back to -- look, I'm
5   not going to force you guys to put pen to paper tonight to
6   deal with this issue.  If you want to put your own notes
7   together and just relay it orally tomorrow, I think that's
8   sufficient.
9          I'll go back, I'll look a little bit more at the
10  briefing for the motion in limine so you're not repeating
11  yourselves, so...
12         MR. MARKETOS:  Procedurally, Your Honor, if they said
13  something was opened in opening, if we --
14         THE COURT:  Well, actually, Janssen hasn't said that.
15  I'm saying I have concerns about it because I addressed this
16  issue prior to the trial.  I also said but it's subject to you
17  all maybe opening the door during the trial, right?
18         So here I am now saying, well, did you open it or not?
19         Now, obviously, I guess, Janssen's position is you did,
20  but why don't we all look at the transcript to be a little
21  more accurate about where we are?
22         MR. MARKETOS:  Okay.
23         THE COURT:  All right.  But anything further --
24         MR. MARKETOS:  No.  Thank you.
25         THE COURT:  -- before we adjourn just for the day?
```

1          Ms. Brown, anything from the defense side that we need

2   to chat about unrelated to this or --

3          MS. BROWN:  No, Your Honor.  Thank you.

4          THE COURT:  All right.  We're adjourned for the day,

5   but let's be on time tomorrow.  9:00 a.m. we're going to have

6   to address this issue, at the bear minimum, unless something

7   else comes up.

8          And then you have what?  Ms. Graham is going to be back

9   on cross, and then you're going to have --

10          MR. MARKETOS:  Ms. Strand, Sarah Strand.

11          THE COURT:  Do you anticipate -- look, we're behind

12   schedule, apparently.  We had two witnesses, we got through

13   half of one.  So are we on target to get through those, and

14   will you to need to line up somebody else tomorrow?

15          MR. MARKETOS:  Yes, Ms. Nancy Bartnett is on notice

16   that -- she's a Janssen witness that we're calling on cross.

17          THE COURT:  All right.  So Ms. Bartnett.

18          MR. MARKETOS:  Actually -- yes.

19          THE COURT:  What do you mean calling on cross?  Or

20   you mean you're going to --

21          MR. MARKETOS:  Calling her adversely.

22          THE COURT:  I got it.  She's a hostile witness,

23   right?  So there's going to be leading questions.  Is that

24   real --

25          MR. MARKETOS:  Yes, sir.

1          The point of telling you that is because it's their

2     witness we scheduled.  That was the only reason.

3               THE COURT:  Okay.  But just to be clear -- well, let

4     me just talk about that for a moment, folks.

5          They're calling this witness.  Ms. Brown, you don't

6     intend to call this witness a second time, do you?

7               MS. BROWN:  No.  I assumed I'd be allowed to do my

8     questioning now and then --

9               THE COURT:  You will, right?

10         So I want to be very clear about any witness on both

11    your sides.  That witness gets called, I have the authority

12    and I have the discretion to say, even if it's outside the

13    scope of direct, I'm going to allow the cross-examination.

14    I'm not bringing any person back to this courtroom twice.

15         So that goes for both sides.  You call their witness,

16    you start objecting to outside the scope, I'll tell you --

17    yesterday I told you that I was going to allow that because

18    we're not calling the witness back.  And it would be the same

19    thing for you folks, right?

20         But let's not see any of these names repeated on the

21    defense case.  I want to make sure that we're all on the same

22    page.

23         Is there any objection to that, although I'm going to

24    overrule it, but I want you to place your record?

25              MR. MARKETOS:  Go ahead and object, Andrew.

1              No.  Judge, no.  This is how we anticipated it.

2                  THE COURT:  Yeah, I mean, just to keep this moving.

3        All right.  So that's the -- be well, folks.  I'll see you

4        tomorrow morning.  We're adjourned.

5                  THE DEPUTY COURT CLERK:  All rise.

6                  (Court concludes at 4:00 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          FEDERAL OFFICIAL COURT REPORTER'S CERTIFICATE.

2          - - - - - - - - - - - - - - - - - - - - - -

3

4      I certify that the foregoing is a correct transcript from

5  the record of proceedings in the above-entitled matter.

6

7

8      I

9

10

11  /S/ Megan McKay-Soule, RDR, CRR    May 7, 2024

12          Court Reporter                          Date

13

14

15

16

17

18

19

20

21

22

23

24

25

**$**

**$17** [2] - 45:18, 69:16
**$200,000** [1] - 19:2
**$230** [1] - 69:16
**$300** [1] - 123:11
**$400,000** [1] - 69:20
**$430** [1] - 110:25
**$700** [1] - 83:8
**$704** [2] - 13:1, 15:24
**$800** [1] - 128:14
**$81** [3] - 12:23, 15:21, 126:11

**'**

**'13** [1] - 131:17
**'90s** [2] - 151:4, 177:13

**/**

**/S** [1] - 269:11

**0**

**08608** [1] - 1:9

**1**

**1** [9] - 1:5, 6:9, 36:1, 36:7, 39:5, 99:11, 100:20, 128:7, 183:15
**1-800** [2] - 117:2, 119:20
**1.1** [1] - 171:25
**1.5** [1] - 206:1
**10** [3] - 191:7, 251:2, 264:12
**100** [1] - 95:6
**1000** [1] - 6:9
**12** [4] - 26:24, 47:5, 83:10, 170:18
**12:25** [1] - 139:3
**12:30** [7] - 9:1, 25:19, 25:21, 25:23, 25:25, 26:4, 27:24
**13** [1] - 176:19
**14** [1] - 199:24
**141** [1] - 2:5
**15** [3] - 250:19, 251:2, 264:12
**154** [1] - 205:23
**170** [1] - 2:10
**174** [1] - 2:12
**183** [5] - 2:14, 184:14, 184:16, 184:24, 185:4
**185** [1] - 2:14

**1950s** [1] - 83:17
**1980s** [4] - 88:12, 88:13, 88:14, 88:22
**1981** [4] - 87:23, 88:6, 88:9
**1990s** [4] - 88:14, 88:23, 89:8, 90:11
**1992** [1] - 89:1
**1997** [2] - 150:20, 151:5
**1:00** [2] - 124:24, 125:1
**1:15** [1] - 139:1
**1:28** [1] - 139:3

**2**

**2** [10] - 12:6, 12:24, 17:24, 19:2, 36:2, 36:9, 39:7, 99:11, 100:20, 170:24
**2.2** [3] - 15:22, 21:24, 126:11
**20** [1] - 192:15
**20-page** [3] - 105:16, 261:15, 263:11
**200** [1] - 69:19
**2000s** [2] - 145:10, 145:13
**2003** [1] - 145:10
**2003-2004** [1] - 150:17
**2005** [1] - 212:10
**2006** [28] - 45:8, 53:12, 55:25, 57:24, 91:24, 104:9, 118:18, 122:9, 122:11, 122:12, 122:18, 122:23, 143:9, 150:18, 155:9, 155:25, 156:8, 160:4, 160:5, 160:15, 160:17, 170:18, 171:20, 175:4, 177:15, 177:19, 187:22, 188:20
**2007** [5] - 155:25, 156:8, 156:12, 171:23, 203:7
**2008** [10] - 55:25, 57:24, 58:9, 91:25, 94:6, 118:18, 164:7, 164:10, 178:9, 237:18
**2009** [2] - 158:17, 198:1
**2010** [7] - 15:21, 16:16, 79:17, 117:18, 118:18, 128:17, 131:17

**2011** [4] - 143:9, 240:10, 244:7, 244:9
**2013** [6] - 15:22, 79:22, 122:13, 122:19, 122:24, 128:17
**2014** [1] - 45:8
**202** [1] - 2:16
**2024** [4] - 1:10, 3:3, 105:10, 269:11
**21** [2] - 65:24, 66:1
**23rd** [4] - 10:3, 10:4, 10:18, 10:19
**24** [6] - 117:3, 183:9, 183:12, 185:20, 187:12, 187:17
**24-week** [4] - 179:18, 180:1, 183:9, 186:23
**25** [3] - 7:22, 18:19, 75:2
**26** [4] - 106:11, 106:14, 106:15, 106:19
**262** [1] - 171:24
**27** [2] - 18:20, 188:17
**28** [5] - 15:16, 15:17, 15:21, 17:25, 24:1
**29** [7] - 15:16, 15:24, 18:1, 24:2, 24:3, 190:9, 190:15
**2:00** [2] - 168:1, 169:15
**2:51** [1] - 217:1
**2:54** [1] - 220:7

**3**

**3** [7] - 36:4, 36:10, 39:9, 99:9, 100:20, 174:21, 225:24
**30** [9] - 7:18, 8:10, 8:16, 28:4, 93:15, 143:14, 226:4, 226:21, 227:13
**30-minute** [1] - 8:3
**300** [2] - 69:20, 80:23
**353** [4] - 2:10, 167:11, 170:4, 170:12
**365** [1] - 119:21
**37** [2] - 191:25, 192:2
**38** [1] - 192:14
**380** [1] - 88:8
**3:12-cv-07758-ZNQ-JBD** [1] - 1:4
**3TC** [1] - 150:5

**4**

**4** [6] - 36:11, 39:10, 100:20, 171:17,

227:2, 227:10
**40** [2] - 74:7, 87:22
**400-and-some** [1] - 128:19
**402** [1] - 1:9
**404** [1] - 17:11
**404(b** [1] - 21:10
**40s** [1] - 102:18
**45** [8] - 8:11, 8:12, 8:13, 8:17, 8:20, 8:22, 28:2, 124:23
**48-week** [2] - 68:3, 183:12
**483** [1] - 123:11
**49** [1] - 205:22
**4:00** [1] - 268:6
**4:15** [1] - 227:10
**4:30** [1] - 227:11

**5**

**5** [2] - 39:12, 172:4
**5,000** [1] - 80:19
**50** [6] - 86:20, 106:11, 153:1, 153:2, 199:24, 205:22
**50-page** [1] - 107:16
**50s** [1] - 102:19

**6**

**6** [3] - 39:14, 175:15, 175:17
**60** [4] - 68:18, 153:1, 153:2, 205:23
**600** [1] - 1:17
**609** [1] - 1:24
**65** [1] - 153:10
**650** [1] - 119:7

**7**

**7** [6] - 1:10, 3:2, 39:17, 58:12, 117:3, 269:11
**7,000** [1] - 105:25
**704** [2] - 18:2, 21:25
**73** [5] - 2:16, 202:10, 202:12, 202:17, 202:21
**740** [1] - 19:2
**750** [1] - 1:17
**75201** [1] - 1:17

**8**

**8** [1] - 46:5
**800-some** [1] - 130:10
**81** [3] - 17:24, 19:2, 21:24
**815-2319** [1] - 1:24

**86** [1] - 87:22
**89** [6] - 2:12, 173:6, 173:19, 173:22, 174:17, 174:20

**9**

**9,000** [3] - 71:24, 81:7, 115:25
**920** [1] - 1:21
**96-week** [1] - 183:13
**9:00** [5] - 1:10, 3:3, 7:20, 262:6, 266:5
**9:30** [5] - 5:11, 5:13, 5:17, 26:19, 251:11
**9:42** [1] - 26:12

**A**

**a.m** [4] - 1:10, 3:3, 26:12, 266:5
**Aaron** [1] - 74:5
**Abbott** [1] - 73:16
**ability** [9] - 39:5, 70:10, 81:13, 96:1, 102:25, 113:9, 114:23, 133:20, 203:19
**able** [21] - 11:20, 28:19, 29:2, 90:13, 101:4, 123:14, 123:21, 125:17, 130:3, 130:10, 131:19, 133:19, 134:22, 162:13, 169:6, 183:17, 212:2, 214:7, 252:14, 258:24, 259:22
**above-entitled** [1] - 269:5
**absolute** [1] - 86:8
**absolutely** [10] - 5:21, 62:1, 64:2, 75:13, 112:11, 130:17, 132:3, 168:10, 184:10, 247:1
**abuse** [1] - 66:19
**academic** [2] - 72:6, 74:24
**accelerated** [1] - 89:2
**acceptable** [1] - 49:16
**accepted** [1] - 74:17
**access** [13] - 33:5, 46:2, 61:1, 92:22, 93:2, 93:10, 97:9, 157:24, 168:9, 169:2, 185:13, 203:17
**accessible** [2] - 93:7,

97:21
**accident** [1] - 102:12
**accommodate** [4] -
98:3, 98:8, 229:13,
230:5
**accommodated** [2] -
229:5, 229:14
**accordance** [2] - 95:3,
95:5
**account** [6] - 60:21,
119:4, 119:5, 119:8,
224:4, 241:5
**accounted** [1] -
205:20
**accounts** [1] - 60:24
**accurate** [6] - 137:8,
165:11, 243:21,
260:11, 260:18,
265:21
**accused** [1] - 124:8
**achieved** [1] - 175:1
**acquaintance** [1] -
245:23
**acronym** [1] - 185:18
**acronyms** [1] - 185:15
**Act** [9] - 30:25, 31:11,
31:18, 31:21, 31:25,
80:8, 132:15, 143:3,
212:15
**act** [1] - 117:7
**acted** [2] - 30:24, 31:7
**action** [4] - 193:20,
195:16, 233:13,
242:3
**ACTION** [1] - 1:3
**actions** [2] - 95:9,
148:13
**activity** [2] - 112:6,
215:22
**actors** [1] - 64:24
**Acts** [2] - 30:1, 31:19
**actual** [6] - 72:7,
95:22, 118:13,
132:8, 134:8, 136:16
**ad** [2] - 183:25, 212:19
**ADAM** [1] - 1:16
**add** [7] - 90:3, 116:15,
116:19, 130:15,
132:18, 162:8, 262:8
**added** [1] - 106:9
**adding** [1] - 211:4
**addition** [8] - 31:11,
34:5, 55:10, 56:7,
74:3, 80:1, 107:24,
112:4
**additional** [6] - 24:5,
31:23, 32:4, 56:9,
57:3, 182:15
**address** [30] - 5:10,
6:17, 17:1, 18:9,

18:12, 19:5, 20:8,
21:7, 21:8, 27:25,
29:4, 125:19,
125:24, 129:23,
133:19, 137:7,
138:5, 210:1,
219:23, 220:4,
250:2, 250:4,
250:11, 250:17,
251:14, 251:18,
253:2, 253:10, 266:6
**addressed** [9] - 12:17,
16:12, 18:10, 21:3,
21:4, 233:7, 233:8,
264:12, 265:15
**addressing** [3] -
17:13, 21:11, 131:5
**adequate** [1] - 211:3
**adhere** [1] - 60:10
**adherence** [2] - 59:17,
198:19
**adherent** [2] - 152:14,
179:24
**adjourn** [2] - 264:21,
265:25
**adjourned** [2] - 266:4,
268:4
**adjust** [2] - 84:18,
163:13
**adjustment** [2] -
40:12, 83:21
**adjustments** [2] -
83:23, 84:7
**administer** [1] - 96:17
**administers** [1] -
96:11
**Administration** [5] -
45:15, 50:18, 52:20,
89:10, 154:13
**admissible** [4] -
20:23, 22:4, 129:3,
129:15
**admissions** [1] -
17:18
**admit** [6] - 6:9, 170:5,
173:12, 174:17,
184:24, 202:17
**admitted** [9] - 6:10,
20:17, 34:2, 167:13,
170:9, 170:11,
174:19, 185:3,
202:20
**advance** [7] - 8:11,
9:17, 11:16, 12:13,
28:9, 28:19, 251:15
**advances** [1] - 53:7
**advantage** [2] - 41:7,
56:9
**advantages** [1] -
171:4

**adverse** [10] - 51:13,
56:13, 172:21,
172:23, 172:24,
237:5, 237:8, 237:9,
237:11, 237:12
**adversely** [1] - 266:21
**advertise** [1] - 54:3
**advertising** [2] -
75:20, 95:2
**advice** [1] - 246:10
**advisory** [4] - 228:3,
228:7, 228:11, 229:2
**advocating** [1] -
138:15
**Aetna** [2] - 96:14,
96:23
**affairs** [2] - 109:21,
113:24
**affect** [1] - 201:1
**affected** [3] - 87:23,
110:3, 111:2
**affiliates** [1] - 79:17
**afraid** [1] - 112:17
**Africa** [1] - 91:8
**afternoon** [4] - 61:4,
142:15, 158:16,
249:22
**age** [2] - 51:11, 52:24
**agencies** [3] - 93:3,
94:13, 94:18
**agency** [5] - 45:15,
94:10, 94:15,
154:11, 262:14
**agent** [1] - 144:25
**aggressive** [1] -
162:19
**aggressively** [1] -
172:9
**ago** [12] - 6:14, 17:7,
47:5, 75:22, 87:20,
88:6, 105:23,
142:21, 142:25,
171:19, 199:12,
238:16
**agree** [8] - 16:24,
29:23, 92:11, 128:7,
128:11, 131:18,
218:23, 253:25
**agreed** [7] - 23:1,
36:5, 106:4, 137:1,
137:4, 140:2, 140:25
**agreement** [4] - 20:14,
22:25, 41:9, 170:5
**agreements** [2] -
20:20, 21:23
**ahead** [7] - 9:14,
28:13, 125:16,
179:22, 256:14,
260:20, 267:25
**aid** [2] - 195:17,

195:22
**aided** [1] - 1:25
**AIDS** [4] - 21:19,
21:20, 89:19, 114:4
**al** [1] - 1:4
**alcohol** [4] - 45:24,
72:3, 72:25, 212:6
**alert** [2] - 40:12, 40:13
**alerts** [3] - 15:6, 15:7,
15:9
**alignment** [1] - 257:22
**alive** [3] - 87:8, 88:16,
92:24
**Alka** [1] - 198:14
**Alka-Seltzer** [1] -
198:14
**allegations** [36] -
12:23, 12:24, 15:19,
15:20, 47:20, 47:21,
60:18, 79:18, 79:23,
85:22, 86:5, 86:10,
87:15, 95:17,
105:12, 105:15,
111:6, 113:10,
114:10, 114:18,
115:24, 118:2,
118:11, 118:16,
120:10, 122:14,
123:16, 124:18,
127:12, 132:4,
245:10, 253:13,
253:16, 253:20,
262:13
**alleged** [5] - 30:22,
31:8, 83:3, 117:14,
120:23
**alleging** [1] - 107:13
**alleyway** [1] - 49:9
**Alli** [3] - 4:4, 85:18,
89:18
**ALLISON** [1] - 1:19
**allow** [13] - 18:16,
20:9, 27:2, 27:6,
31:19, 53:5, 134:14,
134:24, 219:11,
226:10, 267:13,
267:17
**allowable** [1] - 212:8
**allowed** [10] - 22:7,
39:24, 52:7, 52:13,
58:17, 89:11,
119:10, 167:3,
239:24, 267:7
**almost** [15] - 5:7, 47:5,
63:6, 69:16, 71:23,
71:24, 86:6, 87:22,
87:24, 88:9, 114:16,
122:4, 171:25,
176:20, 176:22
**alone** [4] - 21:15,

86:12, 86:17, 123:24
**AMERICA** [1] - 1:3
**amount** [18] - 16:17,
17:14, 20:6, 21:13,
91:8, 114:7, 127:2,
127:9, 128:9,
129:11, 131:5,
134:2, 135:5,
135:10, 188:25,
209:5, 226:1, 250:7
**amounts** [18] - 15:19,
15:20, 16:4, 16:14,
17:18, 17:20, 18:13,
18:16, 19:21, 20:2,
20:22, 65:6, 127:25,
128:22, 131:19,
132:1, 134:15, 138:4
**analogues** [1] - 31:22
**Analysis** [2] - 185:23,
185:25
**analysis** [2] - 175:1,
188:21
**Andrew** [3] - 3:15,
46:18, 267:25
**ANDREW** [1] - 1:15
**anesthesia** [1] -
144:25
**angle** [2] - 263:6,
263:9
**anonymous** [6] -
117:2, 117:3, 235:9,
235:10, 235:14,
248:4
**answer** [9] - 20:4,
21:15, 37:11,
205:12, 219:3,
221:14, 222:9,
262:1, 264:8
**answering** [2] -
108:20, 252:21
**answers** [2] - 243:13,
243:14
**Anti** [7] - 30:10, 31:8,
111:9, 111:11,
112:11, 116:8,
159:11
**Anti-Kickback** [7] -
30:10, 31:8, 111:9,
111:11, 112:11,
116:8, 159:11
**antibiotic** [7] - 98:24,
99:2, 99:9, 99:11,
144:24, 145:2
**anticipate** [4] - 8:12,
83:15, 264:16,
266:11
**anticipated** [2] -
53:21, 268:1
**anticipating** [2] - 5:12,
7:8

**antiretroviral** [7] - 54:12, 55:5, 90:7, 92:23, 97:15, 100:6, 149:24
**anyway** [3] - 128:15, 137:13, 250:19
**apart** [2] - 254:21, 257:2
**apologize** [5] - 217:6, 217:8, 217:11, 217:15, 217:21
**appearance** [2] - 224:20, 252:6
**appearances** [2] - 3:6, 3:9
**apples** [1] - 261:7
**Applicable** [1] - 29:24
**applied** [1] - 100:6
**applies** [1] - 42:14
**apply** [3] - 29:14, 42:14, 82:25
**appreciate** [8] - 7:17, 7:20, 26:17, 44:9, 260:1, 262:24, 264:3
**appreciated** [1] - 44:10
**approach** [4] - 14:18, 14:20, 15:10, 167:17
**appropriate** [20] - 22:5, 22:22, 93:10, 95:25, 97:2, 101:10, 102:14, 102:15, 102:21, 103:10, 104:5, 104:17, 104:19, 111:3, 120:8, 164:9, 165:19, 182:3, 196:3
**appropriately** [1] - 112:12
**approval** [8] - 56:10, 70:25, 74:25, 89:2, 89:11, 91:23, 109:16, 109:22
**approve** [3] - 94:22, 166:21
**approved** [48] - 51:4, 51:11, 51:20, 54:7, 55:25, 56:8, 58:10, 60:5, 65:13, 66:17, 71:20, 74:14, 77:23, 78:5, 89:4, 89:6, 91:24, 91:25, 94:2, 99:13, 102:4, 102:11, 104:9, 109:9, 109:20, 109:25, 110:7, 110:10, 110:11, 110:15, 111:4, 122:11, 145:9, 159:25, 160:20,

162:24, 164:7, 166:13, 178:18, 179:6, 179:17, 181:18, 198:9, 222:8, 222:14, 237:17
**approves** [1] - 154:11
**approving** [1] - 94:21
**April** [1] - 156:8
**Aptivus** [4] - 177:5, 188:25, 189:4, 190:15
**area** [5] - 15:3, 59:18, 149:21, 182:2, 244:18
**argue** [4] - 18:18, 18:19, 18:21, 21:9
**argued** [1] - 126:3
**arguing** [2] - 18:17, 20:5
**argument** [4] - 128:15, 131:22, 241:16, 254:15
**arguments** [10] - 36:7, 43:13, 43:15, 43:25, 44:4, 44:6, 44:14, 260:1, 263:2, 264:3
**Arizona** [1] - 248:5
**arose** [1] - 134:8
**ARPS** [1] - 1:19
**arrange** [1] - 223:3
**arrangement** [1] - 140:10
**arrow** [1] - 172:12
**article** [2] - 34:3, 34:4
**articulated** [2] - 255:24, 258:23
**ARV** [1] - 187:3
**AS** [1] - 142:9
**aspect** [1] - 257:16
**aspirational** [1] - 154:18
**aspirin** [2] - 102:17, 102:19
**assert** [1] - 31:12
**asserted** [1] - 85:24
**assess** [1] - 31:22
**assessment** [1] - 230:2
**assist** [1] - 141:4
**assistant** [1] - 153:8
**assistants** [1] - 210:3
**assume** [1] - 40:24
**assumed** [1] - 267:7
**assumption** [1] - 181:19
**Assumptions** [1] - 170:24
**asterisk** [1] - 134:17
**attached** [2] - 94:24,

162:14
**attack** [1] - 102:18
**attacking** [1] - 54:14
**attain** [1] - 163:11
**attempting** [1] - 135:22
**attend** [8] - 10:2, 10:5, 10:9, 211:6, 213:17, 215:20, 216:7, 228:7
**attended** [3] - 213:19, 216:5, 229:4
**attendee** [1] - 73:12
**attendees** [1] - 224:6
**attending** [1] - 222:2
**attends** [1] - 122:12
**attention** [6] - 27:12, 32:20, 41:1, 41:4, 44:10, 247:11
**attorney** [1] - 243:10
**attorney's** [1] - 35:18
**attorneys** [9] - 42:19, 42:20, 42:25, 43:12, 243:4, 250:17
**audience** [7] - 72:6, 72:15, 113:2, 221:23, 221:24, 222:21, 223:7
**audiences** [2] - 71:4, 116:6
**authority** [1] - 267:11
**authorization** [2] - 98:23, 98:25
**automatic** [1] - 178:25
**available** [5] - 40:25, 97:8, 98:1, 98:12, 100:9
**averaged** [1] - 71:22
**averaging** [1] - 206:1
**award** [2] - 70:2, 96:6
**aware** [13] - 55:22, 59:25, 60:1, 105:11, 111:11, 130:4, 140:12, 161:7, 214:24, 254:8, 260:25, 261:1, 262:13
**awareness** [3] - 15:1, 144:12, 210:5
**awful** [1] - 146:21
**AZT** [4] - 145:23, 146:15, 146:19, 147:6

### B

**baby** [2] - 102:17, 102:19
**backed** [1] - 222:18
**background** [2] - 52:22, 259:17

**backup** [2] - 71:2, 221:14
**backyard** [1] - 216:6
**bad** [5] - 56:15, 77:21, 85:20, 120:9, 240:23
**Bag** [1] - 108:7
**bag** [6] - 49:9, 108:19, 108:23, 109:1, 109:13, 117:7
**bags** [1] - 108:15
**Bailey** [1] - 214:21
**baiting** [1] - 194:2
**ball** [1] - 22:10
**ban** [1] - 32:21
**bananas** [1] - 261:7
**bang** [1] - 25:10
**bar** [1] - 249:1
**barreling** [1] - 89:18
**barrier** [1] - 198:5
**barriers** [5] - 91:12, 91:17, 182:13, 187:20, 187:22
**Bartnett** [10] - 64:22, 79:11, 174:2, 174:4, 174:6, 174:10, 185:14, 203:15, 266:15, 266:17
**based** [21] - 36:13, 84:14, 110:8, 110:16, 113:6, 113:7, 120:13, 144:4, 145:18, 159:24, 162:22, 162:23, 163:10, 163:21, 175:12, 184:1, 187:14, 190:7, 209:3, 249:15, 261:25
**basis** [9] - 52:17, 61:15, 117:2, 176:15, 176:22, 202:4, 219:15, 219:18, 219:22
**battle** [2] - 47:6, 88:15
**bear** [4] - 15:17, 39:17, 73:25, 266:6
**beat** [1] - 257:6
**beaten** [1] - 165:15
**beautiful** [1] - 72:23
**became** [9] - 147:8, 148:14, 151:24, 177:25, 178:1, 193:12, 209:21, 210:12
**become** [10] - 53:3, 53:9, 63:3, 75:4, 88:13, 125:24, 149:20, 161:7, 164:7, 201:19
**becoming** [1] - 158:20

**BEEN** [1] - 142:9
**began** [1] - 213:1
**begin** [10] - 43:24, 44:8, 44:13, 44:22, 227:8, 227:17, 250:16, 250:18, 251:7, 251:11
**beginning** [7] - 3:9, 22:16, 88:22, 187:21, 204:16, 227:5, 234:15
**begins** [2] - 168:1, 217:1
**behalf** [8] - 3:16, 3:17, 31:12, 31:20, 46:22, 47:25, 85:19, 257:25
**behavior** [7] - 81:3, 81:15, 81:20, 112:21, 112:23, 246:22, 247:9
**behind** [6] - 3:20, 200:6, 200:11, 234:15, 262:18, 266:11
**Belgium** [2] - 91:6, 91:10
**belief** [1] - 39:2
**believability** [1] - 39:17
**believable** [1] - 39:20
**believes** [1] - 262:23
**belly** [2] - 180:24
**Ben** [1] - 158:11
**bench** [4] - 11:15, 34:21, 219:23, 220:5
**Bench** [1] - 34:19
**benefits** [1] - 80:11
**Berger** [1] - 263:12
**best** [15] - 28:23, 45:22, 51:22, 72:24, 93:4, 102:3, 104:21, 105:20, 109:14, 121:1, 135:7, 152:5, 204:21, 205:1, 206:8
**better** [10] - 40:15, 43:23, 62:22, 83:25, 91:11, 110:4, 172:17, 177:25, 206:9, 207:4
**between** [13] - 24:18, 24:21, 30:22, 45:8, 55:25, 57:24, 150:7, 166:13, 167:8, 167:16, 180:10, 181:22, 257:22
**beyond** [5] - 42:12, 218:2, 219:21, 219:23, 226:21
**bias** [2] - 39:11, 253:10

**BID** [7] - 178:21, 178:25, 179:4, 180:2, 183:15, 196:21, 198:6
**big** [7] - 17:21, 56:9, 103:24, 108:12, 127:18, 211:25
**biggest** [2] - 114:19, 183:14
**billion** [14] - 12:6, 12:24, 15:22, 17:24, 21:24, 46:5, 77:17, 86:6, 116:20, 121:17, 122:4, 126:11, 149:5, 171:25
**billion-dollar** [1] - 121:17
**binders** [2] - 66:9, 250:8
**Biosciences** [1] - 153:21
**bit** [30] - 13:23, 25:15, 40:15, 44:7, 73:21, 85:7, 85:17, 89:15, 94:7, 96:1, 96:9, 98:21, 99:12, 102:5, 106:22, 121:25, 135:18, 138:1, 143:10, 158:16, 166:19, 186:4, 193:8, 193:25, 203:2, 228:10, 248:17, 253:4, 265:9
**black** [3] - 52:11, 154:18, 154:19
**Blackberries** [1] - 32:25
**Blackberry** [1] - 32:25
**blanket** [1] - 132:25
**blasted** [1] - 254:10
**blatant** [1] - 62:19
**blessed** [1] - 110:12
**blind** [1] - 50:25
**blinds** [1] - 38:12
**block** [1] - 90:14
**blockades** [1] - 100:7
**blog** [2] - 33:15, 34:11
**blood** [1] - 101:14
**blow** [1] - 204:13
**Blue** [3] - 96:14, 96:24
**BMS** [8] - 147:15, 147:17, 151:6, 155:18, 203:22, 238:13, 238:15, 238:17
**board** [7] - 68:23, 114:3, 114:8, 163:18, 184:8, 212:19, 228:7

**boards** [4] - 183:25, 228:3, 228:11, 229:2
**body** [3] - 89:24, 89:25, 149:4
**body's** [1] - 89:25
**bolster** [1] - 254:19
**bonus** [3] - 208:24, 208:25, 209:5
**boosted** [1] - 164:16
**bored** [1] - 155:19
**boss** [3] - 150:10, 203:9, 208:17
**bosses** [1] - 225:6
**Boston** [2] - 76:25, 229:12
**bother** [1] - 137:13
**bottom** [5] - 60:8, 76:3, 93:8, 100:5, 171:2
**bought** [1] - 176:11
**bound** [1] - 166:22
**box** [3] - 5:13, 26:20, 40:13
**Brad** [2] - 4:8, 85:19
**BRADLEY** [1] - 1:20
**brake** [1] - 89:22
**Brancaccio** [33] - 31:19, 46:20, 46:21, 47:7, 48:14, 61:12, 83:3, 85:24, 86:4, 92:10, 92:14, 92:16, 92:19, 107:7, 107:11, 108:22, 116:10, 116:12, 119:3, 119:5, 121:14, 142:18, 155:5, 204:6, 241:23, 242:3, 242:12, 242:15, 243:5, 244:4, 244:12, 248:18, 253:14
**brand** [1] - 144:12
**brave** [2] - 47:3, 87:6
**break** [34] - 8:1, 8:2, 8:9, 9:6, 10:11, 24:18, 24:21, 25:2, 25:9, 25:12, 25:20, 25:22, 25:24, 26:4, 27:20, 27:24, 28:2, 44:23, 64:16, 83:13, 83:21, 84:1, 84:7, 124:22, 138:22, 193:25, 205:25, 206:11, 217:3, 225:23, 226:6, 226:9, 226:24, 227:3
**breaking** [2] - 25:17, 207:1
**breakouts** [1] - 195:20

**breaks** [1] - 32:12
**bribe** [1] - 30:14
**bribed** [6] - 86:2, 111:6, 111:7, 115:20, 115:21
**bribing** [2] - 114:18, 124:9
**Brief** [2] - 249:19, 264:25
**brief** [5] - 4:14, 18:20, 30:8, 263:5
**briefed** [1] - 21:3
**briefing** [3] - 252:2, 265:3, 265:10
**briefly** [3] - 40:19, 121:22, 125:8
**brilliant** [2] - 76:25
**bring** [12] - 8:4, 14:14, 31:20, 32:20, 53:18, 60:15, 60:16, 88:18, 131:16, 139:7, 212:23
**bringing** [4] - 28:5, 46:21, 263:20, 267:14
**brings** [2] - 247:19, 247:20
**Bristol** [17] - 147:14, 147:21, 148:17, 150:12, 150:15, 150:18, 150:20, 151:4, 152:24, 153:17, 153:18, 155:1, 155:6, 155:11, 183:2, 234:23, 238:9
**Bristol-Myers** [16] - 147:14, 147:21, 148:17, 150:12, 150:15, 150:18, 150:20, 151:4, 152:24, 153:17, 153:18, 155:1, 155:6, 155:11, 234:23, 238:9
**broader** [3] - 56:17, 76:18, 76:21
**brought** [15] - 41:17, 46:10, 47:21, 143:2, 212:9, 233:11, 247:11, 249:7, 253:18, 254:4, 254:7, 257:9, 261:8, 261:19, 263:11
**BROWN** [76] - 1:19, 4:4, 5:1, 5:5, 5:7, 5:19, 5:21, 6:23, 7:15, 8:14, 8:18, 10:17, 10:23, 10:25, 11:4, 11:6, 12:1,

12:8, 12:12, 12:22, 13:7, 13:24, 24:17, 24:22, 24:25, 25:3, 85:2, 85:13, 85:15, 122:1, 137:9, 137:14, 138:23, 139:11, 139:22, 140:4, 141:15, 167:12, 167:17, 168:2, 168:6, 168:12, 168:16, 168:18, 168:20, 168:23, 169:3, 169:8, 169:10, 169:13, 170:8, 173:9, 174:18, 185:2, 202:19, 216:14, 217:6, 217:8, 217:11, 217:14, 217:21, 217:23, 218:22, 219:13, 219:19, 220:3, 220:6, 227:12, 250:7, 250:11, 250:25, 251:4, 262:8, 263:3, 266:3, 267:7
**Brown** [24] - 4:4, 4:19, 4:25, 6:4, 11:25, 85:1, 85:11, 85:18, 130:12, 135:2, 135:15, 141:14, 170:7, 173:8, 202:18, 217:2, 250:1, 250:23, 260:24, 261:10, 261:13, 262:7, 266:1, 267:5
**Brown's** [1] - 132:22
**budget** [2] - 57:11, 81:8
**budgeted** [1] - 53:17
**buffalo** [1] - 180:23
**Building** [1] - 1:8
**bullet** [2] - 68:2, 172:15, 186:20
**bunch** [2] - 121:9, 180:21
**burden** [13] - 41:18, 42:1, 43:3, 86:11, 86:12, 86:18, 86:21, 123:25, 124:13, 146:24, 147:3, 198:18, 198:20
**bureau** [18] - 113:22, 114:4, 114:11, 114:12, 114:20, 183:24, 190:1, 191:11, 192:15, 192:18, 214:12,

214:16, 215:1, 215:6, 216:10, 218:2, 221:7, 247:7
**bureau..** [1] - 218:9
**business** [12] - 51:18, 60:19, 68:8, 80:16, 174:1, 174:8, 174:25, 204:21, 205:1, 205:6, 206:12, 234:6
**but..** [1] - 183:16
**buy** [2] - 94:24, 176:13
**buying** [1] - 73:15
**BY** [27] - 1:14, 1:19, 2:5, 142:14, 170:15, 171:1, 171:18, 172:5, 173:16, 173:21, 174:24, 175:16, 184:15, 185:7, 185:21, 188:19, 190:10, 190:24, 191:19, 192:1, 192:13, 202:11, 202:24, 204:15, 221:5, 227:24, 249:20
**bye** [2] - 15:11, 254:9

**C**

**caboodle** [1] - 135:12
**calculated** [1] - 45:3
**calendar** [2] - 9:17, 11:14
**California** [6] - 31:13, 88:2, 116:2, 122:22, 122:23, 180:10
**CAM** [2] - 185:17, 188:6
**campaign** [2] - 45:9, 82:1
**CAMs** [1] - 185:16
**cancer** [1] - 88:3
**Candace** [1] - 158:13
**candidate** [1] - 192:25
**cannot** [6] - 69:9, 69:11, 69:12, 69:13, 70:20, 102:24, 111:12, 154:8
**cap** [1] - 48:8
**capsules** [1] - 198:13
**cardiovascular** [1] - 53:10
**cards** [1] - 242:19
**Care** [1] - 108:6
**care** [19] - 13:2, 30:20, 48:18, 49:4, 49:13, 49:15, 49:17, 50:17, 75:3, 80:9, 103:8, 113:23, 133:1,

133:2, 133:13,
133:14, 159:10,
170:10, 217:17
**cared** [1] - 70:11
**careful** [4] - 63:4,
107:17, 167:15,
170:10
**carefully** [1] - 121:18
**cares** [7] - 80:4, 103:9,
104:18, 105:4,
133:5, 133:14,
133:15
**Carolina** [1] - 31:16
**carries** [1] - 75:23
**carry** [1] - 66:10
**carrying** [4] - 38:10,
97:7, 100:8, 107:9
**Case** [1] - 29:24
**case** [171] - 6:20, 6:25,
9:2, 9:3, 10:18,
11:23, 12:24, 12:25,
20:10, 20:19, 25:21,
27:1, 29:12, 29:25,
30:5, 30:9, 32:9,
32:20, 33:6, 33:8,
33:10, 34:2, 34:4,
34:7, 34:9, 34:12,
34:13, 34:18, 35:21,
36:8, 36:11, 39:11,
41:16, 41:19, 42:7,
43:6, 43:8, 43:17,
45:2, 46:7, 46:10,
48:15, 48:19, 49:3,
49:19, 50:4, 50:13,
50:15, 52:3, 52:6,
52:16, 52:18, 54:11,
55:21, 56:17, 62:1,
65:9, 68:2, 69:18,
75:3, 75:16, 76:15,
76:18, 76:22, 77:20,
77:22, 78:14, 78:17,
79:4, 79:5, 79:13,
79:23, 82:10, 85:23,
86:16, 87:18, 92:18,
93:14, 94:8, 94:19,
95:4, 95:10, 95:12,
95:13, 95:14, 95:15,
95:19, 102:22,
103:15, 104:1,
105:3, 105:12,
105:18, 105:19,
106:6, 108:4,
110:19, 110:23,
113:11, 113:20,
115:20, 115:24,
116:8, 116:22,
117:22, 118:3,
122:14, 123:8,
123:18, 123:24,
124:12, 124:14,

124:17, 127:10,
128:10, 128:14,
128:17, 129:4,
130:17, 132:6,
132:8, 132:15,
132:16, 132:17,
132:24, 133:11,
142:8, 142:18,
143:3, 168:7,
230:21, 242:12,
242:18, 243:5,
246:13, 249:3,
249:5, 249:7,
249:10, 249:15,
251:25, 252:16,
253:14, 254:8,
254:21, 255:6,
255:13, 255:19,
256:20, 256:23,
256:24, 257:4,
257:24, 258:3,
258:10, 258:12,
258:16, 258:19,
259:16, 261:18,
261:23, 262:14,
262:17, 262:19,
263:7, 263:18,
267:21
**cases** [12] - 12:5,
12:15, 29:3, 42:14,
42:15, 126:16,
126:24, 127:5,
128:17, 129:10,
133:3, 259:14
**cash** [2] - 30:15, 49:9
**catch** [1] - 133:16
**categories** [3] -
111:18, 148:12,
192:19
**categorizing** [2] -
192:21, 192:24
**category** [2] - 56:18,
103:18
**Category** [1] - 55:24
**Catherine** [6] - 79:10,
108:4, 108:8, 109:7,
119:14, 119:16
**caught** [4] - 119:14,
119:23, 120:2,
120:24
**caused** [4] - 31:3,
31:5, 134:21, 151:2
**causing** [2] - 149:1,
180:16
**caveat** [1] - 134:16
**CDC** [2] - 93:19, 94:14
**Ceftin** [1] - 144:20,
145:1
**cell** [2] - 32:24, 33:10
**cells** [1] - 89:25

**center** [1] - 91:10
**Centers** [1] - 94:14
**cents** [1] - 12:10
**certain** [14] - 17:5,
36:21, 37:14, 52:24,
90:14, 97:5, 99:13,
101:21, 138:8,
176:18, 187:13,
209:5, 235:23
**certainly** [7] - 45:7,
63:4, 78:12, 157:23,
166:24, 192:24,
261:21
**CERTIFICATE** [1] -
269:1
**certify** [1] - 269:4
**cetera** [1] - 257:3
**chairs** [1] - 141:9
**challenge** [1] - 155:19
**chambers** [1] - 7:23
**chance** [2] - 228:14,
243:19
**chances** [1] - 77:15
**change** [16] - 7:8,
13:18, 54:22, 81:3,
81:14, 82:2, 112:21,
112:23, 118:8,
146:1, 163:20,
175:11, 222:14,
222:17, 237:4
**changed** [7] - 90:18,
133:6, 136:12,
177:19, 180:15,
222:16, 222:19
**changes** [4] - 7:7,
116:4, 118:14
**charge** [3] - 60:23,
72:12, 94:21
**chat** [9] - 4:12, 4:16,
7:10, 125:7, 138:21,
139:7, 262:5,
264:23, 266:2
**chatroom** [1] - 33:15
**check** [7] - 11:13,
11:14, 11:15, 72:18,
98:19, 99:2, 210:7
**checking** [2] - 224:22,
230:17
**cheeks** [1] - 181:2
**chemotherapy** [1] -
181:3
**Chicago** [1] - 229:4
**chief** [3] - 74:9, 79:6,
79:9
**choice** [7] - 62:10,
62:13, 68:23,
113:16, 195:5,
195:6, 238:1
**choices** [2] - 151:17,
178:3

**cholesterol** [11] -
56:11, 56:15, 56:18,
57:3, 57:5, 65:23,
66:2, 164:13,
164:18, 164:20
**choose** [5] - 101:23,
150:4, 150:6, 150:7,
218:11
**choosing** [1] - 148:11
**chose** [2] - 159:23,
183:24
**chosen** [2] - 86:4,
216:8
**Christine** [7] - 46:19,
61:12, 142:18,
155:5, 204:6,
241:23, 244:11
**chronic** [1] - 151:24
**chronology** [1] -
209:16
**CIAs** [2] - 12:19, 20:17
**circumscribed** [1] -
132:22
**circumstance** [1] -
132:4
**circumstances** [1] -
67:2
**Circumstantial** [1] -
37:20
**circumstantial** [5] -
38:6, 38:7, 38:10,
38:15, 38:19
**city** [1] - 152:25
**City** [2] - 147:19,
245:20
**CIVIL** [1] - 1:3
**civil** [2] - 41:16, 42:14
**claim** [22] - 29:25,
41:21, 42:3, 42:4,
96:7, 99:5, 110:23,
115:20, 116:9,
116:14, 116:16,
116:19, 117:20,
117:23, 122:15,
122:20, 122:25,
123:4, 123:10,
123:12, 259:8,
259:12
**claimed** [1] - 123:25
**claiming** [2] - 103:19,
104:10, 106:12
**claims** [40] - 30:4,
30:19, 30:22, 31:3,
31:5, 31:12, 32:2,
34:16, 46:22, 48:12,
85:25, 95:15, 95:19,
96:17, 105:8, 106:4,
106:8, 106:11,
111:6, 111:8, 116:8,
118:21, 122:5,

122:6, 122:21,
123:7, 123:11,
123:18, 123:23,
124:5, 128:16,
128:18, 172:13,
242:8, 258:3, 258:9,
261:1, 261:21,
262:12, 263:20
**Claims** [10] - 30:1,
30:25, 31:11, 31:18,
31:21, 31:25, 80:8,
132:15, 143:3
**CLAIRMONT** [1] - 3:22
**Clairmont** [1] - 3:23
**clarification** [1] -
256:17
**clarified** [1] - 134:1
**clarify** [4] - 138:10,
162:6, 171:12,
226:19
**Clarkson** [1] - 1:8
**class** [14] - 56:4, 94:6,
97:14, 97:16, 97:25,
98:12, 100:2,
101:23, 110:5,
149:25, 150:3,
172:25, 202:7,
212:23
**classes** [4] - 74:11,
101:6, 101:7, 150:14
**cleaning** [1] - 226:20
**clear** [20] - 9:9, 20:13,
22:17, 32:11, 32:18,
35:11, 52:12, 67:5,
99:22, 100:4,
100:24, 103:2,
129:15, 136:19,
219:7, 230:19,
248:16, 261:23,
267:3, 267:10
**clearly** [2] - 119:9,
257:21
**cleaves** [1] - 148:25
**CLERK** [20] - 3:4,
14:4, 24:12, 25:19,
26:9, 26:11, 84:3,
84:25, 85:4, 125:4,
139:2, 139:5, 141:8,
141:18, 142:11,
226:13, 226:15,
227:19, 251:19,
268:5
**client** [3] - 155:5,
203:21, 204:5
**client's** [1] - 43:14
**clients** [4] - 37:6,
143:2, 261:14,
261:17
**cliff** [3] - 89:19, 90:4
**clinical** [4] - 152:6,

155:14, 165:8, 166:23

**clinics** [1] - 152:12

**close** [4] - 15:13, 16:21, 41:1, 124:5

**closed** [2] - 38:12, 255:7

**closely** [2] - 157:22, 213:18

**closer** [2] - 10:10, 40:15

**closet** [1] - 151:20

**closing** [7] - 43:13, 43:15, 43:21, 43:23, 44:4, 44:6, 44:13

**CMS** [22] - 94:19, 98:3, 98:7, 98:20, 100:1, 100:7, 100:8, 103:8, 103:9, 105:4, 105:5, 105:7, 105:10, 105:14, 105:20, 105:24, 105:25, 133:13, 133:14, 133:15, 262:10

**co** [2] - 118:22, 120:22

**co-workers** [2] - 118:22, 120:22

**cocktail** [1] - 148:15

**coincidence** [3] - 10:22, 77:16, 77:17

**colleagues** [5] - 46:19, 85:18, 114:23, 123:7, 164:9

**collective** [1] - 41:7

**collectively** [1] - 264:4

**college** [2] - 143:16, 143:21

**colluding** [1] - 253:18

**Colorado** [4] - 31:13, 143:15, 240:13, 248:13

**Columbia** [2] - 31:17, 32:3

**combination** [2] - 101:4, 101:15

**comfortable** [5] - 41:10, 41:11, 194:25, 247:24, 248:1

**coming** [16] - 7:17, 9:12, 15:7, 15:10, 22:17, 61:11, 85:16, 93:3, 113:20, 119:4, 124:12, 137:16, 141:20, 198:3, 263:8

**Commencing** [1] - 1:10

**commercial** [1] - 172:6

**commit** [1] - 29:2

**commitments** [1] - 206:4

**committed** [2] - 179:25, 239:21

**committee** [1] - 113:23

**common** [7] - 36:17, 59:19, 82:21, 82:23, 82:25, 200:19, 236:1

**commonplace** [1] - 201:21

**communicate** [5] - 33:5, 33:7, 33:9, 33:12, 33:23

**communication** [1] - 107:18

**communications** [3] - 63:16, 63:17, 157:7

**community** [6] - 111:25, 112:4, 161:21, 203:18, 239:23

**companies** [21] - 16:3, 45:4, 48:3, 50:19, 50:23, 51:17, 52:6, 52:8, 55:9, 55:16, 71:16, 78:1, 95:2, 96:12, 96:14, 96:15, 143:14, 153:11, 153:16, 201:22, 245:5

**company** [45] - 15:25, 45:5, 47:1, 47:11, 56:2, 58:17, 61:2, 61:21, 61:24, 62:11, 63:2, 66:22, 67:9, 67:22, 68:16, 68:18, 69:3, 69:17, 73:12, 73:17, 75:12, 75:25, 82:12, 82:16, 107:22, 129:2, 144:4, 147:11, 153:20, 157:22, 162:15, 163:4, 166:14, 175:11, 176:12, 201:24, 209:13, 209:16, 225:18, 230:2, 232:12, 238:11, 238:24, 240:15

**company's** [8] - 53:16, 53:20, 61:6, 66:3, 68:24, 73:2, 107:21, 236:15

**compare** [5] - 78:23, 181:15, 199:20, 202:5, 238:7

**compared** [5] - 161:21, 165:7, 167:1, 189:21,

205:23

**comparing** [6] - 65:19, 166:1, 166:4, 204:23, 205:4, 207:2

**compass** [1] - 167:7

**compel** [1] - 127:6

**compelled** [3] - 151:15, 239:19, 240:7

**compendium** [1] - 100:15

**compensate** [1] - 112:8

**compensated** [1] - 115:3

**competitive** [2] - 57:7, 187:3

**competitor** [7] - 57:8, 58:3, 177:6, 189:2, 190:11, 191:15, 191:22

**competitors** [3] - 160:11, 178:5, 180:12

**complained** [3] - 104:23, 107:2, 248:6

**complained-about** [1] - 104:23

**complaining** [1] - 105:2

**complaint** [2] - 116:16, 263:15

**complaints** [2] - 255:12, 255:17

**complete** [1] - 98:9

**completely** [8] - 71:5, 127:9, 128:10, 135:12, 150:2, 161:15, 248:4, 261:9

**complex** [2] - 100:24, 101:24

**compliance** [46] - 45:7, 47:16, 60:9, 63:12, 63:14, 70:18, 75:4, 75:10, 75:14, 79:9, 79:14, 79:15, 79:16, 79:21, 80:1, 80:6, 80:7, 80:12, 80:16, 107:16, 107:21, 108:2, 108:4, 108:9, 108:21, 111:13, 113:23, 115:1, 116:24, 117:6, 117:7, 119:14, 119:16, 120:24, 127:18, 215:17, 215:20, 216:2, 216:5, 232:19, 233:3, 233:22,

233:24, 235:2, 248:4, 257:9

**Compliance** [1] - 108:6

**compliant** [1] - 236:15

**comply** [2] - 107:23, 115:1

**comports** [1] - 99:19

**compromise** [1] - 247:22

**compromising** [1] - 88:5

**computer** [4] - 1:25, 33:11, 119:7, 168:13

**computer-aided** [1] - 1:25

**computers** [1] - 33:4

**concealed** [1] - 49:12

**concept** [1] - 133:10

**concern** [12] - 108:25, 109:1, 127:16, 133:10, 141:7, 164:12, 200:13, 251:22, 252:17, 255:24, 257:15, 260:3

**concerned** [6] - 21:22, 225:3, 225:6, 225:11, 225:15, 257:23

**concerns** [5] - 16:3, 53:8, 239:5, 257:8, 265:15

**conclude** [1] - 38:11

**concluded** [2] - 169:15, 220:7

**concludes** [2] - 252:25, 268:6

**conclusion** [5] - 32:15, 34:16, 36:21, 36:22, 83:2

**conclusions** [1] - 66:9

**condition** [2] - 38:5, 51:11

**conditions** [21] - 98:10

**conduct** [21] - 18:22, 20:5, 20:8, 20:15, 21:21, 32:6, 47:4, 51:18, 52:4, 62:8, 62:9, 71:7, 73:10, 79:19, 79:20, 83:7, 107:1, 126:14, 127:24, 159:17, 255:5

**Conduct** [1] - 32:5

**conducted** [2] - 74:22, 264:15

**conducting** [1] - 194:21

**confer** [8] - 11:9,

12:11, 13:5, 13:20, 17:6, 19:18, 138:1, 138:11

**conference** [5] - 13:13, 34:21, 35:19, 35:20, 234:16

**Conferences** [1] - 34:19

**conferences** [4] - 35:12, 35:17, 108:10, 199:25

**confidence** [1] - 235:13

**confident** [1] - 83:2

**confidential** [1] - 35:2

**confines** [1] - 34:14

**conflict** [7] - 9:5, 9:18, 9:19, 11:17, 28:10, 28:11, 118:17

**conflicts** [1] - 28:16

**confusing** [2] - 131:3, 248:17

**congresses** [1] - 199:25

**congruent** [1] - 162:18

**conjecture** [1] - 81:16

**conjunction** [2] - 51:21, 260:7

**connect** [1] - 114:23

**Connecticut** [1] - 31:13

**connection** [1] - 119:12

**consent** [1] - 22:20

**consequences** [6] - 50:2, 50:3, 51:13, 51:14, 52:16, 56:13

**consider** [8] - 10:14, 35:19, 36:18, 37:16, 38:17, 39:4, 42:8, 97:24

**consideration** [1] - 51:15

**considered** [2] - 39:15, 146:14

**considering** [1] - 42:2

**consist** [1] - 163:7

**consistent** [9] - 56:10, 60:7, 75:16, 78:19, 111:3, 120:8, 137:15, 243:23, 257:20

**consistently** [4] - 47:15, 52:17, 61:20, 235:22

**consists** [1] - 35:25

**conspiracy** [1] - 117:14

**consult** [1] - 34:10

**contact** [1] - 246:10
**contacts** [1] - 80:21
**contents** [1] - 27:8
**context** [8] - 48:20, 49:17, 118:16, 132:5, 134:23, 164:25, 261:6, 261:9
**contexts** [1] - 50:2
**continuation** [1] - 258:4
**continue** [9] - 18:18, 26:18, 131:8, 197:25, 205:3, 205:7, 227:21, 237:14, 251:9
**continued** [7] - 18:19, 105:14, 105:24, 153:19, 261:1, 262:10, 264:13
**continues** [1] - 262:14
**continuing** [2] - 18:21, 21:9
**continuously** [1] - 105:7
**contract** [2] - 96:16, 115:22
**contracts** [3] - 96:12, 114:24, 115:21
**contradict** [1] - 133:22
**contradicted** [1] - 39:12
**contradictory** [1] - 133:23
**control** [8] - 30:5, 36:23, 67:14, 68:7, 91:21, 206:10, 207:5, 207:7
**Control** [1] - 94:15
**controlled** [1] - 51:1
**conversation** [7] - 152:6, 167:16, 214:22, 215:5, 222:11, 222:12, 232:1
**conversations** [4] - 232:8, 246:24, 247:5
**conviction** [1] - 78:22
**convince** [6] - 122:16, 127:21, 128:24, 131:1, 151:12, 183:17
**convinced** [2] - 22:2, 260:17
**convincing** [1] - 19:20
**coordinate** [3] - 242:15, 244:20, 245:6
**coordinated** [2] - 211:7, 246:7
**coordination** [1] -

141:5
**copies** [5] - 27:7, 27:10, 168:4, 168:5, 168:6
**copy** [5] - 14:10, 167:12, 168:3, 168:24, 168:25
**core** [2] - 195:17, 195:21
**corner** [2] - 74:6, 171:2
**corporate** [2] - 20:14, 20:19
**correct** [55] - 16:19, 17:16, 18:3, 19:15, 40:2, 103:22, 131:12, 131:25, 143:1, 145:14, 148:20, 158:10, 159:6, 160:10, 166:2, 167:9, 170:21, 170:22, 176:25, 177:9, 177:16, 178:20, 179:5, 179:7, 183:18, 186:10, 189:3, 189:18, 189:20, 189:22, 189:24, 195:3, 197:24, 203:25, 204:2, 204:7, 205:2, 208:5, 208:10, 208:19, 215:12, 215:14, 215:16, 218:11, 230:7, 232:13, 232:14, 235:19, 236:21, 241:25, 243:3, 248:24, 249:8, 256:23, 269:4
**corrections** [1] - 23:17
**correctly** [3] - 35:14, 176:20, 237:7
**correspondence** [1] - 100:3
**corroborate** [3] - 49:1, 82:17, 82:18
**Counsel** [2] - 22:15, 83:12, 124:21, 125:16, 251:17
**counsel** [39] - 3:8, 15:12, 18:5, 18:6, 40:10, 43:4, 43:7, 45:1, 102:5, 103:23, 107:1, 107:16, 112:21, 115:25, 121:6, 125:3, 125:6, 125:10, 125:21, 127:18, 133:12, 134:20, 137:21,

137:25, 140:7, 140:11, 167:16, 170:5, 202:10, 246:14, 250:2, 250:22, 251:13, 251:23, 252:12, 252:13, 252:23, 256:9, 263:12
**counsel's** [1] - 92:13
**country** [15] - 60:14, 61:9, 61:16, 64:15, 67:16, 68:12, 89:4, 93:3, 93:16, 111:8, 117:23, 200:20, 206:9, 207:3, 228:13
**couple** [20] - 81:1, 90:8, 122:2, 125:1, 128:20, 142:21, 142:25, 143:14, 152:5, 153:23, 174:14, 177:24, 180:20, 189:15, 199:25, 209:18, 229:10, 239:17, 245:5, 248:7
**course** [13] - 7:9, 17:18, 29:21, 35:16, 40:23, 41:2, 65:2, 70:16, 87:5, 112:25, 152:11, 182:7, 195:10
**Court** [9] - 1:23, 9:5, 28:11, 29:2, 132:2, 169:10, 257:15, 268:6, 269:12
**court** [13] - 3:1, 9:21, 10:1, 10:4, 15:6, 28:22, 36:14, 36:16, 40:22, 47:13, 170:1, 217:18, 221:1
**COURT** [245] - 1:1, 3:4, 3:5, 3:19, 3:25, 4:10, 4:24, 5:2, 5:6, 5:8, 5:20, 5:23, 6:2, 6:8, 6:19, 6:24, 7:3, 7:6, 7:16, 8:13, 8:15, 8:22, 10:21, 10:24, 11:1, 11:5, 11:8, 12:10, 12:13, 12:18, 12:20, 13:4, 13:8, 13:14, 13:17, 14:1, 14:4, 14:5, 14:9, 14:16, 15:17, 16:10, 16:20, 16:24, 17:4, 17:22, 18:4, 18:12, 18:15, 19:1, 19:7, 19:10, 19:13, 19:16, 20:2, 20:7, 20:21, 20:25, 22:1, 22:12, 22:25, 23:3, 23:7,

23:16, 23:21, 23:25, 24:3, 24:5, 24:8, 24:10, 24:12, 24:13, 24:20, 24:23, 25:1, 25:4, 25:8, 25:19, 25:20, 26:6, 26:9, 26:11, 26:13, 44:16, 44:19, 83:12, 84:3, 84:5, 84:25, 85:1, 85:3, 85:4, 85:5, 85:14, 121:24, 124:21, 125:4, 125:6, 125:12, 125:14, 125:21, 126:1, 126:15, 126:19, 126:21, 126:23, 127:1, 128:3, 128:6, 129:6, 129:22, 130:2, 130:6, 131:6, 131:12, 132:10, 133:18, 133:22, 134:4, 134:12, 136:2, 136:9, 136:12, 136:15, 137:1, 137:8, 137:10, 137:20, 138:17, 138:20, 138:24, 139:2, 139:5, 139:6, 139:10, 139:12, 139:17, 139:20, 139:24, 140:5, 140:17, 140:24, 141:3, 141:8, 141:10, 141:14, 141:16, 141:18, 141:19, 141:22, 142:2, 142:11, 167:13, 167:15, 167:18, 168:11, 168:14, 168:17, 169:1, 169:5, 169:9, 169:12, 169:14, 170:2, 170:6, 170:9, 170:14, 173:8, 173:12, 174:19, 185:1, 185:3, 202:18, 202:20, 216:16, 217:2, 217:7, 217:9, 217:12, 217:16, 217:22, 218:6, 218:13, 218:18, 218:21, 218:23, 219:7, 219:17, 219:20, 220:4, 221:2, 225:24, 226:5, 226:8, 226:13, 226:15, 226:16, 226:23,

227:4, 227:14, 227:16, 227:19, 227:20, 249:18, 249:25, 250:10, 250:13, 251:1, 251:6, 251:19, 251:21, 253:6, 253:22, 254:3, 254:6, 254:23, 255:22, 256:6, 256:22, 257:1, 257:12, 258:25, 259:19, 259:21, 260:23, 261:5, 262:2, 262:24, 263:23, 264:2, 264:10, 265:4, 265:14, 265:23, 265:25, 266:4, 266:11, 266:17, 266:19, 266:22, 267:3, 267:9, 268:2, 268:5, 269:1
**Court's** [4] - 24:17, 37:9, 133:10, 137:16
**courtesy** [1] - 28:23
**courthouse** [1] - 10:9
**Courthouse** [1] - 1:8
**courtroom** [25] - 9:1, 26:12, 33:24, 34:15, 36:12, 38:9, 47:24, 81:2, 84:4, 84:11, 86:25, 106:2, 118:7, 118:8, 118:12, 125:5, 139:19, 140:1, 140:9, 140:15, 140:20, 141:1, 141:17, 251:20, 267:14
**cover** [4] - 64:9, 65:2, 75:15, 107:20
**coverage** [1] - 93:11
**covered** [3] - 38:9, 192:3, 228:24
**cracking** [3] - 73:8, 212:11, 213:1
**crashing** [1] - 70:22
**create** [3] - 72:17, 144:12, 210:5
**Created** [1] - 190:3
**created** [5] - 58:18, 58:24, 89:1, 262:17, 262:21
**creating** [1] - 207:17
**credentials** [2] - 70:9, 72:7
**Credibility** [1] - 38:22
**credibility** [6] - 38:25, 39:1, 78:15, 118:1, 124:11, 254:19

**credo** [5] - 75:24, 75:25, 76:3, 76:4, 76:7
**criminal** [3] - 42:14, 50:3, 255:4
**crisis** [1] - 90:25
**criteria** [8] - 70:14, 113:8, 216:10, 218:8, 218:18, 219:2, 219:4, 219:11
**critical** [2] - 92:23, 166:20
**critically** [3] - 91:19, 92:8, 103:5
**Crix** [1] - 180:24
**CRM** [5] - 230:11, 231:4, 231:13, 231:19, 232:3
**Cross** [2] - 96:14, 96:24
**cross** [25] - 15:9, 43:5, 43:7, 181:15, 199:20, 227:5, 227:8, 227:12, 227:17, 250:3, 250:6, 250:15, 250:18, 250:21, 251:8, 252:14, 252:25, 264:11, 264:13, 264:15, 266:9, 266:16, 266:19, 267:13
**cross-compare** [2] - 181:15, 199:20
**cross-exam** [1] - 250:6
**cross-examination** [11] - 15:9, 227:8, 250:3, 250:15, 250:18, 250:21, 251:8, 252:14, 252:25, 264:11, 267:13
**cross-examine** [2] - 43:5, 43:7
**crossed** [2] - 260:2, 260:10
**crowd** [1] - 113:9
**crowded** [1] - 187:3
**CRR** [1] - 269:11
**crystal** [2] - 22:10, 67:5
**culture** [3] - 234:11, 234:13, 235:15
**current** [3] - 38:5, 82:2, 157:10
**customer** [2] - 188:21, 230:14
**customers** [4] - 68:5, 76:2, 192:3, 206:4

**cut** [5] - 70:8, 112:20, 129:16, 251:1, 255:1
**CVS** [1] - 108:14

## D

**daily** [1] - 60:4
**Dallas** [1] - 1:17
**damages** [5] - 31:22, 31:23, 77:1, 104:11, 122:9
**dangerous** [1] - 78:10
**dark** [1] - 49:9
**data** [36] - 68:3, 103:17, 104:12, 104:16, 110:2, 110:8, 110:16, 111:2, 114:9, 155:14, 167:2, 175:12, 175:18, 176:5, 176:6, 176:8, 176:11, 176:13, 176:14, 176:16, 176:21, 179:18, 180:1, 180:2, 183:10, 183:12, 183:13, 183:14, 186:23, 187:1, 187:17, 207:15, 213:21, 214:2, 222:20
**date** [7] - 9:23, 10:10, 10:22, 11:22, 176:3, 188:25
**Date** [1] - 269:12
**dates** [3] - 11:11, 11:16, 11:19
**day-to-day** [3] - 61:15, 146:8, 150:12
**days** [6] - 29:1, 65:24, 66:1, 117:3, 119:21, 142:25
**DDD** [1] - 176:12
**De** [1] - 158:6
**deadly** [1] - 88:11
**deal** [2] - 206:14, 265:6
**dealing** [1] - 15:5
**dealt** [1] - 109:25
**death** [5] - 53:2, 57:1, 87:20, 145:21, 177:23
**decade** [3] - 47:6, 117:15, 122:16
**decades** [2] - 87:8, 124:9
**deceiving** [1] - 185:17
**deception** [1] - 45:3
**decide** [17] - 29:13, 29:16, 34:8, 34:13,

38:20, 38:23, 76:8, 78:18, 79:2, 83:4, 96:16, 101:7, 167:1, 248:14, 259:22, 259:24, 264:19
**decided** [7] - 17:7, 23:11, 53:12, 182:19, 247:24, 260:2, 261:25
**decides** [2] - 102:7, 120:19
**deciding** [3] - 38:23, 39:3, 101:9
**Decile** [1] - 192:5
**decision** [18] - 22:4, 22:15, 30:6, 31:10, 36:13, 36:16, 37:3, 47:3, 52:2, 100:12, 100:21, 101:24, 130:8, 256:8, 257:4, 257:10, 259:15, 261:22
**decisions** [4] - 29:20, 29:22, 120:5, 123:19
**deck** [6] - 70:23, 70:25, 71:2, 210:3, 221:9, 222:8
**declaration** [4] - 243:15, 243:17, 244:20, 246:7
**declarations** [3] - 47:23, 121:20, 257:19
**declined** [5] - 255:13, 255:19, 259:9, 259:16, 262:16
**dedicated** [2] - 157:4, 157:18
**defamation** [2] - 257:3, 261:22
**default** [2] - 8:13, 8:22
**defend** [1] - 258:12
**defendant** [3] - 42:2, 45:9, 47:15
**Defendant** [10] - 29:25, 30:1, 30:3, 41:17, 41:24, 42:20, 43:5, 43:6, 129:3, 135:22
**Defendants** [2] - 1:7, 1:22
**defense** [14] - 25:13, 27:21, 43:8, 44:24, 83:14, 125:10, 133:22, 246:20, 251:24, 252:14, 252:15, 252:18, 266:1, 267:21
**defenses** [1] - 34:17
**defers** [1] - 100:22

**definitely** [2] - 233:16, 257:17
**definition** [6] - 55:18, 65:14, 165:3, 165:22, 259:6, 259:12
**defrauded** [3] - 86:22, 106:2, 106:15
**Delaware** [2] - 1:22, 31:13
**deliberate** [4] - 32:9, 41:8, 43:17, 44:8
**deliberating** [1] - 82:23
**deliberation** [1] - 32:16
**deliberations** [10] - 27:6, 30:6, 32:12, 32:13, 32:14, 34:18, 40:25, 43:24, 125:15
**deliver** [1] - 44:4
**demonstrate** [5] - 20:9, 73:25, 77:5, 127:8, 130:17
**demonstrating** [1] - 128:16
**denies** [1] - 30:3
**denying** [1] - 35:20
**department** [15] - 63:12, 63:14, 70:18, 79:21, 80:1, 80:6, 80:7, 109:20, 158:11, 201:17, 201:18, 207:25, 208:1, 215:17
**Department** [38] - 94:11, 94:12, 94:15, 95:8, 241:13, 242:4, 243:1, 243:24, 245:10, 245:15, 246:11, 247:11, 248:14, 252:3, 252:7, 252:8, 252:16, 254:8, 254:20, 254:25, 255:1, 255:13, 255:17, 255:21, 256:12, 257:6, 257:18, 257:21, 257:25, 258:2, 258:5, 258:12, 258:13, 261:14, 261:17, 261:20, 261:24, 262:23, 263:12
**DEPUTY** [20] - 3:4, 14:4, 24:12, 25:19, 26:9, 26:11, 84:3, 84:25, 85:4, 125:4, 139:2, 139:5, 141:8, 141:18, 142:11,

226:13, 226:15, 227:19, 251:19, 268:5
**describe** [17] - 146:8, 153:15, 157:25, 159:19, 161:13, 162:17, 163:6, 175:3, 183:4, 186:2, 196:17, 199:17, 203:11, 209:23, 212:14, 221:24, 228:10
**described** [4] - 89:17, 92:14, 160:25, 163:8
**describing** [1] - 205:14
**description** [1] - 29:24
**Description** [2] - 2:9, 42:17
**deserves** [2] - 36:20, 39:22
**designate** [1] - 175:21
**designed** [3] - 144:23, 213:9, 231:4
**despite** [3] - 57:24, 105:14, 105:25
**detail** [2] - 43:20, 53:14
**detailed** [3] - 30:4, 44:3, 105:16
**detailing** [1] - 120:1
**details** [1] - 78:20
**deter** [1] - 132:13
**determine** [5] - 50:15, 96:1, 96:25, 100:17, 101:15
**determined** [4] - 45:16, 46:4, 52:20, 53:22
**determining** [1] - 42:6
**deterrent** [1] - 246:21
**devastating** [1] - 145:21
**develop** [1] - 59:15
**developed** [4] - 54:17, 54:18, 91:6, 92:9
**developing** [1] - 91:11
**device** [1] - 33:11
**devices** [2] - 33:3, 33:11
**devoted** [1] - 93:3
**DI** [1] - 187:3
**diagnosed** [2] - 88:3, 88:9
**diagnostic** [1] - 153:24
**dictate** [1] - 226:11
**dictionaries** [1] - 34:10
**die** [2] - 56:24, 151:17

**died** [2] - 87:24, 151:22

**difference** [4] - 105:13, 166:13, 166:18, 201:23

**different** [57] - 15:21, 15:23, 20:10, 20:11, 43:22, 61:16, 72:8, 78:6, 79:19, 81:4, 94:13, 101:6, 101:14, 103:14, 103:16, 104:14, 110:9, 112:2, 113:8, 117:8, 122:13, 122:24, 122:25, 123:1, 126:15, 127:9, 128:3, 130:15, 130:17, 130:24, 132:3, 132:4, 138:7, 143:10, 143:14, 148:11, 148:12, 148:16, 150:2, 152:6, 152:16, 164:23, 180:21, 214:4, 217:17, 233:11, 234:21, 238:19, 245:5, 253:11, 260:17, 261:9, 263:9

**differently** [4] - 41:22, 205:6, 260:14, 264:7

**difficult** [4] - 22:9, 41:3, 84:15, 138:3

**digitally** [1] - 14:19

**diminish** [1] - 135:17

**dined** [3] - 45:24, 72:2, 72:24

**dinner** [2] - 72:3, 213:20

**dinners** [1] - 45:24

**DIRECT** [2] - 2:5, 142:14

**Direct** [1] - 37:20

**direct** [16] - 37:22, 37:23, 38:2, 38:3, 38:19, 118:17, 185:10, 203:1, 225:25, 227:6, 227:17, 227:22, 252:5, 260:6, 262:3, 267:13

**directed** [4] - 27:9, 37:15, 109:1, 222:11

**direction** [4] - 61:23, 76:8, 82:15

**directive** [1] - 93:6

**directly** [8] - 30:14, 60:16, 61:23, 62:25, 143:22, 203:19,
208:4, 208:9

**director** [6] - 60:19, 158:5, 158:7, 241:5, 245:4

**directors** [4] - 61:7, 163:18, 236:7

**directs** [1] - 93:9

**dirty** [1] - 240:24

**disadvantage** [1] - 57:8

**disagree** [3] - 23:4, 205:10, 263:23

**disclaimer** [3] - 66:13, 66:14, 246:19

**disclaimers** [1] - 246:15

**disclose** [1] - 116:23

**disclosed** [1] - 129:2

**disconnect** [1] - 168:7

**discourage** [1] - 246:22

**discourse** [1] - 71:5

**discovered** [4] - 87:23, 88:8, 88:12, 88:16

**discovery** [2] - 73:4, 80:23

**discretion** [4] - 48:10, 51:22, 52:4, 267:12

**discuss** [4] - 5:24, 32:9, 223:14, 260:8

**discussed** [8] - 60:7, 68:11, 109:8, 204:20, 205:11, 224:8, 231:18, 257:16

**discussing** [4] - 65:19, 205:1, 250:22, 263:14

**discussion** [4] - 136:4, 222:22, 257:5, 262:9

**discussions** [2] - 32:21, 163:7

**disease** [37] - 52:25, 53:3, 53:10, 56:22, 57:1, 74:7, 87:19, 87:25, 88:8, 88:12, 88:19, 90:15, 90:21, 91:21, 93:20, 100:24, 105:5, 111:22, 111:23, 115:16, 144:13, 144:22, 145:15, 145:19, 148:12, 149:4, 150:16, 151:18, 151:25, 157:12, 177:12, 177:19, 180:14, 195:16, 202:6

**Disease** [1] - 94:14

**diseases** [3] - 74:10, 98:11, 103:6

**disgruntled** [1] - 121:10

**disguised** [1] - 49:12

**dismiss** [1] - 251:7

**dismissed** [5] - 32:11, 226:12, 256:20, 257:4, 258:18

**dispute** [2] - 92:7, 132:9

**disputed** [1] - 133:6

**disputes** [5] - 53:1, 110:12, 110:15, 110:17, 113:4

**disputing** [1] - 52:5

**disregard** [4] - 36:10, 37:16, 58:6, 62:19

**disrespectful** [1] - 217:15

**disseminated** [1] - 68:22

**dissemination** [1] - 228:8

**dissolve** [2] - 198:14, 198:15

**distended** [1] - 180:25

**distinction** [4] - 38:18, 162:8, 165:5, 181:22

**distinguish** [3] - 126:24, 130:25, 132:6

**district** [21] - 174:12, 175:4, 175:19, 185:9, 189:7, 190:12, 192:4, 202:15, 203:1, 203:15, 204:8, 204:23, 205:5, 205:21, 205:24, 206:8, 217:5, 217:16, 217:18, 233:20, 239:22

**District** [4] - 3:2, 31:17, 32:3, 258:16

**DISTRICT** [3] - 1:1, 1:1, 1:12

**districts** [3] - 204:21, 204:24, 207:2

**division** [3] - 156:21, 156:22, 157:3

**divorced** [1] - 262:15

**doctor** [57] - 10:18, 11:5, 49:20, 49:25, 51:20, 52:1, 54:21, 65:25, 66:21, 67:5, 68:8, 69:3, 70:11, 70:12, 70:22, 72:18, 73:6, 82:14, 96:20,
99:1, 101:13, 101:22, 102:7, 102:23, 102:24, 111:12, 113:15, 114:1, 117:19, 117:22, 119:23, 120:1, 122:9, 122:17, 122:21, 122:22, 122:24, 122:25, 123:1, 123:2, 151:12, 176:15, 176:22, 198:8, 207:12, 211:20, 222:22, 229:19, 230:3, 230:4, 230:6, 230:9, 230:23, 239:19, 240:3

**doctor's** [5] - 61:15, 67:7, 102:25, 151:12, 151:19

**doctor-by-doctor** [2] - 176:15, 176:22

**doctors** [137] - 45:10, 45:12, 45:18, 45:19, 45:22, 47:17, 50:5, 52:3, 55:17, 57:22, 59:11, 59:12, 60:13, 60:22, 61:21, 64:25, 66:11, 66:23, 67:12, 68:12, 69:4, 69:10, 69:12, 69:15, 69:19, 70:4, 70:13, 70:15, 72:2, 72:5, 72:19, 72:20, 72:21, 73:5, 73:16, 74:1, 74:12, 76:16, 77:7, 77:8, 77:12, 77:13, 77:14, 79:25, 80:19, 80:20, 80:24, 81:1, 81:9, 81:14, 81:18, 81:21, 81:24, 81:25, 86:1, 87:7, 87:8, 87:11, 88:3, 89:20, 90:5, 92:5, 93:17, 93:18, 93:20, 96:1, 98:14, 98:19, 99:24, 100:13, 100:22, 100:23, 101:7, 101:10, 102:1, 102:13, 102:17, 102:20, 104:4, 104:15, 104:16, 104:23, 107:3, 109:17, 110:7, 111:6, 111:7, 111:18, 111:19, 111:21, 111:24, 111:25, 112:8, 112:9, 113:1, 115:9, 115:16, 116:7,
117:15, 117:17, 120:4, 120:25, 122:10, 124:9, 146:5, 147:3, 152:23, 153:2, 156:2, 156:5, 159:4, 166:7, 182:24, 183:5, 183:9, 183:18, 183:21, 188:11, 190:18, 190:20, 191:4, 196:15, 197:25, 200:6, 200:24, 205:14, 210:16, 211:18, 212:18, 213:4, 218:3, 230:15, 233:5, 240:2

**doctors'** [3] - 65:5, 110:13, 144:11

**document** [27] - 63:18, 68:1, 73:4, 107:18, 107:19, 111:13, 111:14, 112:19, 112:20, 112:24, 113:1, 127:18, 127:20, 129:2, 170:16, 171:3, 173:10, 173:24, 175:1, 175:3, 184:16, 184:21, 185:22, 186:4, 188:20, 202:17

**documentation** [3] - 173:17, 196:18, 247:3

**documenting** [1] - 232:8

**documents** [36] - 6:12, 6:16, 18:23, 36:2, 48:25, 55:20, 58:12, 59:24, 63:8, 63:9, 63:24, 67:25, 69:23, 75:12, 76:14, 76:19, 81:10, 82:17, 84:10, 100:14, 103:4, 103:7, 118:12, 118:20, 119:6, 120:23, 121:20, 136:25, 137:1, 137:12, 138:8, 166:11, 170:20, 184:22

**DOJ** [8] - 240:20, 253:11, 253:12, 255:2, 262:16, 262:18, 263:15, 263:21

**dollar** [27] - 15:19, 16:4, 16:14, 16:17,

17:14, 17:20, 18:13,
18:16, 19:21, 20:2,
20:22, 73:5, 121:17,
127:1, 127:9, 128:9,
128:22, 129:11,
131:2, 131:5,
131:19, 132:1,
134:2, 134:15,
135:5, 135:9, 138:4
**dollars** [19] - 45:12,
45:20, 53:19, 57:11,
73:6, 81:6, 86:6,
96:6, 104:11, 106:8,
110:20, 116:20,
122:4, 128:19,
128:20, 129:12,
130:10, 135:14,
175:23
**done** [24] - 5:7, 10:15,
11:5, 44:19, 64:1,
69:20, 71:16, 122:1,
133:3, 135:13,
166:20, 188:21,
198:19, 199:21,
207:17, 209:12,
217:7, 227:1, 230:2,
243:2, 254:23,
256:13, 261:2,
264:12
**DONNA** [2] - 2:4,
142:9
**Donna** [5] - 61:3,
142:1, 142:13,
143:12, 194:10
**door** [19] - 68:24,
125:14, 132:20,
135:1, 135:2,
252:10, 252:13,
254:15, 255:10,
258:23, 261:3,
261:21, 261:22,
262:21, 263:10,
263:16, 263:21,
264:20, 265:17
**doors** [1] - 70:23
**dose** [1] - 102:14
**doses** [1] - 59:15
**dosing** [3] - 51:12,
59:16, 60:4
**double** [5] - 11:13,
11:15, 10:25, 98:19,
99:2
**double-check** [4] -
11:13, 11:15, 98:19,
99:2
**doubt** [1] - 42:13
**down** [33] - 22:2,
38:14, 47:11, 54:24,
57:21, 59:3, 61:10,
62:23, 69:7, 73:8,

74:2, 82:12, 89:19,
89:23, 90:2, 93:8,
100:5, 108:19,
114:15, 131:9,
193:25, 201:14,
205:25, 206:11,
207:1, 212:11,
213:1, 243:11,
243:12, 243:13,
243:14, 247:16,
247:18
**downplaying** [1] -
126:8
**downstairs** [1] -
140:16
**dozens** [4] - 211:8,
222:13
**Dr** [10] - 74:5, 74:19,
89:15, 91:7, 114:3,
114:11, 122:12,
122:13
**dramatic** [1] - 247:20
**drive** [2] - 204:21,
207:18
**driving** [2] - 205:1,
206:12
**drop** [1] - 198:13
**dropped** [1] - 108:25
**drops** [1] - 38:9
**drove** [1] - 115:11
**drug** [106] - 21:19,
21:20, 51:2, 51:4,
51:5, 51:7, 51:8,
51:9, 51:10, 51:20,
51:23, 52:2, 52:7,
53:13, 53:18, 53:23,
54:19, 55:11, 55:19,
56:3, 56:4, 56:9,
57:13, 57:22, 58:4,
58:7, 58:8, 58:14,
58:20, 58:21, 59:9,
59:15, 61:22, 65:21,
68:9, 69:4, 69:13,
70:12, 71:20, 72:7,
72:10, 73:18, 74:1,
77:8, 78:11, 89:2,
89:11, 101:19,
127:3, 130:21,
144:25, 145:7,
145:23, 148:3,
148:7, 149:10,
149:12, 149:14,
149:16, 149:18,
149:25, 150:3,
151:2, 151:13,
152:8, 154:8,
159:25, 161:16,
163:20, 165:7,
166:1, 166:16,
166:21, 175:23,

177:6, 178:8, 178:9,
178:18, 179:4,
179:17, 179:25,
180:2, 180:5,
180:10, 182:20,
183:5, 186:17,
187:15, 189:2,
191:22, 196:8,
196:15, 196:21,
198:4, 198:5, 198:6,
202:6, 206:5, 214:3,
215:23, 225:19,
239:10
**Drug** [5] - 45:15,
50:17, 52:20, 89:10,
154:13
**drug's** [2] - 152:7,
212:17
**drugs** [71] - 45:10,
45:14, 46:1, 46:3,
46:6, 47:17, 50:7,
50:19, 50:20, 52:9,
52:18, 53:4, 54:12,
54:13, 54:15, 54:23,
55:1, 55:5, 55:13,
57:4, 58:22, 58:25,
61:16, 61:20, 64:7,
64:12, 64:20, 65:5,
66:16, 69:25, 73:2,
77:22, 77:23, 78:4,
78:8, 79:19, 79:20,
79:24, 82:15,
132:23, 132:24,
133:2, 144:13,
144:23, 145:4,
145:5, 145:24,
146:6, 147:8,
147:24, 148:11,
149:21, 150:13,
153:19, 177:3,
177:24, 178:5,
179:20, 180:16,
181:3, 181:5, 187:6,
187:13, 187:14,
189:10, 190:12,
191:15, 196:6,
221:10
**DULY** [1] - 142:9
**during** [60] - 9:6,
10:11, 28:17, 29:18,
29:21, 32:7, 32:12,
32:18, 33:23, 34:20,
34:24, 35:6, 40:23,
40:25, 41:2, 41:14,
45:19, 54:11, 55:7,
55:15, 55:21, 56:23,
65:9, 71:23, 71:24,
73:7, 74:14, 81:4,
81:12, 81:14, 83:21,
84:7, 87:5, 104:10,

104:11, 110:10,
112:15, 112:25,
116:3, 116:25,
134:8, 134:18,
134:25, 135:2,
136:3, 136:16,
143:6, 153:11,
154:2, 157:21,
159:16, 166:3,
170:20, 174:8,
181:8, 204:5,
240:16, 241:23,
260:24, 265:17
**duties** [1] - 157:5

## E

**early** [10] - 7:17,
58:24, 91:23,
102:18, 105:9,
145:9, 145:13,
145:19, 181:2,
239:13
**earshot** [1] - 35:8,
136:5, 250:17
**easier** [5] - 96:19,
146:15, 183:6,
250:5, 253:1
**easiest** [1] - 59:14
**East** [1] - 1:9
**Eastern** [1] - 258:16
**eastern** [1] - 60:20
**easy** [4] - 93:2, 97:9,
250:9, 250:12
**economics** [1] - 76:24
**EDPA** [2] - 217:17,
262:17
**educate** [2] - 112:1,
112:4
**educated** [2] - 109:6,
113:2
**educating** [1] - 65:7
**education** [3] - 67:8,
70:9, 82:3
**educational** [5] -
64:10, 65:3, 66:14,
71:18, 109:8
**effect** [3] - 110:4,
178:2, 258:1
**effective** [18] - 45:17,
46:4, 50:20, 51:3,
52:21, 53:4, 53:23,
54:7, 54:16, 56:4,
57:25, 58:15, 60:4,
66:18, 81:19, 90:12,
91:1, 91:14
**effectively** [2] - 101:4,
101:16
**effectiveness** [1] -
59:1

**effects** [4] - 51:14,
180:15, 180:18,
181:7
**efficacy** [3] - 152:7,
179:19, 180:2
**effort** [1] - 112:16
**efforts** [1] - 99:24
**ego** [1] - 14:22
**eight** [3] - 63:7, 71:23,
146:17
**eight-year** [1] - 71:23
**either** [14] - 13:18,
26:2, 27:6, 33:21,
38:19, 50:12, 68:23,
141:1, 150:5, 195:7,
207:22, 244:22,
252:14, 258:12
**electronic** [3] - 33:3,
34:12, 168:4
**electronically** [6] -
23:22, 33:7, 33:12,
168:5, 168:11, 169:1
**element** [1] - 263:7
**elements** [5] - 30:8,
30:10, 30:25,
127:17, 262:11
**elevator** [1] - 33:19
**elevators** [1] - 8:19
**elicit** [6] - 135:23,
218:16, 252:19,
256:16, 256:18,
257:10
**elicited** [1] - 256:11
**eligible** [4] - 48:6,
58:13, 72:10
**elixir** [1] - 198:17
**Elizabeth** [1] - 115:22
**email** [17] - 33:13,
108:20, 113:15,
116:11, 116:15,
119:3, 119:4, 119:8,
121:15, 202:15,
203:12, 204:10,
204:19, 204:23,
205:19, 206:12,
246:25
**emails** [5] - 63:20,
63:23, 76:19, 119:7,
246:13
**embrace** [1] - 68:13
**emotion** [1] - 247:20
**emotional** [1] - 151:14
**emphasize** [1] - 66:11
**employed** [1] - 143:8
**employee** [2] - 92:17,
119:10
**employees** [24] - 45:6,
46:25, 47:22, 60:25,
63:15, 63:23, 64:11,
64:18, 65:7, 66:3,

66:8, 67:10, 74:22, 75:18, 76:2, 92:14, 105:25, 107:19, 107:22, 108:1, 119:1, 119:2, 121:10, 124:8
**employment** [2] - 143:6, 244:6
**empty** [1] - 81:15
**encourage** [1] - 48:5
**end** [29] - 27:4, 30:5, 31:24, 32:4, 34:18, 41:8, 43:24, 46:14, 48:11, 50:13, 63:24, 67:12, 68:23, 71:25, 72:1, 73:15, 77:19, 82:10, 82:22, 88:7, 88:9, 88:14, 113:15, 121:22, 123:9, 206:7, 209:2, 222:7, 227:17
**ending** [1] - 52:25
**enforcement** [1] - 95:9
**engage** [1] - 52:4
**engaged** [6] - 30:1, 45:9, 57:20, 62:8, 62:9, 232:1
**England** [1] - 244:18
**enhance** [1] - 240:5
**enlarged** [1] - 6:15
**enormously** [1] - 106:5
**ensure** [3] - 93:10, 140:7, 251:11
**ensuring** [1] - 119:18
**enter** [1] - 141:17
**entering** [2] - 20:15, 21:23
**enters** [1] - 26:12
**entertain** [1] - 136:18
**entire** [9] - 60:20, 60:24, 92:18, 108:20, 114:12, 120:3, 161:21, 235:12, 262:9
**entirely** [1] - 120:8
**entitled** [2] - 48:6, 269:5
**environment** [6] - 62:18, 68:21, 234:18, 235:7, 238:25
**environments** [1] - 234:19
**epicenter** [1] - 180:9
**epidemic** [2] - 74:8, 88:14
**equally** [1] - 56:4
**equals** [2] - 128:19, 128:20

**Eric** [2] - 185:12, 203:16
**Eric's** [1] - 185:18
**escaping** [1] - 149:1
**especially** [4] - 17:16, 41:12, 56:24, 152:12
**ESQUIRE** [8] - 1:14, 1:15, 1:15, 1:16, 1:16, 1:19, 1:20, 1:20
**essentially** [10] - 101:6, 148:24, 192:23, 193:16, 193:17, 210:8, 232:15, 232:16, 235:25, 246:19
**establish** [2] - 152:2, 152:19
**established** [2] - 75:6, 210:21
**et** [2] - 1:3, 257:3
**ethics** [1] - 107:10
**evaluations** [3] - 224:1, 224:8, 228:1
**Evans** [2] - 75:1
**evans** [1] - 75:9
**eve** [2] - 116:12, 116:18
**evening** [2] - 256:3, 256:7
**event** [13] - 10:4, 10:9, 104:25, 123:9, 172:24, 209:25, 210:4, 230:3, 230:4, 237:8, 237:10, 237:11, 237:12
**events** [16] - 36:19, 70:13, 71:4, 109:10, 115:8, 116:5, 123:15, 172:23, 211:6, 216:3, 221:19, 222:4, 222:13, 223:7, 224:1, 228:3
**eventually** [7] - 61:5, 146:1, 183:17, 183:19, 189:12, 203:24, 240:8
**everyday** [1] - 36:18
**evidence** [130] - 2:11, 2:13, 2:15, 2:17, 4:15, 6:11, 20:18, 21:16, 29:13, 29:18, 30:7, 30:12, 30:21, 31:1, 32:8, 32:23, 34:2, 34:9, 34:17, 35:14, 35:23, 35:24, 36:6, 36:13, 36:18, 36:21, 36:24, 36:25, 37:1, 37:3, 37:5,

37:7, 37:8, 37:12, 37:14, 37:16, 37:17, 37:21, 37:22, 37:23, 38:3, 38:6, 38:7, 38:11, 38:15, 38:17, 38:20, 38:21, 39:13, 39:15, 39:18, 41:20, 41:21, 41:23, 42:2, 42:5, 42:7, 42:10, 42:22, 42:23, 43:2, 43:6, 43:7, 43:10, 43:11, 43:14, 43:16, 50:23, 52:22, 60:15, 60:16, 76:18, 76:20, 76:21, 79:14, 80:14, 83:1, 86:14, 86:19, 87:16, 87:18, 92:15, 92:21, 95:20, 96:9, 97:24, 99:10, 100:11, 104:21, 105:7, 105:11, 105:22, 106:6, 106:10, 106:20, 108:24, 109:11, 110:25, 112:7, 113:13, 113:19, 113:20, 116:17, 116:22, 117:13, 117:22, 118:19, 120:24, 124:6, 124:9, 124:16, 127:7, 127:11, 127:17, 130:3, 134:6, 134:8, 134:14, 135:24, 136:17, 170:12, 174:20, 185:4, 202:21, 254:14
**Evidence** [2] - 37:20, 41:15
**evoke** [1] - 16:5
**exact** [8] - 58:9, 69:8, 75:18, 77:11, 79:18, 156:5, 256:3, 258:4
**exactly** [9] - 18:9, 24:25, 69:14, 156:4, 220:1, 237:3, 246:21, 255:25, 257:22
**exam** [4] - 250:6, 252:5, 260:7, 262:4
**EXAMINATION** [2] - 2:5, 142:14
**examination** [12] - 15:9, 227:8, 227:22, 250:3, 250:15, 250:18, 250:21, 251:8, 252:14, 252:25, 264:11, 267:13

**EXAMINATIONS** [1] - 2:3
**examine** [3] - 43:5, 43:7, 142:1
**examined** [1] - 73:23
**example** [7] - 34:8, 37:23, 51:10, 64:13, 65:18, 67:24, 98:22, 157:13, 176:8, 194:3, 194:7, 194:12, 198:7, 199:19, 206:23, 207:12, 214:20
**examples** [2] - 109:14, 229:1
**exceeded** [1] - 209:4
**excepted** [1] - 139:16
**excesses** [2] - 71:13, 73:9
**excessive** [1] - 212:25
**exchange** [2] - 69:22, 80:11
**exchanged** [2] - 4:18, 63:8
**excited** [1] - 155:15
**excitement** [1] - 179:21
**exclude** [1] - 126:4
**excluded** [5] - 13:2, 16:6, 37:17, 80:10, 262:15
**exclusion** [2] - 132:1, 139:15
**exclusive** [1] - 45:23
**excuse** [5] - 70:3, 125:2, 139:13, 251:16, 264:14
**executives** [4] - 53:16, 61:1, 64:16, 157:22
**exercise** [1] - 65:3
**exhibit** [6] - 6:13, 36:24, 37:18, 38:4, 188:18, 190:15
**Exhibit** [10] - 2:9, 2:10, 2:12, 2:14, 2:16, 6:9, 170:12, 174:20, 185:4, 202:21
**exhibits** [8] - 6:10, 6:20, 36:2, 42:9, 84:11, 137:22, 138:2, 168:21
**exist** [2] - 201:2, 249:5
**existence** [1] - 38:4
**existing** [1] - 193:13
**exists** [1] - 256:24
**exit** [1] - 251:20
**exited** [1] - 84:4
**exits** [1] - 125:5
**expect** [5] - 78:21,

152:8, 206:3, 262:5, 264:17
**expectation** [1] - 53:20
**expectations** [3] - 57:17, 64:3, 163:4
**expected** [7] - 6:21, 53:18, 69:21, 175:6, 225:10, 234:22, 234:23
**expects** [3] - 42:23, 96:10, 107:22
**expense** [2] - 46:8, 248:9
**expenses** [1] - 72:23
**expensive** [1] - 212:20
**experience** [19] - 36:18, 36:20, 59:19, 76:12, 82:23, 84:11, 113:8, 114:6, 114:14, 120:17, 145:19, 159:10, 159:17, 162:22, 172:2, 188:9, 199:14, 206:14, 212:14
**experienced** [21] - 54:8, 54:9, 54:10, 55:13, 58:11, 62:16, 104:2, 111:7, 160:23, 161:3, 161:4, 161:18, 161:22, 171:13, 178:16, 180:4, 180:6, 181:17, 181:23, 188:6, 195:24
**expert** [6] - 48:24, 73:20, 75:4, 82:19, 88:18, 89:14
**experts** [10] - 74:5, 93:15, 101:2, 114:3, 123:6, 124:3, 139:15, 140:1, 140:25
**explain** [22] - 29:21, 144:9, 147:13, 148:23, 149:23, 155:10, 157:2, 164:15, 166:18, 177:21, 179:16, 198:7, 201:11, 207:20, 208:25, 216:13, 221:9, 229:8, 238:2, 238:22, 240:21, 246:18
**explicit** [1] - 63:3
**explicitly** [1] - 63:22
**expose** [1] - 47:4

**exposed** [2] - 77:7, 77:10
**extend** [3] - 8:24, 147:7, 240:5
**extensive** [1] - 106:25
**extent** [2] - 126:7, 141:3
**extra** [5] - 9:6, 116:14, 125:1, 138:24, 139:1
**eyes** [1] - 63:18

## F

**facade** [1] - 72:18
**face** [4] - 231:1, 231:2
**face-to-face** [1] - 231:2
**Facebook** [1] - 33:16
**facilities** [1] - 60:23
**facing** [1] - 93:20
**fact** [41] - 16:16, 19:24, 34:23, 37:4, 38:4, 38:8, 39:18, 42:3, 42:4, 42:6, 50:2, 55:20, 56:5, 68:17, 70:14, 75:22, 76:13, 81:16, 86:7, 87:5, 97:15, 100:18, 105:25, 110:3, 120:22, 121:5, 133:23, 139:25, 142:25, 149:20, 153:15, 155:23, 163:21, 164:21, 229:21, 235:13, 244:6, 257:5, 257:8, 258:15, 258:20
**factfinders** [1] - 83:4
**factors** [3] - 39:4, 39:17, 130:22
**facts** [18] - 6:21, 20:11, 29:13, 29:14, 29:15, 29:17, 35:24, 36:4, 38:7, 38:23, 41:9, 50:15, 86:15, 87:17, 104:1, 118:14, 124:7, 143:6
**factual** [1] - 103:22
**fail** [1] - 42:1
**failed** [6] - 92:2, 99:10, 160:23, 161:19, 180:7, 187:15
**failing** [1] - 251:25
**fair** [7] - 91:8, 115:3, 223:24, 224:24, 242:25, 250:7, 253:6
**fake** [1] - 122:6
**false** [10] - 31:4, 32:1, 122:6, 122:15, 122:17, 123:1,

123:4, 123:10, 123:11, 262:22
**False** [10] - 30:1, 30:25, 31:11, 31:18, 31:21, 31:25, 80:8, 132:15, 143:22
**familiar** [3] - 145:15, 186:8, 201:19
**family** [1] - 33:8
**far** [17] - 5:7, 5:10, 49:11, 55:7, 55:8, 59:20, 83:19, 84:8, 84:14, 135:7, 139:17, 192:16, 192:18, 229:5, 234:15, 263:25, 264:7
**faster** [1] - 89:12
**fat** [1] - 180:25
**fatally** [1] - 74:23
**favor** [2] - 10:19, 19:8
**favorable** [2] - 41:23
**fax** [2] - 207:22, 207:24
**faxed** [1] - 201:16
**FDA** [53] - 45:15, 46:4, 50:18, 50:24, 51:2, 53:21, 56:10, 60:4, 63:25, 65:13, 66:17, 70:22, 70:24, 70:25, 74:13, 74:25, 78:4, 89:1, 89:5, 91:22, 91:24, 91:25, 93:18, 94:3, 94:19, 94:20, 94:25, 95:1, 95:7, 95:11, 102:4, 102:9, 104:7, 109:16, 109:20, 109:22, 109:23, 110:7, 110:10, 110:13, 110:15, 117:17, 117:18, 120:9, 154:12, 159:9, 166:13, 178:18, 225:14, 232:7
**FDA's** [2] - 50:18, 51:16
**FDA-approved** [1] - 166:13
**February** [2] - 160:17, 205:22
**federal** [11] - 13:2, 30:1, 31:6, 31:11, 49:25, 73:8, 75:1, 78:12, 80:10, 93:9, 255:14
**FEDERAL** [1] - 269:1
**feed** [2] - 218:7, 256:2
**fees** [3] - 50:5, 69:24
**fellow** [3] - 32:20,

111:19, 115:16
**felt** [23] - 37:25, 62:10, 62:13, 151:15, 155:19, 162:18, 162:20, 199:9, 199:11, 200:20, 211:1, 238:23, 239:19, 239:21, 240:4, 240:7, 240:23, 240:24, 247:21, 248:11
**few** [12] - 23:17, 26:21, 27:6, 32:6, 49:2, 77:19, 138:24, 222:5, 226:10, 229:24, 245:11, 250:24
**fewer** [1] - 181:6
**fiddle** [1] - 70:10
**field** [12] - 20:19, 64:11, 65:5, 66:10, 66:16, 85:7, 127:25, 157:8, 157:18, 157:19, 158:18, 197:20
**fight** [2] - 88:17, 89:24
**fighting** [1] - 47:6
**fights** [1] - 89:25
**figure** [10] - 7:11, 83:23, 84:17, 84:19, 88:4, 88:15, 168:2, 169:5, 255:2, 261:24
**figured** [2] - 23:7
**figures** [1] - 73:6
**file** [7] - 242:6, 244:1, 244:4, 248:14, 249:1, 252:17, 255:15
**filed** [15] - 41:18, 217:23, 242:3, 242:8, 242:25, 243:23, 248:18, 248:19, 248:20, 248:23, 248:25, 251:23, 256:19, 256:25, 257:20
**files** [1] - 151:21
**filing** [2] - 116:18, 253:10
**fill** [3] - 224:3, 224:11, 224:13
**filled** [2] - 99:19, 115:11
**filling** [2] - 232:20, 233:4
**fills** [1] - 96:22
**final** [3] - 43:19, 44:5, 80:18
**finally** [6] - 49:2, 71:13, 76:23, 77:19,

99:14, 111:5
**finance** [1] - 76:24
**financial** [4] - 61:25, 78:16, 117:12, 249:9
**fine** [7] - 21:17, 136:12, 138:20, 140:4, 140:10, 140:25, 203:6
**finger** [2] - 62:6, 62:7
**finish** [7] - 126:19, 131:8, 227:6, 227:9, 227:10, 227:18
**finished** [1] - 44:6
**Finkelstein** [1] - 204:3
**fire** [1] - 64:4
**fired** [3] - 195:8, 244:23, 248:7
**first** [85] - 4:23, 4:24, 9:23, 12:7, 12:22, 14:8, 14:23, 17:17, 26:22, 27:18, 30:13, 31:3, 32:7, 42:19, 43:3, 43:20, 45:12, 48:17, 53:13, 54:4, 55:4, 56:7, 59:1, 61:3, 74:21, 76:2, 86:5, 86:9, 87:23, 88:12, 89:11, 90:6, 90:8, 90:12, 90:16, 90:18, 91:1, 91:13, 92:2, 92:4, 97:11, 97:22, 97:24, 101:11, 101:13, 105:9, 107:11, 114:4, 123:2, 124:14, 133:19, 138:11, 141:24, 143:11, 143:23, 151:20, 159:25, 161:9, 163:1, 177:22, 179:9, 179:17, 181:15, 198:10, 204:19, 209:23, 212:23, 217:2, 221:12, 239:5, 239:7, 242:6, 244:7, 244:10, 244:12, 244:23, 246:2, 248:3, 249:1, 252:12, 256:24, 256:25, 263:21
**first-generation** [7] - 90:12, 90:16, 90:18, 91:1, 91:13, 92:2, 92:4
**first-to-file** [1] - 249:1
**firsthand** [2] - 47:2, 47:3
**Fisher** [1] - 1:8
**fits** [1] - 100:19

**five** [18] - 7:18, 13:3, 29:1, 45:22, 61:25, 72:22, 78:16, 81:23, 121:23, 124:2, 130:15, 141:6, 153:19, 155:22, 212:3, 232:23, 253:5
**five-star** [3] - 45:22, 72:22, 81:23
**fixed** [2] - 33:4, 33:10
**flag** [3] - 224:23, 232:9, 260:3
**flags** [2] - 248:9, 260:20
**flavor** [1] - 122:3
**flawed** [1] - 74:23
**fleshes** [1] - 23:12
**flexible** [1] - 227:4
**flight** [6] - 93:17, 117:15, 123:6, 123:12, 123:16, 123:20
**flipped** [1] - 76:7
**flipping** [1] - 12:2
**FLOM** [1] - 1:19
**Florida** [4] - 31:13, 205:4, 205:10, 229:10
**Florida's** [2] - 205:22, 205:23
**flow** [2] - 26:2, 251:22
**flowed** [1] - 46:6
**flushes** [1] - 22:6
**fly** [2] - 72:21, 212:23
**focus** [3] - 19:19, 62:20, 180:15
**focused** [2] - 150:16, 236:17
**focuses** [1] - 90:4
**folks** [108] - 3:5, 3:19, 5:9, 7:16, 8:13, 14:5, 14:17, 16:2, 20:11, 24:15, 24:16, 26:13, 26:14, 26:17, 40:7, 40:10, 44:13, 44:19, 46:14, 46:18, 47:5, 47:9, 47:11, 47:19, 48:2, 48:10, 50:1, 50:8, 51:16, 52:3, 52:11, 56:16, 58:16, 59:23, 60:6, 60:11, 60:19, 61:17, 61:25, 62:15, 62:21, 63:22, 64:1, 64:13, 65:18, 67:9, 67:21, 68:10, 70:20, 71:21, 73:3, 73:7, 73:19, 74:3, 75:9, 75:19, 76:9, 77:20, 78:5, 79:4, 79:13, 80:2, 80:25,

81:3, 81:10, 82:4, 82:10, 83:7, 83:13, 83:22, 83:23, 84:1, 84:5, 84:21, 85:5, 85:7, 85:19, 87:24, 88:2, 88:10, 88:16, 96:12, 100:3, 114:2, 114:6, 115:21, 118:17, 121:2, 121:3, 121:11, 121:13, 121:18, 124:22, 125:6, 135:19, 139:6, 139:10, 141:19, 168:23, 170:11, 226:8, 226:16, 227:20, 255:1, 264:21, 267:4, 267:19, 268:3
**follow** [6] - 29:23, 30:7, 37:13, 234:1, 234:6, 246:15
**followed** [1] - 234:4
**following** [6] - 29:10, 35:25, 36:6, 39:4, 42:18, 43:6
**FOLLOWS** [1] - 142:10
**Food** [5] - 45:14, 50:17, 52:19, 89:10, 154:13
**food** [2] - 8:4, 228:24
**FOR** [1] - 1:1
**force** [12] - 61:8, 64:14, 65:7, 68:13, 68:19, 81:6, 93:2, 108:9, 108:20, 200:3, 235:12, 265:5
**forecast** [1] - 161:13
**Forecasting** [1] - 170:24
**forecasts** [1] - 161:8
**foregoing** [1] - 269:4
**forever** [1] - 123:17
**forged** [2] - 207:11, 208:6
**forget** [8] - 3:20, 125:25, 126:1, 128:17, 151:3, 185:15, 247:17
**forgot** [1] - 187:11
**form** [7] - 38:3, 50:4, 69:2, 201:15, 207:16, 207:18, 218:21
**formal** [1] - 211:16
**formally** [1] - 36:4
**formed** [1] - 90:18
**former** [3] - 46:25, 92:14, 121:10

**forms** [8] - 68:3, 160:2, 202:4, 202:8, 206:1, 207:12, 207:19, 247:6
**formulated** [1] - 43:18
**forth** [3] - 51:4, 131:19, 263:17
**fortunately** [1] - 151:23
**forward** [7] - 28:2, 47:3, 48:5, 83:25, 84:10, 124:16, 195:4
**foundation** [2] - 173:10, 173:13
**four** [7] - 60:6, 60:13, 141:6, 148:16, 152:25, 155:12, 232:24
**fourth** [2] - 30:24, 31:8
**Frank** [7] - 185:8, 192:3, 202:25, 203:9, 214:19, 214:22, 214:25
**fraud** [2] - 110:24, 111:1
**fraudulent** [3] - 32:1, 122:6, 123:9
**free** [5] - 36:22, 45:24, 72:2, 72:3, 141:4
**frequently** [3] - 174:13, 214:7, 229:18
**fresh** [2] - 43:25, 44:7
**Friday** [1] - 28:14
**Fridays** [1] - 9:11
**friend** [1] - 245:22
**friendly** [14] - 58:2, 110:21, 110:24, 111:1, 120:8, 120:9, 164:24, 165:4, 165:6, 165:11, 165:15, 181:22, 182:21, 239:12
**friends** [7] - 33:9, 113:12, 121:3, 124:3, 241:17, 241:20, 253:17
**front** [10] - 20:9, 35:4, 87:7, 113:9, 127:18, 184:16, 217:4, 217:13, 220:2, 252:20
**fulfill** [1] - 35:13
**full** [8] - 11:20, 62:21, 64:10, 65:4, 66:15, 71:7, 180:25
**fully** [4] - 53:20, 55:21, 59:25, 60:1
**funded** [2] - 74:21, 75:7

**future** [1] - 132:14
**Fuzeon** [3] - 189:6, 189:7, 190:25

## G

**G-R-A-H-A-M** [1] - 142:13
**gain** [4] - 41:7, 62:2, 86:6
**gaining** [1] - 223:24
**gather** [1] - 64:14
**gathered** [1] - 222:20
**general** [2] - 50:20, 234:11
**generally** [11] - 150:3, 150:7, 162:17, 193:21, 207:17, 212:2, 222:7, 222:17, 224:4, 228:13, 233:14
**generated** [2] - 69:16, 73:6
**generation** [10] - 90:12, 90:16, 90:18, 91:1, 91:5, 91:13, 91:15, 92:1, 92:2, 92:4
**gentleman** [4] - 240:25, 244:15, 245:17, 248:5
**gentlemen** [5] - 44:25, 45:1, 45:2, 76:5, 80:15
**Geoff** [3] - 4:6, 85:18, 257:13
**GEOFFREY** [1] - 1:20
**George** [1] - 75:19
**Georgia** [1] - 31:13
**get-go** [1] - 239:9
**GI** [3] - 145:3, 171:3, 172:17
**gift** [1] - 108:15
**ginormous** [1] - 117:12
**gist** [1] - 126:3
**given** [10] - 38:19, 41:1, 41:12, 43:1, 50:5, 117:4, 130:7, 135:4, 135:23, 261:14
**glad** [2] - 212:9, 233:11
**glasses** [1] - 142:7
**Glatt** [2] - 74:5, 74:19
**Glenn** [5] - 53:17, 61:2, 61:24, 79:8, 158:2
**Gmail** [1] - 119:4
**goal** [14] - 45:25,

72:25, 113:3, 163:13, 163:25, 175:1, 181:5, 195:25, 209:4, 234:15, 235:22, 236:18, 239:10
**goals** [12] - 62:17, 64:4, 162:14, 162:17, 162:23, 163:1, 163:4, 163:12, 163:17, 175:4, 175:12, 236:20
**gold** [1] - 50:25
**golfed** [1] - 212:20
**Gossett** [3] - 157:13, 158:3, 194:20
**Gottlieb** [1] - 114:3
**Government** [129] - 6:14, 6:16, 12:5, 12:23, 12:24, 18:18, 18:22, 18:25, 20:16, 21:20, 21:22, 30:20, 31:6, 31:20, 45:15, 46:11, 46:13, 46:17, 48:2, 48:10, 48:12, 48:15, 52:2, 63:25, 73:8, 75:6, 77:1, 77:3, 78:13, 80:4, 80:5, 83:9, 86:17, 86:22, 88:24, 92:22, 93:7, 93:9, 93:10, 93:18, 93:22, 94:1, 94:10, 94:13, 95:14, 95:16, 95:21, 95:23, 96:4, 96:7, 96:10, 96:11, 96:18, 97:1, 97:2, 97:5, 97:7, 97:12, 97:13, 97:15, 97:23, 98:11, 98:14, 98:18, 98:22, 98:23, 99:1, 99:3, 99:4, 99:8, 99:14, 99:16, 99:19, 99:22, 100:4, 100:11, 100:14, 100:16, 100:21, 100:22, 101:25, 102:2, 102:25, 103:2, 103:12, 103:19, 104:18, 105:11, 105:17, 106:3, 107:3, 110:24, 116:21, 122:7, 122:18, 123:19, 126:13, 127:8, 127:12, 128:2, 129:10, 129:11, 133:1, 133:5, 212:11, 213:1, 225:12,

225:13, 225:15, 232:6, 251:25, 252:15, 255:15, 257:9, 258:10, 258:18, 258:21, 259:8, 259:16, 259:17, 260:13, 260:25, 261:1, 261:8, 262:13, 263:7, 263:20
**Government's** [9] - 31:10, 48:11, 103:3, 103:7, 254:16, 258:8, 259:8, 259:11, 259:13
**Government-related** [1] - 263:7
**governments** [1] - 48:7
**graduating** [1] - 143:21
**graham** [1] - 153:11
**Graham** [49] - 61:3, 142:1, 142:13, 142:15, 143:12, 143:16, 145:8, 154:3, 159:9, 159:16, 170:16, 171:2, 171:19, 172:6, 172:15, 173:17, 174:25, 175:17, 177:2, 181:9, 184:16, 185:8, 185:22, 186:5, 186:20, 187:6, 188:2, 188:20, 192:2, 200:24, 202:12, 202:25, 215:22, 221:6, 227:10, 227:25, 233:21, 235:2, 239:4, 239:14, 240:15, 241:16, 246:13, 249:21, 252:6, 253:20, 256:19, 262:4, 266:8
**GRAHAM** [3] - 2:4, 142:7, 142:9
**grant** [1] - 35:18
**granted** [2] - 91:23, 133:20
**granting** [1] - 35:19
**granular** [1] - 176:16
**great** [16] - 24:22, 75:25, 83:17, 86:8, 155:17, 170:25, 194:8, 194:10, 198:5, 198:11, 206:5, 206:24,

207:9, 207:13,
207:15, 239:16
**greed** [1] - 45:3
**green** [1] - 91:14
**Grooms** [5] - 61:12,
245:17, 245:25,
246:4, 246:10
**grooms** [1] - 246:8
**ground** [3] - 47:11,
61:14, 82:12
**ground-level** [1] -
47:11
**group** [11] - 53:24,
55:7, 72:4, 88:2,
103:24, 104:2,
157:6, 158:15,
161:20, 238:3
**groups** [2] - 64:17,
111:25
**growth** [5] - 175:25,
176:1, 186:12,
186:18, 186:19
**guarantee** [1] - 82:7
**guess** [6] - 18:1,
98:14, 99:24,
196:20, 239:14,
265:19
**guidance** [2] - 29:11,
117:18
**guide** [1] - 29:22
**guideline** [1] - 101:1
**guidelines** [16] -
74:15, 93:12, 93:13,
93:16, 93:23, 94:2,
94:4, 94:11, 97:5,
98:4, 98:9, 100:23,
102:2, 116:5
**gun** [1] - 200:21
**guy** [1] - 158:6
**guys** [38] - 9:7, 10:4,
11:8, 11:14, 11:24,
12:14, 13:4, 13:22,
14:1, 17:6, 24:21,
25:11, 26:3, 26:17,
26:19, 48:16, 50:16,
62:22, 70:17, 76:8,
78:18, 79:2, 96:14,
117:25, 122:4,
137:11, 138:24,
139:20, 140:17,
140:24, 141:5,
168:12, 169:3,
223:14, 251:10,
255:7, 263:1, 265:5

## H

**habits** [2] - 82:2,
184:2
**half** [18] - 6:14, 9:20,

9:22, 9:25, 10:11,
10:16, 10:19, 28:18,
28:21, 29:1, 87:24,
88:10, 116:19,
116:20, 215:4,
252:4, 258:17,
266:13
**hall** [1] - 33:19
**hand** [8] - 40:2, 40:9,
56:12, 64:5, 67:12,
74:5, 250:8
**handful** [1] - 211:23
**handling** [1] - 8:25
**hands** [6] - 63:24,
64:8, 68:5, 196:24,
196:25, 201:5
**hang** [3] - 32:18,
141:1, 141:10
**hanging** [1] - 252:8
**happy** [3] - 84:16,
140:10, 251:4
**hard** [5] - 25:20,
27:24, 59:7, 227:10,
261:18
**harder** [3] - 55:16,
55:17, 99:12
**Harvard** [1] - 229:12
**HAVING** [1] - 142:9
**Hawaii** [1] - 31:14
**HCC** [1] - 108:6
**HDL** [1] - 164:20
**head** [7] - 44:20,
67:10, 74:9, 166:8,
181:16
**head-to-head** [2] -
166:8, 181:16
**headquarters** [1] -
156:20
**heads** [4] - 9:14,
11:10, 28:8, 165:15
**heads-up** [3] - 9:14,
11:10, 28:8
**Health** [5] - 94:11,
94:12, 94:16, 94:17,
108:6
**health** [16] - 13:2,
30:20, 48:18, 49:4,
49:13, 49:15, 49:17,
50:16, 53:8, 75:3,
80:9, 90:25, 113:23,
159:10, 174:5,
185:15
**healthy** [1] - 65:22
**hear** [132] - 18:4, 18:5,
18:9, 21:16, 21:19,
25:6, 27:18, 27:21,
29:13, 36:11, 36:14,
36:15, 39:6, 40:1,
40:7, 40:11, 40:12,
40:15, 40:17, 44:23,

47:7, 47:8, 47:10,
47:25, 48:23, 48:24,
49:6, 53:14, 56:16,
59:16, 59:25, 60:17,
61:4, 62:12, 62:24,
64:22, 65:8, 67:1,
68:17, 69:18, 70:9,
71:10, 71:13, 73:20,
74:4, 75:16, 78:21,
78:24, 79:4, 79:7,
79:11, 79:12, 82:19,
87:6, 87:13, 87:21,
88:1, 89:1, 90:9,
91:22, 92:15, 92:25,
93:14, 93:25, 94:4,
97:4, 97:11, 97:13,
98:13, 99:21, 101:2,
101:9, 101:13,
101:24, 102:1,
104:6, 104:14,
106:7, 106:12,
106:18, 107:24,
108:3, 109:16,
109:22, 109:23,
110:9, 113:10,
114:5, 114:14,
115:4, 115:5, 115:9,
116:3, 116:9, 117:1,
117:6, 117:16,
117:19, 118:11,
119:11, 119:13,
119:23, 120:2,
120:4, 120:11,
121:2, 121:7, 124:2,
124:3, 124:14,
126:1, 129:17,
130:12, 131:7,
131:13, 136:20,
212:2, 228:7,
236:12, 242:20,
252:12, 252:24,
255:8, 256:8,
257:12, 260:13,
264:3
**heard** [27] - 32:8, 38:1,
42:12, 51:24, 82:10,
85:23, 85:25, 86:10,
86:14, 92:13, 94:8,
94:14, 94:20, 95:10,
103:23, 105:19,
109:4, 110:1,
122:18, 125:10,
125:20, 135:7,
242:24, 253:17,
255:25, 258:1,
258:17
**hearing** [3] - 22:6,
34:21, 105:14
**hearsay** [3] - 6:14,
218:14, 219:22
**heart** [8] - 18:9, 18:15,

21:11, 53:9, 56:22,
57:1, 102:18
**heavily** [4] - 49:14,
64:22, 64:23
**heels** [1] - 125:9
**held** [7] - 3:1, 67:23,
143:11, 155:23,
157:11, 209:25,
229:2
**hello** [1] - 142:16
**help** [17] - 13:13, 30:7,
34:13, 42:22, 48:19,
91:15, 92:23,
101:16, 106:24,
120:16, 121:16,
141:5, 151:15,
239:4, 240:3, 240:4
**helped** [2] - 89:15,
157:18
**helpful** [2] - 43:14,
89:17
**helping** [4] - 116:21,
149:3, 152:9, 240:4
**herself** [1] - 119:3
**hesitant** [1] - 108:12
**HHS** [2] - 94:15, 94:18
**hi** [1] - 143:12
**hidden** [1] - 49:12
**hide** [1] - 232:11
**high** [17] - 48:17,
53:15, 60:25, 67:21,
67:23, 70:2, 71:25,
72:1, 91:12, 91:17,
146:24, 184:2,
215:22, 215:24,
234:18, 234:19,
253:5
**high-end** [2] - 71:25,
72:1
**high-five** [1] - 253:5
**high-level** [2] - 48:17,
60:25
**high-risk** [1] - 215:22
**high-stress** [2] -
234:18, 234:19
**higher** [1] - 42:15
**highest** [2] - 73:11,
184:4
**highest-potential** [1] -
184:4
**highly** [7] - 12:6,
49:17, 69:5, 69:6,
101:25, 112:6,
195:23
**Highly** [1] - 187:3
**hire** [2] - 64:24, 123:6
**hired** [2] - 73:11,
144:11
**hires** [1] - 157:9
**hit** [2] - 11:12, 225:24

**HIV** [135] - 30:3, 52:24,
53:2, 53:8, 53:12,
53:24, 54:12, 54:13,
55:7, 55:14, 55:23,
56:2, 56:23, 56:25,
57:2, 57:14, 58:8,
58:12, 59:7, 59:14,
65:21, 65:22, 69:25,
74:6, 86:1, 86:23,
86:24, 87:3, 87:7,
87:19, 87:21, 87:23,
88:1, 88:8, 88:9,
88:13, 88:18, 89:7,
89:12, 89:14, 89:16,
89:18, 90:10, 90:14,
90:23, 91:8, 91:9,
91:11, 92:23, 93:2,
93:6, 93:10, 93:11,
93:12, 93:13, 93:17,
95:23, 95:24, 96:9,
98:10, 99:23, 99:25,
100:1, 100:12,
100:13, 100:18,
100:23, 100:24,
101:3, 102:2, 103:6,
103:11, 103:12,
104:15, 104:19,
104:20, 105:1,
106:17, 111:7,
111:22, 114:3,
123:12, 123:14,
123:20, 132:24,
145:5, 145:7,
145:15, 145:19,
146:12, 146:19,
146:24, 147:2,
148:9, 148:13,
148:16, 148:25,
150:15, 150:16,
151:1, 151:9,
151:15, 152:12,
153:19, 153:22,
155:13, 157:4,
157:15, 161:21,
162:22, 164:19,
177:12, 177:19,
180:9, 188:14,
188:15, 190:13,
192:10, 198:16,
198:19, 198:22,
198:23, 200:1,
239:18, 239:20,
239:21
**Hivid** [11] - 145:6,
145:11, 145:23,
146:4, 146:9,
146:14, 147:1,
147:6, 149:8,
149:10, 177:23
**Hoffmann** [10] -
143:25, 144:2,

144:3, 144:7, 144:15, 145:5, 147:10, 150:10, 150:13, 150:23
**Hoffmann-La** [10] - 143:25, 144:2, 144:3, 144:7, 144:15, 145:5, 147:10, 150:10, 150:13, 150:23
**hold** [7] - 11:13, 83:6, 125:12, 168:24, 169:8, 169:11, 251:15
**holding** [1] - 127:19
**Holshoe** [4] - 61:13, 244:15, 244:21, 245:13
**home** [9] - 44:20, 115:13, 134:17, 156:18, 157:19, 158:1, 158:17, 197:18, 229:22
**honestly** [1] - 146:22
**Honor** [108] - 3:11, 3:13, 3:22, 4:4, 4:6, 4:8, 4:17, 5:1, 5:21, 6:1, 6:23, 7:1, 7:14, 7:15, 8:10, 10:17, 12:2, 12:22, 13:24, 14:6, 15:18, 16:1, 16:19, 17:17, 18:7, 20:12, 20:17, 21:14, 22:24, 23:2, 23:15, 24:7, 24:9, 24:17, 25:3, 25:6, 44:15, 44:18, 85:2, 85:13, 121:22, 124:20, 125:8, 125:19, 127:13, 127:21, 129:20, 131:4, 131:11, 131:25, 132:7, 132:19, 133:9, 136:8, 136:24, 137:14, 138:18, 138:23, 139:9, 139:13, 141:2, 141:13, 141:21, 141:25, 167:17, 170:3, 170:4, 170:8, 170:13, 173:5, 173:9, 174:16, 184:24, 185:2, 202:16, 202:19, 216:14, 217:6, 217:14, 217:21, 217:24, 219:14, 225:22, 226:3, 226:7, 226:19,

227:12, 227:23, 249:17, 249:24, 250:7, 251:5, 253:3, 254:1, 255:11, 256:15, 256:18, 257:13, 258:23, 260:22, 261:12, 262:8, 262:15, 262:20, 263:5, 265:2, 265:12, 266:3
**HONORABLE** [1] - 1:11
**Honorable** [1] - 3:1
**honoraria** [2] - 228:17, 230:7
**honorarium** [2] - 210:4, 210:6
**hope** [3] - 21:14, 114:13, 223:3
**hoped** [1] - 193:2
**hopeful** [1] - 10:17
**hopes** [1] - 53:15
**hoping** [2] - 113:25, 158:10
**horrible** [1] - 86:13
**hospital** [1] - 74:10
**hospitals** [2] - 60:23, 152:12
**host** [1] - 132:10
**hostage** [1] - 11:14
**hostile** [1] - 266:22
**hot** [2] - 125:9
**hotels** [2] - 228:13, 229:3
**hotline** [5] - 117:3, 117:7, 235:2, 235:4, 248:4
**hour** [7] - 8:3, 24:24, 27:21, 28:3, 212:21, 252:4, 258:17
**hours** [5] - 115:11, 115:12, 117:3, 146:17, 229:24
**huddle** [1] - 264:17
**huge** [1] - 70:18
**Human** [3] - 94:11, 94:12, 94:16
**human** [1] - 248:5
**hump** [1] - 180:23
**hundred** [8] - 35:4, 53:18, 57:11, 61:9, 81:6, 108:18, 128:20, 260:18
**hundreds** [17] - 45:20, 46:6, 72:8, 74:11, 80:20, 81:5, 96:6, 104:11, 104:22, 106:8, 110:19, 124:8, 129:12, 135:14

**hypercholesterolemia** [3] - 56:14, 172:22, 237:6
**hyperlipemia** [1] - 56:14
**hyperlipidemia** [2] - 172:22, 237:5

---

**I**

---

**idea** [12] - 88:11, 116:14, 119:24, 194:17, 194:19, 197:2, 199:6, 209:7, 223:9, 231:14, 231:16, 261:15
**identified** [3] - 188:24, 189:25, 192:15
**identify** [2] - 32:1, 114:4
**identifying** [3] - 12:14, 192:9
**ignore** [1] - 37:10
**illegal** [16] - 45:9, 49:17, 49:19, 58:16, 65:14, 66:7, 68:4, 69:1, 70:16, 71:11, 78:7, 79:20, 159:17, 159:20, 200:15, 247:5
**illegally** [2] - 78:4, 83:9
**Illinois** [1] - 31:14
**immediately** [1] - 5:14
**immune** [2] - 54:14, 88:5
**impact** [10] - 58:3, 81:20, 110:11, 110:14, 110:16, 110:18, 110:21, 110:22, 164:22, 165:7
**impacted** [1] - 84:9
**impactful** [1] - 82:1
**impacts** [1] - 66:2
**implemented** [1] - 68:9
**implied** [1] - 261:2
**implying** [1] - 260:12
**importance** [2] - 119:17, 119:19
**important** [37] - 32:22, 35:12, 39:20, 40:11, 52:1, 53:9, 54:20, 59:16, 60:22, 60:23, 77:9, 91:19, 92:8, 95:21, 95:23, 97:18, 101:18, 103:5, 115:15, 115:17, 117:25, 126:8,

127:8, 129:14, 133:15, 138:14, 147:3, 147:8, 152:19, 178:2, 180:18, 187:13, 187:15, 199:1, 213:16, 239:5, 247:4
**importantly** [1] - 120:17
**improper** [3] - 37:7, 128:10, 133:2
**improve** [1] - 66:5
**improvement** [10] - 68:15, 68:19, 235:16, 235:21, 235:24, 236:4, 236:10, 236:12, 236:17, 239:17
**inception** [1] - 74:7
**inclined** [1] - 131:18
**include** [5] - 93:17, 93:18, 113:17, 153:6, 164:3
**included** [1] - 16:7
**includes** [1] - 33:8
**including** [11] - 18:24, 30:14, 32:20, 33:13, 39:4, 46:9, 53:16, 61:2, 61:24, 113:8, 119:14
**inconsistencies** [1] - 124:11
**incorrect** [1] - 165:6
**increase** [6] - 90:1, 164:18, 193:2, 196:1, 223:1, 223:2
**increasing** [1] - 180:19
**incumbent** [2] - 140:7, 140:11
**independent** [3] - 34:6, 199:21, 200:25
**Indiana** [1] - 31:14
**indicating** [2] - 29:18, 257:21
**indication** [13] - 35:21, 160:21, 161:16, 162:21, 162:24, 163:10, 172:3, 178:13, 180:6, 186:21, 198:2, 236:23, 237:9
**indications** [1] - 103:16
**indicative** [2] - 132:7, 132:8
**indirectly** [1] - 30:14
**individual** [1] - 41:7
**individualized** [1] - 100:21

**individually** [1] - 45:20
**individuals** [5] - 46:25, 47:12, 47:24, 61:13, 61:25
**induce** [2] - 30:17, 69:13
**inducement** [2] - 30:22, 69:11
**industries** [1] - 49:16
**industry** [12] - 49:4, 49:13, 49:14, 50:17, 56:20, 143:14, 143:21, 143:24, 153:12, 154:2, 154:21, 238:20
**infection** [2] - 90:1, 145:2
**infections** [1] - 89:24
**infectious** [1] - 74:9
**influence** [11] - 36:16, 45:9, 49:6, 49:24, 50:6, 69:20, 81:9, 81:14, 81:18, 201:3, 223:3
**influenced** [6] - 37:4, 37:8, 76:16, 80:19, 122:17, 123:2
**influencing** [4] - 45:25, 73:1, 214:8, 214:9
**info** [1] - 117:20
**information** [47] - 34:12, 34:14, 35:2, 35:12, 66:12, 66:20, 66:22, 67:16, 68:4, 68:22, 69:10, 71:1, 71:19, 80:23, 98:2, 99:5, 109:17, 116:6, 116:7, 127:22, 135:4, 137:12, 160:1, 194:3, 194:4, 194:8, 194:11, 196:24, 197:3, 201:5, 201:10, 205:15, 206:15, 206:24, 207:13, 208:2, 208:3, 208:8, 222:19, 222:23, 223:17, 224:9, 224:22, 224:25, 225:4, 228:9, 243:8
**Information** [9] - 201:6, 201:12, 201:15, 201:24, 202:4, 202:8, 206:1, 207:11, 207:19
**inhibitor** [21] - 147:25, 148:1, 148:2, 148:4, 148:22, 148:23,

148:24, 150:5, 150:8, 160:7, 160:24, 161:5, 161:6, 161:19, 162:10, 162:12, 164:17, 175:24, 180:7, 190:8

**inhibitors** [2] - 161:20, 184:5

**initial** [1] - 221:11

**initiate** [1] - 95:8

**injectable** [2] - 144:24, 145:1

**injury** [2] - 259:12, 259:13

**inordinate** [1] - 65:6

**insert** [11] - 51:8, 95:22, 154:8, 159:21, 160:20, 166:21, 166:23, 173:1, 195:15, 201:10, 221:13

**inside** [3] - 48:3, 61:15, 132:16

**insider** [2] - 48:22, 82:11

**insiders** [2] - 47:10, 78:16

**insinuate** [1] - 257:7

**insinuated** [1] - 260:12

**insinuation** [1] - 232:10

**instance** [3] - 146:10, 233:3, 248:5

**instances** [1] - 230:1

**instant** [2] - 33:13, 33:14

**instead** [5] - 8:12, 99:17, 163:15, 207:16, 211:16

**institute** [2] - 98:22, 99:8

**instituted** [1] - 212:15

**Institutes** [1] - 94:17

**instruct** [8] - 32:7, 40:16, 43:12, 49:18, 50:9, 50:14, 231:20, 250:20

**instructed** [6] - 27:9, 37:11, 42:8, 163:24, 193:22, 231:20

**instruction** [11] - 17:6, 17:10, 19:11, 19:18, 21:5, 21:8, 27:10, 37:13, 43:19, 118:4, 138:10

**instructions** [24] - 4:14, 5:14, 25:2, 25:11, 26:24, 26:25,

27:1, 27:5, 27:7, 27:13, 27:17, 29:7, 29:11, 30:4, 30:5, 31:23, 32:4, 40:20, 43:19, 44:1, 44:3, 44:5, 44:9, 63:2

**instrumental** [1] - 61:10

**insurance** [3] - 49:25, 96:12, 96:14

**integrity** [3] - 20:14, 20:20, 247:22

**Intel** [1] - 210:18

**Intelence** [44] - 30:3, 30:18, 58:7, 58:8, 58:10, 58:13, 58:20, 58:23, 59:5, 60:3, 60:5, 65:10, 70:1, 88:20, 91:4, 91:16, 91:25, 92:22, 93:25, 98:5, 105:8, 122:14, 122:15, 122:19, 158:8, 158:12, 158:13, 159:22, 178:12, 178:15, 178:18, 179:6, 196:9, 196:20, 197:11, 197:14, 197:23, 198:4, 198:8, 198:12, 210:17, 210:22, 213:7, 236:20

**intend** [2] - 106:16, 267:6

**intended** [2] - 58:21, 111:14

**intending** [1] - 218:16

**intent** [3] - 17:5, 129:25, 130:2

**intention** [1] - 24:18

**intentional** [1] - 100:12

**intentionally** [4] - 35:1, 86:1, 105:5, 113:17

**interact** [3] - 107:2, 107:3, 228:15

**interactive** [1] - 108:1

**interest** [5] - 39:10, 51:23, 78:16, 117:12, 249:9

**interesting** [1] - 107:15

**interfere** [3] - 51:18, 100:12, 102:25

**internal** [9] - 55:20, 58:12, 59:24, 64:9, 73:3, 75:8, 76:18, 109:8, 257:9

**internally** [6] - 18:23,

18:25, 21:23, 80:8, 128:25, 129:2

**internet** [4] - 33:5, 33:15, 34:8, 34:11

**interpret** [1] - 43:13

**interrupt** [3] - 12:9, 26:2, 84:8

**intervene** [2] - 251:25, 252:15

**intervened** [1] - 258:21

**intervention** [4] - 257:3, 257:10, 259:15, 262:16

**introduce** [1] - 143:11

**introduced** [1] - 263:8

**Introduction** [1] - 29:9

**investigate** [1] - 95:8

**investigated** [3] - 47:21, 75:2, 258:13

**investigating** [5] - 255:4, 255:5, 257:7, 259:18

**investigation** [2] - 34:6, 257:11

**investigator** [1] - 121:9

**investigators** [1] - 66:5

**investment** [2] - 69:18, 213:15

**invited** [2] - 183:25, 228:6

**invoke** [1] - 139:14

**involved** [8] - 13:9, 64:23, 72:7, 113:21, 117:15, 137:6, 186:11, 218:1

**involvement** [2] - 67:18, 254:16

**involves** [1] - 113:23

**involving** [1] - 12:5

**Iowa** [1] - 31:14

**iPad** [2] - 201:17, 207:23

**iPads** [1] - 207:23

**iPhones** [2] - 32:24, 33:2

**Island** [1] - 31:16

**Israel** [2] - 73:22, 76:23

**issue** [54] - 5:9, 5:16, 5:22, 13:20, 15:18, 16:22, 17:13, 18:16, 22:18, 22:20, 22:23, 23:6, 23:9, 23:12, 28:8, 48:18, 51:3, 52:18, 57:7, 78:14, 79:13, 80:18, 87:9, 96:3, 102:22,

103:15, 131:21, 133:25, 134:8, 134:19, 134:20, 136:18, 169:10, 250:1, 250:11, 250:17, 251:17, 251:24, 252:11, 253:7, 254:7, 254:14, 255:19, 258:4, 259:14, 259:23, 259:25, 260:1, 264:18, 265:3, 265:6, 265:16, 266:6

**issued** [1] - 53:22

**issues** [20] - 4:20, 17:5, 28:16, 35:3, 35:7, 49:3, 77:20, 108:2, 111:22, 117:2, 117:9, 117:12, 119:21, 130:4, 130:7, 130:21, 135:25, 164:19, 251:14, 253:4

**item** [1] - 37:11

**itself** [9] - 4:22, 57:2, 73:10, 81:4, 102:2, 164:17, 164:19, 173:10, 180:21

---

**J**

**J&J** [4] - 100:4, 117:7, 119:4, 119:9

**Janssen** [232] - 4:3, 4:5, 4:7, 4:9, 12:17, 16:8, 19:21, 20:14, 24:8, 30:13, 30:24, 31:4, 31:5, 31:7, 31:21, 31:25, 45:9, 45:21, 46:2, 46:5, 46:11, 46:16, 46:25, 47:2, 47:10, 47:22, 48:4, 50:11, 52:12, 52:17, 53:11, 53:15, 54:2, 55:21, 56:22, 57:10, 57:24, 59:23, 59:25, 60:8, 60:12, 60:20, 61:20, 62:6, 62:18, 62:21, 64:2, 64:13, 64:18, 64:24, 65:2, 65:6, 66:7, 66:19, 66:24, 68:1, 68:7, 68:10, 68:18, 68:21, 69:6, 69:14, 69:15, 69:21, 70:6, 70:11, 70:14, 70:17, 70:21, 71:3, 71:15, 71:22, 72:8, 72:11, 72:19, 72:21, 73:3,

73:10, 73:25, 74:13, 74:22, 75:17, 76:6, 76:18, 76:22, 77:2, 77:11, 78:3, 78:8, 78:15, 78:24, 79:17, 79:22, 80:21, 81:4, 81:5, 81:11, 81:13, 81:17, 81:21, 81:25, 82:7, 82:11, 82:14, 83:6, 85:19, 85:21, 91:7, 92:15, 95:2, 104:24, 107:1, 121:4, 124:8, 126:12, 126:23, 127:22, 127:23, 128:13, 128:25, 129:18, 130:3, 130:13, 131:7, 131:9, 131:17, 133:16, 134:1, 138:21, 143:3, 143:6, 143:8, 150:19, 153:18, 153:20, 154:16, 154:23, 155:8, 155:10, 155:20, 155:21, 155:23, 156:22, 156:24, 157:4, 159:16, 161:7, 161:8, 166:3, 170:21, 176:5, 176:8, 176:14, 176:21, 178:9, 184:19, 184:22, 186:5, 186:21, 188:15, 188:21, 188:24, 190:11, 192:9, 192:22, 193:6, 193:10, 193:13, 195:11, 199:14, 200:1, 200:12, 200:14, 201:4, 201:20, 201:23, 203:24, 207:21, 211:21, 212:4, 213:4, 213:12, 215:15, 215:17, 221:18, 221:19, 223:6, 228:3, 228:22, 228:24, 229:14, 229:20, 230:6, 230:11, 232:10, 232:22, 233:21, 233:22, 234:12, 234:13, 235:15, 236:1, 238:18, 240:8, 241:3, 241:4, 241:9, 241:11, 241:24, 244:7, 244:11, 244:13,

244:25, 245:4, 245:24, 246:1, 246:14, 246:23, 252:21, 254:6, 255:4, 257:12, 257:14, 260:14, 261:8, 265:14, 266:16
**JANSSEN** [1] - 1:6
**Janssen's** [27] - 31:8, 46:1, 48:19, 48:21, 50:7, 55:20, 58:11, 60:22, 60:25, 61:8, 63:6, 67:4, 68:25, 75:5, 75:8, 77:5, 79:5, 79:14, 79:15, 80:6, 80:24, 136:25, 170:5, 207:25, 252:13, 256:9, 265:19
**Janssen-sponsored** [1] - 70:21
**January** [3] - 156:8, 160:17, 205:21
**jeopardize** [1] - 132:13
**JERSEY** [1] - 1:1
**Jersey** [16] - 1:9, 31:12, 46:9, 116:2, 122:24, 144:5, 156:17, 158:23, 158:24, 159:4, 197:21, 210:19, 210:20, 211:1, 211:5, 216:8
**Jessica** [5] - 46:20, 61:12, 142:18, 204:3, 242:18
**Jim** [1] - 158:7
**job** [20] - 49:21, 50:9, 50:14, 50:18, 51:16, 83:4, 97:2, 147:13, 156:3, 157:5, 158:24, 193:13, 195:9, 199:11, 200:15, 205:9, 225:18, 248:12, 251:11
**jobs** [3] - 62:14, 152:1, 234:25
**Joe** [2] - 158:12, 244:15
**johnson** [1] - 170:23
**JOHNSON** [2] - 1:6
**Johnson** [28] - 20:15, 75:21, 75:22, 75:23, 79:22, 118:23, 118:25, 119:1, 126:13, 157:3, 167:10, 167:14,

171:16, 174:21, 175:14, 185:5, 185:20, 188:17, 190:9, 191:18, 202:9, 202:23, 204:14
**Johnson's** [1] - 20:15
**join** [2] - 160:15, 241:13
**joined** [7] - 150:18, 150:20, 156:24, 160:17, 161:7, 188:15, 203:24
**Joseph** [1] - 61:13
**Josh** [3] - 3:13, 142:17, 253:5
**JOSH** [1] - 1:15
**Joy** [1] - 3:23
**judge** [14] - 11:19, 27:9, 29:19, 46:24, 49:18, 50:9, 50:10, 50:13, 67:20, 82:21, 118:1, 118:3, 124:11, 268:1
**JUDGE** [1] - 1:12
**Judge** [7] - 3:2, 3:15, 10:12, 139:11, 141:15, 254:18, 260:10
**judges** [2] - 29:15, 38:25
**judging** [1] - 29:16
**judgment** [10] - 102:7, 102:15, 102:20, 102:23, 104:4, 104:17, 105:1, 105:6, 120:25, 200:25
**juice** [1] - 10:13
**July** [1] - 170:18
**jump** [1] - 53:12
**jumping** [1] - 203:2
**juncture** [1] - 134:14
**June** [3] - 11:21, 11:22, 160:18
**juror** [2] - 26:7, 32:20
**Jurors** [1] - 40:18
**jurors** [35] - 5:11, 7:11, 7:25, 9:4, 9:12, 15:7, 21:18, 23:14, 24:23, 29:11, 32:6, 35:3, 83:15, 83:18, 83:19, 84:4, 84:11, 84:12, 118:1, 125:3, 139:8, 141:16, 141:17, 226:11, 226:18, 226:24, 227:16, 250:18, 251:6, 251:16, 251:20, 255:2,

255:18, 255:20, 263:19
**Jury** [3] - 29:9, 32:5, 39:23
**jury** [98] - 8:2, 8:7, 8:18, 9:13, 10:16, 14:22, 17:21, 20:9, 20:10, 23:22, 26:12, 26:16, 32:8, 33:24, 34:24, 35:1, 41:6, 41:10, 43:16, 45:1, 45:2, 85:1, 125:5, 127:8, 127:19, 128:4, 128:9, 128:14, 128:18, 128:23, 129:1, 129:9, 129:13, 129:19, 130:10, 130:25, 131:3, 131:20, 133:15, 133:24, 134:15, 135:10, 135:12, 135:23, 136:5, 137:2, 137:23, 138:9, 143:11, 144:9, 144:22, 146:8, 147:13, 148:23, 157:2, 157:25, 159:19, 161:14, 163:6, 164:15, 166:18, 171:6, 171:19, 172:16, 174:23, 175:3, 177:21, 179:16, 183:4, 185:6, 186:2, 196:17, 198:7, 199:17, 202:22, 204:13, 207:20, 208:25, 209:23, 212:14, 214:20, 216:13, 217:4, 217:13, 220:2, 228:10, 229:1, 229:8, 230:19, 238:2, 238:22, 240:21, 244:6, 246:18, 252:6, 252:20, 253:24, 255:8
**JURY** [1] - 1:5
**just..** [1] - 26:9
**Justice** [32] - 95:8, 241:14, 242:4, 243:1, 243:24, 245:10, 245:15, 246:11, 247:11, 252:4, 252:7, 252:8, 252:16, 254:8, 254:20, 254:25,

255:1, 255:13, 255:17, 255:21, 256:12, 257:6, 257:18, 257:21, 257:25, 258:2, 258:14, 261:14, 261:18, 261:20, 262:23, 263:13
**justice** [1] - 86:8

**K**

**Kaletra** [8] - 110:5, 165:8, 166:1, 171:7, 172:17, 177:10, 189:5, 191:20
**Kansas** [1] - 245:20
**Kaucher** [6] - 79:10, 108:4, 108:8, 109:7, 119:15, 119:16
**keep** [29] - 7:6, 8:23, 9:17, 21:17, 32:22, 34:17, 35:11, 35:16, 70:2, 84:16, 85:8, 85:9, 88:15, 88:21, 112:8, 124:16, 140:11, 176:5, 179:23, 205:18, 231:4, 231:6, 231:9, 231:12, 238:13, 238:15, 238:17, 246:2, 268:2
**keeping** [1] - 186:5
**kept** [3] - 12:1, 165:5, 242:21
**Key** [1] - 170:24
**key** [12] - 49:3, 60:21, 60:24, 77:19, 79:5, 112:7, 114:19, 118:14, 172:13, 192:3, 224:4, 241:5
**kick** [1] - 22:2
**Kickback** [7] - 30:10, 31:8, 111:9, 111:11, 112:11, 116:8, 159:11
**kickback** [8] - 30:2, 30:14, 69:13, 77:11, 115:23, 116:8, 116:16, 116:19
**kickbacks** [11] - 12:24, 45:13, 47:17, 49:5, 50:4, 52:15, 57:23, 61:22, 79:24, 82:14, 126:12
**kicked** [1] - 262:20
**kid** [3] - 102:12, 102:14, 229:12
**kidney** [1] - 202:6
**kids** [2] - 102:10,

102:11
**kids'** [1] - 108:15
**kill** [1] - 183:11
**Kim** [8] - 9:18, 11:11, 24:10, 84:19, 124:25, 139:12, 141:3, 142:3
**kind** [38] - 5:10, 30:15, 33:11, 33:13, 43:18, 56:19, 63:1, 64:1, 99:24, 116:13, 120:21, 121:10, 122:5, 132:21, 135:17, 150:2, 151:1, 151:3, 151:14, 152:10, 152:21, 158:14, 165:15, 180:11, 180:20, 182:22, 193:22, 194:2, 196:18, 198:14, 216:6, 218:2, 238:7, 240:6, 240:22, 240:23, 247:9, 248:8
**kinds** [1] - 38:17
**King** [1] - 1:21
**kit** [1] - 135:12
**Klein** [2] - 4:8, 85:19
**KLEIN** [14] - 1:20, 4:8, 15:16, 15:18, 16:18, 16:21, 17:3, 17:16, 18:3, 23:4, 24:9, 131:11, 131:25, 132:12
**knocking** [1] - 136:13
**knowing** [9] - 64:10, 65:4, 66:14, 71:7, 109:13, 243:1, 253:13, 253:14, 253:20
**knowingly** [2] - 30:24, 31:7
**knowledge** [3] - 47:2, 163:2, 218:5
**known** [11] - 51:24, 54:7, 55:5, 55:13, 56:6, 58:20, 65:8, 69:1, 95:17, 148:14, 231:11
**knows** [4] - 37:24, 60:9, 145:3, 259:16
**Kozub** [1] - 158:12

**L**

**L.P** [1] - 1:7
**label** [155] - 12:23, 30:2, 31:9, 51:3, 51:4, 51:9, 51:10, 51:24, 52:10, 52:12,

52:14, 53:22, 54:5,
54:6, 56:10, 56:12,
57:6, 57:12, 57:21,
57:24, 58:5, 58:13,
58:17, 59:5, 60:7,
60:13, 61:10, 61:21,
63:1, 64:6, 64:12,
64:20, 65:5, 65:8,
65:10, 66:7, 66:22,
67:16, 68:4, 68:12,
68:22, 69:10, 70:13,
70:16, 70:22, 71:1,
71:2, 71:4, 71:11,
71:19, 72:10, 74:14,
74:20, 76:15, 77:5,
77:7, 77:8, 78:8,
79:19, 79:20, 89:6,
94:23, 95:6, 95:12,
95:22, 102:6, 102:9,
102:14, 102:19,
102:24, 103:1,
103:4, 103:5, 103:9,
103:24, 109:2,
110:2, 111:2,
114:25, 117:20,
119:18, 126:11,
126:12, 127:2,
133:1, 133:5,
133:13, 154:3,
154:11, 154:15,
160:19, 164:5,
165:25, 166:4,
166:9, 166:22,
167:4, 167:5, 167:8,
172:21, 173:2,
189:19, 189:23,
193:15, 194:3,
194:4, 196:6, 197:3,
197:5, 197:7,
197:17, 197:25,
198:9, 199:15,
199:17, 199:18,
201:4, 205:12,
205:15, 206:14,
208:3, 208:8,
216:11, 221:7,
221:12, 221:14,
221:16, 221:20,
222:2, 222:11,
222:14, 222:16,
222:18, 222:22,
223:17, 224:8,
224:16, 224:22,
225:1, 225:4,
225:20, 228:8,
232:1, 232:3, 232:8,
234:22, 234:23,
236:13, 237:4,
237:7, 237:18,
238:24
**labeling** [1] - 52:18

**labels** [3] - 95:3,
109:19, 116:4
**laboratories** [1] -
80:10
**laboratory** [1] - 120:18
**Labs** [1] - 13:1
**lack** [1] - 254:16
**ladies** [5] - 44:25,
45:1, 45:2, 76:5,
80:15
**landing** [1] - 134:12
**landscape** [1] - 48:18
**lane** [1] - 219:8
**language** [3] - 22:18,
258:25, 259:2
**laptop** [1] - 211:19
**laptops** [1] - 33:3
**large** [8] - 15:19, 16:4,
55:10, 56:5, 79:9,
88:10, 104:2, 157:24
**largely** [1] - 53:5
**larger** [1] - 162:1
**largest** [5] - 45:3,
55:7, 80:9, 188:25,
238:3
**last** [10] - 73:12,
83:10, 132:18,
142:12, 153:25,
164:2, 176:19,
180:5, 245:25,
258:17
**last-resort** [1] - 180:5
**lasting** [1] - 81:20
**late** [4] - 26:23, 58:21,
102:18, 151:4
**late-term** [1] - 58:21
**launch** [4] - 160:16,
160:18, 160:19,
184:19
**launched** [3] - 160:5,
178:9, 197:14
**launching** [1] - 210:23
**law** [25] - 29:14, 29:20,
29:23, 30:4, 35:15,
38:18, 43:12, 45:7,
46:23, 47:16, 48:5,
48:13, 50:10, 50:11,
50:14, 60:9, 62:19,
63:13, 63:18, 67:4,
86:10, 115:1,
246:16, 248:25,
261:23
**Law** [1] - 29:24
**lawful** [1] - 71:1
**laws** [1] - 60:9
**lawsuit** [40] - 31:20,
41:17, 41:18, 86:5,
86:9, 86:13, 87:5,
87:10, 87:15, 95:18,
96:3, 99:21, 103:19,

106:4, 106:9,
106:21, 107:14,
116:15, 116:18,
116:21, 117:11,
118:16, 118:21,
119:12, 119:24,
120:23, 121:12,
121:17, 122:3,
124:1, 124:6,
124:18, 242:25,
243:23, 244:1,
244:4, 253:11,
253:12, 257:20,
259:7
**lawsuits** [1] - 242:16
**lawyer** [7] - 33:18,
36:24, 36:25, 37:1,
37:2, 40:2, 85:20
**lawyers** [19] - 27:9,
34:21, 35:7, 36:7,
36:9, 37:5, 39:24,
40:11, 47:19, 47:21,
105:17, 116:11,
116:18, 119:6,
121:8, 121:16,
121:19, 124:4
**lay** [1] - 173:13
**laying** [1] - 261:20
**lays** [1] - 105:18
**LDL** [1] - 164:20
**leadership** [1] -
175:11
**leading** [3] - 93:17,
114:3, 266:23
**leads** [1] - 36:21
**leaning** [1] - 15:12
**learn** [31] - 45:8,
45:18, 48:8, 49:13,
50:1, 52:8, 52:16,
54:11, 54:20, 56:21,
57:2, 57:15, 58:16,
58:23, 60:11, 64:13,
66:19, 68:4, 68:10,
69:5, 69:14, 72:19,
76:5, 89:15, 93:1,
147:2, 154:3,
160:19, 212:10,
242:2
**learned** [2] - 137:5,
212:14
**learning** [1] - 91:8
**least** [10] - 11:18,
13:3, 22:14, 27:24,
72:1, 80:12, 134:13,
138:14, 160:23,
180:7
**leave** [9] - 21:15,
122:2, 137:25,
200:6, 236:9,
236:11, 239:2,

240:8, 240:12
**leaves** [1] - 105:5
**leaving** [4] - 134:5,
229:22, 240:15
**left** [24] - 20:19, 56:1,
74:5, 121:23,
153:20, 171:2,
177:1, 187:25,
200:11, 200:12,
200:14, 226:2,
226:4, 227:7,
227:25, 240:13,
244:6, 244:11,
244:13, 244:23,
244:25, 246:1,
246:2, 252:6
**left-hand** [1] - 74:5
**legal** [3] - 29:20,
29:22, 250:17
**legally** [1] - 57:13
**legitimate** [3] - 55:2,
58:18, 58:25
**length** [1] - 35:17
**lengthier** [1] - 44:5
**less** [11] - 35:9, 55:15,
78:25, 104:8,
151:24, 178:1,
181:6, 198:18,
211:16
**letter** [1] - 263:11
**letters** [2] - 95:7,
242:20
**letting** [1] - 219:10
**level** [9] - 47:11,
48:17, 55:4, 60:25,
61:1, 70:3, 88:21,
223:4, 233:7
**levels** [8] - 56:11,
57:4, 57:5, 63:2,
65:23, 66:2, 152:16,
164:18
**liability** [1] - 17:19
**liable** [1] - 83:6
**liaison** [1] - 203:18
**liaisons** [1] - 203:18
**liars** [1] - 85:25
**license** [1] - 51:21
**lie** [2] - 58:1
**lied** [1] - 86:1
**life** [2] - 28:20, 52:25
**life-ending** [1] - 52:25
**lifesaving** [2] - 92:11,
106:16
**lift** [1] - 86:20
**light** [4] - 36:18,
39:15, 41:20, 94:8
**lighting** [1] - 84:14
**likely** [6] - 25:22,
41:21, 42:3, 59:20,
86:18, 86:22

**limine** [15] - 12:17,
13:10, 16:13, 18:10,
19:5, 20:18, 20:22,
126:4, 126:6,
129:23, 130:8,
217:23, 251:23,
265:3, 265:10
**limit** [1] - 99:18
**limitation** [1] - 56:3,
57:6, 59:5
**limited** [13] - 37:12,
77:23, 133:25,
135:7, 160:21,
162:24, 178:13,
178:15, 179:18,
180:1, 186:21,
187:1, 236:22
**limiting** [1] - 17:5,
17:10, 19:10, 21:5,
21:8
**limits** [2] - 99:15,
259:15
**line** [11] - 3:20, 54:25,
59:3, 60:9, 74:2,
194:7, 199:11,
216:15, 260:3,
260:10, 266:14
**lined** [1] - 140:14
**lines** [3] - 87:7, 167:8,
260:21
**lining** [1] - 140:19
**link** [1] - 30:21
**LinkedIn** [1] - 33:17
**lipid** [24] - 57:4, 57:5,
58:2, 65:23, 66:2,
110:8, 110:9,
110:22, 110:24,
120:7, 164:18,
164:22, 164:24,
165:3, 165:5,
165:10, 165:12,
165:15, 171:3,
181:21, 182:21,
237:14, 239:12
**lipids** [29] - 56:11,
56:16, 56:17, 56:19,
58:3, 65:12, 110:1,
110:3, 110:4,
110:11, 110:14,
110:16, 110:18,
111:2, 120:7,
164:13, 164:23,
165:7, 171:8,
172:18, 172:19,
180:19, 181:10,
181:11, 181:20,
237:15, 237:21
**lipoatrophy** [1] -
181:1
**lipodystrophy** [1] -

180:20
**liquor** [1] - 45:24
**list** [5] - 6:13, 51:12, 168:21, 184:1, 192:18
**listed** [7] - 93:12, 172:23, 186:21, 192:14, 204:10, 237:8, 237:9
**listen** [8] - 34:1, 34:5, 72:21, 81:11, 121:18, 121:19, 124:16
**lists** [2] - 190:3, 190:6
**literally** [1] - 254:13
**literature** [2] - 76:12, 109:5
**litigant** [1] - 259:10
**litigate** [1] - 132:16
**live** [4] - 53:5, 101:16, 240:25, 256:2
**lives** [8] - 35:4, 53:6, 87:21, 88:10, 93:5, 106:24, 147:7, 240:5
**living** [1] - 239:20
**Lloyd** [3] - 214:21, 214:23, 215:5
**LLP** [1] - 1:19
**lobby** [1] - 33:20
**location** [1] - 233:15
**locations** [2] - 72:23, 229:1
**lodged** [1] - 137:6
**lofty** [1] - 163:11
**logged** [3] - 205:20, 205:22, 230:15
**logistical** [1] - 140:22
**logistics** [1] - 141:5
**long-term** [1] - 241:6
**Look** [4] - 9:5, 22:6, 130:3, 135:13
**look** [62] - 5:12, 9:16, 9:23, 10:10, 14:14, 18:19, 20:7, 27:19, 57:18, 68:5, 71:5, 72:5, 73:14, 79:3, 80:14, 82:9, 83:15, 84:12, 84:13, 93:22, 112:25, 118:13, 124:16, 128:9, 129:22, 135:9, 135:11, 135:13, 137:22, 151:11, 166:11, 167:1, 170:23, 173:1, 180:11, 181:11, 184:13, 190:23, 191:17, 218:6, 218:7, 254:18, 255:25, 256:7,

260:9, 260:16, 261:7, 261:9, 262:2, 262:3, 262:25, 263:1, 263:23, 264:2, 264:6, 264:7, 265:2, 265:4, 265:9, 265:20, 266:11
**looked** [10] - 16:24, 73:22, 76:17, 110:17, 111:4, 155:14, 183:4, 228:10, 260:10, 264:4
**looking** [8] - 15:15, 90:5, 135:3, 147:4, 147:6, 210:11, 211:19, 211:20
**lookout** [4] - 118:6, 118:13, 118:15, 124:10
**looks** [5] - 75:11, 95:22, 146:8, 171:24, 192:3
**lose** [6] - 59:1, 62:2, 62:13, 200:15, 225:18, 248:12
**losing** [1] - 88:15
**lost** [2] - 88:10, 115:6
**lottery** [1] - 77:18
**loud** [1] - 40:6
**Louis** [1] - 245:21
**Louisiana** [1] - 31:14
**low** [6] - 67:24, 69:24, 110:10, 110:14, 110:21, 184:3
**lower** [4] - 40:8, 57:16, 63:1, 63:2
**loyal** [2] - 73:16, 73:17
**loyalty** [1] - 73:15
**lunch** [11] - 8:1, 8:3, 8:9, 9:6, 10:12, 25:17, 28:2, 28:5, 124:23, 125:7
**luncheon** [1] - 139:3
**lunchtime** [1] - 27:23

**M**

**ma'am** [6] - 40:14, 162:7, 173:24, 239:8, 250:15, 250:20
**magnitude** [2] - 126:4, 126:7
**main** [1] - 43:8
**maintain** [1] - 26:18
**maintaining** [1] - 137:18
**major** [4] - 56:21, 56:23, 57:7

**majority** [3] - 48:13, 56:1, 238:5
**Man** [1] - 203:8
**man** [1] - 75:23
**manageable** [2] - 53:3, 151:25
**management** [2] - 100:5, 230:14
**manager** [8] - 60:21, 174:5, 185:9, 185:16, 192:4, 203:1, 224:4
**managerial** [1] - 63:2
**managers** [1] - 64:21
**mandates** [1] - 92:22
**mandatory** [1] - 10:6
**Manhattan** [5] - 156:1, 156:9, 156:16, 158:25, 181:8
**manifest** [1] - 180:21
**manner** [3] - 39:9, 41:5, 42:18
**map** [2] - 121:6, 167:5
**marginal** [1] - 149:15
**Mark** [7] - 157:13, 158:3, 194:20, 240:25, 241:2, 247:14, 248:13
**mark** [1] - 60:21
**marked** [1] - 45:14
**market** [39] - 21:21, 51:17, 52:7, 52:13, 53:5, 53:12, 54:2, 54:15, 55:1, 56:5, 57:8, 57:13, 57:25, 58:8, 58:14, 60:3, 78:8, 89:12, 90:7, 92:3, 103:25, 105:9, 115:3, 145:7, 175:23, 175:24, 176:2, 177:3, 179:20, 186:12, 186:13, 186:16, 187:6, 188:21, 189:11, 190:8, 210:23, 238:5
**marketed** [4] - 50:21, 56:10, 61:20, 82:14
**marketing** [37] - 12:23, 30:2, 31:9, 47:17, 72:22, 75:20, 75:21, 76:10, 76:11, 77:6, 78:4, 79:19, 79:20, 79:24, 80:21, 81:6, 81:8, 81:22, 82:1, 82:3, 82:5, 95:3, 95:11, 126:11, 126:12, 127:2, 133:1, 133:5, 154:4, 154:15, 158:11,

159:20, 188:3, 197:7, 228:8, 228:15, 247:6
**Marketos** [4] - 3:12, 131:24, 138:17, 253:2
**MARKETOS** [104] - 1:14, 1:14, 3:11, 4:17, 6:1, 6:4, 6:12, 7:1, 7:4, 7:13, 8:10, 12:7, 12:9, 12:16, 12:19, 12:21, 13:6, 13:12, 13:15, 13:25, 14:13, 18:7, 18:14, 18:17, 19:6, 19:9, 19:12, 19:15, 20:1, 20:4, 20:12, 20:24, 21:2, 22:11, 22:24, 23:2, 23:15, 23:19, 23:23, 24:1, 24:4, 24:7, 25:6, 26:5, 44:15, 44:18, 125:8, 125:13, 125:17, 125:23, 126:2, 126:18, 126:20, 126:22, 126:25, 127:13, 128:5, 129:5, 129:20, 130:1, 130:5, 131:4, 131:10, 133:9, 133:21, 134:3, 134:11, 136:1, 136:8, 136:10, 136:14, 136:24, 137:3, 138:16, 138:18, 139:9, 139:13, 139:18, 140:3, 140:16, 140:22, 141:2, 141:13, 141:25, 253:3, 253:8, 253:25, 254:5, 254:22, 255:11, 256:5, 256:14, 263:4, 264:24, 265:1, 265:12, 265:22, 265:24, 266:10, 266:15, 266:18, 266:21, 266:25, 267:25
**markets** [1] - 187:4
**Massachusetts** [1] - 31:14
**massive** [1] - 63:6
**match** [2] - 101:7, 187:21
**material** [5] - 18:18, 18:22, 31:9, 34:10, 127:7
**materiality** [5] - 20:6,

21:9, 130:1, 132:23, 262:11
**materials** [2] - 109:19, 195:18
**math** [2] - 128:18, 128:19
**matter** [13] - 8:25, 27:25, 63:10, 63:16, 63:17, 75:11, 121:25, 127:9, 130:15, 132:11, 143:3, 269:5
**matters** [7] - 21:9, 34:6, 126:14, 127:14, 129:9, 131:17, 263:8
**Mattes** [5] - 53:17, 61:2, 61:24, 79:8, 158:2
**Matthew** [2] - 61:12, 245:17
**McKay** [2] - 1:23, 269:11
**McKay-Soule** [2] - 1:23, 269:11
**MEAGHER** [1] - 1:19
**meals** [3] - 72:25, 212:4, 212:6
**mean** [101] - 7:1, 10:7, 13:10, 20:11, 20:25, 33:1, 34:2, 64:20, 65:17, 65:19, 65:25, 84:21, 98:21, 123:18, 128:21, 129:3, 130:8, 134:7, 139:17, 145:22, 147:5, 148:10, 151:14, 152:5, 152:17, 152:19, 152:25, 157:23, 158:2, 159:20, 163:8, 163:17, 169:5, 169:6, 173:23, 176:11, 180:8, 181:3, 181:11, 182:9, 183:8, 183:14, 183:15, 183:23, 186:15, 188:13, 188:14, 193:17, 195:6, 195:7, 195:14, 198:1, 199:20, 199:23, 200:10, 200:11, 200:19, 201:2, 201:21, 202:5, 211:7, 211:25, 212:24, 213:14, 213:23, 216:7, 217:14, 222:16,

224:24, 225:10, 225:19, 227:4, 229:3, 229:21, 230:4, 230:7, 231:17, 232:9, 233:7, 233:9, 234:10, 235:12, 235:25, 238:16, 239:9, 239:13, 239:21, 242:18, 246:19, 247:8, 256:2, 259:10, 262:25, 266:19, 266:20, 268:2

**means** [10] - 37:2, 39:1, 41:20, 91:13, 123:12, 123:15, 123:18, 154:6, 186:2, 221:24

**meant** [4] - 112:4, 112:5, 246:20, 246:21

**measure** [1] - 118:12

**measured** [1] - 160:1

**mechanical** [1] - 1:25

**mechanism** [1] - 195:15

**mechanisms** [1] - 148:13

**Medicaid** [1] - 106:12

**medical** [26] - 51:21, 66:20, 66:24, 66:25, 74:15, 98:10, 102:7, 102:20, 102:23, 104:17, 105:1, 105:6, 113:24, 120:25, 158:6, 158:7, 160:1, 201:17, 207:25, 208:1, 228:7, 228:16, 236:9, 236:11, 239:2

**Medical** [9] - 201:6, 201:12, 201:14, 201:24, 202:3, 202:7, 206:1, 207:11, 207:19

**medically** [3] - 74:17, 95:25, 103:9

**Medicare** [5] - 96:4, 96:7, 96:11, 96:17, 97:4

**medicating** [1] - 145:16

**medication** [2] - 133:14, 151:9

**medications** [9] - 146:21, 147:2, 148:9, 148:16, 149:6, 150:15,

152:15, 188:16, 192:10

**medicine** [33] - 51:19, 53:7, 53:11, 74:9, 88:16, 88:23, 89:4, 89:21, 94:24, 97:16, 99:6, 99:16, 100:6, 100:20, 101:18, 101:23, 102:8, 103:11, 104:13, 104:15, 104:19, 106:17, 110:2, 111:12, 112:9, 113:9, 114:1, 120:15, 120:16, 120:20, 122:14, 122:23

**medicines** [100] - 30:3, 86:2, 86:16, 86:23, 87:1, 87:3, 87:9, 87:11, 88:19, 89:12, 90:5, 90:7, 90:8, 90:10, 90:12, 90:16, 90:19, 90:23, 91:1, 91:3, 91:5, 91:11, 91:13, 91:16, 91:23, 92:1, 92:2, 92:3, 92:5, 92:7, 92:8, 92:12, 92:23, 93:2, 93:4, 93:7, 93:11, 93:23, 94:1, 94:3, 94:6, 94:21, 94:22, 95:3, 95:5, 95:15, 95:16, 95:24, 96:5, 96:8, 96:10, 97:8, 97:10, 97:12, 97:14, 97:17, 97:18, 97:23, 97:25, 98:6, 98:7, 98:12, 99:13, 99:15, 99:25, 100:1, 100:8, 100:9, 100:17, 101:3, 101:8, 101:9, 101:15, 101:21, 102:10, 102:11, 103:14, 105:10, 105:21, 105:24, 106:13, 106:23, 106:24, 107:4, 109:18, 109:19, 110:4, 111:20, 112:5, 114:17, 114:19, 114:20, 115:17, 120:4, 120:12, 121:1, 123:8, 123:14, 123:21

**meds** [4] - 157:4, 198:16, 198:22, 198:24

**meet** [12] - 17:6,

19:18, 42:1, 64:4, 138:1, 138:11, 154:25, 155:5, 162:13, 162:23, 163:1, 163:16

**meeting** [12] - 108:10, 146:5, 182:24, 233:8, 233:12, 233:13, 234:17, 235:22, 235:23, 236:18, 239:25

**meetings** [8] - 108:9, 108:23, 157:11, 174:12, 193:20, 212:21, 233:4, 233:12

**Megan** [3] - 1:23, 14:22, 269:11

**Megan_McKay** [1] - 1:24

**Megan_McKay-Soule@njd. uscourts.gov** [1] - 1:24

**members** [3] - 26:16, 41:10, 112:5

**memo** [7] - 105:16, 105:22, 261:13, 261:20, 262:9, 263:11

**memories** [3] - 41:7, 41:12, 41:13

**memorize** [3] - 27:3, 27:5, 66:8

**memorizing** [2] - 27:14, 44:2

**memory** [1] - 39:8

**men** [1] - 87:6

**mention** [5] - 17:24, 18:1, 111:23, 187:11

**mentioned** [15] - 26:22, 49:5, 76:23, 81:22, 146:23, 148:19, 159:9, 160:25, 165:25, 196:11, 209:18, 210:10, 213:3, 213:21, 214:1

**merit** [2] - 262:19, 262:22

**message** [6] - 58:17, 107:19, 109:9, 110:11, 182:6, 206:6

**messages** [21] - 33:12, 33:13, 60:7, 60:13, 61:10, 68:12, 68:13, 70:16, 71:12, 74:12, 76:16, 77:7, 109:24, 109:25, 110:10, 111:4,

120:9, 214:8, 228:8, 242:19

**messaging** [1] - 33:14

**messing** [1] - 8:23

**met** [12] - 46:19, 85:17, 87:11, 142:21, 142:25, 204:5, 209:4, 236:19, 241:9, 241:10, 241:11, 241:23

**methods** [1] - 68:11

**metric** [3] - 67:20, 147:3, 213:16

**metrics** [3] - 208:18, 235:23, 236:18

**Mexico** [1] - 31:15

**mic** [1] - 85:15

**Michael** [1] - 203:17

**Michigan** [1] - 31:15

**microphone** [4] - 40:5, 40:6, 40:8, 40:15

**mid-'90s** [1] - 145:20

**mid-1990s** [1] - 90:6

**mid-2000s** [1] - 53:2

**middle** [1] - 88:13

**might** [25] - 7:1, 11:17, 11:20, 13:13, 37:18, 41:10, 41:12, 55:3, 59:1, 62:2, 63:24, 79:12, 81:2, 114:5, 121:10, 132:11, 136:6, 219:23, 219:24, 226:25, 254:18, 254:24, 255:24, 265:2

**Mike** [2] - 158:4, 194:20

**million** [27] - 12:23, 13:1, 15:21, 15:24, 17:24, 18:2, 19:2, 21:24, 21:25, 45:18, 53:18, 57:11, 69:16, 69:17, 83:8, 87:22, 110:25, 116:20, 123:11, 126:11, 128:14, 130:10, 130:24, 171:24

**millions** [2] - 45:12, 46:6, 63:7, 81:5, 96:6, 104:11, 106:8, 110:19, 129:12, 135:14

**mind** [12] - 13:18, 24:20, 32:22, 34:17, 42:16, 43:25, 49:7, 112:8, 124:16, 218:25, 219:17, 253:3

**mindful** [3] - 44:11, 251:10, 251:13

**minds** [1] - 44:7

**mine** [1] - 14:14

**minimal** [4] - 110:16, 110:21, 164:22, 165:7

**minimum** [2] - 35:17, 266:6

**Minnesota** [1] - 31:15

**minute** [13] - 24:21, 25:12, 27:20, 83:13, 84:1, 148:24, 158:9, 168:17, 171:19, 199:12, 226:8, 249:17, 253:5

**minutes** [22] - 7:18, 7:22, 8:11, 8:16, 8:20, 23:17, 28:2, 28:4, 84:22, 121:23, 124:23, 125:2, 138:25, 226:4, 226:10, 226:12, 226:21, 227:13, 250:19, 250:24, 251:3, 264:12

**MIR** [9] - 68:2, 201:6, 201:8, 205:11, 205:16, 208:4, 209:6, 223:19, 247:6

**MIRs** [8] - 66:20, 67:3, 67:11, 201:19, 206:14, 206:20, 207:1, 207:21

**misconduct** [3] - 21:24, 47:2, 126:9

**misleading** [1] - 124:9

**misled** [1] - 86:1

**missed** [1] - 168:6

**missing** [3] - 59:15, 122:22, 251:22

**mistaken** [1] - 130:11

**mistakes** [1] - 76:4

**mitigate** [1] - 261:24

**mix** [2] - 101:7, 112:16

**mobster** [1] - 49:9

**model** [1] - 122:9

**molecular** [1] - 153:24

**molecule** [3] - 148:13, 149:1, 155:16

**moment** [2] - 131:9, 267:4

**Monday** [4] - 28:9, 28:12, 28:15, 28:25

**money** [30] - 46:10, 46:11, 47:16, 49:5, 49:21, 54:1, 55:15, 57:12, 57:19, 77:2, 77:25, 78:1, 78:2, 78:3, 80:5, 81:8,

86:10, 106:5,
106:18, 106:21,
115:6, 115:7,
115:14, 116:15,
118:17, 122:7,
123:3, 135:16,
135:19, 249:12
**monitor** [14] - 83:18,
83:19, 83:22, 83:24,
84:7, 84:12, 84:13,
84:18, 84:23, 85:6,
213:18, 213:22,
213:24, 218:25
**monitored** [1] - 107:8
**monitors** [1] - 83:16
**Monogram** [1] -
153:21
**Montague** [1] - 263:12
**Montana** [1] - 31:15
**month** [6] - 67:4,
71:22, 202:8,
205:21, 215:3, 215:4
**months** [1] - 142:21
**morning** [51] - 3:6,
3:7, 3:8, 3:11, 3:13,
3:15, 3:17, 3:19,
3:22, 4:2, 4:4, 4:6,
4:8, 4:10, 4:13, 4:16,
5:4, 5:25, 6:1, 7:19,
9:14, 10:16, 24:19,
25:9, 26:16, 26:19,
44:25, 85:16, 85:25,
94:20, 102:5,
103:13, 105:19,
109:4, 110:1, 121:6,
134:7, 212:22,
241:16, 250:16,
250:18, 250:24,
251:4, 251:7,
259:24, 260:8,
262:5, 263:2,
264:17, 268:4
**morphine** [2] - 102:11,
102:14
**most** [27] - 32:22,
34:25, 45:4, 45:23,
49:6, 49:8, 55:8,
55:19, 56:24, 60:17,
60:22, 71:21, 72:4,
94:18, 111:7,
117:15, 117:24,
117:25, 120:17,
121:2, 180:18,
184:5, 188:13,
229:15, 257:5
**mostly** [1] - 203:14
**motion** [13] - 12:17,
13:10, 18:10, 19:5,
20:18, 20:22, 126:6,
129:22, 130:8,

217:23, 251:23,
252:18, 265:10
**motions** [2] - 16:13,
126:3
**motive** [1] - 39:11
**mouth** [1] - 40:5
**move** [22] - 6:7, 6:8,
28:24, 59:2, 121:25,
163:25, 164:3,
170:5, 173:5,
174:16, 182:11,
182:15, 182:19,
184:24, 193:9,
195:25, 202:17,
205:6, 226:21,
227:3, 239:10,
239:11
**moved** [6] - 131:1,
151:20, 156:17,
189:17, 237:11,
248:13
**moves** [1] - 122:24
**movie** [1] - 83:17
**moving** [9] - 6:18,
28:2, 29:7, 83:25,
84:10, 182:9,
240:13, 247:14,
268:2
**MP** [1] - 222:1
**MR** [204] - 2:5, 3:11,
3:13, 3:15, 4:6, 4:8,
4:17, 6:1, 6:4, 6:12,
7:1, 7:4, 7:13, 8:10,
12:7, 12:9, 12:16,
12:19, 12:21, 13:6,
13:12, 13:15, 13:25,
14:6, 14:12, 14:13,
14:14, 15:16, 15:18,
16:18, 16:21, 17:3,
17:16, 18:3, 18:7,
18:14, 18:17, 19:6,
19:9, 19:12, 19:15,
20:1, 20:4, 20:12,
20:24, 21:2, 22:11,
22:24, 23:2, 23:4,
23:15, 23:19, 23:23,
24:1, 24:4, 24:7,
24:9, 25:6, 26:5,
44:15, 44:18, 44:25,
125:8, 125:13,
125:17, 125:23,
126:2, 126:18,
126:20, 126:22,
126:25, 127:13,
128:5, 129:5,
129:20, 130:1,
130:5, 131:4,
131:10, 131:11,
131:25, 132:12,
133:9, 133:21,

134:3, 134:11,
136:1, 136:8,
136:10, 136:14,
136:24, 137:3,
138:16, 138:18,
139:9, 139:13,
139:18, 140:3,
140:16, 140:22,
141:2, 141:13,
141:21, 141:25,
142:14, 167:10,
167:14, 168:4,
168:10, 168:19,
168:21, 170:3,
170:13, 170:15,
170:23, 171:1,
171:16, 171:18,
172:4, 172:5, 173:5,
173:15, 173:16,
173:18, 173:21,
174:16, 174:21,
174:24, 175:14,
175:16, 184:14,
184:15, 184:24,
185:5, 185:7,
185:20, 185:21,
188:17, 188:19,
190:9, 190:10,
190:23, 190:24,
191:17, 191:19,
191:24, 192:1,
192:12, 192:13,
202:9, 202:11,
202:16, 202:22,
202:24, 204:13,
204:15, 218:12,
218:15, 218:20,
219:6, 221:5,
225:22, 226:3,
226:7, 226:19,
227:2, 227:15,
227:23, 227:24,
249:17, 249:20,
249:23, 253:3,
253:8, 253:25,
254:5, 254:22,
255:11, 256:5,
256:14, 256:15,
256:18, 256:25,
257:2, 257:13,
259:6, 259:20,
260:21, 260:24,
261:12, 263:4,
264:1, 264:9,
264:24, 265:1,
265:12, 265:22,
265:24, 266:10,
266:15, 266:18,
266:21, 266:25,
267:25
**MS** [79] - 3:17, 3:21,

3:22, 4:4, 5:1, 5:5,
5:7, 5:19, 5:21, 6:23,
7:15, 8:14, 8:18,
10:17, 10:23, 10:25,
11:4, 11:6, 12:1,
12:8, 12:12, 12:22,
13:7, 13:24, 24:17,
24:22, 24:25, 25:3,
85:2, 85:13, 85:15,
122:1, 137:9,
137:14, 138:23,
139:11, 139:22,
140:4, 141:15,
142:7, 167:12,
167:17, 168:2,
168:6, 168:12,
168:16, 168:18,
168:20, 168:23,
169:3, 169:8,
169:10, 169:13,
170:8, 173:9,
174:18, 185:2,
202:19, 216:14,
217:6, 217:8,
217:11, 217:14,
217:21, 217:23,
218:22, 219:13,
219:19, 220:3,
220:6, 227:12,
250:7, 250:11,
250:25, 251:4,
262:8, 263:3, 266:3,
267:7
**mud** [1] - 29:23
**multidisciplinary** [1] -
113:16
**multifunctional** [1] -
158:14
**multiple** [6] - 63:20,
74:22, 101:3, 230:8,
236:5, 236:6
**Murphy** [7] - 185:8,
202:25, 203:9,
204:12, 205:14,
207:1, 214:19
**must** [12] - 29:22,
30:9, 30:11, 31:1,
31:22, 32:1, 33:6,
36:13, 37:13, 40:25,
42:1, 263:20
**mutated** [2] - 54:18,
90:17
**mutation** [1] - 187:14
**mutations** [2] - 90:14,
91:2
**Myers** [17] - 147:14,
147:21, 148:17,
150:12, 150:15,
150:18, 150:20,
151:4, 152:24,

153:17, 153:18,
155:1, 155:6,
155:11, 183:2,
234:23, 238:9

---

**N**

**naive** [38] - 55:6, 56:8,
58:1, 58:15, 103:18,
103:21, 103:24,
104:3, 104:5, 104:9,
104:13, 135:11,
149:22, 149:23,
149:25, 161:1,
161:23, 161:25,
162:9, 162:12,
164:4, 164:5,
164:10, 165:1,
171:14, 181:21,
182:3, 182:22,
194:9, 198:2,
206:25, 207:14,
236:25, 237:9,
237:17, 238:3, 238:6
**name** [13] - 46:18,
64:22, 85:17,
142:11, 142:12,
142:17, 143:12,
156:25, 177:3,
185:18, 204:3,
212:17
**named** [3] - 240:25,
244:15, 245:17
**names** [6] - 190:18,
191:7, 192:24,
193:1, 210:25,
267:20
**Nancy** [7] - 64:22,
79:11, 174:2, 174:4,
185:14, 203:15,
266:15
**narrative** [5] - 252:20,
253:23, 255:7,
262:18, 262:22
**nation** [1] - 233:18
**national** [22] - 61:6,
64:14, 93:1, 93:8,
97:7, 97:9, 98:4,
98:8, 100:9, 156:15,
157:6, 157:11,
157:21, 158:4,
193:10, 193:12,
193:20, 233:7,
233:14, 234:17
**National** [1] - 94:17
**nationally** [1] - 114:13
**nationwide** [4] -
52:17, 57:21, 116:1,
117:14
**natural** [1] - 258:4

**near** [1] - 40:5
**nearly** [4] - 57:19, 74:7, 75:2, 105:25
**necessarily** [6] - 39:19, 129:3, 130:7, 198:20, 253:25, 263:23
**necessary** [3] - 34:20, 35:13, 74:18
**neck** [1] - 180:23
**need** [73] - 4:12, 4:16, 5:16, 5:24, 6:8, 7:10, 7:22, 7:23, 9:1, 9:3, 13:9, 14:5, 14:14, 14:23, 16:6, 23:13, 23:17, 25:20, 26:4, 32:22, 50:16, 51:14, 59:10, 59:21, 64:6, 65:25, 66:11, 67:1, 71:19, 72:16, 78:1, 84:22, 87:3, 93:7, 97:19, 97:25, 98:25, 100:10, 101:3, 101:7, 125:7, 132:16, 133:4, 138:6, 138:21, 138:24, 139:1, 139:14, 140:13, 141:4, 141:5, 165:2, 166:8, 168:2, 168:7, 168:8, 168:25, 169:6, 183:12, 195:9, 195:25, 205:11, 225:23, 226:9, 226:10, 226:17, 226:25, 230:2, 250:8, 264:23, 266:1, 266:14
**needed** [8] - 116:7, 155:19, 157:8, 163:16, 164:16, 171:11, 219:25, 240:24
**needing** [1] - 8:12
**needle** [3] - 182:9, 182:11, 182:16
**needs** [7] - 9:5, 97:8, 100:22, 100:24, 102:13, 102:16, 230:2
**negative** [1] - 206:7
**negotiate** [1] - 137:15
**net** [2] - 53:18, 92:1
**networking** [1] - 33:16
**neutral** [5] - 58:2, 164:22, 165:13, 181:21, 237:14
**Nevada** [1] - 31:15
**never** [25] - 55:4,

62:17, 103:20, 104:23, 104:25, 108:24, 108:25, 122:19, 123:17, 149:24, 209:12, 215:21, 216:6, 233:8, 233:9, 234:22, 236:14, 238:23, 238:25, 239:2, 242:24, 244:1, 244:4
**new** [13] - 26:1, 54:23, 91:11, 155:19, 157:9, 176:1, 179:22, 183:5, 195:11, 195:13, 202:7, 223:5
**NEW** [1] - 1:1
**New** [41] - 1:9, 31:12, 31:15, 46:9, 116:2, 122:24, 144:5, 146:12, 147:18, 147:19, 149:21, 151:20, 156:7, 156:17, 158:22, 158:23, 158:24, 159:4, 174:9, 179:11, 180:9, 184:19, 186:12, 188:24, 190:12, 197:9, 197:21, 203:7, 204:1, 204:8, 204:16, 204:20, 210:11, 210:18, 210:19, 210:20, 211:1, 211:5, 216:8, 244:18
**newer** [1] - 155:13
**newspaper** [1] - 34:3
**next** [20] - 7:21, 9:11, 9:15, 28:9, 28:11, 28:14, 28:20, 42:20, 98:2, 127:14, 134:17, 145:23, 185:17, 186:20, 189:5, 190:23, 191:17, 191:24, 192:12, 227:1
**nice** [2] - 211:10, 228:13
**night** [1] - 72:24
**NIH** [1] - 94:17
**nine** [6] - 24:12, 63:7, 151:7, 155:18, 183:7, 205:24
**Nine** [1] - 151:8
**nine-year** [1] - 63:7
**nine-year-long** [1] - 183:7
**NNRTI** [1] - 162:11

**nobody** [11] - 15:2, 32:25, 95:4, 102:22, 106:13, 106:15, 110:12, 110:15, 110:17, 113:4, 259:16
**nobody's** [1] - 92:7
**non** [3] - 148:1, 148:3, 150:8
**non-nucleoside** [3] - 148:1, 148:3, 150:8
**noncompliance** [2] - 119:19, 119:22
**none** [16] - 7:4, 39:3, 65:13, 74:13, 74:14, 74:24, 77:20, 77:24, 95:10, 99:22, 99:23, 123:13, 132:11, 235:10, 235:11
**nonetheless** [2] - 53:3, 71:9
**nonintervention** [1] - 262:21
**normal** [1] - 53:5
**normally** [3] - 8:2, 9:6, 89:12
**North** [1] - 31:16
**Note** [1] - 40:18
**note** [5] - 26:21, 27:2, 43:18, 50:8, 206:7
**Note-Taking** [1] - 40:18
**note-taking** [1] - 27:2
**notebooks** [1] - 33:3
**notes** [23] - 41:2, 41:4, 41:10, 41:11, 41:13, 41:14, 226:22, 231:4, 231:6, 231:9, 231:12, 231:13, 231:19, 232:3, 232:20, 233:4, 233:10, 238:13, 238:15, 238:17, 247:15, 265:6
**nothing** [20] - 10:5, 22:8, 52:14, 62:1, 62:2, 78:2, 92:5, 112:10, 113:4, 113:13, 120:12, 130:8, 134:4, 134:5, 134:12, 136:12, 138:18, 150:15, 151:21, 252:16
**notice** [5] - 11:16, 28:9, 28:18, 50:8, 266:15
**notion** [1] - 200:24
**November** [1] - 237:18
**nucleoside** [4] - 147:25, 148:1,

148:3, 150:8
**nucleus** [1] - 148:25
**number** [32] - 24:1, 32:1, 35:16, 39:4, 39:19, 41:6, 47:1, 53:4, 55:1, 57:1, 61:5, 70:6, 94:13, 99:9, 99:11, 101:14, 108:23, 109:25, 110:9, 113:8, 119:21, 127:17, 128:16, 128:18, 137:5, 183:15, 191:7, 196:1, 198:21, 207:1, 207:19
**Number** [2] - 175:15, 175:17
**NUMBER** [1] - 1:3
**numbers** [16] - 16:7, 22:13, 23:24, 67:21, 67:23, 67:24, 73:23, 126:10, 129:7, 129:14, 136:20, 137:18, 161:12, 163:17, 180:11, 205:25
**numerous** [4] - 34:23, 47:10, 117:1, 217:7
**nurse** [7] - 152:14, 153:7, 153:9, 159:7, 210:2, 239:19, 240:3
**nurses** [2] - 153:6, 153:7
**Nutley** [1] - 144:4
**NY** [1] - 186:12

## O

**o'clock** [3] - 225:25, 227:3, 227:10
**oath** [2] - 47:13, 47:23
**object** [4] - 37:2, 216:14, 219:14, 267:25
**objected** [4] - 16:2, 125:18, 137:4, 137:16
**objecting** [4] - 6:18, 131:14, 137:11, 267:16
**objection** [44] - 4:18, 5:3, 5:7, 6:9, 14:6, 16:11, 16:15, 16:18, 17:12, 17:23, 19:24, 22:14, 23:10, 25:4, 25:7, 37:4, 37:9, 131:12, 131:18, 137:6, 137:18, 139:22, 168:22,

148:3, 150:8
**objections** [4] - 12:2, 36:9, 37:5, 37:6
**objectives** [1] - 196:20
**obligated** [1] - 10:1
**obligation** [3] - 37:6, 95:5, 117:17
**obligations** [1] - 157:5
**obstacles** [4] - 179:13, 179:15, 179:16, 180:8
**obtain** [1] - 34:12
**obtained** [2] - 46:12, 47:23
**obvious** [1] - 15:25
**obviously** [6] - 7:8, 19:10, 23:4, 54:25, 251:8, 265:19
**occur** [1] - 134:23
**occurred** [7] - 14:3, 84:24, 134:6, 134:13, 226:14, 230:1, 233:13
**occurs** [4] - 134:16, 134:18, 136:3, 136:16
**OF** [2] - 1:1, 1:3
**off-label** [101] - 12:23, 30:2, 31:9, 51:24, 52:10, 57:21, 58:17, 60:7, 60:13, 61:10, 61:21, 63:1, 64:6, 64:12, 64:20, 65:5, 65:8, 66:7, 66:22, 67:16, 68:4, 68:12, 68:22, 69:10, 70:13, 70:16, 70:22, 71:2, 71:4, 71:11, 72:10, 74:20, 76:15, 77:5, 77:7, 77:8, 78:8, 79:19, 79:20, 102:6, 102:14, 103:1, 103:4, 103:5, 103:9, 103:24, 109:2, 114:25, 117:20, 126:11, 126:12, 127:2, 133:1, 133:5, 133:13, 154:3, 154:15, 189:19, 189:23, 193:15, 194:3, 196:6, 197:3, 197:5, 197:7,

197:17, 197:25,
199:15, 199:17,
199:18, 201:4,
205:12, 205:15,
206:14, 208:3,
208:8, 216:11,
221:7, 221:14,
221:16, 221:20,
222:2, 222:11,
222:18, 222:22,
223:17, 224:8,
224:16, 224:22,
225:1, 225:4,
225:20, 228:8,
232:1, 232:3, 232:8,
234:22, 234:23,
236:13, 237:18,
238:24
**off-labeling** [1] - 52:18
**offenses** [1] - 75:3
**offer** [5] - 6:6, 67:11,
80:11, 93:4, 98:9
**offered** [3] - 30:13,
30:16, 37:7
**offers** [1] - 36:24
**office** [16] - 61:15,
101:11, 101:12,
151:12, 151:19,
151:21, 152:10,
152:18, 156:18,
157:20, 157:24,
158:1, 158:17,
166:7, 182:24,
197:18
**officer** [3] - 79:9,
108:4, 119:14
**offices** [4] - 65:5,
109:17, 110:13,
144:11
**Official** [1] - 1:23
**OFFICIAL** [1] - 269:1
**officially** [1] - 88:7
**often** [2] - 74:21,
74:22
**oftentimes** [1] -
211:10
**Oklahoma** [1] - 31:16
**older** [1] - 102:18
**on-label** [12] - 58:13,
71:1, 71:19, 102:19,
103:9, 114:25,
119:18, 133:13,
165:25, 166:4,
221:12, 222:14
**once** [24] - 3:7, 51:20,
59:10, 60:4, 64:15,
65:11, 90:25, 99:17,
132:14, 132:15,
179:3, 179:4,
196:11, 196:15,

196:21, 196:24,
198:8, 198:11,
199:2, 199:4,
219:20, 233:16,
237:17, 244:9
**once-a-day** [2] -
196:21, 196:24
**once-daily** [1] - 60:4
**one** [131] - 6:10, 9:18,
10:8, 11:3, 11:20,
12:14, 18:24, 26:7,
26:14, 28:8, 28:17,
30:16, 37:22, 38:7,
41:5, 43:18, 44:2,
45:3, 49:21, 49:24,
50:8, 53:1, 53:19,
53:21, 55:5, 55:12,
57:1, 59:14, 59:21,
61:6, 64:21, 65:18,
67:4, 68:17, 69:3,
70:14, 73:14, 75:17,
75:24, 77:17, 78:19,
81:24, 86:25, 87:2,
88:24, 89:22, 90:9,
94:5, 96:3, 96:23,
98:5, 98:11, 98:13,
99:3, 100:19,
101:17, 103:22,
106:1, 106:2,
107:16, 108:10,
108:14, 109:13,
114:19, 115:12,
116:2, 117:24,
119:8, 119:15,
119:24, 120:6,
122:10, 122:21,
123:15, 131:9,
134:16, 138:14,
144:1, 148:19,
149:20, 151:3,
151:19, 152:1,
160:11, 160:23,
161:19, 166:9,
177:4, 180:7,
183:20, 184:8,
186:8, 186:11,
187:15, 188:2,
188:8, 189:5, 191:8,
196:20, 206:23,
207:16, 207:18,
207:21, 211:7,
213:3, 214:21,
218:16, 219:21,
222:1, 224:5, 229:4,
229:25, 233:15,
234:11, 244:24,
246:1, 249:17,
253:7, 254:18,
258:15, 260:21,
261:12, 262:8,
262:11, 266:13

**One** [1] - 1:21
**one-size-fits-all** [1] -
100:19
**ones** [3] - 75:3, 184:7,
191:6
**ongoing** [3] - 157:10,
157:17, 214:22
**open** [14] - 3:1, 25:11,
32:22, 34:17, 84:16,
124:16, 132:20,
138:13, 252:10,
252:13, 261:22,
262:21, 263:21,
265:18
**Open** [2] - 170:1,
221:1
**opened** [11] - 134:25,
135:2, 151:20,
255:10, 258:23,
261:3, 261:21,
263:9, 263:16,
264:20, 265:13
**opening** [56] - 4:15,
4:19, 6:6, 14:8, 18:9,
21:15, 21:17, 21:19,
22:3, 22:21, 23:11,
25:2, 27:18, 27:19,
27:21, 29:7, 42:19,
42:21, 42:24, 42:25,
43:15, 44:15, 44:16,
83:14, 84:8, 84:9,
85:11, 92:13,
112:15, 125:10,
125:20, 132:22,
133:7, 133:24,
134:9, 135:3,
135:15, 253:17,
258:6, 258:8,
258:25, 259:1,
259:2, 259:5, 260:6,
260:25, 261:10,
261:13, 261:14,
261:19, 263:13,
265:13, 265:17
**openings** [7] - 4:18,
4:22, 5:15, 24:18,
25:12, 27:20, 262:3
**openly** [1] - 30:15
**opens** [2] - 125:14,
254:15
**operates** [1] - 117:3
**operation** [1] - 102:13
**opinion** [7] - 16:12,
35:21, 165:6, 252:9,
252:10, 254:13,
256:10
**opinions** [1] - 13:11
**opportunities** [2] -
70:5, 186:3
**opportunity** [6] - 4:20,

39:5, 43:1, 49:21,
82:2, 125:22
**opposed** [4] - 59:10,
59:22, 157:19,
196:21
**opposing** [1] - 202:10
**opposite** [4] - 41:24,
58:5, 75:18, 104:2
**optimistic** [1] - 5:22
**option** [1] - 92:5
**optional** [1] - 195:2
**options** [5] - 55:3,
59:4, 98:9, 145:22,
147:6
**oral** [1] - 246:23
**orally** [4] - 33:9, 43:20,
44:1, 265:7
**order** [13] - 7:5, 30:7,
101:4, 148:13,
159:24, 166:20,
195:25, 196:23,
210:4, 221:14,
254:10, 254:12,
263:19
**ordered** [1] - 37:15
**ordinary** [1] - 67:2
**organically** [1] -
223:18
**organization** [3] -
61:1, 63:6, 232:17
**original** [1] - 237:7
**originally** [3] - 57:19,
137:16, 143:12
**otherwise** [2] - 42:8,
86:2
**ourselves** [3] - 205:4,
232:17, 238:8
**outcome** [2] - 39:10,
249:9
**outdated** [1] - 33:1
**outline** [2] - 42:22,
226:20
**outperforming** [1] -
205:25
**outset** [2] - 27:1,
264:11
**outside** [20] - 6:20,
34:14, 35:7, 36:12,
36:15, 38:2, 64:24,
73:11, 81:17, 81:18,
118:7, 136:4,
139:25, 141:9,
143:13, 154:9,
159:21, 250:17,
267:12, 267:16
**outsmart** [1] - 90:10
**outweigh** [1] - 128:23
**outweighed** [1] -
128:13
**outweighs** [1] - 135:8

**overarching** [2] -
56:19
**overrule** [2] - 19:25,
267:24
**overruled** [2] - 37:10,
137:17
**oversees** [1] - 74:11
**overview** [1] - 48:17
**owe** [1] - 206:5
**owes** [1] - 77:3
**own** [21] - 11:9, 18:23,
18:24, 34:6, 37:25,
45:6, 55:20, 58:11,
67:4, 71:7, 75:8,
81:10, 103:7,
131:22, 133:17,
198:3, 200:25,
221:16, 242:8,
242:25, 265:6

## P

**p.m** [7] - 139:3, 139:4,
168:1, 169:15,
217:1, 220:7, 268:6
**PA** [1] - 222:1
**pace** [3] - 206:9,
207:4, 208:18
**package** [11] - 51:7,
95:22, 154:7,
159:21, 160:20,
166:21, 166:23,
173:1, 195:15,
201:10, 221:13
**packet** [1] - 51:8
**pads** [1] - 212:16
**page** [11] - 18:19,
107:16, 126:5,
136:23, 138:2,
185:20, 188:17,
190:9, 190:15,
190:23, 267:22
**PAGE** [1] - 2:3
**Page** [1] - 2:9
**paid** [38] - 30:13,
30:17, 45:12, 45:18,
61:21, 69:15, 70:5,
72:10, 72:19, 72:23,
73:25, 78:12, 80:5,
80:24, 81:3, 81:17,
82:14, 86:22, 95:16,
95:18, 96:8, 97:1,
97:23, 103:20,
111:8, 115:14,
122:19, 124:4,
193:6, 208:22,
209:4, 210:4, 210:7,
211:21, 215:15,
222:22, 228:22,
230:9

**pain** [3] - 102:13, 102:16, 145:1
**painfully** [1] - 214:24
**pancreatitis** [1] - 151:3
**pandemic** [1] - 236:8
**panel** [1] - 93:15
**paper** [12] - 65:17, 75:11, 80:8, 94:23, 107:6, 154:10, 168:6, 168:24, 200:9, 232:2, 247:9, 265:5
**par** [2] - 182:22, 238:8
**paradigm** [6] - 164:1, 164:3, 182:20, 189:17, 195:25, 239:11
**parenthetical** [1] - 192:5
**parity** [1] - 171:7
**part** [22] - 6:24, 21:6, 29:16, 39:3, 68:25, 77:9, 88:10, 89:25, 95:10, 100:25, 111:16, 122:8, 148:25, 152:21, 181:13, 183:24, 188:13, 235:15, 240:1, 254:9, 258:19, 262:14
**participate** [2] - 72:22, 192:21
**participated** [1] - 192:23
**particular** [16] - 9:2, 10:22, 11:2, 27:10, 37:3, 50:21, 72:6, 76:14, 101:18, 127:12, 144:14, 144:15, 180:18, 191:7, 251:8, 254:21
**particularly** [11] - 91:19, 92:8, 94:7, 103:6, 149:11, 149:22, 159:25, 180:12, 216:8, 234:14, 234:15
**parties** [7] - 19:17, 23:1, 36:5, 36:8, 41:16, 108:15, 138:14
**parties'** [1] - 43:8
**partner** [1] - 212:24
**party** [7] - 33:18, 41:17, 42:23, 43:1, 138:14, 258:3
**pass** [2] - 33:19, 249:23
**passed** [1] - 219:21

**passing** [2] - 67:19, 89:9
**passion** [1] - 78:22
**passionate** [2] - 115:16, 239:20
**past** [4] - 6:15, 82:1, 135:20, 205:11
**pasted** [1] - 112:20
**patience** [1] - 44:10
**patient** [48] - 28:24, 29:5, 35:9, 45:16, 51:12, 51:22, 51:23, 54:10, 54:22, 58:6, 58:22, 58:25, 59:2, 59:14, 66:23, 76:2, 96:21, 99:5, 99:7, 99:10, 101:10, 101:12, 101:16, 101:20, 102:8, 103:10, 103:12, 104:5, 104:20, 105:4, 122:23, 133:14, 149:23, 161:3, 161:4, 162:19, 163:25, 179:23, 179:24, 180:4, 180:12, 181:23, 182:23, 186:19, 198:21, 206:25, 223:5
**patient's** [1] - 54:14
**patients** [95] - 45:6, 49:25, 53:5, 53:8, 53:25, 54:8, 54:9, 55:2, 55:4, 55:6, 55:7, 55:11, 55:12, 55:14, 55:18, 56:2, 56:8, 56:23, 56:24, 57:3, 57:4, 58:1, 58:15, 58:19, 59:7, 59:9, 59:20, 60:10, 65:22, 74:18, 78:9, 86:23, 87:3, 87:8, 89:21, 92:6, 92:24, 93:4, 93:21, 95:25, 104:3, 104:13, 111:25, 120:14, 121:1, 123:14, 123:21, 123:22, 144:14, 149:22, 160:23, 161:1, 161:18, 161:21, 161:23, 161:25, 162:1, 162:22, 164:4, 164:5, 164:10, 165:1, 171:14, 178:16, 180:6, 180:16, 181:17, 181:21, 182:3, 184:5, 194:9,

195:24, 196:1, 198:16, 198:19, 199:1, 199:24, 203:19, 206:5, 207:14, 215:11, 237:18, 238:6, 239:21, 239:25, 240:1, 240:2, 240:4
**patients'** [6] - 56:11, 56:15, 58:3, 59:25, 65:12, 88:5
**Paul** [1] - 1:17
**pause** [2] - 249:19, 264:25
**pay** [33] - 27:12, 41:1, 41:4, 46:11, 52:2, 76:4, 77:12, 77:13, 96:10, 97:6, 97:12, 98:20, 98:24, 99:3, 99:9, 99:16, 99:20, 100:17, 100:19, 105:24, 106:16, 111:12, 112:8, 112:13, 123:22, 159:14, 210:8, 212:4, 215:22, 230:6, 261:1, 262:14
**paying** [8] - 47:17, 79:24, 95:14, 98:7, 105:20, 112:17, 112:22, 123:19
**payment** [5] - 30:19, 31:10, 57:23, 228:17, 262:10
**payments** [7] - 45:21, 69:11, 69:12, 69:16, 69:22, 70:1, 77:12
**payroll** [1] - 80:24
**pays** [3] - 69:3, 96:4, 103:12
**peak** [1] - 171:25
**peer** [1] - 166:24
**peer-reviewed** [1] - 166:24
**peers** [2] - 210:1, 224:25
**pen** [1] - 265:5
**pending** [2] - 255:6, 256:20
**Penelow** [29] - 31:19, 46:20, 46:21, 47:8, 48:14, 61:12, 83:3, 85:24, 86:4, 92:10, 92:13, 107:7, 107:11, 108:22, 116:10, 116:12, 142:18, 154:25, 203:22, 203:24, 241:20, 242:3, 242:15, 243:1,

243:4, 244:1, 244:8, 248:17, 253:13
**Penelow's** [1] - 242:12
**Penn** [1] - 143:19
**Pennsylvania** [1] - 258:16
**pens** [1] - 212:16
**people** [67] - 14:23, 15:12, 18:24, 35:4, 36:19, 60:17, 61:9, 62:4, 62:11, 62:21, 63:3, 65:1, 65:14, 66:24, 66:25, 67:11, 67:23, 68:13, 68:23, 72:15, 85:22, 87:22, 88:8, 89:8, 92:1, 93:7, 100:9, 102:18, 108:13, 109:3, 119:10, 119:21, 123:13, 124:11, 132:13, 133:17, 141:8, 146:19, 151:15, 151:21, 152:14, 152:18, 157:25, 163:3, 168:24, 169:8, 180:22, 203:11, 203:12, 208:15, 209:9, 211:24, 212:3, 221:19, 234:3, 236:3, 236:9, 236:10, 239:1, 239:2, 239:20, 241:17, 247:7
**people's** [4] - 96:4, 106:24, 110:3, 147:7
**per** [6] - 73:12, 116:2, 198:21, 206:1, 206:2, 207:18
**percent** [5] - 58:12, 68:18, 86:20, 95:6, 260:18
**percentage** [2] - 175:24, 176:1
**perfectly** [2] - 49:16, 71:1
**perform** [2] - 200:21, 200:22
**performance** [13] - 67:20, 68:15, 68:19, 174:25, 209:3, 235:16, 235:21, 235:23, 236:3, 236:10, 236:12, 236:17, 239:1
**perhaps** [4] - 12:4, 150:6, 184:3, 233:18
**period** [30] - 52:19, 55:8, 55:15, 56:23, 71:24, 71:25, 74:14,

79:10, 81:5, 81:13, 81:14, 88:22, 90:13, 92:18, 104:10, 104:11, 114:5, 114:13, 114:16, 116:3, 116:25, 118:13, 121:4, 121:21, 127:3, 130:22, 204:5, 212:10, 236:24, 242:13
**periods** [1] - 176:18
**permission** [3] - 15:6, 170:13, 258:18
**permits** [1] - 136:22
**permitted** [3] - 37:1, 39:25, 43:9
**person** [10] - 63:19, 142:25, 173:23, 200:16, 203:17, 203:18, 223:6, 234:11, 244:8, 267:14
**person's** [1] - 15:1
**personal** [4] - 35:4, 119:8, 120:17, 218:5
**personally** [8] - 62:8, 62:9, 165:14, 181:9, 211:6, 213:24, 219:3, 222:3
**personnel** [1] - 188:9
**persons** [1] - 41:6
**perspective** [1] - 8:19
**pervasive** [1] - 71:10
**Pete** [1] - 3:12
**PETE** [1] - 1:14
**pharma** [2] - 153:25
**pharmaceutical** [30] - 16:3, 45:4, 50:19, 50:23, 51:17, 52:6, 52:8, 55:9, 55:15, 67:22, 69:3, 71:16, 73:17, 75:20, 76:11, 78:1, 143:13, 143:20, 143:24, 144:4, 144:9, 146:9, 147:11, 153:12, 153:16, 154:2, 154:21, 201:21, 209:13, 238:20
**pharmacy** [3] - 94:25, 96:22
**Philadelphia** [2] - 143:13, 146:11
**Phoenician** [1] - 212:19
**phone** [4] - 33:10, 63:19, 230:25
**phones** [3] - 32:24, 33:2

**phrase** [2] - 165:12, 171:3

**physician** [12] - 54:21, 101:19, 105:6, 109:15, 152:17, 192:5, 195:18, 195:19, 201:15, 210:1, 210:3, 210:8

**physician's** [1] - 153:8

**physicians** [28] - 51:14, 80:11, 81:25, 112:4, 146:13, 152:11, 179:13, 180:5, 182:2, 182:5, 184:1, 184:4, 187:17, 191:8, 191:10, 199:2, 199:15, 199:22, 201:9, 210:2, 212:12, 213:17, 213:19, 221:10, 221:19, 224:25, 228:6, 228:17

**physicians'** [1] - 181:24

**pick** [3] - 206:9, 207:4, 208:17

**picture** [1] - 49:7

**piece** [7] - 69:20, 94:23, 97:24, 109:15, 110:6, 154:9

**pieces** [1] - 109:21

**pigeonhole** [1] - 195:23

**pigeonholed** [1] - 180:3

**pill** [6] - 59:21, 59:22, 146:24, 147:3, 198:18, 198:20

**pills** [2] - 59:8, 59:20

**pinpoint** [1] - 234:11

**PIP** [3] - 235:18, 235:20

**pitch** [1] - 105:20

**place** [16] - 25:24, 53:8, 79:17, 79:21, 98:18, 99:7, 118:25, 120:9, 122:16, 133:19, 140:13, 187:18, 226:1, 226:6, 262:9, 267:24

**placebo** [1] - 50:25

**places** [2] - 86:11, 228:12

**plaintiff** [1] - 255:15

**Plaintiff's** [4] - 2:14, 2:16, 185:4, 202:21

**Plaintiffs** [1] - 1:4

**Plaintiffs'** [4] - 2:10, 2:12, 170:12, 174:20

**Plan** [5] - 96:13, 96:23, 97:3, 98:3, 100:16

**plan** [18] - 8:4, 9:14, 25:9, 25:22, 28:6, 28:13, 68:8, 68:19, 80:17, 93:4, 98:18, 184:19, 193:20, 233:13, 234:6, 235:21, 235:24, 236:13

**plane** [1] - 229:23

**plans** [12] - 28:19, 68:15, 96:3, 97:20, 98:8, 235:16, 236:4, 236:10, 236:17, 239:1

**plant** [2] - 221:24, 222:10

**plants** [7] - 71:3, 71:11, 221:23, 222:3, 222:21, 223:6

**plate** [1] - 117:25

**play** [6] - 22:10, 29:16, 64:19, 84:23, 91:4, 120:3

**players** [1] - 70:17

**plays** [1] - 25:15

**pleasant** [2] - 181:4, 234:14

**pledge** [1] - 107:10

**pledged** [1] - 107:12

**pledges** [1] - 107:25

**plus** [3] - 27:5, 165:4, 188:15

**POA** [2] - 233:8, 233:12

**pocket** [1] - 123:23

**podium** [2] - 14:20, 15:12

**point** [44] - 7:2, 13:12, 16:21, 32:4, 44:21, 52:24, 54:16, 54:20, 54:25, 55:1, 55:19, 59:3, 62:6, 62:7, 68:2, 68:17, 75:24, 76:6, 83:14, 136:3, 149:7, 162:22, 166:3, 172:15, 174:16, 180:14, 186:20, 187:9, 193:23, 210:22, 212:9, 239:24, 240:15, 242:2, 242:5, 243:4, 243:15, 253:8, 253:10, 253:18, 253:22, 259:11, 262:11, 267:1

**points** [2] - 16:7,

100:16

**policies** [19] - 67:4, 71:7, 75:8, 75:12, 106:25, 107:2, 107:5, 107:6, 107:8, 107:25, 113:5, 116:23, 132:24, 216:2, 233:22, 233:23, 234:1, 234:7, 236:15

**policy** [9] - 63:10, 68:24, 97:7, 100:9, 111:10, 118:23, 119:1, 119:9, 132:12

**politician** [1] - 49:9

**pop** [2] - 5:9, 7:23

**popping** [1] - 137:23

**popular** [1] - 149:20

**population** [21] - 53:24, 55:10, 55:14, 55:23, 57:14, 58:11, 58:13, 66:16, 90:22, 90:23, 91:20, 100:1, 103:21, 103:25, 162:1, 162:19, 180:13, 186:19, 238:4, 238:5

**populations** [1] - 97:19

**portable** [3] - 33:3, 33:4, 33:10

**portion** [5] - 48:6, 54:8, 79:9, 86:7, 96:25

**position** [7] - 131:23, 164:21, 241:4, 252:1, 258:11, 259:9, 265:19

**positioning** [1] - 172:12

**positions** [3] - 43:14, 155:23, 238:19

**positive** [1] - 239:20

**possible** [1] - 47:16

**posted** [2] - 7:6, 9:17

**posters** [1] - 200:2

**postings** [1] - 33:12

**potential** [12] - 51:13, 59:2, 159:24, 184:3, 184:4, 184:7, 186:18, 190:4, 190:7, 192:21, 248:11

**potentially** [1] - 78:11

**power** [4] - 60:12, 95:1, 121:25

**powerful** [2] - 45:4, 48:3

**powers** [1] - 95:7

**practical** [2] - 59:19,

76:12

**practice** [9] - 51:19, 64:19, 64:25, 115:7, 200:19, 229:22, 231:21, 234:3, 236:1

**practiced** [1] - 217:18

**practices** [7] - 43:22, 71:10, 159:20, 204:22, 205:1, 239:6, 247:6

**practitioners** [4] - 153:7, 153:9, 159:7, 210:2

**precluded** [2] - 251:24, 254:11

**precluding** [1] - 252:18

**prefer** [1] - 120:14

**preference** [4] - 59:12, 59:13, 120:15, 246:23

**preferences** [2] - 60:1, 60:2

**preferred** [2] - 94:6, 98:6

**prejudice** [2] - 39:11, 128:13

**prejudicial** [6] - 12:6, 16:6, 128:22, 131:21, 135:8, 135:21

**preliminary** [11] - 4:14, 5:14, 25:1, 25:11, 26:24, 27:1, 27:13, 27:17, 29:6, 29:11, 44:9

**preparation** [1] - 221:9

**prepared** [1] - 115:10

**preponderance** [5] - 30:11, 31:1, 41:19, 42:4, 42:7

**Preponderance** [1] - 41:15

**prescribe** [40] - 45:10, 46:1, 50:6, 51:23, 55:17, 57:22, 61:22, 69:12, 70:4, 70:8, 70:12, 72:9, 73:1, 73:18, 77:10, 77:13, 77:14, 86:2, 101:22, 102:14, 102:17, 104:15, 111:8, 111:12, 112:18, 112:22, 113:3, 114:1, 114:16, 114:19, 114:20, 120:4, 120:19, 151:13, 153:7, 179:22, 183:18,

183:22, 213:5, 223:4

**prescribed** [20] - 55:22, 58:21, 58:23, 59:20, 74:1, 77:8, 86:23, 87:11, 95:24, 99:17, 101:3, 103:11, 103:14, 112:14, 123:17, 144:14, 146:6, 187:13, 196:2, 214:4

**prescriber** [2] - 152:2, 175:18

**prescribers** [23] - 69:24, 70:2, 153:4, 176:6, 189:7, 189:9, 190:1, 190:12, 190:16, 190:25, 191:2, 191:13, 191:15, 191:20, 192:10, 192:14, 193:1, 201:1, 201:5, 209:18, 210:10, 210:11, 214:10

**prescribers'** [1] - 60:1

**prescribes** [6] - 120:12, 120:13, 120:17, 122:13, 122:23, 123:1

**prescribing** [32] - 45:19, 45:25, 50:6, 51:14, 54:21, 59:11, 59:12, 60:13, 69:19, 69:21, 69:25, 70:2, 73:1, 81:15, 81:20, 82:2, 101:18, 102:6, 103:5, 103:16, 112:21, 112:23, 120:5, 147:4, 163:25, 184:2, 200:25, 214:2, 214:11, 215:11, 215:23, 247:8

**prescription** [21] - 51:7, 96:20, 96:21, 96:23, 122:15, 123:5, 123:8, 154:10, 159:15, 175:25, 176:1, 176:2, 176:5, 176:6, 176:13, 176:14, 176:21, 186:17, 213:19, 213:24, 214:4

**prescriptions** [31] - 30:17, 30:20, 69:22, 70:1, 70:7, 80:12, 98:19, 99:18, 103:1, 103:20, 104:22, 105:2, 105:3, 113:7, 114:7, 114:15,

114:22, 176:1,
176:18, 178:4,
181:25, 190:7,
190:11, 190:13,
193:2, 210:14,
210:16, 213:10,
213:22, 215:9
**present** [14] - 8:7,
43:1, 43:4, 43:5,
43:6, 43:9, 43:12,
70:24, 127:11,
134:14, 135:23,
221:12, 254:14,
257:24
**presentation** [10] -
4:15, 32:23, 63:11,
80:13, 107:21,
134:8, 136:16,
170:18, 221:7
**presentations** [2] -
111:19, 111:21
**presented** [10] - 5:3,
34:9, 35:14, 38:18,
43:9, 43:11, 134:6,
174:1, 223:17,
224:22
**presenting** [2] -
195:19, 211:21
**president** [9] - 53:16,
61:2, 61:24, 68:18,
79:8, 157:14, 158:3,
158:4, 234:16
**press** [1] - 125:9
**pressing** [1] - 11:21
**pressure** [3] - 62:16,
62:18, 238:23
**prestigious** [1] - 74:10
**presume** [6] - 19:16,
22:23, 23:21, 38:12,
38:14, 123:22
**pretrial** [1] - 7:4
**pretty** [11] - 67:3,
75:11, 84:14, 90:17,
154:19, 156:6,
163:8, 183:23,
212:25, 239:13,
261:23
**prevent** [4] - 102:17,
148:14, 149:3,
252:21
**prevented** [1] - 91:20
**preventing** [1] - 149:3
**prevents** [3] - 54:13,
119:1, 149:1
**previous** [2] - 156:3,
211:2
**previously** [2] -
132:19, 161:6
**Prezista** [102] - 30:3,
30:17, 53:13, 53:15,

53:22, 54:5, 54:6,
55:22, 55:25, 56:9,
56:12, 57:21, 57:25,
58:2, 58:14, 65:11,
65:19, 69:25, 88:20,
91:3, 91:16, 91:24,
92:22, 93:25, 94:5,
96:21, 98:5, 101:22,
101:23, 104:6,
104:8, 105:8, 110:3,
110:13, 111:3,
122:11, 123:1,
155:15, 158:7,
158:12, 159:22,
160:5, 160:11,
160:16, 160:20,
161:8, 162:15,
162:24, 164:1,
164:7, 164:9,
164:12, 164:16,
164:21, 165:4,
165:12, 165:16,
165:22, 166:1,
166:4, 171:3, 171:8,
171:11, 171:22,
172:19, 174:9,
177:6, 178:13,
179:9, 179:14,
181:9, 182:2,
183:10, 183:18,
184:9, 186:6,
187:21, 193:2,
194:9, 195:23,
196:2, 197:11,
197:23, 198:2,
199:20, 205:6,
205:12, 206:5,
210:14, 210:22,
213:5, 214:11,
215:10, 215:11,
236:20, 236:24,
236:25, 237:5,
237:14, 237:17,
237:18
**Prezista's** [3] - 57:6,
172:9, 172:21
**primary** [1] - 49:22
**principal** [1] - 57:8
**principles** [1] - 29:22
**print** [1] - 168:23
**private** [4] - 121:9,
211:17, 212:1,
259:10
**probative** [6] - 128:8,
128:12, 128:24,
133:7, 135:7, 135:9
**problem** [13] - 4:21,
18:11, 53:21, 56:21,
56:23, 90:15, 90:20,
118:20, 134:21,

140:4, 140:22,
205:14, 250:25
**problems** [1] - 116:24
**procedural** [3] -
255:23, 256:11,
257:16
**procedurally** [2] -
260:11, 265:12
**proceed** [7] - 42:18,
44:22, 85:14, 170:2,
249:3, 250:24,
256:21
**proceeding** [2] - 9:21,
10:1
**PROCEEDINGS** [1] -
3:1
**Proceedings** [2] -
1:25, 42:17
**proceedings** [1] -
269:5
**process** [15] - 32:17,
34:24, 35:1, 89:2,
89:11, 96:20,
113:16, 113:21,
201:11, 205:11,
214:5, 221:9,
223:19, 255:18,
263:15
**produced** [2] - 1:25,
42:10
**product** [18] - 15:22,
15:23, 52:13, 55:9,
94:23, 95:6, 95:21,
111:23, 132:3,
144:12, 146:18,
154:9, 155:17,
166:22, 179:19,
187:18, 210:5, 223:4
**PRODUCTS** [1] - 1:7
**products** [8] - 12:5,
51:17, 113:2,
144:16, 155:12,
155:13, 157:16,
199:2
**prof** [1] - 75:19
**Professor** [6] - 73:21,
74:3, 76:23, 77:15,
82:5, 82:7
**professor** [6] - 74:10,
75:19, 76:9, 76:24,
76:25, 82:4
**profile** [6] - 110:8,
110:22, 152:8,
172:17, 178:2,
187:12
**profit** [4] - 16:4, 54:1,
56:2, 249:12
**profitable** [1] - 55:8
**profits** [5] - 45:5,
47:15, 60:8, 62:20,

76:3
**program** [35] - 30:21,
70:8, 75:10, 79:14,
79:15, 79:16, 87:13,
96:4, 96:5, 96:11,
96:17, 107:4,
107:17, 108:5,
108:7, 109:13,
113:3, 115:5,
115:25, 117:7,
120:10, 122:12,
122:18, 193:9,
209:15, 209:24,
209:25, 213:18,
214:16, 221:25,
222:2, 224:1,
227:25, 229:20,
229:25
**programs** [42] - 13:2,
69:1, 69:5, 69:9,
70:21, 71:12, 71:14,
71:17, 71:21, 72:4,
72:13, 72:20, 73:5,
73:8, 73:14, 75:6,
75:7, 79:25, 80:10,
81:7, 81:19, 106:12,
107:21, 107:25,
111:16, 111:17,
111:18, 111:24,
112:2, 112:3, 116:1,
116:2, 117:6,
159:23, 213:20,
215:19, 216:7,
223:17, 229:11,
230:8
**prohibit** [4] - 107:1,
118:24, 134:19,
136:4
**prohibited** [1] - 52:9
**prohibits** [1] - 118:23
**project** [1] - 40:5
**projected** [2] - 53:17,
57:11
**projecting** [1] - 205:5
**projections** [5] -
57:16, 162:15,
163:21, 171:20,
171:22
**projector** [1] - 83:17
**promise** [4] - 27:4,
27:15, 34:25, 254:6
**promised** [3] - 115:19,
163:18, 163:19
**promote** [21] - 46:3,
52:7, 52:13, 58:18,
64:7, 70:15, 95:5,
102:24, 103:23,
106:23, 107:4,
109:2, 112:5, 145:4,
154:8, 166:6, 172:9,

198:7, 234:22,
234:23, 238:23
**promoted** [4] - 50:22,
52:17, 58:24, 61:6
**promoting** [7] - 52:9,
93:11, 95:2, 95:11,
112:9, 159:21, 196:5
**promotion** [9] - 74:16,
106:22, 156:12,
156:14, 181:14,
193:15, 196:6,
197:5, 197:17
**promotional** [6] -
65:14, 67:6, 67:8,
70:13, 110:6, 112:6
**promotions** [1] -
133:3
**prompt** [2] - 67:10,
197:2
**prompted** [1] - 221:19
**prompting** [2] - 230:3,
230:4
**promptly** [1] - 32:21
**proof** [5] - 38:7, 42:12,
42:13, 43:4, 124:13
**propensity** [1] - 19:13
**properly** [2] - 101:4,
101:8
**proportional** [1] -
71:18
**proposal** [1] - 19:17
**proposing** [1] - 17:10
**proposition** [1] -
172:10
**prosecuted** [3] -
48:12, 258:9, 258:12
**prosecuting** [3] -
259:8, 259:11,
259:13
**prosecutor** [1] - 75:2
**prospective** [1] - 35:2
**protease** [19] - 148:2,
148:22, 148:23,
148:24, 150:5,
150:7, 160:7,
160:24, 161:5,
161:6, 161:19,
161:20, 162:10,
162:12, 164:16,
175:24, 180:7,
184:5, 190:8
**protect** [1] - 35:2
**protected** [4] - 97:14,
97:16, 97:25, 100:2
**protecting** [1] -
232:16
**prove** [5] - 30:9,
30:11, 31:1, 39:18,
41:20
**proved** [3] - 38:4,

42:4, 42:6
**proven** [4] - 78:11, 110:8, 110:18, 110:22
**provide** [5] - 31:23, 32:3, 93:1, 102:15, 197:5
**provided** [1] - 182:6
**provider** [7] - 159:14, 190:14, 197:2, 201:16, 208:2, 208:4, 208:9
**providers** [9] - 159:14, 159:21, 186:8, 197:1, 214:9, 214:21, 222:1, 228:14, 230:15
**providing** [2] - 127:23, 212:11
**proving** [7] - 41:18, 86:13, 86:18, 86:21, 123:25, 124:5, 124:17
**Proviron** [1] - 144:20
**proximity** [1] - 15:13
**public** [2] - 50:20, 90:25
**publications** [2] - 199:23, 200:2
**publish** [7] - 23:22, 167:14, 170:11, 170:13, 174:23, 185:5, 202:22
**published** [3] - 103:17, 104:12, 167:2
**publishing** [1] - 129:1
**Puerto** [1] - 81:24
**pull** [11] - 22:3, 22:13, 51:7, 125:17, 167:10, 168:8, 168:11, 168:14, 169:3, 173:18, 202:9
**pulled** [2] - 22:20, 225:19
**pulling** [1] - 20:18
**punch** [1] - 257:6
**purely** [1] - 16:5
**purple** [1] - 91:15
**purpose** [14] - 16:1, 18:8, 30:16, 37:12, 49:21, 49:22, 49:23, 49:24, 75:14, 77:23, 81:8, 135:22, 254:18, 254:24
**purposes** [10] - 48:15, 64:10, 65:15, 66:14, 119:24, 184:8, 213:3, 226:20, 258:10

**push** [3] - 85:6, 194:22, 226:21
**pushback** [2] - 183:8, 183:14
**pushed** [5] - 68:21, 68:22, 83:19, 84:7, 261:4
**pushing** [2] - 61:10, 117:20
**put** [70] - 5:13, 7:21, 11:24, 13:22, 17:14, 18:16, 26:19, 32:16, 40:14, 41:22, 42:15, 45:5, 47:15, 48:19, 57:12, 63:4, 63:10, 64:2, 66:13, 68:14, 68:18, 70:20, 71:3, 72:15, 79:3, 79:6, 81:7, 89:22, 93:14, 93:16, 93:19, 97:13, 97:15, 98:18, 99:7, 99:15, 100:2, 108:19, 114:7, 116:14, 124:12, 124:15, 126:10, 127:18, 129:18, 130:3, 131:2, 131:19, 132:5, 133:24, 140:14, 157:7, 163:4, 164:25, 182:22, 223:6, 231:13, 231:19, 235:23, 236:3, 236:12, 238:8, 246:15, 252:3, 252:19, 253:23, 258:11, 265:5, 265:6
**puts** [6] - 57:2, 57:7, 75:17, 98:11, 108:16, 109:21
**putting** [14] - 60:8, 63:20, 76:1, 78:9, 116:16, 124:17, 135:9, 207:16, 222:21, 232:3, 232:17, 233:9, 246:24, 262:17

## Q

**QD** [4] - 178:25, 179:2, 179:4, 196:11
**qualify** [1] - 166:19
**quality** [1] - 39:7
**quantity** [2] - 99:15, 99:18
**quarter** [6] - 71:22, 124:24, 125:1, 176:3, 209:3, 233:14

**questioning** [3] - 15:13, 216:15, 267:8
**Questions** [1] - 39:23
**questions** [24] - 36:7, 37:5, 39:24, 39:25, 71:4, 108:2, 108:12, 108:21, 109:3, 109:12, 114:25, 115:13, 193:24, 194:1, 196:23, 205:12, 221:15, 222:9, 239:13, 243:10, 249:22, 253:19, 266:23
**qui** [2] - 259:7, 263:18
**quick** [3] - 83:15, 85:6, 225:23
**quickly** [5] - 59:3, 90:17, 90:21, 90:22, 226:21
**quite** [2] - 103:13, 104:1
**quote** [3] - 72:22, 133:12, 258:9
**quote-unquote** [1] - 72:22
**quote/unquote** [1] - 254:15
**QURAISHI** [2] - 1:11, 3:2

## R

**race** [2] - 114:11, 151:16
**Race** [1] - 115:22
**radio** [1] - 34:3
**raincoat** [1] - 38:9
**raining** [4] - 38:2, 38:3, 38:11, 38:16
**rainy** [1] - 130:22
**raise** [8] - 40:2, 40:9, 57:5, 86:4, 86:9, 117:12, 134:22, 264:10
**raised** [6] - 16:3, 108:24, 108:25, 258:5, 258:6, 262:9
**raises** [1] - 57:3
**raising** [7] - 17:13, 134:20, 136:13, 251:24, 260:4, 260:19, 264:8
**ramifications** [1] - 225:19
**ran** [2] - 112:3, 182:13
**random** [1] - 20:19
**rare** [3] - 67:3, 88:3, 202:6
**rarely** [1] - 62:25

**rate** [1] - 90:2
**rather** [4] - 8:6, 8:15, 59:9, 198:8
**RDR** [1] - 269:11
**re** [1] - 125:24
**re-address** [1] - 125:24
**reach** [5] - 7:23, 34:16, 36:22, 41:9, 141:4
**reached** [2] - 132:9, 243:5
**reaching** [1] - 37:22
**reaction** [1] - 172:22
**reactions** [1] - 237:5
**read** [8] - 34:1, 34:4, 118:3, 133:9, 171:6, 172:15, 204:19, 252:9
**ready** [14] - 5:11, 7:12, 23:14, 26:18, 44:13, 44:18, 85:1, 85:2, 85:11, 85:14, 89:16, 116:17, 139:9, 227:21
**real** [4] - 49:10, 85:20, 218:25, 266:24
**realistic** [4] - 162:21, 163:21, 172:2, 195:22
**reality** [1] - 123:23
**really** [48] - 10:12, 10:13, 14:25, 17:21, 53:15, 59:7, 67:1, 67:18, 70:11, 82:22, 85:6, 102:12, 106:20, 117:10, 117:16, 118:6, 118:15, 121:16, 123:18, 127:14, 133:6, 138:5, 145:22, 147:5, 150:13, 150:16, 151:1, 152:9, 155:15, 155:16, 165:4, 177:23, 179:21, 183:12, 186:16, 187:18, 198:20, 199:1, 238:5, 239:18, 244:24, 246:20, 247:18, 247:19, 251:12, 258:11
**reason** [13] - 7:22, 14:7, 35:5, 40:16, 59:13, 80:21, 88:11, 120:5, 125:18, 215:7, 248:10, 256:23, 267:2
**reasonable** [3] -

39:14, 42:13, 74:17
**reasonably** [1] - 36:21
**reasons** [14] - 32:21, 41:3, 41:6, 41:14, 54:4, 55:10, 132:2, 132:10, 132:12, 137:18, 239:17, 258:22, 262:20
**reboot** [1] - 24:21
**rebuttal** [1] - 43:10
**receive** [2] - 48:13, 228:17
**received** [9] - 19:19, 36:2, 36:23, 37:12, 42:10, 69:22, 73:4, 80:20, 80:23
**receiving** [2] - 6:22, 7:7
**recently** [1] - 245:8
**Recess** [1] - 26:10
**recess** [8] - 7:21, 11:24, 13:22, 14:3, 84:21, 84:24, 139:3, 226:14
**recognize** [6] - 170:16, 173:22, 190:18, 191:4, 191:7, 202:12
**recognized** [1] - 114:13
**recollection** [2] - 256:7, 260:18
**recollections** [1] - 260:17
**recommend** [2] - 191:10, 210:20
**recommendation** [3] - 102:3, 113:14, 113:22
**recommendations** [4] - 93:19, 218:11, 218:15, 218:16
**recommended** [4] - 94:1, 94:3, 94:5, 214:11
**recommending** [3] - 218:19, 219:3, 219:12
**reconsidering** [1] - 131:15
**record** [6] - 3:8, 37:15, 129:19, 142:12, 267:24, 269:5
**recorded** [3] - 1:25, 30:21, 119:17
**recording** [2] - 79:12, 119:20
**recordings** [2] - 118:24, 119:15
**recover** [3] - 46:10,

48:7, 48:9
**recovery** [2] - 48:13, 80:9
**recruited** [1] - 211:2
**Red** [1] - 108:6
**red** [9] - 108:19, 108:23, 109:13, 117:7, 224:23, 232:9, 248:9, 260:3, 260:19
**redaction** [1] - 138:4
**redactions** [2] - 138:5, 138:9
**reduced** [1] - 230:7
**REESE** [1] - 1:14
**refer** [4] - 15:18, 83:18, 84:16, 180:24
**reference** [7] - 15:24, 16:16, 19:3, 19:23, 34:10, 146:23, 261:13
**referenced** [1] - 40:19
**references** [1] - 16:1
**referred** [3] - 46:24, 178:21, 235:18
**referring** [1] - 235:11
**reflect** [2] - 17:20, 240:16
**regarding** [2] - 31:23, 179:18
**regardless** [4] - 42:9, 42:10, 65:10, 151:16
**regime** [2] - 54:23, 59:17
**regimen** [1] - 179:23
**regimented** [1] - 154:7
**region** [2] - 64:17, 233:19
**regional** [3] - 60:19, 236:7, 245:4
**regions** [1] - 61:16
**regular** [1] - 96:13
**regulate** [1] - 51:16
**regulated** [5] - 49:14, 50:17, 69:6, 112:6, 215:25
**regulators** [1] - 63:25
**regulatory** [1] - 109:21
**rehearse** [1] - 64:19
**reimburse** [5] - 93:24, 98:15, 99:5, 104:18, 105:14
**reimbursed** [8] - 86:16, 96:18, 103:2, 105:3, 105:8, 106:13, 123:21, 129:12
**reimbursement** [7] - 30:23, 95:14, 99:13, 103:4, 103:8,

185:13, 203:17
**reimbursing** [3] - 99:25, 100:8, 105:10
**reiterate** [1] - 263:18
**relate** [1] - 132:24
**related** [5] - 6:13, 34:1, 45:11, 164:12, 263:7
**relating** [3] - 30:2, 34:4, 34:7
**relationship** [2] - 183:7, 241:6
**relationships** [2] - 188:6, 188:11
**relatively** [3] - 120:7, 161:20, 245:8
**Relator** [6] - 255:12, 255:16, 255:20, 255:21, 256:12, 263:19
**Relator's** [1] - 83:24
**Relators** [68] - 1:18, 3:10, 3:12, 3:14, 3:16, 3:18, 3:21, 3:23, 3:24, 16:8, 22:12, 22:20, 24:6, 27:19, 29:25, 30:8, 30:11, 31:1, 31:11, 31:19, 41:16, 41:18, 41:20, 41:23, 41:24, 41:25, 42:19, 43:3, 43:4, 43:5, 43:7, 44:22, 46:23, 47:25, 76:21, 85:20, 85:24, 86:12, 86:17, 96:5, 103:15, 105:2, 110:23, 116:19, 116:23, 117:1, 117:5, 117:8, 118:19, 119:11, 119:25, 121:4, 122:8, 123:24, 124:2, 134:14, 141:25, 142:17, 184:16, 254:14, 254:21, 258:9, 263:16, 264:22
**Relators'** [18] - 14:7, 18:5, 18:6, 25:2, 25:4, 43:6, 44:14, 77:20, 105:17, 134:20, 167:11, 173:6, 173:22, 202:12, 250:22, 251:23, 252:12, 256:24
**relay** [1] - 265:7
**relevant** [4] - 52:19, 71:24, 74:14, 74:15, 81:5, 81:12, 81:14,

258:20, 261:11
**relief** [2] - 102:13, 102:16
**reliever** [1] - 145:1
**reliving** [1] - 240:22
**rely** [3] - 72:4, 150:20, 223:18
**remain** [9] - 14:1, 14:4, 23:25, 94:3, 114:24, 119:18, 125:3, 140:1, 251:17
**remained** [1] - 153:12
**remains** [1] - 253:12
**remember** [31] - 6:22, 6:24, 7:7, 16:13, 27:8, 33:20, 59:21, 78:20, 78:25, 97:6, 98:4, 107:17, 112:20, 146:16, 148:2, 175:21, 176:20, 178:24, 185:18, 210:25, 211:4, 214:2, 229:3, 229:17, 231:11, 231:17, 231:18, 237:7, 244:24, 246:1
**Remember** [2] - 27:8, 246:15
**remind** [3] - 9:12, 14:17, 217:19
**reminded** [2] - 198:23, 198:24
**reminder** [2] - 9:9, 15:4
**remuneration** [2] - 30:13, 30:16
**Rent** [2] - 146:16, 146:23
**rep** [21] - 104:24, 107:10, 109:5, 113:25, 120:1, 123:3, 156:1, 156:7, 156:11, 158:20, 197:9, 200:12, 200:14, 203:7, 204:1, 208:22, 209:19, 211:2, 212:10, 244:19, 245:20
**repay** [1] - 46:16
**repeat** [1] - 44:12
**repeated** [2] - 27:15, 267:20
**repeatedly** [1] - 260:24
**repeating** [1] - 265:10
**rephrase** [3] - 219:8, 219:10, 221:3
**replicates** [1] - 149:4
**replicating** [2] -

148:14, 149:4
**replication** [3] - 89:23, 90:3, 149:2
**report** [8] - 34:3, 34:5, 116:24, 117:10, 117:17, 117:21, 119:21, 247:13
**reported** [5] - 109:12, 117:2, 117:8, 117:22, 261:18
**reporter** [2] - 15:6, 40:22
**Reporter** [2] - 1:23, 269:12
**REPORTER'S** [1] - 269:1
**reporting** [2] - 119:19, 241:13
**reports** [1] - 248:9
**represent** [3] - 46:19, 58:2, 142:17
**representation** [2] - 114:6, 263:24
**representative** [7] - 92:20, 144:8, 144:10, 152:1, 174:9, 181:8, 209:1
**representatives** [5] - 146:9, 157:11, 183:21, 194:14, 196:14
**represented** [1] - 174:11
**reprimanded** [1] - 67:24
**reprint** [1] - 23:20
**reps** [25] - 87:12, 107:7, 108:11, 108:18, 109:6, 109:12, 109:17, 110:12, 113:11, 113:13, 113:18, 113:21, 120:6, 120:13, 193:13, 195:11, 195:13, 196:19, 197:17, 200:19, 201:2, 203:15, 223:11, 231:13, 232:7
**reputation** [2] - 113:9, 114:22
**request** [11] - 35:18, 35:20, 66:22, 67:7, 67:19, 139:15, 160:1, 201:14, 205:16, 208:9, 223:19
**Request** [9] - 201:6, 201:12, 201:15, 201:24, 202:4,

202:8, 206:1, 207:11, 207:19
**requested** [3] - 67:5, 208:3, 209:7
**requesting** [2] - 37:2, 138:6
**requests** [6] - 66:20, 68:8, 205:20, 205:22, 205:23, 209:6
**require** [1] - 116:23
**required** [8] - 19:18, 28:22, 33:22, 42:24, 74:25, 116:5, 117:19, 256:11
**requires** [2] - 80:5, 99:18
**research** [7] - 34:6, 34:8, 57:12, 59:18, 72:7, 76:12, 91:10
**researchers** [2] - 88:7, 166:25
**researching** [1] - 91:9
**reserve** [4] - 22:4, 22:14, 23:5, 217:24
**reside** [1] - 143:15
**resistance** [10] - 54:18, 59:15, 91:12, 91:17, 101:19, 120:18, 153:21, 187:12, 207:15
**resistant** [4] - 101:21, 101:22, 161:19, 187:14
**resolve** [3] - 5:17, 23:13, 132:9
**resolved** [1] - 23:3
**resort** [2] - 164:2, 180:5
**resorts** [3] - 45:22, 72:22, 81:23
**resource** [3] - 100:16, 206:4, 261:25
**resource-based** [1] - 261:25
**resources** [2] - 204:12, 248:6
**respect** [7] - 15:21, 15:22, 23:10, 49:25, 75:24, 152:22, 255:19
**respectful** [1] - 225:22
**respiratory** [1] - 145:2
**respond** [2] - 90:24, 92:6
**responded** [1] - 88:25
**responding** [1] - 92:4
**response** [5] - 82:7, 126:6, 201:13, 201:18, 208:1

**responsibility** [1] - 35:13
**responsible** [8] - 45:16, 60:22, 61:8, 72:13, 83:7, 157:9, 157:10, 230:16
**responsiveness** [1] - 258:20
**rest** [4] - 23:25, 171:6, 212:22, 263:1
**restaurant** [3] - 209:25, 212:1, 212:20
**restaurants** [5] - 45:23, 72:1, 72:2, 72:25, 211:10
**restroom** [1] - 226:9
**restructure** [1] - 85:10
**result** [2] - 67:12, 208:8
**results** [1] - 66:6
**retained** [2] - 46:12, 83:10
**retaliation** [1] - 248:12
**retire** [2] - 32:8, 43:16
**retired** [1] - 76:24
**return** [5] - 69:17, 69:18, 83:7, 83:8, 213:15
**reversal** [1] - 144:25
**reverse** [3] - 148:1, 148:3, 150:8
**review** [9] - 13:9, 40:25, 89:5, 170:18, 243:19, 256:3, 260:6, 260:7
**reviewed** [6] - 5:2, 76:14, 130:9, 166:24, 259:3, 260:15
**reviewing** [2] - 5:4, 5:5
**revise** [1] - 57:16
**revisit** [9] - 22:23, 134:9, 134:24, 136:2, 177:17, 178:6, 252:10, 254:13, 262:4
**revisited** [1] - 134:19
**revisiting** [2] - 134:9, 136:17
**reward** [2] - 30:17, 213:9
**Reyataz** [49] - 56:6, 56:7, 56:9, 57:9, 58:4, 65:19, 147:23, 148:1, 148:19, 148:21, 149:18, 149:20, 150:6, 160:9, 160:11,

160:13, 161:22, 164:25, 165:3, 165:17, 165:23, 166:4, 166:7, 171:7, 171:8, 171:12, 171:13, 171:15, 172:18, 172:19, 172:24, 173:1, 173:2, 177:8, 181:10, 181:12, 181:16, 181:17, 181:20, 182:23, 189:4, 189:21, 191:2, 199:20, 237:15, 237:19, 238:5, 238:8
**Rhode** [1] - 31:16
**Rico** [1] - 81:24
**rid** [1] - 248:10
**ride** [1] - 33:19
**rigor** [1] - 74:24
**rigorous** [1] - 50:24
**ripe** [1] - 23:6
**ripped** [1] - 76:7
**rise** [14] - 3:4, 26:11, 84:3, 84:25, 85:4, 125:4, 139:2, 139:5, 141:18, 226:13, 226:15, 227:19, 251:19, 268:5
**risk** [4] - 55:2, 57:3, 215:22, 215:24
**risks** [3] - 58:18, 58:25, 73:9
**risky** [2] - 69:6, 69:9
**ritonavir** [8] - 164:17, 165:2, 165:4, 165:23, 165:24, 171:12, 171:13
**road** [4] - 22:2, 62:23, 69:8, 167:5
**robust** [2] - 107:20, 113:16
**Rocephin** [2] - 144:19, 144:24
**Roche** [11] - 143:25, 144:2, 144:3, 144:7, 144:15, 145:5, 147:10, 150:10, 150:14, 150:23, 241:10
**Rodney** [1] - 1:21
**ROI** [1] - 213:12
**ROIs** [1] - 69:17
**Role** [1] - 29:9
**role** [3] - 29:19, 64:19, 118:1
**roles** [1] - 143:11
**Romazicon** [2] - 144:20, 144:25

**rookie** [1] - 62:15
**room** [15] - 32:8, 32:12, 32:16, 32:17, 35:4, 38:14, 43:16, 108:12, 108:16, 108:18, 133:9, 140:16, 196:19, 211:17, 212:1
**Rosa** [1] - 158:6
**Rosenberg** [1] - 89:15
**roughly** [4] - 150:11, 150:17, 151:6, 152:23
**roundtable** [4] - 211:13, 211:15, 211:16, 211:19
**roundtables** [2] - 211:23, 213:20
**row** [1] - 14:23
**rude** [1] - 33:22
**rule** [4] - 37:3, 129:15, 129:17, 139:14
**ruled** [8] - 13:16, 13:17, 19:7, 22:16, 22:18, 22:19, 129:21, 137:23
**rules** [10] - 36:23, 37:1, 37:8, 48:18, 50:1, 52:11, 52:15, 62:22, 70:18
**ruling** [13] - 16:22, 17:1, 18:10, 21:11, 37:9, 131:14, 132:19, 134:5, 135:6, 136:21, 137:16, 218:24
**rumors** [1] - 36:14
**run** [8] - 55:3, 97:20, 101:14, 107:3, 108:13, 134:17, 159:10, 179:13
**running** [1] - 120:18
**rush** [1] - 121:24
**rushing** [1] - 226:23
**Russ** [11] - 3:13, 142:1, 142:17, 170:2, 218:10, 221:2, 227:21, 249:25, 252:5, 252:23, 259:1
**RUSS** [81] - 1:15, 2:5, 3:13, 14:6, 14:12, 14:14, 141:21, 142:14, 167:10, 167:14, 168:4, 168:10, 168:19, 168:21, 170:3, 170:13, 170:15, 170:23, 171:1, 171:16, 171:18,

172:4, 172:5, 173:5, 173:15, 173:16, 173:18, 173:21, 174:16, 174:21, 174:24, 175:14, 175:16, 184:14, 184:15, 184:24, 185:5, 185:7, 185:20, 185:21, 188:17, 188:19, 190:9, 190:10, 190:23, 190:24, 191:17, 191:19, 191:24, 192:1, 192:12, 192:13, 202:9, 202:11, 202:16, 202:22, 202:24, 204:13, 204:15, 218:12, 218:15, 218:20, 219:6, 221:5, 225:22, 226:3, 226:7, 226:19, 227:2, 227:15, 227:23, 227:24, 249:17, 249:20, 249:23, 256:15, 256:18, 256:25, 257:2, 259:20, 261:12
**RX** [13] - 2:14, 2:16, 170:4, 173:6, 173:19, 173:22, 174:17, 184:14, 184:24, 185:4, 202:10, 202:17, 202:21

## S

**safe** [12] - 45:17, 46:4, 50:20, 51:3, 52:20, 53:23, 54:6, 57:25, 58:14, 60:3, 66:18, 235:7
**safety** [9] - 45:16, 58:6, 58:18, 60:10, 92:1, 113:22, 152:7, 179:19, 180:1
**Saint** [1] - 1:17
**salary** [1] - 209:2
**sale** [5] - 144:9, 162:15, 171:22, 178:15, 231:20
**sales** [9] - 47:15, 61:8, 64:14, 65:7, 67:15, 68:13, 68:19, 75:21, 77:12, 81:6, 87:12, 92:19, 104:24, 107:7, 107:10, 108:9,

108:10, 108:11, 108:18, 108:20, 108:23, 109:5, 109:6, 109:12, 109:17, 110:12, 113:11, 113:13, 113:18, 113:21, 113:25, 119:25, 120:6, 120:13, 123:3, 144:8, 152:1, 156:1, 156:7, 156:11, 156:15, 157:6, 157:11, 157:21, 158:5, 158:20, 161:8, 162:14, 162:17, 162:23, 163:4, 171:25, 174:8, 175:4, 175:12, 181:8, 183:21, 185:9, 188:8, 188:9, 193:10, 193:12, 193:13, 194:14, 195:11, 195:13, 196:14, 196:19, 197:9, 197:17, 200:2, 200:22, 201:2, 203:7, 203:15, 204:1, 206:8, 208:22, 208:23, 208:25, 209:19, 212:10, 223:1, 223:2, 223:11, 231:12, 232:7, 234:17, 235:12, 244:19, 245:20
**sales-schemer** [1] - 77:12
**salespeople** [23] - 47:12, 57:17, 61:14, 62:15, 62:16, 62:25, 64:3, 64:14, 64:25, 66:24, 67:3, 67:17, 68:20, 71:15, 72:11, 72:12, 163:1, 205:24, 231:21, 232:11, 236:6, 236:7
**salesperson** [4] - 61:5, 67:14, 67:18, 155:3
**salesperson's** [1] - 67:20
**salespersons** [1] - 67:22
**salvage** [2] - 58:20, 163:25
**sanctions** [1] - 225:17
**SANDERSON** [1] - 1:16

**Sara** [2] - 60:19, 245:1
**Sarah** [1] - 266:10
**sat** [3] - 217:10, 247:16, 247:18
**satisfied** [1] - 51:2
**satisfying** [1] - 78:25
**saturated** [2] - 180:11, 186:16
**save** [3] - 93:5, 106:24, 164:2
**saw** [13] - 34:23, 35:10, 38:1, 62:4, 121:5, 127:17, 159:19, 170:20, 208:11, 244:7, 244:10, 244:12, 245:25
**scale** [2] - 41:24, 86:20
**scales** [1] - 41:25
**scene** [1] - 64:23
**scenes** [1] - 262:18
**schedule** [2] - 4:13, 266:12
**scheduled** [1] - 267:2
**scheme** [8] - 45:19, 46:7, 48:20, 48:21, 52:23, 57:21, 63:7, 68:25
**schemer** [1] - 77:12
**schemes** [1] - 30:2
**Scherr** [1] - 185:12
**science** [3] - 116:4, 174:5, 185:16
**scienter** [2] - 129:24, 130:1
**scientific** [7] - 67:8, 67:13, 74:24, 104:16, 109:5, 110:2, 110:8
**scientists** [2] - 66:23, 91:6
**scoot** [1] - 227:2
**scope** [5] - 126:7, 131:25, 219:23, 267:13, 267:16
**Scottsdale** [1] - 212:20
**screen** [5] - 83:17, 112:19, 126:10, 211:17, 261:16
**screens** [1] - 136:21
**scrips** [1] - 188:25
**script** [1] - 76:7
**seal** [6] - 242:10, 242:13, 249:6, 253:12, 253:15, 263:15
**search** [1] - 34:11
**seat** [3] - 125:6, 139:6,

251:21
**seated** [11] - 3:5, 4:11, 14:1, 14:4, 24:15, 26:13, 84:5, 85:5, 141:19, 226:16, 227:20
**seating** [2] - 83:23, 85:10
**second** [34] - 14:12, 18:24, 30:16, 31:5, 34:1, 45:14, 48:21, 50:16, 56:3, 58:7, 58:8, 59:5, 68:2, 68:25, 70:10, 73:21, 74:4, 91:5, 91:15, 92:1, 98:14, 99:24, 103:19, 116:13, 124:13, 145:7, 166:10, 167:17, 168:8, 172:15, 177:4, 178:6, 209:15, 267:6
**second-generation** [3] - 91:5, 91:15, 92:1
**second-guess** [2] - 98:14, 99:24
**secret** [4] - 119:11, 119:15, 119:20, 119:23
**secretly** [7] - 30:15, 118:22, 119:2, 119:10, 119:25, 120:21
**section** [1] - 115:23
**see** [128] - 3:25, 9:23, 10:15, 10:24, 11:15, 13:19, 14:5, 14:9, 21:1, 21:16, 22:7, 22:10, 23:12, 23:14, 24:10, 24:13, 24:16, 24:20, 25:15, 27:22, 28:1, 33:19, 34:25, 36:11, 36:14, 36:15, 38:13, 39:5, 40:22, 48:3, 48:25, 49:10, 54:5, 55:21, 59:23, 59:24, 60:6, 60:7, 65:16, 65:20, 66:3, 67:25, 68:1, 68:2, 69:23, 70:14, 73:7, 82:17, 83:1, 84:15, 84:18, 93:8, 98:2, 99:4, 100:3, 100:13, 100:17, 100:25, 102:10, 103:3, 103:7, 105:16, 105:18, 106:25, 107:5, 107:15, 107:18, 107:19, 109:23, 111:10,

111:13, 113:5, 114:9, 114:15, 116:9, 116:11, 116:23, 117:4, 119:5, 121:14, 122:21, 128:6, 129:14, 136:5, 136:21, 138:5, 168:12, 171:2, 172:6, 172:9, 172:12, 173:2, 173:17, 174:8, 174:13, 174:25, 179:19, 180:11, 182:9, 184:16, 185:22, 186:5, 186:11, 186:20, 186:23, 188:4, 188:20, 190:3, 192:6, 192:7, 192:18, 204:12, 204:17, 205:18, 205:19, 215:19, 227:7, 227:14, 227:17, 246:14, 253:23, 258:7, 261:20, 263:6, 267:20, 268:3
**seeking** [2] - 96:5, 132:1
**segment** [5] - 55:23, 55:25, 57:14, 58:10, 237:2
**segments** [2] - 64:7, 66:16
**select** [2] - 218:17, 219:5
**selected** [8] - 113:6, 113:7, 113:17, 113:25, 218:5, 219:4
**selecting** [3] - 8:2, 113:14, 213:4
**selection** [3] - 34:24, 35:1, 218:1
**sell** [23] - 50:19, 55:9, 55:16, 57:21, 59:7, 62:25, 66:16, 68:9, 145:4, 153:19, 164:9, 165:12, 165:16, 175:6, 181:9, 183:5, 196:14, 197:25, 202:5, 204:8, 214:3, 237:14, 237:18
**selling** [23] - 46:5, 61:15, 64:12, 64:20, 65:5, 145:11, 145:16, 146:4, 146:9, 147:1, 147:21, 148:16,

149:21, 151:9, 153:24, 161:22, 163:20, 164:12, 177:22, 179:9, 187:21, 188:15, 236:13
**Seltzer** [1] - 198:14
**send** [9] - 70:24, 70:25, 95:7, 108:20, 194:10, 201:18, 202:7, 208:1, 212:18
**sending** [8] - 63:20, 202:4, 204:12, 207:11, 242:19, 242:20, 263:11
**sends** [2] - 96:22, 109:21
**sense** [9] - 9:24, 11:1, 21:14, 36:17, 59:19, 65:20, 82:21, 82:23, 82:24, 82:25, 136:7, 144:22, 252:25, 256:3, 264:14
**senses** [1] - 37:25
**sent** [13] - 105:17, 105:23, 119:7, 119:9, 121:14, 201:16, 202:15, 203:12, 207:19, 207:22, 207:25, 208:4, 208:9
**sentence** [5] - 53:2, 87:20, 145:22, 177:23, 204:19
**separate** [4] - 71:6, 253:11, 254:21, 257:2
**sequence** [3] - 187:14, 187:16, 187:19
**sequestration** [1] - 139:17
**series** [1] - 241:17
**serious** [12] - 50:1, 50:2, 52:15, 52:16, 53:3, 85:21, 102:12, 124:5, 127:12, 128:1, 237:9, 237:11
**seriously** [1] - 126:14
**Serono** [1] - 13:1
**Serono's** [1] - 13:1
**service** [1] - 207:4
**services** [2] - 33:14, 33:16
**Services** [3] - 94:12, 94:13, 94:16
**session** [1] - 157:15
**set** [7] - 14:12, 97:5, 99:17, 118:22,

146:17, 221:11, 221:12
**sets** [2] - 51:4, 94:10
**settle** [3] - 79:18, 132:11, 132:14
**settled** [3] - 12:15, 79:23, 142:5
**settlement** [12] - 13:1, 15:25, 16:17, 17:17, 17:18, 21:7, 21:11, 21:12, 21:13, 129:11, 132:7, 132:8
**settlements** [16] - 12:4, 12:16, 15:20, 16:12, 16:16, 17:2, 17:14, 21:2, 21:3, 21:4, 21:8, 126:5, 128:2, 132:14, 132:17, 133:19
**seven** [5] - 61:18, 78:15, 82:11, 205:24
**several** [6] - 41:3, 75:22, 154:1, 157:7, 158:9, 239:22
**severity** [3] - 20:5, 20:8, 126:8
**sexuality** [1] - 151:16
**shake** [1] - 22:10
**Shaked** [5] - 73:22, 74:3, 76:23, 77:15, 82:5
**Shaked's** [1] - 82:8
**share** [8] - 56:6, 176:2, 189:11, 199:22, 200:2, 204:21, 238:6
**shelf** [1] - 45:24
**Sherr** [1] - 203:16
**Sherry** [1] - 3:21
**Shield** [1] - 96:24
**shift** [3] - 26:14, 53:7, 53:11
**shoes** [4] - 48:14, 255:14, 258:10, 259:7
**short** [5] - 14:3, 84:24, 90:13, 226:1, 226:14
**shorter** [1] - 9:15
**shortly** [1] - 91:24
**show** [42] - 19:13, 20:25, 42:23, 58:12, 63:9, 66:1, 75:9, 75:10, 76:1, 77:1, 77:4, 77:6, 79:14, 80:15, 81:1, 81:10, 82:6, 87:18, 92:16, 92:21, 95:20, 96:9, 100:11, 104:1, 105:7, 105:11, 105:22, 108:24,

109:11, 110:25, 113:13, 114:9, 116:22, 118:19, 126:13, 128:4, 129:8, 133:4, 176:18, 184:14, 190:15, 233:21
**showed** [3] - 55:21, 82:18, 107:16
**showing** [7] - 80:1, 128:22, 128:25, 129:13, 175:18, 175:22, 176:3
**shown** [1] - 37:19
**shows** [5] - 80:2, 82:20, 111:14, 175:3, 175:5
**shut** [1] - 38:14
**shy** [1] - 63:22
**sick** [1] - 146:20
**Side** [1] - 156:10
**side** [24] - 6:13, 6:14, 7:13, 25:5, 36:25, 41:25, 44:14, 51:14, 83:18, 83:24, 84:12, 84:13, 95:13, 130:14, 140:19, 141:1, 178:2, 180:15, 180:18, 181:6, 255:9, 263:6, 263:8, 266:1
**Sidebar** [4] - 168:1, 169:15, 217:1, 220:7
**sidebar** [8] - 34:22, 35:19, 35:20, 85:17, 216:16, 219:1, 219:24, 219:25
**sidebars** [2] - 34:23, 35:2
**sides** [6] - 22:15, 41:24, 260:1, 264:3, 267:11, 267:15
**sift** [1] - 112:7
**sign** [5] - 121:15, 201:9, 201:16, 243:15
**signed** [6] - 107:11, 114:24, 115:19, 115:21, 115:22, 121:13
**significant** [4] - 35:3, 86:7, 128:9, 238:4
**significantly** [4] - 35:9, 162:3, 175:9, 238:4
**signs** [1] - 131:2
**Sillup** [3] - 75:19, 76:9, 82:4
**similar** [10] - 58:3, 70:2, 150:11,

172:18, 172:19, 184:22, 195:13, 223:19, 258:3
**similarity** [1] - 223:21
**simple** [2] - 6:18, 148:10
**simplest** [1] - 69:2
**simply** [3] - 37:2, 42:22, 129:1
**single** [8] - 29:3, 71:23, 94:2, 105:23, 109:15, 123:8, 132:15, 255:16
**sit** [7] - 9:10, 9:24, 11:20, 82:20, 82:25, 124:2, 125:21
**sitting** [10] - 9:10, 9:11, 14:22, 14:23, 28:9, 28:11, 28:18, 72:6, 259:4, 259:22
**situated** [1] - 142:6
**situation** [5] - 40:3, 100:19, 122:8, 207:7, 229:19
**situational** [1] - 14:25
**situations** [2] - 206:10, 207:5
**six** [4] - 97:17, 105:23, 146:17
**size** [1] - 100:19
**sizes** [1] - 128:2
**SKADDEN** [1] - 1:19
**SLATE** [1] - 1:19
**slide** [25] - 12:14, 12:20, 12:22, 17:17, 70:23, 70:25, 71:2, 95:13, 107:17, 111:17, 127:15, 127:19, 172:6, 177:1, 191:17, 191:24, 191:25, 192:2, 192:12, 192:14, 210:3, 221:9, 222:8, 262:10
**Slide** [12] - 15:21, 15:24, 17:25, 24:1, 24:3, 170:24, 171:17, 172:4, 174:21, 175:14, 175:17
**slides** [30] - 4:18, 12:3, 12:14, 14:7, 14:9, 14:11, 15:15, 15:16, 16:8, 17:19, 17:23, 18:8, 19:22, 19:23, 22:3, 22:13, 22:21, 23:10, 23:18, 23:22, 71:2, 125:18, 132:19, 211:19, 211:20, 221:11,

221:12, 221:14, 222:14, 222:18
**slightly** [3] - 25:25, 131:1, 260:17
**slips** [1] - 63:8
**slow** [2] - 89:23, 90:2
**small** [7] - 53:23, 53:24, 55:22, 72:14, 72:4, 161:20, 199:23
**smaller** [3] - 55:14, 58:10, 104:3
**smart** [5] - 32:24, 33:2, 33:10, 62:21, 70:17
**smarter** [2] - 90:15, 90:16
**SMITH** [1] - 3:21
**Smith** [3] - 3:21, 122:12, 122:13
**so..** [3] - 10:16, 138:15, 265:11
**social** [2] - 33:16, 152:13
**sold** [20] - 94:21, 144:16, 145:6, 147:2, 147:22, 149:6, 150:13, 155:11, 155:12, 160:13, 164:25, 175:5, 182:2, 189:12, 197:23, 199:4, 232:24
**sole** [3] - 38:25, 49:22, 62:19
**solely** [1] - 256:11
**solicit** [6] - 114:25, 193:23, 196:23, 206:20, 222:21, 239:12
**solicited** [2] - 225:1, 225:4
**soliciting** [3] - 194:1, 194:12, 223:22
**solve** [1] - 4:21
**someone** [5] - 38:8, 72:6, 78:21, 102:16, 161:5
**sometimes** [25] - 7:17, 7:18, 8:19, 64:20, 64:24, 67:11, 72:12, 84:15, 90:11, 102:3, 102:13, 102:17, 102:20, 147:15, 151:3, 178:21, 211:14, 228:13, 230:7, 233:14, 233:15, 233:16, 233:19, 235:18
**Sometimes** [2] - 72:14, 120:14

**somewhat** [2] - 41:25, 180:3
**soon** [2] - 13:8, 26:8
**sophisticated** [1] - 70:17
**sorry** [4] - 3:20, 11:25, 12:9, 16:10, 44:16, 125:13, 145:6, 148:4, 150:18, 150:24, 167:12, 168:7, 197:1, 210:19, 217:14, 233:2, 238:14, 260:20, 264:24
**sort** [25] - 88:3, 89:15, 90:4, 90:10, 96:19, 103:22, 105:20, 106:7, 106:9, 107:15, 108:1, 111:17, 112:16, 116:13, 117:24, 132:6, 132:18, 132:20, 146:24, 156:20, 167:5, 241:17, 250:8, 257:22, 260:12
**sought** [1] - 70:15
**Soule** [2] - 1:23, 269:11
**Soule@njd.uscourts .gov** [1] - 1:24
**sounds** [2] - 22:19, 26:6
**source** [2] - 34:14, 60:16
**sourced** [1] - 12:3
**space** [1] - 56:1
**speaker** [85] - 50:4, 50:5, 69:1, 69:5, 69:12, 69:16, 69:24, 70:7, 70:21, 71:12, 71:16, 72:13, 72:20, 73:5, 75:5, 79:25, 81:7, 81:19, 87:12, 104:25, 107:4, 111:5, 111:16, 111:17, 112:3, 113:3, 113:17, 113:22, 113:24, 114:2, 114:4, 114:8, 114:11, 114:12, 115:8, 122:10, 122:18, 123:6, 159:23, 183:24, 184:8, 190:1, 190:4, 191:11, 192:15, 192:18, 193:8, 209:15, 209:24, 209:25, 210:3,

211:6, 211:18, 213:4, 213:18, 213:20, 214:12, 214:16, 215:1, 215:6, 215:13, 215:19, 216:3, 216:7, 216:10, 218:1, 218:9, 218:19, 219:4, 219:12, 221:6, 221:19, 222:3, 222:8, 222:13, 223:7, 223:17, 224:1, 224:7, 224:8, 227:25, 229:9, 229:20, 247:7
**speakers** [38] - 70:3, 70:7, 72:5, 72:9, 80:24, 87:12, 112:13, 112:14, 112:18, 112:22, 113:5, 113:14, 114:18, 114:19, 114:20, 114:24, 115:1, 115:4, 115:18, 115:19, 119:18, 159:23, 192:21, 209:21, 210:12, 210:20, 211:1, 213:22, 213:25, 215:22, 218:4, 218:11, 219:5, 221:6, 221:16, 224:5, 224:6, 229:5
**speaking** [9] - 33:24, 40:8, 70:10, 115:6, 116:5, 221:10, 225:20, 229:11, 257:19
**speaks** [1] - 108:9
**special** [1] - 98:12
**specialist** [1] - 74:6
**specialists** [4] - 100:25, 123:13, 123:16, 123:20
**specialized** [1] - 101:25
**specific** [8] - 66:22, 66:23, 111:20, 160:22, 175:19, 214:20, 229:3, 255:23
**specifically** [12] - 63:25, 70:15, 131:5, 157:4, 161:5, 161:13, 162:11, 200:1, 211:4, 231:11, 231:17, 260:16

speculate [1] - 37:17
speculation [1] -
216:15
speech [7] - 33:25,
71:22, 72:16,
115:10, 115:11,
115:12
speeches [4] - 71:23,
71:24, 115:2, 213:9
spelled [1] - 178:25
spelling [1] - 142:12
spend [2] - 73:12,
186:4
spends [1] - 65:6
spent [6] - 81:5, 91:7,
115:13, 175:23,
230:17, 239:22
spoil [1] - 129:13
spoken [1] - 244:22
sponsored [1] - 70:21
sponsors [2] - 96:13,
96:16, 96:23, 97:3,
98:3, 98:18, 98:24,
100:16
spontaneous [6] -
67:7, 67:14, 68:7,
71:6, 207:8, 223:22
spotting [2] - 259:23,
260:2
spouse [1] - 212:24
spread [7] - 60:13,
67:15, 68:5, 68:11,
69:10, 71:19, 91:20
spreading [2] - 71:11,
74:13
spreads [1] - 90:10
spring [1] - 160:15
Square [1] - 1:21
squeeze [2] - 9:7,
10:13
Squibb [4] - 147:14,
153:17, 153:18,
155:11
St [1] - 245:21
stable [1] - 55:19
staff [1] - 139:1
stage [1] - 128:7
stake [1] - 62:1
stakeholders [1] -
57:18
stale [1] - 125:24
stand [20] - 14:18,
25:23, 47:8, 48:14,
61:18, 65:1, 77:21,
77:24, 79:6, 82:13,
86:6, 118:2, 124:15,
217:5, 219:19,
219:20, 222:10,
249:12, 258:9, 259:7
standard [4] - 8:21,

42:13, 42:15, 50:25
standards [1] - 75:6
standing [1] - 255:14
stands [2] - 133:12,
178:23
star [3] - 45:22, 72:22,
81:23
start [20] - 5:14, 26:20,
34:18, 49:4, 63:2,
116:10, 118:4,
139:15, 141:22,
143:23, 155:25,
160:3, 204:16,
206:9, 207:4, 239:7,
250:3, 250:23,
251:4, 267:16
started [11] - 25:16,
53:8, 88:2, 90:22,
108:6, 119:6, 133:8,
179:9, 207:11,
237:11, 239:5
starting [2] - 56:24,
253:1
starts [1] - 171:3
State [4] - 1:9, 31:18,
31:22, 143:19
state [17] - 30:1,
31:20, 46:9, 93:9,
111:22, 122:22,
142:11, 144:13,
145:15, 145:19,
150:16, 157:12,
177:12, 177:19,
180:14, 195:16,
205:21
statement [9] - 14:8,
42:20, 42:21, 42:24,
85:12, 125:10,
132:25, 135:3,
135:15
statements [15] - 4:15,
22:21, 27:18, 27:19,
29:7, 36:7, 42:21,
42:25, 43:15, 43:21,
43:24, 44:17, 44:22,
111:1, 134:10
States [12] - 3:2,
12:15, 31:12, 32:2,
46:8, 46:22, 57:2,
60:20, 60:24, 80:9,
225:13
states [8] - 46:9,
46:22, 106:11,
106:14, 106:15,
106:19, 118:24,
144:22
STATES [3] - 1:1, 1:3,
1:12
statistical [1] - 77:16
statistician [2] -

73:22, 82:8
statistics [5] - 73:24,
76:24, 77:5, 82:6,
82:8
stats [1] - 81:16
Statute [7] - 30:11,
31:8, 111:9, 111:11,
112:11, 116:9,
159:11
stay [8] - 87:8, 92:24,
118:15, 156:16,
167:8, 203:5, 219:8,
239:15
stayed [1] - 151:6
stays [1] - 118:9
steak [2] - 45:24, 72:2
Stenographer [1] -
256:17
stenography [1] - 1:25
step [4] - 48:22, 99:8,
165:10
step-by-step [1] -
48:22
stepping [1] - 9:7
steps [2] - 73:23,
182:15
still [18] - 4:13, 6:3,
11:22, 13:20, 17:7,
19:18, 55:6, 92:16,
129:6, 135:21,
209:12, 212:8,
227:2, 247:23,
255:6, 256:8, 257:7,
260:13
stints [1] - 153:23
stip [1] - 6:8
stipulated [1] - 36:4
stipulation [1] - 6:2
stipulations [3] - 6:19,
6:21
Stoffels [1] - 91:7
stop [6] - 28:1, 75:13,
75:14, 205:13,
226:1, 261:18
stopped [1] - 91:1
stopping [1] - 63:13
stories [1] - 118:14
strains [2] - 90:22,
91:18
Strand [5] - 60:19,
245:1, 245:9, 266:10
strand [1] - 245:6
strategic [1] - 183:23
strategy [6] - 93:1,
93:9, 97:9, 170:18,
172:6, 239:10
street [3] - 8:4, 28:5,
108:14
Street [4] - 1:9, 1:17,
1:21, 163:19

strength [1] - 106:6
strengths [4] - 186:3,
187:25, 188:2, 188:8
stress [4] - 27:13,
234:18, 234:19,
238:23
stretch [2] - 24:23,
226:9
stricter [1] - 42:13
strictly [1] - 52:9
strong [4] - 61:9, 81:7,
188:2, 188:6
strongly [1] - 10:8
struck [2] - 37:15,
37:17
struggled [1] - 72:15
studied [1] - 76:10
studies [19] - 50:25,
65:8, 65:10, 65:16,
65:18, 66:7, 74:20,
74:21, 89:5, 166:10,
198:19, 199:12,
199:15, 199:17,
199:18, 199:21,
199:23, 200:6
study [11] - 65:18,
65:21, 66:6, 66:9,
165:25, 166:4,
166:8, 166:13,
166:14, 181:16,
200:14
studying [1] - 65:23,
91:11
stuff [12] - 62:2, 63:8,
63:10, 64:11, 65:4,
65:13, 66:15, 69:8,
70:19, 76:10, 76:13,
247:15
subject [3] - 173:9,
251:12, 265:16
submissions [1] -
265:1
submit [5] - 50:24,
96:17, 97:2, 124:1,
207:21
submitted [12] -
30:20, 30:22, 31:3,
31:4, 31:5, 32:2,
97:1, 192:24, 193:1,
193:4, 209:18, 211:2
submitting [3] - 50:23,
209:6, 210:25
substantially [3] -
128:12, 128:23,
135:8
subtle [1] - 49:11
succeeded [1] - 68:14
successful [1] -
189:13
sudden [1] - 116:17

sue [1] - 116:16
suffered [2] - 77:2,
259:12
sufficient [3] - 8:6,
85:8, 265:8
suggest [2] - 118:5,
260:5
suggested [2] - 10:8,
259:17
suggesting [1] -
112:21
suggestion [1] -
263:14
suing [2] - 92:10,
116:12
suit [3] - 248:18,
248:19, 257:3
Suite [1] - 1:17
summarize [1] - 43:13
summary [1] - 30:8
Summary [1] - 29:24
sunny [1] - 130:22
Sunshine [1] - 212:15
support [5] - 103:17,
124:10, 135:24,
188:3, 247:3
supported [11] -
74:13, 74:15, 86:14,
86:15, 87:16,
104:12, 118:21,
121:20, 124:6, 124:7
supports [1] - 76:21
supposed [22] - 17:6,
33:21, 63:13, 64:7,
67:13, 67:14, 68:6,
71:17, 71:18, 71:19,
75:7, 138:25, 160:2,
201:11, 201:13,
206:17, 207:7,
216:2, 223:22,
224:3, 225:1, 236:19
suppress [3] - 88:20,
101:8, 101:16
suppressing [2] -
54:13, 54:16
surprised [1] - 93:1
surprisingly [1] - 59:8
surveys [2] - 72:23,
81:22
surviving [1] - 146:19
suspect [1] - 233:21
suspected [1] -
116:24
suspicions [1] - 36:15
sustain [1] - 22:14
sustained [4] - 23:10,
37:10, 219:9, 221:3
Sustiva [6] - 147:22,
148:2, 149:16,
150:2, 150:6, 162:11

**swear** [4] - 61:19, 142:3, 142:4, 142:6
**switch** [2] - 26:1, 179:14
**sworn** [2] - 29:10, 47:23
**SWORN/AFFIRMED** [1] - 142:9
**SWOT** [2] - 185:23, 185:25
**system** [9] - 54:14, 86:8, 223:24, 230:11, 230:14, 231:4, 231:13, 231:19, 232:3
**systematic** [1] - 57:20
**systems** [1] - 88:5

# T

**T-cells** [1] - 89:25
**table** [5] - 3:9, 15:12, 23:9, 27:7, 211:24
**tablets** [1] - 198:13
**tack** [1] - 106:8
**tack-on** [1] - 106:8
**tactic** [1] - 68:9
**tag** [1] - 253:4
**tainted** [1] - 123:17
**takeaway** [1] - 186:12
**talks** [10] - 75:25, 76:1, 100:18, 102:2, 110:8, 112:24, 113:1, 120:13, 120:18, 246:14
**tam** [2] - 259:7, 263:18
**tape** [9] - 118:22, 119:10, 119:14, 119:23, 120:2, 120:3, 120:6, 120:22, 120:24
**taped** [1] - 119:25
**tapes** [1] - 119:11
**taping** [3] - 119:2, 119:9, 119:25
**target** [6] - 148:13, 175:7, 175:9, 184:6, 189:4, 266:13
**targeted** [1] - 184:4
**targeting** [1] - 189:9
**task** [1] - 93:2
**taxpayer** [1] - 46:11
**taxpayers** [2] - 45:6, 46:8
**teach** [3] - 66:8, 157:15
**teaches** [1] - 74:11
**team** [14] - 95:7, 113:22, 113:23, 113:24, 152:21,

158:6, 188:8, 204:16, 204:20, 205:15, 228:15, 228:16, 240:1, 253:4
**teases** [1] - 67:10
**technically** [1] - 250:16
**technology** [1] - 33:5
**television** [2] - 15:14, 34:3
**ten** [15] - 24:11, 24:21, 25:12, 27:20, 73:13, 83:13, 84:1, 84:21, 116:1, 117:23, 188:15, 192:5, 226:8, 226:12, 251:12
**Ten** [1] - 192:3
**ten-minute** [6] - 24:21, 25:12, 27:20, 83:13, 84:1, 226:8
**ten-plus** [1] - 188:15
**Tennessee** [1] - 31:16
**term** [7] - 42:12, 51:25, 56:17, 58:21, 69:17, 120:7, 241:6
**terminal** [1] - 151:17
**terminated** [2] - 62:12, 68:16
**terms** [1] - 49:6
**terrible** [1] - 87:19
**terrific** [3] - 10:23, 11:6, 11:7
**territory** [5] - 78:10, 78:11, 175:20, 206:2, 216:8
**test** [1] - 101:19
**TESTIFIED** [1] - 142:9
**testified** [4] - 38:1, 39:20, 206:17, 219:5
**testifies** [3] - 37:24, 39:6, 255:12
**testify** [7] - 47:25, 81:2, 113:12, 118:5, 139:19, 143:5, 255:16
**testifying** [5] - 39:9, 41:5, 218:4, 218:13, 254:20
**testimony** [30] - 6:22, 25:16, 27:22, 36:1, 36:10, 37:14, 37:16, 38:24, 39:14, 39:21, 40:23, 41:1, 42:8, 48:24, 73:20, 76:20, 82:19, 121:8, 121:18, 139:14, 218:2, 244:20, 245:6, 246:5, 246:7, 250:22, 255:22,

256:10, 258:1
**testing** [2] - 153:22, 153:24
**tests** [4] - 101:14, 101:17, 120:18, 120:19
**Texas** [2] - 1:17, 31:16
**text** [2] - 33:13, 242:19
**texts** [1] - 33:13
**THE** [248] - 1:1, 1:11, 3:4, 3:5, 3:19, 3:25, 4:10, 4:24, 5:2, 5:6, 5:8, 5:20, 5:23, 6:2, 6:8, 6:19, 6:24, 7:3, 7:6, 7:16, 8:13, 8:15, 8:22, 10:21, 10:24, 11:1, 11:5, 11:8, 12:10, 12:13, 12:18, 12:20, 13:4, 13:8, 13:14, 13:17, 14:1, 14:4, 14:5, 14:9, 14:16, 15:17, 16:10, 16:20, 16:24, 17:4, 17:22, 18:4, 18:12, 18:15, 19:1, 19:7, 19:10, 19:13, 19:16, 20:2, 20:7, 20:21, 20:25, 22:1, 22:12, 22:25, 23:3, 23:7, 23:16, 23:21, 23:25, 24:3, 24:5, 24:8, 24:10, 24:12, 24:13, 24:20, 24:23, 25:1, 25:4, 25:8, 25:19, 25:20, 26:6, 26:9, 26:11, 26:13, 44:16, 44:19, 83:12, 84:3, 84:5, 84:25, 85:1, 85:3, 85:4, 85:5, 85:14, 121:24, 124:21, 125:4, 125:6, 125:12, 125:14, 125:21, 126:1, 126:15, 126:19, 126:21, 126:23, 127:1, 128:3, 128:6, 129:6, 129:22, 130:2, 130:6, 131:6, 131:12, 132:10, 133:18, 133:22, 134:4, 134:12, 136:2, 136:9, 136:12, 136:15, 137:1, 137:8, 137:10, 137:20, 138:17, 138:20, 138:24, 139:2, 139:5, 139:6, 139:10, 139:12,

139:17, 139:20, 139:24, 140:5, 140:17, 140:24, 141:3, 141:8, 141:10, 141:14, 141:16, 141:18, 141:19, 141:22, 142:2, 142:11, 142:13, 167:13, 167:15, 167:18, 168:11, 168:14, 168:17, 169:1, 169:5, 169:9, 169:12, 169:14, 170:2, 170:6, 170:9, 170:14, 170:25, 173:8, 173:12, 173:20, 174:19, 185:1, 185:3, 202:18, 202:20, 216:16, 217:2, 217:7, 217:9, 217:12, 217:16, 217:22, 218:6, 218:13, 218:18, 218:21, 218:23, 219:7, 219:17, 219:20, 220:4, 221:2, 225:24, 226:5, 226:8, 226:13, 226:15, 226:16, 226:23, 227:4, 227:14, 227:16, 227:19, 227:20, 249:18, 249:25, 250:10, 250:13, 251:1, 251:6, 251:19, 251:21, 253:6, 253:22, 254:3, 254:6, 254:23, 255:22, 256:6, 256:22, 257:1, 257:12, 258:25, 259:19, 259:21, 260:23, 261:5, 262:2, 262:24, 263:23, 264:2, 264:10, 265:4, 265:14, 265:23, 265:25, 266:4, 266:11, 266:17, 266:19, 266:22, 267:3, 267:9, 268:2, 268:5
**theirs** [1] - 20:14
**theme** [3] - 60:8, 75:16, 257:17
**themselves** [6] - 21:22, 62:7, 71:6, 87:8, 126:5, 128:1

**theories** [1] - 105:19
**therapeutic** [1] - 150:14
**therapy** [1] - 99:9
**thereafter** [3] - 91:24, 132:16, 255:18
**therefore** [2] - 123:3, 256:13
**thereof** [1] - 254:16
**they've** [12] - 17:14, 62:23, 70:19, 71:16, 106:2, 123:25, 129:9, 134:21, 137:6, 253:9, 261:4
**thinking** [5] - 112:17, 113:19, 181:20, 242:21, 259:20
**thinks** [2] - 36:25, 262:18
**third** [2] - 30:19, 31:7
**thoughts** [1] - 8:8
**thousand** [2] - 128:19, 128:20
**thousands** [3] - 45:20, 80:21, 104:22
**threaten** [1] - 64:4
**threats** [1] - 186:3
**three** [17] - 9:15, 48:16, 71:22, 101:6, 111:18, 112:2, 114:16, 114:21, 115:10, 115:25, 116:1, 179:1, 202:7, 211:18, 232:25, 233:1
**three-day** [1] - 9:15
**throughout** [11] - 7:9, 32:23, 52:19, 56:17, 60:14, 67:16, 68:12, 83:16, 154:20, 200:20, 228:12
**throw** [1] - 247:17
**Thursday** [6] - 9:10, 28:10, 28:14, 28:15, 28:20, 28:25
**Tibotec** [5] - 156:25, 157:2, 157:3, 184:19, 186:9
**TID** [1] - 178:25
**timeline** [3] - 150:22, 193:9, 248:17
**tip** [1] - 41:25
**title** [1] - 203:16
**Today** [1] - 8:16
**today** [20] - 8:17, 9:5, 11:18, 15:5, 26:22, 28:7, 55:6, 81:11, 85:17, 91:3, 92:17, 92:18, 94:3, 105:9, 112:14, 118:4,

212:8, 246:5, 247:10
**together** [16] - 41:8,
50:15, 72:14, 93:14,
93:16, 93:19,
109:21, 116:16,
121:4, 150:4, 150:5,
233:15, 233:18,
233:19, 265:7
**tolerated** [2] - 172:17,
177:25
**tomorrow** [13] - 8:17,
250:16, 251:7,
253:1, 259:23,
262:6, 263:2,
264:13, 264:17,
265:7, 266:5,
266:14, 268:4
**ton** [1] - 59:8
**tonight** [1] - 265:5
**took** [15] - 46:17, 50:4,
53:7, 59:1, 76:6,
77:2, 83:9, 118:25,
122:15, 132:19,
138:18, 153:23,
255:12, 255:17,
262:9
**tool** [5] - 67:6, 67:15,
99:7, 99:14, 100:5
**toolbox** [1] - 200:4
**tools** [8] - 33:4, 33:7,
34:12, 64:6, 98:17,
99:22, 99:24
**top** [31] - 45:19, 45:24,
53:16, 57:21, 61:1,
61:11, 61:23, 63:3,
69:19, 82:11, 82:16,
93:17, 117:15,
123:6, 123:16,
123:20, 185:22,
189:4, 189:9,
190:12, 190:15,
190:25, 191:2,
191:13, 191:15,
191:20, 192:9,
192:14, 192:15,
203:5, 210:11
**top-down** [1] - 57:21
**top-flight** [5] - 93:17,
117:15, 123:6,
123:16, 123:20
**top-level** [1] - 61:1
**top-shelf** [1] - 45:24
**topic** [1] - 26:1
**topics** [1] - 178:8
**tops** [1] - 47:11
**Toradol** [2] - 144:19,
145:1
**total** [8] - 46:5, 58:6,
152:10, 164:18,
164:19, 175:25,

176:2
**totally** [2] - 122:13,
262:15
**touch** [5] - 136:10,
245:11, 246:2,
246:4, 261:16
**touched** [1] - 38:1
**touches** [1] - 127:17
**touted** [1] - 235:9
**town** [2] - 45:23, 72:25
**toxic** [4] - 68:20,
146:20, 151:2, 181:3
**track** [12] - 67:21,
90:3, 176:5, 176:14,
178:4, 182:5, 186:6,
190:11, 190:13,
213:12, 213:23,
214:7
**tracked** [7] - 70:6,
80:22, 176:8,
176:24, 202:3, 247:6
**tracking** [2] - 81:17,
181:24
**tracks** [5] - 64:9, 65:2,
75:15, 89:19, 107:20
**trail** [3] - 200:9, 232:2,
247:9
**train** [9] - 72:19,
89:18, 89:23,
157:20, 193:13,
193:15, 195:11,
196:14, 231:20
**trained** [7] - 72:20,
154:15, 157:8,
157:12, 157:17,
197:17, 224:5
**trainer** [5] - 156:15,
157:21, 193:12,
197:14, 231:12
**trainers** [3] - 157:18,
157:20
**training** [26] - 61:7,
61:8, 72:21, 107:17,
107:20, 107:25,
108:8, 111:13,
111:14, 115:2,
117:4, 119:16,
157:9, 157:10,
157:14, 157:17,
158:5, 159:10,
188:3, 193:10,
194:14, 195:13,
195:20, 196:3,
196:5, 196:8
**trainings** [1] - 193:19
**trajectory** [1] - 88:1
**transcribing** [1] -
40:23
**transcript** [7] - 1:25,
256:1, 256:19,

259:3, 264:5,
265:20, 269:4
**transcriptase** [3] -
148:1, 148:4, 150:8
**transcription** [1] -
1:25
**transcripts** [1] - 40:24
**transition** [2] - 154:23,
209:14
**transmits** [1] - 90:21
**travel** [1] - 229:6
**traveled** [2] - 115:11,
115:13
**traveling** [3] - 229:9,
229:23
**treat** [8] - 37:10,
51:11, 86:24, 88:11,
93:20, 101:5,
103:12, 123:14
**treated** [2] - 45:22,
100:25
**treating** [6] - 54:21,
74:6, 87:7, 100:18,
182:22, 240:2
**treatment** [69] - 54:8,
54:9, 54:10, 55:3,
55:6, 55:13, 56:8,
57:25, 58:11, 58:15,
59:4, 59:17, 93:10,
93:12, 93:13, 98:9,
100:13, 100:23,
102:1, 102:3,
103:18, 103:21,
103:24, 104:2,
104:3, 104:5, 104:9,
104:13, 149:22,
149:23, 152:21,
160:23, 161:1,
161:3, 161:4,
161:18, 161:22,
161:23, 161:25,
162:9, 164:1, 164:3,
164:4, 164:5,
164:10, 165:1,
171:13, 171:14,
178:16, 180:4,
180:6, 181:17,
181:21, 181:23,
182:3, 182:20,
182:22, 189:17,
194:9, 195:24,
198:2, 206:25,
207:14, 236:25,
237:17, 238:3,
238:6, 239:11
**treatment-**
**experienced** [17] -
54:8, 54:9, 54:10,
55:13, 104:2,
160:23, 161:3,

161:4, 161:18,
161:22, 171:13,
178:16, 180:4,
180:6, 181:17,
181:23, 195:24
**treatment-naive** [30] -
55:6, 58:15, 103:18,
103:21, 103:24,
104:3, 104:5, 104:9,
104:13, 149:22,
149:23, 161:1,
161:23, 161:25,
162:9, 164:4, 164:5,
164:10, 165:1,
171:14, 181:21,
182:3, 182:22,
194:9, 198:2,
206:25, 207:14,
236:25, 238:3, 238:6
**Trenton** [1] - 1:9
**trial** [56] - 7:9, 9:15,
18:20, 22:7, 22:9,
22:16, 27:4, 27:16,
28:17, 29:18, 29:21,
31:24, 32:4, 32:7,
32:15, 32:18, 33:23,
34:9, 34:20, 35:6,
39:13, 40:21, 40:23,
41:2, 41:9, 41:14,
42:18, 44:19, 46:14,
83:16, 112:16,
112:25, 114:14,
115:5, 126:17,
127:6, 130:16,
130:19, 130:20,
131:20, 132:2,
132:3, 134:18,
134:25, 136:3,
136:16, 140:11,
217:25, 254:14,
254:15, 265:16,
265:17
**TRIAL** [1] - 1:5
**Trial** [1] - 42:17
**trials** [5] - 165:8,
166:20, 166:23,
166:24, 166:25
**trick** [1] - 112:17
**tried** [5] - 121:9,
126:4, 165:8,
229:13, 259:14
**tries** [1] - 65:2
**triglycerides** [3] -
56:18, 164:18,
164:20
**trip** [2] - 228:20,
228:22
**trips** [1] - 80:11
**trouble** [8] - 69:8,
70:19, 73:10, 79:18,

127:24, 129:9,
130:6, 133:16
**true** [15] - 60:18,
82:20, 86:14, 87:15,
114:11, 118:7,
124:1, 124:18,
133:4, 237:23,
242:25, 243:17,
257:16, 258:14,
262:23
**truly** [4] - 88:13, 92:1,
109:10, 235:10
**trust** [2] - 152:2,
152:20
**truth** [8] - 61:19,
78:22, 87:2, 87:4,
117:13, 118:8, 120:2
**truthfully** [1] - 224:13
**try** [21] - 5:11, 25:1,
25:22, 26:18, 32:19,
34:5, 34:13, 64:8,
64:9, 88:20, 88:21,
122:16, 147:7,
151:12, 226:21,
227:3, 230:5,
239:10, 248:9,
251:11, 257:24
**trying** [37] - 16:5, 25:8,
26:2, 26:17, 27:8,
35:11, 66:5, 89:20,
89:22, 89:23,
100:17, 113:1,
127:21, 128:3,
129:6, 133:11,
137:15, 146:13,
152:14, 182:19,
183:5, 203:5,
209:15, 227:2,
232:11, 240:4,
247:19, 248:9,
254:19, 256:15,
256:18, 257:10,
261:22, 261:23
**Tuesday** [1] - 28:12
**tune** [2] - 21:24,
110:25
**turn** [14] - 67:15,
67:19, 76:6, 80:16,
127:14, 171:16,
172:4, 174:21,
175:14, 185:20,
188:17, 190:9,
191:25, 225:21
**turns** [2] - 67:9,
249:15
**TV** [1] - 49:10
**twice** [14] - 59:6,
59:10, 64:15, 99:17,
178:17, 178:19,
179:4, 179:6,

193:21, 196:11, 198:6, 198:8, 233:16, 267:14
**twice-a-day** [1] - 198:6
**Twitter** [1] - 33:14
**two** [50] - 3:9, 12:2, 12:10, 12:14, 14:7, 17:14, 28:21, 30:2, 37:21, 43:22, 45:10, 45:11, 46:6, 52:18, 54:4, 58:8, 59:22, 87:9, 89:22, 90:4, 91:6, 94:5, 94:18, 104:8, 104:10, 109:19, 112:17, 115:10, 115:12, 125:17, 141:8, 143:22, 143:23, 145:24, 147:5, 153:11, 159:3, 159:5, 161:9, 211:18, 212:21, 219:21, 229:16, 230:3, 232:25, 253:4, 261:6, 266:12
**two-year** [1] - 104:10
**type** [19] - 18:22, 21:21, 21:23, 34:7, 37:22, 38:6, 51:12, 52:2, 99:2, 119:19, 122:8, 123:12, 126:14, 127:3, 127:24, 138:10, 148:7, 196:1, 223:5
**type-flight** [1] - 123:12
**typed** [1] - 121:11
**types** [16] - 37:21, 49:6, 78:20, 80:7, 89:21, 97:17, 101:3, 103:14, 112:2, 147:24, 170:20, 184:22, 195:13, 199:18, 233:11

## U

**U.S** [1] - 1:8
**ultimate** [1] - 22:15
**ultimately** [7] - 23:11, 48:9, 49:19, 68:10, 68:15, 193:6, 199:2
**umbrella** [1] - 38:10
**unable** [2] - 40:1, 91:15
**unapproved** [9] - 46:3, 47:18, 52:18, 54:2, 57:22, 61:21, 78:9, 79:24, 82:15
**unattainable** [2] - 162:20, 163:10

**unbeknownst** [1] - 119:16
**unbelievably** [1] - 135:21
**unblocked** [1] - 93:11
**unclear** [2] - 187:11, 187:18
**under** [26] - 17:11, 20:10, 31:17, 35:14, 37:7, 47:23, 51:21, 67:2, 94:12, 94:15, 94:18, 95:5, 96:5, 129:15, 156:25, 170:5, 170:24, 175:9, 200:20, 242:10, 242:13, 248:25, 249:6, 253:12, 253:14, 263:15
**understood** [6] - 107:7, 137:20, 219:6, 230:21, 232:16, 234:10
**undetectable** [1] - 88:21
**unfettered** [1] - 93:2
**unfold** [1] - 222:6
**unfortunately** [2] - 87:24, 89:9
**unimpeded** [1] - 93:11
**UNITED** [3] - 1:1, 1:3, 1:12
**United** [10] - 3:2, 12:15, 32:2, 46:8, 46:22, 57:2, 60:20, 60:24, 80:9, 225:13
**universe** [2] - 80:25
**University** [1] - 76:25
**unlawful** [5] - 46:7, 49:19, 52:23, 68:25, 82:15
**unlawfully** [3] - 46:12, 46:17, 83:8
**unless** [11] - 22:25, 28:10, 33:23, 42:7, 109:8, 130:11, 136:21, 138:6, 138:14, 259:11, 266:6
**unlimited** [1] - 55:1
**unnecessary** [1] - 15:14
**unobjected** [1] - 6:7
**unquote** [1] - 72:22
**unrealistic** [3] - 64:3, 161:15, 163:9
**unrelated** [5] - 9:3, 12:15, 20:10, 25:21, 266:2
**unsafe** [1] - 78:12

**unseen** [1] - 62:19
**unsolicited** [11] - 160:2, 193:24, 194:1, 194:5, 194:12, 196:23, 201:13, 205:12, 206:18, 207:8, 239:12
**up** [92] - 9:4, 9:14, 11:10, 14:14, 28:8, 28:16, 46:15, 48:9, 63:24, 64:14, 70:1, 74:1, 74:2, 74:5, 76:7, 81:1, 81:17, 82:22, 86:20, 89:10, 93:3, 95:7, 112:17, 112:19, 116:14, 118:12, 120:22, 121:9, 121:11, 124:15, 125:18, 126:23, 127:18, 131:9, 133:12, 137:23, 140:14, 140:19, 141:20, 145:18, 148:9, 151:20, 162:13, 164:1, 164:3, 167:10, 168:11, 168:14, 168:24, 169:3, 169:8, 169:11, 173:18, 182:20, 187:21, 189:17, 191:9, 194:6, 195:25, 202:9, 204:13, 206:9, 207:4, 208:17, 212:9, 219:16, 219:19, 222:10, 222:18, 224:21, 229:12, 233:11, 234:6, 237:11, 239:10, 239:11, 247:19, 247:20, 251:15, 252:3, 253:18, 254:7, 259:15, 261:8, 261:15, 261:19, 262:10, 263:11, 264:17, 266:7, 266:14
**update** [1] - 174:1
**updates** [1] - 174:8
**Upper** [1] - 156:10
**upper** [2] - 74:5, 145:2
**upset** [2] - 145:3, 247:23
**usage** [1] - 83:25
**uses** [23] - 45:14, 46:3, 47:18, 50:21, 51:4, 51:24, 52:19,

54:2, 57:22, 61:21, 66:17, 71:20, 74:16, 74:17, 78:4, 78:9, 79:20, 79:24, 82:15, 104:23, 120:7
**utilization** [5] - 98:17, 99:7, 99:14, 99:23, 100:5
**utilized** [1] - 221:14

## V

**Valentine** [1] - 203:17
**Valeriani** [1] - 158:12
**value** [14] - 49:20, 103:4, 115:3, 128:8, 128:12, 128:22, 128:24, 132:8, 135:7, 135:8, 135:9, 172:10, 212:12
**variant** [2] - 91:20, 101:20
**variations** [1] - 90:14
**variety** [1] - 98:9
**various** [5] - 46:8, 46:22, 150:14, 155:23, 228:12
**vast** [1] - 48:13
**vendor** [1] - 73:11
**vendors** [2] - 81:17, 81:18
**venue** [1] - 72:14
**verbal** [1] - 246:24
**verbatim** [1] - 254:13
**verdict** [5] - 29:19, 35:21, 37:22, 42:1, 43:17
**Versed** [2] - 144:20, 144:24
**versions** [1] - 31:18
**versus** [8] - 63:20, 130:20, 175:1, 175:5, 184:3, 196:11, 205:24
**via** [1] - 207:22
**viable** [2] - 55:3, 59:4
**vice** [2] - 157:14, 158:3
**Videx** [4] - 147:22, 147:25, 149:14, 150:4
**view** [2] - 8:10, 8:18
**viewed** [1] - 206:8
**violated** [5] - 29:25, 31:21, 31:25, 75:6, 75:8
**violation** [4] - 30:10, 30:25, 111:9, 112:11
**violations** [4] - 31:9, 63:13, 75:14, 75:15

**Virginia** [3] - 31:17, 75:1
**virologic** [1] - 149:2
**virtually** [2] - 54:15, 71:12
**virtue** [1] - 263:14
**virus** [22] - 54:13, 54:16, 54:17, 56:25, 57:2, 88:17, 88:21, 89:24, 90:16, 90:17, 91:2, 91:18, 92:4, 92:6, 101:5, 101:8, 101:16, 101:20, 101:21
**visceral** [1] - 180:25
**visible** [1] - 138:9
**visit** [3] - 33:21, 231:2, 231:4
**visited** [3] - 104:24, 123:2, 233:3
**visual** [2] - 195:17, 195:22
**volume** [3] - 175:25, 213:19, 213:25
**VOLUME** [1] - 1:5
**vulnerable** [2] - 97:19, 100:1

## W

**wait** [11] - 23:12, 24:13, 24:15, 79:3, 106:18, 117:11, 124:12, 125:12, 136:5, 192:7, 217:3
**waited** [1] - 115:13
**waiting** [2] - 26:6, 141:9
**walk** [7] - 48:21, 125:2, 129:16, 131:23, 140:8, 140:20, 150:9
**walked** [1] - 38:8
**walking** [4] - 14:24, 15:1
**Wall** [1] - 163:19
**wants** [10] - 97:12, 98:14, 98:20, 99:1, 99:3, 99:16, 99:19, 101:25, 252:22, 252:24
**warned** [1] - 56:13
**warning** [5] - 18:23, 18:24, 172:21, 172:25, 235:25
**warnings** [4] - 51:13, 80:7, 80:16, 237:4
**Washington** [1] - 31:17
**wasting** [2] - 137:10,

181:1
**watch** [1] - 34:4
**Watch** [1] - 133:17
**watches** [1] - 146:17
**watching** [2] - 208:18, 256:2
**water** [4] - 38:9, 142:8, 198:13, 198:15
**wave** [2] - 89:11, 90:6
**ways** [13] - 45:11, 59:14, 66:21, 98:15, 103:14, 104:15, 105:2, 109:11, 117:1, 117:8, 152:6, 180:21, 221:18
**weakness** [1] - 186:21
**weaknesses** [2] - 186:3, 186:6
**wearing** [1] - 38:9
**website** [1] - 33:15
**websites** [2] - 33:16, 34:11
**Wednesday** [2] - 9:11, 28:12
**week** [16] - 9:10, 9:11, 9:15, 28:9, 28:10, 28:11, 28:14, 28:20, 108:17, 113:12, 117:3, 118:5, 121:3, 206:2, 206:7
**weekend** [1] - 228:14
**weekly** [5] - 176:20, 176:22, 202:4, 214:2, 214:6
**weeks** [10] - 28:21, 29:1, 124:2, 130:16, 176:19, 183:9, 183:12, 187:12, 199:24, 248:7
**weeks'** [1] - 187:17
**weighing** [1] - 36:17
**weight** [7] - 36:19, 38:19, 38:20, 39:18, 39:21, 41:12, 83:1
**welcome** [1] - 26:16
**well-established** [1] - 75:6
**well-known** [1] - 231:11
**Wendel** [1] - 3:17
**WENDEL** [2] - 1:16, 3:17
**West** [1] - 156:10
**western** [1] - 60:24
**wet** [1] - 38:10
**whatsoever** [5] - 62:1, 67:15, 67:19, 68:7, 249:13
**whistleblowers** [1] - 46:23, 48:5

**white** [4] - 52:11, 154:9, 154:18, 154:19
**WHITNEY** [1] - 1:16
**Whitney** [1] - 3:17
**whole** [14] - 16:2, 81:8, 86:9, 106:21, 107:18, 109:20, 115:23, 124:14, 130:15, 133:10, 151:9, 205:19, 207:3, 262:18
**widely** [1] - 68:3
**widespread** [2] - 234:3, 236:9
**wife** [1] - 212:24
**Wilhelm** [6] - 60:21, 240:25, 241:2, 241:7, 241:13, 242:8
**willfully** [1] - 30:24
**willing** [4] - 70:3, 70:4, 70:12, 70:15
**willingness** [1] - 216:11
**Wilmington** [1] - 1:22
**windfall** [1] - 135:17
**wined** [3] - 45:23, 72:2, 72:24
**wink** [1] - 64:1
**winning** [1] - 77:17
**wipe** [1] - 64:8
**Wirmani** [2] - 3:15, 46:18
**WIRMANI** [8] - 1:15, 3:15, 44:25, 259:6, 260:21, 260:24, 264:1, 264:9
**wish** [1] - 41:11
**witness** [67] - 4:23, 4:24, 14:18, 14:19, 14:20, 15:11, 25:16, 25:23, 27:22, 33:18, 37:18, 37:23, 37:24, 37:25, 38:1, 39:1, 39:2, 39:5, 39:6, 39:10, 39:12, 39:13, 40:1, 40:4, 40:7, 40:13, 41:4, 47:8, 61:3, 61:18, 65:1, 77:21, 79:6, 82:13, 139:15, 139:25, 141:20, 141:24, 142:3, 173:10, 173:14, 173:18, 184:14, 202:10, 227:9, 245:7, 249:23, 251:9, 252:3, 252:23, 254:4, 254:7, 254:19, 254:25,

255:11, 256:4, 266:16, 266:22, 267:2, 267:5, 267:6, 267:10, 267:11, 267:15, 267:18
**WITNESS** [3] - 142:13, 170:25, 173:20
**witness's** [4] - 39:7, 39:9, 39:14, 41:5
**witnessed** [3] - 47:2, 143:6, 238:18
**witnesses** [47] - 14:18, 15:5, 15:8, 15:13, 36:1, 39:1, 39:19, 39:21, 39:25, 40:1, 40:11, 42:8, 43:4, 43:8, 48:23, 49:1, 59:25, 61:17, 61:18, 62:3, 69:23, 71:15, 76:20, 77:20, 77:24, 78:15, 78:19, 78:24, 79:4, 79:5, 82:11, 82:19, 106:19, 118:2, 118:5, 121:5, 121:21, 124:15, 139:18, 140:8, 140:12, 140:19, 141:6, 141:23, 253:9, 253:19, 266:12
**Witnesses** [2] - 38:22, 39:23
**Witteck** [1] - 158:7
**women** [1] - 87:6
**wondering** [1] - 205:5
**word** [4] - 27:14, 47:20, 56:19, 120:9
**words** [7] - 32:6, 34:9, 55:12, 56:15, 74:16, 148:5, 219:21
**worker** [1] - 152:13
**workers** [2] - 118:22, 120:22
**works** [3] - 76:11, 76:13, 96:20
**workshop** [2] - 194:6, 194:21
**workshops** [2] - 157:11, 193:22
**world** [3] - 45:4, 49:10, 159:10
**worried** [1] - 44:2
**worry** [2] - 27:2, 125:14
**worth** [5] - 10:13, 65:17, 128:14, 187:17, 229:24
**worthless** [1] - 75:13
**worthy** [1] - 39:1

**write** [5] - 103:1, 108:19, 123:9, 201:14, 210:16
**writes** [1] - 96:20
**writing** [20] - 16:17, 27:11, 27:16, 43:21, 44:2, 63:5, 63:11, 63:21, 66:21, 75:17, 98:19, 184:9, 198:5, 214:15, 214:23, 214:24, 215:8, 215:9, 215:10
**written** [10] - 27:7, 63:16, 63:24, 65:17, 99:2, 103:20, 104:22, 121:8, 123:6, 233:23
**wrongfully** [2] - 77:2, 83:9
**wrote** [16] - 39:13, 105:1, 113:7, 114:7, 121:16, 121:19, 121:21, 130:9, 173:23, 184:5, 190:8, 210:14, 243:11, 243:12, 243:13, 243:14
**WYATT** [3] - 1:20, 4:6, 257:13
**Wyatt** [4] - 4:6, 85:18, 130:12, 257:13

**X**

**XYZ** [1] - 51:10

**Y**

**Yacovellis** [1] - 194:20
**Yancovitz** [1] - 158:4
**year** [24] - 6:14, 17:7, 53:19, 63:7, 64:15, 71:23, 81:7, 88:7, 93:15, 94:2, 104:10, 119:21, 145:8, 161:9, 163:1, 174:14, 176:3, 183:7, 188:25, 193:21, 199:25, 233:16, 233:17
**year-to-date** [1] - 188:25
**years** [47] - 13:3, 47:1, 47:5, 58:8, 59:18, 61:5, 73:13, 74:7, 75:2, 75:22, 76:13, 83:10, 90:8, 104:8, 105:23, 107:13, 114:16, 114:21, 116:1, 116:16,

117:11, 117:23, 143:14, 143:22, 143:23, 151:7, 151:8, 151:23, 153:19, 154:1, 155:18, 155:22, 158:9, 159:3, 159:5, 188:14, 188:15, 217:18, 232:23, 239:22, 240:17, 242:24, 243:24, 245:11, 253:13, 253:20, 257:20
**yell** [2] - 234:16, 234:17
**yellow** [1] - 91:14
**yesterday** [10] - 8:1, 16:2, 26:23, 34:23, 35:10, 46:19, 85:17, 244:10, 244:14, 267:17
**York** [23] - 31:15, 146:12, 147:18, 147:19, 149:21, 151:20, 156:7, 158:22, 174:9, 179:11, 180:9, 184:19, 186:12, 188:24, 190:12, 197:9, 203:7, 204:1, 204:8, 204:16, 204:20, 210:11, 210:18
**yourself** [3] - 60:18, 114:10, 143:11
**yourselves** [4] - 32:10, 79:7, 206:6, 265:11
**YouTube** [1] - 33:17

**Z**

**ZAHID** [2] - 1:11, 3:2
**Zantac** [2] - 144:19, 145:2
**Zerit** [6] - 147:22, 147:25, 148:7, 149:12, 150:4
**zone** [1] - 116:3