```
 1              UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF NEW JERSEY
 2

 3   ─────────────────────────────

     UNITED STATES OF AMERICA, et    CIVIL ACTION NUMBER:
 4   al,
          Plaintiffs,               3:12-cv-07758-ZNQ-JBD
 5
          v.                         JURY TRIAL VOLUME 2
 6
     JOHNSON & JOHNSON, JANSSEN
 7   PRODUCTS, L.P.
          Defendants.
 8   ─────────────────────────────
              Clarkson S. Fisher Building & U.S. Courthouse
 9            402 East State Street
              Trenton, New Jersey  08608
10            May 8, 2024
              Commencing at 9:00 a.m.
11
     B E F O R E:            THE HONORABLE ZAHID N. QURAISHI,
12                           UNITED STATES DISTRICT JUDGE

13   A P P E A R A N C E S:

14        REESE MARKETOS
          BY:  PETE MARKETOS, ESQUIRE
15             JOSH RUSS, ESQUIRE
               ANDREW WIRMANI, ESQUIRE
16             ADAM SANDERSON, ESQUIRE
               WHITNEY WENDEL, ESQUIRE
17        750 N. Saint Paul Street, Suite 600
          Dallas, Texas 75201
18        For the Relators

19        SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
          BY:  ALLISON M. BROWN, ESQUIRE
20             GEOFFREY M. WYATT, ESQUIRE
               BRADLEY A. KLEIN, ESQUIRE
21        One Rodney Square
          920 King Street
22        Wilmington, Delaware
          For the Defendants
23
          Megan McKay-Soule, Official Court Reporter
24             Megan_McKay-Soule@njd.uscourts.gov
                    (609) 815-2319
25   Proceedings recorded by mechanical stenography; transcript
          produced by computer-aided transcription.
```

I N D E X

EXAMINATIONS                                          PAGE

**DONNA GRAHAM**
CROSS-EXAMINATION BY MS. BROWN                        352
REDIRECT EXAMINATION BY MR. RUSS                      489
**SARA STRAND**                                       527
DIRECT EXAMINATION BY MR. WIRMANI                     527

E X H I B I T S

Exhibit No.        Description                         Page
Defendant's Exhibit D-81 in                           379
evidence.
Defendant's Exhibit D-85 in                           381
evidence.
Defendant's Exhibit D-2095 in                         384
evidence.
Defendant's Exhibit D-8697 for                        395
identification.
Defendant's Exhibit D-8701 in                         403
evidence.
Defendant's Exhibit D-8637 in                         422
evidence.
Defendant's Exhibit D-8635 in                         427
evidence.
Defendant's Exhibits D-8556 and                       438
D-8567 in evidence.
Defendant's Exhibits D-2104 and                       444
D-2105 in evidence.
Defendant's Exhibit D-8560 in                         461
evidence.
Defendant's Exhibit D-6061 in                         483
evidence.
Plaintiff's Exhibit 1148 in                           560
evidence.
Defendant's Exhibit 1102 in                           571
evidence.
Plaintiff's Exhibit 87 in                             579
evidence.
Relators' Exhibit 222 in evidence.                    592
Plaintiff's Exhibit 272 in                            611
evidence.
Plaintiff's Exhibit 27 in                             613
evidence.
Plaintiff's Exhibit 132 in                            618
evidence.
Plaintiff's Exhibit 353 in                            620
evidence.

1          (PROCEEDINGS held in open court before The Honorable

2     ZAHID N. QURAISHI, United States District Judge, on May 8,

3     2024, at 9:00 a.m.)

4               THE DEPUTY COURT CLERK:  All rise.

5               THE COURT:  All right, folks.  You may be seated.

6          Let me just have appearances just for the full day this

7     morning, beginning with the Relators' counsel.

8               MR. MARKETOS:  Good morning, Your Honor.

9     Pete Marketos for the Relators.

10              MR. RUSS:  Good morning, Your Honor.  Josh Russ for

11    the Relators.

12              MR. WIRMANI:  Andrew Wirmani for the Relators, Judge.

13              MS. WENDEL:  Good morning.  Wendy Wendel for

14    Relators.

15              THE COURT:  Good morning, folks.

16         And from the defense.

17              MS. BROWN:  Good morning, Your Honor.  Alli Brown for

18    Janssen.

19              MR. WYATT:  Good morning, Your Honor.  Geoff Wyatt

20    for Janssen.

21              MR. KLEIN:  Good morning, Your Honor.  Brad Klein for

22    Janssen.

23              THE COURT:  All right.  Good morning to you all.

24         So do we have any other housekeeping issues we need to

25    address before I talk a little bit about the issue that I

```
 1   raised yesterday?

 2         Mr. Marketos?

 3          MR. MARKETOS:  We do not, Your Honor.

 4          THE COURT:  All right.  Ms. Brown, anything else?

 5          MS. BROWN:  No, nothing from us, Your Honor.

 6          THE COURT:  All right.  Well, then I going to speed

 7   up a little bit.  I'm going to give you my thoughts first,

 8   then I'll hear from you if you disagree or if you have

 9   something else you want to place on the record.

10         Let me just first say at the outset that the issues I

11   raised yesterday with respect to the references to the

12   Department of Justice, there was no objection from the

13   defense.  I raised it sua sponte, and I will tell you all that

14   it's rare that I do that.

15         In this particular case -- I usually sit back.  If

16   there's no objection, I allow you all to try the case and

17   defend the case the way you want to.  But in this particular

18   instance, because it was related to an opinion that I gave on

19   the motion in limine, I felt obligated to raise the issue, at

20   least to issue-spot it for the parties to discuss it, because

21   in my opinion on that motion in limine from the Relators, I

22   had left it open that if I thought that the door had been

23   opened, that we revisit this issue as to whether the defense

24   would be prohibited or excluded from addressing the issue of

25   the government deciding not to intervene in the case.
```

1          Let me tell you, after reviewing the transcript -- and

2     I will tell you, I'll hear from you, but the focus is more on

3     the testimony from Ms. Graham.  I'm less concerned about your

4     opening statements.  They're not evidence.  Whether your

5     opening statements are married to what happens in the trial or

6     not is on you folks, not on me.  So I'm a little less

7     concerned --

8          Bear with me.  I think my computer is making noise.

9          -- is less concerning to me.

10          But when I reviewed the transcript of Ms. Graham's

11     testimony, there are references to the Department of Justice.

12     I will tell you that upon reading those references, I don't

13     believe that the Relators, through that particular testimony,

14     has opened the door for the defense to address the issue of

15     the Government reviewing this case and making a decision not

16     to intervene.  And I stand by my initial opinion, which is a

17     whole can of worms that we'd have to get into where the

18     Government's decision not to intervene in a particular qui tam

19     case can be for a slew of reasons, not necessarily because of

20     materiality or any other issues.  And I don't believe that's

21     how the testimony came out from Ms. Graham.

22          Here is my concern, though.  There is nothing in the

23     preliminary instructions, or even in the proposed instructions

24     that the parties have provided to the Court, that educates

25     these jurors about the False Claims Act.  And what I mean is

1    something as simple as, you know, in order for a private

2    citizen to bring a claim under the False Claims Act, they

3    first have to disclose their allegations to the Department of

4    Justice before bringing suit in federal court, or words to

5    that effect.  And also, the Department of Justice is not

6    involved in this case.

7        So my thought is, you know, we have 12 jurors that

8    probably don't know anything about qui tam or the False Claims

9    Act.  They have no idea why the Department of Justice is being

10   referred to.  They may have no idea why the Department of

11   Justice would have any involvement when you have private

12   citizens, these Relators, that have brought a federal lawsuit

13   in federal court.

14       And so my thought process is to have some form of

15   instruction to the jury that maybe you all meet and confer on

16   and I can say, maybe at the conclusion of Ms. Graham's

17   testimony, that would apply throughout the case, and maybe

18   even insert it in the final instructions that say something to

19   this effect -- and I haven't created the language.  I really

20   think the attorneys should be kind of working through this

21   because you may come to some agreement because it's very

22   boilerplate.  But something to the effect of:

23       You heard testimony from Ms. Graham where she has

24   referred to the Department of Justice on several occasions.

25   To be clear, in order for a private citizen to bring a claim

1  under the False Claims Act, they first have to disclose their

2  allegations to the Department of Justice.  The Department of

3  Justice is not involved in this case.  Period.

4      Now, in that -- in that type of instruction, I'm making

5  them aware -- because they might hear the Department of

6  Justice again from another witness.  They might hear it from

7  the Relators, right, in this present case.  I want to give

8  them some context because I don't like the narrative of

9  leaving it kind of open for the jurors when they have no

10  education about this type of a lawsuit, there's no instruction

11  to them, and we left them thinking, like, well, what's the

12  Department of Justice doing about this case?  Or are they

13  representing the Department of Justice?  Are they in this

14  case?  Are they doing something separate?

15      So that instruction -- I know I'm paraphrasing, but

16  that language that I just provided to you is kind of what my

17  recommendation would be.  It will give them context for

18  Ms. Graham's testimony, as well as any other time they might

19  hear a reference to the Department of Justice.

20      And I also think that at the conclusion -- in the final

21  instructions, that specific instruction that you all agreed to

22  that I'm giving to the jurors at the conclusion of

23  Ms. Graham's testimony would be inserted, and maybe it would

24  be even more detailed.  I don't know.  Maybe there's a more

25  detailed procedure for bringing a lawsuit from the False

1   Claims Act that we would have in the final instructions so

2   they have some context for this.

3       So that's where I'm landing based upon my review of the

4   testimony.  Now, that doesn't mean that if something else

5   happens in the next five weeks, we wouldn't revisit this

6   issue, but that's where I land now based on the testimony that

7   I reviewed from Ms. Graham.

8       Let me first hear from Relators' counsel as to, one,

9   whether you agree with that assessment; two, whether you agree

10  with my recommendation or at least where I'm inclined to go.

11  But for now I'm making a recommendation that some form of

12  instruction should be given to the jurors so they have some

13  context for this, because that is going to come up again; I

14  guarantee it.  And at least in my experience -- and look, you

15  folks have worked with the FCA much more than I have.  I mean,

16  even as a practitioner, this wasn't my wheelhouse.  But I'm

17  trying to pretend I'm one of these ten jurors sitting in the

18  box.

19      They have even less knowledge than all of you, and

20  certainly less than me, and so I don't know if they have any

21  context for these references.

22      So, Mr. Marketos, I don't know if -- I presume you've

23  reviewed Ms. Graham's testimony as well.  But maybe focus a

24  little bit on what I'm recommending, and then tell me where

25  you agree or disagree.

```
 1          MR. MARKETOS:  Absolutely, Your Honor.  I think the
 2   clarification on the instructions is a good idea.  I actually
 3   think that the parties proposed an instruction that was an
 4   agreed Instruction Number 2, but it, based on what you're
 5   saying, Your Honor, would need to be beefed up a little bit.
 6          When we agreed on our Instruction Number 2, it just
 7   said the Relators are X, Y, and Z and they are would bring
 8   claims on behalf of --
 9          THE COURT:  I saw that sentence, by the way.  I did
10   see that, Mr. Marketos.  So I'm not saying you didn't have
11   anything in the final instructions.  But I'm not sure that's
12   enough either because --
13          MR. MARKETOS:  Right.
14          THE COURT:  -- that's something that, when you put it
15   in there, I think we all understand what you're all proposing
16   there.  But if you're one of these folks, right, that really
17   has no appreciation for this type of a lawsuit, I think a
18   little bit more context is required.
19          I'm not saying we need to have paragraphs on how to
20   bring a False Claims Act where you have that, you know, this
21   is step 1 and step 2 and step 3.  I also don't think we need
22   to go into the steps of, you know, the Government then reviews
23   the case and they have the ability to investigate and all
24   those things.  I mean, that's where we kind of get into the
25   issue where I precluded Janssen from raising it in the first
```

 1    place.  But the concept of them having to report their

 2    allegations as part of the process to bring this suit as

 3    private citizens under the FCA, that, to me, I don't believe,

 4    necessarily prejudices the Relators or Janssen, and it -- also

 5    we make it clear.  The Government is not -- the Department of

 6    Justice is not in this case as a party.

 7         So is there any objection to that type of instruction?

 8         MR. MARKETOS:  There's not at all.  And the only --

 9    the only slight point I would raise is, of course, Ms. Graham

10    was testifying about a different case in the Eastern District

11    of Pennsylvania.  So it's two steps removed, and I want to be

12    perfectly clear on that, that Mr. Russ's examination of her

13    was about how she had filed a case and then it got

14    dismissed --

15         THE COURT:  But do you anticipate that it will come

16    up in this case as well at some point in the trial, that the

17    Relators in this case disclosed their allegations to the

18    Department of Justice and then brought suit in federal court

19    or something to that effect?

20         MR. MARKETOS:  It could.  It could, yes, Your Honor.

21    And that's why I think a suggestion about an instruction is a

22    good one.

23         The tension that we will work on with opposing counsel

24    will be between those procedural steps that you described.  So

25    we're not inviting the Government to decline the case, but

1    also, the Government filed a statement of interest in this

2    case, right, on your docket.  And the Government is interested

3    in the case, but they're not in the case --

4        THE COURT:  Yeah, I don't think we need to go there

5    one way or the other.

6        All right.  Let me -- I'm sorry, Mr. Wyatt.  I'm sure

7    Janssen's disagreeing, but let me hear your thoughts as well.

8        MR. WYATT:  Appreciate that, Your Honor.  Geoff Wyatt

9    for Janssen.

10        So we agree that at the very least an instruction would

11    be required.  But I don't think that goes far enough.  I

12    actually had a different reaction after going through the

13    testimony yesterday, which is that it was worse looking at it

14    again than -- than sort of maybe I initially appreciated the

15    first time.

16        We have the impression created precisely because of

17    Your Honor's -- I think this goes to the heart of the issue --

18    that, yes, we understand how a qui tam process works but the

19    jury does not understand that at all.  Right?

20        So the way this was -- this came in yesterday was, you

21    know -- and I think in an effort to inoculate against cross --

22    why didn't you do anything while you were on the job?  Right?

23    Why did you wait three years?

24        And she says, Well, I did some reflection, and then I

25    went to the DOJ.

```
 1          That's not even true.  She didn't even go to the DOJ.
 2          THE COURT:  Well, that -- that, you can deal with on
 3   cross-examination.
 4          MR. WYATT:  Understood, and we are.  And I do want to
 5   separate the two.
 6          So we should be able to, in my opinion, go into the
 7   Eastern District of Pennsylvania case soup to nuts because
 8   that's on the table, and we now need to talk about that:  what
 9   happened there, what the issues were.
10          The in limine here is about talking about defamation in
11   this case.  There's no in limine about talking the Eastern
12   District of Pennsylvania case, which is a different lawsuit,
13   as counsel just said.
14          So that is a separate issue, but it was connected up to
15   this case.  Right?  And the reason for invoking the DOJ very
16   clearly was to suggest that the DOJ was sort of -- their
17   attention was brought to this matter and the DOJ cared about
18   this matter.  It wasn't an empty gesture --
19          THE COURT:  I don't necessarily agree with that, and
20   I think that's your interpretation of why it was brought up.
21   I agree with -- and I don't know if it was Mr. Marketos or
22   Mr. Russ yesterday, but I agree with their initial assessment
23   that the reason why it was raised is to somewhat corroborate
24   Ms. Graham's testimony that, look, she had raised similar
25   issues to the Relators in this case in a prior lawsuit, and
```

1  that was to -- I think in some ways to bolster or -- maybe her

2  credibility or to bolster the credibility of the Relators in

3  this case, that she's independent and apart from this case and

4  yet she brought very similar allegations that did not move

5  forward because the Relators in our particular case were

6  first-to-file.

7      That's my interpretation.  I understand that your

8  interpretation is different.  But I don't believe, after I

9  reviewed verbatim -- and, again, yesterday was my

10 recollection, last night --it's very different when I review

11 what was said.  My take was there was nothing in there that

12 was explicit or implicit that the Department of Justice is

13 somehow supporting this particular case or supporting the

14 Relators' case.

15     MR. WYATT:  Sorry.  If I could just jump in, Your

16 Honor.  I understand the witness is in the courtroom and we're

17 talking about issues that may come up.

18     THE COURT:  Yeah.  Why is the witness in the

19 courtroom?

20     MR. MARKETOS:  We'll excuse the witness.

21     THE COURT:  Excuse the witness because Janssen is

22 still able to cross-examine.  And I don't know to what extent

23 that we're discussing maybe part of the cross.

24     MR. MARKETOS:  She is on cross.  Do you want me to

25 explain or --

1        THE COURT:  Yeah.  I'm not going to get off the bench

2   to do it.  You're going to have to bring her out and put her

3   somewhere, and we'll bring her back in when we're ready.

4        Yeah, folks.  When we have these issues in

5   housekeeping, I don't want any witnesses in the room,

6   especially when somebody's going to be on cross-examination

7   and some of what we discuss may be at the heart or at least a

8   portion of that cross-examination.

9        So let's be mindful of that moving forward.

10       Sorry, Mr. Wyatt.

11        MR. WYATT:  No, I appreciate that, Your Honor.

12       So to continue, that was the way this issue was

13   introduced.  And what really happened was -- and to your

14   point, and this is a cross-point, but I think it's relevant

15   context -- the witness went to a lawyer, filed a lawsuit, and

16   when she alleged, I am entitled to 25 percent of any recovery

17   in this case -- and then because the statute requires her to

18   do so, reported that to the DOJ.  Under 31 U.S.C. 3270, you

19   have to serve the Government within a certain period of time

20   with your complaints.

21       So that's how the DOJ got involved.  It was not I went

22   to ring the alarm, the DOJ came to my side and agreed with

23   this.  What we heard about it after that point, at least nine

24   times in yesterday's testimony, DOJ this, DOJ that, repeatedly

25   was framed as filing an action with the DOJ, implying to a

```
 1    jury who doesn't understand the procedure, certainly, that the
 2    DOJ was a coparty --
 3         THE COURT:  Right.  But all that can be cured by the
 4    proposed instruction that I'm presenting to you all.  And I'm
 5    not saying that you have to agree to the exact language that
 6    I'm proposing, and this is just coming from me.  But you can
 7    all agree on language that completely clarifies that issue.
 8         I agree with you, Mr. Wyatt.  Leaving this testimony
 9    alone is not where I'm inclined to go.  I'm inclined to give
10    some form of instruction to the jury, but I also think that
11    it's incumbent upon you all to first meet on this to say, What
12    do we think is a sufficient instruction to educate?
13         And look, if there's a dispute as to how much of an
14    instruction to give, well, I'll be the first one to resolve
15    that for you all.  But I think, at a bare minimum, you should
16    all do the homework first, present it to me, and then I can
17    make a call if for some reason you're not in agreement.
18         MR. WYATT:  We'll do that, Your Honor, and I'll wrap
19    up.  But I just want to sort of bring it home because it
20    didn't just stay in the EDPA silo, right?  Like, at some point
21    the question was asked, you know, Did you learn at some point
22    that Ms. Brancaccio and Ms. Penelow had filed this action with
23    the Department of Justice?  And it's the same theme.  And they
24    go on to say, Well, first-to-file rule, I couldn't pursue it.
25         The suggestion really is that the DOJ was looking at
```

 1    one or two cases to join, it joined this case because this

 2    case was first filed.  That is the impression that I am very

 3    concerned that the jury is left with, and I'm not a hundred

 4    percent sure that an instruction solves that problem, you

 5    know, without us being able to very specifically say, DOJ had

 6    an option to intervene; it heard the allegations from

 7    Ms. Graham and from these Relators, and it chose not do so.

 8            THE COURT:  All right.  I hear your point, and, look,

 9    I think that's a leap, Mr. Wyatt.  I don't think that based on

10    what was testified the jury has some impression that the

11    Department of Justice is supporting this case or somehow on

12    board with it.

13            And, again, to the extent it's left open, which -- I

14    agree and we don't want the jurors speculating about it -- an

15    instruction -- and not a curative instruction.  I don't think

16    there's anything to cure.  What I'm saying is an instruction

17    that explains to them that the Department of Justice is

18    required to be involved in order for a private citizen to file

19    a claim -- or the FCA.  It's sufficient to satisfy the concern

20    from Janssen and the Court's concern that I raised initially

21    yesterday.  So that's where I land on it.

22            And just to be clear, my analysis doesn't change if for

23    some -- because Ms. Graham raised that Relators in this case

24    went to the Department of Justice.  It's the same issue.

25            I guess I'm kind of curious, though.  In all the False

1    Claims Act cases that you've worked on, there's no instruction

2    that you all normally provide to a jury to educate them about

3    that particular part of the process so they have some

4    understanding about why the Department of Justice is being

5    involved here?

6        Look, in a regular civil lawsuit, right, you have

7    plaintiffs, you have a defendant or defendants, and you don't

8    have to educate jurors, really, on any of that.  Right?

9    Plaintiffs bring a lawsuit.  There's no middle entity by the

10   Government in order to proceed as a private citizen.

11       I'm kind of curious, though.  Why is this an issue that

12   I'm raising?  Or am I missing something here and I'm being

13   overly cautious about my jury that's sitting here?

14       MR. WYATT:  So, Your Honor, I would say you're right,

15   this is a unique area in the law.  This comes up -- we tried a

16   case in the last couple years.  I don't remember there being

17   an instruction on it.  It absolutely came in, that they had to

18   go report it to the Department of Justice.  In that case the

19   judge said, Okay, but you can't get into the declination

20   decision, because all the case law is the same.  That opens

21   the door to what did the Government actually think --

22       THE COURT:  Right.

23       MR. MARKETOS:  -- was it resources driven, was it

24   because of the -- whatever host of reasons.  Maybe they didn't

25   have a AUSA in the civil division as an ASA attorney that

 1    could have proceeded with it.

 2         So -- or maybe -- in this case I think the ASA maybe

 3    either retired, went into private practice -- I mean, so

 4    there's a whole host of reasons that we would spin off and

 5    talk about.

 6         But no, I think it is appropriate to educate the jury a

 7    little bit, and it may have been my fault for assuming that,

 8    you know, that was more well known, that you had to --

 9         THE COURT:  And look, maybe I'm wrong, but I don't

10    think a layman who sits in the jury --

11         MR. MARKETOS:  I think you're right.

12         THE COURT:  -- and based on the jury we have, I don't

13    know if even one of the ten fully can appreciate how one of

14    these cases is brought.

15         All right.  So it doesn't sound like there's any

16    objection from the Relators.

17         Mr. Wyatt, I presume -- I don't want to presume.

18         MR. WYATT:  No, I understand the Court's ruling.

19    We'll work with the Relators on the instruction.

20         In answer to your question, it really just varies from

21    case to case, right, like, it depends on how it comes in.  So

22    in this case, as I said, I think we at the very least need an

23    instruction --

24         THE COURT:  All right.

25         MR. WYATT:  -- to spell this out, and I think

 1    Your Honor gave us the language to work with and we can do

 2    that.

 3         There is at least one other issue that I want to

 4    address that's related to this, which is -- because this is

 5    going to come up -- right?

 6              THE COURT:  Right.

 7              MR. WYATT:  Yesterday it was brought up that the --

 8    and you alluded to it earlier, Your Honor, when you started,

 9    about the opening statement and the memo that was given there.

10         That is not at all related to this issue.  That's not

11    an intervention issue.  That -- does the Government have

12    knowledge and then choose to keep paying for the product?

13    That is core materiality.  I mean, that's straight out of --

14              THE COURT:  Yeah, this has to do with the fact that

15    you're saying the Government is aware, yes, they're still

16    reimbursing --

17              MR. WYATT:  Correct.

18              THE COURT:  -- for these things.

19         I will tell you, I agree with what I said yesterday.  I

20    don't know what term I used.  I think it was like apples and

21    oranges or apples and bananas.  They're completely separate.

22    I don't find that in the context of Janssen's opening with

23    respect to the Government they were even touching on this

24    particular issue about intervention.

25         So I agree with you there, Mr. Wyatt.

1          And, Mr. Marketos, if you want to put something on the

2     record, that's fine.  It won't change where I'm going with

3     that.  But I did hear you all yesterday on this.

4          So tell me if you want to put something additional on

5     the record about that, but I find those to be completely

6     separate issues, and I haven't changed my mind today about

7     that.

8          MR. MARKETOS:  Yes, Your Honor.  You're right.  They

9     are separate issues until you get to the memo that she's

10    talking about.

11         THE COURT:  All right.  Well, I don't have the memo

12    yet.

13         MR. MARKETOS:  Yeah.

14         THE COURT:  If there's a really an issue with the

15    memo, it's hard for me to discuss without me pulling it up.

16    And I'm -- if we -- I guess what I'm saying is when is this

17    memo going to be involved?  I don't think we have to do that

18    this morning.  Right?  If there's still an issue about this

19    memo, I'll address it in real time as it comes up or, you

20    know, later in the trial when the defense has this and is

21    going to be maybe moving to admit it or the morning of that

22    particular day where you're going to say, Judge, remember this

23    memo we've been talking about, today's the day or tomorrow's

24    the day.

25         So why don't we just table that for now since it's not

1  going to be an issue for this morning.

2       And I do want to give you some time this morning -- and

3  I don't even know -- on the lunch break because it's my

4  intention to give that instruction at the conclusion of

5  Ms. Graham's testimony.  Not all the way in the final

6  instructions, not wait for four other people to reference the

7  DOJ.

8       So you all need to get your heads together this morning

9  and maybe during breaks and then let me know when we finish

10  Ms. Graham's testimony if we have to sidebar some dispute or

11  you guys have come to an agreement.

12       But I want to be clear:  Don't make this a treatise.

13  Right?  The proposed instruction that I am kind of

14  recommending is, in essence, kind of the length of that

15  instruction.  It really is only going to hit on one part of

16  this.  I'm not intending to explain the entire False Claims

17  Act process to this jury.  I don't find it relevant to the

18  trial, and then it starts to involve the Government more, and

19  then we're right back to square one where we're talking about

20  intervention.

21       So none of that's going to be part of it.  It's really

22  just about explaining to them why they're even hearing

23  references to the Department of Justice.

24       So I just want to be careful that you guys don't take

25  this work on an instruction and I've got five pages from one

1  party and half a page from another, because I'm telling you

2  right now, this is going to be half a page or less.

3        So just be mindful of what, you know, what I'm inclined

4  to do with that instruction so you're not wasting your own

5  time or mine.

6        Sorry, Mr. Marketos.  I know you're standing, and I'll

7  get back to Mr. Wyatt.  But what -- do you have anything

8  further?

9            MR. MARKETOS:  No, Your Honor.

10           THE COURT:  All right.  So Mr. Wyatt, do you have

11  anything further that you want to place on the record?

12           MR. WYATT:  Just one point of clarification,

13  Your Honor.  We do want to get into the declination in the

14  EDPA case, and I don't understand that to be in the scope of

15  the ruling, but I do want to clarify that before we ask the

16  question --

17           THE COURT:  Well, then -- but then here's the

18  problem, right?  You're going to talk about the very same

19  process in the EDPA case.  You're going to talk about

20  declination, which is then going to open the door and the

21  question of Well, what happened in this case?

22        So they're going to want to have some implied narrative

23  that the DOJ is intervening in this case.  But when I give an

24  instruction that DOJ is not in this case, now you've got your

25  intervention in through the back door.  So the answer is no.

1    You're not going to go into intervention in this case or in

2    the EDPA case, because for me, I find that to be a back door

3    to getting an intervention in this case, which I've already

4    precluded.  And, again, nothing to this point has changed the

5    record that would make me revisit that.

6         Now, a week from now or weeks from now if you believe

7    that the door has been opened because of the opinion that I

8    have in the motion in limine, it's always going to be an

9    asterisk.  Right?  If the door is opened, you can revisit it.

10   I wouldn't revisit it, though, if the testimony is

11   substantially similar to what Ms. Graham did.  It's going to

12   have to be something more than that.

13        But I'm not precluding you, Mr. Wyatt, or Janssen from

14   raising the issue later in trial if you think something worse

15   has happened now that has put something before the jury that

16   the Government is somehow part of this case.

17        But I'm telling you, for now, I think this is the

18   appropriate way to channel it.

19         MR. WYATT:  Understood.  And just to make the -- to

20   complete the record on that issue, I do think this witness has

21   opened the door by talking about the fact that her case was

22   dismissed because she was told -- we don't know by whom --

23   that hers is not the first to be filed.

24        There's a broader procedural history to that case.

25   Clearly the fact that the Government declined to intervene

1  could've played into the decision to dismiss or whatever

2  actions were taken after that, and so I think that case does

3  stand on a different posture from this one, at least in terms

4  of the testimony that's come in so far.

5       THE COURT:  I don't read it that way.  I think that her

6  case did not proceed, whether it's -- well, her case didn't

7  proceed, right?  So we know -- and I think you can come out in

8  cross-examination, the Department of Justice is not involved

9  in her case.  But I don't want you getting in to intervention.

10      MR. WYATT:  Okay.

11      MS. BROWN:  Okay.  So I just want to make sure I

12  don't run afoul of the Court's ruling.  Talking about the EDPA

13  cases is fine.  The Government was not a part of that case.

14  You dismissed that case.  That's all fine.  I won't show the

15  declination.

16      THE COURT:  I believe that's -- I think that's

17  sufficient.  If there's an objection, Mr. Marketos, let me

18  know.  But, no, all of that is free game.

19      MS. BROWN:  Okay.

20      MR. MARKETOS:  Yeah, the case is under seal, so that

21  is --

22      MS. BROWN:  It's not -- well --

23      MR. MARKETOS:  It's under seal, sorry.  So -- but

24  however she plans to deal with that, I think we just should

25  talk about it first, and maybe we can confer on that and save

1    Your Honor the heartache of --

2          THE COURT:  Well, I don't know.  What do you mean by

3    that?  The case is under seal and so what?

4          MS. BROWN:  Yeah.

5          THE COURT:  I mean, so she spoke about it verbally in

6    open court --

7          MR. MARKETOS:  No, I understand.

8          THE COURT:  -- in a public proceeding, so...

9          MR. MARKETOS:  She did, and she said it's under seal.

10          THE COURT:  That's fair.

11          MR. MARKETOS:  So that's just the complaint.  It's in

12    the record.  She said it's under seal.  It was dismissed.

13          THE COURT:  But I don't think -- I don't think

14    Ms. Brown is just saying, I'm going to go into all the

15    allegations in this complain that's under seal.

16        I think she said, Is it -- is it free game for me to be

17    able to cross-examine on some of these topics like the

18    Government's not involved in your case.  Your case has either

19    been dismissed or is not proceeding forward.

20          MR. MARKETOS:  Fine by us, Your Honor.

21          THE COURT:  All right.  Ms. Brown, sorry, is there

22    anything more?  I do want you all to be careful though.  Do

23    not go into intervention in the EDPA case or in this case

24    but -- but other than that.

25          MS. BROWN:  I will.  I mean, to be perfectly fair,

      1    I'm just going to do -- Government's not involved, you

      2    dismissed the case, and one other issue on the caption.  You

      3    know, she amended the complaint to remove her name.

      4            THE COURT:  All right.

      5            MS. BROWN:  So that's all I'm doing.

      6            THE COURT:  All right.  I don't have any issues

      7    there, and like I said, if something does come up in real

      8    time, an objection can be raised.

      9            MS. BROWN:  Sure.

     10            THE COURT:  And I'll deal with you folks outside of

     11    your earshot of the jury.

     12         All right.  So I'm sorry.  I know this -- well,

     13    anything further from Plaintiff?

     14            MR. MARKETOS:  No, Your Honor.  Thank you.

     15            THE COURT:  Ms. Brown, anything further that we need

     16    to address this morning?

     17            MS. BROWN:  I do just have a logistical issue I

     18    wanted to raise with the Court.  Is it okay if I question from

     19    this podium so I can use the ELMO there, and I'll have a mic

     20    on?

     21            THE COURT:  I don't have any issue.  Look, I've got

     22    a -- I have an imaginary line, right?  You see where counsel

     23    is at the edge of the Relator's table?

     24            MS. BROWN:  Yep.

     25            THE COURT:  Nobody go beyond that.  That's two feet

1    from the first row of the jurors.

2              MS. BROWN:  Right.

3              THE COURT:  Do not encroach in that space.  It's an

4    imaginary line, but I don't want you that close.  But -- so

5    where will you put the --

6              MS. BROWN:  So yeah.  So I was just hoping to put my

7    documents next to me, question from the podium, and I like to

8    use hard copy documents, so I was going to give counsel and

9    the witness a binder of what's going up on the screen.

10             THE COURT:  I don't have -- I don't have any

11   objection to that.  And, counsel, you're able to use that

12   podium as well, but I don't know if there's any objection to

13   be raised by this.

14             MR. MARKETOS:  No.

15             THE COURT:  But I have no issues there.

16             MS. BROWN:  Thank you.

17             THE COURT:  And are you going to leave the podium

18   exactly where it is, or are you moving it somewhere else?

19             MS. BROWN:  Yeah, exactly, just so I can reach the

20   ELMO.  Otherwise it's going to be a lot of --

21             THE COURT:  Yeah, I don't have any issue.  And like I

22   said, for Relators' counsel, if for some reason logistically

23   the main podium is not as good as -- I will tell you, folks go

24   back and forth.

25             Some folks don't love the screen that's on the main

1  podium because it gets in the way of their papers, and some

2  folks love it because all they do is play on the equipment.

3        (Discussion with court staff.)

4        THE COURT:  So I guess I had them move the screen

5  because it was bothering some of the lawyers.

6        All right.  Folks, feel free to do what you need to do

7  to present your case in a comfortable manner.  This monitor is

8  still okay where we have it over there?

9        MR. MARKETOS:  It is, Your Honor.  We moved the

10 Relators over here so they could see the jury.

11        THE COURT:  All right.  And that's satisfactory to

12 you all?  I apologize, but you got to have these monitors

13 because the jurors I felt were struggling a little bit at

14 least on this side, and I think it's beneficial to both

15 parties to have both these monitors as opposed to just this

16 movie screen that's fairly far away from some of these.

17        MR. MARKETOS:  No problem.

18        THE COURT:  All right, so.  Nothing further, right,

19 Mr. Marketos?

20        MR. MARKETOS:  No, Your Honor.

21        THE COURT:  Ms. Brown, anything further before we at

22 least go in recess, and I've got to see where the jurors are

23 in the next 10, 15 minutes?

24        MS. BROWN:  No.  Thank you, Your Honor.

25        THE COURT:  Then if you want, as we get closer to

1    9:30, Mr. Marketos, I would have Ms. Graham back in the

2    witness stand, right?  When we start I'd rather her be here.

3    We're not calling her.  She's on cross.  But you can give her

4    ten minutes or so.

5            And, folks, be mindful, as we move forward, we're going

6    to have issues that we're going to have to talk about in the

7    morning.  I don't want your witnesses in the courtroom.  So

8    just be mindful of that.  It's your job to police that, not

9    mine.

10           I can't see who is coming in and out.  As far as I'm

11   concerned, everybody that's coming in are all parts of your

12   law firms or the Relators or folks or the parties.

13           So if you see any of your folks in there and you know

14   that, Hey, we might be talking about issue, they really

15   shouldn't be in here for this morning housekeeping, I'm going

16   to hold you all responsible for ensuring that you police that

17   in the morning.  Okay?

18             MR. MARKETOS:  Yes, Your Honor.

19             MS. BROWN:  One more issue.  I'm looking at my

20   outline if I could interrupt, because I'm looking at my

21   outline.

22           But one thing I do want to show from the complaint,

23   it's just the one paragraph that gives the percentage of

24   recovery she would have been entitled to.  So it just says up

25   to 25 percent.  That's the only piece of the EDPA case that I

1    was intending to show.

2          THE COURT:  All right.  Let me hear from

3    Mr. Marketos.

4          MR. MARKETOS:  Yeah.  It's just a back door to the

5    Relators' share.  Your Honor's given the instructions --

6          THE COURT:  No, no, no.  Let me just be clear.

7    Ms. -- well, let me clarify with Ms. Brown what she just said.

8          I thought you were saying, Ms. Graham, if the case was

9    successful, would be entitled to 25 percent.

10          MS. BROWN:  Correct, Your Honor.

11          THE COURT:  This just goes into the monetary benefit

12    that a Relator gets from a case.  It's no different than her

13    talking about the benefit your Relators would benefit from if

14    victorious in this case and the amount of money they would

15    get.

16          How is that any different -- how is that not

17    appropriate on cross-exam, that she would have a financial

18    benefit by the case that she brought?

19          MR. MARKETOS:  Financial benefit, no problem,

20    Your Honor.  The amount of the Relators' share because it's up

21    to a number of factors, you'll see in the final instructions

22    that are submitted, and including in the proposed instructions

23    from other cases that they've submitted to you, the Relators'

24    share amount is left out, because it's always subject to a

25    number of different factors.

1          THE COURT:  Yeah, but let me just understand this.

2          If -- there's -- if you're trying to demonstrate bias

3     or a witness' interest in a particular matter, right, isn't it

4     relevant, well, how much of an interest do they have?

5          Because if she's only going to get $5 at the end of the

6     day or nothing at the end of the day, that shows that there's

7     not strong interest, but if you're going to get 25 percent of

8     whatever the outcome might be, all that tells jurors is, Look,

9     there's -- it's a little more significant.  This isn't a small

10    amount that you would have benefited from if you were

11    successful in your particular case.

12         I don't see how that's really a problem.  Why is that

13    outside from the scope of cross-exam?  It's not different than

14    what's going to happen to the Relators in this case if they're

15    sitting in the witness box.

16          MR. MARKETOS:  Your Honor -- well, because the amount

17    is -- this is why the amount of potential recovery is always

18    left out of the instructions.

19          THE COURT:  But that's not the amount.  That's the

20    percentage.

21          MR. MARKETOS:  No, that's what I mean, the actual

22    percentage is left out because the jurors can do the math on

23    the numbers.

24          THE COURT:  What's the number then that -- what's the

25    number for her case?  Like in your case, you have a number,

1  right?

2          MR. MARKETOS:  No.

3          THE COURT:  You have not presented math that these

4  claims are 400,000 plus claims, and that results in --

5          MR. MARKETOS:  Yes.  Oh, yes.

6          THE COURT:  -- in 7 or $800 million worth of damage?

7  I mean, they're talking about it, how oof, that's a lot of

8  money.

9          So do we have that from Ms. Graham?

10          MR. MARKETOS:  No, Your Honor.  And the amount, you

11  know, that they can recover is left out of the Relators' share

12  instructions to the jurors for a reason under the case law.

13  The fact that they have a financial stake is permissible and

14  usually instructed so that the jurors know that they have a

15  financial stake in the case.

16          But because it's determined on a number of factors that

17  play out after the case is over, they can't get into --

18          THE COURT:  So you're telling me that the 25 percent

19  is something that the case would prohibit, but not, hey, she

20  was seeking $800 million?

21          MR. MARKETOS:  Correct.  Correct, Your Honor, and

22  it's the same factor --

23          THE COURT:  All right.  Well, then let me ask you

24  this, Ms. Brown.  Why are you going over after the 25 percent

25  which doesn't educate the jurors that much because 25 percent

1   of what?  Why not just cross-examine on the dollar amount she

2   was -- she was trying to claim, which sounds like that meets

3   your --

4        MS. BROWN:  Well, I don't think it does, Your Honor,

5   because we don't have that discovery, right?  The case never

6   got to that point.  Here they've put before the jury an

7   opening slide that said, We want almost a billion dollars.

8        THE COURT:  There was nothing in the complaint that

9   alleged --

10       MS. BROWN:  No, no.

11       THE COURT:  -- how much the damages would be?

12       MS. BROWN:  No, no.

13       THE COURT:  That's something that would have come

14   later?

15       MS. BROWN:  Correct, Your Honor.  So that's why I

16   have to do it to the Court's point.  Otherwise the jury may be

17   thinking $5, $10, something nominal.  This is a significant

18   percentage of the recovery.

19       THE COURT:  Has this been briefed?

20       MR. MARKETOS:  Yes, Your Honor.

21       MS. BROWN:  No.

22       MR. MARKETOS:  Well, it -- in the proposed

23   instructions that we were arguing over, it was briefed.

24       THE COURT:  And then do you guys -- did you brief

25   that as well?  Is that in there because I haven't looked at

1    this issue because it's coming to me for the first time this

2    morning, which doesn't make me happy since we're on

3    cross-exam.

4         So did you all brief that?

5         MR. WYATT:  Yeah, Your Honor, we're proposing an

6    instruction that would mention the percentage range.

7         Look, if the issue is we don't know what it'll be until

8    after the case, that's fine.  We can use the statutory range,

9    but it goes to Your Honor's point, which is that it goes to

10   the extent of bias.

11        Simply to say that somebody has a monetary stake in a

12   case does not inform the jury, like how much?  One dollar or

13   700 million or something in between, right, and --

14        THE COURT:  Mr. Marketos, you're telling me --

15   because I'm going to go back in chambers to look at this case

16   law.

17        You're telling me the case law says if you have a

18   witness not the Relator in this case, but a witness who has

19   testified about her qui tam case, which is independent and

20   apart from this one, that she can't be cross-examined on what

21   the financial benefit or percentage of benefit would have been

22   if her case was moved forward or --

23        MR. MARKETOS:  I'm definitely not telling you that

24   that issue as a witness has been briefed in this case.

25        THE COURT:  All right, because that's the issue,

1    right?  Do you see how that's different anyway --

2              MR. MARKETOS:  I see, Your Honor.

3              THE COURT:  -- because what you're telling me is that

4    Ms. Brown is handcuffed to say, Ms. Graham, would you receive

5    a benefit from this case, yes, and that's it.

6         She can't say how much the benefit would be because

7    that also goes to bias or interest in the matter, especially

8    when you've established on direct exam that her case

9    apparently is synonymous or identical to this case, right?

10             MR. MARKETOS:  No, I understand the issue of

11   financial --

12             THE COURT:  So let me tell you this, then.  I'm going

13   to ask you:  Before I go look at anything or make you all

14   brief it, are you telling me there's case law that prevents

15   Ms. Brown from cross-examining a third party on their qui tam

16   case on the percentage of benefit they would be entitled to

17   when the case didn't move forward so that's all we have?

18        All we have is a percentage because we don't have a

19   dollar amount.

20             MR. MARKETOS:  Yeah.  Your Honor, I would have to

21   stand on my feet and tell you that the cases have a direct

22   witness in the case referring to another qui tam case, and I

23   will not represent that right now.

24             THE COURT:  And, Mr. Wyatt, have guys briefed that in

25   this dispute in the jury instructions?  Because I haven't

1    resolved the jury instructions yet, and I don't even intend to

2    do at that maybe until partway through the trial.

3         We'll probably have the jury conference at some point,

4    but have you guys addressed this particular issue before I go

5    look at what you guys did?  Because if not, this is --

6         MR. WYATT:  This is the case law on both sides, I

7    believe, would refer to the Relators in the actual case --

8         THE COURT:  In the actual case?

9         MR. WYATT:  Yes.  Uh-huh.

10        MR. MARKETOS:  And the problem, Your Honor, is the

11   same issue with the declination issue.  You're bringing a

12   Relators' share of 25 percent through the backdoor from

13   another qui tam case.  The amount is just like Your Honor

14   addressed with the dollar amounts of the settlement.

15        Why do we have to get into the dollar amounts of the --

16        THE COURT:  Well, her percentage doesn't necessarily

17   mean this percentage.

18        MS. BROWN:  Right.

19        MR. MARKETOS:  It's by statute.

20        THE COURT:  Yeah, but -- but do they know that?

21        MS. BROWN:  No.

22        MR. MARKETOS:  Well, okay.  But isn't that what's

23   going to be instructed?  We're talking about what we're

24   ultimately going to instruct the jury, so, oh, okay,

25   Ms. Graham -- that's why it's a backdoor way, and I would just

 1  ask the Court to let us address this issue before it --

 2          THE COURT:  Let me just understand, though.  When you

 3  say instructed, you're saying the proposed instruction that

 4  you guys are supporting is that the jurors would be instructed

 5  on a percentage or would not be?

 6          MR. MARKETOS:  Would not be.  There -- it's -- and

 7  that's what I think what Mr. Wyatt was saying about there's

 8  cases on both.  We're talking about in this circuit.

 9          THE COURT:  Well, then just walk me through it

10  because I'm just trying to figure out why it needs to be

11  tabled, right?

12      So if I agree that this jury will not be instructed on

13  the percentage, let's just go with that hypothetical for now.

14          MR. MARKETOS:  Right.

15          THE COURT:  Then what does it matter what Her

16  percentage was in her case, which is separate and apart from

17  yours, if the jurors won't know what the percentage is in this

18  particular case?

19          MR. MARKETOS:  Your Honor, because they will know

20  that what -- that's -- in this circuit, in the Eastern

21  District of Pennsylvania, she asked for 25 percent, and

22  they're going to get that in through the back door as to our

23  Relators.

24      And there's a reason the Courts keep the amount out,

25  right?  And that will show you that -- that -- that law, and

1    it would be just like saying, Well, that was a different case.

2    The Government declined to intervene.

3         And then they can apply those facts and circumstances

4    to the Relators in this case.  It's getting it in through the

5    back door.

6         And if we could just take a moment to show you the case

7    law, I think it would make a difference before she opens a can

8    of worms that we can't -- we can't get this under.

9         Why -- why can't she examine her on the fact that she

10   had a financial interest in that?  She can examine it to her

11   heart's content, but the actual percentage is going to be a

12   problem because then we're not going to be able to keep it out

13   as to the Relators in this case.

14             MR. WYATT:  Judge, I'm sorry --

15             THE COURT:  No, no, you can't interrupt.  By the way,

16   don't do that again.

17             MR. WYATT:  I'm sorry, Your Honor.

18             THE COURT:  All right.  This isn't your courtroom.

19   I'm still talking with Mr. Marketos.  Just wait your turn.

20             MR. WYATT:  Understood, Your Honor.

21             THE COURT:  I'll give you guys an opportunity.  You

22   guys haven't sat down so I know you have something that you

23   want to say.

24             MR. WYATT:  Understood, Your Honor.

25             THE COURT:  Mr. Marketos, I'm sorry, is there

 1   anything more on that?

 2        MR. MARKETOS:  Just -- just that, Your Honor.  If we

 3   have a chance to brief it or -- or address it with some case

 4   law.

 5        THE COURT:  Well -- well, let me ask another

 6   question, and maybe this is for, Mr. Wyatt, or Ms. Brown, but

 7   let me ask you all this.

 8        So you have on -- and we're on cross-examination.

 9   Percentage itself -- and look, I may agree with Mr. Marketos.

10   Since I haven't decided yet whether that instruction is going

11   to be given to this jury, it's possible that this is -- it's

12   almost like similar to the intervention issue.

13        If you talk about intervention with Ms. Graham in her,

14   somehow that can be kind of connected to the Relator's case in

15   this case.

16        Why aren't you able -- and, Ms. Brown, are you

17   doing the cross?

18        MS. BROWN:  I am.

19        THE COURT:  All right.  So I don't know who this is

20   for.  Maybe it's for Ms. Brown or maybe it's Mr. Wyatt, but

21   why can't you just cross on, you know, You've seen this case,

22   the Relators in this case are asking for hundreds of millions

23   of dollars.  You would have benefited significantly from your

24   case, just like they would, correct.

25        MS. BROWN:  Sure.

```
 1          THE COURT:  I mean, you testified that your case is
 2   very similar to theirs.
 3          MS. BROWN:  Sure.
 4          THE COURT:  Why can't you get out that she would have
 5   had a significant windfall or she was going to be entitled to
 6   a significant amount of money without locking in the
 7   percentage?  Because here's what's going to happen.
 8          If you really want to go there, well, then we're going
 9   to table it because I don't have anything from you all that
10   tells me the law on this and I am not going to shoot from the
11   hip on this particular issue that you guys are bringing to me
12   for the first time this morning while the witness is on
13   cross-examination.
14          So that's a plague at least on both your houses, but
15   more on Janssen because you're on cross, and this is what you
16   intend to do.  You had to anticipate this might be objected
17   to, and you haven't briefed me on it.
18          So why can't you all just get the point you want to
19   make without talking about the specific percentage when you
20   could use the numbers in this case with Ms. Graham?
21          MS. BROWN:  Yeah.  And, Your Honor, I think the issue
22   for us -- and one, on the issue of why it's not before the
23   Court, I actually was surprised to hear questioning on this.
24   I really was, and I will tell you why.  Because look at the
25   issues it raises.
```

1    I mean, where we are now, they have put the affirmative

2    EDPA story in, but we're having trouble being able to cross on

3    it.  We can't do declination.

4    And the reason that I need to be able to do the

5    percentage, Your Honor, is because they have put the

6    affirmative story in, and the jury doesn't know what's

7    significant.  I mean, these are numbers no one can wrap their

8    head around, a billion dollars?

9    Everything of a billion dollars is significant.  I

10   mean, it's just hard to be able to take crazy money and

11   explain to the jury what that means in terms of someone

12   deciding to say nothing for ten years at a company but hire a

13   lawyer and file a lawsuit like this.

14   Like we need to be able to put some parameters on it,

15   and they made a strategic decision at the end of that

16   cross-examination to go into this territory.  And this is only

17   fair cross.

18   THE COURT:  Yeah, but Ms. Brown, so let me just

19   understand.  You knew this issue was in dispute because it's

20   in dispute in the final jury instructions on what this jury

21   gets instructed, correct?

22   So this isn't that different from the intervention

23   issue, right?  You guys are precluded from at least at this

24   point raising the declination, right, that the Government

25   decided not to intervene in this case.

1          So that's no different here when Ms. Graham is here,

2     and you all are saying, Hey, judge we found another way to get

3     the Government's lack of intervention, we'll just get it

4     through Ms. Graham's case.

5          And now here we are on the percentage fee.  I don't

6     even understand why this is better for you than the billion

7     dollars that's been on the screen.

8          If -- if the purpose of the cross-examination is to

9     demonstrate that Ms. Graham would have a financial motivation

10    in bringing forward her EDPA case, you have more than enough

11    evidence to do that.  You don't need to attempt to get the

12    percentage that would be her share necessarily when it's an

13    issue in dispute that hasn't been resolved by the Court.

14         If you're telling me you're going do that, then I'm

15    going to preclude you from doing it until I have briefing by

16    the parties.

17              MS. BROWN:  Understood, Your Honor.

18              THE COURT:  Because then you guys are going to have

19    to go through it because what you're telling me is the only

20    issue you address in the papers to the Court are whether that

21    percentage should be instructed to this jury regarding the

22    Relators in this case, not on whether a third-party witness

23    who has testified has brought a very similar case but was not

24    first-to-file, and now this seems to be a back door to get

25    into that issue.

1    So whether you guys anticipated that or not, that's how

2    I see it.  I'm not faulting you all necessarily, but you

3    haven't provided me anything, and this is a very -- this is a

4    different issue, but I agree that it has to be scrutinized

5    because what this witness says about her qui tam case could be

6    connected to the qui tam case that's presently before the

7    jury, and those issues haven't been resolved yet.

8        So my two cents is how do you want to proceed with your

9    cross?  I think you have ample information regarding the

10   dollar amounts that you can use to demonstrate there's a

11   benefit without going into the exact percentage, but you tell

12   me --

13       MS. BROWN:  Sure.

14       THE COURT:  -- how you want to proceed.  But if you

15   want to proceed with the percentage, then that's on hold.  You

16   can call her back at some point to do it if I decide in your

17   favor, which I may not.

18       MS. BROWN:  Okay.

19       THE COURT:  Or you can go through all the ample

20   information you have on the monetary benefit to get your point

21   across that there's a financial incentive to bringing the

22   case, which I -- I think is -- is going to be fairly obvious

23   and clear.

24       MS. BROWN:  I understand the Court's position.  I

25   think what I would request to be able to say then is, for

1    example, in this case, the Relators asked in opening for

2    almost a billion dollars.

3         And in your case, you would have stood to recover a

4    very significant percentage of whatever the total was in that

5    case.

6         THE COURT:  So you're not going into the specific

7    percentage, Mr. Marketos.  What's the concern here?

8         MR. MARKETOS:  None.

9         THE COURT:  All right.  So I think -- all right.  So

10   then there's the middle ground.  Is that acceptable with you,

11   Ms. Brown?  because, again, I'm not going to tell you what to

12   do on the cross-exam, but if you guys are going to put

13   something as nuanced as this before me today while we're on

14   cross-examination, I need time.  You're going to have to give

15   me more than there might be some case law out there on this,

16   but we didn't specifically identify this issue.  The case law

17   we provided, which goes a little back and forth, may deal

18   specifically with the Relators in our case.

19        Right?

20        MS. BROWN:  No, I understand the Court's ruling, and

21   I think I'll be able to ask questions in accordance with it.

22        Just -- I mean, for the record, I think the issue for

23   us is the similarity that was being suggested.  I mean, the

24   very reason we're implicating a motion in limine about this

25   case is because the way the testimony was put on was to

1   suggest EDPA and this case somehow are connected.  And that's,

2   you know, why we're having the issue with the percentage

3   and --

4           THE COURT:  But, Ms. Brown, I actually thought you

5   got more than what you even asked for.  You get to

6   cross-examine on significant percentage.

7           MS. BROWN:  I understand, Your Honor.  I understand.

8           THE COURT:  How is that even worse for you?

9           MS. BROWN:  I understand.  I understand.  I

10  understand the Court's ruling.

11          THE COURT:  All right.  Okay.

12      Sorry.  Anything further on this point, although I got

13  it?

14      Mr. Marketos?

15          MR. MARKETOS:  No, Your Honor.

16          THE COURT:  Ms. Brown?

17          MS. BROWN:  No, thank you, Your Honor.

18          THE COURT:  All right.  The jurors are here.  That's

19  my secret note.  So are we ready for the jurors?  Can we at

20  least get Ms. Graham back into the witness box and also get

21  the jurors at this time, or is there something else that we

22  need to address, folks?

23          MR. MARKETOS:  No, we're ready to call her up, and we

24  can get going.

25          THE COURT:  Okay.

```
 1            MS. BROWN:  Your Honor, may I put a binder up there
 2  for the witness of the --
 3            THE COURT:  Yes.  Why don't we do that.  I don't
 4  even --
 5            THE DEPUTY COURT CLERK:  All rise.
 6            (Jury enters the courtroom.)
 7            THE COURT:  All right, folks.  Everybody be seated.
 8       Good morning, folks.  Welcome back.  We're in another
 9  day of trial.
10       We're going to continue where we were yesterday.  We're
11  going to proceed with cross-examination of the witness,
12  Ms. Graham, and then we'll continue with additional witness
13  testimony today, and we'll see how far we get with the morning
14  break and the afternoon break and, obviously, a lunch break.
15       Again, for any reason if you folks need a break at a
16  time that I am not identifying, try to raise your hand, get
17  Kim's attention.  I may not be looking at you.  I may be
18  looking at the lawyers or talking with them or the witness.
19  So if you don't get my attention, try to get hers, and I can
20  always take a break at a different time.  Okay.
21       One other thing I just want to remind you folks.
22  Continue not to discuss this case.  It's early on, and from
23  time to time, not every day, but I'm going to give you every
24  few days a reminder, do not discuss the case with each other.
25  That's very important.  You don't discuss this case until the
```

GRAHAM - CROSS - BROWN

1   conclusion of the trial and when you're in deliberations.  You

2   can chat about anything else, personal matters, how you doing,

3   what's going on in the world, what are you doing this weekend;

4   all those other things, feel free to talk about, and that's

5   common among jurors.

6          And to be clear, don't talk about this case outside

7   with anybody else.  So just continue to follow that rule and

8   that reminder.

9          And with that, Ms. Brown, are you ready to proceed with

10  cross-examination?

11             MS. BROWN:  Yes, Your Honor.

12             THE COURT:  All right.  And just -- I'm sorry,

13  Ms. Graham, I just want to remind you you're still under oath

14  from yesterday.  Okay?

15             THE WITNESS:  Yes.

16             THE COURT:  You may proceed when you're ready.

17             MS. BROWN:  Thank you very much, Your Honor.

18  (CROSS-EXAMINATION BY MS. BROWN:)

19  Q.   Good morning, Ms. Graham.

20  A.   Good morning.

21             MS. BROWN:  Good morning, everyone.

22  BY MS. BROWN:

23  Q.   Ms. Graham, you told our jurors yesterday that after you

24  left Janssen, you were so upset about the conduct that you

25  claimed took place while you were there that you reported it

—— GRAHAM - CROSS - BROWN ——

1   to the Department of Justice.

2       Do you remember that testimony?

3   A.  Yes.

4   Q.  Okay.

5       And you said something like you hadn't done the right

6   thing while you were at Janssen and you thought reporting the

7   case to the Department of Justice gave you the opportunity to

8   do the right thing after you left the company?

9       Do you remember that?

10  A.  Yes.

11  Q.  But you left out a couple of things about the report to

12  the Department of Justice; isn't that right?

13  A.  I'm not sure what you're referring to.

14  Q.  Well, the truth, Ms. Graham, is that you didn't actually

15  first report to the Department of Justice.

16      Correct?

17  A.  But I did not know that at the time.

18  Q.  The truth is, you didn't call up a hotline or the

19  Department of Justice to say, Alert, alert, something's going

20  wrong at Janssen.

21      Right?

22  A.  No.  I mean, that's -- I guess that's not the protocol.

23  We -- we went to an attorney.

24  Q.  Right.

25      Rather than call the Government and tell the Government

─GRAHAM - CROSS - BROWN─

1  that you thought something wrong was going on, what you did

2  first was get a lawyer.

3      Correct?

4  A.  Yes.

5  Q.  And you hired a lawyer with your partner, Mr. Wilhelm.

6      Correct?

7  A.  Well, we didn't hire him, but, yes, we secured him, I

8  guess.

9  Q.  Okay.

10      And when you say you didn't hire him, you didn't give

11  the lawyer any money --

12  A.  Correct.

13  Q.  -- is what you mean?

14      Okay.

15      He agreed to be your lawyer without taking money.  Is

16  that --

17  A.  That's correct.

18  Q.  Okay.

19      So you got a lawyer to represent you.

20      Correct?

21  A.  Yes.

22  Q.  Okay.

23      And Mr. Wilhelm -- you currently live with Mr. Wilhelm,

24  correct?

25  A.  I do.  I do.

—GRAHAM - CROSS - BROWN—

1    Q.    Okay.

2          And you worked with him at Janssen.

3          Correct?

4    A.    I did.

5    Q.    Okay.

6          And he actually, I think, is coming in here to talk to

7    our jury tomorrow; isn't that right?

8    A.    That's my understanding, yes.

9    Q.    Did you fly out here to New Jersey with him?

10   A.    No.

11   Q.    Okay.

12         And so you and Mr. Wilhelm, rather than call the

13   Department of Justice to report this activity, what you and

14   Mr. Wilhelm did was hire a lawyer to represent you in filing a

15   lawsuit.

16         Correct?

17   A.    Again, there was no money exchanged, so we -- you know,

18   to me, "hire" means that you're paying somebody.  So we --

19   well, we secured some representation, yes.

20   Q.    Okay.

21         And this lawsuit that you retained a lawyer to help you

22   file would have permitted you to receive a large percentage of

23   any monetary award in the case.

24         Correct?

25   A.    Possibly, yes.

GRAHAM - CROSS - BROWN

1  Q.  Okay.

2      And when you decided to secure a lawyer to put these

3  cases -- put these allegations in a lawsuit, you knew that,

4  right?

5  A.  I mean, I knew that it was a possibility, yes.

6  Q.  You knew that the whistleblower law under which you

7  wanted to bring your lawsuit would have entitled you and your

8  partner, Mr. Wilhelm, to a very significant amount of money.

9      Correct?

10  A.  If we won, yes.

11  Q.  And you also knew that the reason you had to give this

12  information to the Department of Justice is because that's how

13  that whistleblower law works, correct?

14  A.  Honestly, I was not under the impression that you could

15  go to the Department of Justice directly.

16  Q.  And you learned that from the lawyer.

17      Correct?

18  A.  What part?

19  Q.  Well, you told our jurors yesterday --

20      THE COURT:  Is there an objection because --

21      MR. RUSS:  Your Honor, may we approach?

22      THE COURT:  You may.

23      (Sidebar begins at 9:45 a.m.)

24      MR. RUSS:  Your Honor, I don't represent Ms. Graham,

25  but I do think it's incumbent upon attorneys to make sure that

GRAHAM - CROSS - BROWN

1    we don't violate the privilege about what her attorney told

2    her.

3            THE COURT:  I know.  I was waiting for you to object.

4        So is that the objection?

5            MR. RUSS:  That's the objection, Your Honor.

6            MS. BROWN:  I'll rephrase, Your Honor.

7            THE COURT:  Rephrase it.  Thank you.

8            (Sidebar was concluded at 9:46 a.m.).

9            (Open court.)

10   BY MS. BROWN:

11   Q.   And so, Ms. Graham, when you secured the lawyer to file

12   your lawsuit under a law that entitled you to a significant

13   percentage of money, you learned that you needed to provide

14   information to the Department of Justice.

15       Correct?

16   A.   Yes.

17   Q.   Okay.

18       And so when you said you reported to the Department of

19   Justice, it was in the context of your lawsuit for a lot of

20   money.

21       Correct?

22   A.   Yes.

23   Q.   Okay.

24       And part of what you were obligated to do when you

25   reported to the Department of Justice is give them any

GRAHAM - CROSS - BROWN

1   materials or any documents you might be relying on for your

2   lawsuit allegations.

3       Correct?

4   A.   Yes.

5   Q.   Okay.

6       And you had some, right?

7   A.   Correct.

8   Q.   You had some old documents and papers and things that you

9   had taken from your time at Janssen.

10       Correct?

11  A.   Yes.

12  Q.   And you typed up some notes of your views on those

13  documents and papers and notes.

14       Correct?

15  A.   Yes.

16  Q.   And you, in connection with the law that entitles you to

17  money, you sent that over to the Department of Justice.

18       Correct?

19  A.   Through the lawyer.

20  Q.   Right.

21       And the -- incidentally, those documents, those are the

22  documents you believe support some of the allegations you told

23  our jury about yesterday.

24       Correct?

25  A.   Yes.

GRAHAM - CROSS - BROWN

1    Q.   Okay.

2         And you didn't bring any of those into the courtroom

3    yesterday, though.

4    A.   I'm not sure what you're saying.

5    Q.   Well, you had a bunch of documents that you provided in

6    connection with your lawsuit.

7         Right?

8    A.   Yes.

9    Q.   And you didn't bring any of those in here yesterday,

10   though, to show our jurors.

11        Right?

12   A.   Me, physically bring the documents in?

13   Q.   Yes, ma'am.

14   A.   Why would I do that?

15   Q.   Well, you were talking about --

16        THE COURT:  Ms. Graham, just to be clear, on

17   cross-examination, the lawyer will ask the questions --

18        THE WITNESS:  I'm sorry.

19        THE COURT:  -- and you have to respond.  But you

20   can't ask questions of the lawyers.  This is one of those

21   one-way streets that you're driving on.

22        Do you understand what I mean?

23        THE WITNESS:  I'm sorry.

24        THE COURT:  All right.  That's okay.  I want to make

25   sure we're not going back and forth here.

————GRAHAM - CROSS - BROWN————

1          THE WITNESS:  Yeah.

2          No.  I didn't know that I was supposed to.

3     BY MS. BROWN:

4     Q.  Okay.

5          And you understood that when you filed the lawsuit that

6     allowed you to get a lot of money and you gave the documents

7     to the Department of Justice, you understood that the

8     Department of Justice was obligated under that law to look at

9     what you gave them.

10          Right?

11    A.  I assume so.

12    Q.  You understand that under this law that you secured the

13    lawyer to bring this lawsuit, that the Department of Justice

14    needs to check out what you were saying in the lawsuit.

15          Right?

16    A.  I'm assuming that's how it works.

17    Q.  Okay.

18          And after -- and the Department of Justice did that in

19    your case.

20          Correct?

21    A.  Yes.

22    Q.  And the Department of Justice was not part of your case,

23    correct?

24    A.  I'm not sure what you mean by that.

25    Q.  Well, the Department of Justice looked at the materials

GRAHAM - CROSS - BROWN

```
 1   that you gave them.
 2        Correct?
 3   A.   Yes.
 4   Q.   Okay.
 5        And the Department of Justice did not become a part of
 6   your case.
 7        Correct?
 8        MR. RUSS:  Objection, Your Honor.
 9        May we approach?
10        THE COURT:  Sustained.
11   BY MS. BROWN:
12   Q.   Okay.
13        And ultimately, Ms. Graham, you dismissed your case,
14   correct?
15   A.   I didn't personally dismiss it.  It was dismissed because
16   it was discovered that we were not the first to file.
17   Q.   Okay.
18        And as part of your case being dismissed, you
19   understand that the Government had to agree to that dismissal.
20        Correct?
21   A.   I don't know particularly how that works.
22   Q.   Okay.
23        Did you see the dismissal in which counsel for the
24   Government agreed to dismiss the case?
25   A.   Did I physically see a letter of dismissal?  I don't
```

GRAHAM - CROSS - BROWN

```
 1   recall.
 2   Q.   All right.
 3           MS. BROWN:  Your Honor, permission to show D8627,
 4   please.
 5           THE COURT:  Yeah.  To the witness.
 6       I'm sorry?
 7           MS. BROWN:  Permission to publish, Your Honor, if
 8   there's no objection.
 9           THE COURT:  Oh.  Is there any objection to that
10   exhibit?  I didn't know if you were asking to show the
11   witness --
12           MS. BROWN:  Oh, I apologize --
13           THE COURT:  -- or move to admit it.
14           MS. BROWN:  -- and it's Tab 37.
15           MR. RUSS:  There is an objection, Your Honor.
16       If we may approach, this is a similar issue.
17           THE COURT:  All right.
18       By the way, folks, just to be clear, is this monitor,
19   now that we've moved it -- does that address the issue, or do
20   I need to move it to this side?
21           JUROR:  Your Honor, I can't see her.
22           THE COURT:  You cannot see her.
23       Kim, while I'm talking with the folks, can you see if
24   maybe we can adjust the monitor all the way to the right side,
25   because that's going to occur with any witness that's less
```

——— GRAHAM - CROSS - BROWN ———

1    than six foot tall.

2        THE WITNESS:  Do you have a booster seat?

3        THE COURT:  Yeah.  I think -- I think it's going to

4    happen more than once.  But let's see if we can -- yeah,

5    folks.  The monitor is important because the witness is able

6    to see documents like you are right in front of them, but I

7    also need to ensure you can see all the witnesses.  So --

8        THE DEPUTY COURT CLERK:  Hold on.

9        THE WITNESS:  Yeah, it is.

10       THE COURT:  Can it go more right because -- or is

11   that helpful?  Sorry, Kim.

12           (Sidebar begins at 9:51 a.m.)

13       MR. RUSS:  Your Honor, we have a similar issue here.

14   I mean, Janssen clearly wants to get into this idea that the

15   Government doesn't like these allegations.  This is a letter

16   and the filings that the Government agreed --

17       THE COURT:  Let me see it.

18       MR. RUSS:  -- to dismiss the case.

19       And my statute, the Government has to agree, but this

20   opens a whole door of why do they agree to dismiss it.  Well,

21   it's a first-to-file bar.  Are we going to instruct on the

22   first-to-file bar?

23       It leaves the impression that the Government did an

24   investigation, which is what Ms. Brown is asking, looked at

25   all her documents, and then said, You should or can dismiss

GRAHAM - CROSS - BROWN

1    this case.

2           THE COURT:  Ms. Brown, let me hear from you.

3           MS. BROWN:  Sure, Your Honor.

4           THE COURT:  And by the way, before I hear from you,

5    let me just tell you.  You went into the very issue that I

6    precluded you from going into.  When I sustained that

7    objection from Mr. Russ, you were going into intervention.

8           So how did you go into that when I told you not to do

9    it?

10           MS. BROWN:  Well, Your Honor, I specifically

11    understood I was allowed to say three things.  The Government

12    was not part of this case.

13           THE COURT:  That's not what you said.  Do you want me

14    to look up the question you asked?

15           MS. BROWN:  I a hundred percent apologize,

16    Your Honor.  The only thing I --

17           THE COURT:  All right.  That's why I sustained the

18    objection.

19           MS. BROWN:  -- I was going to ask for a sidebar

20    because I thought I could say the Government was not a part of

21    the case.

22           THE COURT:  But that's not how you -- you went,

23    reviewed all these things, and then they decided not to be

24    part of the case.  You basically were implying --

25           MS. BROWN:  I understand, Your Honor.

GRAHAM - CROSS - BROWN

1    THE COURT:  -- the exact intervention by using --

2    MS. BROWN:  I did not --

3    THE COURT:  -- different language.

4    MS. BROWN:  I did not -- I didn't --

5    THE COURT:  So I sustained the objection, but you

6    already hit that line.  And so now I'm telling you that this

7    document -- it sounds like you're still going into the same

8    place.

9         So I'm going to preclude this from being published.

10   You're going into intervention.  I told you folks before that

11   I was not going to let you get into the Government choosing

12   not to be a part of this case.

13        You already are getting very close when you said they

14   reviewed all the documents and all these other things.  You

15   told me you were going to get into the case being dismissed.

16   That's fine.  The case isn't proceeding.

17        MS. BROWN:  Right.

18        THE COURT:  She wasn't first to file, but you're

19   going to stay away from this line, which is talking about the

20   Government's decision not to move forward in the case, the

21   Government agreeing to dismiss your case, because then they

22   have to come back and now we've opened up that Pandora's Box

23   that I've told Janssen you cannot go into.

24        So find a different line of questioning.  I'm not

25   letting you go into that document.

GRAHAM - CROSS - BROWN

1          MS. BROWN:  I understand, Your Honor.

2          And the issue that I'm having a hard time with is they

3   have put out this first-to-file issue, which is nowhere on the

4   docket.  I mean, there's no suggestion that that is the reason

5   this case was dismissed.  I understand the Court doesn't want

6   us to get into intervention.  I am not intending to do that.

7   I very seriously just want to say the Government is not a

8   part.

9          But we have -- they put a reason before the jury that's

10  not necessarily --

11         THE COURT:  Mr. Russ, where is it written that the

12  dismissal is first-to-file other than Ms. Graham's testimony?

13         MR. RUSS:  That's her testimony.  That's why she was

14  dismissed.

15         THE COURT:  All right.  Okay.  But if that dismissal

16  doesn't say first to file, she could say, Where in this letter

17  does it say the case was dismissed because you were not first

18  to file?  because you put a reason for it.

19         MR. RUSS:  Correct.  But getting into the Government

20  agreeing without explaining the Government's reasons --

21         THE COURT:  Well, let me ask you this, Ms. Brown.

22  Which case was filed first?

23         MS. BROWN:  This case was filed first.

24         THE COURT:  Okay.  And you have a good faith basis

25  that Ms. Graham's case was dismissed for some other reason

GRAHAM - CROSS - BROWN

1    other than it was not first to file?

2            MS. BROWN:  I do, Your Honor.  A couple of reasons.

3        There were different allegations that were made.  So

4    here, the alleged allegations are, you know, before off-label

5    uses, she had some very different allegations in this case.

6    It was not anti-kickback.  There was no anti-kickback

7    allegations there.  And she had claimed different off-label

8    marketing, like for GI side effects was, like, a big focus.

9            (Reporter clarification.)

10           MS. BROWN:  I'm sorry.

11       Nobody filed a motion on the first-to-file issue, and I

12   think if they had, she could have said, This is substantially

13   different because I'm alleging GI off-label.

14       And we don't know why that happened, but they put

15   something as the reason that there's no evidence on the

16   document.  I scoured the docket last night.  There's no

17   evidence it was first-to-file.

18       So I'm not -- I understand the Court's ruling.  I'm not

19   going to say it is because they --

20           THE COURT:  But you want to be able to refute the

21   first-to-file because she testified --

22           MS. BROWN:  It doesn't say anything about --

23           THE COURT:  Mr. Russ, how are they supposed to

24   cross-examine on your witness's first-to-file reasoning if

25   they can't say, We don't have a single document that says your

GRAHAM - CROSS - BROWN

1    case was dismissed because of first to file?

2         MR. RUSS:  They absolutely should be able to, Your

3    Honor.  I will tell you in practice, putting a standard Rule

4    41 dismissal on the docket in these cases, and there are

5    multiple cases that I have seen that they're one, two, three

6    multiple cases --

7         THE COURT:  They never say first-to-file.

8         MR. RUSS:  Because first-to-file, it's just dismissed

9    without prejudice is usually what happens.

10        My only concern, cross-examine away on her motive -- or

11   it looks different allegations.  But if you're putting in

12   there -- this is the line that she was asking.  You looked at

13   all the documents, you did an investigation --

14        THE COURT:  And then they dismissed the case.

15        MR. RUSS:  Dismissed the case.

16        And it's Government agreeing to dismiss that we don't

17   know why the Government agreed to dismiss.

18        MS. BROWN:  But they told the jury why they believe

19   the Government dismissed.

20        MR. RUSS:  No, that's different, Your Honor.  She has

21   the right to move to dismiss, and the Government has to agree.

22   She doesn't understand the procedure.

23        The Government then says, You're right, Ms. Graham, you

24   can dismiss.  The Government didn't dismiss the case.  That's

25   my point.

——GRAHAM - CROSS - BROWN——

```
 1            THE COURT:  They just agreed to the dismissal.

 2            MR. RUSS:  Correct.

 3            THE COURT:  All right.  So if you want to

 4   cross-examine that there's no -- on the first-to-file, if you

 5   really -- if you believe you have a good faith basis that this

 6   case would turn on, that's fine.

 7            I'm not letting this document in because the line of

 8   questioning that you've been going down is insinuating to this

 9   jury that the Government dismissed this case for some

10   substantive reason.  They reviewed the documents.  They

11   reviewed the allegations, all the documents you provided to

12   them, and then they chose not to be in the case.  That to me

13   is another way you are trying to backdoor intervention.

14            I'm not saying you're doing it intentionally.  I'm not

15   saying you're trying to circumvent my order, because if that

16   was the case, we'd have a very different conversation.

17            I'd dismiss the jurors, and we'd have a conversation on

18   the record out there.

19            The reason why I'm saying it on sidebar is because

20   you're getting very close.  You're too close to that line, and

21   once you hit it, I can't unring that bell.  So stay away from

22   it.  That documents is out.

23            What do you intend to do now with first-to-file?

24            MS. BROWN:  Here's the problem, though, Your Honor.

25   How do I cross on first to file.  She --
```

GRAHAM - CROSS - BROWN

1          THE COURT:  You can say there's no document in the

2     discovery that says anything about first-to-file.

3          MS. BROWN:  -- aware there's nothing on the docket

4     that suggests that's why, and in fact you dismissed the case,

5     and you and the Government dismissed the case.  I mean, the

6     suggestion has been made that this was like a technicality.

7     Look for -- I don't think they know that.  I mean, maybe they

8     do and --

9          THE COURT:  But what you're doing now is you're going

10    to say it's not a technicality.  We dismissed for some

11    substantive reason --

12         MS. BROWN:  I'm suggesting --

13         THE COURT:  -- that the Government reviewed the case

14    and decided not to intervene, and that's a problem, too.

15         MS. BROWN:  Look, I mean, I think that's the problem

16    with putting out EDPA.  I mean, RPMs are sort of tied to it,

17    Judge.  They introduced this affirmatively to say you were

18    saying the same things, and the only reason we couldn't go

19    forward with it is first-to-file.

20         That is not anywhere --

21         THE COURT:  No, but what I think you can say in a

22    case that's being dismissed is that your case was never

23    reviewed by the court on its merits.  It was never determined

24    one way or the other on the merits of your case whether it was

25    substantiated or not, whether you would have been able to

GRAHAM - CROSS - BROWN

1    prove your case or not.

2         This case was dismissed early on in the outset of the

3    litigation.  You have all those things.  There's nothing in

4    the fact that someone has filed a lawsuit before this jury

5    that implies that the lawsuit would have been successful.  The

6    case was dismissed.

7         So you have that.  You have the ability to say, There's

8    nothing involving in your case that anyone has demonstrated

9    any merit.

10        What you can't say, Because the Government dismissed

11   the case or did not intervene in the case, that somehow the

12   case lacks merit.  It's the same thing -- you both are stuck

13   with what you have, which is she filed a lawsuit.  It didn't

14   go anywhere.  It went away, and it was never adjudicated.

15        MR. RUSS:  If I could just to clarify one procedural:

16   The Department of Justice doesn't move to dismiss on a

17   first-to-file bar.  The Courts decides that.

18        Right?  So she could have proceeded.

19        The Government can agree to her dismissal, but this --

20   I think she's saying the Government dismissed the it

21   because -- the DOJ, the civil division, does not make that --

22        THE COURT:  No, I know.  It's a court order.

23        MR. RUSS:  Right.

24        THE COURT:  I understand the procedure but I don't

25   know if that changes the argument here.  So then she's going

—GRAHAM - CROSS - BROWN—

1    to imply that the Court dismissed it just substantively.

2            MS. BROWN:  But we don't have any evidence that

3    that's why the Court did it.  I mean, that's the part I'm

4    struggling with, Your Honor.

5            What we have is a declination and then a dismissal on

6    the heels of a declination.  We don't have any evidence --

7            THE COURT:  Well, you can explore that there's no

8    evidence, there's nothing written in any document, and you

9    guys, if you want, can rehabilitate on -- on -- on redirect,

10   but I'm not going to allow this insinuation that the

11   Government substantively didn't intervene or allowed the case

12   to be dismissed because they reviewed it on its merits.

13           And if the problem is you went through this.  Your line

14   of questioning got you here.  Because if you had told me,

15   Look, Judge, she says those first-to-file -- this document

16   doesn't say first-to-file, we just want to cross-examine on

17   that issue.

18           But you went through the Government reviewed all the

19   documents.  She brought all the documents.  You went through

20   substantive reviews that the Government was involved in this,

21   and then now you want to say they're dismissed.

22           So the answer is no.  I've made my ruling.  I

23   understand your objection, but your line of questioning got

24   you here, not me.

25           If you want to say, Ma'am, you said that your case was

GRAHAM - CROSS - BROWN

1  the first-to-file, we don't see any discover -- any kind of

2  discovery or any court document that says first-to-file.  Oh,

3  I'm not aware.

4       And then if you want to say, Look, at this document

5  this is dismissal, anything in here say first-to-file?  No.

6  That I might have permitted.

7       But your line of questioning prior to this has led you

8  down to a path where it looks like now you're saying the

9  Government is agreeing to dismiss the case because of

10 substance, and it lacks the merit.

11      So I've made my ruling.

12          MS. BROWN:  I understand, Your Honor.

13          THE COURT:  You're going to --

14          MS. BROWN:  I don't -- I don't --

15          THE COURT:  But appreciate the ruling for your next

16 line of questions.

17          MS. BROWN:  That's what I just was going to say,

18 because I don't want to run afoul of the ruling.

19          THE COURT:  I know.

20          MS. BROWN:  I am allowed to say -- I'm going to go

21 back and just summarize where we are since it's been a little

22 bit of a break.  And the -- pursuant to the law -- I mean, you

23 don't want me to go back on the investigation.  That runs

24 afoul of the Court's ruling.  I mean, they looked at the

25 stuff, and --

GRAHAM - CROSS - BROWN

1          THE COURT:  No.  Look, you -- you went there, and

2    there was no objection at the time, but now because you've

3    asked those questions --

4          MS. BROWN:  I understand.

5          THE COURT:  -- you've now taken it to a place --

6          MS. BROWN:  I understand.

7          THE COURT:  -- that what you're trying to get leads

8    to intervention --

9          MS. BROWN:  So I intend to --

10          THE COURT:  -- and lack thereof.

11          MS. BROWN:  -- say they looked at it, and the fact of

12    the matter is you dismissed it, and you said it's

13    first-to-file, but there's no evidence on the docket.

14          THE COURT:  I think that's fair game, Mr. Russ.

15          MS. BROWN:  Okay.

16          THE COURT:  And I think you would agree, but you

17    better be very clean on --

18          MS. BROWN:  Exactly, exactly.

19          THE COURT:  -- what you just told me because anything

20    that insinuates that the Government looked at this and the

21    merits and somehow has dismissed it for, like, lack of

22    intervention or they didn't believe in the case or they didn't

23    think the proofs were there or whatever it might, that's

24    problematic.

25          By the way, you already have -- so it's asked and

GRAHAM - CROSS - BROWN

1    answered.  You already had the Government review the documents

2    you provided.  You're not asking that again.  That's asked and

3    answered.

4            MS. BROWN:  And -- okay.  I understand.

5            THE COURT:  I know you want to go back.

6            MS. BROWN:  Right.

7            THE COURT:  But we're not going to.  That was a

8    dangerous question in the first place --

9            MS. BROWN:  But I didn't understand --

10           THE COURT:  -- so to have you repeat it, you already

11   have it.

12           MR. RUSS:  I agree, Your Honor.

13           THE COURT:  So I'm going to let you go to where you

14   are.

15           MS. BROWN:  Which is it was dismissed.

16           THE COURT:  It was dismissed.  You say it was

17   first-to-file.

18       Now, I -- is there a state- -- did you provide a

19   statement -- there's no document -- are you aware there's no

20   document on the docket in your case that says --

21           MS. BROWN:  That's --

22           THE COURT:  -- the case was dismissed for

23   first-to-file.  That I will allow, but that's it.  Let's go.

24           MS. BROWN:  Okay.

25           THE COURT:  All right.

GRAHAM - CROSS - BROWN

1          MS. BROWN:  I understand.  Thank you.

2          (Sidebar was concluded at 10:02 a.m.).

3          (Open court.)

4          THE COURT:  Sorry, folks, that's on me.  Sometimes my

5   50 words is more so than the five I should use.

6          So all right.  We're back.  I sustained the objection.

7          Ms. Brown, you'll rephrase or you'll continue on with

8   your examination.  You may proceed when you're ready.

9          MS. BROWN:  I will, Your Honor.  Thank you.

10  BY MS. BROWN:

11  Q.  Ms. Graham, when we left, we were talking about your

12  lawsuit that you raised yesterday.

13         Do you recall that?

14  A.  Yes.

15  Q.  And that was the lawsuit that you raised in the context

16  of reporting to the Department of Justice.

17         Correct?

18  A.  Yes.

19  Q.  And your lawsuit actually was ultimately dismissed.

20         Correct?

21  A.  Yes.

22  Q.  And you told us yesterday you believed that was because

23  of a first-to-file reason?

24         Do you recall that testimony?

25  A.  Yes, that's what I was told.

GRAHAM - CROSS - BROWN

1  Q.  And are you aware there's no public court document that

2  gives that reason for the dismissal?

3  A.  I have no idea.

4  Q.  All right.

5      So at the time you filed in -- one of the things you

6  did, Ms. Graham, in connection with this lawsuit is you

7  amended the complaint to remove your real name.

8      Correct?

9  A.  Yes.

10 Q.  And you did that to change it from Donna Graham to

11 Jane Doe.

12     Correct?

13 A.  Yes.

14 Q.  And your partner, Mr. Wilhelm, amended the complaint to

15 complaining from Mark Wilhelm to John Doe.

16     Correct?

17 A.  Yes.

18 Q.  And you did that because you didn't want anyone to know

19 you had filed the complaint.

20     Correct?

21 A.  Well, it still worked in the pharmaceutical industry,

22 and, yes, that is correct.

23 Q.  And you said yesterday you had no idea about

24 Ms. Penelow's case that we're here on.

25     Correct?

---GRAHAM - CROSS - BROWN---

1    A.    Correct.

2    Q.    Okay.

3          But you and Ms. Penelow have been friends a long time?

4          Correct?

5    A.    We have, yes.

6    Q.    You worked together at Bristol-Myers Squibb.

7          Correct?

8    A.    Yes.

9    Q.    That's about 20 years ago now?

10   A.    Yeah.

11   Q.    All right.

12         And then you worked together at Janssen?

13         Correct?

14   A.    Yes.

15   Q.    And you were, in fact, a bridesmaid in Ms. Penelow's

16   wedding.

17         Right?

18   A.    Yes.

19   Q.    You have pictures from what I'm sure was a nice event

20   showing that you all are very close.

21         Correct?

22   A.    Yes.

23   Q.    Okay.

24         MS. BROWN:  And, Your Honor, permission to publish

25   D8700.

───GRAHAM - CROSS - BROWN───

1              THE COURT:  Was that already admitted?

2              MS. BROWN:  No, it's not, Your Honor.

3              THE COURT:  All right.  So, yeah.  Just so you guys

4    move, like move to admit, and then I'll know that it's a

5    document that I got to go to Relators' counsel.

6         So any objection, folks?

7              MS. BROWN:  And it would be tab 81 in the binder.  I

8    can show it to you.

9              MR. RUSS:  No objection.

10             THE COURT:  All right.  It's so admitted, and you may

11   publish.

12             MS. BROWN:  Thank you.

13   (Defendant's Exhibit 81 in evidence.)

14   BY MS. BROWN:

15   Q.  And this, in fact, is a picture.  You guys have a lot of

16   pictures, of course, from the wedding online.

17        Right?

18   A.  Yeah, I suppose.

19   Q.  Yes.  And this is Ms. Penelow, the bride.

20        Right?

21   A.  Correct.

22   Q.  And that's you right next to her.

23        Is that right?

24   A.  Yes.

25   Q.  Okay.

—————— GRAHAM - CROSS - BROWN ——————

1      And you would agree that PCP is a close friend of

2  yours.

3      Correct?

4  A.   Yes.

5  Q.   Okay.

6      But you said, nevertheless, you had no idea that you

7  were all filing lawsuits about the same thing.

8      Right?

9  A.   I did not.

10  Q.   Okay.

11  A.   Though there was a point in time where we did not talk

12  for years.

13  Q.   And do you know why she would have had a copy of your

14  lawsuit before it became public?

15  A.   I have no idea.

16          MS. BROWN:  Your Honor, I like to admit D-8702.

17          THE COURT:  Counsel, any objection?

18          MR. RUSS:  What tab?

19          MS. BROWN:  Sorry, it's Tab 85.

20          MR. RUSS:  I'm sorry.  I don't have it.

21          MS. BROWN:  Oh, 85, sorry.

22          MR. RUSS:  No objection, Your Honor.

23          THE COURT:  I'm sorry?

24          MR. RUSS:  No objection.

25          THE COURT:  So admitted, and you may publish.

GRAHAM - CROSS - BROWN

1          MS. BROWN:  Thank you, Your Honor.

2   (Defendant's Exhibit 85 in evidence.)

3   BY MS. BROWN:

4   Q.   I'm showing you, Ms. Graham, D8702.

5          Do you see this is an email from Ms. Penelow to

6   Ms. Brancaccio.

7          Do you see that?

8   A.   I do.

9   Q.   And this email is dated 2015.

10         Do you see that?

11  A.   I do.

12  Q.   And you filed your EDPA lawsuit in 2014.

13         Correct?

14  A.   I don't remember the date.

15  Q.   And in the initial years of your lawsuit it was filed

16  under seal.

17         Correct?

18  A.   Yes.

19  Q.   Okay.

20         And that means even Janssen didn't know about it.

21         Right?

22  A.   That's correct, although they did find out about it even

23  though it was under seal.

24  Q.   All right.

25         And do you know how in the world Ms. Penelow would have

GRAHAM - CROSS - BROWN

1  found out about it and sent it to Ms. Brancaccio when it was

2  still not public?

3  A.    I have no idea, unless, you know, it came through her set

4  of lawyers because if I remember at the time, the lawyer that

5  we had secured was in conversation with their lawyers when

6  they found out -- when he found out that we were not the

7  first-to-file.

8  Q.    And do you know why Ms. Penelow would have been sharing

9  it with Ms. Brancaccio?

10  A.    I have no idea.  I didn't know that she had a copy.

11  Q.    Okay.

12        And at the time, Ms. Graham, that you retained a lawyer

13  to file a lawsuit under this -- did I do something on this --

14  at the time you retained a lawyer to file this lawsuit, you

15  had already left Janssen.

16        Correct?

17  A.    Yes.

18  Q.    And you had been gone from Janssen for several years, in

19  fact.

20        Correct?

21  A.    I left in 2011, so a few years, yes.

22  Q.    So about three years you had been gone?

23  A.    Yes.

24  Q.    Okay.

25        And one of the things you could have done after you

GRAHAM - CROSS - BROWN

1  left Janssen is you could have reported what you claimed was

2  this illegal activity.

3      Correct?

4  A.   In theory, yes.

5  Q.   Okay.

6      One of the things you could have done during that

7  period of time is you could have called up Medicare and tell

8  them that you believed they were being defrauded.

9      Right?

10 A.   I'm not under the impression that you can just call up

11 Medicare and do that.

12 Q.   Are you aware of hotlines that exist that are Government

13 of people saying that there is illegal activity going on like

14 what you described yesterday?

15 A.   I was not aware of that.  I know, you know, when you work

16 for the company, there's a hotline, but I was not aware that

17 there was a hotline to call Medicare or Medicaid or the DOJ.

18 I was not aware of that.

19 Q.   What you chose to do instead of reporting to the

20 Government is get a lawsuit and file a lawsuit -- get a lawyer

21 and file a lawsuit?

22 A.   I thought that was the protocol.

23 Q.   But the fact of the matter is during the time period that

24 you were at Janssen, you never once reported any of the

25 conduct that you told our jurors about yesterday.

GRAHAM - CROSS - BROWN

1          Correct?

2   A.    That's correct, because I did not feel that it was a safe

3   environment to do so.  I didn't feel that it was anonymous.

4   Q.    And you knew that Janssen had a number of different ways

5   that employees could report any suspected illegal conduct.

6          Correct?

7   A.    Yes.  They also have a number of ways of finding out who

8   did it as well.

9   Q.    For example, Janssen has an anonymous hotline.

10         Correct?

11  A.    Supposedly, yes.

12  Q.    And Janssen has a compliance department.

13         Correct?

14  A.    Yes.

15  Q.    And Janssen has an HR department.

16         Correct?

17  A.    Yes.

18  Q.    And at -- during some period of time, sales reps had

19  compliance apps on their IPs.

20         Correct?

21  A.    I don't recall that.

22  Q.    Do you know that there's a credo -- a Johnson & Johnson

23  credo website where you can report any concerns you might

24  have?

25  A.    I did not.

—————GRAHAM – CROSS – BROWN—————

1  Q.   Okay.

2       And so your testimony --

3  A.   I was not aware of that.

4  Q.   You were trained on Johnson & Johnson's compliance

5  policies.

6       Correct, Ms. Graham?

7  A.   Yes.

8  Q.   All right.

9       And you know that Johnson & Johnson's policies actually

10 require employees to report any suspected illegal or improper

11 activity.

12      Correct?

13 A.   I did not know that it was required, no.

14 Q.   Let's take a look at tab 45.

15      MS. BROWN:  And, Your Honor, permission to publish

16 D2095.  It's already in evidence, agreed upon.

17      THE COURT:  Oh, it's already in evidence?

18      MS. BROWN:  Well, we agreed upon it.  It's from our

19 openings.

20      THE COURT:  So you agreed upon it.

21   So no objection?

22      MR. RUSS:  No objection.

23      THE COURT:  All right.  Now it's admitted.

24      MS. BROWN:  Thank you, Your Honor.

25 (Defendant's Exhibit 2095 in evidence.)

*United States District Court*
*District of New Jersey*

─── GRAHAM - CROSS - BROWN ───

```
 1            THE COURT:  It's a little bury.

 2            MS. BROWN:  I think it's stuck on my other document.

 3  Sorry, Your Honor.  One second.

 4            (Brief pause.)

 5            MS. BROWN:  Sorry, Your Honor.

 6            THE COURT:  That's all right.

 7            (Brief pause.)

 8            MS. BROWN:  Thank you.

 9  BY MS. BROWN:

10  Q.   Ms. Graham, I'm showing you what is J&J's health care

11  compliance policy document.

12            Do you see that?

13  A.   I do.

14  Q.   All right.

15            And this one is entitled "promotion of FDA regulated

16  product."

17            Do you see that?

18  A.   I do.

19  Q.   All right.

20            And this would have been in effect -- this is one from

21  the relevant time period when you were there.

22            Correct?

23  A.   Yes.

24  Q.   Okay.

25            And if we go to the second page, we see the scope and
```

GRAHAM - CROSS - BROWN

1    target audience.

2        Do you see that?

3    A.   I do.

4    Q.   All right.

5        And this compliance document that Janssen had in effect

6    at the time period you were there says that it applies to the

7    accepted behaviors, communications, and information exchanged

8    between customers and marketing teams slash commercial

9    field-based staff.

10       Do you see that?

11   A.   I do.

12   Q.   The next paragraph it talks about how these policies are

13   for use including by sales representatives.

14       Correct?

15   A.   I see that, yes.

16   Q.   All right.

17       And if you look at responsibility and applicability you

18   see failure to comply with this policy may be considered a

19   serious offense and warrant immediate suspension.

20       Do you see that?

21   A.   I do.

22   Q.   All right.

23       And under the responsibility to disclose, this policy

24   says our company maintains an open environment in which

25   employees and suppliers can report, without fear of

GRAHAM - CROSS - BROWN

1    retaliation, any conduct they believe is in violation of

2    Government laws and company policy.

3        Do you see that?

4    A.  I do.

5    Q.  All right.

6        And down below, "As an employee or supplier, personnel

7    are required to report known or suspected violations of the

8    law."

9        Do you see that?

10   A.  I do.

11   Q.  And this was a compliance policy that was in effect

12   during the time period that you were at Janssen.

13       Correct?

14   A.  According to the date, yes.

15   Q.  And one of the things that you did at Janssen is you

16   underwent regular training, including on compliance policies.

17       Correct?

18   A.  It was once a year, yes.

19   Q.  All right.

20       And despite the fact that Janssen had a number of ways

21   in which employees could report any alleged concerns, despite

22   the fact that Janssen had a policy that required employees to

23   report concerns, you did not report any of the activities you

24   testified to our jury about yesterday during the time period

25   you were at Janssen.

GRAHAM - CROSS - BROWN

1   A.   Again, because I did not feel that it was anonymous, and

2   I did fear retaliation.

3   Q.   And even after you left Janssen, for the next several

4   years, when you weren't even working at Janssen, you also

5   didn't report any of the alleged activity that you spoke to

6   our jury about yesterday.

7        Correct?

8   A.   I did not.  I tried to move on from it.

9        And when we found a bunch of notes and documents when

10  we moved, that's when it really just brought up all those

11  emotions again, and we felt that maybe we needed to do the

12  right thing.

13  Q.   Okay.

14       And in terms of doing the right thing, what you decided

15  to do was hire a lawyer and file a lawsuit in which you stood

16  to gain a lot of money.

17       Correct?

18  A.   We hired a lawyer to file a lawsuit because I thought

19  that was the protocol.

20  Q.   And one of the things you told us about yesterday,

21  Ms. Graham, is that you had a -- you thought it was a

22  difficult environment at Johnson -- at Janssen.

23       Correct?

24  A.   It wasn't pleasant, no.

25  Q.   Yeah.

GRAHAM - CROSS - BROWN

1          And I think you described it as a very high stress

2     environment, correct?

3     A.    Yes.

4     Q.    You said many people were fearful for their jobs, right?

5     A.    Yes.

6     Q.    You were all sort of uncomfortable all the time, correct?

7     A.    Yes.

8     Q.    You described to our jury that you believed you were

9     being directed to break the law.

10          Correct?

11    A.    Yes.

12    Q.    And that everybody sort of lived in fear of getting found

13    out or having other problems.

14          Correct?

15    A.    Absolutely, yes.

16    Q.    Okay.

17          And so you described to our jury there was just sort of

18    a general dissatisfaction amongst the sales reps with being at

19    Janssen at that time.

20          Correct?

21    A.    I would agree with that, yes.

22    Q.    All right.

23          Let's take a look -- the truth is, though, outside of

24    the courtroom, Ms. Graham, that's not what you and your

25    colleagues had to say about working at Tibotec and Janssen.

GRAHAM - CROSS - BROWN

1         Correct?

2   A.   I'm not sure what you're referring to.

3   Q.   Okay.

4         Let's take a look --

5             MS. BROWN:  Your Honor, permission to admit D-8697.

6   It's tab 78, which I'll give to you.

7             THE COURT:  Any objection?

8             MR. RUSS:  I object to hearsay, Your Honor.

9             THE COURT:  Let me see the document.

10        Let's see you at sidebar.

11            (Sidebar begins at 10:17 a.m.)

12            THE COURT:  So is this what you're terming as a prior

13  inconsistent statement?

14            MS. BROWN:  Yes, Your Honor.

15            THE COURT:  So here's what I would ask you to do, and

16  you can correct me if you disagree, but my take on doing the

17  prior inconsistent statement -- she doesn't recall.  She

18  doesn't know what you're referring to.

19        So I think before you can move to admit this, you first

20  have to give her a chance to review it and see if that

21  refreshes her recollection as to whether she gave a different

22  statement about her time there.

23        Now, if she says, Okay, that refreshes my recollection.

24  I said something different, dah, dah, dah, then you get what

25  you get.

GRAHAM - CROSS - BROWN

1        MS. BROWN:  I understand.

2        THE COURT:  Now, if she says, No, I still haven't

3   said anything, then why is she not able to -- she didn't

4   cross-examine her on this.

5        MR. RUSS:  Absolutely.  There's one line in here from

6   her, and then a bunch from people I don't know who they are.

7   And so --

8        THE COURT:  Well, I'm just looking at this -- you're

9   moving to admit this or to question her about it?

10        MS. BROWN:  I just want to question her about it,

11   yeah.

12        THE COURT:  Why don't we question her about it first.

13        But I don't see anything improper about if she says she

14   doesn't know what you're talking about, and may I approach.

15   You can refer her to this document or show her -- only her --

16   on the screen --

17        MS. BROWN:  Okay.

18        THE COURT:  -- have her review it, say, Now that

19   you've read that, did you say something different about --

20        MS. BROWN:  Right.

21        THE COURT:  And I don't know -- what's these --

22        MS. BROWN:  These are all the sales reps talking

23   about what a great time they had, what an amazing experience

24   it was.

25        THE COURT:  Every single one of these are sales reps?

GRAHAM - CROSS - BROWN

1          MS. BROWN:  Yeah, correct.  This is the team they

2    were on.

3          MR. RUSS:  Your Honor, it's from 2020, and there are

4    a bunch of people that aren't on our witness list.  It's just

5    for the admissibility of these statements from people that

6    aren't witnesses.

7          THE COURT:  All right.  Well, for now, you intend to

8    question her about it to see if that refreshes --

9          MS. BROWN:  I'll question her about it, but, I mean,

10   she got --

11         THE COURT:  She did write this?

12         MS. BROWN:  Part of it.

13         THE COURT:  Where is her statement?

14         MS. BROWN:  Her comment is on this page right here.

15   They're all talking about how much they loved it.  "I echo

16   what everyone else has said" and "Amazing group of people" --

17         THE COURT:  All right.  So why don't you

18   cross-examine on it because it may come out in her testimony,

19   and you're going to be showing it --

20         MS. BROWN:  Right.

21         But the other issue, Your Honor, is that she said that

22   everybody was miserable.  "We all thought we were breaking the

23   law."  And these are all her colleagues, and every single

24   person is talking about how wonderful it was when --

25         THE COURT:  I mean, you can cross-examine on other

─────GRAHAM - CROSS - BROWN─────

1    colleagues representing the same positive experience.

2              MS. BROWN:  Right.  Janssen --

3              THE COURT:  But then how are you admitting the

4    document after that?

5              MS. BROWN:  I'm just going to use it for cross, and I

6    want to show it.

7              THE COURT:  You can use it for cross.

8              MS. BROWN:  Can I show it as well?

9              THE COURT:  Only to her.

10             MS. BROWN:  Okay.

11             (Sidebar was concluded at 10:19 a.m.).

12             (Open court.)

13             THE COURT:  And us, but not the jury.

14             MS. BROWN:  Understood.

15         And, Your Honor, may I approach the witness with a

16   copy, then?

17             THE COURT:  You may.

18             MS. BROWN:  Thank you.

19             THE COURT:  The objection is sustained, but I'm going

20   to allow you to at least provide the document to refresh the

21   witness's recollection.

22             MS. BROWN:  Ms. Graham, here you go.

23   BY MS. BROWN:

24   Q.  Ms. Graham, I'm handing you what we've marked as D-8697.

25             Do you see this document?

GRAHAM - CROSS - BROWN

1    A.   I do.

2    (Defendant's Exhibit D-8697 for identification.)

3    BY MS. BROWN:

4    Q.   And do you recognize it as a Facebook posting with a

5    number of your former colleagues from your time at Janssen

6    and -- which was formerly called Tibotec?

7    A.   I do.

8    Q.   All right.

9         And do you recognize in this document that a number of

10   the people on this Facebook post were sales representatives

11   that you worked with, correct?

12   A.   Yes.

13   Q.   And that would include, for example, Jimmy Plock.

14        Right?

15   A.   I guess.  I see his name, yes.

16   Q.   Right.

17        A number of these folks are the very same sales reps

18   that you worked with during the time period that you were

19   discussing with our jury yesterday.

20        Correct?

21   A.   Yes.

22   Q.   All right.

23        And what this group of sales reps is discussing, in

24   this Facebook post, is sort of reminiscing --

25             THE COURT:  Sustained.

GRAHAM - CROSS - BROWN

```
 1          MR. RUSS:  Objection, hearsay.
 2   BY MS. BROWN:
 3   Q.   Okay.
 4          Does this refresh your recollection, Ms. Graham, about
 5   a conversation or a social media interaction you had with some
 6   of your former colleagues about your time at Janssen?
 7   A.   Yes.  But I'd like to qualify that, if I could.
 8          Yeah.  I mean, I still think a lot of the sales reps
 9   that worked there were amazing people.  We were all really
10   dedicated to the disease of HIV.  It's independent of what the
11   culture was, though.  I mean, yes, I still highly regard these
12   people, and I have a lot of respect for them, but that doesn't
13   necessarily mean that what went on didn't happen.
14   Q.   And my question, Ms. Graham, was does this refresh your
15   recollection about a Facebook thread where you and your former
16   colleagues were reminiscing about the time you had at Janssen?
17   A.   I think what we're reminiscing about was the time --
18          MR. RUSS:  Objection, Your Honor.  Hearsay.  And she
19   did not say she doesn't remember this.  It's not a
20   recollection refresh.
21          THE COURT:  Well, she's asking if it refreshes her
22   recollection, so the witness can answer that question.
23          So objection is overruled.
24          THE WITNESS:  I'm sorry.  Can you repeat the
25   question?
```

GRAHAM - CROSS - BROWN

```
 1   BY MS. BROWN:
 2   Q.   Sure.
 3        Does taking a look at this Facebook social media
 4   posting with your former colleagues at Janssen refresh your --
 5   help you remember when you were all posting about your time
 6   back at Janssen?
 7   A.   It refreshes my memory about the feelings that I had
 8   about these people who I thought were great people and had a
 9   lot of respect for.
10   Q.   Yeah.
11        And if you look at page 2, for -- oh, sorry.  Yeah,
12   sort of on the second page where Mr. Plock, he is one of your
13   colleagues -- he was one of your colleagues.
14        Correct?
15   A.   Yes.  I mean, he was an acquaintance, but yes.
16   Q.   Okay.
17        Do you know that he's one of the sales representatives
18   that Ms. Penelow and Ms. Brancaccio have specific allegations
19   about in this case?
20   A.   I'm not aware.
21   Q.   All right.
22        And does this -- looking at this document, does it
23   refresh your recollection that Mr. Plock was reflecting on
24   whether or not working at Janssen was a positive experience in
25   his career?
```

GRAHAM - CROSS - BROWN

1   A.   I can't see --

2          MR. MARKETOS:  Objection, Your Honor.  Hearsay.

3          THE COURT:  Sustained.

4   BY MS. BROWN:

5   Q.   Do you see, looking at this document, Ms. Graham, that a

6   number of your former colleagues were commenting on how their

7   time at Janssen impact -- it impacted their careers?

8          MR. RUSS:  Objection, Your Honor.  Hearsay.

9          THE COURT:  Sustained.

10         MR. RUSS:  Move to strike.

11         THE COURT:  Move to strike the question?

12         MR. RUSS:  Yes, Your Honor.

13         THE COURT:  Okay, I'll move to strike the question.

14      So, folks, that simply just means don't consider the

15  question that was just asked.  All right?

16  BY MS. BROWN:

17  Q.   Ms. Graham, you and your former colleagues at Janssen

18  have posted on social media about the positive time that you

19  had working at Janssen.

20      Correct?

21         MR. RUSS:  Objection, Your Honor.  Hearsay objection.

22         THE COURT:  Sustained.

23         MS. BROWN:  Your Honor, may we approach?

24         THE COURT:  Yes.

25         (Sidebar begins at 10:23 a.m.)

—————— GRAHAM - CROSS - BROWN ——————

1          MS. BROWN:  She testified --

2          (Reporter clarification.)

3          MS. BROWN:  I apologize.

4     She testified at length yesterday, Your Honor, about

5 how her and colleagues talked all the time about how they were

6 being forced to do illegal activity.  This is a fair rebuttal

7 to that.

8          THE COURT:  Yeah, I don't think -- I think you can

9 cross-examine her and say, Look -- and you've gone through the

10 thread, and you said, Look, this is all positive.  Now she's

11 qualified it.  She's saying, Well, not about my time at

12 Janssen.  It's about the people I was with.

13     But now you're beating a dead horse and -- can I ask

14 you:  What about this person?  What about this person?  How is

15 that not all hearsay?

16          MS. BROWN:  Well, it's the effect on her, Your Honor.

17 I think it's an exception to hearsay because what she's saying

18 is I knew all of these people were telling me, and such a

19 horrible environment, and she testified at length to that

20 yesterday.

21          THE COURT:  Now you're going to the truth of the

22 matter.  It's not going to the effect of -- I know the

23 difference.  Right?  This isn't the first time I've dealt with

24 hearsay, folks.

25     You're trying to say, no the truth of the matter is

—— GRAHAM - CROSS - BROWN ——

1   that these positive statements they made, they're out of

2   court; that's the truth of the matter.  Put --

3           MS. BROWN:  I understand.

4           THE COURT:  You know, John Doe told you this.  What

5   did you do next?  Oh, objection, hearsay.  No, it's not,

6   because we don't care if what John Doe says is truthful.  I

7   think what we're saying is what did she do after she was told

8   that?

9        So there's a difference.

10          MS. BROWN:  I understand.

11          (Sidebar was concluded at 10:25 a.m.).

12          (Open court.)

13          MS. BROWN:  May I proceed, Your Honor?

14          THE COURT:  You may.

15   BY MS. BROWN:

16   Q.   And, Ms. Graham, to wrap this up, would you say there are

17   about four or five pages of comments from a number of

18   different colleagues of yours back from your time at Janssen?

19   A.   Yes.

20   Q.   And would you agree that uniformly each one of your

21   colleagues has --

22          MR. RUSS:  Objection, Your Honor.  Hearsay.

23          THE COURT:  Let me hear the question.

24          MS. BROWN:  Your Honor --

25   BY MS. BROWN:

─GRAHAM - CROSS - BROWN─

1    Q.   And, Ms. Graham, you would agree that you didn't say

2    anything negative about your time at Janssen in this thread.

3         Correct?

4    A.   My comment was more related to the people.

5    Q.   And you never said anything, when you were speaking

6    publicly on social media, about feeling threatened during your

7    time at Janssen.

8         Correct?

9    A.   I don't know that that's appropriate, to do that on

10   social media.

11   Q.   Okay.

12        And you never made any posting or made any comments

13   that you thought you had a difficult time at Janssen or you

14   were working in a stressful environment?

15        Correct?

16   A.   No.

17   Q.   Ms. Graham, I want to talk to you a little bit about some

18   of the testimony that you gave to our jury yesterday.  One of

19   the things you spoke about was the sales goals for Prezista.

20        Do you remember that?

21   A.   I do.

22   Q.   Okay.

23        And you talked about your view that those were set to a

24   level that wasn't realistic.

25        Correct?

GRAHAM - CROSS - BROWN

1    A.    Agreed, yes.

2    Q.    And to be clear, you weren't involved in setting the

3    sales forecasts for Prezista.

4          Correct?

5    A.    That is correct.

6    Q.    All right.

7          You weren't involved in disseminating or spreading

8    those sales figures to different outside parties, correct?

9    A.    Correct.

10   Q.    You testified yesterday that the forecasts had been

11   shared with Wall Street.

12         Do you remember that?

13   A.    I do.

14   Q.    All right.

15         You weren't involved in any outside communications

16   about projected forecasts for Prezista.

17         Correct?

18   A.    No, I -- but my understanding is that's typically how

19   that works.

20   Q.    And the fact of the matter -- and one of the things you

21   said to our jury was that these forecasts created a very

22   stressful environment for sales reps like you.

23         Correct?

24   A.    Yes.

25   Q.    And you said that put a lot of pressure on you and your

─────GRAHAM - CROSS - BROWN─────

1  colleagues to promote off-label.

2      Right?

3  A.  Yes.

4  Q.  You told our jurors that those sales reps -- for -- those

5  forecasts were never revised.

6      Correct?

7  A.  Correct.

8  Q.  And that wasn't true, right?

9  A.  Not to my recollection.

10  Q.  Okay.

11      Let's take a look -- I'd like to show you --

12          MS. BROWN:  Your Honor, Tab 82, 8701.

13          THE COURT:  Has that been admitted, or are you moving

14  to admit it?

15          MS. BROWN:  I'm going to move to admit it,

16  Your Honor.

17          THE COURT:  Folks?

18          MR. RUSS:  No objection, Your Honor.

19          THE COURT:  All right.  So admitted.

20  (Defendant's Exhibit D-8701 in evidence.)

21  BY MS. BROWN:

22  Q.  Ms. Graham, I'm going to show you a transcript of a

23  voicemail to the entire sales field from 2006.

24      From -- and this is, for the record, D-8701.

25      And, Ms. Graham, do you know who Deb O'Connor is?

—————GRAHAM - CROSS - BROWN—————

1    A.    Yes.

2    Q.    All right.  Tell our jury who Ms. O'Connor is.

3    A.    She was the national sales director at the time.

4    Q.    All right.

5          And from time to time, particularly around 2006, one of

6    the ways the higher management communicated with the field was

7    to leave voicemails.

8          Correct?

9    A.    I don't recall that, but, yes.  I mean, I think that was

10   used a long time ago.

11   Q.    All right.

12   A.    I don't remember that specifically at J&J.  You know, I

13   remember it at Bristol-Myers and at Roche, but not

14   specifically J&J.

15   Q.    Okay.

16         And this voicemail from Deb O'Connor, she says up top,

17   is going to the entire field with copies to internal

18   personnel.

19         Do you see that?

20   A.    I do.

21   Q.    And she says, "When we met last month at the POA."

22         That's a big sales meeting.

23         Correct?

24   A.    Correct.

25   Q.    All right.

GRAHAM - CROSS - BROWN

1          She shared a Glenn -- that's Glenn Mattes?

2          Correct?

3   A.   Uh-huh.  Yes.

4   Q.   And he was the president of the organization at the time.

5          Correct?

6   A.   Correct.

7   Q.   All right.

8          And she says, "Glenn and I shared with you our thoughts

9   around the first four months of Prezista's launch."

10          Correct?

11   A.   Yes.

12   Q.   And she says there were some positive things, but then

13   she goes on to identify some challenges that the sales team

14   was having early on.

15          Correct?

16   A.   I mean, I would need a minute to read it, but...

17   Q.   Sure.

18          And I'm just going to direct you to this last sentence

19   here --

20   A.   Yes, I see it.

21   Q.   -- right?

22   A.   Uh-huh.

23   Q.   She's going to talk about some of the market challenges

24   we encountered.

25   A.   Yes.

GRAHAM - CROSS - BROWN

1    Q.   Correct?

2    A.   Yes.

3    Q.   All right.

4         And in -- at least in the voicemail she had three

5    challenges that the salespeople were facing early on.

6         Right?

7    A.   Yes.

8    Q.   All right.

9         And the first one had to do with the early access

10   program for Prezista.

11        Correct?

12   A.   I see that, yes.

13   Q.   All right.

14        And when -- the early access program was a way to get

15   this medication to a small group of doctors before it even

16   became approved.

17        Correct?

18   A.   It was to get the medication to the patient.

19   Q.   Correct.  Through physicians.

20        Correct?

21   A.   Yes.

22   Q.   Okay.

23        And that's a good thing.

24        Right?  We can agree on that?

25   A.   Absolutely, yes.

GRAHAM - CROSS - BROWN

1  Q.   The early access program for Prezista and Intelence no

2  doubt saved people's lives.

3       Correct?

4  A.   Potentially, yes.  I mean, I would have no idea how each

5  patient was affected by it.

6  Q.   Sure.

7       But, I mean, we can Prezista and Intelence are good

8  medicines?

9       Correct?

10 A.   Prezista is much better than Intelence, but, yeah.

11 Q.   They're lifesaving HIV medicines.

12      Correct?

13 A.   They are part of the -- of the treatment strategy, yes.

14 Q.   All right.

15      And the second issue that Deb O'Connor identifies in

16 there was some delays around the DDMAC review process.

17      Do you that?

18 A.   I do.

19 Q.   And the DDMAC review process is a process of getting FDA

20 approval for promotional materials.

21      Do you know that?

22 A.   I remember that now, yes.

23 Q.   Okay.

24      And you know that before any promotional material could

25 be used by a sales representative, Janssen had to send it to

GRAHAM - CROSS - BROWN

1    the FDA.

2        Right?

3    A.    Correct.

4    Q.    And the department at the FDA that it had to go to was

5    called DDMAC.  You know that.

6        Right?

7    A.    Yes.

8    Q.    And one of the delays was before Janssen could give you

9    all pieces to share with doctors, the FDA had to say it was

10   okay.

11       Right?

12   A.    Yes.

13   Q.    All right.

14       And that's another thing that she identifies as slowing

15   down the sales, and then finally she says some of the

16   customers struggled to find a second medicine to use with

17   Prezista.

18       Right?

19   A.    Yes.

20   Q.    All right.

21       And if we go down to the next paragraph, she talks

22   about what you talked about yesterday, which is that

23   originally Janssen wasn't meeting its sales goals.

24       Correct?

25   A.    Yes.

GRAHAM - CROSS - BROWN

1    Q.  All right.

2         So the original forecast was 49 million.

3         Right?

4    A.  Yeah, I don't -- I didn't remember what it was until I

5    see it now.  Yeah, I didn't remember yesterday what it was.

6    Q.  All right.

7         And what she talks about is revising that goal.

8         Do you see that?

9    A.  I do.

10   Q.  All right.

11        And if we go down to the very next paragraph, we get

12   some details on -- you see this, "revised forecast"?

13   A.  I do.

14   Q.  You see that?

15        And so you had told our jury yesterday this -- this

16   forecast was never revised.

17        Do you see that?

18   A.  I do.

19   Q.  All right.

20        And, in fact, not only was it revised, it was revised

21   quite significantly, wasn't it?

22   A.  It was.

23   Q.  All right.

24        So we had started out with 49 million.

25        You see that?

GRAHAM - CROSS - BROWN

1  A.   Yes.

2  Q.   And then because of these other factors that were going

3  on, including the FDA is taking a long time to tell us we can

4  use marketing materials, we revise it.

5       Right?

6  A.   I see that, yes.

7  Q.   All right.

8       Not only do we revise it, we cut it by more than -- by

9  almost half?

10      Right?

11 A.   Yes.

12 Q.   All right.

13      And what's significant as it relates to your testimony

14 is the revised forecast was what being used to calculate

15 bonuses.

16      Do you see that?

17 A.   Yes.

18 Q.   All right.

19      So what that means is in light of the three factors we

20 looked at, Janssen actually did revise the forecast.

21      Correct?

22 A.   I stand corrected.  I did not recall that.

23 Q.   And not only did they revise it, but they translated that

24 reduction by half to how they calculated bonuses of sales reps

25 like -- like you.

GRAHAM - CROSS - BROWN

1          Correct?

2    A.    Yes.

3    Q.    All right.

4          And that, you would agree, would no doubt have

5    decreased some of the sales pressure that people would have

6    felt if the forecast was more than double.

7          Right?

8    A.    It alleviate -- I would imagine, yes, that it alleviated

9    some.  I just -- I do not remember this.

10   Q.    Okay.

11         And so it's -- it was mistaken.

12         Right?

13   A.    Yes.

14   Q.    And when you thought back -- and fair enough, because

15   this happened a long time ago.

16         Right?

17   A.    Yes.

18   Q.    You were asked questions yesterday about other people's

19   PowerPoints from 2006.

20         Right?

21   A.    Correct.

22   Q.    And that's almost 20 years ago now.

23         Right?

24   A.    Yes.

25   Q.    All right.

GRAHAM - CROSS - BROWN

1      And so you thought it seemed like a high-pressure time.

2      Right?

3  A.   I still feel that it was high-pressure time.  I mean,

4  this is a very small snapshot in time.

5  Q.   Sure.

6      And you thought that there was a high forecast that was

7  never revised, and it turns out that wasn't right?

8  A.   Yes.

9  Q.   All right.

10 A.   As I said, I stand corrected.

11 Q.   All right.

12     And one of the things you were asked a lot about

13 yesterday was whether or not you were deciding to do these

14 illegal activities you talked about or whether somebody was

15 directing you to do them.

16     Do you remember that?

17 A.   Vaguely, yes.

18 Q.   And I wasn't really clear on who it was who was directing

19 you to do these activities.

20     Who is the person or people that you believed directed

21 you to do something improper?

22 A.   I mean, directly, I -- my district manager, which would

23 have been Frank Murphy, but I can tell you, you know, one of

24 the things that he said to us was he never asked us to do

25 things that he wasn't asked of himself.

GRAHAM - CROSS - BROWN

1   Q.   And Mr. Murphy also supervised Ms. Penelow.

2        Correct?

3   A.   Yes.

4   Q.   And he also supervised Ms. Brancaccio.

5        Correct?

6   A.   Yeah, uh-huh.

7   Q.   And you believe he gave them that same direction.

8        Is that right?

9   A.   Yes.

10  Q.   All right.

11       Have you spoken to Ms. Penelow about whether or not she

12  believes Mr. Murphy gave that direction?

13  A.   No.

14  Q.   All right.

15  A.   I mean, not any time recently.

16  Q.   And so working for somebody who was directing you to

17  break the law must have been a pretty bad experience.

18       Right?

19  A.   It wasn't -- yeah.  I did not feel good about it.

20  Q.   And it's super weird then, Ms. Graham, that you would

21  have described Mr. Murphy as the best manager you ever had.

22       Right?

23  A.   I would still say he was one of the best managers I have

24  ever had.

25  Q.   Because one of the things you did is you filled out an

1    employment evaluation for your manager.

2         Correct?

3    A.    Yes.   Uh-huh.

4    Q.    And when you did that you had very positive things to say

5    about Mr. Murphy?

6    A.    I still have very positive things to say about him.

7    Q.    And rather than raising in that context that you were

8    concerned he was directing you to break the law, you said he

9    was the best manager you ever had?

10   A.    Because I know it wasn't his idea.   He was asking us to

11   do it because it was being asked of him.

12   Q.    And you didn't ever, when you were reviewing Mr. Murphy

13   who you say for multiple years was directing you to break the

14   law -- you didn't ever raise any concerns that he was telling

15   you to do something that you thought was improper.

16        Correct?

17   A.    No.   I did it because I know it was being asked of him.

18   Q.    And one of the things that you talked about yesterday was

19   the pressure to promote off-label to increase your sales.

20        Correct?

21   A.    Yes.

22   Q.    And you know, however, that Janssen have a policy that it

23   doesn't compensate sales representatives for off-label sales.

24        Correct?

25   A.    I don't know how they would discern that, but -- and I

GRAHAM - CROSS - BROWN

1  was not aware that that was part of the policy, no.

2  Q.  Okay.

3      So when you told our jury yesterday that there was all

4  this pressure to promote off-label to get a better bonus, you

5  didn't know that Janssen has a policy that it will not

6  compensate sales reps for off-label prescriptions?

7  A.  I don't recall that.

8  Q.  Because you're not involved in those compensation

9  decisions.

10      Right, ma'am?

11  A.  No.

12  Q.  So in terms -- there's a whole committee, you know at

13  Janssen that decides compensation sales reps.

14      Right?

15  A.  I didn't know -- I mean, obviously there's one on the

16  corporate level, but I thought each division did their own.

17  Q.  And in terms -- do you know if compliance is involved in

18  how decisions are made in setting sales reps's compensations?

19      Did you know that?

20  A.  I did not.

21  Q.  Okay.

22      And do you know one of the things compliance is

23  concerned about is making sure that we are not incentivizing

24  sales reps to promote off-label?

25  A.  No.

1    Q.   Okay.

2         Do you know that where Janssen could identify off-label

3    sales, it removed that from compensation?

4    A.   I'm sorry, could you repeat that?

5    Q.   Sure.

6         Do you know that if Janssen could identify

7    prescriptions that a prescriber was writing off-label, it

8    wouldn't count those in a sales reps's compensation?

9         Did you know that?

10   A.   Yeah, but I don't know how they would identify that.

11   Q.   Okay.

12        Let's take a look at a document.  It is tab 68, D-8662.

13        MS. BROWN:  And, Your Honor, I'd like to admit it.

14        MR. RUSS:  I don't have it, Alli.

15        MS. BROWN:  You don't have 68?  I'm sorry.

16        MR. RUSS:  Your Honor, my objection would be if she

17   can lay a foundation of knowledge for this witness.

18        THE COURT:  I don't have the document before me.  Do

19   you want to try to lay a foundation, or do we need to discuss

20   it more?

21        MS. BROWN:  Sure.  I'll lay a foundation.

22        THE COURT:  All right.

23   BY MS. BROWN:

24   Q.   Mr. Mike Iacobellis was the national sales director.

25        Correct?

GRAHAM - CROSS - BROWN

1   A.   For a period of time, after Deb O'Connor stepped down.

2   Q.   Sure.

3        And so we were just looking at a voicemail from

4   Deb O'Connor, and Mr. Iacobellis actually took her place.

5        Correct?

6   A.   Yes.

7   Q.   And Mr. Iacobellis was in charge, in part, of reviewing

8   sales rep compensation.

9        Correct?

10  A.   I would imagine, yes.

11  Q.   All right.

12       And one of the things you know is that Intelence was

13  not approved for use in kids.

14       Right?  It didn't have a pediatric indication.

15       Right?

16  A.   No, it did not.

17  Q.   And did you know that Mr. Iacobellis said that we

18  couldn't give sales reps credit --

19       MR. RUSS:  Objection, hearsay.

20       MS. BROWN:  I'll rephrase.

21       THE COURT:  Yeah.  I thought you were laying the

22  foundation for the document.  The witness doesn't have it

23  before here.

24       Are you trying to lay the foundation for this

25  particular document?

GRAHAM - CROSS - BROWN

```
 1           MS. BROWN:  I'm just going to do the topic,
 2   Your Honor, and I'll move away from the document.
 3           THE COURT:  All right.
 4   BY MS. BROWN:
 5   Q.  And do you know that Mr. Iacobellis was involved in
 6   trying to identify sales that doctors were writing off-label
 7   for kids?
 8   A.  I did not.
 9   Q.  And did you that the reason he was doing that was to make
10   sure that sales reps weren't compensated for off-label
11   prescriptions?
12           MR. RUSS:  Objection, assumes facts not in evidence.
13           THE COURT:  Overruled.
14           THE WITNESS:  I'm sorry, could you repeat the
15   question?
16   BY MS. BROWN:
17   Q.  Sure.
18       Do you know the reason Mr. Iacobellis was doing that
19   was to make sure that sales reps weren't compensated for
20   prescriptions that doctors were intentionally writing
21   off-label for kids?
22   A.  I did not, but I would like to say is that it's much
23   easier to identify writing for a child because the
24   prescription is coming from a pediatrician.
25       If a HIV treating physician is writing a prescription
```

GRAHAM - CROSS - BROWN

1  for an adult, I don't see how you could identify whether it

2  was for a treatment-experienced patient or a treatment-naive

3  patient.

4  Q.  And that's actually -- you raised a good point,

5  Ms. Graham.

6      When it came to looking at prescriptions, there was no

7  way for Janssen to know if a doctor was writing for a

8  treatment-naive patient or a treatment-experienced patient.

9      Correct?

10 A.  Correct, yes.

11 Q.  And there was no way for Janssen to know if a doctor was

12 writing because of a lipid message or not.

13     Correct?

14 A.  No.  But you could see the trend increasing, or you could

15 see the number of prescriptions increasing whether, you know,

16 the physician had attended a speaker program or, you know, an

17 ad board or something like that.  I mean, they track those

18 things.

19 Q.  My question, though, was:  There's no way to know if a

20 physician is writing a prescription because the sales rep was

21 talking about lipids.

22     Correct?

23 A.  Not specifically, no.

24 Q.  Okay.

25     You spoke a bit about something called MIRs yesterday?

GRAHAM - CROSS - BROWN

1          Do you remember that?

2   A.   I do.

3   Q.   All right.

4          And those are medical information requests.

5          Correct?

6   A.   Correct.

7   Q.   Okay.

8          And the purpose of a medical information request is to

9   provide the sales rep with a way to get information to a

10  doctor that he or she is requesting.

11         Correct?

12  A.   Off-label information, yes.

13  Q.   Because sales reps aren't allowed to talk off-label.

14         Right?

15  A.   Yes.

16  Q.   Sales reps --

17  A.   Technically, yes.

18  Q.   I apologize.

19         Sales reps are only allowed to speak about information

20  in the product label.

21         Correct?

22  A.   Yes.

23  Q.   Well, one of the things you know is that doctors don't

24  only prescribe based on the product label.

25         Correct?

GRAHAM - CROSS - BROWN

1    A.    That occurs, yes.

2    Q.    Right.

3          It actually -- in HIV it occurs a lot.

4          Right?

5    A.    I don't know that I would say a lot.  I think it happens

6    a lot more in oncology, but there was only so many drugs for

7    HIV, right, so...

8    Q.    And are you familiar with the Government treatment

9    guidelines, Ms. Graham?

10   A.    The IAS?

11   Q.    HHS.

12   A.    DHHS?

13   Q.    Yep.

14   A.    I mean, I was at the time.  I'm not -- I don't remember

15   them, quite honestly.

16   Q.    And one of the things you know that doctors are permitted

17   to do is use their medical judgment to prescribe off-label

18   when they think the data and the medicine and their experience

19   supports it.

20         Right?

21   A.    Yes.

22   Q.    All right.

23         And sometimes that's a really good thing for a patient.

24         Correct?

25   A.    It could be, yes.

GRAHAM - CROSS - BROWN

1   Q.   Sure.

2        And so when a doctor had a question that was off-label,

3   there had to be a process in place for Janssen to be able to

4   answer it.

5        Correct?

6   A.   Absolutely.  I have no problem when it's an unsolicited

7   question.

8   Q.   So let's take a look at one of your -- and in part, were

9   you in charge of putting the MIR process in place?

10  A.   No.

11  Q.   Okay.

12       Let's look at tab 50.

13           MS. BROWN:  Your Honor, permission to admit D-8637.

14           THE COURT:  Folks, any objection?

15           MR. RUSS:  No objection, Your Honor.

16           THE COURT:  All right.  So admitted.

17           MS. BROWN:  Thank you, Your Honor.

18  (Defendant's Exhibit D-8637 in evidence.)

19  BY MS. BROWN:

20  Q.   I'm going to show you, Ms. Graham, one of these MIR, or

21  medical information request, forms that you were involved in

22  putting together.

23       Do you see this, ma'am?

24  A.   I do.

25  Q.   All right.

GRAHAM - CROSS - BROWN

1          And it looks like this is a medical information request

2     form from about 2009.

3          Correct?  I'm just looking at the fax.

4     A.   Yes.  Uh-huh.

5     Q.   And it lists here that the products that are subject to

6     this request are Prezista and Intelence.

7          Correct?

8     A.   Yes, uh-huh.

9     Q.   Let me make it bigger so I can make sure everybody can

10    see it.

11         And these are the particular questions that the

12    physician had.

13         Correct?

14    A.   That's what it says, yes.

15    Q.   All right.

16         And one of the things you said yesterday that sales

17    reps were doing was breaking up the questions and filing

18    separate MIRs.

19         Do you remember that?

20    A.   Yes.  After -- when we started being tracked about how

21    many we were faxing in, that was one of the things that we

22    did.  Instead of putting, you know, multiple questions on one

23    MIR form, we would put one question perform.

24    Q.   Okay.

25         And at least what you did in 2009 is you put multiple

GRAHAM - CROSS - BROWN

 1  questions on the same form.

 2       Right?

 3  A.   Well, I -- yes.  Yes.

 4  Q.   Okay.

 5       So at least for the one that we have from you, you

 6  didn't do that?

 7  A.   Not for this one, no.

 8  Q.   Okay.

 9       And do you know that one of the reasons compliance was

10  tracking MIRs was to make sure sales reps weren't talking

11  off-label?

12  A.   No, I don't know what their -- their metrics are.

13  Q.   All right.

14       And at least here the questions that the doctor had --

15  some had to do with Prezista, and some had to do with

16  Intelence.

17       Correct?

18  A.   Yes.

19  Q.   And one of the things that has to happen before Janssen

20  can send this information to the doctor is the doctor has to

21  request it.

22       Right?

23  A.   Yes.

24  Q.   And if you look under here, we see this Dr. Stephen

25  Manocchio.

GRAHAM - CROSS - BROWN

1          Right?

2    A.    Uh-huh.

3    Q.    All right.

4          And he was from New Jersey, one of the doctors you

5    visited.

6          Correct?

7    A.    Yes.  I mean, that must have been his home address

8    because I didn't cover Short Hills.

9    Q.    And one of the things the doctor has to do is certify why

10   they're making the request.

11         Right?

12   A.    Do you mean sign?

13   Q.    Well, let's look under the signature.  They have do have

14   to sign.

15         Correct?

16   A.    Yes.

17   Q.    All right.

18         And this says "By signing, I certify that this

19   submission is solely based on my unsolicited request for

20   information and that I was not prompted to complete this

21   form."

22         Do you see that?

23   A.    I do.

24   Q.    Okay.

25         And in this case, this doctor from New Jersey,

GRAHAM - CROSS - BROWN

1   Dr. Manocchio, he signed that.

2        Correct?

3   A.   He did.

4   Q.   And he certified, as a medical doctor treating HIV

5   patients, that he was requesting this information.

6        Correct?

7   A.   Yes.  But I don't think they ever read the small print.

8        You're getting the signature as they're walking out the

9   door, so -- and I don't even know sometimes if they were aware

10  that the question was solicited as an unsolicited question.

11  Q.   Ma'am, what these doctors required to do is sign and

12  certify that this was an unsolicited request.

13       Correct, ma'am?

14  A.   Again, they had to sign for it, yes.  I don't know that

15  they were under the impression that they were certifying that

16  was an unsolicited request.

17  Q.   This doctor is not in the courtroom right now, so all we

18  know is what he signed.

19       Right?

20  A.   Okay.

21  Q.   Right?

22  A.   Yes.

23  Q.   And what he signed is a certification that this was an

24  unsolicited request.

25       Correct?

GRAHAM - CROSS - BROWN

1    A.    Apparently, yes.

2    Q.    And this actually happened on every one of your MIRs.

3    The doctor had to sign and certify that it was unsolicited.

4         Correct?

5    A.    They had to sign, yes.

6    Q.    All right.

7         And what would happen after the doctor signed and

8    certified that they had an unsolicited question that they

9    wanted an answer to, to be able to treat HIV patients, Janssen

10   would respond.

11        Right?

12   A.    Yes.

13   Q.    All right.

14        MS. BROWN:  Tab 48, Your Honor.  Permission to admit

15   D-8635.

16        THE COURT:  Folks?

17        MR. RUSS:  No objection, Your Honor.

18        THE COURT:  All right.  So admitted.

19   (Defendant's Exhibit D-8635 in evidence.)

20        MS. BROWN:  Thank you, Your Honor.

21   BY MS. BROWN:

22   Q.    And so to get our understanding what happened when

23   that -- when a request like that comes in, this is the

24   response that comes from Janssen.

25        Correct?

GRAHAM - CROSS - BROWN

 1  A.   Yes.

 2  Q.   All right.

 3       And here, a letter goes to the provider that has signed

 4  and said, I want information.

 5       Correct?

 6  A.   Yes.

 7  Q.   And it says, "This is coming to you -- this information

 8  is being supplied to you because of your specific request and

 9  is not intended as an endorsement or a promotion of any usage

10  not contained in the prescribing information."

11       Correct?

12  A.   I see that, yes.

13  Q.   All right.

14       So the doctor makes a request; Janssen sends the

15  information.

16       Right?

17  A.   Yes.

18  Q.   And then what follows in this document is a summary of

19  the response.

20       Correct?

21  A.   Yes.

22  Q.   And then multiple pages of scientific information.

23       Correct?

24  A.   Yes.

25  Q.   Because one of the things we know is that there was

GRAHAM - CROSS - BROWN

1  scientific data that supported the use of these medicines in

2  ways that it was not contained in the package insert.

3       Correct?

4  A.   Yeah.  You could say that for a lot of medications.

5  Q.   Sure.

6       I mean, a lot of times medicines are studied and used

7  in ways that are not approved by the FDA.

8  A.   Correct.  But you're also at risk because if it hasn't

9  been studied, you don't know the safety information for that

10 particular -- that particular use.

11 Q.   And that's -- doctors know that.

12      Right, ma'am?

13 A.   I would hope so, yes.

14 Q.   Sure.

15      And in case they don't, Janssen reminds them of it in

16 the letter that they send, right?  They point them to the

17 complete package insert information when they respond to the

18 medical information request.

19      Correct?

20 A.   Of course.  I would imagine that they need to do that.

21 Q.   Right.  And the reason they need to do that is because

22 when we're promoting the medicine, we have to stay within the

23 package insert.

24      Correct?

25 A.   Yes.  Technically.

GRAHAM - CROSS - BROWN

1    Q.   All right.

2         And doctors in their own medical judgment can use this

3    information as they see fit or not at all.

4         Correct?

5    A.   Yes.  It is up to them.

6    Q.   Okay.

7         And so this process that Janssen had in place was a way

8    to respond to doctors' questions that were outside of the

9    product's label.

10        Correct?

11   A.   That's the purpose of it, yes.

12   Q.   And the thing that doesn't make any sense to me,

13   Ms. Graham, is if sales reps were in doctors' offices all the

14   time talking about off-label data and off-label studies and

15   off-label usages, why would we even need to have an MIR

16   process to send information like this to doctors like

17   Dr. Manocchio?

18   A.   Because it's documentation to support what we were

19   talking about.  We couldn't -- we were told not to leave

20   anything that wasn't approved behind in the offices.

21        So this was a way to get what we discussed with them

22   in -- you know, have some backup data.

23   Q.   But your testimony was that you were in offices talking

24   about off-label uses.

25        Right?

GRAHAM - CROSS - BROWN

1    A.    Yes.  But this is supporting documentation.

2    Q.    But your testimony was you were handing out off-label

3    studies.

4    A.    No, that was not my testimony.  I didn't hand out

5    off-label studies.  They were for our information, and we

6    would not leave them with the providers.

7    Q.    And, in fact, those studies that the sales reps got, they

8    were marked "Cannot be used for promotion."

9          Correct?

10   A.    Yes.

11   Q.    They had big markings all the way across the middle of

12   the studies for "Educational purpose only."

13         Correct?

14   A.    Yes.  That's standard practice.

15   Q.    Okay.

16         So to make sure that people weren't using them with

17   physicians in a way that was improper.

18         Correct?

19   A.    Well, I think it was a way for them to cover themselves

20   in the event of something like this.

21   Q.    Ma'am, these studies were marked to direct sales reps not

22   to use them with doctors.

23   A.    It did say that, yes.

24   Q.    Correct.

25         And, in fact, you, when you disseminated -- you were a

GRAHAM - CROSS - BROWN

1    trainer for a period of time, correct?

2    A.   I was, yes.

3    Q.   And as part of that role, sometimes you had to send

4    information to the field --

5    A.   I did.

6    Q.   -- correct?

7         And when you did that, you reminded sales reps that you

8    were sending information for their information only.

9         Correct?

10   A.   Yes.  That was part of the disclaimer that we had to add

11   to the email.

12   Q.   And you expected that the sales reps you were instructing

13   would follow your direction.

14   A.   I don't know that I had an expectation one way or the

15   other.  You know, it was put on there for this exact purpose.

16   It was -- it's the first line of defense.

17        I don't believe that it was inherently meant to

18   discourage or deter that behavior.

19   Q.   You wrote in your emails -- and we can take a look at

20   some of them --

21   A.   Sure.

22   Q.   -- "For your information only."

23   A.   Sure.

24   Q.   You wrote in your emails, "This is not to be used for

25   promotion."

GRAHAM - CROSS - BROWN

1  A.   I did.

2  Q.   Right.

3       And you expected that your direction would be followed?

4       Correct?

5  A.   Again, I don't know that I had an expectation that -- I

6  put it in the email because I had to.

7       MS. BROWN:  Your Honor, I'm about to transition to a

8  different area.  I don't know if you want to take the morning

9  break.

10      THE COURT:  I was thinking around 11.  So unless you

11 have five minutes, do you want -- is this is a good spot to

12 stop?

13      MS. BROWN:  This is fine, yes.

14      THE COURT:  All right.  Folks, why don't we take our

15 morning break.  It sounds like it's a good place to stop.

16 I'll let the jurors get out of here, and we'll kind of

17 reconvene in ten minutes.

18      THE DEPUTY COURT CLERK:  All rise.

19      (Jury exits the courtroom.)

20      THE COURT:  All right, folks.  Everyone be seated.

21 We're in recess.

22      (A short recess occurred.)

23      THE DEPUTY COURT CLERK:  Please remain seated.

24      THE COURT:  All right, folks.  Are we good to bring

25 the jury back?

GRAHAM - CROSS - BROWN

1           THE DEPUTY COURT CLERK:  Yes, Your Honor.

2           THE COURT:  All right, let's do that.

3       Oh, just one side note, just -- on these sidebars when

4   we have them, just be mindful that -- wait for each other to

5   speak, including me and each other, because it's difficult to

6   do the reporting of the sidebars.

7       And so right now, you know, there's going to be dashes

8   in the transcript because I'm trying to speak and somebody is

9   excited and trying to say something, and I appreciate that

10  everybody wants to get in their point, their argument.  But I

11  will give you an opportunity to speak when we're at sidebar.

12      But you have to remember that even when we're here,

13  it's like speaking when you're at a counsel table, so that we

14  have a transcript of the sidebars and an accurate one.

15      So that's my only point.

16      But otherwise, folks -- sorry.  Are we good for the

17  jurors?

18          MR. RUSS:  Yes, Your Honor.

19          MS. BROWN:  Yes, Your Honor.

20          THE COURT:  Okay.

21          THE DEPUTY COURT CLERK:  All rise.

22          (Jury enters the courtroom.)

23          THE COURT:  All right, folks.  Everyone can be

24  seated.

25      When you're ready, you may continue.

GRAHAM - CROSS - BROWN

```
 1          MS. BROWN:  Thank you very much, Your Honor.
 2    BY MS. BROWN:
 3    Q.   Welcome back, Ms. Graham.
 4    A.   Thank you.
 5    Q.   Just a few more topics I want to talk to you about this
 6    morning.
 7          MS. BROWN:  Your Honor, permission to publish an
 8    opening slide.
 9        Counsel has no objections.
10          THE COURT:  No objection?
11          MR. RUSS:  No objection.
12          THE COURT:  All right.  So feel free.  It's admitted,
13    and you may publish it.
14          MS. BROWN:  Thank you very much, Your Honor.
15    BY MS. BROWN:
16    Q.   Ms. Graham, I'm going to show you a slide that I showed
17    our jurors during opening statements.
18          Were you here for opening statements?
19    A.   Yours, yes.
20    Q.   Okay.
21    A.   Yes.
22    Q.   One of the things we talked about in opening statements,
23    Ms. Graham, are the different types of uses of these medicines
24    that the Relators in this case are complaining about.
25          Do you remember that?
```

GRAHAM - CROSS - BROWN

1    A.   Yes.

2    Q.   And this is the slide of sort of the four different types

3    of uses of these medicines that are at issue in this lawsuit.

4         Do you see that?

5    A.   I do.

6    Q.   And as it relates -- and you worked as a sales rep with

7    Ms. Penelow and Ms. Brancaccio at the same time.

8         Correct?

9    A.   For a couple years, yes.

10   Q.   Right.

11        And you actually had the same district manager, Frank

12   Murphy, correct?

13   A.   Yes.

14   Q.   And your claim here, under oath, is that it was

15   Mr. Murphy who was directing you and others to promote

16   off-label.

17        Correct?

18   A.   I don't think he was the mastermind, but yes.

19   Q.   Okay.

20        But I didn't say "mastermind."  I said in terms of your

21   direction --

22   A.   Yes.

23   Q.   -- came from Frank Murphy, according to you.

24        Correct?

25   A.   Yes.

GRAHAM - CROSS - BROWN

1  Q.  All right.

2      And as it relates to these claims that the Relators

3  have put at issue in this lawsuit, you don't know anything

4  about anybody ever promoting Intelence for treatment-naive.

5      Correct?

6  A.  I don't remember that.  That could have happened after I

7  left.

8  Q.  Okay.

9      So in terms of the Relators' claims in the lawsuit,

10  that from 2016 to 2014 there was instructions to promote

11  Intelence in treatment-naive, for your period of time at

12  Janssen you never heard of that.

13  A.  I left in 2011.  Again, I don't recall that.  I don't

14  remember the direction around that.  I don't remember speaking

15  about it in treatment-naive patients.  Maybe that happened

16  after I left in 2011.

17  Q.  Okay.

18      I'd like to take a look at some of the direction you

19  gave folks during the time period that you were working in

20  training.

21          MS. BROWN:  I'd like to admit Tabs 20 and 21, please.

22          MR. RUSS:  What's the exhibit number?

23          MS. BROWN:  D-8566 and D-8567, which is the

24  attachment.

25          MR. RUSS:  No objection.

GRAHAM - CROSS - BROWN

1          THE COURT:  All right.  So admitted.

2          MS. BROWN:  Thank you, Your Honor.

3   (Defendant's Exhibits D-8556 and D-8567 in evidence.)

4   BY MS. BROWN:

5   Q.   Ms. Graham, I'm showing you an email --

6   A.   Uh-huh.  Yes.

7   Q.   -- from you to a number of your colleagues at Janssen.

8        Do you see that?

9   A.   I do.

10  Q.   All right.

11       And this -- you would have written this email during

12  the time period in your role as a -- one of the trainers.

13       Correct?

14  A.   Yes.

15  Q.   And, in fact, if we look at your signature block down

16  here, you're listed as the manager, sales training and

17  development.

18       Correct?

19  A.   Correct.  Uh-huh.

20  Q.   Okay.

21       And the subject of your email to these folks here is:

22  "Questions for physicians at POA."

23       Do you see that?

24  A.   I do.

25  Q.   And that's because you all were going to have some

GRAHAM - CROSS - BROWN

1    doctors come in to one of your sales meetings to talk about

2    their experience.

3         Correct?

4    A.   Yes.

5    Q.   All right.

6         And what you say here is "Please remember if you are

7    facilitating this workshop that the four points noted at the

8    bottom of the questions must be addressed up front."

9         Do you see this?

10   A.   I do.

11   Q.   All right.

12        "Also, if the conversation heads towards an off-label

13   direction, you, as the facilitator, must redirect the

14   conversation back to an online discussion."

15        Do you see that?

16   A.   I do.

17   Q.   And what you meant by that was on-label.

18        Right?

19   A.   Yes.

20   Q.   All right.

21        And so you're directing the folks on this email that if

22   something comes up off-label, they need to direct it back to

23   the label.

24        Correct?

25   A.   Yes.

GRAHAM - CROSS - BROWN

1  Q.   And you refer to four points in the document that you're

2  attaching, correct?

3  A.   Yes.

4  Q.   All right.

5       And if we look -- these are some of the questions, I

6  guess, that are going to be asked of the physicians.

7       Do you see that?

8  A.   I do.

9  Q.   All right.

10      So doctors were coming in to kind of share their

11  experience, and you had some questions that were going to be

12  asked of them.

13      Correct?

14  A.   Yes.

15  Q.   All right.  And then down at the bottom, you have an

16  important note.

17      Correct?

18  A.   Yes.

19  Q.   All right.

20      And it says, "Most of these questions are related to

21  how a physician practices HIV medicine."

22      Correct?

23  A.   Uh-huh.  Yes.

24  Q.   And then you say, "In order for this Q and A session to

25  occur, these steps have to be in place."

GRAHAM - CROSS - BROWN

1          Right?

2   A.   Yes.

3   Q.   And you have four steps that you put in the document that

4   you attached to this email.

5          Correct?

6   A.   Yes.

7   Q.   And those are the four points that you identified in your

8   cover email.

9          Right?

10  A.   It appears to be, yes.

11  Q.   All right.

12         The first point is that "The speaker, the physician,

13  the doctor, must be trained to remain within the label."

14         Correct?

15  A.   Yes.

16  Q.   That's what you wrote.

17         Correct?

18  A.   That's what it says, yes.

19  Q.   Yeah.

20         "He or she should be instructed not to discuss any

21  off-label usage of Prezista or Intelence."

22         Correct?

23  A.   Yes.

24  Q.   That's what you wrote and directed your colleagues to do

25  in this email.

GRAHAM - CROSS - BROWN

1          Correct?

2    A.   I see that, yes.

3    Q.   All right.

4          Number 2, "At the beginning, the speaker has to

5    acknowledge that they are expressing their own personal views

6    and not to be taken as medical advice or sales direction."

7          Correct?

8    A.   Yes.

9    Q.   All right.

10          Number 3, "Specific sales training direction should be

11   provided, if necessary, on on-label questions."

12          Correct?

13   A.   Yes.

14   Q.   And then finally you say, "The information discussed is

15   for information only and not for a selling situation."

16          Correct?

17   A.   Yes.

18   Q.   These were four compliance notes that you typed out in

19   this document you sent to your colleagues.

20          Correct?

21   A.   Yes.

22   Q.   All right.

23          And those are the same four notes that you directed

24   these folks to in the cover email.

25          Right?

GRAHAM - CROSS - BROWN

1    A.   It appears so, yes.

2    Q.   Right.

3         You said please remember these four points --

4    A.   Yes.

5    Q.   -- right?

6         And the four points are meant to ensure that the

7    discussion with the physician remains compliant.

8         Correct?

9    A.   Yes.

10   Q.   And the discussion with the physician remains on-label.

11        Correct?

12   A.   That's what it says, yes.

13   Q.   And, in fact, during your time period as a sales trainer,

14   you created a lot of PowerPoint presentations.

15        Correct?

16   A.   A fair amount, yes.

17   Q.   And you repeatedly directed your colleagues and people

18   that you were training to important compliance notes.

19        Correct?

20   A.   Yes.  It had to be included.

21   Q.   Sure.

22        You repeatedly trained and taught and educated people

23   to stay on-label.

24        Correct?

25   A.   Yes.  That was in the emails, yes.

GRAHAM - CROSS - BROWN

```
 1   Q.   And you -- and in your presentations as well, right?
 2   A.   I believe there was always a slide that we addressed.
 3   Q.   And that slide was always right up at the beginning.
 4        Right, ma'am?
 5   A.   Yes.
 6   Q.   The very first page of almost every presentation you gave
 7   at Janssen listed several different key compliance notes.
 8        Correct?
 9   A.   It did list compliance, yes.
10   Q.   All right.
11        And when you gave these presentations, you frequently
12   pointed out those compliance notes.
13        Correct?
14   A.   As I recall, we would get up on the stage and we would
15   say, Here's the compliance notes.  I don't think we, you know,
16   read through them.  I don't recall that.
17   Q.   Okay.
18        MS. BROWN:  Tab 5, Your Honor, permission to publish
19   and admit D-2105 as well as 2104, Your Honor, which is the
20   cover email, the tab right before it.
21        MR. RUSS:  No objection, Your Honor.
22        THE COURT:  All right.  So admitted.
23        MS. BROWN:  Thanks.
24   (Defendant's Exhibits D-2104 and D-2105 in evidence.)
25   BY MS. BROWN:
```

GRAHAM - CROSS - BROWN

 1  Q.  And I want to talk to you about an objection handler

 2  document, Ms. Graham, okay?

 3  A.  Okay.

 4  Q.  This is an email from a Mr. Anthony Dolisi.  You're

 5  familiar with him.

 6       Correct?

 7  A.  I am.

 8  Q.  And it has both Ms. Penelow, who used to be called --

 9  known as Ms. Finkelstein on there, correct?

10  A.  Yes.

11  Q.  And Ms. Brancaccio is on there as well, right?

12  A.  Yes.

13  Q.  And Mr. Kwak, he's on there.  Remember we saw him in that

14  Facebook post?

15  A.  Yeah.  I'm not sure why he's on there.  He was not in

16  that district.

17  Q.  All right.

18       And he -- Mr. Kwak wasn't in the New York district?

19  A.  Oh, you know what?  He was in LA, and then I think he did

20  move to New York.  I'm sorry, I forgot that.

21  Q.  Yes, ma'am.

22  A.  Yes.

23  Q.  Yes, ma'am.

24       He started out in LA --

25  A.  Yes.

GRAHAM - CROSS - BROWN

1  Q.  -- and moved to New York?

2  A.  Yeah, I just kind of remember him as being in LA.

3  Q.  Yep.

4  A.  My apologies.

5  Q.  I think by 2009 he was in New York with Ms. --

6  A.  I remember that now.  My apologies.

7  Q.  No, no, no problem.

8      And what Mr. Dolisi is doing here is he is sending to

9  his New York team a PowerPoint presentation that you had put

10 together.

11     Correct?

12 A.  It appears so, yes.

13 Q.  All right.

14     And it says, "Many thanks to you for the attached

15 slides."

16     And I want to just quickly take a look at those slides.

17 This is the Prezista objection handler for this 2008 meeting.

18     Do you see that?

19 A.  I do.

20 Q.  All right.

21     And the first thing of course it says is this is

22 "educational use only.  Not to be used in a selling

23 situation."

24     Correct?

25 A.  Yes.

GRAHAM - CROSS - BROWN

```
 1   Q.   All right.
 2        And like almost every presentation you did, the first
 3   page talks about the fact that this is for training purposes
 4   only.
 5        Right?
 6   A.   Yes.  That had to be put in there.
 7   Q.   Sure.
 8        And you were the trainer, so you frequently had this
 9   note on page 1 of your decks.
10        Right?
11   A.   Yeah.  It was probably, you know, in a template.
12   Q.   Well, because it was important to make sure that people
13   understood they weren't supposed to be taking this to doctors?
14   A.   It -- it needed to be included for -- to -- yes.
15   Q.   And then even beyond the fact that it was only for
16   training purposes, the very next slide gives some additional
17   compliance direction in your presentation.
18        Correct?
19   A.   It does.
20   Q.   Right.
21        And these are very similar to the four points that you
22   put in the email we just looked at.
23        Correct?
24   A.   It appears to be, yes.
25   Q.   Right?
```

GRAHAM - CROSS - BROWN

1        The very first bullet has to do with promoting only

2   within the FDA-approved label, correct?

3   A.    Yes.

4   Q.    And in case people are confused about the way that that

5   could happen, you have some sub-bullets here.

6        Right?

7   A.    It appears so, yes.

8   Q.    Talking about verbal communication as well as printed

9   materials.

10       Right?

11  A.    Yes.

12  Q.    And product discussions with customers should highlight

13  pertinent safety information.

14       Correct?

15  A.    Yes.

16  Q.    And all unsolicited label -- or off-label requests should

17  go to medical information.

18       Right?

19  A.    Correct.

20  Q.    And that's part of that medical information request we

21  were just looking at.

22       Correct?

23  A.    That is correct, yes.

24  Q.    But that was the process for how to get answers to these

25  off-label questions.

GRAHAM - CROSS - BROWN

1           Correct?

2    A.    Yes.

3    Q.    All right.

4           At no time should there be a side-by-side on safety or

5    efficacy.

6           Correct?

7    A.    Yes.  I mean, I think that was referring to -- with other

8    drugs outside of the package, that were not included in the

9    clinical trial.

10   Q.    Right.

11          And then it talks about the Promotional Review

12   Committee.  Do you see that there in the third main bullet?

13   A.    I do.

14   Q.    And, Ms. Graham, you were not on the Promotional Review

15   Committee.

16          Correct?

17   A.    I was not.

18   Q.    Do you know who participated in the Promotional Review

19   Committee?

20   A.    I do not.

21   Q.    Do you know the role that the Promotional Review

22   Committee had in getting materials approved by our Food and

23   Drug Administration?

24   A.    Not intimately, no.

25   Q.    Okay.

GRAHAM - CROSS - BROWN

1          Do you know the process and the people at Janssen in

2   play who were in charge of submitting all promotional

3   materials to the FDA?

4   A.   I knew that was a thing, yes.

5   Q.   Right.

6          And do you know that there were many members of that

7   committee who were in charge of that?

8   A.   I am not familiar with who was on the committee.

9   Q.   Were you involved in any of the back-and-forth with the

10  FDA on appropriate promotional materials?

11  A.   No.  I'm assuming that's more marketing.

12  Q.   And finally you say here, promote -- "prompting off-label

13  questions is inconsistent with compliance policies."

14         Do you see that?

15  A.   I do.

16  Q.   And you knew that to be true.

17         Correct?

18  A.   Yes.

19  Q.   That's why you put it in your presentation.

20         Correct?

21  A.   It had to be put in the presentation, yes.

22  Q.   Yep.

23         And, in fact, if you look at your documents and your

24  presentations and your correspondence during the time period

25  that you were at Janssen, almost every one contains these

GRAHAM - CROSS - BROWN

1    important compliance notes.

2         Right?

3    A.   Yes.

4    Q.   And that's because you felt it was important to make sure

5    that the people you were training understood these principles.

6         Correct?

7    A.   I don't know that I said I felt that.  I mean, it was

8    something that needed -- it was a standard operating practice

9    to put them in the emails.  I -- honestly I didn't give it

10   that much thought.  I just knew they needed to be in the

11   email.

12   Q.   Okay.

13        I want to talk to you, Ms. Graham, about how you became

14   involved in this lawsuit, okay, ma'am?

15   A.   Uh-huh.

16   Q.   So one of the things that happened is that many years

17   after you had left Janssen, Ms. Penelow's lawyers contacted

18   you.

19        Correct?

20   A.   Yes.

21   Q.   And they actually -- was it an investigator, a private

22   investigator that came out to see you?

23   A.   No.

24   Q.   It was a lawyer that came out to see you?

25   A.   Yes.

GRAHAM - CROSS - BROWN

1    Q.   All right.

2         They came out to see you in Colorado, which is where

3    you then lived with Mr. Wilhelm.

4         Correct?

5    A.   I still do.

6    Q.   Okay.

7    A.   Yes.

8    Q.   And they asked if you would sign a declaration for

9    Ms. Penelow and Ms. Brancaccio's case.

10        Correct?

11   A.   I did sign the declaration, yes.

12   Q.   And that's what they asked you to do.

13        Correct?

14   A.   Yes.

15   Q.   And they wrote up a declaration for you.

16        Correct?

17   A.   No.  They wrote up a declaration based upon questions or

18   answers or of a conversation that we had.  It's not like they

19   wrote it up and presented it to me to sign.

20   Q.   Well, you didn't type it up.

21        Right, ma'am?

22   A.   No, I did not.

23   Q.   And you have no memory of whether you edit it or not.

24        Correct?

25   A.   No.

GRAHAM - CROSS - BROWN

1   Q.   All right.

2        So they did type it up.  They gave it to you to sign,

3   and you signed it?

4   A.   Well, I read it before I signed it.

5   Q.   Sure.

6        And you signed it.

7        Right?

8   A.   I did, yes.

9   Q.   With the understanding that it would be used in your

10  friend Ms. Penelow's case.

11       Right?

12  A.   Yes.

13  Q.   All right.

14       And there were some things in that declaration, though,

15  that the lawyers typed up that you don't agree with.

16       Right?

17  A.   I don't recall.

18  Q.   There are some things in that declaration that the

19  lawyers typed up and asked you to sign for your friend's

20  lawsuit that just aren't right.

21       Right?

22  A.   I'm not sure what you're referring to.

23  Q.   Okay.

24       Let's take a look at the declaration.

25           MS. BROWN:  Just for demonstrative purposes,

───────────── GRAHAM - CROSS - BROWN ─────────────

1    Your Honor, I want to show D-8560, and I can show it to the

2    witness and just ask about it first.

3           MR. RUSS:  Your Honor, objection.  This is an

4    impeachment that is not proper, if we can approach.

5           THE COURT:  I'm sorry I didn't hear the last part.

6           MR. RUSS:  Improper impeachment, and if we need to

7    approach I'm happy to do so.

8           MS. BROWN:  I think I can --

9           THE COURT:  Well, isn't she going to -- Ms. Brown,

10   don't you intend to ask questions about what she wrote in her

11   declaration --

12          MS. BROWN:  Yes, Your Honor.

13          THE COURT:  -- that you believe are inconsistent?

14          MS. BROWN:  Yes.

15          THE COURT:  Or -- okay.  I mean, what's the basis for

16   the objection?

17          MR. RUSS:  Well, my understanding is she needs to

18   testify from the court -- or from the witness box what's

19   inconsistent before she can be impeached with a prior

20   inconsistent statement.

21          MS. BROWN:  Your Honor, may we approach?

22          THE COURT:  Yeah.  Let me see you, folks.

23          (Sidebar begins at 11:29 a.m.)

24          THE COURT:  Let's make sure we all speak one at a

25   time.

GRAHAM - CROSS - BROWN

1        So she's testified already on direct exam.  She's

2  testified on cross-exam.

3        Ms. Brown, now you believe that she has inconsistent

4  statements in her declaration compared to her testimony in

5  court.

6        Is that right?

7           MS. BROWN:  Well, I believe that there are statements

8  in the declaration that she signed that even at her deposition

9  she said she doesn't agree with.  And that's what I want to

10 refresh her, that the lawyers asked you to sign, and you

11 signed, but you don't agree with it.

12          THE COURT:  So why don't you have her review the

13 declaration first because she says she doesn't recall.

14          MS. BROWN:  Yes.

15          THE COURT:  Have her review the declaration, say, Now

16 that you've reviewed declaration, are there statements in your

17 declaration that you do not agree with?

18          MS. BROWN:  Yes.

19          THE COURT:  Lock her in one way or the other because

20 if she says, Oh, no, you're right, I disagree with A, B and

21 C --

22          MS. BROWN:  Yeah.

23          THE COURT:  -- well, then you got what you wanted,

24 and there's reason to cross-exam -- to use this.  But I'm

25 saying:  Don't you have to at least establish that first?

GRAHAM - CROSS - BROWN

1          MS. BROWN:  Sure.  What I want to do, Judge, is

2     say --

3          THE COURT:  And it's a declaration under penalty of

4     perjury?

5          MS. BROWN:  She signed it, yeah.  Of course.  You

6     signed it, and the lawyers asked you to say what's in

7     paragraph 90, and you don't agree with what's in paragraph 90.

8          THE COURT:  Do you want to ask her first -- are you

9     going to ask her first about the declaration then?

10         MS. BROWN:  I want to hand it to her and say, I want

11    to direct you to paragraph 90.

12         THE COURT:  Yep.

13         MS. BROWN:  The lawyers wanted you to say these

14    medicines were not medically necessary --

15         THE COURT:  Do you agree with that or not.

16         MS. BROWN:  -- and you don't agree with that.

17         THE COURT:  What's the problem there?

18         MR. RUSS:  No.  It's just the procedure, Your Honor.

19         THE COURT:  I'm okay with that.

20         MS. BROWN:  Thank you.

21         THE COURT:  All right.  Yep.

22         (Sidebar was concluded at 11:30 a.m.).

23         (Open court.)

24         MS. BROWN:  Your Honor, may I approach the witness?

25         THE COURT:  Yes, you may.

─────── GRAHAM - CROSS - BROWN ───────

 1  BY MS. BROWN:

 2  Q.   Ms. Graham, I'm going to hand you the declaration that

 3  we've been speaking about that the lawyers --

 4  A.   I may have to grab my glasses.  Do I need to read it?

 5  Q.   Oh, sure.

 6       Yes.  Sorry?

 7  A.   That's okay.

 8  Q.   And I can put it up -- well, no.  Sorry.

 9  A.   That's okay.  I just need -- I just need a minute.

10       THE COURT:  Well, you're able to put things on the

11  screen just for the witness, just not for the jury.  So -- but

12  if you're going to --

13  BY MS. BROWN:

14  Q.   I'll do that then, Ms. Graham, so it's easier for you.

15  A.   Yes.

16       MS. BROWN:  Can we show this just to Ms. Graham?

17  Okay.

18       THE COURT:  And, Counsel, you have it on your screen as

19  well, right?

20       MR. RUSS:  Yes, Your Honor.

21       THE COURT:  I mean, look, this may be just a

22  simple --

23       MS. BROWN:  Yeah, I just -- yeah.  Okay.

24  BY MS. BROWN:

25  Q.   Can you read that, Ms. Graham?

GRAHAM - CROSS - BROWN

1    A.    I can, yes.

2    Q.    Okay, perfect.

3          And so if you look -- first of all, this is the

4    declaration, and you have the hard copy there.  I don't want

5    to make you have to get your glasses but -- that the lawyers

6    typed up for you when they came out to Colorado.

7          Correct?

8    A.    It appears to be, yes.

9    Q.    Sure.

10         And if you look at the page I'm showing you, that's

11   your signature there, Donna Graham, correct?

12   A.    Yes.

13   Q.    Executed on March 21st, 2018, in Evergreen, Colorado,

14   where you live.

15         Correct?

16   A.    Yes.

17   Q.    And declaring under penalty of perjury that what you said

18   in here was true.

19         Right?

20   A.    Yes.

21   Q.    But the fact is that some of the things that the lawyers

22   wanted you to agree with for the lawsuit, you actually don't

23   agree with.

24         Right?

25   A.    I'm not saying I don't agree.  I just don't recall it.  I

GRAHAM - CROSS - BROWN

1    don't recall specifically as a strategy going out and talking

2    about Intelence -- yeah, Intelence for naive patients.  I just

3    don't recall myself doing that.

4    Q.   Sure.

5         And I'm not talking at all about Intelence for naive

6    patients.

7    A.   Oh, okay.  Okay.

8    Q.   What I want to talk about is there are statements in this

9    declaration that the lawyers typed up and asked you to sign

10   that you don't agree with.

11        Right?

12   A.   I -- I'm not sure.

13   Q.   Okay.

14        Let's take a look.  Let's take a look.

15   A.   Okay.  Okay.

16   Q.   So the first paragraph I want to talk to you about on

17   that score is paragraph 90.

18        Can you see that on your screen?

19   A.   I can, yes.

20   Q.   Okay.

21        And one of the things that the lawyers wanted you to

22   agree with in the context of the lawsuit where they represent

23   your friend is that Janssen's off-label marketing efforts were

24   designed to generate --

25             MR. RUSS:  Objection, Your Honor.  If we can admit

GRAHAM - CROSS - BROWN

1   this document, then I think it's appropriate for her to read

2   from it, but just reading from something that the witness

3   doesn't remember is not in evidence.

4           THE COURT:  Well, she's asking her whether she

5   remembers this statement and whether she agrees with it, so

6   I'm going to allow that.

7           MR. RUSS:  Okay.  Thank you, Your Honor.

8           THE COURT:  I mean, look, I will make it even

9   simpler.  Is there no objection to the admissibility of this

10  declaration?

11          MR. RUSS:  If she's going to read from it, we believe

12  that it needs to be admitted, Your Honor.  So no objection to

13  its admission.

14          THE COURT:  You don't have any objection to the

15  admissibility of the document?

16          MR. RUSS:  Correct, Your Honor.

17          THE COURT:  All right.  Then life just became easier.

18      Ms. Brown, why don't you move to admit the document,

19  and then we don't even have to have that.  So are you moving

20  to admit this?

21          MS. BROWN:  Yes, sir.

22          THE COURT:  Any objection?

23          MR. RUSS:  No, Your Honor.

24          THE COURT:  All right.  Well, then it's admitted.  We

25  might as well let everybody see it.

GRAHAM - CROSS - BROWN

1          MS. BROWN:  Thank you very much.

2          THE COURT:  So the jurors can now look at it.

3  (Defendant's Exhibit D-8560 in evidence.)

4  BY MS. BROWN:

5  Q.   Here we go.  We're on the last page of your

6  declaration --

7  A.   Okay.  Yes.

8  Q.   -- that we have now admitted into evidence, and I wanted

9  to talk about paragraph 90 that the lawyers typed up and

10  wanted you to sign.

11          Do you see it?

12  A.   I do.

13  Q.   Okay.

14          And what this paragraph talks about is a statement that

15  "Janssen's off-label marketing --" you see that up at the top?

16  A.   I could.

17  Q.   "-- was designed to generate overutilization of Prezista

18  and Intelence in clinical situations in which it was not

19  proven safe and effective and/or was not medically necessary

20  for the treatment of patient's specific medical conditions."

21          Do you see that?

22  A.   I do.

23  Q.   And you don't agree with the fact that Prezista and

24  Intelence were prescribed in ways that were medically not

25  necessary.

GRAHAM - CROSS - BROWN

1         Correct?

2  A.   Do I not agree with that?

3  Q.   Correct.

4  A.   No.  I don't think I don't agree with that.

5  Q.   Let me rephrase.  Too many negatives are my fault.

6  A.   Okay.

7  Q.   You believe, Ms. Graham, because we asked you about it in

8  your deposition, that this statement is not accurate.

9         Correct?

10  A.   No, I don't -- I -- I don't think that it's not correct.

11  Q.   One of the things you said in your deposition that you

12  wanted to clarify is that you do not believe it is accurate to

13  say that the way the prescribing of Prezista and Intelence are

14  alleged in this case means that those medicines were medically

15  unnecessary, correct?

16         MR. RUSS:  Objection, Your Honor.  Inappropriate

17  impeachment.

18         THE COURT:  Overruled.  Repeat the question.  It's

19  testimony about her deposition.  She's asking her if she said

20  something inconsistent in the deposition.  I'm going to allow

21  it.

22         THE WITNESS:  I don't -- I think I got the question.

23  I don't think you need to repeat it.

24         What I'm saying is what I meant by that is that there's

25  a distinct line between medical necessity and what is in the

GRAHAM - CROSS - BROWN

1    package insert, in my opinion.

2         So just because it's medically necessary and it's not

3    in the package insert, there may be other objections that are

4    approved.

5    BY MS. BROWN:

6    Q.   Let me follow up a little bit because I'm not sure I

7    understood your answer.

8    A.   Okay.  Okay.

9    Q.   What you told us and what you believe is that people who

10   have HIV need HIV medicines, correct?

11   A.   Absolutely, yes.

12   Q.   Okay.

13        What you told us and what you agree -- what you believe

14   is that whether or not the particular uses that are at issue

15   in this lawsuit were in the package inserts -- you do not

16   believe it is accurate to say that the promotion of these

17   medicines resulted in prescribing that was medically

18   unnecessary?

19   A.   I'm not sure that I'm following this, I got to be honest.

20   Q.   Let's -- let's look at your testimony.

21        MS. BROWN:  Your Honor, may I -- may I play

22   Ms. Graham's testimony where she explains this, please?

23        THE COURT:  Well, I'm going to try to clarify this

24   for myself.

25        So it's rare that I ask questions of witnesses, but I

─────────── GRAHAM - CROSS - BROWN ───────────

1    am having trouble following.

2         So, ma'am, I'm going to have you look at paragraph 90

3    on the screen.

4              THE WITNESS:  Yes.

5              THE COURT:  The first sentence, okay, it starts off

6    with, "Janssen off-label marketing efforts," and it goes on.

7              THE WITNESS:  Yes.

8              THE COURT:  Right?

9         And it says, "In which it was not proven safe."  Right?

10   So it was designed -- and said, "In which it was not proven

11   safe and effective and/or was not medically necessary for the

12   treatment of patients' specific medical conditions."

13        My question is, do you have personal knowledge that

14   this was prescribed in which that was medically unnecessary?

15   And if so, how would you know that because you're not a

16   physician?

17             THE WITNESS:  Correct.  Right.  What I -- I mean, to

18   me what it's saying is that it was -- it was designed to

19   generate utilization of the products in clinical situations

20   that have not been proven safe because we were talking outside

21   of the package label.

22        Technically, anything outside of the package label, the

23   safety and efficacy --

24             THE COURT:  Okay.  But there's a second part to that

25   sentence, ma'am --

GRAHAM - CROSS - BROWN

1          THE WITNESS:  Okay.

2          THE COURT:  -- so you're skipping a part, which

3   was --

4          THE WITNESS:  Okay.

5          THE COURT:  -- "and/or was not medically necessary

6   for the treatment of patients' specific medical conditions."

7      That is going into the realm of physicians and saying

8   they were prescribing these drugs but they were not medically

9   necessary for those patients.

10     How would you know that?

11         THE WITNESS:  I don't know that I would.

12         THE COURT:  But you signed this declaration where it

13  says that, right?

14         THE WITNESS:  But it said something different to me.

15  To me what that says is the -- it may not have been medically

16  necessary because there could have been another drug that was

17  already proven for that indication.

18     To give an example, if you're using it in, you know,

19  treatment-naive patients and it hadn't been indicated yet for

20  treatment-naive patients, there's other drugs that are

21  indicated for treatment-naive patient.

22     To me, that's what that says.

23         THE COURT:  All right.  So you read it differently

24  than what it says.

25         THE WITNESS:  Yeah.

GRAHAM - CROSS - BROWN

1          THE COURT:  All right.  Ms. Brown, I'll let you

2    follow up.  I don't know if that helped or not.

3          MS. BROWN:  Thank you, Your Honor.  It did help.

4    BY MS. BROWN:

5    Q.  Ma'am, what you told us is that to say that it's

6    medically unnecessary is not accurate.  -

7    A.  So --

8    Q.  -- correct?

9          That was your testimony.

10   A.  I don't recall.  But, again, I think I need to

11   distinguish that, right?

12         HIV patients need HIV medications.  Absolutely.  Was it

13   medically necessary for them to have specifically Prezista and

14   Intelence?  No, I don't believe that to be the case.

15         There's other HIV medications that they could choose

16   from that were indicated for whatever specifically that

17   patient population was.

18         MS. BROWN:  Your Honor, permission to play the

19   deposition clip to impeach.  Thank you.

20         THE COURT:  Well, let me hear from -- objection?

21         MR. MARKETOS:  Can we get the page and line, Your

22   Honor?

23         MS. BROWN:  Oh, yes.  I apologize.

24         THE COURT:  That would be helpful.

25         MS. BROWN:  I apologize.

─────── GRAHAM - CROSS - BROWN ───────

1          It's Ms. Graham's deposition, January 22nd, 2019,

2     lines 90 -- page 90, line 9, to page 91, line 14.

3          MR. RUSS:  Just one minute, Your Honor.

4          (Brief pause.)

5          MR. RUSS:  I've got it, Your Honor.

6          THE COURT:  I'm sorry?

7          MR. RUSS:  I have it up.

8          THE COURT:  All right.  Is there any objection?

9          MR. RUSS:  No, Your Honor.

10         THE COURT:  All right.  Let's hear it.

11         (Deposition clip played at this time.)

12    BY MS. BROWN:

13    Q.  And, Ms. Graham, there are other things in that very same

14    paragraph that you also don't know about.

15         Correct?

16    A.  I'm not sure what you're referring to.

17         MS. BROWN:  Let's go back to paragraph (sic) 90, if

18    we could, of the declaration.  If I could just have the ELMO.

19    BY MS. BROWN:

20    Q.  The testimony you just gave was that you don't think it's

21    accurate to say it's not medically necessary.

22         Correct?  That's what we just saw.

23    A.  But I think I expounded upon that here.  I mean, was it

24    medically necessary for them to specifically prescribe

25    Prezista and Intelence?  No.  But was it medically necessary

GRAHAM - CROSS - BROWN

1    for them to prescribe HIV drugs?  Absolutely.  There's a

2    distinction there.

3    Q.   Ma'am, I just asked you, did we just look at your

4    testimony --

5    A.   Yes.

6    Q.   -- when you said it was not accurate to say what they

7    said in this paragraph, that it was medically unnecessary.

8         Correct?

9    A.   I did say that, but what --

10   Q.   That was my only question.

11   A.   Okay.

12   Q.   That's what you said.

13        Right?

14   A.   Yes.

15   Q.   All right.

16        And what the lawyers also wrote for you in this

17   paragraph that they wanted you to sign for your friend's

18   lawsuit is that "Janssen caused pharmacies and physicians to

19   submit claims for reimbursement to insurance programs funded

20   by the United States and certain states which were ineligible

21   for reimbursement at the time submitted and therefore false."

22        Do you see that?

23   A.   I do.

24   Q.   During the entire time period you worked at Janssen, you

25   had no responsibility or knowledge about how claims were

GRAHAM - CROSS - BROWN

1  submitted to Medicare, Medicaid, or other federal payment

2  programs.

3       Correct, ma'am?

4  A.   I mean, I know that they were submitted.  I don't know

5  the process.  That's what we had an access and reimbursement

6  team for.

7  Q.   Right.

8       You are not aware of Medicare Part D's guidelines for

9  medical Plan D -- Medicare Plan D sponsors about what is or is

10 not eligible for Medicare reimbursement.

11      Correct?

12 A.   I'm sorry.  Could you repeat that?

13 Q.   Yeah, that was a bad question.

14      You're not aware of the eligibility requirements that

15 Medicare has in place for reimbursement, correct?

16 A.   I mean, not intimately.  I mean, most patients were

17 covered by Medicare or Medicaid if they qualified.

18 Q.   What the lawyers wanted you to swear was true, under

19 penalty of perjury, was that claims were submitted to the

20 United States and certain states -- what states are they

21 talking about.  Do you know?

22 A.   I do not.

23 Q.   No.

24      Do you know if all states had the same requirements for

25 reimbursement of HIV medicines?

GRAHAM - CROSS - BROWN

1  A.  No, they do not.

2  Q.  Okay.

3      Do you know what states allow for reimbursement of

4  Prezista and Intelence off-label versus what don't?

5  A.  I do not.  I know that New York at the time was one of

6  the most generous states.  You know, if you needed to be on

7  ADAP or Medicare or Medicaid, that was a good state to live

8  in.

9  Q.  For sure.  Florida too, right?

10  A.  I don't recall.

11  Q.  Okay.  There are states that say off-label, on-label, we

12  don't care.  Get HIV patients their HIV medicines.

13      Right?

14  A.  Again, I don't know the specifics of what the criteria

15  is.

16  Q.  Well, what the lawyers wanted you to swear under penalty

17  of perjury was that these medicines were ineligible for

18  reimbursement in certain states.

19      Do you see that sentence?

20  A.  I do.

21  Q.  And you don't know if that's true or not.

22  A.  Well, I do recall that in certain states that they were

23  much more difficult to get.  So, yes, that is true.

24  Q.  Ma'am, this says, "Certain states, these medicines were

25  ineligible for reimbursement."

GRAHAM - CROSS - BROWN

1      You don't even know what states they are talking about.

2  A.   I believe it was Texas.

3  Q.   And what are the eligibility requirements for

4  reimbursement of Prezista in Texas from 2006 to 2014?

5      Do you know that?

6  A.   I don't.

7  Q.   Right.  And what they wanted you to certify, under oath,

8  was that they were ineligible for reimbursement by the

9  United States of America under Medicare Part D.  But you don't

10 have any experience with the eligibility requirements for

11 Medicare Part D.

12     Correct?

13 A.   Can you ask the question again?

14 Q.   Sure.

15     The United States of America -- do you know the federal

16 agency that administers Medicare?  Are you familiar with --

17 A.   CMS.

18 Q.   Okay.

19     Are you familiar with the eligibility requirements CMS

20 puts out for its Medicare Part D prescription medicine

21 program?

22 A.   Not currently, no.

23 Q.   Okay.

24     So when you signed this declaration that the lawyers

25 wrote up for this case of your friend, you actually don't have

GRAHAM - CROSS - BROWN

1   any knowledge about whether or not these medicines were or

2   were not eligible for reimbursement.

3       Correct?

4   A.   I would not say -- I would not agree with that in

5   totality.  I do know it was very difficult to get in certain

6   states versus other states.

7   Q.   But you just told New York was a great state.

8   A.   They were much more generous or liberal than other

9   states, yes.

10  Q.   Okay.

11      You don't know the individual requirements for each of

12  the individual states.

13  A.   I do not.

14  Q.   And you don't know the requirements for the federal

15  Government.

16      Correct?

17  A.   Well, they're kind of one and the same.

18  Q.   Ma'am, do you understand there are different requirements

19  for Medicaid versus Medicare?

20  A.   Yes, versus -- yes.  Yes, I do.

21  Q.   All right.

22      And as to the difference of those requirements when it

23  comes to reimbursement of an HIV medicine for an HIV patient,

24  you're not familiar with those.

25      Correct?

GRAHAM - CROSS - BROWN

1    A.   Not specifically, no.

2    Q.   Okay.

3         Let's talk about another thing that the lawyers wanted

4    you to sign in the declaration that is not true.  Paragraph

5    21.

6         This paragraph lawyers typed up for you says there was

7    "No information in Prezista's product inserts indicating that

8    Prezista is a more lipid-friendly treatment than those of its

9    competitors."

10        Do you see that?

11   A.   I do.

12   Q.   And that is not true.

13        Correct?

14   A.   That is not true.

15   Q.   Right.

16        Because you're familiar with Prezista's package insert.

17        Correct?

18   A.   Yes.

19   Q.   And you're familiar with approved FDA promotional pieces

20   based on data in the package insert.

21        Correct?

22   A.   Yes.

23   Q.   Particularly as it relates to data about lipids.

24        Correct?

25   A.   Yes.

─────GRAHAM - CROSS - BROWN─────

1  Q.   Particularly as it relates to scientific studies

2  comparing Prezista to a competitor drug called Kaletra.

3       Correct?

4  A.   Yes.

5  Q.   And you're familiar with the fact that those studies show

6  that Prezista is more lipid friendly than Kaletra.

7  A.   I would not use the words "lipid friendly."  I would say

8  it had a lesser impact on lipids than Kaletra did.  But to say

9  the words "lipid friendly" infers that there's no -- there's

10 no impact at all.

11 Q.   To who?

12 A.   To the patient.

13 Q.   Well, this information is not being given to the patient,

14 ma'am.

15      MR. RUSS:  Objection.  Argumentative.

16 BY MS. BROWN:

17 Q.   You understand that we're here --

18      THE COURT:  Overruled.

19 BY MS. BROWN:

20 Q.   -- we're here talking about things that are being made to

21 physicians.

22      Do you understand that?

23 A.   I understand that.  But to use the word "lipid friendly"

24 is overstating the minimal impact when you compare it to

25 Kaletra.

GRAHAM - CROSS - BROWN

1   Q.   Okay.

2   A.   I don't think "lipid friendly" is the correct words to

3   use.

4   Q.   Were you at all involved in correspondence with the FDA

5   about appropriate lipid approved messages?

6   A.   I was not.

7   Q.   Okay.

8        Are you aware of the different messages that the FDA

9   approved regarding Prezista from 2006 to 2014?

10  A.   I'm -- vaguely, yes.

11  Q.   Okay.

12       You understand that proven lipid profile was an

13  approved FDA message?

14  A.   Yes.  But I'd like to qualify that, if I can.

15  Q.   Well, your counsel will be back and give you an

16  opportunity.

17  A.   Okay.

18  Q.   And you understand that minimal --

19           MR. RUSS:  Objection, Your Honor.  Just the point I'm

20  not her counsel, just for the record.

21           THE COURT:  That's fair.  All right.  I think --

22           MS. BROWN:  I apologize.

23           THE COURT:  You mean that you'll have an opportunity

24  on redirect to answer the question --

25           THE WITNESS:  Yes.  I understand.

GRAHAM - CROSS - BROWN

1           THE COURT:  That's fair.

2    BY MS. BROWN:

3    Q.  A fair point.  Mr. Russ is not your lawyer.

4        Correct?

5    A.  Correct.

6    Q.  Okay.

7        You did have a couple calls with him, though, getting

8    ready for your testimony.

9        Right?

10   A.  I did.

11   Q.  Right?

12       I think he mentioned he did a Zoom with you; is that

13   right?

14   A.  Correct.

15   Q.  And then you also met him in person before your testimony

16   here today?

17   A.  I did.

18   Q.  Or yesterday?

19   A.  Yes.

20   Q.  Okay.

21       And he talked to you a little bit about the questions

22   he was going to ask you in front of our jurors?

23   A.  Yes.

24   Q.  Right?

25       He told you that he was going to ask you about that

GRAHAM - CROSS - BROWN

1    EDPA lawsuit that you filed and was dismissed.

2        Right?

3    A.   What's EDPA?

4    Q.   I'm sorry.  Your -- remember when you said you reported

5    to the Department of Justice?

6    A.   Yes.

7    Q.   Okay.

8        It was actually when you retained the lawyer.  Remember

9    that testimony?

10   A.   Yes.

11   Q.   Mr. Russ told you he was going to ask you those

12   questions.

13       Right?

14   A.   He did.

15   Q.   Right.

16       So even though he's not your lawyer, he did kind of

17   preview with you what he wanted to ask you about in front of

18   our jury.

19       Correct?

20   A.   Yes.

21   Q.   Okay.

22       And Mr. Russ's firm and some of these other lawyers

23   representing the Relators here, they paid for you to fly out

24   here for your testimony; is that right?

25   A.   They did.

GRAHAM - CROSS - BROWN

1    Q.    They're paying for you to stay over through the course of

2    your testimony?

3    A.    Yes.

4    Q.    Paying for your expenses, like dinner with your friends

5    Jessica and Christine?

6    A.    I did not have dinner with my friends Jessica and

7    Christine.  I had dinner by myself every night.

8    Q.    Okay.  I apologize.

9          I thought you mentioned in your testimony that you had

10   a chance to catch up with her when you got here.

11   A.    I saw her in the hall for three minutes.

12   Q.    Okay.

13         All your expenses are paid by the lawyers coming out

14   here to testify.

15         Correct?

16   A.    Yes.

17   Q.    And that's the same for your partner, who's going to be

18   here to testify tomorrow, correct?

19   A.    Yes.

20   Q.    All right.

21         Getting back to where we were, talking about the

22   approved FDA messages, and you are aware that proven lipid

23   profile is an approved FDA message.

24         Correct?

25   A.    It's proven because they tested it in the clinical

GRAHAM - CROSS - BROWN

1    trials.  So, yes, it's -- what the results are are proven.

2    Q.    Right.

3         And so when the lawyers wanted you to say, "No

4    information in the package insert showing more lipid friendly

5    than those of the competitors," that's not right.

6    A.    That is not correct.  It's not lipid friendly.  If they

7    want to say there's a minimal impact on lipids compared to

8    Kaletra, then that is correct.

9    Q.    And if they want to say low impact on lipids, that's also

10   correct.

11        Right, ma'am?

12   A.    A low impact versus Kaletra.

13   Q.    Are you familiar with the low-impact-on-lipids message

14   that was approved by the FDA?

15   A.    I am, yes.

16   Q.    Okay.

17        And you understand that wasn't limited to say with

18   Kaletra?

19   A.    Yes.

20   Q.    Right.

21        You testified yesterday that you've never heard of

22   anybody getting into trouble at Janssen for issues with

23   compliance.

24        Do you remember that testimony?

25   A.    I don't.  I mean, yes, I remember.  I don't recall

GRAHAM - CROSS - BROWN

1    anybody getting in trouble, no.

2    Q.   Right.

3         And the fact of the matter is, though, that actually

4    your performance reviews included some trouble you were having

5    with compliance.

6         Right?

7    A.   No.

8    Q.   Okay.

9    A.   Not to my knowledge.

10   Q.   Okay.

11        Do you know who Amit Patel is?

12   A.   Yes.

13   Q.   All right.

14        And are you aware that Mr. Patel was in -- gave some

15   feedback on your performance during the time period you were

16   at the company?

17   A.   Am I aware of that?  Now that you mentioned that, I

18   recall that, but that was when I was a trainer and we had to

19   argue over every sentence of every email that I put out.  And

20   I needed some coaching on how to work under those guidelines.

21   Q.   Right.

22        The fact of the matter is you were getting a little

23   frustrated that compliance and regulatory wanted to look at

24   every email and every correspondence and every PowerPoint

25   presentation you were putting out.

GRAHAM - CROSS - BROWN

1  A.   No, I wasn't upset that they wanted to look.  That was

2  understood.  It was -- the frustration was -- finally, I said,

3  you know, every time I tried to word something, he would say,

4  No, that's not correct.  You can't word it that way.

5       So finally the way that I was coached to work with him

6  is I said, Okay, then I need you to write it for me, what's

7  going to be compliant.

8  Q.   Right.

9       At the time Mr. Patel was in regulatory.  Correct?

10  A.   Yes.

11  Q.   He was in charge of making sure that your messages to the

12  field and outside the company complied with the regulations

13  that Janssen operates under.

14       Correct?

15  A.   That's his job, yes.

16  Q.   As a result, he had a lot of editing and feedback to give

17  you on what you could or could not say.

18       Correct?

19  A.   Not just me, everybody.

20  Q.   And that frustrated you.  Correct?

21  A.   I think it frustrated most people.

22  Q.   Right.

23  A.   Yeah.

24  Q.   Because you wanted to just send out an email, and the

25  compliance people at Janssen are telling you, Wait.  We've got

GRAHAM - CROSS - BROWN

1   to look at it first.

2   A.   That's not what frustrated me.  I don't object to them

3   having to review it.  It was just, you know, the minutiae of

4   the words.  It was just -- you know, it was very -- yes, it

5   was frustrating.  Yes.  Absolutely.

6   Q.   These folks were super detailed about what they wanted to

7   review before it got sent out to the field or outside the

8   company.

9        Correct?

10  A.   Yes.  That's their job.

11  Q.   I'm sorry.

12  A.   That's their job.

13  Q.   Sure.

14       And as a result, that created some extra work for you.

15  Correct?

16  A.   I don't think that it -- it's not that I was upset about

17  it created extra work.  I just couldn't ascertain what it was

18  specifically that he wanted me to say.

19       So, again, after being coached and saying, Okay, I

20  want -- this is what I want to say; you write how that

21  happens.

22       I mean, it was -- it was just very minutiae oriented.

23  Q.   Okay.

24       And the reason Mr. Patel was so focused on the wording

25  of what you had to say is because he was trying to make sure

GRAHAM - CROSS - BROWN

1  what you were saying was compliant.

2       Correct?

3  A.   Yes.  Uh-huh.

4  Q.   You took an oath, a pledge, when you joined Janssen not

5  to do the very things that you claimed you did for several

6  years.

7       Correct?

8  A.   Yes.

9  Q.   All right.

10       MS. BROWN:  Your Honor, permission to admit Tab 1,

11  D-6061.  Tab 1.

12       THE COURT:  Any objection?

13       MR. RUSS:  No objection, Your Honor.

14       THE COURT:  All right.  So admitted.

15       You may publish.

16       MS. BROWN:  Thank you, Your Honor.

17  (Defendant's Exhibit D-6061 in evidence.)

18  BY MS. BROWN:

19  Q.   Let's orient ourselves here.

20       Donna Graham, that's you.  Correct?

21  A.   Yes.

22  Q.   Signed on February 6th, 2006?

23  A.   Correct.

24  Q.   This is best manager ever, Frank Murphy?  He signed, too?

25  A.   One of the best managers, yes.

GRAHAM - CROSS - BROWN

1  Q.  All right.

2      But you said, actually, the best manager you've ever --

3  A.  But that was how many years ago.

4  Q.  Fair.  All right.

5      Good manager since then.

6  A.  Yes.

7  Q.  All right.

8      So at the time best manager, February 6th, 2006.

9  Correct?

10 A.  Yes.

11 Q.  All right.

12     And this is the professional sales representative's

13 pledge of ethics.  Correct?

14 A.  Yes.

15 Q.  And the very first thing that it says, that "As a

16 professional sales representative, you had a responsibility to

17 communicate our, Janssen's, ethical standards to physicians,

18 pharmacists, and other health professionals in a professional

19 manner."

20     Do you see that?

21 A.  I do.

22 Q.  And you were expected to "live up to a high level of

23 ethical conduct."

24     Do you see that?

25 A.  I do.

GRAHAM - CROSS - BROWN

1   Q.   And you said that you pledged that your promotional

2   presentations to help professionals will recommend usage only

3   in accordance with the FDA-approved labeling, that you would

4   offer to these professionals a copy of the current official

5   product brochure or label --

6   A.   Uh-huh.

7   Q.   -- for each of the prescription medicines for which you

8   promoted.

9        Correct?

10  A.   Yes.

11  Q.   And that all product comparisons will be based on fact.

12       Correct?

13  A.   Yes.

14  Q.   And it is your testimony, Ms. Graham, that for all of the

15  years that you worked at Janssen, you violated this pledge.

16       Correct?

17  A.   I was asked to do so, yes.

18  Q.   And it is your testimony, for all of the years that

19  you've worked at Janssen, you didn't tell anybody that you

20  were violating this pledge.

21       Correct?

22  A.   Yes, that is correct.  Again, I didn't feel like it was a

23  safe, anonymous environment without retaliation.

24  Q.   And for all of the years that you claim in this lawsuit

25  being brought by your friend that you were violating this

GRAHAM - CROSS - BROWN

1  pledge, breaking the law, you don't have any documents to show

2  our jurors that show someone directing you to break the law

3  and promote these medicines off-label?

4  A.   I don't agree with that statement.

5  Q.   Okay.

6       Do you have any document to show our jury that says you

7  should promote these medicines off-label?

8  A.   I believe we showed documentation yesterday.

9  Q.   Well, we saw what you saw yesterday, and we didn't see

10 any document where someone said promote these off-label.

11      Correct?

12         MR. WIRMANI:  Objection.

13         THE COURT:  Sustained.

14 BY MS. BROWN:

15 Q.   All right.

16      Other than the documents you showed our jury yesterday,

17 you don't have any documents.

18      Correct?

19 A.   I don't personally -- did not bring documents with me.

20 Any documents that I had had, I forwarded on to the -- the law

21 firm.

22 Q.   And none of the documents that you showed our jury

23 yesterday instructed you to break the law.

24      Correct?

25 A.   I'd have to review them again.  I do think there is some

GRAHAM - CROSS - BROWN

1  documentation.  When it happens, sometimes documents leak out.

2  Q.   But, ma'am, I'm asking about what documents you have.

3  You don't have a document that supports the very, very, very

4  serious claims you've made to our jurors that you were

5  instructed for five years to break the law.

6       Correct?

7  A.   I disagree with that statement.

8  Q.   And you don't have any texts or emails or correspondence

9  between you and your fellow sales representatives that you

10 were breaking the law.

11      Correct?

12 A.   That is correct.

13 Q.   And you don't have any correspondence between you and

14 your fellow sales reps and the Relators in this case talking

15 about whether or not you should report this illegal activity.

16      Correct?

17 A.   No.

18 Q.   And when you say you disagree with me and you think you

19 do have documents, you're referring to the documents counsel

20 went through with you yesterday?

21 A.   Yes.

22      MS. BROWN:  No further questions.  Thank you,

23 Your Honor.

24      THE COURT:  All right.  Thank you.

25      Counsel, any redirect?

GRAHAM - REDIRECT - RUSS

1          MR. RUSS:  Yes, Your Honor.

2    (REDIRECT EXAMINATION BY MR. RUSS:)

3    Q.  Good afternoon, Ms. Graham.

4    A.  Good afternoon.

5    Q.  I know you've been up here a while.  I'm going to try to

6    move through a couple topics.

7    A.  Okay.

8    Q.  Ms. Brown asked you some questions insinuating that you

9    did not report your concerns internally while you were at

10   Janssen.

11         Do you recall that?

12   A.  I do.

13   Q.  But you did report internally, didn't you?  You talked to

14   Frank Murphy?

15   A.  I did, yes.

16   Q.  Tell the jury what you told Frank Murphy.  Remind the

17   jury who Frank Murphy was.

18   A.  Frank Murphy was my direct sales manager, yeah.

19   Q.  And what did you tell Mr. Murphy?

20   A.  I mean, we had multiple conversations about how I was not

21   comfortable talking off-label.

22   Q.  Okay.

23         I think yesterday you also testified about some

24   gentleman named Mike Iacobellis?

25   A.  Yes.

GRAHAM - REDIRECT - RUSS

1   Q.   And Mark Gossett?

2   A.   Correct, yes.

3   Q.   Remind the jury who those gentlemen were.

4   A.   So Mike Iacobellis was the national sales director as

5   well as the training director for a period of time, and

6   Mark Gossett was the vice president.

7   Q.   When you were national sales trainer at the home

8   office --

9   A.   Yes.

10  Q.   -- did you tell Mr. Iacobellis and Mr. Gossett that you

11  had a concern or problem with something that they wanted you

12  to do?

13  A.   Yes, with the workshop that they wanted me to do at one

14  of the plan of action meetings.

15  Q.   What was it that they wanted you to do?

16  A.   They wanted me to run a workshop that -- generally in

17  workshops, we have slide decks and directions about how the

18  workshop is supposed to play out or what the objective of the

19  workshop is.

20       But this particular workshop, there were no slides.

21  There was no documentation.  What I was asked to do is to --

22  essentially to teach in this workshop how to solicit

23  unsolicited questions, so to get them up to what they

24  considered the line.

25       In my opinion, the line had already -- crossed the

GRAHAM - REDIRECT - RUSS

1  line.  You're not supposed to solicit unsolicited questions.

2  Q.   In fact, Ms. Brown showed you a policy that you're not

3  supposed to solicit off-label questions?

4  A.   Correct.

5  Q.   And you believe that that violated the law?

6  A.   Yes, I was very uncomfortable, and I said I wasn't going

7  to do it.

8  Q.   Who did you say that to?

9  A.   Mark Gossett, Mike Iacobellis, and I believe Ron Martin

10 may have been in the office as well.

11 Q.   Remind the jury, who is Ron Martin?

12 A.   Oh, Ron was like my counterpart as the national -- as a

13 trainer.

14 Q.   Did you tell them why you felt uncomfortable as far as it

15 being illegal?

16 A.   I told them I was uncomfortable.  I didn't think it was

17 right, and I have no idea how I would even run that workshop.

18 Q.   You told them what, that you weren't going to do it?

19 A.   I did.

20 Q.   What did they say?

21 A.   It's not an option; you're going to do it.

22 Q.   And how high up in the company are these gentlemen that

23 you just named?

24 A.   Well, Mark Gossett was the vice president of sales.  Mike

25 Iacobellis was the national sales director.  He also at that

GRAHAM - REDIRECT - RUSS

1    time -- again I think he had a dual role where he was the

2    director of sales training.

3    Q.   I thought I heard you say when you spoke to Mr. Murphy --

4    who you liked, right?

5    A.   Very much so, yes.

6    Q.   And was one of your favorite managers?

7    A.   He was.

8    Q.   You liked a lot of people you worked with at Janssen.

9    A.   I loved a lot of people that we worked with at Janssen,

10   yes.

11   Q.   Okay.

12       What did Mr. Murphy tell you when you brought the

13   concerns up to him?

14   A.   He -- you know, his -- he would always say, I'm not

15   asking you to do anything that I haven't been asked to do.

16   Q.   And what did you interpret that to mean?

17   A.   That he -- it has been asked of him, this is the way for

18   us to meet our sales goals, so this is what we need to do.

19   Q.   When Mr. Murphy was your supervisor, you were a sales rep

20   in Manhattan?

21   A.   I was.

22   Q.   And who was Mr. Murphy's boss?

23   A.   I'm trying to remember.  I think it was Sara Strand.

24   Q.   Sara Strand?

25   A.   Yes.

GRAHAM - REDIRECT - RUSS

1   Q.   Okay.

2          MR. RUSS:  If we could, Ms. Johnson, publish -- and

3   this is already in evidence -- Defendant's 2095.

4          And can we zoom in on that document, please,

5   Ms. Johnson.

6   BY MR. RUSS:

7   Q.   Ms. Graham, do you remember Ms. Brown going over this

8   document with you?

9   A.   I do.

10  Q.   And this is a policy document on FDA regulated products?

11  A.   Yes.

12         MR. RUSS:  If we could go to the next page, please.

13  If you could, please, go down to "responsibility to disclose."

14  BY MR. RUSS:

15  Q.   Ms. Graham, do you see four paragraphs down where it

16  starts with the word "reports"?

17  A.   I do.

18  Q.   "Reports may be made verbally or in writing to your

19  immediate supervisor."

20         Did I read that correctly?

21  A.   Yes.

22  Q.   Is that what you did?

23  A.   Yes.

24  Q.   You verbally reported concerns to Mr. Murphy?

25  A.   Multiple times.

GRAHAM - REDIRECT - RUSS

1  Q.  Who was your immediate supervisor?

2  A.  Yes.

3  Q.  And Mr. Iacobellis?

4  A.  He was -- yeah.

5  Q.  Was he your immediate supervisor, or was he even higher?

6  A.  So when I was a trainer for a while, he was my immediate

7  supervisor.

8  Q.  And what about Mr. Gossett?

9  A.  He was Mike Iacobellis boss, so he was the vice

10 president, so one step higher.

11 Q.  So you verbally report your concerns about the training

12 for off-label promotion that they were asking you to do to

13 Mr. Iacobellis, your direct boss?

14 A.  Yes.

15 Q.  And your boss's boss, Mr. Gossett?

16 A.  Yes.  I mean, in essence, yes.

17 Q.  Okay.  And continue, it doesn't say you have to report

18 that to the law department to -- it's an "or."  It gives you

19 an option.

20 A.  Yes.

21 Q.  And you followed that policy?

22 A.  I didn't realize that at the time, but I guess I did,

23 yes.

24 Q.  Is that because the policies -- there are a lot of

25 policies at Janssen?

GRAHAM - REDIRECT - RUSS

1   A.   Yes.

2   Q.   Okay.

3        And just because there's a policy, you agree with me it

4   doesn't mean that you can't break those policies or break the

5   law?

6   A.   Right.

7   Q.   But in reality now if you look at it, you complied with

8   the provision that Ms. Brown talked to you about it?

9   A.   I did, yes.

10       MR. RUSS:  We can take that down, Ms. Johnson.

11  BY MR. RUSS:

12  Q.   Now, Ms. Graham, Ms. Brown also asked you about a

13  transcribed voicemail on change forecast.

14       Do you recall that?

15  A.   Yes.

16  Q.   Did you receive that voicemail?

17  A.   I don't recall.

18  Q.   Do you -- I mean, there was a transcribed voicemail.

19       Right?

20  A.   Yes.

21  Q.   Did you receive any other correspondence or did she show

22  you any other policy changes or any other documents that

23  support that there was a change in that forecast?

24  A.   I did not see any other documents, no.

25  Q.   And you said that you didn't remember whether or not your

GRAHAM - REDIRECT - RUSS

1    quota changed.

2    A.    Yes.

3    Q.    Explain to us what you didn't recall about that.

4    A.    I just don't remember the goal being adjusted.

5    Q.    Do you remember the pressure being adjusted?

6    A.    No.

7    Q.    I want to talk to you briefly about the declaration --

8    A.    Yes.

9    Q.    -- that Ms. Brown showed you.

10   A.    Yes.

11   Q.    Did you review that declaration for accuracy before you

12   signed it?

13   A.    I -- I'm assuming I did.  I usually do.

14   Q.    Do you want to be careful to make sure it was accurate?

15   A.    Yes.

16   Q.    There were things that Ms. Brown went over with you today

17   including the medical necessity paragraph at the end.

18        Do you recall that?

19   A.    Yes.

20   Q.    Did you believe that was true when you signed it?

21   A.    So I think there's a couple different ways that you can

22   look at it, right?  Are HIV medications medically necessary?

23   They are.

24        Was it medically necessary to prescribe specifically

25   Prezista or Intelence?  Not inherently, no.

GRAHAM - REDIRECT - RUSS

1   Q.   Okay.

2        Do we have the declaration in evidence that we can show

3   Ms. Graham.  If we could enhance that.

4   BY MR. RUSS:

5   Q.   Now, Ms. Graham, your declaration was multiple pages

6   long.

7        Right?

8   A.   I'm sure it was.

9        MR. RUSS:  And in fact, if we could go to the end the

10  fine paragraph, please.

11  BY MR. RUSS:

12  Q.   90 paragraphs long.

13       Do you see that?

14  A.   Yes.

15  Q.   Ms. Brown didn't go over the other information in your

16  declaration, other than those two paragraphs.

17       Right?

18  A.   Yes.

19  Q.   Is it your testimony that those drugs may not be

20  medically necessary for patients, but they may need HIV

21  medication?

22  A.   Yes.

23  Q.   Okay.

24       And what was the other paragraph that Ms. Brown showed

25  you?  I think it was 21.

GRAHAM - REDIRECT - RUSS

1     Now, Ms. Graham, this sentence reads, "There is no

2 information in Prezista product inserts indicating that

3 Prezista is a more lipid friendly treatment than those of

4 competitors."

5     Do you see that?

6 A.  Yes.

7 Q.  And Ms. Brown suggested that you don't think that's

8 accurate.

9 A.  I don't think it's accurate.  I don't think the words

10 "lipid friendly" are accurate, and I don't recall "lipid

11 friendly" being in the package insert.

12 Q.  There's a lot of "nots" there.  You think what's written

13 there is true?

14 A.  Yes.  It is true, yes.

15 Q.  In fact it says competitors with an S.

16     Right?

17 A.  Correct.

18 Q.  Now, is it your recollection that you could market

19 Prezista as lipid friendly at all?

20 A.  I'm sorry.  Could you repeat that?

21 Q.  Is it your recollection that you could ever market

22 Prezista as, quote, lipid friendly?

23 A.  No, I don't think -- I don't think that's technically

24 correct.  It is -- does it have a minimal impact on lipids

25 compared to another product?  Yes.

GRAHAM - REDIRECT - RUSS

1          But to say that -- to me "lipid friendly" insinuates

2    that there's absolutely no impact at all.

3    Q.   Would that be the same as "lipid neutral" in your mind?

4    A.   In my mind, yes.

5    Q.   The words "lipid friendly" that are quotes in your

6    declaration, are those even in the package insert?

7    A.   No.

8    Q.   So it's true that's not in the insert.

9         Right?

10   A.   Correct.

11   Q.   And it says competitors.  I think you talked about

12   Kaletra, and there was a study on the package insert comparing

13   Prezista to Kaletra.

14        Right?

15   A.   Yes.  That was the clinical trial for registration, yes.

16   Q.   So you could show doctors that -- that trial.  That would

17   be on-label?

18   A.   Yes.

19   Q.   What about -- was there ever a study you're familiar with

20   that was on-label comparing Prezista to Reyataz for lipids?

21   A.   There was not a head-to-head comparison in our label, no.

22   Q.   So really the label only talked about the competitor --

23   one competitor?

24   A.   Yes.  The way that Prezista received its indication was

25   based upon that clinical trial, that it was a head-to-head

GRAHAM - REDIRECT - RUSS

1  trial against Kaletra.

2  Q.   Ms. Brown was suggesting to you that you were either

3  mistaken or that you were going along with your friend's

4  attorneys?

5  A.   Yes, I felt that she was trying to twist my words, if I

6  can be honest.

7  Q.   Do you feel like you were being honest when you signed

8  this declaration?

9  A.   Yes.

10  Q.   And when she kept pointing back at Ms. Penelow's -- your

11  friend's attorneys -- you and I met, what, a month ago, two

12  months ago?

13  A.   Yes.

14  Q.   Anybody at this table that you met back when you signed

15  this declaration?

16  A.   No.

17  Q.   I want to shift gears and talk to you --

18        MR. RUSS:  And, Your Honor, I'm cognizant of the

19  time.  I think we're going to be able to get through this

20  redirect in time for lunch.

21        THE COURT:  All right.

22  BY MR. RUSS:

23  Q.   I want to talk to you about the MIRs.

24  A.   Yes.

25  Q.   Medical information requests.

GRAHAM - REDIRECT - RUSS

```
 1  A.   Yes.

 2          MR. RUSS:  If we could, please, pull up Defendant's

 3  Exhibit 8637.  That's in evidence.

 4  BY MR. RUSS:

 5  Q.   Ms. Graham, this is the exhibit Ms. Brown showed you

 6  that's on Tibotec's header, medical information request form.

 7          Do you see that?

 8  A.   Yes, I do.

 9  Q.   Okay.

10          Remember yesterday when you talked about how many

11  medical information requests that you were being asked as a

12  district to submit, I think the number was 49.

13  A.   I could -- did he give us -- he said how many we had

14  submitted.

15  Q.   Comparing the four?

16  A.   Yes, yes.

17  Q.   Okay.

18          So this is just one example.

19          Right?

20  A.   Correct.

21  Q.   All right.

22          Ms. Graham, she said that you signed this.

23  A.   Well, the physician signed it.

24  Q.   Well, your name's on the bottom.

25  A.   Yes, it is, yes, uh-huh.
```

GRAHAM - REDIRECT - RUSS

1   Q.   And the way the practice is supposed to work is that the

2   requester -- the requester prescriber can sign right here.

3        Right?

4   A.   Yes.

5   Q.   You were explaining a little bit about how the process

6   actually worked?

7   A.   Yes.

8   Q.   You said something about the doctors would be running out

9   of the office.

10       Explain to the jury of the dozens and dozens of MIR

11  requests that we're talking about just in your district how

12  that process would actually work in physicians' offices.

13  A.   I mean, more often than not the physician was running out

14  the door and, you know, Here, let me get your signature, and

15  that was the way it was done as he was walking out the door to

16  the next patient.

17  Q.   You had mentioned yesterday that some of these were

18  forged.

19  A.   Yes.

20  Q.   Where I circled right there is that where people would

21  forge doctors' --

22  A.   Yes.

23  Q.   -- signatures?

24  A.   Yes.

25  Q.   If we could, Ms. Graham, take a look at the questions.

GRAHAM - REDIRECT - RUSS

1  Were some of the questions that were submitted on the MIR

2  forms related to the off-label messages in this case; in other

3  words, Intelence QD dosing?

4  A.   Yes.

5  Q.   Was that a common one?

6  A.   Yeah.  Yes.

7  Q.   Was it also common for Prezista lipids?

8  A.   Yes.

9  Q.   Was it common for resistive-naive patients?

10 A.   Yes.

11 Q.   Ms. Graham, on this one example -- this one example of

12 MIR form, do you see where it says Intelence, once daily?

13 A.   Yes.

14 Q.   Is that common to put on these MIR requests, Intelence

15 once daily?

16 A.   Yes.

17 Q.   And then what would happen once this was submitted

18 internally to Janssen?

19 A.   Then the medical department would send out the response

20 to the physician.

21 Q.   And that response we saw too.

22        MR. RUSS:  And if we can, pull up Defendant's 8635,

23 if it's in evidence.  If not, I'll put it on the ELMO.

24 BY MR. RUSS:

25 Q.   Ms. Graham, do you remember going over with Ms. Brown

GRAHAM - REDIRECT - RUSS

1    Defendant's 8635, which was an example of what they sent in?

2    A.    Yes.  A response.

3    Q.    A response.

4    A.    Yes.

5    Q.    Would you get a copy of these as a salesperson?

6    A.    I believe that we did.

7    Q.    Would you get a copy of the response --

8    A.    I believe that we did, but --

9            THE COURT:  Wait.

10           THE WITNESS:  Oh.

11           THE COURT:  You also have to bait for him to complete

12   the question.

13           THE WITNESS:  I'm sorry.

14           THE COURT:  It's okay.  I know it sounds

15   conversational, but the court reporter is trying to manage all

16   the statements, and that's for both of you.

17           THE WITNESS:  My apologies.

18           THE COURT:  It's all right.

19   BY MR. RUSS:

20   Q.    Now, Ms. Graham, the next page that I'm going to show is

21   page 1 of what would be sent to the doctor.

22           Right?

23   A.    Yes.

24   Q.    Now, we talked about how you were asked to train

25   salespeople on soliciting off-label questions.

GRAHAM - REDIRECT - RUSS

1   A.   Yes.

2   Q.   Were you also taught and trained others how to solicit

3   MIR requests?

4   A.   Yes.  I mean, I don't specifically recall that, but

5   essentially, you know, it was the way that we would solicit

6   unsolicited -- or solicit unsolicited questions would be to

7   say, you know, wouldn't it be great for you -- wouldn't it be

8   helpful for you to get some information on once-daily dosing?

9   Sure, that would be great.  Okay, here.  Sign this and I'll

10  have it sent to you.

11  Q.   Let me break that down.

12       So that first step, wouldn't it be great if you got

13  some information on once-daily dosing.

14  A.   Yes.

15  Q.   Once-daily dosing Intelence was off-label.

16  A.   Yes.

17  Q.   Was that an appropriate marketing tactic?

18  A.   No.

19  Q.   Okay.

20       And when they would say yes, you would say, And sign

21  here.  You would give this MIR form to a doctor to sign?

22  A.   Yes.

23  Q.   How long did that transaction take place?

24  A.   Ten seconds.

25  Q.   Okay.

GRAHAM - REDIRECT - RUSS

1      And then you would submit that.  And then this is an

2  example of something that would come back on Intelence

3  once-a-day dosing, isn't it?

4  A.   Yes, it is.

5  Q.   And that would also get sent directly to physicians.

6  A.   Yes.

7  Q.   And prescribers.

8  A.   Yes.

9  Q.   And Mr. Murphy -- and I can show you the emails that we

10 went over yesterday.

11     Do you remember the email where he was comparing the

12 forms and how many MIR requests there were?

13 A.   Painfully, yes.

14 Q.   Why do you say "painfully"?

15 A.   Because it was -- you know, it was just ridiculous.

16 Q.   Why was it ridiculous, Ms. Graham?

17 A.   Because the medical information request forms are not

18 supposed to be solicited.  So for you to quantify them is

19 silly.

20 Q.   Was that being used as a metric to compare you to other

21 sales districts?

22 A.   It was.

23 Q.   Was it, based on your experience, an important metric?

24 A.   Based on my experience -- I know why it was a metric

25 because when -- the number of medical information requests

GRAHAM - REDIRECT - RUSS

1  forms, particularly in Florida, had a direct link to sales.

2  Q.   Let's take a look at that email briefly, Ms. Graham.

3  A.   Okay.

4  Q.   It's Relator's Exhibit 73.  It's in evidence.

5       Do you remember this email from yesterday, Ms. Graham?

6  A.   I do.

7  Q.   "I know that we have discussed what other districts are

8  doing to drive business."

9       Right?

10 A.   Yes.

11 Q.   "Driving business" being -- what does that mean to you?

12 A.   To increase the market share or increase the number of

13 prescriptions.

14 Q.   And we just looked at some of the MIR requests and some

15 of the information that gets sent to doctors, and it's

16 off-label.

17 A.   Yes, it is.

18 Q.   Is it fair to say that the purpose of an MIR request is

19 to cover off-label information?

20 A.   Absolutely.

21 Q.   Okay.

22      Let's keep moving then and see, "For the month of

23 January, we have 49 requests logged in."  That's the 49 that I

24 was talking about.

25 A.   Okay, yeah.  Okay.

GRAHAM - REDIRECT - RUSS

1  Q.   So Florida's 50.

2       Do you see that?

3  A.   I do.

4  Q.   "In February we had 60 requests to Florida's 154."

5       What does that mean to you?

6  A.   To me that means we're being compared, and 154 just seems

7  enormous to me.

8  Q.   And is that based on your experience in the

9  pharmaceutical industry?

10 A.   Yes.

11 Q.   How off base is that as far as a number of MIR requests

12 in a month?

13 A.   I mean, I can tell you I sell a drug now for a rare

14 kidney disease, and it's the first drug in its class, it's the

15 first one indicated specifically for the disease, and I

16 probably have three or four a month.

17 Q.   The bottom line says, "If we are going to" -- I think

18 it's missing a "B" -- "be viewed as the best sales district in

19 the country, we better start to pick up the pace and control

20 these situations."

21 A.   Yes.

22 Q.   What does that mean to you?

23 A.   It means that we better submit some more request forms.

24 Q.   How can you control that if the doctors are supposed to

25 be asking unsolicited?

GRAHAM - REDIRECT - RUSS

1  A.   You can't.  I mean, the only way to do that is to, again,
2  either, you know, forge them or put multiple questions -- only
3  one question on a format time.
4  Q.   Explain that one question on a format a time.  What does
5  that do for you?
6  A.   So if you -- if there were three questions and you -- if
7  there's three questions on one medical information request
8  form, that's counted as one medical information request form.
9  If I put one question on three different forms, then it's
10 three medical information request forms.
11 Q.   Did you talk to the other sales representatives that told
12 you they also forged MRIs?
13 A.   Yes.
14 Q.   Do you recall who?
15 A.   Mostly everyone in my district.  So, you know, Tim
16 McSherry, Arnolda Vega, Jessica, Christine.  I'm trying to
17 remember.  Angel, Brad.  You know, so multiple people in my
18 districts who then also talked to, you know, other people
19 within the country.
20 Q.   Ms. Graham, Ms. Brown had some questions for you about a
21 Facebook post from 2020?
22 A.   Yeah.
23 Q.   She had some questions for you about some disclaimer
24 language that you put on emails?
25 A.   Yes.

GRAHAM - REDIRECT - RUSS

1   Q.   Right?

2        When you were a national sales trainer, for instance?

3   A.   Yes.

4   Q.   Let me talk about the Facebook post.

5        Is there anything that changes your testimony in the

6   last two days based on what you posted on a Facebook message

7   in 2020?

8   A.   No.  To me the message was -- we were -- you know, there

9   was only like a hundred of us.  We were so dedicated to HIV

10  and to its patients that I liked most of the -- most of the

11  sales reps.  Like, I really did.  And I am still, you know,

12  friends with them on Facebook to this day.  I still think very

13  highly of them.  I have a lot of respect for them, and I feel

14  nothing but fondness towards a lot of the reps that work

15  there.

16  Q.   Okay.

17       And on the compliance language that Ms. Brown talked to

18  you about on some of your emails, can you explain why that

19  language was put on the emails, if that's not what was taking

20  place?

21  A.   Again, I think this is a perfect example why we're

22  sitting here today.  It was a first line of defense to say,

23  Well, we told you not to do.  But it wasn't meant as a

24  deterrent or to discourage that behavior because it was

25  occurring.

GRAHAM - REDIRECT - RUSS

1  Q.   If Ms. Brown put up a hundred policies from the time,

2  would that change your testimony of what was happening on the

3  ground?

4  A.   Absolutely not.

5  Q.   If Ms. Brown gave you a hundred emails that you had that

6  disclaimer language on, would that change what you testified

7  actually occurred?

8  A.   No.  And there's probably 300 or more emails that say

9  that.

10 Q.   And you testified about what you saw and what you did.

11 Right?

12 A.   Yes.

13 Q.   And Ms. Graham, finally, there was maybe some suggestion

14 that you're friends with Jessica so -- Ms. Penelow, so you

15 want to show up here and help her.

16 A.   Yes.  There was.

17 Q.   Do you want to be here?

18 A.   Absolutely not.

19 Q.   Explain why not.

20 A.   Because I've had to call in sick for work the last three

21 days.  I've been away from home.  This not a pleasant

22 experience.  I absolutely do not want to be here.

23 Q.   Are you concerned about the repercussions on your job for

24 testifying?

25 A.   Yes.

GRAHAM - REDIRECT - RUSS

1  Q.   What are those?

2  A.   I mean, I don't know how the current -- the company that

3  I currently work for would respond if they found out that I'm

4  testifying against another pharmaceutical company.  I'm very

5  uncomfortable about it.  I'm very concerned about it.  I do

6  not want to be here.  I can't wait for it to be over.

7  Q.   Ms. Graham, I'm going to try to make that a possibility.

8       MR. RUSS:  I'm going to pass the witness.

9       THE COURT:  All right.  Well, pass the witness to me,

10  no?  There's no more.

11       You're done with your examination?

12       MR. RUSS:  If there's no recross, I'm done.

13       THE COURT:  Ma'am, you're excused from the trial.

14       THE WITNESS:  Thank you.

15       THE COURT:  Hey, folks, we've hit that time.  So I

16  think what I'm going to is we're going to break for lunch, and

17  we'll begin with some new witness testimony when we come back.

18       So let's say 45 minutes.  Let's excuse the jurors, and

19  counsel, just remain for a moment in case there's anything we

20  need to chat about before you run out.

21       All right, thanks.

22       THE DEPUTY COURT CLERK:  All rise.

23       (Jury exits the courtroom.)

24       THE COURT:  You all may be seated.

25       Anything we need to chat about, folks, before we head

GRAHAM - REDIRECT - RUSS

1  out for lunch for 45 minutes?

2          MS. BROWN:  No, Your Honor.

3          MR. RUSS:  No, Your Honor.  Not from Relators.

4          THE COURT:  Nothing from Relators.

5      Anything from defense?

6          MS. BROWN:  No.

7          THE COURT:  All right.  I'll see you all in 45

8  minutes.

9          MR. RUSS:  Oh, Your Honor, the instruction that you

10 wanted us to write, we need to coordinate.

11         THE COURT:  You guys are going to work on that?  Is

12 it something you want to try to do after the lunch break?

13         MR. RUSS:  That would be fine with us.

14         THE COURT:  All right.  And one other thing.  I know

15 I didn't mention this, but let me just mention it now.

16     I think it's appropriate that -- not the end of each

17 day because this is a longer trial.  If this was a one-week

18 trial, I would say at the end of each day.  This is a five,

19 five-and-a-half week case, so at the end of each week, I'd

20 like you all to coordinate on which exhibits have been

21 admitted, that you're on the same page and that you're

22 coordinating with my courtroom deputy so that we don't run

23 into any problems in week three or four.

24     And if there's a discrepancy, it's very easy to

25 reconcile, due to the transcript.  But I would like you to do

GRAHAM - REDIRECT - RUSS

1    that at the kind of end of each week so that we are not

2    waiting five weeks from now to deal with a pile of stuff.

3         The only other thing I was going to ask for is, a lot

4    of times during the trial, a party is looking to move an

5    exhibit in and it hasn't been admitted, there's no objection.

6    I was under the impression that you guys had worked that out

7    and were just going to admit -- here's Exhibit 1 through 1000.

8    We agree.  Let's move to admit them.  There's no objection.

9    And then we don't have to go through this delay every time.

10        Is that not happening, Mr. Marketos?

11         MR. MARKETOS:  That process begins immediately with

12   the next witness.

13         THE COURT:  Okay, perfect, because it just seemed

14   like that wasn't happening and there's no objections and I'm

15   thinking, Well, why don't you just move all these exhibits in

16   so you don't have to ask and just -- they're already admitted;

17   you can publish them.

18        If they're not admitted, I want to be very clear --

19   because that will be a real misstep for you all.  If you look

20   to publish a document that has not been admitted and that

21   later there's an objection to, which is even more problematic,

22   that's on you.  So that's why I'm saying be mindful of just

23   moving in those exhibits.  You can feel comfortable publishing

24   them because they're already admitted.

25        But, again, I'm going to defer to you all if you

GRAHAM - REDIRECT - RUSS

1   continue that practice, but hopefully you'll do that for the

2   next witness.

3        All right.  So anything further before we let you all

4   go?

5              MR. RUSS:  No, Your Honor.

6              MS. BROWN:  Yes.  Sorry, Your Honor.

7        So how is that supposed to work on cross?  So I

8   wouldn't give them to them in advance, like --

9              THE COURT:  It's going to be different for you.

10             MS. BROWN:  Okay, okay.

11             THE COURT:  Right?  Unless there are defense exhibits

12  that are part of this agreement that you have.  If you have

13  exhibits and they have exhibits and you're just all saying,

14  These are admissible, then if you were on cross, since they're

15  already admitted, all you would say is Your Honor, this has

16  been previously admitted.  We move to publish this exhibit.

17             MS. BROWN:  I understand.

18             THE COURT:  So I think, in that context, you could do

19  it.  If you're telling me, because it's cross-examination,

20  you're not clear on what exhibits you're going to use and

21  you're not necessarily going to have an agreement with them,

22  that's fine.

23             MS. BROWN:  I understand.

24             THE COURT:  I'm just saying, if you have an

25  agreement, I think you can move it quicker.

GRAHAM - REDIRECT - RUSS

1        So anything further?

2            MS. BROWN:  No, thank you, Your Honor.

3            THE COURT:  All right, folks.  Be well.  I'll see you

4    back in 45 minutes, which is 1:15.

5            (Luncheon recess was taken from 12:30 to 1:15.)

6            THE DEPUTY COURT CLERK:  All rise.

7            THE COURT:  Folks, do we need to talk about anything?

8        Oh.  I didn't know if you were just going to keep

9    rising and let the jury come in.

10       But do we have something we need to chat about?

11           MR. RUSS:  Just the instruction we talked about, Your

12   Honor.

13           THE COURT:  Oh, yes.  Let's talk about that.

14           MR. MARKETOS:  Your Honor, I just sent our version to

15   them.  They have sent their version to us.  So they haven't

16   had a chance to look at ours yet -- I'm sorry -- over the

17   break.

18           THE COURT:  Oh, I see.  It's two different --

19           MR. MARKETOS:  Well, they proposed one that we don't

20   agree with, respectfully, and then we responded with some

21   language that Mr. Wyatt has not had a chance to look at yet.

22   So I want to give them some time to look at it, but I know

23   we've got to get going.

24           THE COURT:  Well, take a look at it.  I mean, how

25   long is the instruction?

GRAHAM - REDIRECT - RUSS

1          MS. BROWN:  I'm looking at it on behalf of Mr. Wyatt.

2          So I think the issue that got deleted from our version

3     that we would ask to be put back in here is that the

4     Department of Justice is not part of the case.

5          THE COURT:  Right, which is what I recommended.

6     What's the objection to this?  We're not saying they didn't

7     intervene or anything; we're just saying they're not part of

8     the case.

9          MR. MARKETOS:  Yeah, no.  We said without the

10    Department of Justice's direct participation because they're

11    still filing statements of interest and they're still -- they

12    have to approve the dismissal of the case or not.

13         So it's not accurate to say that they're not part of

14    the case.

15         THE COURT:  Well, it's accurate for purposes of the

16    jury.  I mean, if you want to be technical about it -- give me

17    the language again.

18         MR. MARKETOS:  Sure.  Here's what we proposed,

19    Your Honor.

20         In order for a private citizen to bring claims under

21    the False Claims Act, the private citizen must disclose his or

22    her allegations to the Department of Justice.  The private

23    citizen, known as a Relator, may then pursue claims on behalf

24    of the Government without the Department of Justice's direct

25    participation.

GRAHAM - REDIRECT - RUSS

1          That is the case here.

2              THE COURT:  Can you guys email me these things?

3              MR. MARKETOS:  Yes.

4              THE COURT:  Why don't you email me both versions.

5     Let me look at them.  It's hard to do this in a vacuum.

6              MR. RUSS:  And, Your Honor, I know this is very

7     technical, but the Department of Justice is never a party when

8     they intervene.  It's always the United States.  And so it's

9     just trying to get that language right about what the role of

10    the Department of Justice actually is in these cases.

11             THE COURT:  Sorry.  Say it again.

12             MR. RUSS:  So the Department of Justice isn't listed

13    as a party ever, even if the Government brings a False Claims

14    Act.  It's the United States.

15             THE COURT:  Yeah.  These guys don't know this, right?

16    This isn't about -- see, this is where I think you guys

17    misunderstand what's happening here.  This has nothing to do

18    with what's technically accurate.  It has to do with informing

19    this jury in a way that they're not being sidetracked by

20    issues that have absolutely no relevance in this trial.

21             So you keep talking about the Department of Justice,

22    not the United States.  So I'm trying to give them some

23    clarity there that these references to the Department of

24    Justice have really no bearing on this case whatsoever other

25    than it's some formality to bring the lawsuit to federal

GRAHAM - REDIRECT - RUSS

1    court.

2         Am I -- is what I'm saying not being understood?

3    because I feel like I'm being as clear as day, and now you

4    guys want to go through the bible of exactly how a False

5    Claims Act case is brought, which is going to confuse these

6    folks even more.

7         So --

8              MR. MARKETOS:  Right.  I think you can see the

9    proposal, their proposal, that's what it does.

10             THE COURT:  All right.  And who are you sending it to

11   so I know how I'm going to get it?

12             MR. MARKETOS:  What's your preference, Your Honor.

13             THE COURT:  Do you have Kim's email?  I mean, Kim, do

14   you want to get it and print both versions so I can look at it

15   in hard copy?

16        Send your versions to Kim Stillman.  I'll have her

17   print them.  I'll sit for a moment to look at them, and then

18   let's see if we can resolve this.

19             MR. MARKETOS:  And may I make one comment, Your

20   Honor?  Very quickly I'm going to send that to Kim right now.

21        We're going to give -- Your Honor's going to give an

22   instruction on the whole -- this issue to the jurors before

23   they get the case.  Do we think that we should do this right

24   now and maybe actually get them focusing more on the

25   Department of Justice?  I know that they want it, but it seems

GRAHAM - REDIRECT - RUSS

1    to me like we're actually focusing the jurors' attention away

2    from --

3              THE COURT:  What is the instruction that you believe

4    is going to fix all this and cure all this at the end of the

5    trial?

6              MR. MARKETOS:  I think the one that Your Honor gets

7    to look at, which is the -- exactly what we're saying.  They

8    are Relators.  They file a claim.  They have to disclose that

9    to the Department of Justice, and they may pursue --

10             THE COURT:  Wait, I'm sorry.  You say I already have

11   that or the one you're sending to me now?  I'm

12   misunderstanding.

13             MR. MARKETOS:  Yes.  I think the one that we're going

14   to send to you now is ultimately -- Your Honor's going to give

15   some form of that instruction, I assume.

16             THE COURT:  What's the harm -- if I'm giving that at

17   the end, what's the harm in giving it now and at the end?

18             MR. MARKETOS:  It's not.  It's just I'm wondering

19   whether it makes sense to do it now.  If we're thinking about

20   don't think of a pink elephant, does that --

21             THE COURT:  Well, you guys -- the witness you called

22   put that elephant into the room, right, by referring to the

23   Department of Justice on several occasions.

24             MR. MARKETOS:  Okay.

25             THE COURT:  And so we put that before the jury

GRAHAM - REDIRECT - RUSS

1    with -- and if I look at the preliminary instructions, none of

2    the preliminary instructions talk about the False Claims Act

3    and how a case is brought and why they might be hearing about

4    the Department of Justice.

5         So I think waiting five or five and a half weeks to

6    educate them as to why they're going to hear from numerous

7    witnesses about the United States or the Department of

8    Justice -- I think is confusing to them.

9         MR. MARKETOS:  Okay.

10         THE COURT:  And I don't see what the prejudice is.

11   If you want to articulate what the prejudice is to the

12   Relators in doing that not just at the end but once at the

13   outset, what is it?  because I'm just not appreciating it

14   maybe, and maybe there is.

15         MR. MARKETOS:  I'm not claiming a prejudice,

16   Your Honor.  I didn't mean to suggest one.  I was just

17   wondering if it might be confusing.

18        But as we're trying not to -- but I understand your

19   concern.

20         THE COURT:  All right.

21        Ms. Brown, you guys have a version?

22         MR. WYATT:  Yes, we do.

23         THE COURT:  Kim, are you going to print these, and

24   I'll look at them real quick?

25        Are you guys sending them now?

GRAHAM - REDIRECT - RUSS

1           MR. WYATT:  Yes, Your Honor.

2           THE COURT:  All right.

3           (Brief pause.)

4           THE COURT:  Well, I'm definitely -- I can tell you

5      right now that the full instruction from Janssen, I'm not

6      going to sign off on.  So this definitely needs revision, but

7      I'm now going to look at the Relators', because you guys went

8      beyond what I told you to go beyond, so this is what happens

9      to this one.  It goes over there.  So now I'm going to look at

10     the Relators' and see if they listened to me, because I told

11     you not to go beyond the instructions that I gave you.  So now

12     we're going to delay the jury, and I'm going to have to go

13     through this.

14          (Brief pause.)

15          THE COURT:  Where did I tell you all to put in there

16     that the Government reviews all materials and all that,

17     Mr. Wyatt?  Where did I say that if I go back in the

18     transcript, what I told you earlier today?

19          MR. WYATT:  Your Honor, I was simply --

20          THE COURT:  I told you not to go beyond what I said,

21     correct?

22          MR. WYATT:  Yes, Your Honor.  I thought part of what

23     you wanted was an explanation of how the False Claims Act

24     process works.

25          THE COURT:  No.  That's not what I asked for.

GRAHAM - REDIRECT - RUSS

 1          MR. WYATT:  Understood.  And apologies.

 2          (Brief pause.)

 3          MR. MARKETOS:  Ms. Stillman, the subject matter of my

 4   email is "Proposed Instruction RE:  DOJ."

 5          (Brief pause.)

 6          THE COURT:  All right.  Let me run this by you, and

 7   then I'll see what you folks have to say about it.  This is a

 8   little bit of a hybrid between the two.

 9          So you have heard testimony -- this is first going from

10   the Relators' proposed instruction that I added some language

11   to.

12          So:  You have heard testimony from Ms. Donna Graham.

13   Ms. Graham's testimony refers to the Department of Justice or

14   DOJ.  In order for a private citizen to bring claims over the

15   False Claims Act, the private citizen must disclose his or her

16   allegations to the Department of Justice.

17          And then this is my revision, and the rest I took out.

18   I wrote:

19          The private citizen, known as the Relator, may then

20   pursue her claims in federal court.  The Department of Justice

21   was not involved in Ms. Graham's case and is not involved in

22   this case.  Period.

23          I don't want to talk about reviewing materials.  I

24   don't need to really say anything more about the Government

25   doesn't agree or disagree.  I don't know why we -- I think --

GRAHAM - REDIRECT - RUSS

1    what is the objection there from Relator?

2          MR. RUSS:  Your Honor, we're trying to get -- get

3    past this.  They are involved, but we don't have any --

4          THE COURT:  No, no, I understand there may tangential

5    involvement with the Department.  What I'm talking about is in

6    the reality of this courtroom and the trial and what's

7    material or relevant to the jurors, that's not going to be

8    relevant to them, right, that they might still be a part of

9    the case in some way or they may still have some kind of

10    interest, because if you put that before them, the defense is

11    going to come back and say, Wait a minute.  Relators are

12    saying that the Government has an interest in this case as if

13    they agree with the case, and now we want to come in and say

14    they decline to intervene.

15          So, again, I think all that opens the door to more of

16    this infighting as opposed to it's accurate for purposes of

17    the trial.

18          But I want to hear from you.  I mean -- yeah,

19    Mr. Marketos.

20          MR. MARKETOS:  Can we say for our purposes or for the

21    purposes of this trial?  That may be the best way to do it

22    because otherwise, we've got an incorrect statement on the

23    law, and that's the only thing I'm worried about.

24          THE COURT:  All right.  So you want me to say the

25    Department of Justice was not involved in Ms. Graham's case

GRAHAM - REDIRECT - RUSS

1   and is not involved in this case for purposes of this trial?

2           MR. MARKETOS:  Yes, Your Honor.

3           THE COURT:  I mean, I don't think that's going to be

4   confusing.  I don't think they're going to read anything more

5   into it.

6           But let me hear from Mr. Wyatt or --

7           MR. WYATT:  No objection.

8           THE COURT:  All right.  So that's going to be the

9   instruction I'm going to give.

10          Now, now that I've given it at the outset, let me just

11  put one more thing before you.  At the conclusion of the

12  trial, if you all think that you believe more detail should be

13  in it -- it has to be consistent with what you all just agreed

14  to now.  But if you're saying, Look, in the final

15  instructions, Judge, as many of the instructions, are more

16  elaborate -- right? -- it's -- we have more instructions on

17  the elements; we have more instructions about the definitions.

18          If you all think over the next couple of weeks that

19  Hey, we want to propose a more detailed instruction on this

20  for purposes of the final instructions, I will hear from you.

21  But I'm talking about this one-time instruction in real time,

22  Ms. Graham has just testified, but I'm not going to prohibit

23  you all from producing more.

24          So even with respect to Mr. Wyatt, I know I cut off

25  most of your instruction.  I'm not prohibiting you from

GRAHAM - REDIRECT - RUSS

1  revisiting that additional language in the final instruction.

2       Does that make sense?

3          MR. WYATT:  Understood, and appreciate it.

4          THE COURT:  All right.  And that applies to the

5  Relators as well.  There may be additional language that you

6  believe may be pertinent to be more clear in the final

7  instructions because they're more detailed.  You all should

8  still meet and confer on that one instruction.  I understood

9  you met and conferred on all the other final instructions, so

10 this one you're required to meet and confer on as well.

11      But if there's a disagreement, submit to me the one

12 instruction with whatever objections either of you have, and

13 I'll make that call at the charging conference when we address

14 the other disputes.  But that, I will leave you some freedom

15 on.  But for now, it sounds like there's no objections to

16 this.

17      I'm going to give this instruction at the outset of the

18 jury coming in and then you're going to call Ms. Strand?

19          MR. MARKETOS:  That's right, Your Honor.

20          THE COURT:  All right.

21      Bear with me because my chicken scratch is going to be

22 difficult to read here, and I want to make sure I get it

23 verbatim.  So I'm going to rewrite this.

24          (Brief pause.)

25          THE DEPUTY COURT CLERK:  All rise.

GRAHAM - REDIRECT - RUSS

1              (Jury enters the courtroom.)

2              THE COURT:  Folks, why don't everybody have a seat.

3      Welcome back from lunch, folks.

4              Just briefly, I just want to give you a brief

5      instruction, and then we'll continue with witness testimony

6      today.

7              You have heard testimony from Ms. Donna Graham.

8      Ms. Graham's testimony refers to the Department of Justice or

9      DOJ.

10             In order for a private citizen to bring claims under

11     the False Claims Act, the private citizen must disclose his or

12     her allegations to the Department of Justice.  The private

13     citizen, known as the Relator, may then pursue his or her

14     claims in federal court.

15             The Department of Justice was not involved in

16     Ms. Graham's case and is not involved in this case for

17     purposes of this trial.

18             So I just wanted to make sure I gave you that very

19     brief instruction on that reference.

20             With that, Counsel, do we have the next witness

21     available?

22             MR. WIRMANI:  We do, Your Honor.  We call

23     Sara Strand.

24             THE COURT:  All right.  Let's do that.

25             Ma'am, why don't you just come up, and once you get

STRAND - DIRECT - WIRMANI

1  settled in the witness box area, I'm going to have my

2  courtroom deputy just swear you in, okay?

3        MS. STRAND:  Great.  Thank you.

4  (**SARA STRAND**, HAVING BEEN DULY SWORN/AFFIRMED, TESTIFIED AS

5  FOLLOWS:)

6        THE DEPUTY COURT CLERK:  Please state your name and

7  the spelling of your last name for the record.

8        THE WITNESS:  Sara Lee Strand, S-T-R-A-N-D.

9        THE COURT:  All right.  Counsel, whenever you're

10  ready to proceed.

11        MR. WIRMANI:  Thank you, Your Honor.

12  (DIRECT EXAMINATION BY MR. WIRMANI:)

13  Q.  Ms. Strand, good afternoon.  Would you introduce yourself

14  to the jury, please.

15  A.  Sure.  So no laughing.  It's Sara Lee -- I can bake --

16  Strand, and I was the regional business director for the

17  East coast for Tibotec for five and a half years.

18  Q.  And, Ms. Strand, when you refer to Tibotec, at some point

19  did that company become Janssen?

20  A.  Yeah, in 2011.

21  Q.  I want to back up a little.  Where do you live?

22  A.  I currently live in Lake City, Texas.

23  Q.  And at --

24  A.  And at the time that I was in that position, I actually

25  lived in Chicago.

STRAND - DIRECT - WIRMANI

1    Q.   Where did you grow up, Ms. Strand?

2    A.   I was born and raised in Iowa, and that's where I went to

3    college as well.

4    Q.   And where did you go to college?

5    A.   I went to the University of Iowa.  I'm pretty unique

6    because I actually have a Bachelor of Science in nursing,

7    which most people in sales don't have that.  But at the time,

8    it was one of the top ten nursing schools in the country, and

9    it was really rigorous.

10         I paid for a hundred percent of my college education,

11   and I realized -- I'll never forget this -- I had finished

12   120 hours, and it took 128 to graduate, and I realized I

13   didn't want to be a nurse.

14         So I was like, Okay, well, I'll stay, so I stayed

15   another year and took business classes, and then I figured I

16   could marry the two subjects together, and it ended up working

17   out.

18         When I started interviewing for positions, the

19   pharmaceutical companies and the insurance companies were very

20   interested --

21   Q.   Ms. Strand, let me stop you right there.

22   A.   Yep.  No problem.

23   Q.   We got to do question and answer or else the judge is

24   going to get upset with me.

25         So when you left -- after you graduated from college,

STRAND - DIRECT - WIRMANI

1    did you get into the pharmaceutical industry?

2    A.    Yeah.

3    Q.    What was your first position?

4    A.    So I worked for a small company in Minneapolis called

5    Upsher-Smith Laboratories.

6    Q.    What did you do for Upsher-Smith Laboratories?

7    A.    The first year I was there, I was in inside sales, so

8    telephone sales, and then I was promoted after a year, and I

9    was an account manager, so I called on everything from

10   wholesalers who distributed the drugs to big retail chains

11   like Walgreens and Rite Aid and managed care organizations.

12   Q.    Okay.

13         How long did you stay in that position for?

14   A.    For two years.

15   Q.    What did you do next?

16   A.    After that, I had -- all of my nursing had been done in

17   oncology.  That was part of why I didn't like it, too, was it

18   tugged at my heart too much.

19         And so I was recruited by an oncology company that was

20   selling chemotherapy drugs, and that's where I went to work

21   for.  And I wanted to leave the other company because they

22   didn't really do research and development, where this company

23   was constantly developing new products.

24   Q.    What was name of that new company?

25   A.    Adria Laboratories.

STRAND - DIRECT - WIRMANI

1    Q.  Were they particular oncology drugs that you sold during

2    your time there?

3    A.  Yeah.  Adriamycin is, like, a really common drug that's

4    used for -- it has, like, 27 different tumor types that it

5    works on, so that was my main product.  I launched a drug for

6    acute myelocytic leukemia while I was there.

7         And then in 1992, this was my first entry into the HIV

8    market.  We sold a product for -- it was called Mycobutin.  It

9    was for an opportunistic infection for HIV patients.

10   Q.  And when you say you sold these products, describe to the

11   jury:  What do you mean by that?  Sold them to whom?

12   A.  Yeah.  So I would call on physician oncologists and tell

13   them about the research and talk to them about the products.

14        I would call on buyers like -- based in Minneapolis, I

15   had -- Mayo Clinic was one of my largest accounts, so I would

16   talk to purchasing agents there.

17        I was, you know, responsible for making the sales

18   numbers in my geography, which included Iowa and Minnesota at

19   the time.

20   Q.  And when you say you called on these doctors, do you mean

21   by telephone?  Did you go to their offices?

22   A.  Yeah.  I made in-person phone calls, and the nurses were

23   also really critical because they're the ones that give the

24   oncology drugs and the chemotherapy, so I spent a lot of time

25   talking to nurses as well, but it was always face-to-face that

STRAND - DIRECT - WIRMANI

1    I was with them.

2    Q.   And you mentioned -- was there an HIV drug that you sold

3    during that time period?

4    A.   Yeah.

5    Q.   What was that drug?

6    A.   So it was a drug for -- so if you had HIV, obviously your

7    blood cells are really low, and you're susceptible to getting

8    a lot more infections.

9        So it was drug for MAC infection, which is myco --

10    acute bacteria, and it was like a bacteria that got in your

11    system and could kill patients.  I mean, it basically took

12    over your entire body and made patients really sick.

13    Q.   At what time frame were you selling the HIV drug?

14    A.   That was from '92 to '97.

15    Q.   Okay.

16        In 1997, where did you go next in your career?

17    A.   Before I left Atria Laboratories, they actually decided

18    to do a managed care group.  They promoted ten of us, and I

19    was chosen to be one of the people in that group.

20        So I actually -- based in Minneapolis, so I learned

21    that I had some huge accounts, so I learned all about managed

22    care, and I would sell, like, to insurance companies, PBMs,

23    which are like distributors of the drugs, through insurance

24    companies.

25        I would do clinical presentations to people that were

STRAND - DIRECT - WIRMANI

1  on the formulary committees, so that's how I was involved in

2  that.

3  Q.   And how long did you do that for?

4  A.   I did that for the last two years that I was there.

5  Q.   And where did you go next in terms of career?

6  A.   So at that time, pharmaceutical companies are notorious

7  for merging, and so originally we were -- Adria was kind of

8  owned by Pharmacia so they were called Pharmacia.

9       And then Upjohn purchased Pharmacia, and then

10  Warner-Lambert purchased Pharmacia and Upjohn, and then

11  eventually Pfizer purchased us.

12      So I guess I was at -- at that point I left, basically,

13  because they wanted me to move to Omaha, Nebraska, and I had

14  been calling on all these national accounts, and they wanted

15  me to take these really tiny accounts, and I just didn't feel

16  like I was going to be challenged.

17  Q.   So what was your next challenge then after that?

18  A.   So at that time then I had learned about an HIV company

19  that was -- it was a brand new startup company.  It was based

20  in California.  Some of my friends had gone there that I'd

21  worked with previously.

22      And so I learned about that opportunity, and I

23  interviewed with them, and I kind of got tired -- I mean, I

24  won a lot of president cups for having high sales, but I just

25  got tired of like -- you always have the numbers hanging over

STRAND - DIRECT - WIRMANI

1    your head.  You always have to produce, you know, and

2    constantly be at the top of your game.

3         And so this was an opportunity for me to get kind of

4    back into my nursing side of things.  So I went to that

5    company, and I was a science liaison, which meant I worked on

6    everything from Phase 1 through 4 clinical trials, and I also

7    called only key opinion leaders.  I presented the data to

8    them.

9    Q.   What particular medical field?

10   A.   So that was an HIV product.  And it was -- at the time it

11   was the fourth protease inhibitor that was on the marketplace,

12   but it was the first one that was actually extremely effective

13   and tolerable for the patients to take.

14        Prior to that, the drugs had either been too weak, or

15   they had so many side effects, that it was impossible for

16   anybody to stay on them very long.

17   Q.   When you said you were doing clinical research, kind of

18   describe that to the jury.  What were you doing?

19   A.   Yeah.  So the way clinical research works -- and I don't

20   mean to insult anybody's intelligence, but there's a lot of

21   kind of clinical things I'll talk about today.

22        So a Phase 1 study is usually done in animals.  A

23   Phase 2 study is typically done to look at the dosing, so

24   they're looking at different doses in patients to see how

25   they'll do.

STRAND - DIRECT - WIRMANI

1          And then a Phase 3 study is like a full-blown study

2     with patients, and they have a placebo arm.

3          And then a Phase 4 study is anything that's after it's

4     already been approved with the FDA.

5          So I was involved in all of those.

6     Q.   So was the end goal of those clinical studies to

7     ultimately get FDA approval for that drug?

8     A.   Yeah, because of the need at the time.  We actually got

9     approval based on a Phase 2 study, the dose finding study,

10    because there were just no drugs to help these people, and it

11    was such a need and a life-threatening need.

12         So the FDA will approve products like that on

13    accelerated approval, and then they basically make demands on

14    you that you must go on and finish these other studies and

15    then go back and apply to them again, and then they'll give

16    you full approval.

17         But when there's such a need, they will approve it

18    early.

19    Q.   And just to orient the jury, what time frame is this now

20    that you're doing these clinical studies?

21    A.   This was from January of 1997, and I did that until 2000.

22    Q.   What did you do in 2000?

23    A.   I always wanted to be a manager, and when one of the

24    purchases came through, the Pfizer purchase -- or actually it

25    was the Warner-Lambert purchase they had the opportunity to

1    expand, so they were going to put more districts in place.

2         And so I kind of begged the national sales director to

3    give me an opportunity to be a district sales manager, and so

4    I -- at the time I lived in Minneapolis, and I moved to

5    Cincinnati, Ohio, and had that opportunity to manage people

6    for the first time.

7    Q.   And what type of -- what were your salespeople selling

8    when you were managing in that position?

9    A.   So the entire time they were selling the protease

10   inhibitor.  It was called Viracept.  And we really didn't have

11   any other products until the very end when I was about ready

12   to leave.

13        We had bought a drug that Upjohn had that was called

14   Delavirdine, which was not really used very frequently.  We

15   had purchased it because we thought it might boost other drugs

16   like protease inhibitors.

17        And boost means like the drugs not strong enough on its

18   own, so sometimes you can combine it with another drug, and it

19   will make it efficacious, so that was kind of their hope with

20   that drug.

21   Q.   You mentioned protease inhibitor.  The jury may have

22   heard that term.  Can you tell them what that is?

23   A.   Yeah.  So a protease inhibitor basically, like, works

24   specifically on the virus.

25        First, to kind of give you an understanding, if you

STRAND - DIRECT - WIRMANI

1  have HIV, you have a virus in your body.  You're not

2  considered to have AIDS until your virus gets to the point

3  where you have less -- 200 or less like virals floating around

4  in your blood.

5       So like when Magic Johnson -- and I think you probably

6  all remember that, that was like a big breakthrough that he

7  was diagnosed with AIDS, and when he said he was cured, it was

8  because he became undetectable.  But he had full-blown AIDS.

9  His viral load was 200 or less.

10      Did I answer that?

11 Q.   You did, thank you.

12      And that protease inhibitor you guys were selling is

13 that one of the early stage protease inhibitors?

14 A.   Yeah.  It was the first drug that patients could really

15 tolerate and it worked really well.  It did cause diarrhea in

16 patients.

17      But overall, it was -- I mean, it worked miracles

18 because when I first went there, people were dying all the

19 time.  Like I remember I called on this doctor.  His name was

20 Keith Henry, and he was in Minneapolis.

21      And I went in to call on him, and he was like, Today is

22 not a good day, I can't talk to you, Sara, and this is like

23 3 o'clock in the afternoon.  And he goes, I had five patients

24 die today and the last one sat up in bed and said to me, You

25 did this to me.

STRAND - DIRECT - WIRMANI

1          And the guy was just, like, beside himself and felt --

2     I'm like, Okay, see you later, because that's how it was at

3     that time.

4          I mean, people were -- people were doing reverse

5     mortgages on their house.  They were selling life insurance

6     policies.  I mean, there was just no hope that you were going

7     to make it.

8     Q.   And you said you were at a district manager role there.

9     Where did you go next?

10    A.   So I stayed in that role.  I was successful for several

11    years, and then after that, we had moved to Cincinnati, like I

12    said, and I was told I would be there two years.

13         We weren't really enamored with Cincinnati, and my kids

14    were really getting far behind with the school systems, and my

15    daughter was about ready to go to middle school.

16         And so at that time, Pfizer had purchased

17    Warner-Lambert, Pharmacia, Upjohn.  So I had the opportunity.

18    They were expanding.

19         And so I had the opportunity to interview for an

20    oncology district manager job in Chicago.  And it was actually

21    the people that I had worked with at Adria Laboratories.  It

22    was all of those same people.

23         So they knew my reputation.  They knew my work ethic,

24    so I was able to move to Chicago and be a district manager in

25    oncology for Pfizer.

STRAND - DIRECT - WIRMANI

1    Q.   After Pfizer, what did you do next?

2    A.   So actually, while I was at Pfizer, about a year into it,

3    Deb O'Connor from Tibotec, from Janssen, had called me and

4    asked me to be the regional business director for the

5    East Coast.

6         I had worked with her at Agouron, and she knew that I

7    had been very successful, and she called, and she just said,

8    Sara, you're ready for the next, you know, level in your

9    career path and I really think you could do this job and --

10   but you've got to come move to New Jersey.

11        And I had promised my daughter -- she had already moved

12   like three times then, and I promised her I wouldn't move her

13   when she was in high school, and I just -- I said it to her,

14   you know, I love the opportunity.  I'm flattered that you

15   called me, but we have even hardly unpacked the boxes, and my

16   husband is going to kill me if I tell him I want to move to

17   New Jersey.

18        So I just, you know, said no.  Passed gracefully, and I

19   was very happy at Pfizer in the oncology position.  So I

20   stayed there.

21   Q.   But to be clear, nothing against the state of New Jersey?

22   A.   Right.

23   Q.   Okay.

24        So you had said you were recruited by Deb O'Connor.

25   Who is Deb O'Connor?

STRAND - DIRECT - WIRMANI

1   A.   So Deb O'Connor was the national director at Janssen in

2   the HIV division, and she had been like a regional business

3   director at Agouron the entire time that I was there.

4   Q.   And did you eventually go to work at Janssen?

5   A.   Yeah, so again, I kind of had put all of that out of my

6   mind, but a lot of people that I had worked with Agouron,

7   there was an opening in Chicago for a district manager for

8   Janssen.

9        And so they started calling me saying, You got to come

10  over and work with us.  I remember Frank Murphy was one of

11  them.  Tony Dolisi in New York, I had worked with them.  I'd

12  worked with Scott Libby in Florida, and some of the sales reps

13  knew me too.

14       And so they were all like, you know, You really need to

15  come to this company, and the person that was hiring me was

16  Cheryl Gay who ended up being my counterpart as the regional

17  business director, and she had just heard such great things

18  about me that she even called me and said, you know, Please

19  just come in and talk to me.

20       And so I went in in December and I was hired as a

21  district manager there.

22  Q.   You mentioned some names that we are going to talk about

23  today so I just wanted to point out to the jury -- you

24  mentioned Tony Dolisi.  Who is he?

25  A.   So Tony Dolisi was a -- I'm trying to think.  He was

STRAND - DIRECT - WIRMANI

1    originally a sales representatives at Agouron.  Then he got

2    promoted to, like, a key account manager, and then I believe

3    he was a district manager when he left Agouron as well.

4    Q.   Okay.

5         You mentioned Frank Murphy?

6    A.   Yeah.  Frank Murphy, he was a district manager at Agouron

7    as well.

8    Q.   And then Scott Libby?

9    A.   Scott Libby had been a manager with me at Agouron as

10   well.

11   Q.   And all these folks had moved over to Janssen?

12   A.   Yeah.

13   Q.   All right.

14        And you said you got this district manager role.  Were

15   you eventually pretty quickly promoted at Janssen?

16   A.   Yeah.  So Cheryl that was my counterpart didn't have any

17   HIV background experience, and she also hadn't necessarily

18   hired a lot of people, and I had because I had been at, you

19   know, like a lot of startup companies.

20        And so when I was brought in, Deb O'Connor basically

21   said to me, Sara, I know you're district manager, but you're

22   right there in Chicago with Cheryl, I'd like you to help her

23   hire kind of the entire sales force for Tibotec for Janssen's

24   HIV firm because you know the HIV providers.

25        So if people throw out names, you'll know if that's

STRAND - DIRECT - WIRMANI

1  really a legitimate provider or they're a big name.  You'll

2  also know just the disease state, and, you know, you know

3  who's good in this field.

4        And it would have a very limited field.  I mean, you

5  could have only worked for four companies in HIV at that

6  point.

7        And then I had a lot of hiring experience, so she just

8  said, I'd like you to kind of oversee that in your role.

9  Q.  So you did that from your district manager position?

10  A.  Right.

11  Q.  And then were you eventually promoted to be regional

12  business director of the East?

13  A.  Yeah.  So then it was about, I don't know, the end of

14  January or February, and I got a call again from Deb O'Connor

15  and just completely out of the blue.  I remember I was out in

16  the field working with a rep, and it just kind of, like, threw

17  me off, and she goes, you know, Sara, she goes we have had so

18  many come through here and interview for this regional

19  business director on the East, and it's like we're trying to

20  put, you know, a square peg in a round hole.  We're just not

21  finding the person that we need, and you're -- we just know

22  you're like the perfect fit that we really need.

23        So she said, I drummed up an idea, listen to me and

24  think about this.  And she said, What if I made you the East

25  regional business director, but I let you stay in Chicago.

STRAND - DIRECT - WIRMANI

1    You wouldn't have to move.

2         There could be some synergy there because Cheryl was

3    based in Chicago too.  There was a Janssen office there that

4    we went to.  We had an assistant there.

5         And so really it was great because we could collaborate

6    together.  We could, you know -- we had offices right next to

7    each other, and so I was like, I would do that, you know.  It

8    meant a lot of travel for me because I had to come to

9    New Jersey almost every single week.

10        But it was an opportunity I was really looking for, and

11   I was excited, and so I was given that position, and I started

12   April 1st in that role prior to us having the drug approved

13   for HIV.

14   Q.   Let me stop you there, Ms. Strand.  Remind the jury, what

15   year is this?

16   A.   So this was 2006.  December 2006 was when I joined the

17   company.

18   Q.   You mentioned that you hadn't had the drug approved yet.

19        At this point in time did Janssen have an HIV product

20   on the market?

21   A.   No.  They had, like, a really tiny sales force that was

22   selling a drug called Procrit, which is for -- like when you

23   take chemotherapy and your white blood cells get so low, you

24   get really sick.

25        So they were selling that, just kind of a placeholder

STRAND - DIRECT - WIRMANI

1    because they wanted to keep up the relationships with HIV

2    providers they had.  And so that's -- so, you know, I didn't

3    even really -- honestly I was busy hiring.  I didn't really

4    sell Procrit or have too much to do with it.

5    Q.   Okay.

6         So you're hiring up this HIV sales force.  You're in

7    the Chicago office, and your counterpart for the western

8    United States is in that same office?

9    A.   Yep.

10   Q.   Okay.

11        How do you go about hiring HIV sales force?  What are

12   you looking for in terms of bringing on folks to eventually

13   sell this new drug?

14   A.   Yeah.  So we were looking for people that -- at that

15   point in time, like I mentioned 1992 was about the time when

16   anybody could have started selling an HIV drug.

17        So we were looking for people that had a lot of

18   experience in that, and the reason being is because we knew we

19   didn't have time to build relationships with doctors.  We

20   needed to get this drug off the ground quickly.

21        And so if you had a sales rep that had already called

22   on this doctor for five years, they knew the back door into

23   their office.  They knew how to get in.  They -- they could

24   definitely see the provider.

25        And a lot of times at these big teaching institutes,

1    you get shut off at the front door.  You can't get in, and if

2    you don't have a relationship, it can take you years to build

3    that with that doctor, and you may not even ever get in

4    because they're not going to let you in the front door.

5        But these people knew these providers, had worked with

6    them a long time.  The providers trusted them, you know, and

7    they understood why they were changing companies because it

8    was like the drugs kept getting better and better.

9        So it made sense that they would progress on to the

10   next company.

11   Q.  And I think you touched on it a little bit, but why is

12   that -- why is that trust relationship so important in hiring

13   your sales staff to sell this HIV drug?

14   A.  As you probably learned over the last couple days, HIV is

15   a really complicated disease state, and there's a lot of like

16   jargon, and just it takes you a long time.  I remember when I

17   first got into, it was kind of Greek to me because, you know,

18   you have to learn all these different names.

19       And not only do they have different brand names, then

20   they have a generic name and then sometimes just go by

21   initials.

22       So if you hire people that already had those

23   experiences, they understood the whole marketplace, and they

24   would be able to call up the doctor and get an appointment

25   with them immediately, so we knew we could get in.

STRAND - DIRECT - WIRMANI

1          So that's what we are really looking for, and people

2     that had been successful, and they were respected.  I mean,

3     again, it's not an easy product to sell, but they were

4     respected that they knew the science and could understand the

5     science.

6  Q.   How many sales people did you ultimately have under

7     your -- your authority at Janssen?

8  A.   So I had 60 sales reps and 5 district managers to start

9     with, and then we expanded, and I ended up having 6 district

10    managers, and then the key account management group was like a

11    separate group.  They had originally reported to Tony Dolisi

12    and to Mark Wilhelm, and then they decided to kind of dissolve

13    that group and just roll them into the sales force.

14         So that brought me up to 72 reps.

15  Q.   And you mentioned it.  So what is a key account manager?

16  A.   So a key account manager is -- I guess the best way to

17    describe him is they're kind of like a super rep.  They can't

18    really talk anymore than we can as far as on-label.  They're

19    restricted by the same guidelines as we are, but the

20    difference is they have a very small customer base, and it's

21    more they're calling on people that are very influential that

22    are like speakers that work at teaching hospitals.  They're

23    not really dealing so much with the community people, and

24    they're just more like high science, you know, trying to talk

25    at that level.

1  Q.   And you mentioned, you said, five or six regional

2  directors.  Was Frank Murphy one of them?

3  A.   Yeah.  Frank Murphy was one of them from the very start

4  that reported to me.

5  Q.   Chris Cruz, was he also one of them?

6  A.   Yeah.  He was in Boston.

7  Q.   What about above you, kind of?  What was the chain of

8  command going up the Janssen ladder?

9  A.   Yeah.  So I reported directly up to Deb O'Connor, who was

10  the national sales director, and then she reported to a woman

11  named Gail Scazorski.  She was, like, the vice president of

12  commercial, and she had come from Merck.  She had one sole one

13  of the protease inhibitors that had been very successful.  I

14  mean, it was a great drug, but, again, it had so many side

15  effects.

16       I mean, I remember a patient coming in and talking to

17  us, and they literally carried around jugs of water, like a

18  milk gallon jug, because they had to drink so much water

19  because the drug caused, like, the sludge in their system and,

20  you know, it would get so -- it was like kidney stones, if

21  you've ever had a kidney stone, they just -- and they had to

22  drink that much water every single day.  I mean, it was just

23  terrible for them.

24       And so she had launched that drug and had been in HIV

25  and had, you know, very good knowledge of the marketplace.

STRAND - DIRECT - WIRMANI

1          And then Gail reported up to Glenn Mattes, who was the

2    president of Janssen's HIV division.

3    Q.   Okay.

4          And then just at a high level, kind of once you hire

5    this HIV sales force, what are your day-to-day duties and

6    responsibilities at the company?

7    A.   So you have to understand that now Janssen has put

8    this -- you know, all their different divisions together and

9    have one name.  But they used to have -- if you sold, like,

10   medical equipment, it was one name.  If you sold, you know,

11   the Procrit product, it was a different name.  If you sold HIV

12   products, it was a different name.

13         And so Tibotec was completely independent.  I mean, our

14   checks came from Ortho Biotech, but we had our own HR

15   division, we had our own everything.  I mean, we totally

16   operated on an island by ourself.

17         And so I was responsible -- I mean, we're trying to set

18   things up for the future, so I did things like, you know, we

19   wanted to make sure we had career letters for people.  So, you

20   know, you could be like a rep, you could be a senior rep, you

21   could be an executive rep.  So I put criteria together for

22   things like that.

23         I was involved with the incentive comp plan, talking to

24   people on that side of, you know, what it should look like.

25         I would work with reps and try to get to know them.  I

STRAND - DIRECT - WIRMANI

1  would work with the sales managers.  They were in the process

2  of hiring people.

3       So pretty much anybody that got hired had to interview

4  with me as well.  I kind of put the final stamp on it.  You

5  know, the manager would identify the last person and then I

6  would interview them.

7       And then I was also very involved in, like, just all

8  the preplanning.  I mean, when a new product comes to market,

9  there are lots and lots of different things to do.  And I had

10  to know everything from reimbursement to clinical to kind of

11  the marketing side of things, and the sales side.  So I was

12  responsible kind of for coordinating all of that and making

13  sure that the East was going to be successful.

14  Q.   So you had a pretty good view into kind of the entirety

15  of what was going on in the eastern part of the United States.

16       Is that fair?

17  A.   That's very fair.

18  Q.   I think you mentioned Mark Wilhelm earlier.  What was his

19  position?

20  A.   He was over the key account managers on the West Coast.

21  Q.   And you know Donna Graham, correct?

22  A.   Right.

23  Q.   Does Donna Graham work with you today?

24  A.   Yeah.  I actually have hired her at other companies.

25  Q.   Okay.

STRAND - DIRECT - WIRMANI

1  A.   We don't talk about this because honestly, I didn't want

2  anybody to know I was really involved in this.  And it's just

3  been kind of hush-hush.

4  Q.   And because -- Donna Graham, is it your understanding

5  she's in a relationship with Mark Wilhelm?

6  A.   Correct.

7  Q.   Because of that, have you seen Mark over the years since

8  you left Janssen?

9  A.   Yeah.  When I left -- I lived in Chicago for quite a

10  while, and then I moved to Colorado for about two and a half

11  years.  And when I moved out there, I moved with my children.

12  I was divorced at that point.  I didn't know anybody in

13  Denver.  But I took a job there.  And my kids, within about

14  two weeks, both went off to college, and I found myself an

15  empty nester with no friends and not knowing anyone in the

16  community.

17        So I had called -- I knew that Donna and Mark lived

18  there, and so I had called them.  And I really didn't see them

19  very frequently.  I mean, I think I went to their house two

20  times to have dinner with them and just kind of catch up and,

21  you know, they told me things to do in the area and that.

22        And, you know, eventually I made other friends.  And I

23  love to play golf and got on a women's golf league and stuff,

24  so that kind of helped.

25        But I didn't socialize with them that much.

STRAND - DIRECT - WIRMANI

1    Q.   Sure.

2         What about a salesperson named Matt Grooms?  Did you

3    know him?

4    A.   Yeah.  You know, I just know him that he was a

5    salesperson that was at the company.  He was based in Kansas

6    City.  I don't know how he left the company.  I'm not sure it

7    was on good terms.  But I know that he interviewed with a

8    company that I was with previously called Vyera.  He wouldn't

9    have reported to me, but I sat in on the interview because I

10   was with another manager and that manager wanted my opinion.

11        And so that's the last time I saw him.

12   Q.   Okay.

13        No ongoing friendship with Matt Grooms?

14   A.   No, I don't have his phone number or anything.

15   Q.   Would you ever have considered him to be a friend of

16   yours?

17   A.   Not really.  It was a colleague that I just, you know...

18   Q.   And was he under your leadership a couple steps down?

19   A.   I'm pretty sure he was reported to the West the entire

20   time I was there, so I don't think he was ever under my

21   leadership.

22   Q.   Okay.

23        What about a salesperson named Joseph Holshoe?  Did you

24   have any ongoing relationship with him?

25   A.   Yeah.  I actually knew Joe much better because he was in

STRAND - DIRECT - WIRMANI

1   my region.  So he reported to Chris Cruz who was based in

2   Boston.  And Joe had struggled with his sales, and eventually

3   Chris Cruz was term- -- well, he wasn't terminated.  I think

4   he was moved to a different division because we weren't happy

5   with his performance, and Joe Holshoe had been put on a

6   performance improvement plan.  And so consequently I got to go

7   out and work with him all the time because, you know, you

8   couldn't evaluate him if you weren't in the field with him and

9   stuff.

10          So he's based in Rhode Island.  A lot of times I'd have

11  to fly in on a Sunday night, I'd spend a few days in the field

12  with him, but that's -- other than that -- and, you know, I

13  believe he ended up finding another job.  We didn't terminate

14  him, but...

15  Q.   Was your relationship with him purely professional or was

16  it friends?

17  A.   No.  Purely professional.  And especially -- I mean,

18  that's a tense situation when you get in the car with somebody

19  that's on a performance improvement plan.  They're, obviously,

20  not real happy with you, and, you know.  But I was always very

21  fair with him and, you know, tried to give him advice and help

22  him to make him better.

23  Q.   I mean, you were basically Joe Holshoe's indirect boss;

24  is that fair?

25  A.   Yes.

STRAND - DIRECT - WIRMANI

1  Q.  What about Christine Brancaccio and Jessica Penelow, did

2  they work in your region?

3  A.  Yeah.  Both of them are in my region, New York.

4       I remember working with Christina I think definitely

5  one time, maybe two times.  All I remember is that she was a

6  really good sales rep.  She had great relationships with

7  people.  And, you know, we had fun in the car together.  We

8  had some personal things that we shared back and forth, you

9  know.  I remember laughing and having a good day with her.

10      But other than that, I didn't have any kind of

11  relationship with her.  I mean, I probably talked to her at

12  sales meetings.

13      And Jessica came on a little bit later.  I think she

14  was hired -- and I could be wrong about this.  But I think she

15  was hired after the launch of the product and, you know, like

16  she was in Frank Murphy's district.  You know, I just remember

17  her, like, at plan of action meetings, being there and making

18  comments and stuff.

19      But I didn't really talk to her too much at the

20  meetings.

21  Q.  Was your relationship with Ms. Brancaccio or Ms. Penelow,

22  was it any different than the other 60 or 70 salespeople that

23  you oversaw during your time at Janssen?

24  A.  No.  And, you know, I mean, there were some sales reps

25  that I would have kept their phone number and stayed in touch

STRAND - DIRECT - WIRMANI

1    with, but those two, I didn't ever stay in touch.  It was

2    strictly a, you know, platonic working relationship.

3    Q.    When is the first time you saw them since you've left the

4    company?

5    A.    I'm trying to think.  Last night at dinner.  They were in

6    a room at the hotel where I was staying, and that was the

7    first time I've seen them since I left the company in 2011.

8    Q.    Okay.

9          And to be clear, you were preparing for trial, and

10   there was a number of different people --

11   A.    Right.

12   Q.    -- having dinner, correct?

13   A.    Yeah.  And I didn't -- I mean, we said hi -- like, we

14   hadn't seen each other in so long that it was kind of like,

15   oh, I -- I didn't even recognize one of them at first, you

16   know.

17         But we just kind of -- they sat at the complete

18   opposite end of the table, and I sat down here, and then I had

19   to go prep for today.  And so I still haven't had a chance to

20   even catch up with them or know too much about their personal

21   lives.

22   Q.    And you and me met last night to kind of get ready for

23   your testimony.  Fair?

24   A.    Yes.

25   Q.    And we looked at some documents that we're going to look

STRAND - DIRECT - WIRMANI

1    at in court today.

2         Fair?

3    A.    Right, yep.

4    Q.    Do you have any financial interest in this case

5    whatsoever, ma'am?

6    A.    None.  And I would tell you, if my heart wasn't in this

7    and I didn't feel like Janssen did not one thing but multiple

8    things that were completely illegal and made me feel

9    uncomfortable and a nervous wreck the entire time I worked

10   there, I wouldn't be here, because I've spent just -- it's

11   been time-consuming, nerve-wracking.  You know, it's -- and I

12   get nothing out of it at all.

13   Q.    Have you spent most of the time in the last day or two

14   just on the phone, just trying to do other work?

15   A.    Yeah.  I mean, I've tried to balance my real job right

16   now.  I mean, I'm still a district manager.  I still have nine

17   people that report to me.  So yesterday, I had a conference

18   call with my team and tried to do some other things for my job

19   as well.

20   Q.    So I want to talk about, you know, kind of the HIV

21   disease state when you got to Janssen.

22         So how much collective experience did you have in HIV

23   sales by the time you got to Janssen?

24   A.    By the time I was there, I had over ten years of HIV

25   experience.  And that was pretty typical of most of the people

STRAND - DIRECT - WIRMANI

1  that we hired.  They had anywhere from five to 12 years or so.

2  Q.   And you talked earlier about some of these stories of

3  early drugs and some of the struggles that patients and

4  doctors had.

5       Kind of where were we in terms of HIV treatment in 2006

6  when Janssen was ramping up for the launch of its first drug?

7  A.   So at that time -- I mean, we were excited about this

8  drug because it worked for patients that were resistant.  They

9  had no other options.  So this was going to be something great

10 that they were going to be able to take.

11      But the market had evolved so much by then.  You know,

12 I think the first protease inhibitor was approved in 1995.  So

13 this is now -- what, 2006?  Am I correct?  Yeah.  And so they

14 were, like, the sixth protease inhibitor to the marketplace.

15 A couple that had come before, one of the Bristol-Myer

16 products, Reyataz, as well as Kaletra, that was made by

17 Abbott, those were both really dominating the market share,

18 and they were well tolerated, and people were undetectable --

19 so you couldn't find the virus in their blood.

20      So there was -- they were pretty satisfied.  There was

21 really no reason to change therapy for a lot of these patients

22 at that point in time.

23 Q.   And you said there were six to seven protease inhibitors.

24 How many collective HIV antiretroviral drugs were there on the

25 market --

STRAND - DIRECT - WIRMANI

```
 1  A.   Yeah --
 2  Q.   -- in 2012.
 3  A.   By that point in time, there were about 12 different
 4  products in, like -- with three different mechanisms of
 5  action.
 6  Q.   And were those products, were they working in terms of,
 7  you know, suppressing the virus and allowing these patients to
 8  live largely normal lives?
 9  A.   Yes.  It was the first time that -- like, they could plan
10  for their future or, you know, it was a huge turnaround.
11       And actually, Viracept, the very first drug I sold,
12  really, like, made a difference for people.  That was kind of
13  the turning point.
14  Q.   You mentioned the launch of Janssen's first drug.  Was
15  that Prezista?
16  A.   Yes, it was.
17  Q.   Do you remember approximately when that drug was
18  launched?
19  A.   I believe it was in June of 2006.
20  Q.   Did Prezista have limitations on its FDA-approved
21  labeling that made its market share pretty small in the HIV
22  space?
23  A.   Yeah.  You had to have failed other antiretroviral
24  therapies, and you had to fail specifically another protease
25  inhibitor in order to qualify to take Prezista.
```

STRAND - DIRECT - WIRMANI

1  Q.   Are you familiar with the term "treatment experienced"?

2  A.   Yes.

3  Q.   Okay.

4       Was Prezista approved only for treatment-experienced

5  patients at that point in time?

6  A.   Yes, it was.

7  Q.   Was it all treatment-experienced patients?

8  A.   Again, it had specific things that they had to fail, a

9  protease inhibitor, another brand of protease inhibitor, and

10 they had to fail another therapy before they could go on it.

11 Q.   Okay.

12      Do you have a sense for -- you know, kind of given the

13 label, a sense for what market share, how large the market was

14 for Janssen to sell Prezista on-label to at that point in

15 time?

16 A.   Yeah.  It seemed like every meeting I went to they always

17 put up this chart that showed you the number of naive patients

18 and the number of treatment-experienced patients.  It came

19 from a publication called the MMWR.  I think it stands for

20 Morbidity and Mortality Weekly Report.  It was put out by the

21 CDC.

22      So it broke, kind of, the epidemiology down of

23 everything from, you know, were more Caucasians or, you know,

24 blacks getting HIV; the age group span that was getting HIV;

25 how many people were in treatment; how many people were, you

STRAND - DIRECT - WIRMANI

1    know, resistant to other products.

2        But when you looked at that chart, it was very clear

3    that there were a huge amount more of the treatment-naive

4    patients.  So it was probably about two-thirds of the patients

5    fell in that category, and only a third were over here in the

6    treatment experienced.

7        And that didn't count.  There were also -- like, not on

8    the chart.  There were also these people over here that were

9    HIV positive.  They just didn't want to admit that they had

10   it, weren't ready to start therapy, couldn't deal with it.  Or

11   maybe they didn't know they had it yet.  So if you added those

12   in, I mean, it was definitely probably more like 80/20.

13   Q.  As a sales rep, are there additional challenges in

14   selling a new drug to a treatment-experienced patient?

15   A.  Yeah.  Again, it's a very complicated disease, but they

16   had to -- they had to fail things, and they would get

17   resistant.  If you think about, like, resistance to, you

18   know pen- -- or not penicillin, to antibiotics, they had to be

19   susceptible to the drug.  So, you know, they had to take that

20   into consideration.

21   Q.  And was there actually testing that had to be done before

22   a patient could be put on Prezista?

23   A.  Yes, there was.

24   Q.  What was the purpose of that testing?

25   A.  So there were two different kinds of testing:  phenotype

STRAND - DIRECT - WIRMANI

1    and genotype testing.

2         The genotype testing was where they took the patient's

3    blood and they could see which, like, mutations they had so

4    they could name them off and say, This patient is not going to

5    respond to this because they already have this mutation.

6    Like, K103N was a common one, R65.

7         And the phenotype was they would actually take your

8    blood and then put all the other drugs that were available,

9    all the other treatments with it, and then it would come back

10   and say, like, this drug should be good for this patient.

11        So it was two different types of tests they had.

12   Q.   And did every treatment-experienced patient pass that

13   test and qualify for Prezista, or was it only a portion that

14   passed?

15   A.   No.  There were only a portion of patients.  I mean, I

16   would say the majority did qualify for Prezista.  They, you

17   know, had failed the protease inhibitor because that was the

18   most common drug on the market.  But there were, you know, a

19   few people that had developed a mutation and couldn't take it.

20   Q.   And amongst this treatment-experienced population, are a

21   lot of these patients stable on the drugs that they're already

22   on?

23   A.   Yeah.  At that time -- again, if you were on Kaletra or

24   Reyataz, they were well tolerated.  Their viral loads were

25   undetectable.  There was no reason for them to make a switch.

STRAND - DIRECT - WIRMANI

1          And as a matter of fact, you wouldn't want them to make

2     a switch because if you -- there's a limited number of drugs

3     you can take.  So if they made the switch too early, you

4     basically used up that drug before it was ready to be used up.

5          MR. WIRMANI:  And can we bring up, just for the

6     witness, Exhibit 1148, Plaintiff's Exhibit 1148.

7          And, Your Honor, there's no objection to this

8     exhibit, so can we publish to the jury when it's up there?

9          THE COURT:  Yep.  You mean it's already admitted, or

10    you're telling me there's no --

11         MR. WIRMANI:  There's no objection.

12         MS. BROWN:  No objection, Your Honor.

13         THE COURT:  All right.  I've got to hear it from

14    them.

15         MR. WIRMANI:  Sure.

16         THE COURT:  It's admitted.

17    (Plaintiff's Exhibit 1148 in evidence.)

18         THE WITNESS:  So what would you like me to look at

19    here?

20    BY MR. WIRMANI:

21    Q.   Yeah, and I'll ask you a question.  I just want to make

22    sure it's up here for the jury.

23         Ma'am, what is that document you see in front of you?

24    A.   That's the package insert that was approved by the FDA

25    for Prezista.

STRAND - DIRECT - WIRMANI

1   Q.   Would that be the original package insert from 2006?

2   A.   I would have to see more of it to know that.

3   Q.   Okay.  We'll look through it.

4        MR. WIRMANI:  Can we blow up that first paragraph

5   there?

6   BY MR. WIRMANI:

7   Q.   And there's a reference.  It says Prezista, and then it

8   says Darunavir -- I can't pronounce that word in the brackets

9   there.

10  A.   Oh, darunavir.

11  Q.   Is that a -- is that, like, the chemical name for

12  Prezista?

13  A.   Right.

14       MR. WIRMANI:  Can we go to page 14 of that document.

15       Can we blow up that first paragraph there.

16  BY MR. WIRMANI:

17  Q.   What do we see there on the screen, Ms. Strand?

18  A.   So Prezista couldn't be taken by itself.  It wasn't

19  strong enough.  It had to be boosted with a hundred milligrams

20  of ritonavir.  Ritonavir is the second drug that was ever

21  developed.  It was very hard to take and caused a lot of

22  issues, like, you know, high cholesterol levels.

23       But the miracle with it was if you put it with some of

24  these other protease inhibitors, it would bring their levels

25  of drug up so that it would be efficacious.  So it was used

STRAND - DIRECT - WIRMANI

1   with several different protocols where they would use a

2   hundred milligrams of ritonavir along with the other protease

3   inhibitor.

4   Q.   And when you say Prezista had to be taken with ritonavir,

5   what do you mean by that?

6   A.   Had you taken it alone without the ritonavir, it would

7   not have been effective.

8   Q.   And was Prezista approved by the FDA to be taken alone

9   without ritonavir?

10  A.   No, it was only approved to be taken with a hundred

11  milligrams of ritonavir.  And that was because that's how the

12  studies were designed, so they really didn't know how Prezista

13  would be by itself.

14  Q.   Was there a particular reason that ritonavir was bad for

15  cholesterol?

16  A.   It was -- scientifically, I'm not sure.  I just know that

17  it raised cholesterol levels in the studies they had done by

18  themselves, because originally it had been a single agent that

19  was used with patients.

20  Q.   And if we look -- can you see there where it references

21  "For treatment-experienced adult patients"?

22  A.   Yes.

23  Q.   Is that what you were testifying about earlier in terms

24  of the limitation on the label?

25  A.   Yeah.  It was not to be used for -- you know, like, when

1    I first started selling Viracept, you could use it on any

2    patient because there was such need, and we didn't

3    differentiate between naive and treatment-experienced.

4         But Prezista was specifically for patients that had

5    failed other drugs, had certain mutations, and that's where it

6    was supposed to be used.

7              MR. WIRMANI:  Can we blow that back in and then go to

8    the third bullet point on that label, please.

9    BY MR. WIRMANI:

10   Q.   What does that say there on the screen, Ms. Strand?

11   A.   So that's saying that Prezista with ritonavir has not

12   been studied in naive patients or pediatric patients.  They

13   have no idea how it works in those patients.

14        It's a completely different patient population because

15   they don't have any of those mutations, so it's just -- it's

16   disclosure that don't use it in patients that aren't

17   treatment-experienced.

18             MR. WIRMANI:  Can we go to page 32, please.

19   BY MR. WIRMANI:

20   Q.   You see down at the bottom it says, "adverse reactions."

21        What does this refer to, if you know?

22   A.   So that's just referring to -- like, the TMC, that stood

23   for the study names that -- the different numbers on them.  So

24   it's referring to three different studies that were done.

25        And the recommended dose for it -- that came out of

STRAND - DIRECT - WIRMANI

1  those dose-finding studies was that it should be 600

2  milligrams of Prezista, a hundred milligrams of ritonavir

3  given twice daily.

4  Q.   When it says, "adverse reactions," does that section of

5  the label deal with adverse reactions from those on-label

6  studies?

7  A.   Correct.

8  Q.   Okay.

9        MR. WIRMANI:  Can we go to -- excuse me -- 34,

10  please.  And can we blow up the metabolic nutritional

11  disorders portion of that page?

12  BY MR. WIRMANI:

13  Q.   What do we see on the screen there, Ms. Strand?

14  A.   So anorexia, they -- people would lose weight on this

15  product.

16  Q.   Let's stop there, just to speed this along.

17  A.   Okay.

18  Q.   Particularly with respect to hypercholesterolemia and

19  hyperlipidemia.

20  A.   Yeah.  So hypocholesterolemia means that it would

21  increase your total cholesterol levels, and hyperlipidemia

22  means that it would increase your triglyceride levels.

23        So over all it was increasing all of the markers for

24  your heart, basically.

25  Q.   What is the significance of that being under that adverse

STRAND - DIRECT - WIRMANI

1    reactions portion of the label?

2            MS. BROWN:  Objection, Your Honor.  Expert testimony.

3            MR. WIRMANI:  She's familiar with these products.

4    She sold them for 15 years.

5            THE COURT:  Sorry.  Let me look at the question.

6        Let me see you folks at sidebar.

7            (Sidebar begins at 2:25 p.m.)

8            THE COURT:  I'm sorry.

9        Can you repeat the question?  I couldn't pull it up

10   right away, and I didn't want to delay getting back into the

11   system.

12           MR. WIRMANI:  I was asking her what the significance

13   of the adverse reactions portion of that label is.  I can lay

14   a better foundation.

15           THE COURT:  Let me ask you this:  What do you

16   anticipate the response is going to be?  That's really what

17   I'm trying to figure out.

18           MR. WIRMANI:  I think she's going to say what the

19   criteria is to have something in that adverse reactions

20   portion of the label, which she knows based on her experience

21   in the field as a salesperson.

22           THE COURT:  She's -- she's not involved in the

23   creation of these labels, right?

24           MR. WIRMANI:  But she has to understand and interpret

25   them to be able to sell the product to a doctor.

STRAND - DIRECT - WIRMANI

1          THE COURT:  Yeah, but my understanding is I thought

2     you were going to ask her -- these are like side effects,

3     right, by using the drug, is that what this is?

4          MR. WIRMANI:  Yeah.

5          THE COURT:  You can ask her that.

6          MR. WIRMANI:  Okay.

7          THE COURT:  But your question was different.

8          MR. WIRMANI:  I'm asking what the significance is,

9     like -- give the jurors some context as to what adverse

10    reaction means effectively.

11         THE COURT:  The significance of the category?

12         MR. WIRMANI:  Yeah.

13         THE COURT:  Meaning something to this effect,

14    patients and doctors need to know what the side effects of

15    these medications are?  I'm trying to understand.

16         MR. WIRMANI:  She knows from a clinical test how bad

17    the side effect has to be to make it into that portion of the

18    label.

19         THE COURT:  How does she know that?

20         MR. WIRMANI:  She needs to --

21         THE COURT:  Slow down, because the court reporter is

22    going to go crazy.

23         MR. WIRMANI:  I apologize, Judge.

24         THE COURT:  How does she know this.

25         MR. WIRMANI:  Number one, she already testified that

1    she did clinical research in her prior job.

2         Number two, she needs to know that stuff to be able to

3    sell the product to a doctor.

4         THE COURT:  If you want to -- yeah, but she needs to

5    know that stuff through hearsay.  Look, I can tell a sales rep

6    9,000 things.  It doesn't mean they can testify to those

7    things if they're just -- their knowledge is just based on

8    somebody instructing them about it.

9         What I'm trying to figure out is does she have the

10   foundation to testify to this.  I don't know if she does.

11        MR. WIRMANI:  I can try to lay it.

12        THE COURT:  All right.  Ms. Brown?

13        MS. BROWN:  Yeah, can I be heard quickly.

14        Your Honor, this is highly regulated.  These different

15   sections of an FDA-approved reg label have different

16   scientific and regulator requirements that she is woefully

17   unqualified to speak about.

18        And so he's really asking for expert testimony.  It's

19   totally improper.  I object.

20        MR. WIRMANI:  I can ask if she -- I mean, if she has

21   the foundation --

22        THE COURT:  I'm going to -- I'm going to sustain the

23   objection for now.  If you want to rephrase the question, but

24   we may be right back here in a minute.  All right.

25        MS. BROWN:  Thank you, Your Honor.

STRAND - DIRECT - WIRMANI

1          THE COURT:  All right.  Let's go.

2          (Sidebar was concluded at 2:27 p.m.).

3          (Open court.)

4      MR. WIRMANI:  Ms. Johnson, if we could go to page 35 of

5  that document, please.

6  BY MR. WIRMANI:

7  Q.   Ms. Strand, what do we see there?

8  A.   Those are all of the treatment-emergent lab tests that

9  were done on these patients and the changes that they had from

10  baseline to at the end of the study.

11  Q.   And is it your understanding -- are those the on-label

12  studies that are done for this drug, Prezista?

13  A.   Yes, they are.

14  Q.   Okay.

15          If you look up at the top, it's the three categories

16  from Prezista's to comparator, and then the last Prezista

17  category.

18          Do you know what those columns mean?

19  A.   Yeah.  So the first one was they were looking at Prezista

20  plus ritonavir at a 600-milligram dose taken twice a day, and

21  OBR means optimized background regimen.  These drugs had to be

22  taken with other HIV drugs, and there was a limited number

23  that could be put together.

24          So it wasn't specifying you have to use this with AZT,

25  you have to use this with DDI.  It was whatever the patient

1    could take that they hadn't had previously or what would work

2    well together.

3        The other one, the comparator PI was -- actually, in

4    this study, it was looking at Crixivan or lopinavir and an

5    optimized background.

6        Then the other one was Prezista plus ritonavir,

7    600 milligrams BID, so it was not adding any other

8    antiretrovirals to it.  So it was just looking straight at

9    Prezista.  You didn't take anything else with it.

10   Q.   And that comparator category, just to make sure I

11   understand, you said it's being -- is it being compared to --

12   what drug did you say?  Is it Kaletra or was it --

13   A.   It was actually being compared to Kaletra.

14   Q.   Okay.

15       Is that the generic name of Kaletra that you just

16   mentioned?

17   A.   Yeah.

18   Q.   Okay.

19       MR. WIRMANI:  Can we put that back in.  Can we go to

20   the -- highlight the total cholesterol and triglycerides

21   columns there.

22   BY MR. WIRMANI:

23   Q.   Just generally from your perspective as a salesperson out

24   in the field, what does that show?  What you can say to

25   doctors based on that?

STRAND - DIRECT - WIRMANI

1   A.   So, first of all, I'm not sure in some of the early

2   protease inhibitors that you would have even seen these things

3   in their package insert.  I remember I was in Rochester,

4   New York, talking to this physician, and you know, HIV men are

5   usually in really good shape.  They're young.  They're like

6   30 years old, and he was telling me about how there's

7   something going on with these drugs.

8        Like, these patients on Kaletra -- I had a patient

9   30 years old drop dead the other day.  And they'd never really

10  thought about -- I mean, they were worried about keeping them

11  alive with their HIV.  They weren't worried about their heart

12  conditions at that point.

13       But after -- I mean, they had several experiences where

14  these young patients would just drop dead.  They realized, Oh,

15  maybe we better pay attention to this.  And HIV in general can

16  increase these a little bit.  But certain drugs can boost them

17  even higher than that.

18  Q.   Is anything you see there on the screen lipid controlled,

19  ma'am?

20  A.   No.

21  Q.   Is --

22  A.   I mean, they're slowing increases all across the board.

23  I mean, the only one would be the comparator arm with the

24  3.3 percent change in cholesterol.  That's -- I mean, I

25  probably could get that from eating a steak tonight.

STRAND - DIRECT - WIRMANI

1  Q.  Is there anything about that that is lipid friendly?

2  A.  No.  I mean, those are pretty significant changes.

3  Q.  Okay.

4        MR. WIRMANI:  You can take that down, Ms. Johnson.

5  Can we bring up 1102.  There's no objection.

6        THE COURT:  Ms. Brown, is that right?

7        MS. BROWN:  That's correct, Your Honor.

8        THE COURT:  So it's admitted.  You can publish it if

9  you need to.

10  (Defendant's Exhibit 1102 in evidence.)

11        MR. WIRMANI:  Thank you, Your Honor.

12        And can we blow up the top there.

13  BY MR. WIRMANI:

14  Q.  Do you recognize the document here on the screen, ma'am?

15  A.  Yes.  This was --

16  Q.  And I think if we blow back out of that, you can see the

17  date on the lower right-hand corner.

18  A.  Yeah.  So this -- I just want to look here further.  I

19  believe this was after we had our naive indication that we got

20  in 2008.  Yes, it's talking about -- if you look under dosage

21  and administration, it's talking about treatment-naive

22  patients as well as treatment-experienced patients.

23        MR. WIRMANI:  Can we go to page 11 of that label.

24  Can we blow up 6.3.

25        MS. BROWN:  Your Honor, I apologize for the late

────STRAND - DIRECT - WIRMANI────

1   objection.  I didn't realize this was a draft.  I thought it

2   was the final version, so I do object.

3          THE COURT:  Is there a reason why the draft is being

4   presented rather than the true version, or do we need to

5   address this outside the earshot of the jury?

6          (Brief pause.)

7          MR. WIRMANI:  Can I have the ELMO, please.  I'm going

8   to ask one question.

9          THE COURT:  Are we observing what happened here?

10          MS. BROWN:  I gave him my copy, Your Honor.  I'm just

11   wondering if the folder had a second copy to grab back.  If

12   not, I'll look at it on the screen.  That's okay.  It's just

13   2008.

14          (Brief pause.)

15          MR. WIRMANI:  May I publish this, Your Honor.

16          THE COURT:  Is that a different document, though?

17          MR. WIRMANI:  It is the same document.  It is the

18   actual version as opposed to the draft version.

19          THE COURT:  All right.  So for purposes of what was

20   admitted, though, I just want to be clear on the record --

21          MR. WIRMANI:  We withdraw that exhibit, Your Honor.

22          THE COURT:  And this final, not the draft -- this

23   will be the document that -- okay.  All right.  I just want to

24   be clear on the record so we know for later what -- what

25   exhibits would go with the jury.

1          All right.  Thank you.

2               MS. BROWN:  Thank you, Your Honor.

3               MR. WIRMANI:  And Your Honor, for the record this is

4     DX1115.

5               THE COURT:  Thank you.  You may proceed.

6     BY MR. WIRMANI:

7     Q.  Ma'am, just so you can see -- can you see the date down

8     there at the bottom, the revision date?

9     A.  Yeah.  12 of 2008.  That's when we had already received

10    the approval for the naive indication for Prezista.

11    Q.  If we go to page --

12              MS. WENDEL:  Your Honor, may I approach?

13              THE COURT:  Are you trying to help him with this

14    Elmo?

15              MS. WENDEL:  Yes.

16              THE COURT:  Better you than me.

17              MR. WIRMANI:  No, the 6.3.  Thank you, Ms. Wendel.

18    BY MR. WIRMANI:

19    Q.  Ms. Strand, if you look one, two, three -- five lines

20    down, do you see hypercholesterolemia, and then right under

21    that, low-density microprotein?  The Series ADR section 6.3?

22    A.  Yes, I do.

23    Q.  What has changed between the 2006 label and now this 2008

24    labeling that we are looking at in terms of lipids and

25    cholesterol?

STRAND - DIRECT - WIRMANI

1  A.  So in the first package insert when we had the

2  treatment-experienced study, it was considered an adverse

3  event, which means that, you know, you had an event that you

4  didn't want to happen to you.  It hurt the patient, harmed the

5  patient.

6      But a serious adverse event means that it was -- it

7  could have caused you to be hospitalized.  It could have

8  caused you -- maybe you were in the hospital already, but it

9  caused you to stay longer.  So it had a greater impact on your

10  health.  So it was very serious.

11      And this also includes -- because the treatment

12  experienced product on the marketplace.  If doctors had side

13  effects in their real-life clinic patient, they would call

14  them into the company.

15      Or if we went in as sales representatives and they told

16  us like, Oh, I had somebody gain 20 pounds on your drug, we

17  would write that up as an adverse event because that wasn't in

18  our original package insert.  That was, you know, something

19  out of the ordinary we weren't expecting.

20      And so this is taking into consideration all of the

21  things that had been reported from clinic patients that

22  weren't in the original clinical trials plus the patients that

23  were in the naive study here.

24          THE COURT:  Ms. Brown?

25          MS. BROWN:  Objection, Your Honor.  Expert testimony.

STRAND - DIRECT - WIRMANI

1  Move to strike.

2          THE COURT:  All right.  Let me see you both at

3  sidebar again.

4          (Sidebar begins at 2:37 p.m.)

5          THE COURT:  How was she able to all this medial stuff

6  as a salesperson?

7          (Stenographer clarification.)

8          THE COURT:  Can you hear me?  Sorry.

9      She's is not a physician, correct?

10          MR. WIRMANI:  Well --

11          THE COURT:  No, answer my questions, and then I'll

12  let you --

13          MR. WIRMANI:  She's not an physician.  She's a nurse.

14          THE COURT:  So she is a nurse?

15          MR. WIRMANI:  Yes.

16          THE COURT:  Okay.  And she's able to -- she's

17  testifying as to what these ADRs mean?  Is that what she's

18  testifying to?

19      And what's the objection?

20          MS. BROWN:  The objection, Your Honor, that's expert

21  testimony because she was not acting in a registered nurse

22  capacity at Janssen.  Her role was regional sales director.

23  She was a promotional person.

24      And she's here giving expert testimony about the

25  meanings of the parts of the label that she's unfamiliar with

STRAND - DIRECT - WIRMANI

1    that have regulatory implications and medical implications

2    that --

3            MR. WIRMANI:  I don't --

4            MS. BROWN:  -- she's not qualified to opine on.

5            MR. WIRMANI:  I'm sorry.

6            THE COURT:  Go ahead.

7            MR. WIRMANI:  I don't believe she's -- that she's

8    unfamiliar.  I think she had to be familiar to do her job.

9            THE COURT:  But there's two different questions,

10   right?

11        So earlier you asked a question in a way -- and there

12   was no objection.  You said as a sales rep, what did you

13   convey regarding this?  That's a very different question.

14        But you're asking her like she is a medical expert now.

15           MR. WIRMANI:  Well, I asked --

16           THE COURT:  She's a physician or a nurse saying, Let

17   me tell you what about hypercholesterolemia or hyperlipidemia

18   -- what all these different medical terms are.  That's not her

19   role on the witness stand.

20        If you want to say, you know, In seeing these ADRs

21   here, what did you convey regarding these as a sales rep, that

22   I'll permit you to do because that's who she is in the witness

23   box.

24           MR. WIRMANI:  Fair enough.

25           THE COURT:  So is that fair?

1      MR. WIRMANI:  Yeah, fair enough.

2      THE COURT:  So I'm going to strike her last response,

3  although I got to tell, I don't think anybody understood it

4  anyway.  I certainly didn't.  It was 9 lines, 15 lines long.

5      MS. BROWN:  It was long.

6      MR. WIRMANI:  I thought she was just going to say

7  what you just said.

8      THE COURT:  But why don't you do this:  If you want

9  to ask her in her capacity what did she convey these things

10 meant to either physicians or other folks, I'm going to allow

11 that.  That's very within her realm.

12     MS. BROWN:  I agree, I agree.

13     THE COURT:  But she is not a medical expert.

14     MR. WIRMANI:  Fair enough.

15     MS. BROWN:  Thanks, Your Honor.

16     (Sidebar was concluded at 2:39 p.m.).

17     (Open court.)

18     THE COURT:  All right.  Folks, I'm just going to

19 request that you strike that last response to the extent you

20 understood it, that don't consider it.

21     I'm going to ask counsel to rephrase the particular

22 question.  Okay.  That's all there is to that.

23 BY MR. WIRMANI:

24 Q.  With respect to the 2006 label I asked you about as a

25 salesperson, what you would convey to physicians based on that

STRAND - DIRECT - WIRMANI

1  label.

2          I'm going to ask you the same question here.  In the

3  2006 label under 6.3 series ADRs, what would you convey to a

4  physician as a salesperson about lipids and cholesterol based

5  on what you see on the label there?

6  A.   Because it's now turned into a serious adverse reaction,

7  I would convey that because you need to be fair balanced, and

8  you don't want a doctor to ever put a patient on something

9  that's going to cause them harm and not be aware of that.

10          I will say that this is very common, that you will see

11  changes in package inserts because when patients are in

12  clinical trials, they're constantly seeing the doctor.  They

13  have to go in, like, every three weeks.  They're tested for

14  all these different things.

15          When you get out in the real world, that's not how it

16  is.  It's, like, get on a drug, and maybe six months later you

17  go back to the doctor, and you're not being monitored for all

18  these things, so it's pretty common to see changes in a real

19  world patient versus a clinical trial patient that's being

20  very closely monitored.

21  Q.   Thank you, Ms. Strand.

22          MR. WIRMANI:  Can we switch back from the Elmo,

23  Ms. Johnson.

24          Can we bring up just for the witness Relators' 1157,

25  please.

1          Your Honor, my understanding is there's no objection.

2              THE COURT:  Is there an objection?

3              MS. BROWN:  No objection.

4              THE COURT:  Okay.  That's fine.  So it's admitted.

5     (Plaintiff's Exhibit 87 in evidence.)

6              MR. WIRMANI:  Thank you, Judge.

7          And can we publish that to the jury, Ms. Johnson.

8     BY MR. WIRMANI:

9     Q.   Ms. Strand, do you recognize what you see on the screen

10    there?

11    A.   Yeah.  This is the package insert for atazanavir that's

12    made by Bristol-Myers Squibb.

13             MR. WIRMANI:  Could we go to page 35 of that

14    document, please.  Can we zoom in as best we can on the top

15    there.

16    BY MR. WIRMANI:

17    Q.   Ma'am, what is this portion of the label dealing with?

18    A.   So this is looking at Reyataz, at their cholesterol --

19    their total cholesterol level, their breakdown of the good

20    cholesterol and the bad cholesterol.

21         The good cholesterol is the high-density cholesterol.

22    The bad is the LDL, and then triglycerides is looking at that

23    as well.

24    Q.   And, Ms. Strand, same question here:  As a salesperson,

25    assuming you were selling Reyataz, what would you convey to

─── STRAND - DIRECT - WIRMANI ───

1  doctors about cholesterol and triglycerides based on what you

2  see on the Reyataz label?

3          MS. BROWN:  Objection, Your Honor.  Speculation.

4          THE COURT:  What would she convey to the physicians

5  based on what she's reviewed?

6          MS. BROWN:  She -- she didn't sell Reyataz.  It's a

7  hypothetical.

8          THE COURT:  Well, if she didn't sell it, why would

9  she be -- I'm a little confused.  Well, did you sell this

10  drug?

11          THE WITNESS:  No, I did not sell Reyataz.

12          THE COURT:  Did you ever convey anything about this

13  drug to physicians?

14          THE WITNESS:  Yeah.  I mean, I would sometimes

15  compare the package inserts if they asked me specific

16  questions.

17          THE COURT:  All right.  Then I'll overrule it.  I'll

18  allow it.

19          MS. BROWN:  Thank you, Your Honor.

20          THE COURT:  Sorry, if you want to repeat the question

21  or -- do you want to repeat the question?

22  BY MR. WIRMANI:

23  Q.  Ms. Strand, my question is simply:  As a salesperson, if

24  you were discussing Reyataz with a physician, what would you

25  convey to them about cholesterols and lipids and triglycerides

STRAND - DIRECT - WIRMANI

1    based on what you see on the label there?

2              MS. BROWN:  Same objection, Your Honor.

3              THE COURT:  Overruled.

4              THE WITNESS:  So I would convey that there wasn't a

5    lot of change.  Like, you know, a total cholesterol change in

6    48 weeks, that's, you know, almost a year.  To increase by

7    only 2 percent is basically negligible as far as change.

8         The triglycerides going down 9 percent, I would say

9    that's very favorable, you know, the high-density lipid

10   cholesterol, like I said, that's the good cholesterol.  So

11   that's a positive that it went up 13 percent.

12        So, I mean, I would say that this is very lipid

13   friendly, that there was no, you know, changes in any of

14   their -- their cholesterol levels or their triglyceride levels

15   related to Reyataz.

16   BY MR. WIRMANI:

17   Q.   Thank you, Ms. Strand.

18              MR. WIRMANI:  Ms. Johnson, we can take that down?

19              THE WITNESS:  Can you show me the rest of that.

20   BY MR. WIRMANI:

21   Q.   I'm going to move on, Ms. Strand, to keep things moving.

22        So, Ms. Strand, I want to move on.  I want to talk

23   about you're here at Janssen and it's the 2006 time period.

24   You guys are about to launch Prezista.

25        How did the companies forecast their projections?  How

STRAND - DIRECT - WIRMANI

1  do they compare to the label in a market for Prezista?

2  A.   As soon as we -- so, again, most of us had been in the

3  HIV world for ten years or so.  As soon as we saw the sales

4  numbers, we were like, there's no way.  And the reason I say

5  that is because Viracept that I had sold had done, like, say,

6  $50 million in a year, and our forecast for six months was

7  25 million, and we didn't have -- we couldn't use it on naive

8  patients.  We could only use it on a niche of

9  treatment-experienced patients.

10       So it just didn't seem like it was realistic.  There

11  was just no way you could get that much business.  And as I

12  described before, they would always put up that chart and show

13  there's so many treatment-naive patients than there are

14  treatment-experienced patients.  So...

15  Q.   And where were the expectations coming from within the

16  company?

17  A.   I mean, Glenn Mattes probably gave them to us.  That's

18  who presented the goals.  But I'm sure they came from somebody

19  higher up at Janssen that, you know, had determined what we

20  needed to sell.

21  Q.   What is the reaction within Janssen when the forecast

22  relatively, like, matched up with the actual label of Prezista

23  in the market for?

24  A.   As far as the sales force?

25  Q.   Correct.

STRAND - DIRECT - WIRMANI

1  A.   We're all, like, this is impossible.  You know, we just

2  knew from our experience that there was no way we could get

3  that much business.

4       And the other thing was we felt like this showed us

5  that Janssen didn't understand the HIV marketplace at all

6  because, first of all, you had to give these resistant tests,

7  so that took two weeks, usually, to get back.  And then it's

8  not like the patient ran in once they got the resistant test.

9  Usually the doctor would take a week, kind of look at it.

10 Then maybe they'd call the patient back in.

11      So, I mean, there was going to be a lag of at least six

12 weeks.  And that's saying you saw the patient the very first

13 day that we were approved.  And there wasn't any rush.  I

14 mean, like I said, most of these patients were on therapies

15 that were relatively tolerable.  They were seeing viral load

16 decreases.  So it wasn't like, oh, you've got to come in right

17 away.  We got this new drug for treatment-experienced patient.

18 They're just going to let the patients flow as they would

19 through their normal visits.

20 Q.   Did the home office, did they have a meeting very shortly

21 after the launch of Prezista?

22 A.   Yeah.

23 Q.   Tell the jury what you recall about that.

24 A.   Yeah.

25      So regardless of what you ever had on your personal

STRAND - DIRECT - WIRMANI

1  schedule, I basically received a call, like at 3:30 on a day,

2  and Cheryl and I were in the regional office together and we

3  were told, Yo, fly to New Jersey this evening, we're having a

4  meeting tomorrow, you need to get in here.  We've got to

5  figure out what we're going to do about these sales.  We are

6  so far behind.

7  Q.   And let me stop you there.  Take this a little bit more

8  question and answer.

9       Where was that meeting held?

10  A.   So that meeting was at Janssen's.  Like, we had a meeting

11  room there in the home office, and that's where it was held.

12  Q.   And that's here in New Jersey?

13  A.   Yes.

14  Q.   Okay.

15       Now, who was in attendance at that meeting?

16  A.   So it was anybody that was really a director level above.

17  So the East and West regional business directors.  The East

18  and West key account manager, directors.  Everybody in the

19  entire marketing department was there.  The reimbursement

20  person, Ken McCormick, was there.  I believe Harry Tablet, who

21  was responsible for getting it into the correctional

22  facilities and the VA's, he was there.  We had people there

23  from medical, and we had people there from -- I don't really

24  remember compliance, to tell you the truth.  We had other,

25  like, reimbursement people that there were there as well.

STRAND - DIRECT - WIRMANI

1          Oh, I know who it was.  It was -- we had a gentleman,

2     his name was Lou Seibert, and he was responsible for, like,

3     educating patients and doing patient programs and stuff.  So

4     he was there.

5     Q.   Who ran that meeting?

6     A.   It was Glenn.  He opened the meeting up.  And I've never

7     worked at a company where I just got screamed at.  And it was

8     like they didn't understand.  It was, like, How could you

9     expect us to make these numbers.  It hasn't even been two

10    weeks yet for these patients to get the resistance testing

11    back, but they didn't want to hear that, you know.  They just

12    ignored anything we had to say.

13         And the other thing they didn't understand was 80

14    percent of these drugs are paid for by the Government; so ADAP

15    programs, state Medicaid.  And certain states actually

16    purchase the products and keep it in a warehouse.  They have

17    multiple locations.  And the patients, like, say, in the

18    states were Florida, Tennessee stocks them, Arkansas stocks

19    them, New York stocks them.  Those states had to buy the drug

20    and that hadn't been done yet because they don't just -- a new

21    drug gets approved and they just don't stock their warehouse.

22    It has to be approved on their formulary.  So, you know, it

23    had to go through the formulary committee and stuff.

24         So we hadn't gotten any of those direct purchases which

25    could be really high amounts -- high dollar amounts, you know.

STRAND - DIRECT - WIRMANI

1  Q.  Ms. Strand, you mentioned Glenn.  Was that Glenn Mattes

2  who ran the meeting?

3  A.  Yes.

4  Q.  Do you remember anything specific that Glenn Mattes said

5  during that meeting?

6  A.  He was just like, you know, we're so far behind.  I mean,

7  I think we were, like, at 10 or 15 percent to goal at that

8  point.  And he was like, you know, if we don't get this up, we

9  can't make it up, you know.  I mean, there's not going to be

10  enough time left in the year.  There's only six months.  We

11  need it figure out what we need to do right now, you know.

12  Break out into groups and talk about this.

13       And I remember we were just kind of all -- we broke out

14  into, like, groups of four or five and we were given, you

15  know, flip charts to write things on.  And we're all just kind

16  of all looking at each other because we had plans in place,

17  but in a week, you can't really implement it.  Do you want to

18  change what your plan is in a week?  I mean, you don't even

19  know if it's going to work because you haven't had time to

20  implement it.  He wanted things put together.

21       And so that's when we kind of came up with things,

22  like, you know, well, we can do more education programs.  We

23  could -- you know, we'll try to hurry up these ADAP people to

24  buy directly, you know.  How can we move that system up?

25       So we just tried to come up with things to appease him,

STRAND - DIRECT - WIRMANI

1    I guess.

2    Q.    How would you describe, like, the state of that meeting?

3    Is it anger?  Is it panic?  Is it, you know, you need to

4    change the course?  What was the tone?

5    A.    If you remember the children's book, the Emperor's New

6    Clothes, where he really has no clothes on, it felt like that.

7    It was like every single person in the room knew that this

8    goal was completely impossible.  But Glenn just didn't want to

9    accept that.

10        And that would have been the time he could have gone

11   back to Janssen and said, like, Look, we've got this forecast

12   completely off.  We didn't take some of these assumptions into

13   place.  You know, we didn't know this marketplace.  But he

14   didn't.  He just -- he didn't want any excuses.  He just

15   wanted to know how we were going to move this product forward.

16        And it was so intense.  I remember afterwards, like,

17   going out for a drink with Deb O'Connor and she was like, "Oh,

18   my God.  I need a stiff drink after that meeting."

19        And we -- they were, like, probably six of us that had

20   worked together and had ten years of experience, and we were

21   like, Deb, we can't make this.  There's no way.  There's not

22   enough treatment-experienced patients.  They had to forecast

23   those treatment-naive patients in there.  It just -- the

24   numbers don't add up.

25        And she was like, Yeah, I know, but, you know, Glenn

STRAND - DIRECT - WIRMANI

1   doesn't want to hear that.

2          And I remember talking to Mike Iacobellis, who was in

3   sales training at the time, too, I mean, he agreed.  Ken

4   McCormick, who was in charge of the reimbursement -- I mean,

5   we all had the same thoughts, that it was impossible to do.

6   Q.   Ms. Strand, you mentioned a Gail Scazorski earlier --

7   A.   Right.

8   Q.   -- president of sales.  Was she still there at that time?

9   A.   No.  And this is what the environment was like.  Like, as

10  soon as I joined, I remember going to a meeting in home office

11  and Gail was just, like, a nervous wreck.  I mean, she was

12  standing outside, waiting to go into the conference room, and

13  she was like, Where is Allen?  I need to find Allen.  Allen

14  was our medical director, and she wanted Allen to sit next to

15  her because she was afraid she was going to pass out.  She was

16  so, like, on edge and nervous and stuff.

17         And that was a very common practice.  I mean, you were

18  scared to say anything at a meeting because he was just going

19  to rip your head off.  Whatever you said, it wasn't going to

20  be right.

21         And so the very first day --

22             THE COURT:  Sorry, Counsel, what was the question?

23             MR. WIRMANI:  I asked her Gail Scazorski, if she was

24  still at the company.

25             THE COURT:  And is the answer yes or no?

STRAND - DIRECT - WIRMANI

```
 1          THE WITNESS:  So --
 2          THE COURT:  No, no.  Is the answer yes or no, ma'am.
 3          THE WITNESS:  No, she was not.
 4          THE COURT:  Then move on.
 5          MR. WIRMANI:  And I can ask a little bit more
 6  questions.
 7          THE COURT:  Then move onto the next question, because
 8  that's the question.
 9          And, ma'am, you have to respond to the question that
10  you're being asked.
11          THE WITNESS:  Okay.
12          THE COURT:  So the question was whether somebody was
13  there.  The answer is yes or no.
14          MR. WIRMANI:  And I'll try to make it a little bit
15  more question-and-answer just so we can --
16          THE COURT:  All right.
17  BY MR. WIRMANI:
18  Q.  Gail Scazorski, did she ultimately leave the company?
19  A.  Yes.  The way we were supposed to launch the product.
20  Q.  The day you were supposed to launch the product.
21          Do you know why she left the company?
22  A.  She had had a meeting with Glenn Mattes for several hours
23  that morning.  She came back to her desk.  She sat down the
24  company Blackberry, she walked out the front door and never
25  walked back in.
```

STRAND - DIRECT - WIRMANI

1   Q.   This meeting that took place two weeks after the launch

2   of Prezista, were there any directions that came down to kind

3   of the sales force from that meeting?

4   A.   So about -- after we had this meeting, we put slides

5   together with all of our plans, coordinated everything.  And

6   then we had a conference call with the district manager team

7   and basically rolled it down to them and said, Here is our

8   plans.  This is -- you know, we had this meeting, this is what

9   we're going to do moving forward to try to get our sales up.

10  Q.   Was the company also looking for guidelines from the

11  ground-level salespeople and the regional directors about what

12  they were seeing trying to sell this product?

13  A.   Yes.

14       At that point in time, they had been out in the field

15  for about a month, the sales reps and the district managers,

16  so they had a lot of feedback from the customers that we had

17  not heard yet, so they were sharing that.

18  Q.   Thank you.

19       MR. WIRMANI:  Ms. Johnson, could you bring up

20  Relators' 222.  I believe there's no objection so we can

21  publish this as soon as Ms. Brown confirms.

22       MS. BROWN:  I have no objection to the document if

23  you can lay a foundation that she wrote it.

24       THE COURT:  All right.  So why don't we do that.  You

25  want to show it to the witness first?

STRAND - DIRECT - WIRMANI

1              MR. WIRMANI:  Just for the witness, Ms. Johnson.

2    BY MR. WIRMANI:

3    Q.   Ms. Strand, do you recognize the document you see on the

4    screen?

5    A.   Yes, I do.

6    Q.   You see the date up in the upper left-hand corner?

7    A.   Yes.

8    Q.   You testified earlier about a conference call that took

9    place shortly after this all hands meeting in New Jersey?

10   A.   Uh-huh.

11   Q.   Correct?

12        Is this -- is this the date on which this conference

13   call took place?

14   A.   Yes, it is.

15   Q.   Okay.

16        And at the top there it says, "Notes from conference

17   call with management team," and it says Glenn Mattes?

18   A.   Correct.

19   Q.   It lists a number of participants.  Are you the first

20   participant listed there?

21   A.   Yes, I am.

22   Q.   Were you present at this meeting?

23   A.   Yes, I was.

24   Q.   Had you reviewed these notes before?

25   A.   Yes, I did.

STRAND - DIRECT - WIRMANI

1  Q.  Did the notes accurately reflect what took place at the

2  meeting?

3  A.  Very much so.

4  Q.  Who wrote these notes, if you know?

5  A.  You know what?  It would have been Ashley Regazzini that

6  was in home office.  She was the assistant to Deb O'Connor.

7  Or else it was my assistant in Chicago, Emily Schope, that

8  took these notes.

9  Q.  Would they be disseminated after the meeting to the

10  participants?

11  A.  Yeah.

12  Q.  Would these have been notes that you would have received

13  shortly after this meeting during your time at Janssen?

14  A.  Yes.

15      MR. WIRMANI:  At this time, I'd move to admit

16  Relators' 222, Your Honor.

17      MS. BROWN:  No objection.

18      THE COURT:  All right.  So admitted.

19  (Relators' Exhibit 222 in evidence.)

20      THE COURT:  You may publish.

21    By the way, Mr. Wirmani, do you have a -- how much

22  longer do you have on direct?  And I only ask if you want to

23  stop either before or after this document because I do want to

24  give the jurors a break around 3 o'clock.

25      MR. WIRMANI:  I have some time left, Your Honor.  A

STRAND - DIRECT - WIRMANI

1    good deal of time.  I don't think we're going to finish direct

2    today.  This document takes a little time so now is a

3    perfectly --

4           THE COURT:  Do you want to break before the document

5    so we don't cut it up?

6           MR. WIRMANI:  Yeah, that's fine.

7           THE COURT:  All right.  Folks, we're going to take

8    that short afternoon break so that we can push through to 4

9    o'clock.  Let's do that, and then we'll be back in ten

10   minutes.

11        Thank you.

12           THE DEPUTY COURT CLERK:  All rise.

13           (Jury exits the courtroom.)

14           THE COURT:  Folks, be seated.  Do we need to chat

15   about anything?

16           MR. WIRMANI:  Nothing from the Relators.

17           MS. BROWN:  Nothing, Your Honor.

18           THE COURT:  I'll see you all in ten minutes.

19           (A short recess occurred.)

20           THE DEPUTY COURT CLERK:  All rise.

21           THE COURT:  Do we need to talk about anything before

22   I get the jurors?

23           MR. WIRMANI:  Nothing from the Relators.

24           MS. BROWN:  Nothing, Your Honor.

25           THE COURT:  All right.  Let's bring them in.

STRAND - DIRECT - WIRMANI

```
 1            THE DEPUTY COURT CLERK:  All rise.

 2            (Jury enters the courtroom.)

 3            THE COURT:  All right, folks, everybody be seated.

 4   We'll continue.

 5            Counsel, when you're ready to proceed, Mr. Wirmani.

 6   BY MR. WIRMANI:

 7   Q.  Ms. Strand, before we broke, you were looking at Relators

 8   Exhibit 22.  If you look at the top up there, it says, "Notes

 9   from conference call with management," and it says

10   Glenn Mattes.

11            You mentioned Glenn Mattes a couple of times.  Remind

12   the jury, who is Glenn Mattes?

13   A.  Glenn Mattes is the president of the HIV division of

14   Janssen.  He's the very top person in the company.

15   Q.  And there's a group of participants right below that,

16   correct?

17   A.  Right.

18   Q.  Who -- just generally, who are those people?

19   A.  Again, the first ones were -- the first row were people

20   that were actually at that meeting in New Jersey.  Underneath

21   that is Susan Neumeyer was a district manager in San

22   Francisco.  Fran Devlin was in California in LA.  Scott Libby

23   was a district manager in Florida.  Denise Levere was another

24   manager.  And Chris Cruz and Frank Murphy were also managers

25   as well.
```

STRAND - DIRECT - WIRMANI

1    Q.   Okay.

2         What do you recall about the purpose of this conference

3    call?

4    A.   The purpose was really to share that we had had this

5    meeting and that the sales were behind and we were rolling out

6    what we had found.  And also the purpose was to gain insight

7    from them because they had been out talking to the doctors and

8    they knew -- at this point we hadn't really talked to that

9    many doctors so we wanted to hear what the doctors were saying

10   about our product.

11   Q.   Is that why some of the district managers were present

12   for this second meeting, this second conference call?

13   A.   Yes.

14   Q.   If you look at the -- if you look at that first paragraph

15   there, it says, "Goals for launch results to date."

16        Do you see that?

17   A.   Yes.

18   Q.   It says, "Not off to the start hoping for.  NTS 45MM."

19        Do you see that?

20   A.   Yes.

21   Q.   Do you know what NTS 45MM means?

22   A.   I believe that was the national sales goal of 45 million.

23   Q.   Okay.

24        And it says -- and that would be for the rest of the

25   year, correct?

STRAND - DIRECT - WIRMANI

1  A.   For the rest of the six months.

2  Q.   That six-month period?

3  A.   Yep.

4  Q.   The next bullet point says, "Month one objective, 3,700

5  as of today 896 RX's."

6       Do you know that what means?

7  A.   So that means they're expecting 3700 scripts or doctors

8  to write for Prezista, and we were at 896, which you do the

9  math, it's, like, 25 percent to goal.

10      MR. WIRMANI:  Can we unexpand that and go to where it

11  says "Speaker programs will be key to this market"?

12  BY MR. WIRMANI:

13  Q.   Do you see that there?  It says, under Harry -- do you

14  remember who Harry was?

15  A.   Yeah.  So Harry was responsible for the correctional

16  people, so selling to jails and, I guess, county facilities,

17  federal facilities.

18  Q.   Okay.

19      And one of his bullet points is "Speaker programs will

20  be key to this market."  Correct?

21  A.   Right.

22      MR. WIRMANI:  Can we go to page 2 of that document.

23  BY MR. WIRMANI:

24  Q.   Up to at the top it says "Susan."

25      Do you remember who Susan?

─────STRAND - DIRECT - WIRMANI─────

1   A.   She was the manager in San Francisco.

2   Q.   Okay.

3        She says, "90 percent of practices undetectable.  Other

4   patients are unreliable."

5        And then she says, "Much smaller available market for

6   Prezista."

7        Do you recall that conversation, what it was about?

8   A.   Yeah.  So she was saying that the doctors that she had

9   talked to the San Francisco marketplace, which was, obviously,

10  a huge marketplace, they were basically saying 90 percent of

11  their patients were already on therapies, they were

12  comfortable with them.  They weren't having any haven't --

13  their viral load was not showing up so they were stable.

14  There was no reason to change them.

15       And then she was saying the other patients are

16  unreliable.  You know, sometimes HIV patients aren't very good

17  to come to clinic or very good to take their drugs, and so she

18  was saying that kind of made up another portion.

19       So she was saying there's really not too much left for

20  us in the Prezista marketplace to take.

21       MR. WIRMANI:  And can we go to the portion of that

22  document where it says "Abbott planting the seed under Fran."

23  BY MR. WIRMANI:

24  Q.   Do you remember who Fran was?

25  A.   Yeah.  He was the manager in LA, Fran Devlin.

STRAND - DIRECT - WIRMANI

1  Q.  And can you say his name one more time?

2  A.  Fran Devlin.

3  Q.  And Mr. Devlin says, in this first bullet, "Abbott

4  planting seed that data in our PI about use of lipid

5  triglyceride lowering agents in the use of Prezista casting a

6  shadow on our safety and tolerability data."

7       Do you know that refers to?

8  A.  Yeah.

9       So when we look at cholesterol levels and our studies,

10 we allowed patients to take lipid-lowering agents, so they

11 could be on Crestor or whatever, and that made a difference.

12      So these -- the levels you saw were above and beyond

13 the patients that are already being treated for that

14 condition.

15      The Reyataz study excluded those in their numbers.  So

16 if they were on cholesterol-lowering agents, they didn't count

17 those patients.

18 Q.  So make sure I understand.

19      The Prezista underlying on-label studies included

20 patients that were on statins.

21      Correct?

22 A.  Correct, yes.

23 Q.  And you're saying that the Reyataz label, their studies

24 did not include patients on statins?

25 A.  No.

STRAND - DIRECT - WIRMANI

1  Q.  Just very briefly, what's the significance of that from a

2  sales standpoint?

3  A.  It just -- from the sales standpoint.

4      Just that our patients should have been under control.

5  They shouldn't have had high cholesterol levels and high

6  triglycerides because they were being treated for that.  And

7  so the patients on the Reyataz studies were purely clean.

8  They weren't taking anything to lower their lipids.

9          MR. WIRMANI:  And can we go to the portion of that

10  document that says "Needs to enforce the broad range of

11  patients."

12  BY MR. WIRMANI:

13  Q.  That section is labeled "Strategies and tactics to

14  overcome these issues."

15      Do you see that?

16  A.  Yes.

17  Q.  Was that one particular person's comments, or was that

18  kind of the totality of the meeting?

19  A.  Can you show me?

20          MR. WIRMANI:  Sure.  Can we zoom back out of that?

21          THE WITNESS:  Yeah, zoom back out.

22          MS. BROWN:  Your Honor, I object to that question.

23  Speculation.  She didn't write the document.

24          THE COURT:  I'm sorry, what's the question again, Mr.

25  Wirmani?

STRAND - DIRECT - WIRMANI

1          MR. WIRMANI:  I'm asking if that's strategy and

2     tactics to overcome these issues, if that is a -- was that a

3     discussion by the collective group, or is that one particular

4     person like some of these other categories in the document?

5     And she did say she was at the meeting and recalls it.

6          THE COURT:  Yeah, I'm going to overrule it.  She was

7     at the meeting so she can address whether that's accurate or

8     not.

9          Whether she drafted the notes is less relevant.  All

10    right?

11         THE WITNESS:  So that was comments by multiple

12    people.  And suggestions by the district managers that were on

13    the call.

14    BY MR. WIRMANI:

15    Q.   That -- it sounded like earlier in the document we were

16    kind of talking about some of the issues with selling drugs.

17         Is that fair?

18    A.   Correct.

19    Q.   Are we now moving to the portion where there's kind of

20    like discussion about what to do about it?

21    A.   Yeah.  These are managers that are making suggestions.

22    So Frank's -- Frank Murphy and --

23    Q.   Let me just stop you there, Ms. Strand.

24    A.   Yeah.

25    Q.   The third bullet point says, "Need to enforce the broad

STRAND - DIRECT - WIRMANI

1    range of patients."

2           How do you understand that?

3    A.    So what they're saying is that we need to not just get

4    the patients that are treatment-experienced, but we need to

5    try to get the drug used sooner in patients that maybe aren't

6    tolerating a current therapy or that are ready for a change.

7    You know, they can't take the other drug they're on previously

8    for some reason.

9           MR. WIRMANI:  Can we zoom back out of that?

10          And can we go to page 3 that says "Ad boards" under

11   Chris Cruz.

12   BY MR. WIRMANI:

13   Q.    Ms. Strand, do you see that second bullet point there?

14   Under Chris Cruz's comments it says "Ad boards"?

15   A.    Yes.

16   Q.    Just -- we're going to talk more about this later, but

17   just high level, was is an "ad board"?

18   A.    So an ad board is when marketing invites physicians to

19   come in and give their opinion and get their opinion on what

20   they think of the drug and just, like, how would you market it

21   if you were in our shoes.

22          And they're paid consultants so they come in.  We fly

23   them to some city, they get paid an honorarium to attend the

24   meeting, and we gather their feedback from it.

25   Q.    And did you personally attend some of these ad board

1  meetings?

2  A.   I was at all of them new.

3  Q.   Was part of the purpose of these ad board meetings to

4  disseminate off-label information to physicians that attended?

5  A.   Yeah.  They would pay speakers that we had or consultants

6  that we had to present our data.  Because part of it was we

7  wanted to educate these doctors to make sure they understood

8  about the product, but we would also show things that were

9  off-label as well that, you know, they may not be aware or

10 questions would come up and they would be, like, Well, do you

11 have information data on that?  And if we did, we would

12 present it to them.

13 Q.   And that was at Janssen's sponsored events?

14 A.   Yes.

15      MR. WIRMANI:  Can we zoom back out of that?

16 BY MR. WIRMANI:

17 Q.   It also says their position up in line.

18      It says -- the bullet point there says, "Stress range

19 of patient in studies position up in line of therapy."

20      Do you know what that refers to?

21 A.   Yeah.  So our studies were broken out based on, like, how

22 many resistant mutations they had.  So they were saying like

23 instead of getting the train-wreck patients that maybe already

24 were resistant to eight different mutations, try to get

25 doctors to use it sooner when they maybe only had one or two

STRAND - DIRECT - WIRMANI

1  mutations.

2  Q.   At this point in time, did it necessarily refer to

3  treatment-naive patients, or were they talking about pushing

4  closer to that category?

5  A.   They were -- these were still treatment-experienced

6  patients, but they were not as sick as the ones with multiple

7  mutations.

8  Q.   Okay.

9       Were they on Prezista's label or off Prezista's label

10  at that point in time?

11  A.   At that point in time, that would have been on-label.

12  Q.   Okay.

13       MR. WIRMANI:  Can we zoom back out of that.

14  BY MR. WIRMANI:

15  Q.   Then at the bottom there it says "action plan."

16       Do you see that?

17  A.   Yes.

18  Q.   And the paragraph down there says "SRL's involvement with

19  IAS meeting and data dissemination to drive awareness of new

20  information."

21       Next sentence says "use more med info with customers

22  and get SRL out to discuss tough issues with customers."

23       Do you know what that refers to?

24  A.   Yes.  So, first of all, I'm shocked that this was even on

25  here because SRL's are science research liaisons, and they're

*United States District Court*
*District of New Jersey*

STRAND - DIRECT - WIRMANI

1    part of the medical department, and they're -- in any

2    pharmaceutical company there's a huge firewall that medical

3    should not be talking with sales.  It's -- they're two

4    different departments.

5         Medical has a lot more information we don't have

6    available to us, and you shouldn't intermingle the two.

7         So it's basically saying IAS is a huge HIV meeting, so

8    they were saying, make sure that we get the science people at

9    this meeting to talk providers that are at the meeting and

10   disseminate any new -- you know, any information about our

11   product that is off-label or not well-known by doctors.

12        And then to use more medical information with customers

13   was to get medical information requests from the customers,

14   and to also -- so you can't just send a medical information

15   request in.  The doctor has to unsolicitly ask for it.

16        So they have to say like, Do you have any information

17   on your cholesterol levels?  Do you have any information on

18   BID dosing?

19        And so -- but we were being encouraged to kind of get

20   them to ask this kind of questions, and then not only to send

21   in that this doctor would like information on that, but also

22   to include and have the science person go out and talk to him

23   in person.

24   Q.   Ms. Strand, let me ask you a question, and we're going to

25   talk more about medical information requests later in your

STRAND - DIRECT - WIRMANI

1   testimony:  But by definition, should medical information

2   requests be part of the company company's action plan?

3   A.   No.

4   Q.   And just very briefly, why not?

5   A.   In any company I've worked with, I've never had any idea

6   how many medical information requests were sent in.  Again,

7   they're unsolicited questions.

8        So, you know, one rep might have two of these they turn

9   in a month, and one rep might have six of them.  It just

10  depends on what questions they get from the doctor.  You can't

11  control that.  And it's not normal to try to get doctors to

12  ask these questions.

13       MR. WIRMANI:  And you can take that down,

14  Ms. Johnson.

15  BY MR. WIRMANI:

16  Q.   Did the -- did the pressure and kind of the meetings --

17  did they continue after this July conference call?

18  A.   It only got worse from there.

19  Q.   At some point did the company make the decision to start

20  marketing Prezista for off-label uses?

21  A.   Those -- the meeting we had with Glenn in New Jersey and

22  then the feedback that we got from the district managers, this

23  is when the wheels really started to turn, like what can we do

24  that's going to make us sell more, what can we -- how can we

25  change our messaging, and that's when we really started to

STRAND - DIRECT - WIRMANI

1  realize, you know, we could try to naive patients, and we

2  could also talk about that it's lipid friendly because that's

3  the main reason that Reyataz was getting so much business was

4  because of the lipid profile being so friendly.

5  Q.   Before we kind of get into the messaging -- I mean, what

6  is the -- do you know where the impetus of this was for the

7  company?  I know we talked about various meetings, but were

8  there specific people that were kind of coming up with these

9  ideas?

10 A.   Yeah.  Tony Dolisi is brilliant.  He's has worked with me

11 at a couple companies.  He is very creative.  He was one of

12 the people that, you know -- he had Glenn Mattes' ear, so he

13 would go in his office and talk to him and say, you know, we

14 thought about doing this or give him suggestions.

15      Scott Libby in Florida was very aggressive.  The reason

16 that we had that on there to get more MIRs filled out and get

17 the information to doctors was because the Florida region was

18 the number 1 region in the company.  They were doing very

19 well.

20      And so it was correlated that if you send more of these

21 off-label information things to the doctors, they're going to

22 write more for the product and have more information.

23      So that's kind of where that came from.

24 Q.   And would you have conversations with Mr. Dolisi and

25 Mr. Libby about these issues?

STRAND - DIRECT - WIRMANI

1    A.    Yes.  I mean, it was kind of like we would all brainstorm

2    about what can we do, and some of these people were more

3    outspoken than others about different ideas.

4    Q.    Were some of those ideas off-label ideas?

5    A.    Yes.

6    Q.    Would Glenn Mattes be present for those types of

7    discussions?

8    A.    Yes, he would have been.

9    Q.    Would other senior executives at the company have been

10   present for those types of discussions?

11   A.    Yeah.  I mean, it would be basically all of those people

12   that were listed on that conference call.  All of those people

13   would be involved in the discussion.

14   Q.    Okay.

15        That's basically Glenn Mattes on down to you guys, and

16   then below you guys is the regional director?

17   A.    Yep.

18   Q.    Is that right?

19   A.    Yep.

20   Q.    And you mentioned that the decision was made to push

21   Prezista further up in the line of treatment.

22        Was the drug actually pushed into the treatment-naive

23   market in terms of the company's marketing to doctors?

24   A.    So originally part of our message was if they used it on

25   a train wreck patient and it worked, then take that experience

STRAND - DIRECT - WIRMANI

1  and tell the doctor, like, Well, why wouldn't you start with

2  that, you know?

3       Like if it's, you know, like a machine gun in a

4  treatment-experienced patient that's really, really sick,

5  wouldn't it make sense to use it in a naive patient that

6  hasn't had -- you know, thinking how much longer they could,

7  you know, be undetectable, and they could tolerate it.

8       So, yeah, that was kind of the start of it.

9  Q.  And to your knowledge, I mean, would you go on sales

10  calls with some of the reps in your -- in your region?

11  A.  Yeah, especially when we launched, I was probably out in

12  the field with reps working two or three days a week and

13  attending dinner programs.

14  Q.  Were reps using that sales pitch that this drug can be

15  used in treatment-naive patients, Prezista?

16  A.  Yes, they were -- they were especially saying using, you

17  know -- like when they're very first treatment-experienced,

18  but they were also saying, you know, consider it for naive

19  patients as well.

20  Q.  And was that a practice that was limited to a couple of

21  salespeople, or was that like district wide for the eastern

22  part of your -- the company?

23  A.  It was actually nationwide because all of the district

24  managers across the entire company were getting this message

25  pushed down to them to have their reps say these things.

1    So it was disseminated across the entire company.

2    Q.   You mentioned the phrase lipid friendly.  Was that phrase

3    just made in general or was it in some specific competitive

4    content against another drug?

5    A.   It was made specifically against Reyataz.  So at the time

6    we launched, Kaletra was the number 1 protease inhibitor on

7    the market.  Reyataz was second, but it was soon overtaking

8    Kaletra.

9        And so -- the reason being when we asked them like, Why

10   do you like Kaletra, they would always say, Because of the

11   lipid profile.

12       So that's kind of where the idea came up was, We'll

13   tell people that we're lipid profile -- or that we're lipid

14   friendly as well, and they'll use it sooner.

15   Q.   Was Prezista lipid friendly compared to Reyataz?

16   A.   No.

17   Q.   Were there other protease inhibitors that Prezista might

18   have been lipid friendly in comparison to?

19   A.   We were probably comparable to Kaletra.

20   Q.   Okay.

21       But the phraseology was not used in competition with

22   Kaletra.

23       Is that fair?

24   A.   That's very fair, and we didn't have any studies against

25   Reyataz, so you were taking a leap of faith.  There was -- and

1    I don't know.  Coming from a scientific background, lipid

2    friendly is absolutely not a medical term, but it's a total

3    marketing ploy word that's used.

4    Q.   Is it anywhere on the Prezista label?

5    A.   No, it's not.

6    Q.   Is there any study on the Prezista label comparing

7    Prezista's impact on lipids to Reyataz's impact on lipids?

8    A.   No, there's not.

9    Q.   Was the terminology "lipid neutral" also used?

10   A.   Yes.

11   Q.   What was the purpose of that phrase?

12   A.   To -- to basically show that it was -- it -- we didn't

13   have significant changes across the board with our

14   triglycerides and cholesterol.

15   Q.   Would that also have been in a competitive context

16   against Reyataz?

17   A.   Yes.

18   Q.   To your knowledge, would salespeople make comparisons

19   between Prezista's lipid profile and Reyataz's lipid profile?

20   A.   Yes, they would, and you can't compare studies against

21   each other because they're done completely different.  For

22   instance, the -- and this was one of the things that we taught

23   the sales reps to say.

24        Our cutoff for looking at triglycerides was 400, and

25   Reyataz used anything greater than 750.  So we would say,

STRAND - DIRECT - WIRMANI

1   Yeah, but look, we used much stringent criteria, you know,

2   if -- anything 400 and above, we counted, and Reyataz didn't

3   count it until it hit 750.

4        So that was kind of one of the things that we would

5   bring out.

6   Q.   And why can't you make those types of comparisons?

7   A.   Against the studies are not designed the same.

8        It's totally different drugs.  You just -- you can't do

9   it.

10  Q.   Okay.

11       And you can do that if it's on the label.

12       Correct?

13  A.   If it's on the label or you've done the head-to-head

14  studies.

15       MR. WIRMANI:  Can we pull up Relators' 272.  I

16  believe there's no objection.

17       MS. BROWN:  No objection, Your Honor.

18       THE COURT:  All right.  So admitted.

19  (Plaintiff's Exhibit 272 in evidence.)

20       MR. WIRMANI:  Can we publish that to the jury,

21  Ms. Johnson.  Can we go to the lower part of that document,

22  that email from Mr. Thomas Turner.

23  BY MR. WIRMANI:

24  Q.   Ma'am, do you see that there on the screen?

25  A.   Yes.

STRAND - DIRECT - WIRMANI

1  Q.  And the subject of that email is "four months to reach

2  our team goals and beat June update."

3       Do you see that?

4  A.  Uh-huh.

5  Q.  Okay.

6       Who is Thomas Turner, if you know?

7  A.  He was the district manager in Chicago.

8  Q.  Was within your region?  Was he under you?

9  A.  Yes, he was.

10 Q.  Are these other individuals on here other district

11 managers from the company?

12 A.  Most of them are the sales reps that reported to him

13 except for -- I just saw another manager.  Ken Nelson, I

14 believe, was a district manager.

15 Q.  Okay.

16      And so is this -- is your understanding that this is an

17 email from Mr. Turner to his sales force copying you as the

18 regional director?

19 A.  Yes.

20 Q.  You're on that email, obviously?

21 A.  Uh-huh.

22      MR. WIRMANI:  Can we bring that back down and go to

23 page 2 of the document.  Can we blow up the portion that says

24 "Prezista lipids."

25 BY MR. WIRMANI:

STRAND - DIRECT - WIRMANI

1  Q.  Does Mr. Turner there -- he says that the subject is

2  Prezista lipids.  He says, "We have a strong lipid profile,

3  but our providers are not giving us our due credit.  Are they

4  acknowledging the lipid data in Aretmis in relation to NCEB

5  cutoffs."

6      And then he says, "Prezista does not have a strong

7  lipid profile.  Only against Kaletra it has a strong lipid

8  profile, period."

9      Is that true based on what you know?

10 A.  No.  I mean, at this time we do have the naive

11 indication, but, again, our studies in naive didn't look at

12 Reyataz, so we don't have any data to base that on.

13 Q.  Even at this point in time was there any on-label study

14 that compared Prezista's impact on lipids to other PI as a

15 class?

16 A.  I believe they only had data against us was all.

17     MR. WIRMANI:  We can take that down.  Can we go to

18 Plaintiff's Exhibit 327.

19     THE COURT:  Are you moving to admit this as well?

20     MR. WIRMANI:  I believe there's no objection.

21     MS. BROWN:  No objection, Your Honor.

22     THE COURT:  All right.  So admitted.

23 (Plaintiff's Exhibit 27 in evidence.)

24 BY MR. WIRMANI:

25 Q.  And do you see, Ms. Strand -- is that an email from

─────STRAND - DIRECT - WIRMANI─────

1  Anthony Dolisi.  Is that Tony Dolisi?

2  A.   Yes, it is.

3  Q.   And remind the jury, what was his position within the

4  company?

5  A.   What's the date on this?  2010.  So he was a district

6  manager in New York that reported to me at that point.  He had

7  been in charge of the key account managers, but they decided

8  to dissolve those, so he reported to me, and these are the

9  people that were on his team.

10       Eric Sheer is a --

11 Q.   Stop right there, Ms. Strand.  I asked only about Tony.

12       You said he -- he was in charge of the key account

13 managers.  Was that a high-level position within Janssen when

14 they had those separate key account managers?

15 A.   Yeah.  Yes, he was comparable to me.

16 Q.   Okay.

17       You're obviously on that email?

18 A.   Uh-huh.

19 Q.   Okay.

20       You see Ms. Brancaccio and Ms. Penelow are also on that

21 email?

22 A.   Yes.

23 Q.   And also a Nancy Bartnett?

24 A.   Uh-huh.

25 Q.   And the subject is "July target results," correct?

STRAND - DIRECT - WIRMANI

1    A.   Yes.

2            MR. WIRMANI:  Can we bring that back in.  Can we go

3    down to the second page.  Go back up one second.

4    BY MR. WIRMANI:

5    Q.   It says there in the middle of the page Prezista,

6    correct, right above that graph?

7    A.   Correct.

8    Q.   Okay.

9            MR. WIRMANI:  Can we go to the second page.

10   BY MR. WIRMANI:

11   Q.   And if we move down at 1, 2, 3, 4, 5, 6 -- that bullet.

12   It says "use the new support visual aid to drive --" is that

13   Prezista, PRZA?

14   A.   Yes.

15   Q.   "Lipid profile."  And it says "In the separation within

16   the class."

17           Do you see that?

18   A.   Yep.

19   Q.   Was there on-label data supporting the idea that Prezista

20   with respect to lipids was separated from the class of

21   protease inhibitors?

22   A.   No, there was only data against Kaletra at the time, and

23   there could have been maybe Viracept data, but there was

24   nothing against Reyataz.

25   Q.   Okay.

STRAND - DIRECT - WIRMANI

1          So would that have been a true statement at that point

2    in time?

3    A.   No.

4          MR. WIRMANI:  Can we expand that back in.

5    BY MR. WIRMANI:

6    Q.   Are all of those -- you see the top there, "it says your

7    goal for the remainder of the year is to flawlessly execute

8    the POA objectives, to formulate the realistic objective to

9    achieving immediate productive impact."

10          It says, "These are the following POA objectives for

11   Prezista:

12          Do you know what POA stands for?

13   A.   POA is plan of action, so it's like national sales

14   meetings or meetings we have twice a year typically.

15   Q.   Were those kind of the -- those bullet points there, were

16   they kind of the plan of action that these salespeople were

17   directed to carry out?

18   A.   Yes, they were.

19          MR. WIRMANI:  Can we take that down and go to 132,

20   please.

21          I believe there's no objection to this as well,

22   Your Honor.

23          MS. BROWN:  Your Honor, I have no objection to the

24   document subject to foundation.

25          MR. WIRMANI:  Fair enough.

STRAND - DIRECT - WIRMANI

1          Can we bring this up for the witness only,

2    Ms. Johnson.

3    BY MR. WIRMANI:

4    Q.   Ma'am, do you see the document on the screen?

5    A.   Yes.

6    Q.   Do you recognize those types of documents?

7    A.   Yeah.  This was from the marketing department.  It was

8    presented in 2009, but it was the tactical plan for what we

9    were going to do to promote the product in 2010.

10   Q.   And there's a name there, Ben Kozub.  Do you know who Ben

11   Kozub is?

12   A.   He was responsible for Prezista.  He was the brand

13   manager.

14   Q.   And would it have been your understanding that that was

15   the plan that the company was going to implement in 2010?

16   A.   Yes.

17   Q.   It's kind of what the title says?

18   A.   Uh-huh.

19   Q.   Would you have been privy to these types of documents

20   during your time at Janssen?

21   A.   I don't know that I would have the document, but I would

22   have sat in on the meetings and listened to all of this

23   information.

24   Q.   So you would have seen the slide presence?

25   A.   Right.

STRAND - DIRECT - WIRMANI

```
 1          MR. WIRMANI:  At this time I'd move to admit
 2   Relators' 132, Your Honor.
 3          MS. BROWN:  No objection.
 4          THE COURT:  All right.  So admitted.
 5   (Plaintiff's Exhibit 132 in evidence.)
 6          MR. WIRMANI:  Can we go to page 7 of this tactical
 7   plan document.
 8   BY MR. WIRMANI:
 9   Q.  You see that there on the screen, Ms. Strand?
10   A.  Uh-huh.
11   Q.  It's page 7 of that document.  It says at the top
12   "elevate tolerability profile within the PA class."
13          Do you know what that means?
14   A.  Oh, there we are.  Okay.
15          Yes.  So it's just saying that make Prezista -- make
16   doctors believe that Prezista's is as tolerable or the most
17   tolerable in the PI class.
18   Q.  And it says "strategic objectives" right below that.
19          Correct?
20   A.  Uh-huh.
21   Q.  And it says "increase patient inquiries about GI lipid
22   issues."
23   A.  Uh-huh.
24   Q.  Do you see that?
25   A.  Uh-huh.
```

STRAND - DIRECT - WIRMANI

1    Q.   And then on the side there written horizontally is

2    "Prezista strategies."

3         Do you see that?

4    A.   Yes.

5    Q.   In the middle there is a box for lipids?

6    A.   Uh-huh.

7    Q.   What does that first bullet point say?

8    A.   It says "to eliminate the perception of Reyataz as the

9    most lipid friendly."

10   Q.   Do you have an understanding of what that means based on

11   being in that meeting?

12   A.   Yes.  So that's what Reyataz is known for, that they're

13   lipid friendly and tolerable.  So they're saying, Get rid of

14   that perception with the doctors, make them understand that

15   our product is just as good and lipid friendly.

16   Q.   And who else would have been at these types of PowerPoint

17   presentations by Mr. Kozub?

18   A.   It would have been the entire marketing department.  It

19   would have been my counterpart.  It would have been medical.

20   It would have been Glenn Mattes, Mike Iacobellis who was the

21   national sales director at that time --

22   Q.   So again --

23   A.   -- reimbursement people.

24   Q.   Would it have been -- would it have included all of the

25   high-level people within the company?

STRAND - DIRECT - WIRMANI

1  A.   Yes.

2        MR. WIRMANI:  Can we take that down and go to

3  Exhibit 353.  Again, I believe there's no objection to this

4  document.

5        MS. BROWN:  No objection.

6        THE COURT:  All right.  So admitted.

7  (Plaintiff's Exhibit 353 in evidence.)

8        MR. WIRMANI:  And, Ms. Johnson, we can publish that

9  to the jury as well.

10 BY MR. WIRMANI:

11 Q.   Is this another one of those business plan-type

12 documents, Ms. Strand?

13 A.   Yes, but this is more at the rep level and the key

14 account manager level.

15 Q.   So what's the -- do they have different business plans at

16 different levels of the company?

17 A.   Yeah, because the marketing department is looking at, you

18 know, the plan that they're going to push down to the sales

19 force and their marketing messages where this is the sales rep

20 saying what they're going to do in their own individual

21 territory to grow a business.

22 Q.   So would it be fair to characterize these types of plans

23 as more implementation of what was discussed and

24 conceptualized at a higher level of the company?

25 A.   Yes.

STRAND - DIRECT - WIRMANI

1          MR. WIRMANI:  Can we go to page 5 of that document.

2     BY MR. WIRMANI:

3     Q.   And we don't have to go back, but the date on that was --

4     the date on that first page was July of 2006, if you recall.

5     Otherwise I can go back to the document.

6     A.   It was July of 2006.

7     Q.   Okay.

8          How long after Prezista's launch would that have been?

9     A.   So that would have been -- we would have still had the

10    treatment experience indication at that point in time.

11    Q.   Okay.

12    A.   And it would have been July -- I mean, that would have

13    been like almost immediately.

14    Q.   And it says there at the top its commercial strategy.

15         Correct?

16    A.   Uh-huh.

17    Q.   And the next sentence down says "aggressively promote

18    Prezista value proposition."

19         Do you see that?

20    A.   Yes.

21    Q.   "Initially in later stage patients but with a view to the

22    future."

23         Do you see that?

24    A.   Yes.

25    Q.   And then on the side there, there's a little arrow that

STRAND - DIRECT - WIRMANI

1    says "positioning in key claims."

2        Correct?

3    A.    Yes.

4    Q.    Second bullet point that last -- or it says "well

5    tolerated, better GI profile than Kaletra."

6        What does that last portion of that sentence say?

7    A.    Similar lipids to Reyataz.

8    Q.    Do you have an understanding of what the sales folks --

9    what this strategy they're implementing is?

10   A.    They're basically trying to neutralize the two

11   competitors that we have, so -- with the GI profile for

12   Kaletra, and they're trying to neutralize the lipid difference

13   with Reyataz.

14   Q.    Okay.

15       Would that have been done through terminology like

16   lipid neutral, similar lipids to Reyataz, lipid friendly?

17   A.    Yes.

18   Q.    And, again, is that something that was conceptualized by

19   the salespeople on the ground or was that a directive they

20   received from above?

21   A.    Can you go back to the first page?

22   Q.    Yes.

23   A.    So this would have been coming from above, because this

24   is a template that would have been standard that would have

25   been given to all the sales representatives.

STRAND - DIRECT - WIRMANI

1          MR. WIRMANI:  We can take that down.  Can we bring up

2     just for the witness Relators' 1553, and I do believe there's

3     an objection to this document, Your Honor, if you'd like us to

4     approach.

5          THE COURT:  Yep.  Let's go chat about it.

6          (Sidebar begins at 3:46 p.m.)

7          THE COURT:  Does somebody have the document?

8          MS. BROWN:  Sure.  We do, Your Honor.  It was a

9     letter from the FDA to Amit Patel, one of our regulatory

10    specialists who was in charge of DDMAC approval.  But the

11    objection is twofold.

12         Number 1, it didn't go to Sara Strand.

13         Number 2, it involves a direct consumer marketing

14    piece, which is not at issue in this lawsuit and which is

15    governed by totally different regulatory standards.  And the

16    risk of prejudice is so great because it has to do with lipids

17    that can be given directly to consumers.  But it's a different

18    regulation, and it's not what's at issue here.

19         So what they're going to try to do is say, Ah ha, DDMAC

20    said you can't use this language, direct to consumers.  But

21    DDMAC didn't say that when it came to doctors, which is what

22    is at issue here.

23         So at the risk of confusion, Your Honor, intentional or

24    not, is great.  So it is a relevance issue and a 403 issue.

25              THE COURT:  Let me hear from you.

STRAND - DIRECT - WIRMANI

1        By the way, is that accurate, that this is about direct

2   to consumer?

3        MR. WIRMANI:  It is about direct to consumer.  I

4   think we disagree strongly with that distinction she is

5   drawing.

6        I would note the only reason I am bringing this up is

7   in her examination of that prior witness, her questions on

8   cross were, Did you know that DDMAC is approved lipid this,

9   lipid that, lipid this.  And I'd like to dispel that notion

10  with that document in front of the jury.

11       She didn't actually show the jury any documents when

12  she asked those questions.

13       MS. BROWN:  Because they didn't go to the witness,

14  Your Honor.  That's the issue this --

15       (Reporter clarification.)

16       MS. BROWN:  I apologize.

17       So it's not even close to appropriate with this

18  witness.  It didn't even go to her.  She wasn't responsible

19  for dealing with DDMAC.

20       The reason I asked those questions of Ms. Graham is

21  because she tried to tell the jury what was appropriate with

22  the messaging, and I want to see if she's aware of what the

23  FDA said was appropriate.

24       MR. WIRMANI:  And I can ask her the questions without

25  admitting the exhibits, Your Honor, as Ms. Brown --

STRAND - DIRECT - WIRMANI

1    THE COURT:  Well, I do have concerns about the

2  document.  So let me just say for now -- and this has to do

3  with direct to consumer.  Correct?  I mean, now that's -- to

4  me, I agree that that's separate and apart from what we're

5  talking about here.  Unless you're going to fully brief those

6  two issues and get them to me about how the regulations are

7  identical and everything that's direct to consumer is

8  analogous to what can be told to a physician, which I don't

9  think you're going to do, but you can do that tonight.

10    This document is not coming in.

11    MR. WIRMANI:  I understand that, Judge.

12    THE COURT:  Now, tell me what you want to ask her.

13    MR. WIRMANI:  Well, here's the point, and I don't

14  think this actually goes to the issue of who it's directed to

15  because right here it says "The claim that Prezista had low

16  impacts on cholesterol is misleading because it minimizes the

17  risks associated with the use of Prezista specifically."

18    So it's not just saying this is not a good marketing

19  tactic; this is saying this is not true.

20    THE COURT:  Well, it doesn't say all the -- it's in

21  the context, though, of what?  Right?  I mean, pulling that

22  sentence out, what is the context?

23    MR. WIRMANI:  It's in the context of proposed

24  marketing pieces and the FDA is telling Janssen you cannot say

25  that.

```
 1              MS. BROWN:  May I be heard on that, Your Honor?

 2              MR. WIRMANI:  And let me finish, Ms. Brown.

 3         And it's not just saying you cannot say that.  It is

 4    saying that is misleading because it is not true.  It is

 5    minimizing the impact.  So it's looking at the science and

 6    it's minimizing the impact.  If you look at the label, it

 7    says, this is what the label actually says.

 8         So I don't believe this is an issue that is narrowed

 9    just to who it's going to.  It's a question of the --

10              THE COURT:  Do you have a witness from --

11              MS. BROWN:  Yes.

12              THE COURT:  -- HHS that is coming in to say --

13              MR. WIRMANI:  You have one?

14              MS. BROWN:  Right.  I said Mr. Patel is going to

15    testify about this document.  They asked him about it in his

16    dep.  I thought that's what you mean, Judge.

17         No HHS witness is coming in to testify.

18              THE COURT:  All right.  So let me hear what you

19    wanted to say.

20              MS. BROWN:  And, Your Honor, if I could just steal

21    this back from you a second.

22         So this low impact on cholesterol is actually an

23    approved message for the doctor pieces.  And so what they're

24    trying to do here is --

25              MR. WIRMANI:  There is no document that says that.
```

─────────── STRAND - DIRECT - WIRMANI ───────────

1        MS. BROWN:  Okay.  The way DDMAC works is you submit

2   your documents to them and then FDA responds where they have

3   edits, and they've done that.  And we've sent a number of

4   these that say DDMAC on the doctor's side that had proven

5   impact on lipids, low impact on lipids, minimal impact on

6   lipids, and those were acceptable.

7        And the way the regulations work that Mr. Patel

8   explained in his deposition --

9        THE COURT:  No, but let me -- don't interrupt.

10  You're doing the same thing that you asked her not no do.

11       MR. WIRMANI:  I did.  I did.  I apologize.

12       THE COURT:  So let me hear her out.

13       MS. BROWN:  Correct.

14       And what Mr. Patel explained in his deposition is that

15  those messages were sent to DDMAC's person which was a

16  different set of regulations, and they were not objected to.

17  And because we got fast-track approval for these medicines, we

18  couldn't go into a doctor's office.  They had gone to the FDA,

19  and they responded.  And they did on a lot of pieces.  But on

20  this statement, as it relates to the doctor pieces, they have

21  no objection.

22       Now, they did have an objection as it relates to direct

23  to consumer, and that's a totally different regulation --

24       THE COURT:  By the way, why do you need this witness

25  for this?  What does this witness have to do with that

STRAND - DIRECT - WIRMANI

1   information or that document?

2        MR. WIRMANI:  And I may let it go at this point.

3   Just for -- but just for future purposes, I'd like to lay a

4   little bit of a predicate --

5        THE COURT:  Well, no.  Then here's what I would like

6   to do then.

7        I'm going to sustain the objection for now with respect

8   to this witness with respect to what you've all provided me.

9   If you want to say after a subsequent witness you think that

10  you're either going to relate by letter to articulate how this

11  is admissible, then I'll hear what you have to say.  Or if

12  through another witness you think that somehow that changes

13  the analysis for the Court, I'll consider it.

14       But I don't know if you're withdrawing this from this

15  witness or you want me to rule.

16       MR. WIRMANI:  I guess all I'd like on the record for

17  later purposes, Judge, is that the argument they're making, I

18  send something to the Government, they don't respond, they've

19  approved it is patently absurd.

20       And that's basically what Ms. Brown is arguing so we

21  can take that up at a later time --

22       (Reporter clarification.)

23       MR. WIRMANI:  All right.  And we don't have to --

24  obviously the Judge is not going to rule right now, I

25  understand that.  I'm just flagging it for the future --

STRAND - DIRECT - WIRMANI

```
 1            THE COURT:  All right.

 2            MR. WIRMANI:  -- consideration.

 3            THE COURT:  I understand what your concern is.

 4        Ms. Brown, I presume you disagree and you're saying,

 5   look, if we submit all these things and say this is what we're

 6   going to do and the Government doesn't say you can't do that,

 7   then here's some acquiescence by their silence.  And we can

 8   get into that on a different day, but for now, I'm ruling that

 9   this is not coming in for now.

10        But we can talk more about that.  Or if you want to

11   brief that particular issue where you want to equate what is

12   marketed to consumers can be somehow admissible in this case

13   when we're talking about physicians and you want to say those

14   are completely distinguishable, I wouldn't -- I'm not asking

15   you to file any formal motions.  We're in trial.  But if you

16   want to put a letter together and you want me to review it and

17   we can talk about that issue -- there's going to be a lot of

18   witnesses coming into this trial.  And if you really think --

19   I'm saying this for now.  I'm not prohibiting you for all time

20   in the trial, but for now, we're putting this on hold.

21        And if you think there's another witness, then I'll

22   hear what you have to say, but you're going to have to give me

23   more than a sidebar conversation about it's A or it's B.  I'm

24   going to need more to assess that.

25            MR. WIRMANI:  Understood.
```

STRAND - DIRECT - WIRMANI

1          MS. BROWN:  Thank you, Your Honor.

2          THE COURT:  Yep.

3          (Sidebar was concluded at 3:53 p.m.)

4          (Open court.)

5          THE COURT:  By the way, Counsel, I'm just looking at

6  the time.  So we have about ten minutes.  I just want to give

7  you that sense if there's a place -- I'm not saying you need

8  to stop now.  I'm happy to go ten more minutes and push the

9  jurors a little bit closer to 4 o'clock.

10          But if there is a spot where you think is a good place,

11  you let me know.  Okay?

12          MR. WIRMANI:  I think I can get about ten minutes and

13  use everyone's time.

14          THE COURT:  All right.  Let's do that.

15  BY MR. WIRMANI:

16  Q.  Ms. Strand, let's move on.

17          We talked about Prezista and looked at some documents.

18  Talked about off-label messages that were used.

19          Did Janssen introduce a second HIV drug in 2008?

20  A.  Yes.  It was Intelence.

21  Q.  Approximately when was that drug launched?

22  A.  I don't remember the month.  I'm sorry.

23  Q.  In the 2008 time period.  Is that fair?

24  A.  It was definitely then.

25  Q.  Did Intelence have similar limitations on its potential

STRAND - DIRECT - WIRMANI

1  market based on its label as Prezista did?

2  A.   Yeah.  I mean, it was approved for treatment-experienced

3  patients again.  Although it looked very promising because

4  that's a drug in the NNRTI class.  And anybody that took an

5  NNRTI got a K103 mutation, and our drug worked.  People were

6  really excited about that drug, to be able to use it.

7  Q.   What segment of the HIV population practice were excited

8  by the drug?  Where was it going to be used based on its

9  label?

10  A.   It was still going to be used in treatment-experienced

11  patients.

12  Q.   And were there other limitations that decreased the

13  potential market share for that drug?

14  A.   Yes.  So the time, there had recently been an adherence

15  study that came out that showed HIV patients specifically that

16  took once-a-day dosing were much more apt to be adherent, take

17  it frequently, where if you took it twice a day -- I mean,

18  it's like antibiotics.  I think we have all probably not

19  finished a course of antibiotics or forgot the second pill

20  during the day.

21  Q.   Based on your experience as a salesperson, do physicians

22  and patients care about once- or twice-daily dosing in their

23  HIV medications?

24  A.   Both of them do.  Because doctors know they're more

25  adherent to once a day, and patients like it because it's

STRAND - DIRECT - WIRMANI

1   easier to remember.

2   Q.   Give the jury a sense in that class of -- I think you

3   said NNRTI, in that class, how many of those other drugs were

4   for twice-daily dosing?

5   A.   Everything else was once a day in that class.

6   Q.   So how many other drugs would that have been,

7   approximately?

8   A.   Viramune, Durabolin, and the big one was Sustiva.

9   Q.   And based on your experience, I mean, how big of a

10  competitive disadvantage did that put Intelence at?

11  A.   For treatment-experienced patients, I don't think it did.

12  If you were going to use a treatment-naive, then it would be a

13  disadvantage.

14  Q.   Did the company ultimately market Intelence for

15  treatment-naive patients?

16  A.   Yes.

17  Q.   Did it ultimately market the drug as safe and effective

18  for once-daily dosing?

19  A.   They tried to show the half-life to prove that you could

20  use it with once-daily dosing, because the half-life was 96

21  hours.  So they tried to get doctors to take that leap of

22  faith that they could use it that way.

23  Q.   Was there a study on the label of Intelence that said,

24  you know, we've studied this pill for once-daily dosing and

25  we've determined that it's safe and effective?

STRAND - DIRECT - WIRMANI

1   A.   Not on the actual package insert.

2   Q.   Did -- has Intelence ever received that indication,

3   once-daily dosing from the FDA?

4   A.   No.  Intelence was a good drug.  I know several of us

5   went to them and tried to get them to make changes or to look

6   at that, but they had another drug coming down the pipeline

7   that was called -- like, MKC278, and it was going to be for

8   naive patients.  And they wanted to sink all their money in

9   that.  So they're, like, we're not going to do anything else

10  with that.

11  Q.   When you say "several of us went to them" --

12  A.   Yes.

13  Q.   -- who is "them"?

14  A.   So, like, I know that I had gone to, like, Glenn Mattes,

15  the marketing department suggested this.  Scott Libby had done

16  the same.  I mean, the managers would speak up at meetings and

17  say, like, why don't we study this with once-a-day dosing.

18  Q.   Okay.

19       And does it cost Janssen money to do the studies needed

20  to get the -- you know, the type of research that they can

21  submit to the FDA to get once-daily dosing?

22  A.   Yes.  I mean, it would have been very expensive to do a

23  study like that.  And knowing that we had the other drug that

24  was in the pipeline and it was probably going to be a year to

25  two years behind, they weren't willing to put any other money

STRAND - DIRECT - WIRMANI

1    into Intelence.

2    Q.   Did the folks that you were having those conversations

3    with, including Glenn Mattes, did they know that people in the

4    field were selling Intelence for treatment-naive patients for

5    once-daily dosing?

6    A.   Yes.  Because it was trained.  I mean, we go to our plan

7    of action meeting, and we would train people to say, like,

8    Well, look at the half-life there.  Ask the doctor what he

9    thinks that means.

10        And, you know.  So they were definitely trained.  And

11   everyone knew that that was being said.

12   Q.   So not a lot of motivation to go spend money on research

13   if it's already being sold that way.  Is that fair?

14   A.   Correct.

15        MR. WIRMANI:  Can we bring up Plaintiff's 136.

16        It's the last document I'll show you today.

17        I believe there's no objection.

18        THE COURT:  Wait.  Hold up, folks.  Don't publish

19   that document until I get at least a statement from counsel

20   that there's no objection.

21        You guys have to take it off again.

22        MS. BROWN:  I have no objection.

23        THE COURT:  All right.  Now you can put it on.

24        Be careful of that because one time there's going to be

25   an objection, and I don't want things published without at

STRAND - DIRECT - WIRMANI

1    least resolving the issue.

2             MR. MARKETOS:  It's already in evidence.

3             THE COURT:  It's previously admitted.  Ah, then --

4    you guys have to tell me.  If it's previously admitted, then

5    I'm not concerned.  If it's not, I want to at least have the

6    Court rule before it goes up.

7             All right.  Fair enough.

8    BY MR. WIRMANI:

9    Q.   If we look at that second email on that page, is that

10   from Ben Kozub?

11   A.   Yes.

12   Q.   And do you have a sense -- that group of people that he's

13   emailing, what is that group of people?  Is it a region?

14   A.   Some of the names I don't recognize.  Keith Moran was in

15   sales analytics.  Jim Witek was a medical director.  Greg

16   Ruppersberger was in sales analytics, I believe.  And most of

17   the other ones were in sales or marketing.

18   Q.   Was Mike Iacobellis, was he the head of marketing or head

19   of sales at that time?

20   A.   He was head of -- this is 2010.  He was head of sales at

21   that time.

22   Q.   Okay.

23             So he would have been your boss at that point in time.

24   A.   Yes.

25   Q.   Okay.

STRAND - DIRECT - WIRMANI

1      And you're on that email, obviously?

2   A.   Yes.

3         MR. WIRMANI:  Can we expand that back down.

4   BY MR. WIRMANI:

5   Q.   And it says, "Hi, Jan, Martin, and Deb."

6         Is that Deb O'Connor?

7   A.   Yes.

8         MR. WIRMANI:  Can we -- I don't need it blown up

9   right now.  Thank you.

10  BY MR. WIRMANI:

11  Q.   And the -- if you look at the second capitalized kind of

12  portion down, but it says, "Intelence opportunity."

13        Do you see that?

14  A.   Yes.

15  Q.   And above that it says, "What questions do we still need

16  answered by sales point and others?"

17        Do you see that?

18  A.   Uh-huh.

19  Q.   And then the next bullet -- or the next bold point on

20  there says, "What are the off-label opportunities for NNRTIs?"

21        And then it says, "Intelence," and there's another drug

22  in brackets.

23        Do you see that?

24  A.   Uh-huh.

25  Q.   And would your understanding be that that is a --

STRAND - DIRECT - WIRMANI

1          MR. WIRMANI:  And can we move that up just a little

2    bit, Ms. Johnson, or down.

3    BY MR. WIRMANI:

4    Q.   What is your understanding of that question, "What are

5    the off-label opportunities for the NNRTIs, Intelence"?

6    A.   They're looking to see, like, where else we could use it

7    besides treatment-experienced patients.

8          MR. WIRMANI:  Can we go to the second page of that

9    document.

10   BY MR. WIRMANI:

11   Q.   And is that the same set of bullet points that comes

12   under that, "What are the opportunities for off-label

13   Intelence" for the last page?

14        It's a carryover of those bullet points from the

15   previous page.  Is that fair?

16   A.   Yeah.

17   Q.   Okay.

18        What does that third bullet point say?

19   A.   "What can we speak to promotionally that will allow us to

20   capitalize on this opportunity?"

21   Q.   And what opportunity are they talking about?

22   A.   The off-label opportunities for Intelence, and 278 was

23   the new drug that was coming to market.

24   Q.   Is it legal for Janssen to speak promotionally to

25   off-label opportunities for one of its drugs?

STRAND - DIRECT - WIRMANI

1    A.   No.  It's -- it's legal for a doctor to write off-label,

2    but it's not legal for us to promote it there.

3    Q.   And this is a -- fair to say this is a strategic email of

4    Janssen about how it's going to promote the drug?  Is that a

5    fair characterization?

6    A.   Uh-huh.

7    Q.   Is that a "yes," ma'am?

8    A.   Yes, it is.

9         MR. WIRMANI:  Your Honor, I think this is probably a

10   good point to stop.

11        THE COURT:  I appreciate that, Counsel.

12        All right.  So, folks, we're close to 4 o'clock.  I

13   want to say I do appreciate your attention throughout the day.

14   I look forward to seeing you all tomorrow.  We're going to

15   dismiss you for the day.  Enjoy the rest of it.  And let's try

16   to be here to start at 9:30 on time.  I'll have the lawyers at

17   9.

18        Counsel, remain, as we always do, just so I can briefly

19   speak with you both.

20        Let's dismiss the jurors.

21        THE DEPUTY COURT CLERK:  All rise.

22        (Jury dismissed.)

23        THE COURT:  All right, folks.  Have a seat.

24        Before we are adjourned for the day, Mr. Marketos,

25   anything we need to chat about at least until tomorrow

 1    morning?  Let me know.

 2            MR. MARKETOS:  Just one thing, Your Honor.  Ms. Brown

 3    and I were talking about a witness in particular.  So there's

 4    a witness that we're putting on tomorrow that has to go

 5    tomorrow.  His name is Mark Wilhelm.

 6            THE COURT:  Okay.

 7            MR. MARKETOS:  He's coming in from out of state.

 8            And Janssen has a witness waiting for us as well,

 9    Ms. Bartnett, Nancy Bartnett, who has an hour and a half to

10    travel.

11            We're thinking we're probably not going to get to

12    Ms. Bartnett tomorrow.  So if we're going to finish with

13    Ms. Strand and then do Mr. Wilhelm, I think it's both of our

14    expectation that we might not get to Ms. Bartnett.

15            I'd just like to -- if it's okay with the Court, if we

16    end up at 3:30, I don't want to make Ms. Bartnett come in for

17    an hour and a half.

18            THE COURT:  Oh, I see what you're saying.  We may end

19    a little bit early tomorrow.

20            MR. MARKETOS:  If that's okay.

21            THE COURT:  I don't have an issue with that.  I mean,

22    look, this is going to be hard -- let me ask you this, though.

23    Is this case going slower than we anticipated?  because day

24    one we were supposed to have two witnesses, and we're still on

25    the second.

     1          So I'm a little concerned, unless you're all telling

     2     me, No, Judge, this is kind of going as we planned.  This

     3     is -- these first witnesses were going to be longer; we

     4     anticipated this.

     5          What are your thoughts about it?  It's a little early.

     6     I probably wouldn't have this discussion with you all until,

     7     like, the end of week number two, to kind of see where you

     8     think we are on pace.  But where do you think we are now, just

     9     because we're talking about it?

    10          MR. MARKETOS:  I do think the first two witnesses

    11     always take longer, and I think that the testimony gets

    12     truncated, and we move more quickly as the jury hears the

    13     evidence some.

    14          I would still suspect that we're going to do 13 days.

    15          THE COURT:  All right.  I presume there's no

    16     objection, then, from Ms. Brown if we don't get to Bartnett --

    17     is it Bartnett?

    18          MR. MARKETOS:  Yes, sir.

    19          THE COURT:  If we don't get to that particular

    20     witness and we end a little bit earlier than we usually do

    21     tomorrow, just because it's hard to time this whole thing, I

    22     don't presume there's any objection on your --

    23          MS. BROWN:  No.  I mean, actually, they were

    24     accommodating my request, so I appreciate it.  She was waiting

    25     today, and I just didn't want her to have to come back.

```
 1            THE COURT:  Two days in a row.

 2            MS. BROWN:  Yeah.  And so they were kind to her, you

 3    know --

 4            THE COURT:  All right.  Let's do this to at least

 5    avoid that inconvenience for this witness two days in a row.

 6        So tomorrow we're going to finish with Ms. Strand, and

 7    then we're going to go to this witness who's only available

 8    tomorrow.

 9        What's the name?

10            MR. MARKETOS:  Mark Wilhelm, Your Honor.

11            THE COURT:  Mark Wilhelm.

12        And Bartnett will be -- she won't be on deck tomorrow.

13            MR. MARKETOS:  Yes, Your Honor.

14            MS. BROWN:  Thank you, Your Honor.  We appreciate

15    that.

16            THE COURT:  All right.  And is Bartnett expected to

17    testify, then, next week?

18            MR. MARKETOS:  On Monday, Your Honor.

19            THE COURT:  All right.  That's fine.  All right.

20    I'll do this.

21        Look, if we start getting a little backtracked here by

22    the end of week two or so, we think that we're having some

23    trouble with timing, then we're going to have to expedite some

24    things.  But for me, let me accommodate you guys.

25        What else?  Anything else that we need to chat about at
```

1    least for today?

2         And I'll get to you guys.  I'm still waiting on the

3    Relators.

4              MR. MARKETOS:  No, Your Honor, thank you.

5              THE COURT:  Ms. Brown, there might be some issues we

6    need to chat about?

7              MS. BROWN:  One thing I did want to raise with the

8    Court, and I might defer to my colleagues who know the order

9    better, but we do believe there is one physician for whom we

10   need to request the Court's permission to have remote

11   testimony.  The others will be live.  I know that was the

12   Court's preference.

13        But we do believe there is one for whom we will need to

14   ask for permission to Zoom in.

15             THE COURT:  Is there an unavailability issue, or what

16   is the concern?

17             MS. BROWN:  I believe there is a personal family

18   health care issue that is creating -- in conjunction with the

19   treating patient schedule -- that's creating an issue.

20             THE COURT:  All right.  Is that physician scheduled

21   to testify soon, or this someone you intend to call later in

22   the trial?

23             MS. BROWN:  No, no, in our case.  I was -- before we

24   told him that that would be acceptable and he should hold it

25   on his calendar, we wanted to at least make sure the Court

 1  would permit that.

 2        THE COURT:  Well, then, let me ask you this.  Is

 3  there any objection from Relators?  I don't have a particular

 4  issue, but I'm not necessarily going to delve into it if you

 5  guys agree to it.

 6        If there's some objection, then I'm going to have to

 7  get some more information on this to determine it.  But I'm

 8  not necessarily looking to jump into his family medical

 9  business if there's no objection.

10        Let me hear from Mr. Marketos.

11        MR. MARKETOS:  Your Honor, our general preference is

12  that, as was expressed by Your Honor in the pretrial list,

13  that we have witnesses live.  I know they're doctors and

14  they're busy, but we really need them in the courtroom.

15        THE COURT:  Well, no -- well, that's a different

16  story.  If this is about I'm a physician and I'm busy and I

17  can't come to this trial, that would be every physician.  So

18  why don't we do this.  I'm just going to table the issue

19  because I need more information from you or Mr. Wyatt or

20  whoever has it.  And if you want table it for tomorrow morning

21  or another morning when we're doing housekeeping to say,

22  Judge, here's the issue so we can provide you more

23  information.

24        But with some caution that if this is about him being

25  busy at work and not wanting to leave his office, that I'm not

1    going to accommodate.  But if there's a family medical issue

2    and you want to provide more information --

3            MS. BROWN:  I will do that, Your Honor.

4            THE COURT:  And if for some reason there's privacy

5    issues and you want to provide some of that information

6    outside the earshot of at least the gallery, we can also kind

7    of handle that, since this isn't necessarily information that

8    has to be relevant to the public.

9            But why don't we table this for now.

10           And Mr. Marketos, what I would ask you to do, since --

11   and I understand your objection, especially since initially my

12   preference is always with these trials the witnesses will be

13   in person for a trial, not just like this, any trial.  But I'd

14   ask you to meet and confer with defense counsel to learn the

15   additional information.  And if you still want to lodge your

16   objection, I will address it.  But I would prefer you first

17   hear the information first because your position may change

18   when you find out it's something different.

19           MR. MARKETOS:  That's fair.

20           THE COURT:  Is there anything else for today that we

21   need to address before I adjourn for the day?

22           MS. BROWN:  No, thank you, Your Honor.

23           THE COURT:  All right.  I know we're still meeting at

24   9.  I'm going to continue to do that.  If at some point we run

25   out of issues in the morning and you're all just sitting here

 1    rotting for 30 minutes, I'll change that protocol, and you can

 2    come at 9:25.

 3            But because we're early in the trial, I still want you

 4    here at 9.

 5            One other thing I want to remind you of.  I don't need

 6    this tomorrow, and I don't need this by the end of the week or

 7    even by the end of, necessarily, next week.  But at least

 8    half -- at the halfway mark, this instruction on the False

 9    Claims Act, the one that we addressed earlier today that was a

10    brief version of it, I have a feeling that the parties are

11    going to want a more detailed version for the final

12    instructions.  I want that in advance.  I don't want to be

13    waiting until the end of the trial to put my head around that,

14    right, because I might need some time to take a look at it.  I

15    might have to look at some law to see where I think I fall on

16    what that instruction is going to be.

17            So in the next week or so, I'd like you all to confer

18    and then provide me with whatever that instruction is going to

19    be.  And if you're in agreement, wonderful.  If not, you'll do

20    it like you did the other instructions.  I'm going to want to

21    see the objections to what each party wants.

22            So that's an outstanding assignment that you all have,

23    but I'm just giving you a deadline of, say, like, at the

24    halfway mark of the trial, and that way I have plenty of time.

25            Other than that, is there anything else outstanding

 1    that you owe me other than that instruction?

 2            MR. MARKETOS:  No, Your Honor.  I don't believe so.

 3    But if we do, you'll let us know.

 4            THE COURT:  I will.  That's probably right, but I

 5    don't want to have to remember it twice.

 6        Ms. Brown?

 7            MS. BROWN:  I don't think so, Your Honor.  Thank you.

 8            THE COURT:  Well, then, you all can remain seated.

 9    You've been jumping up and down all day between me and the

10    jurors.  So remain seated.  We are adjourned for the day, and

11    I'll see you at 9:00 a.m. tomorrow.

12            THE DEPUTY COURT CLERK:  All rise.

13            (Court concludes at 4:11 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1          FEDERAL OFFICIAL COURT REPORTER'S CERTIFICATE.

2              - - - - - - - - - - - - - - - - - - - - -

3

4        I certify that the foregoing is a correct transcript from

5     the record of proceedings in the above-entitled matter.

6

7

8        I

9

10

11    /S/ Megan McKay-Soule, RDR, CRR     May 8, 2024

12              Court Reporter                        Date

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$10** [1] - 338:17
**$50** [1] - 582:6
**$800** [2] - 337:6, 337:20

## '

**'92** [1] - 531:14
**'97** [1] - 531:14

## /

**/S** [1] - 647:11

## 0

**08608** [1] - 306:9

## 1

**1** [12] - 314:21, 447:9, 483:10, 483:11, 503:21, 513:7, 533:6, 533:22, 606:18, 609:6, 615:11, 623:12
**10** [2] - 333:23, 586:7
**1000** [1] - 513:7
**10:02** [1] - 376:2
**10:17** [1] - 391:11
**10:19** [1] - 394:11
**10:23** [1] - 398:25
**10:25** [1] - 400:11
**11** [2] - 433:10, 571:23
**1102** [3] - 307:19, 571:5, 571:10
**1148** [4] - 307:18, 560:6, 560:17
**1157** [1] - 578:24
**11:29** [1] - 454:23
**11:30** [1] - 456:22
**12** [4] - 311:7, 555:1, 556:3, 573:9
**120** [1] - 528:12
**128** [1] - 528:12
**12:30** [1] - 515:5
**13** [2] - 581:11, 640:14
**132** [4] - 307:23, 616:19, 618:2, 618:5
**136** [1] - 634:15
**14** [2] - 467:2, 561:14
**15** [4] - 333:23, 565:4, 577:4, 586:7
**154** [2] - 507:4, 507:6
**1553** [1] - 623:2
**1992** [2] - 530:7, 543:15
**1995** [1] - 555:12

**1997** [2] - 531:16, 534:21
**1:15** [2] - 515:4, 515:5
**1st** [1] - 542:12

## 2

**2** [13] - 306:5, 314:4, 314:6, 314:21, 397:11, 442:4, 533:23, 534:9, 581:7, 596:22, 612:23, 615:11, 623:13
**20** [4] - 378:9, 411:22, 437:21, 574:16
**200** [2] - 536:3, 536:9
**2000** [2] - 534:21, 534:22
**2006** [19] - 403:23, 404:5, 411:19, 471:4, 475:9, 483:22, 484:8, 542:16, 555:5, 555:13, 556:19, 561:1, 573:23, 577:24, 578:3, 581:23, 621:4, 621:6
**2008** [7] - 446:17, 571:20, 572:13, 573:9, 573:23, 630:19, 630:23
**2009** [4] - 423:2, 423:25, 446:5, 617:8
**2010** [4] - 614:5, 617:9, 617:15, 635:20
**2011** [5] - 382:21, 437:13, 437:16, 527:20, 553:7
**2012** [1] - 556:2
**2014** [4] - 381:12, 437:10, 471:4, 475:9
**2015** [1] - 381:9
**2016** [1] - 437:10
**2018** [1] - 458:13
**2019** [1] - 467:1
**2020** [3] - 393:3, 508:21, 509:7
**2024** [3] - 306:10, 308:3, 647:11
**2095** [2] - 385:25, 492:3
**21** [3] - 437:21, 473:5, 496:25
**2104** [1] - 444:19
**21st** [1] - 458:13
**22** [1] - 594:8
**222** [4] - 307:21, 590:20, 592:16,

592:19
**22nd** [1] - 467:1
**25** [1] - 319:16, 334:25, 335:9, 336:7, 337:18, 337:24, 337:25, 341:12, 342:21, 582:7, 596:9
**27** [3] - 307:22, 530:4, 613:23
**272** [3] - 307:21, 611:15, 611:19
**278** [1] - 637:22
**2:25** [1] - 565:7
**2:27** [1] - 568:2
**2:37** [1] - 575:4
**2:39** [1] - 577:16

## 3

**3** [7] - 314:21, 442:10, 534:1, 536:23, 592:24, 601:10, 615:11
**3,700** [1] - 596:4
**3.3** [1] - 570:24
**30** [3] - 570:6, 570:9, 645:1
**300** [1] - 510:8
**31** [1] - 319:18
**32** [1] - 563:18
**327** [1] - 613:18
**3270** [1] - 319:18
**34** [1] - 564:9
**35** [2] - 568:4, 579:13
**352** [1] - 307:3
**353** [2] - 307:24, 620:3, 620:7
**37** [1] - 362:14
**3700** [1] - 596:7
**379** [1] - 307:7
**381** [1] - 307:8
**384** [1] - 307:9
**395** [1] - 307:10
**3:12-cv-07758-ZNQ-JBD** [1] - 306:4
**3:30** [2] - 584:1, 639:16
**3:46** [1] - 623:6
**3:53** [1] - 630:3

## 4

**4** [6] - 533:6, 534:3, 593:8, 615:11, 630:9, 638:12
**400** [2] - 610:24, 611:2
**400,000** [1] - 337:4
**402** [1] - 306:9
**403** [2] - 307:11,

623:24
**41** [1] - 368:4
**422** [1] - 307:12
**427** [1] - 307:13
**438** [1] - 307:14
**444** [1] - 307:15
**45** [6] - 385:14, 511:18, 512:1, 512:7, 515:4, 595:22
**45MM** [2] - 595:18, 595:21
**461** [1] - 307:16
**48** [2] - 427:14, 581:6
**483** [1] - 307:17
**489** [1] - 307:3
**49** [5] - 409:2, 409:24, 500:12, 506:23
**4:11** [1] - 646:13

## 5

**5** [6] - 336:5, 338:17, 444:18, 545:8, 615:11, 621:1
**50** [3] - 376:5, 422:12, 507:1
**527** [2] - 307:4, 307:4
**560** [1] - 307:18
**571** [1] - 307:19
**579** [1] - 307:20
**592** [1] - 307:21

## 6

**6** [2] - 545:9, 615:11
**6.3** [4] - 571:24, 573:17, 573:21, 578:3
**60** [3] - 507:4, 545:8, 552:22
**600** [3] - 306:17, 564:1, 569:7
**600-milligram** [1] - 568:20
**609** [1] - 306:24
**611** [1] - 307:21
**613** [1] - 307:22
**618** [1] - 307:23
**620** [1] - 307:24
**68** [2] - 416:12, 416:15
**6th** [2] - 483:22, 484:8

## 7

**7** [3] - 337:6, 618:6, 618:11
**70** [1] - 552:22
**700** [1] - 339:13
**72** [1] - 545:14
**73** [1] - 506:4

**750** [3] - 306:17, 610:25, 611:3
**75201** [1] - 306:17
**78** [1] - 391:6

## 8

**8** [3] - 306:10, 308:2, 647:11
**80** [1] - 585:13
**80/20** [1] - 558:12
**81** [2] - 379:7, 379:13
**815-2319** [1] - 306:24
**82** [1] - 403:12
**85** [3] - 380:19, 380:21, 381:2
**8635** [2] - 502:22, 503:1
**8637** [1] - 500:3
**87** [2] - 307:20, 579:5
**8701** [1] - 403:12
**896** [2] - 596:5, 596:8

## 9

**9** [6] - 467:2, 577:4, 581:8, 638:17, 644:24, 645:4
**9,000** [1] - 567:6
**90** [12] - 456:7, 456:11, 459:17, 461:9, 464:2, 467:2, 467:17, 496:12, 597:3, 597:10
**91** [1] - 467:2
**920** [1] - 306:21
**96** [1] - 632:20
**9:00** [3] - 306:10, 308:3, 646:11
**9:25** [1] - 645:2
**9:30** [2] - 334:1, 638:16
**9:45** [1] - 356:23
**9:46** [1] - 357:8
**9:51** [1] - 363:12

## A

**a.m** [8] - 306:10, 308:3, 356:23, 363:12, 391:11, 398:25, 454:23, 646:11
**a.m.)** [5] - 357:8, 376:2, 394:11, 400:11, 456:22
**Abbott** [3] - 555:17, 597:22, 598:3
**ability** [2] - 314:23, 371:7

**able** [30] - 317:6, 318:22, 321:5, 330:17, 332:11, 343:12, 344:16, 346:2, 346:4, 346:10, 346:14, 348:25, 349:21, 363:5, 367:20, 368:2, 370:25, 392:3, 422:3, 427:9, 457:10, 499:19, 537:24, 544:24, 555:10, 565:25, 567:2, 575:5, 575:16, 631:6
**above-entitled** [1] - 647:5
**absolutely** [18] - 314:1, 322:17, 368:2, 390:15, 392:5, 406:25, 422:6, 463:11, 466:12, 468:1, 482:5, 498:2, 506:20, 510:4, 510:18, 510:22, 517:20, 610:2
**absurd** [1] - 628:19
**accelerated** [1] - 534:13
**accept** [1] - 587:9
**acceptable** [3] - 349:10, 627:6, 642:24
**accepted** [1] - 387:7
**access** [4] - 406:9, 406:14, 407:1, 469:5
**accommodate** [2] - 641:24, 644:1
**accommodating** [1] - 640:24
**accordance** [2] - 349:21, 485:3
**according** [2] - 388:14, 436:23
**account** [11] - 529:9, 540:2, 545:10, 545:15, 545:16, 548:20, 584:18, 614:7, 614:12, 614:14, 620:14
**accounts** [4] - 530:15, 531:21, 532:14, 532:15
**accuracy** [1] - 495:11
**accurate** [17] - 434:14, 462:8, 462:12, 463:16, 466:6, 467:21, 468:6, 495:14, 497:8,

497:9, 497:10, 516:13, 516:15, 517:18, 523:16, 600:7, 624:1
**accurately** [1] - 592:1
**achieving** [1] - 616:9
**acknowledge** [1] - 442:5
**acknowledging** [1] - 613:4
**acquaintance** [1] - 397:15
**acquiescence** [1] - 629:7
**Act** [16] - 310:25, 311:2, 311:9, 312:1, 313:1, 314:20, 322:1, 326:17, 516:21, 517:14, 518:5, 520:2, 521:23, 522:15, 526:11, 645:9
**acting** [1] - 575:21
**action** [10] - 319:25, 320:22, 489:14, 552:17, 556:5, 603:15, 605:2, 616:13, 616:16, 634:7
**ACTION** [1] - 306:3
**actions** [1] - 329:2
**activities** [3] - 388:23, 412:14, 412:19
**activity** [7] - 355:13, 383:2, 383:13, 385:11, 389:5, 399:6, 487:15
**actual** [7] - 336:21, 341:7, 341:8, 343:11, 572:18, 582:22, 633:1
**acute** [2] - 530:6, 531:10
**ad** [5] - 419:17, 601:17, 601:18, 601:25, 602:3
**Ad** [2] - 601:10, 601:14
**ADAM** [1] - 306:16
**ADAP** [3] - 470:7, 585:14, 586:23
**add** [2] - 432:10, 587:24
**added** [2] - 522:10, 558:11
**adding** [1] - 569:7
**additional** [7] - 325:4, 351:12, 447:16, 525:1, 525:5, 558:13, 644:15

**address** [16] - 308:25, 310:14, 324:4, 325:19, 331:16, 342:1, 344:3, 347:20, 350:22, 362:19, 425:7, 525:13, 572:5, 600:7, 644:16, 644:21
**addressed** [5] - 341:4, 341:14, 439:8, 444:2, 645:9
**addressing** [1] - 309:24
**adherence** [1] - 631:14
**adherent** [2] - 631:16, 631:25
**adjourn** [1] - 644:21
**adjourned** [2] - 638:24, 646:10
**adjudicated** [1] - 371:14
**adjust** [1] - 362:24
**adjusted** [2] - 495:4, 495:5
**administers** [1] - 471:16
**Administration** [1] - 449:23
**administration** [1] - 571:21
**admissibility** [3] - 393:5, 460:9, 460:15
**admissible** [3] - 514:14, 628:11, 629:12
**admission** [1] - 460:13
**admit** [24] - 325:21, 362:13, 379:4, 380:16, 391:5, 391:19, 392:9, 403:14, 403:15, 416:13, 422:13, 427:14, 437:21, 444:19, 459:25, 460:18, 460:20, 483:10, 513:7, 513:8, 558:9, 592:15, 613:19, 618:1
**admitted** [35] - 379:1, 379:10, 380:25, 385:23, 403:13, 403:19, 422:16, 427:18, 435:12, 438:1, 444:22, 460:12, 460:24, 461:8, 483:14,

512:21, 513:5, 513:16, 513:18, 513:20, 513:24, 514:15, 514:16, 560:9, 560:16, 571:8, 572:20, 579:4, 592:18, 611:18, 613:22, 618:4, 620:6, 635:3, 635:4
**admitting** [2] - 394:3, 624:25
**ADR** [1] - 573:21
**Adria** [3] - 529:25, 532:7, 537:21
**Adriamycin** [1] - 530:3
**ADRs** [3] - 575:17, 576:20, 578:3
**adult** [2] - 419:1, 562:21
**advance** [2] - 514:8, 645:12
**adverse** [11] - 563:20, 564:4, 564:5, 564:25, 565:13, 565:19, 566:9, 574:2, 574:6, 574:17, 578:6
**advice** [2] - 442:6, 551:21
**affected** [1] - 407:5
**affirmatively** [1] - 370:17
**afoul** [1] - 329:12, 373:18, 373:24
**afraid** [1] - 588:15
**afternoon** [6] - 351:14, 488:3, 488:4, 527:13, 536:23, 593:8
**afterwards** [1] - 587:16
**age** [1] - 557:24
**agency** [1] - 471:16
**agent** [1] - 562:18
**agents** [4] - 530:16, 598:5, 598:10, 598:16
**aggressive** [1] - 606:15
**aggressively** [1] - 621:17
**ago** [7] - 378:9, 404:10, 411:15, 411:22, 484:3, 499:11, 499:12
**Agouron** [7] - 538:6, 539:3, 539:6, 540:1, 540:3, 540:6, 540:9
**agree** [56] - 313:9,

313:25, 316:10, 317:19, 317:21, 317:22, 320:5, 320:7, 320:8, 321:14, 324:19, 324:25, 342:12, 344:9, 348:4, 361:19, 363:19, 363:20, 368:21, 371:19, 374:16, 375:12, 380:1, 390:21, 400:20, 401:1, 406:24, 411:4, 453:15, 455:9, 455:11, 455:17, 456:7, 456:15, 456:16, 458:22, 458:23, 458:25, 459:10, 459:22, 461:23, 462:2, 462:4, 463:13, 472:4, 486:4, 494:3, 513:8, 515:20, 522:25, 523:13, 577:12, 625:4, 643:5
**agreed** [15] - 312:21, 314:4, 314:6, 319:22, 354:15, 361:24, 363:16, 368:17, 369:1, 385:16, 385:18, 385:20, 402:1, 524:13, 588:3
**agreeing** [4] - 365:21, 366:20, 368:16, 373:9
**agreement** [7] - 311:21, 320:17, 326:11, 514:12, 514:21, 514:25, 645:19
**agrees** [1] - 460:5
**ahead** [1] - 576:6
**aid** [1] - 615:12
**Aid** [1] - 529:11
**aided** [1] - 306:25
**AIDS** [3] - 536:2, 536:7, 536:8
**al** [1] - 306:4
**alarm** [1] - 319:22
**Alert** [1] - 353:19
**alert** [1] - 353:19
**alive** [1] - 570:11
**allegations** [21] - 311:3, 312:2, 315:2, 315:17, 318:4, 321:6, 330:15, 356:3, 358:2, 358:22, 363:15,

367:3, 367:4, 367:5,
367:7, 368:11,
369:11, 397:18,
516:22, 522:16,
526:12
**alleged** [6] - 319:16,
338:9, 367:4,
388:21, 389:5,
462:14
**alleging** [1] - 367:13
**Allen** [4] - 588:13,
588:14
**alleviate** [1] - 411:8
**alleviated** [1] - 411:8
**Alli** [2] - 308:17,
416:14
**ALLISON** [1] - 306:19
**allow** [10] - 309:16,
372:10, 375:23,
394:20, 460:6,
462:20, 470:3,
577:10, 580:18,
637:19
**allowed** [7] - 360:6,
364:11, 372:11,
373:20, 420:13,
420:19, 598:10
**allowing** [1] - 556:7
**alluded** [1] - 324:8
**almost** [11] - 338:7,
344:12, 349:2,
410:9, 411:22,
444:6, 447:2,
450:25, 542:9,
581:6, 621:13
**alone** [3] - 320:9,
562:6, 562:8
**Amazing** [1] - 393:16
**amazing** [2] - 392:23,
396:9
**amended** [3] - 331:3,
377:7, 377:14
**America** [2] - 471:9,
471:15
**AMERICA** [1] - 306:3
**Amit** [2] - 480:11,
623:9
**amount** [16] - 335:14,
335:20, 335:24,
336:10, 336:16,
336:17, 336:19,
337:10, 338:1,
340:19, 341:13,
342:24, 345:6,
356:8, 443:16, 558:3
**amounts** [5] - 341:14,
341:15, 348:10,
585:25
**ample** [2] - 348:9,
348:19

**analogous** [1] - 625:8
**analysis** [2] - 321:22,
628:13
**analytics** [2] - 635:15,
635:16
**ANDREW** [1] - 306:15
**Andrew** [1] - 308:12
**angel** [1] - 508:17
**anger** [1] - 587:3
**animals** [1] - 533:22
**anonymous** [4] -
384:3, 384:9, 389:1,
485:23
**anorexia** [1] - 564:14
**answer** [16] - 323:20,
327:25, 372:22,
396:22, 422:4,
427:9, 463:7,
475:24, 528:23,
536:10, 575:11,
584:8, 588:25,
589:2, 589:13,
589:15
**answered** [3] - 375:1,
375:3, 636:16
**answers** [2] - 448:24,
452:18
**Anthony** [2] - 445:4,
614:1
**anti** [2] - 367:6
**anti-kickback** [2] -
367:6
**antibiotics** [3] -
558:18, 631:18,
631:19
**anticipate** [3] -
315:15, 345:16,
565:16
**anticipated** [3] -
348:1, 639:23, 640:4
**antiretroviral** [2] -
555:24, 556:23
**antiretrovirals** [1] -
569:8
**anyway** [2] - 340:1,
577:4
**apart** [4] - 318:3,
339:20, 342:16,
625:4
**apologies** [4] - 446:4,
446:6, 503:17, 522:1
**apologize** [13] -
333:12, 362:12,
364:15, 399:3,
420:18, 466:23,
466:25, 475:22,
478:8, 566:23,
571:25, 624:16,
627:11
**appearances** [1] -

308:6
**appease** [1] - 586:25
**apples** [2] - 324:20,
324:21
**applicability** [1] -
387:17
**applies** [2] - 387:6,
525:4
**apply** [3] - 311:17,
343:3, 534:15
**appointment** [1] -
544:24
**appreciate** [10] -
316:8, 319:11,
323:13, 373:15,
434:9, 525:3,
638:11, 638:13,
640:24, 641:14
**appreciated** [1] -
316:14
**appreciating** [1] -
520:13
**appreciation** [1] -
314:17
**approach** [12] -
356:21, 361:9,
362:16, 392:14,
394:15, 398:23,
454:4, 454:7,
454:21, 456:24,
573:12, 623:4
**appropriate** [12] -
323:6, 328:18,
335:17, 401:9,
450:10, 460:1,
475:5, 504:17,
512:16, 624:17,
624:21, 624:23
**approval** [8] - 407:20,
534:7, 534:9,
534:13, 534:16,
573:10, 623:10,
627:17
**approve** [3] - 516:12,
534:12, 534:17
**approved** [32] -
406:16, 417:13,
429:7, 430:20,
448:2, 449:22,
463:4, 473:19,
475:5, 475:9,
475:13, 478:22,
478:23, 479:14,
485:3, 534:4,
542:12, 542:18,
555:12, 556:20,
557:4, 560:24,
562:8, 562:10,
567:15, 583:13,
585:21, 585:22,

624:8, 626:23,
628:19, 631:2
**apps** [1] - 384:19
**April** [1] - 542:12
**apt** [1] - 631:16
**area** [4] - 322:15,
433:8, 527:1, 549:21
**Aretmis** [1] - 613:4
**argue** [1] - 480:19
**arguing** [2] - 338:23,
628:20
**argument** [3] - 371:25,
434:10, 628:17
**argumentative** [1] -
474:15
**Arkansas** [1] - 585:18
**arm** [2] - 534:2, 570:23
**Arnolda** [1] - 508:16
**ARPS** [1] - 306:19
**arrow** [1] - 621:25
**articulate** [2] - 520:11,
628:10
**AS** [1] - 527:4
**ASA** [2] - 322:25,
323:2
**ascertain** [1] - 482:17
**Ashley** [1] - 592:5
**assess** [1] - 629:24
**assessment** [2] -
313:9, 317:22
**assignment** [1] -
645:22
**assistant** [2] - 542:4,
592:6, 592:7
**associated** [1] -
625:17
**assume** [2] - 360:11,
519:15
**assumes** [1] - 418:12
**assuming** [5] - 323:7,
360:16, 450:11,
495:13, 579:25
**assumptions** [1] -
587:12
**asterisk** [1] - 328:9
**atazanavir** [1] - 579:11
**Atria** [1] - 531:17
**attached** [2] - 441:4,
446:14
**attaching** [1] - 440:2
**attachment** [1] -
437:24
**attempt** [1] - 347:11
**attend** [2] - 601:23,
601:25
**attendance** [1] -
584:15
**attended** [2] - 419:16,
602:4
**attending** [1] - 608:13

**attention** [6] - 317:17,
351:17, 351:19,
519:1, 570:15,
638:13
**attorney** [3] - 322:25,
353:23, 357:1
**attorneys** [2] - 311:20,
356:25, 499:4,
499:11
**audience** [1] - 387:1
**AUSA** [1] - 322:25
**authority** [1] - 545:7
**available** [5] - 526:21,
559:8, 597:5, 604:6,
641:7
**avoid** [1] - 641:5
**award** [1] - 355:23
**aware** [23] - 312:5,
324:15, 370:3,
373:3, 375:19,
377:1, 383:12,
383:15, 383:16,
383:18, 385:3,
397:20, 415:1,
426:9, 469:8,
469:14, 475:8,
478:22, 480:14,
480:17, 578:9,
602:9, 624:22
**awareness** [1] -
603:19
**AZT** [1] - 568:24

## B

**Bachelor** [1] - 528:6
**back-and-forth** [1] -
450:9
**backdoor** [3] - 341:12,
341:25, 369:13
**background** [4] -
540:17, 568:21,
569:5, 610:1
**backtracked** [1] -
641:21
**backup** [1] - 430:22
**bacteria** [2] - 531:10
**bad** [6] - 413:17,
469:13, 562:14,
566:16, 579:20,
579:22
**bait** [1] - 503:11
**bake** [1] - 527:15
**balance** [1] - 554:15
**balanced** [1] - 578:7
**bananas** [1] - 324:21
**bar** [3] - 363:21,
363:22, 371:17
**bare** [1] - 320:15
**Bartnett** [10] - 614:23,

639:9, 639:12, 639:14, 639:16, 640:16, 640:17, 641:12, 641:16
**base** [3] - 507:11, 545:20, 613:12
**based** [39] - 313:3, 313:6, 314:4, 321:9, 323:12, 387:9, 420:24, 425:19, 452:17, 473:20, 485:11, 498:25, 505:23, 505:24, 507:8, 509:6, 530:14, 531:20, 532:19, 534:9, 542:3, 550:5, 551:1, 551:10, 565:20, 567:7, 569:25, 577:25, 578:4, 580:1, 580:5, 581:1, 602:21, 613:9, 619:10, 631:1, 631:8, 631:21, 632:9
**baseline** [1] - 568:10
**basis** [3] - 366:24, 369:5, 454:15
**bear** [2] - 310:8, 525:21
**bearing** [1] - 517:24
**beat** [1] - 612:2
**beating** [1] - 399:13
**became** [5] - 380:14, 406:16, 451:13, 460:17, 536:8
**become** [2] - 361:5, 527:19
**bed** [1] - 536:24
**beefed** [1] - 314:5
**BEEN** [1] - 527:4
**begged** [1] - 535:2
**begin** [1] - 511:17
**beginning** [3] - 308:7, 442:4, 444:3
**begins** [9] - 356:23, 363:12, 391:11, 398:25, 454:23, 513:11, 565:7, 575:4, 623:6
**behalf** [3] - 314:8, 516:1, 516:23
**behavior** [2] - 432:18, 509:24
**behaviors** [1] - 387:7
**behind** [6] - 430:20, 537:14, 584:6, 586:6, 595:5, 633:25
**believes** [1] - 413:12
**bell** [1] - 369:21
**below** [4] - 388:6,

594:15, 607:16, 618:18
**Ben** [3] - 617:10, 635:10
**bench** [1] - 319:1
**beneficial** [1] - 333:14
**benefit** [12] - 335:11, 335:13, 335:18, 335:19, 339:21, 340:5, 340:6, 340:16, 348:11, 348:20
**benefited** [2] - 336:10, 344:23
**beside** [1] - 537:1
**best** [11] - 413:21, 413:23, 414:9, 483:24, 483:25, 484:2, 484:8, 507:18, 523:21, 545:16, 579:14
**better** [15] - 347:6, 374:17, 407:10, 415:4, 507:19, 507:23, 544:8, 550:25, 551:22, 565:14, 570:15, 573:16, 622:5, 642:9
**between** [11] - 315:24, 339:13, 387:8, 462:25, 487:9, 487:13, 522:8, 563:3, 573:23, 610:19, 646:9
**beyond** [7] - 331:25, 447:15, 521:8, 521:11, 521:20, 598:12
**bias** [3] - 336:2, 339:10, 340:7
**bible** [1] - 518:4
**BID** [2] - 569:7, 604:18
**big** [9] - 367:8, 404:22, 431:11, 529:10, 536:6, 541:1, 543:25, 632:8, 632:9
**bigger** [1] - 423:9
**billion** [1] - 338:7, 346:8, 346:9, 347:6, 349:2
**binder** [3] - 332:9, 351:1, 379:7
**Biotech** [1] - 547:14
**bit** [25] - 308:25, 309:7, 313:24, 314:5, 314:18, 323:7, 333:13, 373:22, 401:17, 419:25, 463:6, 476:21, 501:5,

522:8, 544:11, 552:13, 570:16, 584:7, 589:5, 589:14, 628:4, 630:9, 637:2, 639:19, 640:20
**Blackberry** [1] - 589:24
**blacks** [1] - 557:24
**block** [1] - 438:15
**blood** [6] - 531:7, 536:4, 542:23, 555:19, 559:3, 559:8
**blow** [8] - 561:4, 561:15, 563:7, 564:10, 571:12, 571:16, 571:24, 612:23
**blown** [3] - 534:1, 536:8, 636:8
**blue** [1] - 541:15
**board** [8] - 321:12, 419:17, 570:22, 601:17, 601:18, 601:25, 602:3, 610:13
**boards** [2] - 601:10, 601:14
**body** [2] - 531:12, 536:1
**boilerplate** [1] - 311:22
**bold** [1] - 636:19
**bolster** [2] - 318:1, 318:2
**bonus** [1] - 415:4
**bonuses** [2] - 410:15, 410:24
**book** [1] - 587:5
**boost** [3] - 535:15, 535:17, 570:16
**boosted** [1] - 561:19
**booster** [1] - 363:2
**born** [1] - 528:2
**boss** [6] - 491:22, 493:9, 493:13, 493:15, 551:23, 635:23
**boss's** [1] - 493:15
**Boston** [2] - 546:6, 551:2
**bothering** [1] - 333:5
**bottom** [7] - 439:8, 440:15, 500:24, 507:17, 563:20, 573:8, 603:15
**bought** [1] - 535:13
**box** [7] - 313:18, 336:15, 350:20, 454:18, 527:1,

576:23, 619:5
**Box** [1] - 365:22
**boxes** [1] - 538:15
**brackets** [2] - 561:8, 636:22
**Brad** [2] - 308:21, 508:17
**BRADLEY** [1] - 306:20
**brainstorm** [1] - 607:1
**Brancaccio** [11] - 320:22, 381:6, 382:1, 382:9, 397:18, 413:4, 436:7, 445:11, 552:1, 552:21, 614:20
**Brancaccio's** [1] - 452:9
**brand** [4] - 532:19, 544:19, 557:9, 617:12
**break** [26] - 326:3, 351:14, 351:15, 351:20, 373:22, 390:9, 413:17, 414:8, 414:13, 433:9, 433:15, 486:2, 486:23, 487:5, 494:4, 504:11, 511:16, 512:12, 515:17, 586:12, 592:24, 593:4, 593:8
**breakdown** [1] - 579:19
**breaking** [4] - 393:22, 423:17, 486:1, 487:10
**breaks** [1] - 326:9
**breakthrough** [1] - 536:6
**bride** [1] - 379:19
**bridesmaid** [1] - 378:15
**Brief** [10] - 386:4, 386:7, 467:4, 521:3, 521:14, 522:2, 522:5, 525:24, 572:6, 572:14
**brief** [9] - 338:24, 339:4, 340:14, 344:3, 526:4, 526:19, 625:5, 629:11, 645:10
**briefed** [5] - 338:19, 338:23, 339:24, 340:24, 345:17
**briefing** [1] - 347:15
**briefly** [6] - 495:7, 506:2, 526:4, 599:1,

605:4, 638:18
**brilliant** [1] - 606:10
**bring** [32] - 311:2, 311:25, 314:7, 314:20, 315:2, 319:2, 319:3, 320:19, 322:9, 356:7, 359:2, 359:9, 359:12, 360:13, 433:24, 486:19, 516:20, 517:25, 522:14, 526:10, 560:5, 561:24, 571:5, 578:24, 590:19, 593:25, 611:5, 612:22, 615:2, 617:1, 623:1, 634:15
**bringing** [8] - 311:4, 312:25, 341:11, 345:11, 347:10, 348:21, 543:12, 624:6
**brings** [1] - 517:13
**Bristol** [4] - 378:6, 404:13, 555:15, 579:12
**Bristol-Myer** [1] - 555:15
**Bristol-Myers** [3] - 378:6, 404:13, 579:12
**broad** [2] - 599:10, 600:25
**broader** [1] - 328:24
**brochure** [1] - 485:5
**broke** [3] - 557:22, 586:13, 594:7
**broken** [1] - 602:21
**brought** [17] - 311:12, 315:18, 317:17, 317:20, 318:4, 323:14, 324:7, 335:18, 347:23, 372:19, 389:10, 485:25, 491:12, 518:5, 520:3, 540:20, 545:14
**Brown** [55] - 308:17, 309:4, 330:14, 330:21, 331:15, 333:21, 335:7, 337:24, 340:4, 340:15, 344:6, 344:16, 344:20, 346:18, 349:11, 350:4, 350:16, 352:9, 363:24, 364:2, 366:21, 376:7, 454:9, 455:3,

460:18, 466:1,
488:8, 490:2, 492:7,
494:8, 494:12,
495:9, 495:16,
496:15, 496:24,
497:7, 499:2, 500:5,
502:25, 508:20,
509:17, 510:1,
510:5, 520:21,
567:12, 571:6,
574:24, 590:21,
624:25, 626:2,
628:20, 629:4,
639:2, 640:16, 642:5
**BROWN** [275] -
306:19, 307:3,
308:17, 309:5,
329:11, 329:19,
329:22, 330:4,
330:25, 331:5,
331:9, 331:17,
331:24, 332:2,
332:6, 332:16,
332:19, 333:24,
334:19, 335:10,
338:4, 338:10,
338:12, 338:15,
338:21, 341:18,
341:21, 344:18,
344:25, 345:3,
345:21, 347:17,
348:13, 348:18,
348:24, 349:20,
350:7, 350:9,
350:17, 351:1,
352:11, 352:17,
352:18, 352:21,
352:22, 357:6,
357:10, 360:3,
361:11, 362:3,
362:7, 362:12,
362:14, 364:3,
364:10, 364:15,
364:19, 364:25,
365:2, 365:4,
365:17, 366:1,
366:23, 367:2,
367:10, 367:22,
368:18, 369:24,
370:3, 370:12,
370:15, 372:2,
373:12, 373:14,
373:17, 373:20,
374:4, 374:6, 374:9,
374:11, 374:15,
374:18, 375:4,
375:6, 375:9,
375:15, 375:21,
375:24, 376:1,
376:9, 376:10,
378:24, 379:2,

379:7, 379:12,
379:14, 380:16,
380:19, 380:21,
381:1, 381:3,
385:15, 385:18,
385:24, 386:2,
386:5, 386:8, 386:9,
391:5, 391:14,
392:1, 392:10,
392:17, 392:20,
392:22, 393:1,
393:9, 393:12,
393:14, 393:20,
394:2, 394:5, 394:8,
394:10, 394:14,
394:18, 394:22,
394:23, 395:3,
396:2, 397:1, 398:4,
398:16, 398:23,
399:1, 399:3,
399:16, 400:3,
400:10, 400:13,
400:15, 400:24,
400:25, 403:12,
403:15, 403:21,
416:13, 416:15,
416:21, 416:23,
417:20, 418:1,
418:4, 418:16,
422:13, 422:17,
422:19, 427:14,
427:20, 427:21,
433:7, 433:13,
434:19, 435:1,
435:2, 435:7,
435:14, 435:15,
437:21, 437:23,
438:2, 438:4,
444:18, 444:23,
444:25, 453:25,
454:8, 454:12,
454:14, 454:21,
455:7, 455:14,
455:18, 455:22,
456:1, 456:5,
456:10, 456:13,
456:16, 456:20,
456:24, 457:1,
457:13, 457:16,
457:23, 457:24,
460:21, 461:1,
461:4, 463:5,
463:21, 466:3,
466:4, 466:18,
466:23, 466:25,
467:12, 467:17,
467:19, 474:16,
474:19, 475:22,
476:2, 483:10,
483:16, 483:18,
486:14, 487:22,

512:2, 512:6, 514:6,
514:10, 514:17,
514:23, 515:2,
516:1, 560:12,
565:2, 567:13,
567:25, 571:7,
571:25, 572:10,
573:2, 574:25,
575:20, 576:4,
577:5, 577:12,
577:15, 579:3,
580:3, 580:6,
580:19, 581:2,
590:22, 592:17,
593:17, 593:24,
599:22, 611:17,
613:21, 616:23,
618:3, 620:5, 623:8,
624:13, 624:16,
626:1, 626:11,
626:14, 626:20,
627:1, 627:13,
630:1, 634:22,
640:23, 641:2,
641:14, 642:7,
642:17, 642:23,
644:3, 644:22, 646:7
**brown** [1] - 646:6
**build** [2] - 543:19,
544:2
**Building** [1] - 306:8
**bullet** [17] - 448:1,
449:12, 563:8,
596:4, 596:19,
598:3, 600:25,
601:13, 602:18,
615:11, 616:15,
619:7, 622:4,
636:19, 637:11,
637:14, 637:18
**bullets** [1] - 448:5
**bunch** [4] - 359:5,
389:9, 392:6, 393:4
**bury** [1] - 386:1
**business** [18] - 506:8,
506:11, 527:16,
528:15, 538:4,
539:2, 539:17,
541:12, 541:19,
541:25, 582:11,
583:3, 584:17,
606:3, 620:11,
620:15, 620:21,
643:9
**busy** [4] - 543:3,
643:14, 643:16,
643:25
**but..** [2] - 405:16,
551:14
**buy** [2] - 585:19,

586:24
**buyers** [1] - 530:14
**BY** [101] - 306:14,
306:19, 307:3,
307:3, 307:4,
352:18, 352:22,
357:10, 360:3,
361:11, 376:10,
379:14, 381:3,
386:9, 394:23,
395:3, 396:2, 397:1,
398:4, 398:16,
400:15, 400:25,
403:21, 416:23,
418:4, 418:16,
422:19, 427:21,
435:2, 435:15,
438:4, 444:25,
457:1, 457:13,
457:24, 461:4,
463:5, 466:4,
467:12, 467:19,
474:16, 474:19,
476:2, 483:18,
492:6, 492:14,
494:11, 496:4,
496:11, 499:22,
500:4, 502:24,
503:19, 527:12,
560:20, 561:6,
561:16, 563:9,
563:19, 564:12,
568:6, 569:22,
571:13, 573:6,
573:18, 577:23,
579:8, 579:16,
580:22, 581:16,
581:20, 589:17,
591:2, 594:6,
596:12, 596:23,
597:23, 599:12,
600:14, 601:12,
602:16, 603:14,
605:15, 611:23,
612:25, 613:24,
615:4, 615:10,
616:5, 617:3, 618:8,
620:10, 621:2,
630:15, 635:8,
636:4, 636:10,
637:3, 637:10

## C

**calculate** [1] - 410:14
**calculated** [1] -
410:24
**calendar** [1] - 642:25
**California** [2] -
532:20, 594:22

**Cannot** [1] - 431:8
**cannot** [4] - 362:22,
365:23, 625:24,
626:3
**capacity** [2] - 575:22,
577:9
**capitalize** [1] - 637:20
**capitalized** [1] -
636:11
**caption** [1] - 331:2
**car** [2] - 551:18, 552:7
**care** [8] - 386:10,
400:6, 470:12,
529:11, 531:18,
531:22, 631:22,
642:18
**cared** [1] - 317:17
**career** [5] - 397:25,
531:16, 532:5,
538:9, 547:19
**careers** [1] - 398:7
**careful** [4] - 326:24,
330:22, 495:14,
634:24
**carried** [1] - 546:17
**carry** [1] - 616:17
**carryover** [1] - 637:14
**case** [225] - 309:15,
309:16, 309:17,
309:25, 310:15,
310:19, 311:6,
311:17, 312:3,
312:7, 312:12,
312:14, 314:23,
315:6, 315:10,
315:13, 315:16,
315:17, 315:25,
316:2, 316:3, 317:7,
317:11, 317:12,
317:15, 317:25,
318:3, 318:5,
318:13, 318:14,
319:17, 321:1,
321:2, 321:11,
321:23, 322:16,
322:18, 322:20,
323:2, 323:21,
323:22, 327:14,
327:19, 327:21,
327:23, 327:24,
328:1, 328:2, 328:3,
328:16, 328:21,
328:24, 329:2,
329:6, 329:9,
329:13, 329:14,
329:20, 330:3,
330:18, 330:23,
331:2, 333:7,
334:25, 335:8,
335:12, 335:14,

335:18, 336:11, 336:14, 336:25, 337:12, 337:15, 337:17, 337:19, 338:5, 339:8, 339:12, 339:15, 339:17, 339:18, 339:19, 339:22, 339:24, 340:5, 340:8, 340:9, 340:14, 340:16, 340:17, 340:22, 341:6, 341:7, 341:8, 341:13, 342:16, 342:18, 343:1, 343:4, 343:6, 343:13, 344:3, 344:14, 344:15, 344:21, 344:22, 344:24, 345:1, 345:20, 346:25, 347:4, 347:10, 347:22, 347:23, 348:5, 348:6, 348:22, 349:1, 349:3, 349:5, 349:15, 349:16, 349:18, 349:25, 350:1, 351:22, 351:24, 351:25, 352:6, 353:7, 355:23, 360:19, 360:22, 361:6, 361:13, 361:18, 361:24, 363:18, 364:1, 364:12, 364:21, 364:24, 365:12, 365:15, 365:16, 365:20, 365:21, 366:5, 366:17, 366:22, 366:23, 366:25, 367:5, 368:1, 368:14, 368:15, 368:24, 369:6, 369:9, 369:12, 369:16, 370:4, 370:5, 370:13, 370:22, 370:24, 371:1, 371:2, 371:6, 371:8, 371:11, 371:12, 372:11, 372:25, 373:9, 374:22, 375:20, 375:22, 377:24, 397:19, 425:25, 429:15, 435:24, 448:4, 452:9, 453:10, 462:14, 466:14, 471:25, 487:14, 502:2,

511:19, 512:19, 516:4, 516:8, 516:12, 516:14, 517:1, 517:24, 518:5, 518:23, 520:3, 522:21, 522:22, 523:9, 523:12, 523:13, 523:25, 524:1, 526:16, 554:4, 629:12, 639:23, 642:23
**cases** [12] - 321:1, 322:1, 323:14, 329:13, 335:23, 340:21, 342:8, 356:3, 368:4, 368:5, 368:6, 517:10
**casting** [1] - 598:5
**catch** [3] - 478:10, 549:20, 553:20
**categories** [2] - 568:15, 600:4
**category** [5] - 558:5, 566:11, 568:17, 569:10, 603:4
**Caucasians** [1] - 557:23
**caused** [6] - 468:18, 546:19, 561:21, 574:7, 574:8, 574:9
**caution** [1] - 643:24
**cautious** [1] - 322:13
**CDC** [1] - 557:21
**cells** [2] - 531:7, 542:23
**cents** [1] - 348:8
**certain** [9] - 319:19, 468:20, 469:20, 470:18, 470:22, 472:5, 563:5, 570:16, 585:15
**Certain** [1] - 470:24
**certainly** [3] - 313:20, 320:1, 577:4
**CERTIFICATE** [1] - 647:1
**certification** [1] - 426:23
**certified** [2] - 426:4, 427:8
**certify** [6] - 425:9, 425:18, 426:12, 427:3, 471:7, 647:4
**certifying** [1] - 426:15
**chain** [1] - 546:7
**chains** [1] - 529:10
**challenge** [1] - 532:17
**challenged** [1] - 532:16

**challenges** [4] - 405:13, 405:23, 406:5, 558:13
**chambers** [1] - 339:15
**chance** [6] - 344:3, 391:20, 478:10, 515:16, 515:21, 553:19
**change** [19] - 321:22, 325:2, 377:10, 494:13, 494:23, 510:2, 510:6, 555:21, 570:24, 581:5, 581:7, 586:18, 587:4, 597:14, 601:6, 605:25, 644:17, 645:1
**changed** [4] - 325:6, 328:4, 495:1, 573:23
**changes** [11] - 371:25, 494:22, 509:5, 568:9, 571:2, 578:11, 578:18, 581:13, 610:13, 628:12, 633:5
**changing** [1] - 544:7
**channel** [1] - 328:18
**characterization** [1] - 638:5
**characterize** [1] - 620:22
**charge** [9] - 417:7, 422:9, 450:2, 450:7, 481:11, 588:4, 614:7, 614:12, 623:10
**charging** [1] - 525:13
**chart** [4] - 557:17, 558:2, 558:8, 582:12
**charts** [1] - 586:15
**chat** [9] - 352:2, 511:20, 511:25, 515:10, 593:14, 623:5, 638:25, 641:25, 642:6
**check** [1] - 360:14
**checks** [1] - 547:14
**chemical** [1] - 561:11
**chemotherapy** [3] - 529:20, 530:24, 542:23
**Cheryl** [5] - 539:16, 540:16, 540:22, 542:2, 584:2
**Chicago** [11] - 527:25, 537:20, 537:24, 539:7, 540:22, 541:25, 542:3, 543:7, 549:9, 592:7,

612:7
**chicken** [1] - 525:21
**child** [1] - 418:23
**children** [1] - 549:11
**children's** [1] - 587:5
**cholesterol** [26] - 561:22, 562:15, 562:17, 564:21, 569:20, 570:24, 573:25, 578:4, 579:18, 579:19, 579:20, 579:21, 580:1, 581:5, 581:10, 581:14, 598:9, 598:16, 599:5, 604:17, 610:14, 625:16, 626:22
**cholesterol-lowering** [1] - 598:16
**cholesterols** [1] - 580:25
**choose** [2] - 324:12, 466:15
**choosing** [1] - 365:11
**chose** [3] - 321:7, 369:12, 383:19
**chosen** [1] - 531:19
**Chris** [6] - 546:5, 551:1, 551:3, 594:24, 601:11, 601:14
**Christina** [1] - 552:4
**Christine** [4] - 478:5, 478:7, 508:16, 552:1
**Cincinnati** [2] - 535:5, 537:11, 537:13
**circled** [1] - 501:20
**circuit** [2] - 342:8, 342:20
**circumstances** [1] - 343:3
**circumvent** [1] - 369:15
**citizen** [13] - 311:2, 311:25, 321:18, 322:10, 516:20, 516:21, 516:23, 522:14, 522:15, 522:19, 526:10, 526:11, 526:13
**citizens** [2] - 311:12, 315:3
**City** [2] - 527:22, 550:6
**city** [1] - 601:23
**civil** [3] - 322:6, 322:25, 371:21
**CIVIL** [1] - 306:3
**claim** [8] - 311:2,

311:25, 321:19, 338:2, 436:14, 485:24, 519:8, 625:15
**claimed** [4] - 352:25, 367:7, 383:1, 483:5
**claiming** [1] - 520:15
**claims** [16] - 314:8, 337:4, 437:2, 437:9, 468:19, 468:25, 469:19, 487:4, 516:20, 516:23, 522:14, 522:20, 526:10, 526:14, 622:1
**Claims** [16] - 310:25, 311:2, 311:8, 312:1, 313:1, 314:20, 322:1, 326:16, 516:21, 517:13, 518:5, 520:2, 521:23, 522:15, 526:11, 645:9
**clarification** [7] - 314:2, 327:12, 367:9, 399:2, 575:7, 624:15, 628:22
**clarifies** [1] - 320:7
**clarify** [5] - 327:15, 335:7, 371:15, 462:12, 463:23
**clarity** [1] - 517:23
**Clarkson** [1] - 306:8
**class** [10] - 507:14, 613:15, 615:16, 615:20, 618:12, 618:17, 631:4, 632:2, 632:3, 632:5
**classes** [1] - 528:15
**clean** [2] - 374:17, 599:7
**clear** [21] - 311:25, 315:5, 315:12, 321:22, 326:12, 335:6, 348:23, 352:6, 359:16, 362:18, 402:2, 412:18, 513:18, 514:20, 518:3, 525:6, 538:21, 553:9, 558:2, 572:20, 572:24
**clearly** [3] - 317:16, 328:25, 363:14
**CLERK** [16] - 308:4, 351:5, 363:8, 433:18, 433:23, 434:1, 434:21, 511:22, 515:6, 525:25, 527:6,

593:12, 593:20, 594:1, 638:21, 646:12
**clinic** [3] - 574:13, 574:21, 597:17
**Clinic** [1] - 530:15
**clinical** [19] - 449:9, 461:18, 464:19, 478:25, 498:15, 498:25, 531:25, 533:6, 533:17, 533:19, 533:21, 534:6, 534:20, 548:10, 566:16, 567:1, 574:22, 578:12, 578:19
**clip** [2] - 466:19, 467:11
**close** [8] - 332:4, 365:13, 369:20, 378:20, 380:1, 624:17, 638:12
**closely** [1] - 578:20
**closer** [3] - 333:25, 603:4, 630:9
**Clothes** [1] - 587:6
**clothes** [1] - 587:6
**CMS** [2] - 471:17, 471:19
**coached** [2] - 481:5, 482:19
**coaching** [1] - 480:20
**coast** [1] - 527:17
**Coast** [2] - 538:5, 548:20
**cognizant** [1] - 499:18
**collaborate** [1] - 542:5
**colleague** [1] - 550:17
**colleagues** [20] - 390:25, 393:23, 394:1, 395:5, 396:6, 396:16, 397:4, 397:13, 398:6, 398:17, 399:5, 400:18, 400:21, 403:1, 438:7, 441:24, 442:19, 443:17, 642:8
**collective** [3] - 554:22, 555:24, 600:3
**college** [5] - 528:3, 528:4, 528:10, 528:25, 549:14
**Colorado** [4] - 452:2, 458:6, 458:13, 549:10
**columns** [2] - 568:18, 569:21
**combine** [1] - 535:18
**comfortable** [4] -

333:7, 488:21, 513:23, 597:12
**coming** [23] - 320:6, 334:10, 334:11, 339:1, 355:6, 418:24, 428:7, 440:10, 478:13, 525:18, 546:16, 582:15, 606:8, 610:1, 622:23, 625:10, 626:12, 626:17, 629:9, 629:18, 633:6, 637:23, 639:7
**command** [1] - 546:8
**Commencing** [1] - 306:10
**comment** [3] - 393:14, 401:4, 518:19
**commenting** [1] - 398:6
**comments** [6] - 400:17, 401:12, 552:18, 599:17, 600:11, 601:14
**commercial** [3] - 387:8, 546:12, 621:14
**committee** [4] - 415:12, 450:7, 450:8, 585:23
**Committee** [4] - 449:12, 449:15, 449:19, 449:22
**committees** [1] - 532:1
**common** [11] - 352:5, 502:5, 502:7, 502:9, 502:14, 530:3, 559:6, 559:18, 578:10, 578:18, 588:17
**communicate** [1] - 484:17
**communicated** [1] - 404:6
**communication** [1] - 448:8
**communications** [2] - 387:7, 402:15
**community** [2] - 545:23, 549:16
**comp** [1] - 547:23
**companies** [11] - 528:19, 531:22, 531:24, 532:6, 540:19, 541:5, 544:7, 548:24, 581:25, 606:11
**company** [55] -

346:12, 353:8, 383:16, 387:24, 388:2, 480:16, 481:12, 482:8, 490:22, 511:2, 511:4, 527:19, 529:4, 529:19, 529:21, 529:22, 529:24, 532:18, 532:19, 533:5, 539:15, 542:17, 544:10, 547:6, 550:5, 550:6, 550:8, 553:4, 553:7, 574:14, 582:16, 585:7, 588:24, 589:18, 589:21, 589:24, 590:10, 594:14, 604:2, 605:2, 605:5, 605:19, 606:7, 606:18, 607:9, 608:22, 608:24, 609:1, 612:11, 614:4, 617:15, 619:25, 620:16, 620:24, 632:14
**company's** [2] - 605:2, 607:23
**comparable** [2] - 609:19, 614:15
**comparator** [4] - 568:16, 569:3, 569:10, 570:23
**compare** [5] - 474:24, 505:20, 580:15, 582:1, 610:20
**compared** [8] - 455:4, 479:7, 497:25, 507:6, 569:11, 569:13, 609:15, 613:14
**comparing** [6] - 474:2, 498:12, 498:20, 500:15, 505:11, 610:6
**comparison** [2] - 498:21, 609:18
**comparisons** [3] - 485:11, 610:18, 611:6
**compensate** [2] - 414:23, 415:6
**compensated** [2] - 418:10, 418:19
**compensation** [5] - 415:8, 415:13, 416:3, 416:8, 417:8
**compensations** [1] - 415:18

**competition** [1] - 609:21
**competitive** [3] - 609:3, 610:15, 632:10
**competitor** [3] - 474:2, 498:22, 498:23
**competitors** [6] - 473:9, 479:5, 497:4, 497:15, 498:11, 622:11
**complain** [1] - 330:15
**complaining** [2] - 377:15, 435:24
**complaint** [7] - 330:11, 331:3, 334:22, 338:8, 377:7, 377:14, 377:19
**complaints** [1] - 319:20
**complete** [5] - 328:20, 425:20, 429:17, 503:11, 553:17
**completely** [11] - 320:7, 324:21, 325:5, 541:15, 547:13, 554:8, 563:14, 587:8, 587:12, 610:21, 629:14
**compliance** [25] - 384:12, 384:19, 385:4, 386:11, 387:5, 388:11, 388:16, 415:17, 415:22, 424:9, 442:18, 443:18, 444:7, 444:9, 444:12, 444:15, 447:17, 450:13, 451:1, 479:23, 480:5, 480:23, 481:25, 509:17, 584:24
**compliant** [3] - 443:7, 481:7, 483:1
**complicated** [2] - 544:15, 558:15
**complied** [2] - 481:12, 494:7
**comply** [1] - 387:18
**computer** [2] - 306:25, 310:8
**computer-aided** [1] - 306:25
**concept** [1] - 315:1
**conceptualized** [2] - 620:24, 622:18

**concern** [9] - 310:22, 321:19, 321:20, 349:7, 368:10, 489:11, 520:19, 629:3, 642:16
**concerned** [10] - 310:3, 310:7, 321:3, 334:11, 414:8, 415:23, 510:23, 511:5, 635:5, 640:1
**concerning** [1] - 310:9
**concerns** [9] - 384:23, 388:21, 388:23, 414:14, 488:9, 491:13, 492:24, 493:11, 625:1
**concluded** [8] - 357:8, 376:2, 394:11, 400:11, 456:22, 568:2, 577:16, 630:3
**concludes** [1] - 646:13
**conclusion** [6] - 311:16, 312:20, 312:22, 326:4, 352:1, 524:11
**condition** [1] - 598:14
**conditions** [4] - 461:20, 464:12, 465:6, 570:12
**conduct** [5] - 352:24, 383:25, 384:5, 388:1, 484:23
**confer** [6] - 311:15, 329:25, 525:8, 525:10, 644:14, 645:17
**conference** [13] - 341:3, 525:13, 554:17, 588:12, 590:6, 591:8, 591:12, 591:16, 594:9, 595:2, 595:12, 605:17, 607:12
**conferred** [1] - 525:9
**confirms** [1] - 590:21
**confuse** [1] - 518:5
**confused** [2] - 448:4, 580:9
**confusing** [3] - 520:8, 520:17, 524:4
**confusion** [1] - 623:23
**conjunction** [1] - 642:18
**connected** [4] - 317:14, 344:14, 348:6, 350:1
**connection** [3] - 358:16, 359:6, 377:6

consequently [1] -
551:6
consider [4] - 398:14,
577:20, 608:18,
628:13
consideration [3] -
558:20, 574:20,
629:2
considered [5] -
387:18, 489:24,
536:2, 550:15, 574:2
consistent [1] -
524:13
constantly [3] -
529:23, 533:2,
578:12
consultants [2] -
601:22, 602:5
consumer [6] -
623:13, 624:2,
624:3, 625:3, 625:7,
627:23
consumers [3] -
623:17, 623:20,
629:12
consuming [1] -
554:11
contacted [1] - 451:17
contained [2] -
428:10, 429:2
contains [1] - 450:25
content [2] - 343:11,
609:4
context [18] - 312:8,
312:17, 313:2,
313:13, 313:21,
314:18, 319:15,
324:22, 357:19,
376:15, 414:7,
459:22, 514:18,
566:9, 610:15,
625:21, 625:22,
625:23
continue [13] - 319:12,
351:10, 351:12,
351:22, 352:7,
376:7, 434:25,
493:17, 514:1,
526:5, 594:4,
605:17, 644:24
control [4] - 507:19,
507:24, 599:4,
605:11
controlled [1] - 570:18
conversation [9] -
369:16, 369:17,
382:5, 396:5,
439:12, 439:14,
452:18, 597:7,
629:23

conversational [1] -
503:15
conversations [3] -
488:20, 606:24,
634:2
convey [11] - 576:13,
576:21, 577:9,
577:25, 578:3,
578:7, 579:25,
580:4, 580:12,
580:25, 581:4
coordinate [2] -
512:10, 512:20
coordinated [1] -
590:5
coordinating [2] -
512:22, 548:12
coparty [1] - 320:2
copies [1] - 404:17
copy [11] - 332:8,
380:13, 382:10,
394:16, 458:4,
485:4, 503:5, 503:7,
518:15, 572:10,
572:11
copying [1] - 612:17
core [1] - 324:13
corner [2] - 571:17,
591:6
corporate [1] - 415:16
correct [264] - 324:17,
335:10, 337:21,
338:15, 344:24,
346:21, 353:16,
354:3, 354:6,
354:12, 354:17,
354:20, 354:24,
355:3, 355:16,
355:24, 356:9,
356:13, 356:17,
357:15, 357:21,
358:3, 358:7,
358:10, 358:14,
358:18, 358:24,
360:20, 360:23,
361:2, 361:7,
361:14, 361:20,
366:19, 369:2,
376:17, 376:20,
377:8, 377:12,
377:16, 377:20,
377:22, 377:25,
378:1, 378:4, 378:7,
378:13, 378:21,
379:21, 380:3,
381:13, 381:17,
381:22, 382:16,
382:20, 383:3,
384:1, 384:2, 384:6,
384:10, 384:13,

384:16, 384:20,
385:6, 385:12,
386:22, 387:14,
388:13, 388:17,
389:7, 389:17,
389:23, 390:2,
390:6, 390:10,
390:14, 390:20,
391:1, 391:16,
393:1, 395:11,
395:20, 397:14,
398:20, 401:3,
401:8, 401:15,
401:25, 402:4,
402:5, 402:8, 402:9,
402:17, 402:23,
403:6, 403:7, 404:8,
404:23, 404:24,
405:2, 405:5, 405:6,
405:10, 405:15,
406:1, 406:19,
406:20, 407:3,
407:9, 407:12,
408:3, 411:1,
411:21, 413:2,
413:5, 414:2,
414:16, 414:20,
414:24, 416:25,
417:5, 417:9,
419:10, 419:13,
419:22, 420:6,
420:21, 420:25,
423:3, 423:7,
423:13, 425:6,
425:15, 426:6,
426:13, 426:25,
427:4, 427:25,
428:11, 428:20,
428:23, 429:3,
429:8, 429:19,
429:24, 430:4,
431:9, 431:13,
431:24, 432:1,
432:6, 432:9, 433:4,
436:8, 436:12,
436:17, 436:24,
437:5, 438:13,
438:18, 438:19,
439:3, 439:24,
440:2, 440:13,
440:17, 440:22,
441:5, 441:14,
441:17, 441:22,
442:1, 442:7,
442:12, 442:16,
442:20, 443:8,
443:11, 443:15,
443:19, 443:24,
444:8, 444:13,
445:6, 445:9,
446:11, 446:24,

447:18, 447:23,
448:2, 448:14,
448:19, 448:22,
448:23, 449:1,
449:6, 449:16,
452:13, 452:24,
458:11, 460:16,
462:3, 462:10,
462:15, 463:10,
464:17, 466:8,
467:22, 469:3,
469:11, 469:15,
473:24, 474:3,
475:2, 476:5,
476:14, 477:19,
478:15, 478:18,
479:6, 479:8,
479:10, 481:4,
481:18, 483:23,
484:13, 485:12,
485:16, 485:21,
485:22, 486:11,
487:6, 487:12,
489:2, 490:4,
497:17, 497:24,
498:10, 500:20,
521:21, 548:21,
549:6, 553:12,
555:13, 564:7,
571:7, 575:9,
582:25, 591:11,
591:18, 594:16,
595:25, 596:20,
598:22, 600:18,
614:25, 615:6,
615:7, 622:2, 625:3,
627:13, 634:14,
647:4
Correct [54] - 406:11,
406:17, 408:24,
410:21, 419:9,
420:5, 420:11,
421:24, 422:5,
424:17, 426:2,
428:5, 430:10,
431:18, 450:17,
450:20, 451:6,
451:19, 452:4,
452:10, 452:16,
458:7, 458:15,
462:1, 462:9,
467:15, 468:8,
471:12, 472:3,
472:16, 472:25,
473:13, 473:17,
473:21, 476:4,
478:24, 481:9,
481:14, 481:20,
482:9, 482:15,
483:2, 483:7,
483:20, 484:9,

485:9, 486:18,
486:24, 487:11,
487:16, 598:21,
611:12, 618:19,
621:15
corrected [2] - 410:22,
412:10
correctional [2] -
584:21, 596:15
correctly [1] - 492:20
correlated [1] - 606:20
correspondence [6] -
450:24, 475:4,
480:24, 487:8,
487:13, 494:21
corroborate [1] -
317:23
cost [1] - 633:19
could've [1] - 329:1
counsel [24] - 308:7,
313:8, 315:23,
317:13, 331:22,
332:8, 332:11,
332:22, 361:23,
379:5, 380:17,
434:13, 435:9,
475:15, 475:20,
487:19, 487:25,
511:19, 527:9,
577:21, 594:5,
634:19, 638:18,
644:14
Counsel [5] - 457:18,
526:20, 588:22,
630:5, 638:11
count [4] - 416:8,
558:7, 598:16, 611:3
counted [2] - 508:8,
611:2
counterpart [5] -
490:12, 539:16,
540:16, 543:7,
619:19
country [3] - 507:19,
508:19, 528:8
county [1] - 596:16
couple [14] - 322:16,
353:11, 367:2,
436:9, 476:7, 488:6,
495:21, 524:18,
544:14, 550:18,
555:15, 594:11,
606:11, 608:20
course [8] - 315:9,
379:16, 429:20,
446:21, 456:5,
478:1, 587:4, 631:19
Court [17] - 306:23,
310:24, 331:18,
342:1, 345:23,

347:13, 347:20,
366:5, 372:1, 372:3,
628:13, 635:6,
639:15, 642:8,
642:25, 646:13,
647:12
**COURT** [471] - 306:1,
308:4, 308:5,
308:15, 308:23,
309:4, 309:6, 314:9,
314:14, 315:15,
316:4, 317:2,
317:19, 318:18,
318:21, 319:1,
320:3, 321:8,
322:22, 323:9,
323:12, 323:24,
324:6, 324:14,
324:18, 325:11,
325:14, 327:10,
327:17, 329:5,
329:16, 330:2,
330:5, 330:8,
330:10, 330:13,
330:21, 331:4,
331:6, 331:10,
331:15, 331:21,
331:25, 332:3,
332:10, 332:15,
332:17, 332:21,
333:4, 333:11,
333:18, 333:21,
333:25, 335:2,
335:6, 335:11,
336:1, 336:19,
336:24, 337:3,
337:6, 337:18,
337:23, 338:8,
338:11, 338:13,
338:19, 338:24,
339:14, 339:25,
340:3, 340:12,
340:24, 341:8,
341:16, 341:20,
342:2, 342:9,
342:15, 343:15,
343:18, 343:21,
343:25, 344:5,
344:19, 345:1,
345:4, 346:18,
347:18, 348:14,
348:19, 349:6,
349:9, 350:4, 350:8,
350:11, 350:16,
350:18, 350:25,
351:3, 351:5, 351:7,
352:12, 352:16,
356:20, 356:22,
357:3, 357:7,
359:16, 359:19,
359:24, 361:10,

362:5, 362:9,
362:13, 362:17,
362:22, 363:3,
363:8, 363:10,
363:17, 364:2,
364:4, 364:13,
364:17, 364:22,
365:1, 365:3, 365:5,
365:18, 366:11,
366:15, 366:21,
366:24, 367:20,
367:23, 368:7,
368:14, 369:1,
369:3, 370:1, 370:9,
370:13, 370:21,
371:22, 371:24,
372:7, 373:13,
373:15, 373:19,
374:1, 374:5, 374:7,
374:10, 374:14,
374:16, 374:19,
375:5, 375:7,
375:10, 375:13,
375:16, 375:22,
375:25, 376:4,
379:1, 379:3,
379:10, 380:17,
380:23, 380:25,
385:17, 385:20,
385:23, 386:1,
386:6, 391:7, 391:9,
391:12, 391:15,
392:2, 392:8,
392:12, 392:18,
392:21, 392:25,
393:7, 393:11,
393:13, 393:17,
393:25, 394:3,
394:7, 394:9,
394:13, 394:17,
394:19, 395:25,
396:21, 398:3,
398:9, 398:11,
398:13, 398:22,
398:24, 399:8,
399:21, 400:4,
400:14, 400:23,
403:13, 403:17,
403:19, 416:18,
416:22, 417:21,
418:3, 418:13,
422:14, 422:16,
427:16, 427:18,
433:10, 433:14,
433:18, 433:20,
433:23, 433:24,
434:1, 434:2,
434:20, 434:21,
434:23, 435:10,
435:12, 438:1,
444:22, 454:5,

454:9, 454:13,
454:15, 454:22,
454:24, 455:12,
455:15, 455:19,
455:23, 456:3,
456:8, 456:12,
456:15, 456:17,
456:19, 456:21,
456:25, 457:10,
457:18, 457:21,
460:4, 460:8,
460:14, 460:17,
460:22, 460:24,
461:2, 462:18,
463:23, 464:5,
464:8, 464:24,
465:2, 465:5,
465:12, 465:23,
466:1, 466:20,
466:24, 467:6,
467:8, 467:10,
474:18, 475:21,
475:23, 476:1,
483:12, 483:14,
486:13, 487:24,
499:21, 503:9,
503:11, 503:14,
503:18, 511:9,
511:13, 511:15,
511:22, 511:24,
512:4, 512:7,
512:11, 512:14,
513:13, 514:9,
514:11, 514:18,
514:24, 515:3,
515:6, 515:7,
515:13, 515:18,
515:24, 516:5,
516:15, 517:2,
517:4, 517:11,
517:15, 518:10,
518:13, 519:3,
519:10, 519:16,
519:21, 519:25,
520:10, 520:20,
520:23, 521:2,
521:4, 521:15,
521:20, 521:25,
522:6, 523:4,
523:24, 524:3,
524:8, 525:4,
525:20, 525:25,
526:2, 526:24,
527:6, 527:9, 560:9,
560:13, 560:16,
565:5, 565:8,
565:15, 565:22,
566:1, 566:5, 566:7,
566:11, 566:13,
566:19, 566:21,
566:24, 567:4,

567:12, 567:22,
568:1, 571:6, 571:8,
572:3, 572:9,
572:16, 572:19,
572:22, 573:5,
573:13, 573:16,
574:24, 575:2,
575:5, 575:8,
575:11, 575:14,
575:16, 576:6,
576:9, 576:16,
576:25, 577:2,
577:8, 577:13,
577:18, 579:2,
579:4, 580:4, 580:8,
580:12, 580:17,
580:20, 581:3,
588:22, 588:25,
589:2, 589:4, 589:7,
589:12, 589:16,
590:24, 592:18,
592:20, 593:4,
593:7, 593:12,
593:14, 593:18,
593:20, 593:21,
593:25, 594:1,
594:3, 599:24,
600:6, 611:18,
613:19, 613:22,
618:4, 620:6, 623:5,
623:7, 623:25,
625:1, 625:12,
625:20, 626:10,
626:12, 626:18,
627:9, 627:12,
627:24, 628:5,
629:1, 629:3, 630:2,
630:5, 630:14,
634:18, 634:23,
635:3, 638:11,
638:21, 638:23,
639:6, 639:18,
639:21, 640:15,
640:19, 641:1,
641:4, 641:11,
641:16, 641:19,
642:5, 642:15,
642:20, 643:2,
643:15, 644:4,
644:20, 644:23,
646:4, 646:8,
646:12, 647:1
**court** [27] - 308:1,
311:4, 311:13,
315:18, 330:6,
333:3, 357:9,
370:23, 371:22,
373:2, 376:3, 377:1,
394:12, 400:2,
400:12, 454:18,
455:5, 456:23,

503:15, 518:1,
522:20, 526:14,
554:1, 566:21,
568:3, 577:17, 630:4
**Court's** [11] - 321:20,
323:18, 329:12,
338:16, 348:24,
349:20, 350:10,
367:18, 373:24,
642:10, 642:12
**Courthouse** [1] -
306:8
**courtroom** [18] -
318:16, 318:19,
334:7, 343:18,
351:6, 359:2,
390:24, 426:17,
433:19, 434:22,
511:23, 512:22,
523:6, 526:1, 527:2,
593:13, 594:2,
643:14
**Courts** [2] - 342:24,
371:17
**cover** [6] - 425:8,
431:19, 441:8,
442:24, 444:20,
506:19
**covered** [1] - 469:17
**crazy** [2] - 346:10,
566:22
**created** [6] - 311:19,
316:16, 402:21,
443:14, 482:14,
482:17
**creating** [2] - 642:18,
642:19
**creation** [1] - 565:23
**creative** [1] - 606:11
**credibility** [2] - 318:2
**credit** [2] - 417:18,
613:3
**credo** [2] - 384:22,
384:23
**Crestor** [1] - 598:11
**criteria** [4] - 470:14,
547:21, 565:19,
611:1
**critical** [1] - 530:23
**Crixivan** [1] - 569:4
**cross** [50] - 316:21,
317:3, 318:22,
318:23, 318:24,
319:6, 319:8,
319:14, 329:8,
330:17, 334:3,
335:17, 336:13,
338:1, 339:3,
339:20, 340:15,
344:8, 344:17,

344:21, 345:13, 345:15, 346:2, 346:16, 346:17, 347:8, 348:9, 349:12, 349:14, 350:6, 351:11, 352:10, 359:17, 367:24, 368:10, 369:4, 369:25, 372:16, 392:4, 393:18, 393:25, 394:5, 394:7, 399:9, 455:2, 455:24, 514:7, 514:14, 514:19, 624:8
**CROSS** [2] - 307:3, 352:18
**cross-exam** [6] - 335:17, 336:13, 339:3, 349:12, 455:2, 455:24
**CROSS-EXAMINATION** [2] - 307:3, 352:18
**cross-examination** [13] - 317:3, 319:6, 319:8, 329:8, 344:8, 345:13, 346:16, 347:8, 349:14, 351:11, 352:10, 359:17, 514:19
**cross-examine** [12] - 318:22, 330:17, 338:1, 350:6, 367:24, 368:10, 369:4, 372:16, 392:4, 393:18, 393:25, 399:9
**cross-examined** [1] - 339:20
**cross-examining** [1] - 340:15
**cross-point** [1] - 319:14
**crossed** [1] - 489:25
**CRR** [1] - 647:11
**Cruz** [5] - 546:5, 551:1, 551:3, 594:24, 601:11
**Cruz's** [1] - 601:14
**culture** [1] - 396:11
**cups** [1] - 532:24
**curative** [1] - 321:15
**cure** [2] - 321:16, 519:4
**cured** [2] - 320:3, 536:7
**curious** [2] - 321:25, 322:11
**current** [3] - 485:4,

511:2, 601:6
**customer** [1] - 545:20
**customers** [8] - 387:8, 408:16, 448:12, 590:16, 603:21, 603:22, 604:12, 604:13
**cut** [3] - 410:8, 524:24, 593:5
**cutoff** [1] - 610:24
**cutoffs** [1] - 613:5

## D

**D's** [1] - 469:8
**D-2095** [1] - 307:9
**D-2104** [2] - 307:15, 444:24
**D-2105** [3] - 307:15, 444:19, 444:24
**D-6061** [3] - 307:17, 483:11, 483:17
**D-81** [1] - 307:7
**D-85** [1] - 307:8
**D-8556** [2] - 307:14, 438:3
**D-8560** [3] - 307:16, 454:1, 461:3
**D-8566** [1] - 437:23
**D-8567** [3] - 307:14, 437:23, 438:3
**D-8635** [3] - 307:13, 427:15, 427:19
**D-8637** [3] - 307:12, 422:13, 422:18
**D-8662** [1] - 416:12
**D-8697** [4] - 307:10, 391:5, 394:24, 395:2
**D-8701** [3] - 307:11, 403:20, 403:24
**D-8702** [1] - 380:16
**D2095** [1] - 385:16
**D8627** [1] - 362:3
**D8700** [1] - 378:25
**D8702** [1] - 381:4
**dah** [1] - 391:24
**daily** [14] - 502:12, 502:15, 504:8, 504:13, 504:15, 564:3, 631:22, 632:4, 632:18, 632:20, 632:24, 633:3, 633:21, 634:5
**Dallas** [1] - 306:17
**damage** [1] - 337:6
**damages** [1] - 338:11
**dangerous** [1] - 375:8
**Darunavir** [1] - 561:8
**darunavir** [1] - 561:10
**dashes** [1] - 434:7

**data** [18] - 421:18, 429:1, 430:14, 430:22, 473:20, 473:23, 533:7, 598:4, 598:6, 602:6, 602:11, 603:19, 613:4, 613:12, 613:16, 615:19, 615:22, 615:23
**Date** [1] - 647:12
**date** [11] - 381:14, 388:14, 571:17, 573:7, 573:8, 591:6, 591:12, 595:15, 614:5, 621:3, 621:4
**dated** [1] - 381:9
**daughter** [2] - 537:15, 538:11
**day-to-day** [1] - 547:5
**days** [9] - 351:24, 509:6, 510:21, 544:14, 551:11, 608:12, 640:14, 641:1, 641:5
**DDI** [1] - 568:25
**DDMAC** [10] - 407:16, 407:19, 408:5, 623:10, 623:19, 623:21, 624:8, 624:19, 627:1, 627:4
**DDMAC's** [1] - 627:15
**dead** [3] - 399:13, 570:9, 570:14
**deadline** [1] - 645:23
**deal** [8] - 317:2, 329:24, 331:10, 349:17, 513:2, 558:10, 564:5, 593:1
**dealing** [3] - 545:23, 579:17, 624:19
**dealt** [1] - 399:23
**Deb** [17] - 403:25, 404:16, 407:15, 417:1, 417:4, 538:3, 538:24, 538:25, 539:1, 540:20, 541:14, 546:9, 587:17, 587:21, 592:6, 636:5, 636:6
**December** [2] - 539:20, 542:16
**decide** [1] - 348:16
**decided** [9] - 344:10, 346:25, 356:2, 364:23, 370:14, 389:14, 531:17, 545:12, 614:7
**decides** [2] - 371:17, 415:13
**deciding** [3] - 309:25,

346:12, 412:13
**decision** [8] - 310:15, 310:18, 322:20, 329:1, 346:15, 365:20, 605:19, 607:20
**decisions** [2] - 415:9, 415:18
**deck** [1] - 641:12
**decks** [2] - 447:9, 489:17
**declaration** [33] - 452:8, 452:11, 452:15, 452:17, 453:14, 453:18, 453:24, 454:11, 455:4, 455:8, 455:13, 455:15, 455:16, 455:17, 456:3, 456:9, 457:2, 458:4, 459:9, 460:10, 461:6, 465:12, 467:18, 471:24, 473:4, 495:7, 495:11, 496:2, 496:5, 496:16, 498:6, 499:8, 499:15
**declaring** [1] - 458:17
**declination** [9] - 322:19, 327:13, 327:20, 329:15, 341:11, 346:3, 346:24, 372:5, 372:6
**decline** [2] - 315:25, 523:14
**declined** [2] - 328:25, 343:2
**decreased** [2] - 411:5, 631:12
**decreases** [1] - 583:16
**dedicated** [2] - 396:10, 509:9
**defamation** [1] - 317:10
**defend** [1] - 309:17
**defendant** [1] - 322:7
**Defendant's** [28] - 307:7, 307:8, 307:9, 307:10, 307:11, 307:12, 307:13, 307:14, 307:15, 307:16, 307:17, 307:19, 379:13, 381:2, 385:25, 395:2, 403:20, 422:18, 427:19, 438:3, 444:24, 461:3, 483:17, 492:3, 500:2,

502:22, 503:1, 571:10
**Defendants** [2] - 306:7, 306:22
**defendants** [1] - 322:7
**defense** [11] - 308:16, 309:13, 309:23, 310:14, 325:20, 432:16, 509:22, 512:5, 514:11, 523:10, 644:14
**defer** [2] - 513:25, 642:8
**definitely** [8] - 339:23, 521:4, 521:6, 543:24, 552:4, 558:12, 630:24, 634:10
**definition** [1] - 605:1
**definitions** [1] - 524:17
**defrauded** [1] - 383:8
**Delavirdine** [1] - 535:14
**Delaware** [1] - 306:22
**delay** [3] - 513:9, 521:12, 565:10
**delays** [2] - 407:16, 408:8
**deleted** [1] - 516:2
**deliberations** [1] - 352:1
**delve** [1] - 643:4
**demands** [1] - 534:13
**demonstrate** [3] - 336:2, 347:9, 348:10
**demonstrated** [1] - 371:8
**demonstrative** [1] - 453:25
**Denise** [1] - 594:23
**density** [3] - 573:21, 579:21, 581:9
**Denver** [1] - 549:13
**dep** [1] - 626:16
**Department** [68] - 309:12, 310:11, 311:3, 311:5, 311:9, 311:10, 311:24, 312:2, 312:5, 312:12, 312:13, 312:19, 315:5, 315:18, 318:12, 320:23, 321:11, 321:17, 321:24, 322:4, 322:18, 326:23, 329:8, 353:1, 353:7, 353:12, 353:15, 353:19, 355:13,

356:12, 356:15, 357:14, 357:18, 357:25, 358:17, 360:7, 360:8, 360:13, 360:18, 360:22, 360:25, 361:5, 371:16, 376:16, 477:5, 516:4, 516:10, 516:22, 516:24, 517:7, 517:10, 517:12, 517:21, 517:23, 518:25, 519:9, 519:23, 520:4, 520:7, 522:13, 522:16, 522:20, 523:5, 523:25, 526:8, 526:12, 526:15

**department** [11] - 384:12, 384:15, 408:4, 493:18, 502:19, 584:19, 604:1, 617:7, 619:18, 620:17, 633:15

**departments** [1] - 604:4

**deposition** [10] - 455:8, 462:8, 462:11, 462:19, 462:20, 466:19, 467:1, 467:11, 627:8, 627:14

**DEPUTY** [16] - 308:4, 351:5, 363:8, 433:18, 433:23, 434:1, 434:21, 511:22, 515:6, 525:25, 527:6, 593:12, 593:20, 594:1, 638:21, 646:12

**deputy** [2] - 512:22, 527:2

**describe** [4] - 530:10, 533:18, 545:17, 587:2

**described** [7] - 315:24, 383:14, 390:1, 390:8, 390:17, 413:21, 582:12

**Description** [1] - 307:6

**designed** [6] - 459:24, 461:17, 464:10, 464:18, 562:12, 611:7

**desk** [1] - 589:23

**despite** [2] - 388:20, 388:21

**detail** [1] - 524:12

**detailed** [6] - 312:24, 312:25, 482:6, 524:19, 525:7, 645:11

**details** [1] - 409:12

**deter** [1] - 432:18

**determine** [1] - 643:7

**determined** [4] - 337:16, 370:23, 582:19, 632:25

**deterrent** [1] - 509:24

**developed** [2] - 559:19, 561:21

**developing** [1] - 529:23

**development** [2] - 438:17, 529:22

**Devlin** [4] - 594:22, 597:25, 598:2, 598:3

**DHHS** [1] - 421:12

**diagnosed** [1] - 536:7

**diarrhea** [1] - 536:15

**die** [1] - 536:24

**difference** [8] - 343:7, 399:23, 400:9, 472:22, 545:20, 556:12, 598:11, 622:12

**different** [83] - 315:10, 316:12, 317:12, 318:8, 318:10, 329:3, 335:12, 335:16, 335:25, 336:13, 340:1, 343:1, 346:22, 347:1, 348:4, 351:20, 365:3, 365:24, 367:3, 367:5, 367:7, 367:13, 368:11, 368:20, 369:16, 384:4, 391:21, 391:24, 392:19, 400:18, 402:8, 433:8, 435:23, 436:2, 444:7, 465:14, 472:18, 475:8, 495:21, 508:9, 514:9, 515:18, 530:4, 533:24, 544:18, 544:19, 547:8, 547:11, 547:12, 548:9, 551:4, 552:22, 553:10, 556:3, 556:4, 558:25, 559:11,

562:1, 563:14, 563:23, 563:24, 566:7, 567:14, 567:15, 572:16, 576:9, 576:13, 576:18, 578:14, 602:24, 604:4, 607:3, 610:21, 611:8, 620:15, 620:16, 623:15, 623:17, 627:16, 627:23, 629:8, 643:15, 644:18

**differentiate** [1] - 563:3

**differently** [1] - 465:23

**difficult** [6] - 389:22, 401:13, 434:5, 470:23, 472:5, 525:22

**dinner** [7] - 478:4, 478:6, 478:7, 549:20, 553:5, 553:12, 608:13

**direct** [22] - 340:8, 340:21, 405:18, 431:21, 439:22, 455:1, 456:11, 488:18, 493:13, 506:1, 516:10, 516:24, 585:24, 592:22, 593:1, 623:13, 623:20, 624:1, 624:3, 625:3, 625:7, 627:22

**DIRECT** [2] - 307:4, 527:12

**directed** [7] - 390:9, 412:20, 441:24, 442:23, 443:17, 616:17, 625:14

**directing** [8] - 412:15, 412:18, 413:16, 414:8, 414:13, 436:15, 439:21, 486:2

**direction** [11] - 413:7, 413:12, 432:13, 433:3, 436:21, 437:14, 437:18, 439:13, 442:6, 442:10, 447:17

**directions** [2] - 489:17, 590:2

**directive** [1] - 622:19

**directly** [6] - 356:15, 412:22, 505:5, 546:9, 586:24, 623:17

**director** [23] - 404:3,

416:24, 489:4, 489:5, 490:25, 491:2, 527:16, 535:2, 538:4, 539:1, 539:3, 539:17, 541:12, 541:19, 541:25, 546:10, 575:22, 584:16, 588:14, 607:16, 612:18, 619:21, 635:15

**directors** [4] - 546:2, 584:17, 584:18, 590:11

**disadvantage** [2] - 632:10, 632:13

**disagree** [9] - 309:8, 313:25, 391:16, 455:20, 487:7, 487:18, 522:25, 624:4, 629:4

**disagreeing** [1] - 316:7

**disagreement** [1] - 525:11

**discern** [1] - 414:25

**disclaimer** [3] - 432:10, 508:23, 510:6

**disclose** [8] - 311:3, 312:1, 387:23, 492:13, 516:21, 519:8, 522:15, 526:11

**disclosed** [1] - 315:17

**disclosure** [1] - 563:16

**discourage** [2] - 432:18, 509:24

**discover** [1] - 373:1

**discovered** [1] - 361:16

**discovery** [3] - 338:5, 370:2, 373:2

**discrepancy** [1] - 512:24

**discuss** [9] - 309:20, 319:7, 325:15, 351:22, 351:24, 351:25, 416:19, 441:20, 603:22

**discussed** [4] - 430:21, 442:14, 506:7, 620:23

**discussing** [4] - 318:23, 395:19, 395:23, 580:24

**discussion** [8] - 333:3, 439:14, 443:7, 443:10,

600:3, 600:20, 607:13, 640:6

**discussions** [3] - 448:12, 607:7, 607:10

**disease** [7] - 396:10, 507:14, 507:15, 541:2, 544:15, 554:21, 558:15

**dismiss** [17] - 329:1, 361:15, 361:24, 363:18, 363:20, 363:25, 365:21, 368:16, 368:17, 368:21, 368:24, 369:17, 371:16, 373:9, 638:15, 638:20

**dismissal** [12] - 361:19, 361:23, 361:25, 366:12, 366:15, 368:4, 369:1, 371:19, 372:5, 373:5, 377:2, 516:12

**dismissed** [39] - 315:14, 328:22, 329:14, 330:12, 330:19, 331:2, 361:13, 361:15, 361:18, 365:15, 366:5, 366:14, 366:17, 366:25, 368:1, 368:8, 368:14, 368:15, 368:19, 369:9, 370:4, 370:5, 370:10, 370:22, 371:2, 371:6, 371:10, 371:20, 372:1, 372:12, 372:21, 374:12, 374:21, 375:15, 375:16, 375:22, 376:19, 477:1, 638:22

**disorders** [1] - 564:11

**dispel** [1] - 624:9

**dispute** [6] - 320:13, 326:10, 340:25, 346:19, 346:20, 347:13

**disputes** [1] - 525:14

**dissatisfaction** [1] - 390:18

**disseminate** [2] - 602:4, 604:10

**disseminated** [3] - 431:25, 592:9, 609:1

**disseminating** [1] -

402:7

**dissemination** [1] - 603:19

**dissolve** [2] - 545:12, 614:8

**distinct** [1] - 462:25

**distinction** [2] - 468:2, 624:4

**distinguish** [1] - 466:11

**distinguishable** [1] - 629:14

**distributed** [1] - 529:10

**distributors** [1] - 531:23

**DISTRICT** [3] - 306:1, 306:1, 306:12

**District** [5] - 308:2, 315:10, 317:7, 317:12, 342:21

**district** [36] - 412:22, 436:11, 445:16, 445:18, 500:12, 501:11, 507:18, 508:15, 535:3, 537:8, 537:20, 537:24, 539:7, 539:21, 540:3, 540:6, 540:14, 540:21, 541:9, 545:8, 545:9, 552:16, 554:16, 590:6, 590:15, 594:21, 594:23, 595:11, 600:12, 605:22, 608:21, 608:23, 612:7, 612:10, 612:14, 614:5

**districts** [4] - 505:21, 506:7, 508:18, 535:1

**division** [8] - 322:25, 371:21, 415:16, 539:2, 547:2, 547:15, 551:4, 594:13

**divisions** [1] - 547:8

**divorced** [1] - 549:12

**docket** [7] - 316:2, 366:4, 367:16, 368:4, 370:3, 374:13, 375:20

**doctor** [35] - 419:7, 419:11, 420:10, 422:2, 424:14, 424:20, 425:9, 425:25, 426:4, 426:17, 427:3, 427:7, 428:14,

441:13, 503:21, 504:21, 536:19, 543:22, 544:3, 544:24, 565:25, 567:3, 578:8, 578:12, 578:17, 583:9, 604:15, 604:21, 605:10, 608:1, 626:23, 627:20, 634:8, 638:1

**doctor's** [2] - 627:4, 627:18

**doctors** [44] - 406:15, 408:9, 418:6, 418:20, 420:23, 421:16, 425:4, 426:11, 429:11, 430:2, 430:16, 431:22, 439:1, 440:10, 447:13, 498:16, 501:8, 506:15, 507:24, 530:20, 543:19, 555:4, 566:14, 569:25, 574:12, 580:1, 595:7, 595:9, 596:7, 597:8, 602:7, 602:25, 604:11, 605:11, 606:17, 606:21, 607:23, 618:16, 619:14, 623:21, 631:24, 632:21, 643:13

**doctors'** [3] - 430:8, 430:13, 501:21

**document** [85] - 365:7, 365:25, 367:16, 367:25, 369:7, 370:1, 372:8, 372:15, 373:2, 373:4, 375:19, 375:20, 377:1, 379:5, 386:2, 386:11, 387:5, 391:9, 392:15, 394:4, 394:20, 394:25, 395:9, 397:22, 398:5, 416:12, 416:18, 417:22, 417:25, 418:2, 428:18, 440:1, 441:3, 442:19, 445:2, 460:1, 460:15, 460:18, 486:6, 486:10, 487:3, 492:4, 492:8, 492:10, 513:20, 560:23, 561:14, 568:5, 571:14, 572:16, 572:17,

572:23, 579:14, 590:22, 591:3, 592:23, 593:2, 593:4, 596:22, 597:22, 599:10, 599:23, 600:4, 600:15, 611:21, 612:23, 616:24, 617:4, 617:21, 618:7, 618:11, 620:4, 621:1, 621:5, 623:3, 623:7, 624:10, 625:2, 625:10, 626:15, 626:25, 628:1, 634:16, 634:19, 637:9

**documentation** [5] - 430:18, 431:1, 486:8, 487:1, 489:21

**documents** [41] - 332:7, 332:8, 358:1, 358:8, 358:13, 358:21, 358:22, 359:5, 359:12, 360:6, 363:6, 363:25, 365:14, 368:13, 369:10, 369:11, 369:22, 372:19, 375:1, 389:9, 450:23, 486:1, 486:16, 486:17, 486:19, 486:20, 486:22, 487:1, 487:2, 487:19, 494:22, 494:24, 553:25, 617:6, 617:19, 620:12, 624:11, 627:2, 630:17

**Doe** [4] - 377:11, 377:15, 400:4, 400:6

**DOJ** [22] - 316:25, 317:1, 317:15, 317:16, 317:17, 319:18, 319:21, 319:22, 319:24, 319:25, 320:2, 320:25, 321:5, 326:7, 327:23, 327:24, 371:21, 383:17, 522:4, 522:14, 526:9

**Dolisi** [10] - 445:4, 446:8, 539:11, 539:24, 539:25, 545:11, 606:10, 606:24, 614:1

**dollar** [7] - 338:1, 339:12, 340:19,

341:14, 341:15, 348:10, 585:25

**dollars** [6] - 338:7, 344:23, 346:8, 346:9, 347:7, 349:2

**dominating** [1] - 555:17

**done** [21] - 353:5, 382:25, 383:6, 501:15, 511:11, 511:12, 529:16, 533:22, 533:23, 558:21, 562:17, 563:24, 568:9, 568:12, 582:5, 585:20, 610:21, 611:13, 622:15, 627:3, 633:15

**DONNA** [1] - 307:2

**Donna** [9] - 377:10, 458:11, 483:20, 522:12, 526:7, 548:21, 548:23, 549:4, 549:17

**door** [22] - 309:22, 310:14, 322:21, 327:20, 327:25, 328:2, 328:7, 328:9, 328:21, 335:4, 342:22, 343:5, 347:24, 363:20, 426:9, 501:14, 501:15, 523:15, 543:22, 544:1, 544:4, 589:24

**dosage** [1] - 571:20

**dose** [4] - 534:9, 563:25, 564:1, 568:20

**dose-finding** [1] - 564:1

**doses** [1] - 533:24

**dosing** [17] - 502:3, 504:8, 504:13, 504:15, 505:3, 533:23, 604:18, 631:16, 631:22, 632:4, 632:18, 632:20, 632:24, 633:3, 633:17, 633:21, 634:5

**double** [1] - 411:6

**doubt** [2] - 407:2, 411:4

**down** [45] - 343:22, 369:8, 373:8, 388:6, 408:15, 408:21, 409:11, 417:1, 438:15, 440:15, 492:13, 492:15,

494:10, 504:11, 550:18, 553:18, 557:22, 563:20, 566:21, 571:4, 573:7, 573:20, 581:8, 581:18, 589:23, 590:2, 590:7, 603:18, 605:13, 607:15, 608:25, 612:22, 613:17, 615:3, 615:11, 616:19, 620:2, 620:18, 621:17, 623:1, 633:6, 636:3, 636:12, 637:2, 646:9

**dozens** [1] - 501:10

**Dr** [3] - 424:24, 426:1, 430:17

**draft** [4] - 572:1, 572:3, 572:18, 572:22

**drafted** [1] - 600:9

**drawing** [1] - 624:5

**drink** [4] - 546:18, 546:22, 587:17, 587:18

**drive** [3] - 506:8, 603:19, 615:12

**driven** [1] - 322:23

**driving** [2] - 359:21, 506:11

**drop** [2] - 570:9, 570:14

**Drug** [1] - 449:23

**drug** [68] - 465:16, 474:2, 507:13, 507:14, 530:3, 530:5, 531:2, 531:5, 531:6, 531:9, 531:13, 534:7, 535:13, 535:18, 535:20, 536:14, 542:12, 542:18, 542:22, 543:13, 543:16, 543:20, 544:13, 546:14, 546:19, 546:24, 555:6, 555:8, 556:11, 556:14, 556:17, 558:14, 558:19, 559:10, 559:18, 560:4, 561:20, 561:25, 566:3, 568:12, 569:12, 574:16, 578:16, 580:10, 580:13, 583:17, 585:19, 585:21, 601:5, 601:7,

601:20, 607:22,
608:14, 609:4,
630:19, 630:21,
631:4, 631:5, 631:6,
631:8, 631:13,
632:17, 633:4,
633:6, 633:23,
636:21, 637:23,
638:4
**drugs** [33] - 421:6,
449:8, 465:8,
465:20, 468:1,
496:19, 529:10,
529:20, 530:1,
530:24, 531:23,
533:14, 534:10,
535:15, 535:17,
544:8, 555:3,
555:24, 559:8,
559:21, 560:2,
563:5, 568:21,
568:22, 570:7,
570:16, 585:14,
597:17, 600:16,
611:8, 632:3, 632:6,
637:25
**drummed** [1] - 541:23
**dual** [1] - 491:1
**due** [2] - 512:25, 613:3
**DULY** [1] - 527:4
**Durabolin** [1] - 632:8
**during** [23] - 326:9,
383:6, 383:23,
384:18, 388:12,
388:24, 395:18,
401:6, 435:17,
437:19, 438:11,
443:13, 450:24,
468:24, 480:15,
513:4, 530:1, 531:3,
552:23, 586:5,
592:13, 617:20,
631:20
**duties** [1] - 547:5
**DX1115** [1] - 573:4
**dying** [1] - 536:18

---

**E**

---

**ear** [1] - 606:12
**early** [15] - 351:22,
371:2, 405:14,
406:5, 406:9,
406:14, 407:1,
534:18, 536:13,
555:3, 560:3, 570:1,
639:19, 640:5, 645:3
**earshot** [3] - 331:11,
572:5, 644:6
**easier** [4] - 418:23,

457:14, 460:17,
632:1
**East** [9] - 306:9,
527:17, 538:5,
541:12, 541:19,
541:24, 548:13,
584:17
**Eastern** [4] - 315:10,
317:7, 317:11,
342:20
**eastern** [2] - 548:15,
608:21
**easy** [2] - 512:24,
545:3
**eating** [1] - 570:25
**echo** [1] - 393:15
**edge** [2] - 331:23,
588:16
**edit** [1] - 452:23
**editing** [1] - 481:16
**edits** [1] - 627:3
**EDPA** [14] - 320:20,
327:14, 327:19,
328:2, 329:12,
330:23, 334:25,
346:2, 347:10,
350:1, 370:16,
381:12, 477:1, 477:3
**educate** [7] - 320:12,
322:2, 322:8, 323:6,
337:25, 520:6, 602:7
**educated** [1] - 443:22
**educates** [1] - 310:24
**educating** [1] - 585:3
**education** [3] -
312:10, 528:10,
586:22
**educational** [1] -
446:22
**Educational** [1] -
431:12
**effect** [11] - 311:5,
311:19, 311:22,
315:19, 386:20,
387:5, 388:11,
399:16, 399:22,
566:13, 566:17
**effective** [6] - 461:19,
464:11, 533:12,
562:7, 632:17,
632:25
**effectively** [1] - 566:10
**effects** [6] - 367:8,
533:15, 546:15,
566:2, 566:14,
574:13
**efficacious** [2] -
535:19, 561:25
**efficacy** [2] - 449:5,
464:23

**effort** [1] - 316:21
**efforts** [2] - 459:23,
464:6
**eight** [1] - 602:24
**either** [10] - 314:12,
323:3, 330:18,
499:2, 508:2,
525:12, 533:14,
577:10, 592:23,
628:10
**elaborate** [1] - 524:16
**elements** [1] - 524:17
**elephant** [2] - 519:20,
519:22
**elevate** [1] - 618:12
**eligibility** [4] - 469:14,
471:3, 471:10,
471:19
**eligible** [2] - 469:10,
472:2
**eliminate** [1] - 619:8
**ELMO** [5] - 331:19,
332:20, 467:18,
502:23, 572:7
**Elmo** [2] - 573:14,
578:22
**email** [36] - 381:5,
381:9, 432:11,
433:6, 438:5,
438:11, 438:21,
439:21, 441:4,
441:8, 441:25,
442:24, 444:20,
445:4, 447:22,
451:11, 480:19,
480:24, 481:24,
505:11, 506:2,
506:5, 517:2, 517:4,
518:13, 522:4,
611:22, 612:1,
612:17, 612:20,
613:25, 614:17,
614:21, 635:9,
636:1, 638:3
**emailing** [1] - 635:13
**emails** [11] - 432:19,
432:24, 443:25,
451:9, 487:8, 505:9,
508:24, 509:18,
509:19, 510:5, 510:8
**emergent** [1] - 568:8
**Emily** [1] - 592:7
**emotions** [1] - 389:11
**Emperor's** [1] - 587:5
**employee** [1] - 388:6
**employees** [5] - 384:5,
385:10, 387:25,
388:21, 388:22
**employment** [1] -
414:1

**empty** [2] - 317:18,
549:15
**enamored** [1] - 537:13
**encountered** [1] -
405:24
**encouraged** [1] -
604:19
**encroach** [1] - 332:3
**end** [26] - 336:5,
336:6, 346:15,
495:17, 496:9,
512:16, 512:18,
512:19, 513:1,
519:4, 519:17,
520:12, 534:6,
535:11, 541:13,
553:18, 568:10,
639:16, 639:18,
640:7, 640:20,
641:22, 645:6,
645:7, 645:13
**ended** [4] - 528:16,
539:16, 545:9,
551:13
**endorsement** [1] -
428:9
**enforce** [2] - 599:10,
600:25
**enhance** [1] - 496:3
**enjoy** [1] - 638:15
**enormous** [1] - 507:7
**ensure** [2] - 363:7,
443:6
**ensuring** [1] - 334:16
**enters** [4] - 351:6,
434:22, 526:1, 594:2
**entire** [14] - 326:16,
403:23, 404:17,
468:24, 531:12,
535:9, 539:3,
540:23, 550:19,
554:9, 584:19,
608:24, 609:1,
619:18
**entirety** [1] - 548:14
**entitled** [9] - 319:16,
334:24, 335:9,
340:16, 345:5,
356:7, 357:12,
386:15, 647:5
**entitles** [1] - 358:16
**entity** [1] - 322:9
**entry** [1] - 530:7
**environment** [9] -
384:3, 387:24,
389:22, 390:2,
399:19, 401:14,
402:22, 485:23,
588:9
**epidemiology** [1] -

557:22
**equate** [1] - 629:11
**equipment** [2] - 333:2,
547:10
**Eric** [1] - 614:10
**especially** [6] - 319:6,
340:7, 551:17,
608:11, 608:16,
644:11
**ESQUIRE** [8] - 306:14,
306:15, 306:15,
306:16, 306:16,
306:19, 306:20,
306:20
**essence** [2] - 326:14,
493:16
**essentially** [2] -
489:22, 504:5
**establish** [1] - 455:25
**established** [1] -
340:8
**et** [1] - 306:3
**ethic** [1] - 537:23
**ethical** [2] - 484:17,
484:23
**ethics** [1] - 484:13
**evaluate** [1] - 551:8
**evaluation** [1] - 414:1
**evening** [1] - 584:3
**event** [6] - 378:19,
431:20, 574:3,
574:6, 574:17
**events** [1] - 602:13
**eventually** [7] -
532:11, 539:4,
540:15, 541:11,
543:12, 549:22,
551:2
**Evergreen** [1] - 458:13
**evidence** [56] - 307:7,
307:8, 307:9,
307:11, 307:12,
307:13, 307:14,
307:15, 307:16,
307:17, 307:18,
307:19, 307:20,
307:21, 307:22,
307:23, 307:24,
307:25, 310:4,
347:11, 367:15,
367:17, 372:2,
372:6, 372:8,
374:13, 379:13,
381:2, 385:16,
385:17, 385:25,
403:20, 418:12,
422:18, 427:19,
438:3, 444:24,
460:3, 461:3, 461:8,
483:17, 492:3,

496:2, 500:3, 502:23, 506:4, 560:17, 571:10, 579:5, 592:19, 611:19, 613:23, 618:5, 620:7, 635:2, 640:13

**evolved** [1] - 555:11

**exact** [4] - 320:5, 348:11, 365:1, 432:15

**exactly** [6] - 332:18, 332:19, 374:18, 518:4, 519:7

**exam** [8] - 335:17, 336:13, 339:3, 340:8, 349:12, 455:1, 455:2, 455:24

**examination** [17] - 315:12, 317:3, 319:6, 319:8, 329:8, 344:8, 345:13, 346:16, 347:8, 349:14, 351:11, 352:10, 359:17, 376:8, 511:11, 514:19, 624:7

**EXAMINATION** [6] - 307:3, 307:3, 307:4, 352:18, 488:2, 527:12

**EXAMINATIONS** [1] - 307:1

**examine** [14] - 318:22, 330:17, 338:11, 343:9, 343:10, 350:6, 367:24, 368:10, 369:4, 372:16, 392:4, 393:18, 393:25, 399:9

**examined** [1] - 339:20

**examining** [1] - 340:15

**example** [10] - 349:1, 384:9, 395:13, 465:18, 500:18, 502:11, 503:1, 505:2, 509:21

**except** [1] - 612:13

**exception** [1] - 399:17

**exchanged** [2] - 355:17, 387:7

**excited** [5] - 434:9, 542:11, 555:7, 631:6, 631:7

**excluded** [2] - 309:24, 598:15

**excuse** [4] - 318:20, 318:21, 511:18,

564:9

**excused** [1] - 511:13

**excuses** [1] - 587:14

**execute** [1] - 616:7

**executed** [1] - 458:13

**executive** [1] - 547:21

**executives** [1] - 607:9

**Exhibit** [43] - 307:6, 307:7, 307:8, 307:9, 307:10, 307:11, 307:12, 307:13, 307:16, 307:17, 307:18, 307:19, 307:20, 307:21, 307:21, 307:22, 307:23, 307:24, 379:13, 381:2, 385:25, 395:2, 403:20, 422:18, 427:19, 461:3, 483:17, 500:3, 506:4, 513:7, 560:6, 560:17, 571:10, 579:5, 592:19, 594:8, 611:19, 613:18, 613:23, 618:5, 620:3, 620:7

**exhibit** [7] - 362:10, 437:22, 500:5, 513:5, 514:16, 560:8, 572:21

**Exhibits** [4] - 307:14, 307:15, 438:3, 444:24

**exhibits** [9] - 512:20, 513:15, 513:23, 514:11, 514:13, 514:20, 572:25, 624:25

**exist** [1] - 383:12

**exits** [3] - 433:19, 511:23, 593:13

**expand** [1] - 535:1, 616:4, 636:3

**expanded** [1] - 545:9

**expanding** [1] - 537:18

**expect** [1] - 585:9

**expectation** [3] - 432:14, 433:5, 639:14

**expectations** [1] - 582:15

**expected** [4] - 432:12, 433:3, 484:22, 641:16

**expecting** [2] - 574:19, 596:7

**expedite** [1] - 641:23

**expenses** [2] - 478:4,

478:13

**expensive** [1] - 633:22

**experience** [25] - 313:14, 392:23, 394:1, 397:24, 413:17, 421:18, 439:2, 440:11, 471:10, 505:23, 505:24, 507:8, 510:22, 540:17, 541:7, 543:18, 554:22, 554:25, 565:20, 583:2, 587:20, 607:25, 621:10, 631:21, 632:9

**experienced** [28] - 419:2, 419:8, 557:1, 557:4, 557:7, 557:18, 558:6, 558:14, 559:12, 559:20, 562:21, 563:3, 563:17, 571:22, 574:2, 574:12, 582:9, 582:14, 583:17, 587:22, 601:4, 603:5, 608:4, 608:17, 631:2, 631:10, 632:11, 637:7

**experiences** [2] - 544:23, 570:13

**expert** [7] - 565:2, 567:18, 574:25, 575:20, 575:24, 576:14, 577:13

**explain** [8] - 318:25, 326:16, 346:11, 495:3, 501:10, 508:4, 509:18, 510:19

**explained** [2] - 627:8, 627:14

**explaining** [1] - 326:22, 366:20, 501:5

**explains** [2] - 321:17, 463:22

**explanation** [1] - 521:23

**explicit** [1] - 318:12

**explore** [1] - 372:7

**expounded** [1] - 467:23

**expressed** [1] - 643:12

**expressing** [1] - 442:5

**extent** [4] - 318:22, 321:13, 339:10,

577:19

**extra** [2] - 482:14, 482:17

**extremely** [1] - 533:12

## F

**face** [2] - 530:25

**face-to-face** [1] - 530:25

**Facebook** [10] - 395:4, 395:10, 395:24, 396:15, 397:3, 445:14, 508:21, 509:4, 509:6, 509:12

**facilitating** [1] - 439:7

**facilitator** [1] - 439:13

**facilities** [3] - 584:22, 596:16, 596:17

**facing** [1] - 406:5

**fact** [33] - 324:14, 328:21, 328:25, 337:13, 343:9, 370:4, 371:4, 374:11, 378:15, 379:15, 382:19, 383:23, 388:20, 388:22, 402:20, 409:20, 431:7, 431:25, 438:15, 443:13, 447:3, 447:15, 450:23, 458:21, 461:23, 474:5, 480:3, 480:22, 485:11, 490:2, 496:9, 497:15, 560:1

**factor** [1] - 337:22

**factors** [5] - 335:21, 335:25, 337:16, 410:2, 410:19

**facts** [2] - 343:3, 418:12

**fail** [4] - 556:24, 557:8, 557:10, 558:16

**failed** [1] - 556:23, 559:17, 563:5

**failure** [1] - 387:18

**fair** [35] - 330:10, 330:25, 346:17, 374:14, 399:6, 411:14, 443:16, 475:21, 476:1, 476:3, 484:4, 506:18, 548:16, 548:17, 551:21, 551:24, 553:23, 554:2, 576:24, 576:25, 577:1, 577:14, 578:7,

600:17, 609:23, 609:24, 616:25, 620:22, 630:23, 634:13, 635:7, 637:15, 638:3, 638:5, 644:19

**fairly** [2] - 333:16, 348:22

**faith** [4] - 366:24, 369:5, 609:25, 632:22

**fall** [1] - 645:15

**False** [16] - 310:25, 311:2, 311:8, 312:1, 312:25, 314:20, 321:25, 326:16, 516:21, 517:13, 518:4, 520:2, 521:23, 522:15, 526:11, 645:8

**false** [1] - 468:21

**familiar** [14] - 421:8, 445:5, 450:8, 471:16, 471:19, 472:24, 473:16, 473:19, 474:5, 479:13, 498:19, 557:1, 565:3, 576:8

**family** [3] - 642:17, 643:8, 644:1

**far** [13] - 316:11, 329:4, 333:16, 334:10, 351:13, 490:14, 507:11, 537:14, 545:18, 581:7, 582:24, 584:6, 586:6

**fast** [1] - 627:17

**fast-track** [1] - 627:17

**fault** [2] - 323:7, 462:5

**faulting** [1] - 348:2

**favor** [1] - 348:17

**favorable** [1] - 481:9

**favorite** [1] - 491:6

**fax** [1] - 423:3

**faxing** [1] - 423:21

**FCA** [3] - 313:15, 315:3, 321:19

**FDA** [33] - 386:15, 407:19, 408:1, 408:4, 408:9, 410:3, 429:7, 448:2, 450:3, 450:10, 473:19, 475:4, 475:8, 475:13, 478:22, 478:23, 479:14, 485:3, 492:10, 534:4, 534:7, 534:12, 556:20, 560:24, 562:8,

567:15, 623:9,
624:23, 625:24,
627:2, 627:18,
633:3, 633:21
**FDA-approved** [4] -
448:2, 485:3,
556:20, 567:15
**fear** [3] - 387:25,
389:2, 390:12
**fearful** [1] - 390:4
**February** [4] - 483:22,
484:8, 507:4, 541:14
**federal** [11] - 311:4,
311:12, 311:13,
315:18, 469:1,
471:15, 472:14,
517:25, 522:20,
526:14, 596:17
**FEDERAL** [1] - 647:1
**fee** [1] - 347:5
**feedback** [5] - 480:15,
481:16, 590:16,
601:24, 605:22
**feelings** [1] - 397:7
**feet** [2] - 331:25,
340:21
**fell** [1] - 558:5
**fellow** [2] - 487:9,
487:14
**felt** [11] - 309:19,
333:13, 389:11,
411:6, 451:4, 451:7,
490:14, 499:5,
537:1, 583:4, 587:6
**few** [5] - 351:24,
382:21, 435:5,
551:11, 559:19
**field** [18] - 387:9,
403:23, 404:6,
404:17, 432:4,
481:12, 482:7,
533:9, 541:3, 541:4,
541:16, 551:8,
551:11, 565:21,
569:24, 590:14,
608:12, 634:4
**field-based** [1] - 387:9
**figure** [5] - 342:10,
565:17, 567:9,
584:5, 586:11
**figured** [1] - 528:15
**figures** [1] - 402:8
**file** [47] - 318:6,
320:24, 321:18,
346:13, 347:24,
355:22, 357:11,
361:16, 363:21,
363:22, 365:18,
366:3, 366:12,
366:16, 366:18,

367:1, 367:11,
367:17, 367:21,
367:24, 368:1,
368:7, 368:8, 369:4,
369:23, 369:25,
370:2, 370:19,
371:17, 372:15,
372:16, 373:1,
373:2, 373:5,
374:13, 375:17,
375:23, 376:23,
382:7, 382:13,
382:14, 383:20,
383:21, 389:15,
389:18, 519:8,
629:15
**filed** [17] - 315:13,
316:1, 319:15,
320:22, 321:2,
328:23, 360:5,
366:22, 366:23,
367:11, 371:4,
371:13, 377:5,
377:19, 381:12,
381:15, 477:1
**filing** [5] - 319:25,
355:14, 380:7,
423:17, 516:11
**filings** [1] - 363:16
**filled** [2] - 413:25,
606:16
**final** [16] - 311:18,
312:20, 313:1,
314:11, 326:5,
335:21, 346:20,
524:14, 524:20,
525:1, 525:6, 525:9,
548:4, 572:2,
572:22, 645:11
**finally** [6] - 408:15,
442:14, 450:12,
481:2, 481:5, 510:13
**financial** [10] - 335:17,
335:19, 337:13,
337:15, 339:21,
340:11, 343:10,
347:9, 348:21, 554:4
**fine** [14] - 325:2,
329:13, 329:14,
330:20, 339:8,
365:16, 369:6,
433:13, 496:10,
512:13, 514:22,
579:4, 593:6, 641:19
**finish** [6] - 326:9,
534:14, 593:1,
626:2, 639:12, 641:6
**finished** [2] - 528:11,
631:19
**Finkelstein** [1] - 445:9

**firewall** [1] - 604:2
**firm** [3] - 477:22,
486:21, 540:24
**firms** [1] - 334:12
**first** [123] - 309:7,
309:10, 311:3,
312:1, 313:8,
314:25, 316:15,
318:6, 320:11,
320:14, 320:16,
320:24, 321:2,
328:23, 329:25,
332:1, 339:1,
345:12, 347:24,
353:15, 354:2,
361:16, 363:21,
363:22, 365:18,
366:3, 366:12,
366:16, 366:17,
366:22, 366:23,
367:1, 367:11,
367:17, 367:21,
367:24, 368:1,
368:7, 368:8, 369:4,
369:23, 369:25,
370:2, 370:19,
371:17, 372:15,
372:16, 373:1,
373:2, 373:5,
374:13, 375:8,
375:17, 375:23,
376:23, 382:7,
391:19, 392:12,
399:23, 405:9,
406:9, 432:16,
441:12, 444:6,
446:21, 447:2,
448:1, 454:2,
455:13, 455:25,
456:8, 456:9, 458:3,
459:16, 464:5,
482:1, 484:15,
504:12, 507:14,
507:15, 509:22,
522:9, 529:3, 529:7,
530:7, 533:12,
535:6, 535:25,
536:14, 536:18,
544:17, 553:3,
553:7, 553:15,
555:6, 555:12,
556:9, 556:11,
556:14, 561:4,
561:15, 563:1,
568:19, 570:1,
574:1, 583:6,
583:12, 588:21,
590:25, 591:19,
594:19, 595:14,
598:3, 603:24,
608:17, 619:7,

621:4, 622:21,
640:3, 640:10,
644:16, 644:17
**first-to-file** [28] -
318:6, 320:24,
347:24, 363:21,
363:22, 366:3,
366:12, 367:11,
367:17, 367:21,
367:24, 368:7,
368:8, 369:4,
369:23, 370:2,
370:19, 371:17,
372:15, 372:16,
373:1, 373:2, 373:5,
374:13, 375:17,
375:23, 376:23,
382:7
**Fisher** [1] - 306:8
**fit** [2] - 430:3, 541:22
**five** [18] - 313:5,
326:25, 376:5,
400:17, 433:11,
487:5, 512:18,
512:19, 513:2,
520:5, 527:17,
536:23, 543:22,
546:1, 555:1,
573:19, 586:14
**five-and-a-half** [1] -
512:19
**fix** [1] - 519:4
**flagging** [1] - 628:25
**flattered** [1] - 538:14
**flawlessly** [1] - 616:7
**flip** [1] - 586:15
**floating** [1] - 536:3
**FLOM** [1] - 306:19
**Florida** [7] - 470:9,
506:1, 539:12,
585:18, 594:23,
606:15, 606:17
**Florida's** [2] - 507:1,
507:4
**flow** [1] - 583:18
**fly** [5] - 355:9, 477:23,
551:11, 584:3,
601:22
**focus** [3] - 310:2,
313:23, 367:8
**focused** [1] - 482:24
**focusing** [2] - 518:24,
519:1
**folder** [1] - 572:11
**folks** [63] - 308:5,
308:15, 310:6,
313:15, 314:16,
319:4, 331:10,
332:23, 332:25,
333:2, 333:6, 334:5,

334:12, 334:13,
350:22, 351:7,
351:8, 351:15,
351:21, 362:18,
362:23, 363:5,
365:10, 376:4,
379:6, 395:17,
398:14, 399:24,
403:17, 422:14,
427:16, 433:14,
433:20, 433:24,
434:16, 434:23,
437:19, 438:21,
439:21, 442:24,
454:22, 482:6,
511:15, 511:25,
515:3, 515:7, 518:6,
522:7, 526:2, 526:3,
540:11, 543:12,
565:6, 577:10,
577:18, 593:7,
593:14, 594:3,
622:8, 634:2,
634:18, 638:12,
638:23
**follow** [4] - 352:7,
432:13, 463:6, 466:2
**followed** [2] - 433:3,
493:21
**following** [3] - 463:19,
464:1, 616:10
**follows** [1] - 428:18
**FOLLOWS** [1] - 527:5
**fondness** [1] - 509:14
**Food** [1] - 449:22
**foot** [1] - 363:1
**FOR** [1] - 306:1
**force** [10] - 540:23,
542:21, 543:6,
543:11, 545:13,
547:5, 582:24,
590:3, 612:17,
620:19
**forced** [1] - 399:6
**forecast** [14] - 409:2,
409:12, 409:16,
410:14, 410:20,
411:6, 412:6,
494:13, 494:23,
581:25, 582:6,
582:21, 587:11,
587:22
**forecasts** [5] - 402:3,
402:10, 402:16,
402:21, 403:5
**foregoing** [1] - 647:4
**forge** [2] - 501:21,
508:2
**forged** [2] - 501:18,
508:12

**forget** [1] - 528:11
**forgot** [2] - 445:20, 631:19
**form** [13] - 311:14, 313:11, 320:10, 423:2, 423:23, 424:1, 425:21, 500:6, 502:12, 504:21, 508:8, 519:15
**formal** [1] - 629:15
**formality** [1] - 517:25
**format** [2] - 508:3, 508:4
**former** [6] - 395:5, 396:6, 396:15, 397:4, 398:6, 398:17
**formerly** [1] - 395:6
**forms** [8] - 422:21, 502:2, 505:12, 505:17, 506:1, 507:23, 508:9, 508:10
**formulary** [3] - 532:1, 585:22, 585:23
**formulate** [1] - 616:8
**forth** [5] - 332:24, 349:17, 359:25, 450:9, 552:8
**forward** [12] - 318:5, 319:9, 330:19, 334:5, 339:22, 340:17, 347:10, 365:20, 370:19, 587:15, 590:9, 638:14
**forwarded** [1] - 486:20
**foundation** [10] - 416:17, 416:19, 416:21, 417:22, 417:24, 565:14, 567:10, 567:21, 590:23, 616:24
**four** [20] - 326:6, 400:17, 405:9, 436:2, 439:7, 440:1, 441:3, 441:7, 442:18, 442:23, 443:3, 443:6, 447:21, 492:15, 500:15, 507:16, 512:23, 541:5, 586:14, 612:1
**fourth** [1] - 533:11
**frame** [2] - 531:13, 534:19
**framed** [1] - 319:25
**Fran** [5] - 594:22, 597:22, 597:24, 597:25, 598:2

**Francisco** [3] - 594:22, 597:1, 597:9
**Frank** [16] - 412:23, 436:11, 436:23, 483:24, 488:14, 488:16, 488:17, 488:18, 539:10, 540:5, 540:6, 546:2, 546:3, 552:16, 594:24, 600:22
**Frank's** [1] - 600:22
**free** [5] - 329:18, 330:16, 333:6, 352:4, 435:12
**freedom** [1] - 525:14
**frequently** [5] - 444:11, 447:8, 535:14, 549:19, 631:17
**friend** [6] - 380:1, 453:10, 459:23, 471:25, 485:25, 550:15
**friend's** [4] - 453:19, 468:17, 499:3, 499:11
**friendly** [28] - 473:8, 474:6, 474:7, 474:9, 474:23, 475:2, 479:4, 479:6, 497:3, 497:10, 497:11, 497:19, 497:22, 498:1, 498:5, 571:1, 581:13, 606:2, 606:4, 609:2, 609:14, 609:15, 609:18, 610:2, 619:9, 619:13, 619:15, 622:16
**friends** [9] - 378:3, 478:4, 478:6, 509:12, 510:14, 532:20, 549:15, 549:22, 551:16
**friendship** [1] - 550:13
**front** [9] - 363:6, 439:8, 476:22, 477:17, 544:1, 544:4, 560:23, 589:24, 624:10
**frustrated** [4] - 480:23, 481:20, 481:21, 482:2
**frustrating** [1] - 482:5
**frustration** [1] - 481:2
**full** [5] - 308:6, 521:5, 534:1, 534:16, 536:8
**full-blown** [2] - 534:1, 536:8
**fully** [2] - 323:13,

625:5
**fun** [1] - 552:7
**funded** [1] - 468:19
**future** [5] - 547:18, 556:10, 621:22, 628:3, 628:25

# G

**Gail** [6] - 546:11, 547:1, 588:6, 588:11, 588:23, 589:18
**gain** [3] - 389:16, 574:16, 595:6
**gallery** [1] - 644:6
**gallon** [1] - 546:18
**game** [4] - 329:18, 330:16, 374:14, 533:2
**gather** [1] - 601:24
**Gay** [1] - 539:16
**gears** [1] - 499:17
**general** [4] - 390:18, 570:15, 609:3, 643:11
**generally** [3] - 489:16, 569:23, 594:18
**generate** [3] - 459:24, 461:17, 464:19
**generic** [2] - 544:20, 569:15
**generous** [2] - 470:6, 472:8
**genotype** [2] - 559:1, 559:2
**gentleman** [2] - 488:24, 585:1
**gentlemen** [2] - 489:3, 490:22
**Geoff** [2] - 308:19, 316:8
**GEOFFREY** [1] - 306:20
**geography** [1] - 530:18
**gesture** [1] - 317:18
**GI** [5] - 367:8, 367:13, 618:21, 622:5, 622:11
**given** [12] - 313:12, 324:9, 335:5, 344:11, 474:13, 524:10, 542:11, 557:12, 564:3, 586:14, 622:25, 623:17
**glasses** [2] - 457:4, 458:5
**Glenn** [24] - 405:1,

405:8, 547:1, 582:17, 585:6, 586:1, 586:4, 587:8, 587:25, 589:22, 591:17, 594:10, 594:11, 594:12, 594:13, 605:21, 606:12, 607:6, 607:15, 619:20, 633:14, 634:3
**goal** [8] - 409:7, 495:4, 534:6, 586:7, 587:8, 595:22, 596:9, 616:7
**Goals** [1] - 595:15
**goals** [5] - 401:19, 408:23, 491:18, 582:18, 612:2
**God** [1] - 587:18
**golf** [2] - 549:23
**Gossett** [7] - 489:1, 489:6, 489:10, 490:9, 490:24, 493:8, 493:15
**governed** [1] - 623:15
**government** [1] - 309:25
**Government** [63] - 310:15, 314:22, 315:5, 315:25, 316:1, 316:2, 319:19, 322:10, 322:21, 324:11, 324:15, 324:23, 326:18, 328:16, 328:25, 329:13, 343:2, 346:24, 353:25, 361:19, 361:24, 363:15, 363:16, 363:19, 363:23, 364:11, 364:20, 365:11, 365:21, 366:7, 366:19, 368:16, 368:17, 368:19, 368:21, 368:23, 368:24, 369:9, 370:5, 370:13, 371:10, 371:19, 371:20, 372:11, 372:18, 372:20, 373:9, 374:20, 375:1, 383:12, 383:20, 388:2, 421:8, 472:15, 516:24, 517:13, 521:16, 522:24, 523:12, 585:14, 628:18, 629:6
**Government's** [6] - 310:18, 330:18,

331:1, 347:3, 365:20, 366:20
**grab** [2] - 457:4, 572:11
**gracefully** [1] - 538:18
**graduate** [1] - 528:12
**graduated** [1] - 528:25
**graham** [1] - 511:7
**GRAHAM** [1] - 307:2
**Graham** [94] - 310:3, 310:21, 311:23, 313:7, 315:9, 321:7, 321:23, 328:11, 334:1, 335:8, 337:9, 340:4, 341:25, 344:13, 345:20, 347:1, 347:9, 350:20, 351:12, 352:13, 352:19, 352:23, 353:14, 356:24, 357:11, 359:16, 361:13, 368:23, 376:11, 377:6, 377:10, 381:4, 382:12, 385:6, 386:10, 389:21, 390:24, 394:22, 394:24, 396:4, 396:14, 398:5, 398:17, 400:16, 401:1, 401:17, 403:22, 403:25, 413:20, 419:5, 421:9, 422:20, 430:13, 435:3, 435:16, 435:23, 438:5, 445:2, 449:14, 451:13, 457:2, 457:14, 457:16, 457:25, 458:11, 462:7, 467:13, 483:20, 485:14, 488:3, 492:7, 492:15, 494:12, 496:3, 496:5, 497:1, 500:5, 500:22, 501:25, 502:11, 502:25, 503:20, 505:16, 506:2, 506:5, 508:20, 510:13, 522:12, 524:22, 526:7, 548:21, 548:23, 549:4, 624:20
**Graham's** [18] - 310:10, 311:16, 312:18, 312:23, 313:23, 317:24, 326:5, 326:10,

347:4, 366:12,
366:25, 463:22,
467:1, 522:13,
522:21, 523:25,
526:8, 526:16
**graph** [1] - 615:6
**great** [14] - 392:23,
397:8, 472:7, 504:7,
504:9, 504:12,
527:3, 539:17,
542:5, 546:14,
552:6, 555:9,
623:16, 623:24
**greater** [2] - 574:9,
610:25
**Greek** [1] - 544:17
**Greg** [1] - 635:15
**Grooms** [2] - 550:2,
550:13
**ground** [5] - 349:10,
510:3, 543:20,
590:11, 622:19
**ground-level** [1] -
590:11
**group** [13] - 393:16,
395:23, 406:15,
531:18, 531:19,
545:10, 545:11,
545:13, 557:24,
594:15, 600:3,
635:12, 635:13
**groups** [2] - 586:12,
586:14
**grow** [2] - 528:1,
620:21
**guarantee** [1] - 313:14
**guess** [13] - 321:25,
325:16, 333:4,
353:22, 354:8,
395:15, 440:6,
493:22, 532:12,
545:16, 587:1,
596:16, 628:16
**guidelines** [5] - 421:9,
469:8, 480:20,
545:19, 590:10
**gun** [1] - 608:3
**guy** [1] - 537:1
**guys** [36] - 326:11,
326:24, 338:24,
340:24, 341:4,
341:5, 342:4,
343:21, 343:22,
345:11, 346:23,
347:18, 348:1,
349:12, 372:9,
379:3, 379:15,
512:11, 513:6,
517:2, 517:15,
517:16, 518:4,

519:21, 520:21,
520:25, 521:7,
536:12, 581:24,
607:15, 607:16,
634:21, 635:4,
641:24, 642:2, 643:5

## H

**half** [14] - 327:1,
327:2, 410:9,
410:24, 512:19,
520:5, 527:17,
549:10, 632:19,
632:20, 634:8,
639:9, 639:17, 645:8
**half-life** [3] - 632:19,
632:20, 634:8
**halfway** [2] - 645:8,
645:24
**hall** [1] - 478:11
**hand** [6] - 351:16,
431:4, 456:10,
457:2, 571:17, 591:6
**handcuffed** [1] - 340:4
**handing** [2] - 394:24,
431:2
**handle** [1] - 644:7
**handler** [2] - 445:1,
446:17
**hands** [1] - 591:9
**hanging** [1] - 532:25
**happy** [6] - 339:2,
454:7, 538:19,
551:4, 551:20, 630:8
**hard** [10] - 325:15,
332:8, 346:10,
366:2, 458:4, 517:5,
518:15, 561:21,
639:22, 640:21
**hardly** [1] - 538:15
**harm** [3] - 519:16,
519:17, 578:9
**harmed** [1] - 574:4
**Harry** [4] - 584:20,
596:13, 596:14,
596:15
**HAVING** [1] - 527:4
**head** [15] - 346:8,
498:21, 498:25,
511:25, 533:1,
588:19, 611:13,
635:18, 635:20,
645:13
**head-to-head** [3] -
498:21, 498:25,
611:13
**header** [1] - 500:6
**heads** [2] - 326:8,
439:12

**health** [4] - 386:10,
484:18, 574:10,
642:18
**hear** [33] - 309:8,
310:2, 312:5, 312:6,
312:19, 313:8,
316:7, 321:8, 325:3,
335:2, 345:23,
364:2, 364:4,
400:23, 454:5,
466:20, 467:10,
520:6, 523:18,
524:6, 524:20,
560:13, 575:8,
585:11, 588:1,
595:9, 623:25,
626:18, 627:12,
628:11, 629:22,
643:10, 644:17
**heard** [14] - 311:23,
319:23, 321:6,
437:12, 479:21,
491:3, 522:9,
522:12, 526:7,
535:22, 539:17,
567:13, 590:17,
626:1
**hearing** [2] - 326:22,
520:3
**hears** [1] - 640:12
**hearsay** [1] - 391:8,
396:1, 396:18,
398:2, 398:8,
398:21, 399:15,
399:17, 399:24,
400:5, 400:22,
417:19, 567:5
**heart** [6] - 316:17,
319:7, 529:18,
554:6, 564:24,
570:11
**heart's** [1] - 343:11
**heartache** [1] - 330:1
**heels** [1] - 372:6
**held** [3] - 308:1, 584:9,
584:11
**help** [9] - 355:21,
397:5, 466:3, 485:2,
510:15, 534:10,
540:22, 551:21,
573:13
**helped** [2] - 466:2,
549:24
**helpful** [3] - 363:11,
466:24, 504:8
**Henry** [1] - 536:20
**HHS** [3] - 421:11,
626:12, 626:17
**hi** [1] - 553:13
**Hi** [1] - 636:5

**high** [20] - 390:1,
412:1, 412:3, 412:6,
484:22, 490:22,
532:24, 538:13,
545:24, 547:4,
561:22, 579:21,
581:9, 585:25,
599:5, 601:17,
614:13, 619:25
**high-density** [2] -
579:21, 581:9
**high-level** [2] -
614:13, 619:25
**high-pressure** [2] -
412:1, 412:3
**higher** [6] - 404:6,
493:5, 493:10,
570:17, 582:19,
620:24
**highlight** [2] - 448:12,
569:20
**highly** [3] - 396:11,
509:13, 567:14
**Hills** [1] - 425:8
**himself** [2] - 412:25,
537:1
**hip** [1] - 345:11
**hire** [9] - 346:12,
354:7, 354:10,
355:14, 355:18,
389:15, 540:23,
544:22, 547:4
**hired** [9] - 354:5,
389:18, 539:20,
540:18, 548:3,
548:24, 552:14,
552:15, 555:1
**hiring** [7] - 539:15,
541:7, 543:3, 543:6,
543:11, 544:12,
548:2
**history** [1] - 328:24
**hit** [5] - 326:15, 365:6,
369:21, 511:15,
611:3
**HIV** [69] - 396:10,
407:11, 418:25,
421:3, 421:7, 426:4,
427:9, 440:21,
463:10, 466:12,
466:15, 468:1,
469:25, 470:12,
472:23, 495:22,
496:20, 509:9,
530:7, 530:9, 531:2,
531:6, 531:13,
532:18, 533:10,
536:1, 539:2,
540:17, 540:24,
541:5, 542:13,

542:19, 543:1,
543:6, 543:11,
543:16, 544:13,
544:14, 546:24,
547:2, 547:5,
547:11, 554:20,
554:22, 554:24,
555:5, 555:24,
556:21, 557:24,
558:9, 568:22,
570:4, 570:11,
570:15, 582:3,
583:5, 594:13,
597:16, 604:7,
630:19, 631:7,
631:15, 631:23
**hold** [6] - 334:16,
348:15, 363:8,
629:20, 634:18,
642:24
**hole** [1] - 541:20
**Holshoe** [2] - 550:23,
551:5
**Holshoe's** [1] - 551:23
**home** [8] - 320:19,
425:7, 489:7,
510:21, 583:20,
584:11, 588:10,
592:6
**homework** [1] -
320:16
**honest** [3] - 463:19,
499:6, 499:7
**honestly** [5] - 356:14,
421:15, 451:9,
543:3, 549:1
**Honor** [228] - 308:8,
308:10, 308:17,
308:19, 308:21,
309:3, 309:5, 314:1,
314:5, 315:20,
316:8, 318:16,
319:11, 320:18,
322:14, 324:1,
324:8, 325:8, 327:9,
327:13, 330:1,
330:20, 331:14,
333:9, 333:20,
333:24, 334:18,
335:10, 335:20,
336:16, 337:10,
337:21, 338:4,
338:15, 338:20,
339:5, 340:2,
340:20, 341:10,
341:13, 342:19,
343:17, 343:20,
343:24, 344:2,
345:21, 346:5,
347:17, 350:7,

350:15, 350:17,
351:1, 352:11,
352:17, 356:21,
356:24, 357:5,
357:6, 361:8, 362:3,
362:7, 362:15,
362:21, 363:13,
364:3, 364:10,
364:16, 364:25,
366:1, 367:2, 368:3,
368:20, 369:24,
372:4, 373:12,
375:12, 376:9,
378:24, 379:2,
380:16, 380:22,
381:1, 385:15,
385:24, 386:3,
386:5, 391:5, 391:8,
391:14, 393:3,
393:21, 394:15,
396:18, 398:2,
398:8, 398:12,
398:21, 398:23,
399:4, 399:16,
400:13, 400:22,
400:24, 403:12,
403:16, 403:18,
416:13, 416:16,
418:2, 422:13,
422:15, 422:17,
427:14, 427:17,
427:20, 433:7,
434:1, 434:18,
434:19, 435:1,
435:7, 435:14,
438:2, 444:18,
444:19, 444:21,
454:1, 454:3,
454:12, 454:21,
456:18, 456:24,
457:20, 459:25,
460:7, 460:12,
460:16, 460:23,
462:16, 463:21,
466:3, 466:18,
466:22, 467:3,
467:5, 467:9,
475:19, 483:10,
483:13, 483:16,
487:23, 488:1,
499:18, 512:2,
512:3, 512:9, 514:5,
514:6, 514:15,
515:2, 515:12,
515:14, 516:19,
517:6, 518:12,
518:20, 519:6,
520:16, 521:1,
521:19, 521:22,
523:2, 524:2,
525:19, 526:22,

527:11, 560:7,
560:12, 565:2,
567:14, 567:25,
571:7, 571:11,
571:25, 572:10,
572:15, 572:21,
573:2, 573:3,
573:12, 574:25,
575:20, 577:15,
579:1, 580:3,
580:19, 581:2,
592:16, 592:25,
593:17, 593:24,
599:22, 611:17,
613:21, 616:22,
616:23, 618:2,
623:3, 623:8,
623:23, 624:14,
624:25, 626:1,
626:20, 630:1,
638:9, 639:2,
641:10, 641:13,
641:14, 641:18,
642:4, 643:11,
643:12, 644:3,
644:22, 646:2, 646:7
**Honor's** [5] - 316:17,
335:5, 339:9,
518:21, 519:14
**HONORABLE** [1] -
306:11
**Honorable** [1] - 308:1
**honorarium** [1] -
601:23
**hope** [3] - 429:13,
535:19, 537:6
**hopefully** [1] - 514:1
**hoping** [2] - 332:6,
595:18
**horizontally** [1] -
619:1
**horrible** [1] - 399:19
**horse** [1] - 399:13
**hospital** [1] - 574:8
**hospitalized** [1] -
574:7
**hospitals** [1] - 545:22
**host** [2] - 322:24,
323:4
**hotel** [1] - 553:6
**hotline** [4] - 353:18,
383:16, 383:17,
384:9
**hotlines** [1] - 383:12
**hour** [2] - 639:9,
639:17
**hours** [3] - 528:12,
589:22, 632:21
**house** [2] - 537:5,
549:19

**housekeeping** [4] -
308:24, 319:5,
334:15, 643:21
**houses** [1] - 345:14
**HR** [2] - 384:15,
547:14
**huge** [6] - 531:21,
556:10, 558:3,
597:10, 604:2, 604:7
**hundred** [10] - 321:3,
364:15, 509:9,
510:1, 510:5,
528:10, 561:19,
562:2, 562:10, 564:2
**hundreds** [1] - 344:22
**hurry** [1] - 586:23
**hurt** [1] - 574:4
**husband** [1] - 538:16
**hush** [2] - 549:3
**hush-hush** [1] - 549:3
**hybrid** [1] - 522:8
**hypercholesterolemi
a** [3] - 564:18,
573:20, 576:17
**hyperlipidemia** [3] -
564:19, 564:21,
576:17
**hypocholesterolemi
a** [1] - 564:20
**hypothetical** [2] -
342:13, 580:7

**I**

**Iacobellis** [17] -
416:24, 417:4,
417:7, 417:17,
418:5, 418:18,
488:24, 489:4,
489:10, 490:9,
490:25, 493:3,
493:9, 493:13,
588:2, 619:20,
635:18
**IAS** [3] - 421:10,
603:19, 604:7
**idea** [18] - 311:9,
311:10, 314:2,
363:14, 377:3,
377:23, 380:6,
380:15, 382:3,
382:10, 407:4,
414:10, 490:17,
541:23, 563:13,
605:5, 609:12,
615:19
**ideas** [4] - 606:9,
607:3, 607:4
**identical** [2] - 340:9,
625:7

**identification** [2] -
307:10, 395:2
**identified** [1] - 441:7
**identifies** [2] - 407:15,
408:14
**identify** [9] - 349:16,
405:13, 416:2,
416:6, 416:10,
418:6, 418:23,
419:1, 548:5
**identifying** [1] -
351:16
**ignored** [1] - 585:12
**illegal** [9] - 383:2,
383:13, 384:5,
385:10, 399:6,
412:14, 487:15,
490:15, 554:8
**imaginary** [2] -
331:22, 332:4
**imagine** [3] - 411:8,
417:10, 429:20
**immediate** [6] -
387:19, 492:19,
493:1, 493:5, 493:6,
616:9
**immediately** [3] -
513:11, 544:25,
621:13
**impact** [21] - 398:7,
474:8, 474:10,
474:24, 479:7,
479:9, 479:12,
479:13, 497:24,
498:2, 574:9, 610:7,
613:14, 616:9,
626:5, 626:6,
626:22, 627:5
**impacted** [1] - 398:7
**impacts** [1] - 625:16
**impeach** [1] - 466:19
**impeached** [1] -
454:19
**impeachment** [3] -
454:4, 454:6, 462:17
**impetus** [1] - 606:6
**implement** [3] -
586:17, 586:20,
617:15
**implementation** [1] -
620:23
**implementing** [1] -
622:9
**implicating** [1] -
349:24
**implications** [2] -
576:1
**implicit** [1] - 318:12
**implied** [1] - 327:22
**implies** [1] - 371:5

**imply** [1] - 372:1
**implying** [2] - 319:25,
364:24
**important** [9] -
351:25, 363:5,
440:16, 443:18,
447:12, 451:1,
451:4, 505:23,
544:12
**impossible** [4] -
533:15, 583:1,
587:8, 588:5
**impression** [8] -
316:16, 321:2,
321:10, 356:14,
363:23, 383:10,
426:15, 513:6
**improper** [7] - 385:10,
392:13, 412:21,
414:15, 431:17,
454:6, 567:19
**improvement** [2] -
551:6, 551:19
**in-person** [1] - 530:22
**inappropriate** [1] -
462:16
**incentive** [2] - 348:21,
547:23
**incentivizing** [1] -
415:23
**incidentally** [1] -
358:21
**inclined** [4] - 313:10,
320:9, 327:3
**include** [3] - 395:13,
598:24, 604:22
**included** [7] - 443:20,
447:14, 449:8,
480:4, 530:18,
598:19, 619:24
**includes** [1] - 574:11
**including** [7] - 335:22,
387:13, 388:16,
410:3, 434:5,
495:17, 634:3
**inconsistent** [8] -
391:13, 391:17,
450:13, 454:13,
454:19, 454:20,
455:3, 462:20
**inconvenience** [1] -
641:5
**incorrect** [1] - 523:22
**increase** [8] - 414:19,
506:12, 564:21,
564:22, 570:16,
581:6, 618:21
**increases** [1] - 570:22
**increasing** [3] -
419:14, 419:15,

564:23
**incumbent** [2] -
320:11, 356:25
**independent** [4] -
318:3, 339:19,
396:10, 547:13
**indicated** [4] - 465:19,
465:21, 466:16,
507:15
**indicating** [2] - 473:7,
497:2
**indication** [8] -
417:14, 465:17,
498:24, 571:19,
573:10, 613:11,
621:10, 633:2
**indirect** [1] - 551:23
**individual** [3] -
472:11, 472:12,
620:20
**individuals** [1] -
612:10
**industry** [3] - 377:21,
507:9, 529:1
**ineligible** [4] - 468:20,
470:17, 470:25,
471:8
**infection** [2] - 530:9,
531:9
**infections** [1] - 531:8
**infers** [1] - 474:9
**infighting** [1] - 523:16
**influential** [1] - 545:21
**info** [1] - 603:21
**inform** [1] - 339:12
**information** [79] -
348:9, 348:20,
356:12, 357:14,
387:7, 420:4, 420:8,
420:9, 420:12,
420:19, 422:21,
423:1, 424:20,
425:20, 426:5,
428:4, 428:7,
428:10, 428:15,
428:22, 429:9,
429:17, 429:18,
430:3, 430:16,
431:5, 432:4, 432:8,
432:22, 442:14,
442:15, 448:13,
448:17, 448:20,
473:7, 474:13,
479:4, 496:15,
497:2, 499:25,
500:6, 500:11,
504:8, 504:13,
505:17, 505:25,
506:15, 506:19,
508:7, 508:8,

508:10, 602:4,
602:11, 603:20,
604:5, 604:10,
604:12, 604:13,
604:14, 604:16,
604:17, 604:21,
604:25, 605:1,
605:6, 606:17,
606:21, 606:22,
617:23, 628:1,
643:7, 643:19,
643:23, 644:2,
644:5, 644:7,
644:15, 644:17
**informing** [1] - 517:18
**inherently** [2] -
432:17, 495:25
**inhibitor** [13] - 533:11,
535:10, 535:21,
535:23, 536:12,
555:12, 555:14,
556:25, 557:9,
559:17, 562:3, 609:6
**inhibitors** [8] - 535:16,
536:13, 546:13,
555:23, 561:24,
570:2, 609:17,
615:21
**initial** [3] - 310:16,
317:22, 381:15
**initials** [1] - 544:21
**inoculate** [1] - 316:21
**inquiries** [1] - 618:21
**insert** [20] - 311:18,
429:2, 429:17,
429:23, 463:1,
463:3, 473:16,
473:20, 479:4,
497:11, 498:6,
498:8, 498:12,
560:24, 561:1,
570:3, 574:1,
574:18, 579:11,
633:1
**inserted** [1] - 312:23
**inserts** [5] - 463:15,
473:7, 497:2,
578:11, 580:15
**inside** [1] - 529:7
**insight** [1] - 595:6
**insinuates** [2] -
374:20, 498:1
**insinuating** [2] -
369:8, 488:8
**insinuation** [1] -
372:10
**instance** [3] - 309:18,
509:2, 610:22
**instead** [3] - 383:19,
423:22, 602:23

**institutes** [1] - 543:25
**instruct** [2] - 341:24,
363:21
**instructed** [10] -
337:14, 341:23,
342:3, 342:4,
342:12, 346:21,
347:21, 441:20,
486:23, 487:5
**instructing** [2] -
432:12, 567:8
**Instruction** [3] -
314:4, 314:6, 522:4
**instruction** [53] -
311:15, 312:4,
312:10, 312:15,
312:21, 313:12,
314:3, 315:7,
315:21, 316:10,
320:4, 320:10,
320:12, 320:14,
321:4, 321:15,
321:16, 322:1,
322:17, 323:19,
323:23, 326:4,
326:13, 326:15,
326:25, 327:4,
327:24, 339:6,
342:3, 344:10,
512:9, 515:11,
515:25, 518:22,
519:3, 519:15,
521:5, 522:10,
524:9, 524:19,
524:21, 524:25,
525:1, 525:8,
525:12, 525:17,
526:5, 526:19,
645:8, 645:16,
645:18, 646:1
**instructions** [30] -
310:23, 311:18,
312:21, 313:1,
314:2, 314:11,
326:6, 335:5,
335:21, 335:22,
336:18, 337:12,
338:23, 340:25,
341:1, 346:20,
437:10, 520:1,
520:2, 521:11,
524:15, 524:16,
524:17, 524:20,
525:7, 525:9,
645:12, 645:20
**insult** [1] - 533:20
**insurance** [5] -
468:19, 528:19,
531:22, 531:23,
537:5

**Intelence** [38] - 407:1,
407:7, 407:10,
417:12, 423:6,
424:16, 437:4,
437:11, 441:21,
459:2, 459:5,
461:18, 461:24,
462:13, 466:14,
467:25, 470:4,
495:25, 502:3,
502:12, 502:14,
504:15, 505:2,
630:20, 630:25,
632:10, 632:14,
632:23, 633:2,
633:4, 634:1, 634:4,
636:12, 636:21,
637:5, 637:13,
637:22
**intelligence** [1] -
533:20
**intend** [7] - 341:1,
345:16, 369:23,
374:9, 393:7,
454:10, 642:21
**intended** [1] - 428:9
**intending** [3] - 326:16,
335:1, 366:6
**intense** [1] - 587:16
**intention** [1] - 326:4
**intentional** [1] -
623:23
**intentionally** [2] -
369:14, 418:20
**interaction** [1] - 396:5
**interest** [10] - 316:1,
336:3, 336:4, 336:7,
340:7, 343:10,
516:11, 523:10,
523:12, 554:4
**interested** [2] - 316:2,
528:20
**intermingle** [1] - 604:6
**internal** [1] - 404:17
**internally** [3] - 488:9,
488:13, 502:18
**interpret** [2] - 491:16,
565:24
**interpretation** [3] -
317:20, 318:7, 318:8
**interrupt** [3] - 334:20,
343:15, 627:9
**intervene** [1] -
309:25, 310:16,
310:18, 321:6,
328:25, 343:2,
346:25, 370:14,
371:11, 372:11,
516:7, 517:8, 523:14
**intervening** [1] -

327:23
**intervention** [19] -
324:11, 324:24,
326:20, 327:25,
328:1, 328:3, 329:9,
330:23, 344:12,
344:13, 346:22,
347:3, 364:7, 365:1,
365:10, 366:6,
369:13, 374:8,
374:22
**interview** [5] - 537:19,
541:18, 548:3,
548:6, 550:9
**interviewed** [2] -
532:23, 550:7
**interviewing** [1] -
528:18
**intimately** [2] -
449:24, 469:16
**introduce** [2] - 527:13,
630:19
**introduced** [2] -
319:13, 370:17
**investigate** [1] -
314:23
**investigation** [3] -
363:24, 368:13,
373:23
**investigator** [2] -
451:21, 451:22
**invites** [1] - 601:18
**inviting** [1] - 315:25
**invoking** [1] - 317:15
**involve** [1] - 326:18
**involved** [34] - 311:6,
312:3, 319:21,
321:18, 322:5,
325:17, 329:8,
330:18, 331:1,
372:20, 402:2,
402:7, 402:15,
415:8, 415:17,
418:5, 422:21,
450:9, 451:14,
475:4, 522:21,
523:3, 523:25,
524:1, 526:15,
526:16, 532:1,
534:5, 547:23,
548:7, 549:2,
565:22, 607:13
**involvement** [3] -
311:11, 523:5,
603:18
**involves** [1] - 623:13
**involving** [1] - 371:8
**Iowa** [3] - 528:2,
528:5, 530:18
**IPs** [1] - 384:19

island [1] - 547:16
Island [1] - 551:10
issue [85] - 308:25,
309:19, 309:20,
309:23, 309:24,
310:14, 313:6,
314:25, 316:17,
317:14, 319:12,
320:7, 321:24,
322:11, 324:3,
324:10, 324:11,
324:24, 325:14,
325:18, 326:1,
328:14, 328:20,
331:2, 331:17,
331:21, 332:21,
334:14, 334:19,
339:1, 339:7,
339:24, 339:25,
340:10, 341:4,
341:11, 342:1,
344:12, 345:11,
345:21, 345:22,
346:19, 346:23,
347:13, 347:20,
347:25, 348:4,
349:16, 349:22,
350:2, 362:16,
362:19, 363:13,
364:5, 366:2, 366:3,
367:11, 372:17,
393:21, 407:15,
436:3, 437:3,
463:14, 516:2,
518:22, 623:14,
623:18, 623:22,
623:24, 624:14,
625:14, 626:8,
629:11, 629:17,
635:1, 639:21,
642:15, 642:18,
642:19, 643:4,
643:18, 643:22,
644:1
issue-spot [1] -
309:20
issues [27] - 308:24,
309:10, 310:20,
317:9, 317:25,
318:17, 319:4,
325:6, 325:9, 331:6,
332:15, 334:6,
345:25, 348:7,
479:22, 517:20,
561:22, 599:14,
600:2, 600:16,
603:22, 606:25,
618:22, 625:6,
642:5, 644:5, 644:25
it'll [1] - 339:7

itself [3] - 344:9,
561:18, 562:13

---

## J

J&J [2] - 404:12,
404:14
J&J's [1] - 386:10
jails [1] - 596:16
Jan [1] - 636:5
Jane [1] - 377:11
janssen [1] - 394:2
Janssen [126] -
308:18, 308:20,
308:22, 314:25,
315:4, 316:9,
318:21, 321:20,
328:13, 345:15,
352:24, 353:6,
353:20, 355:2,
358:9, 363:14,
365:23, 378:12,
381:20, 382:15,
382:18, 383:1,
383:24, 384:4,
384:9, 384:12,
384:15, 387:5,
388:12, 388:15,
388:20, 388:22,
388:25, 389:3,
389:4, 389:22,
390:19, 390:25,
395:5, 396:6,
396:16, 397:4,
397:6, 397:24,
398:7, 398:17,
398:19, 399:12,
400:18, 401:2,
401:7, 401:13,
407:25, 408:8,
408:23, 410:20,
414:22, 415:5,
415:13, 416:2,
416:6, 419:7,
419:11, 422:3,
424:19, 427:9,
427:24, 428:14,
429:15, 430:7,
437:12, 438:7,
444:7, 450:1,
450:25, 451:17,
464:6, 468:18,
468:24, 479:22,
481:13, 481:25,
483:4, 485:15,
485:19, 488:10,
491:8, 491:9,
493:25, 502:18,
521:5, 527:19,
538:3, 539:1, 539:4,
539:8, 540:11,

540:15, 542:3,
542:19, 545:7,
546:8, 547:7, 549:8,
552:23, 554:7,
554:21, 554:23,
555:6, 557:14,
575:22, 581:23,
582:19, 582:21,
583:5, 587:11,
592:13, 594:14,
614:13, 617:20,
625:24, 630:19,
633:19, 637:24,
638:4, 639:8
JANSSEN [1] - 306:6
Janssen's [10] -
316:7, 324:22,
459:23, 461:15,
484:17, 540:23,
547:2, 556:14,
584:10, 602:13
January [4] - 467:1,
506:23, 534:21,
541:14
jargon [1] - 544:16
JERSEY [1] - 306:1
Jersey [13] - 306:9,
355:9, 425:4,
425:25, 538:10,
538:17, 538:21,
542:9, 584:3,
584:12, 591:9,
594:20, 605:21
Jessica [6] - 478:5,
478:6, 508:16,
510:14, 552:1,
552:13
Jim [1] - 635:15
Jimmy [1] - 395:13
job [14] - 316:22,
334:8, 481:15,
482:10, 482:12,
510:23, 537:20,
538:9, 549:13,
551:13, 554:15,
554:18, 567:1, 576:8
jobs [1] - 390:4
Joe [4] - 550:25,
551:2, 551:5, 551:23
John [3] - 377:15,
400:4, 400:6
JOHNSON [2] - 306:6
Johnson [21] - 384:22,
385:4, 385:9,
389:22, 492:2,
492:5, 494:10,
536:5, 568:4, 571:4,
578:23, 579:7,
581:18, 590:19,
591:1, 605:14,

611:21, 617:2,
620:8, 637:2
Johnson's [2] - 385:4,
385:9
join [1] - 321:1
joined [4] - 321:1,
483:4, 542:16,
588:10
Joseph [1] - 550:23
Josh [1] - 308:10
JOSH [1] - 306:15
Judge [15] - 308:2,
308:12, 325:22,
370:17, 372:15,
456:1, 524:15,
566:23, 579:6,
625:11, 626:16,
628:17, 628:24,
640:2, 643:22
judge [4] - 322:19,
343:14, 347:2,
528:23
JUDGE [1] - 306:12
judgment [2] - 421:17,
430:2
jug [1] - 546:18
jugs [1] - 546:17
July [5] - 605:17,
614:25, 621:4,
621:6, 621:12
jump [2] - 318:15,
643:8
jumping [1] - 646:9
June [2] - 556:19,
612:2
JUROR [1] - 362:21
jurors [44] - 310:25,
311:7, 312:9,
312:22, 313:12,
313:17, 321:14,
322:8, 332:1,
333:13, 333:22,
336:8, 336:22,
337:12, 337:14,
337:25, 342:4,
342:17, 350:18,
350:19, 350:21,
352:5, 352:23,
356:19, 359:10,
369:17, 383:25,
403:4, 433:16,
434:17, 435:17,
461:2, 476:22,
486:2, 487:4,
511:18, 518:22,
523:7, 566:9,
592:24, 593:22,
630:9, 638:20,
646:10
jurors' [1] - 519:1

Jury [8] - 351:6,
433:19, 434:22,
511:23, 526:1,
593:13, 594:2,
638:22
JURY [1] - 306:5
jury [86] - 311:15,
316:19, 320:1,
320:10, 321:3,
321:10, 322:2,
322:13, 323:6,
323:10, 323:12,
326:17, 328:15,
331:11, 333:10,
338:6, 338:16,
339:12, 340:25,
341:1, 341:3,
341:24, 342:12,
344:11, 346:6,
346:11, 346:20,
347:21, 348:7,
355:7, 358:23,
366:9, 368:18,
369:9, 371:4,
388:24, 389:6,
390:8, 390:17,
394:13, 395:19,
401:18, 402:21,
404:2, 409:15,
415:3, 433:25,
457:11, 477:18,
486:6, 486:16,
486:22, 488:16,
488:17, 489:3,
490:11, 501:10,
515:9, 516:16,
517:19, 519:25,
521:12, 525:18,
527:14, 530:11,
533:18, 534:19,
535:21, 539:23,
542:14, 560:8,
560:22, 572:5,
572:25, 579:7,
583:23, 594:12,
611:20, 614:3,
620:9, 624:10,
624:11, 624:21,
632:2, 640:12
Justice [65] - 309:12,
310:11, 311:4,
311:5, 311:9,
311:11, 311:24,
312:2, 312:3, 312:6,
312:12, 312:13,
312:19, 315:6,
315:18, 318:12,
320:23, 321:11,
321:17, 321:24,
322:4, 322:18,
326:23, 329:8,

353:1, 353:7,
353:12, 353:15,
353:19, 355:13,
356:12, 356:15,
357:14, 357:19,
357:25, 358:17,
360:7, 360:8,
360:13, 360:18,
360:22, 360:25,
361:5, 371:16,
376:16, 477:5,
516:4, 516:22,
517:7, 517:10,
517:12, 517:21,
517:24, 518:25,
519:9, 519:23,
520:4, 520:8,
522:13, 522:16,
522:20, 523:25,
526:8, 526:12,
526:15
**Justice's** [2] - 516:10,
516:24

## K

**K103** [1] - 631:5
**K103N** [1] - 559:6
**Kaletra** [25] - 474:2,
474:6, 474:8,
474:25, 479:8,
479:12, 479:18,
498:12, 498:13,
499:1, 555:16,
559:23, 569:12,
569:13, 569:15,
570:8, 609:6, 609:8,
609:10, 609:19,
609:22, 613:7,
615:22, 622:5,
622:12
**Kansas** [1] - 550:5
**keep** [9] - 324:12,
342:24, 343:12,
506:22, 515:8,
517:21, 543:1,
581:21, 585:16
**keeping** [1] - 570:10
**Keith** [2] - 536:20,
635:14
**Ken** [3] - 584:20,
588:3, 612:13
**kept** [3] - 499:10,
544:8, 552:25
**key** [15] - 444:7, 533:7,
540:2, 545:10,
545:15, 545:16,
548:20, 584:18,
596:11, 596:20,
614:7, 614:12,

614:14, 620:13,
622:1
**kickback** [2] - 367:6
**kidney** [3] - 507:14,
546:20, 546:21
**kids** [5] - 417:13,
418:7, 418:21,
537:13, 549:13
**kill** [2] - 531:11,
538:16
**Kim** [6] - 362:23,
363:11, 518:13,
518:16, 518:20,
520:23
**Kim's** [2] - 351:17,
518:13
**kind** [78] - 311:20,
312:9, 312:16,
314:24, 321:25,
322:11, 326:13,
326:14, 344:14,
373:1, 433:16,
440:10, 446:2,
472:17, 477:16,
513:1, 523:9, 532:7,
532:23, 533:3,
533:17, 533:21,
535:2, 535:19,
535:25, 539:5,
540:23, 541:8,
541:16, 542:25,
544:17, 545:12,
545:17, 546:7,
547:4, 548:4,
548:10, 548:12,
548:14, 549:3,
549:20, 549:24,
552:10, 553:14,
553:17, 553:22,
554:20, 555:5,
556:12, 557:12,
557:22, 583:9,
586:13, 586:15,
586:21, 590:2,
597:18, 599:18,
600:16, 600:19,
604:19, 604:20,
605:16, 606:5,
606:8, 606:23,
607:1, 608:8,
609:12, 611:4,
616:15, 616:16,
617:17, 636:11,
640:2, 640:7, 641:2,
644:6
**kinds** [1] - 558:25
**King** [1] - 306:21
**Klein** [1] - 308:21
**KLEIN** [2] - 306:20,
308:21

**know..** [1] - 550:17
**knowing** [2] - 549:15,
633:23
**knowledge** [11] -
313:19, 324:12,
416:17, 464:13,
468:25, 472:1,
480:9, 546:25,
567:7, 608:9, 610:18
**known** [8] - 323:8,
388:7, 445:9,
516:23, 522:19,
526:13, 604:11,
619:12
**knows** [2] - 565:20,
566:16
**Kozub** [4] - 617:10,
617:11, 619:17,
635:10
**Kwak** [2] - 445:13,
445:18

## L

**L.P** [1] - 306:7
**LA** [5] - 445:19,
445:24, 446:2,
594:22, 597:25
**lab** [1] - 568:8
**label** [121] - 367:4,
367:7, 367:13,
403:1, 414:19,
414:23, 415:4,
415:6, 415:24,
416:2, 416:7, 418:6,
418:10, 418:21,
420:12, 420:13,
420:20, 420:24,
421:17, 422:2,
424:11, 430:9,
430:14, 430:15,
430:24, 431:2,
431:5, 436:16,
439:12, 439:17,
439:22, 439:23,
441:13, 441:21,
442:11, 443:10,
443:23, 448:2,
448:16, 448:25,
450:12, 459:23,
461:15, 464:6,
464:21, 464:22,
470:4, 470:11,
485:5, 486:3, 486:7,
486:10, 488:21,
490:3, 493:12,
498:17, 498:20,
498:21, 498:22,
502:2, 503:25,
504:15, 506:16,

506:19, 545:18,
557:13, 557:14,
562:24, 563:8,
564:5, 565:1,
565:13, 565:20,
566:18, 567:15,
568:11, 571:23,
573:23, 575:25,
577:24, 578:1,
578:3, 578:5,
579:17, 580:2,
581:1, 582:1,
582:22, 598:19,
598:23, 602:4,
602:9, 603:9,
603:11, 604:11,
605:20, 606:21,
607:4, 610:4, 610:6,
611:11, 611:13,
613:13, 615:19,
626:6, 626:7,
630:18, 631:1,
631:9, 632:23,
636:20, 637:5,
637:12, 637:22,
637:25, 638:1
**labeled** [1] - 599:13
**labeling** [3] - 485:3,
556:21, 573:24
**labels** [1] - 565:23
**Laboratories** [5] -
529:5, 529:6,
529:25, 531:17,
537:21
**lack** [3] - 347:3,
374:10, 374:21
**lacks** [2] - 371:12,
373:10
**ladder** [1] - 546:8
**lag** [1] - 583:11
**Lake** [1] - 527:22
**Lambert** [3] - 532:10,
534:25, 537:17
**land** [2] - 313:6,
321:21
**landing** [1] - 313:3
**language** [17] -
311:19, 312:16,
320:5, 320:7, 324:1,
365:3, 508:24,
509:17, 509:19,
510:6, 515:21,
516:17, 517:9,
522:10, 525:1,
525:5, 623:20
**large** [2] - 355:22,
557:13
**largely** [1] - 556:8
**largest** [1] - 530:15
**last** [25] - 318:10,

322:16, 367:16,
404:21, 405:18,
454:5, 461:5, 509:6,
510:20, 527:7,
532:4, 536:24,
544:14, 548:5,
550:11, 553:5,
553:22, 554:13,
568:16, 577:2,
577:19, 622:4,
622:6, 634:16,
637:13
**late** [1] - 571:25
**laughing** [2] - 527:15,
552:9
**launch** [11] - 405:9,
552:15, 555:6,
556:14, 581:24,
583:21, 589:19,
589:20, 590:1,
595:15, 621:8
**launched** [6] - 530:5,
546:24, 556:18,
608:11, 609:6,
630:21
**law** [38] - 322:15,
322:20, 334:12,
337:12, 339:16,
339:17, 340:14,
341:6, 342:25,
343:7, 344:4,
345:10, 349:15,
349:16, 356:6,
356:13, 357:12,
358:16, 360:8,
360:12, 373:22,
388:8, 390:9,
393:23, 413:17,
414:8, 414:14,
486:1, 486:2,
486:20, 486:23,
487:5, 487:10,
490:5, 493:18,
494:5, 523:23,
645:15
**laws** [1] - 388:2
**lawsuit** [51] - 311:12,
312:10, 312:25,
314:17, 317:12,
317:25, 319:15,
322:6, 322:9,
346:13, 355:15,
355:21, 356:3,
356:7, 357:12,
357:19, 358:2,
359:6, 360:5,
360:13, 360:14,
371:4, 371:5,
371:13, 376:12,
376:15, 376:19,

377:6, 380:14,
381:12, 381:15,
382:13, 382:14,
383:20, 383:21,
389:15, 389:18,
436:3, 437:3, 437:9,
451:14, 453:20,
458:22, 459:22,
463:15, 468:18,
477:1, 485:24,
517:25, 623:14
**lawsuits** [1] - 380:7
**lawyer** [25] - 319:15,
346:13, 354:2,
354:5, 354:11,
354:15, 354:19,
355:14, 355:21,
356:2, 356:16,
357:11, 358:19,
359:17, 360:13,
382:4, 382:12,
382:14, 383:20,
389:15, 389:18,
451:24, 476:3,
477:8, 477:16
**lawyers** [27] - 333:5,
351:18, 359:20,
382:4, 382:5,
451:17, 453:15,
453:19, 455:10,
456:6, 456:13,
457:3, 458:5,
458:21, 459:9,
459:21, 461:9,
468:16, 469:18,
470:16, 471:24,
473:3, 473:6,
477:22, 478:13,
479:3, 638:16
**lay** [8] - 416:17,
416:19, 416:21,
417:24, 565:13,
567:11, 590:23,
628:3
**laying** [1] - 417:21
**layman** [1] - 323:10
**LDL** [1] - 579:22
**leaders** [1] - 533:7
**leadership** [2] -
550:18, 550:21
**leads** [1] - 374:7
**league** [1] - 549:23
**leak** [1] - 487:1
**leap** [3] - 321:9,
609:25, 632:21
**learn** [3] - 320:21,
544:18, 644:14
**learned** [7] - 356:16,
357:13, 531:20,
531:21, 532:18,

532:22, 544:14
**least** [30] - 309:20,
313:10, 313:14,
316:10, 319:7,
319:23, 323:22,
324:3, 329:3,
333:14, 333:22,
345:14, 346:23,
350:20, 394:20,
406:4, 423:25,
424:5, 424:14,
455:25, 583:11,
634:19, 635:1,
635:5, 638:25,
641:4, 642:1,
642:25, 644:6, 645:7
**leave** [9] - 332:17,
404:7, 430:19,
431:6, 525:14,
529:21, 535:12,
589:18, 643:25
**leaves** [1] - 363:23
**leaving** [2] - 312:9,
320:8
**led** [1] - 373:7
**Lee** [2] - 527:8, 527:15
**left** [34] - 309:22,
312:11, 321:3,
321:13, 335:24,
336:18, 336:22,
337:11, 352:24,
353:8, 353:11,
376:11, 382:15,
382:21, 383:1,
389:3, 437:7,
437:13, 437:16,
451:17, 528:25,
531:17, 532:12,
540:3, 549:8, 549:9,
550:6, 553:3, 553:7,
586:10, 589:21,
591:6, 592:25,
597:19
**left-hand** [1] - 591:6
**legal** [3] - 637:24,
638:1, 638:2
**legitimate** [1] - 541:1
**length** [3] - 326:14,
399:4, 399:19
**less** [3] - 310:3,
310:6, 310:9,
313:19, 313:20,
327:2, 362:25,
536:3, 536:9, 600:9
**lesser** [1] - 474:8
**letter** [8] - 361:25,
363:15, 366:16,
428:3, 429:16,
623:9, 628:10,
629:16

**letters** [1] - 547:19
**letting** [2] - 365:25,
369:7
**leukemia** [1] - 530:6
**level** [15] - 401:24,
415:16, 484:22,
538:8, 545:25,
547:4, 579:19,
584:16, 590:11,
601:17, 614:13,
619:25, 620:13,
620:14, 620:24
**levels** [12] - 561:22,
561:24, 562:17,
564:21, 564:22,
581:14, 598:9,
598:12, 599:5,
604:17, 620:16
**Levere** [1] - 594:23
**liaison** [1] - 533:5
**liaisons** [1] - 603:25
**Libby** [7] - 539:12,
540:8, 540:9,
594:22, 606:15,
606:25, 633:15
**liberal** [1] - 472:8
**life** [7] - 460:17,
534:11, 537:5,
574:13, 632:19,
632:20, 634:8
**life-threatening** [1] -
534:11
**lifesaving** [1] - 407:11
**light** [1] - 410:19
**limine** [6] - 309:19,
309:21, 317:10,
317:11, 328:8,
349:24
**limitation** [1] - 562:24
**limitations** [3] -
556:20, 630:25,
631:12
**limited** [5] - 479:17,
541:4, 560:2,
568:22, 608:20
**line** [26] - 331:22,
332:4, 365:6,
365:19, 365:24,
368:12, 369:7,
369:20, 372:13,
372:23, 373:7,
373:16, 392:5,
432:16, 462:25,
466:21, 467:2,
489:24, 489:25,
490:1, 507:17,
509:22, 602:17,
602:19, 607:21
**lines** [4] - 467:2,
573:19, 577:4

**link** [1] - 506:1
**lipid** [53] - 419:12,
473:8, 474:6, 474:7,
474:9, 474:23,
475:2, 475:5,
475:12, 478:22,
479:4, 479:6, 497:3,
497:10, 497:19,
497:22, 498:1,
498:3, 498:5,
570:18, 571:1,
581:9, 581:12,
598:4, 598:10,
606:2, 606:4, 609:2,
609:11, 609:13,
609:15, 609:18,
610:1, 610:9,
610:19, 613:2,
613:4, 613:7,
615:15, 618:21,
619:9, 619:13,
619:15, 622:12,
622:16, 624:8, 624:9
**lipid-friendly** [1] -
473:8
**lipid-lowering** [1] -
598:10
**lipids** [26] - 419:21,
473:23, 474:8,
479:7, 479:9,
479:13, 497:24,
498:20, 502:7,
573:24, 578:4,
580:25, 599:8,
610:7, 612:24,
613:2, 613:14,
615:20, 619:5,
622:7, 622:16,
623:16, 627:5, 627:6
**list** [3] - 393:4, 444:9,
643:12
**listed** [5] - 438:16,
444:7, 517:12,
591:20, 607:12
**listen** [1] - 541:23
**listened** [2] - 521:10,
617:22
**lists** [2] - 423:5,
591:19
**literally** [1] - 546:17
**litigation** [1] - 371:3
**live** [9] - 354:23,
458:14, 470:7,
484:22, 527:21,
527:22, 556:8,
642:11, 643:13
**lived** [6] - 390:12,
452:3, 527:25,
535:4, 549:9, 549:17
**lives** [3] - 407:2,

553:21, 556:8
**LLP** [1] - 306:19
**load** [3] - 536:9,
583:15, 597:13
**loads** [1] - 559:24
**locations** [1] - 585:17
**lock** [1] - 455:19
**locking** [1] - 345:6
**lodge** [1] - 644:15
**logged** [1] - 506:23
**logical** [1] - 331:17
**logistically** [1] -
332:22
**look** [98] - 313:14,
317:24, 320:13,
321:8, 322:6, 323:9,
331:21, 339:7,
339:15, 340:13,
341:5, 344:9,
345:24, 360:8,
364:14, 370:7,
370:15, 374:1,
385:14, 387:17,
390:23, 391:4,
397:3, 397:11,
403:11, 416:12,
422:8, 422:12,
424:24, 425:13,
432:19, 437:18,
438:15, 440:5,
446:16, 450:23,
453:24, 457:21,
458:3, 458:10,
459:14, 460:8,
461:2, 463:20,
464:2, 468:3,
480:23, 481:1,
482:1, 494:7,
495:22, 501:25,
506:2, 513:19,
515:16, 515:21,
515:22, 515:24,
517:5, 518:14,
518:17, 519:7,
520:1, 520:24,
521:7, 521:9,
533:23, 547:24,
553:25, 560:18,
561:3, 562:20,
565:5, 567:5,
568:15, 571:18,
571:20, 572:12,
573:19, 583:9,
594:8, 595:14,
598:9, 611:1,
613:11, 626:6,
629:5, 633:5, 634:8,
635:9, 636:11,
638:14, 639:22,
641:21, 645:14,

645:15
**Look** [7] - 336:8,
372:15, 373:4,
399:9, 399:10,
524:14, 587:11
**looked** [14] - 338:25,
360:25, 363:24,
368:12, 373:24,
374:11, 374:20,
410:20, 447:22,
506:14, 553:25,
558:2, 630:17, 631:3
**looking** [36] - 316:13,
320:25, 334:19,
334:20, 351:17,
351:18, 392:8,
397:22, 398:5,
417:3, 419:6, 423:3,
448:21, 513:4,
516:1, 533:24,
542:10, 543:12,
543:14, 543:17,
545:1, 568:19,
569:4, 569:8,
573:24, 579:18,
579:22, 586:16,
590:10, 594:7,
610:24, 620:17,
626:5, 630:5, 637:6,
643:8
**looks** [3] - 368:11,
373:8, 423:1
**lopinavir** [1] - 569:4
**lose** [1] - 564:14
**Lou** [1] - 585:2
**love** [4] - 332:25,
333:2, 538:14,
549:23
**loved** [2] - 393:15,
491:9
**low** [9] - 479:9,
479:12, 479:13,
531:7, 542:23,
573:21, 625:15,
626:22, 627:5
**low-density** [1] -
573:21
**low-impact-on-lipids**
[1] - 479:13
**lower** [3] - 571:17,
599:8, 611:21
**lowering** [3] - 598:5,
598:10, 598:16
**lunch** [7] - 326:3,
351:14, 499:20,
511:16, 512:1,
512:12, 526:3
**Luncheon** [1] - 515:5

**M**

**Ma'am** [1] - 372:25
**ma'am** [35] - 359:13,
415:10, 422:23,
426:11, 426:13,
429:12, 431:21,
444:4, 445:21,
445:23, 451:14,
452:21, 464:2,
464:25, 466:5,
468:3, 469:3,
470:24, 472:18,
474:14, 479:11,
487:2, 511:13,
526:25, 554:5,
560:23, 570:19,
571:14, 573:7,
579:17, 589:2,
589:9, 611:24,
617:4, 638:7
**MAC** [1] - 531:9
**machine** [1] - 608:3
**Magic** [1] - 536:5
**main** [5] - 332:23,
332:25, 449:12,
530:5, 606:3
**maintains** [1] - 387:24
**majority** [1] - 559:16
**manage** [2] - 503:15,
535:5
**managed** [3] - 529:11,
531:18, 531:21
**management** [4] -
404:6, 545:10,
591:17, 594:9
**manager** [45] - 412:22,
413:21, 414:1,
414:9, 436:11,
438:16, 483:24,
484:2, 484:5, 484:8,
488:18, 529:9,
534:23, 535:3,
537:8, 537:20,
537:24, 539:7,
539:21, 540:2,
540:3, 540:6, 540:9,
540:14, 540:21,
541:9, 545:15,
545:16, 548:5,
550:10, 554:16,
584:18, 590:6,
594:21, 594:23,
594:24, 597:1,
597:25, 612:7,
612:13, 612:14,
614:6, 617:13,
620:14
**managers** [19] -
413:23, 483:25,

491:6, 545:8,
545:10, 548:1,
548:20, 590:15,
594:24, 595:11,
600:12, 600:21,
605:22, 608:24,
612:11, 614:7,
614:13, 614:14,
633:16
**managing** [1] - 535:8
**Manhattan** [1] -
491:20
**manner** [2] - 333:7,
484:19
**Manocchio** [2] -
424:25, 430:17
**manocchio** [1] - 426:1
**March** [1] - 458:13
**Mark** [13] - 377:15,
489:1, 489:6, 490:9,
490:24, 545:12,
548:18, 549:5,
549:7, 549:17,
639:5, 641:10,
641:11
**mark** [2] - 645:8,
645:24
**marked** [3] - 394:24,
431:8, 431:21
**markers** [1] - 564:23
**market** [27] - 405:23,
497:18, 497:21,
506:12, 518:20,
542:20, 548:8,
555:11, 555:17,
555:25, 556:21,
557:13, 559:18,
582:1, 582:23,
596:11, 596:20,
597:5, 601:20,
607:23, 609:7,
631:1, 631:13,
632:14, 632:17,
637:23
**marketed** [1] - 629:12
**marketing** [24] -
367:8, 387:8, 410:4,
450:11, 459:23,
461:15, 464:6,
504:17, 548:11,
584:19, 601:18,
605:20, 607:23,
610:3, 617:7,
619:18, 620:17,
620:19, 623:13,
625:18, 625:24,
633:15, 635:17,
635:18
**MARKETOS** [85] -
306:14, 306:14,

308:8, 309:3, 314:1,
314:13, 315:8,
315:20, 318:20,
318:24, 322:23,
323:11, 325:8,
325:13, 327:9,
329:20, 329:23,
330:7, 330:9,
330:11, 330:20,
331:14, 332:14,
333:9, 333:17,
333:20, 334:18,
335:4, 335:19,
336:16, 336:21,
337:2, 337:5,
337:10, 337:21,
338:20, 338:22,
339:23, 340:2,
340:10, 340:20,
341:10, 341:19,
341:22, 342:6,
342:14, 342:19,
344:2, 349:8,
350:15, 350:23,
398:2, 466:21,
513:11, 515:14,
515:19, 516:9,
516:18, 517:3,
518:8, 518:12,
518:19, 519:6,
519:13, 519:18,
519:24, 520:9,
520:15, 522:3,
523:20, 524:2,
525:19, 635:2,
639:2, 639:7,
639:20, 640:10,
640:18, 641:10,
641:13, 641:18,
642:4, 643:11,
644:19, 646:2
**Marketos** [22] - 308:9,
309:2, 313:22,
314:10, 317:21,
325:1, 327:6,
329:17, 333:19,
334:1, 335:3,
339:14, 343:19,
343:25, 344:9,
349:7, 350:14,
513:10, 523:19,
638:24, 643:10,
644:10
**marketplace** [10] -
533:11, 544:23,
546:25, 555:14,
574:12, 583:5,
587:13, 597:9,
597:10, 597:20
**markings** [1] - 431:11
**married** [1] - 310:5

**marry** [1] - 528:16
**Martin** [3] - 490:9,
490:11, 636:5
**mastermind** [2] -
436:18, 436:20
**matched** [1] - 582:22
**material** [2] - 407:24,
523:7
**materiality** [2] -
310:20, 324:13
**materials** [10] - 358:1,
360:25, 407:20,
410:4, 448:9,
449:22, 450:3,
450:10, 521:16,
522:23
**math** [3] - 336:22,
337:3, 596:9
**Matt** [2] - 550:2,
550:13
**matter** [16] - 317:17,
317:18, 336:3,
340:7, 342:15,
374:12, 383:23,
399:22, 399:25,
400:2, 402:20,
480:3, 480:22,
522:3, 560:1, 647:5
**matters** [1] - 352:2
**Mattes** [16] - 405:1,
547:1, 582:17,
586:1, 586:4,
589:22, 591:17,
594:10, 594:11,
594:12, 594:13,
607:6, 607:15,
619:20, 633:14,
634:3
**Mattes'** [1] - 606:12
**Mayo** [1] - 530:15
**McCormick** [2] -
584:20, 588:4
**McKay** [2] - 306:23,
647:11
**McKay-Soule** [2] -
306:23, 647:11
**McSherry** [1] - 508:16
**MEAGHER** [1] -
306:19
**mean** [152] - 310:25,
313:4, 313:15,
314:24, 323:3,
324:13, 330:2,
330:5, 330:25,
336:21, 337:7,
341:17, 345:1,
346:1, 346:7,
346:10, 349:22,
349:23, 353:22,
354:13, 356:5,

359:22, 360:24, 363:14, 366:4, 370:5, 370:7, 370:15, 370:16, 372:3, 373:22, 373:24, 393:9, 393:25, 396:8, 396:11, 396:13, 397:15, 404:9, 405:16, 407:4, 407:7, 412:3, 412:22, 413:15, 415:15, 419:17, 421:14, 425:7, 425:12, 429:6, 449:7, 451:7, 454:15, 457:21, 460:8, 464:17, 467:23, 469:4, 469:16, 475:23, 479:25, 482:22, 488:20, 491:16, 493:16, 494:4, 494:18, 501:13, 504:4, 506:11, 507:5, 507:13, 507:22, 508:1, 511:2, 515:24, 516:16, 518:13, 520:16, 523:18, 524:3, 530:11, 530:20, 531:11, 532:23, 533:20, 536:17, 537:4, 537:6, 541:4, 545:2, 546:14, 546:16, 546:22, 547:13, 547:15, 547:17, 548:8, 549:19, 551:17, 551:23, 552:11, 552:24, 553:13, 554:15, 554:16, 555:7, 558:12, 559:15, 560:9, 562:5, 567:6, 567:20, 568:18, 570:10, 570:13, 570:22, 570:23, 570:24, 571:2, 575:17, 580:14, 581:12, 582:17, 583:11, 583:14, 586:6, 586:9, 586:18, 588:3, 588:4, 588:11, 588:17, 606:5, 607:1, 607:11, 608:9, 613:10, 621:12, 625:3, 625:21, 626:16, 631:2, 631:17,

632:9, 633:16, 633:22, 634:6, 639:21, 640:23
**meaning** [1] - 566:13
**meanings** [1] - 575:25
**means** [21] - 346:11, 355:18, 381:20, 398:14, 410:19, 462:14, 507:6, 507:23, 535:17, 564:20, 564:22, 566:10, 568:21, 574:3, 574:6, 595:21, 596:6, 596:7, 618:13, 619:10, 634:9
**meant** [8] - 432:17, 439:17, 443:6, 462:24, 509:23, 533:5, 542:8, 577:10
**mechanical** [1] - 306:25
**mechanisms** [1] - 556:4
**med** [1] - 603:21
**media** [5] - 396:5, 397:3, 398:18, 401:6, 401:10
**medial** [1] - 575:5
**Medicaid** [6] - 383:17, 469:1, 469:17, 470:7, 472:19, 585:15
**medical** [48] - 420:4, 420:8, 421:17, 422:21, 423:1, 426:4, 429:18, 430:2, 442:6, 448:17, 448:20, 461:20, 462:25, 464:12, 465:6, 469:9, 495:17, 499:25, 500:6, 500:11, 502:19, 505:17, 505:25, 508:7, 508:8, 508:10, 533:9, 547:10, 576:1, 576:14, 576:18, 577:13, 584:23, 588:14, 604:1, 604:2, 604:5, 604:12, 604:13, 604:14, 604:25, 605:1, 605:6, 610:2, 619:19, 635:15, 643:8, 644:1
**medically** [20] - 456:14, 461:19, 461:24, 462:14,

463:2, 463:17, 464:11, 464:14, 465:5, 465:8, 465:15, 466:6, 466:13, 467:21, 467:24, 467:25, 468:7, 495:22, 495:24, 496:20
**Medicare** [15] - 383:7, 383:11, 383:17, 469:1, 469:8, 469:9, 469:10, 469:15, 469:17, 470:7, 471:9, 471:11, 471:16, 471:20, 472:19
**medication** [3] - 406:15, 406:18, 496:21
**medications** [6] - 429:4, 466:12, 466:15, 495:22, 566:15, 631:23
**medicine** [6] - 408:16, 421:18, 429:22, 440:21, 471:20, 472:23
**medicines** [19] - 407:8, 407:11, 429:1, 429:6, 435:23, 436:3, 456:14, 462:14, 463:10, 463:17, 469:25, 470:12, 470:17, 470:24, 472:1, 485:7, 486:3, 486:7, 627:17
**meet** [6] - 311:15, 320:11, 491:18, 525:8, 525:10, 644:14
**meeting** [43] - 404:22, 408:23, 446:17, 557:16, 583:20, 584:4, 584:9, 584:10, 584:15, 585:5, 585:6, 586:2, 586:5, 587:2, 587:18, 588:10, 588:18, 589:22, 590:1, 590:3, 590:4, 590:8, 591:9, 591:22, 592:2, 592:9, 592:13, 594:20, 595:5, 595:12, 599:18, 600:5, 600:7, 601:24, 603:19, 604:7, 604:9, 605:21, 619:11,

634:7, 644:23
**meetings** [13] - 439:1, 489:14, 552:12, 552:17, 552:20, 602:1, 602:3, 605:16, 606:7, 616:14, 617:22, 633:16
**meets** [1] - 338:2
**Megan** [2] - 306:23, 647:11
**Megan_McKay** [1] - 306:24
**Megan_McKay-Soule@njd. uscourts.gov** [1] - 306:24
**members** [1] - 450:6
**memo** [7] - 324:9, 325:9, 325:11, 325:15, 325:17, 325:19, 325:23
**memory** [2] - 397:7, 452:23
**men** [1] - 570:4
**mention** [3] - 339:6, 512:15
**mentioned** [21] - 476:12, 478:9, 480:17, 501:17, 531:2, 535:21, 539:22, 539:24, 540:5, 542:18, 543:15, 545:15, 546:1, 548:18, 556:14, 569:16, 586:1, 588:6, 594:11, 607:20, 609:2
**Merck** [1] - 546:12
**merging** [1] - 532:7
**merit** [3] - 371:9, 371:12, 373:10
**merits** [4] - 370:23, 370:24, 372:12, 374:21
**message** [9] - 419:12, 475:13, 478:23, 479:13, 509:6, 509:8, 607:24, 608:24, 626:23
**messages** [8] - 475:5, 475:8, 478:22, 481:11, 502:2, 620:19, 627:15, 630:18
**messaging** [3] - 605:25, 606:5, 624:22
**met** [6] - 404:21,

476:15, 499:11, 499:14, 525:9, 553:22
**metabolic** [1] - 564:10
**metric** [3] - 505:20, 505:23, 505:24
**metrics** [1] - 424:12
**mic** [1] - 331:19
**microprotein** [1] - 573:21
**middle** [6] - 322:9, 349:10, 431:11, 537:15, 615:5, 619:5
**might** [24] - 312:5, 312:6, 312:18, 334:14, 336:8, 345:16, 349:15, 358:1, 373:6, 374:23, 384:23, 460:25, 520:3, 520:17, 523:8, 535:15, 605:8, 605:9, 609:17, 639:14, 642:5, 642:8, 645:14, 645:15
**Mike** [9] - 416:24, 488:24, 489:4, 490:9, 490:24, 493:9, 588:2, 619:20, 635:18
**milk** [1] - 546:18
**milligrams** [6] - 561:19, 562:2, 562:11, 564:2, 569:7
**million** [8] - 337:6, 337:20, 339:13, 409:2, 409:24, 582:6, 582:7, 595:22
**millions** [1] - 344:22
**mind** [4] - 325:6, 498:3, 498:4, 539:6
**mindful** [6] - 319:9, 327:3, 334:5, 334:8, 434:4, 513:22
**mine** [2] - 327:5, 334:9
**minimal** [5] - 474:24, 475:18, 479:7, 497:24, 627:5
**minimizes** [1] - 625:16
**minimizing** [1] - 626:5, 626:6
**minimum** [1] - 320:15
**Minneapolis** [5] - 529:4, 530:14, 531:20, 535:4, 536:20
**Minnesota** [1] - 530:18
**minute** [5] - 405:16,

457:9, 467:3,
523:11, 567:24
**minutes** [15] - 333:23,
334:4, 433:11,
433:17, 478:11,
511:18, 512:1,
512:8, 515:4,
593:10, 593:18,
630:6, 630:8,
630:12, 645:1
**minutiae** [2] - 482:3,
482:22
**MIR** [14] - 422:9,
422:20, 423:23,
430:15, 501:10,
502:1, 502:12,
502:14, 504:3,
504:21, 505:12,
506:14, 506:18,
507:11
**miracle** [1] - 561:23
**miracles** [1] - 536:17
**MIRs** [6] - 419:25,
423:18, 424:10,
427:2, 499:23,
606:16
**miserable** [1] - 393:22
**misleading** [2] -
625:16, 626:4
**missing** [2] - 322:12,
507:18
**misstep** [1] - 513:19
**mistaken** [2] - 411:11,
499:3
**misunderstand** [1] -
517:17
**misunderstanding** [1]
- 519:12
**MKC278** [1] - 633:7
**MMWR** [1] - 557:19
**moment** [3] - 343:6,
511:19, 518:17
**Monday** [1] - 641:18
**monetary** [4] - 335:11,
339:11, 348:20,
355:23
**money** [17] - 335:14,
337:8, 345:6,
346:10, 354:11,
354:15, 355:17,
356:8, 357:13,
357:20, 358:17,
360:6, 389:16,
633:8, 633:19,
633:25, 634:12
**monitor** [4] - 333:7,
362:18, 362:24,
363:5
**monitored** [2] -
578:17, 578:20

**monitors** [2] - 333:12,
333:15
**Month** [1] - 596:4
**month** [9] - 404:21,
499:11, 506:22,
507:12, 507:16,
590:15, 596:2,
605:9, 630:22
**months** [7] - 405:9,
499:12, 578:16,
582:6, 586:10,
596:1, 612:1
**Moran** [1] - 635:14
**Morbidity** [1] - 557:20
**morning** [33] - 308:7,
308:8, 308:10,
308:13, 308:15,
308:17, 308:19,
308:21, 308:23,
325:18, 325:21,
326:1, 326:2, 326:8,
331:16, 334:7,
334:15, 334:17,
339:2, 345:12,
351:8, 351:13,
352:19, 352:20,
352:21, 433:8,
433:15, 435:6,
589:23, 639:1,
643:20, 643:21,
644:25
**Mortality** [1] - 557:20
**mortgages** [1] - 537:5
**most** [16] - 469:16,
470:6, 481:21,
509:10, 524:25,
528:7, 554:13,
554:25, 559:18,
582:2, 583:14,
612:12, 618:16,
619:9, 635:16
**Most** [1] - 440:20
**mostly** [1] - 508:15
**motion** [5] - 309:19,
309:21, 328:8,
349:24, 367:11
**motions** [1] - 629:15
**motivation** [2] - 347:9,
634:12
**motive** [1] - 368:10
**move** [45] - 318:4,
333:4, 334:5,
340:17, 362:13,
362:20, 365:20,
368:21, 371:16,
379:4, 389:8,
391:19, 398:10,
398:11, 398:13,
403:15, 418:2,
445:20, 460:18,

488:6, 513:4, 513:8,
513:15, 514:16,
514:25, 532:13,
537:24, 538:10,
538:12, 538:16,
542:1, 575:1,
581:21, 581:22,
586:24, 587:15,
589:4, 589:7,
592:15, 615:11,
618:1, 630:16,
637:1, 640:12
**moved** [3] - 333:9,
339:22, 362:19,
389:10, 446:1,
535:4, 537:11,
538:11, 540:11,
549:10, 549:11,
551:4
**movie** [1] - 333:16
**moving** [12] - 319:9,
325:21, 332:18,
392:9, 403:13,
460:19, 506:22,
513:23, 581:21,
590:9, 600:19,
613:19
**MR** [361] - 307:3,
307:4, 308:8,
308:10, 308:12,
308:19, 308:21,
309:3, 314:1,
314:13, 315:8,
315:20, 316:8,
317:4, 318:15,
318:20, 318:24,
319:11, 320:18,
322:14, 322:23,
323:11, 323:18,
323:25, 324:7,
324:17, 325:8,
325:13, 327:9,
327:12, 328:19,
329:10, 329:20,
329:23, 330:7,
330:9, 330:11,
330:20, 331:14,
332:14, 333:9,
333:17, 333:20,
334:18, 335:4,
335:19, 336:16,
336:21, 337:2,
337:5, 337:10,
337:21, 338:20,
338:22, 339:5,
339:23, 340:2,
340:10, 340:20,
341:6, 341:9,
341:10, 341:19,
341:22, 342:6,
342:14, 342:19,

343:14, 343:17,
343:20, 343:24,
344:2, 349:8,
350:15, 350:23,
356:21, 356:24,
357:5, 361:8,
362:15, 363:13,
363:18, 366:13,
366:19, 368:2,
368:8, 368:15,
368:20, 369:2,
371:15, 371:23,
375:12, 379:9,
380:18, 380:20,
380:22, 380:24,
385:22, 391:8,
392:5, 393:3, 396:1,
396:18, 398:2,
398:8, 398:10,
398:12, 398:21,
400:22, 403:18,
416:14, 416:16,
417:19, 418:12,
422:15, 427:17,
434:18, 435:11,
437:22, 437:25,
444:21, 454:3,
454:6, 454:17,
456:18, 457:20,
459:25, 460:7,
460:11, 460:16,
460:23, 462:16,
466:21, 467:3,
467:5, 467:7, 467:9,
474:15, 475:19,
483:13, 486:12,
488:1, 488:2, 492:2,
492:6, 492:12,
492:14, 494:10,
494:11, 496:4,
496:9, 496:11,
499:18, 499:22,
500:2, 500:4,
502:22, 502:24,
503:19, 511:8,
511:12, 512:3,
512:9, 512:13,
513:11, 514:5,
515:11, 515:14,
515:19, 516:9,
516:18, 517:3,
517:6, 517:12,
518:8, 518:12,
518:19, 519:6,
519:13, 519:18,
519:24, 520:9,
520:15, 520:22,
521:1, 521:19,
521:22, 522:1,
522:3, 523:2,
523:20, 524:2,

524:7, 525:3,
525:19, 526:22,
527:11, 527:12,
560:5, 560:11,
560:15, 560:20,
561:4, 561:6,
561:14, 561:16,
563:7, 563:9,
563:18, 563:19,
564:9, 564:12,
565:3, 565:12,
565:18, 565:24,
566:4, 566:6, 566:8,
566:12, 566:16,
566:20, 566:23,
566:25, 567:11,
567:20, 568:4,
568:6, 569:19,
569:22, 571:4,
571:11, 571:13,
571:23, 572:7,
572:15, 572:17,
572:21, 573:3,
573:6, 573:17,
573:18, 575:10,
575:13, 575:15,
576:3, 576:5, 576:7,
576:15, 576:24,
577:1, 577:6,
577:14, 577:23,
578:22, 579:6,
579:8, 579:13,
579:16, 580:22,
581:16, 581:18,
581:20, 588:23,
589:5, 589:14,
589:17, 590:19,
591:1, 591:2,
592:15, 592:25,
593:6, 593:16,
593:23, 594:6,
596:10, 596:12,
596:22, 596:23,
597:21, 597:23,
599:9, 599:12,
599:20, 600:1,
600:14, 601:9,
601:12, 602:15,
602:16, 603:13,
603:14, 605:13,
605:15, 611:15,
611:20, 611:23,
612:22, 612:25,
613:17, 613:20,
613:24, 615:2,
615:4, 615:9,
615:10, 616:4,
616:5, 616:19,
616:25, 617:3,
618:1, 618:6, 618:8,
620:2, 620:8,

620:10, 621:1, 621:2, 623:1, 624:3, 624:24, 625:11, 625:13, 625:23, 626:2, 626:13, 626:25, 627:11, 628:2, 628:16, 628:23, 629:2, 629:25, 630:12, 630:15, 634:15, 635:2, 635:8, 636:3, 636:4, 636:8, 636:10, 637:1, 637:3, 637:8, 637:10, 638:9, 639:2, 639:7, 639:20, 640:10, 640:18, 641:10, 641:13, 641:18, 642:4, 643:11, 644:19, 646:2
**MRIs** [1] - 508:12
**MS** [278] - 307:3, 308:13, 308:17, 309:5, 329:11, 329:19, 329:22, 330:4, 330:25, 331:5, 331:9, 331:17, 331:24, 332:2, 332:6, 332:16, 332:19, 333:24, 334:19, 335:10, 338:4, 338:10, 338:12, 338:15, 338:21, 341:18, 341:21, 344:18, 344:25, 345:3, 345:21, 347:17, 348:13, 348:18, 348:24, 349:20, 350:7, 350:9, 350:17, 351:1, 352:11, 352:17, 352:18, 352:21, 352:22, 357:6, 357:10, 360:3, 361:11, 362:3, 362:7, 362:12, 362:14, 364:3, 364:10, 364:15, 364:19, 364:25, 365:2, 365:4, 365:17, 366:1, 366:23, 367:2, 367:10, 367:22, 368:18, 369:24, 370:3, 370:12, 370:15, 372:2, 373:12, 373:14, 373:17, 373:20, 374:4,

374:6, 374:9, 374:11, 374:15, 374:18, 375:4, 375:6, 375:9, 375:15, 375:21, 375:24, 376:1, 376:9, 376:10, 378:24, 379:2, 379:7, 379:12, 379:14, 380:16, 380:19, 380:21, 381:1, 381:3, 385:15, 385:18, 385:24, 386:2, 386:5, 386:8, 386:9, 391:5, 391:14, 392:1, 392:10, 392:17, 392:20, 392:22, 393:1, 393:9, 393:12, 393:14, 393:20, 394:2, 394:5, 394:8, 394:10, 394:14, 394:18, 394:22, 394:23, 395:3, 396:2, 397:1, 398:4, 398:16, 398:23, 399:1, 399:3, 399:16, 400:3, 400:10, 400:13, 400:15, 400:24, 400:25, 403:12, 403:15, 403:21, 416:13, 416:15, 416:21, 416:23, 417:20, 418:1, 418:4, 418:16, 422:13, 422:17, 422:19, 427:14, 427:20, 427:21, 433:7, 433:13, 434:19, 435:1, 435:2, 435:7, 435:14, 435:15, 437:21, 437:23, 438:2, 438:4, 444:18, 444:23, 444:25, 453:25, 454:8, 454:12, 454:14, 454:21, 455:7, 455:14, 455:18, 455:22, 456:1, 456:5, 456:10, 456:13, 456:16, 456:20, 456:24, 457:1, 457:13, 457:16, 457:23, 457:24, 460:21, 461:1, 461:4, 463:5, 463:21, 466:3,

466:4, 466:18, 466:23, 466:25, 467:12, 467:17, 467:19, 474:16, 474:19, 475:22, 476:2, 483:10, 483:16, 483:18, 486:14, 487:22, 512:2, 512:6, 514:6, 514:10, 514:17, 514:23, 515:2, 516:1, 527:3, 560:12, 565:2, 567:13, 567:25, 571:7, 571:25, 572:10, 573:2, 573:12, 573:15, 574:25, 575:20, 576:4, 577:5, 577:12, 577:15, 579:3, 580:3, 580:6, 580:19, 581:2, 590:22, 592:17, 593:17, 593:24, 599:22, 611:17, 613:21, 616:23, 618:3, 620:5, 623:8, 624:13, 624:16, 626:1, 626:11, 626:14, 626:20, 627:1, 627:13, 630:1, 634:22, 640:23, 641:2, 641:14, 642:7, 642:17, 642:23, 644:3, 644:22, 646:7
**multiple** [15] - 368:5, 368:6, 414:13, 423:22, 423:25, 428:22, 488:20, 492:25, 496:5, 508:2, 508:17, 554:7, 585:17, 600:11, 603:6
**Murphy** [27] - 412:23, 413:1, 413:12, 413:21, 414:5, 414:12, 436:12, 436:15, 436:23, 483:24, 488:14, 488:16, 488:17, 488:18, 488:19, 491:3, 491:12, 491:19, 492:24, 505:9, 539:10, 540:5, 540:6, 546:2, 546:3, 594:24, 600:22
**Murphy's** [2] - 491:22, 552:16
**must** [9] - 413:17,

425:7, 439:8, 439:13, 441:13, 516:21, 522:15, 526:11, 534:14
**mutation** [3] - 559:5, 559:19, 631:5
**mutations** [7] - 559:3, 563:5, 563:15, 602:22, 602:24, 603:1, 603:7
**myco** [1] - 531:9
**Mycobutin** [1] - 530:8
**myelocytic** [1] - 530:6
**Myer** [1] - 555:15
**Myers** [3] - 378:6, 404:13, 579:12

# N

**naive** [34] - 419:2, 419:8, 437:4, 437:11, 437:15, 459:2, 459:5, 465:19, 465:20, 465:21, 502:9, 557:17, 558:3, 563:3, 563:12, 571:19, 571:21, 573:10, 574:23, 582:7, 582:13, 587:23, 603:3, 606:1, 607:22, 608:5, 608:15, 608:18, 613:10, 613:11, 632:12, 632:15, 633:8, 634:4
**name** [21] - 331:3, 377:7, 395:15, 527:6, 527:7, 529:24, 536:19, 541:1, 544:20, 547:9, 547:10, 547:11, 547:12, 559:4, 561:11, 569:15, 585:2, 598:1, 617:10, 639:5, 641:9
**name's** [1] - 500:24
**named** [5] - 488:24, 490:23, 546:11, 550:2, 550:23
**names** [6] - 539:22, 540:25, 544:18, 544:19, 563:23, 635:14
**Nancy** [2] - 614:23, 639:9
**narrative** [2] - 312:8, 327:22
**narrowed** [1] - 626:8

**national** [14] - 404:3, 416:24, 489:4, 489:7, 490:12, 490:25, 509:2, 532:14, 535:2, 539:1, 546:10, 595:22, 616:13, 619:21
**nationwide** [1] - 608:23
**NCEB** [1] - 613:4
**Nebraska** [1] - 532:13
**necessarily** [15] - 310:19, 315:4, 317:19, 341:16, 347:12, 348:2, 366:10, 396:13, 514:21, 540:17, 603:2, 643:4, 643:8, 644:7, 645:7
**necessary** [16] - 442:11, 456:14, 461:19, 461:25, 463:2, 464:11, 465:5, 465:9, 465:16, 466:13, 467:21, 467:24, 467:25, 495:22, 495:24, 496:20
**necessity** [2] - 462:25, 495:17
**Need** [1] - 600:25
**need** [79] - 308:24, 314:5, 314:19, 314:21, 316:4, 317:8, 323:22, 326:8, 331:15, 333:6, 346:4, 346:14, 347:11, 349:14, 350:22, 351:15, 362:20, 363:7, 405:16, 416:19, 429:20, 429:21, 430:15, 439:22, 454:6, 457:4, 457:9, 462:23, 463:10, 466:10, 466:12, 481:6, 491:18, 496:20, 511:20, 511:25, 512:10, 515:7, 515:10, 522:24, 534:8, 534:11, 534:17, 539:14, 541:21, 541:22, 563:2, 566:14, 571:9, 572:4, 578:7, 584:4, 586:11, 587:3, 587:18, 588:13,

593:14, 593:21,
601:3, 601:4,
627:24, 629:24,
630:7, 636:8,
636:15, 638:25,
641:25, 642:6,
642:10, 642:13,
643:14, 643:19,
644:21, 645:5,
645:6, 645:14
**needed** [10] - 357:13,
389:11, 447:14,
451:8, 451:10,
470:6, 480:20,
543:20, 582:20,
633:19
**needs** [8] - 342:10,
360:14, 454:17,
460:12, 521:6,
566:20, 567:2, 567:4
**Needs** [1] - 599:10
**negative** [1] - 401:2
**negatives** [1] - 462:5
**negligible** [1] - 581:7
**Nelson** [1] - 612:13
**nerve** [1] - 554:11
**nerve-wracking** [1] -
554:11
**nervous** [3] - 554:9,
588:11, 588:16
**nester** [1] - 549:15
**Neumeyer** [1] - 594:21
**neutral** [3] - 498:3,
610:9, 622:16
**neutralize** [2] -
622:10, 622:12
**never** [20] - 338:5,
368:7, 370:22,
370:23, 371:14,
383:24, 401:5,
401:12, 403:5,
409:16, 412:7,
412:24, 437:12,
479:21, 517:7,
528:11, 570:9,
585:6, 589:24, 605:5
**nevertheless** [1] -
380:6
**NEW** [1] - 306:1
**new** [14] - 511:17,
529:23, 529:24,
532:19, 543:13,
548:8, 558:14,
583:17, 585:20,
602:2, 603:19,
604:10, 615:12,
637:23
**New** [26] - 306:9,
355:9, 425:4,
425:25, 445:18,

445:20, 446:1,
446:5, 446:9, 470:5,
472:7, 538:10,
538:17, 538:21,
539:11, 542:9,
552:3, 570:4, 584:3,
584:12, 585:19,
587:5, 591:9,
594:20, 605:21,
614:6
**next** [37] - 313:5,
332:7, 333:23,
373:15, 379:22,
387:12, 389:3,
400:5, 408:21,
409:11, 447:16,
492:12, 501:16,
503:20, 513:12,
514:2, 524:18,
526:20, 529:15,
531:16, 532:5,
532:17, 537:9,
538:1, 538:8, 542:6,
544:10, 588:14,
589:7, 596:4,
603:21, 621:17,
636:19, 641:17,
645:7, 645:17
**nice** [1] - 378:19
**niche** [1] - 582:8
**night** [6] - 318:10,
367:16, 478:7,
551:11, 553:5,
553:22
**nine** [2] - 319:23,
554:16
**NNRTI** [3] - 631:4,
631:5, 632:3
**NNRTIs** [2] - 636:20,
637:5
**nobody** [2] - 331:25,
367:11
**noise** [1] - 310:8
**nominal** [1] - 338:17
**none** [5] - 326:21,
349:8, 486:22,
520:1, 554:6
**normal** [3] - 556:8,
583:19, 605:11
**normally** [1] - 322:2
**note** [5] - 350:19,
434:3, 440:16,
447:9, 624:6
**noted** [1] - 439:7
**notes** [16] - 358:12,
358:13, 389:9,
442:18, 442:23,
443:18, 444:7,
444:12, 444:15,
451:1, 591:24,

592:1, 592:4, 592:8,
592:12, 600:9
**Notes** [2] - 591:16,
594:8
**nothing** [22] - 309:5,
310:22, 318:11,
328:4, 333:18,
336:6, 338:8,
346:12, 370:3,
371:3, 371:8, 372:8,
509:14, 512:4,
517:17, 538:21,
554:12, 593:16,
593:17, 593:23,
593:24, 615:24
**notion** [1] - 624:9
**notorious** [1] - 532:6
**nots** [1] - 497:12
**nowhere** [1] - 366:3
**NTS** [2] - 595:18,
595:21
**nuanced** [1] - 349:13
**NUMBER** [1] - 306:3
**Number** [2] - 314:4,
314:6
**number** [39] - 335:21,
335:25, 336:24,
336:25, 337:16,
384:4, 384:7,
388:20, 395:5,
395:9, 395:17,
398:6, 400:17,
419:15, 437:22,
438:7, 442:4,
442:10, 500:12,
505:25, 506:12,
507:11, 550:14,
552:25, 553:10,
557:17, 557:18,
560:2, 566:25,
567:2, 568:22,
591:19, 606:18,
609:6, 623:12,
623:13, 627:3, 640:7
**numbers** [10] -
336:23, 345:20,
346:7, 530:18,
532:25, 563:23,
582:4, 585:9,
587:24, 598:15
**numerous** [1] - 520:6
**nurse** [5] - 528:13,
575:13, 575:14,
575:21, 576:16
**nurses** [2] - 530:22,
530:25
**nursing** [4] - 528:6,
528:8, 529:16, 533:4
**nutritional** [1] -
564:10

**nuts** [1] - 317:7

# O

**o'clock** [5] - 536:23,
592:24, 593:9,
630:9, 638:12
**O'Connor** [16] -
403:25, 404:2,
404:16, 407:15,
417:1, 417:4, 538:3,
538:24, 538:25,
539:1, 540:20,
541:14, 546:9,
587:17, 592:6, 636:6
**oath** [4] - 352:13,
436:14, 471:7, 483:4
**object** [6] - 357:3,
391:8, 482:2,
567:19, 572:2,
599:22
**objected** [2] - 345:16,
627:16
**objection** [117] -
309:12, 309:16,
315:7, 323:16,
329:17, 331:8,
332:11, 332:12,
356:20, 357:4,
357:5, 361:8, 362:8,
362:9, 362:15,
364:7, 364:18,
365:5, 372:23,
374:2, 376:6, 379:6,
379:9, 380:17,
380:22, 380:24,
385:21, 385:22,
391:7, 394:19,
396:1, 396:18,
396:23, 398:2,
398:8, 398:21,
400:5, 400:22,
403:18, 416:16,
417:19, 418:12,
422:14, 422:15,
427:17, 435:10,
435:11, 437:25,
444:21, 445:1,
446:17, 454:3,
454:16, 459:25,
460:9, 460:12,
460:14, 460:22,
462:16, 466:20,
467:8, 474:15,
475:19, 483:12,
483:13, 486:12,
513:5, 513:8,
513:21, 516:6,
523:1, 524:7, 560:7,
560:11, 560:12,
565:2, 567:23,

571:5, 572:1,
574:25, 575:19,
575:20, 576:12,
579:1, 579:2, 579:3,
580:3, 581:2,
590:20, 590:22,
592:17, 611:16,
611:17, 613:20,
613:21, 616:21,
616:23, 618:3,
620:3, 620:5, 623:3,
623:11, 627:21,
627:22, 628:7,
634:17, 634:20,
634:22, 634:25,
640:16, 640:22,
643:3, 643:6, 643:9,
644:11, 644:16
**objections** [6] - 435:9,
463:3, 513:14,
525:12, 525:15,
645:21
**objective** [3] - 489:18,
596:4, 616:8
**objectives** [3] - 616:8,
616:10, 618:18
**obligated** [3] - 309:19,
357:24, 360:8
**OBR** [1] - 568:21
**observing** [1] - 572:9
**obvious** [1] - 348:22
**obviously** [9] -
351:14, 415:15,
531:6, 551:19,
597:9, 612:20,
614:17, 628:24,
636:1
**occasions** [2] -
311:24, 519:23
**occur** [2] - 362:25,
440:25
**occurred** [3] - 433:22,
510:7, 593:19
**occurring** [1] - 509:25
**occurs** [2] - 421:1,
421:3
**OF** [2] - 306:1, 306:3
**off-label** [61] - 367:4,
367:7, 367:13,
403:1, 414:19,
414:23, 415:4,
415:6, 415:24,
416:2, 416:7, 418:6,
418:10, 418:21,
420:12, 420:13,
421:17, 422:2,
424:11, 430:14,
430:15, 430:24,
431:2, 431:5,
436:16, 439:12,

439:22, 441:21,
448:16, 448:25,
450:12, 459:23,
461:15, 464:6,
470:4, 470:11,
486:3, 486:7,
486:10, 488:21,
490:3, 493:12,
502:2, 503:25,
504:15, 506:16,
506:19, 602:4,
602:9, 604:11,
605:20, 606:21,
607:4, 630:18,
636:20, 637:5,
637:12, 637:22,
637:25, 638:1
**offense** [1] - 387:19
**offer** [1] - 485:4
**office** [15] - 489:8,
490:10, 501:9,
542:3, 543:7, 543:8,
543:23, 583:20,
584:2, 584:11,
588:10, 592:6,
606:13, 627:18,
643:25
**offices** [6] - 430:13,
430:20, 430:23,
501:12, 530:21,
542:6
**Official** [1] - 306:23
**OFFICIAL** [1] - 647:1
**official** [1] - 485:4
**often** [1] - 501:13
**Ohio** [1] - 535:5
**old** [3] - 358:8, 570:6,
570:9
**Omaha** [1] - 532:13
**on-label** [15] - 439:17,
442:11, 443:10,
443:23, 470:11,
498:17, 498:20,
545:18, 557:14,
564:5, 568:11,
598:19, 603:11,
613:13, 615:19
**once** [26] - 363:4,
369:21, 383:24,
388:18, 502:12,
502:15, 502:17,
504:8, 504:13,
504:15, 505:3,
520:12, 526:25,
547:4, 583:8,
631:16, 631:22,
631:25, 632:5,
632:18, 632:20,
632:24, 633:3,
633:17, 633:21,

634:5
**once-a-day** [3] -
505:3, 631:16,
633:17
**once-daily** [9] - 504:8,
504:13, 504:15,
632:18, 632:20,
632:24, 633:3,
633:21, 634:5
**oncologists** [1] -
530:12
**oncology** [8] - 421:6,
529:17, 529:19,
530:1, 530:24,
537:20, 537:25,
538:19
**one** [168] - 313:8,
313:17, 314:16,
315:22, 316:5,
320:14, 321:1,
323:13, 324:3,
326:15, 326:19,
326:25, 327:12,
329:3, 331:2,
334:19, 334:22,
334:23, 339:12,
339:20, 345:22,
346:7, 351:21,
359:20, 359:21,
368:5, 370:24,
371:15, 377:5,
382:25, 383:6,
386:3, 386:15,
386:20, 388:15,
389:20, 392:5,
392:25, 397:12,
397:13, 397:17,
400:20, 401:18,
402:20, 404:5,
406:9, 408:8,
412:12, 412:23,
413:23, 413:25,
414:18, 415:15,
415:22, 417:12,
420:23, 421:16,
422:8, 422:20,
423:16, 423:21,
423:22, 423:23,
424:5, 424:7, 424:9,
424:19, 425:4,
425:9, 427:2,
428:25, 432:14,
434:3, 434:14,
435:22, 438:12,
439:1, 450:25,
451:16, 454:24,
455:19, 459:21,
462:11, 467:3,
470:5, 472:17,
483:25, 489:13,

491:6, 493:10,
498:23, 500:18,
502:5, 502:11,
507:15, 508:3,
508:4, 508:7, 508:8,
508:9, 512:14,
512:17, 515:19,
518:19, 519:6,
519:11, 519:13,
520:16, 521:9,
524:11, 524:21,
525:8, 525:10,
525:11, 528:8,
530:15, 531:19,
533:12, 534:23,
536:13, 536:24,
539:10, 546:2,
546:3, 546:5,
546:12, 547:9,
547:10, 552:5,
553:15, 554:7,
555:15, 559:6,
566:25, 568:19,
569:3, 569:6,
570:23, 572:8,
573:19, 596:4,
596:19, 598:1,
599:17, 600:3,
602:25, 605:8,
605:9, 606:11,
610:22, 611:4,
615:3, 620:11,
623:9, 626:13,
632:8, 634:24,
637:25, 639:2,
639:24, 642:7,
642:9, 642:13,
645:5, 645:9
**One** [1] - 306:21
**one-time** [1] - 524:21
**one-way** [1] - 359:21
**one-week** [1] - 512:17
**ones** [4] - 530:23,
594:19, 603:6,
635:17
**ongoing** [2] - 550:13,
550:24
**online** [2] - 379:16,
439:14
**oof** [1] - 337:7
**open** [7] - 308:1,
309:22, 312:9,
321:13, 327:20,
330:6, 387:24
**Open** [8] - 357:9,
376:3, 394:12,
400:12, 456:23,
568:3, 577:17, 630:4
**opened** [7] - 309:23,
310:14, 328:7,

328:9, 328:21,
365:22, 585:6
**opening** [11] - 310:4,
310:5, 324:9,
324:22, 338:7,
349:1, 435:8,
435:17, 435:18,
435:22, 539:7
**openings** [1] - 385:19
**opens** [4] - 322:20,
343:7, 363:20,
523:15
**operated** [1] - 547:16
**operates** [1] - 481:13
**operating** [1] - 451:8
**opine** [1] - 576:4
**opinion** [11] - 309:18,
309:21, 310:16,
317:6, 328:7, 463:1,
489:25, 533:7,
550:10, 601:19
**opportunistic** [1] -
530:9
**opportunities** [5] -
636:20, 637:5,
637:12, 637:22,
637:25
**opportunity** [17] -
343:21, 353:7,
434:11, 475:16,
475:23, 532:22,
533:3, 534:25,
535:3, 535:5,
537:17, 537:19,
538:14, 542:10,
636:12, 637:20,
637:21
**opposed** [3] - 333:15,
523:16, 572:18
**opposing** [1] - 315:23
**opposite** [1] - 553:18
**optimized** [2] -
568:21, 569:5
**option** [3] - 321:6,
490:21, 493:19
**options** [1] - 555:9
**oranges** [1] - 324:21
**order** [12] - 311:1,
311:25, 321:18,
322:10, 369:15,
371:22, 440:24,
516:20, 522:14,
526:10, 556:25,
642:8
**ordinary** [1] - 574:19
**organization** [1] -
405:4
**organizations** [1] -
529:11
**orient** [2] - 483:19,

534:19
**oriented** [1] - 482:22
**original** [4] - 409:2,
561:1, 574:18,
574:22
**originally** [6] - 408:23,
532:7, 540:1,
545:11, 562:18,
607:24
**Ortho** [1] - 547:14
**otherwise** [5] -
332:20, 338:16,
434:16, 523:22,
621:5
**ourself** [1] - 547:16
**ourselves** [1] - 483:19
**outcome** [1] - 336:8
**outline** [2] - 334:20,
334:21
**outset** [5] - 309:10,
371:2, 520:13,
524:10, 525:17
**outside** [15] - 331:10,
336:13, 352:6,
390:23, 402:8,
402:15, 430:8,
449:8, 464:20,
464:22, 481:12,
482:7, 572:5,
588:12, 644:6
**outspoken** [1] - 607:3
**outstanding** [2] -
645:22, 645:25
**overall** [1] - 536:17
**overcome** [2] -
599:14, 600:2
**overly** [1] - 322:13
**overrule** [2] - 580:17,
600:6
**overruled** [5] - 396:23,
418:13, 462:18,
474:18, 581:3
**oversaw** [1] - 552:23
**oversee** [1] - 541:8
**overstating** [1] -
474:24
**overtaking** [1] - 609:7
**overutilization** [1] -
461:17
**owe** [1] - 646:1
**own** [8] - 327:4,
415:16, 430:2,
442:5, 535:18,
547:14, 547:15,
620:20
**owned** [1] - 532:8

## P

**p.m** [5] - 565:7, 575:4,

623:6, 630:3, 646:13
**p.m.)** [2] - 568:2,
577:16
**PA** [1] - 618:12
**pace** [2] - 507:19,
640:8
**package** [24] - 429:2,
429:17, 429:23,
449:8, 463:1, 463:3,
463:15, 464:21,
464:22, 473:16,
473:20, 479:4,
497:11, 498:6,
498:12, 560:24,
561:1, 570:3, 574:1,
574:18, 578:11,
579:11, 580:15,
633:1
**Page** [1] - 307:6
**page** [40] - 327:1,
327:2, 386:25,
393:14, 397:11,
397:12, 444:6,
447:3, 447:9,
458:10, 461:5,
466:21, 467:2,
492:12, 503:20,
503:21, 512:21,
561:14, 563:18,
564:11, 568:4,
571:23, 573:11,
579:13, 596:22,
601:10, 612:23,
615:3, 615:5, 615:9,
618:6, 618:11,
621:1, 621:4,
622:21, 635:9,
637:8, 637:13,
637:15
**PAGE** [1] - 307:1
**pages** [4] - 326:25,
400:17, 428:22,
496:5
**paid** [6] - 477:23,
478:13, 528:10,
585:14, 601:22,
601:23
**painfully** [2] - 505:13,
505:14
**Pandora's** [1] - 365:22
**panic** [1] - 587:3
**papers** [4] - 333:1,
347:20, 358:8,
358:13
**paragraph** [25] -
334:23, 387:12,
408:21, 409:11,
456:7, 456:11,
459:16, 459:17,
461:9, 461:14,

464:2, 467:14,
467:17, 468:7,
468:17, 473:4,
473:6, 495:17,
496:10, 496:24,
561:4, 561:15,
595:14, 603:18
**paragraphs** [4] -
314:19, 492:15,
496:12, 496:16
**parameters** [1] -
346:14
**paraphrasing** [1] -
312:15
**Part** [4] - 469:8, 471:9,
471:11, 471:20
**part** [44] - 315:2,
318:23, 322:3,
326:15, 326:21,
328:16, 329:13,
356:18, 357:24,
360:22, 361:5,
361:18, 364:12,
364:20, 364:24,
365:12, 366:8,
372:3, 393:12,
407:13, 415:1,
417:7, 422:8, 432:3,
432:10, 448:20,
454:5, 464:24,
465:2, 514:12,
516:4, 516:7,
516:13, 521:22,
523:8, 529:17,
548:15, 602:3,
602:6, 604:1, 605:2,
607:24, 608:22,
611:21
**participant** [1] -
591:20
**participants** [3] -
591:19, 592:10,
594:15
**participated** [1] -
449:18
**participation** [2] -
516:10, 516:25
**particular** [30] -
309:15, 309:17,
310:13, 310:18,
318:5, 318:13,
322:3, 324:24,
325:22, 336:3,
336:11, 341:4,
342:18, 345:11,
417:25, 423:11,
429:10, 463:14,
489:20, 530:1,
533:9, 562:14,
577:21, 599:17,

600:3, 629:11,
639:3, 640:19, 643:3
**particularly** [6] -
361:21, 404:5,
473:23, 474:1,
506:1, 564:18
**parties** [8] - 309:20,
310:24, 314:3,
333:15, 334:12,
347:16, 402:8,
645:10
**partner** [4] - 354:5,
356:8, 377:14,
478:17
**parts** [2] - 334:11,
575:25
**partway** [1] - 341:2
**party** [8] - 315:6,
327:1, 340:15,
347:22, 513:4,
517:7, 517:13,
645:21
**pass** [4] - 511:8,
511:9, 559:12,
588:15
**passed** [2] - 538:18,
559:14
**past** [1] - 523:3
**Patel** [8] - 480:11,
480:14, 481:9,
482:24, 623:9,
626:14, 627:7,
627:14
**patently** [1] - 628:19
**path** [2] - 373:8, 538:9
**patient** [40] - 406:18,
407:5, 419:2, 419:3,
419:8, 421:23,
465:21, 466:17,
472:23, 474:12,
474:13, 501:16,
546:16, 558:14,
558:22, 559:4,
559:10, 559:12,
563:2, 563:14,
568:25, 570:8,
574:4, 574:5,
574:13, 578:8,
578:19, 583:8,
583:10, 583:12,
583:17, 585:3,
602:19, 607:25,
608:4, 608:5,
618:21, 642:19
**patient's** [2] - 461:20,
559:2
**patients** [94] - 426:5,
427:9, 437:15,
459:2, 459:6, 465:9,
465:19, 465:20,

466:12, 469:16,
470:12, 496:20,
502:9, 509:10,
530:9, 531:11,
531:12, 533:13,
533:24, 534:2,
536:14, 536:16,
536:23, 555:3,
555:8, 555:21,
556:7, 557:5, 557:7,
557:17, 557:18,
558:4, 559:15,
559:21, 562:19,
562:21, 563:4,
563:12, 563:13,
563:16, 566:14,
568:9, 570:8,
570:14, 571:22,
574:21, 574:22,
578:11, 582:8,
582:9, 582:13,
582:14, 583:14,
583:18, 585:3,
585:10, 585:17,
587:22, 587:23,
597:4, 597:11,
597:15, 597:16,
598:10, 598:13,
598:17, 598:20,
598:24, 599:4,
599:7, 599:11,
601:1, 601:4, 601:5,
602:23, 603:3,
603:6, 606:1,
608:15, 608:19,
621:21, 631:3,
631:11, 631:15,
631:22, 631:25,
632:11, 632:15,
633:8, 634:4, 637:7
**patients'** [2] - 464:12,
465:6
**Paul** [1] - 306:17
**pause** [10] - 386:4,
386:7, 467:4, 521:3,
521:14, 522:2,
522:5, 525:24,
572:6, 572:14
**pay** [2] - 570:15, 602:5
**paying** [4] - 324:12,
355:18, 478:1, 478:4
**payment** [1] - 469:1
**PBMs** [1] - 531:22
**PCP** [1] - 380:1
**pediatric** [2] - 417:14,
563:12
**pediatrician** [1] -
418:24
**peg** [1] - 541:20
**pen** [1] - 558:18

**penalty** [4] - 456:3,
458:17, 469:19,
470:16
**Penelow** [16] - 320:22,
378:3, 379:19,
381:5, 381:25,
382:8, 397:18,
413:1, 413:11,
436:7, 445:8, 452:9,
510:14, 552:1,
552:21, 614:20
**Penelow's** [5] -
377:24, 378:15,
451:17, 453:10,
499:10
**penicillin** [1] - 558:18
**Pennsylvania** [4] -
315:11, 317:7,
317:12, 342:21
**people** [90] - 326:6,
383:13, 390:4,
392:6, 393:4, 393:5,
393:16, 395:10,
396:9, 396:12,
397:8, 399:12,
399:18, 401:4,
411:5, 412:20,
431:16, 443:17,
443:22, 447:12,
448:4, 450:1, 451:5,
463:9, 481:21,
481:25, 491:8,
491:9, 501:20,
508:17, 508:18,
528:7, 531:19,
531:25, 534:10,
535:5, 536:18,
537:4, 537:21,
537:22, 539:6,
540:18, 540:25,
543:14, 543:17,
544:5, 544:22,
545:1, 545:6,
545:21, 545:23,
547:19, 547:24,
548:2, 552:7,
553:10, 554:17,
554:25, 555:18,
556:12, 557:25,
558:8, 559:19,
564:14, 584:22,
584:23, 584:25,
586:23, 594:18,
594:19, 596:16,
600:12, 604:8,
606:8, 606:12,
607:2, 607:11,
607:12, 609:13,
614:9, 619:23,
619:25, 631:5,

634:3, 634:7, 635:12, 635:13
**people's** [2] - 407:2, 411:18
**percent** [21] - 319:16, 321:4, 334:25, 335:9, 336:7, 337:18, 337:24, 337:25, 341:12, 342:21, 364:15, 528:10, 570:24, 581:7, 581:8, 581:11, 585:14, 586:7, 596:9, 597:3, 597:10
**percentage** [30] - 334:23, 336:20, 336:22, 338:18, 339:6, 339:21, 340:16, 340:18, 341:16, 341:17, 342:5, 342:13, 342:16, 342:17, 343:11, 344:9, 345:7, 345:19, 346:5, 347:5, 347:12, 347:21, 348:11, 348:15, 349:4, 349:7, 350:2, 350:6, 355:22, 357:13
**perception** [2] - 619:8, 619:14
**perfect** [4] - 458:2, 509:21, 513:13, 541:22
**perfectly** [3] - 315:12, 330:25, 593:3
**perform** [1] - 423:23
**performance** [5] - 480:4, 480:15, 551:5, 551:6, 551:19
**period** [26] - 312:3, 319:19, 383:7, 383:23, 384:18, 386:21, 387:6, 388:12, 388:24, 395:18, 417:1, 432:1, 437:11, 437:19, 438:12, 443:13, 450:24, 468:24, 480:15, 489:5, 522:22, 531:3, 581:23, 596:2, 613:8, 630:23
**perjury** [4] - 456:4, 458:17, 469:19, 470:17
**permissible** [1] - 337:13

**permission** [13] - 362:3, 362:7, 378:24, 385:15, 391:5, 422:13, 427:14, 435:7, 444:18, 466:18, 483:10, 642:10, 642:14
**permit** [2] - 576:22, 643:1
**permitted** [3] - 355:22, 373:6, 421:16
**person** [18] - 393:24, 399:14, 412:20, 476:15, 530:22, 539:15, 541:21, 548:5, 575:23, 584:20, 587:7, 594:14, 600:4, 604:22, 604:23, 627:15, 644:13
**person's** [1] - 599:17
**personal** [7] - 352:2, 442:5, 464:13, 552:8, 553:20, 583:25, 642:17
**personally** [3] - 361:15, 486:19, 601:25
**personnel** [2] - 388:6, 404:18
**perspective** [1] - 569:23
**pertinent** [2] - 448:13, 525:6
**Pete** [1] - 308:9
**PETE** [1] - 306:14
**Pfizer** [7] - 532:11, 534:24, 537:16, 537:25, 538:1, 538:2, 538:19
**pharmaceutical** [7] - 377:21, 507:9, 511:4, 528:19, 529:1, 532:6, 604:2
**Pharmacia** [5] - 532:8, 532:9, 532:10, 537:17
**pharmacies** [1] - 468:18
**pharmacists** [1] - 484:18
**Phase** [6] - 533:6, 533:22, 533:23, 534:1, 534:3, 534:9
**phenotype** [2] - 558:25, 559:7
**phone** [4] - 530:22, 550:14, 552:25, 554:14

**phrase** [3] - 609:2, 610:11
**phraseology** [1] - 609:21
**physically** [2] - 359:12, 361:25
**physician** [24] - 418:25, 419:16, 419:20, 423:12, 440:21, 441:12, 443:7, 443:10, 464:16, 500:23, 501:13, 502:20, 530:12, 570:4, 575:9, 575:13, 576:16, 578:4, 580:24, 625:8, 642:9, 642:20, 643:16, 643:17
**physicians** [17] - 406:19, 431:17, 438:22, 440:6, 465:7, 468:18, 474:21, 484:17, 505:5, 577:10, 577:25, 580:4, 580:13, 601:18, 602:4, 629:13, 631:21
**physicians'** [1] - 501:12
**PI** [4] - 569:3, 598:4, 613:14, 618:17
**pick** [1] - 507:19
**picture** [1] - 379:15
**pictures** [2] - 378:19, 379:16
**piece** [2] - 334:25, 623:14
**pieces** [6] - 408:9, 473:19, 625:24, 626:23, 627:19, 627:20
**pile** [1] - 513:2
**pill** [2] - 631:19, 632:24
**pink** [1] - 519:20
**pipeline** [2] - 633:6, 633:24
**pitch** [1] - 608:14
**place** [25] - 309:9, 315:1, 327:11, 352:25, 365:8, 374:5, 375:8, 417:4, 422:3, 422:9, 430:7, 433:15, 440:25, 469:15, 504:23, 509:20, 535:1, 586:16, 587:13, 590:1, 591:9,

591:13, 592:1, 630:7, 630:10
**placebo** [1] - 534:2
**placeholder** [1] - 542:25
**plague** [1] - 345:14
**Plaintiff** [1] - 331:13
**Plaintiff's** [15] - 307:18, 307:20, 307:21, 307:22, 307:23, 307:24, 560:6, 560:17, 579:5, 611:19, 613:18, 613:23, 618:5, 620:7, 634:15
**Plaintiffs** [1] - 306:4
**plaintiffs** [2] - 322:7, 322:9
**Plan** [2] - 469:9
**plan** [17] - 489:14, 547:23, 551:6, 551:19, 552:17, 556:9, 586:18, 603:15, 605:2, 616:13, 616:16, 617:8, 617:15, 618:7, 620:11, 620:18, 634:6
**plan-type** [1] - 620:11
**planned** [1] - 640:2
**plans** [6] - 329:24, 586:16, 590:5, 590:8, 620:15, 620:22
**planting** [2] - 597:22, 598:4
**platonic** [1] - 553:2
**play** [7] - 333:2, 337:17, 450:2, 463:21, 466:18, 489:18, 549:23
**played** [2] - 329:1, 467:11
**pleasant** [2] - 389:24, 510:21
**pledge** [5] - 483:4, 484:13, 485:15, 485:20, 486:1
**pledged** [1] - 485:1
**plenty** [1] - 645:24
**Plock** [3] - 395:13, 397:12, 397:23
**ploy** [1] - 610:3
**plus** [4] - 337:4, 568:20, 569:6, 574:22
**POA** [6] - 404:21, 438:22, 616:8, 616:10, 616:12, 616:13

**podium** [6] - 331:19, 332:7, 332:12, 332:17, 332:23, 333:1
**point** [68] - 315:9, 315:16, 319:14, 319:23, 320:20, 320:21, 321:8, 327:12, 328:4, 338:6, 338:16, 339:9, 341:3, 345:18, 346:24, 348:16, 348:20, 350:12, 368:25, 380:11, 419:4, 429:16, 434:10, 434:15, 441:12, 475:19, 476:3, 527:18, 532:12, 536:2, 539:23, 541:6, 542:19, 543:15, 549:12, 555:22, 556:3, 556:13, 557:5, 557:14, 563:8, 570:12, 586:8, 590:14, 595:8, 600:25, 601:13, 602:18, 603:2, 603:10, 603:11, 605:19, 613:13, 614:6, 616:1, 619:7, 621:10, 622:4, 625:13, 628:2, 635:23, 636:16, 636:19, 637:18, 638:10, 644:24
**pointed** [1] - 444:12
**pointing** [1] - 499:10
**points** [10] - 439:7, 440:1, 441:7, 443:3, 443:6, 447:21, 596:19, 616:15, 637:11, 637:14
**police** [2] - 334:8, 334:16
**policies** [10] - 385:5, 385:9, 387:12, 388:16, 450:13, 493:24, 493:25, 494:4, 510:1, 537:6
**policy** [14] - 386:11, 387:18, 387:23, 388:2, 388:11, 388:22, 414:22, 415:1, 415:5, 490:2, 492:10, 493:21, 494:3, 494:22
**population** [4] -

466:17, 559:20, 563:14, 631:7
**portion** [16] - 319:8, 559:13, 559:15, 564:11, 565:1, 565:13, 565:20, 566:17, 579:17, 597:18, 597:21, 599:9, 600:19, 612:23, 622:6, 636:12
**position** [14] - 348:24, 527:24, 529:3, 529:13, 535:8, 538:19, 541:9, 542:11, 548:19, 602:17, 602:19, 614:3, 614:13, 644:17
**positioning** [1] - 622:1
**positions** [1] - 528:18
**positive** [10] - 394:1, 397:24, 398:18, 399:10, 400:1, 405:12, 414:4, 414:6, 558:9, 581:11
**possibility** [2] - 356:5, 511:7
**possible** [1] - 344:11
**possibly** [1] - 355:25
**post** [5] - 395:10, 395:24, 445:14, 508:21, 509:4
**posted** [2] - 398:18, 509:6
**posting** [4] - 395:4, 397:4, 397:5, 401:12
**posture** [1] - 329:3
**potential** [3] - 336:17, 630:25, 631:13
**potentially** [1] - 407:4
**pounds** [1] - 574:16
**PowerPoint** [4] - 443:14, 446:9, 480:24, 619:16
**PowerPoints** [1] - 411:19
**practice** [9] - 323:3, 368:3, 431:14, 451:8, 501:1, 514:1, 588:17, 608:20, 631:7
**practices** [2] - 440:21, 597:3
**practitioner** [1] - 313:16
**precisely** [1] - 316:16
**preclude** [2] - 347:15, 365:9
**precluded** [4] -

314:25, 328:4, 346:23, 364:6
**precluding** [1] - 328:13
**predicate** [1] - 628:4
**prefer** [1] - 644:16
**preference** [4] - 518:12, 642:12, 643:11, 644:12
**prejudice** [5] - 368:9, 520:10, 520:11, 520:15, 623:16
**prejudices** [1] - 315:4
**preliminary** [3] - 310:23, 520:1, 520:2
**prep** [1] - 553:19
**preparing** [1] - 553:9
**preplanning** [1] - 548:8
**prescribe** [5] - 420:24, 421:17, 467:24, 468:1, 495:24
**prescribed** [2] - 461:24, 464:14
**prescriber** [2] - 416:7, 501:2
**prescribers** [1] - 505:7
**prescribing** [4] - 428:10, 462:13, 463:17, 465:8
**prescription** [5] - 418:24, 418:25, 419:20, 471:20, 485:7
**prescriptions** [7] - 415:6, 416:7, 418:11, 418:20, 419:6, 419:15, 506:13
**presence** [1] - 617:24
**present** [9] - 312:7, 320:16, 333:7, 591:22, 595:11, 602:6, 602:12, 607:6, 607:10
**presentation** [7] - 444:6, 446:9, 447:2, 447:17, 450:19, 450:21, 480:25
**presentations** [7] - 443:14, 444:1, 444:11, 450:24, 485:2, 531:25, 619:17
**presented** [6] - 337:3, 452:19, 533:7, 572:4, 582:18, 617:8
**presenting** [1] - 320:4
**presently** [1] - 348:6
**president** [9] - 405:4,

489:6, 490:24, 493:10, 532:24, 546:11, 547:2, 588:8, 594:13
**pressure** [8] - 402:25, 411:5, 412:1, 412:3, 414:19, 415:4, 495:5, 605:16
**presume** [6] - 313:22, 323:17, 629:4, 640:15, 640:22
**pretend** [1] - 313:17
**pretrial** [1] - 643:12
**pretty** [11] - 413:17, 528:5, 540:15, 548:3, 548:14, 550:19, 554:25, 555:20, 556:21, 571:2, 578:18
**prevents** [1] - 340:14
**preview** [1] - 477:17
**previous** [1] - 637:15
**previously** [7] - 514:16, 532:21, 550:8, 569:1, 601:7, 635:3, 635:4
**Prezista** [88] - 401:19, 402:3, 402:16, 406:10, 407:1, 407:7, 407:10, 408:17, 423:6, 424:15, 441:21, 446:17, 461:17, 461:23, 462:13, 466:13, 467:25, 470:4, 471:4, 473:8, 474:2, 474:6, 475:9, 495:25, 497:2, 497:3, 497:19, 497:22, 498:13, 498:20, 498:24, 502:7, 556:15, 556:20, 556:25, 557:4, 557:14, 558:22, 559:13, 559:16, 560:25, 561:7, 561:12, 561:18, 562:4, 562:8, 562:12, 563:4, 563:11, 564:2, 568:12, 568:16, 568:19, 569:6, 569:9, 573:10, 581:24, 582:1, 582:22, 583:21, 590:2, 596:8, 597:6, 597:20, 598:5, 598:19, 605:20, 607:21, 608:15,

609:15, 609:17, 610:4, 610:6, 612:24, 613:2, 613:6, 615:5, 615:13, 615:19, 616:11, 617:12, 618:15, 619:2, 621:18, 625:15, 625:17, 630:17, 631:1
**Prezista's** [11] - 405:9, 473:7, 473:16, 568:16, 603:9, 610:7, 610:19, 613:14, 618:16, 621:8
**principles** [1] - 451:5
**print** [4] - 426:7, 518:14, 518:17, 520:23
**printed** [1] - 448:8
**privacy** [1] - 644:4
**private** [17] - 311:1, 311:11, 311:25, 315:3, 321:18, 322:10, 323:3, 451:21, 516:20, 516:21, 516:22, 522:14, 522:15, 522:19, 526:10, 526:11, 526:12
**privilege** [1] - 357:1
**privy** [1] - 617:19
**problem** [16] - 321:4, 327:18, 333:17, 335:19, 336:12, 341:10, 343:12, 369:24, 370:14, 370:15, 372:13, 422:6, 446:7, 456:17, 489:11, 528:22
**problematic** [2] - 374:24, 513:21
**problems** [2] - 390:13, 512:23
**procedural** [3] - 315:24, 328:24, 371:15
**procedure** [5] - 312:25, 320:1, 368:22, 371:24, 456:18
**proceed** [14] - 322:10, 329:6, 329:7, 348:8, 348:14, 348:15, 351:11, 352:9, 352:16, 376:8, 400:13, 527:10, 573:5, 594:5

**proceeded** [2] - 323:1, 371:18
**proceeding** [3] - 330:8, 330:19, 365:16
**PROCEEDINGS** [1] - 308:1
**proceedings** [1] - 647:5
**Proceedings** [1] - 306:25
**process** [21] - 311:14, 315:2, 316:18, 322:3, 326:17, 327:19, 407:16, 407:19, 422:3, 422:9, 430:7, 430:16, 448:24, 450:1, 469:5, 501:5, 501:12, 513:11, 521:24, 548:1
**Procrit** [3] - 542:22, 543:4, 547:11
**produce** [1] - 533:1
**produced** [1] - 306:25
**producing** [1] - 524:23
**product** [32] - 324:12, 386:16, 420:20, 420:24, 448:12, 473:7, 485:5, 485:11, 497:2, 497:25, 530:5, 530:8, 533:10, 542:19, 545:3, 547:11, 548:8, 552:15, 564:15, 565:25, 567:3, 574:12, 587:15, 589:19, 589:20, 590:12, 595:10, 602:8, 604:11, 606:22, 617:9, 619:15
**product's** [1] - 430:9
**productive** [1] - 616:9
**PRODUCTS** [1] - 306:7
**products** [15] - 423:5, 464:19, 492:10, 529:23, 530:10, 530:13, 534:12, 535:11, 547:12, 555:16, 556:4, 556:6, 558:1, 565:3, 585:16
**professional** [5] - 484:12, 484:16, 484:18, 551:15, 551:17

professionals [3] - 484:18, 485:2, 485:4
profile [14] - 475:12, 478:23, 606:4, 609:11, 609:13, 610:19, 613:2, 613:7, 613:8, 615:15, 618:12, 622:5, 622:11
program [5] - 406:10, 406:14, 407:1, 419:16, 471:21
programs [8] - 468:19, 469:2, 585:3, 585:15, 586:22, 596:11, 596:19, 608:13
progress [1] - 544:9
prohibit [2] - 337:19, 524:22
prohibited [1] - 309:24
prohibiting [2] - 524:25, 629:19
projected [1] - 402:16
projections [1] - 581:25
promised [2] - 538:11, 538:12
promising [1] - 631:3
promote [14] - 403:1, 414:19, 415:4, 415:24, 436:15, 437:10, 450:12, 486:3, 486:7, 486:10, 617:9, 621:17, 638:2, 638:4
promoted [6] - 485:8, 529:8, 531:18, 540:2, 540:15, 541:11
promoting [3] - 429:22, 437:4, 448:1
promotion [6] - 386:15, 428:9, 431:8, 432:25, 463:16, 493:12
promotional [7] - 407:20, 407:24, 450:2, 450:10, 473:19, 485:1, 575:23
Promotional [4] - 449:11, 449:14, 449:18, 449:21
promotionally [2] - 637:19, 637:24
prompted [1] - 425:20
prompting [1] - 450:12

pronounce [1] - 561:8
proofs [1] - 374:23
proper [1] - 454:4
proposal [2] - 518:9
propose [1] - 524:19
proposed [11] - 310:23, 314:3, 320:4, 326:13, 335:22, 338:22, 342:3, 515:19, 516:18, 522:10, 625:23
Proposed [1] - 522:4
proposing [3] - 314:15, 320:6, 339:5
proposition [1] - 621:18
protease [21] - 533:11, 535:9, 535:16, 535:21, 535:23, 536:12, 536:13, 546:13, 555:12, 555:14, 555:23, 556:24, 557:9, 559:17, 561:24, 562:2, 570:2, 609:6, 609:17, 615:21
protocol [4] - 353:22, 383:22, 389:19, 645:1
protocols [1] - 562:1
prove [2] - 371:1, 632:19
proven [10] - 461:19, 464:9, 464:10, 464:20, 465:17, 475:12, 478:22, 478:25, 479:1, 627:4
provide [9] - 322:2, 357:13, 375:18, 394:20, 420:9, 643:22, 644:2, 644:5, 645:18
provided [9] - 310:24, 312:16, 348:3, 349:17, 359:5, 369:11, 375:2, 442:11, 628:8
provider [3] - 428:3, 541:1, 543:24
providers [7] - 431:6, 540:24, 543:2, 544:5, 544:6, 604:9, 613:3
provision [1] - 494:8
PRZA [1] - 615:13
public [5] - 330:8, 377:1, 380:14, 382:2, 644:8
publication [1] -

557:19
publicly [1] - 401:6
publish [22] - 362:7, 378:24, 379:11, 380:25, 385:15, 435:7, 435:13, 444:18, 483:15, 492:2, 513:17, 513:20, 514:16, 560:8, 571:8, 572:15, 579:7, 590:21, 592:20, 611:20, 620:8, 634:18
published [2] - 365:9, 634:25
publishing [1] - 513:23
pull [4] - 500:2, 502:22, 565:9, 611:15
pulling [2] - 325:15, 625:21
purchase [3] - 534:24, 534:25, 585:16
purchased [2] - 532:9, 532:10, 532:11, 535:15, 537:16
purchases [2] - 534:24, 585:24
purchasing [1] - 530:16
purely [3] - 551:15, 551:17, 599:7
purpose [12] - 347:8, 420:8, 430:11, 431:12, 432:15, 506:18, 558:24, 595:2, 595:4, 595:6, 602:3, 610:11
purposes [13] - 447:3, 447:16, 453:25, 516:15, 523:16, 523:20, 523:21, 524:1, 524:20, 526:17, 572:19, 628:3, 628:17
pursuant [1] - 373:22
pursue [5] - 320:24, 516:23, 519:9, 522:20, 526:13
push [4] - 593:8, 607:20, 620:18, 630:8
pushed [2] - 607:22, 608:25
pushing [1] - 603:3
put [73] - 314:14, 319:2, 325:1, 325:4, 328:15, 332:5,

332:6, 338:6, 346:1, 346:5, 346:14, 349:12, 349:25, 351:1, 356:2, 356:3, 366:3, 366:9, 366:18, 367:14, 400:2, 402:25, 423:23, 423:25, 432:15, 433:6, 437:3, 441:3, 446:9, 447:6, 447:22, 450:19, 450:21, 451:9, 457:8, 457:10, 480:19, 502:14, 502:23, 508:2, 508:9, 508:24, 509:19, 510:1, 516:3, 519:22, 519:25, 521:15, 523:10, 524:11, 535:1, 539:5, 541:20, 547:7, 547:21, 548:4, 551:5, 557:17, 557:20, 558:22, 559:8, 561:23, 568:23, 569:19, 578:8, 582:12, 586:20, 590:4, 629:16, 632:10, 633:25, 634:23, 645:13
puts [1] - 471:20
putting [9] - 368:3, 368:11, 370:16, 422:9, 422:22, 423:22, 480:25, 629:20, 639:4

## Q

QD [1] - 502:3
qualified [3] - 399:11, 469:17, 576:4
qualify [5] - 396:7, 475:14, 556:25, 559:13, 559:16
quantify [1] - 505:18
question-and-answer [1] - 589:15
questioning [6] - 345:23, 365:24, 369:8, 372:14, 372:23, 373:7
questions [53] - 349:21, 359:17, 359:20, 373:16, 374:3, 411:18, 423:11, 423:17, 423:22, 424:1,

424:14, 430:8, 438:22, 439:8, 440:5, 440:11, 440:20, 442:11, 448:25, 450:13, 452:17, 454:10, 463:25, 476:21, 477:12, 487:22, 488:8, 489:23, 490:1, 490:3, 501:25, 502:1, 503:25, 504:6, 508:2, 508:6, 508:7, 508:20, 508:23, 575:11, 576:9, 580:16, 589:6, 602:10, 604:20, 605:7, 605:10, 605:12, 624:7, 624:12, 624:20, 624:24, 636:15
qui [9] - 310:18, 311:8, 316:18, 339:19, 340:15, 340:22, 341:13, 348:5, 348:6
quick [1] - 520:24
quicker [1] - 514:25
quickly [6] - 446:16, 518:20, 540:15, 543:20, 567:13, 640:12
quite [3] - 409:21, 421:15, 549:9
quota [1] - 495:1
quote [1] - 497:22
quotes [1] - 498:5
QURAISHI [2] - 306:11, 308:2

## R

R65 [1] - 559:6
raise [6] - 309:19, 315:9, 331:18, 351:16, 414:14, 642:7
raised [14] - 309:1, 309:11, 309:13, 317:23, 317:24, 321:20, 321:23, 331:8, 332:13, 376:12, 376:15, 419:4, 528:2, 562:17
raises [1] - 345:25
raising [5] - 314:25, 322:12, 328:14, 346:24, 414:7
ramping [1] - 555:6
ran [3] - 583:8, 585:5, 586:2

**range** [5] - 339:6, 339:8, 599:10, 601:1, 602:18
**rare** [3] - 309:14, 463:25, 507:13
**rather** [5] - 334:2, 353:25, 355:12, 414:7, 572:4
**RDR** [1] - 647:11
**RE** [1] - 522:4
**reach** [2] - 332:19, 612:1
**reaction** [4] - 316:12, 566:10, 578:6, 582:21
**reactions** [6] - 563:20, 564:4, 564:5, 565:1, 565:13, 565:19
**read** [14] - 329:5, 392:19, 405:16, 426:7, 444:16, 453:4, 457:4, 457:25, 460:1, 460:11, 465:23, 492:20, 524:4, 525:22
**reading** [2] - 310:12, 460:2
**reads** [1] - 497:1
**ready** [17] - 319:3, 350:19, 350:23, 352:9, 352:16, 376:8, 434:25, 476:8, 527:10, 535:11, 537:15, 538:8, 553:22, 558:10, 560:4, 594:5, 601:6
**real** [11] - 325:19, 331:7, 377:7, 513:19, 520:24, 524:21, 551:20, 554:15, 574:13, 578:15, 578:18
**real-life** [1] - 574:13
**realistic** [3] - 401:24, 582:10, 616:8
**reality** [2] - 494:7, 523:6
**realize** [3] - 493:22, 572:1, 606:1
**realized** [3] - 528:11, 528:12, 570:14
**really** [77] - 311:19, 314:16, 319:13, 320:25, 322:8, 323:20, 325:14, 326:15, 326:21, 334:14, 336:12, 345:8, 345:24,

369:5, 389:10, 396:9, 412:18, 421:23, 498:22, 509:11, 517:24, 522:24, 528:9, 529:22, 530:3, 530:23, 531:7, 531:12, 532:15, 535:10, 535:14, 536:14, 536:15, 537:13, 537:14, 538:9, 539:14, 541:1, 541:22, 542:5, 542:10, 542:21, 542:24, 543:3, 544:15, 545:1, 545:18, 545:23, 549:2, 549:18, 550:17, 552:6, 552:19, 555:17, 555:21, 556:12, 562:12, 565:16, 567:18, 570:5, 570:9, 584:16, 584:23, 585:25, 586:17, 587:6, 595:4, 595:8, 597:19, 605:23, 605:25, 608:4, 629:18, 631:6, 643:14
**realm** [2] - 465:7, 577:11
**reason** [40] - 317:15, 317:23, 320:17, 332:22, 337:12, 342:24, 346:4, 349:24, 351:15, 356:11, 366:4, 366:9, 366:18, 366:25, 367:15, 369:10, 369:19, 370:11, 370:18, 376:23, 377:2, 418:9, 418:18, 429:21, 455:24, 482:24, 543:18, 555:21, 559:25, 562:14, 572:3, 582:4, 597:14, 601:8, 606:3, 606:15, 609:9, 624:6, 624:20, 644:4
**reasoning** [1] - 367:24
**reasons** [6] - 310:19, 322:24, 323:4, 366:20, 367:2, 424:9
**rebuttal** [1] - 399:6
**receive** [4] - 340:4, 355:22, 494:16,

494:21
**received** [6] - 498:24, 573:9, 584:1, 592:12, 622:20, 633:2
**recently** [2] - 413:15, 631:14
**recess** [5] - 333:22, 433:21, 433:22, 515:5, 593:19
**recognize** [8] - 395:4, 395:9, 553:15, 571:14, 579:9, 591:3, 617:6, 635:14
**recollection** [12] - 318:10, 391:21, 391:23, 394:21, 396:4, 396:15, 396:20, 396:22, 397:23, 403:9, 497:18, 497:21
**recommend** [1] - 485:2
**recommendation** [3] - 312:17, 313:10, 313:11
**recommended** [2] - 516:5, 563:25
**recommending** [2] - 313:24, 326:14
**reconcile** [1] - 512:25
**reconvene** [1] - 433:17
**record** [17] - 309:9, 325:2, 325:5, 327:11, 328:5, 328:20, 330:12, 349:22, 369:18, 403:24, 475:20, 527:7, 572:20, 572:24, 573:3, 628:16, 647:5
**recorded** [1] - 306:25
**recover** [2] - 337:11, 349:3
**recovery** [4] - 319:16, 334:24, 336:17, 338:18
**recross** [1] - 511:12
**recruited** [2] - 529:19, 538:24
**redirect** [5] - 372:9, 439:13, 475:24, 487:25, 499:20
**REDIRECT** [2] - 307:3, 488:2
**reduction** [1] - 410:24
**REESE** [1] - 306:14
**refer** [6] - 341:7, 392:15, 440:1,

527:18, 563:21, 603:2
**reference** [4] - 312:19, 326:6, 526:19, 561:7
**references** [7] - 309:11, 310:11, 310:12, 313:21, 326:23, 517:23, 562:20
**referred** [2] - 311:10, 311:24
**referring** [11] - 340:22, 353:13, 391:2, 391:18, 449:7, 453:22, 467:16, 487:19, 519:22, 563:22, 563:24
**refers** [5] - 522:13, 526:8, 598:7, 602:20, 603:23
**reflect** [1] - 592:1
**reflecting** [1] - 397:23
**reflection** [1] - 316:24
**refresh** [7] - 394:20, 396:4, 396:14, 396:20, 397:4, 397:23, 455:10
**refreshes** [5] - 391:21, 391:23, 393:8, 396:21, 397:7
**refute** [1] - 367:20
**reg** [1] - 567:15
**regard** [1] - 396:11
**regarding** [5] - 347:21, 348:9, 475:9, 576:13, 576:21
**regardless** [1] - 583:25
**Regazzini** [1] - 592:5
**regimen** [1] - 568:21
**region** [8] - 551:1, 552:2, 552:3, 606:17, 606:18, 608:10, 612:8, 635:13
**regional** [14] - 527:16, 538:4, 539:2, 539:16, 541:11, 541:18, 541:25, 546:1, 575:22, 584:2, 584:17, 590:11, 607:16, 612:18
**registered** [1] - 575:21
**registration** [1] - 498:15
**regular** [2] - 322:6, 388:16
**regulated** [3] - 386:15,

492:10, 567:14
**regulation** [2] - 623:18, 627:23
**regulations** [4] - 481:12, 625:6, 627:7, 627:16
**regulator** [1] - 567:16
**regulatory** [5] - 480:23, 481:9, 576:1, 623:9, 623:15
**rehabilitate** [1] - 372:9
**reimbursement** [18] - 468:19, 468:21, 469:5, 469:10, 469:15, 469:25, 470:3, 470:18, 470:25, 471:4, 471:8, 472:2, 472:23, 548:10, 584:19, 584:25, 588:4, 619:23
**reimbursing** [1] - 324:16
**relate** [1] - 628:10
**related** [7] - 309:18, 324:4, 324:10, 401:4, 440:20, 502:2, 581:15
**relates** [7] - 410:13, 436:6, 437:2, 473:23, 474:1, 627:20, 627:22
**relation** [1] - 613:4
**relationship** [8] - 544:2, 544:12, 549:5, 550:24, 551:15, 552:11, 552:21, 553:2
**relationships** [3] - 543:1, 543:19, 552:6
**relatively** [2] - 582:22, 583:15
**Relator** [6] - 335:12, 339:18, 516:23, 522:19, 523:1, 526:13
**Relator's** [3] - 331:23, 344:14, 506:4
**relators** [1] - 523:11
**Relators** [45] - 306:18, 308:9, 308:11, 308:12, 308:14, 309:21, 310:13, 311:12, 312:7, 314:7, 315:4, 315:17, 317:25, 318:2, 318:5, 321:7, 321:23, 323:16, 323:19, 333:10, 334:12, 335:13,

336:14, 341:7,
342:23, 343:4,
343:13, 344:22,
347:22, 349:1,
349:18, 435:24,
437:2, 477:23,
487:14, 512:3,
512:4, 519:8,
520:12, 525:5,
593:16, 593:23,
594:7, 642:3, 643:3
**Relators'** [22] -
307:21, 308:7,
313:8, 318:14,
332:22, 335:5,
335:20, 335:23,
337:11, 341:12,
379:5, 437:9, 521:7,
521:10, 522:10,
578:24, 590:20,
592:16, 592:19,
611:15, 618:2, 623:2
**relevance** [1] - 517:20,
623:24
**relevant** [8] - 319:14,
326:17, 336:4,
386:21, 523:7,
523:8, 600:9, 644:8
**relying** [1] - 358:1
**remain** [6] - 433:23,
441:13, 511:19,
638:18, 646:8,
646:10
**remainder** [1] - 616:7
**remains** [2] - 443:7,
443:10
**remember** [70] -
322:16, 325:22,
353:2, 353:9,
381:14, 382:4,
396:19, 397:5,
401:20, 402:12,
404:12, 404:13,
407:22, 409:4,
409:5, 411:9,
412:16, 420:1,
421:14, 423:19,
434:12, 435:25,
437:6, 437:14,
439:6, 443:3,
445:13, 446:2,
446:6, 460:3, 477:4,
477:8, 479:24,
479:25, 491:23,
492:7, 494:25,
495:4, 495:5,
500:10, 502:25,
505:11, 506:5,
508:17, 536:6,
536:19, 539:10,

541:15, 544:16,
546:16, 552:4,
552:5, 552:9,
552:16, 556:17,
570:3, 584:24,
586:4, 586:13,
587:5, 587:16,
588:2, 588:10,
596:14, 596:25,
597:24, 630:22,
632:1, 646:5
**remembers** [1] - 460:5
**remind** [9] - 351:21,
352:13, 488:16,
489:3, 490:11,
542:14, 594:11,
614:3, 645:5
**reminded** [1] - 432:7
**reminder** [2] - 351:24,
352:8
**reminds** [1] - 429:15
**reminiscing** [3] -
395:24, 396:16,
396:17
**remote** [1] - 642:10
**remove** [2] - 331:3,
377:7
**removed** [2] - 315:11,
416:3
**rep** [20] - 417:8,
419:20, 420:9,
436:6, 491:19,
541:16, 543:21,
545:17, 547:20,
547:21, 552:6,
558:13, 567:5,
576:12, 576:21,
605:8, 605:9,
620:13, 620:19
**repeat** [11] - 375:10,
396:24, 416:4,
418:14, 462:18,
462:23, 469:12,
497:20, 565:9,
580:20, 580:21
**repeatedly** [3] -
319:24, 443:17,
443:22
**repercussions** [1] -
510:23
**rephrase** [7] - 357:6,
357:7, 376:7,
417:20, 462:5,
567:23, 577:21
**report** [20] - 315:1,
322:18, 353:11,
353:15, 355:13,
384:5, 384:23,
385:10, 387:25,
388:7, 388:21,

388:23, 389:5,
487:15, 488:9,
488:13, 493:11,
493:17, 554:17
**Report** [1] - 557:20
**reported** [20] - 319:18,
352:25, 357:18,
357:25, 383:1,
383:24, 477:4,
492:24, 545:11,
546:4, 546:9,
546:10, 547:1,
550:9, 550:19,
551:1, 574:21,
612:12, 614:6, 614:8
**Reporter** [6] - 306:23,
367:9, 399:2,
624:15, 628:22,
647:12
**reporter** [2] - 503:15,
566:21
**REPORTER'S** [1] -
647:1
**reporting** [4] - 353:6,
376:16, 383:19,
434:6
**reports** [2] - 492:16,
492:18
**represent** [5] - 340:23,
354:19, 355:14,
356:24, 459:22
**representation** [1] -
355:19
**representative** [2] -
407:25, 484:16
**representative's** [1] -
484:12
**representatives** [9] -
387:13, 395:10,
397:17, 414:23,
487:9, 508:11,
540:1, 574:15,
622:25
**representing** [3] -
312:13, 394:1,
477:23
**reps** [41] - 384:18,
390:18, 392:22,
392:25, 395:17,
395:23, 396:8,
402:22, 403:4,
410:24, 415:6,
415:13, 415:24,
417:18, 418:10,
418:19, 420:13,
420:16, 420:19,
423:17, 424:10,
430:13, 431:7,
431:21, 432:7,
432:12, 487:14,

509:11, 509:14,
539:12, 545:8,
545:14, 547:25,
552:24, 590:15,
608:10, 608:12,
608:14, 608:25,
610:23, 612:12
**reps's** [2] - 415:18,
416:8
**reputation** [1] -
537:23
**request** [27] - 348:25,
420:8, 422:21,
423:1, 423:6,
424:21, 425:10,
425:19, 426:12,
426:16, 426:24,
427:23, 428:8,
428:14, 429:18,
448:20, 500:6,
505:17, 506:18,
507:23, 508:7,
508:8, 508:10,
577:19, 604:15,
640:24, 642:10
**requester** [2] - 501:2
**requesting** [2] -
420:10, 426:5
**requests** [17] - 420:4,
448:16, 499:25,
500:11, 501:11,
502:14, 504:3,
505:12, 505:25,
506:14, 506:23,
507:4, 507:11,
604:13, 604:25,
605:2, 605:6
**require** [1] - 385:10
**required** [8] - 314:18,
316:11, 321:18,
385:13, 388:7,
388:22, 426:11,
525:10
**requirements** [10] -
469:14, 469:24,
471:3, 471:10,
471:19, 472:11,
472:14, 472:18,
472:22, 567:16
**requires** [1] - 319:17
**research** [8] - 529:22,
530:13, 533:17,
533:19, 567:1,
603:25, 633:20,
634:12
**resistance** [2] -
558:17, 585:10
**resistant** [7] - 555:8,
558:1, 558:17,
583:6, 583:8,

602:22, 602:24
**resistive** [1] - 502:9
**resistive-naive** [1] -
502:9
**resolve** [2] - 320:14,
518:18
**resolved** [3] - 341:1,
347:13, 348:7
**resolving** [1] - 635:1
**resources** [1] - 322:23
**respect** [11] - 309:11,
324:23, 396:12,
397:9, 509:13,
524:24, 564:18,
577:24, 615:20,
628:7, 628:8
**respected** [2] - 545:2,
545:4
**respectfully** [1] -
515:20
**respond** [8] - 359:19,
427:10, 429:17,
430:8, 511:3, 559:5,
589:9, 628:18
**responded** [2] -
515:20, 627:19
**responds** [1] - 627:2
**response** [10] -
427:24, 428:19,
502:19, 502:21,
503:2, 503:3, 503:7,
565:16, 577:2,
577:19
**responsibilities** [1] -
547:6
**responsibility** [5] -
387:17, 387:23,
468:25, 484:16,
492:13
**responsible** [9] -
334:16, 530:17,
547:17, 548:12,
584:21, 585:2,
596:15, 617:12,
624:18
**rest** [5] - 522:17,
581:19, 595:24,
596:1, 638:15
**restricted** [1] - 545:19
**result** [2] - 481:16,
482:14
**resulted** [1] - 463:17
**results** [4] - 337:4,
479:1, 595:15,
614:25
**retail** [1] - 529:10
**retained** [4] - 355:21,
382:12, 382:14,
477:8
**retaliation** [3] - 388:1,

389:2, 485:23
**retired** [1] - 323:3
**reverse** [1] - 537:4
**Review** [4] - 449:11, 449:14, 449:18, 449:21
**review** [14] - 313:3, 318:10, 375:1, 391:20, 392:18, 407:16, 407:19, 455:12, 455:15, 482:3, 482:7, 486:25, 495:11, 629:16
**reviewed** [15] - 310:10, 313:7, 313:23, 318:9, 364:23, 365:14, 369:10, 369:11, 370:13, 370:23, 372:12, 372:18, 455:16, 580:5, 591:24
**reviewing** [5] - 310:1, 310:15, 414:12, 417:7, 522:23
**reviews** [4] - 314:22, 372:20, 480:4, 521:16
**revise** [4] - 410:4, 410:8, 410:20, 410:23
**revised** [7] - 403:5, 409:12, 409:16, 409:20, 410:14, 412:7
**revising** [1] - 409:7
**revision** [3] - 521:6, 522:17, 573:8
**revisit** [5] - 309:23, 313:5, 328:5, 328:9, 328:10
**revisiting** [1] - 525:1
**rewrite** [1] - 525:23
**Reyataz** [28] - 498:20, 555:16, 559:24, 579:18, 579:25, 580:2, 580:6, 580:11, 580:24, 581:15, 598:15, 598:23, 599:7, 606:3, 609:5, 609:7, 609:15, 609:25, 610:16, 610:25, 611:2, 613:12, 615:24, 619:8, 619:12, 622:7, 622:13, 622:16
**Reyataz's** [2] - 610:7, 610:19

**Rhode** [1] - 551:10
**rid** [1] - 619:13
**ridiculous** [2] - 505:15, 505:16
**right-hand** [1] - 571:17
**rigorous** [1] - 528:9
**ring** [1] - 319:22
**rip** [1] - 588:19
**rise** [12] - 308:4, 351:5, 433:18, 434:21, 511:22, 515:6, 525:25, 593:12, 593:20, 594:1, 638:21, 646:12
**rising** [1] - 515:9
**risk** [3] - 429:8, 623:16, 623:23
**risks** [1] - 625:17
**Rite** [1] - 529:11
**ritonavir** [12] - 561:20, 562:2, 562:4, 562:6, 562:9, 562:11, 562:14, 563:11, 564:2, 568:20, 569:6
**Roche** [1] - 404:13
**Rochester** [1] - 570:3
**Rodney** [1] - 306:21
**role** [12] - 432:3, 438:12, 449:21, 491:1, 517:9, 537:8, 537:10, 540:14, 541:8, 542:12, 575:22, 576:19
**roll** [1] - 545:13
**rolled** [1] - 590:7
**rolling** [1] - 595:5
**Ron** [3] - 490:9, 490:11, 490:12
**room** [6] - 319:5, 519:22, 553:6, 584:11, 587:7, 588:12
**rotting** [1] - 645:1
**round** [1] - 541:20
**row** [4] - 332:1, 594:19, 641:1, 641:5
**RPMs** [1] - 370:16
**rule** [5] - 320:24, 352:7, 628:15, 628:24, 635:6
**Rule** [1] - 368:3
**ruling** [12] - 323:18, 327:15, 329:12, 349:20, 350:10, 367:18, 372:22, 373:11, 373:15, 373:18, 373:24, 629:8

**run** [8] - 329:12, 373:18, 489:16, 490:17, 511:20, 512:22, 522:6, 644:24
**running** [2] - 501:8, 501:13
**runs** [1] - 373:23
**Ruppersberger** [1] - 635:16
**rush** [1] - 583:13
**russ** [1] - 367:23
**Russ** [7] - 308:10, 317:22, 364:7, 366:11, 374:14, 476:3, 477:11
**RUSS** [94] - 306:15, 307:3, 308:10, 356:21, 356:24, 357:5, 361:8, 362:15, 363:13, 363:18, 366:13, 366:19, 368:2, 368:8, 368:15, 368:20, 369:2, 371:15, 371:23, 375:12, 379:9, 380:18, 380:20, 380:22, 380:24, 385:22, 391:8, 392:5, 393:3, 396:1, 396:18, 398:8, 398:10, 398:12, 398:21, 400:22, 403:18, 416:14, 416:16, 417:19, 418:12, 422:15, 427:17, 434:18, 435:11, 437:22, 437:25, 444:21, 454:3, 454:6, 454:17, 456:18, 457:20, 459:25, 460:7, 460:11, 460:16, 460:23, 462:16, 467:3, 467:5, 467:7, 467:9, 474:15, 475:19, 483:13, 488:1, 488:2, 492:2, 492:6, 492:12, 492:14, 494:10, 494:11, 496:4, 496:9, 496:11, 499:18, 499:22, 500:2, 500:4, 502:22, 502:24, 503:19, 511:8, 511:12, 512:3, 512:9, 512:13, 514:5,

515:11, 517:6, 517:12, 523:2
**Russ's** [2] - 315:12, 477:22
**RX's** [1] - 596:5

## S

**S-T-R-A-N-D** [1] - 527:8
**safe** [8] - 384:2, 461:19, 464:9, 464:11, 464:20, 485:23, 632:17, 632:25
**safety** [5] - 429:9, 448:13, 449:4, 464:23, 598:6
**Saint** [1] - 306:17
**sales** [138] - 384:18, 387:13, 390:18, 392:22, 392:25, 395:10, 395:17, 395:23, 396:8, 397:17, 401:19, 402:3, 402:8, 402:22, 403:4, 403:23, 404:3, 404:22, 405:13, 407:25, 408:15, 408:23, 410:24, 411:5, 414:19, 414:23, 415:6, 415:13, 415:18, 415:24, 416:3, 416:8, 416:24, 417:8, 417:18, 418:6, 418:10, 418:19, 419:20, 420:9, 420:13, 420:16, 420:19, 423:16, 424:10, 430:13, 431:7, 431:21, 432:7, 432:12, 436:6, 438:16, 439:1, 442:6, 442:10, 443:13, 484:12, 484:16, 487:9, 487:14, 488:18, 489:4, 489:7, 490:24, 490:25, 491:2, 491:18, 491:19, 505:21, 506:1, 507:18, 508:11, 509:2, 509:11, 528:7, 529:7, 529:8, 530:17, 532:24, 535:2, 535:3, 539:12, 540:1,

540:23, 542:21, 543:6, 543:11, 543:21, 544:13, 545:6, 545:8, 545:13, 546:10, 547:5, 548:1, 548:11, 551:2, 552:6, 552:12, 552:24, 554:23, 558:13, 567:5, 574:15, 575:22, 576:12, 576:21, 582:3, 582:24, 584:5, 588:3, 588:8, 590:3, 590:9, 590:15, 595:5, 595:22, 599:2, 599:3, 604:3, 608:9, 608:14, 610:23, 612:12, 612:17, 616:13, 619:21, 620:18, 620:19, 622:8, 622:25, 635:15, 635:16, 635:17, 635:19, 635:20, 636:16
**salespeople** [9] - 406:5, 503:25, 535:7, 552:22, 590:11, 608:21, 610:18, 616:16, 622:19
**salesperson** [12] - 503:5, 550:2, 550:5, 550:23, 565:21, 569:23, 575:6, 577:25, 578:4, 579:24, 580:23, 631:21
**San** [3] - 594:21, 597:1, 597:9
**SANDERSON** [1] - 306:16
**SARA** [2] - 307:4, 527:4
**Sara** [10] - 491:23, 491:24, 526:23, 527:8, 527:15, 536:22, 538:8, 540:21, 541:17, 623:12
**sat** [7] - 343:22, 536:24, 550:9, 553:17, 553:18, 589:23, 617:22
**satisfactory** [1] - 333:11
**satisfied** [1] - 555:20
**satisfy** [1] - 321:19
**save** [1] - 329:25

**saved** [1] - 407:2
**saw** [14] - 314:9, 445:13, 467:22, 478:11, 486:9, 502:21, 510:10, 550:11, 553:3, 582:3, 583:12, 598:12, 612:13
**scared** [1] - 588:18
**Scazorski** [4] - 546:11, 588:6, 588:23, 589:18
**schedule** [2] - 584:1, 642:19
**scheduled** [1] - 642:20
**school** [3] - 537:14, 537:15, 538:13
**schools** [1] - 528:8
**Schope** [1] - 592:7
**science** [8] - 533:5, 545:4, 545:5, 545:24, 603:25, 604:8, 604:22, 626:5
**Science** [1] - 528:6
**scientific** [5] - 428:22, 429:1, 474:1, 567:16, 610:1
**scientifically** [1] - 562:16
**scope** [3] - 327:14, 336:13, 386:25
**score** [1] - 459:17
**Scott** [6] - 539:12, 540:8, 540:9, 594:22, 606:15, 633:15
**scoured** [1] - 367:16
**scratch** [1] - 525:21
**screamed** [1] - 585:7
**screen** [21] - 332:9, 332:25, 333:4, 333:16, 347:7, 392:16, 457:11, 457:18, 459:18, 464:3, 561:17, 563:10, 564:13, 570:18, 571:14, 572:12, 579:9, 591:4, 611:24, 617:4, 618:9
**scripts** [1] - 596:7
**scrutinized** [1] - 348:4
**seal** [8] - 329:20, 329:23, 330:3, 330:9, 330:12, 330:15, 381:16, 381:23
**seat** [3] - 363:2, 526:2, 638:23

**seated** [10] - 308:5, 351:7, 433:20, 433:23, 434:24, 511:24, 593:14, 594:3, 646:8, 646:10
**second** [23] - 386:3, 386:25, 397:12, 407:15, 408:16, 464:24, 561:20, 572:11, 595:12, 601:13, 609:7, 615:3, 615:9, 622:4, 626:21, 630:19, 631:19, 635:9, 636:11, 637:8, 639:25
**seconds** [1] - 504:24
**secret** [1] - 530:19
**section** [3] - 564:4, 573:21, 599:13
**sections** [1] - 567:15
**secure** [1] - 356:2
**secured** [5] - 354:7, 355:19, 357:11, 360:12, 382:5
**see** [162] - 314:10, 331:22, 333:10, 333:22, 334:10, 334:13, 335:21, 336:12, 340:1, 340:2, 348:2, 351:13, 361:23, 361:25, 362:21, 362:22, 362:23, 363:4, 363:6, 363:7, 363:17, 373:1, 381:5, 381:7, 381:10, 386:12, 386:17, 386:25, 387:2, 387:10, 387:15, 387:18, 387:20, 388:3, 388:9, 391:9, 391:10, 391:20, 392:13, 393:8, 394:25, 395:15, 398:1, 398:5, 404:19, 405:20, 406:12, 409:5, 409:8, 409:12, 409:14, 409:17, 409:25, 410:6, 410:16, 419:1, 419:14, 419:15, 422:23, 423:10, 424:24, 425:22, 428:12, 430:3, 436:4, 438:8, 438:23, 439:9, 439:15, 440:7,

442:2, 446:18, 449:12, 450:14, 451:22, 451:24, 452:2, 454:22, 459:18, 460:25, 461:11, 461:15, 461:21, 468:22, 470:19, 473:10, 484:20, 484:24, 486:9, 492:15, 494:24, 496:13, 497:5, 500:7, 502:12, 506:22, 507:2, 512:7, 515:3, 515:18, 517:16, 518:8, 518:18, 520:10, 521:10, 522:7, 533:24, 537:2, 543:24, 549:18, 559:3, 560:23, 561:2, 561:17, 562:20, 563:20, 564:13, 565:6, 568:7, 570:18, 571:16, 573:7, 573:20, 575:2, 578:5, 578:10, 578:18, 579:9, 580:2, 581:1, 591:3, 591:6, 593:18, 595:16, 595:19, 596:13, 599:15, 601:13, 603:16, 611:24, 612:3, 613:25, 614:20, 615:17, 616:6, 617:4, 618:9, 618:24, 619:3, 621:19, 621:23, 624:22, 636:13, 636:17, 636:23, 637:6, 639:18, 640:7, 645:15, 645:21, 646:11
**seed** [2] - 597:22, 598:4
**seeing** [5] - 576:20, 578:12, 583:15, 590:12, 638:14
**seeking** [1] - 337:20
**seem** [1] - 582:10
**segment** [1] - 631:7
**Seibert** [1] - 585:2
**sell** [16] - 507:13, 531:22, 543:4, 543:13, 544:13, 545:3, 557:14, 565:25, 567:3, 580:6, 580:8, 580:9, 580:11, 582:20,

590:12, 605:24
**selling** [17] - 442:15, 446:22, 529:20, 531:13, 535:7, 535:9, 536:12, 537:5, 542:22, 542:25, 543:16, 558:14, 563:1, 579:25, 596:16, 600:16, 634:4
**send** [14] - 407:25, 424:20, 429:16, 430:16, 432:3, 481:24, 502:19, 518:16, 518:20, 519:14, 604:14, 604:20, 606:20, 628:18
**sending** [5] - 432:8, 446:8, 518:10, 519:11, 520:25
**sends** [1] - 428:14
**senior** [2] - 547:20, 607:9
**sense** [10] - 430:12, 519:19, 525:2, 544:9, 557:12, 557:13, 608:5, 630:7, 632:2, 635:12
**sent** [14] - 358:17, 382:1, 442:19, 482:7, 503:1, 503:21, 504:10, 505:5, 506:15, 515:14, 515:15, 605:6, 627:3, 627:15
**sentence** [11] - 314:9, 405:18, 464:5, 464:25, 470:19, 480:19, 497:1, 603:21, 621:17, 622:6, 625:22
**separate** [11] - 312:14, 317:5, 317:14, 324:21, 325:6, 325:9, 342:16, 423:18, 545:11, 614:14, 625:4
**separated** [1] - 615:20
**separation** [1] - 615:15
**Series** [1] - 573:21
**series** [1] - 578:3
**serious** [5] - 387:19, 487:4, 574:6, 574:10, 578:6
**seriously** [1] - 366:7
**serve** [1] - 319:19
**session** [1] - 440:24
**set** [5] - 382:3, 401:23,

547:17, 627:16, 637:11
**setting** [2] - 402:2, 415:18
**settled** [1] - 527:1
**settlement** [1] - 341:14
**seven** [1] - 555:23
**several** [12] - 311:24, 382:18, 389:3, 444:7, 483:5, 519:23, 537:10, 562:1, 570:13, 589:22, 633:4, 633:11
**shadow** [1] - 598:6
**shape** [1] - 570:5
**share** [14] - 335:5, 335:20, 335:24, 337:11, 341:12, 347:12, 408:9, 440:10, 506:12, 555:17, 556:21, 557:13, 595:4, 631:13
**shared** [4] - 402:11, 405:1, 405:8, 552:8
**sharing** [2] - 382:8, 590:17
**Sheer** [1] - 614:10
**shift** [1] - 499:17
**shocked** [1] - 603:24
**shoes** [1] - 601:21
**shoot** [1] - 345:10
**short** [3] - 433:22, 593:8, 593:19
**Short** [1] - 425:8
**shortly** [3] - 583:20, 591:9, 592:13
**show** [39] - 329:14, 334:22, 335:1, 342:25, 343:6, 359:10, 362:3, 362:10, 379:8, 392:15, 394:6, 394:8, 403:11, 403:22, 422:20, 435:16, 454:1, 457:16, 474:5, 486:1, 486:2, 486:6, 494:21, 496:2, 498:16, 503:20, 505:9, 510:15, 569:24, 581:19, 582:12, 590:25, 599:19, 602:8, 610:12, 624:11, 632:19, 634:16
**showed** [11] - 435:16, 486:8, 486:16,

486:22, 490:2, 495:9, 496:24, 500:5, 557:17, 583:4, 631:15

**showing** [8] - 378:20, 381:4, 386:10, 393:19, 438:5, 458:10, 479:4, 597:13

**shows** [1] - 336:6

**shut** [1] - 544:1

**sic** [1] - 467:17

**sick** [5] - 510:20, 531:12, 542:24, 603:6, 608:4

**side** [21] - 319:22, 333:14, 362:20, 362:24, 367:8, 434:3, 449:4, 533:4, 533:15, 546:14, 547:24, 548:11, 566:2, 566:14, 566:17, 574:12, 619:1, 621:25, 627:4

**side-by-side** [1] - 449:4

**sidebar** [8] - 326:10, 364:19, 369:19, 391:10, 434:11, 565:6, 575:3, 629:23

**Sidebar** [16] - 356:23, 357:8, 363:12, 376:2, 391:11, 394:11, 398:25, 400:11, 454:23, 456:22, 565:7, 568:2, 575:4, 577:16, 623:6, 630:3

**sidebars** [3] - 434:3, 434:6, 434:14

**sides** [1] - 341:6

**sidetracked** [1] - 517:19

**sign** [21] - 425:12, 425:14, 426:11, 426:14, 427:3, 427:5, 452:8, 452:11, 452:19, 453:2, 453:19, 455:10, 459:9, 461:10, 468:17, 473:4, 501:2, 504:9, 504:20, 504:21, 521:6

**signature** [5] - 425:13, 426:8, 438:15, 458:11, 501:14

**signatures** [1] - 501:23

**signed** [22] - 426:1,

426:18, 426:23, 427:7, 428:3, 453:3, 453:4, 453:6, 455:8, 455:11, 456:5, 456:6, 465:12, 471:24, 483:22, 483:24, 495:12, 495:20, 499:7, 499:14, 500:22, 500:23

**significance** [5] - 564:25, 565:12, 566:8, 566:11, 599:1

**significant** [13] - 336:9, 338:17, 345:5, 345:6, 346:7, 346:9, 349:4, 350:6, 356:8, 357:12, 410:13, 571:2, 610:13

**significantly** [2] - 344:23, 409:21

**signing** [1] - 425:18

**silence** [1] - 629:7

**silly** [1] - 505:19

**silo** [1] - 320:20

**similar** [12] - 317:24, 318:4, 328:11, 344:12, 345:2, 347:23, 362:16, 363:13, 447:21, 622:7, 622:16, 630:25

**similarity** [1] - 349:23

**simple** [2] - 311:1, 457:22

**simpler** [1] - 460:9

**simply** [4] - 339:11, 398:14, 521:19, 580:23

**single** [7] - 367:25, 392:25, 393:23, 542:9, 546:22, 562:18, 587:7

**sink** [1] - 633:8

**sit** [3] - 309:15, 518:17, 588:14

**sits** [1] - 323:10

**sitting** [5] - 313:17, 322:13, 336:15, 509:22, 644:25

**situation** [3] - 442:15, 446:23, 551:18

**situations** [3] - 461:18, 464:19, 507:20

**six** [11] - 363:1, 546:1, 555:23, 578:16, 582:6, 583:11, 586:10, 587:19,

596:1, 596:2, 605:9

**six-month** [1] - 596:2

**sixth** [1] - 555:14

**SKADDEN** [1] - 306:19

**skipping** [1] - 465:2

**slash** [1] - 387:8

**SLATE** [1] - 306:19

**slew** [1] - 310:19

**slide** [9] - 338:7, 435:8, 435:16, 436:2, 444:2, 444:3, 447:16, 489:17, 617:24

**slides** [4] - 446:15, 446:16, 489:20, 590:4

**slight** [1] - 315:9

**slow** [1] - 566:21

**slower** [1] - 639:23

**slowing** [2] - 408:14, 570:22

**sludge** [1] - 546:19

**small** [7] - 336:9, 406:15, 412:4, 426:7, 529:4, 545:20, 556:21

**smaller** [1] - 597:5

**Smith** [2] - 529:5, 529:6

**snapshot** [1] - 412:4

**so..** [3] - 330:8, 421:7, 582:14

**social** [5] - 396:5, 397:3, 398:18, 401:6, 401:10

**socialize** [1] - 549:25

**sold** [12] - 530:1, 530:8, 530:10, 530:11, 531:2, 547:9, 547:10, 547:11, 556:11, 565:4, 582:5, 634:13

**sole** [1] - 546:12

**solely** [1] - 425:19

**solicit** [6] - 489:22, 490:1, 490:3, 504:2, 504:5, 504:6

**solicited** [2] - 426:10, 505:18

**soliciting** [1] - 503:25

**solves** [1] - 321:4

**someone** [5] - 346:11, 371:4, 486:2, 486:10, 642:21

**something's** [1] - 353:19

**sometimes** [7] - 376:4, 421:23, 426:9, 432:3, 487:1,

535:18, 544:20, 580:14, 597:16

**somewhat** [1] - 317:23

**somewhere** [2] - 319:3, 332:18

**soon** [6] - 582:2, 582:3, 588:10, 590:21, 609:7, 642:21

**sooner** [3] - 601:5, 602:25, 609:14

**Sorry** [1] - 318:15

**sorry** [51] - 316:6, 319:10, 327:6, 329:23, 330:21, 331:12, 343:14, 343:17, 343:25, 350:12, 352:12, 359:18, 359:23, 362:6, 363:11, 367:10, 376:4, 380:19, 380:20, 380:21, 380:23, 386:3, 386:5, 396:24, 397:11, 416:4, 416:15, 418:14, 434:16, 445:20, 454:5, 457:6, 457:8, 467:6, 469:12, 477:4, 482:11, 497:20, 503:13, 514:6, 515:16, 517:11, 519:10, 565:5, 565:8, 575:8, 576:5, 580:20, 588:22, 599:24, 630:22

**sort** [10] - 316:14, 317:16, 320:19, 370:16, 390:6, 390:12, 390:17, 395:24, 397:12, 436:2

**Soule** [2] - 306:23, 647:11

**Soule@njd.uscourts .gov** [1] - 306:24

**sound** [1] - 323:15

**sounded** [1] - 600:15

**sounds** [5] - 338:2, 365:7, 433:15, 503:14, 525:15

**soup** [1] - 317:7

**space** [2] - 332:3, 556:22

**span** [1] - 557:24

**speaker** [3] - 419:16, 441:12, 442:4

**Speaker** [2] - 596:11,

596:19

**speakers** [2] - 545:22, 602:5

**speaking** [4] - 401:5, 434:13, 437:14, 457:3

**specialists** [1] - 623:10

**specific** [13] - 312:21, 345:19, 349:6, 397:18, 428:8, 461:20, 464:12, 465:6, 557:8, 580:15, 586:4, 606:8, 609:3

**Specific** [1] - 442:10

**specifically** [22] - 321:5, 349:16, 349:18, 364:10, 404:12, 404:14, 419:23, 459:1, 466:13, 466:16, 467:24, 473:1, 482:18, 495:24, 504:4, 507:15, 535:24, 556:24, 563:4, 609:5, 625:17, 631:15

**specifics** [1] - 470:14

**specifying** [1] - 568:24

**speculating** [1] - 321:14

**speculation** [2] - 580:3, 599:23

**speed** [2] - 309:6, 564:16

**spell** [1] - 323:25

**spelling** [1] - 527:7

**spend** [2] - 551:11, 634:12

**spent** [3] - 530:24, 554:10, 554:13

**spin** [1] - 323:4

**spoken** [1] - 413:11

**sponsored** [1] - 602:13

**sponsors** [1] - 469:9

**sponte** [1] - 309:13

**spot** [3] - 309:20, 433:11, 630:10

**spreading** [1] - 402:7

**Square** [1] - 306:21

**square** [2] - 326:19, 541:20

**Squibb** [2] - 378:6, 579:12

**SRL** [1] - 603:22

**SRL's** [2] - 603:18, 603:25

**stable** [2] - 559:21, 597:13
**staff** [3] - 333:3, 387:9, 544:13
**stage** [3] - 444:14, 536:13, 621:21
**stake** [3] - 337:13, 337:15, 339:11
**stamp** [1] - 548:4
**stand** [7] - 310:16, 329:3, 334:2, 340:21, 410:22, 412:10, 576:19
**standard** [4] - 368:3, 431:14, 451:8, 622:24
**standards** [2] - 484:17, 623:15
**standing** [2] - 327:6, 588:12
**standpoint** [2] - 599:2, 599:3
**stands** [2] - 557:19, 616:12
**start** [11] - 334:2, 507:19, 545:8, 546:3, 558:10, 595:18, 605:19, 608:1, 608:8, 638:16, 641:21
**started** [11] - 324:8, 409:24, 423:20, 445:24, 528:18, 539:9, 542:11, 543:16, 563:1, 605:23, 605:25
**starts** [3] - 326:18, 464:5, 492:16
**startup** [2] - 532:19, 540:19
**state** [11] - 375:18, 470:7, 472:7, 527:6, 538:21, 541:2, 544:15, 554:21, 585:15, 587:23, 639:7
**State** [1] - 306:9
**statement** [17] - 316:1, 324:9, 375:19, 391:13, 391:17, 391:22, 393:13, 454:20, 460:5, 461:14, 462:8, 486:4, 487:7, 523:22, 616:1, 627:20, 634:19
**statements** [13] - 310:4, 310:5, 393:5, 400:1, 435:17, 435:18, 435:22, 455:4, 455:7,

455:16, 459:8, 503:16, 516:11
**States** [11] - 308:2, 468:20, 469:20, 471:9, 471:15, 517:8, 517:14, 517:22, 520:7, 543:8, 548:15
**states** [18] - 468:20, 469:20, 469:24, 470:3, 470:6, 470:11, 470:18, 470:22, 470:24, 471:1, 472:6, 472:9, 472:12, 585:15, 585:18, 585:19
**STATES** [3] - 306:1, 306:3, 306:12
**statins** [2] - 598:20, 598:24
**statute** [3] - 319:17, 341:19, 363:19
**statutory** [1] - 339:8
**stay** [12] - 320:20, 365:19, 369:21, 429:22, 443:23, 478:1, 528:14, 529:13, 533:16, 541:25, 553:1, 574:9
**stayed** [4] - 528:14, 537:10, 538:20, 552:25
**staying** [1] - 553:6
**steak** [1] - 570:25
**steal** [1] - 626:20
**stenographer** [1] - 575:7
**stenography** [1] - 306:25
**step** [5] - 314:21, 493:10, 504:12
**Stephen** [1] - 424:24
**stepped** [1] - 417:1
**steps** [6] - 314:22, 315:11, 315:24, 440:25, 441:3, 550:18
**stiff** [1] - 587:18
**still** [38] - 318:22, 324:15, 325:18, 333:8, 343:19, 352:13, 365:7, 377:21, 382:2, 392:2, 396:8, 396:11, 412:3, 413:23, 414:6, 452:5, 509:11, 509:12, 516:11, 523:8, 523:9, 525:8, 553:19, 554:16,

588:8, 588:24, 603:5, 621:9, 631:10, 636:15, 639:24, 640:14, 642:2, 644:15, 644:23, 645:3
**Stillman** [2] - 518:16, 522:3
**stock** [1] - 585:21
**stocks** [3] - 585:18, 585:19
**stone** [1] - 546:21
**stones** [1] - 546:20
**stood** [3] - 349:3, 389:15, 563:22
**stop** [11] - 433:12, 433:15, 528:21, 542:14, 564:16, 584:7, 592:23, 600:23, 614:11, 630:8, 638:10
**stories** [1] - 555:2
**story** [3] - 346:2, 346:6, 643:16
**straight** [2] - 324:13, 569:8
**strand** [1] - 639:13
**STRAND** [3] - 307:4, 527:3, 527:4
**Strand** [37] - 491:23, 491:24, 525:18, 526:23, 527:8, 527:13, 527:16, 527:18, 528:1, 528:21, 542:14, 561:17, 563:10, 564:13, 568:7, 573:19, 578:21, 579:9, 579:24, 580:23, 581:17, 581:21, 581:22, 586:1, 588:6, 591:3, 594:7, 600:23, 601:13, 604:24, 613:25, 614:11, 618:9, 620:12, 623:12, 630:16, 641:6
**strategic** [3] - 346:15, 618:18, 638:3
**Strategies** [1] - 599:13
**strategies** [1] - 619:2
**strategy** [5] - 407:13, 459:1, 600:1, 621:14, 622:9
**Street** [4] - 306:9, 306:17, 306:21, 402:11
**streets** [1] - 359:21
**Stress** [1] - 602:18

**stress** [1] - 390:1
**stressful** [2] - 401:14, 402:22
**strictly** [1] - 553:2
**strike** [6] - 398:10, 398:11, 398:13, 575:1, 577:2, 577:19
**stringent** [1] - 611:1
**strong** [6] - 336:7, 535:17, 561:19, 613:2, 613:6, 613:7
**strongly** [1] - 624:4
**struggled** [2] - 408:16, 551:2
**struggles** [1] - 555:3
**struggling** [2] - 333:13, 372:4
**stuck** [2] - 371:12, 386:2
**studied** [4] - 429:6, 429:9, 563:12, 632:24
**studies** [29] - 430:14, 431:3, 431:5, 431:7, 431:12, 431:21, 474:1, 474:5, 534:6, 534:14, 534:20, 562:12, 562:17, 563:24, 564:1, 564:6, 568:12, 598:9, 598:19, 598:23, 599:7, 602:19, 602:21, 609:24, 610:20, 611:7, 611:14, 613:11, 633:19
**study** [21] - 498:12, 498:19, 533:22, 533:23, 534:1, 534:3, 534:9, 563:23, 568:10, 569:4, 574:2, 574:23, 598:15, 610:6, 613:13, 631:15, 632:23, 633:17, 633:23
**stuff** [11] - 373:25, 513:2, 549:23, 551:9, 552:18, 567:2, 567:5, 575:5, 585:3, 585:23, 588:16
**sua** [1] - 309:13
**sub** [1] - 448:5
**sub-bullets** [1] - 448:5
**subject** [8] - 335:24, 423:5, 438:21, 522:3, 612:1, 613:1, 614:25, 616:24
**subjects** [1] - 528:16

**submission** [1] - 425:19
**submit** [8] - 468:19, 500:12, 505:1, 507:23, 525:11, 627:1, 629:5, 633:21
**submitted** [9] - 335:22, 335:23, 468:21, 469:1, 469:4, 469:19, 500:14, 502:1, 502:17
**submitting** [1] - 450:2
**subsequent** [1] - 628:9
**substance** [1] - 373:10
**substantially** [2] - 328:11, 367:12
**substantiated** [1] - 370:25
**substantive** [3] - 369:10, 370:11, 372:20
**substantively** [2] - 372:1, 372:11
**successful** [8] - 335:9, 336:11, 371:5, 537:10, 538:7, 545:2, 546:13, 548:13
**sufficient** [3] - 320:12, 321:19, 329:17
**suggest** [3] - 317:16, 350:1, 520:16
**suggested** [3] - 349:23, 497:7, 633:15
**suggesting** [2] - 370:12, 499:2
**suggestion** [5] - 315:21, 320:25, 366:4, 370:6, 510:13
**suggestions** [3] - 600:12, 600:21, 606:14
**suggests** [1] - 370:4
**suit** [3] - 311:4, 315:2, 315:18
**Suite** [1] - 306:17
**summarize** [1] - 373:21
**summary** [1] - 428:18
**Sunday** [1] - 551:11
**super** [3] - 413:20, 482:6, 545:17
**supervised** [2] - 413:1, 413:4
**supervisor** [1] - 491:19, 492:19,

493:1, 493:5, 493:7
**supplied** [1] - 428:8
**supplier** [1] - 388:6
**suppliers** [1] - 387:25
**support** [4] - 358:22,
430:18, 494:23,
615:12
**supported** [1] - 429:1
**supporting** [6] -
318:13, 321:11,
342:4, 431:1, 615:19
**supports** [2] - 421:19,
487:3
**suppose** [1] - 379:18
**supposed** [14] - 360:2,
367:23, 447:13,
489:18, 490:1,
490:3, 501:1,
505:18, 507:24,
514:7, 563:6,
589:19, 589:20,
639:24
**supposedly** [1] -
384:11
**suppressing** [1] -
556:7
**surprised** [1] - 345:23
**Susan** [3] - 594:21,
596:24, 596:25
**susceptible** [2] -
531:7, 558:19
**suspect** [1] - 640:14
**suspected** [2] - 384:5,
385:10, 388:7
**suspension** [1] -
387:19
**sustain** [2] - 567:22,
628:7
**sustained** [11] -
361:10, 364:6,
364:17, 365:5,
376:6, 394:19,
395:25, 398:3,
398:9, 398:22,
486:13
**Sustiva** [1] - 632:8
**swear** [3] - 469:18,
470:16, 527:2
**switch** [4] - 559:25,
560:2, 560:3, 578:22
**SWORN/AFFIRMED**
[1] - 527:4
**synergy** [1] - 542:2
**synonymous** [1] -
340:9
**system** [4] - 531:11,
546:19, 565:11,
586:24
**systems** [1] - 537:14

# T

**tab** [10] - 379:7,
380:18, 385:14,
391:6, 416:12,
422:12, 427:14,
444:18, 444:20,
483:11
**Tab** [4] - 362:14,
380:19, 403:12,
483:10
**table** [10] - 317:8,
325:25, 331:23,
345:9, 434:13,
499:14, 553:18,
643:18, 643:20,
644:9
**tabled** [1] - 342:11
**Tablet** [1] - 584:20
**Tabs** [1] - 437:21
**tactic** [2] - 504:17,
625:19
**tactical** [2] - 617:8,
618:6
**tactics** [2] - 599:13,
600:2
**talks** [6] - 387:12,
408:21, 409:7,
447:3, 449:11,
461:14
**tall** [1] - 363:1
**tam** [9] - 310:18,
311:8, 316:18,
339:19, 340:15,
340:22, 341:13,
348:5, 348:6
**tangential** [1] - 523:4
**target** [2] - 387:1,
614:25
**taught** [3] - 443:22,
504:2, 610:22
**teach** [1] - 489:22
**teaching** [2] - 543:25,
545:22
**team** [9] - 393:1,
405:13, 446:9,
469:6, 554:18,
590:6, 591:17,
612:2, 614:9
**teams** [1] - 387:8
**technical** [2] - 516:16,
517:7
**technicality** [2] -
370:6, 370:10
**technically** [5] -
420:17, 429:25,
464:22, 497:23,
517:18
**telephone** [2] - 529:8,
530:21

**template** [2] - 447:11,
622:24
**ten** [16] - 313:17,
323:13, 334:4,
346:12, 433:17,
504:24, 528:8,
531:18, 554:24,
582:3, 587:20,
593:9, 593:18,
630:6, 630:8, 630:12
**Tennessee** [1] -
585:18
**tense** [1] - 551:18
**tension** [1] - 315:23
**term** [5] - 324:20,
535:22, 551:3,
557:1, 610:2
**terminate** [1] - 551:13
**terminated** [1] - 551:3
**terming** [1] - 391:12
**terminology** [1] -
610:9, 622:15
**terms** [16] - 329:3,
346:11, 389:14,
415:12, 415:17,
436:20, 437:9,
532:5, 543:12,
550:7, 555:5, 556:6,
562:23, 573:24,
576:18, 607:23
**terrible** [1] - 546:23
**territory** [2] - 346:16,
620:21
**test** [3] - 559:13,
566:16, 583:8
**tested** [2] - 478:25,
578:13
**testified** [19] - 321:10,
339:19, 345:1,
347:23, 367:21,
388:24, 399:1,
399:4, 399:19,
402:10, 455:1,
455:2, 479:21,
488:23, 510:6,
510:10, 524:22,
566:25, 591:8
**TESTIFIED** [1] - 527:4
**testify** [9] - 454:18,
478:14, 478:18,
567:6, 567:10,
626:15, 626:17,
641:17, 642:21
**testifying** [6] - 315:10,
510:24, 511:4,
562:23, 575:17,
575:18
**testimony** [67] - 310:3,
310:11, 310:13,
310:21, 311:17,

311:23, 312:18,
312:23, 313:4,
313:6, 313:23,
316:13, 317:24,
319:24, 320:8,
326:5, 326:10,
328:10, 329:4,
349:25, 351:13,
353:2, 366:12,
366:13, 376:24,
385:2, 393:18,
401:18, 410:13,
430:23, 431:2,
431:4, 455:4,
462:19, 463:20,
463:22, 466:9,
467:20, 468:4,
476:8, 476:15,
477:9, 477:24,
478:2, 478:9,
479:24, 485:14,
485:18, 496:19,
509:5, 510:2,
511:17, 522:9,
522:12, 522:13,
526:5, 526:7, 526:8,
553:23, 565:2,
567:18, 574:25,
575:21, 575:24,
605:1, 640:11,
642:11
**testing** [6] - 558:21,
558:24, 558:25,
559:1, 559:2, 585:10
**tests** [3] - 559:11,
568:8, 583:6
**Texas** [4] - 306:17,
471:2, 471:4, 527:22
**texts** [1] - 487:8
**THE** [504] - 306:1,
306:11, 308:4,
308:5, 308:15,
308:23, 309:4,
309:6, 314:9,
314:14, 315:15,
316:4, 317:2,
317:19, 318:18,
318:21, 319:1,
320:3, 321:8,
322:22, 323:9,
323:12, 323:24,
324:6, 324:14,
324:18, 325:11,
325:14, 327:10,
327:17, 329:5,
329:16, 330:2,
330:5, 330:8,
330:10, 330:13,
330:21, 331:4,
331:6, 331:10,

331:15, 331:21,
331:25, 332:3,
332:10, 332:15,
332:17, 332:21,
333:4, 333:11,
333:18, 333:21,
333:25, 335:2,
335:6, 335:11,
336:1, 336:19,
336:24, 337:3,
337:6, 337:18,
337:23, 338:8,
338:11, 338:13,
338:19, 338:24,
339:14, 339:25,
340:3, 340:12,
340:24, 341:8,
341:16, 341:20,
342:2, 342:9,
342:15, 343:15,
343:18, 343:21,
343:25, 344:5,
344:19, 345:1,
345:4, 346:18,
347:18, 348:14,
348:19, 349:6,
349:9, 350:4, 350:8,
350:11, 350:16,
350:18, 350:25,
351:3, 351:5, 351:7,
352:12, 352:15,
352:16, 356:20,
356:22, 357:3,
357:7, 359:16,
359:18, 359:19,
359:23, 359:24,
360:1, 361:10,
362:5, 362:9,
362:13, 362:17,
362:22, 363:2,
363:3, 363:8, 363:9,
363:10, 363:17,
364:2, 364:4,
364:13, 364:17,
364:22, 365:1,
365:3, 365:5,
365:18, 366:11,
366:15, 366:21,
366:24, 367:20,
367:23, 368:7,
368:14, 369:1,
369:3, 370:1, 370:9,
370:13, 370:21,
371:22, 371:24,
372:7, 373:13,
373:15, 373:19,
374:1, 374:5, 374:7,
374:10, 374:14,
374:16, 374:19,
375:5, 375:7,
375:10, 375:13,

375:16, 375:22, 375:25, 376:4, 379:1, 379:3, 379:10, 380:17, 380:23, 380:25, 385:17, 385:20, 385:23, 386:1, 386:6, 391:7, 391:9, 391:12, 391:15, 392:2, 392:8, 392:12, 392:18, 392:21, 392:25, 393:7, 393:11, 393:13, 393:17, 393:25, 394:3, 394:7, 394:9, 394:13, 394:17, 394:19, 395:25, 396:21, 396:24, 398:3, 398:9, 398:11, 398:13, 398:22, 398:24, 399:8, 399:21, 400:4, 400:14, 400:23, 403:13, 403:17, 403:19, 416:18, 416:22, 417:21, 418:3, 418:13, 418:14, 422:14, 422:16, 427:16, 427:18, 433:10, 433:14, 433:18, 433:20, 433:23, 433:24, 434:1, 434:2, 434:20, 434:21, 434:23, 435:10, 435:12, 438:1, 444:22, 454:5, 454:9, 454:13, 454:15, 454:22, 454:24, 455:12, 455:15, 455:19, 455:23, 456:3, 456:8, 456:12, 456:15, 456:17, 456:19, 456:21, 456:25, 457:10, 457:18, 457:21, 460:4, 460:8, 460:14, 460:17, 460:22, 460:24, 461:2, 462:18, 462:22, 463:23, 464:4, 464:5, 464:7, 464:8, 464:17, 464:24, 465:1, 465:2, 465:4, 465:5, 465:11, 465:12, 465:14, 465:23, 465:25, 466:1,

466:20, 466:24, 467:6, 467:8, 467:10, 474:18, 475:21, 475:23, 475:25, 476:1, 483:12, 483:14, 486:13, 487:24, 499:21, 503:9, 503:10, 503:11, 503:13, 503:14, 503:17, 503:18, 511:9, 511:13, 511:14, 511:15, 511:22, 511:24, 512:4, 512:7, 512:11, 512:14, 513:13, 514:9, 514:11, 514:18, 514:24, 515:3, 515:6, 515:7, 515:13, 515:18, 515:24, 516:5, 516:15, 517:2, 517:4, 517:11, 517:15, 518:10, 518:13, 519:3, 519:10, 519:16, 519:21, 519:25, 520:10, 520:20, 520:23, 521:2, 521:4, 521:15, 521:20, 521:25, 522:6, 523:4, 523:24, 524:3, 524:8, 525:4, 525:20, 525:25, 526:2, 526:24, 527:6, 527:8, 527:9, 560:9, 560:13, 560:16, 560:18, 565:5, 565:8, 565:15, 565:22, 566:1, 566:5, 566:7, 566:11, 566:13, 566:19, 566:21, 566:24, 567:4, 567:12, 567:22, 568:1, 571:6, 571:8, 572:3, 572:9, 572:16, 572:19, 572:22, 573:5, 573:13, 573:16, 574:24, 575:2, 575:5, 575:8, 575:11, 575:14, 575:16, 576:6, 576:9, 576:16, 576:25, 577:2, 577:8, 577:13, 577:18, 579:2, 579:4, 580:4, 580:8,

580:11, 580:12, 580:14, 580:17, 580:20, 581:3, 581:4, 581:19, 588:22, 588:25, 589:1, 589:2, 589:3, 589:4, 589:7, 589:11, 589:12, 589:16, 590:24, 592:18, 592:20, 593:4, 593:7, 593:12, 593:14, 593:18, 593:20, 593:21, 593:25, 594:1, 594:3, 599:21, 599:24, 600:6, 600:11, 611:18, 613:19, 613:22, 618:4, 620:6, 623:5, 623:7, 623:25, 625:1, 625:12, 625:20, 626:10, 626:12, 626:18, 627:9, 627:12, 627:24, 628:5, 629:1, 629:3, 630:2, 630:5, 630:14, 634:18, 634:23, 635:3, 638:11, 638:21, 638:23, 639:6, 639:18, 639:21, 640:15, 640:19, 641:1, 641:4, 641:11, 641:16, 641:19, 642:5, 642:15, 642:20, 643:2, 643:15, 644:4, 644:20, 644:23, 646:4, 646:8, 646:12

**theirs** [1] - 345:2
**theme** [1] - 320:23
**themselves** [2] - 431:19, 562:18
**theory** [1] - 383:4
**therapies** [3] - 556:24, 583:14, 597:11
**therapy** [5] - 555:21, 557:10, 558:10, 601:6, 602:19
**therefore** [1] - 468:21
**thereof** [1] - 374:10
**they've** [4] - 335:23, 338:6, 627:3, 628:18
**thinking** [7] - 312:11, 338:17, 433:10, 513:15, 519:19, 608:6, 639:11
**thinks** [1] - 634:9

**third** [7] - 340:15, 347:22, 449:12, 558:5, 563:8, 600:25, 637:18
**third-party** [1] - 347:22
**thirds** [1] - 558:4
**Thomas** [2] - 611:22, 612:6
**thoughts** [5] - 309:7, 316:7, 405:8, 588:5, 640:5
**thread** [3] - 396:15, 399:10, 401:2
**threatened** [1] - 401:6
**threatening** [1] - 534:11
**three** [21] - 316:23, 364:11, 368:5, 382:22, 406:4, 410:19, 478:11, 507:16, 508:6, 508:7, 508:9, 508:10, 510:20, 512:23, 538:12, 556:4, 563:24, 568:15, 573:19, 578:13, 608:12
**threw** [1] - 541:16
**throughout** [2] - 311:17, 638:13
**throw** [1] - 540:25
**Tibotec** [7] - 390:25, 395:6, 527:17, 527:18, 538:3, 540:23, 547:13
**Tibotec's** [1] - 500:6
**tied** [1] - 370:16
**Tim** [1] - 508:15
**time-consuming** [1] - 554:11
**timing** [1] - 641:23
**tiny** [2] - 532:15, 542:21
**tired** [2] - 532:23, 532:25
**title** [1] - 617:17
**TMC** [1] - 563:22
**Today** [1] - 536:21
**today** [21] - 325:6, 349:13, 351:13, 476:16, 495:16, 509:22, 521:18, 526:6, 533:21, 536:24, 539:23, 548:23, 553:19, 554:1, 593:2, 596:5, 634:16, 640:25, 642:1, 644:20, 645:9
**today's** [1] - 325:23

**together** [17] - 326:8, 378:6, 378:12, 422:22, 446:10, 528:16, 542:6, 547:8, 547:21, 552:7, 568:23, 569:2, 584:2, 586:20, 587:20, 590:5, 629:16
**tolerability** [2] - 598:6, 618:12
**tolerable** [5] - 533:13, 583:15, 618:16, 618:17, 619:13
**tolerate** [2] - 536:15, 608:7
**tolerated** [3] - 555:18, 559:24, 622:5
**tolerating** [1] - 601:6
**tomorrow** [16] - 355:7, 478:18, 584:4, 638:14, 638:25, 639:4, 639:5, 639:12, 639:19, 640:21, 641:6, 641:8, 641:12, 643:20, 645:6, 646:11
**tomorrow's** [1] - 325:23
**tone** [1] - 587:4
**tonight** [2] - 570:25, 625:9
**Tony** [7] - 539:11, 539:24, 539:25, 545:11, 606:10, 614:1, 614:11
**took** [18] - 352:25, 417:4, 483:4, 522:17, 528:12, 528:15, 531:11, 549:13, 559:2, 583:7, 590:1, 591:8, 591:13, 592:1, 592:8, 631:4, 631:16, 631:17
**top** [14] - 404:16, 461:15, 528:8, 533:2, 568:15, 571:12, 579:14, 591:16, 594:8, 594:14, 596:24, 616:6, 618:11, 621:14
**topic** [1] - 418:1
**topics** [3] - 330:17, 435:5, 488:6
**total** [6] - 349:4, 564:21, 569:20, 579:19, 581:5, 610:2

**totality** [2] - 472:5, 599:18
**totally** [5] - 547:15, 567:19, 611:8, 623:15, 627:23
**touch** [2] - 552:25, 553:1
**touched** [1] - 544:11
**touching** [1] - 324:23
**tough** [1] - 603:22
**towards** [2] - 439:12, 509:14
**track** [2] - 419:17, 627:17
**tracked** [1] - 423:20
**tracking** [1] - 424:10
**train** [4] - 503:24, 602:23, 607:25, 634:7
**train-wreck** [1] - 602:23
**trained** [6] - 385:4, 441:13, 443:22, 504:2, 634:6, 634:10
**trainer** [8] - 432:1, 443:13, 447:8, 480:18, 489:7, 490:13, 493:6, 509:2
**trainers** [1] - 438:12
**training** [12] - 388:16, 437:20, 438:16, 442:10, 443:18, 447:3, 447:16, 451:5, 489:5, 491:2, 493:11, 588:3
**transaction** [1] - 504:23
**transcribed** [2] - 494:13, 494:18
**transcript** [9] - 306:25, 310:1, 310:10, 403:22, 434:8, 434:14, 512:25, 521:18, 647:4
**transcription** [1] - 306:25
**transition** [1] - 433:7
**translated** [1] - 410:23
**travel** [2] - 542:8, 639:10
**treat** [1] - 427:9
**treated** [2] - 598:13, 599:6
**treating** [3] - 418:25, 426:4, 642:19
**treatise** [1] - 326:12
**treatment** [58] - 407:13, 419:2, 419:8, 421:8, 437:4, 437:11, 437:15,

461:20, 464:12, 465:6, 465:19, 465:20, 465:21, 473:8, 497:3, 555:5, 557:1, 557:4, 557:7, 557:18, 557:25, 558:3, 558:6, 558:14, 559:12, 559:20, 562:21, 563:3, 563:17, 568:8, 571:21, 571:22, 574:2, 574:11, 582:9, 582:13, 582:14, 583:17, 587:22, 587:23, 601:4, 603:3, 603:5, 607:21, 607:22, 608:4, 608:15, 608:17, 621:10, 631:2, 631:10, 632:11, 632:12, 632:15, 634:4, 637:7
**treatment-emergent** [1] - 568:8
**treatment-experienced** [25] - 419:2, 419:8, 557:4, 557:7, 557:18, 558:14, 559:12, 559:20, 562:21, 563:3, 563:17, 571:22, 574:2, 582:9, 582:14, 583:17, 587:22, 601:4, 603:5, 608:4, 608:17, 631:2, 631:10, 632:11, 637:7
**treatment-naive** [18] - 419:2, 419:8, 437:4, 437:11, 437:15, 465:19, 465:20, 465:21, 558:3, 571:21, 582:13, 587:23, 603:3, 607:22, 608:15, 632:12, 632:15, 634:4
**treatments** [1] - 559:9
**trend** [1] - 419:14
**Trenton** [1] - 306:9
**trial** [37] - 310:5, 315:16, 325:20, 326:18, 328:14, 341:2, 351:9, 352:1, 449:9, 498:15, 498:16, 498:25, 499:1, 511:13, 512:17, 512:18,

513:4, 517:20, 519:5, 523:6, 523:17, 523:21, 524:1, 524:12, 526:17, 553:9, 578:19, 629:15, 629:18, 629:20, 642:22, 643:17, 644:13, 645:3, 645:13, 645:24
**TRIAL** [1] - 306:5
**trials** [5] - 479:1, 533:6, 574:22, 578:12, 644:12
**tried** [11] - 322:15, 389:8, 481:3, 551:21, 554:15, 554:18, 586:25, 624:21, 632:19, 632:21, 633:5
**triglyceride** [3] - 564:22, 581:14, 598:5
**triglycerides** [8] - 569:20, 579:22, 580:1, 580:25, 581:8, 599:6, 610:14, 610:24
**trouble** [6] - 346:2, 464:1, 479:22, 480:1, 480:4, 641:23
**true** [19] - 317:1, 403:8, 450:16, 458:18, 469:18, 470:21, 470:23, 473:4, 473:12, 473:14, 495:20, 497:13, 497:14, 498:8, 572:4, 613:9, 616:1, 625:19, 626:4
**truncated** [1] - 640:12
**trust** [1] - 544:12
**trusted** [1] - 544:6
**truth** [7] - 353:14, 353:18, 390:23, 399:21, 399:25, 400:2, 584:24
**truthful** [1] - 400:6
**try** [19] - 309:16, 351:16, 351:19, 416:19, 463:23, 488:5, 511:7, 512:12, 547:25, 567:11, 586:23, 589:14, 590:9, 601:5, 602:24, 605:11, 606:1, 623:19, 638:15
**trying** [35] - 313:17, 336:2, 338:2,

342:10, 369:13, 369:15, 374:7, 399:25, 417:24, 418:6, 434:8, 434:9, 482:25, 491:23, 499:5, 503:15, 508:16, 517:9, 517:22, 520:18, 523:2, 539:25, 541:19, 545:24, 547:17, 553:5, 554:14, 565:17, 566:15, 567:9, 573:13, 590:12, 622:10, 622:12, 626:24
**tugged** [1] - 529:18
**tumor** [1] - 530:4
**turn** [4] - 343:19, 369:6, 605:8, 605:23
**turnaround** [1] - 556:10
**turned** [1] - 578:6
**Turner** [4] - 611:22, 612:6, 612:17, 613:1
**turning** [1] - 556:13
**turns** [1] - 412:7
**twice** [7] - 564:3, 568:20, 616:14, 631:17, 631:22, 632:4, 646:5
**twice-daily** [2] - 631:22, 632:4
**twist** [1] - 499:5
**two** [45] - 313:9, 315:11, 317:5, 321:1, 331:25, 348:8, 368:5, 496:16, 499:11, 509:6, 515:18, 522:8, 528:16, 529:14, 532:4, 537:12, 549:10, 549:14, 549:19, 552:5, 553:1, 554:13, 558:4, 558:25, 559:11, 567:2, 573:19, 576:9, 583:7, 585:9, 590:1, 602:25, 604:3, 604:6, 605:8, 608:12, 622:10, 625:6, 633:25, 639:24, 640:7, 640:10, 641:1, 641:5, 641:22
**two-thirds** [1] - 558:4
**twofold** [1] - 623:11
**type** [9] - 312:4, 312:10, 314:17,

315:7, 452:20, 453:2, 535:7, 620:11, 633:20
**typed** [8] - 358:12, 442:18, 453:15, 453:19, 458:6, 459:9, 461:9, 473:6
**types** [11] - 435:23, 436:2, 530:4, 559:11, 607:6, 607:10, 611:6, 617:6, 617:19, 619:16, 620:22
**typical** [1] - 554:25
**typically** [3] - 402:18, 533:23, 616:14

---

## U

**U.S** [1] - 306:8
**U.S.C** [1] - 319:18
**ultimately** [9] - 341:24, 361:13, 376:19, 519:14, 534:7, 545:6, 589:18, 632:14, 632:17
**unavailability** [1] - 642:15
**uncomfortable** [6] - 390:6, 490:6, 490:14, 490:16, 511:5, 554:9
**under** [52] - 311:2, 312:1, 315:3, 319:18, 329:20, 329:23, 330:3, 330:9, 330:12, 330:15, 337:12, 343:8, 352:13, 356:6, 356:14, 357:12, 360:8, 360:12, 381:16, 381:23, 382:13, 383:10, 387:23, 424:24, 425:13, 426:15, 436:14, 456:3, 458:17, 469:18, 470:16, 471:7, 471:9, 480:20, 481:13, 513:6, 516:20, 526:10, 545:6, 550:18, 550:20, 564:25, 571:20, 573:20, 578:3, 596:13, 597:22, 599:4, 601:10, 601:14, 612:8, 637:12

**underlying** [1] - 598:19

**underneath** [1] - 594:20

**Understood** [1] - 317:4

**understood** [22] - 328:19, 343:20, 343:24, 347:17, 360:5, 360:7, 364:11, 394:14, 447:13, 451:5, 463:7, 481:2, 518:2, 522:1, 525:3, 525:8, 544:7, 544:23, 577:3, 577:20, 602:7, 629:25

**underwent** [1] - 388:16

**undetectable** [5] - 536:8, 555:18, 559:25, 597:3, 608:7

**unexpand** [1] - 596:10

**unfamiliar** [2] - 575:25, 576:8

**uniformly** [1] - 400:20

**unique** [2] - 322:15, 528:5

**UNITED** [3] - 306:1, 306:3, 306:12

**United** [11] - 308:2, 468:20, 469:20, 471:9, 471:15, 517:8, 517:14, 517:22, 520:7, 543:8, 548:15

**University** [1] - 528:5

**unless** [5] - 382:3, 433:10, 514:11, 625:5, 640:1

**unnecessary** [5] - 462:15, 463:18, 464:14, 466:6, 468:7

**unpacked** [1] - 538:15

**unqualified** [1] - 567:17

**unreliable** [2] - 597:4, 597:16

**unring** [1] - 369:21

**unsolicited** [15] - 422:6, 425:19, 426:10, 426:12, 426:16, 426:24, 427:3, 427:8, 448:16, 489:23, 490:1, 504:6, 507:25, 605:7

**unsolicitly** [1] - 604:15

**up** [140] - 309:7,

313:13, 314:5, 315:16, 317:14, 317:20, 318:17, 320:19, 322:15, 324:5, 324:7, 325:15, 325:19, 331:7, 332:9, 334:24, 335:20, 350:23, 351:1, 353:18, 358:12, 364:14, 365:22, 383:7, 383:10, 389:10, 400:16, 404:16, 423:17, 430:5, 439:8, 439:22, 444:3, 444:14, 452:15, 452:17, 452:19, 452:20, 453:2, 453:15, 453:19, 457:8, 458:6, 459:9, 461:9, 461:15, 463:6, 466:2, 467:7, 471:25, 473:6, 478:10, 484:22, 488:5, 489:23, 490:22, 491:13, 500:2, 502:22, 507:19, 510:1, 510:15, 526:25, 527:21, 528:1, 528:16, 536:24, 539:16, 541:23, 543:1, 543:6, 544:24, 545:9, 545:14, 546:8, 546:9, 547:1, 547:18, 549:20, 551:13, 553:20, 555:6, 557:17, 560:4, 560:5, 560:8, 560:22, 561:4, 561:15, 561:25, 564:10, 565:9, 568:15, 571:5, 571:12, 571:24, 574:17, 578:24, 581:11, 582:12, 582:19, 582:22, 585:6, 586:8, 586:9, 586:21, 586:23, 586:24, 586:25, 587:24, 590:9, 590:19, 591:6, 593:5, 594:8, 596:24, 597:13, 597:18, 602:10, 602:17, 602:19, 606:8, 607:21, 609:12, 611:15, 612:23, 615:3,

617:1, 623:1, 624:6, 628:21, 633:16, 634:15, 634:18, 635:6, 636:8, 637:1, 639:16, 646:9

**update** [1] - 612:2

**Upjohn** [4] - 532:9, 532:10, 535:13, 537:17

**upper** [1] - 591:6

**upset** [4] - 352:24, 481:1, 482:16, 528:24

**Upsher** [2] - 529:5, 529:6

**Upsher-Smith** [2] - 529:5, 529:6

**usage** [3] - 428:9, 441:21, 485:2

**usages** [1] - 430:15

**uses** [6] - 367:5, 430:24, 435:23, 436:3, 463:14, 605:20

**utilization** [1] - 464:19

---

**V**

---

**VA's** [1] - 584:22

**vacuum** [1] - 517:5

**vaguely** [2] - 412:17, 475:10

**value** [1] - 621:18

**varies** [1] - 323:20

**various** [1] - 606:7

**Vega** [1] - 508:16

**verbal** [1] - 448:8

**verbally** [4] - 330:5, 492:18, 492:24, 493:11

**verbatim** [2] - 318:9, 525:23

**version** [10] - 515:14, 515:15, 516:2, 520:21, 572:2, 572:4, 572:18, 645:10, 645:11

**versions** [3] - 517:4, 518:14, 518:16

**versus** [6] - 470:4, 472:6, 472:19, 472:20, 479:12, 578:19

**vice** [4] - 489:6, 490:24, 493:9, 546:11

**victorious** [1] - 335:14

**view** [2] - 401:23, 548:14, 621:21

**viewed** [1] - 507:18

**views** [2] - 358:12, 442:5

**violate** [1] - 357:1

**violated** [2] - 485:15, 490:5

**violating** [2] - 485:20, 485:25

**violation** [1] - 388:1

**violations** [1] - 388:7

**Viracept** [5] - 535:10, 556:11, 563:1, 582:5, 615:23

**viral** [4] - 536:9, 559:24, 583:15, 597:13

**virals** [1] - 536:3

**Viramune** [1] - 632:8

**virus** [5] - 535:24, 536:1, 536:2, 555:19, 556:7

**visited** [1] - 425:5

**visits** [1] - 583:19

**visual** [1] - 615:12

**voicemail** [7] - 403:23, 404:16, 406:4, 417:3, 494:13, 494:16, 494:18

**voicemails** [1] - 404:7

**VOLUME** [1] - 306:5

**Vyera** [1] - 550:8

---

**W**

---

**wait** [8] - 316:23, 326:6, 343:19, 434:4, 503:9, 511:6, 519:10, 634:18

**Wait** [2] - 481:25, 523:11

**waiting** [8] - 357:3, 513:2, 520:5, 588:12, 639:8, 640:24, 642:2, 645:13

**Walgreens** [1] - 529:11

**walk** [1] - 342:9

**walked** [2] - 589:24, 589:25

**walking** [2] - 426:8, 501:15

**Wall** [1] - 402:11

**wants** [3] - 363:14, 434:10, 645:21

**warehouse** [2] - 585:16, 585:21

**Warner** [3] - 532:10, 534:25, 537:17

**Warner-Lambert** [3] - 532:10, 534:25,

537:17

**warrant** [1] - 387:19

**wasting** [1] - 327:4

**water** [3] - 546:17, 546:18, 546:22

**ways** [9] - 318:1, 384:4, 384:7, 388:20, 404:6, 429:2, 429:7, 461:24, 495:21

**weak** [1] - 533:14

**website** [1] - 384:23

**wedding** [2] - 378:16, 379:16

**week** [17] - 328:6, 512:17, 512:19, 512:23, 513:1, 542:9, 583:9, 586:17, 586:18, 608:12, 640:7, 641:17, 641:22, 645:6, 645:7, 645:17

**weekend** [1] - 352:3

**Weekly** [1] - 557:20

**weeks** [12] - 313:5, 328:6, 513:2, 520:5, 524:18, 549:14, 578:13, 581:6, 583:7, 583:12, 585:10, 590:1

**weight** [1] - 564:14

**weird** [1] - 413:20

**welcome** [3] - 351:8, 435:3, 526:3

**well-known** [1] - 604:11

**Wendel** [2] - 308:13, 573:17

**WENDEL** [4] - 306:16, 308:13, 573:12, 573:15

**Wendy** [1] - 308:13

**West** [4] - 548:20, 550:19, 584:17, 584:18

**western** [1] - 543:7

**whatsoever** [2] - 517:24, 554:5

**wheelhouse** [1] - 313:16

**wheels** [1] - 605:23

**whistleblower** [2] - 356:6, 356:13

**white** [1] - 542:23

**WHITNEY** [1] - 306:16

**whole** [7] - 310:17, 323:4, 363:20, 415:12, 518:22, 544:23, 640:21

**wholesalers** [1] -

529:10
**wide** [1] - 608:21
**Wilhelm** [16] - 354:5,
354:23, 355:12,
355:14, 356:8,
377:14, 377:15,
452:3, 545:12,
548:18, 549:5,
639:5, 639:13,
641:10, 641:11
**willing** [1] - 633:25
**Wilmington** [1] -
306:22
**windfall** [1] - 345:5
**WIRMANI** [157] -
306:15, 307:4,
308:12, 486:12,
526:22, 527:11,
527:12, 560:5,
560:11, 560:15,
560:20, 561:4,
561:6, 561:14,
561:16, 563:7,
563:9, 563:18,
563:19, 564:9,
564:12, 565:3,
565:12, 565:18,
565:24, 566:4,
566:6, 566:8,
566:12, 566:16,
566:20, 566:23,
566:25, 567:11,
567:20, 568:4,
568:6, 569:19,
569:22, 571:4,
571:11, 571:13,
571:23, 572:7,
572:15, 572:17,
572:21, 573:3,
573:6, 573:17,
573:18, 575:10,
575:13, 575:15,
576:3, 576:5, 576:7,
576:15, 576:24,
577:1, 577:6,
577:14, 577:23,
578:22, 579:6,
579:8, 579:13,
579:16, 580:22,
581:16, 581:18,
581:20, 588:23,
589:5, 589:14,
589:17, 590:19,
591:1, 591:2,
592:15, 592:25,
593:6, 593:16,
593:23, 594:6,
596:10, 596:12,
596:22, 596:23,
597:21, 597:23,

599:9, 599:12,
599:20, 600:1,
600:14, 601:9,
601:12, 602:15,
602:16, 603:13,
603:14, 605:13,
605:15, 611:15,
611:20, 611:23,
612:22, 612:25,
613:17, 613:20,
613:24, 615:2,
615:4, 615:9,
615:10, 616:4,
616:5, 616:19,
616:25, 617:3,
618:1, 618:6, 618:8,
620:2, 620:8,
620:10, 621:1,
621:2, 623:1, 624:3,
624:24, 625:11,
625:13, 625:23,
626:2, 626:13,
626:25, 627:11,
628:2, 628:16,
628:23, 629:2,
629:25, 630:12,
630:15, 634:15,
635:8, 636:3, 636:4,
636:8, 636:10,
637:1, 637:3, 637:8,
637:10, 638:9
**Wirmani** [4] - 308:12,
592:21, 594:5,
599:25
**Witek** [1] - 635:15
**withdraw** [1] - 572:21
**withdrawing** [1] -
628:14
**WITNESS** [33] -
352:15, 359:18,
359:23, 360:1,
363:2, 363:9,
396:24, 418:14,
462:22, 464:4,
464:7, 464:17,
465:1, 465:4,
465:11, 465:14,
465:25, 475:25,
503:10, 503:13,
503:17, 511:14,
527:8, 560:18,
580:11, 580:14,
581:4, 581:19,
589:1, 589:3,
589:11, 599:21,
600:11
**witness** [71] - 312:6,
318:16, 318:18,
318:20, 318:21,
319:15, 328:20,

332:9, 334:2,
336:15, 339:18,
339:24, 340:22,
345:12, 347:22,
348:5, 350:20,
351:2, 351:11,
351:12, 351:18,
362:5, 362:11,
362:25, 363:5,
393:4, 394:15,
396:22, 416:17,
417:22, 454:2,
454:18, 456:24,
457:11, 460:2,
511:8, 511:9,
511:17, 513:12,
514:2, 519:21,
526:5, 526:20,
527:1, 560:6,
576:19, 576:22,
578:24, 590:25,
591:1, 617:1, 623:2,
624:7, 624:13,
624:18, 626:10,
626:17, 627:24,
627:25, 628:8,
628:9, 628:12,
628:15, 629:21,
639:3, 639:4, 639:8,
640:20, 641:5, 641:7
**witness'** [1] - 336:3
**witness's** [2] - 367:24,
394:21
**witnesses** [12] -
319:5, 334:7, 363:7,
393:6, 463:25,
520:7, 629:18,
639:24, 640:3,
640:10, 643:13,
644:12
**woefully** [1] - 567:16
**woman** [1] - 546:10
**women's** [1] - 549:23
**won** [2] - 356:10,
532:24
**wonderful** [2] -
393:24, 645:19
**wondering** [3] -
519:18, 520:17,
572:11
**word** [8] - 474:23,
481:3, 481:4,
492:16, 561:8, 610:3
**wording** [1] - 482:24
**words** [10] - 311:4,
376:5, 474:7, 474:9,
475:2, 482:4, 497:9,
498:5, 499:5, 502:3
**works** [11] - 316:18,
356:13, 360:16,

361:21, 402:19,
521:24, 530:5,
533:19, 535:23,
563:13, 627:1
**workshop** [8] - 439:7,
489:13, 489:16,
489:18, 489:19,
489:20, 489:22,
490:17
**workshops** [1] -
489:17
**world** [5] - 352:3,
381:25, 578:15,
578:19, 582:3
**worms** [2] - 310:17,
343:8
**worried** [3] - 523:23,
570:10, 570:11
**worse** [4] - 316:13,
328:14, 350:8,
605:18
**worth** [1] - 337:6
**wracking** [1] - 554:11
**wrap** [3] - 320:18,
346:7, 400:16
**wreck** [4] - 554:9,
588:11, 602:23,
607:25
**write** [10] - 393:11,
481:6, 482:20,
512:10, 574:17,
586:15, 596:8,
599:23, 606:22,
638:1
**writing** [9] - 416:7,
418:6, 418:20,
418:23, 418:25,
419:7, 419:12,
419:20, 492:18
**written** [5] - 366:11,
372:8, 438:11,
497:12, 619:1
**wrote** [13] - 432:19,
432:24, 441:16,
441:24, 452:15,
452:17, 452:19,
454:10, 468:16,
471:25, 522:18,
590:23, 592:4
**Wyatt** [20] - 308:19,
316:6, 316:8,
319:10, 321:9,
323:17, 324:25,
327:7, 327:10,
328:13, 340:24,
342:7, 344:6,
344:20, 515:21,
516:1, 521:17,
524:6, 524:24,
643:19

**wyatt** [1] - 320:8
**WYATT** [29] - 306:20,
308:19, 316:8,
317:4, 318:15,
319:11, 320:18,
322:14, 323:18,
323:25, 324:7,
324:17, 327:12,
328:19, 329:10,
339:5, 341:6, 341:9,
343:14, 343:17,
343:20, 343:24,
520:22, 521:1,
521:19, 521:22,
522:1, 524:7, 525:3

**Y**

**year** [13] - 388:18,
528:15, 529:7,
529:8, 538:2,
542:15, 581:6,
582:6, 586:10,
595:25, 616:7,
616:14, 633:24
**years** [37] - 316:23,
322:16, 346:12,
378:9, 380:12,
381:15, 382:18,
382:21, 382:22,
389:4, 411:22,
414:13, 436:9,
451:16, 483:6,
484:3, 485:15,
485:18, 485:24,
487:5, 527:17,
529:14, 532:4,
537:11, 537:12,
543:22, 544:2,
549:7, 549:11,
554:24, 555:1,
565:4, 570:6, 570:9,
582:3, 587:20,
633:25
**yesterday** [52] - 309:1,
309:11, 316:13,
316:20, 317:22,
318:9, 321:21,
324:7, 324:19,
325:3, 351:10,
352:14, 352:23,
356:19, 358:23,
359:3, 359:9,
376:12, 376:22,
377:23, 383:14,
383:25, 388:24,
389:6, 389:20,
395:19, 399:4,
399:20, 401:18,
402:10, 408:22,
409:5, 409:15,

411:18, 412:13,
414:18, 415:3,
419:25, 423:16,
476:18, 479:21,
486:8, 486:9,
486:16, 486:23,
487:20, 488:23,
500:10, 501:17,
505:10, 506:5,
554:17

**yesterday's** [1] -
319:24

**Yo** [1] - 584:3

**York** [12] - 445:18,
445:20, 446:1,
446:5, 446:9, 470:5,
472:7, 539:11,
552:3, 570:4,
585:19, 614:6

**young** [2] - 570:5,
570:14

**yourself** [1] - 527:13

## Z

**ZAHID** [2] - 306:11,
308:2

**zoom** [7] - 492:4,
579:14, 599:20,
599:21, 601:9,
602:15, 603:13

**Zoom** [2] - 476:12,
642:14