1              UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF NEW JERSEY
2

3  _____

UNITED STATES OF AMERICA, et    CIVIL ACTION NUMBER:
4  al,
        Plaintiffs,              3:12-cv-07758-ZNQ-JBD
5
        v.                       JURY TRIAL - VOLUME 4
6
JOHNSON & JOHNSON, JANSSEN
7  PRODUCTS, L.P.
        Defendants.
8  _____
                Clarkson S. Fisher Building & U.S. Courthouse
9               402 East State Street
                Trenton, New Jersey  08608
10              May 13, 2024
                Commencing at 9:00 a.m.
11
   B E F O R E:              THE HONORABLE ZAHID N. QURAISHI,
12                           UNITED STATES DISTRICT JUDGE

13  A P P E A R A N C E S:

14      REESE MARKETOS
        BY:  PETE MARKETOS, ESQUIRE
15           JOSH RUSS, ESQUIRE
             ANDREW WIRMANI, ESQUIRE
16           ADAM SANDERSON, ESQUIRE
             WHITNEY WENDEL, ESQUIRE
17      750 N. Saint Paul Street, Suite 600
        Dallas, Texas 75201
18      For the Relators

19      SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
        BY:  ALLISON M. BROWN, ESQUIRE
20           GEOFFREY M. WYATT, ESQUIRE
             BRADLEY A. KLEIN, ESQUIRE
21      One Rodney Square
        920 King Street
22      Wilmington, Delaware
        For the Defendants
23
        Megan McKay-Soule, Official Court Reporter
24           Megan_McKay-Soule@njd.uscourts.gov
                    (609) 815-2319
25  Proceedings recorded by mechanical stenography; transcript
        produced by computer-aided transcription.

              United States District Court
                District of New Jersey

```
 1                    I N D E X

 2   EXAMINATIONS                                    PAGE

 3
               MARK WILHELM
 4        DIRECT EXAMINATION BY MR. RUSS              966
          CROSS-EXAMINATION BY MS. BROWN            1075
 5        REDIRECT EXAMINATION BY MR. RUSS          1230

 6                  E X H I B I T S

 7        Exhibit No.                               Page

 8        Relators' Exhibit 195 in evidence.       1006
          Relators' Exhibit 42 in evidence.        1010
 9        Relators' Exhibit 1143 in                1012
          evidence.
10        Relators' 1582 Exhibit in                1013
          evidence.
11        Relators' Exhibit 177 in evidence.       1024
          Relators' Exhibit 165 in evidence.       1029
12        Relators' Exhibit 199 in evidence.       1034
          Relators' Exhibit 139 in evidence.       1071
13        Defendant's Exhibit 2401 in              1099
          evidence.
14        Defendant's Exhibit 1007 A in            1120
          evidence.
15        Defendant's Exhibit 2079 in              1131
          evidence.
16        Defendant's Exhibit 8674 in              1142
          evidence.
17        Defendant's Exhibit 8675 in              1147
          evidence.
18        Defendant's Exhibit 8767 in              1151
          evidence.
19        Defendant's Exhibit 2089 in              1176
          evidence.
20        Defendant's Exhibit 3026 in              1186
          evidence.
21        Defendant's Exhibit 8799 in              1194
          evidence.
22        Defendant's Exhibit 8702 in              1215
          evidence.
23        Defendant's Exhibit 6092 in              1216
          evidence.
24

25
```

*United States District Court*
*District of New Jersey*

```
 1              (PROCEEDINGS held in open court before The Honorable

 2    ZAHID N. QURAISHI, United States District Judge, on May 13,

 3    2024, at 9:00 a.m.)

 4              THE DEPUTY COURT CLERK:  All rise.

 5              THE COURT:  Thanks, folks.  You may be seated.

 6         All right.  We are on the record in week two of trial.

 7    Why don't we just do appearances this morning from counsel,

 8    beginning with the Relators, and then --

 9              MR. MARKETOS:  Good morning, Your Honor.  Pete

10    Marketos for the Relators.

11              MR. RUSS:  Good morning, Your Honor.  Josh Russ for

12    Relators.

13              MR. WIRMANI:  Andrew Wirmani on behalf of the

14    Relators, Judge.

15              MS. WENDEL:  Good morning, Your Honor.  Whitney Wendel

16    on behalf of Relators.

17              THE COURT:  All right.  Good morning, folks.

18         Defense.

19              MS. BROWN:  Good morning, Your Honor.  Alli Brown for

20    Janssen.

21              MR. WYATT:  Good morning, Your Honor.  Geoff Wyatt

22    for Janssen.

23              MR. KLEIN:  Good morning, Your Honor.  Brad Klein for

24    Janssen.

25              THE COURT:  All right.  Good morning, folks.
```

1      Other than the request to strike a portion of

2  Ms. Strand's testimony that I believe you guys -- I reviewed

3  your papers; they were submitted on Friday -- but is there

4  anything else we need to address this morning?

5          MR. MARKETOS:  I don't believe so, Your Honor, except

6  that it sounds like there's a technical issue with the video

7  system, which I think we're going to have to resolve before we

8  get started.

9          THE COURT:  Okay.  That's fine.  I mean, I think

10  they're working on it.  So that's fine with me.

11      Ms. Brown, anything further from the defense?

12          MS. BROWN:  Just one question, Your Honor.  I

13  understand the second witness that Relators will call today is

14  a witness they've subpoenaed of ours.  So it will be, I guess,

15  an adverse witness.  They'll cross, and then I'll direct.

16      Will that be the end of the questioning?  So it's just

17  they get one cross and then we get one direct?

18          THE COURT:  I mean, the way I view it is that the

19  witness is still on direct exam.  They're just permitted to

20  use leading questions because it's a hostile witness.  So I'm

21  still going to give them a second bite at the apple for a

22  redirect.

23      Is that the question?

24          MS. BROWN:  That is the question because it seems

25  like then they're getting two crosses.

1    MR. MARKETOS:  We're just calling the witness

2    adversely in our case in chief, so we're going to direct him

3    using leading questions.  She'll get to cross him, and then

4    we'll get to redirect him.

5    THE COURT:  Yeah.  I mean, Ms. Brown, is there

6    something -- is there a rule that you're going to cite to that

7    that says that's prohibited?

8    MS. BROWN:  No.  I'm just wondering as sort of as a

9    matter of fairness because, if we had called him in our case,

10   I would get redirect, right?  They would just get one bite at

11   the apple on cross.  So I'm just wondering if it --

12   THE COURT:  I know, but you keep calling it cross.  I

13   don't see it as cross-examination.  Right?  It's a -- it's the

14   Relators' counsel calling an adverse witness on direct exam.

15   MS. BROWN:  Okay.

16   THE COURT:  So I don't view it as cross-examination.

17   Right?  Their cross-examination is when you call a witness,

18   and then they question that witness.  The only real -- it's

19   more of a stylistic difference, but they're permitted to lead

20   because it's an adverse or hostile witness, which I don't

21   think we need to establish.  So I think that's understood.

22   But that's how I view it.  I don't think it would be

23   any different than, say, you called a witness that was adverse

24   to Janssen.  Right?  You would be permitted to lead that

25   witness on direct exam, they would be able to cross-examine

1    and you would be redirect, even with leading questions.

2    That's how I view it.  I don't think it would be any different

3    for Janssen.

4         But unless you're going to cite to something that says

5    that that's prohibited, which I don't I believe it is -- in

6    fact, I've seen it that way on more than one occasion.  I've

7    been in trials where that's how it's been conducted in this

8    court.

9         But if you want to cite to something that says, Judge,

10   that's not how this should go, it's prohibited, then I'll hear

11   from you.  But if it's more -- if it's my discretion, then

12   that's how we're going to proceed, although I would not

13   preclude Janssen from doing the exact same thing.  You call a

14   hostile witness, as long as it's established as hostile or

15   it's clear that it is, you would be able to have two bites at

16   the apple there.

17        MS. BROWN:  Okay, I understand.

18        So will the Court permit, though, as to do a second,

19   like a redirect or second part of our examination, or that's

20   it?

21        THE COURT:  I'm sorry.  So this is for the witness,

22   the second witness coming today?

23        MS. BROWN:  Right, right.  So he's our witness, I

24   would put him on in my case, but they subpoenaed him.  That's

25   their right --

 1          THE COURT:  I think what I would do is -- no, I

 2    wouldn't have you call the witness back.  I would tell you

 3    what I told you all last week, which is if you're looking to

 4    question this witness outside the scope of the direct exam,

 5    I'm going to permit that.  And same thing for Relators'

 6    counsel, because I don't want witnesses being called back

 7    twice.  I think that's a waste of time for the parties and

 8    also for me.

 9          So basically, I would just expand the scope of your

10    questioning.  So if an objection came from Mr. Marketos or

11    whoever is handling the witness that said, Your Honor, we

12    didn't even touch that issue, Ms. Brown shouldn't be able to

13    go into it, I would say, no, no, no, no.  I already told you

14    all in advance that I was going to expand the scope, because

15    why would I bring this witness back a second time to be called

16    redirect?

17          MS. BROWN:  I understand, Your Honor.  Thank you.

18          THE COURT:  All right.

19       Anything else, folks?

20          MR. MARKETOS:  No, Your Honor.

21          THE COURT:  Ms. Brown, that was the only issue?

22          MS. BROWN:  Yes.  That's the only issue.  Thank you,

23    Your Honor.

24          THE COURT:  All right.  Let me at least just resolve

25    Ms. Strand's issue just so we can put that behind us and move

1    on.

2        So, look, I appreciate it.  I reviewed the

3    correspondence from both parties for May 10th.  And upon

4    reviewing the transcript and also the arguments about waiver,

5    I'm going to deny the request to strike any portion of

6    Ms. Strand's testimony.  And it's going to be really for two

7    reasons.

8        First, I will tell you, folks, I believe the objection

9    is untimely and it's been waived.  The appropriate time to

10   raise the objection was as soon as Janssen knew or reasonably

11   should have known the grounds for objection, unless the

12   postponement is desirable for a special reason, not unfair to

13   the opposition.

14       Here I believe Janssen reasonably was aware of the

15   issue at the time the question was asked.  So much so that,

16   even on sidebar, I was sitting here thinking, You might be

17   objecting to this, but you didn't.  And so I think, at least

18   by the time the question was asked about reimbursement from

19   Relators' counsel, it's not when the response started coming

20   out; I believe, at that time, it was appropriate for Janssen

21   to object.

22       Also, I will tell you, folks, you know, you've been

23   objecting to both questions, testimony and exhibits in real

24   time.  So I don't see anything specific about this particular

25   testimony from Ms. Strand would that -- would have required

1    you all to wait and review a transcript of it.  You guys have

2    been making objections in real time.

3         My other concern also is at what point do we stop this,

4    then?  Are you all going to be able to object to witness

5    testimony a week from now and say, hey, remember on day three,

6    when we're three weeks into the trial, we want to move to

7    strike.

8         So for a host of reasons that I've articulated on the

9    record that I believe Relators' counsel articulated with case

10   law from the Third Circuit, I believe the objection has been

11   waived.  It's untimely.  And so I deny the request for that

12   reason.

13        Secondly, I will also say that, even if the objection

14   was not untimely, I believe Janssen opened the door to

15   Ms. Strand's testimony when on cross-examination Janssen asked

16   Ms. Strand about her knowledge of the CMS process and how

17   claims are submitted to CMS.

18        Janssen went even further, even though I believe an

19   objection was sustained, but went even further to ask

20   Ms. Strand why Relators' counsel failed to ask her about the

21   reimbursement process.  So at that point, Mr. Wirmani says,

22   Okay, I'm going to ask her on redirect.  I'll ask her about

23   the reimbursement process.

24        So in that way, I also believe that it's an appropriate

25   line of questioning on redirect in light of the foundation

1    that was established by Janssen on cross-examination.

2        So I appreciate the submissions.  It gave me time to

3    review the particular points of the transcript.  If there's

4    anything more that either party wants to place on the record

5    outside of the written submissions, I'll let you do that now,

6    but that is my ruling, and we're going to move forward.

7        But I will tell you all that in light of that ruling,

8    keep in mind, as we move forward in this trial, you don't

9    object within a very short amount of time, whether the

10   question or part of the response comes out, I'm not going to

11   be revisiting testimony.  I think that's only fair, not just

12   to Relators' counsel but also to Janssen.  So I kind of put

13   that warning to Relators' counsel as well that, at the end of

14   the day, especially when a witness has been excused -- and the

15   one other thing I'll place on the record is not only that

16   there was no special circumstance here to allow for this

17   belated objection, but it would have prejudiced Relators'

18   counsel.  They were done with the witness.  The witness was

19   off.  They couldn't have any opportunity to rephrase the

20   question or lay an additional foundation if I didn't find that

21   the foundation wasn't already established by

22   cross-examination.

23       So for those reasons, I'll deny the request.

24       But anything from Relators' counsel on that particular

25   issue?  But I did want to resolve it this morning so you all

1    knew that it wasn't sitting.

2         MR. MARKETOS:  No, Your Honor.  Thank you.

3         THE COURT:  Ms. Brown, Mr. Wyatt, anything further on

4    that issue?

5         MS. BROWN:  No.  Thank you, Your Honor.

6         THE COURT:  All right.  So are we in recess for the

7    next short while?  And, plus, I think you need time anyway for

8    this technology issue -- right? -- to work out.  I believe the

9    folks from the courthouse are assisting with that.

10        Is it not working?  Is it not playing anything?

11        MR. MARKETOS:  Sounds like it's resolved, Your Honor.

12   So we're just ready to go.

13        THE COURT:  All right.  If not, you guys troubleshoot

14   it.  But it sounds like it worked out.

15        All right, look.  We're in recess.  Let's see if the

16   jurors can get here by 9:30.

17        I also -- I didn't mention this, but I hope everyone

18   was able to celebrate Mother's Day or celebrate a mother or

19   whatever you were able to do this weekend.  So welcome back.

20   It's Monday.  And we'll go from there.

21        So remain seated.  I'm going to step off the bench.

22   You're going to have to pop up anyway when the jurors come in,

23   and we'll go from there.  So be well.

24        MS. BROWN:  Thank you, Your Honor.

25             (A short recess occurred.)

```
 1              THE DEPUTY COURT CLERK:  Please remain seated.

 2              THE COURT:  All right, folks.  We ready for the

 3   jurors?  Let's go.

 4              THE DEPUTY COURT CLERK:  All rise.

 5              (Jury enters the courtroom.)

 6              THE COURT:  All right, folks.  Everybody have a seat.

 7         Members of the jury, welcome back.  Hopefully everybody

 8   had a good weekend if anyone is celebrating Mother's Day or

 9   celebrating with a mother, so we'll have to get back into

10   gear.

11         And at this point, I don't know who's got the next

12   witness from Relators' counsel table.

13              MR RUSS:  I do, Your Honor.

14              THE COURT:  All right.  Are you ready to call the

15   next witness?

16              MR. RUSS:  We are, Your Honor.

17              THE COURT:  Let's do that.

18              MR. RUSS:  Your Honor, Relators call Mark Wilhelm.

19              THE COURT:  Mr. Wilhelm, come around to the witness

20   box.  I'm going to have you sworn in before you begin your

21   testimony.  All right.

22   (**MARK WILHELM,** HAVING BEEN DULY SWORN/AFFIRMED, TESTIFIED AS

23   FOLLOWS:)

24              THE DEPUTY COURT CLERK:  Please state your name and

25   the spelling of your last name for the record.
```

──WILHELM - DIRECT - RUSS──

1          THE WITNESS:  Mark Wilhelm, W-I-L-H-E-L-M.

2          MR. RUSS:  May I proceed?

3          THE COURT:  Yes, you may.

4     (DIRECT EXAMINATION BY MR. RUSS:)

5     Q.   Good morning, Mr. Wilhelm.

6     A.   Good morning.

7     Q.   My name is Josh Russ.  I represent the Relators,

8     Ms. Brancaccio and Ms. Penelow.

9          You understand that?

10    A.   I do, yes.

11    Q.   Introduce yourself to the jury.  Where do you live?

12    A.   My name is Mark Wilhelm.  I live in Evergreen, Colorado,

13    a little mountain town west of Denver.

14    Q.   Now, you and I met maybe a month or so ago via Zoom.

15         Correct?

16    A.   Correct.

17    Q.   And we met in person last week when you were here to

18    testify, but we weren't able to get you on the stand.

19    A.   That's correct.

20    Q.   So you came back to testify today.

21    A.   That's correct.

22    Q.   And are you doing so voluntarily?

23    A.   I am.

24    Q.   Mr. Wilhelm, tell the jury where you grew up and where

25    you went to college.

WILHELM - DIRECT - RUSS

1  A.  I grew up in Colorado Springs, Colorado.  I went to

2  Arizona State where I got my undergraduate degree, and then

3  went to Denver University and got my master's degree.

4  Q.  What did you get a master's degree in?

5  A.  Master's of science and biology.

6  Q.  After you graduated from Denver University, Mr. Wilhelm,

7  did you go to work for the pharmaceutical industry?

8  A.  I did.

9  Q.  Explain to the jury your first stopover in the

10  pharmaceutical industry.

11  A.  So I started with Hoffmann-La Roche, more commonly known

12  as Roche Pharmaceuticals.  I started in 1987 as a territory

13  sales representative in Colorado Springs.

14  Q.  What were you selling at Hoffmann-La Roche?

15  A.  The main products were Rocephin, which is an antibiotic;

16  Versed, which is a drug that is used for sedation; Zantac,

17  which is a drug we comarketed with Glaxo.

18      Those were the three main ones.

19  Q.  Where were you in the United States at that time?

20  A.  I was based out of Colorado Springs.

21  Q.  Okay.

22      After Hoffmann -- or how long did you stay there?

23  A.  As a territory sales representative or with Roche?

24  Q.  With Roche.

25  A.  About 11 years through a variety of other positions.

*United States District Court*
*District of New Jersey*

WILHELM - DIRECT - RUSS

1  Q.  What other positions did you hold at Roche?

2  A.  So I went from a territory specialist to a, what they

3  call a medical center representative, where you're responsible

4  for calling on the teaching institutions, so I moved to

5  Denver.

6      Then I was promoted and came into Nutley, New Jersey,

7  and worked as a sales trainer, and then out to Portland,

8  Oregon, as a district sales manager.

9  Q.  At some point did you leave Roche, Mr. Wilhelm?

10 A.  I did.

11 Q.  Where did you go?

12 A.  I went to Johnson & Johnson, their subsidiary called

13 Ortho-McNeil.

14 Q.  Ortho-McNeil?

15 A.  Correct.

16 Q.  Where were you located at that point?

17 A.  I was still in Portland.

18 Q.  What was your job title?

19 A.  District sales manager as well.

20 Q.  Explain to the jury what you were doing for Ortho-McNeil.

21 A.  So when I was at Roche as a district sales manager

22 selling Rocephin, which was a fairly widely used antibiotic,

23 we were very successful.  I was recruited by Ortho-McNeil to

24 come over to work for -- for them as a district sales manager,

25 because they also had an antibiotic called Levaquin, and so I

WILHELM - DIRECT - RUSS

1    think they felt like I had a lot of knowledge and a lot of

2    leadership skills to be able to help them sell their

3    antibiotic in the marketplace.

4    Q.   Mr. Wilhelm, at that stopover, did you meet a gentleman

5    named Glenn Mattes?

6    A.   I did.

7    Q.   Explain to the jury who Mr. Mattes was.

8    A.   At that time, Glenn Mattes was the president/CEO of

9    Ortho-McNeil.  That was his title.

10   Q.   What was his management style like?

11   A.   Very militant.  Fear and intimidation was the way that he

12   would manage people, manage the organization.  His nickname,

13   which was commonly known throughout the organization, was

14   Glenn "Mad At Us" because typically, when he would address the

15   sales organization in any manner, it was typically to berate

16   them.

17        In leadership, in my opinion, you praise in public and

18   you coach or criticize in private.  He had the exact opposite

19   style.  He was very quick to embarrass or criticize people in

20   a public setting, which made it very uncomfortable.

21   Q.   Notwithstanding, Mr. Wilhelm, did you enjoy your time at

22   Ortho-McNeil?

23   A.   I did.

24   Q.   Did you have any pressure at Ortho-McNeil to sell any

25   drugs off-label?

WILHELM - DIRECT - RUSS

1   A.   No.

2   Q.   Where did you go after Ortho-McNeil?

3   A.   I was promoted to a position with Janssen as an account

4   manager down in the Dallas, Texas, area.  I lived in Frisco,

5   Texas.

6   Q.   Now, in this trial, there are a lot of names of Janssen

7   and Tibotec.  When you say "Janssen" there, is it the same as

8   Tibotec?

9   A.   No.  Thanks for catching that.

10       So this was Janssen Primary Care division, so

11  different.  In fact, Tibotec was only Tibotec when I left.

12  It, I guess, kind of transitioned to Janssen sometime after I

13  left.  And I think it occurred in 2011, when they transitioned

14  the name.

15  Q.   So this was Janssen Primary Care?

16  A.   Correct.

17  Q.   What were you doing for Janssen Primary Care?

18  A.   As an account manager, we would call on key distribution

19  centers where they were -- whether they were hospitals or

20  pharmacies.  Not your local CVS pharmacies but large

21  distribution centers, such as PharMerica or Omnicare, and talk

22  to them about purchasing opportunities, discounts that they

23  could realize, you know, based on volume of purchases.

24  Q.   Did you enjoy your time at Janssen Primary Care?

25  A.   I did.

WILHELM - DIRECT - RUSS

1  Q.  Any activity that you suspected might have been illegal

2  while you were there?

3  A.  No.

4  Q.  Where did you move from Janssen Primary Care?

5  A.  So I stayed in Frisco, Texas, but I received another

6  promotion to what they called Johnson & Johnson Health Care

7  Systems, which was basically the same type of account

8  management position; however, instead of just being focused on

9  Janssen products, I was focused on five or six different J&J

10  operating companies' products, which included Ortho-McNeil,

11  Janssen, some others.

12  Q.  So from your start at Ortho-McNeil through your time at

13  J&J Health Systems, how many years are we talking?

14  A.  Probably about seven.

15  Q.  Did you enjoy your job at J&J Health Systems?

16  A.  Yeah, I loved that job.

17  Q.  Any concerns about off-label marketing or illegal

18  activity at that position?

19  A.  No, none whatsoever.

20  Q.  So you had three different jobs within J&J or different

21  Janssen organizations prior to arriving at Tibotec.

22      Is that fair?

23  A.  That's correct.

24  Q.  When you left J&J Health Systems, explain to the jury why

25  you left and where you went.

WILHELM - DIRECT - RUSS

1   A.   So at that time, there was about 22 of us across the

2   country.  We were promoting some products that were about to

3   go off-label -- or excuse me -- not off-label but off-patent.

4   So once a drug goes generic, they typically don't have a lot

5   of field sales activity promoting that drug any further

6   because, oftentimes, that drug just gets switched to the

7   generic product.

8        So they downsized that organization significantly.  So

9   they took an organization of about 22 of us account managers

10  and retained two of them; the other 20 were let go.  They did

11  give those individuals an opportunity to interview with other

12  J&J operating companies, and there were over 200 of them, I

13  think, at that point.

14       There was an opening with Tibotec/Janssen in the Dallas

15  market.  When I was with Roche, early on, there were two HIV

16  products that they had.  One was called Hivid and the other

17  one was Embrace.

18       So because I had some -- at that point it was probably

19  at least 10 to 12 years prior in my career -- but I had some

20  HIV sales experience, I was allowed to interview for that

21  district sales manager job with Tibotec, and then that's how

22  it all started.

23  Q.   When did you begin as a district sales manager at

24  Tibotec?

25  A.   Oh, boy.  Let's say early 2006.

WILHELM - DIRECT - RUSS

1    Q.    Was that also in Frisco or the Dallas area of Texas?

2    A.    Yes.

3    Q.    So now you're at your fourth stopover within the J&J

4    family; is that fair?

5    A.    That's correct, yes.

6    Q.    Something different at this stopover?

7    A.    Quite a bit different, yes.

8    Q.    What do you mean by that?

9    A.    Well, as I mentioned, Glenn had a reputation when he was

10   president at Ortho-McNeil.  He was reassigned, I guess I'll

11   call it, from a very large J&J operating company to Tibotec,

12   which was a start-up and going to be a much smaller

13   organization.

14        That reputation that he had certainly followed him, and

15   that fear and intimidation factor was always at play.  And

16   when we launched the drug -- and I guess I don't want to get

17   ahead of myself because I don't know where you're going with

18   your questioning -- but it's important to understand that that

19   first month that we launched the product, we were at about

20   25 percent of our expected prescription volume.

21   Q.    Is that Prezista that you're talking about?

22   A.    That's Prezista.

23   Q.    Describe a little bit more detail what do you mean by

24   25 percent of your estimate?

25   A.    So as I recall, we had a goal the first month of about

WILHELM - DIRECT - RUSS

1    3,700 prescriptions, and we came in at -- I think it was 869

2    or 879.  So not even quite 25 percent of what our anticipated

3    initial launch uptake was to be.

4          So, you know, it was almost immediate that, you know,

5    Glenn -- I think "panic" might be the best word -- and became

6    even more of a tyrant with regards to his expectations and his

7    frustrations and, in his opinion, the sales force inability to

8    effectively launch this drug, which, you know, is quite

9    insulting because, not only were these -- let me back up for

10   just one second.

11         So in the primary care pharmaceutical world, oftentimes

12   these are younger, a little a less-experienced, less-tenured

13   salespeople.  For specialty products, which HIV, cancer and

14   some other areas are considered specialty areas, these sales

15   representatives and district managers are -- are very

16   experienced, highly trained, high performing.  And, you know,

17   when he began to accuse people of not effectively being able

18   to do their job, I think, you know, it put everybody -- it was

19   just a lot of tension, a lot of uncomfortableness, discord,

20   you know, throughout the organization.

21   Q.   So at this time, this was 2006?

22   A.   Correct.

23   Q.   And you were a district sales manager?

24   A.   Correct.

25   Q.   Did you have salespeople under you that you were their

WILHELM - DIRECT - RUSS

1  boss?

2  A.    I did.

3  Q.    How many?

4  A.    Roughly ten.

5  Q.    Mainly in Texas?

6  A.    Mainly, but we also had some sales representatives in

7  other states as well.

8  Q.    What states, do you recall?

9  A.    I had one -- a sales rep based out of St. Louis, one in

10  Kansas City, one in Denver, and I think the rest from Texas.

11  Q.    Was there a problem or an issue that was preventing these

12  salespeople, your people, from meeting their sales goals for

13  Prezista?

14  A.    Absolutely.  One of the main factors was the initial

15  indication.  I think they had had hopes that there was going

16  to be a less restrictive FDA indication approval for

17  Prezista's use.

18      What the FDA indication clearly stated was it was for

19  highly treatment-experienced patients.

20  Q.    Is that a limited indication?

21  A.    Very limited.

22  Q.    Okay.

23      I cut you off.  Continue.

24  A.    Well, I was just going to say that the other term that

25  was common, at least amongst the treating physicians, was

WILHELM - DIRECT - RUSS

1   salvage.  So these were salvage patients that Prezista was to

2   be used in.

3   Q.   What is a salvage patient?

4   A.   A patient that has failed multiple HIV/AIDS medications

5   and typically was not doing.  The virus was not undetectable.

6   There was -- there was a higher viral load that could be

7   detected, and oftentimes that leads to a lot of other

8   debilitating illnesses.

9   Q.   And why would the indication that it's for salvage or

10  highly treatment-experienced be an impediment to selling the

11  drug?

12  A.   Well, there's a very limited number of those patients,

13  so, you know, as HIV medications progressed and improved over

14  the years, a large, large percentage of those patients were

15  what they call undetectable.  So they -- the virus was

16  suppressed and doing what they were doing relatively well.

17       So the market was very small.  I want to -- and I think

18  I've -- I remember this number accurately, but I want to say

19  there was only about 9,000 patients that they put into the

20  highly -- or salvaged bucket of available patients.

21  Q.   In Texas?

22  A.   No.  In -- in the country.

23  Q.   Were there any other roadblocks to selling the drug at

24  that time?

25  A.   Well, there were a lot of products that were deemed the

1    gold standard.  You know, there were products out on the

2    market that were already very well tolerated, highly used and

3    did quite well, and that's why there were very few patients

4    that were actually -- again, 90 percent-ish were undetectable.

5        So there was -- there was -- there was a very limited

6    market of available patients to be put on a drug that had such

7    a limited FDA approval.

8    Q.   When you say other drugs, do you remember the names of

9    some of those that were the gold standard?

10   A.   The two main ones, at least in the protease inhibitor

11   marketplace, were Kaletra and Reyataz, and Reyataz I would say

12   at that time was the gold standard.

13   Q.   And when you say undetectable, you're not say- -- you

14   don't mean that you can't find the patient.  You mean that the

15   virus isn't detectable in the patient?

16   A.   Right, the virus has been -- you know, you can't cure

17   HIV, but you can reduce the viral count so low that they call

18   it undetectable.

19   Q.   Is that the goal?

20   A.   Yes.

21   Q.   So Prezista was launched in what, June of 2006?

22   A.   Correct.

23   Q.   Were you called to a meeting that was run by a Mr. Mattes

24   in July of 2006?

25   A.   I was.

WILHELM - DIRECT - RUSS

1    Q.   And was this an in-person meeting, or was it on a

2    telephone call?

3    A.   That particular one was a conference call.

4            MR. RUSS:  If we could -- and this has been

5    preadmitted -- publish Relators' 222.

6            If we could, please, Ms. Johnson, blow up the top

7    half of that document.

8    BY MR. RUSS:

9    Q.   Mr. Wilhelm, do you see -- I'm going to run through some

10   of these participants with you.  Do you see the date at the

11   top, July 26, 2006?

12   A.   Yes.

13   Q.   Was this an 8:00 a.m. call?

14   A.   Yes.

15   Q.   And this was -- is this the management team?

16   A.   Yes, and others, a few others.

17   Q.   So the participants were Sara Strand?

18   A.   Correct.

19   Q.   Was she pretty high up in the company?

20   A.   She was a regional sales director.

21   Q.   What does that mean for the jury?

22   A.   So there were ten district sales managers across the

23   country, and those district sales managers reported up to two

24   regional sales directors, one for the east and one for the

25   west.

WILHELM - DIRECT - RUSS

1    Sara Strand was the regional sales director over five

2    district managers in the east.

3    Q.    Cheryl Gay?

4    A.    She was the regional sales director for the west.

5    Q.    So the same as Ms. Strand but for the western part of the

6    country?

7    A.    Correct.

8    Q.    Were there like two of those at the time?

9    A.    Yes.

10    Q.    Ken McCormick?

11    A.    He was the director of -- oh, boy, let's see.  This is

12    really taxing my memory -- corporate accounts.

13    Q.    Tony Dolisi?

14    A.    He was a district sales manager at one point, but at that

15    point, he was involved with a different department.

16    Q.    Any other names on here that you recognize?

17    A.    Harry Tabler also worked for Ken McCormick's department.

18    The list of the other names below that are district sales

19    managers.  Glenn Mattes is the president.  Ron Falcon was in

20    the medical information department.  He's a physician.  Mike

21    Iacobellis was the training manager at the time.  And

22    Se Se Yennes, he is -- was on one of the product teams.

23    Q.    You said Mr. Iacobellis was the sales manager or trainer

24    at the time.  Did he get promoted?

25    A.    Director.  Yeah he got promoted eventually to national

WILHELM - DIRECT - RUSS

1   sales director.

2   Q.   Is that fairly high up within the company?

3   A.   It is.

4   Q.   Of course -- I don't know if you said this.  Ron Falcon,

5   how high up is he?

6   A.   He, I believe -- very high up.  I think he was the

7   director of the medical information physician team.

8   Q.   What was this phone call like?

9   A.   I'm trying to think of the right word.  Caustic, somewhat

10  hostile, somewhat punishing in nature.  A lot of frustration

11  was expressed about the poor performance, and it turned into a

12  bit of a brainstorming around what was going on in the

13  marketplace, what hurdles were being put in front of the sales

14  organization.

15  Q.   Was one of those hurdles serious side effects or

16  something called adverse drug reactions related to

17  cholesterol?

18  A.   Yes.

19  Q.   Explain to the jury what that problem was.

20  A.   So many of the HIV medications are -- can cause adverse

21  events.  With the protease inhibitor class in particular, it

22  was boosted with a product called ritonavir.

23       So by boosted, I mean they -- the protease inhibitor

24  and ritonavir are broken down or processed through the liver

25  at the same binding receptor, and so by using them in

WILHELM - DIRECT - RUSS

1  combination, it would elevate the levels of the drug that

2  you're wanting to increase to eliminate -- or I guess you

3  can't say eliminate, but to decrease the amount of HIV virus

4  in the body.

5  Q.  You mentioned gold standard drugs earlier, and one of

6  those was Reyataz.  Was Reyataz known to be positive or

7  neutral for lipids?

8  A.  Yeah.  It was -- the terminology that was used was it was

9  lipid neutral or lipid friendly.

10 Q.  As part of your brainstorm -- I guess let me back up.

11      Explain to the jury some of the ideas that your team

12 and the team over at Tibotec came up with in order to boost

13 the sales of Prezista.

14 A.  Yeah.  So on almost a weekly base, we would have calls

15 every Friday morning with I'll call them senior leadership,

16 which include Glenn Mattes, Mark Gossett, and Mike Iacobellis

17 and others, sometimes members of the physician medical

18 information team.

19      But those calls were often to discuss or to brainstorm

20 solutions, you know, What is it that we can do differently,

21 what is it that we can do better, what are we hearing in the

22 field from physicians that are obstacles to Prezista being

23 used more frequently?

24      So, you know, those discussions oftentimes would

25 develop into strategies around What -- what does the sales

WILHELM - DIRECT - RUSS

1  organization need to say if they say they prefer to use

2  Kaletra or they prefer to use Reyataz or if they use Reyataz

3  because it has little to no effect on lipids?

4      And so a lot of the messaging and strategies were

5  developed in these frequent, sometimes in-person meetings but

6  also Friday conference calls.

7      Did that -- is that --

8  Q.  That's helpful.

9      During those conference calls, was one of the

10  strategies to push Prezista up in the treatment regimen?

11  A.  Yes, absolutely.  So oftentimes they would show a slide

12  that kind of broke down the HIV marketplace into buckets, and

13  it would show the highly treatment-experienced bucket and then

14  an arrow going kind of across this timeline, for lack of a

15  better word that -- and a lot of conversations about how we

16  were going to move Prezista from the highly

17  treatment-experienced market or -- or patient type into early

18  treatment-experienced patients or naive patients.

19  Q.  Was that on-label?

20  A.  No.  That was not on-label.

21  Q.  Mr. Wilhelm, if you look under the goals for launch

22  results, do you see the second bullet point there?  It starts

23  "month one objective."

24  A.  Yes.

25  Q.  So one month into the launch of Prezista, the goal was

WILHELM - DIRECT - RUSS

1   3,700 prescriptions?

2   A.   Yes.

3   Q.   Were these prescriptions normally on a monthly basis?

4   A.   Yes.

5   Q.   So if you just unleashed the drug, the goal for the

6   company was to get around 3,000, almost 4,000 new patients on

7   the drug?

8   A.   Correct.

9   Q.   But you just told the jury that there were only 9,000

10  highly treatment-experienced patients in the whole country?

11  A.   That's correct.

12  Q.   Were the projections that the company put upon you as

13  salespeople -- did they include patient classes outside of

14  highly treatment-experienced?

15  A.   They had to be.

16  Q.   Why do you say that?

17  A.   Because that's the only way you were going to meet the

18  goal, and there was pushback even when this first came out

19  because the sales organization, again, these are highly

20  trained, smart individuals.

21       So managers and, I think, sales representatives alike

22  were like, This is not a reasonable goal, not only because

23  you're launching the product in a marketplace where there are

24  a tremendous number of patients that are already doing well on

25  a drug and are undetectable, but now you're forcing a sales

WILHELM - DIRECT - RUSS

1  organization -- if they're going to achieve their goal and be

2  successful, which all of us wanted to do, you've got to

3  promote this product in areas other than its very limited

4  indication.

5  Q.   In addition to that strategy -- let me back up.  Was

6  there some concerns regarding Prezista as far as

7  hyperlipidemia and hypercholesterolemia?

8  A.   Yes.  They were mentioned as adverse reactions in our

9  package insert.

10 Q.   Was there a strategy that was put in place from this fall

11 thereafter to compete with Reyataz because Reyataz was lipid

12 friendly and lipid neutral?

13 A.   Yes.  Part of the marketing message was, you know, its

14 superior safety and tolerability profile and that, you know,

15 it was -- Prezista was at least equivalent and was lipid

16 neutral and lipid friendly as well.

17 Q.   Are you saying it was, or was that the strategy?

18 A.   That was the strategy.

19 Q.   Was it true?

20 A.   Is that -- no.  I mean, I don't know how you can know

21 that.  You know, again our initial FDA approval was with

22 24-week data, so, you know, in six months of a drug being

23 studied, there's no way to know the long-term effects of a

24 drug on cholesterol and lipids and LDL.

25       So, you know, those -- those factors take time to

WILHELM - DIRECT - RUSS

1  develop and to fester, for lack of a better word, to

2  potentially leading to heart attack, stroke, or death.

3  Q.   But what -- you knew at the time what was on the label,

4  what the FDA had said the drug was approved for and what the

5  adverse drug reactions were.

6       Right?

7  A.   Correct.

8  Q.   And those included hyperlipidemia and

9  hypercholesterolemia?

10 A.   Absolutely they did.

11 Q.   Did the company ignore that in its messaging of Prezista

12 to compete with Reyataz?

13 A.   They did.

14 Q.   Did the company lie about the adverse drug reactions, the

15 side effects related to hypercholesterolemia, lipids, LDL,

16 cholesterol, triglycerides?

17 A.   I believe that they --

18       MS. BROWN:  Objection, Your Honor.  Argumentative.

19       THE COURT:  Sustained.

20 BY MR. RUSS:

21 Q.   Did the company lie about Prezista?

22       MS. BROWN:  Same objection, Your Honor.

23       THE COURT:  Sustained.

24 BY MR. RUSS:

25 Q.   Did the company misrepresent the information on

WILHELM - DIRECT - RUSS

1    Prezista's label to doctors?

2    A.    Yes.

3    Q.    Now, Mr. Wilhelm, how long were you in that position in

4    Texas as a district sales manager?

5    A.    For about a year.

6    Q.    Were you promoted?

7    A.    Yes.

8    Q.    Tell the jury where -- what position you took next within

9    Tibotec.

10    A.    So I was promoted from a district sales manager to what

11    they call a key account director, so again there -- so we had

12    the two regional sales directors that, in essence, were over

13    the sales representatives.

14        And then we had created two key account directors that

15    had key account managers under -- under the key account

16    directors that were focused on a little different area.

17    They -- they had selling responsibility as well and overlap

18    with the sales representatives but focused mainly on key

19    opinion leaders and speakers.

20    Q.    When you were promoted to key account director for the

21    west, was that in July of 2007?

22    A.    Yes.

23    Q.    Did you hold that job for two years?

24    A.    I did.

25    Q.    Was that job pretty high up in the company?

WILHELM - DIRECT - RUSS

1    A.    It was.

2    Q.    How many states did you oversee?

3    A.    About 30.

4    Q.    Can you just name some to give the jury a sense for what

5    you were overseeing?

6    A.    Well, everything in the west, but I had all four time

7    zones, so I basically had North Carolina kind of in a swoop

8    around to Illinois, and everything in the southeast, midwest,

9    then out to the west coast.

10   Q.    So as a key account director for the west, you were no

11   longer directly supervising sales folks.

12         Right?

13   A.    Not virology sales specialists but key account managers,

14   yes.

15   Q.    Explain to the jury what a key account manager is.

16   A.    So a key account manager differed a little bit from the

17   virology sales specialist.  So, again, if there were ten

18   virology sales specialists in a district, you would have at

19   least one, sometimes two key account managers that covered

20   that exact same geography.

21         So, you know, again, depending on what district it was,

22   you would have one key account manager that had the same

23   geographic responsibility as ten salespeople.

24         And their main responsibility was to add additional

25   call volume, sales touches to those key opinion leaders, high

WILHELM - DIRECT - RUSS

1    prescribers, and our speakers.

2    Q.   So let me make sure that I understand.

3         Your key account director here, underneath, how many

4    KAMs did you have, or key account managers?

5    A.   Oh, gosh.  Probably eight to ten.

6    Q.   And underneath those key account managers was another

7    level of the sales force?

8    A.   Yeah.  I mean, I don't know that I'd necessarily say

9    under the key account manager, but, you know, kind of two

10   separate parts of the organization:  The sales organization,

11   which was regional sales directors, district managers,

12   virology sales specialists, and then kind of on the other side

13   were the key account directors and then the KAMs underneath.

14   Q.   Roughly how many sales reps were you responsible for in

15   that position?

16   A.   As a key account director?

17   Q.   Yes, sir.

18   A.   Eight to ten.

19   Q.   Eight to ten per district or total across the country?

20   A.   Across the western half.

21   Q.   That --

22   A.   Across those 30 states.

23   Q.   I'm asking about the sales reps.

24   A.   Oh, okay.

25   Q.   How many sales reps were underneath your leadership?

WILHELM - DIRECT - RUSS

1   A.   As the key account director, really -- really none

2   technically.  I mean, I would interact with, but they didn't

3   directly report to me.  There was a -- I'd say there was a

4   dotted line from the sales representatives to me.

5        They reported to their district sales manager, which --

6   Q.   Understood.

7   A.   -- I used to be.

8   Q.   I'm trying to figure out how many sales reps were in the

9   west, if you can recall.

10  A.   Oh, 60 to 70 in total.

11  Q.   Okay.

12       And at this time, was there somebody else overseeing

13  the eastern part of the country?

14  A.   Correct, yes.

15  Q.   Who was that?

16  A.   Tony Dolisi.

17  Q.   What were your job duties -- what was a week like as key

18  account director for you?

19  A.   So in a normal week, I would spend four days in the

20  field, usually two days with one key account manager, and then

21  two days with another key account manager.

22       And then Friday was always the office day where a good

23  portion of the morning was spent on conference calls initially

24  with senior leadership, you know, Glenn Mattes, Mark Gossett,

25  Mike Iacobellis, and oftentimes others, either people from the

WILHELM - DIRECT - RUSS

1    product team or the medical information team.

2          And, again, a lot of strategies and tactics were

3    discussed during that call, which typically was an hour.

4          And then each district sales manager or key account

5    director would then have their call with the people that

6    reported to them, typically for an hour right after that call

7    concluded, to kind of translate the marching orders from what

8    was discussed with the leadership team down to the sales

9    organization.

10   Q.   And you mentioned Mr. Iacobellis.  Was he on most of

11   those calls?

12   A.   Yes, he was.

13   Q.   Were you also riding along with the sales reps and

14   visiting with doctors in that position?

15   A.   Yes.

16   Q.   Explain to the jury what you were doing.

17   A.   Well, again, the key account manager would overlap with

18   the virology sales specialist and call again on the highest

19   prescribers, key opinion leaders, people that would -- had the

20   greatest likelihood to either write the most prescriptions or

21   influence other physicians with regards to their prescribing

22   habits.

23          So we would call on those key opinion leaders.  Many of

24   those were also the speakers, so the key account manager had

25   the responsibility to contact that speaker two weeks before

WILHELM - DIRECT - RUSS

1  they had a speaking engagement, and then after that speaking

2  engagement occurred, follow up with them two weeks later --

3  within two weeks to provide feedback and coaching.

4       And if they misspoke or maybe misunderstood a key

5  point, you know, they were to help coach or guide the

6  physician in making it more impactful.

7  Q.   Now, you mentioned speakers.  I want to transition and

8  talk about speakers.  Was there a speaker bureau at Janssen,

9  Tibotec?

10 A.   There was a huge speaker bureau.

11 Q.   Did you see things regarding that speaker program that

12 concerned you?

13 A.   Yes, I did.

14 Q.   Explain to the jury what your concerns were, please, sir.

15 A.   Well, I think the biggest concern that I had was -- well,

16 quite honestly there were a few.

17      An incredibly large number of speakers that were

18 selected -- the speakers that weren't writing enough of the

19 drug were eliminated from our speakers' bureau, so we're --

20 we're paying people, but they weren't doing what -- what Glenn

21 and Mark and Mike wanted, so then they would be cut from the

22 speakers' bureau.

23 Q.   What did that leadership team -- what did they do?

24 A.   Well, they wanted them to use more drug personally.

25 Q.   Okay.

WILHELM - DIRECT - RUSS

1    A.    Yeah.    I think, you know, the messaging to the physicians

2    was, You need to be writing more of this drug so that you have

3    personal experience with it, so that when you get a question

4    from an audience member, you can not only talk to the data,

5    the published study literature, the package insert but also to

6    your personal experience.

7          So that was, I guess, one of the key things that stood

8    out.  But then we also would select speakers based on how

9    readily or how comfortable they would talk off-label.

10         So they have a slide deck that is approved from the

11   FDA, but there was all kinds of conversation on our Friday

12   calls about Okay, which speaker spoke this week?  How did it

13   go?  How was that message received from the attending -- the

14   physicians in the audience?  Did they voluntarily launch into

15   an off-label drug about Prezista's use in early

16   treatment-experienced or naive patients?

17         Those physicians were the ones that were more highly

18   desirable and the ones that we as a company would -- you know,

19   I don't know if I need to repeat the names, you know -- would

20   encourage the sales organization to use the physicians that

21   would more frequently and more readily speak to off-label

22   indications.

23   Q.    That was discussed on Friday phone calls?

24   A.    Yes.

25   Q.    Did you know Tibotec or Janssen had a policy that

1   prohibited doctors from speaking off-label unless it was

2   solicited by an unsolicited question from the audience?

3   A.   Yes.

4   Q.   Why didn't you report that this was happening within the

5   company?

6   A.   What good would it do to report it to somebody that's

7   giving you the direction and the education and the resources

8   and the expectation that you better -- you better sell this

9   drug?  You better make your goal or you're not going to be

10  here.

11       That was widely understood and communicated, and word

12  travels fast through the sales organization.  People that were

13  in the bottom 20 percent of performance were going to be put

14  on a performance improvement plan or fired from the company.

15       So, of course, they have that shield that they like to

16  stand behind that says for, you know, your information only,

17  or not to be used in promotional situations.

18       But the reality is they spent an inordinate amount of

19  time talking to the entire sales organization about what the

20  problem is, what the solution is, how to overcome those

21  concerns and objections by a physician, so that we could get

22  this drug's sales growth back on track.

23  Q.   Was the president of the company, Mr. Mattes, present on

24  those calls when you discussed speakers going off-label?

25  A.   Not all of them, but he was on some of them, yes.

WILHELM - DIRECT - RUSS

1  Q.   Do you know if he reported himself?

2  A.   I would doubt it.

3  Q.   What about Mr. Iacobellis?  Was he on many of those

4  calls?

5  A.   He was.

6  Q.   Do you know if he ever reported within the company that

7  this was happening?

8  A.   No, I don't think he did.

9  Q.   Why don't you think he did?

10  A.   Because nothing -- no one ever paid attention to it.

11  There was never any internal conversation about -- or

12  reprimand that I'm aware of, of off-label promotion.

13  Q.   Okay.

14       And you had seen speaker programs at some of your

15  positions; is that fair?

16  A.   Yes, absolutely.

17  Q.   Was there something different about Tibotec's speaker

18  program than what you had seen in the industry before?

19  A.   Absolutely.  In my previous pharmaceutical experience, a

20  lot of the speaker programs that were conducted I would say

21  were more educational in nature.  And what I mean by that is

22  they were more about the disease state and informative in

23  nature.

24       The speaker programs with Tibotec/Janssen were very

25  promotional.  It was just all about Prezista and how it was

WILHELM - DIRECT - RUSS

1   either superior or as good as Kaletra and Reyataz and also

2   quickly transitioned to off-label marketing, you know.

3          So they would not spend much time talking about the

4   highly treatment-experienced or the salvage indication.  They

5   would spend a lot of time talking about other areas of

6   utilization of the product.

7          With previous companies, I don't recall ever hearing an

8   off-label presentation from a speaker at the podium.

9   Q.   Did you hear off-label presentations when you were at

10  Tibotec?

11  A.   I did.

12  Q.   Did you attend those?

13  A.   I did.

14  Q.   How frequently would a physician who was speaking go

15  off-label?

16  A.   The majority of the time.

17  Q.   We've heard -- this jury has heard a little about

18  something called the use of plants.  Are you familiar with

19  that tactic?

20  A.   Very familiar with it.

21  Q.   Explain to the jury what Tibotec was doing with the

22  plants.

23  A.   So one of the responsibilities of the virology sales

24  specialist, as well as the key account manager, was to drive

25  attendance to these speakers' programs because they wanted to

WILHELM - DIRECT - RUSS

1    make sure that we could get as many doctors there to listen to

2    the subject of other experts, and just in case that speaker

3    wasn't willing or would rapidly kind of get into some of the

4    off-label utilization opportunities of Prezista, we had

5    prepped attendees, attending physicians, to ask specific

6    questions that would lead or -- "force" is a strong word, I

7    guess -- but would lead the presenting doctor into a

8    conversation about off-label utilization.

9         So they would ask a question, and then that -- that

10   speaker could feel more comfortable addressing the off-label

11   question.

12   Q.   Did you have insight as to who was targeted to become

13   speakers in this program?

14   A.   Yes.

15   Q.   Who was targeted?

16   A.   Well, they were broken out into different categories but

17   high-prescribing physicians, key --

18   Q.   Why were they targeted?

19   A.   Because if you get them on board and you're paying them

20   money and they're speaking about the benefits of your product,

21   I think it's human nature, when you're talking to a group of

22   individuals, let alone physicians, and you're touting the

23   benefits of a drug, that's going to influence your own beliefs

24   and your own behavior.

25   Q.   On that point, did Tibotec/Janssen monitor and track the

WILHELM - DIRECT - RUSS

1  prescriptions of the speakers?

2  A.    They did.

3  Q.    How is that done?

4  A.    Typically by the sales organization of the key account

5  managers.  So -- but I'm sure the virology sales specialist

6  did it as well.  But you would, you know, get the drug

7  distribution data that would show the number of prescriptions

8  and the market share of Prezista versus the competitors in the

9  marketplace, and you could see, you know, if this speaker

10  program was held in January and they had a market share of

11  whatever, ten, there's always a lag.  There's, like, a

12  three-month lag in that data, but you could then see, all

13  right, after that program was held, so let's say, you know, in

14  April you might get February's data.  And you could say, okay.

15  What changed from January to February?  Did the prescriptions

16  of Prezista increase with that speaker and with those

17  physicians that attended?

18          MR. RUSS:  Let's pull up, Ms. Johnson, just for the

19  witness and opposing counsel and the Court, please, Relators'

20  94.

21  BY MR. RUSS:

22  Q.   Mr. Wilhelm, do you see on your screen a document with

23  the plant Relators' Trial Exhibit 94?

24  A.    Yes.

25  Q.   Do you recognize this document?

WILHELM - DIRECT - RUSS

1    A.    I do.

2    Q.    What is it?

3    A.    It's a business plan -- or a plan of action is what POA

4    stands for -- for a sales representative in the Pacific South

5    district.

6    Q.    Do you know who Richard Miller is?

7    A.    Yes.

8    Q.    Who is that?

9    A.    At this point, he was a virology sales specialist that

10   reported to a district sales manager in Los Angeles, Frank

11   Devlin.  At a later date, he was a key account manager and

12   worked for me.

13         MR. RUSS:  If you could, Ms. Johnson --

14         MS. BROWN:  Your Honor, I object on foundation to the

15   time of this document.

16         THE COURT:  Has he moved it yet?

17         MR. RUSS:  I have not, Your Honor.

18         MS. BROWN:  Okay.  I apologize.

19         THE COURT:  No, no.  I'll note your objection, but

20   let me see if there's any more foundation he's going to lay.

21       Objection is overruled but for now.

22         MR. RUSS:  Ms. Johnson, if you could flip through

23   that document so Mr. Wilhelm can see the subsequent pages,

24   please.

25   BY MR. RUSS:

WILHELM - DIRECT - RUSS

1  Q.  Mr. Wilhelm, during your time at the company, was it

2  common for you to see these POA, or plan of action,

3  presentations?

4  A.  Yes.

5  Q.  Does this appear to be a true and correct copy of the

6  type of POA actions you would see in your various positions?

7  A.  Yes.

8  Q.  And how do you know that?

9  A.  Because I saw a lot of them, and they looked -- they all

10  looked similar.  I mean, they were somewhat templated, and

11  the -- you know, some of the information in there about top

12  prescribers of various product, things of that nature, were

13  something that each sales representative or key account

14  manager would identify.

15          MR. RUSS:  Your Honor, Relators offer Relators' 94.

16          MS. BROWN:  Your Honor, I have an objection on

17  foundation.

18          THE COURT:  Meaning when was -- what specifically is

19  the foundation?

20          MS. BROWN:  This particular key account manager did

21  not report to Mr. Wilhelm at the time this document was

22  created.  There's no evidence this ever would have gone to him

23  in the ordinary course as a result.

24          MR. RUSS:  Your Honor, may we approach?

25          THE COURT:  Yes.

┌─────────────────────────────────────────────────────────
WILHELM - DIRECT - RUSS

1          (Sidebar begins at 10:19 a.m.)

2          MR. RUSS:  I think what we have here is an objection

3   to his testimony potentially.  The foundation, I'm not hearing

4   an objection to the admission of the document, but I am going

5   to ask him about some slides to see if it was that type of

6   conduct throughout his district and throughout his --

7          THE COURT:  Well, you can't go into that type of

8   conduct because you're going into the content of the document.

9   It's not yet admitted, right?  Right now you're trying to lay

10  a foundation to admit this document.  Correct, Mr. Russ?

11         MR. RUSS:  Yes, Your Honor.

12         THE COURT:  And how does he know this particular

13  document?  Has he testified yet?  Because I haven't heard

14  anything for the basis for Ms. Brown's objection.  He hasn't

15  received it.  Is this something he's received in his job, that

16  that particular key account manager submitted this document to

17  him as part of his role as a supervisor?

18         MR. RUSS:  I have not asked that specific question.

19  He did say he is familiar with these types of documents.

20         THE COURT:  I know.  But "these types of documents"

21  is very vague.  It's very general.  I mean, you're trying to

22  make a specific document.

23         So, for me, I'm going to ask you to lay a foundation

24  that he's aware of this document, this is something he

25  received as the supervisor of these key account managers.  But

WILHELM - DIRECT - RUSS

1    I think if he does that, I'll probably allow it in, but I

2    haven't heard that yet.

3          MR. RUSS:  Understood, Your Honor.

4          THE COURT:  And I think there's a general sense of

5    are these the type of documents you may have seen or may have

6    reviewed, and that's a bit broad.  I mean, you have very

7    particular content in this specific document.

8       You're not admitting, like, 50 of these, are you?

9          MR. RUSS:  I am not, Your Honor.

10         THE COURT:  Just this one.

11         MR. RUSS:  We may have some more, but just for this

12   witness, just this one.

13         THE COURT:  That's what I presume.  The content of

14   the specific document is going to be put before the jury?

15         MR. RUSS:  Correct, Your Honor.

16         THE COURT:  All right.  Then I'm going to ask you to

17   lay a little bit more foundation.

18      But, Ms. Brown, let me hear from you.

19         MS. BROWN:  Thank you very much, Your Honor.

20      And the issue for me is this is a business plan by a

21   Mr. Richard Miller identified as from the Pacific South.  That

22   is not and never was and never has been a territory that

23   Mr. Wilhelm had responsibility for.

24      So if they have an email that shows, for whatever

25   reason unbeknownst to the regular process, somebody else's

─WILHELM - DIRECT - RUSS─

1    direct reports would have gone to Mr. Wilhelm, I wouldn't have

2    an objection to it.  But just having him say, I saw these

3    types of reports, sure, from the folks who reported to you,

4    not from somebody else's district.

5            THE COURT:  I think that's fair.  So I'm also going

6    to establish even if he wasn't overseeing Mr. Miller, would

7    Mr. Miller still be required to submit these documents to him?

8    I mean, like, was he still cc'd on them?

9        In other words, you're going to have to establish a

10   little bit more.

11           MR. RUSS:  I'll ask him and then move on.

12           MS. BROWN:  Thanks very much, Your Honor.

13           THE COURT:  All right.

14           (Sidebar was concluded at 10:22 a.m.)

15           (Open court.)

16   BY MR. RUSS:

17   Q.  Mr. Wilhelm, did you oversee Mr. Miller in the Pacific

18   South at any point at your time at Janssen?

19   A.  No.  I think I mentioned he reported to Frank Devlin at

20   that point.

21   Q.  Did Frank Devlin report to you?

22   A.  No, not at that point.

23   Q.  Okay.

24           MR. RUSS:  I'll move on, Your Honor.

25           THE COURT:  All right.

*United States District Court*
*District of New Jersey*

WILHELM - DIRECT - RUSS

1  BY MR. RUSS:

2  Q.   Mr. Wilhelm, you mentioned targeting high prescribers.

3  Was one of the goals selecting prescribers or physicians to

4  sort of obtain loyalty to the company?

5  A.   Without a doubt.

6  Q.   Can you explain what you mean by that?

7  A.   Well, you know, physicians are paid a fairly nice

8  honorarium to be able to speak for the product.  And, again,

9  the thought is if a speaker is touting your product, some of

10  the benefits of using that product, that it would influence

11  their willingness and ability to write more of that product.

12         MR. RUSS:  Ms. Johnson, if you could bring up for the

13  witness, opposing counsel and Court only Relators' 195.

14  BY MR. RUSS:

15  Q.   Mr. Wilhelm, do you recognize this document?

16  A.   I do.

17  Q.   Is this an email that you're included on?

18  A.   It is.

19  Q.   It's dated March 20th, 2006?

20  A.   Yes.

21  Q.   And you're on an email below that, I believe.

22         MR. RUSS:  If you go to the next page.

23      One more, please.

24  BY MR. RUSS:

25  Q.   Mr. Wilhelm, do you see that you're on this email thread?

*1004*

WILHELM - DIRECT - RUSS

1    A.   Yes, I do.

2              MR. RUSS:  Ms. Johnson, is page 3 the last page of

3    this document?

4         Your Honor, there's a piece of evidence issue with

5    this, if we can approach.  I apologize.

6              THE COURT:  Sure.

7              (Sidebar begins at 10:24 a.m.)

8              MR. RUSS:  The email itself is -- there's no issue as

9    far as I can tell, but the attachments have been designated

10   attorneys' eyes only.  And I'm not trying to show the

11   attachments, so I'm not going to show this witness anything on

12   any of them.  And I don't want it to go back to the jury

13   either.  It's a list of doctors.

14             THE COURT:  Okay.  So you're limiting it to the email

15   chain, but you're not going to put that list of doctors --

16             MS. BROWN:  May I be heard?

17        My only objection would be the first email in the chain

18   was sent to Mr. Wilhelm.  I have no objection to that.  But

19   there was a subsequent chain that involves people that are not

20   him, and so I would just object to showing anything above --

21             THE COURT:  How do you get those other emails in,

22   then, if he's not receiving them?  I think it's different if

23   what you're saying, what's the impact on Mr. Wilhelm when he

24   received an email and he's on it, but how do you get the chain

25   that's forwarded to other people that he's not privy to?

────────── WILHELM - DIRECT - RUSS ──────────

1          MR. RUSS:  Well, I think it's admissible, but I may

2   not be able to ask the questions about what happened after

3   he --

4          THE COURT:  How is it admissible?

5          MR. RUSS:  Well, I don't think there's any objection

6   to any hearsay or authenticity to the document.  He's proven

7   it up that it --

8          THE COURT:  She just made the objection.  She said,

9   I'm open to the admissibility of the email -- unless I'm

10  mistaken, there's no objection to the email where he's

11  received it.  But then you have a subsequent email that is a

12  part of this document where he's not a recipient on a "CC"

13  line or a "to" line or a "from" line.

14       How do those emails get in through this witness if he

15  didn't receive them?

16         MR. RUSS:  We could try to get a copy of just the

17  first email, Your Honor.  This is the copy that we have.  I

18  don't know if it was even produced just that --

19         THE COURT:  Can you put it on the ELMO and just cover

20  it --

21         MR. RUSS:  Absolutely.

22         THE COURT:  -- and then later create a document that

23  only had the email with him?  That way we save some time.  I'm

24  open to admitting it, but you have to cover those emails;

25  otherwise, they're going to see things that --

WILHELM - DIRECT - RUSS

1    MR. RUSS:  I understand.  Sure.

2    THE COURT:  All right.

3    MS. BROWN:  Thank you, Your Honor.

4    (Sidebar was concluded at 10:26 a.m.)

5    (Open court.)

6    MR. RUSS:  Your Honor, we offer Relators' 195,

7  subject to the bench conference.

8    MS. BROWN:  No objection, Your Honor, subject to our

9  discussion.

10    THE COURT:  All right.  So admitted in light of what

11  we just discussed at sidebar.

12    (Relators' Exhibit 195 in evidence.)

13    MR. RUSS:  Ms. Johnson, I only want you to publish

14  page 3 of document at this time, please.

15    Ms. Johnson, if you could expand that for the witness

16  and the jury, please.

17  BY MR. RUSS:

18  Q.  Mr. Wilhelm, do you see that this is an email from Tony

19  Dolisi in March 14, 2006, to a number of people within

20  Tibotec?

21  A.  I do.

22  Q.  And you were included in this email?

23  A.  Correct.

24  Q.  Mr. Dolisi says, "Attached is the current promotional

25  speakers' bureau list."

WILHELM - DIRECT - RUSS

1    Do you see that?

2 A.   I do.

3 Q.   Now, this was March 14th, 2006.  Did Prezista -- was it

4 even on the market yet?

5 A.   It was not.

6 Q.   "If you would like to add a provider to the list, please

7 include all the necessary contact information and send it to

8 Kim Saladana.  She will forward your recommendation to the

9 vendor who is handling the invite process."

10    Do you see that?

11 A.   I do.

12 Q.   Are these salespeople that Mr. Dolisi is emailing?

13 A.   Sales management.

14 Q.   It's not compliance, is it?

15 A.   Nope.

16 Q.   Mr. Dolisi is asking the sales management to add

17 providers to the list of potential speakers' bureau for

18 Prezista; is that fair?

19 A.   Yes.

20 Q.   Okay.

21    "Keep in mind that A, B, C represents most important of

22 round one A of invites; B is round two and C is the final."

23    What was going on there?

24 A.   So they were, in essence, identifying and segmenting the

25 highest prescribers as being A, the mid-volume prescribers as

WILHELM - DIRECT - RUSS

1  B and then, as I recollect, C was oftentimes a key-thought

2  leader that was associated with academia.  So they had perhaps

3  participated in one of the clinical trials, they had knowledge

4  of the drug but they weren't necessarily likely to prescribe a

5  high volume of the drug because they were more in a teaching

6  role than in a treating and prescribing role.

7  Q.   So the C category included people that were teaching, not

8  necessarily the people that could prescribe a lot of volume.

9  A.   Correct.

10  Q.   What about A and B?

11  A.   Higher prescribers.  More influential.

12  Q.   But the drug is not out yet, so what are they

13  prescribing?

14  A.   They weren't able to prescribe Prezista.

15  Q.   Well, what were they higher prescribers of at this time

16  before Prezista?

17  A.   Protease inhibitors or NNRTIs.

18  Q.   Competitor drugs?

19  A.   Yes.

20  Q.   Mr. Dolisi says, "The process will continue A, B, C until

21  150 providers have responded 'yes.'"

22        Do you see that?

23  A.   I do.

24  Q.   How did the company determine that they needed 150

25  speakers to go out and speak about Prezista, which wasn't on

WILHELM - DIRECT - RUSS

1  the market?

2  A.    I have absolutely no idea.  In fact, in my previous --

3  you know, I guess I had 22 to 23 years of pharmaceutical

4  experience; in other companies we maybe utilized ten speakers.

5  So how they came up with a 150, I have no idea, other than I

6  know that they wanted to do -- have an incredibly high number

7  of speakers paid so that we could do a very large volume of

8  speaker programs.  And I think by paying -- the more

9  physicians you could pay, the thought, I'm sure, is that the

10 more loyalty you can establish.

11 Q.    Was it difficult to fill 150 spots, Mr. Wilhelm?

12 A.    No.  It went very quickly.  In fact, we probably could

13 have filled more.

14 Q.    Did you have a hard time getting doctors and prescribers

15 to agree to get paid to get on the speaker program?

16 A.    No.  They were happy to be paid.

17        MR. RUSS:  Let's pull up for the witness opposing,

18 counsel and Court only Relators' 42, please.

19 BY MR. RUSS:

20 Q.    Mr. Wilhelm, do you see Relators' 42 is an email that you

21 were -- that was sent to you from Kim Saladana?

22 A.    Yes.

23 Q.    And it was dated May 4th, 2006?

24 A.    Yes.

25 Q.    So this is about two months after the email we just

WILHELM - DIRECT - RUSS

1  looked at?

2  A.   Correct.

3       MR. RUSS:  Your Honor, Relators' move -- they offer

4  Relators' 42, please.

5       MS. BROWN:  No objection, Your Honor.

6       THE COURT:  All right.  So admitted.

7       (Relators' Exhibit 42 in evidence.)

8       MR. RUSS:  Ms. Johnson, if we can publish that for

9  the jury, please.

10       And if we could expand it.

11  BY MR. RUSS:

12  Q.   Mr. Wilhelm, do you see that this May 4th, 2006, email --

13  and, again, this is before the launch of Prezista?

14  A.   Correct.

15  Q.   -- it's from Kim Saladana, and she says that there's a

16  speaker bureau update?

17  A.   Yes.

18  Q.   She says, "I'm very pleased to let you know that we have

19  met our target goal of 150 speakers for the speaker training

20  meeting."

21       Do you see that?

22  A.   Yes.

23  Q.   So it took, what, about two months to fill 150 spots?

24  A.   Yes.

25  Q.   For a drug that physicians couldn't prescribe yet?

WILHELM - DIRECT - RUSS

1  A.  Correct.

2  Q.  And there's going to be training.  Describe for the jury

3  what these trainings were like.

4  A.  They entailed going through -- the entire slide deck,

5  slide by slide, talking to and educating those speakers about

6  the key points that we would like to have emphasized with

7  regards to how that product would be utilized.

8      I mean, that was it in a nutshell.

9  Q.  Mr. Wilhelm, do you see that there were two locations for

10  the speaker program training?

11  A.  I do.

12  Q.  San Francisco and Miami?

13  A.  Correct.

14  Q.  Would the company pay the doctors' travel to those

15  locations?

16  A.  They did.

17  Q.  They paid -- they actually paid the physicians

18  themselves?

19  A.  They paid the physicians and they paid their travel

20  expenses and for the hotel and meals and...

21  Q.  Do you recall this first training in San Francisco being

22  at the Palace Hotel in San Francisco?

23  A.  I do.

24  Q.  Have you been to the Palace Hotel in San Francisco?

25  A.  I have been, yes.

WILHELM - DIRECT - RUSS

1    MR. RUSS:  Okay.  If we could, Ms. Johnson, show only

2    the witness, opposing counsel and the Court Relators' 1413.

3    BY MR. RUSS:

4    Q.   Mr. Wilhelm, is that exhibit in front of you, is that a

5    true and correct copy of a photograph that accurately depicts

6    the lobby of the Palace Hotel in San Francisco?

7    A.   Yes.

8    Q.   Any reason to believe that this photograph misrepresents

9    or misdepicts the nature of that lobby or the way that lobby

10   looked back in 2006?

11   A.   No.

12   Q.   And had you visited the Palace Hotel around that time?

13   A.   Yes.

14        MR. RUSS:  Your Honor, we offer Relators' 1413.

15        MS. BROWN:  No objection.

16        THE COURT:  All right.  So admitted.

17   (Relators' Exhibit 1143 in evidence.)

18        MR. RUSS:  If we could publish that to the jury,

19   please.

20   BY MR. RUSS:

21   Q.   Mr. Wilhelm, so the very first speaker program training,

22   other than Miami -- by the way, do you know where the one was

23   in Miami?

24   A.   I believe it was the Biltmore.

25   Q.   Okay.

WILHELM - DIRECT - RUSS

1    The one in the west was at the Palace Hotel, which was
2  this hotel right here?
3  A.   Correct.
4  Q.   Fair to say it was a very nice hotel?
5  A.   That's fair to say.
6  Q.   How long did that training last?  Do you recall?
7  A.   I think two and a half, three days.
8       MR. RUSS:  If we could pull that down, Ms. Johnson,
9  and show to the witness, opposing counsel and the Court only
10  Relators' 1582.
11  BY MR. RUSS:
12  Q.   Mr. Wilhelm, is Relators' 1582 an email chain that you
13  are included on from the very top?
14  A.   Yes, it is.
15  Q.   Is it dated September 22nd, 2006?
16  A.   Yes.
17       MR. RUSS:  Your Honor, we offer Relators' 1582.
18       MS. BROWN:  No objection, Your Honor.
19       THE COURT:  All right.  So admitted.
20  (Relators' 1582 Exhibit in evidence.)
21       MR. RUSS:  If we could start at the very first email in
22  this chain on the last page, Ms. Johnson.
23  BY MR. RUSS:
24  Q.   So now we're in September of 2006, and the speaker
25  program is off and running.

WILHELM - DIRECT - RUSS

1   Right?

2   A.   Correct.

3   Q.   Do you see at the bottom of the -- of page 2 there's an

4   email from Cheryl Gay and a number of people at Tibotec?

5   A.   Yes.

6   Q.   Again, we'll get to the email that you're on, but you're

7   up at the top?

8   A.   Yes.

9   Q.   Do you see Ms. Cheryl Gay is talking about a disturbing

10  voicemail she received from Frank Devlin describing Prezista

11  presentation from Bill O'Brien?

12  A.   Yes.

13  Q.   Do you know who Bill O'Brien was?

14  A.   Yeah.  He was a physician on our speakers' bureau.

15  Q.   Do you remember where he was located?

16  A.   In Texas.

17  Q.   He was speaking in Long Beach, California, back in

18  September of 2006?

19  A.   Correct.

20  Q.   You see the second bullet point, Mr. Wilhelm, where

21  Ms. Gay says he, Bill O'Brien, keeps calling the darunavir

22  tipranavir?

23  A.   Correct.

24  Q.   Was the darunavir resistant?

25  A.   Yes.

WILHELM - DIRECT - RUSS

1  Q.   What is tipranavir?

2  A.   Aptivus, if I remember right.

3  Q.   Was that a drug that Tibotec was selling?

4  A.   Selling?  No.  It was a competitor.

5  Q.   So he is referring to Prezista as a competitor drug?

6  A.   Correct.

7  Q.   And he stated, quote, "The only problem with this drug is

8  that it is bad on triglycerides."

9       Do you see that?

10 A.   I see that.

11 Q.   Do you see a couple lines down in the next paragraph that

12 Ms. Gay says, "It is not a good idea to put Dr. O'Brien in

13 front of our customers until we get some time with him to

14 ensure that his message is consistent with our package

15 insert"?

16 A.   I see that, yes.

17 Q.   Was his message that it was not good for triglycerides

18 consistent with the package insert?

19 A.   Yes.

20       MR. RUSS:  If we could go up to the two emails -- so

21 this is the bottom of page 1, please.

22 BY MR. RUSS:

23 Q.   Mr. Wilhelm, this is an email that you get copied in on

24 dated September 21st, 2006.

25       Do you see that?

WILHELM - DIRECT - RUSS

 1  A.   Yes.

 2  Q.   Do you see at the bottom of the page Steve Mercieca.  Who

 3  is that?

 4  A.   He was a sales representative in California.  Obviously

 5  he had -- he had coverage for Long Beach in the speaker

 6  program.

 7  Q.   Do you see Mr. Mercieca says, "Dr. O'Brien did some good

 8  things last night, and there are some things he can improve

 9  on."

10       Do you see that?

11  A.   Yes.

12  Q.   Do you see number 3?

13  A.   I do.

14  Q.   "He closed well w/a, with a, recommendation to consider

15  Prezista along with Kaletra for first PI failures."

16  A.   I see that.

17  Q.   Was that all there?

18  A.   No, it was not.

19  Q.   "He also said that Prezista is better tolerated and might

20  be more lipid friendly."

21       Was that on-label?

22  A.   No.

23  Q.   But Mr. Mercieca is praising, you know, that those are

24  some of the things you do.

25       Correct?

WILHELM - DIRECT - RUSS

1    A.    Right.

2             MR. RUSS:  If we could go to the top of the next

3    page, Ms. Johnson.

4    BY MR. RUSS:

5    Q.   Mr. Mercieca says, "If I were to make any recommendations

6    to Dr. O'Brien, it would be these."

7             Do you see number 3?

8    A.    Yes.

9    Q.   "Review the triglyceride data that we have.  (He

10   mentioned that Prezista was in the PI group that increased

11   triglycerides, unlike Reyataz and Invirase.)"

12   A.    Yes.

13   Q.    And that was true, wasn't it?

14   A.    That was correct.

15   Q.    "Later in the talk he recovered when he showed the

16   48-week triglyceride slide."

17             Do you see that?

18   A.    I do.

19   Q.    Explain to the jury what the 48-week data was at that

20   point.

21   A.    Well, it was, you know, again, another six months of the

22   study that initially was approved on 24-week data, and

23   although the 48-week data was not in our package insert and

24   not approved by the FDA at this point, the information would

25   come out at large either national or international HIV/AIDS

WILHELM - DIRECT - RUSS

1    conferences.

2         And that information would be sent from us to the

3    speaker, and in the 48-week data, the triglyceride data, I

4    think, may have looked slightly better.  However, it's

5    important, I think, for me to mention that our initial package

6    insert with 24-week data said that -- that

7    hypercholesterolemia and hyperlipidemia and LDL, the bad

8    cholesterol, was an adverse reaction.

9         Even when we got the later indication in 2008, I

10   believe it was, there -- they actually upgraded the

11   hyperlipidemia and hypercholesterolemia to a serious adverse

12   reaction.

13        So it actually got worse after two years when our

14   package insert was revised.

15   Q.   Was the 48-week data in 2006 on-label?

16   A.   No.

17   Q.   He had a slide with off-label information that he

18   presented?

19   A.   Correct.

20   Q.   And this is the same doctor who is referring to the drug

21   as tipranavir?

22   A.   Yeah, right.

23   Q.   The bottom of that same email, Mr. Wilhelm, you see that

24   Mr. Mercieca provides an opinion about Dr. O'Brien?

25   A.   I do.

WILHELM - DIRECT - RUSS

1  Q.   He said he is most aligned with Roche?

2  A.   Yes.

3  Q.   Is that the name of the game here, Roche?

4  A.   Very much so.

5  Q.   "He seemed to lean more towards Prezista with Fuzeon."

6       Is Fuzeon a competitor drug as well?

7  A.   Yes.

8  Q.   And he still considers -- am I saying this right,

9  Invirase?

10  A.   Invirase.

11  Q.   Invirase.  "He still considers Invirase as a choice for

12  first PI."

13  A.   Yes.

14  Q.   "I'm not quite sure there's anything we can do about this

15  considering that he has an honorarium of $2,500."

16       Did I read that correctly?

17  A.   Yes.

18  Q.   Was that a high honorarium at the time?

19  A.   It was.

20  Q.   Mr. Mercieca is saying we're paying him a high

21  honorarium, and he's still not loyal to us?

22  A.   Yep, not doing what we wanted him to do.

23  Q.   "And we probably have speakers who are more committed to

24  Tibotec.  I'm sure we can use other speakers."

25  A.   Correct.

┌─────────────────────────────────────────────┐
WILHELM - DIRECT - RUSS

1   Q.   The ones that are committed to Tibotec.

2        Right?

3   A.   Right.

4   Q.   Now, at the top of that email, Ms. Saladana -- who is

5   Ms. Saladana?

6   A.   She was on one of the product teams.

7             MR. RUSS:  If we could, Ms. Johnson, go to the top of

8   page 1 of Exhibit 1582, Relators' 1582.

9   BY MR. RUSS:

10  Q.   Ms. Saladana says, three paragraphs down:  "As a company,

11  I think we have every right to expect our speakers to be

12  familiar with the material they are supposed to present and be

13  well prepared for the program."

14       She says in paren, "regardless of their honoraria

15  rate."

16       Right?

17  A.   Correct.

18  Q.   She says in the next paragraph, "I don't want to play

19  speaker bureau watchdog here."

20       So she didn't want to do that job?

21  A.   Right.

22  Q.   "But since it's included in your email, I must address."

23       She says, "You identify that Dr. O'Brien included data

24  and slides in his presentation that are not part of the

25  DDMAC/Tibotec approved slide."

┌─────────────────────────────────────────────────┐

WILHELM - DIRECT - RUSS

1       Do you see that?

2   A.   I do.

3   Q.   So this is early in the speaker program, and the company,

4   Ms. Saladana at least and everybody included, knows that there

5   were slide decks being used with speakers that aren't

6   approved.

7   A.   That's correct.

8   Q.   Was that a current -- or a frequent occurrence?

9   A.   It was.

10  Q.   Did it stop after this email?

11  A.   Absolutely not.

12  Q.   You left the company in 2015?

13  A.   That's correct.

14  Q.   Did it continue to occur during your entire time at the

15  company?

16  A.   It absolutely did.

17  Q.   And by "it," I mean using off-label slides with speakers.

18  A.   Yes.  Some of those were given to the speaker by

19  Tibotec/Janssen as backup slide decks, so a lot of those

20  slides were provided by us.

21       But, again, as in this situation, I believe, physicians

22  would take the liberty of putting in some of their own slides.

23  Q.   Towards the bottom, Mr. Wilhelm, she says, "I'm a

24  realist."

25       Do you see that?

WILHELM - DIRECT - RUSS

1   A.   Yep.

2   Q.   "I know it's going to happen, but as a technicality, it's

3   now your obligation to report this to quote -- in your

4   'program host' feedback evaluation form that you submit via

5   AHM."

6        What's AHM?

7   A.   Our health management records system, as I recall.

8   Q.   She says, "This is a J&J requirement."

9   A.   Yeah.

10  Q.   Do you know if anybody in this email reported this event?

11  A.   I do not.

12  Q.   You were on it.  Why didn't you report it?

13  A.   I didn't feel like there was a need to do it, and it was

14  widely understood that everybody already knew it, so why would

15  I report something that people already know about it?

16  Q.   Now, remind the jury who Cheryl Gay was at this point and

17  what her title was.

18  A.   So at this point she was the regional sales director and

19  my boss.  So regional sales director of the west.

20  Q.   Your boss was on this email?

21  A.   Correct.

22  Q.   Did you report it to her?

23  A.   She got -- she's copied on the email.

24  Q.   Do you know if she reported it?

25  A.   I don't know, but I would assume she did not.

─────WILHELM - DIRECT - RUSS─────

1   Q.   So Ms. Saladana says she's a realist and it's going to

2   happen.

3        It is it fair to say it continued happening?

4   A.   That's fair to say.

5        MR. RUSS:  You can take that down, Ms. Johnson.

6   BY MR. RUSS:

7   Q.   During your time at Tibotec/Janssen was -- on the speaker

8   program, was there sort of a push to spend as much money as

9   quickly as possible on speakers?

10  A.   Yep, absolutely.  It was communicated that if you don't

11  spend it, you'll lose it, so if you're not going to spend all

12  the money that's been allocated to you, then they would cut

13  the amount that you would need the next year.

14       MR. RUSS:  If we could show, for the witness,

15  opposing counsel, and Court only Relators' 177, please.

16  BY MR. RUSS:

17  Q.   Mr. Wilhelm, again, do you recognize this as an email

18  that you're on dated June 28, 2008, from Mr. Iacobellis?

19  A.   I do.

20  Q.   True and correct copy of the email you received?

21  A.   Yes.

22       MR. RUSS:  Your Honor, Relators offer Relators' 177.

23       MS. BROWN:  No objection, Your Honor.

24       THE COURT:  All right.  So admitted.

25  (Relators' Exhibit 177 in evidence.)

*United States District Court*
*District of New Jersey*

WILHELM - DIRECT - RUSS

1     MR. RUSS:  If we could publish that for the jury,

2  please, Ms. Johnson.

3     If could you zoom out and just scroll through the pages

4  a little bit for Mr. Wilhelm.

5  BY MR. RUSS:

6  Q.   Do you recognize this event, or do you recall it?

7  A.   Yes.

8  Q.   What was happening here?

9  A.   We were told that we needed to allocate all of our

10 speakers funds by June of this year.

11 Q.   What does that mean?

12 A.   It means spend all the money, load it up front in the

13 year as much as you possibly can so that it drives and

14 incentivizes speakers to write more of Prezista.

15     MR. RUSS:  If you could look at the second email on

16 the first page, Ms. Johnson.  If we could expand that.

17 BY MR. RUSS:

18 Q.   Mr. Wilhelm, you pushed back on Mr. Iacobellis, didn't

19 you?

20 A.   I did, indeed.

21 Q.   You said, "Mike" -- is that Mike Iacobellis?

22 A.   It is.

23 Q.   "Why the fire drill?"

24     Do you see that?

25 A.   Yep.

WILHELM - DIRECT - RUSS

1  Q.  You said, "If not I would prefer a proactive approach
2  with a sense of urgency but would not support such a hard
3  deadline.  I am also not comfortable asking them to spend
4  80 percent of their budget by the end of June to then turn
5  around and ask them to spend the rest of it in two weeks.
6        "Not effective planning and management in my opinion.
7  I have always preferred that speaker money is spent wisely and
8  with purpose, not in a rush to get it on the books approach."
9  A.  That's correct.
10 Q.  What were you telling Mr. Iacobellis?
11 A.  Number one, I think it was a bad business practice, but
12 number two, I think it was part of the illegal scheme to fund
13 physicians to speak to incentivize them to write more of the
14 drug.
15 Q.  Now, you didn't say it was part of a scheme in this
16 email?
17 A.  I did not.
18 Q.  Why not?
19 A.  They knew that.  That was common knowledge throughout, I
20 think, the entire organization.
21 Q.  Was that discussed on the Friday phone calls that
22 Mr. Iacobellis was involved in?
23 A.  Very frequently, yes.
24 Q.  What were the types of conversations you would have with
25 Mr. Iacobellis and other people on the management team

WILHELM - DIRECT - RUSS

1  regarding the use of speaker funds and paying speakers more

2  quickly?

3  A.   Well, again, it was very common for each district sales

4  manager to talk about each individual speaker program that

5  they had during the week, and there were multiple, you know.

6       We could have up to a dozen speaker programs in a given

7  district in a week, and those conversations were around who

8  spoke, what did they say, how comfortable were they going

9  off-label, how well was the message received with the

10  recipients.

11      So there was a lot of planning and understanding

12  amongst the entire organization as to what those speaker

13  programs were meant to do and who was doing the best job of

14  delivering off-label, unapproved, unethical messaging.

15          MR. RUSS:  If you could look at the top of that

16  email, Ms. Johnson, the second paragraph.

17  BY MR. RUSS:

18  Q.   Do you see where Mr. Iacobellis says, "I see it as an

19  impact now that can have a long-term benefit if we change

20  physician behavior now versus waiting"?

21  A.   Yes.

22  Q.   What did you interpret that to mean?

23  A.   I interpreted that to mean that we were behind on goal.

24  We were not performing well.  We were being chastised for not

25  doing our job effectively.

WILHELM - DIRECT - RUSS

1     And the more we could front-load and change physician

2  or speaker behavior, the better off we were going to be, and

3  the more likely we might catch up and ideally, hopefully,

4  attain our sales goal.

5  Q.   That included the speakers' prescriptions -- or the

6  prescriptions for the speakers?

7  A.   Absolutely.  They were the highest writers.

8  Q.   What's that?

9  A.   They were the highest-writing doctors.

10        (Stenographer clarification.)

11  BY MR. RUSS:

12  Q.   Does that also include getting -- that also include

13  getting off-label information out to the attendees?

14  A.   Yes, absolutely.

15        MR. RUSS:  I apologize for that.

16  BY MR. RUSS:

17  Q.   Now, Mr. Wilhelm, you yourself tracked speaker

18  prescriptions?

19  A.   I did indeed.

20  Q.   Did you track them before and after an event?

21  A.   I did.

22  Q.   So before and after they got paid?

23  A.   Yes.

24  Q.   What would normally happen?

25  A.   Their utilization would increase.

─WILHELM - DIRECT - RUSS─

1    Q.   What would happen if it didn't?  Are physicians -- or

2    speakers stopped writing?

3    A.   They would be cut from the speakers' bureau.

4    Q.   How do you know that?

5    A.   Because I saw it happen, and I heard peers talk about

6    having to have those conversations with physicians.

7    Q.   Describe what you mean by you saw it happen.

8    A.   Well, I mean, I was involved in those conversations

9    directly with key account managers and other district sales

10   managers, and I was told by two district managers specifically

11   that they were going to go have a very difficult conversation

12   with a couple prescribers in New York City.

13   Q.   Do you remember who told you that?

14   A.   Tony Dolisi and Frank Murphy.

15        MR. RUSS:  If we could bring up, just for the

16   witness, opposing counsel, and the Court only, Relators' 165.

17   BY MR. RUSS:

18   Q.   Mr. Wilhelm, do you recognize this document?

19   A.   I do.

20   Q.   Do you recognize an individual named Melissa Wade?

21   A.   Yes.  She was one of my virology sales specialists in

22   St. Louis.

23   Q.   Is this a coaching or performance form you would fill out

24   for Ms. Wade?

25   A.   Yes, it is.

┌─────────────────────────────────────────────────────────┐
WILHELM - DIRECT - RUSS

1  Q.   You filled this document out?

2  A.   I did.

3       MR. RUSS:  Your Honor, Relators offer Relators' 165.

4       MS. BROWN:  No objection, Your Honor.

5       THE COURT:  So admitted.

6  (Relators' Exhibit 165 in evidence.)

7       MR. RUSS:  If we could, Ms. Johnson, publish that for

8  the jury.

9  BY MR. RUSS:

10 Q.   So describe -- how frequently were these reports filled

11 out for the people that you supervised?

12 A.   We were supposed to fill one out every single time we

13 rode with a sales representative, so twice a week in a normal

14 week.

15 Q.   Was that a big part of your job?

16 A.   Yes.

17       MR. RUSS:  If you could, Ms. Johnson, turn to page 7,

18 under "management comments."

19 BY MR. RUSS:

20 Q.   At the top -- top left box, please.  Mr. Wilhelm, this is

21 you writing this?

22 A.   It is.

23 Q.   "Melissa, you have successfully implemented many parts of

24 your business plan.  You have held targeted speaker programs,

25 in-services and partnership activities with various support
└─────────────────────────────────────────────────────────┘

WILHELM - DIRECT - RUSS

1   personnel.  The trained speakers within your territory are an

2   area for improved sales growth."

3        Do you see that?

4   A.   I see.

5   Q.   Were you targeting the speakers for them to write more

6   prescriptions?

7   A.   Absolutely.

8   Q.   Why?

9   A.   Because they oftentimes were selected because they had

10  the most prescription volume in the given drug class, and

11  oftentimes had high market share with other products, and we

12  were trying to build loyalty to get them to write more

13  Prezista.

14        MS. BROWN:  Objection, Your Honor.  Speculation as to

15  the selection of the speakers.

16        MR. RUSS:  Your Honor, may I respond?

17        THE COURT:  Selection or recommendation for a

18  speaker?  You're talking about selection?

19        MS. BROWN:  Correct.

20        THE COURT:  I'll sustain that objection based on the

21  response.  You have to rephrase the question because we're

22  talking about recommending a speaker or how speakers are

23  selected.

24  BY MR. RUSS:

25  Q.   Do you understand that we're talking about your

WILHELM - DIRECT - RUSS

1  experience with the speaker selection?  You were familiar with

2  the recommendation of the speakers?

3  A.  Definitely, yes.

4  Q.  Were you familiar at all with the selection process for

5  those speakers after they were recommended by the sales team?

6  A.  Yes.

7  Q.  All right.

8      Can you explain what that process was like?

9  A.  Well, there were ongoing conversations within not only

10 the sales organization but up through the district manager

11 about what speakers have -- were considered key opinion

12 leaders, which ones had good skills, you know, speaking skills

13 at the podium, but most importantly, were they a high volume

14 prescriber of HIV medications.

15 Q.  And you knew that to be the case for both the

16 recommendation and the selection of these speakers?

17 A.  Correct.

18 Q.  And so when -- you were just telling the jury that one of

19 the rationales and drives of this recommendation and selection

20 was loyalty, I believe you said?

21 A.  Correct.

22 Q.  So you say, Mr. Wilhelm, "several of the St. Louis

23 speakers need to increase prescribing within their own

24 practice."

25      Do you see that?

WILHELM - DIRECT - RUSS

1   A.   I do.

2   Q.   What were you telling her?

3   A.   Well, one of the things is that if our speakers weren't

4   deemed to be writing enough of Prezista and couldn't speak to

5   their own personal experience, that they would be removed from

6   the speakers' bureau.

7   Q.   Did you tell your salespeople that?

8   A.   Absolutely I did, and they knew that.  I mean, they knew

9   that because it was happening across the country.

10  Q.   The salespeople knew that?

11  A.   Yeah.

12  Q.   You'd have that conversation internally with your

13  salespeople?

14  A.   I would.

15       MR. RUSS:  If we could go to page 11, please.

16  BY MR. RUSS:

17  Q.   Mr. Wilhelm, do you see there this is a longer box that

18  you're writing to Melissa?

19  A.   Yes.

20  Q.   You say about two lines down, "You're in the bottom

21  quarter of the sales organization."

22       Does that mean she was in danger of being on a PIP?

23  A.   Yep.  And the sales organization knew very well that that

24  was a possibility as well.  That was no secret.

25  Q.   Did you put people on performance improvement plans?

WILHELM - DIRECT - RUSS

1  A.   I did.

2  Q.   "You are in the bottom quarter of the sales organization,

3  and a targeted approach with key customers like Dr. Parks and

4  Dr. Overton to increase sales will be required.  You know your

5  key customers and have good relationships with many of them.

6       "It will be imperative that you continue to deliver a

7  complete and consistent Prezista message and increase

8  utilization among top targets, several of whom who are trained

9  speakers."

10 A.   Correct.

11 Q.   So when you said earlier that the company was tracking

12 the prescriptions of speakers, you wouldn't be able to write

13 this unless you knew that?

14 A.   Correct.

15 Q.   Okay.

16      Let's talk about getting cut if you weren't writing

17 prescriptions.

18      MR. RUSS:  If we could, for the witness, opposing

19 counsel, and the Court only, pull up Relators' 199.

20 BY MR. RUSS:

21 Q.   Mr. Wilhelm, is Relators' 199 an email that you're copied

22 on?

23 A.   Yes, it is.

24      MR. RUSS:  Your Honor, we offer Relators' 199.

25      MS. BROWN:  No objection, Your Honor.

WILHELM - DIRECT - RUSS

1    THE COURT:  So admitted.

2    (Relators' Exhibit 199 in evidence.)

3    MR. RUSS:  If we could start at the bottom of this

4  email thread, Ms. Johnson.

5    Your Honor, I want to be respectful of everyone's time.

6  This is an email that is kind of lengthy, if we need to take a

7  break.

8    THE COURT:  I was going to wait.  I didn't know how

9  long you were going to be on this.  So let's do that.  Why

10  don't we hold off, and then you can go into it after the

11  ten-minute break.

12    All right, folks.  We're going to take a ten-minute

13  break to stretch and do what you need to do, and then we'll be

14  back on.  Thank you all.  Let's get the jurors out.

15    THE DEPUTY COURT CLERK:  All rise.

16    THE COURT:  All right, folks.  We're in recess.  You

17  may be seated.

18    Mr. Wilhelm, you can step off the witness box.  When we

19  reconvene, let's have Mr. Wilhelm back in the witness box.

20    MR. RUSS:  Yes, Your Honor.

21    THE COURT:  All right.

22    (A short recess occurred.)

23    THE COURT:  Please remain seated.

24    All right.  Let's get these folks.

25    THE DEPUTY COURT CLERK:  All rise.

*1035*

WILHELM - DIRECT - RUSS

1           (Jury enters.)

2           THE COURT:  All right, folks.  Please be seated.

3       Mr. Russ, you may continue when you're ready.

4           MR. RUSS:  Thank you, Your Honor.

5   BY MR. RUSS:

6   Q.  Mr. Wilhelm, before we talked about this email, do you

7   recall earlier when you pushed back on Mr. Iacobellis about

8   the fire drill?

9   A.  Yes.

10  Q.  At some point, did he write you up?

11  A.  He did.

12  Q.  Do you know why?

13  A.  I have my opinion, yes.

14  Q.  What's your opinion?

15  A.  I think he was -- again, this is -- you've got to

16  understand the environment or the culture of this particular

17  J&J operating company, and it was very militant.  It was very,

18  "You will do this, fall in line, do as you're instructed" type

19  of atmosphere.  So I think any time that there was an opinion

20  that differed from upper management, there was retribution.

21  Q.  Do you have reason to believe, if you reported concerns

22  about the compliance, that that would not be taken well?

23  A.  I do, yeah.

24  Q.  What were those reasons?  Same reasons you just

25  described?

```
 1   A.   Yep.  Exactly.

 2        And I think they already knew it.  So I think that, if

 3   anything would have, you know, been formally reported, there

 4   would have been repercussions.

 5   Q.   Now, if we could turn your attention to Relators' 199,

 6   which is the email that we left off before the break.

 7   A.   Yes.

 8   Q.   And this is an email that you eventually are copied in

 9   on, but we're going to start from the bottom of the chain.

10        Okay?

11   A.   Okay.

12   Q.   Do you see that it's dated February 20th, 2007?

13   A.   I do.

14   Q.   So we're about seven, eight months into Prezista's

15   launch?

16   A.   Correct.

17   Q.   Do you see that Stacey Vogel is writing OBI 45-214?

18   A.   Yes.

19   Q.   Stacey Vogel, do you know who that was?

20   A.   Yes.

21   Q.   Who is that?

22   A.   At that time, she was a virology sales specialist in the

23   San Francisco market.

24   Q.   And that OBI 45-214, is that sort of a mailing list to

25   people?
```

WILHELM - DIRECT - RUSS

1  A.   I believe so, yes.

2  Q.   Okay.

3       You see in the second paragraph, Ms. Vogel says,

4  "Attached is the current bureau list.  There were five names

5  deleted as indicated in the first column.  We cannot recover

6  these individuals.  For the most part, either their

7  institutions restrict them from conducting promotional

8  programs or they were inactive in 2006."

9       Do you see that?

10 A.   Yes.

11 Q.   Was there a problem or a difficulty getting speakers that

12 were part of institutions that wouldn't allow them to be paid

13 speakers?

14 A.   I believe there were some, yes.  Mainly

15 government-affiliated speakers.

16 Q.   They just had a prohibition on paid speaking --

17 A.   Yes.

18 Q.   -- from pharmaceutical companies?

19 A.   Yeah.

20 Q.   Do you see underneath the speaker list, it says, "The

21 next step is to review all the names."

22      Do you see that?

23 A.   Yes.

24 Q.   "We will only be able to recommend four speakers per

25 territory, number 1 being highest priority.

WILHELM - DIRECT - RUSS

1    "Please consider the following criterion when selecting

2  your speakers."

3    Read to the jury what the number 1, first criteria is,

4  please?

5  A.   "Greater than 5 Prezista scripts.  If less, rationale

6  must be brought forward to support the selection."

7  Q.   Was it an important criteria for the company that the

8  doctor had a specified number of prescriptions even to get

9  onto the program?

10  A.   Yes.  That was the goal, to have physicians that were

11  prescribing -- preferably the higher volume, the better -- and

12  to increase the scripts as being a member of the speaker

13  bureau.

14  Q.   But going back to 2006, when 150 speakers were selected

15  before there was even a drug on the market, that couldn't have

16  been a criteria.

17    Right?

18  A.   Right.

19  Q.   What was the most important criteria back then?

20  A.   High volume of prescriptions within the -- in this case,

21  protease inhibitor class, and being considered an influential

22  thought leader within at least their geographic area, if not

23  nationally.

24  Q.   Okay.

25    MR. RUSS:  If we could turn to the next page, bottom

WILHELM - DIRECT - RUSS

1   of page 3, Ms. Johnson.

2       And if we could enlarge that for the jury.  I know it's

3   a fairly small text.

4   BY MR. RUSS:

5   Q.   Do you see Stacey Vogel is again responding -- or writing

6   an email to Susan Newmeyer?

7   A.   Correct.

8   Q.   And who is Susan Newmeyer?

9   A.   She was the district sales manager in San Francisco,

10  Northern California.

11  Q.   And you saw her name earlier in the July 2006 notes from

12  that meeting?

13  A.   Yes.

14  Q.   Ms. Vogel says, "Key points.  The eligibility criteria

15  were specific and are listed below."

16       That's the criteria we just looked that?

17  A.   Correct.

18  Q.   Starting with writing more than five Prezista scripts?

19  A.   Yes.

20  Q.   Okay.

21       "Number 2, per Felicia, we did not pursue Dr. Sisneros

22  for a new contract based on his lack of Prezista utilization

23  and comfort at the podium."

24  A.   Yes.

25  Q.   Did I read that correctly?

WILHELM - DIRECT - RUSS

1   A.   You did.

2   Q.   If we go up, Mr. Wilhelm, to the next email, it starts at

3   the bottom of page 2 and spills -- no, I take that back.

4        It starts at the bottom of page 2 and finishes up on

5   the top of page 3.

6        Do you see that?

7   A.   Yes.

8   Q.   And Stacey Vogel, again, to Susan Newmeyer, and she's

9   copied Felicia Bradley.

10  A.   Yes.

11  Q.   Yeah.

12       You see at the top, Mr. Wilhelm, of page 3 where she

13  says -- she's talking about a couple different doctors.

14       Do you see that?

15  A.   Yes.

16  Q.   She says, "Very short list of speakers where contract

17  extensions offered to only five speakers."

18       Do you recognize that first name?

19  A.   Yes.

20  Q.   Who is that?

21  A.   Bill O'Brien, who was the one that was referenced earlier

22  by Steve Mercieca.

23  Q.   Now, Dr. O'Brien didn't even know the drug name back in

24  2006, fair?

25  A.   Fair.

*1041*

WILHELM - DIRECT - RUSS

1  Q.  And he was saying that it was bad for triglycerides.

2        Do you remember that?

3  A.  I remember that.

4  Q.  Mr. Mercieca said he would talk to him about the slides

5  and the 48-week data.

6        Do you recall that?

7  A.  Yes, I recall that.

8  Q.  So Ms. Saladana flags Dr. O'Brien as using off-label

9  slides.

10       Right?

11  A.  Right.

12  Q.  It is possible that that's a different Dr. O'Brien.  Do

13  you recall any other Dr. O'Brien?

14  A.  I don't.  No.

15  Q.  But not only does he not get flagged or reported, he's

16  getting a contract extension.

17       Do you see that?

18  A.  Yes.

19  Q.  All right.

20       Do you see where it says "Silver?"  Was Silver another

21  doctor?

22  A.  Yes.

23  Q.  "Silver was not a priority per Felicia but would not have

24  met criteria due to lack of product utilization either."

25       Do you see that?

—WILHELM - DIRECT - RUSS—

1   A.   I see that.

2   Q.   Now, explain to the jury how you can have 150 speakers

3   that fly out to Miami and San Francisco and get trained for

4   two and a half to three days and they somehow later lose

5   knowledge about the drug?

6   A.   They wouldn't lose knowledge of the drug, but if they

7   weren't using it and they wouldn't speak to their off-label

8   utilization of the drug, they weren't a preferred speaker and

9   they wouldn't be used.  And if they weren't writing the drug

10  at all, they were removed from the speaker bureau.

11  Q.   Do you see at the bottom of that next paragraph, "And

12  possibly a, quote, fresh start for speakers who did not meet

13  criteria on earlier bureaus and had increased utilization."

14  A.   Yes.

15  Q.   What's that saying?

16  A.   That's saying, if they finally start doing what the

17  company wanted them to do and they started writing the drug,

18  when they weren't previously, then we would have an

19  opportunity to bring them back as a speaker.

20  Q.   Start paying them again?

21  A.   Start paying them again.

22  Q.   Okay.

23       The next email in the middle of page 2, Mr. Wilhelm, is

24  from Felicia Bradley.  Now, remember, she was copied in on the

25  email we just looked at from Stacey Vogel.

WILHELM - DIRECT - RUSS

```
1   A.   Correct.

2   Q.   Do you know who Felicia Bradley was?

3   A.   I do.

4   Q.   Who was that?

5   A.   She was a sales representative in California, if I

6   recall.

7   Q.   She's writing to Stacey Vogel, and she writes, "Susan and

8   Stacey" -- although it doesn't appear Susan Newmeyer is on

9   this email.

10       Do you see that?

11  A.   I do.

12  Q.   Do you see where at the bottom of the second paragraph

13  Ms. Bradley says -- and she's talking about knowing what the

14  requirements are so she can relay those, if you want a minute

15  to read that.

16  A.   Yeah.

17       I mean, go ahead.

18  Q.   Do you see where she says, "If I had, in the case of

19  Dr. Scott" -- that's another doctor?

20  A.   Yes.

21  Q.   -- "I would have told him so he could have done his three

22  programs.  He has no issues with utilization."

23       What's "utilization" mean?

24  A.   Using Prezista more frequently.

25  Q.   Okay.
```

WILHELM - DIRECT - RUSS

1  A.   So he must be using a fair amount of Prezista if he has

2  no issues with it, utilization.

3  Q.   At the bottom of the next paragraph, she says, "I

4  understand that his low utilization was ultimately the reason

5  he was not asked back."

6       And she's talking about Silver --

7  A.   Silver there.

8  Q.   -- there.

9       Do you see that?

10 A.   Yes, I see that.

11 Q.   So this is going in writing.  He's not asked back because

12 of his low utilization.

13      Right?

14 A.   Correct.

15 Q.   "I still think he and Highland" -- is that another

16 doctor?

17 A.   Yes.

18 Q.   So we're talking about a lot of doctors here?

19 A.   Yes.

20 Q.   All right.

21      "He and Highland are very important to the district and

22 my territory and ultimately would like to develop and continue

23 to build on that business opportunity and those

24 relationships."

25 A.   Yeah.

WILHELM - DIRECT - RUSS

1    Q.    What's she saying there?

2    A.    Well, I mean, this was -- this was all part of the game.

3    This was the strategy that was developed to influence and

4    entice, encourage physicians to get paid and to speak highly

5    about Prezista and utilize it increasingly, them, personally.

6          MR. RUSS:  If we could go to the bottom of page 1,

7    Ms. Johnson.

8    BY MR. RUSS:

9    Q.    The email thread continues, Mr. Wilhelm, as Stacey Vogel

10   responding to Ms. Bradley and then now she's CC'd Susan

11   Newmeyer.

12         Do you see that?

13   A.    I see that.

14   Q.    Ms. Vogel says, "Hi, Felicia.  There was a

15   miscommunication regarding Silver continuing on the bureau

16   because I would not have deterred his participation if that

17   was your preference.  I agree that he is appropriate for

18   certain audiences, and you are happy with his improving

19   comfort with the data.  But my recollection is that you opted

20   out of pursuing him because he couldn't have a physician at

21   the podium that was not using the drug."

22   A.    Correct.

23   Q.    "Having said that, I did, quote, appeal to keep him as an

24   option and had to justify his lack of product utilization."

25         Do you see that?

*1046*

WILHELM - DIRECT - RUSS

1    A.    I see that.

2    Q.    "The explanation was his extended paternity leave

3    limiting his opportunity to become familiar and prescribe

4    Prezista.  He was still denied based on the actual activity."

5          Do you see that?

6    A.    I see that.

7    Q.    In the next paragraph we see, "It's correct that you had

8    found alternate names that were not previously on the bureau,

9    and they stood a chance of being added.  O'Brien and Burack

10   met criteria as new or returning."

11         So Dr. O'Brien again?

12   A.    Yes.

13   Q.    "Borkert" -- another doctor?

14   A.    Yes.

15   Q.    -- "was denied early on for lack of use and no programs."

16         Do you see that?

17   A.    I do.

18   Q.    "We challenged for Kubota" -- is that another doctor?

19   A.    Yes.

20   Q.    -- "(filling in for Netherda and not being able to commit

21   to programs), Scott (travel limitations) and Sisneros;

22   however, their product utilization at the end of June 2007 was

23   low, which was end of existing contract."

24         Is that what you were telling this jury earlier, that

25   it was being tracked and you were cutting people that weren't

WILHELM - DIRECT - RUSS

1    writing?

2    A.    Yep.  That's exactly what I was saying.

3    Q.    Ms. Newmeyer writes back November 1st, 2007.  "Hi, Mark

4    and Cheryl."

5          So you're on this email?

6    A.    Yes.

7    Q.    She tells you, "No need to read this lengthy email

8    string."

9          Do you see that?

10   A.    Yes.

11   Q.    She says, "Wanted to know if you have this situation.

12   Has anyone had to explain to a customer" -- by the way, who

13   was Janssen's customer?

14   A.    The prescribing physicians.

15   Q.    The doctors?

16   A.    The doctors.

17   Q.    "Has anyone had to explain to a customer that he/she was

18   not invited on to a speakers' bureau because he/she didn't

19   prescribe enough drug?"

20         Do you see that?

21   A.    Yes.

22   Q.    "Any suggestions on a tactful way to handle this?"

23         And Cheryl Gay was your boss.  Or were you equal at

24   this time?

25   A.    Let's see.  November of -- I would have been a key

WILHELM - DIRECT - RUSS

1  account director.  We would have been peers, equal.

2  Q.   So your peer was high up in the company, Ms. Gay.

3       Right?

4  A.   Yes.

5  Q.   She responds.  And she says, "I would recommend that we

6  stay away from the discussion around prescribing levels."

7       Did I read that correctly?

8  A.   You did.

9  Q.   What's going on here?

10  A.   It was well-known and understood that you had to be

11  extremely careful about anything that was put into writing.

12  Anything that's put into writing could be discoverable as

13  evidence in a trial such as this.  And for that reason, most

14  of the direction and communication around the things that we

15  did was verbal.  It was on Friday conference calls.  It was

16  at -- we held meetings to hold meetings.

17       And so the discussions with the senior management and

18  the sales management would talk about these different

19  strategies and tactics, preparation for the meetings, and then

20  we'd have the meetings with the entire sales organization.

21       So all of the things that occurred were verbal because

22  there was a very heightened insecurity about things being put

23  into writing.  And I think that's what Cheryl is kind of

24  cautioning Susan about, to not put things such as this into a

25  document.

WILHELM - DIRECT - RUSS

1  Q.   Were you all trained on something called the

2  Anti-Kickback Statute?

3  A.   Yes.

4  Q.   Do you understand what that statute prohibits?

5  A.   I do.

6  Q.   What's your understanding of what it prohibits?

7  A.   You cannot pay, entice a physician who is a speaker by

8  paying them and then expecting them to write more of the

9  product.  You also should not take someone off of a speakers'

10 bureau just because they're not writing sufficient quantities

11 of a drug.

12       To be an expert speaker about a subject, particularly

13 something like HIV or AIDS, it doesn't necessarily require you

14 to be using a high quantity of that product.  In fact, you may

15 not even have to write the drug.  You may have been involved

16 in a clinical trial.  Some of the smartest key opinion leaders

17 in the country are in teaching institutions that don't

18 necessarily treat a great deal of patients, but they are the

19 ones that are the most knowledgeable about what is the best

20 treatment choice, what's the best option, what's the best plan

21 of care.

22       So the fact that you would take someone potentially

23 like this and remove them from a speakers' bureau simply

24 because they weren't writing the drug is a violation.

25 Q.   So back in 2006 -- we talked about this -- there weren't

WILHELM - DIRECT - RUSS

1  any prescriptions before launch.

2       Right?

3  A.   Correct.

4  Q.   And those doctors were trained on the drug?

5  A.   Correct.

6  Q.   The criteria we just saw had more than five Prezista

7  scripts to be considered.

8       Do you remember that?

9  A.   Yes.

10 Q.   And then the email correspondence goes through from

11 various salespeople talking about not being able to keep

12 people on because they're not writing enough.

13      Do you remember that?

14 A.   I remember that.

15 Q.   Ms. Gay responds and then the email thread shuts down.

16      Do you see that?

17 A.   I do.

18 Q.   If prescription volume were a legitimate metric for a

19 speaker, what's your understanding of why Ms. Gay is saying,

20 "I recommend that we stay away from talking about

21 prescribing," then?

22      MS. BROWN:  Objection, Your Honor.  Speculation.

23      THE COURT:  Can you repeat the question?

24      MR. RUSS:  I said, What is your understanding,

25 Mr. Wilhelm, of why Ms. Gay would be recommending that they

WILHELM - DIRECT - RUSS

1    stay alive away from prescription-level discussion?

2            THE WITNESS:  Because it's incriminating --

3            THE COURT:  Wait.

4            MR. RUSS:  Yeah, wait.

5            THE WITNESS:  I'm sorry, I'm sorry.

6            THE COURT:  I'm still addressing the objection.

7    That's okay.

8            I'll overrule it.  I'll allow it.

9            Mr. Wilhelm, you can answer.

10   BY MR. RUSS:

11   Q.   Do you want me to -- yeah.  I'll rephrase it.

12          If writing five prescriptions or prescription volume

13   were a legitimate metric for putting people on a speakers'

14   bureau, what is your understanding of why Ms. Gay is saying,

15   "I recommend that we stay away from this discussion around

16   prescribing"?

17   A.   Because it incriminates Tibotec/Janssen from violating

18   the Anti-Kickback Statute, which is, you're removing someone

19   because they didn't use the drug.

20   Q.   And not paying them anymore.

21   A.   Right.

22   Q.   Were some of these speakers also --

23           MR. RUSS:  You can take that down, Ms. Johnson.

24   BY MR. RUSS:

25   Q.   Were some of these speakers also invited to something

WILHELM - DIRECT - RUSS

1  called ad boards?

2  A.    They were.

3  Q.    Or sometimes called an advisory board?

4  A.    Correct.  There's both.

5  Q.    What are those?

6  A.    Well, an advisory board was, again, formal meetings in

7  very nice locations where thought leaders -- initially they

8  would have -- and they held a lot of them -- but where the

9  brand team would run information past these key opinion

10 leaders that would -- not only was it an opportunity to

11 disseminate off-label information but to gain their feedback

12 on appropriateness and how it would compare to our competitors

13 and what message resonated.

14      So they would have a couple of different messages

15 around a certain point and get feedback from the advisory

16 board participants as to what -- what made the most sense,

17 what sounded the best, what influenced them the most.

18      They would also show, you know, when we launched the

19 drug, they'd have pictures of a supposed HIV highly

20 treatment-experienced patient on the cover and throughout the

21 sales aid with a patient that looked like they could run a

22 marathon.  I mean, they looked as healthy as you and I.

23 Q.    What's the problem with that?

24 A.    Well, it's not an accurate depiction of a highly

25 treatment-experienced AIDS patient.

WILHELM - DIRECT - RUSS

1    Q.   What do they normally look like?

2    A.   Well, I mean, not like they can run a marathon.  I mean,

3    they look somewhat emaciated, weight loss, sometimes, you

4    know, in severe cases, hunched back.  They don't look healthy.

5    Q.   Is that part of the marketing effort of pushing Prezista

6    into treatment-naive classes?

7    A.   Yes.

8    Q.   Were these ad boards, were they -- where were they?

9    A.   Oh, in nice locations, various places.  Chicago, Miami, I

10   think some in New York, Dallas.  Various locations in

11   California.

12        The other thing that advisory boards -- before I

13   forget -- kind of transitioned to is then having high

14   prescribers that were very familiar with Prezista as well as

15   mixing in medium-level and even maybe low-level prescribers so

16   that it was an opportunity, again, for the higher-prescribing

17   physician to influence the trends and the prescription

18   tendencies that the higher prescribers were using.  They were

19   hoping that, you know, during these discussions and sharing,

20   again, various marketing messages, that that would translate

21   from the people that were very comfortable using the product

22   down to people that were less comfortable with the product at

23   the time.

24   Q.   Did the physicians want to be on that advisory boards?

25   A.   Absolutely.

WILHELM - DIRECT - RUSS

1  Q.  Did Tibotec/Janssen use advisory boards as another way to

2  get loyalty from these doctors?

3  A.  They did.

4  Q.  Were the doctors paid?

5  A.  They were.

6  Q.  So like the speaker program where they were paid -- or

7  sorry, the speaker training where they were paid for their

8  time and flying out and nice hotels, is it a similar type of

9  setup with the advisory board?

10  A.  I would say it's almost the exact same thing, yes.

11  Q.  Okay.

12       Now, at some point, Mr. Wilhelm, you left the key

13  account director position, and you took another position.

14       Right?

15  A.  That's correct.

16  Q.  What position did you take?

17  A.  Went back to district sales manager.  So at one point

18  they decided that instead of the key account managers

19  reporting to the key account directors, Tony and I, that they

20  would roll that key account manager into the district itself.

21       So the -- as I mentioned, so if there are ten sales

22  representatives and one key account manager, instead of having

23  a separate reporting structure, it would all be under the

24  district sales manager.

25  Q.  So you went back to overseeing sales reps?

WILHELM - DIRECT - RUSS

1    A.    Correct.

2    Q.    Where was this?

3    A.    In Atlanta.

4    Q.    So originally you were in Frisco, Texas, as a sales

5    manager.

6          Right?

7    A.    Right.

8    Q.    Then you were -- were you still in Dallas, or did you

9    move to Colorado to become a key account manager?

10   A.    No.  I moved to Colorado.  It was not -- it wasn't

11   something that the company paid for in full.  They gave me

12   some financial assistance, but I had to pay a certain portion

13   of that to move myself because both Dallas and Denver were, of

14   course, part of that 30-state area that I covered.

15         I'm from Colorado.  I wanted to move back closer to

16   friends and family.  They allowed that, but, again, I had to

17   pay for some of that out of my own pocket, and then they

18   wanted me to move from the Denver area to Atlanta when they

19   realigned the organization.

20   Q.    So before you moved to Atlanta, how many physicians did

21   you and your -- did you personally go into physicians' offices

22   and see Prezista sold?

23   A.    Absolutely.

24   Q.    How many --

25   A.    You definitely -- oh, God.  Hundreds.

WILHELM - DIRECT - RUSS

1    Q.   Okay.

2         In 2008 there was a drug that came out called

3    Intelence?

4    A.   Correct.

5    Q.   Did you also sell Intelence?

6    A.   Yes.

7    Q.   Was that drug being pushed off-label?

8    A.   Yes.

9    Q.   How so?

10   A.   It was indicated BID.  It was a very large --

11   Q.   BID is twice a day?

12   A.   Twice a day, yeah, uh-huh.

13   Q.   Okay.

14   A.   And it was a very large pill; referred to it as a horse

15   pill.  And so with these HIV patients, they have a very large

16   pill burden.  They take a lot of medications, so it's very

17   difficult to -- it's very advantageous to be able to take

18   something once a day versus twice a day.

19        So it was pushed once a day, and as we got feedback

20   from the physicians that were being called on that it was

21   difficult to take and it was large and it was twice a day,

22   they ended up putting together a video that showed how you

23   could dissolve those pills in water and then reduce the pill

24   burden and use that same glass of dissolved Intelence to take

25   the remaining HIV medications that you were prescribed.

WILHELM - DIRECT - RUSS

1    Q.   Were there any other off-label messages that you can

2    recall regarding Intelence?

3    A.   Also promotional messages around using it in naive

4    patients.

5    Q.   Was there a similar limited indication for Intelence as

6    there was Prezista?

7    A.   Yes.

8    Q.   What was this?

9    A.   Also treatment-experienced patients.

10   Q.   So, again, not this category of -- population of patients

11   that are naive?

12   A.   Correct.

13   Q.   Did you personally see sales reps sell to doctors that

14   Prezista had the same lipid profile as Reyataz?

15   A.   I did.

16   Q.   Did you personally see sales reps sell to doctors that

17   Prezista had a lipid-neutral or lipid-friendly side effect?

18   A.   Yes, I did.

19   Q.   Did you personally see sales reps -- before you moved to

20   Atlanta, did you personally see sales reps sell Intelence as

21   appropriate for once daily dosing?

22   A.   I did.

23   Q.   And what about Intelence for naive patients?

24   A.   Yes, I did.

25   Q.   You saw that?

WILHELM - DIRECT - RUSS

1    A.   I saw that.

2    Q.   How often would that happen?

3    A.   I would say on a daily basis when I was in the field.

4    Q.   How often were you in the field?

5    A.   Four days a week, typically.

6    Q.   And what were you doing on Fridays?

7    A.   In office on calls with the senior management and with

8    sales representatives.

9    Q.   Did you hide from senior management what was happening in

10   those doctors' offices?

11   A.   Not at all.  They knew very well.

12   Q.   Did you talk to them about it?

13   A.   Yes, we talked about it on Friday calls.

14   Q.   Did they tell you to cut it out?

15   A.   No.

16   Q.   Did they tell you stop doing it?

17   A.   No.

18   Q.   They didn't tell you, Train your people and tell them to

19   quit selling doctors on off-label medicine?

20   A.   No.  When they disseminated the information, they would

21   put the disclaimer on it, but that was about the extent of it.

22   Q.   Contrast and compare the disclaimer in writing versus

23   what was being discussed on those Friday calls.

24   A.   Well, I mean, again, pharmaceutical companies -- they're

25   not stupid.  I mean, they know that that's a violation, so any

WILHELM - DIRECT - RUSS

1   time that they send out studies or information that is not on

2   the approved FDA label, they will typically stamp it with

3   something to the effect of confidential, for your information

4   only, not to be used in promotional environment, you know,

5   something to that effect.

6        And so, you know, at least in the case with -- of

7   Tibotec/Janssen, that was -- that was the facade.  That was

8   the shield that they would put up to CYA, you know, cover

9   their rear end.

10       But the reality was we were underperforming.  There

11  were threats for people's jobs based on their need to improve

12  sales performance.  They spent an inordinate amount of time

13  discussing what needed to be done, what objections were being

14  heard in the field, how to overcome those objections.

15       Then all the off-label studies that would help address

16  those challenges and issues were -- we would have conference

17  calls where we would be trained on what's in that study.

18  What's an important differentiating point?  Why is this

19  important to be able to combat Kaletra or Reyataz, our

20  competitors?

21       So why -- why would an organization give the sales

22  force all of the information to be able to address and to

23  promote a product in an off-label situation?  They do that

24  because they want you to sell that.  They want you to perform

25  better, and if you don't, you're going to lose your job.

WILHELM - DIRECT - RUSS

1          So that's the reality behind This is only for your

2     information.

3     Q.   Are you familiar with something called a careful

4     communications policy at Tibotec/Janssen?

5     A.   I am.

6     Q.   What was it?

7     A.   Basically to -- I mean, in writing they would say, Don't

8     talk off-label and to not put things in writing.

9     Q.   Mr. Wilhelm, there's been some discussion -- this jury's

10    heard something called an MIR, or medical information request.

11         Are you familiar with those?

12    A.   Yes, very familiar.

13    Q.   What are they?

14    A.   They are supposed to be unsolicited request forms from a

15    physician.  So if a physician unprompted asked you about a

16    utilization of a product that's not on your FDA-approved

17    label, you fill out a form, and our medical information

18    department sends that physician information on his request.

19    Q.   Let me stop you there.

20         Before your stopover at Tibotec/Janssen, were you

21    familiar with MIRs in your other positions?

22    A.   Yes.

23    Q.   How frequent -- how frequent were they?

24    A.   Extremely rare.

25    Q.   And why is that?

WILHELM - DIRECT - RUSS

1  A.   With the other products that I promoted in other disease

2  states, there wasn't off-label utilization of most of those

3  products.  On occasion there might be, so they would have an

4  occasional MIR request, but again, very seldom.

5  Q.   At Tibotec/Janssen, were the -- was the MIR process ever

6  used?

7  A.   Yes.

8  Q.   How?

9  A.   Well, it was used as a metric to evaluate sales

10 representatives.  There was training on how to question a

11 physician to elicit the request, so these supposed unsolicited

12 questions became solicited by the sales organization, and in

13 essence prompted the physician so that they would ask the

14 question so that the form could be filled out.

15 Q.   Was that part of the effort to get off-label data and

16 information in the hands of prescribers?

17 A.   It was one of the many ways that they tried to get

18 off-label information to prescribers.

19 Q.   How -- you were a manager?

20 A.   Yep.

21 Q.   How can you expect your salespeople to be judged on

22 something that they are not supposed to be able to control?

23 A.   I think it was very unfair and ridiculous, and I brought

24 it up, as a matter of fact, in a midyear performance review

25 with all the district managers and senior management in the

WILHELM - DIRECT - RUSS

1    summer of 2007, that it was -- how could it be a fair metric

2    to evaluate sales representatives on something that they have

3    no control over theoretically, and by definition it should be

4    unsolicited?

5         So why are you going to use that method to evaluate a

6    sales rep's performance when they're not supposed to be

7    involved in that request?  It's a complete contradiction.

8    Q.   How was that received?

9    A.   Not well.

10   Q.   Who did -- who did you talk to about that?

11   A.   Glenn Mattes, Mark Gossett, Mike Iacobellis, and there

12   were others in the room from the marketing teams and medical

13   information.

14   Q.   When you say "not well," can you give us some flavor for

15   that?  Where is this happening?

16   A.   Yeah, yeah, absolutely.  So the top sales district in the

17   nation was the Florida district, and the Florida district had

18   an inordinately high number of MIR requests, much higher than

19   any other district in the nation.

20        So they were held up as, again, kind of the gold

21   standard on why -- part of the reason why they were performing

22   extremely well.  There are some other reasons that I don't

23   know we necessarily need to get into it.

24        But with regards to the MIR form, they had at least

25   three times more MIR forms filled out than any other district

WILHELM - DIRECT - RUSS

1    in the nation.

2        And it was explained very clearly that they felt like

3    that was one of the reasons why the sales in that district

4    were so good, because they were getting more off-label early-

5    treatment-experienced/naive information into the hands of that

6    prescribing physician than the other districts.

7    Q.   After you voiced that you thought it was unfair, did the

8    company stop looking at MIR metrics for salespeople?

9    A.   No, I'd say probably more emphasis was placed on it.

10   Q.   So, Mr. Wilhelm -- and I'm getting close to finishing my

11   questioning, at least for the first part of this morning --

12   you were -- you were personally tracking prescriptions of

13   speakers --

14   A.   Correct, yes.

15   Q.   -- attendees, doctors that were receiving off-label

16   information?

17   A.   Yes.

18   Q.   And how frequently were you tracking them?

19   A.   After every program -- well, before and after every

20   program.

21   Q.   A weekly basis fair to say?

22   A.   Yeah.

23   Q.   And this was part, I think you said, of the tactics to

24   overcome the limited indication of selling these drugs?

25   A.   Correct.

WILHELM - DIRECT - RUSS

1  Q.  Did it work?

2  A.  To a -- yeah, to a certain extent.

3  Q.  Did it increase sales?

4  A.  Yes.

5  Q.  How do you know that?

6  A.  Because we began to close the gap on how far behind we

7  were in sales performance and then, you know, in future years

8  began to meet or exceed slightly those sales goals.

9  Q.  Could you also see it in the tracking in the data?

10  A.  Oh, absolutely, yep.  That's what we tracked.  I mean,

11  when we track it, we track it from the data, so the data's

12  given to us, and then we put it into a spreadsheet.

13  Q.  Now, Mr. Wilhelm, at some point in 2010 you leave the

14  company?

15  A.  Correct.

16  Q.  And you go back to Colorado.

17      Is that right?

18  A.  I'm still there, yes.

19  Q.  Well, you were in Atlanta at the time?

20  A.  No.  I never moved to Atlanta.

21  Q.  Oh, I see.  You never moved to Atlanta.

22  A.  Yeah, so I --

23  Q.  So when you went back to district sales manager, you were

24  in Colorado?

25  A.  Correct.

WILHELM - DIRECT - RUSS

1  Q.  Okay.

2      Got it.

3  A.  But covering Atlanta, so flying down to Atlanta every

4  week.

5  Q.  Oh, so you were responsible for Atlanta?

6  A.  Right.

7  Q.  I understand.  My apologies.

8  A.  Yeah, I know.

9  Q.  At some point you leave, and this jury has heard that you

10 were in a relationship at that point with somebody named

11 Donna Graham.

12 A.  Yes.

13 Q.  Are you still in a relationship with Ms. Graham?

14 A.  I am.

15 Q.  Do you live together?

16 A.  We do.

17 Q.  At some point after you left the company, did you and

18 Ms. Graham discuss some concerns about the conduct that you

19 experienced and were asked to participate in while you were at

20 Janssen?

21 A.  We did.

22      MR. RUSS:  Your Honor, may we approach.

23      THE COURT:  Approach me?

24      MR. RUSS:  Yes.

25      THE COURT:  Sure.

WILHELM - DIRECT - RUSS

1          (Sidebar begins at 11:50 a.m.)

2          MR. RUSS:  You may recall, he -- he joined the

3   lawsuit with Ms. Graham.  I don't intend to touch on it very

4   long.  Just because the jury remembers this is a lawsuit that

5   he reported and that he filed with Ms. Graham.

6          I don't want to -- I want to make sure Your Honor's

7   comfortable with that line of questioning.

8          THE COURT:  What is the questioning and answer?  It's

9   going to be similar to what --

10          MR. RUSS:  It will be.

11          THE COURT:  -- was done before?  Nothing more than

12   that because then you're going to open a can of worms.

13          MR. RUSS:  Right.

14          THE COURT:  And I'm going to be dealing with

15   objections.

16          MR. RUSS:  Right.

17          THE COURT:  So what you're going to say, that

18   Ms. Graham testified earlier that she --

19          MR. RUSS:  That she talked to you, that you had

20   concerns.  You went and filed your own -- your own qui tam

21   lawsuit.

22          THE COURT:  Did he join that lawsuit?

23          MR. RUSS:  He was a Relator, yes.

24          THE COURT:  Keep it limited to what we allowed last

25   time.

WILHELM - DIRECT - RUSS

1       MR. RUSS:  I agree.

2       THE COURT:  Ms. Brown, you're going to be paying

3  attention to mind this, but I think we're going to keep it

4  limited to what we allowed from Ms. Graham, which wasn't much.

5       MR. RUSS:  You want me to close the loop that it's

6  dismissed?  I'm happy to do that.

7       THE COURT:  If you don't, it doesn't matter to me who

8  talks about that, but I think I permitted that from Ms. Brown.

9       MS. BROWN:  You did, Your Honor.  You permitted that

10  they provided documents to the Government, that the Government

11  is not -- was not part of that case, and that the case was

12  dismissed and that they stood to get a significant percentage

13  recovery.

14       And so I would do the same here, if you're going to go

15  into it.

16       THE COURT:  Yeah, that's pretty much the limit --

17  that's right -- without the exact percentage.

18       MS. BROWN:  Understood.

19       THE COURT:  But significant was allowed.

20       MS. BROWN:  Yes.

21       THE COURT:  All right.  So as long as you keep it in

22  those parameters because I don't want to go through this twice

23  where I have to go back to Ms. Graham --

24       MR. RUSS:  That's why I wanted to approach.

25       THE COURT:  That's fair.  I appreciate you doing

WILHELM - DIRECT - RUSS

1   that.

2           MR. RUSS:  Thank you, Your Honor.

3           THE COURT:  Thank you, Ms. Brown.

4           MS. BROWN:  Thank you.

5           (Sidebar was concluded at 11:52 a.m.)

6           (Open court.)

7   BY MR. RUSS:

8   Q.  Mr. Wilhelm, did you and Ms. Graham decide that you

9   wanted to file what's called a False Claims Act lawsuit

10  regarding what you saw when you were at Tibotec/Janssen?

11  A.  Yes.

12  Q.  Did you file that?

13  A.  Yes.

14  Q.  And that's since been dismissed.

15      Correct?

16  A.  Correct.

17  Q.  All right.

18      Had you ever seen any conduct in the pharmaceutical

19  industry that you felt the need to report other than Janssen

20  and Tibotec?

21  A.  No.

22  Q.  And you understand that there have been some other people

23  who have provided -- I don't know if you know this or not; if

24  you don't, tell me -- declarations in the litigation of this

25  case?

WILHELM - DIRECT - RUSS

1   A.   I'm sorry.  Can you rephrase that?

2   Q.   Let me say it this way.  Let me just ask you.  Do you

3   know somebody names Joe Holshoe?

4   A.   I do.

5   Q.   Do you know him well?

6   A.   No.

7   Q.   Did you ever manage him?

8   A.   No.

9   Q.   Do you know an individual named Matt Grooms?

10  A.   I did.

11  Q.   You were his boss?

12  A.   Yep.  He used to work for me.

13  Q.   Are you close?

14  A.   No.

15  Q.   Were you close when he worked for you?

16  A.   I mean, I guess as close as manager and a sales

17  representative, I mean, could be.

18  Q.   Have you stayed in touch with him since you left?

19  A.   No.

20  Q.   How about Mr. Holshoe?

21  A.   No.

22  Q.   Did you know, when you were at Janssen Tibotec, my client

23  Jessica Penelow?

24  A.   Yes.

25  Q.   How did you know her?

WILHELM - DIRECT - RUSS

1    A.   She was in the New York district, so I didn't know her

2    well, but, you know, I certainly knew -- there was only a

3    hundred sales representatives in the organization.  I knew of

4    just about everybody.

5    Q.   You knew most of the hundred sales reps?

6    A.   Right.

7    Q.   What about Christine Brancaccio, also my client?

8    A.   Same.

9    Q.   Have you kept in touch with Ms. Brancaccio?

10   A.   No.

11   Q.   What about Ms. Penelow?

12   A.   No.

13   Q.   Do consider yourself friends?

14   A.   Yeah, sure.  Yes.

15   Q.   Friendly?

16   A.   Yeah.  Yes.

17   Q.   You don't see them very often?

18   A.   I haven't -- I haven't seen them since 2010.  I think I

19   saw Jessica once for a few minutes when she was out visiting a

20   friend in Denver, but very briefly.

21   Q.   What about Sara Strand?

22   A.   I mean, I know of her.  We were peers at one point.  I

23   never reported to Sara, and then we were peers for a period of

24   time.  But, I mean, I haven't talked to her since, again,

25   probably 2010.

```
 1            MR. RUSS:  Your Honor, if I may have a minute to
 2   confer with co-counsel.
 3            THE COURT:  You may.
 4            (Brief pause.)
 5   BY MR. RUSS:
 6   Q.  Mr. Wilhelm, on the careful communications policy that we
 7   talked about, I just want to make sure that I have everything
 8   in evidence that we talked about.
 9            Were you trained on the careful communications
10   compliance?
11   A.  Yes.
12            MR. RUSS:  If we could pull up, just for the witness,
13   opposing counsel, and the Court, Relators' 139, please.
14   BY MR. RUSS:
15   Q.  Do you see, Mr. Wilhelm, this is a careful communications
16   policy with the Effective Health Care Compliance logo at the
17   bottom right?
18   A.  Yes.
19   Q.  Were you required when you were at Tibotec/Janssen to sit
20   in on trainings from time to time about compliance on careful
21   communications?
22   A.  Yes.
23   Q.  Does this look like a true and accurate --
24            MR. RUSS:  And if you can flip through, Ms. Johnson.
25   BY MR. RUSS:
```

─WILHELM - DIRECT - RUSS─

1    Q.   Does this look like a template -- a true and accurate

2    copy of the type of training that you would receive

3    periodically?

4    A.   Yes, it does.

5    Q.   Was it pretty standardized?

6    A.   Yes.

7         MR. RUSS:  Your Honor, we offer Relators' 139.

8         MS. BROWN:  Your Honor, we -- this is a document we

9    discussed before openings, and consistent with the Court's

10   ruling, we would have no objection with those redactions.

11        MR. RUSS:  It's actually a different version of that

12   document, Your Honor.

13        THE COURT:  Wait.  I'm sorry.  Say it again.

14        MR. RUSS:  It's actually a different version of that

15   document but some of the same information.

16        MS. BROWN:  I think the point is the same.  The same

17   slides exist, Your Honor.

18        THE COURT:  Okay.  So subject to the same ruling, or

19   is this something different that we need a sidebar on?

20        MR. RUSS:  Not on this exhibit as far as I know,

21   Your Honor.

22        THE COURT:  All right.

23        MS. BROWN:  Okay.  Okay.

24      If that's -- I'll take counsel's representation --

25        THE COURT:  With that representation, then, there's

WILHELM - DIRECT - RUSS

1  no objection.  Just make sure, since all this goes back at

2  some point -- so all right.  It's admitted.  Just confirm

3  that.

4          MR. RUSS:  I've read it three times last night.

5          THE COURT:  All right.  Fair enough.

6          MR. RUSS:  Plaintiff's Exhibit 3 -- or sorry, page 3,

7  please.

8          (Relators' Exhibit 139 in evidence.)

9  BY MR. RUSS:

10  Q.  Mr. Wilhelm, do you see that you were trained, along with

11  Janssen personnel, that emails and other written documents are

12  discoverable by plaintiffs' attorneys and Government

13  regulators?

14  A.  Yes.

15  Q.  Such as the FDA and OIG?

16  A.  Correct.

17          MR. RUSS:  And on page 6, please.

18  BY MR. RUSS:

19  Q.  Do you see number 3, that there was a preference for

20  talking in person or on the phone versus sending multiple

21  emails?

22  A.  Yes.

23  Q.  Is that consistent with the way you and your sales force

24  conducted business?

25  A.  Yes.  And I think that's why in some of those previous

———WILHELM - CROSS - BROWN———

1    documents, people said, Be careful about putting this in

2    writing or let's not talk about this.

3            MR. RUSS:  And page 9, please.

4    BY MR. RUSS:

5    Q.   Do you see there's a "Frequently Asked Questions"?

6    A.   Yes.

7    Q.   "If I carefully direct all communications, why should I

8    be concerned with unintended recipients?"

9            Do you see "Where communications ultimately ends up

10   largely out of your control"?

11   A.   Yes.

12   Q.   You and your employees, co-employees at Janssen, knew

13   that documents like the ones we went over today could end up

14   in court.

15           Right?

16   A.   Yes.

17   Q.   You knew they could result in regulatory inquiries?

18   A.   Yes.

19   Q.   That the federal Government might come in and ask for

20   documentation?

21   A.   Yes.

22   Q.   And you were careful about that?

23   A.   Yes.

24           MR. RUSS:  Pass the witness, Your Honor.

25           THE COURT:  All right.  Thanks, Counsel.

1          Ms. Brown, cross.

2              MS. BROWN:  Yes.  Thank you, Your Honor.

3          May I approach just to get the microphone, Judge?

4              THE COURT:  Yes.

5    (CROSS-EXAMINATION BY MS. BROWN:)

6              MS. BROWN:  And may I proceed, Your Honor?

7              THE COURT:  You may.

8              MS. BROWN:  Thank you.

9    BY MS. BROWN:

10   Q.   Good afternoon, everyone.

11         Good afternoon, Mr. Wilhelm.  How are you, sir?

12   A.   I'm well.  How are you?

13   Q.   Good.

14         We've never met before.  My name is Alli Brown, and I

15   have questions for you on behalf of the folks at Janssen.

16         Okay, sir?

17   A.   Understood.

18   Q.   And what I'd like to do, if it's okay with you, is pick

19   up a little bit where you left off with counsel and discuss a

20   little bit with you how you know some of the folks that our

21   jurors have already heard from.

22         Okay, sir?

23   A.   Okay.

24             MS. BROWN:  Mr. Russ, do you have any objection to

25   this as a demonstrative?

WILHELM - CROSS - BROWN

1    Your Honor, may I display the demonstrative?

2    Thank you.

3    THE COURT:  And there's no objection, I presume.  I

4    don't know what it is, but --

5    MR. RUSS:  No objection, Your Honor.

6    THE COURT:  All right.

7    MS. BROWN:  All right.

8    BY MS. BROWN:

9    Q.   So, Mr. Wilhelm, as you know, this is a lawsuit being

10   brought by Ms. Penelow and Ms. Brancaccio.

11   Do you see that there, sir?

12   A.   I do.

13   Q.   And these are individuals that worked at Janssen at the

14   same time that you did.

15   Correct, sir?

16   A.   Yes.

17   Q.   And one of the things -- I guess the first witness that

18   our jury heard from was Ms. Donna Graham, who you know well.

19   Right, sir?

20   A.   Correct.

21   Q.   You actually are in a relationship with Ms. Graham, and

22   the two of you live together in Colorado.

23   Correct?

24   A.   That's correct.

25   Q.   And you know that Ms. Graham is friends with Ms. Penelow.

WILHELM - CROSS - BROWN

1    Correct?

2  A.   Yes.

3  Q.   And, in fact, this is a picture that we showed our jury

4  during Ms. Graham's testimony.  Ms. Graham was actually in

5  Ms. Penelow's wedding.

6       You know that, right, sir?

7  A.   Yes.

8  Q.   All right.

9       Were you at that wedding, too, sir?

10 A.   I was not.

11 Q.   Okay.

12      And then the other witness that we heard from after

13 Ms. Graham is Ms. Sara Strand.

14      And you know her as well.

15      Correct, sir?

16 A.   We worked together, yes.

17 Q.   And she's actually been to your home in Colorado for

18 dinner.

19      Right, sir?

20 A.   Yes.

21 Q.   All right.

22      And she actually -- Ms. Strand, you worked with her at

23 Janssen as well?

24      Correct?

25 A.   Correct.

WILHELM - CROSS - BROWN

1    Q.   And she actually currently works with your partner,

2    Ms. Graham.

3         Correct?

4    A.   They work at the same company, yes.

5    Q.   And this isn't the first time that they've worked at the

6    same company.

7         Right, sir?

8    A.   I believe that's true, yes.

9    Q.   They now work together at a company called Calliditas; is

10   that correct?

11   A.   Calliditas.

12   Q.   Calliditas.  Okay.

13        That's where they are together right now.

14        Right, sir?

15   A.   Correct.

16   Q.   And before that, they were at another pharmaceutical

17   company together, sir?

18   A.   Yeah, I believe that's right.

19   Q.   All right.

20        And prior to that, they were at Janssen together,

21   correct?

22   A.   Correct.

23   Q.   All right.

24        And there was a time period where Ms. Strand moved out

25   to Colorado where you and Ms. Graham live.

WILHELM - CROSS - BROWN

1    Correct?

2  A.    I believe that is right.  I think she has a daughter that

3  lived there.

4  Q.    All right.

5  A.    If I'm remembering right.

6  Q.    And Ms. Strand told our jurors when she did that, she

7  came over to your place for dinner sometimes.

8    Do you remember that?

9  A.    I think she did once, yes.

10 Q.    And you are here, now our third witness, and you live

11 with Ms. Graham.

12   Correct?

13 A.    Yes.

14 Q.    All right.

15   And I think you told us your interests are aligned with

16 Ms. Graham's.

17   Correct?

18 A.    Well, I don't know what you mean by "interests."  I mean,

19 we filed a claim together, if that's what you mean by

20 "interest."

21 Q.    Sure.

22   When it comes to your interest in this issue that our

23 jury's here to talk about, your interests are aligned with the

24 interests of Ms. Graham.

25   Correct?

WILHELM - CROSS - BROWN

1    A.   Yes.  We had similar experiences at Janssen, yes.

2    Q.   All right.

3         And like Ms. Graham, the lawyers representing

4    Ms. Penelow and Ms. Brancaccio, they wrote up a multipage

5    declaration for you to sign.

6         Right, sir?

7    A.   No.  Well, I mean, I guess they typed up the document

8    that we signed, but most of it, as I understand, was pulled

9    from the claim that Donna and I submitted before we realized

10   that there had already been someone before us that had filed.

11   Q.   You, sir, signed a declaration in this matter.

12        Correct?

13   A.   In what?  I'm sorry.

14   Q.   In this lawsuit.

15        Correct?

16   A.   Yes, uh-huh.

17   Q.   And that declaration was typed up by the lawyers

18   representing Ms. Penelow and Ms. Brancaccio.

19        Correct?

20   A.   Yes.

21   Q.   And you know that this declaration that you signed is

22   almost identical to the declaration that Ms. Donna Graham

23   signed.

24        Right?

25   A.   I would expect them to be similar, yes.

WILHELM - CROSS - BROWN

1   Q.   And I want to ask you, sir, about one of the paragraphs

2   that is, in fact, identical.

3       Okay?

4       MS. BROWN:   And so let's pull up, just for the

5   witness and counsel, please, Tab 3.

6       And if we could just show Mr. Wilhelm his signature on

7   the last page, and then pull up for him paragraph 91, please.

8       Do I need to do it on the ELMO?   I can do it.   I'll do

9   it here.

10      If we can just show counsel and the witness this, that

11  would be great.

12      Thank you very much.

13      MR. RUSS:   Do you have a binder?

14      MS. BROWN:   Oh, I apologize.   Yes.

15      All right.   Mr. Morales, if I put this up, will it just

16  go to counsel and the witness?   Okay.

17  BY MS. BROWN:

18  Q.   So I'm showing you, just to orient you, Mr. Wilhelm, this

19  is the declaration that was typed up for your review and

20  signature in this lawsuit.

21      Correct, sir?

22  A.   Yes, correct.

23  Q.   All right.

24      And if we go to the last page there, you see your

25  signature, and it was executed where you live in Colorado.

WILHELM - CROSS - BROWN

1    Correct, sir?

2  A.  Correct.

3  Q.  All right.

4    And one of the paragraphs that the lawyers typed up for

5  your review and signature is paragraph 91.

6    Do you see that, sir?

7  A.  I do.

8  Q.  All right.

9    And do you know, sir, this is the same concluding

10  paragraph that was typed up for your partner, Ms. Graham, to

11  sign?

12  A.  If you say it is, I'm sure it is.

13  Q.  All right.

14    No reason to dispute that, right, sir?

15  A.  Right.

16  Q.  All right.

17    And here's what I want to ask you about.  When you

18  worked at Janssen as a key account manager and later as a

19  district manager, you didn't have responsibility for

20  interacting and interfacing with Government payors like

21  Medicare or Medicaid.

22    Correct?

23  A.  Not directly, no.

24  Q.  There was another department of folks at Janssen who had

25  responsibility for that.  Would that be fair?

WILHELM - CROSS - BROWN

1    A.    Yes.

2    Q.    There were folks whose primary responsibility it was to

3    talk to the folks at Medicare and talk about reimbursement

4    issues.

5          Correct?

6    A.    Correct.

7    Q.    One of the things you signed and swore to in the

8    declaration that the lawyers typed up for you is right here in

9    paragraph number 91, sir.  The second sentence that you swore

10   to be correct was that Janssen --

11              MR. RUSS:  Objection, Your Honor.  This document is

12   not in evidence.

13              THE COURT:  Are you admitting the declaration?

14              MS. BROWN:  No, Your Honor.

15              THE COURT:  Well, overruled.  She can cross-examine

16   on the declaration.

17              MR. RUSS:  Can we approach, Your Honor?

18              THE COURT:  Sure.

19              (Sidebar begins at 12:07 p.m.)

20              THE COURT:  She is cross-examining him on a prior

21   statement that was made under oath in this matter.

22              MR. RUSS:  He hasn't made any inconsistent statement

23   on the stand to that.

24              THE COURT:  Well, first she has to say, You made a

25   prior statement on this case, right?  That prior statement was

WILHELM - CROSS - BROWN

1  A.  Then I presume she is going to say something to the effect

2  of, Is that an accurate statement?

3         But I don't understand what -- she can't cross-examine

4  on a prior statement made under oath?

5         MR. RUSS:  Well, my understanding in the impeachment

6  process is that she needs to ask him what his position is on

7  it.  If he makes an inconsistent statement based on that prior

8  testimony, then she can impeach with him.  Otherwise, she's

9  just reading documents into the record that aren't in

10  evidence.

11         THE COURT:  All right.  Let me ask Ms. Brown.

12         My understanding is that you established he has a

13  declaration in this case under penalty of perjury.

14         MS. BROWN:  Correct.

15         THE COURT:  I presume you're now going to establish a

16  statement that he made.  No?

17         MS. BROWN:  Correct.

18         THE COURT:  Oh, are you saying she hasn't asked him

19  the question first?

20         MR. RUSS:  Correct.  That's right, Your Honor.

21         MS. BROWN:  But, Your Honor --

22         THE COURT:  Go ahead.

23         MS. BROWN:  I think the way to do this is not for

24  impeaching him.  I'm saying, You signed this and swore it was

25  true.  You signed this, you swore it was true.  You have no

WILHELM - CROSS - BROWN

1    basis to say whether or not it's true.

2          It's similar to Ms. Graham's.  It's the same statement.

3    They had her write --

4          THE COURT:  I think that's right.

5          MS. BROWN:  -- about what was knowledgeable for

6    reimbursement, and they have no --

7          THE COURT:  She's not bringing in any prior -- it's

8    not impeachment on a prior inconsistent statement when she's

9    establishing, which is still impeachment -- for impeachment

10   purposes -- is you made a statement under penalty of perjury,

11   and I'm going to give her leeway to establish that that's not

12   an accurate statement.  And I don't know what your witness is

13   going to say.

14         MR. RUSS:  And I don't either.

15         MS. BROWN:  I mean, she's able to go into it.  She

16   did go into it with Ms. Graham.  I permitted it then, I'm

17   going to permit it now.

18         MR. RUSS:  Okay.

19         THE COURT:  So I understand your point, but now I can

20   appreciate it's not a prior inconsistent statement.  She is

21   trying to establish whether what he signed under oath is not

22   actually true.  Meaning, do you sign things that you provided

23   to him that you typed up that he didn't look at closely and

24   just did one of these?  So we don't know.

25         All right.  I'm going allow it.

WILHELM - CROSS - BROWN

1    MS. BROWN:  Thank you.

2    MR. RUSS:  And just for the record, I want to

3 establish two things real fast.

4    When you say "you guys," obviously we're hired as trial

5 counsel in this case.  I just want to be clear on that.

6    But, two, it is still hearsay that she's crossing him

7 with.  I just want that on the record.  It's an out-of-court

8 statement offered for the truth of the matter asserted.

9    MS. BROWN:  And, Your Honor, I'm asking for the

10 basis.

11    THE COURT:  I don't even know if she's offering it

12 for the truth.  I think she's saying it's false.

13    MS. BROWN:  Right.

14    THE COURT:  So it's the opposite of offering it for

15 the truth, right?

16    She is not offering this statement in paragraph 91 as

17 the truth of anything.  If anything, Janssen's position from

18 day one is this is a false statement.  You signed it under

19 oath, and I'm going to allow the witness to be impeached on

20 it.

21    Now, whether that's effective or not, I leave for you

22 all.  But I'm going to allow that line of questioning.

23    MR. RUSS:  All right.

24    MS. BROWN:  Thank you very much, Your Honor.

25    (Sidebar was concluded at 12:10 p.m.)

─────WILHELM - CROSS - BROWN─────

1              (Open court.)

2              MS. BROWN:  May I proceed, Your Honor?

3              THE COURT:  Yes, you may.

4              MS. BROWN:  Thank you.

5    BY MS. BROWN:

6    Q.   To reorient us, Mr. Wilhelm, we were talking about the

7    declaration that you signed in connection with Ms. Brancaccio

8    and Ms. Penelow's lawsuit.  Okay?

9    A.   Yes.

10   Q.   And this is the one that was typed up by their lawyers

11   for your signature.

12        Correct?

13   A.   Correct.

14   Q.   We're looking at paragraph 91, which is the same exact

15   final paragraph that appears in Ms. Graham's declaration.

16        Do you understand that, sir?

17   A.   Yes.

18   Q.   And one of the things you swore to -- because the lawyers

19   asked you to -- was that Janssen caused pharmacies and

20   physicians to submit claims for reimbursement to insurance

21   programs funded by the United States and certain states which

22   were ineligible for reimbursement at the time submitted and

23   therefore false.

24        Do you see that, sir?

25   A.   I do.

WILHELM - CROSS - BROWN

1   Q.   To be fair, you don't have any knowledge about the

2   Government payors' requirements for reimbursement, correct,

3   sir?

4   A.   I have some knowledge.

5   Q.   And the state -- where it says "Certain states were

6   ineligible for reimbursement," what states are you talking

7   about?

8   A.   I can't remember all of them, but I know for a fact that

9   Oregon and Wyoming and others were ineligible.

10  Q.   Well, Oregon and Wyoming and others, they have Medicaid,

11  correct, sir?

12  A.   Yes.

13  Q.   And each individual state has different requirements for

14  what they allow to be paid under Medicaid, correct, sir?

15  A.   Yes, I understand that, yes.

16  Q.   And those different requirements change at different

17  times, correct, sir?

18  A.   I would agree with that.

19  Q.   And are those states that you just listed, are they the

20  states you were referring to here when you said this was

21  ineligible for reimbursement?

22  A.   Yes, because that was part of the initial claim that we

23  filed through another attorney.  So he pointed that out and

24  was in the original document that he filed.  That's how I know

25  that there were states that were ineligible.

WILHELM - CROSS - BROWN

1   Q.   And what are the requirements for Medicaid reimbursement

2   of an HIV medicine in Oregon, sir?

3   A.   I couldn't tell you specifically, but I would imagine it

4   has to be an FDA label-approved utilization.

5   Q.   No, sir.  I'm asking you, do you know, do you know what

6   the requirements are to have a medicine reimbursed under

7   Medicaid in Oregon?

8   A.   No.  I couldn't quote it.

9   Q.   And what other state did you reference there, sir?

10  A.   Wyoming.

11  Q.   And do you know what the requirements to have an HIV

12  medicine reimbursed in Wyoming are?

13  A.   I couldn't quote it, no.

14  Q.   When you said certain states, Janssen caused claims to be

15  submitted to certain states that were ineligible for

16  reimbursement, what states were you talking about?

17  A.   The ones that I just mentioned.  And they were outlined

18  in the claim that we filed with the DOJ.

19  Q.   You just said you didn't know what the requirements were

20  in those states.

21  A.   I don't know the specific ones, but they were mentioned

22  by the attorney.  I guess we could call him and he can answer

23  the question.

24  Q.   That's the -- that's your lawsuit that was dismissed,

25  sir?

WILHELM - CROSS - BROWN

1   A.   Yes.

2   Q.   And you also say that we caused claims to be submitted to

3   the United States that were ineligible for reimbursement.

4        And what payor are you referring to there?

5   A.   Well, Medicare, Medicaid, the Veterans Administration.

6   Q.   And do you know that Medicare follows a national policy

7   in terms of what they consider to be eligible for

8   reimbursement?

9   A.   I'm sure of that, yes.

10  Q.   And you know there's a national policy to make HIV drugs

11  easily accessible to HIV patients, right, sir?

12  A.   Yes, I know that that's the case.

13  Q.   And you know that Medicare has a policy to make sure that

14  there is unimpeded access to HIV drugs, correct, sir?

15  A.   Unimpeded access, but I don't know that that means that

16  they're suggesting it's okay for a drug to be used off an

17  FDA-approved label.

18  Q.   And when you made the statement here that these claims

19  were false, you didn't speak to anybody at Medicare.

20       Correct?

21  A.   No, I didn't speak to anybody at Medicare.

22  Q.   You didn't speak to anyone at CMS, the agency that

23  operates the Medicare program.

24       Correct?

25  A.   No, I did not.

WILHELM - CROSS - BROWN

1    Q.   Okay.

2         You don't have any information from the Government that

3    operates this program about what they would or would not pay

4    for.

5         Is that fair, sir?

6    A.   I guess that's fair.  Although, I also know that drugs

7    are only to be used on the approved label from the FDA, which

8    is a Government entity, obviously.

9    Q.   And have you looked at the Medicare manual as it relates

10   to whether or not Medicare pays for medicines that are being

11   used off-label?  Have you looked at that?

12   A.   I have not looked at that.

13   Q.   Did you talk to anyone at CMS as it relates to these

14   particular medicines and say, Would you have paid for these

15   medicines if you knew what was being alleged in this lawsuit?

16        Did you have that conversation?

17   A.   I did not have that conversation.

18   Q.   And, in fact, sir --

19        MS. BROWN:  Your Honor, may I display a

20   demonstrative, please?

21        THE COURT:  Yes.  And there's no objection -- I don't

22   know what the demonstrative is.  I don't have it in front of

23   me, but there's no objection?

24        MR. RUSS:  No objection, Your Honor.

25        THE COURT:  All right.

─WILHELM - CROSS - BROWN─

1    BY MS. BROWN:

2    Q.   Sir, this is a demonstrative we've seen a couple of

3    times --

4          MS. BROWN:  Come right back out.

5    BY MS. BROWN:

6    Q.   -- a couple of times in this case.  We'll just -- can you

7    see it on your --

8    A.   I can.  Yeah, I can see it.

9    Q.   Perfect.

10         And you understand that CMS is the entity that operates

11   the Medicare program, correct, sir?

12   A.   Yes.

13   Q.   And you understand that's done through something called

14   Plan D sponsors?

15   A.   Yes.

16   Q.   Generally?

17   A.   Correct.

18   Q.   All right.

19         And you understand to get a claim submitted to CMS,

20   it's got to go from the prescriber to the pharmacy to the

21   sponsor to the Government, right, sir?

22   A.   Yes.

23   Q.   And to be fair, the testimony that you gave our jurors

24   here today had to do with information that was coming from

25   sales reps to physicians.

WILHELM - CROSS - BROWN

1   Correct, sir?

2   A.   Correct.

3   Q.   Fair to say your testimony centered on the left side of

4   this chart.

5        Right?

6   A.   Yes.

7   Q.   All right.

8        You claim, Mr. Wilhelm, that there was a nationwide

9   scheme to promote Prezista and Intelence off-label.

10       Correct, sir?

11  A.   That's correct.

12  Q.   And you say lots of people were involved in that scheme,

13  right, sir?

14  A.   Yes.

15  Q.   More than 100 sales reps around the country?

16  A.   Correct.

17  Q.   And for your testimony, this scheme went on from 2006

18  until the time you left in 2010?

19  A.   That's correct.

20  Q.   All right.

21       And at any one time, sometimes sales reps change

22  positions?

23       Correct?

24  A.   Sure.

25  Q.   So those 100 people could have been, like, 150 during the

WILHELM - CROSS - BROWN

1  time period you were there.

2       Correct?

3  A.   Could have been.

4  Q.   All right.

5       And there would have been managers of those sales reps,

6  right, sir?

7  A.   Yes.

8  Q.   And there would have been senior management in on this

9  scheme.

10      Right?

11 A.   Yes.

12 Q.   And these sales reps, they visited thousands of doctors

13 around the country.

14      Correct?

15 A.   Yes.  I think that's fair to say.

16 Q.   All right.

17      And you understand that doctors, in our country, have a

18 responsibility to report if there are sales reps in their

19 office promoting off-label?

20      Right, sir?

21 A.   I do.

22 Q.   Yeah.  And so this scheme that you described to our

23 jurors would have also had to include all of the doctors that

24 the sales reps visited during the time period.

25      Correct?

WILHELM - CROSS - BROWN

1  A.   In theory, yes.

2  Q.   Okay.

3       And you're not aware of any of the thousands of doctors

4  that Janssen sales representatives visited during the time

5  period you're there -- you're not aware of any one of them

6  reporting or complaining or raising a concern that our sales

7  reps were in their office promoting off-label, correct, sir?

8  A.   I mean, I would have no way to know that.

9  Q.   But in your role, you never heard of any doctor raising

10  that complaint.

11       Right, sir?

12  A.   That's correct.

13  Q.   And so according to you, Mr. Wilhelm, according to your

14  testimony, this nationwide scheme went on totally undetected

15  for nearly a decade until Ms. Penelow and Ms. Brancaccio filed

16  a lawsuit.

17       Right, sir?

18  A.   Well, I don't know what you mean by "undetected."  I

19  mean, physicians were hungry for the information.  They wanted

20  to know what products could be used on-label and off-label.

21       So I don't know why they would in essence report

22  something that they were hungry to receive.

23  Q.   Okay.

24       We're talking about off-label promotions to physicians.

25  Are you with me?

WILHELM - CROSS - BROWN

1  A.   I'm with you.

2  Q.   And you understand that a physician in his or her medical

3  practice -- they're licensed to practice medicine.

4       Right?

5  A.   Correct.

6  Q.   They take certain oaths to do that ethically and

7  appropriately.

8       Correct?

9  A.   Correct.

10  Q.   And they have certain regulations that guide their

11  practice of medicine.

12       Correct?

13  A.   Absolutely.

14  Q.   And one of them is the FDA regulation that would require

15  them to report to the FDA if their sales reps in their office

16  are promoting off-label.

17       Right, sir?

18  A.   I would imagine that they're -- yes, that they're aware

19  of that.  I don't know that they would ever do that.

20  Q.   As far as you know, sir, that never happened.

21       Correct?

22  A.   That is correct.

23  Q.   So I want to talk with you a little bit, Mr. Wilhelm,

24  about how this nationwide conspiracy to promote off-label was

25  carried out.

WILHELM - CROSS - BROWN

1    Okay, sir?

2  A.    Okay.

3  Q.    One thing we can agree on is that it wasn't carried out

4  in writing.

5    Right, sir?

6  A.    Yes.  And if there was ever anything in writing, as we've

7  seen, it was quickly reprimanded.

8  Q.    You never received any written instruction to promote

9  Prezista or Intelence off-label.

10    Fair, sir?

11  A.    Not in writing, correct.

12  Q.    You yourself for the people you supervise never gave any

13  written instruction that those folks should be promoting

14  Prezista and Intelence off-label.

15    Correct?

16  A.    No, nothing in writing, correct.

17  Q.    And, in fact, you know that Janssen had a number of

18  different compliance policies that prohibited the very actions

19  that you're discussing here in this courtroom, correct, sir?

20  A.    Correct.

21  Q.    For example, Janssen had a policy that prohibited

22  off-label promotion.

23    Right?

24  A.    They -- yes, they had that statement.

25    MS. BROWN:  And, Your Honor, permission to display

WILHELM - CROSS - BROWN

1    what is already in evidence, D-2095.

2              THE COURT:  You may.

3              MS. BROWN:  Thank you, Your Honor.

4    BY MS. BROWN:

5    Q.   And our jurors have already seen this health care

6    compliance.  You're familiar with Janssen's health care

7    complains department.

8         Right, sir?

9    A.   I am, yes.

10   Q.   And you're familiar with this policy document on the

11   promotion of FDA-regulated product.

12        Correct, sir?

13   A.   Yes.

14   Q.   And you know that this policy -- this multipage policy

15   directs every employee to promote only on-label.

16        Correct, sir?

17   A.   That's correct.

18   Q.   And you know that Janssen had a compensation policy that

19   only compensated sales reps for on-label promotion and sales.

20        Correct?

21   A.   Well, that may be the policy, but that's not what -- how

22   the -- what the goal was set to do.

23   Q.   We're going to talk about those goals.  Let's talk about

24   policies first okay, sir?

25   A.   Sure.

WILHELM - CROSS - BROWN

1      MS. BROWN:  Your Honor, I would like to move into

2  evidence D-2401, and that's tab 46.

3      MR. RUSS:  No objection.

4      THE COURT:  So admitted.

5  (Defendant's Exhibit 2401 in evidence.)

6  BY MS. BROWN:

7  Q.  And you're similarly familiar, Mr. Wilhelm, with this

8  field compensation review and approval policy right, sir?

9  A.  Sure.

10      MR. RUSS:  Objection, Your Honor.  Can we approach?

11      THE COURT:  All right.

12      (Sidebar begins at 12:23 p.m.)

13      MR. RUSS:  Mr. Wilhelm left in 2010.  This is a 2012

14  policy.  I couldn't get any email that he wasn't on --

15      THE COURT:  Say it again.

16      MR. RUSS:  He left in 2010.  This is 2012 policy.

17      MS. BROWN:  I can swap it with the 2010 version.

18  I'll ask the questions without the policies --

19      MR. RUSS:  That would be great.

20      THE COURT:  All right.  So you're just switching.  So

21  then --

22      MR. RUSS:  They've changed over time.

23      THE COURT:  So then for purposes of admitting the

24  exhibit, are you admitting the one from 2010 as opposed to

25  2012?

─────WILHELM - CROSS - BROWN─────

```
 1              MS. BROWN:  I'll do that.

 2              THE COURT:  All right.  That's fair.

 3              (Sidebar was concluded at 12:24 p.m.)

 4              (Open court.)

 5   BY MS. BROWN:

 6   Q.   Mr. Wilhelm, you know that the field compensation policy

 7   made clear that sales representatives would only be

 8   compensated for sales that resulted from on-label promotion.

 9        Correct, sir?

10   A.   That may -- that may be stated in the policy, yes.

11   Q.   And you spoke a lot about the speaker bureau today.  Do

12   you recall that testimony?

13   A.   I do.

14   Q.   And we're going to talk a little bit about your knowledge

15   of the speaker bureau, but you know that Janssen has a number

16   of different policies that govern the speaker bureau.

17        Correct?

18   A.   Yes.

19   Q.   For example, there are policies about how to create a

20   speaker bureau?

21   A.   I'm sure.

22   Q.   Are you familiar with that policy, sir?

23   A.   To a certain extent, yes.

24   Q.   I mean, not really that much.

25        Right?
```

─WILHELM - CROSS - BROWN─

1   A.   I mean, I couldn't quote it to you, no.

2   Q.   And the reason you're not really familiar with that

3   policy, to be fair, is that you didn't really have

4   responsibility for the speaker bureau when you worked at

5   Janssen.

6        Right, sir?

7   A.   Well, we just made suggestions on what speakers should be

8   on the bureau.

9   Q.   Sure.  I mean, to be fair, the way the speaker bureau is

10  set up on purpose is to keep the sales force out of some of

11  the key decisions about who gets onto the speaker bureau.

12       You know that, right, sir?

13  A.   Yeah, but they would definitely listen to the suggestions

14  of the sales organization as to who are the right people to be

15  on the bureau.

16  Q.   Sure, because you guys are on the ground.

17       Right?

18  A.   Right, exactly.

19  Q.   You know these doctors.

20       Right?

21  A.   Right, exactly.

22  Q.   And so there was a process in place where the sales force

23  sure could recommend folks to be on the bureau.

24       Right?

25  A.   Correct.

WILHELM - CROSS - BROWN

WILHELM - CROSS - BROWN

1   Q.   And a bunch of the documents that you and Mr. Russ showed

2   our jurors this morning, they had to do with those

3   recommendations, right, sir?

4   A.   Yes.

5   Q.   And you don't know, to be fair, what happens once you

6   make a recommendation to the speaker bureau.

7        Correct?

8   A.   Well, I don't know exactly what you're getting at there,

9   but we know who we recommended and whether or not they made

10  the speaker bureau, and I can't recall anyone that we

11  recommended to be on the bureau that wasn't selected to be on

12  the bureau.

13  Q.   And let me show you a slide our jury has seen before from

14  opening.

15       MS. BROWN:  Your Honor, may I display a

16  demonstrative?

17       THE COURT:  Yes.

18       MS. BROWN:  Thank you.

19       THE COURT:  No objection, right?

20       MR. RUSS:  No objection.

21       THE COURT:  I think we saw this before.

22       MS. BROWN:  Yeah.

23  BY MS. BROWN:

24  Q.   So this is a slide our jurors saw in opening, with a

25  couple of other witnesses.

WILHELM - CROSS - BROWN

1      You -- to be fair, Mr. Wilhelm, you were not on the

2  speaker bureau team.

3      Correct?

4  A.   No.  No, I was not.

5  Q.   Do you know and can you tell our jury who sits on the

6  speaker bureau team?

7  A.   I would imagine there's somebody from compliance and then

8  someone from -- if not a group of people from the medical

9  information physician team.

10 Q.   Well, how many folks make up the speaker bureau team?  Do

11 you know?

12 A.   I wouldn't know exactly.

13 Q.   The particulars of who is on the speaker bureau team,

14 when they meet, what guides their decision, to be fair, that's

15 not something you're aware of.

16     Correct?

17 A.   Yeah, I would agree with that.

18 Q.   All right.

19     And you know that the speaker bureau policy requires

20 the speaker bureau team to submit recommendations to something

21 called the SAFE committee.

22     Do you know that, sir?

23 A.   I'm familiar with it, yes.

24 Q.   All right.

25     And do you know what "SAFE" stands for?

WILHELM - CROSS - BROWN

1    A.    I don't remember exactly.

2    Q.    All right.

3          Do you know who sits on the SAFE committee?

4    A.    No.

5    Q.    Do you know what policies or guidelines or rules drive

6    the SAFE committee's determination if someone who's been

7    recommended by the field is appropriate for the bureau?

8    A.    No, not specifically.

9    Q.    Do you know how many folks from health care compliance

10   are involved in the SAFE committee?

11   A.    No, but I think there are only a couple people that were

12   in that department, so I would imagine both of them.

13   Q.    Do you know how many folks that are in medical affairs

14   are involved with the SAFE committee?

15   A.    Not a specific number, no.

16   Q.    Okay.

17         To be fair, once you, from a sales perspective, make a

18   recommendation, you don't know the process for how that

19   recommendation is evaluated.

20         Correct?

21   A.    That's fair.

22   Q.    All right.

23         And we spoke a little bit -- these policies, the

24   speaker bureau policy and the off-label promotion policy, the

25   compensation policy, you would agree that you never received

WILHELM - CROSS - BROWN

1  any verbal instruction that these policies should not be

2  followed?

3        Correct, sir?

4  A.   No, no direction that it shouldn't be followed.

5  Q.   Right.

6        And I'm sorry.  I just couldn't hear you.  You never

7  received any verbal instruction not to follow the company

8  policy.

9        Correct?

10 A.   Correct.

11 Q.   And, in fact, you told us that Janssen's management never

12 encouraged off-label promotion.

13       Right, sir?

14 A.   I don't agree with that.

15 Q.   Well, you said no pharmaceutical company, including

16 Janssen, blatantly encourages a sales force to promote

17 off-label.

18       Do you remember that, sir?

19 A.   Not in writing, but I do believe, based on all the

20 conference calls that we had on Fridays, that a significant

21 amount of conversation and direction had to do with what would

22 be the best way to sell this product and to overcome the

23 obstacles that we were facing and the objections we were

24 getting from physicians as to why they would not at that time

25 use Prezista in -- in -- in place of a competitor.

WILHELM - CROSS - BROWN

1  Q.   Okay.

2       We're going to talk about that, but I want to focus on

3  what people told you.

4       Okay?

5  A.   Okay.

6  Q.   Those Friday conference calls, they would have included

7  Mark Gossett, correct?

8  A.   He was on there on occasion, not all of them.

9  Q.   And Mark Gossett -- you've never heard Mark Gossett say

10 that the sales force should misrepresent Prezista's lipid

11 profile to doctors.

12      Correct, sir?

13 A.   No, he didn't say "misrepresent."

14 Q.   Excuse me?

15 A.   He did not say "misrepresent."

16 Q.   And similarly, you didn't hear Mike Iacobellis say that

17 the sales force should misrepresent Prezista's lipid profile.

18      Correct?

19 A.   No.  They didn't say "misrepresent," but they did say

20 that it was -- had superior safety and tolerability to its

21 competitors.  That could be a misrepresentation.  Sorry.

22 Q.   Safety -- better safety and tolerability; is that what

23 you said?

24 A.   Yeah.

25 Q.   Okay.

WILHELM - CROSS - BROWN

1       They're trying to get data that Prezista has better

2  safety and tolerability compared to competitors.

3       That's in the label, right, sir?

4  A.   Not for all of the label.  Certain parts of the label,

5  perhaps.

6  Q.   Well, it doesn't matter what part of the label it's in.

7  If it's in the label, you can talk about it.

8       Right, sir?

9  A.   Yes.

10 Q.   All right.

11      So when you said they would be talking about Prezista

12 having better safety and tolerability, that's okay?

13 A.   Well, no, because it's an adverse reaction for

14 hypercholesterolemia and hypolipidemia, and they're saying

15 that it has superior safety and tolerability, which is not

16 true because it doesn't.

17      Reyataz was the gold standard and had a much better

18 safety profile with regards to cardiovascular events and

19 diabetes and hypolipidemia.

20 Q.   Okay.

21      We're going to talk about the data on lipids that is in

22 the label.

23      Okay, sir?

24 A.   Okay.

25 Q.   You would agree with me there is data about Prezista's

WILHELM - CROSS - BROWN

1    lipid profile in the label.

2        Correct?

3    A.   Yes, under the adverse reaction.

4        THE COURT:  Ms. Brown, sorry.  I don't know where

5    we're going to stop, but we are at the lunch break.

6        MS. BROWN:  Yep.  Great spot.

7        THE COURT:  Is this all right or is there another one

8    or two questions you want to put in there?

9        MS. BROWN:  No, perfect spot.  Thank you, Your Honor.

10       THE COURT:  All right.  Thank you, then.

11       All right.  Folks, let's break for lunch.  We'll be

12   back at quarter after 1.  Let's first get the jurors out, and

13   then I'll see you all this afternoon when you're done.

14       And, counsel, just remain for a moment.

15       THE DEPUTY COURT CLERK:  All rise.

16       (Jurors exit the courtroom.)

17       THE COURT:  Folks, you can be seated.

18       Sir, you can step out if you want because we're on

19   lunch break for 45 minutes.

20       THE WITNESS:  Thank you, Your Honor.

21       THE COURT:  Let me just speak with counsel.  Yeah,

22   counsel, just remain.

23       Anything we need to chat about, or maybe wait for the

24   witness to leave?  Is there anything we need to discuss before

25   I allow you all to break for lunch?

─── WILHELM - CROSS - BROWN ───

1          MS. BROWN:  Not from our point of view, Your Honor.

2          MR. MARKETOS:  No, Your Honor.

3          THE COURT:  All right.  Well, then you're adjourned.

4   Thank you, guys.  Remain seated.  Be well.

5          (Luncheon recess was taken from 12:30 p.m. until 1:15

6   p.m.)

7          THE DEPUTY COURT CLERK:  All rise.

8          (Jury enters the courtroom.)

9          THE COURT:  Folks, why don't we all have a seat.

10         Mr. Wilhelm, I'm just going to remind you you are still

11  under oath from this morning.

12         THE WITNESS:  Yes.

13         THE COURT:  Okay.  And, Ms. Brown, whenever you're

14  ready to proceed.

15         MS. BROWN:  Great.  Thank you very much.  Welcome

16  back, everyone.

17  BY MS. BROWN:

18  Q.  Welcome back, Mr. Wilhelm.  How are you?

19  A.  I'm well, thank you.

20  Q.  Good.

21         When we left off, we were talking about trying to

22  understand how this nationwide scheme that you've alleged here

23  was carried out.

24         Do you remember that, sir?

25  A.  Yes.

WILHELM - CROSS - BROWN

1   Q.   And one of the things you allege in your declaration as

2   well as your deposition, that it was a situation where smart

3   people were reading between the lines.

4        Do you remember that, sir?

5   A.   Yes.

6   Q.   All right.

7        And what you meant by that in terms of your words is

8   that you felt Janssen was sending mixed messages in some

9   sense.

10       Correct?

11  A.   Correct.

12  Q.   Meaning on the one hand Janssen was instructing the sales

13  force to hit their sales goals.

14       Right?

15  A.   Right.

16  Q.   And on the other hand, Janssen was telling the sales

17  force that you needed to stay on-label.

18       Correct?

19  A.   They weren't saying that.  They were putting that in

20  writing.  What they were saying was that there were ways to

21  increase the sales of the drug and gave us the information

22  necessary to sell it effectively on the off-label indications.

23  Q.   Okay.

24       And your testimony, though, sir, has been that you read

25  between the lines that that was the message that was coming

WILHELM - CROSS - BROWN

1    from Janssen.

2         Correct, sir?

3    A.   Well, I didn't read between the lines.  It was a

4    conversation that we had on a weekly basis.

5    Q.   Okay.

6         What you say in your -- excuse me -- in your

7    declaration was that instructions were coming from management

8    with a wink.

9         Do you recall that?

10   A.   I do.

11   Q.   And what you meant by that is the instructions from

12   management were one thing, but they really meant something

13   else.

14        Correct?

15   A.   That's correct.

16   Q.   All right.

17        And one of the things you talked about -- you have some

18   experience with Glenn Mattes, correct, sir?

19   A.   I do.

20   Q.   And he, as our jury has heard, was the president of

21   Tibotec for a period of time at issue in this lawsuit.

22        Right, sir?

23   A.   Correct.

24   Q.   And you had worked with him at another Johnson & Johnson

25   family of companies.

WILHELM - CROSS - BROWN

1          Correct?

2   A.   That's correct.

3   Q.   All right.

4          And it sounds like you thought he was a little mean.

5          Right?

6   A.   Yeah, I think that's fair.

7   Q.   Okay.

8          And I think you said folks called him -- instead of

9   Glenn Mattes, they called him Glenn Mad at Us.

10          Right?

11  A.   Right.

12  Q.   Because they interpreted him as frequently being mad at

13  them.

14          Right?

15  A.   Correct.

16  Q.   All right.

17          So he was -- from your point of view, he was a little

18  grumpy?

19          Fair to say?

20  A.   That's a fair description.

21  Q.   Okay.

22          But your allegations here are despite that, when you

23  were working with him at the other company, he was never

24  directing off-label.

25          Correct?

WILHELM - CROSS - BROWN

1    A.   That's correct.  There was really no off-label to be

2    utilized in the antibiotic field or in the pain medication

3    field at the time.

4    Q.   And you described a number of other positions that you

5    had at different Johnson & Johnson family of companies, and

6    there, too, you didn't have any experience being pressured to

7    promote off-label.

8         Correct?

9    A.   That's correct.

10   Q.   All right.

11        And you talked a little bit -- and you're not the first

12   witness who has talked to our jury about pressure that the

13   sales force felt at the time of 2006 when Prezista was

14   launched.

15        Do you remember this?

16   A.   Yes.

17   Q.   And one of the things you described about the launch of

18   Prezista is it received early access approval.

19        Correct, sir?

20   A.   Yes.

21   Q.   And that means it got to the market much faster than it

22   normally would.

23        Correct?

24   A.   That's correct.

25   Q.   And that was a good thing because it was a lifesaving

WILHELM - CROSS - BROWN

1    medicine.

2        Correct?

3    A.   That's fair to characterize it that way.

4    Q.   And you would characterize it as a good drug that helped

5    many, many people.

6        Correct?

7    A.   It's a good drug when it's used appropriately in the

8    appropriate patient that it's indicated for.

9    Q.   And one of the issues with getting a drug approved

10   through an early access program is there's not a lot of data

11   at the time it becomes available for prescription -- for

12   doctors to prescribe.

13       Correct?

14   A.   Yes.

15   Q.   And you described that in many ways as a blessing and a

16   curse.

17       Right?

18   A.   Yes.

19   Q.   It was a blessing because a lifesaving medicine got to

20   market quicker.

21       Right?

22   A.   Right.

23   Q.   But it was a curse because you all were out there trying

24   to educate doctors about a medicine for which there wasn't a

25   lot of data available yet.

WILHELM - CROSS - BROWN

1     Right?

2   A.   Exactly, yes.

3   Q.   And you've described particularly HIV doctors as being

4   hungry for data.

5        Right?

6   A.   That's correct.

7   Q.   I mean, these are the men and women on the front line of

8   truly treating an epidemic.

9        Right?

10  A.   Yes.

11  Q.   And many of them had to educate themselves through

12  experience and practice and reading and conferences to be able

13  to do the very best thing they could for their patients.

14       Right?

15  A.   I think that's fair to say, yes.

16  Q.   All right.

17       And so one of the reasons that Prezista didn't meet its

18  initial sales numbers is because of this blessing and curse

19  situation, correct?

20  A.   That's part of the reason, yes.

21  Q.   All right.

22       And because part of the reason was doctors didn't have

23  experience with this new medicine yet that got to the market

24  so quickly.

25       Fair?

WILHELM - CROSS - BROWN

1    A.   Yes.

2    Q.   All right.

3         And you know that, as it relates to the sales force,

4    the forecast were actually lowered when it became clear that

5    Prezista wasn't going to meet the initial forecasted sales.

6         Correct?

7    A.   That first year the goal was lowered, yes.

8    Q.   Yeah.

9         It was actually lowered a number of different times

10   throughout that year.

11        Right, sir?

12   A.   I believe so, as it continued to not live up to

13   expectations.

14   Q.   Right.

15        And let me show you a document that's already in

16   evidence on that score.

17        MS. BROWN:  Your Honor, permission to display D-8701.

18        THE COURT:  You may.

19        MS. BROWN:  Thank you.

20   BY MS. BROWN:

21   Q.   Our jury has already seen this, but this was a

22   transcription or a type-out of a voicemail that went to the

23   entire field organization towards the end of 2006.

24        Do you see that, sir?

25   A.   I do.

WILHELM - CROSS - BROWN

1  Q.   And you would have been part of that organization at the

2  time.

3       Correct?

4  A.   Yes.

5  Q.   All right.

6       And Deb O'Connor at the time, she was the head of the

7  sales organization.

8       Right?

9  A.   She was the national sales director, yes.

10 Q.   She was the national sales director.

11      And incidentally, I didn't hear you say anything about

12 Ms. O'Connor instructing folks to go off-label.  Are you

13 accusing her of that as well?

14 A.   She would have been knowledgeable about that, yes.

15 Q.   Well, was she instructing people or not?

16 A.   Well, again, not formally in writing, but, again, she was

17 part of the management -- upper management that would be on

18 calls.  On Fridays she was, of course, part of all the POA

19 meetings, et cetera.

20 Q.   I want to know -- I didn't mean -- I want to know are you

21 accusing Deb O'Connor of verbally instructing anyone to

22 promote off-label?

23 A.   She didn't say, You need to promote this drug off-label.

24 What all of the organization discussed was, How are we going

25 to sell this product more effectively and how are we going to

WILHELM - CROSS - BROWN

1  reach goal when we have a limited indication, a limited number

2  of patients that are highly treatment-experienced?

3       And the conversation was always, How are we going to

4  move this drug into early treatment experience and into naive?

5  Q.  Okay.

6       Early treatment experience actually was on-label.

7       Right, sir?

8  A.  Not at the time that it was approved.  It was highly

9  treatment-experienced.

10  Q.  Sir, have you looked at the label recently?

11  A.  Yeah.

12  Q.  All right.

13       Have you looked at the 2006 label when it was approved?

14  A.  Yes.

15  Q.  Do you believe it was only approved for highly

16  treatment-experienced?

17  A.  I do.

18  Q.  Okay.

19       Do you know it was approved for experienced patients,

20  including those who had failed just one medicine prior?

21  A.  Fair.

22  Q.  Okay.

23       Did you forget that part?

24  A.  No.

25  Q.  Okay.

WILHELM - CROSS - BROWN

1      That's not highly treatment-experienced.  That's

2  experienced.

3      Right?

4  A.   Well, "highly treatment-experienced" was the words that

5  were always used.  The physicians used the word "salvage," and

6  we were quickly instructed that anybody that used the word

7  "salvage" needed to be corrected.

8  Q.   Right.

9      Because salvage wasn't what we were approved for in

10  2006 alone, right?  It wasn't just salvage.

11  A.   I mean, you can call it what you want.  I'm just telling

12  you that's what the physicians referred to it as.

13  Q.   I want to talk about what we were approved for, what was

14  in the label.

15      Okay, sir?

16  A.   Sure.

17  Q.   And what we were approved for was anyone who had

18  experience and failure on just one other medicine.

19      Right, sir?

20  A.   That's not my recollection.

21  Q.   Okay.

22      Let's take a quick look.

23          MS. BROWN:  Your Honor, permission to admit D-1007A.

24          MR. RUSS:  No objection, Your Honor.

25          THE COURT:  All right.  So admitted.

WILHELM - CROSS - BROWN

1           MS. BROWN:  Thank you.

2           (Defendant's Exhibit D-1007 A in evidence.)

3   BY MS. BROWN:

4   Q.  And we're going to come back to this document, but since

5   you brought it up, this is the Prezista label right here from

6   2006.

7           You're familiar with it, right, sir?

8   A.  Yes.

9   Q.  And this is the label you talked about a couple of times

10  Prezista only being approved for highly treatment-experienced

11  patients.

12          Right?

13  A.  Correct.

14  Q.  And by that you mean somebody who has failed one or two

15  or three or four or five medicines before they get to us.

16          Right?

17  A.  Right.

18  Q.  And sometimes doctors called that salvage patients.

19          Right?

20  A.  Correct.

21  Q.  And that truly means we are out of options and this is

22  the last medicine we have to try and see if it works.

23          Right?

24  A.  One of the few remaining.

25  Q.  Yeah.

WILHELM - CROSS - BROWN

1    But that wasn't what Prezista was approved for back in

2  2006, and fair enough, it's been a while, but let me see if I

3  can remind you, this is the indication for Prezista when it

4  was approved.

5    Do you see that, sir?

6  A.   I do.

7  Q.   All right.

8    And it says that Prezista is coadministered with

9  ritonavir.

10    You know that, right, sir?

11  A.   Correct.

12  Q.   That's the booster drug you were talking about earlier?

13  A.   Correct.

14  Q.   Okay.

15    It's indicated for the treatment of HIV in

16  treatment-experienced adult patients.

17    Do you see that?

18  A.   Yes.  I also see the rest of that sentence.

19  Q.   I'm getting there.

20  A.   Okay.

21  Q.   You see that, treatment-experienced, right?

22  A.   Yep, yep.

23  Q.   And what you want to get to, and so do I, is "such as

24  those with HIV strains resistant to more than one protease

25  inhibitor."

WILHELM - CROSS - BROWN

1    Do you see that?

2   A.   Yeah.  Key word being "protease inhibitor" because there

3   are other classes of HIV drugs that sometimes were utilized

4   before a protease inhibitor.  So they could have failed

5   multiple HIV medications and then also one protease inhibitor.

6   Q.   Sure thing.

7    But that doesn't -- it doesn't matter if they did or if

8   they didn't.  What it's indicated for is an experienced

9   patient that was resistant to more than one protease

10  inhibitor.

11    Right, sir?

12  A.   Yes.

13  Q.   It doesn't say it's only indicated for highly experienced

14  patients who were salvage patients.

15    Right, sir?

16  A.   But by definition, they would have failed more than one

17  product, maybe just one protease inhibitor, but more than one

18  product.

19  Q.   But, sir --

20  A.   Okay.

21  Q.   -- let's get back to where we were.

22    So we're talking about the message that comes out from

23  Deb O'Connor to the field, including you, back in 2006.

24    Right, sir?

25  A.   Correct, yes.

WILHELM - CROSS - BROWN

1  Q.  And this is coming at the time when you had just finished

2  POA meetings.

3       Do you see that in the first paragraph there?

4  A.  Yes.

5  Q.  All right.

6       And what they talk about, and our jury's already seen

7  this, is that it became clear that you were not going to meet

8  the $49 million forecast.

9       Correct?

10 A.  Correct.

11 Q.  And so what Deb O'Connor and Glenn Mattes announced is

12 that they're going to revise the forecast.

13      Right, sir?

14 A.  They did announce that.

15 Q.  And it's not just like they're going to revise it a

16 little bit.  They are going to revise it by 53 percent, right?

17 Or they're going to come down to 53 percent of the original

18 forecast.

19      Right, sir?

20 A.  That's what that says, yes.

21 Q.  So you start at 49, they realize that's not going to

22 work, and they say they're going to take it down to 23.

23      Correct?

24 A.  Correct.

25 Q.  All right.

WILHELM - CROSS - BROWN

1    And what they say is that this is going to be applied
2    evenly across every territory, correct?
3    A.   Yes.
4    Q.   And that the number will be used to calculate the
5    six-month bonuses, correct?
6    A.   Uh-huh.  Yes.
7    Q.   As well as some other awards.
8        Do you see that, sir?
9    A.   I do.
10   Q.   All right.
11       And what Deb and what Ms. O'Connor and Mr. Mattes say
12   here at the end, they got a few closing comments.
13       Right, sir?
14   A.   Yes.
15   Q.   "The decision to lower our launch forecast was not an
16   easy one, but we recognize it's the right thing to do given
17   where we are."
18       Right, sir?
19   A.   Yes.
20   Q.   All right.
21       And what they say is that "All of us have a stake in
22   the success of Prezista."
23       Correct?
24   A.   Correct.
25   Q.   And that they encourage everyone to go out there and make

WILHELM - CROSS - BROWN

1  this new forecast, the $23 million, "our reality."  Correct,

2  sir?

3  A.  Yes.

4  Q.  And certainly you would agree that lowering a forecast

5  down to 53 percent released some of the pressure on the sales

6  force, correct, sir?

7  A.  Yeah.  I would say it relieved some of the pressure, but

8  also keep in mind that the first month we were at about 23 or

9  24 percent of goal.

10      So you could certainly make the argument that they made

11  a step in the right direction, but they didn't necessarily cut

12  the forecast or the dollar goal as much as they could have or

13  should have based on the first month's performance.

14  Q.  You and I can agree that taking 49 million down to 23

15  million is a pretty good step, right?

16  A.  That's a step in the right direction.

17  Q.  Yep.

18      And we can agree that certainly this went a long way in

19  terms of releasing some of the pressure you were talking to

20  our jurors about.

21      Correct?

22  A.  Some of the pressure.

23  Q.  And one of the things that happened, you know, between

24  2006 and the end of 2007 and 2008 is that a lot of additional

25  information became available to doctors about Prezista.

WILHELM - CROSS - BROWN

1          Correct?

2   A.    Yes, that's a fair statement.

3   Q.    There was a lot of scientific research and study that was

4   going on between 2006 and 2008.

5          Correct?

6   A.    Correct.

7   Q.    In fact, at the time of this memo, at the time Prezista

8   comes to market, the studies that would support the indication

9   for naive patients, they were already going on.

10         Right, sir?

11  A.    They were already going on, correct.

12  Q.    And the tricky part for you guys is that doctors knew

13  that.

14         Right?

15  A.    Right.

16  Q.    Doctors knew that there were studies going on beyond the

17  label, and oftentimes, they raised it with the sales force.

18         Right?

19  A.    That's correct.

20  Q.    And that kind of put you guys in a tough spot sometimes

21  because Janssen told you, You can't speak to them off-label.

22         Right?

23  A.    Right.

24  Q.    All right.

25         And not only did studies come out that would support

WILHELM - CROSS - BROWN

1  the new indication, but data was presented at conferences like

2  CROI.

3        Correct?

4  A.   Correct.

5  Q.   And Prezista became, during this time period, recommended

6  in the Government treatment guidelines.

7        Correct?

8  A.   I believe that's a fair statement.

9  Q.   And, in fact, Prezista became one of only two protease

10 inhibitors that our Government recommended for the treatment

11 of HIV.

12       Correct?

13 A.   I believe that's correct.

14 Q.   And you know that Prezista is still a recommended PI to

15 this day?

16 A.   I'm sure it is, yes.

17 Q.   All right.

18       And so one of the things that happened following this

19 reduction of the forecast, all of this data comes out on

20 Prezista and the sales start going up.

21       Right, sir?

22 A.   They did.

23 Q.   Pretty quickly, once the new data came out, the sales of

24 Prezista actually started to exceed the new goals.

25       Correct, sir?

─WILHELM - CROSS - BROWN─

1   A.   A long -- yes.  And I think -- well, I can elaborate on

2   why I believe that is, but I'll stick to your question.

3   Q.   Well, certainly you agree that a large part of it had to

4   do with the additional data that was coming out that

5   physicians were able to look at.

6        Correct?

7   A.   Yes, which would have been considered off-label by

8   definition.

9   Q.   Okay.

10       Well, on that score, though, sir, you understand that

11   doctors can look at whatever they want.

12       Right, sir?

13   A.   Absolutely.

14   Q.   Right?

15       Like, doctors are not restricted by what sales reps are

16   allowed to bring into a doctor's office.

17       Right?

18   A.   Correct.

19   Q.   And doctors can and do in their good medical judgment

20   prescribe medicines off-label all the time.

21       Right, sir?

22   A.   I don't know that I would agree with "all the time," but

23   they do -- they do use it off-label, yes.

24   Q.   And there's nothing wrong with that if they believe, in

25   their medical judgment, it's right for their patient.

WILHELM - CROSS - BROWN

1       Right?

2   A.   That's a fair statement.

3   Q.   And particularly in the field of HIV, doctors prescribe

4   off-label because they have to a lot of the time.

5       Right, sir?

6   A.   I don't know if I would agree with "have to," but they

7   do.

8   Q.   Right.

9       Because in their medical judgment is the best thing

10  they can do for their patients.

11      Right, sir?

12  A.   Of course they have the patient's best interest at heart,

13  yes.

14  Q.   Right.

15      Incidentally, for all the claims that you were in here

16  this morning talking to our jury about, you don't mean to

17  suggest that any of these physicians were doing something

18  harmful to their patients, right, sir?

19  A.   Well, they're not doing something harmful intentionally.

20  However, again, with six months of data when you're using a

21  product that is being promoted at times for indications that

22  are not approved by the FDA, and you don't know the long-term

23  risk of hypolipidemia and hypercholesterolemia, which take

24  years to develop, how do you know what the cardiovascular risk

25  or the stroke risk or the risk of death would be after 24

WILHELM - CROSS - BROWN

1  weeks of data?  You don't.

2      So they're making decisions that could potentially have

3  a bad outcome for a patient.  Not intentionally, but because

4  it's being promoted that way, it could have a detrimental

5  effect.

6  Q.  You understand the FDA approved this medicine with 24

7  weeks of data?

8      Do you understand that?

9  A.  I understand that.

10 Q.  And you understand the FDA did that under a 1992 law that

11 allowed early access to lifesaving medicines?

12 A.  I understand that.

13 Q.  And you understand, in the FDA's judgment, the data at 24

14 weeks supported making this medicine available to doctors to

15 prescribe for patients?

16 A.  I understand that.  And I understand they also have

17 adverse reactions and other warnings in the FDA label.

18 Q.  Let's talk about the message that was being given to the

19 sales representatives, sir.

20      MS. BROWN:  And, Your Honor, I would like to admit

21 D-2079, which is tab 2.

22      MR. RUSS:  Object only to the extent this witness

23 isn't on part of this document.

24      MS. BROWN:  And, Your Honor, I'm just going to get

25 forwarded to somebody that's not him.  I'm just going to show

─────WILHELM - CROSS - BROWN─────

1   the part that he's on.

2          THE COURT:  I'm sorry, you're -- is this similar to

3   the prior document that we had this discussion?  Okay.

4          The document is admitted but only for the portion that

5   the witness received.

6          MS. BROWN:  Yes, sir.

7          MR. RUSS:  Thank you, Your Honor.

8          THE COURT:  Okay.  It's admitted for that purpose.

9          MS. BROWN:  And let me just make sure that we show

10  the part that you are on.

11         (Defendant's Exhibit 2079 in evidence.)

12  BY MS. BROWN:

13  Q.   This is an email from Tuesday, September 30th, 2008.

14       Do you see that, sir?

15  A.   I do.

16  Q.   And this is from Mike Iacobellis.

17       Correct?

18  A.   Yep.

19  Q.   And at this time, he was the national sales director.

20       Is that right, sir?

21  A.   Yes.  I believe by that date he would be, yes.

22  Q.   Yep.  We got him down here national sales director.

23       Right, sir?

24  A.   Uh-huh.

25  Q.   And this email goes to a number of folks.  Sara Strand,

1    she's the witness our jury heard from before you.

2        Right?

3    A.    Yes.

4    Q.    And then we have you, Mark Wilhelm.

5        Right?

6    A.    Yes.

7    Q.    And this is -- the subject is "Promotional Guidelines

8    Compliance."  And you know how you can, like, tag an email if

9    it's super important?  This one gets tagged with high

10    importance.

11        Right?

12    A.    Okay.  Yep.

13    Q.    All right.

14        And this is the time that in 2008 that Prezista is on

15    the eve of getting an additional indication.

16        Correct?

17    A.    Yes.

18    Q.    Because as we talked about, from 2006 to 2008, the

19    studies were going on to support Prezista's use in naive

20    patients.

21        Right?

22    A.    Right.

23    Q.    So you start out in 2006, it's got to be somebody who had

24    experience, but by 2008, now the FDA approves it for any

25    patient.

WILHELM - CROSS - BROWN

1    Correct?

2  A.    Well, for naive patients, yes.

3  Q.    For naive patients.  All right.

4        And so Mr. Iacobellis is sending this compliance email

5  to the sales organization on the eve of that approval.

6        Okay?

7  A.    Uh-huh.

8  Q.    Do you see?

9        And then you received this, right, sir?

10 A.    Yes.

11 Q.    All right.

12       And what he says is that "The excitement for the full

13 label launch is building."

14       Correct?

15 A.    Right.

16 Q.    "But the purpose of the email is to provide a reminder to

17 sales representatives to follow promotional guidelines and

18 refrain from off-label discussions concerning our product."

19       Correct?

20 A.    That's what this email says, yes.

21 Q.    Yep.

22       He says, "All unsolicited off-label requests should be

23 forwarded to medical information."

24       Right?

25 A.    That's what he says.

WILHELM - CROSS - BROWN

1  Q.  And "Tibotec Therapeutic's policy is to promote our

2  products within FDA-approved labeling with fair, balance and

3  full disclosure."

4        Correct?

5  A.  That's the policy.

6  Q.  And he goes on to give some examples of off-label

7  materials that are prohibited to be discussed at this time.

8        Do you see that?

9  A.  I do.

10  Q.  And these are scientific studies, some of them like

11  ARTEMIS and TITAN.

12        Do you see that?

13  A.  I do.

14  Q.  And those studies actually ultimately make it in to the

15  label, right?

16  A.  Correct.

17  Q.  Like here he is saying, We are on the eve of this getting

18  into the label, make sure you don't promote it until it gets

19  into the label.

20        Right?

21  A.  That's what he's saying in this email, yes.

22  Q.  And he gives some examples, and then he says down here,

23  at the bottom, "We look forward to the approval and the

24  ability to discuss this new data once we get the FDA

25  approval?"

WILHELM - CROSS - BROWN

1      Do you see that?

2  A.   I see that.

3  Q.   All right.

4      And it's your testimony, sir, that despite receiving

5  this email, 100 plus sales reps from around the country

6  interpreted this direction to mean they should nevertheless go

7  ahead and promote Prezista off-label?

8  A.   Well, it was occurring -- occurring well before this

9  email came out, and what's important to understand is that

10  these articles ARTEMIS, TITAN and others, were disseminated in

11  binders to this entire sales organization.

12      There is an extensive amount of training provided to

13  the team, so that they were well versed in being able to talk

14  to these studies well before the official approval of the

15  label.

16      And you combine that with the pressure to perform and

17  to meet goal, and when sales representatives were in front of

18  physicians, they knew that that was their opportunity, whether

19  they got the direction -- or the question unsolicited or if

20  they were able to provoke the question, which in essence is a

21  solicited question, which you're not supposed to do.

22      But if they could get the physician to engage in a

23  conversation about off-label use, they would talk about it.

24  Because they knew that they're being judged on their sales

25  performance.  We didn't get data to see how that sales

WILHELM - CROSS - BROWN

1   performance was progressing until about three months later.

2          So if you miss an opportunity to address that and

3   change that physician's behavior at the time that you're

4   sitting there with that doctor, you don't know when you might

5   get another chance to do that.  And if you get an MIR request,

6   which was the other option, that takes time.

7          So, again, there's lag in getting that critical

8   information to the physician that's off-label information.  So

9   you're delaying the results of sales growth that that person

10  is being held accountable for and potentially losing their job

11  if they don't perform.

12  Q.   And very respectfully, sir, that wasn't my question at

13  all.

14         My question was:  Every sales representative who got

15  this email that says do not promote off-label until we get the

16  approval, you're telling our jury, nevertheless, went out and

17  promoted off-label.

18         Right?

19  A.   Well, they were doing that for months before that.  So --

20  so I think it fell on deaf ears, to be honest with you.

21  Q.   And, sir, what is truly remarkable about this is that

22  nobody ever sent an email concerned about whether or not they

23  should follow what's written in the policy or what they

24  thought they should be doing otherwise.

25         Right?

WILHELM - CROSS - BROWN

1   A.   There was never an email sent, but, I mean, there was a

2   lot of discussion about some people being uncomfortable with

3   doing it.

4   Q.   Well, sir, this is back in 2006, '7, '8.

5        Right?

6   A.   Correct.

7   Q.   Believe it or not, we didn't really have texting back

8   then.

9        Right?

10  A.   Right.

11  Q.   Hard to imagine a time without texting.

12       Right?

13  A.   Yeah, yep.

14  Q.   But we didn't have it then.  And so lots of people,

15  including you, used their email to sort of have personal

16  conversations with their colleagues.

17       Right?

18  A.   Well, we tried not to because we were coached not to put

19  it into writing.  So most of the conversations occurred

20  verbally.

21  Q.   Well, we have emails including from folks like you where

22  people are having personal banter.  You know that because you

23  did it.

24       Right, sir?

25  A.   Yeah, personal banter.  I guess that's fair.

WILHELM - CROSS - BROWN

1  Q.  I mean, in large part because we didn't have texting.  We

2  used email like that back in 2006 and '7 and '8.

3      Right, sir?

4  A.  Yeah.  We had voicemail, and we had conference calls

5  weekly.

6  Q.  And what we don't have in this case is any email between

7  sales representatives or sales representatives and district

8  managers or KAMs saying, Oh, my goodness, I'm confused, the

9  direction on paper is not to promote off-label, but I think I

10  have to promote off-label.

11     Right, sir?  You've never seen that?

12  A.  Correct.

13  Q.  And you met with the lawyer representing Ms. Penelow and

14  Ms. Brancaccio before coming in here today.

15     Right, sir?

16  A.  Yes.

17  Q.  And he didn't show you any emails between sales reps

18  having those conversations.

19     Right, sir?

20  A.  No, not that I can recall.

21  Q.  Okay.

22     He did show you some of the emails that he wanted to go

23  through with you here today.

24     Right, sir?

25  A.  Yes.

WILHELM - CROSS - BROWN

1  Q.  And you met with him -- is it at the DoubleTree where you

2  all are staying?

3  A.  That's correct.

4  Q.  That's where all the Relators' lawyers are staying and

5  the witnesses.

6       Right?

7  A.  That's correct.

8  Q.  And you met and prepared for what you were going to say

9  to our jury.

10      Correct?

11 A.  Yes.

12 Q.  And you did that last week.

13      Right?

14 A.  Yes.

15 Q.  Okay?

16      When did you come to New Jersey last week?

17 A.  I got in Wednesday afternoon.

18 Q.  Okay?

19      Did you come with Ms. Graham, or you came separately?

20 A.  Came separately.  I came from a conference in

21 Salt Lake City.

22 Q.  And Ms. Graham told us these lawyers were paying for her

23 expenses.  Were they paying for yours, too?

24 A.  Yes.

25 Q.  And you had to testify on Thursday?

WILHELM - CROSS - BROWN

1    Is that right?

2  A.   I was expecting to be able to testify on Thursday, yes.

3  Q.   We understood there was a reason you had to testify on

4  Thursday?

5    Is that true?

6  A.   Well, there was a conference in Salt Lake City that I had

7  to leave early, which I would have preferred not to, but I

8  did.

9  Q.   Then you went back home to Colorado?

10    Correct?

11  A.   Correct.

12  Q.   And when did you come back here?

13  A.   Sunday evening, last night.

14  Q.   Okay.

15    And you prepared a little bit more with the lawyers to

16  get ready.

17    Correct?

18  A.   Just briefly last night, yes.

19  Q.   Did you speak to Ms. Penelow and Ms. Brancaccio while you

20  were at their hotel?

21  A.   No.  I mean, other than -- not other than "hello."

22  Q.   Okay.

23    If you were really promoting these medicines off-label,

24  Mr. Wilhelm, you would agree with me that you went to great

25  lengths to make sure the documents looked like you were doing

—WILHELM - CROSS - BROWN—

1  everything compliantly.

2      Right?

3  A.   Yes.

4  Q.   Was that part of the scheme, to try and carefully commit,

5  you know -- create reams and reams of documents that looked

6  like you guys are being compliant?

7  A.   Well, I think that's the way that they felt they could

8  sleep at night.

9  Q.   But what about you?  I'm talking about your documents,

10  and we're going to look at them, that talk about compliance,

11  that stress compliance.

12      Were you purposely doing that to try and get people

13  cover up a trail?

14  A.   I mean, yeah.  Everyone knows the risk from a FDA

15  perspective, from a legal perspective for promoting a drug e

16  doff-label, but it didn't prevent or stop the sales

17  organization from promoting the drug in a way that would allow

18  the team to be successful and to meet the sales goal.

19      The only way to do that was to promote it in areas

20  other than what the FDA-approved label was at the time.

21          MS. BROWN:  I'd like to admit, Your Honor, tab 26,

22  D-8674.

23          MR. RUSS:  No objection, Your Honor.

24          THE COURT:  So admitted.

25  (Defendant's Exhibit 8674 in evidence.)

WILHELM - CROSS - BROWN

1  BY MS. BROWN:

2  Q.   Mr. Wilhelm, I want to show you an email that involves

3  you, back in 2009.  We're going to start at the bottom so we

4  can get our bearings here as we move up the email.

5        So this starts with an email from Michael Jones to you

6  titled "resource binder."

7        Do you see that?

8  A.   I do.

9  Q.   Okay.

10       And Mr. Jones worked for you?

11       Is that right, sir?

12  A.   He did.

13  Q.   Okay.

14       And he says this list of items to you -- here are the

15  items, and it has things like product specific slim-jims.

16       Do you see that?

17  A.   Yes.

18  Q.   Were they like glossy visual aids you could bring to a

19  doctor's office?

20  A.   Correct.

21  Q.   You understand those were approved by the FDA?

22  A.   Correct.

23  Q.   Okay.

24       He talks about package insert.

25       Right?

WILHELM - CROSS - BROWN

1  A.   Yes.

2  Q.   Those are the label.

3       Right, sir?

4  A.   That's right.

5  Q.   And he has a few other things on his list, patient

6  assistant pieces.

7       Do you see that?

8  A.   I do.

9  Q.   One of the things you provided doctors with was

10 information about how their patients could get assistance with

11 paying for their medicines from Janssen.

12      Right, sir?

13 A.   Correct.

14 Q.   You know that Janssen has a pretty robust patient

15 assistant program to make medicines available to people who

16 can't afford them.

17      Right?

18 A.   Right.

19 Q.   This is the -- on his list of information that gets

20 forwarded to you.

21      Right, sir?

22 A.   Yes.

23 Q.   All right.

24      And so let's see what you do with this list.  You send

25 it to Tom Keriak and Arthur Shaw.

WILHELM - CROSS - BROWN

```
 1        Do you see that?
 2   A.   Yes.
 3   Q.   And both of those gentlemen are in Janssen's compliance
 4   department.
 5        Right, sir?
 6   A.   Yes.
 7   Q.   And you said that you recently had a brainstorming
 8   session at one of your meetings.
 9        Right?
10   A.   Yes.
11   Q.   And you sort of had this idea that you wanted to run by
12   compliance.
13        Right?
14   A.   Uh-huh.
15   Q.   Is that right, sir?
16   A.   Yes.
17   Q.   All right.
18        And you said I'm wondering if we could put together a
19   resource binder.
20        Correct?
21   A.   Right.
22   Q.   And all the materials that you wanted to include were the
23   once list out below.
24        Correct?
25   A.   Correct.
```

WILHELM - CROSS - BROWN

1  Q.  That would be the label and the slim-jims and the patient

2  assistant stuff.

3       Right?

4  A.  Correct.

5  Q.  And what you say is that all of these materials have been

6  approved separately.

7       Correct?

8  A.  Yes, I believe that's right.

9  Q.  Right.

10      You say right here, "All of the materials we would like

11  no include have been approved separately."

12      Right?

13  A.  Yes.

14  Q.  And what you mean by that is that all of these pieces of

15  information have already gone through compliance review.

16      Correct?

17  A.  Right.

18  Q.  Because you know that as a sales representative before

19  you bring something into a doctor, it has to be approved by

20  committees at Janssen and by the FDA.

21      Right?

22  A.  Well, it's supposed to be.

23  Q.  Yes, sir.

24      And what you're saying here is that everything you're

25  proposing putting in this binder had already gone through that

WILHELM - CROSS - BROWN

1    approval process.

2         Right?

3    A.   Right.

4    Q.   But nevertheless, you're asking the compliance people if

5    you could take together a bunch of approved pieces and put

6    them in a binder.

7         Right?

8    A.   Right.

9    Q.   You are so concerned about compliance that you tell the

10   compliance people before you did that, you thought you better

11   check with these gentlemen.

12        Right?

13   A.   Right.

14   Q.   Okay.

15        So your testimony to our jurors is that you were in

16   doctors' offices freely promoting off-label, but your email is

17   asking for compliance approval to bring in the materials that

18   had actually already been approved.

19        Right, sir?

20   A.   But not completely packaged in a single binder.

21   Q.   Sure.

22        That was your concern.  Can I take all these

23   singular -- all these pieces that have separately been

24   approved, and can I put them together.

25        Right?

WILHELM - CROSS - BROWN

1   A.    Right.

2   Q.    Because you were worried about making sure you were

3   complying with the regulations.

4         Right?

5   A.    Because this was put into writing, and the writing has a

6   paper trail, and so you had to appropriately address something

7   that was put into writing, so that's why I decided it was best

8   to go through health care compliance.

9   Q.    But you are the person who initiated this email.

10        Right, sir?

11  A.    No, Michael Jones did.

12  Q.    Sure.

13        And then you forwarded it to compliance.

14        Right, sir?

15  A.    Yes, because one of my sales representatives asked a

16  specific question about what he could do.

17  Q.    Let's look at another one, if we could, Mr. Wilhelm.

18        MS. BROWN:  I'd like to admit tab 27, D-8675.

19        MR. RUSS:  No objection.

20        THE COURT:  All right.  So admitted.

21  (Defendant's Exhibit 8675 in evidence.)

22  BY MS. BROWN:

23  Q.    You spoke a lot about conference calls today.

24        Right, sir?

25  A.    Correct.

WILHELM - CROSS - BROWN

1    Q.   In fact, one of the things that were discussed on

2    conference calls frequently were compliance issues.

3         Correct?

4    A.   What -- I don't know what you mean by "compliance

5    issues."

6    Q.   Well, you know there were compliance policies and rules

7    that you all had to follow.

8         Correct?

9    A.   Right, right.

10   Q.   You know all of those compliance policies required you to

11   report any of the allegations that you gave to our jury today.

12        Correct?

13   A.   Yeah, but those weren't really topics of conversation on

14   our Friday calls.

15   Q.   And let's look at what is in evidence as D-8675.  This is

16   an email from Tony Dolisi to a number of different folks

17   including yourself.

18        Right, sir?

19   A.   Yes.

20   Q.   And this is you right here.

21        Correct?

22   A.   Correct.

23   Q.   And it talks about an agenda for today's conference call.

24        Correct?

25   A.   Yes.

WILHELM - CROSS - BROWN

1    Q.   And you were actually listed as presenting on a number of

2    these topics.

3         Correct?

4    A.   Correct.

5    Q.   And one of the topics that you and Mr. Dolisi are going

6    to be presenting on is health care compliance training.

7         Correct?

8    A.   Correct.

9    Q.   Training on compliance and the importance of staying

10   on-label.

11        Right?

12   A.   Right.

13   Q.   No off-label discussions.

14        Correct?

15   A.   Correct.

16   Q.   That's you, you're half of the presentation on no

17   off-label discussions.

18        Correct?

19   A.   That is correct.

20   Q.   And your half of the conversation on the importance of

21   staying on-label.

22        Right?

23   A.   Right.

24   Q.   Okay.

25        And your testimony in this lawsuit, though, is

WILHELM - CROSS - BROWN

1  nevertheless, even though you were telling folks on this

2  conference call about the importance of staying on label, you

3  expected everyone to ignore you?

4  A.    Well, everything that is put in writing needed to tow the

5  company line about staying on-label with the promotion of

6  their drug.

7  Q.    And so, sir, when you got on this conference call, you

8  gave this presentation.

9       Right, sir?

10 A.    Yes.

11 Q.    You -- and you gave the compliance presentation on the

12 importance of staying on-label.

13      Right, sir?

14 A.    Yes.

15 Q.    You gave instruction that there should be no off-label

16 discussions.

17      Correct, sir?

18 A.    That's correct.

19 Q.    All right.

20      Let's look at --

21      MS. BROWN:  Your Honor, tab 49, Your Honor, I seek to

22 admit D-8767.

23      THE COURT:  Any objection?

24      MR. RUSS:  I don't think so, Your Honor.

25      THE COURT:  All right.

WILHELM - CROSS - BROWN

1          MS. BROWN:  Yeah.

2          MR. RUSS:  No objection, Your Honor.

3          THE COURT:  So admitted.

4          MS. BROWN:  Thank you.

5     (Defendant's Exhibit 8767 in evidence.)

6     BY MS. BROWN:

7     Q.   All right.

8          Mr. Wilhelm, you actually were our 2007 credo champion?

9          Right, sir?

10    A.   I was in fact, yes.

11    Q.   Yeah.  The one person selected to be the credo champion

12    in the year 2000.

13         Right?

14    A.   Yes.

15    Q.   And you know Johnson & Johnson has a credo that applies

16    to all companies like Tibotec.

17         Correct?

18    A.   Correct.

19    Q.   And Janssen.

20         Right?

21         And it talks about the importance of a number of

22    guiding principles.

23         Correct?

24    A.   Correct.

25    Q.   Including doing the right thing by patients and doctors.

WILHELM - CROSS - BROWN

1      Correct?

2  A.   Correct.

3  Q.   And you -- one of the things -- one of the initiatives

4  that take place at Janssen is something called a credo survey.

5       Right?

6  A.   That is correct.

7  Q.   And it is an opportunity for everybody -- all of the

8  employees to let Janssen know how it's doing, how it's

9  performing against the credo value.

10      Correct?

11 A.   Right.

12 Q.   And each year, senior management picks one employee to be

13 the champion of the credo.

14      Correct?

15 A.   Right.

16 Q.   To be the person who sort of takes feedback from the

17 employees and gets answers as it relates to compliance and

18 other issues they might be having.

19      Correct?

20 A.   Right, correct.

21 Q.   And the way the survey is carried out is meant to be in a

22 way where people can anonymously raise issues.

23      Correct?

24 A.   Correct.

25 Q.   The survey actually has like a locked password so that

WILHELM - CROSS - BROWN

1  nobody can trace your responses back to you.

2      Correct?

3  A.   I don't recall that, but I'm sure that -- I'm not

4  surprised.

5  Q.   You know, as the credo champion, that the survey is

6  conducted by a third party.

7      Right, sir?

8  A.   Yes.

9  Q.   And the purpose of having a third party conduct the credo

10  survey is to protect people who don't want their name

11  associated with their responses.

12      Correct?

13  A.   Right.

14  Q.   And then there's sort of another part of the credo survey

15  where the credo champion leads a focus group.

16      Correct?

17  A.   Correct.

18  Q.   So if you're somebody who doesn't want anybody to know

19  that you're raising some issues, you can stay anonymous.

20      Right?

21  A.   Right.

22  Q.   But if you're somebody who wants to voice your credo

23  concerns, you can come to the credo champion's focus group.

24      Right?

25  A.   Right.

WILHELM - CROSS - BROWN

1  Q.  And you, as the champion of our credo, you lead that

2  discussion.

3       Correct?

4  A.  I helped facilitate it, yes.

5  Q.  Right.

6       You did that for us back in 2008.

7       Correct?

8  A.  Correct.

9  Q.  Incidentally, you never raised any of these concerns in a

10  credo survey.

11       Right, sir?

12  A.  I don't believe in a credo survey, but I raised concerns

13  in other locations.

14  Q.  In -- in your own lawsuit.

15       Right, sir?

16  A.  Yeah, but it was also discussed at times with other

17  district sales managers and regional sales directors when we

18  would sit around after meetings when these types of

19  discussions would take place, and we would express concern

20  amongst our peers about the uncomfortable nature of what we

21  were being asked to do.

22  Q.  Let's look at your year reigning as the credo champion.

23  This is the global credo survey from 2007.

24       Do you remember this, sir?

25  A.  I do.

WILHELM - CROSS - BROWN

1   Q.   All right.

2        And if we go to the first page, we see some folks who

3   participated.  These are the credo action team members.

4        Right, sir?

5   A.   Yes.

6   Q.   And we have you there as the champion.

7        Right?

8   A.   Yep.

9   Q.   All right.

10       And let's look at some of these questions that were

11  raised by your colleague back in 2007 and that you facilitated

12  the responses to.

13       Okay, sir?

14  A.   Okay.

15  Q.   All right.

16       So if we go to page 7, we see this question up here

17  gets raised.  "How much value we bring to the customer?"

18       Do you see that?

19  A.   Yes.

20  Q.   Somebody in the credo discussion had an idea that they

21  wanted to know if it would be compliant to do.

22       Correct?

23  A.   Correct.

24  Q.   And what they say is, Why don't we have the customer --

25  that's the doctor, right?

───WILHELM - CROSS - BROWN───

1    A.    Correct.

2    Q.    Let's have the doctor sign a card, and then we can show

3    them the 48-week data.

4          Right?

5    A.    Right.

6    Q.    That was what some -- one of your colleagues raised as a

7    question.

8          Right?

9    A.    Right.

10   Q.    And at this point, in 2007, the 48-week data wasn't in

11   the label yet.

12         Correct?

13   A.    Correct.

14   Q.    That data is the data that allowed Prezista to be

15   approved for treatment naive.

16         Correct?

17   A.    Right.

18   Q.    It showed that Prezista had more favorable lipid results

19   vis-à-vis Kaletra.

20         Correct?

21   A.    Versus Kaletra, yes, perhaps.

22   Q.    Yep.

23   A.    Yep.

24   Q.    All right.

25         Anyway, at this time, it's not in the label.  And this

WILHELM - CROSS - BROWN

1    person has the idea, let's just get the doctors to sign a card

2    and we'll give them the information.

3         Right?

4    A.   Right.

5    Q.   And the reason it looks like they have this idea is

6    because of some your competitors were doing that, right?

7    A.   I believe Glaxo was at the time, yes.

8    Q.   That's GlaxoSmithKline, right --

9    A.   Yes.

10   Q.   -- another pharmaceutical company?

11   A.   Yes.

12   Q.   And Abbott, that's another pharmaceutical company, too?

13   A.   Correct.

14   Q.   And so the person who responded on this survey is saying,

15   Hey, can't we please do this because our competitors are doing

16   it and we want to be able to get the information out there,

17   too.

18        Right?

19   A.   Right.

20   Q.   And the credo response that you, sir, facilitated was, No

21   way.

22        Right?

23   A.   Well, that was against our company policy.

24   Q.   Sure thing.

25        You, as the champion of the credo, helped provide the

WILHELM - CROSS - BROWN

1   response, "48-week data is not in our label."

2       Right?

3   A.   Right.

4   Q.   And according to the Tibotec health care compliance

5   policy, we have to be promoting only consistent with our

6   label.

7       Correct?

8   A.   That was the company policy, yes.

9   Q.   Right.

10      According to the FDA, that 40-week data at this time

11  wasn't in the label.

12      Right?

13  A.   Right.

14  Q.   Now, we know it -- very shortly after this credo focus

15  group, it gets into the label.

16      Right?

17  A.   Right.

18  Q.   But at this time, it's not there.  And so the answer from

19  the credo champion was no.  True?

20  A.   That's what was put in writing, yes.

21  Q.   All right.

22      Let's look at another question and the response that

23  you facilitated.  Another one of your colleague says, Well,

24  couldn't we just have, like, the top ten questions and answers

25  that physicians might have?

WILHELM - CROSS - BROWN

1     Correct?

2   A.   Correct.

3   Q.   Maybe we can carry some kind of this information, and if

4   it comes up, we can just give out the top ten.

5     Correct?

6   A.   Right.

7   Q.   And, again, the credo response was, No, you can't.

8     Right?

9   A.   Right.

10  Q.   The credo response was, "Unsolicited requests for

11  information not consistent with the label have to be forwarded

12  to the medical information department."

13    Correct?

14  A.   Correct.

15  Q.   The credo response was not, Go ahead and talk about

16  whatever top ten issues you want to.  It was, No, you can't do

17  that.

18    Right?

19  A.   Yes.  In writing, that's what they said, but that wasn't

20  necessarily what happened in reality.

21  Q.   Okay.

22    And these are your colleagues, sir, who have, like,

23  legitimate questions and ideas, and they're raising them in

24  the context of this survey.

25    Correct?

WILHELM - CROSS - BROWN

1   A.   Correct.

2   Q.   And these -- you were selected, amongst all of your

3   peers, to facilitate the credo response.

4        True?

5   A.   Yes.

6   Q.   And just one more, sir, but another thing that some of

7   your -- another issue that some of your peers were worried

8   about is why do reps have to leave when the scientific liaison

9   is given a response to a question.

10        Right, sir?

11  A.   Uh-huh.

12  Q.   You knew that, if a medical person came in to meet with a

13  doctor, the sales reps were asked to leave the room.

14        Correct?

15  A.   On the vast majority of those occasions, but not every

16  time.

17  Q.   Right.

18  A.   But most of the time.

19  Q.   Most of the time.

20        And somebody says, hey, can't we just stay?  You know,

21  we want to stay.  We feel uncomfortable having to leave the

22  room.

23        Right?

24  A.   Right.

25  Q.   And, again, the credo says, no.  The credo -- you, as the

WILHELM - CROSS - BROWN

1  credo champion, says, no.  It puts the company at less risk if

2  you're discussing these unsolicited information if the sales

3  rep leaves.

4       Right?

5  A.   Yes.  But these aren't my comments, just --

6  Q.   Sure.

7  A.   -- to be clear.

8  Q.   You facilitated the discussion where these questions came

9  up, right?

10  A.   Correct.

11  Q.   And you approved or were looped in to the response to the

12  questions.

13       Right?

14  A.   Correct, yes.

15  Q.   And here, somebody wants to at least just be in the room

16  while the medical liaison is answering a scientific question?

17       Right?

18  A.   Right.

19  Q.   And the answer was, no, you can't do that.

20       Right, sir?

21  A.   Yes, right.

22  Q.   The answer, based on the guidelines and the credo, was

23  that this cannot happen.

24       Correct?

25  A.   Correct.

WILHELM - CROSS - BROWN

1  Q.  Okay.

2        And despite the fact, sir, that you did health care

3  compliance conference calls, you reached out to health care

4  compliance, you were the 2007 credo champion, your testimony

5  in this lawsuit of your former colleagues are that you

6  expected everyone to disregard everything you were saying.

7        Right, sir?

8  A.  Well, not -- the direction wasn't to disregard it.  The

9  direction was to sell the drug.  The direction was, This is

10  how you sell against these competitors, and if you don't do it

11  successfully, you will no longer be employed with the company.

12        That was the message.  That was the direction.  They're

13  going to have the company policies in place.  They all do.

14  Every single pharmaceutical company has something similar.

15  But, in reality, that's not how it was practiced in the field,

16  and that's not the direction and the support and the financial

17  resources that were given to the sales organization to achieve

18  those goals.

19  Q.  And, sir, I'm talking about your direction.

20        Okay?

21  A.  Okay.

22  Q.  The direction that you gave on the conference call we

23  looked at at the credo champion survey focus group --

24  A.  Right.

25  Q.  -- the direction you gave was no off-label promotion.

WILHELM - CROSS - BROWN

1          Right, sir?

2  A.    Because that was our written policy, correct.

3  Q.    And you expected that that direction would be followed.

4          Correct?

5  A.    I don't know that I can agree with that.  I'll leave it

6  at that.

7  Q.    When you were giving this direction on conference calls

8  and at the credo survey and when you were writing to

9  compliance with questions, you expected that people would

10 listen to what you were saying.

11         Correct, sir?

12 A.    I expected people to understand what the written policy

13 was, but I also understand what was actually happening in the

14 real world where the pressure was to meet the goal and to

15 disseminate the information to the prescribing physician that

16 were being called on.

17 Q.    Okay.

18         I want to talk to you a little bit, Mr. Wilhelm, about

19 the lipid messaging around Prezista.

20         Okay, sir?

21 A.    Okay, yeah.

22 Q.    And one of the things you told us in your deposition is

23 that there were a number of ways or terms that sales reps used

24 regarding the lipid profile of Prezista.

25         Correct?

WILHELM - CROSS - BROWN

1    A.   Correct.

2    Q.   One of those was "minimal impact on lipids," correct?

3    A.   Correct.

4    Q.   "Low impact on lipids," correct?

5    A.   Yes.

6    Q.   "Lipid friendly," correct?

7    A.   Correct.

8    Q.   And you told us that, from your point of view, they're

9    all pretty much the same.

10        Right?

11   A.   That all the protease inhibitors were pretty much the

12   same?

13   Q.   Bad questions on my part.

14        All those terms, sir -- you said "minimal impact on

15   lipids" --

16   A.   Oh, yeah, those --

17   Q.   -- "proven impact on the lipid profile" -- it's all the

18   same to you.

19        Right?

20   A.   Sure, sure, yes.

21   Q.   Okay.  Let me rephrase it so I get it clean.

22        When you testified, you told us that statements like

23   "proven impact on lipids," "minimal impact on lipids," "low

24   impact on lipids" and "lipid friendly," they're pretty much

25   all the same, right?

WILHELM - CROSS - BROWN

1   A.   Gotcha.  Yep, correct.

2   Q.   Okay.

3        And you remember terms like that being used around the

4   time period that you were working as sales rep, correct?

5   A.   I was never working as a sales rep with Tibotec.

6   Q.   Fair enough.

7   A.   But as a district manager or a key account director, yes.

8   Q.   Sure.

9        Having responsibility for sales reps, correct?

10  A.   Correct.

11  Q.   During that time period, you're familiar with those terms

12  being used, correct?

13  A.   Yes.  Absolutely.

14  Q.   And you've told us to try and distinguish between any one

15  of those terms is like splitting hairs, I think was your

16  description.

17       Right?

18  A.   Well, they're all getting at the same issue, yes.

19  Q.   Right.

20       And you are under the belief that those terms are

21  off-label.

22       Correct, sir?

23  A.   Yeah.  We didn't have -- yes.  "Yes" is the short answer.

24  Q.   Okay.

25       And you know, though, sir, that the FDA has approved

WILHELM - CROSS - BROWN

1   many of those terms.

2       Right?

3   A.   Sure.  Yes.

4   Q.   So that doesn't make it off-label.

5       Right, sir?

6   A.   Well, it's in -- those words are in our label, but it

7   doesn't say -- again, for promotional purposes and from the

8   FDA guidelines, you cannot compare one drug to another unless

9   there's a double-blinded approved clinical trial in your

10  package insert referencing that study.

11      There was nothing in our label that compared us to

12  Kaletra or to Reyataz.  So to compare our package insert side

13  by side with a competitor's package insert and draw any

14  medical conclusion is unethical, at least.

15  Q.   Sir, I'm not talking about that at all.  So let me just

16  reorient to what my question was.

17  A.   Okay.

18  Q.   We're talking about terms like "proven lipid profile."

19      You with me?

20  A.   Okay.

21  Q.   You heard that term being used during the time period you

22  worked at Janssen.

23      Correct?

24  A.   Yes.

25  Q.   Okay.

WILHELM - CROSS - BROWN

1     You heard the term "low impact on lipids" being used at

2  the time period you worked at Janssen.

3          Correct?

4  A.    Correct.

5  Q.    You heard the term "minimal impact on lipids" being used

6  when you worked at Janssen.

7          Correct?

8  A.    Correct.

9  Q.    And you heard the term "lipid friendly" being used.

10          Correct?

11  A.    Correct.

12  Q.    And you were of the view that all of those terms are

13  off-label.

14          Correct?

15  A.    Correct.

16  Q.    And you were of the view that all of those terms

17  essentially mean the same thing.

18          Correct?

19  A.    Right.

20  Q.    Okay.

21          Let's look at Tab 29, which is already in evidence.

22  D-2089.

23          MS. BROWN:  May I display, Your Honor?

24          THE COURT:  You may.

25          MS. BROWN:  Thank you.

WILHELM - CROSS - BROWN

1    BY MS. BROWN:

2    Q.    One of the things you know, Mr. Wilhelm, is that

3    promotional pieces, before they can be shared with doctors,

4    they have to be approved -- sent to the FDA.

5          Correct?

6    A.    Correct.

7    Q.    Okay.

8          And so when you were talking about slim-jims or glossy

9    pieces that you brought in to doctor -- or your folks brought

10   in to doctors' offices, you know that they had gone to the FDA

11   before they were used.

12         Correct?

13   A.    Gone to the FDA but not always formally approved, as I

14   recall, before we started to use them.  They could still have

15   been in review.

16   Q.    Do you understand that, because this medicine was

17   approved early access, it actually had to go to the FDA before

18   it was in use?

19   A.    Yes.

20   Q.    Okay.

21         So let's take a look at one of the pieces as it relates

22   to Prezista that was approved by the FDA.

23         Okay, sir?

24   A.    Sure.

25   Q.    This is D-2089.  And this sort of has those Prezista

WILHELM - CROSS - BROWN

1  colors, right?  This is sort of a -- Prezista glossy came in

2  these colors for a period of time, right, sir?

3  A.   Yes.

4  Q.   Okay.

5       And this is a type of a piece of a visual aid or a

6  document that sales representatives at Janssen could bring in

7  to a physician's office to talk about.

8       Correct?

9  A.   I believe that is the case.

10 Q.   Okay.

11      And it talks about starting with Prezista once daily.

12      Do you see that --

13 A.   Yes.

14 Q.   -- up at the top here?

15 A.   Yes.

16 Q.   And you know --

17      MR. RUSS:  Objection, Your Honor.  May we approach.

18      (Sidebar begins at 2:13 p.m.)

19      MR. RUSS:  I'm sorry, Judge.

20      Our table is telling me this document is not in

21 evidence.  I don't know whenever it was admitted.

22      MS. BROWN:  My green sticker tells me my thoughts

23 already went in, but if not, I'll move it in right now.

24 But --

25      THE COURT:  Is it in or is it not?

WILHELM - CROSS - BROWN

1           MR. RUSS:  I don't believe it is.

2           MS. BROWN:  I believe --

3           THE COURT:  You guys have to be really careful about

4    this because I've already warned you all not to mess around

5    with that.

6           MR. RUSS:  I agree, Your Honor.

7           MS. BROWN:  I believe it is, Your Honor.  Should I

8    take a minute to double-check?

9           THE COURT:  Double-check.

10          Let me ask you this, though:  Is there an objection to

11   this?

12          MR. RUSS:  There is an objection for foundation for

13   this.  I mean, she's asking this witness -- she's never asked,

14   Have you seen this document, and she's assuming facts that he

15   may not know that --

16          THE COURT:  Is this one of the --

17          MR. RUSS:  -- that this is FDA approved.

18          MS. BROWN:  Yes, exactly, Your Honor.

19          THE COURT:  I mean, he testified earlier.  I mean,

20   he's going to be aware of the slim-jims.  He testified to it

21   because there was discussion about the slim-jims in one of the

22   conference calls, and he said he understood what that was, and

23   he said those are the documents that are approved for him to

24   bring to doctors or some kind of, like, short brochures or

25   something to that effect.

WILHELM - CROSS - BROWN

1        MS. BROWN:  Exactly.

2        THE COURT:  So there was testimony on this, Mr. Russ.

3        MR. RUSS:  I agree.

4        THE COURT:  Do you still want her to lay more

5    foundation --

6        MS. BROWN:  I can lay more foundation.

7        MR. RUSS:  If she lays the foundation, absolutely.

8        THE COURT:  All right.  Why don't we do this.

9    Ms. Brown, before we do that --

10        MS. BROWN:  I believe it's in, Your Honor.

11        THE COURT:  Again, I have -- I'm just going to be

12    clear.  When you all tell me something has been previously

13    admitted --

14        MS. BROWN:  I understand.

15        THE COURT:  -- my -- I presume that you have given me

16    accurate information in the courtroom on the record, not that

17    you guys are thinking it's admitted --

18        MS. BROWN:  No.

19        THE COURT:  -- but it's not.  Otherwise, you're going

20    to have to go back to every time you want to move something,

21    you're going to have to go look at your adversary and say, is

22    this going --

23        MS. BROWN:  And I promise you, because it has a green

24    sticker, that was my system for prior admitted.  And so I have

25    absolute certainty that it is, but I will double-check if you

WILHELM - CROSS - BROWN

1  have a question.

2          MR. RUSS:  No doubt that she has good faith that it

3  was in.

4      I think one of the things --

5          THE COURT:  No, no.  I'm not -- and by the way, I'm

6  not insinuating anything differently.

7          MS. BROWN:  No, I understand.  I understand.

8          MR. RUSS:  I think one of the issues that came up

9  earlier that we identified is that Janssen's team thinks that

10 anything that was shown on a slide in opening is admitted.

11 Those documents have not been offered or admitted.

12     So this might have been something that was on --

13         THE COURT:  All right.  Well, let's do this.  Two

14 things, then.

15     One, clarify if it's been admitted or not.  If not,

16 pull it off the screen, ask him foundational questions.  I

17 don't think it's going to be any different than what we did

18 before.

19     I don't think there's going to be much, Mr. Russ,

20 because if this is one of those brochures that was already

21 testified to, I think the foundation has been there.  But we

22 can -- instead of going back into the transcript, I'm going to

23 ask a question or two.

24     But the first thing is, confirm whether it's been

25 admitted.

WILHELM - CROSS - BROWN

1        MS. BROWN:  I'll do that right now.

2        MR. RUSS:  All right.  Thank you.

3        (Sidebar was concluded at 2:16 p.m.)

4        (Open court.)

5        MS. BROWN:  We're going to check, Your Honor, but

6   I'll take it down and --

7        THE COURT:  All right.  Let's pull it off for a

8   moment.

9        MS. BROWN:  Yep.

10       Should I lay the foundation, Your Honor?

11       THE COURT:  Let's do that.  And like I said, maybe it

12   is previously admitted, but let's confirm before we put it up.

13       MS. BROWN:  Sure.

14       THE COURT:  All right.

15   BY MS. BROWN:

16   Q.  Mr. Wilhelm, when we took a quick break, we were talking

17   about some of the slim-jim or glossy pieces that your sales

18   representatives used when they went into doctors' offices.

19       Correct?

20   A.  Yes.

21   Q.  And you understood there was an FDA review process for

22   those materials, correct?

23   A.  Correct.  Yes.

24   Q.  And as a district manager or as a KAM or a KAD, you were

25   familiar at the time with those slim-jims or promotional

WILHELM - CROSS - BROWN

1    pieces.

2          Correct, sir?

3    A.   Yes.

4    Q.   And you directed your sales reps to use those pieces

5    appropriately in the field.

6          Correct?

7    A.   That's fair, yes.

8    Q.   And one of the things you would have been familiar with

9    were the pieces that related to 48-week data on Prezista.

10          Correct?

11   A.   Correct.

12   Q.   Which would have included lipid data.

13          Correct, sir?

14   A.   Yes.

15          MS. BROWN:  Your Honor, at this time, I would move to

16   admit D-2089.

17          THE COURT:  Mr. Russ?

18          MR. RUSS:  Only subject to foundation, Your Honor.

19          THE COURT:  I mean, Ms. Brown, why don't you show

20   just the witness the document --

21          MS. BROWN:  Sure, sure.

22          THE COURT:  -- right, so he appreciates -- I

23   understand the topics you hit, but can we show him the

24   document?

25          MS. BROWN:  I understand.  Yes, ma'am -- yes, sir, I

WILHELM - CROSS - BROWN

```
 1  understand.
 2         So this will just be for the witness, then, Counsel?
 3  Okay.
 4         And here it is.
 5  BY MS. BROWN:
 6  Q.  Do you recognize this as being one of those glossy pieces
 7  or -- I'm sorry.
 8  A.  That's -- all right.
 9  Q.  I'm making it worse for you.  Sorry.
10  A.  Okay.
11  Q.  So does this look -- I'll flip through the pages so you
12  can see.
13         Does this look generally like some of those glossy
14  pieces we were just talking about, sir?
15  A.  Yeah.
16  Q.  Right.
17         And I'll show you the page over here.  It included
18  information such as efficacy, baseline parameters.  Do you see
19  that data here?
20  A.  I do.
21  Q.  And this is the type of a glossy piece that you would
22  have seen and your sales reps would have used at the time you
23  were at Janssen.
24         Correct, sir?
25  A.  Yes.
```

WILHELM - CROSS - BROWN

1    Q.   Okay.

2            MS. BROWN:  Your Honor, with that?

3            MR. RUSS:  No objection.

4            THE COURT:  All right.  So admitted.

5            MS. BROWN:  Okay.

6            THE COURT:  Ms. Brown, you can put it up.

7            MS. BROWN:  Thank you very much.

8            (Defendant's Exhibit D-2089 in evidence.)

9    BY MS. BROWN:

10   Q.   So here we are, sir, in terms of this piece that was

11   approved for sales reps to use at the time in doctors'

12   offices.  You see it has a lipid message.

13          Right, sir?

14   A.   Yes.

15   Q.   And the approved lipid message was based on data.

16          Correct?

17   A.   Uh-huh.

18   Q.   Data that had been conducted at the time this piece was

19   approved.

20          Correct?

21   A.   Correct.

22   Q.   And the approved message was low impact on lipids.

23          Correct?

24   A.   That's what that states.

25   Q.   And you know further on in this document there's

WILHELM - CROSS - BROWN

1    additional information about the data supporting the low

2    impact on lipids statement.

3         Do you see that, sir?

4    A.   I do.

5    Q.   And at the time you would have been familiar with the

6    data that showed Prezista's impact on lipids as it relates to

7    the NCEP cutoff.

8         Correct?

9    A.   Yes.

10   Q.   And so just to orient us, we have kind of how Prezista --

11   how lipids elevate or don't elevate when you take Prezista.

12        Correct?

13   A.   Uh-huh.

14   Q.   And whether that lipid elevation keeps your cholesterol

15   and triglycerides below the national standard.

16        Correct?

17   A.   Correct.

18   Q.   Versus the competitor in this study was Kaletra.

19        Right?

20   A.   Right.

21   Q.   And Kaletra is on the top line, and it shows the

22   elevation with Kaletra was actually much higher than with

23   Prezista.

24        Correct?

25   A.   Correct.

WILHELM - CROSS - BROWN

1   Q.   And this was -- there were many of these types of

2   promotional pieces that related to new data that was coming

3   out regarding Prezista.

4        Correct?

5   A.   Yes.  Correct.

6   Q.   So when you said just a moment ago you thought that the

7   low impact on lipids was an off-label message, you actually

8   just, fair enough, had forgotten about these pieces?

9        Correct?

10  A.   No.  I can't completely agree with that statement.  A

11  couple factors here.  One, despite this data at 48 weeks,

12  again, the lipid and cholesterol data went from an adverse

13  reaction mentioned in the initial label to a serious adverse

14  reaction in the approved naive label, first of all.

15       Second of all, this is a comparison to Kaletra.  The

16  gold standard for having -- being lipid friendly or having no

17  effect on lipids is Reyataz.

18       This does not compare it to Reyataz, and there were no

19  head-to-head clinical trials or data versus Reyataz, and

20  that's what we were promoting the lipid friendly message to,

21  which is Reyataz, not Kaletra.

22  Q.   And very respectfully, though, that wasn't my question at

23  all.

24       What I had asked you was when you said low impact on

25  lipids was an off-label message, you were not aware of pieces

WILHELM - CROSS - BROWN

1    like this that approved saying low impact on lipids.

2         Fair?

3    A.   I don't know how to answer that question.  It was -- we

4    may have gotten this information two years into the promotion

5    of the product when we were talking about it being lipid

6    friendly or low impact on lipids.  But this is, again, two

7    years after the fact when that promotional message was being

8    delivered.

9         This certainly begins to make an argument that it has

10   less or lower impact on lipids, but, again, the approved label

11   said a serious adverse reaction.

12   Q.   Let me -- let me stop you there, and we'll work through

13   this together.

14   A.   Okay.

15   Q.   You point out to our jurors that the label at one point

16   changed from listing lipid reactions from an adverse reaction

17   to a serious adverse reaction.

18        Right?

19   A.   Correct.

20   Q.   And in your mind that was significant as to the magnitude

21   of the adverse reaction.

22        Correct?

23   A.   Well, yeah, there's a concern about serious adverse

24   reactions because, by definition, they can lead to

25   cardiovascular -- cardiovascular events, stroke, death.  I

WILHELM - CROSS - BROWN

1   mean, that's why they're called serious.

2   Q.   To be fair, sir, you're not an expert in FDA

3   product-labeling issues.

4         Fair?

5   A.   I guess I'm not an expert, but I understand what they are

6   intended to communicate.

7   Q.   You understand that in a product label, the FDA sets the

8   different parts of the label.

9         Right?  There are regulations that control the

10  different parts of the label.

11        Right, sir?

12  A.   Certainly makes sense, yes.

13  Q.   You understand at one time the column heading "adverse

14  event" changed to "serious adverse event."

15        Did you know that, sir?

16  A.   I did not know that.

17  Q.   Okay.

18        And in terms of this data that we're looking at on this

19  approved promotional piece, you would agree that the message

20  that was approved was low impact on lipids.

21        Correct?

22  A.   Yes, compared to Kaletra in that study.

23  Q.   And what that means is that your sales representatives at

24  the time could take this glossy piece into a doctor's office

25  and tell them that Prezista had a low impact on lipids.

─────────WILHELM - CROSS - BROWN─────────

1    Correct?

2    A.   As compared to Kaletra, yes.

3    Q.   And this -- incidentally, sir, this doesn't say low

4    impact on lipids, asterisk, only as it relates to Kaletra,

5    does it, sir?

6    A.   No.  But, again, you can only talk about a drug's -- when

7    you're comparing drugs, the study has to be an approved study

8    in your FDA-approved package insert.  You cannot you compare

9    package insert to package insert.

10   Q.   And I'm not talking about that at all.  I'm talking about

11   using the term low impact on lipids.

12        Are you with me?

13   A.   I'm with you.

14   Q.   All right.

15        And so low impact on lipids is right here, and it

16   doesn't say asterisk, only when compared to Kaletra, does it,

17   sir?

18   A.   It does not say that, no.

19   Q.   In terms of this back and forth with the FDA with

20   approved promotional statements, fair to say to say you

21   weren't involved in that.

22        Right, sir?

23   A.   That's fair.

24   Q.   Okay.

25        Let's talk about -- quickly about MIRs.  Janssen did

WILHELM - CROSS - BROWN

1    not have a quota for MIRs.

2        Correct?

3    A.   They didn't have a quota, but they used it as a metric

4    for performance evaluations.

5    Q.   And we looked at a review that you had done of

6    Melissa Wade.

7        Do you remember that?

8    A.   Yes.

9    Q.   Okay.

10        Did you pick out the Melissa Wade performance

11   evaluation to show our jurors?

12   A.   No, I didn't --

13   Q.   Okay.

14        That was selected by the lawyers?

15   A.   I believe that's the case.

16   Q.   Okay.

17        And nowhere in this performance coaching development

18   report does it talk about a quota for MIRs.

19        Right, sir?

20   A.   No.  I would have to reread it, but probably not.

21   Q.   Right.

22        Because there was no formal quota that was used to

23   evaluate sales representatives regarding how many MIRs they

24   submitted.

25        Correct?

WILHELM - CROSS - BROWN

1  A.   Correct.  There was no quota, but it was -- it was used

2  as a way to evaluate sales representatives, and it was clearly

3  communicated to the entire organization that -- how effective

4  they were and held up as this gold standard for why Florida --

5  they believed the Florida district was exceeding the goals.

6       They were the number one sales district in the nation,

7  and the fact that they had tripled the number of MIRs from

8  anyone else -- so you can -- you can infer what the intent

9  was.

10 Q.   One of the reasons Florida was off to a really good start

11 when Prezista was approved was because Florida was quick to

12 put Prezista on formulary for Government payment programs.

13      Correct, sir?

14 A.   I believe that would be true.

15 Q.   So unlike some other states where it was a little bit of

16 a struggle to get Prezista approved for reimbursement, Florida

17 right out of the gate said, We will pay for this medicine.

18      Right, sir?

19 A.   I believe that's the case.

20 Q.   And that's one of the reasons Florida -- the southeast

21 sales folks, they had a lot of early sales, because it was

22 reimbursable earlier than other places.

23      Correct?

24 A.   Highly likely.

25 Q.   Yeah.

WILHELM - CROSS - BROWN

1    And you know that in 2006, with the pace of new drugs

2  and new science, you would expect a lot of MIRs in this area.

3    Correct, sir?

4  A.   I don't know if that's a fair expectation.  I mean, I

5  think the sales representatives were well coached by their

6  district manager, Scott Libby, at the time as to how to elicit

7  an MIR request form.

8         MS. BROWN:  Your Honor, permission to play deposition

9  on that question.

10         MR. RUSS:  Page and line?

11         MS. BROWN:  Yep.  It's the 2019 deposition, page 215,

12  line 22 to 216, line 4.

13         THE COURT:  Mr. Russ, any objection to this?

14         MR. RUSS:  No objection, Your Honor.

15         THE COURT:  All right.  You may play it.

16         MS. BROWN:  Mr. Morales, do you have the number?

17  Correct.  Thank you.

18    (Video clip is played at this time.)

19  BY MS. BROWN:

20  Q.   You would agree that's true, sir.

21    Right?

22    At that time period, there were a lot of new drugs

23  coming out, a lot of new science.

24    Correct?

25  A.   Correct.

WILHELM - CROSS - BROWN

1   Q.   And you would expect as a result there would be a lot of

2   MIRs.

3        Correct?

4   A.   That's one way that a physician could get the

5   information.  There are -- there are other ways.

6   Q.   Okay.

7        In fact, you thought it was appropriate when visiting

8   with a doctor to ask a doctor if there's anything you could

9   bring next time.

10       Right?

11  A.   That was one of the ways that we tried to elicit requests

12  for MIR information, yes.

13  Q.   And you -- even based on your review of that, you thought

14  that was an entirely appropriate question.

15       Right?

16  A.   Yeah.  I don't think it was necessarily inappropriate.

17  Q.   Because what you thought was that it might allow the

18  doctor to ask a question for which an MIR request could be

19  entered.

20       Correct?

21  A.   That is correct.

22  Q.   It might prompt the doctor to say, Actually, there is

23  some data that I want or need or would like to look at.

24       Correct?

25  A.   Correct.  But that's not always how that question was

WILHELM - CROSS - BROWN

1    posed to the physician.

2            MS. BROWN:  Can we look at tab 21, please, and,

3    Your Honor, I move to admit D-2036.

4            MR. RUSS:  No objection.

5            THE COURT:  So admitted.

6    (Defendant's Exhibit 3026 in evidence.)

7    BY MS. BROWN:

8    Q.  And so this is an email from you to Mr. Grooms and

9    Ms. Arellano.

10           Do you see that?

11   A.  I do.

12   Q.  And it's regarding "Matt Grooms field time with Joyce."

13           Right?

14   A.  Yes.

15   Q.  You supervised Mr. Grooms for a period of time.

16           Right, sir?

17   A.  Yes, and Joyce as well.

18   Q.  Okay.

19           And actually you're sort of -- social media, you're

20   sort of connected to Mr. Grooms.

21           Right, sir?

22   A.  Yeah.

23   Q.  You guys sometimes post and talk about sports and things

24   like that.

25           Right?

WILHELM - CROSS - BROWN

1    A.    That's the only conversations we ever have, is about

2    sports.

3    Q.    All right.

4          So I thought I heard you say you don't really know him,

5    but at least on social media you stay in touch a little bit.

6          Right, sir?

7    A.    I mean, once or twice a year maybe, yeah.

8    Q.    And what you're talking about here in this email is how

9    you want Joyce to come and spend some time with Matt.

10         Correct?

11   A.    Correct.

12   Q.    I see some of your emails where you describe Mr. Grooms

13   as a low performer.

14         Right, sir?

15   A.    Correct.

16   Q.    He was pretty much struggling.

17         Fair?

18   A.    Yeah, a lot -- not necessarily due to his skill set, but

19   I think more so due to his marketplace because he was in

20   Kansas City.  It was not a hotbed for HIV like New York,

21   Florida, Texas, California.

22   Q.    That's another reason why you're seeing a lot of MIRs

23   coming out of Florida in part.  There is a larger population

24   of patients who are in need of HIV medicines in Florida, for

25   example.

WILHELM - CROSS - BROWN

1  Correct?

2  A.   Yes but that wouldn't necessarily correlate to the

3  frequency that someone would ask for off-label information.

4  Q.   More HIV patients are treated in Florida than Nebraska.

5  Fair?

6  A.   That's fair.

7  Q.   Okay.

8  And so what you're talking about here is goals that you

9  had to kind of help Mr. Grooms improve his performance.

10  Fair enough?

11  A.   Yes.

12  Q.   And you say, "Another goal that we discussed is improving

13  on a close that motivates the prescriber to take action"?

14  Do you see that?

15  A.   Yes.

16  Q.   Nothing wrong with that.

17  Right, sir?

18  A.   No.

19  Q.   All right.

20  "Asking good probing questions such as 'Is there

21  anything else I can bring back with me next time we meet?'

22  may help generate questions from the customer that will allow

23  MIR requests that can get others involved with your key

24  customers."

25  Right?

WILHELM - CROSS - BROWN

1    A.    Right.

2    Q.    And what you meant by that is allow the medical folks to

3    answer the medical questions.

4          Right?

5    A.    That's correct.

6    Q.    Right.

7          And in your view, there is nothing inappropriate about

8    the way you suggest an MIR be used in this scenario.

9          Correct?

10   A.    Yes, in this scenario, if it is again an unsolicited

11   request from the physician.

12         So this is an appropriate question for a sales

13   representative to be asking the doctor which still kind of

14   borders on soliciting, but it's not as blatant as what

15   happened in reality, which was frequently much more pointed

16   directly to the off-label information.

17         So as an example, Doctor, are you familiar with the

18   study that came out last week from CROI or from you name the

19   conference?  And that -- those more pointed, directed

20   questions that were oftentimes used but never put in writing

21   generated those supposed unsolicited questions in a solicited

22   way.

23   Q.    Sir, if everybody was in every doctor's office from

24   New Jersey to California freely promoting off-label, why did

25   anyone even bother to do an MIR?

WILHELM - CROSS - BROWN

1    A.   Well, the sales representative can always talk to the

2    study that they were trained on from the -- from the medical

3    team or the product management team, depending on which one it

4    was.

5         But keep in mind that MIRs were still used to evaluate

6    performance.  So even if a representative effectively

7    addressed an off-label question themselves in person, they

8    still would get an MIR form so that they -- it was one of the

9    metrics that was evaluating their performance.  They wanted to

10   cover their -- their rear end.

11   Q.   Sir, I've got a couple more topics I want to quickly

12   cover with you, and then I will be finished.

13   A.   Okay.

14   Q.   You had a lot of testimony about the speaker program this

15   morning.

16        Do you remember that, sir?

17   A.   I do.

18   Q.   And when we talked a little bit earlier this morning, you

19   told us, though, despite recommending folks for the speaker

20   program, you had no visibility into how speakers were

21   selected.

22        Correct?

23   A.   No visibility into the inner workings of how they were

24   selected, just who we input and who was approved were

25   basically identical.

WILHELM - CROSS - BROWN

```
1   Q.   And one of the documents that you showed our jury this
2   morning had to do with a Dr. O'Brien.
3        Do you remember that?
4   A.   Yes.
5   Q.   And there was a discussion about Dr. O'Brien frankly not
6   doing such a good job at a speaking event.
7        Correct?
8   A.   Correct.
9   Q.   Do you know Dr. O'Brien?
10  A.   Not well.  I know -- I know of him.
11  Q.   Yeah.
12       Do you know anything about Dr. O'Brien's credentials or
13  qualifications to be a speaker?
14  A.   Not in detail, no.
15  Q.   Do you know anything about the publications that
16  Dr. O'Brien has?
17  A.   No, not in depth.
18  Q.   Okay.
19       Do you know anything about -- and you know publications
20  and stature in the medical community, that's one of the
21  criteria that speakers are judged on.
22       Correct?
23  A.   Sure, that's fair.
24  Q.   You know there's a policy that has eight objective
25  criteria that goes into selecting a speaker.
```

WILHELM - CROSS - BROWN

1          Correct?

2   A.   That wouldn't surprise me.

3   Q.   You're not familiar with that.

4          Fair?

5   A.   Yeah, not, again, intimately.

6   Q.   One of the criteria is experience with our product.

7          Right, sir?

8   A.   Absolutely.

9   Q.   Makes sense, doesn't it?

10  A.   It does.

11  Q.   It would be peculiar to have a speaker talking about

12  Prezista who had never had any involvement with Prezista.

13         Correct?

14  A.   Well, that is one of the ways that we would encourage

15  them to increase their utilization, so that they could talk to

16  their personal experience.

17  Q.   But you would agree with me, it doesn't make sense to

18  have someone speaking about Prezista if they've never

19  prescribed Prezista.

20         Right?

21  A.   Right, but we had 150 of those when we started because

22  the product wasn't on the market yet.

23  Q.   Well, but, sir, doctors were using it in scientific

24  studies under the early access program.

25         Right?

WILHELM - CROSS - BROWN

1  A.   Yeah, certainly a small fraction of the 150.

2  Q.   Now, you showed our jury a document about Dr. O'Brien

3  having a hard time at a presentation.

4       Right?

5  A.   Right.

6  Q.   And I think the suggestion was that we're sort of paying

7  anybody to be a speaker, and look at this guy, he can't even

8  pronounce the name of the medicine.

9       Right?

10 A.   Right.

11 Q.   That was the suggestion.

12      Right?

13 A.   Right.

14 Q.   But you know there was a robust follow-up into what

15 happened with Dr. O'Brien at that speaking event.

16      Right?

17 A.   I don't -- I mean, I don't know what you mean by robust

18 follow-up.

19 Q.   Well, it wasn't like we just said, This guy pronounced

20 the wrong name; let's just keep paying him, right?  We looked

21 into it?

22 A.   Right.

23 Q.   You knew that when you used that example.

24      Correct?

25 A.   Right.

WILHELM - CROSS - BROWN

1    Q.   All right.

2            MS. BROWN:  Your Honor, I would like to admit D-8799.

3            MR. RUSS:  No objection.

4            THE COURT:  All right.  So admitted.

5    (Defendant's Exhibit 8799 in evidence.)

6    BY MS. BROWN:

7    Q.   So Doyletta Minix was actually the sales representative

8    responsible for Dr. O'Brien.

9        Correct?

10   A.   Yeah, I believe that's correct.

11   Q.   And in some of those emails that you showed our jury

12   earlier, she was actually tasked with figuring out what

13   happened with Dr. O'Brien.

14       Correct?

15   A.   I believe that's correct.

16   Q.   And you actually were informed about her discussion with

17   Dr. O'Brien trying to get to the bottom of what happened.

18       Right?

19   A.   Right.

20   Q.   And in your estimation, Doyletta handled this situation

21   beautiful.

22       Right?

23   A.   I think she did a good job talking to him about the

24   concerns.

25   Q.   Right.

WILHELM - CROSS - BROWN

1      Her follow-up with Dr. O'Brien trying to understand why

2   he was sort of mixing things up at this speaker event you

3   thought was handled beautifully.

4      Right, sir?

5   A.   I don't know if those were my words, but perhaps if

6   that's what you're reading.

7   Q.   All right.

8      Let's take a look at what is in evidence as D-8779.

9   And to start, we see you're on the email --

10  A.   Yes.

11  Q.   -- from Doyletta Minix.

12     Right?

13  A.   Correct.

14  Q.   It goes to you and others, and the subject is

15  "Bill O'Brien update."

16     Correct?

17  A.   Correct.

18  Q.   And what we get here is "provide you feedback regarding

19  my appointment with Dr. O'Brien."

20     Correct?

21  A.   Correct.

22  Q.   All right.

23     And this appointment, this follow-up with Dr. O'Brien

24  was done to try and figure out why he had a bad speaking

25  event.

WILHELM - CROSS - BROWN

1    Correct?

2  A.    Correct.

3  Q.    All right.

4    And what she reports is that "Admittedly, he said it

5  was the worst program he'd ever done for a company due to his

6  lack of preparation."

7    Right?

8  A.    That's what it says.

9  Q.    All right.

10    "He explained to me that he had to prepare for an

11  Invirase."

12    What's that?

13  A.    It's another protease inhibitor that Roche --

14  Q.    That's another medicine that we don't make, right?

15  A.    Correct.

16  Q.    So he had to prepare for some other company's advisory

17  board that took place in New York.

18    Right?

19  A.    Correct.

20  Q.    And incidentally, that's one of the things about these

21  speakers.  A lot of them are nationally and internationally

22  recognized experts.

23    Correct?

24  A.    That is correct.

25  Q.    I mean, that's why you want somebody like that to be on

WILHELM - CROSS - BROWN

1    your speaker board.

2         Correct?

3    A.    That's correct, yes.

4    Q.    Because other doctors know and respect them and will come

5    and listen to what they have to say.

6         Right?

7    A.    Exactly.

8    Q.    And almost all of these speakers weren't just speakers

9    for Janssen.

10        Correct?

11   A.    Correct.  They could speak for other companies as well,

12   yes.

13   Q.    They spoke for other companies that made other HIV

14   medicines because they are HIV experts.

15        Right?

16   A.    Right.

17   Q.    Okay.

18        So he was busy because he's on a different advisory

19   board, and not only that, he is flying back from New York to

20   UTMB preparing for an NIH grant fund submission.

21        Do you see that?

22   A.    Yes.

23   Q.    An NIH, that's the National Institute (sic) of Health.

24        Right, sir?

25   A.    That is correct.

WILHELM - CROSS - BROWN

1    Q.   All right.

2         So he's not only speaking about another medicine, but

3    he's doing a study funded by the federal Government.

4         Correct?

5    A.   Correct.

6    Q.   And he didn't sleep on the plane.

7         Right?

8    A.   Well, I can't testify to that.

9    Q.   All right.  Well, we're going to get there.

10        He admitted he was overly tired, right?

11   A.   Uh-huh.

12   Q.   And -- prior to flying.  And he informed me -- oh.  He

13   slept on the plane, not preparing for the lecture.

14        So he did sleep but it meant he didn't prepare.

15        Right, sir?

16   A.   That's what that says.

17   Q.   All right.

18        And he also commented he probably was a mess.

19        Right?  Looked disheveled and was perspiring when he

20   arrived?

21   A.   Hmm.  Okay.

22   Q.   Looks like he's got some trouble with the temperature in

23   the room.

24        Right?

25   A.   Yeah.

WILHELM - CROSS - BROWN

1  Q.   All right.

2        But here's the point.  Right, sir?

3        These were the areas that your sales representative or

4  Ms. Minix was able to provide feedback and coach on.

5        Right?

6  A.   Okay.

7  Q.   So she gives instruction, "Dr. O'Brien, you've got to

8  arrive on time."

9        Right?

10 A.   Right.

11 Q.   Number 1, you've got to get there on time, and it would

12 be rude if you were a little late.

13       Correct?

14 A.   Correct.

15 Q.   "You have to make sure that when" -- they're using terms

16 here that is like the molecular term of the medicine, right?

17 Darunavir?

18 A.   Correct.

19 Q.   And all of these protease inhibitors, they have molecular

20 names that end in "avir."

21       Right?

22 A.   Correct.

23 Q.   Like, lopinavir, darunavir, ritonavir.  And he messed our

24 darunavir up with another T/VIR one.

25       Correct?

WILHELM - CROSS - BROWN

1   A.   That's correct.

2   Q.   And they tell him, "You've got to get that straight."

3   Right?

4   A.   Yep.

5   Q.   All right.

6        And then they talked about point number 3, the lipid

7   abnormality, that he confused two of the findings.

8        Right?  Do you see that in number 3?

9   A.   I do.

10  Q.   He was able to clarify the lipid and lab abnormality.

11       Right?

12  A.   Yes.

13  Q.   All right.

14       He agree -- he's clear on our lipid data now.

15       Right?

16  A.   Yes.

17  Q.   And Ms. Minix says, "I touched on the fact that he should

18  not give his personal opinion on the data, especially if we

19  haven't done the trials yet."

20       Right?

21  A.   That's what she puts in writing, yes.

22  Q.   That's good instruction to this speaker.

23       Right, sir?

24  A.   Yes.

25  Q.   All right.

WILHELM - CROSS - BROWN

1          And then they talked about some other scientific --

2     what other active agents are sensitive.

3          Correct?

4     A.   Yes.

5     Q.   And there was some positive feedback from the audience as

6     well that Ms. Minix updated him on?

7     A.   Yes.

8     Q.   All right.

9          And the bottom line is that Ms. Minix, after having

10    this long conversation with Mr. -- Dr. O'Brien, she believes

11    that he is an appropriate speaker.

12         Correct?

13    A.   I think after the coaching session, yes.

14    Q.   All right.

15         And Ms. Minix offered to sit down with him after

16    release of the FDA-approved slides to review the data.

17         Correct?

18    A.   Yes.

19    Q.   And incidentally, these slides that the speakers use,

20    they are also sent to the FDA for approval.

21         Correct, sir?

22    A.   Yes, there are FDA approved slides and then there are

23    backup slides, is what they were called.

24    Q.   And you know backup slides that were made by Janssen,

25    they went to the FDA, too.

WILHELM - CROSS - BROWN

1    Right?

2    A.   I would assume they did, yes.

3    Q.   Yeah.

4         And after all of this follow-up with Dr. O'Brien and

5    all of the plans to get Dr. O'Brien back on track, you

6    determined that this was a difficult situation.

7         Right?

8    A.   Correct.

9    Q.   I mean, telling an internationally recognized HIV doctor

10   that he messed up the name is kind of awkward.

11        Right?

12   A.   Definitely, yeah.

13   Q.   All right.

14        So it's a difficult situation that you, in your

15   estimation, felt was handled beautifully.

16        Right?

17   A.   Yes.

18   Q.   All right.

19        And this follow-up to Dr. O'Brien, that's not a

20   document that you showed our jurors when you showed the

21   previous email.

22        Correct?

23   A.   Correct.

24   Q.   Okay.

25        And you also -- another document that you showed our

WILHELM - CROSS - BROWN

1  jury had to do with a discussion of speakers who were not

2  selected for the speaker bureau.

3       Do you recall that?

4  A.   Yes.

5  Q.   Like Dr. Silver and Dr. Scott, right?

6  A.   Correct.

7  Q.   And I thought I heard you say earlier "Every

8  recommendation we ever made got on the speaker bureau."

9       Did I hear you --

10 A.   The original 150.

11 Q.   Yeah.

12 A.   Yeah.

13 Q.   These folks didn't get on.

14      Right, sir?

15 A.   Correct.  In the revision, I believe.

16 Q.   Yeah.

17      And one of the reasons these folks didn't get on is

18 because of the strict SAFE committee requirements.

19      Right, sir?

20 A.   I don't know if that was the rationale.  I know that some

21 of them weren't writing sufficient quantities of the drug.

22 Q.   And so the part of this email -- and this --

23      MS. BROWN:  Let's just show Plaintiffs' Exhibit 199.

24 BY MS. BROWN:

25 Q.   This was the email about Dr. Scott and Dr. Silver not

WILHELM - CROSS - BROWN

1  getting selected by the SAFE committee.

2      Right?

3  A.   Right.

4  Q.   And when this paragraph went up, you guys highlighted the

5  very, very last paragraph -- the very, very last sentence here

6  about a "fresh start for speakers who did not meet the

7  criteria."

8      Do you remember that?

9  A.   Yes.

10  Q.   But you didn't highlight the beginning of that paragraph,

11  and so I want to show it to you.

12      Okay?

13  A.   Okay.

14  Q.   All right.

15      So what Stacey Vogel says here is that there's been a

16  lot of changes and updates to the speaker bureau process.

17      Right, sir?

18  A.   Yes.

19  Q.   "We were all unprepared for the HCC" -- that's health

20  care compliance, right?

21  A.   Yes.

22  Q.   -- "HCC/SAFE criteria being so rigid."

23      Do you see that?

24  A.   I do.

25  Q.   And when it comes to that SAFE criteria, to be fair,

WILHELM - CROSS - BROWN

1    Mr. Wilhelm, you don't know what that is.

2        Right?

3    A.   I don't recall what the --

4    Q.   All right.

5    A.   -- what it stands for.

6    Q.   So this email that you showed our jury earlier talks

7    about the compliance criteria being so rigid.  But in

8    fairness, you're not sure what part of it was rigid.

9        Right?

10   A.   Well, part of the rigidity had to do with meeting the

11   prescription quantity requirements.

12   Q.   Sir, have you looked at the SAFE committee rigid

13   requirements?

14   A.   No.

15   Q.   Okay.

16       You don't have any idea what those requirements are.

17       Fair?

18   A.   I'm sure I could refresh my memory.  I'm sure I did at

19   one point.  I can't recall it at the moment.

20   Q.   So they say, "We're all unprepared for the HCC/SAFE

21   criteria being so rigid and would have planned differently to

22   prevent losing so many important providers."

23       Do you see that?

24   A.   I do.

25   Q.   Because there were many providers who the SAFE committee

WILHELM - CROSS - BROWN

1    determined were not appropriate for the speaker bureau.

2        You know that, right, sir?

3    A.   Correct.

4    Q.   And so there is a process by which recommendations from

5    the field don't make it on to the committee.

6        Right, sir?

7    A.   I believe after the initial go-around, yes.

8    Q.   Okay.

9        You, during your time period, sir -- a couple -- two

10   more areas I want to just quickly review with you, and I'm

11   going to be done.

12       During the entire -- your time period you were at

13   Janssen, you never reported any of the alleged compliance

14   violations you discussed with our jury to anyone at the

15   company.

16       Correct, sir?

17   A.   Well, we talked about it amongst the district managers

18   and the regional sales directors at the time in a more

19   informal setting after meeting time in the restaurant.

20       I mean, there were -- there were people copied on

21   emails that we've gone through today.  I mean, but I didn't go

22   sit down with -- I didn't make a formal complaint, if that's

23   what you're asking.

24   Q.   You didn't report the allegations you made to our jury

25   this morning to compliance.

WILHELM - CROSS - BROWN

1    Right, sir?

2  A.   I did not.

3  Q.   You didn't report the allegations you made to our jury to

4  human resources.

5    Correct?

6  A.   I did not.

7  Q.   You didn't report it to the legal department.

8    Correct?

9  A.   Correct.

10  Q.   Okay.

11    You didn't report it to anybody in the medical

12  department?

13  A.   Correct.

14  Q.   And you had a lot to say about Mr. Mattes, right, but you

15  didn't report it to him.

16    Right, sir?

17  A.   No.  I did voice some concerns in meetings that he

18  attended, but that mainly was around the MRI evaluation

19  process.

20  Q.   And you -- I apologize.

21    You left Janssen at the end of 2010.

22    Is that right, sir?

23  A.   No.  It was, I want to say, June.

24  Q.   June of 2010?

25  A.   Right.

WILHELM - CROSS - BROWN

1  Q.   Okay.

2       And after you left Janssen, for many, many years you

3  didn't report this conduct either.

4       Correct, sir?

5  A.   Correct.  Well, yeah.  I mean, I don't -- it might have

6  been -- I don't remember the exact year that we went to the

7  DOJ with the complaint, but, right, it wasn't -- it wasn't for

8  a number of years.

9  Q.   And the way you first raised these issues a number of

10  years later was to get a lawyer.

11       Correct, sir?

12  A.   Right.

13  Q.   And to pursue bringing a lawsuit in which you stood to

14  recover a significant percentage of money.

15       Right, sir?

16  A.   I mean, I don't know what a significant portion would be.

17  We just felt that there had been some inappropriate, illegal

18  things that had occurred during our tenure at Tibotec and

19  that -- that needed to be -- people needed to be made aware of

20  it, particularly the federal Government.

21  Q.   And the way that you wanted to make people aware of that

22  was by hiring a lawyer to bring a lawsuit.

23       Correct, sir?

24  A.   That's correct.

25  Q.   You didn't make people aware of that by calling up the

WILHELM - CROSS - BROWN

1  Government and reporting these issues.

2      Correct?

3  A.   No.  We did it through an attorney.

4  Q.   Okay.

5      And before -- one of the things you did in that case is

6  you amended the complaint to remove your real name so it said

7  John Doe.

8      Correct?

9  A.   After we dropped -- I believe it occurred after we

10  decided -- once we were informed that there was already a

11  pending lawsuit, we wanted to -- there was no further reason

12  to pursue the litigation on our behalf, since it was already

13  in the works.

14      So because Donna was already -- or currently in the

15  pharmaceutical industry -- to me, it didn't matter to me much

16  at all because I had moved on to a different sector of health

17  care, but Donna had concern about that becoming public

18  knowledge and potentially jeopardizing her career in her new

19  pharmaceutical company.

20  Q.   You both changed your names to Jane Doe and John Doe.

21      Correct?

22  A.   I mean --

23  Q.   In the documents?

24  A.   I guess.  I mean, I didn't personally do that.  We just

25  asked to have our names redacted.

WILHELM - CROSS - BROWN

1   Q.   Removed.  Okay.

2        So that nobody would know you had filed this.

3        Correct?

4   A.   Correct.

5   Q.   All right.

6        And did you know at the time you went to file your own

7   lawsuit that Ms. Penelow and Ms. Brancaccio had filed a

8   lawsuit?

9   A.   No.  Otherwise, we wouldn't have filed it.

10  Q.   Okay.

11       And do you know why it is, then, sir, that Ms. Penelow

12  would have had a copy of your lawsuit before it was unsealed?

13  A.   I have no idea.  It must have been shared from our

14  attorney to theirs, I'm speculating.

15  Q.   And let me --

16           MS. BROWN:  And, Your Honor, I want to admit D-8702.

17           THE COURT:  I don't know what it is, so...

18       Is there an objection?

19           MS. BROWN:  I apologize.  I apologize.  That is

20  Tab 40.

21           MR. RUSS:  Objection to foundation, Your Honor.

22           THE COURT:  I don't even know what the exhibit is, so

23  why don't we sidebar because I can't make a ruling without

24  knowing what it is.

25           MS. BROWN:  Sure.

WILHELM - CROSS - BROWN

```
 1              (Sidebar begins at 2:54 p.m.)

 2              MS. BROWN:  Your Honor, this is --

 3              THE COURT:  Just wait for him.

 4              MS. BROWN:  Sorry.

 5              THE COURT:  No, go ahead, Ms. Brown.

 6              MS. BROWN:  This is the email I used with Ms. Graham.

 7    It is his complaints that is attached, and this is an

 8    admission of a party's --

 9              THE COURT:  First of all, was this admitted when --

10              MS. BROWN:  My notes say no, which is why I was

11    trying to do it here.

12              THE COURT:  Okay.

13              MS. BROWN:  I definitely showed it, Your Honor.

14    Whether I formally did it, my folks say no.

15              MR. RUSS:  Your Honor, what question could she

16    possibly ask this witness about an email?

17              THE COURT:  Well, I think you just -- you asked it

18    already.  Right?  Didn't you ask, Do you know how these folks

19    got a copy of your complaint?

20              MS. BROWN:  Right.  I want to show it to him and say,

21    Your complaint is attached to this email.  Do you know how it

22    got there?

23              THE COURT:  Well, he doesn't know.  I mean, he

24    already said, I don't know how they got it.

25              MS. BROWN:  But he hasn't seen the email.
```

WILHELM - CROSS - BROWN

1    THE COURT:  But he's not on the email.

2    MS. BROWN:  No, but it's an admission because they're

3    the party that brought it.  This is Ms. Penelow and

4    Ms. Brancaccio.  So because it's -- I think the foundation

5    exists, Your Honor, because it's his complaint that he just

6    identified, and this is an admission -- the email is an

7    admission, the same as they've been doing with the Janssen

8    documents.

9    THE COURT:  What is the objection to the admission?

10   She can ask the question, and he says, I have no clue.  It's

11   just going to be consistent with what he just testified.

12   What's the problem -- what's the objection about this

13   testimony?

14   MR. RUSS:  I think this could be admitted through a

15   different witness.  If she's asking him --

16   THE COURT:  It could probably be admitted without any

17   witness.

18   MR. RUSS:  Right.

19   THE COURT:  No?

20   MR. RUSS:  I think that's probably right, Your Honor.

21   THE COURT:  So if it could be admitted without a

22   witness, then just move to admit it, it's now admitted.

23   Publish it, ask the witness a question.  But if he says, I

24   have no clue or words to that effect, you're going to have to

25   move on.

WILHELM - CROSS - BROWN

1    MS. BROWN:  Sure thing.

2    THE COURT:  But I think she can move to admit it.  I

3 agree with you, not this witness necessarily -- but you don't

4 need the witness to put this in.

5    Is there an objection to this document coming in?

6    MR. RUSS:  No.  I think the document comes in.  It's

7 to the question about this document that -- there's no reason

8 to believe he's even seen this.  He's already answered, "I

9 don't know how I got it."

10    And, frankly, Your Honor, I'm going to have to handle

11 this on redirect.  Due to this process there's two overlapping

12 qui tams this year, other civil qui tams all the time, and

13 that's probably how she got it.

14    So there's nothing nefarious about this, and there's

15 certainly an implication coming from Janssen's counsel --

16    THE COURT:  Go slower, go slower.  Because I'm

17 feeling the court reporter and the hairs on my neck are going

18 up.

19    So on redirect, if you want to address it briefly, but,

20 Mr. Russ, I'd be careful about what you're -- what are you

21 doing on redirect?

22    MR. RUSS:  So the implication in this line of

23 questioning -- and the same thing happened with Ms. Graham --

24 is that somehow they violated a seal or a coordinating.  In

25 reality, what happens when there are two overlapping qui tam

WILHELM - CROSS - BROWN

1   cases, the main justice puts those lawyers in touch and then

2   has an order from a court allowing the sharing of those

3   agreements or those complaints.

4          THE COURT:  All right.  You can ask them something to

5   that effect to counter what might be insinuated with her

6   questions saying there's another possible reason why they

7   might have this other than something inappropriate, like

8   sharing a sealed document.  I'm not necessarily going to

9   prevent you from doing that.

10         But for now, this document is coming in.  Right?

11  There's no objection to the document coming in?

12         MR. RUSS:  Correct, Your Honor.

13         THE COURT:  She is going to publish it, ask the

14  question, and move on.

15         MS. BROWN:  Yep.  Thank you, Your Honor.

16         (Sidebar was concluded at 2:57 p.m.)

17         (Open court.)

18         MS. BROWN:  Your Honor, may I admit D-8702?

19         THE COURT:  You may.

20         Without objection, correct, Mr. Russ?

21         MR. RUSS:  Yes, Your Honor.

22         THE COURT:  All right.  It's admitted.

23         MS. BROWN:  Thank you, Your Honor.

24         (Defendant's Exhibit D-8702 in evidence.)

25  BY MS. BROWN:

WILHELM - CROSS - BROWN

1   Q.   This, Mr. Wilhelm, is an email from Ms. Penelow's

2   personal account to Ms. Brancaccio's personal account.

3        Do you see that, sir?

4   A.   I do.

5   Q.   That's dated October of 2015, before that complaint was

6   unsealed.

7        Do you see that?

8   A.   Okay.  Yes.

9   Q.   The subject is "COMPL."

10       Right?

11  A.   Yes.

12  Q.   And the attachment is the complaint that you filed under

13  seal.

14       Do you see that?

15  A.   Yes.  And I see that it says there's an attachment.

16  Q.   And do you have any idea how Ms. Penelow would have

17  gotten a hold of a complaint that you had filed under seal?

18  A.   I do not.

19  Q.   Okay.

20       Final -- and this lawsuit that you filed, it is

21  dismissed.

22       Correct, sir?

23  A.   Yes.

24  Q.   And like this case, the Government was not involved in

25  your lawsuit.

WILHELM - CROSS - BROWN

1    Correct, sir?

2    A.   Correct.

3    Q.   All right.

4    Final topic, I want to talk a little bit about some

5    performance issues you had at Janssen.

6    Okay, sir?

7    A.   Sure.

8    Q.   You received a formal written warning regarding some

9    performance issues you had.

10   Correct, sir?

11   A.   That's correct.

12        MS. BROWN:  Your Honor, D -- this is tab 1, D-6092.

13        Your Honor, I would seek to admit.

14        MR. RUSS:  No objection.

15        THE COURT:  All right.  So admitted.

16        MS. BROWN:  Okay.

17   (Defendant's Exhibit D-6092 in evidence.)

18   BY MS. BROWN:

19   Q.   Just let's just look at it together, then.

20        Sir, this is a memo from Mike Iacobellis to you in

21   August of 2008.

22        Correct?

23   A.   That's correct.

24   Q.   All right.

25        And this is a performance discussion of formal warning.

WILHELM - CROSS - BROWN

1      Right, sir?

2  A.   Yes.

3  Q.   All right.

4      And he references prior meetings where concerns about

5  your management performance and judgment behaviors have been

6  discussed.

7      Correct?

8  A.   Correct.

9  Q.   You had received a number of evaluations and feedback

10  that critiqued your judgment and your management.

11      Fair?

12  A.   Yes.

13  Q.   Okay.

14      And he talks in this formal warning about some of the

15  events that led to this warning.

16      Correct?

17  A.   Correct.

18  Q.   All right.

19      And one of them has to do with events that were hosted

20  near your home in Denver, Colorado.

21      Correct?

22  A.   Correct.

23  Q.   And he reports in this warning that some members of your

24  team were uncomfortable at these events.

25      Correct?

WILHELM - CROSS - BROWN

1    A.    That's what he reports.

2    Q.    Right.

3          He reports that their perception was that the focus of

4    these events wasn't on work, it was on drinking.

5          Right?

6    A.    That's what he reports.

7    Q.    Right.

8          I mean, that was what he reports the concerns were.

9          Correct?

10   A.    Correct.

11   Q.    Okay.

12         You disagree.

13         Right, sir?

14   A.    Correct.

15   Q.    You actually think this was a witch hunt.

16         Right, sir?

17   A.    I do.

18   Q.    You think it was a witch hunt led by Mr. Iacobellis

19   against you.

20         Right?

21   A.    I do.

22   Q.    You believe that you were mistreated by Janssen.

23         Correct?

24   A.    Yes.

25   Q.    You believe that the allegations in this written warning

WILHELM - CROSS - BROWN

1    are garbage, to use your term.

2         Right, sir?

3    A.    Yes.  I mean, this entire document that was put together

4    was never discussed with me at the time.  This was pre-typed

5    and presented to me on August 6th.

6         So he's taken account from somebody that's unnamed

7    without talking to me or getting my version of the events or

8    as far as I know Tony Dolisi's either, who was the other key

9    account director at the time.

10        And so I'm singled out of this when there were two of

11   us, and there weren't multiple evening stops.  We went to two

12   iconic locations, restaurants, in the Morris and Denver area.

13   One was called the Morrison Inn.  The other one is called

14   The Fort.

15        Every single Janssen or J&J or Roche or any other

16   pharmaceutical company for that matter that I'm aware of

17   always has alcohol available.  So nobody was forcing anybody

18   to do anything.  We weren't -- it's not like we were taking

19   shots or anything that is kind of being insinuated here.

20   Q.    And I think you referenced no one had talked to you about

21   this before you got this warning.

22        Is that right, sir?

23   A.    Yeah.  I mean, this document was completely written out

24   when I first saw it.

25   Q.    Okay.

WILHELM - CROSS - BROWN

1      And just so -- to look at what the document says,

2  though, it references a conference call discussion with you

3  about these issues.

4      Right?

5  A.   Yeah.  I think he initially brought that up on a call

6  before we met in person.

7  Q.   Okay.

8      So this final formal written warning is in August,

9  August 6th.

10      Right?

11  A.   Right.

12  Q.   And it starts out by saying, I'm giving you this written

13  letter to reiterate concerns about your management performance

14  and judgment behaviors that were discussed with you on a

15  conference call at the end of July.

16      Right?

17  A.   Right.

18  Q.   And he says "as well as today at your midyear performance

19  review."

20      Right?

21  A.   Right.

22  Q.   So there was a discussion at the end of July, and there

23  was a discussion at the performance review, and this formal

24  written warning resulted.

25      Correct?

WILHELM - CROSS - BROWN

1   A.   Correct.

2   Q.   And one of the examples of a lapse in judgment and

3   leadership that he raises had to do with an event where folks

4   felt that the focus was on drinking.

5        Right?

6   A.   That's what's being -- what's the right word?  That's

7   what I'm being accused of, I guess.

8   Q.   Okay.

9        And there are a couple other situations that were

10  pointed out to you as evidence of bad judgment, according to

11  this letter.

12       Correct?

13  A.   Correct.

14  Q.   There was an issue with a candidate, Ms. Christina Robb.

15       Correct?

16  A.   Correct.

17  Q.   Crysta Robb.

18       Correct?

19  A.   Yes.

20  Q.   And there was a concern about some of the things you said

21  in that interview.

22       Correct?

23  A.   I don't think it took place during the interview.  I

24  think it took place after the interview.

25  Q.   Okay.

WILHELM - CROSS - BROWN

1    A.    Yeah.

2    Q.    You made some comment about her personal situation.

3          Is that right, sir?

4    A.    Yeah.  So with your permission, I'd like to give a little

5    clarity to this whole point.

6    Q.    Sure.

7          I'll just ask a couple of questions, and if Mr. Russ

8    has more, you're going to have an opportunity to explain it.

9    A.    Fair enough.

10   Q.    The allegations in this formal warning were that you said

11   some things that were perceived to be evidence of bad

12   judgment.

13         Correct?

14             MR. RUSS:  Objection.  Relevance.

15             THE COURT:  Overruled.

16   BY MS. BROWN:

17   Q.    That's what's written in the warning.

18             THE COURT:  That means you can answer the question.

19             PROSPECTIVE JUROR:  Okay.  Yeah.

20         Yes.

21   BY MS. BROWN:

22   Q.    Okay.

23         And just like the drinking episode, you also don't

24   think this is founded, these allegations against Ms. Robb.

25         Correct?

WILHELM - CROSS - BROWN

1   A.   It's completely -- it's completely out of context, yes.

2   Q.   Okay.

3        And there was also a concern about blind copying your

4   team on correspondence with Ms. Saladana.

5        Do you remember that?

6   A.   Yes, I do remember that.

7   Q.   Okay.

8        And similarly, you don't think this is sort of a fair

9   critique.

10       Correct?

11  A.   Well, I mean, I certainly don't recall making it a blind

12  copy, but it's a Dear Doctor letter that I'm sure everybody

13  was familiar with anyway, so I don't know -- I don't know what

14  the issue is with copying my team.

15  Q.   And in addition to the issues with some judgment that

16  were raised at this meeting, there were also some issues

17  raised about coaching, performance management, and skill

18  development.

19       Correct?

20  A.   Yes.  I don't recall that, but I am seeing it now.

21  Q.   Okay.

22       And another issue that was raised was something about

23  Mr. Rick Miller.

24       Do you remember him, sir?

25  A.   I do.

WILHELM - CROSS - BROWN

1  Q.  Okay.

2       And it says here there were specific situations

3  including the Rick Miller situation.

4       Right, sir?

5  A.  Right.

6  Q.  Now, Mr. Miller was someone that you supervised.

7       Right?

8  A.  For a portion of the time, yes.

9  Q.  Okay.

10      And you actually took the lead in terminating

11 Mr. Miller.

12      Correct?

13 A.  That's correct.

14 Q.  And the reason you did that was because he had some

15 questionable expense reports, sir?

16 A.  That's correct.  That's part of it.

17 Q.  He had essentially submitted expenses for a three-day

18 event and he submitted them only as a one-day event or

19 something like that?

20 A.  Yeah, and he recorded calls which was over the

21 Thanksgiving holiday, but he attended a gala where he did see

22 those physicians and talk to them, but there's an issue I

23 guess with recording a call when it's a holiday.

24 Q.  Right.

25      I mean, there was a question that he wasn't really

WILHELM - CROSS - BROWN

1    doing his job.

2         Right, sir?

3    A.   Yes, not so much directly to that event, but in previous

4    months, yes.

5    Q.   He had been a poor performer.

6         Fair enough?

7    A.   That's fair.

8    Q.   He asked to be reassigned, for example, to the

9    Palm Springs area.

10        Right?

11   A.   I think it was Phoenix, but, yes.

12   Q.   Okay.

13        And it turns out he sort of never visited a doctor in

14   the area?

15   A.   So that's when he was a key account manager, and one of

16   the complaints by the district manager and some of those sales

17   representatives that he worked with or supported was that he

18   wasn't frequently where he needed to be where he told them

19   they would be, and he wasn't coaching the speakers before and

20   after the program and oftentimes didn't attend the speaker

21   programs when he said that he would be in attendance.

22   Q.   Bottom line, Mr. Miller wasn't doing his job.

23        Right?

24   A.   Fair to say.

25   Q.   And he was terminated.

WILHELM - CROSS - BROWN

1    Correct?

2  A.  Fair to say.

3  Q.  With your blessing.

4    Correct?

5  A.  Yeah.

6  Q.  Because in your view he was not performing to the

7  standard that he should have been at Janssen.

8    Correct?

9  A.  Yes.

10 Q.  Okay.

11   And Ms. Strand was in here and told us he got fired

12 because he reported off-label promotion, but you never heard

13 of that.

14   Right, sir?

15 A.  I'm not recollecting that.

16 Q.  Okay.

17   This --

18 A.  But also -- I guess I would also say that I don't know

19 whether or not he went to anyone in the corporate office to

20 report it.

21 Q.  As it relates to the allegations in your formal warning,

22 sir, they really left a bad taste in your mouth.

23   Fair to say?

24 A.  Yeah, I think it was unfair.

25 Q.  All right.

WILHELM - CROSS - BROWN

1      I mean, you didn't review -- you didn't view any of

2  these things as a fair critique of your judgment or your

3  performance.

4      Right?

5  A.   Agreed.

6  Q.   You viewed yourself to be a top performer at Janssen.

7      Right?

8  A.   I was a president's award winner, so, yes, I was a top

9  performer.

10  Q.   And you think, in fact, that this decision to close the

11  operations in Florida and have you go to Atlanta -- you think

12  that too was particularly unfair.

13      Right?

14  A.   Well, they didn't close the operations in Florida, but

15  they just realigned where the base city needed to be for the

16  district sales managers.

17      So Denver at least historically had been a hub, but

18  they conveniently, in my opinion, decided that it would be

19  best for me to move from Denver to Atlanta.

20  Q.   Right.

21      And that was very difficult for you.

22      Right, sir?

23  A.   Yeah --

24  Q.   And you had --

25  A.   -- for sure.

WILHELM - CROSS - BROWN

1    Q.   Oh, I apologize.

2    A.   Oh, I mean, it's a long travel.

3    Q.   Yes.  Not close --

4    A.   Right.

5    Q.   -- to commute to Atlanta?

6    A.   Correct.

7    Q.   And that -- I think you described that yourself as being

8    frustrated with that.

9         Right, sir?

10   A.   Well, that, and, you know, I had intentions to move.  I

11   went there with my family, did house hunting, was trying to

12   sell my home.  This was, you know, 2009, when the market was

13   not good.  Couldn't sell the house on my own.

14        Typically, J&J and other pharmaceutical companies, when

15   you move to another position, would purchase your home, and

16   they wouldn't do that because my home was stucco.  So I

17   couldn't sell it, and they wouldn't buy it, so I was

18   commuting.

19        So that, yes, that was difficult.

20   Q.   Right.

21        And the bottom line, sir, as it relates to this

22   warning, the transfer to Atlanta, the failure to buy your

23   house, you were frustrated with J&J.

24        Correct?

25   A.   I think that's -- yeah, I think it's fair to say

WILHELM - CROSS - BROWN

1    frustrated.

2          MS. BROWN:  I have no further questions.  Thanks very

3    much, Mr. Wilhelm.  I appreciate your time.

4          THE WITNESS:  Yeah.  Thanks.

5          THE COURT:  All right.  Thanks.

6      Mr. Russ, do you have any redirect, and if so, how long

7    is it?

8          MR. RUSS:  I do, Your Honor, but a break would

9    probably be appropriate.

10          THE COURT:  All right.  Then let's do that first.  I

11    want to give you folks a ten-minute break, and then we'll

12    reconvene.  All right?

13          THE DEPUTY COURT CLERK:  All rise.

14          (Jurors exit the courtroom.)

15          (A short recess occurred.)

16          THE DEPUTY COURT CLERK:  Please remain seated.

17          THE COURT:  Mr. Russ, how long do you think?

18          MR. RUSS:  Hopefully not more than 30 minutes, Judge.

19          THE COURT:  And we're going to get done just with

20    this witness today.

21          MR. RUSS:  It appears that it's likely.

22          THE COURT:  All right.

23          THE DEPUTY COURT CLERK:  All rise.

24          (Jurors enter courtroom.)

25          THE COURT:  All right, folks.  Everyone be seated.

```
1       Mr. Russ, whenever you're ready you can proceed with
2   redirect.
3           MR. MARKETOS:  Thank you, Your Honor.
4   (REDIRECT EXAMINATION BY MR. RUSS:)
5   Q.  Good afternoon, Mr. Wilhelm.
6   A.  Hello.
7   Q.  I know it's been a long day.  I've got a couple questions
8   for you.
9   A.  Sure.
10  Q.  I want to start with where Ms. Brown left off.  She
11  talked to you about whether you were frustrated at your time
12  at Janssen.
13          Do you recall that?
14  A.  Yes.
15  Q.  Now, tell the jury what awards you won.  I think you said
16  it was the president's cup?
17  A.  Yeah, president's achievement award.  That was when I was
18  a district sales manager in 2007 as the Dallas district
19  manager.
20  Q.  And, in fact, and Ms. Brown covered this with you, you
21  were the credo champion.
22  A.  Correct.
23  Q.  Right?
24  A.  Yes.
25  Q.  You were -- you were Janssen's guy?
```

WILHELM - REDIRECT - RUSS

1    A.    In many ways, yes.

2    Q.    And she showed you a formal warning from Mr. Iacobellis.

3          Do you remember that?

4    A.    I do.

5    Q.    Do you recall the date on that?

6    A.    August 6th, I believe.

7    Q.    What year?

8    A.    2008.

9    Q.    You stayed with the company for two more years?

10   A.    I did.

11   Q.    Did you understand her questioning to be an insinuation

12   that you were upset, and you made up a story all these years

13   about what you saw at Janssen?

14          MS. BROWN:  Objection, Your Honor.

15          THE COURT:  Sustained.

16   BY MR. RUSS:

17   Q.    Did you make up a story about what you saw at Janssen?

18   A.    Absolutely not.

19   Q.    In fact, Mr. Wilhelm, you did report in writing -- we

20   heard about your DOJ -- sorry, your False Claims Act lawsuit.

21   A.    Correct.

22   Q.    Okay.

23          Oh, and by the way, do you know one way or the other if

24   the Department of Justice or the Government provided your

25   complaint to counsel for Ms. Penelow and Ms. Christine

WILHELM - REDIRECT - RUSS

1  Brancaccio?

2  A.   I have no idea, but I assume that they did because it

3  looks like they have it.

4  Q.   Nothing wrong with that?

5          MS. BROWN:  Your Honor, may we approach on that

6  question, please.

7          THE COURT:  Yes.

8          (Sidebar begins at 3:25 p.m.)

9          MS. BROWN:  Your Honor, I have a concern about

10  opening the door because his testimony was that the lawyers

11  provided it, and he just led him into the Department of

12  Justice provided it as if the Department of Justice somehow

13  had some view on the merits of this and were in coordination

14  with the lawyers here.

15       It's in direct contradiction to what he said on the

16  testimony, which maybe my lawyer gave it to her lawyer.  Now,

17  we've injected an affirmative action of the Department of

18  Justice that we have no evidence in the record to be true.

19          THE COURT:  Well, we have no evidence that he shared

20  it with your folks either.  You put that before the jury, so

21  on sidebar, I said, You wanted to put before the jury that

22  they might have done something inappropriate by sharing a

23  sealed complaint with the Relators in your case, even though

24  you have no solid evidence that that's how they received it.

25       What Mr. Russ is saying is that, Look, if we're going

WILHELM - REDIRECT - RUSS

1    to put that narrative before them, I should at least be able

2    to ask the basic question of:  Do you know whether the

3    Department of Justice provided you that.

4         MS. BROWN:  And, Your Honor, I would just say the

5    difference is I asked him, Do you know, and he is saying, Did

6    the Department of Justice do this, which is in direct

7    contradiction to what he just said.

8         THE COURT:  Do you know one way or the other if they

9    did.  He asked it almost in the exact same format you just did

10   on sidebar, and that's as far as you're going to go.

11        MS. BROWN:  I understand.

12        MR. RUSS:  That's it, Your Honor.

13        MS. BROWN:  I understand.  I understand.  Understand.

14        (Sidebar was concluded at 3:27 p.m.)

15        (Open court.)

16   BY MR. RUSS:

17   Q.   Now, Mr. Wilhelm, there was some language used that the

18   case was dismissed.  I think you said you voluntarily

19   dismissed that case.

20        Right?

21   A.   Correct.

22   Q.   You don't have any financial interest in the outcome of

23   this case?

24   A.   That's correct.

25   Q.   After you filed that suit, you also gave a detailed

─WILHELM - REDIRECT - RUSS─

1    declaration in this case that you covered with Ms. Brown.

2         Do you remember that?

3    A.   I do.

4    Q.   That was under oath?

5    A.   Yes.

6    Q.   And then you sat for deposition?

7    A.   Yes.

8    Q.   You were also under oath?

9    A.   Yes.

10   Q.   And you're under oath today?

11   A.   Correct.

12   Q.   Did Ms. Brown point out to the jury any inconsistencies

13   in the facts that you have outlined in each of those

14   occasions?

15   A.   No, I do not believe so.

16   Q.   Let's go back to the crux of what you and I talked about

17   this morning.  Did the company off-label market these two

18   drugs or not?

19   A.   They absolutely did.

20   Q.   Does the existence of policy documents stop that?

21   A.   It doesn't stop it, but I can see why they do it to --

22   again, they need to cover in writing the legality of doing

23   what happened in reality.

24   Q.   And based on your experience at the company and your

25   years there, did the company pay doctors to be speakers, one

WILHELM - REDIRECT - RUSS

1   purpose of which was to increase their prescription of your

2   two drugs?

3   A.   They absolutely did, yes.

4   Q.   You've been consistent about that, haven't you?

5   A.   I have.

6   Q.   If we wanted, Mr. Wilhelm, to see what the effect of that

7   conduct would be, where should we look?  In other words, if we

8   wanted to see the effect on prescription behavior, where would

9   we look?

10  A.   In the DD data that we tracked and could see that

11  physicians that were being paid increased their prescription

12  volume.

13  Q.   Ms. Brown asked you about a national mandate related to

14  HIV medication.

15       Do you remember that?

16  A.   Yes.

17  Q.   There are a lot of diseases that we humans have.

18       Correct?

19  A.   Correct.

20  Q.   And it's important to treat them correctly?

21  A.   Absolutely.

22  Q.   What's the purpose of having the FDA approve a label

23  based on your experience and training?

24  A.   To make sure that it's used appropriately in the

25  appropriate population and the indications that the FDA grants

WILHELM - REDIRECT - RUSS

1  in its label.

2  Q.   Is it a national mandate to get drugs to HIV patients

3  that are not proven safe and effective for their use?

4  A.   No.

5  Q.   Is it a national mandate to get HIV medications to HIV

6  patients that are procured by kickbacks?

7  A.   No, I don't -- I'm not --

8  Q.   Are you aware if that's part of the national mandate?

9  A.   Yes.

10  Q.   It is?

11  A.   No.  I mean, no, it's not part of the mandate.

12  Q.   Okay.

13  A.   Yeah.  I'm aware, though.

14  Q.   Is there anything in the national mandate -- what is the

15  national mandate, by the way?

16  A.   Of the --

17  Q.   That she talked to you about, the national mandate for

18  HIV medication.

19  A.   It's the same as -- there are no exceptions, whether it's

20  HIV or cancer.  I mean, certainly they have expedited approval

21  through the FDA at times, but there's no difference.  The

22  FDA-approved label is the FDA-approved label, and you need

23  to -- you cannot talk off of what is on that document.

24        So you not only cannot promote it for other

25  indications, but you can't promote it for other patient types,

WILHELM - REDIRECT - RUSS

1    you know, whether that be for lipid neutrality or GI side

2    effects or any other side effect, for that matter.

3    Q.   Is that because it's important to get the right drugs to

4    the right patient?

5    A.   It absolutely is important to do that.

6    Q.   And not every drug is right for all patients.

7         Right?

8    A.   That's right.

9    Q.   Is there an exception to the national mandate that says

10   you can commit fraud on the Government?

11   A.   No.  There's no exception.

12   Q.   And, in fact, Mr. Wilhelm, were you trained when you were

13   at Tibotec and Janssen -- I think you told me and you told

14   this jury that you were trained on the Anti-Kickback Statute?

15   A.   We were.

16   Q.   Okay.

17        At any point during your time at Janssen, or, frankly,

18   any pharmaceutical company, has anybody ever told you that

19   there's a national mandate for HIV medications so you can pay

20   kickbacks?

21   A.   No.

22   Q.   At any point in your time at Janssen or Tibotec, were you

23   ever trained by compliance or told by any business people

24   there's a national mandate for HIV medication so you can speak

25   off-label?

WILHELM - REDIRECT - RUSS

1    A.   Absolutely not.

2    Q.   Or that there's a national mandate for HIV medication so

3    push it for unapproved uses?

4    A.   No.

5    Q.   When you were being trained at Janssen, did you learn

6    about the consequences for violating off-label promotion

7    requirements and Anti-Kickback Statute?

8    A.   Yes.

9    Q.   And what are those consequences?

10   A.   Fines, jail time, potentially.  They're pretty serious.

11   Q.   Companies -- did Janssen train you that when companies

12   are found violating those laws that they get to keep the

13   money?

14   A.   No.

15        MS. BROWN:  Objection, Your Honor.  I object.

16        THE COURT:  Hold on, folks.

17      Overruled.

18   BY MR. RUSS:

19   Q.   When you were at Janssen and Tibotec, did they ever train

20   you, if we get caught doing this off-label marketing or

21   violating the Anti-Kickback Statute, we get to keep the

22   Government's money?

23   A.   Nope.  They never said that.

24   Q.   You can't remember anybody ever saying that?

25   A.   No, I cannot.  In fact, I'll add that I was told directly

WILHELM - REDIRECT - RUSS

1    from someone on the Prezista brand team at the time that

2    Tibotec/Janssen/J&J sets money aside --

3         MS. BROWN:  Objection, Your Honor.  May we approach,

4    please?

5         THE COURT:  Sustained.  Strike that last response.

6         Counsel, side.

7         (Sidebar begins at 3:33 p.m.)

8         MR. RUSS:  Obviously, I had no idea he was going to

9    go there.

10        MS. BROWN:  I don't think he did, but there's --

11        THE COURT:  I believe you.  I struck it.  That's

12   enough -- I think enough theatrics for the jury to get not to

13   bother even trying to consider it.  He didn't complete the

14   rest of the sentence.

15        MR. RUSS:  Right.

16        THE COURT:  But be mindful.  I don't think you

17   intended to go there, but, yeah, moving forward, you may want

18   to talk to some of these witnesses, Don't be going into these

19   things.

20        And, by the way, I'm going to talk to you a little bit

21   about this when we break for the day.  I want to speak to you

22   guys about some of these witnesses because our trial is going

23   on extremely long.

24        MR. RUSS:  I agree, Your Honor.

25        THE COURT:  And one of the reasons why is the

WILHELM - REDIRECT - RUSS

1  witnesses you are calling do not answer the questions posed to

2  them on cross-exam.  And Ms. Brown's been patient -- going out

3  without an objection, but I'm not.  It's weighing down my

4  trial day.

5         Moving forward -- and I'm saying this more generally so

6  all counsel can hear -- if I start seeing the witness going 30

7  lines or a response to a question that was "Yes or no, did you

8  report to me," I'm going to get involved.  And this doesn't

9  look good in front of a jury, but I'll do it.  Because my

10  trial days are going much slower than you all anticipated for,

11  whatever the reason, that these witnesses get asked a question

12  and they want to go on and on and on and on.

13         And, again, I normally will not fix that unless there's

14  an objection, but it's causing a delay, I think, in the trial.

15  So you all need to mind that a little bit better.

16            MS. BROWN:  I should have -- I understand.

17            THE COURT:  If you ask me, because I've done this

18  before, to say, Your Honor, I ask the Court to direct the

19  witness to answer the question posed, boom, you've given me a

20  green light to get in there.  You haven't done that, neither

21  of you.

22         So starting tomorrow, I'm going in there with or

23  without you all, which I don't want to do because sometimes

24  the judge can get in the way of the tactical decision by a

25  party.  But this is taking long.

WILHELM - REDIRECT - RUSS

1      MR. RUSS:  I agree.

2      THE COURT:  All right.  We're all agreed on this.

3      MS. BROWN:  Can I just say one thing on this?  And I

4  absolutely do not think you anticipated that was going to

5  happen.  I don't mean to suggest otherwise, but I will say he

6  testified to that in his deposition, and then we filed a

7  motion in limine, and the Court granted it.  Or you agreed to

8  it.

9      So I just -- I don't think you did it on purpose, but,

10  like, we knew this guy had this piece of testimony, and that's

11  why we filed a motion in limine.

12      THE COURT:  The thing is he went on that on his own.

13      MS. BROWN:  I know, I know.

14      THE COURT:  This wasn't even a question by Mr. Russ.

15  So he answered the question --

16      MS. BROWN:  I know, I know.

17      THE COURT:  -- and then tried to say one more thing.

18  Nobody knows --

19      MS. BROWN:  I know.  I agree.  Thank you.

20      (Sidebar was concluded at 3:36 p.m.)

21      (Open court.)

22      MR. RUSS:  May I proceed, Your Honor?

23      THE COURT:  You may.

24  BY MR. RUSS:

25  Q.   I have more notes to go through, Mr. Wilhelm.

WILHELM - REDIRECT - RUSS

1    I believe you indicated that you believe Prezista and

2  Intelence were good drugs.

3  A.   I do believe they're good drugs.

4  Q.   Is there a qualification to that?

5  A.   Yeah.  That the FDA has a label in place for a given

6  reason, and although they're -- both of them are good drugs,

7  there are drugs that are, based on their label, more

8  appropriate for certain patient types.

9  Q.   You also were asked some questions about the forecast

10 being dropped.

11 A.   Yes.

12 Q.   Do you know what that document was that Ms. Brown showed

13 you?

14 A.   Yeah.

15 Q.   Was it a -- do you remember getting a voicemail?

16 A.   Yep.  From Deb O'Connor.

17 Q.   And that was in November of 2006, right at the end of the

18 calendar year?

19 A.   Yes.

20 Q.   In January 2007, did the forecast go right back up?

21 A.   It definitely went up, yes.

22 Q.   Do you recall roughly the magnitude of the increase just

23 two months later?

24 A.   Not off the top of my head, no.

25 Q.   Fair enough.

WILHELM - REDIRECT - RUSS

1    Now, Ms. Brown also asked you some questions about the

2  FDA's approval of certain messages, and she showed you -- it's

3  called a slim-jim?

4  A.   A slim-jim, yeah.

5  Q.   Did Ms. Brown show you any FDA written approval of the

6  phrase "low impact on lipids"?

7  A.   No.

8  Q.   Have you ever seen that approval?

9  A.   I have not.

10  Q.   And I think you talked on cross-examination that there is

11  some context for what you can say about lipids related to

12  certain drugs if it's on the label.

13  A.   Right.

14  Q.   And I think you said, and correct me if I'm wrong, that

15  there was a head-to-head study between Prezista and Kaletra on

16  the 2006 label.

17  A.   That was the graph that she showed me, yes.

18  Q.   And that was what she showed you on the slim-jim?

19  A.   Correct.

20  Q.   Does that mean, based on your training and experience,

21  that you could ever make those same claims against another

22  drug?

23  A.   Absolutely not.  You cannot do that.

24  Q.   Why?

25  A.   Because it's not -- it's not fair, and it's not proven in

WILHELM - REDIRECT - RUSS

1  a head-to-head, double-blind clinical trial that's required by

2  the FDA.  And it's also clear that you cannot make a

3  comparison from one package insert to another package insert.

4  It has --

5  Q.  Do you ever see any of the -- do you know what DDMAC is?

6  A.  Yeah.

7  Q.  Did you ever see any DDMAC correspondence between Janssen

8  and the FDA?

9  A.  No.

10  Q.  Okay.

11      So you don't know one way or the other what was

12  approved in any correspondence between DDMAC, which is a part

13  of the FDA, and Janssen?

14  A.  Correct.

15  Q.  That just wasn't your job.

16  A.  That was for the medical information team.

17  Q.  I want to pull up Defendant's 1115 --

18      MR. RUSS:  Which I believe, Ms. Brown, has been

19  admitted in your cross.

20      If we could Zoom in on that, please.

21  BY MR. RUSS:

22  Q.  Do you see on the first page there -- and this is the

23  2008 Prezista label.  If you need to flip through it, we can.

24  A.  No.  That's okay.

25  Q.  Do you see on the first page there's "Adverse Reactions"

WILHELM - REDIRECT - RUSS

1  on the top right?

2  A.   Yes.

3       MR. RUSS:   If we could go to page 2 of the table of

4  contents, please.

5  BY MR. RUSS:

6  Q.   Now, on the bottom, about midway through on the left side

7  of the page, I think there might be some confusion,

8  Mr. Wilhelm.

9       Did the FDA change adverse reaction to serious ADRs in

10  2008?

11  A.   I was not aware of that fact, but that's what --

12  Q.   Well, take a look at this label.  Do you see there's a

13  title called "Adverse Reactions"?

14  A.   I do.

15  Q.   And then within that, there's serious ADRs.

16  A.   I see.

17  Q.   What are "serious ADRs"?

18  A.   Drug -- or not drug interactions, but interactions or

19  side effects of a product that could cause serious harm to a

20  patient, whether it's cardiovascular, stroke, death, a variety

21  of different unwanted events.

22  Q.   We can agree, I think, in 2008 that the hypolipidemia and

23  hypercholesterolemia and concern about triglycerides showed up

24  in the 2008 label as a serious ADR.

25  A.   That's what I said earlier, yes.

─WILHELM - REDIRECT - RUSS─

1   Q.   It's not minor.

2   A.   Correct.

3   Q.   Do you know if a serious ADR, how that -- the FDA defines

4   that?

5   A.   No.  I guess not technically, but --

6   Q.   I won't ask.  We'll give it out and this jury can hear it

7   another time.

8   A.   Okay.

9   Q.   Mr. Wilhelm, you and I went through some documents.  We

10  spent a few hours this morning going through those documents.

11       Right?

12  A.   Yes.

13  Q.   There were some documents that were, by definition, in

14  writing.

15       Do you recall those?

16  A.   Yes.

17  Q.   Okay.

18       So we're not taking your word for what was happening at

19  the time; we saw documents.

20       Fair?

21  A.   Fair.

22  Q.   When Ms. Brown asked you -- whether specific phrases were

23  told to you, like you were instructed to off-label market, do

24  you recall when she was asking those questions?

25  A.   Yes.

WILHELM - REDIRECT - RUSS

1    Q.   And you said no.

2         Explain to the jury how the messages actually were

3    gotten.

4    A.   Well, in a variety of different ways, but I would say the

5    most common way was on our Friday calls, which occurred

6    weekly, and there was almost every week discussion about how

7    we are going to message Prezista versus our competitors, and

8    we didn't have the information in our product label.  So how

9    were we going to do that.

10        And there was a tremendous amount of not only financial

11   resources but human resources dedicated to training the sales

12   organization as to what information was in clinical trials

13   that would help the sales representative verbalize where

14   Prezista should be used and could be used, even though it was

15   not in our FDA-approved indication.

16        So, again, it was only for -- I used the term "highly

17   treatment-experienced" or "salvaged," because that's what the

18   physicians used, and we had to move that product to early

19   treatment-experienced, first line protease inhibitor

20   utilization, or in naive patients.

21        And all of the conversation that took place on these

22   calls had to do with how are we going to do that?  How are we

23   going to drive utilization into the patient community that

24   wasn't an official FDA indication so that we would meet our

25   goal?

WILHELM - REDIRECT - RUSS

1    And so there was training directly to the sales

2    representatives.  There were ad boards to the physicians.

3    There were speaker programs to pay speakers to incentivize

4    them to write more scripts.  There were -- we were cutting

5    speakers that weren't writing prescriptions.  We were filling

6    out MIR requests that were supposed to be unsolicited, but we

7    were trained on how to solicit an unsolicited question, which

8    is also unethical and illegal.

9    So I think there's a variety of different ways to

10   answer the question.

11   Q.  So, Mr. Wilhelm, so far this jury has heard from

12   Donna Graham, Sara Strand, and today, you.  Do you remember

13   when Ms. Brown put up a picture of the three of you and drew

14   connections?

15   A.  Yes.

16   Q.  What did you interpret from that?

17   A.  She's trying to insinuate that --

18       MS. BROWN:  I object, Your Honor, to the question.

19       THE COURT:  Sustained.

20   BY MR. RUSS:

21   Q.  Are the three of you in touch to make up a brand

22   conspiracy against Janssen?

23   A.  No.

24   Q.  Okay.

25       In fact, Mr. Wilhelm, you didn't just testify that

WILHELM - REDIRECT - RUSS

1  other people were involved in serious misconduct today, did

2  you?

3  A.    No.

4  Q.    You took responsibility for what you did.

5  A.    Correct.

6  Q.    You said you did it.

7  A.    That was part of it, yes.

8  Q.    Are you proud of it?

9  A.    No.  I feel used.

10  Q.    Why did you do it?

11  A.    I enjoyed being an employed person.  And, you know, when

12  you're -- when you're passionate about something, you want to

13  do what's best for the patient and the physicians.  You

14  provide the information that they either request or they need

15  and was determined by our company that they needed.

16  Oftentimes it was off-label.

17       So, again, the salespeople, particularly within

18  Tibotec/Janssen, were high performers.  Have -- many of us had

19  histories of being top, top performers.  So, you know, when

20  pressure is applied to someone and there is constant

21  discussion about people losing their jobs, you do what you

22  feel like you have to do at the time, and you get kind of

23  caught up in the day-to-day striving towards doing best for

24  the company because, you know, people like J&J.

25       So I guess that's my answer.

```
 1            MR. RUSS:  Can I have one moment, Your Honor?

 2            THE COURT:  You may.

 3            (Brief pause.)

 4            MR. RUSS:  Mr. Wilhelm, I know it's been a long day.

 5  We thank you for your time and attention.

 6        I pass the witness, Your Honor.

 7            THE COURT:  Sir, you're excused from the trial.

 8  Thank you.

 9            THE WITNESS:  Oh, okay.  Thanks.

10            THE COURT:  What's next, folks?  Or are we close to

11  that time again?

12            MR. MARKETOS:  Your Honor, we've got 12 minutes.  If

13  it's okay with Your Honor it seems like a better --

14            THE COURT:  A better use to do it tomorrow instead of

15  getting through some background and cutting off?

16            MR. MARKETOS:  Yes, Your Honor.  I think so.

17            THE COURT:  All right.  Why don't we do this.

18        Folks, I'm going to adjourn for the day.  Counsel,

19  remain, though, because I do want to speak with all of you,

20  but let's get the jury to be dismissed for today, and tomorrow

21  we'll just continue with witness testimony.

22        Let's get the jurors out of here.  Jury excused.

23            (Jury excused.)

24            THE COURT:  All right, folks.  Have a seat.

25        So, Mr. Marketos, this schedule is not going -- it
```

1    seems to be -- the pace of the trial seems to be going a lot

2    slower than anticipated.

3         Am I misstating, or do you agree with me?

4         MR. MARKETOS:  No, you are not misstating it.  You

5    are accurately stating it, I think, probably from both sides.

6         THE COURT:  All right.  Let me tell you what I

7    alluded to at sidebar but I want all counsel to hear because

8    this is where we're going to be tomorrow.

9         So here is what I'm detecting is the problem.  Right?

10   We have witnesses that are going on 20-minute narratives for a

11   question that requires five words.  And nobody's minding that

12   out there.  You're not minding it on direct, and I haven't

13   seen anyone from Janssen minding it on the cross, Ms. Brown.

14        And look, I appreciate there may be tactical decisions

15   why you don't want to object or ask the Court to direct a

16   witness to respond to the question posed, but I'm done.

17   Tomorrow I start intervening.

18        So you can either ask me to do that or not ask me to do

19   that, but if I have a witness going on for ten minutes off of

20   a question that they weren't asked, or if they are on

21   cross-exam and they've got -- they had their narrative out,

22   that day is over.  They have to answer the questions that

23   they pose -- that are posed to them.  Whether or not they like

24   the questions, I'm going to, as the judge, intervene.  Right?

25   Because -- not that I want to put my thumb on the scale, but I

 1    can't have the trial -- we're averaging one witness per day.

 2         So I don't know if there's any other concerns you're

 3    all seizing, but that one, I'm going to seize on and start

 4    getting more involved tomorrow if it persists.  I'm not saying

 5    that every witness is going to answer like this.  But this is

 6    what we've been looking at.

 7         So what are your thoughts, Mr. Marketos?  Because we

 8    can't average one witness per day, but I agree with you,

 9    starting the background of a witness with ten minutes really

10    doesn't -- is not helpful to the jurors, and so we might as

11    well start this particular witness tomorrow.

12         But what are you seeing that I'm not?

13          MR. MARKETOS:  My observations are that we've covered

14    now one, two, three witnesses who span eight years of a very

15    complicated case.  And then on the cross-examination, this is

16    no -- it's not pejorative; it's just a tactical -- they're

17    going into credibility-related issues that are not related to

18    what we asked about on direct, which they're entitled to --

19          THE COURT:  I don't think the questions on cross are

20    causing the delay.  I think it's the responses on cross, and

21    even some of the responses on direct.  And look, I'm going to

22    get to that in a second, by the way, because that issue that

23    came up where I struck a statement, I'm going to address that

24    also.

25         But for now, I don't think it's the questioning.  I'm

1  not faulting the questioning on direct exam or cross-exam.

2  I'm faulting these witnesses being given the ability to just

3  speak their minds as if this is some kind of therapy session,

4  which it is not.

5      So they have to answer the questions posed to them.

6  The Court doesn't like to intervene.  As a general matter, I

7  don't really like to do that.  But I can't also sit idly by if

8  this is what we expect to happen every day or you're going to

9  tell me these witnesses are a little unique.  They are a

10  little bit more of the, I guess, the bigger witnesses, and as

11  we go through the trial, the witnesses are going to be

12  quicker.  They're going to be able to answer questions "yes"

13  or "no" when -- I mean, we have questions where if you just

14  want to say, Is the sky blue?  We have to hear the sky is blue

15  today, but let me tell you what the color was yesterday, five

16  days ago, a year and a half ago, and that's not the question

17  being asked.

18      So all right.

19      MR. MARKETOS:  Your Honor, that is the case.  These

20  three witnesses are the meat, and then we get into a Janssen

21  witness tomorrow with Mr. Iacobellis.

22      I will say this:  The case has been framed as a

23  credibility war.  I think you heard that in opening

24  statements.  Right?  And whistleblower cases always are.

25  You're out for the money.  No.  You did it, right?

```
 1          And so when a witness is -- essentially the insinuation
 2   is you're all connected, you are biased, they have to be
 3   allowed to untangle --
 4          THE COURT:  On redirect.
 5          MR. MARKETOS:  Yes.
 6          THE COURT:  Not on cross.  See, that's where I think
 7   we mistake each other.  Right?  They don't get to untangle
 8   that on cross-exam.  If you want to address it and have them
 9   rehabilitate on a redirect, so be it.
10          MR. MARKETOS:  Sure.
11          THE COURT:  But what's happening here is we have
12   witnesses that are going on -- and, by the way, I don't find
13   that to be the only issue.  Right?  I don't think they're all
14   dealing with bias questions and spending time trying to
15   rehabilitate on a cross-examination.  There are just factual
16   questions.  Did you report to John Doe?  In my world, where I
17   come from, the answer is yes or no.  Either you reported to
18   John Doe or you didn't.  It's I didn't report to John Doe, but
19   let me tell you the 20 things I said on direct.  Let's do that
20   again.
21          So I'm just being -- I'm just letting you all know this
22   isn't for you to mind necessarily or Ms. Brown to mind.  What
23   I'm telling you all is, tomorrow, I start minding it.  So you
24   can either do what you want to do with that -- but I'm giving
25   you forewarning that I've been patient with the witnesses
```

1  because I don't like to intervene if it's going to be policed.

2  But if it's not going to be policed, I can't have the trial

3  days go the way they're going because our five and a half is

4  going to become seven.

5          MR. MARKETOS:  I understand.

6          THE COURT:  All right?  So that's all I'm telling

7  you.

8       Anything more on that?

9       Or Ms. Brown, do you have anything you want to comment

10  on that issue?

11          MS. BROWN:  No.  I mean, I appreciate the Court's

12  guidance on this issue.  I think sometimes I'm reticent to ask

13  for help because you don't know what is going to happen, but I

14  appreciate the guidance, and we'll move to strike to move

15  things along.

16          THE COURT:  All right.  And that's fair.  And like

17  I'm saying, I get it.  As a tactical decision people don't

18  want to stop the witness or things like that.  I get it, if

19  things were moving faster.  But now you're going to have to

20  make tactical decisions that say, We've got to cut this

21  witness off, and we've got to go back to the questions.

22       And there's been more than one time, by the way, where

23  that's happened, where counsel has actually had to say.  That

24  wasn't my question.  So we just lost two minutes, right?  Let

25  me go back now, repeat the exact same question that I just

1    asked, and then go from there.

2        So I just want to put that out there because if I start

3    intervening tomorrow or day after, I thought, let me at least

4    give you forewarning that that time is over.

5        The second issue is on this testimony from Mr. Wilhelm

6    where he halfway brought out information that I believe was

7    precluded from the trial.

8        Is that right, Mr. Russ?

9        MR. RUSS:  That's right, Your Honor.  As far as I can

10   tell, that's where he was going.

11       THE COURT:  Okay.

12       MR. RUSS:  But --

13       MR. MARKETOS:  Yeah, I thought he was going to say

14   there was some reserve.

15       Did it seem like that's what he was going to say,

16   Ms. Brown.

17       MS. BROWN:  It did.  We had a motion in limine on

18   that because he said it at his deposition, so --

19       MR. MARKETOS:  I understand.  It seems like that's

20   what he was going to say.

21       THE COURT:  That's what he was going to say.

22       Now, look, I think we all were kind of catching it in

23   real time, and so I was able to stop that.  But here's what

24   I'm going to tell counsel.  Right.

25       And by the way, I want to be clear.  At no time did I

1  think you were eliciting that response.  In fact, you

2  certainly did not.  It was almost like the witness just wanted

3  to say something else.  So let's not do any more of that also.

4       When a question is answered and the witness says, Can I

5  say something else?  I'm going to intervene and be just like,

6  No, you can't.  You can only speak in response to a direct

7  question.

8       But here's my second point, and this is going to be for

9  all counsel.  If I have ruled that something is inadmissible,

10  it is incumbent upon you to make sure that the witness that

11  you call understands what my rulings have been, because next

12  time, whether it's Relators' counsel or Janssen, I will hold

13  you responsible if a witness that you are calling up to ask

14  questions then decides to testify in front of this jury as to

15  something I already previously ruled cannot come in.  Right?

16  So you're going to have to mind that little bit.

17       There's not that many hot-button issues that I've said

18  no to.  But the ones that I have, if you even think remotely

19  you're calling a witness that could touch on it, you might

20  want to let them know, since you are communicating with them,

21  do not speak A, B, C, and D because the judge is going to get

22  very upset.  That usually will control the witness not to do

23  it.

24       Don't say the other side is going to get upset.  That's

25  not going to control the witness.  Say I will get upset, and

```
 1    I'm pretty sure that will manage the witness to stay away from
 2    any area that I ruled they cannot speak to.
 3         So that's just for moving forward.  Again, don't
 4    presume from any of that that I thought anything was done
 5    improper today, because I don't.  If anything, the witness
 6    spontaneously wanted to say something else, and who knows what
 7    that was going to be.  And I certainly couldn't predict it,
 8    just like counsel, but once we started hearing the words, I
 9    immediately stopped it.  I don't think there's anything more
10    to do with that, other than I told the jurors an immediate
11    instruction to strike it.  I'm not even sure they understood
12    what was about to come out, because I don't think they're as
13    involved in these types of cases as you all are.
14         So I think there's no real concern there.  But I want
15    you to be mindful if you're calling witnesses -- and, again,
16    Janssen, this is going to apply to you on anybody you call.
17    If I've ruled that there's something you can't do, if you
18    think your witness even remotely can touch on it, then be
19    mindful to talk to them about it and say, Hey, I'm not asking
20    you about it, but just to be clear, don't also say it, right,
21    because the Court has said we can't talk about it.
22         Other than that, because I do want to let you all go
23    for the day, what's the lineup for tomorrow?
24         Sorry, Mr. Marketos.  I guess we're going with --
25              MR. MARKETOS:  We have Mr. Iacobellis tomorrow, Your
```

1    Honor.

2            THE COURT:  Right.

3            MR. MARKETOS:  And then after Mr. Iacobellis is

4    Ms. -- is Relator Ms. Christy Brancaccio.

5            THE COURT:  Okay.

6            Is the first witness long?  Is -- do you anticipate

7    that --

8            MR. MARKETOS:  Yeah.

9            THE COURT:  -- he's going to be kind of like these

10   folks?

11           MR. MARKETOS:  Yes, Your Honor, I do.

12           THE COURT:  All right.  So at most, we will see how

13   far we get, but we're not going to get anybody else lined up

14   if you have one of the Relators.

15           MR. MARKETOS:  We will not, Your Honor.

16           THE COURT:  All right.  Anything else we need to chat

17   about before I adjourn for the day and see you all at 9 a.m.

18   tomorrow?

19           MR. MARKETOS:  Not from the Relators.  Thank you.

20           THE COURT:  All right.  On behalf of Janssen?

21           MS. BROWN:  No.  Thank you, Your Honor.

22           THE COURT:  All right.  You guys, remain seated.

23   It's been a day, but I'll see you all tomorrow morning at 9.

24           MS. BROWN:  Thank you, Your Honor.

25           MR. MARKETOS:  Thank you, Your Honor.

1        THE DEPUTY COURT CLERK:  All rise.

2        (Court concludes at 3:58 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              FEDERAL OFFICIAL COURT REPORTER'S CERTIFICATE.

 2              - - - - - - - - - - - - - - - - - - - - - -

 3

 4       I certify that the foregoing is a correct transcript from

 5  the record of proceedings in the above-entitled matter.

 6

 7

 8       I

 9

10

11  /S/ Megan McKay-Soule, RDR, CRR     May 13, 2024

12          Court Reporter                          Date

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**$**

**$2,500** [1] - 1019:15
**$23** [1] - 1125:1
**$49** [1] - 1123:8

**'**

**'8** [2] - 1137:4, 1138:2
**'ls** [1] - 1188:20
**'program** [1] - 1022:4
**'yes** [1] - 1008:21

**/**

**/S** [1] - 1261:11

**0**

**08608** [1] - 954:9

**1**

**1** [8] - 1015:21,
    1020:8, 1037:25,
    1038:3, 1045:6,
    1108:12, 1199:11,
    1216:12
**10** [1] - 972:19
**100** [3] - 1093:15,
    1093:25, 1135:5
**1006** [1] - 955:8
**1007** [1] - 955:14
**1010** [1] - 955:8
**1012** [1] - 955:9
**1013** [1] - 955:10
**1024** [1] - 955:11
**1029** [1] - 955:11
**1034** [1] - 955:12
**1071** [1] - 955:12
**1075** [1] - 955:4
**1099** [1] - 955:13
**10:19** [1] - 1000:1
**10:22** [1] - 1002:14
**10:24** [1] - 1004:7
**10:26** [1] - 1006:4
**10th** [1] - 961:3
**11** [2] - 967:25,
    1032:15
**1115** [1] - 1244:17
**1120** [1] - 955:14
**1131** [1] - 955:15
**1142** [1] - 955:16
**1143** [2] - 955:9,
    1012:17
**1147** [1] - 955:17
**1151** [1] - 955:18
**1176** [1] - 955:19
**1186** [1] - 955:20
**1194** [1] - 955:21

**11:50** [1] - 1066:1
**11:52** [1] - 1068:5
**12** [2] - 972:19,
    1250:12
**1215** [1] - 955:22
**1216** [1] - 955:23
**1230** [1] - 955:5
**12:07** [1] - 1083:19
**12:10** [1] - 1086:25
**12:23** [1] - 1099:12
**12:24** [1] - 1100:3
**12:30** [1] - 1109:5
**13** [3] - 954:10, 956:2,
    1261:11
**139** [4] - 955:12,
    1071:13, 1072:7,
    1073:8
**14** [1] - 1006:19
**1413** [2] - 1012:2,
    1012:14
**14th** [1] - 1007:3
**150** [12] - 1008:21,
    1008:24, 1009:5,
    1009:11, 1010:19,
    1010:23, 1038:14,
    1042:2, 1093:25,
    1192:21, 1193:1,
    1203:10
**1582** [7] - 955:10,
    1013:10, 1013:12,
    1013:17, 1013:20,
    1020:8
**165** [4] - 955:11,
    1028:16, 1029:3,
    1029:6
**177** [4] - 955:11,
    1023:15, 1023:22,
    1023:25
**195** [4] - 955:8,
    1003:13, 1006:6,
    1006:12
**1987** [1] - 967:12
**199** [7] - 955:12,
    1033:19, 1033:21,
    1033:24, 1034:2,
    1036:5, 1203:23
**1992** [1] - 1130:10
**1:15** [1] - 1109:5
**1st** [1] - 1047:3

**2**

**2** [7] - 1014:3,
    1039:21, 1040:3,
    1040:4, 1042:23,
    1130:21, 1245:3
**20** [3] - 972:10,
    993:13, 1254:19
**20-minute** [1] -
    1251:10

**200** [1] - 972:12
**2000** [1] - 1151:12
**2006** [38] - 972:25,
    974:21, 977:21,
    977:24, 978:11,
    1003:19, 1006:19,
    1007:3, 1009:23,
    1010:12, 1012:10,
    1013:15, 1013:24,
    1014:18, 1015:24,
    1018:15, 1037:8,
    1038:14, 1039:11,
    1040:24, 1049:25,
    1093:17, 1113:13,
    1116:23, 1118:13,
    1119:10, 1120:6,
    1121:2, 1122:23,
    1125:24, 1126:4,
    1132:18, 1132:23,
    1137:4, 1138:2,
    1184:1, 1242:17,
    1243:16
**2007** [13] - 986:21,
    1036:12, 1046:22,
    1047:3, 1062:1,
    1125:24, 1151:8,
    1154:23, 1155:11,
    1156:10, 1162:4,
    1230:18, 1242:20
**2008** [16] - 1018:9,
    1023:18, 1056:2,
    1125:24, 1126:4,
    1131:13, 1132:14,
    1132:18, 1132:24,
    1154:6, 1216:21,
    1231:8, 1244:23,
    1245:10, 1245:22,
    1245:24
**2009** [2] - 1142:3,
    1228:12
**2010** [10] - 1064:13,
    1070:18, 1070:25,
    1093:18, 1099:13,
    1099:16, 1099:17,
    1099:24, 1207:21,
    1207:24
**2011** [1] - 970:13
**2012** [3] - 1099:13,
    1099:16, 1099:25
**2015** [2] - 1021:12,
    1215:5
**2019** [1] - 1184:11
**2024** [3] - 954:10,
    956:3, 1261:11
**2079** [2] - 955:15,
    1131:11
**2089** [1] - 955:19
**20th** [2] - 1003:19,
    1036:12
**21** [1] - 1186:2

**215** [1] - 1184:11
**216** [1] - 1184:12
**21st** [1] - 1015:24
**22** [4] - 972:1, 972:9,
    1009:3, 1184:12
**222** [1] - 978:5
**22nd** [1] - 1013:15
**23** [4] - 1009:3,
    1123:22, 1125:8,
    1125:14
**24** [4] - 1125:9,
    1129:25, 1130:6,
    1130:13
**24-week** [3] - 984:22,
    1017:22, 1018:6
**2401** [2] - 955:13,
    1099:5
**25** [3] - 973:20,
    973:24, 974:2
**26** [2] - 978:11,
    1141:21
**27** [1] - 1147:18
**28** [1] - 1023:18
**29** [1] - 1167:21
**2:13** [1] - 1169:18
**2:16** [1] - 1173:3
**2:54** [1] - 1211:1
**2:57** [1] - 1214:16

**3**

**3** [13] - 1004:2,
    1006:14, 1016:12,
    1017:7, 1039:1,
    1040:5, 1040:12,
    1073:6, 1073:19,
    1081:5, 1200:6,
    1200:8
**3,000** [1] - 983:6
**3,700** [2] - 974:1,
    983:1
**30** [4] - 987:3, 988:22,
    1229:18, 1240:6
**30-state** [1] - 1055:14
**3026** [2] - 955:20,
    1186:6
**30th** [1] - 1131:13
**3:12-cv-07758-ZNQ-
    JBD** [1] - 954:4
**3:25** [1] - 1232:8
**3:27** [1] - 1233:14
**3:33** [1] - 1239:7
**3:36** [1] - 1241:20
**3:58** [1] - 1260:2

**4**

**4** [1] - 1184:12
**4,000** [1] - 983:6
**40** [1] - 1210:20

**40-week** [1] - 1158:10
**402** [1] - 954:9
**42** [5] - 955:8,
    1009:18, 1009:20,
    1010:4, 1010:7
**45** [1] - 1108:19
**45-214** [2] - 1036:17,
    1036:24
**46** [1] - 1099:2
**48** [1] - 1178:11
**48-week** [10] -
    1017:16, 1017:19,
    1017:23, 1018:3,
    1018:15, 1041:5,
    1156:3, 1156:10,
    1158:1, 1174:9
**49** [1] - 1123:21,
    1125:14, 1150:21
**4th** [2] - 1009:23,
    1010:12

**5**

**5** [2] - 954:5, 1038:5
**50** [1] - 1001:8
**53** [3] - 1123:16,
    1123:17, 1125:5

**6**

**6** [1] - 1073:17
**60** [1] - 989:10
**600** [1] - 954:17
**609** [1] - 954:24
**6092** [1] - 955:23
**6th** [3] - 1219:5,
    1220:9, 1231:6

**7**

**7** [4] - 1029:17,
    1137:4, 1138:2,
    1155:16
**70** [1] - 989:10
**750** [1] - 954:17
**75201** [1] - 954:17

**8**

**80** [1] - 1025:4
**815-2319** [1] - 954:24
**8674** [2] - 955:16,
    1141:25
**8675** [2] - 955:17,
    1147:21
**869** [1] - 974:1
**8702** [1] - 955:22
**8767** [2] - 955:18,
    1151:5
**879** [1] - 974:2

**8799** [2] - 955:21, 1194:5
**8:00** [1] - 978:13

## 9

**9** [3] - 1074:3, 1259:17, 1259:23
**9,000** [2] - 976:19, 983:9
**90** [1] - 977:4
**91** [5] - 1081:7, 1082:5, 1083:9, 1086:16, 1087:14
**920** [1] - 954:21
**94** [3] - 997:20, 997:23, 999:15
**966** [1] - 955:4
**9:00** [2] - 954:10, 956:3
**9:30** [1] - 964:16

## A

**a.m** [10] - 954:10, 956:3, 978:13, 1000:1, 1002:14, 1004:7, 1006:4, 1066:1, 1068:5, 1259:17
**Abbott** [1] - 1157:12
**ability** [3] - 1003:11, 1134:24, 1253:2
**able** [32] - 958:25, 959:15, 960:12, 962:4, 964:18, 964:19, 966:18, 969:2, 974:17, 1003:8, 1005:2, 1008:14, 1033:12, 1037:24, 1046:20, 1050:11, 1056:17, 1059:19, 1059:22, 1061:22, 1085:15, 1115:12, 1128:5, 1135:13, 1135:20, 1140:2, 1157:16, 1199:4, 1200:10, 1233:1, 1253:12, 1256:23
**abnormality** [2] - 1200:7, 1200:10
**above-entitled** [1] - 1261:5
**absolute** [1] - 1171:25
**absolutely** [31] - 975:14, 982:11, 985:10, 994:16, 994:19, 1005:21, 1009:2, 1021:11,

**1021**:16, 1023:10, 1027:7, 1027:14, 1030:7, 1032:8, 1053:25, 1055:23, 1062:16, 1064:10, 1096:13, 1128:13, 1165:13, 1171:7, 1192:8, 1231:18, 1234:19, 1235:3, 1235:21, 1237:5, 1238:1, 1241:4, 1243:23
**academia** [1] - 1008:2
**access** [7] - 1090:14, 1090:15, 1113:18, 1114:10, 1130:11, 1168:17, 1192:24
**accessible** [1] - 1090:11
**according** [5] - 1095:13, 1158:4, 1158:10, 1221:10
**account** [50] - 970:3, 970:18, 971:7, 972:9, 986:11, 986:14, 986:15, 986:20, 987:10, 987:13, 987:15, 987:16, 987:19, 987:22, 988:3, 988:4, 988:6, 988:9, 988:13, 988:16, 989:1, 989:18, 989:20, 989:21, 990:4, 990:17, 990:24, 995:24, 997:4, 998:11, 999:13, 999:20, 1000:16, 1000:25, 1028:9, 1048:1, 1054:13, 1054:18, 1054:19, 1054:20, 1054:22, 1055:9, 1082:18, 1165:7, 1215:2, 1219:6, 1219:9, 1225:15
**accountable** [1] - 1136:10
**accounts** [1] - 979:12
**accurate** [6] - 1052:24, 1071:23, 1072:1, 1084:2, 1085:12, 1171:16
**accurately** [3] - 976:18, 1012:5, 1251:5
**accuse** [1] - 974:17
**accused** [1] - 1221:7
**accusing** [2] - 1117:13, 1117:21

**achieve** [2] - 984:1, 1162:17
**achievement** [1] - 1230:17
**Act** [2] - 1068:9, 1231:20
**ACTION** [1] - 954:3
**action** [5] - 998:3, 999:2, 1155:3, 1188:13, 1232:17
**actions** [2] - 999:6, 1097:18
**active** [1] - 1201:2
**activities** [1] - 1029:25
**activity** [4] - 971:1, 971:18, 972:5, 1046:4
**actual** [1] - 1046:4
**ad** [3] - 1052:1, 1053:8, 1248:2
**ADAM** [1] - 954:16
**add** [4] - 987:24, 1007:6, 1007:16, 1238:25
**added** [1] - 1046:9
**addition** [2] - 984:5, 1223:15
**additional** [6] - 963:20, 987:24, 1125:24, 1128:4, 1132:15, 1177:1
**address** [10] - 957:4, 969:14, 1020:22, 1059:15, 1059:22, 1136:2, 1147:6, 1213:19, 1252:23, 1254:8
**addressed** [1] - 1190:7
**addressing** [2] - 996:10, 1051:6
**adjourn** [2] - 1250:18, 1259:17
**adjourned** [1] - 1109:3
**Administration** [1] - 1090:5
**admissibility** [1] - 1005:9
**admissible** [2] - 1005:1, 1005:4
**admission** [6] - 1000:4, 1211:8, 1212:2, 1212:6, 1212:7, 1212:9
**admit** [14] - 1000:10, 1119:23, 1130:20, 1141:21, 1147:18, 1150:22, 1174:16, 1186:3, 1194:2, 1210:16, 1212:22,

1213:2, 1214:18, 1216:13
**admitted** [37] - 1000:9, 1006:10, 1010:6, 1012:16, 1013:19, 1023:24, 1029:5, 1034:1, 1073:2, 1099:4, 1119:25, 1131:4, 1131:8, 1141:24, 1147:20, 1151:3, 1169:21, 1171:13, 1171:17, 1171:24, 1172:10, 1172:11, 1172:15, 1172:25, 1173:12, 1176:4, 1186:5, 1194:4, 1198:10, 1211:9, 1212:14, 1212:16, 1212:21, 1212:22, 1214:22, 1216:15, 1244:19
**Admittedly** [1] - 1196:4
**admitting** [5] - 1001:8, 1005:24, 1083:13, 1099:23, 1099:24
**ADR** [2] - 1245:24, 1246:3
**ADRs** [3] - 1245:9, 1245:15, 1245:17
**adult** [1] - 1121:16
**advance** [1] - 960:14
**advantageous** [1] - 1056:17
**adversary** [1] - 1171:21
**Adverse** [2] - 1244:25, 1245:13
**adverse** [24] - 957:15, 958:14, 958:20, 958:23, 980:16, 980:20, 984:8, 985:5, 985:14, 1018:8, 1018:11, 1107:13, 1108:3, 1130:17, 1178:12, 1178:13, 1179:11, 1179:16, 1179:17, 1179:21, 1179:23, 1180:13, 1180:14, 1245:9
**adversely** [1] - 958:2
**advisory** [9] - 1052:3, 1052:6, 1052:15, 1053:12, 1053:24, 1054:1, 1054:9, 1196:16, 1197:18
**affairs** [1] - 1104:13
**affiliated** [1] - 1037:15
**afford** [1] - 1143:16

**afternoon** [5] - 1075:10, 1075:11, 1108:13, 1139:17, 1230:5
**agency** [1] - 1090:22
**agenda** [1] - 1148:23
**agents** [1] - 1201:2
**ago** [4] - 966:14, 1178:6, 1253:16
**agree** [31] - 1009:15, 1045:17, 1067:1, 1088:18, 1097:3, 1103:17, 1104:25, 1105:14, 1107:25, 1125:4, 1125:14, 1125:18, 1128:3, 1128:22, 1129:6, 1140:24, 1163:5, 1170:6, 1171:3, 1178:10, 1180:19, 1184:20, 1192:17, 1200:14, 1213:3, 1239:24, 1241:1, 1241:19, 1245:22, 1251:3, 1252:8
**agreed** [3] - 1227:5, 1241:2, 1241:7
**agreements** [1] - 1214:3
**ahead** [6] - 973:17, 1043:17, 1084:22, 1135:7, 1159:15, 1211:5
**AHM** [2] - 1022:5, 1022:6
**aid** [2] - 1052:21, 1169:5
**aided** [1] - 954:25
**AIDS** [2] - 1049:13, 1052:25
**aids** [1] - 1142:18
**al** [1] - 954:4
**alcohol** [1] - 1219:17
**aligned** [3] - 1019:1, 1079:15, 1079:23
**alike** [1] - 983:21
**alive** [1] - 1051:1
**allegations** [8] - 1112:22, 1148:11, 1206:24, 1207:3, 1218:25, 1222:10, 1222:24, 1226:21
**allege** [1] - 1110:1
**alleged** [1] - 1091:15, 1109:22, 1206:13
**Alli** [2] - 956:19, 1075:14
**ALLISON** [1] - 954:19
**allocate** [1] - 1024:9
**allocated** [1] -

1023:12
**allow** [13] - 963:16, 1001:1, 1037:12, 1051:8, 1085:25, 1086:19, 1086:22, 1088:14, 1108:25, 1141:17, 1185:17, 1188:22, 1189:2
**allowed** [9] - 972:20, 1055:16, 1066:24, 1067:4, 1067:19, 1128:16, 1130:11, 1156:14, 1254:3
**allowing** [1] - 1214:2
**alluded** [1] - 1251:7
**almost** [9] - 974:4, 981:14, 983:6, 1054:10, 1080:22, 1197:8, 1233:9, 1247:6, 1257:2
**alone** [2] - 996:22, 1119:10
**alternate** [1] - 1046:8
**amended** [1] - 1209:6
**AMERICA** [1] - 954:3
**amount** [9] - 963:9, 981:3, 993:18, 1023:13, 1044:1, 1059:12, 1105:21, 1135:12, 1247:10
**and..** [1] - 1011:20
**Andrew** [1] - 956:13
**ANDREW** [1] - 954:15
**Angeles** [1] - 998:10
**announce** [1] - 1123:14
**announced** [1] - 1123:11
**anonymous** [1] - 1153:19
**anonymously** [1] - 1152:22
**answer** [19] - 1051:9, 1066:8, 1089:22, 1158:18, 1161:19, 1161:22, 1165:23, 1179:3, 1189:3, 1222:18, 1240:1, 1240:19, 1248:10, 1249:25, 1251:22, 1252:5, 1253:5, 1253:12, 1254:17
**answered** [3] - 1213:8, 1241:15, 1257:4
**answering** [1] - 1161:16
**answers** [2] - 1152:17, 1158:24
**Anti** [5] - 1049:2,

1051:18, 1237:14, 1238:7, 1238:21
**Anti-Kickback** [5] - 1049:2, 1051:18, 1237:14, 1238:7, 1238:21
**antibiotic** [5] - 967:15, 968:22, 968:25, 969:3, 1113:2
**anticipate** [1] - 1259:6
**anticipated** [4] - 974:2, 1240:10, 1241:4, 1251:2
**anyway** [4] - 964:7, 964:22, 1156:25, 1223:13
**apologies** [1] - 1065:7
**apologize** [8] - 998:18, 1004:5, 1027:15, 1081:14, 1207:20, 1210:19, 1228:1
**appeal** [1] - 1045:23
**appear** [2] - 999:5, 1043:8
**appearances** [1] - 956:7
**apple** [3] - 957:21, 958:11, 959:16
**applied** [2] - 1124:1, 1249:20
**applies** [1] - 1151:15
**apply** [1] - 1258:16
**appointment** [2] - 1195:19, 1195:23
**appreciate** [8] - 961:2, 963:2, 1067:25, 1085:20, 1229:3, 1251:14, 1255:11, 1255:14
**appreciates** [1] - 1174:22
**approach** [14] - 999:24, 1004:5, 1025:1, 1025:8, 1033:3, 1065:22, 1065:23, 1067:24, 1075:3, 1083:17, 1099:10, 1169:17, 1232:5, 1239:3
**appropriate** [15] - 961:9, 961:20, 962:24, 1045:17, 1057:21, 1104:7, 1114:8, 1185:7, 1185:14, 1189:12, 1201:11, 1206:1, 1229:9, 1235:25, 1242:8
**appropriately** [5] -

1096:7, 1114:7, 1147:6, 1174:5, 1235:24
**appropriateness** [1] - 1052:12
**approval** [17] - 975:16, 977:7, 984:21, 1099:8, 1113:18, 1133:5, 1134:23, 1134:25, 1135:14, 1136:16, 1146:1, 1146:17, 1201:20, 1236:20, 1243:2, 1243:5, 1243:8
**approve** [1] - 1235:22
**approved** [64] - 985:4, 992:10, 1017:22, 1017:24, 1020:25, 1021:6, 1059:2, 1060:16, 1089:4, 1090:17, 1091:7, 1114:9, 1118:8, 1118:13, 1118:15, 1118:19, 1119:9, 1119:13, 1119:17, 1120:10, 1121:1, 1121:4, 1129:22, 1130:6, 1134:2, 1141:20, 1142:21, 1145:6, 1145:11, 1145:19, 1146:5, 1146:18, 1146:24, 1156:15, 1161:11, 1165:25, 1166:9, 1168:4, 1168:13, 1168:17, 1168:22, 1170:17, 1170:23, 1176:11, 1176:15, 1176:19, 1176:22, 1178:14, 1179:1, 1179:10, 1180:19, 1180:20, 1181:7, 1181:8, 1181:20, 1183:11, 1183:16, 1190:24, 1201:16, 1201:22, 1236:22, 1244:12, 1247:15
**approves** [1] - 1132:24
**April** [1] - 997:14
**Aptivus** [1] - 1015:2
**area** [12] - 970:4, 973:1, 986:16, 1030:2, 1038:22, 1055:14, 1055:18, 1184:2, 1219:12, 1225:9, 1225:14, 1258:2
**areas** [7] - 974:14, 984:3, 995:5,

1141:19, 1199:3, 1206:10
**Arellano** [1] - 1186:9
**argument** [2] - 1125:10, 1179:9
**argumentative** [1] - 985:18
**arguments** [1] - 961:4
**Arizona** [1] - 967:2
**ARPS** [1] - 954:19
**arrive** [1] - 1199:8
**arrived** [1] - 1198:20
**arriving** [1] - 971:21
**arrow** [1] - 982:14
**ARTEMIS** [2] - 1134:11, 1135:10
**Arthur** [1] - 1143:25
**articles** [1] - 1135:10
**articulated** [2] - 962:8, 962:9
**AS** [1] - 965:22
**aside** [1] - 1239:2
**asserted** [1] - 1086:8
**assistance** [2] - 1055:12, 1143:10
**assistant** [3] - 1143:6, 1143:15, 1145:2
**assisting** [1] - 964:9
**associated** [2] - 1008:2, 1153:11
**assume** [3] - 1022:25, 1202:2, 1232:2
**assuming** [1] - 1170:14
**asterisk** [2] - 1181:4, 1181:16
**Atlanta** [14] - 1055:3, 1055:18, 1055:20, 1057:20, 1064:19, 1064:20, 1064:21, 1065:3, 1065:5, 1227:11, 1227:19, 1228:5, 1228:22
**atmosphere** [1] - 1035:19
**Attached** [2] - 1006:24, 1037:4
**attached** [2] - 1211:7, 1211:21
**attachment** [2] - 1215:12, 1215:15
**attachments** [2] - 1004:9, 1004:11
**attack** [1] - 985:2
**attain** [1] - 1027:4
**attend** [2] - 995:12, 1225:20
**attendance** [2] - 995:25, 1225:21
**attended** [3] - 997:17,

1207:18, 1224:21
**attendees** [3] - 996:5, 1027:13, 1063:15
**attending** [2] - 992:13, 996:5
**attention** [4] - 994:10, 1036:5, 1067:3, 1250:5
**attorney** [4] - 1088:23, 1089:22, 1209:3, 1210:14
**attorneys** [1] - 1073:12
**attorneys'** [1] - 1004:10
**audience** [4] - 992:4, 992:14, 993:2, 1201:5
**audiences** [1] - 1045:18
**August** [5] - 1216:21, 1219:5, 1220:8, 1220:9, 1231:6
**authenticity** [1] - 1005:6
**available** [8] - 976:20, 977:6, 1114:11, 1114:25, 1125:25, 1130:14, 1143:15, 1219:17
**average** [1] - 1252:8
**averaging** [1] - 1252:1
**avir** [1] - 1199:20
**award** [2] - 1227:8, 1230:17
**awards** [2] - 1124:7, 1230:15
**aware** [16] - 961:14, 994:12, 1000:24, 1095:3, 1095:5, 1096:18, 1103:15, 1170:20, 1178:25, 1208:19, 1208:21, 1208:25, 1219:16, 1236:8, 1236:13, 1245:11
**awkward** [1] - 1202:10

## B

**background** [2] - 1250:15, 1252:9
**backup** [3] - 1021:19, 1201:23, 1201:24
**bad** [10] - 1015:8, 1018:7, 1025:11, 1041:1, 1130:3, 1164:13, 1195:24, 1221:10, 1222:11, 1226:22

balance [1] - 1134:2
banter [2] - 1137:22, 1137:25
base [2] - 981:14, 1227:15
based [18] - 967:20, 970:23, 975:9, 992:8, 1030:20, 1039:22, 1046:4, 1059:11, 1084:7, 1105:19, 1125:13, 1161:22, 1176:15, 1185:13, 1234:24, 1235:23, 1242:7, 1243:20
baseline [1] - 1175:18
basic [1] - 1233:2
basis [7] - 983:3, 1000:14, 1058:3, 1063:21, 1085:1, 1086:10, 1111:4
Beach [2] - 1014:17, 1016:5
bearings [1] - 1142:4
beautiful [1] - 1194:21
beautifully [2] - 1195:3, 1202:15
became [7] - 974:5, 1061:12, 1116:4, 1123:7, 1125:25, 1127:5, 1127:9
become [4] - 996:12, 1046:3, 1055:9, 1255:4
becomes [1] - 1114:11
becoming [1] - 1209:17
BEEN [1] - 965:22
began [3] - 974:17, 1064:6, 1064:8
begin [2] - 965:20, 972:23
beginning [2] - 956:8, 1204:10
begins [10] - 1000:1, 1004:7, 1066:1, 1083:19, 1099:12, 1169:18, 1179:9, 1211:1, 1232:8, 1239:7
behalf [5] - 956:13, 956:16, 1075:15, 1209:12, 1259:20
behavior [5] - 996:24, 1026:20, 1027:2, 1136:3, 1235:8
behaviors [2] - 1217:5, 1220:14
behind [5] - 960:25, 993:16, 1026:23,

1060:1, 1064:6
belated [1] - 963:17
belief [1] - 1165:20
beliefs [1] - 996:23
believes [1] - 1201:10
below [5] - 979:18, 1003:21, 1039:15, 1144:23, 1177:15
bench [2] - 964:21, 1006:7
benefit [1] - 1026:19
benefits [3] - 996:20, 996:23, 1003:10
berate [1] - 969:15
best [14] - 974:5, 1026:13, 1049:19, 1049:20, 1052:17, 1105:22, 1115:13, 1129:9, 1129:12, 1147:7, 1227:19, 1249:13, 1249:23
better [19] - 981:21, 982:15, 985:1, 993:8, 993:9, 1016:19, 1018:4, 1027:2, 1038:11, 1059:25, 1106:22, 1107:1, 1107:12, 1107:17, 1146:10, 1240:15, 1250:13, 1250:14
between [11] - 1110:3, 1110:25, 1111:3, 1125:23, 1126:4, 1138:6, 1138:17, 1165:14, 1243:15, 1244:7, 1244:12
beyond [1] - 1126:16
bias [1] - 1254:14
biased [1] - 1254:2
BID [2] - 1056:10, 1056:11
big [1] - 1029:15
bigger [1] - 1253:10
biggest [1] - 991:15
Bill [5] - 1014:11, 1014:13, 1014:21, 1040:21, 1195:15
Biltmore [1] - 1012:24
binder [6] - 1081:13, 1142:6, 1144:19, 1145:25, 1146:6, 1146:20
binders [1] - 1135:11
binding [1] - 980:25
biology [1] - 967:5
bit [25] - 973:7, 973:23, 980:12, 987:16, 1001:6, 1001:17, 1002:10,

1024:4, 1075:19, 1075:20, 1096:23, 1100:14, 1104:23, 1113:11, 1123:16, 1140:15, 1163:18, 1183:15, 1187:5, 1190:18, 1216:4, 1239:20, 1240:15, 1253:10, 1257:16
bite [2] - 957:21, 958:10
bites [1] - 959:15
blatant [1] - 1189:14
blatantly [1] - 1105:16
blessing [4] - 1114:15, 1114:19, 1115:18, 1226:3
blind [3] - 1223:3, 1223:11, 1244:1
blinded [1] - 1166:9
blow [1] - 978:6
blue [2] - 1253:14
board [8] - 996:19, 1052:3, 1052:6, 1052:16, 1054:9, 1196:17, 1197:1, 1197:19
boards [6] - 1052:1, 1053:8, 1053:12, 1053:24, 1054:1, 1248:2
body [1] - 981:4
bonuses [1] - 1124:5
books [1] - 1025:8
boom [1] - 1240:19
boost [1] - 981:12
boosted [2] - 980:22, 980:23
booster [1] - 1121:12
borders [1] - 1189:14
Borkert [1] - 1046:13
boss [5] - 975:1, 1022:19, 1022:20, 1047:23, 1069:11
bother [2] - 1189:25, 1239:13
bottom [25] - 993:13, 1014:3, 1015:21, 1016:2, 1018:23, 1021:23, 1032:20, 1033:2, 1034:3, 1036:9, 1038:25, 1040:3, 1040:4, 1042:11, 1043:12, 1044:3, 1045:6, 1071:17, 1134:23, 1142:3, 1194:17, 1201:9, 1225:22, 1228:21, 1245:6
box [5] - 965:20,

1029:20, 1032:17, 1034:18, 1034:19
boy [2] - 972:25, 979:11
Brad [1] - 956:23
BRADLEY [1] - 954:20
Bradley [5] - 1040:9, 1042:24, 1043:2, 1043:13, 1045:10
brainstorm [2] - 981:10, 981:19
brainstorming [2] - 980:12, 1144:7
Brancaccio [14] - 966:8, 1070:7, 1070:9, 1076:10, 1080:4, 1080:18, 1087:7, 1095:15, 1138:14, 1140:19, 1210:7, 1212:4, 1232:1, 1259:4
Brancaccio's [1] - 1215:2
brand [3] - 1052:9, 1239:1, 1248:21
break [12] - 1034:7, 1034:11, 1034:13, 1036:6, 1108:5, 1108:11, 1108:19, 1108:25, 1173:16, 1229:8, 1229:11, 1239:21
Brief [2] - 1071:4, 1250:3
briefly [3] - 1070:20, 1140:18, 1213:19
bring [14] - 960:15, 1003:12, 1028:15, 1042:19, 1128:16, 1142:18, 1145:19, 1146:17, 1155:17, 1169:6, 1170:24, 1185:9, 1188:21, 1208:22
bringing [2] - 1085:7, 1208:13
broad [1] - 1001:6
brochures [2] - 1170:24, 1172:20
broke [1] - 982:12
broken [2] - 980:24, 996:16
brought [9] - 1038:6, 1061:23, 1076:10, 1120:5, 1168:9, 1212:3, 1220:5, 1256:6
BROWN [183] - 954:19, 955:4, 956:19, 957:12,

957:24, 958:8, 958:15, 959:17, 959:23, 960:17, 960:22, 964:5, 964:24, 985:18, 985:22, 998:14, 998:18, 999:16, 999:20, 1001:19, 1002:12, 1004:16, 1006:3, 1006:8, 1010:5, 1012:15, 1013:18, 1023:23, 1029:4, 1030:14, 1030:19, 1033:25, 1050:22, 1067:9, 1067:18, 1067:20, 1068:4, 1072:8, 1072:16, 1072:23, 1075:2, 1075:5, 1075:6, 1075:8, 1075:9, 1075:24, 1076:7, 1076:8, 1081:4, 1081:14, 1081:17, 1083:14, 1084:14, 1084:17, 1084:21, 1084:23, 1085:5, 1085:15, 1086:1, 1086:9, 1086:13, 1086:24, 1087:2, 1087:4, 1087:5, 1091:19, 1092:1, 1092:4, 1092:5, 1097:25, 1098:3, 1098:4, 1099:1, 1099:6, 1099:17, 1100:1, 1100:5, 1102:15, 1102:18, 1102:22, 1102:23, 1108:6, 1108:9, 1109:1, 1109:15, 1109:17, 1116:17, 1116:19, 1116:20, 1119:23, 1120:1, 1120:3, 1130:20, 1130:24, 1131:6, 1131:9, 1131:12, 1141:21, 1142:1, 1147:18, 1147:22, 1150:21, 1151:1, 1151:4, 1151:6, 1167:23, 1167:25, 1168:1, 1169:22, 1170:2, 1170:7, 1170:18, 1171:1, 1171:6, 1171:10, 1171:14, 1171:18, 1171:23, 1172:7, 1173:1, 1173:5, 1173:9, 1173:13, 1173:15, 1174:15, 1174:21,

1174:25, 1175:5, 1176:2, 1176:5, 1176:7, 1176:9, 1184:8, 1184:11, 1184:16, 1184:19, 1186:2, 1186:7, 1194:2, 1194:6, 1203:23, 1203:24, 1210:16, 1210:19, 1210:25, 1211:2, 1211:4, 1211:6, 1211:10, 1211:13, 1211:20, 1211:25, 1212:2, 1213:1, 1214:15, 1214:18, 1214:23, 1214:25, 1216:12, 1216:16, 1216:18, 1222:16, 1222:21, 1229:2, 1231:14, 1232:5, 1232:9, 1233:4, 1233:11, 1233:13, 1238:15, 1239:3, 1239:10, 1240:16, 1241:3, 1241:13, 1241:16, 1241:19, 1248:18, 1255:11, 1256:17, 1259:21, 1259:24

**Brown** [34] - 956:19, 957:11, 958:5, 960:12, 960:21, 964:3, 1001:18, 1067:2, 1067:8, 1068:3, 1075:1, 1075:14, 1084:11, 1108:4, 1109:13, 1171:9, 1174:19, 1176:6, 1211:5, 1230:10, 1230:20, 1234:1, 1234:12, 1235:13, 1242:12, 1243:1, 1243:5, 1244:18, 1246:22, 1248:13, 1251:13, 1254:22, 1255:9, 1256:16

**Brown's** [2] - 1000:14, 1240:2
**bucket** [2] - 976:20, 982:13
**buckets** [1] - 982:12
**budget** [1] - 1025:4
**build** [2] - 1030:12, 1044:23
**Building** [1] - 954:8
**building** [1] - 1133:13
**bullet** [2] - 982:22, 1014:20
**bunch** [2] - 1102:1,

1146:5
**Burack** [1] - 1046:9
**burden** [2] - 1056:16, 1056:24
**bureau** [46] - 991:8, 991:10, 991:19, 991:22, 1006:25, 1007:17, 1010:16, 1014:14, 1020:19, 1028:3, 1032:6, 1037:4, 1038:13, 1042:10, 1045:15, 1046:8, 1047:18, 1049:10, 1049:23, 1051:14, 1100:11, 1100:15, 1100:16, 1100:20, 1101:4, 1101:8, 1101:9, 1101:11, 1101:15, 1101:23, 1102:6, 1102:10, 1102:11, 1102:12, 1103:2, 1103:6, 1103:10, 1103:13, 1103:19, 1103:20, 1104:7, 1104:24, 1203:2, 1203:8, 1204:16, 1206:1
**bureaus** [1] - 1042:13
**business** [7] - 998:3, 1001:20, 1025:11, 1029:24, 1044:23, 1073:24, 1237:23
**busy** [1] - 1197:18
**button** [1] - 1257:17
**buy** [2] - 1228:17, 1228:22
**BY** [88] - 954:14, 954:19, 955:4, 955:4, 955:5, 966:4, 978:8, 985:20, 985:24, 997:21, 998:25, 1002:16, 1003:1, 1003:14, 1003:24, 1006:17, 1009:19, 1010:11, 1012:3, 1012:20, 1013:11, 1013:23, 1015:22, 1017:4, 1020:9, 1023:6, 1023:16, 1024:5, 1024:17, 1026:17, 1027:11, 1027:16, 1028:17, 1029:9, 1029:19, 1030:24, 1032:16, 1033:20, 1035:5, 1039:4, 1045:8, 1051:10, 1051:24, 1068:7, 1071:5, 1071:14,

1071:25, 1073:9, 1073:18, 1074:4, 1075:5, 1075:9, 1076:8, 1081:17, 1087:5, 1092:1, 1092:5, 1098:4, 1099:6, 1100:5, 1102:23, 1109:17, 1116:20, 1120:3, 1131:12, 1142:1, 1147:22, 1151:6, 1168:1, 1173:15, 1175:5, 1176:9, 1184:19, 1186:7, 1194:6, 1203:24, 1214:25, 1216:18, 1222:16, 1222:21, 1230:4, 1231:16, 1233:16, 1238:18, 1241:24, 1244:21, 1245:5, 1248:20

# C

**calculate** [1] - 1124:4
**calendar** [1] - 1242:18
**California** [7] - 1014:17, 1016:4, 1039:10, 1043:5, 1053:11, 1187:21, 1189:24
**Calliditas** [3] - 1078:9, 1078:11, 1078:12
**cancer** [2] - 974:13, 1236:20
**candidate** [1] - 1221:14
**cannot** [12] - 1037:5, 1049:7, 1161:23, 1166:8, 1181:8, 1236:23, 1236:24, 1238:25, 1243:23, 1244:2, 1257:15, 1258:2
**card** [2] - 1156:2, 1157:1
**cardiovascular** [5] - 1107:18, 1129:24, 1179:25, 1245:20
**Care** [7] - 970:10, 970:15, 970:17, 970:24, 971:4, 971:6, 1071:16
**care** [12] - 974:11, 1049:21, 1098:5, 1098:6, 1104:9, 1147:8, 1149:6, 1158:4, 1162:2, 1162:3, 1204:20, 1209:17

**career** [2] - 972:19, 1209:18
**careful** [10] - 1048:11, 1060:3, 1071:6, 1071:9, 1071:15, 1071:20, 1074:1, 1074:22, 1170:3, 1213:20
**carefully** [2] - 1074:7, 1141:4
**Carolina** [1] - 987:7
**carried** [4] - 1096:25, 1097:3, 1109:23, 1152:21
**carry** [1] - 1159:3
**case** [31] - 958:2, 958:9, 959:24, 962:9, 996:2, 1031:15, 1038:20, 1043:18, 1059:6, 1067:11, 1068:25, 1083:25, 1084:13, 1086:5, 1090:12, 1092:6, 1138:6, 1169:9, 1182:15, 1183:19, 1209:5, 1215:24, 1232:23, 1233:18, 1233:19, 1233:23, 1234:1, 1252:15, 1253:19, 1253:22
**cases** [4] - 1053:4, 1214:1, 1253:24, 1258:13
**catch** [1] - 1027:3
**catching** [2] - 970:9, 1256:22
**categories** [1] - 996:16
**category** [2] - 1008:7, 1057:10
**caught** [2] - 1238:20, 1249:23
**caused** [3] - 1087:19, 1089:14, 1090:2
**causing** [2] - 1240:14, 1252:20
**caustic** [1] - 980:9
**cautioning** [1] - 1048:24
**CC** [1] - 1005:12
**cc'd** [1] - 1002:8
**CC'd** [1] - 1045:10
**celebrate** [2] - 964:18
**celebrating** [2] - 965:8, 965:9
**center** [1] - 968:3
**centered** [1] - 1093:3
**centers** [2] - 970:19, 970:21

**certain** [14] - 1045:18, 1052:15, 1055:12, 1064:2, 1087:21, 1089:14, 1089:15, 1096:6, 1096:10, 1100:23, 1107:4, 1242:8, 1243:2, 1243:12
**Certain** [1] - 1088:5
**certainly** [14] - 973:14, 1070:2, 1125:4, 1125:10, 1125:18, 1128:3, 1179:9, 1180:12, 1193:1, 1213:15, 1223:11, 1236:20, 1257:2, 1258:7
**certainty** [1] - 1171:25
**CERTIFICATE** [1] - 1261:1
**certify** [1] - 1261:4
**cetera** [1] - 1117:19
**chain** [7] - 1004:15, 1004:17, 1004:19, 1004:24, 1013:12, 1013:22, 1036:9
**challenged** [1] - 1046:18
**challenges** [1] - 1059:16
**champion** [14] - 1151:8, 1151:11, 1152:13, 1153:5, 1153:15, 1154:1, 1154:22, 1155:6, 1157:25, 1158:19, 1161:1, 1162:4, 1162:23, 1230:21
**champion's** [1] - 1153:23
**chance** [2] - 1046:9, 1136:5
**change** [6] - 1026:19, 1027:1, 1088:16, 1093:21, 1136:3, 1245:9
**changed** [5] - 997:15, 1099:22, 1179:16, 1180:14, 1209:20
**changes** [1] - 1204:16
**characterize** [2] - 1114:3, 1114:4
**chart** [1] - 1093:4
**chastised** [1] - 1026:24
**chat** [2] - 1108:23, 1259:16
**check** [5] - 1146:11, 1170:8, 1170:9, 1171:25, 1173:5

**Cheryl** [7] - 979:3, 1014:4, 1014:9, 1022:16, 1047:4, 1047:23, 1048:23
**Chicago** [1] - 1053:9
**chief** [1] - 958:2
**choice** [2] - 1019:11, 1049:20
**cholesterol** [6] - 980:17, 984:24, 985:16, 1018:8, 1177:14, 1178:12
**Christina** [1] - 1221:14
**Christine** [2] - 1070:7, 1231:25
**Christy** [1] - 1259:4
**Circuit** [1] - 962:10
**circumstance** [1] - 963:16
**cite** [3] - 958:6, 959:4, 959:9
**City** [5] - 975:10, 1028:12, 1139:21, 1140:6, 1187:20
**city** [1] - 1227:15
**civil** [1] - 1213:12
**CIVIL** [1] - 954:3
**claim** [6] - 1079:19, 1080:9, 1088:22, 1089:18, 1092:19, 1093:8
**Claims** [1] - 1068:9, 1231:20
**claims** [7] - 962:17, 1087:20, 1089:14, 1090:2, 1090:18, 1129:15, 1243:21
**clarification** [1] - 1027:10
**clarify** [2] - 1172:15, 1200:10
**clarity** [1] - 1222:5
**Clarkson** [1] - 954:8
**class** [3] - 980:21, 1030:10, 1038:21
**classes** [3] - 983:13, 1053:6, 1122:3
**clean** [1] - 1164:21
**clear** [11] - 959:15, 1086:5, 1100:7, 1116:4, 1123:7, 1161:7, 1171:12, 1200:14, 1244:2, 1256:25, 1258:20
**clearly** [3] - 975:18, 1063:2, 1183:2
**CLERK** [12] - 956:4, 965:1, 965:4, 965:24, 1034:15,

1034:25, 1108:15, 1109:7, 1229:13, 1229:16, 1229:23, 1260:1
**client** [2] - 1069:22, 1070:7
**clinical** [6] - 1008:3, 1049:16, 1166:9, 1178:19, 1244:1, 1247:12
**clip** [1] - 1184:18
**close** [11] - 1063:10, 1064:6, 1067:5, 1069:13, 1069:15, 1069:16, 1188:13, 1227:10, 1227:14, 1228:3, 1250:10
**closed** [1] - 1016:14
**closely** [1] - 1085:23
**closer** [1] - 1055:15
**closing** [1] - 1124:12
**clue** [2] - 1212:10, 1212:24
**CMS** [6] - 962:16, 962:17, 1090:22, 1091:13, 1092:10, 1092:19
**co** [2] - 1071:2, 1074:12
**co-counsel** [1] - 1071:2
**co-employees** [1] - 1074:12
**coach** [3] - 969:18, 991:5, 1199:4
**coached** [2] - 1137:18, 1184:5
**coaching** [6] - 991:3, 1028:23, 1182:17, 1201:13, 1223:17, 1225:19
**coadministered** [1] - 1121:8
**coast** [1] - 987:9
**colleague** [2] - 1155:11, 1158:23
**colleagues** [4] - 1137:16, 1156:6, 1159:22, 1162:5
**college** [1] - 966:25
**color** [1] - 1253:15
**Colorado** [16] - 966:12, 967:1, 967:13, 967:20, 1055:9, 1055:10, 1055:15, 1064:16, 1064:24, 1076:22, 1077:17, 1078:25, 1081:25, 1140:9, 1217:20

**colors** [2] - 1169:1, 1169:2
**column** [2] - 1037:5, 1180:13
**comarketed** [1] - 967:17
**combat** [1] - 1059:19
**combination** [1] - 981:1
**combine** [1] - 1135:16
**comfort** [2] - 1039:23, 1045:19
**comfortable** [7] - 992:9, 996:10, 1025:3, 1026:8, 1053:21, 1053:22, 1066:7
**coming** [15] - 959:22, 961:19, 1092:24, 1110:25, 1111:7, 1123:1, 1128:4, 1138:14, 1178:2, 1184:23, 1187:23, 1213:5, 1213:15, 1214:10, 1214:11
**Commencing** [1] - 954:10
**comment** [2] - 1222:2, 1255:9
**commented** [1] - 1198:18
**comments** [3] - 1029:18, 1124:12, 1161:5
**commit** [3] - 1046:20, 1141:4, 1237:10
**committed** [2] - 1019:23, 1020:1
**committee** [9] - 1103:21, 1104:3, 1104:10, 1104:14, 1203:18, 1204:1, 1205:12, 1205:25, 1206:5
**committee's** [1] - 1104:6
**committees** [1] - 1145:20
**common** [5] - 975:25, 999:2, 1025:19, 1026:3, 1247:5
**commonly** [2] - 967:11, 969:13
**communicate** [1] - 1180:6
**communicated** [3] - 993:11, 1023:10, 1183:3
**communicating** [1] - 1257:20

**communication** [1] - 1048:14
**communications** [7] - 1060:4, 1071:6, 1071:9, 1071:15, 1071:21, 1074:7, 1074:9
**community** [2] - 1191:20, 1247:23
**commute** [1] - 1228:5
**commuting** [1] - 1228:18
**companies** [13] - 972:12, 995:7, 1009:4, 1037:18, 1058:24, 1111:25, 1113:5, 1151:16, 1197:11, 1197:13, 1228:14, 1238:11
**companies'** [1] - 971:10
**company** [59] - 973:11, 978:19, 980:2, 983:6, 983:12, 985:11, 985:14, 985:21, 985:25, 986:25, 992:18, 993:5, 993:14, 993:23, 994:6, 999:1, 1003:4, 1008:24, 1011:14, 1020:10, 1021:3, 1021:12, 1021:15, 1033:11, 1035:17, 1038:7, 1042:17, 1048:2, 1055:11, 1063:8, 1064:14, 1065:17, 1078:4, 1078:6, 1078:9, 1078:17, 1105:7, 1105:15, 1112:23, 1150:5, 1157:10, 1157:12, 1157:23, 1158:8, 1161:1, 1162:11, 1162:13, 1162:14, 1196:5, 1206:15, 1209:19, 1219:16, 1231:9, 1234:17, 1234:24, 1234:25, 1237:18, 1249:15, 1249:24
**company's** [1] - 1196:16
**compare** [6] - 1052:12, 1058:22, 1166:8, 1166:12, 1178:18, 1181:8
**compared** [5] - 1107:2, 1166:11,

1180:22, 1181:2, 1181:16
**comparing** [1] - 1181:7
**comparison** [2] - 1178:15, 1244:3
**compensated** [2] - 1098:19, 1100:8
**compensation** [4] - 1098:18, 1099:8, 1100:6, 1104:25
**compete** [2] - 984:11, 985:12
**competitor** [6] - 1008:18, 1015:4, 1015:5, 1019:6, 1105:25, 1177:18
**competitor's** [1] - 1166:13
**competitors** [9] - 997:8, 1052:12, 1059:20, 1106:21, 1107:2, 1157:6, 1157:15, 1162:10, 1247:7
**COMPL** [1] - 1215:9
**complaining** [1] - 1095:6
**complains** [1] - 1098:7
**complaint** [12] - 1095:10, 1206:22, 1208:7, 1209:6, 1211:19, 1211:21, 1212:5, 1215:5, 1215:12, 1215:17, 1231:25, 1232:23
**complaints** [3] - 1211:7, 1214:3, 1225:16
**complete** [3] - 1033:7, 1062:7, 1239:13
**completely** [5] - 1146:20, 1178:10, 1219:23, 1223:1
**Compliance** [2] - 1071:16, 1132:8
**compliance** [37] - 1007:14, 1035:22, 1071:10, 1071:20, 1097:18, 1098:6, 1103:7, 1104:9, 1133:4, 1141:10, 1141:11, 1144:3, 1144:12, 1145:15, 1146:4, 1146:9, 1146:10, 1146:17, 1147:8, 1147:13, 1148:2, 1148:4, 1148:6, 1148:10,

1149:6, 1149:9, 1150:11, 1152:17, 1158:4, 1162:3, 1162:4, 1163:9, 1204:20, 1205:7, 1206:13, 1206:25, 1237:23

**compliant** [2] - 1141:6, 1155:21

**compliantly** [1] - 1141:1

**complicated** [1] - 1252:15

**complying** [1] - 1147:3

**computer** [1] - 954:25

**computer-aided** [1] - 954:25

**concern** [12] - 962:3, 991:15, 1095:6, 1146:22, 1154:19, 1179:23, 1209:17, 1221:20, 1223:3, 1232:9, 1245:23, 1258:14

**concerned** [4] - 991:12, 1074:8, 1136:22, 1146:9

**concerning** [1] - 1133:18

**concerns** [16] - 971:17, 984:6, 991:14, 993:21, 1035:21, 1065:18, 1066:20, 1153:23, 1154:9, 1154:12, 1194:24, 1207:17, 1217:4, 1218:8, 1220:13, 1252:2

**concluded** [10] - 990:7, 1002:14, 1006:4, 1068:5, 1086:25, 1100:3, 1173:3, 1214:16, 1233:14, 1241:20

**concludes** [1] - 1260:2

**concluding** [1] - 1082:9

**conclusion** [1] - 1166:14

**conduct** [7] - 1000:6, 1000:8, 1065:18, 1068:18, 1153:9, 1208:3, 1235:7

**conducted** [5] - 959:7, 994:20, 1073:24, 1153:6, 1176:18

**conducting** [1] - 1037:7

**confer** [1] - 1071:2

**conference** [24] - 978:3, 982:6, 982:9, 989:23, 1006:7, 1048:15, 1059:16, 1105:20, 1106:6, 1138:4, 1139:20, 1140:6, 1147:23, 1148:2, 1148:23, 1150:2, 1150:7, 1162:3, 1162:22, 1163:7, 1170:22, 1189:19, 1220:2, 1220:15

**conferences** [3] - 1018:1, 1115:12, 1127:1

**confidential** [1] - 1059:3

**confirm** [3] - 1073:2, 1172:24, 1173:12

**confused** [2] - 1138:8, 1200:7

**confusion** [1] - 1245:7

**connected** [2] - 1186:20, 1254:2

**connection** [1] - 1087:7

**connections** [1] - 1248:14

**consequences** [2] - 1238:6, 1238:9

**consider** [5] - 1016:14, 1038:1, 1070:13, 1090:7, 1239:13

**considered** [5] - 974:14, 1031:11, 1038:21, 1050:7, 1128:7

**considering** [1] - 1019:15

**considers** [2] - 1019:8, 1019:11

**consistent** [9] - 1015:14, 1015:18, 1033:7, 1072:9, 1073:23, 1158:5, 1159:11, 1212:11, 1235:4

**conspiracy** [2] - 1096:24, 1248:22

**constant** [1] - 1249:20

**contact** [2] - 990:25, 1007:7

**content** [3] - 1000:8, 1001:7, 1001:13

**contents** [1] - 1245:4

**context** [3] - 1159:24, 1223:1, 1243:11

**continue** [7] - 975:23, 1008:20, 1021:14, 1033:6, 1035:3, 1044:22, 1250:21

**continued** [2] - 1023:3, 1116:12

**continues** [1] - 1045:9

**continuing** [1] - 1045:15

**contract** [4] - 1039:22, 1040:16, 1041:16, 1046:23

**contradiction** [3] - 1062:7, 1232:15, 1233:7

**contrast** [1] - 1058:22

**control** [6] - 1061:22, 1062:3, 1074:10, 1180:9, 1257:22, 1257:25

**conveniently** [1] - 1227:18

**conversation** [15] - 992:11, 994:11, 996:8, 1028:11, 1032:12, 1091:16, 1091:17, 1105:21, 1111:4, 1118:3, 1135:23, 1148:13, 1149:20, 1201:10, 1247:21

**conversations** [10] - 982:15, 1025:24, 1026:7, 1028:6, 1028:8, 1031:9, 1137:16, 1137:19, 1138:18, 1187:1

**coordinating** [1] - 1213:24

**coordination** [1] - 1232:13

**copied** [7] - 1015:23, 1022:23, 1033:21, 1036:8, 1040:9, 1042:24, 1206:20

**copy** [9] - 999:5, 1005:16, 1005:17, 1012:5, 1023:20, 1072:2, 1210:12, 1211:19, 1223:12

**copying** [2] - 1223:3, 1223:14

**corporate** [2] - 979:12, 1226:19

**correct** [449] - 966:15, 966:16, 966:19, 966:21, 968:15, 970:16, 971:23, 973:5, 974:22, 974:24, 977:22,

978:18, 979:7, 983:8, 983:11, 985:7, 989:14, 999:5, 1000:10, 1001:15, 1006:23, 1008:9, 1010:2, 1010:14, 1011:1, 1011:13, 1012:5, 1013:3, 1014:2, 1014:19, 1014:23, 1015:6, 1017:14, 1018:19, 1019:25, 1020:17, 1021:7, 1021:13, 1022:21, 1023:20, 1025:9, 1030:19, 1031:17, 1031:21, 1033:10, 1033:14, 1036:16, 1039:7, 1039:17, 1043:1, 1044:14, 1045:22, 1046:7, 1050:3, 1050:5, 1052:4, 1054:15, 1055:1, 1056:4, 1057:12, 1063:14, 1063:25, 1064:15, 1064:25, 1068:16, 1073:16, 1076:15, 1076:20, 1076:23, 1076:24, 1077:1, 1077:15, 1077:24, 1077:25, 1078:3, 1078:10, 1078:15, 1078:21, 1078:22, 1079:1, 1079:12, 1079:17, 1079:25, 1080:12, 1080:15, 1080:19, 1081:21, 1081:22, 1082:1, 1082:2, 1082:22, 1083:5, 1083:6, 1083:10, 1084:14, 1084:17, 1084:20, 1087:12, 1087:13, 1088:2, 1088:11, 1088:14, 1088:17, 1090:14, 1090:20, 1090:24, 1092:11, 1092:17, 1093:1, 1093:2, 1093:10, 1093:11, 1093:16, 1093:19, 1093:23, 1094:2, 1094:14, 1094:25, 1095:7, 1095:12, 1096:5, 1096:9, 1096:22, 1097:11, 1097:16, 1097:19, 1097:20, 1098:12, 1098:16, 1098:17, 1100:9, 1101:25, 1105:3,

1105:10, 1106:7, 1106:12, 1110:11, 1110:18, 1111:2, 1111:15, 1111:18, 1111:23, 1112:1, 1112:2, 1112:15, 1112:25, 1113:1, 1113:9, 1113:19, 1113:24, 1115:6, 1115:19, 1120:13, 1120:20, 1121:11, 1121:13, 1122:25, 1123:10, 1123:23, 1123:24, 1124:2, 1124:5, 1124:23, 1124:24, 1125:1, 1125:6, 1125:21, 1126:1, 1126:5, 1126:6, 1126:11, 1126:19, 1127:3, 1127:4, 1127:7, 1127:12, 1127:13, 1127:25, 1128:6, 1128:18, 1131:17, 1132:16, 1133:1, 1133:14, 1133:19, 1134:4, 1134:16, 1137:6, 1138:12, 1139:3, 1139:7, 1139:10, 1140:10, 1140:11, 1140:17, 1142:20, 1142:22, 1143:13, 1144:20, 1144:24, 1144:25, 1145:4, 1145:7, 1145:16, 1147:25, 1148:3, 1148:8, 1148:12, 1148:21, 1148:22, 1148:24, 1149:3, 1149:4, 1149:7, 1149:8, 1149:14, 1149:15, 1149:18, 1149:19, 1150:17, 1150:18, 1151:17, 1151:18, 1151:23, 1151:24, 1152:1, 1152:2, 1152:6, 1152:10, 1152:14, 1152:19, 1152:20, 1152:23, 1152:24, 1153:2, 1153:12, 1153:16, 1153:17, 1154:3, 1154:7, 1154:8, 1155:22, 1155:23, 1156:1, 1156:12, 1156:13, 1156:16, 1156:20, 1157:13, 1158:7, 1159:1, 1159:2, 1159:5, 1159:13, 1159:14,

1159:25, 1160:1,
1160:14, 1161:10,
1161:14, 1161:24,
1161:25, 1163:2,
1163:4, 1163:11,
1163:25, 1164:1,
1164:2, 1164:3,
1164:4, 1164:6,
1164:7, 1165:1,
1165:4, 1165:9,
1165:10, 1165:12,
1165:22, 1166:23,
1167:3, 1167:4,
1167:7, 1167:8,
1167:10, 1167:11,
1167:14, 1167:15,
1167:18, 1168:5,
1168:6, 1168:12,
1169:8, 1173:19,
1173:22, 1173:23,
1174:2, 1174:6,
1174:10, 1174:11,
1174:13, 1175:24,
1176:16, 1176:20,
1176:21, 1176:23,
1177:8, 1177:12,
1177:16, 1177:17,
1177:24, 1177:25,
1178:4, 1178:5,
1178:9, 1179:19,
1179:22, 1180:21,
1181:1, 1182:2,
1182:25, 1183:1,
1183:13, 1183:23,
1184:3, 1184:17,
1184:24, 1184:25,
1185:3, 1185:20,
1185:21, 1185:24,
1185:25, 1187:10,
1187:11, 1187:15,
1188:1, 1189:5,
1189:9, 1190:22,
1191:7, 1191:8,
1191:22, 1192:1,
1192:13, 1193:24,
1194:9, 1194:10,
1194:14, 1194:15,
1195:13, 1195:17,
1195:21, 1196:1,
1196:2, 1196:15,
1196:19, 1196:23,
1196:24, 1197:2,
1197:3, 1197:10,
1197:11, 1197:25,
1198:4, 1198:5,
1199:13, 1199:14,
1199:18, 1199:22,
1199:25, 1200:1,
1201:3, 1201:12,
1201:17, 1201:21,
1202:8, 1202:22,

1202:23, 1203:6,
1203:15, 1206:3,
1206:16, 1207:5,
1207:8, 1207:9,
1207:13, 1208:4,
1208:5, 1208:11,
1208:23, 1208:24,
1209:2, 1209:8,
1209:21, 1210:3,
1210:4, 1214:12,
1214:20, 1215:22,
1216:1, 1216:2,
1216:10, 1216:11,
1216:22, 1216:23,
1217:7, 1217:8,
1217:16, 1217:17,
1217:21, 1217:22,
1217:25, 1218:9,
1218:10, 1218:14,
1218:23, 1220:25,
1221:1, 1221:12,
1221:13, 1221:15,
1221:16, 1221:18,
1221:22, 1222:13,
1222:25, 1223:10,
1223:19, 1224:12,
1224:13, 1224:16,
1226:1, 1226:4,
1226:8, 1228:6,
1228:24, 1230:22,
1231:21, 1233:21,
1233:24, 1234:11,
1235:18, 1235:19,
1243:14, 1243:19,
1244:14, 1246:2,
1249:5, 1261:4
**Correct** [27] - 1016:25,
1068:15, 1096:8,
1096:12, 1096:21,
1097:15, 1098:20,
1100:17, 1102:7,
1103:3, 1103:16,
1104:20, 1105:9,
1106:18, 1108:2,
1110:10, 1111:14,
1113:8, 1113:23,
1114:2, 1114:6,
1114:13, 1116:6,
1117:3, 1123:9,
1195:16, 1195:20
**corrected** [1] - 1119:7
**correctly** [4] -
1019:16, 1039:25,
1048:7, 1235:20
**correlate** [1] - 1188:2
**correspondence** [5] -
961:3, 1050:10,
1223:4, 1244:7,
1244:12
**Counsel** [2] - 1074:25,

1175:2
**counsel** [40] - 956:7,
958:14, 960:6,
961:19, 962:9,
962:20, 963:12,
963:13, 963:18,
963:24, 965:12,
997:19, 1003:13,
1009:18, 1012:2,
1013:9, 1023:15,
1028:16, 1033:19,
1071:2, 1071:13,
1075:19, 1081:5,
1081:10, 1081:16,
1086:5, 1108:14,
1108:21, 1108:22,
1213:15, 1231:25,
1239:6, 1240:6,
1250:18, 1251:7,
1255:23, 1256:24,
1257:9, 1257:12,
1258:8
**counsel's** [1] -
1072:24
**count** [1] - 977:17
**counter** [1] - 1214:5
**country** [13] - 972:2,
976:22, 978:23,
979:6, 983:10,
988:19, 989:13,
1032:9, 1049:17,
1093:15, 1094:13,
1094:17, 1135:5
**couple** [15] - 1015:11,
1028:12, 1040:13,
1052:14, 1092:2,
1092:6, 1102:25,
1104:11, 1120:9,
1178:11, 1190:11,
1206:9, 1221:9,
1222:7, 1230:7
**course** [6] - 980:4,
993:15, 999:23,
1055:14, 1117:18,
1129:12
**Court** [18] - 954:23,
959:18, 997:19,
1003:13, 1009:18,
1012:2, 1013:9,
1023:15, 1028:16,
1033:19, 1071:13,
1240:18, 1241:7,
1251:15, 1253:6,
1258:21, 1260:2,
1261:12
**COURT** [239] - 954:1,
956:4, 956:5,
956:17, 956:25,
957:9, 957:18,
958:5, 958:12,

958:16, 959:21,
960:1, 960:18,
960:21, 960:24,
964:3, 964:6,
964:13, 965:1,
965:2, 965:4, 965:6,
965:14, 965:17,
965:19, 965:24,
966:3, 985:19,
985:23, 998:16,
998:19, 999:18,
999:25, 1000:7,
1000:12, 1000:20,
1001:4, 1001:10,
1001:13, 1001:16,
1002:5, 1002:13,
1002:25, 1004:6,
1004:14, 1004:21,
1005:4, 1005:8,
1005:19, 1005:22,
1006:2, 1006:10,
1010:6, 1012:16,
1013:19, 1023:24,
1029:5, 1030:17,
1030:20, 1034:1,
1034:8, 1034:15,
1034:16, 1034:21,
1034:23, 1034:25,
1035:2, 1050:23,
1051:3, 1051:6,
1065:23, 1065:25,
1066:8, 1066:11,
1066:14, 1066:17,
1066:22, 1066:24,
1067:2, 1067:7,
1067:16, 1067:19,
1067:21, 1067:25,
1068:3, 1071:3,
1072:13, 1072:18,
1072:22, 1072:25,
1073:5, 1074:25,
1075:4, 1075:7,
1076:3, 1076:6,
1083:13, 1083:15,
1083:18, 1083:20,
1083:24, 1084:11,
1084:15, 1084:18,
1084:22, 1085:4,
1085:7, 1085:19,
1086:11, 1086:14,
1087:3, 1091:21,
1091:25, 1098:22,
1099:4, 1099:11,
1099:15, 1099:20,
1099:23, 1100:2,
1102:17, 1102:19,
1102:21, 1108:4,
1108:7, 1108:10,
1108:15, 1108:17,
1108:21, 1109:3,
1109:7, 1109:9,

1109:13, 1116:18,
1119:25, 1131:2,
1131:8, 1141:24,
1147:20, 1150:23,
1150:25, 1151:3,
1167:24, 1169:25,
1170:3, 1170:9,
1170:16, 1170:19,
1171:2, 1171:4,
1171:8, 1171:11,
1171:15, 1171:19,
1172:5, 1172:13,
1173:7, 1173:11,
1173:14, 1174:17,
1174:19, 1174:22,
1176:4, 1176:6,
1184:13, 1184:15,
1186:5, 1194:4,
1210:17, 1210:22,
1211:3, 1211:5,
1211:9, 1211:12,
1211:17, 1211:23,
1212:1, 1212:9,
1212:16, 1212:19,
1212:21, 1213:2,
1213:16, 1214:4,
1214:13, 1214:19,
1214:22, 1216:15,
1222:15, 1222:18,
1229:5, 1229:10,
1229:13, 1229:16,
1229:17, 1229:19,
1229:22, 1229:23,
1229:25, 1231:15,
1232:7, 1232:19,
1233:8, 1238:16,
1239:5, 1239:11,
1239:16, 1239:25,
1240:17, 1241:2,
1241:12, 1241:14,
1241:17, 1241:23,
1248:19, 1250:2,
1250:7, 1250:10,
1250:14, 1250:17,
1250:24, 1251:6,
1252:19, 1254:4,
1254:6, 1254:11,
1255:6, 1255:16,
1256:11, 1256:21,
1259:2, 1259:5,
1259:9, 1259:12,
1259:16, 1259:20,
1259:22, 1260:1,
1261:1
**court** [15] - 956:1,
959:8, 1002:15,
1006:5, 1068:6,
1074:14, 1086:7,
1087:1, 1100:4,
1173:4, 1213:17,
1214:2, 1214:17,

1233:15, 1241:21
**Court's** [2] - 1072:9,
1255:11
**courthouse** [1] -
964:9
**Courthouse** [1] -
954:8
**courtroom** [7] - 965:5,
1097:19, 1108:16,
1109:8, 1171:16,
1229:14, 1229:24
**cover** [8] - 1005:19,
1005:24, 1052:20,
1059:8, 1141:13,
1190:10, 1190:12,
1234:22
**coverage** [1] - 1016:5
**covered** [5] - 987:19,
1055:14, 1230:20,
1234:1, 1252:13
**covering** [1] - 1065:3
**create** [3] - 1005:22,
1100:19, 1141:5
**created** [2] - 986:14,
999:22
**credentials** [1] -
1191:12
**credibility** [2] -
1252:17, 1253:23
**credibility-related** [1]
- 1252:17
**credo** [35] - 1151:8,
1151:11, 1151:15,
1152:4, 1152:9,
1152:13, 1153:5,
1153:9, 1153:14,
1153:15, 1153:22,
1153:23, 1154:1,
1154:10, 1154:12,
1154:22, 1154:23,
1155:3, 1155:20,
1157:20, 1157:25,
1158:14, 1158:19,
1159:7, 1159:10,
1159:15, 1160:3,
1160:25, 1161:1,
1161:22, 1162:4,
1162:23, 1163:8,
1230:21
**criteria** [18] - 1038:3,
1038:7, 1038:16,
1038:19, 1039:14,
1039:16, 1041:24,
1042:13, 1046:10,
1050:6, 1191:21,
1191:25, 1192:6,
1204:7, 1204:22,
1204:25, 1205:7,
1205:21
**criterion** [1] - 1038:1

**critical** [1] - 1136:7
**criticize** [2] - 969:18,
969:19
**critique** [1] - 1223:9,
1227:2
**critiqued** [1] - 1217:10
**CROI** [2] - 1127:2,
1189:18
**CROSS** - 955:4,
1075:5
**cross** [28] - 957:15,
957:17, 958:3,
958:11, 958:12,
958:13, 958:16,
958:17, 958:25,
962:15, 963:1,
963:22, 1075:1,
1083:15, 1083:20,
1084:3, 1240:2,
1243:10, 1244:19,
1251:13, 1251:21,
1252:15, 1252:19,
1252:20, 1253:1,
1254:6, 1254:8,
1254:15
**cross-exam** [4] -
1240:2, 1251:21,
1253:1, 1254:8
**cross-examination** [9]
- 958:13, 958:16,
958:17, 962:15,
963:1, 963:22,
1243:10, 1252:15,
1254:15
**CROSS-**
**EXAMINATION** [2] -
955:4, 1075:5
**cross-examine** [3] -
958:25, 1083:15,
1084:3
**cross-examining** [1] -
1083:20
**crosses** [1] - 957:25
**crossing** [1] - 1086:6
**CRR** [1] - 1261:11
**crux** [1] - 1234:16
**Crysta** [1] - 1221:17
**culture** [1] - 1035:16
**cup** [1] - 1230:16
**cure** [1] - 977:16
**current** [3] - 1006:24,
1021:8, 1037:4
**curse** [3] - 1114:16,
1114:23, 1115:18
**customer** [6] -
1047:12, 1047:13,
1047:17, 1155:17,
1155:24, 1188:22
**customers** [4] -
1015:13, 1033:3,

1033:5, 1188:24
**cut** [8] - 975:23,
991:21, 1023:12,
1028:3, 1033:16,
1058:14, 1125:11,
1255:20
**cutoff** [1] - 1177:7
**cutting** [3] - 1046:25,
1248:4, 1250:15
**CVS** [1] - 970:20
**CYA** [1] - 1059:8

# D

**D-1007** [1] - 1120:2
**D-1007A** [1] - 1119:23
**D-2036** [1] - 1186:3
**D-2079** [1] - 1130:21
**D-2089** [4] - 1167:22,
1168:25, 1174:16,
1176:8
**D-2095** [1] - 1098:1
**D-2401** [1] - 1099:2
**D-6092** [2] - 1216:12,
1216:17
**D-8674** [1] - 1141:22
**D-8675** [2] - 1147:18,
1148:15
**D-8701** [1] - 1116:17
**D-8702** [3] - 1210:16,
1214:18, 1214:24
**D-8767** [1] - 1150:22
**D-8779** [1] - 1195:8
**D-8799** [1] - 1194:2
**daily** [3] - 1057:21,
1058:3, 1169:11
**Dallas** [8] - 954:17,
970:4, 972:14,
973:1, 1053:10,
1055:8, 1055:13,
1230:18
**danger** [1] - 1032:22
**darunavir** [5] -
1014:21, 1014:24,
1199:17, 1199:23,
1199:24
**data** [58] - 984:22,
992:4, 997:7,
997:12, 997:14,
1017:9, 1017:19,
1017:22, 1017:23,
1018:3, 1018:6,
1018:15, 1020:23,
1041:5, 1045:19,
1061:15, 1064:9,
1064:11, 1107:1,
1107:21, 1107:25,
1114:10, 1114:25,
1115:4, 1127:1,
1127:19, 1127:23,

1128:4, 1129:20,
1130:1, 1130:7,
1130:13, 1134:24,
1135:25, 1156:3,
1156:10, 1156:14,
1158:1, 1158:10,
1174:9, 1174:12,
1175:19, 1176:15,
1176:18, 1177:1,
1177:6, 1178:2,
1178:11, 1178:12,
1178:19, 1180:18,
1185:23, 1200:14,
1200:18, 1201:16,
1235:10
**data's** [1] - 1064:11
**date** [4] - 978:10,
998:11, 1131:21,
1231:5
**Date** [1] - 1261:12
**dated** [7] - 1003:19,
1009:23, 1013:15,
1015:24, 1023:18,
1036:12, 1215:5
**daughter** [1] - 1079:2
**day-to-day** [1] -
1249:23
**days** [9] - 989:19,
989:20, 989:21,
1013:7, 1042:4,
1058:5, 1240:10,
1253:16, 1255:3
**DD** [1] - 1235:10
**DDMAC** [3] - 1244:5,
1244:7, 1244:12
**DDMAC/Tibotec** [1] -
1020:25
**deadline** [1] - 1025:3
**deaf** [1] - 1136:20
**deal** [1] - 1049:18
**dealing** [2] - 1066:14,
1254:14
**Dear** [1] - 1223:12
**death** [4] - 985:2,
1129:25, 1179:25,
1245:20
**Deb** [6] - 1117:6,
1117:21, 1122:23,
1123:11, 1124:11,
1242:16
**debilitating** [1] - 976:8
**decade** [1] - 1095:15
**decide** [1] - 1068:8
**decided** [4] - 1054:18,
1147:7, 1209:10,
1227:18
**decides** [1] - 1257:14
**decision** [5] -
1103:14, 1124:15,
1227:10, 1240:24,

1255:17
**decisions** [4] -
1101:11, 1130:2,
1251:14, 1255:20
**deck** [2] - 992:10,
1011:4
**decks** [2] - 1021:5,
1021:19
**declaration** [15] -
1080:5, 1080:11,
1080:17, 1080:21,
1080:22, 1081:19,
1083:8, 1083:13,
1083:16, 1084:13,
1087:7, 1087:15,
1110:1, 1111:7,
1234:1
**declarations** [1] -
1068:24
**decrease** [1] - 981:3
**dedicated** [1] -
1247:11
**deemed** [2] - 976:25,
1032:4
**Defendant's** [23] -
955:13, 955:14,
955:15, 955:16,
955:17, 955:18,
955:19, 955:20,
955:21, 955:22,
955:23, 1099:5,
1120:2, 1131:11,
1141:25, 1147:21,
1151:5, 1176:8,
1186:6, 1194:5,
1214:24, 1216:17,
1244:17
**Defendants** [2] -
954:7, 954:22
**defense** [2] - 956:18,
957:11
**defines** [1] - 1246:3
**definitely** [6] - 1031:3,
1055:25, 1101:13,
1202:12, 1211:13,
1242:21
**definition** [5] - 1062:3,
1122:16, 1128:8,
1179:24, 1246:13
**degree** [3] - 967:2,
967:3, 967:4
**Delaware** [1] - 954:22
**delay** [2] - 1240:14,
1252:20
**delaying** [1] - 1136:9
**deleted** [1] - 1037:5
**deliver** [1] - 1033:6
**delivered** [1] - 1179:8
**delivering** [1] -
1026:14

**demonstrative** [6] - 1075:25, 1076:1, 1091:20, 1091:22, 1092:2, 1102:16
**denied** [2] - 1046:4, 1046:15
**Denver** [12] - 966:13, 967:3, 967:6, 968:5, 975:10, 1055:13, 1055:18, 1070:20, 1217:20, 1219:12, 1227:17, 1227:19
**deny** [3] - 961:5, 962:11, 963:23
**Department** [6] - 1231:24, 1232:11, 1232:12, 1232:17, 1233:3, 1233:6
**department** [11] - 979:15, 979:17, 979:20, 1060:18, 1082:24, 1098:7, 1104:12, 1144:4, 1159:12, 1207:7, 1207:12
**depiction** [1] - 1052:24
**depicts** [1] - 1012:5
**deposition** [7] - 1110:2, 1163:22, 1184:8, 1184:11, 1234:6, 1241:6, 1256:18
**depth** [1] - 1191:17
**DEPUTY** [12] - 956:4, 965:1, 965:4, 965:24, 1034:15, 1034:25, 1108:15, 1109:7, 1229:13, 1229:16, 1229:23, 1260:1
**describe** [5] - 973:23, 1011:2, 1028:7, 1029:10, 1187:12
**described** [7] - 1035:25, 1094:22, 1113:4, 1113:17, 1114:15, 1115:3, 1228:7
**describing** [1] - 1014:10
**description** [2] - 1112:20, 1165:16
**designated** [1] - 1004:9
**desirable** [2] - 961:12, 992:18
**despite** [5] - 1112:22, 1135:4, 1162:2, 1178:11, 1190:19

**detail** [2] - 973:23, 1191:14
**detailed** [1] - 1233:25
**detectable** [1] - 977:15
**detected** [1] - 976:7
**detecting** [1] - 1251:9
**determination** [1] - 1104:6
**determine** [1] - 1008:24
**determined** [3] - 1202:6, 1206:1, 1249:15
**deterred** [1] - 1045:16
**detrimental** [1] - 1130:4
**develop** [4] - 981:25, 985:1, 1044:22, 1129:24
**developed** [2] - 982:5, 1045:3
**development** [2] - 1182:17, 1223:18
**Devlin** [4] - 998:11, 1002:19, 1002:21, 1014:10
**diabetes** [1] - 1107:19
**differed** [2] - 987:16, 1035:20
**difference** [3] - 958:19, 1233:5, 1236:21
**different** [37] - 958:23, 959:2, 970:11, 971:9, 971:20, 973:6, 973:7, 979:15, 986:16, 994:17, 996:16, 1004:22, 1040:13, 1041:12, 1048:18, 1052:14, 1072:11, 1072:14, 1072:19, 1088:13, 1088:16, 1097:18, 1100:16, 1113:5, 1116:9, 1148:16, 1172:17, 1180:8, 1180:10, 1197:18, 1209:16, 1212:15, 1245:21, 1247:4, 1248:9
**differentiating** [1] - 1059:18
**differently** [3] - 981:20, 1172:6, 1205:21
**difficult** [8] - 1009:11, 1028:11, 1056:17, 1056:21, 1202:6, 1202:14, 1227:21,

1228:19
**difficulty** [1] - 1037:11
**dinner** [2] - 1077:18, 1079:7
**DIRECT** [2] - 955:4, 966:4
**direct** [19] - 957:15, 957:17, 957:19, 958:2, 958:14, 958:25, 960:4, 1002:1, 1074:7, 1232:15, 1233:6, 1240:18, 1251:12, 1251:15, 1252:18, 1252:21, 1253:1, 1254:19, 1257:6
**directed** [2] - 1174:4, 1189:19
**directing** [1] - 1112:24
**direction** [19] - 993:7, 1048:14, 1105:4, 1105:21, 1125:11, 1125:16, 1135:6, 1135:19, 1138:9, 1162:8, 1162:9, 1162:12, 1162:16, 1162:19, 1162:22, 1162:25, 1163:3, 1163:7
**directly** [8] - 987:11, 989:3, 1028:9, 1082:23, 1189:16, 1225:3, 1238:25, 1248:1
**director** [25] - 978:20, 979:1, 979:4, 979:11, 979:25, 980:1, 980:7, 986:11, 986:20, 987:10, 988:16, 989:1, 989:18, 990:5, 1022:18, 1022:19, 1048:1, 1054:13, 1117:9, 1117:10, 1131:19, 1131:22, 1165:7, 1219:9
**directors** [9] - 978:24, 986:12, 986:14, 986:16, 988:11, 988:13, 1054:19, 1154:17, 1206:18
**directs** [1] - 1098:15
**disagree** [1] - 1218:12
**disclaimer** [2] - 1058:21, 1058:22
**disclosure** [1] - 1134:3
**discord** [1] - 974:19
**discounts** [1] - 970:22

**discoverable** [2] - 1048:12, 1073:12
**discretion** [1] - 959:11
**discuss** [5] - 981:19, 1065:18, 1075:19, 1108:24, 1134:24
**discussed** [17] - 990:3, 990:8, 992:23, 993:24, 1006:11, 1025:21, 1058:23, 1072:9, 1117:24, 1134:7, 1148:1, 1154:16, 1188:12, 1206:14, 1217:6, 1219:4, 1220:14
**discussing** [3] - 1059:13, 1097:19, 1161:2
**discussion** [20] - 1006:9, 1048:6, 1051:1, 1051:15, 1060:9, 1131:3, 1137:2, 1154:2, 1155:20, 1161:8, 1170:21, 1191:5, 1194:16, 1203:1, 1216:25, 1220:2, 1220:22, 1220:23, 1247:6, 1249:21
**discussions** [8] - 981:24, 1048:17, 1053:19, 1133:18, 1149:13, 1149:17, 1150:16, 1154:19
**disease** [2] - 994:22, 1061:1
**diseases** [1] - 1235:17
**disheveled** [1] - 1198:19
**dismissed** [8] - 1067:6, 1067:12, 1068:14, 1089:24, 1215:21, 1233:18, 1233:19, 1250:20
**display** [6] - 1076:1, 1091:19, 1097:25, 1102:15, 1116:17, 1167:23
**dispute** [1] - 1082:14
**disregard** [2] - 1162:6, 1162:8
**disseminate** [2] - 1052:11, 1163:15
**disseminated** [2] - 1058:20, 1135:10
**dissolve** [1] - 1056:23
**dissolved** [1] - 1056:24
**distinguish** [1] -

1165:14
**distribution** [3] - 970:18, 970:21, 997:7
**DISTRICT** [3] - 954:1, 954:1, 954:12
**District** [1] - 956:2
**district** [57] - 968:8, 968:19, 968:21, 968:24, 972:21, 972:23, 974:15, 974:23, 978:22, 978:23, 979:2, 979:14, 979:18, 986:4, 986:10, 987:18, 987:21, 988:11, 988:19, 989:5, 990:4, 998:5, 998:10, 1000:6, 1002:4, 1026:3, 1026:7, 1028:9, 1028:10, 1031:10, 1039:9, 1044:21, 1054:17, 1054:20, 1054:24, 1061:25, 1062:16, 1062:17, 1062:19, 1062:25, 1063:3, 1064:23, 1070:1, 1082:19, 1138:7, 1154:17, 1165:7, 1173:24, 1183:5, 1183:6, 1184:6, 1206:17, 1225:16, 1227:16, 1230:18
**districts** [1] - 1063:6
**disturbing** [1] - 1014:9
**division** [1] - 970:10
**doctor** [22] - 996:7, 1018:20, 1038:8, 1041:21, 1043:19, 1044:16, 1046:13, 1046:18, 1095:9, 1136:4, 1145:19, 1155:25, 1156:2, 1160:13, 1168:9, 1185:8, 1185:18, 1185:22, 1189:13, 1202:9, 1225:13
**Doctor** [2] - 1189:17, 1223:12
**doctor's** [4] - 1128:16, 1142:19, 1180:24, 1189:23
**doctors** [46] - 986:1, 990:14, 993:1, 996:1, 1004:13, 1004:15, 1009:14, 1027:9, 1040:13,

1044:18, 1047:15, 1047:16, 1050:4, 1054:2, 1054:4, 1057:13, 1057:16, 1058:19, 1063:15, 1094:12, 1094:17, 1094:23, 1095:3, 1101:19, 1106:11, 1114:12, 1114:24, 1115:3, 1115:22, 1120:18, 1125:25, 1126:12, 1126:16, 1128:11, 1128:15, 1128:19, 1129:3, 1130:14, 1143:9, 1151:25, 1157:1, 1168:3, 1170:24, 1192:23, 1197:4, 1234:25

**doctors'** [6] - 1011:14, 1058:10, 1146:16, 1168:10, 1173:18, 1176:11

**document** [56] - 978:7, 997:22, 997:25, 998:15, 998:23, 999:21, 1000:4, 1000:8, 1000:10, 1000:13, 1000:16, 1000:22, 1000:24, 1001:7, 1001:14, 1003:15, 1004:3, 1005:6, 1005:12, 1005:22, 1006:14, 1028:18, 1029:1, 1048:25, 1072:8, 1072:12, 1072:15, 1080:7, 1083:11, 1088:24, 1098:10, 1116:15, 1120:4, 1130:23, 1131:3, 1131:4, 1169:6, 1169:20, 1170:14, 1174:20, 1174:24, 1176:25, 1193:2, 1202:20, 1202:25, 1213:5, 1213:6, 1213:7, 1214:8, 1214:10, 1214:11, 1219:3, 1219:23, 1220:1, 1236:23, 1242:12

**documentation** [1] - 1074:20

**documents** [23] - 1000:19, 1000:20, 1001:5, 1002:7, 1067:10, 1073:11, 1074:1, 1074:13, 1084:9, 1102:1, 1140:25, 1141:5,

1141:9, 1170:23, 1172:11, 1191:1, 1209:23, 1212:8, 1234:20, 1246:9, 1246:10, 1246:13, 1246:19

**Doe** [6] - 1209:7, 1209:20, 1254:16, 1254:18

**doff** [1] - 1141:16

**doff-label** [1] - 1141:16

**DOJ** [3] - 1089:18, 1208:7, 1231:20

**Dolisi** [10] - 979:13, 989:16, 1006:19, 1006:24, 1007:12, 1007:16, 1008:20, 1028:14, 1148:16, 1149:5

**Dolisi's** [1] - 1219:8

**dollar** [1] - 1125:12

**done** [18] - 963:18, 997:3, 1043:21, 1059:13, 1066:11, 1092:13, 1108:13, 1182:5, 1195:24, 1196:5, 1200:19, 1206:11, 1229:19, 1232:22, 1240:17, 1240:20, 1251:16, 1258:4

**Donna** [7] - 1065:11, 1076:18, 1080:9, 1080:22, 1209:14, 1209:17, 1248:12

**door** [2] - 962:14, 1232:10

**dosing** [1] - 1057:21

**dotted** [1] - 989:4

**double** [5] - 1166:9, 1170:8, 1170:9, 1171:25, 1244:1

**double-blind** [1] - 1244:1

**double-blinded** [1] - 1166:9

**double-check** [3] - 1170:8, 1170:9, 1171:25

**DoubleTree** [1] - 1139:1

**doubt** [3] - 994:2, 1003:5, 1172:2

**down** [23] - 970:4, 980:24, 982:12, 990:8, 1013:8, 1015:11, 1020:10, 1023:5, 1032:20, 1050:15, 1051:23,

1053:22, 1065:3, 1123:17, 1123:22, 1125:5, 1125:14, 1131:22, 1134:22, 1173:6, 1201:15, 1206:22, 1240:3

**downsized** [1] - 972:8

**Doyletta** [3] - 1194:7, 1194:20, 1195:11

**dozen** [1] - 1026:6

**Dr** [36] - 1015:12, 1016:7, 1017:6, 1018:24, 1020:23, 1033:3, 1033:4, 1039:21, 1040:23, 1041:8, 1041:12, 1041:13, 1043:19, 1046:11, 1191:2, 1191:5, 1191:9, 1191:12, 1191:16, 1193:2, 1193:15, 1194:8, 1194:13, 1194:17, 1195:1, 1195:19, 1195:23, 1199:7, 1201:10, 1202:4, 1202:5, 1202:19, 1203:5, 1203:25

**draw** [1] - 1166:13

**drew** [1] - 1248:13

**drill** [2] - 1024:23, 1035:8

**drinking** [3] - 1218:4, 1221:4, 1222:23

**drive** [3] - 995:24, 1104:5, 1247:23

**drives** [2] - 1024:13, 1031:19

**dropped** [2] - 1209:9, 1242:10

**drug** [73] - 967:16, 967:17, 972:4, 972:5, 972:6, 973:16, 974:8, 976:11, 976:23, 977:6, 980:16, 981:1, 983:5, 983:7, 983:25, 984:22, 984:24, 985:4, 985:5, 985:14, 991:19, 991:24, 992:2, 992:15, 993:9, 996:23, 997:6, 1008:4, 1008:5, 1008:12, 1010:25, 1015:3, 1015:5, 1015:7, 1018:20, 1019:6, 1025:14, 1030:10, 1038:15, 1040:23,

1042:5, 1042:6, 1042:8, 1042:9, 1042:17, 1045:21, 1047:19, 1049:11, 1049:15, 1049:24, 1050:4, 1051:19, 1052:19, 1056:2, 1056:7, 1090:16, 1110:21, 1114:4, 1114:7, 1114:9, 1117:23, 1118:4, 1121:12, 1141:15, 1141:17, 1150:6, 1162:9, 1166:8, 1203:21, 1237:6, 1243:22, 1245:18

**drug's** [2] - 993:22, 1181:6

**drugs** [21] - 969:25, 977:8, 981:5, 1008:18, 1063:24, 1090:10, 1090:14, 1091:6, 1122:3, 1181:7, 1184:1, 1184:22, 1234:18, 1235:2, 1236:2, 1237:3, 1242:2, 1242:3, 1242:6, 1242:7, 1243:12

**due** [5] - 1041:24, 1187:18, 1187:19, 1196:5, 1213:11

**DULY** [1] - 965:22

**during** [19] - 982:9, 990:3, 999:1, 1021:14, 1023:7, 1026:5, 1053:19, 1077:4, 1093:25, 1094:24, 1095:4, 1127:5, 1165:11, 1166:21, 1206:9, 1206:12, 1208:18, 1221:23, 1237:17

**duties** [1] - 989:17

---

# E

**early** [17] - 972:15, 972:25, 982:17, 992:15, 1021:3, 1046:15, 1063:4, 1113:18, 1114:10, 1118:4, 1118:6, 1130:11, 1140:7, 1168:17, 1183:21, 1192:24, 1247:18

**ears** [1] - 1136:20

**easily** [1] - 1090:11

**east** [2] - 978:24, 979:2

**East** [1] - 954:9

**eastern** [1] - 989:13

**easy** [1] - 1124:16

**educate** [2] - 1114:24, 1115:11

**educating** [1] - 1011:5

**education** [1] - 993:7

**educational** [1] - 994:21

**effect** [13] - 982:3, 1057:17, 1059:3, 1059:5, 1084:1, 1130:5, 1170:25, 1178:17, 1212:24, 1214:5, 1235:6, 1235:8, 1237:2

**Effective** [1] - 1071:16

**effective** [4] - 1025:6, 1086:21, 1183:3, 1236:3

**effectively** [6] - 974:8, 974:17, 1026:25, 1110:22, 1117:25, 1190:6

**effects** [5] - 980:15, 984:23, 985:15, 1237:2, 1245:19

**efficacy** [1] - 1175:18

**effort** [2] - 1053:5, 1061:15

**eight** [6] - 988:5, 988:18, 988:19, 1036:14, 1191:24, 1252:14

**either** [16] - 963:4, 989:25, 990:20, 995:1, 1004:13, 1017:25, 1037:6, 1041:24, 1085:14, 1208:3, 1219:8, 1232:20, 1249:14, 1251:18, 1254:17, 1254:24

**elaborate** [1] - 1128:1

**elevate** [3] - 981:1, 1177:11

**elevation** [2] - 1177:14, 1177:22

**elicit** [3] - 1061:11, 1184:6, 1185:11

**eliciting** [1] - 1257:1

**eligibility** [1] - 1039:14

**eligible** [1] - 1090:7

**eliminate** [2] - 981:2, 981:3

**eliminated** [1] - 991:19

**ELMO** [2] - 1005:19, 1081:8

**emaciated** [1] - 1053:3
**email** [87] - 1001:24, 1003:17, 1003:21, 1003:25, 1004:8, 1004:14, 1004:17, 1004:24, 1005:9, 1005:10, 1005:11, 1005:17, 1005:23, 1006:18, 1006:22, 1009:20, 1009:25, 1010:12, 1013:12, 1013:21, 1014:4, 1014:6, 1015:23, 1018:23, 1020:4, 1020:22, 1021:10, 1022:10, 1022:20, 1022:23, 1023:17, 1023:20, 1024:15, 1025:16, 1026:16, 1033:21, 1034:4, 1034:6, 1035:6, 1036:6, 1036:8, 1039:6, 1040:2, 1042:23, 1042:25, 1043:9, 1045:9, 1047:5, 1047:7, 1050:10, 1050:15, 1099:14, 1131:13, 1131:25, 1132:8, 1133:4, 1133:16, 1133:20, 1134:21, 1135:5, 1135:9, 1136:15, 1136:22, 1137:1, 1137:15, 1138:2, 1138:6, 1142:2, 1142:4, 1142:5, 1146:16, 1147:9, 1148:16, 1186:8, 1187:8, 1195:9, 1202:21, 1203:22, 1203:25, 1205:6, 1211:6, 1211:16, 1211:21, 1211:25, 1212:1, 1212:6, 1215:1
**emailing** [1] - 1007:12
**emails** [12] - 1004:21, 1005:14, 1005:24, 1015:20, 1073:11, 1073:21, 1137:21, 1138:17, 1138:22, 1187:12, 1194:11, 1206:21
**embarrass** [1] - 969:19
**Embrace** [1] - 972:17
**emphasis** [1] - 1063:9
**emphasized** [1] - 1011:6
**employed** [2] -

1162:11, 1249:11
**employee** [2] - 1098:15, 1152:12
**employees** [4] - 1074:12, 1152:8, 1152:17
**encourage** [4] - 992:20, 1045:4, 1124:25, 1192:14
**encouraged** [1] - 1105:12
**encourages** [1] - 1105:16
**end** [16] - 957:16, 963:13, 1025:4, 1046:22, 1046:23, 1059:9, 1074:13, 1116:23, 1124:12, 1125:24, 1190:10, 1199:20, 1207:21, 1220:15, 1220:22, 1242:17
**ended** [1] - 1056:22
**ends** [1] - 1074:9
**engage** [1] - 1135:22
**engagement** [2] - 991:1, 991:2
**enjoy** [3] - 969:21, 970:24, 971:15
**enjoyed** [1] - 1249:11
**enlarge** [1] - 1039:2
**ensure** [1] - 1015:14
**entailed** [1] - 1011:4
**enter** [1] - 1229:24
**entered** [1] - 1185:19
**enters** [3] - 965:5, 1035:1, 1109:8
**entice** [2] - 1045:4, 1049:7
**entire** [11] - 993:19, 1011:4, 1021:14, 1025:20, 1026:12, 1048:20, 1116:23, 1135:11, 1183:3, 1206:12, 1219:3
**entirely** [1] - 1185:14
**entitled** [2] - 1252:18, 1261:5
**entity** [2] - 1091:8, 1092:10
**environment** [2] - 1035:16, 1059:4
**epidemic** [1] - 1115:8
**episode** [1] - 1222:23
**equal** [2] - 1047:23, 1048:1
**equivalent** [1] - 984:15
**especially** [2] - 963:14, 1200:18

**ESQUIRE** [8] - 954:14, 954:15, 954:15, 954:16, 954:16, 954:19, 954:20, 954:20
**essence** [5] - 986:12, 1007:24, 1061:13, 1095:21, 1135:20
**essentially** [3] - 1167:17, 1224:17, 1254:1
**establish** [8] - 958:21, 1002:6, 1002:9, 1009:10, 1084:15, 1085:11, 1085:21, 1086:3
**established** [4] - 959:14, 963:1, 963:21, 1084:12
**establishing** [1] - 1085:9
**estimate** [1] - 973:24
**estimation** [2] - 1194:20, 1202:15
**et** [2] - 954:3, 1117:19
**ethically** [1] - 1096:6
**evaluate** [6] - 1061:9, 1062:2, 1062:5, 1182:23, 1183:2, 1190:5
**evaluated** [1] - 1104:19
**evaluating** [1] - 1190:9
**evaluation** [3] - 1022:4, 1182:11, 1207:18
**evaluations** [2] - 1182:4, 1217:9
**eve** [3] - 1132:15, 1133:5, 1134:17
**evening** [2] - 1140:13, 1219:11
**evenly** [1] - 1124:2
**event** [13] - 1022:10, 1024:6, 1027:20, 1180:14, 1191:6, 1193:15, 1195:2, 1195:25, 1221:3, 1224:18, 1225:3
**events** [9] - 980:21, 1107:18, 1179:25, 1217:15, 1217:19, 1217:24, 1218:4, 1219:7, 1245:21
**eventually** [2] - 979:25, 1036:8
**Evergreen** [1] - 966:12
**evidence** [56] - 955:8, 955:8, 955:9,

955:10, 955:11, 955:11, 955:12, 955:12, 955:13, 955:14, 955:15, 955:16, 955:17, 955:18, 955:19, 955:20, 955:21, 955:22, 955:23, 999:22, 1004:4, 1006:12, 1010:7, 1012:17, 1013:20, 1023:25, 1029:6, 1034:2, 1048:13, 1071:8, 1073:8, 1083:12, 1084:10, 1098:1, 1099:2, 1099:5, 1116:16, 1120:2, 1131:11, 1141:25, 1147:21, 1148:15, 1151:5, 1167:21, 1169:21, 1176:8, 1186:6, 1194:5, 1195:8, 1214:24, 1216:17, 1221:10, 1222:11, 1232:18, 1232:19, 1232:24
**exact** [9] - 959:13, 969:18, 987:20, 1054:10, 1067:17, 1087:14, 1208:6, 1233:9, 1255:25
**exactly** [11] - 1036:1, 1047:2, 1101:18, 1101:21, 1102:8, 1103:12, 1104:1, 1115:2, 1170:18, 1171:1, 1197:7
**exam** [9] - 957:19, 958:14, 958:25, 960:4, 1240:2, 1251:21, 1253:1, 1254:8
**examination** [10] - 958:13, 958:16, 958:17, 959:19, 962:15, 963:1, 963:22, 1243:10, 1252:15, 1254:15
**EXAMINATION** [6] - 955:4, 955:4, 955:5, 966:4, 1075:5, 1230:4
**EXAMINATIONS** [1] - 955:2
**examine** [3] - 958:25, 1083:15, 1084:3
**examining** [1] - 1083:20
**example** [6] - 1097:21,

1100:19, 1187:25, 1189:17, 1193:23, 1225:8
**examples** [3] - 1134:6, 1134:22, 1221:2
**exceed** [2] - 1064:8, 1127:24
**exceeding** [1] - 1183:5
**except** [1] - 957:5
**exception** [2] - 1237:9, 1237:11
**exceptions** [1] - 1236:19
**excitement** [1] - 1133:12
**excuse** [3] - 972:3, 1106:14, 1111:6
**excused** [4] - 963:14, 1250:7, 1250:22, 1250:23
**executed** [1] - 1081:25
**exhibit** [4] - 1012:4, 1072:20, 1099:24, 1210:22
**Exhibit** [43] - 955:7, 955:8, 955:8, 955:9, 955:10, 955:11, 955:11, 955:12, 955:12, 955:13, 955:14, 955:15, 955:16, 955:17, 955:18, 955:19, 955:20, 955:21, 955:22, 955:23, 997:23, 1006:12, 1010:7, 1012:17, 1013:20, 1020:8, 1023:25, 1029:6, 1034:2, 1073:6, 1073:8, 1099:5, 1120:2, 1131:11, 1141:25, 1147:21, 1151:5, 1176:8, 1186:6, 1194:5, 1203:23, 1214:24, 1216:17
**exhibits** [1] - 961:23
**exist** [1] - 1072:17
**existence** [1] - 1234:20
**existing** [1] - 1046:23
**exists** [1] - 1212:5
**exit** [2] - 1108:16, 1229:14
**expand** [5] - 960:9, 960:14, 1006:15, 1010:10, 1024:16
**expect** [6] - 1020:11, 1061:21, 1080:25,

1184:2, 1185:1, 1253:8
**expectation** [2] - 993:8, 1184:4
**expectations** [2] - 974:6, 1116:13
**expected** [6] - 973:20, 1150:3, 1162:6, 1163:3, 1163:9, 1163:12
**expecting** [2] - 1049:8, 1140:2
**expedited** [1] - 1236:20
**expense** [1] - 1224:15
**expenses** [3] - 1011:20, 1139:23, 1224:17
**experience** [20] - 972:20, 992:3, 992:6, 994:19, 1009:4, 1031:1, 1032:5, 1111:18, 1113:6, 1115:12, 1115:23, 1118:4, 1118:6, 1119:18, 1132:24, 1192:6, 1192:16, 1234:24, 1235:23, 1243:20
**experienced** [29] - 974:12, 974:16, 975:19, 976:10, 982:13, 982:17, 982:18, 983:10, 983:14, 992:16, 995:4, 1052:20, 1052:25, 1057:9, 1065:19, 1118:2, 1118:9, 1118:16, 1118:19, 1119:1, 1119:2, 1119:4, 1120:10, 1121:16, 1121:21, 1122:8, 1122:13, 1247:17, 1247:19
**experienced/naive** [1] - 1063:5
**experiences** [1] - 1080:1
**expert** [3] - 1049:12, 1180:2, 1180:5
**experts** [3] - 996:2, 1196:22, 1197:14
**explain** [18] - 967:9, 968:20, 969:7, 971:24, 980:19, 981:11, 987:15, 990:16, 991:14, 995:21, 1003:6, 1017:19, 1031:8,

1042:2, 1047:12, 1047:17, 1222:8, 1247:2
**explained** [2] - 1063:2, 1196:10
**explanation** [1] - 1046:2
**express** [1] - 1154:19
**expressed** [1] - 980:11
**extended** [1] - 1046:2
**extension** [1] - 1041:16
**extensions** [1] - 1040:17
**extensive** [1] - 1135:12
**extent** [4] - 1058:21, 1064:2, 1100:23, 1130:22
**extremely** [4] - 1048:11, 1060:24, 1062:22, 1239:23
**eyes** [1] - 1004:10

# F

**facade** [1] - 1059:7
**facilitate** [2] - 1154:4, 1160:3
**facilitated** [4] - 1155:11, 1157:20, 1158:23, 1161:8
**facing** [1] - 1105:23
**fact** [30] - 959:6, 970:11, 1009:2, 1009:12, 1049:14, 1049:22, 1061:24, 1077:3, 1081:2, 1088:8, 1091:18, 1097:17, 1105:11, 1126:7, 1127:9, 1148:1, 1151:10, 1162:2, 1179:7, 1183:7, 1185:7, 1200:17, 1227:10, 1230:20, 1231:19, 1237:12, 1238:25, 1245:11, 1248:25, 1257:1
**factor** [1] - 973:15
**factors** [3] - 975:14, 984:25, 1178:11
**facts** [2] - 1170:14, 1234:13
**factual** [1] - 1254:15
**failed** [6] - 962:20, 976:4, 1118:20, 1120:14, 1122:4, 1122:16

**failure** [2] - 1119:18, 1228:22
**failures** [1] - 1016:15
**fair** [78] - 963:11, 971:22, 973:4, 994:15, 1002:5, 1007:18, 1013:4, 1013:5, 1023:3, 1023:4, 1040:24, 1040:25, 1044:1, 1062:1, 1063:21, 1067:25, 1073:5, 1082:25, 1088:1, 1091:5, 1091:6, 1092:23, 1093:3, 1094:15, 1097:10, 1100:2, 1101:3, 1101:9, 1102:5, 1103:1, 1103:14, 1104:17, 1104:21, 1112:6, 1112:19, 1112:20, 1114:3, 1115:15, 1115:25, 1118:21, 1121:2, 1126:2, 1127:8, 1129:2, 1134:2, 1137:25, 1165:6, 1174:7, 1178:8, 1179:2, 1180:2, 1180:4, 1181:20, 1181:23, 1184:4, 1187:17, 1188:5, 1188:6, 1188:10, 1191:23, 1192:4, 1204:25, 1205:17, 1217:11, 1222:9, 1223:8, 1225:6, 1225:7, 1225:24, 1226:2, 1226:23, 1227:2, 1228:25, 1242:25, 1243:25, 1246:20, 1246:21, 1255:16
**fairly** [4] - 968:22, 980:2, 1003:7, 1039:3
**fairness** [2] - 958:9, 1205:8
**faith** [1] - 1172:2
**Falcon** [2] - 979:19, 980:4
**fall** [2] - 984:10, 1035:18
**false** [4] - 1086:12, 1086:18, 1087:23, 1090:19
**False** [2] - 1068:9, 1231:20
**familiar** [26] - 995:18, 995:20, 1000:19,

1020:12, 1031:1, 1031:4, 1046:3, 1053:14, 1060:3, 1060:11, 1060:12, 1060:21, 1098:6, 1098:10, 1099:7, 1100:22, 1101:2, 1103:23, 1120:7, 1165:11, 1173:25, 1174:8, 1177:5, 1189:17, 1192:3, 1223:13
**family** [5] - 973:4, 1055:16, 1111:25, 1113:5, 1228:11
**far** [10] - 984:6, 1004:9, 1064:6, 1072:20, 1096:20, 1219:8, 1233:10, 1248:11, 1256:9, 1259:13
**fast** [2] - 993:12, 1086:3
**faster** [2] - 1113:21, 1255:19
**faulting** [2] - 1253:1, 1253:2
**favorable** [1] - 1156:18
**FDA** [59] - 975:16, 975:18, 977:7, 984:21, 985:4, 992:11, 1017:24, 1059:2, 1060:16, 1073:15, 1089:4, 1090:17, 1091:7, 1096:14, 1096:15, 1098:11, 1129:22, 1130:6, 1130:10, 1130:17, 1132:24, 1134:2, 1134:24, 1141:14, 1141:20, 1142:21, 1145:20, 1158:10, 1165:25, 1166:8, 1168:4, 1168:10, 1168:13, 1168:17, 1168:22, 1170:17, 1173:21, 1180:2, 1180:7, 1181:8, 1181:19, 1201:16, 1201:20, 1201:22, 1201:25, 1235:22, 1235:25, 1236:21, 1236:22, 1242:5, 1243:5, 1244:2, 1244:8, 1244:13, 1245:9, 1246:3, 1247:15, 1247:24
**FDA's** [2] - 1130:13,

1243:2
**FDA-approved** [9] - 1060:16, 1090:17, 1134:2, 1141:20, 1181:8, 1201:16, 1236:22, 1247:15
**FDA-regulated** [1] - 1098:11
**fear** [2] - 969:11, 973:15
**February** [2] - 997:15, 1036:12
**February's** [1] - 997:14
**federal** [3] - 1074:19, 1198:3, 1208:20
**FEDERAL** [1] - 1261:1
**feedback** [10] - 991:3, 1022:4, 1052:11, 1052:15, 1056:19, 1152:16, 1195:18, 1199:4, 1201:5, 1217:9
**Felicia** [6] - 1039:21, 1040:9, 1041:23, 1042:24, 1043:2, 1045:14
**fell** [1] - 1136:20
**felt** [9] - 969:1, 1063:2, 1068:19, 1110:8, 1113:13, 1141:7, 1202:15, 1208:17, 1221:4
**fester** [1] - 985:1
**few** [8] - 977:3, 978:16, 991:16, 1070:19, 1120:24, 1124:12, 1143:5, 1246:10
**field** [18] - 972:5, 981:22, 989:20, 1058:3, 1058:4, 1059:14, 1099:8, 1100:6, 1104:7, 1113:2, 1113:3, 1116:23, 1122:23, 1129:3, 1162:15, 1174:5, 1186:12, 1206:5
**figure** [2] - 989:8, 1195:24
**figuring** [1] - 1194:12
**file** [3] - 1068:9, 1068:12, 1210:6
**filed** [17] - 1066:5, 1066:20, 1079:19, 1080:10, 1088:23, 1088:24, 1089:18, 1095:15, 1210:2, 1210:7, 1210:9,

1215:12, 1215:17, 1215:20, 1233:25, 1241:6, 1241:11

**fill** [5] - 1009:11, 1010:23, 1028:23, 1029:12, 1060:17

**filled** [5] - 1009:13, 1029:1, 1029:10, 1061:14, 1062:25

**filling** [2] - 1046:20, 1248:5

**final** [5] - 1007:22, 1087:15, 1215:20, 1216:4, 1220:8

**finally** [1] - 1042:16

**financial** [4] - 1055:12, 1162:16, 1233:22, 1247:10

**findings** [1] - 1200:7

**fine** [2] - 957:9, 957:10

**fines** [1] - 1238:10

**finished** [2] - 1123:1, 1190:12

**finishes** [1] - 1040:4

**finishing** [1] - 1063:10

**fire** [2] - 1024:23, 1035:8

**fired** [2] - 993:14, 1226:11

**first** [39] - 961:8, 967:9, 973:19, 973:25, 983:18, 1004:17, 1005:17, 1011:21, 1012:21, 1013:21, 1016:15, 1019:12, 1024:16, 1037:5, 1038:3, 1040:18, 1063:11, 1076:17, 1078:5, 1083:24, 1084:19, 1098:24, 1108:12, 1113:11, 1116:7, 1123:3, 1125:8, 1125:13, 1155:2, 1172:24, 1178:14, 1208:9, 1211:9, 1219:24, 1229:10, 1244:22, 1244:25, 1247:19, 1259:6

**Fisher** [1] - 954:8

**five** [11] - 971:9, 979:1, 1037:4, 1039:18, 1040:17, 1050:6, 1051:12, 1120:15, 1251:11, 1253:15, 1255:3

**fix** [1] - 1240:13

**flagged** [1] - 1041:15

**flags** [1] - 1041:8

**flavor** [1] - 1062:14

**flip** [4] - 998:22, 1071:24, 1175:11, 1244:23

**FLOM** [1] - 954:19

**Florida** [14] - 1062:17, 1183:4, 1183:5, 1183:10, 1183:11, 1183:16, 1183:20, 1187:21, 1187:23, 1187:24, 1188:4, 1227:11, 1227:14

**fly** [1] - 1042:3

**flying** [4] - 1054:8, 1065:3, 1197:19, 1198:12

**focus** [7] - 1106:2, 1153:15, 1153:23, 1158:14, 1162:23, 1218:3, 1221:4

**focused** [4] - 971:8, 971:9, 986:16, 986:18

**folks** [52] - 956:5, 956:17, 956:25, 960:19, 961:8, 961:22, 964:9, 965:2, 965:6, 987:11, 1002:3, 1034:12, 1034:16, 1034:24, 1035:2, 1075:15, 1075:20, 1082:24, 1083:2, 1083:3, 1097:13, 1101:23, 1103:10, 1104:9, 1104:13, 1108:11, 1108:17, 1109:9, 1112:8, 1117:12, 1131:25, 1137:21, 1148:16, 1150:1, 1155:2, 1168:9, 1183:21, 1189:2, 1190:19, 1203:13, 1203:17, 1211:14, 1211:18, 1221:3, 1229:11, 1229:25, 1232:20, 1238:16, 1250:10, 1250:18, 1250:24, 1259:10

**follow** [11] - 991:2, 1105:7, 1133:17, 1136:23, 1148:7, 1193:14, 1193:18, 1195:1, 1195:23, 1202:4, 1202:19

**follow-up** [6] - 1193:14, 1193:18, 1195:1, 1195:23, 1202:4, 1202:19

**followed** [4] - 973:14,

1105:2, 1105:4, 1163:3

**following** [2] - 1038:1, 1127:18

**FOLLOWS** [1] - 965:23

**follows** [1] - 1090:6

**FOR** [1] - 954:1

**force** [16] - 974:7, 988:7, 996:6, 1059:22, 1073:23, 1101:10, 1101:22, 1105:16, 1106:10, 1106:17, 1110:13, 1110:17, 1113:13, 1116:3, 1125:6, 1126:17

**forcing** [2] - 983:25, 1219:17

**forecast** [11] - 1116:4, 1123:8, 1123:12, 1123:18, 1124:15, 1125:1, 1125:4, 1125:12, 1127:19, 1242:9, 1242:20

**forecasted** [1] - 1116:5

**foregoing** [1] - 1261:4

**forewarning** [2] - 1254:25, 1256:4

**forget** [2] - 1053:13, 1118:23

**forgotten** [1] - 1178:8

**form** [7] - 1022:4, 1028:23, 1060:17, 1061:14, 1062:24, 1184:7, 1190:8

**formal** [11] - 1052:6, 1182:22, 1206:22, 1216:8, 1216:25, 1217:14, 1220:8, 1220:23, 1222:10, 1226:21, 1231:2

**formally** [4] - 1036:3, 1117:16, 1168:13, 1211:14

**format** [1] - 1233:9

**former** [1] - 1162:5

**forms** [2] - 1060:14, 1062:25

**formulary** [1] - 1183:12

**Fort** [1] - 1219:14

**forth** [1] - 1181:19

**forward** [8] - 963:6, 963:8, 1007:8, 1038:6, 1134:23, 1239:17, 1240:5, 1258:3

**forwarded** [6] -

1004:25, 1130:25, 1133:23, 1143:20, 1147:13, 1159:11

**foundation** [20] - 962:25, 963:20, 963:21, 998:14, 998:20, 999:17, 999:19, 1000:3, 1000:10, 1000:23, 1001:17, 1170:12, 1171:5, 1171:6, 1171:7, 1172:21, 1173:10, 1174:18, 1210:21, 1212:4

**foundational** [1] - 1172:16

**founded** [1] - 1222:24

**four** [5] - 987:6, 989:19, 1037:24, 1058:5, 1120:15

**fourth** [1] - 973:3

**fraction** [1] - 1193:1

**framed** [1] - 1253:22

**Francisco** [8] - 1011:12, 1011:21, 1011:22, 1011:24, 1012:6, 1036:23, 1039:9, 1042:3

**Frank** [5] - 998:10, 1002:19, 1002:21, 1014:10, 1028:14

**frankly** [3] - 1191:5, 1213:10, 1237:17

**fraud** [1] - 1237:10

**freely** [2] - 1146:16, 1189:24

**frequency** [1] - 1188:3

**frequent** [4] - 982:5, 1021:8, 1060:23

**frequently** [11] - 981:23, 992:21, 995:14, 1025:23, 1029:10, 1043:24, 1063:18, 1112:12, 1148:2, 1189:15, 1225:18

**Frequently** [1] - 1074:5

**fresh** [2] - 1042:12, 1204:6

**Friday** [13] - 957:3, 981:15, 982:6, 989:22, 992:11, 992:23, 1025:21, 1048:15, 1058:13, 1058:23, 1106:6, 1148:14, 1247:5

**Fridays** [3] - 1058:6, 1105:20, 1117:18

**friend** [1] - 1070:20

**friendly** [12] - 981:9, 984:12, 984:16, 1016:20, 1057:17, 1070:15, 1164:6, 1164:24, 1167:9, 1178:16, 1178:20, 1179:6

**friends** [3] - 1055:16, 1070:13, 1076:25

**Frisco** [4] - 970:4, 971:5, 973:1, 1055:4

**front** [10] - 980:13, 1012:4, 1015:13, 1024:12, 1027:1, 1091:22, 1115:7, 1135:17, 1240:9, 1257:14

**front-load** [1] - 1027:1

**frustrated** [4] - 1228:8, 1228:23, 1229:1, 1230:11

**frustration** [1] - 980:10

**frustrations** [1] - 974:7

**full** [3] - 1055:11, 1133:12, 1134:3

**fund** [2] - 1025:12, 1197:20

**funded** [2] - 1087:21, 1198:3

**funds** [2] - 1024:10, 1026:1

**future** [1] - 1064:7

**Fuzeon** [1] - 1019:5, 1019:6

## G

**gain** [1] - 1052:11

**gala** [1] - 1224:21

**game** [2] - 1019:3, 1045:2

**gap** [1] - 1064:6

**garbage** [1] - 1219:1

**gate** [1] - 1183:17

**Gay** [11] - 979:3, 1014:4, 1014:9, 1014:21, 1015:12, 1022:16, 1047:23, 1048:2, 1050:15, 1050:19, 1050:25

**gay** [1] - 1051:14

**gear** [1] - 965:10

**general** [2] - 1000:21, 1001:4, 1253:6

**generally** [3] - 1092:16, 1175:13, 1240:5

**generate** [1] - 1188:22

**generated** [1] - 1189:21
**generic** [2] - 972:4, 972:7
**gentleman** [1] - 969:4
**gentlemen** [2] - 1144:3, 1146:11
**Geoff** [1] - 956:21
**GEOFFREY** [1] - 954:20
**geographic** [2] - 987:23, 1038:22
**geography** [1] - 987:20
**GI** [1] - 1237:1
**given** [12] - 1021:18, 1026:6, 1030:10, 1064:12, 1124:16, 1130:18, 1160:9, 1162:17, 1171:15, 1240:19, 1242:5, 1253:2
**glass** [1] - 1056:24
**Glaxo** [2] - 967:17, 1157:7
**GlaxoSmithKline** [1] - 1157:8
**Glenn** [14] - 969:5, 969:8, 969:14, 973:9, 974:5, 979:19, 981:16, 989:24, 991:20, 1062:11, 1111:18, 1112:9, 1123:11
**global** [1] - 1154:23
**glossy** [8] - 1142:18, 1168:8, 1169:1, 1173:17, 1175:6, 1175:13, 1175:21, 1180:24
**go-around** [1] - 1206:7
**goal** [22] - 973:25, 977:19, 982:25, 983:5, 983:18, 983:22, 984:1, 993:9, 1010:19, 1026:23, 1027:4, 1038:10, 1098:22, 1116:7, 1118:1, 1125:9, 1125:12, 1135:17, 1141:18, 1163:14, 1188:12, 1247:25
**goals** [10] - 975:12, 982:21, 1003:3, 1064:8, 1098:23, 1110:13, 1127:24, 1162:18, 1183:5, 1188:8

**God** [1] - 1055:25
**gold** [8] - 977:1, 977:9, 977:12, 981:5, 1062:20, 1107:17, 1178:16, 1183:4
**goodness** [1] - 1138:8
**gosh** [1] - 988:5
**Gossett** [6] - 981:16, 989:24, 1062:11, 1106:7, 1106:9
**gotcha** [1] - 1165:1
**govern** [1] - 1100:16
**government** [1] - 1037:15
**Government** [18] - 1067:10, 1073:12, 1074:19, 1082:20, 1088:2, 1091:2, 1091:8, 1092:21, 1127:6, 1127:10, 1183:12, 1198:3, 1208:20, 1209:1, 1215:24, 1231:24, 1237:10
**Government's** [1] - 1238:22
**government-affiliated** [1] - 1037:15
**graduated** [1] - 967:6
**Graham** [27] - 1065:11, 1065:13, 1065:18, 1066:3, 1066:5, 1066:18, 1067:4, 1067:23, 1068:8, 1076:18, 1076:21, 1076:25, 1077:4, 1077:13, 1078:2, 1078:25, 1079:11, 1079:24, 1080:3, 1080:22, 1082:10, 1085:16, 1139:19, 1139:22, 1211:6, 1213:23, 1248:12
**Graham's** [4] - 1077:4, 1079:16, 1085:2, 1087:15
**grant** [1] - 1197:20
**granted** [1] - 1241:7
**grants** [1] - 1235:25
**graph** [1] - 1243:17
**great** [6] - 1049:18, 1081:11, 1099:19, 1108:6, 1109:15, 1140:24
**greater** [1] - 1038:5
**greatest** [1] - 990:20
**green** [3] - 1169:22,

1171:23, 1240:20
**grew** [2] - 966:24, 967:1
**Grooms** [2] - 1069:9, 1186:12
**grooms** [5] - 1186:8, 1186:15, 1186:20, 1187:12, 1188:9
**ground** [1] - 1101:16
**grounds** [1] - 961:11
**group** [7] - 996:21, 1017:10, 1103:8, 1153:15, 1153:23, 1158:15, 1162:23
**growth** [3] - 993:22, 1030:2, 1136:9
**grumpy** [1] - 1112:18
**guess** [24] - 957:14, 970:12, 973:10, 973:16, 981:2, 981:10, 992:7, 996:7, 1009:3, 1069:16, 1076:17, 1080:7, 1089:22, 1091:6, 1137:25, 1180:5, 1209:24, 1221:7, 1224:23, 1226:18, 1246:5, 1249:25, 1253:10, 1258:24
**guidance** [2] - 1255:12, 1255:14
**guide** [2] - 991:5, 1096:10
**Guidelines** [1] - 1132:7
**guidelines** [5] - 1104:5, 1127:6, 1133:17, 1161:22, 1166:8
**guides** [1] - 1103:14
**guiding** [1] - 1151:22
**guy** [4] - 1193:7, 1193:19, 1230:25, 1241:10
**guys** [15] - 957:2, 962:1, 964:13, 1086:4, 1101:16, 1109:4, 1126:12, 1126:20, 1141:6, 1170:3, 1171:17, 1186:23, 1204:4, 1239:22, 1259:22

---

# H

**habits** [1] - 990:22
**hairs** [2] - 1165:15, 1213:17
**half** [8] - 978:7,

988:20, 1013:7, 1042:4, 1149:16, 1149:20, 1253:16, 1255:3
**halfway** [1] - 1256:6
**hand** [2] - 1110:12, 1110:16
**handle** [2] - 1047:22, 1213:10
**handled** [3] - 1194:20, 1195:3, 1202:15
**handling** [2] - 960:11, 1007:9
**hands** [2] - 1061:16, 1063:5
**happy** [3] - 1009:16, 1045:18, 1067:6
**hard** [4] - 1009:14, 1025:2, 1137:11, 1193:3
**harm** [1] - 1245:19
**harmful** [2] - 1129:18, 1129:19
**Harry** [1] - 979:17
**HAVING** [1] - 965:22
**HCC** [1] - 1204:19
**HCC/SAFE** [2] - 1204:22, 1205:20
**he/she** [2] - 1047:17, 1047:18
**head** [8] - 1117:6, 1178:19, 1242:24, 1243:15, 1244:1
**head-to-head** [3] - 1178:19, 1243:15, 1244:1
**heading** [1] - 1180:13
**Health** [6] - 971:6, 971:13, 971:15, 971:24, 1071:16, 1197:23
**health** [11] - 1022:7, 1098:5, 1098:6, 1104:9, 1147:8, 1149:6, 1158:4, 1162:2, 1162:3, 1204:19, 1209:16
**healthy** [2] - 1052:22, 1053:4
**hear** [11] - 959:10, 995:9, 1001:18, 1105:6, 1106:16, 1117:11, 1203:9, 1240:6, 1246:6, 1251:7, 1253:14
**heard** [26] - 995:17, 1000:13, 1001:2, 1004:16, 1028:5, 1059:14, 1060:10, 1065:9, 1075:21,

1076:18, 1077:12, 1095:9, 1106:9, 1111:20, 1132:1, 1166:21, 1167:1, 1167:5, 1167:9, 1187:4, 1203:7, 1226:12, 1231:20, 1248:11, 1253:23
**hearing** [4] - 981:21, 995:7, 1000:3, 1258:8
**hearsay** [2] - 1005:6, 1086:6
**heart** [2] - 985:2, 1129:12
**heightened** [1] - 1048:22
**held** [9] - 956:1, 997:10, 997:13, 1029:24, 1048:16, 1052:8, 1062:20, 1136:10, 1183:4
**hello** [2] - 1140:21, 1230:6
**help** [7] - 969:2, 991:5, 1059:15, 1188:9, 1188:22, 1247:13, 1255:13
**helped** [3] - 1114:4, 1154:4, 1157:25
**helpful** [2] - 982:8, 1252:10
**Hi** [2] - 1045:14, 1047:3
**hide** [1] - 1058:9
**high** [22] - 974:16, 978:19, 980:2, 980:9, 980:6, 986:25, 987:25, 996:17, 1003:2, 1008:5, 1009:6, 1019:18, 1019:20, 1030:11, 1031:13, 1038:20, 1048:2, 1049:14, 1053:13, 1062:18, 1132:9, 1249:18
**high-prescribing** [1] - 996:17
**higher** [8] - 976:6, 1008:11, 1008:15, 1038:11, 1053:16, 1053:18, 1062:18, 1177:22
**higher-prescribing** [1] - 1053:16
**highest** [5] - 990:18, 1007:25, 1027:7, 1027:9, 1037:25
**highest-writing** [1] -

1027:9
**Highland** [2] -
1044:15, 1044:21
**highlight** [1] - 1204:10
**highlighted** [1] -
1204:4
**highly** [24] - 974:16,
975:19, 976:10,
976:20, 977:2,
982:13, 982:16,
983:10, 983:14,
983:19, 992:17,
995:4, 1045:4,
1052:19, 1052:24,
1118:2, 1118:8,
1118:15, 1119:1,
1119:4, 1120:10,
1122:13, 1183:24,
1247:16
**himself** [1] - 994:1
**hired** [1] - 1086:4
**hiring** [1] - 1208:22
**historically** [1] -
1227:17
**histories** [1] - 1249:19
**hit** [2] - 1110:13,
1174:23
**HIV** [40] - 972:15,
972:20, 974:13,
976:13, 977:17,
980:20, 981:3,
982:12, 1031:14,
1049:13, 1052:19,
1056:15, 1056:25,
1089:2, 1089:11,
1090:10, 1090:11,
1090:14, 1115:3,
1121:15, 1121:24,
1122:3, 1122:5,
1127:11, 1129:3,
1187:20, 1187:24,
1188:4, 1197:13,
1197:14, 1202:9,
1235:14, 1236:2,
1236:5, 1236:18,
1236:20, 1237:19,
1237:24, 1238:2
**HIV/AIDS** [2] - 976:4,
1017:25
**Hivid** [1] - 972:16
**hmm** [1] - 1198:21
**Hoffmann** [3] -
967:11, 967:14,
967:22
**Hoffmann-La** [2] -
967:11, 967:14
**hold** [7] - 968:1,
986:23, 1034:10,
1048:16, 1215:17,
1238:16, 1257:12

**holiday** [2] - 1224:21,
1224:23
**Holshoe** [2] - 1069:3,
1069:20
**home** [6] - 1077:17,
1140:9, 1217:20,
1228:12, 1228:15,
1228:16
**honest** [1] - 1136:20
**honestly** [1] - 991:16
**Honor** [156] - 956:9,
956:11, 956:15,
956:19, 956:21,
956:23, 957:5,
957:12, 960:11,
960:17, 960:20,
960:23, 964:2,
964:5, 964:11,
964:24, 965:13,
965:16, 965:18,
965:18, 985:22,
998:14, 998:17,
999:15, 999:16,
999:24, 1000:11,
1001:3, 1001:9,
1001:15, 1001:19,
1002:12, 1002:24,
1004:4, 1005:17,
1006:3, 1006:6,
1006:8, 1010:3,
1010:5, 1012:14,
1013:17, 1013:18,
1023:22, 1023:23,
1029:3, 1029:4,
1030:14, 1030:16,
1033:24, 1033:25,
1034:5, 1034:20,
1035:4, 1050:22,
1065:22, 1067:9,
1068:2, 1071:1,
1072:7, 1072:8,
1072:12, 1072:17,
1072:21, 1074:24,
1075:2, 1075:6,
1076:1, 1076:5,
1083:11, 1083:14,
1083:17, 1084:20,
1084:21, 1086:9,
1086:24, 1087:2,
1091:19, 1091:24,
1097:25, 1098:3,
1099:1, 1099:10,
1102:15, 1108:9,
1108:20, 1109:1,
1109:2, 1116:17,
1119:23, 1119:24,
1130:20, 1130:24,
1131:7, 1141:21,
1141:23, 1150:21,
1150:24, 1151:2,

1167:23, 1169:17,
1170:6, 1170:7,
1170:18, 1171:10,
1173:5, 1173:10,
1174:15, 1174:18,
1176:2, 1184:8,
1184:14, 1186:3,
1194:2, 1210:16,
1210:21, 1211:2,
1211:13, 1211:15,
1212:5, 1212:20,
1213:10, 1214:12,
1214:15, 1214:18,
1214:21, 1214:23,
1216:12, 1216:13,
1229:8, 1230:3,
1231:14, 1232:5,
1232:9, 1233:4,
1233:12, 1238:15,
1239:3, 1239:24,
1240:18, 1241:22,
1248:18, 1250:1,
1250:6, 1250:12,
1250:13, 1250:16,
1253:19, 1256:9,
1259:1, 1259:11,
1259:15, 1259:21,
1259:24, 1259:25
**Honor's** [1] - 1066:6
**HONORABLE** [1] -
954:11
**Honorable** [1] - 956:1
**honoraria** [1] -
1020:14
**honorarium** [4] -
1003:8, 1019:15,
1019:18, 1019:21
**hope** [1] - 964:17
**hopefully** [3] - 965:7,
1027:3, 1229:18
**hopes** [1] - 975:15
**hoping** [1] - 1053:19
**horse** [1] - 1056:14
**hospitals** [1] - 970:19
**host** [1] - 962:8
**host'** [1] - 1022:4
**hosted** [1] - 1217:19
**hostile** [5] - 957:20,
958:20, 959:14,
980:10
**hot** [1] - 1257:17
**hot-button** [1] -
1257:17
**hotbed** [1] - 1187:20
**hotel** [4] - 1011:20,
1013:2, 1013:4,
1140:20
**Hotel** [5] - 1011:22,
1011:24, 1012:6,
1012:12, 1013:1

**hotels** [1] - 1054:8
**hour** [2] - 990:3, 990:6
**hours** [1] - 1246:10
**house** [3] - 1228:11,
1228:13, 1228:23
**hub** [1] - 1227:17
**huge** [1] - 991:10
**human** [3] - 996:21,
1207:4, 1247:11
**humans** [1] - 1235:17
**hunched** [1] - 1053:4
**hundred** [1] - 1070:3,
1070:5
**hundreds** [1] -
1055:25
**hungry** [3] - 1095:19,
1095:22, 1115:4
**hunt** [2] - 1218:15,
1218:18
**hunting** [1] - 1228:11
**hurdles** [2] - 980:13,
980:15
**hypercholesterolemi
a** [8] - 984:7, 985:9,
985:15, 1018:7,
1018:11, 1107:14,
1129:23, 1245:23
**hyperlipidemia** [4] -
984:7, 985:8,
1018:7, 1018:11
**hypolipidemia** [4] -
1107:14, 1107:19,
1129:23, 1245:22

---

# I

**Iacobellis** [24] -
979:21, 979:23,
981:16, 989:25,
990:10, 994:3,
1023:18, 1024:18,
1024:21, 1025:10,
1025:22, 1025:25,
1026:18, 1035:7,
1062:11, 1106:16,
1131:16, 1133:4,
1216:20, 1218:18,
1231:2, 1253:21,
1258:25, 1259:3
**iconic** [1] - 1219:12
**idea** [12] - 1009:2,
1009:5, 1015:12,
1144:11, 1155:20,
1157:1, 1157:5,
1205:16, 1210:13,
1215:16, 1232:2,
1239:8
**ideally** [1] - 1027:3
**ideas** [2] - 981:11,
1159:23

**identical** [3] -
1080:22, 1081:2,
1190:25
**identified** [3] -
1001:21, 1172:9,
1212:6
**identify** [2] - 999:14,
1020:23
**identifying** [1] -
1007:24
**idly** [1] - 1253:7
**ignore** [2] - 985:11,
1150:3
**illegal** [5] - 971:1,
971:17, 1025:12,
1208:17, 1248:8
**Illinois** [1] - 987:8
**illnesses** [1] - 976:8
**imagine** [5] - 1089:3,
1096:18, 1103:7,
1104:12, 1137:11
**immediate** [2] - 974:4,
1258:10
**immediately** [1] -
1258:9
**impact** [25] - 1004:23,
1026:19, 1164:2,
1164:4, 1164:14,
1164:17, 1164:23,
1164:24, 1167:1,
1167:5, 1176:22,
1177:2, 1177:6,
1178:7, 1178:24,
1179:1, 1179:6,
1179:10, 1180:20,
1180:25, 1181:4,
1181:11, 1181:15,
1243:6
**impactful** [1] - 991:6
**impeach** [1] - 1084:8
**impeached** [1] -
1086:19
**impeaching** [1] -
1084:24
**impeachment** [4] -
1084:5, 1085:8,
1085:9
**impediment** [1] -
976:10
**imperative** [1] -
1033:6
**implemented** [1] -
1029:23
**implication** [2] -
1213:15, 1213:22
**importance** [6] -
1132:10, 1149:9,
1149:20, 1150:2,
1150:12, 1151:21
**important** [14] -

973:18, 1007:21, 1018:5, 1038:7, 1038:19, 1044:21, 1059:18, 1059:19, 1132:9, 1135:9, 1205:22, 1235:20, 1237:3, 1237:5
**importantly** [1] - 1031:13
**improper** [1] - 1258:5
**improve** [3] - 1016:8, 1059:11, 1188:9
**improved** [2] - 976:13, 1030:2
**improvement** [2] - 993:14, 1032:25
**improving** [2] - 1045:18, 1188:12
**in-person** [2] - 978:1, 982:5
**in-services** [1] - 1029:25
**inability** [1] - 974:7
**inactive** [1] - 1037:8
**inadmissible** [1] - 1257:9
**inappropriate** [5] - 1185:16, 1189:7, 1208:17, 1214:7, 1232:22
**incentivize** [2] - 1025:13, 1248:3
**incentivizes** [1] - 1024:14
**incidentally** [6] - 1117:11, 1129:15, 1154:9, 1181:3, 1196:20, 1201:19
**include** [8] - 981:16, 983:13, 1007:7, 1027:12, 1094:23, 1144:22, 1145:11
**included** [13] - 971:10, 985:8, 1003:17, 1006:22, 1008:7, 1013:13, 1020:22, 1020:23, 1021:4, 1027:5, 1106:6, 1174:12, 1175:17
**including** [8] - 1105:15, 1118:20, 1122:23, 1137:15, 1137:21, 1148:17, 1151:25, 1224:3
**inconsistencies** [1] - 1234:12
**inconsistent** [4] - 1083:22, 1084:7, 1085:8, 1085:20
**increase** [12] - 981:2,

997:16, 1027:25, 1031:23, 1033:4, 1033:7, 1038:12, 1064:3, 1110:21, 1192:15, 1235:1, 1242:22
**increased** [3] - 1017:10, 1042:13, 1235:11
**increasingly** [1] - 1045:5
**incredibly** [2] - 991:17, 1009:6
**incriminates** [1] - 1051:17
**incriminating** [1] - 1051:2
**incumbent** [1] - 1257:10
**indeed** [1] - 1024:20, 1027:19
**indicated** [7] - 1037:5, 1056:10, 1114:8, 1121:15, 1122:8, 1122:13, 1242:1
**indication** [17] - 975:15, 975:16, 975:18, 975:20, 976:9, 984:4, 995:4, 1018:9, 1057:5, 1063:24, 1118:1, 1121:3, 1126:8, 1127:1, 1132:15, 1247:15, 1247:24
**indications** [5] - 992:22, 1110:22, 1129:21, 1235:25, 1236:25
**individual** [4] - 1026:4, 1028:20, 1069:9, 1088:13
**individuals** [5] - 972:11, 983:20, 996:22, 1037:6, 1076:13
**industry** [5] - 967:7, 967:10, 994:18, 1068:19, 1209:15
**ineligible** [7] - 1087:22, 1088:6, 1088:9, 1088:21, 1088:25, 1089:15, 1090:3
**infer** [1] - 1183:8
**influence** [5] - 990:21, 996:23, 1003:10, 1045:3, 1053:17
**influenced** [1] - 1052:17
**influential** [2] -

1008:11, 1038:21
**informal** [1] - 1206:19
**information** [60] - 979:20, 980:7, 981:18, 985:25, 990:1, 993:16, 999:11, 1007:7, 1017:24, 1018:2, 1018:17, 1027:13, 1052:9, 1052:11, 1058:20, 1059:1, 1059:3, 1059:22, 1060:2, 1060:10, 1060:17, 1060:18, 1061:16, 1061:18, 1062:13, 1063:5, 1063:16, 1072:15, 1091:2, 1092:24, 1095:19, 1103:9, 1110:21, 1125:25, 1133:23, 1136:8, 1143:10, 1143:19, 1145:15, 1157:2, 1157:16, 1159:3, 1159:11, 1159:12, 1161:2, 1163:15, 1171:16, 1175:18, 1177:1, 1179:4, 1185:5, 1185:12, 1188:3, 1189:16, 1244:16, 1247:8, 1247:12, 1249:14, 1256:6
**informative** [1] - 994:22
**informed** [3] - 1194:16, 1198:12, 1209:10
**inhibitor** [12] - 977:10, 980:21, 980:23, 1038:21, 1121:25, 1122:2, 1122:4, 1122:5, 1122:10, 1122:17, 1196:13, 1247:19
**inhibitors** [4] - 1008:17, 1127:10, 1164:11, 1199:19
**initial** [9] - 974:3, 975:14, 984:21, 1018:5, 1088:22, 1115:18, 1116:5, 1178:13, 1206:7
**initiated** [1] - 1147:9
**initiatives** [1] - 1152:3
**injected** [1] - 1232:17
**Inn** [1] - 1219:13
**inner** [1] - 1190:23
**inordinate** [2] - 993:18, 1059:12

**inordinately** [1] - 1062:18
**input** [1] - 1190:24
**inquiries** [1] - 1074:17
**insecurity** [1] - 1048:22
**insert** [16] - 984:9, 992:5, 1015:15, 1015:18, 1017:23, 1018:6, 1018:14, 1142:24, 1166:10, 1166:12, 1166:13, 1181:8, 1181:9, 1244:3
**insight** [1] - 996:12
**insinuate** [1] - 1248:17
**insinuated** [2] - 1214:5, 1219:19
**insinuating** [1] - 1172:6
**insinuation** [2] - 1231:11, 1254:17
**instead** [6] - 971:8, 1054:18, 1054:22, 1112:8, 1172:22, 1250:14
**Institute** [1] - 1197:23
**institutions** [4] - 968:4, 1037:7, 1037:12, 1049:17
**instructed** [3] - 1035:18, 1119:6, 1246:23
**instructing** [4] - 1110:12, 1117:12, 1117:15, 1117:21
**instruction** [8] - 1097:8, 1097:13, 1105:1, 1105:7, 1150:15, 1199:7, 1200:22, 1258:11
**instructions** [2] - 1111:7, 1111:11
**insulting** [1] - 974:9
**insurance** [1] - 1087:20
**Intelence** [11] - 1056:3, 1056:5, 1056:24, 1057:2, 1057:5, 1057:20, 1057:23, 1093:9, 1097:9, 1097:14, 1242:2
**intend** [1] - 1066:3
**intended** [2] - 1180:6, 1239:17
**intent** [1] - 1183:8
**intentionally** [2] - 1129:19, 1130:3

**intentions** [1] - 1228:10
**interact** [1] - 989:2
**interacting** [1] - 1082:20
**interactions** [2] - 1245:18
**interest** [4] - 1079:20, 1079:22, 1129:12, 1233:22
**interests** [4] - 1079:15, 1079:18, 1079:23, 1079:24
**interfacing** [1] - 1082:20
**internal** [1] - 994:11
**internally** [1] - 1032:12
**international** [1] - 1017:25
**internationally** [2] - 1196:21, 1202:9
**interpret** [2] - 1026:22, 1248:16
**interpreted** [3] - 1026:23, 1112:12, 1135:6
**intervene** [4] - 1251:24, 1253:6, 1255:1, 1257:5
**intervening** [2] - 1251:17, 1256:3
**interview** [5] - 972:11, 972:20, 1221:21, 1221:23, 1221:24
**intimately** [1] - 1192:5
**intimidation** [2] - 969:11, 973:15
**introduce** [1] - 966:11
**Invirase** [5] - 1017:11, 1019:9, 1019:10, 1019:11, 1196:11
**invirase** [1] - 1019:11
**invite** [1] - 1007:9
**invited** [2] - 1047:18, 1051:25
**invites** [1] - 1007:22
**involved** [15] - 979:15, 1025:22, 1028:8, 1049:15, 1062:7, 1093:12, 1104:10, 1104:14, 1181:21, 1188:23, 1215:24, 1240:8, 1249:1, 1252:4, 1258:13
**involvement** [1] - 1192:12
**involves** [2] - 1004:19, 1142:2
**ish** [1] - 977:4

**issue** [26] - 957:6,
960:12, 960:21,
960:22, 960:25,
961:15, 963:25,
964:4, 964:8,
975:11, 1001:20,
1004:4, 1004:8,
1079:22, 1111:21,
1160:7, 1165:18,
1221:14, 1223:14,
1223:22, 1224:22,
1252:22, 1254:13,
1255:10, 1255:12,
1256:5
**issues** [22] - 1043:22,
1044:2, 1059:16,
1083:4, 1114:9,
1148:2, 1148:5,
1152:18, 1152:22,
1153:19, 1159:16,
1172:8, 1180:3,
1208:9, 1209:1,
1216:5, 1216:9,
1220:3, 1223:15,
1223:16, 1252:17,
1257:17
**items** [2] - 1142:14,
1142:15
**itself** [2] - 1004:8,
1054:20

## J

**J&J** [14] - 971:9,
971:13, 971:15,
971:20, 971:24,
972:12, 973:3,
973:11, 1022:8,
1035:17, 1219:15,
1228:14, 1228:23,
1249:24
**jail** [1] - 1238:10
**Jane** [1] - 1209:20
**JANSSEN** [1] - 954:6
**Janssen** [96] - 956:20,
956:22, 956:24,
958:24, 959:3,
959:13, 961:10,
961:14, 961:20,
962:14, 962:15,
962:18, 963:1,
963:12, 970:3,
970:6, 970:7,
970:10, 970:12,
970:15, 970:17,
970:24, 971:4,
971:9, 971:11,
971:21, 991:8,
992:25, 1002:18,
1065:20, 1068:19,

1069:22, 1073:11,
1074:12, 1075:15,
1076:13, 1077:23,
1078:20, 1080:1,
1082:18, 1082:24,
1083:10, 1087:19,
1089:14, 1095:4,
1097:17, 1097:21,
1098:18, 1100:15,
1101:5, 1105:16,
1110:8, 1110:12,
1110:16, 1111:1,
1126:21, 1143:11,
1143:14, 1145:20,
1151:19, 1152:4,
1152:8, 1166:22,
1167:2, 1167:6,
1169:6, 1175:23,
1181:25, 1197:9,
1201:24, 1206:13,
1207:21, 1208:2,
1212:7, 1216:5,
1218:22, 1219:15,
1226:7, 1227:6,
1230:12, 1231:13,
1231:17, 1237:13,
1237:17, 1237:22,
1238:5, 1238:11,
1238:19, 1244:7,
1244:13, 1248:22,
1251:13, 1253:20,
1257:12, 1258:16,
1259:20
**Janssen's** [8] -
1047:13, 1086:17,
1098:6, 1105:11,
1144:3, 1172:9,
1213:15, 1230:25
**January** [3] - 997:10,
997:15, 1242:20
**jeopardizing** [1] -
1209:18
**JERSEY** [1] - 954:1
**Jersey** [4] - 954:9,
968:6, 1139:16,
1189:24
**Jessica** [2] - 1069:23,
1070:19
**jim** [4] - 1173:17,
1243:3, 1243:4,
1243:18
**jims** [6] - 1142:15,
1145:1, 1168:8,
1170:20, 1170:21,
1173:25
**job** [20] - 968:18,
971:15, 971:16,
972:21, 974:18,
986:23, 986:25,
989:17, 1000:15,

1020:20, 1026:13,
1026:25, 1029:15,
1059:25, 1136:10,
1191:6, 1194:23,
1225:1, 1225:22,
1244:15
**jobs** [3] - 971:20,
1059:11, 1249:21
**Joe** [1] - 1069:3
**John** [5] - 1209:7,
1209:20, 1254:16,
1254:18
**JOHNSON** [2] - 954:6
**Johnson** [35] - 968:12,
971:6, 978:6,
997:18, 998:13,
998:22, 1003:12,
1004:2, 1006:13,
1006:15, 1010:8,
1012:1, 1013:8,
1013:22, 1017:3,
1020:7, 1023:5,
1024:2, 1024:16,
1026:16, 1029:7,
1029:17, 1034:4,
1039:1, 1045:7,
1051:23, 1071:24,
1111:24, 1113:5,
1151:15
**join** [1] - 1066:22
**joined** [1] - 1066:2
**Jones** [3] - 1142:5,
1142:10, 1147:11
**Josh** [2] - 956:11,
966:7
**JOSH** [1] - 954:15
**Joyce** [3] - 1186:12,
1186:17, 1187:9
**Judge** [6] - 956:2,
956:14, 959:9,
1075:3, 1169:19,
1229:18
**JUDGE** [1] - 954:12
**judge** [3] - 1240:24,
1251:24, 1257:21
**judged** [3] - 1061:21,
1135:24, 1191:21
**judgment** [12] -
1128:19, 1128:25,
1129:9, 1130:13,
1217:5, 1217:10,
1220:14, 1221:2,
1221:10, 1222:12,
1223:15, 1227:2
**July** [6] - 977:24,
978:11, 986:21,
1039:11, 1220:15,
1220:22
**June** [7] - 977:21,
1023:18, 1024:10,

1025:4, 1046:22,
1207:23, 1207:24
**JUROR** [1] - 1222:19
**jurors** [22] - 964:16,
964:22, 965:3,
1034:14, 1075:21,
1079:6, 1092:23,
1094:23, 1098:5,
1102:2, 1102:24,
1108:12, 1108:16,
1125:20, 1146:15,
1179:15, 1182:11,
1202:20, 1229:24,
1250:22, 1252:10,
1258:10
**Jurors** [1] - 1229:14
**Jury** [3] - 965:5,
1035:1, 1250:23
**JURY** [1] - 954:5
**jury** [69] - 965:7,
966:11, 966:24,
967:9, 968:20,
969:7, 971:24,
978:21, 980:19,
981:11, 983:9,
986:8, 987:4,
987:15, 990:16,
991:14, 995:17,
995:21, 1001:14,
1004:12, 1006:16,
1010:9, 1011:2,
1012:18, 1017:19,
1022:16, 1024:1,
1029:8, 1031:18,
1038:3, 1039:2,
1042:2, 1046:24,
1065:9, 1066:4,
1076:18, 1077:3,
1102:13, 1103:5,
1109:8, 1111:20,
1113:12, 1116:21,
1129:16, 1132:1,
1136:16, 1139:9,
1148:11, 1191:1,
1193:2, 1194:11,
1203:1, 1205:6,
1206:14, 1206:24,
1207:3, 1230:15,
1232:20, 1232:21,
1234:12, 1237:14,
1239:12, 1240:9,
1246:6, 1247:2,
1248:11, 1250:20,
1250:22, 1257:14
**jury's** [3] - 1060:9,
1079:23, 1123:6
**Justice** [6] - 1231:24,
1232:12, 1232:18,
1233:3, 1233:6
**justice** [1] - 1214:1

**justify** [1] - 1045:24

## K

**KAD** [1] - 1173:24
**Kaletra** [18] - 977:11,
982:2, 995:1,
1016:15, 1059:19,
1156:19, 1156:21,
1166:12, 1177:18,
1177:21, 1177:22,
1178:15, 1178:21,
1180:22, 1181:2,
1181:4, 1181:16,
1243:15
**KAM** [1] - 1173:24
**KAMs** [3] - 988:4,
988:13, 1138:8
**Kansas** [2] - 975:10,
1187:20
**keep** [13] - 958:12,
963:8, 1045:23,
1050:11, 1066:24,
1067:3, 1067:21,
1101:10, 1125:8,
1190:5, 1193:20,
1238:12, 1238:21
**Keep** [1] - 1007:21
**keeps** [2] - 1014:21,
1177:14
**Ken** [2] - 979:10,
979:17
**kept** [1] - 1070:9
**Keriak** [1] - 1143:25
**key** [61] - 970:18,
986:11, 986:14,
986:15, 986:18,
986:20, 987:10,
987:13, 987:15,
987:16, 987:19,
987:22, 987:25,
988:3, 988:4, 988:6,
988:9, 988:13,
988:16, 989:1,
989:17, 989:20,
989:21, 990:4,
990:17, 990:19,
990:23, 990:24,
991:4, 992:7,
995:24, 996:17,
997:4, 998:11,
999:13, 999:20,
1000:16, 1000:25,
1008:1, 1011:6,
1028:9, 1031:11,
1033:3, 1033:5,
1047:25, 1049:16,
1052:9, 1054:12,
1054:18, 1054:19,
1054:20, 1054:22,

1055:9, 1082:18,
1101:11, 1122:2,
1165:7, 1188:23,
1219:8, 1225:15
**Key** [1] - 1039:14
**key-thought** [1] -
1008:1
**Kickback** [5] - 1049:2,
1051:18, 1237:14,
1238:7, 1238:21
**kickbacks** [2] -
1236:6, 1237:20
**Kim** [3] - 1007:8,
1009:21, 1010:15
**kind** [25] - 963:12,
970:12, 982:12,
982:14, 987:7,
988:9, 988:12,
990:7, 996:3,
1034:6, 1048:23,
1053:13, 1062:20,
1126:20, 1159:3,
1170:24, 1177:10,
1188:9, 1189:13,
1202:10, 1219:19,
1249:22, 1253:3,
1256:22, 1259:9
**kinds** [1] - 992:11
**King** [1] - 954:21
**Klein** [1] - 956:23
**KLEIN** [2] - 954:20,
956:23
**knowing** [2] -
1043:13, 1210:24
**knowledge** [10] -
962:16, 969:1,
1008:3, 1025:19,
1042:5, 1042:6,
1088:1, 1088:4,
1100:14, 1209:18
**knowledgeable** [3] -
1049:19, 1085:5,
1117:14
**known** [5] - 961:11,
967:11, 969:13,
981:6, 1048:10
**knows** [4] - 1021:4,
1141:14, 1241:18,
1258:6
**Kubota** [1] - 1046:18

## L

**L.P** [1] - 954:7
**lab** [1] - 1200:10
**label** [167] - 969:25,
971:17, 972:3,
982:19, 982:20,
985:3, 986:1, 992:9,
992:15, 992:21,

993:1, 993:24,
994:12, 995:2,
995:8, 995:9,
995:15, 996:4,
996:8, 996:10,
1016:21, 1018:15,
1018:17, 1021:17,
1026:9, 1026:14,
1027:13, 1041:8,
1042:7, 1052:11,
1056:7, 1057:1,
1058:19, 1059:2,
1059:15, 1059:23,
1060:8, 1060:17,
1061:2, 1061:15,
1061:18, 1063:4,
1063:15, 1089:4,
1090:17, 1091:7,
1091:11, 1093:9,
1094:19, 1095:7,
1095:20, 1095:24,
1096:16, 1096:24,
1097:9, 1097:14,
1097:22, 1098:15,
1098:19, 1100:8,
1104:24, 1105:12,
1105:17, 1107:3,
1107:4, 1107:6,
1107:7, 1107:22,
1108:1, 1110:17,
1110:22, 1112:24,
1113:1, 1113:7,
1117:12, 1117:22,
1117:23, 1118:6,
1118:10, 1118:13,
1119:14, 1120:5,
1120:9, 1126:17,
1126:21, 1128:7,
1128:20, 1128:23,
1129:4, 1130:17,
1133:13, 1133:18,
1133:22, 1134:6,
1134:15, 1134:18,
1134:19, 1135:7,
1135:15, 1135:23,
1136:8, 1136:15,
1136:17, 1138:9,
1138:10, 1140:23,
1141:16, 1141:20,
1143:2, 1145:1,
1146:16, 1149:10,
1149:13, 1149:17,
1149:21, 1150:2,
1150:5, 1150:12,
1150:15, 1156:11,
1156:25, 1158:1,
1158:6, 1158:11,
1158:15, 1159:11,
1162:25, 1165:21,
1166:4, 1166:6,
1166:11, 1167:13,

1178:7, 1178:13,
1178:14, 1178:25,
1179:10, 1179:15,
1180:7, 1180:8,
1180:10, 1188:3,
1189:16, 1189:24,
1190:7, 1226:12,
1234:17, 1235:22,
1236:1, 1236:22,
1237:25, 1238:6,
1238:20, 1242:5,
1242:7, 1243:12,
1243:16, 1244:23,
1245:12, 1245:24,
1246:23, 1247:8,
1249:16
**label-approved** [1] -
1089:4
**labeling** [2] - 1134:2,
1180:3
**lack** [7] - 982:14,
985:1, 1039:22,
1041:24, 1045:24,
1046:15, 1196:6
**lag** [3] - 997:11,
997:12, 1136:7
**Lake** [2] - 1139:21,
1140:6
**language** [1] -
1233:17
**lapse** [1] - 1221:2
**large** [13] - 970:20,
973:11, 976:14,
991:17, 1009:7,
1017:25, 1056:10,
1056:14, 1056:15,
1056:21, 1128:3,
1138:1
**largely** [1] - 1074:10
**larger** [1] - 1187:23
**last** [20] - 960:3,
965:25, 966:17,
1004:2, 1013:6,
1013:22, 1016:8,
1066:24, 1073:4,
1081:7, 1081:24,
1120:22, 1139:12,
1139:16, 1140:13,
1140:18, 1189:18,
1204:5, 1239:5
**late** [1] - 1199:12
**launch** [11] - 974:3,
974:8, 982:21,
982:25, 992:14,
1010:13, 1036:15,
1050:1, 1113:17,
1124:15, 1133:13
**launched** [5] - 973:16,
973:19, 977:21,
1052:18, 1113:14

**launching** [1] - 983:23
**law** [2] - 962:10,
1130:10
**laws** [1] - 1238:12
**lawsuit** [25] - 1066:3,
1066:4, 1066:21,
1066:22, 1068:9,
1076:9, 1080:14,
1081:20, 1087:8,
1089:24, 1091:15,
1095:16, 1111:21,
1149:25, 1154:14,
1162:5, 1208:13,
1208:22, 1209:11,
1210:7, 1210:8,
1210:12, 1215:20,
1215:25, 1231:20
**lawyer** [5] - 1138:13,
1208:10, 1208:22,
1232:16
**lawyers** [13] - 1080:3,
1080:17, 1082:4,
1083:8, 1087:10,
1087:18, 1139:4,
1139:22, 1140:15,
1182:14, 1214:1,
1232:10, 1232:14
**lay** [8] - 963:20,
998:20, 1000:9,
1000:23, 1001:17,
1171:4, 1171:6,
1173:10
**lays** [1] - 1171:7
**LDL** [3] - 984:24,
985:15, 1018:7
**lead** [7] - 958:19,
958:24, 996:6,
996:7, 1154:1,
1179:24, 1224:10
**leader** [2] - 1008:2,
1038:22
**leaders** [8] - 986:19,
987:25, 990:19,
990:23, 1031:12,
1049:16, 1052:7,
1052:10
**leadership** [8] - 969:2,
969:17, 981:15,
988:25, 989:24,
990:8, 991:23,
1221:3
**leading** [4] - 957:20,
958:3, 959:1, 985:2
**leads** [2] - 976:7,
1153:15
**lean** [1] - 1019:5
**learn** [1] - 1238:5
**least** [18] - 960:24,
961:17, 972:19,
975:25, 977:10,

984:15, 987:19,
1021:4, 1038:22,
1059:6, 1062:24,
1063:11, 1161:15,
1166:14, 1187:5,
1227:17, 1233:1,
1256:3
**leave** [11] - 968:9,
1046:2, 1064:13,
1065:9, 1086:21,
1108:24, 1140:7,
1160:8, 1160:13,
1160:21, 1163:5
**leaves** [1] - 1161:3
**lecture** [1] - 1198:13
**led** [3] - 1217:15,
1218:18, 1232:11
**leeway** [1] - 1085:11
**left** [21] - 970:11,
970:13, 971:24,
971:25, 1021:12,
1029:20, 1036:6,
1054:12, 1065:17,
1069:18, 1075:19,
1093:3, 1093:18,
1099:13, 1099:16,
1109:21, 1207:21,
1208:2, 1226:22,
1230:10, 1245:6
**legal** [2] - 1141:15,
1207:7
**legality** [1] - 1234:22
**legitimate** [3] -
1050:18, 1051:13,
1159:23
**lengths** [1] - 1140:25
**lengthy** [2] - 1034:6,
1047:7
**less** [7] - 974:12,
975:16, 1038:5,
1053:22, 1161:1,
1179:10
**less-experienced** [1] -
974:12
**less-tenured** [1] -
974:12
**letter** [3] - 1220:13,
1221:11, 1223:12
**letting** [1] - 1254:21
**Levaquin** [1] - 968:25
**level** [4] - 988:7,
1051:1, 1053:15
**levels** [2] - 981:1,
1048:6
**liaison** [2] - 1160:8,
1161:16
**Libby** [1] - 1184:6
**liberty** [1] - 1021:22
**licensed** [1] - 1096:3
**lie** [2] - 985:14, 985:21

**lifesaving** [3] - 1113:25, 1114:19, 1130:11
**light** [4] - 962:25, 963:7, 1006:10, 1240:20
**likelihood** [1] - 990:20
**likely** [4] - 1008:4, 1027:3, 1183:24, 1229:21
**limine** [3] - 1241:7, 1241:11, 1256:17
**limit** [1] - 1067:16
**limitations** [1] - 1046:21
**limited** [12] - 975:20, 975:21, 976:12, 977:5, 977:7, 984:3, 1057:5, 1063:24, 1066:24, 1067:4, 1118:1
**limiting** [2] - 1004:14, 1046:3
**line** [19] - 962:25, 989:4, 1005:13, 1035:18, 1066:7, 1086:22, 1115:7, 1150:5, 1177:21, 1184:10, 1184:12, 1201:9, 1213:22, 1225:22, 1228:21, 1247:19
**lined** [1] - 1259:13
**lines** [6] - 1015:11, 1032:20, 1110:3, 1110:25, 1111:3, 1240:7
**lineup** [1] - 1258:23
**lipid** [34] - 981:9, 984:11, 984:12, 984:15, 984:16, 1016:20, 1057:14, 1057:17, 1106:10, 1106:17, 1108:1, 1156:18, 1163:19, 1163:24, 1164:6, 1164:17, 1164:24, 1166:18, 1167:9, 1174:12, 1176:12, 1176:15, 1177:14, 1178:12, 1178:16, 1178:20, 1179:5, 1179:16, 1200:6, 1200:10, 1200:14, 1237:1
**lipid-friendly** [1] - 1057:17
**lipid-neutral** [1] - 1057:17
**lipids** [30] - 981:7,

982:3, 984:24, 985:15, 1107:21, 1164:2, 1164:4, 1164:15, 1164:23, 1164:24, 1167:1, 1167:5, 1176:22, 1177:2, 1177:6, 1177:11, 1178:7, 1178:17, 1178:25, 1179:1, 1179:6, 1179:10, 1180:20, 1180:25, 1181:4, 1181:11, 1181:15, 1243:6, 1243:11
**list** [15] - 979:18, 1004:13, 1004:15, 1006:25, 1007:6, 1007:17, 1036:24, 1037:4, 1037:20, 1040:16, 1142:14, 1143:5, 1143:19, 1143:24, 1144:23
**listed** [3] - 1039:15, 1088:19, 1149:1
**listen** [4] - 996:1, 1101:13, 1163:10, 1197:5
**listing** [1] - 1179:16
**literature** [1] - 992:5
**litigation** [2] - 1068:24, 1209:12
**live** [8] - 966:11, 966:12, 1065:15, 1076:22, 1078:25, 1079:10, 1081:25, 1116:12
**lived** [2] - 970:4, 1079:3
**liver** [1] - 980:24
**LLP** [1] - 954:19
**load** [3] - 976:6, 1024:12, 1027:1
**lobby** [3] - 1012:6, 1012:9
**local** [1] - 970:20
**located** [2] - 968:16, 1014:15
**locations** [7] - 1011:9, 1011:15, 1052:7, 1053:9, 1053:10, 1154:13, 1219:12
**locked** [1] - 1152:25
**logo** [1] - 1071:16
**long-term** [3] - 984:23, 1026:19, 1129:22
**look** [40] - 961:2, 964:15, 982:21, 1024:15, 1026:15, 1053:1, 1053:3,

1053:4, 1071:23, 1072:1, 1085:23, 1119:22, 1128:5, 1128:11, 1134:23, 1141:10, 1147:17, 1148:15, 1150:20, 1154:22, 1155:10, 1158:22, 1167:21, 1168:21, 1171:21, 1175:11, 1175:13, 1185:23, 1186:2, 1193:7, 1195:8, 1216:19, 1220:1, 1235:7, 1235:9, 1240:9, 1245:12, 1251:14, 1252:21, 1256:22
**Look** [1] - 1232:25
**looked** [21] - 999:9, 999:10, 1010:1, 1012:10, 1018:4, 1039:16, 1042:25, 1052:21, 1052:22, 1091:9, 1091:11, 1091:12, 1118:10, 1118:13, 1140:25, 1141:5, 1162:23, 1182:5, 1193:20, 1198:19, 1205:12
**looking** [5] - 960:3, 1063:8, 1087:14, 1180:18, 1252:6
**looks** [3] - 1157:5, 1198:22, 1232:3
**loop** [1] - 1067:5
**looped** [1] - 1161:11
**lopinavir** [1] - 1199:23
**Los** [1] - 998:10
**lose** [4] - 1023:11, 1042:4, 1042:6, 1059:25
**losing** [3] - 1136:10, 1205:22, 1249:21
**loss** [1] - 1053:3
**lost** [1] - 1255:24
**Louis** [3] - 975:9, 1028:22, 1031:22
**loved** [1] - 971:16
**low** [21] - 977:17, 1044:4, 1044:12, 1046:23, 1053:15, 1164:4, 1164:23, 1167:1, 1176:22, 1177:1, 1178:7, 1178:24, 1179:1, 1179:6, 1180:20, 1180:25, 1181:3, 1181:11, 1181:15, 1187:13, 1243:6
**low-level** [1] - 1053:15

**lower** [2] - 1124:15, 1179:10
**lowered** [3] - 1116:4, 1116:7, 1116:9
**lowering** [1] - 1125:4
**loyal** [1] - 1019:21
**loyalty** [5] - 1003:4, 1009:10, 1030:12, 1031:20, 1054:2
**lunch** [4] - 1108:5, 1108:11, 1108:19, 1108:25
**Luncheon** [1] - 1109:5

**M**

**ma'am** [1] - 1174:25
**Mad** [2] - 969:14, 1112:9
**mad** [1] - 1112:12
**magnitude** [2] - 1179:20, 1242:22
**mailing** [1] - 1036:24
**main** [6] - 967:15, 967:18, 975:14, 977:10, 987:24, 1214:1
**majority** [2] - 995:16, 1160:15
**manage** [4] - 969:12, 1069:7, 1258:1
**management** [27] - 969:10, 971:8, 978:15, 1007:13, 1007:16, 1022:7, 1025:6, 1025:25, 1029:18, 1035:20, 1048:17, 1048:18, 1058:7, 1058:9, 1061:25, 1094:8, 1105:11, 1111:7, 1111:12, 1117:17, 1152:12, 1190:3, 1217:5, 1217:10, 1220:13, 1223:17
**manager** [51] - 968:8, 968:19, 968:21, 968:24, 970:4, 970:18, 972:21, 972:23, 974:23, 979:14, 979:21, 979:23, 986:4, 986:10, 987:15, 987:16, 987:22, 988:9, 989:5, 989:20, 989:21, 990:4, 990:17, 990:24, 995:24, 998:10, 998:11, 999:14, 999:20,

1000:16, 1026:4, 1031:10, 1039:9, 1054:17, 1054:20, 1054:22, 1054:24, 1055:5, 1055:9, 1061:19, 1064:23, 1069:16, 1082:18, 1082:19, 1165:7, 1173:24, 1184:6, 1225:15, 1225:16, 1230:18, 1230:19
**managers** [25] - 972:9, 974:15, 978:22, 978:23, 979:2, 979:19, 983:21, 986:15, 987:13, 987:19, 988:4, 988:6, 988:11, 997:5, 1000:25, 1028:9, 1028:10, 1054:18, 1061:25, 1094:5, 1138:8, 1154:17, 1206:17, 1227:16
**mandate** [12] - 1235:13, 1236:2, 1236:5, 1236:8, 1236:11, 1236:14, 1236:15, 1236:17, 1237:9, 1237:19, 1237:24, 1238:2
**manner** [1] - 969:15
**manual** [1] - 1091:9
**marathon** [2] - 1052:22, 1053:2
**March** [3] - 1003:19, 1006:19, 1007:3
**marching** [1] - 990:7
**MARK** [2] - 955:3, 965:22
**Mark** [12] - 965:18, 966:1, 966:12, 981:16, 989:24, 991:21, 1047:3, 1062:11, 1106:7, 1106:9, 1132:4
**market** [20] - 972:15, 976:17, 977:2, 977:6, 982:17, 997:8, 997:10, 1007:4, 1009:1, 1030:11, 1036:23, 1038:15, 1113:21, 1114:20, 1115:23, 1126:8, 1192:22, 1228:12, 1234:17, 1246:23
**marketing** [7] - 971:17, 984:13, 995:2, 1053:5,

1053:20, 1062:12, 1238:20
**Marketos** [5] - 956:10, 960:10, 1250:25, 1252:7, 1258:24
**MARKETOS** [27] - 954:14, 954:14, 956:9, 957:5, 958:1, 960:20, 964:2, 964:11, 1109:2, 1230:3, 1250:12, 1250:16, 1251:4, 1252:13, 1253:19, 1254:5, 1254:10, 1255:5, 1256:13, 1256:19, 1258:25, 1259:3, 1259:8, 1259:11, 1259:15, 1259:19, 1259:25
**marketplace** [7] - 969:3, 977:11, 980:13, 982:12, 983:23, 997:9, 1187:19
**master's** [3] - 967:3, 967:4, 967:5
**material** [1] - 1020:12
**materials** [6] - 1134:7, 1144:22, 1145:5, 1145:10, 1146:17, 1173:22
**Matt** [3] - 1069:9, 1186:12, 1187:9
**matter** [13] - 958:9, 1061:24, 1067:7, 1080:11, 1083:21, 1086:8, 1107:6, 1122:7, 1209:15, 1219:16, 1237:2, 1253:6, 1261:5
**Mattes** [14] - 969:5, 969:7, 969:8, 977:23, 979:19, 981:16, 989:24, 993:23, 1062:11, 1111:18, 1112:9, 1123:11, 1124:11, 1207:14
**McCormick** [1] - 979:10
**McCormick's** [1] - 979:17
**McKay** [2] - 954:23, 1261:11
**McKay-Soule** [2] - 954:23, 1261:11
**McNeil** [11] - 968:13, 968:14, 968:20, 968:23, 969:9, 969:22, 969:24,

970:2, 971:10, 971:12, 973:10
**MEAGHER** [1] - 954:19
**meals** [1] - 1011:20
**mean** [97] - 957:9, 957:18, 958:5, 973:8, 973:23, 977:14, 978:21, 980:23, 984:20, 988:8, 989:2, 994:21, 999:10, 1000:21, 1001:6, 1002:8, 1003:6, 1011:8, 1021:17, 1024:11, 1026:22, 1026:23, 1028:7, 1028:8, 1032:8, 1032:22, 1043:17, 1043:23, 1045:2, 1052:22, 1053:2, 1058:24, 1058:25, 1060:7, 1064:10, 1069:16, 1069:17, 1070:22, 1070:24, 1079:18, 1079:19, 1080:7, 1085:15, 1095:8, 1095:18, 1095:19, 1100:24, 1101:1, 1101:9, 1112:4, 1115:7, 1117:20, 1119:11, 1120:14, 1129:16, 1135:6, 1137:1, 1138:1, 1140:21, 1141:14, 1145:14, 1148:4, 1167:17, 1170:13, 1170:19, 1174:19, 1180:1, 1184:4, 1187:7, 1193:17, 1196:25, 1202:9, 1206:20, 1206:21, 1208:5, 1208:16, 1209:22, 1209:24, 1211:23, 1218:8, 1219:3, 1219:23, 1223:11, 1224:25, 1227:1, 1228:2, 1236:11, 1236:20, 1241:5, 1243:20, 1253:13, 1255:11
**meaning** [3] - 999:18, 1085:22, 1110:12
**means** [6] - 1024:12, 1090:15, 1113:21, 1120:21, 1180:23, 1222:18
**meant** [7] - 1026:13, 1110:7, 1111:11,

1111:12, 1152:21, 1189:2, 1198:14
**meat** [1] - 1253:20
**mechanical** [1] - 954:25
**media** [2] - 1186:19, 1187:5
**Medicaid** [6] - 1082:21, 1088:10, 1088:14, 1089:1, 1089:7, 1090:5
**medical** [25] - 968:3, 979:20, 980:7, 981:17, 990:1, 1060:10, 1060:17, 1062:12, 1096:2, 1103:8, 1104:13, 1128:19, 1128:25, 1129:9, 1133:23, 1159:12, 1160:12, 1161:16, 1166:14, 1189:2, 1189:3, 1190:2, 1191:20, 1207:11, 1244:16
**Medicare** [11] - 1082:21, 1083:3, 1090:5, 1090:6, 1090:13, 1090:19, 1090:21, 1090:23, 1091:9, 1091:10, 1092:11
**medication** [5] - 1113:2, 1235:14, 1236:18, 1237:24, 1238:2
**medications** [9] - 976:4, 976:13, 980:20, 1031:14, 1056:16, 1056:25, 1122:5, 1236:5, 1237:19
**medicine** [21] - 1058:19, 1089:2, 1089:6, 1089:12, 1096:3, 1096:11, 1114:1, 1114:19, 1114:24, 1115:23, 1118:20, 1119:18, 1120:22, 1130:6, 1130:14, 1168:16, 1183:17, 1193:8, 1196:14, 1198:2, 1199:16
**medicines** [11] - 1091:10, 1091:14, 1091:15, 1120:15, 1128:20, 1130:11, 1140:23, 1143:11, 1143:15, 1187:24, 1197:14

**medium** [1] - 1053:15
**medium-level** [1] - 1053:15
**meet** [15] - 969:4, 983:17, 1042:12, 1064:8, 1103:14, 1115:17, 1116:5, 1123:7, 1135:17, 1141:18, 1160:12, 1163:14, 1188:21, 1204:6, 1247:24
**meeting** [8] - 975:12, 977:23, 978:1, 1010:20, 1039:12, 1205:10, 1206:19, 1223:16
**meetings** [12] - 982:5, 1048:16, 1048:19, 1048:20, 1052:6, 1117:19, 1123:2, 1144:8, 1154:18, 1207:17, 1217:4
**Megan** [2] - 954:23, 1261:11
**Megan_McKay** [1] - 954:24
**Megan_McKay-Soule@njd.uscourts.gov** [1] - 954:24
**Melissa** [5] - 1028:20, 1029:23, 1032:18, 1182:6, 1182:10
**member** [2] - 992:4, 1038:12
**members** [4] - 965:7, 981:17, 1155:3, 1217:23
**memo** [2] - 1126:7, 1216:20
**memory** [2] - 979:12, 1205:18
**men** [1] - 1115:7
**mention** [2] - 964:17, 1018:5
**mentioned** [12] - 973:9, 981:5, 984:8, 990:10, 991:7, 1002:19, 1003:2, 1017:10, 1064:21, 1089:17, 1089:21, 1178:13
**Mercieca** [8] - 1016:2, 1016:7, 1016:23, 1017:5, 1018:24, 1019:20, 1040:22, 1041:4
**merits** [1] - 1232:13
**mess** [2] - 1170:4, 1198:18

**message** [20] - 984:13, 992:13, 1015:14, 1015:17, 1026:9, 1033:7, 1052:13, 1110:25, 1122:22, 1130:18, 1162:12, 1176:12, 1176:15, 1176:22, 1178:7, 1178:20, 1178:25, 1179:7, 1180:19, 1247:7
**messages** [7] - 1052:14, 1053:20, 1057:1, 1057:3, 1110:8, 1243:2, 1247:2
**messaging** [5] - 982:4, 985:11, 992:1, 1026:14, 1163:19
**messed** [2] - 1199:23, 1202:10
**met** [1] - 966:14, 966:17, 1010:19, 1041:24, 1046:10, 1075:14, 1138:13, 1139:1, 1139:8, 1220:6
**method** [1] - 1062:5
**metric** [5] - 1050:18, 1051:13, 1061:9, 1062:1, 1182:3
**metrics** [2] - 1063:8, 1190:9
**Miami** [5] - 1011:12, 1012:22, 1012:23, 1042:3, 1053:9
**Michael** [2] - 1142:5, 1147:11
**microphone** [1] - 1075:3
**mid** [1] - 1007:25
**mid-volume** [1] - 1007:25
**middle** [1] - 1042:23
**midway** [1] - 1245:6
**midwest** [1] - 987:8
**midyear** [2] - 1061:24, 1220:18
**might** [21] - 961:16, 971:1, 974:5, 997:14, 1016:19, 1027:3, 1061:3, 1074:19, 1136:4, 1152:18, 1158:25, 1172:12, 1185:17, 1185:22, 1208:5, 1214:5, 1214:7, 1232:22, 1245:7, 1252:10, 1257:19

**Mike** [10] - 979:20,
981:16, 989:25,
991:21, 1024:21,
1062:11, 1106:16,
1131:16, 1216:20
**militant** [2] - 969:11,
1035:17
**Miller** [10] - 998:6,
1001:21, 1002:6,
1002:7, 1002:17,
1223:23, 1224:3,
1224:6, 1224:11,
1225:22
**million** [4] - 1123:8,
1125:1, 1125:14,
1125:15
**mind** [10] - 963:8,
1007:21, 1067:3,
1125:8, 1179:20,
1190:5, 1240:15,
1254:22, 1257:16
**mindful** [3] - 1239:16,
1258:15, 1258:19
**minding** [4] - 1251:11,
1251:12, 1251:13,
1254:23
**minds** [1] - 1253:3
**minimal** [4] - 1164:2,
1164:14, 1164:23,
1167:5
**Minix** [7] - 1194:7,
1195:11, 1199:4,
1200:17, 1201:6,
1201:9, 1201:15
**minor** [1] - 1246:1
**minute** [6] - 1034:11,
1034:12, 1043:14,
1071:1, 1170:8,
1229:11
**minutes** [7] - 1070:19,
1108:19, 1229:18,
1250:12, 1251:19,
1252:9, 1255:24
**MIR** [16] - 1060:10,
1061:4, 1061:5,
1062:18, 1062:24,
1062:25, 1063:8,
1136:5, 1184:7,
1185:12, 1185:18,
1188:23, 1189:8,
1189:25, 1190:8,
1248:6
**MIRs** [10] - 1060:21,
1181:25, 1182:1,
1182:18, 1182:23,
1183:7, 1184:2,
1185:2, 1187:22,
1190:5
**miscommunication**
[1] - 1045:15

**misconduct** [1] -
1249:1
**misdepicts** [1] -
1012:9
**misrepresent** [6] -
985:25, 1106:10,
1106:13, 1106:15,
1106:17, 1106:19
**misrepresentation** [1]
- 1106:21
**misrepresents** [1] -
1012:8
**miss** [1] - 1136:2
**misspoke** [1] - 991:4
**misstating** [2] -
1251:3, 1251:4
**mistake** [1] - 1254:7
**mistaken** [1] - 1005:10
**mistreated** [1] -
1218:22
**misunderstood** [1] -
991:4
**mixed** [1] - 1110:8
**mixing** [2] - 1053:15,
1195:2
**molecular** [2] -
1199:16, 1199:19
**moment** [5] - 1108:14,
1173:8, 1178:6,
1205:19, 1250:1
**Monday** [1] - 964:20
**money** [10] - 996:20,
1023:8, 1023:12,
1024:12, 1025:7,
1208:14, 1238:13,
1238:22, 1239:2,
1253:25
**monitor** [1] - 996:25
**month** [8] - 966:14,
973:19, 973:25,
982:23, 982:25,
997:12, 1124:5,
1125:8
**month's** [1] - 1125:13
**monthly** [1] - 983:3
**months** [10] - 984:22,
1009:25, 1010:23,
1017:21, 1036:14,
1129:20, 1136:1,
1136:19, 1225:4,
1242:23
**Morales** [2] - 1081:15,
1184:16
**morning** [26] - 956:7,
956:9, 956:11,
956:15, 956:17,
956:19, 956:21,
956:23, 956:25,
957:4, 963:25,
966:5, 966:6,

981:15, 989:23,
1063:11, 1102:2,
1109:11, 1129:16,
1190:15, 1190:18,
1191:2, 1206:25,
1234:17, 1246:10,
1259:23
**Morris** [1] - 1219:12
**Morrison** [1] - 1219:13
**most** [20] - 990:10,
990:20, 1007:21,
1019:1, 1030:10,
1031:13, 1037:6,
1038:19, 1048:13,
1049:19, 1052:16,
1052:17, 1061:2,
1070:5, 1080:8,
1137:19, 1160:18,
1160:19, 1247:5,
1259:12
**mother** [2] - 964:18,
965:9
**Mother's** [2] - 964:18,
965:8
**motion** [3] - 1241:7,
1241:11, 1256:17
**motivates** [1] -
1188:13
**mountain** [1] - 966:13
**mouth** [1] - 1226:22
**move** [30] - 960:25,
962:6, 963:6, 963:8,
971:4, 982:16,
1002:11, 1002:24,
1010:3, 1055:9,
1055:13, 1055:15,
1055:18, 1099:1,
1118:4, 1142:4,
1169:23, 1171:20,
1174:15, 1186:3,
1212:22, 1212:25,
1213:2, 1214:14,
1227:19, 1228:10,
1228:15, 1247:18,
1255:14
**moved** [9] - 968:4,
998:16, 1055:10,
1055:20, 1057:19,
1064:20, 1064:21,
1078:24, 1209:16
**moving** [4] - 1239:17,
1240:5, 1255:19,
1258:3
**MR** [243] - 955:4,
955:5, 956:9,
956:11, 956:13,
956:21, 956:23,
957:5, 958:1,
960:20, 964:2,
964:11, 965:13,

965:16, 965:18,
966:2, 966:4, 978:4,
978:8, 985:20,
985:24, 997:18,
997:21, 998:13,
998:17, 998:22,
998:25, 999:15,
999:24, 1000:2,
1000:11, 1000:18,
1001:3, 1001:9,
1001:11, 1001:15,
1002:11, 1002:16,
1002:24, 1003:1,
1003:12, 1003:14,
1003:22, 1003:24,
1004:2, 1004:8,
1005:1, 1005:5,
1005:16, 1005:21,
1006:1, 1006:6,
1006:13, 1006:17,
1009:17, 1009:19,
1010:3, 1010:8,
1010:11, 1012:1,
1012:3, 1012:14,
1012:18, 1012:20,
1013:8, 1013:11,
1013:17, 1013:21,
1013:23, 1015:20,
1015:22, 1017:2,
1017:4, 1020:7,
1020:9, 1023:5,
1023:6, 1023:14,
1023:16, 1023:22,
1024:1, 1024:5,
1024:15, 1024:17,
1026:15, 1026:17,
1027:11, 1027:15,
1027:16, 1028:15,
1028:17, 1029:3,
1029:7, 1029:9,
1029:17, 1029:19,
1030:16, 1030:24,
1032:15, 1032:16,
1033:18, 1033:20,
1033:24, 1034:3,
1034:20, 1035:4,
1035:5, 1038:25,
1039:4, 1045:6,
1045:8, 1050:24,
1051:4, 1051:10,
1051:23, 1051:24,
1065:22, 1065:24,
1066:2, 1066:10,
1066:13, 1066:16,
1066:19, 1066:23,
1067:1, 1067:5,
1067:24, 1068:2,
1068:7, 1071:1,
1071:5, 1071:12,
1071:14, 1071:24,
1071:25, 1072:7,

1072:11, 1072:14,
1072:20, 1073:4,
1073:6, 1073:9,
1073:17, 1073:18,
1074:3, 1074:4,
1074:24, 1076:5,
1081:13, 1083:11,
1083:17, 1083:22,
1084:5, 1084:20,
1085:14, 1085:18,
1086:2, 1086:23,
1091:24, 1099:3,
1099:10, 1099:13,
1099:16, 1099:19,
1099:22, 1102:20,
1109:2, 1119:24,
1130:22, 1131:7,
1141:23, 1147:19,
1150:24, 1151:2,
1169:17, 1169:19,
1170:1, 1170:6,
1170:12, 1170:17,
1171:3, 1171:7,
1172:2, 1172:8,
1173:2, 1174:18,
1176:3, 1184:10,
1184:14, 1186:4,
1194:3, 1210:21,
1211:15, 1212:14,
1212:18, 1212:20,
1213:6, 1213:22,
1214:12, 1214:21,
1216:14, 1222:14,
1229:8, 1229:18,
1229:21, 1230:3,
1230:4, 1231:16,
1233:12, 1233:16,
1238:18, 1239:8,
1239:15, 1239:24,
1241:1, 1241:22,
1241:24, 1244:18,
1244:21, 1245:3,
1245:5, 1248:20,
1250:1, 1250:4,
1250:12, 1250:16,
1251:4, 1252:13,
1253:19, 1254:5,
1254:10, 1255:5,
1256:9, 1256:12,
1256:13, 1256:19,
1258:25, 1259:3,
1259:8, 1259:11,
1259:15, 1259:19,
1259:25
**MRI** [1] - 1207:18
**MS** [183] - 955:4,
956:15, 956:19,
957:12, 957:24,
958:8, 958:15,
959:17, 959:23,
960:17, 960:22,

964:5, 964:24,
985:18, 985:22,
998:14, 998:18,
999:16, 999:20,
1001:19, 1002:12,
1004:16, 1006:3,
1006:8, 1010:5,
1012:15, 1013:18,
1023:23, 1029:4,
1030:14, 1030:19,
1033:25, 1050:22,
1067:9, 1067:18,
1067:20, 1068:4,
1072:8, 1072:16,
1072:23, 1075:2,
1075:5, 1075:6,
1075:8, 1075:9,
1075:24, 1076:7,
1076:8, 1081:4,
1081:14, 1081:17,
1083:14, 1084:14,
1084:17, 1084:21,
1084:23, 1085:5,
1085:15, 1086:1,
1086:9, 1086:13,
1086:24, 1087:2,
1087:4, 1087:5,
1091:19, 1092:1,
1092:4, 1092:5,
1097:25, 1098:3,
1098:4, 1099:1,
1099:6, 1099:17,
1100:1, 1100:5,
1102:15, 1102:18,
1102:22, 1102:23,
1108:6, 1108:9,
1109:1, 1109:15,
1109:17, 1116:17,
1116:19, 1116:20,
1119:23, 1120:1,
1120:3, 1130:20,
1130:24, 1131:6,
1131:9, 1131:12,
1141:21, 1142:1,
1147:18, 1147:22,
1150:21, 1151:1,
1151:4, 1151:6,
1167:23, 1167:25,
1168:1, 1169:22,
1170:2, 1170:7,
1170:18, 1171:1,
1171:6, 1171:10,
1171:14, 1171:18,
1171:23, 1172:7,
1173:1, 1173:5,
1173:9, 1173:13,
1173:15, 1174:15,
1174:21, 1174:25,
1175:5, 1176:2,
1176:5, 1176:7,
1176:9, 1184:8,

1184:11, 1184:16,
1184:19, 1186:2,
1186:7, 1194:2,
1194:6, 1203:23,
1203:24, 1210:16,
1210:19, 1210:25,
1211:2, 1211:4,
1211:6, 1211:10,
1211:13, 1211:20,
1211:25, 1212:2,
1213:1, 1214:15,
1214:18, 1214:23,
1214:25, 1216:12,
1216:16, 1216:18,
1222:16, 1222:21,
1229:2, 1231:14,
1232:5, 1232:9,
1233:4, 1233:11,
1233:13, 1238:15,
1239:3, 1239:10,
1240:16, 1241:3,
1241:13, 1241:16,
1241:19, 1248:18,
1255:11, 1256:17,
1259:21, 1259:24
**multipage** [2] -
1080:4, 1098:14
**multiple** [5] - 976:4,
1026:5, 1073:20,
1122:5, 1219:11
**Murphy** [1] - 1028:14
**must** [4] - 1020:22,
1038:6, 1044:1,
1210:13

## N

**naive** [14] - 982:18,
992:16, 1053:6,
1057:3, 1057:11,
1057:23, 1118:4,
1126:9, 1132:19,
1133:2, 1133:3,
1156:15, 1178:14,
1247:20
**name** [17] - 965:24,
965:25, 966:7,
966:12, 970:14,
987:4, 1019:3,
1039:11, 1040:18,
1040:23, 1075:14,
1153:10, 1189:18,
1193:8, 1193:20,
1202:10, 1209:6
**named** [4] - 969:5,
1028:20, 1065:10,
1069:9
**names** [12] - 970:6,
977:8, 979:16,
979:18, 992:19,
1037:4, 1037:21,

1046:8, 1069:3,
1199:20, 1209:20,
1209:25
**narrative** [2] - 1233:1,
1251:21
**narratives** [1] -
1251:10
**nation** [4] - 1062:17,
1062:19, 1063:1,
1183:6
**national** [20] - 979:25,
1017:25, 1090:6,
1090:10, 1117:9,
1117:10, 1131:19,
1131:22, 1177:15,
1235:13, 1236:2,
1236:5, 1236:8,
1236:14, 1236:15,
1236:17, 1237:9,
1237:19, 1237:24,
1238:2
**National** [1] - 1197:23
**nationally** [2] -
1038:23, 1196:21
**nationwide** [4] -
1093:8, 1095:14,
1096:24, 1109:22
**nature** [7] - 980:10,
994:21, 994:23,
996:21, 999:12,
1012:9, 1154:20
**NCEP** [1] - 1177:7
**near** [1] - 1217:20
**nearly** [1] - 1095:15
**Nebraska** [1] - 1188:4
**necessarily** [14] -
988:8, 1008:4,
1008:8, 1049:13,
1049:18, 1062:23,
1125:11, 1159:20,
1185:16, 1187:18,
1188:2, 1213:3,
1214:8, 1254:22
**necessary** [2] -
1007:7, 1110:22
**neck** [1] - 1213:17
**need** [29] - 957:4,
958:21, 964:7,
982:1, 992:2,
992:19, 1022:13,
1023:13, 1031:23,
1034:6, 1034:13,
1047:7, 1059:11,
1062:23, 1068:19,
1072:19, 1081:8,
1108:23, 1108:24,
1117:23, 1185:23,
1187:24, 1213:4,
1234:22, 1236:22,
1240:15, 1244:23,

1249:14, 1259:16
**needed** [11] - 1008:24,
1024:9, 1059:13,
1110:17, 1119:7,
1150:4, 1208:19,
1225:18, 1227:15,
1249:15
**needs** [1] - 1084:6
**nefarious** [1] -
1213:14
**Netherda** [1] - 1046:20
**neutral** [5] - 981:7,
981:9, 984:12,
984:16, 1057:17
**neutrality** [1] - 1237:1
**never** [29] - 994:11,
1001:22, 1064:20,
1064:21, 1070:23,
1075:14, 1095:9,
1096:20, 1097:8,
1097:12, 1104:25,
1105:6, 1105:11,
1106:9, 1112:23,
1137:1, 1138:11,
1154:9, 1165:5,
1170:13, 1189:20,
1192:12, 1192:18,
1206:13, 1219:4,
1225:13, 1226:12,
1238:23
**nevertheless** [4] -
1135:6, 1136:16,
1146:4, 1150:1
**new** [15] - 983:6,
1039:22, 1046:10,
1115:23, 1125:1,
1127:1, 1127:23,
1127:24, 1134:24,
1178:2, 1184:1,
1184:2, 1184:22,
1184:23, 1209:18
**NEW** [1] - 954:1
**New** [10] - 954:9,
968:6, 1028:12,
1053:10, 1070:1,
1139:16, 1187:20,
1189:24, 1196:17,
1197:19
**Newmeyer** [6] -
1039:6, 1039:8,
1040:8, 1043:8,
1045:11, 1047:3
**next** [20] - 964:7,
965:11, 965:15,
986:8, 1003:22,
1015:11, 1017:2,
1020:18, 1023:13,
1037:21, 1038:25,
1040:2, 1042:11,
1042:23, 1044:3,

1046:7, 1185:9,
1188:21, 1250:10,
1257:11
**nice** [5] - 1003:7,
1013:4, 1052:7,
1053:9, 1054:8
**nickname** [1] - 969:12
**night** [5] - 1016:8,
1073:4, 1140:13,
1140:18, 1141:8
**NIH** [2] - 1197:20,
1197:23
**NNRTIs** [1] - 1008:17
**nobody** [5] - 1136:22,
1153:1, 1210:2,
1219:17, 1241:18
**nobody's** [1] -
1251:11
**none** [2] - 971:19,
989:1
**normal** [2] - 989:19,
1029:13
**normally** [5] - 983:3,
1027:24, 1053:1,
1113:22, 1240:13
**North** [1] - 987:7
**Northern** [1] - 1039:10
**note** [1] - 998:19
**notes** [3] - 1039:11,
1211:10, 1241:25
**nothing** [9] - 994:10,
1066:11, 1097:16,
1128:24, 1166:11,
1188:16, 1189:7,
1213:14, 1232:4
**notwithstanding** [1] -
969:21
**November** [3] -
1047:3, 1047:25,
1242:17
**nowhere** [1] - 1182:17
**number** [40] - 976:12,
976:18, 983:24,
991:17, 997:7,
1006:19, 1009:6,
1014:4, 1016:12,
1017:7, 1025:11,
1025:12, 1037:25,
1038:3, 1038:8,
1039:21, 1062:18,
1073:19, 1083:9,
1097:17, 1100:15,
1104:15, 1113:4,
1116:9, 1118:1,
1124:4, 1131:25,
1148:16, 1149:1,
1151:21, 1163:23,
1183:6, 1183:7,
1184:16, 1199:11,
1200:6, 1200:8,

1208:8, 1208:9, 1217:9
**NUMBER** [1] - 954:3
**numbers** [1] - 1115:18
**Nutley** [1] - 968:6
**nutshell** [1] - 1011:8

# O

**O'Brien** [33] - 1014:11, 1014:13, 1014:21, 1015:12, 1016:7, 1017:6, 1018:24, 1020:23, 1040:21, 1040:23, 1041:8, 1041:12, 1041:13, 1046:9, 1046:11, 1191:2, 1191:5, 1191:9, 1191:16, 1193:2, 1193:15, 1194:8, 1194:13, 1194:17, 1195:1, 1195:15, 1195:19, 1195:23, 1199:7, 1201:10, 1202:4, 1202:5, 1202:19
**O'Brien's** [1] - 1191:12
**O'Connor** [7] - 1117:6, 1117:12, 1117:21, 1122:23, 1123:11, 1124:11, 1242:16
**oath** [8] - 1083:21, 1084:4, 1085:21, 1086:19, 1109:11, 1234:4, 1234:8, 1234:10
**oaths** [1] - 1096:6
**OBI** [2] - 1036:17, 1036:24
**object** [9] - 961:21, 962:4, 963:9, 998:14, 1004:20, 1130:22, 1238:15, 1248:18, 1251:15
**objecting** [2] - 961:17, 961:23
**objection** [73] - 960:10, 961:8, 961:10, 961:11, 962:10, 962:13, 962:19, 963:17, 985:18, 985:22, 998:19, 998:21, 999:16, 1000:2, 1000:4, 1000:14, 1002:2, 1004:17, 1004:18, 1005:5, 1005:8, 1005:10, 1006:8, 1010:5,

1012:15, 1013:18, 1023:23, 1029:4, 1030:14, 1030:20, 1033:25, 1050:22, 1051:6, 1072:10, 1073:1, 1075:24, 1076:3, 1076:5, 1083:11, 1091:21, 1091:23, 1091:24, 1099:3, 1099:10, 1102:19, 1102:20, 1119:24, 1141:23, 1147:19, 1150:23, 1151:2, 1169:17, 1170:10, 1170:12, 1176:3, 1184:13, 1184:14, 1186:4, 1194:3, 1210:18, 1210:21, 1212:9, 1212:12, 1213:5, 1214:11, 1214:20, 1216:14, 1222:14, 1231:14, 1238:15, 1239:3, 1240:3, 1240:14
**objections** [6] - 962:2, 993:21, 1059:13, 1059:14, 1066:15, 1105:23
**objective** [2] - 982:23, 1191:24
**obligation** [1] - 1022:3
**observations** [1] - 1252:13
**obstacles** [2] - 981:22, 1105:23
**obtain** [1] - 1003:4
**obviously** [4] - 1016:4, 1086:4, 1091:8, 1239:8
**occasion** [3] - 959:6, 1061:3, 1106:8
**occasional** [1] - 1061:4
**occasions** [2] - 1160:15, 1234:14
**occur** [1] - 1021:14
**occurred** [10] - 964:25, 970:13, 991:2, 1034:22, 1048:21, 1137:19, 1208:18, 1209:9, 1229:15, 1247:5
**occurrence** [1] - 1021:8
**occurring** [2] - 1135:8
**October** [1] - 1215:5
**OF** [2] - 954:1, 954:3
**off-label** [94] - 969:25, 971:17, 972:3,

992:9, 992:15, 992:21, 993:1, 993:24, 994:12, 995:2, 995:8, 995:9, 995:15, 996:4, 996:8, 996:10, 1018:17, 1021:17, 1026:9, 1026:14, 1027:13, 1041:8, 1042:7, 1052:11, 1056:7, 1057:1, 1058:19, 1059:15, 1059:23, 1060:8, 1061:2, 1061:15, 1061:18, 1063:4, 1063:15, 1091:11, 1093:9, 1094:19, 1095:7, 1095:20, 1095:24, 1096:16, 1096:24, 1097:9, 1097:14, 1097:22, 1104:24, 1105:12, 1105:17, 1110:22, 1112:24, 1113:1, 1113:7, 1117:12, 1117:22, 1117:23, 1126:21, 1128:7, 1128:20, 1128:23, 1129:4, 1133:18, 1133:22, 1134:6, 1135:7, 1135:23, 1136:8, 1136:15, 1136:17, 1138:9, 1138:10, 1140:23, 1146:16, 1149:13, 1149:17, 1150:15, 1162:25, 1165:21, 1166:4, 1167:13, 1178:7, 1178:25, 1188:3, 1189:16, 1189:24, 1190:7, 1226:12, 1234:17, 1237:25, 1238:6, 1238:20, 1246:23, 1249:16
**off-patent** [1] - 972:3
**offer** [9] - 999:15, 1006:6, 1010:3, 1012:14, 1013:17, 1023:22, 1029:3, 1033:24, 1072:7
**offered** [4] - 1040:17, 1086:8, 1172:11, 1201:15
**offering** [3] - 1086:11, 1086:14, 1086:16
**office** [11] - 989:22, 1058:7, 1094:19, 1095:7, 1096:15, 1128:16, 1142:19,

1169:7, 1180:24, 1189:23, 1226:19
**offices** [6] - 1055:21, 1058:10, 1146:16, 1168:10, 1173:18, 1176:12
**Official** [1] - 954:23
**official** [2] - 1135:14, 1247:24
**OFFICIAL** [1] - 1261:1
**often** [4] - 981:19, 1058:2, 1058:4, 1070:17
**oftentimes** [13] - 972:6, 974:11, 976:7, 981:24, 982:11, 989:25, 1008:1, 1030:9, 1030:11, 1126:17, 1189:20, 1225:20, 1249:16
**OIG** [1] - 1073:15
**Omnicare** [1] - 970:21
**on-label** [14] - 982:19, 982:20, 1016:21, 1018:15, 1095:20, 1098:15, 1098:19, 1100:8, 1110:17, 1118:6, 1149:10, 1149:21, 1150:5, 1150:12
**once** [15] - 972:4, 1056:18, 1056:19, 1057:21, 1070:19, 1079:9, 1102:5, 1104:17, 1127:23, 1134:24, 1144:23, 1169:11, 1187:7, 1209:10, 1258:8
**one** [153] - 957:12, 957:17, 958:10, 959:6, 963:15, 972:16, 972:17, 974:10, 975:9, 975:10, 975:14, 978:3, 978:24, 979:14, 979:22, 980:15, 981:5, 982:9, 982:23, 982:25, 987:19, 987:22, 989:20, 992:7, 994:10, 995:23, 1001:10, 1001:12, 1003:3, 1003:23, 1007:22, 1008:3, 1012:22, 1013:1, 1020:6, 1025:11, 1028:21, 1029:12, 1031:18, 1032:3, 1040:21,

1054:17, 1054:22, 1061:17, 1063:3, 1070:22, 1076:17, 1081:1, 1082:4, 1083:7, 1085:24, 1086:18, 1087:10, 1087:18, 1093:21, 1095:5, 1096:14, 1097:3, 1099:24, 1108:7, 1110:1, 1110:12, 1111:12, 1111:17, 1113:17, 1114:9, 1115:17, 1118:20, 1119:18, 1120:14, 1120:24, 1121:24, 1122:5, 1122:9, 1122:16, 1122:17, 1124:16, 1125:23, 1127:9, 1127:18, 1132:9, 1143:9, 1144:8, 1147:15, 1147:17, 1148:1, 1149:5, 1151:11, 1152:3, 1152:12, 1156:6, 1158:23, 1160:6, 1163:22, 1164:2, 1165:14, 1166:8, 1168:2, 1168:21, 1170:16, 1170:21, 1172:4, 1172:8, 1172:15, 1172:20, 1174:8, 1175:6, 1178:11, 1179:15, 1180:13, 1183:6, 1183:10, 1183:20, 1185:4, 1185:11, 1190:3, 1190:8, 1191:1, 1191:20, 1192:6, 1192:14, 1196:20, 1199:24, 1203:17, 1205:19, 1209:5, 1217:19, 1219:13, 1219:20, 1221:2, 1224:18, 1225:15, 1231:23, 1233:8, 1234:25, 1239:25, 1241:3, 1241:17, 1244:3, 1244:11, 1250:1, 1252:1, 1252:3, 1252:8, 1252:14, 1255:22, 1259:14
**One** [1] - 954:21
**one-day** [1] - 1224:18
**ones** [11] - 967:18, 977:10, 992:17, 992:18, 1020:1, 1031:12, 1049:19, 1074:13, 1089:17, 1089:21, 1257:18

ongoing [1] - 1031:9
**open** [4] - 956:1, 1005:9, 1005:24, 1066:12
**Open** [9] - 1002:15, 1006:5, 1068:6, 1087:1, 1100:4, 1173:4, 1214:17, 1233:15, 1241:21
**opened** [1] - 962:14
**opening** [6] - 972:14, 1102:14, 1102:24, 1172:10, 1232:10, 1253:23
**openings** [1] - 1072:9
**operates** [3] - 1090:23, 1091:3, 1092:10
**operating** [4] - 971:10, 972:12, 973:11, 1035:17
**operations** [2] - 1227:11, 1227:14
**opinion** [16] - 969:17, 974:7, 986:19, 987:25, 990:19, 990:23, 1018:24, 1025:6, 1031:11, 1035:13, 1035:14, 1035:19, 1049:16, 1052:9, 1200:18, 1227:18
**opportunities** [2] - 970:22, 996:4
**opportunity** [11] - 963:19, 972:11, 1042:19, 1044:23, 1046:3, 1052:10, 1053:16, 1135:18, 1136:2, 1152:7, 1222:8
**opposed** [1] - 1099:24
**opposing** [9] - 997:19, 1003:13, 1009:17, 1012:2, 1013:9, 1023:15, 1028:16, 1033:18, 1071:13
**opposite** [2] - 969:18, 1086:14
**opposition** [1] - 961:13
**opted** [1] - 1045:19
**option** [3] - 1045:24, 1049:20, 1136:6
**options** [1] - 1120:21
**order** [2] - 981:12, 1214:2
**orders** [1] - 990:7
**ordinary** [1] - 999:23
**Oregon** [5] - 968:8,

1088:9, 1088:10, 1089:2, 1089:7
**organization** [40] - 969:12, 969:13, 969:15, 972:8, 972:9, 973:13, 974:20, 980:14, 982:1, 983:19, 984:1, 988:10, 990:9, 992:20, 993:12, 993:19, 997:4, 1025:20, 1026:12, 1031:10, 1032:21, 1032:23, 1033:2, 1048:20, 1055:19, 1059:21, 1061:12, 1070:3, 1101:14, 1116:23, 1117:1, 1117:7, 1117:24, 1133:5, 1135:11, 1141:17, 1162:17, 1183:3, 1247:12
**organizations** [1] - 971:21
**orient** [2] - 1081:18, 1177:10
**original** [3] - 1088:24, 1123:17, 1203:10
**originally** [1] - 1055:4
**Ortho** [11] - 968:13, 968:14, 968:20, 968:23, 969:9, 969:22, 969:24, 970:2, 971:10, 971:12, 973:10
**Ortho-McNeil** [11] - 968:13, 968:14, 968:20, 968:23, 969:9, 969:22, 969:24, 970:2, 971:10, 971:12, 973:10
**otherwise** [6] - 1005:25, 1084:8, 1136:24, 1171:19, 1210:9, 1241:5
**out-of-court** [1] - 1086:7
**outcome** [2] - 1130:3, 1233:22
**outlined** [2] - 1089:17, 1234:13
**outside** [3] - 960:4, 963:5, 983:13
**overcome** [4] - 993:20, 1059:14, 1063:24, 1105:22
**overlap** [2] - 986:17, 990:17

**overlapping** [2] - 1213:11, 1213:25
**overly** [1] - 1198:10
**overrule** [1] - 1051:8
**overruled** [4] - 998:21, 1083:15, 1222:15, 1238:17
**oversee** [2] - 987:2, 1002:17
**overseeing** [4] - 987:5, 989:12, 1002:6, 1054:25
**Overton** [1] - 1033:4
**own** [12] - 996:23, 996:24, 1021:22, 1031:23, 1032:5, 1055:17, 1066:20, 1154:14, 1210:6, 1228:13, 1241:12

---

# P

**p.m** [15] - 1083:19, 1086:25, 1099:12, 1100:3, 1109:5, 1109:6, 1169:18, 1173:3, 1211:1, 1214:16, 1232:8, 1233:14, 1239:7, 1241:20, 1260:2
**pace** [2] - 1184:1, 1251:1
**Pacific** [3] - 998:4, 1001:21, 1002:17
**package** [16] - 984:9, 992:5, 1015:14, 1015:18, 1017:23, 1018:5, 1018:14, 1142:24, 1166:10, 1166:12, 1166:13, 1181:8, 1181:9, 1244:3
**packaged** [1] - 1146:20
**page** [35] - 1003:22, 1004:2, 1006:14, 1013:22, 1014:3, 1015:21, 1016:2, 1017:3, 1020:8, 1024:16, 1029:17, 1032:15, 1038:25, 1039:1, 1040:3, 1040:4, 1040:5, 1040:12, 1042:23, 1045:6, 1073:6, 1073:17, 1074:3, 1081:7, 1081:24, 1155:2, 1155:16, 1175:17, 1184:10, 1184:11, 1244:22,

1244:25, 1245:3, 1245:7
**PAGE** [1] - 955:2
**Page** [1] - 955:7
**pages** [3] - 998:23, 1024:3, 1175:11
**paid** [20] - 994:10, 1003:7, 1009:7, 1009:15, 1009:16, 1011:17, 1011:19, 1027:22, 1037:12, 1037:16, 1045:4, 1054:4, 1054:6, 1054:7, 1055:11, 1088:14, 1091:14, 1235:11
**pain** [1] - 1113:2
**Palace** [5] - 1011:22, 1011:24, 1012:6, 1012:12, 1013:1
**Palm** [1] - 1225:9
**panic** [1] - 974:5
**paper** [2] - 1138:9, 1147:6
**papers** [1] - 957:3
**paragraph** [19] - 1015:11, 1020:18, 1026:16, 1037:3, 1042:11, 1043:12, 1044:3, 1046:7, 1081:7, 1082:5, 1082:10, 1083:9, 1086:16, 1087:14, 1087:15, 1123:3, 1204:4, 1204:5, 1204:10
**paragraphs** [3] - 1020:10, 1081:1, 1082:4
**parameters** [2] - 1067:22, 1175:18
**paren** [1] - 1020:14
**parks** [1] - 1033:3
**part** [48] - 959:19, 963:10, 979:5, 981:10, 984:13, 989:13, 1000:17, 1005:12, 1020:24, 1025:12, 1025:15, 1029:15, 1037:6, 1037:12, 1045:2, 1053:5, 1055:14, 1061:15, 1062:21, 1063:11, 1063:23, 1067:11, 1088:22, 1107:6, 1115:20, 1115:22, 1117:1, 1117:17, 1117:18, 1118:23, 1126:12, 1128:3, 1130:23,

1131:1, 1131:10, 1138:1, 1141:4, 1153:14, 1164:13, 1187:23, 1203:22, 1205:8, 1205:10, 1224:16, 1236:8, 1236:11, 1244:12, 1249:7
**participants** [3] - 978:10, 978:17, 1052:16
**participate** [1] - 1065:19
**participated** [2] - 1008:3, 1155:3
**participation** [1] - 1045:16
**particular** [12] - 961:24, 963:3, 963:24, 978:3, 980:21, 999:20, 1000:12, 1000:16, 1001:7, 1035:16, 1091:14, 1252:11
**particularly** [6] - 1049:12, 1115:3, 1129:3, 1208:20, 1227:12, 1249:17
**particulars** [1] - 1103:13
**parties** [2] - 960:7, 961:3
**partner** [2] - 1078:1, 1082:10
**partnership** [1] - 1029:25
**parts** [5] - 988:10, 1029:23, 1107:4, 1180:8, 1180:10
**party** [5] - 963:4, 1153:6, 1153:9, 1212:3, 1240:25
**party's** [1] - 1211:8
**pass** [2] - 1074:24, 1250:6
**passionate** [1] - 1249:12
**password** [1] - 1152:25
**past** [1] - 1052:9
**patent** [1] - 972:3
**paternity** [1] - 1046:2
**patient** [25] - 976:3, 976:4, 977:14, 977:15, 982:17, 983:13, 1052:20, 1052:21, 1052:25, 1114:8, 1122:9, 1128:25, 1130:3, 1132:25, 1143:5,

1143:14, 1145:1,
1236:25, 1237:4,
1240:2, 1242:8,
1245:20, 1247:23,
1249:13, 1254:25
**patient's** [1] - 1129:12
**patients** [44] - 975:19,
976:1, 976:12,
976:14, 976:19,
976:20, 977:3,
977:6, 982:18,
983:6, 983:10,
983:24, 992:16,
1049:18, 1056:15,
1057:4, 1057:9,
1057:10, 1057:23,
1090:11, 1115:13,
1118:2, 1118:19,
1120:11, 1120:18,
1121:16, 1122:14,
1126:9, 1129:10,
1129:18, 1130:15,
1132:20, 1133:2,
1133:3, 1143:10,
1151:25, 1187:24,
1188:4, 1236:2,
1236:6, 1237:6,
1247:20
**Paul** [1] - 954:17
**pause** [2] - 1071:4,
1250:3
**pay** [10] - 1009:9,
1011:14, 1049:7,
1055:12, 1055:17,
1091:3, 1183:17,
1234:25, 1237:19,
1248:3
**paying** [15] - 991:20,
996:19, 1009:8,
1019:20, 1026:1,
1042:20, 1042:21,
1049:8, 1051:20,
1067:2, 1139:22,
1139:23, 1143:11,
1193:6, 1193:20
**payment** [1] - 1183:12
**payor** [1] - 1090:4
**payors** [1] - 1082:20
**payors'** [1] - 1088:2
**pays** [1] - 1091:10
**peculiar** [1] - 1192:11
**peer** [1] - 1048:2
**peers** [7] - 1028:5,
1048:1, 1070:22,
1070:23, 1154:20,
1160:3, 1160:7
**pejorative** [1] -
1252:16
**penalty** [2] - 1084:13,
1085:10

**pending** [1] - 1209:11
**Penelow** [15] - 966:8,
1069:23, 1070:11,
1076:10, 1076:25,
1080:4, 1080:18,
1095:15, 1138:13,
1140:19, 1210:7,
1210:11, 1212:3,
1215:16, 1231:25
**Penelow's** [3] -
1077:5, 1087:8,
1215:1
**people** [58] - 969:12,
969:19, 974:17,
975:12, 989:25,
990:5, 990:19,
991:20, 993:12,
1004:19, 1004:25,
1006:19, 1008:7,
1008:8, 1014:4,
1022:15, 1025:25,
1029:11, 1032:25,
1036:25, 1046:25,
1050:12, 1051:13,
1053:21, 1053:22,
1058:18, 1068:22,
1074:1, 1093:12,
1093:25, 1097:12,
1101:14, 1103:8,
1104:11, 1106:3,
1110:3, 1114:5,
1117:15, 1137:2,
1137:14, 1137:22,
1141:12, 1143:15,
1146:4, 1146:10,
1152:22, 1153:10,
1163:9, 1163:12,
1206:20, 1208:19,
1208:21, 1208:25,
1237:23, 1249:1,
1249:21, 1249:24,
1255:17
**people's** [1] - 1059:11
**per** [6] - 988:19,
1037:24, 1039:21,
1041:23, 1252:1,
1252:8
**perceived** [1] -
1222:11
**percent** [10] - 973:20,
973:24, 974:2,
977:4, 993:13,
1025:4, 1123:16,
1123:17, 1125:5,
1125:9
**percent-ish** [1] - 977:4
**percentage** [4] -
976:14, 1067:12,
1067:17, 1208:14
**perception** [1] -

1218:3
**perfect** [2] - 1092:9,
1108:9
**perform** [3] - 1059:24,
1135:16, 1136:11
**performance** [27] -
980:11, 993:13,
993:14, 1028:23,
1032:25, 1059:12,
1061:24, 1062:6,
1064:7, 1125:13,
1135:25, 1136:1,
1182:4, 1182:10,
1182:17, 1188:9,
1190:6, 1190:9,
1216:5, 1216:9,
1216:25, 1217:5,
1220:13, 1220:18,
1220:23, 1223:17,
1227:3
**performer** [4] -
1187:13, 1225:5,
1227:6, 1227:9
**performers** [2] -
1249:18, 1249:19
**performing** [5] -
974:16, 1026:24,
1062:21, 1152:9,
1226:6
**perhaps** [4] - 1008:2,
1107:5, 1156:21,
1195:5
**period** [16] - 1070:23,
1078:24, 1094:1,
1094:24, 1095:5,
1111:21, 1127:5,
1165:4, 1165:11,
1166:21, 1167:2,
1169:2, 1184:22,
1186:15, 1206:9,
1206:12
**periodically** [1] -
1072:3
**perjury** [2] - 1084:13,
1085:10
**permission** [5] -
1097:25, 1116:17,
1119:23, 1184:8,
1222:4
**permit** [3] - 959:18,
960:5, 1085:17
**permitted** [6] - 957:19,
958:19, 958:24,
1067:8, 1067:9,
1085:16
**persists** [1] - 1252:4
**person** [14] - 966:17,
978:1, 982:5,
1073:20, 1136:9,
1147:9, 1151:11,

1152:16, 1157:1,
1157:14, 1160:12,
1190:7, 1220:6,
1249:11
**personal** [11] - 992:3,
992:6, 1032:5,
1137:15, 1137:22,
1137:25, 1192:16,
1200:18, 1215:2,
1222:2
**personally** [9] -
991:24, 1045:5,
1055:21, 1057:13,
1057:16, 1057:19,
1057:20, 1063:12,
1209:24
**personnel** [2] -
1030:1, 1073:11
**perspective** [3] -
1104:17, 1141:15
**perspiring** [1] -
1198:19
**Pete** [1] - 956:9
**PETE** [1] - 954:14
**pharmaceutical** [18] -
967:7, 967:10,
974:11, 994:19,
1009:3, 1037:18,
1058:24, 1068:18,
1078:16, 1105:15,
1157:10, 1157:12,
1162:14, 1209:15,
1209:19, 1219:16,
1228:14, 1237:18
**Pharmaceuticals** [1] -
967:12
**pharmacies** [3] -
970:20, 1087:19
**pharmacy** [1] -
1092:20
**PharMerica** [1] -
970:21
**Phoenix** [1] - 1225:11
**phone** [4] - 980:8,
992:23, 1025:21,
1073:20
**photograph** [2] -
1012:5, 1012:8
**phrase** [1] - 1243:6
**phrases** [1] - 1246:22
**physician** [26] -
979:20, 980:7,
981:17, 991:6,
993:21, 995:14,
1014:14, 1026:20,
1027:1, 1045:20,
1049:7, 1053:17,
1060:15, 1060:18,
1061:11, 1061:13,
1063:6, 1096:2,

1103:9, 1135:22,
1136:8, 1163:15,
1185:4, 1186:1,
1189:11
**physician's** [2] -
1136:3, 1169:7
**physicians** [43] -
975:25, 981:22,
990:21, 992:1,
992:14, 992:17,
992:20, 996:5,
996:17, 996:22,
997:17, 1003:3,
1003:7, 1009:9,
1010:25, 1011:17,
1011:19, 1021:21,
1025:13, 1028:1,
1028:6, 1038:10,
1045:4, 1047:14,
1053:24, 1055:20,
1056:20, 1087:20,
1092:25, 1095:19,
1095:24, 1105:24,
1119:5, 1119:12,
1128:5, 1129:17,
1135:18, 1158:25,
1224:22, 1235:11,
1247:18, 1248:2,
1249:13
**physicians'** [1] -
1055:21
**PI** [4] - 1016:15,
1017:10, 1019:12,
1127:14
**pick** [2] - 1075:18,
1182:10
**picks** [1] - 1152:12
**picture** [2] - 1077:3,
1248:13
**pictures** [1] - 1052:19
**piece** [8] - 1004:4,
1169:5, 1175:21,
1176:10, 1176:18,
1180:19, 1180:24,
1241:10
**pieces** [16] - 1143:6,
1145:14, 1146:5,
1146:23, 1168:3,
1168:9, 1168:21,
1173:17, 1174:1,
1174:4, 1174:9,
1175:6, 1175:14,
1178:2, 1178:8,
1178:25
**pill** [4] - 1056:14,
1056:15, 1056:16,
1056:23
**pills** [1] - 1056:23
**PIP** [1] - 1032:22
**place** [14] - 963:4,

963:15, 984:10, 1079:7, 1101:22, 1105:25, 1152:4, 1154:19, 1162:13, 1196:17, 1221:23, 1221:24, 1242:5, 1247:21

**placed** [1] - 1063:9

**places** [2] - 1053:9, 1183:22

**Plaintiff's** [1] - 1073:6

**Plaintiffs** [1] - 954:4

**Plaintiffs'** [1] - 1203:23

**plaintiffs'** [1] - 1073:12

**plan** [7] - 993:14, 998:3, 999:2, 1001:20, 1029:24, 1049:20

**Plan** [1] - 1092:14

**plane** [2] - 1198:6, 1198:13

**planned** [1] - 1205:21

**planning** [2] - 1025:6, 1026:11

**plans** [2] - 1032:25, 1202:5

**plant** [1] - 997:23

**plants** [2] - 995:18, 995:22

**play** [4] - 973:15, 1020:18, 1184:8, 1184:15

**played** [1] - 1184:18

**playing** [1] - 964:10

**pleased** [1] - 1010:18

**plus** [2] - 964:7, 1135:5

**POA** [5] - 998:3, 999:2, 999:6, 1117:18, 1123:2

**pocket** [1] - 1055:17

**podium** [4] - 995:8, 1031:13, 1039:23, 1045:21

**point** [48] - 962:3, 962:21, 965:11, 968:9, 968:16, 972:13, 972:18, 979:14, 979:15, 982:22, 991:5, 996:25, 998:9, 1002:18, 1002:20, 1002:22, 1014:20, 1017:20, 1017:24, 1022:16, 1022:18, 1035:10, 1052:15, 1054:12, 1054:17, 1059:18, 1064:13,

1065:9, 1065:10, 1065:17, 1070:22, 1072:16, 1073:2, 1085:19, 1109:1, 1112:17, 1156:10, 1164:8, 1179:15, 1199:2, 1200:6, 1205:19, 1222:5, 1234:12, 1237:17, 1237:22, 1257:8

**pointed** [4] - 1088:23, 1189:15, 1189:19, 1221:10

**points** [3] - 963:3, 1011:6, 1039:14

**policed** [2] - 1255:1, 1255:2

**policies** [11] - 1097:18, 1098:24, 1099:18, 1100:16, 1100:19, 1104:5, 1104:23, 1105:1, 1148:6, 1148:10, 1162:13

**policy** [35] - 992:25, 1060:4, 1071:6, 1071:16, 1090:6, 1090:10, 1090:13, 1097:21, 1098:10, 1098:14, 1098:18, 1098:21, 1099:8, 1099:14, 1099:16, 1100:6, 1100:10, 1100:22, 1101:3, 1103:19, 1104:24, 1104:25, 1105:8, 1134:1, 1134:5, 1136:23, 1157:23, 1158:5, 1158:8, 1163:2, 1163:12, 1191:24, 1234:20

**poor** [2] - 980:11, 1225:5

**pop** [1] - 964:22

**population** [3] - 1057:10, 1187:23, 1235:25

**portion** [7] - 957:1, 961:5, 989:23, 1055:12, 1131:4, 1208:16, 1224:8

**Portland** [2] - 968:7, 968:17

**pose** [1] - 1251:23

**posed** [6] - 1186:1, 1240:1, 1240:19, 1251:16, 1251:23, 1253:5

**position** [13] - 970:3, 971:8, 971:18,

986:3, 986:8, 988:15, 990:14, 1054:13, 1054:16, 1084:6, 1086:17, 1228:15

**positions** [7] - 967:25, 968:1, 994:15, 999:6, 1060:21, 1093:22, 1113:4

**positive** [2] - 981:6, 1201:5

**possibility** [1] - 1032:24

**possible** [3] - 1023:9, 1041:12, 1214:6

**possibly** [3] - 1024:13, 1042:12, 1211:16

**post** [1] - 1186:23

**postponement** [1] - 961:12

**potential** [1] - 1007:17

**potentially** [7] - 985:2, 1000:3, 1049:22, 1130:2, 1136:10, 1209:18, 1238:10

**practice** [6] - 1025:11, 1031:24, 1096:3, 1096:11, 1115:12

**practiced** [1] - 1162:15

**praise** [1] - 969:17

**praising** [1] - 1016:23

**pre** [1] - 1219:4

**pre-typed** [1] - 1219:4

**preadmitted** [1] - 978:5

**preclude** [1] - 959:13

**precluded** [1] - 1256:7

**predict** [1] - 1258:7

**prefer** [3] - 982:1, 982:2, 1025:1

**preferably** [1] - 1038:11

**preference** [2] - 1045:17, 1073:19

**preferred** [3] - 1025:7, 1042:8, 1140:7

**prejudiced** [1] - 963:17

**preparation** [2] - 1048:19, 1196:6

**prepare** [3] - 1196:10, 1196:16, 1198:14

**prepared** [2] - 1020:13, 1139:8, 1140:15

**preparing** [2] - 1197:20, 1198:13

**prepped** [1] - 996:5

**prescribe** [10] -

1008:4, 1008:8, 1008:14, 1010:25, 1046:3, 1047:19, 1114:12, 1128:20, 1129:3, 1130:15

**prescribed** [2] - 1056:25, 1192:19

**prescriber** [3] - 1031:14, 1092:20, 1188:13

**prescribers** [16] - 988:1, 990:19, 999:12, 1003:2, 1003:3, 1007:25, 1008:11, 1008:15, 1009:14, 1028:12, 1053:14, 1053:15, 1053:18, 1061:16, 1061:18

**prescribing** [13] - 990:21, 996:17, 1008:6, 1008:13, 1031:23, 1038:11, 1047:14, 1048:6, 1050:21, 1051:16, 1053:16, 1063:6, 1163:15

**prescription** [11] - 973:20, 1030:10, 1050:18, 1051:1, 1051:12, 1053:17, 1114:11, 1205:11, 1235:1, 1235:8, 1235:11

**prescription-level** [1] - 1051:1

**prescriptions** [19] - 974:1, 983:1, 983:3, 990:20, 997:1, 997:7, 997:15, 1027:5, 1027:6, 1027:18, 1030:6, 1033:12, 1033:17, 1038:8, 1038:20, 1050:1, 1051:12, 1063:12, 1248:5

**present** [2] - 993:23, 1020:12

**presentation** [7] - 995:8, 1014:11, 1020:24, 1149:16, 1150:8, 1150:11, 1193:3

**presentations** [2] - 995:9, 999:3

**presented** [3] - 1018:18, 1127:1, 1219:5

**presenting** [3] - 996:7, 1149:1, 1149:6

**president** [4] - 973:10, 979:19, 993:23, 1111:20

**president's** [3] - 1227:8, 1230:16, 1230:17

**president/CEO** [1] - 969:8

**pressure** [9] - 969:24, 1113:12, 1125:5, 1125:7, 1125:19, 1125:22, 1135:16, 1163:14, 1249:20

**pressured** [1] - 1113:6

**presume** [6] - 1001:13, 1076:3, 1084:1, 1084:15, 1171:15, 1258:4

**pretty** [13] - 978:19, 986:25, 1067:16, 1072:5, 1125:15, 1127:23, 1143:14, 1164:9, 1164:11, 1164:24, 1187:16, 1238:10, 1258:1

**prevent** [3] - 1141:16, 1205:22, 1214:9

**preventing** [1] - 975:11

**previous** [6] - 994:19, 995:7, 1009:2, 1073:25, 1202:21, 1225:3

**previously** [5] - 1042:18, 1046:8, 1171:12, 1173:12, 1257:15

**Prezista** [100] - 973:21, 973:22, 975:13, 976:1, 977:21, 981:13, 981:22, 982:10, 982:16, 982:25, 984:6, 984:15, 985:11, 985:21, 994:25, 996:4, 997:8, 997:16, 1007:3, 1007:18, 1008:14, 1008:16, 1008:25, 1010:13, 1014:10, 1015:5, 1016:15, 1016:19, 1017:10, 1019:5, 1024:14, 1030:13, 1032:4, 1033:7, 1038:5, 1039:18, 1039:22, 1043:24, 1044:1, 1045:5, 1046:4, 1050:6, 1053:5, 1053:14,

1055:22, 1057:6,
1057:14, 1057:17,
1093:9, 1097:9,
1097:14, 1105:25,
1107:1, 1107:11,
1113:13, 1113:18,
1115:17, 1116:5,
1120:5, 1120:10,
1121:1, 1121:3,
1121:8, 1124:22,
1125:25, 1126:7,
1127:5, 1127:9,
1127:14, 1127:20,
1127:24, 1132:14,
1135:7, 1156:14,
1156:18, 1163:19,
1163:24, 1168:22,
1168:25, 1169:1,
1169:11, 1174:9,
1177:10, 1177:11,
1177:23, 1178:3,
1180:25, 1183:11,
1183:12, 1183:16,
1192:12, 1192:18,
1192:19, 1239:1,
1242:1, 1243:15,
1244:23, 1247:7,
1247:14
**Prezista's** [9] -
975:17, 986:1,
992:15, 1036:14,
1106:10, 1106:17,
1107:25, 1132:19,
1177:6
**Primary** [5] - 970:10,
970:15, 970:17,
970:24, 971:4
**primary** [2] - 974:11,
1083:2
**principles** [1] -
1151:22
**priority** [2] - 1037:25,
1041:23
**private** [1] - 969:18
**privy** [1] - 1004:25
**proactive** [1] - 1025:1
**probing** [1] - 1188:20
**problem** [8] - 975:11,
980:19, 993:20,
1015:7, 1037:11,
1052:23, 1212:12,
1251:9
**proceed** [7] - 959:12,
966:2, 1075:6,
1087:2, 1109:14,
1230:1, 1241:22
**PROCEEDINGS** [1] -
956:1
**proceedings** [1] -
1261:5

**Proceedings** [1] -
954:25
**process** [18] - 962:16,
962:21, 962:23,
1001:25, 1007:9,
1008:20, 1031:4,
1031:8, 1061:5,
1084:6, 1101:22,
1104:18, 1146:1,
1173:21, 1204:16,
1206:4, 1207:19,
1213:11
**processed** [1] -
980:24
**procured** [1] - 1236:6
**produced** [2] - 954:25,
1005:18
**product** [42] - 972:7,
973:19, 979:22,
980:22, 983:23,
984:3, 990:1, 995:6,
996:20, 999:12,
1003:8, 1003:9,
1003:10, 1003:11,
1011:7, 1020:6,
1041:24, 1045:24,
1046:22, 1049:9,
1049:14, 1053:21,
1053:22, 1059:23,
1060:16, 1098:11,
1105:22, 1117:25,
1122:17, 1122:18,
1129:21, 1133:18,
1142:15, 1179:5,
1180:3, 1180:7,
1190:3, 1192:6,
1192:22, 1245:19,
1247:8, 1247:18
**product-labeling** [1] -
1180:3
**products** [13] -
967:15, 971:9,
971:10, 972:2,
972:16, 974:13,
976:25, 977:1,
1030:11, 1061:1,
1061:3, 1095:20,
1134:2
**PRODUCTS** [1] -
954:7
**profile** [9] - 984:14,
1057:14, 1106:11,
1106:17, 1107:18,
1108:1, 1163:24,
1164:17, 1166:18
**program** [28] - 991:11,
994:18, 996:13,
997:10, 997:13,
1009:15, 1011:10,
1012:21, 1013:25,

1016:6, 1020:13,
1021:3, 1023:8,
1026:4, 1038:9,
1054:6, 1063:19,
1063:20, 1090:23,
1091:3, 1092:11,
1114:10, 1143:15,
1190:14, 1190:20,
1192:24, 1196:5,
1225:20
**programs** [16] -
994:14, 994:20,
994:24, 995:25,
1009:8, 1026:6,
1026:13, 1029:24,
1037:8, 1043:22,
1046:15, 1046:21,
1087:21, 1183:12,
1225:21, 1248:3
**progressed** [1] -
976:13
**progressing** [1] -
1136:1
**prohibited** [7] - 958:7,
959:5, 959:10,
993:1, 1097:18,
1097:21, 1134:7
**prohibition** [1] -
1037:16
**prohibits** [2] - 1049:4,
1049:6
**projections** [1] -
983:12
**promise** [1] - 1171:23
**promote** [19] - 984:3,
1059:23, 1093:9,
1096:24, 1097:8,
1098:15, 1105:16,
1113:7, 1117:22,
1117:23, 1134:1,
1134:18, 1135:7,
1136:15, 1138:9,
1138:10, 1141:19,
1236:24, 1236:25
**promoted** [11] - 968:6,
970:3, 979:24,
979:25, 986:6,
986:10, 986:20,
1061:1, 1129:21,
1130:4, 1136:17
**promoting** [13] -
972:2, 972:5,
1094:19, 1095:7,
1096:16, 1097:13,
1140:23, 1141:15,
1141:17, 1146:16,
1158:5, 1178:20,
1189:24
**promotion** [13] -
971:6, 994:12,

1097:22, 1098:11,
1098:19, 1100:8,
1104:24, 1105:12,
1150:5, 1162:25,
1179:4, 1226:12,
1238:6
**Promotional** [1] -
1132:7
**promotional** [14] -
993:17, 994:25,
1006:24, 1037:7,
1057:3, 1059:4,
1133:17, 1166:7,
1168:3, 1173:25,
1178:2, 1179:7,
1180:19, 1181:20
**promotions** [1] -
1095:24
**prompt** [1] - 1185:22
**prompted** [1] -
1061:13
**pronounce** [1] -
1193:8
**pronounced** [1] -
1193:19
**proposing** [1] -
1145:25
**PROSPECTIVE** [1] -
1222:19
**protease** [16] - 977:10,
980:21, 980:23,
1008:17, 1038:21,
1121:24, 1122:2,
1122:4, 1122:5,
1122:9, 1122:17,
1127:9, 1164:11,
1196:13, 1199:19,
1247:19
**protect** [1] - 1153:10
**proud** [1] - 1249:8
**proven** [6] - 1005:6,
1164:17, 1164:23,
1166:18, 1236:3,
1243:25
**provide** [6] - 991:3,
1133:16, 1157:25,
1195:18, 1199:4,
1249:14
**provided** [10] -
1021:20, 1067:10,
1068:23, 1085:22,
1135:12, 1143:9,
1231:24, 1232:11,
1232:12, 1233:3
**provider** [1] - 1007:6
**providers** [4] -
1007:17, 1008:21,
1205:22, 1205:25
**provides** [1] - 1018:24
**provoke** [1] - 1135:20

**public** [3] - 969:17,
969:20, 1209:17
**publications** [2] -
1191:15, 1191:19
**publish** [8] - 978:5,
1006:13, 1010:8,
1012:18, 1024:1,
1029:7, 1212:23,
1214:13
**published** [1] - 992:5
**pull** [10] - 997:18,
1009:17, 1013:8,
1033:19, 1071:12,
1081:4, 1081:7,
1172:16, 1173:7,
1244:17
**pulled** [1] - 1080:8
**punishing** [1] - 980:10
**purchase** [1] -
1228:15
**purchases** [1] -
970:23
**purchasing** [1] -
970:22
**purpose** [8] - 1025:8,
1101:10, 1131:8,
1133:16, 1153:9,
1235:1, 1235:22,
1241:9
**purposely** [1] -
1141:12
**purposes** [3] -
1085:10, 1099:23,
1166:7
**pursue** [3] - 1039:21,
1208:13, 1209:12
**pursuing** [1] - 1045:20
**push** [3] - 982:10,
1023:8, 1238:3
**pushback** [1] - 983:18
**pushed** [4] - 1024:18,
1035:7, 1056:7,
1056:19
**pushing** [1] - 1053:5
**put** [46] - 959:24,
960:25, 963:12,
974:18, 976:19,
977:6, 980:13,
983:12, 984:10,
993:13, 1001:14,
1004:15, 1005:19,
1015:12, 1032:25,
1048:11, 1048:12,
1048:22, 1048:24,
1058:21, 1059:8,
1060:8, 1064:12,
1081:15, 1108:8,
1126:20, 1137:18,
1144:18, 1146:5,
1146:24, 1147:5,

1147:7, 1150:4,
1158:20, 1173:12,
1176:6, 1183:12,
1189:20, 1213:4,
1219:3, 1232:20,
1232:21, 1233:1,
1248:13, 1251:25,
1256:2
**puts** [3] - 1161:1,
1200:21, 1214:1
**putting** [6] - 1021:22,
1051:13, 1056:22,
1074:1, 1110:19,
1145:25

## Q

**qualification** [1] -
1242:4
**qualifications** [1] -
1191:13
**quantities** [2] -
1049:10, 1203:21
**quantity** [2] - 1049:14,
1205:11
**quarter** [3] - 1032:21,
1033:2, 1108:12
**questionable** [1] -
1224:15
**questioning** [12] -
957:16, 960:10,
962:25, 973:18,
1063:11, 1066:7,
1066:8, 1086:22,
1213:23, 1231:11,
1252:25, 1253:1
**Questions** [1] -
1074:5
**questions** [41] -
957:20, 958:3,
959:1, 961:23,
996:6, 1005:2,
1061:12, 1075:15,
1099:18, 1108:8,
1155:10, 1158:24,
1159:23, 1161:8,
1161:12, 1163:9,
1164:13, 1172:16,
1188:20, 1188:22,
1189:3, 1189:20,
1189:21, 1214:6,
1222:7, 1229:2,
1230:7, 1240:1,
1242:9, 1243:1,
1246:24, 1251:22,
1251:24, 1252:19,
1253:5, 1253:12,
1253:13, 1254:14,
1254:16, 1255:21,
1257:14

**qui** [4] - 1066:20,
1213:12, 1213:25
**quick** [4] - 969:19,
1119:22, 1173:16,
1183:11
**quicker** [2] - 1114:20,
1253:12
**quickly** [11] - 995:2,
1009:12, 1023:9,
1026:2, 1097:7,
1115:24, 1119:6,
1127:23, 1181:25,
1190:11, 1206:10
**quit** [1] - 1058:19
**quite** [6] - 973:7,
974:2, 974:8, 977:3,
991:16, 1019:14
**quota** [5] - 1182:1,
1182:3, 1182:18,
1182:22, 1183:1
**quote** [7] - 1015:7,
1022:3, 1042:12,
1045:23, 1089:8,
1089:13, 1101:1
**QURAISHI** [2] -
954:11, 956:2

## R

**raise** [2] - 961:10,
1152:22
**raised** [10] - 1126:17,
1154:9, 1154:12,
1155:11, 1155:17,
1156:6, 1208:9,
1223:16, 1223:17,
1223:22
**raises** [1] - 1221:3
**raising** [4] - 1095:6,
1095:9, 1153:19,
1159:23
**rapidly** [1] - 996:3
**rare** [1] - 1060:24
**rate** [1] - 1020:15
**rationale** [2] - 1038:5,
1203:20
**rationales** [1] -
1031:19
**RDR** [1] - 1261:11
**reach** [1] - 1118:1
**reached** [1] - 1162:3
**reaction** [11] - 1018:8,
1018:12, 1107:13,
1108:3, 1178:13,
1178:14, 1179:11,
1179:16, 1179:17,
1179:21, 1245:9
**reactions** [7] - 980:16,
984:8, 985:5,
985:14, 1130:17,

1179:16, 1179:24
**Reactions** [2] -
1244:25, 1245:13
**read** [9] - 1019:16,
1038:3, 1039:25,
1043:15, 1047:7,
1048:7, 1073:4,
1110:24, 1111:3
**readily** [2] - 992:9,
992:21
**reading** [4] - 1084:9,
1110:3, 1115:12,
1195:6
**ready** [7] - 964:12,
965:2, 965:14,
1035:3, 1109:14,
1140:16, 1230:1
**real** [8] - 958:18,
961:23, 962:2,
1086:3, 1163:14,
1209:6, 1256:23,
1258:14
**realigned** [2] -
1055:19, 1227:15
**realist** [2] - 1021:24,
1023:1
**reality** [9] - 993:18,
1059:10, 1060:1,
1125:1, 1159:20,
1162:15, 1189:15,
1213:25, 1234:23
**realize** [2] - 970:23,
1123:21
**realized** [1] - 1080:9
**really** [19] - 961:6,
979:12, 989:1,
1100:24, 1101:2,
1101:3, 1111:12,
1113:1, 1137:7,
1140:23, 1148:13,
1170:3, 1183:10,
1187:4, 1224:25,
1226:22, 1252:9,
1253:7
**reams** [2] - 1141:5
**rear** [2] - 1059:9,
1190:10
**reason** [21] - 961:12,
962:12, 1001:25,
1012:8, 1035:21,
1044:4, 1048:13,
1062:21, 1082:14,
1101:2, 1115:20,
1115:22, 1140:3,
1157:5, 1187:22,
1209:11, 1213:7,
1214:6, 1224:14,
1240:11, 1242:6
**reasonable** [1] -
983:22

**reasonably** [2] -
961:10, 961:14
**reasons** [12] - 961:7,
962:8, 963:23,
1035:24, 1062:22,
1063:3, 1115:17,
1183:10, 1183:20,
1203:17, 1239:25
**reassigned** [2] -
973:10, 1225:8
**receive** [3] - 1005:15,
1072:2, 1095:22
**received** [20] - 971:5,
992:13, 1000:15,
1000:25, 1004:24,
1005:11, 1014:10,
1023:20, 1026:9,
1062:8, 1097:8,
1104:25, 1105:7,
1113:18, 1131:5,
1133:9, 1216:8,
1217:9, 1232:24
**receiving** [3] -
1004:22, 1063:15,
1135:4
**recently** [2] - 1118:10,
1144:7
**receptor** [1] - 980:25
**recess** [7] - 964:6,
964:15, 964:25,
1034:16, 1034:22,
1109:5, 1229:15
**recipient** [1] - 1005:12
**recipients** [2] -
1026:10, 1074:8
**recognize** [10] -
979:16, 997:25,
1003:15, 1023:17,
1024:6, 1028:18,
1028:20, 1040:18,
1124:16, 1175:6
**recognized** [2] -
1196:22, 1202:9
**recollect** [1] - 1008:1
**recollecting** [1] -
1226:15
**recollection** [2] -
1045:19, 1119:20
**recommend** [5] -
1037:24, 1048:5,
1050:20, 1051:15,
1101:23
**recommendation** [10]
- 1007:8, 1016:14,
1030:17, 1031:2,
1031:16, 1031:19,
1102:6, 1104:18,
1104:19, 1203:8
**recommendations** [2]
- 1017:5, 1102:3,

1103:20, 1206:4
**recommended** [7] -
1031:5, 1102:9,
1102:11, 1104:7,
1127:5, 1127:10,
1127:14
**recommending** [3] -
1030:22, 1050:25,
1190:19
**reconvene** [2] -
1034:19, 1229:12
**record** [11] - 956:6,
962:9, 963:4,
963:15, 965:25,
1084:9, 1086:2,
1086:7, 1171:16,
1232:18, 1261:5
**recorded** [2] - 954:25,
1224:20
**recording** [1] -
1224:23
**records** [1] - 1022:7
**recover** [2] - 1037:5,
1208:14
**recovered** [1] -
1017:15
**recovery** [1] - 1067:13
**recruited** [1] - 968:23
**redacted** [1] - 1209:25
**redactions** [1] -
1072:10
**REDIRECT** [2] - 955:5,
1230:4
**redirect** [15] - 957:22,
958:4, 958:10,
959:1, 959:19,
960:16, 962:22,
962:25, 1213:11,
1213:19, 1213:21,
1229:6, 1230:2,
1254:4, 1254:9
**reduce** [2] - 977:17,
1056:23
**reduction** [1] -
1127:19
**REESE** [1] - 954:14
**reference** [1] - 1089:9
**referenced** [2] -
1040:21, 1219:20
**references** [2] -
1217:4, 1220:2
**referencing** [1] -
1166:10
**referred** [2] - 1056:14,
1119:12
**referring** [4] - 1015:5,
1018:20, 1088:20,
1090:4
**refrain** [1] - 1133:18
**refresh** [1] - 1205:18

**regarding** [12] - 984:6, 991:11, 1026:1, 1045:15, 1057:2, 1068:10, 1163:24, 1178:3, 1182:23, 1186:12, 1195:18, 1216:8
**regardless** [1] - 1020:14
**regards** [5] - 974:6, 990:21, 1011:7, 1062:24, 1107:18
**regimen** [1] - 982:10
**regional** [10] - 978:20, 978:24, 979:1, 979:4, 986:12, 988:11, 1022:18, 1022:19, 1154:17, 1206:18
**regular** [1] - 1001:25
**regulated** [1] - 1098:11
**regulation** [1] - 1096:14
**regulations** [3] - 1096:10, 1147:3, 1180:9
**regulators** [1] - 1073:13
**regulatory** [1] - 1074:17
**rehabilitate** [2] - 1254:9, 1254:15
**reigning** [1] - 1154:22
**reimbursable** [1] - 1183:22
**reimbursed** [2] - 1089:6, 1089:12
**reimbursement** [15] - 961:18, 962:21, 962:23, 1083:3, 1085:6, 1087:20, 1087:22, 1088:2, 1088:6, 1088:21, 1089:1, 1089:16, 1090:3, 1090:8, 1183:16
**reiterate** [1] - 1220:13
**related** [8] - 980:16, 985:15, 1174:9, 1178:2, 1235:13, 1243:11, 1252:17
**relates** [9] - 1091:9, 1091:13, 1116:3, 1152:17, 1168:21, 1177:6, 1181:4, 1226:21, 1228:21
**relationship** [3] - 1065:10, 1065:13, 1076:21

**relationships** [2] - 1033:5, 1044:24
**relatively** [1] - 976:16
**Relator** [2] - 1066:23, 1259:4
**Relators** [15] - 954:18, 956:8, 956:10, 956:12, 956:14, 956:16, 957:13, 965:18, 966:7, 999:15, 1023:22, 1029:3, 1232:23, 1259:14, 1259:19
**Relators'** [54] - 955:8, 955:8, 955:9, 955:10, 955:11, 955:11, 955:12, 955:12, 958:14, 960:5, 961:19, 962:9, 962:20, 963:12, 963:13, 963:17, 963:24, 965:12, 978:5, 997:19, 997:23, 999:15, 1003:13, 1006:6, 1006:12, 1009:18, 1009:20, 1010:3, 1010:4, 1010:7, 1012:2, 1012:14, 1012:17, 1013:10, 1013:12, 1013:17, 1013:20, 1020:8, 1023:15, 1023:22, 1023:25, 1028:16, 1029:3, 1029:6, 1033:19, 1033:21, 1033:24, 1034:2, 1036:5, 1071:13, 1072:7, 1073:8, 1139:4, 1257:12
**relay** [1] - 1043:14
**release** [1] - 1201:16
**released** [1] - 1125:5
**releasing** [1] - 1125:19
**relevance** [1] - 1222:14
**relieved** [1] - 1125:7
**remain** [9] - 964:21, 965:1, 1034:23, 1108:14, 1108:22, 1109:4, 1229:16, 1250:19, 1259:22
**remaining** [2] - 1056:25, 1120:24
**remarkable** [1] - 1136:21
**remember** [35] - 962:5, 976:18,

977:8, 1014:15, 1015:2, 1028:13, 1041:2, 1041:3, 1042:24, 1050:8, 1050:13, 1050:14, 1079:8, 1088:8, 1104:1, 1105:18, 1109:24, 1110:4, 1113:15, 1154:24, 1165:3, 1182:7, 1190:16, 1191:3, 1204:8, 1208:6, 1223:5, 1223:6, 1223:24, 1231:3, 1234:2, 1235:15, 1238:24, 1242:15, 1248:12
**remembering** [1] - 1079:5
**remembers** [1] - 1066:4
**remind** [3] - 1022:16, 1109:10, 1121:3
**reminder** [1] - 1133:16
**remotely** [2] - 1257:18, 1258:18
**remove** [2] - 1049:23, 1209:6
**removed** [3] - 1032:5, 1042:10, 1210:1
**removing** [1] - 1051:18
**reorient** [2] - 1087:6, 1166:16
**rep** [4] - 975:9, 1161:3, 1165:4, 1165:5
**rep's** [1] - 1062:6
**repeat** [3] - 992:19, 1050:23, 1255:25
**repercussions** [1] - 1036:4
**rephrase** [5] - 963:19, 1030:21, 1051:11, 1069:1, 1164:21
**report** [26] - 989:3, 993:4, 993:6, 999:21, 1002:21, 1022:3, 1022:12, 1022:15, 1022:22, 1068:19, 1094:18, 1095:21, 1096:15, 1148:11, 1182:18, 1206:24, 1207:3, 1207:7, 1207:11, 1207:15, 1208:3, 1226:20, 1231:19, 1240:8, 1254:16, 1254:18
**reported** [18] - 978:23,

989:5, 990:6, 994:1, 994:6, 998:10, 1002:3, 1002:19, 1022:10, 1022:24, 1035:21, 1036:3, 1041:15, 1066:5, 1070:23, 1206:13, 1226:12, 1254:17
**reporter** [1] - 1213:17
**Reporter** [2] - 954:23, 1261:12
**REPORTER'S** [1] - 1261:1
**reporting** [4] - 1054:19, 1054:23, 1095:6, 1209:1
**reports** [10] - 1002:1, 1002:3, 1029:10, 1196:4, 1217:23, 1218:1, 1218:3, 1218:6, 1218:8, 1224:15
**represent** [1] - 966:7
**representation** [2] - 1072:24, 1072:25
**representative** [17] - 967:13, 967:23, 968:3, 998:4, 999:13, 1016:4, 1029:13, 1043:5, 1069:17, 1136:14, 1145:18, 1189:13, 1190:1, 1190:6, 1194:7, 1199:3, 1247:13
**representatives** [27] - 974:15, 975:6, 983:21, 986:13, 986:18, 989:4, 1054:22, 1058:8, 1061:10, 1062:2, 1070:3, 1095:4, 1100:7, 1130:19, 1133:17, 1135:17, 1138:7, 1147:15, 1169:6, 1173:18, 1180:23, 1182:23, 1183:2, 1184:5, 1225:17, 1248:2
**representing** [3] - 1080:3, 1080:18, 1138:13
**represents** [1] - 1007:21
**reprimand** [1] - 994:12
**reprimanded** [1] - 1097:7
**reps** [31] - 988:14, 988:23, 988:25, 989:8, 990:13,

1054:25, 1057:13, 1057:16, 1057:19, 1057:20, 1070:5, 1092:25, 1093:15, 1093:21, 1094:5, 1094:12, 1094:18, 1094:24, 1095:7, 1096:15, 1098:19, 1128:15, 1135:5, 1138:17, 1160:8, 1160:13, 1163:23, 1165:9, 1174:4, 1175:22, 1176:11
**reputation** [2] - 973:9, 973:14
**request** [15] - 957:1, 961:5, 962:11, 963:23, 1060:10, 1060:14, 1060:18, 1061:4, 1061:11, 1062:7, 1136:5, 1184:7, 1185:18, 1189:11, 1249:14
**requests** [6] - 1062:18, 1133:22, 1159:10, 1185:11, 1188:23, 1248:6
**require** [2] - 1049:13, 1096:14
**required** [6] - 961:25, 1002:7, 1033:4, 1071:19, 1148:10, 1244:1
**requirement** [1] - 1022:8
**requirements** [13] - 1043:14, 1088:2, 1088:13, 1088:16, 1089:1, 1089:6, 1089:11, 1089:19, 1203:18, 1205:11, 1205:13, 1205:16, 1238:7
**requires** [2] - 1103:19, 1251:11
**reread** [1] - 1182:20
**research** [1] - 1126:3
**reserve** [1] - 1256:14
**resistant** [3] - 1014:24, 1121:24, 1122:9
**resolve** [3] - 957:7, 960:24, 963:25
**resolved** [1] - 964:11
**resonated** [1] - 1052:13
**resource** [2] - 1142:6, 1144:19
**resources** [5] - 993:7, 1162:17, 1207:4,

1247:11
**respect** [1] - 1197:4
**respectful** [1] - 1034:5
**respectfully** [2] - 1136:12, 1178:22
**respond** [2] - 1030:16, 1251:16
**responded** [2] - 1008:21, 1157:14
**responding** [2] - 1039:5, 1045:10
**responds** [2] - 1048:5, 1050:15
**response** [16] - 961:19, 963:10, 1030:21, 1157:20, 1158:1, 1158:22, 1159:7, 1159:10, 1159:15, 1160:3, 1160:9, 1161:11, 1239:5, 1240:7, 1257:1, 1257:6
**responses** [5] - 1153:1, 1153:11, 1155:12, 1252:20, 1252:21
**responsibilities** [1] - 995:23
**responsibility** [12] - 986:17, 987:23, 987:24, 990:25, 1001:23, 1082:19, 1082:25, 1083:2, 1094:18, 1101:4, 1165:9, 1249:4
**responsible** [5] - 968:3, 988:14, 1065:5, 1194:8, 1257:13
**rest** [4] - 975:10, 1025:5, 1121:18, 1239:14
**restaurant** [1] - 1206:19
**restaurants** [1] - 1219:12
**restrict** [1] - 1037:7
**restricted** [1] - 1128:15
**restrictive** [1] - 975:16
**result** [3] - 999:23, 1074:17, 1185:1
**resulted** [2] - 1100:8, 1220:24
**results** [3] - 982:22, 1136:9, 1156:18
**retained** [1] - 972:10
**reticent** [1] - 1255:12
**retribution** [1] - 1035:20

returning [1] - 1046:10
**review** [18] - 962:1, 963:3, 1017:9, 1037:21, 1061:24, 1081:19, 1082:5, 1099:8, 1145:15, 1168:15, 1173:21, 1182:5, 1185:13, 1201:16, 1206:10, 1220:19, 1220:23, 1227:1
**reviewed** [3] - 957:2, 961:2, 1001:6
**reviewing** [1] - 961:4
**revise** [3] - 1123:12, 1123:15, 1123:16
**revised** [1] - 1018:14
**revision** [1] - 1203:15
**revisiting** [1] - 963:11
**Reyataz** [19] - 977:11, 981:6, 982:2, 984:11, 985:12, 995:1, 1017:11, 1057:14, 1059:19, 1107:17, 1166:12, 1178:17, 1178:18, 1178:19, 1178:21
**Richard** [2] - 998:6, 1001:21
**Rick** [2] - 1223:23, 1224:3
**ridiculous** [1] - 1061:23
**riding** [1] - 990:13
**rigid** [5] - 1204:22, 1205:7, 1205:8, 1205:12, 1205:21
**rigidity** [1] - 1205:10
**rise** [9] - 956:4, 965:4, 1034:15, 1034:25, 1108:15, 1109:7, 1229:13, 1229:23, 1260:1
**risk** [6] - 1129:23, 1129:24, 1129:25, 1141:14, 1161:1
**ritonavir** [4] - 980:22, 980:24, 1121:9, 1199:23
**roadblocks** [1] - 976:23
**Robb** [3] - 1221:14, 1221:17, 1222:24
**robust** [3] - 1143:14, 1193:14, 1193:17
**Rocephin** [2] - 967:15, 968:22
**Roche** [13] - 967:11, 967:12, 967:14,

967:23, 967:24, 968:1, 968:9, 968:21, 972:15, 1019:1, 1019:3, 1196:13, 1219:15
**rode** [1] - 1029:13
Rodney [1] - 954:21
**role** [4] - 1000:17, 1008:6, 1095:9
**roll** [1] - 1054:20
Ron [2] - 979:19, 980:4
**room** [5] - 1062:12, 1160:13, 1160:22, 1161:15, 1198:23
**roughly** [3] - 975:4, 988:14, 1242:22
**round** [2] - 1007:22
**rude** [1] - 1199:12
**rule** [1] - 958:6
**ruled** [4] - 1257:9, 1257:15, 1258:2, 1258:17
**rules** [2] - 1104:5, 1148:6
**ruling** [5] - 963:6, 963:7, 1072:10, 1072:18, 1210:23
**rulings** [1] - 1257:11
**run** [6] - 977:23, 978:9, 1052:9, 1052:21, 1053:2, 1144:11
**running** [1] - 1013:25
**rush** [1] - 1025:8
**Russ** [19] - 956:11, 966:7, 1000:10, 1035:3, 1075:24, 1102:1, 1171:2, 1172:19, 1174:17, 1184:13, 1213:20, 1214:20, 1222:7, 1229:6, 1229:17, 1230:1, 1232:25, 1241:14, 1256:8
**RUSS** [216] - 954:15, 955:4, 955:5, 956:11, 965:13, 965:16, 965:18, 966:2, 966:4, 978:4, 978:8, 985:20, 985:24, 997:18, 997:21, 998:13, 998:17, 998:22, 998:25, 999:15, 999:24, 1000:2, 1000:11, 1000:18, 1001:3, 1001:9, 1001:11, 1001:15, 1002:11, 1002:16,

1002:24, 1003:1, 1003:12, 1003:14, 1003:22, 1003:24, 1004:2, 1004:8, 1005:1, 1005:5, 1005:16, 1005:21, 1006:1, 1006:6, 1006:13, 1006:17, 1009:17, 1009:19, 1010:3, 1010:8, 1010:11, 1012:1, 1012:3, 1012:14, 1012:18, 1012:20, 1013:8, 1013:11, 1013:17, 1013:21, 1013:23, 1015:20, 1015:22, 1017:2, 1017:4, 1020:7, 1020:9, 1023:5, 1023:6, 1023:14, 1023:16, 1023:22, 1024:1, 1024:5, 1024:15, 1024:17, 1026:15, 1026:17, 1027:11, 1027:15, 1027:16, 1028:15, 1028:17, 1029:3, 1029:7, 1029:9, 1029:17, 1029:19, 1030:16, 1030:24, 1032:15, 1032:16, 1033:18, 1033:20, 1033:24, 1034:3, 1034:20, 1035:4, 1035:5, 1038:25, 1039:4, 1045:6, 1045:8, 1050:24, 1051:4, 1051:10, 1051:23, 1051:24, 1065:22, 1065:24, 1066:2, 1066:10, 1066:13, 1066:16, 1066:19, 1066:23, 1067:1, 1067:5, 1067:24, 1068:2, 1068:7, 1071:1, 1071:5, 1071:12, 1071:14, 1071:24, 1071:25, 1072:7, 1072:11, 1072:14, 1072:20, 1073:4, 1073:6, 1073:9, 1073:17, 1073:18, 1074:3, 1074:4, 1074:24, 1076:5, 1081:13, 1083:11, 1083:17, 1083:22, 1084:5, 1084:20, 1085:14, 1085:18, 1086:2, 1086:23, 1091:24, 1099:3,

1099:10, 1099:13, 1099:16, 1099:19, 1099:22, 1102:20, 1119:24, 1130:22, 1131:7, 1141:23, 1147:19, 1150:24, 1151:2, 1169:17, 1169:19, 1170:1, 1170:6, 1170:12, 1170:17, 1171:3, 1171:7, 1172:2, 1172:8, 1173:2, 1174:18, 1176:3, 1184:10, 1184:14, 1186:4, 1194:3, 1210:21, 1211:15, 1212:14, 1212:18, 1212:20, 1213:6, 1213:22, 1214:12, 1214:21, 1216:14, 1222:14, 1229:8, 1229:18, 1229:21, 1230:4, 1231:16, 1233:12, 1233:16, 1238:18, 1239:8, 1239:15, 1239:24, 1241:1, 1241:22, 1241:24, 1244:18, 1244:21, 1245:3, 1245:5, 1248:20, 1250:1, 1250:4, 1256:9, 1256:12

## S

**SAFE** [11] - 1103:21, 1103:25, 1104:3, 1104:6, 1104:10, 1104:14, 1203:18, 1204:1, 1204:25, 1205:12, 1205:25
**safe** [1] - 1236:3
**safety** [8] - 984:14, 1106:20, 1106:22, 1107:2, 1107:12, 1107:15, 1107:18
**Saint** [1] - 954:17
**Saladana** [10] - 1007:8, 1009:21, 1010:15, 1020:4, 1020:5, 1020:10, 1021:4, 1023:1, 1041:8, 1223:4
**sales** [206] - 967:13, 967:23, 968:7, 968:8, 968:19, 968:21, 968:24, 969:15, 972:5, 972:20, 972:21, 972:23, 974:7, 974:14, 974:23,

975:6, 975:9, 975:12, 978:20, 978:22, 978:23, 978:24, 979:1, 979:4, 979:14, 979:18, 979:23, 980:1, 980:13, 981:13, 981:25, 983:19, 983:21, 983:25, 986:4, 986:10, 986:12, 986:13, 986:18, 987:11, 987:13, 987:17, 987:18, 987:25, 988:7, 988:10, 988:11, 988:12, 988:14, 988:23, 988:25, 989:4, 989:5, 989:8, 990:4, 990:8, 990:13, 990:18, 992:20, 993:12, 993:19, 993:22, 995:23, 997:4, 997:5, 998:4, 998:9, 998:10, 999:13, 1007:13, 1007:16, 1016:4, 1022:18, 1022:19, 1026:3, 1027:4, 1028:9, 1028:21, 1029:13, 1030:2, 1031:5, 1031:10, 1032:21, 1032:23, 1033:2, 1033:4, 1036:22, 1039:9, 1043:5, 1048:18, 1048:20, 1052:21, 1054:17, 1054:21, 1054:24, 1054:25, 1055:4, 1057:13, 1057:16, 1057:19, 1057:20, 1058:8, 1059:12, 1059:21, 1061:9, 1061:12, 1062:2, 1062:6, 1062:16, 1063:3, 1064:3, 1064:7, 1064:8, 1064:23, 1069:16, 1070:3, 1070:5, 1073:23, 1092:25, 1093:15, 1093:21, 1094:5, 1094:12, 1094:18, 1094:24, 1095:4, 1095:6, 1096:15, 1098:19, 1100:7, 1100:8, 1101:10, 1101:14, 1101:22, 1104:17, 1105:16, 1106:10, 1106:17, 1110:12,

1110:13, 1110:16, 1110:21, 1113:13, 1115:18, 1116:3, 1116:5, 1117:7, 1117:9, 1117:10, 1125:5, 1126:17, 1127:20, 1127:23, 1128:15, 1130:19, 1131:19, 1131:22, 1133:5, 1133:17, 1135:5, 1135:11, 1135:17, 1135:24, 1135:25, 1136:9, 1136:14, 1138:7, 1138:17, 1141:16, 1141:18, 1145:18, 1147:15, 1154:17, 1160:13, 1161:2, 1162:17, 1163:23, 1165:4, 1165:5, 1165:9, 1169:6, 1173:17, 1174:4, 1175:22, 1176:11, 1180:23, 1182:23, 1183:2, 1183:6, 1183:21, 1184:5, 1189:12, 1190:1, 1194:7, 1199:3, 1206:18, 1225:16, 1227:16, 1230:18, 1247:11, 1247:13, 1248:1

**salespeople** [13] - 974:13, 974:25, 975:12, 983:13, 987:23, 1007:12, 1032:7, 1032:10, 1032:13, 1050:11, 1061:21, 1063:8, 1249:17

**Salt** [2] - 1139:21, 1140:6

**salvage** [11] - 976:1, 976:3, 976:9, 995:4, 1119:5, 1119:7, 1119:9, 1119:10, 1120:18, 1122:14

**salvaged** [2] - 976:20, 1247:17

**San** [3] - 1011:12, 1011:21, 1011:22, 1011:24, 1012:6, 1036:23, 1039:9, 1042:3

**SANDERSON** [1] - 954:16

**Sara** [7] - 978:17, 979:1, 1070:21, 1070:23, 1077:13, 1131:25, 1248:12

**sat** [1] - 1234:6
**save** [1] - 1005:23
**saw** [16] - 999:9, 1002:2, 1028:5, 1028:7, 1039:11, 1050:6, 1057:25, 1058:1, 1068:10, 1070:19, 1102:21, 1102:24, 1219:24, 1231:13, 1231:17, 1246:19
**scale** [1] - 1251:25
**scenario** [2] - 1189:8, 1189:10
**schedule** [1] - 1250:25
**scheme** [10] - 1025:12, 1025:15, 1093:9, 1093:12, 1093:17, 1094:9, 1094:22, 1095:14, 1109:22, 1141:4
**science** [3] - 967:5, 1184:2, 1184:23
**scientific** [6] - 1126:3, 1134:10, 1160:8, 1161:16, 1192:23, 1201:1
**scope** [3] - 960:4, 960:9, 960:14
**score** [2] - 1116:16, 1128:10
**Scott** [5] - 1043:19, 1046:21, 1184:6, 1203:5, 1203:25
**screen** [2] - 997:22, 1172:16
**scripts** [5] - 1038:5, 1038:12, 1039:18, 1050:7, 1248:4
**scroll** [1] - 1024:3
**Se** [2] - 979:22
**seal** [3] - 1213:24, 1215:13, 1215:17
**sealed** [2] - 1214:8, 1232:23
**seat** [3] - 965:6, 1109:9, 1250:24
**seated** [11] - 956:5, 964:21, 965:1, 1034:17, 1034:23, 1035:2, 1108:17, 1109:4, 1229:16, 1229:25, 1259:22
**second** [18] - 957:13, 957:21, 959:18, 959:19, 959:22, 960:15, 974:10, 982:22, 1014:20, 1024:15, 1026:16,

1037:3, 1043:12, 1083:9, 1178:15, 1252:22, 1256:5, 1257:8
**secondly** [1] - 962:13
**secret** [1] - 1032:24
**sector** [1] - 1209:16
**sedation** [1] - 967:16
**see** [160] - 958:13, 961:24, 964:15, 978:9, 978:10, 979:11, 982:22, 991:11, 997:9, 997:12, 997:22, 998:20, 998:23, 999:2, 999:6, 1000:5, 1003:25, 1005:25, 1006:18, 1007:1, 1007:10, 1008:22, 1009:20, 1010:12, 1010:21, 1011:9, 1014:3, 1014:9, 1014:20, 1015:9, 1015:10, 1015:11, 1015:16, 1015:25, 1016:2, 1016:7, 1016:10, 1016:12, 1016:16, 1017:7, 1017:17, 1018:23, 1021:1, 1021:25, 1024:24, 1026:18, 1030:3, 1030:4, 1031:25, 1032:17, 1036:12, 1036:17, 1037:3, 1037:9, 1037:20, 1037:22, 1039:5, 1040:6, 1040:12, 1040:14, 1041:17, 1041:20, 1041:25, 1042:1, 1042:11, 1043:10, 1043:12, 1043:18, 1044:9, 1044:10, 1045:12, 1045:13, 1045:25, 1046:1, 1046:5, 1046:6, 1046:7, 1046:16, 1047:9, 1047:20, 1047:25, 1050:16, 1055:22, 1057:13, 1057:16, 1057:19, 1057:20, 1064:9, 1064:21, 1070:17, 1071:15, 1073:10, 1073:19, 1074:5, 1074:9, 1076:11, 1081:24, 1082:6, 1087:24, 1092:7, 1092:8, 1108:13, 1116:24,

1120:22, 1121:2, 1121:5, 1121:17, 1121:18, 1121:21, 1122:1, 1123:3, 1124:8, 1131:14, 1133:8, 1134:8, 1134:12, 1135:1, 1135:2, 1135:25, 1142:7, 1142:16, 1143:7, 1143:24, 1144:1, 1155:2, 1155:16, 1155:18, 1169:12, 1175:12, 1175:18, 1176:12, 1177:3, 1186:10, 1187:12, 1188:14, 1195:9, 1197:21, 1200:8, 1204:23, 1205:23, 1215:3, 1215:7, 1215:14, 1215:15, 1224:21, 1234:21, 1235:6, 1235:8, 1235:10, 1244:5, 1244:7, 1244:22, 1244:25, 1245:12, 1245:16, 1254:6, 1259:12, 1259:17, 1259:23
**seeing** [4] - 1187:22, 1223:20, 1240:6, 1252:12
**seek** [2] - 1150:21, 1216:13
**seem** [1] - 1256:15
**segmenting** [1] - 1007:24
**seize** [1] - 1252:3
**seizing** [1] - 1252:3
**seldom** [1] - 1061:4
**select** [1] - 992:8
**selected** [12] - 991:18, 1030:9, 1030:23, 1038:14, 1102:11, 1151:11, 1160:2, 1182:14, 1190:21, 1190:24, 1203:2, 1204:1
**selecting** [3] - 1003:3, 1038:1, 1191:25
**selection** [8] - 1030:15, 1030:17, 1030:18, 1031:1, 1031:4, 1031:16, 1031:19, 1038:6
**sell** [16] - 969:2, 969:24, 993:8, 1056:5, 1057:13, 1057:16, 1057:20, 1059:24, 1105:22, 1110:22, 1117:25,

1162:9, 1162:10,
1228:12, 1228:13,
1228:17
**selling** [9] - 967:14,
968:22, 976:10,
976:23, 986:17,
1015:3, 1015:4,
1058:19, 1063:24
**send** [3] - 1007:7,
1059:1, 1143:24
**sending** [3] - 1073:20,
1110:8, 1133:4
**sends** [1] - 1060:18
**senior** [8] - 981:15,
989:24, 1048:17,
1058:7, 1058:9,
1061:25, 1094:8,
1152:12
**sense** [8] - 987:4,
1001:4, 1025:2,
1052:16, 1110:9,
1180:12, 1192:9,
1192:17
**sensitive** [1] - 1201:2
**sent** [7] - 1004:18,
1009:21, 1018:2,
1136:22, 1137:1,
1168:4, 1201:20
**sentence** [4] - 1083:9,
1121:18, 1204:5,
1239:14
**separate** [2] - 988:10,
1054:23
**separately** [5] -
1139:19, 1139:20,
1145:6, 1145:11,
1146:23
**September** [5] -
1013:15, 1013:24,
1014:18, 1015:24,
1131:13
**serious** [16] - 980:15,
1018:11, 1178:13,
1179:11, 1179:17,
1179:23, 1180:1,
1180:14, 1238:10,
1245:9, 1245:15,
1245:17, 1245:19,
1245:24, 1246:3,
1249:1
**services** [1] - 1029:25
**session** [3] - 1144:8,
1201:13, 1253:3
**set** [3] - 1098:22,
1101:10, 1187:18
**sets** [2] - 1180:7,
1239:2
**setting** [2] - 969:20,
1206:19
**setup** [1] - 1054:9

**seven** [3] - 971:14,
1036:14, 1255:4
**several** [2] - 1031:22,
1033:8
**severe** [1] - 1053:4
**share** [3] - 997:8,
997:10, 1030:11
**shared** [3] - 1168:3,
1210:13, 1232:19
**sharing** [4] - 1053:19,
1214:2, 1214:8,
1232:22
**Shaw** [1] - 1143:25
**shield** [2] - 993:15,
1059:8
**short** [8] - 963:9,
964:7, 964:25,
1034:22, 1040:16,
1165:23, 1170:24,
1229:15
**shortly** [1] - 1158:14
**shots** [1] - 1219:19
**show** [27] - 982:11,
982:13, 997:7,
1004:10, 1004:11,
1012:1, 1013:9,
1023:14, 1052:18,
1081:6, 1081:10,
1102:13, 1116:15,
1130:25, 1131:9,
1137:18, 1138:22,
1142:2, 1156:2,
1174:19, 1174:23,
1175:17, 1182:11,
1203:23, 1204:11,
1211:20, 1243:5
**showed** [20] -
1017:15, 1056:22,
1077:3, 1102:1,
1156:18, 1177:6,
1191:1, 1193:2,
2194:11, 1202:20,
1202:25, 1205:6,
1211:13, 1231:2,
1242:12, 1243:2,
1243:17, 1243:18,
1245:23
**showing** [2] -
1004:20, 1081:18
**shown** [1] - 1172:10
**shows** [2] - 1001:24,
1177:21
**shuts** [1] - 1050:15
**sic** [1] - 1197:23
**side** [13] - 980:15,
985:15, 988:12,
1057:17, 1093:3,
1166:12, 1166:13,
1237:1, 1237:2,
1239:6, 1245:6,

1245:19, 1257:24
**Sidebar** [18] - 1000:1,
1002:14, 1004:7,
1006:4, 1066:1,
1068:5, 1083:19,
1086:25, 1099:12,
1100:3, 1169:18,
1173:3, 1211:1,
1214:16, 1232:8,
1233:14, 1239:7,
1241:20
**sidebar** [7] - 961:16,
1006:11, 1072:19,
1210:23, 1232:21,
1233:10, 1251:7
**sides** [1] - 1251:5
**sign** [5] - 1080:5,
1082:11, 1085:22,
1156:2, 1157:1
**signature** [5] - 1081:6,
1081:20, 1081:25,
1082:5, 1087:11
**signed** [10] - 1080:8,
1080:11, 1080:21,
1080:23, 1083:7,
1084:24, 1084:25,
1085:21, 1086:18,
1087:7
**significant** [6] -
1067:12, 1067:19,
1105:20, 1179:20,
1208:14, 1208:16
**significantly** [1] -
972:8
**Silver** [7] - 1041:20,
1044:6, 1044:7,
1045:15, 1203:5,
1203:25
**silver** [1] - 1041:23
**similar** [9] - 999:10,
1054:8, 1057:5,
1066:9, 1080:1,
1080:25, 1085:2,
1131:2, 1162:14
**similarly** [3] - 1099:7,
1106:16, 1223:8
**simply** [1] - 1049:23
**single** [4] - 1029:12,
1146:20, 1162:14,
1219:15
**singled** [1] - 1219:10
**singular** [1] - 1146:23
**Sisneros** [2] -
1039:21, 1046:21
**sit** [5] - 1071:19,
1154:18, 1201:15,
1206:22, 1253:7
**sits** [2] - 1103:5,
1104:3
**sitting** [3] - 961:16,

964:1, 1136:4
**situation** [10] -
1021:21, 1047:11,
1059:23, 1110:2,
1115:19, 1194:20,
1202:6, 1202:14,
1222:2, 1224:3
**situations** [3] -
993:17, 1221:9,
1224:2
**six** [5] - 971:9, 984:22,
1017:21, 1124:5,
1129:20
**six-month** [1] - 1124:5
**SKADDEN** [1] -
954:19
**skill** [2] - 1187:18,
1223:17
**skills** [3] - 969:2,
1031:12
**sky** [2] - 1253:14
**SLATE** [1] - 954:19
**sleep** [3] - 1141:8,
1198:6, 1198:14
**slept** [1] - 1198:13
**slide** [3] - 982:11,
992:10, 1011:4,
1011:5, 1017:16,
1018:17, 1020:25,
1021:5, 1021:19,
1102:13, 1102:24,
1172:10
**slides** [13] - 1000:5,
1020:24, 1021:17,
1021:20, 1021:22,
1041:4, 1041:9,
1072:17, 1201:16,
1201:19, 1201:22,
1201:23, 1201:24
**slightly** [2] - 1018:4,
1064:8
**slim** [10] - 1142:15,
1145:1, 1168:8,
1170:20, 1170:21,
1173:17, 1173:25,
1243:3, 1243:4,
1243:18
**slim-jim** [4] - 1173:17,
1243:3, 1243:4,
1243:18
**slim-jims** [6] -
1142:15, 1145:1,
1168:8, 1170:20,
1170:21, 1173:25
**slower** [4] - 1213:16,
1240:10, 1251:2
**small** [3] - 976:17,
1039:3, 1193:1
**smaller** [1] - 973:12
**smart** [2] - 983:20,

1110:2
**smartest** [1] - 1049:16
**so..** [1] - 1210:17
**social** [2] - 1186:19,
1187:5
**sold** [3] - 1055:22
**solicit** [1] - 1248:7
**solicited** [4] - 993:2,
1061:12, 1135:21,
1189:21
**soliciting** [1] -
1189:14
**solid** [1] - 1232:24
**solution** [1] - 993:20
**solutions** [1] - 981:20
**someone** [11] -
1049:9, 1049:22,
1051:18, 1080:10,
1103:8, 1104:6,
1188:3, 1192:18,
1224:6, 1239:1,
1249:20
**sometime** [1] - 970:12
**sometimes** [11] -
981:17, 982:5,
987:19, 1052:3,
1053:3, 1079:7,
1093:21, 1120:18,
1122:3, 1126:20,
1186:23, 1240:23,
1255:12
**somewhat** [4] - 980:9,
980:10, 999:10,
1053:3
**soon** [1] - 961:10
**sorry** [18] - 959:21,
1051:5, 1054:7,
1069:1, 1072:13,
1073:6, 1080:13,
1105:6, 1106:21,
1108:4, 1131:2,
1169:19, 1175:7,
1175:9, 1211:4,
1231:20, 1258:24
**sort** [16] - 958:8,
1003:4, 1023:8,
1036:24, 1137:15,
1144:11, 1152:16,
1153:14, 1168:25,
1169:1, 1186:19,
1186:20, 1193:6,
1195:2, 1223:8,
1225:13
**Soule** [2] - 954:23,
1261:11
**Soule@njd.uscourts
.gov** [1] - 954:24
**sounded** [1] - 1052:17
**sounds** [4] - 957:6,
964:11, 964:14,

1112:4
**South** [3] - 998:4,
1001:21, 1002:18
**southeast** [2] - 987:8,
1183:20
**span** [1] - 1252:14
**speaker** [81] - 990:25,
991:8, 991:10,
991:11, 992:12,
994:14, 994:17,
994:20, 994:24,
995:8, 996:2,
996:10, 997:9,
997:16, 1003:9,
1009:8, 1009:15,
1010:16, 1010:19,
1011:10, 1012:21,
1013:24, 1016:5,
1018:3, 1020:19,
1021:3, 1021:18,
1023:7, 1025:7,
1026:1, 1026:4,
1026:6, 1026:12,
1027:2, 1027:17,
1029:24, 1030:18,
1030:22, 1031:1,
1037:20, 1038:12,
1042:8, 1042:10,
1042:19, 1049:7,
1049:12, 1050:19,
1054:6, 1054:7,
1100:11, 1100:15,
1100:16, 1100:20,
1101:4, 1101:9,
1101:11, 1102:6,
1102:10, 1103:2,
1103:6, 1103:10,
1103:13, 1103:19,
1103:20, 1104:24,
1190:14, 1190:19,
1191:13, 1191:25,
1192:11, 1193:7,
1195:2, 1197:1,
1200:22, 1201:11,
1203:2, 1203:8,
1204:16, 1206:1,
1225:20, 1248:3
**speakers** [65] -
986:19, 988:1,
990:24, 991:7,
991:8, 991:17,
991:18, 992:8,
993:24, 996:13,
997:1, 1008:25,
1009:4, 1009:7,
1010:19, 1011:5,
1019:23, 1019:24,
1020:11, 1021:5,
1021:17, 1023:9,
1024:10, 1024:14,

1026:1, 1027:6,
1028:2, 1030:1,
1030:5, 1030:15,
1030:22, 1031:2,
1031:5, 1031:11,
1031:16, 1031:23,
1032:3, 1033:9,
1033:12, 1037:11,
1037:13, 1037:15,
1037:24, 1038:2,
1038:14, 1040:16,
1040:17, 1042:2,
1042:12, 1051:22,
1051:25, 1063:13,
1101:7, 1190:20,
1191:21, 1196:21,
1197:8, 1201:19,
1203:1, 1204:6,
1225:19, 1234:25,
1248:3, 1248:5
**speakers'** [13] -
991:19, 991:22,
995:25, 1006:25,
1007:17, 1014:14,
1027:5, 1028:3,
1032:6, 1047:18,
1049:9, 1049:23,
1051:13
**speaking** [13] - 991:1,
993:1, 995:14,
996:20, 1014:17,
1031:12, 1037:16,
1191:6, 1192:18,
1193:15, 1195:24,
1198:2
**special** [2] - 961:12,
963:16
**specialist** [7] - 968:2,
987:17, 990:18,
995:24, 997:5,
998:9, 1036:22
**specialists** [4] -
987:13, 987:18,
988:12, 1028:21
**specialty** [2] - 974:13,
974:14
**specific** [13] - 961:24,
996:5, 1000:18,
1000:22, 1001:7,
1001:14, 1039:15,
1089:21, 1104:15,
1142:15, 1147:16,
1224:2, 1246:22
**specifically** [4] -
999:18, 1028:10,
1089:3, 1104:8
**specified** [1] - 1038:8
**speculating** [1] -
1210:14
**speculation** [2] -

1030:14, 1050:22
**spelling** [1] - 965:25
**spend** [10] - 989:19,
995:3, 995:5,
1023:8, 1023:11,
1024:12, 1025:3,
1025:5, 1187:9
**spending** [1] -
1254:14
**spent** [5] - 989:23,
993:18, 1025:7,
1059:12, 1246:10
**spills** [1] - 1040:3
**splitting** [1] - 1165:15
**sponsor** [1] - 1092:21
**sponsors** [1] -
1092:14
**spontaneously** [1] -
1258:6
**sports** [2] - 1186:23,
1187:2
**spot** [3] - 1108:6,
1108:9, 1126:20
**spots** [2] - 1009:11,
1010:23
**spreadsheet** [1] -
1064:12
**Springs** [4] - 967:1,
967:13, 967:20,
1225:9
**Square** [1] - 954:21
**St** [3] - 975:9,
1028:22, 1031:22
**Stacey** [9] - 1036:17,
1036:19, 1039:5,
1040:8, 1042:25,
1043:7, 1043:8,
1045:9, 1204:15
**stake** [1] - 1124:21
**stamp** [1] - 1059:2
**stand** [3] - 966:18,
993:16, 1083:23
**standard** [10] - 977:1,
977:9, 977:12,
981:5, 1062:21,
1107:17, 1177:15,
1178:16, 1183:4,
1226:7
**standardized** [1] -
1072:5
**stands** [3] - 998:4,
1103:25, 1205:5
**start** [23] - 971:12,
973:12, 1013:21,
1034:3, 1036:9,
1042:12, 1042:16,
1042:20, 1042:21,
1123:21, 1127:20,
1132:23, 1142:3,
1183:10, 1195:9,

1204:6, 1230:10,
1240:6, 1251:17,
1252:3, 1252:11,
1254:23, 1256:2
**start-up** [1] - 973:12
**started** [10] - 957:8,
961:19, 967:11,
967:12, 972:22,
1042:17, 1127:24,
1168:14, 1192:21,
1258:8
**starting** [4] - 1039:18,
1169:11, 1240:22,
1252:9
**starts** [5] - 982:22,
1040:2, 1040:4,
1142:5, 1220:12
**state** [5] - 965:24,
994:22, 1088:5,
1088:13, 1089:9
**State** [2] - 954:9,
967:2
**statement** [24] -
1083:21, 1083:22,
1083:25, 1084:2,
1084:4, 1084:7,
1084:16, 1085:2,
1085:8, 1085:10,
1085:12, 1085:20,
1086:8, 1086:16,
1086:18, 1090:18,
1097:24, 1126:2,
1127:8, 1129:2,
1177:2, 1178:10,
1252:23
**statements** [3] -
1164:22, 1181:20,
1253:24
**states** [17] - 975:7,
975:8, 987:2,
988:22, 1061:2,
1087:21, 1088:5,
1088:6, 1088:19,
1088:20, 1088:25,
1089:14, 1089:15,
1089:16, 1089:20,
1176:24, 1183:15
**States** [4] - 956:2,
967:19, 1087:21,
1190:3
**STATES** [3] - 954:1,
954:3, 954:12
**stating** [1] - 1251:5
**stature** [1] - 1191:20
**Statute** [5] - 1049:2,
1051:18, 1237:14,
1238:7, 1238:21
**statute** [1] - 1049:4
**stay** [11] - 967:22,
1048:6, 1050:20,

1051:1, 1051:15,
1110:17, 1153:19,
1160:20, 1160:21,
1187:5, 1258:1
**stayed** [3] - 971:5,
1069:18, 1231:9
**staying** [7] - 1139:2,
1139:4, 1149:9,
1149:21, 1150:2,
1150:5, 1150:12
**stenographer** [1] -
1027:10
**stenography** [1] -
954:25
**step** [7] - 964:21,
1034:18, 1037:21,
1108:18, 1125:11,
1125:15, 1125:16
**Steve** [2] - 1016:2,
1040:22
**stick** [1] - 1128:2
**sticker** [2] - 1169:22,
1171:24
**still** [23] - 957:19,
957:21, 968:17,
1002:7, 1002:8,
1019:8, 1019:11,
1019:21, 1044:15,
1046:4, 1051:6,
1055:8, 1064:18,
1065:13, 1085:9,
1086:6, 1109:10,
1127:14, 1168:14,
1171:4, 1189:13,
1190:5, 1190:8
**stood** [4] - 992:7,
1046:9, 1067:12,
1208:13
**stop** [12] - 962:3,
1021:10, 1058:16,
1060:19, 1063:8,
1108:5, 1141:16,
1179:12, 1234:20,
1234:21, 1255:18,
1256:23
**stopover** [5] - 967:9,
969:4, 973:3, 973:6,
1060:20
**stopped** [2] - 1028:2,
1258:9
**stops** [1] - 1219:11
**story** [2] - 1231:12,
1231:17
**straight** [1] - 1200:2
**strains** [1] - 1121:24
**Strand** [13] - 961:25,
962:20, 978:17,
979:1, 979:5,
1070:21, 1077:13,
1077:22, 1078:24,

1079:6, 1131:25, 1226:11, 1248:12
**strand** [1] - 962:16
**Strand's** [3] - 957:2, 960:25, 961:6
**strand's** [1] - 962:15
**strategies** [5] - 981:25, 982:4, 982:10, 990:2, 1048:19
**strategy** [5] - 984:5, 984:10, 984:17, 984:18, 1045:3
**Street** [3] - 954:9, 954:17, 954:21
**stress** [1] - 1141:11
**stretch** [1] - 1034:13
**strict** [1] - 1203:18
**strike** [6] - 957:1, 961:5, 962:7, 1239:5, 1255:14, 1258:11
**string** [1] - 1047:8
**striving** [1] - 1249:23
**stroke** [4] - 985:2, 1129:25, 1179:25, 1245:20
**strong** [1] - 996:6
**struck** [2] - 1239:11, 1252:23
**structure** [1] - 1054:23
**struggle** [1] - 1183:16
**struggling** [1] - 1187:16
**stucco** [1] - 1228:16
**studied** [1] - 984:23
**studies** [10] - 1059:1, 1059:15, 1126:8, 1126:16, 1126:25, 1132:19, 1134:10, 1134:14, 1135:14, 1192:24
**study** [13] - 992:5, 1017:22, 1059:17, 1126:3, 1166:10, 1177:18, 1180:22, 1181:7, 1189:18, 1190:2, 1198:3, 1243:15
**stuff** [1] - 1145:2
**stupid** [1] - 1058:25
**style** [2] - 969:10, 969:19
**stylistic** [1] - 958:19
**subject** [9] - 996:2, 1006:7, 1006:8, 1049:12, 1072:18, 1132:7, 1174:18, 1195:14, 1215:9
**submission** [1] -

1197:20
**submissions** [2] - 963:2, 963:5
**submit** [4] - 1002:7, 1022:4, 1087:20, 1103:20
**submitted** [11] - 957:3, 962:17, 1000:16, 1080:9, 1087:22, 1089:15, 1090:2, 1092:19, 1182:24, 1224:17, 1224:18
**subpoenaed** [2] - 957:14, 959:24
**subsequent** [3] - 998:23, 1004:19, 1005:11
**subsidiary** [1] - 968:12
**success** [1] - 1124:22
**successful** [3] - 968:23, 984:2, 1141:18
**successfully** [2] - 1029:23, 1162:11
**sufficient** [2] - 1049:10, 1203:21
**suggest** [3] - 1129:17, 1189:8, 1241:5
**suggesting** [1] - 1090:16
**suggestion** [2] - 1193:6, 1193:11
**suggestions** [3] - 1047:22, 1101:7, 1101:13
**suit** [1] - 1233:25
**Suite** [1] - 954:17
**summer** [1] - 1062:1
**Sunday** [1] - 1140:13
**super** [1] - 1132:9
**superior** [4] - 984:14, 995:1, 1106:20, 1107:15
**supervise** [1] - 1097:12
**supervised** [3] - 1029:11, 1186:15, 1224:6
**supervising** [1] - 987:11
**supervisor** [2] - 1000:17, 1000:25
**support** [7] - 1025:2, 1029:25, 1038:6, 1126:8, 1126:25, 1132:19, 1162:16
**supported** [2] - 1130:14, 1225:17

**supporting** [1] - 1177:1
**supposed** [11] - 1020:12, 1029:12, 1052:19, 1060:14, 1061:11, 1061:22, 1062:6, 1135:21, 1145:22, 1189:21, 1248:6
**suppressed** [1] - 976:16
**surprise** [1] - 1192:2
**surprised** [1] - 1153:4
**survey** [13] - 1152:4, 1152:21, 1152:25, 1153:5, 1153:10, 1153:14, 1154:10, 1154:12, 1154:23, 1157:14, 1159:24, 1162:23, 1163:8
**Susan** [7] - 1039:6, 1039:8, 1040:8, 1043:7, 1043:8, 1045:10, 1048:24
**suspected** [1] - 971:1
**sustain** [1] - 1030:20
**sustained** [6] - 962:19, 985:19, 985:23, 1231:15, 1239:5, 1248:19
**swap** [1] - 1099:17
**switched** [1] - 972:6
**switching** [1] - 1099:20
**swoop** [1] - 987:7
**swore** [5] - 1083:7, 1083:9, 1084:24, 1084:25, 1087:18
**sworn** [1] - 965:20
**SWORN/AFFIRMED** [1] - 965:22
**system** [3] - 957:7, 1022:7, 1171:24
**Systems** [4] - 971:7, 971:13, 971:15, 971:24

# T

**T/VIR** [1] - 1199:24
**tab** [7] - 1099:2, 1130:21, 1141:21, 1147:18, 1150:21, 1186:2, 1216:12
**Tab** [3] - 1081:5, 1167:21, 1210:20
**table** [3] - 965:12, 1169:20, 1245:3
**Tabler** [1] - 979:17
**tactful** [1] - 1047:22

**tactic** [1] - 995:19
**tactical** [5] - 1240:24, 1251:14, 1252:16, 1255:17, 1255:20
**tactics** [3] - 990:2, 1048:19, 1063:23
**tag** [1] - 1132:8
**tagged** [1] - 1132:9
**talks** [7] - 1067:8, 1142:24, 1148:23, 1151:21, 1169:11, 1205:6, 1217:14
**tam** [2] - 1066:20, 1213:25
**tams** [2] - 1213:12
**target** [1] - 1010:19
**targeted** [5] - 996:12, 996:15, 996:18, 1029:24, 1033:3
**targeting** [2] - 1003:2, 1030:5
**targets** [1] - 1033:8
**tasked** [1] - 1194:12
**taste** [1] - 1226:22
**taxing** [1] - 979:12
**teaching** [4] - 968:4, 1008:5, 1008:7, 1049:17
**team** [29] - 978:15, 980:7, 981:11, 981:12, 981:18, 990:1, 990:8, 991:23, 1025:25, 1031:5, 1052:9, 1103:2, 1103:6, 1103:9, 1103:10, 1103:13, 1103:20, 1135:13, 1141:18, 1155:3, 1172:9, 1190:3, 1217:24, 1223:4, 1223:14, 1239:1, 1244:16
**teams** [2] - 979:22, 1020:6, 1062:12
**technical** [1] - 957:6
**technicality** [1] - 1022:2
**technically** [2] - 989:2, 1246:5
**technology** [1] - 964:8
**telephone** [1] - 978:2
**temperature** [1] - 1198:22
**template** [1] - 1072:1
**templated** [1] - 999:10
**ten** [18] - 975:4, 978:22, 987:17, 987:23, 988:5, 988:18, 988:19, 997:11, 1009:4,

1034:11, 1034:12, 1054:21, 1158:24, 1159:4, 1159:16, 1229:11, 1251:19, 1252:9
**ten-minute** [3] - 1034:11, 1034:12, 1229:11
**tendencies** [1] - 1053:18
**tension** [1] - 974:19
**tenure** [1] - 1208:18
**tenured** [1] - 974:12
**term** [12] - 975:24, 984:23, 1026:19, 1129:22, 1166:21, 1167:1, 1167:5, 1167:9, 1181:11, 1199:16, 1219:1, 1247:16
**terminated** [1] - 1225:25
**terminating** [1] - 1224:10
**terminology** [1] - 981:8
**terms** [17] - 1090:7, 1110:7, 1125:19, 1163:23, 1164:14, 1165:3, 1165:11, 1165:15, 1165:20, 1166:1, 1166:18, 1167:12, 1167:16, 1176:10, 1180:18, 1181:19, 1199:15
**territory** [8] - 967:12, 967:23, 968:2, 1001:22, 1030:1, 1037:25, 1044:22, 1124:2
**testified** [8] - 1000:13, 1066:18, 1164:22, 1170:19, 1170:20, 1172:21, 1212:11, 1241:6
**TESTIFIED** [1] - 965:22
**testify** [8] - 966:18, 966:20, 1139:25, 1140:2, 1140:3, 1198:8, 1248:25, 1257:14
**testimony** [29] - 957:2, 961:6, 961:23, 961:25, 962:5, 962:15, 963:11, 965:21, 1000:3, 1077:4, 1084:8, 1092:23, 1093:3, 1093:17, 1095:14,

1100:12, 1110:24, 1135:4, 1146:15, 1149:25, 1162:4, 1171:2, 1190:14, 1212:13, 1232:10, 1232:16, 1241:10, 1250:21, 1256:5

**Texas** [12] - 954:17, 970:4, 970:5, 971:5, 973:1, 975:5, 975:10, 976:21, 986:4, 1014:16, 1055:4, 1187:21

**text** [1] - 1039:3

**texting** [3] - 1137:7, 1137:11, 1138:1

**Thanksgiving** [1] - 1224:21

**THE** [246] - 954:1, 954:11, 956:4, 956:5, 956:17, 956:25, 957:9, 957:18, 958:5, 958:12, 958:16, 959:21, 960:1, 960:18, 960:21, 960:24, 964:3, 964:6, 964:13, 965:1, 965:2, 965:4, 965:6, 965:14, 965:17, 965:19, 965:24, 966:1, 966:3, 985:19, 985:23, 998:16, 998:19, 999:18, 999:25, 1000:7, 1000:12, 1000:20, 1001:4, 1001:10, 1001:13, 1001:16, 1002:5, 1002:13, 1002:25, 1004:6, 1004:14, 1004:21, 1005:4, 1005:8, 1005:19, 1005:22, 1006:2, 1006:10, 1010:6, 1012:16, 1013:19, 1023:24, 1029:5, 1030:17, 1030:20, 1034:1, 1034:8, 1034:15, 1034:16, 1034:21, 1034:23, 1034:25, 1035:2, 1050:23, 1051:2, 1051:3, 1051:5, 1051:6, 1065:23, 1065:25, 1066:8, 1066:11, 1066:14, 1066:17, 1066:22, 1066:24, 1067:2, 1067:7,

1067:16, 1067:19, 1067:21, 1067:25, 1068:3, 1071:3, 1072:13, 1072:18, 1072:22, 1072:25, 1073:5, 1074:25, 1075:4, 1075:7, 1076:3, 1076:6, 1083:13, 1083:15, 1083:18, 1083:20, 1083:24, 1084:11, 1084:15, 1084:18, 1084:22, 1085:4, 1085:7, 1085:19, 1086:11, 1086:14, 1087:3, 1091:21, 1091:25, 1098:2, 1099:4, 1099:11, 1099:15, 1099:20, 1099:23, 1100:2, 1102:17, 1102:19, 1102:21, 1108:4, 1108:7, 1108:10, 1108:15, 1108:17, 1108:20, 1108:21, 1109:3, 1109:7, 1109:9, 1109:12, 1109:13, 1116:18, 1119:25, 1131:2, 1131:8, 1141:24, 1147:20, 1150:23, 1150:25, 1151:3, 1167:24, 1169:25, 1170:3, 1170:9, 1170:16, 1170:19, 1171:2, 1171:4, 1171:8, 1171:11, 1171:15, 1171:19, 1172:5, 1172:13, 1173:7, 1173:11, 1173:14, 1174:17, 1174:19, 1174:22, 1176:4, 1176:6, 1184:13, 1184:15, 1186:5, 1194:4, 1210:17, 1210:22, 1211:3, 1211:5, 1211:9, 1211:12, 1211:17, 1211:23, 1212:1, 1212:9, 1212:16, 1212:19, 1212:21, 1213:2, 1213:16, 1214:4, 1214:13, 1214:19, 1214:22, 1216:15, 1222:15, 1222:18, 1229:4, 1229:5, 1229:10, 1229:13, 1229:16, 1229:17, 1229:19, 1229:22, 1229:23, 1229:25,

1231:15, 1232:7, 1232:19, 1233:8, 1238:16, 1239:5, 1239:11, 1239:16, 1239:25, 1240:17, 1241:2, 1241:12, 1241:14, 1241:17, 1241:23, 1248:19, 1250:2, 1250:7, 1250:9, 1250:10, 1250:14, 1250:17, 1250:24, 1251:6, 1252:19, 1254:4, 1254:6, 1254:11, 1255:6, 1255:16, 1256:11, 1256:21, 1259:2, 1259:5, 1259:9, 1259:12, 1259:16, 1259:20, 1259:22, 1260:1

**theatrics** [1] - 1239:12

**theirs** [1] - 1210:14

**themselves** [3] - 1011:18, 1115:11, 1190:7

**theoretically** [1] - 1062:3

**theory** [1] - 1095:1

**Therapeutic's** [1] - 1134:1

**therapy** [1] - 1253:3

**thereafter** [1] - 984:11

**therefore** [1] - 1087:23

**they've** [6] - 957:14, 1078:5, 1099:22, 1192:18, 1212:7, 1251:21

**thinking** [2] - 961:16, 1171:17

**thinks** [1] - 1172:9

**third** [3] - 1079:10, 1153:6, 1153:9

**Third** [1] - 962:10

**thoughts** [2] - 1169:22, 1252:7

**thousands** [2] - 1094:12, 1095:3

**thread** [4] - 1003:25, 1034:4, 1045:9, 1050:15

**threats** [1] - 1059:11

**three** [18] - 962:5, 962:6, 967:18, 971:20, 997:12, 1013:7, 1020:10, 1042:4, 1043:21, 1062:25, 1073:4, 1120:15, 1136:1, 1224:17, 1248:13, 1248:21, 1252:14,

1253:20

**three-day** [1] - 1224:17

**three-month** [1] - 997:12

**throughout** [7] - 969:13, 974:20, 1000:6, 1025:19, 1052:20, 1116:10

**thumb** [1] - 1251:25

**Thursday** [3] - 1139:25, 1140:2, 1140:4

**Tibotec** [30] - 970:7, 970:8, 970:11, 971:21, 972:21, 972:24, 973:11, 981:12, 986:9, 991:9, 992:25, 995:10, 995:21, 1006:20, 1014:4, 1015:3, 1019:24, 1020:1, 1068:20, 1069:22, 1111:21, 1134:1, 1151:16, 1158:4, 1165:5, 1208:18, 1237:13, 1237:22, 1238:19

**Tibotec's** [1] - 994:17

**Tibotec/Janssen** [14] - 972:14, 994:24, 996:25, 1021:19, 1023:7, 1051:17, 1054:1, 1059:7, 1060:4, 1060:20, 1061:5, 1068:10, 1071:19, 1249:18

**Tibotec/Janssen/J& J** [1] - 1239:2

**timeline** [1] - 982:14

**tipranavir** [3] - 1014:22, 1015:1, 1018:21

**tired** [1] - 1198:10

**TITAN** [2] - 1134:11, 1135:10

**title** [4] - 968:18, 969:9, 1022:17, 1245:13

**titled** [1] - 1142:6

**today** [19] - 957:13, 959:22, 966:20, 1074:13, 1092:24, 1100:11, 1138:14, 1138:23, 1147:23, 1148:11, 1206:21, 1220:18, 1229:20, 1234:10, 1248:12, 1249:1, 1250:20, 1253:15, 1258:5

**today's** [1] - 1148:23

**together** [15] - 1056:22, 1065:15, 1076:22, 1077:16, 1078:9, 1078:13, 1078:17, 1078:20, 1079:19, 1144:18, 1146:5, 1146:24, 1179:13, 1216:19, 1219:3

**tolerability** [6] - 984:14, 1106:20, 1106:22, 1107:2, 1107:12, 1107:15

**tolerated** [2] - 977:2, 1016:19

**Tom** [1] - 1143:25

**tomorrow** [14] - 1240:22, 1250:14, 1250:20, 1251:8, 1251:17, 1252:4, 1252:11, 1253:21, 1254:23, 1256:3, 1258:23, 1258:25, 1259:18, 1259:23

**Tony** [7] - 979:13, 989:16, 1006:18, 1028:14, 1054:19, 1148:16, 1219:8

**took** [11] - 972:9, 986:8, 1010:23, 1054:13, 1173:16, 1196:17, 1221:23, 1221:24, 1224:10, 1247:21, 1249:4

**top** [26] - 978:6, 978:11, 999:11, 1013:13, 1014:7, 1017:2, 1020:4, 1020:7, 1026:15, 1029:20, 1033:8, 1040:5, 1040:12, 1062:16, 1158:24, 1159:4, 1159:16, 1169:14, 1177:21, 1227:6, 1227:8, 1242:24, 1245:1, 1249:19

**topic** [1] - 1216:4

**topics** [5] - 1148:13, 1149:2, 1149:5, 1174:23, 1190:11

**total** [2] - 988:19, 989:10

**totally** [1] - 1095:14

**touch** [9] - 960:12, 1066:3, 1069:18, 1070:9, 1187:5, 1214:1, 1248:21, 1257:19, 1258:18

touched [1] - 1200:17
touches [1] - 987:25
tough [1] - 1126:20
touting [2] - 996:22, 1003:9
tow [1] - 1150:4
towards [4] - 1019:5, 1021:23, 1116:23, 1249:23
town [1] - 966:13
trace [1] - 1153:1
track [6] - 993:22, 996:25, 1027:20, 1064:11, 1202:5
tracked [4] - 1027:17, 1046:25, 1064:10, 1235:10
tracking [4] - 1033:11, 1063:12, 1063:18, 1064:9
trail [2] - 1141:13, 1147:6
train [2] - 1238:11, 1238:19
Train [1] - 1058:18
trained [16] - 974:16, 983:20, 1030:1, 1033:8, 1042:3, 1049:1, 1050:4, 1059:17, 1071:9, 1073:10, 1190:2, 1237:12, 1237:14, 1237:23, 1238:5, 1248:7
trainer [2] - 968:7, 979:23
training [17] - 979:21, 1010:19, 1011:2, 1011:10, 1011:21, 1012:21, 1013:6, 1054:7, 1061:10, 1072:2, 1135:12, 1149:6, 1149:9, 1235:23, 1243:20, 1247:11, 1248:1
trainings [2] - 1011:3, 1071:20
transcript [6] - 954:25, 961:4, 962:1, 963:3, 1172:22, 1261:4
transcription [2] - 954:25, 1116:22
transfer [1] - 1228:22
transition [1] - 991:7
transitioned [4] - 970:12, 970:13, 995:2, 1053:13
translate [2] - 990:7, 1053:20
travel [4] - 1011:14,

1011:19, 1046:21, 1228:2
travels [1] - 993:12
treat [2] - 1049:18, 1235:20
treated [1] - 1188:4
treating [3] - 975:25, 1008:6, 1115:8
treatment [32] - 975:19, 976:10, 982:10, 982:13, 982:17, 982:18, 983:10, 983:14, 992:16, 995:4, 1049:20, 1052:20, 1052:25, 1053:6, 1057:9, 1063:5, 1118:2, 1118:4, 1118:6, 1118:9, 1118:16, 1119:1, 1119:4, 1120:10, 1121:15, 1121:16, 1121:21, 1127:6, 1127:10, 1156:15, 1247:17, 1247:19
treatment-experienced [22] - 975:19, 976:10, 982:13, 982:17, 982:18, 983:10, 983:14, 992:16, 995:4, 1052:20, 1052:25, 1057:9, 1118:2, 1118:9, 1118:16, 1119:1, 1119:4, 1120:10, 1121:16, 1121:21, 1247:17, 1247:19
treatment-experienced/naive [1] - 1063:5
treatment-naive [1] - 1053:6
tremendous [2] - 983:24, 1247:10
trends [1] - 1053:17
Trenton [1] - 954:9
Trial [1] - 997:23
TRIAL [1] - 954:5
trial [19] - 956:6, 962:6, 963:8, 970:6, 1048:13, 1049:16, 1086:4, 1166:9, 1239:22, 1240:4, 1240:10, 1240:14, 1244:1, 1250:7, 1251:1, 1252:1, 1253:11, 1255:2, 1256:7
trials [5] - 959:7,

1008:3, 1178:19, 1200:19, 1247:12
tricky [1] - 1126:12
tried [4] - 1061:17, 1137:18, 1185:11, 1241:17
triglyceride [3] - 1017:9, 1017:16, 1018:3
triglycerides [7] - 985:16, 1015:8, 1015:17, 1017:11, 1041:1, 1177:15, 1245:23
tripled [1] - 1183:7
trouble [1] - 1198:22
troubleshoot [1] - 964:13
true [19] - 984:19, 999:5, 1012:5, 1017:13, 1023:20, 1071:23, 1072:1, 1078:8, 1084:25, 1085:1, 1085:22, 1107:16, 1140:5, 1158:19, 1160:4, 1183:14, 1184:20, 1232:18
truly [3] - 1115:8, 1120:21, 1136:21
truth [4] - 1086:8, 1086:12, 1086:15, 1086:17
try [6] - 1005:16, 1120:22, 1141:4, 1141:12, 1165:14, 1195:24
trying [17] - 980:9, 989:8, 1000:9, 1000:21, 1004:10, 1030:12, 1085:21, 1107:1, 1109:21, 1114:23, 1194:17, 1195:1, 1211:11, 1228:11, 1239:13, 1248:17, 1254:14
Tuesday [1] - 1131:13
turn [4] - 1025:4, 1029:17, 1036:5, 1038:25
turned [1] - 980:11
turns [1] - 1225:13
twice [8] - 960:7, 1029:13, 1056:11, 1056:12, 1056:18, 1056:21, 1067:22, 1187:7
two [53] - 956:6, 957:25, 959:15, 961:6, 972:10,

972:15, 977:10, 978:23, 979:8, 986:12, 986:14, 986:23, 987:19, 988:9, 989:20, 989:21, 990:25, 991:2, 991:3, 1007:22, 1009:25, 1010:23, 1011:9, 1013:7, 1015:20, 1018:13, 1025:5, 1025:12, 1028:10, 1032:20, 1042:4, 1076:22, 1086:3, 1086:6, 1108:8, 1120:14, 1127:9, 1172:13, 1172:23, 1179:4, 1179:6, 1200:7, 1206:9, 1213:11, 1213:25, 1219:10, 1219:11, 1231:9, 1234:17, 1235:2, 1242:23, 1252:14, 1255:24
type [12] - 971:7, 982:17, 999:6, 1000:5, 1000:7, 1001:5, 1035:18, 1054:8, 1072:2, 1116:22, 1169:5, 1175:21
type-out [1] - 1116:22
typed [9] - 1080:7, 1080:17, 1081:19, 1082:4, 1082:10, 1083:8, 1085:23, 1087:10, 1219:4
types [9] - 1000:19, 1000:20, 1002:3, 1025:24, 1154:18, 1178:1, 1236:25, 1242:8, 1258:13
typically [10] - 969:14, 969:15, 972:4, 976:5, 990:3, 990:6, 997:4, 1058:5, 1059:2, 1228:14
tyrant [1] - 974:6

## U

U.S [1] - 954:8
ultimately [4] - 1044:4, 1044:22, 1074:9, 1134:14
unapproved [2] - 1026:14, 1238:3
unbeknownst [1] - 1001:25
uncomfortable [5] -

969:20, 1137:2, 1154:20, 1160:21, 1217:24
uncomfortableness [1] - 974:19
under [25] - 974:25, 982:21, 986:15, 988:9, 1029:18, 1054:23, 1083:21, 1084:4, 1084:13, 1085:10, 1085:21, 1086:18, 1088:14, 1089:6, 1108:3, 1109:11, 1130:10, 1165:20, 1192:24, 1215:12, 1215:17, 1234:4, 1234:8, 1234:10
undergraduate [1] - 967:2
underneath [5] - 988:3, 988:6, 988:13, 988:25, 1037:20
underperforming [1] - 1059:10
understood [12] - 958:21, 989:6, 993:11, 1001:3, 1022:14, 1048:10, 1067:18, 1075:17, 1140:3, 1170:22, 1173:21, 1258:11
undetectable [6] - 976:5, 976:15, 977:4, 977:13, 977:18, 983:25
undetected [2] - 1095:14, 1095:18
unethical [3] - 1026:14, 1166:14, 1248:8
unfair [5] - 961:12, 1061:23, 1063:7, 1226:24, 1227:12
unimpeded [2] - 1090:14, 1090:15
unintended [1] - 1074:8
unique [1] - 1253:9
United [4] - 956:2, 967:19, 1087:21, 1090:3
UNITED [3] - 954:1, 954:3, 954:12
University [2] - 967:3, 967:6
unleashed [1] - 983:5
unless [7] - 959:4, 961:11, 993:1,

1005:9, 1033:13, 1166:8, 1240:13
**unlike** [2] - 1017:11, 1183:15
**unnamed** [1] - 1219:6
**unprepared** [2] - 1204:19, 1205:20
**unprompted** [1] - 1060:15
**unsealed** [2] - 1210:12, 1215:6
**Unsolicited** [1] - 1159:10
**unsolicited** [11] - 993:2, 1060:14, 1061:11, 1062:4, 1133:22, 1135:19, 1161:2, 1189:10, 1189:21, 1248:6, 1248:7
**untangle** [2] - 1254:3, 1254:7
**untimely** [3] - 961:9, 962:11, 962:14
**unwanted** [1] - 1245:21
**up** [94] - 964:22, 966:24, 967:1, 973:12, 974:9, 978:6, 978:19, 978:23, 980:2, 980:5, 980:6, 981:10, 981:12, 982:10, 984:5, 986:25, 991:2, 997:18, 1003:12, 1005:7, 1009:5, 1009:17, 1014:7, 1015:20, 1024:12, 1026:6, 1027:3, 1028:15, 1031:10, 1033:19, 1035:10, 1040:2, 1040:4, 1048:2, 1056:22, 1059:8, 1061:24, 1062:20, 1071:12, 1074:9, 1074:13, 1075:19, 1080:4, 1080:7, 1080:17, 1081:4, 1081:7, 1081:15, 1081:19, 1082:4, 1082:10, 1083:8, 1085:23, 1087:10, 1101:10, 1103:10, 1116:12, 1120:5, 1127:20, 1141:13, 1142:4, 1155:16, 1159:4, 1161:9, 1169:14, 1172:8, 1173:12,

1176:6, 1183:4, 1193:14, 1193:18, 1195:1, 1195:2, 1195:23, 1199:24, 1202:4, 1202:10, 1202:19, 1204:4, 1208:25, 1213:18, 1220:5, 1231:12, 1231:17, 1242:20, 1242:21, 1244:17, 1245:23, 1248:13, 1248:21, 1249:23, 1252:23, 1257:13, 1259:13
**update** [2] - 1010:16, 1195:15
**updated** [1] - 1201:6
**updates** [1] - 1204:16
**upgraded** [1] - 1018:10
**upper** [2] - 1035:20, 1117:17
**upset** [4] - 1231:12, 1257:22, 1257:24, 1257:25
**uptake** [1] - 974:3
**urgency** [1] - 1025:2
**uses** [1] - 1238:3
**utilization** [22] - 995:6, 996:4, 996:8, 1027:25, 1033:8, 1039:22, 1041:24, 1042:8, 1042:13, 1043:22, 1043:23, 1044:2, 1044:4, 1044:12, 1045:24, 1046:22, 1060:16, 1061:2, 1089:4, 1192:15, 1247:20, 1247:23
**utilize** [1] - 1045:5
**utilized** [4] - 1009:4, 1011:7, 1113:2, 1122:3
**UTMB** [1] - 1197:20

**V**

**vague** [1] - 1000:21
**value** [2] - 1152:9, 1155:17
**variety** [4] - 967:25, 1245:20, 1247:4, 1248:9
**various** [7] - 999:6, 999:12, 1029:25, 1050:11, 1053:9, 1053:10, 1053:20
**vast** [1] - 1160:15
**vendor** [1] - 1007:9

**verbal** [4] - 1048:15, 1048:21, 1105:1, 1105:7
**verbalize** [1] - 1247:13
**verbally** [2] - 1117:21, 1137:20
**Versed** [1] - 967:16
**versed** [1] - 1135:13
**version** [4] - 1072:11, 1072:14, 1099:17, 1219:7
**versus** [9] - 997:8, 1026:20, 1056:18, 1058:22, 1073:20, 1156:21, 1177:18, 1186:1, 1247:7
**Veterans** [1] - 1090:5
**via** [2] - 966:14, 1022:4
**video** [3] - 957:6, 1056:22, 1184:18
**view** [13] - 957:18, 958:16, 958:22, 959:2, 1109:1, 1112:17, 1164:8, 1167:12, 1167:16, 1189:7, 1226:6, 1227:1, 1232:13
**viewed** [1] - 1227:6
**violated** [1] - 1213:24
**violating** [4] - 1051:17, 1238:6, 1238:12, 1238:21
**violation** [2] - 1049:24, 1058:25
**violations** [1] - 1206:14
**viral** [2] - 976:6, 977:17
**virology** [10] - 987:13, 987:17, 987:18, 988:12, 990:18, 995:23, 997:5, 998:9, 1028:21, 1036:22
**virus** [5] - 976:5, 976:15, 977:15, 977:16, 981:3
**vis-à-vis** [1] - 1156:19
**visibility** [2] - 1190:20, 1190:23
**visited** [5] - 1012:12, 1094:12, 1094:24, 1095:4, 1225:13
**visiting** [3] - 990:14, 1070:19, 1185:7
**visual** [2] - 1142:18, 1169:5
**Vogel** [11] - 1036:17, 1036:19, 1037:3,

1039:5, 1039:14, 1040:8, 1042:25, 1043:7, 1045:9, 1045:14, 1204:15
**voice** [2] - 1153:22, 1207:17
**voiced** [1] - 1063:7
**voicemail** [4] - 1014:10, 1116:22, 1138:4, 1242:15
**volume** [14] - 970:23, 973:20, 987:25, 1007:25, 1008:5, 1008:8, 1009:7, 1030:10, 1031:13, 1038:11, 1038:20, 1050:18, 1051:12, 1235:12
**VOLUME** [1] - 954:5
**voluntarily** [3] - 966:22, 992:14, 1233:18

**W**

**W-I-L-H-E-L-M** [1] - 966:1
**w/a** [1] - 1016:14
**Wade** [4] - 1028:20, 1028:24, 1182:6, 1182:10
**wait** [7] - 962:1, 1034:8, 1051:3, 1051:4, 1072:13, 1108:23, 1211:3
**waiting** [1] - 1026:20
**waived** [2] - 961:9, 962:11
**waiver** [1] - 961:4
**wants** [3] - 963:4, 1153:22, 1161:15
**war** [1] - 1253:23
**warned** [1] - 1170:4
**warning** [15] - 963:13, 1216:8, 1216:25, 1217:14, 1217:15, 1217:23, 1218:25, 1219:21, 1220:8, 1220:24, 1222:10, 1222:17, 1226:21, 1228:22, 1231:2
**warnings** [1] - 1130:17
**waste** [1] - 960:7
**watchdog** [1] - 1020:19
**water** [1] - 1056:23
**ways** [10] - 1061:17, 1110:20, 1114:15, 1163:23, 1185:5,

1185:11, 1192:14, 1231:1, 1247:4, 1248:9
**wedding** [2] - 1077:5, 1077:9
**Wednesday** [1] - 1139:17
**week** [17] - 956:6, 960:3, 962:5, 966:17, 989:17, 989:19, 992:12, 1026:5, 1026:7, 1029:13, 1029:14, 1058:5, 1065:4, 1139:12, 1139:16, 1189:18, 1247:6
**weekend** [2] - 964:19, 965:8
**weekly** [5] - 981:14, 1063:21, 1111:4, 1138:5, 1247:6
**weeks** [9] - 962:6, 990:25, 991:2, 991:3, 1025:5, 1130:1, 1130:7, 1130:14, 1178:11
**weighing** [1] - 1240:3
**weight** [1] - 1053:3
**welcome** [2] - 964:19, 965:7, 1109:15, 1109:18
**well-known** [1] - 1048:10
**WENDEL** [2] - 954:16, 956:15
**Wendel** [1] - 956:15
**west** [10] - 966:13, 978:25, 979:4, 986:21, 987:6, 987:9, 987:10, 989:9, 1013:1, 1022:19
**western** [2] - 979:5, 988:20
**whatsoever** [1] - 971:19
**whistleblower** [1] - 1253:24
**WHITNEY** [1] - 954:16
**Whitney** [1] - 956:15
**whole** [3] - 968:22, 993:11, 1022:14
**widely** [3] - 968:22, 993:11, 1022:14
**WILHELM** [2] - 955:3, 965:22
**Wilhelm** [100] - 965:18, 965:19, 966:1, 966:5, 966:12, 966:24,

967:6, 968:9, 969:4, 969:21, 978:9, 982:21, 986:3, 997:22, 998:23, 999:1, 999:21, 1001:23, 1002:1, 1002:17, 1003:2, 1003:15, 1003:25, 1004:18, 1004:23, 1006:18, 1009:11, 1009:20, 1010:12, 1011:9, 1012:4, 1012:21, 1013:12, 1014:20, 1015:23, 1018:23, 1021:23, 1023:17, 1024:4, 1024:18, 1027:17, 1028:18, 1029:20, 1031:22, 1032:17, 1033:21, 1034:18, 1034:19, 1035:6, 1040:2, 1040:12, 1042:23, 1045:9, 1050:25, 1051:9, 1054:12, 1060:9, 1063:10, 1064:13, 1068:8, 1071:6, 1071:15, 1073:10, 1075:11, 1076:9, 1081:6, 1081:18, 1087:6, 1093:8, 1095:13, 1096:23, 1099:7, 1099:13, 1100:6, 1103:1, 1109:10, 1109:18, 1132:4, 1140:24, 1142:2, 1147:17, 1151:8, 1163:18, 1168:2, 1173:16, 1205:1, 1215:1, 1229:3, 1230:5, 1231:19, 1233:17, 1235:6, 1237:12, 1241:25, 1245:8, 1246:9, 1248:11, 1248:25, 1250:4, 1256:5
**willing** [1] - 996:3
**willingness** [1] - 1003:11
**Wilmington** [1] - 954:22
**wink** [1] - 1111:8
**winner** [1] - 1227:8
**Wirmani** [2] - 956:13, 962:21
**WIRMANI** [2] - 954:15, 956:13
**wisely** [1] - 1025:7
**witch** [2] - 1218:15,

1218:18
**WITNESS** [7] - 966:1, 1051:2, 1051:5, 1108:20, 1109:12, 1229:4, 1250:9
**witness** [93] - 957:13, 957:14, 957:15, 957:19, 957:20, 958:1, 958:14, 958:17, 958:18, 958:20, 958:23, 958:25, 959:14, 959:21, 959:22, 959:23, 960:2, 960:4, 960:11, 960:15, 962:4, 963:14, 963:18, 965:12, 965:15, 965:19, 997:19, 1001:12, 1003:13, 1004:11, 1005:14, 1006:15, 1009:17, 1012:2, 1013:9, 1023:14, 1028:16, 1033:18, 1034:18, 1034:19, 1071:12, 1074:24, 1076:17, 1077:12, 1079:10, 1081:5, 1081:10, 1081:16, 1085:12, 1086:19, 1108:24, 1113:12, 1130:22, 1131:5, 1132:1, 1170:13, 1174:20, 1175:2, 1211:16, 1212:15, 1212:17, 1212:22, 1212:23, 1213:3, 1213:4, 1229:20, 1240:6, 1240:19, 1250:6, 1250:21, 1251:16, 1251:19, 1252:1, 1252:5, 1252:8, 1252:9, 1252:11, 1253:21, 1254:1, 1255:18, 1255:21, 1257:2, 1257:4, 1257:10, 1257:13, 1257:19, 1257:22, 1257:25, 1258:1, 1258:5, 1258:18, 1259:6
**witnesses** [17] - 960:6, 1102:25, 1139:5, 1239:18, 1239:22, 1240:1, 1240:11, 1251:10, 1252:14, 1253:2, 1253:9, 1253:10, 1253:11, 1253:20, 1254:12, 1254:25,

1258:15
**women** [1] - 1115:7
**won** [1] - 1230:15
**wondering** [3] - 958:8, 958:11, 1144:18
**word** [11] - 974:5, 980:9, 982:15, 985:1, 993:11, 996:6, 1119:5, 1119:6, 1122:2, 1221:6, 1246:18
**words** [9] - 1002:9, 1110:7, 1119:4, 1166:6, 1195:5, 1212:24, 1235:7, 1251:11, 1258:8
**workings** [1] - 1190:23
**works** [3] - 1078:1, 1120:22, 1209:13
**world** [3] - 974:11, 1163:14, 1254:16
**worms** [1] - 1066:12
**worried** [2] - 1147:2, 1160:7
**worse** [2] - 1018:13, 1175:9
**worst** [1] - 1196:5
**write** [12] - 990:20, 1003:11, 1024:14, 1025:13, 1030:5, 1030:12, 1033:12, 1035:10, 1049:8, 1049:15, 1085:3, 1248:4
**writers** [1] - 1027:7
**writes** [2] - 1043:7, 1047:3
**writing** [49] - 991:18, 992:2, 1027:9, 1028:2, 1029:21, 1032:4, 1032:18, 1033:16, 1036:17, 1039:5, 1039:18, 1042:9, 1042:17, 1043:7, 1044:11, 1047:1, 1048:11, 1048:12, 1048:23, 1049:10, 1049:24, 1050:12, 1051:12, 1058:22, 1060:7, 1060:8, 1074:2, 1097:4, 1097:6, 1097:11, 1097:16, 1105:19, 1110:20, 1117:16, 1137:19, 1147:5, 1147:7, 1150:4, 1158:20, 1159:19, 1163:8, 1189:20, 1200:21,

1203:21, 1231:19, 1234:22, 1246:14, 1248:5
**written** [15] - 963:5, 1073:11, 1097:8, 1097:13, 1136:23, 1163:2, 1163:12, 1216:8, 1218:25, 1219:23, 1220:8, 1220:12, 1220:24, 1222:17, 1243:5
**wrote** [1] - 1080:4
**WYATT** [1] - 954:20, 956:21
**Wyatt** [2] - 956:21, 964:3
**Wyoming** [4] - 1088:9, 1088:10, 1089:10, 1089:12

## Y

**year** [15] - 986:5, 1023:13, 1024:10, 1024:13, 1116:7, 1116:10, 1151:12, 1152:12, 1154:22, 1187:7, 1208:6, 1213:12, 1231:7, 1242:18, 1253:16
**years** [18] - 967:25, 971:13, 972:19, 976:14, 986:23, 1009:3, 1018:13, 1064:7, 1129:24, 1179:4, 1179:7, 1208:2, 1208:8, 1208:10, 1231:9, 1231:12, 1234:25, 1252:14
**Yennes** [1] - 979:22
**yesterday** [1] - 1253:15
**York** [6] - 1028:12, 1053:10, 1070:1, 1187:20, 1196:17, 1197:19
**younger** [1] - 974:12
**yourself** [7] - 966:11, 1027:17, 1070:13, 1097:12, 1148:17, 1227:6, 1228:7

## Z

**ZAHID** [2] - 954:11, 956:2
**Zantac** [1] - 967:16
**zones** [1] - 987:7
**zoom** [1] - 1024:3

**Zoom** [2] - 966:14, 1244:20