1    **UNITED STATES DISTRICT COURT**
     **FOR THE DISTRICT OF NEW JERSEY**
2

3    ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

     UNITED STATES OF AMERICA, et    CIVIL ACTION NUMBER:
4    al,
          Plaintiffs,               3:12-cv-07758-ZNQ-JBD
5
          v.                        JURY TRIAL - VOLUME 5
6
     JOHNSON & JOHNSON, JANSSEN
7    PRODUCTS, L.P.
          Defendants.
8    ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
          Clarkson S. Fisher Building & U.S. Courthouse
9        402 East State Street
          Trenton, New Jersey  08608
10       May 14, 2024
          Commencing at 9:00 a.m.
11

12   **B E F O R E:**          THE HONORABLE ZAHID N. QURAISHI,
                               UNITED STATES DISTRICT JUDGE

13   **A P P E A R A N C E S:**

14       REESE MARKETOS
         BY:  PETE MARKETOS, ESQUIRE
15            JOSH RUSS, ESQUIRE
              ANDREW WIRMANI, ESQUIRE
16            ADAM SANDERSON, ESQUIRE
              WHITNEY WENDEL, ESQUIRE
17       750 N. Saint Paul Street, Suite 600
         Dallas, Texas 75201
18       For the Relators

19       SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
         BY:  ALLISON M. BROWN, ESQUIRE
20            GEOFFREY M. WYATT, ESQUIRE
              BRADLEY A. KLEIN, ESQUIRE
21       One Rodney Square
         920 King Street
22       Wilmington, Delaware
         For the Defendants
23

         Megan McKay-Soule, Official Court Reporter
24            Megan_McKay-Soule@njd.uscourts.gov
                   (609) 815-2319
25   Proceedings recorded by mechanical stenography; transcript
         produced by computer-aided transcription.

*United States District Court*
*District of New Jersey*

1    I N D E X

2

3    EXAMINATIONS                                    PAGE

4

5    **MICHAEL IACOBELLIS**
     DIRECT EXAMINATION BY MR. MARKETOS        1311
     CROSS-EXAMINATION BY MS. BROWN            1517
6    REDIRECT EXAMINATION BY MR. MARKETOS      1566

7

8              E X H I B I T S

9    Exhibit No.          Description                 Page

10        Relators' Exhibit 179 in evidence.      1334
          Relators' Exhibit 385 in evidence.      1365
          Relators' Exhibit 360 in evidence.      1368
11        Relators' Exhibit 122 in evidence.      1413
          Relators' Exhibit 308 in evidence.      1421
12        Defendants' Exhibit 2083 in             1433
          evidence.
13        Relators' Exhibit 45 in evidence.       1447
          Relators' Exhibit 418 in evidence.      1453
14        Relators' Exhibit 124 in evidence.      1456
          Relators' Exhibit 170 in evidence.      1469
15        Relators' Exhibit 236 in evidence.      1493
          Relators' Exhibit 88 in evidence.       1499
16        Relators' Exhibit 283 in evidence.      1514
          Defendants' Exhibit D-1092 in           1554
17        evidence.

18

19

20

21

22

23

24

25

**United States District Court**
**District of New Jersey**

```
 1        (PROCEEDINGS held in open court before The Honorable

 2   ZAHID N. QURAISHI, United States District Judge, on May 14,

 3   2024, at 9:00 a.m.)

 4            THE DEPUTY COURT CLERK:  All rise.

 5            THE COURT:  All right, folks.  Thank you.  You can be

 6   seated.

 7        Why don't we just have appearances for the full day,

 8   beginning with Relators' counsel, just so we have a record of

 9   it.

10            MR. MARKETOS:  Good morning, Your Honor.

11   Pete Marketos for the Relators.

12            MS. WENDEL:  Good morning.  Whitney Wendel for

13   Relators.

14            MR. WIRMANI:  Andrew Wirmani for the Relators.

15            MR. RUSS:  Josh Russ for Relators.

16            THE COURT:  All right.  Good morning.

17        From the defense?

18            MS. BROWN:  Good morning, Your Honor.  Alli Brown for

19   Janssen.

20            MR. WYATT:  Good morning, Your Honor.  Geoff Wyatt

21   for Janssen.

22            MR. KLEIN:  And good morning, Your Honor.  Brad Klein

23   for Janssen.

24            THE COURT:  All right.  Good morning to you three as

25   well.
```

```
 1          Mr. Marketos, anything that we need to chat about this
 2   morning, any housekeeping or anything that's come up?
 3          MR. MARKETOS:  Not this morning, Your Honor.  Thank
 4   you.
 5          THE COURT:  All right.  Ms. Brown?  I may have
 6   something, but, Ms. Brown, anything on your end that we need
 7   to chat about?
 8          MS. BROWN:  No.  The only thing that came up this
 9   morning logistically, Your Honor, is at some point -- and
10   maybe not this morning -- if we could have a joint
11   conversation about schedule and just make sure we're all on
12   the same page about when we're going to get the case so we can
13   make sure our witnesses are lined up accordingly.
14          THE COURT:  You want to talk during a -- like a
15   little bit before the lunch break?
16          MS. BROWN:  Yes, whenever is convenient.  I haven't
17   had a chance to raise it with them.  I just wanted to put it
18   out there, you know, given where we are because we had people
19   scheduled beginning the week after Memorial Day, and I just
20   want to make sure we're still on --
21          THE COURT:  You're still on target for that?
22          MS. BROWN:  Correct.
23          THE COURT:  All right.  So why don't you guys -- do
24   you guys want to --
25          MS. BROWN:  Sure.
```

1       THE COURT:  -- confer first before you bring me into

2  it?

3       MS. BROWN:  Sure.

4       THE COURT:  Because I'd like to know, too, where we

5  are on it, but I think it makes more sense for you all to

6  speak and kind of just update me.

7       MS. BROWN:  Sure.

8       THE COURT:  I have -- well, just a little bit of

9  housekeeping.  So June 5th, which I believe is a Wednesday, I

10  can't sit, so in that week, we won't be sitting Wednesday or

11  Friday.  So I want to make sure you guys have it in advance.

12       I don't think I'm going to really inform the jurors of

13  that today.  It's a little far in advance for them to process,

14  so I just think it makes more sense for counsel to be aware of

15  it, but June 5th is a date that I can't sit, and I believe

16  we'll still be in trial that week because that's in our fifth

17  week, and then we'll see where we are.

18       The other thing is I know you guys have been

19  coordinating on exhibits.  Just continue to do that.  I know I

20  suggested end of the week.  It sounds like you're doing it

21  each day because there's a significant number of exhibits, and

22  I think that makes sense.

23       Mr. Marketos.

24       MR. MARKETOS:  Yes, Your Honor, and we have a couple

25  of clarifications in the record where an exhibit was misnamed

```
 1   by us or them, and we'll work with them at the end of each day

 2   to make sure that the numbers are correct and that we're

 3   helping the Court with that.

 4        THE COURT:  Okay.  I appreciate that, and really,

 5   that's for me, but it's going to be more for -- at the end of

 6   this case, I don't want to lose time coordinating then on

 7   which exhibits would go back with the jurors or which ones

 8   they're able to see.

 9        So if you guys can continue to do it, whether it's end

10   of the week or maybe the way you've been doing it now, which

11   is, I think, at the end of each day, I think it makes sense.

12        The only other thing that I'll mention is some of the

13   jurors mentioned to Kim at the end of the trial day yesterday

14   that they're fine with kind of pushing through to 4 o'clock,

15   and if a witness is available and they can only get 10 or

16   15 minutes, they're willing to move forward.

17        So based on that suggestion, I'm just letting you know,

18   partly probably is because they're sensing maybe things are

19   moving slow.  I haven't communicated with them about that, but

20   these folks are sitting.

21        They might be thinking, Hey, you know, if we need that

22   extra time, even if it's 10 or 15 minutes each day, that

23   starts to add up after a couple of weeks.

24        So what I'm telling you folks is I don't know where we

25   are on the witness today.  I don't know how long the first
```

*United States District Court*
*District of New Jersey*

1  witness is going to be.

2       But if we get to a point where we're at 3:40 or 3:30 or

3  3:45 and we think, Oh, let's start tomorrow, I might say,

4  Let's get another 15 minutes in just so the jurors know that

5  we're doing what we can, even if it's psychologically, to push

6  the case forward, so that they're getting it as soon as they

7  can and the case is moving forward.

8       So that was the only other comment that came from a few

9  of the jurors, and that came to Kim, and I wanted to make sure

10 that I related to all of you.

11      But I think that's all the housekeeping I have for now.

12 Just a reminder, though, we're sitting tomorrow, but then this

13 week, that's the last trial day is tomorrow.

14      So do we have anything else we need to chat about?

15 Otherwise, I'll put you in recess until the jurors get here.

16 They have been coming on time, so I expect to be back at 9:30.

17      But, Mr. Marketos, anything from the Relators before I

18 jump off the bench?

19           MR. MARKETOS:  No, Your Honor.  Thank you.

20           THE COURT:  Ms. Brown?

21           MS. BROWN:  No.  Thank you, Judge.

22           THE COURT:  You're in recess.  Remain seated.  I'll

23 see you all in about 15, 20 minutes.

24           MS. BROWN:  Thank you, Your Honor.

25           MR. MARKETOS:  Thank you, Your Honor.

1    (A short recess occurred.)

2    THE DEPUTY COURT CLERK:  Please remain seated.

3    THE COURT:  All right, folks.  We lost a little bit

4  of time.  One of the jurors was in traffic.  I think Kim tried

5  to convey that to you all, but the juror is here, unbelievably

6  apologetic.

7    I was trying to calm him down, but life happens, and

8  these things happen, so I'm just going to give him a minute to

9  settle in, and we're going to get the jurors.

10    And then who has the next witness, Mr. Marketos?  Which

11  one of you is doing the direct?

12    MR. MARKETOS:  I am, Your Honor.

13    THE COURT:  So do you have that witness ready to go?

14    MR. MARKETOS:  I believe he's in the courtroom.

15    THE COURT:  Okay.  Even better.

16    MS. BROWN:  Can we have him take the stand,

17  Your Honor?

18    THE COURT:  I would rather you call him just because

19  he's not on the stand yet.

20    MS. BROWN:  I see.  I see.

21    THE COURT:  It's not for theatrics.  I want the jury

22  to track who the heck is in the box.

23    MS. BROWN:  I understand.

24    THE COURT:  But once he's in, if we take a break, and

25  then should we skip the morning break?

1    MR. MARKETOS:  Well, what's your -- that's what I was

2 going to ask, your preference.  So we're 30 minutes late now.

3 We usually go 9:30 to 11:00, take a break, and then do lunch

4 at 12:30.

5    Should we do 11:15 for five minutes?

6    THE COURT:  Yeah, that's my only concern.  If it was

7 the military, I would just say, One of you is late, all of you

8 are late, but that's not where we are.

9    So I'm not going to hold every juror and all of you

10 responsible for one juror coming late.  So why don't you all

11 just tell me where you think a break makes sense.  Maybe we

12 take it a little bit later, and maybe we break around 12:30

13 rather than 12:00.

14    Why don't you just see in your direct.  You think this

15 witness will still be on direct around that time?

16    MR. MARKETOS:  I do, Your Honor.

17    THE COURT:  All right.  So why don't you find a good

18 spot for it.  But if you want to push it out a little bit, so

19 normally we take a morning break around 11:00, but if you're

20 around 11:15, 11:20, that makes more sense.

21    And instead of around 12:00, we'll break maybe around

22 12:30 for lunch, and I think that makes the most sense.

23    Yeah, I thought about just skipping the morning break

24 all together, but that would mean that everybody's bladder has

25 to be on the same page, and I'm not going to do that to the

1  entire courtroom.

2      So, all right.  Kim, do you want to see if he's all

3  right and we're ready?

4          THE DEPUTY COURT CLERK:  Sure.

5          THE COURT:  These things happen.  Can't happen to you

6  all, though.  It can't happen to you all, though, just to be

7  clear.  When I mean these things happen, I mean they can

8  happen with the jurors.  You all need to be here on time and

9  calculate traffic in advance of coming to this courtroom.

10          THE DEPUTY COURT CLERK:  All rise.

11          (Jury enters courtroom.)

12          THE COURT:  All right, folks.  Everybody have a seat.

13      Members of the jury, welcome back.  We are going to

14  continue with more trial testimony, and I know we're starting

15  a little bit late.  Life gets in the way.  It happens.

16      There's sometimes traffic.  Things will get in the way,

17  and if that happens, we'll just adjust, so I think our morning

18  break will probably just be 15 to 20 minutes later than we

19  would normally take it, and I'm going to push the lunch just a

20  little bit later, but nothing that's going to really cause, I

21  think, any of you inconvenience.

22      If for some reason, though, it is causing you some

23  inconvenience, you need that break earlier than we're getting

24  to, we just ask that you kind of raise your hand or get Kim's

25  attention.  She'll let me know if I'm not paying attention to

──────IACOBELLIS - DIRECT - MARKETOS──────

1   you all, and we can take the break earlier, and that's the

2   same with counsel and anyone else involved in the case.

3       So with that, Mr. Marketos, do you have the next

4   witness available and ready to be called up?

5           MR. MARKETOS:  Yes, Your Honor.  Good morning.  The

6   Relators call Mr. Michael Iacobellis.

7           THE COURT:  All right.  Mr. Iacobellis, why don't you

8   just come down, and I'll have you sworn in, and you can take

9   your seat.

10  (**MICHAEL IACOBELLIS**, HAVING BEEN DULY SWORN/AFFIRMED,

11  TESTIFIED AS FOLLOWS:)

12          THE DEPUTY COURT CLERK:  Please state your name and

13  the spelling of your last name for the record.

14          THE WITNESS:  Mike Iacobellis, I-A-C-O-B-E-L-L-I-S.

15          THE COURT:  Why don't you just have a seat.

16      And then, Mr. Marketos, whenever you're ready, you can

17  begin your direct.

18          MR. MARKETOS:  Thank you, Your Honor.

19  (DIRECT EXAMINATION BY MR. MARKETOS:)

20  Q.  Good morning, sir.

21  A.  Good morning.

22  Q.  Would you say your last name for us so I pronounce it

23  correctly?

24  A.  You did a good job.  Iacobellis.

25  Q.  Iacobellis.  Thank you, Mr. Iacobellis.  My name's

IACOBELLIS - DIRECT - MARKETOS

1  Pete Marketos.  I represent the Relators in this case,

2  Ms. Christine Brancaccio and Ms. Jessica Penelow.

3        Do you understand that, sir?

4  A.  Yes, sir.

5  Q.  You and I had not had a chance to speak before today.

6        Correct?

7  A.  No.  That's correct.

8  Q.  You're currently an employee of Janssen.

9        Correct?

10 A.  That is incorrect.  I retired two years ago.

11 Q.  Oh, you did retire?

12 A.  Yes.

13 Q.  Did you retire before Janssen became Johnson & Johnson

14 Innovative Medicine?

15 A.  Yes.

16 Q.  Thank you, sir.

17        So you've retired for good?

18 A.  Yeah.  January of 2022.

19 Q.  Congratulations, sir.

20 A.  Thank you.

21 Q.  And thank you for taking the time to be with us today,

22 Mr. Iacobellis.  I'm going to try to get your truthful

23 testimony about some events that occurred within the Johnson &

24 Johnson organization, specifically Janssen, during a time

25 period from 2006 to 2014.

IACOBELLIS - DIRECT - MARKETOS

1      Okay, sir?

2  A.   Thank you.  I know that's important.

3  Q.   Yes.  I know it's important, and I know that you were an

4  employee of various organizations within Johnson & Johnson

5  during that same time frame.

6      Correct?

7  A.   Yes, sir.

8  Q.   And I'm going to try to clear up a little bit of

9  confusion because, in fairness, Johnson & Johnson has a lot of

10  subsidiaries and divisions whose names have somewhat changed

11  over time.

12      True?

13  A.   True.

14  Q.   All right.

15      And so that we can get our bearings, there was a

16  company called Tibotec that itself became a part of the

17  Janssen organization.

18      Correct?

19  A.   Correct.  It was Tibotec Therapeutics.

20  Q.   Tibotec Therapeutics, and that became Janssen, or part of

21  Janssen.  Janssen had -- itself had a number of different

22  divisions.  That would be Janssen Pharmaceuticals was one.

23      Right, sir?

24  A.   Correct.

25  Q.   Janssen Products was another?

IACOBELLIS - DIRECT - MARKETOS

1    A.    Correct.

2            THE COURT:  Sir, do you mind just taking the mic and

3    putting it -- yeah, just a little bit closer to you.  That way

4    you won't have to project.

5            THE WITNESS:  Sorry.  Thank you.

6            THE COURT:  No, that's all right.

7    BY MR. MARKETOS:

8    Q.    Janssen Products is another subdivision of Janssen.

9         Correct?

10   A.    Correct.

11   Q.    For all intents and purposes, when we're speaking today

12   about Janssen, I'm talking about the collection of Johnson &

13   Johnson organizations, otherwise known as Janssen.

14        Okay, sir?

15   A.    Sure.

16   Q.    And I'm not going to refer to Tibotec because its name

17   changed to Janssen.  I'm not going to refer to Janssen

18   Products or Janssen Pharmaceuticals.  I'm referring, instead,

19   to the collection of companies that you worked for known as

20   Janssen.

21        Okay, sir?

22   A.    Thank you.

23   Q.    All right.

24        That includes, of course, the parent organization,

25   Johnson & Johnson.

─────────────── IACOBELLIS - DIRECT - MARKETOS ───────────────

1     Do you understand that?

2   A.   Yes, sir.

3   Q.   And, sir, you graduated from college with a bachelor's in

4   microbiology and immunology back in the early '80s.

5        Correct?

6   A.   '81, yes.

7   Q.   And then you also received a master's of science in

8   administration, as I understand it.

9   A.   Yes.

10  Q.   And in the mid-1980s, you began to work in the

11  pharmaceutical industry.

12       Correct?

13  A.   Yes, yes.  I believe so.  I'm terrible at dates.

14  Q.   And it's not a memory test, sir.  I promise.

15       What I will do, though, is if we speak over each other

16  during the course of the day, I'm going to stop and re-ask my

17  question, just so that the court reporter can take my question

18  and your answer.  And it's natural for us to interrupt each

19  other in common parlance, but we can't do that today.

20       Okay?

21  A.   Okay.

22  Q.   All right, sir.

23       So let's just very quickly talk about your background

24  in the pharmaceutical industry before I ask you some questions

25  about your time with Janssen.

IACOBELLIS - DIRECT - MARKETOS

1      Okay?

2   A.   Okay.

3   Q.   You, as I understand it, began working for Ives

4   Laboratory, which was part of Searle Pharmaceuticals in the

5   mid-'80s?

6   A.   That's incorrect.  It was a division of American Home

7   Products.

8   Q.   American Home Products.  Thank you.

9        And you were with Searle Pharmaceuticals, which merged

10  with Monsanto?

11  A.   Correct.

12  Q.   Monsanto became or was acquired by Upjohn?

13  A.   Pharmacia & Upjohn, correct.

14  Q.   Pharmacia & Upjohn were acquired by Pfizer?

15  A.   That is correct.  It went through both those mergers.

16  Q.   And for approximately 20 years, you were with the

17  organization that became Searle, Monsanto, Upjohn Pharmacia

18  Pfizer.

19       Correct?

20  A.   Pharmacia and then Pfizer.

21  Q.   Yes, sir.

22       And then for a while you were at Watson.

23       Correct?

24  A.   Correct.

25  Q.   And you were involved mostly in sales and development for

IACOBELLIS - DIRECT - MARKETOS

1    those organizations?

2    A.    Sales and learning development.

3    Q.    Sales and learning development?

4    A.    Yeah.

5    Q.    So development of sales tactics, training of

6    representatives, that type of conduct.

7          Right?

8    A.    Right.  The leadership development, et cetera.

9    Q.    The development of leaders in the area of selling and

10   promotion of pharmaceutical products.

11   A.    Yes.

12   Q.    And you told us today that you retired from Janssen in

13   2022.  You first went to work for Janssen in or about 2005.

14         Right, sir?

15   A.    Yes, sir.

16   Q.    And that was -- you went over from Pfizer and were

17   employed by Janssen in New Jersey?

18   A.    I believe I went from Watson to J&J.

19   Q.    Okay, so from Watson.  Thank you, sir.

20         From Watson you went over to Johnson & Johnson.  And

21   specifically you were asked to join the Tibotec part of

22   Janssen.

23         Correct?

24   A.    Yes.

25   Q.    That's the Tibotec company that had -- or was about to

IACOBELLIS - DIRECT - MARKETOS

1    launch a new product called Prezista.

2    A.    Yes, sir.

3    Q.    And you began -- so let's see.  In 2005, you led the

4    training and development of that organization.

5          Correct, sir?

6    A.    Yes, sir.  Yes.

7    Q.    That's the organization, to be clear, that we're talking

8    about today in this lawsuit.

9          Do you understand that?

10   A.    Yes, sir.

11   Q.    All right.

12         And your job at that time, when you were first hired in

13   2005, was to lead the training and development of the sales

14   force.

15         Correct?

16   A.    Yes.

17   Q.    And when we're talking about a sales force at this

18   particular division of Janssen, we're talking about sales

19   managers and representatives throughout the country.

20         Correct?

21   A.    Yes.

22   Q.    These are the people who include sales representatives

23   like Ms. Brancaccio and Ms. Penelow who actually go and visit

24   doctors in their offices and their clinics.

25         Correct?

IACOBELLIS - DIRECT - MARKETOS

1  A.   Yes.

2  Q.   And then those who manage them, the regional managers,

3  the district managers, all reported up the chain.

4       Correct?

5  A.   Yes.

6  Q.   And you were responsible initially for training those

7  people on how to promote Janssen's products to doctors.

8  A.   Yes.

9  Q.   And in 2007, after you had been the leader of training

10 and development for a couple of years, you actually became

11 first the interim national sales director and then the

12 national sales director for the entire organization.

13      Correct?

14 A.   Yes, sir.  December of '07, the national sales director

15 went out and I sat in the seat until she came back.  And then

16 in April of '08, that's when I became the full-time NSD.

17 Q.   And --

18 A.   I'm sorry, national sales director.

19 Q.   And I'm sorry, sir.  You may have to touch the microphone

20 a little bit closer so our jurors can hear you speak.

21 A.   Okay.  Thank you.

22 Q.   No problem, sir.

23      So just to be clear, there was a period of time where

24 you said you sat in the seat of the national sales director

25 for an interim period, and then you became the national sales

IACOBELLIS - DIRECT - MARKETOS

1   director yourself.

2   A.   Yes, sir.

3   Q.   All right.

4        And that was in or about 2007 and early 2008.

5   A.   Correct.

6   Q.   And as of early 2008, you had responsibility for the

7   entire country in terms of the sales force for Janssen.

8        Correct?

9   A.   Yes.

10  Q.   And that would have been responsibility over the sales

11  and promotion of the two products that Janssen -- this

12  division of Janssen had at the time, Prezista and eventually

13  Intelence in 2008.

14       Correct?

15  A.   Yes, yes.

16  Q.   Those are the two drugs we're talking about in this case.

17       You understand that?

18  A.   Yes.

19  Q.   Both of which are HIV drugs that are promoted or at least

20  Janssen promoted to patients and doctors.

21       Correct?

22  A.   Yes.

23  Q.   And at the time when you became the national sales

24  director, you reported to Mark Gossett and to

25  Mr. Glenn Mattes, who we've heard a little bit about.

1     Correct?

2   A.   I'm sorry, you said when -- what was the timing of that?

3   Q.   When you were the national sales director.

4   A.   Yes.

5   Q.   All right.

6        So you reported up to Mr. Mark Gossett and

7   Mr. Glenn Mattes while you were the head of sales for the

8   entire organization.

9        Correct?

10  A.   Yes, sir.

11  Q.   Mr. Glenn Mattes was the -- was he the president?

12  A.   Yes.

13  Q.   Of the entire company.

14       Right?

15  A.   Yes.

16  Q.   And then from 2011 to 2014, you went over to Janssen

17  Pharmaceuticals.

18       Correct?

19  A.   I went to a center of excellence that supported all five

20  operating companies.

21  Q.   Okay.

22       All five operating companies, Janssen companies?

23  A.   Yes.  Pharmaceutical -- five different pharmaceutical

24  companies that make up Janssen.

25  Q.   Okay.

IACOBELLIS - DIRECT - MARKETOS

1      So there are -- we're talking about one of those

2   companies today.

3   A.   Right.

4   Q.   But you went to a position that oversaw training and

5   development and leadership development for all five Janssen

6   subsidiaries.

7   A.   Yes.  And operations.

8   Q.   And operations.

9      So you were responsible for the operations and training

10  and development.

11     Is that right?

12  A.   Yes.

13  Q.   That was a promotion.

14  A.   Yes, it was.

15     Just a point of clarification.  There was no longer any

16  responsibility for product training or selling skills or any

17  of those.  Each of the operating companies had their own

18  learning and development training centers.

19  Q.   All right, sir.

20     While you were with Janssen/Tibotec, for lack of a

21  better term, Janssen/Tibotec, the organization we're talking

22  about today, from 2005 to 2007, you did have responsibility to

23  train the sales representatives on how to promote Prezista and

24  Intelence to doctors.

25     Correct?

IACOBELLIS - DIRECT - MARKETOS

1    A.   Yes, sir.  It was a disease state --

2    Q.   And --

3    A.   I'm sorry.  It was a disease state product knowledge, the

4    environment, selling.

5    Q.   And your training responsibilities covered all of the

6    sales representatives in the company.

7         Correct?

8    A.   For that, yeah, Tibotec, that's correct.

9    Q.   For that company.  Yes?

10   A.   Yes.

11   Q.   You directly supervised Mark Wilhelm and Sara Strand

12   during that time period from 2007 to 2011.

13        Correct?

14   A.   That's incorrect.  That was after I became the national

15   sales director in April of '08.

16   Q.   Okay.  I'm sorry.  I said during the time period from

17   2007 to 2011.

18        I see.  You're saying it didn't begin --

19   A.   Yeah.  And they -- I had no responsibility for them when

20   I was in learning and development.

21   Q.   Let's start over, then.

22        From 2008 to 2011, you had direct supervisory authority

23   over Mr. Mark Wilhelm and Ms. Sara Strand.

24        Correct?

25   A.   Yes, sir.

IACOBELLIS - DIRECT - MARKETOS

1    Q.   All right.

2        And then from, again, 2014 to 2022, you had been

3    promoted over all five Janssen operating companies.

4    A.   That's incorrect.  It was June of -- it was about

5    May/June of 2011 until my retirement in January of 2022.  So I

6    left in May -- I was transitioning out in May of 2011.

7    Q.   I'm sorry, sir.

8        In 2014, you were promoted to a senior director of

9    commercial development.

10        Correct?

11   A.   No.  I mean, I had left the position, national sales

12   director for Tibotec Therapeutics, in May -- May/June of 2011.

13   Q.   I understand.

14        In 2014, were you not promoted to senior director?

15   A.   No.  I was a senior director at that time.

16   Q.   Okay, sir.

17        Now, to be clear, sir, you're testifying today, and you

18   are -- you understand you're being represented by Janssen's

19   lawyers.

20        Is that fair?

21   A.   Yes, sir.

22   Q.   And you've been meeting with Janssen and its counsel in

23   order to prepare for your testimony today.

24        Correct?

25   A.   Yes, yes.

─IACOBELLIS - DIRECT - MARKETOS─

```
 1   Q.  All right.

 2       And did Janssen pay for your travel here today, or did

 3   you just drive?

 4   A.  I drove.

 5   Q.  All right.

 6       And you're not needing to go stay in any hotels because

 7   you drove from your home, I presume?

 8   A.  I stayed in a hotel because it's an hour and a half away,

 9   and I was supposed to go earlier yesterday.

10   Q.  You stayed in the hotel that Janssen and its attorneys

11   are staying in for this trial.

12   A.  Yes.

13   Q.  Is that fair?

14   A.  Yes.

15   Q.  And you worked with them to prepare for your testimony

16   today.

17       Fair?

18   A.  Yes.

19   Q.  All right.

20       And that's what you would expect to do if you want to

21   prepare yourself to testify to a jury.

22       Fair?

23   A.  I would assume so, yes.

24   Q.  That includes speaking with salespeople at Janssen and

25   reviewing documents.
```

———IACOBELLIS - DIRECT - MARKETOS———

1        Right, sir?

2   A.   Yes, sir.

3   Q.   All right.

4        And Janssen's paying for your room and board while

5   you're down here testifying.

6        Fair?

7   A.   Yes.

8   Q.   Now, I'd like to just -- draw your attention to your

9   understandings of the allegations in this case.

10       Now, you've given testimony before in this case.

11       Correct, sir?

12  A.   Yes.

13  Q.   And so that everybody understands, there are, during the

14  case -- the course of civil trials, an opportunity to sit down

15  and give sworn testimony under oath just like you're in trial,

16  and that's then what's called a deposition.

17       Correct?

18  A.   Yes.

19  Q.   And there's a court reporter, a videographer and you

20  swear an oath just like you did to tell the truth this

21  morning.

22       Correct?

23  A.   Yes.

24  Q.   And you've done that in this case.

25       Correct?

IACOBELLIS - DIRECT - MARKETOS

1  A.   Yes.

2  Q.   And you're aware that my clients, Ms. Penelow and

3  Ms. Brancaccio, and many other witnesses have done the same.

4  A.   Yes.

5  Q.   True?

6  A.   Yes.

7  Q.   Did you have an opportunity to go over that testimony

8  that you provided before in this case in order to prepare

9  today?

10 A.   My testimony?

11 Q.   Yes, sir.

12 A.   Yes.

13 Q.   All right.

14      And you're aware of the fact that the allegations in

15 this case that were brought by Ms. Penelow and Ms. Brancaccio

16 are:

17      One, that Janssen, during the time period from 2006 to

18 2014, paid kickbacks to doctors in order for the doctors to

19 increase their prescriptions of Janssen's drugs.

20      Do you understand that's one of the allegations?

21 A.   Yes.

22 Q.   And the second allegation is that Janssen was engaged in

23 off-label promotion of those two drugs, Prezista and

24 Intelence.

25      Right, sir?

IACOBELLIS - DIRECT - MARKETOS

1   A.   Yes.

2   Q.   And those allegations are brought under what's called the

3   False Claims Act, which is brought on behalf of the

4   United States Government.

5        Do you understand that?

6   A.   Yes.

7   Q.   All right.

8        I'd like to turn your attention now to the beginning of

9   the relevant time period that we're talking about, which is

10  March of 2006.

11       In March of 2006 -- and you were involved from a

12  training perspective right before Prezista was launched.

13  Fair?

14  A.   Yes.

15  Q.   And Prezista was an HIV protease inhibitor, a drug that

16  was intended to essentially slow down the replication of the

17  HIV virus in the human body.

18  A.   Yes.

19  Q.   And as I understand it, sir, that product launched in or

20  about June of 2006.

21       Right?

22  A.   I believe so, yes.

23  Q.   But for years prior to that launch, Janssen had obtained

24  a patent on that product.

25       Correct?

——————IACOBELLIS - DIRECT - MARKETOS——————

1  A.   I was not aware.  I don't know the specifics of that.

2  Q.   I'm not asking you about timing.  You know --

3  A.   The patents and how that patent would work.

4  Q.   All right.

5       It was a Janssen-patented drug.  Did you know that?

6  A.   Yes.

7  Q.   All right.

8       And Janssen had attempted to go to the Food and Drug

9  Administration, the FDA, to get an approval for that drug to

10 be given to patients in the United States.

11 A.   Yes.

12 Q.   That approval process in this instance was expedited.

13      Right, sir?

14 A.   Yes.

15 Q.   And ultimately the approved indication, the label that

16 Janssen obtained for Prezista, was relatively narrow.

17 A.   Yes.

18 Q.   And by "relatively narrow," what I mean, sir, is there

19 was a specific segment of the HIV patient population for which

20 that drug was approved by the FDA.

21      Right, sir?

22 A.   Yes.

23 Q.   And that's because in order to get an approval for an FDA

24 drug, a company like Janssen, a pharmaceutical manufacturer,

25 must show clinical evidence that its drug is safe and

IACOBELLIS - DIRECT - MARKETOS

1  effective for the patients that it's intended for.

2      Correct?

3  A.  Yes.

4  Q.  And what might happen, as you're aware given your, I

5  guess, some 40 years of experience in the industry, what might

6  happen is a pharmaceutical manufacturer can make the decision

7  to take a longer period of time and develop clinical evidence

8  and get a broader label from the FDA, or it can move more

9  quickly to market and get a narrower indication.

10     Correct?

11  A.  Yes, yes.

12  Q.  In this instance, with respect to Prezista, Janssen chose

13  the latter.  That is, it decided strategically to go for an

14  expedited process to obtain a more narrow label for Prezista.

15     Correct?

16  A.  Yes.

17  Q.  And so in or about March of 2006, Janssen knew that its

18  patient segmentation, that is, the area or the segment of the

19  patient population who had HIV, was a narrow one.  Fair?

20  A.  Fair.

21      MR. MARKETOS:  And if we take a look at, just for the

22  witness, please -- Relators' Exhibit 179.

23  BY MR. MARKETOS:

24  Q.  What I'm going to show you during the course of the day,

25  Mr. Iacobellis, are some exhibits that you've reviewed, I'm

IACOBELLIS - DIRECT - MARKETOS

1    sure, before today.  If you haven't, I'll take you through

2    them.

3         Okay, sir?

4    A.   Okay.

5    Q.   All right.

6         What we're looking at here -- do you see on the screen?

7    -- is the "Prezista Sales Activation Project."  This is dated

8    March of 2007.

9         Do you see that?

10   A.   Yes.

11   Q.   All right.

12        And do you recognize this document?

13   A.   Actually, I don't.

14   Q.   Okay.

15        Were you part of -- you received Janssen's marketing

16   strategy documents that were circulated to you so that you

17   could train on them.

18        Correct?

19   A.   Not necessarily the strategy because we don't train on

20   strategy.  My role came in to really train the disease state,

21   the therapeutic area until the product was approved, and then

22   we started training on the product.

23        But as far as strategy, that was national sales

24   director at the time and the president and the clinical

25   people --

─────IACOBELLIS - DIRECT - MARKETOS─────

1   Q.   All right.

2   A.   -- in marketing.

3   Q.   Let's take a look at the bottom right.  I'm going to show

4   you this is a document that was produced by Janssen in this

5   case.

6        Do you see that at the bottom, sir, there's a Bates

7   label on that?

8   A.   Yes.

9   Q.   All right.

10       And you actually worked with the monitor group yourself

11  and circulated a lot of presentations that the monitor group

12  had put together.

13       Do you recall that?

14  A.   I didn't work directly with them.  I don't recall if I'd

15  sent -- which ones those were.

16  Q.   All right.  Let me see if I can refresh your

17  recollection.

18       MR. MARKETOS:  Let's pull up Relators' Exhibit 1701,

19  just for the witness, please, Ms. Johnson.

20       Thank you.

21  BY MR. MARKETOS:

22  Q.   Relators' Exhibit 1701 is in front of you, sir, and I'm

23  just going to see if this refreshes your recollection.

24       You can take a look at your name in this email below

25  and a discussion about the Prezista team and the monitor

IACOBELLIS - DIRECT - MARKETOS

```
 1  group.
 2       Do you see that?
 3  A.   Yes.
 4  Q.   All right.
 5       You understand that you were privy to, at the time,
 6  communications about the strategies, and you were actually
 7  provided these presentations.
 8       Right, sir?
 9  A.   Yes.
10  Q.   I'm going to turn your attention back to exhibit --
11  Relators' Exhibit 179.  This is one of those documents.
12       Do you see that, sir?
13  A.   Yes.
14  Q.   All right.
15       MR. MARKETOS:  Your Honor, we'd offer
16  Relators' Exhibit 179.
17       MS. BROWN:  I would object, Your Honor, on
18  foundation.  He said he's never seen it before.
19       THE COURT:  Well, then he showed him an email, and he
20  changed his response.  I'm going to allow it.  Overruled.
21       THE WITNESS:  Well, I mean, just a point of
22  clarification.  You asked if I distributed --
23       THE COURT:  Sir?
24       THE WITNESS:  Sorry.
25       THE COURT:  There's only one judge.  I'm going to
```

1    address the objection.  It's overruled for now.  I'm going to

2    allow it in.

3    (Relators' Exhibit 179 in evidence.)

4    BY MR. MARKETOS:

5    Q.   Turn to page 9 of this, sir.  I jut want to ask you if

6    you have a recollection, and in fairness, Mr. Iacobellis, you

7    may not.  If you don't, you can tell me.

8         Okay?

9    A.   Uh-huh.

10   Q.   All right.

11        What I want to show you is the patient segmentation,

12   and this is in evidence.

13         MR. MARKETOS:  You may publish it, Ms. Johnson.

14   BY MR. MARKETOS:

15   Q.   What we're showing to the members of the jury,

16   Mr. Iacobellis, is the new patient segmentation.

17        Now, having taken a look at the way that Janssen

18   segmented the HIV population, does this come back to you?

19   A.   Yes.

20   Q.   All right.

21        So to be clear, what we're looking at here is the new

22   patient segmentation.  And from left to right on this screen,

23   HIV -- different HIV populations based on their disease state

24   are what's reflected in the categories of letters at the

25   bottom.

─────IACOBELLIS - DIRECT - MARKETOS─────

1          Correct?

2     A.    Yes.

3     Q.    And going from left to right, we have the patients who

4     are relatively -- the disease is relatively new to those

5     patients.  It's naive.

6          Fair?

7     A.    Correct.

8     Q.    And with respect to their treatments, those patients in

9     segment A in general are naive patients who may or may not

10    have even had treatment with any drug at all.

11         Correct?

12    A.    Correct.

13    Q.    All right.

14         So the naive patients in general have not received any

15    treatment, 34.

16         And all the way over to Segment H, that's in the highly

17    treatment-experienced patients.

18         Correct?

19    A.    Correct.

20    Q.    And that matters because the way that the HIV virus

21    works, there are potentially levels of mutation and resistance

22    that the patients develop over time, and they must be put in

23    certain categories to be treated correctly.

24         Right, sir?

25    A.    Correct.

─IACOBELLIS - DIRECT - MARKETOS─

1   Q.   And what we're looking at over here on the right, the

2   natural playfield, that is the natural playfield for which

3   Prezista was approved by the FDA.

4        Correct?

5   A.   Yes.

6   Q.   So if we're looking for the playfield, the population of

7   HIV patients for whom this drug was approved by the FDA,

8   that's Segment H.  That's on-label patient.

9        Right, sir?

10  A.   Yes.

11  Q.   But in 2006, before the product was launched, Janssen

12  recognized that in order for it to meet forecasts -- projected

13  sales of this drug and meet its forecasts, it must play in

14  segments that were not on-label.

15       Correct?

16  A.   I was not involved with those discussions, being in

17  training.

18  Q.   All right.

19       You were not involved.  Let's see if you can -- this

20  refreshes your recollection.

21       In 2006, in March of 2006, before Janssen launched the

22  drug, it recognized that it must play -- it must promote its

23  drug and sell it into populations that were off-label.

24       True?

25  A.   I disagree with how you're characterizing the question

IACOBELLIS - DIRECT - MARKETOS

1  because, again, I think there's a difference between planning

2  and promotion, and those decisions about how we were going to

3  plan a launch, I can't definitively say that, being in the

4  learning and development seat.

5  Q.   All right, sir.  Let me see if I can rephrase my question

6  in a way that's more fair.  Okay?

7       As I understand it, you weren't privy to the strategy

8  behind Janssen's tactics of what it was going to do in the

9  marketplace.

10      Is that fair?

11 A.   You mean the decisions relative to the launch?

12 Q.   The decisions relative to the launch was not your

13 bailiwick.  That wasn't -- that was --

14 A.   Exactly.

15 Q.   -- somebody else's job.

16      Is that right?

17 A.   That was the marketing team with finance and the senior

18 people.

19 Q.   The marketing people, the financial team, and the senior

20 people like Glenn Mattes.

21      Right?

22 A.   Correct.

23 Q.   Okay.

24      And then you were in charge of executing when they gave

25 you the strategy.

───────IACOBELLIS - DIRECT - MARKETOS───────

1           Is that right?

2   A.    Exactly.

3   Q.    All right.

4           So that's fair.  You were just the execution Friday in

5   the sales side.

6           Is that fair?

7   A.    That's fair.

8   Q.    But what you do know is that Janssen wanted to play in

9   segments of the patient population outside of the patient

10  population for which it obtained FDA approval.

11          Fair?

12  A.    I can't say that definitively.  You're saying that was a

13  decision made prior to launch and that was advance planning

14  for three products in five years and new indications that it

15  was phased out -- phased out over time.

16  Q.    All right, sir.

17          You don't know.  Is that right?

18          When you said "I can't say that definitively," are

19  you talking --

20  A.    There was -- there was no decision made to promote

21  off-label prior to launch, no, if that was the question.

22  Q.    I'm sorry.  You just told us you weren't privy to those

23  decisions.

24          Is that fair?

25  A.    As far as the early promotion because of what I was

IACOBELLIS - DIRECT - MARKETOS

1  handed to train the sales force.

2  Q.   All right.

3       So what we do know is that there was a must play

4  segment.

5       Right, sir?

6  A.   Yes.

7  Q.   And you know that when you were executing with the sales

8  force, at least training them on how to promote the drug, that

9  Janssen did want doctors to adopt its drug earlier on in the

10 patient cycle, that is, more naive.

11      You know that, right?  That's what you were training

12 people to do.

13      Fair?

14 A.   That was the future focus, but I can't say that

15 definitively at the time.

16 Q.   Okay.

17      Let's look at Page 10.  Now, we'll get into the dates

18 and times in which Prezista -- the drug obtained a new label

19 in late 2008, but for our purposes, in 2006 and 2007 when this

20 document was drafted, what we know is the current -- then

21 current U.S. label only permitted Prezista to be promoted to

22 patients such as those with HIV 1 strains resistant to more

23 than one protease inhibitor.

24      Do you see that at the top?

25 A.   Yes.

IACOBELLIS - DIRECT - MARKETOS

1  Q.  So what Janssen is doing internally in this document is

2  it's looking at the label it obtained approval for.

3      Right, sir?

4  A.  Yes.

5  Q.  That's the narrow label.

6      Right?

7  A.  Yes.

8  Q.  That one patient population H in blue?

9  A.  Yes.

10  Q.  And it's comparing that to the actual patient population

11  to which it could potentially promote the drug.

12      Fair?

13  A.  Yes.

14  Q.  And we're not talking about a narrow label wherein

15  Janssen could promote Prezista to just anybody.  It had to be

16  patients with HIV strains resistant to more than one protease

17  inhibitor.

18      Right, sir?

19  A.  Correct.

20  Q.  So now you're talking about potentially being the third

21  or fourth protease inhibitor that would be prescribed to an

22  HIV patient.

23      Right, sir?

24  A.  Could be, yes.

25  Q.  Highly treatment-experienced patients.

─IACOBELLIS - DIRECT - MARKETOS─

1      Right?

2  A.   Yes.

3  Q.   Janssen, by this point in time in 2006 and 2007, had not

4  taken clinical studies approved by the FDA and delivered them

5  to the FDA in order to obtain an expanded label.

6      Right, sir?

7  A.   I didn't know the timing of that.

8  Q.   Well, you know --

9  A.   I can't say.

10 Q.   I'm sorry.  I interrupted.

11     You know that Janssen obtained an expanded label for

12 Prezista in October of 2008.

13     Right, sir?

14 A.   Yes.

15 Q.   So for this time that we're talking about, all of 2006,

16 all of 2007 and most of 2008, Janssen had not delivered enough

17 data to the FDA to get and expanded label.

18     Fair?

19 A.   I can't say that, not in my seat, that -- when the timing

20 was when they submitted the information and the data.

21 Q.   Okay.

22     What we can see is that Janssen stated in a March 2007

23 strategy document, "We need to distinguish between patients

24 that are on-label and patients we can commercially target,

25 i.e., ask for in sales activities."

*1342*

IACOBELLIS - DIRECT - MARKETOS

1    Do you see that?

2  A.  Yes.

3  Q.  Let's take a look at that dynamic market it was looking

4  at to the right.  Again, we've got our Segment H, on-label for

5  Prezista.

6    Right, sir?

7  A.  Yes.

8  Q.  And then Janssen was looking at patients who were earlier

9  on in the process who had not failed a protease inhibitor yet.

10    Right, sir?

11  A.  Yes.

12  Q.  Okay.

13    And that includes patients in segments E and F because

14  those patients numbered in the 80,000 range.  There were

15  80,000 more potential patients in E and F than there were in

16  the 20,000 in Segment H.

17    Right, sir?

18  A.  Yes.

19  Q.  And if you want to sell a drug, you have to have patients

20  to sell it to.

21    Fair?

22  A.  Yes.

23  Q.  The more patients that are available to sell to, the more

24  you can generate sales naturally?

25  A.  Yes.

─────IACOBELLIS - DIRECT - MARKETOS─────

1    Q.   Right, sir?

2         All right.  And if we look at -- under "We need to

3    distinguish between patients that are on-label and patients we

4    can commercially target or ask for in sales activities,"

5    here's what Janssen said at the time:

6         "On-label patients are patients that physicians should

7    feel comfortable prescribing the drug to, but the sales force

8    can only speak about power study patients and the detail aid

9    can only contain power study data."

10        Do you see that?

11   A.   Yes.

12   Q.   All right.

13        What that means is we want to sell, but we have to have

14   the data to back it up.

15        Fair?

16   A.   Fair.

17   Q.   And if we take a look at the next page, please.

18        MR. MARKETOS:  Blow this up for the members of the

19   jury, if we could, Ms. Johnson.  Thank you.

20   BY MR. MARKETOS:

21   Q.   Janssen in 2007 was assessing its growth target for that

22   year.

23        Right, sir?

24   A.   Yes.

25   Q.   And to achieve Janssen's 2007 target, Janssen needed to

─IACOBELLIS - DIRECT - MARKETOS─

1   believe that it could capture between 30 percent and

2   80 percent of the addressable market.

3          MR. MARKETOS:  If you look at the bottom right and

4   blow that up, please, Ms. Johnson.

5          It's the bottom right box.

6          Thank you.

7          We'll just blow that up -- blow that out, if you can.

8          Thank you.

9   BY MR. MARKETOS:

10  Q.   Janssen believed it needed to capture between 30 percent

11  and 80 percent of its addressable market in order to meet its

12  sales forecasts.

13          True?

14  A.   I'm not sure specifically what "addressable market" means

15  in this regard to this report.  I can't say.

16  Q.   We'll look at that.  I'm just -- right now I'm just

17  reading the words.

18  A.   Yeah.

19  Q.   And I assume, sir -- look, there's always context.  But

20  generally speaking, the words mean what they mean.

21          Is that fair?

22  A.   Context is important.  Especially --

23  Q.   Sorry.

24  A.   Sorry, go ahead.

25  Q.   Context is important.  Let's see the context.

IACOBELLIS - DIRECT - MARKETOS

1    MR. MARKETOS:  Back out of that, if you would,

2    please.

3    BY MR. MARKETOS:

4    Q.  Let's take a look at what Janssen defined as the

5    "addressable market" so we don't have to guess.

6    That addressable market is the conservative market on

7    the left.

8    Do you see that, the conservative market is 20?

9    Do you see that, sir?

10   A.  Yes.

11   Q.  That's the conservative market because that was the

12   patient segment, Segment H, that the drug was actually

13   approved for, the 20,000 patients in that segment.  And it's

14   even colored blue.

15   Do you see that?

16   A.  Yes.

17   Q.  But the addressable market, the max addressable market

18   for Janssen included patients in segments beyond the label,

19   11, 12, and 12, from the other segments, E, F, and G.

20   Do you see that?

21   A.  I do.

22   Q.  All right.

23   So what Janssen was saying, now that we understand the

24   addressable market, is that it needed to capture between 30 to

25   80 percent of that addressable market in order to meet its

—————— IACOBELLIS - DIRECT - MARKETOS ——————

1    sales forecasts.

2         Right, sir?

3    A.    Is -- in regard to this particular document, I know it's

4    internal planning.  And, again, I didn't concern myself with

5    what their planning was versus how we were phasing in new-hire

6    representatives.  So I can't definitively say that in my role.

7    Q.    All right.

8         You can read a document and understand it.

9    A.    I can, but I don't know the context or why or the

10   objectives that marketing or if -- or the people who arranged

11   with monitor to create this report and what that data is.

12   Q.    I understand.  You're just saying you were doing as you

13   were told.

14        Is that fair?

15   A.    No.  I -- I was part of the internal office, but we all

16   had our responsibilities, and mine at the time was learning

17   and development.  So this information wasn't important to me

18   at the time because I was more of an execution arm.

19   Q.    Fair enough.  But I'm just asking you about it now.

20   A.    Yeah.  But I can't definitively answer that.

21   Q.    Okay.

22        You can't definitively read the document as we're

23   looking at it.

24        Is that fair?

25   A.    What I'm saying is that as marketing and monitor were

─IACOBELLIS - DIRECT - MARKETOS─

1  working together and they brought this analysis in, I didn't

2  know the context or the objectives for why they did it so I

3  can't definitively say that.

4  Q.  All right, sir.  I'm not --

5  A.  I mean, I was copied on the email, but I don't recall

6  being part of some of these discussions.

7  Q.  I understand.  Let's take a look at the next page.

8      Maybe you're learning something about the strategy that

9  you didn't know at that time.

10     Is that fair?

11  A.  It's been a long time.

12  Q.  I understand.

13     If we take a look at the longer-term view of the market

14  penetration strategy -- I mean, in fairness, Mr. Iacobellis,

15  we're looking at the strategy documents coming from the

16  strategy people.

17     Right, sir?

18  A.  Yes.

19  Q.  And if we take a look at the longer-term view of the

20  market penetration strategy, we can see again that the

21  longer-term strategy was for Janssen to get this drug pushed

22  into the naive side of the spectrum.

23     Do you see that?

24  A.  It was the internal planning understanding future

25  indications, that's correct.

─IACOBELLIS - DIRECT - MARKETOS─

1    Q.   Understood.

2         And the benchmark, if we look at the middle, the

3    benchmark is Reyataz.

4         MR. MARKETOS:  And we'll blow that up, if you would,

5    please, Ms. Johnson.

6    BY MR. MARKETOS:

7    Q.   The benchmark is Reyataz.  The middle bubble.

8         MR. MARKETOS:  Sorry, Ms. Johnson.  The middle bubble

9    at the top.

10   BY MR. MARKETOS:

11   Q.   "Benchmark is Reyataz and less Kaletra."  Right?  "Need

12   to prove favorable differentiation primarily on lipids."

13        Do you see that?

14   A.   Yes.

15   Q.   Let's stop for a moment there.

16        You have an understanding about what the lipid profile

17   was of the drug Prezista.

18   A.   Yes.

19   Q.   Right, sir?

20   A.   Yes.

21   Q.   And I'm not going to ask you as a doctor.  I'm not going

22   to ask you as a clinician.  I'm not going to ask you as a

23   scientist.  But in order to teach people how to sell this drug

24   as a national sales director or as a trainer, you had to know

25   what the drug did to people.

────IACOBELLIS - DIRECT - MARKETOS────

1              Right?

2    A.    Yes.

3    Q.    One of the things that Prezista did, it had a potential

4    adverse reaction, and it would potentially increase a

5    patient's cholesterol and triglycerides -- excuse me -- their

6    cholesterol and their lipoproteins.

7              Right, sir?  HDL.

8    A.    I think there was -- there's always a continuum, and I

9    know that the label was specific to the data and the clinical

10   trials and the -- I think over time we were -- we were

11   approved for proven lipid profile as a --

12   Q.    We'll get to that.  I promise you, sir.

13             THE COURT:  I'm going to ask you, there's a

14   particular question that's being asked of you.  That was not

15   the question that he asked.  So I'm going to ask you to just

16   pay attention to the question that's posed to you and just

17   respond to the question that you're asked.

18        Do you understand that?

19             THE WITNESS:  Thank you, Your Honor.

20             THE COURT:  Thank you, sir.

21   BY MR. MARKETOS:

22   Q.    All right, sir.

23        Just to be clear, the benchmark is Reyataz.  That was a

24   competitive drug.

25        Right sir?

IACOBELLIS - DIRECT - MARKETOS

1  A.   Yes, it was.

2  Q.   Reyataz didn't have the label limitations that Prezista

3  had when it was launched.

4       Right, sir?  It wasn't limited to a very small segment

5  of the population.

6       Correct?

7  A.   Correct.

8  Q.   It also did not have the lipid problems on its label that

9  Prezista did.

10      Correct?

11 A.   I don't recall, but they had an expanded label.

12 Q.   They had an expanded label, and they didn't have a

13 hypercholesterolemia or hypolipidemia problem, at least on

14 their label.

15      Fair?

16 A.   I can't recall specifically.

17 Q.   Okay.  You don't remember.

18      But one thing that was necessary in order for Janssen

19 to expand into this category of patients, it had to

20 differentiate Prezista from Reyataz, specifically on lipids.

21      Correct?

22 A.   Whether it was short term or long term, I don't recall

23 that internal planning.

24 Q.   All right.

25      Let's take a look at the next page, page 12.  One of

─────── IACOBELLIS - DIRECT - MARKETOS ───────

1   the --

2           MR. MARKETOS:  Page 12, actually.  It's on that same

3   page.  One of the -- that we were just on.

4           You can blow this up, please, Ms. Johnson.

5   BY MR. MARKETOS:

6   Q.   One of these tactics that was being suggested was to

7   generate spontaneous off-label usage.

8           Do you see that, sir?

9           MR. MARKETOS:  We can blow that up.

10  BY MR. MARKETOS:

11  Q.   It's in the third line.  "Our belief is that the max

12  commercial benefit for 125 can be extracted by proving

13  efficacy in early NNRTI-resistant patients."

14          These are the notes that are at the bottom of the

15  slide.

16          Do you see that?

17  A.   Second paragraph?

18  Q.   It's the first paragraph.  "The max commercial benefit

19  for 125" -- that's Prezista, right? -- "can be extracted by

20  proving efficacy in early NNRTI-resistant patients showing

21  compelling S&T advantages to capture SE switches and generate

22  spontaneous off-label usage in special patient populations."

23          Do you see that?

24  A.   Yes.

25  Q.   All right.

IACOBELLIS - DIRECT - MARKETOS

1        I'll ask you this in a moment, sir, but when we're

2   talking about how to train the sales force.

3        But something that is spontaneous is difficult to

4   generate.

5        Would you agree?

6   A.   Correct.

7   Q.   Let's a take a look at page 11, if we could, very

8   quickly.

9        The forecast at the time was for approximately, if we

10   look in the U.S. dollar section, was to get to 75 to 80

11   million.  The forecast in growth was almost tripled that from

12   the prior year.

13        Is that fair?

14   A.   I don't see what the forecast was year over year here.

15   Q.   Okay.

16        Forecasted growth targets, and then if you look down at

17   the bottom, U.S. dollars, $13 million, and then it goes up to

18   75- to $80 million in that projected forecast.

19   A.   I see that.

20   Q.   Okay.

21        And we'll get into the specifics in a little bit, sir,

22   but during this -- the time period while you were with Janssen

23   and you were overseeing the sales of these products, you can

24   tell the jurors that Prezista and Intelence ended up

25   generating multiple billions of dollars in revenues.

1          Correct?

2   A.   I don't know what the -- what the total revenues were.

3   Q.   You know it was multiple billions.

4          True?

5   A.   I can't say that definitively.  I was there for the five

6   years, and the first year and a half there was no product.

7   Q.   Okay.  You don't know --

8   A.   So for that three-year window, I'm not sure what the

9   total revenue was.  And for the lifetime of the drug, I have

10  no knowledge of what that might be.

11  Q.   I understand, sir.  I was only asking about the time that

12  you were there.

13         Okay?

14  A.   So I can't definitively say it's billions.

15  Q.   Okay.

16         You don't know how many -- how much money in revenue

17  Janssen generated off these two drugs while you were the

18  national director of its sales.

19  A.   I can't say specifically, but in three and a half years,

20  it wasn't in the billions, I don't believe.

21  Q.   Okay.

22  A.   Especially since struggling for the first several years

23  and launching a new product.

24  Q.   Okay, sir.

25         And you continued to be in operation oversight of this

IACOBELLIS - DIRECT - MARKETOS

1  company when you were promoted.

2      Right, sir?

3  A.  Yes.

4  Q.  Okay.  We'll get into the dollars later, then.

5      What you do know is that sales goals increased over

6  time after launch.

7      Right, sir?

8  A.  Yes.  Yes.

9  Q.  But if we turn back to the 2006 time frame, shortly after

10  launch, there was a moment of panic within Janssen.

11      Is that fair?

12  A.  I wouldn't call it "panic."  There was a disappointment

13  of the launch.

14  Q.  Let's turn back to the July 2006 time frame.

15      Shortly after this product went to market in 2006,

16  there were a number of obstacles that the sales force ran

17  into.

18      Do you agree?

19  A.  I'm not sure that they were obstacles or how physicians

20  were receiving the launch with our narrow indication.

21  Q.  There were impediments to hitting your forecast.

22  A.  I guess I would say yes for that.

23  Q.  And there was a limited indication of the label, and

24  there were potential side effects that physicians were

25  concerned about.

IACOBELLIS - DIRECT - MARKETOS

```
 1        Right, sir?
 2   A.   The only thing I recall is that, when we launched with
 3   the limited indication, we had -- we had physicians who were
 4   lay-to-doctors, meaning for any new drug they were a little
 5   cautious to see how the product would react in the
 6   marketplace.  And then other people were more comfortable,
 7   because it was such a wonderful agent, they would reserve it.
 8        And we were being really, for the highly experienced
 9   patient, there is people that were the sick of the sick that
10   were reserving this for.  So that really further narrowed it
11   down versus the actual indication was much broader than this.
12   Q.   Do you remember my question, sir?
13        There was a limited indication of a narrow patient
14   population.  That was a problem, right?  That was an obstacle
15   that you had to overcome?
16   A.   Yes.
17   Q.   There were potential side effects.  Is it your testimony
18   that you don't recall that the potential side effects
19   associated with lipids was a problem?
20   A.   No, I don't recall that.  And I can give you what I did
21   recall.  You asked me what obstacles existed.
22   Q.   Okay.
23        You don't recall the side effects being a problem?
24   A.   I don't recall that.
25   Q.   Okay.
```

─────────IACOBELLIS - DIRECT - MARKETOS─────────

1      There was a meeting called at headquarters that other

2  witnesses have testified about.  Do you recall being called to

3  a meeting at headquarters with Ms. Sara Strand and Mr. Glenn

4  Mattes and others?

5  A.    Yes.

6  Q.    That was a meeting before the meeting, a meeting before a

7  nationwide phone call with the higher-ups.

8      Do you recall that?

9  A.    We had many meetings, sir.  I don't know what specific...

10  Q.    Well, let's just talk about the one you just said you

11  remembered.

12      There was a meeting with Mr. Mattes and Ms. Sara

13  Strand.

14      Do you recall that?

15  A.    And you said others.  And when we -- what I immediately

16  started thinking about was that it was a cross-functional

17  meeting, which included everybody, to discuss the launch.

18      So I'm not sure -- I don't recall any meeting with just

19  Sara Strand or Glenn.  I don't think that ever happened.

20  Q.    Okay.  Let me be more specific.

21      There was a meeting with higher-ups within the

22  organization to discuss the missed forecast.

23      Correct?

24  A.    The higher-ups would be the cross-functional leaders,

25  marketing, clinical, compliance, regulatory, legal and sales.

IACOBELLIS - DIRECT - MARKETOS

1  Q.  Was there a meeting with Mr. Mattes that you were at

2  after you missed the forecast?

3  A.  There were many.

4  Q.  Do you remember a meeting with Mr. Mattes and others in

5  July of 2006 to discuss why Janssen had missed its forecast?

6  A.  Yes.

7  Q.  Thank you.

8      Do you recall Mr. Mattes yelling at that meeting?

9  That's all I want to know.

10     And to be clear, sir, I just want to know if you recall

11 Mr. Mattes yelling at that meeting you just told us about.

12 A.  I recall him being very disappointed.  So not yelling.  I

13 don't remember yelling.

14 Q.  All right.

15     You don't remember him yelling.  You just remember him

16 being disappointed.

17 A.  Yeah.

18 Q.  And the words that he was using.

19 A.  Yes.

20 Q.  Was he using those words loudly?

21 A.  Well, yeah.  Well, yes.  I mean, demonstrating his

22 disappointment for the launch, yes.

23 Q.  Loud disappointment.

24     Fair?

25 A.  Fair.  But not yelling.

IACOBELLIS - DIRECT - MARKETOS

1  Q.   Okay.  Loud disappointment we'll call it.

2        And the -- there was a call to brainstorm about what to

3  do to get sales up, to get forecasts back on track.

4        Right, sir?

5  A.   Yes.

6  Q.   Now, at that point, there was a $45 million national

7  sales goal for half of the year, from July through December of

8  2006.

9        Correct?

10 A.   I don't recall the specific number, but there was a

11 target, yes.

12 Q.   All right.

13       Let's look at Relators' Exhibit 222.  We'll refresh

14 your memory.  This is in evidence.

15       These are notes of a meeting in July of 2006, shortly

16 after launch.  And we've looked at these before, but if you

17 take a look, sir, it says, "Month one objective, 3,700; as of

18 today, 896 prescriptions."

19       Do you see that?

20 A.   Yes.

21 Q.   So you're off by about -- my math is bad.  Is that --

22 you're off by about three-quarters?

23 A.   Yes.

24 Q.   Okay.

25       That's not good.

IACOBELLIS - DIRECT - MARKETOS

1   A.   No.

2   Q.   And the team, the sales team that was attending this

3   meeting, was asked to brainstorm, how do we get this back on

4   track?

5        Right, sir?

6   A.   Yes.

7   Q.   Now, you get to a meeting like this, sir, and the

8   company, the organization has forecasts for a certain number

9   of prescriptions, and those forecasts turn from prescriptions

10  into dollars.

11       Right?

12  A.   Yes.

13  Q.   And that's why you set sales goals.  You want to make a

14  certain amount of money to hit forecast.

15       Right, sir?

16  A.   Yes.

17  Q.   If you're not selling the -- the doctors aren't writing

18  the prescriptions, Janssen doesn't get paid, you miss

19  forecasts.

20       Fair?

21  A.   Fair.

22  Q.   But there was a fork in the road here.  What Janssen

23  could have said is, Oh, no, we strategically messed up

24  somehow.  Our forecasts should be adjusted.

25       That's one thing it could do.

IACOBELLIS - DIRECT - MARKETOS

1  Right, sir?

2  A.  Yes.

3  Q.  Another thing it could do is say, Let's try to hit the

4  forecast that we missed by three-quarters.

5  Right, sir?

6  A.  Yes.

7  Q.  Okay.

8  And I'll get to what actually happened, but those

9  are -- that's the decision tree.  You have fork in the road.

10  Mr. Mattes could go back to the chairman of the board or his

11  board and say, We screwed up.  We messed up on the strategy.

12  We've got to downgrade our forecast.

13  That's one road you could take.

14  Fair?

15  A.  Yes.

16  Q.  And the other is, we're going to get our sales up however

17  we can.

18  Fair?

19  A.  That's not a fair representation, not -- not get our

20  sales up any way we can.  We always stayed on promotion, and

21  over time, they did lower the forecast.

22  Q.  I understand that's your testimony, and we'll get to that

23  in a moment.

24  I'm talking about generating sales in order to catch up

25  to the forecast.  Okay.

IACOBELLIS - DIRECT - MARKETOS

1        Is that fair?

2   A.   Yes.

3   Q.   All right.

4        And in this instance, what your organization was trying

5   to do, that was this road, catch up on sales.

6   A.   At the initial part of the launch, yes.

7   Q.   Okay.

8        Now, some of the discussions that came out of this call

9   included executing on a speaker program.

10       Right, sir?

11  A.   I don't recall that.

12  Q.   Well, let's just back up for a moment.

13       We're now in July of 2006.  Before launch, Janssen had

14  actually planned a speaker program comprised of doctors who

15  were going to talk about this product.

16       Right, sir?

17  A.   You know, I didn't know the specific.  Again, I was

18  leading learning and development.  So my role at this meeting

19  was to see if there was any additional training needs for the

20  organization.  So I don't recall what the sales organization

21  had planned at that point.

22  Q.   Okay.

23       You don't remember, and we'll show you some documents

24  that you sent later on.  Maybe it'll refresh your

25  recollection.

IACOBELLIS - DIRECT - MARKETOS

1     Okay?

2  A.   I'm not sure I would send something on speaker programs

3  in July of 2006 because I was in learning and development.  I

4  wasn't leading the sales force.

5  Q.   All right, sir.  Well, we'll just take a look.

6  A.   Well, I'm just, yeah, clarifying.  Yeah.

7  Q.   Okay.  All right, sir.

8     But you don't remember any discussion about speaker

9  programs at this call?  In other words, let's see if we can

10  get doctors on a speaker bureau and potentially give them

11  honoraria payments and get them speaking about this drug.

12     Is that your testimony?

13  A.   I can't recall that that long ago.

14  Q.   All right, sir.

15     And you don't recall whether or not there was stress at

16  this meeting to push the Prezista sales with physicians

17  earlier on to naive patients.

18  A.   I don't recall.

19  Q.   Is that fair?  You don't remember that?

20  A.   I don't recall that.

21  Q.   You don't remember -- well, when you say you don't recall

22  that, just so -- when you say -- one second, sir.

23  A.   Yes.

24  Q.   A lot of people say, "I don't recall that."

25     Are you saying, "I don't remember"?

IACOBELLIS - DIRECT - MARKETOS

1    A.    I have no recollection of that.

2    Q.    I understand.  Just -- I want to make sure we're using

3    the same words, parlance.

4          When you say "I don't recall" or "I have no

5    recollection," what you're telling the jurors is "I don't

6    remember."

7          Fair?

8    A.    Fair.

9    Q.    If we take a look at the ad boards.  Did you remember a

10   discussion about ad boards coming out of this meeting?  That

11   is, advisory boards where doctors would be paid for their

12   suggestions about how to promote this drug?

13         Do you recall any of those suggestions coming out of

14   this meeting?

15   A.    Again, I don't recall that.

16   Q.    All right.

17         So you don't remember?

18   A.    I don't remember.

19   Q.    And is it fair to say that the pressure that you felt

20   coming from Mr. Mattes and others to execute on the sales

21   forecasts got worse after this meeting?

22   A.    I don't recall that.  The pressure -- everybody was under

23   pressure when you're launching a new drug, and then it

24   increased over time.  It was consistent.

25   Q.    All right.

IACOBELLIS - DIRECT - MARKETOS

1    So I think I heard you said everybody's under pressure

2  when you launch a new drug, and that increased over time?

3  A.   No.  I said the pressure is always there when you're

4  launching a new drug, but I -- it's no different two or three

5  months out versus initially when it's not performing.

6  Q.   All right.

7    Fair to say as we sit here today, you don't remember a

8  lot about this meeting.

9    Is that right?

10  A.   That's fair.

11  Q.   You actually have some notes of the meeting that you took

12  yourself I'm going to show you on the screen to see if you

13  recognize them.  It's Relators' Exhibit 385.

14    MR. MARKETOS:  Just for the witness, please,

15  Ms. Johnson.

16  BY MR. MARKETOS:

17  Q.   You've reviewed these notes before your testimony today,

18  right, sir, notes that you took?

19  A.   Not -- not this one.

20  Q.   All right.

21    This is Relators' Exhibit 385, and I just want you to

22  identify them as notes that you took on the same day,

23  July 26th, 2006.  Do you recognize your notes?

24  A.   Yes, that's my writing, correct.

25    MR. MARKETOS:  Offer Relators' Exhibit 385,

IACOBELLIS - DIRECT - MARKETOS

1    Your Honor.

2          MS. BROWN:  No objection, Your Honor.

3          THE COURT:  So admitted.

4    (Relators' Exhibit 385 in evidence.)

5          MR. MARKETOS:  Can we publish that?  Let's go down

6    just a minute, if we can.

7    BY MR. MARKETOS:

8    Q.   And I'd like to ask you about some notes you took.

9          MR. MARKETOS:  If we can go down to the bottom of

10   these notes.

11   BY MR. MARKETOS:

12   Q.   There's a reference, sir, to naive, and I'm wondering if

13   this will refresh your recollection.

14         MR. MARKETOS:  Can you go to that portion with the

15   arrow, please, Ms. Johnson.

16   BY MR. MARKETOS:

17   Q.   While we're pulling that up, sir, at the time you wanted

18   to make sure that the drug was fully stocked and that there

19   wasn't a problem with getting the supply out to the field.

20        Right?

21   A.   Yes, I recall that.

22   Q.   All right.

23        And it turns out that wasn't a problem.

24        Right, sir?

25   A.   Correct.

IACOBELLIS - DIRECT - MARKETOS

1    Q.  And what you also wanted to do is make sure -- you also

2    wanted to make sure that you didn't have any obstacles

3    associated with cost.  There was a full pace on ritonavir.

4    That was the other drug.

5           Right, sir?

6           That was the other drug administered with Prezista.

7    A.  Yes.

8    Q.  They were -- just so the members of the jury remember,

9    this drug also had to be coadministered with another drug, a

10   booster, called ritonavir.

11          Right?

12   A.  Correct.

13   Q.  So when you're executing on it, you want to make sure

14   that there's enough Prezista out there in the pharmacies and

15   that there's enough ritonavir that has to be taken with it.

16          Right, sir?

17   A.  Correct.

18   Q.  All right.

19          And I'm going to move on from these notes because I

20   couldn't find what I was looking for.

21          One thing, though, sir, when you came over to Janssen,

22   you actually were trained on how to communicate internal to

23   the company.

24          Right, sir?

25   A.  I -- I -- I believe so, yes.

IACOBELLIS - DIRECT - MARKETOS

1    Q.   Yes.

2         You took specific training courses on what to write,

3    what not to write, how to be compliant, how to put things in

4    writing, how to not put things in writing.

5         Do you recall that?

6    A.   I recall careful communications, if that's what you're

7    referring to.

8    Q.   Well, you guessed it.  Let's take a look at

9    Relators' Exhibit 139.  This is in evidence.

10        MR. MARKETOS:  You can publish it, Ms. Johnson.

11   BY MR. MARKETOS:

12   Q.   Yes.  Careful communications.  This was something that

13   you were trained on.

14        Right, sir?

15   A.   Yes.

16   Q.   All right.

17        And everybody who comes in, becomes a new Janssen

18   employee has -- is trained on how to write emails, in part.

19        Fair?

20        That's part of the training you received?

21   A.   Yeah.  Fair.

22   Q.   There are other things you're trained on?

23   A.   Yes.

24   Q.   This is one of those things?

25   A.   Yes.

IACOBELLIS - DIRECT - MARKETOS

1    Q.    Okay.

2          MR. MARKETOS:    Let's take a look at Relators' Exhibit

3    360, just for the witness, please, Ms. Johnson.

4    BY MR. MARKETOS:

5    Q.    Do you recognize Relators' Exhibit 360?  It's a health

6    care compliance training.  It's also a compliance document.

7          If you take a look at the careful communications

8    portion of it.

9          MR. MARKETOS:    There we go, the slide.  Thank you.

10   All right.

11   BY MR. MARKETOS:

12   Q.    Do you recognize this training document as one that you

13   took in 2006?

14   A.    Yes.

15         MR. MARKETOS:    We offer Relators' Exhibit 360

16   redacted, Your Honor.

17         MS. BROWN:    No objection, Your Honor.

18         THE COURT:    All right.  So admitted.

19   (Relators' Exhibit 360 in evidence.)

20   BY MR. MARKETOS:

21   Q.    All right, sir.  Now, this is coinciding -- this

22   document, this training document actually just happens to

23   coincide with the exact timing of the launch of Prezista.

24         Do you see that?

25   A.    Yes.

────IACOBELLIS - DIRECT - MARKETOS────

1   Q.   All right.

2        And if we look at page 10, there's a reference to

3   Johnson & Johnson here as a resource.

4        Do you see that?

5   A.   Yes.

6   Q.   All right.

7        Let's go to page 59.  This document that Janssen

8   trained its staff on, including you, didn't just tell

9   everybody how to put stuff in writing.  It actually laid out

10  what the laws are, what the regulations are that a

11  pharmaceutical company has to follow when it's promoting its

12  drugs.

13       Right?

14  A.   Yes.

15  Q.   And they even told you -- the organization, Johnson &

16  Johnson, the parent, told Janssen employees what is considered

17  off-label.

18       Correct?

19  A.   In this document, yes.

20  Q.   All right.

21       In this document and others.  We've seen others as

22  well.

23       Right, sir?

24       All right.

25       Let's take a look at that.  What is off-label?  That

IACOBELLIS - DIRECT - MARKETOS

1  means a different use, a different dose, a different patient

2  population, a different dosing schedule, a different stage of

3  disease.

4       Right?  That's what Johnson & Johnson was teaching all

5  of the people in Janssen.

6       True?

7  A.   True.

8  Q.   You included.

9       Right?

10 A.   True.

11 Q.   And what that means is if a drug gets approved by the FDA

12 and you're selling it for a different use case or a different

13 dosage or to a different patient population that it was

14 intended for or on a different schedule, once a day versus

15 twice a day or twice a day versus once a day, or a different

16 stage of the disease, that would be considered off-label

17 promotion of the drug.

18      Correct?

19 A.   True.

20 Q.   And that would be not legal.  Do you agree?

21 A.   Absolutely.

22          MS. BROWN:  Your Honor, can we approach?

23          THE COURT:  Yes.

24      (Sidebar begins at 11:05 a.m.)

25          MS. BROWN:  We have a motion in limine on this the

1    Court granted in terms of not using the term "illegal," and

2    this was the second time this had happened, so I just wanted

3    to bring it to the Court's attention.

4         I don't think he's doing it on purpose.

5         THE COURT:  Don't shake your head.  Just listen and

6    talk, but don't shake your head while the jury's looking over

7    here.

8         All right.  So I understand the objection.

9         Mr. Marketos, what's your response to that?

10        MR. MARKETOS:  There is -- that's not true.  She's

11   talking about the misbranding, the motion in limine where you

12   can't say "illegal" or "misbranded prescriptions."

13        We've been talking about the law in this case from the

14   outset, so I think what she's confusing is that, the illegal

15   prescriptions, and it's in Your Honor's motion in limine.

16        THE COURT:  I have it.  Let's get to the bottom of

17   it.  Bear with me.

18        (Brief pause.)

19        THE COURT:  I don't know where that section is.  Bear

20   with me.

21        MS. BROWN:  Judge, should I just ask my colleagues?

22        THE COURT:  What page of my opinion are we looking

23   at?

24        (Brief pause.)

25        MS. BROWN:  Your Honor, we have had it as number 2

IACOBELLIS - DIRECT - MARKETOS

1     that was granted.

2          THE COURT:  Let me look at it, and then I can give

3     you --

4          MS. BROWN:  Sure.  Thank you.

5          THE COURT:  Ms. Brown, I understand the ruling.  This

6     is dealing with the prescriptions, referring to the

7     prescriptions as "illegal."

8          All he is asking is about off-label marketing, and that

9     if Janssen were to market Prezista or Intelence in this

10    manner, that would be illegal.

11         That's not -- this is all about the prescriptions being

12    identified.  Do you see that?  It's in numerous parts of the

13    opinion.

14         So where do you see that this issue has been addressed

15    in the opinion?

16         MS. BROWN:  I think -- yeah, I think it's the same

17    issue, Your Honor.  I mean, this is an off-label marketing

18    case.  I think everything he's talking about here would be a

19    different case under FDA rules that they haven't moved on,

20    right?

21         THE COURT:  Well, what would you want him to use in

22    this context?  It's a violation of the law.

23         MS. BROWN:  Well, I don't think it's relevant,

24    frankly, but it's prejudicial, but --

25         THE COURT:  So where is the objection, your

IACOBELLIS - DIRECT - MARKETOS

1    objection?

2         MS. BROWN:  The objection is prejudicial as to

3    "illegal" because really that is not a claim at issue here.

4         THE COURT:  As opposed to what?

5         MS. BROWN:  False Claims Act.

6         THE COURT:  As opposed to what, that it's unlawful?

7         MS. BROWN:  He is --

8         THE STENOGRAPHER:  Ms. Brown?  Ms. Brown?

9         MS. BROWN:  -- not anything was off-label.  That's

10   not an issue before the jury, and that's why we moved on this

11   illegality or misbranding or off-label, because it's

12   prejudicial.

13        THE COURT:  Do you --

14        MS. BROWN:  I'm sorry, Your Honor, but it would

15   confuse the jury that this is an issue, that it matters here.

16   And if he wants to do it, fine.  But it's the illegal part

17   that is prejudicial to us, not --

18        THE COURT:  But in this context, what else -- how

19   else could he phrase it?  It's unlawful to market this drug in

20   this manner, and that's why you're being told about it?  How

21   does the word "unlawful" or "illegal" change the summary?

22        Again, I think it's unrelated to the issue in the

23   motion in limine, so I disagree with you there.  But now I'm

24   trying to get back into the context of this cross-examination.

25        MS. BROWN:  Understood.

1          THE COURT:  This witness was informed of what

2     off-label marketing was in a very specific way, at least in

3     this PowerPoint, maybe in other documents.  I'm sure there

4     are.

5          The bottom line is he's saying, And you were told that

6     this was illegal.

7          MS. BROWN:  How about off-label?  I mean, it's the

8     legality of it that I think is prejudicial --

9          THE COURT:  But that's the whole --

10         MS. BROWN:  -- in a case where that's not the issue.

11         THE COURT:  I disagree.

12         MS. BROWN:  I mean, we'll present evidence,

13    Your Honor, that's seen as payments for off-label

14    prescriptions.  This case is about whether or not they would

15    have paid, and so this --

16         THE COURT:  I understand that.  We are not talking

17    about doctors prescribing medication off-label.  We're not

18    talking about patients being able to take medication that's

19    off-label as prescribed by a medical doctor.  This PowerPoint

20    is about what Janssen is trying to do with marketing the drug,

21    correct?

22         MS. BROWN:  Understood.

23         THE COURT:  So why can't the context of this slide,

24    at least in questioning the witness, like, what's the context

25    of this slide?  Here you're being told that if you were to

1  market this drug off-label, and hear a very specific thing,

2  that that would be illegal, that that would be a problem for

3  you.

4       I think in that context it's okay.  I agree with you

5  that if we're going to get into -- and I presume you will not,

6  Mr. Marketos, because we're having this discussion now -- when

7  you're talking about prescriptions and other things, my ruling

8  does apply there.

9       But I think, in the context of this particular slide, I

10  don't think it's prejudicial to Janssen.  I think it's going

11  to be pretty clear.

12       Are you taking a different position?  Is Janssen saying

13  that marketing the drugs in those ways, even though your

14  PowerPoint slide says this is wrong to do, are you saying it's

15  okay to do that?  That's contrary to the document.

16       MS. BROWN:  So here's a quick example.  So CMS

17  specifically does not consider dose.  Right?  So while

18  marketing off-label dose in an FDA context may be an issue, it

19  may be branded, may be off-label, may be a whole another --

20       THE COURT:  This is your whole defense.  But what

21  does that have to do with this slide?  I understand that part

22  of your defense is, Hey, even if Janssen's sales

23  representatives did something improper, even if they marketed

24  a drug off-label when they shouldn't have, that would not have

25  impacted CMS reimbursing.

─────────── IACOBELLIS - DIRECT - MARKETOS ───────────

1          I understand that's a defense that you've raised in

2     your opening statement and your cross-exam.

3               MS. BROWN:  Yeah.

4               THE COURT:  But, again, that's something you can

5     elicit or bring out.

6          This document is simply saying that Janssen's being

7     told that this is improper, because part of the Relators' case

8     is that they disagree with your theory and your defense.

9               MS. BROWN:  Yep.

10               THE COURT:  They believe -- and I don't know if this

11     will flesh out in evidence or not -- that, first, they have to

12     demonstrate, I presume, that they did something improper.

13     They were marketing a drug off-label.

14               MS. BROWN:  Yep.

15               THE COURT:  And I presume they're also trying to

16     connect to say that that was a fraud on the Government in

17     reimbursing for claims in which the drug was marketed

18     off-label to the doctors that prescribed it.

19          You guys have two different theories.

20               MS. BROWN:  Sure.

21               THE COURT:  You're allowed to present it, but in this

22     particular PowerPoint I'm going to allow it.  But I understand

23     the line that you're drawing.

24               MS. BROWN:  Okay.  Just to illegality.  It's just the

25     illegal part that I think is prejudicial, but I understand --

IACOBELLIS - DIRECT - MARKETOS

1    THE COURT:  I understand.  But if you use the word

2    "unlawful," it would be the same thing.

3    MS. BROWN:  Off-label is what -- but I understand

4    the --

5    THE COURT:  But, yeah, what's the point of that?  The

6    reason why they're being told you can't do this off-label is

7    because it's in violation of the law.  That's why it's in a

8    compliance PowerPoint.  It's not a compliance PowerPoint

9    because we just don't feel like you guys marketing off-label.

10   The entire point to this is you are not to do this because

11   it's a violation of the law.

12        I don't think if you use the word "illegal" or

13   "unlawful" it really matters.

14        I'm going to let it go.

15        MS. BROWN:  I understand.

16        THE COURT:  All right.

17        (Sidebar was concluded at 11:12 a.m.)

18        (Open court.)

19   BY MR. MARKETOS:

20   Q.   Sorry, sir.  Where were we?

21        Let me take a look at this -- I just want to make sure

22   that you were -- you understand you and other Janssen

23   employees were trained by Johnson & Johnson on what is and is

24   not permitted with respect to off-label marketing.

25        Okay?

─IACOBELLIS - DIRECT - MARKETOS─

1    A.    Yes.

2    Q.    All right.

3          And you were told that this was specifically the

4    different ways that a drug could be marketed off-label, and

5    that was what you were not supposed to do.

6          Fair?

7    A.    Correct.

8    Q.    If we take a look at the next page.

9          You're also not supposed to -- and you were taught by

10   Johnson & Johnson -- that it's okay for a doctor to prescribe

11   off-label and it's okay if there's an unsolicited request from

12   a doctor for information about a drug.

13         So, for instance, a doctor could say, Can you tell me

14   more about X?  Can you tell me more about this side effect?

15   And there are certain procedures that a Janssen sales rep

16   would then have to follow to comply.

17         Right, sir?

18   A.    Correct.

19   Q.    But what was not permitted was unsolicited -- that had to

20   be unsolicited.  What was not permitted was soliciting a

21   doctor to obtain information that was off-label.  You were

22   taught that.

23         Right?

24   A.    Yes.

25   Q.    And you knew that unsolicited means not prompted or in

────IACOBELLIS - DIRECT - MARKETOS────

1    any way encouraged by a Tibotec/Janssen employee.

2        Right?

3    A.    Correct.

4    Q.    So in other words, Doctor, would you like to get maybe

5    some more information about the cholesterol profile or the

6    lipid profile in Prezista?  I can send it to you.

7        That would be solicited.

8        Right, sir?

9    A.    That would be inappropriate.

10    Q.    That would be inappropriate, and that is something that

11    Johnson & Johnson and Janssen knew it could not do.

12        Right?

13    A.    Yes.

14    Q.    And you know that that's a way to get around a rule that

15    is designed to protect patient safety.

16        Right, sir?

17    A.    Correct.

18    Q.    And if we look at 67 of this slide, you were taught that

19    reimbursement -- why a reimbursement issues policy.  This has

20    to do with getting money from the federal Government or state

21    Government for Janssen's drugs.

22        Correct?

23    A.    Yes.

24    Q.    Numerous state and federal laws prohibit submission of

25    false or fraudulent claims for payments to Government

─IACOBELLIS - DIRECT - MARKETOS─

1   programs, commercial insurers, and other health care plans.

2   That's what every Janssen employee who is involved in sales

3   and promotion was taught.

4        Right, sir?

5   A.   Yes.

6   Q.   And you knew that it mattered to the Government, that

7   this was a material, important issue to the Government.

8   That's what Johnson & Johnson taught you.

9        MS. BROWN:  Objection, Your Honor.

10        THE COURT:  Sustained.

11        Yeah, rephrase the question.  At least the way it's

12   formed now, Mr. Marketos.

13        MR. MARKETOS:  All right.

14   BY MR. MARKETOS:

15   Q.   You were -- Johnson & Johnson was teaching you and your

16   employees that the federal Government took these matters

17   seriously.

18        Correct?

19   A.   Absolutely.

20   Q.   And that -- you were even taught on what violations could

21   lead to.

22        Right, sir?

23   A.   Correct.

24   Q.   And false claims laws, you were taught, have been applied

25   to health care manufacturers -- and I'm not talking about the

IACOBELLIS - DIRECT - MARKETOS

1    last one -- when the manufacturer took action that caused its

2    customer to submit false claims.

3         Right, sir?

4    A.    Yes.

5    Q.    What that means is cases like this have been brought

6    where health care manufacturers coerce a doctor into writing

7    an off-label prescription.

8              MS. BROWN:  Objection, Your Honor.

9              THE COURT:  Basis?

10             MS. BROWN:  It's a legal conclusion, "cases like

11   this," interpreting this reimbursement slide in a compliance

12   deck.

13             THE COURT:  All right.  Let me see you at sidebar.

14             (Sidebar begins at 11:17 a.m.)

15             THE COURT:  Sorry.  Just repeat the objection so I

16   understand.

17        And just to be clear, it's literally written in your

18   PowerPoint that is admitted into evidence.

19        So explain to me how he can't ask about that.

20             MS. BROWN:  But he's trying to draw a legal

21   conclusion about the merits of this case.  He said, "claims

22   cases like this" are these -- or where the manufacturer took

23   action which allegedly caused its customer to submit false

24   claims.

25        I mean, he's trying to make a legal judgment that is

IACOBELLIS - DIRECT - MARKETOS

1    before our jury.

2         THE COURT:  To say that this case --

3         MS. BROWN:  Yeah.  That's totally inappropriate.

4         THE COURT:  Mr. Marketos, I think the way you formed

5    that question -- by the way, now that I'm kind of thinking

6    about how you formed it, I believe that's a sustained

7    objection.

8         But what are you trying to get at so you don't go back

9    and do it twice?

10        MR. MARKETOS:  This is a False Claims Act case.  He

11   was taught false claims laws have been applied in cases like

12   this.

13        THE COURT:  When you say "cases like this," that's a

14   smoking gun.  No, but --

15        MR. MARKETOS:  I can rephrase.

16        THE COURT:  You have to rephrase it, but you can't

17   say "cases like this" because then we have to get into, well,

18   let's go into all the particulars of this case and how that

19   compares to this general statement in the PowerPoint.

20        I mean, your point is getting across from the slide.

21   And I want you to be to be very careful here because I've

22   given you a lot of leeway and I think it's fair because this

23   is admitted into evidence.

24        What you can't do is draw some type of conclusion with

25   this witness that the very thing they feared were the facts of

1    this case.  You see what I'm saying?  And that's what you're

2    getting to when you keep saying, So this is being advised to

3    you because of cases like this, because what you're drawing

4    from there is a narrative that somehow the facts of this case

5    is what they feared, and Janssen is taking a very different

6    position.  Janssen is saying, no, no, no.  We fear that issue,

7    but we've taken the position in this trial that that didn't

8    happen here.

9         So I want to be clear that this is not the witness to

10   draw your conclusion.  You can argue this at closing, but be

11   careful --

12             MR. MARKETOS:  Absolutely.

13             THE COURT:  Yeah.  What do you intend to ask this

14   witness about?

15             MR. MARKETOS:  Do you mind if I expand on this?  This

16   is going to get into the heart of the materiality ruling that

17   you made.  So we're being super cautious to step all the way

18   through it with Janssen documents.  We're going to get into

19   CIA later.  There's going to be objections because they don't

20   want it in, and I understand that.  But Your Honor's ruled on

21   it.  I want to stairstep our way through it.

22        This all goes to materiality.  They're arguing that the

23   Government doesn't care, we're arguing they do.

24             THE COURT:  Well, let me ask you:  Why can't you ask

25   him with a little more specificity doesn't draw an objection?

IACOBELLIS - DIRECT - MARKETOS

1  For example, you can say, you know, this is a False Claims Act

2  case.  Right?

3          MR. MARKETOS:  I can say that.

4          THE COURT:  This is a False Claims Act case.  Right?

5  It was brought against Janssen because of fraudulent claims

6  that were submitted.

7          I think you can say generally that -- not the facts of

8  this case is something that Janssen fears, but that this type

9  of case, a Relator bringing a False Claims Act case where, you

10  know, these types of facts are being alleged, the allegations

11  of this type of case.  Something to that effect.

12          So in other words, where he's not drawing a conclusion

13  and, you know, the very thing that Janssen feared are these

14  facts.

15          And I also agree that this PowerPoint and this line of

16  questioning can address that the Government takes it serious.

17  Because you guys are -- well, he already got that out.  He

18  already got that question out.

19          MS. BROWN:  I understand, Your Honor.  That's fine,

20  Your Honor.  I understand.  I objected to the one before it --

21          THE COURT:  I know, but there was no objection --

22          MS. BROWN:  It's fine.

23          But this is a Janssen territory.  Janssen takes this

24  seriously.  Right?  Janssen knows what the False Claims Act

25  is, and we take this seriously.

IACOBELLIS - DIRECT - MARKETOS

1    To say this case is somehow what we believe breaks the

2    law is what I'm objecting to.

3         THE COURT:  But no.  He's being trained on this.  And

4    what is his understanding of this PowerPoint?

5         MS. BROWN:  Right.  But --

6         THE COURT:  I think you can word it in that way, but

7    I'm going to allow further line of questioning on this.

8         And, look, obviously, Ms. Brown, you're going to keep

9    an eye on it, and I'll pay attention as well, which I have

10   been, but I'm going to allow him to continue.

11        But rephrase at least the last question and within the

12   parameters of what we're discussing, Mr. Marketos.  I

13   understand that you're trying to get into materiality.  I

14   don't think that he can't get into it off of this PowerPoint

15   slide.  This slide smells of it.  I mean, this is what it's

16   talking about.

17        These are all violations of the law, that the

18   Government might not reimburse -- I'm paraphrasing, but I

19   think if you're trying to argue that somehow he can't question

20   the witness about the importance of these issues, then why was

21   he being trained on it?

22        MS. BROWN:  Right.  I think that's fine, Your Honor.

23   In the abstract, we agree that there are issues that the

24   Government cares about, there are issues that are material to

25   the Government.  We disagree that this is one of them.  It's

IACOBELLIS - DIRECT - MARKETOS

1    just the comparison that somehow --

2          THE COURT:  Well, I agree.  The facts of this case --

3    so just to be clear, the facts of this case you can't come out

4    and say, this is the exact type of conduct.  But the type of

5    case being brought, that's definitely being briefed out there.

6    And so I'm going to allow him part of that.

7          MR. MARKETOS:  And I thought that's what I said.

8          THE COURT:  All right.  It was a little bit

9    different.

10          MR. MARKETOS:  Okay.  Thank you.

11          (Sidebar was concluded at 11:22 a.m.)

12          (Open court.)

13          THE COURT:  Mr. Marketos, you can continue, but

14   rephrase and then we'll continue from there.

15          MR. MARKETOS:  Sure.

16   BY MR. MARKETOS:

17   Q.   Fair to say, Mr. Iacobellis, we can all see what Johnson

18   & Johnson was training you on in March of 2006.

19          Right, sir?  We can read it and you remember it.

20   A.   It's very serious and very important, yes.

21          MR. MARKETOS:  And let's take a look at the next

22   slide.  93, please.

23          Let's go to the next slide.

24   BY MR. MARKETOS:

25   Q.   All right.  Now I'd like to ask you about this careful

1  communications policy.

2      All right, sir?

3        MR. MARKETOS:  Let's pull that up there.

4  BY MR. MARKETOS:

5  Q.  You were taught that emails last forever.

6      Right, sir?

7  A.  Yes.

8  Q.  And you had been taught that before, and you were taught

9  it in other modules, be careful what you put in writing.

10     Is that fair?

11 A.  Yes.

12 Q.  And one reason that you were taught that was because

13 emails and other written documents are discoverable by

14 plaintiff attorneys and Government regulators such as the Food

15 and Drug Administration and the Office of the Inspector

16 General.

17     Right, sir?

18 A.  Correct.

19 Q.  And, you know, what Johnson & Johnson was teaching you

20 was "Approximately a hundred million emails are generated per

21 month.  Be careful."

22     Right?

23     Be careful what you put in writing because it might end

24 up getting turned over in an investigation.

25     Fair?

─────IACOBELLIS - DIRECT - MARKETOS─────

1  A.  Yes, but not the only reason.

2  Q.  I'm sorry?

3  A.  Not the only reason.

4  Q.  Sure.  Not the only reason.

5      This reason that I'm asking about.

6      Right?

7        MR. MARKETOS:  Let's take a look at page 97.

8  BY MR. MARKETOS:

9  Q.  And this is something that I'd really like to ask your

10 opinion about, sir.

11     You were taught with respect to compliance the issue is

12 what the intent of the activity that Janssen is engaging in.

13     Right?

14     It's not about whether or not you structure something

15 so that you can get away with it with compliance.  It's about

16 how it's intended.

17     Do you understand that?

18 A.  I'm trying to understand.  Are you still on emails?

19 Q.  No.  I said -- it's literally the next slide.  I'm asking

20 about -- actually, it's not the next slide.  97.  It's the HCC

21 thought process, intent.

22     And I asked a bad question.  Let me rephrase it.

23 A.  Thank you.

24 Q.  Okay?  I confused myself.

25     The issue that they're telling you is, look, if you

────────IACOBELLIS - DIRECT - MARKETOS────────

1   want to know -- if you're doing something that's structured

2   improperly, you paper it right, you write all the right things

3   down, but it's inappropriate in its intent; then the activity

4   is the problem.

5       Right, sir?

6   A.   Absolutely.

7   Q.   In other words, don't just try to paper the file.  Think

8   about what you're actually doing in real life.  That's what

9   you were taught.

10      Right?

11  A.   Yes.

12  Q.   Okay.

13      And then on the next slide, you were taught why these

14  problems were being addressed with compliance rules.  "Areas

15  of Risk Identified By the OIG."  You were taught, "Does the

16  arrangement or practice have a potential to interfere with or

17  skew clinical decision-making?"

18      Right, sir?

19  A.   Correct.

20  Q.   That means, does your practice, is what you're doing out

21  in real life, affecting medical decisions by doctors; right?

22  A.   Correct.

23  Q.   "Does it have the potential" -- excuse me.  "If the

24  arrangement or practice involves providing information to

25  doctors, decision-makers, prescribers or patients, is it

1    complete, is it accurate and is it not misleading?"

2        Right, sir?

3    A.   Correct.

4    Q.   You were also taught "Does the arrangement or practice

5    have a potential to increase the costs to federal health care

6    programs?"

7        Right, sir?

8    A.   Yes, sir.

9    Q.   And is it going to increase the cost to Medicare or

10   Medicaid, for instance.

11       Right?

12   A.   Yes.

13   Q.   All right.

14       And on the next slide, areas of risk that were also

15   identified was, "Does the arrangement or practice have a

16   potential to increase the risk of over" --

17          MR. MARKETOS:  No, the next one.  Sorry.

18   BY MR. MARKETOS:

19   Q.   "Does the arrangement or practice have a potential to

20   increase the risk of overutilization or inappropriate

21   utilization?"

22       Using a drug for somebody it's not intended for.

23       Right, sir?

24   A.   Correct.

25   Q.   And then, "Does the arrangement or practice raise patient

─────IACOBELLIS - DIRECT - MARKETOS─────

1   safety or quality of care concerns?"

2          Right, sir?

3   A.   Yes.

4   Q.   Is information about a drug, its safety, its potential

5   side effects being accurately conveyed for patient safety?

6   You were taught that that was important.

7          Fair?

8   A.   Very important.

9   Q.   All right.

10         THE COURT:  Mr. Marketos, you and I are both looking

11  at our watch.  But we agree this is a good point to take a

12  ten-minute break?

13         MR. MARKETOS:  Yes, Your Honor.

14         THE COURT:  All right.  Let's do that, folks.  Let's

15  take a ten-minute recess, and then we'll be back.

16         And let's get the jurors out of here.

17         THE DEPUTY COURT CLERK:  All rise.

18         (Jury exits the courtroom.)

19         THE COURT:  Mr. Iacobellis, you can step off and take

20  your ten-minute break with everybody else.

21         THE WITNESS:  Thank you.

22         THE COURT:  Folks, you can be seated.  You're in

23  recess for ten minutes.

24         (A short recess occurred.)

25         THE DEPUTY COURT CLERK:  Please remain seated.

IACOBELLIS - DIRECT - MARKETOS

1    THE COURT:  All right, folks.  Mr. Marketos, you want

2    to have the witness come back up?

3        And then, Kim, you want to get the jurors?

4        THE DEPUTY COURT CLERK:  Sure.

5        THE COURT:  Take your time.

6        (Jury enters the courtroom.)

7        THE DEPUTY COURT CLERK:  All rise.

8        THE COURT:  Folks, everybody have a seat.

9        Mr. Iacobellis, just a reminder you're still under

10   oath.

11       Mr. Marketos, whenever you're ready, you may proceed.

12       MR. MARKETOS:  Thank you, Your Honor.

13   BY MR. MARKETOS:

14   Q.  Mr. Iacobellis, just a reminder that this is what we were

15   just going through was -- was training that was provided by

16   Johnson & Johnson to its employees in March of 2006.  And I

17   say that because we're now going to start discussing what was

18   taking place within the sales organization as Prezista was

19   getting to launch right at this time.

20       Okay, sir?

21   A.  Yes.

22   Q.  All right.

23       So if we take a look at Relators' Exhibit 195, which is

24   in evidence, during this time period, before the Prezista drug

25   had actually been launched in June, there was an attempt to

IACOBELLIS - DIRECT - MARKETOS

1   gather 150 doctors for a speaker program that Janssen was

2   going to put on.

3       Do you recall that?

4   A.   I do not.

5   Q.   Oh, okay.

6   A.   I was in my learning and development seat.

7   Q.   Fair enough.

8       Let's just orient you in time, and we can talk about

9   what you were doing.  We discussed this earlier in the trial.

10  Tony Dolisi, he worked with you.

11      Right, sir?

12  A.   Yes.

13  Q.   All right.

14      And you see Ms. Sara Strand and a number of other

15  people on this email.  What we know is that, at this time,

16  there was an attempt to put together doctors for a speaker

17  bureau, and they wanted 150 of them.

18      Do you see that?

19  A.   I see it again.  These people didn't report to me, and

20  the speaker program was owned by marketing.

21  Q.   I understand.

22      You're saying that marketing owned the speaker program.

23  Okay.  We'll come to learn, you'll tell us, sales actually

24  executed on it.

25      Right?

*1394*

IACOBELLIS - DIRECT - MARKETOS

1    A.   The actual programs, yes.

2    Q.   Just so we can maybe save ourselves some time, you say

3    marketing owned it.  That means marketing was responsible.  It

4    was a promotional speakers' bureau.

5         Right?

6    A.   Yes.

7    Q.   Promoting a product through a speakers' bureau?

8    A.   Yes.

9    Q.   And marketing you say owned the product, owned that

10   bureau, right, sir, that program?

11   A.   They are the program owner, yes.

12   Q.   And sales, your area, they executed on those speeches.

13        Right?

14   A.   Yes.

15   Q.   Put them on, put them together, suggested doctors, all of

16   those things.

17        Correct?

18   A.   Yeah, but not at this time.

19   Q.   All right.

20        Let's take -- yeah.  At this time, it hasn't happened

21   yet.  You're just putting the program together?

22   A.   No.  Meaning I wasn't responsible for the sales force at

23   this time.

24   Q.   Okay.

25   A.   So what we are referring to here, I was not involved in

─IACOBELLIS - DIRECT - MARKETOS─

1   as a trainer.

2   Q.   Okay.

3        But you don't have to have been involved in something

4   to learn about it.

5        Right, sir?

6   A.   Sure.

7   Q.   Okay.

8        So the way it usually works is if something goes on one

9   side of the organization and your side of the organization is

10  responsible for executing on it, you learn about it before you

11  execute on it.

12       Fair?

13  A.   You keep saying -- just the characterization of the

14  question, you keep saying that "you learn it," that for your

15  side of the organization to execute on it.

16       So this was not my side of the organization at that

17  time.

18  Q.   Okay.

19  A.   Just to be fair.

20  Q.   Just to be fair.  I want to be fair.

21  A.   Yeah.

22  Q.   So did you ever learn that anybody in the company,

23  marketing, sales or otherwise, had put together a list of

24  150 doctors to be on a paid promotional speakers' bureau?

25  A.   I knew about the speakers' bureau but not the number.

IACOBELLIS - DIRECT - MARKETOS

1   Q.   Okay, sir.  That's fair.

2        Let's take a look at Relators' Exhibit 42.

3   Relators' Exhibit 42 is already in evidence, and I'm going to

4   ask you if you were aware about this speaker training that, in

5   fact, by March -- excuse me.

6        By May of 2006, the organization had met its goal of

7   putting together the list of 150 doctors who are going to be

8   on this speakers' bureau at the outset.

9        Were you aware of that?

10  A.   Again, I'm just trying to be truthful here.  Right?  I

11  mean, I knew the speakers' program was part of the promotional

12  effort at launch, but I was not responsible for it.

13       So I knew it was happening, but I didn't know the

14  specifics.

15  Q.   All right, sir.

16       And let just get through the specifics, if we can.

17       Marketing, you said, owned the program and developed

18  the content.

19       Is that right?

20  A.   Yes.

21  Q.   And they prepared the presentation materials?

22  A.   Yes, they do.

23  Q.   All right.

24       That was Ben Kozub -- Ben Kozub, he was the head of

25  marketing at the time for Prezista.

1    Right?

2  A.    I believe so.  Kim was in marketing as well.

3  Q.    All right, sir.

4    But you said that sales would give input on the right

5  doctors to speak.

6    Correct?

7  A.    Marketing would set the objectives for the program and

8  ask for input from the field.

9  Q.    And that's the part I was asking about.

10    So marketing, you said, set the criteria.  Let's --

11  let's just be clear.  There's a marketing department and a

12  sales department, and they're both involved in the promotion

13  of Janssen's products.

14    Right?

15  A.    Yes.

16  Q.    They're both involved in trying to drive sales of the

17  drugs.

18    Right?

19  A.    Yes, that is correct.

20  Q.    So marketing, you say, set the criteria for which

21  speakers would be on the list, and sales would give input on

22  who the right doctors were.

23    Is that fair?

24  A.    Yes.

25  Q.    So marketing and sales picked the doctors for this

1    program?

2    A.    The sales organization, and, again, I don't know from the

3    time period that I was involved, they would provide the

4    recommendations.  It would go to marketing along with the

5    SAFE committee, and the SAFE committee consisted of health

6    care compliance, medical affairs and the speakers' bureau

7    committee, and sales was not part of that.

8    Q.    When did you learn that last part about the

9    SAFE committee?

10    A.    SAFE committee was always -- it was outside of my

11    jurisdiction, so the SAFE committee -- I mean, because they

12    owned the program, from a compliance standpoint, they had to

13    ensure that the content, the number of speakers, the number of

14    programs was consistent and compliant.

15    Q.    Mr. Iacobellis, several years ago you gave a deposition

16    in this case.

17         Right, sir?

18    A.    Yes.

19    Q.    And you were asked about your knowledge about how

20    speakers were selected for this program.

21         Do you recall that?

22    A.    I do not, no.

23    Q.    You don't recall --

24    A.    I mean, there was questioning around speaker programs.  I

25    do remember or recall that.

─────IACOBELLIS - DIRECT - MARKETOS─────

1   Q.   Okay.

2       But one thing it's fair to say you've never mentioned

3   before today is your knowledge of some SAFE department that

4   was -- doctors were run through to see if they could meet the

5   criteria for this program.

6       Is that fair?

7   A.   I knew there was a cross-functional piece -- I didn't

8   know what it was called, but it was the compliance and

9   marketing associated with it, yes, I knew that.

10  Q.   I'm sorry, Mr. Iacobellis.  My question was a little bit

11  different.

12      Let me try to phrase it again so you can hear me.

13  A.   Okay.

14  Q.   Okay?

15      You haven't mentioned that before today, any

16  SAFE department or SAFE committee that was reviewing doctors

17  as a part of this program, have you?

18  A.   As far as the deposition, I don't remember anything, but

19  I can't -- I can't recall.

20  Q.   Okay, sir.

21      So if we take a look at -- actually, sir --

22          MR. MARKETOS:  May I approach the witness,

23  Your Honor?

24          THE COURT:  With what?

25          MR. MARKETOS:  Just the deposition transcript.

*United States District Court*
*District of New Jersey*

1          THE COURT:  Sure.  Counsel, you know, you've got a

2    copy or -- okay.  Go ahead.

3          You don't have a copy?

4          MS. BROWN:  No, I do now.  Thank you.

5          THE COURT:  All right.

6    BY MR. MARKETOS:

7    Q.  Mr. Iacobellis, from time to time I might ask you to

8    refer to a copy of the transcript of your deposition that was

9    given earlier in this case.  Again, that's where you swore

10   under oath.

11         Right, sir?

12   A.  Yes, sir.

13   Q.  And you were asked certain questions.

14         It's true that marketing set the criteria and sales

15   gave the inputs on the right doctors for this program.

16         Correct?

17   A.  Correct.  I would assume so.

18   Q.  And the doctors were paid what you'd call or what Janssen

19   called "honoraria."

20   A.  Yes.

21   Q.  Do you recall that name?

22   A.  Yes.

23   Q.  And that's -- let's -- forgive me, sir.  That's a fancy

24   name for a check.

25         Right?

IACOBELLIS - DIRECT - MARKETOS

1   A.   It is the fee for them performing this program.

2   Q.   Yes.

3        It's -- it's the money that comes in the form of a

4   check from Janssen that's written to a doctor for giving a

5   speech.

6   A.   Correct.

7   Q.   Okay.

8        And that ranged -- and you're aware of this.  That

9   ranged anywhere from 1,500 to $2,500 to any doctor to give,

10  you know, a speech; sometimes higher than 2,500.

11       Fair?

12  A.   I didn't know the exact amount.  That sounds right.

13  Q.   It sounds right.  You actually, for one period of time,

14  oversaw the budgets that were being disseminated to your sales

15  team for these programs.

16       Right?

17  A.   The logistical part, yes.

18  Q.   The logistical part, the part that involves giving the

19  different districts their budget --

20  A.   Yes.

21  Q.   -- for this speaker program.  You were involved in that

22  yourself.

23       Right?

24  A.   Absolutely, but not the speaker honorariums.

25  Q.   Yeah.

IACOBELLIS - DIRECT - MARKETOS

1    Not -- you might not have been involved in how much --

2   how much each doctor got paid.  You got involved in how much

3   each district had to pay doctors.

4       Right?

5   A.   Not to pay doctors.  To conduct the program, those

6   promotional programs.

7   Q.   Which included paying doctors.

8       Is that fair?

9   A.   I don't -- paying doctors, no, we didn't pay doctors.  We

10  paid for the logistics, the venue, the program and then the

11  meal and so on and so forth where they heard an exchange, a

12  peer-to-peer exchange, with the speaker --

13  Q.   I see.

14  A.   -- to build awareness of the program.

15  Q.   I understand.

16      You're talking about paying for the restaurants, the

17  venues --

18  A.   Yeah.

19  Q.   -- the setup?

20  A.   Yeah.  We didn't pay doctors.

21  Q.   Okay.

22      I'm sorry.  Who did pay the doctors?

23  A.   Marketing paid the honorarium for the speakers.

24  Q.   I see.  Thank you for that.

25      So -- so the sales side of the organization paid for

IACOBELLIS - DIRECT - MARKETOS

1    the restaurants, the setup, the venues, the training.  That

2    was what was in sales budget.

3         Is that right?

4    A.   Not the training, but, yes, the restaurant, the

5    logistical part of it.

6    Q.   The food?

7    A.   Yes.

8    Q.   The beverages?

9    A.   Yes, correct.

10   Q.   All right.

11        That was in sales?

12   A.   Yes.

13   Q.   And marketing paid the checks for the speakers?

14   A.   Speakers, that is correct.

15   Q.   Thank you, sir.

16        And so it's fair to say you didn't have an insight

17   yourself into how much the doctors were getting paid to speak?

18   A.   That's correct.

19   Q.   Did you ever learn how much doctors were getting paid to

20   speak?

21   A.   I think I've heard the range you -- you highlighted, but

22   I can't recall specifically.  That changed over time, or that

23   was where it was when we first started.

24   Q.   Okay.  The purpose of the Promotional Speaker Bureau was

25   to get the paid speakers and the attendees to increase

─────────── IACOBELLIS - DIRECT - MARKETOS ───────────

1   prescriptions of the drugs that Janssen was selling?

2   A.   That's incorrect.  It's -- it's to build awareness for

3   the attendees, to build awareness of the product, and so that

4   the attendees would be more comfortable in prescribing it, but

5   not the speakers.

6   Q.   Mr. Iacobellis, I'm going to ask you to turn to page 127

7   of your sworn deposition in this case.

8   A.   Yep.

9        MR. MARKETOS:  And I'll refer counsel to pages --

10  page 127, lines 11 through 4.

11  BY MR. MARKETOS:

12  Q.   And you can turn to this, sir, and we'll go ahead and

13  play it for you, okay?

14  A.   Yes.

15  Q.   All right.

16       (Video clip played at this time.)

17  BY MR. MARKETOS:

18  Q.   All right.  Now, sir, when you -- when you attend these

19  Promotional Speaker Bureaus -- you would attend them yourself

20  from time to time.

21       Right, sir?

22  A.   Here or there.

23  Q.   All right.

24       Here and there.  Let's be clear.  You attended here and

25  there about one-half of 1 percent of the time that these

IACOBELLIS - DIRECT - MARKETOS

1    programs were taking place.

2         Is that fair?

3    A.   I don't know the specifics.  When I was in the field and

4    the reps were having a problem, I would attend, but that was

5    probably three or four times a year.

6    Q.   About three or four times a year, and you know -- thank

7    you.

8         You went to these speeches.  You went to restaurants, I

9    take it?

10   A.   Yes.

11   Q.   And you would sit down and have dinner where food and

12   alcohol was served.

13        Right, sir?

14   A.   Yes.

15   Q.   Paid for by Janssen.

16        Correct?

17   A.   Yes.

18   Q.   And you attended that three or four times a year.

19        Right, sir?

20   A.   When I was in the field, yes.

21   Q.   When you were in the field.

22        But you are aware of the fact that Janssen on an annual

23   basis ran about a thousand per year of these speeches.

24        Correct?

25   A.   Again, I don't know the numbers, but we ran a number of

IACOBELLIS - DIRECT - MARKETOS

1  programs.

2  Q.  Well, you were responsible -- you were a part of the

3  organization that was executing on the program.

4      Right?

5  A.  Yes, sir.  Yes, sir.

6  Q.  So that part I can ask you about because that part is

7  what you were responsible for implementing.

8      Right?

9  A.  Yes.

10 Q.  And you know that approximately 1,000 programs per year

11 were put on by Janssen.

12     Right?

13 A.  I don't recall the number.  I really can't tell you,

14 yeah.

15 Q.  Well, we can -- we can look.

16     Are you -- any reason to think that that wasn't the

17 number, approximately?

18 A.  I know there was a number of programs, but I can't tell

19 you specifically the amount.

20 Q.  Fair enough, sir.

21     Fair to say to say, though, that if I'm right, it's

22 about a thousand per year.  You went to about three or four

23 per year, right, yourself?

24 A.  Yes.

25 Q.  It was your sales representatives who were actually

IACOBELLIS - DIRECT - MARKETOS

1    attending and running these speakers' bureaus.

2          Correct?

3    A.    We had a number of -- it was the sales reps running them.

4    They would be in attendance.  Many times there were district

5    sales managers, and then our health care compliance would also

6    attend at random times to audit the programs.

7    Q.    When did you learn that about compliance?

8    A.    From the time I joined the organization.  One thing I

9    have a great degree of trust in is my business partners, and

10   I'm very close, and I always conducted myself very closely

11   with health care, compliance, legal, regulatory, and our HR

12   department.

13         So that interaction that I've always had with those

14   individuals I trusted because I don't have all the knowledge.

15         So when it comes to promotion and these type of events,

16   I know that they're actively involved.  So I know that they

17   would come to me when I was in charge of the sales force and

18   say, Hey, we're going to be attending some of these programs

19   to audit them.

20         So it was not recent.  This -- this thing I've known

21   since I joined the organization and got into that role.

22   Q.    Thank you, for that, sir.

23            THE COURT:  Yeah, I'm going to say, sir, the question

24   was When did you learn that about compliance?  When did you

25   learn that folks in compliance were attending these --

```
 1              THE WITNESS:  When I took over.

 2              THE COURT:  -- speaker programs?

 3              THE WITNESS:  Okay.

 4              THE COURT:  That's a three-to-five-word answer, so

 5    I'm going to direct you to answer the questions that are posed

 6    to you, because if you answer it like this, that's how you're

 7    going to answer for Janssen's counsel in about an hour.  Okay?

 8              THE WITNESS:  Okay.

 9              THE COURT:  Do you understand me?

10              THE WITNESS:  Yes.  At the time I took over the sales

11    force.

12    BY MR. MARKETOS:

13    Q.  Was it your understanding, Mr. Iacobellis, your --

14    understanding is apparently that compliance was actually --

15    members of compliance were actually attending these dinners,

16    these speaker programs?

17    A.  Not randomly.

18    Q.  I don't -- sir, for the purpose of this question, I'm not

19    concerned about whether it was sometimes, all the time, or

20    randomly.

21         Is it your testimony that members of compliance were

22    attending these programs?

23    A.  At various times, yes.

24    Q.  At various times.  That was your understanding?

25    A.  Yes.
```

IACOBELLIS - DIRECT - MARKETOS

1  Q.  Okay.

2      Fair to say that might be a better question for

3  somebody in compliance.

4  A.  Yes.

5  Q.  Right?

6  A.  Yes.

7  Q.  Since that's a -- three to four times a year you went,

8  compliance wasn't there, were they?

9  A.  Correct.

10  Q.  And again, you went randomly over the course of three to

11  four times a year, and you never went when someone from

12  compliance was there, true?

13  A.  Okay.

14  Q.  So let's look at Exhibit 316.  This is in evidence.

15      You are aware of the fact, sir, that your organization,

16  the sales side of the equation was tracking the prescriptions

17  of the speakers who were speaking on the speaker bureau.

18      True?

19  A.  No, we would track speakers that are called on universe.

20  Q.  Okay.

21      Let me back up.  Let's go to the next slide.

22      What we're looking here -- at here is the New England

23  speaker sales performance.  That was a region -- a district

24  region that ultimately reported up to you as the national

25  director of sales.

IACOBELLIS - DIRECT - MARKETOS

1      Correct?

2  A.   Yes.  Yes.

3  Q.   All right.

4      You're aware of the fact that the New England speaker

5  sales performance is tracking the sales performance of the

6  speakers?

7  A.   No, that is incorrect.  There was -- I never saw any

8  analysis specifically to -- connecting prescriptions to the

9  speakers for speaking events.  I know we did track physicians

10 who were are on our call by universe, and some physicians were

11 but not connected to the program specifically, and that's not

12 what this says.

13 Q.   Let me make sure I understand, sir.

14     This is -- hold on, sir.  Sorry.  I'm just going to ask

15 my question.  I'll give you an opportunity to answer it, okay?

16 A.   Yes.

17 Q.   The New England speaker sales performance that we're

18 looking at right here is actually the performance of speakers

19 who are doctors.

20     Is that part of my question -- is that true?

21 A.   Yes, yes.

22 Q.   And the performance measurement is the number of

23 prescriptions of Prezista and Intelence; is that true?

24 A.   Yes.  But, again, it's not connected to the speaker

25 programs specifically.

IACOBELLIS - DIRECT - MARKETOS

1  Q.   Okay.

2  A.   Can I explain?  Would you like me to explain?

3  Q.   I'll -- I'll always give you a chance to explain,

4  Mr. Iacobellis.

5        Can you do me this favor, sir, for the purpose of this

6  question?

7        Is New England speaker sales performance measuring

8  something other than a speaker's sales performance according

9  to you?

10 A.   Yes.  Can I explain?

11 Q.   Sure.

12 A.   Okay.  So we had speakers that were academia, part of our

13 investigators, and people that -- not necessarily wrote

14 prescriptions, but we did have speakers that were on our

15 speaker bureau but were also called on by our representatives.

16      So if they were in our target universe, and our reps

17 called on them, that was part of that uniform, then we tracked

18 those prescriptions.

19      So it's a difference, right?  We're not -- these aren't

20 prescriptions specifically tied to a speaking engagement.

21 These may be prescriptions that were generated as a result of

22 reps visiting them and making their sales call.

23      So we did have community-based physicians who spoke for

24 us as well that the reps actually called on.

25 Q.   Okay.

IACOBELLIS - DIRECT - MARKETOS

1       Let's take a look at --

2           THE COURT:  I'm going to strike that response as

3   nonresponsive to the question.

4           So, members of the jury, as you know, if I strike

5   something, that just means you're not to consider it.

6           You may continue, Mr. Marketos.

7           MR. MARKETOS:  Thank you, Your Honor.

8           Exhibit -- Relators' Exhibit 122 just for the witness,

9   please, Ms. Johnson.

10  BY MR. MARKETOS:

11  Q.  Mr. Iacobellis, this is an email from you to your sales

12  team, and it's about the action plan for speaker development

13  and program implementation, and it's dated February 15, 2008.

14      Do you see that?

15  A.  Yes.

16  Q.  It says when you're the interim sales -- national sales

17  director.

18      Correct?

19  A.  Correct.

20  Q.  So just so that we're all clear, this is when you are the

21  head of all sales for the organization throughout the

22  United States.

23      Correct?

24  A.  Yes.

25  Q.  All right.

1    MR. MARKETOS:  We'd offer exhibit Relators' 122.

2    MS. BROWN:  No objection, Your Honor.

3    THE COURT:  All right.  So admitted.

4  (Relators' Exhibit 122 in evidence.)

5  BY MR. MARKETOS:

6  Q.  And, sir, you came up yourself with -- you put into place

7  an action plan for executing on this speaker program.

8    Right?

9  A.  Yes.

10  Q.  So one more time, marketing was involved, and then you

11  were responsible for executing.

12    Right, sir?

13  A.  Correct.

14  Q.  And then you -- to execute, you told all the people who

15  reported to you what to do.

16    Right?

17  A.  Yes.

18  Q.  You also instructed your districts and your sales

19  representatives to make sure that they used all of their

20  allotted budget within a specific time frame and spent it on

21  these speaker programs.

22    True?

23  A.  Yes.

24  Q.  At one point, you actually got some pushback from one of

25  your district managers, Mr. Wilhelm.

1    Right, sir?

2  A.   Yes.

3  Q.   That's something you've reviewed recently to refresh your

4  recollection.

5    Fair?

6  A.   Yes.

7  Q.   Let's look at Exhibit Relators' 177.

8    MR. MARKETOS:  It's in evidence, Your Honor.

9    THE COURT:  You may.

10    MR. MARKETOS:  Thank you.

11  BY MR. MARKETOS:

12  Q.   At one point in 2008, right around this time period where

13  you became the full-time national sales director --

14    MR. MARKETOS:  And we're going to go down to the

15  original email, if we could, at the bottom, please,

16  Ms. Johnson.

17  BY MR. MARKETOS:

18  Q.   Mr. Wilhelm said to you, "Mike, why the fire drill?"

19    All right, sir?

20    And this is something -- you know what's going on here

21  because you reviewed this recently to prepare for your

22  testimony today.

23    Right?

24  A.   Yes.

25  Q.   Okay.

─────IACOBELLIS - DIRECT - MARKETOS─────

1    And Mr. Wilhelm was essentially telling you -- and I'm

2   going to nutshell it.  He was essentially telling you why do

3   we have -- why do we have to -- why do we have to spend all of

4   our money so fast?  Why don't we tap the brakes?

5        That's what he was telling you.

6        Right?

7   A.   Yes.

8   Q.   Okay.

9        I fairly characterized it.  I'm not going to read the

10   whole paragraph.

11   A.   Yeah, that's fine.

12   Q.   Okay.

13        And then you essentially respond to him, "Because we

14   have the money.  And if you don't use it, you're going to lose

15   it."

16        Right?

17   A.   I indicated -- well, the bottom line, it was a business

18   discussion, answer that -- we were in launch mode.  We were

19   trying to get building awareness for the product.  And the

20   earlier the better relative to how we're trying to get to the

21   physician universe.

22   Q.   Fair enough.

23        What you told them was Mike, Mark, we need to spend

24   this money now because that turns into dollars later.

25        Right?

IACOBELLIS - DIRECT - MARKETOS

1    A.    Well, we're building awareness for the product, yes.

2    Q.    "We have potential business needs now," right.  "It's not

3    a fire drill."  "I see it as impact now that can have a

4    long-term benefit if we change physician behavior now."

5          Right, sir?

6    A.    Yes.

7    Q.    You wanted to change prescribers' behavior such that they

8    would prescribe the drugs now.

9          Right?

10   A.    Yes.

11   Q.    And ultimately that turns into sales.

12   A.    Yes.

13   Q.    And given that you were overseeing this portion, at

14   least, of the execution of the speaker program, you're aware

15   that Janssen spent many millions of dollars on this program.

16         Is that fair?

17   A.    I don't know the specifics, but it was -- the budget was

18   handled by marketing.

19   Q.    Okay.

20         You never learned that approximately $17 million was

21   spent just with respect to speakers and reimbursement of

22   speakers.

23         Is that right?

24   A.    Again, I can't recall the exact numbers.

25   Q.    All right.

IACOBELLIS - DIRECT - MARKETOS

```
 1        You also know that there were many millions more paid
 2   for attendees, dinners, meals, venues, setup.  That was what
 3   you were responsible for overseeing.
 4        Correct?
 5   A.   I can't say that.  When you quoted 17 million, is that a
 6   rolled-up cost including the honorariums and the logistics?
 7   Q.   Let me go ahead and separate them out.
 8   A.   Yeah.
 9   Q.   All right.
10        Let's put aside the amounts that were paid directly to
11   doctors, either for what you call honoraria or for
12   reimbursement for their travel and expenses.  I'm setting that
13   aside.
14        I'm talking now about the part you were responsible
15   for, the amount of money that Janssen spent at Morton's
16   restaurant or other steakhouses to pay for people to go and
17   eat and drink and attend the program.
18        Okay?
19   A.   Yes.
20   Q.   That was what you were responsible for overseeing.
21        Fair?
22   A.   Yes.
23   Q.   And that was many millions of dollars while you were the
24   national sales director?
25   A.   Could be.  Again, I don't recall.
```

IACOBELLIS - DIRECT - MARKETOS

1  Q.   Now, not only did you ask certain representatives to set

2  up as many of these programs as they could in order to finish

3  out their budget, but sales representatives were actually

4  graded on a performance basis for how well they executed on

5  this program.

6       True?

7  A.   Can you rephrase the question?  I mean --

8  Q.   It was a bad one.  Let me try it again.

9       Part of the metric for sales representatives in

10 assessing their performance was how well they had executed on

11 these speaker programs.

12      Right, sir?

13 A.   All activity, including speaker programs, yes.

14 Q.   Given that we're talking about all activity, I was only

15 asking about this part.

16 A.   Yeah.

17 Q.   This part being sales representatives, like

18 Ms. Brancaccio, Ms. Penelow, and others throughout the nation.

19 They were graded, their performance was measured, on how well

20 they had executed on these speaker program dinners.

21      Right?

22 A.   Again, one component, not all.

23 Q.   No part of my question asked about all.

24 A.   Okay.

25 Q.   They were obviously graded on other things.

IACOBELLIS - DIRECT - MARKETOS

1      Right?

2  A.   Yes.  Thank you.  Yep.

3  Q.   How much their doctors sold, right?  That was one thing.

4  How many sales they got.

5      Right?

6  A.   Call activity, calling on their targeted physicians, et

7  cetera.

8  Q.   Just the part I'm asking about, sir.

9  A.   That's correct.

10  Q.   I'll get to all of this, but right now, I want to ask you

11  about one thing.

12      Sales representatives out in the field were measured as

13  a function of their performance on executing on these speaker

14  dinners, true?

15  A.   True.

16  Q.   Now, sir, there came a time in late 2006 when it became

17  apparent that, even with the speaker program and even with the

18  sales calls and even with the sales representatives being out

19  in the field calling on doctors, that Janssen was still going

20  to miss its initial forecast for the year.

21      True?

22  A.   Yes.

23  Q.   All right.

24      And for a period of time in 2006 -- we've seen a

25  one-page voicemail.  Did you review that before today, about a

IACOBELLIS - DIRECT - MARKETOS

1   lowering of a forecast?

2   A.   Yes.

3   Q.   Okay.

4        So in order to testify today, you reviewed Defendants'

5   Exhibit 8701, which is in evidence.

6        MR. MARKETOS:  I'd like to put that up on the screen.

7   BY MR. MARKETOS:

8   Q.   You looked at this before you came in here to testify.

9        Fair?

10  A.   Yes.

11  Q.   Okay.

12       Let's remind everybody what this is.  It's a one-page

13  document that is, I think, a transcription of a voicemail.

14       Is that right?

15  A.   I believe so.

16  Q.   Okay.

17       And there was a voicemail that was sent in November of

18  2006, and it adjusted downward the 2006 forecast for Janssen.

19       Right?

20  A.   Yes?

21  Q.   And it adjusted it downward retroactive, going backwards

22  in time, to June.

23       Right?

24  A.   Yes.

25  Q.   Essentially, you knew you were going to miss the

─── IACOBELLIS - DIRECT - MARKETOS ───

1   forecast, and you had to adjust it downward going back in

2   time.

3        Right?

4   A.   Yes.

5   Q.   But then in January of 2007, the forecast went right back

6   up to over 6 million.

7        True?

8   A.   I mean, what time period again, sir?  I'm sorry.

9   Q.   Two months later, the next year.  January of 2007.

10  A.   Yeah, they are the starts of the new calendar year.

11  Q.   Okay.  So let's show you exhibit --

12  Relators' Exhibit 308.

13       Relators' Exhibit 308 is just on the screen in front of

14  you, sir, and there's a CAT review.

15       You know what a CAT review is, right?

16  A.   Competitive Action Team, I believe.

17  Q.   Yes.

18       And there were monthly performance reports.  And there

19  is a reference -- first of all, you recognize this document?

20  A.   Yes, I do, sir.

21       MR. MARKETOS:  We offer Plaintiffs' Exhibit 308 --

22  excuse me -- Relators'.

23       MS. BROWN:  No objection, Your Honor.

24       THE COURT:  All right.  So admitted.

25  (Relators' Exhibit 308 in evidence.)

IACOBELLIS - DIRECT - MARKETOS

1      MR. MARKETOS:  And we can take a look at slide 8, and

2  it's going to give us a sense for where we are now.

3  BY MR. MARKETOS:

4  Q.  So what we can see is that, as of 2007, the forecast for

5  the entire year was $106 million.

6      Right, sir?

7  A.  I'm looking at it, yes.

8  Q.  Sure.

9  A.  Yes.  Yes.

10  Q.  Okay.

11      And so -- just so that everyone understands, there was

12  a period of time in 2006 where the forecast was lowered

13  because you'd missed it already.

14      Right?

15  A.  Yes.

16  Q.  And then it was jacked up again -- raised again, I should

17  say, in January of 2007.

18      Fair?

19  A.  Yes.

20  Q.  All right.

21      The pressure was back on to make sales goals and

22  forecasts.

23      Is that fair?

24  A.  It normally is year over year.

25  Q.  And this was normal.

—IACOBELLIS - DIRECT - MARKETOS—

1    Right?

2  A.   Depending on the, yes, the variabilities that they look

3  at.

4  Q.   And if you see, as of slide 8, it looks like the drug was

5  still $30 million under forecast for the year.

6    Is that right?

7  A.   Yes.

8  Q.   And then if we take a look at slide 19, this is dealing

9  with an off-label use of another drug -- of Prezista at the

10 time.

11    Right, sir?

12 A.   Yes.  That's what it says.

13 Q.   All right.

14    It's looking at once-daily dosing, and Prezista

15 off-label continues to grow.

16    Right, sir?

17 A.   Yes.

18 Q.   Okay.

19    And then if we look at open questions, it says, "What

20 can we impact?"

21    Do you see that?

22 A.   Yes.

23 Q.   And the organization's asking what can it do to impact

24 sales.

25    Fair?

IACOBELLIS - DIRECT - MARKETOS

1   A.   Yes.

2   Q.   "How much is once daily in naive?"

3        Do you see that?

4   A.   Yes.

5        MR. MARKETOS:  Let's take a look at the next slide.

6   BY MR. MARKETOS:

7   Q.   And it says in the second bullet, "Medical information

8   requests around QD" -- that's once-daily dosing.

9        Right, sir?

10  A.   Yes.

11  Q.   -- "and naive continue to increase."

12       Right?

13  A.   Yes.

14  Q.   Just so we can orient ourselves on what that means, it's

15  being reported within the organization that requests for

16  off-label information are increasing.

17       True?

18  A.   Yes.

19  Q.   One of those things was the use of Prezista in the naive

20  population that it wasn't indicated for.

21       Correct?

22  A.   Correct.

23  Q.   If we look at slide 53, we can see that the share of

24  sales of Prezista in the naive segment of the population, that

25  is, the segment of the population that was off-label, was

IACOBELLIS - DIRECT - MARKETOS

1    growing by 7 percent in that calendar year.

2        True?

3    A.    True.

4    Q.    Now, Mr. Iacobellis, Janssen uniformly promoted to its

5    sales representatives the messages that it wanted them to

6    deliver to doctors around the country.

7        Correct?

8    A.    The approved messages from a compliance standpoint.

9    Q.    The company provided its sales representatives around the

10   country with marketing messaging regarding Prezista and

11   Intelence that they were to use when selling the drugs to

12   doctors.

13   A.    Yes.

14   Q.    And Janssen also provided its reps with marketing

15   materials to help them meet their sales goals.

16       Right?

17   A.    Yes.

18   Q.    You understand, sir, in this case there are allegations

19   that there were certain off-label messages that were being

20   delivered by Janssen and its sales representatives to

21   physicians during the time period from 2006 to 2014.

22       You understand those allegations, right, sir?

23   A.    Yes, I do.

24   Q.    And if we can break them down, I'm going to show you a

25   quick demonstrative.

IACOBELLIS - DIRECT - MARKETOS

1              MR. MARKETOS:  You can put it --

2     BY MR. MARKETOS:

3     Q.   One of those was a message about Prezista's effect on a

4     patient's lipid, the cholesterol and triglycerides.  You

5     understand that that's an allegation that is being made in

6     this case.

7     A.   I actually didn't know that, but --

8     Q.   You did not know that.

9     A.   What that message, no.

10    Q.   You did not know that that was an allegation.

11    A.   I know there's an allegation of off-label messaging, but

12    not the specifics.

13    Q.   All right.  Let me just reorient you, then, sir.

14         There is an allegation that sales representatives, at

15    the behest of Janssen, were delivering false messages to

16    doctors about the effect that a Prezista prescription would

17    have on a patient's cholesterol and triglycerides, minimizing

18    the side effects.

19         Do you understand that?

20    A.   The allegation, thank you.

21    Q.   It's the allegation still.  Right.

22         And then, second, that Prezista was being promoted in

23    treatment-naive patients, the segment of the population that

24    was off its label.

25         Okay, sir?

1    A.    Okay.

2    Q.    For a period of time until it got a new label.

3          Third, that Intelence was being promoted, the new drug

4    Intelence that came out in 2008, that was being promoted for

5    patients who are also treatment-naive, outside of its label.

6          Do you understand that's an allegation?

7    A.    Yes.

8    Q.    And then, finally, that Intelence was being promoted by

9    Janssen on a once-daily dosing basis when it was only approved

10   for BID, twice daily.

11         Do you understand those are allegations?

12   A.    Yes, sir.

13   Q.    All right.

14         And you are aware of the fact that Intelence was only

15   labeled, only indicated, for twice-daily dosing.

16   A.    Yes.

17   Q.    Right, sir?

18   A.    Yes.

19   Q.    And what that means is a patient, based on the studies

20   that Janssen submitted to the Food and Drug Administration,

21   the FDA, and it was approved for, the patient had to take that

22   drug twice a day for it to be effective.

23         Right, sir?

24   A.    Yes.

25   Q.    All right.

IACOBELLIS - DIRECT - MARKETOS

1       And do you understand the allegation is in this case

2   that Janssen's sales representatives knew that that was an

3   obstacle to a physician prescribing it because patients with

4   HIV did not want to be burdened with too many pills during the

5   course of the day?

6       Do you understand that that's the allegation?

7   A.   Yes, I do.

8   Q.   And you understood at the time that the pill burden on an

9   HIV patient was an obstacle to getting a doctor to write a

10  prescription.

11      Right?

12  A.   Yes.

13  Q.   It would be better for Janssen if its drug had been

14  approved to be taken once a day.

15      Right, sir?

16  A.   Yes.

17  Q.   But Janssen had not done the studies necessary to

18  demonstrate to the Food and Drug Administration that giving

19  Intelence once a day would be effective to treat the patient

20  properly.

21      Correct?

22  A.   That's correct.

23  Q.   And because it had not done so, it had instead been

24  approved for twice daily.

25      Correct?

IACOBELLIS - DIRECT - MARKETOS

1    A.    Yes.

2    Q.    All right.

3          Now, Prezista, you know, was also only approved for

4    treatment-experienced patients.  We've discussed that already.

5          Right, sir?

6    A.    Yes.

7    Q.    I'm going to turn your attention for the time being to

8    the discussion about Prezista's side effects, the lipid

9    cholesterol, triglyceride issue.

10          Okay?

11          Take a look at Exhibit 1148, Relators' 1148, which is

12    in evidence.  I'm going to take a quick look at the label.

13          All right?

14    A.    Uh-huh.

15    Q.    You acknowledge, Mr. Iacobellis, that Prezista, its

16    initial label in 2006 at launch, had hypercholesterolemia,

17    hypolipidemia as side effects of this drug.

18          True?

19    A.    True.

20    Q.    And what that meant was, if this drug was administered as

21    it was indicated to patients in the -- who had HIV, it had the

22    potential to increase their cholesterol and their

23    triglycerides.

24          Right, sir?

25    A.    It's a possibility, yes.

─────IACOBELLIS - DIRECT - MARKETOS─────

1  Q.   And, of course, the disease itself has a tendency, as you

2  know, to increase in certain patients their cholesterol and

3  their triglycerides.

4        Right, sir?

5  A.   Yes.

6  Q.   And that's potentially dangerous because patients were

7  living longer on these drugs at this time period, and you

8  didn't want them to get congestive heart failure or something

9  like that.

10       You were made aware of that, right?

11       MS. BROWN:  I object, Your Honor.  That calls for

12 expert testimony.

13       THE COURT:  Well, he's only asking if he was made

14 aware of it.  He is not asking if that's his medical opinion.

15       So I'll overrule it.

16       You can answer that, sir.

17       THE WITNESS:  I'm aware of that.

18 BY MR. MARKETOS:

19 Q.   You're aware of that.  Okay.

20       So to be clear, Janssen would not want -- let me

21 rephrase that.

22       To be clear, if Janssen were minimizing the potential

23 side effects of Prezista with respect to cholesterol and

24 lipids in patients, that could potentially present a patient

25 safety issue.

IACOBELLIS - DIRECT - MARKETOS

1    Do you agree with that?

2   A.   It could.

3   Q.   If we take a look at exhibit -- Defendants' Exhibit 1115.

4        Defendants' Exhibit 1115 is the 2008 Prezista label.

5   This is when you were -- this is what came out in October of

6   2008, and this was when you were the national sales director

7   for Janssen.

8        Correct?

9   A.   Yes.

10  Q.   This label, the lipid issue, hypercholesterolemia,

11  hypolipidemia, triglycerides, that's listed as a serious

12  adverse drug reaction.

13       Correct?

14  A.   Yes.

15  Q.   What that means, sir, is that there was now more data

16  available when this label was changed in 2008.

17       Correct?

18  A.   Yes.

19  Q.   If Janssen and its sales representatives were to mislead

20  prescribers about this condition that could arise, that could

21  present a serious patient safety issue.

22       True?

23  A.   Yes.

24  Q.   But as I understand your testimony that you've given in

25  this case, there were so many terms being thrown around on how

IACOBELLIS - DIRECT - MARKETOS

1  to categorize or how to characterize the lipid profile

2  associated with Prezista that it actually confused you.

3      True?

4  A.   I'm not sure about the confused side, but I know that

5  there was different terms being tossed around.  But we did

6  train and deliver to the sales force what was approved through

7  our marketing and health care compliance area.

8  Q.   Let me be clear.  Whatever was approved by marketing, you

9  trained the sales staff on that.

10      Right?

11  A.   Correct.

12  Q.   And so as I understand it, you said there are so many

13  terms being thrown around on how to characterize the lipid

14  issue, the side effect, associated with Prezista.

15      Correct?

16  A.   Correct.

17  Q.   And --

18  A.   It was just a lead from marketing.

19  Q.   Yes.  Marketing was responsible for coming up with the

20  message, and you were responsible for training your staff on

21  it.

22  A.   Correct.

23  Q.   Right, sir?

24  A.   Correct.

25  Q.   All right.

─IACOBELLIS - DIRECT - MARKETOS─

1        Throughout the country?

2   A.   Yes.

3   Q.   And there were a number of different terms that marketing

4   proposed that Janssen used when describing the lipid side

5   effect associated with Prezista.

6        Correct?

7   A.   Correct.

8        MR. MARKETOS:  Let's take a look at, just for the

9   witness, please, Ms. Johnson, Defendants' Exhibit 2083.

10  BY MR. MARKETOS:

11  Q.   All right, sir.

12       I'm showing you a copy of a compliance memo that was --

13  that you were actually copied on.  It went to the entire field

14  sales team.

15       Do you see that?

16  A.   Yes.

17  Q.   All right.

18       It's dated November 3rd, 2008?

19  A.   Yes.

20  Q.   All right.

21       MR. MARKETOS:  We'd offer Defendants' Exhibit 2083.

22       MS. BROWN:  No objection, Your Honor.

23       THE COURT:  All right.  So admitted.

24       (Defendants' Exhibit 2083 in evidence.)

25  BY MR. MARKETOS:

IACOBELLIS - DIRECT - MARKETOS

1    Q.   You can see at the bottom of the second page --

2           MR. MARKETOS:  You can publish it now.

3    BY MR. MARKETOS:

4    Q.   -- you're CC'd on it.

5           Do you see that, sir?

6    A.   Yes, sir.

7    Q.   All right.

8           Let's see if we can establish one base fact for the

9    members of the jury here, sir.

10           In order to compare one drug, like Prezista, against

11   another drug, like any of its competitors in the protease

12   inhibitor class, the FDA requires two adequate,

13   well-controlled clinical trials.

14           Right?

15   A.   Yes.

16   Q.   That's substantial evidence to demonstrate that Prezista

17   head-to-head is more effective or safer than other

18   competitors.

19           Right?

20   A.   Yes, sir.

21   Q.   Without that, unless you have two adequate,

22   well-controlled clinical trials that have been submitted to

23   the FDA for approval, it is not proper, it is not appropriate

24   for Janssen or its sales representatives to compare Prezista

25   and its effectiveness or its side effects with a competitor

IACOBELLIS - DIRECT - MARKETOS

1    drug.

2        True?

3    A.    True, with the exception of dosing.

4    Q.    We'll come to that in a minute.  We'll talk about dosing

5    in a minute, but let's just -- for the time being, let's

6    accept your qualification of dosing.  Let's move it out of my

7    question.

8        Okay?

9        It would not be proper, for instance, for Janssen or

10   its sales representatives to tell a doctor, Prezista is better

11   for lipids than Reyataz.

12       True?

13   A.    If it has to do with dosing, there is that possibility

14   you could.  I can explain.

15   Q.    It is not proper for a Janssen sales representative to

16   tell a doctor, Prezista is more friendly for lipids than

17   Reyataz.  That would not be appropriate because you would be

18   comparing two drugs that had not been measured in FDA-approved

19   studies head-to-head.

20       True?

21   A.    I think, if I recall, that when you compare dosing -- and

22   I think we had a sales aid that discussed lipids impact, and

23   it had the national cholesterol education program.

24       And when you looked at the ritonavir piece, and Reyataz

25   and Prezista had the same dosage with ritonavir, and the DHHS

─────IACOBELLIS - DIRECT - MARKETOS─────

1   guidelines on HIV protocol indicated it was the ritonavir

2   component that had the impact on cholesterol, triglycerides.

3       So because that, Reyataz and Prezista both were boosted

4   with ritonavir 100 milligrams, when you look at the

5   guidelines, you couldn't potentially make that claim.

6   Q.  Let's look at the document that you were sent from

7   compliance.

8       All right, sir?  Let's focus on that.

9       What you were being told -- you were copied on a memo

10  that was being sent to the field.  This is the compliance part

11  that we're talking about now.

12      Right, sir?

13  A.  Okay.  Yes.

14  Q.  The "don't do this" part.

15      Right?

16  A.  Okay.

17  Q.  That's what this memo was all about.

18      Right?

19  A.  Okay.

20  Q.  Okay.

21      And let's just be clear about something.  If you have a

22  document that says don't do something but you do do something,

23  that would not be compliant.

24      Fair?

25  A.  Fair.

IACOBELLIS - DIRECT - MARKETOS

1    Q.   Okay.

2        It serves no purpose to have compliance documents with

3    disclaimers or instructions about what not to do under the

4    regulations or otherwise if you go and do them?

5        MS. BROWN:  Your Honor, object to the

6    characterization of the document as misrepresenting the

7    document.

8        THE COURT:  I can't see -- can you show me the first

9    part of the document?  I don't know what this is anymore.

10       MR. MARKETOS:  Yeah, sure.

11       THE COURT:  Is it from compliance?

12       MS. BROWN:  It's not, Your Honor.

13       THE COURT:  All right.  Then rephrase the question.

14       MS. BROWN:  Thank you.

15       MR. MARKETOS:  Fair enough.

16       THE COURT:  Objection sustained.

17       MR. MARKETOS:  All right.

18       THE COURT:  Now you can go back.

19   BY MR. MARKETOS:

20   Q.   To the -- well, you tell us, Mr. Iacobellis.

21       This is to the virology field sales community liaison

22   access and reimbursement team from the Prezista brand team.

23       Right?

24   A.   Marketing, yes.

25   Q.   Okay.

IACOBELLIS - DIRECT - MARKETOS

1    A.    It's the marketing team.

2    Q.    This is marketing?

3    A.    Yeah.

4    Q.    Okay.

5          So we'll talk about that.

6          Let's go down to the section that I was just

7    discussing.  I thought -- I'm sorry, sir.  I thought that

8    marketing ran its messages through compliance.

9    A.    Yes.

10   Q.    Okay.

11         You were being told:  "The following claims are not

12   approved.  Prezista has a better or more favorable GI or lipid

13   profile than lopinavir."

14         Right, sir?

15   A.    Yes.

16   Q.    That -- couldn't say that.

17         Right?

18   A.    Right.

19   Q.    Then they say why.

20         Now, that's not Reyataz.  That's a different drug, a

21   different competitor.

22         Right?

23   A.    I believe so.

24   Q.    "At no time should you engage in a package insert

25   side-by-side comparative discussion of safety and efficacy

─────IACOBELLIS - DIRECT - MARKETOS─────

1    between our products and other antiretroviral agents."

2         Right, sir?

3    A.   That's correct.

4    Q.   If that was taking place in the field -- if that were

5    actually happening, that would be bad?

6    A.   Yes.

7    Q.   Do you agree?

8    A.   Yes.

9    Q.   Because the FDA requires head-to-head studies for any of

10   your sales representatives to say, Doctor, you should

11   prescribe Prezista because it's better than Reyataz for X.

12        Right?

13   A.   Correct.

14   Q.   If you look at page 2.  I'm sorry.

15        THE COURT:  Mr. Marketos, do you have a lot on this

16   document?  I didn't want to cut off your point, but do you

17   have more on this document?

18        We need to take a break soon for the lunch.

19        MR. MARKETOS:  Now would be a good time, Your Honor.

20   Thank you.

21        THE COURT:  All right.  So here's what we're going to

22   do, folks.  We are going to break for 45 minutes.  We'll be

23   back quarter after 1:00.  I'm going to let the jurors be

24   dismissed.

25        Counsel, just remain for a moment.  Let's get the

IACOBELLIS - DIRECT - MARKETOS

1  jurors out.

2          THE DEPUTY COURT CLERK:  All rise.

3          (Jury exits the courtroom.)

4          THE COURT:  Folks, have a seat, whoever is remaining.

5  You can return back to counsel table.

6      How much longer you think you have, Mr. Marketos?

7          MR. MARKETOS:  So I have -- Your Honor, I expect to

8  go until -- if we come back at 1:15, I would expect to go

9  until 2:45.

10          THE COURT:  All right.  And then, Ms. Brown, do you

11  have a sense of how long your cross is?  Are we getting to

12  another witness today?

13          MS. BROWN:  I sure would love to finish today.  If I

14  get the witness at 2:45, I think I could probably do it in an

15  hour.  If we could try to complete this witness today to get

16  back on track, I'm certainly going to do my best.

17          THE COURT:  All right.  I mean, I don't know where we

18  are, but, I mean, I want to get them out around 4:00, so I

19  think it's going to be tight, but let's see where we are.

20      All right.  Anything else we need to discuss before I

21  let you all break for lunch?

22          MR. MARKETOS:  Not from us, Your Honor.

23          MS. BROWN:  No, Your Honor.  Thank you very much.

24          THE COURT:  All right.  Be well.  Remain seated.

25          (Luncheon recess was taken from 12:30 p.m. until 1:15

IACOBELLIS - DIRECT - MARKETOS

1    p.m.)

2            THE DEPUTY COURT CLERK:  Please remain seated.

3            THE COURT:  Folks, you ready?

4        Mr. Iacobellis, you want to come back up.

5        Do we need to chat about anything before we proceed,

6    Mr. Marketos?

7            MR. MARKETOS:  Not from the Relators, no.  Thank you,

8    Your Honor.

9            THE COURT:  Ms. Brown?

10            MS. BROWN:  No, thank you, Your Honor.

11            THE COURT:  All right.  Kim, do you want to get the

12    jurors?

13        You can come on up, sir.  Go ahead, have a seat.

14            THE WITNESS:  Thank you.

15            THE DEPUTY COURT CLERK:  All rise.

16        (Jury enters courtroom.)

17            THE COURT:  All right, folks.  Everyone be seated.

18        Mr. Iacobellis, just a reminder you're still under oath

19    from this morning.

20        Mr. Marketos, whenever you're ready, you may proceed.

21            MR. MARKETOS:  Thank you, Your Honor.

22    BY MR. MARKETOS:

23    Q.  Mr. Iacobellis, good afternoon, sir.

24    A.  Thank you.  Good afternoon.

25    Q.  Mr. Iacobellis, before the break, we were discussing some

IACOBELLIS - DIRECT - MARKETOS

1   issues relating to how Prezista was being marketed by Janssen

2   and sold to doctors, specifically with respect to the

3   lipids -- the lipid issue.

4        Do you recall that?

5   A.   Yes.

6   Q.   And correct me if I'm wrong, sir, I thought I understood

7   you to say that the messages that were to be promoted by

8   Janssen and used by the sales force in the field with

9   prescribers, with doctors, that those came from the marketing

10  department?

11  A.   Yes.  Correct.

12  Q.   And I also thought I understood you to say -- and correct

13  me if I'm wrong -- that you have faith in the marketing

14  department, in your colleagues, and, therefore, you assumed

15  that the messages that were delivered to your force to go out

16  in the field and spread were accurate?

17  A.   Confident of HCC alignment.

18  Q.   I'm sorry?

19  A.   Confident of marketing and health care compliance

20  alignment.

21  Q.   All right.

22       So you were -- so you were confident that messages that

23  you were being asked to train your sales force on and have

24  them share with doctors was not misleading, for instance,

25  because they were coming to you from -- from marketing?

IACOBELLIS - DIRECT - MARKETOS

1    A.    Yes.

2    Q.    Fair?

3    A.    Fair.

4    Q.    And safe to say that, as part of your job, sir, you never

5    took it upon yourself to determine yourself whether or not

6    those messages that marketing was asking your sales force to

7    deliver to the market were, in fact, approved by the FDA.

8          Fair?

9    A.    I'm sorry.  Can you restate the question?

10   Q.    Sure.

11         You didn't try yourself to determine, Wait a minute, is

12   this message that is coming from marketing, that they want my

13   sales force to promote out in the field -- is it actually

14   approved by the FDA?  That's not something you did?

15   A.    I agree with that, but it's not the FDA.  It's reviewed

16   by health care compliance and regulatory, our internal groups.

17   Q.    Well, hold on.  Let me make sure -- let me make sure we

18   can --

19   A.    I mean, not all of the messages go to FDA is what I'm

20   saying.

21   Q.    I understand.

22         So what you're -- I think you're making a distinction,

23   and that's a fair point.  Let me make sure I get it right.

24         Okay?

25         What you're saying is you trusted the fact that

IACOBELLIS - DIRECT - MARKETOS

1  whatever marketing was delivering to you on the sales side of

2  things, it had been approved by Janssen's own regulatory

3  compliance people?

4  A.   Yes.

5  Q.   Let's start there.  You never took it upon yourself, I

6  assume, to determine whether, in fact, marketing had received

7  clearance from Janssen's own regulatory compliance people,

8  fair?

9  A.   Trusted them, yes.

10  Q.   Took it as a matter of faith --

11  A.   Yes.

12  Q.   -- an article of faith that marketing had run its

13  promotional messages that it wanted you to deliver to the

14  field through compliance?

15  A.   Yes.

16  Q.   You did not, then, I take it, ever try to determine

17  whether or not Janssen had, in fact, gotten approval from the

18  Food and Drug Administration for the messages that the

19  marketing department was asking you to deliver to the field?

20  A.   I think -- I think a point of distinction is that I

21  believe when a product is launched, things have to go to

22  DDMAC.  Post approval is really -- plan of action to plan of

23  action on an ongoing basis after launch.

24  Q.   Yeah, let's just --

25  A.   It's a different process.  But, I mean, I didn't hear the

IACOBELLIS - DIRECT - MARKETOS

1   distinction in your question.  That's why I'm clarifying.

2   Q.   Sure.

3        Let's just take it step by step.  I'm just trying to

4   make sure that we can tell the members of the jury one thing:

5   You're not aware one way or the other as to whether or not the

6   Government, the Food and Drug Administration, actually

7   approved the messages that marketing was asking your force to

8   deliver?

9   A.   No.

10  Q.   Fair?

11  A.   Fair.

12  Q.   All right.

13       And, for instance, if marketing was suggesting that

14  your sales group, your sales force, should promote Prezista as

15  lipid friendly, right, for instance, if that was one example,

16  they said you should promote Prezista as lipid friendly.

17       You're not aware one way or the other as we sit here

18  today as to whether that is something the FDA had approved.

19       True?

20  A.   True.

21  Q.   And you may have seen -- I think we've seen some of them

22  in this case, like a glossy -- someone referred to it as a

23  slim-jim --

24  A.   Yeah, the sales aids.

25  Q.   -- that part?

IACOBELLIS - DIRECT - MARKETOS

1    A.   The sales aids.

2    Q.   Those are sales aids that the sales force -- your sales

3    force at the time was taking into doctor's offices to help

4    them sell the drugs?

5    A.   Correct.

6    Q.   All right.

7         And if we see something on a sales aid that says, you

8    know, for instance, Prezista is lipid neutral or Prezista is

9    lipid friendly or Prezista has a minimal impact on lipids, if

10   those messages are on the glossy, you don't know one way or

11   the other whether or not those were actually approved by the

12   FDA.

13        Fair?

14   A.   Fair.

15   Q.   Let's take a look at -- I'd like to turn your attention

16   now to the -- a different subject, okay, sir?  Off-label

17   studies, data that Janssen was collecting through studies that

18   were not FDA approved.

19        Do you understand that subject?

20   A.   Yes, sir.

21   Q.   All right.

22        Let's talk about -- let's show you exhibit --

23   Relators' Exhibit 45.  This is also in evidence already as

24   Defendants' Exhibit 2079.

25             MR. MARKETOS:  Let's just pull it up for the witness.

IACOBELLIS - DIRECT - MARKETOS

1   BY MR. MARKETOS:

2   Q.   All right, sir.

3        There is a -- you're on an email here that's dated

4   September 30, 2008, and you're sending an email to the sales

5   organization.

6        Do you see that?

7   A.   Yes.

8        MR. MARKETOS:  Your Honor, I would offer Plaintiffs'

9   Exhibit 45 -- Relators'.

10       MS. BROWN:  No objection, Your Honor.

11       THE COURT:  So admitted.

12       MR. MARKETOS:  I'm sorry.  The exhibit sticker says

13  plaintiffs'.  That's why I keep doing that.  I apologize.

14  Relators' Exhibit 45.

15       THE COURT:  That's fine.

16       (Relators' Exhibit 45 in evidence.)

17  BY MR. MARKETOS:

18  Q.   Mr. Iacobellis, one thing that you were telling to your

19  sales force in this specific email was that some of the

20  studies that Janssen was looking at with respect to the effect

21  and safety of its drugs were off-label, and therefore,

22  prohibited.

23       Correct?

24  A.   Correct.

25  Q.   And the point of that is Janssen might want to collect

IACOBELLIS - DIRECT - MARKETOS

1    data on its drugs, but they might not have a sufficiently

2    powerful enough study that would meet the FDA guidelines.

3        Correct?

4    A.    I don't know how that works.

5    Q.    Okay.

6        Let me -- let me back up, then.

7        We talked earlier about the memo that was circulated

8    saying for FDA approval of a study, there had to be two

9    specific studies conducted in a specific fashion that met FDA

10   standards.

11       Essentially, they're quality standards in order for it

12   to be FDA approved.

13   A.    Correct.

14   Q.    Off-label studies don't meet those standards.

15       Right, sir?

16   A.    That's correct.

17   Q.    And because they don't meet those standards, they might

18   not have enough patients, or they might not have the right

19   disease treatment.  They might not have the right dosage.

20   They might not have the right setup.  They might not have the

21   right control.

22       Correct?

23   A.    Correct.

24   Q.    Those are off-label studies that cannot be used to

25   promote the drug to doctors.

1       Correct?

2   A.   Correct.

3   Q.   And that's what we're looking at here.  You're referring

4   to a few examples of off-label discussions and materials that

5   are prohibited including -- and then list a number of them

6   below.

7        Right, sir?

8   A.   Yes.

9   Q.   And so in order for a sales representative to promote a

10  study to a doctor, that study would have to be an on-label,

11  FDA-approved study.

12       Correct?

13  A.   Correct.

14  Q.   What -- which you would then see on the actual package

15  insert, the label?

16  A.   Correct.

17  Q.   These are off-label, because by definition, studies like

18  the ones we're looking at in Exhibit 45, Relators' Exhibit 45,

19  are not part of the package insert.

20       Correct?

21  A.   Correct.

22  Q.   And they can't be used.  They can't be used to promote

23  and sell the drug.

24       Correct?

25  A.   Correct.

1    Q.   And for that reason, Mr. Iacobellis, it's not a good

2    practice to disseminate off-label studies to sales

3    representatives who are going out into the field to sell to

4    doctors.

5         Agreed?

6    A.   Correct.

7    Q.   You don't want sales representatives to take off-label

8    studies and then feel like they're incentivized to use those

9    studies to promote a drug for unsafe reasons?

10   A.   Correct.

11   Q.   If we take a look at Exhibit 132.  This is Relators' 132.

12   This is in evidence already, sir, so I'm going to ask you to

13   take a look at it.

14        This is a Prezista IBP tactical plan 2010.  This is

15   from Mr. Ben Kozub, and it's dated August 16, 2009.

16        Do you see that?

17   A.   Yes, sir.

18   Q.   Now, for the jury's benefit, we've heard Mr. Kozub's name

19   before, but he was the marketing guy.

20        Right?

21        He was the head of the marketing department that you're

22   referring to that was delivering you the messages.

23        Correct?

24   A.   There was two or three, yeah.  I can't remember the

25   specific time, but he was certainly one of them.

─IACOBELLIS - DIRECT - MARKETOS─

1   Q.   He was one of them?

2   A.   Yeah.

3   Q.   All right.

4        And if we take a look at page 7, we're looking at, as

5   of 2009, one of the strategic objectives from the marketing

6   department, and it was to elevate the tolerability profile

7   within the protease inhibitor class.

8        Do you see that?

9   A.   Yes.

10  Q.   And specifically as it relates to the lipid issue, the

11  cholesterol/triglyceride issue, the strategy was to eliminate

12  the perception of Reyataz as the most lipid friendly.

13       Do you see that?

14  A.   Yes.

15  Q.   And in actuality, Reyataz was more lipid friendly.

16       Correct?

17  A.   Yes.

18  Q.   But the strategy was to eliminate that perception with

19  doctors because Reyataz was a competitor drug, and Prezista --

20  and Janssen wanted to eliminate that perception.

21       Correct?

22  A.   Correct.

23  Q.   And what Janssen wanted to do was to drive awareness of

24  the low-impact-on-lipids claim over 96 weeks.

25       Do you see that?

IACOBELLIS - DIRECT - MARKETOS

1    A.    Yes.

2    Q.    And then what's observed here -- and this is important

3    for us, sir -- "approximately 30 percent of patients switching

4    for tolerability reasons have hypolipidemia."

5          Do you see that?

6    A.    Yes.

7    Q.    So here's what Janssen was saying at the time.  "We're

8    going after this segment of patients, and 30 percent of them

9    have hypolipidemia."

10         Correct?

11   A.    That's what it says.

12   Q.    That's what it says, meaning the patients that we're

13   going after have elevated lipids, which is a potential side

14   effect.

15         Correct?

16   A.    Yes.

17   Q.    And we want to eliminate the perception that Reyataz is a

18   better drug for those people.

19         Right, sir?

20   A.    Correct.

21   Q.    And then if we take a look at -- let's take a look at

22   Relators' Exhibit 418.  This is not --

23   A.    Can I explain something on this?

24   Q.    I'll tell you what, sir:  We're going to try to move this

25   along.

IACOBELLIS - DIRECT - MARKETOS

1      THE COURT:  If there's a question, you can answer it.

2  But if there's something else, you'll have questions by the

3  other counsel to say additional things.  All right?

4      THE WITNESS:  Okay.  Thank you.

5      MR. MARKETOS:  Thank you.

6  BY MR. MARKETOS:

7  Q.  Exhibit 418, sir, I'm just going to show it to you on the

8  screen.  This is the DART study.  Do you remember the

9  DART study?

10  A.  I remember the name, not the specifics.

11  Q.  Sure.

12      Take a look at it and see if you recall what this study

13  was.  It's plaintiffs' -- Relators' Trial Exhibit 418.

14      Do you see there's a title at the top?  Does that

15  refresh your recollection that there was a DART study that was

16  performed that Janssen was using?

17  A.  Yes, despite my age, thank you.

18      MR. MARKETOS:  Your Honor, we'd offer plaintiffs' --

19  Relators' Exhibit 418.

20      MS. BROWN:  No objection, Your Honor.

21      THE COURT:  All right.  So admitted.

22  (Relators' Exhibit 418 in evidence.)

23  BY MR. MARKETOS:

24  Q.  Now, this is an example, Mr. Iacobellis, of an off-label

25  study that Janssen was observing.

IACOBELLIS - DIRECT - MARKETOS

1          Right, sir?

2     A.    I believe so.

3     Q.    Okay.

4          And what was actually being measured here, it was

5     taking a look at darunavir, a new HIV protease inhibitor that

6     was Prezista.

7          Correct?

8     A.    Yes.

9     Q.    All right.

10         And if we just go down to the methods.  This was --

11    let's take a look at this.  This is an off-label study because

12    this study was performed on 49 HIV-negative healthy male

13    volunteers.

14         Correct?

15    A.    Correct.

16    Q.    So just to start with, the study was being performed on

17    healthy people.

18         Right?

19    A.    That's what it says, yes.

20    Q.    Healthy people who did not have the HIV virus.

21         Correct?

22    A.    Correct.

23    Q.    And it was on -- it was actually administering this drug

24    for 21 days.

25         Do you see that?

IACOBELLIS - DIRECT - MARKETOS

1    A.    Yes, sir.

2    Q.    The effect of this study was to determine whether

3    people's lipids and cholesterol went up after they took

4    Prezista for 21 days.

5         Right?

6    A.    Yes.

7    Q.    And they were healthy people to begin with.

8         Right?

9    A.    Yes.

10   Q.    So this would not be a sufficiently powered study that

11   Janssen could use to promote its drug.

12        Correct?

13   A.    That probably would be correct, yes.

14   Q.    It's not an FDA-approved study for reasons that we're

15   looking at.

16        Right, sir?

17   A.    True.

18   Q.    This would be an off-label study, and it would be

19   inappropriate for Janssen and its sales representatives to use

20   the data in this study to promote its drug as being lipid

21   neutral, lipid friendly, or minimally impacting lipids.

22        Agreed?

23   A.    Agreed.

24   Q.    It also would be bad practice to have the sales

25   representatives given this DART study to use in a doctor's

─────────IACOBELLIS - DIRECT - MARKETOS─────────

1    office.

2         Right?

3    A.   Correct.

4    Q.   It's an off-label study.  You wouldn't want them to use

5    information that might be bad to promote the drug.

6         Correct?

7    A.   Correct.

8         MR. MARKETOS:  If we take a look at Exhibit 124, just

9    for the witness, please, Ms. Johnson.

10   BY MR. MARKETOS:

11   Q.   All right, sir.  This is an email string that you're on.

12   It's dated October 28, 2008.

13        Do you see that?

14   A.   Yes.

15        MR. MARKETOS:  We'd offer Relators' Exhibit 124.

16        MS. BROWN:  No objection, Your Honor.

17        THE COURT:  All right.  So admitted.

18   (Relators' Exhibit 124 in evidence.)

19   BY MR. MARKETOS:

20   Q.   All right, sir.  I'm going to go to the bottom.

21        There's a gentleman by the name of Francis Devlin.  Is

22   that Frank Devlin?

23   A.   Fran.

24   Q.   Fran.  I'm sorry, I said it wrong.  Fran Devlin.

25        And Fran writes a number of things about Prezista, and

IACOBELLIS - DIRECT - MARKETOS

1    I will not read all of it to you.  Okay.  But I'd like you to

2    take a look on page 1 and 2 where there's a reference to

3    Prezista's minimal impact on lipids.

4            MR. MARKETOS:  See if we can blow that up.  It's on

5    the top of the second page.

6    BY MR. MARKETOS:

7    Q.  "For Prezista we want to highlight once-daily dosing for

8    naive patients" and then "reenforce the GI tolerability and

9    minimal impact on lipids with Prezista once daily."

10           Do you see that?

11   A.  Yes.

12   Q.  All right.

13           Now, to be clear, this email is the actual execution -

14   beginning of the execution phase.  The strategy was proposed

15   by marketing.

16           Right, sir?

17   A.  Yes.

18   Q.  And now sales is executing on it.

19           Right?

20   A.  Yes.

21   Q.  All right.

22           And that includes reenforcing the idea that Prezista

23   has a minimal impact on lipids.

24           Right?

25   A.  Yes.

IACOBELLIS - DIRECT - MARKETOS

1    Q.   And then in response you said, "Fran, great job."

2         And this is at the top, sir.

3         "Fran, great job.  I appreciate the follow up and

4    setting clear direction to your team.  I appreciate your

5    leadership."

6         Right, sir?

7    A.   Yes.

8    Q.   All right.

9         Now that's actually what you wanted your sales force to

10   be doing, providing clear direction on the message that was

11   being promoted to doctors.

12        Right?

13   A.   Yes.

14   Q.   And Ms. Devlin -- or Fran Devlin had said, We're going to

15   work on the Prezista minimal impact on lipids message.

16        Right?

17   A.   Yes.

18   Q.   You told her, "Great job.  Clear direction."  That's what

19   you wanted her -- that's what you wanted to be doing.  That's

20   what you wanted to be happening.

21        Correct?

22   A.   Him.

23   Q.   Thank you.  I was wondering.

24   A.   Yeah.

25   Q.   So you wanted Mr. Devlin to be setting a clear direction

────── IACOBELLIS - DIRECT - MARKETOS ──────

1  for the sales force.

2      Fair?

3  A.   I do, yes.  I did, but I don't think I probably read as

4  close relative to the specific term.

5  Q.   Fair enough.

6      Let's back up for a second.  What you're saying is you

7  wanted him to be setting clear direction but you maybe hadn't

8  paid attention to the message that was being delivered?

9  A.   The term, yeah.

10 Q.   The term "minimal impact on lipids."

11     Right, sir?

12 A.   Correct.

13 Q.   Because that's not true, is it?

14 A.   No.

15 Q.   Prezista did not have a minimal impact on lipids, did it?

16 A.   I think it was -- it might have been low impact, but I

17 can't remember what the term was at this point.

18 Q.   If doctors were being told that Prezista had a minimal

19 impact on lipids, that would not be true.  Can you tell us

20 that?

21 A.   Again, I can't remember the specific term, but if it was,

22 we had been approved for low impact, that would be true.  But

23 sometimes a lot of low impact, minimum impact, lipid friendly,

24 many times that's -- those are just different adjectives for

25 it, so I may have just overlooked it.

IACOBELLIS - DIRECT - MARKETOS

1    Q.  I understand, sir.

2         Let's just be clear about this.  You overlooked

3    something that you believed was not true, a message that you

4    believed was not true.

5    A.  I'm probably not aware of that, picked that out.  But

6    your statement -- your statement is correct.

7    Q.  Sorry.  I just have to get it for the record.

8    A.  That's fine.

9    Q.  At the time you may have missed it, but the statement is

10   not true, minimal impact on lipids.

11   A.  If that wasn't the approved term, correct, at that time.

12   Q.  If we take a look at -- well, let's take a look at the

13   issue with respect to Intelence once-daily dosing.  All right,

14   sir?  I'd like to shift our attention to that message.

15        As I understand it, you have no knowledge of any of the

16   sales representatives or district managers or regional

17   managers within Janssen delivering the message to doctors that

18   Intelence could be dosed once a day.

19        Is that right?

20   A.  No knowledge of that happening.

21   Q.  All right.

22        That's actually what you said in your deposition.  You

23   have no knowledge of that happening.

24        Fair?

25   A.  Fair.

IACOBELLIS - DIRECT - MARKETOS

1  Q.  And that's because Intelence has a label.  We don't have

2  to quibble over lipid friendly or lipid neutral or anything

3  like that on this issue.  Intelence has a label that it must

4  be dosed BID, twice daily.

5  A.  Yes.

6  Q.  Correct?

7  A.  Yes.

8  Q.  So when we see QD dosing for Intelence, that would be an

9  off-label message.

10      Right, sir?

11 A.  Correct.

12 Q.  And that would be something that would not be approved by

13 the FDA.

14      You understand that.

15 A.  Correct.

16 Q.  The reason for that, sir, is because the studies that

17 Janssen had submitted to the FDA demonstrated that Intelence,

18 if it was safe and effective, it was safe and effective in a

19 dose that was taken over the course of twice a day.

20      Correct?

21 A.  Correct.

22 Q.  Now, on the label for Intelence, there was data

23 associated with something called its half life.

24      Do you recall that?

25 A.  Yes.

IACOBELLIS - DIRECT - MARKETOS

1  Q.  Half life is a measure, as I understand it, sir, of how

2  long a drug stays in a person's system before it's eliminated.

3      Correct?

4  A.  Correct.

5  Q.  If your sales force was using that data to promote to

6  doctors the idea of dosing once a day instead of twice a day,

7  that would be off-label promotion.

8      Do you agree?

9  A.  Yes, I do.

10  Q.  Let's be clear about this.  If you use information that

11  is on the label and it's dosed for twice a day and you use

12  that information, like a half life, to convince a doctor to

13  prescribe it once a day, you're going off-label.

14      Agreed?

15  A.  Agreed.

16  Q.  And that -- if it were happening -- would be wrong.

17      Do you agree?

18  A.  Yes, I agree.

19  Q.  Now, let's take a look at Relators' Exhibit 136.  This is

20  in evidence already, sir.

21          MR. MARKETOS:  We can bring it up on the screen.

22  BY MR. MARKETOS:

23  Q.  This is an email that you were copied on later in 2010,

24  November of 2010.  Do you see at the top that you are

25  receiving an email from and then responding to Mr. Ben Kozub?

IACOBELLIS - DIRECT - MARKETOS

1   A.   Yes.

2   Q.   All right.

3        MR. MARKETOS:  And we'll blow it up so we can read

4   it.

5   BY MR. MARKETOS:

6   Q.   But this is an email that Mr. Kozub sent to a number of

7   people within the organization, yourself included.

8        Correct?

9   A.   Correct.

10  Q.   And just to remind everybody, Mr. Kozub, he was over at

11  marketing.

12       Right?

13  A.   I think one thing we'd have to check here, if he had

14  moved on.  I think at some point, I have to check my facts,

15  whether he moved to a global role, but I can't be certain.

16  Q.   Okay.  Let's do this.

17       You, at the time, were the national sales director.

18       Right?

19  A.   That is correct.

20  Q.   You were the sales director of this nation,

21  United States.

22  A.   Yes.

23  Q.   All right.

24       And Mr. Kozub emailed this email to a number of people,

25  including you.

IACOBELLIS - DIRECT - MARKETOS

1       Right, sir?

2   A.   Correct.

3   Q.   And Scott Libby, he was over -- he was over Florida, in

4   that district.

5       Right?

6   A.   He was over the entire western part of the country.

7   Q.   And that's a little strange because --

8   A.   It was very strange.

9   Q.   -- he was over the entire western part of the country,

10  which included Florida.

11  A.   Yes.  The -- the national sales director at the time who

12  launched the product, Deb O'Connor, hired him and helped him

13  live in his home state but cover the western part of the

14  country.

15      So, yeah, it is a little strange.

16  Q.   All right.

17      And by the way, FDA labels, the Food and Drug

18  Administration, is for the United States.

19      Right, sir?

20  A.   Yes.

21  Q.   And the Food and Drug Administration in the

22  United States, they have labels for drugs that are to be sold

23  to patients in the United States.

24      Correct?

25  A.   Correct.

IACOBELLIS - DIRECT - MARKETOS

1  Q.  Overseas might have its own rules, but labels are about

2  the United States.

3         Correct?

4  A.  Correct.

5  Q.  And if we take a look at what Mr. Kozub writes down here

6  at the bottom, he says, "What are the off-label opportunities

7  for the NNRTIs, including Intelence?"

8         Do you see that?

9  A.  Yes, I do.

10 Q.  "Where is Intelence getting the business today in the F

11 and G segments" was his question.

12        Right?

13 A.  Yes.

14 Q.  And to be clear, sir, you looked at this email before

15 your testimony today.

16        Correct?

17 A.  Yes.

18 Q.  All right.

19        MR. MARKETOS:  And we can pull up the bullet points

20 that are on the next page and put them on underneath.

21 BY MR. MARKETOS:

22 Q.  And he asks, "What are our competitors getting in that

23 space?"  And he talks about a number of competitor drugs,

24 including Reyataz.

25        Right?

IACOBELLIS - DIRECT - MARKETOS

1    A.   That's correct.

2    Q.   And then he says, "What can we speak to promotionally

3    that will allow us to capitalize on this opportunity for the

4    commercial team?"

5         Right, sir?

6    A.   Yes.

7    Q.   All right.

8         To be clear, the commercial team is the team that is

9    promoting the drug in the United States.

10        Right?

11   A.   Yes.

12   Q.   And he's asking about the off-label opportunities because

13   Intelence was being prescribed, at this point, in naive

14   patients.

15        Right, sir?

16        Or less treatment-experienced.

17   A.   I'm sorry.  Say it again?

18   Q.   It's a bad question.

19        What he's asking about is what are the off-label

20   opportunities.  We can all read that.

21        Right?

22   A.   Yes.

23   Q.   Okay.

24        And when he wrote that, he wrote that to a number of

25   people, including you.

IACOBELLIS - DIRECT - MARKETOS

1        Right?

2   A.   Yes.

3   Q.   Did you report it?

4   A.   Did I report it?  It was an internal planning -- no.  It

5   was an internal planning team --

6   Q.   I apologize for interrupting.  I just want to ask one

7   question at a time.

8   A.   Okay.

9   Q.   Did you report this email to your superiors?

10  A.   No, because it was a planning meeting.

11  Q.   I understand.

12       Should somebody be planning off-label promotion of

13  Janssen's drugs?

14  A.   Not if it -- specific to promotion at that current time.

15  Q.   One more time.  Janssen should not be planning to promote

16  drugs off-label in this country.

17       Correct?

18  A.   That's right.

19  Q.   You didn't report this to anybody when you received it,

20  did you?

21  A.   No.

22  Q.   And if we take a look at all of the names on the list,

23  that included some of the higher-up people in the

24  organization.

25       Do you agree?

1   A.    Yes.

2   Q.    Yourself included?

3   A.    Yes.

4   Q.    If we take a look at -- well, let's be clear.  This part

5   wasn't -- this part wasn't being hidden, the discussion, the

6   plan for promoting off-label opportunities, right, or

7   identifying off-label opportunity.  That wasn't hidden, was

8   it?

9   A.    No.  It's a brainstorming session.

10  Q.    Brainstorming session.  Okay.

11          MR. MARKETOS:  And if we take a look at

12  Relators' Exhibit 170, just for the witness, please.

13  BY MR. MARKETOS:

14  Q.    I'd like to turn your attention to your studies that your

15  organization performed, Mr. Iacobellis, with respect to what

16  physicians, what doctors were hearing out in the field from

17  your sales representatives.

18        Okay?

19        And what we're looking at here, Plaintiffs'

20  Exhibit 170, is an email from you to William Whyte.

21        Right, sir?

22  A.    Yes.

23  Q.    Mr. Whyte was actually taking over and you were handing

24  off the baton to him when he was coming in as the national

25  sales director.

─────────IACOBELLIS - DIRECT - MARKETOS─────────

1          Correct?

2   A.    Correct.

3   Q.    And what he asked for was a number of things, one of

4   which was training modules, how to train the sale staff.

5          Correct?

6   A.    Correct.

7   Q.    And what you sent to him was a number of modules that

8   included surveys of doctors and the messages that they were

9   receiving from your sales representatives.

10         Right?

11  A.    I can't definitively say that.  Are you talking about

12  sales force business review?

13  Q.    Well, let me do it this way, sir.  This is an email from

14  you to Mr. Whyte.

15         Right, sir?

16  A.    Yes, correct.

17         MR. MARKETOS:  Offer Relators' Exhibit 170.

18         MS. BROWN:  I have no objection, Your Honor.

19         THE COURT:  All right.  So admitted.

20  (Relators' Exhibit 170 in evidence.)

21  BY MR. MARKETOS:

22  Q.    Now, you sent training modules to Mr. Whyte, and you

23  actually included them as attachments to this email.

24         Correct?

25  A.    Correct.

IACOBELLIS - DIRECT - MARKETOS

1    Q.   And if we turn to that attachment, we're going to look at

2    page 3, this is "Sales Force Effectiveness & Activity, 2011

3    Brand A&U."

4         Do you see that?

5    A.   Yes.

6    Q.   All right.  So let's explain what this is.

7         This is a collection of information where Janssen, the

8    organization, is studying the effectiveness of its sales

9    representatives out in the street.

10        Right, sir?

11   A.   Correct.

12   Q.   It's studying how effective Janssen's sales force is at

13   delivering messages to doctors.

14        Right?

15   A.   Yes.

16   Q.   One of the things that Janssen wanted to study is, Is our

17   message being delivered and are doctors receiving it?

18        Right?

19   A.   Correct.

20   Q.   And so what Janssen did was it commissioned surveys of

21   physicians to determine how and what they were hearing from

22   your sales force.

23        Correct?

24   A.   Correct.

25   Q.   And if we take a look at page 18, this has to do with

1  Intelence, the drug we were just discussing, once daily, twice

2  daily.

3         Do you remember that?

4  A.   Yes.

5  Q.   Now, what we can see from this -- and this is information

6  that's been compiled for Janssen -- at the bottom of the page

7  is the question that is being asked of the physicians.

8         MR. MARKETOS:  And we'll blow that up so we can all

9  see it.

10  BY MR. MARKETOS:

11  Q.   All right.

12         I'm going to read it out loud and you can follow along

13  with me.

14         All right, sir?

15         The first question that was asked was -- of the

16  physicians, of the doctors was, "During your most recent visit

17  by a sales representative promoting each of the products

18  listed below, what was the main message of the presentation by

19  that sales representative?  Please be as specific and as

20  detailed as possible."

21         Do you see that?

22  A.   Yes.

23  Q.   And then it says, "For each of the following statements

24  below, please indicate if you recall having seen or heard from

25  a sales representative for any brand used for the treatment of

IACOBELLIS - DIRECT - MARKETOS

1    HIV."

2          Do you see that?

3    A.   Yes.

4    Q.   All right.

5          Now, for Intelence, what we have displayed above is the

6    unaided message recall from the doctors themselves.

7          Right?

8    A.   Yes.

9    Q.   And if we pull up the unaided message recall of an

10   Intelence sales presentation by a Janssen sales

11   representative, you see that the issue of dosing is the third

12   largest message that the doctors are receiving about that

13   drug.

14         True?

15   A.   True.

16   Q.   "The availability of a 200-milligram tablet,

17   dissolvability and QD dosing get the majority of attention?"

18         Right?

19   A.   Yes.

20   Q.   Apparently, doctors were receiving the message from

21   Janssen sales force about once-daily dosing for Intelence.

22         True?

23   A.   Not necessarily.  I think it -- these market research

24   surveys have some limitations.  So -- and I know that market

25   research would follow up and validate some of this

1   information, but they could've heard from a competitor.  They

2   could've heard from a medical science liaison who is a

3   representative of Tibotec Therapeutics or one of our sales

4   representatives.

5        So with the limitations of these surveys, I can't

6   answer whether our reps did this or not.

7   Q.   All right.

8        So you think maybe it's possible that the information

9   that was being presented that you were sending out yourself to

10  the incoming national sales director was bad information?

11  A.   No.  It's insightful.  Any information for a new leader

12  coming in is helpful for them to transition in with caveats

13  and understanding that it's key trends, not all specifics.

14  Q.   Let's take a look at the cover slide again of this and

15  see what we're trying to measure.

16       What you were trying to measure was the sales force

17  effectiveness.

18       Right?

19  A.   Yes.

20  Q.   The effectiveness of your sales force.

21  A.   Yes.

22  Q.   Right?

23  A.   Yes.

24  Q.   Not a nurse practitioner or somebody else in the office.

25       Right?

IACOBELLIS - DIRECT - MARKETOS

1  A.   That is correct.

2  Q.   And you're paying --

3  A.   That's the intent.

4  Q.   I'm sorry.

5       And you're paying for these surveys to be performed.

6       Right?

7  A.   Yes, market research, yes.

8  Q.   You're paying for market research, and you received

9  market research to measure specifically how well your sales

10 force was performing.

11      Correct?

12 A.   Absolutely.

13 Q.   And then we can look at the question that was

14 specifically asked again.  The question that was specifically

15 asked again was about the representative for the brand.

16      Right, sir?

17 A.   But again, my understanding of these -- these surveys

18 have limitations where the physician -- we can't be certain

19 that it wasn't somebody from the medical science liaison

20 department who could speak differently than a rep.

21      I can't -- I can't contextualize that.

22 Q.   Okay.

23      Just to be clear, what -- the company that you paid to

24 perform this service to Janssen that you then sent out to the

25 national sales director who was replacing you --

IACOBELLIS - DIRECT - MARKETOS

1  A.   Yes, yes.

2  Q.   -- framed their question:  "During your most recent visit

3  by a sales representative promoting each of the products

4  listed below, what was the main message of the presentation by

5  that sales representative?"

6       Right, sir?

7  A.   Well, again, we don't know how the physician is defining

8  sales representatives.  I mean, it's just we don't know.  But

9  it's -- it's insightful, right.

10 Q.   It's insightful?

11 A.   Yeah.

12 Q.   If you get this information and you see that one of the

13 main messages that doctors are receiving is an off-label

14 message about your drug, that would give you some insight.

15      Right?

16 A.   Yes.

17 Q.   And it would cause you, no doubt, some concern because

18 you would want to make sure that was not happening?

19 A.   Right.

20 Q.   So you investigate it?

21 A.   So we would reenforce our key messages to the field.

22 Bill was taking over as the national sales director, and I

23 believe the head of market research followed up to try to

24 validate the question and some of the responses, but I can't

25 tell you what that investigation provided.

─────IACOBELLIS - DIRECT - MARKETOS─────

1    Q.   Yeah.

2         So let's take a look at what you actually said to

3    the -- to the person you were handing the baton to.

4         All right, sir?

5    A.   Yeah.

6    Q.   You said to him -- he asked about sales force

7    effectiveness, correct, sales force effectiveness research,

8    and you provided it to him.

9    A.   Right.

10   Q.   Right?

11        What you did not say is, Hey -- is it Bill or William?

12   A.   Bill.

13   Q.   Hey, Bill, look out, we may have an off-label problem.

14        Not something you said?

15   A.   No.

16   Q.   We take a look at -- turn your attention, sir, to the

17   issue about Intelence naive.

18        Okay?  And while we're -- we're shifting subjects, let

19   me pause for a moment.

20        You don't recall, as we sit here today, any sales

21   representative, while you were the national sales director,

22   ever being disciplined or fired for delivering an off-label

23   message to the physician.

24        True?

25   A.   True.  We did have a district manager.  It was reported

IACOBELLIS - DIRECT - MARKETOS

1  anonymously, which is the way the system should work, that

2  spoke to an off-label clinical study.  We investigate and took

3  disciplinary action.

4  Q.   One more time, sir.  Let me make sure I get my question

5  out.

6       There were 100 sales representatives across the country

7  out delivering the message that you had wanted them to

8  deliver.

9       Fair?

10 A.   Yes.

11 Q.   And they may have been delivering messages that,

12 according to you, they should not have been delivering.

13      Fair?

14 A.   I don't know.  I have to trust they are given the

15 approved messaging.

16 Q.   Right.

17      What we can establish is that no sales representative

18 during the years that you were at Janssen in a position of the

19 national sales director -- no sales representative was ever

20 disciplined or fired for delivering an off-label message to a

21 physician?

22 A.   I can't recall that, no, but I can't say for certain.

23 Q.   Well, let's make sure we use precise language.

24      Okay, sir?

25      You don't remember anyone --

IACOBELLIS - DIRECT - MARKETOS

1  A.   No.

2  Q.   -- ever being disciplined or fired, a sales

3  representative, for off-label marketing.

4        True?

5  A.   True.  It would have to be reported to us to investigate,

6  and we would take that seriously.

7  Q.   All right.

8        It would have to be reported to you.  Either the sales

9  rep reports it to you, or, for instance, you get the results

10 of a survey that show an off-label message.

11       Fair?

12 A.   Well, the survey piece, again, has limitations.

13 Q.   Okay.  All right.

14       Now, Intelence -- just to remind us, Intelence was also

15 a drug that was only indicated, only permitted to be

16 prescribed to patients that were highly treatment-experienced.

17       Correct?

18 A.   Correct.

19 Q.   Intelence was not a drug that had been proven safe and

20 effective in treatment-naive patients.

21       Right, sir?

22 A.   Correct.

23 Q.   We saw what the strategy was, though.  The strategy

24 was -- at least the brainstorming session you described for us

25 was to capture patients in that naive segment of the market.

IACOBELLIS - DIRECT - MARKETOS

1    Correct?

2  A.   Are you referring to the Ben Kozub deck?

3  Q.   That's one of them, yes.

4  A.   Because on the bottom of that slide that you shared that

5  information, it did say, subject to legal, regulatory

6  compliance and regulatory review.

7        So if that ever saw the light of day, I don't know.

8  But it did say, Subject to review by our compliance and

9  regulatory people.

10  Q.   It had part of the careful communications language in it.

11        True?

12  A.   It was in there, and I'm sure he took it through the

13  process.  You would have to ask him.

14  Q.   All right, sir.

15        What we have also looked at is other strategy documents

16  where it was necessary to hit forecast to capture patients in

17  the naive range of the market.

18        True?

19  A.   Planning versus promotion.  It was true that there was

20  those discussions.

21  Q.   All right.

22        That's all I'm asking about right now.

23  A.   Yeah.

24  Q.   That there were discussions about targeting an aggressive

25  portion of the market that was not in the label.

IACOBELLIS - DIRECT - MARKETOS

1        True?

2    A.    Not certain with your question that it was considering

3    future indications or future products as well.

4        Remember, we're -- we're acting concurrently.  We're

5    launching three drugs in five years.  We are also getting new

6    indications constantly and new data.

7        So internally there is very -- a number of different

8    discussions on a number of topics, but that didn't translate

9    into what we promoted.

10        What we promoted and trained the sales force on, gave

11    direction, was approved messaging.

12        MR. MARKETOS:  Move to strike, Your Honor.

13        THE COURT:  Let me see you guys on sidebar.

14        (Sidebar begins at 2:02 p.m.)

15        THE COURT:  I presume the move is because it's

16    nonresponsive to the question.

17        Ms. Brown, I got to be honest with you, if he answers

18    your questions and he answers succinctly and clearly, I'm

19    going to hit him in front of the jury, and he knows how to

20    answer questions.

21        And he just doesn't seem to be able to demonstrate it

22    with Relators' counsel, so if you believe that this witness

23    you prepped and you met with is going to answer your questions

24    in this ridiculous manner --

25        MS. BROWN:  Your Honor, just a couple of things from

IACOBELLIS - DIRECT - MARKETOS

1  my perspective because I think he has been very --

2           THE COURT:  I don't.

3           MS. BROWN:  -- consistent in almost all the yes-or-no

4  answers.

5           THE COURT:  I don't believe that at all, but I'm

6  listening.

7           MS. BROWN:  From my perspective, Your Honor, I

8  understand the Court, and counsel disagrees.

9      But there has been maybe like three or four answers

10 that he has tried to contextualize.  I absolutely -- the Court

11 has my representation -- instructed him consistent with

12 Your Honor's discussion yesterday, that he needed to be very

13 careful about listening to the question and just answering the

14 question.

15     And I truly believe he is doing that.  There really

16 have only been a handful of questions, and I think this one is

17 legitimately a contextualization of what the answer was.

18          THE COURT:  All right.  We'll find out when we pass

19 the witness to you.

20          MS. BROWN:  I understand, Your Honor.

21     And I would just say, I mean, the other thing is when

22 Mr. Wilhelm was on the stand yesterday, I mean, the answers

23 were enormously long, and, you know --

24          THE COURT:  I know, and you all didn't police that.

25 I told you all that continue not to police it, and I will.

IACOBELLIS - DIRECT - MARKETOS

1        MS. BROWN:  I understand.

2        THE COURT:  So here we are.

3        MS. BROWN:  I understand that, Your Honor, but he

4   certainly was instructed.  I truly believe he's doing the very

5   best he can, and I think 90 percent of his answers have been

6   yes or no.

7        THE COURT:  This particular question, though,

8   Mr. Marketos, the question is about whether there were

9   discussions about promoting -- I forget which drug you're

10  focusing on right now.

11       MR. MARKETOS:  Intelence.

12       THE COURT:  Whether there were discussions about

13  promoting Intelence off-label.  His response, although

14  long-winded, I think what he's saying -- I'm paraphrasing it

15  now because I don't have it on the screen in front of me, but

16  I can go look -- is that, We had discussions.

17       But he's not willing to concede that they're -- that

18  they were done, you know, in the marketing of it because the

19  labels have changed, and this might have been strategy that

20  was not implemented.

21       So I think you're going to have to be more careful

22  about the question.  So I'm going to -- I'm not going to

23  strike his response, but -- so for now, I'm going to let that

24  response stay.

25       If you want to rephrase the question to get -- to

IACOBELLIS - DIRECT - MARKETOS

1  elicit a different response, that's fine.  But I'm putting

2  everybody on warning that this is why.  You know, we're

3  getting these kind of nonresponsive long-winded responses.

4       So I'm going to keep -- I'm going to keep an eye on it,

5  but I'm going to overrule the objection.

6       Does that make sense?

7         MS. BROWN:  Yes, Your Honor.  Thank you.

8         (Sidebar was concluded at 2:05 p.m.)

9         (Open court.)

10        THE COURT:  All right.  The objection to the response

11  is overruled.

12       But, Mr. Marketos, you can continue with your line of

13  questioning.

14        MR. MARKETOS:  Thank you, Your Honor.

15  BY MR. MARKETOS:

16  Q.  Mr. Iacobellis, as I understand it, you're not aware of

17  sales representatives being instructed or taught how to

18  promote Intelence for naive patients.

19       Is that true?

20  A.  Confident to say we never trained them or directed them,

21  no.

22  Q.  I'm sorry?

23  A.  No.

24  Q.  No, you're not aware of that happening?

25  A.  No, we never did training or direction.

───────IACOBELLIS - DIRECT - MARKETOS───────

1    Q.   All right.

2         You -- well, you believe that Intelence -- you

3    understand that Intelence was never approved by the FDA for

4    naive patients.

5         Right, sir?

6    A.   Correct.

7    Q.   Patients that hadn't developed complications with the HIV

8    virus?

9    A.   Correct.

10   Q.   Not to this day has Intelence ever been approved for that

11   segment of the patient population.

12        Correct?

13   A.   I've been away from it a long time.  I don't believe so.

14   Q.   At least through the time -- through 2022, when you

15   retired, you're aware of the fact that Intelence never

16   received a label expansion.

17        Right?

18   A.   I was in charge of five -- my organization was in charge

19   of five operating --

20        THE COURT:  What about the time you were there?  The

21   time you were there, were you aware of this?

22        THE WITNESS:  Yes, yes.

23        THE COURT:  All right.  Continue.

24        THE WITNESS:  I retired 2022, yeah.

25        THE COURT:  I know.  The time that you were there,

─────IACOBELLIS - DIRECT - MARKETOS─────

1   you're not aware of that?

2          THE WITNESS:  Right.

3   BY MR. MARKETOS:

4   Q.   During the time period that you were at Janssen and the

5   time period that you were in this specific division, you also

6   know that Intelence was never approved for QD dosing.

7          Correct?

8   A.   Correct.

9   Q.   All right.

10         Sir, I'd like to turn your attention to a topic that's

11  been discussed with previous witnesses.  I want to ask about

12  medical information requests.

13         Okay?

14  A.   Yes.

15  Q.   Now, we looked at training and instruction that you

16  received from Janssen back in 2006 and continuing education as

17  to what it means to solicit an unsolicited response from a

18  doctor.

19         Correct?

20  A.   Correct.

21  Q.   All right.

22         And it's fair to say, sir, that your sales

23  representatives, you knew, were not permitted to ask a doctor

24  if he or she would like off-label information.

25         Right?

1  A.   Totally forbidden, yes.

2  Q.   Yeah, it's completely forbidden.  That's not something

3  that the FDA permits.  That's not something that the company,

4  according to you, permitted.

5  A.   Correct.

6  Q.   And the reason for that is because, again, if a doctor

7  wants off-label information, he or she is permitted to ask for

8  it, and there are very strict regulations and rules to follow

9  in order to get that doctor that information.

10       Right?

11  A.   Yes.  Yes.

12  Q.   But you don't want your sales force to actually

13  incentivize those questions from the doctor because that's

14  just a backdoor way to promote off-label.

15       Right?

16  A.   Correct.

17  Q.   All right.

18       So if we take a look at Relators' Exhibit 73.  If you

19  do not want at the organization sales representatives to use

20  medical information requests, MIRs, to promote off-label, you

21  would not want sales representatives to be judged on their

22  performance based on the number of medical information

23  requests that are being issued.

24       Do you agree?

25  A.   Agree.

IACOBELLIS - DIRECT - MARKETOS

1    Q.   And let's explain why.  Again, if a medical information

2    request comes from a doctor, it must be in response to a

3    question that is not prompted or encouraged or solicited by

4    Janssen.

5         Correct?

6    A.   Absolutely.

7    Q.   And what we would not want to do -- what Janssen would

8    not want to do would be to say, Sales representatives, we're

9    gauging you on your sales activity and the number of MIRs that

10   you're generating.

11        Right?

12   A.   Correct.

13   Q.   Okay.

14        Because if MIRs are supposed to be spontaneous, the

15   sales representatives themselves are not supposed to have any

16   involvement in the number that they get.

17        Right, sir?

18   A.   Correct.

19   Q.   And it would be a big red flag to the organization if one

20   district, for instance, had a much higher level of spontaneous

21   requests than another district.

22        Right?

23   A.   Correct.

24   Q.   That would be something that would trigger a red flag for

25   you.  You would say, Why is this district all of a sudden

1    having a really high number of unsolicited requests for

2    off-label information?

3        Right, sir?

4    A.    That's correct.

5    Q.    And here, Mr. Murphy, in 2007, is discussing the use of

6    resources.  You've looked at this email in preparation for

7    your testimony.

8        Correct?

9    A.    Just recently, yes.

10   Q.    Yes, just recently.

11       And what you see -- in order to prepare for your

12   testimony today.

13       Right?

14   A.    Yes.

15   Q.    Okay.

16       And what you see here is a comparison that Mr. Murphy

17   is performing, and he was over the New York team.

18       Right?

19   A.    One of the New York teams, yes.

20   Q.    One of the New York teams.

21       And what he notes is that Florida had a very high

22   number of MIR requests.

23       Right?

24   A.    Yes.

25   Q.    Florida was also leading the nation in your sales force

─── IACOBELLIS - DIRECT - MARKETOS ───

1   in sales.

2       Correct?

3   A.   This was -- I was in learning and development.  They have

4   had a history of success, but...

5   Q.   Let me make sure.  Florida was the leader.

6       Right?

7   A.   I can't say they were number 1 or 2 or 3.  They were one

8   of the leaders, if I recall.

9   Q.   And what Janssen actually realized was Well, Florida is

10  one of the leaders, if not the leader, in sales across the

11  country, and it turns out they have a much higher number of

12  medical information requests.

13      True?

14  A.   True.

15  Q.   What Mr. Murphy is saying, he -- did he report to you at

16  the time or no?

17  A.   No, he didn't.

18  Q.   All right.

19      What he was saying here was Let's get our act together,

20  New York.  You need to have your people pick up the pace on

21  medical information requests.

22      Did I accurately characterize what he was saying?

23  A.   What's interesting about this --

24  Q.   I'm sorry, sir.

25          THE COURT:  Yeah.  I'm going to -- you heard a

IACOBELLIS - DIRECT - MARKETOS

1    question, right?

2            THE WITNESS:  Okay.  Can you rephrase the question.

3            THE COURT:  He didn't ask you what you thought was

4    interesting about the email.  He asked you a specific

5    question.  You are directed to answer it, and that's how the

6    process works.  I don't want to keep telling you that.

7            THE WITNESS:  I'm sorry.  I'm sorry.  I'm sorry.

8        Can you restate the question, please?

9    BY MR. MARKETOS:

10   Q.  Yes, sir.  I don't want to read the whole email, but I

11   can.  I'll make it easier.

12       What Mr. Murphy says is:  "For the month of January,

13   we, New York, had 49 medical information requests logged in to

14   Florida's 50.  But in February, we had 60 requests to

15   Florida's 154.  We're a district of nine reps versus seven,

16   and they're outperforming us."

17       Do you see that?

18   A.  Yes, I do.

19   Q.  Then he says, "If you break the numbers down," et cetera.

20   And then he says, "Prezista is a great drug, and we owe it to

21   patients and yourselves to get the message out about it."

22       Right, sir?

23   A.  Yes.

24   Q.  Now, let me be clear about this one thing.

25       Prezista may be a great drug, but not if the message

IACOBELLIS - DIRECT - MARKETOS

1  you're getting out about it is off-label information.

2      Agreed?

3  A.  Agreed.

4  Q.  You don't want to have a drug that might be good for what

5  it's approved for being pushed for things that it's not

6  approved for.

7      Right, sir?

8  A.  Agreed.

9  Q.  And then he says, "I don't want to end the week on a

10  negative note but feel that if we are going to be viewed as

11  the best sales district in the country, we better start to

12  pick up the pace and control these situations."

13      Do you see that?

14  A.  Yes.

15  Q.  If you had known that the sales force was measuring or

16  comparing performance based on the number of what were

17  supposed to be spontaneous MIR requests, that would have

18  concerned you, I take it?

19  A.  Absolutely.

20  Q.  All right.

21      While you were at Janssen, you don't recall any

22  district manager, regional manager or sales representative

23  being disciplined for prompting, or encouraging medical

24  information requests.

25      True?

IACOBELLIS - DIRECT - MARKETOS

1    A.   No.

2    Q.   Oh, you're saying it's not true?

3    A.   I mean, true.

4    Q.   Thank you.

5         It's true that did not happen?

6    A.   I'm sorry.  Yeah.

7    Q.   All right.

8         If we take a look at Relators' Exhibit 236.

9         MR. MARKETOS:  And this is just for the witness,

10   please.

11   BY MR. MARKETOS:

12   Q.   And I'd like you to identify the fact, sir, that you are

13   on this email.

14   A.   A lot of names.

15   Q.   Yes.  We'll highlight it for you.

16   A.   Thank you.

17   Q.   Can you highlight --

18   A.   If you say it is, I'm sure it is.

19   Q.   Well, let's just go ahead and make sure, sir.  Take the

20   time to read it, also, sir.

21        You notice the subject is U.S. Viral Franchise

22   Scilnsights Voice of Customer.

23        Do you see that?

24   A.   Yes, I do.

25   Q.   And now you see your name highlighted on this email.

─IACOBELLIS - DIRECT - MARKETOS─

1          Correct?

2    A.    That's correct.

3          MR. MARKETOS:  We offer Relators' 236, Your Honor.

4          MS. BROWN:  No objection, Your Honor.

5          THE COURT:  So admitted.

6    (Relators' Exhibit 236 in evidence.)

7          MR. MARKETOS:  This is top Prezista MIR requests on

8    lipid versus Reyataz, if we can take a look at the next page,

9    please.  Thank you.

10   BY MR. MARKETOS:

11   Q.    Before I turn to this, sir, it's true that Prezista and

12   Reyataz could not be compared head-to-head.

13         Right?

14   A.    Correct.

15   Q.    They had never been studied head-to-head.

16         Right?

17   A.    Correct.

18   Q.    All right.

19         Let's take a look at the top unsolicited MIR topics

20   that were being requested through these medical information

21   requests that we were just discussing.  Okay?

22         The top request for unsolicited MIR topics was

23   comparative use versus Reyataz and the Reyataz lipid profile.

24         Right, sir?

25   A.    That's what it says.

IACOBELLIS - DIRECT - MARKETOS

1  Q.  This is, to be clear, the Reyataz lipid profile that

2  Janssen wanted to eliminate with respect to its competitive

3  disadvantage.

4      Right?

5  A.  True.

6  Q.  In fairness, sir, it appears that physicians, with

7  respect to their supposedly unsolicited requests, were asking

8  about that topic number one.

9      Right?

10 A.  True.

11 Q.  If we take a look at Intelence -- and before we go there,

12 we'll take a look at what the top unsolicited requests were

13 for information about Intelence, but QD dosing would not be a

14 good one, would it?

15 A.  No.

16 Q.  Let's take a look --

17 A.  Again, sir, I had left my role in May, and this was Q4 of

18 '11.

19 Q.  Okay.  Understood, sir.

20     This is actually an assimilation of information over

21 the course of some time.

22     Do you agree?

23 A.  I haven't seen this.

24 Q.  All right.

25     Well, you were on it.

IACOBELLIS - DIRECT - MARKETOS

1  A.   Yeah.  I mean, but they could have left my name on it,

2  but I had left the position.

3  Q.   Okay.  Well, let's just take a look at what it says.

4       "Top unsolicited MIR topics.  Dosing frequency, once

5  daily," by far the number one request from doctors in these

6  MIR topics.

7       Right, sir?

8  A.   That's what it says, yes.

9  Q.   And that, of course, would be off-label.  Agreed?

10 A.   Yes.

11 Q.   Now, as I understand it, you have no knowledge of the

12 number of MIR request forms that sales representatives were

13 filling out.  You had no knowledge of that ever being used as

14 a metric for their performance.

15      Is that true?

16 A.   Never happened.

17 Q.   It never happened.

18 A.   Never -- I didn't even get the reports.  Health care

19 compliance would come to me on a periodic basic if they had

20 questions.  They would show me the information at that time,

21 and they would share with me that they may be investigating if

22 something was out of whack regarding MIRs.

23 Q.   Okay.

24      And you're saying it never happened.

25 A.   No.

IACOBELLIS - DIRECT - MARKETOS

1  Q.  Okay, sir.

2  A.  I didn't say never -- when you say it never happens, what

3  never happens?

4      We didn't get reports.  Sales did not get reports of

5  MRIs by district at all.  But health care compliance would

6  come to me, as the national sales director, and then show me

7  data if they had any concerns that they were going to follow

8  up to do an investigation.

9      That's the extent of it.  I never had privy to that

10  information.

11  Q.  Okay, sir.

12      And you had no knowledge one way or the other as to

13  whether your sales force was being measured based on the

14  number of MIR forms they generated.

15      Right?

16  A.  We did not measure that, true.  We did not measure it.

17  Q.  Okay.

18      Let's take a look at -- now, you did receive PATH,

19  P-A-T-H, like PATH reports.

20      Right, sir?

21  A.  Yes.  Yes.

22  Q.  Those were circulated to you.  They went from your sales

23  reps to the district manager to the regional managers to you.

24      Correct?

25  A.  Yes.  Insights from the field.

IACOBELLIS - DIRECT - MARKETOS

1    Q.  All right.

2          MR. MARKETOS:  And let's take a look at RX-88.

3    BY MR. MARKETOS:

4    Q.  Do you recognize a PATH report -- do you recognize PATH

5    reports like this one being circulated to you?

6    A.  Yes, sir.

7    Q.  All right.

8          MR. MARKETOS:  We offer Relators' Exhibit 88.

9          MS. BROWN:  It's just unclear to me how this one got

10   to him.  So object on foundation, Your Honor.

11         THE COURT:  I'll sustain it for now.  You want to ask

12   a few more questions for foundational purposes?

13         MR. MARKETOS:  Sure.

14       Let's take a look at DX -- excuse me.  RX-1700.  This

15   is in evidence.

16       Oh, no, it's not.  Excuse me.

17   BY MR. MARKETOS:

18   Q.  Let me back up for a second, sir.

19       You've testified about receiving PATH reports in your

20   role while you were at Janssen.

21       Correct?

22   A.  Yes.

23   Q.  Those PATH reports would be generated and then circulated

24   up the chain to you.

25       Correct?

IACOBELLIS - DIRECT - MARKETOS

1    A.   Yes.  It started with the NSD prior to me, and I

2    continued it sir.

3    Q.   I'm sorry.  It started -- that process started with the

4    national sales director before you, and you continued that

5    process.

6    A.   Yes.  To get insights in the field from the field.

7    Q.   All right.

8         So if you see a PATH report that has been generated by

9    somebody else in the field, that PATH report would have been

10   circulated to you.

11        Fair?

12   A.   Yes.

13        MR. MARKETOS:  Your Honor, we offer

14   Relators' Exhibit 88.

15        MS. BROWN:  Your Honor, I still have the same

16   objection because of the date on the 88.

17        THE COURT:  I don't have that document in front of

18   me.

19        MR. MARKETOS:  We'll pull up Relators' Exhibit 88.

20   BY MR. MARKETOS:

21   Q.   In September of 2006, you were at Janssen.

22        Right, sir?

23   A.   Yes, sir.

24   Q.   You were receiving the PATH reports.

25        Right?

IACOBELLIS - DIRECT - MARKETOS

1    A.   Yes.

2            MR. MARKETOS:  Thank you.  We offer Relators' 88.

3            MS. BROWN:  No objection.

4            THE COURT:  All right.  So admitted.

5            (Relators' Exhibit 88 in evidence.)

6    BY MR. MARKETOS:

7    Q.   All right.

8            We'll take a look here, sir.  This is from Tony Dolisi,

9    September 14, 2006.

10           Do you see that?

11   A.   Yes, sir.

12   Q.   And -- Mr. Tony Dolisi.  This one comes from Mickey

13   Allison, a weekly district PATH report.

14           Right, sir?

15   A.   Yes.

16   Q.   And if we take a look in the middle of the page,

17   Mr. Dolisi -- you worked with him for quite a while.

18           Right?

19   A.   After I became the NSD.

20   Q.   For a number of years?

21   A.   Yes.

22   Q.   And he reported to you at one point.

23   A.   Yes.

24   Q.   All right.

25           And if we take a look at what he says under T, this is

IACOBELLIS - DIRECT - MARKETOS

1    a tactic.  "Tactics implemented from the business plan."  So

2    let me stop here for a second and take look at what he's

3    saying.

4         T -- T in the PATH report is for tactics.

5         Right, sir?

6    A.   Correct.

7    Q.   The tactics implemented from business plan, he's

8    reporting this, and they are ultimately reported up the chain

9    to his superiors.

10        Correct?

11   A.   Correct.

12   Q.   And he says, "MIR forms are being widely used to get the

13   48-week data into the hands of all customers."

14        Do you see that?

15   A.   Yes.

16   Q.   All right.

17        So what he's saying is the medical information request

18   forms that are supposed to be unsolicited -- right, sir --

19   they're supposed to be unsolicited --

20   A.   Yes.

21   Q.   -- they're actually being widely used to get 48-week data

22   into the hands of all doctors.

23        Right?

24   A.   I can't speak to what his intent was here.

25   Q.   Okay.

IACOBELLIS - DIRECT - MARKETOS

1          So I'm not going to ask you to do that, because what

2     happens in your business is the people who report to you, they

3     report to you.

4          Right?

5     A.   However, he did not report to me.  I was in the learning

6     and development function based on this date.  And when I

7     looked at these reports, it was to get insights about what

8     additional training was needed by the field.

9          So Tony did not report to me at this point in time.

10    Q.   Okay.

11         You looked at these reports at the time for something

12    different.

13    A.   It's triage.  It goes to marketing.  It goes to clinical,

14    training.  I would look and try to harvest training needs out

15    of these reports.

16    Q.   Mr. Iacobellis, a few moments ago you told us that this

17    type of practice that we're looking at here that's being

18    recorded by Mr. Dolisi was not being done.

19         Do you recall that?

20    A.   I think to clarify, I said that it started with

21    Deb O'Connor, who was the NSD who Tony reported to based on

22    this date.  Once I became the NSD, I continued this to get

23    field insights.

24         But what you're showing me right now is not -- Tony did

25    not report to me, and I was in the front harvesting learning

1   and development insights.

2   Q.  Is today now, right this moment the first time you're

3   seeing this type of activity taking place?

4   A.  You know, I don't recall it, because I didn't look at it

5   specifically.  So I don't recall it.

6       I received these, but I looked at it with a very

7   different lens, and that was from a learning and development

8   lens, not MIR or marketing or any of that.

9   Q.  Is right now, today, Mr. Iacobellis, the first time that

10  you are seeing somebody in Mr. Tony Dolisi's position stating

11  that MIR forms are being used for this purpose?

12  A.  I believe so.

13  Q.  And what you can see is that he's saying they are being

14  used to get into the hands of all doctors.

15      Right?

16  A.  That's what he appears to say.  I can't, again --

17  Q.  Is that -- well, it appears to say that, in fairness,

18  sir, in plain English.

19      Do you agree?

20  A.  It does.

21  Q.  All right.

22      And if that type of conduct was taking place, that

23  would be wrong.

24      Do you agree with that?

25  A.  Agree.

IACOBELLIS - DIRECT - MARKETOS

1    Q.  If we take a look at RX-328, this is another PATH report.

2    Take a look at that one, sir.  This is from October 2006.

3        Was that when you were still in the training segment?

4    A.  Yes, it was.

5    Q.  Would you have reviewed this document for the -- for

6    training purposes?

7    A.  I don't remember if things were rolled up at a national

8    level before I received the -- but I know these PATH reports

9    existed.  I can't recall seeing this one.

10   Q.  All right.  Let me ask you this question, then, sir.

11       Do you recall it being discussed that Prezista was

12   being marketed as a lipid-friendly drug?

13   A.  We had internal discussions on that.

14   Q.  I'm sorry --

15   A.  We had internal discussions on that.

16   Q.  -- not quite my question.  A little different.

17   A.  Okay.

18   Q.  Do you recall it being reported within the organization

19   that actually, out in the field, Janssen was promoting

20   Prezista as a lipid-friendly drug?

21   A.  I don't recall that.  I'm sorry.

22   Q.  All right.

23       So safe to say you don't recall having received this

24   particular PATH report.

25       Is that right?

─────IACOBELLIS - DIRECT - MARKETOS─────

1    A.    That's safe to say.

2    Q.    All right.

3          MR. MARKETOS:  If we could pull up 272, please.

4    Relators' 272.  This is admitted.

5          You can show it to the witness and to the members of

6    the jury, Ms. Johnson.

7    BY MR. MARKETOS:

8    Q.    Mr. Thomas Turner, he actually was a sales rep.  Was he a

9    manager as well?

10    A.    He was a district sales manager at the time, I believe.

11    Q.    All right.  A district sales manager.

12          And he, in September of 2010 -- this is when you were

13    the national sales director.

14    A.    Correct.

15    Q.    Correct?

16    A.    Correct.

17    Q.    All right.

18          And you're actually on this email at the top.

19          Right, sir?

20    A.    Yes.

21    Q.    Let's go down to the bottom of what this email starts

22    with Mr. Turner, and he's reporting his activities up the

23    chain to you.

24    A.    Okay.

25    Q.    Correct?

IACOBELLIS - DIRECT - MARKETOS

1  A.   Correct.

2  Q.   All right.

3       And what he says is what he's doing.

4        MR. MARKETOS:  Let's take a look at the next page,

5  please, Ms. Johnson.  There we go.

6       He's got the low rankings.

7       And I really want to take a look at the middle of the

8  page, Ms. Johnson, about "Prezista Lipids," if you could blow

9  that up for us.

10 BY MR. MARKETOS:

11 Q.   Mr. Turner was reporting up the chain, and he said, "We

12 have a very strong lipid profile, but our providers are not

13 giving us our due credit."

14      Do you see that?

15 A.   Yes.

16 Q.   "Are they acknowledging the lipid data in ARTEMIS in

17 relation to the NCEP cutoffs?  Prezista does not have a strong

18 lipid profile only against Kaletra, it has a strong lipid

19 profile, period."

20      Right, sir?

21 A.   Yes.  I saw that.

22 Q.   And first of all, that's not true, right?  Prezista

23 didn't have a strong lipid profile.

24 A.   It's interpretation, but I'd probably -- that'd be

25 exaggerated.

———IACOBELLIS - DIRECT - MARKETOS———

1  Q.   Yeah.   It would be an exaggeration to say that something

2  that has an adverse reaction that raises lipids has a strong

3  lipid profile.

4        True?

5  A.   Agree.

6  Q.   All right.

7        And if that message was being delivered, that would be

8  misleading.

9        Do you agree?

10 A.   Yes.

11 Q.   If we take a look up the page, your response at the time,

12 back in 2010, was, "Thank you, Tom.   I appreciated our

13 discussion yesterday, and we are committed to your success.   I

14 appreciate the adjustments, actions, communication and

15 direction to improve performance."

16       Right, sir?

17 A.   Yes, I said that.

18 Q.   You don't recall reporting Mr. Turner himself for

19 promoting Prezista in an off-label or misleading fashion.

20       Is that fair?

21 A.   That's fair.

22 Q.   Take a look at -- all right.

23       Mr. Iacobellis, I'm trying to get through the end of

24 your testimony, sir, and I'm going to try to move quickly.

25       Okay?

IACOBELLIS - DIRECT - MARKETOS

1   A.   Okay.

2   Q.   It turns out that the speaker programs, those that were

3   implemented by your sales force, they were enormously

4   successful.

5        Correct?

6   A.   I never saw ROI, but I know when peer to peer is

7   important.

8   Q.   Well, let's take a step back, then.

9        You said, "I never saw ROI."  Let's talk about that.

10       ROI, what you're saying is, "I never saw return on

11  investment."

12       Correct?

13  A.   Correct.

14  Q.   And you're aware of the fact that Janssen tracked its

15  return on investment from the speaker program.

16       Right, sir?

17  A.   I'm assuming marketing did because they were the program

18  owners.

19  Q.   So marketing tracked ROI and they never told you anything

20  about it?

21  A.   I saw prescription data for the attendees.

22  Q.   All right.

23  A.   And so that was what we were interested in, was the

24  growth -- the attendee prescriptions and how it related to

25  goal attainment.

IACOBELLIS - DIRECT - MARKETOS

1  Q.  Just a simple question.  I'm trying to move through this

2  quickly, sir.

3  A.  Yeah.  I mean, there's a distinction there.

4  Q.  All right.

5      Just to be clear, I'm asking now about whether or not

6  it was communicated to you what Janssen's return was in terms

7  of dollars on the investment that it made in this speaker

8  program.

9      That was not made known to you.

10     Is that right?

11  A.  That's true, and I have no recollection of that.

12  Q.  Okay, sir.

13     You know that Janssen tracked it, though.

14     Right?

15  A.  Yes.

16  Q.  And what they tracked specifically was how much money

17  Janssen made compared to how much money it spent on the

18  program.

19     Right?

20  A.  I've never seen that.

21  Q.  Okay.

22     As we sit here today, you don't know what that return

23  on investment was.

24  A.  Absolutely not.

25  Q.  All right.

─IACOBELLIS - DIRECT - MARKETOS─

1      Very quickly, sir, it's true -- and you know this as a

2  member of the sales side, as a national sales director -- that

3  certain speakers, if they weren't up to snuff, so to speak, if

4  they stopped prescribing, they would get kicked off the

5  program.

6      Right?

7  A.   I have no recollection of that happening.

8  Q.   Okay.

9      You are aware of the fact that your sales reps

10 themselves were responsible for at least suggesting which

11 doctors should be on the program.

12     Right?

13 A.   Again, they made the recommendations, and it went to

14 marketing.

15 Q.   Thank you.

16     So the answer to my question was yes.

17 A.   Yes.

18 Q.   Okay.

19     And so those sales reps would also track, you're aware,

20 the performance of their speakers and their prescriptions

21 after they got on the program.

22     Right?

23 A.   We did not do that.  I saw no prescription activity in

24 relation to speakers and speaking events.  If they're on the

25 speakers' bureau but they were called on by our

IACOBELLIS - DIRECT - MARKETOS

1    representatives in their targeted universe, meaning they had a

2    practice and our reps went there physically, we did track

3    those prescriptions.

4        But not in relation- -- I never saw anything in

5    relation to the speaker programs or their speaking

6    specifically.

7    Q.   Okay.  I'll ask you a different question, then.

8        If that happened, that's something you didn't know

9    about.

10        Is that fair?

11   A.   I -- no.  Yes.  I never heard that.

12   Q.   Okay.

13        But we did hear about specific speakers, how they were

14   selected, according to Janssen, was based upon their

15   accolades, their experience, their schools that they attended,

16   schools that they taught at.

17        Is it fair to say that that was part of the criteria

18   for selecting speakers?

19   A.   They had to be credible.

20   Q.   Okay.

21        And, in fact, sometimes Janssen would put speakers on

22   its speakers' bureau and couldn't get an audience for those

23   speakers because they weren't credible speakers.

24        Do you remember that happening?

25   A.   I do not recollect.

─────────── IACOBELLIS - DIRECT - MARKETOS ───────────

1    Q.   And sometimes Janssen would put speakers on a

2    speaker bureau because they were high-potential prescribers.

3         Do you recall that?

4    A.   I can't specifically say that.  We tried to follow the

5    criteria involved that was communicated to us.

6    Q.   All right, sir.

7         And, in fact, sometimes it would be a difficult

8    conversation to have with the doctor to say, Sir, you've been

9    on this speaker program and we've paid you money on the

10   speaker program but you're not prescribing enough.  We're

11   going to remove you from the program.

12        Were you ever involved in those discussions?

13   A.   Absolutely not.

14        MR. MARKETOS:  Let's take a look at Exhibit 199,

15   which is in evidence.  Relators' 199.

16   BY MR. MARKETOS:

17   Q.   I'll represent to you, sir, this has been discussed

18   previously, but I'm going to focus on one specific portion of

19   the email and then I'm going to ask you about it.

20        It says in the middle, "Hi, Mark, and Cheryl."

21        That's from Ms. Susan Newmeyer.  You knew Susan.

22        Right?

23   A.   Yes.  She was the district manager.

24   Q.   All right.

25        So this is a district manager, and she's asking

IACOBELLIS - DIRECT - MARKETOS

1   Mr. Mark Wilhelm, who reported to you.

2       Correct?

3   A.   Not at this time.

4   Q.   Okay.  All right.  Mr. Wilhelm ultimately reported to

5   you.

6   A.   Yeah.

7   Q.   She said, "Wanted to know if you've had this situation.

8   Has anyone had to explain to a customer that he/she was not

9   invited on to a speakers' bureau because he/she didn't

10  prescribe enough drugs?"

11      Do you see that?

12  A.   Yes, I do.

13  Q.   All right.

14      "Any suggestions on a tactful way to handle this?"

15      She's asking for advice.

16      Right?

17  A.   It appears that way.

18  Q.   And then there's a response from Ms. Cheryl Gay.  She

19  says, "I would recommend that we stay away from the discussion

20  around prescribing levels."

21      Do you see that?

22  A.   Yes.

23  Q.   All right.

24      If it's true that doctors were being removed from the

25  speaker bureau because they weren't writing enough

IACOBELLIS - DIRECT - MARKETOS

1    prescriptions for the drug, that would be a bad thing to say

2    to the doctor.

3         Do you agree?

4    A.   I do, but I have no recollection of this.  That was in my

5    previous role.

6    Q.   I'm just asking you about the concept, sir.

7    A.   Okay.

8    Q.   You told us it didn't happen, I thought.

9    A.   Yeah.  That -- not that I am aware of.

10   Q.   Not that you knew about.

11   A.   Right.

12   Q.   Okay.  All right.

13        Now, if we take a look at Relators' 283, and this is

14   the last on this topic I'm going to have for you, sir.

15        We heard something about a Dr. Torres.  I'll represent

16   to you, sir, that Mr. Torres was one of the doctors that was

17   on the speaker program for a while.

18        Do you recall Dr. Richard Torres?

19   A.   I do not.

20   Q.   Well, let's see.  I'll remind you.  You're on this email,

21   and there's an email from Ms. Kristin Wong to you -- to

22   Mr. Patel and copied to you and Mr. Kozub in marketing.

23        Do you see that?

24   A.   Yes, I do.

25   Q.   All right.

1          MR. MARKETOS:  We'll offer Relators' Exhibit 283,

2    Your Honor.

3          MS. BROWN:  No objection, Your Honor.

4          THE COURT:  So admitted.

5          (Relators' Exhibit 283 in evidence.)

6    BY MR. MARKETOS:

7    Q.   Now, this is 2010, when you're the national sales

8    director.

9          Right, sir?

10   A.   Yes.

11   Q.   You're on the sales side of things.  Mr. Kozub is on the

12   marketing side of things.

13   A.   Yes, sir.

14   Q.   All right.

15        Now, Mr. -- or Dr. Torres had been selected to speak on

16   this program.  He had been paid to be a speaker on this

17   program.  You understand that.

18        Right?

19   A.   Yes, I assume so.

20   Q.   And tell me if this is true or not.  Your

21   representatives, including Sara Strand, were having a hard

22   time getting people to show up for Dr. Torres' speaking

23   engagements because he was not respected in the field.

24        Do you recall that?

25   A.   I do not.

IACOBELLIS - DIRECT - MARKETOS

1    Q.   All right.

2         And then we heard -- do you know that Dr. Torres taught

3    at Yale Medicine?

4    A.   I don't have a recollection of that.

5    Q.   You don't have a recollection one way or the other?

6    A.   It's been a long time.  Sorry.

7    Q.   But what happened -- I understand.

8         What happened, sir, and you know this because you were

9    copied on this email --

10   A.   Yes.

11   Q.   -- was Dr. Torres showed up to a program that he was

12   supposed to talk about Prezista, and he talked about anything

13   but Prezista.

14        Right, sir?

15        I'll save you the memory test.  Let's take a look at

16   what happened.  This was what was reported to you.

17        MR. MARKETOS:  Right down below, Ms. Johnson.

18   BY MR. MARKETOS:

19   Q.   There was an anonymous nurse practitioner.  She called in

20   to report a possible compliance issue at a program in

21   Connecticut.  This is what the doctor who we heard was a Yale

22   guy.

23        All right?

24        He says:  "Location:  Marriott" -- "Marriott, Hartford,

25   Connecticut.  Report saw an advertisement for the program on

IACOBELLIS - DIRECT - MARKETOS

1  the CT aids training center website and thought it would be a

2  meeting detailing Prezista.  She stated that the advertisement

3  stated that Dr. Richard Torres would be speaking about

4  Prezista."

5        Do you see that?

6  A.  Yes, I do.

7  Q.  "The content of the presentation did not discuss Prezista

8  at all.  Dr. Torres discussed his clinic, his patients and

9  information regarding drug substance abuse."

10       Do you see that?

11 A.  Yes.

12 Q.  "At the end he disclosed he received an honoraria from

13 Tibotec."

14       That's the doctor telling everybody at the end, I just

15 got a check from Janssen.

16       Right?

17 A.  Yes.

18 Q.  And then he thanked his local rep for allowing him to use

19 his only slides during the presentation.

20       Do you see that?

21 A.  I do.

22 Q.  All right.

23       It really doesn't matter whether this particular

24 doctor, Dr. Richard Torres, taught a class at Yale or went

25 through some other function.  It turns out he was not doing

IACOBELLIS - DIRECT - MARKETOS

1   what he was supposed to do.

2         Is that fair?

3   A.   That's fair, and it's problematic.

4   Q.   And it's problematic, and if this doctor were doing these

5   things, Janssen would not want to be paying him.

6         Right?

7   A.   Correct.

8   Q.   Except that this doctor wrote a lot of prescriptions for

9   Prezista after he got on the speaker bureau.

10        True?

11  A.   Again, I don't recall specifics.

12        MR. MARKETOS:  Thank you for your time,

13  Mr. Iacobellis.  I'll pass the witness.

14        THE COURT:  All right, thank you Mr. Marketos.

15        Ms. Brown.

16        MS. BROWN:  May I proceed, Your Honor?

17        THE COURT:  Yes, you may.

18  (CROSS-EXAMINATION BY MS. BROWN:)

19  Q.   Mr. Iacobellis, good afternoon.

20  A.   Hello.

21        MS. BROWN:  Good afternoon, jurors.

22  BY MS. BROWN:

23  Q.   Let's pick right up where we left off, and let's go

24  quickly so we can get you home today.

25        Okay?

IACOBELLIS - CROSS - BROWN

1    All right.

2    Dr. Torres, he showed up at a speaker event, and you

3  just looked at a document that he didn't stick to the approved

4  slide deck.

5    Right?

6  A.  Yes.  That's what it said.

7  Q.  And what's your view on what Janssen should do in a

8  situation like that?

9  A.  From a compliance standpoint, remove him from the

10  program.

11  Q.  Okay.

12    And when you weren't shown but what happened -- I want

13  to take a look at --

14    MS. BROWN:  Your Honor, this is actually Plaintiffs'

15  Exhibit 283.  Permission to admit.

16    MR. MARKETOS:  No objection, Your Honor.

17    THE COURT:  All right.  So admitted.

18  BY MS. BROWN:

19  Q.  And here you were just shown a moment ago a complaint

20  that Janssen received from a nurse practitioner who had been

21  at the speaker event.

22    Do you recall that?

23  A.  Yes.

24  Q.  Incidentally, Mr. Iacobellis, at these speaker events,

25  are there other doctors and nurses and medical professional in

─────IACOBELLIS - CROSS - BROWN─────

1    the audience?

2    A.    Yes.

3    Q.    And do you understand that those doctors and

4    professionals have a responsibility to report if something is

5    going wrong?

6    A.    Yes, absolutely.

7    Q.    And during your entire time period at Janssen, did you

8    become aware that any doctor or any nurse in one of our

9    speaker programs reported speakers speaking off-label in the

10   way that's been alleged in this case?

11   A.    I don't believe that ever happened.

12   Q.    But counsel showed you an email where a nurse

13   practitioner did report something going awry at a Janssen

14   speaker event.

15        Correct?

16   A.    Correct.

17   Q.    That nurse practitioner carried out her responsibility to

18   speak up if something was going wrong.

19        Right?

20   A.    Yes, that's how the system should work.

21   Q.    And, in your view, as the head of sales for a long time

22   period at Janssen, if Janssen got a complaint like the one

23   that was just shown to you, what should Janssen do?

24   A.    Do exactly what's in this email, remove them from the

25   program.

1  Q.   And we're looking at what we just admitted as

2  Plaintiffs' 283.

3       And do you see this to be a follow-up to the situation

4  that counsel just ended his questioning of you on?

5  A.   Yes.

6  Q.   And what action, according to this document, was taken

7  when a nurse practitioner raised his or her hand and indicated

8  that something had gone awry?

9  A.   That they were no longer to participate as a speaker.

10 Q.   Did you -- based on your experience at Janssen, did you

11 understand there to be oversight of the speaker program?

12 A.   Yes.

13 Q.   Describe that for us, please.

14 A.   So, again, marketing, as the owner of the program, would

15 review -- they would be in charge of the promotional slide

16 decks, backup slides and had to get it through regulatory and

17 legal and then also set the criteria and, from the criteria,

18 receive recommendations from the field.

19      Then they go through our compliance process, the

20 speakers' bureau committee, which sales was not part of, and

21 -- and through HCC, I believe, and medical affairs for

22 clinical accuracy.

23 Q.   Okay.

24      You were shown early on, Mr. Iacobellis, a compliance

25 training deck.

IACOBELLIS - CROSS - BROWN

1          Do you remember that?

2   A.   Yes.

3   Q.   And it was pretty big.

4          Do you remember that?

5   A.   Yes.  Yes, it was.

6   Q.   And let's just put it up.  It was health care compliance,

7   March 8th, 2006.

8          Do you remember that?

9   A.   Yes.

10  Q.   During your time period at Janssen, did you participate

11  in a number of compliance training sessions like the one

12  outlined in this PowerPoint?

13  A.   Yeah.  We had health care compliance training pretty

14  extensive on a yearly basis.

15  Q.   Okay.

16          And one of the things counsel asked you questions about

17  was something called careful communication.

18          Do you remember that?

19  A.   Yes.

20  Q.   Okay.

21          Did you understand careful communication to be a

22  direction to cover your tracks for illegal activity that you

23  were conducting at the company?

24  A.   No.

25  Q.   One of the things counsel pointed out to you in the

IACOBELLIS - CROSS - BROWN

1  careful communication section was a section that emails might

2  be taken out of context.

3      Did you see that, sir?

4  A.  Yes.

5  Q.  Okay.

6      And then throughout the questioning here today, in

7  fact, you were shown a bunch of emails from other people.

8      Correct?

9  A.  Yes.

10  Q.  Did you have the context for all of those emails?

11  A.  No, which is problematic.

12  Q.  Okay.

13      I want to talk to you about some of them and what you

14  know and what you don't know, but before we do that, I want to

15  talk to you about the allegations in this case.

16      Okay, sir?

17      Do you understand generally that you personally are

18  being accused of being part of something wrong at Janssen?

19  A.  Yes, and, quite frankly, it's a personal insult.  I take

20  great -- I take great pride in my integrity.  I've done it for

21  40 years of my career.  I've never been deposed.  I've never

22  been brought forward on something like this.

23      And the accusations, quite frankly, are insulting.

24  I've worked very hard over many years to prevent -- prevent

25  these kinds of things from happening and doing the right

─IACOBELLIS – CROSS – BROWN─

1    thing.

2         And what I mean by that specifically is that

3    partnerships with the people that matter most are critically

4    important to me as a leader.  What I'm referring to is I

5    didn't do anything without health care compliance, regulatory,

6    our legal department.

7         I had very close relationships with our lawyers during

8    the Tibotec days, and also just as importantly, HR.

9    Q.  And I want to stop you right there because I have some

10   follow-ups to that.

11        Okay, sir?

12        You never testified in a courtroom before.

13        Is that right?

14   A.  Never.  Scaring the hell out of me, quite frankly.

15   Q.  Ok.

16        And are you appearing here today pursuant to a subpoena

17   that the Relators served on you?

18   A.  Yes.

19   Q.  Okay.

20        And did we actually pull you out of your Mother's Day

21   to have you come here and help get ready?

22   A.  Yes, but it's important.

23   Q.  Okay.

24        Do you take your testimony here seriously?

25   A.  Absolutely.  That's why I'm here.

IACOBELLIS - CROSS - BROWN

1   Q.   Did you take your job at Janssen seriously?

2   A.   Absolutely.

3   Q.   And let me just ask you, sir:  Did you oversee a

4   nationwide scheme to promote Prezista and Intelence off-label?

5   A.   No.  Definitively, no.

6   Q.   Did you oversee a nationwide scheme to bribe leading HIV

7   physicians so that they would prescribe more of our medicines?

8   A.   No.

9   Q.   I want to talk to you specifically about some of the

10  allegations that were made about you.

11       Okay, sir?

12       Donna Graham, who's friends with Ms. Penelow, was in

13  our courtroom and said that you instructed her at a POA

14  meeting to do a training that she was uncomfortable with

15  because it had to do with off-label marketing.

16       Did that happen?

17  A.   That did not happen.  What -- what I can share with you

18  is when she was in the training department, she had trouble

19  with the processes of going through HCC and regulatory.  She

20  was very talented.  We brought her in the field, promoted her,

21  and she was responsible for the design of the workshops.

22       What I instructed the training department to do, that

23  if there was -- sometimes things aren't black and white.

24  We're seeing that.  Sometimes things are not black and white.

25       So my instruction to her was Always take it to

IACOBELLIS - CROSS - BROWN

1  regulatory and compliance to get their guidance and finalize

2  the workshops.  We did not go to any POA meetings without a

3  compliance-approved training program.  And that's what we

4  executed.

5  Q.  And we've heard quite a bit about these POA meetings,

6  Mr. Iacobellis.

7      Can you tell us a little bit -- just what were they,

8  and how frequently did they happen?

9  A.  So it depends on what was coming, and if there was a

10  full-scale launch, it was a different situation.  But we

11  normally did it two or three times a year.

12      And the POA meetings were large.  We would bring the

13  entire organization in, and when I say "the entire

14  organization," because we were so small, we always included

15  our internal partners.

16      So health care compliance was in attendance.  The

17  marketing department, HR, regulatory, our lawyers were there

18  as well.

19      The only time I got in front of people, it was in front

20  of a hundred and some people.  So for -- to be accused of

21  giving direction to the sales force to talk off-label is

22  just -- I just can't even imagine where this is coming from.

23      Not only that, from a POA standpoint, I can almost say

24  definitively that I would always invite our health care

25  compliance officer to come on stage and give a presentation on

IACOBELLIS - CROSS - BROWN

1    compliance, to keep our representatives safe.

2         I think there's a couple things that are important in

3    what I took very seriously as a leader and not just at Tibotec

4    Therapeutics.  I'm talking about my entire career.

5    Q.   Let me follow up a little bit on that.

6         So, Mr. Iacobellis, I know you haven't testified

7    before, but we're going to do question and answer, if that

8    works for you, sir.

9    A.   Okay.  That's fine.  Thank you.

10   Q.   And this is an important topic to you.

11        Is that fair?

12   A.   Yes, I'm very passionate about it.

13   Q.   And you view, I think just told us, these allegations as

14   a personal attack on you and your career and your credibility.

15        Is that fair, sir?

16   A.   Yes.

17   Q.   And you seem frankly a little upset about it.

18        Is that fair?

19   A.   Yes.  It's emotional.

20   Q.   Okay.  And I want to make sure you have the opportunity

21   to explain yourself.

22        Okay?

23        But I just need to ask some questions to do that.

24   A.   That's fine.

25   Q.   Is that fair?

IACOBELLIS - CROSS - BROWN

1    A.   That's fine.  Thank you.

2    Q.   I appreciate it, sir.

3         And we were talking about these POA meetings.

4         Correct?

5    A.   Yes.

6    Q.   And our jury heard some allegations that you, from

7    Donna Graham, had instructed her to run a session at a POA

8    meeting that made her uncomfortable because she thought it was

9    violating the law.

10        And so let me just ask you some specific questions

11   about that.

12        At these POA meetings, number one, did you ever

13   instruct anyone to do -- to take any action that was not

14   compliant?

15   A.   No.

16   Q.   At these POA meetings, Mr. Iacobellis, did you ever

17   instruct anyone to use slides or materials or information that

18   had not been reviewed and cleared by compliance?

19   A.   No.

20   Q.   At -- as it relates to Ms. Graham in particular, did you

21   ever instruct Ms. Graham at a POA meeting to do anything that

22   would not comport with the compliance directive and

23   instructions?

24   A.   No.  It was a process they had to follow.

25   Q.   Okay.

─IACOBELLIS - CROSS - BROWN─

1      What do you recall about Ms. Graham's performance at

2  the POA -- the POA meetings?

3  A.   I think, again, she always fulfilled her job, and she did

4  a very nice job of it.  She was -- she did a great job

5  designing the workshops, taking it through compliance and

6  regulatory, and then she was very good and very credible in

7  front of the sales force because she had their respect.

8  Q.   Sitting here today before our jurors, can you think of

9  any incident or anything that might have happened at any one

10  of your POA meetings that remotely comes close to what

11  Ms. Graham has alleged happened?

12  A.   No.

13  Q.   Okay.

14      Have you seen any documents -- and being a part of this

15  case for many years now, have you seen any documents that

16  would suggest to you what Ms. Graham described occurred at

17  that POA meeting actually happened?

18  A.   No.

19  Q.   Were you ever present for any POA meeting where a message

20  was given to the sales force to promote off-label?

21  A.   No.

22  Q.   Let me ask you just as a practical matter,

23  Mr. Iacobellis:  You described the initial Prezista label as

24  being somewhat limited.

25      Is that correct?

IACOBELLIS - CROSS - BROWN

1   A.   Correct.

2   Q.   Was it limited during the entire time period the product

3   was on the market?

4   A.   No.

5   Q.   Okay.

6        And it's still on the market today.  Do you know that,

7   sir?

8   A.   Yeah, I believe so.

9   Q.   Okay.

10        Did it receive an expanded indication shortly after it

11   launched?

12   A.   Yes.

13   Q.   Okay.

14        If you have a narrow indication like Prezista, wouldn't

15   you have the opportunity to make more sales and make more

16   money if you promoted the product off-label?

17   A.   Probably, yeah.

18   Q.   So why wouldn't you do that?

19   A.   Because it was the wrong thing to do and not right, and

20   it was -- it was out of compliance.

21   Q.   Would -- did you ever at Janssen or over the course of

22   your career allow sales motivation to get in the way of

23   compliance directive?

24   A.   No.

25   Q.   Mr. Iacobellis, Mr. Wilhelm was in here --

IACOBELLIS - CROSS - BROWN

1  A.   Can I say one more thing, though?

2  Q.   Is there something you want to add, Mr. Iacobellis?

3  A.   To that -- that previous piece.

4  Q.   Yes.

5  A.   As an agent of the pharmaceutical company, my

6  responsibility is to keep patients safe first.  It's personal

7  for me because my father was a physician.  He died of coronary

8  heart disease.  He had heart disease.  He was on a lot of

9  medications.

10       My mother had diabetes, hypertension, died of

11  non-Hodgkin's lymphoma.  They were on multiple medications.

12  It was important that doctors prescribe the right agents for

13  them.

14       And so patient safety is extremely important to me.

15  And so when I take on these kind of responsibilities, it's to

16  keep patients safe, keep my reps safe, because I don't want

17  them out there getting in trouble potentially jeopardizing

18  their job.

19       I don't want to be comprised.  I have a wonderful

20  family that I work hard for, and I'm not going to compromise

21  them either.

22       And then obviously hold people accountable to their

23  performance based on what my job was.  Sorry.

24  Q.   Mr. Wilhelm was in here, Mr. Iacobellis.

25  A.   Yes.

IACOBELLIS - CROSS - BROWN

1  Q.  And he also made allegations specifically targeted at

2  you, and I want to ask you about them.  Okay?

3  A.  Okay.

4  Q.  He described for us a somewhat stressful situation when

5  Prezista was first launched.

6      Do you recall that time period?

7  A.  Upfront during the launch, the initial launch --

8  Q.  Yes.

9  A.  -- or when I took over?  I'm sorry.

10 Q.  In around 2006, at the initial launch.

11     Do you recall that time period generally?  I know it's

12 a long time ago.

13 A.  I was in my training seat, but, yeah.

14 Q.  But do you remember it generally?  You were working at

15 the company.

16     Right, sir?

17 A.  Yes.

18 Q.  Okay.

19     And I know you've described a couple times for us today

20 your position changed over the time period that counsel was

21 asking you questions about.

22     Right?

23 A.  Yes.

24 Q.  Okay.

25     And so from about 2006 to 2008, you were in a training

—————IACOBELLIS - CROSS - BROWN—————

1   role.

2       Correct, sir?

3   A.   Yes, yes.

4   Q.   And then from 2008 onward, you were in the national sales

5   director role?

6   A.   To -- to May, June of '11, 2011.

7   Q.   Okay.

8       And during the time period from 2006 to 2008, were you

9   on Friday afternoon conference calls with Mr. Wilhelm and

10  Mr. Mattes and others?

11  A.   I vaguely recall, buy we did have field director calls to

12  understand field insights.

13  Q.   And even though you would have been in your training

14  position at that time, did you participate in those Friday

15  phone calls?

16  A.   Yes.

17  Q.   Okay.

18      Mr. Wilhelm, when he was here, I think, just yesterday,

19  told our jurors that it was on those Friday calls with you,

20  sir, that the plan was sort of hatched to promote these

21  medicines off-label.

22      Is that true?

23  A.   That did not happen.

24  Q.   Do you recall any Friday afternoon or Friday conference

25  call where you and Mr. Wilhelm and Mr. Mattes and others

─IACOBELLIS - CROSS - BROWN─

1  discussed promoting these products off-label?

2  A.    No.

3  Q.    Do you recall any conversations that you ever had at

4  Janssen where a plan was made to promote these medicines in a

5  way that was not compliant?

6  A.    No.

7  Q.    Let's take a step back.  I want to get to some of the

8  documents that counsel showed you and talk just a little bit

9  about them.  I want to be mindful of the time, but I do want

10  to give you a chance to introduce yourself a little more to

11  our jurors.

12         Can you briefly, sir, just tell them who you are and

13  where you're from?

14  A.    Mike Iacobellis, again, and I'm from Detroit, Michigan,

15  Dearborn, Michigan, grew up there.  Went to school at Michigan

16  State University.  Came out of school.  It was microbiology

17  and public health.

18         And then after trying research, I was more of a people

19  person, so went into the pharmaceutical industry, and I worked

20  as a sales rep.  Got an appreciation for the role.

21         Then I moved on to another organization and was a rep

22  there, successful rep, and then went into training and

23  development, and that became a passion of mine.

24         From training and development I went into a district

25  manager role, so I learned the responsibilities of leading a

IACOBELLIS - CROSS - BROWN

1  sales organization responsibly.  And I went up to Minneapolis

2  and learned account management at a hybrid role up there.  And

3  then I had a great opportunity to come into the home office in

4  Skokie with Searle Pharmaceuticals at the time and go into

5  marketing.

6       And that was great because then I got to understand how

7  messages are produced, how materials are produced, how --

8  what's the process for taking things through compliance and

9  regulatory and what goes out to the field and how a field

10 executes it.

11      And then my dream came true to head up a sales learning

12 and development area.  I went through two major mergers and

13 acquisitions, as you heard earlier, with Pharmacia and Upjohn

14 purchasing Searle Monsanto and forming Pharmacia, and then

15 Pfizer acquired us a year later, after moving my young family

16 from the Midwest to the East Coast, which was kind of

17 disruptive.

18      But then the stint with Watson before coming to this

19 amazing company called J&J.  And what was great is that

20 Johnson & Johnson had just a rich pipeline and opportunity for

21 me.

22      So married 40- - it will be 42 years married in August,

23 and very proud of that.  And then two grown-up children, a

24 boy, girl, and they each have a son.

25      So that's a little bit.

IACOBELLIS - CROSS - BROWN

1  Q.  And what attracted you -- we heard a little bit about

2  your work in the pharmaceutical industry before coming to

3  Janssen.  What attracted you to Janssen when you first started

4  with us, sir?

5  A.  Yeah.  As a rep, in the field, I used to run into the

6  Janssen representatives, and I was always impressed by the

7  sales reps and always researched the company; I was very

8  interested in the company.

9       So when a chance came about to join the Janssen

10  organization, that was a great opportunity.  And what I loved

11  about it is that you had this huge J&J organization, but this

12  entrepreneurial startup company called Tibotec Therapeutics

13  that they were kicking off.  And so an opportunity for a

14  professional to kind of help build an organization, launch new

15  products was -- was great.

16       And then in 2011, I was able to lift from this small

17  company out -- out and up over Janssen so my -- I had

18  development and sales operations.  And the development piece

19  was great and evolved over time -- to make a long story

20  short -- and that was I was responsible for leadership

21  development, learning technology, account management

22  development, and marketing development.

23       And everything about marketing development is that we

24  launched various framework, which is how do you build business

25  plans compliantly and take it through the process, et cetera.

IACOBELLIS - CROSS - BROWN

1  Q.   How long -- I understand you're recently retired --

2  A.   Yes.

3  Q.   -- from Janssen.

4       Right?

5  A.   Yes.

6  Q.   Congratulations.

7  A.   Thank you.

8  Q.   How long were you at Janssen?

9  A.   Sixteen and a half years.

10 Q.   And for how long did you have responsibilities that

11 touched the two products that we're here to discuss in our

12 case?

13 A.   A year and a half in training, and three and a half in

14 sales, leadership.  '05.

15 Q.   And during the entire time period that you had that

16 responsibility, Mr. Iacobellis, were you involved in promoting

17 these medicines off-label?

18 A.   No.

19 Q.   During the entire time period that you had responsibility

20 for these medicines, were you involved in overseeing other

21 people who you believed were promoting these medicines

22 off-label?

23 A.   No.

24 Q.   During that entire time period, were you involved in any

25 way in a scheme or supervision of a scheme to bribe doctors?

1  A.   No.

2  Q.   Tell us briefly, Mr. Iacobellis, what you have done in

3  the last two years since you retired from Janssen.

4  A.   Yeah.  I retired in January 2022, and I became adjunct

5  professor at DeSales University.  So I teach leadership and

6  management.  I took a little hiatus from that.

7       And I also work with Braven Corporation.  And Braven is

8  a nonprofit organization that works with lower socioeconomic

9  students graduating from college.  So they're first-generation

10 diversity students.  And it's mentoring and coaching them how

11 to find their first job, how to navigate their careers, how to

12 be successful in the workplace.  So that's been very rewarding

13 for me.

14 Q.   Do you take your professional reputation seriously,

15 Mr. Iacobellis?

16 A.   Absolutely.

17 Q.   And did you, to the very, very best of your ability

18 during the 40-year career you had in the pharmaceutical

19 industry, did you do your best to operate in a compliant

20 manner?

21 A.   Yes.

22 Q.   Do you believe you did that?

23 A.   Yes.

24 Q.   Okay.

25       Did you ever become aware, as it relates specifically

IACOBELLIS - CROSS - BROWN

1  to these two products, that anyone at Janssen for whom you had

2  supervisory behavior over was promoting these medicines in the

3  way that's been described in this lawsuit?

4  A.   No.  And it's so many years with no reporting.  We have

5  anonymous hotline calls.  That's not Tibotec; it's

6  Janssen-wide.  So totally anonymous.  If it would have come

7  in, I would -- I wish the Relators would have contacted that

8  hotline if they saw it or observed anything, reported it,

9  because there would have been an internal investigation.

10 Q.   Do you think -- fair to say you're not -- and I think

11 counsel pointed it out.  I mean, you're not in the field with

12 these folks every -- on every single call.

13      Right?

14 A.   No.

15 Q.   So you are really like the top of the sales organization

16 over more than a hundred reps who are visiting on doctors.

17      Is that right?

18 A.   Yeah.  I mean, because it was such a fast-paced time in

19 the industry, I had a lot of home office responsibility.

20 Also, I had a young family, so travel -- I wasn't travelling

21 that much.  I relied on the regional business directors and

22 the district sales managers to coach daily in the field.

23 Q.   And similarly, as it relates to the speaker program, you

24 were not the person who was at every single one of these

25 speaker events.

─IACOBELLIS - CROSS - BROWN─

1      Is that right?

2   A.   I just couldn't -- I just couldn't go to that many.

3   Q.   Do you think it's possible, Mr. Iacobellis, that all of

4   this stuff went on for the nearly ten years that these folks

5   allege in this lawsuit and you just never became aware of it?

6   A.   It's hard to fathom that with how small we are and how

7   vocal our sales reps are.

8      I mean, they're so good.  They're so very passionate.

9   They love HIV.  I'm sure that -- you know, we haven't had any

10  complaints other than this.

11  Q.   Okay.

12     Let's talk a little bit -- you were asked a lot of

13  questions about the speaker program.

14     Do you remember that, sir?

15  A.   Yes.

16  Q.   Was sales the primary department responsible for the

17  speaker program?

18  A.   No.  We just gave recommendations.

19  Q.   Okay.

20     Do you have knowledge or context about all of the

21  requirements that a recommendation for the speaker program had

22  to meet in order to be approved?

23  A.   Criteria were set.  They asked for recommendations, and

24  then the approval process went on behind the scenes with

25  marketing in that department.

IACOBELLIS - CROSS - BROWN

1  Q.   Did you, as the national sales director, or anybody from

2  the sales organization sit on those committees that made the

3  determination about whether a speaker was appropriate for the

4  speaker board or not?

5  A.   No.

6  Q.   Okay.

7       Are you the best person to ask questions about -- when

8  it comes to the selection of speakers for a speaker bureau?

9  A.   No.

10 Q.   Okay.

11      Do you -- you were asked some questions about whether

12 or not speakers were paid to prescribe medicines.

13      Do you remember that?

14 A.   Yes.

15 Q.   And you were also asked some questions about whether we

16 tracked the prescriptions of attendees at speaker events.  And

17 I want to follow up on those two things.

18      Okay?

19 A.   Yes.

20 Q.   Was the purpose of a speaker event to educate the

21 attendees in the audience?

22 A.   Yes.

23 Q.   Was the purpose of speaker events promotional as it

24 related to the attendees in the audience?

25 A.   Yes.  They're approved promotional decks.

─IACOBELLIS - CROSS - BROWN─

1   Q.   Meaning was part of the purpose to encourage, when

2   appropriate, the doctors in the audience to prescribe more of

3   our medicines?

4   A.   Yeah.  The attendees, yes.

5   Q.   But what about the speakers?  Was a purpose of those

6   events to get the speakers to prescribe more?

7   A.   No.

8   Q.   Was the purpose of those events to pay speakers so that

9   speakers would write more prescriptions?

10  A.   No.

11  Q.   And I understood that to be your testimony,

12  Mr. Iacobellis, but then we saw a deposition clip.

13       Do you remember that?

14  A.   Yes.

15  Q.   And it sounded like you were saying something else.  Did

16  you hear that?

17  A.   Yeah, I did.  I think, quite frankly, I made a mistake.

18  I got confused.  There was, I think, a page before in the

19  deposition it did say about speakers not.  But when the

20  gentleman asked the question, it was a stressful time to be

21  going through a deposition for the first time, and he combined

22  in the question speakers and attendees.  And I guess because

23  there was a line of questioning on attendees, I just assumed

24  he was referring to attendees only.  And so I said "yes" to

25  that answer.

IACOBELLIS - CROSS - BROWN

1    Q.   So let me just ask you, to make sure we're crystal clear.

2         Based on your time at Janssen and your role as the

3    national sales director, do you believe the purpose of the

4    speaker program was to induce speakers to write more

5    prescriptions?

6    A.   No.

7    Q.   We heard some testimony, Mr. Iacobellis, in this case so

8    far from some folks who were sales reps or sales managers

9    underneath you, like Donna Graham and Sara Strand and

10   Mark Wilhelm.

11        Are you generally familiar with those folks?

12   A.   Yes.  Donna in the training department.

13   Q.   Okay.

14        And one of the things we heard from a number of folks

15   was that there was a belief among the sales folks that there

16   was a directive to put 20 percent of the sales team on a

17   performance improvement plan.

18        Is that true?

19   A.   I had no knowledge of that ever happening.

20   Q.   You were, for a long period of time, the highest person

21   in the sales organization.

22        Correct?

23   A.   Yes.

24   Q.   Did you ever give the directive to put 20 percent of the

25   sales force on a performance improvement plan?

IACOBELLIS - CROSS - BROWN

 1  A.    No.  It was a very individual thing.

 2  Q.    What was your approach to performance improvement plans

 3  during the time period you were at Janssen?

 4  A.    Yeah.  So I've been managing people for many, many years.

 5  And I've learned early on, to be fair and equitable to an

 6  entire organization, that you treat people as individuals but

 7  you take the emotion out of it.  It's not about whether you

 8  like them or you don't like them.  You put -- if there's a

 9  performance issue, it's about behaviors.  What are they doing

10  specifically?  Skill gaps, competencies, behaviors that are

11  problematic.

12        And that can be nonperformance related as well.  It

13  doesn't have to be just about the numbers.

14        And then the performance improvement plan is -- the

15  intent of a performance improvement plan is to help people

16  succeed.  It's not to terminate anyone.  The "I" in it is

17  "improvement."  So we highlight very specific actions for that

18  individual.  If they fulfill those, and many did, they were

19  kept with the organization.  And we like that.

20        The goal was not to get rid of people.  And the reason

21  is that, when you lose someone in the field, whether you do a

22  termination or they resign, that's an issue.  It's an issue

23  from a business standpoint --

24  Q.    Why is that, Mr. Iacobellis?

25  A.    -- and the reason is -- yeah.

─IACOBELLIS - CROSS - BROWN─

1  Q.   Why is that?

2  A.   Yeah, because the time you take to go through the HR

3  process, to post the position, interview people, select

4  someone and then train that individual and then to build the

5  relationships that are necessary to be successful, and doctors

6  are hard to see, it could be months.

7        So you think about the gap that exists when someone

8  leaves a territory in the field.  It's quite significant.  So

9  it's not good business to remove someone from the role, and we

10 wanted people to be successful.

11 Q.   And we heard a little bit about performance improvement

12 plans that Ms. Strand and Mr. Wilhelm were on.

13       Are you generally familiar with those, Mr. Iacobellis?

14 A.   Through the kind of process, yeah.

15 Q.   And did you understand those performance improvement

16 plans that affected Ms. Strand and Mr. Wilhelm, did you

17 understand those to be focused on sales numbers?

18 A.   No, not at all.  They weren't performance at all.  It was

19 about leadership behaviors.

20 Q.   I want to show you a couple of documents that you were

21 shown and to see if we can get some of that context that you

22 were talking about.

23       You were shown --

24        MS. BROWN:  And, Your Honor, permission to redisplay

25 what was entered as Plaintiffs' 179.

─IACOBELLIS - CROSS - BROWN─

1              THE COURT:  You may.

2              MS. BROWN:  Thank you.

3    BY MS. BROWN:

4    Q.   You were shown this PowerPoint presentation by something

5    called the monitor group.

6         Do you see that, sir?

7    A.   Yes.

8    Q.   And do you know what the monitor group is?

9    A.   I know they did outside research for us from an analytics

10   perspective.  But I wasn't familiar with the group because I

11   had recently joined the organization.

12   Q.   Okay.

13        I thought I heard you, when you were talking about this

14   document, say something like, there's a difference between

15   planning and promoting?

16   A.   Yeah.

17   Q.   And I wanted to ask you what you meant by that.

18   A.   Yeah.  Again, there was a lot of internal conversations

19   around a lot of different topics, and that was kind of the

20   planning piece.

21        But when it came time to promotion, we only focused on

22   what was on-label, what we were able to get through marketing

23   from an approved messaging standpoint, tactics, et cetera.

24   Those conversations went on quite frequently.  And the reason

25   is is that, for an indication or launching a new product, you

─────IACOBELLIS - CROSS - BROWN─────

1    might have to start a year in advance.  So there's a lot of

2    planning that goes involved.

3          So we were working concurrently, planning with how to

4    improve performance today but, most importantly, what the

5    future held in having those conversations.  We included a lot

6    of people in these meetings, including Sara and Mark Wilhelm,

7    and they were experts.  They were experts in HIV.  We had a

8    lot of respect for their knowledge.  It wasn't to bring them

9    in to then send a wink-wink-type thing to then go do.  It was

10   to get their input to support the planning process, which we

11   respected their background and experience.

12   Q.   And as somebody who operates in pharmaceutical sales, do

13   you understand that the promotional side of your activities is

14   pretty heavily regulated?

15   A.   Yes.  Absolutely.

16   Q.   There are -- are there rules that you and your colleagues

17   need to follow when it comes to promoting medicines that are

18   regulated by the FDA?

19   A.   Yes.  Clear policies.

20   Q.   But when it comes to internal planning and discussions

21   with colleagues and strategy sessions, are you aware of any

22   rules or regulations that govern what you can talk about on a

23   conference call with your colleagues?

24   A.   No.  No.  I mean, it was -- there were open discussions

25   to generate brainstorming but also for planning purposes.

IACOBELLIS - CROSS - BROWN

1    Q.   I mean, for example, you were shown somebody else's email

2    talking about a strong lipid profile.

3         Are you aware of any rules or regulations that regulate

4    the way you talk about products in an internal email?

5    A.   Yeah.  I agree, if that went promotionally, that would be

6    problematic.  I agreed with counsel on that.

7         But I know some of these internal documents are to

8    build enthusiasm in the field and so on and so forth, but

9    they're internal documents.

10   Q.   Okay.

11        As it relates to this internal document that you were

12   shown -- the date on it is March 15th, 2007.

13        Do you see that, sir?

14   A.   Yes.

15   Q.   And just to orient us, is that pretty much smack in

16   between the two different Prezista labels that have sort of

17   been discussed in this case so far?

18   A.   Again, I'm terrible on dates, but I believe so.

19   Q.   Okay.

20        Do you understand there was an initial indication in

21   2006 --

22   A.   Yes.

23   Q.   -- for Prezista?

24   A.   Yes.

25   Q.   Okay.  And do you recall generally, by 2008, there was an

1  updated approval and an updated indication?

2  A.   Expanded, yes.

3  Q.   And do you understand generally what that expanded

4  indication included?

5  A.   I believe it was naive and QD dosing, I believe.

6  Q.   Okay.  And you're right, your memory is correct.

7       When Prezista became approved in 2008 for

8  treatment-naive patients and for once-daily dosing, is that

9  something that happened, in terms of a scientific support for

10 that, is that something that happened overnight?

11 A.   No.  A lot of advanced planning.  Again, I'm not privy to

12 the clinical side of the equation of product development, but

13 I know it's months and years in advance.

14 Q.   How about from a sales and strategy perspective?  I want

15 to ask you about that.

16      As a salesperson and with some of these other marketing

17 and strategy colleagues, do you need to plan for something

18 like an expanded indication in advance?

19 A.   Yeah.  We would start early.  We would start

20 discussing -- you know, we'd have to -- we had to a hundred

21 percent understand the marketplace, what was happening in the

22 marketplace, but also a lot of physicians write prescriptions

23 based on their own independent judgment.  But understanding

24 the market, those key insights and then that advanced planning

25 is important.

─IACOBELLIS - CROSS - BROWN─

1   Q.   And you were shown a number of pages from this PowerPoint

2   presentation about different segments of the market.

3        Do you remember that, sir?

4   A.   Yes.

5   Q.   And I think one of the page -- pages you were shown was

6   this one.

7        Do you see that, sir?

8   A.   Yes.

9   Q.   All right.

10       And the title -- tell us what the title of this slide

11  here in this internal presentation is.

12  A.   "Long Return View of the Market Penetration Strategy."

13       THE COURT REPORTER:  Ms. Brown, I think your mic is

14  off.

15       MS. BROWN:  Your Honor, can I have a minute just to

16  switch mics?

17       THE COURT:  Well, why don't we do this:  Can you hold

18  off on this line of questioning so we can do that short break

19  for the afternoon?  Because it's a little after 3:00.

20       MS. BROWN:  Absolutely.

21       THE COURT:  Why don't we take a ten-minute break, and

22  then we can recharge and get -- swap mics.  All right.

23       THE DEPUTY COURT CLERK:  All rise.

24       (A short recess occurred.)

25       THE DEPUTY COURT CLERK:  Please remain seated.

IACOBELLIS - CROSS - BROWN

1          THE COURT:  Why don't we get the witness back in.

2      Ms. Brown, how much longer do you think?

3          MS. BROWN:  I'm going to try to finish in less than

4  15 minutes.

5          THE COURT:  Mr. Marketos, do you have a little bit?

6          MR. MARKETOS:  I will, Your Honor, but I'm going to

7  try to make it fast.

8          MS. BROWN:  I'll do ten.  I don't want to --

9          THE COURT:  No, no.  That's all right.  Let's see

10  where we are.

11      All right.  Let's get the folks in.  So maybe we extend

12  a little bit past 4:00, but let's see where we are.

13          MS. BROWN:  Okay.

14          (Jury enters the courtroom.)

15          THE DEPUTY COURT CLERK:  All rise.

16          THE COURT:  All right, folks.  Everyone be seated.

17  And let me just make sure I've got everyone -- sorry, folks.

18  It's a little quick to get everybody down.

19      Ms. Brown, when you're ready, you can continue.

20          MS. BROWN:  Thank you very much.

21  BY MS. BROWN:

22  Q.  Mr. Iacobellis, I want to quickly go through some of

23  these documents, then get out of your hair.

24      So in these segments that you were shown, do you

25  remember discussions about why there were strategy documents

─────IACOBELLIS - CROSS - BROWN─────

1  looking at segments that we didn't yet have an approval for?

2  A.   Yeah.  Because it's a dynamic market and patients shift

3  and controlled different ways.

4  Q.   And do you see, at least as it relates on this slide,

5  that there was some discussion about -- the slide talks about

6  the anticipated expanded approval.

7       Do you remember that, sir?

8  A.   Yes.

9  Q.   And even in that "must play" category, do they describe

10 what became the expanded approval?

11 A.   Yes.

12 Q.   Based on your experience with Janssen, was Janssen

13 planning for the known expanded approval of Prezista in 2008?

14 A.   Again, that advanced planning needed to take place, yes.

15 Q.   And in terms of your role, though, your role wasn't

16 strategy and planning, was it, sir?

17 A.   No.

18 Q.   Your role had to do with what the sales reps were allowed

19 to promote.

20      Correct?

21 A.   What we currently had approved, current indications,

22 current promotional materials.

23 Q.   Okay.

24      As it relates to what the sales reps were allowed to

25 promote, we looked at this document that you sent to the sales

─IACOBELLIS - CROSS - BROWN─

1   force shortly before the expanded label.

2        Correct?

3   A.   Yes.

4   Q.   And this is in September of 2008, and the expanded label

5   was just about a month away.

6        Correct?

7   A.   Yes.

8   Q.   And you point out that there are a number of things that

9   the sales reps can't yet do because it's not in the label.

10       Right?

11  A.   Yes.

12  Q.   Even though you're only a month away of having it in the

13  label.

14       Right, sir?

15  A.   Yes.

16  Q.   And some of those things that you point out are

17  scientific studies.

18       Correct?

19  A.   Yes.

20  Q.   And you -- in your direction, what was the purpose of

21  this direction to the sales team in September of 2008?

22  A.   Again, it's the -- give them an update but also to make

23  sure that they were compliantly promoting and continuing what

24  their existing plan was.

25  Q.   You --

IACOBELLIS - CROSS - BROWN

1   A.   And also put clear restrictions on -- and to give them a

2   heads-up that they are not to participate in any of this

3   off-label things.

4   Q.   Okay.

5        You were asked some questions about scientific studies

6   and educating reps about studies that might come up in

7   discussions.

8        Do you remember that?

9   A.   Yes.

10  Q.   Is there a difference, in your mind, sir, between

11  educating the sales force and instructing them to promote?

12  A.   Absolutely.

13       We made a decision -- when I say "we," I define that

14  with legal, regulatory, health care compliance.  We made a

15  decision that, if there was new studies hitting the market, we

16  need to build awareness for our sales organization.

17       This was a very exciting time for HIV patients.  There

18  was new studies, new products, new clinical indications.

19  There was press releases.  There was conference updates.

20       We have a very experienced, at the time, virology sales

21  force, HIV sales force.  They would research things

22  themselves.  They would find information.  And -- because of

23  their thirst for knowledge.

24       They would also have such great relationships with

25  their physicians.  The physicians could say, Hey, did you hear

─IACOBELLIS - CROSS - BROWN─

1    about that press release?  Tell me about it.  Right?

2         So we made a decision that we would send out a training

3    document with the appropriate restrictions, say, this is out

4    there, you need to be aware of it.  And if something comes up

5    regarding this topic, this is how you handle it.  You don't

6    engage.  If -- if they want information, they are to fill out

7    an MIR, but then you need to redirect back to our label

8    promotion.

9         So we did that to keep them informed but also to

10   protect the company and keep them safe as well.  Because if we

11   didn't do anything, they could read something on their own or

12   their doctors, who they had great relationships with, could

13   bring it up, and all of a sudden, they're engaging in an

14   off-label conversation in something that might be coming.

15        So we protected the company.

16        MS. BROWN:  Your Honor, permission to admit and

17   display D-1092.

18        MR. MARKETOS:  No objection, Your Honor.

19        THE COURT:  All right.  So admitted.

20   (Defendants' Exhibit D-1092 in evidence.)

21   BY MS. BROWN:

22   Q.  And I'm showing you what we've marked as D-1092.  Is this

23   sort of the format, Mr. Iacobellis, which you made some of

24   these educational pieces available to the sales force?

25   A.  Yes.  This and others, yeah.

IACOBELLIS - CROSS - BROWN

1  Q.  Would you consider that to be clearly marked with the

2  instructions that the sales force were not to use it for

3  promotion?

4  A.  Yes.

5  Q.  And did you, in your role, believe it was important to

6  have an educated sales force?

7  A.  For their own credibility, so they weren't blindsided or

8  created an uncomfortable situation for them.

9  Q.  When you were providing information like this stamped

10  "Educational purposes only:  Not to be used in a selling

11  situation," were you secretly telegraphing to the sales force

12  that they should actually take this stamped article in and

13  give it to a doctor?

14  A.  No.  Absolutely not.

15  Q.  Okay.

16      You were shown this email --

17      MS. BROWN:  Your Honor, permission to display what

18  was already admitted as 1224.

19      THE COURT:  Yes, of course.

20      MS. BROWN:  Thank you.

21  BY MS. BROWN:

22  Q.  You were shown this email from a gentleman named Francis

23  Devlin.

24      Do you recall that?

25  A.  Yes.

IACOBELLIS - CROSS - BROWN

1  Q.  And you were pointed to this one line in this email up

2  here, "Minimal impact on lipids with Prezista once daily."

3       Do you see that?

4  A.  Yes.

5  Q.  Did you understand during the time period that you were

6  at Janssen that there were certain approved lipid messages?

7  A.  Yes.

8  Q.  And do you understand, sitting here today in 2024, what

9  those were?

10  A.  I don't recall.

11  Q.  Do you, in your mind, understand if there's a difference

12  between low impact on lipids and minimal impact on lipids?

13  A.  That's what, as counsel said, is confusing.  And, yeah,

14  it's very difficult to differentiate.

15  Q.  As someone who has sales knowledge and sales training,

16  did the sales reps have certain approved messages?

17  A.  Yes.

18  Q.  Okay.

19       Were the sales reps required to read verbatim only the

20  words that were on the actual approved message?

21  A.  It was a conversation with providers.

22  Q.  And were the sales reps instructed and trained to have a

23  conversation consistent with the label and consistent with the

24  approved material?

25  A.  Yes.  Absolutely.

───IACOBELLIS - CROSS - BROWN───

1  Q.  And whether minimal impact on lipids or low impact on

2  lipids was an approved message, what were your -- putting

3  aside the particulars of the adjective, what would your

4  instruction to the sales reps have been at the time that you

5  were national sales director?

6  A.  To ensure that in those conversations they were staying

7  compliant but also being very clear.

8  Q.  Okay.

9      You were asked a question about Ben Kozub's email from

10 2010.

11     Do you remember that, sir?

12 A.  Yes, I do.

13 Q.  And there was some question about Mr. Kozub's role at the

14 time.  I think you raised that.

15     Do you recall that, sir?

16 A.  Yes.

17 Q.  And just if we look at the back, his signature block

18 there, does that clear up for you what his role was at the

19 time?

20 A.  Yeah.  I guess I didn't catch that, but, yeah, he was in

21 global marketing.  I thought he might have been moved on by

22 then.

23 Q.  Okay.

24     And you were asked why you did not report Ben Kozub's

25 question at the bottom of this email regarding Intelence.

IACOBELLIS - CROSS - BROWN

1    When you read this email from Ben Kozub back in 2010, did you

2    understand this to be a directive or an instruction or a plan

3    to break the law?

4    A.    No.

5    Q.    You were shown this document from 2006 that went from

6    somebody else to somebody else that may have gotten forwarded

7    to you.

8          Do you remember that, sir?

9    A.    Yes.

10   Q.    And you were asked questions about MRIs being widely used

11   regarding the 48-week data.

12         Do you recall that?

13   A.    Yes.

14   Q.    Okay.

15         And to break down here, regarding that 48-week data, it

16   says that it's in the public domain.

17         Do you see that?

18   A.    Yes.

19   Q.    And how do you interpret that?

20   A.    So that it was publicly available.

21   Q.    All right.

22         And do you see -- is there anything on this PATH report

23   that was sent to Mr. Dolisi that indicates that MIR forms

24   about data that are in the public domain are being improperly

25   solicited from doctors?

IACOBELLIS - CROSS - BROWN

```
 1   A.   No, I have no way of knowing that.

 2   Q.   And did you write this internal PATH report?

 3   A.   No.

 4   Q.   Did you ever instruct your sales force to solicit

 5   improperly solicited MIRs?

 6   A.   No.

 7   Q.   Okay.

 8        Did you ever learn during your time period that you

 9   were at Janssen about a scheme to solicit MIRs to get

10   off-label information into the hands of prescribers?

11   A.   No.

12   Q.   You were shown an email from Thomas Turner.

13        Do you know who that is?

14   A.   Yeah.  District manager.

15   Q.   Okay.

16        And it looks like -- he was sending an email to his

17   Midwest team.  Do you remember questioning about this --

18   A.   Yes.

19   Q.   -- document?

20   A.   Yes.

21   Q.   And you were asked questions about "strong lipid profile,

22   period."

23        Do you see that?

24   A.   Yes.

25   Q.   Okay.
```

IACOBELLIS - CROSS - BROWN

1      Does this email at all talk about messages that are

2  being put in front of doctors?

3  A.  No.

4  Q.  Okay.

5      Have you seen the approved FDA lipid messaging that

6  refers to Prezista as having a proven lipid profile?

7  A.  I believe it was proven.

8  Q.  And in terms of your direction to the field, did you ever

9  direct the field to use misleading or inappropriate messaging

10  as it related to lipids?

11  A.  No.

12  Q.  Okay.

13      Is there even a difference, sir, in your mind, between

14  strong and proven and friendly?

15  A.  It's hard to say.  I don't think I can answer that.  But

16  it's hard to, right, because the adjectives are many.

17  Q.  You were shown this PowerPoint presentation about lipids

18  and lipid friendly.

19      Do you see that language on there?

20      And I thought, sir, you had mentioned there was

21  something else you wanted to add.

22      Was there something you wanted to add there?

23  A.  Yeah.  I think this was a strategy document, but I think

24  there was something on the bottom where it said, Subject to

25  legal and regulatory review.  So this was not going to be put

─IACOBELLIS - CROSS - BROWN─

1    in front of the sales force for promotion.  This wasn't any

2    direction to go do.  It was something to, again, inform the

3    internal organization about planning -- again, difference

4    between planning and promotion.

5         And, obviously, I'm sure that -- I forgot who the

6    author of this was, but that meant that they needed to take it

7    through our lawyers and our regulatory people before this

8    becomes -- can move forward as a strategy.

9    Q.   You were -- are you aware of any regulation or

10   requirement or compliance directive that prevents the folks at

11   Janssen about brainstorming on issues about their products?

12   A.   No.

13   Q.   Are you aware of any regulation or compliance directive

14   that prevents the folks at Janssen from strategizing

15   internally --

16   A.   No.

17   Q.   -- about plans and future plans for their products?

18   A.   No.

19   Q.   All right.

20        You were shown this document about speaker sales

21   performance.

22        Do you recall questions about that, sir?

23   A.   Yes.

24   Q.   Did you track -- in your role, did you track the

25   prescriptions that speakers were writing following or in

IACOBELLIS - CROSS - BROWN

1    relation to a speaking engagement?

2    A.    No.

3    Q.    During the time period you were at Janssen, did you ever

4    see any analysis of whether or not a speaker's prescriptions

5    went up or went down following a paid speaking engagement?

6    A.    No, I've never seen a communication, participated in any

7    discussion on it or seen anything as such.

8    Q.    And I thought --

9    A.    Or analysis.

10   Q.    Similarly on this document, sir, I thought you suggested

11   that there was something else you wanted to add about this

12   document.  I wanted to make sure to give you the opportunity.

13   A.    Well, I don't think I remember.  I'm sorry.

14   Q.    Okay, no problem.  No problem.  I had it in my notes.  I

15   wanted to make sure.

16         You were shown somebody else's notes of a conference

17   call from almost ten years ago -- almost 20 years ago.

18         Do you remember that, sir?

19   A.    I was reminded today.

20   Q.    Yeah, okay.

21         And certainly there were some struggles in the

22   beginning when Prezista launched.

23         Correct?

24   A.    Yes.

25   Q.    Did -- despite the fact that things were difficult after

─────IACOBELLIS - CROSS - BROWN─────

1    the launch, did you participate in any meeting where a

2    decision was made that the way to meet sales goals was to

3    promote off-label?

4    A.   No.

5    Q.   Did you participate in any meeting after the launch where

6    the decision was made the way to meet sales goals is to bribe

7    doctors?

8    A.   No.

9    Q.   You actually had your own notes following this meeting.

10        Correct, sir?

11   A.   I think so.

12   Q.   And remember you were shown these briefly and you said

13   this was your handwriting?

14   A.   Yes, it is my handwriting.

15   Q.   Okay.

16        And I just want to point out to you one of the things

17   that appears in your notes.  You see the What are you doing

18   about it section?

19   A.   Yes.

20   Q.   All right.

21        And Frank, he -- that's Frank Murphy, the New York

22   district manager?

23   A.   Yes.

24   Q.   Okay.

25        One of the things that he talks about doing about it is

IACOBELLIS - CROSS - BROWN

1    this last bullet.

2        Right?

3    A.   Yes.

4    Q.   What does he say there, sir?

5    A.   Go through the package insert, the approved label.

6    Q.   In terms of your memory of the plans of what next steps

7    would be taken following the launch, is that consistent with

8    your memory of this conversation?

9    A.   Yes, I believe so.

10   Q.   Do you recall ever there being any kind of agreement or

11   discussion or determination that the way to meet these sales

12   numbers was to break the law?

13   A.   No.

14   Q.   You were asked some questions -- we just looked at a

15   document about MIRs.

16       Do you remember that?

17   A.   Yes, yes.

18   Q.   Based on your role at Janssen, were MIR numbers used as a

19   metric of rating performance?

20   A.   No.  No, it wasn't.

21   Q.   Did you, in your sales role, ever get information about

22   how many MIRs were being requested in a particular district?

23   A.   No.  It would be brought to me periodically from our

24   health care compliance officer.

25   Q.   Tell me about that.  What does that mean?

—IACOBELLIS - CROSS - BROWN—

1    A.    So they would come to me if they -- looking at the MIR

2    request, and they would look at the extremes, right?  If there

3    was a significant number of MIRs, then they need to

4    investigate why.  Was there an any off-label unsolicited

5    requests going on?  So they needed to investigate it.

6         Conversely, they also looked at people that didn't have

7    any MIRs.  And that, quite frankly, is equally a concern

8    because if there's no MIRs and they're engaging in a

9    conversation with physicians, the chance of nothing coming up

10   ever for a quarter of time could potentially mean that they

11   were engaged in an off-label discussion.

12        So that had to be equally investigated if there was

13   that type of extreme as well.

14   Q.    And do you have a particular memory during your time --

15   during your time at Janssen about compliance coming to you

16   with questions about MIRs?

17   A.    Yes.

18   Q.    Just tell us a little bit about it.

19   A.    So, again, it wasn't often, but if they had a question,

20   they would come to me, and then they'd indicate -- they would

21   share with me, loop me in, that they were going to do an

22   investigation to look into it, to make sure that everything

23   was -- because they were very sensitized to that.

24   Q.    Were you shown, Mr. Iacobellis, any documents here today

25   from other people's emails or strategy marketing decks that

IACOBELLIS - CROSS - BROWN

1  changes your view that there was no off-label marketing or

2  bribing of physicians that went on during the time period that

3  you were at Janssen?

4  A.   There was no off-label promotion.

5  Q.   Okay.

6       Is there any doubt in your mind based on your

7  experience and your time at Janssen that the allegations that

8  are being made in this lawsuit are not true?

9  A.   No.

10 Q.   Thank you very much.

11       MS. BROWN:  I have no further questions.

12       THE COURT:  All right.  Thank you.

13   Mr. Marketos, any redirect?

14       MR. MARKETOS:  Yes, Your Honor, briefly.  Thank you.

15 (REDIRECT EXAMINATION BY MR. MARKETOS:)

16 Q.   Mr. Iacobellis, let's try to get you out of here, sir.

17 A.   Thank you.  I'm sure the jurors as well.

18 Q.   Yes, sir.

19       Just briefly, you took the stand just now in response

20 to questions from Janssen's outside counsel.

21       Right, sir?

22 A.   Yes.

23 Q.   Somebody like me who is from an outside law firm who is

24 representing a client.

25 A.   Yes.

1    Q.   You understand that.  Right?

2         So there's no "we."  There's an outside counsel

3    representing Janssen.  You understand that.

4         Right?

5    A.   Yes.

6    Q.   They're also representing you today?

7    A.   Yes.

8    Q.   Except that you're not a defendant in this case.  You

9    understand that.

10         Right?

11   A.   Yes.

12   Q.   Nobody's making accusations that you yourself should be

13   held liable for anything.  You understand that.

14         Right?

15   A.   I believe so, yes.

16   Q.   Okay.

17        The claims that are being brought by the Relators,

18   Ms. Penelow, Ms. Brancaccio, are against the company that you

19   used to work for.

20        Do you understand that?

21   A.   Yes, sir.

22   Q.   All right.

23        And you said it's personal to you and you find it

24   insulting that two sales representatives would bring a

25   whistleblower lawsuit claiming that there was off-label

IACOBELLIS - REDIRECT - MARKETOS

1  promotion and kickbacks being paid to doctors by the company

2  you used to work for.

3        Do you remember that?

4  A.   Yes.

5  Q.   It would be -- of course, you would expect it to be

6  personal to Donna Graham, whether or not what she says is

7  believed.

8        Right, sir?

9  A.   I think it was personal for me as well because I think --

10  Q.   You already said your peace, sir.

11  A.   Okay.

12  Q.   I'm going to remind you, sir, that Donna Graham,

13  Mark Wilhelm, Chrissy Brancaccio, Jessica Penelow,

14  Matt Grooms, Sara Strand, and Joe Holshoe, seven people from

15  inside the organization that you ran, have stepped forward and

16  made sworn statements that these activities were taking place.

17        You understand that.

18        Right?

19  A.   Yes, I do.

20  Q.   It's personal to them as well.

21        You understand that?

22  A.   Yes.

23  Q.   Okay.  You say it didn't happen.  They say it did.

24        Right?

25        And the job of the ladies and gentlemen of this jury is

IACOBELLIS - REDIRECT - MARKETOS

1  to figure out which one took place.

2      Do you understand that?

3  A.  Yes, I do.

4  Q.  And I also understand that you said, sir, that none of

5  this activity actually took place with respect to

6  Ms. Donna Graham, but you did respect her expertise.

7      Do you recall that?

8  A.  Yes, yes.

9  Q.  Now, Mr. Wilhelm, Ms. Graham, a lot of these other sales

10 representatives, they were hired for their expertise specific

11 to the HIV area, the HIV field.

12     Correct?

13 A.  Absolutely.  They were experts in HIV.

14 Q.  You also told us, sir, and correct me if I'm wrong, that

15 when you were asked by marketing to deliver messages to your

16 sales force and have them promote that to doctors, that you

17 assumed that those messages were on-label.

18 A.  Yes.

19 Q.  That's what you told us?

20 A.  Yes.

21 Q.  You got pushback from Ms. Donna Graham when you asked her

22 to train on a message that you apparently believed was

23 on-label.

24     Is that fair?

25 A.  Can you give more context to that?

IACOBELLIS - REDIRECT - MARKETOS

1  Q.  Ms. Graham told you she did not want to train --

2  specifically train the sales force on matters relating to

3  Prezista's lipid profile because she felt like it was

4  misleading and off-label.

5      Do you recall that?

6  A.  No, I don't.

7  Q.  Okay.

8      You don't recall that ever taking place?

9  A.  Because their job -- their job was that if they had

10 questions regarding the development of a workshop, that they

11 needed to go to Amit Patel, the regulatory people and

12 compliance officers to get the correct verbiage, and then

13 that's how -- what they were to deliver at the POAs.

14     That was the expectation of our training managers.  I

15 had the sales force.  She reported to our training manager,

16 Ron Martin, at the time, so...

17 Q.  Let me see if I can speed this up, sir.

18 A.  All right.  That's fine.

19 Q.  Ms. Graham testified that she told you that she did not

20 want to push off-label lessons, training sessions to the sales

21 force.

22     You're saying you don't recall that?

23 A.  I don't -- I don't think that happened.  That did not

24 happen.

25 Q.  And you're saying -- you're saying, if I understand it,

IACOBELLIS - REDIRECT - MARKETOS

1  that the expectation would be if she felt like she was being

2  compelled to promote an off-label message, she shouldn't have

3  told you, her supervisor; she should have gone to another

4  department?

5  A.   No, I'm not saying that.  I'm saying she was to deliver a

6  compliant message, so go to the compliance officer in

7  regulatory, get the right verbiage, and that's what you would

8  train to the field, to a POA, not that -- forcing them to do

9  it or get permission to do it.  Get the right verbiage from

10 the regulatory, the compliance officer, and then execute that.

11 Q.   Okay.

12      So she should not really be complaining to you about a

13 message.  She should be complaining to compliance.

14 A.   Or get the right message --

15      THE COURT:  Sorry.  Wait for the question because the

16 court reporter is trying to type the questions and the

17 response.

18      So just repeat that again.

19      MR. MARKETOS:  Okay.

20      THE WITNESS:  Thank you.

21 BY MR. MARKETOS:

22 Q.   As I understand it, just so that we're all clear, you're

23 saying Ms. Graham should have gone to a different department,

24 compliance, to get the right message that she should be

25 training the sales force on?

─────IACOBELLIS - REDIRECT - MARKETOS─────

1    A.   Yes.

2    Q.   Not you, the leader of sales training and development?

3    A.   Well, again, because they work with marketing, and HCC

4    knew what the appropriate messaging was or verbiage was.

5    Q.   Okay.

6         You're saying she should have gone to someone else?

7    A.   Yes.

8    Q.   Okay.

9         Very quickly, sir, I think you gave some -- an

10   explanation about testimony that you had provided in your

11   deposition that we played on the screen.

12   A.   Yeah.

13        MR. MARKETOS:  Can we switch over to the ELMO,

14   please.  I just want to make sure that I understand what the

15   confusion was, okay?

16   BY MR. MARKETOS:

17   Q.   You were asked -- I'm going to read from page 127 of your

18   sworn --

19        MS. BROWN:  Your Honor, it's improper impeachment.  I

20   object.

21        THE COURT:  Sidebar.

22        (Sidebar begins at 3:53 p.m.)

23        THE COURT:  I'll hear it.

24        MS. BROWN:  Because he hasn't -- he's just putting

25   prior testimony up on the screen.  He hasn't -- if he answers

IACOBELLIS - REDIRECT - MARKETOS

1  the question inconsistently, which he already did, he already

2  impeached with that.  Now --

3       THE COURT:  He already impeached him.  Let me finish.

4  He already impeached him.

5       MS. BROWN:  Correct.

6       THE COURT:  Then when you questioned him, he gave a

7  whole explanation about he didn't understand the question.

8       MS. BROWN:  Correct.

9       THE COURT:  And now that he sees it, he understands

10  it.  He didn't even know or didn't appreciate -- I'm going to

11  allow him to redirect on that to see how confusing that

12  question or the context around that question was.

13       I think he's allowed to go into that.  This was already

14  into the deposition.  It was already played.  He already

15  questioned about it.

16       Is there -- is there an objection between transcript

17  versus video?

18       MS. BROWN:  My objection is to put it on the screen,

19  Your Honor.  I mean, he wants to ask him about it, of course.

20  I asked about it.  I agree with the Court.  He can ask about

21  it.

22       My objection is to putting the hearsay statement on the

23  screen out of an improper impeachment context.

24       THE COURT:  I think he's already got the impeachment

25  context, and he's already played it.  To be honest, I think

───────IACOBELLIS - REDIRECT - MARKETOS───────

1    the only difference is he's going to do it a second time

2    because you questioned him about that and he gave a very

3    different response.  Right?

4            Initially, on the direct exam, he gave one testimony

5    here.  He was contradicted by the deposition where he said

6    yes, rather than no.

7            Then on cross-examination by Janssen, he then gave a

8    much further explanation as to why his statement was

9    inconsistent in the deposition.

10           I'm going to allow it.

11              (Sidebar was concluded at 3:55 p.m.)

12              (Open court.)

13              THE COURT:  All right, sir.

14           MR. MARKETOS:  Thank you, Your Honor.

15   BY MR. MARKETOS:

16   Q.  Mr. Iacobellis, I'm going to just read the testimony that

17   you gave, the question and answer in your deposition, and when

18   you were also under oath in this case.

19           Do you understand that?

20   A.  Yes.

21   Q.  All right.

22           This is from page 127 of your deposition:

23           "QUESTION:  The purpose was to get the paid speakers

24   and the attendees to increase their prescriptions of the

25   drugs, right?

─────IACOBELLIS - REDIRECT - MARKETOS─────

1        "ANSWER:  Yes."

2   A.   Yes.

3   Q.   Did you give that testimony in response to that question

4   then?

5   A.   Yes, I did.

6   Q.   And, sir, it's not a simple matter of giving testimony.

7   You actually, upon having testified, received a copy of that

8   transcript after you gave the testimony.

9        Right, sir?

10  A.   Yes.

11  Q.   And you had an opportunity to make corrections to it

12  years ago.

13       Correct?

14  A.   Yes.  I missed it.

15  Q.   You missed it.

16  A.   Right.

17  Q.   Just so that we're clear, the first time we're hearing

18  your testimony in this case as something different than that

19  the purpose of this speaker program was to get the paid

20  speakers and the attendees to increase their prescriptions of

21  the drugs, that's from the stand today.

22       That's the first time you're saying that.

23       Right, sir?

24  A.   Yes.

25  Q.   All right.

IACOBELLIS - REDIRECT - MARKETOS

1    So I also understood you to say, sir, and you correct

2  me if I'm wrong, that this nationwide scheme that is being

3  alleged in this case could not have taken place as described,

4  and that -- did you say you have not had any complaints about

5  this type of activity other than in this case?

6  A.   Doctors or the reps.

7  Q.   Let me ask one more time so that we're clear.

8    Are you testifying before this jury that during your

9  time with Janssen, Janssen Products, there were no complaints

10  about off-label marketing other than in this case?

11  A.   I don't remember, but I don't think so.  I don't

12  remember.  I can't -- I don't think so.

13  Q.   All right, sir.

14    Actually, you yourself, you were trained as a member of

15  Janssen Pharmaceuticals.  You were trained on what is called a

16  corporate integrity agreement that was entered into.

17    Do you recall that?

18  A.   Yes.

19  Q.   You specifically had to be trained because of your role

20  and your involvement in the promotion of drugs for Janssen.

21    Do you understand that?

22    Right?

23  A.   That's part of newer science, I believe.

24  Q.   Let's be clear about this now.  You -- you know that you

25  were trained while you were at Janssen that you had to adhere

IACOBELLIS - REDIRECT - MARKETOS

1    to a corporate integrity agreement that was entered into in

2    2010 with the Government?

3    A.   Yes, yes.

4    Q.   And let's take a look at Relators' Exhibit 423.

5         MR. MARKETOS:  Put that up just for the witness,

6    please, Ms. Johnson.

7    BY MR. MARKETOS:

8    Q.   You knew, sir, and you were trained on the fact that the

9    Government takes allegations of off-label marketing extremely

10   seriously.

11       Correct?

12   A.   Correct.

13   Q.   And you were trained on that, and you learned that in

14   relation to an instance in which allegations in a

15   whistleblower lawsuit turned into a corporate integrity

16   agreement that this company had to sign with the Government.

17       Correct?

18   A.   Yes.

19   Q.   All right.

20       And you actually learned the specifics about what the

21   company was required to do, Janssen Pharmaceuticals was

22   required to do.

23       Correct?

24   A.   Correct.

25   Q.   And you had to adhere to that corporate integrity

IACOBELLIS - REDIRECT - MARKETOS

1  agreement, and you had to teach people to adhere to that

2  corporate integrity agreement after it was entered.

3       Right?

4  A.   The company did, yes.

5  Q.   The company did.  You learned it from the company; the

6  company taught you.

7       Right, sir?

8  A.   Yes.

9  Q.   All right.

10      And you recognize that corporate integrity agreement

11 between the Office of the Inspector General and the Department

12 of Health and Human Services and Ortho-McNeil, Janssen

13 Pharmaceuticals.

14      Correct?

15 A.   Yes, sir.

16 Q.   All right.

17      Just to be clear, you were trained on this document

18 after it was executed in 2010.

19      Correct?

20 A.   Yes, sir.

21      MR. MARKETOS:  We offer Relators' Exhibit 423,

22 Your Honor.

23      MS. BROWN:  Your Honor, I haven't had a chance to

24 review the entire exhibit.  I don't have a copy here.

25      THE COURT:  Do you intend to publish that today, or

─────IACOBELLIS - REDIRECT - MARKETOS─────

1    is this being offered but not being published to this jury

2    today?

3              MR. MARKETOS:  I can offer it and publish it later,

4    Your Honor.

5              THE COURT:  I'm going to reserve on it.  Ms. Brown,

6    I'm going to give you time to review it.  We can just address

7    it tomorrow morning.

8          So you're moving to admit Relators' Exhibit -- what was

9    it -- 423?

10             MR. MARKETOS:  Yes, Your Honor.

11             THE COURT:  I'll reserve.  Ms. Brown, why don't we

12   just address it in the morning because it's not something that

13   Mr. Marketos intends to publish at this second.

14             MS. BROWN:  Thank you, Your Honor.  I appreciate it.

15             THE COURT:  Continue.

16             MR. MARKETOS:  All right.

17   BY MR. MARKETOS:

18   Q.  And, sir, just so that we're clear, it's not your

19   testimony that the Government doesn't take allegations like

20   those that had been lodged in this case seriously.

21         Is that fair?

22   A.  It does take it seriously.

23   Q.  Okay.

24         And you're not saying that it doesn't happen from time

25   to time, are you?

*United States District Court*
*District of New Jersey*

─────IACOBELLIS - REDIRECT - MARKETOS─────

1   A.   No.

2   Q.   Okay.

3        In fact, sir, you were also made aware of a 2013

4   corporate integrity agreement that was entered into by Johnson

5   & Johnson and Janssen with the federal government.

6        Correct?

7   A.   I wasn't aware of that.

8   Q.   You were trained -- you were trained on that in 2013 when

9   this corporate integrity agreement was amended.

10       Correct?

11  A.   I'll take your word for it.

12  Q.   Well, no.  I don't want to put words in your mouth.

13  A.   No, I mean, I just -- I don't recall that, 2013.  I was

14  in a different role, and it probably was part of the training.

15  I just don't recall it.

16  Q.   Okay.

17       Let's be clear here.  Let me just show you -- and we

18  can address its admission at a later time -- Relators' Exhibit

19  361.

20       You can take your time to review that document.  That

21  is a corporate integrity agreement between the Office of the

22  Inspector General of the Department of Health and Human

23  Services and Johnson & Johnson.

24       Do you see that?

25  A.   Yes, sir.

IACOBELLIS - REDIRECT - MARKETOS

1   Q.   And that applied to all Johnson & Johnson affiliates,

2   including Janssen.

3        Correct?

4   A.   Yes.

5   Q.   And there was a reason that this agreement was entered

6   into between Johnson & Johnson and Janssen specifically and

7   the federal government.

8        Right, sir?

9   A.   Yes.

10  Q.   And that was a result of allegations of off-label

11  marketing of drugs.

12       Right, sir?

13  A.   Yes.

14  Q.   And you're aware of the fact that the Government

15  addressed these matters by requiring Johnson & Johnson and all

16  of its affiliates to adhere to an agreement that lasted over

17  the course of eight years, from 2010, and then another in 2013

18  for another five years.

19       Right, sir?

20  A.   Yes.

21  Q.   Sir, are you aware of the fact that under these corporate

22  integrity agreements, Janssen and Johnson & Johnson were

23  required to report instances in which it became aware of

24  off-label promotion by its sales force?

25       Right, sir?

IACOBELLIS - REDIRECT - MARKETOS

1   A.   Yes.

2   Q.   And Johnson & Johnson and Janssen knew that if they did

3   not adhere to these agreements, that the Government could

4   exclude them from the Medicare program.  You understood that.

5        Right?

6   A.   Yes.

7   Q.   You understand that Johnson & Johnson was required to

8   report and Janssen was required to report regularly to the

9   Government with respect to promotional activities with its

10  pharmaceutical drugs.

11       Right?

12  A.   Yes.

13  Q.   Nothing to do with this case.

14       Right, sir?

15  A.   Yes.

16  Q.   All right.

17       MR. MARKETOS:  Your Honor, I have a few more

18  questions for this witness on this topic.  Should I continue?

19       THE COURT:  Yes.

20       MR. MARKETOS:  All right.  Thank you.

21  BY MR. MARKETOS:

22  Q.   Just to be clear, sir, Johnson & Johnson and Janssen,

23  while -- while you were there, knew that this type of

24  off-label -- the allegations of off-label promotion that have

25  occurred in this case, the Government took those extremely

─IACOBELLIS - REDIRECT - MARKETOS─

1    seriously.

2        Right, sir?

3    A.   Yes, sir.

4    Q.   All right.

5        And you also know that it was not just material to the

6    Government, but Johnson & Johnson and Janssen knew about it?

7        MS. BROWN:  Objection, Your Honor, to the form of the

8    question.  Material.

9        MR. MARKETOS:  It was a bad question.  I'll rephrase.

10       THE COURT:  All right.  Sustained.

11       Yeah, rephrase.

12       MR. MARKETOS:  Yeah, it was a bad question.

13   BY MR. MARKETOS:

14   Q.   Johnson & Johnson and Janssen know that they are required

15   to adhere to the FDA regulations on off-label promotion of

16   drugs.

17       Correct?

18   A.   Yes.

19   Q.   All right.

20       And that means, sir -- let's be clear.  In 2010, a

21   corporate integrity agreement was entered into.

22       Right, sir?

23   A.   Yes.

24   Q.   Separately, other allegations of off-label marketing were

25   brought forward, and Johnson & Johnson entered into a second

IACOBELLIS - REDIRECT - MARKETOS

1    agreement.

2         Right, sir?

3    A.   Yes.

4    Q.   Extending it another five years, based on alleged

5    off-label promotion of drugs.

6         Right, sir?

7    A.   Yes.

8    Q.   And because of alleged kickbacks paid to doctors with

9    respect to speaker programs.

10        You understand that.

11        Right?

12   A.   Yes.

13   Q.   You're not telling this jury that Janssen was not aware

14   that these issues were a problem for the federal government;

15   it's your testimony that you just believe they didn't happen

16   in this case.

17        Is that right?

18   A.   I was not aware of any off-label promotion.  It didn't

19   happen, at least to my knowledge.

20   Q.   At least to your knowledge.

21        And you, sir, of course, have testified that there are

22   a lot of things that we looked at today that you were not

23   aware of.

24        Is that fair?

25   A.   Just based on the time frame.

─────IACOBELLIS - REDIRECT - MARKETOS─────

1  Q.   Isn't it better -- isn't it fair to say, Mr. Iacobellis,

2  that the people who knew what was going on in the field were

3  the people that were in the field at Janssen from the time

4  period of 2006 to 2014?

5  A.   You would think, yes.

6        MR. MARKETOS:  No further questions, Your Honor.

7        THE COURT:  All right.  Thank you, Mr. Marketos.

8        Sir, you're excused from the trial.  You may be

9  excused.  Thank you.

10        THE WITNESS:  Thank you, Judge.

11        THE COURT:  Folks, we're going to adjourn for the

12  day.  I will see you all tomorrow morning.  Do what you can to

13  be here on time, folks.  I understand things will come up.  So

14  that's human, and that may happen with one of us one day.  So

15  just do what you can; we'll be ready here at 9 o'clock.  For

16  all of you, at 9:30.  We'll continue with witness testimony.

17        Counsel, remain.  I do want to speak with you at

18  least -- maybe even off the record to give the court reporter

19  a break unless there's something critical.  But let's dismiss

20  the jurors for the day.

21        Thank you, folks.  See you tomorrow morning.

22            (Jury dismissed.)

23        THE COURT:  Anything we need to discuss on the

24  record, or can we discuss off the record?  But I don't know if

25  there's something critical that we need to put on the record.

1    MS. BROWN:  The one thing that I'm -- oh, sorry.

2    THE COURT:  No, no.  That's all right.

3    Mr. Marketos, nothing?

4    MR. MARKETOS:  Nothing from the Relators, Your Honor.

5    THE COURT:  All right.  Let me hear from Ms. Brown.

6    MS. BROWN:  Your Honor, the one thing I would like to

7  discuss, and I had reached out several weeks ago on this, but

8  I think now is the appropriate time.  We would like the

9  limiting instruction on the CIAs read first --

10    THE COURT:  It's in my notes.

11    MS. BROWN:  Okay.  Okay.  Thank you.

12    THE COURT:  So what I was going to say to you all --

13  well, we can do this on the record, but I presume there's no

14  disagreement.  I'm going to give a limiting instruction so --

15  with respect to the Corporate Integrity Agreement.

16    So why don't briefly just discuss off the record, since

17  we're all on the same page, that that is something I'm going

18  to have you entertain.  But I just want to give Megan a break

19  for the afternoon.

20    MS. BROWN:  Sure.  Sure.

21    THE COURT:  All right.  So we're off the record.

22    (Court ends at 4:07 p.m.)

23

24

25

1    FEDERAL OFFICIAL COURT REPORTER'S CERTIFICATE.

2         - - - - - - - - - - - - - - - - - - - - -

3

4      I certify that the foregoing is a correct transcript from

5    the record of proceedings in the above-entitled matter.

6

7

8      I

9

10

11   /S/ Megan McKay-Soule, RDR, CRR    May 14, 2024

12            Court Reporter                        Date

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$106** [1] - 1422:5
**$13** [1] - 1352:17
**$17** [1] - 1416:20
**$2,500** [1] - 1401:9
**$30** [1] - 1423:5
**$45** [1] - 1358:6
**$80** [1] - 1352:18

## '

**'05** [1] - 1536:14
**'07** [1] - 1319:14
**'08** [2] - 1319:16, 1323:15
**'11** [2] - 1494:18, 1532:6
**'80s** [1] - 1315:4
**'81** [1] - 1315:6

## /

**/S** [1] - 1587:11

## 0

**08608** [1] - 1301:9

## 1

**1** [4] - 1339:22, 1404:25, 1457:2, 1489:7
**1,000** [1] - 1406:10
**1,500** [1] - 1401:9
**10** [4] - 1306:15, 1306:22, 1339:17, 1369:2
**100** [2] - 1436:4, 1477:6
**11** [3] - 1345:19, 1352:7, 1404:10
**1115** [2] - 1431:3, 1431:4
**1148** [2] - 1429:11
**11:00** [2] - 1309:3, 1309:19
**11:05** [1] - 1370:24
**11:12** [1] - 1377:17
**11:15** [2] - 1309:5, 1309:20
**11:17** [1] - 1381:14
**11:20** [1] - 1309:20
**11:22** [1] - 1386:11
**12** [4] - 1345:19, 1350:25, 1351:2
**122** [4] - 1302:11, 1412:8, 1413:1, 1413:4

**1224** [1] - 1555:18
**124** [4] - 1302:14, 1456:8, 1456:15, 1456:18
**125** [2] - 1351:12, 1351:19
**127** [4] - 1404:6, 1404:10, 1572:17, 1574:22
**12:00** [2] - 1309:13, 1309:21
**12:30** [4] - 1309:4, 1309:12, 1309:22, 1440:25
**1311** [1] - 1302:5
**132** [1] - 1450:11
**1334** [1] - 1302:9
**136** [1] - 1462:19
**1365** [1] - 1302:10
**1368** [1] - 1302:10
**139** [1] - 1367:9
**14** [4] - 1301:10, 1303:2, 1499:9, 1587:11
**1413** [1] - 1302:11
**1421** [1] - 1302:11
**1433** [1] - 1302:12
**1447** [1] - 1302:13
**1453** [1] - 1302:13
**1456** [1] - 1302:14
**1469** [1] - 1302:14
**1493** [1] - 1302:15
**1499** [1] - 1302:15
**15** [7] - 1306:16, 1306:22, 1307:4, 1307:23, 1310:18, 1412:13, 1550:4
**150** [4] - 1393:1, 1393:17, 1395:24, 1396:7
**1514** [1] - 1302:16
**1517** [1] - 1302:5
**154** [1] - 1490:15
**1554** [1] - 1302:16
**1566** [1] - 1302:6
**15th** [1] - 1547:12
**16** [1] - 1450:15
**17** [1] - 1417:5
**170** [5] - 1302:14, 1468:12, 1468:20, 1469:17, 1469:20
**1701** [2] - 1332:18, 1332:22
**177** [1] - 1414:7
**179** [6] - 1302:9, 1330:22, 1333:11, 1333:16, 1334:3, 1544:25
**18** [1] - 1470:25
**19** [1] - 1423:8

**195** [1] - 1392:23
**199** [2] - 1511:14, 1511:15
**1:00** [1] - 1439:23
**1:15** [2] - 1440:8, 1440:25

## 2

**2** [4] - 1371:25, 1439:14, 1457:2, 1489:7
**2,500** [1] - 1401:10
**20** [7] - 1307:23, 1310:18, 1316:16, 1345:8, 1542:16, 1542:24, 1562:17
**20,000** [2] - 1342:16, 1345:13
**200-milligram** [1] - 1472:16
**2005** [4] - 1317:13, 1318:3, 1318:13, 1322:22
**2006** [43] - 1312:25, 1327:17, 1328:10, 1328:11, 1328:20, 1330:17, 1336:11, 1336:21, 1339:19, 1341:3, 1341:15, 1354:9, 1354:14, 1354:15, 1357:5, 1358:8, 1358:15, 1361:13, 1362:3, 1364:23, 1368:13, 1386:18, 1392:16, 1396:6, 1419:16, 1419:24, 1420:18, 1422:12, 1425:21, 1429:16, 1485:16, 1498:21, 1499:9, 1503:2, 1521:7, 1531:10, 1531:25, 1532:8, 1547:21, 1558:5, 1585:4
**2007** [18] - 1319:9, 1320:4, 1322:22, 1323:12, 1323:17, 1331:8, 1339:19, 1341:3, 1341:16, 1341:22, 1343:21, 1343:25, 1421:5, 1421:9, 1422:4, 1422:17, 1488:5, 1547:12
**2008** [24] - 1320:4, 1320:6, 1320:13, 1323:22, 1339:19, 1341:12, 1341:16, 1412:13, 1414:12,

**1427:4, 1431:4,** 1431:6, 1431:16, 1433:18, 1447:4, 1456:12, 1531:25, 1532:4, 1532:8, 1547:25, 1548:7, 1551:13, 1552:4, 1552:21
**2009** [2] - 1450:15, 1451:5
**2010** [12] - 1450:14, 1462:23, 1462:24, 1504:12, 1506:12, 1514:7, 1557:10, 1558:1, 1577:2, 1578:18, 1581:17, 1583:20
**2011** [10] - 1321:16, 1323:12, 1323:17, 1323:22, 1324:5, 1324:6, 1324:12, 1470:2, 1532:6, 1535:16
**2013** [4] - 1580:3, 1580:8, 1580:13, 1581:17
**2014** [8] - 1312:25, 1321:16, 1324:2, 1324:8, 1324:14, 1327:18, 1425:21, 1585:4
**2022** [7] - 1312:18, 1317:13, 1324:2, 1324:5, 1484:14, 1484:24, 1537:4
**2024** [4] - 1301:10, 1303:3, 1556:8, 1587:11
**2079** [1] - 1446:24
**2083** [4] - 1302:12, 1433:9, 1433:21, 1433:24
**21** [2] - 1454:24, 1455:4
**222** [1] - 1358:13
**236** [4] - 1302:15, 1492:8, 1493:3, 1493:6
**26th** [1] - 1364:23
**272** [2] - 1504:3, 1504:4
**28** [1] - 1456:12
**283** [6] - 1302:16, 1513:13, 1514:1, 1514:5, 1518:15, 1520:2
**2:02** [1] - 1480:14
**2:05** [1] - 1483:8
**2:45** [2] - 1440:9, 1440:14

## 3

**3** [2] - 1470:2, 1489:7
**3,700** [1] - 1358:17
**30** [7] - 1309:2, 1344:1, 1344:10, 1345:24, 1447:4, 1452:3, 1452:8
**308** [5] - 1302:11, 1421:12, 1421:13, 1421:21, 1421:25
**316** [1] - 1409:14
**34** [1] - 1335:15
**360** [5] - 1302:10, 1368:3, 1368:5, 1368:15, 1368:19
**361** [1] - 1580:19
**385** [5] - 1302:10, 1364:13, 1364:21, 1364:25, 1365:4
**3:00** [1] - 1549:19
**3:12-cv-07758-ZNQ-JBD** [1] - 1301:4
**3:30** [1] - 1307:2
**3:40** [1] - 1307:2
**3:45** [1] - 1307:3
**3:53** [1] - 1572:22
**3:55** [1] - 1574:11
**3rd** [1] - 1433:18

## 4

**4** [2] - 1306:14, 1404:10
**40** [3] - 1330:5, 1522:21, 1534:22
**40-year** [1] - 1537:18
**402** [1] - 1391:9
**418** [6] - 1302:13, 1452:22, 1453:7, 1453:13, 1453:19, 1453:22
**42** [3] - 1396:2, 1396:3, 1534:22
**423** [3] - 1577:4, 1578:21, 1579:9
**45** [8] - 1302:13, 1439:22, 1446:23, 1447:9, 1447:14, 1447:16, 1449:18
**48-week** [4] - 1500:13, 1500:21, 1558:11, 1558:15
**49** [2] - 1454:12, 1490:13
**4:00** [2] - 1440:18, 1550:12
**4:07** [1] - 1586:22

## 5

**50** [1] - 1490:14
**53** [1] - 1424:23
**59** [1] - 1369:7
**5th** [2] - 1305:9, 1305:15

## 6

**6** [2] - 1301:5, 1421:6
**60** [1] - 1490:14
**600** [1] - 1301:17
**609** [1] - 1301:24
**67** [1] - 1379:18

## 7

**7** [2] - 1425:1, 1451:4
**73** [1] - 1486:18
**75** [2] - 1352:10, 1352:18
**750** [1] - 1301:17
**75201** [1] - 1301:17

## 8

**8** [2] - 1422:1, 1423:4
**80** [4] - 1344:2, 1344:11, 1345:25, 1352:10
**80,000** [2] - 1342:14, 1342:15
**815-2319** [1] - 1301:24
**8701** [1] - 1420:5
**88** [7] - 1302:15, 1497:8, 1498:14, 1498:16, 1499:19, 1499:2, 1499:5
**896** [1] - 1358:18
**8th** [1] - 1521:7

## 9

**9** [2] - 1334:5, 1585:15
**90** [1] - 1482:5
**920** [1] - 1301:21
**93** [1] - 1386:22
**96** [1] - 1451:24
**97** [2] - 1388:7, 1388:20
**9:00** [2] - 1301:10, 1303:3
**9:30** [3] - 1307:16, 1309:3, 1585:16

## A

**A&U** [1] - 1470:3
**a.m** [6] - 1301:10,

1303:3, 1370:24, 1377:17, 1381:14, 1386:11
**ability** [1] - 1537:17
**able** [5] - 1306:8, 1374:18, 1480:21, 1535:16, 1545:22
**above-entitled** [1] - 1587:5
**absolutely** [21] - 1370:21, 1380:19, 1383:12, 1389:6, 1401:24, 1474:12, 1481:10, 1487:6, 1491:19, 1508:24, 1511:13, 1519:6, 1523:25, 1524:2, 1537:16, 1546:15, 1549:20, 1553:12, 1555:14, 1556:25, 1569:13
**abstract** [1] - 1385:23
**abuse** [1] - 1516:9
**academia** [1] - 1411:12
**accept** [1] - 1435:6
**access** [1] - 1437:22
**accolades** [1] - 1510:15
**according** [5] - 1411:8, 1477:12, 1486:4, 1510:14, 1520:6
**accordingly** [1] - 1304:13
**account** [2] - 1534:2, 1535:21
**accountable** [1] - 1530:22
**accuracy** [1] - 1520:22
**accurate** [2] - 1390:1, 1442:16
**accurately** [2] - 1391:5, 1489:22
**accusations** [2] - 1522:23, 1567:12
**accused** [2] - 1522:18, 1525:20
**achieve** [1] - 1343:25
**acknowledge** [1] - 1429:15
**acknowledging** [1] - 1505:16
**acquired** [3] - 1316:12, 1316:14, 1534:15
**acquisitions** [1] - 1534:13
**Act** [7] - 1328:3, 1373:5, 1382:10,

1384:1, 1384:4, 1384:9, 1384:24
**act** [1] - 1489:19
**acting** [1] - 1480:4
**Action** [1] - 1421:16
**action** [9] - 1381:1, 1381:23, 1412:12, 1413:7, 1444:22, 1444:23, 1477:3, 1520:6, 1527:13
**ACTION** [1] - 1301:3
**actions** [2] - 1506:14, 1543:17
**Activation** [1] - 1331:7
**actively** [1] - 1407:16
**activities** [6] - 1341:25, 1343:4, 1504:22, 1546:13, 1568:16, 1582:9
**activity** [11] - 1388:12, 1389:3, 1418:13, 1418:14, 1419:6, 1487:9, 1502:3, 1509:23, 1521:22, 1569:5, 1576:5
**Activity** [1] - 1470:2
**actual** [6] - 1340:10, 1355:11, 1394:1, 1449:14, 1457:13, 1556:20
**actuality** [1] - 1451:15
**ad** [2] - 1363:9, 1363:10
**ADAM** [1] - 1301:16
**add** [5] - 1306:23, 1530:2, 1560:21, 1560:22, 1562:11
**additional** [3] - 1361:19, 1453:3, 1501:8
**address** [5] - 1334:1, 1384:16, 1579:6, 1579:12, 1580:18
**addressable** [9] - 1344:2, 1344:11, 1344:14, 1345:5, 1345:6, 1345:17, 1345:24, 1345:25
**addressed** [3] - 1372:14, 1389:14, 1581:15
**adequate** [2] - 1434:12, 1434:21
**adhere** [6] - 1576:25, 1577:25, 1578:1, 1581:16, 1582:3, 1583:15
**adjective** [1] - 1557:3
**adjectives** [2] - 1459:24, 1560:16

**adjourn** [1] - 1585:11
**adjunct** [1] - 1537:4
**adjust** [2] - 1310:17, 1421:1
**adjusted** [3] - 1359:24, 1420:18, 1420:21
**adjustments** [1] - 1506:14
**administered** [2] - 1366:6, 1429:20
**administering** [1] - 1454:23
**Administration** [8] - 1329:9, 1387:15, 1427:20, 1428:18, 1444:18, 1445:6, 1464:18, 1464:21
**administration** [1] - 1315:8
**admission** [1] - 1580:18
**admit** [3] - 1518:15, 1554:16, 1579:8
**admitted** [19] - 1365:3, 1368:18, 1381:18, 1382:23, 1413:3, 1421:24, 1433:23, 1447:11, 1453:21, 1456:17, 1469:19, 1493:5, 1499:4, 1504:4, 1514:4, 1518:17, 1520:1, 1554:19, 1555:18
**adopt** [1] - 1339:9
**advance** [7] - 1305:11, 1305:13, 1310:9, 1338:13, 1546:1, 1548:13, 1548:18
**advanced** [3] - 1548:11, 1548:24, 1551:14
**advantages** [1] - 1351:21
**adverse** [3] - 1349:4, 1431:12, 1506:2
**advertisement** [2] - 1515:25, 1516:2
**advice** [1] - 1512:15
**advised** [1] - 1383:2
**advisory** [1] - 1363:11
**affairs** [2] - 1398:6, 1520:21
**affected** [1] - 1544:16
**affecting** [1] - 1389:21
**affiliates** [2] - 1581:1, 1581:16
**afternoon** [8] - 1441:23, 1441:24, 1517:19, 1517:21,

1532:9, 1532:24, 1549:19, 1586:19
**age** [1] - 1453:17
**agent** [2] - 1355:7, 1530:5
**agents** [2] - 1439:1, 1530:12
**aggressive** [1] - 1479:24
**ago** [10] - 1312:10, 1362:13, 1398:15, 1501:16, 1518:19, 1531:12, 1562:17, 1575:12, 1586:7
**agree** [26] - 1352:5, 1354:18, 1370:20, 1375:4, 1384:15, 1385:23, 1386:2, 1391:11, 1431:1, 1439:7, 1443:15, 1462:8, 1462:17, 1462:18, 1467:25, 1486:24, 1486:25, 1494:22, 1502:19, 1502:24, 1502:25, 1506:5, 1506:9, 1513:3, 1547:5, 1573:20
**agreed** [10] - 1450:5, 1455:22, 1455:23, 1462:14, 1462:15, 1491:2, 1491:3, 1491:8, 1495:9, 1547:6
**agreement** [14] - 1564:10, 1576:16, 1577:1, 1577:16, 1578:1, 1578:2, 1578:10, 1580:4, 1580:9, 1580:21, 1581:5, 1581:16, 1583:21, 1584:1
**Agreement** [1] - 1586:15
**agreements** [2] - 1581:22, 1582:3
**ahead** [6] - 1344:24, 1400:2, 1404:12, 1417:7, 1441:13, 1492:19
**aid** [3] - 1343:8, 1435:22, 1446:7
**aided** [1] - 1301:25
**aids** [4] - 1445:24, 1446:1, 1446:2, 1516:1
**al** [1] - 1301:4
**alcohol** [1] - 1405:12
**alignment** [2] - 1442:17, 1442:20

**allegation** [10] - 1327:22, 1426:5, 1426:10, 1426:11, 1426:14, 1426:20, 1426:21, 1427:6, 1428:1, 1428:6

**allegations** [20] - 1326:9, 1327:14, 1327:20, 1328:2, 1384:10, 1425:18, 1425:22, 1427:11, 1522:15, 1524:10, 1526:13, 1527:6, 1531:1, 1566:7, 1577:9, 1577:14, 1579:19, 1581:10, 1582:24, 1583:24

**allege** [1] - 1539:5

**alleged** [6] - 1384:10, 1519:10, 1528:11, 1576:3, 1584:4, 1584:8

**allegedly** [1] - 1381:23

**Alli** [1] - 1303:18

**ALLISON** [1] - 1301:19

**Allison** [1] - 1499:13

**allotted** [1] - 1413:20

**allow** [10] - 1333:20, 1334:2, 1376:22, 1385:7, 1385:10, 1386:6, 1466:3, 1529:22, 1573:11, 1574:10

**allowed** [4] - 1376:21, 1551:18, 1551:24, 1573:13

**allowing** [1] - 1516:18

**almost** [5] - 1352:11, 1481:3, 1525:23, 1562:17

**amazing** [1] - 1534:19

**amended** [1] - 1580:9

**AMERICA** [1] - 1301:3

**American** [2] - 1316:6, 1316:8

**Amit** [1] - 1570:11

**amount** [4] - 1359:14, 1401:12, 1406:19, 1417:15

**amounts** [1] - 1417:10

**analysis** [4] - 1347:1, 1410:8, 1562:4, 1562:9

**analytics** [1] - 1545:9

**Andrew** [1] - 1303:14

**ANDREW** [1] - 1301:15

**annual** [1] - 1405:22

**anonymous** [3] -

1515:19, 1538:5, 1538:6

**anonymously** [1] - 1477:1

**ANSWER** [1] - 1575:1

**answer** [20] - 1315:18, 1346:20, 1408:4, 1408:5, 1408:6, 1408:7, 1410:15, 1415:18, 1430:16, 1453:1, 1473:6, 1480:20, 1480:23, 1481:17, 1490:5, 1509:16, 1526:7, 1541:25, 1560:15, 1574:17

**answering** [1] - 1481:13

**answers** [7] - 1480:17, 1480:18, 1481:4, 1481:9, 1481:22, 1482:5, 1572:25

**anticipated** [1] - 1551:6

**antiretroviral** [1] - 1439:1

**apologetic** [1] - 1308:6

**apologize** [2] - 1447:13, 1467:6

**apparent** [1] - 1419:17

**appearances** [1] - 1303:7

**appearing** [1] - 1523:16

**applied** [3] - 1380:24, 1382:11, 1581:1

**apply** [1] - 1375:8

**appreciate** [7] - 1306:4, 1458:3, 1458:4, 1506:14, 1527:2, 1573:10, 1579:14

**appreciated** [1] - 1506:12

**appreciation** [1] - 1533:20

**approach** [3] - 1370:22, 1399:22, 1543:2

**appropriate** [7] - 1434:23, 1435:17, 1540:3, 1541:2, 1554:3, 1572:4, 1586:8

**approval** [15] - 1329:9, 1329:12, 1329:23, 1338:10, 1340:2, 1434:23, 1444:17, 1444:22, 1448:8,

1539:24, 1548:1, 1551:1, 1551:6, 1551:10, 1551:13

**approved** [53] - 1329:15, 1329:20, 1331:21, 1336:3, 1336:7, 1341:4, 1345:13, 1349:11, 1370:11, 1425:8, 1427:9, 1427:21, 1428:14, 1428:24, 1429:3, 1432:6, 1432:8, 1435:18, 1438:12, 1443:7, 1443:14, 1444:2, 1445:7, 1445:18, 1446:11, 1446:18, 1448:12, 1449:11, 1455:14, 1459:22, 1460:11, 1461:12, 1477:15, 1480:11, 1484:3, 1484:10, 1485:6, 1491:5, 1491:6, 1518:3, 1525:3, 1539:22, 1540:25, 1545:23, 1548:7, 1551:21, 1556:6, 1556:16, 1556:20, 1556:24, 1557:2, 1560:5, 1564:5

**April** [2] - 1319:16, 1323:15

**area** [7] - 1317:9, 1330:18, 1331:21, 1394:12, 1432:7, 1534:12, 1569:11

**areas** [1] - 1390:14

**Areas** [1] - 1389:14

**argue** [2] - 1383:10, 1385:19

**arguing** [2] - 1383:22, 1383:23

**arise** [1] - 1431:20

**arm** [1] - 1346:18

**ARPS** [1] - 1301:19

**arranged** [1] - 1346:10

**arrangement** [6] - 1389:16, 1389:24, 1390:4, 1390:15, 1390:19, 1390:25

**arrow** [1] - 1365:15

**ARTEMIS** [1] - 1505:16

**article** [2] - 1444:12, 1555:12

**AS** [1] - 1311:11

**aside** [3] - 1417:10, 1417:13, 1557:3

**assessing** [2] -

1343:21, 1418:10

**assimilation** [1] - 1494:20

**associated** [7] - 1355:19, 1366:3, 1399:9, 1432:2, 1432:14, 1433:5, 1461:23

**assume** [5] - 1325:23, 1344:19, 1400:17, 1444:6, 1514:19

**assumed** [3] - 1442:14, 1541:23, 1569:17

**assuming** [1] - 1507:17

**attachment** [1] - 1470:1

**attachments** [1] - 1469:23

**attack** [1] - 1526:14

**attainment** [1] - 1507:25

**attempt** [2] - 1392:25, 1393:16

**attempted** [1] - 1329:8

**attend** [5] - 1404:18, 1404:19, 1405:4, 1407:6, 1417:17

**attendance** [2] - 1407:4, 1525:16

**attended** [3] - 1404:24, 1405:18, 1510:15

**attendee** [1] - 1507:24

**attendees** [14] - 1403:25, 1404:3, 1404:4, 1417:2, 1507:21, 1540:16, 1540:21, 1540:24, 1541:4, 1541:22, 1541:23, 1541:24, 1574:24, 1575:20

**attending** [6] - 1359:2, 1407:1, 1407:18, 1407:25, 1408:15, 1408:22

**attention** [16] - 1310:25, 1326:8, 1328:8, 1333:10, 1349:16, 1371:3, 1385:9, 1429:7, 1446:15, 1459:8, 1460:14, 1468:14, 1472:17, 1476:16, 1485:10

**attorneys** [2] - 1325:10, 1387:14

**attracted** [2] - 1535:1, 1535:3

**audience** [5] - 1510:22, 1519:1, 1540:21, 1540:24, 1541:2

**audit** [2] - 1407:6, 1407:19

**August** [1] - 1450:15, 1534:22

**author** [1] - 1561:6

**authority** [1] - 1323:22

**availability** [1] - 1472:16

**available** [6] - 1306:15, 1311:4, 1342:23, 1431:16, 1554:24, 1558:20

**aware** [45] - 1305:14, 1327:2, 1327:14, 1329:1, 1330:4, 1396:4, 1396:9, 1401:8, 1405:22, 1409:15, 1410:4, 1416:14, 1427:14, 1430:10, 1430:14, 1430:17, 1430:19, 1445:5, 1445:17, 1460:5, 1483:16, 1483:24, 1484:15, 1484:21, 1485:1, 1507:14, 1509:9, 1509:19, 1513:9, 1519:8, 1537:25, 1539:5, 1546:21, 1547:3, 1554:4, 1561:9, 1561:13, 1580:3, 1580:7, 1581:14, 1581:21, 1581:23, 1584:13, 1584:18, 1584:23

**awareness** [7] - 1402:14, 1404:2, 1404:3, 1415:19, 1416:1, 1451:23, 1553:16

**awry** [2] - 1519:13, 1520:8

## B

**bachelor's** [1] - 1315:3

**backdoor** [1] - 1486:14

**background** [2] - 1315:23, 1546:11

**backup** [1] - 1520:16

**backwards** [1] - 1420:21

**bad** [11] - 1358:21, 1388:22, 1418:8,

1439:5, 1455:24, 1456:5, 1466:18, 1473:10, 1513:1, 1583:9, 1583:12

**bailiwick** [1] - 1337:13

**base** [1] - 1434:8

**based** [19] - 1306:17, 1334:23, 1411:23, 1427:19, 1486:22, 1491:16, 1496:13, 1501:6, 1501:21, 1510:14, 1520:10, 1530:23, 1542:2, 1548:23, 1551:12, 1564:18, 1566:6, 1584:4, 1584:25

**basic** [1] - 1495:19

**basis** [6] - 1381:9, 1405:23, 1418:4, 1427:9, 1444:23, 1521:14

**Bates** [1] - 1332:6

**baton** [2] - 1468:24, 1476:3

**bear** [2] - 1371:17, 1371:19

**bearings** [1] - 1313:15

**became** [20] - 1312:13, 1313:16, 1313:20, 1316:12, 1316:17, 1319:10, 1319:16, 1319:25, 1320:23, 1323:14, 1414:13, 1419:16, 1499:19, 1501:22, 1533:23, 1537:4, 1539:5, 1548:7, 1551:10, 1581:23

**become** [2] - 1519:8, 1537:25

**becomes** [2] - 1367:17, 1561:8

**BEEN** [1] - 1311:10

**began** [3] - 1315:10, 1316:3, 1318:3

**begin** [3] - 1311:17, 1323:18, 1455:7

**beginning** [5] - 1303:8, 1304:19, 1328:8, 1457:14, 1562:22

**begins** [4] - 1370:24, 1381:14, 1480:14, 1572:22

**behalf** [1] - 1328:3

**behavior** [3] - 1416:4, 1416:7, 1538:2

**behaviors** [3] - 1543:9, 1543:10, 1544:19

**behest** [1] - 1426:15

**behind** [2] - 1337:8, 1539:24

**belief** [2] - 1351:11, 1542:15

**below** [6] - 1332:24, 1449:6, 1471:18, 1471:24, 1475:4, 1515:17

**Ben** [8] - 1396:24, 1450:15, 1462:25, 1479:2, 1557:9, 1557:24, 1558:1

**bench** [1] - 1307:18

**benchmark** [5] - 1348:2, 1348:3, 1348:7, 1348:11, 1349:23

**benefit** [4] - 1351:12, 1351:18, 1416:4, 1450:18

**best** [6] - 1440:16, 1482:5, 1491:11, 1537:17, 1537:19, 1540:7

**better** [11] - 1308:15, 1322:21, 1409:2, 1415:20, 1428:13, 1435:10, 1438:12, 1439:11, 1452:18, 1491:11, 1585:1

**between** [17] - 1337:1, 1341:23, 1343:3, 1344:1, 1344:10, 1345:24, 1439:1, 1545:14, 1547:16, 1553:10, 1556:12, 1560:13, 1561:4, 1573:16, 1578:11, 1580:21, 1581:6

**beverages** [1] - 1403:8

**beyond** [1] - 1345:18

**BID** [2] - 1427:10, 1461:4

**big** [2] - 1487:19, 1521:3

**Bill** [4] - 1475:22, 1476:11, 1476:12, 1476:13

**billions** [4] - 1352:25, 1353:3, 1353:14, 1353:20

**bit** [25] - 1304:15, 1305:8, 1308:3, 1309:12, 1309:18, 1310:15, 1310:20, 1313:8, 1314:3, 1319:20, 1320:25, 1352:21, 1386:8,

1399:10, 1525:5, 1525:7, 1526:5, 1533:8, 1534:25, 1535:1, 1539:12, 1544:11, 1550:5, 1550:12, 1565:18

**black** [2] - 1524:23, 1524:24

**bladder** [1] - 1309:24

**blindsided** [1] - 1555:7

**block** [1] - 1557:17

**blow** [11] - 1343:18, 1344:4, 1344:7, 1348:4, 1351:4, 1351:9, 1457:4, 1463:3, 1471:8, 1505:8

**blue** [2] - 1340:8, 1345:14

**board** [4] - 1326:4, 1360:10, 1360:11, 1540:4

**boards** [3] - 1363:9, 1363:10, 1363:11

**body** [1] - 1328:17

**boosted** [1] - 1436:3

**booster** [1] - 1366:10

**bottom** [20] - 1332:3, 1332:6, 1334:25, 1344:3, 1344:5, 1351:14, 1352:17, 1365:9, 1371:16, 1374:5, 1414:15, 1415:17, 1434:1, 1456:20, 1465:6, 1471:6, 1479:4, 1504:21, 1557:25, 1560:24

**box** [2] - 1308:22, 1344:5

**boy** [1] - 1534:24

**Brad** [1] - 1303:22

**BRADLEY** [1] - 1301:20

**brainstorm** [2] - 1358:2, 1359:3

**brainstorming** [5] - 1468:9, 1468:10, 1478:24, 1546:25, 1561:11

**brakes** [1] - 1415:4

**Brancaccio** [7] - 1312:2, 1318:23, 1327:3, 1327:15, 1418:18, 1567:18, 1568:13

**brand** [3] - 1437:22, 1471:25, 1474:15

**Brand** [1] - 1470:3

**branded** [1] - 1375:19

**Braven** [2] - 1537:7

**break** [27] - 1304:15, 1308:24, 1308:25, 1309:3, 1309:11, 1309:12, 1309:19, 1309:21, 1309:23, 1310:18, 1310:23, 1311:1, 1391:12, 1391:20, 1425:24, 1439:18, 1439:22, 1440:21, 1441:25, 1490:19, 1549:18, 1549:21, 1558:3, 1558:15, 1564:12, 1585:19, 1586:18

**breaks** [1] - 1385:1

**bribe** [3] - 1524:6, 1536:25, 1563:6

**bribing** [1] - 1566:2

**Brief** [2] - 1371:18, 1371:24

**briefed** [1] - 1386:5

**briefly** [6] - 1533:12, 1537:2, 1563:12, 1566:14, 1566:19, 1586:16

**bring** [8] - 1305:1, 1371:3, 1376:5, 1462:21, 1525:12, 1546:8, 1554:13, 1567:24

**bringing** [1] - 1384:9

**broader** [2] - 1330:8, 1355:11

**brought** [12] - 1327:15, 1328:2, 1328:3, 1347:1, 1381:5, 1384:5, 1386:5, 1522:22, 1524:20, 1564:23, 1567:17, 1583:25

**BROWN** [112] - 1301:19, 1302:5, 1303:18, 1304:8, 1304:16, 1304:22, 1304:25, 1305:3, 1305:7, 1307:21, 1307:24, 1308:16, 1308:20, 1308:23, 1333:17, 1365:2, 1368:17, 1370:22, 1370:25, 1371:21, 1371:25, 1372:4, 1372:16, 1372:23, 1373:2, 1373:5, 1373:7, 1373:9, 1373:14, 1373:25, 1374:7, 1374:10, 1374:12, 1374:22,

1375:16, 1376:3, 1376:9, 1376:14, 1376:20, 1376:24, 1377:3, 1377:15, 1380:9, 1381:8, 1381:10, 1381:20, 1382:3, 1384:19, 1384:22, 1385:5, 1385:22, 1400:4, 1413:2, 1421:23, 1430:11, 1433:22, 1437:5, 1437:12, 1437:14, 1440:13, 1440:23, 1441:10, 1447:10, 1453:20, 1456:16, 1469:18, 1480:25, 1481:3, 1481:7, 1481:20, 1482:1, 1482:3, 1483:7, 1493:4, 1497:9, 1498:15, 1499:3, 1514:3, 1517:16, 1517:18, 1517:21, 1517:22, 1518:14, 1518:18, 1544:24, 1545:2, 1545:3, 1549:15, 1549:20, 1550:3, 1550:8, 1550:13, 1550:20, 1550:21, 1554:16, 1554:21, 1555:17, 1555:20, 1555:21, 1566:11, 1572:19, 1572:24, 1573:5, 1573:8, 1573:18, 1578:23, 1579:14, 1583:7, 1586:1, 1586:6, 1586:11, 1586:20

**Brown** [18] - 1303:18, 1304:5, 1304:6, 1307:20, 1372:5, 1373:8, 1385:8, 1440:10, 1441:9, 1480:17, 1517:15, 1549:13, 1550:2, 1550:19, 1579:5, 1579:11, 1586:5

**bubble** [2] - 1348:7, 1348:8

**budget** [5] - 1401:19, 1403:2, 1413:20, 1416:17, 1418:3

**budgets** [1] - 1401:14

**build** [8] - 1402:14, 1404:2, 1404:3, 1535:14, 1535:24, 1544:4, 1547:8, 1553:16

**Building** [1] - 1301:8

**building** [2] - 1415:19, 1416:1
**bullet** [3] - 1424:7, 1465:19, 1564:1
**bunch** [1] - 1522:7
**burden** [1] - 1428:8
**burdened** [1] - 1428:4
**Bureau** [1] - 1403:24
**bureau** [19] - 1362:10, 1393:17, 1394:4, 1394:7, 1394:10, 1395:24, 1395:25, 1396:8, 1398:6, 1409:17, 1411:15, 1509:25, 1510:22, 1511:2, 1512:9, 1512:25, 1517:9, 1520:20, 1540:8
**Bureaus** [1] - 1404:19
**bureaus** [1] - 1407:1
**business** [12] - 1407:9, 1415:17, 1416:2, 1465:10, 1469:12, 1500:1, 1500:7, 1501:2, 1535:24, 1538:21, 1543:23, 1544:9
**but..** [1] - 1489:4
**buy** [1] - 1532:11
**BY** [95] - 1301:14, 1301:19, 1302:5, 1302:5, 1302:6, 1311:19, 1314:7, 1330:23, 1332:21, 1334:4, 1334:14, 1343:20, 1344:9, 1345:3, 1348:6, 1348:10, 1349:21, 1351:5, 1351:10, 1364:16, 1365:7, 1365:11, 1365:16, 1367:11, 1368:4, 1368:11, 1368:20, 1377:19, 1380:14, 1386:16, 1386:24, 1387:4, 1388:8, 1390:18, 1392:13, 1400:6, 1404:11, 1404:17, 1408:12, 1412:10, 1413:5, 1414:11, 1414:17, 1420:7, 1422:3, 1424:6, 1426:2, 1430:18, 1433:10, 1433:25, 1434:3, 1437:19, 1441:22, 1447:1, 1447:17, 1453:6, 1453:23, 1456:10, 1456:19, 1457:6, 1462:22,

1463:5, 1465:21, 1468:13, 1469:21, 1471:10, 1483:15, 1485:3, 1490:9, 1492:11, 1493:10, 1497:3, 1497:17, 1498:20, 1499:6, 1504:7, 1505:10, 1511:16, 1514:6, 1515:18, 1517:18, 1517:22, 1518:18, 1545:3, 1550:21, 1554:21, 1555:21, 1566:15, 1571:21, 1572:16, 1574:15, 1577:7, 1579:17, 1582:21, 1583:13

# C

**calculate** [1] - 1310:9
**calendar** [2] - 1421:10, 1425:1
**calm** [1] - 1308:7
**cannot** [1] - 1448:24
**capitalize** [1] - 1466:3
**capture** [6] - 1344:1, 1344:10, 1345:24, 1351:21, 1478:25, 1479:16
**care** [22] - 1368:6, 1380:1, 1380:25, 1381:6, 1383:23, 1390:5, 1391:1, 1398:6, 1407:5, 1407:11, 1432:7, 1442:19, 1443:16, 1495:18, 1496:5, 1521:6, 1521:13, 1523:5, 1525:16, 1525:24, 1553:14, 1564:24
**career** [5] - 1522:21, 1526:4, 1526:14, 1529:22, 1537:18
**careers** [1] - 1537:11
**careful** [15] - 1367:6, 1367:12, 1368:7, 1382:21, 1383:11, 1386:25, 1387:9, 1387:21, 1387:23, 1479:10, 1481:13, 1482:21, 1521:17, 1521:21, 1522:1
**cares** [1] - 1385:24
**carried** [1] - 1519:17
**case** [61] - 1304:12, 1306:6, 1307:6, 1307:7, 1311:2, 1312:1, 1320:16,

1326:9, 1326:10, 1326:14, 1326:24, 1327:8, 1327:15, 1332:5, 1370:12, 1371:13, 1372:18, 1372:19, 1374:10, 1374:14, 1376:7, 1381:21, 1382:2, 1382:10, 1382:18, 1383:1, 1383:4, 1384:2, 1384:4, 1384:8, 1384:9, 1384:11, 1385:1, 1386:2, 1386:3, 1386:5, 1398:16, 1400:9, 1404:7, 1425:18, 1426:6, 1428:1, 1431:25, 1445:22, 1519:10, 1522:15, 1528:15, 1536:12, 1542:7, 1547:17, 1567:8, 1574:18, 1575:18, 1576:3, 1576:5, 1576:10, 1579:20, 1582:13, 1582:25, 1584:16
**cases** [7] - 1381:5, 1381:10, 1381:22, 1382:11, 1382:13, 1382:17, 1383:3
**CAT** [2] - 1421:14, 1421:15
**catch** [3] - 1360:24, 1361:5, 1557:20
**categories** [2] - 1334:24, 1335:23
**categorize** [1] - 1432:1
**category** [2] - 1350:19, 1551:9
**caused** [2] - 1381:1, 1381:23
**causing** [1] - 1310:22
**cautious** [2] - 1355:5, 1383:17
**caveats** [1] - 1473:12
**CC'd** [1] - 1434:4
**center** [2] - 1321:19, 1516:1
**centers** [1] - 1322:18
**certain** [15] - 1335:23, 1359:8, 1359:14, 1378:15, 1400:13, 1418:1, 1425:19, 1430:2, 1463:15, 1474:18, 1477:22, 1480:2, 1509:3, 1556:6, 1556:16
**certainly** [4] -

1440:16, 1450:25, 1482:4, 1562:21
**CERTIFICATE** [1] - 1587:1
**certify** [1] - 1587:4
**cetera** [5] - 1317:8, 1419:7, 1490:19, 1535:25, 1545:23
**chain** [5] - 1319:3, 1497:24, 1500:8, 1504:23, 1505:11
**chairman** [1] - 1360:10
**chance** [7] - 1304:17, 1312:5, 1411:3, 1533:10, 1535:9, 1565:9, 1578:23
**change** [3] - 1373:21, 1416:4, 1416:7
**changed** [7] - 1313:10, 1314:17, 1333:20, 1403:22, 1431:16, 1482:19, 1531:20
**changes** [1] - 1566:1
**characterization** [2] - 1395:13, 1437:6
**characterize** [3] - 1432:1, 1432:13, 1489:22
**characterized** [1] - 1415:9
**characterizing** [1] - 1336:25
**charge** [5] - 1337:24, 1407:17, 1484:18, 1520:15
**chat** [4] - 1304:1, 1304:7, 1307:14, 1441:5
**check** [5] - 1400:24, 1401:4, 1463:13, 1463:14, 1516:15
**checks** [1] - 1403:13
**Cheryl** [2] - 1511:20, 1512:18
**children** [1] - 1534:23
**cholesterol** [12] - 1349:5, 1349:6, 1379:5, 1426:4, 1426:17, 1429:9, 1429:22, 1430:2, 1430:23, 1435:23, 1436:2, 1455:3
**cholesterol/ triglyceride** [1] - 1451:11
**chose** [1] - 1330:12
**Chrissy** [1] - 1568:13
**Christine** [1] - 1312:2

**CIA** [1] - 1383:19
**CIAs** [1] - 1586:9
**circulated** [7] - 1331:16, 1332:11, 1448:7, 1496:22, 1497:5, 1497:23, 1498:10
**CIVIL** [1] - 1301:3
**civil** [1] - 1326:14
**claim** [3] - 1373:3, 1436:5, 1451:24
**claiming** [1] - 1567:25
**claims** [10] - 1376:17, 1379:25, 1380:24, 1381:2, 1381:21, 1381:24, 1382:11, 1384:5, 1438:11, 1567:17
**Claims** [5] - 1328:3, 1373:5, 1382:10, 1384:1, 1384:4, 1384:9, 1384:24
**clarification** [2] - 1322:15, 1333:22
**clarifications** [1] - 1305:25
**clarify** [1] - 1501:20
**clarifying** [2] - 1362:6, 1445:1
**Clarkson** [1] - 1301:8
**class** [3] - 1434:12, 1451:7, 1516:24
**clear** [48] - 1310:7, 1313:8, 1318:7, 1319:23, 1324:17, 1334:21, 1349:23, 1357:10, 1375:11, 1381:17, 1383:9, 1386:3, 1397:11, 1404:24, 1412:20, 1430:20, 1430:22, 1432:8, 1436:21, 1457:13, 1458:4, 1458:10, 1458:18, 1458:25, 1459:7, 1460:2, 1462:10, 1465:14, 1466:8, 1468:4, 1474:23, 1490:24, 1494:1, 1508:5, 1542:1, 1546:19, 1553:1, 1557:7, 1557:18, 1571:22, 1575:17, 1576:7, 1576:24, 1578:17, 1579:18, 1580:17, 1582:22, 1583:20
**clearance** [1] - 1444:7
**cleared** [1] - 1527:18
**clearly** [2] - 1480:18,

1555:1

**CLERK** [15] - 1303:4, 1308:2, 1310:4, 1310:10, 1311:12, 1391:17, 1391:25, 1392:4, 1392:7, 1440:2, 1441:2, 1441:15, 1549:23, 1549:25, 1550:15

**client** [1] - 1566:24

**clients** [1] - 1327:2

**clinic** [1] - 1516:8

**clinical** [14] - 1329:25, 1330:7, 1331:24, 1341:4, 1349:9, 1356:25, 1389:17, 1434:13, 1434:22, 1477:2, 1501:13, 1520:22, 1548:12, 1553:18

**clinician** [1] - 1348:22

**clinics** [1] - 1318:24

**clip** [2] - 1404:16, 1541:12

**close** [4] - 1407:10, 1459:4, 1523:7, 1528:10

**closely** [1] - 1407:10

**closer** [2] - 1314:3, 1319:20

**closing** [1] - 1383:10

**CMS** [2] - 1375:16, 1375:25

**coach** [1] - 1538:22

**coaching** [1] - 1537:10

**coadministered** [1] - 1366:9

**Coast** [1] - 1534:16

**coerce** [1] - 1381:6

**coincide** [1] - 1368:23

**coinciding** [1] - 1368:21

**colleagues** [6] - 1371:21, 1442:14, 1546:16, 1546:21, 1546:23, 1548:17

**collect** [1] - 1447:25

**collecting** [1] - 1446:17

**collection** [3] - 1314:12, 1314:19, 1470:7

**college** [2] - 1315:3, 1537:9

**colored** [1] - 1345:14

**combined** [1] - 1541:21

**comfortable** [3] - 1343:7, 1355:6,

1404:4

**coming** [19] - 1307:16, 1309:10, 1310:9, 1347:15, 1363:10, 1363:13, 1363:20, 1432:19, 1442:25, 1443:12, 1468:24, 1473:12, 1525:9, 1525:22, 1534:18, 1535:2, 1554:14, 1565:9, 1565:15

**Commencing** [1] - 1301:10

**comment** [1] - 1307:8

**commercial** [6] - 1324:9, 1351:12, 1351:18, 1380:1, 1466:4, 1466:8

**commercially** [2] - 1341:24, 1343:4

**commissioned** [1] - 1470:20

**committed** [1] - 1506:13

**committee** [8] - 1398:5, 1398:7, 1398:9, 1398:10, 1398:11, 1399:16, 1520:20

**committees** [1] - 1540:2

**common** [1] - 1315:19

**communicate** [1] - 1366:22

**communicated** [3] - 1306:19, 1508:6, 1511:5

**communication** [5] - 1506:14, 1521:17, 1521:21, 1522:1, 1562:6

**communications** [6] - 1333:6, 1367:6, 1367:12, 1368:7, 1387:1, 1479:10

**community** [2] - 1411:23, 1437:21

**community-based** [1] - 1411:23

**companies** [8] - 1314:19, 1321:20, 1321:22, 1321:24, 1322:2, 1322:17, 1324:3

**company** [32] - 1313:16, 1317:25, 1321:13, 1323:6, 1323:9, 1329:24, 1354:1, 1359:8, 1366:23, 1369:11,

1395:22, 1425:9, 1474:23, 1486:3, 1521:23, 1530:5, 1531:15, 1534:19, 1535:7, 1535:8, 1535:12, 1535:17, 1554:10, 1554:15, 1567:18, 1568:1, 1577:16, 1577:21, 1578:4, 1578:5, 1578:6

**comparative** [2] - 1438:25, 1493:23

**compare** [3] - 1434:10, 1434:24, 1435:21

**compared** [2] - 1493:12, 1508:17

**compares** [1] - 1382:19

**comparing** [3] - 1340:10, 1435:18, 1491:16

**comparison** [2] - 1386:1, 1488:16

**compelled** [1] - 1571:2

**compelling** [1] - 1351:21

**competencies** [1] - 1543:10

**Competitive** [1] - 1421:16

**competitive** [2] - 1349:24, 1494:2

**competitor** [5] - 1434:25, 1438:21, 1451:19, 1465:23, 1473:1

**competitors** [3] - 1434:11, 1434:18, 1465:22

**compiled** [1] - 1471:6

**complaining** [2] - 1571:12, 1571:13

**complaint** [2] - 1518:19, 1519:22

**complaints** [3] - 1539:10, 1576:4, 1576:9

**complete** [2] - 1390:1, 1440:15

**completely** [1] - 1486:2

**compliance** [69] - 1356:25, 1368:6, 1377:8, 1381:11, 1388:11, 1388:15, 1389:14, 1398:6, 1398:12, 1399:8,

1407:5, 1407:7, 1407:11, 1407:24, 1407:25, 1408:14, 1408:15, 1408:21, 1409:3, 1409:8, 1409:12, 1425:8, 1432:7, 1433:12, 1436:7, 1436:10, 1437:2, 1437:11, 1438:8, 1442:19, 1443:16, 1444:3, 1444:7, 1444:14, 1479:6, 1479:8, 1495:19, 1496:5, 1515:20, 1518:9, 1520:19, 1520:24, 1521:6, 1521:11, 1521:13, 1523:5, 1525:1, 1525:3, 1525:16, 1525:25, 1526:1, 1527:18, 1527:22, 1528:5, 1529:20, 1529:23, 1534:8, 1553:14, 1561:10, 1561:13, 1564:24, 1565:15, 1570:12, 1571:6, 1571:10, 1571:13, 1571:24

**compliance-approved** [1] - 1525:3

**compliant** [8] - 1367:3, 1398:14, 1436:23, 1527:14, 1533:5, 1537:19, 1557:7, 1571:6

**compliantly** [2] - 1535:25, 1552:23

**complications** [1] - 1484:7

**comply** [1] - 1378:16

**component** [2] - 1418:22, 1436:2

**comport** [1] - 1527:22

**comprised** [2] - 1361:14, 1530:19

**compromise** [1] - 1530:20

**computer** [1] - 1301:25

**computer-aided** [1] - 1301:25

**concede** [1] - 1482:17

**concept** [1] - 1513:6

**concern** [4] - 1309:6, 1346:4, 1475:17, 1565:7

**concerned** [3] - 1354:25, 1408:19,

1491:18

**concerns** [2] - 1391:1, 1496:7

**concluded** [4] - 1377:17, 1386:11, 1483:8, 1574:11

**conclusion** [5] - 1381:10, 1381:21, 1382:24, 1383:10, 1384:12

**concurrently** [2] - 1480:4, 1546:3

**condition** [1] - 1431:20

**conduct** [4] - 1317:6, 1386:4, 1402:5, 1502:22

**conducted** [2] - 1407:10, 1448:9

**conducting** [1] - 1521:23

**confer** [1] - 1305:1

**conference** [5] - 1532:9, 1532:24, 1546:23, 1553:19, 1562:16

**confident** [4] - 1442:17, 1442:19, 1442:22, 1483:20

**confuse** [1] - 1373:15

**confused** [4] - 1388:24, 1432:2, 1432:4, 1541:18

**confusing** [3] - 1371:14, 1556:13, 1573:11

**confusion** [2] - 1313:9, 1572:15

**congestive** [1] - 1430:8

**congratulations** [2] - 1312:19, 1536:6

**connect** [1] - 1376:16

**connected** [2] - 1410:11, 1410:24

**Connecticut** [2] - 1515:21, 1515:25

**connecting** [1] - 1410:8

**conservative** [3] - 1345:6, 1345:8, 1345:11

**consider** [3] - 1375:17, 1412:5, 1555:1

**considered** [2] - 1369:16, 1370:16

**considering** [1] - 1480:2

**consisted** [1] - 1398:5

**consistent** [7] - 1363:24, 1398:14, 1481:3, 1481:11, 1556:23, 1564:7
**constantly** [1] - 1480:6
**contacted** [1] - 1538:7
**contain** [1] - 1343:9
**content** [3] - 1396:18, 1398:13, 1516:7
**context** [22] - 1344:19, 1344:22, 1344:25, 1346:9, 1347:2, 1372:22, 1373:18, 1373:24, 1374:23, 1374:24, 1375:4, 1375:9, 1375:18, 1522:2, 1522:10, 1539:20, 1544:21, 1569:25, 1573:12, 1573:23, 1573:25
**contextualization** [1] - 1481:17
**contextualize** [2] - 1474:21, 1481:10
**continue** [15] - 1305:19, 1306:9, 1310:14, 1385:10, 1386:13, 1386:14, 1412:6, 1424:11, 1481:25, 1483:12, 1484:23, 1550:19, 1579:15, 1582:18, 1585:16
**continued** [4] - 1353:25, 1498:2, 1498:4, 1501:22
**continues** [1] - 1423:15
**continuing** [2] - 1485:16, 1552:23
**continuum** [1] - 1349:8
**contradicted** [1] - 1574:5
**contrary** [1] - 1375:15
**control** [2] - 1448:21, 1491:12
**controlled** [3] - 1434:13, 1434:22, 1551:3
**convenient** [1] - 1304:16
**conversation** [7] - 1304:11, 1511:8, 1554:14, 1556:21, 1556:23, 1564:8, 1565:9
**conversations** [5] - 1533:3, 1545:18,

1545:24, 1546:5, 1557:6
**conversely** [1] - 1565:6
**convey** [1] - 1308:5
**conveyed** [1] - 1391:5
**convince** [1] - 1462:12
**coordinating** [2] - 1305:19, 1306:6
**copied** [6] - 1347:5, 1433:13, 1436:9, 1462:23, 1513:22, 1515:9
**copy** [6] - 1400:2, 1400:3, 1400:8, 1433:12, 1575:7, 1578:24
**coronary** [1] - 1530:7
**corporate** [11] - 1576:16, 1577:1, 1577:15, 1577:25, 1578:2, 1578:10, 1580:4, 1580:9, 1580:21, 1581:21, 1583:21
**Corporate** [1] - 1586:15
**Corporation** [1] - 1537:7
**Correct** [100] - 1312:6, 1312:9, 1313:6, 1314:9, 1315:5, 1315:12, 1316:19, 1316:23, 1317:23, 1318:15, 1318:25, 1319:4, 1320:8, 1320:21, 1321:9, 1321:18, 1323:7, 1323:13, 1324:10, 1324:24, 1326:22, 1326:25, 1328:25, 1330:2, 1330:15, 1331:18, 1335:18, 1336:4, 1336:15, 1350:6, 1350:21, 1353:1, 1358:9, 1379:22, 1380:18, 1394:17, 1397:6, 1405:16, 1405:24, 1407:2, 1412:18, 1412:23, 1417:4, 1425:7, 1431:8, 1431:13, 1432:15, 1433:6, 1447:23, 1448:3, 1449:1, 1449:12, 1449:20, 1449:24, 1451:16, 1452:15, 1454:7, 1454:21, 1456:6, 1458:21, 1462:3,

1463:8, 1465:3, 1465:16, 1467:17, 1469:1, 1469:5, 1469:24, 1470:23, 1474:11, 1479:1, 1484:12, 1485:7, 1488:8, 1489:2, 1493:1, 1496:24, 1497:21, 1500:10, 1507:5, 1507:12, 1512:2, 1532:2, 1542:22, 1551:20, 1552:2, 1552:6, 1552:18, 1562:23, 1569:12, 1575:13, 1577:11, 1577:17, 1577:23, 1578:14, 1578:19, 1580:6, 1580:10, 1581:3, 1583:17
**correct** [176] - 1304:22, 1306:2, 1312:7, 1313:18, 1313:19, 1313:24, 1314:1, 1314:10, 1316:11, 1316:13, 1316:15, 1316:24, 1318:5, 1318:20, 1319:13, 1320:5, 1320:14, 1321:1, 1322:25, 1323:8, 1323:24, 1326:11, 1326:17, 1330:10, 1335:1, 1335:7, 1335:11, 1335:12, 1335:19, 1335:25, 1337:22, 1340:19, 1347:25, 1350:7, 1350:10, 1352:6, 1356:23, 1364:24, 1365:25, 1366:12, 1366:17, 1369:18, 1370:18, 1374:21, 1378:7, 1378:18, 1379:3, 1379:17, 1380:23, 1387:18, 1389:19, 1389:22, 1390:3, 1390:24, 1397:19, 1400:16, 1400:17, 1401:6, 1403:9, 1403:14, 1403:18, 1409:9, 1410:1, 1412:19, 1413:13, 1419:9, 1424:21, 1424:22, 1428:21, 1428:22, 1428:25, 1431:17, 1432:11, 1432:16, 1432:22, 1432:24, 1433:7, 1439:3, 1439:13, 1442:6,

1442:11, 1442:12, 1446:5, 1447:24, 1448:13, 1448:16, 1448:22, 1448:23, 1449:2, 1449:13, 1449:16, 1449:21, 1449:25, 1450:6, 1450:10, 1450:23, 1451:21, 1451:22, 1452:10, 1452:20, 1454:14, 1454:15, 1454:22, 1455:12, 1455:13, 1456:3, 1456:7, 1459:12, 1460:6, 1460:11, 1461:6, 1461:11, 1461:15, 1461:20, 1461:21, 1462:4, 1463:9, 1463:19, 1464:2, 1464:24, 1464:25, 1465:4, 1466:1, 1469:2, 1469:6, 1469:16, 1469:25, 1470:11, 1470:19, 1470:24, 1474:1, 1476:7, 1478:17, 1478:18, 1478:22, 1484:6, 1484:9, 1485:8, 1485:19, 1485:20, 1486:5, 1486:16, 1487:5, 1487:12, 1487:18, 1487:23, 1488:4, 1493:2, 1493:14, 1493:17, 1497:25, 1500:6, 1500:11, 1504:14, 1504:15, 1504:16, 1504:25, 1505:1, 1507:13, 1517:7, 1519:15, 1519:16, 1522:8, 1527:4, 1528:25, 1529:1, 1548:6, 1563:10, 1569:14, 1570:12, 1573:5, 1573:8, 1576:1, 1577:12, 1577:24, 1587:4
**corrections** [1] - 1575:11
**correctly** [2] - 1311:23, 1335:23
**cost** [3] - 1366:3, 1390:9, 1417:6
**costs** [1] - 1390:5
**could've** [2] - 1473:1, 1473:2
**counsel** [24] - 1303:8, 1305:14, 1311:2, 1324:22, 1400:1,

1404:9, 1408:7, 1439:25, 1440:5, 1453:3, 1480:22, 1481:8, 1519:12, 1520:4, 1521:16, 1521:25, 1531:20, 1533:8, 1538:11, 1547:6, 1556:13, 1566:20, 1567:2, 1585:17
**country** [12] - 1318:19, 1320:7, 1425:6, 1425:10, 1433:1, 1464:6, 1464:9, 1464:14, 1467:16, 1477:6, 1489:11, 1491:11
**couple** [7] - 1305:24, 1306:23, 1319:10, 1480:25, 1526:2, 1531:19, 1544:20
**course** [16] - 1314:24, 1315:16, 1326:14, 1330:24, 1409:10, 1428:5, 1430:1, 1461:19, 1494:21, 1495:9, 1529:21, 1555:19, 1568:5, 1573:19, 1581:17, 1584:21
**courses** [1] - 1367:2
**COURT** [191] - 1301:1, 1303:4, 1303:5, 1303:16, 1303:24, 1304:5, 1304:14, 1304:21, 1304:23, 1305:1, 1305:4, 1305:8, 1306:4, 1307:20, 1307:22, 1308:2, 1308:3, 1308:13, 1308:15, 1308:18, 1308:21, 1308:24, 1309:6, 1309:17, 1310:4, 1310:5, 1310:10, 1310:12, 1311:7, 1311:12, 1311:15, 1314:2, 1314:6, 1333:19, 1333:23, 1333:25, 1349:13, 1349:20, 1365:3, 1368:18, 1370:23, 1371:5, 1371:16, 1371:19, 1371:22, 1372:2, 1372:5, 1372:21, 1372:25, 1373:4, 1373:6, 1373:13, 1373:18, 1374:1, 1374:9, 1374:11, 1374:16,

1374:23, 1375:20, 1376:4, 1376:10, 1376:15, 1376:21, 1377:1, 1377:5, 1377:16, 1380:10, 1381:9, 1381:13, 1381:15, 1382:2, 1382:4, 1382:13, 1382:16, 1383:13, 1383:24, 1384:4, 1384:21, 1385:3, 1385:6, 1386:2, 1386:8, 1386:13, 1391:10, 1391:14, 1391:17, 1391:19, 1391:22, 1391:25, 1392:1, 1392:4, 1392:5, 1392:7, 1392:8, 1399:24, 1400:1, 1400:5, 1407:23, 1408:2, 1408:4, 1408:9, 1412:2, 1413:3, 1414:9, 1421:24, 1430:13, 1433:23, 1437:8, 1437:11, 1437:13, 1437:16, 1437:18, 1439:15, 1439:21, 1440:2, 1440:4, 1440:10, 1440:17, 1440:24, 1441:2, 1441:3, 1441:9, 1441:11, 1441:15, 1441:17, 1447:11, 1447:15, 1453:1, 1453:21, 1456:17, 1469:19, 1480:13, 1480:15, 1481:2, 1481:5, 1481:18, 1481:24, 1482:2, 1482:7, 1482:12, 1483:10, 1484:20, 1484:23, 1484:25, 1489:25, 1490:3, 1493:5, 1497:11, 1498:17, 1499:4, 1514:4, 1517:14, 1517:17, 1518:17, 1545:1, 1549:13, 1549:17, 1549:21, 1549:23, 1549:25, 1550:1, 1550:5, 1550:9, 1550:15, 1550:16, 1554:19, 1555:19, 1566:12, 1571:15, 1572:21, 1572:23, 1573:3, 1573:6, 1573:9, 1573:24, 1574:13, 1578:25, 1579:5, 1579:11,

1579:15, 1582:19, 1583:10, 1585:7, 1585:11, 1585:23, 1586:2, 1586:5, 1586:10, 1586:12, 1586:21, 1587:1
**Court** [8] - 1301:23, 1306:3, 1371:1, 1481:8, 1481:10, 1573:20, 1586:22, 1587:12
**court** [9] - 1303:1, 1315:17, 1326:19, 1377:18, 1386:12, 1483:9, 1571:16, 1574:12, 1585:18
**Court's** [1] - 1371:3
**Courthouse** [1] - 1301:8
**courtroom** [11] - 1308:14, 1310:1, 1310:9, 1310:11, 1391:18, 1392:6, 1440:3, 1441:16, 1523:12, 1524:13, 1550:14
**cover** [3] - 1464:13, 1473:14, 1521:22
**covered** [1] - 1323:5
**create** [1] - 1346:11
**created** [1] - 1555:8
**credibility** [2] - 1526:14, 1555:7
**credible** [3] - 1510:19, 1510:23, 1528:6
**credit** [1] - 1505:13
**criteria** [9] - 1397:10, 1397:20, 1399:5, 1400:14, 1510:17, 1511:5, 1520:17, 1539:23
**critical** [2] - 1585:19, 1585:25
**critically** [1] - 1523:3
**cross** [7] - 1356:16, 1356:24, 1373:24, 1376:2, 1399:7, 1440:11, 1574:7
**CROSS** [2] - 1302:5, 1517:18
**cross-exam** [1] - 1376:2
**cross-examination** [2] - 1373:24, 1574:7
**CROSS-EXAMINATION** [2] - 1302:5, 1517:18
**cross-functional** [3] - 1356:16, 1356:24, 1399:7

**CRR** [1] - 1587:11
**crystal** [1] - 1542:1
**CT** [1] - 1516:1
**current** [5] - 1339:20, 1339:21, 1467:14, 1551:21, 1551:22
**Customer** [1] - 1492:22
**customer** [3] - 1381:2, 1381:23, 1512:8
**customers** [1] - 1500:13
**cut** [1] - 1439:16
**cutoffs** [1] - 1505:17
**cycle** [1] - 1339:10

# D

**D-1092** [4] - 1302:16, 1554:17, 1554:20, 1554:22
**daily** [18] - 1423:14, 1424:2, 1424:8, 1427:9, 1427:10, 1427:15, 1428:24, 1457:7, 1457:9, 1460:13, 1461:4, 1471:1, 1471:2, 1472:21, 1495:5, 1538:22, 1548:8, 1556:2
**Dallas** [1] - 1301:17
**dangerous** [1] - 1430:6
**DART** [4] - 1453:8, 1453:9, 1453:15, 1455:25
**darunavir** [1] - 1454:5
**data** [21] - 1341:17, 1341:20, 1343:9, 1343:14, 1346:11, 1349:9, 1431:15, 1446:17, 1448:1, 1455:20, 1461:22, 1462:5, 1480:6, 1496:7, 1500:13, 1500:21, 1505:16, 1507:21, 1558:11, 1558:15, 1558:24
**date** [5] - 1305:15, 1498:16, 1501:6, 1501:22, 1547:12
**Date** [1] - 1587:12
**dated** [6] - 1331:7, 1412:13, 1433:18, 1447:3, 1450:15, 1456:12
**dates** [3] - 1315:13, 1339:17, 1547:18
**days** [3] - 1454:24,

1455:4, 1523:8
**DDMAC** [1] - 1444:22
**dealing** [2] - 1372:6, 1423:8
**Dearborn** [1] - 1533:15
**Deb** [2] - 1464:12, 1501:21
**December** [2] - 1319:14, 1358:7
**decided** [1] - 1330:13
**decision** [11] - 1330:6, 1338:13, 1338:20, 1360:9, 1389:17, 1389:25, 1553:13, 1553:15, 1554:2, 1563:2, 1563:6
**decision-makers** [1] - 1389:25
**decision-making** [1] - 1389:17
**decisions** [5] - 1337:2, 1337:11, 1337:12, 1338:23, 1389:21
**deck** [4] - 1381:12, 1479:2, 1518:4, 1520:25
**decks** [3] - 1520:16, 1540:25, 1565:25
**defendant** [1] - 1567:8
**Defendants** [2] - 1301:7, 1301:22
**Defendants'** [10] - 1302:12, 1302:16, 1420:4, 1431:3, 1431:4, 1433:9, 1433:21, 1433:24, 1446:24, 1554:20
**defense** [5] - 1303:17, 1375:20, 1375:22, 1376:1, 1376:8
**define** [1] - 1553:13
**defined** [1] - 1345:4
**defining** [1] - 1475:7
**definitely** [1] - 1386:5
**definition** [1] - 1449:17
**definitively** [13] - 1337:3, 1338:12, 1338:18, 1339:15, 1346:6, 1346:20, 1346:22, 1347:3, 1353:5, 1353:14, 1469:11, 1524:5, 1525:24
**degree** [1] - 1407:9
**Delaware** [1] - 1301:22
**deliver** [10] - 1425:6,

1432:6, 1443:7, 1444:13, 1444:19, 1445:8, 1477:8, 1569:15, 1570:13, 1571:5
**delivered** [7] - 1341:4, 1341:16, 1425:20, 1442:15, 1459:8, 1470:17, 1506:7
**delivering** [10] - 1426:15, 1444:1, 1450:22, 1460:17, 1470:13, 1476:22, 1477:7, 1477:11, 1477:12, 1477:20
**demonstrate** [4] - 1376:12, 1428:18, 1434:16, 1480:21
**demonstrated** [1] - 1461:17
**demonstrating** [1] - 1357:21
**demonstrative** [1] - 1425:25
**department** [20] - 1397:11, 1397:12, 1399:3, 1399:16, 1407:12, 1442:10, 1442:14, 1444:19, 1450:21, 1451:6, 1474:20, 1523:6, 1524:18, 1524:22, 1525:17, 1539:16, 1539:25, 1542:12, 1571:4, 1571:23
**Department** [2] - 1578:11, 1580:22
**deposed** [1] - 1522:21
**deposition** [16] - 1326:16, 1398:15, 1399:18, 1399:25, 1400:8, 1404:7, 1460:22, 1541:12, 1541:19, 1541:21, 1572:11, 1573:14, 1574:5, 1574:9, 1574:17, 1574:22
**DEPUTY** [15] - 1303:4, 1308:2, 1310:4, 1310:10, 1311:12, 1391:17, 1391:25, 1392:4, 1392:7, 1440:2, 1441:2, 1441:15, 1549:23, 1549:25, 1550:15
**DeSales** [1] - 1537:5
**describe** [2] - 1520:13, 1551:9
**described** [7] - 1478:24, 1528:16,

1528:23, 1531:4,
1531:19, 1538:3,
1576:3
**describing** [1] -
1433:4
**Description** [1] -
1302:8
**design** [1] - 1524:21
**designed** [1] -
1379:15
**designing** [1] - 1528:5
**despite** [2] - 1453:17,
1562:25
**detail** [1] - 1343:8
**detailed** [1] - 1471:20
**detailing** [1] - 1516:2
**determination** [2] -
1540:3, 1564:11
**determine** [6] -
1443:5, 1443:11,
1444:6, 1444:16,
1455:2, 1470:21
**Detroit** [1] - 1533:14
**develop** [2] - 1330:7,
1335:22
**developed** [2] -
1396:17, 1484:7
**development** [37] -
1316:25, 1317:2,
1317:3, 1317:5,
1317:8, 1317:9,
1318:4, 1318:13,
1319:10, 1322:5,
1322:10, 1322:18,
1323:20, 1324:9,
1337:4, 1346:17,
1361:18, 1362:3,
1393:6, 1412:12,
1489:3, 1501:6,
1502:1, 1502:7,
1533:23, 1533:24,
1534:12, 1535:18,
1535:21, 1535:22,
1535:23, 1548:12,
1570:10, 1572:2
**Devlin** [7] - 1456:21,
1456:22, 1456:24,
1458:14, 1458:25,
1555:23
**DHHS** [1] - 1435:25
**diabetes** [1] - 1530:10
**died** [2] - 1530:7,
1530:10
**difference** [8] -
1337:1, 1411:19,
1545:14, 1553:10,
1556:11, 1560:13,
1561:3, 1574:1
**different** [44] -
1313:21, 1321:23,

1334:23, 1364:4,
1370:1, 1370:2,
1370:12, 1370:13,
1370:14, 1370:15,
1372:19, 1375:12,
1376:19, 1378:4,
1383:5, 1386:9,
1399:11, 1401:19,
1432:5, 1433:3,
1438:20, 1438:21,
1444:25, 1446:16,
1459:24, 1480:7,
1483:1, 1501:12,
1502:7, 1503:16,
1510:7, 1525:10,
1545:19, 1547:16,
1549:2, 1551:3,
1571:23, 1574:3,
1575:18, 1580:14
**differentiate** [2] -
1350:20, 1556:14
**differentiation** [1] -
1348:12
**differently** [1] -
1474:20
**difficult** [4] - 1352:3,
1511:7, 1556:14,
1562:25
**dinner** [1] - 1405:11
**dinners** [4] - 1408:15,
1417:2, 1418:20,
1419:14
**DIRECT** [2] - 1302:5,
1311:19
**direct** [8] - 1308:11,
1309:14, 1309:15,
1311:17, 1323:22,
1408:5, 1560:9,
1574:4
**directed** [2] - 1483:20,
1490:5
**direction** [14] -
1458:4, 1458:10,
1458:18, 1458:25,
1459:7, 1480:11,
1483:25, 1506:15,
1521:22, 1525:21,
1552:20, 1552:21,
1560:8, 1561:2
**directive** [7] -
1527:22, 1529:23,
1542:16, 1542:24,
1558:2, 1561:10,
1561:13
**directly** [3] - 1323:11,
1332:14, 1417:10
**director** [40] -
1319:11, 1319:12,
1319:14, 1319:18,
1319:24, 1320:1,

1320:24, 1321:3,
1323:15, 1324:8,
1324:12, 1324:14,
1324:15, 1331:24,
1348:24, 1353:18,
1409:25, 1412:17,
1414:13, 1417:24,
1431:6, 1463:17,
1463:20, 1464:11,
1468:25, 1473:10,
1474:25, 1475:22,
1476:21, 1477:19,
1496:6, 1498:4,
1504:13, 1509:2,
1514:8, 1532:5,
1532:11, 1540:1,
1542:3, 1557:5
**directors** [1] - 1538:21
**disadvantage** [1] -
1494:3
**disagree** [5] -
1336:25, 1373:23,
1374:11, 1376:8,
1385:25
**disagreement** [1] -
1586:14
**disagrees** [1] - 1481:8
**disappointed** [2] -
1357:12, 1357:16
**disappointment** [4] -
1354:12, 1357:22,
1357:23, 1358:1
**disciplinary** [1] -
1477:3
**disciplined** [4] -
1476:22, 1477:20,
1478:2, 1491:23
**disclaimers** [1] -
1437:3
**disclosed** [1] -
1516:12
**discoverable** [1] -
1387:13
**discuss** [10] -
1356:17, 1356:22,
1357:5, 1440:20,
1516:7, 1536:11,
1585:23, 1585:24,
1586:7, 1586:16
**discussed** [9] -
1393:9, 1429:4,
1435:22, 1485:11,
1503:11, 1511:17,
1516:8, 1533:1,
1547:17
**discussing** [8] -
1385:12, 1392:17,
1438:7, 1441:25,
1471:1, 1488:5,
1493:21, 1548:20

**discussion** [15] -
1332:25, 1362:8,
1363:10, 1375:6,
1415:18, 1429:8,
1438:25, 1468:5,
1481:12, 1506:13,
1512:19, 1551:5,
1562:7, 1564:11,
1565:11
**discussions** [17] -
1336:16, 1347:6,
1361:8, 1449:4,
1479:20, 1479:24,
1480:8, 1482:9,
1482:12, 1482:16,
1503:13, 1503:15,
1511:12, 1546:20,
1546:24, 1550:25,
1553:7
**disease** [11] - 1323:1,
1323:3, 1331:20,
1334:23, 1335:4,
1370:3, 1370:16,
1430:1, 1448:19,
1530:8
**dismiss** [1] - 1585:19
**dismissed** [2] -
1439:24, 1585:22
**display** [2] - 1554:17,
1555:17
**displayed** [1] - 1472:5
**disruptive** [1] -
1534:17
**disseminate** [1] -
1450:2
**disseminated** [1] -
1401:14
**dissolvability** [1] -
1472:17
**distinction** [4] -
1443:22, 1444:20,
1445:1, 1508:3
**distinguish** [2] -
1341:23, 1343:3
**distributed** [1] -
1333:22
**district** [26] - 1319:3,
1402:3, 1407:4,
1409:23, 1413:25,
1460:16, 1464:4,
1476:25, 1487:20,
1487:21, 1487:25,
1490:15, 1491:11,
1491:22, 1496:5,
1496:23, 1499:13,
1504:10, 1504:11,
1511:23, 1511:25,
1533:24, 1538:22,
1559:14, 1563:22,
1564:22

**District** [1] - 1303:2
**DISTRICT** [3] - 1301:1,
1301:1, 1301:12
**districts** [2] - 1401:19,
1413:18
**diversity** [1] - 1537:10
**division** [4] - 1316:6,
1318:18, 1320:12,
1485:5
**divisions** [2] -
1313:10, 1313:22
**Doctor** [2] - 1379:4,
1439:10
**doctor** [30] - 1348:21,
1374:19, 1378:10,
1378:12, 1378:13,
1378:21, 1381:6,
1401:4, 1401:9,
1402:2, 1428:9,
1435:10, 1435:16,
1449:10, 1462:12,
1485:18, 1485:23,
1486:6, 1486:9,
1486:13, 1487:2,
1511:8, 1513:2,
1515:21, 1516:14,
1516:24, 1517:4,
1517:8, 1519:8,
1555:13
**doctor's** [2] - 1446:3,
1455:25
**doctors** [84] -
1318:24, 1319:7,
1320:20, 1322:24,
1327:18, 1339:9,
1355:4, 1359:17,
1361:14, 1362:10,
1363:11, 1374:17,
1376:18, 1389:21,
1389:25, 1393:1,
1393:16, 1394:15,
1395:24, 1396:7,
1397:5, 1397:22,
1397:25, 1399:4,
1399:16, 1400:15,
1400:18, 1402:3,
1402:5, 1402:7,
1402:9, 1402:20,
1402:22, 1403:17,
1403:19, 1410:19,
1417:11, 1419:3,
1419:19, 1425:6,
1425:12, 1426:16,
1442:2, 1442:9,
1442:24, 1448:25,
1450:4, 1451:19,
1458:11, 1459:18,
1460:17, 1462:6,
1468:16, 1469:8,
1470:13, 1470:17,

1471:16, 1472:6,
1472:12, 1472:20,
1475:13, 1495:5,
1500:22, 1502:14,
1509:11, 1512:24,
1513:16, 1518:25,
1519:3, 1530:12,
1536:25, 1538:16,
1541:2, 1544:5,
1554:12, 1558:25,
1560:2, 1563:7,
1568:1, 1569:16,
1576:6, 1584:8
**document** [43] -
1331:12, 1332:4,
1339:20, 1340:1,
1341:23, 1346:3,
1346:8, 1346:22,
1368:6, 1368:12,
1368:22, 1369:7,
1369:19, 1369:21,
1375:15, 1376:6,
1420:13, 1421:19,
1436:6, 1436:22,
1437:6, 1437:7,
1437:9, 1439:16,
1439:17, 1498:17,
1503:5, 1518:3,
1520:6, 1545:14,
1547:11, 1551:25,
1554:3, 1558:5,
1559:19, 1560:23,
1561:20, 1562:10,
1562:12, 1564:15,
1578:17, 1580:20
**documents** [19] -
1325:25, 1331:16,
1333:11, 1347:15,
1361:23, 1374:3,
1383:18, 1387:13,
1437:2, 1479:15,
1528:14, 1528:15,
1533:8, 1544:20,
1547:7, 1547:9,
1550:23, 1550:25,
1565:24
**Dolisi** [6] - 1393:10,
1499:8, 1499:12,
1499:17, 1501:18,
1558:23
**Dolisi's** [1] - 1502:10
**dollar** [1] - 1352:10
**dollars** [8] - 1352:17,
1352:25, 1354:4,
1359:10, 1415:24,
1416:15, 1417:23,
1508:7
**domain** [2] - 1558:16,
1558:24
**done** [8] - 1326:24,

1327:3, 1428:17,
1428:23, 1482:18,
1501:18, 1522:20,
1537:2
**Donna** [8] - 1524:12,
1527:7, 1542:9,
1542:12, 1568:6,
1568:12, 1569:6,
1569:21
**dosage** [3] - 1370:13,
1435:25, 1448:19
**dose** [4] - 1370:1,
1375:17, 1375:18,
1461:19
**dosed** [3] - 1460:18,
1461:4, 1462:11
**dosing** [22] - 1370:2,
1423:14, 1424:8,
1427:9, 1427:15,
1435:3, 1435:4,
1435:6, 1435:13,
1435:21, 1457:7,
1460:13, 1461:8,
1462:6, 1472:11,
1472:17, 1472:21,
1485:6, 1494:13,
1495:4, 1548:5,
1548:8
**doubt** [2] - 1475:17,
1566:6
**down** [22] - 1308:7,
1311:8, 1326:5,
1326:14, 1328:16,
1352:16, 1355:11,
1365:5, 1365:9,
1389:3, 1405:11,
1414:14, 1425:24,
1438:6, 1454:10,
1465:5, 1490:19,
1504:21, 1515:17,
1550:18, 1558:15,
1562:5
**downgrade** [1] -
1360:12
**downward** [3] -
1420:18, 1420:21,
1421:1
**Dr** [10] - 1513:15,
1513:18, 1514:15,
1514:22, 1515:2,
1515:11, 1516:3,
1516:8, 1516:24,
1518:2
**drafted** [1] - 1339:20
**draw** [5] - 1326:8,
1381:20, 1382:24,
1383:10, 1383:25
**drawing** [3] - 1376:23,
1383:3, 1384:12
**dream** [1] - 1534:11

**drill** [2] - 1414:18,
1416:3
**drink** [1] - 1417:17
**drive** [3] - 1325:3,
1397:16, 1451:23
**drove** [2] - 1325:4,
1325:7
**drug** [84] - 1328:15,
1329:5, 1329:9,
1329:20, 1329:24,
1329:25, 1335:10,
1336:7, 1336:13,
1336:22, 1336:23,
1339:8, 1339:9,
1339:18, 1340:11,
1342:19, 1343:7,
1345:12, 1347:21,
1348:17, 1348:23,
1348:25, 1349:24,
1353:9, 1355:4,
1362:11, 1363:12,
1363:23, 1364:2,
1364:4, 1365:18,
1366:4, 1366:6,
1366:9, 1370:11,
1370:17, 1373:19,
1374:20, 1375:1,
1375:24, 1376:13,
1376:17, 1378:4,
1378:12, 1390:22,
1391:4, 1392:24,
1423:4, 1423:9,
1427:3, 1427:22,
1428:13, 1429:17,
1429:20, 1431:12,
1434:10, 1434:11,
1435:1, 1438:20,
1448:25, 1449:23,
1450:9, 1451:19,
1452:18, 1454:23,
1455:11, 1455:20,
1456:5, 1462:2,
1466:9, 1471:1,
1472:13, 1475:14,
1478:15, 1478:19,
1482:9, 1490:20,
1490:25, 1491:4,
1503:12, 1503:20,
1513:1, 1516:9
**Drug** [8] - 1329:8,
1387:15, 1427:20,
1428:18, 1444:18,
1445:6, 1464:17,
1464:21
**drugs** [30] - 1320:16,
1320:19, 1327:19,
1327:23, 1353:17,
1369:12, 1375:13,
1379:21, 1397:17,
1404:1, 1416:8,

1425:11, 1430:7,
1435:18, 1446:4,
1447:21, 1448:1,
1464:22, 1465:23,
1467:13, 1467:16,
1480:5, 1512:10,
1574:25, 1575:21,
1576:20, 1581:11,
1582:10, 1583:16,
1584:5
**due** [1] - 1505:13
**DULY** [1] - 1311:10
**during** [5] - 1304:14,
1312:24, 1313:5,
1315:16, 1323:12,
1323:16, 1326:13,
1327:17, 1330:24,
1352:22, 1392:24,
1425:21, 1428:4,
1475:2, 1477:18,
1485:4, 1516:19,
1519:7, 1521:10,
1523:7, 1529:2,
1531:7, 1532:8,
1536:15, 1536:19,
1536:24, 1537:18,
1543:3, 1556:5,
1559:8, 1562:3,
1565:14, 1565:15,
1566:2, 1576:8
**During** [1] - 1471:16
**DX** [1] - 1497:14
**dynamic** [2] - 1342:3,
1551:2

## E

**early** [9] - 1315:4,
1320:4, 1320:6,
1338:25, 1351:13,
1351:20, 1520:24,
1543:5, 1548:19
**easier** [1] - 1490:11
**East** [2] - 1301:9,
1334:16
**eat** [1] - 1417:17
**educate** [1] - 1540:20
**educated** [1] - 1555:6
**educating** [2] -
1553:6, 1553:11
**education** [2] -
1435:23, 1485:16
**educational** [1] -
1554:24
**Educational** [1] -
1555:10
**effect** [9] - 1378:14,
1384:11, 1426:3,
1426:16, 1432:14,
1433:5, 1447:20,

1452:14, 1455:2
**effective** [8] - 1330:1,
1427:22, 1428:19,
1434:17, 1461:18,
1470:12, 1478:20
**effectiveness** [6] -
1434:25, 1470:8,
1473:17, 1473:20,
1476:7
**Effectiveness** [1] -
1470:2
**effects** [10] - 1354:24,
1355:17, 1355:18,
1355:23, 1391:5,
1426:18, 1429:8,
1429:17, 1430:23,
1434:25
**efficacy** [3] - 1351:13,
1351:20, 1438:25
**effort** [1] - 1396:12
**eight** [1] - 1581:17
**either** [3] - 1417:11,
1478:8, 1530:21
**elevate** [1] - 1451:6
**elevated** [1] - 1452:13
**elicit** [2] - 1376:5,
1483:1
**eliminate** [5] -
1451:11, 1451:18,
1451:20, 1452:17,
1494:2
**eliminated** [1] -
1462:2
**ELMO** [1] - 1572:13
**email** [44] - 1332:24,
1333:19, 1347:5,
1393:15, 1412:11,
1414:15, 1447:3,
1447:4, 1447:19,
1456:11, 1457:13,
1462:23, 1462:25,
1463:6, 1463:24,
1465:14, 1467:9,
1468:20, 1469:13,
1469:23, 1488:6,
1490:4, 1490:10,
1492:13, 1492:25,
1504:18, 1504:21,
1511:19, 1513:20,
1513:21, 1515:9,
1519:12, 1519:24,
1547:1, 1547:4,
1555:16, 1555:22,
1556:1, 1557:9,
1557:25, 1558:1,
1559:12, 1559:16,
1560:1
**emailed** [1] - 1463:24
**emails** [9] - 1367:18,
1387:5, 1387:13,

1387:20, 1388:18, 1522:1, 1522:7, 1522:10, 1565:25
**emotion** [1] - 1543:7
**emotional** [1] - 1526:19
**employed** [1] - 1317:17
**employee** [5] - 1312:8, 1313:4, 1367:18, 1379:1, 1380:2
**employees** [4] - 1369:16, 1377:23, 1380:16, 1392:16
**encourage** [1] - 1541:1
**encouraged** [2] - 1379:1, 1487:3
**encouraging** [1] - 1491:23
**end** [12] - 1304:6, 1305:20, 1306:1, 1306:5, 1306:9, 1306:11, 1306:13, 1387:23, 1491:9, 1506:23, 1516:12, 1516:14
**ended** [2] - 1352:24, 1520:4
**ends** [1] - 1586:22
**engage** [2] - 1438:24, 1554:6
**engaged** [2] - 1327:22, 1565:11
**engagement** [3] - 1411:20, 1562:1, 1562:5
**engagements** [1] - 1514:23
**engaging** [3] - 1388:12, 1554:13, 1565:8
**England** [4] - 1409:22, 1410:4, 1410:17, 1411:7
**English** [1] - 1502:18
**enormously** [2] - 1481:23, 1507:3
**ensure** [2] - 1398:13, 1557:6
**entered** [8] - 1544:25, 1576:16, 1577:1, 1578:2, 1580:4, 1581:5, 1583:21, 1583:25
**enters** [4] - 1310:11, 1392:6, 1441:16, 1550:14
**entertain** [1] - 1586:18
**enthusiasm** [1] - 1547:8
**entire** [20] - 1310:1, 1319:12, 1320:7, 1321:8, 1321:13, 1377:10, 1422:5, 1433:13, 1464:6, 1464:9, 1519:7, 1525:13, 1526:4, 1529:2, 1536:15, 1536:19, 1536:24, 1543:6, 1578:24
**entitled** [1] - 1587:5
**entrepreneurial** [1] - 1535:12
**environment** [1] - 1323:4
**equally** [2] - 1565:7, 1565:12
**equation** [2] - 1409:16, 1548:12
**equitable** [1] - 1543:5
**especially** [2] - 1344:22, 1353:22
**ESQUIRE** [8] - 1301:14, 1301:15, 1301:15, 1301:16, 1301:16, 1301:19, 1301:20, 1301:20
**essentially** [6] - 1328:16, 1415:1, 1415:2, 1415:13, 1420:25, 1448:11
**establish** [2] - 1434:8, 1477:17
**et** [6] - 1301:3, 1317:8, 1419:6, 1490:19, 1535:25, 1545:23
**event** [4] - 1518:2, 1518:21, 1519:14, 1540:20
**events** [10] - 1312:23, 1407:15, 1410:9, 1509:24, 1518:24, 1538:25, 1540:16, 1540:23, 1541:6, 1541:8
**eventually** [1] - 1320:12
**evidence** [49] - 1302:9, 1302:10, 1302:10, 1302:11, 1302:11, 1302:12, 1302:13, 1302:13, 1302:14, 1302:14, 1302:15, 1302:15, 1302:16, 1302:17, 1329:25, 1330:7, 1334:3, 1334:12, 1358:14, 1365:4, 1367:9, 1368:19, 1374:12, 1376:11, 1381:18, 1382:23, 1392:24, 1396:3, 1409:14, 1413:4, 1414:8, 1420:5, 1421:25, 1429:12, 1433:24, 1434:16, 1446:23, 1447:16, 1450:12, 1453:22, 1456:18, 1462:20, 1469:20, 1493:6, 1497:15, 1499:5, 1511:15, 1514:5, 1554:20
**evolved** [1] - 1535:19
**exact** [4] - 1368:23, 1386:4, 1401:12, 1416:24
**exactly** [3] - 1337:14, 1338:2, 1519:24
**exaggerated** [1] - 1505:25
**exaggeration** [1] - 1506:1
**exam** [2] - 1376:2, 1574:4
**examination** [2] - 1373:24, 1574:7
**EXAMINATION** [6] - 1302:5, 1302:5, 1302:6, 1311:19, 1517:18, 1566:15
**EXAMINATIONS** [1] - 1302:3
**example** [5] - 1375:16, 1384:1, 1445:15, 1453:24, 1547:1
**examples** [1] - 1449:4
**excellence** [1] - 1321:19
**except** [2] - 1517:8, 1567:8
**exception** [1] - 1435:3
**exchange** [2] - 1402:11, 1402:12
**exciting** [1] - 1553:17
**exclude** [1] - 1582:4
**excuse** [6] - 1349:5, 1389:23, 1396:5, 1421:22, 1497:14, 1497:16
**excused** [2] - 1585:8, 1585:9
**execute** [5] - 1363:20, 1395:11, 1395:15, 1413:14, 1571:10
**executed** [7] - 1393:24, 1394:12, 1418:4, 1418:10, 1418:20, 1525:4, 1578:18
**executes** [1] - 1534:10
**executing** [10] - 1337:24, 1339:7, 1361:9, 1366:13, 1395:10, 1406:3, 1413:7, 1413:11, 1419:13, 1457:18
**execution** [5] - 1338:4, 1346:18, 1416:14, 1457:13, 1457:14
**exhibit** [9] - 1305:25, 1333:10, 1412:8, 1413:1, 1421:11, 1431:3, 1446:22, 1447:12, 1578:24
**Exhibit** [86] - 1302:8, 1302:9, 1302:10, 1302:10, 1302:11, 1302:11, 1302:12, 1302:13, 1302:13, 1302:14, 1302:14, 1302:15, 1302:15, 1302:16, 1302:16, 1330:22, 1332:18, 1332:22, 1333:11, 1333:16, 1334:3, 1358:13, 1364:13, 1364:21, 1364:25, 1365:4, 1367:9, 1368:2, 1368:5, 1368:15, 1368:19, 1392:23, 1396:2, 1396:3, 1409:14, 1412:8, 1413:4, 1414:7, 1420:5, 1421:12, 1421:13, 1421:21, 1421:25, 1429:11, 1431:3, 1431:4, 1433:9, 1433:21, 1433:24, 1446:23, 1446:24, 1447:9, 1447:14, 1447:16, 1449:18, 1450:11, 1452:22, 1453:7, 1453:13, 1453:19, 1453:22, 1456:8, 1456:15, 1456:18, 1462:19, 1468:12, 1468:20, 1469:17, 1469:20, 1486:18, 1492:8, 1493:6, 1497:8, 1498:14, 1498:19, 1499:5, 1511:14, 1514:1, 1514:5, 1518:15, 1554:20, 1577:4, 1578:21, 1579:8, 1580:18
**exhibits** [4] - 1305:19, 1305:21, 1306:7, 1330:25
**existed** [2] - 1355:21, 1503:9
**existing** [1] - 1552:24
**exists** [1] - 1544:7
**exits** [2] - 1391:18, 1440:3
**expand** [2] - 1350:19, 1383:15
**expanded** [14] - 1341:5, 1341:11, 1341:17, 1350:11, 1350:12, 1529:10, 1548:2, 1548:3, 1548:18, 1551:6, 1551:10, 1551:13, 1552:1, 1552:4
**expansion** [1] - 1484:16
**expect** [5] - 1307:16, 1325:20, 1440:7, 1440:8, 1568:5
**expectation** [2] - 1570:14, 1571:1
**expedited** [2] - 1329:12, 1330:14
**expenses** [1] - 1417:12
**experience** [6] - 1330:5, 1510:15, 1520:10, 1546:11, 1551:12, 1566:7
**experienced** [7] - 1335:17, 1340:25, 1355:8, 1429:4, 1466:16, 1478:16, 1553:20
**expert** [1] - 1430:12
**expertise** [2] - 1569:6, 1569:10
**experts** [3] - 1546:7, 1569:13
**explain** [11] - 1381:19, 1411:2, 1411:3, 1411:10, 1435:14, 1452:23, 1470:6, 1487:1, 1512:8, 1526:21
**explanation** [3] - 1572:10, 1573:7, 1574:8
**extend** [1] - 1550:11
**extending** [1] - 1584:4
**extensive** [1] - 1521:14
**extent** [1] - 1496:9
**extra** [1] - 1306:22
**extracted** [2] -

1351:12, 1351:19
**extreme** [1] - 1565:13
**extremely** [3] - 1530:14, 1577:9, 1582:25
**extremes** [1] - 1565:2
**eye** [2] - 1385:9, 1483:4

---

# F

**fact** [23] - 1327:14, 1396:5, 1405:22, 1409:15, 1410:4, 1427:14, 1434:8, 1443:7, 1443:25, 1444:6, 1444:17, 1484:15, 1492:12, 1507:14, 1509:9, 1510:21, 1511:7, 1522:7, 1562:25, 1577:8, 1580:3, 1581:14, 1581:21
**facts** [8] - 1382:25, 1383:4, 1384:7, 1384:10, 1384:14, 1386:2, 1386:3, 1463:14
**failed** [1] - 1342:9
**failure** [1] - 1430:8
**fair** [113] - 1324:20, 1325:13, 1325:17, 1325:22, 1326:6, 1328:13, 1330:19, 1330:20, 1335:6, 1337:6, 1337:10, 1338:4, 1338:6, 1338:7, 1338:11, 1338:24, 1339:13, 1340:12, 1341:18, 1342:21, 1343:15, 1343:16, 1344:21, 1346:14, 1346:19, 1346:24, 1347:10, 1350:15, 1352:13, 1354:11, 1357:24, 1357:25, 1359:20, 1359:21, 1360:14, 1360:18, 1360:19, 1361:1, 1362:19, 1363:7, 1363:8, 1363:19, 1364:7, 1364:10, 1367:19, 1367:21, 1378:6, 1382:22, 1386:17, 1387:10, 1387:25, 1391:7, 1393:7, 1395:12, 1395:19, 1395:20, 1396:1, 1397:23, 1399:2,

1399:6, 1401:11, 1402:8, 1403:16, 1405:2, 1406:20, 1406:21, 1409:2, 1414:5, 1415:22, 1416:16, 1417:21, 1420:9, 1422:18, 1422:23, 1423:25, 1436:24, 1436:25, 1437:15, 1443:2, 1443:3, 1443:8, 1443:23, 1444:8, 1445:10, 1445:11, 1446:13, 1446:14, 1459:2, 1459:5, 1460:24, 1460:25, 1477:9, 1477:13, 1478:11, 1485:22, 1498:11, 1506:20, 1506:21, 1510:10, 1510:17, 1517:2, 1517:3, 1526:11, 1526:15, 1526:18, 1526:25, 1538:10, 1543:5, 1569:24, 1579:21, 1584:24, 1585:1
**fairly** [1] - 1415:9
**fairness** [5] - 1313:9, 1334:6, 1347:14, 1494:6, 1502:17
**faith** [3] - 1442:13, 1444:10, 1444:12
**False** [7] - 1328:3, 1373:5, 1382:10, 1384:1, 1384:4, 1384:9, 1384:24
**false** [6] - 1379:25, 1380:24, 1381:2, 1381:23, 1382:11, 1426:15
**familiar** [3] - 1542:11, 1544:13, 1545:10
**family** [3] - 1530:20, 1534:15, 1538:20
**fancy** [1] - 1400:23
**far** [7] - 1305:13, 1331:23, 1338:25, 1399:18, 1495:5, 1542:8, 1547:17
**fashion** [2] - 1448:9, 1506:19
**fast** [3] - 1415:4, 1538:18, 1550:7
**fast-paced** [1] - 1538:18
**father** [1] - 1530:7
**fathom** [1] - 1539:6
**favor** [1] - 1411:5
**favorable** [2] -

1348:12, 1438:12
**FDA** [39] - 1329:9, 1329:20, 1329:23, 1330:8, 1336:3, 1336:7, 1338:10, 1341:4, 1341:5, 1341:17, 1370:11, 1372:19, 1375:18, 1427:21, 1434:12, 1434:23, 1435:18, 1439:9, 1443:7, 1443:14, 1443:15, 1443:19, 1445:18, 1446:12, 1446:18, 1448:2, 1448:8, 1448:9, 1448:12, 1449:11, 1455:14, 1461:13, 1461:17, 1464:17, 1484:3, 1486:3, 1546:18, 1560:5, 1583:15
**FDA-approved** [3] - 1435:18, 1449:11, 1455:14
**fear** [1] - 1383:6
**feared** [3] - 1382:25, 1383:5, 1384:13
**fears** [1] - 1384:8
**February** [2] - 1412:13, 1490:14
**federal** [7] - 1379:20, 1379:24, 1380:16, 1390:5, 1580:5, 1581:7, 1584:14
**FEDERAL** [1] - 1587:1
**fee** [1] - 1401:1
**felt** [3] - 1363:19, 1570:3, 1571:1
**few** [5] - 1307:8, 1449:4, 1497:12, 1501:16, 1582:17
**field** [45] - 1365:19, 1397:8, 1405:3, 1405:20, 1405:21, 1419:12, 1419:19, 1433:13, 1436:10, 1437:21, 1439:4, 1442:8, 1442:16, 1443:13, 1444:14, 1444:19, 1450:3, 1468:16, 1475:21, 1496:25, 1498:6, 1498:9, 1501:8, 1501:23, 1503:19, 1514:23, 1520:18, 1524:20, 1532:11, 1532:12, 1534:9, 1535:5, 1538:11, 1538:22, 1543:21, 1544:8, 1547:8,

1560:8, 1560:9, 1569:11, 1571:8, 1585:2, 1585:3
**fifth** [1] - 1305:16
**figure** [1] - 1569:1
**file** [1] - 1389:7
**fill** [1] - 1554:6
**filling** [1] - 1495:13
**finalize** [1] - 1525:1
**finally** [1] - 1427:8
**finance** [1] - 1337:17
**financial** [1] - 1337:19
**fine** [13] - 1306:14, 1373:16, 1384:19, 1384:22, 1385:22, 1415:11, 1447:15, 1460:8, 1483:1, 1526:9, 1526:24, 1527:1, 1570:18
**finish** [4] - 1418:2, 1440:13, 1550:3, 1573:3
**fire** [2] - 1414:18, 1416:3
**fired** [3] - 1476:22, 1477:20, 1478:2
**firm** [1] - 1566:23
**first** [25] - 1305:1, 1306:25, 1317:13, 1318:12, 1319:11, 1351:18, 1353:6, 1353:22, 1376:11, 1403:23, 1421:19, 1437:8, 1471:15, 1502:2, 1502:9, 1505:22, 1530:6, 1531:5, 1535:3, 1537:9, 1537:11, 1541:21, 1575:17, 1575:22, 1586:9
**first-generation** [1] - 1537:9
**Fisher** [1] - 1301:8
**five** [14] - 1309:5, 1321:19, 1321:22, 1321:23, 1322:5, 1324:3, 1338:14, 1353:5, 1408:4, 1480:5, 1484:18, 1484:19, 1581:18, 1584:4
**flag** [2] - 1487:19, 1487:24
**flesh** [1] - 1376:11
**FLOM** [1] - 1301:19
**Florida** [6] - 1464:3, 1464:10, 1488:21, 1488:25, 1489:5, 1489:9
**Florida's** [2] -

1490:14, 1490:15
**focus** [3] - 1339:14, 1436:8, 1511:18
**focused** [2] - 1544:17, 1545:21
**focusing** [1] - 1482:10
**folks** [28] - 1303:5, 1306:20, 1306:24, 1308:3, 1310:12, 1391:14, 1391:22, 1392:1, 1392:8, 1407:25, 1439:22, 1440:4, 1441:3, 1441:17, 1538:12, 1539:4, 1542:8, 1542:11, 1542:14, 1542:15, 1550:11, 1550:16, 1550:17, 1561:10, 1561:14, 1585:11, 1585:13, 1585:21
**follow** [14] - 1369:11, 1378:16, 1458:3, 1471:12, 1472:25, 1486:8, 1496:7, 1511:4, 1520:3, 1523:10, 1526:5, 1527:24, 1540:17, 1546:17
**follow-up** [1] - 1520:3
**follow-ups** [1] - 1523:10
**followed** [1] - 1475:23
**following** [6] - 1438:11, 1471:23, 1561:25, 1562:5, 1563:9, 1564:7
**FOLLOWS** [1] - 1311:11
**Food** [8] - 1329:8, 1387:14, 1427:20, 1428:18, 1444:18, 1445:6, 1464:17, 1464:21
**food** [2] - 1403:6, 1405:11
**FOR** [1] - 1301:1
**forbidden** [2] - 1486:1, 1486:2
**Force** [1] - 1470:2
**force** [61] - 1318:14, 1318:17, 1320:7, 1339:1, 1339:8, 1343:7, 1352:2, 1354:16, 1362:4, 1394:22, 1407:17, 1408:11, 1432:6, 1442:8, 1442:15, 1442:23, 1443:6, 1443:13, 1445:7,

1445:14, 1446:2, 1446:3, 1447:19, 1458:9, 1459:1, 1462:5, 1469:12, 1470:12, 1470:22, 1472:21, 1473:16, 1473:20, 1474:10, 1476:6, 1476:7, 1480:10, 1486:12, 1488:25, 1491:15, 1496:13, 1507:3, 1525:21, 1528:7, 1528:20, 1542:25, 1552:1, 1553:11, 1553:21, 1554:24, 1555:2, 1555:6, 1555:11, 1559:4, 1561:1, 1569:16, 1570:2, 1570:15, 1570:21, 1571:25, 1581:24

**forcing** [1] - 1571:8
**forecast** [22] - 1352:9, 1352:11, 1352:14, 1352:18, 1354:21, 1356:22, 1357:2, 1357:5, 1359:14, 1360:4, 1360:12, 1360:21, 1360:25, 1419:20, 1420:1, 1420:18, 1421:1, 1421:5, 1422:4, 1422:12, 1423:5, 1479:16
**forecasted** [1] - 1352:16
**forecasts** [11] - 1336:12, 1336:13, 1344:12, 1346:1, 1358:3, 1359:8, 1359:9, 1359:19, 1359:24, 1363:21, 1422:22
**foregoing** [1] - 1587:4
**forever** [1] - 1387:5
**forget** [1] - 1482:9
**forgive** [1] - 1400:23
**forgot** [1] - 1561:5
**fork** [2] - 1359:22, 1360:9
**form** [2] - 1401:3, 1583:7
**format** [1] - 1554:23
**formed** [3] - 1380:12, 1382:4, 1382:6
**forming** [1] - 1534:14
**forms** [6] - 1495:12, 1496:14, 1500:12, 1500:18, 1502:11, 1558:23

**forth** [2] - 1402:11, 1547:8
**forward** [7] - 1306:16, 1307:6, 1307:7, 1522:22, 1561:8, 1568:15, 1583:25
**forwarded** [1] - 1558:6
**foundation** [2] - 1333:18, 1497:10
**foundational** [1] - 1497:12
**four** [7] - 1405:5, 1405:6, 1405:18, 1406:22, 1409:7, 1409:11, 1481:9
**fourth** [1] - 1340:21
**frame** [5] - 1313:5, 1354:9, 1354:14, 1413:20, 1584:25
**framed** [1] - 1475:2
**framework** [1] - 1535:24
**Fran** [7] - 1456:23, 1456:24, 1456:25, 1458:1, 1458:3, 1458:14
**Franchise** [1] - 1492:21
**Francis** [2] - 1456:21, 1555:22
**Frank** [3] - 1456:22, 1563:21
**frankly** [7] - 1372:24, 1522:19, 1522:23, 1523:14, 1526:17, 1541:17, 1565:7
**fraud** [1] - 1376:16
**fraudulent** [2] - 1379:25, 1384:5
**frequency** [1] - 1495:4
**frequently** [2] - 1525:8, 1545:24
**Friday** [7] - 1305:11, 1338:4, 1532:9, 1532:14, 1532:19, 1532:24
**friendly** [13] - 1435:16, 1445:15, 1445:16, 1446:9, 1451:12, 1451:15, 1455:21, 1459:23, 1461:2, 1503:12, 1503:20, 1560:14, 1560:18
**friends** [1] - 1524:12
**front** [11] - 1332:22, 1421:13, 1480:19, 1482:15, 1498:17, 1501:25, 1525:19, 1528:7, 1560:2, 1561:1

**fulfill** [1] - 1543:18
**fulfilled** [1] - 1528:3
**full** [5] - 1303:7, 1319:16, 1366:3, 1414:13, 1525:10
**full-scale** [1] - 1525:10
**full-time** [2] - 1319:16, 1414:13
**fully** [1] - 1365:18
**function** [3] - 1419:13, 1501:6, 1516:25
**functional** [3] - 1356:16, 1356:24, 1399:7
**future** [6] - 1339:14, 1347:24, 1480:3, 1546:5, 1561:17

## G

**gap** [1] - 1544:7
**gaps** [1] - 1543:10
**gather** [1] - 1393:1
**gauging** [1] - 1487:9
**Gay** [1] - 1512:18
**general** [3] - 1335:9, 1335:14, 1382:19
**General** [3] - 1387:16, 1578:11, 1580:22
**generally** [9] - 1344:20, 1384:7, 1522:17, 1531:11, 1531:14, 1542:11, 1544:13, 1547:25, 1548:3
**generate** [5] - 1342:24, 1351:7, 1351:21, 1352:4, 1546:25
**generated** [6] - 1353:17, 1387:20, 1411:21, 1496:14, 1497:23, 1498:8
**generating** [3] - 1352:25, 1360:24, 1487:10
**generation** [1] - 1537:9
**gentleman** [3] - 1456:21, 1541:20, 1555:22
**gentlemen** [1] - 1568:25
**Geoff** [1] - 1303:20
**GEOFFREY** [1] - 1301:20
**GI** [2] - 1438:12, 1457:8
**girl** [1] - 1534:24

**given** [12] - 1304:18, 1326:10, 1329:10, 1330:4, 1382:22, 1400:9, 1416:13, 1418:14, 1431:24, 1455:25, 1477:14, 1528:20
**Glenn** [6] - 1320:25, 1321:7, 1321:11, 1337:20, 1356:3, 1356:19
**global** [2] - 1463:15, 1557:21
**glossy** [2] - 1445:22, 1446:10
**goal** [4] - 1358:7, 1396:6, 1507:25, 1543:20
**goals** [6] - 1354:5, 1359:13, 1422:21, 1425:15, 1563:2, 1563:6
**Gossett** [2] - 1320:24, 1321:6
**govern** [1] - 1546:22
**Government** [24] - 1328:4, 1376:16, 1379:20, 1379:21, 1379:25, 1380:6, 1380:7, 1380:16, 1383:23, 1384:16, 1385:18, 1385:24, 1385:25, 1387:14, 1445:6, 1577:2, 1577:9, 1577:16, 1579:19, 1581:14, 1582:3, 1582:9, 1582:25, 1583:6
**government** [3] - 1580:5, 1581:7, 1584:14
**graded** [3] - 1418:4, 1418:19, 1418:25
**graduated** [1] - 1315:3
**graduating** [1] - 1537:9
**Graham** [15] - 1524:12, 1527:7, 1527:20, 1527:21, 1528:11, 1528:16, 1542:9, 1568:6, 1568:12, 1569:6, 1569:9, 1569:21, 1570:1, 1570:19, 1571:23
**Graham's** [1] - 1528:1
**granted** [2] - 1371:1, 1372:1
**Great** [1] - 1458:18
**great** [16] - 1407:9,

**given** 1458:1, 1458:3, 1490:20, 1490:25, 1522:20, 1528:4, 1534:3, 1534:6, 1534:19, 1535:10, 1535:15, 1535:19, 1553:24, 1554:12
**grew** [1] - 1533:15
**Grooms** [1] - 1568:14
**group** [7] - 1332:10, 1332:11, 1333:1, 1445:14, 1545:5, 1545:8, 1545:10
**groups** [1] - 1443:16
**grow** [1] - 1423:15
**growing** [1] - 1425:1
**grown** [1] - 1534:23
**grown-up** [1] - 1534:23
**growth** [4] - 1343:21, 1352:11, 1352:16, 1507:24
**guess** [5] - 1330:5, 1345:5, 1354:22, 1541:22, 1557:20
**guessed** [1] - 1367:8
**guidance** [1] - 1525:1
**guidelines** [3] - 1436:1, 1436:5, 1448:2
**gun** [1] - 1382:14
**guy** [2] - 1450:19, 1515:22
**guys** [9] - 1304:23, 1304:24, 1305:11, 1305:18, 1306:9, 1376:19, 1377:9, 1384:17, 1480:13

## H

**hair** [1] - 1550:23
**half** [11] - 1325:8, 1353:6, 1353:19, 1358:7, 1404:25, 1461:23, 1462:1, 1462:12, 1536:9, 1536:13
**hand** [2] - 1310:24, 1520:7
**handed** [1] - 1339:1
**handful** [1] - 1481:16
**handing** [2] - 1468:23, 1476:3
**handle** [2] - 1512:14, 1554:5
**handled** [1] - 1416:18
**hands** [4] - 1500:13, 1500:22, 1502:14, 1559:10

**handwriting** [2] - 1563:13, 1563:14
**hard** [7] - 1514:21, 1522:24, 1530:20, 1539:6, 1544:6, 1560:15, 1560:16
**Hartford** [1] - 1515:24
**harvest** [1] - 1501:14
**harvesting** [1] - 1501:25
**hatched** [1] - 1532:20
**HAVING** [1] - 1311:10
**HCC** [5] - 1388:20, 1442:17, 1520:21, 1524:19, 1572:3
**HDL** [1] - 1349:7
**he/she** [2] - 1512:8, 1512:9
**head** [19] - 1321:7, 1371:5, 1371:6, 1396:24, 1412:21, 1434:17, 1435:19, 1439:9, 1450:21, 1475:23, 1493:12, 1493:15, 1519:21, 1534:11
**head-to-head** [5] - 1434:17, 1435:19, 1439:9, 1493:12, 1493:15
**headquarters** [2] - 1356:1, 1356:3
**heads** [1] - 1553:2
**heads-up** [1] - 1553:2
**health** [21] - 1368:5, 1380:1, 1380:25, 1381:6, 1390:5, 1398:5, 1407:5, 1407:11, 1432:7, 1442:19, 1443:16, 1495:18, 1496:5, 1521:6, 1521:13, 1523:5, 1525:16, 1525:24, 1533:17, 1553:14, 1564:24
**Health** [2] - 1578:12, 1580:22
**healthy** [4] - 1454:12, 1454:17, 1454:20, 1455:7
**hear** [9] - 1319:20, 1375:1, 1399:12, 1444:25, 1510:13, 1541:16, 1553:25, 1572:23, 1586:5
**heard** [21] - 1320:25, 1364:1, 1402:11, 1403:21, 1450:18, 1471:24, 1473:1, 1473:2, 1489:25,

1510:11, 1513:15, 1515:2, 1515:21, 1525:5, 1527:6, 1534:13, 1535:1, 1542:7, 1542:14, 1544:11, 1545:13
**hearing** [3] - 1468:16, 1470:21, 1575:17
**hearsay** [1] - 1573:22
**heart** [4] - 1383:16, 1430:8, 1530:8
**heavily** [1] - 1546:14
**heck** [1] - 1308:22
**held** [3] - 1303:1, 1546:5, 1567:13
**hell** [1] - 1523:14
**hello** [1] - 1517:20
**help** [5] - 1425:15, 1446:3, 1523:21, 1535:14, 1543:15
**helped** [1] - 1464:12
**helpful** [1] - 1473:12
**helping** [1] - 1306:3
**Hi** [1] - 1511:20
**hiatus** [1] - 1537:6
**hidden** [2] - 1468:5, 1468:7
**high** [3] - 1488:1, 1488:21, 1511:2
**high-potential** [1] - 1511:2
**higher** [7] - 1356:7, 1356:21, 1356:24, 1401:10, 1467:23, 1487:20, 1489:11
**higher-up** [1] - 1467:23
**higher-ups** [3] - 1356:7, 1356:21, 1356:24
**highest** [1] - 1542:20
**highlight** [4] - 1457:7, 1492:15, 1492:17, 1543:17
**highlighted** [2] - 1403:21, 1492:25
**highly** [4] - 1335:16, 1340:25, 1355:8, 1478:16
**himself** [1] - 1506:18
**hire** [1] - 1346:5
**hired** [3] - 1318:12, 1464:12, 1569:10
**history** [1] - 1489:4
**hit** [4] - 1359:14, 1360:3, 1479:16, 1480:19
**hitting** [2] - 1354:21, 1553:15
**HIV** [30] - 1320:19,

1328:15, 1328:17, 1329:19, 1330:19, 1334:18, 1334:23, 1335:20, 1336:7, 1339:22, 1340:16, 1340:22, 1428:4, 1428:9, 1429:21, 1436:1, 1454:5, 1454:12, 1454:20, 1472:1, 1484:7, 1524:6, 1539:9, 1546:7, 1553:17, 1553:21, 1569:11, 1569:13
**HIV-negative** [1] - 1454:12
**Hodgkin's** [1] - 1530:11
**hold** [5] - 1309:9, 1410:14, 1443:17, 1530:22, 1549:17
**Holshoe** [1] - 1568:14
**home** [5] - 1325:7, 1464:13, 1517:24, 1534:3, 1538:19
**Home** [2] - 1316:6, 1316:8
**honest** [2] - 1480:17, 1573:25
**Honor** [93] - 1303:10, 1303:18, 1303:20, 1303:22, 1304:3, 1304:9, 1305:24, 1307:19, 1307:24, 1307:25, 1308:12, 1308:17, 1309:16, 1311:5, 1311:18, 1333:15, 1333:17, 1349:19, 1365:1, 1365:2, 1368:16, 1368:17, 1370:22, 1371:25, 1372:17, 1373:14, 1374:13, 1380:9, 1381:8, 1384:19, 1384:20, 1385:22, 1391:13, 1392:12, 1399:23, 1412:7, 1413:2, 1414:8, 1421:23, 1430:11, 1433:22, 1437:5, 1437:12, 1439:19, 1440:7, 1440:22, 1440:23, 1441:8, 1441:10, 1441:21, 1447:8, 1447:10, 1453:18, 1453:20, 1456:16, 1469:18, 1480:12, 1480:25, 1481:7, 1481:20, 1482:3,

1483:7, 1483:14, 1493:3, 1493:4, 1497:10, 1498:13, 1498:15, 1514:2, 1514:3, 1517:16, 1518:14, 1518:16, 1544:24, 1549:15, 1550:6, 1554:6, 1554:18, 1555:17, 1566:14, 1572:19, 1573:19, 1574:14, 1578:22, 1578:23, 1579:4, 1579:10, 1579:14, 1582:17, 1583:7, 1585:6, 1586:4, 1586:6
**Honor's** [3] - 1371:15, 1383:20, 1481:12
**HONORABLE** [1] - 1301:11
**Honorable** [1] - 1303:1
**honoraria** [4] - 1362:11, 1400:19, 1417:11, 1516:12
**honorarium** [1] - 1402:23
**honorariums** [2] - 1401:24, 1417:6
**hotel** [2] - 1325:8, 1325:10
**hotels** [1] - 1325:6
**hotline** [2] - 1538:5, 1538:8
**hour** [3] - 1325:8, 1408:7, 1440:15
**housekeeping** [3] - 1304:2, 1305:9, 1307:11
**HR** [4] - 1407:11, 1523:8, 1525:17, 1544:2
**huge** [1] - 1535:11
**human** [2] - 1328:17, 1585:14
**Human** [2] - 1578:12, 1580:22
**hundred** [4] - 1387:20, 1525:20, 1538:16, 1548:20
**hybrid** [1] - 1534:2
**hypercholesterolemia** [3] - 1350:13, 1429:16, 1431:10
**hypertension** [1] - 1530:10
**hypolipidemia** [5] - 1350:13, 1429:17, 1431:11, 1452:4, 1452:9

# I

**I-A-C-O-B-E-L-L-I-S** [1] - 1311:14
**i.e** [1] - 1341:25
**IACOBELLIS** [2] - 1302:4, 1311:10
**Iacobellis** [63] - 1311:6, 1311:7, 1311:14, 1311:24, 1311:25, 1312:22, 1330:25, 1334:6, 1334:16, 1347:14, 1386:17, 1391:19, 1392:9, 1392:14, 1398:15, 1399:10, 1400:7, 1404:6, 1408:13, 1411:4, 1412:11, 1425:4, 1429:15, 1437:20, 1441:4, 1441:18, 1441:23, 1441:25, 1447:18, 1450:1, 1453:24, 1468:15, 1483:16, 1501:16, 1502:9, 1506:23, 1517:13, 1517:19, 1518:24, 1520:24, 1525:6, 1526:6, 1527:16, 1528:23, 1529:25, 1530:2, 1530:24, 1533:14, 1536:16, 1537:2, 1537:15, 1539:3, 1541:12, 1542:7, 1543:24, 1544:13, 1550:22, 1554:23, 1565:24, 1566:16, 1574:16, 1585:1
**IBP** [1] - 1450:14
**idea** [2] - 1457:22, 1462:6
**identified** [2] - 1372:12, 1390:15
**Identified** [1] - 1389:15
**identify** [2] - 1364:22, 1492:12
**identifying** [1] - 1468:7
**illegal** [13] - 1371:1, 1371:12, 1371:14, 1372:7, 1372:10, 1373:3, 1373:16, 1373:21, 1374:6, 1375:2, 1376:25, 1377:12, 1521:22
**illegality** [2] - 1373:11, 1376:24
**imagine** [1] - 1525:22

**immediately** [1] - 1356:15
**immunology** [1] - 1315:4
**impact** [24] - 1416:3, 1423:20, 1423:23, 1435:22, 1436:2, 1446:9, 1451:24, 1457:3, 1457:9, 1457:23, 1458:15, 1459:10, 1459:15, 1459:16, 1459:19, 1459:22, 1459:23, 1460:10, 1556:2, 1556:12, 1557:1
**impacted** [1] - 1375:25
**impacting** [1] - 1455:21
**impeached** [3] - 1573:2, 1573:3, 1573:4
**impeachment** [3] - 1572:19, 1573:23, 1573:24
**impediments** [1] - 1354:21
**implementation** [1] - 1412:13
**implemented** [4] - 1482:20, 1500:1, 1500:7, 1507:3
**implementing** [1] - 1406:7
**importance** [1] - 1385:20
**important** [19] - 1313:2, 1313:3, 1344:22, 1344:25, 1346:17, 1380:7, 1386:20, 1391:6, 1391:8, 1452:2, 1507:7, 1523:4, 1523:22, 1526:2, 1526:10, 1530:12, 1530:14, 1548:25, 1555:5
**importantly** [2] - 1523:8, 1546:4
**impressed** [1] - 1535:6
**improper** [5] - 1375:23, 1376:7, 1376:12, 1572:19, 1573:23
**improperly** [3] - 1389:2, 1558:24, 1559:5
**improve** [2] - 1506:15, 1546:4

**improvement** [8] - 1542:17, 1542:25, 1543:2, 1543:14, 1543:15, 1543:17, 1544:11, 1544:15
**inappropriate** [7] - 1379:9, 1379:10, 1382:3, 1389:3, 1390:20, 1455:19, 1560:9
**incentivize** [1] - 1486:13
**incentivized** [1] - 1450:8
**incident** [1] - 1528:9
**incidentally** [1] - 1518:24
**include** [1] - 1318:22
**included** [14] - 1345:18, 1356:17, 1361:9, 1370:8, 1402:7, 1463:7, 1464:10, 1467:23, 1468:2, 1469:8, 1469:23, 1525:14, 1546:5, 1548:4
**includes** [4] - 1314:24, 1325:24, 1342:13, 1457:22
**including** [11] - 1369:8, 1417:6, 1418:13, 1449:5, 1463:25, 1465:7, 1465:24, 1466:25, 1514:21, 1546:6, 1581:2
**incoming** [1] - 1473:10
**inconsistent** [1] - 1574:9
**inconsistently** [1] - 1573:1
**inconvenience** [2] - 1310:21, 1310:23
**incorrect** [6] - 1312:10, 1316:6, 1323:14, 1324:4, 1404:2, 1410:7
**increase** [12] - 1327:19, 1349:4, 1390:5, 1390:9, 1390:16, 1390:20, 1403:25, 1424:11, 1429:22, 1430:2, 1574:24, 1575:20
**increased** [3] - 1354:5, 1363:24, 1364:2
**increasing** [1] - 1424:16

**independent** [1] - 1548:23
**indicate** [2] - 1471:24, 1565:20
**indicated** [7] - 1415:17, 1424:20, 1427:15, 1429:21, 1436:1, 1478:15, 1520:7
**indicates** [1] - 1558:23
**indication** [14] - 1329:15, 1330:9, 1354:20, 1354:23, 1355:3, 1355:11, 1355:13, 1529:10, 1529:14, 1545:25, 1547:20, 1548:1, 1548:4, 1548:18
**indications** [6] - 1338:14, 1347:25, 1480:3, 1480:6, 1551:21, 1553:18
**individual** [3] - 1543:1, 1543:18, 1544:4
**individuals** [2] - 1407:14, 1543:6
**induce** [1] - 1542:4
**industry** [7] - 1315:11, 1315:24, 1330:5, 1533:19, 1535:2, 1537:19, 1538:19
**inform** [2] - 1305:12, 1561:2
**information** [46] - 1341:20, 1346:17, 1378:12, 1378:21, 1379:5, 1389:24, 1391:4, 1424:7, 1424:16, 1456:5, 1462:10, 1462:12, 1470:7, 1471:5, 1473:1, 1473:8, 1473:10, 1473:11, 1475:12, 1479:5, 1485:12, 1485:24, 1486:7, 1486:9, 1486:20, 1486:22, 1487:1, 1488:2, 1489:12, 1489:21, 1490:13, 1491:1, 1491:24, 1493:20, 1494:13, 1494:20, 1495:20, 1496:10, 1500:17, 1516:9, 1527:17, 1553:22, 1554:6, 1555:9, 1559:10, 1564:21
**informed** [2] - 1374:1,

1554:9
**inhibitor** [8] - 1328:15, 1339:23, 1340:17, 1340:21, 1342:9, 1434:12, 1451:7, 1454:5
**initial** [7] - 1361:6, 1419:20, 1429:16, 1528:23, 1531:7, 1531:10, 1547:20
**Innovative** [1] - 1312:14
**input** [4] - 1397:4, 1397:8, 1397:21, 1546:10
**inputs** [1] - 1400:15
**insert** [4] - 1438:24, 1449:15, 1449:19, 1564:5
**inside** [1] - 1568:15
**insight** [2] - 1403:16, 1475:14
**insightful** [3] - 1473:11, 1475:9, 1475:10
**insights** [7] - 1496:25, 1498:6, 1501:7, 1501:23, 1502:1, 1532:12, 1548:24
**Inspector** [3] - 1387:15, 1578:11, 1580:22
**instance** [13] - 1329:12, 1330:12, 1361:4, 1378:13, 1390:10, 1435:9, 1442:24, 1445:13, 1445:15, 1446:8, 1478:9, 1487:20, 1577:14
**instances** [1] - 1581:23
**instead** [4] - 1309:21, 1314:18, 1428:23, 1462:6
**instruct** [4] - 1527:13, 1527:17, 1527:21, 1559:4
**instructed** [8] - 1413:18, 1481:11, 1482:4, 1483:17, 1524:13, 1524:22, 1527:7, 1556:22
**instructing** [1] - 1553:11
**instruction** [6] - 1485:15, 1524:25, 1557:4, 1558:2, 1586:9, 1586:14
**instructions** [3] -

1437:3, 1527:23, 1555:2
**insult** [1] - 1522:19
**insulting** [2] - 1522:23, 1567:24
**insurers** [1] - 1380:1
**Integrity** [1] - 1586:15
**integrity** [12] - 1522:20, 1576:16, 1577:1, 1577:15, 1577:25, 1578:2, 1578:10, 1580:4, 1580:9, 1580:21, 1581:22, 1583:21
**Intelence** [42] - 1320:13, 1322:24, 1327:24, 1352:24, 1372:9, 1410:23, 1425:11, 1427:3, 1427:4, 1427:8, 1427:14, 1428:19, 1460:13, 1460:18, 1461:1, 1461:3, 1461:8, 1461:17, 1461:22, 1465:7, 1465:10, 1466:13, 1471:1, 1472:5, 1472:10, 1472:21, 1476:17, 1478:14, 1478:19, 1482:11, 1482:13, 1483:18, 1484:2, 1484:3, 1484:10, 1484:15, 1485:6, 1494:11, 1494:13, 1524:4, 1557:25
**intend** [2] - 1383:13, 1578:25
**intended** [5] - 1328:16, 1330:1, 1370:14, 1388:16, 1390:22
**intends** [1] - 1579:13
**intent** [6] - 1388:12, 1388:21, 1389:3, 1474:3, 1500:24, 1543:15
**intents** [1] - 1314:11
**interaction** [1] - 1407:13
**interested** [2] - 1507:23, 1535:8
**interesting** [2] - 1489:23, 1490:4
**interfere** [1] - 1389:16
**interim** [21] - 1319:11, 1319:25, 1412:16
**internal** [21] - 1346:4, 1346:15, 1347:24, 1350:23, 1366:22,

1443:16, 1467:4,
1467:5, 1503:13,
1503:15, 1525:15,
1538:9, 1545:18,
1546:20, 1547:4,
1547:7, 1547:9,
1547:11, 1549:11,
1559:2, 1561:3
**internally** [3] - 1340:1,
1480:7, 1561:15
**interpret** [1] - 1558:19
**interpretation** [1] -
1505:24
**interpreting** [1] -
1381:11
**interrupt** [1] - 1315:18
**interrupted** [1] -
1341:10
**interrupting** [1] -
1467:6
**interview** [1] - 1544:3
**introduce** [1] -
1533:10
**investigate** [5] -
1475:20, 1477:2,
1478:5, 1565:4,
1565:5
**investigated** [1] -
1565:12
**investigating** [1] -
1495:21
**investigation** [5] -
1387:24, 1475:25,
1496:8, 1538:9,
1565:22
**investigators** [1] -
1411:13
**investment** [4] -
1507:11, 1507:15,
1508:7, 1508:23
**invite** [1] - 1525:24
**invited** [1] - 1512:9
**involved** [22] - 1311:2,
1316:25, 1328:11,
1336:16, 1336:19,
1380:2, 1394:25,
1395:3, 1397:12,
1397:16, 1398:3,
1401:21, 1402:1,
1402:2, 1407:16,
1413:10, 1511:5,
1511:12, 1536:16,
1536:20, 1536:24,
1546:2
**involvement** [2] -
1487:16, 1576:20
**involves** [2] - 1389:24,
1401:18
**issue** [28] - 1372:14,
1372:17, 1373:3,

1373:10, 1373:15,
1373:22, 1374:10,
1375:18, 1380:7,
1383:6, 1388:11,
1388:25, 1429:9,
1430:25, 1431:10,
1431:21, 1432:14,
1442:3, 1451:10,
1451:11, 1460:13,
1461:3, 1472:11,
1476:17, 1515:20,
1543:9, 1543:22
**issued** [1] - 1486:23
**issues** [7] - 1379:19,
1385:20, 1385:23,
1385:24, 1442:1,
1561:11, 1584:14
**it'll** [1] - 1361:24
**itself** [3] - 1313:16,
1313:21, 1430:1
**Ives** [1] - 1316:3

## J

**J&J** [3] - 1317:18,
1534:19, 1535:11
**jacked** [1] - 1422:16
**Janssen** [225] -
1303:19, 1303:21,
1303:23, 1312:8,
1312:13, 1312:24,
1313:17, 1313:20,
1313:21, 1313:22,
1313:25, 1314:8,
1314:12, 1314:13,
1314:17, 1314:18,
1314:20, 1315:25,
1317:12, 1317:13,
1317:17, 1317:22,
1318:18, 1320:7,
1320:11, 1320:12,
1320:20, 1321:16,
1321:22, 1321:24,
1322:5, 1324:3,
1324:22, 1325:2,
1325:10, 1325:24,
1327:17, 1327:22,
1328:23, 1329:5,
1329:8, 1329:16,
1329:24, 1330:12,
1330:17, 1332:4,
1334:17, 1336:11,
1336:21, 1338:8,
1339:9, 1340:1,
1340:15, 1341:3,
1341:11, 1341:16,
1341:22, 1342:8,
1343:5, 1343:21,
1343:25, 1344:10,
1345:4, 1345:18,
1345:23, 1347:21,

1350:18, 1352:22,
1353:17, 1354:10,
1357:5, 1359:18,
1359:22, 1361:13,
1366:21, 1367:17,
1369:7, 1369:16,
1370:5, 1372:9,
1374:20, 1375:10,
1375:12, 1377:22,
1378:15, 1379:11,
1380:2, 1383:5,
1383:6, 1383:18,
1384:5, 1384:8,
1384:13, 1384:23,
1384:24, 1388:12,
1393:1, 1400:18,
1401:4, 1404:1,
1405:15, 1405:22,
1406:11, 1416:15,
1417:15, 1419:19,
1420:18, 1425:4,
1425:14, 1425:20,
1426:15, 1427:9,
1427:20, 1428:13,
1428:17, 1430:20,
1430:22, 1431:7,
1431:19, 1433:4,
1434:24, 1435:9,
1435:15, 1442:1,
1442:8, 1444:17,
1446:17, 1447:20,
1447:25, 1451:20,
1451:23, 1452:7,
1453:16, 1453:25,
1455:11, 1455:19,
1460:17, 1461:17,
1467:15, 1470:7,
1470:16, 1470:20,
1471:6, 1472:10,
1472:21, 1474:24,
1477:18, 1485:4,
1485:16, 1487:4,
1487:7, 1489:9,
1491:21, 1494:2,
1497:20, 1498:21,
1503:19, 1507:14,
1508:13, 1508:17,
1510:14, 1510:21,
1511:1, 1516:15,
1517:5, 1518:7,
1518:20, 1519:7,
1519:13, 1519:22,
1519:23, 1520:10,
1521:10, 1522:18,
1524:1, 1529:21,
1533:4, 1535:3,
1535:6, 1535:9,
1535:17, 1536:3,
1536:8, 1537:3,
1538:1, 1538:6,
1542:2, 1543:3,

1551:12, 1556:6,
1559:9, 1561:11,
1561:14, 1562:3,
1564:18, 1565:15,
1566:3, 1566:7,
1567:3, 1574:7,
1576:9, 1576:15,
1576:20, 1576:25,
1577:21, 1578:12,
1580:5, 1581:2,
1581:6, 1581:22,
1582:2, 1582:8,
1582:22, 1583:6,
1583:14, 1584:13,
1585:3
**JANSSEN** [1] - 1301:6
**Janssen's** [19] -
1319:7, 1324:18,
1326:4, 1327:19,
1331:15, 1337:8,
1343:25, 1375:22,
1376:6, 1379:21,
1397:13, 1408:7,
1428:2, 1444:2,
1444:7, 1467:13,
1470:12, 1508:6,
1566:20
**Janssen-patented** [1]
- 1329:5
**Janssen-wide** [1] -
1538:6
**Janssen/Tibotec** [2] -
1322:20, 1322:21
**January** [7] - 1312:18,
1324:5, 1421:5,
1421:9, 1422:17,
1490:12, 1537:4
**jeopardizing** [1] -
1530:17
**JERSEY** [1] - 1301:1
**Jersey** [2] - 1301:9,
1317:17
**Jessica** [2] - 1312:2,
1568:13
**jim** [1] - 1445:23
**job** [17] - 1311:24,
1318:12, 1337:15,
1443:4, 1458:1,
1458:3, 1458:18,
1524:1, 1528:3,
1528:4, 1530:18,
1530:23, 1537:11,
1568:25, 1570:9
**Joe** [1] - 1568:14
**Johnson** [82] -
1312:13, 1312:23,
1312:24, 1313:4,
1313:9, 1314:12,
1314:13, 1314:25,
1317:20, 1332:19,

1334:13, 1343:19,
1344:4, 1348:5,
1348:8, 1351:4,
1364:15, 1365:15,
1367:10, 1368:3,
1369:3, 1369:15,
1369:16, 1370:4,
1377:23, 1378:10,
1379:11, 1380:8,
1380:15, 1386:17,
1386:18, 1387:19,
1392:16, 1412:9,
1414:16, 1433:9,
1456:9, 1504:6,
1505:5, 1505:8,
1515:17, 1534:20,
1577:6, 1580:4,
1580:5, 1580:23,
1581:1, 1581:6,
1581:15, 1581:22,
1582:2, 1582:7,
1582:22, 1583:6,
1583:14, 1583:25
**JOHNSON** [2] -
1301:6
**join** [2] - 1317:21,
1535:9
**joined** [3] - 1407:8,
1407:21, 1545:11
**joint** [1] - 1304:10
**JOSH** [1] - 1301:15
**josh** [1] - 1303:15
**judge** [2] - 1333:25,
1371:21
**Judge** [3] - 1303:2,
1307:21, 1585:10
**JUDGE** [1] - 1301:12
**judged** [1] - 1486:21
**judgment** [2] -
1381:25, 1548:23
**July** [7] - 1354:14,
1357:5, 1358:7,
1358:15, 1361:13,
1362:3, 1364:23
**jump** [1] - 1307:18
**June** [7] - 1305:9,
1305:15, 1324:4,
1328:20, 1392:25,
1420:22, 1532:6
**jurisdiction** [1] -
1398:11
**juror** [3] - 1308:5,
1309:9, 1309:10
**jurors** [23] - 1305:12,
1306:7, 1306:13,
1307:4, 1307:9,
1307:15, 1308:4,
1308:9, 1310:8,
1319:20, 1352:24,
1363:5, 1391:16,

1392:3, 1439:23, 1440:1, 1441:12, 1517:21, 1528:8, 1532:19, 1533:11, 1566:17, 1585:20

**jury** [20] - 1308:21, 1310:13, 1325:21, 1334:15, 1343:19, 1366:8, 1373:10, 1373:15, 1382:1, 1412:4, 1434:9, 1441:16, 1445:4, 1480:19, 1504:6, 1527:6, 1568:25, 1576:8, 1579:1, 1584:13

**JURY** [1] - 1301:5

**Jury** [6] - 1310:11, 1391:18, 1392:6, 1440:3, 1550:14, 1585:22

**jury's** [2] - 1371:6, 1450:18

**jut** [1] - 1334:5

**K**

**Kaletra** [2] - 1348:11, 1505:18

**keep** [14] - 1383:2, 1385:8, 1395:13, 1395:14, 1447:13, 1483:4, 1490:6, 1526:1, 1530:6, 1530:16, 1554:9, 1554:10

**kept** [1] - 1543:19

**key** [3] - 1473:13, 1475:21, 1548:24

**kickbacks** [3] - 1327:18, 1568:1, 1584:8

**kicked** [1] - 1509:4

**kicking** [1] - 1535:13

**Kim** [7] - 1306:13, 1307:9, 1308:4, 1310:2, 1392:3, 1397:2, 1441:11

**Kim's** [1] - 1310:24

**kind** [11] - 1305:6, 1306:14, 1310:24, 1382:5, 1483:3, 1530:15, 1534:16, 1535:14, 1544:14, 1545:19, 1564:10

**kinds** [1] - 1522:25

**King** [1] - 1301:21

**Klein** [1] - 1303:22

**KLEIN** [2] - 1301:20, 1303:22

**knowing** [1] - 1559:1

**knowledge** [18] - 1323:3, 1353:10, 1398:19, 1399:3, 1407:14, 1460:15, 1460:20, 1460:23, 1495:11, 1495:13, 1496:12, 1539:20, 1542:19, 1546:8, 1553:23, 1556:15, 1584:19, 1584:20

**known** [6] - 1314:13, 1314:19, 1407:20, 1491:15, 1508:9, 1551:13

**knows** [2] - 1384:24, 1480:19

**Kozub** [12] - 1396:24, 1450:15, 1462:25, 1463:6, 1463:10, 1463:24, 1465:5, 1479:2, 1513:22, 1514:11, 1558:1

**Kozub's** [4] - 1450:18, 1557:9, 1557:13, 1557:24

**Kristin** [1] - 1513:21

**L**

**L.P** [1] - 1301:7

**label** [160] - 1327:23, 1329:15, 1330:8, 1330:14, 1332:7, 1336:8, 1336:14, 1336:23, 1338:21, 1339:18, 1339:21, 1340:2, 1340:5, 1340:14, 1341:5, 1341:11, 1341:17, 1341:24, 1342:4, 1343:3, 1343:6, 1345:18, 1349:9, 1350:2, 1350:8, 1350:11, 1350:12, 1350:14, 1351:7, 1351:22, 1354:23, 1369:17, 1369:25, 1370:16, 1372:8, 1372:17, 1373:9, 1373:11, 1374:2, 1374:7, 1374:13, 1374:17, 1374:19, 1375:1, 1375:18, 1375:19, 1375:24, 1376:13, 1376:18, 1377:3, 1377:6, 1377:9, 1377:24, 1378:4, 1378:11, 1378:21, 1381:7,

1423:9, 1423:15, 1424:16, 1424:25, 1425:19, 1426:11, 1426:24, 1427:2, 1427:5, 1429:12, 1429:16, 1431:4, 1431:10, 1431:16, 1446:16, 1447:21, 1448:14, 1448:24, 1449:4, 1449:10, 1449:15, 1449:17, 1450:2, 1450:7, 1453:24, 1454:11, 1455:18, 1456:4, 1461:1, 1461:3, 1461:9, 1461:22, 1462:7, 1462:11, 1462:13, 1465:6, 1466:12, 1466:19, 1467:12, 1467:16, 1468:6, 1468:7, 1475:13, 1476:13, 1476:22, 1477:2, 1477:20, 1478:3, 1478:10, 1479:25, 1482:13, 1484:16, 1485:24, 1486:7, 1486:14, 1486:20, 1488:2, 1491:1, 1495:9, 1506:19, 1519:9, 1524:4, 1524:15, 1525:21, 1528:20, 1528:23, 1529:16, 1532:21, 1533:1, 1536:17, 1536:22, 1545:22, 1552:1, 1552:4, 1552:9, 1552:13, 1553:3, 1554:7, 1554:14, 1556:23, 1559:10, 1563:3, 1564:5, 1565:4, 1565:11, 1566:1, 1566:4, 1567:25, 1569:17, 1569:23, 1570:4, 1570:20, 1571:2, 1576:10, 1577:9, 1581:10, 1581:24, 1582:24, 1583:15, 1583:24, 1584:5, 1584:18

**labeled** [1] - 1427:15

**labels** [5] - 1464:17, 1464:22, 1465:1, 1482:19, 1547:16

**Laboratory** [1] - 1316:4

**lack** [1] - 1322:20

**ladies** [1] - 1568:25

**laid** [1] - 1369:9

**language** [3] - 1477:23, 1479:10, 1560:19

**large** [1] - 1525:12

**largest** [1] - 1472:12

**last** [31] - 1311:13, 1311:13, 1311:22, 1381:1, 1385:11, 1387:5, 1398:8, 1513:14, 1537:3, 1564:1

**lasted** [1] - 1581:16

**late** [7] - 1309:2, 1309:7, 1309:8, 1309:10, 1310:15, 1339:19, 1419:16

**latter** [1] - 1330:13

**launch** [31] - 1318:1, 1328:23, 1337:3, 1337:11, 1337:12, 1338:13, 1338:21, 1354:6, 1354:10, 1354:13, 1354:20, 1356:17, 1357:22, 1358:16, 1361:6, 1361:13, 1364:2, 1368:23, 1392:19, 1396:12, 1415:18, 1429:16, 1444:23, 1525:10, 1531:7, 1531:10, 1535:14, 1563:1, 1563:5, 1564:7

**launched** [13] - 1328:12, 1328:19, 1336:11, 1336:21, 1350:3, 1355:2, 1392:25, 1444:21, 1464:12, 1529:11, 1531:5, 1535:24, 1562:22

**launching** [5] - 1353:23, 1363:23, 1364:4, 1480:5, 1545:25

**law** [10] - 1371:13, 1372:22, 1377:7, 1377:11, 1385:2, 1385:17, 1527:9, 1558:3, 1564:12, 1566:23

**laws** [4] - 1369:10, 1379:24, 1380:24, 1382:11

**lawsuit** [6] - 1318:8, 1538:3, 1539:5, 1566:8, 1567:25, 1577:15

**lawyers** [4] - 1324:19, 1523:7, 1525:17,

1561:7

**lay** [1] - 1355:4

**lay-to-doctors** [1] - 1355:4

**lead** [3] - 1318:13, 1380:21, 1432:18

**leader** [7] - 1319:9, 1473:11, 1489:5, 1489:10, 1523:4, 1526:3, 1572:2

**leaders** [4] - 1317:9, 1356:24, 1489:8, 1489:10

**leadership** [7] - 1317:8, 1322:5, 1458:5, 1535:20, 1536:14, 1537:5, 1544:19

**leading** [5] - 1361:18, 1362:4, 1488:25, 1524:6, 1533:25

**learn** [11] - 1393:23, 1395:4, 1395:10, 1395:14, 1395:22, 1398:8, 1403:19, 1407:7, 1407:24, 1407:25, 1559:8

**learned** [7] - 1416:20, 1533:25, 1534:2, 1543:5, 1577:13, 1577:20, 1578:5

**learning** [16] - 1317:2, 1317:3, 1322:18, 1323:20, 1337:4, 1346:16, 1347:8, 1361:18, 1362:3, 1393:6, 1489:3, 1501:5, 1501:25, 1502:7, 1534:11, 1535:21

**least** [15] - 1320:19, 1339:8, 1350:13, 1374:2, 1374:24, 1380:11, 1385:11, 1416:14, 1478:24, 1484:14, 1509:10, 1551:4, 1584:19, 1584:20, 1585:18

**leaves** [1] - 1544:8

**led** [1] - 1318:3

**leeway** [1] - 1382:22

**left** [9] - 1324:6, 1324:11, 1334:22, 1335:3, 1345:7, 1494:17, 1495:1, 1495:2, 1517:23

**legal** [11] - 1356:25, 1370:20, 1381:10, 1381:20, 1381:25, 1407:11, 1479:5,

1520:17, 1523:6, 1553:14, 1560:25

**legality** [1] - 1374:8

**legitimately** [1] - 1481:17

**lens** [2] - 1502:7, 1502:8

**less** [3] - 1348:11, 1466:16, 1550:3

**lessons** [1] - 1570:20

**letters** [1] - 1334:24

**letting** [1] - 1306:17

**level** [2] - 1487:20, 1503:8

**levels** [2] - 1335:21, 1512:20

**liable** [1] - 1567:13

**liaison** [3] - 1437:21, 1473:2, 1474:19

**Libby** [1] - 1464:3

**life** [7] - 1308:7, 1310:15, 1389:8, 1389:21, 1461:23, 1462:1, 1462:12

**lifetime** [1] - 1353:9

**lift** [1] - 1535:16

**light** [1] - 1479:7

**limine** [4] - 1370:25, 1371:11, 1371:15, 1373:23

**limitations** [5] - 1350:2, 1472:24, 1473:5, 1474:18, 1478:12

**limited** [6] - 1350:4, 1354:23, 1355:3, 1355:13, 1528:24, 1529:2

**limiting** [2] - 1586:9, 1586:14

**line** [10] - 1351:11, 1374:5, 1376:23, 1384:15, 1385:7, 1415:17, 1483:12, 1541:23, 1549:18, 1556:1

**lined** [1] - 1304:13

**lines** [1] - 1404:10

**lipid** [42] - 1348:16, 1349:11, 1350:8, 1379:6, 1426:4, 1429:8, 1431:10, 1432:1, 1432:13, 1433:4, 1438:12, 1442:3, 1445:15, 1445:16, 1446:8, 1446:9, 1451:10, 1451:12, 1451:15, 1455:20, 1455:21, 1459:23, 1461:2,

1493:8, 1493:23, 1494:1, 1503:12, 1503:20, 1505:12, 1505:16, 1505:18, 1505:23, 1506:3, 1547:2, 1556:6, 1559:21, 1560:5, 1560:6, 1560:18, 1570:3

**lipid-friendly** [2] - 1503:12, 1503:20

**lipids** [29] - 1348:12, 1350:20, 1355:19, 1430:24, 1435:11, 1435:16, 1435:22, 1442:3, 1446:9, 1451:24, 1452:13, 1455:3, 1455:21, 1457:3, 1457:9, 1457:23, 1458:15, 1459:10, 1459:15, 1459:19, 1460:10, 1506:2, 1556:2, 1556:12, 1557:1, 1557:2, 1560:10, 1560:17

**Lipids** [1] - 1505:8

**lipoproteins** [1] - 1349:6

**list** [5] - 1395:23, 1396:7, 1397:21, 1449:5, 1467:22

**listed** [3] - 1431:11, 1471:18, 1475:4

**listen** [1] - 1371:5

**listening** [2] - 1481:6, 1481:13

**literally** [2] - 1381:17, 1388:19

**live** [1] - 1464:13

**living** [1] - 1430:7

**LLP** [1] - 1301:19

**local** [1] - 1516:18

**location** [1] - 1515:24

**lodged** [1] - 1579:20

**logged** [1] - 1490:13

**logistical** [3] - 1401:17, 1401:18, 1403:5

**logistically** [1] - 1304:9

**logistics** [2] - 1402:10, 1417:6

**long-term** [1] - 1416:4

**long-winded** [2] - 1482:14, 1483:3

**longer-term** [3] - 1347:13, 1347:19, 1347:21

**look** [114] - 1330:21,

1332:3, 1332:24, 1334:17, 1339:17, 1342:3, 1343:2, 1343:17, 1344:3, 1344:16, 1344:19, 1345:4, 1347:7, 1347:13, 1347:19, 1348:2, 1350:25, 1352:7, 1352:10, 1352:16, 1358:13, 1358:17, 1362:5, 1363:9, 1367:8, 1368:2, 1368:7, 1369:2, 1369:25, 1372:2, 1377:21, 1378:8, 1379:18, 1385:8, 1386:21, 1388:7, 1388:25, 1392:23, 1396:2, 1399:21, 1406:15, 1409:14, 1412:1, 1414:7, 1422:1, 1423:2, 1423:8, 1423:19, 1424:5, 1424:23, 1429:11, 1429:12, 1431:3, 1433:8, 1436:4, 1436:6, 1439:14, 1446:15, 1450:11, 1450:13, 1451:4, 1452:21, 1453:12, 1454:5, 1454:11, 1456:8, 1457:2, 1460:12, 1462:19, 1465:5, 1467:22, 1468:4, 1468:11, 1470:1, 1470:25, 1473:14, 1474:13, 1476:2, 1476:13, 1476:16, 1482:16, 1486:18, 1492:8, 1493:8, 1493:19, 1494:11, 1494:12, 1494:16, 1495:3, 1496:18, 1497:2, 1497:14, 1499:8, 1499:16, 1499:25, 1500:2, 1501:14, 1502:4, 1503:1, 1503:2, 1505:4, 1505:7, 1506:11, 1506:22, 1511:14, 1513:13, 1515:15, 1518:13, 1557:17, 1565:2, 1565:22, 1577:4

**looked** [15] - 1358:16, 1420:8, 1435:24, 1465:14, 1479:15, 1485:15, 1488:6, 1501:7, 1501:11,

1502:6, 1518:3, 1551:25, 1564:14, 1565:6, 1584:22

**looking** [27] - 1331:6, 1334:21, 1336:1, 1336:6, 1340:2, 1342:3, 1342:8, 1346:23, 1347:15, 1366:20, 1371:6, 1371:22, 1391:10, 1409:22, 1410:18, 1422:7, 1423:14, 1447:20, 1449:3, 1449:18, 1451:4, 1455:15, 1468:19, 1501:17, 1520:1, 1551:1, 1565:1

**looks** [2] - 1423:4, 1559:16

**loop** [1] - 1565:21

**lopinavir** [1] - 1438:13

**lose** [1] - 1306:6, 1415:14, 1543:21

**lost** [1] - 1308:3

**loud** [3] - 1357:23, 1358:1, 1471:12

**loudly** [1] - 1357:20

**love** [2] - 1440:13, 1539:9

**loved** [1] - 1535:10

**low** [7] - 1451:24, 1459:16, 1459:22, 1459:23, 1505:6, 1556:12, 1557:1

**low-impact-on-lipids** [1] - 1451:24

**lower** [2] - 1360:21, 1537:8

**lowered** [1] - 1422:12

**lowering** [1] - 1420:1

**lunch** [6] - 1304:15, 1309:3, 1309:22, 1310:19, 1439:18, 1440:21

**Luncheon** [1] - 1440:25

**lymphoma** [1] - 1530:11

### M

**main** [3] - 1471:18, 1475:4, 1475:13

**major** [1] - 1534:12

**majority** [1] - 1472:17

**makers** [1] - 1389:25

**male** [1] - 1454:12

**manage** [1] - 1319:2

**management** [3] - 1534:2, 1535:21,

1537:6

**manager** [13] - 1476:25, 1491:22, 1496:23, 1504:9, 1504:10, 1504:11, 1511:23, 1511:25, 1533:25, 1559:14, 1563:22, 1570:15

**managers** [11] - 1318:19, 1319:2, 1319:3, 1407:5, 1413:25, 1460:16, 1460:17, 1496:23, 1538:22, 1542:8, 1570:14

**managing** [1] - 1543:4

**manner** [4] - 1372:10, 1373:20, 1480:24, 1537:20

**manufacturer** [4] - 1329:24, 1330:6, 1381:1, 1381:22

**manufacturers** [2] - 1380:25, 1381:6

**March** [11] - 1328:10, 1328:11, 1330:17, 1331:8, 1336:21, 1341:22, 1386:18, 1392:16, 1396:5, 1521:7, 1547:12

**Mark** [10] - 1320:24, 1321:6, 1323:11, 1323:23, 1415:23, 1511:20, 1512:1, 1542:10, 1546:6, 1568:13

**marked** [3] - 1554:22, 1555:1

**Market** [1] - 1549:12

**market** [36] - 1330:9, 1342:3, 1344:2, 1344:11, 1344:14, 1345:5, 1345:6, 1345:8, 1345:11, 1345:17, 1345:24, 1345:25, 1347:13, 1347:20, 1354:15, 1372:9, 1373:19, 1375:1, 1443:7, 1472:23, 1472:24, 1474:7, 1474:8, 1474:9, 1475:23, 1478:25, 1479:17, 1479:25, 1529:3, 1529:6, 1548:24, 1549:2, 1551:2, 1553:15

**marketed** [5] - 1375:23, 1376:17, 1378:4, 1442:1,

*1606*

1503:12
**marketing** [92] - 1331:15, 1332:2, 1337:17, 1337:19, 1346:10, 1346:25, 1356:25, 1372:8, 1372:17, 1374:2, 1374:20, 1375:13, 1375:18, 1376:13, 1377:9, 1377:24, 1393:20, 1393:22, 1394:3, 1394:9, 1395:23, 1396:17, 1396:25, 1397:2, 1397:7, 1397:10, 1397:11, 1397:20, 1397:25, 1398:4, 1399:9, 1400:14, 1402:23, 1403:13, 1413:10, 1416:18, 1425:10, 1425:14, 1432:7, 1432:8, 1432:18, 1432:19, 1433:3, 1437:24, 1438:1, 1438:2, 1438:8, 1442:9, 1442:13, 1442:19, 1442:25, 1443:6, 1443:12, 1444:1, 1444:6, 1444:12, 1444:19, 1445:7, 1445:13, 1450:19, 1450:21, 1451:5, 1457:15, 1463:11, 1478:3, 1482:18, 1501:13, 1502:8, 1507:17, 1507:19, 1509:14, 1513:22, 1514:12, 1520:14, 1524:15, 1525:17, 1534:5, 1535:22, 1535:23, 1539:25, 1545:22, 1548:16, 1557:21, 1565:25, 1566:1, 1569:15, 1572:3, 1576:10, 1577:9, 1581:11, 1583:24
**MARKETOS** [208] - 1301:14, 1301:14, 1302:5, 1302:6, 1303:10, 1304:3, 1305:24, 1307:19, 1307:25, 1308:12, 1308:14, 1309:1, 1309:16, 1311:5, 1311:18, 1311:19, 1314:7, 1330:21, 1330:23, 1332:18, 1332:21, 1333:15, 1334:4, 1334:13,

1334:14, 1343:18, 1343:20, 1344:3, 1344:9, 1345:1, 1345:3, 1348:4, 1348:6, 1348:8, 1348:10, 1349:21, 1351:2, 1351:5, 1351:9, 1351:10, 1364:14, 1364:16, 1364:25, 1365:5, 1365:7, 1365:9, 1365:11, 1365:14, 1365:16, 1367:10, 1367:11, 1368:2, 1368:4, 1368:9, 1368:11, 1368:15, 1368:20, 1371:10, 1377:19, 1380:13, 1380:14, 1382:10, 1382:15, 1383:12, 1383:15, 1384:3, 1386:7, 1386:10, 1386:15, 1386:16, 1386:21, 1386:24, 1387:3, 1387:4, 1388:7, 1388:8, 1390:17, 1390:18, 1391:13, 1392:12, 1392:13, 1399:22, 1399:25, 1400:6, 1404:9, 1404:11, 1404:17, 1408:12, 1412:7, 1412:10, 1413:1, 1413:5, 1414:8, 1414:10, 1414:11, 1414:14, 1414:17, 1420:6, 1420:7, 1421:21, 1422:1, 1422:3, 1424:5, 1424:6, 1426:1, 1426:2, 1430:18, 1433:8, 1433:10, 1433:21, 1433:25, 1434:2, 1434:3, 1437:10, 1437:15, 1437:17, 1437:19, 1439:19, 1440:7, 1440:22, 1441:7, 1441:21, 1441:22, 1446:25, 1447:1, 1447:8, 1447:12, 1447:17, 1453:5, 1453:6, 1453:18, 1453:23, 1456:8, 1456:10, 1456:15, 1456:19, 1457:4, 1457:6, 1462:21, 1462:22, 1463:3, 1463:5, 1465:19, 1465:21, 1468:11, 1468:13,

1469:17, 1469:21, 1471:8, 1471:10, 1480:12, 1482:11, 1483:14, 1483:15, 1485:3, 1490:9, 1492:9, 1492:11, 1493:3, 1493:7, 1493:10, 1497:2, 1497:3, 1497:8, 1497:13, 1497:17, 1498:13, 1498:19, 1498:20, 1499:2, 1499:6, 1504:3, 1504:7, 1505:4, 1505:10, 1511:14, 1511:16, 1514:1, 1514:6, 1515:17, 1515:18, 1517:12, 1518:16, 1550:6, 1554:18, 1566:14, 1566:15, 1571:19, 1571:21, 1572:13, 1572:16, 1574:14, 1574:15, 1577:5, 1577:7, 1578:21, 1579:3, 1579:10, 1579:16, 1579:17, 1582:17, 1582:20, 1582:21, 1583:9, 1583:12, 1583:13, 1585:6, 1586:4
**Marketos** [30] - 1303:11, 1304:1, 1305:23, 1307:17, 1308:10, 1311:3, 1311:16, 1312:1, 1371:9, 1375:6, 1380:12, 1382:4, 1385:12, 1386:13, 1391:10, 1392:1, 1392:11, 1412:6, 1439:15, 1440:6, 1441:6, 1441:20, 1482:8, 1483:12, 1517:14, 1550:5, 1566:13, 1579:13, 1585:7, 1586:3
**marketplace** [4] - 1337:9, 1355:6, 1548:21, 1548:22
**married** [2] - 1534:22
**Marriott** [2] - 1515:24
**Martin** [1] - 1570:16
**master's** [1] - 1315:7
**material** [5] - 1380:7, 1385:24, 1556:24, 1583:5, 1583:8
**materiality** [3] - 1383:16, 1383:22, 1385:13

**materials** [6] - 1396:21, 1425:15, 1449:4, 1527:17, 1534:7, 1551:22
**math** [1] - 1358:21
**Matt** [1] - 1568:14
**matter** [6] - 1444:10, 1516:23, 1523:3, 1528:22, 1575:6, 1587:5
**mattered** [1] - 1380:6
**matters** [6] - 1335:20, 1373:15, 1377:13, 1380:16, 1570:2, 1581:15
**Mattes** [14] - 1320:25, 1321:7, 1321:11, 1337:20, 1356:4, 1356:12, 1357:1, 1357:4, 1357:8, 1357:11, 1360:10, 1363:20, 1532:10, 1532:25
**max** [3] - 1345:17, 1351:11, 1351:18
**May/June** [2] - 1324:5, 1324:12
**McKay** [2] - 1301:23, 1587:11
**McKay-Soule** [2] - 1301:23, 1587:11
**McNeil** [1] - 1578:12
**MEAGHER** [1] - 1301:19
**meal** [1] - 1402:11
**meals** [1] - 1417:2
**mean** [43] - 1309:24, 1310:7, 1324:11, 1329:18, 1333:21, 1337:11, 1344:20, 1347:5, 1347:14, 1357:21, 1372:17, 1374:7, 1374:12, 1381:25, 1382:20, 1385:15, 1396:11, 1398:11, 1398:24, 1418:7, 1421:8, 1440:17, 1440:18, 1443:19, 1444:25, 1475:8, 1481:21, 1481:22, 1492:3, 1495:1, 1508:3, 1523:2, 1538:11, 1538:18, 1539:8, 1546:24, 1547:1, 1564:25, 1565:10, 1573:19, 1580:13
**meaning** [5] - 1355:4, 1394:22, 1452:12, 1510:1, 1541:1

**means** [14] - 1343:13, 1344:14, 1370:1, 1370:11, 1378:25, 1381:5, 1389:20, 1394:3, 1412:5, 1424:14, 1427:19, 1431:15, 1485:17, 1583:20
**meant** [3] - 1429:20, 1545:17, 1561:6
**measure** [6] - 1462:1, 1473:15, 1473:16, 1474:9, 1496:16
**measured** [5] - 1418:19, 1419:12, 1435:18, 1454:4, 1496:13
**measurement** [1] - 1410:22
**measuring** [2] - 1411:7, 1491:15
**mechanical** [1] - 1301:25
**Medicaid** [1] - 1390:10
**medical** [18] - 1374:19, 1389:21, 1398:6, 1430:14, 1473:2, 1474:19, 1485:12, 1486:20, 1486:22, 1487:1, 1489:12, 1489:21, 1490:13, 1491:23, 1493:20, 1500:17, 1518:25, 1520:21
**Medical** [1] - 1424:7
**Medicare** [2] - 1390:9, 1582:4
**medication** [2] - 1374:17, 1374:18
**medications** [2] - 1530:9, 1530:11
**Medicine** [2] - 1312:14, 1515:3
**medicines** [10] - 1524:7, 1532:21, 1533:4, 1536:17, 1536:20, 1536:21, 1538:2, 1540:12, 1541:3, 1546:17
**meet** [13] - 1336:12, 1336:13, 1344:11, 1345:25, 1399:4, 1425:15, 1448:2, 1448:14, 1448:17, 1539:22, 1563:2, 1563:6, 1564:11
**meeting** [34] - 1324:22, 1356:1, 1356:3, 1356:6, 1356:12, 1356:17,

1356:18, 1356:21,
1357:1, 1357:4,
1357:8, 1357:11,
1358:15, 1359:3,
1359:7, 1361:18,
1362:16, 1363:10,
1363:14, 1363:21,
1364:8, 1364:11,
1467:10, 1516:2,
1524:14, 1527:8,
1527:21, 1528:17,
1528:19, 1563:1,
1563:5, 1563:9
**meetings** [10] -
1356:9, 1525:2,
1525:5, 1525:12,
1527:3, 1527:12,
1527:16, 1528:2,
1528:10, 1546:6
**Megan** [3] - 1301:23,
1586:18, 1587:11
**Megan_McKay** [1] -
1301:24
**Megan_McKay-
Soule@njd.
uscourts.gov** [1] -
1301:24
**member** [2] - 1509:2,
1576:14
**members** [10] -
1310:13, 1334:15,
1343:18, 1366:8,
1408:15, 1408:21,
1412:4, 1434:9,
1445:4, 1504:5
**memo** [4] - 1433:12,
1436:9, 1436:17,
1448:7
**Memorial** [1] -
1304:19
**memory** [7] - 1315:14,
1358:14, 1515:15,
1548:6, 1564:6,
1564:8, 1565:14
**mention** [1] - 1306:12
**mentioned** [4] -
1306:13, 1399:2,
1399:15, 1560:20
**mentoring** [1] -
1537:10
**merged** [1] - 1316:9
**mergers** [2] - 1316:15,
1534:12
**merits** [1] - 1381:21
**message** [35] -
1426:3, 1426:9,
1432:20, 1443:12,
1458:10, 1458:15,
1459:8, 1460:3,
1460:14, 1460:17,

1461:9, 1470:17,
1471:18, 1472:6,
1472:9, 1472:12,
1472:20, 1475:4,
1475:14, 1476:23,
1477:7, 1477:20,
1478:10, 1490:21,
1490:25, 1506:7,
1528:19, 1556:20,
1557:2, 1569:22,
1571:2, 1571:6,
1571:13, 1571:14,
1571:24
**messages** [26] -
1425:5, 1425:8,
1425:19, 1426:15,
1438:8, 1442:7,
1442:15, 1442:22,
1443:6, 1443:19,
1444:13, 1444:18,
1445:7, 1446:10,
1450:22, 1469:8,
1470:13, 1475:13,
1475:21, 1477:11,
1534:7, 1556:6,
1556:16, 1560:1,
1569:15, 1569:17
**messaging** [8] -
1425:10, 1426:11,
1477:15, 1480:11,
1545:23, 1560:5,
1560:9, 1572:4
**messed** [2] - 1359:23,
1360:11
**met** [3] - 1396:6,
1448:9, 1480:23
**methods** [1] - 1454:10
**metric** [3] - 1418:9,
1495:14, 1564:19
**mic** [2] - 1314:2,
1549:13
**Michael** [1] - 1311:6
**MICHAEL** [2] - 1302:4,
1311:10
**Michigan** [3] -
1533:14, 1533:15
**Mickey** [1] - 1499:12
**microbiology** [2] -
1315:4, 1533:16
**microphone** [1] -
1319:19
**mics** [2] - 1549:16,
1549:22
**mid-'80s** [1] - 1316:5
**mid-1980s** [1] -
1315:10
**middle** [6] - 1348:2,
1348:7, 1348:8,
1499:16, 1505:7,
1511:20

**Midwest** [2] - 1534:16,
1559:17
**might** [28] - 1306:21,
1307:3, 1330:4,
1330:5, 1353:10,
1385:18, 1387:23,
1400:7, 1402:1,
1409:2, 1447:25,
1448:1, 1448:17,
1448:18, 1448:19,
1448:20, 1456:5,
1459:16, 1465:1,
1482:19, 1491:4,
1522:1, 1528:9,
1546:1, 1553:6,
1554:14, 1557:21
**Mike** [4] - 1311:14,
1414:18, 1415:23,
1533:14
**military** [1] - 1309:7
**milligrams** [1] -
1436:4
**million** [10] - 1352:11,
1352:17, 1352:18,
1358:6, 1387:20,
1416:20, 1417:5,
1421:6, 1422:5,
1423:5
**millions** [3] - 1416:15,
1417:1, 1417:23
**mind** [6] - 1314:2,
1383:15, 1553:10,
1556:11, 1560:13,
1566:6
**mindful** [1] - 1533:9
**mine** [2] - 1346:16,
1533:23
**minimal** [11] - 1446:9,
1457:3, 1457:9,
1457:23, 1458:15,
1459:10, 1459:15,
1459:18, 1460:10,
1556:12, 1557:1
**Minimal** [1] - 1556:2
**minimally** [1] -
1455:21
**minimizing** [2] -
1426:17, 1430:22
**minimum** [1] -
1459:23
**Minneapolis** [1] -
1534:1
**minute** [10] - 1308:8,
1365:6, 1391:12,
1391:15, 1391:20,
1435:4, 1435:5,
1443:11, 1549:15,
1549:21
**minutes** [10] -
1306:16, 1306:22,

1307:4, 1307:23,
1309:2, 1309:5,
1310:18, 1391:23,
1439:22, 1550:4
**MIR** [16] - 1488:22,
1491:17, 1493:7,
1493:19, 1493:22,
1495:4, 1495:6,
1495:12, 1496:14,
1500:12, 1502:8,
1502:11, 1554:7,
1558:23, 1564:18,
1565:1
**MIRs** [12] - 1486:20,
1487:9, 1487:14,
1495:22, 1559:5,
1559:9, 1564:15,
1564:22, 1565:3,
1565:7, 1565:8,
1565:16
**misbranded** [1] -
1371:12
**misbranding** [2] -
1371:11, 1373:11
**mislead** [1] - 1431:19
**misleading** [6] -
1390:1, 1442:24,
1506:8, 1506:19,
1560:9, 1570:4
**misnamed** [1] -
1305:25
**misrepresenting** [1] -
1437:6
**miss** [3] - 1359:18,
1419:20, 1420:25
**missed** [8] - 1356:22,
1357:2, 1357:5,
1360:4, 1422:13,
1460:9, 1575:14,
1575:15
**mistake** [1] - 1541:17
**mode** [1] - 1415:18
**modules** [4] - 1387:9,
1469:4, 1469:7,
1469:22
**moment** [9] - 1348:15,
1352:1, 1354:10,
1360:23, 1361:12,
1439:25, 1476:19,
1502:2, 1518:19
**moments** [1] -
1501:16
**money** [12] - 1353:16,
1359:14, 1379:20,
1401:3, 1415:4,
1415:14, 1415:24,
1417:15, 1508:16,
1508:17, 1511:9,
1529:16
**monitor** [7] - 1332:10,

1332:11, 1332:25,
1346:11, 1346:25,
1545:5, 1545:8
**Monsanto** [4] -
1316:10, 1316:12,
1316:17, 1534:14
**Month** [1] - 1358:17
**month** [4] - 1387:21,
1490:12, 1552:5,
1552:12
**monthly** [1] - 1421:18
**months** [4] - 1364:5,
1421:9, 1544:6,
1548:13
**morning** [24] -
1303:10, 1303:12,
1303:16, 1303:18,
1303:20, 1303:22,
1303:24, 1304:2,
1304:3, 1304:9,
1304:10, 1308:25,
1309:19, 1309:23,
1310:17, 1311:5,
1311:20, 1311:21,
1326:21, 1441:19,
1579:7, 1579:12,
1585:12, 1585:21
**Morton's** [1] - 1417:15
**most** [7] - 1309:22,
1341:16, 1451:12,
1471:16, 1475:2,
1523:3, 1546:4
**mostly** [1] - 1316:25
**mother** [1] - 1530:10
**Mother's** [1] - 1523:20
**motion** [4] - 1370:25,
1371:11, 1371:15,
1373:23
**motivation** [1] -
1529:22
**mouth** [1] - 1580:12
**move** [10] - 1306:16,
1330:8, 1366:19,
1435:6, 1452:24,
1480:12, 1480:15,
1506:24, 1508:1,
1561:8
**moved** [6] - 1372:19,
1373:10, 1463:14,
1463:15, 1533:21,
1557:21
**moving** [4] - 1306:19,
1307:7, 1534:15,
1579:8
**MR** [210] - 1302:5,
1302:6, 1303:10,
1303:14, 1303:15,
1303:20, 1303:22,
1304:3, 1305:24,
1307:19, 1307:25,

1308:12, 1308:14,
1309:1, 1309:16,
1311:5, 1311:18,
1311:19, 1314:7,
1330:21, 1330:23,
1332:18, 1332:21,
1333:15, 1334:4,
1334:13, 1334:14,
1343:18, 1343:20,
1344:3, 1344:9,
1345:1, 1345:3,
1348:4, 1348:6,
1348:8, 1348:10,
1349:21, 1351:2,
1351:5, 1351:9,
1351:10, 1364:14,
1364:16, 1364:25,
1365:5, 1365:7,
1365:9, 1365:11,
1365:14, 1365:16,
1367:10, 1367:11,
1368:2, 1368:4,
1368:9, 1368:11,
1368:15, 1368:20,
1371:10, 1377:19,
1380:13, 1380:14,
1382:10, 1382:15,
1383:12, 1383:15,
1384:3, 1386:7,
1386:10, 1386:15,
1386:16, 1386:21,
1386:24, 1387:3,
1387:4, 1388:7,
1388:8, 1390:17,
1390:18, 1391:13,
1392:12, 1392:13,
1399:22, 1399:25,
1400:6, 1404:9,
1404:11, 1404:17,
1408:12, 1412:7,
1412:10, 1413:1,
1413:5, 1414:8,
1414:10, 1414:11,
1414:14, 1414:17,
1420:6, 1420:7,
1421:21, 1422:1,
1422:3, 1424:5,
1424:6, 1426:1,
1426:2, 1430:18,
1433:8, 1433:10,
1433:21, 1433:25,
1434:2, 1434:3,
1437:10, 1437:15,
1437:17, 1437:19,
1439:19, 1440:7,
1440:22, 1441:7,
1441:21, 1441:22,
1446:25, 1447:1,
1447:8, 1447:12,
1447:17, 1453:5,
1453:6, 1453:18,

1453:23, 1456:8,
1456:10, 1456:15,
1456:19, 1457:4,
1457:6, 1462:21,
1462:22, 1463:3,
1463:5, 1465:19,
1465:21, 1468:11,
1468:13, 1469:17,
1469:21, 1471:8,
1471:10, 1480:12,
1482:11, 1483:14,
1483:15, 1485:3,
1490:9, 1492:9,
1492:11, 1493:3,
1493:7, 1493:10,
1497:2, 1497:3,
1497:8, 1497:13,
1497:17, 1498:13,
1498:19, 1498:20,
1499:2, 1499:6,
1504:3, 1504:7,
1505:4, 1505:10,
1511:14, 1511:16,
1514:1, 1514:6,
1515:17, 1515:18,
1517:12, 1518:16,
1550:6, 1554:18,
1566:14, 1566:15,
1571:19, 1571:21,
1572:13, 1572:16,
1574:14, 1574:15,
1577:5, 1577:7,
1578:21, 1579:3,
1579:10, 1579:16,
1579:17, 1582:17,
1582:20, 1582:21,
1583:9, 1583:12,
1583:13, 1585:6,
1586:4

**MRIs** [2] - 1496:5,
1558:10

**MS** [112] - 1302:5,
1303:12, 1303:18,
1304:8, 1304:16,
1304:22, 1304:25,
1305:3, 1305:7,
1307:21, 1307:24,
1308:16, 1308:20,
1308:23, 1333:17,
1365:2, 1368:17,
1370:22, 1370:25,
1371:21, 1371:25,
1372:4, 1372:16,
1372:23, 1373:2,
1373:5, 1373:7,
1373:9, 1373:14,
1373:25, 1374:7,
1374:10, 1374:12,
1374:22, 1375:16,
1376:3, 1376:9,
1376:14, 1376:20,

1376:24, 1377:3,
1377:15, 1380:9,
1381:8, 1381:10,
1381:20, 1382:3,
1384:19, 1384:22,
1385:5, 1385:22,
1400:4, 1413:2,
1421:23, 1430:11,
1433:22, 1437:5,
1437:12, 1437:14,
1440:13, 1440:23,
1441:10, 1447:10,
1453:20, 1456:16,
1469:18, 1480:25,
1481:3, 1481:7,
1481:20, 1482:1,
1482:3, 1483:7,
1493:4, 1497:9,
1498:15, 1499:3,
1514:3, 1517:16,
1517:18, 1517:21,
1517:22, 1518:14,
1518:18, 1544:24,
1545:2, 1545:3,
1549:15, 1549:20,
1550:3, 1550:8,
1550:13, 1550:20,
1550:21, 1554:16,
1554:21, 1555:17,
1555:20, 1555:21,
1566:11, 1572:19,
1572:24, 1573:5,
1573:8, 1573:18,
1578:23, 1579:14,
1583:7, 1586:1,
1586:6, 1586:11,
1586:20

**multiple** [3] - 1352:25,
1353:3, 1530:11

**Murphy** [5] - 1488:5,
1488:16, 1489:15,
1490:12, 1563:21

**must** [9] - 1329:25,
1335:22, 1336:13,
1336:22, 1339:3,
1461:3, 1487:2,
1551:9

**mutation** [1] - 1335:21

## N

**naive** [23] - 1335:5,
1335:9, 1335:14,
1339:10, 1347:22,
1362:17, 1365:12,
1424:2, 1424:11,
1424:19, 1424:24,
1426:23, 1427:5,
1457:8, 1466:13,
1476:17, 1478:20,
1478:25, 1479:17,

1483:18, 1484:4,
1548:5, 1548:8

**name** [12] - 1311:12,
1311:13, 1311:22,
1314:16, 1332:24,
1400:21, 1400:24,
1450:18, 1453:10,
1456:21, 1492:25,
1495:1

**name's** [1] - 1311:25

**named** [1] - 1555:22

**names** [3] - 1313:10,
1467:22, 1492:14

**narrative** [1] - 1383:4

**narrow** [9] - 1329:16,
1329:18, 1330:14,
1330:19, 1340:5,
1340:14, 1354:20,
1355:13, 1529:14

**narrowed** [1] -
1355:10

**narrower** [1] - 1330:9

**nation** [3] - 1418:18,
1463:20, 1488:25

**national** [38] -
1319:11, 1319:12,
1319:14, 1319:18,
1319:24, 1319:25,
1320:23, 1321:3,
1323:14, 1324:11,
1331:23, 1348:24,
1353:18, 1358:6,
1409:24, 1412:16,
1414:13, 1417:24,
1431:6, 1435:23,
1463:17, 1464:11,
1468:24, 1473:10,
1474:25, 1475:22,
1476:21, 1477:19,
1496:6, 1498:4,
1503:7, 1504:13,
1509:2, 1514:7,
1532:4, 1540:1,
1542:3, 1557:5

**nationwide** [4] -
1356:7, 1524:4,
1524:6, 1576:2

**natural** [3] - 1315:18,
1336:2

**naturally** [1] - 1342:24

**navigate** [1] - 1537:11

**NCEP** [1] - 1505:17

**nearly** [1] - 1539:4

**necessarily** [3] -
1331:19, 1411:13,
1472:23

**necessary** [4] -
1350:18, 1428:17,
1479:16, 1544:5

**need** [23] - 1304:1,

1304:6, 1306:21,
1307:14, 1310:8,
1310:23, 1341:23,
1343:2, 1348:11,
1415:23, 1439:18,
1440:20, 1441:5,
1489:20, 1526:23,
1546:17, 1548:17,
1553:16, 1554:4,
1554:7, 1565:3,
1585:23, 1585:25

**needed** [9] - 1343:25,
1344:10, 1345:24,
1481:12, 1501:8,
1551:14, 1561:6,
1565:5, 1570:11

**needing** [1] - 1325:6

**needs** [3] - 1361:19,
1416:2, 1501:14

**negative** [2] - 1454:12,
1491:10

**neutral** [3] - 1446:8,
1455:21, 1461:2

**never** [34] - 1333:18,
1399:2, 1409:11,
1410:7, 1416:20,
1443:4, 1444:5,
1483:20, 1483:25,
1484:3, 1484:15,
1485:6, 1493:15,
1495:16, 1495:17,
1495:18, 1495:24,
1496:2, 1496:3,
1496:9, 1507:6,
1507:9, 1507:10,
1507:19, 1508:20,
1510:4, 1510:11,
1522:21, 1523:12,
1523:14, 1539:5,
1562:6

**new** [26] - 1318:1,
1334:16, 1334:21,
1335:4, 1338:14,
1339:18, 1346:5,
1353:23, 1355:4,
1363:23, 1364:2,
1364:4, 1367:17,
1421:10, 1427:2,
1427:3, 1454:5,
1473:11, 1480:5,
1480:6, 1535:14,
1545:25, 1553:15,
1553:18

**NEW** [1] - 1301:1

**New** [12] - 1301:9,
1317:17, 1409:22,
1410:4, 1410:17,
1411:7, 1488:17,
1488:19, 1488:20,
1489:20, 1490:13,

1563:21
**new-hire** [1] - 1346:5
**newer** [1] - 1576:23
**Newmeyer** [1] -
1511:21
**next** [20] - 1308:10,
1311:3, 1343:17,
1347:7, 1350:25,
1378:8, 1386:21,
1386:23, 1388:19,
1388:20, 1389:13,
1390:14, 1390:17,
1409:21, 1421:9,
1424:5, 1465:20,
1493:8, 1505:4,
1564:6
**nice** [1] - 1528:4
**nine** [1] - 1490:15
**NNRTI** [2] - 1351:13,
1351:20
**NNRTI-resistant** [2] -
1351:13, 1351:20
**NNRTIs** [1] - 1465:7
**nobody's** [1] -
1567:12
**non** [1] - 1530:11
**non-Hodgkin's** [1] -
1530:11
**none** [1] - 1569:4
**nonperformance** [1] -
1543:12
**nonprofit** [1] - 1537:8
**nonresponse** [3] -
1412:3, 1480:16,
1483:3
**normal** [1] - 1422:25
**normally** [4] -
1309:19, 1310:19,
1422:24, 1525:11
**note** [1] - 1491:10
**notes** [16] - 1351:14,
1358:15, 1364:11,
1364:17, 1364:18,
1364:22, 1364:23,
1365:8, 1365:10,
1366:19, 1488:21,
1562:14, 1562:16,
1563:9, 1563:17,
1586:10
**nothing** [5] - 1310:20,
1565:9, 1582:13,
1586:3, 1586:4
**notice** [1] - 1492:21
**November** [3] -
1420:17, 1433:18,
1462:24
**NSD** [5] - 1319:16,
1498:1, 1499:19,
1501:21, 1501:22
**number** [46] -

1305:21, 1313:21,
1354:16, 1358:10,
1359:8, 1371:25,
1393:14, 1395:25,
1398:13, 1405:25,
1406:13, 1406:17,
1406:18, 1407:3,
1410:22, 1433:3,
1449:5, 1456:25,
1463:6, 1463:24,
1465:23, 1466:24,
1469:3, 1469:7,
1480:7, 1480:8,
1486:22, 1487:9,
1487:16, 1488:1,
1488:22, 1489:7,
1489:11, 1491:16,
1494:8, 1495:5,
1495:12, 1496:14,
1499:20, 1521:11,
1527:12, 1542:14,
1549:1, 1552:8,
1565:3
**NUMBER** [1] - 1301:23
**numbered** [1] -
1342:14
**numbers** [8] - 1306:2,
1405:25, 1416:24,
1490:19, 1543:13,
1544:17, 1564:12,
1564:18
**numerous** [2] -
1372:12, 1379:24
**nurse** [7] - 1473:24,
1515:19, 1518:20,
1519:8, 1519:12,
1519:17, 1520:7
**nurses** [1] - 1518:25
**nutshell** [1] - 1415:2

## O

**o'clock** [2] - 1306:14,
1585:15
**O'Connor** [2] -
1464:12, 1501:21
**oath** [6] - 1326:15,
1326:20, 1392:10,
1400:10, 1441:18,
1574:18
**object** [5] - 1333:17,
1430:11, 1437:5,
1497:10, 1572:20
**objected** [1] - 1384:20
**objecting** [1] - 1385:2
**objection** [33] -
1334:1, 1365:2,
1368:17, 1371:8,
1372:25, 1373:1,
1373:2, 1380:9,

1381:8, 1381:15,
1382:7, 1383:25,
1384:21, 1413:2,
1421:23, 1433:22,
1437:16, 1447:10,
1453:20, 1456:16,
1469:18, 1483:5,
1483:10, 1493:4,
1498:16, 1499:3,
1514:3, 1518:16,
1554:18, 1573:16,
1573:18, 1573:22,
1583:7
**objections** [1] -
1383:19
**objective** [1] - 1358:17
**objectives** [4] -
1346:10, 1347:2,
1397:7, 1451:5
**observed** [2] - 1452:2,
1538:8
**observing** [1] -
1453:25
**obstacle** [3] -
1355:14, 1428:3,
1428:9
**obstacles** [4] -
1354:16, 1354:19,
1355:21, 1366:2
**obtain** [3] - 1330:14,
1341:5, 1378:21
**obtained** [6] -
1328:23, 1329:16,
1338:10, 1339:18,
1340:2, 1341:11
**obviously** [4] -
1385:8, 1418:25,
1530:22, 1561:5
**occurred** [6] - 1308:1,
1312:23, 1391:24,
1528:16, 1549:24,
1582:25
**October** [4] - 1341:12,
1431:5, 1456:12,
1503:2
**OF** [2] - 1301:1,
1301:3
**off-label** [107] -
1327:23, 1336:23,
1338:21, 1351:7,
1351:22, 1369:17,
1369:25, 1370:16,
1372:8, 1372:17,
1373:9, 1373:11,
1374:2, 1374:7,
1374:13, 1374:17,
1374:19, 1375:1,
1375:18, 1375:19,
1375:24, 1376:13,
1376:18, 1377:3,

1377:6, 1377:9,
1377:24, 1378:4,
1378:11, 1378:21,
1381:7, 1423:9,
1423:15, 1424:16,
1424:25, 1425:19,
1426:11, 1446:16,
1447:21, 1448:14,
1448:24, 1449:4,
1449:17, 1450:2,
1450:7, 1453:24,
1454:11, 1455:18,
1456:4, 1461:9,
1462:7, 1462:13,
1465:6, 1466:12,
1466:19, 1467:12,
1467:16, 1468:6,
1468:7, 1475:13,
1476:13, 1476:22,
1477:2, 1477:20,
1478:3, 1478:10,
1482:13, 1485:24,
1486:7, 1486:14,
1486:20, 1488:2,
1491:1, 1495:9,
1506:19, 1519:9,
1524:4, 1524:15,
1525:21, 1528:20,
1529:16, 1532:21,
1533:1, 1536:17,
1536:22, 1553:3,
1554:14, 1559:10,
1563:3, 1565:4,
1565:11, 1566:1,
1566:4, 1567:25,
1570:4, 1570:20,
1571:2, 1576:10,
1577:9, 1581:10,
1581:24, 1582:24,
1583:15, 1583:24,
1584:5, 1584:18
**offer** [17] - 1333:15,
1364:25, 1368:15,
1413:1, 1421:21,
1433:21, 1447:8,
1453:18, 1456:15,
1469:17, 1493:3,
1497:8, 1498:13,
1499:2, 1514:1,
1578:21, 1579:3
**offered** [1] - 1579:1
**office** [5] - 1346:15,
1456:1, 1473:24,
1534:3, 1538:19
**Office** [3] - 1387:15,
1578:11, 1580:21
**officer** [4] - 1525:25,
1564:24, 1571:6,
1571:10
**officers** [1] - 1570:12

**offices** [2] - 1318:24,
1446:3
**Official** [1] - 1301:23
**OFFICIAL** [1] - 1587:1
**often** [1] - 1565:19
**OIG** [1] - 1389:15
**on-label** [10] - 1336:8,
1336:14, 1341:24,
1342:4, 1343:3,
1343:6, 1449:10,
1545:22, 1569:17,
1569:23
**once** [21] - 1308:24,
1370:14, 1370:15,
1423:14, 1424:2,
1424:8, 1427:9,
1428:14, 1428:19,
1457:7, 1457:9,
1460:13, 1460:18,
1462:6, 1462:13,
1471:1, 1472:21,
1495:4, 1501:22,
1548:8, 1556:2
**once-daily** [7] -
1423:14, 1424:8,
1427:9, 1457:7,
1460:13, 1472:21,
1548:8
**One** [2] - 1301:21,
1309:7
**one** [111] - 1308:4,
1308:11, 1309:10,
1313:22, 1322:1,
1327:17, 1327:20,
1330:19, 1333:11,
1333:25, 1339:23,
1340:8, 1340:16,
1349:3, 1350:18,
1350:25, 1351:3,
1351:6, 1356:10,
1358:17, 1359:25,
1360:13, 1362:22,
1364:19, 1366:21,
1367:24, 1368:12,
1381:1, 1384:20,
1385:25, 1387:12,
1390:17, 1395:8,
1399:2, 1401:13,
1404:25, 1407:8,
1413:10, 1413:24,
1414:12, 1418:8,
1418:22, 1419:3,
1419:11, 1419:25,
1420:12, 1424:19,
1426:3, 1434:8,
1434:10, 1445:4,
1445:5, 1445:15,
1445:17, 1446:10,
1447:18, 1450:25,
1451:1, 1451:5,

1463:13, 1467:6, 1467:15, 1469:3, 1470:16, 1473:3, 1475:12, 1477:4, 1479:3, 1481:16, 1487:19, 1488:19, 1488:20, 1489:7, 1489:10, 1490:24, 1494:8, 1494:14, 1495:5, 1496:12, 1497:5, 1497:9, 1499:12, 1499:22, 1503:2, 1503:9, 1511:18, 1513:16, 1515:5, 1519:8, 1519:22, 1521:11, 1521:16, 1521:25, 1527:12, 1528:9, 1530:1, 1538:24, 1542:14, 1549:5, 1549:6, 1556:1, 1563:16, 1563:25, 1569:1, 1574:4, 1576:7, 1585:14, 1586:1, 1586:6

**one-half** [1] - 1404:25
**one-page** [2] - 1419:25, 1420:12
**ones** [3] - 1306:7, 1332:15, 1449:18
**ongoing** [1] - 1444:23
**onward** [1] - 1532:4
**Open** [4] - 1377:18, 1386:12, 1483:9, 1574:12
**open** [3] - 1303:1, 1423:19, 1546:24
**opening** [1] - 1376:2
**operate** [1] - 1537:19
**operates** [1] - 1546:12
**operating** [5] - 1321:20, 1321:22, 1322:17, 1324:3, 1484:19
**operation** [1] - 1353:25
**operations** [4] - 1322:7, 1322:8, 1322:9, 1535:18
**opinion** [5] - 1371:22, 1372:13, 1372:15, 1388:10, 1430:14
**opportunities** [4] - 1465:6, 1466:12, 1466:20, 1468:6
**opportunity** [13] - 1326:14, 1327:7, 1410:15, 1466:3, 1468:7, 1526:20, 1529:15, 1534:3,

1534:20, 1535:10, 1535:13, 1562:12, 1575:11
**opposed** [2] - 1373:4, 1373:6
**order** [19] - 1324:23, 1327:8, 1327:18, 1329:23, 1336:12, 1341:5, 1344:11, 1345:25, 1348:23, 1350:18, 1360:24, 1418:2, 1420:4, 1434:10, 1448:11, 1449:9, 1486:9, 1488:11, 1539:22
**organization** [55] - 1312:24, 1313:17, 1314:24, 1316:17, 1318:4, 1318:7, 1319:12, 1321:8, 1322:21, 1356:22, 1359:8, 1361:4, 1361:20, 1369:15, 1392:18, 1395:9, 1395:15, 1395:16, 1396:6, 1398:2, 1402:25, 1406:3, 1407:8, 1407:21, 1409:15, 1412:21, 1424:15, 1447:5, 1463:7, 1467:24, 1468:15, 1470:8, 1484:18, 1486:19, 1487:19, 1503:18, 1525:13, 1525:14, 1533:21, 1534:1, 1535:10, 1535:11, 1535:14, 1537:8, 1538:15, 1540:2, 1542:21, 1543:6, 1543:19, 1545:11, 1553:16, 1561:3, 1568:15
**organization's** [1] - 1423:23
**organizations** [3] - 1313:4, 1314:13, 1317:1
**orient** [3] - 1393:8, 1424:14, 1547:15
**original** [1] - 1414:15
**Ortho** [1] - 1578:12
**Ortho-McNeil** [1] - 1578:12
**otherwise** [4] - 1307:15, 1314:13, 1395:23, 1437:4
**ourselves** [2] - 1394:2, 1424:14
**outlined** [1] - 1521:12

**outperforming** [1] - 1490:16
**outset** [2] - 1371:14, 1396:8
**outside** [7] - 1338:9, 1398:10, 1427:5, 1545:9, 1566:20, 1566:23, 1567:2
**overcome** [1] - 1355:15
**overlooked** [2] - 1459:25, 1460:2
**overnight** [1] - 1548:10
**overrule** [2] - 1430:15, 1483:5
**overruled** [3] - 1333:20, 1334:1, 1483:11
**oversaw** [2] - 1322:4, 1401:14
**overseas** [1] - 1465:1
**oversee** [2] - 1524:3, 1524:6
**overseeing** [5] - 1352:23, 1416:13, 1417:3, 1417:20, 1536:20
**oversight** [2] - 1353:25, 1520:11
**overutilization** [1] - 1390:20
**overview** [1] - 1490:20
**own** [8] - 1322:17, 1444:2, 1444:7, 1465:1, 1548:23, 1554:11, 1555:7, 1563:9
**owned** [7] - 1393:20, 1393:22, 1394:3, 1394:9, 1396:17, 1398:12
**owner** [2] - 1394:11, 1520:14
**owners** [1] - 1507:18

## P

**p.m** [7] - 1440:25, 1441:1, 1480:14, 1483:8, 1572:22, 1574:11, 1586:22
**pace** [3] - 1366:3, 1489:20, 1491:12
**paced** [1] - 1538:18
**package** [4] - 1438:24, 1449:14, 1449:19, 1564:5
**PAGE** [1] - 1302:3
**page** [38] - 1304:12,

1309:25, 1334:5, 1343:17, 1347:7, 1350:25, 1351:2, 1351:3, 1352:7, 1369:2, 1369:7, 1371:22, 1378:8, 1388:7, 1404:6, 1404:10, 1419:25, 1420:12, 1434:1, 1439:14, 1451:4, 1457:2, 1457:5, 1465:20, 1470:2, 1470:25, 1471:6, 1493:8, 1499:16, 1505:4, 1505:8, 1506:11, 1541:18, 1549:5, 1572:17, 1574:22, 1586:17
**Page** [2] - 1302:8, 1339:17
**pages** [3] - 1404:9, 1549:1, 1549:5
**paid** [27] - 1327:18, 1359:18, 1363:11, 1374:15, 1395:24, 1400:18, 1402:2, 1402:10, 1402:23, 1402:25, 1403:13, 1403:17, 1403:19, 1403:25, 1405:15, 1417:1, 1417:10, 1459:8, 1474:23, 1511:9, 1514:16, 1540:12, 1562:5, 1568:1, 1574:23, 1575:19, 1584:8
**panic** [2] - 1354:10, 1354:12
**paper** [2] - 1389:2, 1389:7
**paragraph** [3] - 1351:17, 1351:18, 1415:10
**parameters** [1] - 1385:12
**paraphrasing** [2] - 1385:18, 1482:14
**parent** [2] - 1314:24, 1369:16
**parlance** [2] - 1315:19, 1363:3
**part** [55] - 1313:16, 1313:20, 1316:4, 1317:21, 1331:15, 1346:15, 1347:6, 1361:6, 1367:18, 1367:20, 1373:16, 1375:21, 1376:7, 1376:25, 1386:6, 1396:11, 1397:9,

1398:7, 1398:8, 1399:17, 1401:17, 1401:18, 1403:5, 1406:2, 1406:6, 1410:20, 1411:12, 1411:17, 1417:14, 1418:9, 1418:15, 1418:17, 1418:23, 1419:8, 1436:10, 1436:14, 1437:9, 1443:4, 1445:25, 1449:19, 1464:6, 1464:9, 1464:13, 1468:4, 1468:5, 1479:10, 1510:17, 1520:20, 1522:18, 1528:14, 1541:1, 1576:23, 1580:14
**participate** [6] - 1520:9, 1521:10, 1532:14, 1553:2, 1563:1, 1563:5
**participated** [1] - 1562:6
**particular** [11] - 1318:18, 1346:3, 1349:14, 1375:9, 1376:22, 1482:7, 1503:24, 1516:23, 1527:20, 1564:22, 1565:14
**particulars** [2] - 1382:18, 1557:3
**partly** [1] - 1306:18
**partners** [2] - 1407:9, 1525:15
**partnerships** [1] - 1523:3
**parts** [1] - 1372:12
**pass** [2] - 1481:18, 1517:13
**passion** [1] - 1533:23
**passionate** [2] - 1526:12, 1539:8
**past** [1] - 1550:12
**Patel** [2] - 1513:22, 1570:11
**patent** [2] - 1328:24, 1329:3
**patented** [1] - 1329:5
**patents** [1] - 1329:3
**PATH** [17] - 1496:18, 1496:19, 1497:4, 1497:19, 1497:23, 1498:8, 1498:9, 1498:24, 1499:13, 1500:4, 1503:1, 1503:8, 1503:24, 1558:22, 1559:2
**patient** [30] - 1329:19,

1330:18, 1330:19, 1334:11, 1334:16, 1334:22, 1336:8, 1338:9, 1339:10, 1340:8, 1340:10, 1340:22, 1345:12, 1351:22, 1355:9, 1355:13, 1370:1, 1370:13, 1379:15, 1390:25, 1391:5, 1427:19, 1427:21, 1428:9, 1428:19, 1430:24, 1431:21, 1484:11, 1530:14

**patient's** [3] - 1349:5, 1426:4, 1426:17

**patients** [64] - 1320:20, 1329:10, 1330:1, 1335:3, 1335:5, 1335:8, 1335:9, 1335:14, 1335:17, 1335:22, 1336:7, 1339:22, 1340:16, 1340:25, 1341:23, 1341:24, 1342:8, 1342:13, 1342:14, 1342:15, 1342:19, 1342:23, 1343:3, 1343:6, 1343:8, 1345:13, 1345:18, 1350:19, 1351:13, 1351:20, 1362:17, 1374:18, 1389:25, 1426:23, 1427:5, 1428:3, 1429:4, 1429:21, 1430:2, 1430:6, 1430:24, 1448:18, 1452:3, 1452:8, 1452:12, 1457:8, 1464:23, 1466:14, 1478:16, 1478:20, 1478:25, 1479:16, 1483:18, 1484:4, 1484:7, 1490:21, 1516:8, 1530:6, 1530:16, 1548:8, 1551:2, 1553:17

**Paul** [1] - 1301:17

**pause** [3] - 1371:18, 1371:24, 1476:17

**pay** [10] - 1325:2, 1349:16, 1385:9, 1402:3, 1402:5, 1402:9, 1402:20, 1402:22, 1417:16, 1541:8

**paying** [9] - 1310:25, 1326:4, 1402:7, 1402:9, 1402:16,

---

1474:2, 1474:5, 1474:8, 1517:5

**payments** [3] - 1362:11, 1374:13, 1379:25

**peace** [1] - 1568:10

**peer** [4] - 1402:12, 1507:6

**peer-to-peer** [1] - 1402:12

**Penelow** [8] - 1312:2, 1318:23, 1327:2, 1327:15, 1418:18, 1524:12, 1567:18, 1568:13

**Penetration** [1] - 1549:12

**penetration** [2] - 1347:14, 1347:20

**people** [56] - 1304:18, 1318:22, 1319:7, 1331:25, 1337:18, 1337:19, 1337:20, 1339:12, 1346:10, 1347:16, 1348:23, 1348:25, 1355:6, 1355:9, 1362:24, 1370:5, 1393:15, 1393:19, 1411:13, 1413:14, 1417:16, 1444:3, 1444:7, 1452:18, 1454:17, 1454:20, 1455:7, 1463:7, 1463:24, 1466:25, 1467:23, 1479:9, 1489:20, 1501:2, 1514:22, 1522:7, 1523:3, 1525:19, 1525:20, 1530:22, 1533:18, 1536:21, 1543:4, 1543:6, 1543:15, 1543:20, 1544:3, 1544:10, 1546:6, 1561:7, 1565:6, 1568:14, 1570:11, 1578:1, 1585:2, 1585:3

**people's** [2] - 1455:3, 1565:25

**per** [5] - 1387:20, 1405:23, 1406:10, 1406:22, 1406:23

**percent** [13] - 1344:1, 1344:2, 1344:10, 1344:11, 1345:25, 1404:25, 1425:1, 1452:3, 1452:8, 1482:5, 1542:16, 1542:24, 1548:21

---

**perception** [4] - 1451:12, 1451:18, 1451:20, 1452:17

**perform** [1] - 1474:24

**performance** [32] - 1409:23, 1410:5, 1410:17, 1410:18, 1410:22, 1411:7, 1411:8, 1418:4, 1418:10, 1418:19, 1419:13, 1421:18, 1486:22, 1491:16, 1495:14, 1506:15, 1509:20, 1528:1, 1530:23, 1542:17, 1542:25, 1543:2, 1543:9, 1543:14, 1543:15, 1544:11, 1544:15, 1544:18, 1546:4, 1561:21, 1564:19

**performed** [5] - 1453:16, 1454:12, 1454:16, 1468:15, 1474:5

**performing** [4] - 1364:5, 1401:1, 1474:10, 1488:17

**period** [41] - 1312:25, 1319:23, 1319:25, 1323:12, 1323:16, 1327:17, 1328:9, 1330:7, 1352:22, 1392:24, 1398:3, 1401:13, 1414:12, 1419:24, 1421:8, 1422:12, 1425:21, 1427:2, 1430:7, 1485:4, 1485:5, 1505:19, 1519:7, 1519:22, 1521:10, 1529:2, 1531:6, 1531:11, 1531:20, 1532:8, 1536:15, 1536:19, 1536:24, 1542:20, 1543:3, 1556:5, 1559:8, 1559:22, 1562:3, 1566:2, 1585:4

**periodic** [1] - 1495:19

**periodically** [1] - 1564:23

**permission** [5] - 1518:15, 1544:24, 1554:16, 1555:17, 1571:9

**permits** [1] - 1486:3

**permitted** [8] - 1339:21, 1377:24, 1378:19, 1378:20,

---

1478:15, 1485:23, 1486:4, 1486:7

**person** [5] - 1476:3, 1533:19, 1538:24, 1540:7, 1542:20

**person's** [1] - 1462:2

**personal** [7] - 1522:19, 1526:14, 1530:6, 1567:23, 1568:6, 1568:9, 1568:20

**personally** [1] - 1522:17

**perspective** [5] - 1328:12, 1481:1, 1481:7, 1545:10, 1548:14

**Pete** [2] - 1303:11, 1312:1

**PETE** [1] - 1301:14

**Pfizer** [5] - 1316:14, 1316:18, 1316:20, 1317:16, 1534:15

**pharmaceutical** [14] - 1315:11, 1315:24, 1317:10, 1321:23, 1329:24, 1330:6, 1369:11, 1530:5, 1533:19, 1535:2, 1537:18, 1546:12, 1582:10

**Pharmaceuticals** [9] - 1313:22, 1314:18, 1316:4, 1316:9, 1321:17, 1534:4, 1576:15, 1577:21, 1578:13

**Pharmacia** [6] - 1316:13, 1316:14, 1316:17, 1316:20, 1534:13, 1534:14

**pharmacies** [1] - 1366:14

**phase** [1] - 1457:14

**phased** [2] - 1338:15

**phasing** [1] - 1346:5

**phone** [2] - 1356:7, 1532:15

**phrase** [2] - 1373:19, 1399:12

**physically** [1] - 1510:2

**physician** [8] - 1415:21, 1416:4, 1428:3, 1474:18, 1475:7, 1476:23, 1477:21, 1530:7

**physicians** [21] - 1343:6, 1354:19, 1354:24, 1355:3, 1362:16, 1410:9,

---

1410:10, 1411:23, 1419:6, 1425:21, 1468:16, 1470:21, 1471:7, 1471:16, 1494:6, 1524:7, 1548:22, 1553:25, 1565:9, 1566:2

**pick** [3] - 1489:20, 1491:12, 1517:23

**picked** [2] - 1397:25, 1460:5

**piece** [6] - 1399:7, 1435:24, 1478:12, 1530:3, 1535:18, 1545:20

**pieces** [1] - 1554:24

**pill** [1] - 1428:8

**pills** [1] - 1428:4

**pipeline** [1] - 1534:20

**place** [12] - 1392:18, 1405:1, 1413:6, 1439:4, 1502:3, 1502:22, 1551:14, 1568:16, 1569:1, 1569:5, 1570:8, 1576:3

**plain** [1] - 1502:18

**plaintiff** [1] - 1387:14

**Plaintiffs** [1] - 1301:4

**Plaintiffs'** [6] - 1421:21, 1447:8, 1468:19, 1518:14, 1520:2, 1544:25

**plaintiffs'** [3] - 1447:13, 1453:13, 1453:18

**plan** [18] - 1337:3, 1412:12, 1413:7, 1444:22, 1450:14, 1468:6, 1500:1, 1500:7, 1532:20, 1533:4, 1542:17, 1542:25, 1543:14, 1543:15, 1548:17, 1552:24, 1558:2

**planned** [2] - 1361:14, 1361:21

**planning** [26] - 1337:1, 1338:13, 1346:4, 1346:5, 1347:24, 1350:23, 1467:4, 1467:5, 1467:10, 1467:12, 1467:15, 1479:19, 1545:15, 1545:20, 1546:2, 1546:3, 1546:10, 1546:20, 1546:25, 1548:11, 1548:24, 1551:13, 1551:14, 1551:16,

1561:3, 1561:4
**plans** [8] - 1380:1, 1535:25, 1543:2, 1544:12, 1544:16, 1561:17, 1564:6
**play** [6] - 1336:13, 1336:22, 1338:8, 1339:3, 1404:13, 1551:9
**played** [4] - 1404:16, 1572:11, 1573:14, 1573:25
**playfield** [3] - 1336:2, 1336:6
**POA** [16] - 1524:13, 1525:2, 1525:5, 1525:12, 1525:23, 1527:3, 1527:7, 1527:12, 1527:16, 1527:21, 1528:2, 1528:10, 1528:17, 1528:19, 1571:8
**POAs** [1] - 1570:13
**point** [25] - 1304:9, 1307:2, 1322:15, 1333:21, 1341:3, 1358:6, 1361:21, 1377:5, 1377:10, 1382:20, 1391:11, 1413:24, 1414:12, 1439:16, 1443:23, 1444:20, 1447:25, 1459:17, 1463:14, 1466:13, 1499:22, 1501:9, 1552:8, 1552:16, 1563:16
**pointed** [3] - 1521:25, 1538:11, 1556:1
**points** [1] - 1465:19
**police** [2] - 1481:24, 1481:25
**policies** [1] - 1546:19
**policy** [2] - 1379:19, 1387:1
**population** [17] - 1329:19, 1330:19, 1334:18, 1336:6, 1338:9, 1338:10, 1340:8, 1340:10, 1350:5, 1355:14, 1370:2, 1370:13, 1424:20, 1424:24, 1424:25, 1426:23, 1484:11
**populations** [3] - 1334:23, 1336:23, 1351:22
**portion** [5] - 1365:14, 1368:8, 1416:13, 1479:25, 1511:18

posed [2] - 1349:16, 1408:5
**position** [11] - 1322:4, 1324:11, 1375:12, 1383:6, 1383:7, 1477:18, 1495:2, 1502:10, 1531:20, 1532:14, 1544:3
**possibility** [2] - 1429:25, 1435:13
**possible** [4] - 1471:20, 1473:8, 1515:20, 1539:3
**post** [2] - 1444:22, 1544:3
**potential** [16] - 1342:15, 1349:3, 1354:24, 1355:17, 1355:18, 1389:16, 1389:23, 1390:5, 1390:16, 1390:19, 1391:4, 1416:2, 1429:22, 1430:22, 1452:13, 1511:2
**potentially** [10] - 1335:21, 1340:11, 1340:20, 1349:4, 1362:10, 1430:6, 1430:24, 1436:5, 1530:17, 1565:10
**power** [2] - 1343:8, 1343:9
**powered** [1] - 1455:10
**powerful** [1] - 1448:2
**PowerPoint** [15] - 1374:3, 1374:19, 1375:14, 1376:22, 1377:8, 1381:18, 1382:19, 1384:15, 1385:4, 1385:14, 1521:12, 1545:4, 1549:1, 1560:17
**practical** [1] - 1528:22
**practice** [11] - 1389:16, 1389:20, 1389:24, 1390:4, 1390:15, 1390:19, 1390:25, 1450:2, 1455:24, 1501:17, 1510:2
**practitioner** [6] - 1473:24, 1515:19, 1518:20, 1519:13, 1519:17, 1520:7
**precise** [1] - 1477:23
**preference** [1] - 1309:2
**prejudicial** [7] - 1372:24, 1373:2, 1373:12, 1373:17,

1374:8, 1375:10, 1376:25
**preparation** [1] - 1488:6
**prepare** [6] - 1324:23, 1325:15, 1325:21, 1327:8, 1414:21, 1488:11
**prepared** [1] - 1396:21
**prepped** [1] - 1480:23
**prescribe** [10] - 1378:10, 1416:8, 1439:11, 1462:13, 1512:10, 1524:7, 1530:12, 1540:12, 1541:2, 1541:6
**prescribed** [5] - 1340:21, 1374:19, 1376:18, 1466:13, 1478:16
**prescribers** [5] - 1389:25, 1431:20, 1442:9, 1511:2, 1559:10
**prescribers'** [1] - 1416:7
**prescribing** [7] - 1343:7, 1374:17, 1404:4, 1428:3, 1509:4, 1511:10, 1512:20
**prescription** [5] - 1381:7, 1426:16, 1428:10, 1507:21, 1509:23
**prescriptions** [33] - 1327:19, 1358:18, 1359:9, 1359:18, 1371:12, 1371:15, 1372:6, 1372:7, 1372:11, 1374:14, 1375:7, 1404:1, 1409:16, 1410:8, 1410:23, 1411:14, 1411:18, 1411:20, 1411:21, 1507:24, 1509:20, 1510:3, 1513:1, 1517:8, 1540:16, 1541:9, 1542:5, 1548:22, 1561:25, 1562:4, 1574:24, 1575:20
**present** [5] - 1374:12, 1376:21, 1430:24, 1431:21, 1528:19
**presentation** [11] - 1396:21, 1471:18, 1472:10, 1475:4, 1516:7, 1516:19, 1525:25, 1545:4,

1549:2, 1549:11, 1560:17
**presentations** [2] - 1332:11, 1333:7
**presented** [1] - 1473:9
**president** [2] - 1321:11, 1331:24
**press** [2] - 1553:19, 1554:1
**pressure** [6] - 1363:19, 1363:22, 1363:23, 1364:1, 1364:3, 1422:21
**presume** [6] - 1325:7, 1375:5, 1376:12, 1376:15, 1480:15, 1586:13
**pretty** [5] - 1375:11, 1521:3, 1521:13, 1546:14, 1547:15
**prevent** [2] - 1522:24
**prevents** [2] - 1561:10, 1561:14
**previous** [3] - 1485:11, 1513:5, 1530:3
**previously** [1] - 1511:18
**Prezista** [102] - 1318:1, 1320:12, 1322:23, 1327:23, 1328:12, 1328:15, 1329:16, 1330:12, 1330:14, 1331:7, 1332:25, 1336:3, 1339:18, 1339:21, 1340:15, 1341:12, 1342:5, 1348:17, 1349:3, 1350:2, 1350:9, 1350:20, 1351:19, 1352:24, 1362:16, 1366:6, 1366:14, 1368:23, 1372:9, 1379:6, 1392:18, 1392:24, 1396:25, 1410:23, 1423:9, 1423:14, 1424:19, 1424:24, 1425:10, 1426:16, 1426:22, 1429:3, 1429:15, 1430:23, 1431:4, 1432:2, 1432:14, 1433:5, 1434:10, 1434:16, 1434:24, 1435:10, 1435:16, 1435:25, 1436:3, 1437:22, 1438:12, 1439:11, 1442:1, 1445:14, 1445:16, 1446:8,

1446:9, 1450:14, 1451:19, 1454:6, 1455:4, 1456:25, 1457:7, 1457:9, 1457:22, 1458:15, 1459:15, 1459:18, 1490:20, 1490:25, 1493:7, 1493:11, 1503:11, 1503:20, 1505:8, 1505:17, 1505:22, 1506:19, 1515:12, 1515:13, 1516:2, 1516:4, 1516:7, 1517:9, 1524:4, 1528:23, 1529:14, 1531:5, 1547:16, 1547:23, 1548:7, 1551:13, 1556:2, 1560:6, 1562:22
**Prezista's** [4] - 1426:3, 1429:8, 1457:3, 1570:3
**pride** [1] - 1522:20
**primarily** [1] - 1348:12
**primary** [1] - 1539:16
**privy** [5] - 1333:5, 1337:7, 1338:22, 1496:9, 1548:11
**problem** [14] - 1319:22, 1350:13, 1355:14, 1355:19, 1355:23, 1365:19, 1365:23, 1375:2, 1389:4, 1405:4, 1476:13, 1562:14, 1584:14
**problematic** [5] - 1517:3, 1517:4, 1522:11, 1543:11, 1547:6
**problems** [2] - 1350:8, 1389:14
**procedures** [1] - 1378:15
**proceed** [4] - 1392:11, 1441:5, 1441:20, 1517:16
**Proceedings** [1] - 1301:25
**PROCEEDINGS** [1] - 1303:1
**proceedings** [1] - 1587:5
**process** [18] - 1305:13, 1329:12, 1330:14, 1342:9, 1388:21, 1444:25, 1479:13, 1490:6, 1498:3, 1498:5,

1520:19, 1527:24, 1534:8, 1535:25, 1539:24, 1544:3, 1544:14, 1546:10

**processes** [1] - 1524:19

**produced** [4] - 1301:25, 1332:4, 1534:7

**product** [24] - 1318:1, 1322:16, 1323:3, 1328:19, 1328:24, 1331:21, 1331:22, 1336:11, 1353:6, 1353:23, 1354:15, 1355:5, 1361:15, 1394:7, 1394:9, 1404:3, 1415:19, 1416:1, 1444:21, 1464:12, 1529:2, 1529:16, 1545:25, 1548:12

**PRODUCTS** [1] - 1301:7

**Products** [6] - 1313:25, 1314:8, 1314:18, 1316:7, 1316:8, 1576:9

**products** [18] - 1317:10, 1319:7, 1320:11, 1338:14, 1352:23, 1397:13, 1439:1, 1471:17, 1475:3, 1480:3, 1533:1, 1535:15, 1536:11, 1538:1, 1547:4, 1553:18, 1561:11, 1561:17

**professional** [3] - 1518:25, 1535:14, 1537:14

**professionals** [1] - 1519:4

**professor** [1] - 1537:5

**profile** [18] - 1348:16, 1349:11, 1379:5, 1379:6, 1432:1, 1438:13, 1451:6, 1493:23, 1494:1, 1505:12, 1505:18, 1505:19, 1505:23, 1506:3, 1547:2, 1559:21, 1560:6, 1570:3

**program** [61] - 1361:9, 1361:14, 1393:1, 1393:20, 1393:22, 1394:10, 1394:11, 1394:21, 1396:11, 1396:17, 1397:7,

1398:1, 1398:12, 1398:20, 1399:5, 1399:17, 1400:15, 1401:1, 1401:21, 1402:5, 1402:10, 1402:14, 1406:3, 1410:11, 1412:13, 1413:7, 1416:14, 1416:15, 1417:17, 1418:5, 1418:20, 1419:17, 1435:23, 1507:15, 1507:17, 1508:8, 1508:18, 1509:5, 1509:11, 1509:21, 1511:9, 1511:10, 1511:11, 1513:17, 1514:16, 1514:17, 1515:11, 1515:20, 1515:25, 1518:10, 1519:25, 1520:11, 1520:14, 1525:3, 1538:23, 1539:13, 1539:17, 1539:21, 1542:4, 1575:19, 1582:4

**programs** [27] - 1362:2, 1362:9, 1380:1, 1390:6, 1394:1, 1398:14, 1398:24, 1401:15, 1402:6, 1405:1, 1406:1, 1406:10, 1406:18, 1407:6, 1407:18, 1408:2, 1408:16, 1408:22, 1410:25, 1413:21, 1418:2, 1418:11, 1418:13, 1507:2, 1510:5, 1519:9, 1584:9

**prohibit** [1] - 1379:24

**prohibited** [2] - 1447:22, 1449:5

**project** [1] - 1314:4

**Project** [1] - 1331:7

**projected** [2] - 1336:12, 1352:18

**promise** [2] - 1315:14, 1349:12

**promote** [33] - 1319:7, 1322:23, 1336:22, 1338:20, 1339:8, 1340:11, 1340:15, 1363:12, 1443:13, 1445:14, 1445:16, 1448:25, 1449:9, 1449:22, 1450:9, 1455:11, 1455:20, 1456:5, 1462:5, 1467:15, 1483:18,

1486:14, 1486:20, 1524:4, 1528:20, 1532:20, 1533:4, 1551:19, 1551:25, 1553:11, 1563:3, 1569:16, 1571:2

**promoted** [18] - 1320:19, 1320:20, 1324:3, 1324:8, 1324:14, 1339:21, 1354:1, 1425:4, 1426:22, 1427:3, 1427:4, 1427:8, 1442:7, 1458:11, 1480:9, 1480:10, 1524:20, 1529:16

**promoting** [17] - 1369:11, 1394:7, 1466:9, 1468:6, 1471:17, 1475:3, 1482:9, 1482:13, 1503:19, 1506:19, 1533:1, 1536:16, 1536:21, 1538:2, 1545:15, 1546:17, 1552:23

**promotion** [28] - 1317:10, 1320:11, 1322:13, 1327:23, 1337:2, 1338:25, 1360:20, 1370:17, 1380:3, 1397:12, 1407:15, 1462:7, 1467:12, 1467:14, 1479:19, 1545:21, 1554:8, 1555:3, 1561:1, 1561:4, 1566:4, 1568:1, 1576:20, 1581:24, 1582:24, 1583:15, 1584:5, 1584:18

**promotional** [11] - 1394:4, 1395:24, 1396:11, 1402:6, 1444:13, 1520:15, 1540:23, 1540:25, 1546:13, 1551:22, 1582:9

**Promotional** [2] - 1403:24, 1404:19

**promotionally** [2] - 1466:2, 1547:5

**prompted** [2] - 1378:25, 1487:3

**prompting** [1] - 1491:23

**pronounce** [1] - 1311:22

**proper** [3] - 1434:23, 1435:9, 1435:15

**properly** [1] - 1428:20

**proposed** [2] - 1433:4, 1457:14

**protease** [8] - 1328:15, 1339:23, 1340:16, 1340:21, 1342:9, 1434:11, 1451:7, 1454:5

**protect** [2] - 1379:15, 1554:10

**protected** [1] - 1554:15

**protocol** [1] - 1436:1

**proud** [1] - 1534:23

**prove** [1] - 1348:12

**proven** [5] - 1349:11, 1478:19, 1560:6, 1560:7, 1560:14

**provide** [1] - 1398:3

**provided** [8] - 1327:8, 1333:7, 1392:15, 1425:9, 1425:14, 1475:25, 1476:8, 1572:10

**providers** [2] - 1505:12, 1556:21

**providing** [3] - 1389:24, 1458:10, 1555:9

**proving** [2] - 1351:12, 1351:20

**psychologically** [1] - 1307:5

**public** [3] - 1533:17, 1558:16, 1558:24

**publicly** [1] - 1558:20

**publish** [7] - 1334:13, 1365:5, 1367:10, 1434:2, 1578:25, 1579:3, 1579:13

**published** [1] - 1579:1

**pull** [8] - 1332:18, 1387:3, 1446:25, 1465:19, 1472:9, 1498:19, 1504:3, 1523:20

**pulling** [1] - 1365:17

**purchasing** [1] - 1534:14

**purpose** [15] - 1371:4, 1403:24, 1408:18, 1411:5, 1437:2, 1502:11, 1540:20, 1540:23, 1541:1, 1541:5, 1541:8, 1542:3, 1552:20, 1574:23, 1575:19

**purposes** [6] - 1314:11, 1339:19, 1497:12, 1503:6,

1546:25, 1555:10

**pursuant** [1] - 1523:16

**push** [5] - 1307:5, 1309:18, 1310:19, 1362:16, 1570:20

**pushback** [2] - 1413:24, 1569:21

**pushed** [2] - 1347:21, 1491:5

**pushing** [1] - 1306:14

**put** [33] - 1304:17, 1307:15, 1332:12, 1335:22, 1367:3, 1367:4, 1369:9, 1387:9, 1387:23, 1393:2, 1393:16, 1394:15, 1395:23, 1406:11, 1413:6, 1417:10, 1420:6, 1426:1, 1465:20, 1510:21, 1511:1, 1521:6, 1542:16, 1542:24, 1543:8, 1553:1, 1560:2, 1560:25, 1573:18, 1577:5, 1580:12, 1585:25

**putting** [7] - 1314:3, 1394:21, 1396:7, 1483:1, 1557:2, 1572:24, 1573:22

## Q

**Q4** [1] - 1494:17

**QD** [6] - 1424:8, 1461:8, 1472:17, 1485:6, 1494:13, 1548:5

**qualification** [1] - 1435:6

**quality** [2] - 1391:1, 1448:11

**quarter** [2] - 1439:23, 1565:10

**quarters** [2] - 1358:22, 1360:4

**QUESTION** [1] - 1574:23

**questioned** [3] - 1573:6, 1573:15, 1574:2

**questioning** [10] - 1374:24, 1384:16, 1385:7, 1398:24, 1483:13, 1520:4, 1522:6, 1541:23, 1549:18, 1559:17

**questions** [32] - 1315:24, 1400:13,

1408:5, 1423:19, 1453:2, 1480:18, 1480:20, 1480:23, 1481:16, 1486:13, 1495:20, 1497:12, 1521:16, 1526:23, 1527:10, 1531:21, 1539:13, 1540:7, 1540:11, 1540:15, 1553:5, 1558:10, 1559:21, 1561:22, 1564:14, 1565:16, 1566:11, 1566:20, 1570:10, 1571:16, 1582:18, 1585:6

**quibble** [1] - 1461:2

**quick** [4] - 1375:16, 1425:25, 1429:12, 1550:18

**quickly** [9] - 1315:23, 1330:9, 1352:8, 1506:24, 1508:2, 1509:1, 1517:24, 1550:22, 1572:9

**quite** [10] - 1499:17, 1503:16, 1522:19, 1522:23, 1523:14, 1525:5, 1541:17, 1544:8, 1545:24, 1565:7

**quoted** [1] - 1417:5

**QURAISHI** [2] - 1301:11, 1303:2

---

## R

**raise** [3] - 1304:17, 1310:24, 1390:25

**raised** [4] - 1376:1, 1422:16, 1520:7, 1557:14

**raises** [1] - 1506:2

**ran** [5] - 1354:16, 1405:23, 1405:25, 1438:8, 1568:15

**random** [1] - 1407:6

**randomly** [3] - 1408:17, 1408:20, 1409:10

**range** [3] - 1342:14, 1403:21, 1479:17

**ranged** [2] - 1401:8, 1401:9

**rankings** [1] - 1505:6

**rather** [3] - 1308:18, 1309:13, 1574:6

**rating** [1] - 1564:19

**RDR** [1] - 1587:11

**re** [1] - 1315:16

**re-ask** [1] - 1315:16

---

**reached** [1] - 1586:7

**react** [1] - 1355:5

**reaction** [3] - 1349:4, 1431:12, 1506:2

**read** [17] - 1346:8, 1346:22, 1386:19, 1415:9, 1457:1, 1459:3, 1463:3, 1466:20, 1471:12, 1490:10, 1492:20, 1554:11, 1556:19, 1558:1, 1572:17, 1574:16, 1586:9

**reading** [1] - 1344:17

**ready** [10] - 1308:13, 1310:3, 1311:4, 1311:16, 1392:11, 1441:3, 1441:20, 1523:21, 1550:19, 1585:15

**real** [2] - 1389:8, 1389:21

**realized** [1] - 1489:9

**really** [17] - 1305:12, 1306:4, 1310:20, 1331:20, 1355:8, 1355:10, 1373:3, 1377:13, 1388:9, 1406:13, 1444:22, 1481:15, 1488:1, 1505:7, 1516:23, 1538:15, 1571:12

**reason** [15] - 1310:22, 1377:6, 1387:12, 1388:1, 1388:3, 1388:4, 1388:5, 1406:16, 1450:1, 1461:16, 1486:6, 1543:20, 1543:25, 1545:24, 1581:5

**reasons** [3] - 1450:9, 1452:4, 1455:14

**receive** [3] - 1516:18, 1520:18, 1529:10

**received** [15] - 1315:7, 1331:15, 1335:14, 1367:20, 1444:6, 1467:19, 1474:8, 1484:16, 1485:16, 1502:6, 1503:8, 1503:23, 1516:12, 1518:20, 1575:7

**receiving** [9] - 1354:20, 1462:25, 1469:9, 1470:17, 1472:12, 1472:20, 1475:13, 1497:19, 1498:24

**recent** [3] - 1407:20, 1471:16, 1475:2

---

**recently** [6] - 1414:3, 1414:21, 1488:9, 1488:10, 1536:1, 1545:11

**recess** [8] - 1307:15, 1307:22, 1308:1, 1391:15, 1391:23, 1391:24, 1440:25, 1549:24

**recharge** [1] - 1549:22

**recognize** [9] - 1331:12, 1364:13, 1364:23, 1368:5, 1368:12, 1421:19, 1497:4, 1578:10

**recognized** [2] - 1336:12, 1336:22

**recollect** [1] - 1510:25

**recollection** [15] - 1332:17, 1332:23, 1334:6, 1336:20, 1361:25, 1363:1, 1363:5, 1365:13, 1414:4, 1453:15, 1508:11, 1509:7, 1513:4, 1515:4, 1515:5

**recommend** [1] - 1512:19

**recommendation** [1] - 1539:21

**recommendations** [5] - 1398:4, 1509:13, 1520:18, 1539:18, 1539:23

**record** [12] - 1303:8, 1305:25, 1311:13, 1460:7, 1585:18, 1585:24, 1585:25, 1586:13, 1586:16, 1586:21, 1587:5

**recorded** [2] - 1301:25, 1501:18

**red** [2] - 1487:19, 1487:24

**redacted** [1] - 1368:16

**redirect** [3] - 1554:7, 1566:13, 1573:11

**REDIRECT** [2] - 1302:6, 1566:15

**redisplay** [1] - 1544:24

**reenforce** [2] - 1457:8, 1475:21

**reenforcing** [1] - 1457:22

**REESE** [1] - 1301:14

**refer** [4] - 1314:16, 1314:17, 1400:8, 1404:9

---

**reference** [4] - 1365:12, 1369:2, 1421:19, 1457:2

**referred** [1] - 1445:22

**referring** [9] - 1314:18, 1367:7, 1372:6, 1394:25, 1449:3, 1450:22, 1479:2, 1523:4, 1541:24

**refers** [1] - 1560:6

**reflected** [1] - 1334:24

**refresh** [6] - 1332:16, 1358:13, 1361:24, 1365:13, 1414:3, 1453:15

**refreshes** [2] - 1332:23, 1336:20

**regard** [2] - 1344:15, 1346:3

**regarding** [8] - 1425:10, 1495:22, 1516:9, 1554:5, 1557:25, 1558:11, 1558:15, 1570:10

**region** [2] - 1409:23, 1409:24

**regional** [5] - 1319:2, 1460:16, 1491:22, 1496:23, 1538:21

**regularly** [1] - 1582:8

**regulate** [1] - 1547:3

**regulated** [2] - 1546:14, 1546:18

**regulation** [2] - 1561:9, 1561:13

**regulations** [6] - 1369:10, 1437:4, 1486:8, 1546:22, 1547:3, 1583:15

**regulators** [1] - 1387:14

**regulatory** [21] - 1356:25, 1407:11, 1443:16, 1444:2, 1444:7, 1479:5, 1479:6, 1479:9, 1520:16, 1523:5, 1524:19, 1525:1, 1525:17, 1528:6, 1534:9, 1553:14, 1560:25, 1561:7, 1570:11, 1571:7, 1571:10

**reimburse** [1] - 1385:18

**reimbursement** [6] - 1379:19, 1381:11, 1416:21, 1417:12, 1437:22

---

**reimbursing** [2] - 1375:25, 1376:17

**related** [5] - 1307:10, 1507:24, 1540:24, 1543:12, 1560:10

**relates** [7] - 1451:10, 1527:20, 1537:25, 1538:23, 1547:11, 1551:4, 1551:24

**relating** [2] - 1442:1, 1570:2

**relation** [6] - 1505:17, 1509:24, 1510:4, 1510:5, 1562:1, 1577:14

**relationships** [4] - 1523:7, 1544:5, 1553:24, 1554:12

**relative** [4] - 1337:11, 1337:12, 1415:20, 1459:4

**relatively** [4] - 1329:16, 1329:18, 1335:4

**Relator** [1] - 1384:9

**Relators** [13] - 1301:18, 1303:11, 1303:13, 1303:14, 1303:15, 1307:17, 1311:6, 1312:1, 1441:7, 1523:17, 1538:7, 1567:17, 1586:4

**Relators'** [76] - 1302:9, 1302:10, 1302:10, 1302:11, 1302:11, 1302:13, 1302:13, 1302:14, 1302:14, 1302:15, 1302:15, 1302:16, 1303:8, 1330:22, 1332:18, 1332:22, 1333:11, 1333:16, 1334:3, 1358:13, 1364:13, 1364:21, 1364:25, 1365:4, 1367:9, 1368:2, 1368:5, 1368:15, 1368:19, 1376:7, 1392:23, 1396:2, 1396:3, 1412:8, 1413:1, 1413:4, 1414:7, 1421:12, 1421:13, 1421:22, 1421:25, 1429:11, 1446:23, 1447:9, 1447:14, 1447:16, 1449:18, 1450:11, 1452:22, 1453:13, 1453:19, 1453:22,

1456:15, 1456:18,
1462:19, 1468:12,
1469:17, 1469:20,
1480:22, 1486:18,
1492:8, 1493:3,
1493:6, 1497:8,
1498:14, 1498:19,
1499:2, 1499:5,
1511:15, 1513:13,
1514:1, 1514:5,
1577:4, 1578:21,
1579:8, 1580:18
**relators'** [1] - 1504:4
**release** [1] - 1554:1
**releases** [1] - 1553:19
**relevant** [2] - 1328:9,
1372:23
**relied** [1] - 1538:21
**remain** [8] - 1307:22,
1308:2, 1391:25,
1439:25, 1440:24,
1441:2, 1549:25,
1585:17
**remaining** [1] - 1440:4
**remember** [52] -
1350:17, 1355:12,
1357:4, 1357:13,
1357:15, 1361:23,
1362:8, 1362:19,
1362:21, 1362:25,
1363:6, 1363:9,
1363:17, 1363:18,
1364:7, 1366:8,
1386:19, 1398:25,
1399:18, 1450:24,
1453:8, 1453:10,
1459:17, 1459:21,
1471:3, 1477:25,
1480:4, 1503:7,
1510:24, 1521:1,
1521:4, 1521:8,
1521:18, 1531:14,
1539:14, 1540:13,
1541:13, 1549:3,
1550:25, 1551:7,
1553:8, 1557:11,
1558:8, 1559:17,
1562:13, 1562:18,
1563:12, 1564:16,
1568:3, 1576:11,
1576:12
**remembered** [1] -
1356:11
**remind** [5] - 1420:12,
1463:10, 1478:14,
1513:20, 1568:12
**reminded** [1] -
1562:19
**reminder** [4] -
1307:12, 1392:9,

1392:14, 1441:18
**remotely** [1] - 1528:10
**remove** [4] - 1511:11,
1518:9, 1519:24,
1544:9
**removed** [1] - 1512:24
**reorient** [1] - 1426:13
**rep** [9] - 1378:15,
1474:20, 1478:9,
1504:8, 1516:18,
1533:20, 1533:21,
1533:22, 1535:5
**repeat** [2] - 1381:15,
1571:18
**rephrase** [14] -
1337:5, 1380:11,
1382:15, 1382:16,
1385:11, 1386:14,
1388:22, 1418:7,
1430:21, 1437:13,
1482:25, 1490:2,
1583:9, 1583:11
**replacing** [1] -
1474:25
**replication** [1] -
1328:16
**report** [30] - 1344:15,
1346:11, 1393:19,
1467:3, 1467:4,
1467:9, 1467:19,
1489:15, 1497:4,
1498:8, 1498:9,
1499:13, 1500:4,
1501:2, 1501:3,
1501:5, 1501:9,
1501:25, 1503:1,
1503:24, 1515:20,
1515:25, 1519:4,
1519:13, 1557:24,
1558:22, 1559:2,
1581:23, 1582:8
**reported** [19] - 1319:3,
1320:24, 1321:6,
1409:24, 1413:15,
1424:15, 1476:25,
1478:5, 1478:8,
1499:22, 1500:8,
1501:21, 1503:18,
1512:1, 1512:4,
1515:16, 1519:9,
1538:8, 1570:15
**Reporter** [2] -
1301:23, 1587:12
**reporter** [4] - 1315:17,
1326:19, 1571:16,
1585:18
**REPORTER** [1] -
1549:13
**REPORTER'S** [1] -
1587:1

**reporting** [5] - 1500:8,
1504:22, 1505:11,
1506:18, 1538:4
**reports** [14] - 1421:18,
1478:9, 1495:18,
1496:4, 1496:19,
1497:5, 1497:19,
1497:23, 1498:24,
1501:7, 1501:11,
1501:15, 1503:8
**represent** [3] - 1312:1,
1511:17, 1513:15
**representation** [2] -
1360:19, 1481:11
**representative** [15] -
1435:15, 1449:9,
1471:17, 1471:19,
1471:25, 1472:11,
1473:3, 1474:15,
1475:3, 1475:5,
1476:21, 1477:17,
1477:19, 1478:3,
1491:22
**representatives** [49] -
1317:6, 1318:19,
1318:22, 1322:23,
1323:6, 1346:6,
1375:23, 1406:25,
1411:15, 1413:19,
1418:1, 1418:3,
1418:9, 1418:17,
1419:12, 1419:18,
1425:5, 1425:9,
1425:20, 1426:14,
1428:2, 1431:19,
1434:24, 1435:10,
1439:10, 1450:3,
1450:7, 1455:19,
1455:25, 1460:16,
1468:17, 1469:9,
1470:9, 1473:4,
1475:8, 1477:6,
1483:17, 1485:23,
1486:19, 1486:21,
1487:8, 1487:15,
1495:12, 1510:1,
1514:21, 1526:1,
1535:6, 1567:24,
1569:10
**represented** [1] -
1324:18
**representing** [3] -
1566:24, 1567:3,
1567:6
**reps** [26] - 1405:4,
1407:3, 1411:16,
1411:22, 1411:24,
1425:14, 1473:6,
1490:15, 1496:23,
1509:9, 1509:19,

1510:2, 1530:16,
1535:7, 1538:16,
1539:7, 1542:8,
1551:18, 1551:24,
1552:9, 1553:6,
1556:16, 1556:19,
1556:22, 1557:4,
1576:6
**reputation** [1] -
1537:14
**request** [7] - 1378:11,
1487:2, 1493:22,
1495:5, 1495:12,
1500:17, 1565:2
**requested** [2] -
1493:20, 1564:22
**requests** [19] - 1424:8,
1424:15, 1485:12,
1486:20, 1486:23,
1487:21, 1488:1,
1488:22, 1489:12,
1489:21, 1490:13,
1490:14, 1491:17,
1491:24, 1493:7,
1493:21, 1494:7,
1494:12, 1565:5
**required** [7] - 1556:19,
1577:21, 1577:22,
1581:23, 1582:7,
1582:8, 1583:14
**requirement** [1] -
1561:10
**requirements** [1] -
1539:21
**requires** [2] - 1434:12,
1439:9
**requiring** [1] -
1581:15
**research** [10] -
1472:23, 1472:25,
1474:7, 1474:8,
1474:9, 1475:23,
1476:7, 1533:18,
1545:9, 1553:21
**researched** [1] -
1535:7
**reserve** [3] - 1355:7,
1579:5, 1579:11
**reserving** [1] -
1355:10
**resign** [1] - 1543:22
**resistance** [1] -
1335:21
**resistant** [4] -
1339:22, 1340:16,
1351:13, 1351:20
**resource** [1] - 1369:3
**resources** [1] - 1488:6
**respect** [19] - 1330:12,
1335:8, 1377:24,

1388:11, 1416:21,
1430:23, 1442:2,
1447:20, 1460:13,
1468:15, 1494:2,
1494:7, 1528:7,
1546:8, 1569:5,
1569:6, 1582:9,
1584:9, 1586:15
**respected** [2] -
1514:23, 1546:11
**respond** [2] - 1349:17,
1415:13
**responding** [1] -
1462:25
**response** [17] -
1333:20, 1371:9,
1412:2, 1458:1,
1482:13, 1482:23,
1482:24, 1483:1,
1483:10, 1485:17,
1487:2, 1506:11,
1512:18, 1566:19,
1571:17, 1574:3,
1575:3
**responses** [2] -
1475:24, 1483:3
**responsibilities** [5] -
1323:5, 1346:16,
1530:15, 1533:25,
1536:10
**responsibility** [11] -
1320:6, 1320:10,
1322:16, 1322:22,
1323:19, 1519:4,
1519:17, 1530:6,
1536:16, 1536:19,
1538:19
**responsible** [19] -
1309:10, 1319:6,
1322:9, 1394:3,
1394:22, 1395:10,
1396:12, 1406:2,
1406:7, 1413:11,
1417:3, 1417:14,
1417:20, 1432:19,
1432:20, 1509:10,
1524:21, 1535:20,
1539:16
**responsibly** [1] -
1534:1
**restate** [2] - 1443:9,
1490:8
**restaurant** [2] -
1403:4, 1417:16
**restaurants** [3] -
1402:16, 1403:1,
1405:8
**restrictions** [2] -
1553:1, 1554:3
**result** [2] - 1411:21,

1581:10
**results** [1] - 1478:9
**retire** [2] - 1312:11, 1312:13
**retired** [8] - 1312:10, 1312:17, 1317:12, 1484:15, 1484:24, 1536:1, 1537:3, 1537:4
**retirement** [1] - 1324:5
**retroactive** [1] - 1420:21
**return** [5] - 1440:5, 1507:10, 1507:15, 1508:6, 1508:22
**Return** [1] - 1549:12
**revenue** [2] - 1353:9, 1353:16
**revenues** [2] - 1352:25, 1353:2
**review** [11] - 1419:25, 1421:14, 1421:15, 1469:12, 1479:6, 1479:8, 1520:15, 1560:25, 1578:24, 1579:6, 1580:20
**reviewed** [8] - 1330:25, 1364:17, 1414:3, 1414:21, 1420:4, 1443:15, 1503:5, 1527:18
**reviewing** [2] - 1325:25, 1399:16
**rewarding** [1] - 1537:12
**Reyataz** [22] - 1348:3, 1348:7, 1348:11, 1349:23, 1350:2, 1350:20, 1435:11, 1435:17, 1435:24, 1436:3, 1438:20, 1439:11, 1451:12, 1451:15, 1451:19, 1452:17, 1465:24, 1493:8, 1493:12, 1493:23, 1494:1
**rich** [1] - 1534:20
**Richard** [3] - 1513:18, 1516:3, 1516:24
**rid** [1] - 1543:20
**ridiculous** [1] - 1480:24
**rise** [8] - 1303:4, 1310:10, 1391:17, 1392:7, 1440:2, 1441:15, 1549:23, 1550:15
**risk** [3] - 1390:14, 1390:16, 1390:20
**Risk** [1] - 1389:15

**ritonavir** [7] - 1366:3, 1366:10, 1366:15, 1435:24, 1435:25, 1436:1, 1436:4
**road** [4] - 1359:22, 1360:9, 1360:13, 1361:5
**Rodney** [1] - 1301:21
**ROI** [4] - 1507:6, 1507:9, 1507:10, 1507:19
**role** [26] - 1331:20, 1346:6, 1361:18, 1407:21, 1463:15, 1494:17, 1497:20, 1513:5, 1532:1, 1532:5, 1533:20, 1533:25, 1534:2, 1542:2, 1544:9, 1551:15, 1551:18, 1555:5, 1557:13, 1557:18, 1561:24, 1564:18, 1564:21, 1576:19, 1580:14
**rolled** [2] - 1417:6, 1503:7
**rolled-up** [1] - 1417:6
**Ron** [1] - 1570:16
**room** [1] - 1326:4
**rule** [1] - 1379:14
**ruled** [1] - 1383:20
**rules** [7] - 1372:19, 1389:14, 1465:1, 1486:8, 1546:16, 1546:22, 1547:3
**ruling** [3] - 1372:5, 1375:7, 1383:16
**run** [4] - 1399:4, 1444:12, 1527:7, 1535:5
**running** [2] - 1407:1, 1407:3
**Russ** [1] - 1303:15
**RUSS** [2] - 1301:15, 1303:15
**RX-1700** [1] - 1497:14
**RX-328** [1] - 1503:1
**RX-88** [1] - 1497:2

## S

**S&T** [1] - 1351:21
**safe** [12] - 1329:25, 1443:4, 1461:18, 1478:19, 1503:23, 1504:1, 1526:1, 1530:6, 1530:16, 1554:10
**SAFE** [8] - 1398:5, 1398:9, 1398:10,

1398:11, 1399:3, 1399:16
**safer** [1] - 1434:17
**safety** [9] - 1379:15, 1391:1, 1391:4, 1391:5, 1430:25, 1431:21, 1438:25, 1447:21, 1530:14
**Saint** [1] - 1301:17
**sale** [1] - 1469:4
**Sales** [3] - 1331:7, 1470:2, 1487:8
**sales** [280] - 1316:25, 1317:2, 1317:3, 1317:5, 1318:13, 1318:17, 1318:18, 1318:22, 1319:11, 1319:12, 1319:14, 1319:18, 1319:24, 1319:25, 1320:7, 1320:10, 1320:23, 1321:3, 1321:7, 1322:23, 1323:6, 1323:15, 1324:11, 1331:23, 1336:13, 1338:5, 1339:1, 1339:7, 1341:25, 1342:24, 1343:4, 1343:7, 1344:12, 1346:1, 1348:24, 1352:2, 1352:23, 1353:18, 1354:5, 1354:16, 1356:25, 1358:3, 1358:7, 1359:2, 1359:13, 1360:16, 1360:20, 1360:24, 1361:5, 1361:20, 1362:4, 1362:16, 1363:20, 1375:22, 1378:15, 1380:2, 1392:18, 1393:23, 1394:12, 1394:22, 1395:23, 1397:4, 1397:12, 1397:16, 1397:21, 1397:25, 1398:2, 1398:7, 1400:14, 1401:14, 1402:25, 1403:2, 1403:11, 1406:25, 1407:3, 1407:5, 1407:17, 1408:10, 1409:16, 1409:23, 1409:25, 1410:5, 1410:17, 1411:7, 1411:8, 1411:22, 1412:11, 1412:16, 1412:21, 1413:18, 1414:13, 1416:11, 1417:24, 1418:3, 1418:9,

1418:17, 1419:4, 1419:12, 1419:18, 1422:21, 1423:24, 1424:24, 1425:5, 1425:9, 1425:15, 1425:20, 1426:14, 1428:2, 1431:6, 1431:19, 1432:6, 1432:9, 1433:14, 1434:24, 1435:10, 1435:15, 1435:22, 1437:21, 1439:10, 1442:8, 1442:23, 1443:6, 1443:13, 1444:1, 1445:14, 1445:24, 1446:1, 1446:2, 1446:7, 1447:4, 1447:19, 1449:9, 1450:2, 1450:7, 1455:19, 1455:24, 1457:18, 1458:9, 1459:1, 1460:16, 1462:5, 1463:17, 1463:20, 1464:11, 1468:17, 1468:25, 1469:9, 1469:12, 1470:8, 1470:12, 1470:22, 1471:17, 1471:19, 1471:25, 1472:10, 1472:21, 1473:3, 1473:10, 1473:16, 1473:20, 1474:9, 1474:25, 1475:3, 1475:5, 1475:8, 1475:22, 1476:6, 1476:7, 1476:20, 1476:21, 1477:6, 1477:17, 1477:19, 1478:2, 1478:8, 1480:10, 1483:17, 1485:22, 1486:12, 1486:19, 1486:21, 1487:9, 1487:15, 1488:25, 1489:1, 1489:10, 1491:11, 1491:15, 1491:22, 1495:12, 1496:4, 1496:6, 1496:13, 1496:22, 1498:4, 1504:8, 1504:10, 1504:11, 1504:13, 1507:3, 1509:2, 1509:9, 1509:19, 1514:7, 1514:11, 1519:21, 1520:20, 1525:21, 1528:7, 1528:20, 1529:15, 1529:22, 1532:4, 1533:20, 1534:1, 1534:11, 1535:7,

1535:18, 1536:14, 1538:15, 1538:22, 1539:7, 1539:16, 1540:1, 1540:2, 1542:3, 1542:8, 1542:15, 1542:16, 1542:21, 1542:25, 1544:17, 1546:12, 1548:14, 1551:18, 1551:24, 1551:25, 1552:9, 1552:21, 1553:11, 1553:16, 1553:20, 1553:21, 1554:24, 1555:2, 1555:6, 1555:11, 1556:15, 1556:16, 1556:19, 1556:22, 1557:4, 1557:5, 1559:4, 1561:1, 1561:20, 1563:2, 1563:6, 1564:11, 1564:21, 1567:24, 1569:9, 1569:16, 1570:2, 1570:15, 1570:20, 1571:25, 1572:2, 1581:24
**salespeople** [1] - 1325:24
**salesperson** [1] - 1548:16
**SANDERSON** [1] - 1301:16
**Sara** [10] - 1323:11, 1323:23, 1356:3, 1356:12, 1356:19, 1393:14, 1514:21, 1542:9, 1546:6, 1568:14
**sat** [2] - 1319:15, 1319:24
**save** [2] - 1394:2, 1515:15
**saw** [13] - 1410:7, 1478:23, 1479:7, 1505:21, 1507:6, 1507:9, 1507:10, 1507:21, 1509:23, 1510:4, 1515:25, 1538:8, 1541:12
**scale** [1] - 1525:10
**scaring** [1] - 1523:14
**scenes** [1] - 1539:24
**schedule** [3] - 1304:11, 1370:2, 1370:14
**scheduled** [1] - 1304:19
**scheme** [6] - 1524:4, 1524:6, 1536:25, 1559:9, 1576:2

**school** [2] - 1533:15, 1533:16
**schools** [2] - 1510:15, 1510:16
**science** [4] - 1315:7, 1473:2, 1474:19, 1576:23
**scientific** [3] - 1548:9, 1552:17, 1553:5
**scientist** [1] - 1348:23
**SciInsights** [1] - 1492:22
**Scott** [1] - 1464:3
**screen** [12] - 1331:6, 1334:22, 1364:12, 1420:6, 1421:13, 1453:8, 1462:21, 1482:15, 1572:11, 1572:25, 1573:18, 1573:23
**screwed** [1] - 1360:11
**SE** [1] - 1351:21
**Searle** [5] - 1316:4, 1316:9, 1316:17, 1534:4, 1534:14
**seat** [12] - 1310:12, 1311:9, 1311:15, 1319:15, 1319:24, 1337:4, 1341:19, 1392:8, 1393:6, 1440:4, 1441:13, 1531:13
**seated** [10] - 1303:6, 1307:22, 1308:2, 1391:22, 1391:25, 1440:24, 1441:2, 1441:17, 1549:25, 1550:16
**second** [14] - 1327:22, 1351:17, 1362:22, 1371:2, 1424:7, 1426:22, 1434:1, 1457:5, 1459:6, 1497:18, 1500:2, 1574:1, 1579:13, 1583:25
**secretly** [1] - 1555:11
**section** [6] - 1352:10, 1371:19, 1438:6, 1522:1, 1563:18
**see** [132] - 1305:17, 1306:8, 1307:23, 1308:20, 1309:14, 1310:2, 1318:3, 1323:18, 1331:6, 1331:9, 1332:6, 1332:16, 1332:23, 1333:2, 1333:12, 1336:19, 1337:5, 1339:24, 1341:22,

1342:1, 1343:10, 1344:25, 1345:8, 1345:9, 1345:15, 1345:20, 1347:20, 1347:23, 1348:13, 1351:8, 1351:16, 1351:23, 1352:14, 1352:19, 1355:5, 1358:19, 1361:19, 1362:9, 1364:12, 1368:24, 1369:4, 1372:12, 1372:14, 1381:13, 1383:1, 1386:17, 1393:14, 1393:18, 1393:19, 1399:4, 1402:13, 1402:24, 1412:14, 1416:3, 1422:4, 1423:4, 1423:21, 1424:3, 1424:23, 1433:15, 1434:1, 1434:5, 1434:8, 1437:8, 1440:19, 1446:7, 1447:6, 1449:14, 1450:16, 1451:8, 1451:13, 1451:25, 1452:5, 1453:12, 1453:14, 1454:25, 1456:13, 1457:4, 1457:10, 1461:8, 1462:24, 1465:8, 1470:4, 1471:5, 1471:9, 1471:21, 1472:2, 1472:11, 1473:15, 1475:12, 1480:13, 1488:11, 1488:16, 1490:17, 1491:13, 1492:23, 1492:25, 1498:8, 1499:10, 1500:14, 1502:13, 1505:14, 1512:11, 1512:21, 1513:20, 1513:23, 1516:5, 1516:10, 1516:20, 1520:3, 1522:3, 1544:6, 1544:21, 1545:6, 1547:13, 1549:7, 1550:9, 1550:12, 1551:4, 1556:3, 1558:17, 1558:22, 1559:23, 1560:19, 1562:4, 1563:17, 1570:17, 1573:11, 1580:24, 1585:12, 1585:21
**seeing** [4] - 1502:3, 1502:10, 1503:9, 1524:24
**seem** [2] - 1480:21, 1526:17

**sees** [1] - 1573:9
**Segment** [5] - 1335:16, 1336:8, 1342:4, 1342:16, 1345:12
**segment** [14] - 1329:19, 1330:18, 1335:9, 1339:4, 1345:12, 1345:13, 1350:4, 1424:24, 1424:25, 1426:23, 1452:8, 1478:25, 1484:11, 1503:3
**segmentation** [4] - 1330:18, 1334:11, 1334:16, 1334:22
**segmented** [1] - 1334:18
**segments** [9] - 1336:14, 1338:9, 1342:13, 1345:18, 1345:19, 1465:11, 1549:2, 1550:24, 1551:1
**select** [1] - 1544:3
**selected** [3] - 1398:20, 1510:14, 1514:15
**selecting** [1] - 1510:18
**selection** [1] - 1540:8
**sell** [9] - 1336:23, 1342:19, 1342:20, 1342:23, 1343:13, 1348:23, 1446:4, 1449:23, 1450:3
**selling** [8] - 1317:9, 1322:16, 1323:4, 1359:17, 1370:12, 1404:1, 1425:11, 1555:10
**send** [4] - 1362:2, 1379:6, 1546:9, 1554:2
**sending** [3] - 1447:4, 1473:9, 1559:16
**senior** [5] - 1324:8, 1324:14, 1324:15, 1337:17, 1337:19
**sense** [10] - 1305:5, 1305:14, 1305:22, 1306:11, 1309:11, 1309:20, 1309:22, 1422:2, 1440:11, 1483:6
**sensing** [1] - 1306:18
**sensitized** [1] - 1565:23
**sent** [11] - 1332:15, 1361:24, 1420:17, 1436:6, 1436:10,

1463:6, 1469:7, 1469:22, 1474:24, 1551:25, 1558:23
**separate** [1] - 1417:7
**separately** [1] - 1583:24
**September** [6] - 1447:4, 1498:21, 1499:9, 1504:12, 1552:4, 1552:21
**serious** [4] - 1384:16, 1386:20, 1431:11, 1431:21
**seriously** [12] - 1380:17, 1384:24, 1384:25, 1478:6, 1523:24, 1524:1, 1526:3, 1537:14, 1577:10, 1579:20, 1579:22, 1583:1
**served** [2] - 1405:12, 1523:17
**serves** [1] - 1437:2
**service** [1] - 1474:24
**Services** [2] - 1578:12, 1580:23
**session** [4] - 1468:9, 1468:10, 1478:24, 1527:7
**sessions** [3] - 1521:11, 1546:21, 1570:20
**set** [8] - 1359:13, 1397:7, 1397:10, 1397:20, 1400:14, 1418:1, 1520:17, 1539:23
**setting** [4] - 1417:12, 1458:4, 1458:25, 1459:7
**settle** [1] - 1308:9
**setup** [4] - 1402:19, 1403:1, 1417:2, 1448:20
**seven** [2] - 1490:15, 1568:14
**several** [3] - 1353:22, 1398:15, 1586:7
**shake** [2] - 1371:5, 1371:6
**share** [4] - 1424:23, 1442:24, 1495:21, 1524:17, 1565:21
**shared** [1] - 1479:4
**shift** [2] - 1460:14, 1551:2
**shifting** [1] - 1476:18
**short** [6] - 1308:1, 1350:22, 1391:24, 1535:20, 1549:18,

1549:24
**shortly** [5] - 1354:9, 1354:15, 1358:15, 1529:10, 1552:1
**show** [18] - 1329:25, 1330:24, 1332:3, 1334:11, 1361:23, 1364:12, 1421:11, 1425:24, 1437:8, 1446:22, 1453:7, 1478:10, 1495:20, 1496:6, 1504:5, 1514:22, 1544:20, 1580:17
**showed** [5] - 1333:19, 1515:11, 1518:2, 1519:12, 1533:8
**showing** [5] - 1334:15, 1351:20, 1433:12, 1501:24, 1554:22
**shown** [22] - 1518:12, 1518:19, 1519:23, 1520:24, 1522:7, 1544:21, 1544:23, 1545:4, 1547:1, 1547:12, 1549:1, 1549:5, 1550:24, 1555:16, 1555:22, 1558:5, 1559:12, 1560:17, 1561:20, 1562:16, 1563:12, 1565:24
**sick** [2] - 1355:9
**side** [31] - 1338:5, 1347:22, 1354:24, 1355:17, 1355:18, 1355:23, 1378:14, 1391:5, 1395:9, 1395:15, 1395:16, 1402:25, 1409:16, 1426:18, 1429:8, 1429:17, 1430:23, 1432:4, 1432:14, 1433:4, 1434:25, 1438:25, 1444:1, 1452:13, 1509:2, 1514:11, 1514:12, 1546:13, 1548:12
**side-by-side** [1] - 1438:25
**sidebar** [3] - 1381:13, 1480:13, 1572:21
**Sidebar** [8] - 1370:24, 1377:17, 1381:14, 1386:11, 1480:14, 1483:8, 1572:22, 1574:11
**sign** [1] - 1577:16
**signature** [1] -

1557:17
**significant** [3] - 1305:21, 1544:8, 1565:3
**similarly** [2] - 1538:23, 1562:10
**simple** [2] - 1508:1, 1575:6
**simply** [1] - 1376:6
**single** [2] - 1538:12, 1538:24
**sit** [9] - 1305:10, 1305:15, 1326:14, 1364:7, 1405:11, 1445:17, 1476:20, 1508:22, 1540:2
**sitting** [5] - 1305:10, 1306:20, 1307:12, 1528:8, 1556:8
**situation** [7] - 1512:7, 1518:8, 1520:3, 1525:10, 1531:4, 1555:8, 1555:11
**situations** [1] - 1491:12
**sixteen** [1] - 1536:9
**SKADDEN** [1] - 1301:19
**skew** [1] - 1389:17
**skill** [1] - 1543:10
**skills** [1] - 1322:16
**skip** [1] - 1308:25
**skipping** [1] - 1309:23
**Skokie** [1] - 1534:4
**SLATE** [1] - 1301:19
**slide** [31] - 1351:15, 1368:9, 1374:23, 1374:25, 1375:9, 1375:14, 1375:21, 1379:18, 1381:11, 1382:20, 1385:15, 1386:22, 1386:23, 1388:19, 1388:20, 1389:13, 1390:14, 1409:21, 1422:1, 1423:4, 1423:8, 1424:5, 1424:23, 1473:14, 1479:4, 1518:4, 1520:15, 1549:10, 1551:4, 1551:5
**slides** [3] - 1516:19, 1520:16, 1527:17
**slim** [1] - 1445:23
**slim-jim** [1] - 1445:23
**slow** [2] - 1306:19, 1328:16
**smack** [1] - 1547:15
**small** [4] - 1350:4, 1525:14, 1535:16,

1539:6
**smells** [1] - 1385:15
**smoking** [1] - 1382:14
**snuff** [1] - 1509:3
**so..** [1] - 1570:16
**socioeconomic** [1] - 1537:8
**sold** [3] - 1419:3, 1442:2, 1464:22
**solicit** [3] - 1485:17, 1559:4, 1559:9
**solicited** [4] - 1379:7, 1487:3, 1558:25, 1559:5
**soliciting** [1] - 1378:20
**someone** [8] - 1409:11, 1445:22, 1543:21, 1544:4, 1544:7, 1544:9, 1556:15, 1572:6
**sometimes** [9] - 1310:16, 1401:10, 1408:19, 1459:23, 1510:21, 1511:1, 1511:7, 1524:23, 1524:24
**somewhat** [4] - 1313:10, 1528:24, 1531:4
**son** [1] - 1534:24
**soon** [2] - 1307:6, 1439:18
**sorry** [47] - 1314:5, 1319:18, 1319:19, 1321:2, 1323:3, 1323:16, 1324:7, 1333:24, 1338:22, 1341:10, 1344:23, 1344:24, 1348:8, 1373:14, 1377:20, 1381:15, 1388:2, 1390:17, 1399:10, 1402:22, 1410:14, 1421:8, 1438:7, 1439:14, 1442:18, 1443:9, 1447:12, 1456:24, 1460:7, 1466:17, 1474:4, 1483:22, 1489:24, 1490:7, 1492:6, 1498:3, 1503:14, 1503:21, 1515:6, 1530:23, 1531:9, 1550:17, 1562:13, 1571:15, 1586:1
**sort** [3] - 1532:20, 1547:16, 1554:23
**Soule** [2] - 1301:23, 1587:11

Soule@njd.uscourts.gov [1] - 1301:24
**sounded** [1] - 1541:15
**sounds** [3] - 1305:20, 1401:12, 1401:13
**space** [1] - 1465:23
**speaker** [65] - 1361:9, 1361:14, 1362:2, 1362:8, 1362:10, 1393:1, 1393:16, 1393:20, 1393:22, 1396:4, 1398:24, 1401:21, 1401:24, 1402:12, 1408:2, 1408:16, 1409:17, 1409:23, 1410:4, 1410:17, 1410:24, 1411:7, 1411:15, 1412:12, 1413:7, 1413:21, 1416:14, 1418:11, 1418:13, 1418:20, 1419:13, 1419:17, 1507:2, 1507:15, 1508:7, 1510:5, 1511:2, 1511:9, 1511:10, 1512:25, 1513:17, 1514:16, 1517:9, 1518:2, 1518:21, 1518:24, 1519:9, 1519:14, 1520:9, 1520:11, 1538:23, 1538:25, 1539:13, 1539:17, 1539:21, 1540:3, 1540:4, 1540:8, 1540:16, 1540:20, 1540:23, 1542:4, 1561:20, 1575:19, 1584:9
**Speaker** [2] - 1403:24, 1404:19
**speaker's** [2] - 1411:8, 1562:4
**speakers** [39] - 1397:21, 1398:13, 1398:20, 1402:23, 1403:13, 1403:14, 1403:25, 1404:5, 1409:17, 1409:19, 1410:6, 1410:9, 1410:18, 1411:12, 1411:14, 1416:21, 1416:22, 1509:3, 1509:20, 1509:24, 1510:13, 1510:18, 1510:21, 1510:23, 1511:1, 1519:9, 1540:8, 1540:12, 1541:5, 1541:6, 1541:8, 1541:9,

1541:19, 1541:22, 1542:4, 1561:25, 1574:23, 1575:20
**speakers'** [12] - 1394:4, 1394:7, 1395:24, 1395:25, 1396:8, 1396:11, 1398:6, 1407:1, 1509:25, 1510:22, 1512:9, 1520:20
**speaking** [14] - 1314:11, 1325:24, 1344:20, 1362:11, 1409:17, 1410:9, 1411:20, 1509:24, 1510:5, 1514:22, 1516:3, 1519:9, 1562:1, 1562:5
**special** [1] - 1351:22
**specific** [24] - 1329:19, 1349:9, 1356:20, 1358:10, 1361:17, 1367:2, 1374:2, 1375:1, 1413:20, 1447:19, 1448:9, 1450:25, 1459:4, 1459:21, 1467:14, 1471:19, 1485:5, 1490:4, 1510:13, 1511:18, 1527:10, 1543:17, 1569:10
**specific..** [1] - 1356:9
**specifically** [31] - 1312:24, 1317:21, 1344:14, 1350:16, 1350:20, 1353:19, 1375:17, 1378:3, 1403:22, 1406:19, 1410:8, 1410:11, 1410:25, 1411:20, 1442:2, 1451:10, 1474:9, 1474:14, 1502:5, 1508:16, 1510:6, 1511:4, 1523:2, 1524:9, 1531:1, 1537:25, 1543:10, 1570:2, 1576:19, 1581:6
**specificity** [1] - 1383:25
**specifics** [11] - 1329:1, 1352:21, 1396:14, 1396:16, 1405:3, 1416:17, 1426:12, 1453:10, 1473:13, 1517:11, 1577:20
**spectrum** [1] - 1347:22

**speech** [2] - 1401:5, 1401:10
**speeches** [3] - 1394:12, 1405:8, 1405:23
**speed** [1] - 1570:17
**spelling** [1] - 1311:13
**spend** [2] - 1415:3, 1415:23
**spent** [5] - 1413:20, 1416:15, 1416:21, 1417:15, 1508:17
**spontaneous** [6] - 1351:7, 1351:22, 1352:3, 1487:14, 1487:20, 1491:17
**spot** [1] - 1309:18
**spread** [1] - 1442:16
**Square** [1] - 1301:21
**staff** [4] - 1369:8, 1432:9, 1432:20, 1469:4
**stage** [3] - 1370:2, 1370:16, 1525:25
**stairstep** [1] - 1383:21
**stamped** [2] - 1555:9, 1555:12
**stand** [5] - 1308:16, 1308:19, 1481:22, 1566:19, 1575:21
**standards** [4] - 1448:10, 1448:11, 1448:14, 1448:17
**standpoint** [6] - 1398:12, 1425:8, 1518:9, 1525:23, 1543:23, 1545:23
**start** [9] - 1307:3, 1323:21, 1392:17, 1444:5, 1454:16, 1491:11, 1546:1, 1548:19
**started** [8] - 1331:22, 1356:16, 1403:23, 1498:1, 1498:3, 1501:20, 1535:3
**starting** [1] - 1310:14
**starts** [3] - 1306:23, 1421:10, 1504:21
**startup** [1] - 1535:12
**State** [2] - 1301:9, 1533:16
**state** [8] - 1311:12, 1323:1, 1323:3, 1331:20, 1334:23, 1379:20, 1379:24, 1464:13
**statement** [7] - 1376:2, 1382:19, 1460:6, 1460:9,

1573:22, 1574:8
**statements** [2] -
1471:23, 1568:16
**States** [10] - 1303:2,
1328:4, 1329:10,
1412:22, 1463:21,
1464:18, 1464:22,
1464:23, 1465:2,
1466:9
**STATES** [3] - 1301:1,
1301:3, 1301:12
**stating** [1] - 1502:10
**stay** [3] - 1325:6,
1482:24, 1512:19
**stayed** [3] - 1325:8,
1325:10, 1360:20
**staying** [2] - 1325:11,
1557:6
**stays** [1] - 1462:2
**steakhouses** [1] -
1417:16
**STENOGRAPHER** [1]
- 1373:8
**stenography** [1] -
1301:25
**step** [6] - 1383:17,
1391:19, 1445:3,
1507:8, 1533:7
**stepped** [1] - 1568:15
**steps** [1] - 1564:6
**stick** [1] - 1518:3
**sticker** [1] - 1447:12
**still** [13] - 1304:20,
1304:21, 1305:16,
1309:15, 1388:18,
1392:9, 1419:19,
1423:5, 1426:21,
1441:18, 1498:15,
1503:3, 1529:6
**stint** [1] - 1534:18
**stocked** [1] - 1365:18
**stop** [4] - 1315:16,
1348:15, 1500:2,
1523:9
**stopped** [1] - 1509:4
**story** [1] - 1535:19
**strains** [1] - 1339:22,
1340:16
**Strand** [11] - 1323:11,
1323:23, 1356:3,
1356:13, 1356:19,
1393:14, 1514:21,
1542:9, 1544:12,
1544:16, 1568:14
**strange** [3] - 1464:7,
1464:8, 1464:15
**strategic** [1] - 1451:5
**strategically** [2] -
1330:13, 1359:23
**strategies** [1] - 1333:6

**strategizing** [1] -
1561:14
**Strategy** [1] - 1549:12
**strategy** [29] -
1331:16, 1331:19,
1331:20, 1331:23,
1337:7, 1337:25,
1341:23, 1347:8,
1347:14, 1347:15,
1347:16, 1347:20,
1347:21, 1360:11,
1451:11, 1451:18,
1457:14, 1478:23,
1479:15, 1482:19,
1546:21, 1548:14,
1548:17, 1550:25,
1551:16, 1560:23,
1561:8, 1565:25
**street** [1] - 1470:9
**Street** [3] - 1301:9,
1301:17, 1301:21
**stress** [1] - 1362:15
**stressful** [2] - 1531:4,
1541:20
**strict** [1] - 1486:8
**strike** [4] - 1412:2,
1412:4, 1480:12,
1482:23
**string** [1] - 1456:11
**strong** [8] - 1505:12,
1505:17, 1505:18,
1505:23, 1506:2,
1547:2, 1559:21,
1560:14
**structure** [1] - 1388:14
**structured** [1] -
1389:1
**struggles** [1] -
1562:21
**struggling** [1] -
1353:22
**students** [2] - 1537:9,
1537:10
**studied** [1] - 1493:15
**studies** [22] - 1341:4,
1427:19, 1428:17,
1435:19, 1439:9,
1446:17, 1447:20,
1448:9, 1448:14,
1448:24, 1449:17,
1450:2, 1450:8,
1450:9, 1461:16,
1468:14, 1552:17,
1553:5, 1553:6,
1553:22, 1553:6
**study** [24] - 1343:8,
1343:9, 1448:2,
1448:8, 1449:10,
1449:11, 1453:8,
1453:9, 1453:12,

1453:15, 1453:25,
1454:11, 1454:12,
1454:16, 1455:2,
1455:10, 1455:14,
1455:18, 1455:20,
1455:25, 1456:4,
1470:16, 1477:2
**studying** [2] - 1470:8,
1470:12
**stuff** [2] - 1369:9,
1539:4
**subdivision** [1] -
1314:8
**Subject** [2] - 1479:8,
1560:24
**subject** [4] - 1446:16,
1446:19, 1479:5,
1492:21
**subjects** [1] - 1476:18
**submission** [1] -
1379:24
**submit** [2] - 1381:2,
1381:23
**submitted** [5] -
1341:20, 1384:6,
1427:20, 1434:22,
1461:17
**subpoena** [1] -
1523:16
**subsidiaries** [2] -
1313:10, 1322:6
**substance** [1] -
1516:9
**substantial** [1] -
1434:16
**succeed** [1] - 1543:16
**success** [2] - 1489:4,
1506:13
**successful** [5] -
1507:4, 1533:22,
1537:12, 1544:5,
1544:10
**succinctly** [1] -
1480:18
**sudden** [2] - 1487:25,
1554:13
**sufficiently** [2] -
1448:1, 1455:10
**suggest** [1] - 1528:16
**suggested** [4] -
1305:20, 1351:6,
1394:15, 1562:10
**suggesting** [2] -
1445:13, 1509:10
**suggestion** [1] -
1306:17
**suggestions** [3] -
1363:12, 1363:13,
1512:14
**Suite** [1] - 1301:17

**summary** [1] -
1373:21
**super** [1] - 1383:17
**superiors** [2] - 1467:9,
1500:9
**supervised** [1] -
1323:11
**supervision** [1] -
1536:25
**supervisor** [1] -
1571:3
**supervisory** [2] -
1323:22, 1538:2
**supply** [1] - 1365:19
**support** [2] - 1546:10,
1548:9
**supported** [1] -
1321:19
**supposed** [10] -
1325:9, 1378:5,
1378:9, 1487:14,
1487:15, 1491:17,
1500:18, 1500:19,
1515:12, 1517:1
**supposedly** [1] -
1494:7
**survey** [1] - 1478:10,
1478:12
**surveys** [6] - 1469:8,
1470:20, 1472:24,
1473:5, 1474:5,
1474:17
**Susan** [2] - 1511:21
**sustain** [1] - 1497:11
**sustained** [4] -
1380:10, 1382:6,
1437:16, 1583:10
**swap** [1] - 1549:22
**swear** [1] - 1326:20
**switch** [2] - 1549:16,
1572:13
**switches** [1] - 1351:21
**switching** [1] - 1452:3
**swore** [1] - 1400:9
**sworn** [5] - 1311:8,
1326:15, 1404:7,
1568:16, 1572:18
**SWORN/AFFIRMED**
[1] - 1311:10
**system** [3] - 1462:2,
1477:1, 1519:20

---

# T

**table** [1] - 1440:5
**tablet** [1] - 1472:16
**tactful** [1] - 1512:14
**tactic** [1] - 1500:1
**tactical** [1] - 1450:14
**tactics** [7] - 1317:5,

1337:8, 1351:6,
1500:1, 1500:4,
1500:7, 1545:23
**talented** [1] - 1524:20
**talks** [3] - 1465:23,
1551:5, 1563:25
**tap** [1] - 1415:4
**target** [7] - 1304:21,
1341:24, 1343:4,
1343:21, 1343:25,
1358:11, 1411:16
**targeted** [3] - 1419:6,
1510:1, 1531:1
**targeting** [1] - 1479:24
**targets** [1] - 1352:16
**taught** [23] - 1378:9,
1378:22, 1379:18,
1380:3, 1380:8,
1380:20, 1380:24,
1382:11, 1387:5,
1387:8, 1387:12,
1388:11, 1389:9,
1389:13, 1389:15,
1390:4, 1391:6,
1483:17, 1510:16,
1515:2, 1516:24,
1578:6
**teach** [3] - 1348:23,
1537:5, 1578:1
**teaching** [3] - 1370:4,
1380:15, 1387:19
**Team** [1] - 1421:16
**team** [20] - 1332:25,
1337:17, 1337:19,
1359:2, 1401:15,
1412:12, 1433:14,
1437:22, 1438:1,
1458:4, 1466:4,
1466:8, 1467:5,
1488:17, 1542:16,
1552:21, 1559:17
**teams** [2] - 1488:19,
1488:20
**technology** [1] -
1535:21
**telegraphing** [1] -
1555:11
**ten** [8] - 1391:12,
1391:15, 1391:20,
1391:23, 1539:4,
1549:21, 1550:8,
1562:17
**ten-minute** [4] -
1391:12, 1391:15,
1391:20, 1549:21
**tendency** [1] - 1430:1
**term** [14] - 1322:21,
1347:13, 1347:19,
1347:21, 1350:22,
1371:1, 1416:4,

1459:4, 1459:9, 1459:10, 1459:17, 1459:21, 1460:11
**terminate** [1] - 1543:16
**termination** [1] - 1543:22
**terms** [11] - 1320:7, 1371:1, 1431:25, 1432:5, 1432:13, 1433:3, 1508:6, 1548:9, 1551:15, 1560:8, 1564:6
**terrible** [2] - 1315:13, 1547:18
**territory** [2] - 1384:23, 1544:8
**test** [2] - 1315:14, 1515:15
**testified** [7] - 1356:2, 1497:19, 1523:12, 1526:6, 1570:19, 1575:7, 1584:21
**TESTIFIED** [1] - 1311:11
**testify** [3] - 1325:21, 1420:4, 1420:8
**testifying** [3] - 1324:17, 1326:5, 1576:8
**testimony** [34] - 1310:14, 1312:23, 1324:23, 1325:15, 1326:10, 1326:15, 1327:7, 1327:10, 1355:17, 1360:22, 1362:12, 1364:17, 1408:21, 1414:22, 1430:12, 1431:24, 1465:15, 1488:7, 1488:12, 1506:24, 1523:24, 1541:11, 1542:7, 1572:10, 1572:25, 1574:4, 1574:16, 1575:3, 1575:6, 1575:8, 1575:18, 1579:19, 1584:15, 1585:16
**Texas** [1] - 1301:17
**thanked** [1] - 1516:18
**that'd** [1] - 1505:24
**THE** [212] - 1301:1, 1301:11, 1303:4, 1303:5, 1303:16, 1303:24, 1304:5, 1304:14, 1304:21, 1304:23, 1305:1, 1305:4, 1305:8, 1306:4, 1307:20, 1307:22, 1308:2,

1308:3, 1308:13, 1308:15, 1308:18, 1308:21, 1308:24, 1309:6, 1309:17, 1310:4, 1310:5, 1310:10, 1310:12, 1311:7, 1311:12, 1311:14, 1311:15, 1314:2, 1314:5, 1314:6, 1333:19, 1333:21, 1333:23, 1333:24, 1333:25, 1349:13, 1349:19, 1349:20, 1365:3, 1368:18, 1370:23, 1371:5, 1371:16, 1371:19, 1371:22, 1372:2, 1372:5, 1372:21, 1372:25, 1373:4, 1373:6, 1373:8, 1373:13, 1373:18, 1374:1, 1374:9, 1374:11, 1374:16, 1374:23, 1375:20, 1376:4, 1376:10, 1376:15, 1376:21, 1377:1, 1377:5, 1377:16, 1380:10, 1381:9, 1381:13, 1381:15, 1382:2, 1382:4, 1382:13, 1382:16, 1383:13, 1383:24, 1384:4, 1384:21, 1385:3, 1385:6, 1386:2, 1386:8, 1386:13, 1391:10, 1391:14, 1391:17, 1391:19, 1391:21, 1391:22, 1391:25, 1392:1, 1392:4, 1392:5, 1392:7, 1392:8, 1399:24, 1400:1, 1400:5, 1407:23, 1408:1, 1408:2, 1408:3, 1408:4, 1408:8, 1408:9, 1408:10, 1412:2, 1413:3, 1414:9, 1421:24, 1430:13, 1430:17, 1433:23, 1437:8, 1437:11, 1437:13, 1437:16, 1437:18, 1439:15, 1439:21, 1440:2, 1440:4, 1440:10, 1440:17, 1440:24, 1441:2, 1441:3, 1441:9, 1441:11, 1441:14, 1441:15, 1441:17,

1447:11, 1447:15, 1453:1, 1453:4, 1453:21, 1456:17, 1469:19, 1480:13, 1480:15, 1481:2, 1481:5, 1481:18, 1481:24, 1482:2, 1482:7, 1482:12, 1483:10, 1484:20, 1484:22, 1484:23, 1484:24, 1484:25, 1485:2, 1489:25, 1490:2, 1490:3, 1490:7, 1493:5, 1497:11, 1498:17, 1499:4, 1514:4, 1517:14, 1517:17, 1518:17, 1545:1, 1549:13, 1549:17, 1549:21, 1549:23, 1549:25, 1550:1, 1550:5, 1550:9, 1550:15, 1550:16, 1554:19, 1555:19, 1566:12, 1571:15, 1571:20, 1572:21, 1572:23, 1573:3, 1573:6, 1573:9, 1573:24, 1574:13, 1578:25, 1579:5, 1579:11, 1579:15, 1582:19, 1583:10, 1585:7, 1585:10, 1585:11, 1585:23, 1586:2, 1586:5, 1586:10, 1586:12, 1586:21
**theatrics** [1] - 1308:21
**themselves** [4] - 1472:6, 1487:15, 1509:10, 1553:22
**theories** [1] - 1376:19
**theory** [1] - 1376:8
**therapeutic** [1] - 1331:21
**Therapeutics** [6] - 1313:19, 1313:20, 1324:12, 1473:3, 1526:4, 1535:12
**therefore** [2] - 1442:14, 1447:21
**thinking** [3] - 1306:21, 1356:16, 1382:5
**third** [4] - 1340:20, 1351:11, 1427:3, 1472:11
**thirst** [1] - 1553:23
**Thomas** [2] - 1504:8, 1559:12
**thousand** [2] -

1405:23, 1406:22
**three** [19] - 1303:24, 1338:14, 1353:8, 1353:19, 1358:22, 1360:4, 1364:4, 1405:5, 1405:6, 1405:18, 1406:22, 1408:4, 1409:7, 1409:10, 1450:24, 1480:5, 1481:9, 1525:11, 1536:13
**three-quarters** [2] - 1358:22, 1360:4
**three-to-five-word** [1] - 1408:4
**three-year** [1] - 1353:8
**throughout** [5] - 1318:19, 1412:21, 1418:18, 1433:1, 1522:6
**thrown** [2] - 1431:25, 1432:13
**Tibotec** [14] - 1313:16, 1313:19, 1313:20, 1314:16, 1317:21, 1317:25, 1323:8, 1324:12, 1473:3, 1516:13, 1523:8, 1526:3, 1535:12, 1538:5
**Tibotec/Janssen** [1] - 1379:1
**tied** [1] - 1411:20
**tight** [1] - 1440:19
**timing** [5] - 1321:2, 1329:2, 1341:7, 1341:19, 1368:23
**title** [3] - 1453:14, 1549:10
**today** [50] - 1305:13, 1306:25, 1312:5, 1312:21, 1314:11, 1315:19, 1317:12, 1318:8, 1322:2, 1322:22, 1324:17, 1324:23, 1325:2, 1325:16, 1327:9, 1331:1, 1358:18, 1364:7, 1364:17, 1399:3, 1399:15, 1414:22, 1419:25, 1420:4, 1440:12, 1440:13, 1440:15, 1445:18, 1465:10, 1465:15, 1476:20, 1488:12, 1502:2, 1502:9, 1508:22, 1517:24, 1522:6, 1523:16, 1528:8, 1529:6, 1531:19,

1546:4, 1556:8, 1562:19, 1565:24, 1567:6, 1575:21, 1578:25, 1579:2, 1584:22
**together** [9] - 1309:24, 1332:12, 1347:1, 1393:16, 1394:15, 1394:21, 1395:23, 1396:7, 1489:19
**tolerability** [3] - 1451:6, 1452:4, 1457:8
**Tom** [1] - 1506:12
**tomorrow** [6] - 1307:3, 1307:12, 1307:13, 1579:7, 1585:12, 1585:21
**Tony** [7] - 1393:10, 1499:8, 1499:12, 1501:9, 1501:21, 1501:24, 1502:10
**took** [24] - 1364:11, 1364:18, 1364:22, 1365:8, 1367:2, 1368:13, 1380:16, 1381:1, 1381:22, 1408:1, 1408:10, 1443:5, 1444:5, 1444:10, 1455:3, 1477:2, 1479:12, 1526:3, 1531:9, 1537:6, 1566:19, 1569:1, 1569:5, 1582:25
**top** [13] - 1339:24, 1348:9, 1453:14, 1457:5, 1458:2, 1462:24, 1493:7, 1493:19, 1493:22, 1494:12, 1495:4, 1504:18, 1538:15
**topic** [6] - 1485:10, 1494:8, 1513:14, 1526:10, 1554:5, 1582:18
**topics** [6] - 1480:8, 1493:19, 1493:22, 1495:4, 1495:6, 1545:19
**Torres** [10] - 1513:15, 1513:16, 1513:18, 1514:15, 1515:2, 1515:11, 1516:3, 1516:8, 1516:24, 1518:2
**Torres'** [1] - 1514:22
**tossed** [1] - 1432:5
**total** [2] - 1353:2, 1353:9

**totally** [3] - 1382:3, 1486:1, 1538:6
**touch** [1] - 1319:19
**touched** [1] - 1536:11
**track** [10] - 1308:22, 1358:3, 1359:4, 1409:19, 1410:9, 1440:16, 1509:19, 1510:2, 1561:24
**tracked** [6] - 1411:17, 1507:14, 1507:19, 1508:13, 1508:16, 1540:16
**tracking** [2] - 1409:16, 1410:5
**tracks** [1] - 1521:22
**traffic** [3] - 1308:4, 1310:9, 1310:16
**train** [14] - 1322:23, 1331:17, 1331:19, 1331:20, 1339:1, 1352:2, 1432:6, 1442:23, 1469:4, 1544:4, 1569:22, 1570:1, 1570:2, 1571:8
**trained** [21] - 1366:22, 1367:13, 1367:18, 1367:22, 1369:8, 1377:23, 1385:3, 1385:21, 1432:9, 1480:10, 1483:20, 1556:22, 1576:14, 1576:15, 1576:19, 1576:25, 1577:8, 1577:13, 1578:17, 1580:8
**trainer** [2] - 1348:24, 1395:1
**training** [59] - 1317:5, 1318:4, 1318:13, 1319:6, 1319:9, 1322:4, 1322:9, 1322:16, 1322:18, 1323:5, 1328:12, 1331:22, 1336:17, 1339:8, 1339:11, 1361:19, 1367:2, 1367:20, 1368:6, 1368:12, 1368:22, 1386:18, 1392:15, 1396:4, 1403:1, 1403:4, 1432:20, 1469:4, 1469:22, 1483:25, 1485:15, 1501:8, 1501:14, 1503:3, 1503:6, 1516:1, 1520:25, 1521:11, 1521:13, 1524:14, 1524:18,

1524:22, 1525:3, 1531:13, 1531:25, 1532:13, 1533:22, 1533:24, 1536:13, 1542:12, 1554:2, 1556:15, 1570:14, 1570:15, 1570:20, 1571:25, 1572:2, 1580:14
**transcript** [6] - 1301:25, 1399:25, 1400:8, 1573:16, 1575:8, 1587:4
**transcription** [2] - 1301:25, 1420:13
**transition** [1] - 1473:12
**transitioning** [1] - 1324:6
**translate** [1] - 1480:8
**travel** [3] - 1325:2, 1417:12, 1538:20
**travelling** [1] - 1538:20
**treat** [2] - 1428:19, 1543:6
**treated** [1] - 1335:23
**treatment** [13] - 1335:10, 1335:15, 1335:17, 1340:25, 1426:23, 1427:5, 1429:4, 1448:19, 1466:16, 1471:25, 1478:16, 1478:20, 1548:8
**treatment-experienced** [5] - 1335:17, 1340:25, 1429:4, 1466:16, 1478:16
**treatment-naive** [4] - 1426:23, 1427:5, 1478:20, 1548:8
**treatments** [1] - 1335:8
**tree** [1] - 1360:9
**trends** [1] - 1473:13
**Trenton** [1] - 1301:9
**triage** [1] - 1501:13
**trial** [9] - 1305:16, 1306:13, 1307:13, 1310:14, 1325:11, 1326:15, 1383:7, 1393:9, 1585:8
**Trial** [1] - 1453:13
**TRIAL** [1] - 1301:5
**trials** [4] - 1326:14, 1349:10, 1434:13, 1434:22
**tried** [3] - 1308:4,

1481:10, 1511:4
**trigger** [1] - 1487:24
**triglyceride** [1] - 1429:9
**triglycerides** [7] - 1349:5, 1426:4, 1426:17, 1429:23, 1430:3, 1431:11, 1436:2
**tripled** [1] - 1352:11
**trouble** [2] - 1524:18, 1530:17
**true** [76] - 1313:12, 1313:13, 1327:5, 1336:24, 1344:13, 1353:4, 1370:6, 1370:7, 1370:10, 1370:19, 1371:10, 1400:14, 1409:12, 1409:18, 1410:20, 1410:23, 1413:22, 1418:6, 1419:14, 1419:15, 1419:21, 1421:7, 1424:17, 1425:2, 1425:3, 1429:18, 1429:19, 1431:22, 1432:3, 1435:2, 1435:3, 1435:12, 1435:20, 1445:19, 1445:20, 1455:17, 1459:13, 1459:19, 1459:22, 1460:3, 1460:4, 1460:10, 1472:14, 1472:15, 1472:22, 1476:24, 1476:25, 1478:4, 1478:5, 1479:11, 1479:18, 1479:19, 1480:1, 1483:19, 1489:13, 1489:14, 1491:25, 1492:2, 1492:3, 1492:5, 1493:11, 1494:5, 1494:10, 1495:15, 1496:16, 1505:22, 1506:4, 1508:11, 1509:1, 1512:24, 1514:20, 1517:10, 1532:22, 1534:11, 1542:18, 1566:8
**truly** [2] - 1481:15, 1482:4
**trust** [2] - 1407:9, 1477:14
**trusted** [3] - 1407:14, 1443:25, 1444:9
**truth** [1] - 1326:20
**truthful** [2] - 1312:22, 1396:10

**try** [16] - 1312:22, 1313:8, 1360:3, 1389:7, 1399:12, 1418:8, 1440:15, 1443:11, 1444:16, 1452:24, 1475:23, 1501:14, 1506:24, 1550:3, 1550:7, 1566:16
**trying** [22] - 1308:7, 1361:4, 1373:24, 1374:20, 1376:15, 1381:20, 1381:25, 1382:8, 1385:13, 1385:19, 1388:18, 1396:10, 1397:16, 1415:19, 1415:20, 1445:3, 1473:15, 1473:16, 1506:23, 1508:1, 1533:18, 1571:16
**turn** [15] - 1328:8, 1333:10, 1334:5, 1354:9, 1354:14, 1359:9, 1404:6, 1404:12, 1429:7, 1446:15, 1468:14, 1470:1, 1476:16, 1485:10, 1493:11
**turned** [2] - 1387:24, 1577:15
**Turner** [5] - 1504:8, 1504:22, 1505:11, 1506:18, 1559:12
**turns** [6] - 1365:23, 1415:24, 1416:11, 1489:11, 1507:2, 1516:25
**twice** [12] - 1370:15, 1382:9, 1427:10, 1427:15, 1427:22, 1428:24, 1461:4, 1461:19, 1462:6, 1462:11, 1471:1
**twice-daily** [1] - 1427:15
**two** [22] - 1312:10, 1320:11, 1320:16, 1327:23, 1353:17, 1364:4, 1376:19, 1421:9, 1434:12, 1434:21, 1435:18, 1448:8, 1450:24, 1525:11, 1534:12, 1534:23, 1536:11, 1537:3, 1538:1, 1540:17, 1547:16, 1567:24
**type** [15] - 1317:6, 1382:24, 1384:8,

1384:11, 1386:4, 1407:15, 1501:17, 1502:3, 1502:22, 1546:9, 1565:13, 1571:16, 1576:5, 1582:23
**types** [1] - 1384:10

## U

**U.S** [5] - 1301:8, 1339:21, 1352:10, 1352:17, 1492:21
**ultimately** [5] - 1329:15, 1409:24, 1416:11, 1500:8, 1512:4
**unaided** [2] - 1472:6, 1472:9
**unbelievably** [1] - 1308:5
**unclear** [1] - 1497:9
**uncomfortable** [3] - 1524:14, 1527:8, 1555:8
**under** [14] - 1326:15, 1328:2, 1343:2, 1363:22, 1364:1, 1372:19, 1392:9, 1400:10, 1423:5, 1437:3, 1441:18, 1499:25, 1574:18, 1581:21
**underneath** [2] - 1465:20, 1542:9
**understandings** [1] - 1326:9
**understood** [10] - 1348:1, 1373:25, 1374:22, 1428:8, 1442:6, 1442:12, 1494:19, 1541:11, 1576:1, 1582:4
**uniform** [1] - 1411:17
**uniformly** [1] - 1425:4
**UNITED** [3] - 1301:1, 1301:3, 1301:12
**United** [10] - 1303:2, 1328:4, 1329:10, 1412:22, 1463:21, 1464:18, 1464:22, 1464:23, 1465:2, 1466:9
**universe** [5] - 1409:19, 1410:10, 1411:16, 1415:21, 1510:1
**University** [2] - 1533:16, 1537:5
**unlawful** [5] - 1373:6,

1373:19, 1373:21,
1377:2, 1377:13
**unless** [2] - 1434:21,
1585:19
**unrelated** [1] -
1373:22
**unsafe** [1] - 1450:9
**unsolicited** [14] -
1378:11, 1378:19,
1378:20, 1378:25,
1485:17, 1488:1,
1493:19, 1493:22,
1494:7, 1494:12,
1495:4, 1500:18,
1500:19, 1565:4
**up** [98] - 1304:2,
1304:8, 1304:13,
1306:23, 1311:4,
1313:8, 1319:3,
1321:6, 1321:24,
1332:18, 1343:14,
1343:18, 1344:4,
1344:7, 1348:4,
1351:4, 1351:9,
1352:17, 1352:24,
1358:3, 1359:23,
1360:11, 1360:16,
1360:20, 1360:24,
1361:5, 1361:12,
1365:17, 1387:3,
1387:24, 1392:2,
1409:21, 1409:24,
1413:6, 1417:6,
1418:2, 1420:6,
1421:6, 1422:16,
1432:19, 1441:4,
1441:13, 1446:25,
1448:6, 1455:3,
1457:4, 1458:3,
1459:6, 1462:21,
1463:3, 1465:19,
1467:23, 1471:8,
1472:9, 1472:25,
1475:23, 1489:20,
1491:12, 1496:8,
1497:18, 1497:24,
1498:19, 1500:8,
1503:7, 1504:3,
1504:22, 1505:9,
1505:11, 1506:11,
1509:3, 1514:22,
1515:11, 1517:23,
1518:2, 1519:18,
1520:3, 1521:6,
1526:5, 1533:15,
1534:1, 1534:2,
1534:11, 1534:23,
1535:17, 1540:17,
1553:2, 1553:6,
1554:4, 1554:13,

1556:1, 1557:18,
1562:5, 1565:9,
1570:17, 1572:25,
1577:5, 1585:13
**update** [2] - 1305:6,
1552:22
**updated** [2] - 1548:1
**updates** [1] - 1553:19
**upfront** [1] - 1531:7
**Upjohn** [5] - 1316:12,
1316:13, 1316:14,
1316:17, 1534:13
**ups** [4] - 1356:7,
1356:21, 1356:24,
1523:10
**upset** [1] - 1526:17
**usage** [2] - 1351:7,
1351:22
**utilization** [1] -
1390:21

---

# V

**vaguely** [1] - 1532:11
**validate** [2] - 1472:25,
1475:24
**variabilities** [1] -
1423:2
**various** [4] - 1313:4,
1408:23, 1408:24,
1535:24
**venue** [1] - 1402:10
**venues** [3] - 1402:17,
1403:1, 1417:2
**verbatim** [1] - 1556:19
**verbiage** [4] -
1570:12, 1571:7,
1571:9, 1572:4
**versus** [10] - 1346:5,
1355:11, 1364:5,
1370:14, 1370:15,
1479:19, 1490:15,
1493:8, 1493:23,
1573:17
**video** [2] - 1404:16,
1573:17
**videographer** [1] -
1326:19
**view** [6] - 1347:13,
1347:19, 1518:7,
1519:21, 1526:13,
1566:1
**View** [1] - 1549:12
**viewed** [1] - 1491:10
**violating** [1] - 1527:9
**violation** [3] -
1372:22, 1377:7,
1377:11
**violations** [2] -
1380:20, 1385:17

**Viral** [1] - 1492:21
**virology** [2] - 1437:21,
1553:20
**virus** [4] - 1328:17,
1335:20, 1454:20,
1484:8
**visit** [3] - 1318:23,
1471:16, 1475:2
**visiting** [2] - 1411:22,
1538:16
**vocal** [1] - 1539:7
**Voice** [1] - 1492:22
**voicemail** [3] -
1419:25, 1420:13,
1420:17
**VOLUME** [1] - 1301:5
**volunteers** [1] -
1454:13

---

# W

**Wait** [1] - 1443:11
**wait** [1] - 1571:15
**wants** [3] - 1373:16,
1486:7, 1573:19
**warning** [1] - 1483:2
**watch** [1] - 1391:11
**Watson** [5] - 1316:22,
1317:18, 1317:19,
1317:20, 1534:18
**ways** [3] - 1375:13,
1378:4, 1551:3
**website** [1] - 1516:1
**Wednesday** [2] -
1305:9, 1305:10
**week** [8] - 1304:19,
1305:10, 1305:16,
1305:17, 1305:20,
1306:10, 1307:13,
1491:9
**weekly** [1] - 1499:13
**weeks** [3] - 1306:23,
1451:24, 1586:7
**welcome** [1] - 1310:13
**well-controlled** [2] -
1434:13, 1434:22
**Wendel** [1] - 1303:12
**WENDEL** [2] -
1301:16, 1303:12
**western** [3] - 1464:6,
1464:9, 1464:13
**whack** [1] - 1495:22
**wherein** [1] - 1340:14
**whistleblower** [2] -
1567:25, 1577:15
**white** [2] - 1524:23,
1524:24
**Whitney** [1] - 1303:12
**WHITNEY** [1] -
1301:16

**whole** [6] - 1374:9,
1375:19, 1375:20,
1415:10, 1490:10,
1573:7
**Whyte** [2] - 1468:20,
1469:22
**whyte** [2] - 1468:23,
1469:14
**wide** [1] - 1538:6
**widely** [3] - 1500:12,
1500:21, 1558:10
**Wilhelm** [19] -
1323:11, 1323:23,
1413:25, 1414:18,
1415:1, 1481:22,
1512:1, 1512:4,
1529:25, 1530:24,
1532:9, 1532:18,
1532:25, 1542:10,
1544:12, 1544:16,
1546:6, 1568:13,
1569:9
**William** [2] - 1468:20,
1476:11
**willing** [2] - 1306:16,
1482:17
**Wilmington** [1] -
1301:22
**winded** [2] - 1482:14,
1483:3
**window** [1] - 1353:8
**wink** [2] - 1546:9
**wink-wink-type** [1] -
1546:9
**Wirmani** [1] - 1303:14
**WIRMANI** [2] -
1301:15, 1303:14
**wish** [1] - 1538:7
**witness** [36] -
1306:15, 1306:25,
1307:1, 1308:10,
1308:13, 1309:15,
1311:4, 1330:22,
1332:19, 1364:14,
1368:3, 1374:1,
1374:24, 1382:25,
1383:9, 1383:14,
1385:20, 1392:2,
1399:22, 1412:8,
1433:9, 1440:12,
1440:14, 1440:15,
1446:25, 1456:9,
1468:12, 1480:22,
1481:19, 1492:9,
1504:5, 1517:13,
1550:1, 1577:5,
1582:18, 1585:16
**WITNESS** [20] -
1311:14, 1314:5,
1333:21, 1333:24,

1349:19, 1391:21,
1408:1, 1408:3,
1408:8, 1408:10,
1430:17, 1441:14,
1453:4, 1484:22,
1484:24, 1485:2,
1490:2, 1490:7,
1571:20, 1585:10
**witnesses** [4] -
1304:13, 1327:3,
1356:2, 1485:11
**wonderful** [2] -
1355:7, 1530:19
**wondering** [2] -
1365:12, 1458:23
**Wong** [1] - 1513:21
**word** [6] - 1373:21,
1377:1, 1377:12,
1385:6, 1408:4,
1580:11
**words** [11] - 1344:17,
1344:20, 1357:18,
1357:20, 1362:9,
1363:3, 1379:4,
1384:12, 1389:7,
1556:20, 1580:12
**workplace** [1] -
1537:12
**works** [6] - 1335:21,
1395:8, 1448:4,
1490:6, 1526:8,
1537:8
**workshop** [1] -
1570:10
**workshops** [3] -
1524:21, 1525:2,
1528:5
**worse** [1] - 1363:21
**write** [9] - 1367:2,
1367:3, 1367:18,
1389:2, 1428:9,
1541:9, 1542:4,
1548:22, 1559:2
**writes** [2] - 1456:25,
1465:5
**writing** [10] - 1359:17,
1364:24, 1367:4,
1369:9, 1381:6,
1387:9, 1387:23,
1512:25, 1561:25
**written** [3] - 1381:17,
1387:13, 1401:4
**wrote** [4] - 1411:13,
1466:24, 1517:8
**Wyatt** [1] - 1303:20
**WYATT** [2] - 1301:20,
1303:20

| Y | 1490:21 |
|---|---|

**Yale** [3] - 1515:3, 1515:21, 1516:24

**year** [28] - 1343:22, 1352:12, 1352:14, 1353:6, 1353:8, 1358:7, 1405:5, 1405:6, 1405:18, 1405:23, 1406:10, 1406:22, 1406:23, 1409:7, 1409:11, 1419:20, 1421:9, 1421:10, 1422:5, 1422:24, 1423:5, 1425:1, 1525:11, 1534:15, 1536:13, 1546:1

**yearly** [1] - 1521:14

**years** [29] - 1312:10, 1316:16, 1319:10, 1328:23, 1330:5, 1338:14, 1353:6, 1353:19, 1353:22, 1398:15, 1477:18, 1480:5, 1499:20, 1522:21, 1522:24, 1528:15, 1534:22, 1536:9, 1537:3, 1538:4, 1539:4, 1543:4, 1548:13, 1562:17, 1575:12, 1581:17, 1581:18, 1584:4

**yelling** [6] - 1357:8, 1357:11, 1357:12, 1357:13, 1357:15, 1357:25

**yes-or-no** [1] - 1481:3

**yesterday** [6] - 1306:13, 1325:9, 1481:12, 1481:22, 1506:13, 1532:18

**York** [6] - 1488:17, 1488:19, 1488:20, 1489:20, 1490:13, 1563:21

**young** [2] - 1534:15, 1538:20

**yourself** [20] - 1320:1, 1325:21, 1332:10, 1364:12, 1401:22, 1403:17, 1404:19, 1406:23, 1413:6, 1443:5, 1443:11, 1444:5, 1463:7, 1468:2, 1473:9, 1526:21, 1533:10, 1567:12, 1576:14

**yourselves** [1] -

| Z |
|---|

**ZAHID** [2] - 1301:11, 1303:2