1              UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF NEW JERSEY
2

3  _____

UNITED STATES OF AMERICA, et    CIVIL ACTION NUMBER:
4  al,
         Plaintiffs,            3:12-cv-07758-ZNQ-JBD
5
         v.                     JURY TRIAL - VOLUME 9
6
JOHNSON & JOHNSON, JANSSEN
7  PRODUCTS, L.P.
         Defendants.
8  _____
             Clarkson S. Fisher Building & U.S. Courthouse
9            402 East State Street
             Trenton, New Jersey  08608
10           May 22, 2024
             Commencing at 8:30 a.m.
11
B E F O R E:            THE HONORABLE ZAHID N. QURAISHI,
12                      UNITED STATES DISTRICT JUDGE

13  A P P E A R A N C E S:

14       REESE MARKETOS
         BY:  PETE MARKETOS, ESQUIRE
15            JOSH RUSS, ESQUIRE
              ANDREW WIRMANI, ESQUIRE
16            ADAM SANDERSON, ESQUIRE
              WHITNEY WENDEL, ESQUIRE
17       750 N. Saint Paul Street, Suite 600
         Dallas, Texas 75201
18       For the Relators

19       SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
         BY:  ALLISON M. BROWN, ESQUIRE
20            GEOFFREY M. WYATT, ESQUIRE
              BRADLEY A. KLEIN, ESQUIRE
21       One Rodney Square
         920 King Street
22       Wilmington, Delaware
         For the Defendants
23
         Megan McKay-Soule, Official Court Reporter
24            Megan_McKay-Soule@njd.uscourts.gov
                   (609) 815-2319
25  Proceedings recorded by mechanical stenography; transcript
         produced by computer-aided transcription.

                    United States District Court
                       District of New Jersey

1                       I N D E X

2  EXAMINATIONS                                    PAGE
                    **GLENN MATTES**
3      DIRECT EXAMINATION BY MR. MARKETOS          2921
       CROSS-EXAMINATION BY MR. KLEIN              2985
4      REDIRECT EXAMINATION BY MR. MARKETOS        3025
                **PROFESSOR GEORGE SILLUP**
5      DIRECT EXAMINATION BY MR. MARKETOS:         3040
       CROSS-EXAMINATION BY MS. BROWN              3102
6      REDIRECT EXAMINATION BY MR. MARKETOS        3186
                   **JESSICA PENELOW**
7         DIRECT EXAMINATION BY MR. RUSS           3205

8                    **E X H I B I T S**
   Exhibit No.      Description                    Page
9          Relators' Exhibit 275 in evidence.     2925
           Relators' Exhibit 1776 in              2934
10         evidence.
           Relators' Exhibit 1777 in              2936
11         evidence.
           Relators' Exhibit 1779 in              2938
12         evidence.
           Relators' Exhibit 1780 in              2940
13         evidence.
           Relators' Exhibit 1784 in              2953
14         evidence.
           Plaintiff's Exhibit 1786 in            2958
15         evidence.
           Relators' Exhibit 1785 in              2960
16         evidence.
           Relators' Exhibit 1787 in              2962
17         evidence.
           Relators' Exhibit 128 in evidence.     2965
18         Relators' Exhibit 1788 in              2967
           evidence.
19         Relators' Exhibit 1789 in              2969
           evidence.
20         Relators' Exhibit 149 page 29 in       2977
           evidence.
21         Relators' Exhibit 1785 in              2980
           evidence.
22         Defendants' Exhibit 8976 in            3013
           evidence.
23         Defendants' Exhibit 8977 in            3018
           evidence.
24         Relators 1319 in evidence.             3240
           Relators 1403 in evidence.             3241
25         Relators 1410 in evidence.             3243
           Relators 1411 in evidence.             3250

***United States District Court***
***District of New Jersey***

```
 1              (PROCEEDINGS held in open court before The Honorable

 2    ZAHID N. QURAISHI, United States District Judge, on May 22,

 3    2024, at 8:30 a.m.)

 4              THE DEPUTY COURT CLERK:  All rise.

 5              THE COURT:  All right, folks.  Be seated.  Thank you.

 6         Folks, we are on the record again.  Before we chat,

 7    let's just get appearances from counsel like we always do,

 8    beginning with Relators' counsel.

 9              MR. MARKETOS:  Good morning, Your Honor.

10    Pete Marketos for the Relators.

11              MS. WENDEL:  Good morning.  Whitney Wendel for the

12    Relators.

13              MR. WIRMANI:  Good morning.  Andrew Wirmani for the

14    Relators.

15              MR. RUSS:  Josh Russ for the Relators.

16              THE COURT:  Good morning, folks.

17              MS. BROWN:  Good morning, Your Honor.  Alli Brown for

18    Janssen.

19              MR. WYATT:  Good morning, Your Honor.  Jeff Wyatt for

20    Janssen.

21              MR. KLEIN:  Good morning, Your Honor.  Brad Klein for

22    Janssen.

23              THE COURT:  All right.  Good morning to all of you as

24    well.

25         So let's -- I don't know where we want to begin.  Do we
```

```
 1  want to first talk about the settlement agreement issue?

 2          MR. MARKETOS:  Sure, Your Honor.  That would be fine.

 3          THE COURT:  All right.

 4          MR. MARKETOS:  So, Your Honor, let me just start

 5  here.  We provided a copy of the settlement agreement and

 6  portions of it that are relevant that we want to get before

 7  the jury and why.

 8      So the settlement agreement -- may I use the ELMO?

 9  That may be the best way.

10      Can you switch to the ELMO, please, when you get a

11  chance.

12          May I approach?

13          THE COURT:  You may.

14          MR. MARKETOS:  Thank you.

15      So, Your Honor --

16          (Brief pause.)

17          MR. MARKETOS:  Sorry, Your Honor.

18          THE COURT:  No, no.  That's all right.

19      So this is the -- you're showing me the -- which

20  settlement agreement is this?

21          MR. MARKETOS:  Yes, Your Honor.

22          THE COURT:  Are there two?  Is it like the CIAs?

23  You're trying to move in one from 2010 and one from 2013?

24          MR. MARKETOS:  So there's not a settlement agreement

25  accessible for 2010.  There are two CIAs, Your Honor, 2010,
```

1    2013, and a settlement agreement at 2013.

2              THE COURT:  So that's all we are talking about this

3    morning?

4              MR. MARKETOS:  Yes, Your Honor.

5              THE COURT:  Okay.  I just want to be clear.

6              MR. MARKETOS:  And this is the settlement agreement

7    that was the subject of Your Honor's ruling and the motion in

8    limine along with the corporate integrity agreement.

9         And the corporate integrity agreement does have some

10   general allegations of illegal conduct, but the settlement

11   agreement is specific to exactly what the allegations were:

12   promoting the sale and use of Risperdal for conditions for

13   which it was not approved that's safe and effective, were not

14   covered by the United States in Medicaid programs.  Okay?

15        So the reimbursements for medically accepted

16   indications that were not covered by the United States and

17   state Medicaid programs.  They made false and misleading

18   statements about the safety and efficacy of Risperdal --

19             THE COURT:  No, no.  I see it.  You don't have to

20   read the whole thing.  But I get it.

21        So that language you're saying, that specificity is not

22   in the CIA, the correlating CIA?

23             MR. MARKETOS:  It's not, Your Honor.

24             THE COURT:  Okay.

25             MR. MARKETOS:  You could patch pieces together, if

 1  you wanted to, from the CIA, but you can't get these

 2  allegations.

 3          THE COURT:  All right.  What else is in here that you

 4  want to show me?

 5          MR. MARKETOS:  There are also references to

 6  defendants -- and this is important -- defendants paying back

 7  amounts that were specifically -- excuse me -- "shall pay to

 8  the United States the Medicaid settlement amount."  And

 9  then -- sorry.

10          THE COURT:  Just to be clear, because that was pretty

11  fast what you're doing there.

12          MR. MARKETOS:  Yeah, it was.

13          THE COURT:  There's a provision about Janssen

14  reimbursing or paying back to the Government, but you've

15  redacted what dollar amounts are involved.

16      Is that correct?

17          MR. MARKETOS:  That's right.

18          THE COURT:  Okay.

19          MR. MARKETOS:  And so, of course, it goes to the

20  essence of the Government requiring payback.

21          THE COURT:  And the CIA doesn't address the

22  reimbursement piece or the payback to the Government piece?

23          MR. MARKETOS:  It addresses that there's a settlement

24  agreement where they shall pay.  It doesn't address with the

25  specificity that there's -- it's payments for Medicare and

1   Medicaid monies.

2            THE COURT:  Okay.

3            MR. MARKETOS:  Okay.

4            THE COURT:  I got it.

5            MR. MARKETOS:  So that's the gist of the specificity

6   there, and that's why we need to get into it.

7            THE COURT:  Okay.  I understand, Mr. Marketos.

8        Mr. Wyatt, are you addressing this?

9            MR. WYATT:  Yes.  Good morning, Your Honor.

10           THE COURT:  Good morning.

11           MR. WYATT:  Our concern remains that this is piling

12  on, and I think there's other aspects of the settlement

13  agreement, particularly in the first passage that was

14  identified by counsel, where in addition to the parts that

15  were highlighted, it also gets into the specific indications

16  of the drug, the specific indications for which it was

17  marketed that were not on the label.  And so we're starting to

18  get into the granular details of the drug that I thought we

19  were trying to stay away from.

20           THE COURT:  Are there other areas that you think

21  should be redacted?

22           MR. WYATT:  I don't know that redaction would solve

23  it.  I remain concerned, apart from that, that we're just

24  piling on by suggesting to the jury that there was some sort

25  of acceptance of responsibility or some validity to the

1    allegations.

2            THE COURT:  I thought there was some language,

3    though -- remind me -- I thought -- and I haven't seen it.

4    This is the first time I'm really looking at this agreement.

5    But isn't there language in this agreement -- I mean, almost

6    every settlement agreement would have some language that

7    states this is not admission or some words to that effect.

8        Is there that language there?

9        MR. WYATT:  There is, Your Honor.

10       THE COURT:  Can I see it?

11       MR. WYATT:  Yes, Your Honor.

12       May I approach with a copy of the agreement for the

13   Court?

14           THE COURT:  Yes, that would be even easier.

15       Liz, do you want to grab that?

16       Sorry.  Liz is -- she's, like, what's going on here?

17   So thanks, Liz.  Liz is helping out this morning for Kim.  So

18   Kim will be here later this afternoon, but we're very

19   appreciative that Liz is here.

20       So we're in paragraph J?

21        MR. WYATT:  I believe so, Your Honor.  Let me just

22   find my copy.

23       Yes, that's right.  Compromise the disputed claims.

24   The agreement is not an admission of facts or liability by the

25   defendants.

```
 1        But we're really asking the jury to parse this and sort
 2   of interpret a settlement agreement.  And I just think it's
 3   too far down the rabbit hole.
 4        THE COURT:  Well, let me ask you this, because I know
 5   we talked about this briefly, now that I see the language
 6   here.
 7        I mean, you have the opportunity to not have them
 8   locate this language somewhere in the agreement during
 9   deliberations.  You have the opportunity in real time to
10   highlight this language for the jury.  No?  Which I presume
11   you would do if I admitted this document.
12        So how is it kind of hidden in there where they may or
13   may not appreciate it when -- I mean, you all are highly
14   competent counsel.  I'm confident that you will put this
15   before the jury, and I would permit it.  Because if the
16   document is admitted, any portion of this agreement, as long
17   as there's no redactions, can get before the jury.
18        So doesn't that address the concern that they might
19   improperly presume that this is an admission or that there was
20   some other meaning behind it?
21        I'm asking you.
22        MR. WYATT:  Yeah.  I mean, Your Honor, correct.  I
23   agree with Your Honor's suggestion that we could get into this
24   provision if the document comes in.
25        My concern is more just getting to the document in the
```

*United States District Court*
*District of New Jersey*

```
 1   first place because we're getting really into sort of
 2   collateral levels and granular levels of details about these
 3   other cases.  And we've already sort of seen the way this is
 4   used yesterday as really more of a propensity type of argument
 5   that I thought we were not going to get into with these
 6   documents.
 7          There was testimony from -- there were questionings --
 8   questions to Mr. Mattes saying, "In fact, the Government has
 9   had enforcement actions about specific drugs that you were
10   selling before, Topamax, right?"
11          And then later, "And that, sir, Topamax, that was a
12   drug that you were overseeing at Ortho-McNeil."
13          So the way we're seeing these questions being put to
14   the witness and the way that the CIA and the settlements are
15   being referenced is really to say, You did this once; aren't
16   you just doing it again here--
17          THE COURT:  Well, I don't agree with that.  I -- I
18   understand there's a concern there about that, but that's why
19   you have an instruction.  Right?  We provide an instruction
20   with the corporate integrity agreements.  There's no reason
21   why I wouldn't have a similar instruction for the settlement
22   agreement.  And those instructions will be given to the jury
23   during deliberations, not only verbally but in writing because
24   they always get a few copies, at least my practice, of the
25   instructions with them so they can refer to them as needed.
```

1        So I think there's a protection there.  I don't think

2    Relators' counsel went into propensity at all.  I think what

3    they're attempting to establish, which I allowed, was, you

4    know, this is important, that this is an issue that you dealt

5    with before with the United States, or with the Government,

6    however we want to say it.  And so you're aware of these

7    issues.  Right?  It goes to materiality, and it goes to

8    absence of mistake and other issues but not propensity.  In

9    fact, they are directed that they can't consider this evidence

10   of propensity.

11       And I will tell you now that if I admit it, I'm going

12   to give that instruction.  Whether you all want me to say that

13   in real time or just make sure that it's part of the

14   instruction in the final instructions, I think that's going to

15   be critical because evidence like this has been admitted in

16   different trials, as long as the jury's instructed on how they

17   can consider it.

18       So is there anything else about the agreement,

19   Mr. Wyatt?  I don't want to waste too much time, but I also

20   don't want to cut you off from building your record.

21       Is there anything more about the agreement that's a

22   concern for Janssen?

23        MR. WYATT:  No, I understand the Court's ruling.  I

24   guess I'll say I have concerns the instruction won't be

25   enough, just given the way the question went in, because I do

1  think it had at least aspects that were geared towards

2  propensity, and I think the questioning should stay away from

3  that.

4        THE COURT:  I will say this -- I'm sorry.

5        MR. WYATT:  I'm sorry.  I have one other issue that's

6  related to this, but if you want to --

7        THE COURT:  Well, let me just make one point to

8  Mr. Marketos.

9      I want to be very clear:  Any of your examination

10 questions regarding the CIA or the settlement agreement -- and

11 by the way, I'm inclined to admit it, so I'm going to admit it

12 based on the arguments -- I'm going to stop you.  And if I

13 find out that you've crossed the line in front of the jury

14 that's counter to my instruction, I may say something in front

15 of the jury to you about it.  So I want you to be very

16 cautious about leaning into propensity.

17     And by the way, I don't think you've done that yet, but

18 because Janssen is raising that concern, I understand that

19 they already believe that concern is there.  I'm not -- I

20 don't agree with Janssen on that point yet, but I also want

21 you to be mindful of that.

22     So are we clear that you can't be cross-examining or

23 trying to put before this jury some form of implication or

24 argument that because Janssen may have done something like

25 this in the past, that they've done it in this particular

1    case?  We're on the same page?

2         MR. MARKETOS:  We are on the same page, absolutely,

3    Your Honor.  And if you'll note, it's not just in -- cautious

4    with the witness.  You're absolutely right that this evidence

5    goes to the -- even before you get into 404(b) land, you know,

6    propensity, absence of mistake, opportunity, plan pattern, the

7    point of this examination -- this investigation was going on

8    while Mr. Mattes started running Tibotec and put this other

9    plan in place for Prezista and Intelence.  It goes to their

10   knowledge, and it goes to materiality.

11        THE COURT:  I agree.  I agree.

12        MR. MARKETOS:  So that's all I'm going to get into

13   with him.  He knew.  Janssen knew, he knew, et cetera.  Never

14   are you going to hear me say, You did it before and you did it

15   again.  That is --

16        THE COURT:  Well, it's going to have to be more than

17   just not saying the words.  Right?  If you make some

18   implication that to me resonates of that, there will be

19   trouble.  Do you agree?

20        MR. MARKETOS:  Yeah, I understand.  I just wanted to

21   frame this issue because I don't want to get afoul of the

22   Court's ruling, and I don't want to get pulled into a sidebar

23   on it.  The issue that we're going to be addressing is

24   knowledge and materiality.

25        THE COURT:  I got it.  All right.

1      What's the next issue, Mr. Wyatt?  Because I wanted to

2  make sure I don't --

3          MR. WYATT:  I appreciate that, Your Honor.

4      So related to this line of questioning, I really,

5  again, feel that the issue is sort of the DOJ's role or not in

6  these cases, has been implicated by the questioning yesterday.

7  Mr. Mattes was asked, "And you're aware of the fact that there

8  were allegations brought by whistleblowers about Topamax that

9  resulted in a corporate integrity agreement that Janssen

10 entered into with the federal Government?

11     And I think we're back sort of where we were with the

12 first witness, where there's been an attempt to equate those

13 types of cases with the current one where the Government is

14 not involved.  And so we would ask for an instruction at the

15 conclusion of this witness's testimony that kind of combines

16 the two instructions that the Court has given previously but

17 in connection with this testimony.

18     And it would be "You have heard additional testimony

19 referencing Janssen's corporate integrity agreements with the

20 Government.  I previously instructed you on the limited

21 purposes for which you may consider those agreements.  Since I

22 gave you that instruction, you have also heard that these

23 corporate integrity agreements were reached as a result of

24 allegations in cases brought by whistleblowers.  I am now

25 instructing you that the Government was involved in those

 1   cases, but as I instructed you previously, the Government is

 2   not involved in this case for purposes of this trial."

 3         THE COURT:  All right.  Any objection to that?

 4         MR. MARKETOS:  Yeah.  I do object to that,

 5   Your Honor.  They're trying to draw a distinction between the

 6   cases that were settled that were originally brought by

 7   whistleblowers as a -- sorry -- a backdoor way to get the

 8   declination.

 9         THE COURT:  Well, I mean, the counterargument to that

10   is, Look, you are bringing in these prior matters, right, for

11   purposes of knowledge and materiality.  So you're making some

12   analogy to that prior conduct, that they are aware of conduct

13   like this.  So if we don't say anything and I give no

14   instruction, then do they get confused that maybe the

15   Government's involved in this case?

16         MR. MARKETOS:  To say that the Government is not

17   involved would itself be misleading.  The Government filed a

18   statement of interest in this case on falsity and materiality.

19   And so -- and we are bringing the case on behalf of the

20   Government.  And at the end of the day, if there's a

21   resolution, if there's a jury verdict, if there's a

22   settlement, the Government is going to be involved.

23         So they remain involved; they are just not prosecuting

24   the case themselves.  And so this attempt is essentially to

25   say because the Government is not litigating the case, that

```
 1    somehow it's different and less important.

 2            THE COURT:  Let me ask you this, because I don't have

 3    any proposal from Relators:  Is there a way to fashion an

 4    instruction that walks farther away from some potential

 5    implication about Government not intervening in this case?

 6            MR. MARKETOS:  I'd have to -- that's the first I've

 7    seen of the proposal they just referenced, Your Honor.  I'd

 8    have to get together with Mr. -- with my colleagues and figure

 9    it out.

10            THE COURT:  All right.  I'm not objecting necessarily

11    to providing an instruction, Mr. Wyatt.  My concern is the

12    issue raised by Mr. Marketos, which is that getting too close

13    to the line of really putting before the jury that the

14    Government got involved in that case, in the prior case but

15    not this one -- I think some instruction may be appropriate,

16    so I don't disagree with Janssen, but I'm not so comfortable

17    with the language that you proposed.  I think there's some

18    language that I think would be -- I think is more prudent,

19    that is a little farther away from that line of the

20    Government's lack of intervention in the case.

21        So that's where I land for now, but I don't have

22    anything else before me.  So are you all going to kind of meet

23    and confer on that to try --

24            MR. WYATT:  We will, Your Honor.

25            THE COURT:  -- to formulate an instruction?  If
```

1    there's still an impasse, I can make the decision.  But I at

2    least want to get some proposal from Relators' counsel, or

3    maybe there's some compromise that you'll agree with.

4         But I'm inclined to give some instruction here as a

5    reminder but not specifically the language that you're

6    proposing just yet.

7         Does that make sense?

8         MR. WYATT:  Understood, Your Honor.  We'll work with

9    them.

10        I do want to clarify one issue about the Government's

11   statement of interest in this case because it's come up a

12   couple of times now.

13        THE COURT:  Well, it's not before the jury, right?

14        MR. WYATT:  It's not, but also it took no position

15   expressly on the merits.  So there's no statement that I'm

16   aware of in this case where the Government said, This is

17   material to us.  That's not part of the record.

18        THE COURT:  I got it.  I understand that.

19        All right.  So -- but that's an issue you're putting on

20   the record for me.  Okay.

21        MR. WYATT:  Yes.

22        THE COURT:  Look, for now, I'm tabling this

23   instruction, but let me ask you this:  This instruction that

24   you're asking for, is that something that you're asking me to

25   provide not just in the final instructions but after

1    Mr. Mattes's testimony?  Or after -- when will the settlement

2    agreement be admitted?

3         MR. MARKETOS:  It would be admitted during the course

4    of his testimony.

5         THE COURT:  All right.  So are you asking for that

6    instruction or some instruction, Mr. Wyatt, at the conclusion

7    of Mr. Mattes's testimony?

8         MR. WYATT:  That's correct, Your Honor.  We can do it

9    at the start of the afternoon, if I understand the sequence of

10   events planned for today.  Number one.

11        But number two, I now have a concern about this coming

12   in with Mr. Mattes, because this settlement that we've been

13   discussing, I believe, is about Risperdal, not about Topamax,

14   and I don't know that he has any knowledge about -- or maybe

15   he does.  I don't know.  But that's not what the questioning

16   yesterday was about.  It wasn't during his tenure at Tibotec.

17        THE COURT:  Mr. Marketos?

18        MR. MARKETOS:  Well, I'm sorry, Your Honor.  The

19   investigation was while he was there, and that's part of why

20   they -- they started doing these compliance steps later on

21   between 2010 when he was there and 2013.

22        There's -- you'll see the ramp-up, and this is what was

23   in Your Honor's limine motion, that they were trying to

24   comply, not just with the 2010 corporate integrity agreement

25   but in 2010, 2011, 2012 before 2013 was --

```
 1          THE COURT:  Well, the agreement can come in.  I mean,
 2   we'll get to this.  The agreement is coming in.  So whether
 3   Mr. Mattes has personal knowledge or can testify to it is a
 4   second issue.  And we'll talk about that a little bit this
 5   morning.  But there are two issues here when it comes to
 6   admissibility and what a witness can speak on.
 7          So for now, I mean, if you want to raise -- if there's
 8   an objection, Mr. Klein -- it's your witness, right?
 9          MR. KLEIN:  Yeah.
10          THE COURT:  So if there's an objection on something,
11   then I'll deal with it in realtime.  But I'm going to alert
12   you to that there's a difference between whether this document
13   is coming in, which it is, versus whether Mr. Mattes has any
14   personal knowledge of which he can speak to it.  But you
15   telling me he has no personal knowledge will not be
16   sufficient.
17          What I would have told you later this morning, but I'll
18   get ahead of myself, is Mr. Marketos or Relators' counsel,
19   whoever has the witness, can ask a witness whether they have
20   knowledge of a particular document.  It may be just as
21   relevant to them that a witness has no knowledge of something.
22          So the proffer itself will not prohibit the
23   questioning.  But once a witness says, I have no idea what
24   this is, eventually we're going to get to it's been asked and
25   answered.
```

1    Now, that objection hasn't been made over the last

2  couple of days.  I will tell you there have been plenty of

3  occasions where it could have been made.  But if you get to a

4  point where you're asking somebody about a document and they

5  say, "I have never seen this in my life.  I don't know

6  anything about it.  No."  And then you're going to take them

7  through eight different pieces of the document, to me it's

8  like beating a dead horse.  It's, like, the person's already

9  said they have no idea what this is.  They've never seen it in

10  their life.  So I think it's clear to a jury that every

11  paragraph of the document will be unknown to that particular

12  witness.

13    It would be different if you're refreshing a witness's

14  recollection.  They don't know if they've seen it.  So you're

15  trying to alert them to other parts of a document to see

16  whether that shakes something in their head, to alert them to

17  it or to refresh their recollection.  But I think that's a

18  separate question.

19    So all right.  I've made my ruling on the settlement

20  agreement, but let me just be clear.  Now that it's coming in,

21  is there anything else besides the objection that Janssen's

22  made that you're concerned about?  Like, the naming of the

23  drug.  My understanding is that that's not really an issue

24  anymore, that the parties have come to an agreement that

25  instead of qualifying that it's a drug in a protected class or

 1   something like that, a particular drug can be mentioned.  Is

 2   there anything else like that that we need to redact out of

 3   this before it's admitted?

 4            MR. WYATT:  Let me take another final look at it,

 5   Your Honor, and --

 6            THE COURT:  All right.  If there is, why don't you

 7   guys confer, but let me be clear about that.  I've already

 8   ruled that the pieces that are material to the Relators' case

 9   that they were intending for this document to come in, those

10   are not going to be redacted.  Right?

11            MR. WIRMANI:  Understood.

12            THE COURT:  That's the specificity of the allegation,

13   the specificity of the payments to the Government, those types

14   of things.  But if there's something else in here that really

15   doesn't go to the issue, Mr. Marketos, but gets you what

16   you're looking for and that I've ruled in your favor, then I'd

17   ask you to meet and confer because those redactions might not

18   be in dispute.

19        So that's what I want to say about it.

20            MR. WYATT:  At one point -- clarification.  Sorry,

21   Your Honor.  I think the language I was pointing out

22   previously about the specific off-label indications, the Court

23   suggested perhaps those would be redacted.  The Court hasn't

24   ruled that part is in.  That's something we can still

25   discuss --

1          THE COURT:  Sorry.  Which part?

2          MR. WYATT:  The issue where it's talking about the

3    specific off-label indications that Risperdal was marketed

4    for.

5          THE COURT:  Yeah.  I mean, I don't know if that

6    matters as much, Mr. Marketos.  This isn't a case about

7    Risperdal.  Now, that level of specificity as to what

8    specifically might have been off-label about that drug, I

9    think you can all work out doesn't really move the ball

10   forward for this jury.  I think the specificity of, like, the

11   type of off-label, you know, whether it's speaker

12   engagements -- I haven't reviewed this whole document, to be

13   candid with you -- so anything like that I understand I'm

14   allowing in.  But if there's some kind of level of specificity

15   that's so tailored to Risperdal that it really isn't relevant

16   to this case, I want you to look at that.

17         MR. MARKETOS:  Yes, Your Honor.  I think, and I hope

18   not, but I think that they're talking about the fact that it

19   was off-label because it was misrepresenting the safety and

20   efficacy?

21         MR. WYATT:  No, no.  The actual indications getting

22   into the details -- the parts you want is not what -- that you

23   had highlighted is not what I'm talking about.

24         THE COURT:  You'll work it out.

25         With that, what are the other issues we have to talk

 1    about this morning?

 2         MR. MARKETOS:  Nothing, Your Honor.  I think you were

 3    addressing the issue that we've had with the documents.

 4         THE COURT:  Yeah.  I'm back to where I was, folks.

 5         All right.  I've got the cases.  I've read them.  I

 6    will tell you, Mr. Marketos, we're just going to have to agree

 7    to disagree.  To me there's some analysis that the Court has

 8    to do.  I can't presume with every document that has been

 9    produced by Janssen that they're somehow per se admissible.

10         For me, I have to look at -- and I'm just looking at my

11    notes, right, from this morning and last night.  When I look

12    at 801, I have to look at, you know, some of the things that

13    would make the document not hearsay.  So are they offered

14    against opposing party?  Were they made by the party's agent

15    or employee?  Was it made during the course of the

16    relationship?  Does it relate to a matter within the scope of

17    the agency employment?

18         So I'm not saying you don't have -- you're incorrect in

19    your argument that many of these documents may be admissible.

20    But for me, I'm going to continue to look at each document on

21    a case-by-case basis.  That hasn't slowed up the trial

22    significantly.  I think the witness testimony has been a

23    little slower than anticipated.  But every once in a while, if

24    there's an objection on the exhibit, I'm going to handle those

25    on a case-by-case basis because there may be an argument there

1    that one of those factors does not apply.  And Janssen has the

2    ability to do that.

3         The other piece I'll say is even if it's admissible,

4    there is an issue as to whether a witness has personal

5    knowledge to testify to it.  But what I've said earlier, and

6    I'm going to repeat this for both counsel, is, either counsel

7    can ask a witness about their knowledge about a document.

8    Right?  Because you have to establish to the jury and on the

9    record whether they know about it or not.

10        That's not going to come through a proffer.  It's not

11   going to come from, The person's title is this and therefore,

12   they couldn't have had knowledge of a document.

13        You get to ask a witness whether they know something

14   about something or not, but once they've established clearly

15   that they really don't know anything about it, move on because

16   at that point you've established the lack of knowledge.

17        There's no refreshing recollection, and so I think

18   there, there's a redundancy that's been happening we're, like,

19   let's now go through multiple pieces, and that doesn't apply

20   just to Relators' counsel.

21        That's equally applying to the folks at Janssen.

22   You're going to be calling witnesses directly at some point in

23   the trial, and even if you're cross-examining a witness and

24   putting up documents, I'm going to equally apply that theory

25   of the law, that once the witness has established lack of

1    knowledge.

2         That being said, I also want to be clear you get to

3    establish that, you know.  You can't just tell me, The witness

4    has no knowledge, Your Honor, we object.  Well, I don't know

5    that.  The jury hasn't heard anything about that.

6         And like I said, it could be material to either side or

7    relevancy or case or defense, that a witness is saying to a

8    jury under oath they have no idea what this is.

9         So for those reasons, we're back to square one.  I'm

10   not telling you that you're prohibited from revisiting this

11   issue, but we've talked about it twice, and neither side has

12   convinced me to go in a particular direction.

13        So I would say -- strongly suggest that this is where

14   I'm likely to rule throughout the trial, that we're going to

15   deal with these documents on a case-by-case basis.

16        I will tell you that I don't think that either side has

17   been -- overly objecting to documents.  You guys have come to

18   an agreement on a multitude of exhibits.  I've heard no

19   objections on exhibit more times than I've heard objection.

20        So again, I don't think that's a real problem in the

21   trial, and I think it's better for the Court to do that full

22   analysis with each document, because I don't know every

23   document either side is going to present to the Court, and to

24   make that analysis prematurely without putting my eyes on it I

25   think is a mistake.

 1          So that's where I land on that.

 2          So anything else you all want to put on the record

 3   about it, I'm happy to hear, but it won't change my mind.

 4   How's that?

 5          MR. MARKETOS:  Completely understood, Your Honor.

 6   And let me just make one point of clarification, if I may, and

 7   then I'll...

 8          There are documents for which Janssen has not even

 9   objected because they are documents on the exhibit list, some

10   of which are even on their exhibit last.  They're Janssen

11   documents.  They're party admissions.  They come in.  They're

12   relevant.

13          They're admissible because they're party opponent

14   statements, and they're clearly -- like a compliance document,

15   for instance.  It's Janssen's compliance document.  It's a

16   deck.  It comes in because there's no objection on hearsay.

17   It's a party opponent statement.

18          What they're -- what we've been facing is that they're

19   objecting to the admission of the evidence with that witness

20   who says he doesn't know about it, and those are two different

21   issues.  The document is admissible, and then the witness's

22   personal knowledge, he can answer yes or no.

23          THE COURT:  Well, I think I just ruled that I

24   somewhat agree with you there because a settlement agreement

25   is coming in, and I think there was an issue as to whether Mr.

1   Mattes could speak to, and that to was a second issue.

2           MR. MARKETOS:  Right.

3           THE COURT:  That was not an issue of admissibility.

4   It was more of an issue of whether the witness could testify

5   to the document.

6       So I don't -- I think we might be on the same page

7   there, Mr. Marketos, so -- but again, here's what we're going

8   to do.

9           It would be better if you all kind of had a discussion

10  about exhibits the day before and if there's no objection, you

11  could easily move in 15 exhibits.  They say no objection, and

12  they're admitted, and we don't have to waste time on every

13  single document.

14          But if that's not going to happen, then every time you

15  move to admit a document, whether from the Relators or

16  Janssen, I always just sit back and wait, because I need to

17  know, Is there an objection to the document?  And if so, I

18  have to address it.

19          So I'm not telling you all what to do, but if there

20  really are 15 or 20 documents you intend to use in a

21  particular day or next week, why not just confer?  Because

22  your trial time will be much more expeditious if you're just

23  saying, Your Honor, we have an agreement here, we're just

24  going to move in the following 20 exhibits.

25          I say, Any objection.  The response is, No, and I say,

1    So admitted.

2         So I leave that to the parties, but I also believe that

3    if you're going to do that now as the Relators' counsel, then

4    you all should be, in good faith, doing that for Janssen as

5    well.  That's why I put it to both sides.

6         But you can save a lot of time, but if you're not going

7    to do that, I'm not even going to give you that ruling, like,

8    Oh, this PowerPoint presentation, Your Honor, those are all

9    party opponent statements and they should be admitted.

10        I have no what is in the PowerPoint.  There could be

11   something else that's going on in the document.  So for me to

12   say this morning, You're right, those are all admitted, I

13   won't entertain an objection from Janssen, I'm not doing that

14   because I have no idea what is in there.

15        And the objection could be something other than this

16   issue about whether it's a statement of a party opponent.

17   That is just one particular issue on an objection which gears

18   with whether a document is hearsay or not.

19        There could be an objection on something that's, you

20   know, overly prejudicial.  There could be some other objection

21   that is unrelated to 801 (D)(2)(d).

22        So again I think we need to be careful about saying, If

23   a document is not hearsay, it's a statement of a party

24   opponent, it's admissible, despite the fact that there could

25   be 14 other objections to the admissibility of that document

 1   unrelated to whether it's hearsay or not.

 2        So do you see my point there?

 3        MR. MARKETOS:  Absolutely, Your Honor.  Heretofore,

 4   the objections are --

 5        THE COURT:  Hereto what?

 6        MR. MARKETOS:  Heretofore.  I just learned that, I

 7   just learned that.  Do you mind if I use it again?

 8        THE COURT:  I know, but you're in Jersey.  I don't

 9   think I've ever used that term in speech or in writing in my

10   life.

11        MR. MARKETOS:  What if I use a southern accent?

12        THE COURT:  That's fair.

13        MR. MARKETOS:  To this point -- to this point the

14   objection has been in each and every case, even for documents

15   that they have not objected to on the witness list, this

16   witness doesn't know about it.

17        THE COURT:  I know.  I get it, and we've talked about

18   this morning -- and I think Janssen's counsel is listening to

19   what we're saying, and they might want to respond, but I'm

20   saying -- you all hear me, that that's not really going to

21   carry the day.

22        And I think I've addressed that this morning.  If a

23   document is admissible, the issue of the witness is a little

24   bit different on a party opponent statement.  It's going to be

25   more about, Is this witness going be able to speak about this

```
 1    thing or not.

 2         And if they can't, folks, then we're going to have to

 3    move on, right?  We're not going to ask 20 questions to

 4    establish a witness has no knowledge of a document when two or

 5    three would be do.

 6         I'm not going to stop you at one because I think there

 7    are times where a witness might say they know nothing about

 8    something, and if you rephrase the question a few different

 9    ways, all of a sudden it triggers something.

10         So I'm going to give you all some latitude on that.

11    But we all know eventually when a witness is saying, You can

12    ask me this eight ways to Sunday, I have no clue what you're

13    talking about.

14         So all right.  Those were two issues.  Do we have

15    anything else we needed to chat about this morning, only

16    because we have a few minutes before the jurors arrive?

17              MR. MARKETOS:  Not from Relators counsel.

18              THE COURT:  Ms. Brown?

19              MS. BROWN:  Your Honor, I do have an update on

20    Dr. Sue, but I'm happy to do it at lunch, if you want to get

21    the jury in.  I don't want to hold us up.

22              THE COURT:  Well, you don't think we're going to need

23    to deal with that -- well, no, we're not dealing with that

24    this morning.  That's for May 30th.

25              MS. BROWN:  Correct.
```

```
 1              THE COURT:  Can we talk about that at lunch?

 2              MS. BROWN:  Absolutely.

 3              THE COURT:  But I do want to address and resolve that

 4   issue, folks, today.

 5              MS. BROWN:  Yep, sure.

 6              THE COURT:  And can I ask you one other thing,

 7   Ms. Brown?  The information you have, have you already met and

 8   conferred with Relators' counsel?

 9              MS. BROWN:  No, but I'll do that, Your Honor.

10              THE COURT:  So let's do that first because I don't

11   even know --

12              MS. BROWN:  Sure.

13              THE COURT:  -- if there's an issue yet before me.  So

14   all right, folks.  I'm going to give you that time, but lunch

15   break then, we're going to use five minutes or so before I

16   dismiss you or -- I don't know if you're starting, we'll deal

17   with it, you know, five minutes before we get the jury back.

18         I prefer to address that issue before I adjourn you all

19   for lunch.

20         Also remember, we're on a much tighter schedule, folks,

21   so I don't know if you're brown bagging it or what you're all

22   doing, but the jurors are ready to go in 30 minutes, and I'm

23   going to ask you all to continue to do that too so that we're

24   not cutting more into the time that you all need, and we're

25   adjusting the schedule.
```

1          MR. MARKETOS:  Yes, Your Honor.  I lost facial

2      awareness yesterday.  What -- what -- what is the Court's

3      preferred schedule on stretch break and lunch, what timing now

4      that we're going to five, nine to --

5          THE COURT:  I have no idea because it came up

6      yesterday for the first time.  So after the lunch break, we're

7      going to five o'clock.  That's a long span.

8          So what I'm going to do is around, you know, 2:30,

9      3:00, around the same time, I'm going to give them that break.

10     If they want another break, I'm going to give it.

11         One thing I didn't say yesterday that I should have is

12     someone at counsel's table might need that second break, so

13     you all just have to just ask, Your Honor, do you mind if we

14     take a brief recess or something here, whatever you want to

15     do, and I'll make that another stretch break.

16         So I'm kind of using the jury as my guide, but that

17     doesn't mean that we can't take a second break in the

18     afternoon, especially on a long stretch.  And you guys are

19     doing all the work in the well.

20         So if somebody needs a break outside, let me know.

21     Unless you're all telling me collectively, Why don't we

22     establish two short breaks so that we just do it.  I just

23     worry that the jury yesterday was like, We don't need it.

24         MR. MARKETOS:  Yeah, I know they didn't.  I get it.

25     I get it completely.  I had actually forgotten yesterday that

```
 1  we had taken a break in the afternoon by the time we got

 2  there.  So I appreciate it, Your Honor.

 3        If we can just say, Is now a good time for a break?

 4        THE COURT:  I'll do that for the first break, and

 5  then the second one, I guess, is discretionary.  How is that?

 6        MR. MARKETOS:  That will be fine, Your Honor.

 7        THE COURT:  So we may have two.  We may have one.

 8  Ms. Brown, any objection to that?

 9        MS. BROWN:  Not at all.

10        THE COURT:  All right.  Anything else substantive

11  other than the witness issue that we're tabling?

12        MR. MARKETOS:  No, Your Honor.

13        MS. BROWN:  No, Your Honor.

14        THE COURT:  All right.  So I have nothing on my

15  plate.  I just want to make sure:  Is there anything before me

16  that I haven't addressed?

17        MR. MARKETOS:  No, Your Honor.

18        THE COURT:  All right.  So then, look, you're -- give

19  me a few minutes, if you want to collect yourselves.  You

20  want -- you want five minutes and then I'll make sure the

21  jury's ready to go?

22        MR. MARKETOS:  That would be great, Your Honor.

23        THE COURT:  Let's do that.  We're in recess for five

24  minutes.  Everybody remain seated.

25            (A short recess occurred.)
```

*United States District Court*
*District of New Jersey*

MATTES - DIRECT - MARKETOS

```
 1              THE DEPUTY COURT CLERK:  Remain seated.

 2              (Jury enters courtroom.)

 3              THE DEPUTY COURT CLERK:  Please rise.

 4              THE COURT:  Folks, everybody have a seat.  Members of

 5     the jury, welcome back for another day.

 6          We're going to continue with witness testimony.  You

 7     may have noticed Liz is in here today without Kim, so we're

 8     just changing faces on you.  I think Kim will be back later on

 9     this afternoon, but, you know, everybody pitches in when

10     things are going on, so I just wanted to thank Liz for her

11     help this morning.

12          Mr. Marketos, if you're ready to proceed, we can

13     continue with the examination.  And, Mr. Mattes, just as a

14     reminder, you'll still under oath from yesterday.

15              THE WITNESS:  Yes, sir.

16              THE COURT:  All right.

17              MR. MARKETOS:  Thank you, Your Honor.

18     (DIRECT EXAMINATION BY MR. MARKETOS:)

19     Q.  Mr. Mattes, good morning, sir.

20     A.  Good morning.

21     Q.  We left off yesterday and we were talking about a

22     corporate integrity agreement that had been entered into with

23     Ortho-McNeil, Janssen, and the federal government.

24          Do you recall that discussion?

25     A.  Yes.
```

MATTES - DIRECT - MARKETOS

1  Q.  The investigation that led to that agreement with the

2  Government actually began a few years before 2010.

3       Do you recall that?

4  A.  Yes.

5  Q.  You actually yourself, were you involved in that

6  investigation, sir?

7  A.  Not directly.

8  Q.  All right.

9       How about indirectly?

10 A.  I might -- I don't know what indirectly really means but

11 not directly.  Might have heard about it, but I was never

12 questioned or -- that I recall.

13 Q.  Okay, sir.

14      And in fairness, sir, at the time that you were over at

15 Janssen and you were operating to get Prezista and Intelence

16 into the marketplace, you were aware about that investigation

17 that led to the corporate integrity agreement.

18      Correct?

19 A.  Yes.

20 Q.  All right.

21      And you were aware of the fact that speaker programs or

22 inducement to doctors were an issue for the Government.

23      Fair?

24 A.  I don't recall that that was the specific issue, but I

25 there was an investigation.

─MATTES - DIRECT - MARKETOS─

1   Q.   And you are aware of the fact that off-label marketing of

2   pharmaceutical drugs was something that the Government was

3   investigating.

4        Right, sir?

5   A.   Yes.

6   Q.   You understood that the Government took those matters

7   very seriously at the time.

8        Right?

9   A.   Yes.

10  Q.   And that the Government ultimately, if it discovered that

11  there was off-label marketing that's taking place by a

12  pharmaceutical company and Medicare or Medicaid has reimbursed

13  for those drugs, it will demand that money back to the

14  Government.

15       Right, sir?

16  A.   That is -- that is one resolution.

17  Q.   Yeah.

18       You knew that at the time that you were operating this

19  Janssen, Tibotec selling Prezista and Intelence --

20  A.   Yes.

21  Q.   -- fair?

22       All right?

23       And, sir, your compliance department, that was a

24  department that also reported to you at Janssen.

25       Right?

─────MATTES - DIRECT - MARKETOS─────

1    A.   On a dotted line basis, yes.

2    Q.   So the compliance department, did that include

3    individuals like Ms. Catherine Kaucher?

4    A.   I don't remember Catherine, but she was part of the

5    group.

6    Q.   All right.

7         And the compliance department within Johnson & Johnson

8    and at Janssen disseminated information to the employees of

9    Janssen to explain to them that off-label marketing was

10   prohibited.

11        Do you recall that?

12   A.   Yes.

13   Q.   And if we take a look at RX 275, this is also Defendants'

14   Exhibit 229, see if you can identify that when it comes --

15   when or if it comes up, Mr. Mattes.  It appears we've got an

16   issue with the screen.

17        MR. MARKETOS:  Your Honor, it looks like the court

18   system may be done.  Can we take a quick break?  I don't think

19   it's working.

20        THE COURT:  You guys want to work on it?

21        MR. MARKETOS:  Yes, if you don't mind.

22        THE COURT:  Oh, we're good.

23        MR. MARKETOS:  Oh, there we go.

24        THE COURT:  Every time you ask me, it's my voice that

25   fixes machines.  I think they get scared of me.

─MATTES - DIRECT - MARKETOS─

1          THE WITNESS:  Keep talking.  Keep talking.  Don't

2    stop talking.

3          MR. MARKETOS:  Just for the witness, if you could,

4    Ms. Johnson, and if it doesn't work, please let me know,

5    and --

6          THE COURT:  The witness has it --

7          MR. MARKETOS:  Okay, thank you.

8          THE COURT:  -- because I can see it.

9          MR. MARKETOS:  There we go.

10    BY MR. MARKETOS:

11    Q.  All right.

12          What I'm showing you, sir, is a compliance training

13    document from Janssen that was actually shown by Janssen's

14    counsel on the ELMO to Ms. Brancaccio.

15          MR. MARKETOS:  This is RX 275 and DX 229.  We'd offer

16    this exhibit.

17          MR. KLEIN:  No objection with the appropriate

18    redactions.

19          THE COURT:  All right.  And those redactions have

20    already been made?

21          MR. MARKETOS:  I'm not sure what they're referring

22    to, Your Honor, but what I can say is that we won't be getting

23    into any of that.

24          MR. KLEIN:  Okay.

25          THE COURT:  Let's sidebar because I just want to make

─────MATTES - DIRECT - MARKETOS─────

1    sure I'm clear before I let a document get published.

2              (Sidebar begins at 9:12 a.m.)

3              MR. KLEIN:  Your Honor, the only thing we're worried

4    about is I think there's a reference to settlement amounts,

5    monetary amounts in that --

6              THE COURT:  Oh --

7              MR. KLEIN:  -- in that document.

8              THE COURT:  Oh, we're good.

9              MR. KLEIN:  So if those are redacted, then we have no

10   objection.

11             THE COURT:  We're good.

12             (Sidebar was concluded at 9:12 a.m.)

13             (Open court.)

14             MR. MARKETOS:  All right.

15             THE COURT:  You may proceed.

16             MR. MARKETOS:  Thank you, Your Honor.  275 is

17   admitted?

18             THE COURT:  Yes.

19             MR. MARKETOS:  Thank you.

20   (Relators' Exhibit 275 in evidence.)

21   BY MR. MARKETOS:

22   Q.   If we turn to page 6, sir, this is a reference to

23   regulatory sales training, sales leadership and medical

24   affairs.

25             Do you see that?

————MATTES - DIRECT - MARKETOS————

1   A.   Yes.

2   Q.   And if we take a look at the next slide, what was being

3   explained to Janssen and its employees was why the healthcare

4   environment in this industry is so heavily regulated.

5        Do you see that?

6   A.   Yes.

7   Q.   Did you attend any of these compliance training courses?

8   A.   I -- I don't recall attending these.  I don't recall --

9   Q.   What's that?

10  A.   I don't recall attending.

11  Q.   Okay.

12  A.   I might have, but I don't recall.

13  Q.   You are aware of the fact that the compliance department

14  instructed Janssen employees that the healthcare industry is

15  unique, has an impact on health and safety of patients.

16       Right, sir?

17  A.   That's absolutely correct.

18  Q.   And that the Government reimburses a large percentage of

19  all prescription products, including Medicare and Medicaid.

20       Right?

21  A.   Yes.

22  Q.   The Government does not want to cover the cost of

23  prescription products when there are violations of the

24  Anti-Kickback Statute or the False Claims Act.

25       Correct?

─MATTES - DIRECT - MARKETOS─

1    A.    Yes.

2    Q.    Those, of course, are the two claims that Relators have

3    filed in this case.

4          Do you understand that?

5    A.    Yes.

6    Q.    The Anti-Kickback Statute, of course, relating to the

7    payment of -- or inducement of a physician in order to

8    prescribe Janssen's drugs, and the False Claims Act relating

9    to off-label marketing.

10          Do you understand that?

11    A.    Yes, I do.

12    Q.    And according to Johnson & Johnson's credo, they wanted

13    to ensure that business was conducted in an ethical manner

14    within the law.

15          Correct?

16    A.    Absolutely.

17    Q.    And if we look at the next page -- yeah, if we look at

18    the next page.

19          MR. MARKETOS:   Thank you.

20    BY MR. MARKETOS:

21    Q.    The noncompliance, Janssen's employees were told, could

22    result in fines, corporate integrity agreements, and exclusion

23    from doing business with the Government, specifically Medicare

24    and Medicaid.

25          Right, sir?

─MATTES - DIRECT - MARKETOS─

1   A.   Yes.

2   Q.   Serious business.

3        Do you agree?

4   A.   Yes.

5        MR. MARKETOS:  Now, if we take a look at Relators'

6   Exhibit 423, which is evidence.  This of course was the

7   corporate integrity agreement.  Oh, yeah.  Thank you.  Let me

8   turn back to page 7 of exhibit 275.  I actually want to take a

9   look at the notes down below.

10  BY MR. MARKETOS:

11  Q.   If we take a look at the notes down below of the slide,

12  what was being taught to Janssen employees was that -- was

13  that "the pharmaceutical industry is heavily regulated and

14  that Government does not want to cover the cost of

15  prescription products when there's a violation of the

16  Anti-Kickback Statute or the exchange of anything of value in

17  return for business."

18       Right, sir?

19  A.   Yes, we --

20  Q.   And that includes --

21  A.   -- discussed that.

22  Q.   -- the False Claims Act, selling off-label or

23  misrepresenting one of Janssen's products.

24       Correct?

25  A.   Yes.

MATTES - DIRECT - MARKETOS

1   Q.   And there are examples given at the bottom.

2        Do you see that?

3   A.   Examples of how much of our products are --

4   Q.   Give examples of our products' reimbursement rate.

5   A.   Yes, yes.

6   Q.   Do you see that?

7   A.   Yes.

8   Q.   The point being, sir, if there are products that are

9   being sold for reimbursement by Medicare and Medicaid and it

10  turns out that those were sold in violation of the law, the

11  Government is going to come back and get its money.

12  A.   Yes.

13  Q.   If we take a look Exhibit RX-1624.

14       Were you -- let me ask you this, sir.  You're aware of

15  the fact that after 2010, there was a second investigation of

16  Janssen by the Government relating to whistleblower

17  allegations.

18       Do you recall that?

19  A.   No, I don't.

20  Q.   Okay.

21       Did you leave Janssen before you learned about an

22  investigation by the Government after specific allegations

23  were brought by a separate whistleblowers relating to a

24  different drug?

25  A.   So you're saying in 2010 that began?

─MATTES - DIRECT - MARKETOS─

1  Q.  Yes, sir.

2      There was a -- and the jury has heard there was a 2010

3  corporate integrity agreement that was entered into.  We just

4  discussed that.

5      Right?

6  A.  Yes.

7  Q.  There was a 2013 one, three years later, that extended

8  for another five years until 2018.

9  A.  Uh-huh.

10  Q.  Are you aware of any of those facts?

11  A.  No.

12  Q.  Okay.

13      So during the time period in 2010 and when you left

14  shortly in 2011, you went on to other ventures.

15      Is that fair?

16  A.  After leaving Johnson & Johnson, yes.

17  Q.  Okay.

18      You went on to other ventures.  During that time period

19  between 2010 when the corporate integrity agreement was

20  entered the first time and when you left Janssen, you weren't

21  made aware of further investigations that the Government was

22  conducting with respect to another whistleblower lawsuit?

23  A.  I don't believe so.  I don't remember being involved.

24  Q.  All right.  Fair enough, sir.

25          MR. MARKETOS:  Take a look at Relators' Exhibit 1624

─MATTES - DIRECT - MARKETOS─

1  for the witness.

2        Your Honor, this is the 2013 settlement agreement.  We

3  offer this exhibit.

4         MR. KLEIN:  Objection, Your Honor.  He just testified

5  he doesn't know anything about it.

6        THE COURT:  Well, it's going to be admitted.  We just

7  talked about that earlier this morning.  But the last response

8  was "I don't believe so.  I don't remember being involved."

9        So I'm going allow the witness to look at the document

10 and see if that refreshes anything.  So for now, I'm going to

11 overrule the objection.

12        Mr. Marketos, you can continue, and we'll see where

13 that goes.

14         MR. MARKETOS:  Thank you.

15        If we take a look -- you can publish this to the jury.

16 BY MR. MARKETOS:

17 Q.  If we take a look at this document, this was a settlement

18 agreement between Janssen Pharmaceuticals and the Office of

19 the Inspector General of the Department of Health and Human

20 Services and a number of other Government agencies.

21        Do you see that, sir?

22 A.  Yes.

23 Q.  The date of this document, I can represent to you, sir,

24 is 2013, some time after you left Janssen.

25 A.  Thank you.  Yes.

─MATTES - DIRECT - MARKETOS─

1    Q.  But was it your understanding at any time that the

2    allegations that led to this resolution with the Government

3    were being investigated while you were still the president?

4    A.  I do not recall.

5    Q.  Do you recall allegations --

6         MR. MARKETOS:  If we take a look at page 4, please.

7    We'll go to the paragraph H.  Okay.  Thank you.

8    BY MR. MARKETOS:

9    Q.  Do you recall allegations relating to the promotion and

10   use of Invega for conditions for which it was not approved

11   safe and effective by the Food and Drug Administration?

12   A.  I don't even remember what Invega --

13   Q.  You don't remember Invega?

14   A.  No.

15   Q.  All right.

16        And specifically that there were false and misleading

17   statements allegedly made about that drug in the marketplace.

18   A.  I don't recall that.

19   Q.  Okay.

20        So you have no knowledge of the allegations relating to

21   Risperdal either.

22        Is that right?

23   A.  I don't recall -- I have -- I have no knowledge.

24   Q.  All right.  Fair enough, sir.

25        So looking at this document does not refresh your

1  recollection about those allegations?

2  A.   Certainly I know Risperdal.  I don't remember what Invega

3  was.

4  Q.   Let me stop there.  I don't want to talk at length about

5  the drug Risperdal.  I'm really focusing on whether you are

6  aware --

7  A.   Okay.

8  Q.   -- there were allegations of off-label use and violations

9  of the Anti-Kickback Statute, paying inducement to doctors to

10 sell that drug.

11 A.   Thank you for the clarification.

12      No.

13 Q.   And do you recall that that, in fact, investigation was

14 taking place while you were still at Janssen?

15 A.   I don't recall that.

16 Q.   All right.  Thank you, sir.

17      I'd like to turn your attention, sir, to the

18 forecasting that was actually taking place for Prezista and

19 Intelence while you were still the president at Janssen.

20      All right, sir?

21 A.   Yes.

22      MR. MARKETOS:  Let's take a look at RX-1776.  This is

23 an email, and you're on the email thread.  You can take a look

24 at 1776.

25 BY MR. MARKETOS:

─MATTES - DIRECT - MARKETOS─

1    Q.   This is a POA 1 objectives email that was sent to you by

2    Mr. Iacobellis that you ultimately responded to.

3         Do you see that?

4    A.   Yes.

5    Q.   All right.

6         MR. MARKETOS:  We offer Relators' 1624.  Excuse me.

7    1776.

8         MR. KLEIN:  No objection, Your Honor.

9         THE COURT:  So admitted.

10        MR. MARKETOS:  Thank you.

11   (Relators' Exhibit 1776 in evidence.)

12        THE WITNESS:  Could you enlarge the document, please.

13        MR. MARKETOS:  I'm sorry, sir?

14        THE WITNESS:  Could you enlarge the document.

15        MR. MARKETOS:  Sure, absolutely.  I'll enlarge it.

16        If you can turn to page 2 of the attachment.

17   BY MR. MARKETOS:

18   Q.   There's a department do's and don't's.

19   A.   Thank you.

20   Q.   All right.

21        There's a reference here from you, sir, that says, "I

22   want to remind you of the expectation I have for you."

23        Can you see that?

24   A.   Let me find that, please.

25   Q.   Sure.

MATTES - DIRECT - MARKETOS

1    A.    What am I looking for again?

2    Q.    Let's turn to the next page.

3    A.    Okay.

4    Q.    Do you remember sending this?

5    A.    No, I don't remember sending this.

6    Q.    Fair enough.

7        If we take a look at the next page, there's a reference

8    to you wanting to remind your employees of the expectations

9    you have for them.  And you actually state, "For the sales

10   organization, it's imperative they realize the goal of driving

11   broader audience penetration of Prezista."

12   A.    Okay.

13   Q.    So do you recall, sir, wanting to drive broader audience

14   penetration of Prezista in January of 2007?

15   A.    As I read this -- I know I'm not answering your question.

16   I'll answer the question yes, broader audience penetration

17   means more users.

18   Q.    I understand.

19       More users of the drug.

20   A.    Correct.

21   Q.    The goal was to drive more users.

22   A.    Get more -- yes.  Get more utilization of the product.

23   Q.    Okay, sir.

24       MR. MARKETOS:  If we take a look at Exhibit 1778.

25   Excuse me.  1777.

─MATTES - DIRECT - MARKETOS─

1    BY MR. MARKETOS:

2    Q.   There's a scenario that was provided to you by Mr. -- how

3    do you -- is it Francois?

4    A.   Francois, yes.

5    Q.   All right.

6         What was Francois doing?  What was his job?

7    A.   So at that time he was the vice president of sales and

8    marketing.  He left shortly into post-launch.

9    Q.   All right.

10        We can see there's an attachment, 1777, and Francois

11   was sending two different scenarios showing forecasting for

12   the growth of this drug in the marketplace.

13        Do you see that on Relators' Trial Exhibit 1777?

14   A.   I see the graph, yes.

15   Q.   All right.

16        MR. MARKETOS:  We'd offer 1777.

17        MR. KLEIN:  No objection, Your Honor.

18        THE COURT:  So admitted.

19   (Relators' Exhibit 1777 in evidence.)

20   BY MR. MARKETOS:

21   Q.   What we can see here, sir, is that as of 2006, Janssen's

22   original forecast for the sales of Prezista had been adjusted

23   downward from $45 million to $22 million for that year.

24        Correct?

25   A.   I don't remember the specific numbers, but they were

─MATTES - DIRECT - MARKETOS─

1  definitely adjusted down.

2  Q.   They were adjusted down after it was a bad start to the

3  sales process.

4       Fair?

5  A.   I don't like the word "bad," but it definitely did not

6  reach the original forecast.

7  Q.   You missed it by 50 percent.

8  A.   Yeah.

9  Q.   That was bad.

10 A.   Your word, not mine.

11 Q.   Okay.

12      It was not good.  Is that fair?

13 A.   Disappointing.

14 Q.   Okay.  Disappointing.

15      What was being projected for 2007, nonetheless, was

16 $132 million in sales of Prezista.

17      Correct?

18 A.   Again, I don't recall the specific number.  Please -- and

19 I don't remember exactly where we landed on that year's

20 forecast.  According to the slide, it would appear that that's

21 what's being suggested.

22 Q.   All right, sir.

23      And those were forecasts that were based on getting out

24 in the marketplace and capturing more sales.

25      Fair?

─MATTES - DIRECT - MARKETOS─

1    A.   Getting more on-label use from users, yes.  Prescribers.

2    Q.   Take a look at 1779.  This is the other attachment.

3    There's a different scenario.

4         MR. MARKETOS:  Thank you.

5    BY MS. MARKETOS:

6    Q.   Do you see there's a different scenario here in

7    Plaintiffs' Trial Exhibit 1779 -- Relators' 1779?

8    A.   The same numbers are there.  What's different about this?

9    Q.   They are the same numbers.  It's a different scenario, as

10   you can see from the chart.

11        Do you see the chart for now, sir?

12   A.   Yes.

13        MR. MARKETOS:  We offer 1779.

14        MR. KLEIN:  No objection, Your Honor.

15        THE COURT:  So admitted.

16   (Relators' Exhibit 1779 in evidence.)

17   BY MR. MARKETOS:

18   Q.   1779 has a different scenario where there's a faster ramp

19   in order to accomplish $132 million.

20        Do you see that?

21   A.   Yeah.  I need to see the other slide side by side, but I

22   take your word for it.

23   Q.   Do you recall at the beginning of 2007 that it was

24   Janssen's intent to ramp up sales?

25   A.   Yes.

1  Q.  All right.

2      And to be clear, sir, you were hoping to accomplish

3  five times as many sales for the calendar year 2007 as you had

4  for a part of 2006.

5      Correct?

6  A.  This is a presentation that was made to probably suggest

7  to me what the sales number could be.  I don't recall where we

8  landed, but my conjecture, only because I don't remember

9  specifically, that Mr. Lillian thought -- was suggesting this

10  could be where we landed in 2007.

11  Q.  All right, sir.

12      It might have been higher or lower.  I'm really

13  specifically talking about what was being proposed in these

14  scenarios.

15      Is that fair?

16  A.  Sorry.  Say again.  Proposed?

17  Q.  What was being proposed in these two scenarios.

18  A.  By -- proposed, yes.

19  Q.  Proposed.  Thank you.

20      MR. MARKETOS:  We'll take a look at the actual

21  forecasts.  RX-1780.

22      While we're pulling that up for you, sir, we offer

23  RX-1780.

24      MR. KLEIN:  No objection, Your Honor.

25      THE COURT:  All right.  So admitted.

───MATTES - DIRECT - MARKETOS───

1           (Relators' Exhibit 1780 in evidence.)

2    BY MR. MARKETOS:

3    Q.   Before we pull that up, sir, we talked a little bit

4    yesterday about how when forecasts were missed in 2006 there

5    was a bit of fork-in-the-road opportunity.

6           And what I mean by that is there was an opportunity for

7    you to go back to your board and tell the board that the

8    strategy analysis for the initial forecast that you had put

9    together for Janssen for Prezista was in error.

10          Do you recall that?

11   A.   Do I recall saying that to my board?

12   Q.   Well, we'll go step by step.

13          Do you recall that discussion that we had yesterday?

14   A.   Specific discussion?  I'm sure it was discussed

15   frequently.

16   Q.   Okay.

17          Did you ever go back to your board and tell the board

18   that there had been mistakes with respect to the strategy in

19   selling Prezista?

20   A.   I just want to make sure.  When you say "board," who are

21   we talking about?

22   Q.   Your board.

23   A.   My board of, like, direct reports and people that --

24   Q.   The board you reported to.

25   A.   Oh, that I reported to.  I didn't report to a board.  I

MATTES - DIRECT - MARKETOS

1    reported to an individual.

2    Q.   Okay.

3    A.   And I -- again, I'm not recalling specifically.  I think

4    the mistake was not in the strategy.  I think if there was a

5    mistake at all, it was in the forecast.

6    Q.   All right.

7         Let me make sure I understand.

8    A.   Sure.

9    Q.   Whether the mistake was in the strategy for how to

10   approach the marketplace or the forecast for sales, did you

11   ever go to the person you report to and tell them there had

12   been a mistake in either one of those things?

13   A.   I would have reported to them that the outcome was

14   different from the original expectation.

15   Q.   Yes, sir, but --

16   A.   I don't recall -- I would -- I don't recall using the

17   word "mistake."

18   Q.   And what I'm getting at here, sir, is there can be a

19   number of reasons why a company like Janssen may have missed

20   its forecasted sales.  One could be the poor performance of

21   the sales force itself.

22        True?

23   A.   Possibly.

24   Q.   Another could be a mistake in the strategy of the

25   executives that was implemented for the sales force.

MATTES - DIRECT - MARKETOS

1    A.   Possibly.

2    Q.   Did you ever report that it was a mistake from the

3    executives in strategy to the people you reported to?

4    A.   I don't believe I did.  If you want to know what I

5    probably said, I would be happy to answer that.

6    Q.   Let's take a look at Exhibit 1780.  I'm going to turn

7    your attention to a discussion that began from you to

8    Ms. McHugh, Julie McHugh, and this is on March 22nd of 2007.

9         Do you see that at the very bottom?

10        You say "forecast review.  Here's the data I referenced

11   this morning with some expanded detail --

12   A.   Yes.

13   Q.   -- on depth and breadth. "

14   A.   I'm sorry.  Yes.

15   Q.   Thank you.

16        Then there's a response, Ms. McHugh writes to

17   Mr. Scodari, and then at the end of the day, Ms. McHugh says,

18   "Joe, as you may recall from our meeting at the end of

19   February, I signaled that our demand for performance for

20   Prezista is falling short of BP target."

21        Do you see that?

22   A.   Yes.

23   Q.   All right.

24        And then it says, "We believe the demand shortfall is

25   attributable to overcalling the size of the market line in

MATTES - DIRECT - MARKETOS

1    lines 3 plus."

2         Do you see that?

3    A.   Yes, I do.

4    Q.   What Janssen's -- what your colleagues were saying was

5    that there had been a strategic error in making the forecast

6    because the demand had been overestimated for a small segment

7    of the HIV population.

8         Correct?

9    A.   That is a way -- that is an acceptable way to define

10   that.  I would define it a little bit differently, but I think

11   it's -- for understanding, I would -- if you want me to

12   clarify.  Well, if not, I won't.

13   Q.   How to accurately characterize what was being discussed

14   here.

15   A.   Yes.  I think you did.

16   Q.   Thank you, sir.

17        And then if we take a look at the response from you to

18   Mr. Gossett, at the top you say, "Mark, confidential.  Please

19   take a look at the email exchange below.  Joe has expressed

20   concern about lowering the target.  Please start the

21   calculation of the metrics at $95 million."

22        Do you see that?

23   A.   Yes, I do.

24   Q.   "And discuss confidentially with them."

25        Do you see that?

MATTES - DIRECT - MARKETOS

1    A.   Yes, I do.

2    Q.   What you wanted to keep confidential, of course, was the

3    discussion about the reason why the forecast had been missed.

4         Is that fair?

5    A.   No.  I would disagree with you there.

6    Q.   All right.

7    A.   I believe, again, many, many years ago, I believe that

8    before I wanted to go public with any calculations that we

9    were doing, I wanted to feel comfortable with the logic behind

10   it and have my team work on it before we all agreed to move

11   forward with it.

12   Q.   All right.

13        Let's take a look at Relators' Exhibit 308, sir.  And

14   this is in evidence already.  This is a Tibotec

15   Therapeutics -- that's Janssen, right?

16        I'm sorry to reiterate.

17   A.   Yes.

18   Q.   I just want to make sure we are still talking about the

19   same company.

20   A.   Yes.  Yes.  Yes, sir.

21   Q.   And monthly performance report.  This is a CAT review

22   dated January 28, 2008.

23        Right, sir?

24   A.   It appears to be.

25   Q.   And it was prepared by the business analytics department.

─MATTES - DIRECT - MARKETOS─

1          Do you see that?

2    A.    Yes.

3    Q.    And if we take a look at Slide 8, the forecast for the

4    year 2007, it turned out, was 106 million.

5          Do you see that?

6    A.    Yes.

7    Q.    All right.

8          So we know it went from 23 million forecast in 2006 --

9    that was actually attained -- to 106 million in 2007.

10          Correct?

11   A.    Again, I just want to be sure.  I -- I don't remember

12   what the final target was for 2007.  I don't know if this is a

13   declaration that this is the number we agreed to.

14   Q.    Fair enough, sir.  Let me remind you of the date of the

15   exhibit, okay?

16          This is a January 28, 2008 document.

17   A.    Aw, okay.  Thank you.

18   Q.    So it's a January 28, 2008 document, looking back on --

19   A.    That's helpful, thank you.

20   Q.    -- back on the forecast for the prior year, and you can

21   see that it was $106 million for that year.

22          Do you see that?

23   A.    Yes.

24   Q.    And there was, as I understand it, a slight miss of that

25   forecast, and $78 million was attained.

MATTES - DIRECT - MARKETOS

1          Is that fair?

2    A.   This would have been where we're going to end '07?

3    Q.   Yes, sir.  See at the top it says --

4    A.   Yes.  Yes.

5    Q.   Sorry.  And, Mr. Mattes, I really apologize for this.

6    You have to make sure not to interrupt for the court reporter.

7          Okay?

8    A.   My apologies as well.

9    Q.   My apologies.

10         We're looking at Prezista performance through

11   December 31, 2007.

12         Do you see that?

13   A.   Yes.

14   Q.   Okay.

15         In the second year, you missed your sales targets

16   again.

17         Right?

18   A.   If these were the targets, it was missed, yes.

19   Q.   If we take a look at Slide 8.

20   A.   This is Slide 8?

21   Q.   Yes.  There's a reference down at the bottom left to the

22   E through H switch share.

23         Do you see that?

24   A.   Yes.

25   Q.   And you were tracking switches of patients in those

*2948*

MATTES - DIRECT - MARKETOS

1  patient segments in order to attain forecast.

2      Do you see that?

3  A.  Yes.

4  Q.  And just to be clear, sir, there was a percentage of

5  targets.  There was a targeted percentage of switches of

6  patients from the segments E, F, G, and H in the forecast for

7  2007.

8      Correct?

9  A.  Yes.

10  Q.  All right.

11      And H was on-label.

12      Correct?

13  A.  I don't recall what E to H -- what was or wasn't

14  on-label, so. . .

15  Q.  All right.

16      You don't know if segment E was off-label, segment --

17  A.  Not --

18  Q.  Sorry, Mr. Mattes --

19  A.  Yes, I did it again.

20  Q.  That's all right, sir.

21      You don't remember if segments E, F, and parts of

22  segment G were off-label?

23  A.  Not 17 years later, no.  If you want to refresh

24  my memory, I'd be happy to --

25  Q.  Fair enough, sir.

1    Let's take a look at Slide 19.  There was a reference

2 to QD dosing.  This is for Prezista.

3    If we take a look at the bottom here, "Prezista

4 off-label 900 milligram QD use continues to grow."

5    Do you see that?

6 A.  Yes.

7 Q.  And there were open questions, What can we impact?" at

8 the bottom.

9    Do you see that?

10 A.  Yes.

11 Q.  "And how much is QD in naive?"

12    Do you see that?

13 A.  Yes.

14 Q.  All right.

15    Just to be clear, as of 2007, Prezista was not allowed

16 to be marketed or promoted to the naive segment of the HIV

17 population.

18    Fair?

19 A.  Yes.  Fair.

20 Q.  Take a look at Slide 20.  There's a reference here, sir,

21 to medical information requests around QD dosing and naive use

22 continuing to increase.

23    Do you see that?

24 A.  Yes.

25 Q.  You understand it's the allegations of the Relators in

─MATTES - DIRECT - MARKETOS─

1  this case that during the time period 2006, 2007, and 2008,

2  before there was a change in Prezista's label, that they were

3  marketing the drug to naive patients?

4  A.   That's the allegation, yes.

5  Q.   Yes, sir.

6       There was an increase in medical information requests

7  around naive use.  It's actually reflected in a bar chart

8  here.

9       Do you see that?

10 A.   Yeah.  I'm -- I'm trying to understand what I'm looking

11 at.

12 Q.   All right.

13 A.   Give me -- give me one second, please.

14 Q.   Sure.

15 A.   Which is the QD?  Oh, I see it.  The naive went to a

16 1 percent.  Okay.  Yes, sir.

17 Q.   Medical information requests around QD dosing in naive is

18 what you were tracking.

19       Right?

20 A.   Yes.  And I don't know what -- what letter E is -- naive

21 or once a day.

22 Q.   Okay, sir.

23       Let's turn to Slide 53.

24 A.   Big deck.

25 Q.   Slide 53, what we see in this slide is that the naive

─────MATTES - DIRECT - MARKETOS─────

1    share -- Prezista naive had grown by 7 percent in the year

2    2007.

3           Right?

4    A.   Yes.

5    Q.   And we know -- we can tell -- you can tell us not --

6    promoting into the naive segment would have been off-label

7    promotion.

8           Fair?

9    A.   If we promoted to use the drug in naive patients --

10   Q.   Yes, sir.

11   A.   -- that would be off-label.

12   Q.   All right.

13          So if there was promotion by Janssen to the segment of

14   the population that had grown in 2007, the naive segment, that

15   would have been off-label?

16   A.   Yes, it would have been off-label.

17   Q.   Take a look at Exhibit RX 1783.  It's an email from

18   Ms. O'Reilly to you, sir.

19          MR. MARKETOS:  And we'd offer 1783, Your Honor.

20          MR. KLEIN:  Sorry, Your Honor.  It doesn't appear

21   that he's on the email.

22          THE COURT:  I know.

23          MR. KLEIN:  So we would object on foundation grounds,

24   unless Mr. Marketos can clarify.

25   BY MR. MARKETOS:

─MATTES - DIRECT - MARKETOS─

1  Q.   This is an email from Ms. O'Reilly to Michael Genus and

2  Mark Gossett and Ben Kozub.

3       Do you see that, sir?

4  A.   Yes.

5           MR. MARKETOS:  If we take a look down at the bottom.

6       Can you go down, please.

7  BY MR. MARKETOS:

8  Q.   There's an attachment, "executive summary market

9  overview."

10      Do you see that, sir?

11 A.   Yes.

12 Q.   And see the attachment, "DDP Mattes, first pass"?

13 A.   Yes, but again this wasn't sent to me, but I see the

14 title.

15 Q.   I'm really asking about the attachment, sir.

16      So there's a document that you made the first pass of

17 that's attached to this email.

18      Do you see it?

19 A.   Attached please find two sections for input.  Where does

20 it say I made it first?

21          THE COURT:  Mr. Mattes, you've got to answer the

22 question that you are being asked.  You don't get to ask

23 questions from the witness stand.  I don't want to tell you

24 that again.

25          THE WITNESS:  All right.

─────MATTES - DIRECT - MARKETOS─────

1  BY MR. MARKETOS:

2  Q.  Do you see both the attachment file names, sir?

3  A.  Yes.

4  Q.  "DP Mattes, first pass"?

5  A.  Yes.

6  Q.  All right.

7          MR. MARKETOS:  We'd offer 1783, Your Honor.

8          MR. KLEIN:  I think they can show it to him and see

9  if --

10          THE COURT:  Just give me the objection.

11          MR. KLEIN:  Objection --

12          THE COURT:  Overruled.

13          MR. KLEIN:  -- foundation.

14          THE COURT:  All right.

15  BY MR. MARKETOS:

16  Q.  Take a look at 1784.  That's the attachment.  Executive

17  summary August 14, 2008.

18          Do you see that, sir?

19  A.  Yes.

20  Q.  This is an attachment that's at least based on the name

21  of the file you had made the first pass on.

22          Do you see that?

23  A.  I see that.  I believe that this is in preparation for

24  first pass --

25  Q.  All right?

—MATTES - DIRECT - MARKETOS—

1    A.    -- with me.

2    Q.    So this is a document you would have received and

3    reviewed.

4         Fair?

5    A.    I don't -- no, not fair.

6    Q.    Oh?  Okay.

7         Let's take a look at -- well, 1784 is an executive

8    summary by Tibotec employees.  You're saying it was prepared

9    for your first pass?

10   A.    I believe that -- I don't remember, but my belief would

11   be they are working on a first pass for me to take a look at.

12   Q.    All right.

13        MR. MARKETOS:  We'd offer 1784, Your Honor.

14        MR. KLEIN:  Same objection.  If he's seen it, he can

15   speak to it.  If not --

16        THE COURT:  All right.  Overruled.  It's admitted.

17        Now, you can ask him about it.

18   (Relators' Exhibit 1784 in evidence.)

19   BY MR. MARKETOS:

20   Q.    Slide number 2, sir.  There is a TT revenue summary

21   that's attached, and it actually just summarizes the revenues

22   associated with the two products as of this time in August of

23   2008.

24        I wanted to ask you if you recall the figures that are

25   being referenced here?

MATTES - DIRECT - MARKETOS

1   A.   I do not.

2   Q.   Okay.

3        You don't recall that the projections for -- from 2008,

4   2009 and 2010 were 148 million, 221 million, and 332 million

5   for Prezista?

6   A.   I do not recall the specific numbers.

7   Q.   With respect to Intelence, do you recall projections of

8   43 million, 62 million, and 130 -- excuse me, 82 million and

9   130 million from Intelence?

10  A.   I do not recall any specific numbers.  I just don't

11  recall.

12  Q.   I understand, sir.

13       Let's turn to slide 18.  What we can see here, sir, is

14  a full year net rate sales.  These were -- these were what was

15  being forecasted for Prezista, the drug, over the course of

16  three years.

17       Do you agree?

18  A.   Which graph am I looking at?

19  Q.   Yeah.

20       If you look at the bottom right, sir?

21  A.   Okay.  Thank you.

22  Q.   It says "full year NTS," and it talks about 2008, 2009,

23  2010?

24  A.   Yes, sir.

25  Q.   Okay?  All right.

—MATTES - DIRECT - MARKETOS—

1          What this is is a forecast.

2          Right, sir?

3    A.   Yes, it's a forecast.

4    Q.   All right.

5          It's being projected to be sold for Prezista by Janssen

6    in 2008 and out into the future 2009, 2010.

7          Right?

8    A.   Correct.  I believe so.

9    Q.   And those numbers, at least as presented in this

10   executive slide deck, were 154 million, 223 million for 2009,

11   and 338 million for 2010.

12         Correct?

13   A.   As per this graph.

14   Q.   If we take a look at slide 24.  This is for Intelence 09

15   dynamic and stable patient summary.

16         Do you see that?

17   A.   Yes.

18   Q.   All right.

19         And what's being discussed here actually is Intelence

20   achieving a 25 percent switch share in 2009 of the overall

21   dynamic market.

22         Do you see that in red?

23   A.   Yes.

24   Q.   And to be clear, sir, what we can see in the left column

25   is the number of switches for A through D naive for Intelence.

1          Do you see that?

2   A.   A -- yes, I do.

3   Q.   That column is showing the projected number of switches

4   of patients in specific segments of the HIV population.

5          Right, sir?

6   A.   I mean, I believe I -- I don't remember seeing it.  I'm

7   processing here, so.

8          Could you ask the question again, please?

9   Q.   Sure.

10         What Janssen was projecting for Intelence in 2009 was a

11  number of switches and specific segments of the HIV patient

12  population -- Janssen would switch to Prezista -- to Intelence

13  as a drug.

14         Correct?

15  A.   It would appear that's what they're doing here.

16  Q.   And that included a large segment of patients in the

17  naive segment of the population.

18         Do you see that?

19  A.   Yes.

20  Q.   Just as reminder, Intelence was never on-label for naive

21  patients, was it?

22  A.   Not that I recall.

23  Q.   Take a look at slide 25 quickly.  There were forecasted

24  sales of 43 million, 82 million and 130 million out into the

25  future for Intelence.

MATTES - DIRECT - MARKETOS

1        Right, sir?

2  A.   On the lower right graph, yes.

3  Q.   And if we look at the lower right -- when we see the word

4  "NTS," that's net trade sales.

5        Right?

6  A.   Correct.

7  Q.   Total amount of dollars that Janssen receives for the

8  sale of this specific drug?

9  A.   On a net basis, yes.

10 Q.   All right.

11       And 48 million for 2008 on the bottom right here,

12 85 million in 2009, and 133 million in 2010.

13       Right, sir?

14 A.   Yes, sir.

15 Q.   And built into this forecast, as we just saw, sir, was a

16 projection of capturing naive patients.

17       Agreed?

18 A.   That's what the call was, yes.

19 Q.   Take a look at RX 1785.  We're talking about January of

20 2009.  I'm fast-forwarding in time, sir.

21       Is this is an email from you?

22 A.   It's -- the exchange is credo.  I don't --

23 Q.   Yes.  Hold on.  There's a cover email.

24 A.   Okay.  Thank you.

25 Q.   Actually, let's take a look at 1786, if we could.  1786

─MATTES - DIRECT - MARKETOS─

1  is an email from Mr. Ruppersberger to you, right, sir?

2      All right.  The email from Ruppersberger to you refers

3  to a 2009 FBP weekly gating.

4      Do you see that?

5  A.  Yes.

6  Q.  All right.

7      MR. MARKETOS:  We're going to offer 1786, Your Honor.

8      MR. KLEIN:  No objection, Your Honor.

9      THE COURT:  So admitted.

10  (Plaintiff's Exhibit 1786 in evidence.)

11  BY MR. MARKETOS:

12  Q.  And it says, "Attached please find the deck we reviewed

13  with the 2009 FBP weekly gating for the $367 million."

14      Do you see that?

15  A.  Yes.

16  Q.  And Mr. Ruppersberger was saying "provide talking points

17  to Glenn and Mark."

18      That's Mark Gossett.

19      Right?

20  A.  Correct.

21  Q.  Provide talking points to you and Mr. Gossett on what it

22  will take to hit $400 million in E through H switch shares and

23  exit prescription market shares."

24      Do you see that?

25  A.  Yes, I see that.

MATTES - DIRECT - MARKETOS

1          MR. MARKETOS:  All right.  And if we take a look back

2   at 1785, Ms. Johnson.

3   BY MR. MARKETOS:

4   Q.   There's an email from you.  It says, "Thanks to all of

5   you for allowing me to sit and contribute to your meeting."

6   We'll see if we can pull that up for you.

7          MR. MARKETOS:  Just for the witness, please,

8   Ms. Johnson.  Thank you.

9   BY MR. MARKETOS:

10  Q.   Can you see this email that you sent, sir, Exhibit 1785?

11  A.   Can I just see the front of it, too, please?

12  Q.   How's that?

13  A.   That's better.  Thank you.

14  Q.   It's an email that you sent to some of the higher-ups at

15  Janssen.

16       Do you see that?

17  A.   Some of the members of the team.  I wouldn't say

18  higher-ups, but, yes.

19  Q.   Okay.

20       Well, Mr. McCormick, Mr. Libby, some of the sales

21  representatives --

22  A.   Yes.

23  Q.   -- and the managers?

24  A.   Yes, sir.

25  Q.   And it was about a meeting, and you said, "My request is

MATTES - DIRECT - MARKETOS

1   that you continue to demonstrate the leadership qualities that

2   will allow our company to capitalize on our increase in

3   investment people."

4          Do you see that?

5   A.   Yes.

6   Q.   All right, sir.

7          And you said, "I ask that we balance the reorg work

8   with intense discussions about moving the business forward."

9          Do you see that?

10  A.   Yes.

11  Q.   You said, "What will it take to increase E through H

12  switch share for Prezista, Intelence users, and E through H

13  share in Prezista naive."

14         Do you see that?

15  A.   Yes.

16         MR. MARKETOS:  Your Honor, we offer 1785.

17         MR. KLEIN:  No objection, Your Honor.

18         THE COURT:  So admitted.

19  (Relators' Exhibit 1785 in evidence.)

20  BY MR. MARKETOS:

21  Q.   Just to be clear, sir, as of 2009, Intelence users in E

22  through H share, that would have been off-label.

23         Do you agree?

24  A.   Some of those segments would not -- yes, would have been

25  off-label.

MATTES - DIRECT - MARKETOS

1    Q.   And what you were wanting to do was increase -- to ask

2    your sales force to do what it took to increase those switch

3    shares.

4         Correct?

5    A.   I don't think I'm giving direction specifically for all

6    this -- for the on-label segments, yes.

7    Q.   My question for the time being is --

8    A.   Sure.

9    Q.   -- with respect to the off-label portion, you were giving

10   direction to see how the sales force could go about getting

11   people to switch in segments that were off-label for

12   Intelence.

13        Do you agree?

14   A.   The way it's written, it would say that.  It should --

15   clearly I'm talking about the on-label shares, but, yes.

16   Q.   Okay.

17        So you were talking about the on-label shares, but the

18   way it was written, it would appear that you were talking

19   about off-label.

20        Is that fair?

21   A.   Yeah.  I have to really think about that, but again, all

22   of our communication was to go only after the on-label

23   segments.

24   Q.   Let's take a look at RX 1786 -- excuse me, 1787.  This

25   was the attachment to the email from Mr. Ruppersberger we were

─MATTES - DIRECT - MARKETOS─

1   just looking at.

2            MR. MARKETOS:  We'd offer 1787 -- 1787.  Thank you.

3            MR. KLEIN:  No objection, Your Honor.

4            THE COURT:  So admitted.

5   (Relators' Exhibit 1787 in evidence.)

6   BY MR. MARKETOS:

7   Q.   Let's take a look at slide 10.  This was a 2009 gating

8   review by business analytics, and if we're looking at what's

9   being tracked here, sir, what is being tracked is Intelence A

10  through D segments, naive share through 2008, 2009.

11       Do you see that?

12  A.   That's what's being tracked here, yes.

13  Q.   Yeah.

14       And then what you can remind us all of is the fact that

15  Intelence was never on-label for that segment of the HIV

16  patient market, A through D.

17       Correct?

18  A.   Correct.  These were spontaneous prescriptions.

19  Q.   They're spontaneous prescriptions for which your sales

20  force had a target, naive share target, naive $92 million?

21  A.   We -- we forecasted there would be $92 million.

22  We're looking -- looking at it, it says we forecasted that

23  there would be $92 million of sales.  It doesn't mean that we

24  went actively after it.

25  Q.   Let's be clear, sir.

MATTES - DIRECT - MARKETOS

1   A.   Sure.

2   Q.   This isn't a prediction of spontaneous sales.  It's an

3   actual naive share target that your sales force was targeting

4   for that year.

5        Correct?

6   A.   I don't even know if it was the sales force target.  It

7   was the company target or company estimate.

8   Q.   Can we agree that what is being projected here is a naive

9   share target of $92 million?

10  A.   In this case I think target means estimate, but whatever

11  it looks like is what we would have expected to achieve in

12  that segment.

13  Q.   All right.

14       And that, of course -- that A through D segment for

15  Intelence again would have been off-label.

16       Fair?

17  A.   Some of it, yes.

18  Q.   Well, all --

19  A.   I don't have the segments in front of me, so I don't know

20  if all of them are off-label or not.

21  Q.   Well, let's be clear, sir.

22       Intelence, from the start to the finish of your tenure

23  at Janssen, was never permitted to be promoted to the naive

24  segment.

25       Right, sir?

1  A.   Yes.  That's true.

2  Q.   It was only indicated for treatment-experienced patient

3  ever.

4       Right?

5  A.   Yes, yes.

6  Q.   So A through D segments, naive share targets, that all

7  would have been off-label.

8       Correct?

9  A.   As I'm saying, I don't know if all A through D was naive.

10 It could have been -- it could have been some other patient

11 segment -- A could have been some other patient segment.  I

12 don't have it in front of me to know that A through D

13 encompassed just naive.

14 Q.   And I can remind you as we go through this if I need to,

15 but this is, of course, characterized as a naive share, right,

16 not some naive, some experienced, a naive share target.

17      Right?

18 A.   Naive prescriptions, share of that -- of naive patients.

19 Q.   Thank you.

20      And naive patients would have been off-label patients?

21 A.   Yes.  Naive patients would have been off-label.

22 Q.   Take a look at RX 128.  All right, sir.  Exhibit

23 Relators' Exhibit 128 is another email from Mr. Ruppersberger

24 to you, sir.

25      Do you see that?

─────MATTES - DIRECT - MARKETOS─────

1    A.   Can you enlarge it?  Yes, thank you.  Yes.

2             MR. MARKETOS:  We'd offer Relators' 128.

3             MR. KLEIN:  No objection, Your Honor.

4             THE COURT:  So admitted.

5    (Relators' Exhibit 128 in evidence.)

6    BY MR. MARKETOS:

7    Q.   There is a -- if we take a look at page 1 of the email,

8    there is a reference to "our forecast discussions," and now

9    we're looking at the forecast for Prezista and Intelence.

10            Do you see that?

11   A.   Yes.

12   Q.   All right.

13            And what we can see is that there is a predicted share

14   of Prezista for $300 million and Intelence for $100 million.

15            Do you see that?

16   A.   Yes.

17   Q.   All right.

18            There's a reference to an exit E through H share for

19   Intelence.

20            Right, sir?

21   A.   Yes.

22   Q.   All right.

23            This is a prediction of the number of patients who are

24   going to switch to Intelence.

25            Right, sir?

MATTES - DIRECT - MARKETOS

1    A.    Prediction of -- yes.  Yes, it is.

2    Q.    If we take a look at the deck that's attached, we're

3    going to take a look at page 3.  Tibotec Therapeutics,

4    $400 million.  That was the projection of sales for 2009 in

5    total between Prezista and Intelence.

6        Right?

7    A.    Again, I don't remember specifically if this is a --

8    aspiratory target or if this was the actual target.  I don't

9    recall the specific number.

10    Q.    Take a look at page 3 of the deck -- excuse me, page 4.

11    You can see there's a breakdown of the target for the Tibotec

12    franchise, and it breaks it out by Prezista and Intelence.

13    A.    Helpful.  Thank you.

14    Q.    Do you see that, sir?

15    A.    Yes.

16    Q.    All right.

17        And there's a projection for Prezista and Intelence for

18    the year, and it totals $382 million in TT.

19        Right?

20    A.    Correct.  Yes.

21    Q.    And then total at the bottom is $400 million projected.

22        Correct?

23    A.    Yes.

24    Q.    If we turn to 1788, please.

25        1788 is a communication from you dated March of 2010 --

—MATTES - DIRECT - MARKETOS—

1    I'm skipping forward to the next year.  Do you see that email

2    from you, and it attaches a one-page strategy?

3    A.    Yes.

4    Q.    It looks like it's to many, many, many, many members of

5    the organization.

6         Is that fair?

7    A.    Yes.

8    Q.    And if we take a look at the one-page strategy --

9         MR. MARKETOS:  We offer 1788, Relators' 1788.

10        MR. KLEIN:  No objection.

11        THE COURT:  So admitted.

12    (Relators' Exhibit 1788 in evidence.)

13        MR. MARKETOS:  All right.  Blow up the second

14    paragraph, if you would, please, Ms. Johnson.

15    BY MR. MARKETOS:

16    Q.    You state, "As we discussed during our call, we took a

17    different approach when developing our strategies for 2010.

18    Rather than a top-down approach, we created our goals from the

19    bottom up working with each team."

20        Do you see that, sir?

21    A.    Yes.

22    Q.    And it says, "The goals on the attached document are the

23    ones upon which our performance as a company and as a team

24    will be measured at the end of 2010."

25        Right, sir?

MATTES - DIRECT - MARKETOS

 1  A.   Yes.

 2  Q.   Turn to slide 4 of the attachment.  "The goal for 2010

 3  was $584 million."

 4       You can confirm that for me?

 5       MR. MARKETOS:  Thank you, Ms. Johnson, if you can

 6  turn to the attachment and go to Slide 4.

 7  BY MR. MARKETOS:

 8  Q.   In a moment --

 9  A.   Sure.

10  Q.   -- we will go to Slide 4.

11  A.   Sure.

12  Q.   Let me see if, while we're pulling that up, we can

13  refresh your recollection, sir.

14       Do you agree or do you have a recollection about

15  $584 million being the target for Prezista and Intelence in

16  2010?

17  A.   I don't recall the specific numbers.

18  Q.   That would have been -- that would have been your last

19  year, full year at the company; is that right?

20  A.   Yes.

21  Q.   All right.

22       We'll circle back when we get that attachment.  Bear

23  with me.

24       All right.  Let's go Relators' 1789.  This is a PBP

25  board review you can see dated August 16, 2010.

MATTES - DIRECT - MARKETOS

1          Do you recognize what a PBP board review would be?

2     A.   I don't recall specifically who PBP was, but...

3     Q.   Okay, sir.

4     A.   I don't know if it was my board or the board that I

5     participated in at a senior level.

6     Q.   One of the two.

7          Fair?

8     A.   Yes, yes.

9               MR. MARKETOS:  We'd offer Relators' 1789, Your Honor.

10              MR. KLEIN:  No objection, Your Honor.

11              THE COURT:  So admitted.

12              (Relators' Exhibit 1789 in evidence.)

13              MR. MARKETOS:  Let's turn to slide 16.

14    BY MR. MARKETOS:

15    Q.   The executive summary as of this date in 2010, August of

16    2010, stated that "The United States' third agent market was

17    expected to grow from 3.7 billion in 2009 to 5 billion by

18    2012."

19         Correct?

20    A.   I don't remember what third agent market was.  What is

21    represented here is what you're saying.  I don't remember

22    specifically what third agent market was.

23    Q.   Okay.

24         But what we can see is what Janssen was projecting for

25    the year 2012?

─MATTES - DIRECT - MARKETOS─

1   A.   The market.

2   Q.   Yeah.  It's the market, and then if you turn to the first

3   bullet point, for protease inhibitor gross sales, expected to

4   reach $2.6 billion.  Prezista's gross sales were projected to

5   hit 941 million.

6        Do you see that?

7   A.   Yes.

8   Q.   And for Intelence, Intelence was an NNRTI.  That was the

9   type of drug.

10       Right?

11  A.   Yes.

12  Q.   The non-nuke, so to speak?

13  A.   Yes, yes.

14  Q.   And it was a market of approximately $1.6 billion.

15       Correct?

16  A.   That's what's being depicted here, yes.

17  Q.   Yes.

18       And Intelence, Janssen was predicting, would hit

19  $233 million in gross sales for the year 2012 alone.

20       Correct?

21  A.   What's depicted here for both Prezista and Intelence are

22  sales and the share of the market.

23  Q.   Correct.  And what we can see is the year-over-year

24  increase in volume, price, and market share.

25       Correct?

MATTES - DIRECT - MARKETOS

```
 1  A.   Yes, yes.
 2  Q.   And if we take a look at Slide 17, quickly.
 3       There's a projection here for one billion dollars in
 4  gross demand in sales in 2011.
 5       Do you see that?
 6  A.   So this was a 2010 presentation, correct.  I'm just
 7  trying to make sure we're on the same page.
 8  Q.   Yes.  It's an August 2010 projection for the next year.
 9       Right?
10  A.   2010.  Yeah, I guess that number was -- was close to a
11  billion dollars, and we could potentially get there.
12  Q.   Yes.
13       And if you take a look at the combined projections for
14  Intelence and Prezista for 2011, it was projected to be
15  $1.3 billion in sales, right, 207 million and 963 million,
16  respectively.
17       Right?
18  A.   Yes.  Little circles.  There it is, yes.  Okay.
19  Q.   And then what was projected for 2012 was $233 million for
20  Intelence and $1.23 billion for Prezista.
21       Correct?
22  A.   Correct.
23  Q.   Now, sir, we touched yesterday -- and I'm going to wrap
24  up here in just a few minutes.
25       We touched yesterday on some issues about return on
```

─MATTES - DIRECT - MARKETOS─

1  investment.  Do you recall that discussion we had about what a

2  return on investment means?

3  A.    I think we had that discussion as it pertained to the

4  medical information requests.

5  Q.    Yes.

6      So we also had that discussion as it related to the

7  speaker -- promotional speaker bureau.

8  A.    Yes, we do --

9  Q.    Do you recall that?

10  A.    Yes, I do recall.

11  Q.    All right.

12      We'll take a look at RX 149.  RX 149 is a DTC pilot ROI

13  analysis.  This is a Janssen deck dated January 29, 2009.

14      Do you know what a pilot ROI analysis is?

15  A.    So I would -- by the cover sheet I would think we were

16  probably looking at potential of return on doing

17  direct-to-consumer advertising, and I would imagine the team,

18  if this was presented to me or whoever it was presented to,

19  would be looking at answering that question.

20          MR. MARKETOS:  We'd offer Relators' 149, Your Honor.

21          MR. KLEIN:  We object, Your Honor.

22          THE COURT:  Sidebar.  I know what the issue is, but I

23  want to talk to you guys about it.

24          (Sidebar begins at 10:05 a.m.)

25          THE COURT:  I guess I want to clarify.  He testified

MATTES - DIRECT - MARKETOS

1    that that's a direct to consumer.  So I thought we've been

2    talking about -- go ahead.

3            MR. MARKETOS:  This has nothing to do -- that

4    distinction, Your Honor.  There's just an ROI analysis of the

5    value of a patient being on Prezista, and one slide has got

6    nothing to do with targeting.

7            THE COURT:  It has nothing to do with marketing to

8    consumers.

9            MR. MARKETOS:  Correct.

10           THE COURT:  All right.  That's different.  But I

11   don't know the deck.

12           MR. KLEIN:  I mean, I don't know that we've seen the

13   deck either, the specific page that Mr. Marketos is planning

14   to show.

15           THE COURT:  Do you have a hard copy?

16           MR. KLEIN:  But, I mean, the deck says -- sorry.

17           THE COURT:  No, no, go ahead.

18           MR. KLEIN:  I mean, the deck on it says DTC.  I mean,

19   everything in that deck, I would presume, relates to direct to

20   consumer, no?

21           MR. MARKETOS:  Two things, Your Honor.  There's no

22   objection to this exhibit on the exhibit list, A.

23        B, this has nothing -- my question has nothing to do

24   with direct to consumer.

25           THE COURT:  Right.  But you're moving in the entire

1  exhibit, right?

2          MR. MARKETOS:  Sure.

3          THE COURT:  I don't know what's in there.  If you

4  only ask him about the issue which I'm okay with, what else is

5  in this deck?  Because it goes back with the jury.

6      Is there anything about marketing to consumers that is

7  going to confuse them as to marketing to physicians, which is

8  different apples and oranges as we talked about before?

9          MR. MARKETOS:  Yeah.  Respectfully, Your Honor, I can

10  address that issue later because it's -- they haven't briefed

11  this issue as a false distinction they're making, but it

12  doesn't matter.

13      I will -- if there's some argument that they want to

14  make afterward with respect to the other slides, I'm only

15  going to the LTD slide, which has to do with how they

16  calculate the value of the prescriptions, period.

17      Nothing to do with the difference between direct to

18  consumer.

19          THE COURT:  Do you want to move in just that

20  particular page, then, for now?

21          MR. MARKETOS:  Yes, sir.

22          THE COURT:  All right.

23          MR. KLEIN:  Well, I mean, I don't think we have any

24  confidence that that's not a direct-to-consumer slide.  It

25  could be a calculation --

MATTES - DIRECT - MARKETOS

1          THE COURT:  No, no.  Well, let me see the slide.

2          MR. MARKETOS:  Sure.

3          (Brief pause.)

4          MR. MARKETOS:  It's on the screen for you,

5    Your Honor.

6          MR. KLEIN:  Can I see it as well?

7          MR. MARKETOS:  Sure.

8          (Brief pause.)

9          THE COURT:  So do you have it as well?

10          MR. KLEIN:  I haven't seen it.

11          MR. MARKETOS:  You've seen it.

12          THE COURT:  But, I mean, Mr. Marketos, so that page

13   is just talking about return on investment with respect to

14   sales of Prezista.

15          MR. MARKETOS:  Yes, sir.  It's how they calculate the

16   forecast, that page.

17          THE COURT:  There's nothing in there about marketing

18   to consumers on that page?

19          MR. MARKETOS:  Not at all.

20          THE COURT:  So then --

21          MR. KLEIN:  Which slide are we on?  I apologize.

22          MR. MARKETOS:  29.

23          THE COURT:  All right.  Guys, unnecessary speaking

24   causes trouble here.

25          So look at page 29.

MATTES - DIRECT - MARKETOS

1          MR. KLEIN:  So isn't this a value of Prezista patient

2     calculation for the direct-to-consumer space?

3          MR. MARKETOS:  No.

4          MR. KLEIN:  How do we know that?

5          MR. MARKETOS:  Because -- may I respond, Your Honor.

6          THE COURT:  Yes.  But respond to me, yeah.

7          MR. MARKETOS:  So two things.  If I could, if this is

8     going to be an objection, you ought to object and raise this

9     issue in advance, A, and they didn't.  This says no objection

10    on the trial exhibit list.

11         B, this is the value -- the financial value of a

12    consumer being on Prezista.  It has nothing do with marketing.

13    This is a metric that goes into their forecasts.  That's it.

14         He's saying that this is the value of a consumer to

15    them.  That's a patient.  That's all this is.  It has nothing

16    to with marketing.  It never has.  This is an actual

17    calculation that goes into their forecasts.

18         MR. KLEIN:  And I just -- this is from a

19    direct-to-consumer deck.  The natural inference would be that,

20    you know, these are patients in the direct-to-consumer space

21    that they're talking about.

22         THE COURT:  There's nothing about marketing in that

23    page.

24         MR. KLEIN:  Correct.

25         THE COURT:  All right.  Here's what I'm going to do:

MATTES - DIRECT - MARKETOS

1    I'm going to allow that one page for now.

2         MR. MARKETOS:  Yes, Your Honor.

3         THE COURT:  I'm reserving on the admissibility of the

4    rest of the deck until I know there's no confusion that can be

5    caused by whatever else is in there.  I don't know.

6         But, Mr. Klein, for now, I'm going to limit the

7    admissibility just to that page.

8         MR. KLEIN:  Thank you, Your Honor.

9         THE COURT:  Later on we can address it.

10        MR. MARKETOS:  Thank you, Your Honor.

11        (Sidebar was concluded at 10:10 a.m.)

12        (Open court.)

13        THE COURT:  I'm sorry.  So, Mr. Marketos, you're

14   going to page 29 of that slide deck for now, correct?

15        MR. MARKETOS:  Yes, Your Honor.

16        THE COURT:  All right.

17        MR. MARKETOS:  Thank you.

18        THE COURT:  The objection is noted, but I'll admit

19   page 29 and reserve on the rest of the deck.

20        MR. KLEIN:  Thank you, Your Honor.

21        (Relators' Exhibit 149 page 29 in evidence.)

22        MR. MARKETOS:  Ms. Johnson, you can publish page 29.

23   BY MR. MARKETOS:

24   Q.   What you see here, sir, is a Janssen/Tibotec calculation

25   of the value of a Prezista patient.

MATTES - DIRECT - MARKETOS

1          Right, sir?

2          It's a calculation of that value?

3   A.   That's -- yes.

4   Q.   And this is essentially putting a dollar figure on the

5   lifetime value of a patient that is taking the drug Prezista.

6          Correct?

7   A.   Yes.  It appears to be.

8   Q.   If you take a look at the outputs there that's circled --

9          MR. MARKETOS:  If you would blow up that circle for

10  us.

11  BY MR. MARKETOS:

12  Q.   The lifetime value of a single patient on the drug

13  Prezista to Janssen was calculated at $32,562 per patient.

14         Correct?

15  A.   Based on somebody's calculation.

16  Q.   Yes.

17         Based on somebody within Janssen?

18  A.   Yes.  I don't recall the sentence, but I assume.

19  Q.   Yes.

20         And then it's got a full-year 2009 value and an average

21  2009 value.

22         Do you see that?

23  A.   Yes.

24  Q.   Calculating the value of a Prezista patient in terms of

25  dollars is how Janssen built forecasts, right, forecasts of

MATTES - DIRECT - MARKETOS

1   projected sales and growth?

2   A.   Basically, the way a forecast is built, it would be the

3   number of prescriptions times -- total prescriptions times the

4   average selling price, and patients -- it's a pretty complex

5   calculation.

6   Q.   Yes.

7   A.   Patients -- patients are included in that.

8   Q.   All right.

9        Just to be clear, this calculation is a necessary input

10  into that calculation, this being the lifetime value of a

11  Prezista patient.

12       Correct?

13  A.   This particular analysis appears to be focused on that.

14  How these numbers were used or not used, I don't know.

15  Q.   Okay.

16       The lifetime value of a Prezista patient is a necessary

17  metric to calculate projected sales.

18       Right?

19  A.   It's not a typical calculation that's used to calculate

20  forecasts.

21  Q.   All right.

22  A.   I would venture to say this was specific to this proposal

23  or analysis as it pertained to direct to consumer.

24  Q.   Okay, sir.

25       Let's take a look at 1791, if we could.

—MATTES - DIRECT - MARKETOS—

1      Mr. Mattes, you are aware of the fact that Johnson &

2  Johnson has what's called a credo, right, sir?

3  A.   Extremely aware, yes.

4  Q.   And that credo is something that Johnson & Johnson has

5  had as part of its organization for decades.

6      Correct?

7  A.   Correct.

8  Q.   And that has to do with the concept not just of doing

9  business and making profits but also doing so in an ethical

10  manner?

11  A.   Correct.

12      MR. MARKETOS:  Let's take a look at -- let's turn to

13  1791, if we could, please, Ms. Johnson.  Actually 1785.  I

14  keep doing that to you.  I'm sorry, ma'am.

15      Your Honor, we offer Relators' 1785.

16      MR. KLEIN:  No objection, Your Honor.

17      THE COURT:  So admitted.

18  (Relators' Exhibit 1785 in evidence.)

19  BY MR. MARKETOS:

20  Q.   All right, sir.

21      Johnson & Johnson's credo is something that is an

22  inspirational message that it has, and it spreads throughout

23  its organization.

24      True?

25  A.   Everybody's reaction to it is different.  It's certainly

MATTES - DIRECT - MARKETOS

1   very inspirational to me.

2   Q.   Okay, sir.

3        And as I understand it, the credo is essentially rules

4   of business but also rules of business ethics that Johnson &

5   Johnson wants to live by.

6        Correct?

7   A.   That's a good definition.

8   Q.   All right.

9        And if we take a look at the first paragraph here,

10  Johnson & Johnson states that "We believe our first

11  responsibility is to the patients, doctors, nurses, mothers,

12  and fathers who use our products and services."

13       Right?

14  A.   Yep.  Yes, sir.

15  Q.   And then the second paragraph refers to the employees.

16  "We are responsible to our employees who work with us

17  throughout the world."

18       Right, sir?

19  A.   Yes.

20  Q.   That would include, of course, employees like sales

21  representatives, like Ms. Chrissy Brancaccio, Ms. Jessica

22  Penelow?

23  A.   Every employee.

24  Q.   Mr. Wilhelm, Ms. Sara Strand.

25       Right, sir?

MATTES - DIRECT - MARKETOS

1    A.    Every employee.

2    Q.    All right.

3          If we take a look at the last paragraph, it says, "Our

4    final responsibility is to our stockholders, and business must

5    make a sound profit."

6          Do you see this?

7    A.    Yes, sir.

8    Q.    It also says, "Research must be carried on, innovative

9    programs developed, investments made for the future, and

10   mistakes paid for."

11         Do you see that?

12   A.    Yes.

13   Q.    You believe in that credo, do you not, sir?

14   A.    Absolutely.

15   Q.    One thing, sir, that is, of course, important to remember

16   is that if you're running an organization within the Johnson &

17   Johnson family, you don't want to skip over the first two

18   principles -- patient safety, employees -- to get to the third

19   principle about profit.

20         Is that fair?

21   A.    Yes.  That's why it's written in that order, and that's

22   why my interpretation is that it's first you do good, and then

23   if you do good, you can do well.

24   Q.    And what Johnson & Johnson tells its employees and tells

25   the world is that if you make a mistake, you have to pay for

1    it.

2         Fair?

3    A.   That's what's written.  Mistakes are paid for.

4    Q.   Mr. Mattes, if it turns out that the organization,

5    Janssen/Tibotec, had marketed Prezista and Intelence off-label

6    and had paid inducements to physicians to prescribe those

7    drugs, you would expect that Janssen would pay for that

8    mistake?

9    A.   You're asking me to be -- to be a judge on that?  I can

10   only respond --

11              THE COURT:  Mr. Mattes?

12              THE WITNESS:  Yes.

13              THE COURT:  You don't ask -- you can't answer the

14   question with a question.

15              THE WITNESS:  Ask the question, please.

16   BY MR. MARKETOS:

17   Q.   Do you want me to rephrase it?

18   A.   Please.  No.  You can resay it, reframe it, whatever

19   you'd like.

20   Q.   Sure.

21        If, in fact, Janssen had promoted Prezista and

22   Intelence off-label for a number of years, and if it paid

23   inducements to physicians in order for them to prescribe more

24   of the drug, you would expect Janssen to pay for that mistake.

25        True?

────CROSS - MATTES - KLEIN────

1   A.   I don't think I can answer that question.  I think it has

2   to be -- I can't answer that question.

3          MR. MARKETOS:  Nothing further, Your Honor.

4          THE COURT:  Thank you, Mr. Marketos.

5        Mr. Klein?

6          MR. KLEIN:  Thank you, Your Honor.  May I proceed?

7          THE COURT:  Yes.

8   (CROSS-EXAMINATION BY MR. KLEIN:)

9   Q.   Good morning, Mr. Mattes.

10  A.   Good morning.

11         MR. KLEIN:  Good morning, everyone.

12  BY MR. KLEIN:

13  Q.   Just a few questions for you on some of the topics that

14  Relators' counsel covered.  I actually want to start with

15  something that they sort of ended with toward the end of the

16  exam.

17         MR. KLEIN:  Can I have the ELMO, please, Mr. Knecht.

18  BY MR. KLEIN:

19  Q.   So I'm showing you Relators' Exhibit 1787, the chart that

20  they showed you from this document.

21         Do you remember --

22  A.   Just recently.

23  Q.   -- discussing that with Relators' counsel?

24  A.   Yes.

25  Q.   Okay.

CROSS - MATTES - KLEIN

1          And there were questions about the company projecting

2   or forecasting receiving naive shares -- a share of the naive

3   market for Intelence.

4          Do you remember that?

5   A.   Yes.

6   Q.   Okay.

7          Now, as a general matter, why would a company be

8   forecasting, projecting receipt of naive share or off-label

9   patient share?

10  A.   Well, we -- in order to be sure we've -- were producing,

11  manufacturing enough product to meet demand, it's important to

12  understand the total demand picture.

13         There's nothing worse than telling -- there's nothing

14  worse than telling a patient, We don't have a drug for you,

15  especially in many conditions, and HIV is one of those -- HIV,

16  AIDS.

17  Q.   So projecting that there will be some naive patients in

18  this case or some off-label patients, does that reflect an

19  assumption that the company will be promoting to those

20  patients?

21  A.   No.  In my career we always have to forecast spontaneous

22  demand for a product to be sure you had supply.

23  Q.   Well, are doctors able to prescribe off -- any drug

24  off-label if in their medical judgment they think it's the

25  most appropriate treatment for the patient?

1  A.   It's their medical judgment that they make, and they can

2  decide what to do.

3  Q.   And so in all these presentations that we've just seen,

4  where there are references to forecasts of patient share that

5  may or may not be off-label, does that imply in any way that

6  the company was planning to promote off-label for those parts

7  of the market?

8  A.   No, it does not.

9  Q.   Okay.

10       Is the assumption, then, as you just -- I just want to

11  confirm.

12       Is the assumption, then, as you just articulated, that

13  the forecast would be the assumption would be that there would

14  be some off-label promotion because of the independent

15  decision-making of doctors?

16  A.   Based on a number of factors, and it's -- yes, there

17  would be -- I think you said spontaneous, yes, spontaneous

18  use.

19  Q.   And so like -- if I can just direct your attention to the

20  bottom of the slide, there's a legend at the bottom that says,

21  "promotion will only occur against on-label uses.  Any sales

22  arising from segments representing off-label uses at that time

23  and assumed that a current PI will be a result of only

24  spontaneous sales."

25       Do you see that?

CROSS - MATTES - KLEIN

1   A.   Yes.

2   Q.   Is that consistent with your understanding of how Janssen

3   promoted and marketed its drugs?

4   A.   Yes.

5   Q.   Thank you.

6        I also wanted to ask you about the forecasting and

7   planning process.

8        So as we've established -- or as you've testified,

9   there can be spontaneous switches for off-label promotions.

10       Correct?

11  A.   There can be spontaneous use, switches, and starts.

12  Whatever the physician wants to do, they can do.

13  Q.   Okay.

14       And I think one of the documents -- just one second.

15       I'm going to show you one of the other documents that

16  Relators had discussed with you yesterday.  I'm showing you

17  Relators' Exhibit 179, and I'm going to show you a couple

18  pages of it that you were shown yesterday.

19       Do you remember discussing this slide with Relators'

20  counsel, the new patient segmentation?

21  A.   Yes.

22  Q.   And I think you had testified that you weren't

23  necessarily clear on exactly who fell into what bucket, but

24  that some -- some of the segments on this slide would be

25  on-label, and some of the segments on this side would be

CROSS - MATTES - KLEIN

 1  off-label.

 2       Is that fair?

 3  A.   It's fair.  Yes, it's fair.

 4  Q.   But if you look -- I don't know if you were shown this

 5  slide, but if you look at page 12 -- let me zoom out a little

 6  bit.

 7       When the presentation was actually populated, when the

 8  analysis was actually inserted, and -- the commentary on the

 9  different segments was asserted, do you see on segment A

10  there --

11  A.   Yes.

12  Q.   -- on the far left under naive?

13  A.   Uh-huh.  Yes.

14  Q.   That says, "priority upon full approval."

15       Do you see that?

16  A.   Yes.

17  Q.   All right.

18       And then do you see the callout box, the dialogue box

19  below it?

20  A.   Yes.

21  Q.   The second bullet where it says, "longer term penetration

22  with 800M QD and possibly 800 milligram formulation."

23       Do you see that?

24  A.   Yes.

25  Q.   All right.

CROSS - MATTES - KLEIN

1          So does this reflect that the company was planning to

2     pursue naive patients upon full approval?  In other words,

3     when the label was expanded and those patients could be

4     promoted to on-label?

5     A.    Upon receipt of the label, yes.

6     Q.    And then actually further back in this same deck -- and I

7     don't know that this was shown to you either -- we have a

8     simplified version of the patient segmentation chart.

9          Do you see that?

10    A.    Yes.

11    Q.    All right.

12         And you see again naive is on the left, experienced is

13    on the right.

14         Right?

15    A.    Yes.

16    Q.    Okay.

17         And then do you see the arrow above that?

18    A.    Yes.

19    Q.    Okay.

20         There's an arrow that looks like a timeline.

21         Right?

22         And on the right it says 2007 to 2008.

23    A.    Yeah, it's kind of going in the reverse direction, but

24    yeah --

25    Q.    Yeah.  It's a little confusing the way it's set up, but

CROSS - MATTES - KLEIN

1  then on the left it says "2009 and beyond."

2  A.   Yes.

3  Q.   Do you see that?

4  A.   Yes.

5  Q.   All right.

6       And did Prezista get its indication for naive patients

7  in 2008?

8  A.   I don't believe so.  I don't remember the exact date that

9  we received it, but you can help me.  But it took time to --

10 Q.   Took time to get it?

11 A.   Right.

12 Q.   But did Prezista launch in 2006?

13 A.   Yes.

14 Q.   Okay.

15      And approximately two years later -- two plus years

16 later, in the fall of 2008, it got the naive indication.

17      Is that consistent with your recollection?

18 A.   Yeah, not specifically to the time.  I don't remember how

19 long.

20 Q.   Okay.

21      So if we look at this chart and the sort of backwards

22 time arrow, would this show that the company was promote --

23 would be seeking to promote to experienced patients in 2007

24 and 2008 and would only be promoting to naive patients 2009

25 and beyond, after it had the indication?

CROSS - MATTES - KLEIN

1   A.   Yeah.  It's also with some of the segments under

2   "experienced" being not highlighted, it tells me that those

3   were not planned until we could actually do it on-label.

4   Q.   But just to be clear for the record, is the answer to my

5   question yes?

6   A.   Yes.

7   Q.   All right.

8        Now, you were shown this document yesterday, a policy

9   document, quite a lengthy policy document.

10       Do you remember discussing this document with counsel

11  yesterday?

12  A.   Yes, very well.

13  Q.   All right.

14       And this document actually -- if you'll see, it has a

15  section on forecasting on page 5.

16       Do you see that?

17  A.   Yes.

18  Q.   All right.

19       Now, for forecasting it says, "Sales forecast should be

20  created in coordination with the finance departments because

21  sales forecast are tools to inform overall business decisions

22  such as supply management and are relied on for financial

23  reporting purposes.  They can include total sales projections

24  including those for on-label and off-label uses and must be

25  accurate and complete."

CROSS - MATTES - KLEIN

1          Do you see that?

2   A.   Yes.

3   Q.   So the plan and forecasting documents that we were just

4   looking at, those slide decks and the Relators' counsel took

5   you through today and yesterday, are they consistent with this

6   policy?

7   A.   Yes.

8   Q.   Yesterday Relators' counsel showed you a number of

9   marketing materials.

10          Do you remember that, the glossy?

11  A.   Yes, yes.

12  Q.   Okay.

13          I think they've been referred to as glossaries or

14  slim-jims, different materials.

15          Do you remember the marketing materials from yesterday?

16  A.   Yes.

17  Q.   Okay.

18          And there were some questions yesterday about whether

19  those marketing materials -- who approved those marketing

20  materials.

21          Do you remember that?

22  A.   Yes.

23  Q.   All right.

24          Is it your understanding that compliance would have

25  reviewed and approved all those marketing materials?

CROSS - MATTES - KLEIN

1   A.   Yes.

2   Q.   Okay.

3        And was it your understanding that marketing

4   materials -- there is a process to submit marketing materials

5   to the Government so that they could review them as well?

6   A.   Yes.  I believe there was a periodic requirement to share

7   materials with the FDA, Government, yes.

8   Q.   Right.

9        Okay.  So let me show you a document you discussed

10  yesterday, although I don't know that we focused on all the

11  parts of it that we're going to highlight here.

12       But do you remember discussing this document,

13  Defendants' Exhibit 2083, regarding the approval of marketing

14  materials?

15  A.   I don't remember specifically the document, but I

16  remember reviewing a lot of these types of documents.

17  Q.   Yeah.

18       And I think yesterday Relators' counsel had focused on

19  the bottom bullet of the first section of the bullet, where it

20  says -- bullets where it says "minimal impact on lipids,

21  safety claim was challenged -- changed to low impact on

22  lipids."

23       Do you remember that?

24  A.   Yes, I do, yes.

25  Q.   Okay.

CROSS - MATTES - KLEIN

1          But let's look at the material above that.

2          Okay?

3          In the paragraph beginning with "the draft version."

4          Do you see that?

5     A.   Yes.

6     Q.   It says, "The draft version you were originally trained

7     on has changed as a result of Prezista's final label and

8     comments from the FDA."

9          Do you see that?

10    A.   Yes.

11    Q.   All right.

12         And then the last sentence in that paragraph says,

13    "Please review these important changes and the compliance note

14    provided below to ensure that the promotion of Prezista is in

15    accordance with FDA guidance and our company policy."

16         Do you see that?

17    A.   Yes.

18    Q.   And then the bullets below follow that.

19         Correct?

20    A.   Yes.

21    Q.   Okay.

22    A.   I was reading them.

23    Q.   No problem.

24         So the changes that are reflected in the bullets,

25    including the change with respect to the lipid messaging, that

CROSS - MATTES - KLEIN

1    was done in response -- was that done in response to FDA

2    guidance and comments?

3              MR. MARKETOS:  Objection, Your Honor.  It assumes

4    facts.  This witness testified as to lack of knowledge.

5              THE COURT:  I'm just looking at the question.  Just

6    bear with me a second.

7              I'll sustain the objection, but just rephrase the

8    question.

9              MR. KLEIN:  Rephrase the question?

10             THE COURT:  So the objection as to form, I'm going to

11   sustain.  Does that make sense?

12             MR. KLEIN:  Yes, Your Honor.  Thank you.

13   BY MR. KLEIN:

14   Q.   So, Mr. Mattes, does this document indicate to you that

15   the modifications to the marketing materials were made based

16   on -- in part at least on FDA comments and feedback?

17   A.   Yes.

18   Q.   All right.

19             And then below, you see the next paragraph, it says,

20   "Please remember the following important compliance points

21   when utilizing the Prezista visual aid with your customers."

22             Do you see that?

23   A.   Yes.

24   Q.   And then the bullet below, "Tibotec Therapeutics' policy

25   is always to promote our products within the FDA-approved

CROSS - MATTES - KLEIN

1  labeling with fair balance and full disclosure."

2      Do you see that?

3  A.   Yes.

4  Q.   All right.

5      And then, second sub-bullet, "All unsolicited off-label

6  requests should be forwarded to the medical information

7  department," and it leaves a phone number.

8      Do you see that?

9  A.   Yes.

10 Q.   All right.

11     Is that description -- well, in your experience and

12 understanding, was the company's promotion of Prezista and

13 Intelence consistent with those bullets in that direction

14 there?

15 A.   Yes.

16 Q.   For all marketing materials that were shown to you

17 yesterday, do you have any reason to believe that they would

18 have been approved for some different process than is outlined

19 here involving the FDA?

20 A.   The process was consistent for everything that went out

21 to the sales force.

22 Q.   I'm going to show you another email that you were shown

23 yesterday by Relators' counsel.  This relates to medical

24 information requests for MIRs.

25     All right?

CROSS - MATTES - KLEIN

1    A.    Aw, yes.

2    Q.    I'll make this a little easier to read.

3    A.    Thanks.

4    Q.    Do you remember discussing this document, an email from

5    Frank Murphy to others relating to the relative volume of MIRs

6    in New York and Florida?

7         Do you remember looking at this document?

8    A.    Yes.

9    Q.    Okay.

10        And I think there were a bunch of questions about this

11   document about, you know, the uses of MIRs.

12        Do you remember that?

13   A.    Yes.

14   Q.    But some of the language in this document I don't

15   think was -- it might not have been highlighted in the exam

16   yesterday, so I just want to make sure we're mindful of it.

17        So in the middle of that description, it says, "As we

18   discussed in the past, we need to use the MIR process to

19   answer unsolicited questions on Prezista that are off-label."

20        Right?

21        And then it goes on to talk about the difference in

22   volume between New York and Florida for MIRs.

23        And then in the second -- the third to last sentence,

24   you see that it says, "That's not what I expected, want all of

25   your commitments to use this resource."

─CROSS - MATTES - KLEIN─

 1          Then it says "Use this resource when asked by your

 2   customers."

 3          So using the MIR process to answer unsolicited

 4   questions, using the resource or recourse I guess you say

 5   there when asked by your customers.

 6          Is that the proper use of the MIR process?

 7   A.   Yes.

 8   Q.   Just sort of on MIRs more generally, if there's a new

 9   product that's just been launched, like Prezista in 2006 or

10   Intelence in 2008, would you expect to have a certain volume

11   of MIRs?

12   A.   You would expect it -- yes.  You want to be -- yes.

13   Q.   Okay.

14          And why would you expect that?

15   A.   Well, there's -- it's a new drug in a difficult-to-treat

16   therapy- -- patient population, and physicians would want to

17   know probably more than what the representative could

18   communicate on-label.

19   Q.   Okay.

20   A.   So, yes, there would be increased use initially.  You

21   would hope there would be increased number of MIRs and -- yes.

22   Q.   So is it -- were MIRs a way to sort of track physician

23   engagement with the sales staff medicine?

24   A.   Yes, yes.

25   Q.   And if -- if you saw very few or no MIRs, would that be a

CROSS - MATTES - KLEIN

1    concern?

2    A.    It would cause you to ask questions, yes.

3    Q.    And why is that?

4    A.    Well, you know, is there no interest?  Are we -- is the

5    message perhaps on the good side?  Is the message so thorough

6    that there are no questions?

7         You know, it would -- it would definitely be abnormal

8    in my experience, and I've launched many products, where you

9    wouldn't get a fairly large amount of inquiries for additional

10   data that we couldn't necessarily disseminate.

11        So there would be lots of reasons to want to assess a

12   dearth of requests.

13   Q.    Let me ask you this:  If there were no MIRs, could that

14   be an indication that reps are talking -- are actually talking

15   to doctors off-label?

16   A.    Could be potentially a consideration, yes.

17   Q.    And why would that be, if there are no MIRs?

18   A.    Well, assuming that the questions are potentially

19   off-label -- first of all, the rep can answer -- should be

20   able to answer on-label questions.  They're trained to do

21   that.

22        If the questions are off-label in nature, the

23   representatives would not be able to answer those questions by

24   policy.

25   Q.    Okay.

CROSS - MATTES - KLEIN

1          And so if there were a lack of MIRs, would that

2    indicate that the reps were just answering those questions

3    improperly rather than submitting them through the process?

4    A.    A sworn consideration could be -- again there was just no

5    interest, you know.  It's --

6    Q.    Okay.

7    A.    -- another issue.

8    Q.    Another issue.  All right.

9          So let's maybe zoom out a little bit.  You've had a

10   long -- I think you testified you've had a long career in this

11   industry, right?

12   A.    Yes.  I think -- I was just pondering how long.

13   Q.    And I understand you testified -- I think you've held

14   several senior positions.

15   A.    Yes.

16   Q.    Okay.

17         Did you ever participate or were you ever you appointed

18   to any Government bodies relating to HIV?

19   A.    Yes.  I had the honor of serving President George W.

20   Bush's action committee on HIV and AIDS.  The committee was --

21   reported to the Department of Health and Human Services.  I

22   was sworn in by the President.

23         I was one of two industry representatives to that

24   committee, during my tenure as president of Tibotec.

25   Q.    Okay.

CROSS - MATTES - KLEIN

1      What sorts of issues did you have to deal with as part

2  of that -- as part of that group?

3  A.   We helped the President establish his policy on the HIV

4  and AIDS patient community, both domestically and globally.

5  We were a member from industry, from clergy, from Government

6  experiences, and there were two committees you were part of.

7      It was called POSHA, and there was a POSHA committee.

8  I was assigned to the international group, which was

9  interesting because I was a president in the U.S., and we

10  helped President Bush establish a piece of legislation called

11  PEPFAR.

12     And PEPFAR was a -- supported the funding by the

13  United States to help ease the strains of the global pandemic

14  and HIV and AIDS, which during those years was quite more

15  profound than others.

16     Interestingly enough, to the President's credit, the

17  legislation was passed as a security measure because he

18  positioned that AIDS was destabilizing third world countries

19  and could potentially lead to unrest and further implications.

20     And under his guidance and leadership and POSHA's

21  support, that legislation was passed into law.

22  Q.   All right.

23     So is it fair to say throughout your career you've been

24  committed to the issue of HIV and AIDS and the treatment of

25  HIV/AIDS population?

CROSS - MATTES - KLEIN

1    A.    Certainly since being given the assignment of president

2    of Tibotec, Janssen, yeah.

3    Q.    Okay.

4          We'll come back to that a little bit later.  We'll come

5    back to the credo a little bit later as well.

6          So there's been a lot of talk about the launch of

7    Prezista in 2006, and the miss -- the forecasting miss, where

8    initial sales did not meet expectations.

9          Do you recall that --

10   A.    Very well.

11   Q.    -- discussion?

12   A.    Very well.

13   Q.    All right.

14         And so based on your understanding as the president of

15   the company, what was the reason for the miss?  In other

16   words, what did the company expect to get that was missing

17   when things actually played out in 2006?

18   A.    So in my opinion, the biggest reason for the slower

19   uptake and results compared to forecast was the rate at which

20   physicians actually switched their patients.  Remember, that

21   was our indication, highly treatment-experienced patients.

22         The drugs that we were competing with, the other

23   protease inhibitors, were quite effective and on the market

24   for some time, and I think the miss was assuming that once a

25   patient became -- their disease, their virus, became

1    detectable again in blood work, they would switch from --

2    assuming they were on one or two other protease inhibitors.

3    That didn't happen as quickly as we thought it would.

4        So from my perspective, and I think research validated

5    that, we got the switches, but it took longer to get the

6    switches.  And our numbers -- our penetration to the market

7    really followed that.

8        So there was the rate of switching, how quickly would a

9    physician switch that caused the slower uptake than what we

10   had forecasted.

11   Q.   Okay.

12       And did the miss of -- did missing a forecast have

13   anything to do at all with the fact that the company was not

14   getting off-label patient populations that it had hoped to

15   get?

16   A.   Yeah.  I don't recall what specific forecasts were given

17   to off-label use.  Again, it was -- that was done for

18   production purposes.

19       But if you looked at the expectation of the approved

20   indication and how quickly those physicians would switch those

21   patients, there was -- to use the language that was used

22   earlier, there was a mistake made in how quickly that would

23   happen.

24   Q.   And I think you've testified that as a result of that,

25   the forecasts were lowered later in the year to match the

CROSS - MATTES - KLEIN

1  actual results.

2        Is that right?

3  A.   To -- yeah.  To match what was -- yes.  Yes.

4  Q.   Okay.

5        And was there a corresponding reduction to sales

6  targets that the sales folks had to meet to get their bonuses?

7  A.   There was a reduction.  I don't recall if it was exactly

8  corresponding, but it was our realization that the sales force

9  should not be penalized for the slower uptake based on that

10 phenomenon.

11 Q.   Okay.

12       And you had mentioned I think just now that the

13 indication for the drug initially was quite a narrow

14 indication, correct, when it first came out before the label

15 is expanded to include naive patients in 2008?

16       Right?

17 A.   It was narrower than the competition who had -- yes.

18 Q.   So one question:  I mean, why didn't the company just

19 wait for the expanded indication?  Why did it go forward with

20 this narrow indication that ended up being hard to market?

21 A.   That was a question I got a lot especially from my

22 research colleagues, and the answer is a simple one for me

23 because if you look at our credo, it wasn't first do good.

24 This was a drug that was developed for patients who were

25 resistant to therapy, meaning that these patients were on

CROSS - MATTES - KLEIN

1    death's door, and to withhold that product from the

2    marketplace because of a commercial outcome would be

3    inconsistent with our credo.

4         So my decision, and that decision was supported

5    wholeheartedly by my people I reported to all the way up to

6    the CEO, was we have no doubt we're going to launch as soon as

7    we can.

8    Q.   Okay.

9         What was the concern about what would have happened if

10   you had delayed the launch?

11   A.   Well, "concern" might not be the right word.  It's just

12   you would be -- you have a drug that's approvable for a

13   segment of patients that desperately need a new protease

14   inhibitor.

15   Q.   So is it fair to say the decision to launch early, even

16   with a narrow indication, was driven by considerations of

17   patient health and safety?

18   A.   Absolutely.

19   Q.   All right.

20        Now, during that time, there's been testimony that it

21   was a disappointing juncture in the -- in the company's

22   marketing Prezista, right, the missing of the forecast.

23        Do you remember that?

24   A.   It was disappointing, yes.

25   Q.   Okay.

CROSS - MATTES - KLEIN

1      You know there have been -- there's been testimony and

2   references to the fact that some of the employees instead of

3   calling you Glenn Mattes, called you Glenn mad at us?

4      Have you heard about that?

5   A.   I heard that.  I've also heard that from my children, so,

6   yes.  It's an easy one, and they turned out okay, so...

7   Q.   What was -- what's your -- how would you describe your

8   management style?

9   A.   So I have high expectations of myself, okay?  I believe

10  in accountability strongly, so I hold myself accountable for

11  what -- in life, professional and personal, to what I

12  should -- what people expect of me and what I'm accountable

13  for from a functional standpoint.  So I do hold people

14  accountable.

15     I also value how you get things done, the integrity

16  base of how you operate, but I do have -- hold people

17  accountable.  I do have high expectations, as I said, of

18  myself and my organization.  People get paid to do a job and

19  produce a result, and they should be accountable for that.

20  Q.   All right.

21     I want to touch on another issue relating to the launch

22  of Prezista and later Intelence.

23     In connection with launching a new product like

24  Prezista, one thing -- is it correct to assume that one thing

25  you have to determine is how to -- how to price the drug?

CROSS - MATTES - KLEIN

1   A.   That -- that is part of the strategy, yes.

2   Q.   And for Prezista in 2006, how did you determine how to

3   set the price of that medicine?

4   A.   So the first thing that we did as a team was to engage

5   with the HIV and AIDS community, and there was a group of

6   people that that were -- I guess we call them activists.  They

7   were extremely vocal about how drugs should be priced, how

8   drugs should be made available to patients.

9         Many of these patients are at death's door.  They can't

10  afford the drugs.  It was a very virulent time, you know.

11  People were going to pharmaceutical companies with caskets and

12  vials of blood.

13        And it was clear that in order for us to -- at least to

14  me and my team, it was very -- it was very important that we

15  connect with these folks to, first of all, understand their

16  points of view and get feedback about how -- feedback and

17  suggestions, not promising we would abide by those

18  suggestions, but reach out to these folks.

19        So -- and they did advise the company in numerous

20  meetings I had with members of my team or individually that

21  price was a concern, and as that relationship went on, I

22  asked, Well, what would be a price that would -- you would be

23  comfortable.

24        There was a practice in the industry that every new

25  drug, every new protease inhibitor or any drug that came to

CROSS - MATTES - KLEIN

1    market was priced at a premium to the prior drugs that were

2    introduced, 10, 20, 30 percent.

3         And the request made of me to present to the company

4    was, Just don't price it any higher.  If you come in at

5    parity, price to the market leader, and you work on our behalf

6    to get reimbursement at the groups called ADAPs that help get

7    reimbursement, I believe, at the state or federal level, we

8    would support that decision, embrace that decision, and that

9    is the decision we took when pricing Prezista.

10        It broke the pattern that the industry had historically

11   done of increase -- every new drug got a higher price.

12   Q.  Okay.  So you --

13   A.  I'm sorry.  And they took price increases annually.  They

14   asked me to consider staying at that price for a period of

15   time.

16   Q.  Okay.

17        So just -- to make sure we understand.  So was the

18   final decision to price Prezista at parity with the existing

19   protease inhibitors and not charge a premium?

20   A.  That was the decision, yes.

21   Q.  Okay.

22        And by doing that, was the company foregoing profits

23   that it could have made if it charged the higher price?

24   A.  The pattern being about a 30 percent price differential,

25   yes.

CROSS - MATTES - KLEIN

1  Q.   Okay.

2       Why did you do that?

3  A.   It was the right thing to document.  You've seen our

4  credo and -- there was even -- this may help answer the

5  question.

6       There was even a third or fourth or I think counsel

7  said tenth protease inhibitor on the market.  Why?  And the

8  answer I got -- I asked the question, and the answer was, If

9  not J&J, who?

10       We had a segment of the patient population that this

11  drug could help, the treatment-experienced patients that were

12  failing.  And if not J&J, who?

13  Q.   All right.

14       And was there any public recognition of the company's

15  pricing policy in that regard?

16  A.   Yes.  We -- when -- as soon as the drug was approved, the

17  head of the fair pricing coalition, a gentleman by the name of

18  Martin Delaney, published broadly that he praised the company.

19       I got the credit, it shouldn't have been me, for the

20  pricing we took.  We had citations read on the floor of

21  Congress and the Senate by members of both bodies to applaud

22  the company's decision in the way we acted in this space.

23  Q.   All right.

24       MR. KLEIN:  Mr. Knecht, if we could put up

25  Defendants' Exhibit 8976.  Just for -- sorry -- just for the

CROSS - MATTES - KLEIN

1    witness and counsel, please.  Take that down.

2    BY MR. KLEIN:

3    Q.  Mr. Mattes, do you see on the screen there --

4           MR. KLEIN:  Can you take that down, Mr. Knecht?  The

5    jury can see it.  It came down there first.

6    BY MR. KLEIN:

7    Q.  Do you see what's on the screen there, Mr. Mattes?

8    A.  There's nothing on my screen.

9           MR. KLEIN:  Mr. Knecht, just to counsel and the

10   witness, please.

11          THE WITNESS:  I see it now.

12   BY MR. KLEIN:

13   Q.  Do you see it now?

14   A.  Yes.

15   Q.  All right.

16          THE COURT:  I don't see it.

17          MR. KLEIN:  Your Honor, can we take a short break so

18   we can get this document?

19          THE COURT:  Also, do you have -- I was going to give

20   the jurors a ten-minute break anyway at 11:00.

21      Why don't we take the break now.  Do you have a lot

22   left on your examination?

23          MR. KLEIN:  Not a whole lot, Your Honor.

24          THE COURT:  Let's take a recess of ten minutes.  I

25   was going to do that anyway.

CROSS - MATTES - KLEIN

1          THE DEPUTY COURT CLERK:  Please rise.

2          THE COURT:  Folks, be seated.

3          (A short recess occurred.)

4          THE DEPUTY COURT CLERK:  Please remain seated.

5          THE COURT:  So save me some time.  Is there some

6   objection to this document?

7          MR. MARKETOS:  I'm just seeing it, Your Honor.

8          THE COURT:  All right.  Well, I mean --

9          MR. MARKETOS:  I don't think so.

10         THE COURT:  Okay.  It will save me time, then,

11  because we're bringing the jury out, so tell me now.

12         MR. KLEIN:  It's a Government record, and we're

13  not -- yeah.  It's a page of the Congressional Record.

14         MR. MARKETOS:  I don't have an objection.

15         THE COURT:  All right.  That just makes it easier,

16  then.  All right.

17         Mr. Klein, are you going to be done soon?

18         MR. KLEIN:  Yes, Your Honor.

19         THE COURT:  And, Mr. Marketos, how long do you have

20  on any -- do you have any redirect?

21         MR. MARKETOS:  Maybe five minutes.

22         THE COURT:  All right.  You told me 30 minutes we had

23  left this morning, and that went long, so your five minutes is

24  going to be five minutes, then.

25         MR. MARKETOS:  Okay.

CROSS - MATTES - KLEIN

```
 1              THE COURT:  We need to be done before noon.

 2              MR. MARKETOS:  No problem.  No problem.

 3              THE COURT:  Folks?  Okay.

 4              MR. KLEIN:  Yeah.  If he's really only got five

 5    minutes, no problem.

 6              THE COURT:  Because my understanding is Mr. Mattes

 7    has to be somewhere.

 8              MR. KLEIN:  That's right.

 9              THE COURT:  All right.  So let's make sure we keep

10    him on time.

11              MR. KLEIN:  Yes, Your Honor.

12              THE WITNESS:  Thank you, Your Honor.

13              THE COURT:  You got it.

14         Since I have you, I'm going to break after Mr. Mattes.

15    I have to be somewhere else in the courthouse at 12:30, so we

16    got to break for lunch where I can do that and be back.

17              MR. MARKETOS:  What time is that, Your Honor?

18              THE COURT:  My engagement is at 12:30.  I probably

19    have to get to the second floor by 12:20, so we can break

20    around 12:15 or so.

21         Do you think -- we won't be done by then?

22              MR. MARKETOS:  No.  I'm just thinking, Your Honor, if

23    you have to do that -- and we'll do whatever you like.

24              THE DEPUTY COURT CLERK:  All rise.

25              THE COURT:  We'll talk about it on the break.
```

1          (The jury enters the courtroom.)

2              THE COURT:  All right.  Folks, everyone be seated.

3          Mr. Klein, when you're ready to proceed, you may.

4              MR. KLEIN:  Your Honor, move to admit

5      Defendants' 8976?

6              MR. MARKETOS:  No objection.

7              THE COURT:  So admitted.

8              (Defendants' Exhibit 8976 in evidence.)

9      BY MR. KLEIN:

10     Q.   Mr. Mattes, you mentioned Congressional recognition of

11     the company's pricing policy.

12             MR. KLEIN:  Actually, Mr. Knecht, can I have the

13     ELMO.

14     BY MR. KLEIN:

15     Q.   All right.

16         So Mr. Mattes, do you see here we have the page from

17     the Congressional Record and statements made by the Honorable

18     Donald M. Payne, titled "Tribute to Johnson & Johnson and

19     Tibotec Therapeutics for the Development of a new drug for

20     HIV/AIDS."

21         Do you see that?

22     A.   Yes.

23     Q.   All right.

24         And do you see the entry starts -- he says,

25     "Mr. Speaker, I rise to congratulate Johnson & Johnson,

CROSS - MATTES - KLEIN

1  Tibotec Therapeutics on its entry into the HIV/AIDS market

2  with the launch of Prezista."

3       Do you see that?

4  A.  Yes.

5  Q.  All right.

6       And then skipping down a bit, the remarks at the end of

7  his statement.  It says, "One of the most challenging

8  obstacles in the care for HIV is finding proper therapies for

9  treatment-experienced patients.  Prezista is an important new

10 option for the thousands of people with HIV in the

11 United States who are resistant to more than one protease

12 inhibitor."

13      And it continues.  He says, "Additionally, the Fair

14 Pricing Coalition believes that Tibotec Therapeutics has

15 priced Prezista responsibly.  This is a particularly

16 thoughtful move on the company's part since it recognizes the

17 crisis of federal funding constraints faced by payers in and

18 out of the Government and the health care system.

19      "I'm pleased to see that the spirit of philanthropy has

20 not eluded the makers of this much needed drug by putting the

21 needs of patients first."

22      Do you see that?

23 A.  Yes.

24 Q.  Was this the Congressional citation that you were

25 referring to in your remarks?

CROSS - MATTES - KLEIN

```
 1   A.   Yes.

 2   Q.   Okay.

 3        And is the description of the pricing decisions and the

 4   principles that inform them consistent with how you decided to

 5   price -- how the company decided to price Prezista?

 6   A.   The company, yes.

 7   Q.   All right.

 8        I think in one of my earlier questions I may have

 9   misspoke, so I just want to be clear.

10        We were talking about spontaneous switches where

11   doctors would spontaneously switch between medicines and might

12   spontaneously prescribe drugs off-label.

13        Do you remember that?

14   A.   Yes.  The -- the word "spontaneous" might not be

15   appropriate, but they can decide to switch a patient who's

16   treatment experienced, which is on-label, or they can decide

17   to do -- prescribe however they want.

18   Q.   And just to -- because this is what I'm leading up to,

19   but just to be clear, Mr. Mattes, were the -- were the doctors

20   who were prescribing Prezista and Intelence off-label -- to

21   your understanding, were they doing that as result of

22   off-label promotion?

23   A.   No.

24   Q.   Okay.  All right.

25        We talked a little bit about the pricing decisions
```

CROSS - MATTES - KLEIN

1    around Prezista.  The company launched Intelence in 2008 as

2    well.

3          Correct?

4    A.   Yes.

5    Q.   Okay.

6          And similarly, is it fair to say you would have had to

7    determine pricing for Intelence when that launched as well?

8          Is that right?

9    A.   Yes.  The same process was put in place.

10   Q.   Okay.

11         And what -- what decision ultimately was reached about

12   Intelence pricing?

13   A.   I don't remember specifically how we priced it.  It was

14   at parity or maybe with a slight premium.  I don't recall

15   specifically, but it was definitely endorsed by the activists'

16   fair pricing committee.

17   Q.   Okay.

18         Would it be fair to say that the price for Intelence on

19   launch had a lower premium over prior drugs than was the

20   industry standard at the time?

21   A.   I don't recall specifically, but I believe so.

22   Q.   Okay.

23         Do you recall whether there was Congressional

24   recognition of that pricing decision?

25   A.   Not specifically.

─────CROSS - MATTES - KLEIN─────

1  Q.   Okay.

2        Let me see if we can refresh your recollection.

3        MR. KLEIN:  Can we put up just for the -- is there

4  going to be an objection -- can we put up just for the witness

5  Defendants' 8977, just for the witness and counsel, please.

6        THE COURT:  I lost it.

7        THE WITNESS:  As did I.

8        THE COURT:  Neither of us have it now.

9        THE WITNESS:  There it is.

10        THE COURT:  We're back.

11        MR. KLEIN:  Okay.  If we -- all right.  If we flip

12  ahead to page E66.  Mr. Knecht, the page at the top.

13  BY MR. KLEIN:

14  Q.   Mr. Mattes, you'll see the statement of the honorable

15  G.K. Butterfield of North Carolina.

16        Do you see that?

17  A.   Yes.

18  Q.   And do you see where Mr. Butterfield says on a

19  Congressional Record, "I rise today to commend and

20  congratulate Tibotec Therapeutics for" --

21        THE COURT:  Hold on.  Is this admitted?

22        MR. KLEIN:  Not yet, Your Honor.

23        THE COURT:  You can't read out of the document.

24        MR. KLEIN:  Okay.

25  BY MR. KLEIN:

CROSS - MATTES - KLEIN

1  Q.  Does this refresh your recollection, Mr. Mattes --

2  A.  Yes, it does.

3  Q.  Hold on.  Let me finish my question.

4      Does this refresh your recollection as to whether

5  Janssen --

6          THE COURT:  Let me ask you this:  Is this a

7  Government record similar to the last --

8          MR. KLEIN:  It's the exact same --

9          THE COURT:  So is there an objection to this?

10         MR. MARKETOS:  There is no objection.

11         THE COURT:  All right.  Now it's admitted.

12  Mr. Klein, you can publish it now.

13         MR. KLEIN:  Okay.  Let's publish, please.

14  (Defendants' Exhibit 8977 in evidence.)

15  BY MR. KLEIN:

16  Q.  All right.  You see the comments of Mr. Butterfield?

17  A.  Yes.

18  Q.  Actually, I'll --

19         MR. KLEIN:  Mr. Knecht, I'll use the ELMO again,

20  please.

21  BY MR. KLEIN:

22  Q.  I've highlighted some portions here.

23      So Mr. Butterfield says, "Madam Speaker, I rise to

24  commend and congratulate Tibotec Therapeutics for their

25  innovation and corporate responsibility in developing new

─CROSS - MATTES - KLEIN─

1    treatments for people living with HIV/AIDS."

2         And you see right under that, it refers to Intelence --

3    the launch of Intelence.

4         Do you see that?

5    A.   Yes.

6    Q.   All right.

7         The statement goes on to say, "Tibotec Therapeutics is

8    also a leader in reaching out to unserved communities highly

9    impacted by HIV."

10        Do you see that?

11   A.   Yes.

12   Q.   Was that a priority for the company while you were

13   president?

14   A.   Yes.  It was one of many priorities but something that I

15   think we -- we wanted to serve all stakeholders, and the

16   community was an integral part of our stakeholders.

17        In fact, we -- we put in a group of folks -- I think

18   they were called community liaisons -- and the sole purpose of

19   those folks was to work some of the major HIV hubs where there

20   were a lot of patients, helping other nonprofits provide

21   services to their constituency.

22        They would -- there's no goals, no objectives.  There

23   was no ROI associated to their work.  They were there

24   completely to serve the community and where we could with our

25   resources provide help to those -- those folks.  And, yes.

CROSS - MATTES - KLEIN

1  Q.   You can see at the bottom of the statement it says,

2  "Finally, Tibotec Therapeutics acted responsibly in pricing

3  Intelence, a fact recognized by many leaders in the HIV

4  community.

5       "In fact, one leading HIV patient advocated stated,

6  'With the introduction of Intelence, Tibotec Therapeutics has

7  demonstrated exceptional leadership in working with the HIV

8  community in an effort to address pricing and access issues.

9       'Tibotec has repeatedly recognized the necessity of

10 responsibly pricing HIV products and should be commended for

11 its leadership in this regard.' "

12      Do you see that?

13 A.   Yes.

14 Q.   Okay.

15      Does this refresh your recollection as to how the

16 company priced Intelence upon its launch?

17 A.   Yes.

18 Q.   Mr. Mattes, I think --

19      MR. KLEIN:  You can take that down.

20 BY MR. KLEIN:

21 Q.   Mr. Mattes, I think you're aware that there are -- there

22 have been allegations in this case that you masterminded a

23 nationwide conspiracy to market Prezista and Intelence

24 off-label, to market Prezista improperly with respect to

25 lipids, and to essentially bribe doctors through speaker

CROSS - MATTES - KLEIN

1    bureau payments.

2         Are you aware of that?

3    A.    Yes.

4    Q.    Did any of that happen?

5    A.    No.

6    Q.    Were there multiple stakeholders within the company that

7    would have been checks on any attempt to do such a thing?

8    A.    The reason I can answer in the affirmative to the first

9    question is because of those checks and balances.

10   Q.    Okay.

11        What -- what were those?

12   A.    Well, we had legal, regulatory, other people, functions,

13   groups of folks that were responsible for the approval of

14   materials, anything that went -- that represented the company

15   or our products to customers.

16        Nothing went out the door that wasn't reviewed.  And my

17   management philosophy was that was a check for me that we were

18   on -- we were not violating any off-label -- or doing anything

19   that was off-label.

20   Q.    Did you ever direct anyone to market any Prezista or

21   Intelence off-label in any way?

22   A.    No.

23   Q.    Did you ever direct anyone to misuse speaker programs as

24   has been alleged in this case?

25   A.    No.

CROSS - MATTES - KLEIN

1   Q.   All right.

2        Is it plausible to you that such a thing could have

3   happened given the checks and balances you've described, given

4   the constant interaction that the staff had -- the field force

5   has with doctors, and not a single person reported it?

6   A.   Well, when -- I can -- confident what went out the door

7   was compliant.  What happened in certain areas of the company

8   that might have not embraced that direction -- I can't sit

9   here categorically and say nothing went on.

10       But if we learned of it, it would have been addressed.

11  Q.   All right.

12       Did you learn of any such thing happening?

13  A.   I don't recall.  It's possible that certain things were

14  brought to my attention.  It may not only be possible, it may

15  be probable.  I don't recall.  Again, I wish I can tell you,

16  but I don't recall anything specifically that came to us.

17       I'm not saying it didn't come to my desk, but I can't

18  recall.

19  Q.   You don't recall anything like that?

20  A.   No.  I don't recall any specifics.

21  Q.   Mr. Mattes, I think there's been a suggestion in this

22  case that the company put profits before people, particularly

23  marketing the drug using speaker programs.

24       How do you -- how do you react to that accusation?

25  A.   On the past question, I don't recall.  It doesn't mean

CROSS - MATTES - KLEIN

1    that something didn't hit my desk.  I just want to make that

2    clear.

3         To your question -- can you rephrase it?  Sorry.  I was

4    still thinking about the other answer.

5    Q.   Yeah.  No problem.

6         So the question was:  There's been an allegation in

7    this case or a suggestion that the company put profits over

8    people.

9         How do you respond to that kind of insinuation?

10   A.   Johnson & Johnson is a business.  Tibotec/Janssen is a

11   business.  By putting profits before people, I cannot say

12   that's what -- that we did that.

13        You look at our credo; you look at how we acted.  If we

14   wanted to put profits before people, we would have priced

15   30 percent higher than Reyataz, whichever the product was.

16   Q.   Okay.

17            MR. KLEIN:  Just one moment, Your Honor.

18            (Brief pause.)

19            MR. KLEIN:  Thank you, Your Honor.  No further

20   questions.

21            THE COURT:  Okay.  Thank you, Mr. Klein.

22        Mr. Marketos, any redirect?

23            MR. MARKETOS:  Just briefly, Your Honor.

24            THE COURT:  All right.

25            MR. MARKETOS:  Can we switch to the ELMO, please,

1  Ms. Johnson.  Thank you.

2  (REDIRECT EXAMINATION BY MR. MARKETOS:)

3  Q.  Mr. Mattes, just very quickly, sir:  You just gave some

4  testimony in response to questions from your lawyer about some

5  pricing issues, how it was that the price of Prezista and the

6  price of Intelence were accomplished in a way that received

7  praise from two specific House -- members of the House of

8  Representatives.

9       Do you recall giving that testimony?

10  A.  Yes.

11  Q.  Just so the members of the jury are clear, there's no

12  allegations relating to the pricing of drugs that are relevant

13  to this dispute.

14       Do you understand that?

15  A.  Yes.

16  Q.  All right.

17       As I understand it, your point was we did a good thing

18  with this pricing as reflected by the comments of these

19  congresspeople.

20       Right, sir?

21  A.  Those are an example of the feedback we got.

22  Q.  Yes, it was an example of the feedback.  I just noticed

23  that the comments were almost identical that were made by the

24  Honorable Donald Payne and the Honorable G.K. Butterfield.  It

25  was actually written by Janssen for those congresspeople to

REDIRECT - MATTES - MARKETOS

1    give on the floor of the House.

2         Right?

3    A.   I'm not aware of how these statements were made.  I had

4    nothing do with what the words were or the fact that they were

5    made.

6    Q.   Are you aware of the fact that the Johnson & Johnson

7    political action committee committed -- contributed thousands

8    of dollars to Mr. G.K. Butterfield?

9    A.   No.

10   Q.   Are you aware of the fact that Johnson & Johnson's

11   political action committee contributed more than $6,000 to

12   Mr. Donald Payne, honorable representative from the state of

13   New Jersey, in the year that he made those statements?

14   A.   No.

15   Q.   Or that it contributed more than $20,000 between the time

16   period of 2000 to 2014?

17   A.   No.

18   Q.   I think you said, sir, that the biggest reason for the

19   miss in the forecast was that you'd made a mistake in terms of

20   assuming switches and how quickly those switches would be

21   corrected and patients would switch to your company's drugs.

22         Is that right?

23   A.   How quickly the patients would -- it would be

24   implemented, how many patients.  Sorry.  Yes, discussion of

25   the word "implemented."

─REDIRECT - MATTES - MARKETOS─

```
 1   Q.   Al right.
 2        So that wouldn't have been -- that would not have been
 3   something that was the fault of the sales representatives out
 4   in the field.
 5        Right?
 6   A.   No.
 7   Q.   All right.
 8        So putting pressure on sales representatives to make a
 9   forecast that is wrong because of an assumption that you had
10   made would be a bad idea.
11        Do you agree?
12   A.   Yes, and we lowered the forecast.
13   Q.   Off-label -- as I understand it, your forecast included
14   off-label sales, but that was done for some purpose other than
15   promoting off-label sales from promotion off-label.
16        Is that right?
17   A.   All demand needed to be accounted for in doing a
18   manufacturing forecast.
19   Q.   Okay.
20        So let me just reframe my question.
21        You testified that there were off-label sales of these
22   drugs in Janssen's forecasts for the sale of Prezista and
23   Intelence just a moment ago.
24        Right, sir?
25   A.   Yes.
```

─────────── REDIRECT - MATTES - MARKETOS ───────────

1    Q.   And it's your testimony, though, that the reasons that

2    off-label sales of Prezista and Intelence were included in the

3    forecast for the company were because of an issue with

4    related -- relating to manufacturing and supply.

5         Is that right?

6    A.   And other financial forecasting needs the company has to

7    report and project.  But the most important is that you have

8    enough product to supply the users.

9    Q.   Yes, sir.

10        And other financial needs.

11        Is that right?

12   A.   Other financial reporting needs.

13   Q.   Okay, sir.

14        MR. MARKETOS:  Let's take a look, if we can switch

15   back to the screen, please, Ms. Johnson.

16   BY MR. MARKETOS:

17   Q.   You testified in response to questions from your counsel

18   about 1787.

19        MR. MARKETOS:  If we can pull up 1787, please,

20   Relators' 1787, Ms. Johnson.  If we can go down to the --

21   let's see -- the slide relating to the $92 million target.

22   BY MR. MARKETOS:

23   Q.   Here's one I need to understand, sir.  If we turn to

24   Slide 10, please.

25        At the bottom of this deck, like we've seen up here on

REDIRECT - MATTES - MARKETOS

1  the bottom of many of Janssen's decks, is a statement,

2  "Promotion will only occur against on-label uses."

3       Right, sir?

4  A.   Yes.

5  Q.   And, of course, the slide itself is projecting

6  $92 million for off-label sales.

7       Right?

8  A.   Naive share -- it looks like it's saying sales that are

9  coming from the naive patients segment.

10  Q.   What actually matters for the purposes of this case is

11  what Janssen was actually doing and not what it stamped on its

12  documents in order to protect itself from liability.

13       Do you agree with that?

14  A.   No, I don't.

15  Q.   Okay.

16       Let's --

17  A.   I think that's preposterous.

18  Q.   Let's take a look at RX-139.  There was a careful

19  communications policy.  We've seen this document.

20       Have you seen this document before, sir?

21  A.   I don't recall.

22  Q.   All right.

23       Let's take a look at page 3.  There's a discussion

24  about emails in particular, "Approximately a hundred million

25  emails are generated per month."

─────REDIRECT - MATTES - MARKETOS─────

1          Do you see that.

2    A.   Yes.

3    Q.   "All written communications matter.  Everything is a

4    document in the eyes of the law."

5          Right?

6    A.   Yes.

7    Q.   "Emails and other written documents are discoverable by

8    plaintiffs' attorneys" --

9    A.   Yes.

10   Q.   -- "and Government regulators, and emails can last

11   forever."

12         Right, sir?

13   A.   Yes.

14   Q.   It was actually -- you were actually taught to be careful

15   with the things you were putting in writing.

16         Right, sir?

17   A.   Yes.

18   Q.   If we take a look at --

19         MR. MARKETOS:  Let's go back to 1787 very quickly and

20   Slide 10, please, Ms. Johnson.

21   BY MR. MARKETOS:

22   Q.   Again, sir, you're talking about a share target that

23   cannot come from off-label promotion.

24         Is that right?

25   A.   Yes.

REDIRECT - MATTES - MARKETOS

1  Q.  So you're targeting sales that have to happen by

2  themselves.

3  A.  Yes.

4  Q.  But $92 million worth?

5  A.  In this case, yes.

6       MR. MARKETOS:  If we take a look at DX-2004, I just

7  wanted to turn to page 5 of that document.

8  BY MR. MARKETOS:

9  Q.  The point of not including off-label forecasting and

10  off-label sales in your forecast is so that they don't turn

11  into sales tactics.

12       Right, sir?

13       That's exactly had the guidance document that your

14  counsel just read to you tells you.

15  A.  Does it say specifically -- does it say specifically,

16  sir, what you just said?

17  Q.  "However to the extent the sales forecast includes

18  off-label sales projection, it should not be used as the basis

19  for developing tact" --

20  A.  Yes.

21  Q.  I'm sorry.

22       -- "developing tactical sales or marketing plans to

23  drive off-label sales growth."

24       Right?

25  A.  Yes.

REDIRECT - MATTES - MARKETOS

1        MR. MARKETOS:  If we take a look at DX-2083, please.

2   BY MR. MARKETOS:

3   Q.   All right.

4        You were asked questions from counsel regarding this

5   exhibit.

6        MR. MARKETOS:  And if you could just please blow up

7   that second paragraph.

8   BY MR. MARKETOS:

9   Q.   Just to reorient us, sir, you were talking about your

10  understanding that what went out into the field had been

11  approved by the FDA specific to messages that were delivered

12  to doctors.

13       Right?

14  A.   No.

15  Q.   You were not talking about that?

16  A.   I was talking about they were approved by our internal

17  review committee.

18  Q.   I am sorry, sir.  I must have misunderstood.

19       I thought what you said in response to this particular

20  email was it said "The draft version you were originally

21  trained on has changed as a result of Prezista's final label

22  and comments from the FDA."

23       You weren't intending to imply in your testimony that

24  your company had received comments from the FDA approving of

25  these messages, were you?

REDIRECT - MATTES - MARKETOS

1   A.   I don't recall whether they did or they didn't, but I

2   don't think I was implying that.

3   Q.   Okay.

4        What you were talking about was your company, Janssen,

5   approved its own messages.

6        Right, sir?

7   A.   We were responsible for -- yes, for that.

8   Q.   Okay.

9        And if there were some approvals from the FDA, you

10  would expect to see that somewhere, some day in writing.

11       Is that fair?

12  A.   I believe the mechanism was to share all materials at

13  some point with the agency.

14  Q.   If you were to have received approval, you would expect

15  it would exist in writing somewhere.

16       Fair?

17  A.   I don't know the answer to that question.

18  Q.   All right, sir.

19       I believe you said that there was -- this product and

20  your goals were driven by patient health and safety.

21       Is that what I heard you say?

22  A.   Were -- if I said it, then I said it.  It was driven by

23  meeting patients' therapeutic needs.

24           MR. MARKETOS:  If we turn to RX-132, please.  It's in

25  evidence.

1        And if we turn to slide 7, please.

2   BY MR. MARKETOS:

3   Q.   At the time that Janssen --

4   A.   Excuse me, sir.  I'll -- I'll answer your question.  I'm

5   sorry.  My bad.

6   Q.   Thank you.

7        We've taken a look at this document.  There's a

8   reference to the lipids issue in the middle.

9        Do you see that?

10  A.   Yes.

11  Q.   All right.

12       And just so that we're clear, sir, we talked about

13  Janssen wanting to eliminate the perception of Reyataz as most

14  lipid friendly, right, during the course of your testimony?

15  A.   I don't recall that specifically.  There was -- we talked

16  a lot about lipids.  I don't recall that we had talked about

17  that specifically, but okay.

18  Q.   But what Janssen knew was that 30 percent of patients

19  that were switching for tolerability reasons had

20  hyperlipidemia.

21       Right, sir?

22       This is what Janssen itself recognized in its own

23  strategy documents?

24  A.   This is a doc- -- I don't know where this document was

25  presented.  This -- I don't know if it's accurate or not.

1  Q.   Okay.

2       Well, at least from this document that's in evidence,

3  we can see that 30 percent of patients switching for

4  tolerability reasons have hyperlipidemia.

5  A.   According to Mr. Kozub.

6  Q.   According to the head of your marketing department at the

7  time.

8       Right?

9  A.   I don't remember if it was head of the market, but he was

10 a member of our marketing department.

11 Q.   Okay, sir.

12      And according to him -- and this is the type of

13 information you relied upon in making decisions for the

14 company.

15      Right?

16 A.   Part of the consideration, yes.

17 Q.   If patients were switched from a drug like Reyataz to a

18 drug like Prezista, that could cause hyperlipidemia, those

19 patients might suffer harm.

20      Do you agree with that premise?

21 A.   I am not a physician.  That's a physician's decision.  I

22 can't confirm or deny -- I'm not a doctor.

23 Q.   If you make a commercial decision to target patients that

24 the drug might be bad for, that would not be good for

25 patients.

REDIRECT - MATTES - MARKETOS

1          Do you agree?

2     A.    In general, yes.  Not specific to this.

3          I don't know the specifics of -- I don't know what

4     you're asking me.  Okay.  I really don't.

5     Q.    Okay, sir.

6          Now, I -- last question.  I know we need to get you out

7     of here, sir.

8          I thought I heard you say that it was not plausible

9     that Janssen would be engaged in an off-label marketing scheme

10    given the checks and balances inherent within Janssen.

11         Is that right?

12    A.    Say that one more time, please.

13    Q.    I just --

14    A.    No, I'm asking you to please repeat the question.

15    Q.    Sure.  I just want to make sure I understood your

16    testimony.

17         You testified in response to questions from your

18    counsel that a scheme to market off-label and a scheme to

19    induce doctors to prescribe more Prezista and Intelence was

20    not plausible given checks and balances inherent within

21    Janssen.

22    A.    That's one -- that's the main reason for believing it was

23    not plausible.

24    Q.    And you're talking about checks and balances like

25    healthcare compliance department, legal and regulatory.

REDIRECT - MATTES - MARKETOS

1          Is that right?

2    A.   Yes.

3    Q.   All right.

4          Those are entities that had a dotted line reporting

5    structure to you.

6          Right, sir?

7    A.   Yes.

8    Q.   You had -- just to be clear, you had a legal and

9    regulatory department, and you had a compliance department

10   when you were at Ortho-McNeil.

11   A.   Yes.

12   Q.   Did you not?

13   A.   Yes.

14   Q.   I thought I heard two different things.  You said it's

15   probable that it was brought to your attention that there were

16   off-label marketing activities going on but you just can't

17   remember the specifics?

18   A.   We talked about --

19          MR. KLEIN:  Objection.

20   BY MR. MARKETOS:

21   Q.   I'm sorry.  Correct me if I'm wrong.

22          THE COURT:  What's the -- when you say "objection,"

23   what's the basis?

24          MR. KLEIN:  Mischaracterizes the testimony.

25          THE COURT:  Well, why don't you ask him whether

REDIRECT - MATTES - MARKETOS

1   that's his testimony.  I thought that's what you were doing.

2          MR. MARKETOS:  I was.

3          THE COURT:  All right.  I'll ask him to rephrase.

4      Objection sustained.  Just ask him so you can

5   characterize it properly.

6   BY MR. MARKETOS:

7   Q.   Correct me if I'm wrong, I thought I heard you testify

8   just a few moments ago that it might be probable that issues

9   related to off-label promotion were brought to your attention

10  while you were the president of Janssen but you don't recall

11  the specifics.

12         Is that what you testified --

13  A.   I don't recall the specifics.

14  Q.   Well, those are two different issues.  So let's start

15  with the first one.

16         It's probable that issues related to off-label

17  promotion of Prezista and Intelence were brought to your

18  attention.

19  A.   Probable, but not certain because I don't recall.

20  Q.   Okay.

21         More likely than not.  That's what probable means.

22  A.   Then thank you for the definition.  My answer is probable

23  but not certain because I don't recall.

24  Q.   All right.

25         Can you tell the members of the jury, as we sit here

─────REDIRECT - MATTES - MARKETOS─────

1  today, what you did in response to any issues related to the

2  off-label promotion of Prezista and Intelence while you were

3  the president of the company?

4  A.  I don't recall specific issues that were presented to me,

5  so I can't -- I can't answer the question.

6        MR. MARKETOS:  All right.  Thank you.

7      Nothing further for this witness, Your Honor.

8        THE COURT:  All right.  Mr. Mattes, you are excused

9  from the trial.  Thank you.

10       THE WITNESS:  Thank you.

11       THE COURT:  Mr. Marketos, do we have the next

12 witness?

13       MR. MARKETOS:  Yes, Your Honor.

14       THE COURT:  Let's keep it moving.  Let's keep

15 continuing.

16       MR. MARKETOS:  Thank you, Your Honor.  Relators call

17 Professor George Sillup.

18       THE COURT:  All right.

19      Sir, my courtroom deputy is just going to swear you in.

20 Okay?

21 (**PROFESSOR GEORGE SILLUP**, HAVING BEEN DULY SWORN/AFFIRMED,

22 TESTIFIED AS FOLLOWS:)

23       THE DEPUTY COURT CLERK:  Please state your name and

24 the spelling of your last name for the record.

25       THE WITNESS:  George P. Sillup.  S, as in Sam,

SILLUP - DIRECT - MARKETOS

1    I-L-L-U-P.

2            THE COURT:  Sir, you can have a seat.

3            THE WITNESS:  Good morning, Your Honor.

4            THE COURT:  Good morning.

5    (DIRECT EXAMINATION BY MR. MARKETOS:)

6    Q.    Good morning, Professor Sillup.  How are you?

7    A.    Doing well.

8    Q.    Sir, would you please introduce yourself to the members

9    of the jury.

10   A.    I'm George Sillup.  I'm working in academia now.  I

11   worked in the pharmaceutical industry for 28 years before

12   transitioning to academia.

13   Q.    Professor Sillup, I'm going to try to stick and move on

14   your testimony today, sir.  We -- we've all been here for a

15   while, so I'm going to try not to belabor a lot of points on

16   your background and your education if you'll bear with me on

17   that.  Okay?

18           MS. BROWN:  And, Your Honor, can I interrupt for a

19   send.  Can I have a copy of the slides you're about to show or

20   you're showing.  I haven't seen what is going up on the

21   screen.  Thanks.

22           THE COURT:  Hey, folks, talk to me not to each other.

23   What's the issue?

24           MS. BROWN:  Your Honor, there are things going over

25   the screen I just haven't seen.  I was wondering if --

SILLUP - DIRECT - MARKETOS

1          THE COURT:  Okay.  Are these demonstratives?

2          MR. MARKETOS:  Yes, they are demonstratives.

3          THE COURT:  Is there a hard copy?

4          MR. MARKETOS:  They're being printed.  The printer is

5    having an issue and so we're going to email them to counsel.

6          THE COURT:  All right.  Do you have them on the

7    screen, Ms. Brown?

8          MS. BROWN:  Yes, Your Honor.  I can see them as they

9    come up, and I'll let the Court know if there's an issue.

10          THE COURT:  Oh, I see, you can't -- how many slides

11   are there?

12          MR. MARKETOS:  About 25 or 30, Your Honor.  I need to

13   check.

14          MS. BROWN:  I'm happy just to get us through lunch,

15   Your Honor.  If I see an issue, I'll pop up --

16          THE COURT:  All right.  If there's an issue, then,

17   pull the slide off the screen and I'll deal with it.  All

18   right.

19          MR. MARKETOS:  Sure.  Thank you, Your Honor.

20          THE COURT:  And I do think there's a technical issue

21   going on internally in the courthouse.

22          MR. MARKETOS:  Yes.

23          THE COURT:  We lost printer and scanning access in

24   chambers, and I don't know if IT has resolved that issue, and

25   that's probably impacting the printer there.

SILLUP - DIRECT - MARKETOS

1    So we're going to move forward, but if there's an

2    objection, let me know and immediately pull the slide off.

3         MR. MARKETOS:  Thank you, Your Honor.

4         THE COURT:  All right.

5    BY MR. MARKETOS:

6    Q.  All right.

7         Professor Sillup, briefly, if you would, sir, can you

8    describe your education, beginning with your appointment to

9    West Point?

10   A.  Coming from high school, I received a military -- my

11   father died from a service-connected death.  I got an

12   appointment to West Point.  Left there the second semester of

13   my freshman year and on to help with a family who was very

14   ill.

15        I transferred to Wilkes -- to Kings College and then

16   from there to Wilkes College, largely attracted to play

17   collegiate football.

18        From that point, after graduation and working in the

19   pharma industry, I went to -- I left Johnson & Johnson and

20   went to Drexel University for a master's degree.  And then

21   returned to work in industry.  And after about five years, I

22   had begun my doctorate, which I received in 1990.

23        At that point, I had begun to think about the

24   background and working in industry, and I wanted to make a

25   transition to academia.  And I wanted to be not just the old

SILLUP - DIRECT - MARKETOS

1    guy from industry but someone respected by my colleagues and

2    peers in academia, and I transferred full time in 2004.

3    Q.   Are you currently a professor -- are you currently a

4    professor at St. Joseph's University at the Haub School of

5    Business, sir?

6    A.   Yes, I am.

7    Q.   And can you tell the members of the jury what you teach?

8    A.   I teach pharmaceutical marketing, forecasting, business

9    ethics.

10   Q.   And for how long have you been a full-time tenured

11   professor teaching pharmaceutical marketing at the School of

12   Business at St. Joseph's?

13   A.   20 years.  And during that time, in addition to teaching,

14   we're encouraged to do consulting and work with the

15   pharmaceutical industry.  So we remain current and bring that

16   to the classroom.

17   Q.   All right, sir.

18        So you currently hold a bachelor's in psychology and

19   political science and master's degree in human behavior and a

20   doctorate in human behavior.

21        Is that fair?

22   A.   Yes, it is.

23   Q.   As I understand it, you had 28 years in -- of experience

24   yourself in the pharmaceutical industry.

25        Is that right?

SILLUP - DIRECT - MARKETOS

1   A.   Yes.

2   Q.   Can you tell us briefly about your actual industry

3   experience that you gathered both before and after you became

4   a professor?

5   A.   Yes.  I started in sales with Colgate-Palmolive.  It was

6   very commercial.  I wanted to do something beyond stocking

7   pharmacies.  So I worked -- was hired by a division of Johnson

8   & Johnson, sold blood and blood reagents in the diagnostic

9   realm.  I did that for about two years.

10       Went back for my master's.  I did research for

11  Honeywell bringing -- I'll call them energy management systems

12  into hospitals and healthcare.

13       I returned to Johnson & Johnson, to one of the

14  corporations they acquired, Extracorporeal.  We kept and

15  launched the company Theracos around the new therapy.

16       From there I went to Johnson & Johnson Corporate, and

17  then I was recruited away to Hoffmann-La Roche.  Worked there

18  for a couple years.  Started a company.  Unplugged the

19  company, and then went to Wyeth Pharmaceuticals.

20  Q.   And during that time you spent 28 years in the

21  pharmaceutical industry, were you yourself involved in

22  developing forecasts for pharmaceutical products like drugs?

23  A.   Yes, I was.

24  Q.   And did you yourself ever take part in selling those

25  drugs to doctors and patients?

SILLUP - DIRECT - MARKETOS

1   A.   Yes, I did.

2   Q.   And, sir, were you also involved in putting together

3   strategies for companies like Johnson & Johnson and others?

4   A.   Yes, I did.

5   Q.   And do you teach that now?

6   A.   Yes, I do.

7   Q.   Can you describe what type of subject matter you teach as

8   it relates to the pharmaceutical market?

9   A.   Well, with pharmaceutical marketing, crafting a forecast

10  is a process.  I always start with the bottom up, and that's

11  with the approved label.  From there you look at the size of

12  patient population.  Those who could be treated, and they are

13  special customers.  They're patients in need.

14       You look at that, and then you're also thinking about

15  the competitive environment.  What other products or drugs are

16  on the market available?

17       And then lastly, the multiplier is price.  What are you

18  going to charge for the product.  And in a sense the strategy,

19  the forecast becomes the quantification.  Adding dollars to

20  the strategy is nothing more than a plan.  So you're adding

21  dollars to your plan.

22  Q.   Professor Sillup, you also mentioned that you teach

23  business ethics.  Can you explain what you teach as it relates

24  to that subject?

25  A.   Basically, business ethics, not unlike the elements of

SILLUP - DIRECT - MARKETOS

1  the credo, are designed to -- it's okay to make money, but how

2  you make it is very important.  So we preach and talk about a

3  triple bottom line of people, planet and, of course, profit.

4  Q.   And is there anything wrong with a company making a

5  profit if it's a for-profit enterprise?

6  A.   Absolutely not.  In fact, you have to do that.  That's

7  important.  That's the lifeblood of a corporation.  But as

8  part of continuing that, you must think about how you're doing

9  that as well as treating your employees.

10 Q.   And, sir, you mentioned that you spent several years at

11 Johnson & Johnson, and you just mentioned the Johnson &

12 Johnson credo.  Tell us a little bit what your experience was

13 like when you were at Johnson & Johnson.

14 A.   I thought the credo was a very insightful document for

15 me.  Basically started with an onboard training.  As part of

16 being hired, you got an orientation to the credo, and I

17 thought, gee, this is interesting.  Is this something that is

18 just window dressing, or they really believe in it and do we,

19 in a sense, walk the walk?  And I was very reinforced by how

20 much that entered into day-to-day business practice.

21 Q.   If we take a look, sir, at the summary of the opinions

22 that you're going to offer to the members of the jury in this

23 case, sir, we've got a summary slide here.

24      And the first opinion that you're going to offer, can

25 you read that to the members of the jury?

SILLUP - DIRECT - MARKETOS

1   A.   Yes.

2        "Janssen's off-label marketing caused physicians to

3   prescribe Prezista and Intelence off-label."

4   Q.   And the second summary of your opinion, sir.

5   A.   "Janssen's specific off-label messages caused physicians

6   to prescribe off-label for those specific reasons."

7   Q.   And the third summary of your opinion, sir?

8   A.   "Janssen's off-label messaging directed at physicians had

9   a lasting impact on physicians' prescribing behavior."

10  Q.   Let's take a look, sir.

11       Can you briefly describe for us the evidence that you

12  considered in order to reach an opinion as an expert in

13  pharmaceutical marketing?

14  A.   Yes.  I reviewed several documents produced in

15  litigation; a number of depositions and exhibits, such as

16  highlighted here the transcripts of depositions, academic

17  literature, regulations, Government enforcement actions, and

18  trial testimony and exhibits.

19       And the trial testimony has been very helpful to me

20  because I find that it brings to life -- it reinforces the

21  observations I had.

22  Q.   Thank you, Professor Sillup.

23       Have you been in this courtroom for the duration of the

24  trial?

25  A.   I have.

SILLUP - DIRECT - MARKETOS

1    Q.   And you heard each witness testify?

2    A.   Yes, I have.

3    Q.   And have you been able to consider the exhibits that have

4    been offered to the members of the jury as well?

5    A.   Yes, I have.

6    Q.   When you were first asked to provide an opinion in this

7    case, you just referenced that you reviewed depositions in

8    this litigation.  And I don't need to belabor this point, but

9    that, of course, is sworn testimony of witnesses.

10        Is that right?

11   A.   Yes.

12   Q.   Did you also review the exhibits, the documents that were

13   shared in those depositions and so the witnesses were

14   questioned on the documents themselves as well?

15   A.   Yes.

16   Q.   And that was before you were asked to render an opinion

17   in this case?

18   A.   Yes.

19   Q.   If you take a look at the depositions, just to be clear,

20   did you review all of the fact witness testimony, including

21   from witnesses of the Relators themselves and witnesses who

22   are testifying consistently with the Relators?

23   A.   Yes.  Yes, I did.  Hoping I can remember all of it.

24   Q.   Did you also review testimony from witnesses that are

25   being proffered by Janssen in this lawsuit?

SILLUP - DIRECT - MARKETOS

1    A.    Yes.

2    Q.    And so that's Ms. Brancaccio, Michael Daily, Tony Dolisi,

3    Donna Graham, Matthew Grooms, Mark Gossett, Joseph Holshoe,

4    Mike Iacobellis, Catherine Kaucher, Debbie Kenworthy, Ben

5    Kozub, Glenn Mattes, Jessica Penelow, Michael Shiv,

6    Sara Strand, and Mark Wilhelm.

7         Fair?

8    A.    Some of whom we heard -- I heard testimony.

9    Q.    You heard from some of these individuals live in this

10   courtroom, including Mr. Mattes and Mr. Iacobellis.

11        Right?

12   A.    Yes.

13   Q.    All right, sir.

14        Can you describe for us, briefly, the FDA approval

15   process and how you understand it to be relevant to

16   pharmaceutical marketing?

17   A.    FDA approval process is a process by which a drug

18   basically provides -- generates data that substantiates its

19   ability to be safe and efficacious.  First it has to be safe,

20   and then it has to be efficacious.  It has to help the problem

21   it said it can help.

22        The normal process is constructing a protocol, which

23   means, this is the way you're going to use the product for a

24   specific disease.

25        That process then goes out to find a series of, we'll

SILLUP - DIRECT - MARKETOS

1    say, experts in the disease area to do clinical studies.  The

2    clinical studies treat the patients in the intended way that

3    the product is planned for use.

4         So, in other words, if a patient is going to be treated

5    once a day, they have a certain phase of the illness, how sick

6    are they?  At what phase of illness will you treat?  The thing

7    that you can't plan, but you need to watch carefully, are the

8    side effects that occur.  This is science.  Even though we

9    select the right amount of disease in a patient and the

10   experts who are doing the treatment, you can't plan the

11   outcome.  Sometimes you have side effects that are encountered

12   during the clinical study.

13        Meanwhile, envision, you know, the patent clock is

14   ticking, so this is going to take possibly 10, 12 years.  And

15   it's significant expenditure, as you can see.

16        Occasionally, the Food and Drug Administration has a

17   fast track for approval.  Costs less, takes less.  However,

18   the downside of that is you can go fast track and gain

19   approval, but you may not be able to fully explore -- have the

20   number of patients you need to power your study so you can be

21   statistically relevant and have a -- come to a conclusion

22   about the full extent of the drug.  You just haven't had the

23   time.  Yet, it's still determined by the Food and Drug

24   Administration that it's important to get this product on the

25   market.

SILLUP - DIRECT - MARKETOS

1  Q.  And, sir, tell us briefly, if you would, about the
2  clinical studies that are necessary to power a study that
3  ended up becoming an FDA-approved label.
4  A.  Well, the norm is two prospective, well-controlled
5  studies, randomized.  You heard Dr. Glatt discussing this.
6  The studies are done.  They're blinded so you don't know who
7  is getting the actual drug or who is getting the comparative
8  drug.  So the studies occur over this period of time, and they
9  generate data.  They generate information to substantiate
10  whether or not this product is medically relevant.  It's safe.
11  It doesn't hurt someone and it is effective.  It can help
12  someone.
13  Q.  Thank you, Professor.
14        And tell us a little bit about research and development
15  and marketing budgets in the pharmaceutical industry.
16  A.  Well, it's interesting, because, you know, research is
17  the life blood.  You're in an industry that's regulated by the
18  Food and Drug Administration.  You must do research to
19  continue.  That's your future.  Your future products.
20  Marketing is, once you have the product available, then you
21  sell the product.  The expenditure for marketing eclipses the
22  spending for R&D.
23  Q.  And let's take a look at that on the next slide, sir.
24  This is something that you looked at in rendering your
25  opinion.

SILLUP - DIRECT - MARKETOS

1      Can you describe for the members of the jury, in the

2  pharmaceutical industry at large, and in terms of

3  expenditures, what is the total spend on marketing versus

4  research and development?

5  A.   Well, as you can see, there's quite a delta difference.

6  More is spent on marketing the product, getting the product

7  out, and you probably have seen what three of every five

8  commercials are -- if you're watching any kind of mainline

9  television, three of every five commercials are rendered about

10  a medical product or a drug.

11  Q.   At least from this graph, there was approximately

12  $120 billion spent by the industry in 2016 on marketing and

13  administrative expenditures.

14      Is that right?

15  A.   That's -- that's correct, and about two thirds of that or

16  about 80 being spent on research and development.

17  Q.   Okay.

18      So about 50 percent more is spent on marketing

19  pharmaceutical products than it is on researching and

20  developing them.

21      Is that right?

22  A.   Yes.

23  Q.   Now, sir, what is the purpose of marketing pharmaceutical

24  products to doctors?  What is the effect of marketing a

25  product to doctors?

SILLUP - DIRECT - MARKETOS

1    A.   Well, the product is something that we can't purchase

2    over the counter.  We can go in and buy a bottle of aspirins.

3    When a product deals with a severe medical situation, such as

4    HIV, you're going to rely on a physician and have her or him

5    guide you in the decision whether or not this medicine is

6    appropriate for you.

7    Q.   All right, sir.

8         And what is it about -- what are some of the benefits

9    of marketing to a doctor who has a number of patients versus,

10   you know, some other form of marketing, direct to consumer?

11   A.   Well, in that case -- if you're marketing to a doctor

12   treating more patients, there's a greater opportunity that he

13   or she will prescribe the drug to more patients or far more

14   patients.

15   Q.   And what is the purpose -- why does the pharmaceutical

16   industry spend so much money marketing their products to

17   doctors?

18   A.   Because it works.  And I think to help, too, to put this

19   on a continuum, think of an expert such as Dr. Glatt.  On one

20   end of the spectrum, you have a highly sophisticated

21   university-based physician, and maybe the discussion/sales

22   call is more about awareness of a new product or actually

23   learning from them.

24        On the other end of the spectrum, if a physician is

25   treating perhaps 20 patients a day, he or she relies on the

SILLUP - DIRECT - MARKETOS

1    sales call to learn more in depth about the product and to

2    understand its full capability.

3         They have the package insert, which is the guide to

4    tell you how to sell this product on-label.  But sometimes a

5    further explanation by a sales rep will help.

6         So just think of that continuum.  On one end, you have

7    Aaron Glatt, highly sophisticated and maybe relying on that

8    for awareness.  On the other end, you've got somebody who's --

9    who's very interested, keenly interested in what a

10   representative has to tell them about the product.

11   Q.  And, Professor Sillup, does marketing to physicians like

12   those that Janssen marketed to in this case -- tell us about

13   whether or not your field and your expertise has an opinion on

14   whether it works.

15   A.  I strongly believe it works.  It has a very significant

16   influence.  As I said, depending on where someone is on the --

17   on the spectrum, but the approach and working with the

18   physician community is seen as the gateway to the success of

19   your product:  Physicians who are treating patients with the

20   drug, if they become someone who appreciates what the

21   pharmaceutical's capability is as well as decides to prescribe

22   that for their patient or patients.

23   Q.  Professor Sillup, why would a company like Janssen spend

24   money on a sales force to go and meet with doctors on sales

25   calls or detailing?

SILLUP - DIRECT - MARKETOS

1    A.    Well, for the same reason.  As I mentioned, it's

2    effective.  It works, and it's something that it is -- and I

3    think the thing that's important to understand, too, this is

4    not I'm going to drop some samples and come to see you and ask

5    about your family.

6         This is usually a substantive discussion about the

7    product's merits, talking about what kind of product and what

8    kind of favorable impact this could make for your patient.

9    It's a new therapeutic alternative.

10   Q.    Professor Sillup, do the messages that are delivered by

11   sales representatives from pharmaceutical companies influence

12   doctors' prescribing habits?

13   A.    Yes.

14   Q.    And is that just the opinion of Professor George Sillup?

15   A.    No.  This -- this is something that -- it's in the

16   literature.  You know, I've had my personal experience.

17   Medical institutions have had concern about this to the point

18   where many institutions have restricted access of sales reps.

19   We have --

20   Q.    Why is that, sir?  I'm sorry.

21   A.    Well, if you can go in the institution, you might be able

22   to influence a number of physicians to understand and

23   prescribe your drug.

24   Q.    And on that topic, sir, you heard Dr. Glatt testify in

25   this case.  He actually does not permit that at his

SILLUP - DIRECT - MARKETOS

1    institution.  He doesn't allow sales representatives from

2    pharmaceutical companies to interact with his doctors.

3          Do you recall that?

4    A.   Unless you can provide some substantive educational

5    material and discussion.

6    Q.   And what is it that certain medical institutions might

7    try to prevent when a sales representative for a

8    pharmaceutical company visits a doctor?

9    A.   The influence on physicians.

10   Q.   Now, we've heard testimony in this -- some testimony in

11   this case or at least some suggestion that, you know, doctors

12   make their own medical judgment on a patient-by-patient basis.

13         Right, sir?

14         Did you hear that --

15   A.   Yes.

16   Q.   -- the question on that topic?

17   A.   Yes, I did.

18   Q.   That completely true?

19   A.   Doctors certainly make their decision, but they factor in

20   information that is imparted to them.

21   Q.   And what's the purpose of delivering messages to doctors

22   before they have made their prescribing decisions, if you're a

23   pharmaceutical company like Janssen?

24   A.   It gives them another alternative.  They now are

25   considering -- instead of two drugs, they now can consider a

SILLUP - DIRECT - MARKETOS

1  third and then -- to answer the question what's most

2  appropriate for my patient.

3  Q.   And how do the messages that are delivered to the doctors

4  influence their prescribing habits?

5  A.   Enhances it.  Enhances them.

6  Q.   If we take a look at the FDA and DDMAC.  What -- what

7  does the Food and Drug Administration and the agencies that

8  oversee pharmaceutical promotions -- what do they believe

9  about the ability of pharmaceutical companies to influence

10  prescribing habits and to influence patients?

11  A.   They work hand in glove.  The Food and Drug

12  Administration basically approves the use of the product based

13  on the safety and efficacy of the data, which you have.  The

14  only thing that you're allowed to present is on-label.

15       So that -- those data go into the package label.  You

16  know, that's that little thing that comes in medicine when you

17  get it.  It folds up, maybe the size of a dollar bill.  When

18  you open it, it will cover the top of your desk.

19       All the information aligned with the study is contained

20  in that package insert or label.

21       I can only promote and talk about that information

22  that's in the label.

23  Q.   And what about -- what do you understand about -- let's

24  say, for example, in the industry certain pharmaceutical

25  companies promote off-label in violation of those rules from

SILLUP - DIRECT - MARKETOS

1  the Food and Drug Administration.

2       Are you aware of the type of enforcement actions that

3  the Government agencies, like the Office of the Inspector

4  General and the Department of Justice, take?

5  A.   Yes.

6  Q.   And are you familiar with whether or not the Office of

7  the Inspector General and the Department of Justice have been

8  active specifically in the pharmaceutical industry for

9  off-label marketing?

10 A.   Yes.

11 Q.   All right.

12      And how about with respect to kickbacks?  Let's talk

13 about that separately, sir.

14      What is it about the payment of money to physicians who

15 are prescribing pharmaceutical companies' drugs that presents

16 concerns in this industry?

17 A.   Well, it's an enticement in a sense, Am I buying a

18 prescription rather than having someone be convinced about the

19 medical viability of a pharmaceutical, the way it can help a

20 patient.  There may be influence based on financial reward.

21 Q.   And, sir, are you aware of enforcement actions that the

22 Department of Justice and the Office of the Inspector General

23 have taken against companies who have paid inducements to

24 physicians to prescribe more of their drug?

25 A.   Yes, I am.

SILLUP - DIRECT - MARKETOS

1  Q.  And would you describe the federal government as being

2  inactive or active in the pharmaceutical industry in

3  enforcement actions?

4  A.  I would say quite active.

5  Q.  Sir, let's talk briefly about the notion of off-label

6  marketing and the different forms that it takes.

7       We see on the left here of your slide the label for

8  Prezista and certain adverse reactions.

9       Do you see that?

10 A.  Yes.

11 Q.  Are you aware of the fact, having studied this case, that

12 there were adverse reactions identified for this drug?

13 A.  Yes.

14 Q.  And are you aware of the fact that there were specific

15 indications relating to this drug and who it could be

16 prescribed to in the HIV patient spectrum?

17 A.  Yes.

18 Q.  All right.

19      What's your understanding of the latter, who this drug

20 could be prescribed to on the label?

21 A.  It's after the failure of two virologic agents, and it is

22 a very narrow band of patients.  These are patients who are --

23 have had the disease for a while, and they're -- they're not

24 responding.  They're getting to a point where, as a physician,

25 you're looking for some type of alternative to mediate the

SILLUP - DIRECT - MARKETOS

1    course of this -- this illness.

2    Q.   Sir, if we take a look at the off-label methods of

3    delivering a promotional message.  You've listed here for us

4    detailing.

5         Is that the same thing as a sales rep making a sales

6    call to a doctor?

7    A.   Yes, it is, although, I've created the term because it's

8    so much more.  It's a constructive discussion, but, yes,

9    that's one way of getting information to a physician.

10   Q.   And in fairness, it's not just a sales call like you

11   might have for a shoe salesman.  These detailing visits are

12   from experienced sales representatives having a lengthy

13   discussion with a doctor?

14   A.   It's a lengthy, substantive discussion about the product.

15   You understand, and you want to relay that information.

16   Sometimes the conceptualization is I'm going to go in and drop

17   a few samples and say hello, and it's extraordinarily

18   different, especially today, with the challenge of getting in

19   to see a physician, so it has to be a substantive one when you

20   get it.

21   Q.   And what about the use of off-label studies to promote a

22   drug?

23        For the -- just for the record, sir, off-label

24   detailing messages delivered on a sales call, off-label

25   studies, false or misleading marketing materials, the use of

SILLUP - DIRECT - MARKETOS

1    -- improper use of MIR forms, off-label messages delivered at

2    promotional speaker programs, is that something that based on

3    your experience would be considered lawful or unlawful?

4    A.    Unlawful, shouldn't be doing it, should be in concert

5    with the label.

6    Q.    And can you describe for us how off-label studies might

7    be used to promote the off-label sales of a drug like Prezista

8    and Intelence?

9    A.    Well, if I have information about a pharmaceutical and it

10   suggests that I'm able to use the drug beyond the confines of

11   the label and that goes to my potentially prescribing

12   physician, he or she is going to look at that and say, Well,

13   maybe this is appropriate.

14          That's certainly different than if a physician comes to

15   a decision on their own to decide, you know, This is really

16   the only therapeutic alternative I have for the patient.

17          Once I begin suggesting the use, it goes into a

18   different category.

19   Q.   What about false or misleading marketing materials that

20   minimize or attempt to eliminate the -- an adverse reaction on

21   the drug's label?  How might that affect or impact physicians'

22   prescribing patterns?

23   A.    That was very concerning, and as you heard with Dr.

24   Glatt, the idea and the example here was with lipids.  You

25   know, the potential concern was if I minimize what that is,

SILLUP - DIRECT - MARKETOS

1    the drug might be prescribed for a patient for whom -- they

2    already have some kind of cardiac -- underlying cardiac

3    condition, could be dangerous.

4        So we wanted someone to understand the full impact of

5    the potential side effects that occur with the drug.  And

6    every drug has side effects to some degree.  But you have to

7    understand what they are and how they could potentially help a

8    patient.

9    Q.   Can adverse reactions that are listed on a drug's label

10   be an impediment, an obstacle to a pharmaceutical company and

11   its ability to sell to doctors?

12   A.   Yes, especially when the -- let's say the competitive

13   products in the same area don't have those limitations.

14   Q.   And if there are false or misleading materials designed

15   to minimize those adverse reactions, what might happen?

16   A.   Well, worst-case scenario, one could have severe

17   consequences from taking a drug if that potential side effect

18   was understated.

19   Q.   And what might happen with respect to a physician's

20   likelihood to prescribe that drug if the adverse reactions or

21   serious adverse reactions are minimized?

22   A.   You won't be getting another visit pretty much.  It's

23   a -- you know, this discussion, too, this is a bond of

24   credibility.

25       When you're working as a sales representative, it's --

SILLUP - DIRECT - MARKETOS

1    I don't want to just see you one time.  I want to be able to

2    have a continuous relationship over time.

3         So if I basically tell you to do something that could

4    endanger your patient, you're not going to be really happy

5    with me.  You want to have a forthright and constructive

6    discussion about what the product can do.

7         And then there's -- there's also a safety valve.  If it

8    gets beyond the scope of the label, let's say a doctor has a

9    question about the product's capability beyond the label,

10   there is an opportunity for a medical information request

11   where that discussion will be held with another physician or a

12   nurse to talk about it on a scientific basis.

13   Q.  And, Professor Sillup, what about the practice of using

14   or soliciting an MIR?

15        THE COURT:  Sorry, Mr. Marketos.  I don't want to

16   interrupt because this might not be a great stop --

17        MR. MARKETOS:  It's fine.

18        THE COURT:  Is this a spot that we can stop at before

19   this question?

20        MR. MARKETOS:  Yes, Your Honor.

21        THE COURT:  All right.  Folks, what I'm going to do

22   is I'm going to break the jurors for lunch.  I have another

23   matter to attend to.  I'm going to run to do that.

24        This lunch may be 45 minutes and not 30 because I'm not

25   so sure I'll be back until 1 o'clock.  So let me -- let's do

SILLUP - DIRECT - MARKETOS

1  45 minutes today only because I don't want folks waiting

2  around if I can't get back into the courtroom.

3      So let's dismiss the jurors, and then I'll address

4  counsel separately.

5          THE DEPUTY COURT CLERK:  All rise.

6          (Jurors exit courtroom.)

7          THE COURT:  Professor Sillup, you can step down as

8  well.  You're on break until 1 o'clock.

9      Off the record.

10     (Luncheon recess was taken from 12:15 p.m. to 1:00

11 p.m.)

12         THE DEPUTY COURT CLERK:  Please remain seated.

13         THE COURT:  Professor, when you're ready, if you

14 don't mind just getting situated.

15         MR. MARKETOS:  I am at the conclusion, Your Honor,

16 and I'm going to offer the exhibits.  I just want to make sure

17 there's no objection to them before I do that.

18         MS. BROWN:  I'm just pulling hard copies, Your Honor,

19 and I'll review them while the testimony is going on and make

20 sure it's okay.

21         THE COURT:  All right.  Thanks.  All right.  So

22 you'll let me know.

23     Anything else we need to talk about before we see if

24 the jurors are ready?

25         MR. MARKETOS:  No, Your Honor.

SILLUP - DIRECT - MARKETOS

1      THE DEPUTY COURT CLERK:  All rise.

2      (Jury enters the courtroom.)

3      THE COURT:  All right.  Folks, why don't everybody

4  have a seat.

5      Mr. Marketos, when you're ready.

6      And Professor Sillup, just to remind you, you're still

7  under oath from earlier today.  All right?

8      THE WITNESS:  Yes, Your Honor.

9      THE COURT:  You may proceed.

10      MR. MARKETOS:  Thank you, Your Honor.

11  BY MR. MARKETOS:

12  Q.   Professor Sillup, just briefly, sir, we had talked about

13  a summary of the opinions that you're offering to this jury

14  today.  You had mentioned earlier on that one of the things

15  that you've done is you've attended trial throughout the

16  course of the last -- since May the 5th in this case.

17  Actually May the 7th.

18      Correct?

19  A.   Yes.

20  Q.   And you've been present for the testimony of the

21  witnesses and seen the exhibits.

22      Right, sir?

23  A.   Yes.

24  Q.   Has your opinion that you're offering today changed at

25  all by virtue of the -- your attendance at trial to hear

SILLUP - DIRECT - MARKETOS

1  witnesses' testimony?

2  A.    It's been helpful and reenforcing.

3  Q.    Thank you, sir.

4        If we could, let's go back to where we were, which was

5  discussing the manners in which off-label promotion takes

6  place and ask you about specifics of this case.

7        All right, sir?

8        We were talking about MIRs, and I just started talking

9  about that.  Did you review information in this case, sir,

10  relating to the manner in which Janssen used medical

11  information requests to disseminate off-label information to

12  doctors?

13  A.    Yes, I did.

14  Q.    Did you hear testimony from witnesses on this topic and

15  review exhibits that the members of the jury have seen as

16  well?

17  A.    Yes.

18  Q.    All right.

19        What is it about the solicitation of medical

20  information requests from doctors that allows for the

21  off-label promotion of products like Prezista and Intelence?

22  A.    Well, this is a vehicle.  An MIR is a request by a

23  physician, a medical professional, about more in-depth

24  information beyond the scope of the approved label.

25        What concerned me as I reviewed the information for

SILLUP - DIRECT - MARKETOS

1    this case is the sheer number of MIRs in the -- I would say

2    the manner in which they were solicited.  I'm surprised from a

3    career and looking of over a number of products of past years,

4    you do get MIRs, yes, but nowhere near the number that I saw

5    in this situation.

6    Q.  And two things, sir.  Were you present for the testimony

7    of Mr. Mattes when he testified about Janssen's tracking of

8    the volume of MIRs, just the volume?

9    A.  Yes.

10   Q.  All right.

11        And were you present for Mr. Mattes's testimony about

12   the use of MIRs as a manner in which to measure the

13   performance of the sales force?

14        MS. BROWN:  Your Honor, I object.  That misstates his

15   testimony.

16        THE COURT:  Sometimes I've got to look.

17        I'll sustain the objection.  You've got to rephrase the

18   question.

19        MS. BROWN:  Thank you, Your Honor.

20   BY MR. MARKETOS:

21   Q.  Were you present for Mr. Mattes's testimony about the use

22   of MIRs being something that Janssen evaluated with respect to

23   its sales force?

24   A.  Yes.

25   Q.  All right.

SILLUP - DIRECT - MARKETOS

1          And what's concerning about that practice to you, sir?

2    A.   Well, I saw two things.  It was -- I looked at it as an

3    invitation for off-label marketing, and it was also a metric

4    for -- it was being used as a metric for someone's

5    performance.

6    Q.   And -- but I'm -- so -- sorry, sir, but so what?

7    A.   So more MIRs, I'm doing a better job.  If I'm not getting

8    the required number -- first of all, I've never seen a

9    requirement to generate MIRs.  They occur, and you would

10   expect that in certain disease entities, cancer, for example.

11   There are questions about off-label use.

12          But to have that used as a vehicle for discussion or a

13   performance measure is outside the box for me.

14   Q.   What about with respect to the Promotional Speaker

15   Bureau?  Did you review testimony and information relating to

16   how those bureaus were used to disseminate off-label

17   information about Prezista and Intelence?

18   A.   Yes.

19   Q.   All right.

20          And what did you learn from the witnesses in the case

21   and the testimony at trial?

22   A.   Again, concerning.  A speaker program should be imparting

23   knowledge and information about a product and not -- one of

24   the reasons to participate should be a quest for that

25   knowledge or understanding, to learn more about how this drug

SILLUP - DIRECT - MARKETOS

1    could help the patient as opposed to how many prescriptions

2    are you writing and is this a vehicle for discussion about

3    off-label uses.

4    Q.  All right, sir.

5         When you talk about -- let me just ask you.

6         Professor Sillup, if a company were to -- a

7    pharmaceutical company wanted to capture off-label sales, can

8    you think of any other ways, other than the manner in which

9    Janssen allegedly did so in this case, that it would do --

10   that it would accomplish that task?

11   A.  Well, you could take a normal breakdown of sales.  You

12   know, if you're selling on-label, you're going to have some

13   off-label use.  Physicians, as you know, can prescribe

14   off-label.  So there's going to be that small percentage, and

15   you could do those as a breakout as opposed to a specific

16   measure.

17   Q.  And in this case, Professor, is it your opinion that

18   Janssen used a number of methods in order to disseminate and

19   promote their drugs off-label?

20   A.  Yes.

21   Q.  Was that limited to a certain portion of the country?

22   Was it nationwide?

23        Describe your understanding.

24   A.  My sense, it was across the nation, of maybe greater

25   concentration in those areas where there were higher HIV

─────SILLUP - DIRECT - MARKETOS─────

1    populations, New York, Florida.

2    Q.   All right, sir.

3         And let's take the time to look at the actual specific

4    claims with respect to Prezista and Intelence being marketed

5    off-label.

6         All right, sir?

7         There's the Prezista lipid messaging issue, which

8    spanned for eight-plus years.  You understand that that

9    relates to the manner in which the sales force was requested

10   to message or describe the lipid issues with Prezista.

11        Right, sir?

12   A.   Yes.

13   Q.   And with respect to Prezista treatment-naive, you -- what

14   do you understand that to be addressing?

15   A.   This -- treatment-naive patients were beyond the scope of

16   the label approval.  Naive means you haven't been treated

17   previously, and the patients who were within the scope of the

18   label were patients -- basically a small percentage of

19   patients who have had treatment failure.

20   Q.   And did you understand that the drug Prezista was not

21   permitted on-label, by its label, to be prescribed in

22   treatment-naive patients during the time period from 2006 to

23   2008?

24   A.   Yes.

25   Q.   Let me be specific.

SILLUP - DIRECT - MARKETOS

1          It was not Janssen's -- Janssen was not permitted to

2     promote the sale of its drug for patients in the naive segment

3     of the population.

4          Correct?

5     A.   Yes.

6     Q.   For that period of time?

7     A.   Yes, that's how I understand it.

8     Q.   And with respect to Intelence treatment naive, for the

9     entire duration, 2006 to 2014, is it your understanding that

10    Intelence never had a label that permitted Janssen to promote

11    that drug for naive patients?

12    A.   That's my understanding.

13    Q.   And how about with respect to this once-daily dosing

14    issue?  Is it your understanding that Intelence never had an

15    on-label use permitting Janssen to promote that drug for

16    once-a-day dosage?

17    A.   That's correct.

18    Q.   Did you have an opportunity to review strategy documents

19    like those that were discussed with Mr. Mattes and other

20    witnesses where Janssen was putting together its plan to go to

21    market?

22    A.   Yes.

23    Q.   What did you first note about that strategy as it relates

24    to the patient segmentation that Prezista was on-label for?

25    A.   The strategy was casting a wider net for more patients

SILLUP - DIRECT - MARKETOS

1    than those identified in the label.

2    Q.   And, Professor Sillup, we've seen documents in this case,

3    and we may refer to them briefly, where the segment H on-label

4    patient population has varied in certain documents between

5    7,000 and 19,000 or 20,000 patients in total.

6         Have you seen those documents?

7    A.   Yes.

8    Q.   And yet, what was your understanding was the initial

9    forecast for half of the year 2006?  Do you recall the volume

10   number being $45 million?

11   A.   Yes.  And the number of patients was concerning to me

12   because you're going into a market where there are other

13   product alternatives.  You're positioning yourself.

14        It was also stated that there is, we'll call it, time

15   to transfer to treatment.  Even though you want to switch me

16   from a drug to one of these, it's going to be some time.  So

17   it's not instant.

18        So with this relatively small segment of patients, I

19   think it would be really challenging to make numbers at that

20   level.

21   Q.   And if Janssen was able to actually overcome and get

22   every patient in that segment to switch from the drugs that

23   they were already on, it captured the entire on-label segment

24   H portion of the market, is it your opinion they would have

25   made forecast anyway?

SILLUP - DIRECT - MARKETOS

1   A.   I don't believe they would have made it, and you're never

2   going to get all the patients.  I've been doing this for a

3   long time, and it's just -- there are reasons that you don't.

4   Maybe there are different combinations that work better.  And

5   you're dealing with a disease entity where you're going to

6   have to do some mix and match.  Especially for patients who

7   are this far advanced in their disease.

8   Q.   We looked at a document, and it was actually asked of

9   Mr. Mattes himself, a document that shows Janssen's strategy

10  at least in 2006 through 2009.  For the time being, I'm

11  focused on that portion of the strategy.

12       Do you see that, sir?

13  A.   Yes, I do.

14  Q.   During the time period, from 2006, 2007, 2008, before

15  Prezista's label changed in October of 2008, were patient

16  segments in E and F on-label or off-label?

17  A.   It was off-label.  You were within segment H.  The

18  terminology, the natural playfield, is basically within the

19  confines of the label.  Spillover, maybe you're going to get

20  some physician decision for -- of one of off-label use, but

21  going after these segments, which are much larger, 37,000

22  patients, puts you into clear off-label territory.

23  Q.   And why, Professor Sillup -- do you have an opinion as to

24  why Janssen had to target patients in segments outside of the

25  label?

SILLUP - DIRECT - MARKETOS

1   A.   Well, it comes back to your forecast.  You know, as we

2   said earlier, forecast is the financial measurement of your

3   strategy or your plan.  The plan was to capture more patients

4   than were in the label.

5   Q.   And you mentioned natural -- excuse me, segment H being

6   the natural playfield.  If we take a look at the assessment of

7   the growth targets that Janssen was looking at in 2007, do you

8   recall this exhibit being discussed at trial with Mr. Mattes

9   and others?

10  A.   Yes, I do.

11  Q.   "To achieve our 2007 target, we need to believe that" --

12  and then there's a total addressable market that Janssen was

13  addressing in this document.

14       Do you recall that?

15  A.   Yes.

16  Q.   And to be clear, sir, there's a reference at the bottom.

17  "To achieve our 2007 targets, we need to believe that -- we

18  need to capture between 30 and 80 percent of our addressable

19  market."

20       Do you see that?

21  A.   Yes.

22  Q.   Now, there was a conservative estimate of 20 -- 20,000 on

23  the left-hand side.

24       Do you see that?

25  A.   Right.  Which is your approved label.

─SILLUP - DIRECT - MARKETOS─

1   Q.   Okay.

2        So the 20 is the approved level, that's segment H

3   natural playfield.

4        And then there's a max addressable market that includes

5   more patients than other segments.

6        Do you see that?

7   A.   Yes, I do.

8   Q.   Can you tell the members of the jury what it appears that

9   Janssen's plan was at this point in time?

10  A.   Well, it appears as though they're crafting a strategy to

11  go after those additional segments beyond the approved label.

12  Q.   And, sir, I discussed this just about an hour or so ago

13  with Mr. Mattes, maybe two hours ago with Mr. Mattes.  What

14  metric had Janssen actually calculated as it relates to the

15  value and dollars to Janssen of a single prescription of this

16  drug?

17  A.   A very -- a lifetime value of a patient or a patient's

18  life on the drug.

19  Q.   Have you seen this metric described in this manner

20  before, sir?

21  A.   No, I have not.

22  Q.   At the end of the day, is it clear to you, sir, that

23  Janssen was calculating on a patient-by-patient basis how much

24  each prescription was worth at Janssen for Prezista?

25  A.   It appears to be that way.

SILLUP - DIRECT - MARKETOS

1  Q.  Now, there were sales goals that were pushed down as a

2  result of the forecast.  Can you explain for us how is it that

3  a forecast for an entire organization turns into sales goals

4  for districts like New York, as an example?

5  A.  Well, you take your forecast, that top line number, and

6  let's say for easy math you have ten districts.  So if your

7  forecast is a million, every district has a hundred thousand

8  forecasts.  And then within that district, if you have ten

9  representatives, each representative would have one-tenth.

10  And it might be a weighted average because one representative

11  is in a more densely populated area than another.  But that

12  becomes the individual goal or quota for a sales

13  representative.

14  Q.  And, sir, if off-label sales are actually factored into a

15  top-level forecast for the entire organization, what happens

16  when that forecast turns into sales goals for representatives

17  like Ms. Brancaccio and Ms. Penelow?

18  A.  Well, it's going to put on a measure of pressure

19  throughout the organization, particularly -- and generally

20  forecasts I like to see built from the bottom up.  How many

21  patients are available?  What's the treatment?  How many could

22  this district do?  And then roll that up to construct your

23  forecast rather than say, here's a number and devolve it down.

24       But for the representative who is getting this quota,

25  it's a considerable amount of pressure, particularly if it's

SILLUP - DIRECT - MARKETOS

1    associated with marketing tactics that are off-label.

2    Q.    And did you note in the evidence that you reviewed, sir,

3    that Janssen recognized that the label that it obtained would

4    not allow it to achieve forecast?

5    A.    It certainly seemed that way.  Unless they were to take

6    some action beyond the label.

7    Q.    If we take a look here at this document, it says,

8    "However, penetrating segments H and G alone will not give us

9    enough swing to reach our growth targets."

10         Do you see that?

11   A.    Yes, I do.

12   Q.    All right.

13         And at the end of the day, what was that communicating

14   to you?

15   A.    Pressure to make possibly an unrealistic number.  One

16   would have to ask is, what's the growth target?  How did you

17   determine what that top number is?

18         And then back and say, what's achievable?  And what

19   makes medical sense as well?  You know, we talk about being

20   able to maintain a constructive and long-term partnership with

21   prescribing physicians.  I want to be able to come back and

22   see you.  I don't want you to feel that you're under duress to

23   prescribe my drug.

24   Q.    And, Professor Sillup, you know, at the end of the day,

25   there was a point we heard about a big meeting in July of

SILLUP - DIRECT - MARKETOS

1    2006, shortly after Prezista's launch.

2        Were you present for that testimony from a number of

3    witnesses?

4    A.   Yes, I was.

5    Q.   And do you recall -- I'll just put it plainly, sir.

6        Do you recall that Janssen essentially whiffed on that

7    forecast?

8    A.   It's a big miss.  You know, if you are projecting 3,700

9    and you come in just shy of 900, that's significant.  You've

10   got to go back and ask yourself why.  And perhaps it was time

11   to transition for patients, but it might also suggest that you

12   are -- there just aren't that many patients, and there are

13   competitive products available.

14   Q.   And, Professor Sillup, if a company like Janssen launches

15   a product and they're at 25 percent of their forecasted sales,

16   what might it suggest is part of the problem?

17   A.   An overzealous forecast.

18   Q.   Sir, some might say, well, the sales force is just not

19   doing its job.

20       Is that another possibility?

21   A.   It is.  It is a possibility.

22   Q.   All right.

23       In this case, did you -- when that fork in the road was

24   reached, in your opinion, what would Mr. Mattes and senior

25   leadership at Janssen, what ought they have to have done?

SILLUP - DIRECT - MARKETOS

1   A.   Well, you've got a choice.  You can go back and say, we

2   need to revisit the forecast, and perhaps consider more

3   careful alignment with the improved label.  Or we may craft

4   strategies that are off-label to enable us to sell to patients

5   outside the label.

6   Q.   And, you know, if you take the left fork and you decide

7   that you need to adjust your forecast, what might the

8   implications be for the executives?

9   A.   I'm sorry.  Would you please repeat that?

10  Q.   I'll see if I can.  I doubt I can.

11       What might the -- what problems might that present for

12  an executive like Mr. Mattes if he had completely messed up

13  the forecast?

14  A.   Significant.  If you develop a forecast -- and once I'm

15  the head guy and the forecast -- everything that comes

16  through, particularly on forecasted budget, is going to go

17  through the office of the president.  So we've convinced you

18  that these are the numbers.  And if after the first month

19  we're -- we've missed it so significantly, you've got to step

20  back and say, do we go back and revisit and maybe generate a

21  more realistic number based on the label, or do we begin a --

22  what we should -- ought to do is that, as opposed to do we

23  look at strategies beyond the label.

24  Q.   And what problems might it present to a senior executive

25  of a company with respect to who he reports to if he's missed

SILLUP - DIRECT - MARKETOS

1    on his forecast strategy?

2    A.    Oh, his credibility.  You know, if it's, I'm the head guy

3    and I missed it significantly and I come back now and tell you

4    this, you might have someone else in my chair in six months.

5        So it's a significant decision.  But before that

6    forecast leaves, because it not only dictates what type of

7    selling you're going to do, it also dictates what kind of

8    spending, what kind of budget you're going to get to support a

9    product launch.

10   Q.    Sir, if we take a look at the longer term view of the

11   market penetration strategy for Prezista, at least as was

12   described in this document, there was a reference earlier to

13   counsel for Mr. Mattes, or counsel for Janssen, to priority

14   upon full approval; that this was only a strategy that Janssen

15   was taking in anticipation of getting full label approval.

16       Do you recall hearing that testimony?

17   A.    Yes, I do.

18   Q.    All right.

19       And is that an accurate -- in your view, having

20   reviewed the documents, is that an accurate representation of

21   what Janssen was actually doing in 2006 and 2007?

22   A.    I don't believe so.  I believe that they were clearly

23   looking to market to segments beyond the scope of the approved

24   label.

25   Q.    Now, there are, we've learned, ways in which companies

SILLUP - DIRECT - MARKETOS

1  like Janssen/Tibotec can send companies and vendors out into

2  the field and learn what doctors are actually hearing from

3  their sales representatives.

4       Do you understand that?

5  A.   Yes, I do.

6  Q.   Did you review a number of those documents, that type of

7  document, where Janssen was getting feedback from physicians

8  in the field from vendors that it paid to perform service?

9  A.   Yes.

10 Q.   Did you hear Mr. Mattes testify that it might be a way to

11 find out if there's off-label promotion going on?

12 A.   Yes.

13 Q.   Did you review some documents that indicated that Janssen

14 was receiving that message back at headquarters?

15 A.   Yes.  It seemed to be working.

16 Q.   And if you take a look at the unaided message recall, for

17 instance, just for Intelence, what would that tell an

18 executive at Janssen about the messages that its sales

19 representatives were delivering to physicians?

20 A.   Well, the off-label messaging was working.  The program

21 was working.  The dosing issue of -- we discussed, you know,

22 once a day being desirable, but marketing a product that is

23 indicated twice a day, once a day is putting you into a

24 different area of off-label.

25 Q.   There's a reference here that we saw in trial at

SILLUP - DIRECT - MARKETOS

1    Exhibit 47 where there was actually a manager who responded to

2    discussions about training and providing the sales force with

3    off-label studies.

4         Do you recall reviewing that information as you

5    performed your job?

6    A.   Yes.

7    Q.   And there was actually a comment by Mr. Martin.  "If we

8    continue to review off-label information with the field, it

9    gives the impression of a training session."

10        Did you see?

11   A.   I did.  I was a field sales trainer, and sometimes very

12   effective training occurs in the field.  So it is a training

13   session.

14        So if we talk about that and then you immediately get

15   to use that information, prior to making a call, we discuss

16   it, then you go use it, it's very reinforcing.

17        So it is a type of training.

18   Q.   Did you review other types of documents, like A&U

19   reports, that showed doctors responding to questions about

20   what they thought to be important as it relates to Prezista

21   and Intelence?

22   A.   Yes.

23   Q.   And is it your understanding that Janssen performed its

24   studies about what doctors were saying about what was

25   important to them in prescribing those two drugs?

SILLUP - DIRECT - MARKETOS

1    A.    Yes.  Yes.

2    Q.    And what was your understanding of one of the main

3    messages that doctors were saying about Prezista?

4    A.    They liked the concept of a product being "lipid

5    neutral," the term that was being used.  Or not creating a

6    harmful lipid situation.

7    Q.    And did you review documents relating to, similar to, or

8    like Reyataz?

9    A.    Yes.

10   Q.    How about with respect to Intelence?  What did -- were

11   doctors informing Janssen was important to them in terms of

12   prescribing that medication?

13   A.    Dosing.  Dosing was important.  Once a day versus the

14   twice a day for Intelence.

15   Q.    And what's the problem with that in terms of a

16   competitive barrier or a barrier to sales?

17   A.    Well, it's off-label.  It's misleading.  And it may --

18   you don't have information to suggest that it actually works.

19   You know, dissolving a drug that is there, and I -- I don't

20   know if I'm going to achieve -- they call it the

21   pharmacokinetic peak -- the same way if I take the drug once a

22   day when I'm supposed to be taking it twice a day.

23       That's what was tested.  Those are the data that you

24   have available.

25   Q.    How about with respect -- you heard me discuss with

SILLUP - DIRECT - MARKETOS

1  Mr. Mattes Janssen's calculation of the return on investment

2  that it was obtaining from the Promotional Speakers' Bureau.

3       First of all, you understand there was a Promotional

4  Speaker Bureau for Prezista and then another Promotional

5  Speaker Bureau for Intelence?

6  A.   Yes.

7  Q.   And what did you learn about the conclusions that Janssen

8  reached when they were analyzing the return on the investment

9  of the money they spent on those programs?

10 A.   I think it was 3 to 1.  You know, for every dollar they

11 invested in the speaker program, they would harvest $3.  Not a

12 bad rate of return, right?

13 Q.   And if we look at the key conclusions here, "The speaker

14 programs produced 40.3 percent more Intelence prescriptions

15 when compared to the controlled doctors."

16      Do you see that?

17 A.   Yes.

18 Q.   Just describe for us what you understand a control group

19 to be versus the group that Janssen was measuring in this

20 metric?

21 A.   Well, in this case, a control is physicians who did not

22 participate in the speaker programs compared to those

23 physicians who did.  And there's a significant difference.

24 Q.   And what would results like this, sir, say to you about

25 whether or not Janssen's Promotional Speaker Bureau program

SILLUP - DIRECT - MARKETOS

1  worked?

2  A.   I think it's quite compelling.  It says it worked, and it

3  worked well.

4  Q.   Now, did you review documents where Janssen had

5  performed -- had -- and had its own vendors perform analyses

6  of the impact that the programs had on speakers' long-term

7  prescribing habits?

8  A.   Yes.

9  Q.   All right.

10        Now, before we get to that, sir, did you review this

11  document that said, "Interestingly, Intelence speaker programs

12  also had an impact on Prezista prescription lift."

13        Do you see that?

14  A.   Yes.

15  Q.   What is brand loyalty as an -- in this field?

16  A.   Well, you use one product from a company and like it and

17  then you might use something else by the same manufacturer.

18        This was -- I was surprised to see how much of a lift

19  this made.  I know that there's some association, but this was

20  a significant lift.

21  Q.   Was Janssen's marketing through the Promotional Speaker

22  Bureau program working?

23  A.   I'd say working very well.

24  Q.   We talk about this document, and I don't want to belabor

25  this point, sir.  There was a reference to Janssen using and

SILLUP - DIRECT - MARKETOS

1    actually having its managers use the MIR forms as a metric and

2    using it to drive the sales force to go out and solicit them.

3         Do you recall that discussion during the course of this

4    case?

5    A.   I do.  And I --

6    Q.   What is the problem with that?

7    A.   You're using something that is supposed to be truly based

8    on an unsolicited request.  You're now -- you've now turned

9    that into a metric.  And I've not seen this treatment before

10   of a medical information request form.

11   Q.   If we take a look, sir, at this next document, there's a

12   discussion about whether, "Do you or does someone on your team

13   have the percentage of spontaneous off-label sales for

14   Prezista and Intelence?"

15        Do you see that?

16   A.   Yes, I do.

17   Q.   All right.

18        How does one -- let me ask this, Professor Sillup.  How

19   does one track off-label sales and characterize them as

20   spontaneous?

21   A.   First of all, the term "spontaneous" sort of bothers me.

22   I think the decision by a physician is very thoughtful.  It's

23   very much in consideration of the patient.  This doesn't just

24   happen.  He or she makes a very significant discernment for

25   the patient.

SILLUP - DIRECT - MARKETOS

1        Tracking those decisions -- and that decision may be to

2   use the product off-label because it's one of my last

3   therapeutic alternatives for the patient.  I get concerned

4   when I see this being used as a measure now because am I truly

5   getting information requests, or have I turned the system into

6   a metric to monitor sales.

7   Q.   This was another exhibit that we looked at during trial,

8   Professor Sillup.  This was a PATH report, a tactical report

9   from manager Tony Dolisi in the New York area in that region.

10       Do you recall this?

11  A.   Yes, I do.

12  Q.   And this was, "MIR forms are being widely used to get the

13  48-week data into the hands of all customers."

14       Professor Sillup, is this essentially giving away the

15  game?

16  A.   So, yes.  So you've taken the tool that -- to be geared

17  toward unsolicited requests to use a product and want to talk

18  to the medical professional and instead, you're now finding

19  that additional data that would enhance the profile of the

20  drug is being disseminated through this vehicle.

21  Q.   And what type of promotion would that constitute?

22  A.   It's -- it's clearly off-label promotion, but it almost

23  goes beyond that because this -- the MIR is something that's

24  held sacred, and there's, as we've heard, there's a, we'll

25  call it, a wall between the on-label promotion that a sales

SILLUP - DIRECT - MARKETOS

1  representative can do and the off-label discussion that's

2  handled, often, a different individual.  A scientific liaison

3  a physician or nurse practitioner can have that discussion.

4  Q.  What was actually happening here?  Was that wall staying

5  up, or was it being breached?

6  A.  The wall -- I don't think there was a wall.  But to hear

7  something like this, I have not seen something as -- I could

8  use the term maybe "bold" as this being done.

9  Q.  Well, and that's another question I have for you, sir.

10  Were you present when we saw some training materials where

11  Janssen employees were taught how to be careful with their

12  communications?

13  A.  Yes.

14  Q.  And does this appear to be careful?

15  A.  This appears to be a faux pas, something that even

16  though, you know, things were discussed but nothing was put in

17  writing, this -- this is something that if it was happening,

18  and it appears to have been, shouldn't have been in writing.

19  Q.  And, sir, what does it say to you about the fact that a

20  manager like Mr. Dolisi was comfortable putting something like

21  this in a written document and distributing in a report?

22  A.  He is -- he drunk the Kool-Aid.  He's behind the -- one

23  of the provocateurs of an on-label -- off-label marketing

24  strategy.

25  Q.  And if an entity like Janssen were concerned about

SILLUP - DIRECT - MARKETOS

1    off-label marketing and reports like this were being

2    circulated within the company, what would you expect to happen

3    to somebody like Mr. Dolisi?

4    A.    I'm thinking like this, and I'm used to -- there is a

5    periodic monitoring by compliance, someone looking at the type

6    of information that is being used or disseminated.

7          Now, it occasionally -- you get that, you know.  I

8    might find -- I work with companies that might have a -- I'll

9    call it rogue salesperson who is doing something, but that's a

10   one-off situation.

11         In this case, it seemed to be rather across the board.

12   Q.    And if we take a look at Janssen's assessment, did

13   Janssen pay vendors to determine the effect that their

14   promotional activities had on physicians' prescribing

15   behavior?

16   A.    Yes.

17   Q.    And what was their conclusion?

18   A.    It was -- it was -- they were working.

19   Q.    And they were working, sir -- it says here, "Speaker

20   programs are an effective way to make a lasting impact on

21   prescribing behavior."

22         First of all, do you agree with Janssen as it relates

23   to this conclusion in their own documents?

24   A.    I agree with it.  I don't agree with the method, but I

25   agree that programs do work very well, and one of the reasons

SILLUP - DIRECT - MARKETOS

1  speaker programs are so effective is you have knowledge

2  imparted by a physician to his or her colleagues.

3          I can come as a representative, but that doesn't have

4  the same lasting impact.

5  Q.  And what might the impact be of paid speakers delivering

6  messages on-label and off-label to a room full of -- or a

7  restaurant full of physicians?

8  A.  Well, this is a concern.  It's one thing to have --

9  impart knowledge and talk about on-label strategy.  It's

10  another -- marketing also works for off-label strategy.

11          So this is just another way to extend beyond the

12  labeled indication.

13  Q.  Did you hear testimony from certain witnesses in this

14  case about the use of plants in the audience at these speaker

15  programs?

16  A.  I did.

17  Q.  Have you ever been involved with a company who used

18  plants to disseminate off-label information at something like

19  a speaker bureau?

20  A.  Through consulting and stuff I have seen -- I have seen

21  that, yes.

22  Q.  You've seen that tactic used before?

23  A.  Yes.

24  Q.  All right.

25          What is your understanding of the likely effect of that

SILLUP - DIRECT - MARKETOS

1    type of tactic in Janssen's promotional speaker programs?

2    A.    It's something that works, particularly if that approach

3    is going to get the audience -- physician audience, the

4    prescribers, to begin thinking about possible use of the

5    product in an off-label manner.

6    Q.    Now, sir, Janssen in this document, RX 657, is examining

7    the prescription lift per participant and the total

8    prescription lift.

9         Do you see that?

10   A.    Yes.  Yes.

11   Q.    And for this one period of time, Janssen calculated that

12   their total lift net rate sales in dollars were 4.3 million.

13        Do you see that?

14   A.    Yes, I do.

15   Q.    And at the bottom there, there's an ROI calculation of

16   $3.15.

17        Explain to the members of the jury what that means

18   about the return on investment that Janssen was getting out of

19   these paid speaker programs?

20   A.    So this is what I mentioned earlier.  For every dollar

21   you invest, I'm gaining three.  So speaker programs were being

22   used beyond the normal approach of imparting knowledge as a

23   marketing tool.

24   Q.    Sir, what -- just -- without going into the details of

25   any other matter, what do you understand that Johnson &

SILLUP - DIRECT - MARKETOS

1    Johnson taught its employees about what might happen to

2    entities that engage in off-label marketing?

3    A.   Well, there could be some significant legal consequences

4    and fines.

5    Q.   And let me ask you this, sir:  Did you also take a look

6    at some of the results from studies that were done in the

7    field about whether or not Janssen's message was having an

8    impact on prescribers?

9    A.   Yes.

10   Q.   And were these studies that Janssen itself commissioned?

11   A.   Yes.

12   Q.   And what was the result that was communicated back to

13   Janssen about whether or not their marketing messages were

14   having an impact out in the field?

15   A.   Seemed to be working.

16        JUROR:  Excuse me.  I'm sorry to disturb you, sir.

17   Could I use the restroom?

18        THE COURT:  Folks, let's take a ten-minute recess.

19        THE DEPUTY COURT CLERK:  All rise.

20        THE COURT:  Have a recess.  We're in recess for ten

21   minutes.

22        You may step out as well.

23        (A short recess occurred.)

24        THE DEPUTY COURT CLERK:  Please remain seated.

25        THE COURT:  Folks, we're going to take another break

SILLUP - DIRECT - MARKETOS

1    between 3:00 and 3:30, just -- with the jurors' communications

2    and because it's a long afternoon, I think I'll probably give

3    a second break, and I always forget.

4         Megan is typing away for hours at a time, so she's

5    probably spending more energy than all of us combined, so

6    we'll take another one, just so you all know.

7         THE DEPUTY COURT CLERK:  All rise.

8         (The jury enters the courtroom.)

9         THE COURT:  All right, folks.  Everybody have a seat.

10   We will continue with the examination.

11        And, by the way, folks, we're going to take another

12   short break somewhere probably between 3:00 and 3:30.  With

13   the long afternoon, I think it's hard to assess whether anyone

14   in the courtroom is going to need another break.

15        So we're just going to do another short one later in

16   the afternoon.  I think that's fair considering how long the

17   stretches are until 5:00 p.m.

18        So with that, Mr. Marketos, you may continue.

19        MR. MARKETOS:  Thank you, Your Honor.

20   BY MR. MARKETOS:

21   Q.  Professor Sillup, don't worry.  I'm not going to retread

22   treadable steps.  I just wanted to touch on something that I

23   had forgotten to ask you about.  Forgive me.

24        We were looking at one of the original strategy

25   documents that Janssen has provided in this case, and the

┌─────────────────────────────────────────────
SILLUP - DIRECT - MARKETOS

1    longer term view of the market penetration strategy

2    specifically.

3            This is one of the documents you reviewed for your

4    report in this case.

5            Do you recall that?

6    A.  Yes, I do.

7    Q.  And there was a reference in the middle, "The benchmark

8    is Reyataz and less Kaletra.  Need to prove favorable

9    differentiation, primarily on lipids and then GI profile."

10           Do you see that?

11   A.  Yes.

12   Q.  Do you see the studies -- the numbered studies that are

13   listed next to the lipids issue?

14   A.  Yes.

15   Q.  Did you review C159 and determine it was an off-label

16   study?

17   A.  Yes.  Made known by a different name other than that

18   number, but I did look at several studies.

19   Q.  And did you look at the DART study in this case?

20   A.  Yes.

21   Q.  All right.

22           MR. MARKETOS:  Let's take a look at -- and let's skip

23   back in time, forward, fortunately, to slide 35, please.

24   Thank you, Ms. Johnson.

25   BY MR. MARKETOS:

SILLUP - DIRECT - MARKETOS

1  Q.  We were looking at the results of what was called a

2  PhysPulse study, a study of physicians and messages that they

3  were receiving.

4      Did you learn that the goal of these studies were to

5  clarify the effectiveness of the promotional efforts that

6  Janssen was engaging in?

7  A.  Yes.

8  Q.  And actually refer to them as selling messages.

9      Right, sir?

10 A.  Yes.

11 Q.  And they wanted to leverage the above information to make

12 timely and impactful adjustments to marketing tactics for

13 Prezista and Intelence.

14     Do you see that?

15 A.  Yes, I do.

16 Q.  And did you learn what physicians were saying was one of

17 the key drivers for Prezista out in the marketplace?

18 A.  Yes.

19 Q.  And what was that as it relates to --

20 A.  The one that's highlighted there, the lipid neutral.

21 Q.  Is it your understanding, sir, based on the evidence

22 you've reviewed and the testimony that you've heard in this

23 courtroom, that Prezista was ever a lipid-neutral drug?

24 A.  No, it was not.

25        MR. MARKETOS:  If we take a look at the next slide,

SILLUP - DIRECT - MARKETOS

1    there's a reference here to -- we'll blow it up.

2    BY MR. MARKETOS:

3    Q.   There's a reference here to "specific Intelence patient

4    profiles discussed in a naive patient segment of 13 percent."

5        Do you see that?

6    A.   Yes.

7    Q.   And it says at the top, "11 percent of physicians were

8    exposed to Intelence patient profiles during their last

9    detail.  These physicians are higher users and spend more time

10   discussing Intelence with reps."

11       Do you see that?

12   A.   Yes.

13   Q.   What did you learn about the messages that Janssen's

14   representatives were delivering as it relates to Intelence?

15   A.   They were -- they were working.

16   Q.   And was it working specifically with respect to the use

17   of Intelence in naive patients?

18   A.   It appeared as though it was working beyond that.

19   Q.   And were -- was Intelence ever on-label for naive

20   patients for the duration of that medicine?

21   A.   Not to my knowledge.

22   Q.   If we take a look at the next slide, there's medication

23   adherence and dosing convenience.  These are key drivers for

24   early prescription experienced market versus Intelence.

25       Do you see that, sir?

SILLUP - DIRECT - MARKETOS

1  A.   Yes, I do.

2  Q.   And what was, for Intelence, the number one driving

3  factor for physicians' prescribing behavior as it was

4  communicated to Janssen in these documents?

5  A.   Once-daily dosing.

6  Q.   Sir, we looked at this exhibit during the course of this

7  trial.  There was a communication.  It ended up going up to

8  Mr. Mike Iacobellis.  And this was from Thomas Turner, who was

9  a sales manager.

10       He stated, "When we professionally challenge providers

11  during AHM programs," those are speaker programs, right, "and

12  on sales calls, we change prescribing behavior."

13       Do you see that?

14  A.   Yes, I do.

15  Q.   Do you agree?

16  A.   Yes.  That's why they do it.

17  Q.   Professor Sillup, you testified about your personal

18  experience working in the industry, even for Johnson &

19  Johnson, for a number of years.

20       Do you recall that?

21  A.   Yes.

22  Q.   You worked for Johnson & Johnson out in the field?

23  A.   Yes, I did.

24  Q.   Did you work for Johnson & Johnson in its headquarters in

25  New Jersey?

SILLUP - DIRECT - MARKETOS

1  A.   Yes, I did.

2  Q.   All right.

3       What -- just remind us again what the credo meant to

4  you?

5  A.   It was the guiding document for the way you conduct

6  business.

7  Q.   Do you still have one?

8  A.   I still keep a copy.

9  Q.   Sir, what -- based on what you saw in this case and what

10 you've seen from the evidence, what was the problem here with

11 respect to this specific division of Johnson & Johnson?

12 A.   What concerned me -- I always think of the stakeholders

13 in health care delivery:  patients, providers, doctors,

14 nurses.  It seemed to me to have -- the triangle was inverted.

15      There was an emphasis on profit, which, again, is not a

16 bad thing, but it shouldn't be pursued and have the other

17 areas de-emphasized, such as creating what I've perceived was

18 a -- I'll call it a challenging environment for those working

19 at Janssen/Tibotec at that time.

20 Q.   All right, sir.

21      At the conclusion of your testimony, Professor Sillup,

22 can you please state the final opinions that you reached in

23 this case for the jury once again?

24 A.   Yes.  Janssen's off-label marketing caused physicians to

25 prescribe -- bless you -- Prezista, Intelence off-label.

SILLUP - DIRECT - MARKETOS

1          Janssen's specific off-label messages caused physicians

2    to prescribe off-label for those specific reasons.

3          And Janssen's off-label messaging directed at

4    physicians had a lasting impact on physicians' prescribing

5    behavior.

6    Q.   Based on your education, your training, your experience

7    in the industry, sir, are you offering these opinions to the

8    members of the jury with a reasonable degree of certainty?

9    A.   Yes, I am.

10   Q.   Has that certainty changed at all as a result of your

11   attendance and the trial testimony throughout the trial of

12   this case?

13   A.   No.  It's been reaffirmed.

14   Q.   All right, sir.

15         I'm going to maybe save you some time here in a few

16   moments.  You're being offered to the members of the jury on

17   matters specific to your areas of expertise.

18         True?

19   A.   Yes.

20   Q.   You are not being offered as an expert to talk about

21   reimbursement.

22         True?

23   A.   True.

24   Q.   You're not being offered as a medical expert, like

25   Dr. Glatt.

SILLUP - DIRECT - MARKETOS

1          True?

2    A.    True.

3    Q.    You're being offered for the opinions that you just

4    provided to the jury and nothing else.

5          Is that fair?

6    A.    That's correct.

7    Q.    During the course of your investigation of this case,

8    have you had access to information that you wanted --

9    A.    Yes.

10   Q.    -- in order to form your opinions?

11   A.    Yes, I did.

12   Q.    And, sir, has attending this trial provided you access

13   beyond even what you had when you rendered your opinion

14   initially in this case?

15   A.    Yes, it did.

16   Q.    All right.

17         And has it confirmed your opinions that you just gave

18   to this jury?

19   A.    Yes.

20   Q.    Professor Sillup, thank you, sir.

21         MR. MARKETOS:  Nothing further, Your Honor.

22         THE COURT:  I just have a quick issue.  Can I just

23   see counsel at sidebar just for a moment.

24         (Sidebar begins at 2:06 p.m.)

25         THE COURT:  I want to be clear because I can't

SILLUP - DIRECT - MARKETOS

1    remember anywhere in the examination.  Does it ever come out

2    that he's testifying as an expert witness in the area of

3    blank?

4            MR. MARKETOS:  Yes.

5            THE COURT:  That did come out?

6            MR. MARKETOS:  Right at the beginning.

7            THE COURT:  What was the area?

8            MR. MARKETOS:  Pharmaceutical marketing.

9            THE COURT:  Okay.  Got it.  I just want to make sure

10   because you normally -- you say it, and, I mean, there's no

11   objection because I already dealt with the motions in limine,

12   but somewhere in there, it's been identified that he's an

13   expert in a particular area.  Correct?

14           MR. MARKETOS:  Yes, Your Honor.  He is offering his

15   opinions in pharmaceutical marketing.  You want me -- you want

16   me to --

17           THE COURT:  No, no, as long as it's in there.  I

18   can't remember it being said.  And so I know he's testifying

19   as an expert and these are his opinions, but usually there's,

20   like, some subject area that the expert is qualified.  So it's

21   in?

22           MR. MARKETOS:  Pharmaceutical marketing.

23           THE COURT:  Got it.  All right.  And there's no

24   objection.  I mean, understanding --

25           MS. BROWN:  It's already been raised.

*United States District Court*
*District of New Jersey*

SILLUP - CROSS - BROWN

1            THE COURT:  Because it's already been raised.  Okay.

2     Understood.  Yeah.

3            MS. BROWN:  Thank you, Your Honor.

4            THE COURT:  Okay.  I'm good.

5            (Sidebar was concluded at 2:07 p.m.)

6            (Open court.)

7            THE COURT:  All right.  Thank you, Mr. Marketos.

8         Ms. Brown, whenever you're ready, you may proceed with

9     cross.

10           MS. BROWN:  Thank you, Your Honor.

11        May I proceed, Your Honor?

12           THE COURT:  You may.

13    (CROSS-EXAMINATION BY MS. BROWN:)

14    Q.   All right.

15        Good afternoon, Professor.

16    A.   Good afternoon.

17           MS. BROWN:  Good afternoon, members of our jury.

18    BY MS. BROWN:

19    Q.   Sir, you here in your testimony have made some serious

20    claims against Janssen.

21        Wouldn't you agree?

22    A.   Yes.

23    Q.   You have accused the folks at Janssen of misleading

24    doctors.

25        Correct?

────SILLUP - CROSS - BROWN────

1   A.   Yes.

2   Q.   You have accused the folks at Janssen of bribing doctors.

3   Correct?

4        MR. MARKETOS:  Forgive me, Your Honor.  That's a

5   legal term.  We object.  Anti-Kickback Statute, not a bribery

6   statute.

7        THE COURT:  I'll sustain it.  Rephrase the question,

8   Ms. Brown.

9   BY MS. BROWN:

10  Q.   You have accused the folks at Janssen of paying money to

11  speakers to induce them to prescribe more medicine.

12       Fair?

13  A.   Yes.

14  Q.   All right.

15       And generally you've just accused the folks at Janssen

16  of engaging in improper conduct.

17       Would you agree?

18  A.   Yes.  Not all of people at Janssen.

19  Q.   And you would agree, Professor, that it would be fair for

20  our jurors to consider your conduct as you approached your

21  work as an expert witness for these lawyers.

22       Correct?

23  A.   Yes.

24  Q.   It would be fair for our jurors to judge your approach to

25  your job here in the same way you've judged Janssen.

─────SILLUP - CROSS - BROWN─────

1          Correct?

2     A.   Yes.

3     Q.   And one of the things that has happened, sir, over the

4     past two and a half weeks or so is that you have sat in the

5     back of the courtroom.

6          Correct?

7     A.   Yes.

8     Q.   And you have watched a document being used over and over

9     and over again in a way that you don't agree with.

10         Right, sir?

11    A.   I have to understand what document -- the document to

12    which you're referring.

13    Q.   And we're going to get to that.  I'm going to put it up

14    and show you.

15         Okay, sir?

16    A.   Okay.

17    Q.   And, in fact, let me ask you:  This presentation that you

18    just went over with counsel for Relators, did you select the

19    documents that went in here that you spoke to our jurors

20    about?

21    A.   It was a combination of working with the legal team.

22    Q.   All right.

23         MS. BROWN:  Could I have the ELMO, please,

24    Mr. Knecht.

25    BY MS. BROWN:

SILLUP - CROSS - BROWN

1  Q.  What about this one?  Was this your decision to include

2  this particular document in this PowerPoint presentation you

3  just went over with our jurors?

4  A.  There was a combination decision, and this is something I

5  recalled.  It just bothered me about the way the MIR system

6  was being used.

7  Q.  Was it your decision, sir, to cut out just a little piece

8  of this document to show our jury?

9  A.  I can't say that it was.

10  Q.  All right.

11      Have you forgotten, perhaps, sir, that this is a

12  document you've seen before?

13  A.  I believe I saw it at some point over the past weeks.

14  Q.  Have you forgotten, sir, that this is a document that you

15  testified about under oath?

16  A.  I've looked at numerous documents.  I may have.

17  Q.  Have you forgotten, sir, that before you came into the

18  courtroom to testify about this PowerPoint that you put

19  together with the lawyers, you swore under oath that these

20  MIRs were appropriate?

21  A.  MIRs are an appropriate tool if used appropriately.

22  Q.  Let's look at the documents, sir, and see if I can

23  refresh you, and then we'll look at your testimony.

24      Okay, sir?

25      Let's look at the whole document.  Okay?

SILLUP - CROSS - BROWN

1              First of all, this document is being sent to Tony

2     Dolisi.

3              Do you see that, sir?

4     A.   Yes, I do.

5     Q.   And you've never spoken to Tony Dolisi.

6              Correct, sir?

7     A.   No, I have not.

8     Q.   All right.

9              Any document that you've seen from Tony Dolisi, that's

10    been provided to you by lawyers.

11             Correct, sir?

12    A.   Yes.

13    Q.   All right.

14             And I want to direct your attention to another part of

15    this document that you've spoken about before and that didn't

16    make it into the PowerPoint presentation, and that's up here

17    under P.

18             Do you see that, sir?

19    A.   Yes, I do.

20    Q.   All right.

21             And it says -- first of all, to orient us, this is

22    September 14, 2006.

23             Do you see that, sir?

24    A.   Yes.  About three months after the approval.

25    Q.   Yes, sir.

SILLUP - CROSS - BROWN

1          And what it says is "The Prezista message seems to be

2   gaining some momentum as customers are experiencing early

3   success with the first patients to be placed on therapy."

4          Do you see that?

5   A.   Yes.

6   Q.   All right.

7          "Many questions have come up around the durability of

8   48-week data that was presented at the IAC in Toronto."

9          Do you see that, sir?

10  A.   Yes, I do.

11  Q.   All right.

12         And the IAC is the International AIDS Conference.

13         Is that right, sir?

14  A.   Yes.

15  Q.   And you understand that, right about this time, the

16  48-week data was presented at a conference for doctors to

17  learn about even before it made it into the label.

18         Correct?

19  A.   Yes.  This could be -- not necessarily a definite pathway

20  to the label, but it would be information to expand from the

21  24 weeks -- I'm not sure what he means around the durability.

22  Q.   Okay, sir.

23         My question is just:  This information was presented at

24  a conference.

25         You're with me?

SILLUP - CROSS - BROWN

1    A.   Yes, I am.

2    Q.   All right.

3         Then the part that you cut out and put on your slide

4    was down here in T.

5         Do you see that?

6    A.   Yes.

7    Q.   And it says, "MIR forms are being widely used to get the

8    48-week data into the hands of all customers."

9         Do you see that?

10   A.   Yes.

11   Q.   And so we have MIR being used to get 48-week data into

12   the hands of all customers, and we have questions coming up

13   around 48-week data.

14        Do you see that?

15   A.   Yes.

16   Q.   And what was interesting to me, sir, is that when you

17   were asked to talk about this document in the slide deck that

18   you put together with the lawyers, I wrote down here -- and

19   you said it was clearly off-label promotion.

20        Do you remember saying that just now?

21   A.   Yes.  Yes, I did.

22   Q.   And you've not seen something as bold as this being done

23   before.

24        Right?

25   A.   Yes.

SILLUP - CROSS - BROWN

1    Q.   Okay.

2         But the truth is, sir, at your deposition, you agreed

3    that a fair reading of this document is that the MIRs were

4    being used in response to questions about the 48-week data

5    that was being presented at the AIDS conference.

6         Do you remember that?

7    A.   Yes.

8         MR. MARKETOS:  Your Honor, I object.  If she's going

9    to say that something was stated at the deposition, she

10   needs to --

11        THE COURT:  Overruled.  I'll allow the question.

12        MR. MARKETOS:  All right.

13   BY MS. BROWN:

14   Q.   Right, sir?

15   A.   Well, I'm sorry.  What was the question.

16   Q.   Yes, sir.

17        At your deposition, when you were shown this document,

18   you agreed that a fair reading of this document was that the

19   48-week data was being provided in response to doctors'

20   questions coming out of the conference.

21        Right, sir?

22   A.   Yes, sir.

23   Q.   And at your deposition, rather than say this was clearly

24   off-label promotion, you agreed it's appropriate to answer

25   questions through the MIR process coming out of a conference

SILLUP - CROSS - BROWN

1    like this.

2    A.    Yes.

3    Q.    And so your testimony under oath, sir, about this very

4    same document was entirely inconsistent with what you came in

5    here to tell our jurors today.

6    A.    My perspective in seeing this was -- it's the part that

7    really hit me, was the 48-week data being widely used, widely

8    disseminated.  It seemed beyond just the questions.  The

9    implication is it's beyond the response to a presentation

10   given at the conference.

11   Q.    Sir, the -- when we asked you about this document, you

12   said a fair reading of what was going on here is that MIR

13   requests were being filled out in response to doctors'

14   questions that were being raised at that conference.

15         Do you remember that, sir?

16   A.    Yes, I do.

17   Q.    Okay.  And then when you came in here today, you clipped

18   out that same document and you cut out the part that explains

19   where the questions about the 48-week data were coming from.

20         Right, sir?

21   A.    We just used that one segment of it.

22   Q.    Then when you came in here today, rather than saying a

23   fair read is that this was an appropriate response to

24   questions at a conference, you said it was clearly off-label

25   promotion.

SILLUP - CROSS - BROWN

1          Right, sir?

2    A.    Yes.

3    Q.    Now, Doctor -- excuse me -- Professor, you have been in

4    court every single day of this trial.

5          Correct?

6    A.    Yes.

7    Q.    And you've been sitting in the back here with some of the

8    other lawyers.

9          Correct?

10   A.    Yes.

11   Q.    Have you been charging the lawyers for the Relators' for

12   the time that you're spending here, sir?

13   A.    Yes.

14   Q.    And is that -- how much are you charging them per hour?

15   A.    The same hourly rate.

16   Q.    Okay.

17         As I understood that, that was $400 an hour.  Is that

18   right, sir?

19   A.    Yes.

20   Q.    And our schedule is shifting a little bit, thanks to the

21   good work of our jury, but it's basically been 9 to 4.

22         Correct?

23   A.    Yes.

24   Q.    All right.

25         So have you been charging the lawyers 7 hours a day

SILLUP - CROSS - BROWN

1    every day of this trial?

2    A.   No.  Take off for lunch and breaks.

3    Q.   Okay.  You deduct the lunch.

4         Right?

5    A.   Yes.

6    Q.   Okay.

7         So how many hours are you averaging about a day?  Six?

8    A.   Yes.

9    Q.   Six hours a day at 400, I get $2,400 a day.

10        Is that about right?

11   A.   Yes.  Before taxes.

12   Q.   Okay.

13        So $2,400 a day to sit here and watch.

14        Fair?

15   A.   Yes.

16   Q.   And that's -- we've been going about four days a week.

17        Right, sir?

18   A.   Yes.

19   Q.   All right.

20        So let's see how good my math is.  I get $9,600 for

21   each of the weeks, correct?

22        Does that sound right?

23        I'm going to show you.  Check me on it.

24   A.   That sounds right.

25   Q.   Is that right?

—SILLUP - CROSS - BROWN—

1          16, carry the 1.  That looks right.  Right?  Okay.

2          So almost $10,000 for each week of this trial to watch.

3          True?

4    A.   Yes.

5    Q.   Okay.

6          So we're in week two and a half.  You're over almost

7    $20,000?

8    A.   Yes.

9    Q.   Are you staying with the legal team, or are you commuting

10   back and forth?

11   A.   A combination.  I was commuting, and I'm going to stay --

12   I stayed last evening; I'm going to stay this evening.

13   Q.   Okay.

14          And that's at the DoubleTree with everybody?

15   A.   Yes.

16   Q.   All right.

17          And, of course, the lawyers are paying for you to stay

18   there as well.

19          Right, sir?

20   A.   Yes.

21   Q.   All right.

22          And so where we are at this point in the trial, then,

23   if you're putting in about six hours a day multiple weeks,

24   you've spent more time at this point watching the trial than

25   you spent putting together your initial expert report.

SILLUP - CROSS - BROWN

1          Fair, sir?

2    A.   I can't recall how much time I spent initially.  I'd say

3    close.

4    Q.   Pretty much.

5          Right?

6    A.   Yes.

7    Q.   Because you told us initially, to put together your

8    initial report concluding that we were influencing physicians

9    and doing all sorts of bad stuff, that took you about 40

10   hours.

11         Right, sir?

12   A.   Yes.

13   Q.   All right.

14         And certainly you've been in this courtroom at the rate

15   of $400 an hour more than 40 hours by now.

16         True?

17   A.   Yes.

18   Q.   All right.

19         And you have -- the fact of the matter is, sir, you've

20   heard a lot of stuff and seen a lot of documents in this trial

21   that you didn't know about before.

22         Right?

23   A.   Yes.  There was some new observations.

24   Q.   Sure.

25         And that's pretty important to your opinions, sir,

SILLUP - CROSS - BROWN

1    because your opinion in this case is based on your

2    determination that the Relators and their friends are

3    credible.

4         Correct?

5    A.   Yes.

6    Q.   Right?

7         You read depositions of some Janssen folks and you read

8    depositions of Relators and their friends.

9         Correct?

10   A.   Right.  When I read those, I looked at -- I didn't know

11   about relationships, didn't care about relationships.  I

12   approached it the same way I would assess any company going in

13   to help them with forecasting.

14   Q.   Yes, sir.

15        And you made the assessment, looking at the cold

16   transcripts, that the Relators and their friends were

17   credible.

18        Correct?

19   A.   Yes.

20   Q.   And now you've sat in this courtroom for two and a half

21   weeks and you've learned a lot of things that you didn't know

22   about before.

23        True?

24   A.   I would say some incremental knowledge.

25   Q.   For example, you didn't know before you formed your

1    opinions in this case about the relationships between the

2    Relators and some of the friends who have testified.

3         Correct?

4    A.   Yes.

5    Q.   Okay.

6         You didn't know -- let me just put up a demonstrative

7    so we can orient ourselves to what you've seen.

8              MS. BROWN:  Mr. Marketos, do you have an objection?

9              MR. MARKETOS:  No objection.

10             THE COURT:  All right.

11             MS. BROWN:  Thank you.

12   BY MS. BROWN:

13   Q.   So one of the things you've learned through the course of

14   sitting here charging money to watch is that Ms. Penelow and

15   Ms. Graham are friends.

16        Right, sir?

17   A.   Yes.

18   Q.   You learned, actually, that Ms. Graham -- and we have the

19   nice picture here -- was a bridesmaid in her wedding.

20        Correct?

21   A.   Yes.

22   Q.   All right.

23        And you learned that Ms. Graham has worked for

24   Ms. Strand several -- in several different companies.

25        Correct?

SILLUP - CROSS - BROWN

1  A.   Yes.

2  Q.   And you've learned that Ms. Graham now is actually living

3  with Mr. Wilhelm in Colorado.

4       Correct?

5  A.   Yes.

6  Q.   And you didn't know, but you learned that these folks

7  actually filed a lawsuit that was dismissed for a significant

8  percentage of money.

9       Right?

10 A.   Yes.

11 Q.   All right.

12      And you learned from Mr. Wilhelm that at least social

13 media-wise, he's friends with a gentleman named Mr. Grooms, we

14 haven't heard from yet.

15      Right?

16 A.   Yes.  And I wasn't sure about the relationship with

17 Matt Grooms.  He's not been here yet.

18 Q.   He has not been here yet.

19      Did you hear Mr. Wilhelm testify they're sort of

20 Facebook friends or friends on social media?

21 A.   Yes, I did.

22 Q.   All of these -- of course you know Ms. Penelow and

23 Ms. Brancaccio.  They're the Relators.

24      Right?

25 A.   Yes.

SILLUP - CROSS - BROWN

1   Q.   All right.

2        And all of these things, of course, you didn't know at

3   the time that you formed your opinions in this case.

4        Correct, sir?

5   A.   Yes.

6   Q.   You also didn't, for example, know what Donna Graham came

7   in here to testify about when she said she had never heard of

8   people promoting Intelence in treatment naive.

9        You haven't known that before you came.

10       Correct?

11  A.   No.

12  Q.   Okay.

13       And, for example, you might have been surprised to hear

14  Ms. Strand testify for the first time that she thought maybe

15  she had gone to the FDA.

16       Do you remember that testimony?

17  A.   Was that the one where she said she called the general

18  number?

19  Q.   Yes, sir.

20  A.   Okay.

21  Q.   Do you remember that day?

22  A.   I do recall.

23  Q.   Right.  And you were judging her credibility that day.

24       Right, sir?

25  A.   Yes.

SILLUP - CROSS - BROWN

1  Q.  All right.

2       And you remember the testimony she gave about that here

3  in this court was inconsistent with what she had said in her

4  deposition that she never reported anything.

5       Right, sir?

6  A.  If you say so.  I can't recall that.

7  Q.  All right.

8       And then you were here, of course, when Ms. Brancaccio

9  testified.

10      Correct, sir?

11 A.  Yes.

12 Q.  And you heard her allegations about Nancy Bartnett.

13      True?

14 A.  Yes.

15 Q.  And you heard her allegations that Nancy Bartnett, of

16 course, didn't like Ray Pacini and was trying to make sure

17 that nobody -- none of the doctors got access to the

18 scientific liaison, Mr. Ray Pacini.

19      Correct?

20 A.  I don't recall the name Ray Pacini.

21 Q.  All right.

22      Do you remember listening to it on the tape, right,

23 where Nancy Bartnett actually invited Ray Pacini to come meet

24 with Dr. Turret?

25      Right?

SILLUP - CROSS - BROWN

1    A.   Yes.

2    Q.   Remember that being sort of inconsistent with what

3    Ms. Brancaccio had told our jurors?

4    A.   Yes.

5    Q.   All right.

6         And all the while, what you've been doing for $400 an

7    hour in the back of the courtroom is sort of weighing the

8    credibility of the evidence that has come in in this case.

9         Fair?

10   A.   Yes.

11   Q.   Okay.

12        And despite everything you've seen over the last two

13   and a half weeks, you are firm on the opinion you came to

14   before you walked in here; that the Relators and their friends

15   are more credible than the Janssen witnesses and the Janssen

16   documents that say this never happened.

17        True?

18   A.   Yes.

19   Q.   All right.

20        One of the things, as I understand it, Professor, that

21   you were here to talk about is your belief that our sales reps

22   influenced the prescribing decisions of doctors.

23        Correct?

24   A.   Yes.

25   Q.   Okay.

SILLUP - CROSS - BROWN

1        And you know, though, that at the time you were asked

2   to form that opinion, you hadn't been provided with the secret

3   recording that we have of a sales visit with a doctor.

4        Right?

5   A.    That's correct.

6   Q.    You are the expert whose opinion is, do sales reps

7   influence physicians, and they didn't give you the one

8   recording of a sales visit with a physician?

9   A.    I didn't ask.  But based on my experience, I know that

10  presenting to physicians influences them.

11  Q.    Yes, sir.  I understand that's your opinion.  We're going

12  to talk about that.

13       My question was just, you're the expert on causation,

14  right?  Does what a sales rep says have any influence on a

15  physician, that's you.

16       Right?

17  A.    Yes, yes.

18  Q.    And we -- in this case we've learned there is one secret

19  recording of a sales visit with a physician.  You know that

20  because you've been watching.

21       Right?

22  A.    Yes.

23  Q.    And yet the lawyers who hired you at $400 an hour didn't

24  give it to you.

25       Right?

─────── SILLUP - CROSS - BROWN ───────

```
 1   A.   I didn't ask.

 2   Q.   Would you have expected to get any information that bared

 3   on the topic you were being hired to opine on?

 4   A.   Yes.

 5   Q.   All right.

 6        So when you heard it, sitting in the back of the

 7   courtroom, you must have been a little surprised.

 8        Right?

 9   A.   I'm -- honestly, I'm trying to recall exactly what that

10   recording was.

11   Q.   Yes, sir.  And it's in evidence.

12        I want to play you a piece of it because as you recall,

13   generally, it's about a visit that Ms. Brancaccio and

14   Ms. Bartnett had with an HIV doctor.

15        Do you remember that part?

16   A.   Yes, I think so.

17   Q.   All right.

18        His name is Glenn Turrett?

19   A.   Somewhat, yes.  And I will say, there might have been a

20   few times when I had to leave to take a phone call and may

21   have missed.

22   Q.   Sure thing.

23   A.   But I remember the name.

24   Q.   Sure thing.

25        And you understand the claims that are being made in
```

SILLUP - CROSS - BROWN

1  this case is that every single time a sales rep went into a

2  doctor's office, they delivered four off-label messages and

3  that influenced a physician.

4       Do you understand that?

5          MR. MARKETOS:  Objection, Your Honor.  That

6  mischaracterizes --

7          THE COURT:  Hold on.

8          MR. MARKETOS:  -- the claims in this case.

9          THE COURT:  Give me a second.

10      Sustained.  Rephrase.

11  BY MS. BROWN:

12  Q.   Do you understand that one of the things the Relators had

13  testified about while you've been watching is that they were

14  delivering off-label messages to doctors like Dr. Turrett?

15  A.   Yes, I recall that.

16      But if I may expand, I did not have the understanding

17  that it was four off-label message -- four, the number four,

18  as opposed to an off-label message.  That's a pretty heavy

19  delivery.

20  Q.   Right.

21      It doesn't really make sense, right?

22  A.   Right.

23  Q.   Like, the sales rep is going into an office and

24  delivering four different off-label messages doesn't even make

25  sense.

SILLUP - CROSS - BROWN

1    A.   Depends on what the message was.

2    Q.   Yes.

3         But you've looked at the data in this case.

4         Right?

5    A.   Yes.

6    Q.   And you think that doesn't make sense.

7         Right?

8    A.   I said it'd have to depend on -- respectfully disagree.

9    It'd have to depend on what the message was.

10   Q.   And you know, sir, because you at least got to listen to

11   part of it, is that what we heard from Dr. Turrett on that

12   recording are explanations of why he prescribes HIV medicines.

13        Correct?

14   A.   Yes.

15   Q.   And as you would expect, he explained that some of those

16   reasons are patient preference.

17        Correct?

18   A.   Yes.  If I'm recalling correctly.

19   Q.   All right.

20        And so it's in evidence, and I want to play it to you

21   where he talks about deferring to his patients on their

22   preference for medicine.

23        Okay, sir?

24   A.   Uh-huh.

25             MS. BROWN:  And then, Your Honor, would I have

SILLUP - CROSS - BROWN

1  permission to play what's already in evidence?

2         THE COURT:  Yes.

3         MS. BROWN:  Okay.  Thank you.

4      It would be audio clip number 2, please, Mr. Knecht.

5      (Audio clip played at this time.)

6  BY MS. BROWN:

7  Q.  Do you recall listening to that, Doctor, during the

8  course of the trial?

9  A.  Somewhat.  I don't know if I -- but listening to it now,

10 I'm --

11 Q.  You're refreshed?

12 A.  I'm refreshed.

13 Q.  And, sir, you would agree one of the things Dr. Turrett

14 talks about on that taped video recording is how part of his

15 prescribing is based on what his patients prefer.

16     Correct?

17 A.  That's what I've heard.  That's what I heard him say,

18 yes.

19 Q.  Yep.

20     And you know, sir, another thing that Dr. Turrett talks

21 about on that tape -- and this one we haven't listened to

22 yet -- is his view that if it ain't broke, you don't fix it.

23     Have you heard that from physicians when it comes to

24 prescribing?

25 A.  Yes, I have.

SILLUP - CROSS - BROWN

1  Q.  Because physicians, particularly in HIV, sometimes don't

2  want to mess with something that's working.

3      Right?

4  A.  That's correct.

5  Q.  All right.

6      Let's listen to what he had to say when Ms. Brancaccio

7  recorded him.

8      MS. BROWN:  Your Honor, permission to play a portion

9  of clip 4, please.

10     THE COURT:  Yes.

11     (Audio clip played at this time.)

12 BY MS. BROWN:

13 Q.  And you heard there, Professor Sillup, that Dr. Turrett

14 was explaining, and Ms. Brancaccio was offering her views,

15 that sometimes patients don't want to switch off something

16 that's working for them.

17     Right?

18 A.  Right.

19 Q.  And that makes sense, doesn't it?

20 A.  It does, unless there are times that the physician feels

21 the medicine needs to change because it's not working well

22 enough.

23 Q.  Sure.  Fair enough.

24     And what Dr. Turrett, though, actually starts off

25 describing here is when he, as a prescriber, sees a medicine

SILLUP - CROSS - BROWN

1    that's working in a patient, sometimes he'll leave it alone

2    because he doesn't -- if it ain't broke, don't fix it.

3         Right?

4    A.    Yes.

5    Q.    And you know, because you were here and we played it

6    already, that Dr. Turrett talked about his views on whether

7    Intelence should be dosed once a day or twice a day.

8         Do you remember that, sir?

9    A.    Yes, I do.

10   Q.    And his view and what he said was for him, as a doctor,

11   Intelence is not an option for once a day.

12        Correct?

13   A.    Yes.

14   Q.    He said -- and we had already listened to it with our

15   jurors -- that for him, it is a twice-a-day medicine.

16        Correct?

17   A.    Yes.

18   Q.    And you heard in this clip neither Ms. Brancaccio nor

19   Ms. Bartnett pushed back and tried to convince him, no, no,

20   no, you should prescribe it once a day.

21        Right?

22   A.    He is prescribing the drug --

23   Q.    Yes, sir.

24   A.    -- as intended by the label.

25   Q.    Yes, sir.

SILLUP - CROSS - BROWN

1          And the claims here, of course, in this case, are that

2   sales reps were in these offices all the time pushing once a

3   day.

4          Do you understand that?

5   A.   I disagree in that there are times to discuss off-label

6   use.  I don't think you're going to do it every single call,

7   but there are times when it's appropriate to do.  And this was

8   one of those times.  The patient is taking the drug.  He or

9   she is doing well.  Why change it?

10         As you say, if it isn't broke -- what's the saying?  If

11  it ain't broke, don't fix it.

12  Q.   If it ain't broke, don't fix it, right.

13         And at least for -- because you understand this is the

14  only recording we have in this case, right?  You've been here,

15  you've seen that.

16         Right?

17  A.   Yes.

18  Q.   And at least for the one piece of evidence we have, you

19  would agree, there's no evidence that Ms. Brancaccio or

20  Ms. Bartnett were pushing a once-a-day message for Intelence.

21         Correct?

22  A.   Well, but it's only an N of one.  Very difficult to draw

23  conclusion that perhaps, on another call, that discussion

24  would be open to off-label.

25  Q.   We don't know.

SILLUP - CROSS - BROWN

1    Right?

2    A.   We don't know, but you can't base a decision on an N of

3    one.  It's just like a small -- it could be just random.

4    Q.   I want to talk to you about the evidence that we do have,

5    though.

6    Fair enough?

7    A.   Okay.  Yes.

8    Q.   Because our jurors are going to be asked to make a

9    decision based on the evidence that comes in in this case, so

10   that's what I'm going to talk to you about.

11   Okay?

12   A.   Yes.

13   Q.   And at least the evidence that we have of a recorded

14   discussion with a physician, we can agree doesn't show any

15   promotion of Intelence for -- for once a day.

16   Correct?

17   A.   For one sales call.

18   Q.   Yes, sir.

19   That's what we're talking about.

20   Right?

21   A.   Yes.

22   Q.   You know actually this sales call last lasted almost

23   45 minutes.

24   Did you know that, sir?

25   A.   I didn't, but that's not unusual.  Earlier I said that a

─────SILLUP - CROSS - BROWN─────

1   substantive call for a disease entity like this is -- that's

2   not surprising.

3   Q.   Right.

4        And you know similarly, sir, in this recording, the

5   only one we have, there were no messages being given to

6   Dr. Turrett to prescribe Intelence in naive patients.

7        Correct, sir?

8   A.   In that one sales call, no.

9   Q.   Right.

10       And you heard at the very end of the call Ms. Bartnett

11  talking about Prezista with Dr. Turrett.

12       Correct?

13  A.   Yes.

14  Q.   And you heard Nancy Bartnett at the end of the call

15  comparing the doses of ritonavir and Reyataz and Prezista.

16       Correct?

17  A.   Yes.

18  Q.   She says they both have 100 milligrams of ritonavir.

19       Right?

20  A.   Yes.

21  Q.   And you know from listening to the evidence in this case

22  and looking at the guidelines and the documents, it's that

23  ritonavir dose in part that can cause lipid issues.

24       Correct?

25  A.   It's contributory.  They're used in tandem.

1    Q.   Yes, sir.

2         And you know one of the things that sales reps are

3    permitted to compare are dosing.

4         Correct?

5    A.   Depending on the -- since you have those data from a

6    clinical study where doses were run next to each other.

7    Q.   You know, sir, in terms of what sales reps are allowed to

8    do?

9    A.   Yes.

10   Q.   They can make a comparison from on dose.  They can say,

11   This is 100 milligrams and this is 100 milligrams.  You know

12   that.

13        Right, sir?

14   A.   Yes.

15   Q.   Okay.  That's what we heard Nancy Bartnett do on

16   Dr. Turrett's tape.

17        Do you remember that?

18   A.   Yes.

19   Q.   All right.

20        And let's listen to that, because I want to ask you

21   something about the lipid message that's discussed here.

22             MS. BROWN:  If we could, with the Court's permission,

23   play clip 5, please.

24             THE COURT:  You may.

25             MS. BROWN:  Thank you.

─── SILLUP – CROSS – BROWN ───

1          (Audio clip played at this time.)

2     BY MS. BROWN:

3     Q.   And, Professor, you heard at the beginning of that clip

4     that we played there Dr. Turrett giving his view about what

5     was going to be Reyataz's deck now.

6          Do you remember that?

7     A.   Yes.

8     Q.   And what he's talking about is once Prezista became

9     approved for once daily dosing, in this provider's mind, that

10    was going to be Reyataz's death now because they didn't have

11    any -- anything else superior to Prezista.

12         Correct?

13    A.   Yes.  What was confusing to me was the fact that saying

14    that there's no concern about lipids.

15    Q.   Yes, sir.

16         And there was a discussion at the end that Dr. Turrett

17    agreed with that both Reyataz and Prezista are dosed with a

18    hundred milligrams of ritonavir.

19         Correct, sir?

20    A.   Yes.

21    Q.   And Nancy Bartnett used the term "relatively lipid

22    friendly."

23         Did you hear that, sir?

24    A.   Yes.

25    Q.   And one of the things that you know but you haven't

SILLUP - CROSS - BROWN

1    looked at in this case is that a number of Janssen's

2    promotional messages and promotional materials were sent to an

3    organization at the FDA called DDMAC.

4         Correct?

5    A.   Yes, familiar with it.

6    Q.   You're very familiar with it because you've been in

7    marketing.

8         Right, sir?

9    A.   Yes.

10   Q.   And you know about DDMAC's 2253 process.

11        Correct, sir?

12   A.   Yes.

13   Q.   And you understand that what companies like Janssen do

14   before they give approved messages to sales reps like

15   Ms. Brancaccio and Ms. Penelow is that they send them to the

16   FDA through a 2253 process.

17        Correct?

18   A.   Yes.

19   Q.   And in terms of what messages Janssen sent to the FDA

20   regarding lipids, that's not something you've reviewed in

21   connection with your opinions in this case.

22        Correct, sir?

23   A.   No, I did not.

24   Q.   Those documents were not made available and provided to

25   you.  Fair enough?

SILLUP - CROSS - BROWN

1   A.   I didn't think they were available.

2   Q.   Yes, sir.

3        Did you ask for them?

4   A.   No.

5   Q.   All right.

6        And you -- I looked at the -- there's a list of

7   depositions that you read, and it looks like you also didn't

8   have the ability to read the deposition of Amit Patel from

9   Janssen who was the regulatory officer in charge of those

10  submissions.

11       Correct?

12  A.   Right.

13  Q.   All right.

14       So that piece of the puzzle, to be fair, is just not

15  something you have an opinion on.

16       Correct?

17  A.   That's right.

18  Q.   All right.

19       I want to talk to you a little bit, sir, about some of

20  the science- -- or academic support you provided to us for

21  your opinions in your expert report.

22       Okay?

23  A.   Okay.

24  Q.   And our jury has heard a lot about experts and expert

25  reports, but one of the things you do is type up a report with

1    all of your opinions and all of the support for your opinions.

2        Is that a fair summary?

3    A.   Yes.

4    Q.   All right.

5    A.   Yes.

6    Q.   And certainly you did that as it related to your opinions

7    that -- that our sales reps, that our marketing influenced

8    physicians.

9        Correct?

10   A.   Yes.

11   Q.   Okay.

12       And, of course, before you do that, you made sure that

13   you were relying on reputable sources of information to

14   support your opinions.

15       Correct, sir?

16   A.   Yes.

17   Q.   Because you wouldn't want to take thousands of dollars

18   for working as an expert witness and rely on stuff that isn't

19   credible.

20       Correct?

21   A.   Yes.

22   Q.   All right.

23       And so let me show you what I want to ask you some

24   questions about in your report, and it's in the section called

25   "Academic and Marketing Literature Show Marketing Influences

SILLUP - CROSS - BROWN

1    Physician Script-Writing."

2         Okay, sir?

3    A.   Yes.

4    Q.   All right.

5         So let's get there.  Okay.  This is the section that I

6    wanted to talk to you about.  It's -- there is the title.  You

7    say that there is literature, like academic literature that

8    supports your opinion that sales reps influence physicians.

9         Right?

10   A.   Yes.

11   Q.   All right.

12        And so your first sentence says, "Academic literature

13   abounds."

14        Do you see that?

15   A.   Yes.

16        MR. MARKETOS:  Your Honor, may we approach.

17        THE COURT:  You may.

18        (Sidebar begins at 2:47 p.m.)

19        THE COURT:  What are we looking at?

20        MR. MARKETOS:  Publishing the expert report on the

21   ELMO right now.

22        THE COURT:  Is that his report?

23        MS. BROWN:  Yes.

24        THE COURT:  How do you get to publish that in front

25   of a jury?

─────────────── SILLUP - CROSS - BROWN ───────────────

1          MS. BROWN:  I apologize, Your Honor.  I apologize for

2    putting it up.  You're right.  I should not have done that.

3          THE COURT:  All right.  Because that's what it was,

4    and I thought maybe I'm mistaken.  You can't just publish his

5    expert report.

6          MS. BROWN:  You're exactly right.  I apologize.  I

7    will -- I will just show it to him and ask him about the

8    citation.  I should not have put it in front of the jury.

9          MR. MARKETOS:  To be clear, she's trying to impeach

10   him with a prior -- with a prior out-of-court hearsay

11   statement that wasn't offered to begin with.

12          So this is -- she's asking about an expert report.  He

13   testified.  He didn't put his expert report into evidence.

14   So...

15          THE COURT:  What are you attempting to do with the

16   expert report?  So I understand.

17          MS. BROWN:  Sure.  I want to talk to him about the

18   sources that he relies on for his opinion that doctors -- that

19   sales reps caused physicians to prescribe in certain ways.

20          THE COURT:  That's fine, but what you can't do is

21   show him the report --

22          MS. BROWN:  Sure.

23          THE COURT:  -- but even privately.  Forget about

24   publicly.  You can't show him the report and say, Let me read

25   off of this report.

SILLUP - CROSS - BROWN

1          It's basically the same thing as publishing a report.

2    What you can say is Do you recall the particular documents?

3    No.  Would it help -- seeing your report, would that refresh

4    your recollection?  Yes.

5          You show it to him.  He looks at it.  Then you say,

6    What is your view?  So let's do it that way.

7               MS. BROWN:  Yes.  I appreciate it.

8               (Sidebar was concluded at 2:49 p.m.)

9               (Open court.)

10              THE COURT:  You may continue.

11              MS. BROWN:  Okay.

12   BY MS. BROWN:

13   Q.   Doctor, I want to talk to you about some of the things

14   you relied on as the scientific evidence for your opinion that

15   sales reps caused doctors to prescribe in certain ways.

16        Okay?

17   A.   Yes.

18   Q.   Okay.

19        And do you recall relying on -- and you believe, sir,

20   that there is a substantial amount of academic literature that

21   would support your opinion that you've given our jury that

22   sales reps influence doctors.

23        Correct?

24   A.   Yes.

25   Q.   And you studied some of that literature in your expert

SILLUP - CROSS - BROWN

1    report.

2         Correct, sir?

3    A.   Yes.

4    Q.   All right.

5         And one of the very first academic cites you provide to

6    us is by a Dr. Van Groningen.

7         Do you know that, sir?

8    A.   Yes.

9    Q.   Okay.

10        And you believe Dr. Van Groningen, of course, is a

11   reliable source of information.

12        Correct?

13   A.   Yes.

14   Q.   All right.

15        And that's why you put it in your expert report.

16        Correct?

17   A.   Yes.

18   Q.   She -- her publication from 2017 supports your opinion

19   that you gave our jury.

20        Correct?

21   A.   Yes.

22   Q.   All right.

23        But you know, sir, that what Dr. Van Groningen actually

24   wrote was a newspaper article.

25        Right, sir?

SILLUP - CROSS - BROWN

1  A.   Yes.

2  Q.   It's not a scientific study.

3       Correct?

4  A.   That's -- that's right.

5  Q.   Right.

6       And you know that when Dr. Van Groningen wrote the

7  newspaper study, the newspaper article, she was about a year

8  out of medical school.

9       Correct?

10 A.   I -- I knew she had graduated recently.

11 Q.   Okay.

12      And you're familiar with statements that

13 Dr. Van Groningen has made about sales reps.

14      Correct?

15 A.   Yes.

16 Q.   All right.

17      And you've seen some of her public statements regarding

18 sales reps?

19 A.   I can't say I've seen them recently.

20 Q.   Okay.

21      You know that Dr. Van Groningen actually is what's

22 called a TikTok influencer.

23      Right, sir?

24 A.   I was not aware of that.

25 Q.   No?

SILLUP - CROSS - BROWN

1      Have you looked at any of her posts online about issues

2 that she frequently writes about?

3 A.   No, I have not.

4 Q.   Have you seen her TikTok videos about what she thinks

5 about sales reps?

6 A.   No, I have not.

7 Q.   Should we look at one?

8 A.   If you'd like to.

9 Q.   Okay.

10         MS. BROWN:  Your Honor, would I have permission to

11 show the video?

12         THE COURT:  This is not in evidence, correct?

13         MS. BROWN:  It is not, Your Honor.

14         THE COURT:  So you don't have permission to show it.

15 Are you moving to admit it?

16         MS. BROWN:  Yes, Your Honor.

17         THE COURT:  Any objection from counsel?

18         MR. MARKETOS:  That would be hearsay, Your Honor.

19 Objection.  Hearsay.

20         THE COURT:  Ms. Brown, what's the exception to

21 hearsay?

22         MS. BROWN:  I'm not offering it for the truth,

23 Your Honor.  I'm offering it for the fact that it exists, and

24 it is a source on which he relied.

25         THE COURT:  Mr. Marketos, you get one more shot.

*United States District Court*
*District of New Jersey*

SILLUP - CROSS - BROWN

 1          MR. MARKETOS:  Your Honor, I'm not sure I understand,

 2   but I think this is an impeachment of a doctor from an

 3   article.

 4          THE COURT:  It's an impeachment of a source that

 5   allegedly Professor Sillup relied upon, in part, in his

 6   report.

 7          MR. MARKETOS:  Yeah.  Still object to hearsay,

 8   Your Honor.

 9          THE COURT:  All right.  It's not being offered for

10   the truth, so it's not hearsay, so if that's the only

11   objection, it's overruled, and you can play it.

12          MS. BROWN:  Okay.  And so --

13          THE COURT:  Just so I know though, what is this,

14   TikTok?

15          MS. BROWN:  Yes, Your Honor.

16          THE COURT:  It's not something inappropriate or

17   something like that.  Do I have to look at this first?

18          MS. BROWN:  I'll show it to you first, if you want.

19          THE COURT:  Yeah, let me see it first.

20          MS. BROWN:  Sure.

21          THE COURT:  And also, is there an exhibit number?

22   Because if it's in, I'd to know what it was identified as.

23          MS. BROWN:  Yes, Your Honor, I have it as D-9074.

24          THE COURT:  All right.  Is there a way for me to see

25   it and hear it without the jurors hearing it?  I just don't

SILLUP - CROSS - BROWN

1    know what it is.  And social media makes me nervous.  All

2    right?

3              MS. BROWN:  Can we take an early break?

4              THE COURT:  We can do our -- we can do our short

5    little -- short second afternoon break.  I can review it, and

6    then we can do just a longer stretch.

7         For the jurors, would that work?  We can go from 3:00

8    to 5:00?

9              All right.  I'm going to do the break.  If we need to

10   take another one, we will, but I need time to see this without

11   you all looking at it, so I'm going to dismiss the jurors.

12             THE DEPUTY COURT CLERK:  All rise.

13             (Jurors exit courtroom.)

14             THE COURT:  You can step off.  Ms. Brown, while we're

15   still on the record -- folks, you can be seated, but I have

16   one question.

17        I've overruled the hearsay objection, but how -- I

18   don't know anything about this video, so how -- you can't get

19   it through this witness.  So how do I know what it is or what

20   it purports to be?  It's going to be on space?  I'm going to

21   see this?  All right.

22             MS. BROWN:  She is in the video.

23             THE COURT:  All right.  Let me see it.  Well, why

24   don't we --

25             MS. BROWN:  Are you going to be able to hear it, too?

SILLUP - CROSS - BROWN

1          THE COURT:  Yeah, am I going to be able to hear it

2    too?

3          THE WITNESS:  Yeah, you will.

4          THE COURT:  Well, then, Professor, I'm going ask you

5    to step out.  Yep.

6      And I appreciate this may be all for nothing, but I

7    have no idea what this video is.

8      How long is it, Ms. Brown?

9          MS. BROWN:  30 seconds maybe.

10          THE COURT:  Okay.

11          MS. BROWN:  Statements about sales reps.

12          THE COURT:  Is this the only video of this particular

13    source?

14          MS. BROWN:  There's a second one actually that's

15    30 seconds that -- if you would look at as well.

16          THE COURT:  All right.

17      (Video clip played at this time.)

18          THE COURT:  That's the whole video?

19          MS. BROWN:  Yes, Your Honor.

20          THE COURT:  And is the other one similar in nature to

21    that?

22          MS. BROWN:  Yes.

23          THE COURT:  And the purpose of this is simply to -- I

24    guess some form of impeachment of one of the sources he relied

25    upon?

SILLUP - CROSS - BROWN

1              MS. BROWN:  Yes.

2              THE COURT:  Is there any reason to believe that's not

3     the person that purports to have written that article that

4     Professor Sillup relied upon, Mr. Marketos?

5              MR. MARKETOS:  Your Honor, I would say that there's

6     reason to believe that this is irrelevant, and she is a doing

7     a character attack on an out-of-court statement that wasn't

8     offered through this witness about a report and now a doctor

9     who wrote a report and a TikTok attack --

10             THE COURT:  Well, let's -- that's a lot of things to

11    untangle.

12             So the first -- the first objection was -- and the only

13    objection so far is hearsay.  Right?

14             It's pretty clear that Ms. Brown is not offering this

15    for the truth of anything she's saying in there.  She's

16    offering it to say, That's the person you're relying upon,

17    right, this person, who went to med school for one year.

18             Now, by the way, I'm not necessarily agreeing with that

19    tactic.  What I'm saying is that's permissible.  He relied

20    upon certain sources.  That's one of them.

21             And you can make whatever counterargument you want to

22    that.  I don't even know what the article is.  I don't know

23    anything about this individual.

24             But I'm not going to prohibit Janssen from

25    cross-examining the professor on at least some of what he may

SILLUP - CROSS - BROWN

1    have relied upon for purposes of his expert opinion.  I think

2    that's fair game.

3         If you want to rehabilitate that on redirect, you have

4    that permission.

5         What's the second issue, or is there no other?

6         MR. MARKETOS:  I guess I could find some other

7    TikToks.  The problem is that she is not in court -- this is

8    an attack on somebody who wrote a report that he didn't

9    offer -- he didn't offer any opinion about this to the jury.

10         So she's trying to impeach a report through a

11   collateral attack that is is a TikTok attack.

12         THE COURT:  Forget about the report.  His opinion in

13   court is based on his expert report.  Correct?

14         MR. MARKETOS:  His opinion that he offered today,

15   Your Honor, was based on academic consensus in the field, and

16   she is taking a Washington Post opinion report and then

17   attacking that doctor with a TikTok.

18         THE COURT:  All right.  My understanding -- and if

19   you're telling me this is incorrect -- because I'm not going

20   to do tit-for-tat for ten minutes on this, so let's be very

21   clear.

22         Professor Sillup is testifying.

23         MR. MARKETOS:  Yes, sir.

24         THE COURT:  His expert report, in part, is based on

25   things he reviewed.

SILLUP - CROSS - BROWN

1          Correct, yes or no?

2               MR. MARKETOS:  Yes, Your Honor.

3               THE COURT:  One of things he reviewed is an article

4     from this individual in a TikTok video as an author, correct?

5               MR. MARKETOS:  Yes, Your Honor.

6               THE COURT:  So that is a source -- not all the

7     sources, but that is at least one source that he relied upon

8     for purposes of his expert opinion which he gave in court

9     today.

10          Yes?

11               MR. MARKETOS:  Yes, Your Honor.

12               THE COURT:  Well, then why can't Janssen impeach some

13    of the sources he relied upon to say, Your opinion is faulty

14    because some of what you relied upon is not reliable.

15               MR. MARKETOS:  But -- okay.  Maybe so, Your Honor,

16    except the impeachment would have to be on the subject matter

17    of the article, and she's playing a TikTok video about seeing

18    medical reps in a hospital.

19               THE COURT:  No.  She's impeaching the author of one

20    of the sources, which I think is fair, so I don't know if you

21    want to rehabilitate that or say it's not material or it's

22    not -- the impeachment is ineffective.  I mean, all those

23    things you have as your tools.

24          But -- so it would be no different than, say, there was

25    a study and one of the physicians who authored the study that

SILLUP - CROSS - BROWN

1    Professor Sillup relied upon is, you know, rotting in prison

2    for committing, you know, 90 different offenses, including

3    fraud in his literature and plagiarism.

4          Would she not be able to cross-examine this witness and

5    say, Are you aware that the author of one of the studies that

6    you relied upon committed all these pieces of misconduct,

7    including plagiarism and lied about statistics and lied about

8    this?

9          How would that be improper cross-examination?

10          MR. MARKETOS:  If it's about the article --

11          THE COURT:  No.  It's about the author, the source of

12    the article.

13          MR. MARKETOS:  Yeah.  So you're now attacking a

14    character for truthfulness of an expert report that wasn't

15    offered --

16          THE COURT:  Reliability.  I'm not saying

17    truthfulness.  I'm not saying anybody lied here.

18          MR. MARKETOS:  But I think she is.  I think the point

19    of this for the jury is that this person was saying this thing

20    on TikTok, so then the study that -- the opinion that she gave

21    about -- that he relied on for his report is somehow -- it's

22    not even impeachment.

23          I don't even know what it is.

24          THE COURT:  All right.

25          MR. MARKETOS:  We can play something about everybody

SILLUP - CROSS - BROWN

1    in every report and find something off of Facebook, but this

2    witness did not offer anything about this person, and it's

3    certainly not impeachment of the article that she wrote in the

4    Washington Post on pharmaceutical representatives.

5         So, Your Honor, I really feel bad even objecting.  If

6    she wants to go down this road, that's her prerogative, but it

7    is --

8         THE COURT:  Then why are we wasting my time with it

9    then?

10        MR. MARKETOS:  Because it's improper impeachment of a

11   collateral source that is is out of court.  She's

12   double-hearsaying this issue.  She's saying it's not offered

13   for the truth, but it's to attack the credibility of a source

14   that even --

15        THE COURT:  Yeah, but you keep using hearsay as your

16   objection, right?

17        So let's just go back to the foundation of that

18   objection, right?  Hearsay is the use of an out-of-court

19   statement, right, for the truth of the matter asserted.

20        Where in this event is anything being offered to the

21   jury for the truth of the matter being asserted in this

22   particular video?

23        Because I'm confident, at least in understanding what's

24   going on here, that she's not going to say anything this

25   person says is truth.  It's almost the opposite.

SILLUP - CROSS - BROWN

1        Wouldn't you agree with that?

2            MR. MARKETOS:  Yes, Your Honor.

3            THE COURT:  So then at least based on the objection

4    you're giving me, it's overruled.

5            MR. MARKETOS:  I understand.

6            THE COURT:  If there's some other objection, you

7    haven't articulated it because everything you've been telling

8    me for the last ten minutes falls under hearsay.

9        But if it's not for the truth of the matter asserted,

10   then that objection is going to be overruled.  If there was

11   some other basis for it, you have to articulate it to the

12   Court.

13       I'm not going to find the objection for you.  So that's

14   where we are.  That's my decision on it.

15       Where are we, because we've now put the jury out here

16   for a few minutes?

17       All right.  I'm going allow it.  Let's get Professor

18   Sillup back in.  Let's get the jury.

19       And I presume that you've got one or two videos, and

20   then you're going to ask him questions about this --

21           MS. BROWN:  Is this what you relied on?

22           THE COURT:  If this is who he relied upon?

23           MS. BROWN:  Correct.

24           THE COURT:  And then you're moving on.

25           MS. BROWN:  Correct.

SILLUP - CROSS - BROWN

1          THE COURT:  I'll permit it.  If there's anything more

2     than that, Ms. Brown, we may revisit.

3          MS. BROWN:  I understand.

4          THE COURT:  All right.

5          MS. BROWN:  I may only do just one of them.

6          THE COURT:  All right.

7          MS. BROWN:  Thanks, Judge.

8          (A short recess occurred.)

9          THE DEPUTY COURT CLERK:  Please remain seated.

10         THE COURT:  Before we get the jurors, though, Ms.

11    Brown, what are you going to do?  Are you going to show them

12    this video and say this is the author of the article?

13         MS. BROWN:  Yes.  I think, Your Honor, I would ask

14    permission to first show her profile so he can refresh on what

15    she looks like and then --

16         THE COURT:  Yeah.  Do you want to do that before I

17    get the jurors all back?  I guess you've got to wait for the

18    jurors to do that.

19         MS. BROWN:  Yeah.

20         THE COURT:  But you're going to show her photograph

21    or something.

22         MS. BROWN:  Correct.  Correct.

23         THE COURT:  Let's do that.

24         MS. BROWN:  Mr. Klein just reminded me to do that,

25    yes.

SILLUP - CROSS - BROWN

1          THE COURT:  Yeah.  I just wanted to be clear.

2          MS. BROWN:  Yeah, yeah, yeah.  Thank you, Your Honor.

3   I appreciate that.

4          THE COURT:  All right.  And, Mr. Marketos, your

5   objections are noted.  But it's going to be short, and so here

6   we go.

7          MS. BROWN:  30 seconds.

8          THE COURT:  So are we getting back?  Are we getting

9   ready?

10          MR. MARKETOS:  It's a first for me.  I think he's

11  coming, yes.

12          THE COURT:  There's been a lot of firsts for all of

13  you, including me here.  Suffer through it.  All right.

14          THE DEPUTY COURT CLERK:  All rise.

15          (Jury enters the courtroom.)

16          THE COURT:  All right, folks.  Let's all be seated.

17      All right, Ms. Brown, you may proceed.

18          MS. BROWN:  Thank you very much, Your Honor.

19  BY MS. BROWN:

20  Q.  Professor, when we left off, we were talking about your

21  reliance on a newspaper article that was written by a Dr.

22  Nicole Van Groningen.

23      Do you recall that, sir?

24  A.  Yes, I do.

25  Q.  Okay.

SILLUP - CROSS - BROWN

1          And you know who Dr. Van Groningen is.

2          Correct, sir?

3   A.   Yes.

4   Q.   Okay.

5          And I want to show you just her bio so you can refresh

6   on what she looks like.

7              MS. BROWN:   It's just for the witness and counsel, if

8   I could, please.

9   BY MS. BROWN:

10  Q.   This is Dr. Van Groningen, who wrote the newspaper

11  article that you rely on to support your opinion.

12         Correct, sir?

13  A.   Yes.

14  Q.   All right.

15         And as we were talking about, the author, the doctor

16  that you rely on for this scientific support, is actually a

17  TikTok influencer.

18         Do you recall that?

19  A.   I recall you saying that.

20  Q.   Yes.

21         And we are going to look at some of the things that

22  Dr. Van Groningen has to say when she -- about sales reps when

23  she posts on TikTok.

24             MS. BROWN:   And, Your Honor, with that, it would be

25  permission to play D-9074.

─────SILLUP - CROSS - BROWN─────

1              THE COURT:  You may.  And the objection is noted.

2         (Video clip played at this time.)

3    BY MS. BROWN:

4    Q.   And that's Dr. Van Groningen on -- influencing on TikTok.

5         Right, sir?

6    A.   Yes.

7    Q.   And that is the source of the very first article or

8    newspaper article that you rely on in your report to support

9    the opinion that you've given our jury.

10        Correct, sir?

11   A.   Yes.

12   Q.   All right.

13        And do you know she actually has other TikTok videos

14   where she gives medical advice based on what she would or

15   would not do as a doctor?

16        Do you know that?

17   A.   No, I did not.

18   Q.   Do you want to see one more?

19   A.   Not particularly, but if you'd like to share it...

20   Q.   Okay.

21             THE COURT:  Ms. Brown, I think one is enough, because

22   I don't even know what the second video is, so I'm not going

23   to break out for the second.

24             MS. BROWN:  I understand.  I understand.

25   BY MS. BROWN:

SILLUP - CROSS - BROWN

1    Q.   Have you read some of her additional publications about

2    her views on exercise and the like?

3    A.   When I determine these, I did a literature search, and I

4    looked at a combination of what's in the peer-reviewed

5    literature, the type Dr. Glatt was discussing the other day,

6    as well contemporary stuff.

7         As you know, literature that's in the peer review can

8    last a long time.  They take two years to get out there.  So

9    some of the more contemporary stuff, such as a newspaper

10   article, might be very helpful.

11   Q.   Sure.

12        And so what you cited for what Dr. Van Groningen wrote,

13   that wasn't peer-reviewed literature.

14        Right, sir?

15   A.   No, it was not.

16   Q.   No.

17   A.   Editorially reviewed.

18   Q.   It was an opinion piece in a newspaper.

19        Right, sir?

20   A.   Yes.

21   Q.   And that actually wasn't the only newspaper article that

22   you relied on for your opinions in this case.

23        Right, sir?

24   A.   Yes.  Yes.

25   Q.   Because you also referred to a U.S. News and World Report

─────────── SILLUP - CROSS - BROWN ───────────

1  study written by someone named Ms. Howley.

2       Do you recall that, sir?

3  A.  Yes.

4  Q.  All right.

5       And that U.S. News and World Report study was actually

6  an article written by a freelance journalist.

7       Right?

8  A.  Yes.

9  Q.  All right.

10      And do you know anything about the qualifications of

11  that journalist?

12  A.  Other than the article itself, no.

13  Q.  Okay.

14      And those at least, sir, are two of the citations that

15  you provided as the basis for your opinion that sales reps

16  influence doctors.

17      Correct, sir?

18  A.  Yes.

19  Q.  All right.

20      And, in fact, in addition to Dr. Van Groningen and

21  Ms. Howley, you did provide a scientific, peer-reviewed

22  article by Larkin.

23      Correct, sir?

24  A.  Yes.

25  Q.  You recall that and you read it.

SILLUP - CROSS - BROWN

1          Correct?

2    A.    I can recall somewhat, yes.

3    Q.    You read it?

4    A.    I looked through it, yes.

5    Q.    Okay.  You skimmed it?

6    A.    Yes.

7    Q.    All right.  It's in your report as the source for your

8    opinion.

9          Right?

10   A.    Yes.

11   Q.    All right.

12         But you know that article concluded, we can't say that

13   pharmaceutical sales reps cause doctors to do something they

14   wouldn't otherwise do.

15         Right, sir?

16   A.    Yes.

17   Q.    Okay.

18   A.    I wanted to address fair balance.

19   Q.    You wanted to address fair balance?

20   A.    To address fair balance.  Some work, some don't.

21   Q.    I'm not sure I understand what you mean.

22   A.    Some articles strongly suggest.

23   Q.    Sure.  I see.

24   A.    Others do not.

25   Q.    I think I understand what you're saying.

SILLUP - CROSS - BROWN

1          There's some articles, like Dr. Van Groningen's

2    article, that supports the opinion that you've given our jury.

3          Correct?

4    A.   Yes.

5    Q.   But there's other articles and other data and other

6    scientific evidence that go the other way.

7          Fair?

8    A.   Yes.

9    Q.   Okay.  I got you.  Fair balance.  Okay.

10         A couple other quick areas I want to go through with

11   you, sir.  You -- let's talk a little bit about how you got

12   involved in being an expert here.

13         Okay, sir?

14   A.   Yes.

15   Q.   All right.

16         You agreed to serve as an expert witness for the

17   lawyers for the Relators before you ever looked at a single

18   document.

19         Correct?

20   A.   That's correct.

21   Q.   Okay.

22         You -- you signed up to testify for the Relators

23   without looking at any of the documents in the case.

24   A.   Well, if I may, there was an interview process during

25   which we talked about this.  And what resonated for me was the

SILLUP - CROSS - BROWN

1  fact that it was right in the wheelhouse of marketing, and it

2  was also Johnson & Johnson, which is a very sensitive area for

3  me.

4  Q.  Yes, sir.

5       Because you used to work for us.

6       Right?

7  A.  Yes, I did.

8  Q.  All right.

9       And so you were interviewed.  Did you say there was an

10  interview process to be an expert?

11  A.  We discussed this.  Primarily to the attorneys.

12  Q.  Okay.

13       And you sort of felt that it was an interview; like,

14  would-you-get-the-job type of a thing?

15  A.  Yes.

16  Q.  You got the job?

17  A.  Yes.

18  Q.  Okay.

19       But when you were interviewing for the job, you didn't

20  look at any documents.  You just listened to what the lawyers

21  told you about the case.

22       Right?

23  A.  Gave -- give an overview.

24  Q.  Sure.

25       And based on what the lawyers told you, you did well in

─── SILLUP - CROSS - BROWN ───

1    the interview.

2         Correct?

3    A.   It sounded interesting.  I do a lot of consulting.  I

4    don't do a lot of expert witnessing.

5    Q.   Sure.

6    A.   But it sounded interesting.

7    Q.   Okay.

8         And that's how you got involved.

9         Right?

10   A.   Yes.

11   Q.   Okay.

12        You were provided documents by the lawyers to get

13   started on forming your opinion.

14        Correct?

15   A.   Yes.

16   Q.   And you described those set of documents as a starter

17   kit.

18        Do you remember that?

19   A.   Yes.

20   Q.   Okay.

21        So they sort of put together a little start -- after

22   the interview, you get the job as an expert, and then they

23   provide you a starter kit of documents that they want you to

24   review.

25        Fair?

SILLUP - CROSS - BROWN

1    A.   Yes.

2    Q.   Okay.

3         And the documents were selected by the lawyers.

4         Correct?

5    A.   That's correct.

6    Q.   All right.

7         And after you looked at the starter kit, you asked for

8    a couple of additional documents.

9         Correct?

10   A.   Yes.

11   Q.   All right.

12        And ultimately, sir, you provided us with the number of

13   the documents where you identified for us the documents that

14   you looked at to form your opinion.

15        Right, sir?

16   A.   Yes.

17   Q.   Okay.

18        And you know that if you count up all the documents on

19   the list, it's 54 documents.

20        Does that sound right?

21   A.   It sounds right.  I didn't count them, but it feels

22   right.

23   Q.   Okay.

24        And you would agree, at least during the time period

25   just that you've been sitting in this trial, we've looked at

SILLUP - CROSS - BROWN

1    more then 54 documents.

2          Right?

3    A.   Yes.

4    Q.   And you understand, generally, that hundreds of

5    thousands, if not millions, of pages of documents were

6    produced in this case.

7          Correct?

8    A.   Yes.

9    Q.   So we can agree that in forming your opinion, in addition

10   to the starter kit from the lawyers, you reviewed a teeny-tiny

11   portion of the documents here.

12         Right?

13   A.   Albeit small, I thought it was meaningful.  And I combine

14   that with my experience assessing these type of situations.

15   Q.   Yes, sir.

16         But you would agree you didn't look at the overwhelming

17   majority of documents that were produced in the case.

18         Fair?

19   A.   No, I did not.

20   Q.   Okay.

21         And so one of the things that happened as a result of

22   just getting a small starter kit is that you provided opinions

23   on topics that you hadn't had the opportunity to look at any

24   documents.

25         Isn't that fair?

SILLUP - CROSS - BROWN

1    A.   Albeit a small sample, I thought it was very telling.

2    Often when I'll consult with companies, I have less

3    information than that.

4    Q.   Yeah.

5         Well, but here's the thing.  Let's take a topic that

6    you offered an opinion on.

7         Okay?

8    A.   Okay.

9    Q.   One of those topics -- and you spoke to our jurors about

10   it this afternoon -- were sales forecasts.

11        Do you remember that?

12   A.   Yes, I do.

13   Q.   Okay.

14        And you told us sort of your view of Janssen's

15   forecasts setting when it came to Prezista.

16        Correct?

17   A.   Yes.

18   Q.   And that would have been back in 2006.

19        Correct?

20   A.   Yes.

21   Q.   But, sir, you didn't actually review the 2006 forecast

22   for Prezista.

23   A.   I just had the snapshot at one month of a -- the July and

24   then --

25   Q.   Well, let's chat on that a little bit.

SILLUP - CROSS - BROWN

1          You offered opinions about the forecast.

2          Do you remember that?

3    A.    Yes.

4    Q.    You even offered opinions about what would have happened

5    to Mr. Mattes if they didn't meet the forecast.

6          Do you remember that?

7    A.    Yes, I do.

8    Q.    Okay.

9          You don't actually know anything about Mr. Mattes's

10   compensation.

11         Right, sir?

12   A.    No, I don't.

13   Q.    Okay.

14         You've never spoken to him.

15         Correct?

16   A.    Nope.

17   Q.    He wasn't questioned on whether or not he was compensated

18   at or below his expected salary.

19         Right?

20   A.    That's correct.

21   Q.    Right.

22         So when you testified about what might have happened to

23   Mr. Mattes, to be fair, you don't know.

24   A.    In terms of his compensation.

25   Q.    Yes, sir.

SILLUP - CROSS - BROWN

1    A.    In terms of reporting on a forecast, I'd respectfully

2    disagree.  I would say that he would definitely want to have a

3    discussion with his management.

4    Q.    Right.

5          Whether he had a discussion with management or the

6    board or somebody else, you don't know.

7    A.    I don't know that.

8    Q.    Okay.

9          And in terms of the opinions that you offered as it

10   relates to the 2006 sales forecast, we can agree that's a

11   document you never looked at.

12         Right, sir?

13   A.    That's correct.

14   Q.    All right.

15         And that's true, actually, for the entire time period

16   that's at issue in this case, 2006 to 2014.  You never looked

17   at any of those forecasts.

18         Right, sir?

19   A.    That's correct.

20   Q.    Okay.

21         And you had not seen and were not aware, sir, at the

22   time you offered these opinions about forecasting and stuff

23   that the forecast was lowered a number of times in 2006.

24         Right, sir?

25   A.    I learned that it was lowered one time during the trial.

1  Q.  That's been one document that's come in on that score.

2      Right?

3  A.  Yes.

4  Q.  And you haven't seen, because they weren't in the starter

5  kit, any of the other documents that relate to lowering of the

6  forecast.

7      True?

8  A.  True.

9  Q.  And you spoke about how you thought forecasts that you

10  had never seen might affect sales quotas.

11      Do you remember that.

12  A.  Yes.

13  Q.  But similarly, you haven't looked at sales quotas either.

14      Right, sir?

15  A.  That's correct.

16  Q.  Right?

17      And you talked about how that might impact an

18  employee's compensation.

19      Do you remember that?

20  A.  Yes.  I talked about that and the impact on the challenge

21  of meeting a quota.

22  Q.  Sure thing.

23      But to be fair in this case, you didn't look at any of

24  the compensation that Ms. Penelow, for example, Ms. Brancaccio

25  received each year that they worked for us.

─────SILLUP - CROSS - BROWN─────

1          Right?

2     A.   That's correct.

3     Q.   So you don't actually know whether or not these sales

4     reps or other sales reps had a salary that increased every

5     single year that they worked at the company.

6          Right?

7     A.   That's right.  I would expect that if someone's

8     performing, unless you were on a performance improvement plan,

9     then you're not going to see a salary increase.

10    Q.   Sure.

11         And in terms to whether -- of whether or not these

12    sales reps or other sales reps received bonuses during the

13    relevant time period, you didn't have the opportunity to

14    review that -- those documentation either.

15         Right, sir?

16    A.   That's correct.  I didn't know those data were available.

17    Q.   You spoke a little bit -- well, let's just look at it, if

18    we could.

19         You showed our jurors during your slide deck --

20         MS. BROWN:  May I have the ELMO, please.

21    BY MS. BROWN:

22    Q.   This is one of the documents that was pasted into your

23    slide deck, sir.  Does this look familiar to you?

24    A.   Yes.

25    Q.   Okay.

SILLUP - CROSS - BROWN

1          And I think what was highlighted and what you and

2    Mr. Marketos were discussing had to do with this paragraph

3    right here.  This is an email from Keith Moran.

4          Do you see that?

5    A.  Yes, I do.

6    Q.  And who -- please tell our jurors who Keith Moran is.

7    A.  I'm sure he's somebody in the Janssen network looking for

8    information.

9    Q.  Well, for sure he works for Janssen, but do you know what

10   he does?

11   A.  No, I do not.

12   Q.  All right.

13          He's an executive compensation.  Does that ring a bell

14   to you?

15   A.  Now it does, yes.

16   Q.  Okay.  All right.

17          So Mr. Moran is talking about whether or not

18   Ms. Kenworthy -- now, do you know who she is?

19   A.  She is one of the depositions, yes.

20   Q.  Yes, sir.

21          Ms. Kenworthy is in business analytics.  Does that help

22   ring a bell?

23   A.  Yes.

24   Q.  All right.

25          And so he's asking about whether we have the number of

1    spontaneous off-label sales for these three medicines.

2        Do you see that?

3    A.   Yes.

4    Q.   And you heard through the testimony here Edurant was

5    another HIV medicine that we sold during the time period at

6    issue.

7        Right, sir?

8    A.   Yes.

9    Q.   Okay.

10       And you haven't formed any views at all on whether or

11   not we were promoting Edurant off-label.

12       Right?

13   A.   I have not looked at Edurant.

14   Q.   And you haven't looked at Ms. Penelow's and

15   Ms. Brancaccio's compensation as it related to Edurant that

16   they were selling.

17       Correct?

18   A.   That's correct.

19   Q.   And you haven't done a comparison, for example, to see

20   whether or not their bonuses for Edurant that they claim they

21   weren't promoting off-label were higher than Prezista and

22   Intelence, which they claim they were.

23       Right?

24   A.   Yeah, I have not seen that information.

25   Q.   Okay.

─────────────── SILLUP - CROSS - BROWN ───────────────

1      And so it happened -- so you and counsel concentrated

2   on this top part, looking for a number of spontaneous

3   off-label sales.

4      Do you remember that?

5   A.   Yes.

6   Q.   Okay.

7      But what it says underneath it is, we're being asked to

8   compile this across all brands that will be in the 2012

9   incentive plans.

10      Do you see that?

11   A.   Yes, I do.

12   Q.   Were you provided with Janssen's employee compensation

13   policy that required off-label sales to be backed out of

14   employee compensation?

15   A.   No, I was not.

16   Q.   Okay.

17   A.   May I add that it's highly unusual to track spontaneous

18   sales.  As I mentioned earlier, I don't like the term, but the

19   off-label use of the product.

20   Q.   Yes.  So let's connect on that for a second.

21      Spontaneous off-label sales.  You would agree with me

22   that doctors in their good medical judgment can prescribe a

23   medicine off-label.

24   A.   Yes, they can.

25   Q.   True.

─────SILLUP - CROSS - BROWN─────

1      And we know that happens all the time.

2      Right, sir?

3  A.  Yes, it does.

4  Q.  Right.

5      You're a marketer.  You know that from your marketing

6  experience.

7      Right, sir?

8  A.  Yes.

9  Q.  All right.

10      And it happens particularly often in the area of HIV.

11  We can agree with that.

12      Right, sir?

13  A.  Yes.

14  Q.  Okay.

15      And you know because you were a marketer, and you saw

16  the data, that pharmaceutical companies get data that allows

17  them to see where doctors might be prescribing their medicines

18  off-label.

19      Right?

20  A.  Yes.

21  Q.  Okay.

22      That doesn't mean they're promoting off-label, but it

23  allows them to see where doctors are writing those

24  prescriptions.

25      True?

─────── SILLUP - CROSS - BROWN ───────

1    A.   True, but one would have to look behind the number of

2    off-label or spontaneous off-label prescriptions.

3    Q.   Sure.  Good point.

4         I mean, you want to look at it and be careful that it's

5    truly spontaneous, but it's data that pharmaceutical companies

6    get to evaluate the entire market.

7         Correct?

8    A.   Yes.

9    Q.   And there's nothing wrong with that.

10        Right, sir?

11   A.   That's correct.

12   Q.   All right.

13        And you had access to data like that when you were

14   working in industry.

15        Correct?

16   A.   Yes.

17   Q.   And it's important for reasons Dr. -- Mr. Mattes told us

18   this morning, because pharmaceutical companies are responsible

19   for making sure that there's enough drugs produced in the

20   factory to stock pharmacy shelves.

21        Correct?

22   A.   Combination -- combination of that.  That's not unusual

23   that you do 10 percent more to make sure you're meeting a

24   spontaneous demand and then 10 percent less so you can keep it

25   running.  It's a -- it's a -- it has a short shelf life.

SILLUP - CROSS - BROWN

1   Q.   Yes, sir.

2   A.   So a product -- so product can update.

3   Q.   Right.

4        Because the -- particularly in the area of HIV, the one

5   thing you don't want to happen is people coming to the

6   pharmacy to fill scripts, and there's not enough physical

7   medicine in the pharmacy to give it to them.

8        Right?

9   A.   That's true for any drug.

10  Q.   Sure.

11       But it's a particular concern with a lifesaving drug

12  like HIV medicine.

13       Correct?

14  A.   Yes.

15  Q.   Okay.

16       And so when -- when companies have this data, one thing

17  that they can do is pull that sales data out of employee

18  compensation so that sales reps are not getting credit for

19  prescriptions that are being written off-label.

20       Right?

21  A.   That's correct.

22  Q.   And you'd agree that's a good thing.

23       Right?

24  A.   Yes, you want to --

25  Q.   All right.

SILLUP - CROSS - BROWN

1            And in terms of Deb Kenworthy's testimony on that score

2    and Mr. Moran's document that talk about our effort to do

3    that, that's not something you reviewed in connection with

4    your opinion.

5            Right, sir?

6    A.   That's correct.

7    Q.   All right.

8            One thing I wanted -- one more thing on this PowerPoint

9    presentation I wanted to ask you about, sir.

10           Here's this slide that you showed, and here's my note

11   on what you said about the slide, and I want to ask you if we

12   can help understand what's going on here.

13           So this is a slide, we can agree, that says, "We should

14   sequence our intervention segment A, F, G, H, within the

15   context of our label."

16           Do you see that?

17   A.   Yes.

18   Q.   All right.

19           But your testimony about this slide was, quote, "The

20   plan was to capture more patients than were in the label."

21           Do you see that?

22   A.   Yes.

23   Q.   Okay.

24           So how is it that you interpret a slide that says

25   "intervene in the context of the label" as meaning the plan

─── SILLUP - CROSS - BROWN ───

1    was to capture people outside of the label?

2    A.   Well, it doesn't make sense to me that you're addressing

3    segments of the patient population outside the label.

4    Q.   But, sir, you know, because if you look beyond sort of

5    the part that was cut out, down here at the bottom there is an

6    analysis percentagewise of how many people are in the label --

7    are on-label in these -- in these categories.

8         Right, sir?

9    A.   Yes.

10   Q.   You see that?

11   A.   Yes.

12   Q.   Right.

13        So there's an effort on this slide actually to identify

14   in each of these segments who would be on-label.

15        Right, sir?

16   A.   Yes.

17   Q.   All right.

18        The other thing that happened with this presentation

19   that I want to ask you about is a slide about speakers.

20        Now, you -- and when you were testifying you showed

21   this document here, Relators' 156.

22        Do you see that, sir?

23   A.   Yes, I do.

24   Q.   Okay.

25        And the title of your slide that you put together I

SILLUP - CROSS - BROWN

1    think is called "off-label marketing caused prescriptions."

2         Do you see that?

3    A.   Yes.

4    Q.   And you had some opinions here about return on investment

5    of the speaker program.

6         Do you see that?

7    A.   Yes.

8    Q.   And you know, as somebody who has a lot of experience in

9    the industry, that speaker programs can be run appropriately.

10        Right, sir?

11   A.   Yes.

12   Q.   You have experience with them yourself.

13        Correct?

14   A.   Yes.

15   Q.   And speaker programs can be run to educate and promote to

16   the members of the audience.

17        Fair?

18   A.   The primary message is education, promotion or discussion

19   about the product on-label.

20   Q.   Yes, sir.

21   A.   You navigate off-label, it takes a different posture.

22   Q.   Sure thing.

23        When done appropriately, on-label message to members of

24   the audience, speaker programs can be a good educational tool.

25        Correct?

SILLUP - CROSS - BROWN

1    A.    Yes.

2    Q.    They can be a way to promote medicines to doctors in the

3    audience.

4          Correct?

5    A.    Yes.

6    Q.    What they can't be is a way to pay the speaker to

7    prescribe.

8          Correct?

9    A.    They -- in some instances, my observation not only in

10   this case but also in other situations, there is financial

11   incentive, paying to prescribe.

12   Q.    Okay.

13         I'm going get to that in a second.  I'm just talking

14   generally speaker programs.  What you are not allowed to do is

15   pay a speaker to prescribe more medicine.

16         Can we agree on that?

17   A.    You were not supposed to do that, yes.

18   Q.    Correct.

19         And so one of the things that's perfectly fine and that

20   you were involved in when you were in the industry is to

21   conduct a return on investment or look at whether these

22   speaker programs are affecting the doctors who are attending

23   the program.

24         Right, sir?

25   A.    Yes.

SILLUP - CROSS - BROWN

1  Q.  There's nothing wrong with that.  That's what the program

2  is meant to do.

3      Right?

4  A.  Let's say a tertiary goal, education, awareness about the

5  product, and then you're going to say was it financially worth

6  it.

7  Q.  Correct.

8      And one thing you know that does not exist and that you

9  have not seen are Janssen documents that show Janssen was

10 tracking speakers to see how much they prescribed or didn't

11 prescribe after a speaker event.

12     Correct?

13 A.  I have not seen those data.

14 Q.  Okay.

15     And, in fact, this document -- you know that Janssen

16 gets prescription data on all physicians that are sort of in

17 the area of its medicine.

18     Correct?

19 A.  Yes.

20 Q.  So as a result, it has prescription data on speakers

21 generally if they're in the area that it's prescribing its

22 medicines.

23     Correct?

24 A.  Yes.

25 Q.  But you know that Janssen was particularly careful not to

*United States District Court*
*District of New Jersey*

SILLUP - CROSS - BROWN

1  look at data of speakers who were attending speaker events.

2        Right, sir?

3  A.   I wasn't aware of that.

4  Q.   Because this slide that you put up here actually cuts

5  some stuff out from the actual document, Relators' 156.  You

6  see this is Relators' 156 down here?  That's the document your

7  slide came from.

8        Right, sir?

9  A.   Yes.

10 Q.   But when you go to the actual document, there's something

11 important, you and I I'm sure can agree, down here on the

12 bottom.

13       You see, down here on the bottom, what it says is

14 "Doctors with more than one attendance" -- this is at the

15 speaker programs -- "have been removed as they are most likely

16 speakers."

17       Do you see that?

18 A.   I do see that.

19 Q.   And so that part, though, didn't make it to the slide

20 that you showed our jurors.

21       Right, sir?

22 A.   That's correct.

23 Q.   All right.

24       As it relates to the speaker program itself, sir, you

25 have not reviewed Janssen's policies on how to run a speaker

SILLUP - CROSS - BROWN

1    program.

2        Correct?

3    A.   No, I have not.

4    Q.   Okay.

5        You don't know anything about our SAFE committee in

6    terms of how speakers are selected.

7        Right, sir?

8    A.   I do not know that specifically.  I know -- I know

9    generally from the industry.

10   Q.   Sure.

11       You have experience because you have run speaker

12   bureaus in your career.

13       Is that right?

14   A.   Yes.

15   Q.   You believe that there is a proper way to run a speaker

16   bureau.

17       True?

18   A.   That's correct.

19   Q.   If you are careful about the way you're selecting people

20   to be on your speakers bureau, it can be a good thing.

21       Right, sir?

22   A.   Yes.

23   Q.   All right.

24       And in terms of the details of how we ran our speaker

25   program, you haven't looked at those documents.

1          Right, sir?

2    A.    No, I have not.

3    Q.    Okay.

4          And in terms of the fair market value caps that were

5    put on payments to speakers, that's also something you -- you

6    haven't looked at those documents.

7          Correct?

8    A.    I have not.  What -- if I may, what I did observe is just

9    the sheer number of speaker programs, which is quite

10   extensively high.

11   Q.    Have you looked, sir, at Janssen's needs assessment

12   documents that evaluated how many programs we needed and where

13   throughout the United States of America we needed them?

14   A.    I was not privy to that information.

15   Q.    Fair enough.

16         You would agree one thing that's a good feature of a

17   speaker program is to conduct something called a needs

18   assessment.

19         Right, sir?

20   A.    Yes.

21   Q.    Because you don't want to just be, like, having programs

22   everywhere if you haven't carefully analyzed Is there a need

23   for this information?

24         Right?

25   A.    Yes.

SILLUP - CROSS - BROWN

1  Q.   And you know because you heard Dr. Mattes talk about it

2  today, in addition to doing promotional speaker programs, we

3  also did community programs.

4        Are you familiar with that?

5  A.   Yes.

6  Q.   We had programs that were not meant to increase the sale

7  of the medicine amongst prescribers but were meant for

8  patients.  You're familiar with that.

9        Right, sir?

10 A.   Yes.

11 Q.   So some of the numbers of the programs you saw actually

12 included those community presentations as well.

13      Do you know that?

14 A.   I did not know that.

15 Q.   And some of the other presentations we did were disease

16 awareness presentations.

17      Did you see some of those documents, sir?

18 A.   I -- I did.

19 Q.   Right.

20      And those are actually speaker presentations where you

21 don't mention the name of any particular product.  You know

22 that.

23      Right, sir?

24 A.   Exactly.  It's to create awareness about the disease, in

25 this case, HIV.

SILLUP - CROSS - BROWN

1    Q.   Sure.  That's a good thing.

2         Right, sir?

3    A.   Yes.

4    Q.   And a lot of the programs that would have been on the

5    list you saw were disease awareness programs as well.

6         Did you know that?

7    A.   Yes, now that you remind me.

8    Q.   Okay.

9         Let me show you --

10        MS. BROWN:  Mr. Marketos, if you don't have an

11   objection.

12        MR. MARKETOS:  No objection.

13        MS. BROWN:  Okay.

14   BY MS. BROWN:

15   Q.   -- a slide that we've shown to a couple of people now.

16   This is sort of the way our speakers got selected.

17        And just to be clear, you're not familiar with the

18   documents that involve who was on Janssen's speaker bureau

19   team.

20        Correct?

21   A.   Correct.

22   Q.   And you don't know anything about who made up the

23   SAFE committee or the policies in terms of how they practiced.

24        Right, sir?

25   A.   That's correct.

SILLUP - CROSS - BROWN

1   Q.  You were asked some questions in your deposition about

2   whether it would be appropriate to have speakers on your

3   speaker bureau who are high prescribers.

4       Do you remember that, sir?

5   A.  Yes.

6   Q.  And your opinion is that it actually makes sense to have

7   people on the speaker bureau who prescribe a lot of medicine

8   because they have experience with it?

9   A.  Well, you want someone experienced.  You might also want

10  clinical trialists, someone who participated in your -- in

11  your clinical study.

12  Q.  Yes, sir.

13      Because you wouldn't want people on a speaker bureau

14  who weren't able to answer questions and didn't know actual

15  data and evidence about your medicine.

16      Right?

17  A.  Correct.

18  Q.  All right.

19      I mean, if you didn't have people on your speaker

20  bureau who were actually prescribing your medicine, you might

21  be accused of just paying people to speak, and they're not

22  really giving any educational information.

23      Right?

24  A.  That's correct.

25  Q.  Right.

SILLUP - CROSS - BROWN

1          And just one more quick area for you, Dr. Sillup.  And

2    at the very end of your questioning, counsel kind of beat me

3    to the punch because you know I've been showing this graphic

4    to a lot of witnesses.

5              MS. BROWN:  Any objection?

6              MR. MARKETOS:  No.

7              MS. BROWN:  Okay.

8    BY MS. BROWN:

9    Q.   I've been showing this graphic to most folks who are

10   coming in here to testify to try and understand what side of

11   this your testimony is on.

12         You're not here, of course, to give any testimony about

13   the reimbursement requirements that CMS has for these

14   medicines.

15         Correct, sir?

16   A.   That's correct.

17   Q.   Or how Plan D sponsors determine whether they should send

18   claims to CMS.

19         True?

20   A.   True.

21   Q.   Your testimony, you are on the left side of our graph

22   here talking about sales reps and doctors.

23         Correct, sir?

24   A.   Yes.

25   Q.   All right.

SILLUP - REDIRECT - MARKETOS

1          MS. BROWN:  Your Honor, may I have one minute to

2     confer with counsel.

3          THE COURT:  You may.

4          MS. BROWN:  Okay.

5          (Brief pause.)

6     BY MS. BROWN:

7     Q.   Professor, I don't have any more questions for you.

8     Thanks so much for your time.  I appreciate it.

9          THE COURT:  All right.  Thank you, Ms. Brown.

10         Mr. Marketos, any redirect?

11         MR. MARKETOS:  Yes, Your Honor.  Thank you.

12    (REDIRECT EXAMINATION BY MR. MARKETOS:)

13    Q.   Professor Sillup, I don't have any videos to play for

14    you, sir, but I have some questions about the evidence that's

15    been presented in this case and the opinions that you gave

16    earlier on in your testimony today.

17         Okay, sir?

18    A.   Okay.

19    Q.   All right.

20         So you were asked a question about a doctor who you got

21    to see her on TikTok.  There was an article cited in your

22    report.  That doctor, she wrote an article about the influence

23    that pharmaceutical representatives have on doctors.

24         Do you recall that?

25    A.   Yes.

─────SILLUP - REDIRECT - MARKETOS─────

1  Q.  That was one of 82 articles that you attached to your

2  report.

3       Right, sir?

4  A.  That's correct.

5  Q.  All right.

6       Now, just as a matter of interest -- I don't have any

7  videos to show you -- do you know where Ms. --

8  Dr. Van Groningen practices medicine?

9  A.  No, I do not.  I selected the article based on its

10  discussion about sales reps.

11  Q.  Sir, you're -- you have a bachelor's degree in

12  psychology.

13       Is that right?

14  A.  Yes.

15  Q.  You also have degrees in and you teach in the areas of

16  marketing.

17       Right, sir?

18  A.  Yes.

19  Q.  Do you teach students on the art of persuasion and

20  techniques that are used to persuade?

21  A.  Yes.

22  Q.  All right.

23       Sir, do you know what -- have you ever heard of the

24  term gaslighting?

25  A.  Yes.

────SILLUP - REDIRECT - MARKETOS────

1  Q.  And do you -- do you know what flipping and projection

2  is?

3  A.  No.

4  Q.  All right.

5       Have you ever heard a phrase described when something

6  is really bad for somebody and they turn around and make it

7  good for themselves?

8       All right.

9       You were played -- just wondering, sir:  Are you aware

10  of the fact that there is an expert in this case who has

11  responded in part to your report?  He goes by the name

12  Dr. Jena?

13  A.  Yes, I am.

14  Q.  Maybe we'll hear from Dr. Jena.  He's an expert that

15  Janssen is proffering, and we might hear from him in this

16  case.

17       You understand that?

18  A.  Yes, I do.

19  Q.  And he's had -- offered some opinions that, as I

20  understand it, are partial rebuttals to your opinions.

21  A.  Yes.

22  Q.  Do you understand that?

23  A.  Yes, they are.

24  Q.  Dr. Jena charges $850 an hour.

25       Are you aware of that?

─── SILLUP - REDIRECT - MARKETOS ───

1   A.   Yes.  I read his rebuttal --

2   Q.   All right.

3   A.   -- report.

4   Q.   You charge -- you charge $400 an hour, and you're a

5   professor.

6        Is that fair?

7   A.   Yes.

8   Q.   All right.

9        And Dr. Jena has not been -- has not been here at trial

10  along with the members of the jury.

11       Is that fair?

12  A.   Unless -- unless it's someone whom I don't know.

13  Q.   Why attend trial?  Is it so that you can charge money to

14  the Relators?

15  A.   No.  For me it was to get a fuller understanding of the

16  perspectives.

17  Q.   Okay, sir.

18       And is there an opportunity to learn things at trial

19  when, for instance, Janssen's witnesses are cross-examined

20  that you might not have known before?

21  A.   Yes.

22  Q.   All right.

23       You were asked about some of the documents you were and

24  weren't provided when you first set out on your effort to

25  render an opinion in this case.

SILLUP - REDIRECT - MARKETOS

1      Right, sir?

2   A.   Yes.

3   Q.   Now, we showed -- and there's a reason I showed you

4   this -- your report and the depositions that you relied on in

5   order to form your opinions.

6        Do you recall that?

7   A.   Yes, I do.

8   Q.   You reviewed over 112 hours' worth of testimony that was

9   given by the witnesses in this case before you rendered your

10  opinion, didn't you?

11  A.   Yes, I did.

12  Q.   That included Janssen's witnesses and that included

13  witnesses that are -- the Relators themselves and witnesses

14  that provided declarations in favor of the Relators.

15       You understand that?

16  A.   Yes, I do.

17  Q.   You also reviewed over 300 exhibits that were attached to

18  that -- those deposition transcripts that the lawyers

19  apparently felt was important to share with those witnesses.

20       Do you agree?

21  A.   Yes.

22  Q.   And then you reviewed a number of other documents that

23  Ms. Brown asked you about.  And you reviewed documents during

24  the course of this trial.

25       Is that fair?

SILLUP - REDIRECT - MARKETOS

1  A.   That is fair.

2  Q.   All right.

3       Now, you didn't review a million pieces of evidence.

4       Is that fair?

5  A.   That is fair.  And I'm glad the way I was presented the

6  information, in bite-sized pieces -- I think it would be very

7  intimidating to get a million sheets of paper at one time.

8  Q.   And, Professor Sillup, you heard Janssen's own witnesses

9  testify about whiffing on the forecast themselves.

10      Right, sir?

11 A.   Yes, I do.

12 Q.   So coming to trial, did you get to hear Janssen's

13 witnesses agree with the assessments that you originally made

14 in this case?

15 A.   Yes, I did.

16 Q.   All right.

17      And just a quick aside, sir.  Are you aware of the fact

18 that the doctor we just saw the TikTok of is actually on a

19 tactical opioids panel with Dr. Jena, Janssen's witness, their

20 expert witness, who they're paying $850 an hour?

21 A.   I was not.  She never ceases to amaze me from this --

22 Q.   All right.

23      Maybe we'll hear from Dr. Jena what he thinks about the

24 woman on TikTok.  Okay?

25 A.   Okay.

───SILLUP - REDIRECT - MARKETOS───

1  Q.  All right, sir.

2      If we could, sir, this concept of Prezista and

3  Intelence -- as I understood it, there was a statement made:

4  If it ain't broke, you don't fix it.

5      Right, sir?

6  A.  Yes.

7  Q.  And that's actually something Dr. Glatt testified about.

8  He was testifying about if a patient is doing well on a drug

9  and they even switch doctors, there's a likelihood that the

10 doctor won't switch them off that drug.

11     Right, sir?

12 A.  Yes.

13 Q.  Okay.

14     But if a doctor is delivered promotional messages,

15 maybe promotional messages off-label, they may be inclined to

16 switch a patient who is already on, say, Reyataz to Prezista.

17     Is that fair?

18 A.  It could influence their decision.

19 Q.  It could influence their decision.  And if that hadn't

20 happened in this case, if it weren't possible because doctors

21 didn't do that, we wouldn't see Prezista and Intelence making

22 hundreds of millions of dollars in the marketplace, would we?

23 A.  It does have a staying power and influence.

24 Q.  Then you were played -- and I was asking you about the

25 art of persuasion and the concepts of flipping and projection.

SILLUP - REDIRECT - MARKETOS

1  You were played an audio tape that Ms. Brancaccio took one

2  time.  You were present during her cross-examination.

3        Do you recall that?

4  A.   Yes.

5  Q.   Do you remember Ms. Brancaccio testifying about that

6  audio tape of Nancy Bartnett?  And you recall her testifying

7  about why she did that one recording.

8        Do you recall that?

9  A.   Yes.

10  Q.   Because Janssen in this trial would otherwise accuse

11  Ms. Brancaccio of making up her story about off-label

12  promotion, including by Ms. Bartnett, who is on the tape.

13        Right, sir?

14  A.   Yes.

15  Q.   And then you got to hear a different part of the

16  45-minute conversation played to you about QD dosing.

17        Right, sir?

18  A.   Yes.

19  Q.   But Ms. Brancaccio had made that tape about Ms. Bartnett

20  showing that she was telling doctors that Prezista was like

21  Reyataz.

22        Do you recall hearing that on the tape?

23  A.   Yes.  Yes, I do.

24  Q.   All right, sir.

25        That testimony and that exhibit was offered for a

SILLUP - REDIRECT - MARKETOS

1  different reason than you just heard from Ms. Brown.

2       Is that fair?

3  A.   Yes.

4  Q.   That doctor also testified that with respect to

5  Intelence -- or excuse me.  He was on the tape saying, with

6  respect to Intelence QD dosing, he had been burned once

7  before.

8       Did you hear that?

9  A.   Yes, I did hear that.

10  Q.   So when you say that maybe not all off-label messages are

11  delivered at the same time, perhaps that doctor, Dr. Turrett,

12  had heard about QD dosing for Intelence, and it had burned him

13  before with another patient.

14       Sound fair?

15  A.   It is possible.

16  Q.   All right.

17       Now, I also heard this was the only one piece of

18  evidence that we have about off-label marketing.  Did you

19  understand that to be the question, that this audio tape was

20  the --

21  A.   Was the one and, I even noted, it's an N of 1.  So it's

22  very difficult to draw a conclusion from that.

23  Q.   Did you hear the president of the organization this

24  morning testifying in front of this jury that he believes it's

25  probable that off-label marketing concerns were brought to his

SILLUP - REDIRECT - MARKETOS

1   attention?

2   A.   Yes, I did.

3   Q.   All right.

4        Have you sat through the trial -- I wanted to show you,

5   sir -- this is in evidence -- Defendants' Exhibit 8560.

6   Defendants actually, in order to examine Ms. Graham on one

7   piece of her declaration, they put her 30-page declaration

8   into evidence, and I'm going to bring it up now very briefly.

9   This is 8560.

10       If the jury wants to see a 30-page rendition of how

11  off-label marketing worked within Janssen during the time

12  period that Ms. Donna Graham was here, they can just pull up

13  Defendants' 8560 and read her sworn testimony there.

14       Is that fair?

15  A.   Yes.

16  Q.   Did you hear Ms. Graham testify?

17  A.   Yes, I did.

18  Q.   Did you hear Ms. Sara Strand testify?

19  A.   Yes, I did.

20  Q.   Did you hear Mr. Mark Wilhelm testify?

21  A.   Yes, I did.

22  Q.   And did you hear Ms. Christy Brancaccio testify?

23  A.   Yes, I did.

24  Q.   Now, I can put a document on the screen, and I could show

25  lines connecting different people who used to work at Janssen

SILLUP - REDIRECT - MARKETOS

1    to one another.

2         Is that fair?

3    A.   Sure.

4    Q.   In fact, Ms. Nancy Bartnett was also at Ms. Penelow's

5    wedding.  Were you aware of that?

6    A.   No, I was not.

7    Q.   All right.

8         Is this case about who was at whose wedding or who was

9    off-label promoting for Prezista and Intelence for hundreds of

10   millions of dollars?

11   A.   No.  As I said when I began this, I knew no one.  I

12   looked at this completely from a blank slate.

13   Q.   All right.

14        And we got to hear from two of the highest members of

15   Janssen who were responsible for that management.  That was

16   the president, and the national sales director,

17   Mr. Iacobellis.

18        Right, sir?

19   A.   Yes.

20   Q.   All right.

21        MR. MARKETOS:  If we take a look at Exhibit 423,

22   please.

23        You were asked -- actually, yes.  Exhibit 423.  Let's

24   go to, actually, Exhibit 301 if we could, please, Ms. Johnson.

25   BY MR. MARKETOS:

─────SILLUP - REDIRECT - MARKETOS─────

1  Q.  You were asked by Ms. Brown a moment ago about this

2  spontaneous -- spontaneous off-label sales.

3       Do you recall that?

4  A.  Yes, I do.

5  Q.  Okay.

6       Your concern, and the only thing I asked you about, was

7  asking -- or tracking spontaneous off-label sales.

8       Do you recall that?

9  A.  That's correct.  Yes, I do.

10  Q.  And what's the -- how are spontaneous off-label sales

11  even trackable?

12       Do you remember me asking you that question?

13  A.  Very difficult to do that, unless someone were using

14  specific off-label strategies.

15  Q.  Okay.

16       Now, I understood the questions that you got from

17  Ms. Brown to be related to that second sentence at the bottom.

18  "We are being asked to compile this across all brands that

19  will be in the 2012 incentive plans."

20       And she asked you were you aware of the fact that

21  Janssen was removing off-label sales from the incentive plans

22  for sales reps.

23       Do you recall that line of questioning?

24  A.  Yes, I do.

25  Q.  All right.

─SILLUP - REDIRECT - MARKETOS─

1          Do you know why that was, sir?

2   A.   I'm not sure.

3           MR. MARKETOS:  Let's take a look, if we could, at the

4   Relators' Exhibit 423, the 2010 corporate integrity agreement

5   that required compliance by Janssen with rules associated with

6   off-label promotion.

7          And if we'll turn to page 56 and 57.

8   BY MR. MARKETOS:

9   Q.   You can see at the top there, sir, there are certain

10  policies and systems that Janssen had to put into place in

11  order to comply with its agreement with the Government.

12         Right, sir?

13  A.   Yes.

14  Q.   The agreement with the Government that Janssen entered

15  into in 2010.

16         Right, sir?

17  A.   Yes.  I see it.

18  Q.   If we take a look at page 57, they were required to

19  remove any incentive for off-label sales from their sales

20  force's compensation plan.

21         Do you see that?

22  A.   Yes, I do.

23  Q.   Okay.

24         So up until 2011, apparently that was something that

25  had not yet been done.

SILLUP - REDIRECT - MARKETOS

1    Do you agree?

2  A.    I agree.

3  Q.    I think you said, we hadn't seen anything -- or at least

4  Ms. Brown said, you haven't seen anything with Janssen

5  tracking speaker prescriptions.  And I think what she was

6  asking you about was documents you had seen before you issued

7  your report.

8    Have you been sitting in this trial every day?

9  A.    Yes, I have.

10  Q.    All right.

11    MR. MARKETOS:  Let's pull up Relators' Exhibit 316.

12  BY MR. MARKETOS:

13  Q.    Do you recall witnesses like Ms. Sara Strand testifying

14  about Janssen's tracking of the prescriptions of its speakers

15  after attending -- after they started paying them to give

16  these speeches?

17    Do you recall her testifying to that, sir?

18  A.    Yes.

19  Q.    All right.

20    Now, we're looking on the screen, Exhibit -- Relators'

21  Exhibit 316 at the New England Speaker Sales Performance.  Do

22  you understand that to be Janssen tracking the performance of

23  the speakers on its Promotional Speaker Bureau based on the

24  number of prescriptions that they were writing?

25  A.    It certainly looks that way, yes.

SILLUP - REDIRECT - MARKETOS

1          MR. MARKETOS:  Let's take a look at Relators' Exhibit

2    163.  And we will go to page 4.  This is in evidence.

3    BY MR. MARKETOS:

4    Q.   We've got speaker performance.  Dr. Brachman,

5    Dr. Catalla, Dr. Hagins, Dr. Melton, Dr. Stephens, Natalie

6    Wilson, Dr. Wade.

7          Do you see that, sir?

8    A.   Yes, I do.

9    Q.   You've got percentages of their speaker sales associated

10   with Prezista and Intelence.

11         Do you see that?

12   A.   Yes.

13   Q.   Are you aware of testimony from witnesses, including

14   Mr. Wilhelm, Ms. Strand, Ms. Graham and others, that speaker

15   performance was, in fact, tracked, including the number of

16   prescriptions they wrote after being paid?

17   A.   Yes.

18   Q.   You were asked about a SAFE committee.  I think I saw a

19   document that shows this SAFE committee.  Some committee that

20   apparently approves --

21   A.   Approves speaker programs, yes.

22   Q.   Did you hear the witnesses who were actually out in the

23   field testify about how speakers were actually selected in

24   real life, not on paper?

25   A.   Yes, I did.

SILLUP - REDIRECT - MARKETOS

1   Q.   All right.

2        And what did you hear from those witnesses about how

3   the speakers were selected?

4   A.   Their ability to -- their ability and they're actually

5   writing scripts.

6   Q.   And that responsibility Janssen put on the sales

7   representatives.

8        Do you recall that testimony?

9   A.   Yes, I do.

10  Q.   All right.

11       Now, there's a SAFE committee.  You reviewed the

12  deposition testimony of Ms. Kaucher.  She was a, as I

13  understand it, a compliance person for Janssen.

14       Do you recall reviewing her deposition testimony?

15  A.   Yes.

16  Q.   Ms. Kaucher had never heard of the SAFE committee.  Do

17  you recall that testimony?

18  A.   I recall that.  I'm still wondering what -- if SAFE is an

19  acronym for something.

20  Q.   Mr. Mattes didn't remember the name of it either.

21       Do you recall that when he was testifying here?

22  A.   Yes.  Yes, I do.

23  Q.   All right.  Maybe we'll find out.

24       Now, I didn't ask you, sir, specifics about the speaker

25  program and its compliance.  I asked you questions about

SILLUP - REDIRECT - MARKETOS

1   off-label promotion through the speaker program.

2        Do you recall that?

3   A.   Yes, I do.

4   Q.   That's your area of expertise.

5        Correct?

6   A.   Yes.

7   Q.   Now, there are other experts, including Ms. Virginia

8   Evans, who will be coming to this courtroom and testifying on

9   Relators' behalf about the speaker program and its compliance

10  with the law.

11       Are you aware of that?

12  A.   Yes.

13  Q.   And have you reviewed her expert report in this case?

14  A.   Yes, I did.

15  Q.   The jurors will hear from Ms. Evans, that's not the

16  testimony that I asked you to offer to the members of the

17  jury.

18       Fair?

19  A.   Yes, it is.

20       MR. MARKETOS:  Your Honor, may I have one minute?  I

21  think I'm done.

22       THE COURT:  You may.

23       MR. MARKETOS:  Thank you.

24       (Brief pause.)

25  BY MR. MARKETOS:

SILLUP - REDIRECT - MARKETOS

1  Q.   Sorry, sir.  One last thing.

2       We heard questions -- you were asked questions from

3  Ms. Brown about these communications between Janssen and the

4  Food and Drug Administration where Janssen purportedly

5  obtained approval for the marketing messages that it was

6  putting out into the field.

7       Right, sir?

8  A.   Yes.

9  Q.   Now, there were questions from Ms. Brown, have you seen

10 any 2253 forms or information that Janssen delivered to the

11 Food and Drug Administration for approval, and you did not.

12 A.   I have not.

13 Q.   All right.

14      As you sat here through the trial, have you seen

15 anything presented from Janssen at any time showing that

16 Janssen obtained approval from the Food and Drug

17 Administration for the messages it was delivering to doctors?

18 A.   No, I did not.  I heard that there was an internal

19 approval.

20 Q.   Approval by Janssen.

21 A.   By Janssen.  That's not the same as DDMAC.

22 Q.   Sir, very briefly, you've offered opinions to the members

23 of the jury today within the field of your expertise.

24      Right, sir?

25 A.   Yes.

SILLUP - REDIRECT - MARKETOS

1  Q.  And as I understand it, the insinuation -- or at least

2  the questions you were asked by Ms. Brown suggested that

3  Janssen's marketing efforts did not influence doctors.

4      We showed the members of the jury Janssen's own

5  conclusions about the effectiveness and the prescribing

6  behavior and the lasting impact their promotional efforts had

7  on doctors.

8      Do you recall that?

9  A.  Yes, I do.

10 Q.  Apparently, now, Janssen is arguing with Janssen.

11     Is that fair?

12     MS. BROWN:  I object, Your Honor, to that question.

13 Argumentative.

14     THE COURT:  Hold on one second.  Yep, let me review

15 it.

16     Sustained.  I'll ask you to rephrase.

17 BY MR. MARKETOS:

18 Q.  Would you agree with me, sir, that in this courtroom,

19 Janssen's lawyers are apparently disagreeing with the

20 conclusion that Janssen's employees and representatives made

21 in real life about their ability to influence doctors'

22 prescriptions?

23 A.  It appears that way.

24     MR. MARKETOS:  Thank you.  Nothing further.

25     Thank you, Professor Sillup.

PENELOW - DIRECT - RUSS

1          THE COURT:  Thank you, Professor Sillup.  You are

2     excused from the trial.

3          THE WITNESS:  Thank you.

4          THE COURT:  What do we have next, Mr. Marketos?

5          MR. RUSS:  We call Jessica Penelow.

6          THE COURT:  Sorry, Mr. Russ, it's your witness.

7          MR. RUSS:  Yes, Your Honor.

8          THE COURT:  I can't keep track.  Everybody pops up

9     and down.  I don't know who is doing what.

10         All right, ma'am.  We're just going to have you sworn

11    in and then obviously you -- well, you can come if you need

12    to.

13    (**JESSICA PENELOW**, HAVING BEEN DULY SWORN/AFFIRMED, TESTIFIED

14    AS FOLLOWS:)

15         THE DEPUTY COURT CLERK:  Please state your name and

16    the spelling of your last name for the record.

17         THE WITNESS:  Jessica Penelow, P-E-N-E-L-O-W.

18         THE COURT:  Are we ready to proceed, folks?

19       Mr. Russ, when you're prepared.

20         MR. RUSS:  Thank you, Your Honor.

21    (DIRECT EXAMINATION BY MR. RUSS:)

22    Q.   Good afternoon, Ms. Penelow.

23    A.   Good afternoon.

24    Q.   You know me?

25    A.   I do know you.

PENELOW - DIRECT - RUSS

1   Q.   Introduce yourself to the jury, please.

2   A.   Hi, how are you.  I'm Jessica Penelow.  Good afternoon.

3   Q.   Ms. Penelow, you've been here throughout the last couple

4   of weeks because you're a Relator in this case.

5        Right?

6   A.   I am.

7   Q.   Tell the jury a little bit about yourself.  Where did you

8   grew up?

9   A.   I was born in New York, and I grew up in south Florida,

10  near The Fort Lauderdale area.

11  Q.   Where did you go to high school?

12  A.   I went to high school in Coral Springs, Florida.

13  Taravella High School.

14  Q.   What about college?

15  A.   I went to University of Central Florida in Orlando first,

16  and then I transferred to Florida Atlantic University in Boca

17  Raton.

18  Q.   What did you study there?

19  A.   I studied healthcare administration.

20  Q.   Did you go on from college and get a master's,

21  eventually, an MBA?

22  A.   I did.

23  Q.   Okay.  We'll talk about that a little bit.

24  A.   Okay.

25  Q.   When you graduated from college, did you go into medical

PENELOW - DIRECT - RUSS

1    sales?

2    A.    I did.    I immediately went into medical sales right after

3    college.

4    Q.    And give the jury a sense of sort of the time frame that

5    we're talking about and what you were doing.

6    A.    It was about 1998 when I graduated, and I started

7    looking -- I was working in doctors' offices, so I was

8    familiar with the medical industry.    Also waiting tables.    And

9    I was very attracted to medicine and thought about possibly

10   going to medical school.

11        So I thought I would find something in my degree, which

12   was healthcare administration, which is the business end, and

13   something on the clinical end, and I went to a job fair and

14   ended up getting a job in medical supply sales.

15        That was my first job, with PSS.

16   Q.    Is that PSS you said?

17   A.    PSS.

18   Q.    What does that stand for?

19   A.    Physician Sales and Service.

20   Q.    Where was that?

21   A.    They were out of Tallahassee, Florida.

22   Q.    Tell the jury what you were doing for that company.

23   A.    So they had over 500,000 products that we sold.    We were

24   a distributor.    So when you got the job, the rule was that you

25   had to be willing to relocate.    So I had to move out of

PENELOW - DIRECT - RUSS

1   Florida if I was going to take the job.

2        I did take the job.  I was able to get the job, and I

3   was immediately transferred to North Carolina, where I did a

4   four-month training program, and then subsequently I was moved

5   to New Jersey.

6   Q.   You were moved to New Jersey with PSS?

7   A.   I was.

8   Q.   What did you do in New Jersey?

9   A.   I sold medical supplies to doctors.  I went into doctors'

10  offices, called on the entire office, whether it be the office

11  manager, nurses, lab staff, physicians, and sold them all the

12  different products in different disease states, depending on

13  whether it was cardiology, internal medicine, so on and so

14  forth.

15  Q.   Now, at some point did you leave PSS to go to a different

16  company?

17  A.   I did.

18  Q.   Where did you go?

19  A.   I went to a company called Synthes.

20  Q.   What does Synthes do?

21  A.   Synthes is an orthopedic trauma company.  So what we did

22  was we sold internal and external fixation.  In laymen's, it's

23  basically plates and screws that fix broken bones.

24       So I was in the operating room.  I was on call 24/7.  I

25  had a pager at that time, and I was up all hours of the night

PENELOW - DIRECT - RUSS

1   working 24, 48 hours at a time without sleep, and worked in

2   the operating room with the orthopedic surgeons to help fix

3   the bones.

4   Q.   Was it hard work?

5   A.   It was extremely hard work.

6   Q.   High pressure?

7   A.   Very high pressure.

8   Q.   Lots of stress?

9   A.   Lots of stress.

10  Q.   At some point did you leave that company?

11       Are we about in the early 2000s at this point?

12  A.   Yes, we are.

13  Q.   Okay.

14  A.   About 2001.

15  Q.   And so did you leave that company and then go to work for

16  a company called GlaxoSmithKline?

17  A.   I did.  GlaxoSmithKline Pharmaceutical Company.

18  Q.   Tell the jury what type of company that is.

19  A.   So that was the pharmaceutical experience that I was

20  being introduced to, coming from medical supplies and devices

21  before.

22       It was -- I was recruited there, and it was on -- the

23  Jersey Shore was my territory.  And I called on cardiologists

24  and endocrinologists and psychiatrists, and I sold a heart

25  management drug, a diabetes drug, and Paxil, which is for

PENELOW - DIRECT - RUSS

1    depression.

2    Q.    You also sold a drug called Avandia; is that right?

3    A.    Avandia is for diabetes.

4    Q.    Okay.

5        Now, compare and contrast how that job was like to your

6    previous jobs in medical sales?

7    A.    Oh, it was very different.  Medical supply and device

8    sales is very different from pharmaceutical sales.

9        Again like I said, the hours are very different.  The

10   demand is very different.  The stress level is very different,

11   and in pharmaceutical sales, there's a lot more regulations,

12   but it is a shorter day.

13   Q.    So when you say "regulation," what are you talking about?

14   A.    When I entered into the pharmaceutical industry, I

15   noticed that there was a lot more regulations than medical

16   device.

17   Q.    Did you at some point leave -- and by the way, are you

18   choosing to leave these companies?  Are they promotions?

19   A.    No, actually I've been lucky, and I've been recruited by

20   a lot of friends.  You know, you network in the industry, and

21   you get a call if you're a good sales rep, and they recruit

22   you to a new company if it's something that you're interested

23   in.

24       And you do the interview and try and get the job.

25   Q.    Did you feel like you were moving up in the industry?

PENELOW - DIRECT - RUSS

1   A.   I felt like going into pharmaceuticals may have been a

2   step back.  9/11 had just occurred, and I was involved in

3   volunteering there.  I took a new lease on life and decided

4   that being on call 24/7 was a little bit rough for me.

5        So I wouldn't say that was necessarily a promotion but

6   a different type of sale.

7   Q.   So pharmaceutical sales, in your experience, was actually

8   less stressful than some of the jobs that you had held before?

9   A.   Absolutely.

10  Q.   Okay.

11       Did you leave to go to BMS?

12  A.   I did.

13  Q.   Tell the jury what BMS is.

14  A.   So B- -- Bristol-Myers Squibb is another pharmaceutical

15  company, and they have a specialty HIV division.  I had a

16  girlfriend that had worked with at Glaxosmithkline who moved

17  into New York to take a territory, and they had an open

18  territory in the lower east side of Manhattan.

19       And she called and asked if I'd be interested.  I was a

20  HIV peer educator in college at Florida Atlantic University,

21  so I had a special passion for patients with HIV.

22       I would go around the college, and I would teach how to

23  protect yourself, how to protect yourself with safe sex, doing

24  demonstrations in front of classes.

25       And so when I got the opportunity to get into HIV, that

PENELOW - DIRECT - RUSS

1   was it for me, and I took the opportunity immediately.

2   Q.   So you were interested in the disease state --

3   A.   Absolutely.

4   Q.   -- back in college?

5   A.   Yes.

6   Q.   Where -- were you in Manhattan at this point?

7   A.   I moved to Manhattan from New Jersey.

8   Q.   What were you selling there?

9   A.   So my first at BMS was to launch Reyataz, which you've

10  heard a lot about, and that was on the lower east side of

11  Manhattan, calling on infectious disease physicians.

12  Q.   Can you name for the jury when you were at BMS some of

13  the physicians that you were calling on to sell Reyataz?

14  A.   Sure.  I had one of the big institutions on the lower

15  east side, which is Beth Israel Medical Center, which is on

16  2nd and 17th in New York City.

17        And some of the physicians, the head of the center was

18  Dr. Nadim Salomon, and some of the physicians were Dr. Gomez,

19  Dr. Koshy, John Weber, who was a PA, Dr. Waldron.

20        There was quite a few physicians that practiced out of

21  this HIV clinic that was strictly HIV.

22  Q.   Now, we've heard a lot about the last couple weeks sort

23  of how fast these sales tactics work, but you were on the

24  ground in doctors' offices.

25        Fair?

PENELOW - DIRECT - RUSS

1   A.   I was.

2   Q.   Tell the jury -- and we'll start with your time at

3   Bristol-Myers.

4   A.   Okay.

5   Q.   Tell the jury sort of what your day-to-day was like when

6   you were meeting doctors and selling them on product like

7   Reyataz.

8   A.   Okay.  I would say no call was the same.  It's a very

9   different job every day, which was nice, and I enjoyed that

10  thoroughly.  Every time you go into a doctor's office you can

11  have a room full of -- I'm sure as you all know a room full of

12  parents or no patients.  You can have a doctor that's had a

13  rough morning or had a wonderful morning.

14        So you never knew what you were walking into.  I walked

15  into the doctors' offices.  I tried to get an appointment with

16  the doctor, if possible, and then get some time with them to

17  be able to promote Sustiva and Reyataz, Sustiva as a non-NUC.

18  I sold that as well.

19        And I would have conversations with physicians and try

20  to get them to prescribe my two -- my two prescriptions that I

21  was selling at the time, get as much time as I possibly could

22  with them.

23  Q.   It's been a couple weeks ago, but this jury was

24  introduced to a woman named Donna Graham.

25  A.   Yes.

PENELOW - DIRECT - RUSS

1   Q.   Is this where you met Ms. Graham?

2   A.   It is.

3   Q.   Did you work together?

4   A.   We worked together.

5   Q.   Okay.

6        In fact, I think Ms. Graham said, and you can correct

7   me if I'm wrong, that she actually helped recruit you to

8   Tibotec?

9   A.   She did.

10  Q.   Tell the jury about that.

11  A.   Donna had left BMS because Tibotec was coming out with

12  this new great -- supposedly great PI that was coming to the

13  market that possibly could have been more efficacious than

14  Reyataz and possibly better tolerability or same as

15  tolerability.

16       And Donna moved from BMS to Johnson & Johnson or then

17  Tibotec, which is their new HIV division.  It was an exciting

18  opportunity because it was a startup in -- under the Johnson &

19  Johnson umbrella.

20       So it was very exciting.  They had a lot of great

21  benefits, great packages, and I was very excited to be able to

22  get into a new protease inhibitor and launch another protease

23  inhibitor because I had done it before with BMS.

24  Q.   Did you enjoy your time at BMS?

25  A.   Very much so.

PENELOW - DIRECT - RUSS

1   Q.   When you were there at GlaxoSmithKline, were you ever

2   asked or instructed to sell any product off-label?

3   A.   No.

4   Q.   At any other position that you held before Tibotec, had

5   you ever been a whistleblower?

6   A.   No.

7   Q.   Have you ever been disciplined at those companies?

8   A.   No.

9   Q.   So let's -- let's jump forward to your time at Tibotec.

10       When did you join, 2006?

11  A.   2006 I joined.

12  Q.   And you were in Manhattan at Bristol-Myers?

13  A.   Yes, I was.

14  Q.   Did you stay in Manhattan?

15  A.   I did.

16  Q.   Tell the jury, were you culling on the same doctors to

17  sell them this new drug, Prezista?

18  A.   Yes.  I think that was maybe why I was attractive to the

19  manager and why he recruited me was because I knew all the

20  doctors already from calling on them for three years at

21  Bristol Meyers.

22       So again, I had Beth Israel with all those same doctors

23  that I mentioned in addition to private practice, the same

24  physicians that I had been calling on for three years.

25  Q.   Did you get a pay raise when you went to Tibotec?

PENELOW - DIRECT - RUSS

```
 1  A.   I did.

 2  Q.   Is that one of the reasons you took it?

 3  A.   Sure.

 4  Q.   So when you joined in 2006, who was your district

 5  manager?

 6  A.   Frank Murphy.

 7  Q.   Tell the jury a little bit about Mr. Murphy.

 8  A.   Frank Murphy was the district manager who was a wonderful

 9  guy.  We had a very good relationship.  He trained me very

10  well.  I went into the home office for their formal training

11  program, and Mr. Murphy and I got out in the field pretty soon

12  after and started calling on physicians together.

13  Q.   So you -- was this sometimes called ride alongs?

14  A.   Ride alongs, yes.

15  Q.   So your district manager, Mr. Murphy, would ride along

16  with you to go sell to distribution?

17  A.   Exactly, we would go into together.

18  Q.   How is that going in 2006 with Prezista?

19  A.   When we first launched Prezista, there was -- it was a

20  high-stress situation.  I think they've heard enough about the

21  fact that, you know, there was a very high goal, and none of

22  us thought we were going to meet our goal.

23       So that was very stressful at the beginning.  Frank

24  Murphy was very good at keeping the corporate anger away from

25  the reps.  He said, I'm going to take on all the hard stuff,
```

PENELOW - DIRECT - RUSS

1   you guys just go out and do your job.  I'm not going to bother

2   you with it, and I'll take it all on, and he did a really good

3   job of doing that.  He really kept it away from us.

4       So it wasn't stressful in the environment.

5   Q.   Now, Ms. Penelow, we're going to move through this pretty

6   quickly because the jury has heard a lot about lipids.

7   A.   Right.

8   Q.   Do you know -- you knew about lipids from your time

9   selling Reyataz.

10      Right?

11  A.   Yes, I did.

12  Q.   Did you -- were you under the belief when you went to

13  sell Prezista that it was a lipid-friendly drug?

14  A.   Absolutely.

15  Q.   Why?

16  A.   That's what I was told.

17  Q.   Who told you that?

18  A.   Frank Murphy and Tibotec.

19  Q.   Did you quickly come to realize that that wasn't the

20  case?

21  A.   I did.  Unfortunately, you know, it was pretty soon after

22  I started that I realized -- analyzing the package insert was

23  my first time realizing it, and then --

24  Q.   What are you talking about there?  You had the package

25  insert or the label.

PENELOW - DIRECT - RUSS

1  A.    Yes.

2  Q.    You can see that's just not true on the label.

3        Right?

4  A.    Correct.

5  Q.    But then at some point, did you start to hear

6  conversations and witness things that you realized this lipid

7  issue may be a real issue?

8  A.    Yes, absolutely.

9  Q.    Tell the jury about that.

10  A.    I had an experience with Dr. Ricky Hsu who is a doctor

11  that I called on.  He was in Cabrini Hospital, if anyone's

12  familiar, and I had come in.

13        And he told me that Nancy Bartnett had been there the

14  day before and shared with him that Prezista coming out is

15  going to be great because it has grit lipids and the same as

16  Reyataz.

17        And he was a bit taken aback and said, I found that to

18  be a little odd that she was talking about a favorable lipid

19  profile when I was in the early access program.

20        So he did all the clinical trials for Prezista, and he

21  said, I actually had a lot of negative lipid parameters with

22  these patients.

23  Q.    So there were some doctors like Dr. Ricky Hsu who knew,

24  who found out?

25  A.    They found out in the early access program.

PENELOW - DIRECT - RUSS

1   Q.   That it's bad for lipids?

2   A.   Yes.

3   Q.   But Nancy Bartnett was telling him that it was lipid

4   friendly?

5   A.   Yes.

6   Q.   Okay.

7        And you had the opportunity to go on many sales rides

8   and sales calls with Ms. Bartnett?

9   A.   I did.

10  Q.   Did she frequently sell to doctors that it was lipid

11  friendly from 2006 to 2013 when you left?

12  A.   Most of the time.

13  Q.   Was one of the reasons that you realized maybe the lipids

14  are a concern because you started seeing these off-label

15  studies?

16  A.   Yes.

17  Q.   Tell the jury about the off-label studies.

18  A.   Frank Murphy would have district meetings, and we would

19  all get together, and he started introducing newer, smaller

20  studies to us, which I didn't quite understand, but certainly

21  was up for listening.

22       And the first study was the DART study, which I think

23  you guys have heard about.  And it was in healthy individuals,

24  not HIV patients, which is my first hint that there was a

25  bit -- something wrong with the study.

PENELOW - DIRECT - RUSS

1          And it said that it was favorable to lipids and

2     comparable to Reyataz in the conclusions.  That's what the

3     study said.

4          So I believed it.

5     Q.   Did you witness people using the conclusions from the

6     DART study with doctors?

7     A.   Yes, I did.

8     Q.   All right.

9          How early in your employment did you see that?

10    A.   I'd say, within the first three to six months,

11    Frank Murphy was using the DART study in the field and

12    Nancy Bartnett was using it very frequently.

13    Q.   So to make sure that I understand and the jury

14    understands, Frank Murphy is your district manager, and then

15    Ms. Bartnett is your KAM, key account --

16    A.   Correct, key account manager.

17    Q.   Are they equals or --

18    A.   Frank Murphy is, I think, one -- one layer above.

19    Q.   Okay.

20         So Frank Murphy, then Ms. Bartnett, then you?

21    A.   Yes.

22    Q.   Okay.

23         Did Ms. Bartnett go on many sales rides with you?

24    A.   I would say probably 80 to 85 percent of my calls were

25    with Nancy Bartnett.

PENELOW - DIRECT - RUSS

1   Q.   Explain that.  Why are there two people going on sales
2   calls to doctors' offices?
3   A.   Nancy had been working for Pfizer-Allergan, which sold
4   Viracept, which was another HIV drug who -- that was on the
5   market before Reyataz and Prezista.  And so she had the same
6   territory as me, so she knew these doctors for over ten years.
7        So where my relationship was only three years, she had
8   it for ten.  So she would come on the rides -- on the rides
9   with me just simply at the beginning because she knew the
10  doctors very well.
11       She also was in charge of the key opinion leaders and
12  the big physicians that wrote a lot of prescriptions and the
13  speakers.  So I had a couple speakers in my territory.  I had
14  a lot of high-writing prescription physicians.
15       So she would come with me to be able to call on the
16  same doctors as I was calling on.
17  Q.   Is part of the sales game, Ms. Penelow, relationships
18  with these doctors and building that trust?
19  A.   Yes.  If you look at any sales manual, you will see that
20  relationship building is one of the top three important things
21  in getting a sale.
22  Q.   In your experience, does it help the doctor trust you
23  that you're telling them the truth about a medication?
24  A.   Takes a lot of trust.
25  Q.   Did Ms. Bartnett use the off-label studies with doctors

PENELOW - DIRECT - RUSS

 1    in this time period?

 2    A.    She did.

 3    Q.    Did she also make homemade slides?

 4    A.    She did.  She made homemade slides for the speakers when

 5    they were doing their programs.

 6    Q.    Okay.

 7          And we'll talk about those slides here in a little bit.

 8    A.    Okay.

 9    Q.    Was there a gentleman who was your sales trainer --

10    A.    Yes.

11    Q.    -- in that position?

12    A.    Yes.

13    Q.    Who is that?

14    A.    Tim McSherry.

15    Q.    Tell the jury about Mr. McSherry.

16    A.    Tim McSherry was a friend of mine.  He was on the west

17    side of Manhattan and called on St. Vincent's, which is a big

18    HIV center as well, and he was in charge of a lot of the

19    clinical information for the district.

20          He would gather studies from conferences and then

21    present them to us at district meetings.

22    Q.    Now, at some point, did you have a conversation with

23    Mr. Murphy about his use of off-label studies and selling

24    off-label?

25    A.    I did.  Early on I expressed concern to Mr. Murphy.

1  Q.  Tell the jury about that.

2  A.  Okay.  I expressed concern immediately because I found

3  that we weren't selling off of the label or the sales pieces

4  and we were using these off-label studies.  He understood

5  completely and told me that I did not have to sell off-label

6  but that him and Nancy were going to continue to do so.

7  Q.  So this was Mr. Murphy that the jury heard from

8  Ms. Brancaccio about, right?

9  A.  Yes.

10 Q.  Because you're both in the same sales district at this

11 point?

12 A.  Yes.

13 Q.  Okay.

14      And I believe there was some testimony that he was a

15 good manager?

16 A.  He was a good manager.

17 Q.  So if I understand correctly, he said he is going to do

18 it, but you don't have to at this point?

19 A.  Yes.

20 Q.  Okay.

21      How did you respond to that?

22 A.  Mixed emotions.  It was difficult to know that we weren't

23 necessarily doing what I was taught from the home office, and

24 all the policies that were put in front of me when I first

25 started, but I understood that he was getting a lot of flack

PENELOW - DIRECT - RUSS

1  from the higher-ups and that we had to get our numbers up and

2  it was nonnegotiable.

3  Q.   Why did you understand that?

4  A.   It was just something that we all talked about as a

5  district.  We're a very close district in New York because we

6  were so centrally located together.  We all became very

7  friendly, and we talked about it very often.

8  Q.   Compare, if you can, your sales pressure at your prior

9  job at Bristol Meyers with the sales pressure that you were

10  facing in 2006 at Tibotec.

11  A.   There was not sales pressure at Bristol Meyers.  It was a

12  purely motivating atmosphere.  You got accolades when you did

13  something good.  Rarely were you reprimanded, but if you were,

14  it was in a very professional way.

15       And the pressure at -- immediately at Tibotec was

16  something I had never seen before, and I wasn't aware of how

17  to respond to it, and it was pretty upsetting at the

18  beginning.

19  Q.   What was the driving force?  Take us back to 2006.  What

20  was the driving force?  Was it making your numbers and making

21  money, or was it the patient?

22  A.   For me it's always been the patients.  But, of course, as

23  salespeople, one of the questions they always ask you on an

24  interview is What do you want most out of your sales career?

25  And they want you to answer money, because they look at you as

PENELOW - DIRECT - RUSS

1    a more motivated salesperson if you want to make more money.

2    Q.   Was there pressure motivation at this point?  We heard

3    all about the forecast to get the sales up.

4    A.   Yes, absolutely.

5    Q.   Okay.

6         Did you start -- even Mr. Murphy didn't demand at this

7    point that you do it.  Did you sell off-label?  Did you sell

8    Prezista off-label?

9    A.   I started to sell off-label, I would say, probably around

10   2007.

11   Q.   Name some of the doctors, prescribers that you would go

12   into their office and give them off-label messages.  Just tell

13   some of the prescriber names.

14   A.   Some of the names.  Okay.  Dr. Kaminsky, Dr. Chavez, Dr.

15   Dalton, Dr. Salomon, Dr. Gomez, Dr. Koshy, John Weber, Mary

16   Waldron.

17        There was quite a -- there was quite a few.

18   Q.   So these were real-life prescribers that you're sitting

19   in their office and giving them off-label information?

20   A.   Yes.

21   Q.   Was Nancy Bartnett doing this?

22   A.   Yes.

23   Q.   Were other salespeople in your district that you talked

24   to doing this?

25   A.   Yes.

PENELOW - DIRECT - RUSS

1  Q.   And you're under oath?

2  A.   Yes.

3  Q.   You understand?

4  A.   I understand.

5  Q.   These people were selling off-label in 2006?

6  A.   We were all told to sell off-label.

7  Q.   Mr. Murphy didn't demand at this point that you do it,

8  though?

9  A.   That was just him and I together, but the rest of the

10 district was selling off-label.

11 Q.   What about Ms. Bartnett?

12 A.   Ms. Bartnett was absolutely with Mr. Dolisi in that if we

13 didn't sell off-label, we were not going to meet our numbers.

14 Q.   So let's fast-forward a little bit.  At some point,

15 Mr. Murphy goes to New Jersey.

16      Right?

17 A.   Correct.

18 Q.   And then Mr. Dolisi comes in to town in Manhattan.

19      Right?

20 A.   Yes.

21 Q.   Was Mr. Dolisi the same type of manager as Mr. Murphy?

22 A.   No, he was not.

23 Q.   How was he different?

24 A.   He managed with fear and intimidation, and he did not

25 keep us away from what was coming in from the higher-ups as

PENELOW - DIRECT - RUSS

1    Frank did.  He yelled at us frequently that we needed to get

2    our numbers up, that we needed to get our MIRs up, that we

3    needed to get more programs on the books, that we needed to

4    meet our sales numbers.

5         And it wasn't done in a nice fashion.

6    Q.   What do you mean by not a nice fashion?

7    A.   He was intimidating in the -- in the way that he spoke to

8    us, but I would also say threatening.

9    Q.   Did he tie your sales metrics and performance to your

10   job?

11   A.   He did.

12   Q.   Did he tell you that he expected you to off-label sell?

13   A.   Absolutely.

14   Q.   Did Nancy Bartnett?

15   A.   Yes.  It was a requirement.

16   Q.   One time they told you this?

17   A.   No.  This was at every meeting.  We had meetings all the

18   time.  As I said, we were a very close district.  Tony liked

19   meetings.  We met frequently, at least twice a month.

20        And at these meetings, Tim McSherry would give us a new

21   off-label study and tell us how to go out in the field and

22   sell it and pass them out to everyone, and that's what we

23   would do.

24   Q.   So let's break that into pieces.

25        How would Mr. Dolisi give you the direction to go out

PENELOW - DIRECT - RUSS

1    and sell this way?

2    A.   He basically said that the entire country was doing it

3    and that we needed to keep up with the country and that our

4    numbers were everything and that we -- our jobs were going to

5    be on the line.

6        We would either be put on a performance improvement

7    plan, a PIP, or we would lose our jobs if we weren't going to

8    make our numbers.

9    Q.   Did you at some point get an opportunity to talk to other

10   sales reps around the country to confirm what Mr. Dolisi said,

11   that it's happening around the country?

12   A.   I did.  Tony Dolisi was very open with me that I had no

13   choice, and so I did open my mouth and talk to other people

14   about it.

15   Q.   Who did you talk to?

16   A.   I talked to everyone in my district about it.  So

17   Christine Brancaccio, Donna Graham, Brad Rothenbuhler, Tim

18   McSherry, Angel Edwards, Reggie Cadet, Nancy Peterson from

19   New Jersey, Laura Knightly from the training department.

20       There was Joe Holshoe from the New York district -- for

21   the New England district, Russ Moyer from the New England

22   district, all the friends that I had made in my short tenure

23   there.

24   Q.   So as you've sat through this trial, Ms. Penelow, you've

25   heard some questions about Don't you know we had a policy to

*United States District Court*
*District of New Jersey*

PENELOW - DIRECT - RUSS

1    report?  Why didn't you report?

2         Have you heard some of those questions?

3    A.   Of course.  Yes, I've heard those questions.

4    Q.   Let me ask you:  You were talking about what you were

5    being required to do with your sales colleagues --

6    A.   I was.

7    Q.   -- who you just mentioned a number of them.

8         Right?

9    A.   Uh-huh.

10   Q.   What was happening?  Why wasn't that being reported?

11   A.   We all discussed that we didn't trust the anonymous line.

12   Others had used the anonymous line with horrible results.

13   They were fired, and we didn't trust that it was anonymous or

14   confidential.

15        So we didn't think that that was the best route to

16   take, the HCC 800 number, if you will.

17   Q.   Were people in fear of losing their jobs?

18   A.   Everyone I spoke to that I mentioned was in fear of

19   losing their job.

20   Q.   Were they in fear of losing their jobs if they raised

21   their hands and said, Hey, stop doing this?

22   A.   A lot of people put their head down and just did what

23   they needed to do.

24   Q.   I want to talk to you a little bit about one of studies

25   that we've discussed.

PENELOW - DIRECT - RUSS

1          MR. RUSS:  And this is Relators' 74, Ms. Johnson.  I
2  believe it's already in evidence.
3  BY MR. RUSS:
4  Q.  Ms. Penelow, you recall this email?
5  A.  I do.
6  Q.  You were on this email.  At the time you
7  were Ms. Finkelstein?
8  A.  I was.  That was my maiden name.
9  Q.  When were you -- when did you get married?
10  A.  I got married in 2008.  I've been married 16 years.
11  Q.  We heard a little about your wedding.  Donna Graham was
12  there?
13  A.  Yes.
14  Q.  Mr. Murphy was there?
15  A.  Mr. Murphy was there.
16  Q.  Dr. Nadim Salomon was there?
17  A.  Dr. Nadim Salomon was there.
18  Q.  Because you had developed trust with him, right?
19  A.  Yes.
20  Q.  Was -- Dr. Kaminsky was there?
21  A.  Dr. Kaminsky was there.
22  Q.  Okay.
23          Do you recall in 2006 -- I know you've seen it since
24  this email that you got from Mr. McSherry.
25  A.  Yes, I do.

PENELOW - DIRECT - RUSS

1    Q.   Now, if we could just spend a little bit of time with

2    this, and I want to go through it fairly quickly because I

3    know the jury has seen it.

4         This is the attachment comparing Prezista to Reyataz, a

5    trial in healthy volunteers looking at lipids.

6         Do you see that?

7    A.   Yes.

8    Q.   Was it around this time you started to realize these were

9    off-label studies about lipids and maybe what you were told

10   about the lipid profile wasn't true?

11   A.   Yes.

12   Q.   Okay.

13        "It was presented last Thursday"-- and we're going to

14   look to see where it was presented, okay?

15   A.   Okay.

16   Q.   -- "as a late-breaker at the DART meeting.  There is no

17   difference between drugs with the regards to lipids."

18        That's not true.

19        Right?

20   A.   That is not a true statement.

21   Q.   "One side note:  The study design had patients on

22   ritonavir alone for seven days before going on boosted

23   Prezista or boosted Reyataz for 21 additional days."

24        Do you see that?

25   A.   I do.

PENELOW - DIRECT - RUSS

1   Q.   Now, Mr. McSherry was confused and actually said, I don't

2   understand why they did this, besides just trying to improve

3   the results.

4        Do you see that?

5   A.   I do.

6        MR. RUSS:  Can we look at the attachment,

7   Ms. Johnson, page 2.  If we could zoom in on the top of this

8   document.

9   BY MR. RUSS:

10  Q.   Do you see this was reported by Jules Levin?

11  A.   I do.

12  Q.   Okay.

13       It was the metabolic changes, lipids, glucose in

14  healthy volunteers.

15  A.   That was the study we discussed before, the DART study.

16  Q.   They didn't have HIV?

17  A.   They did not have HIV.

18  Q.   Okay.

19       "Similar changes in metabolic parameters of darunavir,"

20  Prezista.

21       Right?

22  A.   Yes.

23  Q.   You're going to have to say that for me.  I know it's

24  Reyataz.  How do you pronounce it?

25  A.   Atazanavir.

PENELOW - DIRECT - RUSS

1   Q.   "Each coadministered with low dose ritonavir in healthy

2   volunteers."

3        You see where this was presented at the Frontiers in

4   Drug Development for Antiretroviral Therapies in Cancun,

5   Mexico?

6   A.   I do see that.

7   Q.   Okay.

8        Did you take this and use it with doctors?

9   A.   I did.

10  Q.   Why?

11  A.   It had a great conclusion, which, as I mentioned before,

12  that I believed from the beginning.  And it was a way to make

13  them believe that Prezista was comparable to Reyataz.

14  Q.   So you had some doctors like Dr. Hsu who had already seen

15  the lipid profile who said, Hold on.  That's not right?

16  A.   Yeah.

17  Q.   But you had other doctors who didn't know?

18  A.   That is true.

19  Q.   Tell the jury about those doctors.

20  A.   A lot of doctors don't know whether you're speaking

21  off-label or on-label.  They're -- again, as he mentioned,

22  they built a lot of trust with me.

23       And when I came in with a study, they knew that it came

24  from some conference, it may or may not be off-label, and they

25  would just listen to the conclusions and the summaries of that

PENELOW - DIRECT - RUSS

 1  study.

 2          MR. RUSS:  You can pull that down, Ms. Johnson.

 3  BY MR. RUSS:

 4  Q.   Was there another off-label study called METABOLIK?

 5  A.   There was.

 6  Q.   What was that?

 7  A.   METABOLIK was another small study, and it looked at

 8  lipids as well, and in that study, the conclusion was that it

 9  was similar to Reyataz and it had a favor lipid profile,

10  not --

11  Q.   Favorable?

12  A.   -- not -- not neutral, favorable.

13  Q.   Okay.

14       Did you use that study?

15  A.   I did.  That was a very attractive word to the

16  physicians.

17  Q.   Did the people that you worked with use that study with

18  physicians?

19  A.   Yes, we all did.

20  Q.   Did you personally hear Ms. Bartnett use those studies --

21  A.   I personally --

22  Q.   -- with physicians?

23  A.   I personally heard Ms. Bartnett.

24  Q.   Was there another study that was off-label called TRIAD?

25  A.   There was a TRIAD study.

PENELOW - DIRECT - RUSS

1   Q.   What was that?

2   A.   I don't recall the TRIAD study specifics.

3   Q.   Okay.

4        Was there --

5   A.   Are you thinking of the TRIO?

6   Q.   TRIO.  I'm sorry.

7   A.   TRIO, okay.  TRIO, yes.  So the TRIO study was a

8   different study.  That was a once-daily study of Isentress,

9   which is an integrase inhibitor, which is a different class of

10  drugs.  A protease inhibitor, Prezista and Intelence.

11  Q.   Was that also off-label?

12  A.   That was off-label because it was all once a day, and

13  Intelence is a twice-a-day drug.

14  Q.   It's never been once a day?

15  A.   Never been once a day.

16  Q.   So I know the jury has heard a lot about the DART study

17  but -- and METABOLIK.

18  A.   Yes.

19  Q.   But there were other off-label studies.

20       Right?

21  A.   There was a lot of off-label studies.

22  Q.   We focused on a couple.

23  A.   Yeah, we focused on a couple.

24  Q.   And DeJesus was one of them?

25  A.   DeJesus was another one, correct.

PENELOW - DIRECT - RUSS

1   Q.   Did you use that one?

2   A.   I did use that one.

3   Q.   So Ms. Brown asked Ms. Brancaccio:  Why were you using

4   this if it was stamped for educational purposes only.

5   A.   Right.

6   Q.   Explain that, please.

7   A.   We had multiple copies of the study, so Tibotec or

8   Janssen would send us copies of these off-label studies.  We

9   would get a binder in the mail, and it would have posters in

10  it from the conferences, and it would be stamped for

11  educational purposes only.  Do not use in the field.

12       But we would also get from Tim McSherry, let's say, the

13  Jules Levin NATAP conclusion, and that did not have a stamp on

14  it, so it was much easier to use that as a piece with your

15  physician.

16  Q.   So if you had a piece that didn't have the stamp on it,

17  was it easier to show to the doctor?

18  A.   It was.

19  Q.   Did you leave them behind?

20  A.   I never left anything behind.

21  Q.   Were you trained not to leave them behind?

22  A.   Yes.

23  Q.   Who told you to do that?

24  A.   Tony and Nancy.

25  Q.   Was the idea you didn't want to get caught doing it?

PENELOW - DIRECT - RUSS

1    A.   Absolutely.

2    Q.   We've seen that MIR email quite a few times -- I know;

3    we're moving forward -- where New York is being compared to

4    Florida.

5         Do you remember that?

6    A.   Yes, yes.

7    Q.   Tell the jury what happened, in your experience, with MIR

8    forms.

9    A.   MIR forms were to be unsolicited questions.  Unsolicited

10   questions don't come up very often, but when you are launching

11   a drug, you would hope that they want to know something other

12   -- that is in the label, if they're curious, if they have a

13   patient with maybe something that's different.

14        We were told by Tony and Nancy that we needed to get

15   our MIR volume up because we were being compared to Florida,

16   as you saw in that email, and Texas and California, and our

17   number was way below theirs.

18        So we were instructed to go out and solicit the

19   questions as opposed to use it as an unsolicited resource.

20   Q.   We've seen a policy, Ms. Penelow, that says Janssen

21   doesn't let you -- you're not supposed to be soliciting these

22   things.

23        Do you know what I'm talking about?

24   A.   That's correct.

25   Q.   Why was it being done?

PENELOW - DIRECT - RUSS

1   A.   There was many policies at Janssen.  We had an ethics

2   policy.  We had compliance policy.  We had a policy for

3   everything.  That's not --

4   Q.   Hard stop.

5        Were they being followed or not?

6   A.   They were not being followed in the field.

7   Q.   Tell the jury why.

8   A.   Because the management was under so much pressure that

9   they felt that they needed to tell us to go off-label, use the

10  MIRs, and go out in the field and make the numbers.  Not only

11  was I fearing fir my job, I'm sure that they were fearing for

12  their jobs as well.

13  Q.   Moving right along, I want to talk to you about some of

14  these speakers.

15  A.   Okay.

16  Q.   Right?

17       Did you schedule speaker programs?

18  A.   Yes, I did.

19  Q.   Okay.

20       Tell the jury how that would work.

21  A.   Nancy was in charge of the speaker, and then I would be

22  in charge of filling the seats at the program, at the dinners.

23       So we would let the speaker pick the nicest, hottest

24  restaurant in New York City to do the program at.  It always

25  had to be in a private room, not that we always did it in

PENELOW - DIRECT - RUSS

1   private room, but that was the requirement.

2        And I would recruit for the program based on who the

3   speaker was, whether it was Nadim Salomon or Dr. Segal-Mauer

4   or Dr. Kaminsky.  Some of them were experts on Prezista.  Some

5   of them were experts on Intelence.

6        And then we would all get together, have a program

7   where it's supposed to be promotional.  Off-label information

8   and food and alcohol and everything was provided.

9   Q.   Estimate for us how many speaker programs you went to

10  when you were at Janssen.

11  A.   From 2006 to 2013, about probably close to a hundred.

12  Q.   So how many -- a couple a week?

13  A.   About two or three a week.

14  Q.   Okay.

15  A.   Yeah.

16  Q.   How many of those were at restaurants?

17  A.   I did some in the morning, breakfast.  Those were at

18  restaurants, but diners.  I did some at the hospital, but the

19  majority of them, I would say 80 percent, were at restaurants

20  at night.

21  Q.   Okay.

22        Let's understand that because we just heard -- when

23  Professor Sillup was on the stand, we heard about some of

24  these educational programs and early access and these types of

25  educational-type speeches.

PENELOW - DIRECT - RUSS

1          Right?

2    A.    Right.

3    Q.    You're saying roughly 80 percent of yours were in nice

4    restaurants?

5    A.    Yes.

6    Q.    Okay.

7          Were some of them in the Blue Water Grill in New York?

8    A.    Yes, Blue Water Grill.

9          MR. RUSS:  If we could pull up, just for Ms. Penelow,

10   opposing counsel, and Court, Relators' 1398, please.

11   BY MR. RUSS:

12   Q.    Do you recognize that photograph?

13   A.    I do.

14   Q.    What is it a photograph depicting?

15   A.    That is Blue Water Grill --

16   Q.    And you've heard --

17   A.    Union Square New York.

18   Q.    It's in Union Square?

19   A.    Yes.

20   Q.    Have you personally been to that restaurant?

21   A.    Multiple times.

22   Q.    Is that a true and accurate depiction of the restaurant?

23   A.    It is.

24          MR. RUSS:  Your Honor, we move to admit

25   Relators' 1319.

PENELOW - DIRECT - RUSS

```
 1          MS. BROWN:  No objection.

 2          THE COURT:  So admitted.

 3  (Relators' Exhibit 1319 in evidence.)

 4          MR. RUSS:  If we could publish this for the jury,

 5  please.

 6  BY MR. RUSS:

 7  Q.   Was this a one-time thing that you would have a speaker

 8  event at the Blue Water Grill?

 9  A.   No.  It was a very popular restaurant in New York City,

10  so we had many, many programs there.

11  Q.   Would sometimes doctors request where they wanted to

12  speak at a restaurant?

13  A.   Most of the time.

14  Q.   Again, for some details, which doctors would ask for

15  specific locations, in particular specific restaurants --

16  A.   Right.

17  Q.   -- to speak?

18  A.   Dr. Kaminsky was a foodie, so he would read his Zagat's

19  guide, and he would find out the new hottest restaurant.

20  That's how we would choose the restaurant for the speaker

21  program.

22  Q.   Did you --

23  A.   Dr. Salomon would do the same.

24  Q.   Dr. Salomon would do the same?

25  A.   Yeah.
```

PENELOW - DIRECT - RUSS

1  Q.  Okay.

2      We're going to talk about both of those physicians here

3  in a minute.

4      Did you also have speaker programs, dinners, at

5  Del Frisco's Manhattan?

6  A.  I did.

7  Q.  Okay.

8      MR. RUSS:  And if we could pull up for the witness,

9  the Court and opposing counsel Relators' 1403, please.

10  BY MR. RUSS:

11  Q.  Ms. Penelow, do you see on Relator's 1403 on the screen

12  in front of you?

13  A.  I do.

14  Q.  Do you recognize that as a true and accurate depiction of

15  Del Frisco's in Manhattan?

16  A.  I do.

17  Q.  Have you been to that location?

18  A.  I have.

19  Q.  Okay.

20      MR. RUSS:  Your Honor, we move to admit

21  Relators' 1403.

22      MS. BROWN:  No objection, Your Honor.

23      THE COURT:  So admitted.

24  (Relators' Exhibit 1403 in evidence.)

25  BY MR. RUSS:

PENELOW - DIRECT - RUSS

1  Q.  Ms. Penelow, was this also a location that doctors would

2  pick and say, I want to speak at Del Frisco's?

3  A.  Yes.  It's a very good steak house.

4  Q.  I'm sorry, it's a what?

5  A.  Very good steak house.

6  Q.  Dinner would be served?

7  A.  Dinner would be served.  It would be in the private room.

8  We're not showing the room in this picture, but there is a

9  very nice private room there.

10  Q.  Always all paid for by Janssen.  We've heard --

11  A.  Yes.

12  Q.  -- about that?

13  A.  Yes.

14  Q.  Okay.

15       MR. RUSS:  Let's look at for the witness, the Court,

16  and Janssen's counsel Relators' 1410, please.

17  BY MR. RUSS:

18  Q.  Ms. Penelow, do you recognize Relators' 1410 as Le Marais

19  in New York?

20  A.  I do.  That's the private room.

21  Q.  Have you been to that location?

22  A.  Many, many times.

23  Q.  True and accurate depiction of that restaurant?

24  A.  Yes, very, very nice restaurant.

25       MR. RUSS:  We move to admit Relators' 1410.

PENELOW - DIRECT - RUSS

1          MS. BROWN:  No objection, Your Honor.

2          THE COURT:  So admitted.

3   (Relators' Exhibit 1410 in evidence.)

4   BY MR. RUSS:

5   Q.   Same thing, Ms. Penelow, another location that physicians

6   would request to speak?

7   A.   Yes.

8   Q.   Okay.

9          Name some physician that wanted to speak at this

10  location.

11  A.   This was a Beth Israel favorite, so we had some of the

12  same ones that I mentioned before:  Dr. Salomon, Dr. Gomez,

13  John Weber, Dr. Koshy, Dr. Waldron, Dr. Bailey.

14         We would have repeat attendees because they loved the

15  restaurant so much.

16  Q.   When you say "repeat attendees," how do you know that?

17  A.   Well, I was at all the programs, so I was there, and they

18  would sign the sign-in sheets, and they would all come to many

19  of Dr. Salomon's programs.  He was the director of the

20  Peter Kruger Clinic at Beth Israel, and these were all his

21  subordinates.

22  Q.   Let me break that into a couple questions.

23         So were you responsible for going out and finding

24  attendees?

25  A.   Yes.

PENELOW - DIRECT - RUSS

1  Q.  And how would you go about finding people who were

2  interested to come eat a fancy meal?

3  A.  Well, once I told them that their boss was giving the

4  presentation, it wasn't so hard, and then secondly, the

5  restaurant was a drive.  So I think that they felt somewhat

6  obligated to come hear Dr. Salomon speak.

7  Q.  Make sure that we understand that.  Dr. Salomon had

8  subordinates?

9  A.  Yeah, they were all under -- underneath him, physicians

10 that worked underneath him.

11 Q.  Are you saying that Dr. Salomon would routinely speak to

12 his own subordinates --

13 A.  Yes they --

14 Q.  -- at the speaker program?

15 A.  Yes.  That's what I'm saying.

16 Q.  And Janssen would pay him to speak to the people that

17 work for him?

18 A.  Multiple times.

19 Q.  Roughly how many?

20 A.  Over ten.

21 Q.  Why was Janssen paying Dr. Salomon to speak at a

22 restaurant to his co-workers?

23 A.  I don't think that they looked at that.

24 Q.  What do you mean?

25 A.  I just don't think that they looked at the name of the

PENELOW - DIRECT - RUSS

1  attendees and analyzed whether or not they were at the same

2  institution, and it just -- I never got questioned on it.

3  Q.  When you say "they," where was compliance?

4  A.  Oh, I never saw compliance.

5  Q.  Ever?

6  A.  Ever.

7  Q.  Do you remember Ms. Graham saying the same thing?

8  A.  Yes.

9  Q.  Mr. Wilhelm?

10  A.  Yes.

11  Q.  You guys were, at different points in time, in different

12  parts of the country.

13       Right?

14  A.  We were.

15  Q.  You were in Manhattan, what, an hour away from the home

16  office?

17  A.  Yes.

18  Q.  And you don't remember compliance ever being at one of

19  your speaker programs?

20  A.  They never came to one of my programs.

21  Q.  Why were you and Ms. Bartnett arranging for so many

22  programs for the same attendees?

23  A.  To drive their numbers.  We were paying the physicians

24  for prescriptions.  Basically the more programs that we were

25  giving the doctors, the more prescriptions we were getting in

PENELOW - DIRECT - RUSS

1   return.

2   Q.   There's been some talk -- there was some testimony from

3   Professor Sillup about watching the prescription volume of

4   speakers.

5        Do you recall that testimony?

6   A.   Yes.

7   Q.   Did that happen in New York?

8   A.   Yes.

9   Q.   How did that happen?

10  A.   Tony and Tim would analyze these things after programs.

11  We got a target report from a third party every week that told

12  us our numbers and how many prescriptions were written by each

13  physician.

14       And they would do an analysis and tell us exactly

15  whether or not we've increased or decreased physician

16  prescriptions after the program.

17  Q.   Key distinction.  Did that include the speakers?

18  A.   Absolutely.

19  Q.   You would see the numbers?

20  A.   Yes, I would see the numbers.

21  Q.   Would Mr. Dolisi talk to the field about the numbers from

22  the speaker prescriptions?

23  A.   Yes, sure.

24  Q.   Would Ms. Bartnett?

25  A.   They would show charts all the time.

PENELOW - DIRECT - RUSS

1    Q.    Another way of saying that is they were being tracked?

2    A.    Yes, they were being tracked.

3    Q.    So you had Dr. Salomon, whose -- let me make sure I

4    understand -- requesting restaurants where he wanted to speak?

5    A.    Yes.

6    Q.    Bringing his co-workers?

7    A.    Yes.

8    Q.    You said maybe around ten times?

9    A.    At least.

10   Q.    At least.  Janssen is paying him to do that?

11   A.    Yes.

12   Q.    While ensuring these prescriptions?

13   A.    Yes.

14   Q.    Were they going up?

15   A.    Yes, they were.

16   Q.    Were there some doctors or prescribers whose

17   prescriptions didn't go up enough?

18   A.    Sure.  There was some.

19   Q.    Were you -- was there an instance where you had to give

20   somebody bad news that they weren't going to stay on the

21   speaker bureau?

22   A.    There was.  There was a situation where Nancy came to me

23   and told me that Dr. Bailey, who was also a physician at

24   Beth Israel Medical Center -- that he wasn't writing enough

25   Prezista and that he was going to be kicked off the speaker

PENELOW - DIRECT - RUSS

1   bureau.

2   Q.   So there was a Lloyd Bailey that Ms. Graham talked about.

3   A.   Different Bailey.

4   Q.   This is a different Bailey?

5   A.   Yes.

6   Q.   This is Dr. Juan Bailey.

7   A.   Juan Bailey.

8   Q.   Okay.

9        I want you to describe that incident where Ms. Bartnett

10  came to you and explained to you what the problem was --

11  A.   Okay.

12  Q.   -- with Dr. Juan Bailey's prescriptions.

13  A.   Okay.  We were at the Gramercy Diner on 17th.  I remember

14  it very clearly.  She told me that she didn't want to go to

15  Dr. Bailey and that I was to do it.  And she told me that I

16  could not tell him the truth as to why I was kicking him off

17  the speaker bureau.

18       So we were brainstorming as to what we were going to

19  tell him as to why we were kicking him off, and we came up

20  with just telling him that they were making the speaker

21  bureau -- we had a lot of speakers, obviously you've heard 150

22  speakers, that we were just making the speaker bureau smaller.

23       And he wasn't very happy when I told him.  I did go in

24  and tell him that, and he wasn't very happy about it.

25  Q.   Ms. Bartnett made you tell him?

PENELOW - DIRECT - RUSS

1    A.   She did make me tell him.  She wasn't going to do it.

2    Q.   She told you to lie?

3    A.   She told me to lie.

4    Q.   Did you lie?

5    A.   I did lie.

6    Q.   Why didn't you just tell him the truth, You're not

7    writing enough prescriptions?

8    A.   I still felt that at that time that whatever Nancy and

9    Tony said was the word of the law, and if Nancy told me to do

10   something, I did it.

11           MR. RUSS:  If we could pull up Relators' 42.  I

12   believe this is in evidence already.  If we could zoom in

13   under speaker bureau update.

14   BY MR. RUSS:

15   Q.   Ms. Penelow, I don't know if you recall this email.

16   Mr. Wilhelm talked about it.  We talked about the 150 speakers

17   and how quickly the 150 speakers' spots were filled and the

18   training.

19   A.   Right.

20   Q.   Do you remember that?

21   A.   Right.

22   Q.   Do you see -- we talked about San Francisco.  Mr. Wilhelm

23   talked about where that training was, The Palace in

24   San Francisco.

25           Do you remember that?

PENELOW - DIRECT - RUSS

1   A.   Uh-huh.

2   Q.   Do you see the one in Miami?

3   A.   Yes.

4   Q.   Have you ever been to the Biltmore Hotel in Coral Gables,

5   Florida?

6   A.   I have.

7        MR. RUSS:  If we could pull up for the witness,

8   opposing counsel, and the Court, Relators' 1411, please.

9   BY MR. RUSS:

10  Q.   Ms. Penelow, same question?  Is that a true and accurate

11  depiction of the Biltmore Hotel in Coral Gables, Florida?

12  A.   That is the Biltmore Hotel.

13       MR. RUSS:  Your Honor, we move Relators' 1411.

14       MS. BROWN:  I have no objection.

15       THE COURT:  So admitted.

16  (Relators' Exhibit 1411 in evidence.)

17  BY MR. RUSS:

18  Q.   Was this where, the best of your recollection, the

19  training for the speakers was held in Miami, which is a --

20  Coral Gables is a suburb?

21  A.   Exactly.

22  Q.   You've been to this hotel?

23  A.   I have.

24  Q.   It's pretty nice?

25  A.   Very nice hotel.  My cousin got married there.

PENELOW - DIRECT - RUSS

1  Q.  Okay.

2        Is this another location that Janssen would pay for

3  airfare and meals and travel and hotel for speakers?

4  A.  Yes.

5  Q.  Okay.

6        Let's talk about --

7        MR. RUSS:  You can pull that down, Ms. Johnson.

8  BY MR. RUSS:

9  Q.  Let's talk about those slides that I mentioned a bit ago.

10 A.  Okay.

11 Q.  This jury has heard a little bit about those homemade

12 slides.  How did Ms. Bartnett go about getting off-label

13 slides to speakers?

14 A.  Again, as I mentioned, Tim was very clinical and also

15 great with the computer, so her and Tim together would make

16 the slides.  They would take the results from the conferences

17 and the different updates that were being provided to the

18 physicians.

19        And they would make their own slides, and then they

20 would slip them into the approved slide deck, so that when

21 they got to that slide, they were able to talk off-label.

22 Q.  Was there sort of a prespeech meeting where you and

23 Ms. Bartnett would meet with the doctors to go over the

24 speech?

25 A.  Oh, every program.  She would give the speaker the slides

PENELOW - DIRECT - RUSS

1    that she would prepare.

2    Q.    How did that conversation work?  Give us an example.  A

3    name of a physician, please.

4    A.    Okay.

5    Q.    Right?

6          How did that work where you would sit down and give

7    them off-label slides, and what would you tell them?

8    A.    I remember a specific instance with Dr. Kaminsky because

9    he was in a rush that day, and we ended up staying with him

10   for an hour, and she asked me to come with her to go see Dr.

11   Kaminsky because we always did this together, and he had a

12   program that night.

13         And she had a flash drive, and that's where she would

14   keep all her off-label slides.  And we went into Dr.

15   Kaminsky's office.  He -- she wanted him to go over the slides

16   with her, and he said, I want you to just read them to me.

17         So she put her slide -- her flash drive into his

18   laptop, downloaded the slides on to his computer, so that that

19   night, he can present them to the attendees.

20         And she proceeded to go through the slides, and when

21   she got to the homemade slides, she just told him that there

22   would be someone in the audience that was going to ask a

23   question, if he could just reference these slides at that

24   point.

25   Q.    How did Mr. Bartnett -- Ms. Bartnett know that somebody

PENELOW - DIRECT - RUSS

1  in the audience was going to ask a question?

2  A.   The majority of the time we would put a plant in the

3  audience to ask an off-label question.

4  Q.   Okay.

5       The jury has heard a little about plants over the last

6  three weeks.  Explain that process.  How would you get

7  somebody to raise their hand or stand up and ask an off-label

8  question?

9  A.   Obviously those people I had good relationships with that

10  I was able to ask to come to the program.  Obviously they were

11  going to get a good dinner.  They were going to go to a good

12  restaurant, and all they had to do is ask an off-label

13  question to open up the conversation to off-label

14  conversations.

15       And that's what they would do.  So it would be as

16  simple as, Can you tell us a little bit about any of the new

17  lipid data that's out on the market, or what was taught at the

18  latest conference about lipids, or can you tell us a little

19  bit about Intelence QD.

20       And Nancy would have the slides in the slide deck ready

21  to go for him.

22  Q.   Why were you using plants to ask off-label information?

23  Why not just let the doctor speak on-label?

24  A.   Well, we would sometimes, and a lot of the times it

25  didn't come up.  A lot of questions just didn't get asked.

PENELOW - DIRECT - RUSS

1   And so after a while, we felt that we had to put a plant in

2   the audience to get the conversation to an off-label

3   conversation.

4   Q.   Why?

5   A.   Because we needed to have more than just the AIDS share

6   of patients.  In the experienced patient population, it was a

7   very different time.  Patients were actually doing better at

8   this time.

9        The ones that were really, really sick unfortunately we

10  had lost at that point.  So a lot of patients that were around

11  were on medication, and so we needed to move both drugs,

12  Prezista and Intelence, up the line earlier on.  And so it was

13  very important that we spoke about using them in naive

14  patients.

15  Q.   Did some of these doctors speak off-label on their own

16  without plants?

17  A.   I think once they got used to it, naturally sometimes it

18  would come out.

19  Q.   Okay.

20       But when you heard -- and how many of these about a

21  hundred or so speaker programs would you guess that you heard

22  off-label messages being delivered?

23  A.   I'd say most of them.  But, I mean, 80 to 90 percent.

24  Q.   And were you helping with Ms. Bartnett to get that

25  conversation going through these plants?

PENELOW - DIRECT - RUSS

1   A.   Yes, I was.

2   Q.   And through the off-label slides?

3   A.   I wasn't -- I didn't talk during the program.  This was

4   just beforehand.

5   Q.   Right.

6        Were you and Ms. Bartnett helping the physicians get to

7   an off-label message by giving them these off-label slides?

8   A.   Yes.

9   Q.   Was there any reason to do that other than to increase

10  sales?

11  A.   No.  That was the reason.

12  Q.   Why else would you do it?

13  A.   There would be no reason -- other reason besides raising

14  our numbers and making sure we didn't lose our jobs.

15  Q.   And you knew what your numbers were.

16       Right, Ms. Penelow?

17  A.   We were very aware.

18  Q.   They reminded you?

19  A.   They remind us weekly.

20  Q.   Did this -- did it work?  Did the sales go up?

21  A.   Sales went up.

22  Q.   And you kept doing it?

23  A.   Yes, we kept doing it.

24  Q.   Now, again, I think details matter, who are some of the

25  plants that you would ask to ask off-label questions?

PENELOW - DIRECT - RUSS

 1  A.    Nancy had a really good friend.  Like I said, she was in

 2  the city for ten years, so she knew a lot of people.  She had

 3  a very good friend Mark Miller, who was a nurse at

 4  St. Vincent's.

 5  Q.    Where was that, in Manhattan?

 6  A.    In Manhattan, yes, on the west side of Manhattan, lower

 7  west side.  And he would be a plant many, many times.  I don't

 8  know -- he must have gone to almost 50 programs.

 9       Nadim Salomon, who was a speaker, would also act as a

10  plant for us because he understood the process of what we were

11  trying to accomplish.

12  Q.    Is this the same Dr. Salomon that would pick the

13  restaurant that he wanted to go to?

14  A.    Yes.

15  Q.    And then invite his colleagues?

16  A.    Yes.

17  Q.    And Janssen would pay him to talk to his colleagues?

18  A.    Uh-huh.

19  Q.    He would be a plant for you?

20  A.    He would.

21  Q.    Did you -- did you personally ask --

22  A.    I did.

23  Q.    -- him to be a plant?

24  A.    I did.

25  Q.    How did that exchange happen?

PENELOW - DIRECT - RUSS

1   A.   I would say just like we did at your program and you were

2   able to go to the off-label slides, would you be willing to

3   ask that question at Dr. Kaminsky's program.

4        So they would go to each other's programs and ask these

5   questions for each other.

6        And then there was some -- a couple other off-label

7   plants, John Weber, my PA.  He was not a speaker.  He would

8   come to a lot of Dr. Nadim Salomon programs, and he would

9   pretty much always be the Prezista plant and ask about lipids.

10  Q.   How long do these dinner speeches last?

11  A.   Long, like two to four hours.

12  Q.   Okay.

13  A.   Yeah.

14  Q.   So the whole --

15  A.   The whole evening.

16  Q.   Okay.

17       Well, how long would the talk last?

18  A.   Oh, the talk.  45 minutes to an hour.

19  Q.   And you heard Ms. Brown asking Professor Sillup about his

20  hourly rate.

21  A.   Yes.

22  Q.   So for 45 minutes or so, these doctors were getting paid

23  anywhere between a thousand and $2,500?

24  A.   $2,500 was my speakers.

25  Q.   Your speakers get 2,500?

PENELOW - DIRECT - RUSS

1   A.   Yes.

2   Q.   Okay.

3        $2,500 an hour?

4   A.   Yes.

5   Q.   At restaurants that they would pick --

6   A.   Yes.

7   Q.   -- to speak to sometimes their own colleagues?

8   A.   Yes.

9   Q.   So if it's 45 minutes, you just -- you just said it would

10  sometimes lasts four hours.

11  A.   Yes.

12  Q.   Explain that.

13  A.   It was a very social time.  Again, I think HIV wasn't as

14  detrimental as it was a little bit earlier because patients --

15  it was a manageable disease.  Patients were doing well.

16       So it was a very cheery atmosphere.  Everybody was

17  drinking top shelf alcohol and nice bottles of wine, and

18  people stayed and socialized.

19  Q.   Janssen paid for it?

20  A.   And Janssen paid for it.

21  Q.   We've got a few more minutes here.

22       We've heard a little bit about the speaker selection.

23  A.   Okay.

24  Q.   All right.

25       Just to be clear, before this trial had you ever heard

PENELOW - DIRECT - RUSS

1   of the SAFE committee?

2   A.    I haven't.

3   Q.    But you were working at Janssen --

4   A.    I was.

5   Q.    -- six years?

6         And you don't recall hearing about the SAFE committee?

7   A.    No.

8   Q.    Did Ms. Bartnett recommend speakers?

9   A.    Most of the time.  She would come to me and ask me who

10  would be willing to speak off-label.  I had some conversations

11  with physicians such as John Weber, and he said, I would

12  rather be a plant, I don't want to be the one standing in the

13  front of the room speaking off-label, but I will be your

14  plant.

15        So I would make suggestions to Nancy, but she was in

16  charge of making the recommendations to the upper management.

17  Q.    So Ms. Bartnett would make recommendations for speakers

18  to the home office?

19  A.    Correct.

20  Q.    Are you aware of any time Ms. Bartnett's recommendations

21  were declined?

22  A.    Not very often.  Not that I can think of.

23  Q.    You can't think of any today?

24  A.    Today I can't think of any.

25  Q.    How would Ms. Bartnett choose who she was going to

PENELOW - DIRECT - RUSS

1    recommend to be a speaker?

2    A.    There was a lot of different criteria.  It could be a key

3    opinion leader.  It could be an institution that was well

4    respected, or it could be a high prescription writing

5    physician, or it could be a low prescription writing

6    physician, who she was looking to gain more prescriptions

7    from.

8    Q.    Do you recall that around the spring of 2006 the

9    PowerPoint slides that I went over with Ms. Graham about

10   targeting high prescribers of competitor drugs --

11   A.    Yes.

12   Q.    -- to be speakers?

13   A.    Yes.

14   Q.    And that was in New York?

15   A.    That was in New York.

16   Q.    Okay.

17        Was that -- was that one of the strategies that was

18   used to get prescriptions of Prezista was to target high

19   prescribers of the competitor drug?

20   A.    Sure.  We've all seen the slides this week.  We know that

21   switches are what needed to happen with Prezista, so we needed

22   those Reyataz patients.  So absolutely, that was one of the

23   criteria.

24   Q.    Not just Reyataz; we saw some high prescribers of

25   Kaletra?

PENELOW - DIRECT - RUSS

 1  A.   Kaletra as well.

 2  Q.   Okay.

 3          MR. RUSS:  Your Honor.

 4          THE COURT:  This is the spot.  Is this a good place

 5  to stop?

 6          MR. RUSS:  Yes, it is.

 7          THE COURT:  30 seconds.  You want 30 seconds?  That's

 8  not going to do anything for you, is it?

 9          MR. RUSS:  I'd probably just do something silly.

10          THE COURT:  All right.  Folks, we're going to pause

11  the trial or stop for the day.  Let's get the jurors home, and

12  we'll reboot tomorrow.

13          THE DEPUTY COURT CLERK:  All rise.

14          (The jury is excused.)

15          THE COURT:  Off the record.

16          (Court adjourned at 5:02 p.m.)

17

18

19

20

21

22

23

24

25

1              FEDERAL OFFICIAL COURT REPORTER'S CERTIFICATE.

2              - - - - - - - - - - - - - - - - - - - - -

3

4        I certify that the foregoing is a correct transcript from

5    the record of proceedings in the above-entitled matter.

6

7

8        I

9

10

11   /S/ Megan McKay-Soule, RDR, CRR    May 22, 2024

12            Court Reporter                        Date

13

14

15

16

17

18

19

20

21

22

23

24

25

*United States District Court*
*District of New Jersey*

## $

**$1.23** [1] - 2972:20
**$10,000** [1] - 3113:2
**$100** [1] - 2966:14
**$106** [1] - 2946:21
**$120** [1] - 3052:12
**$132** [2] - 2938:16, 2939:19
**$2,400** [2] - 3112:9, 3112:13
**$2,500** [3] - 3258:23, 3258:24, 3259:3
**$20,000** [2] - 3026:15, 3113:7
**$22** [1] - 2937:23
**$233** [2] - 2971:19, 2972:19
**$3** [1] - 3084:11
**$3.15** [1] - 3091:16
**$300** [1] - 2966:14
**$32,562** [1] - 2979:13
**$367** [1] - 2959:13
**$382** [1] - 2967:18
**$400** [8] - 2959:22, 2967:4, 2967:21, 3111:17, 3114:15, 3120:6, 3121:23, 3189:4
**$45** [2] - 2937:23, 3072:10
**$584** [2] - 2969:3, 2969:15
**$6,000** [1] - 3026:11
**$78** [1] - 2946:25
**$850** [2] - 3188:24, 3191:20
**$9,600** [1] - 3112:20
**$92** [7] - 2963:20, 2963:21, 2963:23, 2964:9, 3028:21, 3029:6, 3031:4
**$95** [1] - 2944:21

## '

**'07** [1] - 2947:2
**'Tibotec** [1] - 3021:9
**'With** [1] - 3021:6

## /

**/S** [1] - 3263:11

## 0

**08608** [1] - 2888:9
**09** [1] - 2956:14

## 1

**1** [8] - 2935:1, 2950:16, 2966:7, 3063:25, 3064:8, 3084:10, 3113:1, 3194:21
**1.3** [1] - 2972:15
**1.6** [1] - 2971:14
**10** [7] - 2963:7, 3009:2, 3028:24, 3030:20, 3050:14, 3172:23, 3172:24
**100** [3] - 3130:18, 3131:11
**106** [2] - 2946:4, 2946:9
**10:05** [1] - 2973:24
**10:10** [1] - 2978:11
**11** [1] - 3096:7
**112** [1] - 3190:8
**11:00** [1] - 3011:20
**12** [2] - 2989:5, 3050:14
**128** [5] - 2889:17, 2965:22, 2965:23, 2966:2, 2966:5
**12:15** [2] - 3013:20, 3064:10
**12:20** [1] - 3013:19
**12:30** [2] - 3013:15, 3013:18
**13** [1] - 3096:4
**130** [3] - 2955:8, 2955:9, 2957:24
**1319** [3] - 2889:24, 3240:25, 3241:3
**133** [1] - 2958:12
**1398** [1] - 3240:10
**14** [3] - 2915:25, 2953:17, 3106:22
**1403** [5] - 2889:24, 3242:9, 3242:11, 3242:21, 3242:24
**1410** [5] - 2889:25, 3243:16, 3243:18, 3243:25, 3244:3
**1411** [4] - 2889:25, 3251:8, 3251:13, 3251:16
**148** [1] - 2955:4
**149** [5] - 2889:20, 2973:12, 2973:20, 2978:21
**15** [2] - 2914:11, 2914:20
**150** [3] - 3249:21, 3250:16, 3250:17
**154** [1] - 2956:10
**156** [3] - 3175:21,

3179:5, 3179:6
**16** [4] - 2969:25, 2970:13, 3113:1, 3230:10
**1624** [2] - 2931:25, 2935:6
**163** [1] - 3200:2
**17** [2] - 2948:23, 2972:2
**1776** [4] - 2889:9, 2934:24, 2935:7, 2935:11
**1777** [6] - 2889:10, 2936:25, 2937:10, 2937:13, 2937:16, 2937:19
**1778** [1] - 2936:24
**1779** [7] - 2889:11, 2939:2, 2939:7, 2939:13, 2939:16, 2939:18
**1780** [3] - 2889:12, 2941:1, 2943:6
**1783** [3] - 2951:17, 2951:19, 2953:7
**1784** [5] - 2889:13, 2953:16, 2954:7, 2954:13, 2954:18
**1785** [10] - 2889:15, 2889:21, 2958:19, 2960:2, 2960:10, 2961:16, 2961:19, 2981:13, 2981:15, 2981:18
**1786** [6] - 2889:14, 2958:25, 2959:7, 2959:10, 2962:24
**1787** [10] - 2889:16, 2962:24, 2963:2, 2963:5, 2985:19, 3028:18, 3028:19, 3028:20, 3030:19
**1788** [6] - 2889:18, 2967:24, 2967:25, 2968:9, 2968:12
**1789** [4] - 2889:19, 2969:24, 2970:9, 2970:12
**179** [1] - 2988:17
**1791** [2] - 2980:25, 2981:13
**17th** [2] - 3212:16, 3249:13
**18** [1] - 2955:13
**19** [1] - 2949:1
**19,000** [1] - 3072:5
**1990** [1] - 3042:22
**1998** [1] - 3207:6
**1:00** [1] - 3064:10

## 2

**2** [4] - 2935:16, 2954:20, 3125:4, 3232:7
**2,500** [1] - 3258:25
**2.6** [1] - 2971:4
**20** [9] - 2914:20, 2914:24, 2917:3, 2949:20, 3009:2, 3043:13, 3053:25, 3074:22, 3075:2
**20,000** [2] - 3072:5, 3074:22
**2000** [1] - 3026:16
**2000s** [1] - 3209:11
**2001** [1] - 3209:14
**2004** [1] - 3043:2
**2006** [34] - 2937:21, 2940:4, 2941:4, 2946:8, 2950:1, 2991:12, 2999:9, 3003:7, 3003:17, 3008:2, 3070:22, 3071:9, 3072:9, 3073:10, 3073:14, 3078:1, 3080:21, 3106:22, 3163:18, 3163:21, 3165:10, 3165:16, 3165:23, 3215:10, 3215:11, 3216:4, 3216:18, 3219:11, 3224:10, 3224:19, 3226:5, 3230:23, 3239:11, 3261:8
**2007** [23] - 2936:14, 2938:15, 2939:23, 2940:3, 2940:10, 2943:8, 2946:4, 2946:9, 2946:12, 2947:11, 2948:7, 2949:15, 2950:1, 2951:2, 2951:14, 2990:22, 2991:23, 3073:14, 3074:7, 3074:11, 3074:17, 3080:21, 3225:10
**2008** [22] - 2945:22, 2946:16, 2946:18, 2950:1, 2953:17, 2954:23, 2955:3, 2955:22, 2956:6, 2958:11, 2963:10, 2990:22, 2991:7, 2991:16, 2991:24, 2999:10, 3005:15, 3017:1, 3070:23, 3073:14, 3073:15, 3230:10

## 2 (continued / column 5)

**2009** [21] - 2955:4, 2955:22, 2956:6, 2956:10, 2956:20, 2957:10, 2958:12, 2958:20, 2959:3, 2959:13, 2961:21, 2963:7, 2963:10, 2967:4, 2970:17, 2973:13, 2979:20, 2979:21, 2991:1, 2991:24, 3073:10
**2010** [30] - 2891:23, 2891:25, 2905:21, 2905:24, 2905:25, 2922:2, 2930:15, 2930:25, 2931:2, 2931:13, 2931:19, 2955:4, 2955:23, 2956:6, 2956:11, 2958:12, 2967:25, 2968:17, 2968:24, 2969:2, 2969:16, 2969:25, 2970:15, 2970:16, 2972:6, 2972:8, 2972:10, 3198:4, 3198:15
**2011** [5] - 2905:25, 2931:14, 2972:4, 2972:14, 3198:24
**2012** [7] - 2905:25, 2970:18, 2970:25, 2971:19, 2972:19, 3170:8, 3197:19
**2013** [10] - 2891:23, 2892:1, 2905:21, 2905:25, 2931:7, 2932:2, 2932:24, 3219:11, 3239:11
**2014** [3] - 3026:16, 3071:9, 3165:16
**2016** [1] - 3052:12
**2017** [1] - 3139:18
**2018** [1] - 2931:8
**2024** [3] - 2888:10, 2890:3, 3263:11
**207** [1] - 2972:15
**2083** [1] - 2994:13
**21** [1] - 3231:23
**22** [3] - 2888:10, 2890:2, 3263:11
**221** [1] - 2955:4
**223** [1] - 2956:10
**2253** [3] - 3133:10, 3133:16, 3203:10
**229** [2] - 2924:14, 2925:15
**22nd** [1] - 2943:8
**23** [1] - 2946:8
**24** [3] - 2956:14, 3107:21, 3209:1

**24/7** [2] - 3208:24, 3211:4
**25** [4] - 2956:20, 2957:23, 3041:12, 3078:15
**275** [6] - 2889:9, 2924:13, 2925:15, 2926:16, 2926:20, 2929:8
**28** [6] - 2945:22, 2946:16, 2946:18, 3040:11, 3043:23, 3044:20
**29** [8] - 2889:20, 2973:13, 2976:22, 2976:25, 2978:14, 2978:19, 2978:21, 2978:22
**2921** [1] - 2889:3
**2925** [1] - 2889:9
**2934** [1] - 2889:9
**2936** [1] - 2889:10
**2938** [1] - 2889:11
**2940** [1] - 2889:12
**2953** [1] - 2889:13
**2958** [1] - 2889:14
**2960** [1] - 2889:15
**2962** [1] - 2889:16
**2965** [1] - 2889:17
**2967** [1] - 2889:18
**2969** [1] - 2889:19
**2977** [1] - 2889:20
**2980** [1] - 2889:21
**2985** [1] - 2889:3
**2:06** [1] - 3100:24
**2:07** [1] - 3102:5
**2:30** [1] - 2919:8
**2:47** [1] - 3136:18
**2:49** [1] - 3138:8
**2nd** [1] - 3212:16

## 3

**3** [5] - 2944:1, 2967:3, 2967:10, 3029:23, 3084:10
**3,700** [1] - 3078:8
**3.7** [1] - 2970:17
**30** [15] - 2918:22, 3009:2, 3009:24, 3012:22, 3024:15, 3034:18, 3035:3, 3041:12, 3063:24, 3074:18, 3144:9, 3144:15, 3152:7, 3262:7
**30-page** [2] - 3195:7, 3195:10
**300** [1] - 3190:17
**301** [1] - 3196:24

**3013** [1] - 2889:22
**3018** [1] - 2889:23
**3025** [1] - 2889:4
**3040** [1] - 2889:5
**308** [1] - 2945:13
**30th** [1] - 2917:24
**31** [1] - 2947:11
**3102** [1] - 2889:5
**316** [2] - 3199:11, 3199:21
**3186** [1] - 2889:6
**3205** [1] - 2889:7
**3240** [1] - 2889:24
**3241** [1] - 2889:24
**3243** [1] - 2889:25
**3250** [1] - 2889:25
**332** [1] - 2955:4
**338** [1] - 2956:11
**35** [1] - 3094:23
**37,000** [1] - 3073:21
**3:00** [4] - 2919:9, 3093:1, 3093:12, 3143:7
**3:12-cv-07758-ZNQ-JBD** [1] - 2888:4
**3:30** [2] - 3093:1, 3093:12

## 4

**4** [8] - 2933:6, 2967:10, 2969:2, 2969:6, 2969:10, 3111:21, 3126:9, 3200:2
**4.3** [1] - 3091:12
**40** [2] - 3114:9, 3114:15
**40.3** [1] - 3084:14
**400** [1] - 3112:9
**402** [1] - 2888:9
**404(b** [1] - 2900:5
**42** [1] - 3250:11
**423** [4] - 2929:6, 3196:21, 3196:23, 3198:4
**43** [2] - 2955:8, 2957:24
**45** [6] - 3063:24, 3064:1, 3129:23, 3258:18, 3258:22, 3259:9
**45-minute** [1] - 3193:16
**47** [1] - 3082:1
**48** [2] - 2958:11, 3209:1
**48-week** [10] - 3087:13, 3107:8, 3107:16, 3108:8,

3108:11, 3108:13, 3109:4, 3109:19, 3110:7, 3110:19

## 5

**5** [4] - 2970:17, 2992:15, 3031:7, 3131:23
**50** [3] - 2938:7, 3052:18, 3257:8
**500,000** [1] - 3207:23
**53** [2] - 2950:23, 2950:25
**54** [2] - 3161:19, 3162:1
**56** [1] - 3198:7
**57** [2] - 3198:7, 3198:18
**5:00** [2] - 3093:17, 3143:8
**5:02** [1] - 3262:16
**5th** [1] - 3065:16

## 6

**6** [1] - 2926:22
**600** [1] - 2888:17
**609** [1] - 2888:24
**62** [1] - 2955:8
**657** [1] - 3091:6

## 7

**7** [4] - 2929:8, 2951:1, 3034:1, 3111:25
**7,000** [1] - 3072:5
**74** [1] - 3230:1
**750** [1] - 2888:17
**75201** [1] - 2888:17
**7th** [1] - 3065:17

## 8

**8** [3] - 2946:3, 2947:19, 2947:20
**80** [6] - 3052:16, 3074:18, 3220:24, 3239:19, 3240:3, 3255:23
**800** [2] - 2989:22, 3229:16
**800M** [1] - 2989:22
**801** [2] - 2910:12, 2915:21
**815-2319** [1] - 2888:24
**82** [3] - 2955:8, 2957:24, 3187:1
**85** [2] - 2958:12, 3220:24

**8560** [3] - 3195:5, 3195:9, 3195:13
**8976** [4] - 2889:22, 3010:25, 3014:5, 3014:8
**8977** [3] - 2889:23, 3018:5, 3019:14
**8:30** [2] - 2888:10, 2890:3

## 9

**9** [2] - 2888:5, 3111:21
**9/11** [1] - 3211:2
**90** [2] - 3148:2, 3255:23
**900** [2] - 2949:4, 3078:9
**920** [1] - 2888:21
**941** [1] - 2971:5
**963** [1] - 2972:15
**9:12** [2] - 2926:2, 2926:12

## A

**A&U** [1] - 3082:18
**a.m** [6] - 2888:10, 2890:3, 2926:2, 2926:12, 2973:24, 2978:11
**Aaron** [1] - 3054:7
**aback** [1] - 3218:17
**abide** [1] - 3008:17
**ability** [8] - 2911:2, 3049:19, 3057:9, 3062:11, 3134:8, 3201:4, 3204:21
**able** [23] - 2916:25, 2986:23, 3000:20, 3000:23, 3048:3, 3050:19, 3055:21, 3061:10, 3063:1, 3072:21, 3077:20, 3077:21, 3143:25, 3144:1, 3148:4, 3184:14, 3208:2, 3213:17, 3214:21, 3221:15, 3252:21, 3254:10, 3258:2
**abnormal** [1] - 3000:7
**abounds** [1] - 3136:13
**above-entitled** [1] - 3263:5
**absence** [2] - 2898:8, 2900:6
**absolutely** [20] - 2900:2, 2900:4, 2916:3, 2918:2, 2927:17, 2928:16,

2935:15, 2983:14, 3006:18, 3046:6, 3211:9, 3212:3, 3217:14, 3218:8, 3225:4, 3226:12, 3227:13, 3237:1, 3247:18, 3261:22
**academia** [4] - 3040:10, 3040:12, 3042:25, 3043:2
**academic** [6] - 3047:16, 3134:20, 3136:7, 3138:20, 3139:5, 3146:15
**Academic** [2] - 3135:25, 3136:12
**accent** [1] - 2916:11
**acceptable** [1] - 2944:9
**acceptance** [1] - 2894:25
**accepted** [1] - 2892:15
**access** [10] - 3021:8, 3041:23, 3055:18, 3100:8, 3100:12, 3119:17, 3172:13, 3218:19, 3218:25, 3239:24
**accessible** [1] - 2891:25
**accolades** [1] - 3224:12
**accomplish** [4] - 2939:19, 2940:2, 3069:10, 3257:11
**accomplished** [1] - 3025:6
**accordance** [1] - 2995:15
**according** [5] - 2928:12, 2938:20, 3035:5, 3035:6, 3035:12
**account** [2] - 3220:15, 3220:16
**accountability** [1] - 3007:10
**accountable** [5] - 3007:10, 3007:12, 3007:14, 3007:17, 3007:19
**accounted** [1] - 3027:17
**accurate** [8] - 2992:25, 3034:25, 3080:19, 3080:20, 3240:22, 3242:14, 3243:23, 3251:10
**accurately** [1] - 2944:13

accusation [1] - 3023:24
accuse [1] - 3193:10
accused [5] - 3102:23, 3103:2, 3103:10, 3103:15, 3184:21
achievable [1] - 3077:18
achieve [5] - 2964:11, 3074:11, 3074:17, 3077:4, 3083:20
achieving [1] - 2956:20
acquired [1] - 3044:14
acronym [1] - 3201:19
Act [3] - 2927:24, 2928:8, 2929:22
act [1] - 3257:9
acted [3] - 3010:22, 3021:2, 3024:13
action [4] - 3001:20, 3026:7, 3026:11, 3077:6
ACTION [1] - 2888:3
actions [5] - 2897:9, 3047:17, 3058:2, 3058:21, 3059:3
active [3] - 3058:8, 3059:2, 3059:4
actively [1] - 2963:24
activists [1] - 3008:6
activists' [1] - 3017:15
activities [2] - 3037:16, 3089:14
actual [12] - 2909:21, 2940:20, 2964:3, 2967:8, 2977:16, 3005:1, 3044:2, 3051:7, 3070:3, 3179:5, 3179:10, 3184:14
ADAM [1] - 2888:16
ADAPs [1] - 3009:6
add [1] - 3170:17
adding [2] - 3045:19, 3045:20
addition [6] - 2894:14, 3043:13, 3156:20, 3162:9, 3182:2, 3215:23
additional [7] - 2901:18, 3000:9, 3075:11, 3087:19, 3155:1, 3161:8, 3231:23
Additionally [1] - 3015:13
address [13] - 2893:21, 2893:24, 2896:18, 2914:18,

2918:3, 2918:18, 2975:10, 2978:9, 3021:8, 3064:3, 3157:18, 3157:19, 3157:20
addressable [3] - 3074:12, 3074:18, 3075:4
addressed [3] - 2916:22, 2920:16, 3023:10
addresses [1] - 2893:23
addressing [6] - 2894:8, 2900:23, 2910:3, 3070:14, 3074:13, 3175:2
adherence [1] - 3096:23
adjourn [1] - 2918:18
adjourned [1] - 3262:16
adjust [1] - 3079:7
adjusted [3] - 2937:22, 2938:1, 2938:2
adjusting [1] - 2918:25
adjustments [1] - 3095:12
administration [2] - 3206:19, 3207:12
Administration [10] - 2933:11, 3050:16, 3050:24, 3051:18, 3057:7, 3057:12, 3058:1, 3203:4, 3203:11, 3203:17
administrative [1] - 3052:13
admissibility [5] - 2906:6, 2914:3, 2915:25, 2978:3, 2978:7
admissible [7] - 2910:9, 2910:19, 2911:3, 2913:13, 2913:21, 2915:24, 2916:23
admission [4] - 2895:7, 2895:24, 2896:19, 2913:19
admissions [1] - 2913:11
admit [10] - 2898:11, 2899:11, 2914:15, 2978:18, 3014:4, 3141:15, 3240:24, 3242:20, 3243:25
admitted [31] -

2896:11, 2896:16, 2898:15, 2905:2, 2905:3, 2908:3, 2914:12, 2915:1, 2915:9, 2915:12, 2926:17, 2932:6, 2935:9, 2937:18, 2939:15, 2940:25, 2954:16, 2959:9, 2961:18, 2963:4, 2966:4, 2968:11, 2970:11, 2981:17, 3014:7, 3018:21, 3019:11, 3241:2, 3242:23, 3244:2, 3251:15
advance [1] - 2977:9
advanced [1] - 3073:7
adverse [7] - 3059:8, 3059:12, 3061:20, 3062:9, 3062:15, 3062:20, 3062:21
advertising [1] - 2973:17
advice [1] - 3154:14
advise [1] - 3008:19
advocated [1] - 3021:5
affairs [1] - 2926:24
affect [2] - 3061:21, 3166:10
affecting [1] - 3177:22
afford [1] - 3008:10
afoul [1] - 2900:21
afternoon [16] - 2895:18, 2905:9, 2919:18, 2920:1, 2921:9, 3093:2, 3093:13, 3093:16, 3102:15, 3102:16, 3102:17, 3143:5, 3163:10, 3205:22, 3205:23, 3206:2
agencies [3] - 2932:20, 3057:7, 3058:3
agency [2] - 2910:17, 3033:13
agent [4] - 2910:14, 2970:16, 2970:20, 2970:22
agents [1] - 3059:21
ago [8] - 2945:7, 3027:23, 3038:8, 3075:12, 3075:13, 3197:1, 3213:23, 3252:9
agree [48] - 2896:23, 2897:17, 2899:20, 2900:11, 2900:19,

2904:3, 2910:6, 2913:24, 2929:3, 2955:17, 2961:23, 2962:13, 2964:8, 2969:14, 3027:11, 3029:13, 3035:20, 3036:1, 3089:22, 3089:24, 3089:25, 3097:15, 3102:21, 3103:17, 3103:19, 3104:9, 3125:13, 3128:19, 3129:14, 3150:1, 3161:24, 3162:9, 3162:16, 3165:10, 3170:21, 3171:11, 3173:22, 3174:13, 3177:16, 3179:11, 3181:16, 3190:20, 3191:13, 3199:1, 3199:2, 3204:18
agreed [8] - 2945:10, 2946:13, 2958:17, 3109:2, 3109:18, 3109:24, 3132:17, 3158:16
agreeing [1] - 3145:18
agreement [45] - 2891:1, 2891:5, 2891:8, 2891:20, 2891:24, 2892:1, 2892:6, 2892:8, 2892:9, 2892:11, 2893:24, 2894:13, 2895:4, 2895:5, 2895:6, 2895:12, 2895:24, 2896:2, 2896:8, 2896:16, 2897:22, 2898:18, 2898:21, 2899:10, 2901:9, 2905:2, 2905:24, 2906:1, 2906:2, 2907:20, 2907:24, 2912:18, 2913:24, 2914:23, 2921:22, 2922:1, 2922:17, 2929:7, 2931:3, 2931:19, 2932:2, 2932:18, 3198:4, 3198:11, 3198:14
agreements [5] - 2897:20, 2901:19, 2901:21, 2901:23, 2928:22
ahead [4] - 2906:18, 2974:2, 2974:17, 3018:12
AHM [1] - 3097:11
aid [1] - 2996:21

Aid [1] - 3088:22
aided [1] - 2888:25
AIDS [10] - 2986:16, 3001:20, 3002:4, 3002:14, 3002:18, 3002:24, 3008:5, 3107:12, 3109:5, 3255:5
ain't [5] - 3125:22, 3127:2, 3128:11, 3128:12, 3192:4
airfare [1] - 3252:3
al [2] - 2888:4, 3027:1
albeit [3] - 3162:13, 3163:1
alcohol [2] - 3239:8, 3259:17
alert [3] - 2906:11, 2907:15, 2907:16
aligned [1] - 3057:19
alignment [1] - 3079:3
allegation [3] - 2908:12, 2950:4, 3024:6
allegations [19] - 2892:10, 2892:11, 2893:2, 2895:1, 2901:8, 2901:24, 2930:17, 2930:22, 2933:2, 2933:5, 2933:9, 2933:20, 2934:1, 2934:8, 2949:25, 3021:22, 3025:12, 3119:12, 3119:15
alleged [1] - 3022:24
allegedly [3] - 2933:17, 3069:9, 3142:5
Allergan [1] - 3221:3
Alli [1] - 2890:17
ALLISON [1] - 2888:19
allow [7] - 2932:9, 2961:2, 2978:1, 3056:1, 3077:4, 3109:11, 3150:17
allowed [5] - 2898:3, 2949:15, 3057:14, 3131:7, 3177:14
allowing [2] - 2909:14, 2960:5
allows [3] - 3066:20, 3171:16, 3171:23
almost [8] - 2895:5, 3025:23, 3087:22, 3113:2, 3113:6, 3129:22, 3149:25, 3257:8
alone [4] - 2971:19,

3077:8, 3127:1, 3231:22

**alongs** [2] - 3216:13, 3216:14

**alternative** [4] - 3055:9, 3056:24, 3059:25, 3061:16

**alternatives** [2] - 3072:13, 3087:3

**amaze** [1] - 3191:21

**America** [1] - 3181:13

**AMERICA** [1] - 2888:3

**Amit** [1] - 3134:8

**amount** [6] - 2893:8, 2958:7, 3000:9, 3050:9, 3076:25, 3138:20

**amounts** [4] - 2893:7, 2893:15, 2926:4, 2926:5

**analogy** [1] - 2902:12

**analyses** [1] - 3085:5

**analysis** [12] - 2910:7, 2912:22, 2912:24, 2941:8, 2973:13, 2973:14, 2974:4, 2980:13, 2980:23, 2989:8, 3175:6, 3247:14

**analytics** [3] - 2945:25, 2963:8, 3168:21

**analyze** [1] - 3247:10

**analyzed** [2] - 3181:22, 3246:1

**analyzing** [2] - 3084:8, 3217:22

**Andrew** [1] - 2890:13

**ANDREW** [1] - 2888:15

**Angel** [1] - 3228:18

**anger** [1] - 3216:24

**annually** [1] - 3009:13

**anonymous** [3] - 3229:11, 3229:12, 3229:13

**answer** [27] - 2913:22, 2936:16, 2943:5, 2952:21, 2984:13, 2985:1, 2985:2, 2992:4, 2998:19, 2999:3, 3000:19, 3000:20, 3000:23, 3005:22, 3010:4, 3010:8, 3022:8, 3024:4, 3033:17, 3034:4, 3038:22, 3039:5, 3057:1, 3109:24, 3184:14, 3224:25

**answered** [1] - 2906:25

**answering** [3] - 2936:15, 2973:19, 3001:2

**Anti** [5] - 2927:24, 2928:6, 2929:16, 2934:9, 3103:5

**Anti-Kickback** [5] - 2927:24, 2928:6, 2929:16, 2934:9, 3103:5

**anticipated** [1] - 2910:23

**anticipation** [1] - 3080:15

**Antiretroviral** [1] - 3233:4

**anyway** [3] - 3011:20, 3011:25, 3072:25

**apart** [1] - 2894:23

**apologies** [2] - 2947:8, 2947:9

**apologize** [5] - 2947:5, 2976:21, 3137:1, 3137:6

**appear** [5] - 2938:20, 2951:20, 2957:15, 2962:18, 3088:14

**appearances** [1] - 2890:7

**appeared** [1] - 3096:18

**applaud** [1] - 3010:21

**apples** [1] - 2975:8

**apply** [3] - 2911:1, 2911:19, 2911:24

**applying** [1] - 2911:21

**appointed** [1] - 3001:17

**appointment** [3] - 3042:8, 3042:12, 3213:15

**appreciate** [7] - 2896:13, 2901:3, 2920:2, 3138:7, 3144:6, 3152:3, 3186:8

**appreciates** [1] - 3054:20

**appreciative** [1] - 2895:19

**approach** [10] - 2891:12, 2895:12, 2942:10, 2968:17, 2968:18, 3054:17, 3091:2, 3091:22, 3103:24, 3136:16

**approached** [2] - 3103:20, 3115:12

**appropriate** [13] - 2903:15, 2925:17, 2986:25, 3016:15, 3053:6, 3057:2, 3061:13, 3105:20, 3105:21, 3109:24, 3110:23, 3128:7, 3184:2

**appropriately** [3] - 3105:21, 3176:9, 3176:23

**approvable** [1] - 3006:12

**approval** [18] - 2989:14, 2990:2, 2994:13, 3022:13, 3033:14, 3049:14, 3049:17, 3050:17, 3050:19, 3070:16, 3080:14, 3080:15, 3106:24, 3203:5, 3203:11, 3203:16, 3203:19, 3203:20

**approvals** [1] - 3033:9

**approved** [21] - 2892:13, 2933:10, 2993:19, 2993:25, 2996:25, 2997:18, 3004:19, 3010:16, 3032:11, 3032:16, 3033:5, 3045:11, 3051:3, 3066:24, 3074:25, 3075:2, 3075:11, 3080:23, 3132:9, 3133:14, 3252:20

**approves** [3] - 3057:12, 3200:20, 3200:21

**approving** [1] - 3032:24

**area** [17] - 3050:1, 3062:13, 3076:11, 3081:24, 3087:9, 3101:2, 3101:7, 3101:13, 3101:20, 3159:2, 3171:10, 3173:4, 3178:17, 3178:21, 3185:1, 3202:4, 3206:10

**areas** [7] - 2894:20, 3023:7, 3069:25, 3098:17, 3099:17, 3158:10, 3187:15

**arguing** [1] - 3204:10

**argument** [5] - 2897:4, 2899:24, 2910:19, 2910:25, 2975:13

**argumentative** [1] - 3204:13

**arguments** [1] - 2899:12

**arising** [1] - 2987:22

**ARPS** [1] - 2888:19

**arranging** [1] - 3246:21

**arrive** [1] - 2917:16

**arrow** [3] - 2990:17, 2990:20, 2991:22

**art** [2] - 3187:19, 3192:25

**article** [25] - 3139:24, 3140:7, 3142:3, 3145:3, 3145:22, 3147:3, 3147:17, 3148:10, 3148:12, 3149:3, 3151:12, 3152:21, 3153:11, 3154:7, 3154:8, 3155:10, 3155:21, 3156:6, 3156:12, 3156:22, 3157:12, 3158:2, 3186:21, 3186:22, 3187:9

**articles** [4] - 3157:22, 3158:1, 3158:5, 3187:1

**articulate** [1] - 3150:11

**articulated** [2] - 2987:12, 3150:7

**AS** [2] - 3039:22, 3205:14

**aside** [1] - 3191:17

**aspects** [2] - 2894:12, 2899:1

**aspiratory** [1] - 2967:8

**aspirins** [1] - 3053:2

**asserted** [2] - 2989:9, 3149:19, 3149:21, 3150:9

**assess** [3] - 3000:11, 3093:13, 3115:12

**assessing** [1] - 3162:14

**assessment** [5] - 3074:6, 3089:12, 3115:15, 3181:11, 3181:18

**assessments** [1] - 3191:13

**assigned** [1] - 3002:8

**assignment** [1] - 3003:1

**associated** [5] - 2954:22, 3020:23, 3077:1, 3198:5, 3200:9

**association** [1] - 3085:19

**assume** [2] - 2979:18, 3007:24

**assumed** [1] - 2987:23

**assumes** [1] - 2996:3

**assuming** [4] - 3000:18, 3003:24, 3004:2, 3026:20

**assumption** [5] - 2986:19, 2987:10, 2987:12, 2987:13, 3027:9

**atazanavir** [1] - 3232:25

**Atlantic** [2] - 3206:16, 3211:20

**atmosphere** [2] - 3224:12, 3259:16

**Attached** [1] - 2959:12

**attached** [7] - 2952:17, 2952:19, 2954:21, 2967:2, 2968:22, 3187:1, 3190:17

**attaches** [1] - 2968:2

**attachment** [15] - 2935:16, 2937:10, 2939:2, 2952:8, 2952:12, 2952:15, 2953:2, 2953:16, 2953:20, 2962:25, 2969:2, 2969:6, 2969:22, 3231:4, 3232:6

**attack** [6] - 3145:7, 3145:9, 3146:8, 3146:11, 3149:13

**attacking** [2] - 3146:17, 3148:13

**attain** [1] - 2948:1

**attained** [2] - 2946:9, 2946:25

**attempt** [4] - 2901:12, 2902:24, 3022:7, 3061:20

**attempting** [2] - 2898:3, 3137:15

**attend** [3] - 2927:7, 3063:23, 3189:13

**attendance** [3] - 3065:25, 3099:11, 3179:14

**attended** [1] - 3065:15

**attendees** [6] - 3244:14, 3244:16, 3244:24, 3246:1, 3246:22, 3253:19

**attending** [6] - 2927:8, 2927:10, 3100:12, 3177:22, 3179:1, 3199:15

**attention** [9] -
2934:17, 2943:7,
2987:19, 3023:14,
3037:15, 3038:9,
3038:18, 3106:14,
3195:1
**attorneys** [2] - 3030:8,
3159:11
**attracted** [2] -
3042:16, 3207:9
**attractive** [2] -
3215:18, 3234:15
**attributable** [1] -
2943:25
**audience** [13] -
2936:11, 2936:13,
2936:16, 3090:14,
3091:3, 3176:16,
3176:24, 3177:3,
3253:22, 3254:1,
3254:3, 3255:2
**audio** [7] - 3125:4,
3125:5, 3126:11,
3132:1, 3193:1,
3193:6, 3194:19
**August** [5] - 2953:17,
2954:22, 2969:25,
2970:15, 2972:8
**author** [6] - 3147:4,
3147:19, 3148:5,
3148:11, 3151:12,
3153:15
**authored** [1] - 3147:25
**available** [9] - 3008:8,
3045:16, 3051:20,
3076:21, 3078:13,
3083:24, 3133:24,
3134:1, 3167:16
**Avandia** [2] - 3210:2,
3210:3
**average** [3] - 2979:20,
2980:4, 3076:10
**averaging** [1] - 3112:7
**aw** [2] - 2946:17,
2998:1
**aware** [37] - 2898:6,
2901:7, 2902:12,
2904:16, 2922:16,
2922:21, 2923:1,
2927:13, 2930:14,
2931:10, 2931:21,
2934:6, 2981:1,
2981:3, 3021:21,
3022:2, 3026:3,
3026:6, 3026:10,
3058:2, 3058:21,
3059:11, 3059:14,
3140:24, 3148:5,
3165:21, 3179:3,
3188:9, 3188:25,

3191:17, 3196:5,
3197:20, 3200:13,
3202:11, 3224:16,
3256:17, 3260:20
**awareness** [7] -
2919:2, 3053:22,
3054:8, 3178:4,
3182:16, 3182:24,
3183:5

# B

**bachelor's** [2] -
3043:18, 3187:11
**backdoor** [1] - 2902:7
**backed** [1] - 3170:13
**background** [2] -
3040:16, 3042:24
**backwards** [1] -
2991:21
**bad** [13] - 2938:2,
2938:5, 2938:9,
3027:10, 3034:5,
3035:24, 3084:12,
3098:16, 3114:9,
3149:5, 3188:6,
3219:1, 3248:20
**bagging** [1] - 2918:21
**Bailey** [8] - 3244:13,
3248:23, 3249:2,
3249:3, 3249:4,
3249:6, 3249:7,
3249:15
**Bailey's** [1] - 3249:12
**balance** [6] - 2961:7,
2997:1, 3157:18,
3157:19, 3157:20,
3158:9
**balances** [5] - 3022:9,
3023:3, 3036:10,
3036:20, 3036:24
**ball** [1] - 2909:9
**band** [1] - 3059:22
**bar** [1] - 2950:7
**bared** [1] - 3122:2
**barrier** [2] - 3083:16
**Bartnett** [42] -
3119:12, 3119:15,
3119:23, 3122:14,
3127:19, 3128:20,
3130:10, 3130:14,
3131:15, 3132:21,
3193:6, 3193:12,
3193:19, 3196:4,
3218:13, 3219:3,
3219:8, 3220:12,
3220:15, 3220:20,
3220:23, 3220:25,
3221:25, 3225:21,
3226:11, 3226:12,

3227:14, 3234:20,
3234:23, 3246:21,
3247:24, 3249:9,
3249:25, 3252:12,
3252:23, 3253:25,
3255:24, 3256:6,
3260:8, 3260:17,
3260:25
**Bartnett's** [1] -
3260:20
**base** [2] - 3007:16,
3129:2
**based** [31] - 2899:12,
2938:23, 2953:20,
2979:15, 2979:17,
2987:16, 2996:15,
3003:14, 3005:9,
3053:21, 3057:12,
3058:20, 3061:2,
3079:21, 3086:7,
3095:21, 3098:9,
3099:6, 3115:1,
3121:9, 3125:15,
3129:9, 3146:13,
3146:15, 3146:24,
3150:3, 3154:14,
3159:25, 3187:9,
3199:23, 3239:2
**basis** [12] - 2910:21,
2910:25, 2912:15,
2924:1, 2958:9,
3031:18, 3037:23,
3056:12, 3063:12,
3075:23, 3150:11,
3156:15
**bear** [2] - 2969:22,
2996:6, 3040:16
**beat** [1] - 3185:2
**beating** [1] - 2907:8
**became** [5] - 3003:25,
3044:3, 3132:8,
3224:6
**become** [1] - 3054:20
**becomes** [2] -
3045:19, 3076:12
**becoming** [1] - 3051:3
**BEEN** [3] - 3039:21,
3205:13
**beforehand** [1] -
3256:4
**began** [4] - 2922:2,
2930:25, 2943:7,
3196:11
**begin** [5] - 2890:25,
3061:17, 3079:21,
3091:4, 3137:11
**beginning** [10] -
2890:8, 2939:23,
2995:3, 3042:8,
3101:6, 3132:3,

3216:23, 3221:9,
3224:18, 3233:12
**begins** [4] - 2926:2,
2973:24, 3100:24,
3136:18
**begun** [2] - 3042:22,
3042:23
**behalf** [3] - 2902:19,
3009:5, 3202:9
**behavior** [9] -
3043:19, 3043:20,
3047:9, 3089:15,
3089:21, 3097:3,
3097:12, 3099:5,
3204:6
**behind** [7] - 2896:20,
2945:9, 3088:22,
3172:1, 3236:19,
3236:20, 3236:21
**belabor** [3] - 3040:15,
3048:8, 3085:24
**belief** [3] - 2954:10,
3120:21, 3217:12
**believes** [2] - 3015:14,
3194:24
**bell** [2] - 3168:13,
3168:22
**below** [10] - 2929:9,
2929:11, 2944:19,
2989:19, 2995:14,
2995:18, 2996:19,
2996:24, 3164:18,
3237:17
**Ben** [2] - 2952:2,
3049:4
**benchmark** [1] -
3094:7
**benefits** [2] - 3053:8,
3214:21
**best** [3] - 2891:9,
3229:15, 3251:18
**Beth** [5] - 3212:15,
3215:22, 3244:11,
3244:20, 3248:24
**better** [7] - 2912:21,
2914:9, 2960:13,
3068:7, 3073:4,
3214:14, 3255:7
**between** [19] - 2902:5,
2905:21, 2906:12,
2931:19, 2932:18,
2967:5, 2975:17,
2998:22, 3016:11,
3026:15, 3072:4,
3074:18, 3087:25,
3093:1, 3093:12,
3116:1, 3203:3,
3231:17, 3258:23
**beyond** [20] - 2991:1,
2991:25, 3044:6,

3061:10, 3063:8,
3063:9, 3066:24,
3070:15, 3075:11,
3077:6, 3079:23,
3080:23, 3087:23,
3090:11, 3091:22,
3096:18, 3100:13,
3110:8, 3110:9,
3175:4
**big** [6] - 2950:24,
3077:25, 3078:8,
3212:14, 3221:12,
3222:17
**biggest** [2] - 3003:18,
3026:18
**bill** [1] - 3057:17
**billion** [9] - 2970:17,
2971:4, 2971:14,
2972:3, 2972:11,
2972:15, 2972:20,
3052:12
**Biltmore** [3] - 3251:4,
3251:11, 3251:12
**binder** [1] - 3236:9
**bio** [1] - 3153:5
**bit** [34] - 2906:4,
2916:24, 2941:3,
2941:5, 2944:10,
2989:6, 3001:9,
3003:4, 3003:5,
3015:6, 3016:25,
3046:12, 3051:14,
3111:20, 3134:19,
3158:11, 3163:25,
3167:17, 3206:7,
3206:23, 3211:4,
3216:7, 3218:17,
3219:25, 3222:7,
3226:14, 3229:24,
3231:1, 3252:9,
3252:11, 3254:16,
3254:19, 3259:14,
3259:22
**bite** [1] - 3191:6
**bite-sized** [1] - 3191:6
**blank** [2] - 3101:3,
3196:12
**bless** [1] - 3098:25
**blinded** [1] - 3051:6
**blood** [5] - 3004:1,
3008:12, 3044:8,
3051:17
**blow** [4] - 2968:13,
2979:9, 3032:6,
3096:1
**Blue** [4] - 3240:7,
3240:8, 3240:15,
3241:8
**BMS** [8] - 3211:11,
3211:13, 3212:9,

3212:12, 3214:11, 3214:16, 3214:23, 3214:24
**board** [16] - 2941:7, 2941:11, 2941:17, 2941:20, 2941:22, 2941:23, 2941:24, 2941:25, 2969:25, 2970:1, 2970:4, 3089:11, 3165:6
**Boca** [1] - 3206:16
**bodies** [2] - 3001:18, 3010:21
**bold** [2] - 3088:8, 3108:22
**bond** [1] - 3062:23
**bones** [2] - 3208:23, 3209:3
**bonuses** [3] - 3005:6, 3167:12, 3169:20
**books** [1] - 3227:3
**boosted** [2] - 3231:22, 3231:23
**born** [1] - 3206:9
**boss** [1] - 3245:3
**bother** [1] - 3217:1
**bothered** [1] - 3105:5
**bothers** [1] - 3088:8
**bottle** [1] - 3053:2
**bottles** [1] - 3259:17
**bottom** [25] - 2930:1, 2943:9, 2947:21, 2949:3, 2949:8, 2952:5, 2955:20, 2958:11, 2967:21, 2968:19, 2987:20, 2994:19, 3021:1, 3028:25, 3029:1, 3045:10, 3046:3, 3074:16, 3076:20, 3091:15, 3175:5, 3179:12, 3179:13, 3197:17
**box** [3] - 2989:18, 3068:13
**BP** [1] - 2943:20
**Brachman** [1] - 3200:4
**Brad** [2] - 2890:21, 3228:17
**BRADLEY** [1] - 2888:20
**brainstorming** [1] - 3249:18
**Brancaccio** [22] - 2925:14, 2982:21, 3049:2, 3076:17, 3117:23, 3119:8, 3120:3, 3122:13, 3126:6, 3126:14, 3127:18, 3128:19,

3133:15, 3166:24, 3193:1, 3193:5, 3193:11, 3193:19, 3195:22, 3223:8, 3228:17, 3236:3
**Brancaccio's** [1] - 3169:15
**brand** [1] - 3085:15
**brands** [2] - 3170:8, 3197:18
**breached** [1] - 3088:5
**breadth** [1] - 2943:13
**break** [32] - 2918:15, 2919:3, 2919:6, 2919:9, 2919:10, 2919:12, 2919:15, 2919:17, 2919:20, 2920:1, 2920:3, 2920:4, 2924:18, 3011:17, 3011:20, 3011:21, 3013:14, 3013:16, 3013:19, 3013:25, 3063:22, 3064:8, 3092:25, 3093:3, 3093:12, 3093:14, 3143:3, 3143:5, 3143:9, 3154:23, 3227:24, 3244:22
**breakdown** [2] - 2967:11, 3069:11
**breaker** [1] - 3231:16
**breakfast** [1] - 3239:17
**breakout** [1] - 3069:15
**breaks** [3] - 2919:22, 2967:12, 3112:2
**bribe** [1] - 3021:25
**bribery** [1] - 3103:5
**bribing** [1] - 3103:2
**bridesmaid** [1] - 3116:19
**brief** [1] - 2919:14
**Brief** [6] - 2891:16, 2976:3, 2976:8, 3024:18, 3186:5, 3202:24
**briefed** [1] - 2975:10
**briefly** [12] - 2896:5, 3024:23, 3042:7, 3044:2, 3047:11, 3049:14, 3051:1, 3059:5, 3065:12, 3072:3, 3195:8, 3203:22
**bring** [2] - 3043:15, 3195:8
**bringing** [5] - 2902:10, 2902:19, 3012:11, 3044:11, 3248:6

**brings** [1] - 3047:20
**Bristol** [6] - 3211:14, 3213:3, 3215:12, 3215:21, 3224:9, 3224:11
**Bristol-Myers** [3] - 3211:14, 3213:3, 3215:12
**broader** [3] - 2936:11, 2936:13, 2936:16
**broadly** [1] - 3010:18
**broke** [7] - 3009:10, 3125:22, 3127:2, 3128:10, 3128:11, 3128:12, 3192:4
**broken** [1] - 3208:23
**brought** [9] - 2901:8, 2901:24, 2902:6, 2930:23, 3023:14, 3037:15, 3038:9, 3038:17, 3194:25
**Brown** [26] - 2890:17, 2917:18, 2918:7, 2920:8, 3041:7, 3102:8, 3103:8, 3141:20, 3143:14, 3144:8, 3145:14, 3151:2, 3151:11, 3152:17, 3154:21, 3186:9, 3190:23, 3194:1, 3197:1, 3197:17, 3199:4, 3203:3, 3203:9, 3204:2, 3236:3, 3258:19
**BROWN** [102] - 2888:19, 2889:5, 2890:17, 2917:19, 2917:25, 2918:2, 2918:5, 2918:9, 2918:12, 2920:9, 2920:13, 3040:18, 3040:24, 3041:8, 3041:14, 3064:18, 3067:14, 3067:19, 3101:25, 3102:3, 3102:10, 3102:13, 3102:17, 3102:18, 3103:9, 3104:23, 3104:25, 3109:13, 3116:8, 3116:11, 3116:12, 3123:11, 3124:25, 3125:3, 3125:6, 3126:8, 3126:12, 3131:22, 3131:25, 3132:2, 3136:23, 3137:1, 3137:6, 3137:17, 3137:22, 3138:7, 3138:11, 3138:12,

3141:10, 3141:13, 3141:16, 3141:22, 3142:12, 3142:15, 3142:18, 3142:20, 3142:23, 3143:3, 3143:22, 3143:25, 3144:9, 3144:11, 3144:14, 3144:19, 3144:22, 3145:1, 3150:21, 3150:23, 3150:25, 3151:3, 3151:5, 3151:7, 3151:13, 3151:19, 3151:22, 3151:24, 3152:2, 3152:7, 3152:18, 3152:19, 3153:7, 3153:9, 3153:24, 3154:3, 3154:24, 3154:25, 3167:20, 3167:21, 3183:10, 3183:13, 3183:14, 3185:5, 3185:7, 3185:8, 3186:1, 3186:4, 3186:6, 3204:12, 3241:1, 3242:22, 3244:1, 3251:14
**brown** [1] - 2918:21
**bucket** [1] - 2988:23
**budget** [2] - 3079:16, 3080:8
**budgets** [1] - 3051:15
**Building** [1] - 2888:8
**building** [3] - 2898:20, 3221:18, 3221:20
**built** [5] - 2958:15, 2979:25, 2980:2, 3076:20, 3233:22
**bullet** [6] - 2971:3, 2989:21, 2994:19, 2996:24, 2997:5
**bullets** [4] - 2994:20, 2995:18, 2995:24, 2997:13
**bunch** [1] - 2998:10
**bureau** [16] - 2973:7, 3022:1, 3090:19, 3180:16, 3180:20, 3183:18, 3184:3, 3184:7, 3184:13, 3184:20, 3248:21, 3249:1, 3249:17, 3249:21, 3249:22, 3250:13
**Bureau** [7] - 3068:15, 3084:2, 3084:4, 3084:5, 3084:25, 3085:22, 3199:23
**bureaus** [2] - 3068:16, 3180:12

**burned** [2] - 3194:6, 3194:12
**Bush** [1] - 3002:10
**Bush's** [1] - 3001:20
**business** [21] - 2928:13, 2928:23, 2929:2, 2929:17, 2945:25, 2961:8, 2963:8, 2981:9, 2982:4, 2983:4, 2992:21, 3024:10, 3024:11, 3043:8, 3045:23, 3045:25, 3046:20, 3098:6, 3168:21, 3207:12
**Business** [2] - 3043:5, 3043:12
**but..** [1] - 2970:2
**Butterfield** [6] - 3018:15, 3018:18, 3019:16, 3019:23, 3025:24, 3026:8
**buy** [1] - 3053:2
**buying** [1] - 3058:17
**BY** [112] - 2888:14, 2888:19, 2889:3, 2889:3, 2889:4, 2889:5, 2889:5, 2889:6, 2889:7, 2921:18, 2925:10, 2926:21, 2928:20, 2929:10, 2932:16, 2933:8, 2934:25, 2935:17, 2937:1, 2937:20, 2939:5, 2939:17, 2941:2, 2951:25, 2952:7, 2953:1, 2953:15, 2954:19, 2959:11, 2960:3, 2960:9, 2961:20, 2963:6, 2966:6, 2968:15, 2969:7, 2970:14, 2978:23, 2979:11, 2981:19, 2984:16, 2985:8, 2985:12, 2985:18, 2996:13, 3011:2, 3011:6, 3011:12, 3014:9, 3014:14, 3018:13, 3018:25, 3019:15, 3019:21, 3021:20, 3025:2, 3028:16, 3028:22, 3030:21, 3031:8, 3032:2, 3032:8, 3034:2, 3037:20, 3038:6, 3040:5, 3042:5, 3065:11, 3067:20, 3093:20, 3094:25,

3096:2, 3102:13,
3102:18, 3103:9,
3104:25, 3109:13,
3116:12, 3123:11,
3125:6, 3126:12,
3132:2, 3138:12,
3152:19, 3153:9,
3154:3, 3154:25,
3167:21, 3183:14,
3185:8, 3186:6,
3186:12, 3196:25,
3198:8, 3199:12,
3200:3, 3202:25,
3204:17, 3205:21,
3230:3, 3232:9,
3234:3, 3240:11,
3241:6, 3242:10,
3242:25, 3243:17,
3244:4, 3250:14,
3251:9, 3251:17,
3252:8

# C

**C159** [1] - 3094:15
**Cabrini** [1] - 3218:11
**Cadet** [1] - 3228:18
**calculate** [4] -
2975:16, 2976:15,
2980:17, 2980:19
**calculated** [3] -
2979:13, 3075:14,
3091:11
**calculating** [2] -
2979:24, 3075:23
**calculation** [13] -
2944:21, 2975:25,
2977:2, 2977:17,
2978:24, 2979:2,
2979:15, 2980:5,
2980:9, 2980:10,
2980:19, 3084:1,
3091:15
**calculations** [1] -
2945:8
**calendar** [1] - 2940:3
**California** [1] -
3237:16
**callout** [1] - 2989:18
**cancer** [1] - 3068:10
**Cancun** [1] - 3233:4
**candid** [1] - 2909:13
**cannot** [2] - 3024:11,
3030:23
**capability** [3] - 3054:2,
3054:21, 3063:9
**capitalize** [1] - 2961:2
**caps** [1] - 3181:4
**capture** [5] - 3069:7,
3074:3, 3074:18,

3174:20, 3175:1
**captured** [1] - 3072:23
**capturing** [2] -
2938:24, 2958:16
**cardiac** [2] - 3062:2
**cardiologists** [1] -
3209:23
**cardiology** [1] -
3208:13
**care** [4] - 3015:8,
3015:18, 3098:13,
3115:11
**career** [6] - 2986:21,
3001:10, 3002:23,
3067:3, 3180:12,
3224:24
**careful** [9] - 2915:22,
3029:18, 3030:14,
3079:3, 3088:11,
3088:14, 3172:4,
3178:25, 3180:19
**carefully** [2] - 3050:7,
3181:22
**Carolina** [2] - 3018:15,
3208:3
**carried** [1] - 2983:8
**carry** [2] - 2916:21,
3113:1
**case** [98] - 2900:1,
2902:2, 2902:15,
2902:18, 2902:19,
2902:24, 2902:25,
2903:5, 2903:14,
2903:20, 2904:11,
2904:16, 2908:8,
2909:6, 2909:16,
2910:21, 2910:25,
2912:7, 2912:15,
2916:14, 2928:3,
2950:1, 2964:10,
2986:18, 3021:22,
3022:24, 3023:22,
3024:7, 3029:10,
3031:5, 3046:23,
3048:7, 3048:17,
3053:11, 3054:12,
3055:25, 3056:11,
3062:16, 3062:16,
3065:16, 3066:6,
3066:9, 3067:1,
3068:20, 3069:9,
3069:17, 3072:2,
3078:23, 3084:21,
3086:4, 3089:11,
3090:14, 3093:25,
3094:4, 3094:19,
3098:9, 3098:23,
3099:12, 3100:7,
3100:14, 3115:1,
3116:1, 3118:3,

3120:8, 3121:18,
3123:1, 3123:8,
3124:3, 3128:1,
3128:14, 3129:9,
3130:21, 3133:1,
3133:21, 3155:22,
3158:23, 3159:21,
3162:6, 3162:17,
3165:16, 3166:23,
3177:10, 3182:25,
3186:15, 3188:10,
3188:16, 3189:25,
3190:9, 3191:14,
3192:20, 3196:8,
3202:13, 3206:4,
3217:20
**case-by-case** [3] -
2910:21, 2910:25,
2912:15
**cases** [7] - 2897:3,
2901:6, 2901:13,
2901:24, 2902:1,
2902:6, 2910:5
**caskets** [1] - 3008:11
**casting** [1] - 3071:25
**CAT** [1] - 2945:21
**Catalla** [1] - 3200:5
**categorically** [1] -
3023:9
**categories** [1] -
3175:7
**category** [1] - 3061:18
**Catherine** [3] -
2924:3, 2924:4,
3049:4
**caught** [1] - 3236:25
**causation** [1] -
3121:13
**caused** [9] - 2978:5,
3004:9, 3047:2,
3047:5, 3098:24,
3099:1, 3137:19,
3138:15, 3176:1
**causes** [1] - 2976:24
**cautious** [2] -
2899:16, 2900:3
**ceases** [1] - 3191:21
**Center** [2] - 3212:15,
3248:24
**center** [2] - 3212:17,
3222:18
**Central** [1] - 3206:15
**centrally** [1] - 3224:6
**CEO** [1] - 3006:6
**certain** [17] - 2999:10,
3023:7, 3023:13,
3038:19, 3038:23,
3050:5, 3056:6,
3057:24, 3059:8,
3068:10, 3069:21,

3072:4, 3090:13,
3137:19, 3138:15,
3145:20, 3198:9
**certainly** [11] - 2934:2,
2981:25, 3003:1,
3056:19, 3061:14,
3077:5, 3114:14,
3135:6, 3149:3,
3199:25, 3219:20
**certainty** [2] - 3099:8,
3099:10
**CERTIFICATE** [1] -
3263:1
**certify** [1] - 3263:4
**cetera** [1] - 2900:13
**chair** [1] - 3080:4
**challenge** [3] -
3060:18, 3097:10,
3166:20
**challenged** [1] -
2994:21
**challenging** [3] -
3015:7, 3072:19,
3098:18
**chambers** [1] -
3041:24
**chance** [1] - 2891:11
**change** [6] - 2913:3,
2950:2, 2995:25,
3097:12, 3126:21,
3128:9
**changed** [6] -
2994:21, 2995:7,
3032:21, 3065:24,
3073:15, 3099:10
**changes** [4] -
2995:13, 2995:24,
3232:13, 3232:19
**changing** [1] - 2921:8
**character** [2] - 3145:7,
3148:14
**characterize** [3] -
2944:13, 3038:5,
3086:19
**characterized** [1] -
2965:15
**charge** [11] - 3009:19,
3045:18, 3134:9,
3189:4, 3189:13,
3221:11, 3222:18,
3238:21, 3238:22,
3260:16
**charged** [1] - 3009:23
**charges** [1] - 3188:24
**charging** [4] -
3111:11, 3111:14,
3111:25, 3116:14
**chart** [9] - 2939:10,
2939:11, 2950:7,
2985:19, 2990:8,

2991:21
**charts** [1] - 3247:25
**chat** [3] - 2890:6,
2917:15, 3163:25
**Chavez** [1] - 3225:14
**check** [3] - 3022:17,
3041:13, 3112:23
**checks** [6] - 3022:7,
3022:9, 3023:3,
3036:10, 3036:20,
3036:24
**cheery** [1] - 3259:16
**children** [1] - 3007:5
**choice** [2] - 3079:1,
3228:13
**choose** [2] - 3241:20,
3260:25
**choosing** [1] -
3210:18
**Chrissy** [1] - 2982:21
**Christine** [1] -
3228:17
**Christy** [1] - 3195:22
**CIA** [6] - 2892:22,
2893:1, 2893:21,
2897:14, 2899:10
**CIAs** [2] - 2891:22,
2891:25
**circle** [2] - 2969:22,
2979:9
**circled** [1] - 2979:8
**circles** [1] - 2972:18
**circulated** [1] - 3089:2
**citation** [2] - 3015:24,
3137:8
**citations** [2] -
3010:20, 3156:14
**cited** [2] - 3155:12,
3186:21
**cites** [1] - 3139:5
**city** [1] - 3257:2
**City** [3] - 3212:16,
3238:24, 3241:9
**CIVIL** [1] - 2888:3
**claim** [3] - 2994:21,
3169:20, 3169:22
**claims** [8] - 2895:23,
2928:2, 3070:4,
3102:20, 3122:25,
3123:8, 3128:1,
3185:18
**Claims** [3] - 2927:24,
2928:8, 2929:22
**clarification** [3] -
2908:20, 2913:6,
2934:11
**clarify** [5] - 2904:10,
2944:12, 2951:24,
2973:25, 3095:5
**Clarkson** [1] - 2888:8

**class** [2] - 2907:25, 3235:9
**classes** [1] - 3211:24
**classroom** [1] - 3043:16
**clear** [37] - 2892:5, 2893:10, 2899:9, 2899:22, 2907:10, 2907:20, 2908:7, 2912:2, 2926:1, 2940:2, 2948:4, 2949:15, 2956:24, 2961:21, 2963:25, 2964:21, 2980:9, 2988:23, 2992:4, 3008:13, 3016:9, 3016:19, 3024:2, 3025:11, 3034:12, 3037:8, 3048:19, 3073:22, 3074:16, 3075:22, 3100:25, 3137:9, 3145:14, 3146:21, 3152:1, 3183:17, 3259:25
**clearly** [9] - 2911:14, 2913:14, 2962:15, 3080:22, 3087:22, 3108:19, 3109:23, 3110:24, 3249:14
**clergy** [1] - 3002:5
**CLERK** [18] - 2890:4, 2921:1, 2921:3, 3012:1, 3012:4, 3013:24, 3039:23, 3064:5, 3064:12, 3065:1, 3092:19, 3092:24, 3093:7, 3143:12, 3151:9, 3152:14, 3205:15, 3262:13
**Clinic** [1] - 3244:20
**clinic** [1] - 3212:21
**clinical** [11] - 3050:1, 3050:2, 3050:12, 3051:2, 3131:6, 3184:10, 3184:11, 3207:13, 3218:20, 3222:19, 3252:14
**clip** [10] - 3125:4, 3125:5, 3126:9, 3126:11, 3127:18, 3131:23, 3132:1, 3132:3, 3144:17, 3154:2
**clipped** [1] - 3110:17
**clock** [1] - 3050:13
**close** [6] - 2903:12, 2972:10, 3114:3, 3224:5, 3227:18, 3239:11

**clue** [1] - 2917:12
**CMS** [2] - 3185:13, 3185:18
**co** [2] - 3245:22, 3248:6
**co-workers** [2] - 3245:22, 3248:6
**coadministered** [1] - 3233:1
**Coalition** [1] - 3015:14
**coalition** [1] - 3010:17
**cold** [1] - 3115:15
**Colgate** [1] - 3044:5
**Colgate-Palmolive** [1] - 3044:5
**collateral** [3] - 2897:2, 3146:11, 3149:11
**colleagues** [9] - 2903:8, 2944:4, 3005:22, 3043:1, 3090:2, 3229:5, 3257:15, 3257:17, 3259:7
**collect** [1] - 2920:19
**collectively** [1] - 2919:21
**college** [7] - 3206:14, 3206:20, 3206:25, 3207:3, 3211:20, 3211:22, 3212:4
**College** [2] - 3042:15, 3042:16
**collegiate** [1] - 3042:17
**Colorado** [1] - 3117:3
**column** [2] - 2956:24, 2957:3
**combination** [6] - 3104:21, 3105:4, 3113:11, 3155:4, 3172:22
**combinations** [1] - 3073:4
**combine** [1] - 3162:13
**combined** [2] - 2972:13, 3093:5
**combines** [1] - 2901:15
**comfortable** [4] - 2903:16, 2945:9, 3008:23, 3088:20
**coming** [21] - 2905:11, 2906:2, 2906:13, 2907:20, 2913:25, 3029:9, 3042:10, 3108:12, 3109:20, 3109:25, 3110:19, 3152:11, 3173:5, 3185:10, 3191:12, 3202:8, 3209:20,

3214:11, 3214:12, 3218:14, 3226:25
**Commencing** [1] - 2888:10
**commend** [2] - 3018:19, 3019:24
**commended** [1] - 3021:10
**comment** [1] - 3082:7
**commentary** [1] - 2989:8
**comments** [8] - 2995:8, 2996:2, 2996:16, 3019:16, 3025:18, 3025:23, 3032:22, 3032:24
**commercial** [3] - 3006:2, 3035:23, 3044:6
**commercials** [2] - 3052:8, 3052:9
**commissioned** [1] - 3092:10
**commitments** [1] - 2998:25
**committed** [3] - 3002:24, 3026:7, 3148:6
**committee** [17] - 3001:20, 3001:24, 3002:7, 3017:16, 3026:7, 3026:11, 3032:17, 3180:5, 3183:23, 3200:18, 3200:19, 3201:11, 3201:16, 3260:1, 3260:6
**committees** [1] - 3002:6
**committing** [1] - 3148:2
**communicate** [1] - 2999:18
**communicated** [2] - 3092:12, 3097:4
**communicating** [1] - 3077:13
**communication** [3] - 2962:22, 2967:25, 3097:7
**communications** [5] - 3029:19, 3030:3, 3088:12, 3093:1, 3203:3
**communities** [1] - 3020:8
**community** [10] - 3002:4, 3008:5, 3020:16, 3020:18, 3020:24, 3021:4,

3021:8, 3054:18, 3182:3, 3182:12
**commuting** [2] - 3113:9, 3113:11
**companies** [19] - 3008:11, 3045:3, 3055:11, 3056:2, 3057:9, 3057:25, 3058:23, 3080:25, 3081:1, 3089:8, 3116:24, 3133:13, 3163:2, 3171:16, 3172:5, 3172:18, 3173:16, 3210:18, 3215:7
**companies'** [1] - 3058:15
**Company** [1] - 3209:17
**company** [66] - 2923:12, 2942:19, 2945:19, 2961:2, 2964:7, 2968:23, 2969:19, 2986:1, 2986:7, 2986:19, 2987:6, 2990:1, 2991:22, 2995:15, 3003:15, 3003:16, 3004:13, 3005:18, 3008:19, 3009:3, 3009:22, 3010:18, 3016:5, 3016:6, 3017:1, 3020:12, 3021:16, 3022:6, 3022:14, 3023:7, 3023:22, 3024:7, 3028:3, 3028:6, 3032:24, 3033:4, 3035:14, 3039:3, 3044:15, 3044:18, 3044:19, 3046:4, 3054:23, 3056:8, 3056:23, 3062:10, 3069:6, 3069:7, 3078:14, 3079:25, 3085:16, 3089:2, 3090:17, 3115:12, 3167:5, 3207:22, 3208:16, 3208:19, 3208:21, 3209:10, 3209:15, 3209:16, 3209:18, 3210:22, 3211:15
**company's** [7] - 2997:12, 3006:21, 3010:14, 3010:22, 3014:11, 3015:16, 3026:21
**comparable** [2] - 3220:2, 3233:13

**comparative** [1] - 3051:7
**compare** [3] - 3131:3, 3210:5, 3224:8
**compared** [5] - 3003:19, 3084:15, 3084:22, 3237:3, 3237:15
**comparing** [2] - 3130:15, 3231:4
**comparison** [2] - 3131:10, 3169:19
**compelling** [1] - 3085:2
**compensated** [1] - 3164:17
**compensation** [10] - 3164:10, 3164:24, 3166:18, 3166:24, 3168:13, 3169:15, 3170:12, 3170:14, 3173:18, 3198:20
**competent** [1] - 2896:14
**competing** [1] - 3003:22
**competition** [1] - 3005:17
**competitive** [4] - 3045:15, 3062:12, 3078:13, 3083:16
**competitor** [2] - 3261:10, 3261:19
**compile** [2] - 3170:8, 3197:18
**complete** [1] - 2992:25
**completely** [7] - 2913:5, 2919:25, 3020:24, 3056:18, 3079:12, 3196:12, 3223:5
**complex** [1] - 2980:4
**compliance** [23] - 2905:20, 2913:14, 2913:15, 2923:23, 2924:2, 2924:7, 2925:12, 2927:7, 2927:13, 2993:24, 2995:13, 2996:20, 3036:25, 3037:9, 3089:5, 3198:5, 3201:13, 3201:25, 3202:9, 3238:2, 3246:3, 3246:4, 3246:18
**compliant** [1] - 3023:7
**comply** [2] - 2905:24, 3198:11
**compromise** [2] -

2895:23, 2904:3
**computer** [3] - 2888:25, 3252:15, 3253:18
**computer-aided** [1] - 2888:25
**concentrated** [1] - 3170:1
**concentration** [1] - 3069:25
**concept** [3] - 2981:8, 3083:4, 3192:2
**concepts** [1] - 3192:25
**conceptualization** [1] - 3060:16
**concern** [23] - 2894:11, 2896:18, 2896:25, 2897:18, 2898:22, 2899:18, 2899:19, 2903:11, 2905:11, 2944:20, 3000:1, 3006:9, 3006:11, 3008:21, 3055:17, 3061:25, 3090:8, 3132:14, 3173:11, 3197:6, 3219:14, 3222:25, 3223:2
**concerned** [6] - 2894:23, 2907:22, 3066:25, 3087:3, 3088:25, 3098:12
**concerning** [4] - 3061:23, 3068:1, 3068:22, 3072:11
**concerns** [3] - 2898:24, 3058:16, 3194:25
**concert** [2] - 3061:4
**concluded** [5] - 2926:12, 2978:11, 3102:5, 3138:8, 3157:12
**concluding** [1] - 3114:8
**conclusion** [13] - 2901:15, 2905:6, 3050:21, 3064:15, 3089:17, 3089:23, 3098:21, 3128:23, 3194:22, 3204:20, 3233:11, 3234:8, 3236:13
**conclusions** [6] - 3084:7, 3084:13, 3204:5, 3220:2, 3220:5, 3233:25
**condition** [1] - 3062:3
**conditions** [3] -

2892:12, 2933:10, 2986:15
**conduct** [8] - 2892:10, 2902:12, 3098:5, 3103:16, 3103:20, 3177:21, 3181:17
**conducted** [1] - 2928:13
**conducting** [1] - 2931:22
**confer** [5] - 2903:23, 2908:7, 2908:17, 2914:21, 3186:2
**Conference** [1] - 3107:12
**conference** [10] - 3107:16, 3107:24, 3109:5, 3109:20, 3109:25, 3110:10, 3110:14, 3110:24, 3233:24, 3254:18
**conferences** [3] - 3222:20, 3236:10, 3252:16
**conferred** [1] - 2918:8
**confidence** [1] - 2975:24
**confident** [3] - 2896:14, 3023:6, 3149:23
**confidential** [3] - 2944:18, 2945:2, 3229:14
**confidentially** [1] - 2944:24
**confines** [2] - 3061:10, 3073:19
**confirm** [4] - 2969:4, 2987:11, 3035:22, 3228:10
**confirmed** [1] - 3100:17
**confuse** [1] - 2975:7
**confused** [2] - 2902:14, 3232:1
**confusing** [2] - 2990:25, 3132:13
**confusion** [1] - 2978:4
**congratulate** [3] - 3014:25, 3018:20, 3019:24
**Congress** [1] - 3010:21
**Congressional** [6] - 3012:13, 3014:10, 3014:17, 3015:24, 3017:23, 3018:19
**congresspeople** [2] - 3025:19, 3025:25
**conjecture** [1] -

2940:8
**connect** [2] - 3008:15, 3170:20
**connected** [1] - 3042:11
**connecting** [1] - 3195:25
**connection** [4] - 2901:17, 3007:23, 3133:21, 3174:3
**consensus** [1] - 3146:15
**consequences** [2] - 3062:17, 3092:3
**conservative** [1] - 3074:22
**consider** [8] - 2898:9, 2898:17, 2901:21, 3009:14, 3048:3, 3056:25, 3079:2, 3103:20
**considerable** [1] - 3076:25
**consideration** [4] - 3000:16, 3001:4, 3035:16, 3086:23
**considerations** [1] - 3006:16
**considered** [2] - 3047:12, 3061:3
**considering** [2] - 3056:25, 3093:16
**consistent** [6] - 2988:2, 2991:17, 2993:5, 2997:13, 2997:20, 3016:4
**consistently** [1] - 3048:22
**conspiracy** [1] - 3021:23
**constant** [1] - 3023:4
**constituency** [1] - 3020:21
**constitute** [1] - 3087:21
**constraints** [1] - 3015:17
**construct** [1] - 3076:22
**constructing** [1] - 3049:22
**constructive** [3] - 3060:8, 3063:5, 3077:20
**consult** [1] - 3163:2
**consulting** [3] - 3043:14, 3090:20, 3160:3
**consumer** [13] - 2973:17, 2974:1,

2974:20, 2974:24, 2975:18, 2975:24, 2977:2, 2977:12, 2977:14, 2977:19, 2977:20, 2980:23, 3053:10
**consumers** [3] - 2974:8, 2975:6, 2976:18
**contained** [1] - 3057:19
**contemporary** [2] - 3155:6, 3155:9
**context** [2] - 3174:15, 3174:25
**continue** [12] - 2910:20, 2918:23, 2921:6, 2921:13, 2932:12, 2961:1, 3051:19, 3082:8, 3093:10, 3093:18, 3138:10, 3223:6
**continues** [2] - 2949:4, 3015:13
**continuing** [3] - 2949:22, 3039:15, 3046:8
**continuous** [1] - 3063:2
**continuum** [2] - 3053:19, 3054:6
**contrast** [1] - 3210:5
**contribute** [1] - 2960:5
**contributed** [3] - 3026:7, 3026:11, 3026:15
**contributory** [1] - 3130:25
**control** [2] - 3084:18, 3084:21
**controlled** [2] - 3051:4, 3084:15
**convenience** [1] - 3096:23
**conversation** [7] - 3193:16, 3222:22, 3253:2, 3254:13, 3255:2, 3255:3, 3255:25
**conversations** [4] - 3213:19, 3218:6, 3254:14, 3260:10
**convince** [1] - 3127:19
**convinced** [3] - 2912:12, 3058:18, 3079:17
**coordination** [1] - 2992:20
**copies** [4] - 2897:24,

3064:18, 3236:7, 3236:8
**copy** [7] - 2891:5, 2895:12, 2895:22, 2974:15, 3040:19, 3041:3, 3098:8
**Coral** [4] - 3206:12, 3251:4, 3251:11, 3251:20
**Corporate** [1] - 3044:16
**corporate** [16] - 2892:8, 2892:9, 2897:20, 2901:9, 2901:19, 2901:23, 2905:24, 2921:22, 2922:17, 2928:22, 2929:7, 2931:3, 2931:19, 3019:25, 3198:4, 3216:24
**corporation** [1] - 3046:7
**corporations** [1] - 3044:14
**Correct** [21] - 2937:24, 2970:19, 2971:15, 2981:6, 3115:9, 3120:23, 3124:17, 3125:16, 3130:12, 3131:4, 3133:4, 3134:16, 3158:19, 3161:9, 3162:7, 3163:16, 3172:7, 3176:13, 3176:25, 3177:8, 3178:12
**correct** [169] - 2893:16, 2896:22, 2905:8, 2917:25, 2922:18, 2927:17, 2927:25, 2928:15, 2929:24, 2936:20, 2938:17, 2940:5, 2944:8, 2946:10, 2948:8, 2948:12, 2956:8, 2956:12, 2957:14, 2958:6, 2959:20, 2962:4, 2963:17, 2963:18, 2964:5, 2965:8, 2967:20, 2967:22, 2971:20, 2971:23, 2971:25, 2972:6, 2972:21, 2972:22, 2974:9, 2977:24, 2978:14, 2979:6, 2979:14, 2980:12, 2981:7, 2981:11, 2982:6, 2988:10, 2995:19, 3005:14, 3007:24, 3017:3,

3037:21, 3038:7,
3052:15, 3065:18,
3071:4, 3071:17,
3100:6, 3101:13,
3102:25, 3103:3,
3103:22, 3104:1,
3104:6, 3106:6,
3106:11, 3107:18,
3111:5, 3111:9,
3111:22, 3112:21,
3115:4, 3115:18,
3116:3, 3116:20,
3116:25, 3117:4,
3118:4, 3118:10,
3119:10, 3119:19,
3121:5, 3124:13,
3126:4, 3127:12,
3127:16, 3128:21,
3129:16, 3130:7,
3130:16, 3130:24,
3132:12, 3132:19,
3133:11, 3133:17,
3133:22, 3134:11,
3135:9, 3135:15,
3135:20, 3138:23,
3139:2, 3139:12,
3139:16, 3139:20,
3140:3, 3140:9,
3140:14, 3141:12,
3146:13, 3147:1,
3147:4, 3150:23,
3150:25, 3151:22,
3153:2, 3153:12,
3154:10, 3156:17,
3156:23, 3157:1,
3158:3, 3158:20,
3160:2, 3160:14,
3161:4, 3161:5,
3163:19, 3164:15,
3164:20, 3165:13,
3165:19, 3166:15,
3167:2, 3167:16,
3169:17, 3169:18,
3172:11, 3172:15,
3172:21, 3173:13,
3173:21, 3174:6,
3177:4, 3177:18,
3178:7, 3178:18,
3178:23, 3179:22,
3180:2, 3180:18,
3181:7, 3183:20,
3183:21, 3183:25,
3184:17, 3184:24,
3185:15, 3185:16,
3185:23, 3187:4,
3197:9, 3202:5,
3214:6, 3218:4,
3220:16, 3226:17,
3235:25, 3237:24,
3260:19, 3263:4
**corrected** [1] -

3026:21
**correctly** [2] -
3124:18, 3223:17
**correlating** [1] -
2892:22
**corresponding** [2] -
3005:5, 3005:8
**cost** [2] - 2927:22,
2929:14
**costs** [1] - 3050:17
**counsel** [46] - 2890:7,
2890:8, 2894:14,
2896:14, 2898:2,
2904:2, 2906:18,
2911:6, 2911:20,
2915:3, 2916:18,
2917:17, 2918:8,
2925:14, 2985:14,
2985:23, 2988:20,
2992:10, 2993:4,
2993:8, 2994:18,
2997:23, 3010:6,
3011:1, 3011:9,
3018:5, 3028:17,
3031:14, 3032:4,
3036:18, 3041:5,
3064:4, 3080:13,
3100:23, 3104:18,
3141:17, 3153:7,
3170:1, 3185:2,
3186:2, 3240:10,
3242:9, 3243:16,
3251:8
**counsel's** [1] -
2919:12
**count** [2] - 3161:18,
3161:21
**counter** [2] - 2899:14,
3053:2
**counterargument** [2]
- 2902:9, 3145:21
**countries** [1] -
3002:18
**country** [6] - 3069:21,
3228:2, 3228:3,
3228:10, 3228:11,
3246:12
**couple** [16] - 2904:12,
2907:2, 2988:17,
3044:18, 3158:10,
3161:8, 3183:15,
3206:3, 3212:22,
3213:23, 3221:13,
3235:22, 3235:23,
3239:12, 3244:22,
3258:6
**course** [35] - 2893:19,
2905:3, 2910:15,
2928:2, 2928:6,
2929:6, 2945:2,

2955:15, 2964:14,
2965:15, 2982:20,
2983:15, 3029:5,
3034:14, 3046:3,
3048:9, 3060:1,
3065:16, 3086:3,
3097:6, 3100:7,
3113:17, 3116:13,
3117:22, 3118:2,
3119:8, 3119:16,
3125:8, 3128:1,
3135:12, 3139:10,
3185:12, 3190:24,
3224:22, 3229:3
**courses** [1] - 2927:7
**COURT** [311] - 2888:1,
2890:4, 2890:5,
2890:16, 2890:23,
2891:3, 2891:13,
2891:18, 2891:22,
2892:2, 2892:5,
2892:19, 2892:24,
2893:3, 2893:10,
2893:13, 2893:18,
2893:21, 2894:2,
2894:4, 2894:7,
2894:10, 2894:20,
2895:2, 2895:10,
2895:14, 2896:4,
2897:17, 2899:4,
2899:7, 2900:11,
2900:16, 2900:25,
2902:3, 2902:9,
2903:2, 2903:10,
2903:25, 2904:13,
2904:18, 2904:22,
2905:5, 2905:17,
2906:1, 2906:10,
2908:6, 2908:12,
2909:1, 2909:5,
2909:24, 2910:4,
2913:23, 2914:3,
2916:5, 2916:8,
2916:12, 2916:17,
2917:18, 2917:22,
2918:1, 2918:3,
2918:6, 2918:10,
2918:13, 2919:5,
2920:4, 2920:7,
2920:10, 2920:14,
2920:18, 2920:23,
2921:1, 2921:3,
2921:4, 2921:16,
2924:20, 2924:22,
2924:24, 2925:6,
2925:8, 2925:19,
2925:25, 2926:6,
2926:8, 2926:11,
2926:15, 2926:18,
2932:6, 2935:9,
2937:18, 2939:15,

2940:25, 2951:22,
2952:21, 2953:10,
2953:12, 2953:14,
2954:16, 2959:9,
2961:18, 2963:4,
2966:4, 2968:11,
2970:11, 2973:22,
2973:25, 2974:7,
2974:10, 2974:15,
2974:17, 2974:25,
2975:3, 2975:19,
2975:22, 2976:1,
2976:9, 2976:12,
2976:17, 2976:20,
2976:23, 2977:6,
2977:22, 2977:25,
2978:3, 2978:9,
2978:13, 2978:16,
2978:18, 2981:17,
2984:11, 2984:13,
2985:4, 2985:7,
2996:5, 2996:10,
3011:16, 3011:19,
3011:24, 3012:1,
3012:2, 3012:4,
3012:5, 3012:8,
3012:10, 3012:15,
3012:19, 3012:22,
3013:1, 3013:3,
3013:6, 3013:9,
3013:13, 3013:18,
3013:24, 3013:25,
3014:2, 3014:7,
3018:6, 3018:8,
3018:10, 3018:21,
3018:23, 3019:6,
3019:9, 3019:11,
3024:21, 3024:24,
3037:22, 3037:25,
3038:3, 3039:8,
3039:11, 3039:14,
3039:18, 3039:23,
3040:2, 3040:4,
3040:22, 3041:1,
3041:3, 3041:6,
3041:10, 3041:16,
3041:20, 3041:23,
3042:4, 3063:15,
3063:18, 3063:21,
3064:5, 3064:7,
3064:12, 3064:13,
3064:21, 3065:1,
3065:3, 3065:9,
3067:16, 3092:18,
3092:19, 3092:20,
3092:24, 3092:25,
3093:7, 3093:9,
3100:22, 3100:25,
3101:5, 3101:7,
3101:9, 3101:17,
3101:23, 3102:1,

3102:4, 3102:7,
3102:12, 3103:7,
3109:11, 3116:10,
3123:7, 3123:9,
3125:2, 3126:10,
3131:24, 3136:17,
3136:19, 3136:22,
3136:24, 3137:3,
3137:15, 3137:20,
3137:23, 3138:10,
3141:12, 3141:14,
3141:17, 3141:20,
3141:25, 3142:4,
3142:9, 3142:13,
3142:16, 3142:19,
3142:21, 3142:24,
3143:4, 3143:12,
3143:14, 3143:23,
3144:1, 3144:4,
3144:10, 3144:12,
3144:16, 3144:18,
3144:20, 3144:23,
3145:2, 3145:10,
3146:12, 3146:18,
3146:24, 3147:3,
3147:6, 3147:12,
3147:19, 3148:11,
3148:16, 3148:24,
3149:8, 3149:15,
3150:3, 3150:6,
3150:22, 3150:24,
3151:1, 3151:4,
3151:6, 3151:9,
3151:10, 3151:16,
3151:20, 3151:23,
3152:1, 3152:4,
3152:8, 3152:12,
3152:14, 3152:16,
3154:1, 3154:21,
3186:3, 3186:9,
3202:22, 3204:14,
3205:1, 3205:4,
3205:6, 3205:8,
3205:15, 3205:18,
3241:2, 3242:23,
3244:2, 3251:15,
3262:4, 3262:7,
3262:10, 3262:13,
3262:15, 3263:1
**court** [17] - 2890:1,
2924:17, 2926:13,
2947:6, 2978:12,
3102:6, 3111:4,
3119:3, 3137:10,
3138:9, 3145:7,
3146:7, 3146:13,
3147:8, 3149:11,
3149:18, 3262:16
**Court** [15] - 2888:23,
2895:13, 2901:16,
2908:22, 2908:23,

2910:7, 2912:21, 2912:23, 3041:9, 3150:12, 3240:10, 3242:9, 3243:15, 3251:8, 3263:12
**Court's** [4] - 2898:23, 2900:22, 2919:2, 3131:22
**courthouse** [2] - 3013:15, 3041:21
**Courthouse** [1] - 2888:8
**courtroom** [21] - 2921:2, 3014:1, 3039:19, 3047:23, 3049:10, 3064:2, 3064:6, 3065:2, 3093:8, 3093:14, 3095:23, 3104:5, 3105:18, 3114:14, 3115:20, 3120:7, 3122:7, 3143:13, 3152:15, 3202:8, 3204:18
**cousin** [1] - 3251:25
**cover** [5] - 2927:22, 2929:14, 2958:23, 2973:15, 3057:18
**covered** [3] - 2892:14, 2892:16, 2985:14
**craft** [1] - 3079:3
**crafting** [2] - 3045:9, 3075:10
**create** [1] - 3182:24
**created** [3] - 2968:18, 2992:20, 3060:7
**creating** [2] - 3083:5, 3098:17
**credibility** [5] - 3062:24, 3080:2, 3118:23, 3120:8, 3149:13
**credible** [4] - 3115:3, 3115:17, 3120:15, 3135:19
**credit** [3] - 3002:16, 3010:19, 3173:18
**credo** [17] - 2928:12, 2958:22, 2981:2, 2981:4, 2981:21, 2982:3, 2983:13, 3003:5, 3005:23, 3006:3, 3010:4, 3024:13, 3046:1, 3046:12, 3046:14, 3046:16, 3098:3
**crisis** [1] - 3015:17
**criteria** [2] - 3261:2, 3261:23
**critical** [1] - 2898:15

**CROSS** [4] - 2889:3, 2889:5, 2985:8, 3102:13
**cross** [8] - 2899:22, 2911:23, 3102:9, 3145:25, 3148:4, 3148:9, 3189:19, 3193:2
**CROSS-EXAMINATION** [4] - 2889:3, 2889:5, 2985:8, 3102:13
**cross-examination** [2] - 3148:9, 3193:2
**cross-examine** [1] - 3148:4
**cross-examined** [1] - 3189:19
**cross-examining** [3] - 2899:22, 2911:23, 3145:25
**crossed** [1] - 2899:13
**CRR** [1] - 3263:11
**culling** [1] - 3215:16
**curious** [1] - 3237:12
**current** [3] - 2901:13, 2987:23, 3043:15
**customers** [3] - 2996:21, 2999:2, 2999:5, 3022:15, 3045:13, 3087:13, 3107:2, 3108:8, 3108:12
**cut** [5] - 2898:20, 3105:7, 3108:3, 3110:18, 3175:5
**cuts** [1] - 3179:4
**cutting** [1] - 2918:24

## D

**D)(2)(d)** [1] - 2915:21
**D-9074** [2] - 3142:23, 3153:25
**Daily** [1] - 3049:2
**daily** [4] - 3071:13, 3097:5, 3132:9, 3235:8
**Dallas** [1] - 2888:17
**Dalton** [1] - 3225:15
**dangerous** [1] - 3062:3
**DART** [7] - 3094:19, 3219:22, 3220:6, 3220:11, 3231:16, 3232:15, 3235:16
**darunavir** [1] - 3232:19
**data** [34] - 2943:10, 3000:10, 3049:18,

3051:9, 3057:13, 3057:15, 3083:23, 3087:13, 3087:19, 3107:8, 3107:16, 3108:8, 3108:11, 3108:13, 3109:4, 3109:19, 3110:7, 3110:19, 3124:3, 3131:5, 3158:5, 3167:16, 3171:16, 3172:5, 3172:13, 3173:16, 3173:17, 3178:13, 3178:16, 3178:20, 3179:1, 3184:15, 3254:17
**Date** [1] - 3263:12
**date** [4] - 2932:23, 2946:14, 2970:15, 2991:8
**dated** [4] - 2945:22, 2967:25, 2969:25, 2973:13
**day-to-day** [2] - 3046:20, 3213:5
**days** [4] - 2907:2, 3112:16, 3231:22, 3231:23
**DDMAC** [3] - 3057:6, 3133:3, 3203:21
**DDMAC's** [1] - 3133:10
**DDP** [1] - 2952:12
**de** [1] - 3098:17
**de-emphasized** [1] - 3098:17
**dead** [1] - 2907:8
**deal** [6] - 2906:11, 2912:15, 2917:23, 2918:16, 3002:1, 3041:17
**dealing** [2] - 2917:23, 3073:5
**deals** [1] - 3053:3
**dealt** [2] - 2898:4, 3101:11
**dearth** [1] - 3000:12
**death** [2] - 3042:11, 3132:10
**death's** [2] - 3006:1, 3008:9
**Deb** [1] - 3174:1
**Debbie** [1] - 3049:4
**decades** [1] - 2981:5
**December** [1] - 2947:11
**decide** [5] - 2987:2, 3016:15, 3016:16, 3061:15, 3079:6
**decided** [3] - 3016:4, 3016:5, 3211:3

**decides** [1] - 3054:21
**decision** [30] - 2904:1, 2987:15, 3006:4, 3006:15, 3009:8, 3009:9, 3009:18, 3009:20, 3010:22, 3017:11, 3017:24, 3035:21, 3035:23, 3053:5, 3056:19, 3061:15, 3073:20, 3080:5, 3086:22, 3087:1, 3105:1, 3105:4, 3105:7, 3129:2, 3129:9, 3150:14, 3192:18, 3192:19
**decision-making** [1] - 2987:15
**decisions** [7] - 2992:21, 3016:3, 3016:25, 3035:13, 3056:22, 3087:1, 3120:22
**deck** [25] - 2913:16, 2950:24, 2956:10, 2959:12, 2967:2, 2967:10, 2973:13, 2974:11, 2974:13, 2974:16, 2974:18, 2974:19, 2975:5, 2977:19, 2978:4, 2978:14, 2978:19, 2990:6, 3028:25, 3108:17, 3132:5, 3167:19, 3167:23, 3252:20, 3254:20
**decks** [2] - 2993:4, 3029:1
**declaration** [3] - 2946:13, 3195:7
**declarations** [1] - 3190:14
**declination** [1] - 2902:8
**declined** [1] - 3260:21
**decreased** [1] - 3247:15
**deduct** [1] - 3112:3
**Defendants** [2] - 2888:7, 2888:22
**defendants** [4] - 2893:6, 2895:25, 3195:6
**Defendants'** [11] - 2889:22, 2889:23, 2924:13, 2994:13, 3010:25, 3014:5, 3014:8, 3018:5, 3019:14, 3195:5, 3195:13

**defense** [1] - 2912:7
**deferring** [1] - 3124:21
**define** [2] - 2944:9, 2944:10
**definite** [1] - 3107:19
**definitely** [5] - 2938:1, 2938:5, 3000:7, 3017:15, 3165:2
**definition** [2] - 2982:7, 3038:22
**degree** [6] - 3042:20, 3043:19, 3062:6, 3099:8, 3187:11, 3207:11
**degrees** [1] - 3187:15
**DeJesus** [2] - 3235:24, 3235:25
**Del** [3] - 3242:5, 3242:15, 3243:2
**Delaney** [1] - 3010:18
**Delaware** [1] - 2888:22
**delayed** [1] - 3006:10
**deliberations** [2] - 2896:9, 2897:23
**delivered** [10] - 3032:11, 3055:10, 3057:3, 3060:24, 3061:1, 3123:2, 3192:14, 3194:11, 3203:10, 3255:22
**delivering** [8] - 3056:21, 3060:3, 3081:19, 3090:5, 3096:14, 3123:14, 3123:24, 3203:17
**delivery** [2] - 3098:13, 3123:19
**delta** [1] - 3052:5
**demand** [13] - 2923:13, 2943:19, 2943:24, 2944:6, 2972:4, 2986:11, 2986:12, 2986:22, 3027:17, 3172:24, 3210:10, 3225:6, 3226:7
**demonstrate** [1] - 2961:1
**demonstrated** [1] - 3021:7
**demonstrations** [1] - 3211:24
**demonstrative** [1] - 3116:6
**demonstratives** [2] - 3041:1, 3041:2
**densely** [1] - 3076:11
**deny** [1] - 3035:22
**Department** [5] -

2932:19, 3001:21, 3058:4, 3058:7, 3058:22

**department** [14] - 2923:23, 2923:24, 2924:2, 2924:7, 2927:13, 2935:18, 2945:25, 2997:7, 3035:6, 3035:10, 3036:25, 3037:9, 3228:19

**departments** [1] - 2992:20

**depicted** [2] - 2971:16, 2971:21

**depicting** [1] - 3240:14

**depiction** [4] - 3240:22, 3242:14, 3243:23, 3251:11

**deposition** [10] - 3109:2, 3109:9, 3109:17, 3109:23, 3119:4, 3134:8, 3184:1, 3190:18, 3201:12, 3201:14

**depositions** [10] - 3047:15, 3047:16, 3048:7, 3048:13, 3048:19, 3115:7, 3115:8, 3134:7, 3168:19, 3190:4

**depression** [1] - 3210:1

**depth** [3] - 2943:13, 3054:1, 3066:23

**DEPUTY** [18] - 2890:4, 2921:1, 2921:3, 3012:1, 3012:4, 3013:24, 3039:23, 3064:5, 3064:12, 3065:1, 3092:19, 3092:24, 3093:7, 3143:12, 3151:9, 3152:14, 3205:15, 3262:13

**deputy** [1] - 3039:19

**describe** [12] - 3007:7, 3042:8, 3045:7, 3047:11, 3049:14, 3052:1, 3059:1, 3061:6, 3069:23, 3070:10, 3084:18, 3249:9

**described** [5] - 3023:3, 3075:19, 3080:12, 3160:16, 3188:5

**describing** [1] - 3126:25

**description** [3] - 2997:11, 2998:17, 3016:3

**Description** [1] - 2889:8

**design** [1] - 3231:21

**designed** [2] - 3046:1, 3062:14

**desirable** [1] - 3081:22

**desk** [3] - 3023:17, 3024:1, 3057:18

**desperately** [1] - 3006:13

**despite** [2] - 2915:24, 3120:12

**destabilizing** [1] - 3002:18

**detail** [2] - 2943:11, 3096:9

**detailing** [4] - 3054:25, 3060:4, 3060:11, 3060:24

**details** [7] - 2894:18, 2897:2, 2909:22, 3091:24, 3180:24, 3241:14, 3256:24

**detectable** [1] - 3004:1

**determination** [1] - 3115:2

**determine** [8] - 3007:25, 3008:2, 3017:7, 3077:17, 3089:13, 3094:15, 3155:3, 3185:17

**determined** [1] - 3050:23

**detrimental** [1] - 3259:14

**develop** [1] - 3079:14

**developed** [3] - 2983:9, 3005:24, 3230:18

**developing** [6] - 2968:17, 3019:25, 3031:19, 3031:22, 3044:22, 3052:20

**Development** [2] - 3014:19, 3233:4

**development** [3] - 3051:14, 3052:4, 3052:16

**device** [2] - 3210:7, 3210:16

**devices** [1] - 3209:20

**devolve** [1] - 3076:23

**diabetes** [2] - 3209:25, 3210:3

**diagnostic** [1] -

3044:8

**dialogue** [1] - 2989:18

**dictates** [2] - 3080:6, 3080:7

**died** [1] - 3042:11

**difference** [6] - 2906:12, 2975:17, 2998:21, 3052:5, 3084:23, 3231:17

**different** [61] - 2898:16, 2903:1, 2907:7, 2907:13, 2913:20, 2916:24, 2917:8, 2930:24, 2937:11, 2939:3, 2939:6, 2939:8, 2939:9, 2939:18, 2942:14, 2968:17, 2974:10, 2975:8, 2981:25, 2989:9, 2993:14, 2997:18, 3037:14, 3038:14, 3059:6, 3060:18, 3061:14, 3061:18, 3073:4, 3081:24, 3088:2, 3094:17, 3116:24, 3123:24, 3147:24, 3148:2, 3176:21, 3193:15, 3194:1, 3195:25, 3208:12, 3208:15, 3210:7, 3210:8, 3210:9, 3210:10, 3211:6, 3213:9, 3226:23, 3235:8, 3235:9, 3237:13, 3246:11, 3249:3, 3249:4, 3252:17, 3255:7, 3261:2

**differential** [1] - 3009:24

**differentiation** [1] - 3094:9

**differently** [1] - 2944:10

**difficult** [5] - 2999:15, 3128:22, 3194:22, 3197:13, 3223:22

**difficult-to-treat** [1] - 2999:15

**Diner** [1] - 3249:13

**diners** [1] - 3239:18

**dinner** [4] - 3243:6, 3243:7, 3254:11, 3258:10

**dinners** [2] - 3238:22, 3242:4

**DIRECT** [6] - 2889:3, 2889:5, 2889:7, 2921:18, 3040:5,

3205:21

**direct** [16] - 2941:23, 2973:17, 2974:1, 2974:19, 2974:24, 2975:17, 2975:24, 2977:2, 2977:19, 2977:20, 2980:23, 2987:19, 3022:20, 3022:23, 3053:10, 3106:14

**direct-to-consumer** [5] - 2973:17, 2975:24, 2977:2, 2977:19, 2977:20

**directed** [3] - 2898:9, 3047:8, 3099:3

**direction** [7] - 2912:12, 2962:5, 2962:10, 2990:23, 2997:13, 3023:8, 3227:25

**directly** [3] - 2911:22, 2922:7, 2922:11

**director** [2] - 3196:16, 3244:19

**disagree** [6] - 2903:16, 2910:7, 2945:5, 3124:8, 3128:5, 3165:2

**disagreeing** [1] - 3204:19

**disappointing** [4] - 2938:13, 2938:14, 3006:21, 3006:24

**discernment** [1] - 3086:24

**disciplined** [1] - 3215:7

**disclosure** [1] - 2997:1

**discoverable** [1] - 3030:7

**discovered** [1] - 2923:10

**discretionary** [1] - 2920:5

**discuss** [5] - 2908:25, 2944:24, 3082:15, 3083:25, 3128:5

**discussed** [20] - 2929:21, 2931:4, 2941:14, 2944:13, 2956:19, 2968:16, 2988:16, 2994:9, 2998:18, 3071:19, 3074:8, 3075:12, 3081:21, 3088:16, 3096:4, 3131:21, 3159:11, 3229:11, 3229:25, 3232:15

**discussing** [11] - 2905:13, 2985:23, 2988:19, 2992:10, 2994:12, 2998:4, 3051:5, 3066:5, 3096:10, 3155:5, 3168:2

**discussion** [33] - 2914:9, 2921:24, 2941:13, 2941:14, 2943:7, 2945:3, 2973:1, 2973:3, 2973:6, 3003:11, 3026:24, 3029:23, 3055:6, 3056:5, 3060:8, 3060:13, 3060:14, 3062:23, 3063:6, 3063:11, 3068:12, 3069:2, 3086:3, 3086:12, 3088:3, 3088:13, 3128:23, 3129:14, 3132:16, 3165:3, 3165:5, 3176:18, 3187:10

**discussion/sales** [1] - 3053:21

**discussions** [3] - 2961:8, 2966:8, 3082:2

**disease** [16] - 3003:25, 3049:24, 3050:1, 3050:9, 3059:23, 3068:10, 3073:5, 3073:7, 3130:1, 3182:15, 3182:24, 3183:5, 3208:12, 3212:2, 3212:11, 3259:15

**dismiss** [3] - 2918:16, 3064:3, 3143:11

**dismissed** [1] - 3117:7

**dispute** [2] - 2908:18, 3025:13

**disputed** [1] - 2895:23

**disseminate** [5] - 3000:10, 3066:11, 3068:16, 3069:18, 3090:18

**disseminated** [4] - 2924:8, 3087:20, 3089:6, 3110:8

**dissolving** [1] - 3083:19

**distinction** [4] - 2902:5, 2974:4, 2975:11, 3247:17

**distributing** [1] - 3088:21

**distribution** [1] - 3216:16
**distributor** [1] - 3207:24
**District** [1] - 2890:2
**DISTRICT** [3] - 2888:1, 2888:1, 2888:12
**district** [20] - 3076:7, 3076:8, 3076:22, 3216:4, 3216:8, 3216:15, 3219:18, 3220:14, 3222:19, 3222:21, 3223:10, 3224:5, 3225:23, 3226:10, 3227:18, 3228:16, 3228:20, 3228:21, 3228:22
**districts** [2] - 3076:4, 3076:6
**disturb** [1] - 3092:16
**division** [4] - 3044:7, 3098:11, 3211:15, 3214:17
**do's** [1] - 2935:18
**doc** [1] - 3034:24
**Doctor** [2] - 3111:3, 3125:7
**doctor** [29] - 3035:22, 3053:9, 3053:11, 3056:8, 3060:6, 3060:13, 3063:8, 3121:3, 3122:14, 3127:10, 3138:13, 3142:2, 3145:8, 3146:17, 3153:15, 3154:15, 3186:20, 3186:22, 3191:18, 3192:10, 3192:14, 3194:4, 3194:11, 3213:12, 3213:16, 3218:10, 3221:22, 3236:17, 3254:23
**doctor's** [2] - 3123:2, 3213:10
**doctorate** [2] - 3042:22, 3043:20
**Doctors** [1] - 3179:14
**doctors** [83] - 2922:22, 2934:9, 2982:11, 2986:23, 2987:15, 3000:15, 3016:11, 3016:19, 3021:25, 3023:5, 3032:12, 3036:19, 3044:25, 3052:24, 3052:25, 3053:17, 3054:24, 3056:2, 3056:11, 3056:19, 3056:21, 3057:3, 3062:11, 3066:12,

3066:20, 3081:2, 3082:19, 3082:24, 3083:3, 3083:11, 3084:15, 3098:13, 3102:24, 3103:2, 3107:16, 3119:17, 3120:22, 3123:14, 3137:18, 3138:15, 3138:22, 3156:16, 3157:13, 3170:22, 3171:17, 3171:23, 3177:2, 3177:22, 3185:22, 3186:23, 3192:9, 3192:20, 3193:20, 3203:17, 3204:3, 3204:7, 3208:9, 3213:6, 3215:16, 3215:20, 3215:22, 3218:23, 3219:10, 3220:6, 3221:6, 3221:10, 3221:16, 3221:18, 3221:25, 3225:11, 3233:8, 3233:14, 3233:17, 3233:19, 3233:20, 3241:11, 3241:14, 3243:1, 3246:25, 3248:16, 3252:23, 3255:15, 3258:22
**doctors'** [9] - 3055:12, 3109:19, 3110:13, 3204:21, 3207:7, 3208:9, 3212:24, 3213:15, 3221:2
**document** [115] - 2896:11, 2896:16, 2896:24, 2896:25, 2906:12, 2906:20, 2907:4, 2907:7, 2907:11, 2907:15, 2908:9, 2909:12, 2910:8, 2910:13, 2910:20, 2911:7, 2911:12, 2912:22, 2912:23, 2913:14, 2913:15, 2913:21, 2914:5, 2914:13, 2914:15, 2914:17, 2915:11, 2915:18, 2915:23, 2915:25, 2916:23, 2917:4, 2925:13, 2926:1, 2926:7, 2932:9, 2932:17, 2932:23, 2933:25, 2935:12, 2935:14, 2946:16, 2946:18, 2952:16, 2954:2, 2968:22, 2985:20, 2992:8, 2992:9, 2992:10,

2992:14, 2994:9, 2994:12, 2994:15, 2996:14, 2998:4, 2998:7, 2998:11, 2998:14, 3010:3, 3011:18, 3012:6, 3018:23, 3029:19, 3029:20, 3030:4, 3031:7, 3031:13, 3034:7, 3034:24, 3035:2, 3046:14, 3073:8, 3073:9, 3074:13, 3077:7, 3080:12, 3081:7, 3085:11, 3085:24, 3086:11, 3088:21, 3091:6, 3098:5, 3104:8, 3104:11, 3105:2, 3105:8, 3105:12, 3105:14, 3105:25, 3106:1, 3106:9, 3106:15, 3108:17, 3109:3, 3109:17, 3109:18, 3110:4, 3110:11, 3110:18, 3158:18, 3165:11, 3166:1, 3174:2, 3175:21, 3178:15, 3179:5, 3179:6, 3179:10, 3195:24, 3200:19, 3232:8
**documentation** [1] - 3167:14
**documents** [71] - 2897:6, 2910:3, 2910:19, 2911:24, 2912:15, 2912:17, 2913:8, 2913:9, 2913:11, 2914:20, 2916:14, 2988:14, 2988:15, 2993:3, 2994:16, 3029:12, 3030:7, 3034:23, 3047:14, 3048:12, 3048:14, 3071:18, 3072:2, 3072:4, 3072:6, 3080:20, 3081:6, 3081:13, 3082:18, 3083:7, 3085:4, 3089:23, 3093:25, 3094:3, 3097:4, 3104:19, 3105:16, 3105:22, 3114:20, 3120:16, 3130:22, 3133:24, 3138:2, 3158:23, 3159:20, 3160:12, 3160:16, 3160:23, 3161:3, 3161:8, 3161:13, 3161:18,

3161:19, 3162:1, 3162:5, 3162:11, 3162:17, 3162:24, 3166:5, 3167:22, 3178:9, 3180:25, 3181:6, 3181:12, 3182:17, 3183:18, 3189:23, 3190:22, 3190:23, 3199:6
**DOJ's** [1] - 2901:5
**Dolisi** [14] - 3049:2, 3087:9, 3088:20, 3089:3, 3106:2, 3106:5, 3106:9, 3226:12, 3226:18, 3226:21, 3227:25, 3228:10, 3228:12, 3247:21
**dollar** [5] - 2893:15, 2979:4, 3057:17, 3084:10, 3091:20
**dollars** [12] - 2958:7, 2972:3, 2972:11, 2979:25, 3026:8, 3045:19, 3045:21, 3075:15, 3091:12, 3135:17, 3192:22, 3196:10
**domestically** [1] - 3002:4
**don't's** [1] - 2935:18
**Donald** [3] - 3014:18, 3025:24, 3026:12
**done** [27] - 2899:17, 2899:24, 2899:25, 2924:18, 2996:1, 3004:17, 3007:15, 3009:11, 3012:17, 3013:1, 3013:21, 3027:14, 3051:6, 3065:15, 3078:25, 3088:8, 3092:6, 3108:22, 3137:2, 3169:19, 3176:23, 3198:25, 3202:21, 3214:23, 3227:5, 3237:25
**Donna** [8] - 3049:3, 3118:6, 3195:12, 3213:24, 3214:11, 3214:16, 3228:17, 3230:11
**door** [4] - 3006:1, 3008:9, 3022:16, 3023:6
**dosage** [1] - 3071:16
**dose** [3] - 3130:23, 3131:10, 3233:1
**dosed** [2] - 3127:7, 3132:17

**doses** [2] - 3130:15, 3131:6
**dosing** [14] - 2949:2, 2949:21, 2950:17, 3071:13, 3081:21, 3083:13, 3096:23, 3097:5, 3131:3, 3132:9, 3193:16, 3194:6, 3194:12
**dotted** [2] - 2924:1, 3037:4
**double** [1] - 3149:12
**double-hearsaying** [1] - 3149:12
**DoubleTree** [1] - 3113:14
**doubt** [2] - 3006:6, 3079:10
**down** [30] - 2896:3, 2929:9, 2929:11, 2938:1, 2938:2, 2947:21, 2952:5, 2952:6, 2968:18, 3011:1, 3011:4, 3011:5, 3015:6, 3021:19, 3028:20, 3064:7, 3076:1, 3076:23, 3108:4, 3108:18, 3149:6, 3175:5, 3179:6, 3179:11, 3179:13, 3205:9, 3229:22, 3234:2, 3252:7, 3253:6
**downloaded** [1] - 3253:18
**downside** [1] - 3050:18
**downward** [1] - 2937:23
**DP** [1] - 2953:4
**Dr** [95] - 2917:20, 3051:5, 3053:19, 3055:24, 3061:23, 3099:25, 3119:24, 3123:14, 3124:11, 3125:13, 3125:20, 3126:13, 3126:24, 3127:6, 3130:6, 3130:11, 3131:16, 3132:4, 3132:16, 3139:6, 3139:10, 3139:23, 3140:6, 3140:13, 3140:21, 3152:21, 3153:1, 3153:10, 3153:22, 3154:4, 3155:5, 3155:12, 3156:20, 3158:1, 3172:17, 3182:1, 3185:1,

3187:8, 3188:12, 3188:14, 3188:24, 3189:9, 3191:19, 3191:23, 3192:7, 3194:11, 3200:4, 3200:5, 3200:6, 3212:18, 3212:19, 3218:10, 3218:23, 3225:14, 3225:15, 3230:16, 3230:17, 3230:20, 3230:21, 3233:14, 3239:3, 3239:4, 3241:18, 3241:23, 3241:24, 3244:19, 3245:6, 3245:7, 3245:11, 3245:21, 3248:3, 3248:23, 3249:6, 3249:12, 3249:15, 3253:8, 3253:10, 3253:14, 3257:12, 3258:3, 3258:8

**draft** [3] - 2995:3, 2995:6, 3032:20

**draw** [3] - 2902:5, 3128:22, 3194:22

**dressing** [1] - 3046:18

**Drexel** [1] - 3042:20

**drinking** [1] - 3259:17

**drive** [8] - 2936:13, 2936:21, 3031:23, 3086:2, 3245:5, 3246:23, 3253:13, 3253:17

**driven** [3] - 3006:16, 3033:20, 3033:22

**drivers** [2] - 3095:17, 3096:23

**driving** [4] - 2936:10, 3097:2, 3224:19, 3224:20

**drop** [2] - 3055:4, 3060:16

**Drug** [11] - 2933:11, 3050:16, 3050:23, 3051:18, 3057:7, 3057:11, 3058:1, 3203:4, 3203:11, 3203:16, 3233:4

**drug** [88] - 2894:16, 2894:18, 2897:12, 2907:23, 2907:25, 2908:1, 2909:8, 2930:24, 2933:17, 2934:5, 2934:10, 2936:19, 2937:12, 2950:3, 2951:9, 2955:15, 2957:13, 2958:8, 2971:9,

2979:5, 2979:12, 2984:24, 2986:14, 2986:23, 2999:15, 3005:13, 3005:24, 3006:12, 3007:25, 3008:25, 3009:11, 3010:11, 3010:16, 3014:19, 3015:20, 3023:23, 3035:17, 3035:18, 3035:24, 3049:17, 3050:22, 3051:7, 3051:8, 3052:10, 3053:13, 3054:20, 3055:23, 3058:24, 3059:12, 3059:15, 3059:19, 3060:22, 3061:7, 3061:10, 3062:1, 3062:5, 3062:6, 3062:17, 3062:20, 3068:25, 3070:20, 3071:2, 3071:11, 3071:15, 3072:16, 3075:16, 3075:18, 3077:23, 3083:19, 3083:21, 3087:20, 3095:23, 3127:22, 3128:8, 3173:9, 3173:11, 3192:8, 3192:10, 3209:25, 3210:2, 3215:17, 3217:13, 3221:4, 3235:13, 3237:11, 3261:19

**drug's** [2] - 3061:21, 3062:9

**drugs** [29] - 2897:9, 2923:2, 2923:13, 2928:8, 2984:7, 2988:3, 3003:22, 3008:7, 3008:8, 3008:10, 3009:1, 3016:12, 3017:19, 3025:12, 3026:21, 3027:22, 3044:22, 3044:25, 3045:15, 3056:25, 3058:15, 3069:19, 3072:22, 3082:25, 3172:19, 3231:17, 3235:10, 3255:11, 3261:10

**drunk** [1] - 3088:22

**DTC** [2] - 2973:12, 2974:18

**DULY** [2] - 3039:21, 3205:13

**durability** [2] - 3107:7, 3107:21

**duration** [3] - 3047:23, 3071:9, 3096:20

**duress** [1] - 3077:22

**during** [35] - 2896:8, 2897:23, 2905:3, 2905:16, 2910:15, 2931:13, 2931:18, 2950:1, 2968:16, 3001:24, 3002:14, 3006:20, 3034:14, 3043:13, 3044:20, 3050:12, 3070:22, 3073:14, 3086:3, 3087:7, 3096:8, 3097:6, 3097:11, 3100:7, 3125:7, 3158:24, 3161:24, 3165:25, 3167:12, 3167:19, 3169:5, 3190:23, 3193:2, 3195:11, 3256:3

**DX** [1] - 2925:15

**DX-2004** [1] - 3031:6

**DX-2083** [1] - 3032:1

**dynamic** [2] - 2956:15, 2956:21

---

# E

**E66** [1] - 3018:12

**early** [10] - 3006:15, 3096:24, 3107:2, 3143:3, 3209:11, 3218:19, 3218:25, 3220:9, 3222:25, 3239:24

**ease** [1] - 3002:13

**easier** [5] - 2895:14, 2998:2, 3012:15, 3236:14, 3236:17

**easily** [1] - 2914:11

**east** [3] - 3211:18, 3212:10, 3212:15

**East** [1] - 2888:9

**easy** [2] - 3007:6, 3076:6

**eat** [1] - 3245:2

**eclipses** [1] - 3051:21

**editorially** [1] - 3155:17

**educate** [1] - 3176:15

**education** [5] - 3040:16, 3042:8, 3099:6, 3176:18, 3178:4

**educational** [7] - 3056:4, 3176:24, 3184:22, 3236:4, 3236:11, 3239:24, 3239:25

**educational-type** [1] - 3239:25

**educator** [1] - 3211:20

**Edurant** [5] - 3169:4, 3169:11, 3169:13, 3169:15, 3169:20

**Edwards** [1] - 3228:18

**effect** [5] - 2895:7, 3052:24, 3062:17, 3089:13, 3090:25

**effective** [8] - 2892:13, 2933:11, 3003:23, 3051:11, 3055:2, 3082:12, 3089:20, 3090:1

**effectiveness** [2] - 3095:5, 3204:5

**effects** [4] - 3050:8, 3050:11, 3062:5, 3062:6

**efficacious** [3] - 3049:19, 3049:20, 3214:13

**efficacy** [3] - 2892:18, 2909:20, 3057:13

**effort** [4] - 3021:8, 3174:2, 3175:13, 3189:24

**efforts** [3] - 3095:5, 3204:3, 3204:6

**eight** [3] - 2907:7, 2917:12, 3070:8

**eight-plus** [1] - 3070:8

**either** [12] - 2911:6, 2912:6, 2912:16, 2912:23, 2933:21, 2942:12, 2974:13, 2990:7, 3166:13, 3167:14, 3201:20, 3228:6

**elements** [1] - 3045:25

**eliminate** [2] - 3034:13, 3061:20

**ELMO** [10] - 2891:8, 2891:10, 2925:14, 2985:17, 3014:13, 3019:19, 3024:25, 3104:23, 3136:21, 3167:20

**eluded** [1] - 3015:20

**email** [30] - 2934:23, 2935:1, 2944:19, 2951:17, 2951:21, 2952:1, 2952:17, 2958:21, 2958:23, 2959:1, 2959:2, 2960:4, 2960:10, 2960:14, 2962:25, 2965:23, 2966:7, 2968:1, 2997:22, 2998:4, 3032:20, 3041:5, 3168:3,

**educator** continues in next column

**educator** [1] - 3211:20

3230:4, 3230:6, 3230:24, 3237:2, 3237:16, 3250:15

**emails** [4] - 3029:24, 3029:25, 3030:7, 3030:10

**embrace** [1] - 3009:8

**embraced** [1] - 3023:8

**emotions** [1] - 3223:22

**emphasis** [1] - 3098:15

**emphasized** [1] - 3098:17

**employee** [6] - 2910:15, 2982:23, 2983:1, 3170:12, 3170:14, 3173:17

**employee's** [1] - 3166:18

**employees** [17] - 2924:8, 2927:3, 2927:14, 2928:21, 2929:12, 2936:8, 2954:8, 2982:15, 2982:16, 2982:20, 2983:18, 2983:24, 3007:2, 3046:9, 3088:11, 3092:1, 3204:20

**employment** [2] - 2910:17, 3220:9

**enable** [1] - 3079:4

**encompassed** [1] - 2965:13

**encountered** [1] - 3050:11

**encouraged** [1] - 3043:14

**end** [20] - 2902:20, 2943:17, 2943:18, 2947:2, 2968:24, 2985:15, 3015:6, 3053:20, 3053:24, 3054:6, 3054:8, 3075:22, 3077:13, 3077:24, 3130:10, 3130:14, 3132:16, 3185:2, 3207:12, 3207:13

**endanger** [1] - 3063:4

**ended** [6] - 2985:15, 3005:20, 3051:3, 3097:7, 3207:14, 3253:9

**endocrinologists** [1] - 3209:24

**endorsed** [1] - 3017:15

**energy** [2] - 3044:11,

3093:5

**enforcement** [5] - 2897:9, 3047:17, 3058:2, 3058:21, 3059:3

**engage** [2] - 3008:4, 3092:2

**engaged** [1] - 3036:9

**engagement** [2] - 2999:23, 3013:18

**engagements** [1] - 2909:12

**engaging** [2] - 3095:6, 3103:16

**England** [3] - 3199:21, 3228:21

**enhance** [1] - 3087:19

**enhances** [2] - 3057:5

**enjoy** [1] - 3214:24

**enjoyed** [1] - 3213:9

**enlarge** [4] - 2935:12, 2935:14, 2935:15, 2966:1

**ensure** [2] - 2928:13, 2995:14

**ensuring** [1] - 3248:12

**entered** [7] - 2901:10, 2921:22, 2931:3, 2931:20, 3046:20, 3198:14, 3210:14

**enterprise** [1] - 3046:5

**enters** [5] - 2921:2, 3014:1, 3065:2, 3093:8, 3152:15

**entertain** [1] - 2915:13

**enticement** [1] - 3058:17

**entire** [9] - 2974:25, 3071:9, 3072:23, 3076:3, 3076:15, 3165:15, 3172:6, 3208:10, 3228:2

**entirely** [1] - 3110:4

**entities** [3] - 3037:4, 3068:10, 3092:2

**entitled** [1] - 3263:5

**entity** [3] - 3073:5, 3088:25, 3130:1

**entry** [2] - 3014:24, 3015:1

**environment** [4] - 2927:4, 3045:15, 3098:18, 3217:4

**envision** [1] - 3050:13

**equally** [2] - 2911:21, 2911:24

**equals** [1] - 3220:17

**equate** [1] - 2901:12

**error** [2] - 2941:9, 2944:5

**especially** [6] - 2919:18, 2986:15, 3005:21, 3060:18, 3062:12, 3073:6

**ESQUIRE** [8] - 2888:14, 2888:15, 2888:15, 2888:16, 2888:16, 2888:19, 2888:20, 2888:20

**essence** [1] - 2893:20

**essentially** [6] - 2902:24, 2979:4, 2982:3, 3021:25, 3078:6, 3087:14

**establish** [7] - 2898:3, 2911:8, 2912:3, 2917:4, 2919:22, 3002:3, 3002:10

**established** [4] - 2911:14, 2911:16, 2911:25, 2988:8

**estimate** [4] - 2964:7, 2964:10, 3074:22, 3239:9

**et** [2] - 2888:3, 2900:13

**ethical** [2] - 2928:13, 2981:9

**ethics** [5] - 2982:4, 3043:9, 3045:23, 3045:25, 3238:1

**evaluate** [1] - 3172:6

**evaluated** [2] - 3067:22, 3181:12

**Evans** [2] - 3202:8, 3202:15

**evening** [3] - 3113:12, 3258:15

**event** [3] - 3149:20, 3178:11, 3241:8

**events** [2] - 2905:10, 3179:1

**eventually** [3] - 2906:24, 2917:11, 3206:21

**everywhere** [1] - 3181:22

**evidence** [75] - 2889:9, 2889:10, 2889:11, 2889:12, 2889:13, 2889:14, 2889:15, 2889:16, 2889:17, 2889:17, 2889:18, 2889:19, 2889:20, 2889:21, 2889:22, 2889:23, 2889:24, 2889:24, 2889:25, 2889:25, 2898:9, 2898:15, 2900:4, 2913:19,

2926:20, 2929:6, 2935:11, 2937:19, 2939:16, 2941:1, 2945:14, 2954:18, 2959:10, 2961:19, 2963:5, 2966:5, 2968:12, 2970:12, 2978:21, 2981:18, 3014:8, 3019:14, 3033:25, 3035:2, 3047:11, 3077:2, 3095:21, 3098:10, 3120:8, 3122:11, 3124:20, 3125:1, 3128:18, 3128:19, 3129:4, 3129:9, 3129:13, 3130:21, 3137:13, 3138:14, 3141:12, 3158:6, 3184:15, 3186:14, 3191:3, 3194:18, 3195:5, 3195:8, 3200:2, 3230:2, 3241:3, 3242:24, 3244:3, 3250:12, 3251:16

**exact** [2] - 2991:8, 3019:8

**exactly** [11] - 2892:11, 2938:19, 2988:23, 3005:7, 3031:13, 3122:9, 3137:6, 3182:24, 3216:17, 3247:14, 3251:21

**exam** [2] - 2985:16, 2998:15

**examination** [8] - 2899:9, 2900:7, 2921:13, 3011:22, 3093:10, 3101:1, 3148:9, 3193:2

**EXAMINATION** [14] - 2889:3, 2889:3, 2889:4, 2889:5, 2889:5, 2889:6, 2889:7, 2921:18, 2985:8, 3025:2, 3040:5, 3102:13, 3186:12, 3205:21

**EXAMINATIONS** [1] - 2889:2

**examine** [2] - 3148:4, 3195:6

**examined** [1] - 3189:19

**examining** [4] - 2899:22, 2911:23, 3091:6, 3145:25

**example** [12] - 3025:21, 3025:22,

3057:24, 3061:24, 3068:10, 3076:4, 3115:25, 3118:6, 3118:13, 3166:24, 3169:19, 3253:2

**examples** [2] - 2930:1, 2930:3, 2930:4

**except** [1] - 3147:16

**exception** [1] - 3141:20

**exceptional** [1] - 3021:7

**exchange** [4] - 2929:16, 2944:19, 2958:22, 3257:25

**excited** [1] - 3214:21

**exciting** [2] - 3214:17, 3214:20

**exclusion** [1] - 2928:22

**excuse** [11] - 2893:7, 2935:6, 2936:25, 2955:8, 2962:24, 2967:10, 3034:4, 3074:5, 3092:16, 3111:3, 3194:5

**excused** [3] - 3039:8, 3205:2, 3262:14

**executive** [9] - 2952:8, 2953:16, 2954:7, 2956:10, 2970:15, 3079:12, 3079:24, 3081:18, 3168:13

**executives** [3] - 2942:25, 2943:3, 3079:8

**exercise** [1] - 3155:2

**exhibit** [19] - 2910:24, 2912:19, 2913:9, 2913:10, 2925:16, 2929:8, 2932:3, 2946:15, 2965:22, 2974:22, 2975:1, 2977:10, 3032:5, 3074:8, 3087:7, 3097:6, 3142:21, 3193:25

**Exhibit** [63] - 2889:8, 2889:9, 2889:9, 2889:10, 2889:11, 2889:12, 2889:13, 2889:14, 2889:15, 2889:16, 2889:17, 2889:18, 2889:19, 2889:20, 2889:21, 2889:22, 2889:23, 2924:14, 2926:20, 2929:6, 2930:13, 2931:25, 2935:11, 2936:24, 2937:13,

2937:19, 2939:7, 2939:16, 2941:1, 2943:6, 2945:13, 2951:17, 2954:18, 2959:10, 2960:10, 2961:19, 2963:5, 2965:23, 2966:5, 2968:12, 2970:12, 2978:21, 2981:18, 2985:19, 2988:17, 2994:13, 3010:25, 3014:8, 3019:14, 3082:1, 3195:5, 3196:21, 3196:23, 3196:24, 3198:4, 3199:11, 3199:20, 3199:21, 3200:1, 3241:3, 3242:24, 3244:3, 3251:16

**exhibits** [12] - 2912:18, 2914:10, 2914:11, 2914:24, 3047:15, 3047:18, 3048:3, 3048:12, 3064:16, 3065:21, 3066:15, 3190:17

**exist** [2] - 3033:15, 3178:8

**existing** [1] - 3009:18

**exists** [1] - 3141:23

**exit** [4] - 2959:23, 2966:18, 3064:6, 3143:13

**expand** [2] - 3107:20, 3123:16

**expanded** [4] - 2943:11, 2990:3, 3005:15, 3005:19

**expect** [13] - 2984:7, 2984:24, 2999:10, 2999:12, 2999:14, 3003:16, 3007:12, 3033:10, 3033:14, 3068:10, 3089:2, 3124:15, 3167:7

**expectation** [3] - 2935:22, 2942:14, 3004:19

**expectations** [4] - 2936:8, 3003:8, 3007:9, 3007:17

**expected** [7] - 2964:11, 2970:17, 2971:3, 2998:24, 3122:2, 3164:18, 3227:12

**expeditious** [1] - 2914:22

**expenditure** [2] - 3050:15, 3051:21

**expenditures** [2] - 3052:3, 3052:13
**experience** [21] - 2997:11, 3000:8, 3043:23, 3044:3, 3046:12, 3055:16, 3061:3, 3097:18, 3099:6, 3121:9, 3162:14, 3171:6, 3176:8, 3176:12, 3180:11, 3184:8, 3209:19, 3211:7, 3218:10, 3221:22, 3237:7
**experienced** [13] - 2965:2, 2965:16, 2990:12, 2991:23, 2992:2, 3003:21, 3010:11, 3015:9, 3016:16, 3060:12, 3096:24, 3184:9, 3255:6
**experiences** [1] - 3002:6
**experiencing** [1] - 3107:2
**expert** [36] - 3047:12, 3053:19, 3099:20, 3099:24, 3101:2, 3101:13, 3101:19, 3101:20, 3103:21, 3113:25, 3121:6, 3121:13, 3134:21, 3134:24, 3135:18, 3136:20, 3137:5, 3137:12, 3137:13, 3137:16, 3138:25, 3139:15, 3146:1, 3146:13, 3146:24, 3147:8, 3148:14, 3158:12, 3158:16, 3159:10, 3160:4, 3160:22, 3188:10, 3188:14, 3191:20, 3202:13
**expertise** [4] - 3054:13, 3099:17, 3202:4, 3203:23
**experts** [6] - 3050:1, 3050:10, 3134:24, 3202:7, 3239:4, 3239:5
**explain** [8] - 2924:9, 3045:23, 3076:2, 3091:17, 3221:1, 3236:6, 3254:6, 3259:12
**explained** [3] - 2927:3, 3124:15, 3249:10

**explaining** [1] - 3126:14
**explains** [1] - 3110:18
**explanation** [1] - 3054:5
**explanations** [1] - 3124:12
**explore** [1] - 3050:19
**exposed** [1] - 3096:8
**expressed** [3] - 2944:19, 3222:25, 3223:2
**expressly** [1] - 2904:15
**extend** [1] - 3090:11
**extended** [1] - 2931:7
**extensively** [1] - 3181:10
**extent** [2] - 3031:17, 3050:22
**external** [1] - 3208:22
**Extracorporeal** [1] - 3044:14
**extraordinarily** [1] - 3060:17
**extremely** [3] - 2981:3, 3008:7, 3209:5
**eyes** [2] - 2912:24, 3030:4

## F

**Facebook** [2] - 3117:20, 3149:1
**faced** [1] - 3015:17
**faces** [1] - 2921:8
**facial** [1] - 2919:1
**facing** [2] - 2913:18, 3224:10
**fact** [40] - 2897:8, 2898:9, 2901:7, 2909:18, 2915:24, 2922:21, 2923:1, 2927:13, 2930:15, 2934:13, 2963:14, 2981:1, 2984:21, 3004:13, 3007:2, 3020:17, 3021:3, 3021:5, 3026:4, 3026:6, 3026:10, 3046:6, 3048:20, 3059:11, 3059:14, 3088:19, 3104:17, 3114:19, 3132:13, 3141:23, 3156:20, 3159:1, 3178:15, 3188:10, 3191:17, 3196:4, 3197:20, 3200:15, 3214:6,

3216:21
**factor** [2] - 3056:19, 3097:3
**factored** [1] - 3076:14
**factors** [2] - 2911:1, 2987:16
**factory** [1] - 3172:20
**facts** [3] - 2895:24, 2931:10, 2996:4
**failing** [1] - 3010:12
**failure** [2] - 3059:21, 3070:19
**Fair** [1] - 3015:13
**fair** [87] - 2916:12, 2922:23, 2923:21, 2931:15, 2931:24, 2933:24, 2936:6, 2938:4, 2938:12, 2938:25, 2940:15, 2945:4, 2946:14, 2947:1, 2948:25, 2949:18, 2949:19, 2951:8, 2954:4, 2954:5, 2962:20, 2964:16, 2968:6, 2970:7, 2983:20, 2984:2, 2989:2, 2989:3, 2997:1, 3002:23, 3006:15, 3010:17, 3017:6, 3017:16, 3017:18, 3033:11, 3033:16, 3043:21, 3049:7, 3093:16, 3100:5, 3103:12, 3103:19, 3103:24, 3109:3, 3109:18, 3110:12, 3110:23, 3112:14, 3114:1, 3120:9, 3126:23, 3129:6, 3133:25, 3134:14, 3135:2, 3146:2, 3147:20, 3157:18, 3157:19, 3157:20, 3158:7, 3158:9, 3160:25, 3162:18, 3162:25, 3164:23, 3166:23, 3176:17, 3181:4, 3181:15, 3189:6, 3189:11, 3190:25, 3191:1, 3191:4, 3191:5, 3192:17, 3194:2, 3194:14, 3195:14, 3196:2, 3202:18, 3204:11, 3207:13, 3212:25
**fairly** [2] - 3000:9, 3231:2
**fairness** [2] - 2922:14,

3060:10
**faith** [1] - 2915:4
**fall** [1] - 2991:16
**falling** [1] - 2943:20
**falls** [1] - 3150:8
**false** [6] - 2892:17, 2933:16, 2975:11, 3060:25, 3061:19, 3062:14
**False** [3] - 2927:24, 2928:8, 2929:22
**falsity** [1] - 2902:18
**familiar** [10] - 3058:6, 3133:5, 3133:6, 3140:12, 3167:23, 3182:4, 3182:8, 3183:17, 3207:8, 3218:12
**family** [3] - 2983:17, 3042:13, 3055:5
**fancy** [1] - 3245:2
**far** [5] - 2896:3, 2989:12, 3053:13, 3073:7, 3145:13
**fashion** [3] - 2903:3, 3227:5, 3227:6
**fast** [6] - 2893:11, 2958:20, 3050:17, 3050:18, 3212:23, 3226:14
**fast-forward** [1] - 3226:14
**fast-forwarding** [1] - 2958:20
**faster** [1] - 2939:18
**father** [1] - 3042:17
**fathers** [1] - 2982:12
**fault** [1] - 3027:3
**faulty** [1] - 3147:13
**faux** [1] - 3088:15
**favor** [3] - 2908:16, 3190:14, 3234:9
**favorable** [6] - 3055:8, 3094:8, 3218:18, 3220:1, 3234:11, 3234:12
**favorite** [1] - 3244:11
**FBP** [2] - 2959:3, 2959:13
**FDA** [19] - 2994:7, 2995:8, 2995:15, 2996:1, 2996:16, 2996:25, 2997:19, 3032:11, 3032:22, 3032:24, 3033:9, 3049:14, 3049:17, 3051:3, 3057:6, 3118:15, 3133:3, 3133:16, 3133:19
**FDA-approved** [2] -

2996:25, 3051:3
**fear** [4] - 3226:24, 3229:17, 3229:18, 3229:20
**fearing** [1] - 3238:11
**feature** [1] - 3181:16
**February** [1] - 2943:19
**FEDERAL** [1] - 3263:1
**federal** [5] - 2901:10, 2921:23, 3009:7, 3015:17, 3059:1
**feedback** [6] - 2996:16, 3008:16, 3025:21, 3025:22, 3081:7
**fell** [1] - 2988:23
**felt** [7] - 3159:13, 3190:19, 3211:1, 3238:9, 3245:5, 3250:8, 3255:1
**few** [17] - 2897:24, 2917:8, 2917:16, 2920:19, 2922:2, 2972:24, 2985:13, 2999:25, 3038:8, 3060:17, 3099:15, 3122:20, 3150:16, 3212:20, 3225:17, 3237:2, 3259:21
**field** [24] - 3023:4, 3027:4, 3032:10, 3054:13, 3081:2, 3081:8, 3082:8, 3082:11, 3082:12, 3085:15, 3092:7, 3092:14, 3097:22, 3146:15, 3200:23, 3203:6, 3203:23, 3216:11, 3220:11, 3227:21, 3236:11, 3238:6, 3238:10, 3247:21
**figure** [2] - 2903:8, 2979:4
**figures** [1] - 2954:24
**file** [2] - 2953:2, 2953:21
**filed** [3] - 2902:17, 2928:3, 3117:7
**fill** [1] - 3173:6
**filled** [2] - 3110:13, 3250:17
**filling** [1] - 3238:22
**final** [9] - 2898:14, 2904:25, 2908:4, 2946:12, 2983:4, 2995:7, 3009:18, 3032:21, 3098:22
**finally** [1] - 3021:2
**finance** [1] - 2992:20

financial [8] -
2977:11, 2992:22,
3028:6, 3028:10,
3028:12, 3058:20,
3074:2, 3177:10
financially [1] - 3178:5
fine [5] - 2891:2,
2920:6, 3063:17,
3137:20, 3177:19
fines [2] - 2928:22,
3092:4
finish [2] - 2964:22,
3019:3
Finkelstein [1] -
3230:7
fir [1] - 3238:11
fired [1] - 3229:13
firm [1] - 3120:13
first [66] - 2891:1,
2894:13, 2895:4,
2897:1, 2901:12,
2903:6, 2918:10,
2919:6, 2920:4,
2931:20, 2952:12,
2952:16, 2952:20,
2953:4, 2953:21,
2953:24, 2954:9,
2954:11, 2971:2,
2982:9, 2982:10,
2983:17, 2983:22,
2994:19, 3000:19,
3005:14, 3005:23,
3008:4, 3008:15,
3011:5, 3015:21,
3022:8, 3038:15,
3046:24, 3048:6,
3049:19, 3068:8,
3071:23, 3079:18,
3084:3, 3086:21,
3089:22, 3106:1,
3106:21, 3107:3,
3118:14, 3136:12,
3139:5, 3142:17,
3142:18, 3142:19,
3145:12, 3151:14,
3152:10, 3154:7,
3189:24, 3206:15,
3207:15, 3212:9,
3216:19, 3217:23,
3219:22, 3219:24,
3220:10, 3223:24
firsts [1] - 3152:12
Fisher [1] - 2888:8
five [15] - 2918:15,
2918:17, 2919:4,
2919:7, 2920:20,
2920:23, 2931:8,
2940:3, 3012:21,
3012:23, 3012:24,
3013:4, 3042:21,

3052:7, 3052:9
fix [7] - 3125:22,
3127:2, 3128:11,
3128:12, 3192:4,
3208:23, 3209:2
fixation [1] - 3208:22
fixes [1] - 2924:25
flack [1] - 3223:25
flash [2] - 3253:13,
3253:17
flip [1] - 3018:11
flipping [2] - 3188:1,
3192:25
FLOM [1] - 2888:19
floor [3] - 3010:20,
3013:19, 3026:1
Florida [14] - 2998:6,
2998:22, 3070:1,
3206:9, 3206:12,
3206:15, 3206:16,
3207:21, 3208:1,
3211:20, 3237:4,
3237:15, 3251:5,
3251:11
focused [6] - 2980:13,
2994:10, 2994:18,
3073:11, 3235:22,
3235:23
focusing [1] - 2934:5
folds [1] - 3057:17
folks [39] - 2890:5,
2890:6, 2890:16,
2910:4, 2911:21,
2917:2, 2918:4,
2918:14, 2918:20,
2921:4, 3005:6,
3008:15, 3008:18,
3012:2, 3013:3,
3014:2, 3020:17,
3020:19, 3020:25,
3022:13, 3040:22,
3063:21, 3064:1,
3065:3, 3092:18,
3092:25, 3093:9,
3093:11, 3102:23,
3103:2, 3103:10,
3103:15, 3115:7,
3117:6, 3143:15,
3152:16, 3185:9,
3205:18, 3262:10
follow [1] - 2995:18
followed [3] - 3004:7,
3238:5, 3238:6
following [2] -
2914:24, 2996:20
FOLLOWS [2] -
3039:22, 3205:14
Food [10] - 2933:11,
3050:16, 3050:23,
3051:18, 3057:7,

3057:11, 3058:1,
3203:4, 3203:11,
3203:16
food [1] - 3239:8
foodie [1] - 3241:18
football [1] - 3042:17
FOR [1] - 2888:1
for-profit [1] - 3046:5
force [19] - 2942:21,
2942:25, 2962:2,
2962:10, 2963:20,
2964:3, 2964:6,
2997:21, 3005:8,
3023:4, 3054:24,
3067:13, 3067:23,
3070:9, 3078:18,
3082:2, 3086:2,
3224:19, 3224:20
force's [1] - 3198:20
forecast [69] -
2937:22, 2938:6,
2938:20, 2941:8,
2942:5, 2942:10,
2943:10, 2944:5,
2945:3, 2946:3,
2946:8, 2946:20,
2946:25, 2948:1,
2948:6, 2956:1,
2956:3, 2958:15,
2966:8, 2966:9,
2976:16, 2980:2,
2986:21, 2987:13,
2992:19, 2992:21,
3003:19, 3004:12,
3006:22, 3026:19,
3027:9, 3027:12,
3027:13, 3027:18,
3028:3, 3031:10,
3031:17, 3045:9,
3045:19, 3072:9,
3072:25, 3074:1,
3074:2, 3076:2,
3076:3, 3076:5,
3076:7, 3076:15,
3076:16, 3076:23,
3077:4, 3078:7,
3078:17, 3079:2,
3079:7, 3079:13,
3079:14, 3079:15,
3080:1, 3080:6,
3163:21, 3164:1,
3164:5, 3165:1,
3165:10, 3165:23,
3166:6, 3191:9,
3225:3
forecasted [8] -
2942:20, 2955:15,
2957:23, 2963:21,
2963:22, 3004:10,
3078:15, 3079:16

forecasting [14] -
2934:18, 2937:11,
2986:2, 2986:8,
2988:6, 2992:15,
2992:19, 2993:3,
3003:7, 3028:6,
3031:9, 3043:8,
3115:13, 3165:22
forecasts [19] -
2938:23, 2940:21,
2941:4, 2977:13,
2977:17, 2979:25,
2980:20, 2987:4,
3004:16, 3004:25,
3027:22, 3044:22,
3076:8, 3076:20,
3163:10, 3163:15,
3165:17, 3166:9
foregoing [2] -
3009:22, 3263:4
forever [1] - 3030:11
forget [3] - 3093:3,
3137:23, 3146:12
forgive [2] - 3093:23,
3103:4
forgotten [5] -
2919:25, 3093:23,
3105:11, 3105:14,
3105:17
fork [3] - 2941:5,
3078:23, 3079:6
fork-in-the-road [1] -
2941:5
form [9] - 2899:23,
2996:10, 3053:10,
3086:10, 3100:10,
3121:2, 3144:24,
3161:14, 3190:5
formal [1] - 3216:10
formed [3] - 3115:25,
3118:3, 3169:10
forming [2] - 3160:13,
3162:9
forms [8] - 3059:6,
3061:1, 3086:1,
3087:12, 3108:7,
3203:10, 3237:8,
3237:9
formulate [1] -
2903:25
formulation [1] -
2989:22
Fort [1] - 3206:10
forth [2] - 3113:10,
3208:14
forthright [1] - 3063:5
fortunately [1] -
3094:23
forward [10] -
2909:10, 2945:11,

2961:8, 2968:1,
3005:19, 3042:1,
3094:23, 3215:9,
3226:14, 3237:3
forwarded [1] - 2997:6
forwarding [1] -
2958:20
foundation [3] -
2951:23, 2953:13,
3149:17
four [9] - 3112:16,
3123:2, 3123:17,
3123:24, 3208:4,
3258:11, 3259:10
four-month [1] -
3208:4
fourth [1] - 3010:6
frame [2] - 2900:21,
3207:4
franchise [1] -
2967:12
Francisco [2] -
3250:22, 3250:24
Francois [4] - 2937:3,
2937:4, 2937:6,
2937:10
Frank [11] - 2998:5,
3216:6, 3216:8,
3216:23, 3217:18,
3219:18, 3220:11,
3220:14, 3220:18,
3220:20, 3227:1
fraud [1] - 3148:3
freelance [1] - 3156:6
frequently [6] -
2941:15, 3141:2,
3219:10, 3220:12,
3227:1, 3227:19
freshman [1] -
3042:13
friend [3] - 3222:16,
3257:1, 3257:3
friendly [6] - 3034:14,
3132:22, 3217:13,
3219:4, 3219:11,
3224:7
friends [11] - 3115:2,
3115:8, 3115:16,
3116:2, 3116:15,
3117:13, 3117:20,
3120:14, 3210:20,
3228:22
Frisco's [3] - 3242:5,
3242:15, 3243:2
front [12] - 2899:13,
2899:14, 2960:11,
2964:19, 2965:12,
3136:24, 3137:8,
3194:24, 3211:24,
3223:24, 3242:12,

3260:13
**Frontiers** [1] - 3233:3
**full** [19] - 2912:21,
2955:14, 2955:22,
2969:19, 2979:20,
2989:14, 2990:2,
2997:1, 3043:2,
3043:10, 3050:22,
3054:2, 3062:4,
3080:14, 3080:15,
3090:6, 3090:7,
3213:11
**full-time** [1] - 3043:10
**full-year** [1] - 2979:20
**fuller** [1] - 3189:15
**fully** [1] - 3050:19
**functional** [1] -
3007:13
**functions** [1] -
3022:12
**funding** [2] - 3002:12,
3015:17
**future** [5] - 2956:6,
2957:25, 2983:9,
3051:19

## G

**G.K** [3] - 3018:15,
3025:24, 3026:8
**Gables** [3] - 3251:4,
3251:11, 3251:20
**gain** [2] - 3050:18,
3261:6
**gaining** [2] - 3091:21,
3107:2
**game** [3] - 3087:15,
3146:2, 3221:17
**gaslighting** [1] -
3187:24
**gateway** [1] - 3054:18
**gather** [1] - 3222:20
**gathered** [1] - 3044:3
**gating** [3] - 2959:3,
2959:13, 2963:7
**geared** [2] - 2899:1,
3087:16
**gears** [1] - 2915:17
**gee** [1] - 3046:17
**general** [4] - 2892:10,
2986:7, 3036:2,
3118:17
**General** [4] - 2932:19,
3058:4, 3058:7,
3058:22
**generally** [8] - 2999:8,
3076:19, 3103:15,
3122:13, 3162:4,
3177:14, 3178:21,
3180:9

**generate** [4] - 3051:9,
3068:9, 3079:20
**generated** [1] -
3029:25
**generates** [1] -
3049:18
**gentleman** [3] -
3010:17, 3117:13,
3222:9
**Genus** [1] - 2952:1
**GEOFFREY** [1] -
2888:20
**George** [5] - 3001:19,
3039:17, 3039:25,
3040:10, 3055:14
**GEORGE** [2] - 2889:4,
3039:21
**GI** [1] - 3094:9
**girlfriend** [1] -
3211:16
**gist** [1] - 2894:5
**given** [16] - 2897:22,
2898:25, 2901:16,
2930:1, 3003:1,
3004:16, 3023:3,
3036:10, 3036:20,
3110:10, 3130:5,
3138:21, 3154:9,
3158:2, 3190:9
**glad** [1] - 3191:5
**Glatt** [8] - 3051:5,
3053:19, 3054:7,
3055:24, 3061:24,
3099:25, 3155:5,
3192:7
**Glaxosmithkline** [4] -
3209:16, 3209:17,
3211:16, 3215:1
**GLENN** [1] - 2889:2
**Glenn** [5] - 2959:17,
3007:3, 3049:5,
3122:18
**global** [1] - 3002:13
**globally** [1] - 3002:4
**glossaries** [1] -
2993:13
**glossy** [1] - 2993:10
**glove** [1] - 3057:11
**glucose** [1] - 3232:13
**goal** [8] - 2936:10,
2936:21, 2969:2,
3076:12, 3095:4,
3178:4, 3216:21,
3216:22
**goals** [2] - 2968:18,
2968:22, 3020:22,
3033:20, 3076:1,
3076:3, 3076:16
**Gomez** [3] - 3212:18,
3225:15, 3244:12

**Gossett** [5] - 2944:18,
2952:2, 2959:18,
2959:21, 3049:3
**government** [2] -
2921:23, 3059:1
**Government** [47] -
2893:14, 2893:20,
2893:22, 2897:8,
2898:5, 2901:10,
2901:13, 2901:20,
2901:25, 2902:1,
2902:16, 2902:17,
2902:20, 2902:22,
2902:25, 2903:5,
2903:14, 2904:16,
2908:13, 2922:2,
2922:22, 2923:2,
2923:6, 2923:10,
2923:14, 2927:18,
2927:22, 2928:23,
2929:14, 2930:11,
2930:16, 2930:22,
2931:21, 2932:20,
2933:2, 2994:5,
2994:7, 3001:18,
3002:5, 3012:12,
3015:18, 3019:7,
3030:10, 3047:17,
3058:3, 3198:11,
3198:14
**Government's** [3] -
2902:15, 2903:20,
2904:10
**grab** [1] - 2895:15
**graduated** [3] -
3140:10, 3206:25,
3207:6
**graduation** [1] -
3042:18
**Graham** [18] - 3049:3,
3116:15, 3116:18,
3116:23, 3117:2,
3118:6, 3195:6,
3195:12, 3195:16,
3200:14, 3213:24,
3214:1, 3214:6,
3228:17, 3230:11,
3246:7, 3249:2,
3261:9
**Gramercy** [1] -
3249:13
**granular** [2] - 2894:18,
2897:2
**graph** [6] - 2937:14,
2955:18, 2956:13,
2958:2, 3052:11,
3185:21
**graphic** [2] - 3185:3,
3185:9
**great** [2] - 2920:22,

3063:16, 3214:12,
3214:20, 3214:21,
3218:15, 3233:11,
3252:15
**greater** [2] - 3053:12,
3069:24
**grew** [2] - 3206:8,
3206:9
**Grill** [4] - 3240:7,
3240:8, 3240:15,
3241:8
**grit** [1] - 3218:15
**Groningen** [14] -
3139:6, 3139:10,
3139:23, 3140:6,
3140:13, 3140:21,
3152:22, 3153:1,
3153:10, 3153:22,
3154:4, 3155:12,
3156:20, 3187:8
**Groningen's** [1] -
3158:1
**grooms** [1] - 3117:13
**Grooms** [2] - 3049:3,
3117:17
**gross** [4] - 2971:3,
2971:4, 2971:19,
2972:4
**ground** [1] - 3212:24
**grounds** [1] - 2951:23
**group** [7] - 2924:5,
3002:2, 3002:8,
3008:5, 3020:17,
3084:18, 3084:19
**groups** [2] - 3009:6,
3022:13
**grow** [2] - 2949:4,
2970:17
**grown** [2] - 2951:1,
2951:14
**growth** [6] - 2937:12,
2980:1, 3031:23,
3074:7, 3077:9,
3077:16
**guess** [10] - 2898:24,
2920:5, 2972:10,
2973:25, 2999:4,
3008:6, 3144:24,
3146:6, 3151:17,
3255:21
**guidance** [4] -
2995:15, 2996:2,
3002:20, 3031:13
**guide** [4] - 2919:16,
3053:5, 3054:3,
3241:19
**guidelines** [1] -
3130:22
**guiding** [1] - 3098:5
**guy** [4] - 3043:1,

3079:15, 3080:2,
3216:9
**guys** [9] - 2908:7,
2912:17, 2919:18,
2924:20, 2973:23,
2976:23, 3217:1,
3219:23, 3246:11

## H

**habits** [4] - 3055:12,
3057:4, 3057:10,
3085:7
**Hagins** [1] - 3200:5
**half** [5] - 3072:9,
3104:4, 3113:6,
3115:20, 3120:13
**hand** [3] - 3057:11,
3074:23, 3254:7
**handle** [1] - 2910:24
**handled** [1] - 3088:2
**hands** [4] - 3087:13,
3108:8, 3108:12,
3229:21
**happy** [8] - 2913:3,
2917:20, 2943:5,
2948:24, 3041:14,
3063:4, 3249:23,
3249:24
**hard** [10] - 2974:15,
3005:20, 3041:3,
3064:18, 3093:13,
3209:4, 3209:5,
3216:25, 3238:4,
3245:4
**harm** [1] - 3035:19
**harmful** [1] - 3083:6
**harvest** [1] - 3084:11
**Haub** [1] - 3043:4
**HAVING** [2] - 3039:21,
3205:13
**HCC** [1] - 3229:16
**head** [10] - 2907:16,
3010:17, 3035:6,
3035:9, 3079:15,
3080:2, 3212:17,
3229:22
**headquarters** [2] -
3081:14, 3097:24
**Health** [2] - 2932:19,
3001:21
**health** [5] - 2927:15,
3006:17, 3015:18,
3033:20, 3098:13
**healthcare** [6] -
2927:3, 2927:14,
3036:25, 3044:12,
3206:19, 3207:12
**healthy** [4] - 3219:23,
3231:5, 3232:14,

3233:1
**hear** [34] - 2900:14, 2913:3, 2916:20, 3056:14, 3065:25, 3066:14, 3081:10, 3088:6, 3090:13, 3117:19, 3118:13, 3132:23, 3142:25, 3143:25, 3144:1, 3188:14, 3188:15, 3191:12, 3191:23, 3193:15, 3194:8, 3194:9, 3194:23, 3195:16, 3195:18, 3195:20, 3195:22, 3196:14, 3200:22, 3201:2, 3202:15, 3218:5, 3234:20, 3245:6
**heard** [79] - 2901:18, 2901:22, 2912:5, 2912:18, 2912:19, 2922:11, 2931:2, 3007:4, 3007:5, 3033:21, 3036:8, 3037:14, 3038:7, 3048:1, 3049:8, 3049:9, 3051:5, 3055:24, 3056:10, 3061:23, 3077:25, 3083:25, 3087:24, 3095:22, 3114:20, 3117:14, 3118:7, 3119:12, 3119:15, 3122:6, 3124:11, 3125:17, 3125:23, 3126:13, 3127:18, 3130:10, 3130:14, 3131:15, 3132:3, 3134:24, 3169:4, 3182:1, 3187:23, 3188:5, 3191:8, 3194:1, 3194:12, 3194:17, 3201:16, 3203:2, 3203:18, 3212:10, 3212:22, 3216:20, 3217:6, 3219:23, 3223:7, 3225:2, 3228:25, 3229:2, 3229:3, 3230:11, 3234:23, 3235:16, 3239:22, 3239:23, 3240:16, 3243:10, 3249:21, 3252:11, 3254:5, 3255:20, 3255:21, 3258:19, 3259:22, 3259:25
**hearing** [5] - 3080:16, 3081:2, 3142:25, 3193:22, 3260:6

**hearsay** [16] - 2910:13, 2913:16, 2915:18, 2915:23, 2916:1, 3137:10, 3141:18, 3141:19, 3141:21, 3142:7, 3142:10, 3143:17, 3145:13, 3149:15, 3149:18, 3150:8
**hearsaying** [1] - 3149:12
**heart** [1] - 3209:24
**heavily** [2] - 2927:4, 2929:13
**heavy** [1] - 3123:18
**held** [7] - 2890:1, 3001:13, 3063:11, 3087:24, 3211:8, 3215:4, 3251:19
**hello** [1] - 3060:17
**help** [22] - 2921:11, 2991:9, 3002:13, 3009:6, 3010:4, 3010:11, 3020:25, 3042:13, 3049:20, 3049:21, 3051:11, 3053:18, 3054:5, 3058:19, 3062:7, 3069:1, 3115:13, 3138:3, 3168:21, 3174:12, 3209:2, 3221:22
**helped** [3] - 3002:3, 3002:10, 3214:7
**helpful** [5] - 2946:19, 2967:13, 3047:19, 3066:2, 3155:10
**helping** [4] - 2895:17, 3020:20, 3255:24, 3256:6
**hereto** [1] - 2916:5
**heretofore** [2] - 2916:3, 2916:6
**hi** [1] - 3206:2
**hidden** [1] - 2896:12
**high** [16] - 3007:9, 3007:17, 3042:10, 3181:10, 3184:3, 3206:11, 3206:12, 3209:6, 3209:7, 3216:20, 3216:21, 3221:14, 3261:4, 3261:10, 3261:18, 3261:24
**High** [1] - 3206:13
**high-stress** [1] - 3216:20
**high-writing** [1] - 3221:14
**higher** [12] - 2940:12,

2960:14, 2960:18, 3009:4, 3009:11, 3009:23, 3024:15, 3069:25, 3096:9, 3169:21, 3224:1, 3226:25
**higher-ups** [4] - 2960:14, 2960:18, 3224:1, 3226:25
**highest** [1] - 3196:14
**highlight** [2] - 2896:10, 2994:11
**highlighted** [8] - 2894:15, 2909:23, 2992:2, 2998:15, 3019:22, 3047:16, 3095:20, 3168:1
**highly** [6] - 2896:13, 3003:21, 3020:8, 3053:20, 3054:7, 3170:17
**himself** [1] - 3073:9
**hint** [1] - 3219:24
**hired** [4] - 3044:7, 3046:16, 3121:23, 3122:3
**historically** [1] - 3009:10
**hit** [5] - 2959:22, 2971:5, 2971:18, 3024:1, 3110:7
**HIV** [45] - 2944:7, 2949:16, 2957:4, 2957:11, 2963:15, 2986:15, 3001:18, 3001:20, 3002:3, 3002:14, 3002:24, 3008:5, 3015:8, 3015:10, 3020:9, 3020:19, 3021:3, 3021:5, 3021:7, 3021:10, 3053:4, 3059:16, 3069:25, 3122:14, 3124:12, 3126:1, 3169:5, 3171:10, 3173:4, 3173:12, 3182:25, 3211:15, 3211:20, 3211:21, 3211:25, 3212:21, 3214:17, 3219:24, 3221:4, 3222:18, 3232:16, 3232:17, 3259:13
**HIV/AIDS** [4] - 3002:25, 3014:20, 3015:1, 3020:1
**Hoffmann** [1] - 3044:17
**Hoffmann-La** [1] - 3044:17

**hold** [10] - 2917:21, 2958:23, 3007:10, 3007:13, 3007:16, 3018:21, 3019:3, 3043:18, 3123:7, 3204:14
**Hold** [1] - 3233:15
**hole** [1] - 2896:3
**Holshoe** [2] - 3049:3, 3228:20
**home** [5] - 3216:10, 3223:23, 3246:15, 3260:18, 3262:11
**homemade** [4] - 3222:3, 3222:4, 3252:11, 3253:21
**honestly** [1] - 3122:9
**Honeywell** [1] - 3044:11
**honor** [1] - 3001:19
**Honor** [164] - 2890:9, 2890:17, 2890:19, 2890:21, 2891:2, 2891:4, 2891:15, 2891:17, 2891:21, 2891:25, 2892:4, 2892:23, 2894:9, 2895:9, 2895:11, 2895:21, 2896:22, 2900:3, 2901:3, 2902:5, 2903:7, 2903:24, 2904:8, 2905:8, 2905:18, 2908:5, 2908:21, 2909:17, 2910:2, 2912:4, 2913:5, 2914:23, 2915:8, 2916:3, 2917:19, 2918:9, 2919:1, 2919:13, 2920:2, 2920:6, 2920:12, 2920:13, 2920:17, 2920:22, 2921:17, 2924:17, 2925:22, 2926:3, 2926:16, 2932:2, 2932:4, 2935:8, 2937:17, 2939:14, 2940:24, 2951:19, 2951:20, 2953:7, 2954:13, 2959:7, 2959:8, 2961:16, 2961:17, 2963:3, 2966:3, 2970:9, 2970:10, 2973:20, 2973:21, 2974:4, 2974:21, 2975:9, 2976:5, 2977:5, 2978:2, 2978:8, 2978:10, 2978:15, 2978:20,

2981:15, 2981:19, 2985:3, 2985:6, 2996:3, 2996:12, 3011:17, 3011:23, 3012:7, 3012:18, 3013:11, 3013:12, 3013:17, 3013:22, 3014:4, 3018:22, 3024:17, 3024:19, 3024:23, 3039:7, 3039:13, 3039:16, 3040:3, 3040:18, 3040:24, 3041:8, 3041:12, 3041:15, 3041:19, 3042:3, 3063:20, 3064:15, 3064:18, 3064:25, 3065:8, 3065:10, 3067:14, 3067:19, 3093:19, 3100:21, 3101:14, 3102:3, 3102:10, 3102:11, 3103:4, 3109:8, 3123:5, 3124:25, 3126:8, 3136:16, 3137:1, 3141:10, 3141:13, 3141:16, 3141:18, 3141:23, 3142:1, 3142:8, 3142:15, 3142:23, 3144:19, 3145:5, 3146:15, 3147:2, 3147:5, 3147:11, 3147:15, 3149:5, 3150:2, 3151:13, 3152:2, 3152:18, 3153:24, 3186:1, 3186:11, 3202:20, 3204:12, 3205:7, 3205:20, 3240:24, 3242:20, 3242:22, 3244:1, 3251:13, 3262:3
**Honor's** [3] - 2892:7, 2896:23, 2905:23
**Honorable** [4] - 2890:1, 3014:17, 3025:24
**HONORABLE** [1] - 2888:11
**honorable** [2] - 3018:14, 3026:12
**hope** [3] - 2909:17, 2999:21, 3237:11
**hoped** [1] - 3004:14
**hoping** [2] - 2940:2, 3048:23
**horrible** [1] - 3229:12
**horse** [1] - 2907:8
**hospital** [2] - 3147:18,

3239:18
**Hospital** [1] - 3218:11
**hospitals** [1] -
3044:12
**Hotel** [3] - 3251:4,
3251:11, 3251:12
**hotel** [3] - 3251:22,
3251:25, 3252:3
**hottest** [2] - 3238:23,
3241:19
**hour** [13] - 3075:12,
3111:14, 3111:17,
3114:15, 3120:7,
3121:23, 3188:24,
3189:4, 3191:20,
3246:15, 3253:10,
3258:18, 3259:3
**hourly** [2] - 3111:15,
3258:20
**hours** [13] - 3075:13,
3093:4, 3111:25,
3112:7, 3112:9,
3113:23, 3114:10,
3114:15, 3208:25,
3209:1, 3210:9,
3258:11, 3259:10
**hours'** [1] - 3190:8
**house** [2] - 3243:3,
3243:5
**House** [3] - 3025:7,
3026:1
**Howley** [2] - 3156:1,
3156:21
**Hsu** [3] - 3218:10,
3218:23, 3233:14
**hubs** [1] - 3020:19
**human** [2] - 3043:19,
3043:20
**Human** [2] - 2932:19,
3001:21
**hundred** [5] - 3029:24,
3076:7, 3132:18,
3239:11, 3255:21
**hundreds** [3] - 3162:4,
3192:22, 3196:9
**hurt** [1] - 3051:11
**hyperlipidemia** [3] -
3034:20, 3035:4,
3035:18

**I**

**I'll..** [1] - 2913:7
**I-L-L-U-P** [1] - 3040:1
**IAC** [2] - 3107:8,
3107:12
**Iacobellis** [5] - 2935:2,
3049:4, 3049:10,
3097:8, 3196:17
**idea** [9] - 2906:23,

2907:9, 2912:8,
2915:14, 2919:5,
3027:10, 3061:24,
3144:7, 3236:25
**identical** [1] - 3025:23
**identified** [6] -
2894:14, 3059:12,
3072:1, 3101:12,
3142:22, 3161:13
**identify** [2] - 2924:14,
3175:13
**ill** [1] - 3042:14
**illegal** [1] - 2892:10
**illness** [3] - 3050:5,
3050:6, 3060:1
**imagine** [1] - 2973:17
**immediately** [7] -
3042:2, 3082:14,
3207:2, 3208:3,
3212:1, 3223:2,
3224:15
**impact** [19] - 2927:15,
2949:7, 2994:20,
2994:21, 3047:9,
3055:8, 3061:21,
3062:4, 3085:6,
3085:12, 3089:20,
3090:4, 3090:5,
3092:8, 3092:14,
3099:4, 3166:17,
3166:20, 3204:6
**impacted** [1] - 3020:9
**impactful** [1] -
3095:12
**impacting** [1] -
3041:25
**impart** [1] - 3090:9
**imparted** [2] -
3056:20, 3090:2
**imparting** [2] -
3068:22, 3091:22
**impasse** [1] - 2904:1
**impeach** [3] - 3137:9,
3146:10, 3147:12
**impeaching** [1] -
3147:19
**impeachment** [8] -
3142:2, 3142:4,
3144:24, 3147:16,
3147:22, 3148:22,
3149:3, 3149:10
**impediment** [1] -
3062:10
**imperative** [1] -
2936:10
**implemented** [3] -
2942:25, 3026:24,
3026:25
**implicated** [1] -
2901:6

**implication** [4] -
2899:23, 2900:18,
2903:5, 3110:9
**implications** [2] -
3002:19, 3079:8
**imply** [2] - 2987:5,
3032:23
**implying** [1] - 3033:2
**important** [24] -
2893:6, 2898:4,
2903:1, 2983:15,
2986:11, 2995:13,
2996:20, 3008:14,
3015:9, 3028:7,
3046:2, 3046:7,
3050:24, 3055:3,
3082:20, 3082:25,
3083:11, 3083:13,
3114:25, 3172:17,
3179:11, 3190:19,
3221:20, 3255:13
**impression** [1] -
3082:9
**improper** [4] - 3061:1,
3103:16, 3148:9,
3149:10
**improperly** [3] -
2896:19, 3001:3,
3021:24
**improve** [1] - 3232:2
**improved** [1] - 3079:3
**improvement** [2] -
3167:8, 3228:6
**in-depth** [1] - 3066:23
**inactive** [1] - 3059:2
**inappropriate** [1] -
3142:16
**incentive** [5] - 3170:9,
3177:11, 3197:19,
3197:21, 3198:19
**incident** [1] - 3249:9
**inclined** [3] - 2899:11,
2904:4, 3192:15
**include** [6] - 2924:2,
2982:20, 2992:23,
3005:15, 3105:1,
3247:17
**included** [7] -
2957:16, 2980:7,
3027:13, 3028:2,
3182:12, 3190:12
**includes** [3] -
2929:20, 3031:17,
3075:4
**including** [13] -
2927:19, 2992:24,
2995:25, 3031:9,
3048:20, 3049:10,
3148:2, 3148:7,
3152:13, 3193:12,

3200:13, 3200:15,
3202:7
**inconsistent** [4] -
3006:3, 3110:4,
3119:3, 3120:2
**incorrect** [2] -
2910:18, 3146:19
**increase** [11] -
2949:22, 2950:6,
2961:2, 2961:11,
2962:1, 2962:2,
2971:24, 3009:11,
3167:9, 3182:6,
3256:9
**increased** [4] -
2999:20, 2999:21,
3167:4, 3247:15
**increases** [1] -
3009:13
**incremental** [1] -
3115:24
**independent** [1] -
2987:14
**indicate** [2] - 2996:14,
3001:2
**indicated** [3] - 2965:2,
3081:13, 3081:23
**indication** [12] -
2991:6, 2991:16,
2991:25, 3000:14,
3003:21, 3004:20,
3005:13, 3005:14,
3005:19, 3005:20,
3006:16, 3090:12
**indications** [7] -
2892:16, 2894:15,
2894:16, 2908:22,
2909:3, 2909:21,
3059:15
**indirectly** [2] - 2922:9,
2922:10
**individual** [5] -
2942:1, 3076:12,
3088:2, 3145:23,
3147:4
**individually** [1] -
3008:20
**individuals** [3] -
2924:3, 3049:9,
3219:23
**induce** [2] - 3036:19,
3103:11
**inducement** [3] -
2922:22, 2928:7,
2934:9
**inducements** [3] -
2984:6, 2984:23,
3058:23
**industry** [37] - 2927:4,
2927:14, 2929:13,

3001:11, 3001:23,
3002:5, 3008:24,
3009:10, 3017:20,
3040:11, 3042:19,
3042:21, 3042:24,
3043:1, 3043:15,
3043:24, 3044:2,
3044:21, 3051:15,
3051:17, 3052:2,
3052:12, 3053:16,
3057:24, 3058:8,
3058:16, 3059:2,
3097:18, 3099:7,
3172:14, 3176:9,
3177:20, 3180:9,
3207:8, 3210:14,
3210:20, 3210:25
**ineffective** [1] -
3147:22
**infectious** [1] -
3212:11
**inference** [1] -
2977:19
**influence** [19] -
3054:16, 3055:11,
3055:22, 3056:9,
3057:4, 3057:9,
3057:10, 3058:20,
3121:7, 3121:14,
3136:8, 3138:22,
3156:16, 3186:22,
3192:18, 3192:19,
3192:23, 3204:3,
3204:21
**influenced** [3] -
3120:22, 3123:3,
3135:7
**influencer** [2] -
3140:22, 3153:17
**Influences** [1] -
3135:25
**influences** [1] -
3121:10
**influencing** [2] -
3114:8, 3154:4
**inform** [2] - 2992:21,
3016:4
**information** [53] -
2918:7, 2924:8,
2949:21, 2950:6,
2950:17, 2973:4,
2997:6, 2997:24,
3035:13, 3051:9,
3056:20, 3057:19,
3057:21, 3060:9,
3060:15, 3061:9,
3063:10, 3066:9,
3066:11, 3066:20,
3066:24, 3066:25,
3068:15, 3068:17,

3068:23, 3082:4,
3082:8, 3082:15,
3083:18, 3086:10,
3087:5, 3089:6,
3090:18, 3095:11,
3100:8, 3107:20,
3107:23, 3122:2,
3135:13, 3139:11,
3163:3, 3168:8,
3169:24, 3181:14,
3181:23, 3184:22,
3191:6, 3203:10,
3222:19, 3225:19,
3239:7, 3254:22
**informing** [1] -
3083:11
**inherent** [2] - 3036:10,
3036:20
**inhibitor** [9] - 2971:3,
3006:14, 3008:25,
3010:7, 3015:12,
3214:22, 3214:23,
3235:9, 3235:10
**inhibitors** [3] -
3003:23, 3004:2,
3009:19
**initial** [5] - 2941:8,
3003:8, 3072:8,
3113:25, 3114:8
**innovation** [1] -
3019:25
**innovative** [1] -
2983:8
**input** [2] - 2952:19,
2980:9
**inquiries** [1] - 3000:9
**insert** [4] - 3054:3,
3057:20, 3217:22,
3217:25
**inserted** [1] - 2989:8
**insightful** [1] -
3046:14
**insinuation** [2] -
3024:9, 3204:1
**Inspector** [4] -
2932:19, 3058:3,
3058:7, 3058:22
**inspirational** [2] -
2981:22, 2982:1
**instance** [5] -
2913:15, 3081:17,
3189:19, 3248:19,
3253:8
**instances** [1] - 3177:9
**instant** [1] - 3072:17
**instead** [4] - 2907:25,
3007:2, 3056:25,
3087:18
**institution** [4] -
3055:21, 3056:1,

3246:2, 3261:3
**institutions** [4] -
3055:17, 3055:18,
3056:6, 3212:14
**instructed** [6] -
2898:16, 2901:20,
2902:1, 2927:14,
3215:2, 3237:18
**instructing** [1] -
2901:25
**instruction** [19] -
2897:19, 2897:21,
2898:12, 2898:14,
2898:24, 2899:14,
2901:14, 2901:22,
2902:14, 2903:4,
2903:11, 2903:15,
2903:25, 2904:4,
2904:23, 2905:6
**instructions** [5] -
2897:22, 2897:25,
2898:14, 2901:16,
2904:25
**integral** [1] - 3020:16
**integrase** [1] - 3235:9
**integrity** [15] - 2892:8,
2892:9, 2897:20,
2901:9, 2901:19,
2901:23, 2905:24,
2921:22, 2922:17,
2928:22, 2929:7,
2931:3, 2931:19,
3007:15, 3198:4
**Intelence** [103] -
2900:9, 2922:15,
2923:19, 2934:19,
2955:7, 2955:9,
2956:14, 2956:19,
2956:25, 2957:10,
2957:12, 2957:20,
2957:25, 2961:12,
2961:21, 2962:12,
2963:9, 2963:15,
2964:15, 2964:22,
2966:9, 2966:14,
2966:19, 2966:24,
2967:5, 2967:12,
2967:17, 2969:15,
2971:8, 2971:18,
2971:21, 2972:14,
2972:20, 2984:5,
2984:22, 2986:3,
2997:13, 2999:10,
3007:22, 3016:20,
3017:1, 3017:7,
3017:12, 3017:18,
3020:2, 3020:3,
3021:3, 3021:6,
3021:16, 3021:23,
3022:21, 3025:6,

3027:23, 3028:2,
3036:19, 3038:17,
3039:2, 3047:3,
3061:8, 3066:21,
3068:17, 3070:4,
3071:8, 3071:10,
3071:14, 3081:17,
3082:21, 3083:10,
3083:14, 3084:5,
3084:14, 3085:11,
3086:14, 3095:13,
3096:3, 3096:8,
3096:10, 3096:14,
3096:17, 3096:19,
3096:24, 3097:2,
3098:25, 3118:8,
3127:7, 3127:11,
3128:20, 3129:15,
3130:6, 3169:22,
3192:3, 3192:21,
3194:5, 3194:6,
3194:12, 3196:9,
3200:10, 3235:10,
3235:13, 3239:5,
3254:19, 3255:12
**intend** [1] - 2914:20
**intended** [2] - 3050:2,
3127:24
**intending** [2] - 2908:9,
3032:23
**intense** [1] - 2961:8
**intent** [1] - 2939:24
**interact** [1] - 3056:2
**interaction** [1] -
3023:4
**interest** [5] - 2902:18,
2904:11, 3000:4,
3001:5, 3187:6
**interested** [6] -
3054:9, 3210:22,
3211:19, 3212:2,
3245:2
**interesting** [6] -
3002:9, 3046:17,
3051:16, 3108:16,
3160:3, 3160:6
**Interestingly** [1] -
3085:11
**interestingly** [1] -
3002:16
**internal** [4] - 3032:16,
3203:18, 3208:13,
3208:22
**internally** [1] -
3041:21
**international** [1] -
3002:8
**International** [1] -
3107:12
**interpret** [2] - 2896:2,

3174:24
**interpretation** [1] -
2983:22
**interrupt** [3] - 2947:6,
3040:18, 3063:16
**intervene** [1] -
3174:25
**intervening** [1] -
2903:5
**intervention** [2] -
2903:20, 3174:14
**interview** [7] -
3158:24, 3159:10,
3159:13, 3160:1,
3160:22, 3210:24,
3224:24
**interviewed** [1] -
3159:9
**interviewing** [1] -
3159:19
**intimidating** [2] -
3191:7, 3227:7
**intimidation** [1] -
3226:24
**introduce** [2] - 3040:8,
3206:1
**introduced** [3] -
3009:2, 3209:20,
3213:24
**introducing** [1] -
3219:19
**introduction** [1] -
3021:6
**Invega** [4] - 2933:10,
2933:12, 2933:13,
2934:2
**inverted** [1] - 3098:14
**invest** [1] - 3091:21
**invested** [1] - 3084:11
**investigated** [1] -
2933:3
**investigating** [1] -
2923:3
**investigation** [10] -
2900:7, 2905:19,
2922:1, 2922:6,
2922:16, 2922:25,
2930:15, 2932:22,
2934:13, 3100:7
**investigations** [1] -
2931:21
**investment** [9] -
2961:3, 2973:1,
2973:2, 2976:13,
3084:1, 3084:8,
3091:18, 3176:4,
3177:21
**investments** [1] -
2983:9
**invitation** [1] - 3068:3

**invite** [1] - 3257:15
**invited** [1] - 3119:23
**involve** [1] - 3183:18
**involved** [19] -
2893:15, 2901:14,
2901:25, 2902:2,
2902:15, 2902:17,
2902:22, 2902:23,
2903:14, 2922:5,
2931:23, 2932:8,
3044:21, 3045:2,
3090:17, 3158:12,
3160:8, 3177:20,
3211:2
**involving** [1] -
2997:19
**irrelevant** [1] - 3145:6
**Isentress** [1] - 3235:8
**Israel** [5] - 3212:15,
3215:22, 3244:11,
3244:20, 3248:24
**issue** [60] - 2891:1,
2898:4, 2899:5,
2900:21, 2900:23,
2901:1, 2901:5,
2903:12, 2904:10,
2904:19, 2906:4,
2907:23, 2908:15,
2909:2, 2910:3,
2911:4, 2912:11,
2913:25, 2914:1,
2914:3, 2914:4,
2915:16, 2915:17,
2916:23, 2918:4,
2918:13, 2918:18,
2920:11, 2922:22,
2922:24, 2924:16,
2973:22, 2975:4,
2975:10, 2975:11,
2977:9, 3001:7,
3001:8, 3002:24,
3007:21, 3028:3,
3034:8, 3040:23,
3041:5, 3041:9,
3041:15, 3041:16,
3041:20, 3041:24,
3070:7, 3071:14,
3081:21, 3094:13,
3100:22, 3146:5,
3149:12, 3165:16,
3169:6, 3218:7
**issued** [1] - 3199:6
**issues** [18] - 2898:7,
2898:8, 2906:5,
2909:25, 2913:21,
2917:14, 2972:25,
3002:1, 3021:8,
3025:5, 3038:8,
3038:14, 3038:16,
3039:1, 3039:4,

3070:10, 3130:23,
3141:1
**IT** [1] - 3041:24
**it'd** [2] - 3124:8,
3124:9
**it..** [1] - 3154:19
**itself** [9] - 2902:17,
2906:22, 2942:21,
3029:5, 3029:12,
3034:22, 3092:10,
3156:12, 3179:24

---

**J**

---

**J&J** [2] - 3010:9,
3010:12
**JANSSEN** [1] - 2888:6
**Janssen** [173] -
2890:18, 2890:20,
2890:22, 2893:13,
2898:22, 2899:18,
2899:20, 2899:24,
2900:13, 2901:9,
2903:16, 2910:9,
2911:1, 2911:21,
2913:8, 2913:10,
2914:16, 2915:4,
2915:13, 2921:23,
2922:15, 2923:19,
2923:24, 2924:8,
2924:9, 2925:13,
2927:3, 2927:14,
2929:12, 2930:16,
2930:21, 2931:20,
2932:18, 2932:24,
2934:14, 2934:19,
2941:9, 2942:19,
2945:15, 2951:13,
2956:5, 2957:10,
2957:12, 2958:7,
2960:15, 2964:23,
2970:24, 2971:18,
2973:13, 2979:13,
2979:17, 2979:25,
2984:7, 2984:21,
2984:24, 2988:2,
3003:2, 3019:5,
3025:25, 3029:11,
3033:4, 3034:3,
3034:13, 3034:18,
3034:22, 3036:9,
3036:10, 3036:21,
3038:10, 3048:25,
3054:12, 3054:23,
3056:23, 3066:10,
3067:22, 3069:9,
3069:18, 3071:1,
3071:10, 3071:15,
3071:20, 3072:21,
3073:24, 3074:7,
3074:12, 3075:14,

3075:15, 3075:23,
3075:24, 3077:3,
3078:6, 3078:14,
3078:25, 3080:13,
3080:14, 3080:21,
3081:7, 3081:13,
3081:18, 3082:23,
3083:11, 3084:7,
3084:19, 3085:4,
3085:25, 3088:11,
3088:25, 3089:13,
3089:22, 3091:6,
3091:11, 3091:18,
3092:10, 3092:13,
3093:25, 3095:6,
3097:4, 3102:20,
3102:23, 3103:2,
3103:10, 3103:15,
3103:18, 3103:25,
3115:7, 3120:15,
3133:13, 3133:19,
3134:9, 3145:24,
3147:12, 3168:7,
3168:9, 3178:9,
3178:15, 3178:25,
3188:15, 3193:10,
3195:11, 3195:25,
3196:15, 3197:21,
3198:5, 3198:10,
3198:14, 3199:4,
3199:22, 3201:6,
3201:13, 3203:3,
3203:4, 3203:10,
3203:15, 3203:16,
3203:20, 3203:21,
3204:10, 3236:8,
3237:20, 3238:1,
3239:10, 3243:10,
3245:16, 3245:21,
3248:10, 3252:2,
3257:17, 3259:19,
3259:20, 3260:3
**Janssen's** [47] -
2901:19, 2907:21,
2913:15, 2916:18,
2925:13, 2928:8,
2928:21, 2929:23,
2937:21, 2939:24,
2944:4, 3027:22,
3029:1, 3047:2,
3047:5, 3047:8,
3067:7, 3071:1,
3073:9, 3075:9,
3084:1, 3084:25,
3085:21, 3089:12,
3091:1, 3092:7,
3096:13, 3098:24,
3099:1, 3099:3,
3133:1, 3163:14,
3170:12, 3179:25,
3181:11, 3183:18,

3189:19, 3190:12,
3191:8, 3191:12,
3191:19, 3199:14,
3204:3, 3204:4,
3204:19, 3204:20,
3243:16
**Janssen/Tibotec** [4] -
2978:24, 2984:5,
3081:1, 3098:19
**January** [6] - 2936:14,
2945:22, 2946:16,
2946:18, 2958:19,
2973:13
**Jeff** [1] - 2890:19
**Jena** [6] - 3188:12,
3188:14, 3188:24,
3189:9, 3191:19,
3191:23
**JERSEY** [1] - 2888:1
**Jersey** [11] - 2888:9,
2916:8, 3026:13,
3097:25, 3208:5,
3208:6, 3208:8,
3209:23, 3212:7,
3226:15, 3228:19
**Jessica** [5] - 2982:21,
3049:5, 3205:5,
3205:17, 3206:2
**JESSICA** [2] - 2889:6,
3205:13
**jims** [1] - 2993:14
**job** [26] - 2937:6,
3007:18, 3068:7,
3078:19, 3082:5,
3103:25, 3159:14,
3159:16, 3159:19,
3160:22, 3207:13,
3207:14, 3207:15,
3207:24, 3208:1,
3208:2, 3210:5,
3210:24, 3213:9,
3217:1, 3217:3,
3224:9, 3227:10,
3229:19, 3238:11
**jobs** [8] - 3210:6,
3211:8, 3228:4,
3228:7, 3229:17,
3229:20, 3238:12,
3256:14
**Joe** [3] - 2943:18,
2944:19, 3228:20
**John** [5] - 3212:19,
3225:15, 3244:13,
3258:7, 3260:11
**Johnson** [76] - 2924:7,
2925:4, 2928:12,
2931:16, 2960:2,
2960:8, 2968:14,
2969:5, 2978:22,
2981:1, 2981:2,

2981:4, 2981:13,
2981:21, 2982:4,
2982:5, 2982:10,
2983:16, 2983:17,
2983:24, 3014:18,
3014:25, 3024:10,
3025:1, 3026:6,
3026:10, 3028:15,
3028:20, 3030:20,
3042:19, 3044:7,
3044:8, 3044:13,
3044:16, 3045:3,
3046:11, 3046:12,
3046:13, 3091:25,
3092:1, 3094:24,
3097:18, 3097:19,
3097:22, 3097:24,
3098:11, 3159:2,
3196:24, 3214:16,
3214:18, 3214:19,
3230:1, 3232:7,
3234:2, 3252:7
**JOHNSON** [2] -
2888:6
**Johnson's** [3] -
2928:12, 2981:21,
3026:10
**join** [1] - 3215:10
**joined** [2] - 3215:11,
3216:4
**Joseph** [1] - 3049:3
**Joseph's** [2] - 3043:4,
3043:12
**josh** [1] - 2890:15
**JOSH** [1] - 2888:15
**journalist** [2] - 3156:6,
3156:11
**Juan** [3] - 3249:6,
3249:7, 3249:12
**Judge** [2] - 2890:2,
3151:7
**JUDGE** [1] - 2888:12
**judge** [2] - 2984:9,
3103:24
**judged** [1] - 3103:25
**judging** [1] - 3118:23
**judgment** [4] -
2986:24, 2987:1,
3056:12, 3170:22
**Jules** [2] - 3232:10,
3236:13
**Julie** [1] - 2943:8
**July** [2] - 3077:25,
3163:23
**jump** [1] - 3215:9
**juncture** [1] - 3006:21
**JUROR** [1] - 3092:16
**jurors** [28] - 2917:16,
2918:22, 3011:20,
3063:22, 3064:3,

3064:6, 3064:24,
3103:20, 3103:24,
3104:19, 3105:3,
3110:5, 3120:3,
3127:15, 3129:8,
3142:25, 3143:7,
3143:11, 3143:13,
3151:10, 3151:17,
3151:18, 3163:9,
3167:19, 3168:6,
3179:20, 3202:15,
3262:11
**jurors'** [1] - 3093:1
**jury** [99] - 2891:7,
2894:24, 2896:1,
2896:10, 2896:15,
2896:17, 2897:22,
2899:13, 2899:15,
2899:23, 2902:21,
2903:13, 2904:13,
2907:10, 2909:10,
2911:8, 2912:5,
2912:8, 2917:21,
2918:17, 2919:16,
2919:23, 2921:2,
2921:5, 2931:2,
2932:15, 2975:5,
3011:5, 3012:11,
3014:1, 3025:11,
3038:25, 3040:9,
3043:7, 3046:22,
3046:25, 3048:4,
3052:1, 3065:13,
3066:15, 3075:8,
3091:17, 3093:8,
3098:23, 3099:8,
3099:16, 3100:4,
3100:18, 3102:17,
3105:8, 3111:21,
3134:24, 3136:25,
3137:8, 3138:21,
3139:19, 3146:9,
3148:19, 3149:21,
3150:15, 3150:18,
3154:9, 3158:2,
3189:10, 3194:24,
3195:10, 3202:17,
3203:23, 3204:4,
3206:1, 3206:7,
3207:4, 3207:22,
3209:18, 3211:13,
3212:12, 3213:2,
3213:5, 3213:23,
3214:10, 3215:16,
3223:1, 3223:7,
3231:3, 3233:19,
3235:16, 3237:7,
3238:7, 3238:20,

3241:4, 3252:11, 3254:5, 3262:14
**Jury** [2] - 3065:2, 3152:15
**JURY** [1] - 2888:5
**jury's** [2] - 2898:16, 2920:21
**Justice** [3] - 3058:4, 3058:7, 3058:22

## K

**Kaletra** [3] - 3094:8, 3261:25, 3262:1
**KAM** [1] - 3220:15
**Kaminsky** [7] - 3225:14, 3230:20, 3230:21, 3239:4, 3241:18, 3253:8, 3253:11
**Kaminsky's** [2] - 3253:15, 3258:3
**Kaucher** [4] - 2924:3, 3049:4, 3201:12, 3201:16
**keenly** [1] - 3054:9
**keep** [14] - 2925:1, 2945:2, 2981:14, 3013:9, 3039:14, 3098:8, 3149:15, 3172:24, 3205:8, 3226:25, 3228:3, 3253:14
**keeping** [1] - 3216:24
**Keith** [2] - 3168:3, 3168:6
**Kenworthy** [3] - 3049:4, 3168:18, 3168:21
**Kenworthy's** [1] - 3174:1
**kept** [4] - 3044:14, 3217:3, 3256:22, 3256:23
**key** [8] - 3084:13, 3095:17, 3096:23, 3220:15, 3220:16, 3221:11, 3247:17, 3261:2
**Kickback** [5] - 2927:24, 2928:6, 2929:16, 2934:9, 3103:5
**kickbacks** [1] - 3058:12
**kicked** [1] - 3248:25
**kicking** [2] - 3249:16, 3249:19
**Kim** [4] - 2895:17, 2895:18, 2921:7,

2921:8
**kind** [15] - 2896:12, 2901:15, 2903:22, 2909:14, 2914:9, 2919:16, 2990:23, 3024:9, 3052:8, 3055:7, 3055:8, 3062:2, 3080:7, 3080:8, 3185:2
**King** [1] - 2888:21
**Kings** [1] - 3042:15
**kit** [6] - 3160:17, 3160:23, 3161:7, 3162:10, 3162:22, 3166:5
**Klein** [3] - 2890:21, 2906:8, 2978:6, 2985:5, 3012:17, 3014:3, 3019:12, 3024:21, 3151:24
**KLEIN** [84] - 2888:20, 2889:3, 2890:21, 2906:9, 2925:17, 2925:24, 2926:3, 2926:7, 2926:9, 2932:4, 2935:8, 2937:17, 2939:14, 2940:24, 2951:20, 2951:23, 2953:8, 2953:11, 2953:13, 2954:14, 2959:8, 2961:17, 2963:3, 2966:3, 2968:10, 2970:10, 2973:21, 2974:12, 2974:16, 2974:18, 2975:23, 2976:6, 2976:10, 2976:21, 2977:1, 2977:4, 2977:18, 2977:24, 2978:8, 2978:20, 2981:16, 2985:6, 2985:8, 2985:11, 2985:12, 2985:17, 2985:18, 2996:9, 2996:12, 2996:13, 3010:24, 3011:2, 3011:4, 3011:6, 3011:9, 3011:12, 3011:17, 3011:23, 3012:12, 3012:18, 3013:4, 3013:8, 3013:11, 3014:4, 3014:9, 3014:12, 3014:14, 3018:3, 3018:11, 3018:13, 3018:22, 3018:24, 3018:25, 3019:8, 3019:13, 3019:15, 3019:19, 3019:21, 3021:19,

3021:20, 3024:17, 3024:19, 3037:19, 3037:24
**Knecht** [9] - 2985:17, 3010:24, 3011:4, 3011:9, 3014:12, 3018:12, 3019:19, 3104:24, 3125:4
**Knightly** [1] - 3228:19
**knowledge** [27] - 2900:10, 2900:24, 2902:11, 2905:14, 2906:3, 2906:14, 2906:15, 2906:20, 2906:21, 2911:5, 2911:7, 2911:12, 2911:16, 2912:1, 2912:4, 2913:22, 2917:4, 2933:20, 2933:23, 2996:4, 3068:23, 3068:25, 3090:1, 3090:9, 3091:22, 3096:21, 3115:24
**known** [3] - 3094:17, 3118:9, 3189:20
**Kool** [1] - 3088:22
**Kool-Aid** [1] - 3088:22
**Koshy** [3] - 3212:19, 3225:15, 3244:13
**Kozub** [3] - 2952:2, 3035:5, 3049:5
**Kruger** [1] - 3244:20

## L

**L.P** [1] - 2888:7
**lab** [1] - 3208:11
**label** [312] - 2894:17, 2908:22, 2909:3, 2909:8, 2909:11, 2909:19, 2923:1, 2923:11, 2924:9, 2928:9, 2929:22, 2934:8, 2939:1, 2948:11, 2948:14, 2948:16, 2948:22, 2949:4, 2950:2, 2951:6, 2951:11, 2951:15, 2951:16, 2957:20, 2961:22, 2961:25, 2962:6, 2962:9, 2962:11, 2962:15, 2962:17, 2962:19, 2962:22, 2963:15, 2964:15, 2964:20, 2965:7, 2965:20, 2965:21, 2984:5, 2984:22, 2986:8, 2986:18,

2986:24, 2987:5, 2987:6, 2987:14, 2987:21, 2987:22, 2988:9, 2988:25, 2989:1, 2990:3, 2990:4, 2990:5, 2992:3, 2992:24, 2995:7, 2997:5, 2998:19, 2999:18, 3000:15, 3000:19, 3000:20, 3000:22, 3004:14, 3004:17, 3005:14, 3016:12, 3016:16, 3016:20, 3016:22, 3021:24, 3022:18, 3022:19, 3022:21, 3027:13, 3027:14, 3027:15, 3027:21, 3028:2, 3029:2, 3029:6, 3030:23, 3031:9, 3031:10, 3031:18, 3031:23, 3032:21, 3036:9, 3036:18, 3037:16, 3038:9, 3038:16, 3039:2, 3045:11, 3047:2, 3047:3, 3047:5, 3047:6, 3047:8, 3051:3, 3054:4, 3057:14, 3057:15, 3057:20, 3057:22, 3057:25, 3058:9, 3059:5, 3059:7, 3059:20, 3060:2, 3060:21, 3060:23, 3060:24, 3061:1, 3061:5, 3061:6, 3061:7, 3061:11, 3061:21, 3062:9, 3063:8, 3063:9, 3066:5, 3066:11, 3066:21, 3066:24, 3068:3, 3068:11, 3068:16, 3069:3, 3069:7, 3069:12, 3069:13, 3069:14, 3069:19, 3070:5, 3070:16, 3070:18, 3070:21, 3071:10, 3071:15, 3071:24, 3072:1, 3072:3, 3072:23, 3073:15, 3073:16, 3073:17, 3073:19, 3073:20, 3073:22, 3073:25, 3074:4, 3074:25, 3075:11, 3076:14, 3077:1, 3077:3, 3077:6, 3079:3, 3079:4, 3079:5,

3079:21, 3079:23, 3080:15, 3080:24, 3081:11, 3081:20, 3081:24, 3082:3, 3082:8, 3083:17, 3086:13, 3086:19, 3087:2, 3087:22, 3087:25, 3088:1, 3088:23, 3089:1, 3090:6, 3090:9, 3090:10, 3090:18, 3091:5, 3092:2, 3094:15, 3096:19, 3098:24, 3098:25, 3099:1, 3099:2, 3099:3, 3107:17, 3107:20, 3108:19, 3109:24, 3110:24, 3123:2, 3123:14, 3123:17, 3123:18, 3123:24, 3127:24, 3128:5, 3128:24, 3169:1, 3169:11, 3169:21, 3170:3, 3170:13, 3170:19, 3170:21, 3170:23, 3171:18, 3171:22, 3172:2, 3173:19, 3174:15, 3174:20, 3174:25, 3175:1, 3175:3, 3175:6, 3175:7, 3175:14, 3176:1, 3176:19, 3176:21, 3176:23, 3192:15, 3193:11, 3194:10, 3194:18, 3194:25, 3195:11, 3196:9, 3197:2, 3197:7, 3197:10, 3197:14, 3197:21, 3198:6, 3198:19, 3202:1, 3215:2, 3217:25, 3218:2, 3219:14, 3219:17, 3221:25, 3222:23, 3222:24, 3223:3, 3223:4, 3223:5, 3225:7, 3225:8, 3225:9, 3225:12, 3225:19, 3226:5, 3226:6, 3226:10, 3226:13, 3227:12, 3227:21, 3231:9, 3233:21, 3233:24, 3234:4, 3234:24, 3235:11, 3235:12, 3235:19, 3235:21, 3236:8, 3237:12, 3238:9, 3239:7, 3252:12, 3252:21, 3253:7, 3253:14,

3254:3, 3254:7,
3254:12, 3254:13,
3254:22, 3254:23,
3255:2, 3255:15,
3255:22, 3256:2,
3256:7, 3256:25,
3258:2, 3258:6,
3260:10, 3260:13
**labeled** [1] - 3090:12
**labeling** [1] - 2997:1
**lack** [5] - 2903:20,
2911:16, 2911:25,
2996:4, 3001:1
**land** [3] - 2900:5,
2903:21, 2913:1
**landed** [3] - 2938:19,
2940:8, 2940:10
**language** [14] -
2892:21, 2895:2,
2895:5, 2895:6,
2895:8, 2896:5,
2896:8, 2896:10,
2903:17, 2903:18,
2904:5, 2908:21,
2998:14, 3004:21
**laptop** [1] - 3253:18
**large** [4] - 2927:18,
2957:16, 3000:9,
3052:2
**largely** [1] - 3042:16
**larger** [1] - 3073:21
**Larkin** [1] - 3156:22
**last** [28] - 2907:1,
2910:11, 2913:10,
2932:7, 2969:18,
2983:3, 2995:12,
2998:23, 3019:7,
3030:10, 3036:6,
3039:24, 3065:16,
3087:2, 3096:8,
3113:12, 3120:12,
3129:22, 3150:8,
3155:8, 3203:1,
3205:16, 3206:3,
3212:22, 3231:13,
3254:5, 3258:10,
3258:17
**lasted** [1] - 3129:22
**lasting** [5] - 3047:9,
3089:20, 3090:4,
3099:4, 3204:6
**lastly** [1] - 3045:17
**lasts** [1] - 3259:10
**late** [1] - 3231:16
**late-breaker** [1] -
3231:16
**latest** [1] - 3254:18
**latitude** [1] - 2917:10
**latter** [1] - 3059:19
**Lauderdale** [1] -

3206:10
**launch** [15] - 2937:8,
2991:12, 3003:6,
3006:6, 3006:10,
3006:15, 3007:21,
3015:2, 3017:19,
3020:3, 3021:16,
3078:1, 3080:9,
3212:9, 3214:22
**launched** [6] - 2999:9,
3000:8, 3017:1,
3017:7, 3044:15,
3216:19
**launches** [1] -
3078:14
**launching** [2] -
3007:23, 3237:10
**Laura** [1] - 3228:19
**law** [7] - 2911:25,
2928:14, 2930:10,
3002:21, 3030:4,
3202:10, 3250:9
**lawful** [1] - 3061:3
**lawsuit** [2] - 2931:22,
3048:25, 3117:7
**lawyer** [1] - 3025:4
**lawyers** [17] -
3103:21, 3105:19,
3106:10, 3108:18,
3111:8, 3111:11,
3111:25, 3113:17,
3121:23, 3158:17,
3159:20, 3159:25,
3160:12, 3161:3,
3162:10, 3190:18,
3204:19
**layer** [1] - 3220:18
**laymen's** [1] - 3208:22
**Le** [1] - 3243:18
**lead** [1] - 3002:19
**leader** [3] - 3009:5,
3020:8, 3261:3
**leaders** [2] - 3021:3,
3221:11
**leadership** [6] -
2926:23, 2961:1,
3002:20, 3021:7,
3021:11, 3078:25
**leading** [2] - 3016:18,
3021:5
**leaning** [1] - 2899:16
**learn** [11] - 3023:12,
3054:1, 3068:20,
3068:25, 3081:2,
3084:7, 3095:4,
3095:16, 3096:13,
3107:17, 3189:18
**learned** [14] - 2916:6,
2916:7, 2930:21,
3023:10, 3080:25,

3115:21, 3116:13,
3116:18, 3116:23,
3117:2, 3117:6,
3117:12, 3121:18,
3165:25
**learning** [1] - 3053:23
**lease** [1] - 3211:3
**least** [28] - 2897:24,
2899:1, 2904:2,
2953:20, 2956:9,
2996:16, 3008:13,
3035:2, 3052:11,
3056:11, 3073:10,
3080:11, 3117:12,
3124:10, 3128:13,
3128:18, 3129:13,
3145:25, 3147:7,
3149:23, 3150:3,
3156:14, 3161:24,
3199:3, 3204:1,
3227:19, 3248:9,
3248:10
**leave** [12] - 2915:2,
2930:21, 3122:20,
3127:1, 3208:15,
3209:10, 3209:15,
3210:17, 3210:18,
3211:11, 3236:19,
3236:21
**leaves** [2] - 2997:7,
3080:6
**leaving** [1] - 2931:16
**led** [3] - 2922:1,
2922:17, 2933:2
**left** [22] - 2921:21,
2931:13, 2931:20,
2932:24, 2937:8,
2947:21, 2956:24,
2989:12, 2990:12,
2991:1, 3011:22,
3012:23, 3042:12,
3042:19, 3059:7,
3074:23, 3079:6,
3152:20, 3185:21,
3214:11, 3219:11,
3236:20
**left-hand** [1] - 3074:23
**legal** [7] - 3022:12,
3036:25, 3037:8,
3092:3, 3103:5,
3104:21, 3113:9
**legend** [1] - 2987:20
**legislation** [3] -
3002:10, 3002:17,
3002:21
**length** [1] - 2934:4
**lengthy** [3] - 2992:9,
3062:12, 3060:14
**less** [7] - 2903:1,
3050:17, 3094:8,

3163:2, 3172:24,
3211:8
**letter** [1] - 2950:20
**level** [8] - 2909:7,
2909:14, 2970:5,
3009:7, 3072:20,
3075:2, 3076:15,
3210:10
**levels** [2] - 2897:2
**leverage** [1] - 3095:11
**Levin** [2] - 3232:10,
3236:13
**liability** [2] - 2895:24,
3029:12
**liaison** [2] - 3088:2,
3119:18
**liaisons** [1] - 3020:18
**Libby** [1] - 2960:20
**lie** [4] - 3250:2,
3250:3, 3250:4,
3250:5
**lied** [3] - 3148:7,
3148:17
**life** [12] - 2907:5,
2907:10, 2916:10,
3007:11, 3047:20,
3051:17, 3075:18,
3172:25, 3200:24,
3204:21, 3211:3,
3225:18
**lifeblood** [1] - 3046:7
**lifesaving** [1] -
3173:11
**lifetime** [5] - 2979:5,
2979:12, 2980:10,
2980:16, 3075:17
**lift** [6] - 3085:12,
3085:18, 3085:20,
3091:7, 3091:8,
3091:12
**likelihood** [2] -
3062:20, 3192:9
**likely** [4] - 2912:14,
3038:21, 3090:25,
3179:15
**Lillian** [1] - 2940:9
**limine** [3] - 2892:8,
2905:23, 3101:11
**limit** [1] - 2978:6
**limitations** [1] -
3062:13
**limited** [2] - 2901:20,
3069:21
**line** [14] - 2899:13,
2901:4, 2903:13,
2903:19, 2924:1,
2943:25, 3037:4,
3046:3, 3076:5,
3197:23, 3228:5,
3229:11, 3229:12,

3255:12
**lines** [2] - 2944:1,
3195:25
**lipid** [21] - 2995:25,
3034:14, 3070:7,
3070:10, 3083:4,
3083:6, 3095:20,
3095:23, 3130:23,
3131:21, 3132:21,
3217:13, 3218:6,
3218:18, 3218:21,
3219:3, 3219:10,
3231:10, 3233:15,
3234:9, 3254:17
**lipid-friendly** [1] -
3217:13
**lipid-neutral** [1] -
3095:23
**lipids** [23] - 2994:20,
2994:22, 3021:25,
3034:8, 3034:16,
3061:24, 3094:9,
3094:13, 3132:14,
3133:20, 3217:6,
3217:8, 3218:15,
3219:1, 3219:13,
3220:1, 3231:5,
3231:9, 3231:17,
3232:13, 3234:8,
3254:18, 3258:9
**list** [7] - 2913:9,
2916:15, 2974:22,
2977:10, 3134:6,
3161:19, 3183:5
**listed** [3] - 3060:3,
3062:9, 3094:13
**listen** [4] - 3124:10,
3126:6, 3131:20,
3233:25
**listened** [3] - 3125:21,
3127:14, 3159:20
**listening** [6] -
2916:18, 3119:22,
3125:7, 3125:9,
3130:21, 3219:21
**literature** [12] -
3047:17, 3055:16,
3136:7, 3136:12,
3138:20, 3138:25,
3148:3, 3155:3,
3155:5, 3155:7,
3155:13
**Literature** [1] -
3135:25
**litigating** [1] - 2902:25
**litigation** [2] -
3047:15, 3048:8
**live** [2] - 2982:5,
3049:9
**living** [2] - 3020:1,

3117:2
**Liz** [7] - 2895:15,
2895:16, 2895:17,
2895:19, 2921:7,
2921:10
**Lloyd** [1] - 3249:2
**LLP** [1] - 2888:19
**locate** [1] - 2896:8
**located** [1] - 3224:6
**location** [6] - 3242:17,
3243:1, 3243:21,
3244:5, 3244:10,
3252:2
**locations** [1] -
3241:15
**logic** [1] - 2945:9
**long-term** [2] -
3077:20, 3085:6
**look** [131] - 2904:22,
2908:4, 2909:16,
2910:10, 2910:11,
2910:12, 2910:20,
2920:18, 2924:13,
2927:2, 2928:17,
2929:5, 2929:9,
2929:11, 2930:13,
2931:25, 2932:9,
2932:15, 2932:17,
2933:6, 2934:22,
2934:23, 2936:7,
2936:24, 2939:2,
2940:20, 2943:6,
2944:17, 2944:19,
2945:13, 2946:3,
2947:19, 2949:1,
2949:3, 2949:20,
2951:17, 2952:5,
2953:16, 2954:7,
2954:11, 2955:20,
2956:14, 2957:23,
2958:3, 2958:19,
2958:25, 2960:1,
2962:24, 2963:7,
2965:22, 2966:7,
2967:2, 2967:3,
2967:10, 2968:8,
2972:2, 2972:13,
2973:12, 2976:25,
2979:8, 2980:25,
2981:12, 2982:9,
2983:3, 2989:4,
2989:5, 2991:21,
2995:1, 3005:23,
3024:13, 3028:14,
3029:18, 3029:23,
3030:18, 3031:6,
3032:1, 3034:7,
3045:11, 3045:14,
3046:21, 3047:10,
3048:19, 3051:23,

3057:6, 3060:2,
3061:12, 3067:16,
3070:3, 3074:6,
3077:7, 3079:23,
3080:10, 3081:16,
3084:13, 3086:11,
3089:12, 3092:5,
3094:18, 3094:19,
3094:22, 3095:25,
3096:22, 3105:22,
3105:23, 3105:25,
3141:7, 3142:17,
3144:15, 3153:21,
3159:20, 3162:16,
3162:23, 3166:23,
3167:17, 3167:23,
3172:1, 3172:4,
3175:4, 3177:21,
3179:1, 3196:21,
3198:3, 3198:18,
3200:1, 3221:19,
3224:25, 3231:14,
3232:6, 3243:15
**Look** [1] - 2902:10
**looked** [30] - 3004:19,
3051:24, 3068:2,
3073:8, 3087:7,
3097:6, 3105:16,
3115:10, 3124:3,
3133:1, 3134:6,
3141:1, 3155:4,
3157:4, 3158:17,
3161:7, 3161:14,
3161:25, 3165:11,
3165:16, 3166:13,
3169:13, 3169:14,
3180:25, 3181:6,
3181:11, 3196:12,
3234:7, 3245:23,
3245:25
**looking** [37] - 2895:4,
2908:16, 2910:10,
2933:25, 2936:1,
2946:18, 2947:10,
2950:10, 2955:18,
2963:1, 2963:8,
2963:22, 2966:9,
2973:16, 2973:19,
2993:4, 2996:5,
2998:7, 3059:25,
3067:3, 3074:7,
3080:23, 3089:5,
3093:24, 3095:1,
3115:15, 3130:22,
3136:19, 3143:11,
3158:23, 3168:7,
3170:2, 3199:20,
3207:7, 3231:5,
3261:6
**looks** [11] - 2924:17,
2964:11, 2968:4,

2990:20, 3029:8,
3113:1, 3134:7,
3138:5, 3151:15,
3153:6, 3199:25
**lose** [2] - 3228:7,
3256:14
**losing** [3] - 3229:17,
3229:19, 3229:20
**lost** [4] - 2919:1,
3018:6, 3041:23,
3255:10
**loved** [1] - 3244:14
**low** [3] - 2994:21,
3233:1, 3261:5
**lower** [8] - 2940:12,
2958:2, 2958:3,
3017:19, 3211:18,
3212:10, 3212:14,
3257:6
**lowered** [4] - 3004:25,
3027:12, 3165:23,
3165:25
**lowering** [2] -
2944:20, 3166:5
**loyalty** [1] - 3085:15
**LTD** [1] - 2975:15
**lucky** [1] - 3210:19
**lunch** [12] - 2917:20,
2918:1, 2918:14,
2918:19, 2919:3,
2919:6, 3013:16,
3041:14, 3063:22,
3063:24, 3112:2,
3112:3
**luncheon** [1] -
3064:10

## M

**ma'am** [2] - 2981:14,
3205:10
**machines** [1] -
2924:25
**mad** [1] - 3007:3
**Madam** [1] - 3019:23
**maiden** [1] - 3230:8
**mail** [1] - 3236:9
**main** [2] - 3036:22,
3083:2
**mainline** [1] - 3052:8
**maintain** [1] - 3077:20
**major** [1] - 3020:19
**majority** [3] - 3162:17,
3239:19, 3254:2
**makers** [1] - 3015:20
**manageable** [1] -
3259:15
**managed** [1] -
3226:24
**management** [10] -

2992:22, 3007:8,
3022:17, 3044:11,
3165:3, 3165:5,
3196:15, 3209:25,
3238:8, 3260:16
**manager** [14] - 3082:1,
3087:9, 3088:20,
3097:9, 3208:11,
3215:19, 3216:5,
3216:8, 3216:15,
3220:14, 3220:16,
3223:15, 3223:16,
3226:21
**managers** [2] -
2960:23, 3086:1
**Manhattan** [14] -
3211:18, 3212:6,
3212:7, 3212:11,
3215:12, 3215:14,
3222:17, 3226:18,
3242:5, 3242:15,
3246:15, 3257:5,
3257:6
**manner** [9] - 2928:13,
2981:10, 3066:10,
3067:2, 3067:12,
3069:8, 3070:9,
3075:19, 3091:5
**manners** [1] - 3066:5
**manual** [1] - 3221:19
**manufacturer** [1] -
3085:17
**manufacturing** [3] -
2986:11, 3027:18,
3028:4
**Marais** [1] - 3243:18
**March** [2] - 2943:8,
2967:25
**Mark** [8] - 2944:18,
2952:2, 2959:17,
2959:18, 3049:3,
3049:6, 3195:20,
3257:3
**market** [45] - 2943:25,
2952:8, 2956:21,
2959:23, 2963:16,
2970:16, 2970:20,
2970:22, 2971:1,
2971:2, 2971:14,
2971:22, 2971:24,
2986:3, 2987:7,
3003:23, 3004:6,
3005:20, 3009:1,
3009:5, 3010:7,
3015:1, 3021:23,
3021:24, 3022:20,
3035:9, 3036:18,
3045:8, 3045:16,
3050:25, 3071:21,
3072:12, 3072:24,

3074:12, 3074:19,
3075:4, 3080:11,
3080:23, 3094:1,
3096:24, 3172:6,
3181:4, 3214:13,
3221:5, 3254:17
**marketed** [7] -
2894:17, 2909:3,
2949:16, 2984:5,
2988:3, 3054:12,
3070:4
**marketer** [2] - 3171:5,
3171:15
**marketing** [80] -
2923:1, 2923:11,
2924:9, 2928:9,
2937:8, 2950:3,
2974:7, 2975:6,
2975:7, 2976:17,
2977:12, 2977:16,
2977:22, 2993:9,
2993:15, 2993:19,
2993:25, 2994:3,
2994:4, 2994:13,
2996:15, 2997:16,
3006:22, 3023:23,
3031:22, 3035:6,
3035:10, 3036:9,
3037:16, 3043:8,
3043:11, 3045:9,
3047:2, 3047:13,
3049:16, 3051:15,
3051:20, 3051:21,
3052:3, 3052:6,
3052:12, 3052:18,
3052:23, 3052:24,
3053:9, 3053:10,
3053:11, 3053:16,
3054:11, 3058:9,
3059:6, 3060:25,
3061:19, 3068:3,
3077:1, 3081:22,
3085:21, 3088:23,
3089:1, 3090:10,
3091:23, 3092:2,
3092:13, 3095:12,
3098:24, 3101:8,
3101:15, 3101:22,
3133:7, 3135:7,
3159:1, 3171:5,
3176:1, 3187:16,
3194:18, 3194:25,
3195:11, 3203:5,
3204:3
**Marketing** [2] -
3135:25
**MARKETOS** [252] -
2888:14, 2888:14,
2889:3, 2889:4,
2889:5, 2889:6,

2890:9, 2891:2, 2891:4, 2891:14, 2891:17, 2891:21, 2891:24, 2892:4, 2892:6, 2892:23, 2892:25, 2893:5, 2893:12, 2893:17, 2893:19, 2893:23, 2894:3, 2894:5, 2900:2, 2900:12, 2900:20, 2902:4, 2902:16, 2903:6, 2905:3, 2905:18, 2909:17, 2910:2, 2913:5, 2914:2, 2916:3, 2916:6, 2916:11, 2916:13, 2917:17, 2919:1, 2919:24, 2920:6, 2920:12, 2920:17, 2920:22, 2921:17, 2921:18, 2924:17, 2924:21, 2924:23, 2925:3, 2925:7, 2925:9, 2925:10, 2925:15, 2925:21, 2926:14, 2926:16, 2926:19, 2926:21, 2928:19, 2928:20, 2929:5, 2929:10, 2931:25, 2932:14, 2932:16, 2933:6, 2933:8, 2934:22, 2934:25, 2935:6, 2935:10, 2935:13, 2935:15, 2935:17, 2936:24, 2937:1, 2937:16, 2937:20, 2939:4, 2939:5, 2939:13, 2939:17, 2940:20, 2941:2, 2951:19, 2951:25, 2952:5, 2952:7, 2953:1, 2953:7, 2953:15, 2954:13, 2954:19, 2959:7, 2959:11, 2960:1, 2960:3, 2960:7, 2960:9, 2961:16, 2961:20, 2963:2, 2963:6, 2966:2, 2966:6, 2968:9, 2968:13, 2968:15, 2969:5, 2969:7, 2970:9, 2970:13, 2970:14, 2973:20, 2974:3, 2974:9, 2974:21, 2975:2, 2975:9, 2975:21, 2976:2, 2976:4, 2976:7, 2976:11,

2976:15, 2976:19, 2976:22, 2977:3, 2977:5, 2977:7, 2978:2, 2978:10, 2978:15, 2978:17, 2978:22, 2978:23, 2979:9, 2979:11, 2981:12, 2981:19, 2984:16, 2985:3, 2996:3, 3012:7, 3012:9, 3012:14, 3012:21, 3012:25, 3013:2, 3013:17, 3013:22, 3014:6, 3019:10, 3024:23, 3024:25, 3025:2, 3028:14, 3028:16, 3028:19, 3028:22, 3030:19, 3030:21, 3031:6, 3031:8, 3032:1, 3032:2, 3032:6, 3032:8, 3033:24, 3034:2, 3037:20, 3038:2, 3038:6, 3039:6, 3039:13, 3039:16, 3040:5, 3041:2, 3041:4, 3041:12, 3041:19, 3041:22, 3042:3, 3042:5, 3063:17, 3063:20, 3064:15, 3064:25, 3065:10, 3065:11, 3067:20, 3093:19, 3093:20, 3094:22, 3094:25, 3095:25, 3096:2, 3100:21, 3101:4, 3101:6, 3101:8, 3101:14, 3101:22, 3103:4, 3109:8, 3109:12, 3116:9, 3123:5, 3123:8, 3136:16, 3136:20, 3137:9, 3141:18, 3142:1, 3142:7, 3145:5, 3146:6, 3146:14, 3146:23, 3147:2, 3147:5, 3147:11, 3147:15, 3148:10, 3148:13, 3148:18, 3148:25, 3149:10, 3150:2, 3150:5, 3152:10, 3183:12, 3185:6, 3186:11, 3186:12, 3196:21, 3196:25, 3198:3, 3198:8, 3199:11, 3199:12, 3200:1, 3200:3, 3202:20, 3202:23, 3202:25,

3204:17, 3204:24
**Marketos** [32] - 2890:10, 2894:7, 2899:8, 2903:12, 2905:17, 2906:18, 2908:15, 2909:6, 2910:6, 2914:7, 2921:12, 2932:12, 2951:24, 2974:13, 2976:12, 2978:13, 2985:4, 3012:19, 3024:22, 3039:11, 3063:15, 3065:5, 3093:18, 3102:7, 3116:8, 3141:25, 3145:4, 3152:4, 3168:2, 3183:10, 3186:10, 3205:4
**marketplace** [8] - 2922:16, 2933:17, 2937:12, 2938:24, 2942:10, 3006:2, 3095:17, 3192:22
**married** [4] - 3230:9, 3230:10, 3251:25
**Martin** [2] - 3010:18, 3082:7
**Mary** [1] - 3225:15
**master's** [4] - 3042:20, 3043:19, 3044:10, 3206:20
**masterminded** [1] - 3021:22
**match** [3] - 3004:25, 3005:3, 3073:6
**material** [6] - 2904:17, 2908:8, 2912:6, 2995:1, 3056:5, 3147:21
**materiality** [5] - 2898:7, 2900:10, 2900:24, 2902:11, 2902:18
**materials** [19] - 2993:9, 2993:14, 2993:15, 2993:19, 2993:20, 2993:25, 2994:4, 2994:7, 2994:14, 2996:15, 2997:16, 3022:14, 3033:12, 3060:25, 3061:19, 3062:14, 3088:10, 3133:2
**math** [2] - 3076:6, 3112:20
**Matt** [1] - 3117:17
**matter** [15] - 2910:16, 2975:12, 2986:7, 3030:3, 3045:7, 3063:23, 3091:25,

3114:19, 3147:16, 3149:19, 3149:21, 3150:9, 3187:6, 3256:24, 3263:5
**matters** [5] - 2902:10, 2909:6, 2923:6, 3029:10, 3099:17
**Mattes** [53] - 2897:8, 2900:8, 2901:7, 2905:12, 2906:3, 2906:13, 2914:1, 2921:13, 2921:19, 2924:15, 2947:5, 2948:18, 2952:12, 2952:21, 2953:4, 2981:1, 2984:4, 2984:11, 2985:9, 2996:14, 3007:3, 3011:3, 3011:7, 3013:6, 3013:14, 3014:10, 3014:16, 3016:19, 3018:14, 3019:1, 3021:18, 3021:21, 3023:21, 3025:3, 3039:8, 3049:5, 3049:10, 3067:7, 3071:19, 3073:9, 3074:8, 3075:13, 3078:24, 3079:12, 3080:13, 3081:10, 3084:1, 3164:5, 3164:23, 3172:17, 3182:1, 3201:20
**MATTES** [1] - 2889:2
**Mattes's** [5] - 2905:1, 2905:7, 3067:11, 3067:21, 3164:9
**Matthew** [1] - 3049:3
**Mauer** [1] - 3239:3
**max** [1] - 3075:4
**MBA** [1] - 3206:21
**McCormick** [1] - 2960:20
**McHugh** [4] - 2943:8, 2943:16, 2943:17
**McKay** [2] - 2888:23, 3263:11
**McKay-Soule** [2] - 2888:23, 3263:11
**McNeil** [2] - 2897:12, 2921:23, 3037:10
**McSherry** [8] - 3222:14, 3222:15, 3222:16, 3227:20, 3228:18, 3230:24, 3232:1, 3236:12
**MEAGHER** [1] - 2888:19
**meal** [1] - 3245:2

**meals** [1] - 3252:3
**mean** [31] - 2895:5, 2896:7, 2896:13, 2896:22, 2902:9, 2906:1, 2906:7, 2909:5, 2919:17, 2941:6, 2957:6, 2963:23, 2974:12, 2974:16, 2974:18, 2975:23, 2976:12, 3005:18, 3012:8, 3023:25, 3101:10, 3101:24, 3147:22, 3157:21, 3171:22, 3172:4, 3184:19, 3227:6, 3245:24, 3255:23
**meaning** [3] - 2896:20, 3005:25, 3174:25
**meaningful** [1] - 3162:13
**means** [9] - 2922:10, 2936:17, 2964:10, 2973:2, 3038:21, 3049:23, 3070:16, 3091:17, 3107:21
**meant** [4] - 3098:3, 3178:2, 3182:6, 3182:7
**meanwhile** [1] - 3050:13
**measure** [6] - 3002:17, 3067:12, 3063:13, 3069:16, 3076:18, 3087:4
**measured** [1] - 2968:24
**measurement** [1] - 3074:2
**measuring** [1] - 3084:19
**mechanical** [1] - 2888:25
**mechanism** [1] - 3033:12
**med** [1] - 3145:17
**media** [3] - 3117:13, 3117:20, 3143:1
**media-wise** [1] - 3117:13
**mediate** [1] - 3059:25
**Medicaid** [8] - 2892:14, 2892:17, 2893:8, 2894:1, 2923:12, 2927:19, 2928:24, 2930:9
**Medical** [2] - 3212:15, 3248:24
**medical** [37] -

2926:23, 2949:21, 2950:6, 2950:17, 2973:4, 2986:24, 2987:1, 2997:6, 2997:23, 3052:10, 3053:3, 3055:17, 3056:6, 3056:12, 3058:19, 3063:10, 3066:10, 3066:19, 3066:23, 3077:19, 3086:10, 3087:18, 3099:24, 3140:8, 3147:18, 3154:14, 3170:22, 3206:25, 3207:2, 3207:8, 3207:10, 3207:14, 3208:9, 3209:20, 3210:6, 3210:7, 3210:15

**medically** [2] - 2892:15, 3051:10

**Medicare** [5] - 2893:25, 2923:12, 2927:19, 2928:23, 2930:9

**medication** [4] - 3083:12, 3096:22, 3221:23, 3255:11

**medicine** [23] - 2999:23, 3008:3, 3053:5, 3057:16, 3096:20, 3103:11, 3124:22, 3126:21, 3126:25, 3127:15, 3169:5, 3170:23, 3173:7, 3173:12, 3177:15, 3178:17, 3182:7, 3184:7, 3184:15, 3184:20, 3187:8, 3207:9, 3208:13

**medicines** [7] - 3016:11, 3124:12, 3169:1, 3171:17, 3177:2, 3178:22, 3185:14

**meet** [12] - 2903:22, 2908:17, 2986:11, 3003:8, 3005:6, 3054:24, 3119:23, 3164:5, 3216:22, 3226:13, 3227:4, 3252:23

**meeting** [11] - 2943:18, 2960:5, 2960:25, 3033:23, 3077:25, 3166:21, 3172:23, 3213:6, 3227:17, 3231:16, 3252:22

**meetings** [6] - 3008:20, 3219:18, 3222:21, 3227:17, 3227:19, 3227:20

**Megan** [3] - 2888:23, 3093:4, 3263:11

**Megan_McKay** [1] - 2888:24

**Megan_McKay-Soule@njd.uscourts.gov** [1] - 2888:24

**Melton** [1] - 3200:5

**member** [2] - 3002:5, 3035:10

**members** [27] - 2921:4, 2960:17, 2968:4, 3008:20, 3010:21, 3025:7, 3025:11, 3038:25, 3040:8, 3043:7, 3046:22, 3046:25, 3048:4, 3052:1, 3066:15, 3075:8, 3091:17, 3099:8, 3099:16, 3102:17, 3176:16, 3176:23, 3189:10, 3196:14, 3202:16, 3203:22, 3204:4

**memory** [1] - 2948:24

**mention** [1] - 3182:21

**mentioned** [19] - 2908:1, 3005:12, 3014:10, 3045:22, 3046:10, 3046:11, 3055:1, 3065:14, 3074:5, 3091:20, 3170:18, 3215:23, 3229:7, 3229:18, 3233:11, 3233:21, 3244:12, 3252:9, 3252:14

**merits** [2] - 2904:15, 3055:7

**mess** [1] - 3126:2

**message** [18] - 2981:22, 3000:5, 3060:3, 3070:10, 3081:14, 3081:16, 3092:7, 3107:1, 3123:17, 3123:18, 3124:1, 3124:9, 3128:20, 3131:21, 3176:18, 3176:23, 3256:7

**messages** [31] - 3032:11, 3032:25, 3033:5, 3047:5, 3055:10, 3056:21,

3057:3, 3060:24, 3061:1, 3081:18, 3083:3, 3090:6, 3092:13, 3095:2, 3095:8, 3096:13, 3099:1, 3123:2, 3123:14, 3123:24, 3130:5, 3133:2, 3133:14, 3133:19, 3192:14, 3192:15, 3194:10, 3203:5, 3203:17, 3225:12, 3255:22

**messaging** [5] - 2995:25, 3047:8, 3070:7, 3081:20, 3099:3

**messed** [1] - 3079:12

**met** [3] - 2918:7, 3214:1, 3227:19

**metabolic** [2] - 3232:13, 3232:19

**METABOLIK** [3] - 3234:4, 3234:7, 3235:17

**method** [1] - 3089:24

**methods** [2] - 3060:2, 3069:18

**metric** [10] - 2977:13, 2980:17, 3068:3, 3068:4, 3075:14, 3075:19, 3084:20, 3086:1, 3086:9, 3087:6

**metrics** [2] - 2944:21, 3227:9

**Mexico** [1] - 3233:5

**Meyers** [3] - 3215:21, 3224:9, 3224:11

**Miami** [2] - 3251:2, 3251:19

**Michael** [3] - 2952:1, 3049:2, 3049:5

**middle** [3] - 2998:17, 3034:8, 3094:7

**might** [54] - 2896:18, 2908:17, 2909:8, 2914:6, 2916:19, 2917:7, 2919:12, 2922:10, 2922:11, 2927:12, 2940:12, 2998:15, 3006:11, 3016:11, 3016:14, 3023:8, 3035:19, 3035:24, 3038:8, 3055:21, 3056:6, 3060:11, 3061:6, 3061:21, 3062:1, 3062:15, 3062:19, 3063:16, 3076:10,

3078:11, 3078:16, 3078:18, 3079:7, 3079:11, 3079:24, 3080:4, 3081:10, 3085:17, 3089:8, 3090:5, 3092:1, 3118:13, 3122:19, 3155:10, 3164:22, 3166:10, 3166:17, 3171:17, 3184:9, 3184:20, 3188:15, 3189:20

**Mike** [2] - 3049:4, 3097:8

**military** [1] - 3042:10

**Miller** [1] - 3257:3

**milligram** [2] - 2949:4, 2989:22

**milligrams** [4] - 3130:18, 3131:11, 3132:18

**million** [53] - 2937:23, 2938:16, 2939:19, 2944:21, 2946:4, 2946:8, 2946:9, 2946:21, 2946:25, 2955:4, 2955:8, 2955:9, 2956:10, 2956:11, 2957:24, 2958:11, 2958:12, 2959:13, 2959:22, 2963:20, 2963:21, 2963:23, 2964:9, 2966:14, 2967:4, 2967:18, 2967:21, 2969:3, 2969:15, 2971:5, 2971:19, 2972:15, 2972:19, 3028:21, 3029:6, 3029:24, 3031:4, 3072:10, 3076:7, 3091:12, 3191:3, 3191:7

**millions** [3] - 3162:5, 3192:22, 3196:10

**mind** [6] - 2913:3, 2916:7, 2919:13, 2924:21, 3064:14, 3132:9

**mindful** [2] - 2899:21, 2998:16

**mine** [2] - 2938:10, 3222:16

**minimal** [1] - 2994:20

**minimize** [3] - 3061:20, 3061:25, 3062:15

**minimized** [1] - 3062:21

**minute** [5] - 3011:20,

3092:18, 3186:1, 3202:20, 3242:3

**minutes** [25] - 2917:16, 2918:15, 2918:17, 2918:22, 2920:19, 2920:20, 2920:24, 2972:24, 3011:24, 3012:21, 3012:22, 3012:23, 3012:24, 3013:5, 3063:24, 3064:1, 3092:21, 3129:23, 3146:20, 3150:8, 3150:16, 3258:18, 3258:22, 3259:9, 3259:21

**MIR** [18] - 2998:18, 2999:3, 2999:6, 3061:1, 3063:14, 3066:22, 3086:1, 3087:12, 3087:23, 3105:5, 3108:7, 3108:11, 3109:25, 3110:12, 3237:2, 3237:7, 3237:9, 3237:15

**MIRs** [25] - 2997:24, 2998:5, 2998:11, 2998:22, 2999:8, 2999:11, 2999:21, 2999:22, 2999:25, 3000:13, 3000:17, 3001:1, 3066:8, 3067:1, 3067:4, 3067:8, 3067:12, 3067:22, 3068:7, 3068:9, 3105:20, 3105:21, 3109:3, 3227:2, 3238:10

**mischaracterizes** [2] - 3037:24, 3123:6

**misconduct** [1] - 3148:6

**misleading** [8] - 2892:17, 2902:17, 2933:16, 3060:25, 3061:19, 3062:14, 3083:17, 3102:23

**misrepresenting** [2] - 2909:19, 2929:23

**miss** [8] - 2946:24, 3003:7, 3003:15, 3003:24, 3004:12, 3026:19, 3078:8

**missed** [10] - 2938:7, 2941:4, 2942:19, 2945:3, 2947:15, 2947:18, 3079:19, 3079:25, 3080:3, 3122:21

**missing** [3] - 3003:16, 3004:12, 3006:22
**misspoke** [1] - 3016:9
**misstates** [1] - 3067:14
**mistake** [15] - 2898:8, 2900:6, 2912:25, 2942:4, 2942:5, 2942:9, 2942:12, 2942:17, 2942:24, 2943:2, 2983:25, 2984:8, 2984:24, 3004:22, 3026:19
**mistaken** [1] - 3137:4
**mistakes** [3] - 2941:18, 2983:10, 2984:3
**misunderstood** [1] - 3032:18
**misuse** [1] - 3022:23
**mix** [1] - 3073:6
**mixed** [1] - 3223:22
**modifications** [1] - 2996:15
**moment** [5] - 2969:8, 3024:17, 3027:23, 3100:23, 3197:1
**moments** [2] - 3038:8, 3099:16
**momentum** [1] - 3107:2
**monetary** [1] - 2926:5
**money** [14] - 2923:13, 2930:11, 3046:1, 3053:16, 3054:24, 3058:14, 3084:9, 3103:10, 3116:14, 3117:8, 3189:13, 3224:21, 3224:25, 3225:1
**monies** [1] - 2894:1
**monitor** [1] - 3087:6
**monitoring** [1] - 3089:5
**month** [5] - 3029:25, 3079:18, 3163:23, 3208:4, 3227:19
**monthly** [1] - 2945:21
**months** [3] - 3080:4, 3106:24, 3220:10
**Moran** [3] - 3168:3, 3168:6, 3168:17
**Moran's** [1] - 3174:2
**morning** [38] - 2890:9, 2890:11, 2890:13, 2890:16, 2890:17, 2890:19, 2890:21, 2890:23, 2892:3, 2894:9, 2894:10, 2895:17, 2906:5,

2906:17, 2910:1, 2910:11, 2915:12, 2916:18, 2916:22, 2917:15, 2917:24, 2921:11, 2921:19, 2921:20, 2932:7, 2943:11, 2985:9, 2985:10, 2985:11, 3012:23, 3040:3, 3040:4, 3040:6, 3172:18, 3194:24, 3213:13, 3239:17
**most** [12] - 2986:25, 3015:7, 3028:7, 3034:13, 3057:1, 3179:15, 3185:9, 3219:12, 3224:24, 3241:13, 3255:23, 3260:9
**mothers** [1] - 2982:11
**motion** [2] - 2892:7, 2905:23
**motions** [1] - 3101:11
**motivated** [1] - 3225:1
**motivating** [1] - 3224:12
**motivation** [1] - 3225:2
**mouth** [1] - 3228:13
**move** [20] - 2891:23, 2909:9, 2911:15, 2914:11, 2914:15, 2914:24, 2917:3, 2945:10, 2975:19, 3014:4, 3015:16, 3040:13, 3042:1, 3207:25, 3217:5, 3240:24, 3242:20, 3243:25, 3251:13, 3255:11
**moved** [5] - 3208:4, 3208:6, 3211:16, 3212:7, 3214:16
**moving** [8] - 2961:8, 2974:25, 3039:14, 3141:15, 3150:24, 3210:25, 3237:3, 3238:13
**Moyer** [1] - 3228:21
**MR** [390] - 2889:3, 2889:3, 2889:4, 2889:5, 2889:6, 2889:7, 2890:9, 2890:13, 2890:15, 2890:19, 2890:21, 2891:2, 2891:4, 2891:14, 2891:17, 2891:21, 2891:24, 2892:4, 2892:6, 2892:23, 2892:25,

2893:5, 2893:12, 2893:17, 2893:19, 2893:23, 2894:3, 2894:5, 2894:9, 2894:11, 2894:22, 2895:9, 2895:11, 2895:21, 2896:22, 2898:23, 2899:5, 2900:2, 2900:12, 2900:20, 2901:3, 2902:4, 2902:16, 2903:6, 2903:24, 2904:8, 2904:14, 2904:21, 2905:3, 2905:8, 2905:18, 2906:9, 2908:4, 2908:11, 2908:20, 2909:2, 2909:17, 2909:21, 2910:2, 2913:5, 2914:2, 2916:3, 2916:6, 2916:11, 2916:13, 2917:17, 2919:1, 2919:24, 2920:6, 2920:12, 2920:17, 2920:22, 2921:17, 2921:18, 2924:17, 2924:21, 2924:23, 2925:3, 2925:7, 2925:9, 2925:10, 2925:15, 2925:17, 2925:21, 2925:24, 2926:3, 2926:7, 2926:9, 2926:14, 2926:16, 2926:19, 2926:21, 2928:19, 2928:20, 2929:5, 2929:10, 2931:25, 2932:4, 2932:14, 2932:16, 2933:6, 2933:8, 2934:22, 2934:25, 2935:6, 2935:8, 2935:10, 2935:13, 2935:15, 2935:17, 2936:24, 2937:1, 2937:16, 2937:17, 2937:20, 2939:4, 2939:13, 2939:14, 2939:17, 2940:20, 2940:24, 2941:2, 2951:19, 2951:20, 2951:23, 2951:25, 2952:5, 2952:7, 2953:1, 2953:7, 2953:8, 2953:11, 2953:13, 2953:15, 2954:13, 2954:14, 2954:19, 2959:7, 2959:8, 2959:11, 2960:1, 2960:3, 2960:7,

2960:9, 2961:16, 2961:17, 2961:20, 2963:2, 2963:3, 2963:6, 2966:2, 2966:3, 2966:6, 2968:9, 2968:10, 2968:13, 2968:15, 2969:5, 2969:7, 2970:9, 2970:10, 2970:13, 2970:14, 2973:20, 2973:21, 2974:3, 2974:9, 2974:12, 2974:16, 2974:18, 2974:21, 2975:2, 2975:9, 2975:21, 2975:23, 2976:2, 2976:4, 2976:6, 2976:7, 2976:10, 2976:11, 2976:15, 2976:19, 2976:21, 2976:22, 2977:1, 2977:3, 2977:4, 2977:5, 2977:7, 2977:18, 2977:24, 2978:2, 2978:8, 2978:10, 2978:15, 2978:17, 2978:20, 2978:22, 2978:23, 2979:9, 2979:11, 2981:12, 2981:16, 2981:19, 2984:16, 2985:3, 2985:6, 2985:8, 2985:11, 2985:12, 2985:17, 2985:18, 2996:3, 2996:9, 2996:12, 2996:13, 3010:24, 3011:2, 3011:4, 3011:6, 3011:9, 3011:12, 3011:17, 3011:23, 3012:7, 3012:9, 3012:12, 3012:14, 3012:18, 3012:21, 3012:25, 3013:2, 3013:4, 3013:8, 3013:11, 3013:17, 3013:22, 3014:4, 3014:6, 3014:9, 3014:12, 3014:14, 3018:3, 3018:11, 3018:13, 3018:22, 3018:24, 3018:25, 3019:8, 3019:10, 3019:13, 3019:15, 3019:19, 3019:21, 3021:19, 3021:20, 3024:17, 3024:19, 3024:23, 3024:25, 3025:2, 3028:14, 3028:16, 3028:19,

3028:22, 3030:19, 3030:21, 3031:6, 3031:8, 3032:1, 3032:2, 3032:6, 3032:8, 3033:24, 3034:2, 3037:19, 3037:20, 3037:24, 3038:2, 3038:6, 3039:6, 3039:13, 3039:16, 3040:5, 3041:2, 3041:4, 3041:12, 3041:19, 3041:22, 3042:3, 3042:5, 3063:17, 3063:20, 3064:15, 3064:25, 3065:10, 3065:11, 3067:20, 3093:19, 3093:20, 3094:22, 3094:25, 3095:25, 3096:2, 3100:21, 3101:4, 3101:6, 3101:8, 3101:14, 3101:22, 3103:4, 3109:8, 3109:12, 3116:9, 3123:5, 3123:8, 3136:16, 3136:20, 3137:9, 3141:18, 3142:1, 3142:7, 3145:5, 3146:6, 3146:14, 3146:23, 3147:2, 3147:5, 3147:11, 3147:15, 3148:10, 3148:13, 3148:18, 3148:25, 3149:10, 3150:2, 3150:5, 3152:10, 3183:12, 3185:6, 3186:11, 3186:12, 3196:21, 3196:25, 3198:3, 3198:8, 3199:11, 3199:12, 3200:1, 3200:3, 3202:20, 3202:23, 3202:25, 3204:17, 3204:24, 3205:5, 3205:7, 3205:20, 3205:21, 3230:1, 3230:3, 3232:6, 3232:9, 3234:2, 3234:3, 3240:9, 3240:11, 3240:24, 3241:4, 3241:6, 3242:8, 3242:10, 3242:20, 3242:25, 3243:15, 3243:17, 3243:25, 3244:4, 3250:11, 3250:14, 3251:7, 3251:9, 3251:13, 3251:17, 3252:7, 3252:8,

3262:3, 3262:6, 3262:9

**MS** [103] - 2889:5, 2890:11, 2890:17, 2917:19, 2917:25, 2918:2, 2918:5, 2918:9, 2918:12, 2920:9, 2920:13, 2939:5, 3040:18, 3040:24, 3041:8, 3041:14, 3064:18, 3067:14, 3067:19, 3101:25, 3102:3, 3102:10, 3102:13, 3102:17, 3102:18, 3103:9, 3104:23, 3104:25, 3109:13, 3116:8, 3116:11, 3116:12, 3123:11, 3124:25, 3125:3, 3125:6, 3126:8, 3126:12, 3131:22, 3131:25, 3132:2, 3136:23, 3137:1, 3137:6, 3137:17, 3137:22, 3138:7, 3138:11, 3138:12, 3141:10, 3141:13, 3141:16, 3141:22, 3142:12, 3142:15, 3142:18, 3142:20, 3142:23, 3143:3, 3143:22, 3143:25, 3144:9, 3144:11, 3144:14, 3144:19, 3144:22, 3145:1, 3150:21, 3150:23, 3150:25, 3151:3, 3151:5, 3151:7, 3151:13, 3151:19, 3151:22, 3151:24, 3152:2, 3152:7, 3152:18, 3152:19, 3153:7, 3153:9, 3153:24, 3154:3, 3154:24, 3154:25, 3167:20, 3167:21, 3183:10, 3183:13, 3183:14, 3185:5, 3185:7, 3185:8, 3186:1, 3186:4, 3186:6, 3204:12, 3241:1, 3242:22, 3244:1, 3251:14

**multiple** [6] - 2911:19, 3022:6, 3113:23, 3236:7, 3240:21, 3245:18

**multiplier** [1] - 3045:17

**multitude** [1] -

2912:18

**Murphy** [22] - 2998:5, 3216:6, 3216:7, 3216:8, 3216:11, 3216:15, 3216:24, 3217:18, 3219:18, 3220:11, 3220:14, 3220:18, 3220:20, 3222:23, 3222:25, 3223:7, 3225:6, 3226:7, 3226:15, 3226:21, 3230:14, 3230:15

**must** [8] - 2983:4, 2983:8, 2992:24, 3032:18, 3046:8, 3051:18, 3122:7, 3257:8

**Myers** [3] - 3211:14, 3213:3, 3215:12

---

## N

**Nadim** [6] - 3212:18, 3230:16, 3230:17, 3239:3, 3257:9, 3258:8

**naive** [60] - 2949:11, 2949:16, 2949:21, 2950:3, 2950:7, 2950:15, 2950:17, 2950:20, 2950:25, 2951:1, 2951:6, 2951:9, 2951:14, 2956:25, 2957:17, 2957:20, 2958:16, 2961:13, 2963:10, 2963:20, 2964:3, 2964:8, 2964:23, 2965:6, 2965:9, 2965:13, 2965:15, 2965:16, 2965:18, 2965:20, 2965:21, 2986:2, 2986:8, 2986:17, 2989:12, 2990:2, 2990:12, 2991:6, 2991:16, 2991:24, 3005:15, 3029:8, 3029:9, 3070:13, 3070:15, 3070:16, 3070:22, 3071:2, 3071:8, 3071:11, 3096:4, 3096:17, 3096:19, 3118:8, 3130:6, 3255:13

**name** [19] - 2953:20, 3010:17, 3039:23, 3039:24, 3094:17, 3119:20, 3122:18, 3122:23, 3182:21,

3188:11, 3201:20, 3205:15, 3205:16, 3212:12, 3225:11, 3230:8, 3244:9, 3245:25, 3253:3

**named** [3] - 3117:13, 3156:1, 3213:24

**names** [3] - 2953:2, 3225:13, 3225:14

**naming** [1] - 2907:22

**Nancy** [26] - 3119:12, 3119:15, 3119:23, 3130:14, 3131:15, 3132:21, 3193:6, 3196:4, 3218:13, 3219:3, 3220:12, 3220:25, 3221:3, 3223:6, 3225:21, 3227:14, 3228:18, 3236:24, 3237:14, 3238:21, 3248:22, 3250:8, 3250:9, 3254:20, 3257:1, 3260:15

**narrow** [4] - 3005:13, 3005:20, 3006:16, 3059:22

**narrower** [1] - 3005:17

**Natalie** [1] - 3200:5

**NATAP** [1] - 3236:13

**nation** [1] - 3069:24

**national** [1] - 3196:16

**nationwide** [2] - 3021:23, 3069:22

**natural** [5] - 2977:19, 3073:18, 3074:5, 3074:6, 3075:3

**naturally** [1] - 3255:17

**nature** [2] - 3000:22, 3144:20

**navigate** [1] - 3176:21

**near** [2] - 3067:4, 3206:10

**necessarily** [7] - 2903:10, 2988:23, 3000:10, 3107:19, 3145:18, 3211:5, 3223:23

**necessary** [3] - 2980:9, 2980:16, 3051:2

**necessity** [1] - 3021:9

**need** [32] - 2894:6, 2908:2, 2914:16, 2915:22, 2917:22, 2918:24, 2919:12, 2919:23, 2939:21, 2965:14, 2998:18, 3006:13, 3013:1, 3028:23, 3036:6,

3041:12, 3045:13, 3048:8, 3050:7, 3050:20, 3064:23, 3074:11, 3074:17, 3074:18, 3079:2, 3079:7, 3093:14, 3094:8, 3143:9, 3143:10, 3181:22, 3205:11

**needed** [18] - 2897:25, 2917:15, 3015:20, 3027:17, 3181:12, 3181:13, 3227:1, 3227:2, 3227:3, 3228:3, 3229:23, 3237:14, 3238:9, 3255:5, 3255:11, 3261:21

**needs** [10] - 2919:20, 3015:21, 3028:6, 3028:10, 3028:12, 3033:23, 3109:10, 3126:21, 3181:11, 3181:17

**negative** [1] - 3218:21

**nervous** [1] - 3143:1

**net** [5] - 2955:14, 2958:4, 2958:9, 3071:25, 3091:12

**network** [2] - 3168:7, 3210:20

**neutral** [4] - 3083:5, 3095:20, 3095:23, 3234:12

**never** [30] - 2900:13, 2907:5, 2907:9, 2922:11, 2957:20, 2963:15, 2964:23, 2977:16, 3068:8, 3071:10, 3071:14, 3073:1, 3106:5, 3118:7, 3119:4, 3120:16, 3164:14, 3165:11, 3165:16, 3166:10, 3191:21, 3201:16, 3213:14, 3224:16, 3235:14, 3235:15, 3236:20, 3246:2, 3246:4, 3246:20

**NEW** [1] - 2888:1

**new** [24] - 2888:20, 2999:8, 2999:15, 3006:13, 3007:23, 3008:24, 3008:25, 3009:11, 3014:19, 3015:9, 3019:25, 3044:15, 3053:22, 3055:9, 3114:23, 3210:22, 3211:3,

3214:12, 3214:17, 3214:22, 3215:17, 3227:20, 3241:19, 3254:16

**New** [31] - 2888:9, 2998:6, 2998:22, 3026:13, 3070:1, 3076:4, 3087:9, 3097:25, 3199:21, 3206:9, 3208:5, 3208:6, 3208:8, 3211:17, 3212:7, 3212:16, 3224:5, 3226:15, 3228:19, 3228:20, 3228:21, 3237:3, 3238:24, 3240:7, 3240:17, 3241:9, 3243:19, 3247:7, 3261:14, 3261:15

**newer** [1] - 3219:19

**News** [2] - 3155:25, 3156:5

**news** [1] - 3248:20

**newspaper** [9] - 3139:24, 3140:7, 3152:21, 3153:10, 3154:8, 3155:9, 3155:18, 3155:21

**next** [18] - 2901:1, 2914:21, 2927:2, 2928:17, 2928:18, 2936:2, 2936:7, 2968:1, 2972:8, 2996:19, 3039:11, 3051:23, 3086:11, 3094:13, 3095:25, 3096:22, 3131:6, 3205:4

**nice** [10] - 3116:19, 3213:9, 3227:5, 3227:6, 3240:3, 3243:9, 3243:24, 3251:24, 3251:25, 3259:17

**nicest** [1] - 3238:23

**Nicole** [1] - 3152:22

**night** [5] - 2910:11, 3208:25, 3239:20, 3253:12, 3253:19

**nine** [1] - 2919:4

**NNRTI** [1] - 2971:8

**nobody** [1] - 3119:17

**non** [2] - 2971:12, 3213:17

**non-NUC** [1] - 3213:17

**non-nuke** [1] - 2971:12

**noncompliance** [1] -

2928:21
**none** [2] - 3119:17, 3216:21
**nonetheless** [1] - 2938:15
**nonnegotiable** [1] - 3224:2
**nonprofits** [1] - 3020:20
**noon** [1] - 3013:1
**norm** [1] - 3051:4
**normal** [3] - 3049:22, 3069:11, 3091:22
**normally** [1] - 3101:10
**North** [2] - 3018:15, 3208:3
**note** [6] - 2900:3, 2995:13, 3071:23, 3077:2, 3174:10, 3231:21
**noted** [4] - 2978:18, 3152:5, 3154:1, 3194:21
**notes** [3] - 2910:11, 2929:9, 2929:11
**nothing** [29] - 2910:2, 2917:7, 2920:14, 2974:3, 2974:6, 2974:7, 2974:23, 2975:17, 2976:17, 2977:12, 2977:15, 2977:22, 2985:3, 2986:13, 3011:8, 3022:16, 3023:9, 3026:4, 3039:7, 3045:20, 3088:16, 3100:4, 3100:21, 3144:6, 3172:9, 3178:1, 3204:24
**noticed** [3] - 2921:7, 3025:22, 3210:15
**notion** [1] - 3059:5
**nowhere** [1] - 3067:4
**NTS** [2] - 2955:22, 2958:4
**NUC** [1] - 3213:17
**nuke** [1] - 2971:12
**NUMBER** [1] - 2888:3
**number** [58] - 2905:10, 2905:11, 2932:20, 2938:18, 2940:7, 2942:19, 2946:13, 2954:20, 2956:25, 2957:3, 2957:11, 2966:23, 2967:9, 2972:10, 2980:3, 2984:22, 2987:16, 2993:8, 2997:7, 2999:21, 3047:15, 3050:20,

3053:9, 3055:22, 3067:1, 3067:3, 3067:4, 3068:8, 3069:18, 3072:10, 3072:11, 3076:5, 3076:23, 3077:15, 3077:17, 3078:2, 3079:21, 3081:6, 3094:18, 3097:2, 3097:19, 3118:18, 3123:17, 3125:4, 3133:1, 3142:21, 3161:12, 3165:23, 3168:25, 3170:2, 3172:1, 3181:9, 3190:22, 3199:24, 3200:15, 3229:7, 3229:16, 3237:17
**numbered** [1] - 3094:12
**numbers** [27] - 2937:25, 2939:8, 2939:9, 2955:6, 2955:10, 2956:9, 2969:17, 2980:14, 3004:6, 3072:19, 3079:18, 3182:11, 3224:1, 3224:20, 3226:13, 3227:2, 3227:4, 3228:4, 3228:8, 3238:10, 3246:23, 3247:12, 3247:19, 3247:20, 3247:21, 3256:14, 3256:15
**numerous** [2] - 3008:19, 3105:16
**nurse** [3] - 3063:12, 3088:3, 3257:3
**nurses** [3] - 2982:11, 3098:14, 3208:11

## O

**o'clock** [3] - 2919:7, 3063:25, 3064:8
**O'Reilly** [2] - 2951:18, 2952:1
**oath** [7] - 2912:8, 2921:14, 3065:7, 3105:15, 3105:19, 3110:3, 3226:1
**object** [10] - 2902:4, 2912:4, 2951:23, 2973:21, 2977:8, 3067:14, 3103:5, 3109:8, 3142:7, 3204:12
**objected** [2] - 2913:9, 2916:15

**objecting** [4] - 2903:10, 2912:17, 2913:19, 3149:5
**objection** [81] - 2902:3, 2906:8, 2906:10, 2907:1, 2907:21, 2910:24, 2912:19, 2913:16, 2914:10, 2914:11, 2914:17, 2914:25, 2915:13, 2915:15, 2915:17, 2915:19, 2915:20, 2916:14, 2920:8, 2925:17, 2926:10, 2932:4, 2932:11, 2935:8, 2937:17, 2939:14, 2940:24, 2953:10, 2953:11, 2954:14, 2959:8, 2961:17, 2963:3, 2966:3, 2968:10, 2970:10, 2974:22, 2977:8, 2977:9, 2978:18, 2981:16, 2996:3, 2996:7, 2996:10, 3012:6, 3012:14, 3014:6, 3018:4, 3019:9, 3019:10, 3037:19, 3037:22, 3038:4, 3042:2, 3064:17, 3067:17, 3101:11, 3101:24, 3116:8, 3116:9, 3123:5, 3141:17, 3141:19, 3142:11, 3143:17, 3145:12, 3145:13, 3149:16, 3149:18, 3150:3, 3150:6, 3150:10, 3150:13, 3154:1, 3183:11, 3183:12, 3185:5, 3241:1, 3242:22, 3244:1, 3251:14
**objections** [4] - 2912:19, 2915:25, 2916:4, 3152:5
**objectives** [2] - 2935:1, 3020:22
**obligated** [1] - 3245:6
**observation** [1] - 3177:9
**observations** [2] - 3047:21, 3114:23
**observe** [1] - 3181:8
**obstacle** [1] - 3062:10
**obstacles** [1] - 3015:8
**obtained** [3] - 3077:3, 3203:5, 3203:16

**obtaining** [1] - 3084:2
**obviously** [4] - 3205:11, 3249:21, 3254:9, 3254:10
**occasionally** [2] - 3050:16, 3089:7
**occasions** [1] - 2907:3
**occur** [6] - 2987:21, 3029:2, 3050:8, 3051:8, 3062:5, 3068:9
**occurred** [5] - 2920:25, 3012:3, 3092:23, 3151:8, 3211:2
**occurs** [1] - 3082:12
**October** [1] - 3073:15
**odd** [1] - 3218:18
**OF** [2] - 2888:1, 2888:3
**off-label** [221] - 2908:22, 2909:3, 2909:8, 2909:11, 2909:19, 2923:1, 2923:11, 2924:9, 2928:9, 2929:22, 2934:8, 2948:16, 2948:22, 2949:4, 2951:6, 2951:11, 2951:15, 2951:16, 2961:22, 2961:25, 2962:9, 2962:11, 2962:19, 2964:15, 2964:20, 2965:7, 2965:20, 2965:21, 2984:5, 2984:22, 2986:8, 2986:18, 2986:24, 2987:5, 2987:6, 2987:14, 2987:22, 2988:9, 2989:1, 2992:24, 2997:5, 2998:19, 3000:15, 3000:19, 3000:22, 3004:14, 3004:17, 3016:12, 3016:20, 3016:22, 3021:24, 3022:18, 3022:19, 3022:21, 3027:13, 3027:14, 3027:15, 3027:21, 3028:2, 3029:6, 3030:23, 3031:9, 3031:10, 3031:18, 3031:23, 3036:9, 3036:18, 3037:16, 3038:9, 3038:16, 3039:2, 3047:2, 3047:3, 3047:5, 3047:6, 3047:8,

3057:25, 3058:9, 3059:5, 3060:2, 3060:21, 3060:23, 3060:24, 3061:1, 3061:6, 3061:7, 3066:5, 3066:11, 3066:21, 3068:3, 3068:11, 3068:16, 3069:3, 3069:7, 3069:13, 3069:14, 3069:19, 3070:5, 3073:16, 3073:17, 3073:20, 3073:22, 3076:14, 3077:1, 3079:4, 3081:11, 3081:20, 3081:24, 3082:3, 3082:8, 3083:17, 3086:13, 3086:19, 3087:2, 3087:22, 3088:1, 3088:23, 3089:1, 3090:6, 3090:10, 3090:18, 3091:5, 3092:2, 3094:15, 3098:24, 3098:25, 3099:1, 3099:2, 3099:3, 3108:19, 3109:24, 3110:24, 3123:2, 3123:14, 3123:17, 3123:18, 3123:24, 3128:5, 3128:24, 3169:1, 3169:11, 3169:21, 3170:3, 3170:13, 3170:19, 3170:21, 3170:23, 3171:18, 3171:22, 3172:2, 3173:19, 3176:1, 3176:21, 3192:15, 3193:11, 3194:10, 3194:18, 3194:25, 3195:11, 3196:9, 3197:2, 3197:7, 3197:10, 3197:14, 3197:21, 3198:6, 3198:19, 3202:1, 3215:2, 3219:14, 3219:17, 3221:25, 3222:23, 3222:24, 3223:4, 3223:5, 3225:7, 3225:8, 3225:9, 3225:12, 3225:19, 3226:5, 3226:6, 3226:10, 3226:13, 3227:12, 3227:21, 3231:9, 3233:21, 3233:24, 3234:4, 3234:24, 3235:11, 3235:12, 3235:19, 3235:21, 3236:8, 3238:9,

3239:7, 3252:12,
3252:21, 3253:7,
3253:14, 3254:3,
3254:7, 3254:12,
3254:13, 3254:22,
3255:2, 3255:15,
3255:22, 3256:2,
3256:7, 3256:25,
3258:2, 3258:6,
3260:10, 3260:13

**offenses** [1] - 3148:2

**offer** [24] - 2925:15,
2932:3, 2935:6,
2937:16, 2939:13,
2940:22, 2951:19,
2953:7, 2954:13,
2959:7, 2961:16,
2963:2, 2966:2,
2968:9, 2970:9,
2973:20, 2981:15,
3046:22, 3046:24,
3064:16, 3146:9,
3149:2, 3202:16

**offered** [21] - 2910:13,
3048:4, 3099:16,
3099:20, 3099:24,
3100:3, 3137:11,
3142:9, 3145:8,
3146:14, 3148:15,
3149:12, 3149:20,
3163:6, 3164:1,
3164:4, 3165:9,
3165:22, 3188:19,
3193:25, 3203:22

**offering** [9] - 3065:13,
3065:24, 3099:7,
3101:14, 3126:14,
3141:22, 3141:23,
3145:14, 3145:16

**Office** [4] - 2932:18,
3058:3, 3058:6,
3058:22

**office** [13] - 3079:17,
3123:2, 3123:23,
3208:10, 3213:10,
3216:10, 3223:23,
3225:12, 3225:19,
3246:16, 3253:15,
3260:18

**officer** [1] - 3134:9

**offices** [6] - 3128:2,
3207:7, 3208:10,
3212:24, 3213:15,
3221:2

**Official** [1] - 2888:23

**OFFICIAL** [1] - 3263:1

**often** [6] - 3088:2,
3163:2, 3171:10,
3224:7, 3237:10,
3260:22

**old** [1] - 3042:25

**on-label** [38] - 2939:1,
2948:11, 2948:14,
2957:20, 2962:6,
2962:15, 2962:17,
2962:22, 2963:15,
2987:21, 2988:25,
2990:4, 2992:3,
2992:24, 2999:18,
3000:20, 3016:16,
3029:2, 3054:4,
3057:14, 3069:12,
3070:21, 3071:15,
3071:24, 3072:3,
3072:23, 3073:16,
3087:25, 3088:23,
3090:6, 3090:9,
3096:19, 3175:7,
3175:14, 3176:19,
3176:23, 3233:21,
3254:23

**onboard** [1] - 3046:15

**once** [34] - 2897:15,
2906:23, 2910:23,
2911:14, 2911:25,
2950:21, 3003:24,
3050:5, 3051:20,
3061:17, 3071:13,
3071:16, 3079:14,
3081:22, 3081:23,
3083:13, 3083:21,
3097:5, 3098:23,
3127:7, 3127:11,
3127:20, 3128:2,
3128:20, 3129:15,
3132:8, 3132:9,
3194:6, 3235:8,
3235:12, 3235:14,
3235:15, 3245:3,
3255:17

**once-a-day** [2] -
3071:16, 3128:20

**once-daily** [3] -
3071:13, 3097:5,
3235:8

**one** [175] - 2891:23,
2899:5, 2899:7,
2901:13, 2903:15,
2904:10, 2905:10,
2908:20, 2911:1,
2912:9, 2913:6,
2915:17, 2917:6,
2918:6, 2919:11,
2920:5, 2920:7,
2923:16, 2929:23,
2931:7, 2942:12,
2942:20, 2950:13,
2968:2, 2968:8,
2970:6, 2972:3,
2974:5, 2978:1,

2983:15, 2986:15,
2988:14, 2988:15,
3001:23, 3004:2,
3005:18, 3005:22,
3007:6, 3007:24,
3015:7, 3015:11,
3016:8, 3020:14,
3021:5, 3024:17,
3028:23, 3036:12,
3036:22, 3038:15,
3044:13, 3053:19,
3054:6, 3060:9,
3060:19, 3062:16,
3063:1, 3065:14,
3068:23, 3072:16,
3073:20, 3076:9,
3076:10, 3077:15,
3083:2, 3085:16,
3086:18, 3086:19,
3087:2, 3088:22,
3089:10, 3089:25,
3090:8, 3091:11,
3093:6, 3093:15,
3093:24, 3094:3,
3095:16, 3095:20,
3097:2, 3098:7,
3104:3, 3105:1,
3110:21, 3116:13,
3118:17, 3120:20,
3121:7, 3121:18,
3123:12, 3125:13,
3125:21, 3128:8,
3128:18, 3128:22,
3129:3, 3129:17,
3130:5, 3130:8,
3131:2, 3132:25,
3134:25, 3139:5,
3141:7, 3141:25,
3143:10, 3143:16,
3144:14, 3144:20,
3144:24, 3145:17,
3145:20, 3147:3,
3147:7, 3147:19,
3147:25, 3148:5,
3150:19, 3151:5,
3154:18, 3154:21,
3162:21, 3163:9,
3163:23, 3165:25,
3166:1, 3167:22,
3168:19, 3172:1,
3173:4, 3173:16,
3174:8, 3177:19,
3178:8, 3179:14,
3181:16, 3185:1,
3186:1, 3187:1,
3191:7, 3193:1,
3193:7, 3194:17,
3194:21, 3195:6,
3196:1, 3196:11,
3202:20, 3203:1,
3204:14, 3212:14,

3216:2, 3219:13,
3220:18, 3221:20,
3224:23, 3227:16,
3229:24, 3231:21,
3235:24, 3235:25,
3236:1, 3236:2,
3241:7, 3246:18,
3246:20, 3251:2,
3260:12, 3261:17,
3261:22

**One** [1] - 2888:21

**one-off** [1] - 3089:10

**one-page** [2] - 2968:2,
2968:8

**one-tenth** [1] - 3076:9

**one-time** [1] - 3241:7

**ones** [3] - 2968:23,
3244:12, 3255:9

**online** [1] - 3141:1

**open** [8] - 2890:1,
2949:7, 3057:18,
3128:24, 3211:17,
3228:12, 3228:13,
3254:13

**Open** [4] - 2926:13,
2978:12, 3102:6,
3138:9

**operate** [1] - 3007:16

**operating** [4] -
2922:15, 2923:18,
3208:24, 3209:2

**opine** [1] - 3122:3

**opinion** [51] -
3003:18, 3046:24,
3047:4, 3047:7,
3047:12, 3048:6,
3048:16, 3051:25,
3054:13, 3055:14,
3065:24, 3069:17,
3072:24, 3073:23,
3078:24, 3100:13,
3115:1, 3120:13,
3121:2, 3121:6,
3121:11, 3134:15,
3136:8, 3137:18,
3138:14, 3138:21,
3139:18, 3146:1,
3146:9, 3146:12,
3146:14, 3146:16,
3147:8, 3147:13,
3148:20, 3153:11,
3154:9, 3155:18,
3156:15, 3157:8,
3158:2, 3160:13,
3161:14, 3162:9,
3163:6, 3174:4,
3184:6, 3189:25,
3190:10, 3221:11,
3261:3

**opinions** [30] -

3046:21, 3065:13,
3098:22, 3099:7,
3100:3, 3100:10,
3100:17, 3101:15,
3101:19, 3114:25,
3116:1, 3118:3,
3133:21, 3134:21,
3135:1, 3135:6,
3135:14, 3155:22,
3162:22, 3164:1,
3164:4, 3165:9,
3165:22, 3176:4,
3186:15, 3188:19,
3188:20, 3190:5,
3203:22

**opioids** [1] - 3191:19

**opponent** [6] -
2913:13, 2913:17,
2915:9, 2915:16,
2915:24, 2916:24

**opportunity** [16] -
2896:7, 2896:9,
2900:6, 2941:5,
2941:6, 3053:12,
3063:10, 3071:18,
3162:23, 3167:13,
3189:18, 3211:25,
3212:1, 3214:18,
3219:7, 3228:9

**opposed** [5] - 3069:1,
3069:15, 3079:22,
3123:18, 3237:19

**opposing** [4] -
2910:14, 3240:10,
3242:9, 3251:8

**opposite** [1] - 3149:25

**option** [2] - 3015:10,
3127:11

**oranges** [1] - 2975:8

**order** [14] - 2928:7,
2939:19, 2948:1,
2983:21, 2984:23,
2986:10, 3008:13,
3029:12, 3047:12,
3069:18, 3100:10,
3190:5, 3195:6,
3198:11

**organization** [12] -
2936:10, 2968:5,
2981:5, 2981:23,
2983:16, 2984:4,
3007:18, 3076:3,
3076:15, 3076:19,
3133:3, 3194:23

**orient** [2] - 3106:21,
3116:7

**orientation** [1] -
3046:16

**original** [4] - 2937:22,
2938:6, 2942:14,

3093:24
**originally** [4] - 2902:6, 2995:6, 3032:20, 3191:13
**Orlando** [1] - 3206:15
**Ortho** [2] - 2897:12, 2921:23, 3037:10
**Ortho-McNeil** [3] - 2897:12, 2921:23, 3037:10
**orthopedic** [2] - 3208:21, 3209:2
**otherwise** [2] - 3157:14, 3193:10
**ought** [3] - 2977:8, 3078:25, 3079:22
**ourselves** [1] - 3116:7
**out-of-court** [3] - 3137:10, 3145:7, 3149:18
**outcome** [3] - 2942:13, 3006:2, 3050:11
**outlined** [1] - 2997:18
**outputs** [1] - 2979:8
**outside** [6] - 2919:20, 3068:13, 3073:24, 3079:5, 3175:1, 3175:3
**overall** [2] - 2956:20, 2992:21
**overcalling** [1] - 2943:25
**overcome** [1] - 3072:21
**overestimated** [1] - 2944:6
**overly** [2] - 2912:17, 2915:20
**overrule** [1] - 2932:11
**overruled** [7] - 2953:12, 2954:16, 3109:11, 3142:11, 3143:17, 3150:4, 3150:10
**oversee** [1] - 3057:8
**overseeing** [1] - 2897:12
**overview** [2] - 2952:9, 3159:23
**overwhelming** [1] - 3162:16
**overzealous** [1] - 3078:17
**own** [12] - 3033:5, 3034:22, 3056:12, 3061:15, 3085:5, 3089:23, 3191:8, 3204:4, 3245:12, 3252:19, 3255:15,

3259:7

# P

**P-E-N-E-L-O-W** [1] - 3205:17
**p.m** [8] - 3064:10, 3064:11, 3093:17, 3100:24, 3102:5, 3136:18, 3138:8, 3262:16
**PA** [2] - 3212:19, 3258:7
**Pacini** [4] - 3119:16, 3119:18, 3119:20, 3119:23
**package** [5] - 3054:3, 3057:15, 3057:20, 3217:22, 3217:24
**packages** [1] - 3214:21
**Page** [1] - 2889:8
**PAGE** [1] - 2889:2
**page** [44] - 2889:20, 2900:1, 2900:2, 2914:6, 2926:22, 2928:17, 2928:18, 2929:8, 2933:6, 2935:16, 2936:2, 2936:7, 2966:7, 2967:3, 2967:10, 2968:2, 2968:8, 2972:7, 2974:13, 2975:20, 2976:12, 2976:16, 2976:18, 2976:25, 2977:23, 2978:1, 2978:7, 2978:14, 2978:19, 2978:21, 2978:22, 2989:5, 2992:15, 3012:13, 3014:16, 3018:12, 3029:23, 3031:7, 3198:7, 3198:18, 3200:2, 3232:7
**pager** [1] - 3208:25
**pages** [2] - 2988:18, 3162:5
**paid** [14] - 2983:10, 2984:3, 2984:6, 2984:22, 3007:18, 3058:23, 3081:8, 3090:5, 3091:19, 3200:16, 3243:10, 3258:22, 3259:19, 3259:20
**Palace** [1] - 3250:23
**Palmolive** [1] - 3044:5
**pandemic** [1] - 3002:13

**panel** [1] - 3191:19
**paper** [2] - 3191:7, 3200:24
**paragraph** [12] - 2895:20, 2907:11, 2933:7, 2968:14, 2982:9, 2982:15, 2983:3, 2995:3, 2995:12, 2996:19, 3032:7, 3168:2
**parameters** [2] - 3218:21, 3232:19
**parents** [1] - 3213:12
**parity** [3] - 3009:5, 3009:18, 3017:14
**parse** [1] - 2896:1
**part** [36] - 2898:13, 2904:17, 2905:19, 2908:24, 2909:1, 2924:4, 2940:4, 2981:5, 2996:16, 3002:1, 3002:2, 3002:6, 3008:1, 3015:16, 3020:16, 3035:16, 3044:24, 3046:8, 3046:15, 3078:16, 3106:14, 3108:3, 3110:6, 3110:18, 3122:15, 3124:11, 3125:14, 3130:23, 3142:5, 3146:24, 3170:2, 3175:5, 3179:19, 3188:11, 3193:15, 3221:17
**partial** [1] - 3188:20
**participant** [1] - 3091:7
**participate** [3] - 3001:17, 3068:24, 3084:22
**participated** [2] - 2970:5, 3184:10
**particular** [19] - 2899:25, 2906:20, 2907:11, 2908:1, 2912:12, 2914:21, 2915:17, 2975:20, 2980:13, 3029:24, 3032:19, 3101:13, 3105:2, 3138:2, 3144:12, 3149:22, 3173:11, 3182:21, 3241:15
**particularly** [12] - 2894:13, 3015:15, 3023:22, 3076:19, 3076:25, 3079:16, 3091:2, 3126:1, 3154:19, 3171:10,

3173:4, 3178:25
**parties** [2] - 2907:24, 2915:2
**partnership** [1] - 3077:20
**parts** [7] - 2894:14, 2907:15, 2909:22, 2948:21, 2987:6, 2994:11, 3246:12
**party** [9] - 2910:14, 2913:11, 2913:13, 2913:17, 2915:9, 2915:16, 2915:23, 2916:24, 3247:11
**party's** [1] - 2910:14
**pas** [1] - 3088:15
**pass** [6] - 2952:12, 2952:16, 2953:4, 2953:21, 2953:24, 2954:9, 2954:11, 3227:22
**passage** [1] - 2894:13
**passed** [2] - 3002:17, 3002:21
**passion** [1] - 3211:21
**past** [6] - 2899:25, 2998:18, 3023:25, 3067:3, 3104:4, 3105:13
**pasted** [1] - 3167:22
**patch** [1] - 2892:25
**Patel** [1] - 3134:8
**patent** [1] - 3050:13
**PATH** [1] - 3087:8
**pathway** [1] - 3107:19
**patient** [71] - 2948:1, 2956:15, 2957:11, 2963:16, 2965:2, 2965:10, 2965:11, 2974:5, 2977:1, 2977:15, 2978:25, 2979:5, 2979:12, 2979:13, 2979:24, 2980:11, 2980:16, 2983:18, 2986:9, 2986:14, 2986:25, 2987:4, 2988:20, 2990:8, 2999:16, 3002:4, 3003:25, 3004:14, 3006:17, 3010:10, 3016:15, 3021:5, 3033:20, 3045:12, 3050:4, 3050:9, 3054:22, 3055:8, 3056:12, 3057:2, 3058:20, 3059:16, 3061:16, 3062:1, 3062:8, 3063:4, 3069:1, 3071:24, 3072:4,

3072:22, 3073:15, 3075:17, 3075:23, 3086:23, 3086:25, 3087:3, 3096:3, 3096:4, 3096:8, 3124:16, 3127:1, 3128:8, 3175:3, 3192:8, 3192:16, 3194:13, 3224:21, 3237:13, 3255:6
**patient's** [1] - 3075:17
**patient-by-patient** [2] - 3056:12, 3075:23
**patients** [108] - 2927:15, 2947:25, 2948:6, 2950:3, 2951:9, 2957:4, 2957:16, 2957:21, 2958:16, 2965:18, 2965:20, 2965:21, 2966:23, 2977:20, 2980:4, 2980:7, 2982:11, 2986:17, 2986:18, 2986:20, 2990:2, 2990:3, 2991:6, 2991:23, 2991:24, 3003:20, 3003:21, 3004:21, 3005:15, 3005:24, 3005:25, 3006:13, 3008:8, 3008:9, 3010:11, 3015:9, 3015:21, 3020:20, 3026:21, 3026:23, 3026:24, 3029:9, 3034:18, 3035:3, 3035:17, 3035:19, 3035:23, 3035:25, 3044:25, 3045:13, 3050:2, 3050:20, 3053:9, 3053:12, 3053:13, 3053:14, 3053:25, 3054:19, 3054:22, 3057:10, 3059:22, 3070:15, 3070:17, 3070:18, 3070:19, 3070:22, 3071:2, 3071:11, 3071:25, 3072:5, 3072:11, 3072:18, 3073:2, 3073:6, 3073:22, 3073:24, 3074:3, 3075:5, 3076:21, 3078:11, 3078:12, 3079:4, 3096:17, 3096:20, 3098:13, 3107:3, 3124:21, 3125:15, 3126:15, 3130:6, 3174:20, 3182:8, 3211:21, 3213:12,

3218:22, 3219:24, 3224:22, 3231:21, 3255:6, 3255:7, 3255:10, 3255:14, 3259:14, 3259:15, 3261:22
**patients'** [1] - 3033:23
**pattern** [3] - 2900:6, 3009:10, 3009:24
**patterns** [1] - 3061:22
**Paul** [1] - 2888:17
**pause** [7] - 2891:16, 2976:3, 2976:8, 3024:18, 3186:5, 3202:24, 3262:10
**Paxil** [1] - 3209:25
**pay** [12] - 2893:7, 2893:24, 2983:25, 2984:7, 2984:24, 3089:13, 3177:6, 3177:15, 3215:25, 3245:16, 3252:2, 3257:17
**payback** [2] - 2893:20, 2893:22
**payers** [1] - 3015:17
**paying** [12] - 2893:6, 2893:14, 2934:9, 3103:10, 3113:17, 3177:11, 3184:21, 3191:20, 3199:15, 3245:21, 3246:23, 3248:10
**payment** [2] - 2928:7, 3058:14
**payments** [4] - 2893:25, 2908:13, 3022:1, 3181:5
**Payne** [3] - 3014:18, 3025:24, 3026:12
**PBP** [3] - 2969:24, 2970:1, 2970:2
**peak** [1] - 3083:21
**peer** [5] - 3155:4, 3155:7, 3155:13, 3156:21, 3211:20
**peer-reviewed** [3] - 3155:4, 3155:13, 3156:21
**peers** [1] - 3043:2
**penalized** [1] - 3005:9
**PENELOW** [2] - 2889:6, 3205:13
**Penelow** [25] - 2982:22, 3049:5, 3076:17, 3116:14, 3117:22, 3133:15, 3166:24, 3205:5, 3205:17, 3205:22, 3206:2, 3206:3,

3217:5, 3221:17, 3228:24, 3230:4, 3237:20, 3240:9, 3242:11, 3243:1, 3243:18, 3244:5, 3250:15, 3251:10, 3256:16
**Penelow's** [2] - 3169:14, 3196:4
**penetrating** [1] - 3077:8
**penetration** [7] - 2936:11, 2936:14, 2936:16, 2989:21, 3004:6, 3080:11, 3094:1
**people** [43] - 2941:23, 2943:3, 2961:3, 2962:11, 3006:5, 3007:12, 3007:13, 3007:16, 3007:18, 3008:6, 3008:11, 3015:10, 3020:1, 3022:12, 3023:22, 3024:8, 3024:11, 3024:14, 3046:3, 3103:18, 3118:8, 3173:5, 3175:1, 3175:6, 3180:19, 3183:15, 3184:7, 3184:13, 3184:19, 3184:21, 3195:25, 3220:5, 3221:1, 3226:5, 3228:13, 3229:17, 3229:22, 3234:17, 3245:1, 3245:16, 3254:9, 3257:2, 3259:18
**PEPFAR** [2] - 3002:11, 3002:12
**per** [6] - 2910:9, 2956:13, 2979:13, 3029:25, 3091:7, 3111:14
**perceived** [1] - 3098:17
**percent** [21] - 2938:7, 2950:16, 2951:1, 2956:20, 3009:2, 3009:24, 3024:15, 3034:18, 3035:3, 3052:18, 3074:18, 3078:15, 3084:14, 3096:4, 3096:7, 3172:23, 3172:24, 3220:24, 3239:19, 3240:3, 3255:23
**percentage** [7] - 2927:18, 2948:4, 2948:5, 3069:14,

3070:18, 3086:13, 3117:8
**percentages** [1] - 3200:9
**percentagewise** [1] - 3175:6
**perception** [1] - 3034:13
**perfectly** [1] - 3177:19
**perform** [2] - 3081:8, 3085:5
**Performance** [1] - 3199:21
**performance** [14] - 2942:20, 2943:19, 2945:21, 2947:10, 2968:23, 3067:13, 3068:5, 3068:13, 3167:8, 3199:22, 3200:4, 3200:15, 3227:9, 3228:6
**performed** [3] - 3082:5, 3082:23, 3085:5
**performing** [1] - 3167:8
**perhaps** [8] - 2908:23, 3000:5, 3053:25, 3078:10, 3079:2, 3105:11, 3128:23, 3194:11
**period** [17] - 2931:13, 2931:18, 2950:1, 2975:16, 3009:14, 3026:16, 3051:8, 3070:22, 3071:6, 3073:14, 3091:11, 3161:24, 3165:15, 3167:13, 3169:5, 3195:12, 3222:1
**periodic** [2] - 2994:6, 3089:5
**permissible** [1] - 3145:19
**permission** [8] - 3125:1, 3126:8, 3131:22, 3141:10, 3141:14, 3146:4, 3151:14, 3153:25
**permit** [3] - 2896:15, 3055:25, 3151:1
**permitted** [5] - 2964:23, 3070:21, 3071:1, 3071:10, 3131:3
**permitting** [1] - 3071:15
**person** [9] - 2942:11, 3023:5, 3145:3, 3145:16, 3145:17,

3148:19, 3149:2, 3149:25, 3201:13
**person's** [2] - 2907:8, 2911:11
**personal** [8] - 2906:3, 2906:14, 2906:15, 2911:4, 2913:22, 3007:11, 3055:16, 3097:17
**personally** [5] - 3234:20, 3234:21, 3234:23, 3240:20, 3257:21
**perspective** [2] - 3004:4, 3110:6
**perspectives** [1] - 3189:16
**persuade** [1] - 3187:20
**persuasion** [2] - 3187:19, 3192:25
**pertained** [2] - 2973:3, 2980:23
**Pete** [1] - 2890:10
**PETE** [1] - 2888:14
**Peter** [1] - 3244:20
**Peterson** [1] - 3228:18
**Pfizer** [1] - 3221:3
**Pfizer-Allergan** [1] - 3221:3
**pharma** [1] - 3042:19
**pharmaceutical** [49] - 2923:2, 2923:12, 2929:13, 3008:11, 3040:11, 3043:8, 3043:11, 3043:15, 3043:24, 3044:21, 3044:22, 3045:8, 3045:9, 3047:13, 3049:16, 3051:15, 3052:2, 3052:19, 3052:23, 3053:15, 3055:11, 3056:2, 3056:8, 3056:23, 3057:8, 3057:9, 3057:24, 3058:8, 3058:15, 3058:19, 3059:2, 3061:9, 3062:10, 3069:7, 3101:8, 3101:15, 3101:22, 3149:4, 3157:13, 3171:16, 3172:5, 3172:18, 3186:23, 3209:19, 3210:8, 3210:11, 3210:14, 3211:7, 3211:14
**Pharmaceutical** [1] - 3209:17
**pharmaceutical's** [1] -

3054:21
**Pharmaceuticals** [2] - 2932:18, 3044:19
**pharmaceuticals** [1] - 3211:1
**pharmacies** [1] - 3044:7
**pharmacokinetic** [1] - 3083:21
**pharmacy** [3] - 3172:20, 3173:6, 3173:7
**phase** [2] - 3050:5, 3050:6
**phenomenon** [1] - 3005:10
**philanthropy** [1] - 3015:19
**philosophy** [1] - 3022:17
**phone** [2] - 2997:7, 3122:20
**photograph** [3] - 3151:20, 3240:12, 3240:14
**phrase** [1] - 3188:5
**physical** [1] - 3173:6
**Physician** [2] - 3136:1, 3207:19
**physician** [35] - 2928:7, 2988:12, 2999:22, 3004:9, 3035:21, 3053:4, 3053:21, 3053:24, 3054:18, 3059:24, 3060:9, 3060:19, 3061:12, 3061:14, 3063:11, 3066:23, 3073:20, 3086:22, 3088:3, 3090:2, 3091:3, 3121:8, 3121:15, 3121:19, 3123:3, 3126:20, 3129:14, 3236:15, 3244:9, 3247:13, 3247:15, 3248:23, 3253:3, 3261:5, 3261:6
**physician's** [2] - 3035:21, 3062:19
**physicians** [60] - 2975:7, 2984:6, 2984:23, 2999:16, 3003:20, 3004:20, 3047:2, 3047:5, 3047:8, 3054:11, 3054:19, 3055:22, 3056:9, 3058:14, 3058:24, 3069:13, 3077:21, 3081:7,

3081:19, 3084:21, 3084:23, 3090:7, 3095:2, 3095:16, 3096:7, 3096:9, 3098:24, 3099:1, 3099:4, 3114:8, 3121:7, 3121:10, 3125:23, 3126:1, 3135:8, 3136:8, 3137:19, 3147:25, 3178:16, 3208:11, 3212:11, 3212:13, 3212:17, 3212:18, 3212:20, 3213:19, 3215:24, 3216:12, 3221:12, 3221:14, 3234:16, 3234:18, 3234:22, 3242:2, 3244:5, 3245:9, 3246:23, 3252:18, 3256:6, 3260:11

**physicians'** [5] - 3047:9, 3061:21, 3089:14, 3097:3, 3099:4

**PhysPulse** [1] - 3095:2

**PI** [2] - 2987:23, 3214:12

**pick** [4] - 3238:23, 3243:2, 3257:12, 3259:5

**picture** [3] - 2986:12, 3116:19, 3243:8

**piece** [13] - 2893:22, 2911:3, 3002:10, 3105:7, 3122:12, 3128:18, 3134:14, 3155:18, 3194:17, 3195:7, 3236:14, 3236:16

**pieces** [9] - 2892:25, 2907:7, 2908:8, 2911:19, 3148:6, 3191:3, 3191:6, 3223:3, 3227:24

**piling** [2] - 2894:11, 2894:24

**pilot** [2] - 2973:12, 2973:14

**PIP** [1] - 3228:7

**pitches** [1] - 2921:9

**place** [7] - 2897:1, 2900:9, 2923:11, 2934:14, 2934:18, 3017:9, 3066:6, 3198:10, 3262:4

**placed** [1] - 3107:3

**plagiarism** [2] - 3148:3, 3148:7

**plainly** [1] - 3078:5

**Plaintiff's** [2] - 2889:14, 2959:10

**Plaintiffs** [1] - 2888:4

**plaintiffs'** [1] - 3030:8

**Plaintiffs'** [1] - 2939:7

**Plan** [1] - 3185:17

**plan** [16] - 2900:6, 2900:9, 2993:3, 3045:20, 3045:21, 3050:7, 3050:10, 3071:20, 3074:3, 3075:9, 3167:8, 3174:20, 3174:25, 3198:20, 3228:7

**planet** [1] - 3046:3

**planned** [3] - 2905:10, 2992:3, 3050:3

**planning** [4] - 2974:13, 2987:6, 2988:7, 2990:1

**plans** [4] - 3031:22, 3170:9, 3197:19, 3197:21

**plant** [9] - 3254:2, 3255:1, 3257:7, 3257:10, 3257:19, 3257:23, 3258:9, 3260:12, 3260:14

**plants** [8] - 3090:14, 3090:18, 3254:5, 3254:22, 3255:16, 3255:25, 3256:25, 3258:7

**plate** [1] - 2920:15

**plates** [1] - 3208:23

**plausible** [4] - 3023:2, 3036:8, 3036:20, 3036:23

**play** [10] - 3042:16, 3122:12, 3124:20, 3125:1, 3126:8, 3131:23, 3142:11, 3148:25, 3153:25, 3186:13

**played** [12] - 3003:17, 3125:5, 3126:11, 3127:5, 3132:1, 3132:4, 3144:17, 3154:2, 3188:9, 3192:24, 3193:1, 3193:16

**playfield** [3] - 3073:18, 3074:6, 3075:3

**playing** [1] - 3147:17

**pleased** [1] - 3015:19

**plenty** [1] - 2907:2

**plus** [3] - 2944:1, 2991:15, 3070:8

**POA** [1] - 2935:1

**point** [45] - 2899:7, 2899:20, 2900:7, 2907:4, 2908:20, 2911:16, 2911:22, 2913:6, 2916:2, 2916:13, 2930:8, 2971:3, 3025:17, 3031:9, 3033:13, 3042:18, 3042:23, 3048:8, 3055:17, 3059:24, 3075:9, 3077:25, 3085:25, 3105:13, 3113:22, 3113:24, 3148:18, 3172:3, 3208:15, 3209:10, 3209:11, 3210:17, 3212:6, 3218:5, 3222:22, 3223:11, 3223:18, 3225:2, 3225:7, 3226:7, 3226:14, 3228:9, 3253:24, 3255:10

**Point** [2] - 3042:9, 3042:12

**pointing** [1] - 2908:21

**points** [6] - 2959:16, 2959:21, 2996:20, 3008:16, 3040:15, 3246:11

**policies** [5] - 3179:25, 3183:23, 3198:10, 3223:24, 3238:1

**policy** [16] - 2992:8, 2992:9, 2993:6, 2995:15, 2996:24, 3000:24, 3002:3, 3010:15, 3014:11, 3029:19, 3170:13, 3228:25, 3237:20, 3238:2

**political** [3] - 3026:7, 3026:11, 3043:19

**pondering** [1] - 3001:12

**poor** [1] - 2942:20

**pop** [1] - 3041:15

**pops** [1] - 3205:8

**popular** [1] - 3241:9

**populated** [2] - 2989:7, 3076:11

**population** [14] - 2944:7, 2949:17, 2951:14, 2957:4, 2957:12, 2957:17, 2999:16, 3002:25, 3010:10, 3045:12, 3071:3, 3072:4, 3175:3, 3255:6

**populations** [2] -

3004:14, 3070:1

**portion** [7] - 2896:16, 2962:9, 3069:21, 3072:24, 3073:11, 3126:8, 3162:11

**portions** [2] - 2891:6, 3019:22

**POSHA** [2] - 3002:7

**POSHA's** [1] - 3002:20

**position** [3] - 2904:14, 3215:4, 3222:11

**positioned** [1] - 3002:18

**positioning** [1] - 3072:13

**positions** [1] - 3001:14

**possibility** [2] - 3078:20, 3078:21

**possible** [6] - 3023:13, 3023:14, 3091:4, 3192:20, 3194:15, 3213:16

**possibly** [9] - 2942:23, 2943:1, 2989:22, 3050:14, 3077:15, 3207:9, 3213:21, 3214:13, 3214:14

**post** [1] - 2937:8

**Post** [2] - 3146:16, 3149:4

**post-launch** [1] - 2937:8

**posters** [1] - 3236:9

**posts** [2] - 3141:1, 3153:23

**posture** [1] - 3176:21

**potential** [5] - 2903:4, 2973:16, 3061:25, 3062:5, 3062:17

**potentially** [6] - 2972:11, 3000:16, 3000:18, 3002:19, 3061:11, 3062:7

**power** [3] - 3050:20, 3051:2, 3192:23

**PowerPoint** [7] - 2915:8, 2915:10, 3105:2, 3105:18, 3106:16, 3174:8, 3261:9

**practice** [6] - 2897:24, 3008:24, 3046:20, 3063:13, 3068:1, 3215:23

**practiced** [2] - 3183:23, 3212:20

**practices** [1] - 3187:8

**practitioner** [1] - 3088:3

**praise** [1] - 3025:7

**praised** [1] - 3010:18

**preach** [1] - 3046:2

**predicted** [1] - 2966:13

**predicting** [1] - 2971:18

**prediction** [3] - 2964:2, 2966:23, 2967:1

**prefer** [2] - 2918:18, 3125:15

**preference** [2] - 3124:16, 3124:22

**preferred** [1] - 2919:3

**prejudicial** [1] - 2915:20

**prematurely** [1] - 2912:24

**premise** [1] - 3035:20

**premium** [4] - 3009:1, 3009:19, 3017:14, 3017:19

**preparation** [1] - 2953:23

**prepare** [1] - 3253:1

**prepared** [3] - 2945:25, 2954:8, 3205:19

**preposterous** [1] - 3029:17

**prerogative** [1] - 3149:6

**prescribe** [30] - 2928:8, 2984:6, 2984:23, 2986:23, 3016:12, 3016:17, 3036:19, 3047:3, 3047:6, 3053:13, 3054:21, 3055:23, 3058:24, 3062:20, 3069:13, 3077:23, 3098:25, 3099:2, 3103:11, 3127:20, 3130:6, 3137:19, 3138:15, 3170:22, 3177:7, 3177:11, 3177:15, 3178:11, 3184:7, 3213:20

**prescribed** [5] - 3059:16, 3059:20, 3062:1, 3070:21, 3178:10

**prescriber** [2] - 3126:25, 3225:13

**prescribers** [11] - 2939:1, 3091:4, 3092:8, 3182:7, 3184:3, 3225:11, 3225:18, 3248:16,

3261:10, 3261:19, 3261:24
**prescribes** [1] - 3124:12
**prescribing** [26] - 3016:20, 3047:9, 3055:12, 3056:22, 3057:4, 3057:10, 3058:15, 3061:11, 3061:22, 3077:21, 3082:25, 3083:12, 3085:7, 3089:14, 3089:21, 3097:3, 3097:12, 3099:4, 3120:22, 3125:15, 3125:24, 3127:22, 3171:17, 3178:21, 3184:20, 3204:5
**prescription** [17] - 2927:19, 2927:23, 2929:15, 2959:23, 3058:18, 3075:15, 3075:24, 3085:12, 3091:7, 3091:8, 3096:24, 3178:16, 3178:20, 3221:14, 3247:3, 3261:4, 3261:5
**prescriptions** [30] - 2963:18, 2963:19, 2965:18, 2975:16, 2980:3, 3069:1, 3084:14, 3171:24, 3172:2, 3173:19, 3176:1, 3199:5, 3199:14, 3199:24, 3200:16, 3204:22, 3213:20, 3221:12, 3246:24, 3246:25, 3247:12, 3247:16, 3247:22, 3248:12, 3248:17, 3249:12, 3250:7, 3261:6, 3261:18
**present** [14] - 2912:23, 3009:3, 3057:14, 3065:20, 3067:6, 3067:11, 3067:21, 3078:2, 3079:11, 3079:24, 3088:10, 3193:2, 3222:21, 3253:19
**presentation** [11] - 2915:8, 2940:6, 2972:6, 2989:7, 3104:17, 3105:2, 3106:16, 3110:9, 3174:9, 3175:18, 3245:4
**presentations** [5] -

2987:3, 3182:12, 3182:15, 3182:16, 3182:20
**presented** [15] - 2956:9, 2973:18, 3034:25, 3039:4, 3107:8, 3107:16, 3107:23, 3109:5, 3186:15, 3191:5, 3203:15, 3231:13, 3231:14, 3233:3
**presenting** [1] - 3121:10
**presents** [1] - 3058:15
**president** [13] - 2933:3, 2934:19, 2937:7, 3001:24, 3002:9, 3003:1, 3003:14, 3020:13, 3038:10, 3039:3, 3079:17, 3194:23, 3196:16
**President** [4] - 3001:19, 3001:22, 3002:3, 3002:10
**President's** [1] - 3002:16
**prespeech** [1] - 3252:22
**pressure** [12] - 3027:8, 3076:18, 3076:25, 3077:15, 3209:6, 3209:7, 3224:8, 3224:9, 3224:11, 3224:15, 3225:2, 3238:8
**presume** [5] - 2896:10, 2896:19, 2910:8, 2974:19, 3150:19
**pretty** [13] - 2893:10, 2980:4, 3062:22, 3114:4, 3114:25, 3123:18, 3145:14, 3216:11, 3217:5, 3217:21, 3224:17, 3251:24, 3258:8
**prevent** [1] - 3056:7
**previous** [1] - 3210:6
**previously** [5] - 2901:16, 2901:20, 2902:1, 2908:22, 3070:17
**Prezista** [129] - 2900:9, 2922:15, 2923:19, 2934:18, 2936:11, 2936:14, 2937:22, 2938:16, 2941:9, 2941:19, 2943:20, 2947:10,

2949:2, 2949:3, 2949:15, 2951:1, 2955:5, 2955:15, 2956:5, 2957:12, 2961:12, 2961:13, 2966:9, 2966:14, 2967:5, 2967:12, 2967:17, 2969:15, 2971:21, 2972:14, 2972:20, 2974:5, 2976:14, 2977:1, 2977:12, 2978:25, 2979:5, 2979:13, 2979:24, 2980:11, 2980:16, 2984:5, 2984:21, 2991:6, 2991:12, 2995:14, 2996:21, 2997:12, 2998:19, 2999:9, 3003:7, 3006:22, 3007:22, 3007:24, 3008:2, 3009:9, 3009:18, 3015:2, 3015:9, 3015:15, 3016:5, 3016:20, 3017:1, 3021:23, 3021:24, 3022:20, 3025:5, 3027:22, 3028:2, 3035:18, 3036:19, 3038:17, 3039:2, 3047:3, 3059:8, 3061:7, 3066:21, 3068:17, 3070:4, 3070:7, 3070:10, 3070:13, 3070:20, 3071:24, 3075:24, 3080:11, 3082:20, 3083:3, 3084:4, 3085:12, 3086:14, 3095:13, 3095:17, 3095:23, 3098:25, 3107:1, 3130:11, 3130:15, 3132:8, 3132:11, 3132:17, 3163:15, 3163:22, 3169:21, 3192:2, 3192:16, 3192:21, 3193:20, 3196:9, 3200:10, 3215:17, 3216:18, 3216:19, 3217:13, 3218:14, 3218:20, 3221:5, 3225:8, 3231:4, 3231:23, 3232:20, 3233:13, 3235:10, 3239:4, 3248:25, 3255:12, 3258:9, 3261:18, 3261:21
**Prezista's** [6] - 2950:2, 2971:4,

2995:7, 3032:21, 3073:15, 3078:1
**price** [20] - 2971:24, 2980:4, 3007:25, 3008:3, 3008:21, 3008:22, 3009:4, 3009:5, 3009:11, 3009:13, 3009:14, 3009:18, 3009:23, 3009:24, 3016:5, 3017:18, 3025:5, 3025:6, 3045:17
**priced** [6] - 3008:7, 3009:1, 3015:15, 3017:13, 3021:16, 3024:14
**Pricing** [1] - 3015:14
**pricing** [17] - 3009:9, 3010:15, 3010:17, 3010:20, 3014:11, 3016:3, 3016:25, 3017:7, 3017:12, 3017:16, 3017:24, 3021:2, 3021:8, 3021:10, 3025:5, 3025:12, 3025:18
**primarily** [2] - 3094:9, 3159:11
**primary** [1] - 3176:18
**principle** [1] - 2983:19
**principles** [2] - 2983:18, 3016:4
**printed** [1] - 3041:4
**printer** [3] - 3041:4, 3041:23, 3041:25
**priorities** [1] - 3020:14
**priority** [3] - 2989:14, 3020:12, 3080:13
**prison** [1] - 3148:1
**private** [6] - 3215:23, 3238:25, 3239:1, 3243:7, 3243:9, 3243:20
**privately** [1] - 3137:23
**privy** [1] - 3181:14
**probable** [6] - 3023:15, 3037:15, 3038:8, 3038:16, 3038:19, 3038:21, 3038:22, 3194:25
**problem** [13] - 2912:20, 2995:23, 3013:2, 3013:5, 3024:5, 3049:20, 3078:16, 3083:15, 3086:6, 3098:10, 3146:7, 3249:10
**problems** [2] - 3079:11, 3079:24
**proceed** [9] - 2921:12,

2926:15, 2985:6, 3014:3, 3065:9, 3102:8, 3102:11, 3152:17, 3205:18
**proceeded** [1] - 3253:20
**proceedings** [1] - 3263:5
**PROCEEDINGS** [1] - 2890:1
**Proceedings** [1] - 2888:25
**process** [23] - 2938:3, 2988:7, 2994:4, 2997:18, 2997:20, 2998:18, 2999:3, 2999:6, 3001:3, 3017:9, 3045:10, 3049:15, 3049:17, 3049:22, 3049:25, 3109:25, 3133:10, 3133:16, 3158:24, 3159:10, 3254:6, 3257:10
**processing** [1] - 2957:7
**produce** [1] - 3007:19
**produced** [7] - 2888:25, 2910:9, 3047:14, 3084:14, 3162:6, 3162:17, 3172:19
**producing** [1] - 2986:10
**product** [49] - 2936:22, 2986:11, 2986:22, 2999:9, 3006:1, 3007:23, 3024:15, 3028:8, 3033:19, 3045:18, 3049:23, 3050:3, 3050:24, 3051:10, 3051:20, 3051:21, 3052:6, 3052:10, 3052:25, 3053:1, 3053:3, 3053:22, 3054:1, 3054:4, 3054:10, 3054:19, 3055:7, 3057:12, 3060:14, 3063:6, 3068:23, 3072:13, 3078:15, 3080:9, 3081:22, 3083:4, 3085:16, 3087:2, 3087:17, 3091:5, 3170:19, 3173:2, 3176:19, 3178:5, 3182:21, 3213:6, 3215:2
**product's** [2] - 3055:7,

3063:9
**production** [1] -
3004:18
**PRODUCTS** [1] -
2888:7
**products** [24] -
2927:19, 2927:23,
2929:15, 2929:23,
2930:3, 2930:8,
2954:22, 2982:12,
2996:25, 3000:8,
3021:10, 3022:15,
3044:22, 3045:15,
3051:19, 3052:19,
3052:24, 3053:16,
3062:13, 3066:21,
3067:3, 3078:13,
3207:23, 3208:12
**products'** [1] - 2930:4
**professional** [4] -
3007:11, 3066:23,
3087:18, 3224:14
**professionally** [1] -
3097:10
**professor** [9] - 3043:3,
3043:4, 3043:11,
3044:4, 3064:13,
3145:25, 3152:20,
3186:7, 3189:5
**PROFESSOR** [2] -
2889:4, 3039:21
**Professor** [47] -
3039:17, 3040:6,
3040:13, 3042:7,
3045:22, 3047:22,
3051:13, 3054:11,
3054:23, 3055:10,
3055:14, 3063:13,
3064:7, 3065:6,
3065:12, 3069:6,
3069:17, 3072:2,
3073:23, 3077:24,
3078:14, 3086:18,
3087:8, 3087:14,
3093:21, 3097:17,
3098:21, 3100:20,
3102:15, 3103:19,
3111:3, 3120:20,
3126:13, 3132:3,
3142:5, 3144:4,
3145:4, 3146:22,
3148:1, 3150:17,
3186:13, 3191:8,
3204:25, 3205:1,
3239:23, 3247:3,
3258:19
**proffer** [2] - 2906:22,
2911:10
**proffered** [1] -
3048:25

**proffering** [1] -
3188:15
**profile** [7] - 3087:19,
3094:9, 3151:14,
3218:19, 3231:10,
3233:15, 3234:9
**profiles** [2] - 3096:4,
3096:8
**profit** [6] - 2983:5,
2983:19, 3046:3,
3046:5, 3098:15
**profits** [6] - 2981:9,
3009:22, 3023:22,
3024:7, 3024:11,
3024:14
**profound** [1] -
3002:15
**program** [32] -
3068:22, 3081:20,
3084:11, 3084:25,
3085:22, 3176:5,
3177:23, 3178:1,
3179:24, 3180:1,
3180:25, 3181:17,
3201:25, 3202:1,
3202:9, 3208:4,
3216:11, 3218:19,
3218:25, 3238:22,
3238:24, 3239:2,
3239:6, 3241:21,
3245:14, 3247:16,
3252:25, 3253:12,
3254:10, 3256:3,
3258:1, 3258:3
**programs** [55] -
2892:14, 2892:17,
2922:21, 2983:9,
3022:23, 3023:23,
3061:2, 3084:9,
3084:14, 3084:22,
3085:6, 3085:11,
3089:20, 3089:25,
3090:1, 3090:15,
3091:1, 3091:19,
3091:21, 3097:11,
3176:9, 3176:15,
3176:24, 3177:14,
3177:22, 3179:15,
3181:9, 3181:12,
3181:21, 3182:2,
3182:3, 3182:6,
3182:11, 3183:4,
3183:5, 3200:21,
3222:5, 3227:3,
3238:17, 3239:9,
3239:24, 3241:10,
3242:4, 3244:17,
3244:19, 3246:19,
3246:20, 3246:22,
3246:24, 3247:10,

3255:21, 3257:8,
3258:4, 3258:8
**prohibit** [2] - 2906:22,
3145:24
**prohibited** [2] -
2912:10, 2924:10
**project** [1] - 3028:7
**projected** [10] -
2938:15, 2956:5,
2957:3, 2964:8,
2967:21, 2971:4,
2972:14, 2972:19,
2980:1, 2980:17
**projecting** [7] -
2957:10, 2970:24,
2986:1, 2986:8,
2986:17, 3029:5,
3078:8
**projection** [8] -
2958:16, 2967:4,
2967:17, 2972:3,
2972:8, 3031:18,
3188:1, 3192:25
**projections** [4] -
2955:3, 2955:7,
2972:13, 2992:23
**promising** [1] -
3008:17
**promote** [15] - 2987:6,
2991:22, 2991:23,
2996:25, 3057:21,
3057:25, 3060:21,
3061:7, 3069:19,
3071:2, 3071:10,
3071:15, 3176:15,
3177:2, 3213:17
**promoted** [6] -
2949:16, 2951:9,
2964:23, 2984:21,
2988:3, 2990:4
**promoting** [10] -
2892:12, 2951:6,
2986:19, 2991:24,
3027:15, 3118:8,
3169:11, 3169:21,
3171:22, 3196:9
**promotion** [28] -
2933:9, 2951:7,
2951:13, 2987:14,
2987:21, 2995:14,
2997:12, 3016:22,
3027:15, 3030:23,
3038:9, 3038:17,
3039:2, 3066:5,
3066:21, 3081:11,
3087:21, 3087:22,
3087:25, 3108:19,
3109:24, 3110:25,
3129:15, 3176:18,
3193:12, 3198:6,

3202:1, 3211:5
**Promotion** [1] -
3029:2
**promotional** [13] -
2973:7, 3060:3,
3061:2, 3089:14,
3091:1, 3095:5,
3133:2, 3182:2,
3192:14, 3192:15,
3204:6, 3239:7
**Promotional** [7] -
3068:14, 3084:2,
3084:3, 3084:4,
3084:25, 3085:21,
3199:23
**promotions** [3] -
2988:9, 3057:8,
3210:18
**pronounce** [1] -
3232:24
**propensity** [7] -
2897:4, 2898:2,
2898:8, 2898:10,
2899:2, 2899:16,
2900:6
**proper** [2] - 2999:6,
3015:8, 3180:15
**properly** [1] - 3038:5
**proposal** [4] - 2903:3,
2903:7, 2904:2,
2980:22
**proposed** [6] -
2903:17, 2940:13,
2940:16, 2940:17,
2940:18, 2940:19
**proposing** [1] -
2904:6
**prosecuting** [1] -
2902:23
**prospective** [1] -
3051:4
**protease** [11] - 2971:3,
3003:23, 3004:2,
3006:13, 3008:25,
3009:19, 3010:7,
3015:11, 3214:22,
3235:10
**protect** [3] - 3029:12,
3211:23
**protected** [1] -
2907:25
**protection** [1] -
2898:1
**protocol** [1] - 3049:22
**prove** [1] - 3094:8
**provide** [11] - 2897:19,
2904:25, 2959:16,
2959:21, 3020:20,
3020:25, 3048:6,
3056:4, 3139:5,

3156:21, 3160:23
**provided** [20] -
2891:5, 2937:2,
2995:14, 3093:25,
3100:4, 3100:12,
3106:10, 3109:19,
3121:2, 3133:24,
3134:20, 3156:15,
3160:12, 3161:12,
3162:22, 3170:12,
3189:24, 3190:14,
3239:8, 3252:17
**provider's** [1] - 3132:9
**providers** [2] -
3097:10, 3098:13
**provides** [1] - 3049:18
**providing** [2] -
2903:11, 3082:2
**provision** [2] -
2893:13, 2896:24
**provocateurs** [1] -
3088:23
**prudent** [1] - 2903:18
**PSS** [5] - 3207:15,
3207:16, 3207:17,
3208:6, 3208:15
**psychiatrists** [1] -
3209:24
**psychology** [2] -
3043:18, 3187:12
**public** [3] - 2945:8,
3010:14, 3140:17
**publication** [1] -
3139:18
**publications** [1] -
3155:1
**publicly** [1] - 3137:24
**publish** [7] - 2932:15,
2978:22, 3019:12,
3019:13, 3136:24,
3137:4, 3241:4
**published** [2] -
2926:1, 3010:18
**publishing** [2] -
3136:20, 3138:1
**pull** [14] - 2941:3,
2960:6, 3028:19,
3041:17, 3042:2,
3173:17, 3195:12,
3199:11, 3234:2,
3240:9, 3242:8,
3250:11, 3251:7,
3252:7
**pulled** [1] - 2900:22
**pulling** [3] - 2940:22,
2969:12, 3064:18
**punch** [1] - 3185:3
**purchase** [1] - 3053:1
**purely** [1] - 3224:12
**purportedly** [1] -

3203:4
**purports** [2] - 3143:20, 3145:3
**purpose** [6] - 3020:18, 3027:14, 3052:23, 3053:15, 3056:21, 3144:23
**purposes** [10] - 2901:21, 2902:2, 2902:11, 2992:23, 3004:18, 3029:10, 3146:1, 3147:8, 3236:4, 3236:11
**pursue** [1] - 2990:2
**pursued** [1] - 3098:16
**pushed** [2] - 3076:1, 3127:19
**pushing** [2] - 3128:2, 3128:20
**put** [43] - 2896:14, 2897:13, 2899:23, 2900:8, 2913:2, 2915:5, 2941:8, 3010:24, 3017:9, 3018:3, 3018:4, 3020:17, 3023:22, 3024:7, 3024:14, 3053:18, 3076:18, 3078:5, 3088:16, 3104:13, 3105:18, 3108:3, 3108:18, 3114:7, 3116:6, 3137:8, 3137:13, 3139:15, 3150:15, 3160:21, 3175:25, 3179:4, 3181:5, 3195:7, 3195:24, 3198:10, 3201:6, 3223:24, 3228:6, 3229:22, 3253:17, 3254:2, 3255:1
**puts** [1] - 3073:22
**putting** [17] - 2903:13, 2904:19, 2911:24, 2912:24, 2979:4, 3015:20, 3024:11, 3027:8, 3030:15, 3045:2, 3071:20, 3081:23, 3088:20, 3113:23, 3113:25, 3137:2, 3203:6
**puzzle** [1] - 3134:14

## Q

**QD** [11] - 2949:2, 2949:4, 2949:11, 2949:21, 2950:15, 2950:17, 2989:22, 3193:16, 3194:6,

3194:12, 3254:19
**qualifications** [1] - 3156:10
**qualified** [1] - 3101:20
**qualifying** [1] - 2907:25
**qualities** [1] - 2961:1
**quantification** [1] - 3045:19
**quest** [1] - 3068:24
**questioned** [4] - 2922:12, 3048:14, 3164:17, 3246:2
**questioning** [7] - 2899:2, 2901:4, 2901:6, 2905:15, 2906:23, 3185:2, 3197:23
**questionings** [1] - 2897:7
**questions** [59] - 2897:8, 2897:13, 2899:10, 2917:3, 2949:7, 2952:23, 2985:13, 2986:1, 2993:18, 2998:10, 2998:19, 2999:4, 3000:2, 3000:6, 3000:18, 3000:20, 3000:22, 3000:23, 3001:2, 3016:8, 3024:20, 3025:4, 3028:17, 3032:4, 3036:17, 3068:11, 3082:19, 3107:7, 3108:12, 3109:4, 3109:20, 3109:25, 3110:8, 3110:14, 3110:19, 3110:24, 3135:24, 3150:20, 3184:1, 3184:14, 3186:7, 3186:14, 3197:16, 3201:25, 3203:2, 3203:9, 3204:2, 3224:23, 3228:25, 3229:2, 3229:3, 3237:9, 3237:10, 3237:19, 3244:22, 3254:25, 3256:25, 3258:5
**quick** [5] - 2924:18, 3100:22, 3158:10, 3185:1, 3191:17
**quickly** [14] - 2957:23, 2972:2, 3004:3, 3004:8, 3004:20, 3004:22, 3025:3, 3026:20, 3026:23, 3030:19, 3217:6, 3217:19, 3231:2,

3250:17
**quite** [13] - 2992:9, 3002:14, 3003:23, 3005:13, 3052:5, 3059:4, 3085:2, 3181:9, 3212:20, 3219:20, 3225:17, 3237:2
**quota** [3] - 3076:12, 3076:24, 3166:21
**quotas** [2] - 3166:10, 3166:13
**quote** [1] - 3174:19
**QURAISHI** [2] - 2888:11, 2890:2

## R

**R&D** [1] - 3051:22
**rabbit** [1] - 2896:3
**raise** [4] - 2906:7, 2977:8, 3215:25, 3254:7
**raised** [5] - 2903:12, 3101:25, 3102:1, 3110:14, 3229:20
**raising** [2] - 2899:18, 3256:13
**ramp** [3] - 2905:22, 2939:18, 2939:24
**ramp-up** [1] - 2905:22
**ran** [1] - 3180:24
**random** [1] - 3129:3
**randomized** [1] - 3051:5
**rarely** [1] - 3224:13
**rate** [9] - 2930:4, 2955:14, 3003:19, 3004:8, 3084:12, 3091:12, 3111:15, 3114:14, 3258:20
**rather** [8] - 2968:18, 3001:3, 3058:18, 3076:23, 3089:11, 3109:23, 3110:22, 3260:12
**Raton** [1] - 3206:17
**Ray** [4] - 3119:16, 3119:18, 3119:20, 3119:23
**RDR** [1] - 3263:11
**reach** [5] - 2938:6, 2971:4, 3008:18, 3047:12, 3077:9
**reached** [5] - 2901:23, 3017:11, 3078:24, 3084:8, 3098:22
**reaching** [1] - 3020:8
**react** [1] - 3023:24
**reaction** [2] - 2981:25,

3061:20
**reactions** [6] - 3059:8, 3059:12, 3062:9, 3062:15, 3062:20, 3062:21
**read** [22] - 2892:20, 2910:5, 2936:15, 2998:2, 3010:20, 3018:23, 3031:14, 3046:25, 3110:23, 3115:7, 3115:10, 3134:7, 3134:8, 3137:24, 3155:1, 3156:25, 3157:3, 3189:1, 3195:13, 3241:18, 3253:16
**reading** [4] - 2995:22, 3109:3, 3109:18, 3110:12
**ready** [11] - 2918:22, 2920:21, 2921:12, 3014:3, 3064:13, 3064:24, 3065:5, 3102:8, 3152:9, 3205:18, 3254:20
**reaffirmed** [1] - 3099:13
**reagents** [1] - 3044:8
**real** [7] - 2896:9, 2898:13, 2912:20, 3200:24, 3204:21, 3218:7, 3225:18
**real-life** [1] - 3225:18
**realistic** [1] - 3079:21
**realization** [1] - 3005:8
**realize** [3] - 2936:10, 3217:19, 3231:8
**realized** [3] - 3217:22, 3218:6, 3219:13
**realizing** [1] - 3217:23
**really** [37] - 2895:4, 2896:1, 2897:1, 2897:4, 2897:15, 2901:4, 2903:13, 2907:23, 2908:14, 2909:9, 2909:15, 2911:15, 2914:20, 2916:20, 2922:10, 2934:5, 2940:12, 2947:5, 2952:15, 2962:21, 3004:7, 3013:4, 3036:4, 3046:18, 3061:15, 3063:4, 3072:19, 3110:7, 3123:21, 3149:5, 3184:22, 3188:6, 3217:2, 3217:3, 3255:9, 3257:1

**realm** [1] - 3044:9
**realtime** [1] - 2906:11
**reason** [17] - 2897:20, 2945:3, 2997:17, 3003:15, 3003:18, 3022:8, 3026:18, 3036:22, 3055:1, 3145:2, 3145:6, 3190:3, 3194:1, 3256:9, 3256:11, 3256:13
**reasonable** [1] - 3099:8
**reasons** [15] - 2912:9, 2942:19, 3000:11, 3028:1, 3034:19, 3035:4, 3047:6, 3068:24, 3073:3, 3089:25, 3099:2, 3124:16, 3172:17, 3216:2, 3219:13
**reboot** [1] - 3262:12
**rebuttal** [1] - 3189:1
**rebuttals** [1] - 3188:20
**recalled** [1] - 3105:5
**recalling** [2] - 2942:3, 3124:18
**receipt** [2] - 2986:8, 2990:5
**received** [9] - 2954:2, 2991:9, 3025:6, 3032:24, 3033:14, 3042:10, 3042:22, 3166:25, 3167:12
**receives** [1] - 2958:7
**receiving** [3] - 2986:2, 3081:14, 3095:3
**recently** [3] - 2985:22, 3140:10, 3140:19
**recess** [11] - 2919:14, 2920:23, 2920:25, 3011:24, 3012:3, 3064:10, 3092:18, 3092:20, 3092:23, 3151:8
**recognition** [3] - 3010:14, 3014:10, 3017:24
**recognize** [4] - 2970:1, 3240:12, 3242:14, 3243:18
**recognized** [4] - 3021:3, 3021:9, 3034:22, 3077:3
**recognizes** [1] - 3015:16
**recollection** [13] - 2907:14, 2907:17, 2911:17, 2934:1, 2969:13, 2969:14,

2991:17, 3018:2, 3019:1, 3019:4, 3021:15, 3138:4, 3251:18

**recommend** [2] - 3260:8, 3261:1

**recommendations** [1] - 3260:16, 3260:17, 3260:20

**record** [16] - 2890:6, 2898:20, 2904:17, 2904:20, 2911:9, 2913:2, 2992:4, 3012:12, 3019:7, 3039:24, 3060:23, 3064:9, 3143:15, 3205:16, 3262:15, 3263:5

**Record** [3] - 3012:13, 3014:17, 3018:19

**recorded** [3] - 2888:25, 3126:7, 3129:13

**recording** [9] - 3121:3, 3121:8, 3121:19, 3122:10, 3124:12, 3125:14, 3128:14, 3130:4, 3193:7

**recourse** [1] - 2999:4

**recruit** [3] - 3210:21, 3214:7, 3239:2

**recruited** [4] - 3044:17, 3209:22, 3210:19, 3215:19

**red** [1] - 2956:22

**redact** [1] - 2908:2

**redacted** [5] - 2893:15, 2894:21, 2908:10, 2908:23, 2926:9

**redaction** [1] - 2894:22

**redactions** [4] - 2896:17, 2908:17, 2925:18, 2925:19

**REDIRECT** [4] - 2889:4, 2889:6, 3025:2, 3186:12

**redirect** [4] - 3012:20, 3024:22, 3146:3, 3186:10

**reduction** [2] - 3005:5, 3005:7

**redundancy** [1] - 2911:18

**reenforcing** [1] - 3066:2

**REESE** [1] - 2888:14

**refer** [3] - 2897:25,

3072:3, 3095:8

**reference** [18] - 2926:4, 2926:22, 2935:21, 2936:7, 2947:21, 2949:1, 2949:20, 2966:8, 2966:18, 3034:8, 3074:16, 3080:12, 3081:25, 3085:25, 3094:7, 3096:1, 3096:3, 3253:23

**referenced** [5] - 2897:15, 2903:7, 2943:10, 2954:25, 3048:7

**references** [3] - 2893:5, 2987:4, 3007:2

**referencing** [1] - 2901:19

**referred** [2] - 2993:13, 3155:25

**referring** [3] - 2925:21, 3015:25, 3104:12

**refers** [3] - 2959:2, 2982:15, 3020:2

**reflect** [2] - 2986:18, 2990:1

**reflected** [3] - 2950:7, 2995:24, 3025:18

**reframe** [2] - 2984:18, 3027:20

**refresh** [12] - 2907:17, 2933:25, 2948:23, 2969:13, 3018:2, 3019:1, 3019:4, 3021:15, 3105:23, 3138:3, 3151:14, 3153:5

**refreshed** [2] - 3125:11, 3125:12

**refreshes** [1] - 2932:10

**refreshing** [2] - 2907:13, 2911:17

**regard** [2] - 3010:15, 3021:11

**regarding** [5] - 2899:10, 2994:13, 3032:4, 3133:20, 3140:17

**regards** [1] - 3231:17

**Reggie** [1] - 3228:18

**region** [1] - 3087:9

**regulated** [3] - 2927:4, 2929:13, 3051:17

**regulation** [1] - 3210:13

**regulations** [3] -

3047:17, 3210:11, 3210:15

**regulators** [1] - 3030:10

**regulatory** [5] - 2926:23, 3022:12, 3036:25, 3037:9, 3134:9

**rehabilitate** [2] - 3146:3, 3147:21

**reimbursed** [1] - 2923:12

**reimbursement** [7] - 2893:22, 2930:4, 2930:9, 3009:6, 3009:7, 3099:21, 3185:13

**reimbursements** [1] - 2892:15

**reimburses** [1] - 2927:18

**reimbursing** [1] - 2893:14

**reinforced** [1] - 3046:19

**reinforces** [1] - 3047:20

**reinforcing** [1] - 3082:16

**reiterate** [1] - 2945:16

**relate** [2] - 2910:16, 3166:5

**related** [10] - 2899:6, 2901:4, 2973:6, 3028:4, 3038:9, 3038:16, 3039:1, 3135:6, 3169:15, 3197:17

**relates** [13] - 2974:19, 2997:23, 3045:8, 3045:23, 3070:9, 3071:23, 3075:14, 3082:20, 3089:22, 3095:19, 3096:14, 3165:10, 3179:24

**relating** [16] - 2928:6, 2928:8, 2930:16, 2930:23, 2933:9, 2933:20, 2998:5, 3001:18, 3007:21, 3025:12, 3028:4, 3028:21, 3059:15, 3066:10, 3068:15, 3083:7

**relationship** [7] - 2910:16, 3008:21, 3063:2, 3117:16, 3216:9, 3221:7, 3221:20

**relationships** [5] -

3115:11, 3116:1, 3221:17, 3254:9

**relative** [1] - 2998:5

**relatively** [2] - 3072:18, 3132:21

**Relator** [1] - 3206:4

**Relator's** [1] - 3242:11

**Relators** [31] - 2888:18, 2889:24, 2889:24, 2889:25, 2889:25, 2890:10, 2890:12, 2890:14, 2890:15, 2903:3, 2914:15, 2917:17, 2928:2, 2949:25, 2988:16, 3039:16, 3048:21, 3048:22, 3104:18, 3115:2, 3115:8, 3115:16, 3116:2, 3117:23, 3120:14, 3123:12, 3158:17, 3158:22, 3189:14, 3190:13, 3190:14

**Relators'** [81] - 2889:9, 2889:9, 2889:10, 2889:11, 2889:12, 2889:13, 2889:15, 2889:16, 2889:17, 2889:18, 2889:19, 2889:20, 2889:21, 2890:8, 2898:2, 2904:2, 2906:18, 2908:8, 2911:20, 2915:3, 2918:8, 2926:20, 2929:5, 2931:25, 2935:6, 2935:11, 2937:13, 2937:19, 2939:7, 2939:16, 2941:1, 2945:13, 2954:18, 2961:19, 2963:5, 2965:23, 2966:2, 2966:5, 2968:9, 2968:12, 2969:24, 2970:9, 2970:12, 2973:20, 2978:21, 2981:15, 2981:18, 2985:14, 2985:19, 2985:23, 2988:17, 2988:19, 2993:4, 2993:8, 2994:18, 2997:23, 3028:20, 3111:11, 3175:21, 3179:5, 3179:6, 3198:4, 3199:11, 3199:20, 3200:1, 3202:9, 3230:1, 3240:10, 3240:25, 3241:3,

3242:9, 3242:21, 3242:24, 3243:16, 3243:18, 3243:25, 3244:3, 3250:11, 3251:8, 3251:13, 3251:16

**relay** [1] - 3060:15

**relevancy** [1] - 2912:7

**relevant** [9] - 2891:6, 2906:21, 2909:15, 2913:12, 3025:12, 3049:15, 3050:21, 3051:10, 3167:13

**reliability** [1] - 3148:16

**reliable** [2] - 3139:11, 3147:14

**reliance** [1] - 3152:21

**relied** [19] - 2992:22, 3035:13, 3138:14, 3141:24, 3142:5, 3144:24, 3145:4, 3145:19, 3146:1, 3147:7, 3147:13, 3147:14, 3148:1, 3148:6, 3148:21, 3150:21, 3150:22, 3155:22, 3190:4

**relies** [2] - 3053:25, 3137:18

**relocate** [1] - 3207:25

**rely** [5] - 3053:4, 3135:18, 3153:11, 3153:16, 3154:8

**relying** [4] - 3054:7, 3135:13, 3138:19, 3145:16

**remain** [9] - 2894:23, 2902:23, 2920:24, 2921:1, 3012:4, 3043:15, 3064:12, 3092:24, 3151:9

**remains** [1] - 2894:11

**remarks** [2] - 3015:6, 3015:25

**remember** [77] - 2918:20, 2924:4, 2931:23, 2932:8, 2933:12, 2933:13, 2934:2, 2936:4, 2936:5, 2937:25, 2938:19, 2940:8, 2946:11, 2948:21, 2954:10, 2957:6, 2967:7, 2970:20, 2970:21, 2983:15, 2985:21, 2986:4, 2988:19, 2991:8, 2991:18, 2992:10, 2993:10, 2993:15,

2993:21, 2994:12, 2994:15, 2994:16, 2994:23, 2996:20, 2998:4, 2998:7, 2998:12, 3003:20, 3006:23, 3016:13, 3017:13, 3035:9, 3037:17, 3048:23, 3101:1, 3101:18, 3108:20, 3109:6, 3110:15, 3118:16, 3118:21, 3119:2, 3119:22, 3120:2, 3122:15, 3122:23, 3127:8, 3131:17, 3132:6, 3160:18, 3163:11, 3164:2, 3164:6, 3166:11, 3166:19, 3170:4, 3184:4, 3193:5, 3197:12, 3201:20, 3237:5, 3246:7, 3246:18, 3249:13, 3250:20, 3250:25, 3253:8

**remind** [10] - 2895:3, 2935:22, 2936:8, 2946:14, 2963:14, 2965:14, 3065:6, 3098:3, 3183:7, 3256:19

**reminded** [2] - 3151:24, 3256:18

**reminder** [3] - 2904:5, 2921:14, 2957:20

**remove** [1] - 3198:19

**removed** [1] - 3179:15

**removing** [1] - 3197:21

**render** [2] - 3048:16, 3189:25

**rendered** [3] - 3052:9, 3100:13, 3190:9

**rendering** [1] - 3051:24

**rendition** [1] - 3195:10

**reorg** [1] - 2961:7

**reorient** [1] - 3032:9

**rep** [7] - 3000:19, 3054:5, 3060:5, 3121:14, 3123:1, 3123:23, 3210:21

**repeat** [5] - 2911:6, 3036:14, 3079:9, 3244:14, 3244:16

**repeatedly** [1] - 3021:9

**rephrase** [10] - 2917:8, 2984:17, 2996:7, 2996:9,

3024:3, 3038:3, 3067:17, 3103:7, 3123:10, 3204:16

**Report** [2] - 3155:25, 3156:5

**report** [51] - 2941:25, 2942:11, 2943:2, 2945:21, 3028:7, 3087:8, 3088:21, 3094:4, 3113:25, 3114:8, 3134:21, 3134:25, 3135:24, 3136:20, 3136:22, 3137:5, 3137:12, 3137:13, 3137:16, 3137:21, 3137:24, 3137:25, 3138:1, 3138:3, 3139:1, 3139:15, 3142:6, 3145:8, 3145:9, 3146:8, 3146:10, 3146:12, 3146:13, 3146:16, 3146:24, 3148:14, 3148:21, 3149:1, 3154:8, 3157:7, 3186:22, 3187:2, 3188:11, 3189:3, 3190:4, 3199:7, 3202:13, 3229:1, 3247:11

**reported** [12] - 2923:24, 2941:24, 2941:25, 2942:1, 2942:13, 2943:3, 3001:21, 3006:5, 3023:5, 3119:4, 3229:10, 3232:10

**reporter** [1] - 2947:6

**Reporter** [2] - 2888:23, 3263:12

**REPORTER'S** [1] - 3263:1

**reporting** [4] - 2992:23, 3028:12, 3037:4, 3165:1

**reports** [5] - 2941:23, 3079:25, 3082:19, 3089:1, 3134:25

**represent** [1] - 2932:23

**representation** [1] - 3080:20

**representative** [11] - 2999:17, 3026:12, 3054:10, 3056:7, 3062:25, 3076:9, 3076:10, 3076:13, 3076:24, 3088:1, 3090:3

**representatives** [18] -

2960:21, 2982:21, 3000:23, 3001:23, 3027:3, 3027:8, 3055:11, 3056:1, 3060:12, 3076:9, 3076:16, 3081:3, 3081:19, 3096:14, 3149:4, 3186:23, 3201:7, 3204:20

**Representatives** [1] - 3025:8

**represented** [2] - 2970:21, 3022:14

**representing** [1] - 2987:22

**reprimanded** [1] - 3224:13

**reps** [33] - 3000:14, 3001:2, 3055:18, 3096:10, 3120:21, 3121:6, 3128:2, 3131:2, 3131:7, 3133:14, 3135:7, 3136:8, 3137:19, 3138:15, 3138:22, 3140:13, 3140:18, 3141:5, 3144:11, 3147:18, 3153:22, 3156:15, 3157:13, 3167:4, 3167:12, 3173:18, 3185:22, 3187:10, 3197:22, 3216:25, 3228:10

**reputable** [1] - 3135:13

**request** [8] - 2960:25, 3009:3, 3063:10, 3066:22, 3086:8, 3086:10, 3241:11, 3244:6

**requested** [1] - 3070:9

**requesting** [1] - 3248:4

**requests** [12] - 2949:21, 2950:6, 2950:17, 2973:4, 2997:6, 2997:24, 3000:12, 3066:11, 3066:20, 3087:5, 3087:17, 3110:13

**required** [5] - 3068:8, 3170:13, 3198:5, 3198:18, 3229:5

**requirement** [4] - 2994:6, 3068:9, 3227:15, 3239:1

**requirements** [1] - 3185:13

**requiring** [1] - 2893:20

**resay** [1] - 2984:18

**research** [9] - 2983:8, 3004:4, 3005:22, 3044:10, 3051:14, 3051:16, 3051:18, 3052:4, 3052:16

**researching** [1] - 3052:19

**reserve** [1] - 2978:19

**reserving** [1] - 2978:3

**resistant** [2] - 3005:25, 3015:11

**resolution** [3] - 2902:21, 2923:16, 2933:2

**resolve** [1] - 2918:3

**resolved** [1] - 3041:24

**resonated** [1] - 3158:25

**resonates** [1] - 2900:18

**resource** [4] - 2998:25, 2999:1, 2999:4, 3237:19

**resources** [1] - 3020:25

**respect** [23] - 2931:22, 2941:18, 2955:7, 2962:9, 2975:14, 2976:13, 2995:25, 3021:24, 3058:12, 3062:19, 3067:22, 3068:14, 3070:4, 3070:13, 3071:8, 3071:13, 3079:25, 3083:10, 3083:25, 3096:16, 3098:11, 3194:4, 3194:6

**respected** [2] - 3043:1, 3261:4

**respectfully** [3] - 2975:9, 3124:8, 3165:1

**respectively** [1] - 2972:16

**respond** [7] - 2916:19, 2977:5, 2977:6, 2984:10, 3024:9, 3223:21, 3224:17

**responded** [3] - 2935:2, 3082:1, 3188:11

**responding** [2] - 3059:24, 3082:19

**response** [16] - 2914:25, 2932:7, 2943:16, 2944:17, 2996:1, 3025:4, 3028:17, 3032:19, 3036:17, 3039:1,

**resay** [1] - 2984:18

3109:4, 3109:19, 3110:9, 3110:13, 3110:23

**responsibility** [5] - 2894:25, 2982:11, 2983:4, 3019:25, 3201:6

**responsible** [6] - 2982:16, 3022:13, 3033:7, 3172:18, 3196:15, 3244:23

**responsibly** [3] - 3015:15, 3021:2, 3021:10

**rest** [3] - 2978:4, 2978:19, 3226:9

**restaurant** [15] - 3090:7, 3238:24, 3240:20, 3240:22, 3241:9, 3241:12, 3241:19, 3241:20, 3243:23, 3243:24, 3244:15, 3245:5, 3245:22, 3254:12, 3257:13

**restaurants** [7] - 3239:16, 3239:18, 3239:19, 3240:4, 3241:15, 3248:4, 3259:5

**restricted** [1] - 3055:18

**restroom** [1] - 3092:17

**result** [13] - 2901:23, 2928:22, 2987:23, 2995:7, 3004:24, 3007:19, 3016:21, 3032:21, 3076:2, 3092:12, 3099:10, 3162:21, 3178:20

**resulted** [2] - 2901:9

**results** [8] - 3003:19, 3005:1, 3084:24, 3092:6, 3095:1, 3229:12, 3232:3, 3252:16

**retread** [1] - 3093:21

**return** [12] - 2929:17, 2972:25, 2973:2, 2973:16, 2976:13, 3084:1, 3084:8, 3084:12, 3091:18, 3176:4, 3177:21, 3247:1

**returned** [2] - 3042:21, 3044:13

**revenue** [1] - 2954:20

**revenues** [1] - 2954:21

**reverse** [1] - 2990:23

**review** [31] - 2943:10, 2945:21, 2963:8, 2969:25, 2970:1, 2994:5, 2995:13, 3032:17, 3048:12, 3048:20, 3048:24, 3064:19, 3066:9, 3066:15, 3068:15, 3071:18, 3081:6, 3081:13, 3082:8, 3082:18, 3083:7, 3085:4, 3085:10, 3094:15, 3143:5, 3155:7, 3160:24, 3163:21, 3167:14, 3191:3, 3204:14

**reviewed** [28] - 2909:12, 2954:3, 2959:12, 2993:25, 3022:16, 3047:14, 3048:7, 3066:25, 3077:2, 3080:20, 3094:3, 3095:22, 3133:20, 3146:25, 3147:3, 3155:4, 3155:13, 3155:17, 3156:21, 3162:10, 3174:3, 3179:25, 3190:8, 3190:17, 3190:22, 3190:23, 3201:11, 3202:13

**reviewing** [3] - 2994:16, 3082:4, 3201:14

**revisit** [3] - 3079:2, 3079:20, 3151:2

**revisiting** [1] - 2912:10

**reward** [1] - 3058:20

**Reyataz** [25] - 3024:15, 3034:13, 3035:17, 3083:8, 3094:8, 3130:15, 3132:17, 3192:16, 3193:21, 3212:9, 3212:13, 3213:7, 3213:17, 3214:14, 3217:9, 3218:16, 3220:2, 3221:5, 3231:4, 3231:23, 3232:24, 3233:13, 3234:9, 3261:22, 3261:24

**Reyataz's** [2] - 3132:5, 3132:10

**Ricky** [2] - 3218:10, 3218:23

**ride** [3] - 3216:13, 3216:14, 3216:15

**rides** [4] - 3219:7,

3220:23, 3221:8

**ring** [2] - 3168:13, 3168:22

**rise** [14] - 2890:4, 2921:3, 3012:1, 3013:24, 3014:25, 3018:19, 3019:23, 3064:5, 3065:1, 3092:19, 3093:7, 3143:12, 3152:14, 3262:13

**Risperdal** [9] - 2892:12, 2892:18, 2905:13, 2909:3, 2909:7, 2909:15, 2933:21, 2934:2, 2934:5

**ritonavir** [6] - 3130:15, 3130:18, 3130:23, 3132:18, 3231:22, 3233:1

**road** [3] - 2941:5, 3078:23, 3149:6

**Roche** [1] - 3044:17

**Rodney** [1] - 2888:21

**rogue** [1] - 3089:9

**ROI** [5] - 2973:12, 2973:14, 2974:4, 3020:23, 3091:15

**role** [1] - 2901:5

**roll** [1] - 3076:22

**room** [12] - 3090:6, 3208:24, 3209:2, 3213:11, 3238:25, 3239:1, 3243:7, 3243:8, 3243:9, 3243:20, 3260:13

**Rothenbuhler** [1] - 3228:17

**rotting** [1] - 3148:1

**rough** [2] - 3211:4, 3213:13

**roughly** [2] - 3240:3, 3245:19

**route** [1] - 3229:15

**routinely** [1] - 3245:11

**rule** [2] - 2912:14, 3207:24

**ruled** [4] - 2908:8, 2908:16, 2908:24, 2913:23

**rules** [4] - 2982:3, 2982:4, 3057:25, 3198:5

**ruling** [5] - 2892:7, 2898:23, 2900:22, 2907:19, 2915:7

**run** [7] - 3063:23, 3131:6, 3176:9, 3176:15, 3179:25,

3180:11, 3180:15

**running** [3] - 2900:8, 2983:16, 3172:25

**ruppersberger** [1] - 2959:1

**Ruppersberger** [4] - 2959:2, 2959:16, 2962:25, 2965:23

**rush** [1] - 3253:9

**RUSS** [37] - 2888:15, 2889:7, 2890:15, 3205:5, 3205:7, 3205:20, 3205:21, 3230:1, 3230:3, 3232:6, 3232:9, 3234:2, 3234:3, 3240:9, 3240:11, 3240:24, 3241:4, 3241:6, 3242:8, 3242:10, 3242:20, 3242:25, 3243:15, 3243:17, 3243:25, 3244:4, 3250:11, 3250:14, 3251:7, 3251:9, 3251:13, 3251:17, 3252:7, 3252:8, 3262:3, 3262:6, 3262:9

**Russ** [4] - 2890:15, 3205:6, 3205:19, 3228:21

**RX** [9] - 2924:13, 2925:15, 2951:17, 2958:19, 2962:24, 2965:22, 2973:12, 3091:6

**RX-132** [1] - 3033:24

**RX-139** [1] - 3029:18

**RX-1624** [1] - 2930:13

**RX-1776** [1] - 2934:22

**RX-1780** [2] - 2940:21, 2940:23

## S

**sacred** [1] - 3087:24

**SAFE** [9] - 3180:5, 3183:23, 3200:18, 3200:19, 3201:11, 3201:16, 3201:18, 3260:1, 3260:6

**safe** [6] - 2892:13, 2933:11, 3049:19, 3051:10, 3211:23

**safety** [9] - 2892:18, 2909:19, 2927:15, 2983:18, 2994:21, 3006:17, 3033:20, 3057:13, 3063:7

**Saint** [1] - 2888:17

**salary** [3] - 3164:18, 3167:4, 3167:9

**sale** [7] - 2892:12, 2958:8, 3027:22, 3071:2, 3182:6, 3211:6, 3221:21

**Sales** [2] - 3199:21, 3207:19

**sales** [190] - 2926:23, 2936:9, 2937:7, 2937:22, 2938:3, 2938:16, 2938:24, 2939:24, 2940:3, 2940:7, 2942:10, 2942:20, 2942:21, 2942:25, 2947:15, 2955:14, 2957:24, 2958:4, 2960:20, 2962:2, 2962:10, 2963:19, 2963:23, 2964:2, 2964:3, 2964:6, 2967:4, 2971:3, 2971:4, 2971:19, 2971:22, 2972:4, 2972:15, 2976:14, 2980:1, 2980:17, 2982:20, 2987:21, 2987:24, 2992:19, 2992:21, 2992:23, 2997:21, 2999:23, 3003:8, 3005:5, 3005:6, 3005:8, 3027:3, 3027:8, 3027:14, 3027:15, 3027:21, 3028:2, 3029:6, 3029:8, 3031:1, 3031:10, 3031:11, 3031:17, 3031:18, 3031:22, 3031:23, 3044:5, 3054:1, 3054:5, 3054:24, 3055:11, 3055:18, 3056:1, 3056:7, 3060:5, 3060:10, 3060:12, 3060:24, 3061:7, 3062:25, 3067:13, 3067:23, 3069:7, 3069:11, 3070:9, 3076:1, 3076:3, 3076:12, 3076:14, 3076:16, 3078:15, 3078:18, 3081:3, 3081:18, 3082:2, 3082:11, 3083:16, 3086:2, 3086:13, 3086:19, 3087:6, 3087:25, 3091:12, 3097:9, 3097:12, 3120:21, 3121:3, 3121:6,

3121:8, 3121:14, 3121:19, 3123:1, 3123:23, 3128:2, 3129:17, 3129:22, 3130:8, 3131:2, 3131:7, 3133:14, 3135:7, 3136:8, 3137:19, 3138:15, 3138:22, 3140:13, 3140:18, 3141:5, 3144:11, 3153:22, 3156:15, 3157:13, 3163:10, 3165:10, 3166:10, 3166:13, 3167:3, 3167:4, 3167:12, 3169:1, 3170:3, 3170:13, 3170:18, 3170:21, 3173:17, 3173:18, 3185:22, 3187:10, 3196:16, 3197:2, 3197:7, 3197:10, 3197:21, 3197:22, 3198:19, 3200:9, 3201:6, 3207:1, 3207:2, 3207:14, 3210:6, 3210:8, 3210:11, 3210:21, 3211:7, 3212:23, 3219:7, 3219:8, 3220:23, 3221:1, 3221:17, 3221:19, 3222:9, 3223:3, 3223:10, 3224:8, 3224:9, 3224:11, 3224:24, 3225:3, 3227:4, 3227:9, 3228:10, 3229:5, 3256:10, 3256:20, 3256:21

**salesman** [1] - 3060:11

**salespeople** [2] - 3224:23, 3225:23

**salesperson** [2] - 3089:9, 3225:1

**Salomon** [16] - 3212:18, 3225:15, 3230:16, 3230:17, 3239:3, 3241:23, 3241:24, 3244:12, 3245:6, 3245:7, 3245:11, 3245:21, 3248:3, 3257:9, 3257:12, 3258:8

**Salomon's** [1] - 3244:19

**Sam** [1] - 3039:25

**sample** [1] - 3163:1

**samples** [2] - 3055:4,

3060:17
**San** [2] - 3250:22, 3250:24
**SANDERSON** [1] - 2888:16
**Sara** [4] - 2982:24, 3049:6, 3195:18, 3199:13
**sat** [5] - 3104:4, 3115:20, 3195:4, 3203:14, 3228:24
**save** [4] - 2915:6, 3012:5, 3012:10, 3099:15
**saw** [16] - 2958:15, 2999:25, 3067:4, 3068:2, 3081:25, 3088:10, 3098:9, 3105:13, 3171:15, 3182:11, 3183:5, 3191:18, 3200:18, 3237:16, 3246:4, 3261:24
**scanning** [1] - 3041:23
**scared** [1] - 2924:25
**scenario** [6] - 2937:2, 2939:3, 2939:6, 2939:9, 2939:18, 3062:16
**scenarios** [3] - 2937:11, 2940:14, 2940:17
**schedule** [5] - 2918:20, 2918:25, 2919:3, 3111:20, 3238:17
**scheme** [3] - 3036:9, 3036:18
**School** [3] - 3043:4, 3043:11, 3206:13
**school** [6] - 3042:10, 3140:8, 3145:17, 3206:11, 3206:12, 3207:10
**science** [3] - 3043:19, 3050:8, 3134:20
**scientific** [8] - 3063:12, 3088:2, 3119:18, 3138:14, 3140:2, 3153:16, 3156:21, 3158:6
**Scodari** [1] - 2943:17
**scope** [6] - 2910:16, 3063:8, 3066:24, 3070:15, 3070:17, 3080:23
**score** [2] - 3166:1, 3174:1
**screen** [13] - 2924:16,

2976:4, 3011:3, 3011:7, 3011:8, 3028:15, 3040:21, 3040:25, 3041:7, 3041:17, 3195:24, 3199:20, 3242:11
**screws** [1] - 3208:23
**Script** [1] - 3136:1
**Script-Writing** [1] - 3136:1
**scripts** [2] - 3173:6, 3201:5
**se** [1] - 2910:9
**search** [1] - 3155:3
**seat** [4] - 2921:4, 3040:2, 3065:4, 3093:9
**seated** [11] - 2890:5, 2920:24, 2921:1, 3012:2, 3012:4, 3014:2, 3064:12, 3092:24, 3143:15, 3151:9, 3152:16
**seats** [1] - 3238:22
**second** [30] - 2906:4, 2914:1, 2919:12, 2919:17, 2920:5, 2930:15, 2947:15, 2950:13, 2968:13, 2982:15, 2988:14, 2989:21, 2996:6, 2997:5, 2998:23, 3013:19, 3032:7, 3042:12, 3047:4, 3093:3, 3123:9, 3143:5, 3144:14, 3146:5, 3154:22, 3154:23, 3170:20, 3177:13, 3197:17, 3204:14
**secondly** [1] - 3245:4
**seconds** [5] - 3144:9, 3144:15, 3152:7, 3262:7
**secret** [2] - 3121:2, 3121:18
**section** [4] - 2992:15, 2994:19, 3135:24, 3136:5
**sections** [1] - 2952:19
**security** [1] - 3002:17
**see** [239] - 2892:19, 2895:10, 2896:5, 2905:22, 2907:15, 2916:2, 2924:14, 2925:8, 2926:25, 2927:5, 2930:2, 2930:6, 2932:10, 2932:12, 2932:21, 2935:3, 2935:23,

2937:10, 2937:13, 2937:14, 2937:21, 2939:6, 2939:10, 2939:11, 2939:20, 2939:21, 2943:9, 2943:21, 2944:2, 2944:22, 2944:25, 2946:1, 2946:5, 2946:21, 2946:22, 2947:3, 2947:12, 2947:23, 2948:2, 2949:5, 2949:9, 2949:12, 2949:23, 2950:9, 2950:15, 2950:25, 2952:3, 2952:10, 2952:12, 2952:13, 2952:18, 2953:2, 2953:8, 2953:18, 2953:22, 2953:23, 2955:13, 2956:16, 2956:22, 2956:24, 2957:1, 2957:18, 2958:3, 2959:4, 2959:14, 2959:24, 2959:25, 2960:6, 2960:10, 2960:11, 2960:16, 2961:4, 2961:9, 2961:14, 2962:10, 2963:11, 2965:25, 2966:10, 2966:13, 2966:15, 2967:11, 2967:14, 2968:1, 2968:20, 2969:12, 2969:25, 2970:24, 2971:6, 2971:23, 2972:5, 2976:1, 2976:6, 2978:24, 2979:22, 2983:6, 2983:11, 2987:25, 2989:9, 2989:15, 2989:18, 2989:23, 2990:9, 2990:12, 2990:17, 2991:3, 2992:14, 2992:16, 2993:1, 2995:4, 2995:9, 2995:16, 2996:19, 2996:22, 2997:2, 2997:8, 2998:24, 3011:3, 3011:5, 3011:7, 3011:11, 3011:13, 3011:16, 3014:16, 3014:21, 3014:24, 3015:3, 3015:19, 3015:22, 3018:2, 3018:14, 3018:16, 3018:18, 3019:16, 3020:2, 3020:4, 3020:10, 3021:1, 3021:12, 3028:21,

3030:1, 3033:10, 3034:9, 3035:3, 3041:8, 3041:10, 3041:15, 3050:15, 3052:5, 3055:4, 3059:7, 3059:9, 3060:19, 3063:1, 3064:23, 3073:12, 3074:20, 3074:24, 3075:6, 3076:20, 3077:10, 3077:22, 3079:10, 3082:10, 3084:16, 3085:13, 3085:18, 3086:15, 3087:4, 3091:9, 3091:13, 3094:10, 3094:12, 3095:14, 3096:5, 3096:11, 3096:25, 3097:13, 3100:23, 3105:22, 3106:3, 3106:18, 3106:23, 3107:4, 3107:9, 3108:5, 3108:9, 3108:14, 3112:20, 3136:14, 3142:19, 3142:24, 3143:10, 3143:21, 3143:23, 3154:18, 3157:23, 3167:9, 3168:4, 3169:2, 3169:19, 3170:10, 3171:17, 3171:23, 3174:16, 3174:21, 3175:10, 3175:22, 3176:2, 3176:6, 3178:10, 3179:6, 3179:13, 3179:17, 3179:18, 3182:17, 3186:21, 3192:21, 3195:10, 3198:9, 3198:17, 3198:21, 3200:7, 3200:11, 3218:2, 3220:9, 3221:19, 3231:6, 3231:14, 3231:24, 3232:4, 3232:10, 3233:3, 3233:6, 3242:11, 3247:19, 3247:20, 3250:22, 3251:2, 3253:10
**seeing** [7] - 2897:13, 2957:6, 3012:7, 3110:6, 3138:3, 3147:17, 3219:14
**seeking** [1] - 2991:23
**sees** [1] - 3126:25
**Segal** [1] - 3239:3
**Segal-Mauer** [1] - 3239:3
**segment** [31] - 2944:6,

2948:16, 2948:22, 2949:16, 2951:6, 2951:13, 2951:14, 2957:16, 2957:17, 2963:15, 2964:12, 2964:14, 2964:24, 2965:11, 2989:9, 3006:13, 3010:10, 3029:9, 3071:2, 3072:3, 3072:18, 3072:22, 3072:23, 3073:17, 3074:5, 3075:2, 3096:4, 3110:21, 3174:14
**segmentation** [3] - 2988:20, 2990:8, 3071:24
**segments** [26] - 2948:1, 2948:6, 2948:21, 2957:4, 2957:11, 2961:24, 2962:6, 2962:11, 2962:23, 2963:10, 2964:19, 2965:6, 2987:22, 2988:24, 2988:25, 2989:9, 2992:1, 3073:16, 3073:21, 3073:24, 3075:5, 3075:11, 3077:8, 3080:23, 3175:3, 3175:14
**select** [2] - 3050:9, 3104:18
**selected** [6] - 3161:3, 3180:6, 3183:16, 3187:9, 3200:23, 3201:3
**selecting** [1] - 3180:19
**selection** [1] - 3259:22
**sell** [20] - 2934:10, 3051:21, 3054:4, 3062:11, 3079:4, 3212:13, 3215:2, 3215:17, 3216:16, 3217:13, 3219:10, 3223:5, 3225:7, 3225:9, 3226:6, 3226:13, 3227:12, 3227:22, 3228:1
**selling** [18] - 2897:10, 2923:19, 2929:22, 2941:19, 2980:4, 3044:24, 3069:12, 3080:7, 3095:8, 3169:16, 3212:8, 3213:6, 3213:21, 3217:9, 3222:23, 3223:3, 3226:5,

3226:10
**semester** [1] -
3042:12
**Senate** [1] - 3010:21
**send** [5] - 3040:19,
3081:1, 3133:15,
3185:17, 3236:8
**sending** [3] - 2936:4,
2936:5, 2937:11
**senior** [4] - 2970:5,
3001:14, 3078:24,
3079:24
**sense** [14] - 2904:7,
2996:11, 3045:18,
3046:19, 3058:17,
3069:24, 3077:19,
3123:21, 3123:25,
3124:6, 3126:19,
3175:2, 3184:6,
3207:4
**sensitive** [1] - 3159:2
**sent** [7] - 2935:1,
2952:13, 2960:10,
2960:14, 3106:1,
3133:2, 3133:19
**sentence** [5] -
2979:18, 2995:12,
2998:23, 3136:12,
3197:17
**separate** [2] -
2907:18, 2930:23
**separately** [2] -
3058:13, 3064:4
**September** [1] -
3106:22
**sequence** [2] -
2905:9, 3174:14
**series** [1] - 3049:25
**serious** [3] - 2929:2,
3062:21, 3102:19
**seriously** [1] - 2923:7
**serve** [3] - 3020:15,
3020:24, 3158:16
**served** [2] - 3243:6,
3243:7
**Service** [1] - 3207:19
**service** [2] - 3042:11,
3081:8
**service-connected** [1]
- 3042:11
**services** [2] - 2982:12,
3020:21
**Services** [2] -
2932:20, 3001:21
**serving** [1] - 3001:19
**session** [2] - 3082:9,
3082:13
**set** [4] - 2990:25,
3008:3, 3160:16,
3189:24

**setting** [1] - 3163:15
**settled** [1] - 2902:6
**settlement** [23] -
2891:1, 2891:5,
2891:8, 2891:20,
2891:24, 2892:1,
2892:6, 2892:10,
2893:8, 2893:23,
2894:12, 2895:6,
2896:2, 2897:21,
2899:10, 2902:22,
2905:1, 2905:12,
2907:19, 2913:24,
2926:4, 2932:2,
2932:17
**settlements** [1] -
2897:14
**seven** [1] - 3231:22
**several** [6] - 3001:14,
3046:10, 3047:14,
3094:18, 3116:24
**severe** [2] - 3053:3,
3062:16
**sex** [1] - 3211:23
**shakes** [1] - 2907:16
**shall** [2] - 2893:7,
2893:24
**share** [29] - 2947:22,
2951:1, 2956:20,
2961:12, 2961:13,
2961:22, 2963:10,
2963:20, 2964:3,
2964:9, 2965:6,
2965:15, 2965:16,
2965:18, 2966:13,
2966:18, 2971:22,
2971:24, 2986:2,
2986:8, 2986:9,
2987:4, 2994:6,
3029:8, 3030:22,
3033:12, 3154:19,
3190:19, 3255:5
**shared** [2] - 3048:13,
3218:14
**shares** [6] - 2959:22,
2959:23, 2962:3,
2962:15, 2962:17,
2986:2
**sheer** [2] - 3067:1,
3181:9
**sheet** [1] - 2973:15
**sheets** [2] - 3191:7,
3244:18
**shelf** [2] - 3172:25,
3259:17
**shelves** [1] - 3172:20
**shifting** [1] - 3111:20
**Shiv** [1] - 3049:5
**shoe** [1] - 3060:11
**Shore** [1] - 3209:23

**short** [14] - 2919:22,
2920:25, 2943:20,
3011:17, 3012:3,
3092:23, 3093:12,
3093:15, 3143:4,
3143:5, 3152:5,
3152:5, 3172:25,
3228:22
**shorter** [1] - 3210:12
**shortfall** [1] - 2943:24
**shortly** [3] - 2931:14,
2937:8, 3078:1
**shot** [1] - 3141:25
**Show** [1] - 3135:25
**show** [32] - 2893:4,
2953:8, 2974:14,
2988:15, 2988:17,
2991:22, 2994:9,
2997:22, 3040:19,
3104:14, 3105:8,
3112:23, 3129:14,
3135:23, 3137:7,
3137:21, 3137:24,
3138:5, 3141:11,
3141:14, 3142:18,
3151:11, 3151:14,
3151:20, 3153:5,
3178:9, 3183:9,
3187:7, 3195:4,
3195:24, 3236:17,
3247:25
**showed** [10] -
2985:20, 2993:8,
3082:19, 3167:19,
3174:10, 3175:20,
3179:20, 3190:3,
3204:4
**showing** [12] -
2891:19, 2925:12,
2937:11, 2957:3,
2985:19, 2988:16,
3040:20, 3185:3,
3185:9, 3193:20,
3203:15, 3243:8
**shown** [9] - 2925:13,
2988:18, 2989:4,
2990:7, 2992:8,
2997:16, 2997:22,
3109:17, 3183:15
**shows** [2] - 3073:9,
3200:19
**shy** [1] - 3078:9
**sick** [2] - 3050:5,
3255:9
**side** [23] - 2912:6,
2912:11, 2912:16,
2912:23, 2939:21,
2988:25, 3000:5,
3050:8, 3050:11,
3062:5, 3062:6,

3062:17, 3074:23,
3185:10, 3185:21,
3211:18, 3212:10,
3212:15, 3222:17,
3231:21, 3257:6,
3257:7
**Sidebar** [8] - 2926:2,
2926:12, 2973:24,
2978:11, 3100:24,
3102:5, 3136:18,
3138:8
**sidebar** [4] - 2900:22,
2925:25, 2973:22,
3100:23
**sides** [1] - 2915:5
**sign** [2] - 3244:18
**sign-in** [1] - 3244:18
**signaled** [1] - 2943:19
**signed** [1] - 3158:22
**significant** [10] -
3050:15, 3054:15,
3078:9, 3079:14,
3080:5, 3084:23,
3085:20, 3086:24,
3092:3, 3117:7
**significantly** [3] -
2910:22, 3079:19,
3080:3
**Sillup** [42] - 3039:17,
3039:25, 3040:6,
3040:10, 3040:13,
3042:7, 3045:22,
3047:22, 3054:11,
3054:23, 3055:10,
3055:14, 3063:13,
3064:7, 3065:6,
3065:12, 3069:6,
3072:2, 3073:23,
3077:24, 3078:14,
3086:18, 3087:8,
3087:14, 3093:21,
3097:17, 3098:21,
3100:20, 3126:13,
3142:5, 3145:4,
3146:22, 3148:1,
3150:18, 3185:1,
3186:13, 3191:8,
3204:25, 3205:1,
3239:23, 3247:3,
3258:19
**SILLUP** [2] - 2889:4,
3039:21
**silly** [1] - 3262:9
**similar** [6] - 2897:21,
3019:7, 3083:7,
3144:20, 3232:19,
3234:9
**similarly** [3] - 3017:6,
3130:4, 3166:13
**simple** [2] - 3005:22,

3254:16
**simplified** [1] - 2990:8
**simply** [2] - 3144:23,
3221:9
**single** [9] - 2914:13,
2979:12, 3023:5,
3075:15, 3111:4,
3123:1, 3128:6,
3158:17, 3167:5
**sit** [6] - 2914:16,
2960:5, 3023:8,
3038:25, 3112:13,
3253:6
**sitting** [6] - 3111:7,
3116:14, 3122:6,
3161:25, 3199:8,
3225:18
**situated** [1] - 3064:14
**situation** [6] - 3053:3,
3067:5, 3083:6,
3089:10, 3216:20,
3248:22
**situations** [2] -
3162:14, 3177:10
**six** [6] - 3080:4,
3112:7, 3112:9,
3113:23, 3220:10,
3260:5
**size** [3] - 2943:25,
3045:11, 3057:17
**sized** [1] - 3191:6
**SKADDEN** [1] -
2888:19
**skimmed** [1] - 3157:5
**skip** [2] - 2983:17,
3094:22
**skipping** [2] - 2968:1,
3015:6
**SLATE** [1] - 2888:19
**slate** [1] - 3196:12
**sleep** [1] - 3209:1
**Slide** [12] - 2946:3,
2947:19, 2947:20,
2949:1, 2949:20,
2950:23, 2950:25,
2969:6, 2969:10,
2972:2, 3028:24,
3030:20
**slide** [55] - 2927:2,
2929:11, 2938:20,
2939:21, 2950:25,
2954:20, 2955:13,
2956:10, 2956:14,
2957:23, 2963:7,
2969:2, 2970:13,
2974:5, 2975:15,
2975:24, 2976:1,
2976:21, 2978:14,
2987:20, 2988:19,
2988:24, 2989:5,

*3306*

2993:4, 3028:21, 3029:5, 3034:1, 3041:17, 3042:2, 3046:23, 3051:23, 3059:7, 3094:23, 3095:25, 3096:22, 3108:3, 3108:17, 3167:19, 3167:23, 3174:10, 3174:11, 3174:13, 3174:19, 3174:24, 3175:13, 3175:19, 3175:25, 3179:4, 3179:7, 3179:19, 3183:15, 3252:20, 3252:21, 3253:17, 3254:20

**slides** [25] - 2975:14, 3040:19, 3041:10, 3222:3, 3222:4, 3222:7, 3252:9, 3252:12, 3252:13, 3252:16, 3252:19, 3252:25, 3253:7, 3253:14, 3253:15, 3253:18, 3253:20, 3253:21, 3253:23, 3254:20, 3256:2, 3256:7, 3258:2, 3261:9, 3261:20

**slight** [2] - 2946:24, 3017:14

**slim** [1] - 2993:14

**slim-jims** [1] - 2993:14

**slip** [1] - 3252:20

**slowed** [4] - 2910:21

**slower** [4] - 2910:23, 3003:18, 3004:9, 3005:9

**small** [9] - 2944:6, 3069:14, 3070:18, 3072:18, 3129:3, 3162:13, 3162:22, 3163:1, 3234:7

**smaller** [2] - 3219:19, 3249:22

**snapshot** [1] - 3163:23

**so..** [2] - 3007:6, 3137:14

**social** [4] - 3117:12, 3117:20, 3143:1, 3259:13

**socialized** [1] - 3259:18

**sold** [13] - 2930:9, 2930:10, 2956:5, 3044:8, 3169:5, 3207:23, 3208:9, 3208:11, 3208:22, 3209:24, 3210:2,

3213:18, 3221:3

**sole** [1] - 3020:18

**solicit** [2] - 3086:2, 3237:18

**solicitation** [1] - 3066:19

**solicited** [1] - 3067:2

**soliciting** [2] - 3063:14, 3237:21

**solve** [1] - 2894:22

**someone** [17] - 2919:12, 3043:1, 3051:11, 3051:12, 3054:16, 3054:20, 3058:18, 3062:4, 3080:4, 3086:12, 3089:5, 3156:1, 3184:9, 3184:10, 3189:12, 3197:13, 3253:22

**sometimes** [14] - 3050:11, 3054:4, 3060:16, 3067:16, 3082:11, 3126:1, 3126:15, 3127:1, 3216:13, 3241:11, 3254:24, 3255:17, 3259:7, 3259:10

**somewhat** [5] - 2913:24, 3122:19, 3125:9, 3157:2, 3245:5

**somewhere** [7] - 2896:8, 3013:7, 3013:15, 3033:10, 3033:15, 3093:12, 3101:12

**soon** [5] - 3006:6, 3010:16, 3012:17, 3216:11, 3217:21

**sophisticated** [2] - 3053:20, 3054:7

**sorry** [37] - 2891:17, 2893:9, 2895:16, 2899:4, 2899:5, 2902:7, 2905:18, 2908:20, 2909:1, 2935:13, 2940:16, 2943:14, 2945:16, 2947:5, 2948:18, 2951:20, 2974:16, 2978:13, 2981:14, 3009:13, 3010:25, 3024:3, 3026:24, 3031:21, 3032:18, 3034:5, 3037:21, 3055:20, 3063:15, 3068:6, 3079:9, 3092:16, 3109:15, 3203:1, 3205:6,

3235:6, 3243:4

**sort** [24] - 2894:24, 2896:1, 2897:1, 2897:3, 2901:5, 2901:11, 2985:15, 2991:21, 2999:8, 2999:22, 3086:21, 3117:19, 3120:2, 3120:7, 3159:13, 3160:21, 3163:14, 3175:4, 3178:16, 3183:16, 3207:4, 3212:22, 3213:5, 3252:22

**sorts** [2] - 3002:1, 3114:9

**Soule** [2] - 2888:23, 3263:11

**Soule@njd.uscourts.gov** [1] - 2888:24

**sound** [4] - 2983:5, 3112:22, 3161:20, 3194:14

**sounded** [2] - 3160:3, 3160:6

**sounds** [2] - 3112:24, 3161:21

**source** [11] - 3139:11, 3141:24, 3142:4, 3144:13, 3147:6, 3147:7, 3148:11, 3149:11, 3149:13, 3154:7, 3157:7

**sources** [7] - 3135:13, 3137:18, 3144:24, 3145:20, 3147:7, 3147:13, 3147:20

**south** [1] - 3206:9

**southern** [1] - 2916:11

**space** [4] - 2977:2, 2977:20, 3010:22, 3143:20

**span** [1] - 2919:7

**spanned** [1] - 3070:8

**speaker** [77] - 2909:11, 2922:21, 2973:7, 3014:25, 3021:25, 3022:23, 3023:23, 3061:2, 3068:22, 3084:11, 3084:13, 3084:22, 3085:11, 3090:1, 3090:14, 3090:19, 3091:1, 3091:19, 3091:21, 3097:11, 3176:5, 3176:9, 3176:15, 3176:24, 3177:6, 3177:14, 3177:15, 3177:22, 3178:11, 3179:1,

3179:15, 3179:24, 3179:25, 3180:11, 3180:15, 3180:24, 3181:9, 3181:17, 3182:2, 3182:20, 3183:18, 3184:3, 3184:7, 3184:13, 3184:19, 3199:5, 3200:4, 3200:9, 3200:14, 3200:21, 3201:24, 3202:1, 3202:9, 3238:17, 3238:21, 3238:23, 3239:3, 3239:9, 3241:7, 3241:20, 3242:4, 3245:14, 3246:19, 3247:22, 3248:21, 3248:25, 3249:17, 3249:20, 3249:22, 3250:13, 3252:25, 3255:21, 3257:9, 3258:7, 3259:22, 3261:1

**Speaker** [9] - 3019:23, 3068:14, 3084:4, 3084:5, 3084:25, 3085:21, 3089:19, 3199:21, 3199:23

**speakers** [33] - 3090:5, 3103:11, 3175:19, 3178:10, 3178:20, 3179:1, 3179:16, 3180:6, 3180:20, 3181:5, 3183:16, 3184:2, 3199:14, 3199:23, 3200:23, 3201:3, 3221:13, 3222:4, 3238:14, 3247:4, 3247:17, 3249:21, 3249:22, 3250:16, 3251:19, 3252:3, 3252:13, 3258:24, 3258:25, 3260:8, 3260:17, 3261:12

**Speakers'** [1] - 3084:2

**speakers'** [2] - 3085:6, 3250:17

**speaking** [3] - 2976:23, 3233:20, 3260:13

**special** [2] - 3045:13, 3211:21

**specialty** [1] - 3211:15

**specific** [41] - 2892:11, 2894:15, 2894:16, 2897:9, 2908:22, 2909:3, 2922:24, 2930:22, 2937:25, 2938:18,

2941:14, 2955:6, 2955:10, 2957:4, 2957:11, 2958:8, 2967:9, 2969:17, 2974:13, 2980:22, 3004:16, 3025:7, 3032:11, 3036:2, 3039:4, 3047:5, 3047:6, 3049:24, 3059:14, 3069:15, 3070:3, 3070:25, 3096:3, 3098:11, 3099:1, 3099:2, 3099:17, 3197:14, 3241:15, 3253:8

**specifically** [27] - 2893:7, 2904:5, 2909:8, 2928:23, 2933:16, 2940:9, 2940:13, 2942:3, 2962:5, 2967:7, 2970:2, 2970:22, 2991:18, 2994:15, 3017:13, 3017:15, 3017:21, 3017:25, 3023:16, 3031:15, 3034:15, 3034:17, 3058:8, 3094:2, 3096:16, 3180:8

**specificity** [8] - 2892:21, 2893:25, 2894:5, 2908:12, 2908:13, 2909:7, 2909:10, 2909:14

**specifics** [8] - 3023:20, 3036:3, 3037:17, 3038:11, 3038:13, 3066:6, 3201:24, 3235:2

**spectrum** [4] - 3053:20, 3053:24, 3054:17, 3059:16

**speech** [2] - 2916:9, 3252:24

**speeches** [3] - 3199:16, 3239:25, 3258:10

**spelling** [2] - 3039:24, 3205:16

**spend** [5] - 3052:3, 3053:16, 3054:23, 3096:9, 3231:1

**spending** [4] - 3051:22, 3080:8, 3093:5, 3111:12

**spent** [10] - 3044:20, 3046:10, 3052:6, 3052:12, 3052:16, 3052:18, 3084:9, 3113:24, 3113:25,

3114:2
**spillover** [1] - 3073:19
**spirit** [1] - 3015:19
**spoken** [3] - 3106:5,
3106:15, 3164:14
**sponsors** [1] -
3185:17
**spontaneous** [25] -
2963:18, 2963:19,
2964:2, 2986:21,
2987:17, 2987:24,
2988:9, 2988:11,
3016:10, 3016:14,
3086:13, 3086:20,
3086:21, 3169:1,
3170:2, 3170:17,
3170:21, 3172:2,
3172:5, 3172:24,
3197:2, 3197:7,
3197:10
**spontaneously** [2] -
3016:11, 3016:12
**spot** [2] - 3063:18,
3262:4
**spots** [1] - 3250:17
**spreads** [1] - 2981:22
**spring** [1] - 3261:8
**Springs** [1] - 3206:12
**Square** [3] - 2888:21,
3240:17, 3240:18
**square** [1] - 2912:9
**Squibb** [1] - 3211:14
**St** [4] - 3043:4,
3043:12, 3222:17,
3257:4
**stable** [1] - 2956:15
**staff** [3] - 2999:23,
3023:4, 3208:11
**stakeholders** [4] -
3020:15, 3020:16,
3022:6, 3098:12
**stamp** [2] - 3236:13,
3236:16
**stamped** [3] -
3029:11, 3236:4,
3236:10
**stand** [4] - 2952:23,
3207:18, 3239:23,
3254:7
**standard** [1] - 3017:20
**standing** [1] - 3260:12
**standpoint** [1] -
3007:13
**start** [12] - 2891:4,
2905:9, 2938:2,
2944:20, 2964:22,
2985:14, 3038:14,
3045:10, 3160:21,
3213:2, 3218:5,
3225:6

**started** [16] - 2900:8,
2905:20, 3044:5,
3044:18, 3046:15,
3066:8, 3160:13,
3199:15, 3207:6,
3216:12, 3217:22,
3219:14, 3219:19,
3223:25, 3225:9,
3231:8
**starter** [6] - 3160:16,
3160:23, 3161:7,
3162:10, 3162:22,
3166:4
**starting** [2] - 2894:17,
2918:16
**starts** [3] - 2988:11,
3014:24, 3126:24
**startup** [1] - 3214:18
**State** [1] - 2888:9
**state** [9] - 2892:17,
2936:9, 2968:16,
3009:7, 3026:12,
3039:23, 3098:22,
3205:15, 3212:2
**statement** [17] -
2902:18, 2904:11,
2904:15, 2913:17,
2915:16, 2915:23,
2916:24, 3015:7,
3018:14, 3020:7,
3021:1, 3029:1,
3137:11, 3145:7,
3149:19, 3192:3,
3231:20
**statements** [10] -
2892:18, 2913:14,
2915:9, 2933:17,
3014:17, 3026:3,
3026:13, 3140:12,
3140:17, 3144:11
**states** [3] - 2895:7,
2982:10, 3208:12
**States** [8] - 2890:2,
2892:14, 2892:16,
2893:8, 2898:5,
3002:13, 3015:11,
3181:13
**STATES** [3] - 2888:1,
2888:3, 2888:12
**States'** [1] - 2970:16
**statistically** [1] -
3050:21
**statistics** [1] - 3148:7
**statute** [1] - 3103:6
**Statute** [5] - 2927:24,
2928:6, 2929:16,
2934:9, 3103:5
**stay** [7] - 2894:19,
2899:2, 3113:11,
3113:12, 3113:17,

3215:14, 3248:20
**stayed** [2] - 3113:12,
3259:18
**staying** [5] - 3009:14,
3088:4, 3113:9,
3192:23, 3253:9
**steak** [2] - 3243:3,
3243:5
**stenography** [1] -
2888:25
**step** [8] - 2941:12,
3064:7, 3079:19,
3092:22, 3143:14,
3144:5, 3211:2
**Stephens** [1] - 3200:5
**steps** [2] - 2905:20,
3093:22
**stick** [1] - 3040:13
**still** [16] - 2904:1,
2908:24, 2921:14,
2933:3, 2934:14,
2934:19, 2945:18,
3024:4, 3050:23,
3065:6, 3098:7,
3098:8, 3142:7,
3143:15, 3201:18,
3250:8
**stock** [1] - 3172:20
**stockholders** [1] -
2983:4
**stocking** [1] - 3044:6
**stop** [10] - 2899:12,
2917:6, 2925:2,
2934:4, 3063:16,
3063:18, 3229:21,
3238:4, 3262:5,
3262:11
**story** [1] - 3193:11
**strains** [1] - 3002:13
**strand** [3] - 3116:24,
3118:14, 3200:14
**Strand** [4] - 2982:24,
3049:6, 3195:18,
3199:13
**strategic** [1] - 2944:5
**strategies** [6] -
2968:17, 3045:3,
3079:4, 3079:23,
3197:14, 3261:17
**strategy** [27] - 2941:8,
2941:18, 2942:4,
2942:9, 2942:24,
2943:3, 2968:2,
2968:8, 3008:1,
3034:23, 3045:18,
3045:20, 3071:18,
3071:23, 3071:25,
3073:9, 3073:11,
3074:3, 3075:10,
3080:1, 3080:11,

3080:14, 3088:24,
3090:9, 3090:10,
3093:24, 3094:1
**Street** [3] - 2888:9,
2888:17, 2888:21
**stress** [4] - 3209:8,
3209:9, 3210:10,
3216:20
**stressful** [3] - 3211:8,
3216:23, 3217:4
**stretch** [4] - 2919:3,
2919:15, 2919:18,
3143:6
**stretches** [1] -
3093:17
**strictly** [1] - 3212:21
**strongly** [4] - 2912:13,
3007:10, 3054:15,
3157:22
**structure** [1] - 3037:5
**students** [1] - 3187:19
**studied** [3] - 3059:11,
3138:25, 3206:19
**studies** [31] - 3050:1,
3050:2, 3051:2,
3051:5, 3051:6,
3051:8, 3060:21,
3060:25, 3061:6,
3082:3, 3082:24,
3092:6, 3092:10,
3094:12, 3094:18,
3095:4, 3148:5,
3219:15, 3219:17,
3219:20, 3221:25,
3222:20, 3222:23,
3223:4, 3229:24,
3231:9, 3234:20,
3235:19, 3235:21,
3236:8
**study** [43] - 3050:12,
3050:20, 3051:2,
3057:19, 3094:16,
3094:19, 3095:2,
3131:6, 3140:2,
3140:7, 3147:25,
3148:20, 3156:1,
3156:5, 3184:11,
3206:18, 3219:22,
3219:25, 3220:3,
3220:6, 3220:11,
3227:21, 3231:21,
3232:15, 3233:23,
3234:1, 3234:4,
3234:7, 3234:8,
3234:14, 3234:17,
3234:24, 3234:25,
3235:2, 3235:7,
3235:8, 3235:16,
3236:7
**stuff** [9] - 3090:20,

3114:9, 3114:20,
3135:18, 3155:6,
3155:9, 3165:22,
3179:5, 3216:25
**style** [1] - 3007:8
**sub** [1] - 2997:5
**sub-bullet** [1] - 2997:5
**subject** [5] - 2892:7,
3045:7, 3045:24,
3101:20, 3147:16
**submissions** [1] -
3134:10
**submit** [1] - 2994:4
**submitting** [1] -
3001:3
**subordinates** [3] -
3244:21, 3245:8,
3245:12
**subsequently** [1] -
3208:4
**substantial** [1] -
3138:20
**substantiate** [1] -
3051:9
**substantiates** [1] -
3049:18
**substantive** [6] -
2920:10, 3055:6,
3056:4, 3060:14,
3060:19, 3130:1
**suburb** [1] - 3251:20
**success** [2] - 3054:18,
3107:3
**sudden** [1] - 2917:9
**Sue** [1] - 2917:20
**suffer** [2] - 3035:19,
3152:13
**sufficient** [1] -
2906:16
**suggest** [6] - 2912:13,
2940:6, 3078:11,
3078:16, 3083:18,
3157:22
**suggested** [3] -
2908:23, 2938:21,
3204:2
**suggesting** [3] -
2894:24, 2940:9,
3061:17
**suggestion** [4] -
2896:23, 3023:21,
3024:7, 3056:11
**suggestions** [3] -
3008:17, 3008:18,
3260:15
**suggests** [1] -
3061:10
**Suite** [1] - 2888:17
**summaries** [1] -
3233:25

**summarizes** [1] - 2954:21
**summary** [12] - 2952:8, 2953:17, 2954:8, 2954:20, 2956:15, 2970:15, 3046:21, 3046:23, 3047:4, 3047:7, 3065:13, 3135:2
**Sunday** [1] - 2917:12
**superior** [1] - 3132:11
**supplies** [2] - 3208:9, 3209:20
**supply** [6] - 2986:22, 2992:22, 3028:4, 3028:8, 3207:14, 3210:7
**support** [10] - 3002:21, 3009:8, 3080:8, 3134:20, 3135:1, 3135:14, 3138:21, 3153:11, 3153:16, 3154:8
**supported** [2] - 3002:12, 3006:4
**supports** [3] - 3136:8, 3139:18, 3158:2
**supposed** [5] - 3083:22, 3086:7, 3177:17, 3237:21, 3239:7
**supposedly** [1] - 3214:12
**surgeons** [1] - 3209:2
**surprised** [4] - 3067:2, 3085:18, 3118:13, 3122:7
**surprising** [1] - 3130:2
**sustain** [4] - 2996:7, 2996:11, 3067:17, 3103:7
**sustained** [3] - 3038:4, 3123:10, 3204:16
**Sustiva** [2] - 3213:17
**swear** [1] - 3039:19
**swing** [1] - 3077:9
**switch** [23] - 2891:10, 2947:22, 2956:20, 2957:12, 2959:22, 2961:12, 2962:2, 2962:11, 2966:24, 3004:1, 3004:9, 3004:20, 3016:11, 3016:15, 3024:25, 3026:21, 3028:14, 3072:15, 3072:22, 3126:15, 3192:9, 3192:10, 3192:16

**switched** [2] - 3003:20, 3035:17
**switches** [13] - 2947:25, 2948:5, 2956:25, 2957:3, 2957:11, 2988:9, 2988:11, 3004:5, 3004:6, 3016:10, 3026:20, 3261:21
**switching** [3] - 3004:8, 3034:19, 3035:3
**swore** [1] - 3105:19
**sworn** [5] - 3001:4, 3001:22, 3048:9, 3195:13, 3205:10
**SWORN/AFFIRMED** [2] - 3039:21, 3205:13
**Synthes** [3] - 3208:19, 3208:20, 3208:21
**system** [4] - 2924:18, 3015:18, 3087:5, 3105:5
**systems** [2] - 3044:11, 3198:10

# T

**table** [1] - 2919:12
**tables** [1] - 3207:8
**tabling** [2] - 2904:22, 2920:11
**tact** [1] - 3031:19
**tactic** [3] - 3090:22, 3091:1, 3145:19
**tactical** [3] - 3031:22, 3087:8, 3191:19
**tactics** [4] - 3031:11, 3077:1, 3095:12, 3212:23
**tailored** [1] - 2909:15
**talks** [4] - 2955:22, 3124:21, 3125:14, 3125:20
**Tallahassee** [1] - 3207:21
**tandem** [1] - 3130:25
**tape** [10] - 3119:22, 3125:21, 3131:16, 3193:1, 3193:6, 3193:12, 3193:19, 3193:22, 3194:5, 3194:19
**taped** [1] - 3125:14
**Taravella** [1] - 3206:13
**target** [23] - 2943:20, 2944:20, 2946:12, 2963:20, 2964:3, 2964:6, 2964:7,

2964:9, 2964:10, 2965:16, 2967:8, 2967:11, 2969:15, 3028:21, 3030:22, 3035:23, 3073:24, 3074:11, 3077:16, 3247:11, 3261:18
**targeted** [1] - 2948:5
**targeting** [4] - 2964:3, 2974:6, 3031:1, 3261:10
**targets** [8] - 2947:15, 2947:18, 2948:5, 2965:6, 3005:6, 3074:7, 3074:17, 3077:9
**task** [1] - 3069:10
**tat** [1] - 3146:20
**taught** [6] - 2929:12, 3030:14, 3088:11, 3092:1, 3223:23, 3254:17
**taxes** [1] - 3112:11
**teach** [9] - 3043:7, 3043:8, 3045:5, 3045:7, 3045:22, 3045:23, 3187:15, 3187:19, 3211:22
**teaching** [2] - 3043:11, 3043:13
**team** [12] - 2945:10, 2960:17, 2968:19, 2968:23, 2973:17, 3008:4, 3008:14, 3008:20, 3086:12, 3104:21, 3113:9, 3183:19
**technical** [1] - 3041:20
**techniques** [1] - 3187:20
**teeny** [1] - 3162:10
**teeny-tiny** [1] - 3162:10
**television** [1] - 3052:9
**ten** [13] - 3011:20, 3011:24, 3076:6, 3076:8, 3092:18, 3092:20, 3146:20, 3150:8, 3221:6, 3221:8, 3245:20, 3248:8, 3257:2
**ten-minute** [2] - 3011:20, 3092:18
**tenth** [2] - 3010:7, 3076:9
**tenure** [4] - 2905:16, 2964:22, 3001:24, 3228:22
**tenured** [1] - 3043:10

**term** [14] - 2916:9, 2989:21, 3060:7, 3077:20, 3080:10, 3083:5, 3085:6, 3086:21, 3088:8, 3094:1, 3103:5, 3132:21, 3170:18, 3187:24
**terminology** [1] - 3073:18
**terms** [16] - 2979:24, 3026:19, 3052:2, 3083:11, 3083:15, 3131:7, 3133:19, 3164:24, 3165:1, 3165:9, 3167:11, 3174:1, 3180:6, 3180:24, 3181:4, 3183:23
**territory** [6] - 3073:22, 3209:23, 3211:17, 3211:18, 3221:6, 3221:13
**tertiary** [1] - 3178:4
**tested** [1] - 3083:23
**testified** [22] - 2932:4, 2973:25, 2988:8, 2988:22, 2996:4, 3001:10, 3001:13, 3004:24, 3027:21, 3028:17, 3036:17, 3038:12, 3067:7, 3097:17, 3105:15, 3116:2, 3119:9, 3123:13, 3137:13, 3164:22, 3192:7, 3194:4
**TESTIFIED** [2] - 3039:22, 3205:13
**testify** [19] - 2906:3, 2911:5, 2914:4, 3038:7, 3048:1, 3055:24, 3081:10, 3105:18, 3117:19, 3118:7, 3118:14, 3158:22, 3185:10, 3191:9, 3195:16, 3195:18, 3195:20, 3195:22, 3200:23
**testifying** [13] - 3048:22, 3101:2, 3101:18, 3146:22, 3175:20, 3192:8, 3193:5, 3193:6, 3194:24, 3199:13, 3199:17, 3201:21, 3202:8
**testimony** [68] - 2897:7, 2901:15, 2901:17, 2901:18,

2905:1, 2905:4, 2905:7, 2910:22, 2921:6, 3006:20, 3007:1, 3025:4, 3025:9, 3028:1, 3032:23, 3034:14, 3036:16, 3037:24, 3038:1, 3040:14, 3047:18, 3047:19, 3048:9, 3048:20, 3048:24, 3049:8, 3056:10, 3064:19, 3065:20, 3066:1, 3066:14, 3067:6, 3067:11, 3067:15, 3067:21, 3068:15, 3068:21, 3078:2, 3080:16, 3090:13, 3095:22, 3098:21, 3099:11, 3102:19, 3105:23, 3110:3, 3118:16, 3119:2, 3169:4, 3174:1, 3174:19, 3185:11, 3185:12, 3185:21, 3186:16, 3190:8, 3193:25, 3195:13, 3200:13, 3201:8, 3201:12, 3201:14, 3201:17, 3202:16, 3223:14, 3247:2, 3247:5
**Texas** [2] - 2888:17, 3237:16
**THE** [329] - 2888:1, 2888:11, 2890:4, 2890:5, 2890:16, 2890:23, 2891:3, 2891:13, 2891:18, 2891:22, 2892:2, 2892:5, 2892:19, 2892:24, 2893:3, 2893:10, 2893:13, 2893:18, 2893:21, 2894:2, 2894:4, 2894:7, 2894:10, 2894:20, 2895:2, 2895:10, 2895:14, 2896:4, 2897:17, 2899:4, 2899:7, 2900:11, 2900:16, 2900:25, 2902:3, 2902:9, 2903:2, 2903:10, 2903:25, 2904:13, 2904:18, 2904:22, 2905:5, 2905:17, 2906:1, 2906:10, 2908:6, 2908:12, 2909:1, 2909:5, 2909:24, 2910:4, 2913:23,

2914:3, 2916:5, 2916:8, 2916:12, 2916:17, 2917:18, 2917:22, 2918:1, 2918:3, 2918:6, 2918:10, 2918:13, 2919:5, 2920:4, 2920:7, 2920:10, 2920:14, 2920:18, 2920:23, 2921:1, 2921:3, 2921:4, 2921:15, 2921:16, 2924:20, 2924:22, 2924:24, 2925:1, 2925:6, 2925:8, 2925:19, 2925:25, 2926:6, 2926:8, 2926:11, 2926:15, 2926:18, 2932:6, 2935:9, 2935:12, 2935:14, 2937:18, 2939:15, 2940:25, 2951:22, 2952:21, 2952:25, 2953:10, 2953:12, 2953:14, 2954:16, 2959:9, 2961:18, 2963:4, 2966:4, 2968:11, 2970:11, 2973:22, 2973:25, 2974:7, 2974:10, 2974:15, 2974:17, 2974:25, 2975:3, 2975:19, 2975:22, 2976:1, 2976:9, 2976:12, 2976:17, 2976:20, 2976:23, 2977:6, 2977:22, 2977:25, 2978:3, 2978:9, 2978:13, 2978:16, 2978:18, 2981:17, 2984:11, 2984:12, 2984:13, 2984:15, 2985:4, 2985:7, 2996:5, 2996:10, 3011:11, 3011:16, 3011:19, 3011:24, 3012:1, 3012:2, 3012:4, 3012:5, 3012:8, 3012:10, 3012:15, 3012:19, 3012:22, 3013:1, 3013:3, 3013:6, 3013:9, 3013:12, 3013:13, 3013:18, 3013:24, 3013:25, 3014:2, 3014:7, 3018:6, 3018:7, 3018:8, 3018:9, 3018:10, 3018:21, 3018:23, 3019:6,

3019:9, 3019:11, 3024:21, 3024:24, 3037:22, 3037:25, 3038:3, 3039:8, 3039:10, 3039:11, 3039:14, 3039:18, 3039:23, 3039:25, 3040:2, 3040:3, 3040:4, 3040:22, 3041:1, 3041:3, 3041:4, 3041:10, 3041:16, 3041:20, 3041:23, 3042:4, 3063:15, 3063:18, 3063:21, 3064:5, 3064:7, 3064:12, 3064:13, 3064:21, 3065:1, 3065:3, 3065:8, 3065:9, 3067:16, 3092:18, 3092:19, 3092:20, 3092:24, 3092:25, 3093:7, 3093:9, 3100:22, 3100:25, 3101:5, 3101:7, 3101:9, 3101:17, 3101:23, 3102:1, 3102:4, 3102:7, 3102:12, 3103:7, 3109:11, 3116:10, 3123:7, 3123:9, 3125:2, 3126:10, 3131:24, 3136:17, 3136:19, 3136:22, 3136:24, 3137:3, 3137:15, 3137:20, 3137:23, 3138:10, 3141:12, 3141:14, 3141:17, 3141:20, 3142:4, 3142:9, 3142:13, 3142:16, 3142:19, 3142:21, 3142:24, 3143:4, 3143:12, 3143:14, 3143:23, 3144:1, 3144:3, 3144:4, 3144:10, 3144:12, 3144:16, 3144:18, 3144:20, 3144:23, 3145:2, 3145:10, 3146:12, 3146:18, 3146:24, 3147:3, 3147:6, 3147:12, 3147:19, 3148:11, 3148:16, 3148:24, 3149:8, 3149:15, 3150:3, 3150:6, 3150:22, 3150:24, 3151:1, 3151:4, 3151:6, 3151:9, 3151:10,

3151:16, 3151:20, 3151:23, 3152:1, 3152:4, 3152:8, 3152:12, 3152:14, 3152:16, 3154:1, 3154:21, 3186:3, 3186:9, 3202:22, 3204:14, 3205:1, 3205:3, 3205:4, 3205:6, 3205:8, 3205:15, 3205:17, 3205:18, 3241:2, 3242:23, 3244:2, 3251:15, 3262:4, 3262:7, 3262:10, 3262:13, 3262:15
**theirs** [1] - 3237:17
**themselves** [7] - 2902:24, 3031:2, 3048:14, 3048:21, 3188:7, 3190:13, 3191:9
**theory** [1] - 2911:24
**Theracos** [1] - 3044:15
**therapeutic** [4] - 3033:23, 3055:9, 3061:16, 3087:3
**Therapeutics** [10] - 2945:15, 2967:3, 3014:19, 3015:1, 3015:14, 3018:20, 3019:24, 3020:7, 3021:2, 3021:6
**Therapeutics'** [1] - 2996:24
**Therapies** [1] - 3233:4
**therapies** [1] - 3015:8
**therapy** [4] - 2999:16, 3005:25, 3044:15, 3107:3
**therefore** [1] - 2911:11
**they've** [6] - 2899:25, 2907:9, 2907:14, 2911:14, 2993:13, 3216:20
**thinking** [6] - 3013:22, 3024:4, 3045:14, 3089:4, 3091:4, 3235:5
**thinks** [2] - 3141:4, 3191:23
**third** [10] - 2970:16, 2970:20, 2970:22, 2983:18, 2998:23, 3002:18, 3010:6, 3047:7, 3057:1, 3247:11
**thirds** [1] - 3052:15
**Thomas** [1] - 3097:8

**thorough** [1] - 3000:5
**thoroughly** [1] - 3213:10
**thoughtful** [2] - 3015:16, 3086:22
**thousand** [2] - 3076:7, 3258:23
**thousands** [4] - 3015:10, 3026:7, 3135:17, 3162:5
**thread** [1] - 2934:23
**threatening** [1] - 3227:8
**three** [15] - 2917:5, 2931:7, 2955:16, 3052:7, 3052:9, 3091:21, 3106:24, 3169:1, 3215:20, 3215:24, 3220:10, 3221:7, 3221:20, 3239:13, 3254:6
**throughout** [9] - 2912:14, 2981:22, 2982:17, 3002:23, 3065:15, 3076:19, 3099:11, 3181:13, 3206:3
**Thursday** [1] - 3231:13
**Tibotec** [28] - 2900:8, 2905:16, 2923:19, 2945:14, 2954:8, 2967:3, 2967:11, 2996:24, 3001:24, 3003:2, 3014:19, 3015:1, 3015:14, 3018:20, 3019:24, 3020:7, 3021:2, 3021:6, 3214:8, 3214:11, 3214:17, 3215:4, 3215:9, 3215:25, 3217:18, 3224:10, 3224:15, 3236:7
**Tibotec/Janssen** [1] - 3024:10
**ticking** [1] - 3050:14
**tie** [1] - 3227:9
**tighter** [1] - 2918:20
**TikTok** [16] - 3140:22, 3141:4, 3142:14, 3145:9, 3146:11, 3146:17, 3147:4, 3147:17, 3148:20, 3153:17, 3153:23, 3154:4, 3154:13, 3186:21, 3191:18, 3191:24
**TikToks** [1] - 3146:7
**Tim** [8] - 3222:14,

3222:16, 3227:20, 3228:17, 3236:12, 3247:10, 3252:14, 3252:15
**timeline** [1] - 2990:20
**timely** [1] - 3095:12
**timing** [1] - 2919:3
**tiny** [1] - 3162:10
**tit** [1] - 3146:20
**tit-for-tat** [1] - 3146:20
**title** [4] - 2911:11, 2952:14, 3136:6, 3175:25
**titled** [1] - 3014:18
**today** [22] - 2905:10, 2918:4, 2921:7, 2993:5, 3018:19, 3039:1, 3040:14, 3060:18, 3064:1, 3065:7, 3065:14, 3065:24, 3110:5, 3110:17, 3110:22, 3146:14, 3147:9, 3182:2, 3186:16, 3203:23, 3260:23, 3260:24
**together** [21] - 2892:25, 2903:8, 2941:9, 3045:2, 3071:20, 3105:19, 3108:18, 3113:25, 3114:7, 3160:21, 3175:25, 3214:3, 3214:4, 3216:12, 3216:17, 3219:19, 3224:6, 3226:9, 3239:6, 3252:15, 3253:11
**tolerability** [4] - 3034:19, 3035:4, 3214:14, 3214:15
**tomorrow** [1] - 3262:12
**Tony** [11] - 3049:2, 3087:9, 3106:1, 3106:5, 3106:9, 3227:18, 3228:12, 3236:24, 3237:14, 3247:10, 3250:9
**took** [16] - 2904:14, 2923:6, 2962:2, 2968:16, 2991:9, 2991:10, 2993:4, 3004:5, 3009:9, 3009:13, 3010:20, 3114:9, 3193:1, 3211:3, 3212:1, 3216:2
**tool** [4] - 3087:16, 3091:23, 3105:21,

3176:24
**tools** [2] - 2992:21, 3147:23
**top** [14] - 2944:18, 2947:3, 2968:18, 3018:12, 3057:18, 3076:5, 3076:15, 3077:17, 3096:7, 3170:2, 3198:9, 3221:20, 3232:7, 3259:17
**top-down** [1] - 2968:18
**top-level** [1] - 3076:15
**Topamax** [4] - 2897:10, 2897:11, 2901:8, 2905:13
**topic** [5] - 3055:24, 3056:16, 3066:14, 3122:3, 3163:5
**topics** [2] - 2985:13, 3162:23, 3163:9
**Toronto** [1] - 3107:8
**total** [11] - 2958:7, 2967:5, 2967:21, 2980:3, 2986:12, 2992:23, 3052:3, 3072:5, 3074:12, 3091:7, 3091:12
**totals** [1] - 2967:18
**touch** [2] - 3007:21, 3093:22
**touched** [2] - 2972:23, 2972:25
**toward** [2] - 2985:15, 3087:17
**towards** [1] - 2899:1
**town** [1] - 3226:18
**track** [6] - 2999:22, 3050:17, 3050:18, 3086:19, 3170:17, 3205:8
**trackable** [1] - 3197:11
**tracked** [6] - 2963:9, 2963:12, 3200:15, 3248:1, 3248:2
**tracking** [9] - 2947:25, 2950:18, 3067:7, 3087:1, 3178:10, 3197:7, 3199:5, 3199:14, 3199:22
**trade** [1] - 2958:4
**trained** [5] - 2995:6, 3000:20, 3032:21, 3216:9, 3236:21
**trainer** [2] - 3082:11, 3222:9
**training** [17] - 2925:12, 2926:23,

2927:7, 3046:15, 3082:2, 3082:9, 3082:12, 3082:17, 3088:10, 3099:6, 3208:4, 3216:10, 3228:19, 3250:18, 3250:23, 3251:19
**transcript** [2] - 2888:25, 3263:4
**transcription** [1] - 2888:25
**transcripts** [3] - 3047:16, 3115:16, 3190:18
**transfer** [1] - 3072:15
**transferred** [4] - 3042:15, 3043:2, 3206:16, 3208:3
**transition** [2] - 3042:25, 3078:11
**transitioning** [1] - 3040:12
**trauma** [1] - 3208:21
**travel** [1] - 3252:3
**treadable** [1] - 3093:22
**treat** [3] - 2999:15, 3050:2, 3050:6
**treated** [3] - 3045:12, 3050:4, 3070:16
**treating** [4] - 3046:9, 3053:12, 3053:25, 3054:19
**treatment** [17] - 2965:2, 2986:25, 3002:24, 3003:21, 3010:11, 3015:9, 3016:16, 3050:10, 3070:13, 3070:15, 3070:19, 3070:22, 3071:8, 3072:15, 3076:21, 3086:9, 3118:8
**treatment-experienced** [4] - 2965:2, 3003:21, 3010:11, 3015:9
**treatment-naive** [3] - 3070:13, 3070:15, 3070:22
**treatments** [1] - 3020:1
**Trenton** [1] - 2888:9
**TRIAD** [3] - 3234:24, 3234:25, 3235:2
**trial** [44] - 2902:2, 2910:21, 2911:23, 2912:14, 2912:21, 2914:22, 2977:10, 3039:9, 3047:18,

3047:19, 3047:24, 3065:15, 3065:25, 3068:21, 3074:8, 3081:25, 3087:7, 3097:7, 3099:11, 3100:12, 3111:4, 3112:1, 3113:2, 3113:22, 3113:24, 3114:20, 3125:8, 3161:25, 3165:25, 3189:9, 3189:13, 3189:18, 3190:24, 3191:12, 3193:10, 3195:4, 3199:8, 3203:14, 3205:2, 3228:24, 3231:5, 3259:25, 3262:11
**Trial** [2] - 2937:13, 2939:7
**TRIAL** [1] - 2888:5
**trialists** [1] - 3184:10
**trials** [2] - 2898:16, 3218:20
**triangle** [1] - 3098:14
**Tribute** [1] - 3014:18
**tried** [2] - 3127:19, 3213:15
**triggers** [1] - 2917:9
**TRIO** [5] - 3235:5, 3235:6, 3235:7
**triple** [1] - 3046:3
**trouble** [2] - 2900:19, 2976:24
**true** [34] - 2942:22, 2965:1, 2981:24, 2984:25, 3056:18, 3099:18, 3099:22, 3099:23, 3100:1, 3100:2, 3113:3, 3114:16, 3115:23, 3119:13, 3120:17, 3165:15, 3166:7, 3166:8, 3170:25, 3171:25, 3172:1, 3173:9, 3180:17, 3185:19, 3185:20, 3218:2, 3231:10, 3231:18, 3231:20, 3233:18, 3240:22, 3242:14, 3243:23, 3251:10
**truly** [3] - 3086:7, 3087:4, 3172:5
**trust** [7] - 3221:18, 3221:22, 3221:24, 3229:11, 3229:13, 3230:18, 3233:22
**truth** [12] - 3109:2, 3141:22, 3142:10, 3145:15, 3149:13,

3149:19, 3149:21, 3149:25, 3150:9, 3221:23, 3249:16, 3250:6
**truthfulness** [2] - 3148:14, 3148:17
**try** [7] - 2903:23, 3040:13, 3040:15, 3056:7, 3185:10, 3210:24, 3213:19
**trying** [14] - 2891:23, 2894:19, 2899:23, 2902:5, 2905:23, 2907:15, 2950:10, 2972:7, 3119:16, 3122:9, 3137:9, 3146:10, 3232:2, 3257:11
**TT** [2] - 2954:20, 2967:18
**turn** [21] - 2926:22, 2929:8, 2934:17, 2935:16, 2936:2, 2943:6, 2950:23, 2955:13, 2967:24, 2969:2, 2969:6, 2970:13, 2971:2, 2981:12, 3028:23, 3031:7, 3031:10, 3033:24, 3034:1, 3188:6, 3198:7
**turned** [4] - 2946:4, 3007:6, 3086:8, 3087:5
**Turner** [1] - 3097:8
**turns** [4] - 2930:10, 2984:4, 3076:3, 3076:16
**Turret** [1] - 3119:24
**Turrett** [13] - 3122:18, 3123:14, 3124:11, 3125:13, 3125:20, 3126:13, 3126:24, 3127:6, 3130:6, 3130:11, 3132:4, 3132:16, 3194:11
**Turrett's** [1] - 3131:16
**twice** [8] - 2912:11, 3081:23, 3083:14, 3083:22, 3127:7, 3127:15, 3227:19, 3235:13
**twice-a-day** [2] - 3127:15, 3235:13
**two** [49] - 2891:22, 2891:25, 2901:16, 2905:11, 2906:5, 2913:20, 2917:4, 2917:14, 2919:22, 2920:7, 2928:2,

2937:11, 2940:17, 2952:19, 2954:22, 2970:6, 2974:21, 2977:7, 2983:17, 2991:15, 3001:23, 3002:6, 3004:2, 3025:7, 3037:14, 3038:14, 3044:9, 3051:4, 3052:15, 3056:25, 3059:21, 3067:6, 3068:2, 3075:13, 3082:25, 3104:4, 3113:6, 3115:20, 3120:12, 3150:19, 3155:8, 3156:14, 3196:14, 3213:20, 3221:1, 3239:13, 3258:11
**type** [21] - 2897:4, 2909:11, 2971:9, 3035:12, 3045:7, 3058:2, 3059:25, 3080:6, 3081:6, 3082:17, 3087:21, 3089:5, 3091:1, 3134:25, 3155:5, 3159:14, 3162:14, 3209:18, 3211:6, 3226:21, 3239:25
**types** [5] - 2901:13, 2908:13, 2994:16, 3082:18, 3239:24
**typical** [1] - 2980:19
**typing** [1] - 3093:4

---

## U

**U.S** [4] - 2888:8, 3002:9, 3155:25, 3156:5
**ultimately** [4] - 2923:10, 2935:2, 3017:11, 3161:12
**umbrella** [1] - 3214:19
**unaided** [1] - 3081:16
**under** [19] - 2912:8, 2921:14, 2989:12, 2992:1, 3002:20, 3020:2, 3065:7, 3077:22, 3105:15, 3105:19, 3106:17, 3110:3, 3150:8, 3214:18, 3217:12, 3226:1, 3238:8, 3245:9, 3250:13
**underlying** [1] - 3062:2
**underneath** [3] - 3170:7, 3245:9, 3245:10

understated [1] - 3062:18
understood [12] - 2904:8, 2908:11, 2913:5, 2923:6, 3036:15, 3102:2, 3111:17, 3192:3, 3197:16, 3223:4, 3223:25, 3257:10
unfortunately [2] - 3217:21, 3255:9
Union [2] - 3240:17, 3240:18
unique [1] - 2927:15
UNITED [3] - 2888:1, 2888:3, 2888:12
United [9] - 2890:2, 2892:14, 2892:16, 2893:8, 2898:5, 2970:16, 3002:13, 3015:11, 3181:13
University [5] - 3042:20, 3043:4, 3206:15, 3206:16, 3211:20
university [1] - 3053:21
university-based [1] - 3053:21
unknown [1] - 2907:11
unlawful [2] - 3061:3, 3061:4
unless [9] - 2919:21, 2951:24, 3056:4, 3077:5, 3126:20, 3167:8, 3189:12, 3197:13
unlike [1] - 3045:25
unnecessary [1] - 2976:23
unplugged [1] - 3044:18
unrealistic [1] - 3077:15
unrelated [2] - 2915:21, 2916:1
unrest [1] - 3002:19
unserved [1] - 3020:8
unsolicited [8] - 2997:5, 2998:19, 2999:3, 3086:8, 3087:17, 3237:9, 3237:19
untangle [1] - 3145:11
unusual [3] - 3129:25, 3170:17, 3172:22
up [83] - 2904:11, 2905:22, 2910:21, 2911:24, 2917:21,

2919:5, 2924:15, 2939:24, 2940:22, 2941:3, 2960:6, 2968:13, 2968:19, 2969:12, 2972:24, 2979:9, 2990:25, 3005:20, 3006:5, 3010:24, 3016:18, 3018:3, 3018:4, 3028:19, 3028:25, 3032:6, 3040:20, 3041:9, 3041:15, 3045:10, 3051:3, 3057:17, 3076:20, 3076:22, 3079:12, 3088:5, 3096:1, 3097:7, 3104:13, 3106:16, 3107:7, 3108:12, 3116:6, 3134:25, 3137:2, 3158:22, 3161:18, 3179:4, 3183:22, 3193:11, 3195:8, 3195:12, 3198:24, 3199:11, 3205:8, 3206:8, 3206:9, 3207:14, 3208:25, 3210:25, 3219:21, 3224:1, 3225:3, 3227:2, 3228:3, 3237:10, 3237:15, 3240:9, 3242:8, 3248:14, 3248:17, 3249:19, 3250:11, 3251:7, 3253:9, 3254:7, 3254:13, 3254:25, 3255:12, 3256:20, 3256:21
update [3] - 2917:19, 3173:2, 3250:13
updates [1] - 3252:17
upper [1] - 3260:16
ups [4] - 2960:14, 2960:18, 3224:1, 3226:25
upsetting [1] - 3224:17
uptake [3] - 3003:19, 3004:9, 3005:9
users [8] - 2936:17, 2936:19, 2936:21, 2939:1, 2961:12, 2961:21, 3028:8, 3096:9
uses [6] - 2987:21, 2987:22, 2992:24, 2998:11, 3029:2, 3069:3
utilization [1] - 2936:22

utilizing [1] - 2996:21

## V

validated [1] - 3004:4
validity [1] - 2894:25
value [20] - 2929:16, 2974:5, 2975:16, 2977:1, 2977:11, 2977:14, 2978:25, 2979:2, 2979:5, 2979:12, 2979:20, 2979:21, 2979:24, 2980:10, 2980:16, 3007:15, 3075:15, 3075:17, 3181:4
valve [1] - 3063:7
Van [15] - 3139:6, 3139:10, 3139:23, 3140:6, 3140:13, 3140:21, 3152:22, 3153:1, 3153:10, 3153:22, 3154:4, 3155:12, 3156:20, 3158:1, 3187:8
varied [1] - 3072:4
vehicle [4] - 3066:22, 3068:12, 3069:2, 3087:20
vendors [4] - 3081:1, 3081:8, 3085:5, 3089:13
venture [1] - 2980:22
ventures [2] - 2931:14, 2931:18
verbally [1] - 2897:23
verdict [1] - 2902:21
version [4] - 2990:8, 2995:3, 2995:6, 3032:20
versus [6] - 2906:13, 3052:3, 3053:9, 3083:13, 3084:19, 3096:24
viability [1] - 3058:19
vials [1] - 3008:12
vice [1] - 2937:7
video [14] - 3125:14, 3141:11, 3143:18, 3143:22, 3144:7, 3144:12, 3144:17, 3144:18, 3147:4, 3147:17, 3149:22, 3151:12, 3154:2, 3154:22
videos [5] - 3141:4, 3150:19, 3154:13, 3186:13, 3187:7
view [9] - 3008:16, 3080:10, 3080:19,

3094:1, 3125:22, 3127:10, 3132:4, 3138:6, 3163:14
views [4] - 3126:14, 3127:6, 3155:2, 3169:10
Vincent's [2] - 3222:17, 3257:4
violating [1] - 3022:18
violation [3] - 2929:15, 2930:10, 3057:25
violations [2] - 2927:23, 2934:8
Viracept [1] - 3221:4
Virginia [1] - 3202:7
virologic [1] - 3059:21
virtue [1] - 3065:25
virulent [1] - 3008:10
virus [1] - 3003:25
visit [5] - 3062:22, 3121:3, 3121:8, 3121:19, 3122:13
visits [2] - 3056:8, 3060:11
visual [1] - 2996:21
vocal [1] - 3008:7
voice [1] - 2924:24
volume [9] - 2971:24, 2998:5, 2998:22, 2999:10, 3067:8, 3072:9, 3237:15, 3247:3
VOLUME [1] - 2888:5
volunteering [1] - 3211:3
volunteers [3] - 3231:5, 3232:14, 3233:2

## W

Wade [1] - 3200:6
wait [3] - 2914:16, 3005:19, 3151:17
waiting [2] - 3064:1, 3207:8
Waldron [3] - 3212:19, 3225:16, 3244:13
walk [2] - 3046:19
walked [2] - 3120:14, 3213:14
walking [1] - 3213:14
walks [1] - 2903:4
wall [4] - 3087:25, 3088:4, 3088:6
wants [4] - 2982:5, 2988:12, 3149:6, 3195:10
Washington [2] -

3146:13, 3149:4
waste [2] - 2898:19, 2914:12
wasting [1] - 3149:8
watch [4] - 3050:7, 3112:13, 3113:2, 3116:14
watched [1] - 3104:8
watching [5] - 3052:8, 3113:24, 3121:20, 3123:13, 3247:3
Water [4] - 3240:7, 3240:8, 3240:15, 3241:8
ways [6] - 2917:9, 2917:12, 3069:8, 3080:25, 3137:19, 3138:15
Weber [5] - 3212:19, 3225:15, 3244:13, 3258:7, 3260:11
wedding [4] - 3116:19, 3196:5, 3196:8, 3230:11
week [8] - 2914:21, 3112:16, 3113:2, 3113:6, 3239:12, 3239:13, 3247:11, 3261:20
weekly [3] - 2959:3, 2959:13, 3256:19
weeks [11] - 3104:4, 3105:13, 3107:21, 3112:21, 3113:23, 3115:21, 3120:13, 3206:4, 3212:22, 3213:23, 3254:6
weighing [1] - 3120:7
weighted [1] - 3076:10
welcome [1] - 2921:5
well-controlled [1] - 3051:4
Wendel [1] - 2890:11
WENDEL [2] - 2888:16, 2890:11
west [3] - 3222:16, 3257:6, 3257:7
West [2] - 3042:9, 3042:12
wheelhouse [1] - 3159:1
whichever [1] - 3024:15
whiffed [1] - 3078:6
whiffing [1] - 3191:9
whistleblower [3] - 2930:16, 2931:22, 3215:5
whistleblowers [4] -

2901:8, 2901:24, 2902:7, 2930:23
**Whitney** [1] - 2890:11
**WHITNEY** [1] - 2888:16
**whole** [7] - 2892:20, 2909:12, 3011:23, 3105:25, 3144:18, 3258:14, 3258:15
**wholeheartedly** [1] - 3006:5
**widely** [4] - 3087:12, 3108:7, 3110:7
**wider** [1] - 3071:25
**Wilhelm** [10] - 2982:24, 3049:6, 3117:3, 3117:12, 3117:19, 3195:20, 3200:14, 3246:9, 3250:16, 3250:22
**Wilkes** [2] - 3042:15, 3042:16
**willing** [3] - 3207:25, 3258:2, 3260:10
**Wilmington** [1] - 2888:22
**Wilson** [1] - 3200:6
**window** [1] - 3046:18
**wine** [1] - 3259:17
**Wirmani** [1] - 2890:13
**WIRMANI** [3] - 2888:15, 2890:13, 2908:11
**wise** [1] - 3117:13
**wish** [1] - 3023:15
**withhold** [1] - 3006:1
**WITNESS** [18] - 2921:15, 2925:1, 2935:12, 2935:14, 2952:25, 2984:12, 2984:15, 3011:11, 3013:12, 3018:7, 3018:9, 3039:10, 3039:25, 3040:3, 3065:8, 3144:3, 3205:3, 3205:17
**witness** [61] - 2897:14, 2900:4, 2901:12, 2906:6, 2906:8, 2906:19, 2906:21, 2906:23, 2907:12, 2910:22, 2911:4, 2911:7, 2911:13, 2911:23, 2911:25, 2912:3, 2912:7, 2913:19, 2914:4, 2916:15, 2916:16, 2916:23, 2916:25, 2917:4, 2917:7, 2917:11,

2920:11, 2921:6, 2925:3, 2925:6, 2932:1, 2932:9, 2952:23, 2960:7, 2996:4, 3011:1, 3011:10, 3018:4, 3018:5, 3039:7, 3039:12, 3048:1, 3048:20, 3101:2, 3103:21, 3135:18, 3143:19, 3145:8, 3148:4, 3149:2, 3153:7, 3158:16, 3191:19, 3191:20, 3205:6, 3218:6, 3220:5, 3242:8, 3243:15, 3251:7
**witness's** [3] - 2901:15, 2907:13, 2913:21
**witnesses** [26] - 2911:22, 3048:9, 3048:13, 3048:21, 3048:24, 3065:21, 3066:14, 3068:20, 3071:20, 3078:3, 3090:13, 3120:15, 3185:4, 3189:19, 3190:9, 3190:12, 3190:13, 3190:19, 3191:8, 3191:13, 3199:13, 3200:13, 3200:22, 3201:2
**witnesses'** [1] - 3066:1
**witnessing** [1] - 3160:4
**woman** [2] - 3191:24, 3213:24
**wonderful** [2] - 3213:13, 3216:8
**wondering** [3] - 3040:25, 3188:9, 3201:18
**word** [10] - 2938:5, 2938:10, 2939:22, 2942:17, 2958:3, 3006:11, 3016:14, 3026:25, 3234:15, 3250:9
**words** [6] - 2895:7, 2900:17, 2990:2, 3003:16, 3026:4, 3050:4
**workers** [2] - 3245:22, 3248:6
**works** [8] - 3053:18, 3054:14, 3054:15, 3055:2, 3083:18, 3090:10, 3091:2,

3168:9
**World** [2] - 3155:25, 3156:5
**world** [3] - 2982:17, 2983:25, 3002:18
**worried** [1] - 2926:3
**worry** [2] - 2919:23, 3093:21
**worse** [2] - 2986:13, 2986:14
**worst** [1] - 3062:16
**worst-case** [1] - 3062:16
**worth** [4] - 3031:4, 3075:24, 3178:5, 3190:8
**would-you-get-the-job** [1] - 3159:14
**wrap** [1] - 2972:23
**writes** [2] - 2943:16, 3141:2
**Writing** [1] - 3136:1
**writing** [16] - 2897:23, 2916:9, 3030:15, 3033:10, 3033:15, 3069:2, 3088:17, 3088:18, 3171:23, 3199:24, 3201:5, 3221:14, 3248:24, 3250:7, 3261:4, 3261:5
**written** [14] - 2962:14, 2962:18, 2983:21, 2984:3, 3025:25, 3030:3, 3030:7, 3088:21, 3145:3, 3152:21, 3156:1, 3156:6, 3173:19, 3247:12
**wrote** [11] - 3108:18, 3139:24, 3140:6, 3145:9, 3146:8, 3149:3, 3153:10, 3155:12, 3186:22, 3200:16, 3221:12
**Wyatt** [6] - 2890:19, 2894:8, 2898:19, 2901:1, 2903:11, 2905:6
**WYATT** [21] - 2888:20, 2890:19, 2894:9, 2894:11, 2894:22, 2895:9, 2895:11, 2895:21, 2896:22, 2898:23, 2899:5, 2901:3, 2903:24, 2904:8, 2904:14, 2904:21, 2905:8, 2908:4, 2908:20, 2909:2, 2909:21

**Wyeth** [1] - 3044:19

**Y**

**year** [28] - 2937:23, 2940:3, 2946:4, 2946:20, 2946:21, 2947:15, 2951:1, 2955:14, 2955:22, 2964:4, 2967:18, 2968:1, 2969:19, 2970:25, 2971:19, 2971:23, 2972:8, 2979:20, 3004:25, 3026:13, 3042:13, 3072:9, 3140:7, 3145:17, 3166:25, 3167:5
**year's** [1] - 2938:19
**year-over-year** [1] - 2971:23
**years** [30] - 2922:2, 2931:7, 2931:8, 2945:7, 2948:23, 2955:16, 2984:22, 2991:15, 3002:14, 3040:11, 3042:21, 3043:13, 3043:23, 3044:9, 3044:18, 3044:20, 3046:10, 3050:14, 3067:3, 3070:8, 3097:19, 3155:8, 3215:20, 3215:24, 3221:6, 3221:7, 3230:10, 3257:2, 3260:5
**yelled** [1] - 3227:1
**yesterday** [27] - 2897:4, 2901:6, 2905:16, 2919:2, 2919:6, 2919:11, 2919:23, 2919:25, 2921:14, 2921:21, 2941:4, 2941:13, 2972:23, 2972:25, 2988:16, 2988:18, 2992:8, 2992:11, 2993:5, 2993:8, 2993:15, 2993:18, 2994:10, 2994:18, 2997:17, 2997:23, 2998:16
**York** [19] - 2998:6, 2998:22, 3070:1, 3076:4, 3087:9, 3206:9, 3211:17, 3212:16, 3224:5, 3228:20, 3237:3, 3238:24, 3240:7, 3240:17, 3241:9, 3243:19, 3247:7,

3261:14, 3261:15
**yourself** [12] - 2922:5, 3040:8, 3043:24, 3044:21, 3044:24, 3072:13, 3078:10, 3176:12, 3206:1, 3206:7, 3211:23
**yourselves** [1] - 2920:19

**Z**

**Zagat's** [1] - 3241:18
**ZAHID** [2] - 2888:11, 2890:2
**zoom** [4] - 2989:5, 3001:9, 3232:7, 3250:12