1              UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF NEW JERSEY
2

3    ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄

     UNITED STATES OF AMERICA, et    CIVIL ACTION NUMBER:
4    al,
          Plaintiffs,                3:12-cv-07758-ZNQ-JBD
5
          v.                         JURY TRIAL - VOLUME 14
6
     JOHNSON & JOHNSON, JANSSEN
7    PRODUCTS, L.P.
          Defendants.
8    ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄
          Clarkson S. Fisher Building & U.S. Courthouse
9         402 East State Street
          Trenton, New Jersey  08608
10        May 31, 2024
          Commencing at 11:30  a.m.
11
     B E F O R E:           THE HONORABLE ZAHID N. QURAISHI,
12                          UNITED STATES DISTRICT JUDGE

13   A P P E A R A N C E S:

14        REESE MARKETOS
          BY:  PETE MARKETOS, ESQUIRE
15             JOSH RUSS, ESQUIRE
               ADAM SANDERSON, ESQUIRE
16             WHITNEY WENDEL, ESQUIRE
          750 N. Saint Paul Street, Suite 600
17        Dallas, Texas 75201
          For the Relators
18
          SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
19        BY:  ALLISON M. BROWN, ESQUIRE
               GEOFFREY M. WYATT, ESQUIRE
20             BRADLEY A. KLEIN, ESQUIRE
          One Rodney Square
21        920 King Street
          Wilmington, Delaware
22        For the Defendants

23        Megan McKay-Soule, Official Court Reporter
               Megan_McKay-Soule@njd.uscourts.gov
24                    (609) 815-2319
     Proceedings recorded by mechanical stenography; transcript
25        produced by computer-aided transcription.

1                        I N D E X

2

3   **EXAMINATIONS**                                    **PAGE**

4              **RICKY HSU**
    CROSS-EXAMINATION BY MR. MARKETOS              5162
5   REDIRECT EXAMINATION BY MS. BROWN              5208
              **IAN DEW**
6   DIRECT EXAMINATION BY MR. MARKETOS            5212
    CROSS EXAMINATION BY MS. BROWN                5256
7   REDIRECT EXAMINATION BY MR. MARKETOS          5306

8                      E X H I B I T S

9   **Exhibit No.**          **Description**              **Page**
        Relators' Exhibit RX-91 in               5165
10       evidence.
        Relators' Exhibit RX-1737 in             5173
11       evidence.
        Defendants' Exhibit 5005 in              5224
12       evidence.
        Relators' Exhibit 0487 in                5224
13       evidence.
        Defendants' Exhibit 5009 in              5224
14       evidence.
        Relators' Exhibit 1003 in                5224
15       evidence.
        Relators' Exhibit 376 in evidence.       5225
16       relators' Exhibit 0378 in                5225
        evidence.
17       Defendants' Exhibit 4533 in              5225
        evidence.
18       Defendants' Exhibit 5007 in              5225
        evidence.
19       Defendant's Exhibit D-9185 in            5281
        evidence.

20   K

21

22

23

24

25

*United States District Court*
*District of New Jersey*

```
 1          (PROCEEDINGS held in open court before The Honorable

 2   ZAHID N. QURAISHI, United States District Judge, on May 31,

 3   2024, at 11:30 a.m.)

 4              THE DEPUTY COURT CLERK:  All rise.

 5              THE COURT:  All right, folks.  You may be seated.

 6          Let me just get appearances from counsel, then we'll

 7   chat a little bit.

 8          But let me hear from Relators' counsel first.

 9              MR. MARKETOS:  Good morning, Your Honor.

10   Pete Marketos for the Relators.

11              MS. WENDEL:  Good morning.  Whitney Wendel for

12   Relators.

13              MR. RUSS:  Good morning.  Josh Russ for Relators.

14              THE COURT:  Oh, there's three.  I'm thinking there's

15   going to be a fourth.  Okay.  That's right.  Mr. Wirmani isn't

16   here today.

17              MR. MARKETOS:  Yes, Your Honor.

18              THE COURT:  That's okay.

19          And let me hear from Janssen.

20              MS. BROWN:  Good morning, Your Honor.  Alli Brown for

21   Janssen.

22              MR. WYATT:  Good morning, Your Honor.  Geoff Wyatt

23   for Janssen.

24              MR. KLEIN:  Good morning, Your Honor.  Brad Klein for

25   Janssen.
```

1          THE COURT:  All right.  Good morning, folks.

2          I wanted you all to come a little early because an

3    issue came up with Juror Number 5.  So Juror Number 5 sits

4    first seat, back row, closest to Relators' counsel's table.

5          My understanding is that his mother was called in for

6    organ transplant surgery this morning at NYU.  He's there now,

7    calling the Court to figure out what he's supposed to do

8    because -- and I don't know much about transplant surgery.  I

9    do know that these are not always anticipated, that you may be

10   on a list, but you don't know when your surgery is going to

11   come up, and when it does, it does.

12         My understanding is he's there with her.  He asked if

13   we could delay the trial today, which I don't think is

14   feasible based on the time schedule that we have.  We have

15   additional jurors, if Juror Number 5 is excused, which would

16   leave us with eight jurors, which is two more than is required

17   to deliberate, and we only have about, I would say, a week and

18   a half or so left before the jury gets the case.

19         So I wanted to hear from you all.  But I was going to

20   have him available by -- telephonically this morning on the

21   record to speak with him briefly, but my inclination is to

22   excuse him similar to what we did with the prior juror who

23   didn't even face -- the issue wasn't even as severe.

24         But, Mr. Marketos, what are your thoughts on what we do

25   with Juror Number 5?  He's not here now, and he probably won't

 1   be here at the time we would need to start.

 2        But I think that's a pretty exceptional circumstance,

 3   but let me hear from you.

 4        MR. MARKETOS:  Sorry.  Your Honor, he asked if we

 5   could delay the trial -- delay it until Monday?

 6        THE COURT:  He asked if we could delay the trial at

 7   least until Monday, which I'm not inclined to do.  I also

 8   don't know whether that would be sufficient for his purposes.

 9   Right?  His mother, I don't know if she's completed the

10   surgery; I don't know if she's in recovery.  He's there now.

11        But that's all the information I know.  I can get more

12   information from Mr. Fricke when we have him telephonically.

13   I'm just telling you briefly what was relayed to us.

14        But what are your thoughts?

15        MR. MARKETOS:  My preference would be to accommodate

16   the delay.  And I know it's going to set us back half a day,

17   but we built that into the trial schedule, Your Honor.  We're

18   half a day ahead.  I don't want a juror who has been here for

19   five weeks to be excused.

20        THE COURT:  Well, Mr. Marketos, I'm a little bit

21   surprised by your position, and here is why.  At the outset of

22   the trial, you didn't even want as many jurors as I placed on

23   the jury.

24        MR. MARKETOS:  No, I understand, Your Honor.  But we

25   placed them, and I'm not -- you asked me.  And so I'm just

1    saying they've been very attentive, and they've been here for

2    five weeks now.  And I understand if it were a significant

3    delay, Your Honor, but I'm just saying somebody who has been

4    here for five weeks, I -- if all we are a talking about is --

5            THE COURT:  Well, they've all been here for five

6    weeks, not just Juror Number 5.  So I guess what I'm trying to

7    understand is, what is the concern for Relators if Juror 5 is

8    dismissed?

9            MR. MARKETOS:  Well, that we're wasting five weeks of

10   a juror's time who's listened to all the evidence.

11           THE COURT:  Oh, you mean his time.  We're worried

12   about Juror Number 5?

13           MR. MARKETOS:  I'm worried about a juror who has been

14   listening to our case for five weeks, and he asked if the

15   trial could be delayed, right?  Not if he could be excused?

16           THE COURT:  That's my initial understanding.  I don't

17   know what he's going to say when we get him on the phone.  But

18   that was the initial understanding; that he asked whether we

19   could postpone today's court day.

20           MR. MARKETOS:  And, Your Honor, that would be my

21   preference.  It's half the day, which -- we've already gained

22   half a day in terms of our schedule, and that would be my

23   preference.  You don't want to excuse a juror for cause for a

24   half a day.

25           THE COURT:  What's the prejudice to Relators if Juror

 1   Number 5 is excused?  I'm trying to understand that part,

 2   though.

 3          MR. MARKETOS:  The prejudice to us is that we have a

 4   juror who has been sitting listening to the evidence for

 5   five --

 6          THE COURT:  So you're saying that you're prejudiced

 7   by having less jurors deliberate in the trial than more, even

 8   though at the outset you wanted less jurors to deliberate in

 9   this trial from the very beginning?

10          MR. MARKETOS:  What if one other one drops off

11   between now and the end?

12          THE COURT:  Well, it would have to be two more, and

13   you would still be okay.  You'd still have a quorum.  In fact,

14   if two more drop off, then you get the amount of jurors that

15   you wanted in the first place.

16          MR. MARKETOS:  Right.  Your Honor, I didn't -- we

17   wanted eight, right?

18          THE COURT:  You wanted eight.

19          MR. MARKETOS:  Right.

20          THE COURT:  Okay.  You wanted eight because you were

21   building in the possibility that we could lose a juror or two

22   and to avoid a mistrial --

23          MR. MARKETOS:  Sure.

24          THE COURT:  -- you thought eight was sufficient.

25          MR. MARKETOS:  Right.  And that's fine, Your Honor.

 1          Listen, at the end of the day, it's one thing to lose a

 2   juror because they have cause like Ms. -- Juror Number 2

 3   originally.

 4          THE COURT:  No, but that issue is actually, I

 5   thought, less severe.  That issue was she was in a car

 6   accident, was not injured in any sort of way, but it would

 7   have delayed the entire trial date because she had no ability

 8   to come to the court.

 9          MR. MARKETOS:  I thought her brother died, Your

10   Honor.

11          THE COURT:  Oh, no, that's not --

12          THE DEPUTY COURT CLERK:  That was her.

13          THE COURT:  Sorry.  A completely different trial?

14          THE DEPUTY COURT CLERK:  Yes.

15          THE COURT:  Never mind.  The issue is her brother

16   passed away.

17          MR. MARKETOS:  Her brother passed away.

18          As I understand this -- right now we've put on evidence

19   for weeks in front of this box, and I'd like -- if we're

20   talking about a half day, you know, it would be my preference

21   to --

22          THE COURT:  I mean, it's a 12:30-to-5 day, which --

23   you have three witnesses, right?  You have Dr. Hsu and your

24   final two witness, which are -- are they both experts?

25          MR. MARKETOS:  Yes, Your Honor.

1          THE COURT:  And then that pushes us into next week.

2          MR. MARKETOS:  Yeah.  It would basically -- we would

3     be going up until the end of the 3rd anyway.  So that's

4     definitely our preference.

5          THE COURT:  I thought you were done by the morning of

6     the 3rd, by lunchtime.

7          MR. MARKETOS:  Right.  But if we take this half day,

8     which is 12:30 to 5, it's going to push it to the end of

9     Monday, maybe the beginning of Tuesday.  So you're talking

10    about just moving it -- that would be early because you had

11    given us until, you know, the end of the day on Monday for our

12    case.  And so we were going to be finished early.

13         THE COURT:  Let me hear from Ms. Brown.

14         MS. BROWN:  Your Honor, I think we need to treat this

15    situation the same way we treated Juror Number 2.  I think we

16    need to excuse the juror.  I do not believe we can risk

17    pausing the trial for a day, because we may get to Monday and

18    find out that that doesn't solve the circumstance.

19         I think we had a similar serious personal situation

20    with Juror Number 2 and we excused her.  I think we need to do

21    the same here with Juror Number 5.

22         I will say, from our point of view, I think we may be

23    particularly prejudiced because my understanding is Dr. Hsu,

24    who is hopefully nearing the very end of his examination, I'm

25    not sure is available next week at all.  In fact, I know he is

1    not.  So we would then need to try and get him back in the

2    very last week of the trial, which does create a huge

3    disruption and prejudice.

4         So I think the reason we asked for more jurors is

5    exactly this reason.  We should treat this juror the same way

6    we treated Number 2, and, unfortunately, we have to excuse him

7    and go forward in an hour.

8         THE COURT:  All right.  And I do appreciate you're

9    right.  Juror Number 2 -- and I apologize.  I confused my

10   trial before this trial.  There was a completely different

11   dismissal issue with a juror that had a car accident.  That's

12   not this one.  You're absolutely right.  Juror 2 had a very

13   serious issue with a sibling who had passed away.

14        Mr. Marketos, what about Dr. Hsu?  I mean --

15        MR. MARKETOS:  Dr. Hsu was being called out of order

16   to accommodate a nonparty witness who they have called who is

17   being accommodated by video in our case.  And we're trying

18   to -- they're saying, We're prejudiced because his schedule

19   would require him to be called in their case versus

20   accommodating a juror who has been sitting adjudicating the

21   case for five weeks.  That doesn't work for us.  I'm sorry,

22   Your Honor.

23        At the end of the day, this is accomodation for

24   Dr. Hsu.  And they've called him in our case.  And if he has

25   to be called, you know, for the second time back in their

```
 1   case, that's not --

 2          THE COURT:  No, but the second time is a little bit

 3   of a concern because Dr. Hsu is dealing with a medical issue

 4   as well.  He has, I think, an in-law who's in hospice care

 5   that we don't even know what will happen in the next week.  We

 6   don't even know what will happen today, which is -- it's

 7   always concerning when somebody's in that type of end-stage

 8   care, right?

 9          So there's a possibility that we've changed the

10   schedule for Dr. Hsu where he's not even available to complete

11   his testimony if we postpone today, which is very different

12   than a jury being able to deliberate whether we have Juror

13   Number 5 or not.

14          MR. MARKETOS:  You know, Your Honor, I understand.

15   But I'm sorry.  This is, you know, a witness that they chose

16   to call out of 300-some doctors -- okay? -- that are on their

17   list.  They chose Dr. Hsu.  And this has been extraordinary

18   accommodation in a federal trial to a witness for a family

19   member.  And now we've got a juror who's asking just for a

20   postponement.

21          My suggestion would be can we call the gentleman and

22   see if he's just talking about today until Monday?  And if

23   that's -- if that's the accommodation that he's asking for,

24   Your Honor, I believe we owe it to him and we owe it to the

25   system of justice to allow the jurors a short accommodation.
```

 1  That happens often without just dismissing somebody for cause
 2  if it's a temporary --
 3       THE COURT:  Okay.  Then what will the schedule be for
 4  next week?
 5       I mean, we'll get him on the phone because, I'll be
 6  candid with you all, the information I relayed to you is all I
 7  have, to be honest.  I wasn't going to -- in fact, I never
 8  spoke to this juror.  The juror's communicating with my
 9  chambers, my staff, the courtroom deputy.  So once I get that
10  preliminary information, that's all I have.  The rest I'll do
11  on the record with you all.
12       All right.  Well, we can get him on the phone.  But
13  what's the schedule going to look like?  And I want to make
14  sure because I don't know what he'll say about whether he only
15  needs until Monday or it's a possibility that there's
16  something more involved here.
17       So say he's able to sit Monday.  We would only have to
18  postpone today's trial day.  You're going to complete the
19  Relators' case by when?
20       MR. MARKETOS:  Well, that would be Mr. Dew and then
21  Dr. -- Professor Shaked, who's the damages expert.  And so my
22  expectation would be Monday or Tuesday morning, depending on
23  how long the cross is, but essentially just moving it back a
24  half to three-quarters of the day.  That's it.
25       And, Your Honor, I think just to remind the Court, like

1  five and a half weeks that they were told is June 12th, so --

2          THE COURT:  Well, I'm not as concerned.  I'm just

3  asking about the schedule.  My greater concern is Dr. Hsu

4  because the Relators, you all agreed to allow that

5  accomodation.  You act like the Court gave some extraordinary

6  accommodation when I thought there was some consensus among

7  the parties that he would be able to testify out of order.  In

8  fact, that's how it was proposed to me, Mr. Marketos.

9      Are you saying that's not accurate?

10         MR. MARKETOS:  Your Honor, they asked us for an

11 accommodation.

12         THE COURT:  And you agreed.

13         MS. BROWN:  Yes.

14         MR. MARKETOS:  I did agree.  I agreed that we would

15 accommodate him.  That's my point, is that that is an

16 accommodation to a witness, which is an extraordinary thing --

17         THE COURT:  And what if he's not available next week?

18 What if something happens with his in-law and he can't

19 testify?  We have a partial testimony of Dr. Hsu, then what?

20 What do I do with Dr. Hsu's partial testimony before a jury

21 that is incomplete with no completed cross-examination and no

22 redirect?

23         MR. MARKETOS:  Your Honor, my response to that would

24 be what if he weren't available today?  I mean, at the end of

25 the day, they said he was available from 2:00 to 5:00 because

     1    of his schedule, but, you know, this witness -- we're

     2    speculating as to Dr. Hsu's availability to testify over --

     3    any time over the next two weeks.

     4         THE COURT:  I'm not speculating.  I'm asking you

     5    before I get back to Janssen's counsel to find out about

     6    Dr. Hsu's schedule.

     7         MR. MARKETOS:  No doubt the response is going to be

     8    he can't make it.  He was only available during this narrow --

     9         THE COURT:  I don't know if that's the response.  I'm

    10    not going to presume what the response is going to be.

    11         Ms. Brown, have you talked to Dr. Hsu about his

    12    availability for next week yet?

    13         MS. BROWN:  No, Your Honor, not while he's been on

    14    the stand, but we knew in advance he is not available next

    15    week.

    16         THE COURT:  Because of what?

    17         MS. BROWN:  We understand it to be travel related to

    18    the mother-in-law, but I don't have the latest and the

    19    greatest on that, Your Honor.  I don't want to misrepresent

    20    it.  If the Court is inclined not to treat Juror Number 5 the

    21    way we treated Juror Number 2, we would request that Dr. Hsu's

    22    testimony be deemed complete.  We would forgo our redirect.

    23         THE COURT:  I'm going to do that.  Let me tell you

    24    this with Dr. Hsu.  First of all, you're going to have to

    25    communicate with Dr. Hsu in a few minutes, and you're going to

1  have to find out if he's available Monday or not.  I'm going

2  to need that information before I talk to Juror Number 5.  I

3  also want to be clear:  Now that I've have reminded of the

4  issue with Juror Number 2, these issues are not analogous.

5  Juror Number 2's sibling passed away.  The juror indicated

6  very clearly that she was not in a position to even

7  concentrate on the trial, that there were going to be services

8  and other things that were going to delay her more than a day.

9  All I know right now from Juror Number 5 is that he is

10  unavailable today.  We may learn more, that there is something

11  more to that narrative, and we can get him on the phone and

12  put him on the record to ask him those questions.  I'm happy

13  to do that.  But before, I think, we get Juror Number 5 on,

14  I'd like to know about Dr. Hsu's availability for Monday.

15          And if he's traveling, then I'm going to want to know

16  what date is he traveling -- is this to Alabama?

17              MS. BROWN:  I believe so, Your Honor.

18              THE COURT:  Yeah, I'm going to want to know.  Does he

19  have an itinerary?  Did he already book the flight?  And I'm

20  going to want to see some of that.  So I'm going to want to

21  know whether he's traveling next week or he's actually

22  traveling Monday or this weekend.

23          Why don't we do this.  I understand the positions of

24  both parties.  But before I get Juror Number 5 on the phone, I

25  would like to at least know the availability of Dr. Hsu since

     1    we told him he would be testifying this week.

     2         In light of this emergency, Relators' counsel was

     3    agreeing to that accommodation.  I don't necessarily see

     4    where, you know, we're trading a witness's issue for a juror's

     5    issue.  I don't see it that way either, Mr. Marketos.  That

     6    being said, I don't know what Juror Five is going to tell us

     7    when we put him on the call.  He may say, I know I asked about

     8    whether we can postpone one day, but there are other things

     9    that are in place right now that he needs to be available for.

    10    So we can -- let's table that call, but can you speak to

    11    Dr. Hsu now since -- I presume he's going to be making himself

    12    available in less than an hour anyway.  You should have some

    13    means to communicate with him.

    14         MS. BROWN:  I will try right now, Your Honor.

    15         THE COURT:  Mr. Marketos.

    16         MR. MARKETOS:  Your Honor, could we call --

    17    Your Honor call Dr. Hsu?  He hasn't returned my calls, and so

    18    -- and I know he is a nonparty witness, but where is Dr. Hsu

    19    now?

    20         MS. BROWN:  I don't know.

    21         MR. MARKETOS:  I thought he was in Alabama now.

    22         MS. BROWN:  I don't know the answer to that.

    23         MR. MARKETOS:  They have to know because they set up

    24    the tech.

    25         THE COURT:  No.  I believe he is in Alabama.  I

1    thought he was doing the tech from out of state in New York.

2         MS. BROWN:  I believe so.

3         THE COURT:  That's what was said the week we

4    discussed this issue.

5         MR. MARKETOS:  Yes.  I don't know the answer.  But it

6    seems like we could call Dr. Hsu the same way we could call

7    the juror.

8         MS. BROWN:  I will truthfully represent to the Court

9    what we learned, which we'll try to do right now.

10        THE COURT:  Yeah --

11        MR. MARKETOS:  That's fine.  That's fine.  You know,

12   I'd like to find out if he has convenience issues or if he has

13   "can't do it" issues.

14        THE COURT:  All right.  I don't have any objection to

15   calling Dr. Hsu and just asking him.  He's expected to be

16   testifying in less than an hour, no?

17        MS. BROWN:  Correct, Your Honor.

18        THE COURT:  Do we have his contact info?

19        MS. BROWN:  I will find out, Your Honor.

20        THE COURT:  All right.  Well, then, maybe I'll call

21   him, and we'll find out right now what his status is before we

22   call Juror Number 5.  But I'd like to do this now.  So can you

23   get that information?

24        MS. BROWN:  Yes.  Can I have a moment?

25        (Brief pause.)

1        MR. RUSS:  Your Honor, may we be seated?

2        THE COURT:  Yes.  Unless you guys are speaking, you

3   don't have to stand.  You all can be seated.

4        MR. RUSS:  Thank you, Your Honor.

5        (Brief pause.)

6        THE COURT:  Did I forget to say please be seated?  I

7   might have forgotten.

8     So if that's the case, Mr. Russ, then that's on me.  I

9   thought you were all standing because you were eager to speak

10  on the issue or something.

11       MR. WYATT:  We were captivated by the news,

12  Your Honor.  We forgot to sit down.

13       THE COURT:  Okay.  The gallery, they are very

14  comfortably seated.  I can see them.  They're not standing,

15  so.

16    Ms. Brown, you have that --

17       MS. BROWN:  I understand, for purposes of the Zoom,

18  if there was an issue, this is where we are supposed to reach

19  them.  So should I hand it up?

20       THE COURT:  Why don't we do this:  Why don't you

21  contact Dr. Hsu and say, Hey, the judge needs to speak with

22  you briefly this morning before your testimony, and then I'll

23  do it.  Why don't you give him a heads-up so I'm -- Juror

24  Number 5 is anticipating my call.  I don't see any reason not

25  to give Dr. Hsu a heads-up.  The judge needs to speak to him

 1  on the record briefly regarding an issue.  Can you just reach

 2  out to him.  If you want to step outside the courtroom, that's

 3  fine.

 4         MS. BROWN:  Thank you.  Do you want my phone, Judge,

 5  or do you want to call him separately?

 6         THE COURT:  We'll call him separately.  But just let

 7  him know we will be calling momentarily after you get off.

 8         (Brief pause.)

 9         MS. BROWN:  He didn't answer, Your Honor.  We left a

10  message, and Mr. Caruso is sending an email.

11         THE COURT:  Why don't we do this:  We'll do it in

12  reverse order.  I'm going to speak with Juror Number 5, and

13  then we'll find out about Dr. Hsu after the fact.

14     Kim, can we get --

15         THE DEPUTY COURT CLERK:  Sure.

16         THE COURT:  -- Juror Number 5 on the phone.

17         Mr. Fricke, can you hear me?  It's Judge Quraishi

18  from the trial.

19         JUROR NO. 5:  Hi, yeah, I can hear you, Judge.

20         THE COURT:  I'm sorry to bother you.  I just wanted

21  to speak with you briefly.  You're on the record in the

22  courtroom with counsel, but it's my understanding that when

23  you contacted chambers this morning, that your mother, she had

24  her surgery scheduled today with NYU; is that right?

25         JUROR NO. 5:  She had it scheduled at 1:00, yeah, so

1    1:00 a.m.

2         THE COURT:  And is the surgery completed, or are you

3    still there awaiting her to come out of the surgery?

4         JUROR NO. 5:  It's completed.  I'm going to see her

5    right now.

6         THE COURT:  Okay.  I wanted to get a sense of what's

7    going on on your end.  Are you asking just to be excused from

8    court today, meaning to adjourn the trial day so that you can

9    join your fellow jurors on Monday to complete your service, or

10   is there something else going on on your end that you would

11   not be able to complete your service as a juror?

12        JUROR NO. 5:  That's what I was looking for

13   originally, but I already let my human resources know -- it

14   was my understanding that I couldn't, like -- I guess once I

15   was out, I was out.  That's what I thought.  That's what Kim

16   -- I thought Kim said that.  I don't know if that makes sense.

17        THE COURT:  I understand.  I'm not talking about

18   human resources.  What about with your mother?  Are you -- is

19   there something that requires you to be with her -- to

20   complete -- to be with her on Monday where you wouldn't be

21   able to complete service, or is this a second issue, which is

22   you alerted your work that you may be coming back Monday?

23        JUROR NO. 5:  Kind of the second issue.  I alerted

24   work I might be coming back.  My mom is still going to be in

25   the hospital for a week.  She's in the ICU right now.  I

1    really just -- I hate to say it, but I have to be there for

2    her right now.  I lost my father in 2018, so I don't want to

3    go down the same path where God forbid something happens.

4          THE COURT:  All right.  So you intend to be at the

5    hospital next week, I guess, to visit with your mother while

6    she's still in intensive care?

7          JUROR NO. 5:  Not particularly, no.  I think she's

8    going to be leaving intensive care over the weekend, but it's

9    really just today.  I mean, next week I wasn't planning on

10   being there during the work hours.

11         THE COURT:  Okay.  So, then, I guess what I'm trying

12   to go back to, then, is if we were going to delay today's

13   trial a day and postpone today and reboot on Monday, would you

14   be able to serve as a juror?

15         JUROR NO. 5:  See, I want to say yes, but that goes

16   back to I just let work know --

17         THE COURT:  Let me ask you this, Mr. Fricke:  You can

18   always let work know, Hey, there was a mistake here.  You're

19   still required to complete your jury service.  You're not

20   excused, right?

21         JUROR NO. 5:  Right.

22         THE COURT:  My concern more is not with respect to

23   the employment.  It's more with respect to your mother's

24   surgery.  Does serving on the jury in any way for next week

25   and the following week impair your ability to focus on the

```
 1   trial because of the surgery that your mother has just

 2   endured?

 3              JUROR NO. 5:  No.

 4              THE COURT:  Again, would you be able to serve as

 5   juror on Monday if I postpone today?

 6              JUROR NO. 5:  Yes, I think I can, yes.

 7              THE COURT:  All right.

 8              JUROR NO. 5:  I know you hate the word "think."  So

 9   yes.

10              THE COURT:  All right, Mr. Fricke, I need to address

11   some issues here in the courtroom, but I appreciate your

12   candid responses.  It sounds like your mother -- it sounds

13   like you're able to serve -- you're able to continue to serve

14   as a juror next week, including Monday, and you can always

15   inform your employment that you're still on jury duty, if

16   that's what's decided.  I haven't made a decision yet on

17   whether to excuse you.  I'm going to speak with the folks here

18   in court and assess the schedule, but I will let you know in

19   short time.  Are you available so we can keep you posted later

20   this morning after a decision is made?

21              JUROR NO. 5:  Yeah.  I'll be on the ferry probably in

22   20 minutes, but I should be able to pick up the phone.  I

23   don't see any issue with that.

24              THE COURT:  All right.  And you don't have concerns

25   that if you had to reach back to your employer and say,
```

1    Actually, the Court has determined that I need to complete my

2    jury service -- there's no consequences to you there if you

3    had to make that change with them?

4         JUROR:  I don't think so.  They just won't have me.

5    That's all.

6         THE COURT:  All right.  All right, Mr. Fricke.  I

7    appreciate it.  I'm going to let you go, but I will have my

8    chambers contact you maybe in the next hour or so, or maybe

9    even sooner than that, just to let you know what decision has

10   been made.  Okay?

11        JUROR:  All right.  I appreciate it.  Thank you.

12        THE COURT:  All right.  Thank you, Mr. Fricke.  I

13   appreciate your time.  Take care.  Bye-bye.

14        (Telephone conference ends.)

15        THE COURT:  So my understanding from that

16   conversation, and I presume everybody's heard the same, is

17   that the issue with his mother wouldn't prohibit him from

18   serving as a juror Monday.  It sounds like he gave a heads-up

19   to human resources at his employment that he was going to

20   return Monday but he can make that correction, if needed.

21       Mr. Marketos?

22        MR. MARKETOS:  Yes, Your Honor.  That's obviously our

23   strong preference.

24        THE COURT:  That you want him to return.

25        MR. MARKETOS:  Yes, Your Honor.  Absolutely.

1        THE COURT:  All right.  And let me make sure I

2   understand the position before we get to Dr. Hsu.  I'm not

3   going to make any decision until I know collectively all of

4   the information here.  But I do want to get a sense from you,

5   Mr. Marketos, your -- the concern from Relators in dismissing

6   this juror is what, so I can kind of appreciate the concern,

7   because I'm still a little bit confused by it.

8        MR. MARKETOS:  Your Honor, the concern with

9   dismissing this juror is because we would be losing a juror

10  and, you know, potentially putting at risk losing other

11  jurors, a juror who has been here for five weeks.  And --

12       THE COURT:  Well, no, those are two different issues.

13  So let me address one at a time.  Right?

14       MR. MARKETOS:  Sure.

15       THE COURT:  Your position at the outset of the trial

16  was to have eight jurors.  Is that correct?

17       MR. MARKETOS:  It was.

18       THE COURT:  No, no.  Just answer my questions first,

19  then we'll get to the primary issue.

20       At that time you expressed no concern, because it was

21  your request to have eight jurors, that in a five-and-a-half

22  week trial, you weren't concerned about a missed trial because

23  we'd have a lack of quorum in this jury.

24       Isn't that true?

25       MR. MARKETOS:  It was, Your Honor, yes.  I said that.

1          THE COURT:  And it was my concern that that was

2     insufficient, that I thought more than eight jurors would be

3     necessary based on my experience.  And I could be wrong, but

4     based on my experience, you might want more than eight jurors

5     because I'd hate to be here for four and a half or five weeks

6     and lose a couple of jurors, and now we're all rebooting to

7     have a new trial in a few months.  So I give you ten.

8          You lose one juror to -- I think we all agreed there

9     now -- was it was not contested when Juror Number 2 was

10    excused based on a pretty significant family death.  And now

11    we have this issue, which would put you at the very same

12    number of jurors that you wanted four weeks ago at the

13    beginning of trial.

14         So when you're telling me, Judge, I'm concerned about

15    losing more jurors, I don't find that to be plausible when you

16    asked initially for eight jurors before the trial even

17    started, knowing it would be five and a half weeks.

18         MR. MARKETOS:  I am talking about losing a juror who

19    has been with this jury.

20         THE COURT:  That's different.  No, you made two

21    arguments.  First, you're saying you're worried about losing a

22    juror that's been on the case, and we'll talk about that.  But

23    you secondly said you're concerned about -- and losing more

24    jurors, indicating that it could be possibly a mistrial if we

25    have -- like, if we lose -- and have less than six jurors in

1    the box.

2         But that can't be a concern for you, because it wasn't

3    a concern for you before we picked the jury.

4          MR. MARKETOS:  Yes, Your Honor, that's true.  Until

5    somebody lost their brother and now we have somebody else

6    who's -- so at the end --

7          THE COURT:  Which happens in life, which is why I

8    gave you all ten jurors, because I know that in life something

9    can happen to these folks and somebody can lose a sibling or

10   be in an accident or have a mother who has surgery or whatever

11   it may be.

12         MR. MARKETOS:  Your Honor, fair enough.  And then

13   that was good foresight on Your Honor's part to make it ten

14   instead of eight.

15        All I would say now is this happens all the time in

16   trial where somebody gets sick --

17         THE COURT:  But let me ask you this because this is

18   another confusing part about it.

19        I don't know much about Juror Number 5.  Maybe you guys

20   are all juror experts.  I really don't know.  How do you even

21   know that Juror Number 5 is sitting in that witness box even

22   in support of your case at all?

23         MR. MARKETOS:  I don't say that he is.

24         THE COURT:  So I'm asking you.  You have no idea if

25   Juror 5 is supportive of your case or supportive of Janssen's

1 defense.

2      Would you agree with me on that at this stage of the

3 trial?

4        MR. MARKETOS:  Absolutely.  And to try to read that

5 is a mistake.

6        THE COURT:  Right.

7        MR. MARKETOS:  But, Your Honor, the idea that, you

8 know, we're wanting Juror Number 5 to stay on the case because

9 he supports our case, no.  We have no idea.  And people who

10 try to read jurors are making a mistake at the end of the day.

11      THE COURT:  So let me ask you this.  Again, what's

12 the prejudice to the Relators if I excuse Juror Number 5?

13      And by the way, I'm not going to decide this anyway

14 until I know more about Dr. Hsu's schedule.

15      But my question to you is, if you agree with me that at

16 the outset you guys had less concern about the numbers of

17 jurors than I did -- so the mistrial issue is not one that I'm

18 going to agree with you on now, when I'm the one who actually,

19 I thought, made more corrective steps to ensure we wouldn't

20 have one with less than six jurors.

21      If you also agree with me that Juror Number 5, you

22 can't read the tea leaves to know one way or the other whether

23 this juror is even supportive or not supportive of your case,

24 what's the prejudice to Relators, with those facts before us,

25 in dismissing Juror Number 5 if I'm confident, as the Court,

```
 1   that we should have six jurors by the end of this trial to
 2   deliberate?
 3        Which I'm fairly confident we would.  If I was less
 4   confident about that, I'd be more inclined to keep Juror
 5   Number 5 no matter what.  But I'm just trying to understand
 6   the prejudice to Relators with those facts before us.
 7             MR. MARKETOS:  Once you have jurors in the box who
 8   have been together --
 9             THE COURT:  They have not discussed this case.
10   They're prohibited from doing so.
11             MR. MARKETOS:  Your Honor, can I -- I didn't say they
12   were discussing the case.  I'm not talking about discussing
13   the case.
14        When you have had a group of jurors together who have
15   put five weeks of time into a trial, it's fair for a half-day
16   delay not to cause him off.  It's fair to let them adjudicate
17   and serve as members of the jury and serve in our justice
18   system.
19        And if we're talking about a half day, which still
20   doesn't push us past the -- we ought to accommodate that.  And
21   that's my concern.
22        And you're saying, How is it of prejudice to us?  They
23   have been together for five weeks hearing our evidence.  We
24   put on evidence based on what we think the jurors want to
25   hear.  They listened to it, and we hope that they hear the
```

```
 1   evidence that we put in.
 2        Saying to this juror, you know, You're dismissed
 3   because of a half-day accommodation, that comes up all the
 4   time.  Somebody gets ill, you don't cause them off the jury.
 5   Right?  That's why we don't do that, if somebody --
 6        THE COURT:  I've done that.  So I don't know -- I've
 7   done that.
 8        MR. MARKETOS:  If somebody gets the flu --
 9        THE COURT:  In fact, I just confused the prior trial
10   with this trial where literally somebody was in a
11   fender-bender for one day.  It was a car accident with zero
12   injuries, but it would have lost an entire day of trial, and
13   we all excused the juror.  And, Mr. Marketos, the parties
14   agreed to excuse that juror.
15        So to say that this is abnormal or extraordinary or
16   never happens, I literally had this scenario not too long ago
17   where even both sides said, We don't need this juror.
18        MR. MARKETOS:  I understand, Your Honor.  And you're
19   asking me -- but you're asking me --
20        THE COURT:  I am.  But I'm also saying to couch it
21   with not saying this is such an extraordinary thing, that this
22   doesn't happen -- like, this happens all the time.
23        MR. MARKETOS:  Yeah, absolutely.
24        THE COURT:  One day of trial is not something that's
25   insignificant.
```

```
 1          MR. MARKETOS:  No, it's not.  It's a half day, but it

 2   is significant.  It is absolutely significant.  You know,

 3   we're all tired.  We've been doing this for a long time.

 4   We've been here six weeks.

 5          THE COURT:  I'm not concerned about the attorneys.

 6   I'm talking about the jurors.

 7          MR. MARKETOS:  Right, I understand, Your Honor.  And

 8   my understanding was he asked for a delay, and that's what

 9   we -- that's what he called in this morning and asked for, a

10   delay.  I would like this juror to be accommodated, and it's a

11   half day.

12          He didn't call in and say, Let me off the jury.  Right?

13   He called in and said, Can you delay the trial.  And I believe

14   we owe it to the system and we owe it to the juror and we,

15   frankly, owe it -- I think we should accommodate it.  It's a

16   half day, and we're going to still be on schedule.

17          That's my view.  I hope -- I mean, I hope Your Honor

18   understands our point of view is that it --

19          THE COURT:  I understand it.

20          All right.  Let me hear briefly from Ms. Brown.  But do

21   we have Dr. Hsu?  Because I do need to have that information

22   before I can totally assess what I'm going to do here.

23          MS. BROWN:  I think, Your Honor, we've reached out

24   every way we know how to, and we're waiting to hear from him.

25   So as soon as calls Mr. Caruso back, we will let the Court
```

1    know.

2            THE COURT:  All right.  Mr. Marketos, I'm going to

3    hear from Dr. Hsu before I assess this situation in totality

4    because I do think that's relevant.

5            All right.  Yeah?

6                (Off-the-record discussion.)

7            THE COURT:  All right, folks.  Here's what I'll do.

8    Why don't I put us in recess until Dr. Hsu surfaces.  And if

9    he surfaces before his testimony, then I want to speak with

10   him before he gets on.  If he doesn't, then I guess I'll have

11   to speak to him at 12:30.  But I'm going to assess the

12   situation.

13           The jurors are already on their way, but that has no

14   impact on my analysis.  If I have to turn them around and send

15   them right home, that's what I'll do.

16           But I do want to hear from Dr. Hsu before I decide

17   whether to keep Juror Number 5 on and adjourn the trial day or

18   continue today without Juror Number 5 in light of the schedule

19   that we put in, including not knowing whether we have a

20   witness who is more than halfway done with his testimony that

21   could be unavailable next week.  And I do think that -- that

22   is something that I do have to consider in the totality of

23   this issue.

24           So anything more?  I know we've talked it out.  So is

25   there anything more, Mr. Marketos, that we have to speak --

```
 1          MR. MARKETOS:  No, Your Honor.

 2          THE COURT:  -- before I hear from Dr. Hsu?

 3     Ms. Brown?

 4          MS. BROWN:  No.  Thank you, Your Honor.

 5          THE COURT:  All right.  Folks, we are in recess.

 6     But, Ms. Brown, if you hear from him, can you alert the

 7     courtroom deputy so that I can come back out early.

 8     Otherwise, we have to wait until 12:30 while the jurors are

 9     sitting around.  And I'm not saying that the delay is the end

10     of the world for them, but I'd like to try to speak with them

11     in advance of 12:30.

12          All right.  We are in recess.  Everybody remain seated.

13          MS. BROWN:  Thank you, Your Honor.

14          (A short recess occurred.)

15          THE DEPUTY COURT CLERK:  Please remain seated.

16          THE COURT:  Do we have Dr. Hsu?

17          MR. CARUSO:  Yes, we have him on the line.

18          THE COURT:  Can we call him back on the court phone?

19     Can you just let him know the judge is going to call him

20     momentarily?

21          MR. CARUSO:  Yes.

22          (Telephone conference begins.)

23          THE COURT:  Dr. Hsu, this is Judge Quraishi from the

24     trial.  Can you hear me okay?

25          THE WITNESS:  Yes, I can.
```

```
 1              THE COURT:  Good.  Doc, I just want to let you know
 2    you're on the record.  I'm speaking to you in the courtroom
 3    with counsel, but I just wanted to touch base on some
 4    logistical issues.
 5              One is, when you're testifying remotely, are you
 6    testifying from New York, or did you travel out of state?  I
 7    just want to -- if you could remind me where you're testifying
 8    from.
 9              THE WITNESS:  Right now, I'm in New York.  Next week
10    I'm traveling.
11              THE COURT:  That's what I wanted to get to.  Next
12    week you have travel plans.  When are you traveling next week,
13    Doc?
14              THE WITNESS:  I leave Wednesday.
15              THE COURT:  Wednesday.  So I want to get a sense,
16    Monday, if you had to testify, you would be available?
17              THE WITNESS:  I do not think so.  I'm just
18    double-booked right now because of my travel.  I could
19    likely -- although I would be flying Wednesday morning, I
20    could likely do Wednesday afternoon after I land.
21    Unfortunately -- yeah.
22              THE COURT:  I'm talking -- Monday not -- you're
23    saying you're traveling Wednesday, or I'm not hearing you
24    right?
25              THE WITNESS:  I'm traveling Wednesday, but because of
```

      1    my travel, I'm double-booked on Monday and Tuesday and

      2    completely slammed with patients --

      3          THE COURT:  So you would be cancelling --

      4          THE WITNESS:  -- Monday and Tuesday, but not be able

      5    to -- be possible.  Wednesday and Thursday, I might be able to

      6    in the afternoon after I land, but not Monday or Tuesday.

      7          THE COURT:  All right.  And Monday you can't -- well,

      8    when you are talking about Monday, Doc, I just want to make

      9    sure you're talking about just work related, that you booked

     10    some patients coming in; is that right?  Appointments?

     11          THE WITNESS:  Yes, I'm double-booked because my

     12    frequent travel for my issues, that --

     13          THE COURT:  Remind me -- remind me -- Sorry.

     14          Remind me.  Are you working with a medical group or

     15    solo?  I just don't recall that at the moment.  When you say

     16    you had these appointments for Monday, is there anybody else

     17    that can see these patients, or can they be postponed, or

     18    what's the status there?

     19          THE WITNESS:  They really -- I mean, if they have to

     20    be, but they're -- it's incredibly -- people are incredibly

     21    frustrated because of my urgent family situation that I've had

     22    to cancel multiple people and rescheduled two or three times.

     23    So having to reschedule them several times, sometimes it's

     24    impossible.  For example, I already have preoperative

     25    clearances Monday and Tuesday; I have other nurse

1    practitioners, and their panels are completely full, too.

2            THE COURT:  Right.

3            All right, Doc, I appreciate it.  I don't have any

4    additional questions.  By the way, you're still prepared at

5    12:30?  You're going to be available, right, when we get -- if

6    we have to reboot; is that right?

7            THE WITNESS:  Yes.  I will have to be ready at 12:30.

8            THE COURT:  Mr. Marketos, you're standing up.  Can I

9    at least -- do we need to speak while Dr. Hsu's on the call?

10           MR. MARKETOS:  Yes, Your Honor.  Just to be clear,

11   can we make sure that he's available Wednesday or Thursday,

12   because he's a defense witness anyway, and so I want to make

13   sure he is available.  I think he said he could be available

14   Wednesday or Thursday.

15           THE COURT:  Dr. Hsu, you said you could be available

16   Wednesday or Thursday as well?

17           THE WITNESS:  Yes.  Let me look at my flight on

18   Wednesday.  So my flight lands about 2 o'clock, and so I

19   should be available from 3:00 to 5:00 on Wednesday, Eastern

20   time.

21           THE COURT:  All right.  We will circle back to you.

22   For now, be ready and available for your testimony at 12:30,

23   but if anything changes where today we might postpone the

24   trial day, then we will have counsel alert you as soon as

25   possible.  Okay.  Does that make sense?

```
 1              THE WITNESS:  Okay.  That's fine.  Also, Thursday, if
 2    needed, I will already be in my destination, so I would be
 3    available, you know, 10 a.m. to 3, 4 p.m.  It might be an
 4    appointment that I might have to reschedule as long as I have
 5    as much notice as possible.
 6              THE COURT:  I appreciate it, Doc.  Be on standby.
 7    But for now, be prepared to pop on at 12:30.
 8              THE WITNESS:  All right.
 9              THE COURT:  All right, thank you, Doctor.
10              THE WITNESS:  Welcome.
11              THE COURT:  All right.
12         Anything further that we have to talk about with
13    respect to Dr. Hsu?  Although that -- I will tell you it
14    doesn't have much impact on what I'm about to say, but you
15    want to speak about Dr. Hsu other than he's available next
16    week?
17              MR. MARKETOS:  Only that it sounds like he's
18    available on those days, Your Honor, and I would obviously
19    prefer to go forward with that.
20              THE COURT:  I appreciate that.
21         Ms. Brown?
22              MS. BROWN:  Your Honor, nothing more than what we
23    already said.  We prefer to resume today and keep going.  The
24    jurors are already on the way, and for the reasons we already
25    articulated we think it makes sense to continue.
```

1          THE COURT:  That's my concern, too.  I'm glad we

2   spoke with Dr. Hsu.  But I am not so sure that changes my mind

3   about how we proceed today.

4          Mr. Marketos, you've acknowledged at least two things

5   before me, right?  You've acknowledged, one, that I provided

6   enough jurors on this jury, even more so than you asked for,

7   to ensure that we would have a sufficient number of jurors to

8   complete the trial.  And I think that we're still there, to be

9   candid with you.  If you want to express some concern about

10  that, you can.  But it seems a little disingenuous when you

11  ask only for eight jurors at the outset and right now, with

12  only a little bit of time left and the Relators' case resting,

13  you'll have eight jurors continuing to deliberate, which even

14  allows some window of opportunity there if something

15  unfortunate were to happen where one or two jurors couldn't

16  serve.

17         My second primary concern that was raised is that I

18  don't see any prejudice to Relators.  You've acknowledged, at

19  least on the record, that nobody can read the tea leaves on

20  any of these particular jurors.  There's no indication that

21  Juror Number 5 is supportive of the Relators' case or

22  supportive of Janssen's defense, and we also all acknowledge

23  that none of these jurors, even though they're communicating

24  with each other, are communicating even for a second about

25  this case.  I couldn't have been any more clear to them.  This

1    has been an attentive jury, and I'm sure they are following my

2    directions as I give them.

3         My greater concern is the request to accommodate one

4    juror at the expense of the other remaining eight jurors, and

5    here's why I say that.  These jurors, all of them, were told

6    at the outset of this trial that they would never sit on a

7    Friday for a trial.  After they were selected, after voir

8    dire, after they relied upon that information from the Court,

9    I called an audible, and I told them this trial is moving

10   slower than anticipated by the parties.  In order to keep this

11   case moving, I need to know whether they can sit on some

12   Fridays.  These other eight jurors have committed to coming

13   here on Fridays, including today, from 12:30 to 5 o'clock, to

14   hear evidence, even though, when they were selected as jurors,

15   they were told they would not be having to sacrifice their

16   Fridays.  They would have that time for personal, for work and

17   other things.  And so we've compromised all these other

18   jurors.  I can't see how I can accommodate Juror Number 5's

19   request at the expense of these other jurors.

20        I understand, Mr. Marketos, that for you all, one day

21   does not mean much.  By the way, it shouldn't.  Right?  This

22   is your job to be here every day.  But I do think it means a

23   lot to those other eight jurors, that losing 12:30 to 5 today

24   is a significant adversity that I'm going to have them face.

25        Mr. Marketos, you want to say something?

1      MR. MARKETOS:  I do, Your Honor.  I want to make sure

2  our position is not thought of as disingenuous.  What I was

3  very clear about, I hope, is that after the jurors are seated,

4  we exercise strikes based upon the consistency of the jury.

5  That juror is a computer scientist, and we're about to put on

6  an expert in computer science -- okay? -- how will talk about

7  all the data that we got.  We tailor the evidence that we

8  present based on the jurors who are in the box, and so at the

9  end of the day, we're losing somebody who we have tailored our

10  evidence to, who we're speaking to, and that's what you do in

11  a trial.  That doesn't mean we can read what they're thinking.

12  That's my concern.  At the end of the day, I am sure --

13      THE COURT:  Mr. Marketos, that's an interesting

14  concern because, when we just spoke about it, this is the

15  first time I'm hearing about computer science.  So when I ask

16  you on the record what's the concern and what's the prejudice

17  to Relators, you were silent on that issue.  Now when I am

18  about to rule and dismiss and excuse Number 5, you've got some

19  other analysis you want to provide.

20      MR. MARKETOS:  No, Your Honor --

21      THE COURT:  And then you want me to say, well, I

22  don't think it's genuine.

23      MR. MARKETOS:  What I want to say is, as we said

24  before on the record, that we tailor the evidence that we

25  present to the members of the jury.  I don't think divulging

1  how we're proceeding with trial and who's on the jury is

2  something that I ordinarily would do, but to suggest that, you

3  know -- it's obviously a concern because of what I said

4  earlier, not what we just said.  What I said earlier is that

5  we present the evidence during the course of the trial based

6  upon the jurors that are in the box.  And that's important.

7  And so it's not merely, you know -- he asked if the trial

8  could be rescheduled.  He obviously wants to serve on the

9  jury, and he wanted to.  And so our view of it is, Look, we

10  got to give him that right and --

11      THE COURT:  We don't have to give him that right.  We

12  also have eight other jurors that are here today that have

13  driven in, maybe some over an hour away, and you want them to

14  lose an entire day that they committed to this trial.  That

15  doesn't mean that, if they get to go home, they get to go to

16  work, they get to go care for their children or go see their

17  grandchildren or all the other things that people do on a

18  particular day in their lives.  We have stolen that day from

19  the other eight jurors, and now you're saying, Let's take that

20  away from eight folks to give one person something when you've

21  also agreed that, whether he has a background in computer

22  science or not, you have no idea whether the evidence you

23  present and the position you present is going to be one that

24  he agrees with.

25      MR. MARKETOS:  It would be disingenuous for me to say

 1    that I know what he's thinking.  But could we ask the jurors

 2    their preference?

 3         MS. BROWN:  Your Honor, that, I would object to.  I

 4    think that puts folks in a very difficult position of having

 5    to make a judgment of how to accommodate another person on the

 6    jury.  I mean, we made our position clear on what the Court

 7    should do, and we leave it in the good hands of the Court.

 8    But asking jurors to weigh in on whether to accommodate

 9    somebody else's -- I think it's in the Court's good hands, and

10    we should not do that.

11         THE COURT:  I have a concern there, too,

12    Mr. Marketos.

13         MR. MARKETOS:  Your Honor, we just said we don't want

14    to inconvenience the jurors at the expense of this juror.  My

15    response to that would be, well, why don't we ask them?  And

16    if that's their preference -- and then we'll find out if their

17    preference is to continue forward this afternoon.

18         THE COURT:  But what you're saying is Juror Number 5

19    is not here.  We can continue on Monday.  I don't know what

20    the relationships are with these jurors.  One thing they're

21    not permitted to do is discuss the case.  But I think we all

22    are well aware that they do communicate with each other.  I

23    don't know what relationships are being formed by this jury.

24    I don't know whether folks like Juror Number 5, don't like

25    Juror Number 5, there's factions in the jury.  These are

1    things that we will never know.  We won't even know when the

2    case is over, but I'm not going to put any pressure on the

3    other eight jurors who really may want to proceed today

4    because that's what they've already told us.  Right.  They've

5    already indicated to the Court that they would rather proceed

6    on Fridays than have this trial extended beyond extra days.

7    They'd rather start adding in the Fridays now, because that's

8    the choice they were given.  Right.  If we don't start sitting

9    on Fridays, this case is anticipated to go longer than it was

10   initially anticipated.  And they already made that choice.  So

11   what second choice am I giving them other than pressure to

12   accommodate a fellow juror?

13         MR. MARKETOS:  Your Honor, I don't think they need to

14   know which juror --

15         THE COURT:  They're going to know.  He's not in the

16   back room.

17         MR. MARKETOS:  They're here already.  Your Honor, I'm

18   not going to die on this hill.  I don't want to -- you can

19   tell that it matters to us who's on the jury and that they've

20   been here for that long and at the end of the day, in our

21   view, a half-day accommodation when we're --

22         THE COURT:  You keep calling it a half day.  It's

23   12:30 --

24         MR. MARKETOS:  We have --

25         THE COURT:  -- 12:30 to 5 o'clock with no lunch.  So

1    again, I think that's mischaracterizing how much can get done

2    from 12:30 to 5.

3        And if you tell me not much could get between 12:30 and

4    5, then why the heck did we add these Fridays in the first

5    place?  The reason why we added them is because a significant

6    amount of testimony and evidence can be presented in a block

7    of 12:30 to 5 with no lunch.  That's my understanding.  So I

8    don't want to be dismissive about what can be done.  It is

9    very possible that you could rest your case today.  That's how

10   much that can get done till 5 o'clock.  No?

11       MR. MARKETOS:  No, Your Honor.  We're not going to

12   rest today.  We were going to go into Monday like we --

13   there's no way.  We've got Dr. Hsu.  We've got Mr. Ian Dew.

14   And we've got our damages expert.

15       THE COURT:  All right.  Well, Mr. Marketos, yesterday

16   you were not that definitive.  You said, Look, it's possible

17   that we would rest today or we would only need the morning on

18   Monday, Judge, so it's only half a day on the 13th.

19       By the way, that's how you characterized it to me

20   within 24 hours ago.

21       MR. MARKETOS:  Yes, Your Honor.

22       THE COURT:  Now it's We absolutely will never finish.

23   This is a 12:30 to 5.  So which one is it?  Are we going to

24   get a significant amount of work done this afternoon, or is

25   it, It's a wash, so we might as well just start Monday because

1    we didn't need to do this Friday in the first place?

2          MR. MARKETOS:  Your Honor, you asked me that at the

3    beginning of the day.  We didn't get to Mr. Dew yesterday.

4    We're still on with Dr. Hsu.  So, yes, that impacts the

5    schedule for today.

6          Like I said, I'm not going to die on the hill, but I

7    don't want to give the Court the impression that I'm

8    mischaracterizing anything.  We told you that in the morning,

9    but we didn't even get to Ian Dew yesterday.  We're still on

10   with Dr. Hsu.

11         And so, of course, that impacts, you know, what the

12   issue is with today.  The juror called.  You called us down

13   here, and he said he wanted to continue with the trial.  He

14   wanted to reschedule until Monday.

15         We called the juror.  He says he could be here on

16   Monday.  And all we're saying is that seems like something we

17   ought to accommodate, if we possibly can.  Dr. Hsu can

18   testify, you know, later on in the week.  We can keep our

19   trial schedule as best as we possibly can, what we've told

20   them, and we told them six and a half weeks, and we're on

21   schedule to do that.

22         So why would we dismiss a juror because we want to get

23   something done on a Friday?  That -- it seems like at the end

24   of the day, Your Honor, we're bending over backwards to not

25   accommodate a juror's --

```
 1          THE COURT:  No, I don't think that's true.  I'm

 2  bending over backwards to accommodate the other eight jurors

 3  that you're not talking about.

 4          MR. MARKETOS:  That's why I am talking --

 5          THE COURT:  Because every day matters to a juror, and

 6  I think that's not being appreciated, Mr. Marketos.

 7          MR. MARKETOS:  My proposal was to ask them.

 8          THE COURT:  Right.  But then that also puts undue

 9  pressure on the remaining jurors because they are well aware

10  that Juror Number 5 is not here.

11          MR. MARKETOS:  Okay.  So --

12          THE COURT:  It's obvious to them, after four weeks,

13  if somebody is missing.  They might think that if we don't

14  start on time it's because Juror Number 5 is late.  That's how

15  probably well they all know each other in that back room.

16      So for us to say, We have an issue.  Can you start

17  Monday -- I think these are smart folks, and I think they've

18  been attentive throughout the trial, and they're listening to

19  evidence about drugs and marketing and all the other things

20  that you provided, Anti-Kickback Statute and regulations.  I

21  think that these jurors can figure out that if we're starting

22  Monday, it's to accommodate Juror Number 5.

23      And maybe you think I'm reading the tea leaves, but I

24  don't because I think you all see how attentive they've been

25  during the trial.  And I do think that's a good thing, to have
```

1    a jury that's doing that, but I don't think it hurts that

2    collective group if Juror Number 5 is not there.  But I do

3    think it puts undue pressure on the eight remaining jurors if

4    we say, Hey, one of your fellow folks -- we need to start on

5    Monday.

6              MR. MARKETOS:  Okay.

7              THE COURT:  Can you do that for him.

8              MR. MARKETOS:  Your Honor said that we weren't

9    talking about the other eight jurors.  My response to that was

10   I was suggesting talking to the other eight jurors.  That's

11   all I wanted to point out, is that we're not ignoring the

12   other eight jurors.

13             THE COURT:  That's fair, but we've already done that

14   once, and we've gotten their response, and their response is

15   Let's move this case.  And we are willing to sacrifice now the

16   last day of the each week, even though, Court, you told us,

17   Judge, we wouldn't have to do that.  But if that's what needs

18   to be done to keep this case moving, we would prefer to do

19   that, because that will make the trial end earlier, that means

20   we get the case earlier, and that means that everything ends a

21   bit earlier for this group of folks.

22             And so for me I believe -- and we can disagree on

23   that -- but I believe that question has already been answered

24   by this collective jury.  I don't see any reason to revisit

25   it, because if I did, I think all it would do is highlight

1    Juror 5's absence and that the request to see whether they'd

2    be willing to reboot Monday is to accommodate Juror Number 5.

3         So -- but with that, Mr. Marketos, I know you say you

4    don't want to die on the hill, but you're getting close.

5         So do you have anything more you want to say?

6         MR. MARKETOS:  Yes.  It was about standing at the top

7    of the hill and giving up.

8         THE COURT:  All right.

9         MR. MARKETOS:  Look, Your Honor, I've said my piece.

10   You understand our concerns.

11        THE COURT:  I do.

12        MR. MARKETOS:  And in particular with a juror who,

13   you know, wants to stay on the jury, I think -- I've said my

14   piece.  I think that in trials like this, the jury system

15   matters, and we should be accommodating as best we possibly

16   can.  And we're trying to forecast the schedule when we're,

17   you know, to this point, ahead of schedule based on --

18        THE COURT:  All right.  Well, I don't disagree with

19   you about the jury system and the jurors wanting to serve is

20   important.  So we're not in disagreement about any of that.

21        I think I just see a different remedy here because I'm

22   looking at the collective jury as a whole and not just the

23   issue with Juror Number 5.

24        I'm also looking at the fact that everything else I've

25   put on the record, Mr. Marketos, right -- I don't see any

 1   prejudice to Relators in dismissing Juror Number 5.  I don't

 2   believe what you've articulated is a prejudice to the

 3   Relators.  I see there's a prejudice to the remaining jurors

 4   in having to extend the trial longer than needed and

 5   especially after they made accommodations to come.

 6       I also -- and I could be wrong -- but I anticipate --

 7   and I'm comfortable that we will have a sufficient number of

 8   jurors to deliberate in this case.  If I'm mistaken about it

 9   because I've dismissed Juror Number 5, because I've

10   accommodated this, then that's on me.

11       But I do believe that we have at least two more windows

12   of opportunity where we really have to have a scare where we

13   may have an insufficient number of jurors that could cause a

14   mistrial.

15       And don't get me wrong.  Every potential juror issue is

16   independent.  So I will tell you now the fact that I'm

17   dismissing Juror Number 5 doesn't mean that if there's another

18   juror issue that I'm going to somehow automatically dismiss

19   that -- that juror.  But based on the facts that I have before

20   us, and based upon the circumstances of where we are in the

21   trial, I'm comfortable excusing Juror Number 5 with the

22   objection of Relators' counsel.  I understand that.

23       But with your objection noted, I'm going to dismiss

24   Juror Number 5.  These folks are here.  We're going to proceed

25   with witness testimony, and I'm going to give them what we

 1   promised to do, which is keep this trial moving without any

 2   prejudice to either side.

 3        I appreciate the arguments, Mr. Marketos.

 4        Ms. Brown, is there anything further Janssen needs to

 5   put on the record?

 6            MS. BROWN:  No.  Thank you, Your Honor.

 7            THE COURT:  All right.  So with that, I think we're

 8   going to be in recess for a few minutes.  We're going to check

 9   to make sure all the other jurors are here.

10        And you folks from Janssen are going to make sure that

11   Dr. Hsu has popped up.

12        And then remind me, Mr. Marketos.  We're still on

13   cross?

14            MR. MARKETOS:  Yes, Your Honor.  We're still on

15   cross.

16            THE COURT:  All right.  So you'll be ready to proceed

17   when we get back.

18        All right.  We're in recess.

19            (A short recess occurred.)

20            THE DEPUTY COURT CLERK:  All rise.

21          (Jury enters the courtroom.)

22            THE COURT:  All right, folks.  Everybody have a seat.

23        Welcome back, jurors.  You are one lighter.  So I just

24   wanted to make sure that you are aware that Juror Number 5 has

25   been excused.  He is okay, and there's nothing to worry about,

1    but issues have come up where he is unable to continue to

2    serve as a juror.  So I just wanted to let you know that this

3    is now the jury.  And your back seat behind you, Juror

4    Number 1, is empty unless you all want to shift over -- unless

5    you're comfortable with where you're sitting.

6         With that, we're going to continue with testimony from

7    yesterday.  I will just push through.  Again, we are not

8    having a lunch break today, but we're going to take at least

9    one short break.  And if we need two, that's fine.  But I'd

10   ask the jurors and counsel that if for some reason I'm not

11   paying attention, if you think there's a good spot to stop or

12   somebody needs to break, just alert me to it, and we can take

13   that ten-minute break and continue from there.  And if I don't

14   see you, just make sure Kim sees you, and she'll make sure I'm

15   aware.

16        With that, Mr. Marketos, you're ready to continue the

17   cross-examination?

18            MR. MARKETOS:  I am.  Thank you, Your Honor.

19            THE COURT:  And Dr. Hsu, can you hear me?

20            THE WITNESS:  Yes, I can.

21            THE COURT:  All right.  Just a reminder, you're still

22   under oath from yesterday.  Okay?

23            THE WITNESS:  Yes, I'm aware.

24            THE COURT:  Okay.

25        Mr. Marketos, you may proceed whenever you are ready.

```
 1           MR. MARKETOS:  Thank you, Your Honor.

 2    (CROSS-EXAMINATION BY MR. MARKETOS:)

 3    Q.   Good afternoon, Dr. Hsu.  How are you, sir?

 4    A.   I'm doing okay.  Thank you.

 5    Q.   Thank you, sir.

 6           Dr. Hsu, we were discussing at the end of your

 7    testimony, while I was asking you some questions yesterday,

 8    the practice of tracking physicians' prescriptions who are on

 9    a paid speaker bureau.  I wanted to make sure that there was

10    an understanding.

11           Sir, you understand that it's not me or the Relators

12    who are tracking return on investment.  It's the Relators'

13    contention that Janssen was doing that.

14           Do you understand that?

15    A.   Okay.

16    Q.   Okay.

17           Do you understand that that is the allegation that the

18    Relators have made, is that Janssen was tracking its return on

19    investment with respect to doctors who were on the Promotional

20    Speaker Bureau?

21    A.   Yes.  I guess I'm a little confused on the term "return

22    on investment."

23    Q.   And I understand that, sir.

24           Let me, if I could -- we're going to bring up an

25    exhibit that goes to that.
```

1          MR. MARKETOS:  Let me take a look, if we could, at --

2    let's see.  Bear with me.  Thank you.

3          Let's take a look at Exhibit 183, sir.  And this is

4    Relators' 183.

5          Bear with us, Doctor.  We're going to try to get this

6    up for you.

7          THE WITNESS:  Sure.

8    BY MR. MARKETOS:

9    Q.  Sir, you're not aware, Dr. Hsu, of how it is that

10   Janssen, or Tibotec in this case, came to select you to be a

11   speaker on its Promotional Speaker Bureau, are you?

12   A.  No.  Generally, selections of people on the speaker

13   bureaus are providers who have a lot of experience with a

14   particular drug.  That can be a provider's ability to discuss

15   the drug and judge the competitive landscape, and they're the

16   ones who's able to articulate this in a manner that's very

17   understandable to the audience.

18   Q.  Thank you, Doctor.

19         If we turn to page -- you see the front page of

20   Exhibit 183.  This is a New York district launch plan for

21   Tibotec, and it's dated April 2006.

22         Do you see that, sir?

23   A.  Yes, I do.

24   Q.  And it's actually put together by Mr. Frank Murphy and

25   Mr. Eric Sherr and also Ms. Nancy Bartnett, who you discussed

1    with us yesterday.

2         Do you see that?

3    A.   Yes.

4    Q.   And if you take -- we're going to turn to page 29.

5         And the -- as you can see up here, sir, we're looking

6    at the 10th -- the top Aptivus prescribers and the number of

7    prescriptions that were being written.  You appear there.

8         Do you see that?

9    A.   Yes, I do.

10   Q.   And then if we turn to page 30.  At the time, sir, you

11   were the fourth highest prescriber at 79 prescriptions of a

12   drug called Fuzeon, based upon the analysis that Janssen was

13   performing.

14        Do you see that?

15   A.   Yes.

16   Q.   All right, sir.

17        And then if we turn to page 34, you were top -- there's

18   "Top Prescriber Summary."  So top Aptivus, Kaletra, Reyataz,

19   and Fuzeon prescribers summary.

20        Do you see that you appear on this sheet as well in the

21   first two buckets?

22   A.   Yes.

23   Q.   Okay.

24        And if we look at page 36, you were one of the top

25   prescription drug prescribers for HIV in the New York district

1   at Number 5.

2       Do you see that analysis that was performed by Janssen?

3   A.   Yes.

4   Q.   All right, sir.

5       MR. MARKETOS:  Your Honor, at this time we offer

6   RX-91.  It's been used with Ms. Virginia Evans, and there's no

7   objection to it on the trial exhibit list.

8       MS. BROWN:  I have no objection, Your Honor.

9       THE COURT:  All right.  So admitted.

10      (Relators' Exhibit RX-91 in evidence.)

11  BY MR. MARKETOS:

12  Q.   And, sir, what we're looking at here is a little later in

13  the year, and there's a business update being performed by

14  Janssen dated October 2006.

15      Do you see that, sir?

16      MS. BROWN:  Could I have the exhibit number -- is

17  this the same...

18      MR. MARKETOS:  RX-91.

19      MS. BROWN:  Thank you.

20      MR. MARKETOS:  RX-91.

21  BY MR. MARKETOS:

22  Q.   Do you see that, sir?

23  A.   I do see it.

24  Q.   All right.

25      If we turn to page 17, can you see the --

```
1            MR. MARKETOS:  Can you move the top of the screen

2    down so we can see the title of the slide, please, Ms.

3    Johnson?

4         Thank you.

5    BY MR. MARKETOS:

6    Q.   Do you see, sir, that Janssen was analyzing the top 25

7    physicians by dollars?

8    A.   Okay.

9    Q.   All right.

10        And --

11   A.   Yes, I do see it.

12   Q.   You were Number 5 -- Number 4 on that list.

13        Do you see that, sir?

14   A.   Yes, I do.

15   Q.   All right.

16        So at the time that you were speaking on the speakers'

17   bureau, you were not aware of the fact that Janssen was

18   analyzing the top 25 physicians based upon the dollars and the

19   amount of prescriptions they had prescribed.

20        Is that fair?

21   A.   I am aware that all -- pretty much all pharmaceuticals

22   that I mentioned, except for maybe in the last 15 years, does

23   track provider prescriptions by the number of prescriptions

24   they write for the particular product and probably -- the

25   company product as well.  But I am not aware specifically of
```

1    how I ranked in this list or other people ranked in this list.

2    Q.   Are you saying that, at the time you were joining and

3    promoting Prezista and Intelence as part of the Promotional

4    Speakers' Bureau, you were aware that Janssen was analyzing

5    the top 25 physicians based on a dollar amount?

6    A.   I was not aware if they were looking at the top 25

7    physicians.  I was aware that they were -- well, I assumed

8    they were likely looking at the number of prescriptions that

9    were written by a provider, whether it be related to dollar

10   amount or not.

11   Q.   So you had an assumption, and as I understand it, it's

12   based on what you said, all pharmaceutical companies were

13   tracking dollars for the speakers who participated on those

14   programs.

15        Is that right?

16   A.   That's correct.  And --

17   Q.   Okay.

18   A.   -- the HIV -- in the sense that the top probably 100

19   prescribing physicians in the country prescribed -- roughly

20   what I heard it was roughly about 70 percent of all of the HIV

21   in the country.

22   Q.   And --

23   A.   That's just the specialty area.  Very few doctors

24   actually select to be part of this disease state.

25   Q.   Yes.  I understand, sir.

```
 1          You're talking about the -- doctors, and I was talking

 2   about a selection that was based upon dollars per

 3   prescription.  And you're saying you were aware, and I

 4   understand it, that you were being chosen to speak on bureaus

 5   based upon dollars; is that right?

 6          MS. BROWN:  I object.  That misstates the testimony.

 7          THE COURT:  Bear with me, folks.

 8          Sustained.

 9   BY MR. MARKETOS:

10   Q.  Sorry, Dr. Hsu.  Let me make sure I get this right.  As I

11   understand it, you are generally aware that, in the

12   pharmaceutical industry, that doctors who speak on speaker

13   bureaus were being tracked based upon prescriptions and

14   revenue.

15          Is that a fair characterization of your testimony?

16          MS. BROWN:  Same objection.

17          THE COURT:  I'll overrule it because he is asking for

18   clarification.

19          Dr. Hsu, you can answer that.

20          THE WITNESS:  Okay.

21          Yes, I am aware of that.

22          MR. MARKETOS:  All right.

23   BY MR. MARKETOS:

24   Q.  Sir, you also did a lot of travel in terms of the

25   Prezista speaker bureau.  You traveled to a number of
```

```
 1  different states and cities.

 2        Do you recall that?

 3  A.   Yes.

 4  Q.   And obviously, yesterday, sir, you made the point some of

 5  the money that you received from Janssen with respect to the

 6  speaker bureau was separate and apart from what it calls

 7  honoraria.  And that's separate and apart from checks for

 8  speaking.  It was inclusive of travel reimbursement, right,

 9  sir?

10  A.   That's correct.

11  Q.   All right.

12        And if we take a look, sir --

13        MR. MARKETOS:  Your Honor, we're offering RX-1737.

14        MS. BROWN:  My only objection, Your Honor --

15        THE WITNESS:  Am I allowed to --

16        MS. BROWN:  I apologize.  I would object on

17  foundation grounds, Your Honor.

18        THE COURT:  I don't know what the document is.  So

19  you guys want to come show it to me?  Let's sidebar, because I

20  don't have anything in front of me.

21        (Sidebar begins at 12:47 p.m.)

22        THE COURT:  Let me just see the document, and just

23  give me a moment.

24        MS. BROWN:  Sure.  Sure.

25        THE COURT:  Mr. Marketos, is this a Janssen document?
```

*5170*

         1          MR. MARKETOS:  Yes, it is, Your Honor, and the last

         2     page has a travel log for -- and the last page has a travel

         3     log for Dr. Hsu.

         4          THE COURT:  Okay.  So you're looking to admit this

         5     document, which is a Janssen travel log; is that right?

         6          MR. MARKETOS:  Yes, Your Honor.

         7          THE COURT:  Along with the email attachment, and then

         8     you'll ask him about this travel log?

         9          MR. MARKETOS:  Yes, Your Honor.

        10          THE COURT:  Then he'll -- and, Ms. Brown, he'll

        11     answer or not answer.  I don't know if he knows about it or

        12     not, but what's the problem with the Janssen travel log?

        13          MS. BROWN:  The problem, Your Honor, would be the

        14     internal email that's going to go up and be shown to him, and

        15     there's just no foundation --

        16          THE COURT:  Are those Janssen employees?

        17          MS. BROWN:  Yes -- well, at least --

        18          THE COURT:  Does it just go back to these are Janssen

        19     documents and Janssen employees and they're statements of a

        20     party opponent and all the other things Mr. Marketos will say,

        21     which -- I'm not trying to cut ahead of your argument, but --

        22          MR. MARKETOS:  Yes.

        23          MS. BROWN:  I understand that, Your Honor, and it's

        24     separately admissible.  That's not what I'm taking issue of.

        25     I'm taking issue with putting internal Janssen emails in front

1   of a witness without first, like, asking the question about

2   did you travel to whatever, which is, I assume, what you're

3   trying to do with the travel log, and then saying, Let me show

4   you and see if this refreshes you.  But what he just did with

5   the other two documents is put up internal PowerPoints and

6   walk him through it, and that, there's no foundation for.  The

7   questions are lacking foundation when they're based off the

8   documents --

9         THE COURT:  Usually -- well, here's why I disagree,

10  Ms. Brown.  Usually, the foundation is required to admit the

11  document.  Right.  He doesn't need to lay the foundation for

12  the admissibility of this document because it's a statement of

13  a party opponent.  That's his position.

14        MS. BROWN:  I agree with that.

15        THE COURT:  So once it's admitted, you can put up a

16  document.  So -- you can disagree with me, but once a document

17  is admitted, meaning this is admissible, he moves to admit it,

18  I admit, he can publish it to the jury, ask the witness a

19  question about it, because it's an admitted piece of evidence.

20  And the witness is going to say, I have no idea what this is.

21  I can't answer your question.  I don't know.  And those are

22  all acceptable responses.  But it doesn't change him moving to

23  admit that document.  Those are two separate things.  Usually,

24  the foundational objection is there if you're saying, You are

25  moving to admit this through a witness and so the witness has

 1    to lay a foundation for this particular document.  But I don't

 2    see that in this particular case.  I think he can admit it,

 3    ask Dr. Hsu about it, and then let's see what he can say about

 4    it.

 5              MS. BROWN:  I almost entirely agree with you,

 6    Your Honor.  It's the form of the questions that need to be

 7    did you know, what were you --

 8              THE COURT:  I didn't hear those questions yet.  He

 9    didn't even get to those questions.

10              MS. BROWN:  I'm just basing it on what happened with

11    the other two PowerPoints where it was assumed to be true.

12    The questions to this witness has to be did you know, because

13    he -- it's not the admissibility of the document, which I'm

14    not taking issue with; it's asking questions off of the

15    document without first establishing some foundation for his

16    knowledge to talk about this stuff.  He may not even know

17    about --

18              THE COURT:  I'll have to hear about the question.

19    The document comes in.

20              MS. BROWN:  I understand.  I'm not disagreeing with

21    that.  That's fine.  How does he know --

22              THE COURT:  Ms. Brown, your objection came when he

23    moved to admit the document, just to be clear.

24              MS. BROWN:  I don't have an objection to the

25    admission of our emails and whatever is attached to it.  It's

1  questioning him without the predicate of --

2          THE COURT:  I have to wait for Mr. Marketos to ask a

3  question.

4          (Sidebar was concluded at 12:50 p.m.)

5          (Open court.)

6          THE COURT:  All right, folks.  We're back.

7          THE WITNESS:  Sir, I'm not sure if I'm allowed to

8  make one more comment about that last slide, about the 25

9  prescribers, or you'd rather me just --

10 BY MR. MARKETOS:

11 Q.  I'm going to actually turn your attention, Dr. Hsu, if I

12 could, to the next exhibit, which is Exhibit 1737.  If

13 there's --

14         THE COURT:  And are you -- sorry.  Are you moving to

15 admit that document?

16         MR. MARKETOS:  Yes, Your Honor.

17         THE COURT:  All right.  Any objection?

18         MS. BROWN:  To that, I have no objection, Your Honor.

19         THE COURT:  So admitted.

20     Now we can proceed.

21     (Relators' Exhibit RX-1737 in evidence.)

22 BY MR. MARKETOS:

23 Q.  Doctor, I'm showing you Exhibit 1737, and I'll let you

24 know, sir, this is a Janssen email where Ms. Bartnett is

25 looking at your travel for the Prezista speaker program, okay,

1  sir?  Prezista and Intelence, okay?

2  A.   Okay.

3  Q.   And take a look at the attached log, if we could.  Thank

4  you.  We'll try to blow that up as large as we can for you,

5  sir.  What you can see -- I'll --

6         MR. MARKETOS:  We'll start with the left column, if

7  we could, Ms. Johnson.

8  BY MR. MARKETOS:

9  Q.   Are you able to see that, Dr. Hsu?

10        MR. MARKETOS:  Let's just start with a few rows, if

11 we could, Ms. Johnson, so the jurors and Dr. Hsu can see that.

12 BY MR. MARKETOS:

13 Q.   Do you see in the left column there is a brand?  It's

14 Prezista, Intelence, Prezista, Intelence, going down the left

15 side and then your name --

16 A.   Yes.

17 Q.   -- as a speaker.  Okay, sir.

18        MR. MARKETOS:  And then if we go over and grab the

19 right two columns, Ms. Johnson, so that we can all see it.

20        From the middle to the right, if you would, starting

21 with the dates.  Thank you.

22 BY MR. MARKETOS:

23 Q.   All right, sir.  Can you see that?

24 A.   Yes, I can.

25 Q.   All right, sir.

```
 1          So these are dates and venues and a list of Janssen
 2   representatives -- sales representatives and a number of
 3   venues that you gave speaking programs at and specific dates
 4   of those events.
 5          Do you see that?
 6   A.   Yes, but these aren't all my speaker events.
 7   Q.   No, absolutely.  Dr. Hsu, I'm not suggesting these are
 8   all of your speaker events.
 9          As I understand it, sir, you gave more than 220
10   speaking events.
11          Does that seem consistent with your memory?
12   A.   Over a period of time.
13   Q.   Well, ever for Prezista and Intelence during the time
14   period that we're discussing.
15          Do you recall approximately --
16   A.   Well, so it's -- Prezista and Intelence is around 20 --
17   almost 20 years, 18 years.  So, yeah, I would say about 10, 15
18   a year would be possible.
19   Q.   Yes, sir.  Thank you.
20          And so what I'm talking about is a travel log that was
21   prepared by a Janssen sales representative, Ms. Nancy
22   Bartnett.  She was the sales representative who called on you
23   out in the field as well.
24          Correct?
25   A.   That is correct.
```

1    Q.   And Ms. Bartnett was one of the sales representatives who

2    was responsible for also setting up speaker programs for you

3    to speak on.

4         Correct?

5    A.   As well as the other representatives, correct.

6    Q.   Thank you.

7         She was one of the sales representatives who was

8    responsible for coordinating the schedule and the venues for

9    your speeches.

10        Correct?

11   A.   Yes.

12   Q.   And, Doctor, we're just looking at a -- what is a

13   snapshot in time, a schedule for about four months, from

14   January to -- well, about six months, from January to July of

15   2010.

16        Do you see that?

17   A.   Uh-huh.

18   Q.   Okay.

19   A.   Yes, I do.

20   Q.   And, sir, as I understand it, you gave a speech on

21   January 19th in New York at the Greenwich House.

22        Right, sir?

23   A.   I certainly could have.  If you can zoom out, I'd

24   appreciate it, so I can see my name.  Yes.

25   Q.   Yes, sir.

1          Well, let me do that one more time, just to show ou you

2    that you're the speaker on all of these events.

3          Okay, sir?

4          If you take a look, this is actually sorted by Janssen

5    for your name, Dr. Ricky Hsu.

6          Do you see that in the first two columns?  Speaker

7    first name, speaker last name?

8    A.   That -- okay.  I do see that.

9          Interesting because I don't recall ever -- I don't

10   recall ever traveling to Honolulu.

11   Q.   I'm sorry?

12   A.   I do not recall ever traveling to Honolulu on behalf of

13   Janssen.

14   Q.   I'm having a little hard time hearing you, Dr. Hsu.  Can

15   you --

16          THE COURT:  He doesn't recall ever traveling to

17   Honolulu for Janssen.  That's what I think he said.  But I

18   don't know if that's what he said, but that's what I heard.

19          MR. MARKETOS:  Okay.  To Honolulu.

20          THE WITNESS:  That -- that is correct.

21          So I am going with the assumption that this is correct,

22   but I actually do not recall -- I do recall maybe three or

23   four places that I've talked at, but I do not recall all

24   these talks.

25          THE COURT:  Can we hold on a second.

*United States District Court*
*District of New Jersey*

1        Folks, are you having difficulty hearing Dr. Hsu?  The

2   audio -- is there a way to clean up -- it does not sound

3   clear, folks.  Do we need to clear that up a little bit?

4   Because it's difficult to hear him, and the jurors are

5   having --

6        THE WITNESS:  I apologize.  I'll try and speak a

7   little louder.

8        Let me just turn off something.

9        THE COURT:  Yeah, if you could do that, Dr. Hsu, to

10  clean it up, because it's cutting in and out and it's chopped

11  up and I think the jurors are having some difficulty hearing

12  what you're saying.  I am as well, and I'm focusing.

13       THE WITNESS:  Okay.  I'm sorry.  Is that better?

14       THE COURT:  It may be.  It's hard to tell in one

15  sentence, but let's see how this goes.  All right?

16       THE WITNESS:  Okay.

17  BY MR. MARKETOS:

18  Q.  All right, sir.

19       Do you recall traveling -- do you recall giving a

20  speech at the Greenwich House in New York, New York?

21  A.   I have given speeches at the Greenwich House.

22  Q.   All right.

23  A.   And I speak for all different companies, so I can't

24  recall if it was for Janssen or when it was or if I actually

25  did that talk.

1          I'm assuming since it's on this list.  And if I have --

2     although I do say that I don't recall ever speaking for

3     Janssen in Honolulu.  Why that's on the list, I have no idea.

4     Q.   All right, sir.  We'll get to that in a moment.

5          You understand that these -- actually, if you take a

6     look at the bottom left, there's a line item in red there for

7     the Cafe Trio in Kansas City, Missouri.

8          Do you see that, sir?

9     A.   Yes, I do.

10    Q.   All right.

11         And do you recall actually being scheduled to go to

12    that event and it being canceled?

13    A.   I do not recall that.

14    Q.   All right.

15         MR. MARKETOS:  If we take a look at the bottom left

16    of the exhibit, Ms. Johnson, and then we can come back to this

17    blowup.

18         There's a reference to that engagement being canceled.

19         There you go.  Bottom left in red.

20         Thank you.

21    BY MR. MARKETOS:

22    Q.   "Program highlighted in red was canceled with pay.  I

23    wanted to keep this on the list as the speaker did receive

24    payment."

25         Do you see that, sir?

1    A.   Yes, I do.

2    Q.   Okay.  Thank you.

3         MR. MARKETOS:  Let's go back to the list of venues,

4    if we could, Ms. Johnson, starting with the date.

5         THE WITNESS:  Could I ask why you mention that?

6         MR. MARKETOS:  Why I mentioned what, sir?  I'm sorry?

7         THE WITNESS:  Why you're mentioning the Cafe Trio

8    program.  The reason why it's --

9         THE COURT:  Dr. Hsu, Dr. Hsu, it's the judge.  This

10   process is a little different from what you may be used to,

11   but as the witness you answer the questions posed to you, but

12   you don't get to ask the lawyers questions.

13        Understood?

14        THE WITNESS:  Understood.

15        THE COURT:  All right.  Thank you.

16   BY MR. MARKETOS:

17   Q.   Yes, sir.

18        There's a -- after the Greenwich House in February, on

19   the same date, you gave a speech to the Atlanta ID Group and

20   then another at Dolce Enoteca e Ristorante.

21        Do you see that?

22   A.   Okay.

23   Q.   Does that conform with your recollection, that you

24   traveled to Atlanta, Georgia, to speak about Janssen's drugs?

25   A.   I have been to Atlanta several times speaking, so I

```
 1  assume that it's correct.

 2  Q.   All right.

 3       And then it looks like the next week or so, about ten

 4  days later, you traveled to Little Rock, Arkansas, and had a

 5  speech at Sonny Williams' restaurant.

 6       Do you see that?

 7  A.   Yes.

 8  Q.   Cafe Trio, we already discussed, was canceled.  That was

 9  the point of that discussion, sir.

10       That was a trip that was canceled that you were to go

11  on to Kansas City, Missouri.

12       Correct?

13  A.   That is correct.  And I was indeed -- if it was canceled,

14  I was indeed paid, like, all -- pharmaceutical within 24, 48

15  hours --

16          THE COURT:  Hold up, guys.  Stop.  Sorry.  It's the

17  Judge.

18       Dr. Hsu, the court reporter can't hear what you're

19  saying.  We're having difficulty transcribing.

20       Is there -- I'm going to ask Janssen's counsel:  Is

21  there something that we can do to alleviate this problem?

22  Because the audio is terrible.

23          MS. BROWN:  I think Dr. Hsu just suggested he could

24  call in, Your Honor.  I think right now the sound is going

25  through his computer.
```

1          Could we try to -- Dr. Hsu -- can I ask him if he could

2     do that?

3          THE COURT:  Well, let me just make sure we can --

4     Kim, can we have him call in?

5          THE DEPUTY COURT CLERK:  I think so.  I'm getting Liz

6     right now.

7          THE COURT:  All right.  We're going to get IT to

8     figure this out, but this is -- all right.  Let's take a

9     ten-minute recess.  Let's reboot this.

10         For the jurors, I'm going to let them go back so we can

11    work this out.  But it sounds like everybody is having some

12    difficulty, including me.

13         Let's clean up the audio, and then he'll bring the

14    jurors back.

15         All right.  We're in recess.

16           (A short recess occurred.)

17           THE COURT:  Let's get them.

18           THE DEPUTY COURT CLERK:  All rise.

19         (The jury enters the courtroom.)

20         THE COURT:  All right, folks.  Everybody have a seat,

21    and hopefully this will be, I think, a little more clear for

22    the jurors through the audio now.

23         And Mr. Marketos, whenever you're ready to proceed.

24           MR. MARKETOS:  Thank you, Your Honor.

25    BY MR. MARKETOS:

```
 1   Q.   Dr. Hsu, can you hear me okay, sir?

 2   A.   Yes, I can.

 3   Q.   Thank you, Dr. Hsu.

 4        Let's get back to the schedule of speaker events that

 5   you had during the 2010 time frame, at least the first half of

 6   that year.

 7        Okay, sir?

 8   A.   Yes.

 9   Q.   All right.

10        To be clear, sir, at this time in 2010, you were based

11   out of New York like you are today.

12        Right, sir?

13   A.   That's correct.

14   Q.   And so for these events, you were traveling from New York

15   to attend each of these events in different cities across the

16   country.

17        Correct?

18   A.   Yes.

19   Q.   And Janssen would pay you for the actual speaker event

20   that you gave just for a speaker's fee.

21        Correct?

22   A.   That's correct.

23   Q.   And then, of course, they would reimburse you for your

24   travel.

25        Fair?
```

```
 1   A.   Fair.

 2   Q.   And the accommodations as well.

 3        Right, sir?

 4   A.   Yes.

 5   Q.   And then, of course, you know, any of the meals that you

 6   had, for instance, at Dolce Enoteca or Sonny Williams' or any

 7   of the other restaurants, they would pay for that.

 8        Correct?

 9   A.   Correct.

10   Q.   And then we see the same day you were in Kansas City,

11   Missouri, it looks like you had a meeting at the Met in

12   Memphis, Tennessee.

13        Do you recall that?

14   A.   Okay.

15   Q.   All right.

16   A.   No, I do not --

17   Q.   All right.

18   A.   -- specifically.

19   Q.   Okay.

20        If we take a look at the -- later in the month of

21   March, it looks like you traveled to Sarasota, Florida, Tampa,

22   Florida, and Denver Colorado.

23        Do you see that?

24   A.   Yes, I do.

25   Q.   And Denver, you were at the Oceanaire Seafood Room.
```

1    Correct?

2  A.   Yes.

3  Q.   And then we see in April you had three speeches you gave

4  that month.  One was in Santa Cruz, California; one was in

5  San Francisco, California; and then another one in Savannah,

6  Georgia.

7    Do you see that?

8  A.   Yes.

9  Q.   All right.

10    And then in May you went to Moran's Restaurant in

11  New York, where you were living at the time.

12    Right, sir?

13  A.   Correct.

14  Q.   You gave a speech there.  And then May 26 you were at

15  Mitchell's Fish Market in Lansing, Michigan.

16    Right, sir?

17  A.   Okay.  Yes.

18  Q.   And then it looks like you went to Grand Rapids,

19  Michigan, the same day and gave another speech.

20    Right, sir?

21  A.   Yes.

22  Q.   And each time you gave a speech, you were paid for the

23  speech you gave regardless of whether it was on the same day.

24    Fair?

25  A.   That's correct.  Usually on the same day, you're paid

 1  half the amount.

 2  Q.   Some lesser amount.

 3       Is that right?

 4  A.   That's correct.

 5  Q.   All right.

 6       And then you were asking about this one.  There's an

 7  entry July 28, 2010.  You don't recall being flown from

 8  New York to Honolulu, Hawaii, to give a speech in Hawaii at

 9  Ruth's Chris Steak House?

10  A.   I do not recall that, no.

11  Q.   Okay.

12  A.   I could be mistaken.  I do not recall that.

13  Q.   And that's fine, sir.

14       Let's take a look at Relators' Exhibit 376, which is in

15  evidence.  And we'll be able to show from Janssen's records,

16  sir -- maybe it will refresh your memory.  We'll pull up a

17  spreadsheet.

18       Sir, you don't recall being in Honolulu, Hawaii, for

19  four days?

20  A.   No, I do not.

21  Q.   Okay.

22       Do you travel to Hawaii frequently, or do you recall

23  ever having been to the state of Hawaii?

24  A.   I've been there several times, yes.

25  Q.   Okay, sir.

```
 1        So you don't recall giving two speeches over the course
 2   of four days in Honolulu, Hawaii, and being paid $5,000 in
 3   speaker fees during that time period?
 4   A.   I do not recall that.
 5   Q.   Okay.
 6   A.   No.
 7   Q.   All right, sir.
 8        We'll try to bring that up for you.
 9        Dr. Hsu, while we're bringing that up, sir, you
10   understand, sir, that there are regulations that apply to
11   pharmaceutical companies with respect to their payments to
12   doctors.
13        Right, sir?
14   A.   Yes.
15   Q.   And, sir, one of the reasons for having those regulations
16   in place, one of the reasons those laws are in place is
17   because it's focused on the pharmaceutical companies' payment
18   of money for inducing prescriptions.  It looks at the
19   pharmaceutical companies' intent.
20        Do you understand that?
21   A.   Yes.
22   Q.   And there's a good reason for that, right, Dr. Hsu?  If
23   pharmaceutical companies, in fact, themselves are intending to
24   induce physicians with money, it's possible that those
25   physicians' judgment might be impaired.
```

```
 1          You understand that's the reason for having these laws
 2   in place?
 3   A.   I think you're referring to kickbacks, correct.
 4   Q.   Yes.
 5          That's focused on the pharmaceutical company and their
 6   intent, right, sir, not on the doctor.
 7          Do you understand that?
 8   A.   Okay.  Yes.
 9   Q.   Okay.
10          So -- you understand that the allegations in this case
11   that are being brought by the Relators are against Janssen
12   with respect to its intent in making payments to doctors.
13          Do you understand that those are the allegations?
14   A.   Yes, but I don't understand how those allegations relate
15   to -- you'll let me know -- to my speaking at these places.
16   Q.   I understand that, sir.
17          And as I understand it, Dr. Hsu, you personally don't
18   believe that you yourself would be influenced by the payment
19   of money from a pharmaceutical company.
20          Is that fair?
21   A.   I hope that is not the case.  I do not think so.
22   Q.   Yes, sir.
23          And part of the reason for having the laws in place is
24   so that we don't have to worry about that potentially
25   happening with a doctor's medical judgment.
```

```
 1          Right, sir?
 2    A.   Sure.
 3    Q.   And then because, of course, the drugs that you're
 4    writing prescriptions for and the other 330-something speakers
 5    on this bureau, those are drugs that, to a large degree, get
 6    reimbursed by the federal government.
 7          Right, sir?
 8    A.   Yes.
 9    Q.   And so the taxpayers and the federal government have an
10    interest in making sure that pharmaceutical companies aren't
11    trying to induce doctors to write prescriptions that get
12    reimbursed by taxpayer money.  You understand that.
13          Right, sir?
14    A.   I do understand that, but what you showed me, like the 25
15    highest prescribers of HIV drugs, including Prezista,
16    darunavir, 15 of those people on the speakers, including some
17    of the very top prescribers, are not on the speakers' bureau
18    because they, whatever reason, either didn't know competitor's
19    data or were unable to convey that information.
20    Q.   I understand, Dr. Hsu, and, again, there were 335
21    speakers on this bureau, doctors.  Do you understand that?
22          Right, sir?
23    A.   Yes.  I would say ten per city, and they're probably --
24    30 major cities throughout the U.S.
25    Q.   Yes, sir.
```

```
 1   A.   That's 300, correct.

 2   Q.   I understand, sir.

 3        And then you were also flying to other cities.

 4        Right?

 5   A.   Yes.  There's a regional speaker, which is -- someone's

 6   considered a regional speaker, a district speaker, and then

 7   the national speakers.  The national speakers are usually

 8   those speakers who have national prominence because they're

 9   speaking in a lot of conferences.  A lot of providers do

10   recognize them as potential key opinion members, so they

11   actually request those speakers to come and speak for them.

12   Q.   Yes, sir.

13        You're describing a segment of the doctor population.

14   I'm just asking if you understand why it is that the laws for

15   anti-kickback statutes are in place.  You understand they're

16   in place to ensure that pharmaceutical companies aren't using

17   the payment of money in a way that induces doctors to

18   prescribe their drugs.

19        Right, sir?

20   A.   I do -- I do understand that.  I was explaining why I'm

21   traveling nationally.

22   Q.   I understand.

23        And it's not your testimony that there aren't doctors

24   in your field that could be influenced by the payment of

25   money, is it?
```

1  A.    I'm sorry.  Could you repeat that question?

2  Q.    Yes, sir.

3        It's not your testimony that there are other doctors in

4  your field who might be influenced by the payment of money by

5  a pharmaceutical company, is it?

6  A.    It's not part of my testimony now.

7  Q.    I'm sorry.  I didn't understand that, sir.

8  A.    It's not part of my testimony, no.  I'm just talking

9  about myself.

10  Q.    I understand.

11        You're speaking only of yourself.  I appreciate that,

12  Dr. Hsu.

13  A.    Okay.

14  Q.    Let's see if we can sort this spreadsheet so we can

15  confirm for you that you actually did speak in Hawaii and

16  Honolulu and at Ruth's Chris Steak House.

17        MR. MARKETOS:  Thank you.

18  BY MR. MARKETOS:

19  Q.    We'll sort that for you by name.  Do you see we're going

20  to enter your name in the database, sir?  All right, sir.

21        So what we're going to look at now --

22        MR. MARKETOS:  If we scroll over to, I guess, to the

23  left, Ms. Johnson.  Thank you.

24  BY MR. MARKETOS:

25  Q.    Do you see we've got the speaker bureau, and it was

1    Prezista, and it was presented in Hawaii in July 29, 2010, and

2    July 30, 2010, Dr. Hsu?

3    A.    Yes.

4    Q.    Do you see we sorted it by specific speaker events that

5    you gave?

6          Do you understand that, sir?

7    A.    Yeah.  I stand corrected.

8    Q.    And that's fine, Dr. Hsu.  It's not a memory test, sir.

9          You actually spent four days in Honolulu and gave two

10   speaker events while you were there.

11         Do you see that, sir?

12   A.    Yes, I do.

13   Q.    Okay.

14         And then, of course, you were reimbursed for travel and

15   you were reimbursed for your restaurant and you were

16   reimbursed for your hotel stay by Janssen.

17         Right, sir?

18   A.    That's correct.

19   Q.    Okay.  And you did receive $5,000 for those two programs.

20         MR. MARKETOS:  We just passed it, Ms. Johnson, to the

21   left.

22         Thank you.

23         THE WITNESS:  Yeah, that is correct.

24   BY MR. MARKETOS:

25   Q.    So just on that one trip, Janssen paid for your travel

1   from New York to Honolulu and $5,000 to speak and for all your

2   room and board and your meals.

3       Fair?

4   A.   That is fair, yes.

5   Q.   Okay, sir.

6       Sir, you had mentioned earlier wanting to have an

7   understanding of how a company like Janssen or a

8   pharmaceutical company might calculate a return on investment

9   with respect to amounts that had been invested in a

10  promotional speaker program and its return on that investment.

11      Do you understand?

12  A.   Yes.

13  Q.   Okay.

14      I'm going to show you Relators' Exhibit 619.  And,

15  Dr. Hsu, fair to say, sir, that you don't know or you did not

16  know, as we sit here today, that Janssen was calculating a

17  return on investment for its programs while you were on the

18  speakers' bureau for Prezista and Intelence.

19      Fair?

20  A.   That's fair.

21  Q.   Okay.

22      We're going to -- when we get 619 pulled up -- you can

23  see that this is a 2011 program evaluation measuring return on

24  investment.

25      Do you see that?

```
 1   A.   Yes.
 2   Q.   Let's just orient ourselves here, sir.  Let's turn to
 3   page 73 of that document.
 4          MR. MARKETOS:  Thank you, Ms. Johnson.
 5        Bear with me, Dr. Hsu.
 6          THE WITNESS:  Sure.
 7   BY MR. MARKETOS:
 8   Q.   All right, sir.  Now, the MedForce speaker programs,
 9   those are programs that were put on by a company called
10   MedForce on behalf of Janssen.
11        Do you recall that?
12   A.   Yes.
13   Q.   And the MedForce speaker programs generated a strong
14   prescription lift per participant -- is what's being reflected
15   in this study that's being performed by Janssen's own vendors.
16        Do you understand that?
17   A.   Okay.
18   Q.   Okay, sir.
19        And what you can see, sir, is Janssen has investment
20   and the number of participants that were listed on the top
21   right there.  It had invested $2.6 million at that period of
22   2011 for almost 12,000 participants.
23        Do you see that?
24   A.   Yes.
25   Q.   Okay.
```

1          And there's a reference to the total prescription lift

2     that Janssen was calculating it had received as a function of

3     these programs.

4          Do you see that?

5     A.   Okay.

6     Q.   You understand that Janssen was calculating the

7     incremental increase in prescriptions of its drugs that it

8     obtained through these programs.

9     A.   Okay.

10    Q.   All right.

11         And then a total NTS lift.  That's a total net trade

12    sales lift of $4,041,513.

13         Do you see that?

14    A.   I see.

15    Q.   For that year to date.

16         And then --

17    A.   Yes.

18    Q.   -- for the total participants, there was a total net

19    trade sales lift of $7.7 million to Janssen.

20         Do you see that?

21    A.   Yes, I do.

22    Q.   And a total number of prescriptions lifted of over 11,000

23    prescriptions.

24         Do you see that, sir?

25    A.   Yes, I do.

```
 1   Q.   Okay.

 2        And it also says at the bottom left there,

 3   "Interestingly, Intelence speaker programs also had impact on

 4   Prezista's prescription lift."

 5        Do you see that?

 6   A.   Yes.

 7   Q.   Okay.

 8        And at the time, sir, that you were participating in

 9   these programs, you were not aware of Janssen calculating

10   returns on investment in terms of the speaker program and

11   prescription lift.

12        Is that fair?

13   A.   I was not aware of it consciously, I would assume, but

14   any pharmaceutical business would want to do something like

15   this.

16        The increase in the number of prescriptions is in

17   relationship to speaking events from providers in the audience

18   and not the speakers, so --

19   Q.   I'm sorry?

20   A.   -- not -- so that increase, prescription lift, is, my

21   understanding -- I'm not the business person -- means the

22   number of increased prescriptions based on these programs that

23   were given.

24        These are not referring to the prescriptions inducing

25   speakers.  These are prescriptions that have increased because
```

1  speakers discuss these drugs to the audience.  The audience

2  now understood, never having utilized them, started

3  prescribing them.

4      So it wasn't, in my mind, an induction for prescribing

5  medicines for speakers.  It was an educational program to

6  educate the providers in the audience to prescribe more.

7  Q.  I understand, Dr. Hsu.

8      This is the first time you're seeing this document.

9      Is it not?

10 A.  That's correct.

11 Q.  Who told you that this was only calculating the number of

12 prescriptions per attendee and not the number of prescriptions

13 for speakers also?

14 A.  Well, it's participants, and this is the treatment lift

15 out of the participants, I'm assuming, or it could be

16 nationally.  I don't know.

17 Q.  All right.

18     You don't know whether or not speakers' prescriptions

19 are included in these calculations.  Is that what you're

20 saying?

21 A.  What I'm saying is there's no way to distinguish between

22 those -- if it was just participants or participants and

23 speakers, there's no way to distinguish this from this

24 calculation.

25 Q.  I understand that, Dr. Hsu.

```
 1          So as we sit here today, you don't know whether or not
 2   Janssen was including prescriptions from speakers also as part
 3   of its calculation of return on investment.
 4          Fair?
 5   A.   That's fair.
 6   Q.   All right, sir.
 7          And you had mentioned earlier, Dr. Hsu, quite a few
 8   times during your testimony Janssen, like all other
 9   pharmaceutical companies, might want to do something like
10   this.
11          Do you recall generally giving that testimony?
12   A.   Yes.
13   Q.   And essentially what you're saying, sir, as I understand
14   it, is that what Janssen is doing with this particular
15   promotional speaker program is no different than all of the
16   other pharmaceutical companies that you have given promotional
17   speaker events on behalf of.
18          Is that right?
19   A.   Yes.
20   Q.   Okay.
21   A.   That's right.
22   Q.   Sir, you gave us a list of those yesterday.  You also
23   have given speeches for GSK, GlaxoSmithKlein.
24          Right, sir?
25   A.   Yes.
```

```
 1   Q.   Merck.

 2        Right?

 3   A.   Yes.

 4   Q.   Abbott.

 5        Correct?

 6   A.   That is correct.

 7   Q.   Serono?

 8        Right, sir?

 9   A.   Yes.

10   Q.   And Gilead was one that you mentioned as well.

11        Do you recall that?

12   A.   Yes.

13   Q.   And as I understand it, you had an issue with Gilead in

14   particular because you learned that they were tying your

15   speaking to prescription writing of their drugs.

16        Right, sir?

17   A.   That is correct.  I did let that out.

18   Q.   As you told us yesterday, that sort of thing is unethical

19   because it -- it is essentially a pharmaceutical company

20   paying for prescriptions and paying a provider to increase its

21   prescriptions.

22        Right?

23   A.   Yes.  First time it ever occurred --

24   Q.   And --

25   A.   -- in my 26 years of practice.
```

*5200*

```
 1   Q.   It was the first time that it was made known to you that

 2   the company was requiring that of you.

 3        Is that fair?

 4   A.   I don't know if they were requiring -- I don't think they

 5   were requiring that of me.  It was that particular rep.  And

 6   that representative was reprimanded for it.  I'm still on the

 7   Gilead speaker bureau and prescribe the medicines and talk

 8   about the medicines as I think is best for those medicines to

 9   be for a patient.

10   Q.   Okay.  Thank you, Dr. Hsu.

11        You're still on the speakers' bureau, but there was a

12   representative who essentially said he wanted you -- he or she

13   wanted you to write more prescriptions.

14        Is that fair?

15   A.   That is fair.

16   Q.   And that was a bad thing, and you knew that, and you

17   didn't want to do that.

18        Right?

19   A.   That's correct.

20   Q.   And, again, sir, that gets back to why these regulations

21   are in place:  to prevent that sort of inducement from taking

22   place and affecting a doctor's medical judgment.

23        Fair?

24   A.   That's fair.

25        And I do not think that I have been induced in any way
```

1  based on my prescriptions speaks for these companies, and, you

2  know, if my prescriptions go up or down, if the company

3  decides to keep me, it's for -- you know, for whatever reason.

4      So this is an example, Abbott, as I mentioned, I spoke

5  for.  Abbott makes Kaletra, which is the predecessor for

6  Prezista, both --

7      THE COURT:  Dr. Hsu, this is the judge.  Can you hear

8  me?

9      THE WITNESS:  Yes.

10     THE COURT:  I'm going to direct you to answer the

11  questions that are posed to you.  I understand that you want

12  to maybe say some other things and Janssen counsel, you know,

13  was examining you earlier, but I'm going to direct you to

14  answer just the questions that this counsel is posing to you.

15     Do you understand that?

16     THE WITNESS:  I do.

17     THE COURT:  All right.  So you did respond to his

18  question, but then you went on to a longer narrative that was

19  nonresponsive.  So I'm going to strike that second part.

20     The question was -- and let me just pull it up.

21     "Again, sir, that gets back to why those regulations

22  are in place, to prevent that sort of inducement from taking

23  place and attempting to influence a doctor's medical judgment.

24  Fair?"

25     And then you said, "That's fair."

 1          That part of the response the jury may consider, but

 2     everything else I'm striking.

 3          All right.  You may move on, Mr. Marketos.

 4          MR. MARKETOS:  Thank you.

 5     BY MR. MARKETOS:

 6     Q.   And Dr. Hsu, I understand it's your belief, sir, that

 7     you're not induced when a pharmaceutical company or multiple

 8     pharmaceutical companies pay you to speak on their programs.

 9          But you understand, sir, that with respect to other

10     physicians, physicians in the United States -- and the

11     government and taxpayers and patients might have a different

12     view of pharmaceutical companies paying doctors who are

13     prescribing their drugs.

14          Right, sir?

15     A.   It's possible, sure.

16     Q.   And if we take a look at RX-360, this is already in

17     evidence.

18          Sir, this is a -- I'll represent to you this is a

19     Janssen compliance document that was actually provided by

20     Johnson & Johnson.

21          MR. MARKETOS:  And if we turn to page 19, please.

22     BY MR. MARKETOS:

23     Q.   There's been a lot of regulation in this industry

24     specifically directed at promotional speaker bureaus and

25     pharmaceutical companies paying kickbacks to doctors.  You're

```
 1   aware of the regulations and the enforcement actions that the
 2   government has taken.
 3         Right, sir?
 4   A.   Yes.  They're oftentimes discussed in our compliance and
 5   training programs.
 6   Q.   Yes, sir.
 7         And they're oftentimes discussed, and you're actually
 8   aware of them, given that you've participated on speakers'
 9   bureaus for a number of pharmaceutical companies who have had
10   enforcement actions taken against them.
11         Fair?
12   A.   Fair.
13          MR. MARKETOS:  And if we take a look at the next
14   slide, slide 21.  Yeah.
15         Thank you.
16   BY MR. MARKETOS:
17   Q.   That actually refers to an FDA enforcement action that
18   was taken against a company, Serono, for paying kickbacks to
19   doctors and off-label marketing for an AIDS-wasting drug.
20         Do you recall that taking place, sir?
21   A.   Yes, I am.
22   Q.   Of course Serono was a company that you had given
23   speeches on behalf of.
24         Correct?
25   A.   That is correct.
```

 1   Q.   Also, sir, in 2008, Merck, one of the other companies

 2   that you provided, settled allegations with the Department of

 3   Justice that it was paying kickbacks to physicians.

 4        Do you recall that?

 5   A.   I'm not aware of Merck's payment.

 6   Q.   Are you aware of the fact that in 2012, GSK,

 7   GlaxoSmithKlein, resolved a government DOJ enforcement action

 8   for paying kickbacks to doctors and engaging in off-label

 9   marketing?

10   A.   I had heard something to that effect, but I'm not aware

11   of the specifics.

12   Q.   That was one of the largest settlements in the

13   pharmaceutical industry's history.

14        Do you recall that?

15   A.   No, I don't.  I do remember I did get the news, and I

16   can't remember if they talked about it --

17   Q.   Okay, sir.

18        So that was, again, one of the companies that you had

19   spoken for, and it was during that same time period, 2012.

20        Right?

21   A.   Yes.  And I think they were very clear to take regulatory

22   measures in their training to make sure that we, as speakers,

23   don't broach things that are considered off label or discussed

24   by --

25   Q.   Yes, sir.

1    And another company that you spoke on behalf of you

2    told us was Abbott.  Abbott settled allegations for paying

3    kickbacks to doctors and off-label marketing in 2018 for

4    conduct that occurred during the 2006 to 2008 time frame.

5    Do you recall the Abbott enforcement action that the

6    federal government took?

7    A.    No, I was not aware of Abbott.

8    Q.    All right.

9    And Gilead, sir, you mentioned that that was the other

10    pharmaceutical company that you have given speeches for on

11    promotional speakers' bureaus.

12    Gilead settled allegations that it was paying kickbacks

13    in 2020.

14    Do you recall that?

15    A.    I do know that Gilead had paid something, but did not

16    know it was about kickbacks.

17    Q.    All right, sir.

18    It's fair to say, sir, that if a pharmaceutical company

19    like Janssen is doing something like all the other

20    pharmaceutical companies that you just described, that doesn't

21    make it okay.

22    Fair?

23    A.    If that's what they're doing, it does not make it okay;

24    that is correct.  I agree with that.

25    Q.    And it's also fair to say, Dr. Hsu, that before today,

1    you were not aware of how Janssen was selecting speakers for

2    the Promotional Speaker Bureau for Prezista and Intelence.

3        True?

4    A.   Other than the general feeling that, again, the providers

5    who are very, I guess, comfortable using the drug, understand

6    the drug, and are best able to convey that to the audience.

7    It's more of a competitive landscape in a clear manner.

8    Q.   And Dr. Hsu, you are not aware, as we sit here today, of

9    whether or not Janssen specifically tracked speakers'

10   prescription lift after they were paid to speak on Janssen's

11   Promotional Speaker Bureau.

12       Is that fair?

13   A.   I am not -- well, I am aware, as I mentioned before, that

14   prescriptions are being tracked by all pharmaceuticals and

15   they are aware of it.  But I haven't seen evidence thus far to

16   me that shows that Janssen picked their speakers based on

17   their prescriptions only.

18       Twenty-five people on that list, as I mentioned, and

19   many of those were not speakers, including some of the highest

20   prescribers.

21   Q.   I understand, sir.

22       And in fairness, you haven't been present at this trial

23   until you gave your testimony over the last two days.

24       Fair?

25   A.   That's fair.

1    Q.   Okay, sir.

2         And yesterday, as I understand it, you agreed that it

3    would be unethical for a company to remove speakers from a

4    speaker bureau if these speakers, those physicians, were not

5    prescribing enough of the company's drugs.

6         Do you recall that testimony?

7    A.   I -- unfortunately, this isn't a "yes" or "no" answer.

8         As I mentioned with Kaletra and Abbott, you know, my

9    prescriptions did go down, and it was replaced because there

10   was this protease inhibitor, Prezista, it had less cholesterol

11   and diarrhea affects than Kaletra.

12        So my speaking for Janssen and no longer speaking for

13   Abbott was probably a mutual decision because I could not

14   consciously talk about using the Kaletra -- a drug like

15   Kaletra, which was less effective, more side effects, diarrhea

16   and high cholesterol.

17        So I was taken off Abbott's speaking bureau, but that

18   was understandable.  It was not because my prescriptions went

19   down.  It's because I could not consciously talk about a drug

20   that I felt wasn't actively prescribing a patient.

21   Q.   I understand, Dr. Hsu.  My question was slightly

22   different.

23        If, in fact, a pharmaceutical company is removing

24   doctors from a speaker bureau because their prescriptions of

25   that drug have tailed off, I understand you told us yesterday

 1    that that, in your view, would be unethical.

 2          Is that fair?

 3    A.    Depending on the situation then.  The last situation that

 4    I described, it's not unethical for me to be taken off the

 5    Abbott speakers' bureau.

 6    Q.    Yes, because you had chosen not to prescribe that drug

 7    anymore at all.

 8          Fair?

 9    A.    Not at all, but, yes.

10    Q.    Okay, sir.

11          And if, in fact, Janssen, in this case, was removing

12    speakers for not prescribing enough Prezista any longer, you

13    wouldn't have a problem with that.

14          Do you agree?

15    A.    With the -- in general, I would agree.

16    Q.    I appreciate your time, Dr. Hsu.

17          MR. MARKETOS:  I have no further questions.

18          THE COURT:  All right.  Thank you, Mr. Marketos.

19          Ms. Brown.

20    (REDIRECT EXAMINATION BY MS. BROWN:)

21    Q.    Hi, Dr. Hsu.  It's Alli Brown again.  I just have about

22    five minutes of questions for you.

23          Okay, sir?

24    A.    Okay.

25    Q.    Dr. Hsu, you were shown by counsel a chart of some of

```
 1   your speaking engagements in the early part of 2010.

 2          Do you recall that chart, sir?

 3   A.   Yes, I do.

 4   Q.   And in your experience as a speaker, sir, did you find

 5   that when there were updates to a particular medicine's label,

 6   you were often called upon to speak more frequently at that

 7   time period?

 8   A.   Yes.

 9          Obviously, if there's a new indication, it would be a

10   reason to utilize the drug.  That message oftentimes would

11   be -- want to be provided to other practitioners.  So the

12   speakers' bureau would be utilized more frequently.

13   Q.   And the time period at issue that you were shown on that

14   chart with California and Hawaii was the early part of 2010.

15          Did you know, Dr. Hsu, that on January 27th of 2010,

16   Prezista's label was expanded to include the 96-week ARTEMIS

17   data?

18   A.   I did not recall that.  That's -- thank you for reminding

19   me.

20   Q.   Was that, in your mind, that 96-week data, was that an

21   important update to the Prezista label?

22   A.   Absolutely.

23          So the ARTEMIS data really highlights naive

24   indications, the use of Prezista in providing treatment as

25   opposed to treatment-experienced patients.  If the
```

1  treatment-experienced patients was in 2006, then I don't

2  recall exactly when the treatment-naive indication was.  But I

3  guess it must have been around that ARTEMIS data.

4  Q.   And Dr. Hsu, in your opinion, do you believe that the

5  presentations you gave for the entire time period you were on

6  our speaker bureau, do you believe that those benefited your

7  medical doctor colleagues who were attendees in the audience?

8  A.   I would hope so, in the sense that, again, at that time

9  the major protease inhibitor that was being utilized was

10  Kaletra, which had that once-a-day naive indication, and

11  since, in my opinion, one provider's opinion, Prezista is

12  found to be superior to return efficacy, which are the

13  diarrhea and lower lipid effect, then I do think it was

14  important for physicians to be aware of this data.

15  Q.   Did the fact, Dr. Hsu, that, as part of your

16  participation in the speaker bureau, Janssen paid for you to

17  travel to the locations that you gave these speeches, did that

18  cause you to prescribe medicines to your patients that were

19  inappropriate?

20  A.   I personally do not think so.

21       As an example, in these last several years, when the

22  integrase inhibitors came out, my prescriptions of Prezista

23  went down because the integrase inhibitors had become more

24  standard of care with lower cholesterol, lower diarrhea side

25  effects, yet similar efficacy, yet I was still being asked to

1   discuss Prezista because I still used Prezista for patients

2   who needed it for a variety of reasons.

3   Q.   You understand that the allegations in this case, Doctor,

4   are that Janssen paid you kickbacks to prescribe more Prezista

5   and more Intelence.

6        From your point of view, is that true?

7   A.   I do not personally think so.  I am not aware of it.  But

8   both my increased and decreased of Prezista use, I feel myself

9   as a speaker had continued to be utilized with fairly the same

10  frequency.

11  Q.   Is there -- for all of the prescriptions that you wrote,

12  Dr. Hsu, for Prezista and Intelence, do you believe you wrote

13  those prescriptions based on your best medical judgment?

14  A.   I would hope so.

15       I mean, the general philosophy is to treat my patients

16  as if I were treating another friend or a family member or

17  even myself.  I like to oftentimes put myself in the shoes and

18  figure out -- the patient's shoes and try and figure out what

19  the best medicine is for that patient for the particular

20  situation.

21  Q.   Thank you very much for your time, Dr. Hsu.  I don't have

22  any more questions for you.

23       THE COURT:  All right.  Thank you, Ms. Brown.

24       Dr. Hsu, this is the judge.  You are excused from the

25  trial, so thank you.  You can log off.

1           THE WITNESS:  Thank you.

2           THE COURT:  We're switching gears back to Relators'

3    case, right.  That was out of turn.

4        But Mr. Marketos, any additional witness from Relators'

5    side?

6           MR. MARKETOS:  Yes, Your Honor.  Thank you.

7        Relators call Mr. Ian Dew.

8           THE COURT:  All right.

9    (**IAN DEW**, HAVING BEEN DULY SWORN/AFFIRMED, TESTIFIED AS

10   FOLLOWS:)

11          THE DEPUTY COURT CLERK:  Please state your name and

12   the spelling of your last name for the record.

13          THE WITNESS:  Ian Dew.  My last name is D-E-W.

14          THE COURT:  Good afternoon.

15       Mr. Marketos, whenever you're ready to proceed with

16   Mr. Dew, you may.

17          MR. MARKETOS:  Thank you, Your Honor.

18   (DIRECT EXAMINATION BY MR. MARKETOS:)

19   Q.   Mr. Dew, good afternoon, sir.

20   A.   Good afternoon.

21   Q.   Mr. Dew, would you please describe for the members of the

22   jury what your background and your expertise is in, sir?

23   A.   Yes.

24       I am currently a data analyst, particularly a

25   consulting expert and an expert witness focusing on primarily

1  False Claims Act cases involving health care -- allegations of

2  health care fraud, particularly against -- involving the

3  Medicaid and Medicare programs.

4  Q.   And I'm sorry, Mr. Dew.  This happens a lot.  If you

5  would try to scoot the microphone closer to your mouth,

6  hopefully we can hear you.

7       We try to get it right, but you may end up having to

8  scoot in closer.

9       Okay, sir?

10 A.   Yes.

11 Q.   So one more time, sir, can you describe for us what your

12 expertise is in specifically?

13 A.   Yes.  It's primarily data analysis and health care

14 transaction data analysis.

15 Q.   All right.

16      When you say "data analysis," you mentioned that you

17 are -- have expertise in areas relating to health care fraud.

18      Is that right?

19 A.   Yes.

20 Q.   And specifically with respect to the False Claims Act.

21      Is that what you said?

22 A.   That's primarily the area, yes.

23 Q.   All right.

24      Before I go into your educational background, can you

25 explain how you have been involved in cases relating to the

1  False Claims Act and allegations of health care fraud and

2  reimbursements from the federal government?

3  A.    Yes.  So I started in 2004 as what I understand is a

4  consulting expert role, and that was exclusively supporting

5  the United States Department of Justice and U.S. Attorney's

6  Offices and state offices of attorneys general and

7  investigating cases from a data perspective, helping attorneys

8  decide whether to intervene in a case or not and also working

9  out numbers for settlement negotiation purposes.

10 Q.    And, sir, just so I can make this clear, you're not a

11 data analyst that does an investigation to figure out whether

12 or not fraud took place, are you?

13 A.    No.  I am informed of allegations, and I look in the data

14 for data that is consistent or not consistent with those

15 allegations.

16 Q.    Why does data have to be analyzed when it comes to

17 looking at Medicare- or Medicaid-reimbursed programs?

18 A.    Well, because, in almost every instance, the claims that

19 are consistent with the allegations are a subset of a dataset

20 that would, you know, be produced by a simple query, and so

21 there are filtering and other steps that need to be performed

22 with some knowledge of the allegations and perhaps relating to

23 other datasets in order to identify those claims.

24 Q.    All right.

25       Mr. Dew, the word "claims" is sometimes confused with

1    claims that are made in a legal case or allegations that are

2    brought in a legal case.

3           Are you talking about claims that are made when a

4    prescription -- a drug prescription is submitted to Medicare

5    or Medicaid or some other government reimbursement program?

6    A.    Yes.  I'm sorry.  I'm referring to claims to government

7    health programs for medical products or services.

8    Q.    And Medicare and Medicaid reimbursed for a lot of drugs

9    and other medical services.

10          Is that fair?

11   A.    Yes.

12   Q.    All right.

13          How much data does the United States Government and

14   other state government agencies warehouse?  How much data does

15   the government keep on pharmaceutical claims that have been

16   submitted and reimbursed?

17   A.    I don't have a good idea of that other than it's massive,

18   from my perspective.  I have worked on projects that were

19   fairly specific as to drugs, for example, and there I had to

20   process in excess of a billion pharmacy claims to do those

21   analyses, and that was, you know, a small set of drugs that

22   were involved in that.  So from that, I would estimate, you

23   know, it's perhaps trillions but many billions.

24   Q.    Many billions of claims are submitted, and that data is

25   stored by government agencies.

1          Is that right?

2    A.    Yes.

3    Q.    Okay, sir.

4          And if you would, let's get back to your background.

5          How did you get into the business or the field of

6    studying data in order to assist with enforcement actions and

7    False Claims Act cases brought by the Department of Justice?

8    A.    Well, so my entire career has involved computer

9    programming, evolving more into high-performance computing and

10   algorithm research and development, and those are, I think,

11   essential skills for managing large datasets and exploring

12   them.  And so my entire career has really been associated with

13   that, connected to that in one way or another.  In terms of

14   the connection to government health program claims, I knew

15   that one job I had was probably -- going to end, and so I was

16   looking for other opportunities, and I found one in this field

17   and pursued it.

18   Q.    All right.

19         How long ago was that that you pursued an interest in

20   analyzing claims data in government enforcement actions?

21   A.    I started this work in March 2004.

22   Q.    So for about the last 20 years or so, you've been

23   involved in analyzing data associated with health care

24   fraud-related claims.

25         Is that fair?

*5217*

```
 1   A.    That's nearly all of the work I've done, yes.

 2   Q.    And approximately how many times have you consulted for

 3   or provided data analytic services for the Department of

 4   Justice?  Can you estimate?

 5   A.    I don't know if it would be more or less than 50 or 60

 6   projects.

 7   Q.    Okay.

 8         You can just give us an approximation, sir.

 9   A.    That's probably as close as I can come off the top of my

10   head.

11   Q.    Okay, sir.

12         Have you done so recently other than in this case?

13   A.    Yes.

14   Q.    All right.

15         And just describe for us, sir, what type of skill sets

16   it takes -- what does one have to do in order to analyze how

17   much money the federal government has reimbursed a

18   pharmaceutical company specifically tied to allegations of

19   fraud?

20   A.    Well, to clarify, the reimbursements would be to

21   pharmacies or something of that nature, but it's a combination

22   of computer science type of skills as well as data analysis

23   skills and then knowledge of the particular types of health

24   care transaction data that are involved.

25   Q.    Okay.
```

**United States District Court**
**District of New Jersey**

1    And briefly describe for us your education, sir.  Where
2    were you educated?
3    A.    I have a bachelor's degree with a double major in
4    mathematics and psychology from the University of Virginia.  I
5    stayed there and received a master's degree in systems
6    engineering.  I then went to work in -- for a small number of
7    defense contractors, primarily doing contract work for the
8    Defense Advanced Research Projects Agency.  During that time,
9    I earned a master's degree in environmental science from the
10   Johns Hopkins University.
11       And I completed course work and passed exams for a
12   Ph.D. in policy studies at the University of Maryland, but I
13   didn't do the dissertation.
14   Q.    All right, sir.
15       You began working, as I understand it, specific to this
16   industry and the type of testimony that you're offering today
17   approximately 20 years ago.
18       Is that right?
19   A.    Yes.
20   Q.    And have you had an opportunity to be a consulting expert
21   on False Claims Act cases related to health care fraud before
22   today, before this case?
23   A.    Yes.
24   Q.    All right.
25       Sir, let me turn your attention to what it is that you

1    did in order to assist with this case.  And before I get into

2    the specifics, Mr. Dew, what generally were you asked to do to

3    assist the Relators in proving the amount of money that had

4    been reimbursed to Janssen as a result of the allegations in

5    this case?

6    A.    I was asked to identify pharmacy claims to government

7    health programs and reimbursement amounts paid on them that

8    are consistent with the allegations in the case.

9    Q.    And did you work with any other experts that were hired

10   by the Relators in this case?

11   A.    Yes.

12   Q.    All right.

13         Who is Cynthia Swanson?

14   A.    She was hired -- she is a registered nurse.  She is a

15   fellow in the American Academy of Professional Coders with

16   multiple credentials from that organization.  She is a senior

17   manager of health care consulting at what was Seim Johnson, I

18   believe, in Nebraska.

19   Q.    Okay.

20         Ms. Swanson is a certified professional medical coder.

21         Is that right?

22   A.    Yes.  I think she has multiple credentials of that type,

23   yes.

24   Q.    All right.

25         And Professor Shaked, who is -- have you worked with

 1  Professor Shaked and his team in this case?

 2  A.    I have.

 3  Q.    And the members of the jury haven't met Professor Shaked

 4  yet, sir.

 5        Do you understand that Professor Shaked is a

 6  statistician and economist who will be offering opinions on

 7  statistical analyses of behavior and also on damages in this

 8  case?

 9  A.    Yes.

10  Q.    And did you have an opportunity to review his report and

11  consult with Professor Shaked as you were performing your

12  work?

13  A.    Yes.

14  Q.    And how about Dr. Aaron Glatt?  He's testified in this

15  case with respect to his medical opinions.

16        Did you have any consultation opportunities with

17  Dr. Glatt as it relates to the work that you performed?

18  A.    I didn't directly interact with him, but I know

19  information was exchanged through Relators' counsel from me

20  that he reviewed, and I got feedback.

21  Q.    Yes.

22        So Dr. Glatt, was he a source of information for you as

23  you prepared to provide services in this case?

24  A.    Yes.

25  Q.    And were you asked to identify Medicare and Medicaid

1    claims that are consistent with the allegations in this case?

2    A.    Yes.

3    Q.    Again, claims being -- and claims that are submitted for

4    reimbursement from the Medicare and Medicaid programs.

5         Right, sir?

6    A.    Yes.

7    Q.    What time period did you -- what time period did you

8    analyze the data for, sir?

9    A.    So for Prezista it was from 2006 through 2014, and for

10   Intelence, it was, I think, January 22nd, 2008, through the

11   end of 2014.

12   Q.    And that's the time period that we're discussing in this

13   case specifically.

14        You understand that?

15   A.    Okay.

16   Q.    All right.

17        So do you understand that there are allegations of

18   violations of the Anti-Kickback Statute and also of the False

19   Claims Act with respect to off-label marketing in this case?

20   A.    Yes.

21   Q.    What data did you set out to gather in order to provide

22   your services?

23   A.    So one key category of data would be claims submitted to

24   government health care programs, in particular, pharmacy

25   claims for Prezista and Intelence.

```
 1    Q.   All right.
 2         With respect to Medicare, sir, did you review Medicare
 3    Part D claims data?
 4    A.   Yes.
 5    Q.   You also reviewed pharmacy claims where you could find
 6    prescriptions and claims for Prezista and Intelence there.
 7         Is that right?
 8    A.   So Medicare Part D claims are pharmacy claims, yes.
 9    Q.   And, sir, approximately how many Medicare claims did --
10    were contained in the data that you first analyzed?
11    A.   So I had Medicaid claims of various types, including
12    pharmacy claims, and Medicare claims of various types,
13    including the Part D claims.  In total, there were
14    approximately 360 million claims.
15    Q.   360 million claims in the data that you began to analyze.
16         Is that right?
17    A.   Yes.
18         THE COURT:  We are going to take a ten-minute recess,
19    and then we'll reboot.  All right, Mr. Marketos.  All right.
20         THE DEPUTY COURT CLERK:  All rise.
21         (A short recess occurred.)
22         THE DEPUTY COURT CLERK:  All rise.
23         THE COURT:  All right, folks.  Everybody have a seat.
24         Mr. Dew, you can have a seat.  Just a reminder you're
25    still under oath from earlier in the break.
```

5223

```
 1          Mr. Marketos, you may proceed when you're ready.
 2              MR. MARKETOS:  Thank you, Your Honor.
 3    BY MR. MARKETOS:
 4    Q.  Mr. Dew, it's 2:15 on a Friday afternoon, and we are
 5    talking about data, so I'm going to try to move this along as
 6    fast as I can.
 7          Okay, sir?
 8          You understand that this case involves allegations that
 9    Janssen sold drugs that it was paid for and that CMS
10    ultimately paid out money in reimbursements for those drugs,
11    Prezista and Intelence.
12          Correct?
13    A.  Yes.
14    Q.  Before the break, I was asking you about some of the data
15    that you were asked to gather, claims data associated with
16    Medicare, Medicaid, and other specific programs.
17          Do you recall that?
18    A.  Yes.
19    Q.  We're going to offer into evidence some of the data
20    repositories that you collected and analyzed for the purposes
21    of this case.
22          Okay, sir?
23    A.  Sure.
24              MR. MARKETOS:  Your Honor, we offer Relators' Exhibit
25    1480, the CMS claims data, Centers for Medicare & Medicaid
```

 1    Services.  I'll do them all at once.

 2             THE COURT:  Is there a list?

 3             MR. MARKETOS:  Yes, Your Honor.  Defendant --

 4             THE COURT:  Is there any objection to any of these,

 5    Ms. Brown?

 6             MS. BROWN:  There is not.  We discussed it at the

 7    break.

 8             THE COURT:  So go ahead.

 9             MR. MARKETOS:  Thank you, Your Honor.

10        Defendants' Exhibit 5005, which is the ADAP data;

11    Relators' Exhibit 0487, which is data from BioScrip pharmacy;

12    Defendants' Exhibit 5009, Rite Aid data; Relators' Exhibit

13    1003, Walgreens-related data; Relators' Exhibit 376, MedForce

14    spreadsheet for speaker expenses and event data; Relators'

15    Exhibit 0378, MedForce spreadsheet data for attendees at

16    speaker events; Defendants' Exhibit 4533, which is the AHM

17    speaker program data for Janssen; Defendants' Exhibit 5007,

18    which are call notes of Janssen for Prezista and Intelence.

19             THE COURT:  All right.  All those exhibits are

20    admitted without objection.

21             MR. MARKETOS:  Thank you, Your Honor.

22             (Defendants' Exhibit 5005 in evidence.)

23             (Relators' Exhibit 0487 in evidence.)

24             (Defendants' Exhibit 5009 in evidence.)

25             (Relators' Exhibit 1003 in evidence.)

```
 1              (Relators' Exhibit 376 in evidence.)

 2              (Relators' Exhibit 0378 in evidence.)

 3              (Defendants' Exhibit 4533 in evidence.)

 4              (Defendants' Exhibit 5007 in evidence.)

 5    BY MR. MARKETOS:

 6    Q.   All right, sir.

 7              With respect to Medicaid, where would you find claims

 8    for relevant drugs?  Medicaid is different from -- at least in

 9    terms of how it is administered, it's a little bit different

10    from Medicare.

11              Do you agree?

12    A.   Yes.

13    Q.   Explain to us how that is, sir.

14    A.   So Medicaid is for low-income individuals, and it is

15    jointly funded by the federal government and state

16    Governments, and it's administered by the states.

17    Q.   Okay, sir.

18              Now, with respect to Medicare, did you analyze

19    88 million Part D prescription drug event records for claims

20    in this case?

21    A.   Yes.

22    Q.   With respect to Medicaid, did you analyze 226 million

23    claims from the chronic conditions data warehouse?

24    A.   So those would be Medicaid claims of a variety of types,

25    including, I believe, the pharmacy claims, yes.
```

```
 1    Q.   Okay.

 2         Medicaid and pharmacy claims included.

 3         Is that right?

 4    A.   As I recall, yes.

 5    Q.   All right.

 6         And with respect to ADAP, can you just -- it's an

 7    acronym.

 8         Can you tell us what it stands for?

 9    A.   Yeah.  It's the AIDS Drug Assistance Program.

10    Q.   All right.

11         What did you do to aggregate data from the states with

12    respect to that program?

13    A.   Well, I didn't aggregate it.  I received it in an

14    aggregate form with one, essentially, dollar amount per drug

15    per state per quarter over the time period of 2008 to 2014.

16    So it didn't go back to 2006.

17    Q.   That data from 2006 to 2008 was unavailable.

18         Is that right?

19    A.   I wasn't provided it, yes.

20    Q.   And with respect to pharmacy prescription data, why did

21    you have to go look at pharmacy prescription data for

22    BioScrip, Walgreens, and Rite Aid?

23    A.   Yeah, so the pharmacy data includes actual dosing

24    instructions that the prescriber would have written for the

25    prescriptions.  So the pharmacies maintain that, and that was
```

1    produced in the data from those three pharmacies.

2    Q.   And was that pharmacy data necessary for you to identify

3    data associated with the Intelence once-daily dosing

4    allegation in this case?

5    A.   Exactly.  I parsed the text of the dosing instructions to

6    distinguish prescriptions with once-daily dosing instructions

7    from those without once-daily dosing instructions.

8    Q.   All right, sir.

9         So you obtained CMS data for Medicare and Medicaid from

10   the chronic conditions data warehouse.

11        Correct?

12   A.   Yes.

13   Q.   And then you obtained data from ADAP, the AIDS Drug

14   Assistance Program that you just described for us, in an

15   aggregated -- aggregated form.

16        Correct?

17   A.   Yes.

18   Q.   And then the pharmacy prescription data, you obtained

19   that from BioScrip, Walgreens, and Rite Aid.

20        Why those three pharmacies?

21   A.   They're quite large, I think, with respect to HIV

22   medications, but I don't recall the specifics of what singled

23   them out.

24   Q.   Are they good -- given the size of those specific

25   pharmacies, were they good proxies with respect to your

1    analysis of the Intelence QD issue?

2    A.   It was extremely good in that it was essentially a sample

3    size of 302,000 prescriptions that I extrapolated to a total

4    of 771,000 Intelence pharmacy claims.  So the ratio of the

5    sample size to the population size is a very large ratio in my

6    experience.  I don't think I've seen that before.

7    Q.   Okay.

8         So the statistics enabled you to extrapolate from that

9    data with respect to certain claims in this case.

10        Is that right?

11   A.   Yes.

12   Q.   If we take a look at MedForce, what was the MedForce data

13   that we just entered into the record?

14   A.   So what I received, I think, was a combined dataset of

15   AHM and MedForce speaker events data, and so that consisted of

16   one file listing the speaker events along with who the speaker

17   was, who the sales rep was, where it was, what the date was

18   and then a separate file listing all the attendees at the

19   events that you could relate via event IDs between the two

20   datasets.

21   Q.   So you described for us the data you gathered and certain

22   sets from -- on the Medicare, Medicaid, ADAP, and pharmacy

23   side and then also data that you gathered from Janssen

24   associated with speaker events and attendees at those events.

25        Right, sir?

```
 1   A.   Yes.
 2   Q.   And then you also gathered call notes data from Janssen
 3   associated with sales representatives' calls, visits to
 4   doctors' offices.
 5        Is that right?
 6   A.   Yes.
 7   Q.   What are health care taxonomy codes?
 8   A.   They're codes that basically -- you can look up in a
 9   database to determine what a particular health care provider's
10   specialty is.
11        So, you know, distinguishing a dental hygienist from an
12   infectious disease specialist, things of that nature.
13   Q.   And what about with respect to NPPES data?  I know it's
14   alphabet soup.
15        What is NPPES data?
16   A.   That's the National Plan and Provider Enumeration System
17   NPI, which is National Provider Identifier, registry.  So
18   NPPES NPI registry.
19        And that is a comprehensive database of all national
20   provider identifiers, or NPIs, which health care providers
21   apply for and can be assigned by CMS.  The database contains
22   those NPI numbers as well as the health care providers' names,
23   addresses, health care specialties in terms of the taxonomy
24   codes, and in certain instances, state Medicaid IDs and
25   license numbers, among other information.
```

1    Q.   Okay.

2         So that data helps you identify specific doctors or

3    other prescribers.

4         Is that right?

5         Nurse practitioners, doctors, and otherwise?

6    A.   Yes.

7    Q.   Now, let's -- have I asked you about, in general terms,

8    all of the data that you gathered to perform your analysis,

9    sir?

10   A.   I would add some sample text of dosing instructions that

11   reflect once-daily dosing.  That was a very small list.

12        And then another list would be ICD-9 codes.  That's

13   International Classification of Diseases, 9th revision codes,

14   that would reflect a diagnosis of a lipid issue, along with a

15   list of drugs that are used to treat lipid issues and a list

16   of National Drug Codes, or NDCs, that identify specific drugs

17   that would appear in the pharmacy claims data that would be

18   used to treat lipid conditions.

19   Q.   Okay.

20        So you gathered that information for -- to interpret

21   diagnoses that were in the claims data.

22        Right?

23        Diagnostic codes?

24   A.   And treatments, yes.

25   Q.   Diagnostic codes and treatments of specific patients who

1    are beneficiaries of these programs.

2         Is that right?

3    A.   Yes.

4    Q.   Now, I'd like to turn your attention, sir, to how you

5    actually prepared the data and shared it with the Relators'

6    testifying expert on statistics and damages, Professor Shaked.

7         Okay?

8    A.   Sure.

9    Q.   All right.

10        What did you do first with your methodology?  How did

11   you first prepare the data before you analyzed it?

12   A.   So every dataset I receive, I perform a number of

13   in-processing steps and quality checks, if you will.  So this

14   is looking at every field and every record in every dataset to

15   determine whether for specific data types they contain valid

16   values and are well formed.

17        And then as part of the QC I can flag certain values

18   that I can address there.  I also create profiles of each

19   dataset.  And so that lists the frequency with which each

20   value appears in each field and each dataset.  And so I can

21   examine those profiles to see trends, look for what might be

22   anomalous values and other things I might need to account for

23   in my processing.

24   Q.   Understood, sir.

25        And so you did some quality control on the data.

*5232*

1          Is that right?

2    A.    Yes.

3    Q.    Now, sir, just give the members of the jury an idea.  How

4    much information is contained in one claim, one beneficiary's

5    claim that is submitted to Medicare?

6    A.    It depends on the claim type.  Pharmacy claims tend to

7    have fewer fields in them, just because they're fairly limited

8    in the scope of what might be reflected and might need to be

9    reflected in them.

10         But inpatient, outpatient, and what are called carrier

11   claims can have quite a lot of information in terms of

12   multiple diagnoses, multiple procedures, multiple -- the

13   diagnoses expressed in multiple versions of codes, along with

14   multiple physicians who might be involved, who's billing, you

15   know, how many units of blood were used.

16         I mean, there can be more than a hundred fields in

17   certain claim types.

18   Q.    More than a hundred fields in one individual claim.

19         Is that right?

20   A.    Yes.

21   Q.    And you reviewed hundreds of millions of claims.

22         Is that right?

23   A.    Well, in terms of the profiles of what's in them.  So

24   that's a sort of succinct representation of the information,

25   yes.

1  Q.    And how did you figure out who was who?  How did you

2  resolve identities?

3  A.    Right.  So there are individuals in the call notes data.

4  Q.    The Janssen call notes?

5  A.    Yes, the Janssen call notes data, as well as the Janssen

6  speaker events data.  And they're listed by name, but some of

7  them also have IDs.

8          And so within those datasets, I could tell that two

9  entries referred to the same person, you know, and two events

10 or two sales calls, that sort of thing.

11         And then as I mentioned before, the NPPES/NPI registry

12 lists health care provider names as well as IDs.  And so

13 across those, I could determine the National Provider

14 Identifier for many of the attendees.

15         And then in the claims data, Medicare Part D claims

16 identify prescribers by NPIs, and so that's a direct

17 identification.

18         And then in Medicaid pharmacy claims, it can be NPIs,

19 but there can also be other IDs, and that's where some of the

20 other types of IDs in the NPPES/NPI, as well as some of the

21 Janssen call notes and events data, helped to -- helped me

22 determine who's who.

23 Q.    How did you figure out which doctors had received

24 payments from Janssen?

25 A.    Well, those would be speakers in the Janssen speaker

1    events data listed by name and various categories of payments

2    that would be listed in each of those records with amounts.

3    Q.    Now, how did you match up doctors or prescribers in the

4    call notes data to the claims themselves?

5    A.    Yes.  So I just described sort of the -- a process that

6    ultimately resulted in my being able to associate many of the

7    attendees at sales calls and speaker events with a National

8    Provider Identifier, or NPI, and also determine what NPI was

9    referenced directly in the Medicare Part D pharmacy claims, as

10   well as what the appropriate NPI is associated with the

11   prescriber in the Medicaid pharmacy claims.

12          And so via NPIs, I could tell who's who.

13   Q.    And for each beneficiary, each patient covered by these

14   programs, Medicare, Medicaid, ADAP, et cetera, did you, for

15   each beneficiary, determine specific dates?

16   A.    Yes.

17          So the CCW --

18   Q.    Sorry.  CCW?

19   A.    Sorry.  Chronic Conditions Data Warehouse.  The Medicaid

20   and Medicare claims have anonymized beneficiary identifiers,

21   but they're consistent across claims within and between claims

22   datasets.

23          So for each beneficiary, I looked at what the date of

24   the first claim of any type was for them, what the date of the

25   first antiretroviral drug claim was for them, what the first

1    date of a Prezista claim was the first date of an Intelence

2    claim, and then dates of any claims that referenced a lipid

3    diagnosis or a drug to treat a lipid issue.

4    Q.   Okay.

5         So you were able to analyze -- or look in the data for

6    a beneficiary who had a prior lipid diagnosis or was being

7    treated for a lipid or cholesterol-related problem.

8         Is that right?

9    A.   Yes.

10   Q.   All right.

11        And was that part of why you needed diagnostic codes,

12   in order to search for and identify those types of patients?

13   A.   Yes.

14   Q.   And is that how Ms. Cynthia Swanson assisted you, the

15   medical coder that you asked for assistance from?

16   A.   Exactly, yes.

17   Q.   Now, sir, were you asked to make certain assumptions --

18   let me - let me step back for a second.

19        You're not testifying before this jury that, as it

20   relates to anything for liability, Janssen did this or Janssen

21   did that.

22        Is that fair?

23   A.   Correct.

24   Q.   Now, as part of your expert opinions and expert services

25   that you offered in this case, sir, did you assume that

1  certain allegations had been proven in this case by the

2  Relators?

3       Or were you asked to assume certain things in order to

4  perform your services?

5  A.   I was asked to assume certain things, yes.

6  Q.   And were you asked to assume that the off-label marketing

7  messages that are at issue in this case were consistently

8  communicated in the calls and the events that you had records

9  for from Janssen?

10  A.   Yes.

11  Q.   How many -- how many calls -- and we're not talking about

12  calls.  I'm not talking about phone calls.

13       How many detailing visits did Janssen's sales

14  representatives make to doctors or other health care providers

15  during the time frame 2006 to 2014?

16  A.   I counted 620,000 records or calls represented in the

17  Janssen call notes dataset.

18  Q.   Okay.

19       So, again, this is a call on a doctor, not a phone call

20  to a doctor.

21       Is that right?

22  A.   That's my understanding.

23  Q.   All right.

24       And 620,000 calls recorded in Janssen's call note

25  repository; is that right?

1  A.   Yes.

2  Q.   And do you recall approximately how many attendances

3  there were, attendees at certain events?

4  A.   It was approximately 1.05 million.

5  Q.   All right.

6       And that would include calls and attendances at certain

7  speaker events.

8       Is that right?

9  A.   No, that's just the call notes.  Sorry.

10 Q.   Thank you.

11      What about the time frames for messages?  Did you

12 examine certain time frames -- were you asked to assume that

13 there was a time frame that certain messages were delivered?

14 A.   Yes.

15      So since there are two drugs, one -- you know, Prezista

16 was introduced in 2006 and Intelence was introduced in 2008, I

17 sort of categorized attendances via, you know, for those two

18 drugs via dates.  Particularly, the first date I noticed with

19 a significant number of sales calls for Intelence was January

20 22nd, 2008.

21      So it's as of that date I utilized the sales calls as

22 being associated with Intelence as well as Prezista.

23 Q.   With respect to Relators' claims in this case that

24 Prezista was marketed and promoted for treatment-naive

25 patients from 2006 to 2008 before it was FDA approved for

1    those patients, what assumptions did you make about the

2    messages that were delivered to doctors during that time

3    frame?

4    A.   Well, as you mentioned, that the off-label messages were

5    consistently communicated in speaker events and sales calls,

6    and so that would have been one of them.

7    Q.   All right, sir.

8         And how about with respect to the Prezista lipid issue?

9    That is, Prezista being promoted as lipid friendly, lipid

10   neutral, proven lipid profile, similar to Reyataz.

11        What were you asked to assume with respect to that

12   off-label message?

13   A.   The same as the others, that it was consistently

14   communicated in speaker events and sales calls.

15   Q.   What about with respect to Intelence once-daily dosing,

16   QD, once-daily dosing?  What were you assuming with respect to

17   that alleged off-label sales promotion?

18   A.   So I was asked to assume that as of the introduction of

19   Intelence that the Intelence -- that Intelence off-label

20   marketing message was consistently communicated during speaker

21   events and sales calls.

22   Q.   And was that the same assumption you made with respect to

23   Intelence being promoted for treatment-naive patients in an

24   off-label fashion?

25   A.   Yes.

1    Q.   All right, sir.

2         Were you able to obtain information from Dr. Glatt

3    before you -- and Dr. Glatt has testified in this case.

4         Were you able to obtain information from Dr. Glatt

5    through Relators' counsel before you deployed any

6    methodologies in this case?  Or employed, I guess.  Sorry.

7    A.   Well, I would say before the results were completed, I

8    did, yes.

9    Q.   And what information did Dr. Glatt provide to you?

10   A.   So I wrote a description of the methodology that I

11   communicated to Relators' counsel.  It's my understanding that

12   they shared that with Dr. Glatt.  And what I learned from

13   Relators' counsel was that he had reviewed it and approved of

14   it.

15   Q.   All right.

16        And was that specifically with respect to the Prezista

17   lipid diagnosis issue?

18   A.   That was the primary feedback, I recall, that he approved

19   of that.

20   Q.   Thank you, sir.

21        Now, how about with respect to the Anti-Kickback

22   Statute?  What assumption did you make with respect to

23   speakers who were prescribers and the date of their first

24   speaking event?

25   A.   So I was asked to assume that for any claim -- pharmacy

5240

1    claim that listed a speaker as the prescriber as of the date

2    after their first speaking event, all such claims were

3    consistent with the kickback allegation.

4    Q.  All right, sir.

5        And does that -- did that assumption center on the

6    first payment date that was made to a speaker -- of a

7    speaker's first event?

8    A.  Yes.

9    Q.  How about with respect to -- and all claims by that

10   speaker from that date on are consistent with the kickback

11   allegations that were made in this case.

12       Is that your assumption?

13   A.  That's the assumption I was provided, yes.

14   Q.  How about with respect to analyzing the data for the

15   off-label False Claims Act claims that Relators are bringing?

16   What criteria did you apply?

17   A.  So for each of the off-label allegations, they were

18   somewhat different.

19       So for, say, the Prezista treatment-naive allegation, I

20   required that the first pharmacy claim for any ARV drug was at

21   least 90 days after the first claim of any type for that

22   beneficiary; and that the first ARV drug prescribed for that

23   beneficiary was Prezista; and that that first prescription, or

24   that first claim, listed as a prescriber someone who attended

25   a Janssen speaker event or sales call prior to the date of

*5241*

1  that Prezista claim.

2  Q.   Okay.

3       And in applying that criteria, sir, first that you're

4  looking at an antiretroviral claim for Prezista specifically,

5  and that the Prezista claim was at least 90 days after the

6  first claim, and that the prescriber, him or herself, was a

7  physician or a prescriber who had been visited by a Janssen

8  sales rep or attended a speaking event, did that narrow down

9  the body of data that you had originally gathered?

10 A.   Yes.

11 Q.   And for Prezista naive, did you apply a date criteria

12 that ended on September 30th, 2008?

13 A.   Yes.

14      So to flesh it out a bit more, if the first Prezista

15 claim satisfied the criteria for the treatment-naive

16 allegation, then the whole series of Prezista claims for that

17 beneficiary satisfied the criteria for the treatment-naive

18 allegations.

19      And in Prezista's case all such sort of series of

20 claims I terminated as of September 30th, 2008.  And so there

21 are no, if you will, treatment-naive Prezista claims in the

22 results beyond that date.

23 Q.   Because in October of 2008, Janssen obtained an expanded

24 label for Prezista.

25      Is that right?

1    A.    That's my understanding, yes.

2    Q.    Okay.

3          And for Intelence -- or why did you apply criteria for

4    a date that was on or after January 22nd, 2008?

5    A.    That's because, I think I mentioned before, that was the

6    first date in the sales calls that had a significant number of

7    Intelence -- sales calls referencing Intelence.  And so

8    that -- I took that as the first date of any marketing for

9    Intelence by Janssen.

10   Q.    And was that series of prescriptions, in your

11   understanding, consistent with the allegations that the

12   Relators have brought in this case with respect to off-label

13   naive for Intelence and Prezista?

14   A.    Yes.

15   Q.    Okay.

16         Now, with respect to the issue of the adverse reaction,

17   the serious adverse reaction that Prezista had, you understand

18   that Relators have alleged that that drug was promoted in an

19   off-label manner that minimized the risk of those side effects

20   to providers.

21         Right, sir?

22   A.    To patients, yes.

23         Or, yes, the messages to providers, yes.

24   Q.    Messages to the health care providers.

25         What criteria did you apply with respect to whether or

1    not a patient had a prior existing claim that identified a

2    lipid issue for that patient?

3    A.    Right.  So I described before that I scanned all of the

4    Medicaid and Medicare claims for each beneficiary to identify

5    the dates of any diagnoses of lipid issues or treatments of

6    lipid issues.

7          And so for that allegation, a claim was consistent with

8    that allegation if prior to the first Prezista claim for a

9    beneficiary or concurrent with it, there is another claim

10   listing a lipid issue diagnosis or a treatment for lipid

11   issues, and then, also, that the prescriber on that first

12   claim for Prezista had attended a sales call or speaking event

13   prior to that date.

14   Q.    And was this the process by which you had used the

15   assistance of the medical coder, Ms. Swanson, and also

16   information from Dr. Glatt?

17   A.    Yes.

18   Q.    How about with respect to the QD, the Intelence QD dosing

19   analysis that you performed?  What dosing instructions did you

20   obtain from the pharmacies?

21   A.    Right.

22          So each record in the datasets from the three

23   pharmacies listed the text of the dosing instructions from the

24   prescriber.  I had example text that reflected once-daily

25   dosing instructions, and so I used that to parse the text in

1    the dosing instructions in the pharmacy -- three pharmacies'

2    data, and I came up with basically a ratio -- or a ratio by

3    quarter of the number of prescriptions that specify once-daily

4    dosing to the total number of prescriptions in that quarter,

5    so ratio of the once-daily dosing to all prescriptions per

6    quarter.

7    Q.   And did you -- was that ratio also multiplied by paid

8    amounts in the claims data, sir?

9    A.   Yes.

10   Q.   And was that consistent with your understanding of the

11   Intelence QD or once-daily dosing allegations in this case?

12   A.   Yes.

13   Q.   All right.

14        With respect to kickbacks, did you apply criteria

15   associated with the claims listing prescribers that are

16   speakers?

17   A.   Yes.  So I think I described this, that if a pharmacy

18   claim listed as a prescriber a person who had spoken at an

19   event prior to the date of that claim, did that claim satisfy

20   the criteria for the kickback allegations, and that would be,

21   you know, in other words, a speaker claim.

22   Q.   You understand it's the Relators' allegations in this

23   case that they brought on behalf of the government that the

24   payments that were made to doctors on the Promotional Speaker

25   Bureau were kickbacks to induce doctors to write

1    prescriptions.

2        Right, sir?

3    A.    That's my understanding.

4    Q.    Did you -- was the criteria that you applied consistent

5    with the Relators' allegations as it relates to that claim?

6    A.    I believe so, yes.

7    Q.    Now, how about with respect to ADAP -- A-D-A-P -- are

8    those reimbursements that are similar to Medicaid?

9    A.    Yes.

10   Q.    All right.

11       And for each of the four allegations, what did you do?

12   A.    So as I described before, the ADAP data is summary data

13   by drug, state, and quarter, so it's not claim-level data that

14   I could -- with which I could perform the same type of

15   analysis I did with the Medicaid and Medicare pharmacy claims.

16   But I used the Medicaid pharmacy claims in my results, those

17   that are consistent with the allegations, and took the

18   proportion of those claims to the total number of Medicaid

19   claims, and I also took the ratio of the dollars in those

20   Medicaid claims that were consistent with the allegations to

21   the total dollars in the Medicaid claims, and that's, you

22   know, specific to each drug by quarter and, I think, by state,

23   and then I multiplied the lower of those two ratios, to try to

24   be conservative, times the dollar amounts that were in the

25   ADAP data to get an estimate for what the corresponding, you

1  know, paid amounts would be for claims that would be

2  consistent with the allegations as they are -- or as I found

3  them in Medicaid.

4  Q.   I didn't hear the last part, sir.  Try to speak up just a

5  little bit.  We're all getting tired.  Thank you.

6  A.   Yes.  So I took the ratios I described, the number of

7  claims satisfying an allegation to the total number of

8  Medicaid claims for the drug, and I also took the ratio of the

9  dollars in those claims satisfying an allegation to the total

10  dollars in Medicaid for that drug, and the lower of those two

11  ratios I took and multiplied by the dollar amount in the ADAP

12  data, and that gave me an estimate for the dollars in ADAP

13  that are consistent with the allegations.

14  Q.   All right.  Thank you, sir.

15       How about with respect to consolidated Medicaid and

16  Medicare?  As I understand it, there's an issue where a single

17  claim could be consistent with more than one allegation that's

18  been made in this case.

19       Right?

20  A.   Correct.

21  Q.   So what did you do?

22  A.   So I created a consolidated dataset of Medicaid and

23  Medicare pharmacy claims where any claim that satisfied any of

24  the allegations would appear in that consolidated dataset once

25  and only once.  And what I did was I annotated each of those

*5247*

```
 1   claims with a list of allegations that they were consistent
 2   with.  So a claim could have between one and three annotations
 3   on it, if you will, depending on which allegations it was
 4   consistent with.
 5   Q.   Thank you, Mr. Dew.
 6        Did you also -- did you then provide certain results
 7   after you performed your analysis to the Michel-Shaked Group,
 8   Professor Shaked's expert firm?
 9   A.   Yes.
10   Q.   And did you compile summaries of Medicaid and Medicare
11   data drug claims and ADAP results so that Professor Shaked
12   could use statistical analyses and calculate damages?
13   A.   Yes.
14   Q.   And did you provide those summaries to Professor Shaked's
15   team?
16   A.   Yes.
17   Q.   What other requests did you receive from Professor
18   Shaked's team with respect to data and analyses that he was
19   performing?
20   A.   So I had numerous interactions with members of his team,
21   and there were numerous requests and discussions.  And so I
22   believe I was able to satisfy all of the requests.  But they
23   were essentially summaries and statistics from the results as
24   well as summaries and statistics from the full sets of
25   Medicaid and Medicare pharmacy claims.
```

1    Q.   Did those summaries include Professor Shaked's

2    description of what are termed "influenced physicians,"

3    "influenced health care providers" by Janssen's marketing

4    messages?

5    A.   Yes.

6    Q.   How about attending physicians or attending health care

7    providers at these speaking events?  Did you identify those in

8    summary form for Professor Shaked's team?

9    A.   Yes.

10   Q.   And how about with respect to doctors or health care

11   providers who were speakers at those events?  Did you provide

12   that summary information to Professor Shaked's team for his

13   analysis?

14   A.   Yes.

15   Q.   And then how about noninfluenced doctors, physicians in

16   the United States who did not receive, according to the

17   records, any promotional messages from Janssen's sales force?

18   Did you identify those noninfluenced physicians in summary

19   form for Professor Shaked's team?

20   A.   Yes.

21   Q.   And, sir, were there 360 million claims that were

22   analyzed, or was it greater than that?

23   A.   Well, so in terms of claims, it was approximately

24   360 million.  For Medicare, the inpatient, outpatient, and

25   carrier claims will have one or more line items, so, you know,

```
 1   listing a specific product or service associated with the
 2   claim.  And so for those, there would have been at least 45,
 3   46 million minimum claimed lines.  And so in terms of total
 4   records, whether it be claim or claim lines, there would have
 5   been over 405 million records that I analyzed, in particular
 6   in association with the lipid diagnoses and treatments.
 7   Q.   405 million claims?
 8   A.   Records.
 9   Q.   Records.  Thank you, Mr. Dew.
10        You didn't analyze -- you didn't look at each record
11   individually yourself with a magnifying glass or something
12   else, did you, sir?
13   A.   No.
14   Q.   How do you analyze data consisting of 405 million or more
15   records?
16   A.   Well, I described the QCing I did, so that's an essential
17   part of understanding -- getting an understanding of the data
18   and what I might need to account for in processing it.  But I
19   -- my background in computer science and high-performance
20   computing, you know, gives me skills with -- that I can apply
21   to make things run fast.
22   Q.   And how many servers did you have running?
23   A.   So I distributed the data across four servers, and on
24   those four servers I can reliably run five processes
25   simultaneously without hardly any slowdown in the processing.
```

1   So compared to running one process on one computer, I can get

2   very close to a 20-fold speed-up on any code I write by what I

3   did.

4   Q.   Now, you say any code -- first of all, you essentially

5   ran four servers with five processes on each server for a

6   20-fold speed increase.

7        Is that right?

8   A.   Essentially, yes.

9   Q.   You mentioned writing scripts.  We're not talking about

10  prescriptions.

11       What are we talking about?

12  A.   Well, scripts -- a scripting language is a kind of

13  programming language that's -- it's technical -- that I don't

14  know it's worth going into, but it's basically a programming

15  language.

16  Q.   So you were able to use programming language to apply

17  scripts to the data that was being processed on the four

18  servers you described for us.

19       Is that right?

20  A.   I would say I wrote scripts with -- in a certain

21  programming language, and so the script would be written in a

22  programming language, and then I ran the scripts on the data.

23  Q.   Thank you, Mr. Dew.

24       Now, data of that volume, does it get you to a

25  reasonable degree of certainty that the information that you

1  are compiling and analyzing is accurate?

2  A.   The volume itself not necessarily alone but in

3  conjunction with the steps I took, yes.

4  Q.   All right, sir.

5       Did you make reasonable assumptions along the way in

6  order to provide information to the Relators' damages and

7  statistical expert at Professor Shaked's team?

8  A.   I believe so, yes.

9  Q.   Now, sir, if you were analyzing data and you had an

10 opportunity to increase or decrease the number of claims, the

11 amount of money that was reimbursed that would go into a

12 damages calculation, which one did you take, the higher or the

13 lower?

14 A.   Well, my first objective is to be accurate and get the

15 right answer.  However, there are situations in which there is

16 some ambiguity, something unknown, and I erred on the side of

17 implementing an approach that would reduce the number of

18 claims and dollar amounts in the results.

19 Q.   So if you had information that wasn't complete, would you

20 decide not to count that towards the number of claims or the

21 dollar amounts in this case?

22 A.   In general, I would, yes.

23 Q.   And did you exclude claims where you couldn't figure out

24 for sure who the first prescriber, who the first doctor or

25 health care provider was who had written a prescription for

1   Intelence or Prezista?

2   A.    Yes.  So in Medicare pharmacy claims, over 98 percent of

3   them list a definitive NPI that identifies the prescriber.

4   Q.    Sorry, sir.

5        NPI, is that the information you used to identify a

6   prescribing doctor or other health care provider?

7   A.    Yes.  It's an ID.

8   Q.    It's an identification?

9   A.    Yes.

10  Q.    Okay.

11       So sorry.  Continue, please.  What did you do with --

12  if you couldn't figure out who a specific provider was?

13  A.    Yes.  So continuing with Medicare Part D pharmacy claims,

14  there is approximately one and a half percent of them, where,

15  in the original data, the NPI identifier was preceded by a

16  negative sign or minus sign, and that, in the documentation --

17  after reading the documentation, indicates that there is some

18  uncertainty as to who the prescriber really is.  And so for

19  those claims, I assumed that the prescriber was unknown and

20  unresolvable.  An so that's how I treated those for Medicare

21  Part D pharmacy claims.

22  Q.    Okay.  So if there was some uncertainty as to who the

23  first prescriber was for Intelence or Prezista, you didn't

24  count it?

25  A.    That's correct.

1    Q.   And what about with respect to Medicaid?  I mean,

2    Medicaid is obviously a program that's run by both the federal

3    and state Governments, right, sir, or at least it receives

4    funding from both?

5    A.   Yeah.  It's administered by states, and every state has

6    its own program and maintains its own data, and as you go back

7    in time, they're different, and in particular with Medicaid, I

8    was unable to determine who the prescriber was in 35 percent

9    of the Medicaid pharmacy claims.  And so, you know, that's

10   compared to one and a half percent of the Medicare Part D

11   pharmacy claims.

12   Q.   How about with respect to ADAP, Mr. Dew?  Were there any

13   -- was there any missing data or any conservative estimates

14   that you had to draw with respect to ADAP?

15   A.   Yeah.  So in my initial QCing of the ADAP data, I noticed

16   that there were some dollar amounts that seemed like they

17   might be incorrect in terms of being too large.  And so

18   looking at them in context, it seemed reasonable to reduce

19   them to a tenth of what the values were, and that brought them

20   in line with adjacent values, if you will, so from quarter to

21   quarter in the state.  There were also numerous dropouts and

22   anomalously low values in that data, but I didn't address

23   those.  I left them as is.

24   Q.   All right, sir.

25        And then when you were finally able to apply -- if you

```
 1  had an estimate and you made the conservative call on a
 2  certain estimate, did you ultimately reach conclusions about
 3  your data analysis in this case with a reasonable degree of
 4  certainty?
 5  A.   Yes.
 6  Q.   And did you apply your knowledge and your training and
 7  your experience, Mr. Dew, in providing data in a form that
 8  could be used by Professor Shaked and his team in this case?
 9  A.   Yes.
10  Q.   Now, let's talk briefly about what you're not.  So I
11  might be able to save you some time, sir.
12       You are not hired to be an expert in any specific realm
13  related to Medicare or Medicaid.  You're an expert in data
14  analysis of those certain programs.
15       Correct?
16  A.   Yes.
17  Q.   But you did analyze Plan D data, Part D Plan-sponsored
18  data in this case.
19       Correct?
20  A.   Yes.
21  Q.   Now, you're not a doctor.  You didn't provide any medical
22  opinions yourself.
23       Right, sir?
24  A.   Correct.
25  Q.   And you're not providing any opinions relating to the
```

1    treatment of HIV or HIV medications.

2         Is that fair?

3    A.   Correct.

4    Q.   All right.

5         But you are -- you did provide analysis of data

6    associated with certain government programs that are involved

7    in reimbursement of prescription drug medications in this

8    case.

9         Correct?

10   A.   Yes.

11   Q.   And did you provide those opinions and analyses with a

12   reasonable degree of certainty in the summaries of data that

13   you provided to Professor Shaked's team?

14   A.   Yes.

15        MR. MARKETOS:  Just a moment, Your Honor.  If I can

16   check with my team.

17        THE COURT:  Sure.

18        (Brief pause.)

19        MR. MARKETOS:  Mr. Dew, thank you for your time this

20   afternoon.

21        Pass the witness, Your Honor.

22        THE COURT:  Thank you, Mr. Marketos.

23        Ms. Brown.

24        MS. BROWN:  Thanks.

25        May I proceed, Judge?

1          THE COURT:  You may.

2          MS. BROWN:  Thank you.

3  (CROSS EXAMINATION BY MS. BROWN:)

4  Q.   Good afternoon, Mr. Dew.  How are you?

5  A.   Good afternoon.  Good.  How are you?

6  Q.   Good, thank you.

7          My name's Alli Brown.  I have some questions for you.

8          Okay, sir?

9  A.   Yes, ma'am.

10          (Reporter request.)

11  BY MS. BROWN:

12  Q.   Okay.  Mr. Dew, we're going to start again, okay?

13          As I understand it, sir, for 20 years, you have worked

14  for a company called Steck Consulting.

15          Is that right, sir?

16  A.   Yes.

17  Q.   Okay.

18          And I understand from your testimony the focus of Steck

19  Consulting is to crunch numbers to support allegations in

20  False Claims Act cases.

21          Correct, sir?

22  A.   That's most of the work, yeah, by and large, yes.

23  Q.   Okay.

24          And I heard you testify on direct examination that 50

25  or 60 times you've been hired by the Department of Justice or

1    the government to do that kind of work.

2         Right, sir?

3    A.   Right.

4    Q.   But to be clear, in this case, you have not been hired by

5    the Department of Justice or the government.

6         Correct, sir?

7    A.   Correct.

8    Q.   Okay.

9         You haven't done any work in this case on behalf of the

10   Department of Justice or the government.

11        Is that right?

12   A.   Correct.

13   Q.   Okay.

14        You've been hired by lawyers representing Ms. Penelow

15   and Ms. Brancaccio.

16        Correct, sir?

17   A.   Yes.

18   Q.   All right.

19        And that's -- this is actually not the first time

20   you've done work for Berger & Montague or some of the lawyers

21   representing the Relators here.

22        Right, sir?

23   A.   Correct.

24   Q.   You've worked with them in the past at least on three

25   occasions.

```
 1          Correct?
 2   A.    Yes.
 3   Q.    And to be fair, you've made a lot of money doing that
 4   work.
 5          Correct, sir?
 6   A.    It's my job, yes.
 7   Q.    All right.
 8          And as I understand it, your hourly rate, sir, for this
 9   type of litigation work is $470.34.
10          Is that right?
11   A.    It was.  It increased to $493 and something.
12   Q.    Okay.
13          At least at the time we took your deposition, it was
14   the very precise number of $470.34 an hour.
15          Right, sir?
16   A.    That could be what it was, yes.
17   Q.    Okay.
18          And I understood at that time, back in 2020, you had
19   worked on this case for 700 hours.
20          Do you recall that testimony?
21   A.    I don't recall the testimony, but the number sounds
22   reasonable.
23   Q.    Sound right.
24          It sounded like it was a lot of data, to be fair.
25          Right?
```

```
 1   A.   And a lot of work on a lot of data, yes.
 2   Q.   Right.
 3        And so $470.34 times 700 is about $329,000.
 4        Correct, sir?
 5   A.   I'll take your word for it.
 6   Q.   Okay.
 7        And have you done work on this case since March of
 8   2020, when you told us about the 700 hours you had worked?
 9   A.   Yes.
10   Q.   And approximately how many more hours do you think you've
11   worked on the case since then?
12   A.   I don't know.  I did tally up -- I think the total comes
13   to close to $400,000 by now.  I don't know how that breaks
14   down in hours off the top of my head.
15   Q.   Okay.
16        Let's talk a little bit, sir, about some of the things
17   you're not doing in this case.
18        Okay?
19   A.   Sure.
20   Q.   You are not going to offer an opinion here that
21   physicians were actually influenced by any message that came
22   from Janssen.
23        Correct?
24   A.   Correct.
25   Q.   That is an opinion you told us is better suited for
```

```
 1   Dr. Sillup, for example.

 2        Correct?

 3   A.   I don't recall that.  It's simply not my opinion.  I --

 4   Q.   Right.

 5   A.   Yeah.

 6   Q.   And so, for example, sir --

 7             MS. BROWN:  Can I have the ELMO, please.

 8        Thank you, Mr. Morales.

 9        Oh, it's not plugged in.  Thank you.

10   BY MS. BROWN:

11   Q.   Okay.

12        Sir, we've been looking at this quite a lot in our

13   trial.

14        And before any of the claims that you're talking about

15   here get to CMS, they have to be prescribed by a doctor.

16        Right, sir?

17   A.   Yes.

18   Q.   Okay.

19        And you're not here to offer any testimony that

20   anything a Janssen sales rep said to a doctor caused that

21   doctor to take any particular action.

22        Right, sir?

23   A.   Right.  That's outside the scope of my work here.

24   Q.   Okay.

25        And that's in part, sir, because you've never witnessed
```

1    a sales call between a pharmaceutical rep and a doctor.

2        Right, sir?

3    A.   I don't recall having witnessed one.

4    Q.   And you've never -- we've been hearing a lot about

5    promotional speeches.  You've never participated or witnessed

6    any one of those.

7        Right?

8    A.   I haven't.

9    Q.   Okay.

10       And you're similarly, as I understand it, sir, you're

11   not here to offer an assessment of damages or the total amount

12   of money that Ms. Penelow and Ms. Brancaccio are going to

13   claim in this lawsuit.

14       Correct, sir?

15   A.   Right.  I'm not a damages expert.

16   Q.   Okay.

17       Your job here was to filter the data and give it to

18   another expert who will come in here later, we expect.

19       Right, sir?

20   A.   And to summarize, among other things, yes.

21   Q.   I'm sorry, sir?

22   A.   And to summarize, among other things.

23   Q.   And to summarize what, sir?

24   A.   Among other things.

25   Q.   Among other things.  Gotcha.  Okay.

1          And you're -- of all the information you have access to

2     in the CMS data, there is no data in CMS that allows you to

3     conclude why an individual doctor wrote a particular

4     prescription.

5          Right, sir?

6     A.   I'm not aware of anything that establishes cause and

7     effect like that.

8     Q.   Right.

9          Now, a lot of the filtering of the data that you spoke

10    about today was based on assumptions that were given to you by

11    the lawyers representing the Relators.

12         Right, sir?

13    A.   Yes.

14    Q.   Okay.

15         And one of the fundamental filterings of the data that

16    you did was you divided the physicians into influenced and

17    noninfluenced physicians.

18         Correct, sir?

19    A.   In addition to attending and speaking, but, yes, that was

20    one of the -- or two of the categories, yes.

21    Q.   Okay.  And the definition of influenced that you used in

22    this exercise was a physician who had one -- either attended

23    one sales call --

24         Correct?

25    A.   At least one, yes.

1    Q.   At least one sales call.

2         -- or attended at least one speaking event.

3         Correct?

4    A.   Yes.

5    Q.   That would make the physician, quote-unquote, influenced

6    in terms of the work that you did.

7         Right?

8    A.   Again, depending on the situation, they might be

9    categorized as an attendee as opposed to influenced.  But

10   that's a superset or a subcategory, I guess, of influenced, if

11   you will.

12   Q.   Sure.

13        If a doctor attended one of Janssen's speaking events,

14   every prescription they wrote after that was considered to be

15   written by an influenced prescriber.

16        Correct, sir?

17   A.   Yes.

18   Q.   Okay.

19        And your definition of -- so just so we understand

20   that.  If a doctor attends a Janssen speaking event in 2006 --

21        Right, sir?

22        You with me?

23   A.   Okay.

24   Q.   -- and then doesn't prescribe Prezista until 2011 --

25        You with me?

*5264*

1   A.   Sure.

2   Q.   -- you consider that 2011 prescription to be influenced

3   by the speaking event they attended back in 2006.

4        Right, sir?

5   A.   Well, I would be a bit more careful with the language in

6   that I'm not considering the prescriber to have been

7   influenced in a -- in a general sense.  I'm categorizing them

8   as influenced in the data, which is maybe a subtle distinction

9   but important for, you know, what I do.

10  Q.   Fair enough.

11       Important for your role.

12       Right?

13  A.   Correct.

14  Q.   You're not saying Janssen -- you're not making a judgment

15  on whether it is reasonable to assume that one speech in 2006

16  actually influenced somebody in 2011.

17       Right?

18  A.   Correct.

19  Q.   What you're doing is taking the instructions from the

20  folks who hired you, and you're just categorizing that claim,

21  that prescription, as influenced.

22       Right?

23  A.   As prescribed by an influenced prescriber, yes.

24  Q.   Right.

25       For your purposes, somebody who attends an event in

```
 1    2006, prescribes Prezista in 2011, that counts in your

 2    filtering as a prescription from a, quote, influenced

 3    provider.

 4         Correct?

 5    A.   Yes.

 6    Q.   And that instruction, to use that definition of

 7    influenced prescriber, was given to you for purposes of your

 8    work.

 9         Correct, sir?

10    A.   Yes.

11    Q.   And it was given to you by the lawyers.

12         Correct, sir?

13    A.   Yes.

14    Q.   Okay.

15         And you haven't done yourself any analysis of how long

16    a promotional sales message sticks with a doctor.

17         Right?

18    A.   Correct.

19    Q.   Okay.

20         You haven't done -- for example, you could use surveys

21    of doctors to find out how they view promotional messages.

22    You haven't done that.

23         Right, sir?

24    A.   Correct.

25    Q.   Okay.
```

```
 1          And you're not passing judgment or offering an opinion

 2   on whether or not that definition of an influenced prescriber

 3   is reasonable.

 4          Right, sir?

 5   A.   That's outside the scope of my work.  It's an assumption

 6   I work with.

 7   Q.   Understood.

 8          You were also asked -- as I understand it, sir, we have

 9   four messages that are at issue in this case.

10          Right?

11          I think you're familiar with these four messages.

12   We've been -- this was an opening slide.

13          We've been talking about Prezista in treatment naive,

14   Prezista lipid friendly or lipid message, and then Intelence

15   treatment naive and Intelence once-a-day dosing.

16          You're familiar with those four messages.

17          Right, sir?

18   A.   Not necessarily the messages in -- specifically, but

19   these -- yeah, these off-label marketing -- the off-label

20   marketing of these drugs in this way.

21   Q.   And you were -- as part of your filtering work, you

22   were -- based on the relevant dates, you were told to assume

23   that the sales representatives, every time they met with a

24   doctor, I think you testified, they consistently communicated

25   messages for both medicines.
```

1        Correct, sir?

2   A.    I think -- I'm not sure the exact wording I used, but

3   that the off-label messages were consistently communicated to

4   health care providers.

5   Q.    Right.

6        And so what that means is depending on the relevant

7   time period when a sales rep went to meet with a doctor, they

8   delivered both a lipid friendly and a once-a-day -- you know,

9   Prezista lipid friendly and Intelence once-a-day message.

10       Correct?

11  A.    Well, potentially, although, there was a year and a half

12  where Prezista was on the market and Intelence wasn't.  So

13  there would be that period where the Prezista off-label

14  marketing messages would exist.

15  Q.    Right.

16  A.    Um --

17  Q.    So here's sort of -- I'm sorry to interrupt, sir.

18       This is the time period that you're working with on

19  these messages.

20       Does that seem right to you, sir?

21  A.    Well, by year, yes.

22  Q.    Okay.

23       And you were meant to assume that based on the relevant

24  time period, all of these messages were delivered consistently

25  at each sales visit.

1        Correct?

2   A.   Well, I would just say that they were consistently

3   delivered.  I don't know that in every sales call every

4   message was delivered.  I don't think that's -- that's a

5   little more strict than just saying they were consistently

6   delivered.

7   Q.   But when you filtered the data, you assumed that a sales

8   call in 2009, for example, would have involved a Prezista

9   lipid-friendly message.

10       Right?

11  A.   Possibly.

12  Q.   Well, yes.

13       Right?

14  A.   Or that it would have already been delivered --

15  Q.   Right.

16  A.   -- potentially.

17  Q.   That that message was delivered.

18       Right?

19       Every time a Janssen sales rep met with a doctor in

20  2009 about Prezista, you were instructed to assume they were

21  delivering a Prezista lipid-friendly message.

22       Right?

23  A.   Well, or that they already done so and didn't need to on

24  the second or third or 12th visit.  So, you know, that it was

25  consistently communicated.

```
 1   Q.   Right.

 2        And what that means, sir, when sales reps were going in

 3   to meet with doctors, they weren't just talking about

 4   Prezista, they were talking about both medicines.  That's kind

 5   of a simple way to put it.

 6        Right?

 7   A.   As of January 22nd, 2008, yes.

 8   Q.   Right.

 9        But -- do you know, sir, the testimony in this case has

10   not supported that assumption that you were given by the

11   lawyers in this case?

12   A.   I'm not aware of that.

13   Q.   Okay.

14        Are you familiar with Ms. Brancaccio's testimony about

15   whether or not she would -- she would have given each one of

16   these messages on each sales call?

17   A.   I wasn't here for that.

18   Q.   All right.

19        What about Dr. Sillup?  Were you here for his testimony

20   about whether it makes sense to think that sales reps were

21   giving multiple different messages about two different

22   medicines?

23        Are you familiar with that, sir?

24   A.   No.

25   Q.   All right.
```

1          You also were instructed to make certain assumptions

2     about what happens when one doctor starts a prescription and

3     then the patient is continued on that medicine by a different

4     prescriber.

5          Correct, sir?

6     A.   Yes.

7     Q.   And you were instructed to assume if the initial

8     prescriber had some contact with Janssen, even if the second

9     prescriber had never seen anybody from Janssen, you should

10    count all of the prescriptions by the second prescriber as

11    being counted from an influenced prescriber.

12         Correct, sir?

13    A.   For the off-label allegations, yes.

14    Q.   Okay.

15         And so let me show you an opening slide that I showed

16    on this point.  What that means and what the data you

17    collected shows is that, if a patient was prescribed Prezista

18    in 2006 and then, at some point before 2013, travels across

19    the country to a new doctor who continues that prescription,

20    you count this new doctor as being influenced as well, the

21    prescriptions written by the new doctor as being influenced by

22    the contact the first doctor had with Janssen.

23         Correct?

24    A.   No.  I don't -- I mean, it depends on who that other

25    doctor is and whether they had received a sales call or not.

```
 1   If they hadn't, then I am not categorizing that doctor as
 2   influenced, but I am including the series of claims for the
 3   patient as being consistent with one of the off-label
 4   allegations if the first one was.
 5   Q.   You count the prescriptions of the second doctor in your
 6   data filtering.
 7        Correct?
 8   A.   Yes.
 9   Q.   So if this doctor is a doctor who had contact -- the
10   first doctor is a doctor who had contact with Janssen.
11        You with me?
12   A.   I am.
13   Q.   You consider that doctor to be influenced.
14        Correct?
15   A.   Right.
16   Q.   And then if many, many years later a second doctor
17   continues that prescription -- you with me?
18   A.   Yes.
19   Q.   -- even if that doctor had no contact with Janssen --
20   right?
21   A.   Okay.
22   Q.   -- you count that second doctor's prescriptions in your
23   filtering of the data.
24        Correct?
25   A.   Their claims, yes.
```

*5272*

1    Q.   Okay.

2         That's part of the claims that you passed on to

3    Dr. Shaked or the other expert in this case?

4         Right, sir?

5    A.   At least summaries of the claims, yes.

6    Q.   Okay.

7         Another assumption, sir, that you were instructed by

8    the lawyers to make is that every prescription written by a

9    physician after they spoke at a Janssen event should be

10   included in the damages for speakers.

11        Correct?

12   A.   I'm not calling them damages.  I would say that they're

13   consistent with the kickback allegations and they would be in

14   those results.

15   Q.   So if a speaker spoke in 2006 for Prezista -- you with

16   me?

17   A.   Yes.

18   Q.   -- every relevant prescription for Prezista that they

19   write through the entire time period is considered in your

20   claims.

21        Correct?

22   A.   It would be in the claims that are consistent with the

23   kickback allegations, yes.

24   Q.   So once a speaker speaks for Janssen, every prescription

25   they write after that to the end of your time period is

1    considered to be the product of a kickback.

2         Correct, sir?

3    A.   I would simply say it's consistent with the allegations

4    and would be in those results.

5    Q.   And you actually, sir, when you were preparing this data

6    for the other expert, you offered, I think, what you described

7    as a menu of ways to look at this data.

8         Do you recall that testimony?

9    A.   Not specifically.

10   Q.   Okay.

11        You offered the folks who are taking your data or the

12   lawyers, you offered them a number of different ways that you

13   could analyze or look at this data.

14        Is that fair?

15   A.   That's very general.  It's certainly true, yes.

16   Q.   Okay.

17        So, for example, talking about this speaker, right,

18   talking about a speaker who in 2006 prescribes Prezista and

19   then you're counting every prescription for the end of time,

20   one thing you had suggested that could be done is you could

21   cut off the analysis after that prescriber received a certain

22   amount of speaker fees.

23        Correct?

24   A.   I honestly don't recall that.  It's possible I did.  I

25   just don't recall it.

*5274*

```
 1   Q.   You told us about producing summaries to the Shaked team.

 2          Do you recall that, sir?

 3   A.   Yes.

 4   Q.   And one includes all speakers, regardless of how much

 5   money they were reimbursed over time.

 6          Right?

 7   A.   Yes.

 8   Q.   And then you have one that limited it to those who were

 9   paid more than a hundred thousand dollars.

10          Do you recall that?

11   A.   That was an independent summary, yes.

12   Q.   All right.

13          And then you have one that was limited to those that

14   were paid more than $50,000.

15          Do you know that?

16   A.   Yeah.  That was a third summary, if you will.

17   Q.   All right.

18          Because from your point of view as the data person,

19   there are a number of different ways you could look at this

20   data, you would agree.

21          Right, sir?

22   A.   Absolutely.

23   Q.   And you offered this what you described as a menu of

24   options to the other expert.

25          Right?
```

1    A.   I don't know how I would characterize it.  It's -- it's

2    -- but, yes, I provided different summaries with different

3    criteria of what would go into each summary for their

4    consideration.

5    Q.   And certainly some of the options that you offered

6    resulted in a lower amount of damages than some of the other

7    options you offered.

8         Right, sir?

9    A.   Well, again, I'm not calculating damages, but in terms

10   of, you know, what impact that would have on the number of

11   claims and dollars and the results that are consistent with

12   allegations, yes, one way or another, the numbers could be

13   higher or lower, depending on that type of filtering.

14   Q.   Sure.

15        If you offer options to the other experts that limit

16   the number of claims that you're filtering, it would limit the

17   number of damages in the model.

18        Right, sir?

19   A.   Again, I don't call them damages, but, yes, the dollar

20   amounts would decrease if the filtering were stricter.

21   Q.   Right.

22        Did you have any discussion with the Shaked team about

23   whether or not they were selecting a stricter filtering or a

24   larger filtering that led to more claims for money?

25   A.   I don't recall explicitly discussing that topic in that

1    way.  It was self-evident, I think, so I don't know that it

2    was explicitly discussed.

3    Q.    Well, I mean, one of the options you talked to the team

4    about or at least you presented to the team when you look at

5    this scenario here is you said, We could not count the

6    prescriptions of a second prescriber.

7          Right?

8    A.    I had a variety of different approaches, and that would

9    be one of them, yes.

10   Q.    Okay.

11         One of the things you said to that team is Look, when

12   we look at this data, if we know there's one physician who you

13   call influenced because they had contact with Janssen, we

14   could just count their prescriptions, and when they go to a

15   different prescriber, we could not count those prescriptions.

16         Right?

17   A.    That was one of the alternative ways of identifying

18   claims consistent with the allegations.  I don't recall,

19   though -- you mentioned about communicating that with, I

20   think, the Shaked group.  I'm not sure that that was something

21   that I discussed in terms of getting their input or not.

22   Q.    Okay.

23         You offered it as a way you could look at this data.

24         Right?

25   A.    Yeah.  I'm just not sure I offered it to the Shaked group

1    or whether that was something more discussed with Relators'

2    counsel.

3    Q.   You might have offered it to the lawyers.

4         Right?

5    A.   Yes.

6    Q.   Okay.

7         And do you know that that offer was rejected and that

8    these prescriptions from a second prescriber, who never saw

9    Janssen ever, are counted in the ultimate damage model?

10   A.   Well, they chose the alternative that I ultimately

11   implemented, yeah.

12   Q.   That alternative has the effect of increasing the number

13   of claims at issue.

14        Right, sir?

15   A.   I would say it results in more claims in dollar amounts

16   in the results, yes.

17   Q.   Right.

18        You also, sir, developed a methodology for determining

19   how to analyze the lipid-related Prezista claims.

20        Right, sir?

21   A.   Can you repeat that, please.

22   Q.   Sure.

23        You developed a method for how to analyze the

24   lipid-related claims.

25        Is that right?

*5278*

```
 1   A.   Yes.
 2   Q.   And the -- what you did was identify patients who had a
 3   claim in the data who had a lipid-related issue in the data
 4   prior to a Prezista claim.
 5        Correct?
 6   A.   Part of their first Prezista claim, yes.
 7   Q.   Okay.
 8        And that was not restricted by the date of that prior
 9   lipid claim in the data.
10        Right, sir?
11   A.   In the ultimate implementation, it wasn't.
12   Q.   Right.
13        This is another area where you offered the lawyers some
14   other filtering options of how you could look at that lipid
15   data.
16        Right?
17   A.   Yes.  It was more that I just wanted to be flexible on
18   that dimension of the filtering and that it was -- yeah.  I
19   would say it that way.
20   Q.   Right.
21        So, for example, you said, Hey, lawyers, one thing we
22   can do is look to see if there's a lipid-related claim just 30
23   days or 60 days or 180 days before you see a Prezista
24   prescription in the Medicaid data.
25        Right?
```

```
 1  A.   For example, yes.
 2  Q.   For example.
 3       And if you did that, if you use that kind of filtering,
 4  that date filtering, it would decrease the number of claims at
 5  issue in this lipid category.
 6       Right, sir?
 7  A.   I would have to run the analysis to be certain on what
 8  thresholds might impact that, but it would tend to go in that
 9  direction.
10  Q.   Yeah.
11       I mean, it's intuitive.
12       Right, sir?
13       If you have the entire time period or you have less
14  than the entire time period, obviously the smaller time period
15  would have less claims.
16       Right?
17  A.   I would expect that to be how it would play out.
18  Q.   Okay.
19       And you're aware that the lawyers did not pick any of
20  those date restrictions on the lipid claims that would have
21  led to lower amounts of damages.
22       Right?
23  A.   Well, I can't speak for the lawyers in terms of whether
24  they made the decision or it was a decision made by Dr. Glatt.
25  So I don't -- I can't speak to that.
```

1    Q.   Okay.

2         And as I understand it, your conversations with

3    Dr. Glatt went through the lawyers.

4         Is that right?

5    A.   Yeah.  I wouldn't call them conversations, but anything

6    that was communicated was done through Relators' counsel.

7    Q.   You never spoke to Dr. Glatt yourself.

8         Right, sir?

9    A.   Correct.

10   Q.   Okay.

11        And there's somebody, a nurse, Cynthia Swanson, who was

12   involved in this process.

13        Is that right, sir?

14   A.   Yes.

15   Q.   Okay.

16        And was she also hired by the lawyers?

17   A.   Yes.

18   Q.   Okay.

19        Does she work for the law firm, do you know?

20   A.   No.  She works for a company that was called Seim Johnson

21   in Omaha, Nebraska.

22   Q.   Okay.

23        And one of the things I think you told us that she did

24   is she gave you some codes that she thinks are related to

25   lipid issues.

1          Is that right, sir?

2   A.    Yes.  She provided ICD-9 and ICD-10, that's International

3   Classification of Diseases, 9th revision and 10th revision

4   diagnosis codes, for lipid-related issues, as well as drug

5   names and National Drug Codes identifying specific drugs that

6   would treat lipid-related issues.

7   Q.    Okay.

8          And do you know if she has any affiliation with

9   Dr. Glatt or she's just affiliated with the lawyers?

10  A.    I have no idea what her affiliations are, other than that

11  she was hired by the lawyers, as far as I know.

12  Q.    Okay.

13          MS. BROWN:  Let's look at tab 7, please.

14          Permission to admit D-9185?

15          MR. MARKETOS:  No objection.

16          THE COURT:  All right.  So admitted.

17  (Defendant's Exhibit D-9185 in evidence.)

18  BY MS. BROWN:

19  Q.    Okay.

20          And sir, this is the list that was produced to us.

21  Does this look familiar to you --

22  A.    Yes.

23  Q.    -- sir?

24          This is the -- oh, sorry.

25          This is the list that came from Cynthia Swanson who

```
 1   works for the lawyers, too.

 2        Right?

 3   A.   Yeah.  We discussed her.  Yes, that's her.

 4   Q.   Okay.

 5        And these were the ICD-9 codes that you used to run the

 6   data and collect information about people who may have had a

 7   prior lipid condition.

 8        Right, sir?

 9   A.   These also include ICD-10 codes.  But yes, otherwise,

10   that's correct.

11   Q.   Okay.

12        And this list includes a bunch of codes that don't have

13   anything to do with lipids.

14        Do you know that, sir?

15   A.   I'm aware of that.

16   Q.   Right.

17        All this hyperglycemia -- all these hyperglycemia

18   codes, they have to do with high blood sugar, not high lipids.

19        Right, sir?

20   A.   That's my understanding.

21   Q.   Okay.

22        And when Dr. Glatt was here in the courtroom, he told

23   us that these codes had to be taken out of the analysis.

24        Did you know that?

25   A.   Yes.  And they were.
```

```
 1   Q.   Okay.

 2        Do you know if these codes were taken out of the

 3   ultimate analysis, sir?

 4   A.   Yes.

 5   Q.   Did you instruct folks to do that?

 6   A.   I was instructed to do that.  I don't know to what extent

 7   I did that or the Shaked team did that.  I think it would have

 8   been me, but I'm not certain.

 9   Q.   So the initial analysis that had the hyperglycemia codes,

10   that was corrected to remove all that?

11   A.   Yes.

12   Q.   All right.

13        I want to talk to you a little bit about your claim

14   data for Intelence once-daily.

15        Okay, sir?

16   A.   Certainly.

17   Q.   Fair to say there were a bunch of limitations with that

18   data.

19        Right, sir?

20   A.   You'd need to be more specific.  I'm not sure what you're

21   referring to.

22   Q.   Okay.

23        We'll go through them, but just generally, you agree it

24   was pretty limited data.

25        Right, sir?
```

```
 1  A.    I -- I wouldn't agree necessarily, no.

 2  Q.    Let's talk about it.

 3  A.    Yes.

 4  Q.    To begin with, you got data from CMS.

 5         Right?

 6         Generally.  You talked about the data you got from CMS.

 7         Right, sir?

 8  A.    The Medicaid and Medicare claims data, yes.

 9  Q.    Right.

10         So CMS, just going back to our chart, that's the part

11  of the government that reimbursed for some of these claims.

12         Right, sir?

13  A.    Yes.

14  Q.    Okay.

15         You got some of the data directly from them.

16         Right?

17  A.    Well, it was actually from CCW, which I understand is

18  administered by HRSA, which is a health resources and services

19  agency, which is a separate agency under the Department of

20  Health and Human Services.

21  Q.    Right.

22         Health and Human Services is the agency above CMS.

23         Right, sir?

24  A.    Yes.

25  Q.    And this CCW is like the part that holds the data.
```

1          Right?

2    A.    It's one copy, yes.

3    Q.    Okay.

4          But you know that the CMS data that you were just

5    describing to us, it doesn't include any information on dose.

6          Right, sir?

7    A.    Except that it contains a field for day supply as well as

8    a field for quantity.  And so in terms of dose in that sense,

9    you can tell how many tablets or pills or units per day are in

10   the prescription.  But it's in that sense.

11   Q.    But you couldn't do that because you had to get data from

12   somewhere else for the dose stuff.

13         Right?

14   A.    Well, there's a difference between dose and dosing

15   instructions.

16   Q.    Yep.

17   A.    And so you can tell how many tablets a day from the

18   claims data itself, but you can't -- it doesn't contain the

19   dosing instructions that the physician wrote on the

20   prescription.  That is in the pharmacy's data.

21   Q.    Right.

22         So if you -- you understand there's a claim in this

23   case that Intelence was being prescribed once a day.

24         Right?

25   A.    Yes.

```
 1   Q.   That's a dosing instruction:  Take this medicine once a

 2   day.

 3        Right, sir?

 4   A.   Correct.

 5   Q.   And that data, you would agree with me, is not contained

 6   in the CMS data you received.

 7        Right, sir?

 8   A.   That's correct.

 9   Q.   And that's because CMS doesn't consider dosing data when

10   it makes reimbursement decisions.

11        Right, sir?

12   A.   I can't speak for CMS, but it's not in their data.

13   Q.   It's not in the data you had access to.

14        Right?

15   A.   Correct.

16   Q.   So you had to go to an entirely different source to get

17   data that would allow you to analyze this once-daily claim.

18        Right?

19   A.   Yes.

20   Q.   All right.

21        And so what you did is you got data from three pharmacy

22   chains.

23        Correct, sir?

24   A.   Right.

25   Q.   Walgreens, Rite Aid, and something called BioScript?
```

```
 1   A.    Without a T, I believe.

 2   Q.    Oh, BioScrip.

 3   A.    Yes.

 4   Q.    Okay.

 5         Who decided on these three pharmacies?

 6   A.    I believe it was Relators' counsel.

 7   Q.    Okay.

 8         The lawyers picked these three.  Do you know why?

 9   A.    I don't recall the specifics.  They were large

10   prescribe- -- or pharmacies that dispensed these drugs.

11   Q.    Okay.

12         But you agreed, sir, that this data that you received

13   from these three pharmacies is not comprehensive of all

14   Intelence once-daily prescriptions.

15         Right?

16   A.    Correct.

17   Q.    And you don't have any idea what percentage of the

18   overall Intelence once-daily prescriptions these three

19   pharmacies represent.

20         Right, sir?

21   A.    I wouldn't have specific knowledge of that.  But knowing

22   that there were -- what was it -- 302,000 prescriptions in

23   that data -- and I was applying what I understood from that

24   data to 771,000 pharmacy claims in the CMS data -- that's a

25   large percentage --
```

```
 1   Q.   Okay.

 2   A.   -- in terms of ratio.

 3   Q.   You don't know what percentage it is.

 4        Right, sir?

 5   A.   Well, it's, you know, three, you know, divided by 7.7.

 6   Q.   You have three pharmacies.

 7        Right, sir?

 8   A.   Yes.

 9   Q.   You don't have, like, Walmart, CVS.  You don't have any

10   of those pharmacies in your data.

11        Right?

12   A.   Correct.

13   Q.   You have Walgreens.  You have Rite Aid and BioScrip.

14        Right?

15   A.   Correct.

16   Q.   All right.

17        And another problem with that data is that you can't

18   link any Intelence once-daily prescription to a particular

19   doctor.

20        Right, sir?

21   A.   Well, I don't know -- you said that's another problem.

22   I'm not sure I agree that there was one prior, that we're

23   following on with another here.

24        But there is information that can be used if one takes

25   some steps to link them.
```

```
 1   Q.   Well, in terms of those steps, sir, you told us you

 2   didn't try to take them.

 3        Right?

 4   A.   Right.

 5   Q.   Okay.

 6        So whether you could do it or you can't, you did not.

 7        True?

 8   A.   Not in my final analysis, no.

 9   Q.   Okay.

10        So you don't know whether any once-daily Intelence

11   claim that you have was written by a health care provider who

12   was in contact with or influenced by Janssen.

13        Right?

14   A.   Correct.  I may have looked at that and seen some, but

15   here and now, I don't recall any.

16   Q.   Right.

17           THE COURT:  Ms. Brown, is this a place we can take

18   that second break?

19           MS. BROWN:  Absolutely, Your Honor.

20           THE COURT:  All right, folks.  We're going to hit

21   that second break, and then we'll hit the home stretch in the

22   last hour, and we'll go from there.

23        Let's let the jurors take a -- we're going to reconvene

24   at 4 o'clock.  You're going to have a few extra minutes.  So

25   we're going to go 4 to 5, and then we'll be done for today.
```

1          (A short recess occurred.)

2          THE COURT:  Remain seated.

3          THE DEPUTY COURT CLERK:  All rise.

4        (The jury enters the courtroom.)

5          THE COURT:  All right, folks.  Everybody have a seat.

6      Ms. Brown, when you're ready to proceed, you may.

7      And Mr. Dew, just remind you you're still under oath

8  from earlier.

9          THE WITNESS:  Yes.

10  BY MS. BROWN:

11  Q.   Okay.

12      Mr. Dew, we're almost done.  We are going to finish up

13  the pharmacy data questions.  I've got one more topic for you.

14  We're going to be done in, I hope, less then 15 minutes.

15      Okay, sir?

16  A.   That's great.

17  Q.   Okay.

18      We were talking about the pharmacy data that you got to

19  analyze these once-daily dosing claims.

20      Do you recall that, sir?

21  A.   Yes.

22  Q.   And you would agree that the data you received does not

23  allow you to link up an individual prescription to an

24  individual prescriber.

25      Correct, sir?

```
 1  A.   No, it does -- I don't know if all three pharmacy
 2  datasets had prescriber NPIs in them, but I think two, if not
 3  three, did.  And so that -- they can be.
 4  Q.   You didn't do it.
 5       Right, sir?
 6  A.   Only as, you know, a test to look at that question, but I
 7  didn't do it in my final analysis.
 8  Q.   All right.
 9       And you told us that the methodology that you employed
10  to evaluate this once-daily dosing data from the pharmacies
11  came from Relators' counsel.
12       Correct, sir?
13  A.   I received it from them, yes.
14  Q.   All right.
15       They also provided you with terms that you should use
16  to search the pharmacy data to determine if a particular
17  prescription included a once-daily dose.
18       Is that right, sir?
19  A.   A once-daily dosing instruction, yes.
20  Q.   All right.
21       And then what you did is you created a ratio from this
22  pharmacy data and applied it to the CMS data.
23       Is that right, sir?
24  A.   Yes, to the Medicaid and Medicare claims.
25  Q.   All right.
```

1          And you didn't do anything, though, to confirm that the

2    pharmacy data represented the same patient population as the

3    Medicare data.

4          Correct?

5    A.   Not specifically.  But they're all HIV, ARV therapy

6    patients taking Intelence, so that's fairly similar.

7    Q.   Well, but one thing that wouldn't be similar,

8    potentially, is Medicare Part D is only available to people

9    over age 65.

10         Right, sir?

11   A.   I don't know that that reflects a difference, because

12   there would be patients going to those pharmacies who are over

13   65.  So I didn't see anything that suggested that it wasn't

14   anything but an apples-to-apples comparison, if you will.

15   Q.   But to be fair, you didn't do that apples-to-apples

16   comparison, because you didn't look at age distribution.

17         Correct, sir?

18   A.   I don't recall doing that.  I know at least one of the

19   datasets didn't contain beneficiary patient ages.

20   Q.   Right.

21         And you also didn't look at any gender distribution.

22         Right, sir?

23   A.   Correct.

24   Q.   You didn't look at any geography parameter.

25         Right, sir?

1    A.    I did notice that the Walgreens' data, which consisted of

2    over 200,000 claims, covered all but Alaska and North Dakota.

3         The BioScrip claims covered 31 states, and all of the

4    large ones.

5         The Rite Aid data covered only 21 states, I believe,

6    and omitted Florida and Texas.

7    Q.    Sir, when we asked you at your deposition if you looked

8    at any kind of geography parameter for the pharmacy data

9    versus the Medicare and Medicaid or ADAP data, you told us you

10   had not.

11        Is that accurate?

12   A.    Yes.  I looked at that since my deposition.

13   Q.    Oh, you looked at that to get ready to testify?

14   A.    Well, it was more in response --

15   Q.    Okay.

16   A.    - to the deposition because I wanted to know after that.

17   Q.    I see.

18        At the time you filtered the data and made these

19   determinations, you had not looked at any geography parameter.

20        Correct?

21   A.    That's correct.  I think, though, that the Rite Aid data

22   might have explicitly listed states.  One of them explicitly

23   listed states, and I recall looking at that in my QC, you

24   know, profiling process.

25        But other than that, I didn't incorporate it into my

1    work.

2    Q.   And one thing you know is that the pharmacy data

3    contained claims that were paid by payors that were not the

4    government.

5         Right, sir?

6    A.   Yes, I believe that is correct.

7    Q.   All right.

8    A.   Including payors who were the government, but yes.

9    Q.   Sorry, sir?

10   A.   They included prescriptions that were paid by the

11   government in addition to claims -- or that were not.

12   Q.   Right.

13        And you understand this case is about claims,

14   reimbursement claims from the government.

15        Right?

16   A.   Yes.

17   Q.   All right.

18        But the data you looked at, at least from these

19   pharmacies, included claims that were paid by, like, Blue

20   Cross Blue Shield, private insurance companies.

21        Right?

22   A.   Yeah.  I don't know the specific ones, but I expect there

23   were private insurance claims represented in there.

24   Q.   Yeah.

25        And you weren't able to identify which claims were the

1  private insurance versus which were the government.

2      Right?

3  A.  No.

4  Q.  Okay.

5  A.  Except I think Rite Aid data explicitly listed Medicaid

6  or Medicare Part D, but the other two had bins, PCMs and group

7  IDs that are more difficult to figure out who the underlying

8  payor was.

9  Q.  The other problem, sir, with some of the pharmacy data is

10  the BioScrip data didn't have any dates.

11      Right, sir?

12  A.  That -- the BioScrip data did not have any dates.  That's

13  correct.

14  Q.  And there were some anomalies with the Rite Aid data,

15  too.  For example, in 2008, it showed only two prescriptions

16  for Intelence.

17      Correct?

18  A.  I don't recall that particular detail, but I do recall

19  that basically the Rite Aid data covered from 2009 on and not

20  in 2008.  That's my general recollection.

21  Q.  Okay.

22      MS. BROWN:  Your Honor, permission, just for

23  demonstrative, to show the methodology, which is Plaintiffs'

24  Exhibit 1234.

25      MR. MARKETOS:  I have no -- is this from his report?

1          MS. BROWN:  Well, the methodology.

2          MR. MARKETOS:  That's fine.  That's fine.

3          THE COURT:  All right.  You may.

4    BY MS. BROWN:

5    Q.  Sir, you see this chart here with some of the details of

6    the pharmacy data you got.

7          This is from your methodology?

8    A.  The write-up I did of it, yes.

9    Q.  Okay.

10         We talked about the fact that these -- all of these

11   33,000 claims from BioScrip, you don't know what year they

12   were from.

13         Right?

14   A.  They're prescriptions, but, yes, that's correct.

15   Q.  They're prescriptions, but whether they're 2008, '9, '10,

16   '11, '12, '13, '14, we don't know because it didn't have that

17   data.

18         Right, sir?

19   A.  That's correct.

20   Q.  And then there's sort of this anomaly here with the

21   Rite Aid prescriptions, 2008, compared to Walgreens; almost

22   9,000 prescriptions we see, too, for Rite Aid.

23         Right?

24   A.  I wouldn't characterize it necessarily as an anomaly

25   other than that what Rite Aid produced started at a later

1    date, as far as I could tell, and there happened to be two in

2    2008.  I'm not sure the reason behind that.

3    Q.  You told us at your deposition that you couldn't verify

4    that that Rite Aid data was complete and accurate.

5         Correct, sir?

6    A.  It's possible I testified to that.  I mean, as I

7    described, I do all of these in-processing QCing steps, so I

8    applied those to Rite Aid, but I didn't check them against an

9    independent data source, if that's what you're referring to.

10   Q.  And then, as it turns out, sir, as it relates to all this

11   work that you did with the pharmacy data, you made a mistake.

12        Right, sir?

13   A.  Yes.

14   Q.  Okay.

15        And that mistake was actually a multimillion-dollar

16   mistake.

17        Right, sir?

18   A.  In terms of the final results, yes.

19   Q.  Right.

20        And we don't have to get into the math of it all, but

21   the bottom line is your number went from 43 -- about 45

22   million to 32 million.

23        Right, sir?

24   A.  That would be the once-daily dosing results in isolation.

25   When you, you know, work out the intersection of the different

5298

1   allegations, it's a smaller number that's uniquely once-daily

2   dosing results.  But that's the sort of top-line number, if

3   you will.

4   Q.   Right.

5        So what happened is our expert, Dr. Jena, sort of

6   checked your work.

7        Right?

8   A.   I assume so.

9   Q.   And he said, I think you made a mistake.

10       Right?

11  A.   That's how I read it, yes.

12  Q.   And to your credit, sir, you agreed you have made a

13  mistake.

14       Right?

15  A.   Yes.

16  Q.   All right.

17       And you corrected it to the tune of 13 or so million

18  dollars.

19       Right?

20  A.   In that top-line number, yes, that's correct.

21  Q.   All right.

22       Let's finally talk quickly about this ADAP data, okay,

23  sir?

24  A.   Sure.

25  Q.   This is the AIDS Drug Assistance Program.  It's called

ADAP.

        Right, sir?

A.    Yes.

Q.    It's another way that folks needing these medicines can

get assistance to pay for them.

        Correct?

A.    That's my understanding.

Q.    All right.

        And it's funded in part by the federal government.

        Correct?

A.    That's my understanding.

Q.    And the way that you got this data was kind of in a

lump-sum number.

        Correct?

A.    Well, it was aggregated by drug, state, and quarter,

listing the dollar amounts and number of clients, I believe,

but I didn't use the number of clients for anything.

Q.    Basically, you got -- for the state of New Jersey, every

quarter of every year, you got a number that ADAP paid for

Prezista.

        Correct?

A.    I'd have to look at the data, but that's, you know, the

ideal situation.  There were dropouts for various states and

various quarters, and I can't speak to New Jersey specifically

on that, but that's the idea.

```
 1   Q.   Good point, sir.
 2        You don't even have the ADAP data for all the relevant
 3   states.
 4        Is that right?
 5   A.   Well, there were dropouts, like I had described.  So,
 6   like, in Pennsylvania, for example, there's a couple quarters
 7   that show amounts of over a hundred thousand dollars and
 8   several quarters with zero followed by a series of quarters
 9   starting up more than a million dollars per quarter.  And so I
10   don't have an explanation for that.  I chose to accept the
11   data as is and -- rather than try to smooth it or gap-fill or
12   something like that.
13   Q.   So you have no information in this ADAP data about who
14   prescribed the medicine.
15        Right, sir?
16   A.   Correct.
17   Q.   No information on who the patients were who received
18   those prescriptions.
19        Right?
20   A.   Correct.
21   Q.   No information on how many prescriptions were reimbursed.
22        Correct, sir?
23   A.   Correct.
24   Q.   And you talked a little bit about being conservative in
25   some of your estimates.
```

*5301*

```
 1          Right, sir?
 2   A.   Yes.
 3   Q.   You said you erred on an approach that reduces the dollar
 4   amount.
 5          Do you remember that?
 6   A.   Something to that effect, yes.
 7   Q.   Okay.
 8          But when it relates to this ADAP data, that was
 9   incomplete.
10          Right?
11   A.   I think so, yes.
12   Q.   All right.
13          That didn't have patient-specific or doctor-specific
14   data.
15          Right?
16   A.   I don't know that I would characterize that as
17   incomplete, but those values weren't included.
18   Q.   Right.
19          I meant that as two different things.  Number one, the
20   ADAP data is incomplete.
21          Right, sir?
22   A.   Could you clarify in what sense you mean that?
23   Q.   Sure.
24          You just said that sometimes it drops out.  You have
25   one quarter, you have no data for another quarter, stuff like
```

 1    that.

 2         Right?

 3    A.   Yeah.  But I don't know the reason behind that, so I'd --

 4    you know, I mean, you could call it incomplete, that's

 5    probably -- the case, but I just wouldn't want to characterize

 6    it in those terms, not to be, you know, disagreeable.

 7    Q.   Sure.  Not at all.

 8         What you couldn't do is link up whether a physician who

 9    had any contact with Janssen prescribed a medicine that was

10    reimbursed by ADAP.  You couldn't make that -- you couldn't

11    find that information in the ADAP data.

12         Correct, sir?

13    A.   It wasn't provided, so I couldn't do that.

14    Q.   Right.

15         But nevertheless, the lawyers instructed you to use

16    that data anyway.

17         Right, sir?

18    A.   Yes.

19    Q.   All right.

20         And so you did.

21         Right, sir?

22    A.   Yes.

23    Q.   And what you did is you assumed that the ADAP

24    reimbursements were similar to the Medicaid reimbursements.

25         Right?

```
 1   A.   Similar in the sense of being consistent amounts where
 2   Medicaid reimbursements are more consistent in amount per
 3   claim than Medicare Part D can be because of the doughnut hole
 4   and factors like that.
 5   Q.   All right.
 6        For purposes of us, though, you assumed -- you made a
 7   -- you assumed that ADAP reimbursements were similar to the
 8   Medicaid reimbursements.
 9        Correct?
10   A.   Yes.
11   Q.   You did that because the lawyers told you to make that
12   assumption.
13        Right, sir?
14   A.   I was informed that they were by Relators' counsel.
15   Q.   Yes, sir.
16        And you didn't do anything to compare the patient
17   population between Medicaid with the patient population of
18   ADAP.
19        Right?
20   A.   No, but both programs serve low-income and otherwise
21   uninsured patients, and they're all on HIV therapies.  But
22   other than that, I didn't do anything explicitly.
23   Q.   You know, actually, though, the programs have very
24   different requirements for what qualifies for funding under
25   Medicaid versus ADAP.
```

```
 1            Do you know that, sir?
 2   A.   I'm not that familiar with the requirements for ADAP.
 3   Q.   Right.
 4            And you don't know the age distribution of the policy
 5   -- you don't know if the age distribution of the folks getting
 6   assistance from ADAP is the same as the folks getting
 7   assistance from Medicaid.
 8            Right?
 9   A.   I don't have specific knowledge on that.
10   Q.   And you don't know if the patient pools for Medicaid and
11   ADAP are at all the same or similar as it relates to patient
12   attributes.
13            Right?
14   A.   I don't have specific knowledge of that, other than what
15   I just said, that they're HIV patients on IV therapies taking
16   Intelence and Prezista.
17   Q.   What you know, though, is that the lawyers told you to
18   make this comparison for purposes of using the ADAP data.
19            Correct?
20   A.   Yes.
21   Q.   You also know there were some limitations in the Medicaid
22   data you received.
23            Right, sir?
24   A.   Can you be more specific.
25   Q.   Sure.
```

1        You told us -- I think you said on direct examination
2   that, for 35 percent of the Medicaid claims, you have no
3   information on the prescribers.
4        Is that right, sir?
5   A.   I couldn't determine who the prescriber was, yes, that's
6   correct.
7   Q.   And if I recall correctly, for some years, like 2013,
8   2014, the Medicaid data dropped off.
9        Is that right, sir?
10  A.   28 states in 2013 and 17 in 2014, yes.
11  Q.   All right.
12       But you were instructed, nevertheless, by the lawyers
13  to use the Medicaid data.
14       Correct, sir?
15  A.   Yes.  And, you know, for those issues with the Medicaid
16  data, that starts to reduce the claims that are in the results
17  of the Medicaid analysis, and by virtue of that, they would
18  reduce the dollars coming out of the extrapolation to the ADAP
19  data.
20  Q.   The ADAP data was still compared to the Medicaid data for
21  extrapolation purposes.
22       Correct?
23  A.   Yes.
24  Q.   Thanks very much, Mr. Dew.  I have no further questions
25  for you.  I appreciate it.

```
 1   A.    Thank you.

 2              THE COURT:  Mr. Marketos, any redirect?

 3              MR. MARKETOS:  Yes.  Thank you, Your Honor.  Just a

 4   moment.

 5   (REDIRECT EXAMINATION BY MR. MARKETOS:)

 6   BY MR. MARKETOS:

 7   Q.    Just a second, Mr. Dew, I apologize.

 8   A.    No problem.

 9   Q.    All right.

10        Thank you.

11              MR. MARKETOS:  May I proceed, Your Honor?

12              THE COURT:  You may.

13              MR. MARKETOS:  Thank you.

14   BY MR. MARKETOS:

15   Q.    Mr. Dew, just a few minutes, or I'm going to try to walk

16   through this.

17        Do you understand that you're answering some questions

18   from Janssen's counsel about some gaps in data that was part

19   of the total cumulative data that you gathered for this

20   exercise.

21        Right?

22   A.    Correct.

23   Q.    Now, you're aware of the fact that Janssen has received

24   money as a result of sales of its drugs Prezista and Intelence

25   to Medicare, Medicaid, and ADAP as part of this exercise.
```

1          Right, sir?

2     A.   Or they were reimbursed by those government health

3     programs, yes.

4     Q.   They received money for drugs that are ultimately

5     reimbursed by those three programs.

6          Right, sir?

7     A.   Yes.

8     Q.   So in order to go out and determine how much money

9     Janssen ultimately made in order to reimburse the government

10    for off-label sales and for kickbacks paid to doctors, you

11    have to get the best data you can get available.

12         Do you agree with that premise?

13    A.   That's desirable, certainly.

14    Q.   Yes.

15         If certain data was not available, you didn't count it

16    in your exercise.

17         Is that right?

18    A.   Correct.

19    Q.   All right.

20         But if data was available where you could make

21    estimates or use a proxy for certain data, did you undertake

22    to do that?

23    A.   Yes.

24    Q.   All right.

25         So you were answering a bunch of questions about

1    Walgreens and Rite Aid and why you used that pharmacy data.

2         Do you recall that?

3    A.   Yes.

4    Q.   For instance, sir, if -- ADAP may not have as good

5    quality of data available as Medicare, would you agree, CMS?

6    A.   I don't know what they have available.  I know what I

7    received, and, yes, it was of -- well, it was aggregated, and

8    it appeared to have gaps.

9    Q.   Okay.

10        And so where there are gaps in data, did you undertake

11   an analysis to make accurate estimations of that data?

12   A.   Can you repeat the question, please.

13   Q.   It was a bad one.  Let me try another one.  It's getting

14   late.

15        Where you were able to, did you use reliable data to

16   make estimates or predictions where you actually had data that

17   was available to you?

18   A.   In certain circumstances, yes.

19   Q.   All right.

20        As it relates to the vast majority of the claims in

21   this case, do those come from Medicare?

22   A.   Yes.

23   Q.   And secondarily, does a smaller subset of the claims in

24   this case come from Medicaid?

25   A.   Yes.

1          Now, the raw numbers are roughly comparable, 71 million

2    in Medicaid to 88 million in Medicare.  But in terms of the

3    results by virtue of some of the, you know, missing prescriber

4    information in Medicaid, the results contain much more -- many

5    more claims relatively of Medicare Part D than Medicaid.

6    Q.   All right, sir.

7          Then finally, ADAP, the ADAP program that you were

8    describing, is that a smaller subset of the data than even

9    Medicaid?

10   A.   In dollars, yes.

11   Q.   And ultimately, sir, if you just went to ADAP and you

12   found that there were certain line items that you couldn't

13   identify and you didn't do any estimates with respect to ADAP,

14   what would happen to the money that Janssen received as a

15   result of that program?

16   A.   Could you repeat that?

17   Q.   Yes, sir.

18          If you went looking for data, say for ADAP -- that's

19   the smaller of the three programs in terms of dollars.

20          Right?

21   A.   Yes.

22   Q.   Significantly smaller than Medicare.

23          Right, sir?

24   A.   Yes.

25   Q.   Okay.

1          So when Ms. Brown is asking you about that piece of

2    your analysis, that's a much smaller piece than Medicare and

3    Medicaid.

4          True?

5    A.   Correct.

6    Q.   All right.

7          When -- if you were to just say, Well, ADAP itself

8    doesn't have all the line items that I need for my analysis

9    and give up, at that point what would happen to the money that

10   Janssen received from that program?

11   A.   It wouldn't change that at all.

12   Q.   So you've been -- you were asked a little bit about

13   expert payments.  You received payments for the services that

14   you've provided to the Relators in this case.

15         Right, sir?

16   A.   The company I work for does, yes.

17   Q.   Yes.

18         And that's your business.  That's the business that

19   you're in, is analyzing data for cases like this that involve

20   off-label sales, False Claims Act-type allegations.

21         Is that right?

22   A.   Yes.

23   Q.   Okay.

24         Are you aware of the fact, Mr. Dew, that Janssen has

25   five paid experts in this case?

1    A.    No.

2    Q.    Okay.

3          And how often are you asked to provide services as it

4    relates to analyzing data in False Claims Act cases?

5    A.    I don't know the frequency, but I typically got -- well,

6    between five and 15 projects that are in -- still working on,

7    whether they're very active or not.  It varies.

8    Q.    Does it take a lot of work -- when we're talking about a

9    nationwide off-label sales scheme, or kickbacks paid to

10   doctors nationwide, does it take a lot of work to get the data

11   and analyze it?

12   A.    It can.  It increases with the number of different

13   datasets as well as the number of analyses I need to perform.

14   Q.    All right.

15         For instance, it was asked, You don't know why a doctor

16   wrote a specific prescription.  That's not going to appear in

17   the data.  You're not going to see a Medicare claims data form

18   that says, I wrote this prescription because Nancy Bartnett

19   told me that this off-label sale was very similar to Reyataz.

20         You're not going to see that in the claims data.

21         Right, sir?

22   A.    Correct.

23   Q.    Your part of the analysis is to figure out how --

24   specific analysis of claims data that were submitted based on

25   allegations that Relators have otherwise attempted to prove.

```
 1           Right, sir?
 2  A.   Yes.
 3  Q.   And then Professor Shaked takes that data and he analyzes
 4  it with statistics.
 5           Right, sir?
 6  A.   That's my understanding, yes.
 7  Q.   So we can check with Professor Shaked, for instance, what
 8  number of influenced physicians from Janssen's marketing
 9  prescribed off-label, and we can compare that to, for
10  instance, the number of off-label prescriptions from a doctor
11  who had never met a Janssen rep.
12           Right, sir?
13  A.   Yes.
14  Q.   And that's something we can see from Dr. Shaked.
15           But that's not what you were asked to perform, was it?
16  A.   No.  I was asked to, you know, summarize and provide
17  inputs for him to do that.
18  Q.   Can you think of a way where you could calculate
19  off-label sales nationwide for a company like Janssen and not
20  perform the analysis of the data that you performed in this
21  case?
22  A.   Nothing comes to mind that would be better.
23  Q.   And at the end of the day, sir, occasionally you'd have
24  to make estimates if certain gaps in the data are apparent.
25           Is that right?
```

1    A.    On occasion, yes.

2    Q.    Is that consistent with the type of estimates that

3    experts in your field make in these False Claims Act cases all

4    the time?

5    A.    Yes.

6    Q.    For instance, you were asked about the liability

7    assumptions that you were asked to make.  And certainly, sir,

8    you could make certain assumptions that would increase the

9    number of claims, that ultimately result in more dollars that

10   are being asked for Janssen to repay the government.

11         You could make assumptions that increase that number.

12         Right?

13   A.    I believe so, yes.

14   Q.    You could also make assumptions that decrease that

15   number.  And, in fact, you've made some of those assumptions

16   in this case.

17         Correct?

18   A.    In instances where there was uncertainty or ambiguity,

19   yes.

20   Q.    For instance, you were asked about -- do you know what

21   the law of large numbers is, Mr. Dew?

22   A.    I've heard of it.

23   Q.    The law of large numbers associated with statistical

24   calculations and how accurate they are the larger the dataset

25   is?

1   A.   Yes.

2   Q.   All right.  A massive dataset in this case.

3        Right?

4   A.   It's a number of them, yes.

5   Q.   And that's a massive amount of claims as well for you to

6   analyze and provide to the damages expert.

7        Right?

8   A.   Correct.

9   Q.   And the statistician.

10       Right, sir?

11  A.   Correct.

12  Q.   We'll hear from the statistician and the damages expert

13  later, but, for instance, I wanted to ask you:  There was an

14  airplane and a doctor -- a patient that flew from one part of

15  the country to the other part of the country five years apart.

16       Do you know what the term "cherry-picking" or an

17  "outlier" is in statistics?

18  A.   Yes.

19  Q.   Okay.

20       And you understand that Professor Shaked, he can apply

21  statistics to the data that you provided to him to see how

22  accurate it is.

23       Right, sir?

24  A.   I believe so, yes.

25  Q.   And, for instance, if a -- in your analysis, if a doctor

1    who had never, ever prescribed- -- never been in contact with

2    a Janssen sales representative had prescribed Prezista or

3    Intelence, and then later on a doctor who had been paid

4    hundreds of thousands of dollars or who had been visited by

5    Janssen 20, 50, or a hundred times prescribed Intelence or

6    Prezista, you didn't count that instance in your analysis, did

7    you?

8    A.    Not in an off-label set of results.  If they were a

9    speaker, they would have -- it would have been counted as a

10   speaker claim.

11   Q.    Yes, sir.

12         So, for instance, you were asked about an instance

13   where an influenced doctor picks up a prescription that was

14   prescribed originally by a -- or a noninfluenced doctor picks

15   up a prescription that was prescribed by a doctor who was

16   influenced by Janssen.

17         Do you recall that?

18   A.    Yes.

19   Q.    And the insinuation, as I understood it, was why would

20   you count prescriptions from doctors who are not influenced

21   after Janssen had influenced the prior doctor.

22         Do you recall that discussion?

23   A.    Yes.

24   Q.    All right.

25         But you didn't do the reverse either.  In other words,

1    if the original prescribing doctor was not an influenced

2    doctor by Janssen, you didn't count subsequent prescriptions

3    even if they were prescribed by a Janssen doctor, a

4    Janssen-influenced doctor.

5         Right?

6    A.    Right.  And that would include instances where I couldn't

7    identify the first prescriber.

8    Q.    Okay.

9         So was there a balance to your analysis in making these

10   estimations?

11   A.    I -- I think so.  I think there's a bias basically rooted

12   in, you know, the Medicaid claims data.  Not being able to

13   identify 35 percent of the prescribers, that would lead to,

14   you know, fewer claims in the results.

15        But otherwise, I think there's a balance otherwise.

16   Q.    There's a bias downwards that benefits Janssen at the end

17   of the day.

18        Right, sir?

19   A.    I would say it leads to fewer claims in my results, but,

20   yes.

21   Q.    At the end of the day, at least a fewer claims, and that

22   would favor Janssen ultimately in terms of dollars they're

23   being asked to reimburse.

24        Is that fair?

25   A.    That's my understanding of -- yes.

```
 1   Q.  And now, you were also asked about counting a second

 2   prescriber.  And you heard testimony from -- or you read

 3   testimony from Dr. Glatt about how patients tend to stay on

 4   the same drug after they've been prescribed that drug.

 5        Do you recall hearing that testimony from Dr. Glatt?

 6   A.  I don't think I heard it, but I'm aware of it.  I think I

 7   read it.

 8   Q.  He said, If it ain't broke, don't fix it.  All right.

 9        And Dr. Jena, who's actually an expert who's going to

10   respond on Janssen's behalf, he says that patients rarely

11   change regimens once they're prescribed.

12        Were you aware of that, sir?

13   A.  I wasn't aware of that from Dr. Jena, but I was aware of

14   that otherwise.

15   Q.  You were aware of the fact that, for instance, if a

16   doctor is being paid by Janssen or being promoted off label by

17   Janssen and they prescribe a drug, Prezista or Intelence, the

18   odds are, if there's a future subscriber, they're going to

19   say, Stay on the same regimen.

20        You understand that testimony.

21        Right?

22   A.  That's my understanding, yes.

23   Q.  Okay.

24        And perhaps Janssen's expert -- perhaps he agrees with

25   that.  We'll find out from him.
```

1          But what I would like to know, sir, is ultimately, when

2     you're making these estimates, are you doing so as accurately

3     as possible with other datasets that you have available to

4     you?

5     A.   Yes.  My first objective is to be accurate and correct in

6     my results, and where there's uncertainty to try and bias --

7     or choose an alternative that would tend to lower the number

8     of claims and dollars in my results.

9     Q.   So you testified about going and getting pharmacy data as

10    a proxy.  One of those pharmacies was Walgreens.

11         Right?

12    A.   Yes.

13    Q.   That's the second-largest pharmacy in the nation.

14         Correct?

15    A.   I wasn't aware of that specifically.  I know it's huge.

16    Q.   Okay.

17         You weren't aware of whether it's second or third or

18    otherwise.  You know it's a big pharmacy.

19    A.   Yes.

20    Q.   All right.

21         BioScrip, that's a specialty pharmacy that prescribes a

22    lot of HIV medications.

23         Were you aware of that?

24    A.   Yes.

25    Q.   All right.

| | |
|---|---|
| 1 | And Rite Aid, it's a large pharmacy as well. |
| 2 | Right, sir? |
| 3 | A.   Yes. |
| 4 | Q.   And you said you obtained 302,000 instances that you were |
| 5 | able to analyze.  What does having such a large dataset enable |
| 6 | you to do in making estimations? |
| 7 | A.   It allows you to make a very accurate estimation.  I |
| 8 | calculated what are called competence -- 95 competence |
| 9 | intervals. |
| 10 | So you do the extrapolation.  You get an estimate. |
| 11 | But in the statistics, you can calculate how confident |
| 12 | you are or how far you might be off with that estimate based |
| 13 | on the number in the sample and the population.  And the |
| 14 | confidence interval around the estimates based on the pharmacy |
| 15 | data is extremely small, relatively speaking.  I mean, the |
| 16 | estimate is very accurate. |
| 17 | Q.   And, sir, you were asked a question at one point about a |
| 18 | mistake that you discovered that was pointed out by Janssen's |
| 19 | expert, Dr. Jena. |
| 20 | Do you recall that? |
| 21 | A.   Yeah.  I didn't discover it, but it was pointed out, and |
| 22 | I agree with it, yes. |
| 23 | Q.   And you agree with that and you corrected it. |
| 24 | Right, sir? |
| 25 | A.   Yes. |

```
 1   Q.   Now, Dr. Jena, of course, is being paid by Janssen to
 2   apparently check your work.
 3        Is that fair?
 4   A.   I would expect that's the case.
 5   Q.   Yes.
 6        Are you aware of Dr. Jena doing any analysis of your
 7   work and saying, Hey, you missed it.  You made this mistake,
 8   and that increases the claims amount by a hundred million
 9   dollars?
10   A.   I don't recall coming across that.
11   Q.   He didn't discover any mistakes that you supposedly made
12   that actually increased the number to Janssen.
13        Right, sir?
14   A.   I'm not aware of any.
15   Q.   All right.
16        Now, you were asked about different methodologies that
17   you could employ and comments about the lawyers, the lawyers.
18        Do you recall that?
19   A.   Yes.
20   Q.   Expert witnesses work with lawyers in cases that lawyers
21   file.
22        Right, sir?
23   A.   That's my experience in what I've seen, yes.
24   Q.   And you've worked with lawyers in the past because
25   lawyers file cases and litigate in court.
```

1          Is that fair?

2   A.   Yes.

3   Q.   And sometimes you're asked to make assumptions about

4   liability that are being covered by other experts or fact

5   witnesses in the case.

6          Right, sir?

7   A.   Yes.

8   Q.   All right.

9          Just like Janssen's experts in this case.

10         Right?

11  A.   I would expect that's the case.

12  Q.   Were the liability assumptions that you were asked to

13  make in this case consistent with the other False Claims Act

14  liability assumptions you've been asked to make before?

15  A.   Yes.

16  Q.   At the end of the day, sir, you can come up with

17  another -- a number of methodologies to figure out how much

18  money Janssen, from the Relators' perspective, ought to

19  reimburse the government.

20         Is that fair?

21  A.   Yes.

22  Q.   For instance, you could say, based on the evidence in

23  this case, this was a nationwide campaign to promote off-label

24  and also a campaign of kickbacks.  So let's just take half of

25  the prescriptions that Janssen got reimbursed for, and that's

```
 1   your number.
 2        That would be one way -- that would be one methodology
 3   of estimating.
 4        Do you agree?
 5   A.   I don't know that I'd glorify it with the term
 6   "methodology," but one could do that and get a number.
 7   Q.   Exactly.
 8        And, of course, Janssen, in this case, are you aware,
 9   made $2.8 billion in reimbursements from the government from
10   the drugs that it sold, for Prezista and Intelence during this
11   time period?
12        Are you aware of that?
13   A.   Yes.
14   Q.   All right.
15        Are you aware of whether the Relators are going to be
16   asking Dr. Shaked to testify to $2.8 billion in damages?
17   A.   I -- I expect that's the case.  I don't have specific
18   knowledge that that's his number after looking at my results
19   and doing what he did.
20   Q.   Dr. Shaked's number, we can hear from him, but of course
21   it's a portion of the amount of reimbursements that Janssen
22   obtained from the government.
23        Do you understand that?
24   A.   Yes.
25   Q.   All right.
```

1        And, again, you can make estimates to make it larger or

2    smaller, but what you tried to do was provide data to support

3    those calculations.

4        Fair?

5    A.   Yes.

6    Q.   Actual, real-world data and not estimates.

7        Right, sir?

8    A.   Other than, you know, what we described about once-daily

9    dosing and extrapolations to ADAP, everything else was

10   claim-specific.

11   Q.   All right, sir.

12       And you were asked questions about distributions of --

13   for instance, Walgreens, 200,000 claims, and you were asked

14   questions about whether you knew the age of the patients that

15   were going to BioScrip versus other pharmacies.

16       Do you recall answering questions about that?

17   A.   Yes.

18   Q.   Were you using large bodies of data to make estimates

19   regardless of how old somebody was in this case?

20   A.   Yes.

21   Q.   All right.

22       And, again, do large bodies of data and large numbers

23   allow for more accurate calculations?

24   A.   Yes, given quality data, which was the case certainly

25   with the pharmacy data.

```
 1   Q.   Are you aware -- were you aware of the fact that
 2   77 percent, for instance, of Medicaid patients are of a
 3   similar type as ADAP patients?
 4        Did you test that assumption?
 5   A.   I'm not that familiar with ADAP in terms of that, so I
 6   didn't.
 7   Q.   Were you able to make some assumptions in this case based
 8   upon the quality of data that you obtained from Medicaid?
 9   A.   Can you repeat that, please.
10   Q.   Yes.
11        Were you able to draw -- make some analyses in this
12   case based upon the data you obtained from Medicaid?
13   A.   Yes.
14   Q.   Was that a large body of data?
15   A.   Yes.
16   Q.   And you provided that to Professor Shaked and his group?
17   A.   Yes.  At least some results.  I don't recall if I
18   provided the claims themselves.  I may have.
19   Q.   Thank you, sir.
20        MR. MARKETOS:  Just a moment, Your Honor, if I may.
21        THE COURT:  You may.
22        MR. MARKETOS:  Thank you.
23   BY MR. MARKETOS:
24   Q.   I remember.  Excuse me.
25        You were asked about testimony in this case that
```

1  apparently doesn't support the assumptions that you made.  I

2  think there was an example given of Ms. Chrissy Brancaccio and

3  how often she would off-label market.

4       Do you recall answering questions like that from

5  Janssen's counsel?

6  A.   Yes.

7  Q.   Okay, sir.

8       Have you been asked to listen to all of the trial

9  testimony in this case, or did you just focus on your analysis

10 with the assumption that the off-label messages were delivered

11 consistently to physicians that Janssen called upon?

12 A.   I was provided that assumption, and I incorporated it

13 into my work, and that's it.

14 Q.   We've heard now from, on my count, 10 or 12 witnesses in

15 this case, many of whom were sales representatives or district

16 managers or regional managers.

17      Do you understand that?

18 A.   I wasn't aware of a number.  I understood that those were

19 some of the types of witnesses.

20 Q.   All right.

21      We can check their testimony on how frequently

22 Janssen's off-label messages were delivered to doctors to see

23 if it squares with the assumptions you were asked to make.

24      Fair?

25 A.   I expect that would be possible, yes.

1  Q.  Mr. Dew, at the end of the day, the questions that

2  Ms. Brown was asking you about this data not being available

3  to you -- or this data not being available to you, did it

4  change any of your analyses or your opinions as to the

5  reasonable degree of certainty that you have in the data that

6  you actually analyzed?

7  A.  No.  I'm confident in the results.

8  Q.  And is that, sir, in large part due to the quality and

9  quantity of the data that you were asked to analyze?

10  A.  Yes.  Overall.

11      MR. MARKETOS:  Thank you, Your Honor.  Nothing

12  further.

13      THE COURT:  All right, thank you, Mr. Marketos.

14      Mr. Dew, you're excused from the trial.  Thank you.

15      Counsel, let me see you all for just one moment.

16  (Sidebar begins at 4:40 p.m.)

17      THE COURT:  Mr. Wyatt is coming.  This isn't a legal

18  issue.  My question for you is, if we start Monday with

19  professor or Dr. Shaked, will we complete by the morning?

20      MR. MARKETOS:  Yeah.  We'll complete by the morning.

21      THE COURT:  Would you prefer, then, to start him

22  Monday morning, because I feel like it's been a long stretch.

23  The jurors are looking a little tired, and I don't want to

24  hurt your presentation by them losing the first 15, 20 minutes

25  of the testimony.  So what are your thoughts?

5327

```
 1          MR. MARKETOS:  I would like nothing more.  That's two

 2   hours of data talk, Your Honor.

 3          THE COURT:  That's my suggestion.  I'm going to break

 4   them early.  I also want to let them know, and I also want to

 5   make sure you are okay with this.  I'm going to say, Look,

 6   folks, we are back on target.  We're hitting week five.  We

 7   anticipate the Relators' case will rest after Ms. Kaucher

 8   coming back and the defense time.  Right?  On Monday,

 9   Janssen's going to begin their defense on Monday.  Am I able

10   to say that comfortably to the jurors?  I'd like to give them

11   that.

12          MR. MARKETOS:  Yes.  Monday's a full day.  Right?

13          THE COURT:  Monday's the 3rd.  This is your last

14   witness.  Correct?

15          MR. MARKETOS:  This is the last -- second-to-last

16   witness.

17          THE COURT:  Yeah, but that's coming in in their time

18   frame.  I'm talking about resting, absent her bringing her

19   back, which I'll let them know.

20          MR. MARKETOS:  Yes, this is our last witness.

21          THE COURT:  Just remind, Ms. Brown.  When you guys

22   start, you're going to be done with the case by the 11th?

23          MS. BROWN:  Yes.

24          THE COURT:  Closings are on the 13th, and if for some

25   reason we are not dark on the 12th, which I'll let you know by
```

 1   next week, we do closing instructions on the 12th.  Right?

 2   That would be the only change, but I will make sure to let you

 3   all know that early next week.  I'm trying to see if I can --

 4   what is going to happen.  But are we -- can I at least let

 5   them know that?  I would like to give them that weekend, that,

 6   Hey, we're back on track.

 7            MR. MARKETOS:  Professor Shaked, he is going to take

 8   quite a bit on direct.  It's lengthy statistical and

 9   economical analysis.  I just want to let Your Honor know that

10   it's probably -- going to be about three hours of direct, two

11   hours and 30 minutes.

12            THE COURT:  Two and a half hours for the damages?

13            MR. MARKETOS:  Maybe less.

14            THE COURT:  All right.  Do you have a long cross for

15   him?

16            MS. BROWN:  Two hours, at least.

17            THE COURT:  All I can tell them is that you're going

18   to rest Monday.  I'm not going to necessarily say you're going

19   to begin Monday.

20            MR. MARKETOS:  Your Honor, it could move a lot

21   quicker, but I'm not -- I'm not missing any steps when they're

22   -- I'm not going to miss any steps.

23            THE COURT:  I get it.  I just want to make sure we're

24   on track here, because my timeline is the timeline that we're

25   trying to get this case to the jury.

```
 1            MS. BROWN:  I will say this, Judge, and we can do

 2   this outside the presence, if you want to --

 3            THE COURT:  Yeah, let me let them go.

 4            MS. BROWN:  We did want to raise -- I wasn't sure if

 5   the Court had finally ruled on Ms. McGrath, but we thought she

 6   might be a suitable, very short witness if we even have an

 7   hour to start our case on Monday.  I mean, I think it's

 8   probably a half an hour --

 9            THE COURT:  Remind me when we get the jurors out of

10   here.  And the McGrath issue, is that pending with me?

11            MS. BROWN:  I don't think so.  I think you ruled, but

12   we didn't want to schedule her without confirmation --

13            THE COURT:  Let me get rid of the jurors.  We'll talk

14   about it afterwards.

15            MS. BROWN:  I just have one other issue that I just

16   need --

17            THE COURT:  You need the jury for it?

18            MS. BROWN:  I'll do this when they leave.  I just

19   want to say I think the door was opened on a motion in limine

20   that I want to argue, but we don't have to do that --

21            THE COURT:  We'll do that later.

22            MS. BROWN:  Okay.  Thanks.

23            (Sidebar was concluded at 4:43 p.m.)

24

25
```

 1              (Open court.)

 2              THE COURT:  All right, folks.  We're just hobnobbing

 3    over here.  So here is where we are.  I'm going to give you a

 4    sense.  You're going to be excused, but I want to let you know

 5    where we are on the trial just so everybody's back on the same

 6    page.

 7              First of all, I appreciate you all changing the trial

 8    schedule.  We are back on track.  So this trial was supposed

 9    to be five and a half weeks.  We are hitting week five.  I

10    anticipate that where we are in the case that Relators will

11    rest their case sometime Monday.  So I'm not going to bring up

12    a witness with 15 minutes left.  I think it's been a long day.

13    We can start that witness on Monday.  Once the Relators

14    rest -- and that's absent just one caveat.  Ms. Kaucher, who

15    is a witness that didn't have her testimony completed, she

16    will be brought back at some point, but that will be during

17    the time that Janssen is presenting their defense.

18              So anticipate Monday we will get through the end of the

19    Relators' presentation of their case in chief.  We will begin

20    Janssen presenting their defense, and then the following week,

21    somewhere around the halfway point, this case is coming to

22    you.  So we are going to be able to get the case to the jury

23    within that five-and-a-half-week mark.  So, again, that's

24    because we used today, and I believe we're on for Friday next

25    week.  Correct me if I'm wrong, but we still need you all to

1   be here for the next Friday, but I think that's where we are.

2   So I wanted to give you a sense before the weekend.

3       So with that, folks, just continue not to discuss the

4   case.  We will start at 9 a.m. Monday.  Have a wonderful

5   weekend, but at least we're back on track.  I appreciate that

6   from the jury.

7       And counsel remain.  We have some issues to discuss

8   once we dismiss the jurors.

9       (Jury is excused.)

10      THE COURT:  All right, folks.  Have a seat.

11      Are we on the record or off the record?

12      MR WYATT:  I think we need to stay on at least for a

13  couple of items, Your Honor.

14      THE COURT:  Let's do this, then.  Let's -- whatever

15  we have on the record, let's talk about first.  And then if

16  there's any logistics or what's happening Monday that we don't

17  need to put on the record, we can give Megan a break.

18      So what's the issue that we need to address on the

19  record?

20      MS. BROWN:  We're on the record?

21      THE COURT:  We are, yeah.  As soon as we're done,

22  I'll cut you loose.

23      Yes?

24      MS. BROWN:  Your Honor, I wanted to raise an issue

25  that I believe a motion in limine was violated in the - in

1    counsel's questioning there on redirect.

2         So they had moved, Your Honor, to preclude reference to

3    treble damages, and then counsel said, Janssen has made almost

4    $3 billion -- I think it was 2.8 or 2.9 billion on Prezista

5    and Intelence, and you understand we're not asking for $2.9

6    billion.

7         And, in fact, of course, they are, Your Honor when you

8    treble the damages that Dr. Shaked will talk about on Monday.

9         And so, Your Honor, I believe by specifically asking,

10   We're not asking for that amount, they have opened the door to

11   us to be able to say, Yes, you are.  And that's what they

12   moved to preclude, but they kicked that door open.  And so --

13        THE COURT:  Well, Dr. Shaked hasn't testified yet.

14        MS. BROWN:  Correct, Your Honor.

15        THE COURT:  So you're telling me that he's going to

16   testify to something that opens the door.

17        Isn't that what you're saying?

18        MS. BROWN:  No, no.

19        To this witness, to Mr. Dew, counsel asked, We are not

20   asking for $2.8 billion.  Right?  He put almost exactly the

21   treble number in front of him and said they we're not asking

22   for that.  But they are in the way that they moved to exclude.

23   Right?

24        THE COURT:  I mean, wasn't the line of questioning

25   from Mr. Marketos in the context of the total amount of

1   reimbursement that Janssen received from these two drugs is

2   about $2.8 million?

3        MS. BROWN:  Yes.

4        THE COURT:  And wasn't the context of him saying,

5   We're asking for less than that, we're not using dollar for

6   dollar, we're not claiming dollar for dollar of every single

7   cent that Janssen made?  Obviously, we've done some deduction

8   there.

9        Wasn't there in that --

10       MS. BROWN:  That is absolutely the context, Your

11  Honor.  I'm not taking issue with that.  But he put a number.

12  He said, We are not asking for almost $3 billion.  And, in

13  fact, they are, because the damages number is almost a

14  billion, subject to trebling.  And that is what they didn't

15  want in front of the jury, but by saying, We're not asking for

16  it, that is opening the door to us saying they have.

17       And this is coupled, Your Honor, with testimony that

18  was --

19       THE COURT:  So let me just - I understand the point.

20  I'll hear from Relators' counsel briefly.

21       But what are you asking?  You're raising the issue.

22  What are you asking me?

23       MS. BROWN:  I want to be able to ask a witness, Do

24  you understand that they are pursuing to the statute by which

25  they brought this case, your damage number would be trebled?

```
 1   And so your nearly 1 billion would be nearly 3 billion.

 2           THE COURT:  Which witness?

 3           MS. BROWN:  Dr. Shaked, I assume, is who it would be.

 4           THE COURT:  The witness tomorrow -- I mean, I'm

 5   sorry.  The witness for Monday.

 6           MS. BROWN:  We're not going to call this witness

 7   back.  Right.

 8           THE COURT:  Right.  Okay.

 9       Well, let me hear from Mr. Marketos.

10           MS. BROWN:  And, Your Honor, could I just add one

11   thing that I think adds to the opening of the door.

12       There was an earlier witness, I believe, Dr. Evans,

13   with whom they said essentially there's no financial

14   disincentive to Janssen, you know, not to violate the False

15   Claims Act.

16       And I thought that came awfully close, but, Your Honor,

17   pairing that with We're not asking for almost $3 billion, I

18   think, together overwhelmingly allows us to at least say,

19   Listen, you want to talk about a financial disincentive,

20   here's the dollar number we're talking about.

21           THE COURT:  Because if you -- what is your point with

22   the Ms. Evans point?  Because if Janssen were caught, it's not

23   like you just give the money back that you got.  You get hit

24   with more money than what you --

25           MS. BROWN:  Correct.  Correct.
```

```
 1              THE COURT:  Well, let me hear from Mr. Marketos
 2    briefly, although I don't know if we'll resolve this today.
 3    But let me -- or maybe we will.
 4          But let me hear from you briefly, Mr. Marketos, on the
 5    issue of whether they should be able to question -- is it
 6    Dr. Shaked?  Professor Shaked?
 7              MR. MARKETOS:  It's Professor Shaked.
 8          So, no.  This is about singles, which is what the jury
 9    is being asked to award.  Okay?  And when they're making
10    claims in the case that You did this and it will increase the
11    number, the point is the total amount of reimbursement, which
12    Professor Shaked will talk about, is X, and the number that
13    Relators are asking for to be awarded, based upon the
14    methodologies that are applied, are a fraction of that.
15    That's every case.  All right?
16          So now they're saying, Well, because you're saying
17    you're only asking for a fraction of that from the members of
18    the jury, they should be able to know that the judicial
19    function that jurors are not allowed to know, the judicial
20    function post-jury, is to treble damages in an FCA case.  That
21    would be every single case.  All right?
22          So of course that's not opening the door.  That is,
23    you're saying we're asking for too much based on the
24    methodology, and we're saying that we're not because it's a
25    much lower number than, you know, if you ask for everything.
```

1    It's a much lower number, and that is trial.

2         So we didn't get into treble damages.  We didn't say a

3    word about treble damages.  They're basically saying if we're

4    trying to show the methodology is reasonable, then it gets

5    trebled afterwards, which the jurors aren't allowed to know,

6    so it's not reasonable.

7         And that's just not how it works in False Claims Act

8    cases.  There's a reason you can't tell the members of the

9    jury that, because of exactly this argument.

10            THE COURT:  Ms. Brown?

11            MS. BROWN:  Well, the reason the jurors are not

12    allowed to know is because we --

13            THE COURT:  But you agree with that point that

14    Mr. Marketos made -- right -- that in the context that I

15    understood him to be questioning the witness, what he was

16    putting before the jury -- and whether you agree with it or

17    not is fine -- is in the context of saying, Look, this is the

18    total amount that Janssen has received in reimbursement.  And

19    when you're questioning the methodology of one of their

20    experts, saying that he's encompassing so much more than what

21    he should be, I thought -- my understanding was Mr. Marketos

22    was putting before the jury through the witness to say, We're

23    not claiming every dollar that they were reimbursed as part of

24    this analysis.

25         And so that's what's before the jury.  Correct?

```
 1          MS. BROWN:  I think you're right, Your Honor.  But if
 2    you don't want the $3 billion number in front of the jury, you
 3    can't say, We're not asking for $3 billion when, in fact,
 4    you've brought a lawsuit under an act that would give you that
 5    based on your damages model.  And you can't question a prior
 6    witness --
 7          THE COURT:  Well, I mean, I don't think he's talking
 8    about the lawsuit.  He's talking about what he's asking the
 9    jury.
10          MS. BROWN:  I understand, Your Honor.  But --
11          THE COURT:  There's a difference, though.
12          MS. BROWN:  I agree with the Court completely.  But
13    what I don't think is fair is to say it's prejudicial to us to
14    have you let the jury know that this amount becomes an even
15    more gigantic amount and then question witnesses and say,
16    We're not asking for a gigantic amount, but you are.  And
17    you've now opened the door to us to be able to say, but you
18    are.
19          And when you question witnesses --
20          THE COURT:  Well, I mean, I think you've made the
21    point that they're asking for a gigantic amount.  I mean, part
22    of your defense through the last four weeks has been there's a
23    significant percentage that the Relators will receive.
24    They've put up damages of almost $1 billion, I think, in their
25    opening.  So I mean...
```

```
 1        I don't think that's -- you don't have that advantage
 2   of putting before this jury that the Relators are asking for a
 3   lot of money in damages.
 4            MS. BROWN:  Well, Your Honor --
 5            THE COURT:  That part's part of the case.  In fact,
 6   you guys have been arguing that.  I think you guys beat that
 7   from the beginning, that they are asking for a lot, and that
 8   some of the motivation -- or the motivation for this case is
 9   monetary as opposed to doing the right thing.  Right?
10        I mean -- and I'm not saying I agree with either side.
11   But I'm saying you've been fairly strong on that point as one
12   of the points that Janssen has raised.
13        So where do you see that it's not before the jury that
14   they're asking for a lot of money?
15            MS. BROWN:  I agree with you, Your Honor, and that's
16   not what I think has opened the door.  I completely agree with
17   the Court we can say a billion dollars is a lot of money.
18        What I think is unfair is to say, You can't tell the
19   jury it's $3 billion and then question a witness, We're not
20   asking for $3 billion, without opening the door to us saying,
21   Actually, you are.  That's --
22            THE COURT:  But they're not asking that from the
23   jury.
24            MS. BROWN:  But that's what they brought the case
25   under --
```

```
 1            THE COURT:  I don't agree with you there.  I don't
 2   know what Dr. or Professor Shaked is going to say on Monday.
 3   So maybe we revisit this issue, depending on how the damages
 4   testimony comes out.  But I'm not there with you, Ms. Brown,
 5   at least what I heard in the context of the cross-examination
 6   from Mr. Dew today.
 7            And I don't recall that the Evans testimony -- well,
 8   you're raising that late.  I mean, Evans, I don't even know
 9   what day that testimony came in.
10            But if you're talking to me about what Mr. Dew
11   testified to in the context of the examination by
12   Mr. Marketos, I don't see how that's going to be put before
13   the jury.  So I'm not with you there.
14            If something occurs differently on Monday, because
15   that's the actual -- I presume he's the damages expert that's
16   going to talk about actual damages --
17            MS. BROWN:  Yes.
18            THE COURT:  -- as opposed to the methodology or
19   formula that he took from Mr. Dew, I will deny this request
20   without prejudice.  How's that?
21            MS. BROWN:  That's good.
22            THE COURT:  And you can revisit it Monday, if
23   something else were to come up that says, Judge, we have an
24   issue here.
25            Mr. Marketos, there can't be more there, because I've
```

```
 1   actually ruled in your favor for today.  So how can there be

 2   more that you want to say?

 3           MR. MARKETOS:  There's not.  I wanted to say, Have a

 4   great weekend.

 5           THE COURT:  Well, no, we're not done.  We've got

 6   more.

 7       But I'm just saying, Be careful.  When I rule in your

 8   favor and you stand up, the only thing that can happen there

 9   is you botch it up where I have to come back and say, Let me

10   reconsider what I just did.

11           MR. MARKETOS:  Have a great weekend, Your Honor.

12           THE COURT:  But we have other issues, folks.

13       Is there anything more on the record, though?

14           MR. WYATT:  One more thing, Your Honor --

15           THE COURT:  Yes.

16           MR. WYATT:  -- on the record.

17           THE COURT:  All right, Mr. Wyatt.

18           MR. WYATT:  The Court asked us to do two things on

19   Monday.  One is to file a brief.  And just for clarification,

20   I assume that was Monday night -- is the deadline for that.

21           THE COURT:  Well, that, I was going to -- that I

22   don't -- needs to be on the record.  I was going to ask you

23   all, though, when I'm getting these submissions for Monday

24   because they are important and I need them then.

25           MR. WYATT:  We can do that part afterwards if you
```

 1    prefer not to do that on the record.

 2         The one record-related question I have about that,

 3    though, is the Court is also requesting us to report on the --

 4    our search for additional documents that would be pertinent to

 5    the discovery request at issue.  And what I would like to do

 6    in a world in which this wouldn't potentially create a problem

 7    is ask Ms. Kaucher if she is aware of any information that

 8    would relate to that request.

 9         But I also don't want to ask her a question while she's

10    technically still on the stand.

11         THE COURT:  I get that.  So, Mr. Wyatt, you'd limit

12    the communication to the witness just about this -- the idea

13    of collecting more documents on the investigation, nothing

14    more related to the investigation or her testimony or

15    otherwise?

16         MR. WYATT:  I would only interview her in the same

17    way I would interview a custodian in a normal discovery

18    situation, you know, where you would have files.

19         THE COURT:  Mr. Marketos, I'm trying to get to the

20    bottom of whether there's any more documents that might be

21    owed to you.  Do you have any objection for that limited

22    communication with the witness?

23         I don't see a problem with it, and I trust that counsel

24    will be careful to just focus on the discovery piece as

25    opposed to witness testimony.

1          MR. MARKETOS:  I trust that as well, Your Honor.

2          THE COURT:  All right.  So, Mr. Wyatt, that

3    communication is permitted.  You can speak to Ms. Kaucher over

4    the weekend to figure out is there anything more, because we

5    do want to -- we do want to tack that down by Monday as well

6    because right now, I believe I have the universe:  What was

7    located, what was disclosed, what has not been disclosed, and

8    what has been disclosed redacted prior to trial.  If there's

9    anything more, I'd really want to tack that down Monday.

10          MR. WYATT:  And that's my reason.  I want to give as

11    complete an answer as I can.

12          THE COURT:  All right.  What else on the record,

13    folks?  And then we can still chat, but it's going to be off

14    the record.

15          MR. MARKETOS:  We have nothing, Your Honor.

16          MR. WYATT:  Nothing else, Your Honor.

17          THE COURT:  All right.  So everybody have a wonderful

18    weekend.  That's just for me saying it on the record, and then

19    we're going to still talk after.

20          So we're going off now.

21          (Court adjourned at 5:00 p.m.)

22

23

24

25

*United States District Court*
*District of New Jersey*

1          FEDERAL OFFICIAL COURT REPORTER'S CERTIFICATE.

2             - - - - - - - - - - - - - - - - - - - - - -

3

4      I certify that the foregoing is a correct transcript from

5  the record of proceedings in the above-entitled matter.

6

7

8      I

9

10

11  /S/ Megan McKay-Soule, RDR, CRR     May 31, 2024

12          Court Reporter                        Date

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$329,000** [1] - 5259:3
**$4,041,513** [1] - 5195:12
**$400,000** [1] - 5259:13
**$470.34** [3] - 5258:9, 5258:14, 5259:3
**$493** [1] - 5258:11
**$5,000** [3] - 5187:2, 5192:19, 5193:1
**$50,000** [1] - 5274:14

## '

**'10** [1] - 5296:15
**'11** [1] - 5296:16
**'12** [1] - 5296:16
**'13** [1] - 5296:16
**'14** [1] - 5296:16

## /

**/S** [1] - 5343:11

## 0

**0378** [3] - 5113:15, 5224:15, 5225:2
**0487** [3] - 5113:12, 5224:11, 5224:23
**08608** [1] - 5112:9

## 1

**1** [3] - 5161:4, 5334:1, 5337:24
**1.05** [1] - 5237:4
**10** [3] - 5147:3, 5175:17, 5325:14
**100** [1] - 5167:18
**1003** [3] - 5113:14, 5224:13, 5224:25
**10th** [2] - 5164:6, 5281:3
**11,000** [1] - 5195:22
**11:30** [2] - 5112:10, 5114:3
**11th** [1] - 5327:22
**12** [1] - 5325:14
**12,000** [1] - 5194:22
**1234** [1] - 5295:24
**12:30** [16] - 5120:8, 5142:11, 5143:8, 5143:11, 5146:5, 5146:7, 5146:22, 5147:7, 5149:13, 5149:23, 5153:23, 5153:25, 5154:2, 5154:3, 5154:7,

5154:23
**12:30-to-5** [1] - 5119:22
**12:47** [1] - 5169:21
**12:50** [1] - 5173:4
**12th** [4] - 5124:1, 5268:24, 5327:25, 5328:1
**13** [1] - 5298:17
**13th** [2] - 5154:18, 5327:24
**14** [1] - 5112:5
**1480** [1] - 5223:25
**15** [7] - 5166:22, 5175:17, 5189:16, 5290:14, 5311:6, 5326:24, 5330:12
**17** [2] - 5165:25, 5305:10
**1737** [2] - 5173:12, 5173:23
**18** [1] - 5175:17
**180** [1] - 5278:23
**183** [3] - 5163:3, 5163:4, 5163:20
**19** [1] - 5202:21
**19th** [1] - 5176:21
**1:00** [2] - 5130:25, 5131:1

## 2

**2** [10] - 5119:2, 5120:15, 5120:20, 5121:6, 5121:9, 5121:12, 5125:21, 5126:4, 5136:9, 5146:18
**2's** [1] - 5126:5
**2.6** [1] - 5194:21
**2.8** [5] - 5322:9, 5322:16, 5332:4, 5332:20, 5333:2
**2.9** [2] - 5332:4, 5332:5
**20** [8] - 5133:22, 5175:16, 5175:17, 5216:22, 5218:17, 5256:13, 5315:5, 5326:24
**20-fold** [2] - 5250:2, 5250:6
**200,000** [2] - 5293:2, 5323:13
**2004** [2] - 5214:3, 5216:21
**2006** [17] - 5163:21, 5165:14, 5205:4, 5210:1, 5221:9, 5226:16, 5226:17,

5236:15, 5237:16, 5237:25, 5263:20, 5264:3, 5264:15, 5265:1, 5270:18, 5272:15, 5273:18
**2008** [18] - 5204:1, 5205:4, 5221:10, 5226:15, 5226:17, 5237:16, 5237:20, 5237:25, 5241:12, 5241:20, 5241:23, 5242:4, 5269:7, 5295:15, 5295:20, 5296:15, 5296:21, 5297:2
**2009** [3] - 5268:8, 5268:20, 5295:19
**2010** [9] - 5176:15, 5183:5, 5183:10, 5186:7, 5192:1, 5192:2, 5209:1, 5209:14, 5209:15
**2011** [6] - 5193:23, 5194:22, 5263:24, 5264:2, 5264:16, 5265:1
**2012** [2] - 5204:6, 5204:19
**2013** [3] - 5270:18, 5305:7, 5305:10
**2014** [6] - 5221:9, 5221:11, 5226:15, 5236:15, 5305:8, 5305:10
**2018** [2] - 5132:2, 5205:3
**2020** [5] - 5205:13, 5258:18, 5259:8
**2024** [3] - 5112:10, 5114:3, 5343:11
**21** [2] - 5203:14, 5293:5
**220** [1] - 5175:9
**226** [1] - 5225:22
**22nd** [4] - 5221:10, 5237:20, 5242:4, 5269:7
**24** [2] - 5154:20, 5181:14
**25** [6] - 5166:6, 5166:18, 5167:5, 5167:6, 5173:8, 5189:14
**26** [2] - 5185:14, 5199:25
**27th** [1] - 5209:15
**28** [2] - 5186:7, 5305:10
**29** [2] - 5164:4, 5192:1
**2:00** [1] - 5124:25

## 2:15 [1] - 5223:4

## 3

**3** [9] - 5147:3, 5332:4, 5333:12, 5334:1, 5334:17, 5337:2, 5337:3, 5338:19, 5338:20
**30** [5] - 5164:10, 5189:24, 5192:2, 5278:22, 5328:11
**300** [1] - 5190:1
**300-some** [1] - 5122:16
**302,000** [3] - 5228:3, 5287:22, 5319:4
**30th** [2] - 5241:12, 5241:20
**31** [4] - 5112:10, 5114:2, 5293:3, 5343:11
**32** [1] - 5297:22
**33,000** [1] - 5296:11
**330-something** [1] - 5189:4
**335** [1] - 5189:20
**34** [1] - 5164:17
**35** [3] - 5253:8, 5305:2, 5316:13
**36** [1] - 5164:24
**360** [4] - 5222:14, 5222:15, 5248:21, 5248:24
**376** [4] - 5113:15, 5186:14, 5224:13, 5225:1
**3:00** [1] - 5146:19
**3:12-cv-07758-ZNQ-JBD** [1] - 5112:4
**3rd** [3] - 5120:3, 5120:6, 5327:13

## 4

**4** [4] - 5147:3, 5166:12, 5289:24, 5289:25
**402** [1] - 5112:9
**405** [3] - 5249:5, 5249:7, 5249:14
**43** [1] - 5297:21
**45** [2] - 5249:2, 5297:21
**4533** [3] - 5113:16, 5224:16, 5225:3
**46** [1] - 5249:3
**48** [1] - 5181:14
**4:40** [1] - 5326:16
**4:43** [1] - 5329:23

## 5

**5** [70] - 5115:3, 5115:15, 5115:25, 5117:6, 5117:7, 5117:12, 5118:1, 5120:8, 5120:21, 5122:13, 5125:20, 5126:2, 5126:9, 5126:13, 5126:24, 5128:22, 5129:24, 5130:12, 5130:16, 5130:19, 5130:25, 5131:4, 5131:12, 5131:23, 5132:7, 5132:15, 5132:21, 5133:3, 5133:6, 5133:8, 5133:21, 5137:19, 5137:21, 5137:25, 5138:8, 5138:12, 5138:21, 5138:25, 5139:5, 5142:17, 5142:18, 5148:21, 5149:13, 5149:23, 5150:18, 5152:18, 5152:24, 5152:25, 5153:25, 5154:2, 5154:4, 5154:7, 5154:10, 5154:23, 5156:10, 5156:14, 5156:22, 5157:2, 5158:2, 5158:23, 5159:1, 5159:9, 5159:17, 5159:21, 5159:24, 5160:24, 5165:1, 5166:12, 5289:25
**5's** [2] - 5149:18, 5158:1
**50** [3] - 5217:5, 5256:24, 5315:5
**5005** [3] - 5113:11, 5224:10, 5224:22
**5007** [3] - 5113:17, 5224:17, 5225:4
**5009** [3] - 5113:13, 5224:12, 5224:24
**5162** [1] - 5113:4
**5165** [1] - 5113:9
**5173** [1] - 5113:10
**5208** [1] - 5113:5
**5224** [4] - 5113:11, 5113:12, 5113:13, 5113:14
**5225** [4] - 5113:15, 5113:15, 5113:16, 5113:17
**5256** [1] - 5113:6
**5281** [1] - 5113:18
**5306** [1] - 5113:6

**5:00** [3] - 5124:25, 5146:19, 5342:21

## 6

**60** [3] - 5217:5, 5256:25, 5278:23
**600** [1] - 5112:16
**609** [1] - 5112:24
**619** [2] - 5193:14, 5193:22
**620,000** [2] - 5236:16, 5236:24
**65** [2] - 5292:9, 5292:13

## 7

**7** [1] - 5281:13
**7.7** [2] - 5195:19, 5288:5
**70** [1] - 5167:20
**700** [3] - 5258:19, 5259:3, 5259:8
**71** [1] - 5309:1
**73** [1] - 5194:3
**750** [1] - 5112:16
**75201** [1] - 5112:17
**77** [1] - 5324:2
**771,000** [2] - 5228:4, 5287:24
**79** [1] - 5164:11

## 8

**815-2319** [1] - 5112:24
**88** [2] - 5225:19, 5309:2

## 9

**9** [2] - 5296:15, 5331:4
**9,000** [1] - 5296:22
**90** [2] - 5240:21, 5241:5
**920** [1] - 5112:21
**95** [1] - 5319:8
**96-week** [2] - 5209:16, 5209:20
**98** [1] - 5252:2
**9th** [2] - 5230:13, 5281:3

## A

**a.m** [5] - 5112:10, 5114:3, 5131:1, 5147:3, 5331:4
**Aaron** [1] - 5220:14
**Abbott** [10] - 5199:4,

5201:4, 5201:5, 5205:2, 5205:5, 5205:7, 5207:8, 5207:13, 5208:5
**Abbott's** [1] - 5207:17
**ability** [2] - 5119:7, 5132:25, 5163:14
**able** [37] - 5122:12, 5123:17, 5124:7, 5131:11, 5131:21, 5132:14, 5133:4, 5133:13, 5133:22, 5145:4, 5145:5, 5163:16, 5174:9, 5186:15, 5206:6, 5234:6, 5235:5, 5239:2, 5239:4, 5247:22, 5250:16, 5253:25, 5254:11, 5294:25, 5308:15, 5316:12, 5319:5, 5324:7, 5324:11, 5327:9, 5330:22, 5332:11, 5333:23, 5335:5, 5335:18, 5337:17
**abnormal** [1] - 5140:15
**above-entitled** [1] - 5343:5
**absence** [1] - 5158:1
**absent** [2] - 5327:18, 5330:14
**absolutely** [11] - 5121:12, 5134:25, 5138:4, 5140:23, 5141:2, 5154:22, 5175:7, 5209:22, 5274:22, 5289:19, 5333:10
**Academy** [1] - 5219:15
**accept** [1] - 5300:10
**acceptable** [1] - 5171:22
**access** [2] - 5262:1, 5286:13
**accident** [4] - 5119:6, 5121:11, 5137:10, 5140:11
**accommodate** [15] - 5116:15, 5121:16, 5124:15, 5139:20, 5141:15, 5149:3, 5149:18, 5152:5, 5152:8, 5153:12, 5155:17, 5155:25, 5156:2, 5156:22, 5158:2
**accommodated** [3] -

5121:17, 5141:10, 5159:10
**accommodating** [2] - 5121:20, 5158:15
**accommodation** [9] - 5122:18, 5122:23, 5122:25, 5124:6, 5124:11, 5124:16, 5127:3, 5140:3, 5153:21
**accommodations** [2] - 5159:5, 5184:2
**accomodation** [2] - 5121:23, 5124:5
**according** [1] - 5248:16
**account** [2] - 5231:22, 5249:18
**accurate** [12] - 5124:9, 5251:1, 5251:14, 5293:11, 5297:4, 5308:11, 5313:24, 5314:22, 5318:5, 5319:7, 5319:16, 5323:23
**accurately** [1] - 5318:2
**acknowledge** [1] - 5148:22
**acknowledged** [3] - 5148:4, 5148:5, 5148:18
**acronym** [1] - 5226:7
**Act** [14] - 5213:1, 5213:20, 5214:1, 5216:7, 5218:21, 5221:19, 5240:15, 5256:20, 5310:20, 5311:4, 5313:3, 5321:13, 5334:15, 5336:7
**act** [2] - 5124:5, 5337:4
**Act-type** [1] - 5310:20
**action** [4] - 5203:17, 5204:7, 5205:5, 5260:21
**ACTION** [1] - 5112:3
**actions** [4] - 5203:1, 5203:10, 5216:6, 5216:20
**active** [1] - 5311:7
**actively** [1] - 5207:20
**actual** [5] - 5183:19, 5226:23, 5323:6, 5339:15, 5339:16
**ADAM** [1] - 5112:15
**ADAP** [46] - 5224:10, 5226:6, 5227:13, 5228:22, 5234:14,

5245:7, 5245:12, 5245:25, 5246:11, 5246:12, 5247:11, 5253:12, 5253:14, 5253:15, 5293:9, 5298:22, 5299:1, 5299:19, 5300:2, 5300:13, 5301:8, 5301:20, 5302:10, 5302:11, 5302:23, 5303:7, 5303:18, 5303:25, 5304:2, 5304:6, 5304:11, 5304:18, 5305:18, 5305:20, 5306:25, 5308:4, 5309:7, 5309:11, 5309:13, 5309:18, 5310:7, 5323:9, 5324:3, 5324:5
**add** [3] - 5154:4, 5230:10, 5334:10
**added** [1] - 5154:5
**adding** [1] - 5153:7
**addition** [2] - 5262:19, 5294:11
**additional** [4] - 5115:15, 5146:4, 5212:4, 5341:4
**address** [5] - 5133:10, 5135:13, 5231:18, 5253:22, 5331:18
**addresses** [1] - 5229:23
**adds** [1] - 5334:11
**adjacent** [1] - 5253:20
**adjourn** [2] - 5131:8, 5142:17
**adjourned** [1] - 5342:21
**adjudicate** [1] - 5139:16
**adjudicating** [1] - 5121:20
**administered** [4] - 5225:9, 5225:16, 5253:5, 5284:18
**admissibility** [2] - 5171:12, 5172:13
**admissible** [2] - 5170:24, 5171:17
**admission** [1] - 5172:25
**admit** [10] - 5170:4, 5171:10, 5171:17, 5171:18, 5171:23, 5171:25, 5172:2, 5172:23, 5173:15, 5281:14
**admitted** [7] - 5165:9,

5171:15, 5171:17, 5171:19, 5173:19, 5224:20, 5281:16
**advance** [2] - 5125:14, 5143:11
**Advanced** [1] - 5218:8
**advantage** [1] - 5338:1
**adverse** [2] - 5242:16, 5242:17
**adversity** [1] - 5149:24
**affecting** [1] - 5200:22
**affects** [1] - 5207:11
**affiliated** [1] - 5281:9
**affiliation** [1] - 5281:8
**affiliations** [1] - 5281:10
**afternoon** [12] - 5144:20, 5145:6, 5152:17, 5154:24, 5162:3, 5212:14, 5212:19, 5212:20, 5223:4, 5255:20, 5256:4, 5256:5
**afterwards** [3] - 5329:14, 5336:5, 5340:25
**age** [5] - 5292:9, 5292:16, 5304:4, 5304:5, 5323:14
**agencies** [2] - 5215:14, 5215:25
**Agency** [1] - 5218:8
**agency** [3] - 5284:19, 5284:22
**ages** [1] - 5292:19
**aggregate** [3] - 5226:11, 5226:13, 5226:14
**aggregated** [4] - 5227:15, 5299:15, 5308:7
**ago** [5] - 5136:12, 5140:16, 5154:20, 5216:19, 5218:17
**agree** [29] - 5124:14, 5138:2, 5138:15, 5138:18, 5138:21, 5171:14, 5172:5, 5205:24, 5208:14, 5208:15, 5225:11, 5274:20, 5283:23, 5284:1, 5286:5, 5288:22, 5290:22, 5307:12, 5308:5, 5319:22, 5319:23, 5322:4, 5336:13, 5336:16, 5337:12, 5338:10, 5338:15,

5338:16, 5339:1
**agreed** [9] - 5124:4, 5124:12, 5124:14, 5136:8, 5140:14, 5151:21, 5207:2, 5287:12, 5298:12
**agreeing** [1] - 5127:3
**agrees** [2] - 5151:24, 5317:24
**ahead** [4] - 5116:18, 5158:17, 5170:21, 5224:8
**AHM** [2] - 5224:16, 5228:15
**Aid** [17] - 5224:12, 5226:22, 5227:19, 5286:25, 5288:13, 5293:5, 5293:21, 5295:5, 5295:14, 5295:19, 5296:21, 5296:22, 5296:25, 5297:4, 5297:8, 5308:1, 5319:1
**aided** [1] - 5112:25
**AIDS** [4] - 5203:19, 5226:9, 5227:13, 5298:25
**AIDS-wasting** [1] - 5203:19
**ain't** [1] - 5317:8
**airplane** [1] - 5314:14
**al** [1] - 5112:4
**Alabama** [3] - 5126:16, 5127:21, 5127:25
**Alaska** [1] - 5293:2
**alert** [3] - 5143:6, 5146:24, 5161:12
**alerted** [2] - 5131:22, 5131:23
**algorithm** [1] - 5216:10
**allegation** [10] - 5162:17, 5227:4, 5240:3, 5240:19, 5241:16, 5243:7, 5243:8, 5246:7, 5246:9, 5246:17
**allegations** [48] - 5188:10, 5188:13, 5188:14, 5204:2, 5205:2, 5205:12, 5211:3, 5213:1, 5214:1, 5214:13, 5214:15, 5214:19, 5214:22, 5215:1, 5217:18, 5219:4, 5219:8, 5221:1, 5221:17, 5223:8, 5236:1, 5240:11,

5240:17, 5241:18, 5242:11, 5244:11, 5244:20, 5244:22, 5245:5, 5245:11, 5245:17, 5245:20, 5246:2, 5246:13, 5246:24, 5247:1, 5247:3, 5256:19, 5270:13, 5271:4, 5272:13, 5272:23, 5273:3, 5275:12, 5276:18, 5298:1, 5310:20, 5311:25
**alleged** [2] - 5238:17, 5242:18
**alleviate** [1] - 5181:21
**Alli** [3] - 5114:20, 5208:21, 5256:7
**ALLISON** [1] - 5112:19
**allow** [5] - 5122:25, 5124:4, 5286:17, 5290:23, 5323:23
**allowed** [5] - 5169:15, 5173:7, 5335:19, 5336:5, 5336:12
**allows** [4] - 5148:14, 5262:2, 5319:7, 5334:18
**almost** [12] - 5172:5, 5175:17, 5194:22, 5214:18, 5290:12, 5296:21, 5332:3, 5332:20, 5333:12, 5333:13, 5334:17, 5337:24
**alone** [1] - 5251:2
**alphabet** [1] - 5229:14
**alternative** [4] - 5276:17, 5277:10, 5277:12, 5318:7
**ambiguity** [2] - 5251:16, 5313:18
**AMERICA** [1] - 5112:3
**American** [1] - 5219:15
**amount** [28] - 5118:14, 5154:6, 5154:24, 5166:19, 5167:5, 5167:10, 5186:1, 5186:2, 5219:3, 5226:14, 5246:11, 5251:11, 5261:11, 5273:22, 5275:6, 5301:4, 5303:2, 5314:5, 5320:8, 5322:21, 5332:10, 5332:25, 5335:11, 5336:18, 5337:14, 5337:15, 5337:16,

5337:21
**amounts** [15] - 5193:9, 5219:7, 5234:2, 5244:8, 5245:24, 5246:1, 5251:18, 5251:21, 5253:16, 5275:20, 5277:15, 5279:21, 5299:16, 5300:7, 5303:1
**analogous** [1] - 5126:4
**analyses** [8] - 5215:21, 5220:7, 5247:12, 5247:18, 5255:11, 5311:13, 5324:11, 5326:4
**analysis** [39] - 5142:14, 5150:19, 5164:12, 5165:2, 5213:13, 5213:14, 5213:16, 5217:22, 5228:1, 5230:8, 5243:19, 5245:15, 5247:7, 5248:13, 5254:3, 5254:14, 5255:5, 5265:15, 5273:21, 5279:7, 5282:23, 5283:3, 5283:9, 5289:8, 5291:7, 5305:17, 5308:11, 5310:2, 5310:8, 5311:23, 5311:24, 5312:20, 5314:25, 5315:6, 5316:9, 5320:6, 5325:9, 5328:9, 5336:24
**analyst** [2] - 5212:24, 5214:11
**analytic** [1] - 5217:3
**analyze** [18] - 5217:16, 5221:8, 5222:15, 5225:18, 5225:22, 5235:5, 5249:10, 5249:14, 5254:17, 5273:13, 5277:19, 5277:23, 5286:17, 5290:19, 5311:11, 5314:6, 5319:5, 5326:9
**analyzed** [7] - 5214:16, 5222:10, 5223:20, 5231:11, 5248:22, 5249:5, 5326:6
**analyzes** [1] - 5312:3
**analyzing** [10] - 5166:6, 5166:18, 5167:4, 5216:20, 5216:23, 5240:14,

5251:1, 5251:9, 5310:19, 5311:4
**annotated** [1] - 5246:25
**annotations** [1] - 5247:2
**anomalies** [1] - 5295:14
**anomalous** [1] - 5231:22
**anomalously** [1] - 5253:22
**anomaly** [2] - 5296:20, 5296:24
**anonymized** [1] - 5234:20
**answer** [14] - 5127:22, 5128:5, 5130:9, 5135:18, 5168:19, 5170:11, 5171:21, 5180:11, 5201:10, 5201:14, 5207:7, 5251:15, 5342:11
**answered** [1] - 5157:23
**answering** [4] - 5306:17, 5307:25, 5323:16, 5325:4
**anti** [1] - 5190:15
**Anti** [3] - 5156:20, 5221:18, 5239:21
**anti-kickback** [1] - 5190:15
**Anti-Kickback** [3] - 5156:20, 5221:18, 5239:21
**anticipate** [4] - 5159:6, 5327:7, 5330:10, 5330:18
**anticipated** [4] - 5115:9, 5149:10, 5153:9, 5153:10
**anticipating** [1] - 5129:24
**antiretroviral** [2] - 5234:25, 5241:4
**anyway** [5] - 5120:3, 5127:12, 5138:13, 5146:12, 5302:16
**apart** [3] - 5169:6, 5169:7, 5314:15
**apologize** [4] - 5121:9, 5169:16, 5178:6, 5306:7
**apparent** [1] - 5312:24
**appear** [5] - 5164:7, 5164:20, 5230:17, 5246:24, 5311:16
**appearances** [1] - 5114:6

**appeared** [1] - 5308:8
**apples** [4] - 5292:14, 5292:15
**apples-to-apples** [2] - 5292:14, 5292:15
**applied** [4] - 5245:4, 5291:22, 5297:8, 5335:14
**apply** [12] - 5187:10, 5229:21, 5240:16, 5241:11, 5242:3, 5242:25, 5244:14, 5249:20, 5250:16, 5253:25, 5254:6, 5314:20
**applying** [2] - 5241:3, 5287:23
**appointment** [1] - 5147:4
**appointments** [2] - 5145:10, 5145:16
**appreciate** [16] - 5121:8, 5133:11, 5134:7, 5134:11, 5134:13, 5135:6, 5146:3, 5147:6, 5147:20, 5160:3, 5176:24, 5191:11, 5208:16, 5305:25, 5330:7, 5331:5
**appreciated** [1] - 5156:6
**approach** [2] - 5251:17, 5301:3
**approaches** [1] - 5276:8
**appropriate** [1] - 5234:10
**approved** [4] - 5237:25, 5239:13, 5239:18
**approximation** [1] - 5217:8
**April** [2] - 5163:21, 5185:3
**Aptivus** [2] - 5164:6, 5164:18
**area** [3] - 5167:23, 5213:22, 5278:13
**areas** [1] - 5213:17
**argue** [1] - 5329:20
**arguing** [1] - 5338:6
**argument** [2] - 5170:21, 5336:9
**arguments** [2] - 5136:21, 5160:3
**Arkansas** [1] - 5181:4
**ARPS** [1] - 5112:18
**ARTEMIS** [3] - 5209:16, 5209:23,

5210:3
**articulate** [1] - 5163:16
**articulated** [2] - 5147:25, 5159:2
**ARV** [3] - 5240:20, 5240:22, 5292:5
**AS** [1] - 5212:9
**assess** [4] - 5133:18, 5141:22, 5142:3, 5142:11
**assessment** [1] - 5261:11
**assigned** [1] - 5229:21
**assist** [3] - 5216:6, 5219:1, 5219:3
**assistance** [5] - 5235:15, 5243:15, 5299:5, 5304:6, 5304:7
**Assistance** [3] - 5226:9, 5227:14, 5298:25
**assisted** [1] - 5235:14
**associate** [1] - 5234:6
**associated** [12] - 5216:12, 5216:23, 5223:15, 5227:3, 5228:24, 5229:3, 5234:10, 5237:22, 5244:15, 5249:1, 5255:6, 5313:23
**association** [1] - 5249:6
**assume** [19] - 5171:2, 5181:1, 5196:13, 5235:25, 5236:3, 5236:5, 5236:6, 5237:12, 5238:11, 5238:18, 5239:25, 5264:15, 5266:22, 5267:23, 5268:20, 5270:7, 5298:8, 5334:3, 5340:20
**assumed** [7] - 5167:2, 5172:11, 5252:19, 5268:7, 5302:23, 5303:6, 5303:7
**assuming** [3] - 5179:1, 5197:15, 5238:16
**assumption** [14] - 5167:11, 5177:21, 5238:22, 5239:22, 5240:5, 5240:12, 5240:13, 5266:5, 5269:10, 5272:7, 5303:12, 5324:4, 5325:10, 5325:12

**assumptions** [16] - 5235:17, 5238:1, 5251:5, 5262:10, 5270:1, 5313:7, 5313:8, 5313:11, 5313:14, 5313:15, 5321:3, 5321:12, 5321:14, 5324:7, 5325:1, 5325:23
**Atlanta** [3] - 5180:19, 5180:24, 5180:25
**attached** [2] - 5172:25, 5174:3
**attachment** [1] - 5170:7
**attempted** [1] - 5311:25
**attempting** [1] - 5201:23
**attend** [1] - 5183:15
**attendances** [3] - 5237:2, 5237:6, 5237:17
**attended** [7] - 5240:24, 5241:8, 5243:12, 5262:22, 5263:2, 5263:13, 5264:3
**attendee** [2] - 5197:12, 5263:9
**attendees** [7] - 5210:7, 5224:15, 5228:18, 5228:24, 5233:14, 5234:7, 5237:3
**attending** [3] - 5248:6, 5262:19
**attends** [2] - 5263:20, 5264:25
**attention** [4] - 5161:11, 5173:11, 5218:25, 5231:4
**attentive** [4] - 5117:1, 5149:1, 5156:18, 5156:24
**Attorney's** [1] - 5214:5
**attorneys** [3] - 5141:5, 5214:6, 5214:7
**attributes** [1] - 5304:12
**audible** [1] - 5149:9
**audience** [7] - 5163:17, 5196:17, 5197:1, 5197:6, 5206:6, 5210:7
**audio** [4] - 5178:2, 5181:22, 5182:13, 5182:22
**automatically** [1] - 5159:18

**availability** [4] - 5125:2, 5125:12, 5126:14, 5126:25
**available** [33] - 5115:20, 5120:25, 5122:10, 5124:17, 5124:24, 5124:25, 5125:8, 5125:14, 5126:1, 5127:9, 5127:12, 5133:19, 5144:16, 5146:5, 5146:11, 5146:13, 5146:15, 5146:19, 5146:22, 5147:3, 5147:15, 5147:18, 5292:8, 5307:11, 5307:15, 5307:20, 5308:5, 5308:6, 5308:17, 5318:3, 5326:2, 5326:3
**avoid** [1] - 5118:22
**awaiting** [1] - 5131:3
**award** [1] - 5335:9
**awarded** [1] - 5335:13
**aware** [52] - 5152:22, 5156:9, 5160:24, 5161:15, 5161:23, 5163:9, 5166:17, 5166:21, 5166:25, 5167:4, 5167:6, 5167:7, 5168:3, 5168:11, 5168:21, 5196:9, 5196:13, 5203:1, 5203:8, 5204:5, 5204:6, 5204:10, 5205:7, 5206:1, 5206:8, 5206:13, 5206:15, 5210:14, 5211:7, 5262:6, 5269:12, 5279:19, 5282:15, 5306:23, 5310:24, 5317:6, 5317:12, 5317:13, 5317:15, 5318:15, 5318:17, 5318:23, 5320:6, 5320:14, 5322:8, 5322:12, 5322:15, 5324:1, 5325:18, 5341:7
**awfully** [1] - 5334:16

## B

**bachelor's** [1] - 5218:3
**background** [5] - 5151:21, 5212:22, 5213:24, 5216:4, 5249:19

**backwards** [2] - 5155:24, 5156:2
**bad** [2] - 5200:16, 5308:13
**balance** [2] - 5316:9, 5316:15
**Bartnett** [5] - 5163:25, 5173:24, 5175:22, 5176:1, 5311:18
**base** [1] - 5144:3
**based** [36] - 5115:14, 5136:3, 5136:4, 5136:10, 5139:24, 5150:4, 5150:8, 5151:5, 5158:17, 5159:19, 5159:20, 5164:12, 5166:18, 5167:5, 5167:12, 5168:2, 5168:5, 5168:13, 5171:7, 5183:10, 5196:22, 5201:1, 5206:16, 5211:13, 5262:10, 5266:22, 5267:23, 5311:24, 5319:12, 5319:14, 5321:22, 5324:7, 5324:12, 5335:13, 5335:23, 5337:5
**basing** [1] - 5172:10
**bear** [4] - 5163:2, 5163:5, 5168:7, 5194:5
**beat** [1] - 5338:6
**become** [1] - 5210:23
**becomes** [1] - 5337:14
**BEEN** [1] - 5212:9
**began** [2] - 5218:15, 5222:15
**begin** [4] - 5284:4, 5327:9, 5328:19, 5330:19
**beginning** [5] - 5118:9, 5120:9, 5136:13, 5155:3, 5338:7
**begins** [3] - 5143:22, 5169:21, 5326:16
**behalf** [8] - 5177:12, 5194:10, 5198:17, 5203:23, 5205:1, 5244:23, 5257:9, 5317:10
**behavior** [1] - 5220:7
**behind** [3] - 5161:3, 5297:2, 5302:3
**belief** [1] - 5202:6
**bender** [1] - 5140:11
**bending** [2] - 5155:24, 5156:2

**beneficiaries** [1] - 5231:1
**beneficiary** [11] - 5234:13, 5234:15, 5234:20, 5234:23, 5235:6, 5240:22, 5240:23, 5241:17, 5243:4, 5243:9, 5292:19
**beneficiary's** [1] - 5232:4
**benefited** [1] - 5210:6
**benefits** [1] - 5316:16
**Berger** [1] - 5257:20
**best** [7] - 5155:19, 5158:15, 5200:8, 5206:6, 5211:13, 5211:19, 5307:11
**better** [3] - 5178:13, 5259:25, 5312:22
**between** [10] - 5118:11, 5154:3, 5197:21, 5228:19, 5234:21, 5247:2, 5261:1, 5285:14, 5303:17, 5311:6
**beyond** [2] - 5153:6, 5241:22
**bias** [3] - 5316:11, 5316:16, 5318:6
**big** [1] - 5318:18
**billing** [1] - 5232:14
**billion** [18] - 5215:20, 5322:9, 5322:16, 5332:4, 5332:6, 5332:20, 5333:12, 5333:14, 5334:1, 5334:17, 5337:2, 5337:3, 5337:24, 5338:17, 5338:19, 5338:20
**billions** [2] - 5215:23, 5215:24
**bins** [1] - 5295:6
**BioScrip** [11] - 5224:11, 5226:22, 5227:19, 5287:2, 5288:13, 5293:3, 5295:10, 5295:12, 5296:11, 5318:21, 5323:15
**BioScript** [1] - 5286:25
**bit** [16] - 5114:7, 5116:20, 5122:2, 5135:7, 5148:12, 5157:21, 5178:3, 5225:9, 5241:14, 5246:5, 5259:16, 5264:5, 5283:13,

5300:24, 5310:12, 5328:8
**block** [1] - 5154:6
**blood** [2] - 5232:15, 5282:18
**blow** [1] - 5174:4
**blowup** [1] - 5179:17
**Blue** [2] - 5294:19, 5294:20
**board** [1] - 5193:2
**bodies** [2] - 5323:18, 5323:22
**body** [2] - 5241:9, 5324:14
**book** [1] - 5126:19
**booked** [4] - 5144:18, 5145:1, 5145:9, 5145:11
**botch** [1] - 5340:9
**bother** [1] - 5130:20
**bottom** [6] - 5179:6, 5179:15, 5179:19, 5196:2, 5297:21, 5341:20
**box** [6] - 5119:19, 5137:1, 5137:21, 5139:7, 5150:8, 5151:6
**Brad** [1] - 5114:24
**BRADLEY** [1] - 5112:20
**Brancaccio** [3] - 5257:15, 5261:12, 5325:2
**Brancaccio's** [1] - 5269:14
**brand** [1] - 5174:13
**break** [11] - 5161:8, 5161:9, 5161:12, 5161:13, 5222:25, 5223:14, 5224:7, 5289:18, 5289:21, 5327:3, 5331:17
**breaks** [1] - 5259:13
**Brief** [4] - 5128:25, 5129:5, 5130:8, 5255:18
**brief** [1] - 5340:19
**briefly** [11] - 5115:21, 5116:13, 5129:22, 5130:1, 5130:21, 5141:20, 5218:1, 5254:10, 5333:20, 5335:2, 5335:4
**bring** [4] - 5162:24, 5182:13, 5187:8, 5330:11
**bringing** [3] - 5187:9, 5240:15, 5327:18
**broach** [1] - 5204:23

**broke** [1] - 5317:8
**brother** [4] - 5119:9, 5119:15, 5119:17, 5137:5
**brought** [10] - 5188:11, 5215:2, 5216:7, 5242:12, 5244:23, 5253:19, 5330:16, 5333:25, 5337:4, 5338:24
**BROWN** [87] - 5112:19, 5113:5, 5113:6, 5114:20, 5120:14, 5124:13, 5125:13, 5125:17, 5126:17, 5127:14, 5127:20, 5127:22, 5128:2, 5128:8, 5128:17, 5128:19, 5128:24, 5129:17, 5130:4, 5130:9, 5141:23, 5143:4, 5143:13, 5147:22, 5152:3, 5160:6, 5165:8, 5165:16, 5165:19, 5168:6, 5168:16, 5169:14, 5169:16, 5169:24, 5170:13, 5170:17, 5170:23, 5171:14, 5172:5, 5172:10, 5172:20, 5172:24, 5173:18, 5181:23, 5208:20, 5224:6, 5255:24, 5256:2, 5256:3, 5256:11, 5260:7, 5260:10, 5281:13, 5281:18, 5289:19, 5290:10, 5295:22, 5296:1, 5296:4, 5327:23, 5328:16, 5329:1, 5329:4, 5329:11, 5329:15, 5329:18, 5329:22, 5331:20, 5331:24, 5332:14, 5332:18, 5333:3, 5333:10, 5333:23, 5334:3, 5334:6, 5334:10, 5334:25, 5336:11, 5337:1, 5337:10, 5337:12, 5338:4, 5338:15, 5338:24, 5339:17, 5339:21
**Brown** [25] - 5114:20, 5120:13, 5125:11, 5129:16, 5141:20, 5143:3, 5143:6, 5147:21, 5160:4,

5170:10, 5171:10, 5172:22, 5208:19, 5208:21, 5211:23, 5224:5, 5255:23, 5256:7, 5289:17, 5290:6, 5310:1, 5326:2, 5327:21, 5336:10, 5339:4
**buckets** [1] - 5164:21
**building** [1] - 5118:21
**Building** [1] - 5112:8
**built** [1] - 5116:17
**bunch** [3] - 5282:12, 5283:17, 5307:25
**bureau** [18] - 5162:9, 5166:17, 5168:25, 5169:6, 5189:5, 5189:17, 5189:21, 5191:25, 5193:18, 5200:7, 5200:11, 5207:4, 5207:17, 5207:24, 5208:5, 5209:12, 5210:6, 5210:16
**Bureau** [6] - 5162:20, 5163:11, 5167:4, 5206:2, 5206:11, 5244:25
**bureaus** [6] - 5163:13, 5168:4, 5168:13, 5202:24, 5203:9, 5205:11
**business** [6] - 5165:13, 5196:14, 5196:21, 5216:5, 5310:18
**BY** [43] - 5112:14, 5112:19, 5113:4, 5113:5, 5113:6, 5113:6, 5162:2, 5163:8, 5165:11, 5165:21, 5166:5, 5168:9, 5168:23, 5173:10, 5173:22, 5174:8, 5174:12, 5174:22, 5178:17, 5179:21, 5180:16, 5182:25, 5191:18, 5191:24, 5192:24, 5194:7, 5202:5, 5202:22, 5203:16, 5208:20, 5212:18, 5223:3, 5225:5, 5256:3, 5256:11, 5260:10, 5281:18, 5290:10, 5296:4, 5306:5, 5306:6, 5306:14, 5324:23
**bye** [2] - 5134:13
**bye-bye** [1] - 5134:13

# C

**Cafe** [3] - 5179:7, 5180:7, 5181:8
**calculate** [4] - 5193:8, 5247:12, 5312:18, 5319:11
**calculated** [1] - 5319:8
**calculating** [6] - 5193:16, 5195:2, 5195:6, 5196:9, 5197:11, 5275:9
**calculation** [2] - 5197:24, 5198:3, 5251:12
**calculations** [4] - 5197:19, 5313:24, 5323:3, 5323:23
**California** [3] - 5185:4, 5185:5, 5209:14
**campaign** [2] - 5321:23, 5321:24
**cancel** [1] - 5145:22
**canceled** [6] - 5179:12, 5179:18, 5179:22, 5181:8, 5181:10, 5181:13
**cancelling** [1] - 5145:3
**candid** [3] - 5123:6, 5133:12, 5148:9
**captivated** [1] - 5129:11
**car** [3] - 5119:5, 5121:11, 5140:11
**care** [32] - 5122:4, 5122:8, 5132:6, 5132:8, 5134:13, 5151:16, 5210:24, 5213:1, 5213:2, 5213:13, 5213:17, 5214:1, 5216:23, 5217:24, 5218:21, 5219:17, 5221:24, 5229:7, 5229:9, 5229:20, 5229:22, 5229:23, 5233:12, 5236:14, 5242:24, 5248:3, 5248:6, 5248:10, 5251:25, 5252:6, 5267:4, 5289:11
**career** [2] - 5216:8, 5216:12
**careful** [3] - 5264:5, 5340:7, 5341:24
**carrier** [2] - 5232:10, 5248:25

**CARUSO** [2] - 5143:17, 5143:21
**Caruso** [2] - 5130:10, 5141:25
**case** [129] - 5115:18, 5117:14, 5120:12, 5121:17, 5121:19, 5121:21, 5121:24, 5122:1, 5123:19, 5129:8, 5136:22, 5137:22, 5137:25, 5138:8, 5138:9, 5138:23, 5139:9, 5139:12, 5139:13, 5148:12, 5148:21, 5148:25, 5149:11, 5152:21, 5153:2, 5153:9, 5154:9, 5157:15, 5157:18, 5157:20, 5159:8, 5163:10, 5172:2, 5188:10, 5188:21, 5208:11, 5211:3, 5212:3, 5214:8, 5215:1, 5215:2, 5217:12, 5218:22, 5219:1, 5219:5, 5219:8, 5219:10, 5220:1, 5220:8, 5220:15, 5220:23, 5221:1, 5221:13, 5221:19, 5223:8, 5223:21, 5225:20, 5227:4, 5228:9, 5235:25, 5236:1, 5236:7, 5237:23, 5239:3, 5239:6, 5240:11, 5241:19, 5242:12, 5244:11, 5244:23, 5246:18, 5251:21, 5254:3, 5254:8, 5254:18, 5255:8, 5257:4, 5257:9, 5258:19, 5259:7, 5259:11, 5259:17, 5266:9, 5269:9, 5269:11, 5272:3, 5285:23, 5294:13, 5302:5, 5308:21, 5308:24, 5310:14, 5310:25, 5312:21, 5313:16, 5314:2, 5320:4, 5321:5, 5321:9, 5321:11, 5321:13, 5321:23, 5322:8, 5322:17, 5323:19, 5323:24, 5324:7, 5324:12, 5324:25, 5325:9, 5325:15, 5327:7, 5327:22,

5328:25, 5329:7, 5330:10, 5330:11, 5330:19, 5330:21, 5330:22, 5331:4, 5333:25, 5335:10, 5335:15, 5335:20, 5335:21, 5338:5, 5338:8, 5338:24

**cases** [12] - 5213:1, 5213:25, 5214:7, 5216:7, 5218:21, 5256:20, 5310:19, 5311:4, 5313:3, 5320:20, 5320:25, 5336:8

**categories** [2] - 5234:1, 5262:20

**categorized** [2] - 5237:17, 5263:9

**categorizing** [3] - 5264:7, 5264:20, 5271:1

**category** [2] - 5221:23, 5279:5

**caught** [1] - 5334:22

**caused** [1] - 5260:20

**caveat** [1] - 5330:14

**CCW** [4] - 5234:17, 5234:18, 5284:17, 5284:25

**cent** [1] - 5333:7

**center** [1] - 5240:5

**Centers** [1] - 5223:25

**certain** [28] - 5228:9, 5228:21, 5229:24, 5231:17, 5232:17, 5235:17, 5236:1, 5236:3, 5236:5, 5237:3, 5237:6, 5237:12, 5237:13, 5247:6, 5250:20, 5254:2, 5254:14, 5255:6, 5270:1, 5273:21, 5279:7, 5283:8, 5307:15, 5307:21, 5308:18, 5309:12, 5312:24, 5313:8

**certainly** [7] - 5176:23, 5273:15, 5275:5, 5283:16, 5307:13, 5313:7, 5323:24

**certainty** [4] - 5250:25, 5254:4, 5255:12, 5326:5

**CERTIFICATE** [1] - 5343:1

**certified** [1] - 5219:20

**certify** [1] - 5343:4

cetera [1] - 5234:14

**chains** [1] - 5286:22

**chambers** [3] - 5123:9, 5130:23, 5134:8

**change** [6] - 5134:3, 5171:22, 5310:11, 5317:11, 5326:4, 5328:2

**changed** [1] - 5122:9

**changes** [2] - 5146:23, 5148:2

**changing** [1] - 5330:7

**characterization** [1] - 5168:15

**characterize** [4] - 5275:1, 5296:24, 5301:16, 5302:5

**characterized** [1] - 5154:19

**chart** [5] - 5208:25, 5209:2, 5209:14, 5284:10, 5296:9

**chat** [2] - 5114:7, 5342:13

**check** [6] - 5160:8, 5255:16, 5297:8, 5312:7, 5320:2, 5325:21

**checked** [1] - 5298:6

**checks** [2] - 5169:7, 5231:13

**cherry** [1] - 5314:16

**cherry-picking** [1] - 5314:16

**chief** [1] - 5330:19

**children** [1] - 5151:16

**choice** [3] - 5153:8, 5153:10, 5153:11

**cholesterol** [4] - 5207:10, 5207:16, 5210:24, 5235:7

**cholesterol-related** [1] - 5235:7

**choose** [1] - 5318:7

**chopped** [1] - 5178:10

**chose** [4] - 5122:15, 5122:17, 5277:10, 5300:10

**chosen** [2] - 5168:4, 5208:6

**Chris** [2] - 5186:9, 5191:16

**Chrissy** [1] - 5325:2

**chronic** [2] - 5225:23, 5227:10

**Chronic** [1] - 5234:19

**circle** [1] - 5146:21

**circumstance** [2] - 5116:2, 5120:18

circumstances [2] - 5159:20, 5308:18

**cities** [4] - 5169:1, 5183:15, 5189:24, 5190:3

**city** [1] - 5189:23

**City** [3] - 5179:7, 5181:11, 5184:10

**CIVIL** [1] - 5112:3

**claim** [50] - 5232:4, 5232:5, 5232:6, 5232:17, 5232:18, 5234:24, 5234:25, 5235:1, 5235:2, 5239:25, 5240:1, 5240:20, 5240:21, 5240:24, 5241:1, 5241:4, 5241:5, 5241:6, 5241:15, 5243:1, 5243:7, 5243:8, 5243:9, 5243:12, 5244:18, 5244:19, 5244:21, 5245:5, 5245:13, 5246:17, 5246:23, 5247:2, 5249:2, 5249:4, 5261:13, 5264:20, 5278:3, 5278:4, 5278:6, 5278:9, 5278:22, 5283:13, 5285:22, 5286:17, 5289:11, 5303:3, 5315:10, 5323:10

**claim-level** [1] - 5245:13

**claim-specific** [1] - 5323:10

**claimed** [1] - 5249:3

**claiming** [2] - 5333:6, 5336:23

**Claims** [14] - 5213:1, 5213:20, 5214:1, 5216:7, 5218:21, 5221:19, 5240:15, 5256:20, 5310:20, 5311:4, 5313:3, 5321:13, 5334:15, 5336:7

**claims** [146] - 5214:18, 5214:23, 5214:25, 5215:1, 5215:3, 5215:6, 5215:15, 5215:20, 5215:24, 5216:14, 5216:20, 5216:24, 5219:6, 5221:1, 5221:3, 5221:23, 5221:25, 5222:3, 5222:5, 5222:6, 5222:8,

5222:9, 5222:11, 5222:12, 5222:13, 5222:14, 5222:15, 5223:15, 5223:25, 5225:7, 5225:19, 5225:23, 5225:24, 5225:25, 5226:2, 5228:4, 5228:9, 5230:17, 5230:21, 5232:6, 5232:11, 5232:21, 5233:15, 5233:18, 5234:4, 5234:9, 5234:11, 5234:20, 5234:21, 5235:2, 5237:23, 5240:2, 5240:9, 5240:15, 5241:16, 5241:20, 5241:21, 5243:4, 5244:8, 5244:15, 5245:15, 5245:16, 5245:18, 5245:19, 5245:20, 5245:21, 5246:1, 5246:7, 5246:8, 5246:9, 5246:23, 5247:1, 5247:11, 5247:25, 5248:21, 5248:23, 5248:25, 5249:7, 5251:10, 5251:18, 5251:20, 5251:23, 5252:2, 5252:13, 5252:19, 5252:21, 5253:9, 5253:11, 5260:14, 5271:2, 5271:25, 5272:2, 5272:5, 5272:20, 5272:22, 5275:11, 5275:16, 5275:24, 5276:18, 5277:13, 5277:15, 5277:19, 5277:24, 5279:4, 5279:15, 5279:20, 5284:8, 5284:11, 5285:18, 5287:24, 5290:19, 5291:24, 5293:2, 5293:3, 5294:3, 5294:11, 5294:13, 5294:14, 5294:19, 5294:23, 5294:25, 5296:11, 5305:2, 5305:16, 5308:20, 5308:23, 5309:5, 5311:17, 5311:20, 5311:24, 5313:9, 5314:5, 5316:12, 5316:14, 5316:19, 5316:21, 5318:8, 5320:8, 5323:13, 5324:18, 5335:10

**clarification** [2] -

5168:18, 5340:19

**clarify** [2] - 5217:20, 5301:22

**Clarkson** [1] - 5112:8

**Classification** [2] - 5230:13, 5281:3

**clean** [3] - 5178:2, 5178:10, 5182:13

**clear** [14] - 5126:3, 5146:10, 5148:25, 5150:3, 5152:6, 5172:23, 5178:3, 5182:21, 5183:10, 5204:21, 5206:7, 5214:10, 5257:4

**clearances** [1] - 5145:25

**clearly** [1] - 5126:6

**CLERK** [12] - 5114:4, 5119:12, 5119:14, 5130:15, 5143:15, 5160:20, 5182:5, 5182:18, 5212:11, 5222:20, 5222:22, 5290:3

**clients** [2] - 5299:16, 5299:17

**close** [5] - 5158:4, 5217:9, 5250:2, 5259:13, 5334:16

**closer** [2] - 5213:5, 5213:8

**closest** [1] - 5115:4

**closing** [1] - 5328:1

**closings** [1] - 5327:24

**CMS** [18] - 5223:9, 5223:25, 5227:9, 5229:21, 5260:15, 5262:2, 5284:4, 5284:6, 5284:10, 5284:22, 5285:4, 5286:6, 5286:9, 5286:12, 5287:24, 5291:22, 5308:5

**code** [2] - 5250:2, 5250:4

**coder** [3] - 5219:20, 5235:15, 5243:15

**Coders** [1] - 5219:15

**codes** [18] - 5229:7, 5229:8, 5229:24, 5230:12, 5230:13, 5230:23, 5230:25, 5232:13, 5235:11, 5280:24, 5281:4, 5282:5, 5282:9, 5282:12, 5282:18, 5282:23, 5283:2, 5283:9

**Codes** [2] - 5230:16,

5281:5
**colleagues** [1] - 5210:7
**collect** [1] - 5282:6
**collected** [2] - 5223:20, 5270:17
**collecting** [1] - 5341:13
**collective** [3] - 5157:2, 5157:24, 5158:22
**collectively** [1] - 5135:3
**Colorado** [1] - 5184:22
**column** [2] - 5174:6, 5174:13
**columns** [2] - 5174:19, 5177:6
**combination** [1] - 5217:21
**combined** [1] - 5228:14
**comfortable** [4] - 5159:7, 5159:21, 5161:5, 5206:5
**comfortably** [2] - 5129:14, 5327:10
**coming** [10] - 5131:22, 5131:24, 5145:10, 5149:12, 5305:18, 5320:10, 5326:17, 5327:8, 5327:17, 5330:21
**Commencing** [1] - 5112:10
**comment** [1] - 5173:8
**comments** [1] - 5320:17
**committed** [2] - 5149:12, 5151:14
**communicate** [3] - 5125:25, 5127:13, 5152:22
**communicated** [9] - 5236:8, 5238:5, 5238:14, 5238:20, 5239:11, 5266:24, 5267:3, 5268:25, 5280:6
**communicating** [4] - 5123:8, 5148:23, 5148:24, 5276:19
**communication** [3] - 5341:12, 5341:22, 5342:3
**companies** [17] - 5167:12, 5178:23, 5187:11, 5187:23, 5189:10, 5190:16, 6198:9, 5198:16,

5201:1, 5202:8, 5202:12, 5202:25, 5203:9, 5204:1, 5204:18, 5205:20, 5294:20
**companies'** [2] - 5187:17, 5187:19
**company** [23] - 5166:25, 5188:5, 5188:19, 5191:5, 5193:7, 5193:8, 5194:9, 5199:19, 5200:2, 5201:2, 5202:7, 5203:18, 5203:22, 5205:1, 5205:10, 5205:18, 5207:3, 5207:23, 5217:18, 5256:14, 5280:20, 5310:16, 5312:19
**company's** [1] - 5207:5
**comparable** [1] - 5309:1
**compare** [2] - 5303:16, 5312:9
**compared** [4] - 5250:1, 5253:10, 5296:21, 5305:20
**comparison** [3] - 5292:14, 5292:16, 5304:18
**competence** [2] - 5319:8
**competitive** [2] - 5163:15, 5206:7
**competitor's** [1] - 5189:18
**compile** [1] - 5247:10
**compiling** [1] - 5251:1
**complete** [15] - 5122:10, 5123:18, 5125:22, 5131:9, 5131:11, 5131:20, 5131:21, 5132:19, 5134:1, 5148:8, 5251:19, 5297:4, 5326:19, 5326:20, 5342:11
**completed** [7] - 5116:9, 5124:21, 5131:2, 5131:4, 5218:11, 5239:7, 5330:15
**completely** [6] - 5119:13, 5121:10, 5145:2, 5146:1, 5337:12, 5338:16
**compliance** [2] - 5202:19, 5203:4

**comprehensive** [2] - 5229:19, 5287:13
**compromised** [1] - 5149:17
**computer** [10] - 5112:25, 5150:5, 5150:6, 5150:15, 5151:21, 5181:25, 5216:8, 5217:22, 5249:19, 5250:1
**computer-aided** [1] - 5112:25
**computing** [2] - 5216:9, 5249:20
**concentrate** [1] - 5126:7
**concern** [22] - 5117:7, 5122:3, 5124:3, 5132:22, 5135:5, 5135:6, 5135:8, 5135:20, 5136:1, 5137:2, 5137:3, 5138:16, 5139:21, 5148:1, 5148:9, 5148:17, 5149:3, 5150:12, 5150:14, 5150:16, 5151:3, 5152:11
**concerned** [5] - 5124:2, 5135:22, 5136:14, 5136:23, 5141:5
**concerning** [1] - 5122:7
**concerns** [2] - 5133:24, 5158:10
**conclude** [1] - 5262:3
**concluded** [2] - 5173:4, 5329:23
**conclusions** [1] - 5254:2
**concurrent** [1] - 5243:9
**condition** [1] - 5282:7
**conditions** [3] - 5225:23, 5227:10, 5230:18
**Conditions** [1] - 5234:19
**conduct** [1] - 5205:4
**conference** [2] - 5134:14, 5143:22
**conferences** [1] - 5190:9
**confidence** [1] - 5319:14
**confident** [5] - 5138:25, 5139:3, 5139:4, 5319:11, 5326:7

**confirm** [2] - 5191:15, 5292:1
**confirmation** [1] - 5329:12
**conform** [1] - 5180:23
**confused** [5] - 5121:9, 5135:7, 5140:9, 5162:21, 5214:25
**confusing** [1] - 5137:18
**conjunction** [1] - 5251:3
**connected** [1] - 5216:13
**connection** [1] - 5216:14
**consciously** [3] - 5196:13, 5207:14, 5207:19
**consensus** [1] - 5124:6
**consequences** [1] - 5134:2
**conservative** [4] - 5245:24, 5253:13, 5254:1, 5300:24
**consider** [5] - 5142:22, 5202:1, 5264:2, 5271:13, 5286:9
**consideration** [1] - 5275:4
**considered** [5] - 5190:6, 5204:23, 5263:14, 5272:19, 5273:1
**considering** [1] - 5264:6
**consisted** [2] - 5228:15, 5293:1
**consistency** [1] - 5150:4
**consistent** [30] - 5175:11, 5214:14, 5214:19, 5219:8, 5221:1, 5234:21, 5240:3, 5240:10, 5242:11, 5243:7, 5244:10, 5245:4, 5245:17, 5245:20, 5246:2, 5246:13, 5246:17, 5247:1, 5247:4, 5271:3, 5272:13, 5272:22, 5273:3, 5275:11, 5276:18, 5303:1, 5303:2, 5313:2, 5321:13
**consistently** [11] - 5236:7, 5238:5,

5238:13, 5238:20, 5266:24, 5267:3, 5267:24, 5268:2, 5268:5, 5268:25, 5325:11
**consisting** [1] - 5249:14
**consolidated** [3] - 5246:15, 5246:22, 5246:24
**consult** [1] - 5220:11
**consultation** [1] - 5220:16
**consulted** [1] - 5217:2
**Consulting** [2] - 5256:14, 5256:19
**consulting** [4] - 5212:25, 5214:4, 5218:20, 5219:17
**contact** [12] - 5128:18, 5129:21, 5134:8, 5270:8, 5270:22, 5271:9, 5271:10, 5271:19, 5276:13, 5289:12, 5302:9, 5315:1
**contacted** [1] - 5130:23
**contain** [4] - 5231:15, 5285:18, 5292:19, 5309:4
**contained** [4] - 5222:10, 5232:4, 5286:5, 5294:3
**contains** [2] - 5229:21, 5285:7
**contention** [1] - 5162:13
**contested** [1] - 5136:9
**context** [8] - 5253:18, 5332:25, 5333:4, 5333:10, 5336:14, 5336:17, 5339:5, 5339:11
**continue** [12] - 5133:13, 5142:18, 5147:25, 5152:17, 5152:19, 5155:13, 5161:1, 5161:6, 5161:13, 5161:16, 5252:11, 5331:3
**continued** [2] - 5211:9, 5270:3
**continues** [2] - 5270:19, 5271:17
**continuing** [2] - 5148:13, 5252:13
**contract** [1] - 5218:7
**contractors** [1] - 5218:7

**control** [1] - 5231:25
**convenience** [1] - 5128:12
**conversation** [1] - 5134:16
**conversations** [2] - 5280:2, 5280:5
**convey** [2] - 5189:19, 5206:6
**coordinating** [1] - 5176:8
**copy** [1] - 5285:2
**correct** [139] - 5128:17, 5135:16, 5167:16, 5169:10, 5175:24, 5175:25, 5176:4, 5176:5, 5176:10, 5177:20, 5177:21, 5181:1, 5181:12, 5181:13, 5183:13, 5183:17, 5183:21, 5183:22, 5184:8, 5184:9, 5185:1, 5185:13, 5185:25, 5186:4, 5188:3, 5190:1, 5192:18, 5192:23, 5197:10, 5199:5, 5199:6, 5199:17, 5200:19, 5203:24, 5203:25, 5205:24, 5223:12, 5227:11, 5227:16, 5235:23, 5246:20, 5252:25, 5254:15, 5254:19, 5254:24, 5255:3, 5255:9, 5256:21, 5257:6, 5257:7, 5257:12, 5257:16, 5257:23, 5258:1, 5258:5, 5259:4, 5259:23, 5259:24, 5260:2, 5261:14, 5262:18, 5262:24, 5263:3, 5263:16, 5264:13, 5264:18, 5265:4, 5265:9, 5265:12, 5265:18, 5265:24, 5267:1, 5267:10, 5268:1, 5270:5, 5270:12, 5270:23, 5271:7, 5271:14, 5271:24, 5272:11, 5272:21, 5273:2, 5273:23, 5278:5, 5280:9, 5282:10, 5286:4, 5286:8, 5286:15, 5286:23, 5287:16, 5288:12, 5288:15,

5289:14, 5290:25, 5291:12, 5292:4, 5292:17, 5292:23, 5293:20, 5293:21, 5294:6, 5295:13, 5295:17, 5296:14, 5296:19, 5297:5, 5298:20, 5299:6, 5299:10, 5299:14, 5299:21, 5300:16, 5300:20, 5300:22, 5300:23, 5302:12, 5303:9, 5304:19, 5305:6, 5305:14, 5305:22, 5306:22, 5307:18, 5310:5, 5311:22, 5313:17, 5314:8, 5314:11, 5318:5, 5318:14, 5327:14, 5330:25, 5332:14, 5334:25, 5336:25, 5343:4
**corrected** [4] - 5192:7, 5283:10, 5298:17, 5319:23
**correction** [1] - 5134:20
**corrective** [1] - 5138:19
**correctly** [1] - 5305:7
**corresponding** [1] - 5245:25
**couch** [1] - 5140:20
**counsel** [30] - 5114:6, 5114:8, 5125:5, 5127:2, 5130:22, 5144:3, 5146:24, 5159:22, 5161:10, 5181:20, 5201:12, 5201:14, 5208:25, 5220:19, 5239:5, 5239:11, 5239:13, 5277:2, 5280:6, 5287:6, 5291:11, 5303:14, 5306:18, 5325:5, 5326:15, 5331:7, 5332:3, 5332:19, 5333:20, 5341:23
**counsel's** [2] - 5115:4, 5332:1
**count** [14] - 5251:20, 5252:24, 5270:10, 5270:20, 5271:5, 5271:22, 5276:5, 5276:14, 5276:15, 5307:15, 5315:6, 5315:20, 5316:2, 5325:14
**counted** [4] - 5236:16,

5270:11, 5277:9, 5315:9
**counting** [2] - 5273:19, 5317:1
**country** [6] - 5167:19, 5167:21, 5183:16, 5270:19, 5314:15
**counts** [1] - 5265:1
**couple** [3] - 5136:6, 5300:6, 5331:13
**coupled** [1] - 5333:17
**course** [14] - 5151:5, 5155:11, 5183:23, 5184:5, 5187:1, 5189:3, 5192:14, 5203:22, 5218:11, 5320:1, 5322:8, 5322:20, 5332:7, 5335:22
**court** [10] - 5114:1, 5117:19, 5119:8, 5131:8, 5133:18, 5143:18, 5173:5, 5181:18, 5320:25, 5330:1
**COURT** [253] - 5112:1, 5114:4, 5114:5, 5114:14, 5114:18, 5115:1, 5116:6, 5116:20, 5117:5, 5117:11, 5117:16, 5117:25, 5118:6, 5118:12, 5118:18, 5118:20, 5118:24, 5119:4, 5119:11, 5119:12, 5119:13, 5119:14, 5119:15, 5119:22, 5120:1, 5120:5, 5120:13, 5121:8, 5122:2, 5123:3, 5124:2, 5124:12, 5124:17, 5125:4, 5125:9, 5125:16, 5125:23, 5126:18, 5127:15, 5127:25, 5128:3, 5128:10, 5128:14, 5128:18, 5128:20, 5129:2, 5129:6, 5129:13, 5129:20, 5130:6, 5130:11, 5130:15, 5130:16, 5130:20, 5131:2, 5131:6, 5131:17, 5132:4, 5132:11, 5132:17, 5132:22, 5133:4, 5133:7, 5133:10, 5133:24, 5134:6, 5134:12, 5134:15, 5134:24,

5135:1, 5135:12, 5135:15, 5135:18, 5136:1, 5136:20, 5137:7, 5137:17, 5137:24, 5138:6, 5138:11, 5139:9, 5140:6, 5140:9, 5140:20, 5140:24, 5141:5, 5141:19, 5142:2, 5142:7, 5143:2, 5143:5, 5143:15, 5143:16, 5143:18, 5143:23, 5144:1, 5144:11, 5144:15, 5144:22, 5145:3, 5145:7, 5145:13, 5146:2, 5146:8, 5146:15, 5146:21, 5147:6, 5147:9, 5147:11, 5147:20, 5148:1, 5150:13, 5150:21, 5151:11, 5152:11, 5152:18, 5153:15, 5153:22, 5153:25, 5154:15, 5154:22, 5156:1, 5156:5, 5156:8, 5156:12, 5157:7, 5157:13, 5158:8, 5158:11, 5158:18, 5160:7, 5160:16, 5160:20, 5160:22, 5161:19, 5161:21, 5161:24, 5165:9, 5168:7, 5168:17, 5169:18, 5169:22, 5169:25, 5170:4, 5170:7, 5170:10, 5170:16, 5170:18, 5171:9, 5171:15, 5172:8, 5172:18, 5172:22, 5173:2, 5173:6, 5173:14, 5173:17, 5173:19, 5177:16, 5177:25, 5178:9, 5178:14, 5180:9, 5180:15, 5181:16, 5182:3, 5182:5, 5182:7, 5182:17, 5182:18, 5182:20, 5201:7, 5201:10, 5201:17, 5208:18, 5211:23, 5212:2, 5212:8, 5212:11, 5212:14, 5222:18, 5222:20, 5222:22, 5222:23, 5224:2, 5224:4, 5224:8, 5224:19, 5255:17, 5255:22, 5256:1,

5281:16, 5289:17, 5289:20, 5290:2, 5290:3, 5290:5, 5296:3, 5306:2, 5306:12, 5324:21, 5326:13, 5326:17, 5326:21, 5327:3, 5327:13, 5327:17, 5327:21, 5327:24, 5328:12, 5328:14, 5328:17, 5328:23, 5329:3, 5329:9, 5329:13, 5329:17, 5329:21, 5330:2, 5331:10, 5331:14, 5331:21, 5332:13, 5332:15, 5332:24, 5333:4, 5333:19, 5334:2, 5334:4, 5334:8, 5334:21, 5335:1, 5336:10, 5336:13, 5337:7, 5337:11, 5337:20, 5338:5, 5338:22, 5339:1, 5339:18, 5339:22, 5340:5, 5340:12, 5340:15, 5340:17, 5340:21, 5341:11, 5341:19, 5342:2, 5342:12, 5342:17, 5343:1
**Court** [22] - 5112:23, 5115:7, 5123:25, 5124:5, 5125:20, 5128:8, 5134:1, 5138:25, 5141:25, 5149:8, 5152:6, 5152:7, 5153:5, 5155:7, 5157:16, 5329:5, 5337:12, 5338:17, 5340:18, 5341:3, 5342:21, 5343:12
**Court's** [1] - 5152:9
**Courthouse** [1] - 5112:8
**courtroom** [10] - 5123:9, 5130:2, 5130:22, 5133:11, 5143:7, 5144:2, 5160:21, 5182:19, 5282:22, 5290:4
**covered** [6] - 5234:13, 5293:2, 5293:3, 5293:5, 5295:19, 5321:4
**create** [3] - 5121:2, 5231:18, 5341:6
**created** [2] - 5246:22, 5291:21

credentials [2] - 5219:16, 5219:22
credit [1] - 5298:12
criteria [11] - 5240:16, 5241:3, 5241:11, 5241:15, 5241:17, 5242:3, 5242:25, 5244:14, 5244:20, 5245:4, 5275:3
CROSS [4] - 5113:4, 5113:6, 5162:2, 5256:3
Cross [1] - 5294:20
cross [7] - 5123:23, 5124:21, 5160:13, 5160:15, 5161:17, 5328:14, 5339:5
CROSS-EXAMINATION [2] - 5113:4, 5162:2
cross-examination [3] - 5124:21, 5161:17, 5339:5
CRR [1] - 5343:11
crunch [1] - 5256:19
Cruz [1] - 5185:4
cumulative [1] - 5306:19
custodian [1] - 5341:17
cut [3] - 5170:21, 5273:21, 5331:22
cutting [1] - 5178:10
CVS [1] - 5288:9
Cynthia [4] - 5219:13, 5235:14, 5280:11, 5281:25

## D

D-9185 [3] - 5113:18, 5281:14, 5281:17
D-E-W [1] - 5212:13
daily [23] - 5227:3, 5227:6, 5227:7, 5230:11, 5238:15, 5238:16, 5243:24, 5244:3, 5244:5, 5244:11, 5283:14, 5286:17, 5287:14, 5287:18, 5288:18, 5289:10, 5290:19, 5291:10, 5291:17, 5291:19, 5297:24, 5298:1, 5323:8
Dakota [1] - 5293:2
Dallas [1] - 5112:17
damage [2] - 5277:9, 5333:25
damages [32] -

5123:21, 5154:14, 5220:7, 5231:6, 5247:12, 5251:6, 5251:12, 5261:11, 5261:15, 5272:10, 5272:12, 5275:6, 5275:9, 5275:17, 5275:19, 5279:21, 5314:6, 5314:12, 5322:16, 5328:12, 5332:3, 5332:8, 5333:13, 5335:20, 5336:2, 5336:3, 5337:5, 5337:24, 5338:3, 5339:3, 5339:15, 5339:16
dark [1] - 5327:25
darunavir [1] - 5189:16
Data [1] - 5234:19
data [251] - 5150:7, 5189:19, 5209:17, 5209:20, 5209:23, 5210:3, 5210:14, 5212:24, 5213:13, 5213:14, 5213:16, 5214:7, 5214:11, 5214:13, 5214:14, 5214:16, 5215:13, 5215:14, 5215:24, 5216:6, 5216:20, 5216:23, 5217:3, 5217:22, 5217:24, 5221:8, 5221:21, 5221:23, 5222:3, 5222:10, 5222:15, 5223:5, 5223:14, 5223:15, 5223:19, 5223:25, 5224:10, 5224:11, 5224:12, 5224:13, 5224:14, 5224:15, 5224:17, 5225:23, 5226:11, 5226:17, 5226:20, 5226:21, 5226:23, 5227:1, 5227:2, 5227:3, 5227:9, 5227:10, 5227:13, 5227:18, 5228:9, 5228:12, 5228:15, 5228:21, 5228:23, 5229:2, 5229:13, 5229:15, 5230:2, 5230:8, 5230:17, 5230:21, 5231:5, 5231:11, 5231:15, 5231:25, 5233:3, 5233:5, 5233:6, 5233:15, 5233:21, 5234:1, 5234:4, 5235:5, 5240:14,

5241:9, 5244:2, 5244:8, 5245:12, 5245:13, 5245:25, 5246:12, 5247:11, 5247:18, 5249:14, 5249:17, 5249:23, 5250:17, 5250:22, 5250:24, 5251:9, 5252:15, 5253:6, 5253:13, 5253:15, 5253:22, 5254:3, 5254:7, 5254:13, 5254:17, 5254:18, 5255:5, 5255:12, 5258:24, 5259:1, 5261:17, 5262:2, 5262:9, 5262:15, 5264:8, 5268:7, 5270:16, 5271:6, 5271:23, 5273:5, 5273:7, 5273:11, 5273:13, 5274:18, 5274:20, 5276:12, 5276:23, 5278:3, 5278:9, 5278:15, 5278:24, 5282:6, 5283:14, 5283:18, 5283:24, 5284:4, 5284:6, 5284:8, 5284:15, 5284:25, 5285:4, 5285:11, 5285:18, 5285:20, 5286:5, 5286:6, 5286:9, 5286:12, 5286:13, 5286:17, 5286:21, 5287:12, 5287:23, 5287:24, 5288:10, 5288:17, 5290:13, 5290:18, 5290:22, 5291:10, 5291:16, 5291:22, 5292:2, 5292:3, 5293:1, 5293:5, 5293:8, 5293:9, 5293:18, 5293:21, 5294:2, 5294:18, 5295:5, 5295:9, 5295:10, 5295:12, 5295:14, 5295:19, 5296:6, 5296:17, 5297:4, 5297:9, 5297:11, 5298:22, 5299:12, 5299:22, 5300:2, 5300:11, 5300:13, 5301:8, 5301:14, 5301:20, 5301:25, 5302:11, 5302:16, 5304:18, 5304:22, 5305:8, 5305:13, 5305:16, 5305:19, 5305:20,

5306:18, 5306:19, 5307:11, 5307:15, 5307:20, 5307:21, 5308:1, 5308:5, 5308:10, 5308:11, 5308:15, 5308:16, 5309:8, 5309:18, 5310:19, 5311:4, 5311:10, 5311:17, 5311:20, 5311:24, 5312:3, 5312:20, 5312:24, 5314:21, 5316:12, 5318:9, 5319:15, 5323:2, 5323:6, 5323:18, 5323:22, 5323:24, 5323:25, 5324:8, 5324:12, 5324:14, 5326:2, 5326:3, 5326:5, 5326:9, 5327:2
database [4] - 5191:20, 5229:9, 5229:19, 5229:21
dataset [12] - 5214:19, 5228:14, 5231:12, 5231:14, 5231:19, 5231:20, 5236:17, 5246:22, 5246:24, 5313:24, 5314:2, 5319:5
datasets [10] - 5214:23, 5216:11, 5228:20, 5233:8, 5234:22, 5243:22, 5291:2, 5292:19, 5311:13, 5318:3
Date [1] - 5343:12
date [28] - 5119:7, 5126:16, 5180:4, 5180:19, 5195:15, 5228:17, 5234:23, 5234:24, 5235:1, 5237:18, 5237:21, 5239:23, 5240:1, 5240:6, 5240:10, 5240:25, 5241:11, 5241:22, 5242:4, 5242:6, 5242:8, 5243:13, 5244:19, 5278:8, 5279:4, 5279:20, 5297:1
dated [2] - 5163:21, 5165:14
dates [10] - 5174:21, 5175:1, 5175:3, 5234:15, 5235:2, 5237:18, 5243:5, 5266:22, 5295:10, 5295:12

days [12] - 5147:18, 5153:6, 5181:4, 5186:19, 5187:2, 5192:9, 5206:23, 5240:21, 5241:5, 5278:23
deadline [1] - 5340:20
dealing [1] - 5122:3
death [1] - 5136:10
decide [4] - 5138:13, 5142:16, 5214:8, 5251:20
decided [2] - 5133:16, 5287:5
decides [1] - 5201:3
decision [7] - 5133:16, 5133:20, 5134:9, 5135:3, 5207:13, 5279:24
decisions [1] - 5286:10
decrease [4] - 5251:10, 5275:20, 5279:4, 5313:14
decreased [1] - 5211:8
deduction [1] - 5333:7
deemed [1] - 5125:22
Defendant [1] - 5224:3
Defendant's [2] - 5113:18, 5281:14
Defendants [2] - 5112:7, 5112:22
Defendants' [12] - 5113:11, 5113:13, 5113:16, 5113:17, 5224:10, 5224:12, 5224:16, 5224:17, 5224:22, 5224:24, 5225:3, 5225:4
Defense [1] - 5218:8
defense [9] - 5138:1, 5146:12, 5148:22, 5218:7, 5327:8, 5327:9, 5330:17, 5330:20, 5337:22
definitely [1] - 5120:4
definition [4] - 5262:21, 5263:19, 5265:6, 5266:2
definitive [2] - 5154:16, 5252:3
degree [8] - 5189:5, 5218:3, 5218:8, 5218:9, 5250:25, 5254:3, 5255:12, 5326:5
Delaware [1] - 5112:21

**delay** [13] - 5115:13, 5116:5, 5116:6, 5116:16, 5117:3, 5126:8, 5132:12, 5139:16, 5141:8, 5141:10, 5141:13, 5143:9
**delayed** [2] - 5117:15, 5119:7
**deliberate** [7] - 5115:17, 5118:7, 5118:8, 5122:12, 5139:2, 5148:13, 5159:8
**delivered** [11] - 5237:13, 5238:2, 5267:8, 5267:24, 5268:3, 5268:4, 5268:6, 5268:14, 5268:17, 5325:10, 5325:22
**delivering** [1] - 5268:21
**demonstrative** [1] - 5295:23
**dental** [1] - 5229:11
**Denver** [2] - 5184:22, 5184:25
**deny** [1] - 5339:19
**Department** [8] - 5204:2, 5214:5, 5216:7, 5217:3, 5256:25, 5257:5, 5257:10, 5284:19
**deployed** [1] - 5239:5
**deposition** [5] - 5258:13, 5293:7, 5293:12, 5293:16, 5297:3
**DEPUTY** [12] - 5114:4, 5119:12, 5119:14, 5130:15, 5143:15, 5160:20, 5182:5, 5182:18, 5212:11, 5222:20, 5222:22, 5290:3
**deputy** [2] - 5123:9, 5143:7
**describe** [4] - 5212:21, 5213:11, 5217:15, 5218:1
**described** [16] - 5205:20, 5208:4, 5227:14, 5228:21, 5234:5, 5243:3, 5244:17, 5245:12, 5246:6, 5249:16, 5250:18, 5273:6, 5274:23, 5297:7, 5300:5, 5323:8

**describing** [3] - 5190:13, 5285:5, 5309:8
**Description** [1] - 5113:8
**description** [2] - 5239:10, 5248:2
**desirable** [1] - 5307:13
**destination** [1] - 5147:2
**detail** [1] - 5295:18
**detailing** [1] - 5236:13
**details** [1] - 5296:5
**determinations** [1] - 5293:19
**determine** [10] - 5229:9, 5231:15, 5233:13, 5233:22, 5234:8, 5234:15, 5253:8, 5291:16, 5305:5, 5307:8
**determined** [1] - 5134:1
**determining** [1] - 5277:18
**developed** [2] - 5277:18, 5277:23
**development** [1] - 5216:10
**Dew** [35] - 5123:20, 5154:13, 5155:3, 5155:9, 5212:7, 5212:13, 5212:16, 5212:19, 5212:21, 5213:4, 5214:25, 5219:2, 5222:24, 5223:4, 5247:5, 5249:9, 5250:23, 5253:12, 5254:7, 5255:19, 5256:4, 5256:12, 5290:7, 5290:12, 5305:24, 5306:7, 5306:15, 5310:24, 5313:21, 5326:1, 5326:14, 5332:19, 5339:6, 5339:10, 5339:19
**DEW** [2] - 5113:5, 5212:9
**diagnoses** [5] - 5230:21, 5232:12, 5232:13, 5243:5, 5249:6
**diagnosis** [6] - 5230:14, 5235:3, 5235:6, 5239:17, 5243:10, 5281:4
**diagnostic** [3] - 5230:23, 5230:25,

5235:11
**diarrhea** [4] - 5207:11, 5207:15, 5210:13, 5210:24
**die** [3] - 5153:18, 5155:6, 5158:4
**died** [1] - 5119:9
**difference** [3] - 5285:14, 5292:11, 5337:11
**different** [32] - 5119:13, 5121:10, 5122:11, 5135:12, 5136:20, 5158:21, 5169:1, 5178:23, 5180:10, 5183:15, 5198:15, 5202:11, 5207:22, 5225:8, 5225:9, 5240:18, 5253:7, 5269:21, 5270:3, 5273:12, 5274:19, 5275:2, 5276:8, 5276:16, 5286:16, 5297:25, 5301:19, 5303:24, 5311:12, 5320:16
**differently** [1] - 5319:14
**difficult** [3] - 5152:4, 5178:4, 5295:7
**difficulty** [4] - 5178:1, 5178:11, 5181:19, 5182:12
**dimension** [1] - 5278:18
**dire** [1] - 5149:8
**DIRECT** [1] - 5212:18
**direct** [7] - 5201:10, 5201:13, 5233:16, 5256:24, 5305:1, 5328:8, 5328:10
**directed** [1] - 5202:24
**direction** [1] - 5279:9
**directions** [1] - 5149:2
**directly** [3] - 5220:18, 5234:9, 5284:15
**disagree** [4] - 5157:22, 5158:18, 5171:9, 5171:16
**disagreeable** [1] - 5302:6
**disagreeing** [1] - 5172:20
**disagreement** [1] - 5158:20
**disclosed** [3] - 5342:7, 5342:8
**discover** [2] - 5319:21, 5320:11
**discovered** [1] -

5319:18
**discovery** [3] - 5341:5, 5341:17, 5341:24
**discuss** [6] - 5152:21, 5163:14, 5197:1, 5211:1, 5331:3, 5331:7
**discussed** [12] - 5128:4, 5139:9, 5163:25, 5181:8, 5203:4, 5203:7, 5204:23, 5224:6, 5276:2, 5276:21, 5277:1, 5282:3
**discussing** [6] - 5139:12, 5162:6, 5175:14, 5221:12, 5275:25
**discussion** [4] - 5142:6, 5181:9, 5275:22, 5315:22
**discussions** [1] - 5247:21
**disease** [2] - 5167:24, 5229:12
**Diseases** [2] - 5230:13, 5281:3
**disincentive** [2] - 5334:14, 5334:19
**disingenuous** [3] - 5148:10, 5150:2, 5151:25
**dismiss** [5] - 5150:18, 5155:22, 5159:18, 5159:23, 5331:8
**dismissal** [1] - 5121:11
**dismissed** [3] - 5117:8, 5140:2, 5159:9
**dismissing** [6] - 5123:1, 5135:5, 5135:9, 5138:25, 5159:1, 5159:17
**dismissive** [1] - 5154:8
**dispensed** [1] - 5287:10
**disruption** [1] - 5121:3
**dissertation** [1] - 5218:13
**distinction** [1] - 5264:8
**distinguish** [3] - 5197:21, 5197:23, 5227:6
**distinguishing** [1] - 5229:11

**distributed** [1] - 5249:23
**distribution** [4] - 5292:16, 5292:21, 5304:4, 5304:5
**distributions** [1] - 5323:12
**DISTRICT** [3] - 5112:1, 5112:1, 5112:12
**District** [1] - 5114:2
**district** [4] - 5163:20, 5164:25, 5190:6, 5325:15
**divided** [2] - 5262:16, 5288:5
**divulging** [1] - 5150:25
**doc** [1] - 5144:1
**Doc** [4] - 5144:13, 5145:8, 5146:3, 5147:6
**doctor** [51] - 5173:23, 5188:6, 5190:13, 5210:7, 5236:19, 5236:20, 5251:24, 5252:6, 5254:21, 5260:15, 5260:20, 5260:21, 5261:1, 5262:3, 5263:13, 5263:20, 5265:16, 5266:24, 5267:7, 5268:19, 5270:2, 5270:19, 5270:20, 5270:21, 5270:22, 5270:25, 5271:1, 5271:5, 5271:9, 5271:10, 5271:13, 5271:16, 5271:19, 5288:19, 5301:13, 5311:15, 5312:10, 5314:14, 5314:25, 5315:3, 5315:13, 5315:14, 5315:15, 5315:21, 5316:1, 5316:2, 5316:3, 5316:4, 5317:16
**Doctor** [5] - 5147:9, 5163:5, 5163:18, 5176:12, 5211:3
**doctor's** [4] - 5188:25, 5200:22, 5201:23, 5271:22
**doctor-specific** [1] - 5301:13
**doctors** [34] - 5122:16, 5162:19, 5167:23, 5168:1, 5168:12, 5187:12, 5188:12, 5189:11, 5189:21, 5190:17,

5190:23, 5191:3,
5202:12, 5202:25,
5203:19, 5204:8,
5205:3, 5207:24,
5230:2, 5230:5,
5233:23, 5234:3,
5236:14, 5238:2,
5244:24, 5244:25,
5248:10, 5248:15,
5265:21, 5269:3,
5307:10, 5311:10,
5315:20, 5325:22
**doctors'** [1] - 5229:4
**document** [18] -
5169:18, 5169:22,
5169:25, 5170:5,
5171:11, 5171:12,
5171:16, 5171:23,
5172:1, 5172:13,
5172:15, 5172:19,
5172:23, 5173:15,
5194:3, 5197:8,
5202:19
**documentation** [2] -
5252:16, 5252:17
**documents** [6] -
5170:19, 5171:5,
5171:8, 5341:4,
5341:13, 5341:20
**DOJ** [1] - 5204:7
**Dolce** [2] - 5180:20,
5184:6
**dollar** [19] - 5167:5,
5167:9, 5226:14,
5245:24, 5246:11,
5251:18, 5251:21,
5253:16, 5275:19,
5277:15, 5297:15,
5299:16, 5301:3,
5333:5, 5333:6,
5334:20, 5336:23
**dollars** [24] - 5166:7,
5166:18, 5167:13,
5168:2, 5168:5,
5245:19, 5245:21,
5246:9, 5246:10,
5246:12, 5274:9,
5275:11, 5298:18,
5300:7, 5300:9,
5305:18, 5309:10,
5309:19, 5313:9,
5315:4, 5316:22,
5318:8, 5320:9,
5338:17
**done** [29] - 5120:5,
5140:6, 5140:7,
5142:20, 5154:1,
5154:8, 5154:10,
5154:24, 5155:23,
5157:13, 5157:18,

5217:1, 5217:12,
5257:9, 5257:20,
5259:7, 5265:15,
5265:20, 5265:22,
5268:23, 5273:20,
5280:6, 5289:25,
5290:12, 5290:14,
5327:22, 5331:21,
5333:7, 5340:5
**door** [10] - 5329:19,
5332:10, 5332:12,
5332:16, 5333:16,
5334:11, 5335:22,
5337:17, 5338:16,
5338:20
**dose** [5] - 5285:5,
5285:8, 5285:12,
5285:14, 5291:17
**dosing** [28] - 5226:23,
5227:3, 5227:5,
5227:6, 5227:7,
5230:10, 5230:11,
5238:15, 5238:16,
5243:18, 5243:19,
5243:23, 5243:25,
5244:1, 5244:4,
5244:5, 5244:11,
5266:15, 5285:14,
5285:19, 5286:1,
5286:9, 5290:19,
5291:10, 5291:19,
5297:24, 5298:2,
5323:9
**double** [4] - 5144:18,
5145:1, 5145:11,
5218:3
**double-booked** [3] -
5144:18, 5145:1,
5145:11
**doubt** [1] - 5125:7
**doughnut** [1] - 5303:3
**down** [13] - 5129:12,
5132:3, 5155:12,
5166:2, 5174:14,
5201:2, 5207:9,
5207:19, 5210:23,
5241:8, 5259:14,
5342:5, 5342:9
**downwards** [1] -
5316:16
**Dr** [132] - 5119:23,
5120:23, 5121:14,
5121:15, 5121:24,
5122:3, 5122:10,
5122:17, 5123:21,
5124:3, 5124:19,
5124:20, 5125:2,
5125:6, 5125:11,
5125:21, 5125:24,
5125:25, 5126:14,

5126:25, 5127:11,
5127:17, 5127:18,
5128:6, 5128:15,
5129:21, 5129:25,
5130:13, 5135:2,
5138:14, 5141:21,
5142:3, 5142:8,
5142:16, 5143:2,
5143:16, 5143:23,
5146:9, 5146:15,
5147:13, 5147:15,
5148:2, 5154:13,
5155:4, 5155:10,
5155:17, 5160:11,
5161:19, 5162:3,
5162:6, 5163:9,
5168:10, 5168:19,
5170:3, 5172:3,
5173:11, 5174:9,
5174:11, 5177:5,
5177:5, 5177:14,
5178:1, 5178:9,
5180:9, 5181:18,
5181:23, 5182:1,
5183:1, 5183:3,
5187:9, 5187:22,
5188:17, 5189:20,
5191:12, 5192:2,
5192:8, 5193:15,
5194:5, 5197:7,
5197:25, 5198:7,
5202:6, 5205:25,
5206:8, 5207:21,
5208:16, 5208:21,
5208:25, 5209:15,
5210:4, 5210:15,
5211:12, 5211:21,
5211:24, 5220:14,
5220:17, 5220:22,
5239:2, 5239:3,
5239:4, 5239:9,
5239:12, 5243:16,
5260:1, 5269:19,
5272:3, 5279:24,
5280:3, 5280:7,
5281:9, 5282:22,
5298:5, 5312:14,
5317:3, 5317:5,
5317:9, 5317:13,
5319:19, 5320:1,
5320:6, 5322:16,
5322:20, 5326:19,
5332:8, 5332:13,
5334:3, 5334:12,
5335:6, 5339:2
**draw** [2] - 5253:14,
5324:11
**driven** [1] - 5151:13
**drop** [1] - 5118:14
**dropouts** [3] -

5253:21, 5299:23,
5300:5
**dropped** [1] - 5305:8
**drops** [2] - 5118:10,
5301:24
**drug** [31] - 5163:14,
5163:15, 5164:12,
5164:25, 5203:19,
5206:5, 5206:6,
5207:14, 5207:19,
5207:25, 5208:6,
5209:10, 5215:4,
5225:19, 5226:14,
5234:25, 5235:3,
5240:20, 5240:22,
5242:18, 5245:13,
5245:22, 5246:8,
5246:10, 5247:11,
5255:7, 5281:4,
5299:15, 5317:4,
5317:17
**Drug** [5] - 5226:9,
5227:13, 5230:16,
5281:5, 5298:25
**drugs** [28] - 5156:19,
5180:24, 5189:3,
5189:5, 5189:15,
5190:18, 5195:7,
5197:1, 5199:15,
5202:13, 5207:5,
5215:8, 5215:19,
5215:21, 5223:9,
5223:10, 5225:8,
5230:15, 5230:16,
5237:15, 5237:18,
5266:20, 5281:5,
5287:10, 5306:24,
5307:4, 5322:10,
5333:1
**due** [1] - 5326:8
**DULY** [1] - 5212:9
**during** [16] - 5125:8,
5132:10, 5151:5,
5156:25, 5175:13,
5183:5, 5187:3,
5198:8, 5204:19,
5205:4, 5218:8,
5236:15, 5238:2,
5238:20, 5322:10,
5330:16
**duty** [1] - 5133:15

5253:21, 5299:23,

**earned** [1] - 5218:9
**East** [1] - 5112:9
**Eastern** [1] - 5146:19
**economical** [1] -
5328:9
**economist** [1] -
5220:6
**educate** [1] - 5197:6
**educated** [1] - 5218:2
**education** [1] - 5218:1
**educational** [2] -
5197:5, 5213:24
**effect** [5] - 5204:10,
5210:13, 5262:7,
5277:12, 5301:6
**effective** [1] - 5207:15
**effects** [3] - 5207:15,
5210:25, 5242:19
**efficacy** [2] - 5210:12,
5210:25
**eight** [25] - 5115:16,
5118:17, 5118:18,
5118:20, 5118:24,
5135:16, 5135:21,
5136:2, 5136:4,
5136:16, 5137:14,
5148:11, 5148:13,
5149:4, 5149:12,
5149:23, 5151:12,
5151:19, 5151:20,
5153:3, 5156:2,
5157:3, 5157:9,
5157:10, 5157:12
**either** [6] - 5127:5,
5160:2, 5189:18,
5262:22, 5315:25,
5338:10
**ELMO** [1] - 5260:7
**email** [4] - 5130:10,
5170:7, 5170:14,
5173:24
**emails** [2] - 5170:25,
5172:25
**emergency** [1] -
5127:2
**employ** [1] - 5320:17
**employed** [2] -
5239:6, 5291:9
**employees** [2] -
5170:16, 5170:19
**employer** [1] -
5133:25
**employment** [3] -
5132:23, 5133:15,
5134:19
**empty** [1] - 5161:4
**enable** [1] - 5319:5
**enabled** [1] - 5228:8
**encompassing** [1] -
5336:20

## E

**eager** [1] - 5129:9
**early** [8] - 5115:2,
5120:10, 5120:12,
5143:7, 5209:1,
5209:14, 5327:4,
5328:3

*5355*

**end** [32] - 5118:11, 5119:1, 5120:3, 5120:8, 5120:11, 5120:24, 5121:23, 5122:7, 5124:24, 5131:7, 5131:10, 5137:6, 5138:10, 5139:1, 5143:9, 5150:9, 5150:12, 5153:20, 5155:23, 5157:19, 5162:6, 5213:7, 5216:15, 5221:11, 5272:25, 5273:19, 5312:23, 5316:16, 5316:21, 5321:16, 5326:1, 5330:18
**end-stage** [1] - 5122:7
**ended** [1] - 5241:12
**ends** [2] - 5134:14, 5157:20
**endured** [1] - 5133:2
**enforcement** [7] - 5203:1, 5203:10, 5203:17, 5204:7, 5205:5, 5216:6, 5216:20
**engagement** [1] - 5179:18
**engagements** [1] - 5209:1
**engaging** [1] - 5204:8
**engineering** [1] - 5218:6
**Enoteca** [2] - 5180:20, 5184:6
**ensure** [3] - 5138:19, 5148:7, 5190:16
**enter** [1] - 5191:20
**entered** [1] - 5228:13
**enters** [3] - 5160:21, 5182:19, 5290:4
**entire** [9] - 5119:7, 5140:12, 5151:14, 5210:5, 5216:8, 5216:12, 5272:19, 5279:13, 5279:14
**entirely** [2] - 5172:5, 5286:16
**entitled** [1] - 5343:5
**entries** [1] - 5233:9
**entry** [1] - 5186:7
**Enumeration** [1] - 5229:16
**environmental** [1] - 5218:9
**Eric** [1] - 5163:25
**erred** [2] - 5251:16, 5301:3
**especially** [1] - 5159:5

**ESQUIRE** [7] - 5112:14, 5112:15, 5112:15, 5112:16, 5112:19, 5112:19, 5112:20
**essential** [2] - 5216:11, 5249:16
**essentially** [10] - 5123:23, 5198:13, 5199:19, 5200:12, 5226:14, 5228:2, 5247:23, 5250:4, 5250:8, 5334:13
**establishes** [1] - 5262:6
**establishing** [1] - 5172:15
**estimate** [9] - 5215:22, 5217:4, 5245:25, 5246:12, 5254:1, 5254:2, 5319:10, 5319:12, 5319:16
**estimates** [12] - 5253:13, 5300:25, 5307:21, 5308:16, 5309:13, 5312:24, 5313:2, 5318:2, 5319:14, 5323:1, 5323:6, 5323:18
**estimating** [1] - 5322:3
**estimation** [1] - 5319:7
**estimations** [3] - 5308:11, 5316:10, 5319:6
**et** [2] - 5112:3, 5234:14
**evaluate** [1] - 5291:10
**evaluation** [1] - 5193:23
**Evans** [5] - 5165:6, 5334:12, 5334:22, 5339:7, 5339:8
**event** [17] - 5179:12, 5183:19, 5224:14, 5225:19, 5228:19, 5239:24, 5240:2, 5240:7, 5240:25, 5241:8, 5243:12, 5244:19, 5263:2, 5263:20, 5264:3, 5264:25, 5272:9
**events** [32] - 5175:4, 5175:6, 5175:8, 5175:10, 5177:2, 5183:4, 5183:14, 5183:15, 5192:4, 5192:10, 5196:17, 5198:17, 5224:16,

5228:15, 5228:16, 5228:19, 5228:24, 5233:6, 5233:9, 5233:21, 5234:1, 5234:7, 5236:8, 5237:3, 5237:7, 5238:5, 5238:14, 5238:21, 5248:7, 5248:11, 5263:13
**evidence** [42] - 5113:9, 5113:10, 5113:11, 5113:12, 5113:13, 5113:14, 5113:15, 5113:16, 5113:17, 5113:18, 5113:19, 5117:10, 5118:4, 5119:18, 5139:23, 5139:24, 5140:1, 5149:14, 5150:7, 5150:10, 5150:24, 5151:5, 5151:22, 5154:6, 5156:19, 5165:10, 5171:19, 5173:21, 5186:15, 5202:17, 5206:15, 5223:19, 5224:22, 5224:23, 5224:24, 5224:25, 5225:1, 5225:2, 5225:3, 5225:4, 5281:17, 5321:22
**evident** [1] - 5276:1
**evolving** [1] - 5216:9
**exact** [1] - 5267:2
**exactly** [7] - 5121:5, 5210:2, 5227:5, 5235:16, 5322:7, 5332:20, 5336:9
**EXAMINATION** [9] - 5113:4, 5113:5, 5113:6, 5113:6, 5162:2, 5208:20, 5212:18, 5256:3, 5306:5
**examination** [7] - 5120:24, 5124:21, 5161:17, 5256:24, 5305:1, 5339:5, 5339:11
**EXAMINATIONS** [1] - 5113:3
**examine** [2] - 5231:21, 5237:12
**examining** [1] - 5201:13
**example** [16] - 5145:24, 5201:4, 5210:21, 5215:19, 5243:24, 5260:1, 5260:6, 5265:20,

5268:8, 5273:17, 5278:21, 5279:1, 5279:2, 5295:15, 5300:6, 5325:2
**exams** [1] - 5218:11
**except** [3] - 5166:22, 5285:7, 5295:5
**exceptional** [1] - 5116:2
**excess** [1] - 5215:20
**exchanged** [1] - 5220:19
**exclude** [2] - 5251:23, 5332:22
**exclusively** [1] - 5214:4
**excuse** [9] - 5115:22, 5117:23, 5120:16, 5121:6, 5133:17, 5138:12, 5140:14, 5150:18, 5324:24
**excused** [14] - 5115:15, 5116:19, 5117:15, 5118:1, 5120:20, 5131:7, 5132:20, 5136:10, 5140:13, 5160:25, 5211:24, 5326:14, 5330:4, 5331:9
**excusing** [1] - 5159:21
**exercise** [5] - 5150:4, 5262:22, 5306:20, 5306:25, 5307:16
**exhibit** [5] - 5162:25, 5165:7, 5165:16, 5173:12, 5179:16
**Exhibit** [39] - 5113:8, 5113:9, 5113:10, 5113:11, 5113:12, 5113:13, 5113:14, 5113:15, 5113:15, 5113:16, 5113:17, 5113:18, 5163:3, 5163:20, 5165:10, 5173:12, 5173:21, 5173:23, 5186:14, 5193:14, 5223:24, 5224:10, 5224:11, 5224:12, 5224:13, 5224:15, 5224:16, 5224:17, 5224:22, 5224:23, 5224:24, 5224:25, 5225:1, 5225:2, 5225:3, 5225:4, 5281:17, 5295:24
**exhibits** [1] - 5224:19
**exist** [1] - 5267:14
**existing** [1] - 5243:1

**expanded** [2] - 5209:16, 5241:23
**expect** [7] - 5261:18, 5279:17, 5294:22, 5320:4, 5321:11, 5322:17, 5325:25
**expectation** [1] - 5123:22
**expected** [1] - 5128:15
**expense** [3] - 5149:4, 5149:19, 5152:14
**expenses** [1] - 5224:14
**experience** [7] - 5136:3, 5136:4, 5163:13, 5209:4, 5228:6, 5254:7, 5320:23
**experienced** [2] - 5209:25, 5210:1
**expert** [28] - 5123:21, 5150:6, 5154:14, 5212:25, 5214:4, 5218:20, 5231:6, 5235:24, 5247:8, 5251:7, 5254:12, 5254:13, 5261:15, 5261:18, 5272:3, 5273:6, 5274:24, 5298:5, 5310:13, 5314:6, 5314:12, 5317:9, 5317:24, 5319:19, 5320:20, 5339:15
**expertise** [3] - 5212:22, 5213:12, 5213:17
**experts** [9] - 5119:24, 5137:20, 5219:9, 5275:15, 5310:25, 5313:3, 5321:4, 5321:9, 5336:20
**explain** [2] - 5213:25, 5225:13
**explaining** [1] - 5190:20
**explanation** [1] - 5300:10
**explicitly** [6] - 5275:25, 5276:2, 5293:22, 5295:5, 5303:22
**exploring** [1] - 5216:11
**express** [1] - 5148:9
**expressed** [2] - 5135:20, 5232:13
**extend** [1] - 5159:4
**extended** [1] - 5153:6
**extent** [1] - 5283:6

**extra** [2] - 5153:6, 5289:24
**extraordinary** [5] - 5122:17, 5124:5, 5124:16, 5140:15, 5140:21
**extrapolate** [1] - 5228:8
**extrapolated** [1] - 5228:3
**extrapolation** [3] - 5305:18, 5305:21, 5319:10
**extrapolations** [1] - 5323:9
**extremely** [2] - 5228:2, 5319:15

## F

**face** [2] - 5115:23, 5149:24
**fact** [25] - 5118:13, 5120:25, 5123:7, 5124:8, 5130:13, 5140:9, 5158:24, 5159:16, 5166:17, 5187:23, 5204:6, 5207:23, 5208:11, 5210:15, 5296:10, 5306:23, 5310:24, 5313:15, 5317:15, 5321:4, 5324:1, 5332:7, 5333:13, 5337:3, 5338:5
**factions** [1] - 5152:25
**factors** [1] - 5303:4
**facts** [3] - 5138:24, 5139:6, 5159:19
**fair** [52] - 5137:12, 5139:15, 5139:16, 5157:13, 5166:20, 5168:15, 5183:25, 5184:1, 5185:24, 5188:20, 5193:3, 5193:4, 5193:15, 5193:19, 5193:20, 5196:12, 5198:4, 5198:5, 5200:3, 5200:14, 5200:15, 5200:23, 5200:24, 5201:24, 5201:25, 5203:11, 5203:12, 5205:18, 5205:22, 5205:25, 5206:12, 5206:24, 5206:25, 5208:2, 5208:8, 5215:10, 5216:25, 5235:22, 5255:2, 5258:3, 5258:24,

5264:10, 5273:14, 5283:17, 5292:15, 5316:24, 5320:3, 5321:1, 5321:20, 5323:4, 5325:24, 5337:13
**fairly** [6] - 5139:3, 5211:9, 5215:19, 5232:7, 5292:6, 5338:11
**fairness** [1] - 5206:22
**False** [14] - 5213:1, 5213:20, 5214:1, 5216:7, 5218:21, 5221:18, 5240:15, 5256:20, 5310:20, 5311:4, 5313:3, 5321:13, 5334:14, 5336:7
**familiar** [7] - 5266:11, 5266:16, 5269:14, 5269:23, 5281:21, 5304:2, 5324:5
**family** [4] - 5122:18, 5136:10, 5145:21, 5211:16
**far** [4] - 5206:15, 5281:11, 5297:1, 5319:12
**fashion** [1] - 5238:24
**fast** [2] - 5223:6, 5249:21
**father** [1] - 5132:2
**favor** [3] - 5316:22, 5340:1, 5340:8
**FCA** [1] - 5335:20
**FDA** [2] - 5203:17, 5237:25
**feasible** [1] - 5115:14
**February** [1] - 5180:18
**federal** [9] - 5122:18, 5189:6, 5189:9, 5205:6, 5214:2, 5217:17, 5225:15, 5253:2, 5299:9
**FEDERAL** [1] - 5343:1
**fee** [1] - 5183:20
**feedback** [2] - 5220:20, 5239:18
**fees** [2] - 5187:3, 5273:22
**fellow** [4] - 5131:9, 5153:12, 5157:4, 5219:15
**felt** [1] - 5207:20
**fender** [1] - 5140:11
**fender-bender** [1] - 5140:11
**ferry** [1] - 5133:21
**few** [8] - 5125:25,

5136:7, 5160:8, 5167:23, 5174:10, 5198:7, 5289:24, 5306:15
**fewer** [4] - 5232:7, 5316:14, 5316:19, 5316:21
**field** [10] - 5175:23, 5190:24, 5191:4, 5216:5, 5216:16, 5231:14, 5231:20, 5285:7, 5285:8, 5313:3
**fields** [3] - 5232:7, 5232:16, 5232:18
**figure** [14] - 5115:7, 5156:21, 5182:8, 5211:18, 5214:11, 5233:1, 5233:23, 5251:23, 5252:12, 5295:7, 5311:23, 5321:17, 5342:4
**file** [5] - 5228:16, 5228:18, 5320:21, 5320:25, 5340:19
**files** [1] - 5341:18
**fill** [1] - 5300:11
**filter** [1] - 5261:17
**filtered** [2] - 5268:7, 5293:18
**filtering** [15] - 5214:21, 5262:9, 5265:2, 5266:21, 5271:6, 5271:23, 5275:13, 5275:16, 5275:20, 5275:23, 5275:24, 5278:14, 5278:18, 5279:3, 5279:4
**filterings** [1] - 5262:15
**final** [4] - 5119:24, 5289:8, 5291:7, 5297:18
**finally** [4] - 5253:25, 5298:22, 5309:7, 5329:5
**financial** [2] - 5334:13, 5334:19
**fine** [12] - 5118:25, 5128:11, 5130:3, 5147:1, 5161:9, 5172:21, 5186:13, 5192:8, 5296:2, 5336:17
**finish** [2] - 5154:22, 5290:12
**finished** [1] - 5120:12
**firm** [2] - 5247:8, 5280:19
**first** [57] - 5114:8,

5115:4, 5118:15, 5125:24, 5135:18, 5136:21, 5150:15, 5154:4, 5155:1, 5164:21, 5171:1, 5172:15, 5177:6, 5177:7, 5183:5, 5197:8, 5199:23, 5200:1, 5222:10, 5231:10, 5231:11, 5234:24, 5234:25, 5235:1, 5237:18, 5239:23, 5240:2, 5240:6, 5240:7, 5240:20, 5240:21, 5240:22, 5240:23, 5240:24, 5241:3, 5241:6, 5241:14, 5242:6, 5242:8, 5243:8, 5243:11, 5250:4, 5251:14, 5251:24, 5252:23, 5257:19, 5270:22, 5271:4, 5271:10, 5278:6, 5316:7, 5318:5, 5326:24, 5330:7, 5331:15
**Fish** [1] - 5185:15
**Fisher** [1] - 5112:8
**Five** [1] - 5127:6
**five** [26] - 5116:19, 5117:2, 5117:4, 5117:5, 5117:9, 5117:14, 5118:5, 5121:21, 5124:1, 5135:11, 5135:21, 5136:5, 5136:17, 5139:15, 5139:23, 5206:18, 5208:22, 5249:24, 5250:5, 5310:25, 5311:6, 5314:15, 5327:6, 5330:9, 5330:23
**five-and-a-half** [1] - 5135:21
**five-and-a-half-week** [1] - 5330:23
**fix** [1] - 5317:8
**flag** [1] - 5231:17
**flesh** [1] - 5241:14
**flew** [1] - 5314:14
**flexible** [1] - 5278:17
**flight** [3] - 5126:19, 5146:17, 5146:18
**FLOM** [1] - 5112:18
**Florida** [3] - 5184:21, 5184:22, 5293:6
**flown** [1] - 5186:7
**flu** [1] - 5140:8
**flying** [2] - 5144:19,

5190:3
**focus** [4] - 5132:25, 5256:18, 5325:9, 5341:24
**focused** [2] - 5187:17, 5188:5
**focusing** [2] - 5178:12, 5212:25
**folks** [35] - 5114:5, 5115:1, 5133:17, 5137:9, 5142:7, 5143:5, 5151:20, 5152:4, 5152:24, 5156:17, 5157:4, 5157:21, 5159:24, 5160:10, 5160:22, 5168:7, 5173:6, 5178:1, 5178:3, 5182:20, 5222:23, 5264:20, 5273:11, 5283:5, 5289:20, 5290:5, 5299:4, 5304:5, 5304:6, 5327:6, 5330:2, 5331:3, 5331:10, 5340:12, 5342:13
**followed** [1] - 5300:8
**following** [4] - 5132:25, 5149:1, 5288:23, 5330:20
**FOLLOWS** [1] - 5212:10
**FOR** [1] - 5112:1
**forbid** [1] - 5132:3
**force** [1] - 5248:17
**forecast** [1] - 5158:16
**foregoing** [1] - 5343:4
**foresight** [1] - 5137:13
**forget** [1] - 5129:6
**forgo** [1] - 5125:22
**forgot** [1] - 5129:12
**forgotten** [1] - 5129:7
**form** [7] - 5172:6, 5226:14, 5227:15, 5248:8, 5248:19, 5254:7, 5311:17
**formed** [2] - 5152:23, 5231:16
**formula** [1] - 5339:19
**forward** [3] - 5121:7, 5147:19, 5152:17
**foundation** [8] - 5169:17, 5170:15, 5171:6, 5171:7, 5171:10, 5171:11, 5172:1, 5172:15
**foundational** [1] - 5171:24
**four** [17] - 5136:5, 5136:12, 5156:12,

5176:13, 5177:23, 5186:19, 5187:2, 5192:9, 5245:11, 5249:23, 5249:24, 5250:5, 5250:17, 5266:9, 5266:11, 5266:16, 5337:22
**fourth** [2] - 5114:15, 5164:11
**fraction** [2] - 5335:14, 5335:17
**frame** [6] - 5183:5, 5205:4, 5236:15, 5237:13, 5238:3, 5327:18
**frames** [2] - 5237:11, 5237:12
**Francisco** [1] - 5185:5
**Frank** [1] - 5163:24
**frankly** [1] - 5141:15
**fraud** [7] - 5213:2, 5213:17, 5214:1, 5214:12, 5216:24, 5217:19, 5218:21
**fraud-related** [1] - 5216:24
**frequency** [3] - 5211:10, 5231:19, 5311:5
**frequent** [1] - 5145:12
**frequently** [4] - 5186:22, 5209:6, 5209:12, 5325:21
**fricke** [1] - 5133:10
**Fricke** [5] - 5116:12, 5130:17, 5132:17, 5134:6, 5134:12
**Friday** [6] - 5149:7, 5155:1, 5155:23, 5223:4, 5330:24, 5331:1
**Fridays** [7] - 5149:12, 5149:13, 5149:16, 5153:6, 5153:7, 5153:9, 5154:4
**friend** [1] - 5211:16
**friendly** [6] - 5238:9, 5266:14, 5267:8, 5267:9, 5268:9, 5268:21
**front** [7] - 5119:19, 5163:19, 5169:20, 5170:25, 5332:21, 5333:15, 5337:2
**frustrated** [1] - 5145:21
**full** [3] - 5146:1, 5247:24, 5327:12
**function** [3] - 5195:2, 5335:19, 5335:20

**fundamental** [1] - 5262:15
**funded** [2] - 5225:15, 5299:9
**funding** [2] - 5253:4, 5303:24
**future** [1] - 5317:18
**Fuzeon** [2] - 5164:12, 5164:19

# G

**gained** [1] - 5117:21
**gallery** [1] - 5129:13
**gap** [1] - 5300:11
**gap-fill** [1] - 5300:11
**gaps** [4] - 5306:18, 5308:8, 5308:10, 5312:24
**gather** [2] - 5221:21, 5223:15
**gathered** [7] - 5228:21, 5228:23, 5229:2, 5230:8, 5230:20, 5241:9, 5306:19
**gears** [1] - 5212:2
**gender** [1] - 5292:21
**general** [9] - 5206:4, 5208:15, 5211:15, 5214:6, 5230:7, 5251:22, 5264:7, 5273:15, 5295:20
**generally** [6] - 5163:12, 5168:11, 5198:11, 5219:2, 5283:23, 5284:6
**generated** [1] - 5194:13
**gentleman** [1] - 5122:21
**genuine** [1] - 5150:22
**Geoff** [1] - 5114:22
**GEOFFREY** [1] - 5112:19
**geography** [3] - 5292:24, 5293:8, 5293:19
**Georgia** [2] - 5180:24, 5185:6
**gigantic** [3] - 5337:15, 5337:16, 5337:21
**Gilead** [5] - 5199:10, 5199:13, 5200:7, 5205:9, 5205:12, 5205:15
**given** [17] - 5120:11, 5153:8, 5178:21, 5196:23, 5198:16, 5198:23, 5203:8,

5203:22, 5205:10, 5227:24, 5262:10, 5265:7, 5265:11, 5269:10, 5269:15, 5323:24, 5325:2
**glad** [1] - 5148:1
**glass** [1] - 5249:11
**Glatt** [16] - 5220:14, 5220:17, 5220:22, 5239:2, 5239:3, 5239:4, 5239:9, 5239:12, 5243:16, 5279:24, 5280:3, 5280:7, 5281:9, 5282:22, 5317:3, 5317:5
**GlaxoSmithKlein** [2] - 5198:23, 5204:7
**glorify** [1] - 5322:5
**God** [1] - 5132:3
**gotcha** [1] - 5261:25
**Government** [1] - 5215:13
**government** [36] - 5189:6, 5189:9, 5202:11, 5203:2, 5204:7, 5205:6, 5214:2, 5215:5, 5215:6, 5215:14, 5215:15, 5215:25, 5216:14, 5216:20, 5217:17, 5219:6, 5221:24, 5225:15, 5244:23, 5255:6, 5257:1, 5257:5, 5257:10, 5284:11, 5294:4, 5294:8, 5294:11, 5294:14, 5295:1, 5299:9, 5307:2, 5307:9, 5313:10, 5321:19, 5322:9, 5322:22
**Governments** [2] - 5225:16, 5253:3
**grab** [1] - 5174:18
**Grand** [1] - 5185:18
**grandchildren** [1] - 5151:17
**great** [3] - 5290:16, 5340:4, 5340:11
**greater** [3] - 5124:3, 5149:3, 5248:22
**greatest** [1] - 5125:19
**Greenwich** [4] - 5176:21, 5178:20, 5178:21, 5180:18
**grounds** [1] - 5169:17
**group** [8] - 5139:14, 5145:14, 5157:2, 5157:21, 5276:20,

5276:25, 5295:6, 5324:16
**Group** [2] - 5180:19, 5247:7
**GSK** [2] - 5198:23, 5204:6
**guess** [11] - 5117:6, 5131:14, 5132:5, 5132:11, 5142:10, 5162:21, 5191:22, 5206:5, 5210:3, 5239:6, 5263:10
**guys** [8] - 5129:2, 5137:19, 5138:16, 5169:19, 5181:16, 5327:21, 5338:6

# H

**half** [33] - 5115:18, 5116:16, 5116:18, 5117:21, 5117:22, 5117:24, 5119:20, 5120:7, 5123:24, 5124:1, 5135:21, 5136:5, 5136:17, 5139:15, 5139:19, 5140:3, 5141:1, 5141:11, 5141:16, 5153:21, 5153:22, 5154:18, 5155:20, 5183:5, 5186:1, 5252:14, 5253:10, 5267:11, 5321:24, 5328:12, 5329:8, 5330:9, 5330:23
**half-day** [2] - 5139:15, 5140:3, 5153:21
**halfway** [2] - 5142:20, 5330:21
**hand** [1] - 5129:19
**hands** [2] - 5152:7, 5152:9
**happy** [1] - 5126:12
**hard** [2] - 5177:14, 5178:14
**hardly** [1] - 5249:25
**hate** [3] - 5132:1, 5133:8, 5136:5
**HAVING** [1] - 5212:9
**Hawaii** [9] - 5186:8, 5186:18, 5186:22, 5186:23, 5187:2, 5191:15, 5192:1, 5209:14
**head** [2] - 5217:10, 5259:14
**heads** [3] - 5129:23, 5129:25, 5134:18
**heads-up** [3] -

5129:23, 5129:25, 5134:18
**Health** [2] - 5284:20, 5284:22
**health** [30] - 5213:1, 5213:2, 5213:13, 5213:17, 5214:1, 5215:7, 5216:14, 5216:23, 5217:23, 5218:21, 5219:7, 5219:17, 5221:24, 5229:7, 5229:9, 5229:20, 5229:22, 5229:23, 5233:12, 5236:14, 5242:24, 5248:3, 5248:6, 5248:10, 5251:25, 5252:6, 5267:4, 5284:18, 5289:11, 5307:2
**hear** [32] - 5114:8, 5114:19, 5115:19, 5116:3, 5120:13, 5130:17, 5130:19, 5139:25, 5141:20, 5141:24, 5142:3, 5142:16, 5143:2, 5143:6, 5143:24, 5149:14, 5161:19, 5172:8, 5172:18, 5178:4, 5181:18, 5183:1, 5201:7, 5213:6, 5246:4, 5314:12, 5322:20, 5333:20, 5334:9, 5335:1, 5335:4
**heard** [10] - 5134:16, 5167:20, 5177:18, 5204:10, 5256:24, 5313:22, 5317:2, 5317:6, 5325:14, 5339:5
**hearing** [8] - 5139:23, 5144:23, 5150:15, 5177:14, 5178:1, 5178:11, 5261:4, 5317:5
**heck** [1] - 5154:4
**held** [1] - 5114:1
**helped** [2] - 5233:21
**helping** [1] - 5214:7
**helps** [1] - 5230:2
**herself** [1] - 5241:6
**hi** [2] - 5130:19, 5208:21
**high** [5] - 5207:16, 5216:9, 5249:19, 5282:18
**high-performance** [2] - 5216:9, 5249:19

**higher** [2] - 5251:12, 5275:13
**highest** [3] - 5164:11, 5189:15, 5206:19
**highlight** [1] - 5157:25
**highlighted** [1] - 5179:22
**highlights** [1] - 5209:23
**hill** [4] - 5153:18, 5155:6, 5158:4, 5158:7
**himself** [1] - 5127:11
**hired** [9] - 5219:9, 5219:14, 5254:12, 5256:25, 5257:4, 5257:14, 5264:20, 5280:16, 5281:11
**history** [1] - 5204:13
**hit** [3] - 5289:20, 5289:21, 5334:23
**hitting** [2] - 5327:6, 5330:9
**HIV** [11] - 5164:25, 5167:18, 5167:20, 5189:15, 5227:21, 5255:1, 5292:5, 5303:21, 5304:15, 5318:22
**hobnobbing** [1] - 5330:2
**hold** [2] - 5177:25, 5181:16
**holds** [1] - 5284:25
**hole** [1] - 5303:3
**home** [3] - 5142:15, 5151:15, 5289:21
**honest** [1] - 5123:7
**honestly** [1] - 5273:24
**Honolulu** [11] - 5177:10, 5177:12, 5177:17, 5177:19, 5179:3, 5186:8, 5186:18, 5187:2, 5191:16, 5192:9, 5193:1
**Honor** [119] - 5114:9, 5114:17, 5114:20, 5114:22, 5114:24, 5116:4, 5116:17, 5116:24, 5117:3, 5117:20, 5118:16, 5118:25, 5119:10, 5119:25, 5120:14, 5121:22, 5122:14, 5122:24, 5123:25, 5124:10, 5124:23, 5125:13, 5125:19, 5126:17, 5127:14, 5127:16, 5127:17,

5128:17, 5128:19, 5129:1, 5129:4, 5129:12, 5130:9, 5134:22, 5134:25, 5135:8, 5135:25, 5137:4, 5137:12, 5138:7, 5139:11, 5140:18, 5141:7, 5141:17, 5141:23, 5143:1, 5143:4, 5143:13, 5146:10, 5147:18, 5147:22, 5150:1, 5150:20, 5152:3, 5152:13, 5153:13, 5153:17, 5154:11, 5154:21, 5155:2, 5155:24, 5157:8, 5158:9, 5160:6, 5160:14, 5161:18, 5162:1, 5165:5, 5165:8, 5169:13, 5169:14, 5169:17, 5170:1, 5170:6, 5170:9, 5170:13, 5170:23, 5172:6, 5173:16, 5173:18, 5181:24, 5182:24, 5212:6, 5212:17, 5223:2, 5223:24, 5224:3, 5224:9, 5224:21, 5255:15, 5255:21, 5289:19, 5295:22, 5306:3, 5306:11, 5324:20, 5326:11, 5327:2, 5328:9, 5328:20, 5331:13, 5331:24, 5332:2, 5332:7, 5332:9, 5332:14, 5333:11, 5333:17, 5334:10, 5334:16, 5337:1, 5337:10, 5338:4, 5338:15, 5340:11, 5340:14, 5342:1, 5342:15, 5342:16
**Honor's** [1] - 5137:13
**HONORABLE** [1] - 5112:11
**Honorable** [1] - 5114:1
**honoraria** [1] - 5169:7
**hope** [8] - 5139:25, 5141:17, 5150:3, 5188:21, 5210:8, 5211:14, 5290:14
**hopefully** [3] - 5120:24, 5182:21, 5213:6
**Hopkins** [1] - 5218:10

**hospice** [1] - 5122:4
**hospital** [2] - 5131:25, 5132:5
**hotel** [1] - 5192:16
**hour** [9] - 5121:7, 5127:12, 5128:16, 5134:8, 5151:13, 5258:14, 5289:22, 5329:7, 5329:8
**hourly** [1] - 5258:8
**hours** [12] - 5132:10, 5154:20, 5181:15, 5258:19, 5259:8, 5259:10, 5259:14, 5327:2, 5328:10, 5328:11, 5328:12, 5328:16
**House** [6] - 5176:21, 5178:20, 5178:21, 5180:18, 5186:9, 5191:16
**HRSA** [1] - 5284:18
**Hsu** [89] - 5119:23, 5120:23, 5121:14, 5121:15, 5121:24, 5122:3, 5122:10, 5122:17, 5124:3, 5124:19, 5125:11, 5125:24, 5125:25, 5126:25, 5127:11, 5127:17, 5127:18, 5128:6, 5128:15, 5129:21, 5129:25, 5130:13, 5135:2, 5141:21, 5142:3, 5142:8, 5142:16, 5143:2, 5143:16, 5143:23, 5146:15, 5147:13, 5147:15, 5148:2, 5154:13, 5155:4, 5155:10, 5155:17, 5160:11, 5161:19, 5162:3, 5162:6, 5163:9, 5168:10, 5168:19, 5170:3, 5172:3, 5173:11, 5174:9, 5174:11, 5175:7, 5177:5, 5177:14, 5178:1, 5178:9, 5180:9, 5181:18, 5181:23, 5182:1, 5183:1, 5183:3, 5187:9, 5187:22, 5188:17, 5189:20, 5191:12, 5192:2, 5192:8, 5193:15, 5194:5, 5197:7, 5197:25, 5198:7, 5200:10, 5201:7,

5202:6, 5205:25, 5206:8, 5207:21, 5208:16, 5208:21, 5208:25, 5209:15, 5210:4, 5210:15, 5211:12, 5211:21, 5211:24
**HSU** [1] - 5113:4
**Hsu's** [7] - 5124:20, 5125:2, 5125:6, 5125:21, 5126:14, 5138:14, 5146:9
**huge** [2] - 5121:2, 5318:15
**Human** [2] - 5284:20, 5284:22
**human** [3] - 5131:13, 5131:18, 5134:19
**hundred** [6] - 5232:16, 5232:18, 5274:9, 5300:7, 5315:5, 5320:8
**hundreds** [2] - 5232:21, 5315:4
**hurt** [1] - 5326:24
**hurts** [1] - 5157:1
**hygienist** [1] - 5229:11
**hyperglycemia** [3] - 5282:17, 5283:9

---

### I

**IAN** [2] - 5113:5, 5212:9
**Ian** [4] - 5154:13, 5155:9, 5212:7, 5212:13
**ICD-10** [2] - 5281:2, 5282:9
**ICD-9** [3] - 5230:12, 5281:2, 5282:5
**ICU** [1] - 5131:25
**ID** [2] - 5180:19, 5252:7
**idea** [12] - 5137:24, 5138:7, 5138:9, 5151:22, 5171:20, 5179:3, 5215:17, 5232:3, 5281:10, 5287:17, 5299:25, 5341:12
**ideal** [1] - 5299:23
**identification** [2] - 5233:17, 5252:8
**identified** [1] - 5243:1
**identifier** [1] - 5252:15
**Identifier** [3] - 5229:17, 5233:14, 5234:8

**identifiers** [2] - 5229:20, 5234:20
**identifies** [1] - 5252:3
**identify** [17] - 5214:23, 5219:6, 5220:25, 5227:2, 5230:2, 5230:16, 5233:16, 5235:12, 5243:4, 5248:7, 5248:18, 5252:5, 5278:2, 5294:25, 5309:13, 5316:7, 5316:13
**identifying** [2] - 5276:17, 5281:5
**identities** [1] - 5233:2
**IDs** [7] - 5228:19, 5229:24, 5233:7, 5233:12, 5233:19, 5233:20, 5295:7
**ignoring** [1] - 5157:11
**ill** [1] - 5140:4
**impact** [5] - 5142:14, 5147:14, 5196:3, 5275:10, 5279:8
**impacts** [2] - 5155:4, 5155:11
**impair** [1] - 5132:25
**impaired** [1] - 5187:25
**implementation** [1] - 5278:11
**implemented** [1] - 5277:11
**implementing** [1] - 5251:17
**important** [7] - 5151:6, 5158:20, 5209:21, 5210:14, 5264:9, 5264:11, 5340:24
**impossible** [1] - 5145:24
**impression** [1] - 5155:7
**in-law** [2] - 5122:4, 5124:18
**in-processing** [2] - 5231:13, 5297:7
**inappropriate** [1] - 5210:19
**inclination** [1] - 5115:21
**inclined** [3] - 5116:7, 5125:20, 5139:4
**include** [6] - 5209:16, 5237:6, 5248:1, 5282:9, 5285:5, 5316:6
**included** [7] - 5197:19, 5226:2, 5272:10, 5291:17,

5294:10, 5294:19, 5301:17
**includes** [3] - 5226:23, 5274:4, 5282:12
**including** [13] - 5133:14, 5142:19, 5149:13, 5182:12, 5189:15, 5189:16, 5198:2, 5206:19, 5222:11, 5222:13, 5225:25, 5271:2, 5294:8
**inclusive** [1] - 5169:8
**income** [2] - 5225:14, 5303:20
**incomplete** [5] - 5124:21, 5301:9, 5301:17, 5301:20, 5302:4
**inconvenience** [1] - 5152:14
**incorporate** [1] - 5293:25
**incorporated** [1] - 5325:12
**incorrect** [1] - 5253:17
**increase** [9] - 5195:7, 5196:16, 5196:20, 5199:20, 5250:6, 5251:10, 5313:8, 5313:11, 5335:10
**increased** [5] - 5196:22, 5196:25, 5211:8, 5258:11, 5320:12
**increases** [2] - 5311:12, 5320:8
**increasing** [1] - 5277:12
**incredibly** [2] - 5145:20
**incremental** [1] - 5195:7
**indeed** [2] - 5181:13, 5181:14
**independent** [3] - 5159:16, 5274:11, 5297:9
**indicated** [2] - 5126:5, 5153:5
**indicates** [1] - 5252:17
**indicating** [1] - 5136:24
**indication** [4] - 5148:20, 5209:9, 5210:2, 5210:10
**indications** [1] - 5209:24

**individual** [4] - 5232:18, 5262:3, 5290:23, 5290:24
**individually** [1] - 5249:11
**individuals** [2] - 5225:14, 5233:3
**induce** [3] - 5187:24, 5189:11, 5244:25
**induced** [2] - 5200:25, 5202:7
**inducement** [2] - 5200:21, 5201:22
**induces** [1] - 5190:17
**inducing** [2] - 5187:18, 5196:24
**induction** [1] - 5197:4
**industry** [3] - 5168:12, 5202:23, 5218:16
**industry's** [1] - 5204:13
**infectious** [1] - 5229:12
**influence** [1] - 5201:23
**influenced** [35] - 5188:18, 5190:24, 5191:4, 5248:2, 5248:3, 5259:21, 5262:16, 5262:21, 5263:5, 5263:9, 5263:10, 5263:15, 5264:2, 5264:7, 5264:8, 5264:16, 5264:21, 5264:23, 5265:2, 5265:7, 5266:2, 5270:11, 5270:20, 5270:21, 5271:2, 5271:13, 5276:13, 5289:12, 5312:8, 5315:13, 5315:16, 5315:20, 5315:21, 5316:1, 5316:4
**info** [1] - 5128:18
**inform** [1] - 5133:15
**information** [37] - 5116:11, 5116:12, 5123:6, 5123:10, 5126:2, 5128:23, 5135:4, 5141:21, 5149:8, 5189:19, 5220:19, 5220:22, 5229:25, 5230:20, 5232:4, 5232:11, 5232:24, 5239:2, 5239:4, 5239:9, 5243:16, 5248:12, 5250:25, 5251:6, 5251:19, 5252:5,

5262:1, 5282:6, 5285:5, 5288:24, 5300:13, 5300:17, 5300:21, 5302:11, 5305:3, 5309:4, 5341:7
**informed** [2] - 5214:13, 5303:14
**inhibitor** [2] - 5207:10, 5210:9
**inhibitors** [2] - 5210:22, 5210:23
**initial** [5] - 5117:16, 5117:18, 5253:15, 5270:7, 5283:9
**injured** [1] - 5119:6
**injuries** [1] - 5140:12
**inpatient** [2] - 5232:10, 5248:24
**input** [1] - 5276:21
**inputs** [1] - 5312:17
**insignificant** [1] - 5140:25
**insinuation** [1] - 5315:19
**instance** [17] - 5184:6, 5214:18, 5308:4, 5311:15, 5312:7, 5312:10, 5313:6, 5313:20, 5314:13, 5314:25, 5315:6, 5315:12, 5317:15, 5321:22, 5323:13, 5324:2
**instances** [4] - 5229:24, 5313:18, 5316:6, 5319:4
**instead** [1] - 5137:14
**instruct** [1] - 5283:5
**instructed** [7] - 5268:20, 5270:1, 5270:7, 5272:7, 5283:6, 5302:15, 5305:12
**instruction** [3] - 5265:6, 5286:1, 5291:19
**instructions** [13] - 5226:24, 5227:5, 5227:6, 5227:7, 5230:10, 5243:19, 5243:23, 5243:25, 5244:1, 5264:19, 5285:15, 5285:19, 5328:1
**insufficient** [2] - 5136:2, 5159:13
**insurance** [3] - 5294:20, 5294:23, 5295:1

**integrase** [2] - 5210:22, 5210:23
**Intelence** [56] - 5167:3, 5174:1, 5174:14, 5175:13, 5175:16, 5193:18, 5196:3, 5206:2, 5211:5, 5211:12, 5221:10, 5221:25, 5222:6, 5223:11, 5224:18, 5227:3, 5228:1, 5228:4, 5235:1, 5237:16, 5237:19, 5237:22, 5238:15, 5238:19, 5238:23, 5242:3, 5242:7, 5242:9, 5242:13, 5243:18, 5244:11, 5252:1, 5252:23, 5266:14, 5266:15, 5267:9, 5267:12, 5283:14, 5285:23, 5287:14, 5287:18, 5288:18, 5289:10, 5292:6, 5295:16, 5304:16, 5306:24, 5315:3, 5315:5, 5317:17, 5322:10, 5332:5
**intend** [1] - 5132:4
**intending** [1] - 5187:23
**intensive** [2] - 5132:6, 5132:8
**intent** [3] - 5187:19, 5188:6, 5188:12
**interact** [1] - 5220:18
**interactions** [1] - 5247:20
**interest** [2] - 5189:10, 5216:19
**interesting** [2] - 5150:13, 5177:9
**Interestingly** [1] - 5196:3
**internal** [3] - 5170:14, 5170:25, 5171:5
**International** [2] - 5230:13, 5281:2
**interpret** [1] - 5230:20
**interrupt** [1] - 5267:17
**intersection** [1] - 5297:25
**interval** [1] - 5319:14
**intervals** [1] - 5319:19
**intervene** [1] - 5214:8
**interview** [2] - 5341:16, 5341:17
**introduced** [2] - 5237:16

**introduction** [1] - 5238:18
**intuitive** [1] - 5279:11
**invested** [2] - 5193:9, 5194:21
**investigating** [1] - 5214:7
**investigation** [3] - 5214:11, 5341:13, 5341:14
**investment** [10] - 5162:12, 5162:19, 5162:22, 5193:8, 5193:10, 5193:17, 5193:24, 5194:19, 5196:10, 5198:3
**involve** [1] - 5310:19
**involved** [10] - 5123:16, 5213:25, 5215:22, 5216:8, 5216:23, 5217:24, 5232:14, 5255:6, 5268:8, 5280:12
**involves** [1] - 5223:8
**involving** [2] - 5213:1, 5213:2
**isolation** [1] - 5297:24
**issue** [59] - 5115:3, 5115:23, 5119:4, 5119:5, 5119:15, 5121:11, 5121:13, 5122:3, 5126:4, 5127:4, 5127:5, 5128:4, 5129:10, 5129:18, 5130:1, 5131:21, 5131:23, 5133:23, 5134:17, 5135:19, 5136:11, 5138:17, 5142:23, 5150:17, 5155:12, 5156:16, 5158:23, 5159:15, 5159:18, 5170:24, 5170:25, 5172:14, 5199:13, 5209:13, 5228:1, 5230:14, 5235:3, 5236:7, 5238:8, 5239:17, 5242:16, 5243:2, 5243:10, 5246:16, 5266:9, 5277:13, 5278:3, 5279:5, 5326:18, 5329:10, 5329:15, 5331:18, 5331:24, 5333:11, 5333:21, 5335:5, 5339:3, 5339:24, 5341:5
**issues** [18] - 5126:4, 5128:12, 5128:13, 5133:11, 5135:12,

5144:4, 5145:12, 5161:1, 5230:15, 5243:5, 5243:6, 5243:11, 5280:25, 5281:4, 5281:6, 5305:15, 5331:7, 5340:12
**IT** [1] - 5182:7
**item** [1] - 5179:6
**items** [4] - 5248:25, 5309:12, 5310:8, 5331:13
**itinerary** [1] - 5126:19
**itself** [3] - 5251:2, 5285:18, 5310:7
**IV** [1] - 5304:15

## J

**Janssen** [127] - 5114:19, 5114:21, 5114:23, 5114:25, 5160:4, 5160:10, 5162:13, 5162:18, 5163:10, 5164:12, 5165:2, 5165:14, 5166:6, 5166:17, 5167:4, 5169:5, 5169:25, 5170:5, 5170:12, 5170:16, 5170:18, 5170:19, 5170:25, 5173:24, 5175:1, 5175:21, 5177:4, 5177:13, 5177:17, 5178:24, 5179:3, 5183:19, 5188:11, 5192:16, 5192:25, 5193:7, 5193:16, 5194:10, 5194:19, 5195:2, 5195:6, 5195:19, 5196:9, 5198:2, 5198:8, 5198:14, 5201:12, 5202:19, 5205:19, 5206:1, 5206:9, 5206:16, 5207:12, 5208:11, 5210:16, 5211:4, 5219:4, 5223:9, 5224:17, 5224:18, 5228:23, 5229:2, 5233:4, 5233:5, 5233:21, 5233:24, 5233:25, 5235:20, 5236:9, 5236:17, 5240:25, 5241:7, 5241:23, 5242:9, 5259:22, 5260:20, 5263:20, 5264:14, 5268:19, 5270:8, 5270:9, 5270:22,

5271:10, 5271:19, 5272:9, 5272:24, 5276:13, 5277:9, 5289:12, 5302:9, 5306:23, 5307:9, 5309:14, 5310:10, 5310:24, 5312:11, 5312:19, 5313:10, 5315:2, 5315:5, 5315:16, 5315:21, 5316:2, 5316:3, 5316:4, 5316:16, 5316:22, 5317:16, 5317:17, 5320:1, 5320:12, 5321:18, 5321:25, 5322:8, 5322:21, 5325:11, 5330:17, 5330:20, 5332:3, 5333:1, 5333:7, 5334:14, 5334:22, 5336:18, 5338:12
**JANSSEN** [1] - 5112:6
**Janssen's** [22] - 5125:5, 5137:25, 5148:22, 5180:24, 5181:20, 5186:15, 5194:15, 5206:10, 5236:13, 5236:24, 5248:3, 5248:17, 5263:13, 5306:18, 5312:8, 5317:10, 5317:24, 5319:18, 5321:9, 5325:5, 5325:22, 5327:9
**Janssen-influenced** [1] - 5316:4
**January** [8] - 5176:14, 5176:21, 5209:15, 5221:10, 5237:19, 5242:4, 5269:7
**Jena** [6] - 5298:5, 5317:9, 5317:13, 5319:19, 5320:1, 5320:6
**JERSEY** [1] - 5112:1
**Jersey** [3] - 5112:9, 5299:18, 5299:24
**job** [4] - 5149:22, 5216:15, 5258:6, 5261:17
**Johns** [1] - 5218:10
**Johnson** [13] - 5166:3, 5174:7, 5174:11, 5174:19, 5179:16, 5180:4, 5191:23, 5192:20, 5194:4, 5202:20, 5219:17, 5280:20
**JOHNSON** [2] -

5112:6
**join** [1] - 5131:9
**joining** [1] - 5167:2
**jointly** [1] - 5225:15
**Josh** [1] - 5114:13
**JOSH** [1] - 5112:15
**judge** [7] - 5129:21, 5129:25, 5143:19, 5163:15, 5180:9, 5201:7, 5211:24
**Judge** [12] - 5114:2, 5130:4, 5130:17, 5130:19, 5136:14, 5143:23, 5154:18, 5157:17, 5181:17, 5255:25, 5329:1, 5339:23
**JUDGE** [1] - 5112:12
**judgment** [8] - 5152:5, 5187:25, 5188:25, 5200:22, 5201:23, 5211:13, 5264:14, 5266:1
**judicial** [2] - 5335:18, 5335:19
**July** [4] - 5176:14, 5186:7, 5192:1, 5192:2
**June** [1] - 5124:1
**JUROR** [14] - 5130:19, 5130:25, 5131:4, 5131:12, 5131:23, 5132:7, 5132:15, 5132:21, 5133:3, 5133:6, 5133:8, 5133:21, 5134:4, 5134:11
**Juror** [56] - 5115:3, 5115:15, 5115:25, 5117:6, 5117:7, 5117:12, 5117:25, 5119:2, 5120:15, 5120:20, 5120:21, 5121:9, 5122:12, 5125:20, 5125:21, 5126:2, 5126:4, 5126:9, 5126:13, 5126:24, 5127:6, 5128:22, 5129:23, 5130:12, 5130:16, 5136:9, 5137:19, 5137:21, 5137:25, 5138:8, 5138:12, 5138:21, 5138:25, 5139:4, 5142:17, 5142:18, 5148:21, 5149:18, 5152:18, 5152:24, 5152:25, 5156:10, 5156:14, 5156:22, 5157:2,

5158:1, 5158:2, 5158:23, 5159:1, 5159:9, 5159:17, 5159:21, 5159:24, 5160:24, 5161:3
**juror** [51] - 5115:22, 5116:18, 5117:13, 5117:23, 5118:4, 5118:21, 5119:2, 5120:16, 5121:5, 5121:11, 5121:12, 5121:20, 5122:19, 5123:8, 5126:5, 5128:7, 5131:11, 5132:14, 5133:5, 5133:14, 5134:18, 5135:6, 5135:9, 5135:11, 5136:8, 5136:18, 5136:22, 5137:20, 5138:23, 5140:2, 5140:13, 5140:14, 5140:17, 5141:10, 5141:14, 5149:4, 5150:5, 5152:14, 5153:12, 5153:14, 5155:12, 5155:15, 5155:22, 5156:5, 5158:12, 5159:15, 5159:18, 5159:19, 5161:2
**juror's** [4] - 5117:10, 5123:8, 5127:4, 5155:25
**jurors** [85] - 5115:15, 5115:16, 5116:22, 5118:7, 5118:8, 5118:14, 5121:4, 5122:25, 5131:9, 5135:11, 5135:16, 5135:21, 5136:2, 5136:4, 5136:6, 5136:12, 5136:15, 5136:16, 5136:24, 5136:25, 5137:8, 5138:10, 5138:17, 5138:20, 5139:1, 5139:7, 5139:14, 5139:24, 5141:6, 5142:13, 5143:8, 5147:24, 5148:6, 5148:7, 5148:11, 5148:13, 5148:15, 5148:20, 5148:23, 5149:4, 5149:5, 5149:12, 5149:14, 5149:18, 5149:19, 5149:23, 5150:3, 5150:8, 5151:6, 5151:12, 5151:19, 5152:1, 5152:8, 5152:14, 5152:20,

5153:3, 5156:2, 5156:9, 5156:21, 5157:3, 5157:9, 5157:10, 5157:12, 5158:19, 5159:3, 5159:8, 5159:13, 5160:9, 5160:23, 5161:10, 5174:11, 5178:4, 5178:11, 5182:10, 5182:14, 5182:22, 5289:23, 5326:23, 5327:10, 5329:9, 5329:13, 5331:8, 5335:19, 5336:5, 5336:11
**JURY** [1] - 5112:5
**jury** [61] - 5115:18, 5116:23, 5122:12, 5124:20, 5132:19, 5132:24, 5133:15, 5134:2, 5135:23, 5136:19, 5137:3, 5139:17, 5140:4, 5141:12, 5148:6, 5149:1, 5150:4, 5150:25, 5151:1, 5151:9, 5152:6, 5152:23, 5152:25, 5153:19, 5157:1, 5157:24, 5158:13, 5158:14, 5158:19, 5158:22, 5160:21, 5161:3, 5171:18, 5182:19, 5202:1, 5212:22, 5220:3, 5232:3, 5235:19, 5290:4, 5328:25, 5329:17, 5330:22, 5331:6, 5331:9, 5333:15, 5335:8, 5335:18, 5335:20, 5336:9, 5336:16, 5336:22, 5336:25, 5337:2, 5337:9, 5337:14, 5338:2, 5338:13, 5338:19, 5338:23, 5339:13
**justice** [2] - 5122:25, 5139:17
**Justice** [7] - 5204:3, 5214:5, 5216:7, 5217:4, 5256:25, 5257:5, 5257:10

## K

**Kaletra** [7] - 5164:18, 5201:5, 5207:8, 5207:11, 5207:14, 5207:15, 5210:10
**Kansas** [3] - 5179:7,

5181:11, 5184:10
**Kaucher** [4] - 5327:7, 5330:14, 5341:7, 5342:3
**keep** [12] - 5133:19, 5139:4, 5142:17, 5147:23, 5149:10, 5153:22, 5155:18, 5157:18, 5160:1, 5179:23, 5201:3, 5215:15
**key** [2] - 5190:10, 5221:23
**Kickback** [3] - 5156:20, 5221:18, 5239:21
**kickback** [7] - 5190:15, 5240:3, 5240:10, 5244:20, 5272:13, 5272:23, 5273:1
**kickbacks** [14] - 5188:3, 5202:25, 5203:18, 5204:3, 5204:8, 5205:3, 5205:12, 5205:16, 5211:4, 5244:14, 5244:25, 5307:10, 5311:9, 5321:24
**kicked** [1] - 5332:12
**Kim** [5] - 5130:14, 5131:15, 5131:16, 5161:14, 5182:4
**kind** [8] - 5131:23, 5135:6, 5250:12, 5257:1, 5269:4, 5279:3, 5293:8, 5299:12
**King** [1] - 5112:21
**Klein** [1] - 5114:24
**KLEIN** [2] - 5112:20, 5114:24
**knowing** [3] - 5136:17, 5142:19, 5287:21
**knowledge** [8] - 5172:16, 5214:22, 5217:23, 5254:6, 5287:21, 5304:9, 5304:14, 5322:18
**known** [1] - 5200:1
**knows** [1] - 5170:11

## L

**L.P** [1] - 5112:7
**label** [38] - 5203:19, 5204:8, 5204:23, 5205:3, 5209:5, 5209:16, 5209:21,

5221:19, 5236:6, 5238:4, 5238:12, 5238:17, 5238:19, 5238:24, 5240:15, 5240:17, 5241:24, 5242:12, 5242:19, 5266:19, 5267:3, 5267:13, 5270:13, 5271:3, 5307:10, 5310:20, 5311:9, 5311:19, 5312:9, 5312:10, 5312:19, 5315:8, 5317:16, 5321:23, 5325:3, 5325:10, 5325:22
**lack** [1] - 5135:23
**lacking** [1] - 5171:7
**land** [2] - 5144:20, 5145:6
**lands** [1] - 5146:18
**landscape** [2] - 5163:15, 5206:7
**language** [7] - 5250:12, 5250:13, 5250:15, 5250:16, 5250:21, 5250:22, 5264:5
**Lansing** [1] - 5185:15
**large** [19] - 5174:4, 5189:5, 5216:11, 5227:21, 5228:5, 5253:17, 5256:22, 5287:9, 5287:25, 5293:4, 5313:21, 5313:23, 5319:1, 5319:5, 5323:18, 5323:22, 5324:14, 5326:8
**larger** [3] - 5275:24, 5313:24, 5323:1
**largest** [2] - 5204:12, 5318:13
**last** [20] - 5121:2, 5157:16, 5166:22, 5170:1, 5170:2, 5173:8, 5177:7, 5206:23, 5208:3, 5210:21, 5212:12, 5212:13, 5216:22, 5246:4, 5289:22, 5327:13, 5327:15, 5327:20, 5337:22
**late** [3] - 5156:14, 5308:14, 5339:8
**latest** [1] - 5125:18
**launch** [1] - 5163:20
**law** [6] - 5122:4, 5124:18, 5125:18, 5280:19, 5313:21, 5313:23

**laws** [4] - 5187:16, 5188:1, 5188:23, 5190:14
**lawsuit** [3] - 5261:13, 5337:4, 5337:8
**lawyers** [29] - 5180:12, 5257:14, 5257:20, 5262:11, 5265:11, 5269:11, 5272:8, 5273:12, 5277:3, 5278:13, 5278:21, 5279:19, 5279:23, 5280:3, 5280:16, 5281:9, 5281:11, 5282:1, 5287:8, 5302:15, 5303:11, 5304:17, 5305:12, 5320:17, 5320:20, 5320:24, 5320:25
**lay** [2] - 5171:11, 5172:1
**lead** [1] - 5316:13
**leads** [1] - 5316:19
**learn** [1] - 5126:10
**learned** [3] - 5128:9, 5199:14, 5239:12
**least** [31] - 5116:7, 5126:25, 5146:9, 5148:4, 5148:19, 5159:11, 5161:8, 5170:17, 5183:5, 5225:8, 5240:21, 5241:5, 5249:2, 5253:3, 5257:24, 5258:13, 5262:25, 5263:1, 5263:2, 5272:5, 5276:4, 5292:18, 5294:18, 5316:21, 5324:17, 5328:4, 5328:16, 5331:5, 5331:12, 5334:18, 5339:5
**leave** [4] - 5115:16, 5144:14, 5152:7, 5329:18
**leaves** [3] - 5138:22, 5148:19, 5156:23
**leaving** [1] - 5132:8
**led** [2] - 5275:24, 5279:21
**left** [14] - 5115:18, 5130:9, 5148:12, 5174:6, 5174:13, 5174:14, 5179:6, 5179:15, 5179:19, 5191:23, 5192:21, 5196:2, 5253:23, 5330:12
**legal** [3] - 5215:1,

5215:2, 5326:17
**lengthy** [1] - 5328:8
**less** [17] - 5118:7, 5118:8, 5119:5, 5127:12, 5128:16, 5136:25, 5138:16, 5138:20, 5139:3, 5207:10, 5207:15, 5217:5, 5279:13, 5279:15, 5290:14, 5328:13, 5333:5
**lesser** [1] - 5186:2
**level** [1] - 5245:13
**liability** [5] - 5235:20, 5313:6, 5321:4, 5321:12, 5321:14
**license** [1] - 5229:25
**life** [2] - 5137:7, 5137:8
**lift** [10] - 5194:14, 5195:1, 5195:11, 5195:12, 5195:19, 5196:4, 5196:11, 5196:20, 5197:14, 5206:10
**lifted** [1] - 5195:22
**light** [2] - 5127:2, 5142:18
**lighter** [1] - 5160:23
**likely** [3] - 5144:19, 5144:20, 5167:8
**limine** [2] - 5329:19, 5331:25
**limit** [3] - 5275:15, 5275:16, 5341:11
**limitations** [2] - 5283:17, 5304:21
**limited** [5] - 5232:7, 5274:8, 5274:13, 5283:24, 5341:21
**line** [10] - 5143:17, 5179:6, 5248:25, 5253:20, 5297:21, 5298:2, 5298:20, 5309:12, 5310:8, 5332:24
**lines** [2] - 5249:3, 5249:4
**link** [4] - 5288:18, 5288:25, 5290:23, 5302:8
**lipid** [37] - 5210:13, 5230:14, 5230:15, 5230:18, 5235:2, 5235:3, 5235:6, 5235:7, 5238:8, 5238:9, 5238:10, 5239:17, 5243:2, 5243:5, 5243:6, 5243:10, 5249:6,

5266:14, 5267:8, 5267:9, 5268:9, 5268:21, 5277:19, 5277:24, 5278:3, 5278:9, 5278:14, 5278:22, 5279:5, 5279:20, 5280:25, 5281:4, 5281:6, 5282:7
**lipid-friendly** [2] - 5268:9, 5268:21
**lipid-related** [6] - 5277:19, 5277:24, 5278:3, 5278:22, 5281:4, 5281:6
**lipids** [2] - 5282:13, 5282:18
**list** [23] - 5115:10, 5122:17, 5165:7, 5166:12, 5167:1, 5175:1, 5179:1, 5179:3, 5179:23, 5180:3, 5198:22, 5206:18, 5224:2, 5230:11, 5230:12, 5230:15, 5247:1, 5252:3, 5281:20, 5281:25, 5282:12
**listed** [11] - 5194:20, 5233:6, 5234:1, 5234:2, 5240:1, 5240:24, 5243:23, 5244:18, 5293:22, 5293:23, 5295:5
**listen** [2] - 5119:1, 5325:8
**Listen** [1] - 5334:19
**listened** [2] - 5117:10, 5139:25
**listening** [3] - 5117:14, 5118:4, 5156:18
**listing** [6] - 5228:16, 5228:18, 5243:10, 5244:15, 5249:1, 5299:16
**lists** [2] - 5231:19, 5233:12
**literally** [2] - 5140:10, 5140:16
**litigate** [1] - 5320:25
**litigation** [1] - 5258:9
**lives** [1] - 5151:18
**living** [1] - 5185:11
**Liz** [1] - 5182:5
**LLP** [1] - 5112:18
**located** [1] - 5342:7
**locations** [1] - 5210:17
**log** [9] - 5170:2,

5170:3, 5170:5, 5170:8, 5170:12, 5171:3, 5174:3, 5175:20, 5211:25
**logistical** [1] - 5144:4
**logistics** [1] - 5331:16
**look** [38] - 5123:13, 5146:17, 5158:9, 5163:1, 5163:3, 5164:24, 5169:12, 5174:3, 5177:4, 5179:6, 5179:15, 5184:20, 5186:14, 5191:21, 5202:16, 5203:13, 5214:13, 5226:21, 5228:12, 5229:8, 5231:21, 5235:5, 5249:10, 5273:7, 5273:13, 5274:19, 5276:4, 5276:12, 5276:23, 5278:14, 5278:22, 5281:13, 5281:21, 5291:6, 5292:16, 5292:21, 5292:24, 5299:22
**Look** [5] - 5151:9, 5154:16, 5276:11, 5327:5, 5336:17
**looked** [7] - 5234:23, 5289:14, 5293:7, 5293:12, 5293:13, 5293:19, 5294:18
**looking** [20] - 5131:12, 5158:22, 5158:24, 5164:5, 5165:12, 5167:6, 5167:8, 5170:4, 5173:25, 5176:12, 5214:17, 5216:16, 5231:14, 5241:4, 5253:18, 5260:12, 5293:23, 5309:18, 5322:18, 5326:23
**looks** [5] - 5181:3, 5184:11, 5184:21, 5185:18, 5187:18
**loose** [1] - 5331:22
**lose** [7] - 5118:21, 5119:1, 5136:6, 5136:8, 5136:25, 5137:9, 5151:14
**losing** [9] - 5135:9, 5135:10, 5136:15, 5136:18, 5136:21, 5136:23, 5149:23, 5150:9, 5326:24
**lost** [3] - 5132:2, 5137:5, 5140:12
**louder** [1] - 5178:7

**low** [3] - 5225:14, 5253:22, 5303:20
**low-income** [2] - 5225:14, 5303:20
**lower** [12] - 5210:13, 5210:24, 5245:23, 5246:10, 5251:13, 5275:6, 5275:13, 5279:21, 5318:7, 5335:25, 5336:1
**lump** [1] - 5299:13
**lump-sum** [1] - 5299:13
**lunch** [3] - 5153:25, 5154:7, 5161:8
**lunchtime** [1] - 5120:6

# M

**ma'am** [1] - 5256:9
**magnifying** [1] - 5249:11
**maintain** [1] - 5226:25
**maintains** [1] - 5253:6
**major** [3] - 5189:24, 5210:9, 5218:3
**majority** [1] - 5308:20
**manager** [1] - 5219:17
**managers** [2] - 5325:16
**managing** [1] - 5216:11
**manner** [3] - 5163:16, 5206:7, 5242:19
**March** [3] - 5184:21, 5216:21, 5259:7
**mark** [1] - 5330:23
**market** [2] - 5267:12, 5325:3
**Market** [1] - 5185:15
**marketed** [1] - 5237:24
**marketing** [13] - 5156:19, 5203:19, 5204:9, 5205:3, 5221:19, 5236:6, 5238:20, 5242:8, 5248:3, 5266:19, 5266:20, 5267:14, 5312:8
**marketos** [1] - 5332:25
**Marketos** [47] - 5114:10, 5115:24, 5116:20, 5121:14, 5124:8, 5127:5, 5127:15, 5134:21, 5135:5, 5140:13, 5142:2, 5142:25, 5146:8, 5148:4,

5149:20, 5149:25, 5150:13, 5152:12, 5154:15, 5156:6, 5158:3, 5158:25, 5160:3, 5160:12, 5161:16, 5161:25, 5169:25, 5170:20, 5173:2, 5182:23, 5202:3, 5208:18, 5212:4, 5212:15, 5222:19, 5223:1, 5255:22, 5306:2, 5326:13, 5334:9, 5335:1, 5335:4, 5336:14, 5336:21, 5339:12, 5339:25, 5341:19
**MARKETOS** [168] - 5112:14, 5112:14, 5113:4, 5113:6, 5114:9, 5114:17, 5116:4, 5116:15, 5116:24, 5117:9, 5117:13, 5117:20, 5118:3, 5118:10, 5118:16, 5118:19, 5118:23, 5118:25, 5119:9, 5119:17, 5119:25, 5120:2, 5120:7, 5121:15, 5122:14, 5123:20, 5124:10, 5124:14, 5124:23, 5125:7, 5127:16, 5127:21, 5127:23, 5128:5, 5128:11, 5134:22, 5134:25, 5135:8, 5135:14, 5135:17, 5135:25, 5136:18, 5137:4, 5137:12, 5137:23, 5138:4, 5138:7, 5139:7, 5139:11, 5140:8, 5140:18, 5140:23, 5141:1, 5141:7, 5143:1, 5146:10, 5147:17, 5150:1, 5150:20, 5150:23, 5151:25, 5152:13, 5153:13, 5153:17, 5153:24, 5154:11, 5154:21, 5155:2, 5156:4, 5156:7, 5156:11, 5157:6, 5157:8, 5158:6, 5158:9, 5158:12, 5160:14, 5161:18, 5162:1, 5162:2, 5163:1, 5163:8, 5165:5, 5165:11, 5165:18, 5165:20,

5165:21, 5166:1, 5166:5, 5168:9, 5168:22, 5168:23, 5169:13, 5170:1, 5170:6, 5170:9, 5170:22, 5173:10, 5173:16, 5173:22, 5174:6, 5174:8, 5174:10, 5174:12, 5174:18, 5174:22, 5177:19, 5178:17, 5179:15, 5179:21, 5180:3, 5180:6, 5180:16, 5182:24, 5182:25, 5191:17, 5191:18, 5191:22, 5191:24, 5192:20, 5192:24, 5194:4, 5194:7, 5202:4, 5202:5, 5202:21, 5202:22, 5203:13, 5203:16, 5208:17, 5212:6, 5212:17, 5212:18, 5223:2, 5223:3, 5223:24, 5224:3, 5224:9, 5224:21, 5225:5, 5255:15, 5255:19, 5281:15, 5295:25, 5296:2, 5306:3, 5306:5, 5306:6, 5306:11, 5306:13, 5306:14, 5324:20, 5324:22, 5324:23, 5326:11, 5326:20, 5327:1, 5327:12, 5327:15, 5327:20, 5328:7, 5328:13, 5328:20, 5335:7, 5340:3, 5340:11, 5342:1, 5342:15
**Maryland** [1] - 5218:12
**massive** [3] - 5215:17, 5314:2, 5314:5
**master's** [2] - 5218:5, 5218:9
**match** [1] - 5234:3
**math** [1] - 5297:20
**mathematics** [1] - 5218:4
**matter** [2] - 5139:5, 5343:5
**matters** [3] - 5153:19, 5156:5, 5158:7
**McGrath** [2] - 5329:5, 5329:10
**McKay** [2] - 5112:23, 5343:11
**McKay-Soule** [2] -

5112:23, 5343:11
**MEAGHER** [1] - 5112:18
**meals** [2] - 5184:5, 5193:2
**mean** [31] - 5117:11, 5119:22, 5121:14, 5123:5, 5124:24, 5132:9, 5141:17, 5145:19, 5149:21, 5150:11, 5151:15, 5152:6, 5159:17, 5211:15, 5232:16, 5253:1, 5270:24, 5276:3, 5279:11, 5297:6, 5301:22, 5302:4, 5319:15, 5329:7, 5332:24, 5334:4, 5337:7, 5337:20, 5337:21, 5338:10, 5339:8
**mean..** [1] - 5337:25
**meaning** [2] - 5131:8, 5171:17
**means** [8] - 5127:13, 5149:22, 5157:19, 5157:20, 5196:21, 5267:6, 5269:2, 5270:16
**meant** [2] - 5267:23, 5301:19
**measures** [1] - 5204:22
**measuring** [1] - 5193:23
**mechanical** [1] - 5112:24
**MedForce** [8] - 5194:8, 5194:10, 5194:13, 5224:13, 5224:15, 5228:12, 5228:15
**Medicaid** [71] - 5213:3, 5214:17, 5215:5, 5215:8, 5220:25, 5221:4, 5222:11, 5223:16, 5223:25, 5225:7, 5225:8, 5225:14, 5225:22, 5225:24, 5226:2, 5227:9, 5228:22, 5229:24, 5233:18, 5234:11, 5234:14, 5234:19, 5243:4, 5245:8, 5245:15, 5245:16, 5245:18, 5245:20, 5245:21, 5246:3, 5246:8, 5246:10, 5246:15, 5246:22,

5247:10, 5247:25,
5253:1, 5253:2,
5253:7, 5253:9,
5254:13, 5278:24,
5284:8, 5291:24,
5293:9, 5295:5,
5302:24, 5303:2,
5303:8, 5303:17,
5303:25, 5304:7,
5304:10, 5304:21,
5305:2, 5305:8,
5305:13, 5305:15,
5305:17, 5305:20,
5306:25, 5308:24,
5309:2, 5309:4,
5309:5, 5309:9,
5310:3, 5316:12,
5324:2, 5324:8,
5324:12

**Medicaid-
reimbursed** [1] -
5214:17

**medical** [14] - 5122:3,
5145:14, 5188:25,
5200:22, 5201:23,
5210:7, 5211:13,
5215:7, 5215:9,
5219:20, 5220:15,
5235:15, 5243:15,
5254:21

**Medicare** [49] -
5213:3, 5214:17,
5215:4, 5215:8,
5220:25, 5221:4,
5222:2, 5222:8,
5222:9, 5222:12,
5223:16, 5223:25,
5225:10, 5225:18,
5227:9, 5228:22,
5232:5, 5233:15,
5234:9, 5234:14,
5234:20, 5243:4,
5245:15, 5246:16,
5246:23, 5247:10,
5247:25, 5248:24,
5252:2, 5252:13,
5252:20, 5253:10,
5254:13, 5284:8,
5291:24, 5292:3,
5292:8, 5293:9,
5295:6, 5303:3,
5306:25, 5308:5,
5308:21, 5309:2,
5309:5, 5309:22,
5310:2, 5311:17

**medications** [4] -
5227:22, 5255:1,
5255:7, 5318:22

**medicine** [5] -
5211:19, 5270:3,

5286:1, 5300:14,
5302:9

**medicine's** [1] -
5209:5

**medicines** [9] -
5197:5, 5200:7,
5200:8, 5210:18,
5266:25, 5269:4,
5269:22, 5299:4

**meet** [2] - 5267:7,
5269:3

**meeting** [1] - 5184:11

**Megan** [3] - 5112:23,
5331:17, 5343:11

**Megan_McKay** [1] -
5112:23

**Megan_McKay-
Soule@njd.
uscourts.gov** [1] -
5112:23

**member** [2] - 5122:19,
5211:16

**members** [9] -
5139:17, 5150:25,
5190:10, 5212:21,
5220:3, 5232:3,
5247:20, 5335:17,
5336:8

**memory** [3] - 5175:11,
5186:16, 5192:8

**Memphis** [1] - 5184:12

**mention** [1] - 5180:5

**mentioned** [16] -
5166:22, 5180:6,
5193:6, 5198:7,
5199:10, 5201:4,
5205:9, 5206:13,
5206:18, 5207:8,
5213:16, 5233:11,
5238:4, 5242:5,
5250:9, 5276:19

**mentioning** [1] -
5180:7

**menu** [2] - 5273:7,
5274:23

**Merck** [2] - 5199:1,
5204:1

**Merck's** [1] - 5204:5

**merely** [1] - 5151:7

**message** [7] -
5130:10, 5209:10,
5238:12, 5238:20,
5259:21, 5265:16,
5266:14, 5267:9,
5268:4, 5268:9,
5268:17, 5268:21

**messages** [23] -
5236:7, 5237:11,
5237:13, 5238:2,
5238:4, 5242:23,

5242:24, 5248:4,
5248:17, 5265:21,
5266:9, 5266:11,
5266:16, 5266:18,
5266:25, 5267:3,
5267:14, 5267:19,
5267:24, 5269:16,
5269:21, 5325:10,
5325:22

**Met** [1] - 5184:11

**met** [4] - 5220:3,
5266:23, 5268:19,
5312:11

**method** [1] - 5277:23

**methodologies** [4] -
5239:6, 5320:16,
5321:17, 5335:14

**methodology** [13] -
5231:10, 5239:10,
5277:18, 5291:9,
5295:23, 5296:1,
5296:7, 5322:2,
5322:6, 5335:24,
5336:4, 5336:19,
5339:18

**Michel** [1] - 5247:7

**Michel-Shaked** [1] -
5247:7

**Michigan** [2] -
5185:15, 5185:19

**microphone** [1] -
5213:5

**middle** [1] - 5174:20

**might** [29] - 5129:7,
5131:24, 5136:4,
5145:5, 5146:23,
5147:3, 5147:4,
5154:25, 5156:13,
5187:25, 5191:4,
5193:8, 5198:9,
5202:11, 5231:21,
5231:22, 5232:8,
5232:14, 5249:18,
5253:17, 5254:11,
5263:8, 5277:3,
5279:8, 5293:22,
5319:12, 5329:6,
5341:20

**million** [21] - 5194:21,
5195:19, 5222:14,
5222:15, 5225:19,
5225:22, 5237:4,
5248:21, 5248:24,
5249:3, 5249:5,
5249:7, 5249:14,
5297:22, 5298:17,
5300:9, 5309:1,
5309:2, 5320:8,
5333:2

**millions** [1] - 5232:21

**mind** [5] - 5119:15,
5148:2, 5197:4,
5209:20, 5312:22

**minimized** [1] -
5242:19

**minimum** [1] - 5249:3

**minus** [1] - 5252:16

**minute** [3] - 5161:13,
5182:9, 5222:18

**minutes** [10] -
5125:25, 5133:22,
5160:8, 5208:22,
5289:24, 5290:14,
5306:15, 5326:24,
5328:11, 5330:12

**mischaracterizing** [2]
- 5154:1, 5155:8

**misrepresent** [1] -
5125:19

**miss** [1] - 5328:22

**missed** [2] - 5135:22,
5320:7

**missing** [4] - 5156:13,
5253:13, 5309:3,
5328:21

**Missouri** [3] - 5179:7,
5181:11, 5184:11

**misstates** [1] - 5168:6

**mistake** [10] -
5132:18, 5138:5,
5138:10, 5297:11,
5297:15, 5297:16,
5298:9, 5298:13,
5319:18, 5320:7

**mistaken** [2] - 5159:8,
5186:12

**mistakes** [1] - 5320:11

**mistrial** [4] - 5118:22,
5136:24, 5138:17,
5159:14

**Mitchell's** [1] -
5185:15

**model** [3] - 5275:17,
5277:9, 5337:5

**mom** [1] - 5131:24

**moment** [8] - 5128:24,
5145:15, 5169:23,
5179:4, 5255:15,
5306:4, 5324:20,
5326:15

**momentarily** [2] -
5130:7, 5143:20

**Monday** [61] - 5116:5,
5116:7, 5120:9,
5120:11, 5120:17,
5122:22, 5123:15,
5123:17, 5123:22,
5126:1, 5126:14,
5126:22, 5131:9,
5131:20, 5131:22,

5132:13, 5133:5,
5133:14, 5134:18,
5134:20, 5144:16,
5144:22, 5145:1,
5145:4, 5145:6,
5145:7, 5145:8,
5145:16, 5145:25,
5152:19, 5154:12,
5154:18, 5154:25,
5155:14, 5155:16,
5156:17, 5156:22,
5157:5, 5158:2,
5326:18, 5326:22,
5327:8, 5327:9,
5328:18, 5328:19,
5329:7, 5330:11,
5330:13, 5330:18,
5331:4, 5331:16,
5332:8, 5334:5,
5339:2, 5339:14,
5339:22, 5340:19,
5340:20, 5340:23,
5342:5, 5342:9

**Monday's** [2] -
5327:12, 5327:13

**monetary** [1] - 5338:9

**money** [27] - 5169:5,
5187:18, 5187:24,
5188:19, 5189:12,
5190:17, 5190:25,
5191:4, 5217:17,
5219:3, 5223:10,
5251:11, 5258:3,
5261:12, 5274:5,
5275:24, 5306:24,
5307:4, 5307:8,
5309:14, 5310:9,
5321:18, 5334:23,
5334:24, 5338:3,
5338:14, 5338:17

**Montague** [1] -
5257:20

**month** [2] - 5184:20,
5185:4

**months** [3] - 5136:7,
5176:13, 5176:14

**Morales** [1] - 5260:8

**Moran's** [1] - 5185:10

**morning** [21] - 5114:9,
5114:11, 5114:13,
5114:20, 5114:22,
5114:24, 5115:1,
5115:6, 5115:20,
5120:5, 5123:22,
5129:22, 5130:23,
5133:20, 5141:9,
5144:19, 5154:17,
5155:8, 5326:19,
5326:20, 5326:22

**most** [1] - 5256:22

**mother** [10] - 5115:5, 5116:9, 5125:18, 5130:23, 5131:18, 5132:5, 5133:1, 5133:12, 5134:17, 5137:10
**mother's** [1] - 5132:23
**mother-in-law** [1] - 5125:18
**motion** [2] - 5329:19, 5331:25
**motivation** [2] - 5338:8
**mouth** [1] - 5213:5
**move** [5] - 5157:15, 5166:1, 5202:3, 5223:5, 5328:20
**moved** [4] - 5172:23, 5332:2, 5332:12, 5332:22
**moves** [1] - 5171:17
**moving** [9] - 5120:10, 5123:23, 5149:9, 5149:11, 5157:18, 5160:1, 5171:22, 5171:25, 5173:14
**MR** [182] - 5113:4, 5113:6, 5114:9, 5114:13, 5114:17, 5114:22, 5114:24, 5116:4, 5116:15, 5116:24, 5117:9, 5117:13, 5117:20, 5118:3, 5118:10, 5118:16, 5118:19, 5118:23, 5118:25, 5119:9, 5119:17, 5119:25, 5120:2, 5120:7, 5121:15, 5122:14, 5123:20, 5124:10, 5124:14, 5124:23, 5125:7, 5127:16, 5127:21, 5127:23, 5128:5, 5128:11, 5129:1, 5129:4, 5129:11, 5134:22, 5134:25, 5135:8, 5135:14, 5135:17, 5135:25, 5136:18, 5137:4, 5137:12, 5137:23, 5138:4, 5138:7, 5139:7, 5139:11, 5140:8, 5140:18, 5140:23, 5141:1, 5141:7, 5143:1, 5143:17, 5143:21, 5146:10, 5147:17, 5150:1, 5150:20, 5150:23, 5151:25,

5152:13, 5153:13, 5153:17, 5153:24, 5154:11, 5154:21, 5155:2, 5156:4, 5156:7, 5156:11, 5157:6, 5157:8, 5158:6, 5158:9, 5158:12, 5160:14, 5161:18, 5162:1, 5162:2, 5163:1, 5163:8, 5165:5, 5165:11, 5165:18, 5165:20, 5165:21, 5166:1, 5166:5, 5168:9, 5168:22, 5168:23, 5169:13, 5170:1, 5170:6, 5170:9, 5170:22, 5173:10, 5173:16, 5173:22, 5174:6, 5174:8, 5174:10, 5174:12, 5174:18, 5174:22, 5177:19, 5178:17, 5179:15, 5179:21, 5180:3, 5180:6, 5180:16, 5182:24, 5182:25, 5191:17, 5191:18, 5191:22, 5191:24, 5192:20, 5192:24, 5194:4, 5194:7, 5202:4, 5202:5, 5202:21, 5202:22, 5203:13, 5203:16, 5208:17, 5212:6, 5212:17, 5212:18, 5223:2, 5223:3, 5223:24, 5224:3, 5224:9, 5224:21, 5225:5, 5255:15, 5255:19, 5281:15, 5295:25, 5296:2, 5306:3, 5306:5, 5306:6, 5306:11, 5306:13, 5306:14, 5324:20, 5324:22, 5324:23, 5326:11, 5326:20, 5327:1, 5327:12, 5327:15, 5327:20, 5328:7, 5328:13, 5328:20, 5331:12, 5335:7, 5340:3, 5340:11, 5340:14, 5340:16, 5340:18, 5340:25, 5341:16, 5342:1, 5342:10, 5342:15, 5342:16
**MS** [87] - 5113:5, 5113:6, 5114:11, 5114:20, 5120:14,

5124:13, 5125:13, 5125:17, 5126:17, 5127:14, 5127:20, 5127:22, 5128:2, 5128:8, 5128:17, 5128:19, 5128:24, 5129:17, 5130:4, 5130:9, 5141:23, 5143:4, 5143:13, 5147:22, 5152:3, 5160:6, 5165:8, 5165:16, 5165:19, 5168:6, 5168:16, 5169:14, 5169:16, 5169:24, 5170:13, 5170:17, 5170:23, 5171:14, 5172:5, 5172:10, 5172:20, 5172:24, 5173:18, 5181:23, 5208:20, 5224:6, 5255:24, 5256:2, 5256:3, 5256:11, 5260:7, 5260:10, 5281:13, 5281:18, 5289:19, 5290:10, 5295:22, 5296:1, 5296:4, 5327:23, 5328:16, 5329:1, 5329:4, 5329:11, 5329:15, 5329:18, 5329:22, 5331:20, 5331:24, 5332:14, 5332:18, 5333:3, 5333:10, 5333:23, 5334:3, 5334:6, 5334:10, 5334:25, 5336:11, 5337:1, 5337:10, 5337:12, 5338:4, 5338:15, 5338:24, 5339:17, 5339:21
**multimillion** [1] - 5297:15
**multimillion-dollar** [1] - 5297:15
**multiple** [10] - 5145:22, 5202:7, 5219:16, 5219:22, 5232:12, 5232:13, 5232:14, 5269:21
**multiplied** [3] - 5244:7, 5245:23, 5246:11
**Murphy** [1] - 5163:24
**must** [1] - 5210:3
**mutual** [1] - 5207:13

---

**N**

**naive** [13] - 5209:23, 5210:2, 5210:10,

5237:24, 5238:23, 5240:19, 5241:11, 5241:15, 5241:17, 5241:21, 5242:13, 5266:13, 5266:15
**name** [12] - 5174:15, 5176:24, 5177:5, 5177:7, 5191:19, 5191:20, 5212:11, 5212:12, 5212:13, 5233:6, 5234:1
**name's** [1] - 5256:7
**names** [3] - 5229:22, 5233:12, 5281:5
**Nancy** [3] - 5163:25, 5175:21, 5311:18
**narrative** [2] - 5126:11, 5201:18
**narrow** [2] - 5125:8, 5241:8
**nation** [1] - 5318:13
**national** [4] - 5190:7, 5190:8, 5229:19
**National** [6] - 5229:16, 5229:17, 5230:16, 5233:13, 5234:7, 5281:5
**nationally** [2] - 5190:21, 5197:16
**nationwide** [4] - 5311:9, 5311:10, 5312:19, 5321:23
**nature** [2] - 5217:21, 5229:12
**NDCs** [1] - 5230:16
**nearing** [1] - 5120:24
**nearly** [3] - 5217:1, 5334:1
**Nebraska** [2] - 5219:18, 5280:21
**necessarily** [6] - 5127:3, 5251:2, 5266:18, 5284:1, 5296:24, 5328:18
**necessary** [2] - 5136:3, 5227:2
**need** [35] - 5116:1, 5120:14, 5120:16, 5120:20, 5121:1, 5126:2, 5133:10, 5134:1, 5140:17, 5141:21, 5146:9, 5149:11, 5153:13, 5154:17, 5155:1, 5157:4, 5161:9, 5171:11, 5172:6, 5178:3, 5214:21, 5231:22, 5232:8, 5249:18, 5268:23, 5283:20, 5310:8,

5311:13, 5329:16, 5329:17, 5330:25, 5331:12, 5331:17, 5331:18, 5340:24
**needed** [5] - 5134:20, 5147:2, 5159:4, 5211:2, 5235:11
**needing** [1] - 5299:4
**needs** [8] - 5123:15, 5127:9, 5129:21, 5129:25, 5157:17, 5160:4, 5161:12, 5340:22
**negative** [1] - 5252:16
**negotiation** [1] - 5214:9
**net** [2] - 5195:11, 5195:18
**neutral** [1] - 5238:10
**never** [16] - 5119:15, 5123:7, 5140:16, 5149:6, 5153:1, 5154:22, 5197:2, 5260:25, 5261:4, 5261:5, 5270:9, 5277:8, 5280:7, 5312:11, 5315:1
**nevertheless** [2] - 5302:15, 5305:12
**new** [5] - 5136:7, 5209:9, 5270:19, 5270:20, 5270:21
**NEW** [1] - 5112:1
**New** [16] - 5112:9, 5128:1, 5144:6, 5144:9, 5163:20, 5164:25, 5176:21, 5178:20, 5183:11, 5183:14, 5185:11, 5186:8, 5193:1, 5299:18, 5299:24
**news** [2] - 5129:11, 5204:15
**next** [26] - 5120:1, 5120:25, 5122:5, 5123:4, 5124:17, 5125:3, 5125:12, 5125:14, 5126:21, 5132:5, 5132:9, 5132:24, 5133:14, 5134:8, 5142:21, 5144:9, 5144:11, 5144:12, 5147:15, 5173:12, 5181:3, 5203:13, 5328:1, 5328:3, 5330:24, 5331:1
**night** [1] - 5340:20
**NO** [12] - 5130:19, 5130:25, 5131:4,

5131:12, 5131:23,
5132:7, 5132:15,
5132:21, 5133:3,
5133:6, 5133:8,
5133:21
**nobody** [1] - 5148:19
**none** [1] - 5148:23
**noninfluenced** [4] -
5248:15, 5248:18,
5262:17, 5315:14
**nonparty** [2] -
5121:16, 5127:18
**nonresponsive** [1] -
5201:19
**normal** [1] - 5341:17
**North** [1] - 5293:2
**note** [1] - 5236:24
**noted** [1] - 5159:23
**notes** [9] - 5224:18,
5229:2, 5233:3,
5233:4, 5233:5,
5233:21, 5234:4,
5236:17, 5237:9
**nothing** [8] - 5147:22,
5160:25, 5312:22,
5326:11, 5327:1,
5341:13, 5342:15,
5342:16
**notice** [2] - 5147:5,
5293:1
**noticed** [2] - 5237:18,
5253:15
**NPI** [9] - 5229:17,
5229:18, 5229:22,
5234:8, 5234:10,
5252:3, 5252:5,
5252:15
**NPIs** [5] - 5229:20,
5233:16, 5233:18,
5234:12, 5291:2
**NPPES** [3] - 5229:13,
5229:15, 5229:18
**NPPES/NPI** [2] -
5233:11, 5233:20
**NTS** [1] - 5195:11
**NUMBER** [1] - 5112:3
**Number** [58] - 5115:3,
5115:15, 5115:25,
5117:6, 5117:12,
5118:1, 5119:2,
5120:15, 5120:20,
5120:21, 5121:6,
5121:9, 5122:13,
5125:20, 5125:21,
5126:2, 5126:4,
5126:5, 5126:9,
5126:13, 5126:24,
5128:22, 5129:24,
5130:12, 5130:16,
5136:9, 5137:19,

5137:21, 5138:8,
5138:12, 5138:21,
5138:25, 5139:5,
5142:17, 5142:18,
5148:21, 5149:18,
5150:18, 5152:18,
5152:24, 5152:25,
5156:10, 5156:14,
5156:22, 5157:2,
5158:2, 5158:23,
5159:1, 5159:9,
5159:17, 5159:21,
5159:24, 5160:24,
5161:4, 5165:1,
5166:12
**number** [74] -
5136:12, 5148:7,
5159:7, 5159:13,
5164:6, 5165:16,
5166:23, 5167:8,
5168:25, 5175:2,
5194:20, 5195:22,
5196:16, 5196:22,
5197:11, 5197:12,
5203:9, 5218:6,
5231:12, 5237:19,
5242:6, 5244:3,
5244:4, 5245:18,
5246:6, 5246:7,
5251:10, 5251:17,
5251:20, 5258:14,
5258:21, 5273:12,
5274:19, 5275:10,
5275:16, 5275:17,
5277:12, 5279:4,
5297:21, 5298:1,
5298:2, 5298:20,
5299:13, 5299:16,
5299:17, 5299:19,
5301:19, 5311:12,
5311:13, 5312:8,
5312:10, 5313:9,
5313:11, 5313:15,
5314:4, 5318:7,
5319:13, 5320:12,
5321:17, 5322:1,
5322:6, 5322:18,
5322:20, 5325:18,
5332:21, 5333:11,
5333:13, 5333:25,
5334:20, 5335:11,
5335:12, 5335:25,
5336:1, 5337:2
**numbers** [10] -
5138:16, 5214:9,
5229:22, 5229:25,
5256:19, 5275:12,
5309:1, 5313:21,
5313:23, 5323:22
**numerous** [3] -
5247:20, 5247:21,

5253:21
**nurse** [4] - 5145:25,
5219:14, 5230:5,
5280:11
**NYU** [2] - 5115:6,
5130:24

---

# O

**o'clock** [5] - 5146:18,
5149:13, 5153:25,
5154:10, 5289:24
**oath** [3] - 5161:22,
5222:25, 5290:7
**object** [3] - 5152:3,
5168:6, 5169:16
**objection** [16] -
5128:14, 5159:22,
5159:23, 5165:7,
5165:8, 5168:16,
5169:14, 5171:24,
5172:22, 5172:24,
5173:17, 5173:18,
5224:4, 5224:20,
5281:15, 5341:21
**objective** [2] -
5251:14, 5318:5
**obtain** [3] - 5239:2,
5239:4, 5243:20
**obtained** [9] - 5195:8,
5227:9, 5227:13,
5227:18, 5241:23,
5319:4, 5322:22,
5324:8, 5324:12
**obvious** [1] - 5156:12
**obviously** [9] -
5134:22, 5147:18,
5151:3, 5151:8,
5169:4, 5209:9,
5253:2, 5279:14,
5333:7
**occasion** [1] - 5313:1
**occasionally** [1] -
5312:23
**occasions** [1] -
5257:25
**occurred** [7] -
5143:14, 5160:19,
5182:16, 5199:23,
5205:4, 5222:21,
5290:1
**occurs** [1] - 5339:14
**Oceanaire** [1] -
5184:25
**October** [2] - 5165:14,
5241:23
**odds** [1] - 5317:18
**OF** [2] - 5112:1,
5112:3
**off-label** [32] -

5203:19, 5204:8,
5205:3, 5221:19,
5236:6, 5238:4,
5238:12, 5238:17,
5238:19, 5238:24,
5240:15, 5240:17,
5242:12, 5242:19,
5266:19, 5267:3,
5267:13, 5270:13,
5271:3, 5307:10,
5310:20, 5311:9,
5311:19, 5312:9,
5312:10, 5312:19,
5315:8, 5321:23,
5325:3, 5325:10,
5325:22
**off-the-record** [1] -
5142:6
**offer** [8] - 5165:5,
5223:19, 5223:24,
5259:20, 5260:19,
5261:11, 5275:15,
5277:7
**offered** [11] - 5235:25,
5273:6, 5273:11,
5273:12, 5274:23,
5275:5, 5275:7,
5276:23, 5276:25,
5277:3, 5278:13
**offering** [4] - 5169:13,
5218:16, 5220:6,
5266:1
**Offices** [1] - 5214:6
**offices** [2] - 5214:6,
5229:4
**Official** [1] - 5112:23
**OFFICIAL** [1] - 5343:1
**often** [4] - 5123:1,
5209:6, 5311:3,
5325:3
**oftentimes** [4] -
5203:4, 5203:7,
5209:10, 5211:17
**old** [1] - 5323:19
**Omaha** [1] - 5280:21
**omitted** [1] - 5293:6
**once** [42] - 5123:9,
5131:14, 5139:7,
5157:14, 5171:15,
5171:16, 5210:10,
5224:1, 5227:3,
5227:6, 5227:7,
5230:11, 5238:15,
5238:16, 5243:24,
5244:3, 5244:5,
5244:11, 5246:24,
5246:25, 5266:15,
5267:8, 5267:9,
5272:24, 5283:14,
5285:23, 5286:1,

5286:17, 5287:14,
5287:18, 5288:18,
5289:10, 5290:19,
5291:10, 5291:17,
5291:19, 5297:24,
5298:1, 5317:11,
5323:8, 5330:13,
5331:8
**once-a-day** [4] -
5210:10, 5266:15,
5267:8, 5267:9
**once-daily** [23] -
5227:3, 5227:6,
5227:7, 5230:11,
5238:15, 5238:16,
5243:24, 5244:3,
5244:5, 5244:11,
5283:14, 5286:17,
5287:14, 5287:18,
5288:18, 5289:10,
5290:19, 5291:10,
5291:17, 5291:19,
5297:24, 5298:1,
5323:8
**one** [118] - 5118:10,
5119:1, 5121:12,
5127:8, 5135:13,
5136:8, 5138:17,
5138:18, 5138:20,
5138:22, 5140:11,
5140:24, 5144:5,
5148:5, 5148:15,
5149:3, 5149:20,
5151:20, 5151:23,
5152:20, 5154:23,
5157:4, 5160:23,
5161:9, 5164:24,
5173:8, 5176:1,
5176:7, 5177:1,
5178:14, 5185:4,
5185:5, 5186:6,
5187:15, 5187:16,
5192:25, 5199:10,
5204:1, 5204:12,
5204:18, 5210:11,
5213:11, 5216:13,
5216:15, 5216:16,
5217:16, 5221:23,
5226:14, 5228:16,
5232:4, 5232:18,
5237:15, 5238:6,
5246:17, 5247:2,
5248:25, 5250:1,
5251:12, 5252:14,
5253:10, 5261:3,
5261:6, 5262:15,
5262:20, 5262:22,
5262:23, 5262:25,
5263:1, 5263:2,
5263:13, 5264:15,
5269:15, 5270:2,

5271:3, 5271:4, 5273:20, 5274:4, 5274:8, 5274:13, 5275:12, 5276:3, 5276:9, 5276:11, 5276:12, 5276:17, 5278:21, 5280:23, 5285:2, 5288:22, 5288:24, 5290:13, 5292:7, 5292:18, 5293:22, 5294:2, 5301:19, 5301:25, 5308:13, 5314:14, 5318:10, 5319:17, 5322:2, 5322:6, 5326:15, 5329:15, 5330:14, 5334:10, 5336:19, 5338:11, 5340:14, 5340:19, 5341:2

**One** [1] - 5112:20
**ones** [3] - 5163:16, 5293:4, 5294:22
**open** [2] - 5114:1, 5332:12
**Open** [2] - 5173:5, 5330:1
**opened** [4] - 5329:19, 5332:10, 5337:17, 5338:16
**opening** [7] - 5266:12, 5270:15, 5333:16, 5334:11, 5335:22, 5337:25, 5338:20
**opens** [1] - 5332:16
**opinion** [8] - 5190:10, 5210:4, 5210:11, 5259:20, 5259:25, 5260:3, 5266:1
**opinions** [7] - 5220:6, 5220:15, 5235:24, 5254:22, 5254:25, 5255:11, 5326:4
**opponent** [2] - 5170:20, 5171:13
**opportunities** [2] - 5216:16, 5220:16
**opportunity** [5] - 5148:14, 5159:12, 5218:20, 5220:10, 5251:10
**opposed** [5] - 5209:25, 5263:9, 5338:9, 5339:18, 5341:25
**options** [6] - 5274:24, 5275:5, 5275:7, 5275:15, 5276:3, 5278:14
**order** [14] - 5121:15,

5124:7, 5130:12, 5149:10, 5214:23, 5216:6, 5217:16, 5219:1, 5221:21, 5235:12, 5236:3, 5251:6, 5307:8, 5307:9
**ordinarily** [1] - 5151:2
**organ** [1] - 5115:6
**organization** [1] - 5219:16
**orient** [1] - 5194:2
**original** [2] - 5252:15, 5316:1
**originally** [4] - 5119:3, 5131:13, 5241:9, 5315:14
**otherwise** [10] - 5143:8, 5230:5, 5282:9, 5303:20, 5311:25, 5316:15, 5317:14, 5318:18, 5341:15
**ou** [1] - 5177:1
**ought** [3] - 5139:20, 5155:17, 5321:18
**ourselves** [1] - 5194:2
**outlier** [1] - 5314:17
**outpatient** [2] - 5232:10, 5248:24
**outset** [6] - 5116:21, 5118:8, 5135:15, 5138:16, 5148:11, 5149:6
**outside** [4] - 5130:2, 5260:23, 5266:5, 5329:2
**overall** [2] - 5287:18, 5326:10
**overrule** [1] - 5168:17
**overwhelmingly** [1] - 5334:18
**owe** [5] - 5122:24, 5141:14, 5141:15
**owed** [1] - 5341:21
**own** [3] - 5194:15, 5253:6

---

**P**

**p.m** [6] - 5147:3, 5169:21, 5173:4, 5326:16, 5329:23, 5342:21
**page** [12] - 5163:19, 5164:4, 5164:10, 5164:17, 5164:24, 5165:25, 5170:2, 5194:3, 5202:21, 5330:6

**PAGE** [1] - 5113:3
**Page** [1] - 5113:8
**paid** [27] - 5162:9, 5181:14, 5185:22, 5185:25, 5187:2, 5192:25, 5205:15, 5206:10, 5210:16, 5211:4, 5219:7, 5223:9, 5223:10, 5244:7, 5246:1, 5274:9, 5274:14, 5294:3, 5294:10, 5294:19, 5299:19, 5307:10, 5310:25, 5311:9, 5315:3, 5317:16, 5320:1
**pairing** [1] - 5334:17
**panels** [1] - 5146:1
**parameter** [3] - 5292:24, 5293:8, 5293:19
**parse** [1] - 5243:25
**parsed** [1] - 5227:5
**Part** [14] - 5222:3, 5222:8, 5222:13, 5225:19, 5233:15, 5234:9, 5252:13, 5252:21, 5253:10, 5254:17, 5292:8, 5295:6, 5303:3, 5309:5
**part** [36] - 5118:1, 5137:13, 5137:18, 5167:3, 5167:24, 5188:23, 5191:6, 5191:8, 5198:2, 5201:19, 5202:1, 5209:1, 5209:14, 5210:15, 5231:17, 5235:11, 5235:24, 5246:4, 5249:17, 5260:25, 5266:21, 5272:2, 5278:6, 5284:10, 5284:25, 5299:9, 5306:18, 5306:25, 5311:23, 5314:14, 5314:15, 5326:8, 5336:23, 5337:21, 5338:5, 5340:25
**part's** [1] - 5338:5
**partial** [2] - 5124:19, 5124:20
**participant** [1] - 5194:14
**participants** [7] - 5194:20, 5194:22, 5195:18, 5197:14, 5197:15, 5197:22
**participated** [3] -

5167:13, 5203:8, 5261:5
**participating** [1] - 5196:8
**participation** [1] - 5210:16
**particular** [22] - 5148:20, 5151:18, 5158:12, 5163:14, 5166:24, 5172:1, 5172:2, 5198:14, 5199:14, 5200:5, 5209:5, 5211:19, 5217:23, 5221:24, 5229:9, 5249:5, 5253:7, 5260:21, 5262:3, 5288:18, 5291:16, 5295:18
**particularly** [5] - 5120:23, 5132:7, 5212:24, 5213:2, 5237:18
**parties** [4] - 5124:7, 5126:24, 5140:13, 5149:10
**party** [2] - 5170:20, 5171:13
**pass** [1] - 5255:21
**passed** [7] - 5119:16, 5119:17, 5121:13, 5126:5, 5192:20, 5218:11, 5272:2
**passing** [1] - 5266:1
**past** [3] - 5139:20, 5257:24, 5320:24
**path** [1] - 5132:3
**patient** [17] - 5200:9, 5207:20, 5211:19, 5234:13, 5243:1, 5243:2, 5270:3, 5270:17, 5271:3, 5292:2, 5292:19, 5301:13, 5303:16, 5303:17, 5304:10, 5304:11, 5314:14
**patient's** [1] - 5211:18
**patient-specific** [1] - 5301:13
**patients** [26] - 5145:2, 5145:10, 5145:17, 5202:11, 5209:25, 5210:1, 5210:18, 5211:1, 5211:15, 5230:25, 5235:12, 5237:25, 5238:1, 5238:23, 5242:22, 5278:2, 5292:6, 5292:12, 5300:17, 5303:21, 5304:15, 5317:3, 5317:10,

5323:14, 5324:2, 5324:3
**Paul** [1] - 5112:16
**pause** [4] - 5128:25, 5129:5, 5130:8, 5255:18
**pausing** [1] - 5120:17
**pay** [5] - 5179:22, 5183:19, 5184:7, 5202:8, 5299:5
**paying** [10] - 5161:11, 5199:20, 5202:12, 5202:25, 5203:18, 5204:3, 5204:8, 5205:2, 5205:12
**payment** [8] - 5179:24, 5187:17, 5188:18, 5190:17, 5190:24, 5191:4, 5204:5, 5240:6
**payments** [7] - 5187:11, 5188:12, 5233:24, 5234:1, 5244:24, 5310:13
**payor** [1] - 5295:8
**payors** [2] - 5294:3, 5294:8
**PCMs** [1] - 5295:6
**pending** [1] - 5329:10
**Penelow** [2] - 5257:14, 5261:12
**Pennsylvania** [1] - 5300:6
**people** [10] - 5138:9, 5145:20, 5145:22, 5151:17, 5163:12, 5167:1, 5189:16, 5206:18, 5282:6, 5292:8
**per** [11] - 5168:2, 5189:23, 5194:14, 5197:12, 5226:14, 5226:15, 5244:5, 5285:9, 5300:9, 5303:2
**percent** [8] - 5167:20, 5252:2, 5252:14, 5253:8, 5253:10, 5305:2, 5316:13, 5324:2
**percentage** [4] - 5287:17, 5287:25, 5288:3, 5337:23
**perform** [7] - 5230:8, 5231:12, 5236:4, 5245:14, 5311:13, 5312:15, 5312:20
**performance** [2] - 5216:9, 5249:19
**performed** [8] -

5165:2, 5165:13, 5194:15, 5214:21, 5220:17, 5243:19, 5247:7, 5312:20
**performing** [3] - 5164:13, 5220:11, 5247:19
**perhaps** [4] - 5214:22, 5215:23, 5317:24
**period** [22] - 5175:12, 5175:14, 5187:3, 5194:21, 5204:19, 5209:7, 5209:13, 5210:5, 5221:7, 5221:12, 5226:15, 5267:7, 5267:13, 5267:18, 5267:24, 5272:19, 5272:25, 5279:13, 5279:14, 5322:11
**permission** [2] - 5281:14, 5295:22
**permitted** [2] - 5152:21, 5342:3
**person** [6] - 5151:20, 5152:5, 5196:21, 5233:9, 5244:18, 5274:18
**personal** [2] - 5120:19, 5149:16
**personally** [3] - 5188:17, 5210:20, 5211:7
**perspective** [3] - 5214:7, 5215:18, 5321:18
**pertinent** [1] - 5341:4
**PETE** [1] - 5112:14
**Pete** [1] - 5114:10
**Ph.D** [1] - 5218:12
**pharmaceutical** [30] - 5167:12, 5168:12, 5181:14, 5187:11, 5187:17, 5187:19, 5187:23, 5188:5, 5188:19, 5189:10, 5190:16, 5191:5, 5193:8, 5196:14, 5198:9, 5198:16, 5199:19, 5202:7, 5202:8, 5202:12, 5202:25, 5203:9, 5204:13, 5205:10, 5205:18, 5205:20, 5207:23, 5215:15, 5217:18, 5261:1
**pharmaceuticals** [2] - 5166:21, 5206:14
**pharmacies** [18] - 5217:21, 5226:25,

5227:1, 5227:20, 5227:25, 5243:20, 5243:23, 5287:5, 5287:10, 5287:13, 5287:19, 5288:6, 5288:10, 5291:10, 5292:12, 5294:19, 5318:10, 5323:15
**pharmacies'** [1] - 5244:1
**pharmacy** [55] - 5215:20, 5219:6, 5221:24, 5222:5, 5222:8, 5222:12, 5224:11, 5225:25, 5226:2, 5226:20, 5226:21, 5226:23, 5227:2, 5227:18, 5228:4, 5228:22, 5230:17, 5232:6, 5233:18, 5234:9, 5234:11, 5239:25, 5240:20, 5244:1, 5244:17, 5245:15, 5245:16, 5246:23, 5247:25, 5252:2, 5252:13, 5252:21, 5253:9, 5253:11, 5286:21, 5287:24, 5290:13, 5290:18, 5291:1, 5291:16, 5291:22, 5292:2, 5293:8, 5294:2, 5295:9, 5296:6, 5297:11, 5308:1, 5318:9, 5318:13, 5318:18, 5318:21, 5319:1, 5319:14, 5323:25
**pharmacy's** [1] - 5285:20
**philosophy** [1] - 5211:15
**phone** [11] - 5117:17, 5123:5, 5123:12, 5126:11, 5126:24, 5130:4, 5130:16, 5133:22, 5143:18, 5236:12, 5236:19
**physician** [7] - 5241:7, 5262:22, 5263:5, 5272:9, 5276:12, 5285:19, 5302:8
**physicians** [21] - 5166:7, 5166:18, 5167:5, 5167:7, 5167:19, 5187:24, 5202:10, 5204:3, 5207:4, 5210:14, 5232:14, 5248:2,

5248:6, 5248:15, 5248:18, 5259:21, 5262:16, 5262:17, 5312:8, 5325:11
**physicians'** [2] - 5162:8, 5187:25
**pick** [2] - 5133:22, 5279:19
**picked** [3] - 5137:3, 5206:16, 5287:8
**picking** [1] - 5314:16
**picks** [2] - 5315:13, 5315:14
**piece** [6] - 5158:9, 5158:14, 5171:19, 5310:1, 5310:2, 5341:24
**pills** [1] - 5285:9
**place** [17] - 5118:15, 5127:9, 5154:5, 5155:1, 5187:16, 5188:2, 5188:23, 5190:15, 5190:16, 5200:21, 5200:22, 5201:22, 5201:23, 5203:20, 5214:12, 5289:17
**placed** [2] - 5116:22, 5116:25
**places** [2] - 5177:23, 5188:15
**Plaintiffs** [1] - 5112:4
**Plaintiffs'** [1] - 5295:23
**plan** [1] - 5163:20
**Plan** [3] - 5229:16, 5254:17
**Plan-sponsored** [1] - 5254:17
**planning** [1] - 5132:9
**plans** [1] - 5144:12
**plausible** [1] - 5136:15
**play** [1] - 5279:17
**plugged** [1] - 5260:9
**point** [23] - 5120:22, 5124:15, 5141:18, 5157:11, 5158:17, 5169:4, 5181:9, 5211:6, 5270:16, 5270:18, 5274:18, 5300:1, 5310:9, 5319:17, 5330:16, 5330:21, 5333:19, 5334:21, 5334:22, 5335:11, 5336:13, 5337:21, 5338:11
**pointed** [2] - 5319:18, 5319:21
**points** [1] - 5338:12

**policy** [2] - 5218:12, 5304:4
**pools** [1] - 5304:10
**pop** [1] - 5147:7
**popped** [1] - 5160:11
**population** [6] - 5190:13, 5228:5, 5292:2, 5303:17, 5319:13
**portion** [1] - 5322:21
**posed** [2] - 5180:11, 5201:11
**posing** [1] - 5201:14
**position** [9] - 5116:21, 5126:6, 5135:2, 5135:15, 5150:2, 5151:23, 5152:4, 5152:6, 5171:13
**positions** [1] - 5126:23
**possibility** [3] - 5118:21, 5122:9, 5123:15
**possible** [12] - 5145:5, 5146:25, 5147:5, 5154:9, 5154:16, 5175:18, 5187:24, 5202:15, 5273:24, 5297:6, 5318:3, 5325:25
**possibly** [5] - 5136:24, 5155:17, 5155:19, 5158:15, 5268:11
**post** [1] - 5335:20
**post-jury** [1] - 5335:20
**posted** [1] - 5133:19
**postpone** [7] - 5117:19, 5122:11, 5123:18, 5127:8, 5132:13, 5133:5, 5146:23
**postponed** [1] - 5145:17
**postponement** [1] - 5122:20
**potential** [2] - 5159:15, 5190:10
**potentially** [6] - 5135:10, 5188:24, 5267:11, 5268:16, 5292:8, 5341:6
**PowerPoints** [2] - 5171:5, 5172:11
**practice** [2] - 5162:8, 5199:25
**practitioners** [3] - 5146:1, 5209:11, 5230:5
**preceded** [1] - 5252:15

**precise** [1] - 5258:14
**preclude** [2] - 5332:2, 5332:12
**predecessor** [1] - 5201:5
**predicate** [1] - 5173:1
**predictions** [1] - 5308:16
**prefer** [5] - 5147:19, 5147:23, 5157:18, 5326:21, 5341:1
**preference** [9] - 5116:15, 5117:21, 5117:23, 5119:20, 5120:4, 5134:23, 5152:2, 5152:16, 5152:17
**prejudice** [14] - 5117:25, 5118:3, 5121:3, 5138:12, 5138:24, 5139:6, 5139:22, 5148:18, 5150:16, 5159:1, 5159:2, 5159:3, 5160:2, 5339:20
**prejudiced** [3] - 5118:6, 5120:23, 5121:18
**prejudicial** [1] - 5337:13
**preliminary** [1] - 5123:10
**premise** [1] - 5307:12
**preoperative** [1] - 5145:24
**prepare** [1] - 5231:11
**prepared** [5] - 5146:4, 5147:7, 5175:21, 5220:23, 5231:5
**preparing** [1] - 5273:5
**prescribe** [9] - 5190:18, 5197:6, 5200:7, 5208:6, 5210:18, 5211:4, 5263:24, 5287:10, 5317:17
**prescribed** [18] - 5166:19, 5167:19, 5240:22, 5260:15, 5264:23, 5270:17, 5285:23, 5300:14, 5302:9, 5312:9, 5315:1, 5315:2, 5315:5, 5315:14, 5315:15, 5316:3, 5317:4, 5317:11
**prescriber** [36] - 5164:11, 5226:24, 5234:11, 5240:1, 5240:24, 5241:6,

5241:7, 5243:11, 5243:24, 5244:18, 5251:24, 5252:3, 5252:18, 5252:19, 5252:23, 5253:8, 5263:15, 5264:6, 5264:23, 5265:7, 5266:2, 5270:4, 5270:8, 5270:9, 5270:10, 5270:11, 5273:21, 5276:6, 5276:15, 5277:8, 5290:24, 5291:2, 5305:5, 5309:3, 5316:7, 5317:2

**Prescriber** [1] - 5164:18

**prescribers** [14] - 5164:6, 5164:19, 5164:25, 5173:9, 5189:15, 5189:17, 5206:20, 5230:3, 5233:16, 5234:3, 5239:23, 5244:15, 5305:3, 5316:13

**prescribes** [3] - 5265:1, 5273:18, 5318:21

**prescribing** [9] - 5167:19, 5197:3, 5197:4, 5202:13, 5207:5, 5207:20, 5208:12, 5252:6, 5316:1

**prescription** [40] - 5164:25, 5168:3, 5194:14, 5195:1, 5196:4, 5196:11, 5196:20, 5199:15, 5206:10, 5215:4, 5225:19, 5226:20, 5226:21, 5227:18, 5240:23, 5251:25, 5255:7, 5262:4, 5263:14, 5264:2, 5264:21, 5265:2, 5270:2, 5270:19, 5271:17, 5272:8, 5272:18, 5272:24, 5273:19, 5278:24, 5285:10, 5285:20, 5288:18, 5290:23, 5291:17, 5311:16, 5311:18, 5315:13, 5315:15

**prescriptions** [68] - 5162:8, 5164:7, 5164:11, 5166:19, 5166:23, 5167:8, 5168:13, 5187:18,

5189:4, 5189:11, 5195:7, 5195:22, 5195:23, 5196:16, 5196:22, 5196:24, 5196:25, 5197:12, 5197:18, 5198:2, 5199:20, 5199:21, 5200:13, 5201:1, 5201:2, 5206:14, 5206:17, 5207:9, 5207:18, 5207:24, 5210:22, 5211:11, 5211:13, 5222:6, 5226:25, 5227:6, 5228:3, 5242:10, 5244:3, 5244:4, 5244:5, 5245:1, 5250:10, 5270:10, 5270:21, 5271:5, 5271:22, 5276:6, 5276:14, 5276:15, 5277:8, 5287:14, 5287:18, 5287:22, 5294:10, 5295:15, 5296:14, 5296:15, 5296:21, 5296:22, 5300:18, 5300:21, 5312:10, 5315:20, 5316:2, 5321:25

**presence** [1] - 5329:2

**present** [6] - 5150:8, 5150:25, 5151:5, 5151:23, 5206:22

**presentation** [2] - 5326:24, 5330:19

**presentations** [1] - 5210:5

**presented** [3] - 5154:6, 5192:1, 5276:4

**presenting** [2] - 5330:17, 5330:20

**pressure** [4] - 5153:2, 5153:11, 5156:9, 5157:3

**presume** [4] - 5125:10, 5127:11, 5134:16, 5339:15

**pretty** [4] - 5116:2, 5136:10, 5166:21, 5283:24

**prevent** [2] - 5200:21, 5201:22

**Prezista** [79] - 5167:3, 5168:25, 5173:25, 5174:1, 5174:14, 5175:13, 5175:16, 5189:15, 5192:1, 5193:18, 5201:6, 5206:2, 5207:10,

5208:12, 5209:21, 5209:24, 5210:11, 5210:22, 5211:1, 5211:4, 5211:8, 5211:12, 5221:9, 5221:25, 5222:6, 5223:11, 5224:18, 5235:1, 5237:15, 5237:22, 5237:24, 5238:8, 5238:9, 5239:16, 5240:19, 5240:23, 5241:1, 5241:4, 5241:5, 5241:11, 5241:14, 5241:16, 5241:21, 5241:24, 5242:13, 5242:17, 5243:8, 5243:12, 5252:1, 5252:23, 5263:24, 5265:1, 5266:13, 5266:14, 5267:9, 5267:12, 5267:13, 5268:8, 5268:20, 5268:21, 5269:4, 5270:17, 5272:15, 5272:18, 5273:18, 5277:19, 5278:4, 5278:6, 5278:23, 5299:20, 5304:16, 5306:24, 5315:2, 5315:6, 5317:17, 5322:10, 5332:4

**Prezista's** [3] - 5196:4, 5209:16, 5241:19

**primarily** [4] - 5212:25, 5213:13, 5213:22, 5218:7

**primary** [3] - 5135:19, 5148:17, 5239:18

**private** [3] - 5294:20, 5294:23, 5295:1

**problem** [11] - 5170:12, 5170:13, 5181:21, 5208:13, 5235:7, 5288:17, 5288:21, 5295:9, 5306:8, 5341:6, 5341:23

**procedures** [1] - 5232:12

**proceed** [13] - 5148:3, 5153:3, 5153:5, 5159:24, 5160:16, 5161:25, 5173:20, 5182:23, 5212:15, 5223:1, 5255:25, 5290:6, 5306:11

**proceeding** [1] - 5151:1

**proceedings** [1] - 5343:5

**Proceedings** [1] - 5112:24

**PROCEEDINGS** [1] - 5114:1

**process** [7] - 5180:10, 5215:20, 5234:5, 5243:14, 5250:1, 5280:12, 5293:24

**processed** [1] - 5250:17

**processes** [2] - 5249:24, 5250:5

**processing** [5] - 5231:13, 5231:23, 5249:18, 5249:25, 5297:7

**produced** [5] - 5112:25, 5214:20, 5227:1, 5281:20, 5296:25

**producing** [1] - 5274:1

**product** [4] - 5166:24, 5166:25, 5249:1, 5273:1

**PRODUCTS** [1] - 5112:7

**products** [1] - 5215:7

**Professional** [1] - 5219:15

**professional** [1] - 5219:20

**professor** [1] - 5326:19

**Professor** [27] - 5123:21, 5219:25, 5220:1, 5220:3, 5220:5, 5220:11, 5231:6, 5247:8, 5247:11, 5247:14, 5247:17, 5248:1, 5248:8, 5248:12, 5248:19, 5251:7, 5254:8, 5255:13, 5312:3, 5312:7, 5314:20, 5324:16, 5328:7, 5335:6, 5335:7, 5335:12, 5339:2

**profile** [1] - 5238:10

**profiles** [3] - 5231:18, 5231:21, 5232:23

**profiling** [1] - 5293:24

**program** [17] - 5173:25, 5179:22, 5180:8, 5193:10, 5193:23, 5196:10, 5197:5, 5198:15,

5215:5, 5216:14, 5224:17, 5226:12, 5253:2, 5253:6, 5309:7, 5309:15, 5310:10

**Program** [3] - 5226:9, 5227:14, 5298:25

**programming** [6] - 5216:9, 5250:13, 5250:14, 5250:16, 5250:21, 5250:22

**programs** [31] - 5167:14, 5175:3, 5176:2, 5192:19, 5193:17, 5194:8, 5194:9, 5194:13, 5195:3, 5195:8, 5196:3, 5196:9, 5196:22, 5202:8, 5203:5, 5213:3, 5214:17, 5215:7, 5219:7, 5221:4, 5221:24, 5223:16, 5231:1, 5234:14, 5254:14, 5255:6, 5303:20, 5303:23, 5307:3, 5307:5, 5309:19

**prohibit** [1] - 5134:17

**prohibited** [1] - 5139:10

**projects** [3] - 5215:18, 5217:6, 5311:6

**Projects** [1] - 5218:8

**prominence** [1] - 5190:8

**promised** [1] - 5160:1

**promote** [1] - 5321:23

**promoted** [5] - 5237:24, 5238:9, 5238:23, 5242:18, 5317:16

**promoting** [1] - 5167:3

**promotion** [1] - 5238:17

**Promotional** [6] - 5162:19, 5163:11, 5167:3, 5206:2, 5206:11, 5244:24

**promotional** [9] - 5193:10, 5198:15, 5198:16, 5202:24, 5205:11, 5248:17, 5261:5, 5265:16, 5265:21

**proportion** [1] - 5245:18

**proposal** [1] - 5156:7

**proposed** [1] - 5124:8

**protease** [2] - 5207:10, 5210:9
**prove** [1] - 5311:25
**proven** [2] - 5236:1, 5238:10
**provide** [15] - 5150:19, 5220:23, 5221:21, 5239:9, 5247:6, 5247:14, 5248:11, 5251:6, 5254:21, 5255:5, 5255:11, 5311:3, 5312:16, 5314:6, 5323:2
**provided** [18] - 5148:5, 5156:20, 5202:19, 5204:2, 5209:11, 5217:3, 5226:19, 5240:13, 5255:13, 5275:2, 5281:2, 5291:15, 5302:13, 5310:14, 5314:21, 5324:16, 5324:18, 5325:12
**provider** [10] - 5166:23, 5167:9, 5199:20, 5229:20, 5233:12, 5251:25, 5252:6, 5252:12, 5265:3, 5289:11
**Provider** [4] - 5229:16, 5229:17, 5233:13, 5234:8
**provider's** [3] - 5163:14, 5210:11, 5229:9
**providers** [14] - 5163:13, 5190:9, 5196:17, 5197:6, 5206:4, 5229:20, 5236:14, 5242:20, 5242:23, 5242:24, 5248:3, 5248:7, 5248:11, 5267:4
**providers'** [1] - 5229:22
**providing** [3] - 5209:24, 5254:7, 5254:25
**proving** [1] - 5219:3
**proxies** [1] - 5227:25
**proxy** [2] - 5307:21, 5318:10
**psychology** [1] - 5218:4
**publish** [1] - 5171:18
**pull** [2] - 5186:16, 5201:20
**pulled** [1] - 5193:22
**purposes** [9] - 5116:8, 5129:17, 5214:9,

5223:20, 5264:25, 5265:7, 5303:6, 5304:18, 5305:21
**pursued** [2] - 5216:17, 5216:19
**pursuing** [1] - 5333:24
**push** [3] - 5120:8, 5139:20, 5161:7
**pushes** [1] - 5120:1
**put** [24] - 5119:18, 5126:12, 5127:7, 5136:11, 5139:15, 5139:24, 5140:1, 5142:8, 5142:19, 5150:5, 5153:2, 5158:25, 5160:5, 5163:24, 5171:5, 5171:15, 5194:9, 5211:17, 5269:5, 5331:17, 5332:20, 5333:11, 5337:24, 5339:12
**puts** [3] - 5152:4, 5156:8, 5157:3
**putting** [5] - 5135:10, 5170:25, 5336:16, 5336:22, 5338:2

## Q

**QC** [2] - 5231:17, 5293:23
**QCing** [3] - 5249:16, 5253:15, 5297:7
**QD** [5] - 5228:1, 5238:16, 5243:18, 5244:11
**qualifies** [1] - 5303:24
**quality** [6] - 5231:13, 5231:25, 5308:5, 5323:24, 5324:8, 5326:8
**quantity** [2] - 5285:8, 5326:9
**quarter** [13] - 5226:15, 5244:3, 5244:4, 5244:6, 5245:13, 5245:22, 5253:20, 5253:21, 5299:15, 5299:19, 5300:9, 5301:25
**quarters** [5] - 5123:24, 5299:24, 5300:6, 5300:8
**query** [1] - 5214:20
**questioning** [5] - 5173:1, 5332:1, 5332:24, 5336:15, 5336:19
**questions** [27] -

5126:12, 5135:18, 5146:4, 5162:7, 5171:7, 5172:6, 5172:8, 5172:9, 5172:12, 5172:14, 5180:11, 5180:12, 5201:11, 5201:14, 5208:17, 5208:22, 5211:22, 5256:7, 5290:13, 5305:24, 5306:17, 5307:25, 5323:12, 5323:14, 5323:16, 5325:4, 5326:1
**quicker** [1] - 5328:21
**quickly** [1] - 5298:22
**quite** [5] - 5198:7, 5227:21, 5232:11, 5260:12, 5328:8
**quorum** [2] - 5118:13, 5135:23
**quote** [2] - 5263:5, 5265:2
**quote-unquote** [1] - 5263:5
**Quraishi** [2] - 5130:17, 5143:23
**QURAISHI** [2] - 5112:11, 5114:2

## R

**raise** [2] - 5329:4, 5331:24
**raised** [2] - 5148:17, 5338:12
**raising** [2] - 5333:21, 5339:8
**ran** [2] - 5250:5, 5250:22
**ranked** [1] - 5167:1
**Rapids** [1] - 5185:18
**rarely** [1] - 5317:10
**rate** [1] - 5258:8
**rather** [4] - 5153:5, 5153:7, 5173:9, 5300:11
**ratio** [10] - 5228:4, 5228:5, 5244:2, 5244:5, 5244:7, 5245:19, 5246:8, 5288:2, 5291:21
**ratios** [3] - 5245:23, 5246:6, 5246:11
**raw** [1] - 5309:1
**RDR** [1] - 5343:11
**reach** [4] - 5129:18, 5130:1, 5133:25, 5254:2
**reached** [1] - 5141:23

**reaction** [2] - 5242:16, 5242:17
**read** [8] - 5138:4, 5138:10, 5138:22, 5148:19, 5150:11, 5298:11, 5317:2, 5317:7
**reading** [2] - 5156:23, 5252:17
**ready** [10] - 5146:7, 5146:22, 5160:16, 5161:16, 5161:25, 5182:23, 5212:15, 5223:1, 5290:6, 5293:13
**real** [1] - 5323:6
**real-world** [1] - 5323:6
**really** [10] - 5132:1, 5132:9, 5137:20, 5145:19, 5153:3, 5159:12, 5209:23, 5216:12, 5252:18, 5342:9
**realm** [1] - 5254:12
**reason** [19] - 5121:4, 5121:5, 5129:24, 5154:5, 5157:24, 5161:10, 5180:8, 5187:22, 5188:1, 5188:23, 5189:18, 5201:3, 5209:10, 5297:2, 5302:3, 5327:25, 5336:8, 5336:11, 5342:10
**reasonable** [11] - 5250:25, 5251:5, 5253:18, 5254:3, 5255:12, 5258:22, 5264:15, 5266:3, 5326:5, 5336:4, 5336:6
**reasons** [4] - 5147:24, 5187:15, 5187:16, 5211:2
**reboot** [5] - 5132:13, 5146:6, 5158:2, 5182:9, 5222:19
**rebooting** [1] - 5136:6
**receive** [6] - 5179:23, 5192:19, 5231:12, 5247:17, 5248:16, 5337:23
**received** [22] - 5169:5, 5195:2, 5218:5, 5226:13, 5228:14, 5233:23, 5270:25, 5273:21, 5286:6, 5287:12, 5290:22, 5291:13, 5300:17, 5304:22, 5306:23,

5307:4, 5308:7, 5309:14, 5310:10, 5310:13, 5333:1, 5336:18
**receives** [1] - 5253:3
**recently** [1] - 5217:12
**recess** [13] - 5142:8, 5143:5, 5143:12, 5143:14, 5160:8, 5160:18, 5160:19, 5182:9, 5182:15, 5182:16, 5222:18, 5222:21, 5290:1
**recognize** [1] - 5190:10
**recollection** [2] - 5180:23, 5295:20
**reconsider** [1] - 5340:10
**reconvene** [1] - 5289:23
**record** [32] - 5115:21, 5123:11, 5126:12, 5130:1, 5130:21, 5142:6, 5144:2, 5148:19, 5150:16, 5150:24, 5158:25, 5160:5, 5212:12, 5228:13, 5231:14, 5243:22, 5249:10, 5331:11, 5331:15, 5331:17, 5331:19, 5331:20, 5340:13, 5340:16, 5340:22, 5341:1, 5341:2, 5342:12, 5342:14, 5342:18, 5343:5
**record-related** [1] - 5341:2
**recorded** [2] - 5112:24, 5236:24
**records** [11] - 5186:15, 5225:19, 5234:2, 5236:8, 5236:16, 5248:17, 5249:4, 5249:5, 5249:8, 5249:9, 5249:15
**recovery** [1] - 5116:10
**red** [3] - 5179:6, 5179:19, 5179:22
**redacted** [1] - 5342:8
**REDIRECT** [4] - 5113:5, 5113:6, 5208:20, 5306:15
**redirect** [4] - 5124:22, 5125:22, 5306:2, 5332:1
**reduce** [4] - 5251:17, 5253:18, 5305:16,

5305:18
**reduces** [1] - 5301:3
**REESE** [1] - 5112:14
**reference** [3] -
5179:18, 5195:1,
5332:2
**referenced** [2] -
5234:9, 5235:2
**referencing** [1] -
5242:7
**referred** [1] - 5233:9
**referring** [5] - 5188:3,
5196:24, 5215:6,
5283:21, 5297:9
**refers** [1] - 5203:17
**reflect** [2] - 5230:11,
5230:14
**reflected** [4] -
5194:14, 5232:8,
5232:9, 5243:24
**reflects** [1] - 5292:11
**refresh** [1] - 5186:16
**refreshes** [1] - 5171:4
**regarding** [1] - 5130:1
**regardless** [3] -
5185:23, 5274:4,
5323:19
**regimen** [1] - 5317:19
**regimens** [1] -
5317:11
**regional** [3] - 5190:5,
5190:6, 5325:16
**registered** [1] -
5219:14
**registry** [3] - 5229:17,
5229:18, 5233:11
**regulation** [1] -
5202:23
**regulations** [6] -
5156:20, 5187:10,
5187:15, 5200:20,
5201:21, 5203:1
**regulatory** [1] -
5204:21
**reimburse** [4] -
5183:23, 5307:9,
5316:23, 5321:19
**reimbursed** [19] -
5189:6, 5189:12,
5192:14, 5192:15,
5192:16, 5214:17,
5215:8, 5215:16,
5217:17, 5219:4,
5251:11, 5274:5,
5284:11, 5300:21,
5302:10, 5307:2,
5307:5, 5321:25,
5336:23
**reimbursement** [10] -
5169:8, 5215:5,

5219:7, 5221:4,
5255:7, 5286:10,
5294:14, 5333:1,
5335:11, 5336:18
**reimbursements** [11] -
5214:2, 5217:20,
5223:10, 5245:8,
5302:24, 5303:2,
5303:7, 5303:8,
5322:9, 5322:21
**rejected** [1] - 5277:7
**relate** [3] - 5188:14,
5228:19, 5341:8
**related** [17] - 5125:17,
5145:9, 5167:9,
5216:24, 5218:21,
5224:13, 5235:7,
5254:13, 5277:19,
5277:24, 5278:3,
5278:22, 5280:24,
5281:4, 5281:6,
5341:2, 5341:14
**relates** [8] - 5220:17,
5235:20, 5245:5,
5297:10, 5301:8,
5304:11, 5308:20,
5311:4
**relating** [4] - 5213:17,
5213:25, 5214:22,
5254:25
**relationship** [1] -
5196:17
**relationships** [2] -
5152:20, 5152:23
**relatively** [2] - 5309:5,
5319:15
**Relators** [35] -
5112:17, 5114:10,
5114:12, 5114:13,
5117:7, 5117:25,
5124:4, 5135:5,
5138:12, 5138:24,
5139:6, 5148:18,
5150:17, 5159:1,
5159:3, 5162:11,
5162:18, 5188:11,
5212:7, 5219:3,
5219:10, 5236:2,
5240:15, 5242:12,
5242:18, 5257:21,
5262:11, 5310:14,
5311:25, 5322:15,
5330:10, 5330:13,
5335:13, 5337:23,
5338:2
**Relators'** [45] -
5113:9, 5113:10,
5113:12, 5113:14,
5113:15, 5114:8,
5115:4, 5123:19,

5127:2, 5148:12,
5148:21, 5159:22,
5162:12, 5163:4,
5165:10, 5173:21,
5186:14, 5193:14,
5212:2, 5212:4,
5220:19, 5223:24,
5224:11, 5224:12,
5224:13, 5224:14,
5224:25, 5225:1,
5231:5, 5237:23,
5239:5, 5239:11,
5239:13, 5244:22,
5245:5, 5251:6,
5277:1, 5280:6,
5287:6, 5291:11,
5303:14, 5321:18,
5327:7, 5330:19,
5333:20
**relators'** [3] - 5113:15,
5224:23, 5225:2
**relayed** [2] - 5116:13,
5123:6
**relevant** [7] - 5142:4,
5225:8, 5266:22,
5267:6, 5267:23,
5272:18, 5300:2
**reliable** [1] - 5308:15
**reliably** [1] - 5249:24
**relied** [1] - 5149:8
**remain** [4] - 5143:12,
5143:15, 5290:2,
5331:7
**remaining** [4] -
5149:4, 5156:9,
5157:3, 5159:3
**remedy** [1] - 5158:21
**remember** [4] -
5204:15, 5204:16,
5301:5, 5324:24
**remind** [9] - 5123:25,
5144:7, 5145:13,
5145:14, 5160:12,
5290:7, 5327:21,
5329:9
**reminded** [1] - 5126:3
**reminder** [2] -
5161:21, 5222:24
**reminding** [1] -
5209:18
**remotely** [1] - 5144:5
**remove** [2] - 5207:3,
5283:10
**removing** [2] -
5207:23, 5208:11
**rep** [8] - 5200:5,
5228:17, 5241:8,
5260:20, 5261:1,
5267:7, 5268:19,
5312:11

**repay** [1] - 5313:10
**repeat** [5] - 5191:1,
5277:21, 5308:12,
5309:16, 5324:9
**replaced** [1] - 5207:9
**report** [3] - 5220:10,
5295:25, 5341:3
**reporter** [1] - 5181:18
**Reporter** [3] -
5112:23, 5256:10,
5343:12
**REPORTER'S** [1] -
5343:1
**repositories** [1] -
5223:20
**repository** [1] -
5236:25
**represent** [3] - 5128:8,
5202:18, 5287:19
**representation** [1] -
5232:24
**representative** [5] -
5175:21, 5175:22,
5200:6, 5200:12,
5315:2
**representatives** [8] -
5175:2, 5176:1,
5176:5, 5176:7,
5236:14, 5266:23,
5325:15
**representatives'** [1] -
5229:3
**represented** [3] -
5236:16, 5292:2,
5294:23
**representing** [3] -
5257:14, 5257:21,
5262:11
**reprimanded** [1] -
5200:6
**reps** [2] - 5269:2,
5269:20
**request** [10] - 5125:21,
5135:21, 5149:3,
5149:19, 5158:1,
5190:11, 5256:10,
5339:19, 5341:5,
5341:8
**requesting** [1] -
5341:3
**requests** [3] -
5247:17, 5247:21,
5247:22
**require** [1] - 5121:19
**required** [4] - 5115:16,
5132:19, 5171:10,
5240:20
**requirements** [2] -
5303:24, 5304:2
**requires** [1] - 5131:19

**requiring** [3] - 5200:2,
5200:4, 5200:5
**reschedule** [3] -
5145:23, 5147:4,
5155:14
**rescheduled** [2] -
5145:22, 5151:8
**research** [1] - 5216:10
**Research** [1] - 5218:8
**resolve** [2] - 5233:2,
5335:2
**resolved** [1] - 5204:7
**resources** [4] -
5131:13, 5131:18,
5134:19, 5284:18
**respect** [47] - 5132:22,
5132:23, 5147:13,
5162:19, 5169:5,
5187:11, 5188:12,
5193:9, 5202:9,
5213:20, 5220:15,
5221:19, 5222:2,
5225:7, 5225:18,
5225:22, 5226:6,
5226:12, 5226:20,
5227:21, 5227:25,
5228:9, 5229:13,
5237:23, 5238:8,
5238:11, 5238:15,
5238:16, 5238:22,
5239:16, 5239:21,
5239:22, 5240:9,
5240:14, 5242:12,
5242:16, 5242:25,
5243:18, 5244:14,
5245:7, 5246:15,
5247:18, 5248:10,
5253:1, 5253:12,
5253:14, 5309:13
**respond** [2] - 5201:17,
5317:10
**response** [10] -
5124:23, 5125:7,
5125:9, 5125:10,
5152:15, 5157:9,
5157:14, 5202:1,
5293:14
**responses** [2] -
5133:12, 5171:22
**responsible** [2] -
5176:2, 5176:8
**rest** [8] - 5123:10,
5154:9, 5154:12,
5154:17, 5327:7,
5328:18, 5330:11,
5330:14
**Restaurant** [1] -
5185:10
**restaurant** [2] -
5181:5, 5192:15

**restaurants** [1] - 5184:7

**resting** [2] - 5148:12, 5327:18

**restricted** [1] - 5278:8

**restrictions** [1] - 5279:20

**result** [4] - 5219:4, 5306:24, 5309:15, 5313:9

**resulted** [2] - 5234:6, 5275:6

**results** [26] - 5239:7, 5241:22, 5245:16, 5247:6, 5247:11, 5247:23, 5251:18, 5272:14, 5273:4, 5275:11, 5277:15, 5277:16, 5297:18, 5297:24, 5298:2, 5305:16, 5309:3, 5309:4, 5315:8, 5316:14, 5316:19, 5318:6, 5318:8, 5322:18, 5324:17, 5326:7

**resume** [1] - 5147:23

**return** [11] - 5134:20, 5134:24, 5162:12, 5162:18, 5162:21, 5193:8, 5193:10, 5193:17, 5193:23, 5198:3, 5210:12

**returned** [1] - 5127:17

**returns** [1] - 5196:10

**revenue** [1] - 5168:14

**reverse** [2] - 5130:12, 5315:25

**review** [2] - 5220:10, 5222:2

**reviewed** [4] - 5220:20, 5222:5, 5232:21, 5239:13

**revision** [3] - 5230:13, 5281:3

**revisit** [3] - 5157:24, 5339:3, 5339:22

**Reyataz** [3] - 5164:18, 5238:10, 5311:19

**Ricky** [1] - 5177:5

**RICKY** [1] - 5113:4

**rid** [1] - 5329:13

**rise** [6] - 5114:4, 5160:20, 5182:18, 5222:20, 5222:22, 5290:3

**risk** [3] - 5120:16, 5135:10, 5242:19

**Ristorante** [1] - 5180:20

**Rite** [17] - 5224:12, 5226:22, 5227:19, 5286:25, 5288:13, 5293:5, 5293:21, 5295:5, 5295:14, 5295:19, 5296:21, 5296:22, 5296:25, 5297:4, 5297:8, 5308:1, 5319:1

**Rock** [1] - 5181:4

**Rodney** [1] - 5112:20

**role** [2] - 5214:4, 5264:11

**Room** [1] - 5184:25

**room** [3] - 5153:16, 5156:15, 5193:2

**rooted** [1] - 5316:11

**roughly** [3] - 5167:19, 5167:20, 5309:1

**row** [1] - 5115:4

**rows** [1] - 5174:10

**rule** [2] - 5150:18, 5340:7

**ruled** [3] - 5329:5, 5329:11, 5340:1

**run** [5] - 5249:21, 5249:24, 5253:2, 5279:7, 5282:5

**running** [2] - 5249:22, 5250:1

**RUSS** [4] - 5112:15, 5114:13, 5129:1, 5129:4

**Russ** [2] - 5114:13, 5129:8

**Ruth's** [2] - 5186:9, 5191:16

**RX-1737** [3] - 5113:10, 5169:13, 5173:21

**RX-360** [1] - 5202:16

**RX-91** [5] - 5113:9, 5165:6, 5165:10, 5165:18, 5165:20

---

# S

**sacrifice** [2] - 5149:15, 5157:15

**Saint** [1] - 5112:16

**sale** [1] - 5311:19

**sales** [46] - 5175:2, 5175:21, 5175:22, 5176:1, 5176:7, 5195:12, 5195:19, 5228:17, 5229:3, 5233:10, 5234:7, 5236:13, 5237:19, 5237:21, 5238:5, 5238:14, 5238:17, 5238:21, 5240:25,

5241:8, 5242:6, 5242:7, 5243:12, 5248:17, 5260:20, 5261:1, 5262:23, 5263:1, 5265:16, 5266:23, 5267:7, 5267:25, 5268:3, 5268:7, 5268:19, 5269:2, 5269:16, 5269:20, 5270:25, 5306:24, 5307:10, 5310:20, 5311:9, 5312:19, 5315:2, 5325:15

**same..** [1] - 5165:17

**sample** [4] - 5228:2, 5228:5, 5230:10, 5319:13

**San** [1] - 5185:5

**SANDERSON** [1] - 5112:15

**Santa** [1] - 5185:4

**Sarasota** [1] - 5184:21

**satisfied** [3] - 5241:15, 5241:17, 5246:23

**satisfy** [2] - 5244:19, 5247:22

**satisfying** [2] - 5246:7, 5246:9

**Savannah** [1] - 5185:5

**save** [1] - 5254:11

**saw** [1] - 5277:8

**scanned** [1] - 5243:3

**scare** [1] - 5159:12

**scenario** [2] - 5140:16, 5276:5

**schedule** [24] - 5115:14, 5116:17, 5117:22, 5121:18, 5122:10, 5123:3, 5123:13, 5124:3, 5125:1, 5125:6, 5133:18, 5138:14, 5141:16, 5142:18, 5155:5, 5155:19, 5155:21, 5158:16, 5158:17, 5176:8, 5176:13, 5183:4, 5329:12, 5330:8

**scheduled** [3] - 5130:24, 5130:25, 5179:11

**scheme** [1] - 5311:9

**science** [6] - 5150:6, 5150:15, 5151:22, 5217:22, 5218:9, 5249:19

**scientist** [1] - 5150:5

**scoot** [2] - 5213:5,

5213:8

**scope** [3] - 5232:8, 5260:23, 5266:5

**screen** [1] - 5166:1

**script** [1] - 5250:21

**scripting** [1] - 5250:12

**scripts** [5] - 5250:9, 5250:12, 5250:17, 5250:20, 5250:22

**scroll** [1] - 5191:22

**Seafood** [1] - 5184:25

**search** [3] - 5235:12, 5291:16, 5341:4

**seat** [8] - 5115:4, 5160:22, 5161:3, 5182:20, 5222:23, 5222:24, 5290:5, 5331:10

**seated** [9] - 5114:5, 5129:1, 5129:3, 5129:6, 5129:14, 5143:12, 5143:15, 5150:3, 5290:2

**second** [25] - 5121:25, 5122:2, 5131:21, 5131:23, 5148:17, 5148:24, 5153:11, 5177:25, 5201:19, 5235:18, 5268:24, 5270:8, 5270:10, 5271:5, 5271:16, 5271:22, 5276:6, 5277:8, 5289:18, 5289:21, 5306:7, 5317:1, 5318:13, 5318:17, 5327:15

**second-largest** [1] - 5318:13

**second-to-last** [1] - 5327:15

**secondarily** [1] - 5308:23

**secondly** [1] - 5136:23

**see** [93] - 5122:22, 5126:20, 5127:3, 5127:5, 5129:14, 5129:24, 5131:4, 5132:15, 5133:23, 5145:17, 5148:18, 5149:18, 5151:16, 5156:24, 5157:24, 5158:1, 5158:21, 5158:25, 5159:3, 5161:14, 5163:2, 5163:19, 5163:22, 5164:2, 5164:5, 5164:8, 5164:14, 5164:20, 5165:2, 5165:15, 5165:22, 5165:23, 5165:25,

5166:2, 5166:6, 5166:11, 5166:13, 5169:22, 5171:4, 5172:2, 5172:3, 5174:5, 5174:9, 5174:11, 5174:13, 5174:19, 5174:23, 5175:5, 5176:16, 5176:24, 5177:6, 5177:8, 5178:15, 5179:8, 5179:25, 5180:21, 5181:6, 5184:10, 5184:23, 5185:3, 5185:7, 5191:14, 5191:19, 5191:25, 5192:4, 5192:11, 5193:23, 5193:25, 5194:19, 5194:23, 5195:4, 5195:13, 5195:14, 5195:20, 5195:24, 5196:5, 5231:21, 5278:22, 5278:23, 5292:13, 5293:17, 5296:5, 5296:22, 5311:17, 5311:20, 5312:14, 5314:21, 5325:22, 5326:15, 5328:3, 5338:13, 5339:12, 5341:23

**seeing** [1] - 5197:8

**seem** [2] - 5175:11, 5267:20

**sees** [1] - 5161:14

**segment** [1] - 5190:13

**Seim** [2] - 5219:17, 5280:20

**select** [2] - 5163:10, 5167:24

**selected** [2] - 5149:7, 5149:14

**selecting** [2] - 5206:1, 5275:23

**selection** [1] - 5168:2

**selections** [1] - 5163:12

**self** [1] - 5276:1

**self-evident** [1] - 5276:1

**send** [1] - 5142:14

**sending** [1] - 5130:10

**senior** [1] - 5219:16

**sense** [16] - 5131:6, 5131:16, 5135:4, 5144:15, 5146:25, 5147:25, 5167:18, 5210:8, 5264:7, 5269:20, 5285:8, 5285:10, 5301:22, 5303:1, 5330:4,

5331:2
**sentence** [1] - 5178:15
**separate** [5] - 5169:6,
5169:7, 5171:23,
5228:18, 5284:19
**separately** [3] -
5130:5, 5130:6,
5170:24
**September** [2] -
5241:12, 5241:20
**series** [5] - 5241:16,
5241:19, 5242:10,
5271:2, 5300:8
**serious** [3] - 5120:19,
5121:13, 5242:17
**Serono** [3] - 5199:7,
5203:18, 5203:22
**serve** [11] - 5132:14,
5133:4, 5133:13,
5139:17, 5148:16,
5151:8, 5158:19,
5161:2, 5303:20
**server** [1] - 5250:5
**servers** [5] - 5249:22,
5249:23, 5249:24,
5250:5, 5250:18
**service** [6] - 5131:9,
5131:11, 5131:21,
5132:19, 5134:2,
5249:1
**services** [11] - 5126:7,
5215:7, 5215:9,
5217:3, 5220:23,
5221:22, 5235:24,
5236:4, 5284:18,
5310:13, 5311:3
**Services** [3] - 5224:1,
5284:20, 5284:22
**serving** [2] - 5132:24,
5134:18
**set** [5] - 5116:16,
5127:23, 5215:21,
5221:21, 5315:8
**sets** [3] - 5217:15,
5228:22, 5247:24
**setting** [1] - 5176:2
**settled** [3] - 5204:2,
5205:2, 5205:12
**settlement** [1] -
5214:9
**settlements** [1] -
5204:12
**several** [5] - 5145:23,
5180:25, 5186:24,
5210:21, 5300:8
**severe** [2] - 5115:23,
5119:5
**Shaked** [32] - 5123:21,
5219:25, 5220:1,
5220:3, 5220:5,

5220:11, 5231:6,
5247:7, 5247:11,
5254:8, 5272:3,
5274:1, 5275:22,
5276:20, 5276:25,
5283:7, 5312:3,
5312:7, 5312:14,
5314:20, 5322:16,
5324:16, 5326:19,
5328:7, 5332:8,
5332:13, 5334:3,
5335:6, 5335:7,
5335:12, 5339:2
**Shaked's** [10] -
5247:8, 5247:14,
5247:18, 5248:1,
5248:8, 5248:12,
5248:19, 5251:7,
5255:13, 5322:20
**shared** [2] - 5231:5,
5239:12
**sheet** [1] - 5164:20
**Sherr** [1] - 5163:25
**Shield** [1] - 5294:20
**shift** [1] - 5161:4
**shoes** [2] - 5211:17,
5211:18
**short** [9] - 5122:25,
5133:19, 5143:14,
5160:19, 5161:9,
5182:16, 5222:21,
5290:1, 5329:6
**show** [2] - 5169:19,
5171:3, 5177:1,
5186:15, 5193:14,
5270:15, 5295:23,
5300:7, 5336:4
**showed** [3] - 5189:14,
5270:15, 5295:15
**showing** [1] - 5173:23
**shown** [3] - 5170:14,
5208:25, 5209:13
**shows** [2] - 5206:16,
5270:17
**sibling** [3] - 5211:13,
5126:5, 5137:9
**sick** [1] - 5137:16
**side** [9] - 5160:2,
5174:15, 5207:15,
5210:24, 5212:5,
5228:23, 5242:19,
5251:16, 5338:10
**sidebar** [1] - 5169:19
**Sidebar** [4] - 5169:21,
5173:4, 5326:16,
5329:23
**sides** [1] - 5140:17
**sign** [2] - 5252:16
**significant** [10] -
5117:2, 5136:10,

5141:2, 5149:24,
5154:5, 5154:24,
5237:19, 5242:6,
5337:23
**significantly** [1] -
5220:22
**silent** [1] - 5150:17
**Sillup** [2] - 5260:1,
5269:19
**similar** [13] - 5115:22,
5120:19, 5210:25,
5238:10, 5245:8,
5292:6, 5292:7,
5302:24, 5303:1,
5303:7, 5304:11,
5311:19, 5324:3
**similarly** [1] - 5261:10
**simple** [2] - 5214:20,
5269:5
**simply** [2] - 5260:3,
5273:3
**simultaneously** [1] -
5249:25
**single** [3] - 5246:16,
5333:6, 5335:21
**singled** [1] - 5227:22
**singles** [1] - 5335:8
**sit** [7] - 5123:17,
5129:12, 5149:6,
5149:11, 5193:16,
5198:1, 5206:8
**sits** [1] - 5115:3
**sitting** [6] - 5118:4,
5121:20, 5137:21,
5143:9, 5153:8,
5161:5
**situation** [11] -
5120:15, 5120:19,
5142:3, 5142:12,
5145:21, 5208:3,
5211:20, 5263:8,
5299:23, 5341:18
**situations** [1] -
5251:15
**six** [6] - 5136:25,
5138:20, 5139:1,
5141:4, 5155:20,
5176:14
**size** [4] - 5227:24,
5228:3, 5228:5
**SKADDEN** [1] -
5112:18
**skill** [1] - 5217:15
**skills** [4] - 5216:11,
5217:22, 5217:23,
5249:20
**slammed** [1] - 5145:2
**SLATE** [1] - 5112:18
**slide** [6] - 5166:2,
5173:8, 5203:14,

5266:12, 5270:15
**slightly** [1] - 5207:21
**slowdown** [1] -
5249:25
**slower** [1] - 5149:10
**small** [4] - 5215:21,
5218:6, 5230:11,
5319:15
**smaller** [8] - 5279:14,
5298:1, 5308:23,
5309:8, 5309:19,
5309:22, 5310:2,
5323:2
**smart** [1] - 5156:17
**smooth** [1] - 5300:11
**snapshot** [1] -
5176:13
**sold** [2] - 5223:9,
5322:10
**solo** [1] - 5145:15
**solve** [1] - 5120:18
**someone** [1] -
5240:24
**sometime** [1] -
5330:11
**sometimes** [4] -
5145:23, 5214:25,
5301:24, 5321:3
**somewhat** [1] -
5240:18
**somewhere** [2] -
5285:12, 5330:21
**Sonny** [2] - 5181:5,
5184:6
**soon** [3] - 5141:25,
5146:24, 5331:21
**sooner** [1] - 5134:9
**sorry** [27] - 5116:4,
5119:13, 5121:21,
5122:15, 5130:20,
5168:10, 5173:14,
5177:11, 5178:13,
5180:6, 5181:16,
5191:1, 5191:7,
5196:19, 5213:4,
5215:6, 5234:18,
5234:19, 5237:9,
5239:6, 5252:4,
5252:11, 5261:21,
5267:17, 5281:24,
5294:9, 5334:5
**Sorry** [1] - 5145:13
**sort** [15] - 5119:6,
5191:14, 5191:19,
5199:18, 5200:21,
5201:22, 5232:24,
5233:10, 5234:5,
5237:17, 5241:19,
5267:17, 5296:20,
5298:2, 5298:5

**sorted** [2] - 5177:4,
5192:4
**Soule** [2] - 5112:23,
5343:11
**Soule@njd.uscourts**
**.gov** [1] - 5112:23
**sound** [3] - 5178:2,
5181:24, 5258:23
**sounded** [1] - 5258:24
**sounds** [6] - 5133:12,
5134:18, 5147:17,
5182:11, 5258:21
**soup** [1] - 5229:14
**source** [3] - 5220:22,
5286:16, 5297:9
**speaker** [65] - 5162:9,
5163:11, 5163:12,
5168:12, 5168:25,
5169:6, 5173:25,
5174:17, 5175:6,
5175:8, 5176:2,
5177:2, 5177:6,
5177:7, 5179:23,
5183:4, 5183:19,
5187:3, 5190:5,
5190:6, 5191:25,
5192:4, 5192:10,
5193:10, 5194:8,
5194:13, 5196:3,
5196:10, 5198:15,
5198:17, 5200:7,
5202:24, 5207:4,
5207:24, 5209:4,
5210:6, 5210:16,
5211:9, 5224:14,
5224:16, 5224:17,
5228:15, 5228:16,
5228:24, 5233:6,
5233:25, 5234:7,
5237:7, 5238:5,
5238:14, 5238:20,
5240:1, 5240:6,
5240:10, 5240:25,
5244:21, 5272:15,
5272:24, 5273:17,
5273:18, 5273:22,
5315:9, 5315:10
**Speaker** [5] - 5162:20,
5163:11, 5206:2,
5206:11, 5244:24
**speaker's** [2] -
5183:20, 5240:7
**speakers** [28] -
5167:13, 5189:4,
5189:16, 5189:21,
5190:7, 5190:8,
5190:11, 5196:18,
5196:25, 5197:1,
5197:5, 5197:13,
5197:23, 5198:2,

5204:22, 5206:1, 5206:16, 5206:19, 5207:3, 5207:4, 5208:12, 5233:25, 5239:23, 5244:16, 5248:11, 5272:10, 5274:4

**speakers'** [10] - 5166:16, 5189:17, 5193:18, 5197:18, 5200:11, 5203:8, 5205:11, 5206:9, 5208:5, 5209:12

**Speakers'** [1] - 5167:4

**speaking** [29] - 5129:2, 5144:2, 5150:10, 5166:16, 5169:8, 5175:3, 5175:10, 5179:2, 5180:25, 5188:15, 5190:9, 5191:11, 5196:17, 5199:15, 5207:12, 5207:17, 5209:1, 5239:24, 5240:2, 5241:8, 5243:12, 5248:7, 5262:19, 5263:2, 5263:13, 5263:20, 5264:3, 5319:15

**speaks** [2] - 5201:1, 5272:24

**specialist** [1] - 5229:12

**specialties** [1] - 5229:23

**specialty** [3] - 5167:23, 5229:10, 5318:21

**specific** [28] - 5175:3, 5192:4, 5215:19, 5218:15, 5223:16, 5227:24, 5230:2, 5230:16, 5230:25, 5231:15, 5234:15, 5245:22, 5249:1, 5252:12, 5254:12, 5281:5, 5283:20, 5287:21, 5294:22, 5301:13, 5304:9, 5304:14, 5304:24, 5311:16, 5311:24, 5322:17, 5323:10

**specifically** [16] - 5166:25, 5184:18, 5202:24, 5206:9, 5213:12, 5213:20, 5217:18, 5221:13, 5239:16, 5241:4, 5266:18, 5273:9, 5292:5, 5299:24,

5318:15, 5332:9

**specifics** [4] - 5204:11, 5219:2, 5227:22, 5287:9

**specify** [1] - 5244:3

**speculating** [2] - 5125:2, 5125:4

**speech** [10] - 5176:20, 5178:20, 5180:19, 5181:5, 5185:14, 5185:19, 5185:22, 5185:23, 5186:8, 5264:15

**speeches** [9] - 5176:9, 5178:21, 5185:3, 5187:1, 5198:23, 5203:23, 5205:10, 5210:17, 5261:5

**speed** [2] - 5250:2, 5250:6

**speed-up** [1] - 5250:2

**spelling** [1] - 5212:12

**spent** [1] - 5192:9

**spoken** [2] - 5204:19, 5244:18

**sponsored** [1] - 5254:17

**spot** [1] - 5161:11

**spreadsheet** [4] - 5186:17, 5191:14, 5224:14, 5224:15

**Square** [1] - 5112:20

**squares** [1] - 5325:23

**staff** [1] - 5123:9

**stage** [2] - 5122:7, 5138:2

**stand** [5] - 5125:14, 5129:3, 5192:7, 5340:8, 5341:10

**standard** [1] - 5210:24

**standby** [1] - 5147:6

**standing** [4] - 5129:9, 5129:14, 5146:8, 5158:6

**stands** [1] - 5226:8

**start** [16] - 5116:1, 5153:7, 5153:8, 5154:25, 5156:14, 5156:16, 5157:4, 5174:6, 5174:10, 5256:12, 5326:18, 5326:21, 5327:22, 5329:7, 5330:13, 5331:4

**started** [5] - 5136:17, 5197:2, 5214:3, 5216:21, 5296:25

**starting** [4] - 5156:21, 5174:20, 5180:4, 5300:9

**starts** [2] - 5270:2, 5305:16

**state** [17] - 5128:1, 5144:6, 5167:24, 5186:23, 5212:11, 5214:6, 5215:14, 5225:15, 5226:15, 5229:24, 5245:13, 5245:22, 5253:3, 5253:5, 5253:21, 5299:15, 5299:18

**State** [1] - 5112:9

**statement** [1] - 5171:12

**statements** [1] - 5170:19

**States** [5] - 5114:2, 5202:10, 5214:5, 5215:13, 5248:16

**STATES** [3] - 5112:1, 5112:3, 5112:12

**states** [11] - 5169:1, 5225:16, 5226:11, 5253:5, 5293:3, 5293:5, 5293:22, 5293:23, 5299:23, 5300:3, 5305:10

**statistical** [5] - 5220:7, 5247:12, 5251:7, 5313:23, 5328:8

**statistician** [3] - 5220:6, 5314:9, 5314:12

**statistics** [8] - 5228:8, 5231:6, 5247:23, 5247:24, 5312:4, 5314:17, 5314:21, 5319:11

**status** [2] - 5128:21, 5145:18

**statute** [1] - 5333:24

**Statute** [3] - 5156:20, 5221:18, 5239:22

**statutes** [1] - 5190:15

**Stay** [1] - 5317:19

**stay** [5] - 5138:8, 5158:13, 5192:16, 5317:3, 5331:12

**stayed** [1] - 5218:5

**Steak** [2] - 5186:9, 5191:16

**Steck** [2] - 5256:14, 5256:18

**stenography** [1] - 5112:24

**step** [2] - 5130:2, 5235:18

**steps** [9] - 5138:19, 5214:21, 5231:13,

5251:3, 5288:25, 5289:1, 5297:7, 5328:21, 5328:22

**sticks** [1] - 5265:16

**still** [29] - 5118:13, 5131:3, 5131:24, 5132:6, 5132:19, 5133:15, 5135:7, 5139:19, 5141:16, 5146:4, 5148:8, 5155:4, 5155:9, 5160:12, 5160:14, 5161:21, 5200:6, 5200:11, 5210:25, 5211:1, 5222:25, 5290:7, 5305:20, 5311:6, 5330:25, 5341:10, 5342:13, 5342:19

**stolen** [1] - 5151:18

**stop** [2] - 5161:11, 5181:16

**stored** [1] - 5215:25

**Street** [3] - 5112:9, 5112:16, 5112:21

**stretch** [2] - 5289:21, 5326:22

**strict** [1] - 5268:5

**stricter** [2] - 5275:20, 5275:23

**strike** [1] - 5201:19

**strikes** [1] - 5150:4

**striking** [1] - 5202:2

**strong** [3] - 5134:23, 5194:13, 5338:11

**studies** [1] - 5218:12

**study** [1] - 5194:15

**studying** [1] - 5216:6

**stuff** [3] - 5172:16, 5285:12, 5301:25

**subcategory** [1] - 5263:10

**subject** [1] - 5333:14

**submissions** [1] - 5340:23

**submitted** [7] - 5215:4, 5215:16, 5215:24, 5221:3, 5221:23, 5232:5, 5311:24

**subscriber** [1] - 5317:18

**subsequent** [1] - 5316:2

**subset** [3] - 5214:19, 5308:23, 5309:8

**subtle** [1] - 5264:8

**succinct** [1] - 5232:24

**sufficient** [4] - 5116:8, 5118:24, 5148:7,

5159:7

**sugar** [1] - 5282:18

**suggest** [1] - 5151:2

**suggested** [3] - 5181:23, 5273:20, 5292:13

**suggesting** [2] - 5157:10, 5175:7

**suggestion** [2] - 5122:21, 5327:3

**suitable** [1] - 5329:6

**Suite** [1] - 5112:16

**suited** [1] - 5259:25

**sum** [1] - 5299:13

**summaries** [9] - 5247:10, 5247:14, 5247:23, 5247:24, 5248:1, 5255:12, 5272:5, 5274:1, 5275:2

**summarize** [4] - 5261:20, 5261:22, 5261:23, 5312:16

**Summary** [1] - 5164:18

**summary** [8] - 5164:19, 5245:12, 5248:8, 5248:12, 5248:18, 5274:11, 5274:16, 5275:3

**superior** [1] - 5210:12

**superset** [1] - 5263:10

**supply** [1] - 5285:7

**support** [4] - 5137:22, 5256:19, 5323:2, 5325:1

**supported** [1] - 5269:10

**supporting** [1] - 5214:4

**supportive** [6] - 5137:25, 5138:23, 5148:21, 5148:22

**supports** [1] - 5138:9

**supposed** [3] - 5115:7, 5129:18, 5330:8

**supposedly** [1] - 5320:11

**surfaces** [2] - 5142:8, 5142:9

**surgery** [10] - 5115:6, 5115:8, 5115:10, 5116:10, 5130:24, 5131:2, 5131:3, 5132:24, 5133:1, 5137:10

**surprised** [1] - 5116:21

**surveys** [1] - 5265:20

sustained [1] - 5168:8
Swanson [6] -
5219:13, 5219:20,
5235:14, 5243:15,
5280:11, 5281:25
switching [1] - 5212:2
SWORN/AFFIRMED
[1] - 5212:9
system [5] - 5122:25,
5139:18, 5141:14,
5158:14, 5158:19
System [1] - 5229:16
systems [1] - 5218:5

## T

tab [1] - 5281:13
table [2] - 5115:4,
5127:10
tablets [2] - 5285:9,
5285:17
tack [2] - 5342:5,
5342:9
tailed [1] - 5207:25
tailor [2] - 5150:7,
5150:24
tailored [1] - 5150:9
talks [1] - 5177:24
tally [1] - 5259:12
Tampa [1] - 5184:21
target [1] - 5327:6
taxonomy [2] -
5229:7, 5229:23
taxpayer [1] - 5189:12
taxpayers [2] -
5189:9, 5202:11
tea [3] - 5138:22,
5148:19, 5156:23
team [17] - 5220:1,
5247:15, 5247:18,
5247:20, 5248:8,
5248:12, 5248:19,
5251:7, 5254:8,
5255:13, 5255:16,
5274:1, 5275:22,
5276:3, 5276:4,
5276:11, 5283:7
tech [2] - 5127:24,
5128:1
technical [1] -
5250:13
technically [1] -
5341:10
Telephone [2] -
5134:14, 5143:22
telephonically [2] -
5115:20, 5116:12
temporary [1] - 5123:2
ten [8] - 5136:7,
5137:8, 5137:13,

5161:13, 5181:3,
5182:9, 5189:23,
5222:18
ten-minute [3] -
5161:13, 5182:9,
5222:18
tend [4] - 5232:6,
5279:8, 5317:3,
5318:7
Tennessee [1] -
5184:12
tenth [1] - 5253:19
term [3] - 5162:21,
5314:16, 5322:5
termed [1] - 5248:2
terminated [1] -
5241:20
terms [26] - 5117:22,
5168:24, 5196:10,
5216:13, 5225:9,
5229:23, 5230:7,
5232:11, 5232:23,
5248:23, 5249:3,
5253:17, 5263:6,
5275:9, 5276:21,
5279:23, 5285:8,
5288:2, 5289:1,
5291:15, 5297:18,
5302:6, 5309:2,
5309:19, 5316:22,
5324:5
terrible [1] - 5181:22
test [3] - 5192:8,
5291:6, 5324:4
testified [7] - 5220:14,
5239:3, 5266:24,
5297:6, 5318:9,
5332:13, 5339:11
TESTIFIED [1] -
5212:9
testify [9] - 5124:7,
5124:19, 5125:2,
5144:16, 5155:18,
5256:24, 5293:13,
5322:16, 5332:16
testifying [7] - 5127:1,
5128:16, 5144:5,
5144:6, 5144:7,
5231:6, 5235:19
testimony [46] -
5122:11, 5124:19,
5124:20, 5125:22,
5129:22, 5142:9,
5142:20, 5146:22,
5154:6, 5159:25,
5161:6, 5162:7,
5168:6, 5168:15,
5190:23, 5191:3,
5191:6, 5191:8,
5198:8, 5198:11,

5206:23, 5207:6,
5218:16, 5256:18,
5258:20, 5258:21,
5260:19, 5269:9,
5269:14, 5269:19,
5273:8, 5317:2,
5317:3, 5317:5,
5317:20, 5324:25,
5325:9, 5325:21,
5326:25, 5330:15,
5333:17, 5339:4,
5339:7, 5339:9,
5341:14, 5341:25
Texas [2] - 5112:17,
5293:6
text [5] - 5227:5,
5230:10, 5243:23,
5243:24, 5243:25
THE [286] - 5112:1,
5112:11, 5114:4,
5114:5, 5114:14,
5114:18, 5115:1,
5116:6, 5116:20,
5117:5, 5117:11,
5117:16, 5117:25,
5118:6, 5118:12,
5118:18, 5118:20,
5118:24, 5119:4,
5119:11, 5119:12,
5119:13, 5119:14,
5119:15, 5119:22,
5120:1, 5120:5,
5120:13, 5121:8,
5122:2, 5123:3,
5124:2, 5124:12,
5124:17, 5125:4,
5125:9, 5125:16,
5125:23, 5126:18,
5127:15, 5127:25,
5128:3, 5128:10,
5128:14, 5128:18,
5128:20, 5129:2,
5129:6, 5129:13,
5129:20, 5130:6,
5130:11, 5130:15,
5130:16, 5130:20,
5131:2, 5131:6,
5131:17, 5132:4,
5132:11, 5132:17,
5132:22, 5133:4,
5133:7, 5133:10,
5133:24, 5134:6,
5134:12, 5134:15,
5134:24, 5135:1,
5135:12, 5135:15,
5135:18, 5136:1,
5136:20, 5137:7,
5137:17, 5137:24,
5138:6, 5138:11,
5139:9, 5140:6,
5140:9, 5140:20,

5140:24, 5141:5,
5141:19, 5142:2,
5142:7, 5143:2,
5143:5, 5143:15,
5143:16, 5143:18,
5143:23, 5143:25,
5144:1, 5144:9,
5144:11, 5144:14,
5144:15, 5144:17,
5144:22, 5144:25,
5145:3, 5145:4,
5145:7, 5145:11,
5145:13, 5145:19,
5146:2, 5146:7,
5146:8, 5146:15,
5146:17, 5146:21,
5147:1, 5147:6,
5147:8, 5147:9,
5147:10, 5147:11,
5147:20, 5148:1,
5150:13, 5150:21,
5151:11, 5152:11,
5152:18, 5153:15,
5153:22, 5153:25,
5154:15, 5154:22,
5156:1, 5156:5,
5156:8, 5156:12,
5157:7, 5157:13,
5158:8, 5158:11,
5158:18, 5160:7,
5160:16, 5160:20,
5160:22, 5161:19,
5161:20, 5161:21,
5161:23, 5161:24,
5163:7, 5165:9,
5168:7, 5168:17,
5168:20, 5169:15,
5169:18, 5169:22,
5169:25, 5170:4,
5170:7, 5170:10,
5170:16, 5170:18,
5171:9, 5171:15,
5172:8, 5172:18,
5172:22, 5173:2,
5173:6, 5173:7,
5173:14, 5173:17,
5173:19, 5177:16,
5177:20, 5177:25,
5178:6, 5178:9,
5178:13, 5178:14,
5178:16, 5180:5,
5180:7, 5180:9,
5180:14, 5180:15,
5181:16, 5182:3,
5182:5, 5182:7,
5182:17, 5182:18,
5182:20, 5192:23,
5194:6, 5201:7,
5201:9, 5201:10,
5201:16, 5201:17,
5208:18, 5211:23,

5212:1, 5212:2,
5212:8, 5212:11,
5212:13, 5212:14,
5222:18, 5222:20,
5222:22, 5222:23,
5224:2, 5224:4,
5224:8, 5224:19,
5255:17, 5255:22,
5256:1, 5281:16,
5289:17, 5289:20,
5290:2, 5290:3,
5290:5, 5290:9,
5296:3, 5306:2,
5306:12, 5324:21,
5326:13, 5326:17,
5326:21, 5327:3,
5327:13, 5327:17,
5327:21, 5327:24,
5328:12, 5328:14,
5328:17, 5328:23,
5329:3, 5329:9,
5329:13, 5329:17,
5329:21, 5330:2,
5331:10, 5331:14,
5331:21, 5332:13,
5332:15, 5332:24,
5333:4, 5333:19,
5334:2, 5334:4,
5334:8, 5334:21,
5335:1, 5336:10,
5336:13, 5337:7,
5337:11, 5337:20,
5338:5, 5338:22,
5339:1, 5339:18,
5339:22, 5340:5,
5340:12, 5340:15,
5340:17, 5340:21,
5341:11, 5341:19,
5342:2, 5342:12,
5342:17
themselves [3] -
5187:23, 5234:4,
5324:18
therapies [2] -
5303:21, 5304:15
therapy [1] - 5292:5
they've [11] - 5117:1,
5117:5, 5121:24,
5153:4, 5153:19,
5156:17, 5156:24,
5317:4, 5337:24
thinking [3] - 5114:14,
5150:11, 5152:1
thinks [1] - 5280:24
third [3] - 5268:24,
5274:16, 5318:17
thoughts [3] -
5115:24, 5116:14,
5326:25
thousand [2] - 5274:9,

5300:7
**thousands** [1] -
5315:4
**three** [24] - 5114:14,
5119:23, 5123:24,
5145:22, 5177:22,
5185:3, 5227:1,
5227:20, 5243:22,
5244:1, 5247:2,
5257:24, 5286:21,
5287:5, 5287:8,
5287:13, 5287:18,
5288:5, 5288:6,
5291:1, 5291:3,
5307:5, 5309:19,
5328:10
**three-quarters** [1] -
5123:24
**thresholds** [1] -
5279:8
**throughout** [2] -
5156:18, 5189:24
**Thursday** [5] - 5145:5,
5146:11, 5146:14,
5146:16, 5147:1
**Tibotec** [2] - 5163:10,
5163:21
**tied** [1] - 5217:18
**timeline** [2] - 5328:24
**tired** [3] - 5141:3,
5246:5, 5326:23
**title** [1] - 5166:2
**today** [39] - 5114:16,
5115:13, 5122:6,
5122:11, 5122:22,
5124:24, 5126:10,
5130:24, 5131:8,
5132:9, 5132:13,
5133:5, 5142:18,
5146:23, 5147:23,
5148:3, 5149:13,
5149:23, 5151:12,
5153:3, 5154:9,
5154:12, 5154:17,
5155:5, 5155:12,
5161:8, 5183:11,
5193:16, 5198:1,
5205:25, 5206:8,
5218:16, 5218:22,
5262:10, 5289:25,
5330:24, 5335:2,
5339:6, 5340:1
**today's** [3] - 5117:19,
5123:18, 5132:12
**together** [5] - 5139:8,
5139:14, 5139:23,
5163:24, 5334:18
**tomorrow** [1] - 5334:4
**took** [11] - 5205:6,
5214:12, 5242:8,

5245:17, 5245:19,
5246:6, 5246:8,
5246:11, 5251:3,
5258:13, 5339:19
**top** [17] - 5158:6,
5164:6, 5164:17,
5164:18, 5164:24,
5166:1, 5166:6,
5166:18, 5167:5,
5167:6, 5167:18,
5189:17, 5194:20,
5217:9, 5259:14,
5298:2, 5298:20
**Top** [1] - 5164:18
**top-line** [2] - 5298:2,
5298:20
**topic** [2] - 5275:25,
5290:13
**total** [20] - 5195:1,
5195:11, 5195:18,
5195:22, 5222:13,
5228:3, 5244:4,
5245:18, 5245:21,
5246:7, 5246:9,
5249:3, 5259:12,
5261:11, 5306:19,
5332:25, 5335:11,
5336:18
**totality** [2] - 5142:3,
5142:22
**totally** [1] - 5141:22
**touch** [1] - 5144:3
**towards** [1] - 5251:20
**track** [5] - 5166:23,
5328:6, 5328:24,
5330:8, 5331:5
**tracked** [3] - 5168:13,
5206:9, 5206:14
**tracking** [4] - 5162:8,
5162:12, 5162:18,
5167:13
**trade** [2] - 5195:11,
5195:19
**trading** [1] - 5127:4
**training** [3] - 5203:5,
5204:22, 5254:6
**transaction** [2] -
5213:14, 5217:24
**transcribing** [1] -
5181:19
**transcript** [2] -
5112:24, 5343:4
**transcription** [1] -
5112:25
**transplant** [2] -
5115:6, 5115:8
**travel** [22] - 5125:17,
5144:6, 5144:12,
5144:18, 5145:1,
5145:12, 5168:24,

5169:8, 5170:2,
5170:5, 5170:8,
5170:12, 5171:2,
5171:3, 5173:25,
5175:20, 5183:24,
5186:22, 5192:14,
5192:25, 5210:17
**traveled** [4] - 5168:25,
5180:24, 5181:4,
5184:21
**traveling** [14] -
5126:15, 5126:16,
5126:21, 5126:22,
5144:10, 5144:12,
5144:23, 5144:25,
5177:10, 5177:12,
5177:16, 5178:19,
5183:14, 5190:21
**travels** [1] - 5270:18
**treat** [8] - 5120:14,
5121:5, 5125:20,
5211:15, 5230:15,
5230:18, 5235:3,
5281:6
**treated** [5] - 5120:15,
5121:6, 5125:21,
5235:7, 5252:20
**treating** [1] - 5211:16
**treatment** [15] -
5197:14, 5209:24,
5209:25, 5210:1,
5210:2, 5237:24,
5238:23, 5240:19,
5241:15, 5241:17,
5241:21, 5243:10,
5255:1, 5266:13,
5266:15
**treatment-
experienced** [2] -
5209:25, 5210:1
**treatment-naive** [7] -
5210:2, 5237:24,
5238:23, 5240:19,
5241:15, 5241:17,
5241:21
**treatments** [4] -
5230:24, 5230:25,
5243:5, 5249:6
**treble** [6] - 5332:3,
5332:8, 5332:21,
5335:20, 5336:2,
5336:3
**trebled** [2] - 5333:25,
5336:5
**trebling** [1] - 5333:14
**trends** [1] - 5231:21
**Trenton** [1] - 5112:9
**trial** [68] - 5115:13,
5116:5, 5116:6,
5116:17, 5116:22,

5117:15, 5118:7,
5118:9, 5119:7,
5119:13, 5120:17,
5121:2, 5121:10,
5122:18, 5123:18,
5126:7, 5130:18,
5131:8, 5132:13,
5133:1, 5135:15,
5135:22, 5136:7,
5136:13, 5136:16,
5137:16, 5138:3,
5139:1, 5139:15,
5140:9, 5140:10,
5140:12, 5140:24,
5141:13, 5142:17,
5143:24, 5146:24,
5148:8, 5149:6,
5149:7, 5149:9,
5150:11, 5151:1,
5151:5, 5151:7,
5151:14, 5153:6,
5155:13, 5155:19,
5156:18, 5156:25,
5157:19, 5159:4,
5159:21, 5160:1,
5165:7, 5206:22,
5211:25, 5260:13,
5325:8, 5326:14,
5330:5, 5330:7,
5330:8, 5336:1,
5342:8
**TRIAL** [1] - 5112:5
**trials** [1] - 5158:14
**tried** [1] - 5323:2
**trillions** [1] - 5215:23
**Trio** [3] - 5179:7,
5180:7, 5181:8
**trip** [2] - 5181:10,
5192:25
**true** [9] - 5135:24,
5137:4, 5156:1,
5172:11, 5206:3,
5211:6, 5273:15,
5289:7, 5310:4
**trust** [2] - 5341:23,
5342:1
**truthfully** [1] - 5128:8
**try** [22] - 5121:1,
5127:14, 5128:9,
5138:4, 5138:10,
5143:10, 5163:5,
5174:4, 5178:6,
5182:1, 5187:8,
5211:18, 5213:5,
5213:7, 5223:5,
5245:23, 5246:4,
5289:2, 5300:11,
5306:15, 5308:13,
5318:6
**trying** [13] - 5117:6,

5118:1, 5121:17,
5132:11, 5139:5,
5158:16, 5170:21,
5171:3, 5189:11,
5328:3, 5328:25,
5336:4, 5341:19
**Tuesday** [6] - 5120:9,
5123:22, 5145:1,
5145:4, 5145:6,
5145:25
**tune** [1] - 5298:17
**turn** [13] - 5142:14,
5163:19, 5164:4,
5164:10, 5164:17,
5165:25, 5173:11,
5178:8, 5194:2,
5202:21, 5212:3,
5218:25, 5231:4
**turns** [1] - 5297:10
**twenty** [1] - 5206:18
**twenty-five** [1] -
5206:18
**two** [44] - 5115:16,
5118:12, 5118:14,
5118:21, 5119:24,
5125:3, 5135:12,
5136:20, 5145:22,
5148:4, 5148:15,
5159:11, 5161:9,
5164:21, 5171:5,
5171:23, 5172:11,
5174:19, 5177:6,
5187:1, 5192:9,
5192:19, 5206:23,
5228:19, 5233:8,
5233:9, 5233:10,
5237:15, 5237:17,
5245:23, 5246:10,
5262:20, 5269:21,
5291:2, 5295:6,
5295:15, 5297:1,
5301:19, 5327:1,
5328:10, 5328:12,
5328:16, 5333:1,
5340:18
**tying** [1] - 5199:14
**type** [14] - 5122:7,
5217:15, 5217:22,
5218:16, 5219:22,
5232:6, 5234:24,
5240:21, 5245:14,
5258:9, 5275:13,
5310:20, 5313:2,
5324:3
**types** [9] - 5217:23,
5222:11, 5222:12,
5225:24, 5231:15,
5232:17, 5233:20,
5235:12, 5325:19
**typically** [1] - 5311:5

## U

**U.S** [3] - 5112:8, 5189:24, 5214:5
**ultimate** [3] - 5277:9, 5278:11, 5283:3
**ultimately** [10] - 5223:10, 5234:6, 5254:2, 5277:10, 5307:4, 5307:9, 5309:11, 5313:9, 5316:22, 5318:1
**unable** [3] - 5161:1, 5189:19, 5253:8
**unavailable** [3] - 5126:10, 5142:21, 5226:17
**uncertainty** [4] - 5252:18, 5252:22, 5313:18, 5318:6
**under** [7] - 5161:22, 5222:25, 5284:19, 5290:7, 5303:24, 5337:4, 5338:25
**underlying** [1] - 5295:7
**understandable** [2] - 5163:17, 5207:18
**understood** [10] - 5180:13, 5180:14, 5197:2, 5231:24, 5258:18, 5266:7, 5287:23, 5315:19, 5325:18, 5336:15
**undertake** [2] - 5307:21, 5308:10
**undue** [2] - 5156:8, 5157:3
**unethical** [4] - 5199:18, 5207:3, 5208:1, 5208:4
**unfair** [1] - 5338:18
**unfortunate** [1] - 5148:15
**unfortunately** [2] - 5121:6, 5207:7
**Unfortunately** [1] - 5144:21
**uninsured** [1] - 5303:21
**uniquely** [1] - 5298:1
**UNITED** [3] - 5112:1, 5112:3, 5112:12
**United** [5] - 5114:2, 5202:10, 5214:5, 5215:13, 5248:16
**units** [2] - 5232:15, 5285:9
**universe** [1] - 5342:6
**University** [3] -

5218:4, 5218:10, 5218:12
**unknown** [2] - 5251:16, 5252:19
**unless** [3] - 5129:2, 5161:4
**unquote** [1] - 5263:5
**unresolvable** [1] - 5252:20
**up** [55] - 5115:3, 5115:11, 5120:3, 5127:23, 5129:19, 5129:23, 5129:25, 5133:22, 5134:18, 5140:3, 5146:8, 5158:7, 5160:11, 5161:1, 5162:24, 5163:6, 5164:5, 5170:14, 5171:5, 5171:15, 5174:4, 5176:2, 5178:2, 5178:3, 5178:10, 5178:11, 5181:16, 5182:13, 5186:16, 5187:8, 5187:9, 5193:22, 5201:2, 5201:20, 5213:7, 5229:8, 5234:3, 5244:2, 5246:4, 5250:2, 5259:12, 5290:12, 5290:23, 5296:8, 5300:9, 5302:8, 5310:9, 5315:13, 5315:15, 5321:16, 5330:11, 5337:24, 5339:23, 5340:8, 5340:9
**update** [2] - 5165:13, 5209:21
**updates** [1] - 5209:5
**urgent** [1] - 5145:21
**utilize** [1] - 5209:10
**utilized** [5] - 5197:2, 5209:12, 5210:9, 5211:9, 5237:21

## V

**valid** [1] - 5231:15
**value** [1] - 5231:20
**values** [7] - 5231:16, 5231:17, 5231:22, 5253:19, 5253:20, 5253:22, 5301:17
**varies** [1] - 5311:7
**variety** [3] - 5211:2, 5225:24, 5276:8
**various** [5] - 5222:11, 5222:12, 5234:1, 5299:23, 5299:24

**vast** [1] - 5308:20
**vendors** [1] - 5194:15
**venues** [4] - 5175:1, 5175:3, 5176:8, 5180:3
**verify** [1] - 5297:3
**versions** [1] - 5232:13
**versus** [5] - 5121:19, 5293:9, 5295:1, 5303:25, 5323:15
**via** [4] - 5228:19, 5234:12, 5237:17, 5237:18
**video** [1] - 5121:17
**view** [10] - 5120:22, 5141:17, 5141:18, 5151:9, 5153:21, 5202:12, 5208:1, 5211:6, 5265:21, 5274:18
**violate** [1] - 5334:14
**violated** [1] - 5331:25
**violations** [1] - 5221:18
**Virginia** [2] - 5165:6, 5218:4
**virtue** [2] - 5305:17, 5309:3
**visit** [3] - 5132:5, 5267:25, 5268:24
**visited** [2] - 5241:7, 5315:4
**visits** [2] - 5229:3, 5236:13
**voir** [1] - 5149:7
**VOLUME** [1] - 5112:5
**volume** [2] - 5250:24, 5251:2

## W

**wait** [2] - 5143:8, 5173:2
**waiting** [1] - 5141:24
**Walgreens** [9] - 5224:13, 5226:22, 5227:19, 5286:25, 5288:13, 5296:21, 5308:1, 5318:10, 5323:13
**Walgreens'** [1] - 5293:1
**Walgreens-related** [1] - 5224:13
**walk** [2] - 5171:6, 5306:15
**Walmart** [1] - 5288:9
**wants** [2] - 5151:8, 5158:13
**Warehouse** [1] -

5234:19
**warehouse** [3] - 5215:14, 5225:23, 5227:10
**wash** [1] - 5154:25
**wasting** [2] - 5117:9, 5203:19
**ways** [4] - 5273:7, 5273:12, 5274:19, 5276:17
**Wednesday** [12] - 5144:14, 5144:15, 5144:19, 5144:20, 5144:23, 5144:25, 5145:5, 5146:11, 5146:14, 5146:16, 5146:18, 5146:19
**week** [34] - 5115:17, 5120:1, 5120:25, 5121:2, 5122:5, 5123:4, 5124:17, 5125:12, 5125:15, 5126:21, 5127:1, 5128:3, 5131:25, 5132:5, 5132:9, 5132:24, 5132:25, 5133:14, 5135:22, 5142:21, 5144:9, 5144:12, 5147:16, 5155:18, 5157:16, 5181:3, 5327:6, 5328:1, 5328:3, 5330:9, 5330:20, 5330:23, 5330:25
**weekend** [9] - 5126:22, 5132:8, 5328:5, 5331:2, 5331:5, 5340:4, 5340:11, 5342:4, 5342:18
**weeks** [21] - 5116:19, 5117:2, 5117:4, 5117:6, 5117:9, 5117:14, 5119:19, 5121:21, 5124:1, 5125:3, 5135:11, 5136:5, 5136:12, 5136:17, 5139:15, 5139:23, 5141:4, 5155:20, 5156:12, 5330:9, 5337:22
**weigh** [1] - 5152:8
**welcome** [2] - 5147:10, 5160:23
**WENDEL** [2] - 5112:16, 5114:11
**Wendel** [1] - 5114:11
**WHITNEY** [1] - 5112:16
**Whitney** [1] - 5114:11

**whole** [2] - 5158:22, 5241:16
**Williams'** [2] - 5181:5, 5184:6
**willing** [2] - 5157:15, 5158:2
**Wilmington** [1] - 5112:21
**window** [1] - 5148:14
**windows** [1] - 5159:11
**Wirmani** [1] - 5114:15
**witness** [42] - 5119:24, 5121:16, 5122:15, 5122:18, 5124:16, 5125:1, 5127:18, 5137:21, 5142:20, 5146:12, 5159:25, 5171:1, 5171:18, 5171:20, 5171:25, 5172:12, 5180:11, 5212:4, 5212:25, 5255:21, 5327:14, 5327:16, 5327:20, 5329:6, 5330:12, 5330:13, 5330:15, 5332:19, 5333:23, 5334:2, 5334:4, 5334:5, 5334:6, 5334:12, 5336:15, 5336:22, 5337:6, 5338:19, 5341:12, 5341:22, 5341:25
**WITNESS** [33] - 5143:25, 5144:9, 5144:14, 5144:17, 5144:25, 5145:4, 5145:11, 5145:19, 5146:7, 5146:17, 5147:1, 5147:8, 5147:10, 5161:20, 5161:23, 5163:7, 5168:20, 5169:15, 5173:7, 5177:20, 5178:6, 5178:13, 5178:16, 5180:5, 5180:7, 5180:14, 5192:23, 5194:6, 5201:9, 5201:16, 5212:1, 5212:13, 5290:9
**witness's** [1] - 5127:4
**witnessed** [3] - 5260:25, 5261:3, 5261:5
**witnesses** [7] - 5119:23, 5320:20, 5321:5, 5325:14, 5325:19, 5337:15, 5337:19

*5377*

**wonderful** [2] - 5331:4, 5342:17

**word** [4] - 5133:8, 5214:25, 5259:5, 5336:3

**wording** [1] - 5267:2

**words** [2] - 5244:21, 5315:25

**works** [3] - 5280:20, 5282:1, 5336:7

**world** [3] - 5143:10, 5323:6, 5341:6

**worried** [3] - 5117:11, 5117:13, 5136:21

**worry** [2] - 5160:25, 5188:24

**worth** [1] - 5250:14

**write** [8] - 5166:24, 5189:11, 5200:13, 5244:25, 5250:2, 5272:19, 5272:25, 5296:8

**write-up** [1] - 5296:8

**writing** [3] - 5189:4, 5199:15, 5250:9

**written** [9] - 5164:7, 5167:9, 5226:24, 5250:21, 5251:25, 5263:15, 5270:21, 5272:8, 5289:11

**wrote** [9] - 5211:11, 5211:12, 5239:10, 5250:20, 5262:3, 5263:14, 5285:19, 5311:16, 5311:18

**Wyatt** [5] - 5114:22, 5326:17, 5340:17, 5341:11, 5342:2

**WYATT** [11] - 5112:19, 5114:22, 5129:11, 5331:12, 5340:14, 5340:16, 5340:18, 5340:25, 5341:16, 5342:10, 5342:16

## Y

**year** [8] - 5165:13, 5175:18, 5183:6, 5195:15, 5267:11, 5267:21, 5296:11, 5299:19

**years** [11] - 5166:22, 5175:17, 5199:25, 5210:21, 5216:22, 5218:17, 5256:13, 5271:16, 5305:7, 5314:15

**yesterday** [12] - 5154:15, 5155:3,

5155:9, 5161:7, 5161:22, 5162:7, 5164:1, 5169:4, 5198:22, 5199:18, 5207:2, 5207:25

**York** [13] - 5128:1, 5144:6, 5144:9, 5163:20, 5164:25, 5176:21, 5178:20, 5183:11, 5183:14, 5185:11, 5186:8, 5193:1

**yourself** [6] - 5188:18, 5191:11, 5249:11, 5254:22, 5265:15, 5280:7

## Z

**ZAHID** [2] - 5112:11, 5114:2

**zero** [2] - 5140:11, 5300:8

**zoom** [1] - 5176:23

**Zoom** [1] - 5129:17

*United States District Court*
*District of New Jersey*