<pre>
 1                 UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF NEW JERSEY
 2

 3  _____

    UNITED STATES OF AMERICA, et   CIVIL ACTION NUMBER:
 4  al,
         Plaintiffs,               3:12-cv-07758-ZNQ-JBD
 5
         v.                        JURY TRIAL - VOLUME 10
 6
    JOHNSON & JOHNSON, JANSSEN
 7  PRODUCTS, L.P.
         Defendants.
 8  _____
         Clarkson S. Fisher Building & U.S. Courthouse
 9       402 East State Street
         Trenton, New Jersey  08608
10       May 23, 2024
         Commencing at 8:30 a.m.
11
    B E F O R E:           THE HONORABLE ZAHID N. QURAISHI,
12                         UNITED STATES DISTRICT JUDGE

13  A P P E A R A N C E S:

14       REESE MARKETOS
         BY:  PETE MARKETOS, ESQUIRE
15            JOSH RUSS, ESQUIRE
              ANDREW WIRMANI, ESQUIRE
16            ADAM SANDERSON, ESQUIRE
              WHITNEY WENDEL, ESQUIRE
17       750 N. Saint Paul Street, Suite 600
         Dallas, Texas 75201
18       For the Relators

19       SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
         BY:  ALLISON M. BROWN, ESQUIRE
20            GEOFFREY M. WYATT, ESQUIRE
              BRADLEY A. KLEIN, ESQUIRE
21       One Rodney Square
         920 King Street
22       Wilmington, Delaware
         For the Defendants
23
         Megan McKay-Soule, Official Court Reporter
24           Megan_McKay-Soule@njd.uscourts.gov
                       (609) 815-2319
25  Proceedings recorded by mechanical stenography; transcript
         produced by computer-aided transcription.
</pre>

*United States District Court*
*District of New Jersey*

1                          **I N D E X**

2    **EXAMINATIONS**                                **PAGE**

3                    **JESSICA PENELOW**
     DIRECT EXAMINATION BY MR. RUSS                    3339
4    CROSS-EXAMINATION BY MS. BROWN                    3384
     REDIRECT EXAMINATION BY MR. RUSS                  3542
5                    **VIRGINIA EVANS**
          DIRECT EXAMINATION BY MR. RUSS               3569
6

7                     **E X H I B I T S**

     **Exhibit No.        Description              Page**
8         Defendants' Exhibit 6028 in              3389
          evidence.
9         Defendants' Exhibit 8512 in              3409
          evidence.
10        Defendants' Exhibit 8511 in              3417
          evidence.
11        Defendants' Exhibit 9090 in              3442
          evidence.
12        Defendants' Exhibit 8848 in              3472
          evidence.
13        Defendants' Exhibit 8849 in              3472
          evidence.
14        Defendants' Exhibit 9092 in              3477
          evidence.
15        Defendants' Exhibit 9093 in              3480
          evidence.
16        Defendants' Exhibit 6036 in              3491
          evidence.
17        Defendants' Exhibit 8518 in              3499
          evidence.
18        Defendants' Exhibit 9088 in              3502
          evidence.
19        Defendants' Exhibit 6057 in              3505
          evidence.
20        Defendants' Exhibit 8753 in              3510
          evidence.
21        Defendants' Exhibit 8529 in              3518
          evidence.
22        Defendants' Exhibit 8987 in              3530
          evidence.
23        Defendants' Exhibit 6049 in              3532
          evidence.

24

25

---

***United States District Court***
***District of New Jersey***

```
 1              (PROCEEDINGS held in open court before The Honorable
 2   ZAHID N. QURAISHI, United States District Judge, on May 23,
 3   2024, at 8:30 a.m.)
 4              THE DEPUTY COURT CLERK:  All rise.
 5              THE COURT:  All right, folks.  Be seated.  Thank you.
 6              Appearances from counsel.  Let's begin with that when
 7   we're ready.
 8              MR. MARKETOS:  Good morning, Your Honor.
 9   Pete Marketos for the Relators.
10              MR. RUSS:  Good morning.  Josh Russ for Relators.
11              MR. WIRMANI:  Good morning, Judge.  Andrew Wirmani
12   for Relators.
13              MS. WENDEL:  Good morning.  Whitney Wendel for the
14   Relators.
15              THE COURT:  Good morning to you all.
16              MS. BROWN:  Good morning, Your Honor.  Alli Brown for
17   Janssen.
18              MR. WYATT:  Good morning, Your Honor.  Jeff Wyatt for
19   Janssen.
20              MR. KLEIN:  Good morning, Your Honor.  Brad Klein for
21   Janssen.
22              THE COURT:  All right.  Good morning, folks.
23         Two things, by the way.  So, Mr. Marketos, you said
24   yesterday, "I have good news."  But it's not good news if you
25   guys finish early.  Ms. Brown was eerily quiet when that
```

1    happened.

2         Are you going to finish early if you get the case

3    earlier?  Because it's not good news if we're still on the

4    same time frame.  I understand that the Relators are going to

5    try to move to get done early, but doesn't that push your

6    timeline forward as well?

7         MS. BROWN:  I would certainly think so, Judge, and

8    we'll try -- we'll certainly endeavor to do that.  I assumed

9    he meant that we would push up as well.

10         THE COURT:  Right, and that's how I understood it.

11   But I didn't hear anything from Janssen.

12         MS. BROWN:  Sorry.  I didn't mean to be eerily quiet.

13         THE COURT:  All right.  So I just want to get a sense

14   of this, and I know I'm fudging with the numbers.  But say --

15   Mr. Marketos, say you all rest around the 30 or 31st, right,

16   in that time frame next week.  Is that what you're thinking

17   may happen?

18         MR. MARKETOS:  Yes, Your Honor.

19         THE COURT:  Well, then, if that happens, then where

20   do you come out, Ms. Brown?

21         MS. BROWN:  So it, sounds to me, if that happens,

22   Your Honor, and we get the case to start on the 3rd as opposed

23   to the 4th, I think it would be fair -- let me say it this

24   way:  I think it would be fair for the Court to assume --

25         THE COURT:  Whatever days they move up earlier,

```
 1   you're going to move up equivalent.

 2           MS. BROWN:  Correct.

 3           THE COURT:  That's all I want to hear.  Okay.  Then

 4   that makes sense to me; then it's good news.  It's not

 5   collectively good news if the Relators end early and you're

 6   still keeping me on the same time frame.

 7           All right.  I appreciate that.  But I wanted to be

 8   clear because, in my head, I was thinking, wait a minute, you

 9   know, when does it get to the jury?

10           So they finish on the 30th, that's two days before.

11   They finish -- well, you get the case on the 31st, that's at

12   least a day before that you were going to get.

13           Does that make sense?

14           MS. BROWN:  Yep.  That makes sense, yep.

15           THE COURT:  All right.

16           And what are we doing with the second issue?  Do we

17   care about this TikTok video or not?

18           MR. MARKETOS:  Your Honor, 1A and 1B, if you didn't

19   mind.

20           1A, Your Honor, is, no, we don't.  We don't care on

21   this issue.  We're going to address it with the jury.

22           THE COURT:  Okay.

23           MR. MARKETOS:  And so to make clear for the record,

24   we have no objection.  We're going to waive the objection as

25   Your Honor requested because we don't want there to be any
```

```
 1   concern about that -- about that on the Court's --

 2          THE COURT:  What's the 1B?

 3          MR. MARKETOS:  1B is this, Your Honor:  As you know,

 4   we had about four levels of problem with that -- that line of

 5   attack.  I just want to -- I want to hem this in so this

 6   doesn't happen again and explain to the Court the basis for

 7   it.

 8          This is an expert in this case, Professor Sillup, who

 9   has been through the Daubert process.  Janssen had his

10   opinion, his report, depositions, and this -- these matters

11   were addressed pretrial.  All right.  And Your Honor ruled --

12          THE COURT:  Well, I mean, not the cross-examination

13   of an expert.  I mean, so that hasn't been addressed pretrial.

14   I mean, I think what's been addressed pretrial -- and you can

15   correct me if I'm wrong -- is that the individuals that I said

16   they could be qualified as experts, they can testify as

17   experts, and I either provided they could testify to the areas

18   you asked for or I limited their testimony in some instances

19   where I would say an expert can testify to A, B and C but not

20   D.

21          MR. MARKETOS:  Correct, Your Honor.  And here's the

22   point of all this.  And if I can -- you know, 30 seconds run

23   through this point because I think it will save us -- I hope

24   it will save us some time if Your Honor thinks we're correct.

25          For instance, they were attacking a doctor who wrote an
```

 1  article that he cited as one of 82 sources in his report.

 2  Okay.  That goes to reliability.  Your Honor even said that.

 3  I think they're attacking reliability.

 4       That's Your Honor's gatekeeping function that

 5  Your Honor addresses at the Daubert motion.  And Your Honor

 6  admitted Mr. Sillup because his opinion concerning causation

 7  is tied to reliable methods and principles, even citing to

 8  three factors, one of which was the sources that he cited in

 9  his report.  This wasn't something that Janssen even brought

10  up.

11       Once Your Honor makes those determinations, of course

12  they can attack an expert's opinion.  No question.  They can

13  attack the opinion; we can attack their expert's opinion, but

14  attacking outside collateral matters that go to the expert's

15  reliability for offering the opinion is a backdoor rechallenge

16  to the Daubert ruling that Your Honor made.  And once that

17  gatekeeping function has been made, bringing outside

18  collateral matters in before the jury, is usurping

19  Your Honor's gatekeeping function.  That is what was

20  essentially happening there.

21       Credibility issues with the witnesses based on their

22  opinions that they're offering, no problem.  But, for

23  instance, we can't take their -- their expert takes the stand,

24  we can't come up and say, oh, okay, well, you know, this judge

25  said this about you in another case or relied on this in

```
 1    another case so your opinions must not be reliable in this

 2    case.

 3          That's going around Your Honor's gatekeeping function

 4    that you spent pages and pages on and we were to have

 5    addressed pretrial in the Daubert.  And I just don't want that

 6    to happen again --

 7          THE COURT:  I'm not sure, though.  So what can you

 8    cross-examine -- I'm not so sure I agree with that, because

 9    what you're telling me is that somehow I've already determined

10    that none of these experts who are permitted to testify can be

11    cross-examined about whether their opinions are faulty or not.

12          MR. MARKETOS:  No.

13          THE COURT:  And that's not what I've done.  What I've

14    said is a very threshold issue.  Can they testify as an

15    expert, and, if so, in what areas are they able to testify?

16          To me, that's pretty much all I've really determined

17    here.  I haven't prevented either you or Janssen from

18    cross-examining experts on whether their opinions are faulty

19    in some other way.  Like, maybe they relied upon information

20    that doesn't make sense or they only reviewed five things when

21    they should have reviewed 30 and so their opinion is based on

22    limited information, things of that nature, which were the

23    subject of the cross.

24          What my concern was, and I don't know if we're -- maybe

25    we're speaking past each other.  My concern is whether you can
```

1    admit extrinsic evidence, which I allowed yesterday -- by the

2    way, I want to be clear because of 1A where the Relators'

3    counsel has withdrawn an objection to that particular piece of

4    evidence does not mean that there is precedent now for that

5    type of evidence to come in moving forward in the trial.

6         So I guess what I'm trying to say is my concern is

7    whether that type of evidence is admissible.  Right?  Under

8    rule -- well, I don't know if we're going to talk about

9    impeachment or not.  But I have concerns about the issue that

10   you raised yesterday, which is, well, Judge, where does this

11   end now?  Because I can go through 25 sources that their

12   experts relied upon, and now I can try the case on one source

13   and admit evidence about one source being, you know,

14   unreliable or that source not being, you know, a source that

15   the -- you know, impeaching that particular source.

16        And what I don't want to do is have that slippery slope

17   in the trial, which is why I wanted to put my thumb down and

18   say, hey, we can either address this one particular video that

19   I already admitted, but if there's a withdrawal of the

20   objection, which there is, that doesn't mean that this type of

21   evidence will continue to come in; it's just Relators' counsel

22   has made a tactical decision not to bother with it; they can

23   address it.

24        I agree, I don't think it really had much impact

25   anyway.  But what I want to do is make sure that at least for

1    Janssen and for you, for Relators' counsel, if moving forward
2    you think that because that video is in somehow you can move
3    in other types of evidence that are extrinsic to impeach a
4    source of an expert report that a particular expert relied
5    upon, you have to demonstrate to me under the rules of
6    evidence why that would be admissible as appropriate
7    impeachment; not necessarily hearsay, which is where I was
8    looking at it before, but how that's appropriate impeachment.
9        So I'll deal with -- if you want to say -- I don't
10   agree with that kind of blanket statement, Mr. Marketos, that
11   you have an expert on the stand and when Ms. Brown or her team
12   is cross-examining, they can't cross-examine on whether the
13   opinion is faulty because it's relied upon limited information
14   or information that they shouldn't have relied upon.  I don't
15   think I closed the door to that type of cross-examination for
16   them or for you.
17       What I do agree with you, though, is that I'm not
18   revisiting whether these folks are experts or whether they can
19   testify in the areas of expertise that I already deemed they
20   can testify as an expert in.
21       I'm also not revisiting whether I limited them in a
22   particular area.  Right?  And that's why I have my opinion on
23   my bench, so that if an issue or an objection comes up, I can
24   go back and say, well, what did I decide when I had a
25   significant amount of time to think about these issues as

1    opposed to deciding them in real time in two minutes?

2         So that's where I land on it.  So I understand your

3    concern, but I don't know if I agree with that across the

4    board.

5         But are we on the same page that, moving forward, if

6    either side is going to admit this type of evidence, you have

7    to demonstrate to me why it would be admissible, not say,

8    well, Judge, we already admitted this other video and this is

9    similar to that?  Because that's not the precedent I set,

10   which is why I told you all this morning, I might have made a

11   mistake on that, but I'm not going to correct it if the

12   Relators' counsel is not -- is withdrawing their objection.  I

13   will only look to correct it if you are continuing your

14   objection and I hear from both sides.

15         MR. MARKETOS:  Yes, Your Honor.  And I want to make

16   sure that I'm making a valid distinction here so that if this

17   issue comes up again, I'm on the record as to the Relators'

18   position on these matters.

19         Specifically this:  Your Honor has not precluded

20   cross-examination of experts on their opinions in this case.

21   And in this case, if either side wants to challenge the basis

22   for the opinions that the expert is offering, that, of course,

23   is fair ground for cross-examination.

24         Based on what we saw yesterday, I'm also anticipating

25   collateral matters coming into this case after Your Honor has

1    already ruled that these experts are admitted for the purposes

2    of the opinions that they're offering in this case.  That's

3    all I'm getting at.

4         The next thing that we're going to see, I'm concerned

5    with, is, you know, expanding, expanding, expanding.

6         THE COURT:  I'll deal with that if the issue comes

7    up.

8         MR. MARKETOS:  Yes.

9         THE COURT:  So what I'm going to ask you all, folks,

10   if the issue comes up, raise the objection, and I'll consider

11   it at that time.  But it's hard to do all this in a vacuum

12   without knowing exactly what's going to be asked, and then I

13   have to look at what -- the particular ruling that I had on

14   that particular expert, and we'll go from there.

15        MR. MARKETOS:  Okay.  Thank you, Your Honor.

16        THE COURT:  So is that issue dead, at least with

17   respect to Relators for now with respect to the TikTok video?

18        MR. MARKETOS:  It is for now, Your Honor.  Of course

19   I'm going to address it on cross, and they'll prepare their --

20        THE COURT:  That's fine.  But the objection to -- for

21   the Court to reconsider whether to have that piece of evidence

22   admitted has been withdrawn.

23        MR. MARKETOS:  Yes, Your Honor.

24        THE COURT:  Okay.  I want to be clear with that.

25        Mr. Wyatt?

1    MR. WYATT:  Just real quick follow-up, if I may,

2  Your Honor --

3         THE COURT:  You may.

4         MR. WYATT:  -- on some of the points that were

5  raised.

6       So it certainly is relevant to examine an expert

7  witness on the sources within on which they rely.  That goes

8  to the credibility of their opinion.  If they rely on a source

9  that is not a credible source, that's something that is fair

10  to bring out on cross.  It's not -- it's not inoculated

11  against cross because there's been a Rule 702 ruling of the --

12         THE COURT:  I don't necessarily disagree.  I might

13  have said almost the same thing.  So I think we're on the same

14  page there, Mr. Wyatt.

15       But there's a line there, so I may have to watch this.

16  Right?  If you're cross-examining on the reliability -- well,

17  I wouldn't say reliability, but on the credibility of the

18  opinion because it may be based on limited information, on

19  information that may not have been exactly what the person

20  should have been reviewing and they should have been reviewing

21  something else, I may allow that cross-examination to continue

22  because I think that is fair cross for both sides on each of

23  the experts.

24       But where is the concern, then?  Is there a concern?

25         MR. WYATT:  There is a concern simply that there's

 1   not this sharp line between reliability and credibility.

 2   Right?

 3        I mean, 104(e) specifically says that this rule,

 4   meaning the rule that is the rule under which the Daubert

 5   analysis takes place, does not limit a party's right to

 6   introduce before the jury evidence that is relevant to the

 7   weight or credibility of other evidence, and torts applying

 8   this rule, *Samuel v. Ford*, 112 F. Supp 2nd 460, have construed

 9   that to mean that you can indeed induce -- introduce extrinsic

10   evidence to challenge the credibility or bias of an expert,

11   including with respect to their reliance materials.

12        And, in fact, this has happened in this case --

13        THE COURT:  Wait.  That part at the end, you went

14   very quickly on, "including the materials."

15        So, Mr. Wyatt, what you're telling me is that if an

16   expert -- I don't know how many experts we have in the trial.

17   Just say we have --

18        MR. MARKETOS:  Nine.

19        THE COURT:  -- nine experts, and those nine experts

20   each rely upon 40 pieces of information, you're telling me

21   that I'm going to sit here and allow the parties to go through

22   those 40 -- forget about the experts -- go through the 40

23   sources and those authors and then admit extrinsic evidence on

24   each of those 40 authors saying that this author is a quack,

25   this author doesn't know what they're talking about, this

1   author has been criticized?

2        That, I definitely won't permit.

3         MR. WYATT:  Understood.

4         THE COURT:  I mean, we would be here till the end of

5   time.

6        So I'm not so sure I agree with that last part of your

7   argument that says you all can admit extrinsic evidence on

8   every source that each expert relied upon.  Because although

9   yesterday we dealt with one, if I open that door, I could be

10  dealing with weeks and weeks and weeks of that.  And I'm not

11  saying that either side would intend to do that, but I can't

12  make a ruling that would even permit you to do that.

13       So where is the line there?

14        MR. WYATT:  I think other constraints limit that.

15  The Court has the ability to narrow examination so it's not

16  cumulative.  You know, one example makes a point; 40 examples

17  doesn't.  Right?  The point wears off at some point.

18       I'm just saying, in other cases, this comes up all the

19  time.  You relied on this article.  This article is written by

20  an author that you funded in some prior study.  Right?  Yes.

21  And sometimes you have to bring in the other evidence or the

22  other article that shows that that's true.

23       We saw this yesterday -- I lost track of time -- with

24  Dr. Glatt's testimony on the redirect.  Counsel showed you the

25  Mcnichol article.  Did you know the Mcnichol was paid money to

1   be a speaker for Janssen?  Right?  It's that kind of

2   examination.  Sometimes you do need another piece of evidence

3   to make the point.

4        But I hear Your Honor's point.  We're not going to do

5   it with 40 sources.  Nobody would do that because it would

6   bore the jury to death, and we would be here forever.

7        So I think there are some practical considerations that

8   limit how far the slippery slope can go.

9          THE COURT:  By the way, Mr. Wyatt makes a good point.

10       Mr. Marketos, where are you on that, when you guys

11  indicate that, hey, are you aware that this author was paid

12  money by Janssen?  Aren't you going into impeachment of the

13  source that's been relied upon by?

14          MR. MARKETOS:  If they offer it to the jury in this

15  case -- and this is what I was getting at yesterday.  There's

16  a witness who's on the box and offers a point to the jury

17  about a source and say, you didn't consider this, then, of

18  course, you can say that person was paid by these guys.  Okay?

19  No question.  That's what I was saying.  Credibility about a

20  source that has been introduced in front of the jury, no

21  question.

22       What they were doing was going to an expert report that

23  hasn't been offered to the jury, it's hearsay, that wasn't

24  even attested to by the witness and attacking a source --

25          THE COURT:  Well, I know, because then later I think

1    that was corrected.  Right?  So you have -- is it Professor

2    Sillup?  Who are we talking about here?

3           MR. MARKETOS:  Yes.

4           THE COURT:  Professor Sillup is here.  He's first

5    cross-examined.  I agree with you on the report.  In fact, I

6    stopped that.  Right?  I mean, I said, hey, you can't put an

7    expert report and publish it to the jury.  We had that

8    sidebar.

9           MR. MARKETOS:  Sure.

10           THE COURT:  But I think later Ms. Brown was

11    cross-examining, saying, okay.  On cross-examination, you

12    relied upon, in part, on an article by Dr. So and So.  Right?

13       And I apologize, I don't remember all the names.

14           MR. MARKETOS:  Sure.

15           THE COURT:  He says, yes.  All right.  So now we're

16    in a cross-examination, the witness has -- it's been elicited

17    from the expert that he has relied upon certain information,

18    including that expert.  So now it's out.  So I didn't see

19    anything wrong with the following cross-examination that said,

20    Are you aware that this author went to med school for about a

21    year?  Are you aware that this expert is a TikTok influencer?

22       Now, I don't know, you know, how much that moves the

23    ball forward on the cross-examination, but I'm not here to

24    judge that.  But I didn't think that was necessarily

25    inappropriate cross.  My concern became more about the

 1   extrinsic evidence.

 2        But how is that different than the analogy that

 3   Mr. Wyatt just made?  I'm still not seeing it.

 4          MR. MARKETOS:  That's exactly it, Your Honor.  There

 5   is no extrinsic evidence that was offered with respect to

 6   anything that they're talking about.

 7        When we're talking bias and you're talking about a

 8   witness who's offering something in front of the jury that

 9   says, This is a sound study, and we're saying in this case,

10   No, it's not a sound study for X, Y and Z, fair game.  And if

11   they wanted to bring up a source that Professor Sillup relied

12   upon and discredit the source, no problem.

13        But when we get into TikTok land, it's the same --

14          THE COURT:  All right.  Then I think, look, we may be

15   all speaking somehow collectively into some type of agreement

16   here, because I will tell you, my concern isn't about the

17   cross-examination.  In fact, that's not what the issue is.  It

18   was about the evidence that was admitted in further support of

19   it when the cross-examination was complete.

20        So, Mr. Marketos, your reservation is -- I understand

21   it.  I will tell you all -- and it sounds like Janssen is not

22   looking to put in a lot of extrinsic evidence anyway.  But

23   here's what I'm going to tell you all.

24        As we move forward and you're cross-examining experts,

25   if you're looking, then, to admit extrinsic evidence, not

1    against the expert but against a source of information that's

2    authored by someone, and the extrinsic evidence is about that

3    particular author, I'm going to hesitate there. We're going

4    to be sidebarring to figure out whether I'm going to allow it

5    or not.

6         So I'm just letting you know, I may be much more

7    conservative in that particular analysis.

8         The cross-examination, I think, is fair game, and I'm

9    going to allow some leeway for Janssen to cross-examine your

10   experts, just like I will allow you that leeway on any experts

11   Janssen's calling. Because I think you have to be able to

12   fight back on expert opinions. And when every side has

13   experts, it can't just be a wash. Right? You have to do some

14   work there to at least make some effort before the jury as to

15   which experts they should listen to and which ones they

16   shouldn't.

17        So I'm going to allow you guys some leeway on the

18   cross-examination. Where I will be concerned is when we get

19   back into what you call TikTok land. That's where I'm going

20   to be a little bit more concerned, and I'm going to scrutinize

21   a little bit more what the extrinsic evidence is, how that

22   should be able to come in and, there, we're going to have to

23   talk for a bit.

24        So I just want to give you guys that -- as a threshold,

25   right, so you see how we're operating moving forward.

```
 1        MR. MARKETOS:  Thank you.

 2        THE COURT:  But I hear you.

 3     Mr. Wyatt, do you have anything more on that?

 4        MR. WYATT:  Just -- sorry, Your Honor.  Yes.  Just

 5  one more clarification on the point that was raised by

 6  Relators' counsel.

 7        The Court's gatekeeping responsibilities continue

 8  through trial.  So I understand the Court has ruled on issues

 9  related to Daubert, but there are certain issues under

10  Rule 702 where depending on how the evidence comes in at trial

11  they can be revisited, and I anticipate that that may be an

12  issue here with Relators' damages experts.

13        So we may be raising -- in fact, I anticipate we will

14  raise a motion to strike that testimony because the

15  assumptions for that opinion are not going to have been

16  established by a preponderance of the evidence.  But we will

17  get to that when we get to it.

18        I just want to say that door's not totally shut --

19        THE COURT:  I get that.  By the way, there's no door

20  that's absolutely shut.  Right?  Any ruling that I've made,

21  I've never prevented either counsel from revisiting, including

22  decisions I've made to the motions in limine.  I will tell you

23  that I'm not inclined to reconsider the decisions unless

24  something new has happened.  Right?  So I want to be clear

25  about that.  There's no reason for you to say, Let's file all
```

1    our pretrial motions again and see if the judge will change

2    his mind, but I hear you.  There are things that may happen in

3    trial that were not anticipated or not before the Court at the

4    time that the motions were filed.

5           And if that happens, of course either side is allowed

6    to revisit an issue and say, Your Honor, we know you ruled on

7    this, but something else is now happened that we believe has

8    opened the door.  In fact, I've used that similar lingo during

9    the trial.  Has a side opened the door for a particular issue

10   that may have been shut before it came to me prior to trial?

11          So I hear you on that, Mr. Wyatt, and I don't disagree,

12   and I think Relators' counsel understands that as well for

13   them that, if an issue -- if an issue comes up during trial

14   that makes you believe that you should revisit a prior

15   decision, then you have that prerogative.

16          But before I get off the bench, Mr. Wyatt, remind me,

17   what was the issue that you just said you might be raising?  I

18   was not tracking that particular --

19          MR. WYATT:  The damage's expert, Your Honor, was

20   given a set of assumptions, factual assumptions, assumed that

21   at trial we prove, you know, every doctor who's ever been

22   detailed is automatically sort of tainted by the message.

23          THE COURT:  Which expert are we talking about?

24          MR. WYATT:  Dr. Shaked.

25          THE COURT:  Oh.  I mean, somebody we haven't heard

1  from yet?

2       MR. WYATT:  Correct.

3       THE COURT:  All right.  I was thinking that, all of a

4  sudden, you guys were waiting days to file something about an

5  expert who was testifying, and I told you all this:  At least

6  raise the objection in real time --

7       MR. WYATT:  That's why I'm raising it now,

8  Your Honor.

9       THE COURT:  I appreciate that.  So this is, you

10 anticipate this problem is coming.

11      MR. WYATT:  Correct.

12      THE COURT:  Can I ask when that expert is scheduled

13 to testify?

14      MR. MARKETOS:  Yes, Your Honor.  Right before --

15 right before theirs does.  I think's he's going to be the last

16 witness in our case in chief.

17      THE COURT:  Is it worth it trying to discuss this

18 issue in advance of the expert getting on the stand?  Not

19 necessarily this morning, but in advance rather than -- or

20 should we wait to see how he testifies first?

21      MR. MARKETOS:  Oh, yes, Your Honor.  This is a

22 preemptive strike by my opponent on a damages expert they

23 don't want to testify.  So, yeah, no doubt we're going to put

24 him on, and if they think that they can, you know, undercut

25 his assumptions, that's what cross-examination is.

```
 1              THE COURT:  Was this part of the motions in limine,
 2    Mr. Wyatt?
 3              MR. MARKETOS:  Yes.
 4              MR. WYATT:  Yes.  There was a motion in limine -- or
 5    a Daubert motion to exclude Dr. Shaked and --
 6              THE COURT:  And what did I say?
 7              MR. MARKETOS:  You said that he was based upon
 8    reliable assumptions and he was permitted to testify based on
 9    the analysis he performed, the assumptions he was given, and
10    the data he was provided.
11              THE COURT:  And so, Mr. Wyatt, just so I'm clear on
12    the record, I'll go back to you now.  Do you think he may do
13    something during the trial that's different than what was
14    before me when I made that ruling?  Because that's where --
15    that's the line that I would revisit.
16              MR. WYATT:  Yep.  I think it will be different
17    because we'll just have -- the trial record will be what it
18    is, and it won't necessarily be the same as prior to trial
19    when the expert is allowed to make assumptions on the
20    assumption that they will be vindicated at trial through the
21    evidence that's elicited through factual testimony and
22    evidence.
23              We are now at trial.  Have those assumptions been
24    established or not?  Could a reasonable jury conclude from the
25    evidence that we've heard that the assumptions given to the
```

1    expert are established?  And if the gap is too big, then the

2    testimony can't stand.

3         But we won't know until we hear the expert's

4    testimony so --

5          THE COURT:  All right.  Look, I will hear from you.

6    And it sounds like you're asking me to revisit a prior

7    decision based on what I might have heard during the trial.

8    I'm not going to preclude Janssen from raising that issue.

9    They've given me well-advanced notice even before the witness

10   is taking the stand.

11        But, Mr. Marketos, I hear you.  We don't need to

12   litigate it today, but what you're telling us is, Your Honor,

13   you made this ruling.  The expert can testify.  They can

14   cross-examine the expert.  But to go back in time now to

15   unravel this, to get our expert kind of tossed and testimony

16   stricken is, you know, beyond the pale.

17        I got it.  I hear your argument.  I know what Mr. Wyatt

18   is raising.  Why don't we just wait and see how that all plays

19   out, and I'll address it in real time.

20        But, Mr. Wyatt, you have an uphill battle because

21   you're going to have to -- before we even get to whether I

22   agree with you or not, you're going to have to demonstrate why

23   what happens in trial was different than what was presented to

24   me at the time of the motion in limine.  Otherwise, I've told

25   you all I don't really revisit my decisions very often.  The

```
 1    TikTok video was the only one so far that I took any pause on.

 2    Not that you all agree with my decisions, but it's not often

 3    that I take them in and say, I might have made a mistake.  Not

 4    that I haven't.

 5         So I just want to be clear where we land.  You have a

 6    much, I think, higher threshold to meet with me on revisiting

 7    a prior ruling on an expert witness, but I will hear from you.

 8              MR. WYATT:  Understood, Judge.  Thank you.

 9              THE COURT:  Sorry, folks.  What else can we chat

10    about before I get off the bench?

11              MR. MARKETOS:  Nothing, Your Honor.  We're ready to

12    go.

13              THE COURT:  Ms. Brown?

14              MS. BROWN:  Ready to go, Judge.  Thank you.

15              THE COURT:  So then do we have Ms. Penelow?  Is she

16    coming back into the witness box?

17              MR. MARKETOS:  Yes, Your Honor.  Do you want us to

18    bring her now?

19              THE COURT:  Well, let's do this.  Take a few minutes,

20    Ms. Penelow.  I'm going to get the jury out here in about ten

21    minutes.  I just didn't foresee I would be out this long, so I

22    need to take care of something.

23         But in about ten minutes, I'll get the jury out.  So

24    all I would ask -- she's still on direct, right, Mr. Russ?

25              MR. RUSS:  That's right, Your Honor.
```

1          THE COURT:  Just in about ten minutes, can you just

2    have her placed back in the box?

3          MR. RUSS:  Of course.

4          THE COURT:  And then when I come out, we can grab the

5    jury and begin?  That's all I've got.  Stay in your seat.

6    We're in recess for about ten minutes.

7          MS. BROWN:  Thank you, Your Honor.

8          MR. MARKETOS:  Thanks, Your Honor.

9          (A short recess occurred.)

10          THE DEPUTY COURT CLERK:  Please remain seated.

11          THE COURT:  Good morning, Ms. Penelow.  We're ready

12    it seems like, right, Mr. Russ?

13          MR. RUSS:  Yes, Your Honor.

14          THE COURT:  Kim, they're here?

15          THE DEPUTY COURT CLERK:  Yes.

16       All rise.

17       (Jurors enter courtroom.)

18          THE COURT:  All right, folks.  Everybody have a seat.

19    Good morning, everyone from the jury.  We're just going to

20    continue with witness testimony today.

21       And just as a reminder, we're not sitting tomorrow,

22    right, Kim?

23          MR. RUSS:  Correct.

24          THE COURT:  Yeah.  So just as a reminder, don't come

25    in tomorrow.  I know that we've changed the schedule.  We

PENELOW - DIRECT - RUSS

1    added some Fridays, but I'm trying to keep track as well.

2    Tomorrow you guys are off, so this is our last day, at least

3    for the week, and I appreciate your attention and your

4    patience.

5         So, Mr. Russ, when you're ready to continue direct

6    examination, and, Ms. Penelow, just as a reminder, you're

7    still under oath from yesterday.

8         THE WITNESS:  Thank you, Your Honor.

9         THE COURT:  All right.

10        MR. RUSS:  Thanks, Your Honor.

11   (DIRECT EXAMINATION CONTINUED BY MR. RUSS:)

12   Q.   Good morning, Ms. Penelow.

13   A.   Good morning.

14   Q.   When we left off yesterday, we were talking about

15   Janssen's speaker program and the selection of speakers.

16        Do you recall that?

17   A.   I do.

18   Q.   We talked about a couple of different doctors.  We talked

19   about -- is it Dr. Donald Kaminsky?

20   A.   Correct.

21   Q.   We talked about Dr. Salomon?

22   A.   Correct.

23   Q.   Nadim Salomon?

24   A.   Nadim Salomon.

25   Q.   And those were two of your primary doctors that you

PENELOW - DIRECT - RUSS

1   called on in the New York area when you worked at Janssen

2   Tibotec?

3   A.   They were two of my biggest speakers and biggest

4   providers of prescriptions.

5   Q.   They wrote a lot of prescriptions for Prezista?

6   A.   They did, and Intelence.

7   Q.   They also wrote for Intelence?

8   A.   They did.

9   Q.   So you told the jury that you went to somewhere around a

10  hundred or so speaker programs, give or take?

11  A.   That would probably be per year.

12  Q.   Okay.

13       So you went to -- you think you went to as many as two

14  or three a week, maybe over a hundred during your time there?

15  A.   Right.

16  Q.   Okay.

17       Dr. Kaminsky, was he also friendly with Ms. Bartnett?

18  A.   Yes, he was.

19  Q.   What about Dr. Salomon?

20  A.   Yes, he was.

21  Q.   Did Ms. Bartnett call on those two doctors with you like

22  she did for so many other doctors?

23  A.   Yes, she did.

24  Q.   Did Dr. Salomon ever ask Ms. Bartnett to arrange travel

25  or programs for him outside of his territory?

PENELOW - DIRECT - RUSS

1  A.   Yes.  That was a common occurrence.  A lot of speakers

2  like to travel across the country and add on a trip for

3  themselves.

4  Q.   Do you recall any instances where Dr. Salomon or

5  Dr. Kaminsky went to visit family while they were giving a

6  speaker program?

7  A.   Yes.  We sent Dr. Salomon to Florida, and he got to see

8  his family there.

9  Q.   Where in Florida?

10 A.   South Florida, Miami area, and he got, I think, somewhere

11 between maybe six speeches while he was down there.

12 Q.   How -- tell the jury how that would be arranged.

13 A.   So -- good morning.

14      Nancy Bartnett would speak to Dr. Salomon, and he would

15 request to go to Florida because he had family down there, and

16 he could get two things done at once.

17      So she would set up as many programs as she could for

18 him while he was down in Florida, and he would get to go back

19 to his family's house and be with family in between.

20 Q.   Are you aware of any needs assessment or evaluation of

21 whether or not doctors or prescribers in Miami needed to hear

22 from a doctor in New York, in particular Dr. Salomon?

23 A.   Well, Nancy Bartnett, as a key account manager, spoke

24 with all the key account managers throughout the country, and

25 so Florida was doing well, but there was certainly nothing

PENELOW - DIRECT - RUSS

1  wrong with having a good off-label talk and increasing

2  prescriptions.

3       So the two KAMs together would make that decision and

4  send him down to Florida.

5  Q.   I guess my question is:  Would the KAM in Miami say

6  There's something special about Dr. Salomon having come down

7  here, or would Dr. Salomon say, Hey, Ms. Bartnett, I want to

8  go to Florida.  Can you send me down there?

9       Do you see the difference?

10 A.   Yeah, I think -- I think both happened.

11 Q.   Okay.

12 A.   Yeah.  I think both things happened, but mainly

13 Dr. Salomon would request to go to, you know, Miami to see

14 family.

15 Q.   And is that similar to Dr. Salomon and Dr. Kaminsky

16 asking you or Ms. Bartnett to make certain programs happen at

17 certain restaurants?

18 A.   Yeah, it's a similar situation.

19 Q.   And, in other words, the doctor was making

20 recommendations or requests for venues, both restaurants and

21 destinations.

22      Is that correct?

23 A.   Correct.

24 Q.   Ms. Penelow, did you ever talk about your sales quota

25 with any of these doctors?

*United States District Court*
*District of New Jersey*

PENELOW - DIRECT - RUSS

1   A.   I did.

2   Q.   Okay.

3        Why would you talk about your sales quota with

4   prescribers?

5   A.   I think, as I mentioned yesterday, we became a very close

6   district, and that included the physicians.  And so if we

7   weren't doing well or we needed some extra prescriptions at

8   the end of a quarter, Nancy and I would go in together and

9   have a very nonchalant conversation to see if they could write

10  some more prescriptions to get our numbers up.

11  Q.   You would -- you or Nancy would ask a doctor -- first of

12  all, the doctor would be familiar with the fact that you have

13  sales goals?

14  A.   Yes.

15  Q.   Which doctors are we talking about here?

16  A.   Mainly Dr. Salomon and Dr. Kaminsky.

17  Q.   The same doctors that were at your wedding?

18  A.   Yes.

19  Q.   And you had asked -- towards the end of goal period --

20  were they monthly?

21  A.   Goals were quarterly.

22  Q.   Quarterly.

23  A.   Uh-huh.

24  Q.   And if you needed help, would you ask a doctor, Hey, can

25  you find some scripts to help?

PENELOW - DIRECT - RUSS

1   A.   Sure.  We were even taught in training that at the end of

2   a call when you close a sales call, you want to say, Can you

3   think of five to ten patients that you can put on Prezista or

4   Intelence?

5   Q.   Did Dr. Kaminsky ever oblige and tell you that he found

6   some patients to write prescriptions to help you?

7   A.   Sure.  It was definitely a mutual relationship in that

8   sense.

9   Q.   Okay.

10       Was Dr. Kaminsky a big speaker on QD Intelence?

11  A.   He was.

12  Q.   Tell the jury about that.

13  A.   Dr. Kaminsky had early experience with using Intelence

14  once a day for naive patients, and when Nancy Bartnett heard

15  his great experience that he shared with us, she asked him if

16  he would go around the country and share for other KAMs and

17  other reps so that the doctors can adopt the idea of starting

18  Intelence earlier so we can include more patients.

19  Q.   So during your discussions and your experience with these

20  doctors, did you ever have any reason to believe that they

21  liked the money that they were getting?

22  A.   Yes, of course.

23  Q.   Do you have any examples you can give or conversations

24  you had with doctors about the money that they were getting

25  from Janssen?

PENELOW - DIRECT - RUSS

1    A.   I think I realized that they really were appreciating the

2    money for more than just the speaker program.  When I was out

3    with Dr. Kaminsky at a program, I happened to have drove him

4    to the program that day.  I didn't do that often, but I picked

5    him up from his office and drove him to the program.

6        And when we got back in the car to go drop him back off

7    at his office, I warned him about going off-label on Intelence

8    at that program.  I thought that he had really gone a little

9    bit too far.  And so I mentioned to him that maybe he wants to

10   be careful.

11       He did say to me that he'll do whatever Nancy says

12   because he needed to pay his mortgage.

13   Q.   Is this the same Dr. Kaminsky -- are you aware that

14   Dr. Kaminsky was paid over $145,000 from Janssen just for the

15   speaker honoraria?

16   A.   I was not aware of that.

17   Q.   Are you surprised?

18   A.   I am surprised.

19   Q.   Why?

20   A.   That sounds like a lot of money.

21   Q.   But based on the per-speech fee and the number of

22   speeches, just math.

23       Right?

24   A.   Yeah, it is just math.  I guess I just didn't realize it

25   added up to so much.  I never did the math.

*United States District Court*
*District of New Jersey*

PENELOW - DIRECT - RUSS

1  Q.  You talked a little bit with our jury yesterday about

2  Dr. Juan Bailey?

3  A.  Yes.

4  Q.  Do you know Dr. Bailey?

5  A.  Yes.

6  Q.  This was the doctor that Ms. Bartnett told you that does

7  not tell the truth and why he was being removed from the

8  speaker program?

9  A.  Yes.

10 Q.  Did you raise concerns to Mr. Dolisi about the situation

11 that you were put in in that position?

12 A.  I did.  I thought that because Nancy Bartnett was in

13 charge of the speakers, that she should have been the one

14 delivering the information.  But her relationship wasn't as

15 good as mine was with Dr. Bailey, so Tony told me that I

16 needed to do it myself.

17 Q.  Was there concern about finding another speaker to take

18 his place?

19 A.  No, no concerns.

20 Q.  I also want to revisit this plants-in-the-audience

21 tactic.

22      Was there a nurse named -- I think you said Mark Miller

23 at some point was a plant?

24 A.  Correct.

25 Q.  And where was he?  Was he in Manhattan?

PENELOW - DIRECT - RUSS

1    A.   He was.  He was at St. Vincent's.

2    Q.   As an RN he couldn't prescribe?

3    A.   Correct.

4    Q.   How would you get Mr. Miller to act as a plant at

5    speeches?

6    A.   So as I mentioned, Nancy was very close with Mr. Miller.

7    They had a personal relationship for years, as her being in

8    the city calling on doctors for years.  And I would witness

9    it, and she would just tell him to make sure that he asked

10   whatever the speaker -- if it was Sorana Segal-Maurer, it

11   would be a Prezista talk.

12        If it was Dr. Kaminsky, it would be an Intelence talk,

13   and she would ask him to please raise the question of either

14   lipids or naive in Prezista, or QD and naive with Intelence.

15   Q.   Was there an instance where Mr. Miller was a little bit

16   less coy about his questioning as a plant in the audience?

17   A.   Yes.

18   Q.   Tell the jury about that, please.

19   A.   Mr. Miller went to a lot of programs.  I must have seen

20   him at over, you know, 40 programs or something.  And he was

21   getting sick of sitting through the approved slide deck, so he

22   very loudly yelled at Dr. Kaminsky to take the slides down and

23   just tell him his experience.  He wanted to know his anecdotal

24   experience in the field with Intelence once a day.

25        So Dr. Kaminsky asked Nancy.  Nancy agreed to it, and

PENELOW - DIRECT - RUSS

1  they took the slides down, and he just went into a talk about

2  Intelence and his absolute success with QD Intelence and

3  naive.

4  Q.  Did you say Mr. Miller went to approximately 40 different

5  events?

6  A.  Approximately.  I don't know exactly.

7  Q.  Was he the only person that you remember going to

8  multiple events over and over and over?

9  A.  No.  It happened pretty frequently, especially with the

10  Beth Israel folks that I spoke about yesterday.

11  Q.  Okay.

12       And those were the folks that worked with

13  Dr. Salomon --

14  A.  Yes.

15  Q.  -- that he would talk to, his colleagues, over dinner?

16  A.  Exactly.

17  Q.  Okay.

18       We mentioned and we saw a picture of a place in

19  Manhattan called Le Marais.

20       Do you recall that restaurant?

21  A.  I do.

22  Q.  Do you recall an instance where Dr. Salomon and

23  Dr. Kaminsky gave back-to-back presentations and were both

24  paid the same night at that restaurant?

25  A.  Yes.  I set up that program.

PENELOW - DIRECT - RUSS

1   Q.   Were you there?

2   A.   I was there.

3   Q.   And they both got paid?

4   A.   And they both got paid.

5   Q.   The same attendees?

6   A.   Same attendees.

7   Q.   Why did you set it up that way?

8   A.   They both were looking to get more programs, and it was

9   something that Janssen allowed, so I took advantage of the

10  opportunity and was able to pay them both on the same night.

11  Q.   They were looking for more programs, or Janssen needed

12  more programs?  Which one was it?

13  A.   The doctors were looking for more programs, knowing that

14  they were going to make more money the more programs they got.

15  Q.   So how would that work?  Did they call you or is this --

16  A.   Yes.

17  Q.   Okay.

18       Explain that, please.

19  A.   They would call me or I would see -- you know, see them

20  either weekly or biweekly, and we would have live

21  conversations about it.  And, again, Dr. Salomon's daughter

22  was going to Yale, and so he was very much looking to get some

23  extra income.

24       And as I mentioned, Dr. Kaminsky clearly had a problem

25  paying his mortgage at that time, so he needed the extra cash

PENELOW - DIRECT - RUSS

1  for that.

2  Q.   And they talked to you about this?

3  A.   Very openly.

4  Q.   You were close to him?

5  A.   I was.

6  Q.   And Ms. Bartnett and the Manhattan district made it

7  happen?

8  A.   She made it happen.

9  Q.   I want to talk to you briefly, Ms. Penelow, about the MIR

10  solicitation process under Tony Dolisi.

11  A.   Okay.

12  Q.   We saw and this jury has seen the email from Frank Murphy

13  back in 2006 about comparing New York to Florida MIRs.

14  A.   Yes.

15  Q.   I want to fast-forward to your time under Tony Dolisi,

16  which was, what, 2008, 2009?

17  A.   2009.

18  Q.   Okay.

19       So -- and this is the time that Mr. Murphy had gone to

20  New Jersey?

21  A.   Correct.

22  Q.   And now Mr. Dolisi was your boss or your boss's boss?

23  A.   He was my direct boss.

24  Q.   Okay.

25       How did Mr. Dolisi approach the concept of soliciting

PENELOW - DIRECT - RUSS

1    MIRs from physicians?

2    A.    It was similar to Frank but a lot more aggressive.  As we

3    had our district meetings or district conference calls, he

4    would be very adamant about the fact that we needed to up our

5    MIRs because we were falling behind compared to other

6    districts.

7         It was the same situation.  Florida continued to submit

8    many MIRs, California and Texas, I think I mentioned

9    yesterday.  And in essence we were competing with them, just

10   like we did dollars for prescriptions.

11   Q.    Did you push back on that practice?

12   A.    I did push back on that practice.

13   Q.    Did you push back directly to Mr. Dolisi?

14   A.    I did push back to Mr. Dolisi.

15   Q.    Please explain that for the jury.

16   A.    Sure.  I told Tony Dolisi at the time that I was well

17   aware from all my training that the questions were supposed to

18   be unsolicited.

19        And so when I went in and had a conversation with Tony

20   about it, he said that it was not an option and that we needed

21   to find a way to go outside the rules and keep it under wraps

22   amongst the districts so that we could win because there was

23   high expectations for the New York district.

24        I told him that I wasn't willing to do it, and

25   subsequently he took me off of some projects and was not happy

PENELOW - DIRECT - RUSS

1    with my performance.

2    Q.   At some point did Mr. Dolisi start using the prospect of

3    putting you on a performance improvement plan, or a PIP, as a

4    hammer to get you to do certain things?

5    A.   He did.  I had a -- sometimes we do field ride days with

6    upper management.  I had a field ride day with Anthony

7    Fernandez, who was Tony's direct boss, and we went out into

8    the field and saw some physicians.  Tony happened to be in the

9    city that day, so he met us for lunch.

10        Tony explained to Anthony Fernandez that he had spoken

11   to me about my low MIRs, and Anthony Fernandez and Tony told

12   me that I would be put on a performance enhancing program if I

13   didn't bring up my MIRs.

14   Q.   Where was that lunch?

15   A.   That was at Japonica in Union Square.

16   Q.   Do you remember that restaurant where that conversation

17   occurred?

18   A.   I remember it very clearly.

19   Q.   Did you also -- and I want to orient the jury.  This is

20   in 2009, 2010.

21   A.   Yeah, exactly.

22   Q.   You raised concerns about the MIR solicitation tactic.

23        Did you also start to raise concerns about using

24   off-label studies and pitching doctors on off-label marketing?

25   A.   Yes.  I will explain the district meetings.  It would

PENELOW - DIRECT - RUSS

1  basically be either Tony or Tim McSherry or Nancy Bartnett

2  that was presenting, and as I mentioned yesterday, they would

3  give out the off-label slides and/or presentations to us to go

4  out in the field.

5       I was very verbal about the fact that I didn't think it

6  was right, and I was verbal in front of the entire district,

7  so...

8  Q.  How was that received?

9  A.  My co-workers pretty much stayed quiet, and Tony

10 reprimanded me and told me that I needed to stay within the

11 lines that he was putting down for the district and that there

12 was no way that I was ever going to be able to do it

13 differently if I was going to make my numbers, and if I didn't

14 make my numbers, then I was going to be fired.

15 Q.  Did you complain to other Janssen employees?

16 A.  I did.  I actually took Nancy and Eric Sherr, who was the

17 access and reimbursement manager -- he was pretty high up, and

18 I took them to lunch and expressed my concerns, and they

19 begged me not to go to HR.  They begged me not to tell anyone

20 else about it.

21      They were protecting Tony.  They all worked together

22 before at another company, and they were protecting Tony, and

23 they asked me please not to say anything.

24 Q.  And I used the word complain because is that how they

25 were viewing you, as a complainer?

PENELOW - DIRECT - RUSS

1    A.    Yeah, unfortunately, there was some times Tony would call

2    me a big mouth, things of that nature, that I needed to stay

3    in my lane.  But at the same time, he would say, Be creative

4    out in the field outside the label.

5    Q.    But in reality, Ms. Penelow, you were reporting concerns

6    about noncompliant and illegal activity to your co-workers and

7    your bosses?

8    A.    I was.

9    Q.    And you said that your boss begged you not to go to HR?

10   A.    Nancy and Eric, so it wasn't Tony directly.  It was Nancy

11   and Eric.

12   Q.    Tell the jury about that incident.

13   A.    So we were at the W Hotel in Union Square, and that was

14   the story I was just talking about.  And they -- instead of

15   telling me to call the HCC line, which is probably what I

16   could have done at that point, they really wanted to keep the

17   district safe.

18        We were all very close.  We were friendly.  Everybody

19   was in on it together.  Nancy was at this point doing a really

20   good job of getting our speakers across the country where they

21   wanted to go.

22        Our numbers were starting to go up, and it was all

23   about numbers, and they didn't want to see the district go

24   down.  So they asked me to please try and keep my mouth shut,

25   put my head down and do what needed to be done because I was

PENELOW - DIRECT - RUSS

1  starting to have anxiety and issues about the situation.

2  Q.   And everybody was making money?

3  A.   Everybody -- yes.  Fair.

4  Q.   Was there an incident -- I think the jury has heard about

5  Julian Cesserio?

6  A.   Yes.

7  Q.   Did Ms. Cesserio go to compliance at some point and

8  report her concerns?

9  A.   She did.  She called the HCC line.

10  Q.   All right.

11       Tell the jury what happened to Ms. Cesserio.

12  A.   So the HCC line is the health care compliance 800 number

13  that you heard about, and she was asked by Frank Murphy in the

14  New Jersey territory to go out into the field and use the

15  TRIO study, which we discussed yesterday, which is QD

16  Intelence, which we know is off-label in naive patients, and

17  Prezista QD in naive patients, as well with Isentress, which

18  is an integrase inhibitor.

19       She felt that it was against policy, so she called

20  health care compliance.  They opened an investigation.  At

21  that time, Joanne Cesserio was not liked by her district.

22       So the entire district got called into the home office,

23  to HR, to go talk to the HR people about this accusation that

24  Frank Murphy was asking them to sell the TRIO study.  They all

25  got together behind her back and decided that they were going

PENELOW - DIRECT - RUSS

1    to save Frank Murphy, which, as I said, he's a great guy, and

2    everybody liked Frank Murphy.

3          And so when they all got called into HR, they lied and

4    said that he never did that.  After that, Joanne Cesserio got

5    fired.

6    Q.   Why wasn't there a written record of what was happening

7    that compliance could have looked at rather than being forced

8    to take the word of salespeople who may have an interest in

9    protecting their paycheck and their employees?

10   A.   I'm not sure, but I think that they believed they did

11   their investigation.  Unfortunately, they didn't know what was

12   going on behind the scenes.

13   Q.   And, Ms. Penelow, you've been here when we've seen

14   documents and training about careful communications?

15   A.   Yes.

16   Q.   Not putting things in writing?

17   A.   Yes.

18   Q.   That came from compliance.

19          Remember that?

20   A.   Yes.

21   Q.   So compliance in that instance was required to take the

22   word of salespeople who didn't tell the truth?

23   A.   Exactly.

24   Q.   And then the conduct continued?

25   A.   The conduct continued.

PENELOW - DIRECT - RUSS

1   Q.   Now, Ms. Penelow, there were other people that you

2   learned, across the country -- I think we talked about a

3   couple of these, and I want to go through a couple names --

4   were having similar issues; that it wasn't limited just to

5   your district.

6        Is that fair?

7   A.   That's fair.

8   Q.   Did you have a conversation with a gentleman named Russ

9   Moyer about what he was going through?

10  A.   I did.

11  Q.   Tell the jury about it.

12  A.   Russ Moyer was a rep in the New England district.  He

13  covered Boston.  And his manager was Chris Cruz, and we had

14  made friendly at a POA, and we became friends and talked on

15  the phone a lot.  We had a lot to talk about based on what was

16  going on in the organization.

17       And Chris Cruz was giving out CDs to his reps and

18  asking them to print up all the off-label trials.  They also

19  had binders that were given to them by Chris Cruz with all the

20  off-label trials.

21       So Russ, although he had great numbers and didn't

22  necessarily go off-label as some others that had bad numbers,

23  he still was being pressured to continue the activities that I

24  have spoke about in New York.

25  Q.   And when you had those conversations with him, did you

PENELOW - DIRECT - RUSS

1   share your concerns that you were facing with him?

2   A.   Yes, I did.

3   Q.   What about Michael Valentine?  Or Valentine?  How do you

4   say it?

5   A.   Valentine.

6   Q.   Okay.

7   A.   Yeah.  Michael Valentine was a community liaison.  A

8   community liaison deals with the patients directly and not the

9   physicians.  So he worked with the New York district directly.

10       He was very aware, because he was at the district

11   meetings, what were we being told.  And I remember a time

12   sitting outside Dr. Chavez's office with him in his car, and I

13   started crying.  I couldn't hold it in anymore.  And I told

14   him that I couldn't continue doing what was being done.  I

15   couldn't live with myself.  I couldn't put my head on the

16   pillow.  I felt terrible about it.

17       And as Nancy and Eric, he did the same thing.  He said,

18   you know, nothing is going to get better.  You need to really

19   try and just go with the flow or you're going to get fired.

20   Q.   This is around the 2010 time period at this point?

21   A.   Yes, it was.

22   Q.   There's a gentleman that the jury's heard about named

23   Joe Holshoe, who is in New England.  We talked a little bit

24   about him yesterday.

25   A.   Yes.

PENELOW - DIRECT - RUSS

1   Q.   Did you have discussions with Mr. Holshoe about what he

2   was dealing with, and did you share your concerns with him?

3   A.   Not as frequent as I did with Russ Moyer, but when I did

4   see him at the POAs, the sales meetings, we would share war

5   stories, if you will.  And he was going through the same

6   situation with Chris Cruz up in New England that I was going

7   through with Tony Dolisi in New York.  And so we would share

8   stories and try and figure out a solution.  And we didn't

9   trust health care compliance because of what happened to

10  Joanne Cesserio, and we didn't trust that it was an anonymous

11  line.

12  Q.   Is there an Angel Edwards that you spoke to?

13  A.   I did.  She was in my district.

14  Q.   Who was that?  A salesperson?

15  A.   She was a salesperson.  She actually was the health care

16  compliance contact in our district.

17  Q.   So she was a salesperson and was supposed to be the point

18  of contact in health care compliance?

19  A.   Correct.

20  Q.   What did you tell Ms. Edwards about your concerns?

21  A.   I told Angel that even though she was in health care

22  compliance, that she knew what was going wrong when we were at

23  these district meetings.  And it was the same situation with

24  Frank Murphy, with Tony Dolisi.  She just couldn't bring it to

25  herself to tell on him and open the can of worms, and we knew

PENELOW - DIRECT - RUSS

1  that we'd all be at risk if it came out.

2      So I told her that I was very uncomfortable with the

3  off-label marketing.  I was very uncomfortable with paying

4  speakers for prescriptions, and, once again, I was told to

5  just put my head down, stay safe, keep my job and not get

6  fired.

7  Q.  So she didn't report your concerns?

8  A.  She did not report.

9  Q.  Steve Smacchia -- is that how you say his name?

10  A.  It is.

11  Q.  Another sales rep in your district?

12  A.  It is.

13  Q.  Did you have conversations with him?

14  A.  I did speak to Steve Smacchia.  Steve Smacchia was not

15  talking off-label.

16  Q.  Okay.

17  A.  Okay.  So his numbers really reflected that, and he was

18  put on a performance enhancing program.

19  Q.  Performance improvement?

20  A.  Improvement program, yes.

21  Q.  Did you tell him about what you were doing or the

22  concerns that you had?

23  A.  Yes.  We -- I mean, he saw it firsthand.  We would go on

24  a couple of calls together in New York City because we worked

25  close in proximity.  And so because he was unable to talk

PENELOW - DIRECT - RUSS

1    off-label and refused to talk off-label, I would go in with

2    him, and I would help him sell to his doctors.

3    Q.   And you were helping him get his --

4    A.   Get his numbers up so he didn't get fired.

5    Q.   Were you successful in helping him?

6    A.   Yes, he did do better.

7    Q.   Okay.

8         What about Yvonne Wind-Vasquez?

9    A.   She's an interesting situation.  Yvonne Wind-Vasquez was

10   a rep in Miami, or Fort Lauderdale area, and she came up for a

11   training program in Bridgewater, New Jersey, that I was also

12   at, and we were done with the day.  We were driving over to

13   the restaurant for dinner, and I said, How does Florida do so

14   good?  You guys's numbers are through the roof.  We are in

15   New York where the epidemic began.  We thought we were going

16   to be a really high-performing district.

17        And she proceeded to tell me that they were utilizing

18   MIRs to get the off-label information to the doctors and, as

19   you saw, it was a lot.

20        And she also shared with me that they were showing the

21   DART and the METABOLIK study.  And as well, she was a nurse

22   practitioner that practiced in one of the HIV offices, so she

23   was not only an employee of Janssen, she was also a

24   prescriber.

25        So she didn't respond well to my telling her this

PENELOW - DIRECT - RUSS

1   story, and, you know, certainly wasn't supportive in telling

2   me to go to HCC.  She shut it down pretty quickly.

3   Q.   She was a sales rep and a prescriber?

4   A.   She was.

5   Q.   Okay.

6        So you told -- and this is all leading up to about

7   2012?

8   A.   About 2012, yeah.

9   Q.   And you told the jury that you were starting to have

10  trouble sleeping and having some anxieties.

11  A.   Yes, I was.

12  Q.   Why?

13  A.   The pressure was becoming too much for me.  Tony was

14  borderline harassing me because I would push back every time

15  he asked me to do something off-label or do an MIR or do a

16  speaker program, like the Nadim and Kaminsky, together, things

17  of that nature.  Just, again, outside -- be creative outside

18  the box type of promotion.

19       And I started experiencing panic and panic attacks.  I

20  couldn't sleep at night.  I had some trouble breathing at

21  times, and it was starting to become a huge concern for me and

22  my family.

23  Q.   And this was after years of having these discussions,

24  including with your boss and your boss's boss, about your

25  concerns.

PENELOW - DIRECT - RUSS

1  A.   In addition to my trainer, who gave me a message from

2  Tony that, if I didn't turn around what I was doing, I was

3  absolutely going to get fired.  And Tim McSherry is the

4  trainer.  He tried to protect me.  He did.  He begged me to

5  please just go with the flow and not lose my job.

6  Q.   And were you having that stress because you were a

7  salesperson, or was it because of what they were having you do

8  and the tactics that they were having you use?

9  A.   I've always loved being a salesperson.  I take a lot of

10  pride in what I do, and I felt as though I had lost my value

11  system in this process.  And so I was very upset.

12       I would go to programs.  I can remember a time I

13  pulled -- I was on my way to a program, I pulled over on the

14  side of the road and called my husband and was having a panic

15  attack.  And I had to go to the nearby walk-in clinic because

16  I didn't know what was happening.  I was having heart

17  palpitations, and it was because I would go into a program

18  that was going to have a plant -- two plants, and I was

19  extremely nervous about it.

20  Q.   Because you were being asked to break the law.

21  A.   I was being asked to break the law.

22  Q.   And you were reporting that, and it wouldn't stop.

23  A.   Correct.

24  Q.   Did you hear Mr. Mattes -- by the way, did you ever meet

25  Mr. Mattes when you were a Tibotec employee?

PENELOW - DIRECT - RUSS

1    A.    Never personally.

2    Q.    Okay.

3          Did you hear him say that he had sympathy for

4    Ms. Brancaccio when he testified?

5    A.    I did hear that.

6    Q.    At some point, Ms. Penelow, did you go on medical leave

7    because of the experiences that you were having with the

8    stress and the anxiety?

9    A.    I did go on medical leave in 2010 for about four months.

10   It was February 2010, and I sought medical help at that time

11   and went to the physician to get it treated.

12   Q.    And so around this time, did you start to have concerns

13   that, my complaints are falling on deaf ears so maybe I'll go

14   outside the organization?

15   A.    I thought about going outside of the organization.  I

16   thought about going to compliance.  I thought about going to

17   HR.  I couldn't decide exactly what the best path for me would

18   be.

19         So after my disability, I decided to try and go back

20   and see if I could talk some sense into Tony and Nancy and

21   Tim.

22   Q.    How'd that go?

23   A.    Not well.  It was the same situation.  The pressure was

24   coming from the top.  Tony was extremely stressed out, and

25   there was no change in what he requested in my activity.

PENELOW - DIRECT - RUSS

1  Q.  And by the way, Tony Dolisi, that's the same individual

2  that Ms. Brancaccio told the jury told her on the phone, "I

3  would have a great whistleblower case if they fired me."

4  A.  That's the same Tony Dolisi.

5  Q.  So at this point, did you go seek legal advice?

6  A.  Not yet.

7  Q.  Okay.  We'll keep walking through.

8      At what point did you realize, I've got to go see an

9  attorney?

10 A.  Before that happened, I decided that I was going to stay

11 in the territory and try and not do it and not let anyone

12 know.  But Nancy was with me so much -- we traveled together

13 and made a lot of calls together -- that she would demand that

14 I made the off-label message before we went into the office so

15 that I could practice it.

16     So it got even worse at that point.

17 Q.  Okay.

18     So you were trying to do it the right way.

19 A.  Yeah.

20 Q.  And was that helping with your stress?

21 A.  Yeah.  I would always feel better if I did an

22 off-label call -- I mean an on-label call, absolutely.

23 Q.  But Ms. Bartnett was with you -- I think you said she was

24 with you maybe on 80, 85 percent of your calls.

25 A.  She was.

PENELOW - DIRECT - RUSS

1  Q.  So she would know if you weren't selling the way she

2  sells.

3  A.  Exactly.

4  Q.  Okay.

5       And so when you -- she required you to?

6  A.  She did require me to.  She wanted me to practice, was

7  the way she verbalized it.

8  Q.  What does that mean?

9  A.  You know, like we do at the POAs.  They make us do role

10  plays.  It's the same kind of thing where, you know, you get

11  your messages right.  You make sure you talk about futures and

12  benefits.  You make sure you talk about the discussion and the

13  conclusion of whichever study you're talking about so that

14  you're nice, smooth, concise when you see the doctor.

15  Sometimes they don't have a lot of time, so practice was

16  necessary.

17  Q.  Okay.

18       Keep walking us through when you realized, this has

19  gotten so bad, I need to seek counsel.

20  A.  It was now in the beginning of 2012, and we did speak

21  about the incident where Mark Miller asked Dr. Kaminsky to

22  take down the slides, and I drove him back to his office.

23       Once I saw that not only were sales reps and the

24  management and the entire country, for that matter, in on it,

25  I started realizing that the doctors were in on it, too, when

PENELOW - DIRECT - RUSS

1  Dr. Kaminsky was, like, I'm willing to do anything.  And that

2  was extremely impactful for me, and I think that was the

3  turning point when I decided I had to go to seek counsel and

4  see what these activities were and what I could do about them.

5  Q.   To be fair, Ms. Penelow, not all the doctors responded

6  the same.  Not all of them were in on it.

7       Right?

8  A.   No, they were not.

9  Q.   Some would not listen to the message.

10 A.   That's correct.

11 Q.   But the ones that you described for this jury, which were

12 your primary prescribers, you felt like they knew it was wrong

13 and they were acting in a way that's improper.

14 A.   Yes.  And they approved of it.

15 Q.   Okay.

16      And so there's been a lot of questions, and

17 Ms. Brancaccio got asked, Why didn't you report it instead of

18 going and filing a lawsuit for a lot of money?

19      Do you recall those questions?

20 A.   I do recall those questions.

21 Q.   Did you even know what a False Claims Act case was?

22 A.   I had no idea.

23 Q.   So you were seeking advice on how you could report under

24 the law.

25 A.   Yes.

PENELOW - DIRECT - RUSS

1    Q.   And is it fair to say, once you went through that

2    process, you had no idea what the damages would be 12 years

3    later?

4    A.   No, I had no idea.

5    Q.   Did you even have idea this process would take 12 years?

6    A.   I couldn't have imagined in a million years that it would

7    take as long as it has taken.

8         So the activities took place 18 years ago, and we filed

9    the case 12 years ago.  So this has been a big part of my

10   life.

11   Q.   And you've been telling the same story, the same facts

12   and the same incident for the last 18 years?

13   A.   Yes.

14   Q.   And the whole time, Janssen has been saying you're not

15   telling the truth?

16   A.   That's correct.

17   Q.   Why were you staying at the company?

18   A.   There was a couple reasons.  I mean, as I said, I was

19   very proud to get a job at Johnson & Johnson when I first did.

20   They have a wonderful tuition reimbursement program.  I think

21   we touched on it a little bit yesterday.  And I decided at

22   that time that I was going to probably end up switching

23   careers because I couldn't continue with this.  I had hoped it

24   would be with Janssen, and they certainly have a lot of

25   operating companies, and I was sure that they couldn't all be

PENELOW - DIRECT - RUSS

1    like this.

2         So I went back to graduate school, and they did

3    reimburse me to get my MBA and my master in science.  So I got

4    two master's degrees at St. Joseph's College in Brooklyn.

5    Q.   So J&J had a program where they would help you get

6    advanced education.

7    A.   Yes.

8    Q.   And you took advantage of that.

9    A.   I did.

10   Q.   Right?

11        I mean, in other words, you applied for it and they

12   approved it?

13   A.   Yes.

14   Q.   And your sales numbers were good.

15   A.   They were good.

16   Q.   Were you a high performer?

17   A.   I wouldn't say I was a high performer.  I would say I was

18   a middle-of-the-line performer.

19   Q.   Middle of the line.

20   A.   Yeah.

21   Q.   Okay.

22        Was that one of the reasons that you had a hard time

23   leaving this organization, was you were taking classes and

24   getting your education paid for?

25   A.   Yeah.  I wanted to complete my degrees.

PENELOW - DIRECT - RUSS

1  Q.  And it wasn't coming from Tibotec.  That was a -- was

2  that a J&J program?

3  A.  I believe it was a J&J program, yes.

4  Q.  At this point, Ms. Penelow, in 2012, you're meeting with

5  counsel.  You're about to file a lawsuit.  Did you ever -- I

6  think you told the jury you've never been a whistleblower

7  before.

8  A.  No, I have not.

9  Q.  Or after?

10  A.  Or after.

11  Q.  Was it scary?

12  A.  Very intimidating.  Very intimidating.  Telling your

13  story is one thing.  Living it is one thing.  But to have to

14  relive it and try and figure out exactly where the wrongdoing

15  was and where we were going to file a lawsuit was difficult.

16  Q.  In fact, the jury has seen some emails that would

17  normally be privileged with attorneys.

18      Right?

19  A.  Right.

20  Q.  That you sent to your mother.

21  A.  I did send an email to my mother, a couple emails to my

22  mother.

23  Q.  Why did you do that?

24  A.  My mother was aware of the panic and anxiety that I had

25  been suffering through the last couple of years, and she was

PENELOW - DIRECT - RUSS

1  clearly very concerned.  My mom is my best friend, and I was

2  just looking for support.  And my lawyers were very supportive

3  from day one, and I wanted my mom to know that I had somebody

4  that believed me and that I had support.

5       That was my only intention.

6  Q.  You didn't think you were doing anything wrong by letting

7  your mom know you were being supported.

8  A.  I had no idea.

9  Q.  Well, you weren't doing anything wrong.

10 A.  No.

11 Q.  But those emails were being used to suggest that somehow

12 your lawyers were.  Do you think your lawyers did anything

13 wrong?

14 A.  Absolutely not.

15 Q.  Have they been supportive of you?

16 A.  Very supportive.

17 Q.  Ms. Penelow, when you brought this suit, you didn't have

18 all the documents that the jury has seen over the last three

19 weeks.

20 A.  I did not.

21 Q.  There's something called discovery where your attorneys

22 get those documents from Janssen.

23      Right?

24 A.  Yes.

25 Q.  So is it fair to say, over the last three weeks, you've

PENELOW - DIRECT - RUSS

1   seen documents that you didn't even know existed?

2   A.   Very fair to say.  I've been very surprised.

3   Q.   Surprised that you were more right than you realized?

4   A.   Yes.  And surprised that it got put in writing.

5   Q.   Did you hear Mr. Mattes on the stand say that off-label

6   marketing may have been happening out in the field and he was

7   probably alerted to it and he can't remember?

8   A.   I did hear that.

9   Q.   You were in the field.

10  A.   I was in the field.

11  Q.   Was it happening?

12  A.   It was absolutely happening.

13  Q.   We also learned over the course of the three weeks that

14  you might have more friends than you realized.

15       Right?

16  A.   Yes, yes.  It's been alluded to, yes.

17  Q.   Well, let's talk about that.

18  A.   Okay.

19  Q.   Are you friends with Sara Strand?

20  A.   No, I am not.

21  Q.   Let's talk about Sara Strand.

22  A.   Okay.

23  Q.   So Frank Murphy, Nancy Bartnett -- or is it Nancy

24  Bartnett, then Frank Murphy?

25  A.   Nancy Bartnett, then Frank Murphy.

PENELOW - DIRECT - RUSS

1    Q.   Nancy Bartnett, Frank Murphy, then Sara Strand?

2    A.   Yes.

3    Q.   So your boss's boss's boss --

4    A.   Uh-huh.

5    Q.   -- testified, and you heard her.

6    A.   I did.

7    Q.   And the allusion has been you're all friends.

8         Were you friends with Ms. Strand when you worked there?

9    A.   I only spoke to Ms. Strand when she interviewed me.  And

10   I never had another conversation with her again.

11   Q.   Okay.

12        You talked about Mr. Holshoe.  He was in a different

13   district.

14   A.   Correct.

15   Q.   Have you been in touch with Mr. Holshoe over the last 12

16   years?

17   A.   Nope.  There's just been one message that he asked me

18   about my lawyers calling him and wishing well for family.

19   That's about it.

20   Q.   Is that the LinkedIn message we heard about?

21   A.   Yes, yes.

22   Q.   The one LinkedIn message over the last 12 years?

23   A.   Yes.

24   Q.   How about Mr. Grooms?

25   A.   I have no relationship with Mr. Grooms.

PENELOW - DIRECT - RUSS

1   Q.   He was in Kansas City.

2   A.   He was in Kansas City.

3   Q.   And you were in New York.

4   A.   Uh-huh.

5   Q.   How often did you see Mr. Grooms?

6   A.   Only at POA meetings.

7   Q.   You were friends with Ms. Graham.

8   A.   With Ms. Graham, I was friends.

9   Q.   Did Ms. Graham go to your wedding?

10  A.   She did go to my wedding.

11  Q.   Okay.

12  A.   I think we've seen the picture a couple times.

13  Q.   You became friendly with Ms. Brancaccio?

14  A.   I did.

15  Q.   Ms. Brancaccio go to your wedding?

16  A.   She did not.

17  Q.   She was a fellow sales rep?

18  A.   She was a fellow sales rep.

19  Q.   Mr. Wilhelm, did you know you were friends with him?

20  A.   No, no friendship with Mr. Wilhelm.

21  Q.   Okay.

22       And, in fact, he was on the western side of the country

23  when you were in Manhattan.

24  A.   Correct.

25  Q.   Okay.

PENELOW - DIRECT - RUSS

1      Is that right?

2  A.   That's right.

3  Q.   So if we draw lines between you, you all worked at

4  Janssen.

5      Right?

6  A.   That's right.

7  Q.   That's your connection?

8  A.   That's what we had in common.

9  Q.   Well, that and your experience off-label marketing?

10 A.   Correct.

11 Q.   Paying speakers.

12     Right?

13 A.   Yeah.

14 Q.   If you were so friendly with Ms. Graham, why is she not

15 your co-relator?

16 A.   When I went to a lawyer and we started talking about the

17 different documents that I may need to prove my case, I was

18 under the impression that I was going to start recording, and

19 Christine was a friend of mine, and in my right mind, I

20 couldn't record her without her knowing.

21     So I decided to tell her about the case and ask her if

22 she would like to come in.

23 Q.   And so --

24 A.   We both experienced the same thing.  We were in the same

25 meetings together.  We were both under Tony Dolisi.  We were

PENELOW - DIRECT - RUSS

1  both under Nancy Bartnett.  We were both under Tim McSherry.

2  Q.   How did Ms. Brancaccio respond to that?

3  A.   She took some time to decide.  She didn't give me a yes

4  right away.  It's something she thought about very long and

5  hard.  She was a single mother.  She certainly could not

6  afford to lose her job, but she also was having a problem

7  putting her head on the pillow at night.

8       And so we really related to each other on that front.

9  So she did come back and say that she would like to join me.

10 Q.   She didn't jump in immediately and say, We're going to

11 make so much money?

12 A.   Not at all.

13 Q.   You talked about recordings.

14      Did you hear Ms. Brancaccio say on her testimony that

15 she looked at the law first to make sure she could record?

16 A.   Yes.

17 Q.   Why were you recording?

18 A.   Because I knew, based on the activity in the last five to

19 six years that I worked for the company, that I was going to

20 have to prove my case, and that Janssen was going to say that

21 I was lying.

22 Q.   Have they said that?

23 A.   They absolutely have said that.

24 Q.   Ms. Brancaccio is pretty impressive.

25      Do you agree?

PENELOW - DIRECT - RUSS

1   A.   I agree.

2   Q.   She might be a little better at recording than you.

3        Is that fair?

4   A.   She's definitely better at recording.

5   Q.   Did your recordings come through grainy?

6   A.   Very grainy, loud music in the restaurants, very hard --

7   Q.   Where were you recording?  When you were at the

8   restaurants were you recording?

9   A.   Yeah, mainly restaurants or possibly a POA.

10  Q.   You heard some testimony from Ms. Graham and Mr. Wilhelm

11  that they, on their own, went and filed their own lawsuit.

12  A.   Yes.

13  Q.   Do you remember that?

14  A.   Yes.

15  Q.   Did you know -- and we need to know this.  Did you know

16  that they had done that?

17  A.   I had no idea.

18  Q.   Did Ms. Graham approach you and say, Hey, I'm going to do

19  this because you did it?

20  A.   She didn't know that I did it, and I didn't know that she

21  did it.

22  Q.   In fact, did there come a time when you couldn't talk

23  about any of this?

24  A.   That time did come.  My lawyers advised me not to.

25  Q.   And Ms. Graham was reaching out to you?

PENELOW - DIRECT - RUSS

1  A.   She was.

2  Q.   And you couldn't respond?

3  A.   No, I couldn't.

4  Q.   You couldn't tell her why?

5  A.   I couldn't tell her why.  I was listening to my counsel.

6  Q.   When you left Janssen -- well, actually let me back up.

7       So you tried to go back after your medical leave.

8       Right?

9  A.   Yes.  I went on medical leave again in 2012 -- so the

10 first one was in 2010 -- tried again to see if I can stay in

11 the environment.  The panic and anxiety became unbearable, and

12 in 2012, in April, I did go back out on disability and get

13 some more help from physicians.

14 Q.   So you didn't quit and hang up.  You tried again?

15 A.   I tried again.

16 Q.   You were only back for a few weeks?

17 A.   I was only back for -- yeah, I went on disability.  I

18 came back for two weeks.

19 Q.   How did those two weeks go?

20 A.   Those two weeks were really rough.  Tony packed my

21 schedule.  He sent me to the home office to get retrained

22 because I had been on disability.  At that point I had, you

23 know, seven years at the company.  I knew the drugs pretty

24 well.  So going into the home office was different.

25       And I decided at that time that I was thinking about

PENELOW - DIRECT - RUSS

1  going to see HR and reporting it, but I had seen the lawyers,

2  and I wasn't supposed to say anything.

3  Q.   We don't need to get into any advice.

4  A.   Yeah.

5  Q.   So ultimately you did receive instructions prepared --

6  instructions from a physician about your health.

7  A.   I did.

8  Q.   Did you decide that it was in the best interest of your

9  health to not be in that position?

10 A.   My physician and myself decided.

11 Q.   Okay.

12      And so you went on leave in 2013?

13 A.   I did.

14 Q.   There's been some discussion that -- because we talked

15 about all the times you reported now.

16      Right?

17 A.   Yes.

18 Q.   It wasn't like I reported, and they fired me the next

19 day?

20 A.   No.

21 Q.   You've been talking and reporting for years?

22 A.   Yes.

23 Q.   You didn't quit, did you, Ms. Penelow?

24 A.   I did not quit.

25 Q.   What happened?

PENELOW - DIRECT - RUSS

1   A.   When I got done with disability, Janssen got in touch

2   with me and told me -- I explained to them, and I obviously

3   had documentation from my doctor and the third-party

4   disability company, that he would not allow me to go back into

5   that toxic environment because I was doing better and he felt

6   that the anxiety and panic attacks would come back.

7       So he wouldn't allow me to go back into that territory,

8   so his request was for me to move to a different Janssen

9   subsidiary.

10  Q.   Did you try to?

11  A.   I tried.  I was very excited about that as an

12  opportunity.

13  Q.   What happened?

14  A.   I found there was a job in Ethicon, which is right near

15  my house, so I immediately called HR and told Megan McGrath,

16  which was my contact at HR throughout my whole disability,

17  that I would like to go to Ethicon and switch to a different

18  division so that I wouldn't remain sick anymore.

19      And she told me that she was unable to fulfill that

20  request.

21  Q.   At some point did you get a letter from the company?

22  You've seen -- we've seen Ms. Brancaccio's letter from the

23  company.

24  A.   We have seen her letter.

25  Q.   At some point did you get one that said, We've determined

PENELOW - DIRECT - RUSS

1  that you've voluntarily resigned?

2  A.    I did.

3  Q.    Did you do that?

4  A.    I did not resign.

5  Q.    So they told you you were fired, basically?

6  A.    I took it as they told me I was fired, but I'm not sure

7  how they see it.

8  Q.    And to be fair, Ms. Penelow, there was some distance

9  between your last day, 2012, and when you got that letter in

10  2013, or a couple months.

11       Right?

12  A.    Yeah.  A couple months, yep.

13  Q.    So at this point you'd filed your lawsuit?

14  A.    I had.

15  Q.    Did you just sit around and wait for the money to come

16  in?

17  A.    No.

18  Q.    What did you do?

19  A.    First I filed for unemployment.

20  Q.    Okay.

21  A.    That was my first step.  And Janssen denied it.

22  Q.    Okay.

23  A.    So I fought the denial, and they did an investigation,

24  and New Jersey did make sure that I got unemployment.

25  Q.    Was there a determination that you didn't resign?

PENELOW - DIRECT - RUSS

1   A.   Correct.

2   Q.   Okay.

3        Then you went and started your own company?

4   A.   I did.  I decided -- I finished my MBA in 2012, and I

5   finished my MS in 2013, so this was right around the time that

6   I was leaving Janssen.

7        So in October I decided to open my own company and

8   distribute pharmaceuticals and medical supplies, and me and my

9   husband ran that company.

10  Q.   How long did you do that?

11  A.   About seven years.

12  Q.   How'd that go?

13  A.   It went wonderful.  We did really, really well, and all

14  of my symptoms had begun to subside, my anxiety, my panic, and

15  I felt like I had a new lease on life.  But, of course, I had

16  the monkey on my back, which was the lawsuit.

17  Q.   Then you had a couple other jobs after -- because at some

18  point you rolled up that business?

19  A.   Yes.  Unfortunately, the products that I was selling, the

20  insurance companies stopped paying for them.  So our income

21  dropped drastically.  So at that point, I realized I had to go

22  back into the field, and I got into genetics.

23  Q.   You're still working -- then you went to another job

24  after that.

25       Right?

PENELOW - DIRECT - RUSS

1    A.    I did.    I worked during the COVID time putting up COVID

2    centers.

3    Q.    Where do you work now?

4    A.    I work now at Mayne Pharma, M-A-Y-N-E.    We're a women's

5    health division, and I sell plant-based birth control and

6    menopausal products.

7    Q.    So you've been consistently working during this process?

8    A.    Yes.

9    Q.    Ms. Penelow, you've heard some questions in this case of

10   multiple witnesses that these are serious allegations.

11        Right?

12   A.    Absolutely.

13   Q.    You agree?

14   A.    I agree.

15   Q.    The conduct was serious, wasn't it?

16   A.    It was.

17   Q.    And it's not been easy for you?

18   A.    It's been a very difficult 18 years.

19   Q.    Fair to say you stood in the shoes to do the right thing

20   for the right reasons?

21   A.    I always said I can't wait to tell my son that I did the

22   right thing.

23   Q.    It's a little bit more serious than TikTok videos and

24   wedding pictures and Facebook posts, isn't it?

25   A.    It sure is.

PENELOW - CROSS - BROWN

1    MR. RUSS:  Pass the witness, Your Honor.

2    THE COURT:  All right.  Thank you, Mr. Russ.

3    Ms. Brown?

4    MS. BROWN:  Thank you, Your Honor.

5    May I approach for the microphone, Judge?

6    THE COURT:  You may.

7    MS. BROWN:  May I proceed, Your Honor?

8    (CROSS-EXAMINATION BY MS. BROWN:)

9    Q.  Good morning, Ms. Penelow.

10   MS. BROWN:  Good morning, ladies and gentlemen of the

11   jury.

12   BY MS. BROWN:

13   Q.  Ma'am, you would agree with me, Ms. Penelow, that the

14   truth doesn't change.

15   Right?

16   A.  Right.

17   Q.  I mean, if something happened, it happened.

18   Right?

19   A.  Absolutely.

20   Q.  And if it didn't happen, it didn't happen.

21   Right?

22   A.  Right.

23   Q.  All right.

24   But to be fair, ma'am, you've had a hard time keeping

25   track of what you claim did or didn't happen in this case.

PENELOW - CROSS - BROWN

1          Is that right?

2   A.   No, I would disagree with this.

3   Q.   Well, some of the testimony that you've given us in the

4   past under oath has been very, very different than the

5   testimony you just gave to our jurors.

6          Isn't that right?

7   A.   I'm not sure.

8   Q.   Well, you swore under oath that in November of 2012, you

9   met with HR --

10  A.   I did.

11  Q.   -- And reported off-label claims to HR.

12         Correct?

13  A.   Correct.

14  Q.   And you told us that, in a document that you signed and

15  swore under oath, that that was true.

16         Correct?

17  A.   Correct.

18  Q.   All right.

19         And we asked you -- our jury's heard quite a bit about

20  depositions by now -- more opportunity to swear to things

21  under oath.

22         Right, ma'am?

23  A.   Right.

24  Q.   And we asked you about that at your deposition, and again

25  you swore under oath that you had reported to HR.

PENELOW - CROSS - BROWN

1      Correct?

2  A.   Correct.

3  Q.   And, actually, when you talked about all the reporting

4  just now with counsel that you claim you did, you didn't

5  mention HR.

6      Right, ma'am?

7  A.   I did mention that I went to an HR meeting.

8  Q.   Okay.

9      And what you told us back in your deposition was that

10  not only had you gone to HR, but you had secretly recorded it.

11      Remember that?

12  A.   I did.

13  Q.   Right.

14      And we asked you, when we learned about that, Well, can

15  we have the recording?

16      Right?

17  A.   Yes, you did.

18  Q.   All right.

19      And because you were obliged to, you, of course, gave

20  it to us.

21      Correct?

22  A.   Yes.

23  Q.   All right.  And what you had done, ma'am, is you had

24  secretly recorded a meeting with Megan McGrath in HR.

25      Correct?

PENELOW - CROSS - BROWN

1  A.   Correct.

2  Q.   And the way you did that was you turned on your phone,

3  and you slipped it in your purse.

4       Correct?

5  A.   Correct.

6  Q.   Okay.

7       And you knew that it was against company policy to

8  secretly record employees.

9       Correct?

10 A.   I didn't know that at the time.

11 Q.   All right.  Do you understand now it was against policy

12 to do that?

13      Right?

14 A.   Yes, I do.

15 Q.   Okay.

16      And you certainly didn't tell our HR director,

17 Megan McGrath, that you were recording the conversation she

18 was having with you.

19      Correct?

20 A.   Correct.

21 Q.   All right.

22      And I want to talk to you about that meeting and that

23 tape.  But one thing that we can agree on is you did not

24 report off-label allegations in that meeting.

25      Right, ma'am?

PENELOW - CROSS - BROWN

1    A.    Correct.

2    Q.    Even though you had sworn under oath not once but twice

3    that you had done that.

4          Right, ma'am?

5    A.    I believe I said that I had a meeting with HR and told

6    them about the off-label marketing.  It was over the phone,

7    and it was a conversation that I did not tape.

8    Q.    Well, what actually happened, ma'am -- we're going to

9    walk through it -- is you told us, I have it on tape and I'll

10   give it to you.

11         Right?

12   A.    Right.

13   Q.    When you gave it to us, we listened to it.

14         Right?

15   A.    Right.

16   Q.    And it says no such thing?

17   A.    You are correct.

18   Q.    All right.

19         So what it says, though, is what I want to talk to you

20   about, okay?

21         MS. BROWN:  Your Honor, permission to admit and play

22   and question about DX-6029, please.

23         MR. RUSS:  No objection.

24         THE COURT:  So admitted.

25   (Defendant's Exhibit 6028 in evidence.)

—PENELOW - CROSS - BROWN—

1   BY MS. BROWN:

2   Q.   So let's -- just to get started, let's just look a little

3   bit, get the -- get the conversation started, and we can see

4   you sort of slipping the phone in your purse.

5          MS. BROWN:  Mr. Knecht, could we please play Clip

6   Number 1.

7          (Video clip played at this time.)

8   BY MS. BROWN:

9   Q.   All right.

10         So to orient us, Ms. Penelow, that's you turning on

11  your phone.  You can see Ms. McGrath.

12         Correct?

13  A.   Uh-huh, yes.

14  Q.   And then you slip it into your purse.

15         Correct?

16  A.   Correct.

17  Q.   And as I mentioned, there -- we're going to listen to it,

18  but this meeting with Ms. McGrath, it lasted about 50 minutes

19  or so.

20         Correct?

21  A.   I don't remember the length of the meeting.

22  Q.   All right.

23         You talked about a lot of things in this meeting with

24  Ms. McGrath.

25         Correct?

PENELOW - CROSS - BROWN

1    A.    Correct.

2    Q.    One of the things you talked about -- and just to orient

3    ourselves, this meeting with Ms. McGrath that you swore was

4    evidence of you reporting to H- -- reporting off-label use, it

5    took place in about November of 2012.

6          Right, ma'am?

7    A.    That is right.

8    Q.    All right.

9          And one of the things you did on this video is you

10   talked about your belief that essentially everyone was out to

11   get you.

12         Right?

13   A.    I don't think I would characterize it that way.

14   Q.    All right.

15         Let's listen to it then, if we could.

16            MS. BROWN:  Could we play Clip Number 2, please.

17         (Video clip played at this time.)

18   BY MS. BROWN:

19   Q.    And so you remember, ma'am, having a discussion with

20   Ms. McGrath about feeling at this time period that folks in

21   your district were out to get you.

22         Remember that?

23   A.    No, I don't believe I used those words.

24   Q.    Right there on the video, did you see it, ma'am?

25   A.    That they were out to get me?

PENELOW - CROSS - BROWN

1   Q.   Yes, ma'am.

2   A.   Sorry.  I don't recall that.

3   Q.   Okay.

4        I think we just looked at it.  Right?

5        Do you remember saying that you didn't feel comfortable

6   in the district.  Right, ma'am?

7   A.   That is something I said.

8   Q.   You were upset that Mr. Fernandez had not come to greet

9   you when you returned from leave.

10       Correct ma'am?

11  A.   That's correct.

12  Q.   All right.  And you complained a bit about Tony Dolisi,

13  who we heard a bit about earlier.

14       Correct?

15  A.   Yes, and I spoke about Janssen as well.

16  Q.   And you went on in this meeting with Ms. McGrath to talk

17  about the fact that you thought Mr. Dolisi was preventing you

18  from being promoted at Janssen.

19       Do you remember those complaints?

20  A.   I do.

21  Q.   And just to orient us, you actually were working with

22  Mr. Dolisi in 2011 because you wanted to be promoted to an

23  executive sales rep.

24       Is that the title, ma'am?

25  A.   Yes, it is.

PENELOW - CROSS - BROWN

1  Q.   Okay.

2       And you had a lot of correspondence with Mr. Dolisi

3  about what you needed to do to fulfill the requirements for

4  that position.

5       Correct, ma'am?

6  A.   Yes.

7  Q.   And in this meeting with Ms. McGrath, you raised some

8  concerns that you weren't being promoted.

9       Correct?

10 A.   Correct.

11 Q.   All right.

12       MS. BROWN:  Let's listen to Clip Number 3, please.

13       (Video clip played at this time.)

14 BY MS. BROWN:

15 Q.   And so one of the things that you were upset about and

16 that you raised in this meeting with Ms. McGrath is your

17 belief that you were not advancing in the organization.

18       Correct, ma'am?

19 A.   Correct.

20 Q.   And you reference your MBA on this clip.

21       Correct?

22 A.   Yes, I do.

23 Q.   And I think I heard you just testify that's an MBA that

24 Janssen paid for you to get.

25       Correct, ma'am?

PENELOW - CROSS - BROWN

1   A.   Partially.

2   Q.   Janssen covered the tuition of your MBA.

3        Correct?

4   A.   Only partial.

5   Q.   Yes, ma'am.  It was part of a program that we have at

6   Janssen to assist with schooling.

7        Correct?

8   A.   Correct.

9   Q.   All right.  And Ms. McGrath explained to you in this

10  meeting that you had that there were no available spots in the

11  organization for you to move up to.

12       Do you remember that?

13  A.   I do.

14  Q.   All right.

15       MS. BROWN:  Let's listen to that, please, Clip

16  Number 4.

17       (Video clip played at this time.)

18  BY MS. BROWN:

19  Q.   Ma'am, you mention a couple of times in this clip that

20  you were of the belief that the folks at Janssen, your

21  superiors, Mr. Dolisi, Mr. Fernandez, were impeding or

22  preventing your ability to move up in the organization.

23       Correct?

24  A.   That as well as my sales numbers.

25  Q.   Sure.

PENELOW - CROSS - BROWN

1          And, I mean, certainly you were -- you were a sales rep

2    at the time.

3          Correct?

4    A.   Yes.

5    Q.   All right.  And one of the performance metrics for sales

6    representatives are sales.

7          Fair enough, right?

8    A.   Fair enough.

9    Q.   Okay.

10         And one of the things you talk about in this clip is

11   that you don't know what the reason is, but for some reason

12   Mr. Dolisi is not helping you advance.

13         Correct?

14   A.   I was well aware of the reason.

15   Q.   And what you don't mention on this tape, even though you

16   swore under oath you had said it, was that you believed you

17   weren't moving up in the organization because you were being

18   forced to promote off-label.

19         Correct?

20   A.   That is correct.

21   Q.   All right.  And, Ms. Penelow, you told Ms. McGrath that

22   you were of the belief that your manager, Mr. Dolisi, had a

23   personal vendetta against you.

24         Correct, ma'am?

25   A.   Yes.

PENELOW - CROSS - BROWN

1          MS. BROWN:  Let's listen to that, Clip Number 5,

2    please.

3          (Video clip played at this time.)

4    BY MS. BROWN:

5    Q.   You didn't just talk about in this meeting, Ms. Penelow,

6    you didn't just talk about Mr. Dolisi and how he was out to

7    get you, but you also spoke about a fellow sales rep of yours,

8    Mr. Tim McSherry.

9          Correct?

10   A.   I don't recall what I said, but that doesn't surprise me.

11   Q.   You spoke about Mr. McSherry yesterday.

12         Do you remember that?

13   A.   I did.  I did.

14   Q.   Mr. McSherry was a fellow sales representative of yours

15   in New York.

16         Correct?

17   A.   Yes.  He was a fellow representative and a friend.

18   Q.   Sure.

19         And you made some serious allegations about him in this

20   case before our jury.

21         Correct?

22   A.   I did.

23   Q.   And you had some things to say about Mr. McSherry when

24   you went to visit Ms. McGrath; that you thought he was being

25   treated better than you were.

PENELOW - CROSS - BROWN

1        Isn't that right, ma'am?

2    A.   Yes, it is.

3    Q.   All right.

4        And you thought you were being treated unfairly, and

5    Mr. McSherry was getting promoted over you.

6        True?

7    A.   I didn't think it.  That was a fact.

8            MS. BROWN:  Let's listen to clip 6, please.

9        (Video clip played at this time.)

10   BY MS. BROWN:

11   Q.   Ma'am, fair to say, in this meeting with Ms. McGrath, you

12   expressed a lot of concern about Mr. McSherry's promotion

13   within the organization.

14       Correct?

15   A.   Correct.

16   Q.   You expressed a lot of concern that Mr. McSherry actually

17   had been given that executive sales representative title that

18   you were, in fact, after.

19       Correct?

20   A.   Correct.

21   Q.   And you were upset, and you said you didn't know why he

22   was being favored over you.

23       Correct?

24   A.   Correct.

25   Q.   And, obviously, Ms. Penelow, you knew you were recording

PENELOW - CROSS - BROWN

1   this conversation.  You had the phone in your purse.

2         Correct, ma'am?

3   A.   Yes.

4   Q.   Okay.

5         And Ms. McGrath didn't know, but you did.

6         True?

7   A.   True.

8   Q.   And you sat with Ms. McGrath in this video.  This tape,

9   it lasts up to almost an hour.

10        Do you know that, ma'am?

11  A.   No, I had no idea.

12  Q.   And you felt comfortable, you would agree, airing a lot

13  of concerns that you had in this meeting.

14        Correct?

15  A.   Correct.

16  Q.   I mean, fair to say you didn't hold back.

17        Right?

18  A.   I did not hold back except for the fact that we were

19  speaking off-label and doing speaker programs and paying

20  speakers for prescriptions.

21  Q.   I'm going to talk to you about that.  But I want to talk

22  about what we have on the tape.

23        Right?

24  A.   That was the only thing I held back.

25  Q.   Okay.

PENELOW - CROSS - BROWN

1        You talked about Tony Dolisi.

2        Correct?

3   A.   Correct.

4   Q.   You talked about Mr. Fernandez.

5        Correct?

6   A.   Correct.

7   Q.   You talked about Mr. McSherry and other colleagues that

8   you felt were being treated better than you were.

9        Correct?

10  A.   No.  Just Mr. McSherry.

11  Q.   You talked about other performers who were equal to you

12  who you thought were getting better treatment.

13       Do you recall that?

14  A.   I don't recall that.

15  Q.   And what happened, ma'am, though, is that one thing you

16  absolutely did not do in this meeting was raise any concern

17  that there was off-label promotion going on.

18       Right?

19  A.   That is correct.

20  Q.   That was a problem for you because you had sworn under

21  oath multiple times that it was this meeting where you rang

22  the alarm.

23       Right?

24  A.   Yes.  I was mistaken in which meeting it was.  I spoke to

25  her many times.

PENELOW - CROSS - BROWN

1  Q.  But the problem was, after swearing it was this meeting

2  and telling us you had it on tape, there was nothing.

3      You agree?

4  A.  I agree with you.

5  Q.  On this tape.

6  A.  Yes.

7  Q.  And so you had to go back and change your testimony.

8      Right?

9  A.  Right.

10 Q.  You had to use something that's called a deposition

11 errata sheet.

12     Right, ma'am?

13 A.  Yes.

14 Q.  Okay.

15     And I don't think we've had a chance to talk about

16 those yet in this trial, but a deposition -- when you sit for

17 a deposition, we have a court reporter, and they type up the

18 questions and the answers.

19     Right, ma'am?

20 A.  Yes.

21 Q.  And you get a printed copy of the deposition.

22     Correct?

23 A.  Yes.

24 Q.  And you can look at it and make sure that the questions

25 were spelled correctly and there's proper punctuation and

PENELOW - CROSS - BROWN

1  things like that.

2      Right?

3  A.  I don't recall exactly what they asked for.

4  Q.  Okay.

5      You have the opportunity, if you see any mistakes, to

6  correct those typographical mistakes.

7      Correct, ma'am?

8  A.  Okay.  Okay.

9  Q.  All right.

10      But you actually used that errata sheet to change the

11  substance of your sworn testimony.

12      Right, ma'am?

13  A.  I don't recall that.

14          MR. RUSS:  Your Honor, can we approach?

15          THE COURT:  You may.

16          (Sidebar begins at 10:22 a.m.)

17          MR. RUSS:  Your Honor, this is going to go into

18  territory that we're going to need one of those instructions.

19  This is completely appropriate use of an errata sheet in a

20  deposition that's used in every single civil case, and the

21  implication being that she somehow lied and had to use an

22  errata as if it's something that's not.

23          THE COURT:  I don't think it's lying.  I think she's

24  saying, you had to change your testimony and, in order to

25  change it, you did it through the process of an errata sheet.

PENELOW - CROSS - BROWN

1    Right?

2         I mean, I don't think there's anything inappropriate

3    about you saying, You spoke under oath and said this is what

4    happened, and then you changed your testimony after the fact.

5    That's appropriate impeachment.

6         So is your concern the technical errata sheet piece?

7              MR. RUSS:  Correct.  The jury doesn't know about an

8    errata --

9              THE COURT:  I agree with that.

10             MR. RUSS:  -- and explain it.  But that is a common

11   practice.  In fact, we have many in this case.

12             THE COURT:  Well -- go ahead, Ms. Brown.

13             MS. BROWN:  Well, we are going to disagree with that,

14   Your Honor.  What is common and what is not is going to be a

15   fact issue for this jury.

16        What is common in an errata, as we all know, is to

17   change spelling and to change grammar.  She made substantive

18   changes to her testimony that's about to unfold, and that's a

19   fact of credibility issue for this jury --

20             THE COURT:  I absolutely agree with that.  I'm sorry,

21   Mr. Russ.  I've taken depositions, too.  Maybe not recently,

22   but she is testifying that the crux of her allegations in this

23   case were on a recording during a deposition.  She then later,

24   after the deposition is complete, probably learned, I don't

25   know, I mean, that's for the jury to determine whether she

PENELOW - CROSS - BROWN

1  learned it's not actually, in fact, on the recording, changes

2  a significant substantive -- one part of her testimony.  I

3  don't know the rest of the deposition, but that is a

4  substantive change.  That is not, hey, I said this was on my

5  left leg but the court reporter typed right.  Or this was --

6  the question was this and she made it as a statement.  We need

7  to clean up some of the spelling and some of the language here

8  because that's not exactly what was asked.

9           This is more substantive.  So I don't see that as

10  inappropriate examination.

11           Is your only concern referencing the errata sheet?

12           Because, Ms. Brown, why can't you just get out what

13  you're doing?  Because now we have to explain what an errata

14  sheet is and how that process works.

15           MS. BROWN:  It's pretty critical, Judge, to see the

16  lines that she deletes and what she --

17           THE COURT:  Can I see it?

18           MS. BROWN:  Yeah.  And can I -- I have a

19  demonstrative that will show it very clear.  Can I grab that

20  for you?

21           THE COURT:  For me on sidebar?

22           MS. BROWN:  Exactly.

23           THE COURT:  Yes.

24           (Brief pause.)

25           MS. BROWN:  Your Honor, here's what happened.  Right?

PENELOW - CROSS - BROWN

1    So in her deposition, she testifies, "That's when I decided to

2    go to human resources and report the off-label activity."

3         And then the errata deletes this part of it.

4         THE COURT:  That's a significant change.

5         MS. BROWN:  Yes, it is.

6         MR. RUSS:  I understand.  And she's going to -- we're

7    going to get on this on redirect in how she was honest and she

8    had multiple conversations with HR and she's mistaken.

9         THE COURT:  Okay.  So then what's the problem?

10         MR. RUSS:  Just the idea that errata sheet is somehow

11    something that's unusual.  I want to be careful that we don't

12    give that impression.

13         THE COURT:  Ms. Brown, are you trying to attempt to

14    say that the use of an errata sheet is unusual or that it's

15    unusual to change the substance of your information?

16         MS. BROWN:  The latter.  Because I'm going to point

17    this out, Judge.  Like, this is what it's for.  It said

18    "Webex" and it should be "Webex."  So it's for this kind of

19    stuff.

20         THE COURT:  Well, I'm not going to say -- I don't

21    know if you necessarily can say this is what it's for, but I

22    think this illustrates that --

23         MS. BROWN:  Exactly.

24         THE COURT:  -- throughout the entire deposition, all

25    these are very, like, I want to say stylistic changes or

─────PENELOW - CROSS - BROWN─────

1  spelling changes.  This is a significant change.  I don't see

2  anything wrong with establishing that.

3       And on redirect, you can rehabilitate her on why that

4  happened.  I don't have any problem with that.

5       But I'm going to allow this.

6       And are you moving to admit the --

7        MS. BROWN:  Errata, I will move to admit.

8       While we're here, I'm going to do these just as

9  demonstratives to show the jury what was previously said and

10 what the errata showed.

11      THE COURT:  All right.

12      MS. BROWN:  And there are a couple of them, Judge.

13      THE COURT:  All right.  Mr. Russ, any -- it's a

14 demonstrative, so I don't believe there's any objection, but

15 you tell me.

16      MS. BROWN:  Yeah.  I mean, she did this many times,

17 so there's a couple.

18      THE COURT:  Can we see just -- without reading them

19 just showing him?

20      MS. BROWN:  Oh, sure.  Yeah.  They're there.  So it's

21 just where she did it, I have a slide that shows, you know,

22 refused to talk off-label, well, actually not true, you know.

23      THE COURT:  Be careful on -- no, no, I got you.

24      All right.  That's a demonstrative, so, look, I'm going

25 to allow it.

PENELOW - CROSS - BROWN

1    Is there any objection to the demonstrative?  They're

2    not going in.

3         MR. RUSS:  No objection.

4         THE COURT:  Are you moving to admit this?

5         MS. BROWN:  Yes, please, sir.

6         THE COURT:  I want to know now, any objection to the

7    errata sheet?

8         MR. RUSS:  Can I see it, Your Honor?

9         THE COURT:  Of course.

10        MR. RUSS:  Judge, just for the record, I just want to

11   state our position that it is not unusual to change, including

12   in this deposition and in other depositions in this case,

13   things like the names.  It's not just in spellings.  When they

14   were hired, if they were mistaken --

15        THE COURT:  I agree with that.  And this will help

16   you to establish that if you want, but I think Ms. Brown has

17   the right to say that context is very different than these are

18   the allegations in the case.  You're saying you reported them

19   to HR, and then you decide later, I did not report them to HR.

20   That's -- and, by the way, if you want to establish that's no

21   different than what's happening here in these other changes,

22   by all means, go ahead and do that.  But I think I'm going to

23   allow it.

24        And -- but, Ms. Brown, I want to be careful here.

25   You've already established that she has an inconsistent

PENELOW - CROSS - BROWN

1  testimony in the deposition.  So walk me through briefly,

2  what's the purpose of the errata sheet, then, if -- because

3  that's the way she changed the testimony?

4          MS. BROWN:  Correct, Judge.  And it's an admission --

5  both her admissions, this is signed and sworn --

6          THE COURT:  Was she ever deposed -- I don't know this

7  because you guys know the case better than me and the

8  discovery process.

9      Was she ever deposed a second time where you

10 established this?  Because then I would find this likely to be

11 maybe redundant.

12         MS. BROWN:  No, sir.  It's just we got the errata and

13 the testimony is deleted.

14         THE COURT:  And this is how it was changed.

15         MS. BROWN:  Correct, sir.

16         THE COURT:  Then I'm going to allow it.

17         MR. RUSS:  And my point is just a little different.

18     Errata sheets are normal.  If we start giving this

19 impression that it's something that she came up with, that's

20 something I want the jury -- I want to be on high alert for

21 that; that this is something that's unusual.  The use of an

22 errata.

23         THE COURT:  The use of an errata sheet is not

24 unusual.  That's not what Ms. Brown is saying.  I'm pretty

25 sure she's used one in every deposition she's ever been in.

─────────────── PENELOW - CROSS - BROWN ───────────────

1      I do think it's unusual -- or at least for purposes of

2  impeachment, she's allowed to establish that this was a

3  significant substantive change in your testimony.

4      And I will tell you, Mr. Russ, if there was a second

5  deposition in which she had clarified that, then I likely

6  would not bother with this errata sheet.  But this is how she

7  changed the substance of her testimony.

8      So I do think it's relevant on cross-examination.  I

9  think the errata is admissible, and the demonstratives, they

10 just tailor to --

11          MS. BROWN:  Yes, sir.

12          THE COURT:  All right.  I hear you.

13          (Sidebar was concluded at 10:29 a.m.)

14          (Open court.)

15          THE COURT:  Sorry, folks.  That's me.  Whenever the

16 sidebar goes longer than anticipated, you can look at me.

17 It's the judge.  It's never the lawyers because they can't

18 keep me there.  I'm the one that keeps them there.

19      So I just want to make sure if there's any

20 accountability that you hold me responsible.

21      Let me ask you this:  Because we're doing longer

22 mornings, do you want to go for a few minutes now or do you

23 want to take the break and then reboot?

24          MS. BROWN:  I completely defer to the Court, whatever

25 makes the most sense.

*United States District Court*
*District of New Jersey*

PENELOW - CROSS - BROWN

1          THE COURT:  All right.  Let's go maybe 10 or 15 more

2    minutes, and then I'm going to give them a break around 10:45,

3    just because, you know, the mornings are starting earlier.

4          MS. BROWN:  Sure.  Thank you, Your Honor.

5       May I proceed?

6          THE COURT:  You may.

7    BY MS. BROWN:

8    Q.   So, Ms. Penelow, just to kind of reorient us where we

9    are, you swore under oath in written statements that, in the

10   fall of 2012, you reported this activity to HR.

11       Correct?

12   A.   Correct.

13   Q.   We asked you at your deposition the very same question,

14   and you swore again, reported it to HR.

15       Right?

16   A.   Right.

17   Q.   And at that point, you said, "Not only did I report it,

18   but I got it on tape."

19       Right?

20   A.   Right.

21   Q.   We said, well, send us the tape, and you did.

22       Correct?

23   A.   Correct.

24   Q.   We listened to the tape, as did you, and you know it has

25   no such thing on it.

PENELOW - CROSS - BROWN

```
 1         Correct?
 2  A.   Yes.
 3  Q.   And so that was a problem because you were incorrect in
 4  your testimony, and so you had to fix it.
 5         Correct?
 6  A.   Correct.
 7             MS. BROWN:  And, Your Honor, permission then to admit
 8  D-8512.
 9             THE COURT:  Mr. Russ?
10             MR. RUSS:  No objection.
11             THE COURT:  So admitted.
12  (Defendants' Exhibit D-8512 in evidence.)
13  BY MS. BROWN:
14  Q.   All right.
15         And so what you did to change your sworn testimony was
16  something called an errata sheet.
17         Do you see that, ma'am?
18  A.   Yes.
19  Q.   Okay.
20         And just to orient us, this is your signed -- this is
21  your signature at the end.
22         Correct?
23  A.   Correct.
24  Q.   Okay.
25         And it says that you read the transcript and, except
```

PENELOW - CROSS - BROWN

1   for the corrections that you note here, you believe it was an

2   accurate record.

3        Correct?

4   A.   Correct.

5   Q.   And some of the things that you did when you read through

6   your transcript is you noticed places where the written record

7   had sort of misspellings, right?  Like this Webex situation.

8        Do you see that?

9   A.   I do.

10  Q.   Or some places where it said "northeast" instead of

11  "New York," things like that.

12       Right?

13  A.   Yes.

14  Q.   Okay.  And you made those corrections.

15       But when it came to testimony that you would agree is

16  kind of central to this case, you made a substantive change.

17       Correct, ma'am?

18  A.   I actually don't recall.

19  Q.   Well, let's take a look at line 70 -- the change you made

20  to line 71.  And what you said is that, at line 71, you had to

21  delete, "Change line to 'decided to go to human resources' and

22  delete line 9."

23       Do you see those two changes?

24  A.   Yes, I do.

25  Q.   And if we look -- we just have a demonstrative to help us

PENELOW - CROSS - BROWN

1  understand what that means.  So your original sworn testimony

2  in January of 2019 was that you went out on leave in June of

3  2012.

4       Right?

5  A.  Yes, I did.

6  Q.  Right.

7       You said that you came back in November.

8       Correct?

9  A.  I did.

10 Q.  Right here on the left side.

11 A.  I did.

12 Q.  Right?

13      And what you swore under oath in January of 2019 was,

14 "That's when I decided to go to human resources and report the

15 off-label activity."

16      Do you see that?

17 A.  I do.

18 Q.  And because that wasn't true, you had to delete that on

19 the errata sheet.

20      Correct, ma'am?

21 A.  Exactly.

22 Q.  Correct.

23      And that -- and then you swore for the third time that,

24 with this deletion, that testimony was accurate.

25      Correct, ma'am?

PENELOW - CROSS - BROWN

```
 1   A.   Correct.
 2   Q.   And it wasn't the only time, ma'am, that you had trouble
 3   keeping track of the facts that you're alleging in this
 4   lawsuit.
 5        Correct?
 6   A.   I'm not sure what you're referencing.
 7   Q.   Okay.
 8        Well, you allege in your complaint that there were
 9   multiple speaker programs where a speaker was speaking
10   off-label.
11        Do you recall that?
12   A.   Yes.
13   Q.   All right.
14        And you told us at your deposition that there are
15   speaker evaluations that you would fill out after an event.
16        Correct?
17   A.   Correct.
18   Q.   And you told us even though those evaluations ask, Did
19   the speaker go off-label, you would always say everything was
20   fine.
21        Correct?
22   A.   Yes.
23   Q.   But you said, even though you would always say everything
24   was fine, you did -- you swore under oath --
25   A.   Uh-huh.
```

PENELOW - CROSS - BROWN

1  Q.  -- report to human resources that these speakers were

2  going off-label.

3      Do you remember that?

4  A.  I do.

5  Q.  And you said you had a record of that conversation, too.

6      Right?

7  A.  Well, that was the same conversation I had with

8  Megan McGrath.

9  Q.  Right.  And neither of those things were true.

10     Correct?

11 A.  No.  That's not correct.

12 Q.  You had to change that testimony because you had also

13 testified incorrectly.

14     Right, ma'am?

15 A.  Again, I'm not sure what you're referring to.

16 Q.  Okay.

17     Let's take a look at a second change you had to make to

18 your sworn testimony.  And you had testified at the deposition

19 that you went to Megan McGrath and recorded off-label

20 presentations by speakers.

21     Do you remember testifying to that?

22 A.  I do not.

23 Q.  All right.

24     MS. BROWN:  Then let's -- let's take a listen to it,

25 then, if we could, please, Mr. Knecht.

─PENELOW - CROSS - BROWN─

1          It's the deposition at 351, 7 to 351, 15.

2          (Video clip played at this time.)

3    BY MS. BROWN:

4    Q.   So that testimony, ma'am, was also untrue.

5          Correct?

6    A.   No.  It was the same mistake I made on the first one,

7    which I did clarify.

8    Q.   So when you testified right there that you had told

9    Megan McGrath about this speaker -- off-label speaker

10   promotion, you had to correct that, too.

11          Right, ma'am?

12   A.   Well, it was on the same day in the same conversation.

13   Q.   Okay.

14          Let's take a look at the changes that you made to your

15   sworn testimony.  Here is the testimony that we just listened

16   to where you said -- well, here's the testimony.  You were

17   asked, "No, I did not, but I did tell human resources.

18          "This is the meeting with Megan McGrath?

19          "Correct."

20          And what you changed from that, you crossed out

21   "Correct."

22          Right?

23   A.   I did.

24   Q.   And you entered "No, I did not record the meeting."

25          Correct?

PENELOW - CROSS - BROWN

1   A.   Correct.  The meeting that I told her that -- about the

2   off-label activity.

3   Q.   Okay.

4        But you know, ma'am, when we asked you about meetings

5   with Ms. McGrath, you testified that you had only ever met

6   with her once?

7   A.   I had only met with her once.  That is correct.

8   Q.   And you told us that you recorded that one time you met

9   with her.

10       Right, ma'am?

11  A.   Yes, that is true.  I had multiple phone calls with

12  Megan McGrath.

13  Q.   Okay.

14       And you told us, though -- and this, ma'am, was not the

15  only time --

16          MS. BROWN:  Your Honor, I'm about to go to another

17  part of the deposition.  Did you want me to stop?

18          THE COURT:  Is it on the same topic?

19          MS. BROWN:  It's the same deposition changes to --

20          THE COURT:  That's all right.  You can continue for a

21  few more.  Let's try to see if we can finish this topic.

22          MS. BROWN:  Sure.

23  BY MS. BROWN:

24  Q.   And that wasn't, of course, the only problem with that

25  testimony.

PENELOW - CROSS - BROWN

1          Right, ma'am?

2    A.    With which testimony?

3    Q.    The testimony that you had to correct here.  This wasn't

4    the only problem with it.

5          Right?

6    A.    I didn't see a problem with it.  I just corrected my

7    mistakes.

8    Q.    Okay.

9          And it's your testimony right now that you had reported

10   speaker program problems in other ways?

11   A.    Yes, I did.

12   Q.    Okay.

13         You know you swore under oath before that wasn't true?

14   A.    That I had not had phone calls with Megan McGrath, is

15   that what you're referring to?

16   Q.    Let's take a look at your sworn testimony, please, ma'am.

17         One of the things we did in this lawsuit, ma'am, is we

18   asked you to swear under oath and admit certain things were

19   true or not true.

20         Right?

21   A.    Right.

22   Q.    And one of the things we asked you about was whether you

23   would admit that you never reported any speaker policy

24   violations.

25         Do you remember that?

PENELOW - CROSS - BROWN

1    A.   No, I don't remember that.

2    Q.   All right.

3         Let's take a look.

4         MS. BROWN:  Your Honor, permission to display D-8511,

5    her request for admission.

6         MR. RUSS:  No objection, Your Honor.

7         THE COURT:  You may.

8         MS. BROWN:  Okay.

9    (Defendants' Exhibit 8511 in evidence.)

10   BY MS. BROWN:

11   Q.   And the first thing that we asked you here, ma'am, was

12   admit that throughout the relevant period, you did not report

13   any speaker policy violations.

14        Do you see that?

15   A.   Yes, I do.

16   Q.   And your answers -- plaintiff -- that's you.

17        Right, ma'am?

18   A.   Yes.

19   Q.   You say that -- you admit that, that it's true.

20        Right?

21   A.   That is not -- that is not true.  I did report it.

22   Q.   Okay.

23        How did this answer get here, ma'am?

24   A.   It's the same thing as the deposition.  Mistakes were

25   made.  We were talking about over a 12-year period.

PENELOW - CROSS - BROWN

```
 1   Q.   But these were really serious questions that we asked you
 2   under oath about the basis --
 3   A.   Sure.
 4   Q.   -- for the lawsuit that you brought against us.
 5        Right, ma'am?
 6   A.   That's right.
 7   Q.   And you understood that you were answering these under
 8   oath.
 9        Right?
10   A.   Absolutely.
11   Q.   And you took -- you see here, these are your responses to
12   our requests for admission.
13        Right?
14   A.   Right.
15   Q.   And as part of the process, you get to ask Janssen
16   questions, and Janssen gets to ask you questions.
17        Right?
18   A.   I don't recall exactly how it works.
19   Q.   And certainly --
20   A.   This is in 2019.
21   Q.   Yep.
22        And certainly you took this seriously.
23        Correct?
24   A.   Of course I took it seriously.
25   Q.   And you understand that it would be important and serious
```

PENELOW - CROSS - BROWN

1  and relevant for Janssen to know if you did or did not report

2  what you're claiming in this lawsuit.

3      Right?

4  A.  Yes.

5  Q.  And, in fact, you told our jury under your direct

6  testimony about a lot of different ways that you claim now you

7  reported these speaker violations.

8      Remember that?

9  A.  I do, but it's not just now.  It's been from the

10 beginning.

11 Q.  Well, ma'am, we asked you in 2019, under oath, to admit

12 that you never reported it, and you admitted that to be true.

13 A.  And I answered that I made a mistake.

14 Q.  Okay.

15     So you made a mistake the first time in the deposition

16 when you said you went to HR to report off-label.

17     Right?

18 A.  On the Megan McGrath issue, yes.

19 Q.  Yes, ma'am.

20     And then you made a mistake again in the deposition

21 when you said you reported the speaker allegations to

22 Megan McGrath.

23     Correct?

24 A.  On the Megan McGrath issue, yes.

25 Q.  And then you made a mistake in a totally separate

PENELOW - CROSS - BROWN

```
 1   document from a different date when you said that you had

 2   never reported the speaker allegations.

 3        Correct?

 4   A.   On the Megan McGrath issue, yes.

 5   Q.   Ma'am, this one has nothing to do with Megan McGrath.

 6   A.   Admit that you were -- I was referring to Megan McGrath.

 7   Q.   This doesn't say anything about Megan McGrath.

 8   A.   But that's what I was referring to.

 9   Q.   So you thought that this question was asking you if you

10   had gone to Megan McGrath?

11   A.   Yes, that I had reported it to -- a speaker violation,

12   yes.

13   Q.   To Megan McGrath?

14   A.   Yes.

15   Q.   Even though it doesn't say that?

16   A.   Well, it doesn't specify.

17   Q.   Okay.

18        Either way, your answer is also not accurate.

19        Correct, ma'am?

20   A.   No, I made a mistake on this.

21   Q.   But that wasn't the only one.

22        Right?

23   A.   No.  That wasn't the only mistake.

24   Q.   These are critical facts to your allegations.

25        Do you understand that?
```

PENELOW - CROSS - BROWN

```
 1  A.   Of course.

 2  Q.   All right.

 3       You got some other facts messed up, too, as it relates

 4  to Nancy Bartnett.

 5       Right, ma'am?

 6  A.   I'm not sure what you're referring to.

 7  Q.   Well, you told us at your deposition that you had

 8  recorded a conversation with Ms. Bartnett where you told her

 9  you refused to talk off-label.

10       Do you remember that?

11  A.   I don't recall exactly that conversation.

12  Q.   All right.

13       Let's listen to it, if we could, please.  It's your

14  deposition at 105, 23 to 106, 16.

15       (Video clip played at this time.)

16  BY MS. BROWN:

17  Q.   And so, ma'am, once again this sworn testimony under oath

18  about a critical issue in your lawsuit against us was not

19  truthful.

20       Correct?

21  A.   I would never not be not truthful.  If anything, it was a

22  mistake.

23  Q.   All right.

24       Your testimony that you had -- you had it on tape, you

25  telling Nancy Bartnett that you weren't going to talk
```

PENELOW - CROSS - BROWN

1    off-label -- your testimony there under oath was a mistake.

2        Right, ma'am?

3    A.   I meant to say fraud, correct.  I believe the recording

4    says fraud, I will not commit fraud.

5    Q.   Actually, ma'am, you deleted the whole thing about the

6    recording because it doesn't exist.

7    A.   I don't know that that's a fact.

8    Q.   All right.

9        So once again, you changed that testimony through the

10   use of this paper that lets you make changes to the

11   transcript.

12       Did you know that?

13   A.   Yes, which is a great opportunity because over a

14   long-term period, sometimes the little specifics are

15   forgotten.

16   Q.   But do you think these are little specifics?

17   A.   Yes, I do.

18   Q.   Okay.

19       You think the question of whether or not you had

20   reported this to HR or not is a little specific?

21   A.   I had reported it to HR.

22   Q.   All right.

23       Well, here you told us that you had -- you had it on

24   tape telling Nancy Bartnett that you refused to talk

25   off-label, and you had to delete that because that was a

PENELOW - CROSS - BROWN

1    mistake, too.

2         Right, ma'am?

3    A.   Correct.

4    Q.   So here is what had to happen here, because this was

5    wrong.

6         So you contend -- this is what we just listened to, the

7    motions and failure to get promoted was based on your refusal

8    to engage in off-label.

9         Do you see that?

10   A.   I do.

11   Q.   And I'm going to want to talk to you about that

12   testimony, too.  We're going to get to that in a second --

13   A.   Okay.

14   Q.   -- because that's also not true.

15        Right?

16   A.   What sentence are you referring to?

17   Q.   I mean, even the very first line.  You say there that

18   you -- you're alleging that you weren't promoted because you

19   refused to promote off-label.

20        You see that?

21   A.   Yes, I do.

22   Q.   You were in here yesterday telling our jury that you did

23   promote off-label?

24   A.   That I did or didn't?  I'm sorry.

25   Q.   Well, what is it?  Did you or didn't you?

PENELOW - CROSS - BROWN

1    A.    I did promote off-label.

2    Q.    So why do you say right here that you weren't promoted

3    because you refused?

4    A.    I think I explained the story yesterday about how I would

5    refuse to Nancy that I wouldn't speak off-label, and then when

6    we got into the doctor's office, she would turn to me to talk

7    off-label.  That was a verbal refusal.

8    Q.    So you didn't actually refuse.  You did it?

9    A.    I verbally refused.

10   Q.    All right.

11         Let's keep on this.  We'll come back to that.  I want

12   to talk to you about that.

13   A.    Okay.

14   Q.    But in any event, in this sworn testimony where you say,

15   I was getting pushback, and I told them I refused to promote

16   off-label, where you had said, Which I do have a taped

17   conversation of me telling Nancy Bartnett I refused to talk

18   off-label, that was another mistake that you had to delete

19   from your sworn testimony.

20         Right, ma'am?

21   A.    Correct.

22   Q.    Because no such tape exists.

23         Correct?

24   A.    Not that I know of.

25   Q.    Well, you'd be the one who made the tape.

PENELOW - CROSS - BROWN

1        Right, ma'am?

2   A.   I have a tape saying that I would not commit fraud.

3   Q.   Well, did you hand it over to us, ma'am?

4   A.   I'm sure.

5   Q.   Is that the tape where you told people you're a hundred

6   percent compliant?

7   A.   Not that -- I don't know which tape you're referring to.

8   Q.   Because you taped some co-workers -- you taped a lot of

9   your co-workers.

10        Right, ma'am?

11  A.   I did.

12  Q.   And one of the things you told your co-workers is I'm not

13  going to lie.

14        Do you remember that?

15  A.   I did.

16  Q.   Is that the tape you're thinking of?

17  A.   Not sure.  There was --

18  Q.   Uh-huh.

19  A.   Not a lot of tapes but quite a few.  I don't know which

20  one was which.

21  Q.   There were multiple times that you secretly taped your

22  co-workers.

23        Fair?

24  A.   Fair.

25  Q.   And there's one tape where you say, I'm a hundred percent

PENELOW - CROSS - BROWN

1    compliant.

2         Do you remember that one?

3    A.    I don't remember that one.

4    Q.    Maybe we'll listen to it later.

5    A.    Okay.

6    Q.    In any event, there is no tape that says what you said it

7    did in this sworn testimony, and so you had to delete it.

8         Right, ma'am?

9    A.    I had to delete it through the errata -- is that how you

10   say it?  Errata?  Yes, I had to change it through the errata.

11   Q.    All right.

12        So this testimony also got deleted because it was not

13   true.

14   A.    That was my opportunity to do that, correct?

15   Q.    Yes, ma'am.

16   A.    Okay.

17   Q.    The errata sheet is the opportunity to correct

18   transcription errors in a transcript.

19        MR. RUSS:  Objection, Your Honor.  Same discussion we

20   had.

21        THE COURT:  Well, I'm going to strike it only because

22   I feel, Ms. Brown, you're answering a question from the

23   witness.

24        So I'm going to strike it for that reason.  I felt like

25   we just went through a role reversal.

PENELOW - CROSS - BROWN

1          So, Ms. Penelow, just as a reminder, your job is to

2   answer questions.  You don't get to ask any.

3              THE WITNESS:  Thank you.

4              THE COURT:  Understood?

5              THE WITNESS:  Yes, absolutely.

6              MS. BROWN:  All right.

7   BY MS. BROWN:

8   Q.   And you -- at the very least, ma'am, you understood --

9   you understood the errata sheet as an opportunity to change up

10  your testimony.

11  A.   Sure.

12  Q.   Right.

13          So you said things that are not accurate, and you

14  deleted them using this errata sheet.

15          Correct?

16  A.   Correct.

17  Q.   And then you signed and said, This time I'm telling you

18  the true and the accurate story.

19          Right?

20  A.   Correct.

21  Q.   All right.

22          Now, you also --

23              THE COURT:  Ms. Brown, is now a good time?

24              MS. BROWN:  Sure.

25              THE COURT:  Are you sure?

PENELOW - CROSS - BROWN

1          MS. BROWN:  Yep, absolutely.

2          THE COURT:  Because I don't want to break up the

3    flow.

4          Folks, we're going to take a ten-minute break.  Let's

5    let the jurors stretch a little bit, and then we'll get back

6    into this.

7          THE DEPUTY COURT CLERK:  All rise.

8          (A short recess occurred.)

9          THE DEPUTY COURT CLERK:  Please remain seated.

10          THE COURT:  All right.  Ms. Brown, we're going to get

11   the jury.

12          MS. BROWN:  Yes.  Good to go.  Thank you.

13          THE DEPUTY COURT CLERK:  All rise.

14          (Jury enters the courtroom.)

15          THE COURT:  All right, folks.  Everybody have a seat.

16          And, Ms. Brown, you can proceed when you're ready.

17          MS. BROWN:  Thank you very much, Your Honor.

18   BY MS. BROWN:

19   Q.   Ms. Penelow, when we left we were discussing one of the

20   changes to your sworn testimony.

21          Do you recall that, ma'am?

22   A.   Yes.

23   Q.   All right.

24          And as we discussed, you crossed out and deleted the

25   part that you had a taped conversation telling Nancy Bartnett

PENELOW - CROSS - BROWN

1   you refused to talk off-label.

2        Right?

3   A.   Correct.

4   Q.   But one of the things you didn't change in this sworn

5   testimony was your statement right up here that you contend

6   that you were not promoted at Janssen because you refused to

7   promote off-label.

8        Right, ma'am?

9   A.   Correct.

10  Q.   And you claim actually that you -- in this lawsuit you

11  claim that you failed to meet your sales targets because you

12  refused to engage in off-label marketing.

13       Correct?

14  A.   Yes.

15  Q.   You claim in this lawsuit that you were denied promotions

16  and bonuses because you refused to engage in these practices.

17       Correct?

18  A.   Yes.

19  Q.   All right.

20       And you also said in your sworn written responses that

21  you never promoted off-label from 2010 to 2013.

22       Right, ma'am?

23  A.   I don't recall that.

24  Q.   All right.

25       And we can take a look at it, but you confirmed it

PENELOW - CROSS - BROWN

1    again in your deposition.

2         Do you recall that, ma'am?

3    A.    I do not.

4    Q.    All right.

5         Why don't we take a look at it, then.

6    A.    Okay.

7         MS. BROWN:  Could we play 104, 11 to 105, 7, please.

8         (Video clip played at this time.)

9    BY MS. BROWN:

10   Q.    So, ma'am, does that refresh you that you swore under

11   oath in this deposition that from 2010 to 2012, you refused to

12   engage in off-label promotion?

13        Correct?

14   A.    Correct.

15   Q.    But you actually changed that testimony as well.

16        Correct?

17   A.    Correct.

18   Q.    Because that was not true?

19   A.    No.  I left in 2013.

20   Q.    Right.

21        We corrected that.  I'm talking about 2010 to 2012,

22   right, ma'am?

23   A.    Correct.  I was still talking off-label.

24   Q.    Okay.

25        But you just said there you refused to do it?

PENELOW - CROSS - BROWN

1  A.   And I believe that I changed that in the -- when I had

2  the opportunity to change my mistakes.

3  Q.   You mean the errata sheet?

4  A.   The errata, yes.

5  Q.   No, you didn't.

6  A.   Okay.

7  Q.   So you just testified here under oath --

8  A.   Yes.

9  Q.   -- are you with me?

10 A.   Yes.

11 Q.   All right.

12      From 2010, you told us under oath --

13 A.   Yes.

14 Q.   -- to 2012 you refused --

15 A.   Correct.

16 Q.   -- to engage in off-label promotion.

17      Right?

18 A.   Yes.  We continued to have the conversation about what

19 the word "refused" meant.  I refused verbally, but I still

20 went in the office and promoted off-label.

21 Q.   Okay.

22      So you refused -- when you said you refused in this

23 deposition testimony --

24 A.   Yes.

25 Q.   -- you meant that you actually did it?

PENELOW - CROSS - BROWN

1  A.   I meant that I verbally refused before I went in on the

2  call.

3  Q.   Okay.

4       You told us actually even later in this very same

5  deposition, even though you had said you refused, you did it.

6       Right?

7  A.   Correct.

8  Q.   All right.

9       You said actually that you would refuse in the car, and

10 then once you got there change your mind and actually do it.

11      Is that right?

12 A.   That's what makes it accurate, yes.

13 Q.   Uh-huh.

14      And your testimony, ma'am, in your deposition was that

15 you engaged in off-label promotion 50 percent of the time from

16 2006 to 2009.

17      Is that correct?

18 A.   That's about accurate.

19 Q.   Well, is there a different answer to that question?

20 A.   No, there's no different answer.

21 Q.   All right.

22      And then you said -- even though you had said on this

23 video you refused, you later in the deposition said from 2010

24 to 2012 you engaged in off-label promotion 80 percent of the

25 time.

PENELOW - CROSS - BROWN

1            Is that right?

2    A.   I believe that's right.

3    Q.   Okay.

4            But when you testified to our jurors yesterday, you

5    actually had a different timeline.

6            Do you know that?

7    A.   No, I don't know that.

8    Q.   When you testified to our jurors yesterday, you said you

9    didn't off-label promote until 2007.

10           Is that true?

11   A.   I began off-label promoting in 2007.

12   Q.   So when you had said in your deposition it started in

13   2006, that wasn't right?

14   A.   I'm not sure.  I thought you just said 2010 to 2012.

15   Q.   Well, you were asked about two different time periods --

16   A.   Okay.

17   Q.   -- in your deposition.

18           And do you recall in your deposition testifying --

19   A.   Uh-huh.

20   Q.   -- that you began --

21           THE COURT:  Ms. Penelow, wait for the entire question

22   to be asked before you speak.  All right?

23           THE WITNESS:  Okay.

24           THE COURT:  Thank you.

25           MS. BROWN:  Thank you, Your Honor.

PENELOW - CROSS - BROWN

1   BY MS. BROWN:

2   Q.   Do you recall testifying in your deposition and alleging

3   in your complaint and your sworn written discovery that you

4   began promoting off-label in 2006?

5   A.   No, I don't recall that.

6   Q.   That what you told our jury yesterday is that it actually

7   started in 2007?

8   A.   Correct.

9   Q.   Okay.

10       And so we heard a lot of testimony, ma'am, about 2006

11  and folks who thought there were a lot of pressure in 2006.

12       Were you here for that testimony?

13  A.   Yes.

14  Q.   All right.

15       But your testimony now here in this courtroom is that

16  despite all this testimony, that pressure and forecasts and

17  missed launch, you weren't promoting off-label in 2006.

18       Is that right?

19  A.   I personally wasn't, but Frank Murphy and Nancy Bartnett

20  were.

21  Q.   But I want to know about you because you're here

22  answering the questions.

23       Okay, ma'am?

24  A.   I answered that question, yes.

25  Q.   Yep.

PENELOW - CROSS - BROWN

1          And so in 2006, you, Ms. Penelow, no off-label

2     promotion.

3          True?

4     A.   To my recollection, yes.

5     Q.   Okay.

6          And your testimony now before our jury is that it

7     actually started in 2007?

8     A.   Correct.

9     Q.   And from 2007 to 2009, what was the percentage of time

10    you were promoting off-label?

11    A.   Probably closer to 70 to 80 percent as opposed to 50.

12    Q.   Okay.

13         But why is that different than what you told us in your

14    deposition?

15    A.   Well, I'm not quite sure of all the dates, but I know

16    that it was between 50 and 80 percent of the time.

17    Q.   Okay.

18         That -- in your deposition you told us 2006 to 2009, 50

19    percent of the time.

20    A.   Right.

21    Q.   I now understand you to say nothing at all in 2006.

22    A.   Right.

23    Q.   And now do you have a different percentage from 2007 to

24    2009?

25    A.   I don't have any percentage.

PENELOW - CROSS - BROWN

1  Q.  Okay.

2       Let's just look at what we asked you in your

3  deposition.

4       Okay, ma'am?

5  A.  Sure.

6       MS. BROWN:  Let's play 98, 8 to 98, 23.

7       (Video clip played at this time.)

8  BY MS. BROWN:

9  Q.  Now, ma'am, is that testimony accurate?

10 A.  Well, we've uncovered that I believe I began in 2007.

11 Q.  All right.

12      Anything else you need to change about that?

13 A.  I don't need to change anything.

14 Q.  Well, is the rest of that accurate?

15 A.  Yes.

16 Q.  All right.

17      And is it still accurate that you -- from 2010 to 2012

18 you say 80 percent of the time, ma'am?

19 A.  Again, I don't feel comfortable giving percentages.  It's

20 just too long ago.  And like I said on my deposition, it was a

21 lot of the time.

22 Q.  Okay.

23      You were comfortable in your deposition giving

24 testimony on this.

25      Do you recall that?

PENELOW - CROSS - BROWN

```
 1   A.   No, I didn't look comfortable at all.
 2   Q.   Okay.
 3        You swore under oath you had an answer to that question
 4   in your deposition.
 5        Do you remember that, ma'am?
 6   A.   I swore under oath, yes, I did.
 7   Q.   Okay.
 8        And what you swore under oath in your deposition was
 9   that, from 2010 to 2012, you promoted off-label 80 percent of
10   the time.
11        Is that accurate?
12   A.   Correct.
13   Q.   All right.
14        Let's talk -- and, ma'am, I thought I heard you say
15   yesterday, just to finish up this topic, that Steve Smacchia
16   did not promote off-label.
17        Is that right?
18   A.   That is right.
19   Q.   Steve Smacchia was in your New York group.
20        Is that right?
21   A.   Yes.
22   Q.   All right.
23        So there were folks in this New York group under your
24   same managers who weren't promoting off-label?
25   A.   That is correct.
```

PENELOW - CROSS - BROWN

1   Q.   All right.  Who else?

2   A.   Just Steve Smacchia.

3   Q.   All right.

4        And Steve Smacchia reported to Tony Dolisi and Frank

5   Murphy, just like you did.

6        Right, ma'am?

7   A.   Yes, he did.

8   Q.   Okay.

9        And were there other folks throughout the country that

10  you were aware of, like Mr. Smacchia, who were promoting

11  off-label?

12  A.   No, I did not.

13  Q.   Okay.

14       Steve Smacchia is the only person you knew in the whole

15  country who wasn't promoting off-label?

16  A.   Correct.

17  Q.   All right.

18       And all of those other folks that you named that you

19  went to -- Angel Edwards, Yvonne from Miami -- all those folks

20  you claim you told about this off-label promotion?

21  A.   Yes, I did.

22  Q.   All right.

23       Are those folks coming in to testify in this trial?

24  A.   Not that I know of.

25  Q.   Did you reach out to them like you did Mr. Holshoe to get

PENELOW - CROSS - BROWN

1    a declaration?

2    A.    I did not reach out to Mr. Holshoe for a declaration.

3    Q.    Have you ever seen a single document that would support

4    the testimony that you gave our jury that you discussed

5    off-label promotion with those lists of people you named under

6    your direct examination?

7    A.    Have I seen -- can you repeat that?

8    Q.    Yes, ma'am.

9          Have you seen a document, an email, a letter, a text, a

10   note that would support your testimony that you spoke to that

11   list of people you ran through on direct examination about

12   promoting off-label?

13   A.    I don't know how I would get that in a document.

14   Q.    Okay.

15         You have seen a lot of emails in this case.

16         Right, ma'am?

17   A.    Yes.

18   Q.    Okay.

19         And what I'm asking you is, is there an email where you

20   raised concerns with any of the list of people that you listed

21   for our jurors?

22   A.    No.  We didn't put anything in writing at Janssen.

23   Q.    Okay.

24         Let's talk -- I want to talk about Ms. Bartnett,

25   please.

PENELOW - CROSS - BROWN

1          All right?

2  A.   Sure.

3  Q.   Ms. Bartnett, during the time period you were at Janssen,

4  was not a manager of yours.

5          Correct?

6  A.   She was a key account manager.

7  Q.   Yes, ma'am.

8          She was not a district manager, a supervisor of you

9  during the time period you were there.

10  A.   No.

11  Q.   Right.

12          And is it your testimony that, 80 percent of the time

13  you visited a doctor, Ms. Bartnett was with you?

14  A.   Yes.

15  Q.   Okay.

16          Do you know that your call notes don't show that?

17  A.   I'm not surprised.

18  Q.   Uh-huh.

19          And that's because your testimony is you were

20  falsifying your call notes?

21  A.   We all were, yes.

22  Q.   That's your testimony?

23  A.   Yes, it is.

24  Q.   Okay.

25          You understand that you're not allowed to do that.

PENELOW - CROSS - BROWN

1              Right, ma'am?

2    A.    Yes, I am.

3    Q.    Okay.

4          And your testimony is that, for the entire time period

5    you worked at Janssen, you were creating falsified records of

6    your visits to see doctors?

7    A.    Yes.  We were instructed by our managers to do so.

8    Q.    And please tell me who instructed you to do that?

9    A.    Frank Murphy and Tony Dolisi.

10   Q.    All right.

11         And how did they instruct you to falsify your call

12   notes?

13   A.    Basically we were only allowed to put call notes on in

14   the beginning, so that was only accurate for the first couple

15   of years.  Then we had a drop-down menu.

16         But they were telling us, basically, that we had to

17   make eight to ten calls a day, and if you didn't make eight to

18   ten calls, make sure you put some extra calls in there so the

19   home office wouldn't question it.

20   Q.    I'm not sure I understood the beginning there.

21         Were you drawing a distinction between when you had

22   free text call notes and drop down call notes?

23   A.    Yes, I was.

24   Q.    And there was a different instruction for the different

25   time periods?

PENELOW - CROSS - BROWN

1   A.   No, same instruction.  You just couldn't put in call

2   notes anymore.

3   Q.   You mean you couldn't put text in there.

4        Right?

5   A.   Correct.

6   Q.   Okay.

7        After a while, you dropped down to pick out what had

8   happened at the call.

9        Correct?

10  A.   So there would be no notes.

11  Q.   And what you did, ma'am, according to your testimony, is

12  you made up visits you didn't actually go on.

13       Is that right?

14  A.   That is right.

15  Q.   Uh-huh.  All right.

16       Let's talk about Nancy Bartnett.  You, ma'am, don't

17  like Nancy Bartnett.

18       True?

19  A.   No, I'm not a big fan of her.

20  Q.   Right.

21       You had had a lot of issues with Nancy Bartnett during

22  the time period you worked at Janssen.

23       Fair?

24  A.   No, we never had any issues.

25  Q.   Oh, really?

PENELOW - CROSS - BROWN

1   A.   Not that I'm aware of.

2   Q.   Okay.

3        You felt like Nancy Bartnett wasn't treating you

4   fairly.

5        Right?

6   A.   Correct.

7   Q.   Well, that was an issue.

8        Right?

9   A.   That was my issue.  Her and I never had a verbal issue.

10  Q.   Okay.

11       You had a written issue with Nancy Bartnett?

12  A.   Not that I'm aware of.

13  Q.   Okay.

14       MS. BROWN:  Let's take a look at tab 109, Your Honor.

15       Permission to admit D-9090.

16       MR. RUSS:  What tab, Alli?  Alli?

17       MS. BROWN:  I'm sorry.  It's tab 109, D-9090.

18       MR. RUSS:  I don't have it, Your Honor.

19       MS. BROWN:  Oh, I'll give it to you from here.

20       MR. RUSS:  No objection.

21       THE COURT:  All right.  So admitted.

22       MS. BROWN:  Thank you, Your Honor.

23  (Defendants' Exhibit D-9090 in evidence.)

24  BY MS. BROWN:

25  Q.   Ms. Penelow, I want to start to show you a note that you

PENELOW - CROSS - BROWN

1 wrote that you asked your mom to give you some comments on

2 regarding Nancy Bartnett.

3        Okay?

4 A.   Okay.

5 Q.   And do you see, just to orient us, this -- the time of

6 this email is in 2011.

7        Do you see that?

8 A.   I do.

9 Q.   And this would have been maybe -- 2012 was the year that

10 you went out on leave.

11        Is that right, ma'am?

12 A.   Correct.

13 Q.   So this was sort of the end of the period of a full year

14 before you went out on leave.

15        Correct?

16 A.   Yes.

17 Q.   And you were having some troubles with Nancy Bartnett

18 then.

19        Correct?

20 A.   I had problems with the way she ran the territory from

21 the beginning.

22 Q.   From the beginning of the time that you worked with Nancy

23 Bartnett, you had issues with her.

24 A.   Yes, I did.

25 Q.   You did not like working with Nancy Bartnett.

PENELOW - CROSS - BROWN

```
 1          True?
 2   A.   True.
 3   Q.   All right.
 4          You felt that she was not respecting you.
 5          True?
 6   A.   I felt that she was bullying me into speaking off-label.
 7   Q.   Well, that's not what you say in this letter.
 8          Right?
 9   A.   I didn't read the letter.
10   Q.   All right.  Let's look at it.
11          You're sending it to your mom for some thoughts before
12   you send it to Nancy.
13          Do you see that?
14   A.   Yes.
15   Q.   All right.
16          And you said that you thought this should be discussed
17   in more words than a text.
18          Correct?
19   A.   Yes.
20   Q.   All right.
21          And you wanted to send your thoughts around the Nadim
22   program next week.
23          Do you see that?
24   A.   Yes.
25   Q.   The person that you're talking about in this email is
```

PENELOW - CROSS - BROWN

1    Dr. Salomon.

2        Correct?

3    A.   Correct.

4    Q.   And Dr. Salomon is an HIV doctor at Mount Sinai.

5        Correct?

6    A.   Beth Israel Medical Center at the time.

7    Q.   Yep.  And now it's Mount Sinai.

8        You know that.

9    A.   I saw it on the screen earlier this week.

10   Q.   Right.

11       He's at the Peter Krueger AIDS and HIV center.

12       Correct?

13   A.   Yes.

14   Q.   Actually, when we looked with Dr. Glatt at the 30 people

15   treating in that AIDS/HIV center, he was one of them.

16       Correct?

17   A.   Yes.

18   Q.   All right.

19       And incidentally, I heard you make a lot of allegations

20   about Dr. Salomon on your direct examination.

21       Correct, ma'am?

22   A.   Yes.

23   Q.   You claim that Dr. Salomon was being bribed by Janssen?

24   A.   I did not use the word "bribe."

25   Q.   Okay.

PENELOW - CROSS - BROWN

1          You claim that Dr. Salomon was taking money from

2   Janssen to increase his prescriptions?

3   A.   Yes, I did.

4   Q.   You claim that Dr. Salomon was knowingly speaking

5   off-label.

6          Correct?

7   A.   Yes, I did.

8   Q.   You claim that you promoted off-label to Dr. Salomon?

9   A.   Yes, I did.

10  Q.   Do you have a declaration or some evidence of support

11  from Dr. Salomon that the very serious allegations you're

12  making about him are true?

13  A.   Not that I know of.

14  Q.   All right.

15         Do you know if Dr. Salomon is going to come in here to

16  this courtroom and support the very serious things you've said

17  about him?

18  A.   I have no idea.

19  Q.   All right.

20         So here we're talking about Dr. Salomon, and what

21  your -- you say that, "I specifically asked if I could cover

22  programs while you were on vacation, and Dr. Salomon is my top

23  doctor in my territory, and I'm very involved."

24         Do you see that?

25  A.   Yes, I do.

PENELOW - CROSS - BROWN

1  Q.  And it looks like you were upset here that Ms. Bartnett

2  asked Mr. Smacchia to cover the logistics of this speaker

3  program.

4       Do you see that?

5  A.  I do.

6  Q.  And you thought that involved a lack of trust and a lack

7  of team unity.

8       Correct?

9  A.  Can I read the email?

10  Q.  Absolutely, ma'am.

11  A.  Okay.

12  Q.  All right.

13      And so you see you're upset about the way things are

14  getting done while Ms. Bartnett is on vacation.

15      Correct?

16  A.  I don't believe I said I was upset.  I think I said I was

17  "blindsided."

18  Q.  "Blindsided and felt like crap."

19      Right?

20  A.  Right.

21  Q.  Okay.

22      And you said that you were hurt.

23      Correct?

24  A.  Correct.

25  Q.  And "this situation lacked team work."

PENELOW - CROSS - BROWN

 1           Correct?

 2    A.    Correct.

 3    Q.    You thought it looked bad.

 4           True?

 5    A.    True.

 6    Q.    All right.

 7           And you asked if your lack of confirmation, attendance,

 8    follow-up support would also have a negative result.

 9           You see that?

10    A.    I do.

11    Q.    And with that, you were going to go to the speaker

12    program.

13           Correct?

14    A.    I did say I was going to go to the speaker program.

15    Q.    All right.

16           And you sent it to your mom, who said -- who was

17    obviously familiar with your troubles with Nancy Bartnett.

18           Correct?

19    A.    Very aware.

20    Q.    Right.

21           You've spoken to your mom a lot about Nancy Bartnett?

22           True?

23    A.    Yes.  Yes, I have.

24    Q.    Because it's been a real source of stress and problems

25    for you during your time period at Janssen.

PENELOW - CROSS - BROWN

1          Correct?

2   A.   Correct.

3   Q.   You did not like working with Nancy Bartnett.

4   A.   Again, I would say that I didn't like her value system in

5   that she bullied me to talk off-label.

6   Q.   And this doesn't say anything about off-label in this

7   paragraph.

8          True?

9   A.   No, it doesn't.

10  Q.   All right.

11         What your mom says is that Ms. Bartnett is very jealous

12  of you.

13         Right?

14  A.   That's what my mom said, correct.

15  Q.   Trying to sabotage your success.

16         Right?

17  A.   Correct.

18  Q.   And we looked at with Ms. Brancaccio a number of emails

19  between you and Ms. Brancaccio where you guys are kind of

20  saying not nice things about Ms. Bartnett.

21         Would you agree?

22  A.   No, I wouldn't agree.

23  Q.   Do you remember the one where you say, "There's plenty,

24  lady.  LOL"?

25  A.   Yes.

PENELOW - CROSS - BROWN

1  Q.  All right.  That's not that nice.

2  A.  I see it a different way.

3  Q.  Okay.  Let's just take a look at it, if we could.  Maybe

4  you can help us understand what's going on here.

5       MS. BROWN:  This is already in evidence, D-6037.  Our

6  jurors have already seen it, so we'll be quick.

7  BY MS. BROWN:

8  Q.  But what happens in this email is that Ms. Brancaccio

9  purports to send a nice email to Ms. Bartnett, copying

10 Mr. Dolisi.

11      Correct?  Do you see that?

12 A.  Yes, I see that.

13 Q.  And he wanted to say, "Thanks for your help, introducing

14 me to folks at Elmhurst."

15      Correct?

16 A.  Correct.

17 Q.  Ms. Brancaccio actually responds with a very nice email

18 of her own.

19      Correct?

20 A.  Correct.

21 Q.  It's her pleasure.  "Thanks isn't necessary but very much

22 appreciated."

23      Right?

24 A.  Yes.

25 Q.  All right.

PENELOW - CROSS - BROWN

1          And she says, "If there's anything else I can do moving

2    forward, please feel free to contact me."

3          Right?

4    A.    Right.

5    Q.    But then Ms. Brancaccio forwards it to you and says her

6    response below.

7          Do you see that here?

8    A.    Yes.

9    Q.    And you say in response to "Let me know if there's

10   anything I can do," I presume, "Oh, there's plenty, lady.

11   LOL."

12         Right?

13   A.    Correct.

14   Q.    What were you talking about?

15   A.    I can't tell you my thought process at the time in 2013.

16   Q.    And the truth is there are a bunch of emails like this

17   where there's sort of some banter about Ms. Bartnett, right,

18   back and forth?

19   A.    Conversations, yes.

20   Q.    Uh-huh.  Let me just show you one more and see if you can

21   tell us what you were talking about.

22         MS. BROWN:  This one is also already in evidence.

23   It's tab 111.  And this one our jury has seen.

24   BY MS. BROWN:

25   Q.    It starts with Ms. Bartnett sharing with her manager,

PENELOW - CROSS - BROWN

1  Tony Dolisi, her Prezista strategy from the POA.

2         Do you see that?

3  A.   I do.

4  Q.   All right.

5         And then she looks like she forwarded it to the

6  Manhattan team, which would have included you at the time.

7         Right?

8  A.   Correct.

9  Q.   And then you forwarded it to Ms. Brancaccio and say, "I

10  don't recall Bill saying stay home and write War and Peace" --

11  "about the story of War and Peace that's already been written.

12  LOL."

13         Right?

14  A.   Yes, I did.

15  Q.   All right.

16         You're referring to what Nancy wrote down here at the

17  bottom?

18  A.   I could have been.

19  Q.   Okay.

20         Do you remember why you wrote that?

21  A.   No, I have no recollection of why I wrote that.

22  Q.   All right.

23         But, in any event, Ms. Bartnett has become the focus of

24  a number of your allegations in this lawsuit.

25         Correct, ma'am?

PENELOW - CROSS - BROWN

```
 1  A.   Yes, she has.
 2  Q.   Okay.
 3       And you had made a number of allegations about her,
 4  including instructing you to promote off-label.
 5       Correct?
 6  A.   Yes.
 7  Q.   And as well as some allegations regarding the MIR
 8  process.
 9       Correct?
10  A.   Yes.
11  Q.   I want to talk to you a little bit about that.  You claim
12  that you were reprimanded at Janssen for not submitting enough
13  MIRs.
14       Is that right?
15  A.   That's correct.
16  Q.   And you said that you actually forged parts of MIRs.
17       Correct?
18  A.   I did.
19  Q.   Right.
20       You claim that you never forged a doctor's signature.
21       Right?
22  A.   Right.
23  Q.   But that you wrote the questions for the doctor and then
24  got him or her to sign it.
25       Correct?
```

PENELOW - CROSS - BROWN

```
 1  A.   Correct.

 2  Q.   All right.

 3       And you say that, as it relates to Nancy Bartnett, she

 4  told you not to submit MIRs and just have the doctor go right

 5  to her.

 6       Correct?

 7  A.   That would be after 2010.

 8  Q.   Okay.

 9       Well, that's one of your allegations in the lawsuit.

10       Right?

11  A.   Correct.  After 2010.

12  Q.   Okay.

13       And when did you recall that there was sort of a date

14  qualification on that?

15  A.   Well, because I know Tony Dolisi became my manager.

16  Q.   Okay.

17       So you say Nancy Bartnett says don't submit any MIRs,

18  let me handle the follow-up.

19       Right?

20  A.   Tony also said it.

21  Q.   Okay.

22       But that's a little confusing, too, because you say

23  Ms. Bartnett would submit MIRs herself.

24       Right?

25  A.   Between 2006 and 2009.
```

─PENELOW - CROSS - BROWN─

1   Q.   You say actually Ms. Bartnett would submit MIRs after

2   every single call.

3        Right?

4   A.   Not every single call.

5   Q.   Okay.

6        That's what you told us.

7   A.   Not every single call.

8   Q.   Okay.

9        Let's listen to it, then.

10       MS. BROWN:  Can we listen to 391, 19 to 393, 7.

11       (Video clip played at this time.)

12  BY MS. BROWN:

13  Q.   What you told us in your deposition was for every call,

14  she filled out an MIR.

15       Correct, ma'am?

16  A.   I believe I also said that it was on most calls.

17  Q.   Okay.

18  A.   Yeah.

19  Q.   And if it was almost every call or every call, that would

20  mean that for her eight to ten calls a day, she was submitting

21  somewhere between 40 and 50 MIRs a week.

22       Is that right, ma'am?

23  A.   No, not that many.

24  Q.   Okay.

25       20 call -- 20 MIRs a week?

PENELOW - CROSS - BROWN

1    A.   That's more reasonable.

2    Q.   All right.

3         So that would be 80 MIRs a month?

4    A.   I'm not sure of her numbers.

5    Q.   Well, if you're saying she's doing eight calls a day --

6    right?

7    A.   Every day is different.

8    Q.   Okay.

9         I thought that was the requirement, eight calls a day.

10   A.   It was a requirement.  It doesn't mean that we met that

11   requirement every day.

12   Q.   All right.

13   A.   Sometimes doctors couldn't see us.

14   Q.   Okay.

15        Because you know it doesn't make sense if she actually

16   was submitting an MIR after every single call.

17        Right, ma'am?

18   A.   I'm not sure why it doesn't make sense.

19   Q.   Because then you would have -- just one person in your

20   district would have almost a hundred MIRs a month from one

21   person.

22        Right?

23   A.   I haven't done the math.

24   Q.   Okay.

25        Well, if she was submitting 20 percent a week.

PENELOW - CROSS - BROWN

1          Right --
2    A.   Right.
3    Q.   -- that would be 80 MIRs a month.
4          Right?
5    A.   Correct.
6    Q.   And that doesn't make sense based on the number of MIRs
7    that were being generated.
8          Right?
9    A.   I have no idea how many calls and MIRs she submitted.
10   Q.   Okay.
11         You told us in your deposition that you reported what
12   you believed to be Ms. Bartnett's MIR abuses to human
13   resources.
14         Do you remember telling us that?
15   A.   No, I don't remember telling you that.
16   Q.   You told us that, again, at that Megan McGrath meeting in
17   2012, you reported these allegations that you're making about
18   Nancy Bartnett.
19         Do you know that?
20   A.   No, I don't recall that.
21         MS. BROWN:  Let's look at 415, 19 to 416, 10.
22         (Video clip played at this time.)
23   BY MS. BROWN:
24   Q.   Of course that's not true.
25         Right, ma'am?

PENELOW - CROSS - BROWN

1  A.    What is not true?

2  Q.    That Megan McGrath 2012 meeting we have the recording

3  of -- remember?

4  A.    Right.

5  Q.    And you would agree with me that in the entire

6  50 minutes, you don't reference Nancy Bartnett once.

7       Correct?

8  A.    I would have to listen to the recording again.  I

9  apologize.

10 Q.    If you had -- you don't have any reason to dispute my

11 representation sitting here right now that there's no

12 reference in the whole 50 minutes to Nancy Bartnett?

13 A.    I don't have a reason.

14 Q.    All right.

15      Let's talk about the speaker bureau, please.  We heard

16 a lot about -- throughout the course of the trial we heard a

17 lot of suggestion that sales representatives were involved in

18 selecting speakers.  You've been here for that.

19      Correct?

20 A.    Yes.

21 Q.    All right.

22      But you know that the truth is that you, ma'am, have no

23 role in selecting speakers.

24      Correct?

25 A.    We made suggestions to Nancy.

PENELOW - CROSS - BROWN

1    Q.  But the answer to the question was whether you had any

2    role in selecting speakers.  The answer is no, you did not.

3         True?

4    A.  I believe giving a recommendation is a role.

5    Q.  Okay.  Let's look at 58, 18 to 23, please.

6         (Video clip played at this time.)

7    BY MS. BROWN:

8    Q.  In addition to not having any role in selecting the

9    speakers, you don't know what department at the home office

10   was involved in selecting the speakers.

11        True?

12   A.  I have no idea.

13   Q.  Right.

14        You testified yesterday you're not familiar with the

15   SAFE committee.

16        Right?

17   A.  No, I am not.

18   Q.  You don't know who in the home office removes or selects

19   speakers.

20        Correct?

21   A.  I know that Tony and Nancy had the last call on it.

22   Q.  And you understand generally that speakers are

23   compensated for their time.

24        Correct, ma'am?

25   A.  Correct.

PENELOW - CROSS - BROWN

1    Q.   But you don't know the particulars of how the fair market

2    value of their compensation is set.

3         Correct?

4    A.   I do not know the fair market value, but I know what they

5    were getting paid.

6    Q.   Okay.

7         And you also are not familiar with Janssen's

8    Promotional Speaker Bureau policy, correct, ma'am?

9    A.   Can you repeat that?

10   Q.   Sure.

11        You are not familiar with Janssen's Promotional Speaker

12   Bureau policy.

13        Correct?

14   A.   I am familiar.

15   Q.   All right.

16        So then you know, ma'am, based on that policy -- you

17   know all of the requirements for speaker qualifications.

18        Is that right?

19   A.   I know some of them.

20   Q.   Okay.

21        You are not familiar, ma'am, with the way the

22   SAFE committee evaluates whether or not speakers meet those

23   requirements.

24        True?

25   A.   True.

PENELOW - CROSS - BROWN

1    Q.  All right.

2         And you're not familiar with the individuals from legal

3    and compliance and otherwise who are affiliated with that

4    review.

5         Is that right?

6    A.  That's right.

7    Q.  And that's one of the reasons -- and you understand part

8    of that is by design.

9         Right, ma'am?

10   A.  No, I don't understand that.

11   Q.  Okay.

12        Do you understand, by design, Janssen's speaker policy

13   was kept separate from the sales force?

14        MR. RUSS:  Objection, Your Honor.  Assumes facts not

15   in evidence.

16        MS. BROWN:  I can rephrase, Your Honor, if it's

17   helpful.

18        THE COURT:  I'll sustain it.  Can you rephrase the

19   question?

20        MS. BROWN:  Yes.

21   BY MS. BROWN:

22   Q.  Do you, to your knowledge, understand if there was a

23   conscious decision to keep speaker bureau decisions away from

24   the sales force?

25   A.  No, I'm not aware of that.

PENELOW - CROSS - BROWN

1  Q.   All right.

2       One of the things you are aware of, though,

3  Ms. Penelow, is that your lawyers were very interested in

4  details about the speaker program in connection with this

5  lawsuit.

6       Right, ma'am?

7  A.   My lawyers were interested in everything I had to say.

8  Q.   Let's take a look at what is already in evidence as

9  D-6028, and this is an email that we looked at with Ms.

10 Brancaccio that is between you, Ms. Brancaccio, and your

11 lawyers, but that ultimately you forward to your mom.

12      Right?

13 A.   Correct.

14 Q.   And that's why we get a chance to see it.

15      Correct?

16 A.   That is the reason we're seeing it.

17 Q.   Okay.

18      And I want to talk to you about some of the things the

19 lawyers raised with you in section number 3 here.

20      Okay, ma'am?

21 A.   Sure.

22 Q.   At this point, just to orient us, we are in August 30th

23 of 2012.

24      Do you see that?

25 A.   I do.

PENELOW - CROSS - BROWN

1  Q.   And it was, in fact, in early 2012 that you decided you

2  were going to bring a lawsuit against Janssen.

3       Correct?

4  A.   Yes.

5  Q.   That's when you went and you got lawyers and you began

6  preparing to bring this case that we're here for today.

7       True, ma'am?

8  A.   That is true.

9  Q.   All right.

10      So the efforts -- and during all of 2012 -- for most of

11 2012, you were out on medical leave.

12      Correct?

13 A.   Yes, I was.

14 Q.   All right.

15      But you were working via email with Ms. Brancaccio to

16 get emails to use in the lawsuit.

17      Correct?

18 A.   Well, certainly I thought that was something that was

19 important.

20 Q.   Sure.

21      And so you were communicating with Ms. Brancaccio while

22 you were on leave about documents that you thought would

23 support your case.

24      Correct?

25 A.   How else would I -- I'm sorry.  I was proving my case

PENELOW - CROSS - BROWN

1    through getting the documents.

2    Q.   Yes, ma'am.

3         And my question was just:  During that time period when

4    you were on leave --

5    A.   Uh-huh.

6    Q.   -- you were communicating with Ms. Brancaccio, who was

7    still at Janssen.

8         Right?

9    A.   Yes.

10   Q.   And those communications were in part intending to send

11   and collect evidence for your lawsuit.

12        Correct?

13   A.   Yes.

14   Q.   Okay.

15        And one of the things we learn in this document is that

16   there were particular pieces of evidence and facts that your

17   lawyers were interested in.

18        Correct?

19   A.   I'm not sure what you're referring to.

20   Q.   Okay.

21        Let's look at the section here titled "dinner and

22   speaker programs."

23        Do you see this?

24   A.   I do.

25   Q.   They're talking about one area of a draft that they sent

1  you that still needs work.

2       Do you see that?

3  A.  Yes.

4  Q.  All right.

5       And they say -- they included a discussion of the

6  speaker programs to show J&J's off-label promotion being

7  delivered nationwide.

8       Right?

9  A.  Yes.

10  Q.  But they may also want to allege that payments for these

11  programs were kickbacks.

12       Right?

13  A.  Correct.

14  Q.  And then they say there's some helpful stuff that would

15  let them strengthen these kickback allegations.

16       Do you see that?

17  A.  I do.

18  Q.  All right.

19       Then there's a list of stuff.

20       Right?

21  A.  Yes.

22  Q.  All right.

23       And the first one includes fancy restaurants.

24       Right?

25  A.  Yes.

─PENELOW - CROSS - BROWN─

1  Q.   We've been seeing a lot of pictures of fancy restaurants

2  in this trial, right?

3  A.   That's because we went to a lot of fancy restaurants.

4  Q.   Well, we're going to that talk about that, though, ma'am,

5  but let's just focus on what they're asking about.

6       Okay?

7  A.   Okay.

8  Q.   One of the things they talk about in this section on

9  information that would help them is fancy restaurants.

10      Right?

11 A.   Yes.

12 Q.   Okay.

13      And that's not the only time your lawyers have been

14 interested in getting a hold of pictures and evidence about

15 fancy restaurants.

16      Right?

17 A.   I don't believe you could file a lawsuit without

18 information.

19 Q.   About fancy restaurants?

20 A.   About the speaker programs in general.

21 Q.   All right.

22      Let's take a look at tab 117?

23         MS. BROWN:  Your Honor, permission to admit D-8848.

24 Do you have it there, or do you need it?  And also the

25 attachment.

PENELOW - CROSS - BROWN

1          MR. RUSS:  Your Honor, may we approach.

2          THE COURT:  You may.

3          (Sidebar begins at 11:39 a.m.)

4          MR. RUSS:  So there have been plenty of exhibits that

5     the parties have been submitting that aren't on the exhibit

6     list, but they've been produced.

7          This has not been produced in this case, the Bates --

8     last exhibit.

9          THE COURT:  For cross-examination?

10         MR. RUSS:  Well, I don't think there's any --

11         THE COURT:  What is it?  I don't even know what it

12    is.

13         MS. BROWN:  It's an admission to certain --

14         THE COURT:  And I'm sorry.  What's the problem with

15    this particular one?  It wasn't produced?

16         MR. RUSS:  Correct, Your Honor.  We had a motion in

17    limine about some of the documents that weren't produced in

18    this case that were requested, and Your Honor granted a

19    portion of that.

20         We're just now getting more documents that they

21    apparently went back in and pulled off Ms. Brancaccio's

22    Tibotec email.  It would have been nice for us to have these

23    in response to our discovery.

24         THE COURT:  Why wasn't this produced?

25         MS. BROWN:  I don't know, Your Honor.  And I would

*United States District Court*
*District of New Jersey*

PENELOW - CROSS - BROWN

1    imagine it is because -- I don't know the answer to that, and

2    I don't know that it's not.

3          MR. RUSS:  I don't think it is, Your Honor.

4          THE COURT:  Well, I mean, I need to know.  Like, are

5    you representing it was never produced, or are you saying you

6    don't know because those are --

7          MS. BROWN:  I don't know the answer to that,

8    Your Honor, and I would say I guess my understanding was it

9    has a DX number.  It's in our possession, and it's

10   cross-examination material.  And so that's why I'm using it.

11         My suspicion if it was not is because of the date.

12   It's too recent.  I believe there was sort of a cutoff for

13   document production, so I suspect the reason, if that's true,

14   Mr. Russ -- and I'm not disputing it -- that would be the

15   reason.

16         THE COURT:  Can I see it?

17         MR. RUSS:  That might be it, Your Honor.  She might

18   be right about that.  That's -- but this is the second one I'm

19   seeing, and I just want to alert the Court.

20         THE COURT:  All right.  I don't think -- I mean, is

21   there anything about this document -- I'm going to be very

22   specific to this document that -- I understand that it may not

23   have been produced.

24         Mr. Russ, is there anything that's really blindsiding

25   you in this particular document?  I may allow it in because

PENELOW - CROSS - BROWN

1    even though you're seeing it for the first time I don't really

2    see any prejudice here for this particular disclosure.

3          But, Ms. Brown, I want you to be mindful as we move

4    forward --

5          MS. BROWN:  Sure.

6          THE COURT:  -- if you are attempting to provide

7    exhibits or admit exhibits that have never been produced, I'm

8    going to look at them on a case-by-case basis.

9          MS. BROWN:  I understand.

10         THE COURT:  But they're not all coming in, you

11   know --

12         MS. BROWN:  Of course.

13         THE COURT:  Is there any particular objection to this

14   one other than minding the discovery process to make sure that

15   you're not getting blindsided by documents during trial?

16         MS. BROWN:  I think the issue is, if I can just jump

17   in, is, you know, she continued to work for us, and we

18   obviously own the emails, and this is just a recent email they

19   were sending about the case, so...

20         MR. RUSS:  One disadvantage on that, Your Honor, is

21   not knowing what all the RFPs said.  It was a part of one of

22   our motions in limine I think Your Honor granted.

23         So maybe during the break, I can go back and look and

24   see if we requested this, which would be an ongoing continuing

25   discovery obligation.

PENELOW - CROSS - BROWN

1          But to keep things moving, I think that I'm fine if we

2    want to go into this one.

3          THE COURT:  Are there any other documents that you

4    intend to go into that are going to fall into this category of

5    may have not been produced?

6          MS. BROWN:  I don't think so, Your Honor, and on

7    that score, I'm almost positive there was not a continuing

8    date obligation, so -- and this was not the subject of the

9    performance reviews that the Court addressed in limine.

10         This is just their admissions.  We have them all

11   because she continued to work for us.

12         THE COURT:  All right.  I'm going allow this one for

13   now based on the line of cross-examination.

14         But I will revisit additional objections, Mr. Russ, if

15   anything else like this comes up moving forward.

16         MR. RUSS:  Thank you, Your Honor.

17         THE COURT:  Fair enough?

18         MS. BROWN:  Thanks very much.

19         (Sidebar was concluded at 11:43 a.m.)

20         (Open court.)

21         MS. BROWN:  May I proceed, Your Honor.

22         THE COURT:  You may.

23         MS. BROWN:  Permission to admit D-8848 and the

24   attachment, 8849.

25         THE COURT:  So admitted.

PENELOW - CROSS - BROWN

1    (Defendants' Exhibit 8848 in evidence.)

2    (Defendants' Exhibit 8849 in evidence.)

3    BY MS. BROWN:

4    Q.   And, Ms. Penelow, we were talking about your efforts to

5    collect information about fancy restaurants when we left off.

6         Do you recall that?

7    A.   I was collecting information about a lot of things.

8    Q.   Ok.

9         Including fancy restaurants.

10        Right?

11        THE COURT:  Ms. Penelow, I'm going to direct you now,

12   just to save time, you've got to answer the question posed to

13   you.  All right?

14        THE WITNESS:  Yes, sure.

15        THE COURT:  If the question is Did you collect

16   information about A, you answer that specific question, and

17   there's always an opportunity for you to respond additionally

18   with redirect from your counsel.  All right?

19        THE WITNESS:  Sure.  Thank you.

20   BY MS. BROWN:

21   Q.   And if we look at -- so the email we were looking at that

22   asked about details about fancy restaurant locations was from

23   August of 2012, but actually your effort to collect that type

24   of information continued, including up until quite recently.

25        Right, ma'am?

PENELOW - CROSS - BROWN

```
 1  A.   I'm not sure what you're referencing.

 2  Q.   If we look, for example, at what is here at D-8848, this

 3  is an email from you to Ms. Brancaccio attaching a speaker

 4  invite.

 5       Correct?

 6  A.   Correct.

 7  Q.   And it talks about a high-end -- you were looking for an

 8  example of an invite at a high-end restaurant.

 9       Correct?

10  A.   Correct.

11  Q.   And you had some suggestions like Le Cirque or Per Se.

12       Right?

13  A.   It says here as an example.  I don't think I was looking

14  for one.

15  Q.   Okay.

16       "Here's an example of an invite at a high-end

17  restaurant."

18       Correct?

19  A.   Correct.

20  Q.   Okay.

21       "Let me know if this is what she wants."

22       Right?

23  A.   Correct.

24  Q.   Okay.

25       And here's what you attach -- it was actually this
```

1    restaurant, BLT Prime in New York.

2        Correct?

3    A.   Correct.

4    Q.   Okay.

5        And this invite that you attached actually wasn't even

6    a promotional speaker event.

7        Do you know that?

8    A.   It was a clinical event.

9    Q.   Right.

10        It was an unbranded program where the speakers aren't

11   even allowed to talk about particular medicines.

12        Did you know that?

13   A.   Yes, I did.

14   Q.   All right.

15        So the example actually that you identified at a fancy

16   location was a disease awareness program about acute HIV.

17        Correct?

18   A.   I'm sorry.  I thought we are talking about the

19   restaurant.

20   Q.   Yes, ma'am.

21   A.   Not the program, the restaurant?

22   Q.   So this is an example of an invite, that you identified,

23   at a fancy restaurant.

24        Correct?

25   A.   Correct.

PENELOW - CROSS - BROWN

1   Q.   BLT Prime.

2        Correct?

3   A.   Yes, it is.

4   Q.   And this was not a speaker -- a promotional speaker

5   event.

6        Correct?

7   A.   Correct.

8   Q.   This was an event called a disease awareness event.

9        Correct?

10  A.   There were still speaker programs from our point of view.

11  Q.   Yes, ma'am.

12       But there are some speaker programs where the speakers

13  are not talking specifically about branded medicines.

14       Correct?

15  A.   That's the intention.

16  Q.   Sure.

17       And this was one of those programs where the speaker

18  was talking about HIV generally and not Prezista or Intelence

19  specifically.

20       Correct?

21  A.   Correct.

22  Q.   All right.

23       And yesterday, ma'am, you spoke quite a bit about

24  Dr. Salomon and his speaker programs.

25       Correct?

PENELOW - CROSS - BROWN

1    A.    Correct.

2    Q.    And you told us that Dr. Salomon was the type who was

3    always looking for a fancy restaurant.

4          Correct?

5    A.    Correct.

6    Q.    And you said that he was paid $2,500 an hour.

7          Right?

8    A.    Yes, he was.

9    Q.    And then you showed a bunch of pictures of fancy

10   restaurants.

11         Do you remember that?

12   A.    Yes.

13   Q.    All right.

14         You didn't take any of those pictures, though.

15         Right?

16   A.    No, I did not.

17   Q.    Okay.

18         And you don't actually know where those pictures came

19   from.

20         Right?

21   A.    No, I do not.

22   Q.    And you know that a lot of the programs that Dr. Salomon

23   did were actually not at restaurants at all.

24   A.    That is not true.

25   Q.    The reason you know that is because you organized some of

PENELOW - CROSS - BROWN

1    them.

2        Right, ma'am?

3    A.   Correct.

4    Q.   All right.

5        MS. BROWN:  Let's look at D-9092.

6        Permission to admit.  It's tab 114.

7        MR. RUSS:  No objection, Your Honor.

8        THE COURT:  All right.  So admitted.

9    (Defendants' Exhibit D-9092 in evidence.)

10   BY MS. BROWN:

11   Q.   Ms. Penelow, I want to show you an email string where you

12   are working to get a speaker program approved for Dr. Salomon.

13        Okay, ma'am?

14   A.   Okay?

15   Q.   All right.

16        And this is from November back in 2011.

17        Do you see that?

18   A.   I do.

19   Q.   All right.

20        And there's some back and forth here about getting this

21   program approved.

22        Can you see that?

23   A.   Yes.

24   Q.   All right.

25        And if we turn to the back, we see that you note that

PENELOW - CROSS - BROWN

1    you had 80 folks registered for this program.

2         Do you see that?

3    A.   Seems like a high number.

4    Q.   Uh-huh.

5    A.   I do see that.

6    Q.   All right.

7         And if we turn here to the back page, we get some

8    information about where this program is, what it is and how

9    much Dr. Salomon is being paid.

10        Correct, ma'am?

11   A.   Correct.

12   Q.   Okay.

13        And this program is actually not taking place at a

14   restaurant at all.

15        True?

16   A.   No, it is not.

17   Q.   It's taking place at the AIDS Service Center in New York.

18        Correct?

19   A.   Correct.

20   Q.   Dr. Salomon is actually not getting paid $2,500.

21        Correct?

22   A.   Correct.

23   Q.   All right.

24        And the 80 folks that attended this program were not

25   Dr. Salomon's residents and people who worked for him.

PENELOW - CROSS - BROWN

1          Correct?

2    A.   No.  It was patients.

3    Q.   Right.

4          This was a program that you know there were a number of

5    community-based programs that Dr. Salomon and other speakers

6    did at locations like the Service Center.

7          Correct?

8    A.   Sure.

9    Q.   That was part of the speaker bureau.

10         Correct?

11   A.   Yes, it was.

12   Q.   All right.

13         And this one here you were trying to get approved so

14   that you could host this program for these 80 folks.

15         Correct?

16   A.   Correct.

17   Q.   And one of the things that was happening at the time of

18   this program is that it was very close to a label change.

19         Did you know that?

20   A.   No, I don't recall that.

21   Q.   Okay.

22         MS. BROWN:  And let's look at D-9093, please, which

23   is tab 115.

24         MR. RUSS:  No objection.

25         THE COURT:  So admitted.

PENELOW - CROSS - BROWN

1    (Defendants' 9093 in evidence.)

2    BY MS. BROWN:

3    Q.    And one of the things you know you were informed about

4    this program is that it had to take place in a certain amount

5    of time to make sure that it was compliant with the label

6    update.

7          Do you see that there?

8    A.    I'm going to take a look at it right now.

9    Q.    Absolutely, ma'am.

10   A.    Okay.

11   Q.    Right?

12         And so one of the things that was happening as it

13   relates to this program is that the program got approved, but

14   you all were instructed that it had to be done before the --

15   November 20th to be compliant with the label update.

16         Do you see that?

17   A.    I'm not on this email, but yes.

18   Q.    You see that there, ma'am, about the program you did?

19   A.    I do.

20   Q.    All right.

21         Let's talk a little bit about -- just a few more topics

22   for you, ma'am.  I want to talk about physicians and the

23   decisions that they make.

24         Okay?

25   A.    Okay.

PENELOW - CROSS - BROWN

1    Q.   And you would agree that doctors consider a number of

2    factors when making prescribing decisions.

3         True?

4    A.   Absolutely.

5    Q.   A lot goes into the decision to prescribe an HIV

6    medicine.

7         Correct?

8    A.   Yes.

9    Q.   Like whether or not the patient has been treated before.

10        Correct?

11   A.   Yes.

12   Q.   The efficacy of the medicine?

13   A.   Yes.

14   Q.   The convenience of the medicine for the patient.

15        Correct?

16   A.   Correct.

17   Q.   Potential side effects.

18        Correct?

19   A.   Correct.

20   Q.   You would agree that you, Ms. Penelow, can't speculate as

21   to why an individual doctor does or does not prescribe a

22   medicine.

23        Correct?

24   A.   Correct.

25   Q.   And you spoke quite a bit about what you say were

PENELOW - CROSS - BROWN

1  off-label studies that you were sharing with physicians.

2       Do you remember that, ma'am?

3  A.   Yes.

4  Q.   And you can't speculate as -- if that happened, as to

5  whether a doctor even paid attention to any of those studies

6  that you claim you gave him or her.

7       Correct?

8  A.   I had actual conversations with them about it.

9  Q.   Well, we asked you this question, ma'am, whether or not

10  you could say, for example, if a doctor relied on the

11  DART study.

12       Right?

13  A.   Correct.

14  Q.   And what you told us was, "I can't tell you what

15  physicians rely on."

16       Right?

17  A.   In some instances.

18  Q.   And that you can't speculate what a doctor would or would

19  not do.

20       Correct?

21  A.   In some instances.

22  Q.   All right.

23       Now, one of the things that happened, Ms. Penelow, in

24  this case, I want to talk to you about some of the steps that

25  took place after you filed this lawsuit.

PENELOW - CROSS - BROWN

1          Okay, ma'am?

2   A.   Okay.

3   Q.   All right.

4          And, first, let's -- just to orient, you decided,

5   during the entire time period that you were at Janssen, you

6   did not report your concerns to the anonymous hotline.

7          Correct?

8   A.   Correct.

9   Q.   We don't have any evidence, including on the 50-minute

10  tape that we listened to, that you reported to HR.

11         Correct?

12  A.   Correct.

13  Q.   We don't have any documentation that, while you were at

14  Janssen, you raised the concerns that you're raising in this

15  lawsuit.

16         Correct?

17  A.   I did not put anything in writing, correct.

18  Q.   Okay.

19         But even in terms of the testimony that you gave our

20  jurors today, you listed a number of people that you now claim

21  you talked to about these off-label allegations?

22  A.   Yes, I did.

23  Q.   All right.

24         And that's inconsistent with some of your prior sworn

25  testimony on this court.

PENELOW - CROSS - BROWN

1          Right?

2    A.    I don't know what you're referring to again.

3    Q.    Well, remember we looked at the beginning of your

4    examination about your sworn statement that you never reported

5    violations of the speaker policy?

6    A.    I'm still not understanding.

7    Q.    All right, ma'am.

8          As it relates to your testimony that you spoke to folks

9    at Janssen about these off -- this off-label promotion, we

10   don't have any documents on that.

11        Correct?

12   A.    No documents.

13   Q.    All right.

14        What we do know is that you stand to recover a

15   significant percentage of money in this lawsuit.

16        True?

17   A.    I've heard that over the last couple of weeks, yes.

18   Q.    You've known that.

19        Right, ma'am?

20   A.    I do know a minimal amount about it.

21   Q.    Sure.

22        I mean, you didn't mean to suggest by your answers to

23   counsel's questions that you didn't know that this lawsuit --

24   in this lawsuit you have a big financial stake.

25   A.    Yes.

PENELOW - CROSS - BROWN

1   Q.   Okay.

2        And, in fact, you have had a number of conversations

3   with Ms. Brancaccio about that.

4        Correct?

5   A.   I don't recall.

6   Q.   Okay.

7        You and Ms. Brancaccio have already decided how you

8   will split up the money that our jury hasn't even decided

9   you're entitled to yet.

10       Right?

11  A.   Well, yes.  We had to make an agreement at the beginning.

12  Q.   Yep.

13       And as I understand, that agreement --

14       MR. RUSS:  Objection, Your Honor.  Can we approach?

15       THE COURT:  All right.

16       (Sidebar begins at 11:55 a.m.)

17       MR. RUSS:  I'm going to move to strike.  I didn't

18  want to do it in front of the jury.  The jury is not

19  determining anything about any share that she's receiving.  So

20  that notion that they would be determining that, that is

21  not --

22       THE COURT:  I don't think that's what she said.  She

23  said that you have an agreement to split the money that the

24  jury hasn't even determined yet -- would grant damages.

25       MR. RUSS:  Well --

PENELOW - CROSS - BROWN

1          MS. BROWN:  Right.

2          THE COURT:  I'll look at the question.  Do you want

3    me to look at the question?

4          MR. RUSS:  Yes, Your Honor.

5          THE COURT:  The question was, "You and Ms. Brancaccio

6    have already decided how to split the money that the jury

7    hasn't even determined yet that you're entitled to."  That's

8    literally verbatim of what she asked.

9          So she didn't put before the jury that they determined

10   the split.  She's saying, you have -- and by the way, this

11   line of questioning came out with Ms. Brancaccio as well, so

12   I'm really confused about the objection here.

13         All she's saying is you have an agreement to split any

14   award you get in the case before the jury has even awarded

15   anything.  That is fair game.

16         Now, I presume you're not going to infer to the jury

17   that they determined the split between Brancaccio and --

18         MS. BROWN:  Right.

19         THE COURT:  Okay.

20         MR. RUSS:  It may have been I misheard.  I heard --

21   and, again, I'll go back --

22         THE COURT:  No, no.  That's okay.

23         MR. RUSS:  -- that the jury was going to determine

24   how much they're entitled to.

25         THE COURT:  Well, how much they're entitled to, yeah.

PENELOW - CROSS - BROWN

1    The amount of money damages.

2           MR. RUSS:  From the United States.  Right.  To the

3    Government, not --

4           THE COURT:  Oh, no, it says to them.

5           MR. RUSS:  That's what I'm concerned about.  They're

6    not deciding anything that goes to Relators.

7           THE COURT:  Well, how do you see that?  Right?  If

8    they award damages, a significant percentage of that money

9    goes to them.

10          MR. RUSS:  I agree.

11          THE COURT:  I think it's not improper to tell the

12   jury -- or to -- for them to be aware that, if they were to

13   award damages, a significant percentage of what they award

14   goes to these two Relators.  That's free game.

15          MR. RUSS:  Right.  But the determination of how much

16   goes to them is, to me -- it's the Government, and there's a

17   process after that.  That's all.

18          THE COURT:  I agree with you, but she didn't have

19   that in the question.

20          MR. RUSS:  Right.  And that may have been --

21          MS. BROWN:  I'm not asking that.

22          MR. RUSS:  All right.  Sorry.

23          MS. BROWN:  No worries.

24          THE COURT:  All right.

25          (Sidebar was concluded at 11:57 a.m.)

PENELOW - CROSS - BROWN

1              (Open court.)

2              MS. BROWN:  May I proceed, Your Honor?

3              THE COURT:  You may.

4    BY MS. BROWN:

5    Q.   Before our jury has even issued a determination --

6              (Reporter clarification.)

7    BY MS. BROWN:

8    Q.   Ms. Penelow, before our jury has even reached a

9    determination of the merits of your lawsuit, you and

10   Ms. Brancaccio have decided how you're going to split up the

11   money.

12        Right?

13   A.   It was required of us to make an agreement at the

14   beginning.

15   Q.   Okay.

16        You determined that it was required to make an

17   agreement.

18        Right, ma'am?

19   A.   Correct.

20   Q.   Okay.

21        And the agreement has you getting 60 percent of the

22   money and Ms. Brancaccio getting 40 percent.

23        Correct?

24   A.   Correct.

25   Q.   And that's because this lawsuit was your idea.

PENELOW - CROSS - BROWN

1          Right?

2   A.   There was multifactorial -- there was a lot of reasons.

3   Q.   Excuse me?

4   A.   There was a lot of reasons.

5   Q.   What were the other ones?

6   A.   That I filed first, that I opened my mouth first, that I

7   went to the lawyer first.

8   Q.   You say you filed first.  Does that suggest somebody else

9   filed?

10  A.   I'm not understanding your question.

11  Q.   Let me rephrase, then, ma'am.

12          The reasons why you're getting 60 percent of the money

13  and Ms. Brancaccio is getting 40 is because you filed first.

14          Is that what you said?

15  A.   Yes.  I went to the lawyer first.

16  Q.   Okay.

17          And what were the other reasons now?

18  A.   Because I spoke up about the off-label marketing and the

19  speaker programs.

20  Q.   Uh-huh.

21          And who did you speak up to?

22  A.   I spoke up to Tony Dolisi, Nancy Bartnett, Tim McSherry,

23  Eric Sherr, Michael Valentine.

24  Q.   Okay.

25          And are any of those folks coming into the trial to say

PENELOW - CROSS - BROWN

1  that you told them that this was going on?

2  A.    Not that I know of.

3  Q.    And we've looked a lot of declarations from witnesses in

4  this case.  And you're aware, generally, that there was an

5  effort to get as many declarations as possible.

6        Correct, ma'am?

7  A.    Yes.

8  Q.    And none of those people that you just listed signed a

9  declaration in support of your lawsuit.

10        Right?

11  A.    No.

12  Q.    Okay.

13        And other than speaking up and getting a lawyer first,

14  were there other reasons you're getting 60 percent to

15  Ms. Brancaccio's 40?

16  A.    No.

17  Q.    Okay.

18        Have you had other discussions about the money that you

19  have not been awarded yet in this case?

20  A.    I don't recall.

21        MS. BROWN:  Let's look, if we could, at D-6036.

22        Permission to admit.

23        MR. RUSS:  What tab?

24        MS. BROWN:  Oh, I apologize.  45.

25        THE COURT:  Take it down.

PENELOW - CROSS - BROWN

1          MS. BROWN:  This is the old one.  Sorry, Judge.  I

2    had this up from before.

3          THE COURT:  Oh, okay.  So it's not the -- never mind.

4    I'm sorry.

5          MS. BROWN:  No, no.  My fault.  Sorry.

6          MR. RUSS:  No objection, Judge.

7          THE COURT:  All right.  So admitted.

8    (Defendants' Exhibit D-6036 in evidence.)

9    BY MS. BROWN:

10   Q.   Okay.

11        This is in another email, ma'am, that you forwarded to

12   your mom.

13        Correct?

14   A.   Yes, I did.

15   Q.   Okay.

16        And this is from December 18, 2012, and the title of it

17   is We're on File.

18        Do you see that?

19   A.   Yes, I do.

20   Q.   And that is an email from your lawyers letting you know

21   that your lawsuit against us had been filed.

22        Correct?

23   A.   Correct.

24   Q.   And what they say here in this email to you is the next

25   step is getting the Government excited about the case.

PENELOW - CROSS - BROWN

1       Do you see that, ma'am?

2   A.   I do.

3   Q.   "They should contact us in a month or so about scheduling

4   the Relator's interview."

5       Do you see that?

6   A.   I do.

7   Q.   All right.

8       Did you participate in an interview with the Government

9   as part of your lawsuit?

10  A.   I did.

11  Q.   Excuse me?

12  A.   I did.

13  Q.   Okay.

14      When did that take place, ma'am?

15  A.   I actually do not know.

16  Q.   All right.

17      You went and met with the United States Government on

18  how many occasions?

19  A.   I believe it's only one, but I don't have much of a

20  recollection of the meeting.

21  Q.   Okay.

22      How long did that meeting last?

23  A.   I have no idea.

24  Q.   Ms. Brancaccio did not come with you to that meeting?

25  A.   I don't know.  I believe she had a meeting with the

PENELOW - CROSS - BROWN

1    Government.  I don't believe we went together.

2    Q.   Okay.

3         Because when I asked her if she had a meeting with the

4    Government -- were you here for that?

5    A.   I was.

6    Q.   All right.

7         -- she said no.

8         Do you have a different recollection?

9    A.   Well, we were just -- it was just brought to my attention

10   that I had a meeting with the Government.

11   Q.   Not sure what you mean by that.

12   A.   I had no recollection of meeting with the Government.

13   Q.   Okay.

14        But it turns out you did.

15   A.   It turns out I did.

16   Q.   Okay.

17        And you just got reminded of that?

18   A.   Yes.

19   Q.   In connection with testifying here?

20   A.   Yes.

21   Q.   Okay.

22        And I assume that was from your lawyers?

23   A.   Yes.

24   Q.   Okay.

25        I'm not --

PENELOW - CROSS - BROWN

```
 1            MR. RUSS:  Objection, Your Honor.  Privilege.

 2            MS. BROWN:  Yep, I'm making sure.

 3            THE COURT:  Yeah, let me see you guys at sidebar.

 4            (Sidebar begins at 12:02 p.m.)

 5            THE COURT:  Sorry.  What came out about what was

 6   privileged?

 7            MR. RUSS:  She said, "I assume it came from your

 8   lawyers."  And I object to the privilege.

 9            THE COURT:  I agree.

10            MS. BROWN:  I was doing that just to say, I'm not

11   entitled to know what you said to your lawyers.  I was trying

12   to preempt.  Like, I don't want her to say, My lawyers told me

13   whatever --

14            THE COURT:  All right.  But the way you word it, it's

15   difficult -- I see where the objection is coming from --

16            MS. BROWN:  I understand.

17            THE COURT:  -- the way you phrased it.

18            MS. BROWN:  I apologize.  I really was trying to make

19   sure we put out there Don't tell me what you told your lawyers

20   about it.

21            THE COURT:  All right.  Start with that next time you

22   go to it and say -- without telling me anything your lawyers

23   told you should be the preface.

24            MS. BROWN:  Yeah, there would be a better way to do

25   it.
```

PENELOW - CROSS - BROWN

1          MR. RUSS:  And we have the similar issue motion in

2    limine.  This came up with Ms. Brancaccio's testimony, about

3    how far she could get into what was shared with the

4    Government, the whole back door --

5          THE COURT:  Let's stay here now.

6      So I'm going to sustain the objection, and rephrase the

7    question.

8          MS. BROWN:  Yes.

9          THE COURT:  Do not get into intervention here,

10   Ms. Brown.

11         MS. BROWN:  Absolutely not.  I'm doing it entirely

12   consistent with what we've done, pursuant to the statute by

13   which you filed your case.  You had to hand over all of the

14   documents, you had to do this Relators' meeting.  You had to

15   answer questions.  They had a time period to investigate.

16   That's as far as I can go.

17         MR. RUSS:  That -- I think that was further than

18   what --

19         THE COURT:  What do you mean, a time period to

20   investigate?  That's not where this was.

21         MS. BROWN:  We had one of the witnesses that the

22   Government investigated the claims.  That's as far as we --

23         THE COURT:  I don't recall that.

24         MR. RUSS:  I don't recall that, Your Honor.

25         THE COURT:  So I'm not going to let you do that until

PENELOW - CROSS - BROWN

1    you show it to me.

2            MS. BROWN:  Okay.  We'll --

3            THE COURT:  You've got 12 people behind you there.

4    They can go do the work.

5            MS. BROWN:  I will have someone do that, Your Honor.

6            THE COURT:  All right.

7            MS. BROWN:  I think it was both -- it's Donna Graham

8    that the Government had a time period to investigate.

9            THE COURT:  All right.

10           MS. BROWN:  And then I thought we changed the --

11           THE COURT:  Let me see where we were.

12           MS. BROWN:  Do you want me to do it now, or should

13   we --

14           THE COURT:  Well, you can can't do it until you show

15   it to me, so you decide how you want to proceed.

16           MR. RUSS:  Thank you, Judge.

17           (Sidebar was concluded at 12:04 p.m.)

18           (Open court.)

19           MS. BROWN:  Your Honor, I believe I can proceed

20   consistent with that, if that would be helpful.

21           THE COURT:  All right.  That's okay, if you want to

22   proceed consistent with --

23           MS. BROWN:  Just to keep it moving and then while --

24           THE COURT:  That's fine.

25           MS. BROWN:  I don't want to waste -- I don't want to

PENELOW - CROSS - BROWN

1    waste time.

2          THE COURT:  All right.

3    BY MS. BROWN:

4    Q.   Okay.  Ms. Penelow, when we were talking just a moment

5    ago, you were telling me about a meeting that you had with the

6    Government.

7          Do you remember that?

8    A.   Yes.

9    Q.   Okay.

10         And without telling me anything about conversations

11   with your lawyers, tell me what you remember about that

12   meeting with the Government.

13   A.   Nothing.

14   Q.   Okay.

15         Do you have any recollection of how long that meeting

16   lasted?

17   A.   I believe you asked me that.  No.

18   Q.   I apologize.  If I did, I apologize.

19         Do you have any recollection of what you said at that

20   meeting?

21   A.   No, I don't.

22   Q.   Okay.

23         And consistent, of course, with your obligations under

24   the statute by which you brought this case, you provided to

25   the Government all the materials that you're relying on for

PENELOW - CROSS - BROWN

1    your allegations here.

2        Correct?

3    A.   I'm not sure.

4    Q.   Okay.

5        One of the things we asked you in your written

6    discovery was to certify or to swear that you had complied

7    with your obligation and given the Government all the

8    materials you had, and you said you did.

9        Does that refresh you?

10   A.   So then I did.

11   Q.   Okay.

12       And in addition to this one meeting with the Government

13   that you just described, do you recall any additional contact

14   with the Government regarding the case?

15   A.   No.  No, I don't.

16   Q.   All right.

17       Let me see if I can refresh you on that.  Let's take a

18   look at tab 54.

19           MS. BROWN:  Your Honor, permission to admit D-8518.

20           MR. RUSS:  Is there an attachment?

21           MS. BROWN:  I'm sorry?

22           MR. RUSS:  Attachment?

23           MS. BROWN:  No, I'm not going to do the attachment.

24   It's just this.

25           MR. RUSS:  No objection, Your Honor.

PENELOW - CROSS - BROWN

1          THE COURT:  So admitted.

2     (Defendants' Exhibit 8518 in evidence.)

3     BY MS. BROWN:

4     Q.   Ma'am, this email we just looked at about the interview

5     with the Government, getting the Government excited about the

6     case, is from just when you filed your complaint.

7          Correct, ma'am?

8     A.   Correct.

9     Q.   Okay.

10         And then I want to show you another email along those

11    same lines from just about exactly a year later.

12         Do you see this one?

13    A.   Yes, I do.

14    Q.   Okay.

15         And this again -- the reason we have here a memo or an

16    email with your lawyers is because this is an another one that

17    you forwarded to your mom.

18         Right?

19    A.   It looks like it.

20    Q.   Okay.

21         And this is an email that comes from your lawyers to

22    you, and it talks about a draft memo that's being sent for

23    your review.

24         Do you see that, ma'am?

25    A.   Yes, I do.

PENELOW - CROSS - BROWN

1    Q.   Okay.

2         And it says that your lawyers are reviewing it but they

3    plan to turn it into a letter for the Government.

4         Correct?

5    A.   Correct.

6    Q.   And if we look up top, we see the title of that is J&J

7    memo FCA.

8         Do you see that?

9    A.   I do.

10   Q.   Okay.

11        And do you understand that memo to be sort of an

12   overview of the allegations that you were making in connection

13   with your lawsuit?

14   A.   Yes.

15   Q.   Okay.

16        And do you understand that that information was, in

17   fact, provided to the Government?

18   A.   Yes.

19   Q.   All right.

20        Now, you continued, Ms. Penelow, to work to collect

21   evidence in further support of your case, even after these

22   emails that we're talking about here.

23        Correct?

24   A.   That would make sense.

25   Q.   Yep.

PENELOW - CROSS - BROWN

1          And at this point you had already left Janssen.

2          Correct?

3    A.    Correct.

4    Q.    And so part of what you did was correspond with

5    Ms. Brancaccio, who was still there.

6          Correct?

7    A.    Correct.

8    Q.    And you directed or requested that she send you a number

9    of things for use in the lawsuit.

10          Correct?

11    A.    Possibly.  I don't have a recollection of it.

12    Q.    Okay.

13          MS. BROWN:  Tab 50- -- sorry -- tab 107.  Permission

14    to admit D-9088.

15          MR. RUSS:  No objection, Your Honor.

16          THE COURT:  All right.  So admitted.

17    (Defendants' 9088 Exhibit in evidence.)

18    BY MS. BROWN:

19    Q.    So the email we're looking at here about information

20    being put together is in December of 2013, and then if we look

21    down here, this is an email that begins -- from Mr. Dolisi to

22    Ms. Brancaccio in 2015, now two years later.

23          Right, ma'am?

24    A.    That's what it looks like.

25    Q.    What it says is "FYI:  Sorona is the keynote for the

PENELOW - CROSS - BROWN

1    POA."

2         Do you see that?

3    A.   I do.

4    Q.   Do you believe Mr. Dolisi is talking about Dr. Sorana

5    Segal-Maurer there?

6    A.   Yes.

7    Q.   And she was a speaker for Janssen.

8         Correct?

9    A.   Yes, she was.

10   Q.   She is a well-known and well-respected HIV provider.

11        Correct?

12   A.   I can't speak to that.

13   Q.   All right.

14        And in any event, it looks like she was going to be a

15   speaker at one of the Janssen meetings.

16        Correct?

17   A.   That is correct.

18   Q.   Because sometimes in training the sales force or in

19   educating the sales force, speakers would come in and talk to

20   the sales force.

21        Correct?

22   A.   Yes.

23   Q.   Okay.

24        And Ms. Brancaccio forwarded this information to you,

25   right, or first to herself and then to you?

PENELOW - CROSS - BROWN

1          Correct?

2   A.   Yes.

3   Q.   All right.

4          And you say, "please forward that."

5          Correct?

6   A.   Yes.

7   Q.   Okay.

8          Were you thinking that information about

9   Dr. Segal-Maurer would be useful to your lawsuit?

10  A.   That makes sense, but, again, this was nine years ago.

11  Q.   Well, I mean, a lot of what you're talking about today

12  happened a long time ago.

13         Right, ma'am?

14  A.   It sure did.

15  Q.   Okay.

16         And you've actually in this lawsuit made a lot of

17  allegations about Dr. Segal-Maurer.

18         Correct?

19  A.   Yes.  Yes, I have.

20  Q.   In terms of your complaint, actually, she might be one of

21  the doctors who's mentioned the most.

22         Right?

23  A.   Very possible.

24  Q.   Okay.

25         And so you were working with Ms. Brancaccio to collect

PENELOW - CROSS - BROWN

1  information like this email about Dr. Segal-Maurer in

2  connection with your lawsuit.

3       Correct?

4  A.   I don't see how this email reflects speaker programs.

5  Q.   What's it about?  Why do you say, "please forward"?

6  A.   I have no idea.  I wasn't even working at the company at

7  the time.

8  Q.   Okay.

9       You, like Ms. Penelow -- excuse me.  Ms. Penelow, you,

10  like Ms. Brancaccio, signed a pledge of ethics when you joined

11  Janssen.

12       Correct?

13  A.   It is a requirement.

14  Q.   Sure.

15       MS. BROWN:  Tab 7, permission to admit 6057.

16       MR. RUSS:  Is this your ethics pledge?

17       MS. BROWN:  It is.

18       MR. RUSS:  No objection.

19       MS. BROWN:  Yes, thank you.

20       THE COURT:  I couldn't hear.

21       MR. MARKETOS:  Sorry, Judge.  No objection.

22       THE COURT:  So admitted.

23  (Defendants' 6057 Exhibit in evidence.)

24  BY MS. BROWN:

25  Q.   And we've seen this now with a number of witnesses.

PENELOW - CROSS - BROWN

1    That's your signature down there at the bottom.

2        Correct, Ms. Penelow?

3    A.  Yes, it is.

4    Q.  With your supervisor at the time, Mr. Murphy?

5    A.  Yes, it is.

6    Q.  And just so I'm clear, Mr. Murphy never directed you to

7    promote off-label?

8    A.  No.  He understood that I was against it.

9    Q.  Okay.

10       So just to answer my question:  Mr. Murphy never

11   directed you to promote off-label.

12       True?

13   A.  True.

14   Q.  All right.

15       And for how long did you report to Mr. Murphy?

16   A.  About from 2006 to 2009.

17   Q.  Okay.

18       From 2006 to 2009, your supervisor did not direct you

19   to promote off-label.

20       True?

21   A.  True.

22   Q.  All right.

23       And this pledge of ethics, essentially when you signed

24   it, you believed it.

25       True?

PENELOW - CROSS - BROWN

1   A.   Yes, I did.

2   Q.   You pledged and swore and agreed that you would not do

3   the very things that you allege you did in this lawsuit.

4        Correct, ma'am?

5   A.   Yes, I did.

6   Q.   Okay.

7        And at least as it related to Prezista and Intelence,

8   you violated this pledge, according to your allegations.

9        Correct?

10  A.   Correct.

11  Q.   But Prezista and Intelence were not the only medicines

12  that you promoted when you were at Janssen.

13       Correct?

14  A.   I very shortly promoted Edurant and Complera.

15  Q.   Correct.  You don't claim you promoted Edurant or

16  Complera off-label.

17       Correct?

18  A.   No, I did not.

19  Q.   And, in fact, during the time period -- Edurant and

20  Complera are two HIV medicines.

21       Correct?

22  A.   Correct.

23  Q.   And during the time period that you promoted those

24  medicines, you were reporting to the same manager as who you

25  reported to for Prezista and Intelence.

PENELOW - CROSS - BROWN

```
 1         Correct?
 2    A.   Tony Dolisi.
 3    Q.   Correct, ma'am?
 4    A.   Correct.
 5    Q.   Yep.
 6         And in fact, you put on a number of speaker programs
 7    for Edurant.
 8         Correct?
 9    A.   I don't recall.
10    Q.   Okay.
11         You used some of the same doctors to speak for Prezista
12    and Intelence as Edurant and Complera; is that right?
13    A.   Yes.  I used the speakers from the speaker bureau.
14    Q.   Okay.
15         But you don't allege that the same speakers spoke
16    off-label for Edurant or Complera.
17         Correct?
18    A.   That's correct.
19    Q.   All right.
20         So you had the same managers, and you had the same
21    speakers, but for two HIV medicines, Complera and Edurant,
22    they did not speak off-label.
23         Correct?
24    A.   Correct.
25    Q.   But your allegations in this lawsuit are that for
```

PENELOW - CROSS - BROWN

1   Prezista and Intelence, they did speak off-label.

2       Correct?

3   A.   Correct.

4   Q.   And your testimony in this case is that part of the

5   reason you were not promoted had to do with the fact that you

6   were resisting promoting off-label.

7       Is that right, ma'am?

8   A.   That is right.

9   Q.   And as a result, your allegations are that your sales

10  numbers weren't as good?

11  A.   That is right.

12  Q.   Okay.

13      Because you are of the belief or your allegations in

14  this case are that if you were promoting off-label, your sales

15  numbers would be better?

16  A.   Yes.

17  Q.   Okay.

18      But the truth is, ma'am, you actually did very well

19  promoting Edurant, which you claim you did not promote

20  off-label?

21  A.   That is correct.  It had a full label.

22  Q.   You actually won an award at one of the POA meetings for

23  your work promoting Edurant.

24      Correct?

25  A.   I'm not familiar with that.

PENELOW - CROSS - BROWN

1    Q.    Okay.

2          You recall at least generally you did quite well

3    promoting Edurant?

4    A.    No, I do not remember that.

5    Q.    All right.

6          Let's just talk a little bit about your allegations

7    about promotion, please, ma'am.

8          Okay?

9    A.    Uh-huh.

10   Q.    You wanted to be an executive sales representative.

11         Correct?

12   A.    Correct.

13   Q.    And we heard, when we started your cross-examination,

14   about some of your frustration that you were not being

15   promoted.

16         Correct?

17   A.    Correct.

18   Q.    And in your view, other people, like Tim McSherry, were

19   being promoted when you were not.

20         Correct?

21   A.    That is correct.

22   Q.    And that frustrated you.

23         True?

24   A.    True.

25   Q.    All right.

PENELOW - CROSS - BROWN

1            And, in fact, Mr. Dolisi is one of the people that

2     you've made a number of allegations about in this case.

3            Correct?

4     A.   Yes, I have.

5     Q.   And, in fact, you and Mr. Dolisi had a little bit of a

6     disagreement in the early part of 2012.

7            Correct?

8     A.   You'll have to refresh my memory.

9     Q.   Sure.

10            MS. BROWN:  Permission to admit tab 82, D-8753.

11            MR. RUSS:  No objection.

12            THE COURT:  All right.  So admitted.

13     (Defendants' Exhibit 8753 in evidence.)

14     BY MS. BROWN:

15     Q.   Okay.

16            Ms. Penelow, I want to refresh your recollection about

17     some things that happened with you and Mr. Dolisi back in

18     February of 2012.

19            Okay?

20     A.   Okay.

21     Q.   All right.

22            So let's start here at the bottom.  This is an email

23     from you to Mr. Dolisi, and it's titled "agenda initiative

24     follow-up."

25            Do you see that, ma'am?

PENELOW - CROSS - BROWN

1  A.   I do.

2  Q.   And you say -- and just to refresh you, ma'am, there was

3  a time that Mr. Dolisi asked you to do something, and you

4  didn't agree that it was something you should do.

5       Does that ring a bell?

6  A.   Yes, it does.

7  Q.   Okay.

8       So what he has said to you is, "Per our conversation on

9  our one-on-one conference call, here is the email you

10  requested that explained why I determined it would be in my

11  best interest to opt out of the agenda project you assigned

12  me."

13       Do you see that?

14  A.   Yes, I do.

15  Q.   Okay.

16       So Mr. Dolisi, your manager, assigned you to something

17  called the agenda project?

18  A.   Correct.

19  Q.   You determined -- I'm sorry.

20       You determined that you shouldn't do the agenda

21  project.

22       True?

23  A.   True.

24  Q.   What's the agenda project now?

25  A.   Writing up an agenda.

PENELOW - CROSS - BROWN

1  Q.   For meetings in the district?

2  A.   For Tony's meetings.

3  Q.   Okay.

4       Your manager in your district?

5  A.   Yes.

6  Q.   You decided that was not something you should do?

7  A.   No.

8  Q.   Okay.

9       And tell us why you didn't think that was something you

10 should be doing.

11 A.   I thought I was overqualified.

12 Q.   Okay.

13      So you were frustrated that you were being asked to do,

14 like, what you perceived to be an administrative task?

15 A.   Correct.

16 Q.   Okay.

17      And you sort of outlined that here, talking about

18 your -- what you perceived to be your qualifications.

19      Correct?

20 A.   If you can give me a second, I'll read it.

21 Q.   Absolutely.

22 A.   Okay.

23 Q.   All right.

24      And so you go through kind of your qualifications,

25 including, as we discussed, the advanced degrees that J&J

PENELOW - CROSS - BROWN

1   helped you pay for.

2        Right?

3   A.   Yes.

4   Q.   All right.

5        And then you say, you know, in your opinion, "with all

6   the aforementioned activity and demonstration of competencies

7   I have to my credit, I do not believe that putting a weekly

8   agenda together is the best use of my skills and ability."

9        Correct?

10  A.   Correct.

11  Q.   I mean, you were just frustrated that you were being

12  asked to do this.

13       Fair enough?

14  A.   I was looking for an initiative.

15  Q.   Okay.

16       And in any event, that's sort of how you ended the

17  message.  "Feel free to let me know if you disagree, and I'm

18  happy to discuss."

19       Right?

20  A.   That's right.

21  Q.   Okay.

22       But you did a little more than just tell your manager

23  that you didn't want to do the project he had assigned you.

24       Remember?

25  A.   No, I don't remember.

PENELOW - CROSS - BROWN

1   Q.   Okay.

2        You actually went above Mr. Dolisi's head and looped in

3   Mr. Dolisi's superior.

4        Correct, ma'am?

5   A.   Yes, I did.

6   Q.   Okay.  So this email goes to Mr. Fernandez, who is

7   Mr. Dolisi's supervisor.

8        Is that right?

9   A.   That is right.

10  Q.   Okay.

11       And so you forward to Mr. Dolisi's supervisor the email

12  you had just sent.

13       Correct?

14  A.   Correct.

15  Q.   And basically you just reiterate to him that you don't

16  think it's appropriate for you to be assigned this agenda

17  project.

18       Correct?

19  A.   Correct.

20  Q.   Okay.

21       And Mr. Dolisi wasn't so happy with that.

22       Correct?

23  A.   That is correct.

24  Q.   He was not happy that you went above his head to his

25  manager.

PENELOW - CROSS - BROWN

1          True?

2   A.   True.

3   Q.   Okay.

4          Mr. Fernandez wasn't too happy either.

5          Correct?

6   A.   I don't believe he was.

7   Q.   Okay.

8          So Mr. Dolisi responds to you.

9          Correct?

10  A.   I'm sure he did.

11  Q.   Yep.

12         And what he says is, "Please follow the hierarchy of

13  reporting."

14         Correct?

15  A.   Correct.

16  Q.   What Mr. Dolisi says to you is that Mr. Fernandez is not

17  available to directly handle this kind of communication.

18         Correct?

19  A.   Correct.

20  Q.   And he says, "Mr. Fernandez and I are aligned in the

21  assignment that was being given to you."

22         Correct?

23  A.   Correct.

24  Q.   All right.

25         And he goes on to say, "Please do the assignment that

PENELOW - CROSS - BROWN

1  we asked of you and let me know if anything further is

2  needed."

3      Correct?

4  A.  Yes.

5  Q.  All right.

6      And Mr. Fernandez chimes in and says that he, too, is

7  aligned in this plan.

8      Correct?

9  A.  Yes, he does.

10  Q.  He says that it would -- it's appropriate for you first

11  to talk to your manager about this disagreement.

12      Correct?

13  A.  Correct.

14  Q.  And then if you have any issues, then you can go to

15  Mr. Fernandez.

16      Correct?

17  A.  If you give me a second, I'll finish reading the email.

18  Q.  Sure, sure.

19  A.  Okay.

20  Q.  Do you see that, ma'am?  He says, "Jessica, I'm aligned

21  with Tony."

22      That's Tony Dolisi.

23      Right?

24  A.  Yes.

25  Q.  "I'm aligned with his email regarding the expectations,

PENELOW - CROSS - BROWN

1  content and process moving forward."

2       Right?

3  A.   Yes.

4  Q.   Okay.

5       And these were the emails that you were talking to

6  Ms. McGrath about on the tape that we listened to at the start

7  of your examination.

8       Right, ma'am?

9  A.   It was one example.

10 Q.   Sure.

11      This time period, this was the difficulty that you were

12 having with Mr. Dolisi.

13      Fair?

14 A.   It was one of the difficulties.

15 Q.   Sure.

16      And this is, in part, what you were complaining to

17 Ms. McGrath about on the tape that we listened to.

18      Correct?

19 A.   Yes.

20 Q.   And, in fact, Ms. Brancaccio was aware of the

21 difficulties you were having in this email chain.

22      Correct?

23 A.   I don't recall.

24      MS. BROWN:  Let's look at D-8529, please.  Tab 66.

25      MR. RUSS:  No objection.

PENELOW - CROSS - BROWN

1          THE COURT:  All right.  So admitted.

2          MS. BROWN:  Thank you, Your Honor.

3   (Defendants' Exhibit D-8529 in evidence.)

4   BY MS. BROWN:

5   Q.  This email correspondence took place in 2012.

6          Right, ma'am?  February 19th, right?

7   A.  Yes.

8   Q.  And it looks like your initial email or the email you

9   received from Mr. Dolisi was February 17th.

10          Right, ma'am?

11  A.  Yes.

12  Q.  And on that very same day, Ms. Brancaccio emailed you

13  some information from the J&J website about employment

14  disputes.

15          Right?

16  A.  If you give me a second, I'll take a look at it.

17  Q.  Sure.  I'll flip the page so you can see.

18          This is sort of the cover page, and here's the

19  information she sent you.  "Common ground introduction."

20          Do you see that?

21  A.  Yes.

22  Q.  Okay.

23          And this is information from J&J's website about

24  employment disputes or problems.

25          Right?

PENELOW - CROSS - BROWN

1  A.   Yes.

2  Q.   And it talks about how J&J has created the common ground,

3  an employee dispute resolution program, to help manage

4  disputes better and quicker.

5        Correct?

6  A.   Yes, it does.

7  Q.   And Ms. Brancaccio sent you this email on the very same

8  day you were having this back and forth with Tony Dolisi

9  because you were having a little bit of an employment dispute

10 with Mr. Dolisi.

11       Correct?

12 A.   I was having an initiative dispute.

13 Q.   Sure.

14       He assigned you to do something that you didn't think

15 was appropriate.

16       Right?

17 A.   Correct.

18 Q.   And you went above his head, and he didn't think that was

19 appropriate.

20       Correct?

21 A.   Correct.

22 Q.   And Ms. Brancaccio was in the loop on this dispute, and

23 she sent you some resources that J&J has for that.

24       Correct?

25 A.   Yes.

PENELOW - CROSS - BROWN

1  Q.  All right.

2      And, ultimately, ma'am, that left you frustrated.

3      True?

4  A.  I don't recall my feelings at that time.

5  Q.  Okay.

6      We certainly heard you on the tape with Ms. McGrath

7  feeling a little frustrated.

8      Correct?

9  A.  That was a different point in time.

10 Q.  Okay.

11     And ultimately, ma'am, you did not -- during the course

12 of this year, later on in 2012, you went out on medical leave.

13     Correct?

14 A.  I'm not sure what month this was.

15 Q.  This was February of 2012.

16 A.  Okay.  A little bit later, I went out.

17 Q.  A little bit later, you went out.

18 A.  Yes.

19 Q.  And ultimately, you never came back.

20     Correct?

21 A.  I came back for two weeks in November of 2012.

22 Q.  Right.

23     And then you went back out again.

24     Correct?

25 A.  Yes, I did.

PENELOW - CROSS - BROWN

1    Q.   You never returned to J&J.

2         Correct?

3    A.   Correct.

4    Q.   And there were multiple attempts by the company to

5    contact you.

6         Right, ma'am?

7    A.   I received a letter stating so.

8    Q.   Okay.

9         And you didn't respond.

10        Correct?

11   A.   I did respond.

12        MS. BROWN:  Let's take a look at tab 26.

13        Permission to admit D-8987.

14        You know what, I'll just do it without it.  I don't

15   need the document.  It's okay.

16        I'll just ask a few questions about this.  No worries.

17   BY MS. BROWN:

18   Q.   Do you recall, Ms. Penelow, the company made multiple

19   attempts to contact you to see if you would want to return to

20   work following your leave?

21   A.   Yes, I do.

22   Q.   Okay.

23        And you were not responsive to those contacts by

24   Janssen.

25        Do you recall?

PENELOW - CROSS - BROWN

1  A.   No.  I spoke with Megan many times.

2  Q.   Okay.

3       And ultimately, you made the decision not to return to

4  Janssen.

5       Correct, ma'am?

6  A.   No, I did not make that decision.

7  Q.   Okay.

8       When the company heard that you had not responded, it

9  determined that you didn't want to come back.

10      Correct, ma'am?

11 A.   In that same letter, it references my response.

12 Q.   Okay.

13      Well, let me find counsel a copy so we can take a look

14 at it, then.

15 A.   Okay.

16 Q.   Hang on one second.

17      THE COURT:  Ms. Brown, is this a good place to stop?

18 Only because you can address this after the lunch break and

19 make sure that Mr. Russ has a copy.

20      MS. BROWN:  Absolutely, Your Honor.

21      THE COURT:  All right.  Folks, we're going to break

22 for lunch.  Let's have the jurors step out, and we'll go from

23 there.

24      (Luncheon recess was taken form 12:30 p.m. until

25 1:12 p.m.)

PENELOW - CROSS - BROWN

1          THE COURT:  Should we get Ms. Penelow?

2      Do you mind just coming back into the witness box?

3      Kim, do you want to see if the jurors are done with

4  lunch?

5          THE DEPUTY COURT CLERK:  Sure.

6          All rise.

7          (Jury enters the courtroom.)

8          THE COURT:  Folks, everybody be seated.

9      I hope everyone enjoyed their lunch from the jury.  We

10  are going to continue with the cross-examination.

11          And, Ms. Penelow, just a reminder, you are still under

12  oath from earlier today.

13          THE WITNESS:  Thank you, Judge.

14          THE COURT:  And, Ms. Brown, are you ready to proceed?

15          MS. BROWN:  I sure am.  Thank you, Your Honor.

16  BY MS. BROWN:

17  Q.  Welcome back, Ms. Penelow.

18  A.  Thank you.

19          MS. BROWN:  Welcome back, jurors.

20  BY MS. BROWN:

21  Q.  We're almost at the end here, ma'am.  I just want to wrap

22  up what we were discussing.

23          When we left off, we had reviewed some of those emails

24  from early 2012 when you were having a dispute with

25  Mr. Dolisi.

PENELOW - CROSS - BROWN

1        Do you recall that, ma'am?

2   A.   Yes.

3   Q.   Okay.

4        And ultimately, you went on some leave throughout 2012.

5        Correct, ma'am?

6   A.   I did.

7   Q.   All right.

8        And I want to -- you had referenced a letter.  When you

9   went on that leave at the end of 2012, in the end, you didn't

10  return to Janssen.

11       Correct?

12  A.   Correct.  My doctor wouldn't let me return.

13  Q.   And let's take a look at -- just for you to see if I can

14  refresh you on some of those details.

15  A.   Okay.

16           MS. BROWN:  And just for counsel, please, and the

17  witness.

18  BY MS. BROWN:

19  Q.   I want to show you what I think is the letter you were

20  referencing.  It's up on the screen.

21  A.   I don't have it.

22  Q.   I'm going to get it to you.  I just want to be mindful of

23  the screen behind you.

24  A.   Oh, okay.

25           MS. BROWN:  Your Honor, if I can approach and just

─────── PENELOW - CROSS - BROWN ───────

1  give Ms. Penelow a copy.  Counsel has a copy.  I can give the

2  Court a copy.

3          THE COURT:  I think that's fine.

4          MS. BROWN:  Okay.  Thank you.

5          THE COURT:  Mr. Russ, do you have a copy, she said?

6          MR. RUSS:  I do, Your Honor.

7          THE COURT:  All right.  Sorry, Ms. Brown.

8          MS. BROWN:  Does the Court want a copy?  I have an

9  extra one.

10          THE COURT:  Then I'll take it.

11          MS. BROWN:  Yep.

12  BY MS. BROWN:

13  Q.  And, Ms. Penelow, I'm showing you a letter that you

14  received from Janssen in 2013.

15          Do you see that, ma'am?

16  A.  Yes, I do.

17  Q.  And you can take a second to take a look at it, but I

18  want to ask you if that refreshes your recollection about

19  Janssen -- actually, it was Ms. McGrath -- reaching out to you

20  in May of 2013.

21  A.  Yes.

22  Q.  All right.

23          And one of the things that Ms. McGrath informed you

24  about at that time was sort of a summary of what had happened

25  over the past, you know, six months or so.

PENELOW - CROSS - BROWN

1          Correct?

2    A.   If you don't mind, if I can just read it real quickly?

3    Q.   Absolutely, ma'am.

4    A.   Okay.

5    Q.   Good?

6    A.   Yes.

7    Q.   All right.

8          And one of the things Ms. McGrath informed you about

9    was that you had been on medical leave from November of 2012

10   to May of 2013.

11         Correct, ma'am?

12   A.   Correct.

13   Q.   And just to orient us, when we started out, we looked at

14   a videotape that you made, or a recording you made, of that

15   meeting with Ms. McGrath, right, in November of 2012.

16         Correct?

17   A.   Yes.

18   Q.   And so shortly after doing -- making that video or making

19   that recording, you went out on leave.

20         Correct?

21   A.   I did.

22   Q.   Okay.

23         And did you make that recording for purposes of use in

24   a lawsuit?

25   A.   No.  I just made that recording so that I would be

PENELOW - CROSS - BROWN

1  believed.

2  Q.   Where were you planning on having to prove that you were

3  believable?

4  A.   Well, we were already working on the lawsuit.

5  Q.   Right.  So that was my question.

6       When you made the secret recording, were you intending

7  to use it in a lawsuit?

8  A.   Possibly.

9  Q.   Okay.

10      But the lawsuit that you were intending to file at the

11 time, it wasn't this lawsuit.

12      Right?

13 A.   Yes, it was this lawsuit.

14 Q.   Okay.

15      The lawsuit that you were intending to file at the time

16 was actually like an employment lawsuit.

17      Right?

18 A.   There was some employment issues as well, but I was not

19 going to file an employment lawsuit.

20 Q.   Because one of the things you talked about a couple of

21 times in that recording was the term "hostile work

22 environment."

23      Do you remember that, ma'am?

24 A.   Correct.

25 Q.   And one of the things Ms. Brancaccio sent to you was

PENELOW - CROSS - BROWN

1    information about how to resolve employment disputes.

2          Do you remember that, ma'am?

3    A.   Yes, I do.

4    Q.   Okay.

5          And so what you were doing when you made that secret

6    recording was try and collect evidence for the lawsuit you

7    intended to file.

8          Correct?

9    A.   Yes.

10   Q.   And while you were trying to collect evidence, you knew

11   that you were being recorded.

12         Right, ma'am?

13   A.   Yes, I did.

14   Q.   And, yet, you never made any statements about off-label

15   promotion.

16         Correct?

17   A.   No, it never did come up.

18   Q.   Okay.

19         So getting back to this letter, Ms. McGrath informed

20   you about the company's efforts in May of 2013 to contact you

21   several times.

22         Right, ma'am?

23   A.   Yes.  It says they sent me a letter dated 5/20, correct.

24   Q.   Right.

25         And you had responded by email.

PENELOW - CROSS - BROWN

1          Correct?

2    A.    I did.

3    Q.    But didn't indicate that you intended to return.

4          Correct?

5    A.    About two lines above that it says that my health care

6    provider would not allow me to return.

7              THE COURT:  Sorry, folks, if we're going to read it,

8    are you going to move to admit it?  Has this been admitted?

9              MS. BROWN:  It has not.  Is there any objection --

10             THE COURT:  Because the witness is reading off the

11   document, so it's got to be one or the other.

12             MR. RUSS:  No objection, Judge.

13             THE COURT:  It's admitted, then.  Now it might be

14   easier.

15             MS. BROWN:  Yeah.  Thank you.  I appreciate it,

16   Your Honor.

17             THE WITNESS:  Okay.  Better.

18   (Defendants' Exhibit D-8987 in evidence.)

19   BY MS. BROWN:

20   Q.    Okay.

21         So we have moved to admit, and the Court has accepted,

22   D-8987, which is the letter from Janssen.  And, ma'am, I'm

23   just going to -- I don't want your personal address on here so

24   just give me one second.  Okay.

25         So this is a letter that you received in May of 2013.

PENELOW - CROSS - BROWN

1    And as we were discussing, it noted that you had been on STD,

2    short-term disability.

3         Right?

4    A.   Correct.

5    Q.   For that time period.

6         And you had exhausted those benefits and were denied

7    long-term disability.

8         Correct?

9    A.   Correct.

10   Q.   And that the company attempted to contact you on multiple

11   occasions since May 9th.

12        Do you see that?

13   A.   I do.

14   Q.   To determine whether you'd be returning to work.

15        Right?

16   A.   Correct.

17   Q.   And they did receive one email response from you on

18   May 23rd.

19        Correct?

20   A.   Yes, I did respond.

21   Q.   But it did not indicate your intentions to return to work

22   or obtain medical documentation.

23        Correct?

24   A.   That is not correct.  My provider did provide

25   documentation.

PENELOW - CROSS - BROWN

1    Q.   I understand that, ma'am, and maybe your counsel will

2    show you that on his questioning, but this is the document I

3    have.

4    A.   Yes, that's what it says.

5    Q.   All right.

6         And per company policy, because you didn't return to

7    work three business days after your approved time off, the

8    company determined you had voluntarily resigned.

9         Do you see that, ma'am?

10   A.   Yes, I do.

11   Q.   Okay.

12        And you did not ever return to work at Janssen after

13   this time.

14   A.   No, I did not.

15   Q.   Okay.

16        And you considered filing an employment lawsuit against

17   Janssen.

18        Correct, ma'am?

19   A.   No, I did not.

20   Q.   Okay.

21        One of the things you did in connection with this

22   lawsuit is have some correspondence with a Mr. Joe Holshoe.

23        Do you recall that?

24   A.   Just on LinkedIn.

25   Q.   On LinkedIn.

PENELOW - CROSS - BROWN

1           Right, ma'am?

2    A.   Uh-huh.

3           MS. BROWN:  Okay.  Your Honor, permission to admit

4    tab 86, D-6049.

5           MR. RUSS:  No objection.

6           THE COURT:  All right.  So admitted.

7    (Defendants' Exhibit D-6049 in evidence.)

8    BY MS. BROWN:

9    Q.   So Mr. Holshoe is actually one of the people that you

10   worked with at Janssen.

11          Correct?

12   A.   Yes, he was.

13   Q.   And he's someone who your lawyers reached out to try and

14   get a statement in support of your case.

15          Correct?

16   A.   Correct.

17   Q.   Incidentally, do you know how many people were contacted

18   to try and get support for your allegations?

19   A.   I don't know exactly, but I did give a long list.

20   Q.   You gave a long list of people?

21   A.   Uh-huh.

22   Q.   Like, 50 people or so?

23   A.   Not that many.  Maybe 25.

24   Q.   25 people, okay.

25          How did you identify the 25 people that you thought

PENELOW - CROSS - BROWN

1  should be asked to support these allegations?

2         MR. RUSS:  Objection, Your Honor.  Privilege.  Move

3  to strike.

4         THE COURT:  I'll sustain the objection and strike the

5  question.

6      If you want to rephrase it in a different way, but I'm

7  going to sustain the objection and strike it.

8         MS. BROWN:  Sure.

9  BY MS. BROWN:

10 Q.  In connection with this lawsuit, Ms. Penelow, I

11 understand you thought there were about 25 people who would

12 support your claims.

13     Is that fair?

14 A.  I just gave the 25 people that I had had discussions

15 with.

16 Q.  And I don't want to --

17        MR. RUSS:  Objection, Your Honor.  Privilege.  I want

18 to make sure this doesn't get into privilege of what

19 Ms. Penelow gave her attorneys.

20        THE COURT:  I'm going to sustain the objection again.

21     Ms. Brown, where are we going with this?  Do you want

22 to sidebar this issue?

23        MS. BROWN:  Yeah.

24        THE COURT:  All right.  Let me see you and Mr. Russ

25 so we can clear this up.

PENELOW - CROSS - BROWN

```
 1              (Sidebar begins at 1:22 p.m.)

 2         THE COURT:  Okay.  Where are we going with this?

 3         MS. BROWN:  This is the only point I want,

 4    Your Honor, is they have a very limited number of people

 5    coming in to support their claims, and we know from deposition

 6    testimony that -- and people called us -- a bunch of other

 7    people were contacted.  And it sounds like she had 25 people

 8    in mind who she thought would support their -- her case, and I

 9    just want to establish they're not --

10         THE COURT:  All right.  Her having an understanding

11    of that or a knowledge that there's 25 people or so that

12    should be contacted regarding the case and they're not all

13    here, that, I would allow.

14         But I want to be careful about what she's providing to

15    the lawyers, what advice the lawyers are giving her as far as

16    who to contact.

17         MS. BROWN:  I'll just keep the questions to you made

18    a list of 25 people you thought would support your case,

19    and --

20         THE COURT:  But isn't that list at the request of her

21    counsel?

22         MS. BROWN:  Well, I don't know that, Your Honor.  I

23    mean, she said, I thought there were 25 people who would

24    support my case.

25         MR. RUSS:  I'm fairly certain -- and you can ask her,
```

PENELOW - CROSS - BROWN

1    and there may be a way to do this -- but that was at the

2    request of counsel.  I don't know a hundred percent, Judge,

3    but I know that counsel was reaching out to witnesses.  So it

4    would make sense.

5            MS. BROWN:  But here's the issue that is

6    discoverable, for example, is this document.  So this is her

7    reaching out to one of the people on the list to try and get

8    them to support her case.

9        So we have sort of this issue is out there, and I want

10   to question how many other people were reached out to who

11   said, I don't believe this.

12           MR. RUSS:  But if she learned that information

13   through her attorneys, it's privilege.  This is not --

14           THE COURT:  Is this one of these emails -- I haven't

15   even looked at it.  Is that an email where she's seeking a

16   declaration from somebody?

17           MS. BROWN:  Correct.

18           THE COURT:  We've got -- but this issue has been

19   addressed before?

20           MR. RUSS:  This one is fine, Judge.

21           THE COURT:  No, no, I'm not saying that.  I'm saying

22   the issue of -- okay.  You've got a declaration here, but all

23   these other folks -- we had a list, for example.  Here's all

24   the people that work in New York and all of this.

25       I don't know if it was a demonstrative or what it was.

PENELOW - CROSS - BROWN

1    You got no declarations from these people, right?

2          MS. BROWN:  Right.

3          MR. RUSS:  Totally fine, Judge.  She's asking who did

4    you give -- I know she's not framing it this way, but I'm

5    afraid it's going to get into attorney -- who did you tell

6    your attorneys to contact?

7          THE COURT:  That you can't say.

8          MS. BROWN:  I absolutely don't want to say that.

9          THE COURT:  But you can say, In your mind, you

10   thought you had 25 people --

11         MS. BROWN:  That's what I want to say.

12         THE COURT:  -- that should be reached out to.

13         MS. BROWN:  Correct.

14         THE COURT:  So can you limit it in a way that she

15   understands that it's about her knowledge?

16         MS. BROWN:  Can I just say that I don't want to know

17   anything you talked to your lawyers about, I just want to

18   know in your mind --

19         THE COURT:  Yes.

20         MS. BROWN:  -- who were the people --

21         MR. RUSS:  And I think she already said that, so

22   that's fine.

23         THE COURT:  Okay.  I'm good with that.  But maybe use

24   that preface, Ms. Brown.

25         MS. BROWN:  I'll preface it.  Yeah.  Of course.  Of

─────PENELOW - CROSS - BROWN─────

1    course.  Thank you.

2            (Sidebar was concluded at 1:25 p.m.)

3            (Open court.)

4             MS. BROWN:  May I proceed, Your Honor?

5            THE COURT:  You may.

6    BY MS. BROWN:

7    Q.   Ms. Penelow, I'm not entitled to know, and I don't want

8    to know anything that you talked to your lawyers about.

9        Okay?

10   A.   Okay.

11   Q.   Do you understand that?

12   A.   Yes.

13   Q.   So my question is really just asking for your testimony

14   and your knowledge.

15       Is that fair?

16   A.   Yes.

17   Q.   Okay.

18       So in connection with your case -- and we are going to

19   look at this document in a second -- one of the things you did

20   was correspond with people who were writing declarations for

21   your case.

22       Correct?

23   A.   Not to my knowledge.

24   Q.   We're going to look at this document in a second, and

25   maybe that will refresh you.

PENELOW - CROSS - BROWN

1          Okay?

2    A.   Okay.

3    Q.   And, again, not telling me what you discussed with your

4    lawyers, but in your mind, there were a list of a number of

5    people who you thought would support your case.

6          Correct?

7    A.   I had no idea if they would support my case.

8    Q.   Okay.

9          There were a list of certain people you believe would

10   have information relevant to the issues in the case.

11         Correct?

12   A.   Relevant to what I had told them.

13   Q.   Do you remember some of the people on that list?

14   A.   Probably some, yes.

15   Q.   Okay.

16         Who can you remember for me, ma'am?

17   A.   Russ Moyer, Lisa Cruz, Nancy Peterson, Joanne Cesserio,

18   Yvonne Wind-Vazquez, Jeanite Holloway.

19         That's about all I can remember right now.

20   Q.   What about Mr. McSherry?

21   A.   Did I give -- I'm sorry.  Ask the question again, please.

22   Q.   In your mind, was Mr. McSherry somebody who would have

23   knowledge relevant to these issues?

24   A.   He would have knowledge, yes.

25   Q.   All right.

PENELOW - CROSS - BROWN

1          And what about Ms. Bartnett?  Would she have knowledge?

2   A.   She would have knowledge.

3   Q.   And Mr. Dolisi, would he have knowledge?

4   A.   He would have knowledge.

5   Q.   And Mr. Murphy, would he have knowledge?

6   A.   He would have knowledge.

7   Q.   Angel Edwards, the HCC person for your district, would

8   she have knowledge?

9   A.   She would.

10  Q.   Okay.

11          And as far as you know, ma'am, none of the folks that

12  you listed or I asked you about have signed declarations to

13  support your case.

14          Correct?

15  A.   As far as I know.

16  Q.   Okay.

17          And let's talk about someone you did -- a Mr. Joseph

18  Holshoe.  You and Mr. Holshoe corresponded on LinkedIn a

19  little bit.

20          Do you recall that?

21  A.   Yes, I do.

22  Q.   All right.

23          And it starts out -- and this is in May of 2008.

24          Do you see that?

25  A.   2018.

PENELOW - CROSS - BROWN

1  Q.   I'm sorry.  Thank you.  2018.

2  A.   You're welcome.

3  Q.   And he says, "Jess, was contacted by the law firm

4  representing you and Christine."

5       I think he meant to say, "gave them an earful about old

6  Tibotec."

7       Do you see that?

8  A.   I do.

9  Q.   And he said that he hoped it would help.

10      Right?

11 A.   Yes.

12 Q.   Then sort of, you know, How are you, what's going on.

13      Right?

14 A.   Correct.

15 Q.   Okay.

16      And one of the things -- there's a little back and

17 forth about your families and things like that.

18      Right?

19 A.   Yes.

20 Q.   And then when he says, after, I guess, telling you he --

21 it looks like at the time he was living in Alaska?

22 A.   Yes.

23 Q.   All right.

24      And he tells you you're always welcome to visit him in

25 Alaska.

PENELOW - REDIRECT - RUSS

1          Right?

2    A.    He does.

3    Q.    All right.

4          And then he says, "good luck in the case."

5          True?

6    A.    True.

7    Q.    "I really hope Tibotec gets what it deserves."

8          Right?

9    A.    Yes.

10   Q.    Mr. Holshoe had kind of a bad taste in his mouth about

11   Tibotec.

12         Fair?

13   A.    Fair.

14   Q.    All right.

15         Ma'am, I have no further questions.  Thanks so much for

16   answering my questions.

17   A.    Thank you.

18         THE COURT:  Thank you, Ms. Brown.

19         Mr. Russ, any redirect?

20         MR. RUSS:  Yes, Your Honor.

21   (REDIRECT EXAMINATION BY MR. RUSS:)

22   Q.    Ms. Penelow, good afternoon.

23   A.    Good afternoon.

24   Q.    You've been waiting 12 years since you filed your lawsuit

25   and 18 years in total to be in that witness box?

PENELOW - REDIRECT - RUSS

```
 1   A.   Yes, I have.

 2   Q.   Just to be clear, Ms. Penelow, do you understand what

 3   type of lawsuit you have filed here?

 4   A.   Yes.

 5   Q.   A False Claims Act lawsuit?

 6   A.   Yes.

 7   Q.   It's not an employment suit, is it?

 8   A.   No, it's not.

 9   Q.   Have you alleged any personal claims in this lawsuit on

10   behalf of you?

11   A.   Can you rephrase the question?

12   Q.   Are you alleging -- are you bringing this lawsuit on

13   behalf of the Government or on behalf of yourself?

14   A.   On behalf of the Government.

15   Q.   It's not an employment suit as to anything that happened

16   in your employment as to your situation?

17   A.   No.

18   Q.   There was discussion about the 60/40 split with you and

19   Ms. Brancaccio?

20   A.   Yes.

21   Q.   Do you remember that?

22        The jury in this case, you understand, is going to be

23   deciding how much money to return back to the Government.

24   A.   Yes.

25   Q.   When we were talking about your work performance --
```

PENELOW - REDIRECT - RUSS

1   Ms. Brown asked you some questions about your work

2   performance.  You told us at some point you wanted to go to

3   Ethicon?

4   A.   Yes.

5   Q.   What was Ethicon?

6   A.   They sold sutures, stitches.

7   Q.   Was it a J&J company?

8   A.   It was.

9   Q.   So were you trying to leave Tibotec, Johnson & Johnson,

10  the family of companies, or were you trying to get out from

11  under Mr. Dolisi?

12  A.   I was trying to get out from underneath Mr. Dolisi.

13  Q.   You brought this case, Ms. Penelow, because it's about

14  off-label marketing kickbacks.

15       Right?

16  A.   Yes, it is.

17  Q.   Do you recall any questions being asked of you by

18  Janssen's counsel about the conduct that Janssen was engaged

19  in compared to whether or not you reported it?

20  A.   Yes.

21  Q.   Right?

22  A.   Yes.

23  Q.   Was the focus on whether or not you actually reported

24  this conduct?

25  A.   Yes.

PENELOW - REDIRECT - RUSS

1  Q.   Did you report it?

2  A.   Yes, I did.

3  Q.   I'm not going to make you list out all the other people

4  that you talked about with me, but give some of the names

5  of -- some of the years that you reported what you were

6  seeing.

7  A.   I started out in 2006 reporting it to Frank Murphy,

8  Nancy Bartnett, and Tim McSherry.  When I received Tony as a

9  manager I reported it to Tony, my direct supervisor.  I

10 reported it to Nancy again, and I reported it to Tim again,

11 and Eric Sherr, who was the access and reimbursement manager.

12 Q.   You were deposed in this case in 2019?

13 A.   I was.

14 Q.   So seven years after you file the lawsuit?

15 A.   Yes.

16 Q.   Did you tell Janssen all those same people at that

17 deposition?

18 A.   Yes, I did.

19 Q.   You've been saying that for a while, haven't you?

20 A.   I've been saying it for -- since the beginning.

21 Q.   Were you here -- I think you said you were -- when

22 Mr. Iacobellis testified?

23 A.   I was.

24 Q.   And you were here when Mr. Mattes testified?

25 A.   I was.

PENELOW - REDIRECT - RUSS

1  Q.  Do you recall Mr. Mattes, again, saying it was

2  probably -- he was probably alerted to off-label marketing in

3  the field?

4  A.  Yes.

5  Q.  He couldn't remember.

6       Were you here when Mr. Marketos put the credo in front

7  of Mr. Mattes and asked him questions about it?

8  A.  I was.

9  Q.  Do you recall, when the questions were asked about

10  mistakes made, when Mr. Marketos asked, if this conduct had

11  occurred, would you expect Janssen to make it right?

12  A.  Yes.

13  Q.  And he said, I don't know how to answer that.

14  A.  Yes.

15  Q.  12 years into this process, have you taken the stand and

16  admitted your role in this and what you did?

17  A.  I have.

18  Q.  Under oath?

19  A.  Under oath.

20  Q.  During that 12-year process, Ms. Penelow, there's been a

21  lot of discovery and a lot of interrogatories and requests for

22  admissions and documents and maybe millions of pages of

23  documents exchanged.

24       Fair?

25  A.  Very fair.

PENELOW - REDIRECT - RUSS

1   Q.   I want to show you the request for admissions that you

2   talked about with Ms. Brown.

3        Do you remember that?

4   A.   Yes, I do.

5        MR. RUSS:  If I could have the ELMO, please.

6   BY MR. RUSS:

7   Q.   Ms. Penelow, I'm first going to show you the last page.

8   You see that there were 78 requests for admissions?

9   A.   Yes, I do.

10  Q.   You see that there were 21 pages of them?

11  A.   Yes, I do.

12  Q.   Okay.

13       And Ms. Brown, I believe, showed you one.  Do you

14  remember that?

15  A.   I do remember.

16  Q.   Okay.

17       Well, let's take a look at some of the other requests

18  for admission.  In particular, let's start with number 4.

19       You see that?

20  A.   Yes.

21  Q.   "Admit that while you were employed as a sales specialist

22  during the relevant period" -- remind us when you were

23  employed.

24  A.   2006 to 2013.

25  Q.   -- "defendants' policies relating to speaker programs,

PENELOW - REDIRECT - RUSS

1  which the sales organization was required to follow, required

2  the field-based employee, who scheduled the event, to report

3  speaker violations of Defendants' policies."

4      Do you see that?

5  A.   Yes.

6  Q.   And you admitted that?

7  A.   Yes.

8  Q.   What were the field-based employees scheduling events

9  supposed to provide under the speaker policy?

10 A.   We were supposed to provide a signed -- I'm not sure

11 exactly what you're asking.

12 Q.   Was there a speaker evaluation form?

13 A.   Evaluation form is a good way to put it, yes.

14 Q.   Tell the jury about the speaker evaluation forms.

15 A.   At the end of the program, a third-party vendor had sent

16 us at-home evaluation forms to fill out on the programs, to

17 tell you how it went, what messages were spoken, and was

18 everything on-label.

19 Q.   So they had a policy that required those to be filled

20 out.

21      Right?

22 A.   Yes.

23 Q.   The next RFA is one Ms. Brown showed you, right, the very

24 next one, number 5.  "Admit that, throughout the relevant time

25 period, you did not report any speaker policy violations."

PENELOW - REDIRECT - RUSS

1      Do you see that?

2  A.   Yes, I do.

3  Q.   So the policy, Ms. Penelow, required you to put into the

4  evaluation form that there was a violation.

5  A.   Yes.

6  Q.   Right?

7  A.   Yes.

8  Q.   So when you admitted that, is that true?  Did you not in

9  that evaluation report a speaker policy evaluation after a

10  speaker program?

11  A.   I did not.

12  Q.   Okay.

13      But Ms. Brown also asked you, when she showed that you,

14  about whether -- let me back up.

15      When she asked you that, do you remember her asking it

16  in the sense Did you ever tell anybody about violations?

17  A.   Yes.

18  Q.   Did you understand that you were referring to the speaker

19  evaluation forms that were in the question right before it?

20  A.   Yes.

21  Q.   Okay.

22      Because in fact, in these 21 pages, there's one,

23  number 73 -- do you see that?

24  A.   Yes.

25  Q.   "Admit that you never reported any known or suspected

1    violations of law or company policy to Defendants' employee

2    hotline, employee website, or to your supervisor."

3          Do you see that?

4    A.    Yes.

5    Q.    Broader question.

6          Right?

7    A.    Absolutely.

8    Q.    What did you say?  "Denied."  You reported to the

9    company's human resource personnel about the company's

10   off-label marketing that occurred regarding Prezista and

11   Intelence and the company's payments of kickbacks to doctors.

12         Do you see that?

13   A.    Yes.

14   Q.    So when we looked at the RFA that Ms. Brown showed you,

15   she didn't show you number 73, did she?

16   A.    She did not.

17   Q.    So you did report concerns about the kickbacks to doctors

18   to your supervisors?

19   A.    I did.

20   Q.    And to human resources?

21   A.    I did.

22   Q.    You didn't fill it out on the speaker evaluation form.

23   A.    I didn't.

24   Q.    So you told the truth?

25   A.    I told the truth.

PENELOW - REDIRECT - RUSS

1   Q.   Better yet, better than 73, you reported it to the

2   Government?

3   A.   I did report it to the Government.

4   Q.   Anything wrong with reporting it to the Government?

5   A.   No.  I thought that was the best way to handle it.

6   Q.   We've got a lot of questions in this lawsuit about your

7   lawyers.

8   A.   Yes.

9   Q.   These lawyers here, Ms. Clairmont in the back, Ms. Sherry

10  Savett.

11       You heard those questions?

12  A.   I have heard those questions.

13  Q.   Let's take a look at Defendants' 6028, which is in

14  evidence.

15       We've seen this one a few times, haven't we,

16  Ms. Penelow?

17  A.   Yes, we have.

18  Q.   Okay.

19       And we're seeing it because you sent it to your mom?

20  A.   Yes.

21  Q.   All right.

22       Let's take a look at the dinner program and speaker

23  programs Ms. Brown likes to ask our witnesses about.

24          MS. BROWN:  Judge, I object to that question.

25          THE COURT:  Yeah, I'm going to sustain it.

PENELOW - REDIRECT - RUSS

1   BY MR. RUSS:

2   Q.   Let's take a look at number 3, on the dinner programs and

3   the speaker programs.

4         Do you see that?

5   A.   Yes, I do.

6   Q.   This is from Ms. Joy Clairmont?  This email is from

7   Joy Clairmont?

8   A.   It is from Joy Clairmont.

9   Q.   What do you think of Joy Clairmont?

10  A.   I think she's a wonderful human being.

11  Q.   Pretty good attorney?

12  A.   Great attorney.

13  Q.   The one area that's a point which still needs work, so

14  there was a draft complaint already.

15        Right?

16  A.   Yes.

17  Q.   Ms. Clairmont is saying, "We want to get this right.

18  Brief description of dinner speakers, number of attendees,

19  health care providers only in audience, fancy restaurant

20  location.  Impermissible reasons for speaker selection,"

21  right?  "High prescribers."

22        Anything -- anything wrong with asking for evidence of

23  misconduct?

24  A.   Not from my perspective, nothing wrong with it.

25  Q.   Okay.

PENELOW - REDIRECT - RUSS

```
 1          If you zoom out, that's not the first thing
 2   Ms. Clairmont was writing about, was it?
 3   A.   No, it's not.
 4   Q.   She actually says on number 1 -- what did she say there?
 5   A.   "Read for accuracy and completeness."
 6   Q.   "If we've gotten any facts wrong or omitted anything
 7   important, please let us know."
 8          You see that?
 9   A.   Yes, I do.
10   Q.   She's asking for your comments.
11          What is she asking for from you, Ms. Penelow?
12   A.   She was trying to gather information about all the claims
13   that I had told her about.
14   Q.   Any information or accurate or complete information?
15   A.   No, accurate and complete information.
16   Q.   "Fill in the blanks if you're able to."
17          Do you see that?
18   A.   Yes.
19   Q.   Anything wrong with Ms. Clairmont trying to be accurate
20   and complete in a lawsuit?
21   A.   No, I think her intention was to be thorough.
22   Q.   Okay.
23          "If you know the answer, please fill it in."
24          She's asking, Do you know the answer to this?
25   A.   Correct.
```

PENELOW - REDIRECT - RUSS

1  Q.   Okay.

2       And on the dinner speaker programs, on number 3 --

3  again, not the first thing she put on her email -- she's

4  asking for details, facts.

5       Right?

6       Anything wrong with that?

7  A.   No.  I looked at it as information that I was gathering

8  for my case.

9  Q.   And you have provided some of this information or raised

10 concerns about some of that information already in your

11 employment?

12 A.   Yes, I have.

13 Q.   I want to talk to you about this meeting with

14 Megan McGrath.  Remind the jury who Ms. McGrath was?

15 A.   Ms. McGrath was a member of human resources in the home

16 office in New Jersey.

17 Q.   We had some questions this morning, Ms. Penelow, about an

18 errata sheet or an errata sheet, depending on maybe where in

19 the country you're from.

20 A.   Right.

21 Q.   Right?

22 A.   Yes.

23 Q.   Had you ever been deposed before?

24 A.   No.

25 Q.   Do you understand that an errata sheet is a normal

1  process for correcting any testimony that may not be accurate

2  in a deposition?

3  A.   I do now.

4  Q.   How long was your deposition?

5  A.   Seven, eight hours.

6  Q.   Okay.

7       And like the email we saw for Ms. Clairmont where she

8  wanted you to be truthful and accurate, did you want your

9  testimony to be represented truthfully and accurately?

10 A.   Absolutely.

11 Q.   So you get a copy of your transcript.

12      Right?

13      Did you read it?

14 A.   I did.

15 Q.   Did you read it for truthfulness?

16 A.   I did.

17 Q.   Did you read it for accuracy?

18 A.   I absolutely did.

19 Q.   And when you did that, did you see some things that you

20 thought needed to be corrected?

21 A.   Yes, I did.

22 Q.   And within a month or two, did you correct them?

23 A.   I did correct them.

24 Q.   So for five years, Janssen's known that you corrected

25 that information.

PENELOW - REDIRECT - RUSS

1    A.    Yes, they have.

2    Q.    2019, you corrected it?

3    A.    I did.

4    Q.    But, in fact, there's some confusion, I think, over how

5    many times you met or called Ms. McGrath.

6    A.    Yes.

7    Q.    Explain to the jury how many times you spoke with

8    Ms. McGrath on the phone.

9    A.    I went on disability at the beginning of 2012, and that

10   was my first conversation with her, and our conversations

11   continued until the end of the year of 2012.  So we had

12   multiple conversations, possibly up to ten.

13   Q.    So when we were talking, Ms. Penelow, this morning and a

14   little bit yesterday late afternoon, you were explaining for

15   the Court and for the jury some of the concerns that you had

16   raised and some of the people you raised those to.

17   A.    Yes, I did.

18   Q.    Did that include Ms. McGrath?

19   A.    Yes.

20   Q.    Was that over time?

21   A.    Yes.

22   Q.    At some -- let me orient us.  The meeting you had with

23   Ms. McGrath that you recorded, right --

24   A.    Yes.

25   Q.    -- you had already contacted lawyers to file a False

PENELOW - REDIRECT - RUSS

1   Claims Act lawsuit?

2   A.   I did.

3   Q.   Months before?

4   A.   Months before, in March.

5   Q.   And, in fact, that meeting was about a month before you

6   filed that lawsuit?

7   A.   Yes, it was.

8   Q.   Okay.

9        So -- and how long did you get back to the company on

10  that stint before you went out on leave and before the company

11  sent you letters saying that you were no longer going to be

12  employed?

13  A.   Can you ask me that one more time?

14  Q.   Yeah.

15       How long did you go back, when you had this meeting?

16  Was it in the two-week period?

17  A.   Okay.  It was in the two-week period before I went -- had

18  to go back out on disability.

19  Q.   In 2012.

20  A.   In 2012.

21  Q.   Okay.

22       So earlier in 2012, or maybe in 2011, you let us know,

23  had you called Ms. McGrath to explain to her what's happening

24  with Tony Dolisi and what's happening with the off-label

25  marketing?

PENELOW - REDIRECT - RUSS

1  A.   Yes.  I told her everything.

2  Q.   All right.

3       Explain to the jury that phone call.

4  A.   I made the phone call to HR because I wasn't getting

5  anywhere going to my direct superiors, Tony Dolisi,

6  Nancy Bartnett, and Tim McSherry.  My intention when making

7  the phone call was to let HR know of the things that were

8  going out in the field on the front lines.

9       I told her that unethical activities were going on,

10  that people were speaking off-label for Prezista and for

11  Intelence and I told her about the speaker programs; that we

12  were incentivizing the speakers to speak for prescriptions in

13  return.

14  Q.   What did she do, if anything?

15  A.   She did nothing.

16  Q.   So you come back from medical leave.  In November of

17  2012, you have a meeting with her that you did record.

18  A.   Yes.

19       MR. RUSS:  If we could, Ms. Johnson, play Clip

20  Number 4 for the jury.

21       (Video clip played at this time.)

22  BY MR. RUSS:

23  Q.   Did you hear you say, "You guys were aware of it.  I told

24  you"?

25  A.   Yes, I did.

PENELOW - REDIRECT - RUSS

1  Q.   You already told HR about these issues.

2  A.   Yes, I did.

3  Q.   And then at your deposition, seven years later, you

4  forgot what you recorded.

5  A.   That's right.

6  Q.   You forgot that you didn't record the phone call.

7  A.   That's right.

8  Q.   Is that fair?

9  A.   That's fair.

10 Q.   And when you found that out, you fixed your testimony.

11 A.   That's exactly what happened.

12 Q.   Okay.

13      Anything wrong that?

14 A.   I didn't see anything wrong with it.

15 Q.   You wanted to be truthful and accurate.

16 A.   I wanted to be as truthful as possible.

17 Q.   You didn't just not tell them that you were changing your

18 testimony.  You sent it to them and said, This is what

19 actually happened.

20      Right?

21 A.   Yes, I did.

22 Q.   Okay.

23      In that meeting, what were you feeling?  The one that

24 we just heard recorded.

25 A.   I remember very specifically how I was feeling because it

1    had been almost a year that my accusations had been ignored.

2    So I was very nervous about -- and I think we heard that

3    earlier on the recording.  I told her that I didn't know who

4    to trust, and that was because I had already told her about

5    what was going on in the field, and she did nothing about it.

6          So that's why I decided to tape the recording.

7    Q.   Were you frustrated?

8    A.   I was very frustrated.

9    Q.   Why?

10   A.   Because I had reported it to my higher-ups, which was the

11   right thing to do, to go to your direct supervisor with

12   off-label marketing and to go to HR with your accusations of

13   off-label marketing and speaker program activities, and it was

14   falling on deaf ears.  And people like Nancy and Eric were

15   begging me not to go to HR even before I went.

16         And I was being pushed by everyone in the district.

17   Tim McSherry told me that Tony told him that if I didn't get

18   on board that I would be fired.

19   Q.   Again, not an employment lawsuit here today.

20         Right?

21   A.   No.

22   Q.   Did you see the email that you visited with Ms. Brown

23   about Tony Dolisi getting upset that you went over his head?

24   A.   Yes.

25   Q.   Do you remember that?

PENELOW - REDIRECT - RUSS

1    A.    Yes.

2    Q.    Because you didn't want to write agendas for him?

3    A.    Yes.

4    Q.    Tell the jury what happened there.  Why was he upset that

5    you went over his head?

6    A.    I had no idea that was a rule of the organization, that

7    you weren't able to reach out to the higher-ups.  Usually it's

8    a very open -- in my experience, working in corporate America,

9    it's an open-door policy, and you can speak to whoever you

10   want, and especially asking for a mentorship and things of

11   that nature.

12        So I had no idea that Tony Dolisi was going to be angry

13   about that action.

14   Q.    Fair to say Tony Dolisi wasn't very open with the idea of

15   you going over his head?

16   A.    Was not a fan of it.

17   Q.    And had you told Tony Dolisi multiple times about the

18   things that you were seeing and pushing back on?

19   A.    For years.

20   Q.    And is he the one who said that you had a big mouth?

21   A.    He did say I had a big mouth.

22   Q.    Okay.

23        Do you remember the deposition clip that Ms. Brown

24   played where she was pushing on you on when you started

25   off-label marketing?  Was it 2006, 2007?

*3561*

PENELOW - REDIRECT - RUSS

1  A.   Yes.

2          MR. RUSS:  Let's go back to that clip, if we can.

3  And it's the depo clip, page 98, line 8 to 98, line 23.

4  BY MR. RUSS:

5  Q.   Ms. Penelow, at the top, do you recognize that question

6  that she played?

7          "Between 2006 and 2009, did you yourself engage in an

8  off-label promotion for Prezista or Intelence?"

9  A.   Yes.

10 Q.   And you answered, "I did."

11         Right?

12 A.   Yes.

13 Q.   2007 is between 2006 and 2009, is it not?

14 A.   Correct.  It is.

15 Q.   So anything inaccurate about your testimony that you

16 started in 2007?

17 A.   No.

18         MR. RUSS:  Thank you.  You can take that down.

19 BY MR. RUSS:

20 Q.   We had some discussion, too, on your cross about

21 percentages.  Do you recall that?  Was it 80 percent?  Was it

22 50 percent?

23 A.   Yes.

24 Q.   Okay.

25         Were those questions about how many times when you went

*United States District Court*
*District of New Jersey*

PENELOW - REDIRECT - RUSS

1  on sales calls that you would present off-label information to

2  a doctor?

3  A.   Yes.

4  Q.   And these were the same doctors that -- were they the

5  same doctors that you were visiting over and over?

6  A.   Yes.  It was almost ten years at that point I had been

7  calling on those same physicians.

8  Q.   And you were answering this in a deposition in 2019.

9       Right?

10  A.   Right.

11  Q.   Were you estimating back some 10 years, 15 years before

12  the rough percentage that you were presenting to doctors on

13  your sales calls how many times you would off-label market?

14  A.   Yes, I absolutely was.

15  Q.   Are you sure it wasn't 73 percent?

16  A.   I'm not sure.

17  Q.   Okay.

18       Well, are you sure that a hundred percent of the

19  doctors, not the number of calls, but a hundred percent of

20  doctors that you called on heard off-label messages?

21  A.   Yes, I am.

22  Q.   That's different.

23       Right?

24  A.   That is different.

25  Q.   Did all of your doctors hear it?

PENELOW - REDIRECT - RUSS

1    A.    Yes, they did.

2    Q.    And that didn't just come from you.  Who else did it come

3    from?

4    A.    Nancy Bartnett and Tony Dolisi.

5    Q.    You also got some questions, as Ms. Brancaccio did last

6    week, about Edurant and Complera.

7          Do you remember that?

8    A.    Yes, I did.

9    Q.    And I think you said, but you didn't elaborate, that

10   there was a different type of label for those drugs.

11   A.    That is correct.

12   Q.    Explain that to the jury, please.

13   A.    Edurant and Complera were very different than Prezista

14   and Intelence because they got the label that they hoped to

15   get from the FDA, so they were able to launch with a full

16   label.  So all patients were available for them to be

17   prescribing and promoting to.

18   Q.    Not the limited label that Prezista and Intelence had?

19   A.    Correct.  Not the limited label.

20   Q.    And that was towards the end of your time, 2012, I think?

21   A.    Yeah, it was the very end.

22   Q.    Mr. Mattes wasn't there anymore, was he?

23   A.    Mr. Mattes was not there anymore.

24   Q.    You think Janssen knew, when they were asking you

25   questions about Complera, that that was a wide label?

PENELOW - REDIRECT - RUSS

1   A.   Yes.

2   Q.   Okay.

3        We talked a little bit this morning, Ms. Penelow, when

4   you and I were visiting, about your friends.

5        Right?

6   A.   Yes.

7   Q.   The people that actually came forward under oath and

8   said, not only did I hear and see it, I did it.

9        Right?

10  A.   That's correct.

11  Q.   Is it more accurate to characterize them, not as your

12  friends, but as your former co-workers and connections that

13  you met almost all of them while you were at Janssen?

14  A.   They were all former colleagues.

15  Q.   There were some questions about whether or not you got

16  declarations from more than those people.

17       Right?

18  A.   Yes.

19  Q.   But you've testified -- and you understand your testimony

20  is evidence in this case?

21  A.   Yes, I do.

22  Q.   Okay.

23       You've testified the names of the people you reported

24  to, and you just shared some more with us.

25       Right?

PENELOW - REDIRECT - RUSS

1   A.   I did.

2   Q.   The same people that you had been telling Janssen in your

3   deposition.

4   A.   Yes.

5   Q.   Five years ago.

6        Do you know if there's anything stopping Janssen from

7   calling those people to testify in this case?

8   A.   I don't believe there is.

9   Q.   But we've called, remember, Mr. Mattes and

10  Mr. Iacobellis.  We heard from them.

11  A.   Yes.  Yes.

12  Q.   And we've heard from already Mr. Wilhelm.

13       Correct?

14  A.   Yes.

15  Q.   Ms. Strand, Ms. Graham, Ms. Brancaccio and now you.

16  A.   Yes.

17  Q.   Okay.

18       Did you think that you have to or need to call hundreds

19  of salespeople in this case?

20  A.   No, I didn't believe I had to.

21  Q.   Now, there's some questions about the documentation that

22  you turned over to the Government when you filed your False

23  Claims Act suit.

24       Do you recall that?

25  A.   Yes.

PENELOW - REDIRECT - RUSS

1   Q.   That was just the documentation, obviously, common sense,

2   that you had when you filed the suit.

3   A.   Correct.

4   Q.   And that was before, Ms. Penelow, this lawsuit went into

5   the discovery phase where Johnson & Johnson/Janssen provided

6   hundreds of thousands if not millions of pages of documents.

7        Right?

8   A.   Yes.

9   Q.   And some of those documents you had never seen before.

10  A.   That is true.

11  Q.   Is it fair to say many of them?

12  A.   That is true.

13  Q.   And we've seen a lot in the last three weeks, haven't we?

14  A.   We have.

15  Q.   Tell the jury some of the ones that you saw that you had

16  never seen before.

17  A.   A lot of the ones from Glenn Mattes, Ben Kozub,

18  Mark Wilhelm, a lot of the upper management emails I was not

19  privy to.

20  Q.   On the whole 60/40 split that we've heard about with you

21  and Ms. Brancaccio, again, is it your understanding that the

22  Government and taxpayers are getting -- recovering in this

23  case?

24  A.   Yes, it's my understanding that they get a large amount.

25  Q.   And we've heard, again, from Mr. Mattes that he can't say

PENELOW - REDIRECT - RUSS

1  this off-label marketing didn't happen in the field and it

2  probably got reported to him.

3        Do you remember that?

4  A.  Yes.

5  Q.  All right.

6        Well, to your knowledge, has Janssen repaid the

7  Government any money?

8  A.  No.

9  Q.  They decided to keep it?

10 A.  Yes, at this point.

11 Q.  Ms. Penelow, again, you've been doing this for 18 years,

12 12 years.  Most of your adult life?

13 A.  Yes.

14 Q.  Are you proud of the efforts that you and Ms. Brancaccio

15 have taken to expose the misconduct at Janssen?

16 A.  I'm very proud of it, and I will be proud to tell my son

17 that I've done it.

18        MR. RUSS:  No further questions.

19        THE COURT:  All right.  Thank you, Mr. Russ.

20      Ms. Penelow, you are excused.  You can return back to

21 your seat.

22        THE WITNESS:  Thank you, Judge.

23        THE COURT:  Mr. Marketos, who is next?

24        MR. RUSS:  Your Honor, we call Virginia Evans.

25        THE COURT:  Oh, Mr. Russ.  I'm sorry.  This is going

EVANS - DIRECT - RUSS

1    to happen all week, I think.  I'm going to pick the wrong

2    lawyer, and that's okay.  I've been doing the same on both

3    sides.

4         Folks, I think, just for planning purposes, a short

5    break around 2:30, and then another short break around 3:30,

6    4.  If that doesn't work, if anyone needs a break other than

7    those time frames, just raise your hand, and I'll cause the

8    break at that time.  All right, folks?

9         Ma'am, I'm sorry.  I'm just going to have you -- you

10   can come on in.  I'm just going to have you sworn in, and then

11   you can get settled.

12   (**VIRGINIA EVANS**, HAVING BEEN DULY SWORN/AFFIRMED, TESTIFIED AS

13   FOLLOWS:)

14        THE DEPUTY COURT CLERK:  Please state your name and

15   the spelling of your last name for the record.

16        THE WITNESS:  Virginia B. Evans.

17        THE COURT:  Mr. Russ, whenever she's telling you

18   ready to proceed, you may.

19        MR. RUSS:  Thank you, Your Honor.

20   (DIRECT EXAMINATION BY MR. RUSS:)

21   Q.  Good afternoon, Ms. Evans.

22   A.  Good afternoon.

23   Q.  Please introduce yourself to the jury.

24   A.  Yes.  My name is Virginia B. Evans.

25   Q.  Ms. Evans, what do you do for a living and where do you

EVANS - DIRECT - RUSS

1  live?

2  A.   I live in Charlottesville, Virginia.  And I am a retired

3  health care attorney, but I have my own consulting firm, and I

4  do consulting in a variety of health care cases.

5  Q.   Ms. Evans, have you been retained by Relators in this

6  case to serve as a health care compliance expert?

7  A.   Yes, sir, I have.

8  Q.   And tell the jury what a health care compliance expert

9  is.

10  A.   Well, a health care compliance expert is somebody who is

11  familiar, by virtue of experience and perhaps study, with many

12  facets of how health care is delivered in this country and how

13  it's paid for.

14       One of the things that I am an expert in is fraud,

15  waste and abuse and compliance programs.  So all

16  pharmaceutical companies and other health care entities in the

17  United States that bill the federal Government for their items

18  and services must have a compliance program in place.

19       So that is what I am an expert in.

20  Q.   We're going to talk quite a bit today about compliance.

21       But, first, I want to introduce you to the jury through

22  your education and experience.  Tell the jury where you grew

23  up, went to school and then into your professional life.

24  A.   Sure.  Thank you.

25       Well, I went to -- first of all, I grew up in

EVANS - DIRECT - RUSS

1    Doylestown, Pennsylvania, which is right across the river,

2    really.  And I went to Lafayette College for undergrad, and

3    then I went to Tulane Law School for law school.  And while I

4    was down there, I stayed for several years practicing in New

5    Orleans, Louisiana, which is where Tulane is.

6          And then about maybe nine years after I graduated, I

7    was married and moved to New York City, where I went to NYU

8    and I got an LLM in taxation.  That's a master of laws in

9    taxation.

10   Q.   Once you got your JD -- so you're an attorney.

11   A.   Yes, sir.

12   Q.   Once you got your JD, did you go to work as an attorney?

13   A.   I did.

14   Q.   Where did you go?

15   A.   In New Orleans, I worked for the United States Department

16   of Justice.  I was a member of the organized crime and

17   racketeering strike force and served as a special attorney

18   there, trying a number of cases involving the racketeering

19   statute and sort of mobsters in New Orleans.

20   Q.   All right.  So let me make sure I break that down.

21         You were within the Department of Justice in New

22   Orleans.

23   A.   That's correct.

24   Q.   You were at what's called main justice?

25   A.   Yes.  It's called main justice.

EVANS - DIRECT - RUSS

1    Q.    Okay.

2          So how long were you a trial attorney or main justice

3    attorney in New Orleans?

4    A.    For eight years, and I did mostly, as I said, organized

5    crime and political corruption down there.

6    Q.    Did you then transfer to another U.S. Attorney's Office?

7    A.    I did.  I went to -- as I said, I went to New York, got

8    my LLM in tax and then went to work for the U.S. Attorney's

9    Office in the Eastern District of New York, which is Brooklyn,

10   Staten Island, Queens, Long Island.

11   Q.    What did you do in Brooklyn?

12   A.    I mostly did financial institution fraud.  I did some

13   insurance fraud and a little bit of health care there, health

14   care frauds.

15         And when I said I did them, I was a prosecutor.  So I

16   took individuals to trial in criminal cases in New York.

17   Q.    Okay.

18         So you were doing criminal prosecutions for a first

19   chunk of your time with the department?

20   A.    Yes, sir.

21   Q.    At some point, did you go over to the civil side?

22   A.    I did.  But that was not until I got to my next location,

23   which was in the District of Maryland.

24         So my husband was an FBI agent, and he transferred down

25   to D.C.  I moved to the District of Maryland, and I lived

EVANS - DIRECT - RUSS

1    there for, and worked in that office, for about 15 years.  I

2    did criminal prosecutions for the first part of it, doing

3    health care and other sorts of frauds against the Government.

4    I've always been interested in white collar crime.

5          And then towards the latter part of my career, I became

6    involved in health care prosecutions, both civilly and

7    criminally.  And in the District of Maryland and in other

8    districts around the country, health care fraud cases are one

9    of those parallel cases, which means there's a civil track and

10   a criminal track, and they're run at the same time.

11         So in that context, I became familiar with the False

12   Claims Act, the Anti-Kickback Statute and other areas of

13   federal, criminal and civil laws.

14         At some point, I moved over into the civil division and

15   thought I would do more health care there because I was

16   interested in proceeding -- with cases under the False Claims

17   Act.  I did that for --

18   Q.   Let me ask you:  Do you have experience in False Claims

19   Act matters?

20   A.   Yes, sir, I have.

21   Q.   Is it during your time with the U.S. Attorney's Office in

22   Maryland that you started doing that on the civil side?

23   A.   Yes, principally.  Because Maryland, as you know, is a

24   location of a number of federal agencies that provide health

25   care services to beneficiaries in the United States,

EVANS - DIRECT - RUSS

1    including, you know, the military, TRICARE.  It's the location

2    of Social Security, it's the location of HHS and CMS.  They're

3    all located in that District of Maryland.  So it's sort of a

4    target-rich area if you're interested in that area of work.

5    Q.    I want to try to break up the alphabet soup that is the

6    federal Government.  But when you say "HHS," is that Health

7    and Human Services?

8    A.    Yes, sir.  That's the Department of Health and Human

9    Services.

10         And while there, I mostly worked with the Office of the

11   Inspector General, which is the investigative and enforcement

12   arm of that particular agency.  CMS also has some regulatory

13   oversight.  I worked with them as well, but mostly with HHS.

14   Q.    So HHS/OIG, what do they investigate?

15   A.    They investigate fraud waste and abuse that is alleged to

16   be or purported to be committed against the federal programs.

17         So they cover, not only federal health insurance, but

18   also state Medicaid programs, because the state Medicaid

19   programs are funded, in part, by the federal Government.  The

20   state pays a share and the federal Government pays a share.

21   And that's how health care is paid for.

22   Q.    So within HHS, we've got Health and Human Services and

23   then centers for Medicare and Medicaid services, which is CMS.

24   A.    That's correct.

25   Q.    Do those two work together in investigations in

EVANS - DIRECT - RUSS

1    recovering amounts paid?

2    A.    Yes, they do.

3          CMS really focuses more on regulatory offenses and

4    Stark violations, violations of the Stark Law, which is not at

5    issue in this case, whereas HHS/OIG works on sort of garden

6    variety False Claims Act cases, works on Anti-Kickback Statute

7    violations and works on other false claims issues.

8    Q.    Okay.

9          So let's go back to your time in Maryland.  So you're

10   working on these type False Claims Act cases.  Give the jury a

11   sense for how many of these you worked on and for how many

12   years.

13   A.    I'm sorry, how many --

14   Q.    How many False Claims Act investigations or cases and

15   over what period of years.

16   A.    Oh, my goodness.  So that was from 1990 to 2005.  And

17   hmm.  I have a hard time putting a number on it, but it was

18   constant.  I was always working on them.

19         And the cases ranged from, you know, false claims to

20   laboratory fraud, pharmaceutical fraud, to all sorts of cases.

21   Q.    Did you rise up to a supervisory role at the U.S.

22   Attorney's Office?

23   A.    I did.  I was -- towards the end of my tenure there, I

24   was the deputy chief for several years of the civil division,

25   which handles False Claims Act, not criminal side, False

EVANS - DIRECT - RUSS

1    Claims Act.  And then I became the civil chief.

2    Q.   Okay.

3         At some point did you leave the Department of Justice

4    and go into the private sector?

5    A.   I did.

6    Q.   Tell us about it.

7    A.   Well, my children were approaching college age, and I was

8    divorced at that point and needed to make some more money,

9    frankly, so I went over to KPMG, and while I was at KPMG, I

10   didn't practice law.

11        What I did was serve as a consultant there in their

12   forensic -- on the forensic side of their health care

13   accounting and auditing services.

14        So -- and that's kind of complicated, but what it

15   really means is that KPMG would be hired either by a provider,

16   a pharmaceutical manufacturer, or a hospital system or

17   academic medical center, and it would go into those

18   organizations and help them with their compliance programs if

19   they were under investigation.  We would help them defend

20   those investigations.  We would set them straight, if you

21   will, if they were veering off into an area that was not

22   compliant.

23   Q.   So you have health care experience on the Government

24   prosecution side.

25        That's fair?

EVANS - DIRECT - RUSS

```
 1            And then on the auditing private side?
 2    A.   Yes, sir.
 3    Q.   At some point did you go to a law firm and provide legal
 4    counsel to entities like pharmaceutical companies and
 5    hospitals?
 6    A.   Yes.  That was my next iteration of what I did in my
 7    career.  I went to work for Ober/Kaler, which is a health care
 8    firm located in Baltimore, Maryland.  It's since merged with
 9    Baker Donelson.
10            But at the time Ober/Kaler was in Baltimore and
11    Washington, and I had offices in both locations, and I handled
12    mostly -- excuse me -- False Claims Act anti-kickback
13    investigations, defending clients, defending health care
14    providers, doctors, pharmaceutical systems, health care
15    systems, pharmaceutical and medical device manufacturers, you
16    know, represented people before the grand jury, things of that
17    nature.
18    Q.   So in addition to the prosecution side and the auditing
19    side, you've -- you've been on the defense side?
20    A.   Yes, sir.
21    Q.   Okay.
22            What type of -- what type of matters were you handling
23    on the defense side?
24    A.   They were certainly lots of False Claims Act -- excuse
25    me -- allegations.  I handled some FDA cases.  While I was
```

EVANS - DIRECT - RUSS

1    there defending clients, both criminally and civilly, who were

2    accused of committing, fraud, waste, and abuse against federal

3    health care programs.

4        And I also became involved in litigating exclusion

5    matters or attempting to help providers who had been excluded.

6    Q.   Let me stop you there.

7        What is an exclusion matter?

8    A.   Okay.  Ex -- so HHS-OIG and the office of legal counsel

9    for HHS-OIG -- excuse me -- it's OGC, has the ability

10   statutorily to exclude a health care provider from being able

11   to bill the federal government for a period of time that can

12   run from, say, 5 years to 25 years and they -- so if they have

13   reason to believe that the provider has engaged in false

14   billing or has violated the False Claims Act or has engaged in

15   other types of fraud that affects the federal program and what

16   they call the federal fisc, which is the dollars that pay for

17   Medicare, Medicaid, and other health care -- federal health

18   care benefits programs, they have the ability to exclude those

19   providers from billing those systems.

20       It's a really, really serious offense -- excuse me -- a

21   very serious incident to be excluded.  And so --

22   Q.   Let me -- let me ask you this:  Did you -- so you've done

23   exclusion matters and FCA defense.  We'll keep moving through

24   your experience.

25       At some point did you leave Ober/Kaler and go to a

EVANS - DIRECT - RUSS

1  hospital system?

2  A.   I did.  I remarried.  My second husband is a professor at

3  UVA.  He recently retired, as did I, from the full-time

4  practice of our professions, but I needed to be closer to

5  where he was in Charlottesville.

6       And I got an offer to go to Centra, which is a

7  four-hospital system in southwest Virginia, to serve as their

8  first general counsel and their compliance officer.  They had

9  no compliance officer.

10      So I did that for three years and built up the legal

11  department, hired on a bunch of attorneys to help them

12  institute a contract management system, electronic contract

13  management system and helped them negotiate a settlement with

14  the Government.

15  Q.   So you were a compliance officer for some time?

16  A.   I was also a compliance officer, yes.

17  Q.   How long?

18  A.   Well, I was there from 2012 to 2015, and sort of towards

19  the end of that period, I think the last year or the last

20  eight months, I served solely as the compliance officer

21  because we broke off the legal counsel and compliance officer

22  functions because it is a better practice to have those be

23  separate functions.

24      The legal counsel should be separate from the

25  compliance officer, just in terms of conflict and who you owe

EVANS - DIRECT - RUSS

1  your loyalty to.  As a compliance officer, you owe your

2  loyalty to the -- to the whole institution, and you have a

3  duty to make sure that the organization is conducting itself

4  in a manner that complies with federal laws and regulations.

5          If you're general counsel, you have more of an

6  obligation to protect that organization, if you will.  So

7  that's kind of the distinction.

8  Q.   And you had done both of those roles at Centra?

9  A.   I'm sorry?

10  Q.   You did both of those roles at Centra?

11  A.   I did.  I did, but that was not ideal.  We just needed to

12  get the program started, and then we split off.

13  Q.   Ms. Evans, have you been retained by the Department of

14  Justice as a consulting or testifying expert in a False Claims

15  Act case before?

16  A.   I have.

17  Q.   Tell us about that.

18  A.   Yes.  So in, I guess it was -- I don't even -- 2016,

19  2017, after I left Centra, I was thinking I was going to

20  retire, and I got a call from the U.S. Attorney's Office in

21  the Southern District of New York, and they asked if I would

22  take a look at the compliance program of a pharmaceutical

23  company called Novartis.

24          So -- and in the Novartis case, which was another case

25  -- whistleblower or qui tam case, the question was whether or

EVANS - DIRECT - RUSS

1    not their compliance program was effective as that term was

2    understood at the time.

3         So you have to look at the time period.

4    Q.   So you've been a compliance expert evaluating in the past

5    the compliance program for pharmaceutical companies?

6    A.   Yes, sir.

7    Q.   Did you -- where do you work now?

8    A.   I work from home, and I do -- I still am doing consulting

9    on compliance matters.  I sometimes -- I have helped

10   compliance -- helped companies and individual providers become

11   compliant.  I've done training and things like that.

12        But after I left Centra and at some point in there, I

13   went to work for Thomson Reuters.  I was recruited to go to

14   work for Thomson Reuters Practical Law to start an online

15   health care legal journal, which went to publication in

16   October of 2020.

17        So I worked on that, again kind of getting it up and

18   rolling, hiring people on.  We had a crew of about six

19   attorneys who were in various sections of our legal -- of the

20   legal online journal.

21        So we had some life sciences people.  We had

22   reimbursement people.  I was government investigations and

23   compliance.

24   Q.   Are you involved with the American Bar Association?

25   A.   I am.

EVANS - DIRECT - RUSS

1  Q.   What do you do for the ABA?

2  A.   Well, I'm a member of the ABA, and I am a member of their

3  health law section, and I am vice chair of the health law

4  policy committee.

5       And that's a committee that meets once a month, and we

6  look at upcoming regulations and legislation, and if the ABA

7  wants to make comments, we help write the comments or submit

8  the comments to the ABA for their approval.

9       We also help -- I've not participated in this

10 particular aspect of it, but we do meet with Congresspeople

11 and raise concerns on behalf of the ABA clients, including

12 pharmaceutical and medical device manufacturers as well as

13 other types of clients.

14      If there's upcoming legislation that they're worried

15 about, in some cases we will make recommendations or discuss

16 that with members of Congress.

17 Q.   Have you done work with members of Congress?

18 A.   I have not.  I have written -- I have written materials

19 that have gone to Congress.

20 Q.   Okay.

21      Are you -- do you have any certifications in health

22 care compliance?

23 A.   I do.  I used to be a member of the Health Care

24 Compliance Association.  I've since dropped that, just let it

25 lapse.  I'm certified in health care research compliance.  I

EVANS - DIRECT - RUSS

1  am a member of the American Health Law Association and am vice

2  chair of publications for the life sciences section of that

3  organization.

4  Q.   Have you written any articles about health care

5  compliance or the Anti-Kickback Statute?

6  A.   I have.  When I was at Thomson Reuters, I wrote

7  articles -- they're not under my byline because we worked as a

8  group, but I helped put those materials together.  I also have

9  written for the American Health Law Association and other

10  organizations.

11  Q.   Are you a current active bar member of any state bars?

12  A.   I am.  Because I moved around so much, I'm a member of a

13  number of bars.  Louisiana.  I actually lecture once a year at

14  the Louisiana Bar Convention, and this year is going to be

15  about health care compliance.  Pennsylvania, New York, and

16  Virginia and Maryland.

17  Q.   Ms. Evans --

18  A.   Excuse me.  I pay a lot of bar dues.

19  Q.   Ms. Evans, are you -- have you reviewed compliance

20  programs to see if they are effective?

21  A.   Yes.

22  Q.   Have you had experience and expertise reviewing

23  compliance perhaps as they relate to speaker bureaus or

24  speaker programs?

25  A.   Yes, I have.

EVANS - DIRECT - RUSS

1  Q.  Were you retained in this case by the Relators to provide

2  an opinion regarding Janssen's speaker bureau -- Promotional

3  Speaker Bureau that it ran from 2006 to 2014?

4  A.  Yes.  I was engaged to take a look at the effectiveness

5  of their compliance program with respect to two speaker

6  programs, which were for Prezista and Intelence during that

7  time period.

8       MR. RUSS:  If I could have the ELMO, Ms. Johnson.

9  BY MR. RUSS:

10  Q.  Ms. Evans, I want to -- you've done two reports in this

11  case.  There was an original report and a supplemental report.

12  A.  Yes, sir.

13  Q.  Okay.

14       I'm going to show you -- not the report.  I'm going to

15  walk through some materials that you reviewed in this case

16  after you were retained by Relators.

17       Okay?

18  A.  Okay.

19  Q.  Can you see that on your screen, Ms. Evans?

20  A.  Yes.

21  Q.  Okay.

22       Run through -- and we don't have to spend a lot of time

23  on this, but give the jury a sense of the materials that you

24  reviewed in coming to your conclusions in this case.

25  A.  Okay.  Well, of course, the first is the False Claims

EVANS - DIRECT - RUSS

1    Act.  I looked at the statute -- statutes with respect to the

2    False Claims Act; the Affordable Care Act, which is sometimes

3    referred to as Obama Care, and that's the law that came into

4    effect in 2010; the Food, Drug and Cosmetic Act, which is FDA

5    laws and regulations.

6          The Anti-Kickback Statute, I reviewed that.  I reviewed

7    the Deficit Reduction Act of 2005 because that predated the

8    Affordable Care Act, the Obama statute, and that had

9    compliance requirements that were imposed on Medicaid

10   providers.

11         I looked at several statutes as well as regulations.

12   That's the Code of Federal Regulations there.  I looked at

13   case law.  *Greber* is a case --

14   Q.   Ms. Evans, I'll just move this along a little bit.

15   A.   Okay.

16   Q.   So you have regulatory guidance and agency guidance?

17   A.   Yep.

18   Q.   Generally what is that?

19   A.   That is guidance that's issued by the various agencies.

20   Some of it is informal.  Some of it is mandatory.  The

21   guidance, for example, is informal.  It's voluntary, but it

22   kind of lays the roadwork for having an effective compliance

23   program, with respect to HHS-OIG, so I looked at that.

24         I looked at -- I also looked at regulatory

25   requirements.  I looked at the Department of Justice

EVANS - DIRECT - RUSS

1    evaluation of corporate compliance programs.  That actually

2    was after the relevant time period in this matter.

3    Q.  Ms. Evans, on this OIG guidance that you talked about, is

4    the OIG -- HHS-OIG that we discussed, does it give guidance

5    out to the industry for health care compliance concerns?

6    A.  It does.

7    Q.  And does that include pharmaceutical companies?

8    A.  It does.

9    Q.  And has that been happening since at least 2000?

10   A.  Yes.

11   Q.  Let's -- let's keep looking at some of the other guidance

12   and information that you looked at, Ms. Evans.  You have

13   industry guidance.

14        You see that?

15   A.  I do.

16   Q.  Then there's some compliance policies.

17        Do you see that?

18   A.  Yes, sir.

19   Q.  What are those?  What did you review?

20   A.  I looked at the compliance policies that were in effect

21   at the time -- the review period that's at issue in this

22   particular case, Janssen's, and then the company before that

23   that was absorbed; Tibotec, I think, is the name of it.  I

24   apologize if I'm mispronouncing that.

25        So, yes, I looked at the speaker bureau policies, you

EVANS - DIRECT - RUSS

1   know, operating procedures, emails back and forth, anything

2   having to do with the compliance program and the compliance

3   policies.

4   Q.   And when you're doing this type of review in a case like

5   this, do you request certain things that you want to see?

6   A.   Yes.  I always do the same -- I go through the same kind

7   of routine with every compliance review that I do, and that is

8   I start out with those compliance program policies.  I want to

9   know what the organization has in writing, if they have

10  something in writing, and they're supposed to at this point.

11  Q.   And there's another page here, Ms. Evans, additional

12  policies and speaker program and MIR policies, some of which

13  this jury has already seen?

14  A.   Yes.

15  Q.   You requested those and had a chance to review those?

16  A.   I did.

17  Q.   There's additional documents.  We lawyers like to call

18  this the Bates stamp.  Each one of these is a document that is

19  in the case?

20  A.   Yes.

21  Q.   Do you see that?

22  A.   Yes.

23  Q.   And there's another page?

24  A.   Yes.

25  Q.   You see those?

EVANS - DIRECT - RUSS

1    A.    Yes.

2    Q.    These are all documents that you reviewed in this case?

3    A.    Yes, sir.

4    Q.    Then we get to the transcripts and exhibits.

5          There was some depositions in this case of some

6    witnesses.

7          You understand that?

8    A.    Yes, sir.

9    Q.    And some of those depositions -- you understand a

10   deposition -- some of these were taken by Janssen, and Janssen

11   would introduce exhibits.

12   A.    That's correct.

13   Q.    And some were taken by Relators' counsel, and we would

14   introduce exhibits.

15   A.    Yes, sir.

16   Q.    Did you review the transcripts and exhibits of the

17   deposition of Christine Brancaccio?

18   A.    I did.

19   Q.    Michael Daly?

20   A.    Yes.

21   Q.    Anthony Dolisi?

22   A.    Yes, sir.

23   Q.    Donna Graham?

24   A.    Yes.

25   Q.    Matthew Grooms?

────────EVANS - DIRECT - RUSS────────

1    A.    Yes.

2    Q.    Joseph Holshoe?

3    A.    Yep.

4    Q.    Mike Iacobellis?

5    A.    Yes.

6    Q.    Ben Kozub?

7    A.    Yes.

8    Q.    Catherine Kaucher?

9    A.    Yes.

10   Q.    Candice Long?

11   A.    Yes.

12   Q.    Glenn Mattes?

13   A.    Yes.

14   Q.    Jessica Penelow?

15   A.    Yes.

16   Q.    Michael Schiff?

17   A.    Yes.

18   Q.    Sara Strand?

19   A.    Yes.

20   Q.    And Mark Wilhelm?

21   A.    Yes.

22   Q.    You also looked at the expert report of Professor Shaked?

23   A.    Yes.

24   Q.    Right?

25         And then your report has additional materials that you

EVANS - DIRECT - RUSS

1   reviewed.

2         Fair?

3   A.   That's correct.

4   Q.   Okay.

5         THE COURT:  Mr. Russ, are you going to switch to

6   another topic?

7         MR. RUSS:  I'm about to, Your Honor.

8         THE COURT:  Do you think this is a good time to take

9   a break?  I didn't know if you were covering more materials.

10  Are you done with that piece?

11        MR. RUSS:  Yeah, I don't want to hold up the jury,

12  but if I could really quickly, I'll show this additional

13  material --

14        THE COURT:  No, no.  Of course.  Once you get done

15  with the materials, why don't we take a short break after

16  that.

17        MR. RUSS:  Thank you, Your Honor.

18  BY MR. RUSS:

19  Q.   Ms. Evans, you recently had a supplemental report?

20  A.   I did.

21  Q.   And you reviewed some additional materials for that?

22  A.   I did.

23  Q.   Just very quickly, Ms. Evans.  You reviewed some

24  additional deposition testimony and documents?

25  A.   I did.

EVANS - DIRECT - RUSS

1    Q.  We have those here.  We have HHS-OIG compliance program

2    guidance for pharmaceutical manufacturers, and I believe that

3    may have actually been cited in your original report.

4    A.  Yes, those were.  I think I added *Teva*.  I started to

5    look at the *Teva* case.  I also -- I looked at a couple other

6    depositions.  I'm not sure they're on here.

7    Q.  They are, Ms. Evans.  I'm going to move this --

8    A.  Okay.

9    Q.  You see those down there, three additional depositions

10   that you reviewed?

11   A.  Yes, sir, and I've reviewed three more since I wrote this

12   report, or before I wrote this report.  I can't recall.

13   Q.  Did you review the deposition of Amit Patel?

14   A.  I did.

15   Q.  And Kim Saladana?

16   A.  I did.

17   Q.  Michael Driscoll?

18   A.  Yes, sir.

19   Q.  And then have you had the opportunity to review some of

20   the testimony in transcript form in this case from this trial?

21   A.  Yes, I have.

22          MR. RUSS:  Your Honor, at this time, I think it's a

23   good moment for a break.

24          THE COURT:  Let's do that, then.

25          Folks, we're going to take a ten-minute break.

EVANS - DIRECT - RUSS

1     Everyone can do what they need to do, and we'll reboot.

2              (A short recess occurred.)

3              THE DEPUTY COURT CLERK:  Please remain seated.

4              THE COURT:  We're good.

5              MR. RUSS:  Yes, Your Honor.

6              THE COURT:  All right, Kim.

7              THE DEPUTY COURT CLERK:  All rise.

8              THE COURT:  All right, folks.  Everyone have a seat.

9         Ma'am, I'll just remind you you're still under oath

10    from earlier in the break.

11         Mr. Russ, whenever you're ready to proceed, you may.

12             MR. RUSS:  Thank you, Your Honor.

13    BY MR. RUSS:

14    Q.  All right.

15         Ms. Evans, I'm sorry to go through that lengthy

16    background of your -- of your experience and materials you

17    relied on, but there are just some things that, in a case like

18    this, you have to get in front of the jury.  I hope you

19    understand.

20         I want to move to now whether you came to a conclusion

21    in this case as to the effectiveness of Janssen's compliance

22    program and specifically as it relates to the speaker --

23    Promotional Speaker Bureau?

24    A.  Yes, I did come to a conclusion.

25    Q.  And is it reflected there at the top of the slide that we

EVANS - DIRECT - RUSS

1    put in front of the jury?

2    A.    Yes.  I concluded that Janssen's compliance program was

3    ineffective with respect to the speaker programs involving

4    Prezista and Intelence.

5    Q.    You said at the top there that there are FDA rules.  We

6    talked a little bit about OIG guidance.  This jury has heard

7    about some of those FDA rules, but why don't you tell us what

8    you were relying on.

9    A.    Yes.  I looked at the speaker programs and looked at how

10   they were designed and implemented over the review period, and

11   I concluded that the compliance program with respect to those

12   particular speaker programs was not effective because the

13   speaker programs did not comply with not only the FDA rules,

14   HHS-OIG guidance about how to properly conduct pharmaceutical

15   marketing and how to use a speaker program, but also the

16   PhRMA Code --

17   Q.    What is the PhRMA Code?

18   A.    Okay.  Well, the PhRMA Code is -- it is -- it's actually

19   two codes that are applicable.  There have been more since

20   then, but there are two codes that are applicable to this time

21   period.  The first was in 2002, and the second was in 2009,

22   and they're voluntary.

23        And basically what the PhRMA Code is, it's a group of

24   organizations who get together, and they come up with

25   standards and rules for conducting different types of

EVANS - DIRECT - RUSS

1  pharmaceutical marketing and using different tools and

2  programs.

3          And you don't have to join the PhRMA Code as a

4  pharmaceutical manufacturer, but if you do join the group, you

5  agree to abide by what the code says in terms of how you're

6  going to do your business, how you're going to conduct your

7  business.

8  Q.   Okay.

9          And then you are about to say, I believe, Janssen's own

10  policies and industry standards.

11          Tell us about those.

12  A.   Yes.  I looked at Janssen's own policies.  We looked at

13  some of them when we were reviewing the materials I relied on

14  when I was writing my reports, so I looked at those.  I looked

15  at their operating procedures, emails, other items,

16  spreadsheets, all kinds of materials that were produced by the

17  defendants or obtained from other sources.

18          And I also looked at industry guidelines, so I looked

19  at what was acceptable with respect to different

20  pharmaceutical manufacturers in -- doing business at the time

21  and what their standards were, what they were supposed to

22  comply with, not only according to the law and the

23  regulations, but what they were doing within their own

24  industry, what was the acceptable method of doing things.

25  Q.   As you were doing that work, Ms. Evans, were you

EVANS - DIRECT - RUSS

1  compensated from Relators for an hourly rate?

2  A.   I was.

3  Q.   What was that rate?

4  A.   $300 an hour.

5  Q.   Okay.

6       Do you have an approximation sitting here today about

7  how many hours you have spent on this matter?

8  A.   I'm sorry.  I don't with respect to the work I did back

9  in 2019.  It's been such a long time ago, but most recently, I

10 would say, in 2024, I've probably worked about maybe 70 hours,

11 80 hours on it.

12 Q.   Okay.

13      Is there any part of your compensation for this

14 engagement that is tied to the outcome in this case?

15 A.   No, sir.

16 Q.   Okay.

17      We have on the slide there, Ms. Evans, a couple points

18 I want to walk you through, and fair to say these are points

19 that you considered in evaluating the effectiveness of

20 Janssen's compliance program as to these standards and its

21 speaker program?

22 A.   Yes.  These are items that I look for when I'm looking at

23 a compliance program with respect to speaker programs to

24 determine whether or not the compliance program is effective

25 in preventing and detecting misconduct in the operation of

1    those.

2    Q.   Is it enough, in your experience and your expertise,

3    Ms. Evans, to just have a policy?

4    A.   No.  Policies can be great on their face.  They can be

5    what we call facially adequate, but if they're not

6    implemented, if there are no disciplinary proceedings that

7    arise if you violate those policies, then they're not worth

8    the paper they're written on, so to speak.

9    Q.   So from your time as a compliance expert and as a

10   compliance officer, is it guesswork, or is there -- it sounds

11   like there's a lot of guidance out there of how a compliance

12   program is supposed to be run.

13        Fair?

14   A.   Absolutely.

15   Q.   So if we look at generally the things that you might be

16   looking for, whether you're evaluating whether a speaker

17   program sort of, you know, went outside of what you would

18   expect the compliance speaker program look like, would you

19   look at whether it was controlled by the sales and marketing

20   team?

21   A.   That's one of the things that I look at when I'm looking

22   at the whole picture, if you will, all the materials, all the

23   depositions.  I look at whether or not -- whatever promotional

24   program it is is primarily controlled by marketing and, with

25   respect to speaker programs, controlled by marketing and

EVANS - DIRECT - RUSS

1    executed by sales.

2          So if sales takes predominance over compliance, then

3    that is a potential red flag that the compliance program may

4    not be effective.

5          So that's one thing that I look at.

6    Q.   When we talk about speaker programs generally, is this --

7    and we're going to look at some evidence that Janssen has

8    produced in this case, but are they highly regulated in risky

9    behavior?

10   A.   They are.  The OIG guidance, which it puts out -- you

11   discussed this -- asked me about this earlier.  The OIG

12   guidance, which it puts out on a regular basis for all sorts

13   of different industries within the larger health care world,

14   for example, there's guidance for nursing homes, there's

15   guidance for hospitals, there's guidance for pharmaceutical

16   manufacturers -- in the OIG guidance for pharmaceutical

17   manufacturers, they recommend that, you know, that certain

18   procedures be followed.

19         And I'm sorry, I lost the track of your question there.

20   Q.   No, I was asking if it was highly regulated and --

21   A.   Oh.

22   Q.   -- a risky endeavor as far as health care compliance

23   goes.

24   A.   I'm sorry, I was getting to that.

25         So, actually, the OIG guidance actually states that

EVANS - DIRECT - RUSS

1  speaker programs are -- and remuneration paid to physicians is

2  risky behavior.

3  Q.   Let's talk about that.  I want to make sure -- we've got

4  a lot of terms.

5       The word "remuneration" might not be a word that the

6  jury is familiar with with the Anti-Kickback Statute.

7       What is remuneration?

8  A.   Sure.  So remuneration --

9            MS. BROWN:  I object, Your Honor.  Legal conclusion.

10           THE COURT:  Let me see you guys at sidebar.

11           (Sidebar begins at 2:50 p.m.)

12           THE COURT:  Are you asking the witness to define a

13  term that's used in the Anti-Kickback Statute?

14           MR. RUSS:  It's in their compliance materials.  I can

15  just have her read it off that.  That's fine, too.

16           THE COURT:  Well, that's fine, but you can't do the

17  question you just asked.  Right?  It's like you're saying,

18  hey, remuneration is in the statute.  I mean, I might have a

19  jury instruction on what remuneration means at the end of the

20  trial if somebody's proposed that or is proposing it, but --

21  all right.  So I'm going to sustain the objection, but you can

22  rephrase the question.  What's the rephrasing going to be?

23           MR. RUSS:  I'm going to eventually go to the slides,

24  the presentations that Janssen trains people on that has the

25  definition of remuneration.

EVANS - DIRECT - RUSS

1          THE COURT:  That's different than -- okay -- than you

2    asking for her expert opinion on defining a term in the

3    statute.

4          All right.  Objection is sustained.

5          You're going to rephrase.

6          MR. RUSS:  Yes, Your Honor.

7          (Sidebar was concluded at 2:51 p.m.)

8          (Open court.)

9    BY MR. RUSS:

10   Q.   When evaluating the speaker programs, Ms. Evans -- I'm

11   going to point your attention to the second bullet point -- is

12   something that you look at whether the speakers who are being

13   paid by pharmaceutical company are selected based on the

14   volume or value of their prescriptions?

15   A.   Yes.  The selection of speakers is something that I

16   always look at, the selection criteria, how it actually works

17   because, once again, sometimes the policies will say one thing

18   and how the speaker programs and the speakers are selected, in

19   reality, can differ from the policies.

20          So one of the things that I look at as a potential red

21   flag to determine if the compliance program is effective is,

22   are the speakers being selected based on their prescription

23   volumes?  Because, to me, that is a red flag.

24   Q.   What about if speakers are being removed if they fail to

25   prescribe the drugs of the pharmaceutical company that is

EVANS - DIRECT - RUSS

1    paying them?

2    A.   That is also a red flag because -- would you like me to

3    explain why?

4    Q.   Yes, ma'am, please.

5    A.   That's also a red flag because, if you're removing

6    speakers, if they failed to prescribe the product, you're

7    essentially providing value, providing a benefit to that

8    speaker if he or she prescribes your product.

9         If he or she can stay on the speaker bureau, if they

10   keep their prescriptions up, that's a benefit going to the

11   provider.  That is value.  That value is something that is

12   prohibited under the Anti-Kickback Statute in certain

13   circumstances.

14        So that is something that I always look at, is the

15   payment to the speaker being based on their prescribing?  If

16   it is, that's a red flag to me.

17   Q.   What about if the programs themselves were highly

18   repetitive or a large number of programs?

19   A.   That, again, is an indication.  So we talked about the

20   PhRMA Codes.  The PhRMA Codes have specific rules and guidance

21   that they provide to pharmaceutical manufacturers so that they

22   can market their products in a manner that complies with the

23   law and with the PhRMA Code.

24        And one of the things that they talk about is that the

25   speaker program, because it's high risky, because it's

EVANS - DIRECT - RUSS

1  conferring value on the speakers, but also on the attendees

2  going to nice dinners and, you know, getting to socialize,

3  they want to make sure that the speaker programs have real

4  educational value.

5      They're supposed to be -- speaker programs are okay if

6  they're designed to impart scientific and medical information

7  to the prescribers who are in attendance or to the health care

8  providers who are in attendance.  They're not supposed to be

9  situations where it's purely social in nature, where somebody

10 gets up and speaks for a short period of time and then

11 everybody has cocktails and a big dinner.  That's not the

12 point of a speaker program.

13     In order to be -- in order not to violate the

14 Anti-Kickback Statute, the remuneration or the value being

15 provided to the speaker and the attendees has to be something

16 that is incidental to the educational purpose for the meeting.

17 Q.  Might you also --

18          MS. BROWN:  Objection, Your Honor.

19      May we approach and move to strike?

20          THE COURT:  You may approach.

21          (Sidebar begins at 2:55 p.m.)

22          THE COURT:  I'm listening.

23          MR. WYATT:  It's the same issue, Judge.  The witness

24 is defining remuneration in her answers.  It's not being

25 elicited, but she's just sort of going on and on and then

EVANS - DIRECT - RUSS

1    saying this is what remuneration is.

2            THE COURT:  Yeah.  I don't necessarily disagree with

3    Mr. Wyatt here.

4            So what I understood is -- and if you have a different

5    position, I'll hear from you, Mr. Russ -- but she can't define

6    the terms in the statute.  Right?  That's for me to instruct

7    on.

8            MR. RUSS:  I agree, Your Honor.

9            THE COURT:  And she's just done that again, and she's

10   also stating remuneration equals the value and, if you do

11   this, that's in violation of the statute.  So she's making

12   some conclusory statements there.

13           So, I mean, ultimately, that's a finding for the jury.

14   Right?

15           MR. RUSS:  I agree, Your Honor.  I'm not trying to

16   elicit that.

17           Can I tell her not use the word --

18           THE COURT:  Yeah.  By the way, I don't think you were

19   attempting to elicit it.  So here's what I'm going to do.  I'm

20   going to grant the motion to strike the response and then just

21   have you rephrase the question, however you want to do it.

22           But are you going to get to the slide of Janssen or --

23           MR. RUSS:  I am.  I wanted to go through the -- what

24   she's looking for in the speaker program and then the slides

25   coming up.

EVANS - DIRECT - RUSS

1          THE COURT:  All right.  How do you preface this to

2    avoid this happening again?  I don't know.  You tell me.  How

3    are you going to do it?

4          MR. RUSS:  Do you not want me to use the word

5    "remuneration"?  It's a narrow document, so that's the kind

6    of --

7          THE COURT:  I don't mind you using it, but as an

8    expert, she can't define it for the jury.  If you have it on a

9    slide from Janssen and Janssen has provided, like, what that

10   means to their folks and you want to read that off, that's a

11   very different scenario.  And I don't think you guys can

12   object, but I'll allow that.

13        But what's happening here -- okay.  I'm not going to

14   allow either expert from either side to say, here's the

15   statute.  Let me define it for you as sort of the judge,

16   because I have to give these final instructions now.

17          MR. RUSS:  And I don't want her to, Your Honor.

18          THE COURT:  That's fair.

19          MS. BROWN:  Thank you.

20          (Sidebar was concluded at 2:57 p.m.)

21          (Open court.)

22          THE COURT:  All right, folks.  I sustained that

23   objection so I'm just going to strike the last response.  You

24   are just not to consider it.  That's the same as any other

25   time I do that.

EVANS - DIRECT - RUSS

1      And, Mr. Russ, you can rephrase the question or the

2   subject matter, if you want, and proceed.

3           MR. RUSS:  Thank you, Your Honor.

4   BY MR. RUSS:

5   Q.   And just quickly, some of the other things you might look

6   at as you're evaluating a speaker program might be whether

7   there's off-label information being disseminated or plants in

8   the venues and the other payments and other types of payments

9   that are going to be made to the prescriber.

10          Is that fair?

11  A.   That's correct.  Yes.

12  Q.   Let's take a look --

13          MR. RUSS:  And this is admitted, Your Honor, at

14  Relator 275.

15          If we could, unless there's an objection, publish that.

16          THE COURT:  It's already admitted?

17          MR. RUSS:  It is admitted, Your Honor.

18          THE COURT:  All right.  Well, then, I don't know what

19  the objection can be.

20          MS. BROWN:  There's no objection, Your Honor.

21          THE COURT:  Yeah.  I mean, once it's in, it's in.

22          Go ahead.  Feel free to publish if it's admitted.

23          MR. RUSS:  Actually, if we could -- because I want to

24  fix one issue real fast.  If we could show Relators' 360,

25  which is also admitted, and go to page -- slide 13, please.

1           And if we could expand that for Ms. Evans.

2    BY MR. RUSS:

3    Q.   Ms. Evans, you've been talking about the federal

4    anti-kickback law.  You've seen this slide presentation from

5    Janssen's compliance department, haven't you?

6    A.   Yes, I have.

7    Q.   Do you see that the term "remuneration," as defined by

8    Janssen, that's to include anything of value, not just cash

9    and kickbacks, but also free products and services or even the

10   opportunity to earn money?

11   A.   That's correct.

12   Q.   Okay.

13          MR. RUSS:  If we could go back to Relators' 275,

14   please.  Slide 7.

15          If we could expand that for Ms. Evans.

16   BY MR. RUSS:

17   Q.   This is a document that our jury has seen, Ms. Evans.  Do

18   you see that this is a Janssen document talking about why the

19   health care industry is so heavily regulated?

20   A.   That's correct.

21   Q.   You agree with that?

22   A.   Yes, it is.

23   Q.   Do you see where Janssen talk -- because it has an impact

24   on the health and safety of the patient.

25   A.   Yes.

EVANS - DIRECT - RUSS

1    Q.    Do you agree with that?

2    A.    Yes, sir.

3    Q.    And that the Government reimburses a large percentage of

4    RX products, prescription products.

5              Do you see that?

6    A.    That's correct.

7    Q.    Then it has Medicare and Medicaid, and I want to talk to

8    you briefly, based on your experience, of what -- and I know

9    you touched on this briefly.

10             Medicare and Medicaid are both programs that are at

11   least partially, if not fully federally funded; is that right?

12   A.    Yes.  Medicare is fully federally funded.  Medicaid is

13   part federal money, part state money.

14   Q.    And the Medicaid programs are administered by the states?

15   A.    They are administered by the states, but at least part of

16   the money that is used to fund them comes from the federal

17   fisc.

18   Q.    And Medicare itself, you're familiar, is broken into

19   different parts?

20   A.    It is.

21   Q.    What are the parts?

22   A.    Well -- excuse me.  Part A is hospitalization.  And that,

23   when you turn 65, I believe it is, you apply for Medicare Part

24   A, that's your hospitalization.  Medicare Part B is fee for

25   service, and that is doctors' visits and things of that

EVANS - DIRECT - RUSS

1    nature.  Medicare Part C is managed care.  Medicare Part D is

2    the prescription drug benefit.

3    Q.    So all those parts together we sort of call Medicare.

4          Is that fair?

5    A.    Right.  And there's also Medicare Supplement, but we

6    won't go into that.

7    Q.    And do you see that Janssen -- and you've seen this

8    document -- was instructing its people that the Government

9    does not want to cover the cost of prescription products when

10   they violate the following:  Anti-Kickback Statute and the

11   False Claims Act.

12         Based on your experience and your expertise, do you

13   agree with that conclusion?

14   A.    Absolutely.

15   Q.    Why do you say that?

16   A.    Because if the Government -- if the Government knows, for

17   example, that a particular prescription was the result of a

18   relationship that violated the Anti-Kickback Statute, because

19   a payment was made to a provider in exchange for a referral or

20   in connection with a referral, recommendation for an item or

21   service, then they consider the claim files for that

22   prescription to be a false claim.

23         MS. BROWN:  Objection, Your Honor.

24         May we approach, please?

25         THE COURT:  Yes.

EVANS - DIRECT - RUSS

1          (Sidebar begins at 3:02 p.m.)

2          THE COURT:  Are we going to the same objection?

3          MR. WYATT:  Yes, Your Honor.  We're defining what

4     counts under False Claims Act --

5          (Reporter clarification.)

6          MR. WYATT:  My apologies.

7          We're defining what counts as a false claim for the

8     False Claims Act.  It's a specific subsection of the

9     Anti-Kickback Statute that says that, if claims are submitted

10    as a result of the foregoing conduct, then it counts as a

11    false claim under the False Claims Act.

12         THE COURT:  All right.  I understand Janssen's

13    position.

14         Mr. Russ, I'll let you respond, but remind me now.  I

15    thought Ms. Evans is an expert in -- and her opinion is

16    focused on whether the Janssen compliance program was

17    sufficient or deficient -- I'm using -- I'm paraphrasing here.

18    But I thought that's the focus of her testimony.

19         Is her testimony also -- I can go back to the motion in

20    limine, but is it also focused on this conduct all violated

21    these statutes?

22         MR. RUSS:  No, Your Honor.  Well, part of her

23    testimony is excluded.  She cannot -- I mean, Your Honor said

24    she cannot testify about the ultimate conclusion as to whether

25    it is --

EVANS - DIRECT - RUSS

1              THE COURT:  I remember.  Right.

2              MR. RUSS:  And obviously.

3         So this is all about whether the compliance program was

4    intended to stop potential violation -- what you would expect

5    for -- to see in the speaker program.

6         Now, to understand what she's evaluating, I have to lay

7    the predicate for their training of knowledge of materiality

8    of what it is they would have been trying to stop.

9              THE COURT:  Well, I have no problem with the first

10   line of questioning, which is, here is what Janssen is saying

11   their issue is.  Do you agree with that in your expert

12   opinion?

13        Yes.

14        This is what they say as far as the Government cares

15   about this.  Do you agree with that?

16        Yes.

17        But let me look now at the last question.

18             MR. RUSS:  Sure.

19        THE COURT:  So where would it be disclosed that

20   Ms. Evans is an expert and can state if a claim was submitted,

21   which is based upon off-label marketing, or something to that

22   effect, it's a false claim for purposes of the Anti-Kickback

23   Statute and that the Government would not reimburse?  Where

24   does it say that that is part of her expert opinion?  Because

25   that's where she's going into now.  It seems to be a little

EVANS - DIRECT - RUSS

1    bit of a different lane than is the compliance program proper

2    or not?

3              MR. RUSS:  Right.  I understood, Your Honor, that was

4    part of it.  I'll move on.  I'll look at it during the break,

5    make sure --

6              THE COURT:  All right.

7              MR. RUSS:  -- because my understanding is it was

8    incorporated in her understanding of what the compliance

9    program is designed to do.

10         But I understand the concern about defining the False

11   Claims Act.

12             THE COURT:  Yeah.  Because I think what's going to

13   happen is you're going to see this in the reverse in about a

14   week.  Right?  You're going to hand off this case, and

15   Janssen's experts is going to say, In my opinion, this is not

16   a false claim and -- I just worry that we're going to have

17   this tit for tat where we're getting conclusory opinions on

18   the issues that are before the trier of fact.  Not me but

19   before the jury.  So I want to be mindful of that.

20             MR. RUSS:  So that's a great point, Your Honor,

21   because we've been fighting back and forth -- you can see it

22   in the jury instructions -- we have been fighting on legal

23   definitions of materiality and falsity.  Obviously your --

24             THE COURT:  I'm going to have to resolve those issues

25   eventually.  We will have a charging conference to do that.  I

EVANS - DIRECT - RUSS

1  haven't done that yet and -- otherwise, I would have spoken

2  with you all.

3       But aren't those things left for me and for all of you

4  to work out?

5       MR. RUSS:  Well, yes and no.  Because if Relators are

6  right, the Court's already ruled as a matter of law, for

7  instance, that a claim has to be medically necessary and

8  reasonable, both on the motion to dismiss opinion and in the

9  summary judgment.  I mean, a lot of the fighting that's been

10  going on with the Relators and --

11       THE COURT:  But medically necessary and reasonable

12  are very different than -- right now I feel like I'm stepping

13  into Janssen's shoes.

14       What I'm saying is you could off-label market all you

15  want.  But there's a second step there, from what you're

16  saying, which is, well, you've got to demonstrate, then, that

17  what the doctor prescribed with Prezista or Intelence was not

18  medically necessary or appropriate for that patient, which is

19  a completely separate question as to whether a salesperson did

20  something wrong in step A.

21       MR. RUSS:  A hundred percent agree with you,

22  Your Honor, and we will be proving what is medically necessary

23  and reasonable.  It's the next step.  Janssen has been

24  arguing, well, that's not false.  And the Court's already

25  rejected that.

EVANS - DIRECT - RUSS

1          And so a lot of the what's false is the law, and so if

2    it's going to be resolved by the Court, great.  We can move

3    this along.  But if it's something I've got to get into

4    evidence, what is false and what is not, then I think that

5    needs to be resolved, and that's been, you know, ongoing --

6          THE COURT:  Well, let me ask this, and I know we're

7    spending a little time on it:  Do you have an expert that's

8    going to say that this is not a false claim?  That if you have

9    a claim that's submitted, even if there's an allegation that

10   that claim was submitted from a physician who received

11   off-label marketing from a salesperson, that that's not --

12   that does not constitute false claim?

13         MS. BROWN:  Well, I think, Your Honor, what we would

14   say is the Medicare manual says that what is --

15         THE COURT:  Come closer.

16         MS. BROWN:  What the Medicare rulemaking documents

17   say is that what Medicare reimburses for is medically

18   appropriate, and medically appropriate includes false

19   labeling.  So whether these prescriptions were written

20   off-label or not, our position on the documents show Medicare

21   Part D reimburses.

22         THE COURT:  Well, I don't necessarily disagree with

23   that.  I mean, part of this analysis -- there's two separate

24   things.  A doctor is able to prescribe any of these drugs

25   off-label if they determine in their own medical expertise

EVANS - DIRECT - RUSS

1    that a particular patient should get this particular drug and

2    they're going to prescribe it off-label.

3          So you saying that this doctor prescribed a drug

4    off-label, that doesn't necessarily constitute a false claim

5    because the doctor may have done nothing wrong.  He or she may

6    have determined that that patient was to receive that

7    medication off-label.

8          So I don't know how you connect those dots.  And maybe

9    that's going to be connected down the road.

10         MR. RUSS:  Two different issues, Your Honor.  So

11   that's obviously the causation fight we're having.

12         THE COURT:  Right.

13         MR. RUSS:  Very factual.  Totally understandable.

14         It's the -- when we get to the part that's counter to

15   the summary judgment and motion to dismiss opinions, from this

16   Court and in this case, that say it has to be medically

17   necessary and medically reasonable.  We have to prove that

18   it's not, of course.  That's a factual dispute.

19         But they have gone further and said, well, actually,

20   that's a condition of payment, and that's where we're --

21         THE COURT:  I'm sorry.  You have to say that slower,

22   for me and for her.

23         MR. RUSS:  They're saying notwithstanding, but the

24   Court has ruled on that, that it's a condition of payment and

25   it has to meet that for falsity or materiality; that we're

EVANS - DIRECT - RUSS

1    going to turn to the Medicare policy guide and try to fight

2    this legal issue of what is false and what is not.

3         And our point is that's been ruled on by Your Honor.

4    And so some of this is how much falsity and materiality and

5    how much is in the legal question and how much of it is going

6    to be --

7         THE COURT:  Well, I mean, we're going to have to

8    resolve this here and now, then, because -- but then I want to

9    be careful.  If I limit Relator, then you're going to be

10   limited in the exact same way when Janssen's experts come up

11   here.

12        So when you're talking about the falsity of the claim,

13   you're going to have evidence that supports what?  That

14   something that is prescribed off-label is not -- but is

15   medically necessary, is not a false claim?

16        MS. BROWN:  Yes.

17        THE COURT:  Right?  You're going to argue and you're

18   going to demonstrate with your evidence, I presume, that says,

19   well, it is a false claim if we can demonstrate that there is

20   causation.  That the reason why the doctor prescribed it

21   off-label was because of the misconduct of the manufacturer.

22        MR. RUSS:  So that's the problem.  They're going to

23   say that's not a false claim, which, just like she's saying,

24   what is a false claim, and Your Honor's already ruled.  If

25   it's not medically necessary and reasonable for Medicare

1    Part D, that would constitute a false claim.

2           So we're having this fight about what is a false claim

3    or not, which gets us potentially in the legal lane.  I don't

4    want to be there.  I think the Court's already ruled on it.

5           THE COURT:  Yeah, I'm not understanding.  Let me just

6    make sure I understand because sometimes I feel like we're

7    talking backwards.

8           If a claim is submitted and it's determined that it

9    wasn't medically necessary -- and is that the term --

10          MR. RUSS:  Medically necessary and medically

11   reasonable.

12          THE COURT:  -- necessary or medically reasonable,

13   then wouldn't that be a false claim?

14          MS. BROWN:  I guess.  I mean --

15          THE COURT:  I can't understand why it wouldn't be.

16          MS. BROWN:  I think that's right.  I mean, I want

17   Mr. Wyatt to make sure I'm not saying anything wrong legally.

18          But as I understand it, Your Honor, the crux of the

19   issue, in part, for the Court, as I understand the briefing,

20   is medically appropriate or medically necessary -- medically

21   accepted indications, does that include off-label?  And our

22   position and our evidence would be it does.  And I think they

23   have a different view.

24          MR. RUSS:  And that's a legal fight, Your Honor.

25   This has been brewing for a while.  I mean, it's a legal

EVANS - DIRECT - RUSS

1    fight.  And so it may move things further along.  It's been

2    sort of in the background in some of our evidence now for four

3    or five weeks.  I think that's probably fair.

4         THE COURT:  Is this something that you guys want me

5    to try to nip in the bud before we get to later in the case?

6    You want me to resolve this issue?  I can't resolve it now at

7    sidebar.  Excuse me.

8         MR. RUSS:  The problem would be, Your Honor, if we

9    are allowed to get into that legal, this is what the CMS says

10   and this is a false claim and this is not a false claim,

11   that's your purview, and the Court's already said what is

12   false for medical necessity and medical indication are two

13   different opinions.  We -- we're not going to get into any of

14   that.  I don't need to touch any of this with her on the

15   Anti-Kickback Statute or anything else.

16        THE COURT:  Where does Janssen disagree with what

17   Mr. Russ just said?  Where is the disagreement here?

18        MR. WYATT:  I think we have a disagreement about what

19   counts for coverage under Part D.  I agree that it's a legal

20   question.  I don't think it actually turns on what this

21   witness says or doesn't say -- or what this witness's

22   testimony needs to be does not turn on the answer to this

23   question.

24        The question is simply what are Medicare's coverage

25   rules really?

EVANS - DIRECT - RUSS

1          THE COURT:  Right.

2          MR. WYATT:  And there's some details to that that has

3    not been fleshed out yet, but there are prior rulings that

4    speak to it, but I don't think it fully closes the door --

5          THE COURT:  Well, here on this PowerPoint slide it

6    says that the Government will not --

7          MR. WYATT:  That's internal education to -- about --

8          THE COURT:  I mean, this is your position at least on

9    this PowerPoint slide.

10          MS. BROWN:  Yeah, but I don't think we disagree.  If

11   you violate the False Claims Act, then Medicare doesn't pay.

12          THE COURT:  No.  But it's saying violate it for

13   purposes of Anti-Kickback Statute.  You know, if you --

14          MS. BROWN:  Sure.  We don't dispute.

15          MR. WYATT:  No, we don't disagree with that.

16          MS. BROWN:  If you violate the law, they don't pay.

17   If you violate the law, if you truly violate these statutes,

18   we agree that the Government --

19          THE COURT:  Yeah.  The dispute is whether there was a

20   violation.

21          MS. BROWN:  Correct.

22          MR. RUSS:  Whether it's false.

23          THE COURT:  Well, no.  I think the dispute isn't

24   whether it's false; the dispute is whether the Anti-Kickback

25   Statute was violated or the -- right?

EVANS - DIRECT - RUSS

1          MS. BROWN:  Correct.  Or the False Claims Act.

2          THE COURT:  False Claims Act.  If you -- I think you

3    have to agree, and it's sitting there right on the PowerPoint,

4    that says, You do this, the Government is not going to say, We

5    don't care that you did that.

6          MS. BROWN:  If you truly violate these laws, the

7    Government cares.  We agree on that.  We disagree on what

8    counts as a violation of these acts.

9          MR. RUSS:  Which is the legal question that we keep

10   getting back to.  Is it a violation of the law or not?  And

11   that's what we've been arguing about, is does it have to be

12   medically necessary or medically reasonable?  This Court and

13   Judge Shipp both ruled, yes, it does.  And they had argued, I

14   think fairly, fairly to your position, maybe not fairly in

15   mine -- but you might take that up on appeal because you think

16   that's a legal question.

17         And our point is you've got it right.  We don't need to

18   fight about this with the facts and the evidence because it's

19   already been determined that if it's not medically --

20   reasonable or it's not medically necessary, then --

21         THE COURT:  Yeah, I don't think we need to get into

22   this anymore than we have, but here's what I'm going to do.

23         We're going to go through these instructions early next

24   week.  Not all the final instructions, but the ones that we

25   think are the hot-button issues on what we need to resolve

EVANS - DIRECT - RUSS

1   early.  I'm going to resolve it, and then we're going to be

2   done with these debates.

3           MR. RUSS:  Honestly, Your Honor, I think that would

4   be very helpful.  It would help move us along.

5           THE COURT:  Yeah.  Why don't we say sometime Monday

6   we're going to deal with this, whether it's in the morning or

7   after the witness --

8           MR. RUSS:  Tuesday.

9           THE COURT:  I'm sorry.  You're right.  Every day is

10  not a holiday for me.  Why don't we say we're going to look at

11  this Tuesday.  We're not going to go through all the final

12  instructions, just the ones that deal with the statutes and

13  what is the violation of the FCA or Anti-Kickback Statute.

14       So I'm going to focus there.

15          MS. BROWN:  Right.

16          THE COURT:  We're going to have some kind of charging

17  conference just on those instructions.  I'm going to give some

18  ruling and guidance, and we're going to move on, and that way

19  at least those are finalized.

20       And I don't know if we can do this in the morning.  It

21  sounds like it's going to take some time.  I think what we can

22  do is you all can submit something that focuses on these --

23  well, did you already submit it?

24       I guess you submitted it through your proposed

25  instructions.

EVANS - DIRECT - RUSS

1          MR. RUSS:  And there's some briefing, I think, in the

2    pretrial brief, but we are happy to continue to brief it.

3          THE COURT:  Well, maybe I'll look at that, and then

4    why don't we touch base on Tuesday after the trial day is over

5    and spend an hour.  That doesn't mean I'll rule, but at least

6    we can spend an hour focusing on it, and then I can resolve it

7    next week.  But for now, I'm going to walk away from the --

8          MR. RUSS:  Yeah, and to be fair, this is more, I

9    think, an argument about the off-label marketing, the medical

10   necessity, and the medically accepted indication, less so

11   about the AKS, but I could be --

12         THE COURT:  I think -- yeah, I mean, I think that's

13   where we're focused now.  This whole discussion has been on

14   this, so let's stay there unless you tell me we should also

15   address both issues.

16         MS. BROWN:  I'll defer to Mr. --

17         MR. WYATT:  I think on Tuesday we can address any

18   other issues that are out there.  There are some other ones

19   that we dispute on AKS, but I don't think it's implicated by

20   the testimony.

21         THE COURT:  All right.  Fair enough.  Let's get back.

22         MS. BROWN:  Thank you, Your Honor.

23         THE COURT:  I feel like I'm delaying.

24         (Sidebar was concluded at 3:15 p.m.)

25         (Open court.)

*United States District Court*
*District of New Jersey*

EVANS - DIRECT - RUSS

1        THE COURT:  All right.  We're back.

2        All right.  Mr. Russ, you can proceed, and we'll go

3    from there.  We're going to -- we're going to table that

4    issue, though, for now.

5        MR. RUSS:  Thank you, Your Honor.

6    BY MR. RUSS:

7    Q.  If we could take a look at the notes, and I think that

8    this has already been shown with the previous witness.  You

9    see on the notes that Janssen was training the types of things

10   the Government does not want to cover the cost of.

11       Right, including the violations of selling off-label or

12   misrepresenting the product?

13   A.  That's correct.

14   Q.  Okay.

15   A.  Yes.

16       MR. RUSS:  If we could, Ms. Johnson, turn to

17   Relators' 360 again.  We will look at Slide 13 again.

18   BY MR. RUSS:

19   Q.  Do you see that Janssen trained that it was the law that

20   it's illegal to ask for, receive, or offer remuneration to

21   influence the selection of products or the referral of

22   patients?

23   A.  Yes, sir.

24       MR. RUSS:  And if we could turn to the next slide.

25   BY MR. RUSS:

EVANS - DIRECT - RUSS

1    Q.    Janssen's internal compliance talked about state and

2    federal false claims laws.

3          Do you see that?

4    A.    Yes, sir.

5    Q.    So we talked a little bit about Medicaid.  Do the states

6    also have their own False Claims Act laws?

7    A.    They do.  They do, and several states have anti-kickback

8    analogs as well.

9    Q.    Okay.

10         And you see that Janssen trained that under these laws,

11   healthcare professionals were prohibited from submitting false

12   or fraudulent claims for a company's products or services to

13   both the state or federal government health care program.

14         Do you see that?

15   A.    Yes.

16   Q.    And then Janssen trained that "A company may be

17   implicated by the Government if it purposely provides

18   information to a health care provider that causes the health

19   care provider to submit false or fraudulent claims for the

20   company's products or services."

21         Do you see that?

22   A.    Yes, sir.

23   Q.    Okay.

24         MR. RUSS:  With that background, let's take a look,

25   if we could, back at our slide show, our slides.  If we could

EVANS - DIRECT - RUSS

1    go to the slide -- I'm not sure my clicker is working.

2    BY MR. RUSS:

3    Q.   Ms. Evans, you've seen some documentation, some evidence

4    in this case, and I know the jury has seen this as well --

5    when we talked about speaker selection, tell us what you're

6    looking for for a red flag if the speakers are being selected

7    based on their prescribing potential.

8    A.   I look for an organization, either a marketing and

9    sales -- first of all, I look to see if sales are

10   predominantly nominating the speakers.  That is a red flag to

11   me.

12         And then I look to determine what they are using to --

13   to recommend that the speakers be included in the speaker

14   bureau.  Are they looking at the volume and value of the

15   speakers' prescriptions?"  That's a concern to me.

16   Q.   Would it be a concern to you, Ms. Evans, if the speakers

17   were being put in buckets that corresponded with their

18   prescribing potential?

19   A.   Yes.  Ranking speakers by their -- the extent of their

20   prescriptions, either numerically or the value of those

21   prescriptions, is a red flag because, again, it looks from a

22   compliance perspective as if you're evaluating the speaker on

23   their -- the number of prescriptions that they're able to or

24   inclined to order of your product as opposed to just imparting

25   information that's scientific and medical in nature.

EVANS - DIRECT - RUSS

1    Q.   Ms. Evans, do you see at the top of Slide 5 where Janssen

2    says, "targeted top activists:  Reyataz, Kaletra, Fuzeon

3    prescribers for the district"?

4    A.   Yes, sir.

5    Q.   All right.

6         This is a 2006 presentation that I believe you've seen

7    where Janssen was rolling out its promotional speaker program.

8         Do you remember that?

9    A.   Yes.  I'm familiar with this particular document,

10   actually.

11   Q.   If we could go to the next slide, please.  Do you see

12   that around the time, 2006, that Janssen was putting lists

13   together with speaker names, an A list, a B list, and a

14   C list?

15   A.   Yes, sir.  I see that.

16   Q.   Okay.

17        And if we could continue to the next slide, you see

18   that Janssen had actually identified before Prezista was

19   approved who the top prescribers were for each of those

20   competitor drugs?

21   A.   Yes.  This particular one is for Aptivus, the top Aptivus

22   prescribers in the New York district, and then there's a list

23   of those prescribers and then the current 12 month -- how many

24   prescriptions they had to the far right.

25   Q.   We'll keep moving on to the next slide.  You see that --

1    ultimately from that list who Janssen ended up making speakers

2    on their Prezista commercial speaker bureau?

3    A.   Yes, sir.  I'm familiar with several of those names on

4    the -- on that top Aptivus prescribers list that have been

5    highlighted as being speakers for Prezista.  Sorry.

6    Q.   And those prescribers made it into one of the A, B, or C

7    buckets.

8         Do you remember that?

9    A.   They did, yes.

10   Q.   Okay.

11        And again they did the same thing for Fuzeon on the

12   next slide, and then the next slide, same thing.  They were

13   put in the buckets of A, B, and C?

14   A.   Yes, sir.

15   Q.   Right?

16        And the next slide, did the same thing for Reyataz?

17   A.   Yes.

18   Q.   Same thing on the next slide?  Who made it into the

19   buckets and who was going to be proposed to be a speaker?

20   A.   Yes, sir.

21   Q.   Okay.

22        Same thing for Kaletra, which is another competitor

23   drug?

24   A.   Yes, sir, same thing for Kaletra.

25   Q.   You see on the right side where the company is tracking

EVANS - DIRECT - RUSS

1    the prescription volume for its competitor drugs for those

2    doctors over a 12-month period?

3    A.    That's correct, and this is before approval of Prezista.

4    Q.    Is that something that you would want to evaluate in

5    determining whether or not the program is being set up and

6    speakers are being selected in an appropriate manner?

7    A.    Yes.

8    Q.    And did you reach a conclusion based on this evidence

9    about whether or not you thought this was a compliant approach

10   to selecting speakers?

11   A.    I felt that this raised a red flag about the

12   effectiveness of the compliance program because it appeared to

13   me as if Janssen was targeting top competitors' prescribers,

14   and that is not necessarily consistent with what one would

15   expect and what Janssen had in its compliance policies about

16   who they should be looking for for speaker selections.

17        Speaker selection is supposed to be based on, you know,

18   whether or not the individual is a knowledge/opinion leader,

19   whether or not the individual is a good speaker, whether or

20   not the individual has academic or clinical trial experience

21   with a particular product.

22        And this idea that they were looking at these

23   prescribers who are top prescribers of the competitors was a

24   red flag to me because it looked as if they were using perhaps

25   prescribing ability as the reason for selecting particular

EVANS - DIRECT - RUSS

1    speakers to be on their bureau.

2         MR. RUSS:  If we could go to slide 15, Ms. Johnson.

3    BY MR. RUSS:

4    Q.   Do you see here ultimately a number of those speakers

5    wound up on the A, B, and C list?  And we've highlighted for

6    you, Ms. Evans, some of the speakers.

7         Do you recognize some of those names?

8    A.   I do recognize many of those names, actually on the A

9    list, a few on the B list, and maybe one or two on the C list.

10   Q.   And then from that point, are you familiar with what

11   happened as far as the Prezista speaker bureau and how many

12   speakers were put on it in 2006?

13   A.   Well, I recall seeing documentary evidence that

14   pre-approval they were looking for a -- had trained 150

15   speakers to be speakers for the Prezista product at launch.

16   And I know that some of the individuals on the A list were in

17   that group, and then later on, some on the B and C lists were

18   also in that group of speakers or a -- sorry -- strike that --

19   a subsequent group of speakers, I should say.

20   Q.   In your review of the materials, did you see any evidence

21   of a needs assessment or some sort of evaluation for why the

22   company decided on around 150 speakers?

23   A.   No, I did not see what I would consider to be an

24   effective business needs assessment of why at the outset they

25   needed 150 speakers, and then within a short period of time

EVANS - DIRECT - RUSS

 1    they asked for another hundred speakers.

 2         There didn't seem to be articulation in the materials

 3    that I reviewed that explained why, from an educational or

 4    scientific perspective, those numbers of speakers were needed.

 5    Q.   There's been some testimony, and you may be familiar with

 6    some of this as an expert in this case, Ms. Evans, about a

 7    SAFE committee.

 8    A.   Yes.  I did read something about the SAFE committee.

 9    Q.   Did you recall reading Ms. Kaucher's deposition testimony

10    about whether she knew what the SAFE committee was?

11    A.   Yes, and I was surprised she had no -- or very little

12    familiarity with the SAFE committee.

13    Q.   And there's another expert in this case that we may hear

14    from, Janssen's expert, Mr. Smollen?

15    A.   Yes.

16    Q.   And you had a chance to review his report and his

17    deposition testimony?

18    A.   I did.

19    Q.   Okay.

20         Do you recall whether or not he saw any evidence that

21    the SAFE committee was involved in overseeing the selection of

22    speakers?

23    A.   Yes.  It's my understanding that Mr. Smollen in his

24    report stated that he had -- either his report or his

25    deposition, I can't recall -- that he had no information or

EVANS - DIRECT - RUSS

1  had made no observation that the SAFE committee was at all

2  involved in speaker selection.

3  Q.   Who was Ms. Kaucher?  Do you recall?

4  A.   Ms. Kaucher was a compliance person who was involved at

5  the beginning of the review period, 2006.  She was in the

6  health care compliance department.  She became the compliance

7  officer for the Prezista and Intelence programs in 2010 -- end

8  of 2009, 2010, I believe.

9  Q.   And you said that she had no memory or didn't know what

10 the SAFE committee was?

11 A.   She really had no information that she could impart about

12 the SAFE committee being used as a control.  She wasn't

13 familiar with it.

14        MR. RUSS:  If we could, Ms. Johnson, move to the next

15 slide.

16 BY MR. RUSS:

17 Q.   Ms. Evans, you've reviewed some of the -- we saw you

18 looked at Professor Shaked's report.  So you've seen some

19 information about how much some of these speakers were paid.

20 A.   Yes, sir.

21 Q.   Can you take a look at that slide and describe for us the

22 type of dollar figures that Janssen ultimately was paying some

23 of these prescribers that we just saw that were selected?

24 A.   Yes.  So one of the names that appeared on the -- one of

25 the earlier exhibits was David Rubin.  David Rubin, for the

EVANS - DIRECT - RUSS

1    Prezista and/or Intelence speaker programs -- Intelence

2    speaker programs, received $157,500 during the time period in

3    question, from 2006 to 2014.

4        Sorana Segal-Maurer, another who is listed, received

5    $402,000 and -- I'm sorry -- 402,250 as honoraria from

6    Janssen.

7        Another big one was Ricky Hsu.  I was tracking his name

8    kind of all the way through the documents when I first started

9    reviewing the materials, and he was 289,250 in honoraria.

10       Now, this was not the only money that they received

11   from Janssen.

12   Q.   Okay.

13       Let me stop you there --

14   A.   Okay.

15   Q.   -- because I want to talk about that.

16       But this slide, based on the information you reviewed,

17   gives an overview of some of the speakers.  You understand

18   there were 335 speakers, right?

19   A.   Yes, sir.

20   Q.   It gives an overview of how much speaker payments they

21   received, and then the column on the right shows how much

22   Janssen received for billing for those prescriptions.

23       Do you see that?

24   A.   That's correct.

25   Q.   Okay.

EVANS - DIRECT - RUSS

1      Do you -- you mentioned that there were other types of

2 payments or maybe things of value that some of these speakers

3 received.  Explain that.

4 A.    Yes, sir.  So in addition to the amounts that they

5 received as honoraria from Janssen, the speakers also received

6 money for travel.  They received money for meals and other

7 expenses connected with the speaker programs.  They received

8 money for speaker training.

9      And at least one of the witnesses whose depositions

10 that I read explained that the money for the -- the money for

11 something called ad boards or speaker training was in addition

12 to the honoraria.

13      Ad boards were, as I understand it, proceedings that

14 were put on by marketing, and they were gathering some of the

15 physicians together who would be potential speakers to pick

16 their brains about how to better market Prezista and

17 Intelence.

18      So this money was in addition to, for example -- for

19 Dr. Segal-Maurer, in addition to the $402,250 she would have

20 received money in connection with ad board travel.  There were

21 other payments that were made.

22 Q.    So at the bottom right, Ms. Evans, does this data

23 reflect, just for these prescribers, approximately $2.6

24 million, resulting in $36 million in reimbursement?

25 A.    That's correct, and I understand that $2,647,300 to be

EVANS - DIRECT - RUSS

1    just the honoraria, not the additional monies, the ad boards

2    and --

3    Q.   Okay.

4         If we could go to the next slide, please.  Those

5    highlights show some of the individuals that received over a

6    hundred thousand dollars.

7    A.   Yes, sir.

8    Q.   Okay.

9         Is that something that you would look at as a

10   compliance officer, how much money any particular prescriber

11   would be receiving in a program like this?

12   A.   Yes.  If I was the compliance officer, I would want to

13   know speakers who were receiving large amounts of honoraria,

14   large amounts of other funds.

15        I mean, I think that was something that should have

16   been tracked and should have caused a -- an analysis of

17   whether or not that was a potential compliance problem,

18   whether or not those were potential payments in violation of

19   the Anti-Kickback Statute.

20        I would have, at that point, wanted to delve further

21   into the cause for the huge amounts of money that was going to

22   the speakers and whether or not there was some business need I

23   had overlooked or that had been overlooked.

24        But I didn't see anything analyzing why the payments

25   were so high.

1  Q.   Am I right, Ms. Evans, that the far right column, the

2  36 million, that's just the reimbursement that Janssen

3  received from those speakers prescriptions?

4  A.   Yes, sir.

5  Q.   Okay.

6       If we could take a look at the next slide.  You see

7  documentation that's been admitted in this case that Janssen

8  was tracking physicians by dollars?

9  A.   Yes, sir.

10 Q.   Is that a red flag for you as a former compliance officer

11 and an expert in health care compliance?

12 A.   It is.  In addition --

13 Q.   Why?

14 A.   Excuse me.  I'm sorry.

15      In addition to the numbers of prescriptions, you also

16 look at the value that they're bringing in or billing for so

17 you can see -- and the number of speaker programs that they've

18 performed.

19      So you can see on this particular exhibit the year to

20 date and then where they were at 13 weeks out, I think it is,

21 and four weeks, I think it is?  So...

22      MR. RUSS:  And if we could move to the next slide,

23 please.

24 BY MR. RUSS:

25 Q.   Do you see some doctors that we've listed on the right

EVANS - DIRECT - RUSS

1    from this top 25 physicians by dollars and highlighted some of

2    the individuals who received high amounts of honoraria

3    payments from Janssen?

4    A.   Yes, sir.

5    Q.   Okay.

6         Same concerns that you just talked to the jury about?

7    A.   Same concerns, yes.

8            MR. RUSS:  If we could turn to Relators' 199, which

9    is already in evidence.  Ms. Johnson, if you could turn to

10   page 4.

11   BY MR. RUSS:

12   Q.   While she's turning to page 4, Ms. Evans, you've seen

13   this email.  This is the email where Cheryl Gay at the top

14   says, I suggest we keep -- you know, not discuss the

15   prescription volume.

16        Do you remember this email?

17   A.   I am familiar with this email, yes.

18   Q.   Well, right there, as a former compliance officer and

19   expert in health care compliance, if there's reference to not

20   discussing prescription volume, is that a red flag?

21   A.   That was on the first page, and, yes, that's something

22   that I noticed, yeah.  So, yes.  Apparently somebody in the

23   program understood that it would be inappropriate to discuss

24   whether or not someone should stay on the speaker bureau based

25   on the volume or value of their prescriptions.

EVANS - DIRECT - RUSS

1   Q.   If you could look at the number 1, you see where it says,

2   "more than five PRZ," which is Prezista scripts?

3   A.   Yes.  As I understand it, this was a -- this is in 2007,

4   and so they were determining who was going to be retained on

5   the speaker bureau.  And one of the requirements was that to

6   be on the speaker bureau, you had to have prescribed more than

7   five Prezista prescriptions.

8   Q.   Is that a red flag?

9   A.   Yes, it is.

10  Q.   Why?

11  A.   Because it's clearly determining whether or not an

12  individual is going to be on the speaker program based on the

13  number of prescriptions, the scripts.

14          MR. RUSS:  And if we could, Ms. Johnson, turn to

15  Relators' 149, which is also admitted.

16  BY MR. RUSS:

17  Q.   Ms. Evans, this evidence came in this week in this trial.

18          MR. RUSS:  If we could take a look at page 29.

19  BY MR. RUSS:

20  Q.   Ms. Evans, do you see there that Janssen had put a value

21  of a Prezista patient calculation together?

22  A.   Yes.

23  Q.   Do you see on the right that's circled -- that there was

24  a lifetime value, discounted for a Prezista patient of about

25  $25,000?

EVANS - DIRECT - RUSS

1  A.  Yes, sir.

2  Q.  So under the email that you just saw, if a speaker had to

3  have five prescriptions to be considered to be a speaker and

4  you apply the lifetime value of a patient, assuming those

5  prescriptions were all for different patients, would that be

6  at a minimum $125,000 to Janssen?

7  A.  Yes.  If you use that discounted $25,000 number times

8  five, that's what this turns out to be.  So as I understand

9  it, that would indicate that a single speaker on the bureau

10  was worth $125,000 to Janssen.

11  Q.  At a minimum?

12  A.  At a minimum.

13  Q.  If we could -- you also mentioned tracking speakers'

14  prescriptions.

15       MR. RUSS:  If we could look at Relators' 316, please,

16  and the second page, please.

17  BY MR. RUSS:

18  Q.  Ms. Evans, this also came into evidence, and this was

19  a New England Speaker Sales Performance.

20       Do you see that?

21  A.  Yes.

22  Q.  And it says, "Speaker Sales."

23       Right?

24  A.  Right.

25  Q.  Is it a red flag?  I think you've already said it's a red

EVANS - DIRECT - RUSS

1  flag to track speaker prescriptions.

2  A.   Yes, it is a red flag.

3  Q.   Why?

4  A.   Because, again, you're clearly determining whether or not

5  an individual stays on the speaker bureau or is used for,

6  perhaps, more programs than another speaker based on the -- on

7  the sales -- excuse me -- the prescriptions that that

8  particular speaker wrote.

9        It's not about whether or not the speaker was a good --

10  you know, was able to speak before a group of people, it's not

11  whether or not the speaker had a good background, a good

12  medical and science background, or saw a number of patients or

13  was renowned in the field.  It's all about the numbers of

14  prescriptions.

15        MR. RUSS:  Let's turn to Relators' 163, please,

16  page 4.

17  BY MR. RUSS:

18  Q.   Ms. Evans, this is also in evidence.  And you see other

19  speaker performance?

20  A.   Yes.

21        MR. RUSS:  Take it down.  Hold on.

22        We can move on, Your Honor.  Sounds like there may be

23  some confusion as to whether or not this has been admitted

24  already.

25        THE COURT:  All right.

EVANS - DIRECT - RUSS

 1  BY MR. RUSS:

 2  Q.   When you take a look at how the speakers are being

 3  selected and then if they were tracked based on the

 4  prescription volume, how does that square up with OIG guidance

 5  and Janssen's own policies?

 6  A.   Well, the OIG guidance makes it clear that if you're

 7  going to be paying or providing remuneration to a prescriber

 8  or someone who is capable of ordering an item or service to be

 9  paid for by the federal Government certain, sort of, I don't

10  know, guardrails should be in place.  And one of the things

11  that the OIG guidance specifically says is that the speakers

12  or consultant should not be -- excuse me -- should not be

13  selected on the basis of their -- of the volume and value of

14  their prescriptions or their ordering.  So that would be of

15  concern.

16       They do -- I'm sorry.  I will stop.

17  Q.   One of the things you said that you looked at was

18  Janssen's own policies.  Did you make conclusions of whether

19  or not Janssen was violating its own policies?

20  A.   Yes, I did.

21  Q.   Tell the jury about that.

22  A.   I looked over all of the policies starting in 2006.  And

23  when I say "all of the policies," I might have missed some,

24  but I basically looked at the general compliance policies, the

25  speaker program compliance policies, the policies about paying

EVANS - DIRECT - RUSS

1    consultants, the policies about implementing and conducting a

2    speaker program, policy on speaker selections.  Like, had them

3    all out, looked at all of them.

4         And I came to the conclusion that -- at least with

5    respect to what some of the emails and the documents going

6    back and forth, the -- you know, looking at the return on

7    investment, looking at the speakers' own prescriptions,

8    looking at the fact that speakers were dropped from the

9    speaker bureau if they didn't keep their prescriptions up, I

10   came to the conclusion that those policies, while they looked

11   pretty good in most cases, were just simply not being

12   followed.

13   Q.  And did you look at two different time periods in your

14   review from 2006 to 2010 and then 2010 to 2014?

15   A.  I did.  I broke it up into two separate time periods.

16        Basically, after I read Ms. Kaucher, so from 2006 to

17   2010, 2009, 2010, there was really, you know, scant oversight

18   of the speaker programs by the compliance department.  I

19   really -- I went back and looked at other compliance testimony

20   since that time, looked at Dr. Patel's testimony, and I could

21   not find anybody who seemed to take responsibility for the

22   speaker programs in the compliance department, at least with

23   respect to Prezista and Intelence.  Right?

24        Then I looked at 2011 through 2014, 2010 through 2014,

25   as kind of a separate chunk.  At that point, Ms. Kaucher was,

EVANS - DIRECT - RUSS

1    in fact, the person who was in charge of the speaker programs,

2    but she was somewhat isolated, if you will, in the compliance

3    department in this sense:  There was information that was

4    being collected from different pieces of the compliance

5    function that didn't get to her or she didn't get her concerns

6    out to them.

7          So there was a gap in compliance communication.  There

8    was not an effective auditing and compliance -- excuse me --

9    auditing and monitoring for compliance with the policies that

10   had been written.

11         So, yeah, I did kind of separate them into two

12   sections.

13   Q.  Were you able to -- based on your evaluation of the

14   depositions and the documents in this case, were you able to

15   figure out who the compliance officer was at Janssen over

16   Prezista and Intelence from 2006 to 2010?

17   A.   No.  There was -- there were compliance officers who were

18   way up in the Janssen parent and -- but I couldn't find

19   anybody who appeared -- as I said, appeared to take

20   responsibility for compliance during that period of time.

21         You know, Dr. Patel, to a certain extent, had some

22   compliance responsibilities, but he did not do an effective

23   job of monitoring the programs.

24         During that time period -- and even during the second

25   time period as well -- but from 2006 to 2010, a lot of the

EVANS - DIRECT - RUSS

1    compliance function was passed back off to the sales

2    representatives.  In other words, the sales representatives

3    were responsible for reporting whether or not the speaker went

4    off-label.  The sales representatives were responsible for,

5    you know, other -- you know, speaker misconduct, for reporting

6    certain things.  And that just seemed, to me, to be a very

7    inefficient way of administering the compliance program,

8    especially because the sales representatives and their

9    managers were all incentivized to sell product.

10         So you've got them, on the one hand, being asked to

11   police the speakers and to do things according to the

12   compliance policies.  On the other hand, it seemed to me that

13   they were being pressured to sell, sell, sell, to have speaker

14   program after speaker program.

15         In fact, they were compensated on the number of speaker

16   programs they held, which I thought was unusual.

17   Q.   So are you aware of the evidence in this case that people

18   have testified that they don't recall compliance being at a

19   speaker event from 2006 to 2010?

20   A.   Yes, I do recall that.

21   Q.   If that is true, what conclusion or concerns would you

22   draw from that, then?

23   A.   That you have no unbiased individual who has oversight

24   about how the speaker programs were actually being conducted

25   in real life.  There was some communication or some testimony

EVANS - DIRECT - RUSS

1    about ride-alongs and -- but ride-alongs appeared, to me, to

2    be the manager going with the sales representative out to see

3    the doctor.  So the manager would sometimes go to the speaker

4    programs, but, again, the managers were also incentivized to

5    sell and have a successful program.

6          So, no, I didn't see any real controls.

7          The other aspect of control that appeared -- or an

8    attempt at control but appeared during that early time period,

9    2006 to 2010, was from AHM, which was the vendor that set up

10   the speaker programs.  They're the people who -- it's a

11   company -- that finds the restaurant, you know, negotiates the

12   final restaurant, sends out the invitations or helps to send

13   it out.

14         And Kaucher -- excuse me.  Ms. Kaucher and other people

15   deferred to AHM in the first instance and then MedForce, which

16   was the vendor for the second half, 2010 through 2014, as

17   being responsible for, you know, letting Janssen know if the

18   speaker went off-label.  Well --

19   Q.   So let me -- so what you're saying is that compliance

20   outsourced someone's job to vendors like MedForce?

21   A.   Yes.  Yes.

22   Q.   Was there -- are you aware that, in 2010, Janssen was

23   subject to a corporate integrity agreement?

24   A.   Yes.

25   Q.   After that 2010 agreement, did you see some sort of --

EVANS - DIRECT - RUSS

1  more activity surrounding the speaker programs?

2  A.    I did.  I saw that the speaker policies were tightened up

3  a little bit.  Some of the processes seemed to be tightened up

4  a little bit, and there were requirements under the corporate

5  integrity agreement in 2010, and again, in 2013, there was a

6  second one, requirements that were imposed on the compliance

7  department.

8       In other words -- excuse me -- HHS/OIG, the regulator,

9  enforcement agency, said to Janssen, You will have these

10 elements in your compliance program.  You will require your

11 compliance department to do the following things.

12      And -- but that was across, as I understand it, all of

13 Janssen.  It wasn't just Prezista and Intelence.

14 Q.    Was one of the requirements for the 2010 CIA that there

15 had to be a hundred speaker programs that compliance attended

16 across all Janssen divisions?

17 A.    Yes.

18 Q.    Okay.  And there was one of the requirements in the 2013

19 CIA that there had to be 150 more compliance visits to a

20 speaker program across all Janssen divisions?

21 A.    That's correct.  They increased the number of -- I think

22 they called them observations, where someone from the

23 compliance department or one of their contractors had to go

24 out.  And when I say "contractors," I don't mean AHM or

25 MedForce.  I mean someone who is engaged as a professional to

EVANS - DIRECT - RUSS

1    go out and look at -- you know, a professional compliance

2    person to go out and look at the speaker programs.

3    Q.    So from 2006 to 2010, did you see any evidence that

4    compliance attended one of the Intelence or Prezista's speaker

5    programs?

6    A.    I could not find any evidence.  If it occurred, the

7    witnesses whose testimonies I read and the documents that I

8    reviewed didn't reflect any that I could find.

9    Q.    Are you aware from 2006 to 2014 that Janssen held

10   approximately just under 9,000 speaker events?

11   A.    Yes.

12   Q.    Okay.

13        From the 2010 to 2014 time period, where they had this

14   obligation to attend these events, how many times were you

15   able to find that Janssen sent compliance to an Intelence or

16   Prezista speech?

17   A.    Well, I actually reviewed spreadsheets, and then had --

18   those were consolidated and sort of organized.  And when I

19   pulled away all the other drugs and was able, with help, to

20   find out which of the observations involved Prezista and

21   Intelence, it was only 20 of the thousands of speaker programs

22   that had occurred between 2010 and 2014.

23   Q.    20 times?

24   A.    Only 20, yeah.  May have been 22, 23, but I think it

25   was -- 20 sticks in my head.

EVANS - DIRECT - RUSS

1    Q.   Okay.

2            THE COURT:  Mr. Russ, is this a good place to stop,

3    or do you -- at least based on this topic?

4            MR. RUSS:  This is a perfect time to stop, Your

5    Honor.

6            THE COURT:  All right.  Let's do the last home

7    stretch of ten minutes.

8        And, Megan, you doing all right?  I want to make sure

9    she can rest her fingers while we're all sitting here.

10       So let's take a break and let the jurors out.

11           (A short recess occurred.)

12           THE DEPUTY COURT CLERK:  Please remain seated.

13           THE COURT:  We good to go?

14           MR. MARKETOS:  Your Honor, we had a discussion with

15   Janssen counsel.  We've got a couple issues, it sounds like,

16   we need to address because we need to get into that testimony

17   with Ms. Evans.

18       And our joint proposal request, begging, would be that

19   we address those issues and let the jurors go for the weekend.

20           THE COURT:  All right.  I just want to hear from

21   Janssen, too.

22           MS. BROWN:  Absolutely.  We're fully supportive of

23   it, Your Honor.

24           THE COURT:  All right.  So we're going to give them a

25   weekend holiday.

1          MR. MARKETOS:  It will save them two hours for one

2     hour.  In other words, we will be getting them extra time

3     saved if we address this issue and let them go.  We both --

4          THE COURT:  I'm going to spin it that way whether

5     that's true or not.

6          MS. BROWN:  I think --

7          THE COURT:  I mean, look, you don't have to convince

8     me we're not going to have to save the jurors, but they're

9     going to be blaming me for this.

10          So all right.  Well, why don't we do this, then:  So

11     should I bring them back in with Ms. Evans on the stand and

12     then conclude, that way they don't know what's happening?

13          MR. MARKETOS:  That would be great, Your Honor.

14          THE COURT:  Kim, let's get them in.

15          THE DEPUTY COURT CLERK:  All rise.

16          (Jury enters the courtroom.)

17          THE COURT:  You've got to come in because we've got

18     to do this process, but I wouldn't even sit.

19          Here's where we are.  We're about to address some legal

20     issues that could actually save us time.  So I'm going to

21     actually adjourn you for the holiday weekend now, and I

22     promise you it actually cuts hours if I address those issues

23     now.  So it's going to save you time in the long run.

24          So what I'd like to do is we're going to excuse you all

25     for the weekend.  I forgot.  We're not sitting Monday either.

1    Right.  You have your holiday weekend.  So Tuesday, 9 o'clock,

2    be ready.  We will be ready.  Any issues that I need to deal

3    with will be resolved by then so we can continue to move

4    forward.  But I wanted to save some time on sidebar.

5           So one last thing I want to instruct, and I haven't

6    given this reminder in a bit.  But we've been going through

7    the trial.  Continue not to discuss the case when you're in

8    the deliberation's room because you're not in deliberations

9    yet.  Don't discuss the case with each other.  Don't discuss

10   it outside of the courtroom with friends or family.  So you're

11   still in that process.

12          There will be a point where I actually put you into

13   deliberations and then you can chat all you want.  I'll be

14   encouraging you to do that on the case, but just remind

15   yourselves.

16          So with that, enjoy your holiday weekend.  I appreciate

17   your attention and patience, and I will see you Tuesday

18   morning at 9 o'clock.  Thank you, all.

19          Folks, everyone else can be seated.  Counsel remain.  I

20   want to chat with you.

21          And, Ms. Evans, you're dismissed for the day as well.

22   So why don't you enjoy your holiday weekend, and you can step

23   out of the witness box.

24              THE WITNESS:  Thank you.

25              (The jury is excused at this time.)

*3647*

```
 1          THE COURT:  All right.  I don't know who wants to

 2   speak first.

 3          Relators?  Yeah, Mr. Marketos, since you raised the

 4   issue.

 5          MR. MARKETOS:  Sure, Your Honor.

 6          THE COURT:  And do we want to wait for Ms. Evans to

 7   be out of the room?  Okay.

 8          MR. MARKETOS:  No, I think the premise is right.

 9   It's going to save -- it sounds like this is a little bit like

10   that DDMAC issue, where they've got a legal point they want to

11   raise.  The problem is that prevents us from getting into the

12   facts with the witness, and so we need to resolve those

13   issues.

14          I will say this, Your Honor:  From our perspective,

15   these issues were resolved because motions in limine were a

16   year and a half ago.  And so when a witness's opinion is

17   expressed in her report and Your Honor rules and even excludes

18   a portion of it that we can't get into, the rest of her

19   opinion, of course, needs to come through the witness from the

20   stand.

21          That's the -- I realize they're bringing up a Part D

22   issue, and I realize they're bringing up DDMAC issues during

23   the course of the case, and our view is, if you have an issue

24   with us putting on our evidence to prove our claims, then that

25   needs to be brought forward in some form or fashion and not
```

1    through trial objections.

2         That's our view of it.  I'm not being critical, but

3    that's preventing us from putting on the case that we need to

4    put on.

5         So if there are some issues they want to brief, I guess

6    maybe they could do that.

7         THE COURT:  Well, just so I'm following the

8    discussion here, so what's the specific issue that you need me

9    to resolve kind of in advance so that we're not hitting it

10   during the trial, other than what I was thinking about during

11   the sidebar, which is this weekend, I'm going to go through

12   the final jury instructions, go through what you may have

13   briefed on it, go through my prior opinions to make sure, you

14   know, where we are with what I believe is going to be

15   instruction for the False Claims Act and the law on that and

16   the Anti-Kickback Statute, and we can talk on Tuesday?

17        But is there something very specific that is outside of

18   the scope of what I had planned to do that we need to address

19   today?

20        MR. MARKETOS:  Well, for instance, and I think it was

21   eventually handled by referring to their own slides, but, for

22   instance, you know, Ms. Evans speaks about remuneration in her

23   opinion, you know, what it means, remuneration, with respect

24   to the Anti-Kickback Statute, and there was an objection to

25   that.  We need to make sure we've got our elements covered.

 1    Right?  That's part of it.

 2         If there are issues --

 3         THE COURT:  But let me ask you this, and I haven't

 4    looked at this yet because I'm going to be kind of

 5    scrutinizing it this weekend.  Is remuneration not defined in

 6    the final instructions by any of the parties?

 7         MR. MARKETOS:  Yes.  It will be exactly.  It will be

 8    defined in the final instructions so --

 9         THE COURT:  So then let me ask you this -- that was

10    my first question.

11         My second question is, why would any witness have to

12    testify to that definition if the definition will come from

13    me, from the Court, as an instruction to the jury as to what

14    that means?

15         MR. MARKETOS:  Well, it's not -- first of all, she's

16    a lawyer.  That's one thing about it.  Right?  They say,

17    objection, legal conclusion.  Well, she's a lawyer, and that's

18    part of her opinions, is that X, Y and Z constitutes

19    remuneration.

20         So attendees at an event, X, Y, Z.  You have to be able

21    to tell the jurors that, you know, remuneration is not just

22    cash money but also X, Y and Z.

23         THE COURT:  And that's not in one of the proposed

24    instructions, in the final instructions?

25         MR. MARKETOS:  It will be.  Remuneration will be

1    defined, no doubt, for the AKS, for the Anti-Kickback Statute.

2    No doubt.  So why would this witness not be able to attest to

3    that?

4           THE COURT:  Well, that's where I -- that's where my

5    concern is.  Right?

6         What you're saying is, I'm going to instruct them on

7    the law, so why can't the witness tell them what the law is?

8    And that, I have a problem with because that instruction

9    should come from me, not from either expert, either from the

10   Relators or Janssen, for the same reason that I would say,

11   well, why would an expert that Janssen called be able to

12   instruct this jury on what the statute means when I'm supposed

13   to instruct on it?  That's where my concern is.  At least

14   that's where my concern was on the one issue that you're

15   raising.  Right?

16         The one issue that I sustained the objection from

17   Janssen was, you were going to have a witness define a term in

18   the statute that I believe, unless I was mistaken, that I

19   would be defining in the jury instruction.  So I'm not so

20   clear on why we would have a witness doing that.

21           MR. MARKETOS:  It would be like a witness like

22   Dr. Glatt saying, Medically accepted indication means X, Y and

23   Z, and here is why this is not a medically accepted

24   indication.  It's because that's what an expert witness is

25   being proffered for and explaining what types of things in a

 1    compliance program or in a speakers' program constitutes

 2    remuneration.  It's the heart of your case.  Right?

 3         So they have to know that she's not just talking about

 4    payments and X, Y, Z but that it's remuneration.

 5         THE COURT:  No.  But why wouldn't it normally be like

 6    this?  Right?  A witness testifies that they received money,

 7    they received dinners, they received all this, and then later

 8    they are instructed on what remuneration means, and then in

 9    closing, you connect the dots on what evidence is there and

10    how that -- those facts or that evidence meets the elements

11    that you are required to prove for your claims.

12         I mean, isn't that normally how it would be done?  We

13    don't have witnesses sit in the witness box and say, Let me

14    tell you, ladies and gentlemen, what I reviewed, this is

15    remuneration.  This is this.  And then they have an expert

16    that's going to do the exact opposite, and then we have two

17    experts giving legal conclusions to the jury when, really,

18    those definitions should come from the Court.

19         That's where I'm trying to draw the line, and I still

20    don't think you've convinced me that you're seeing the same

21    line that I'm seeing.

22         MR. MARKETOS:  Yeah, I'm not, Your Honor, but that's

23    okay.  I think maybe I'm just speaking -- I'm speaking past

24    the Court on this one, and I need to make sure I frame it

25    right.

1      A witness is allowed to attest to what elements she

2 is -- her opinion goes to.  That -- so it makes the testimony

3 helpful to the trier of fact.  And it doesn't just have to

4 break down the elements into their denuded form.  She needs to

5 be able to offer it in whole.

6      You know, I was looking at this with respect to

7 compliance.  I was looking at this, and the reason you can't

8 do it, just like Janssen says in its health care compliance

9 laws, is because that would constitute remuneration.

10      That's what makes her testimony helpful to the trier of

11 fact.  And if we can't do that, it's hard to -- what are we

12 connecting her opinion to?

13      And it doesn't mean we have to get in there and say,

14 24 CFR 21 says X, Y and Z.  But she needs to be able to say,

15 generally speaking, remuneration.  Just like, generally

16 speaking, Medicare requires you to pay money back.  Right?

17 That's not a legal conclusion.

18      And may it just be that I'm not phrasing the issue

19 right, Your Honor.

20          THE COURT:  Let me hear from Janssen.

21          MR. WYATT:  Your Honor, my understanding is the same

22 as the Court's.  An expert can't -- even an expert with a JD,

23 and maybe especially an expert with a JD, cannot get on the

24 stand and say, The Anti-Kickback Statute means X, Y, Z.  That,

25 you cannot do.  I've never seen it done.  I've seen it tried.

1    It often gets excluded at the Daubert stage, and I did not

2    understand that that was going to be part of this witness's

3    opinion.

4         The witness can talk about aspects of the speaker

5    program that, you know, ** guidance, you know, departs from

6    those standards, and the witness has done that.  But the Court

7    is absolutely correct that there's going to be one definition

8    of the word "remuneration" in this case, and it's going to

9    come from Your Honor in the jury instructions.  And then the

10   argument puts the facts and the law together and makes a pitch

11   to the jury that, hey, this is remuneration.  And we are going

12   to say, hey, no, it's not.  And that's going to be how it

13   comes into play in the case.

14        It's particularly problematic here because there is a

15   debate between the parties and within the courts, frankly,

16   about what "remuneration" means.  Does it mean merely giving

17   something of value, or does it mean giving something above

18   fair market value when you're getting something in return for

19   the value that you are giving your contractor.

20        We are obviously going to take the position, and we've

21   taken it in the instructions that we proposed to the Court,

22   that it's the former, and that's the better reason and more

23   true to statutory language definition.  But that is a reason

24   why a witness should not be standing up here, especially

25   before there's been a resolution of that issue, and providing

1    a definition of remuneration to the jury and saying, This is

2    what the Anti-Kickback Statute means.  That's what was really

3    problematic about it.

4         "Remuneration" is a word outside of its use in the

5    statute, of course.  And, you know, if somebody in passing

6    says, This looks like remuneration to me, that's less of a

7    concern.  It may still be objectionable to pay out of context,

8    but that's not what was happening.

9         I mean, she really was almost giving a jury instruction

10   today on the stand, and that is very problematic.

11        THE COURT:  All right.  Mr. Marketos?

12        MR. MARKETOS:  Yeah, and, Your Honor, I just think

13   that that is not an accurate rendition of what she said, but

14   that's --

15        THE COURT:  Let me ask you this -- let me ask you

16   this.  Excuse me.

17        So I'm going to go through the final jury instructions

18   or the proposal of the final jury instructions for both

19   parties over the weekend.  Right?  I'm going to try to nail

20   down where I think I'm comfortable where things are going to

21   go, and where I have questions, we're going to have to address

22   them.  I may have to hear from you more.

23        I don't want any more briefing on the issue.  By the

24   way, when you say you guys have already addressed it, at least

25   in writing, is that in the trial brief, or is that in some

 1    other submission?

 2         So when I'm printing things this weekend to focus on,

 3    where am I focused on?  At least the jury instructions other

 4    than the proposal of the jury instructions from the Relators'

 5    counsel and Janssen?

 6         And, Mr. Marketos, I'll ask you this first:  Where else

 7    are you focusing me on as we've addressed why we believe our

 8    proposed instructions are proper?  Is that in a trial brief,

 9    or is that in some other submission?

10         MR. MARKETOS:  We have both briefing that was

11    submitted in the parties' joint instructions, Your Honor,

12    where we have each one of our positions laid out, and we have

13    our positions laid out in the trial brief, in our responsive

14    trial brief to Janssen's trial brief.

15         THE COURT:  I'll look at both, then, and it proves

16    Janssen has addressed it in both.  You had some submissions

17    that came with the proposed instructions, and you have some

18    additional briefing you did in the trial brief that's related

19    to these issues.

20         MR. WYATT:  That's correct, and I believe both

21    parties in some place cross-referenced in the jury instruction

22    document to their trial briefs where this broader --

23         THE COURT:  Well, that makes it easier.  So then,

24    look, I think -- what I think we need to do here, and maybe

25    this will -- I don't know if this will dispel this dispute or

1    not, but I need to review those over the weekend.

2         I need to come to some decision so that you have a

3    sense of Well, what are those instructions going to be.  And

4    then I think that's going to shape moving forward in the

5    trial.

6         And if that limits the expert testimony from both sides

7    because you know that the judge is instructing on this, so I'm

8    not going to have a witness say what I'm about to say at the

9    end of the trial, then that will be my call.

10        But I don't think it's helpful if you don't know what

11   the instructions are going to be.  I mean, normally I don't do

12   a charging conference until later in the case.

13        The problem, I think, in this particular case is there

14   are substantive disputes, significant disputes about what the

15   instructions will be on the crux of the case, the

16   Anti-Kickback Statute, and what constitutes a violation of the

17   False Claims Act.

18        So I think those issues have to be resolved sooner

19   than -- we'll do a charging conference right before I deliver

20   these instructions because I think it's impacting both parties

21   and how the witnesses may or may not be able to testify.

22        Is that accurate?

23          MR. MARKETOS:  Right, Your Honor.

24          THE COURT:  So then why don't we -- does it make

25   sense, then, to table this until I've reviewed in detail the

1    proposed instructions and your briefing, and then we talk --

2    we're going to have to speak Tuesday.

3         My only concern about that is that may take some time

4    away from the jury popping out at 9 o'clock, and if we have to

5    do that, we have to do that.  But that's my proposal.

6         Does that not make sense?  I mean, you tell me.

7         MR. MARKETOS:  It does.  It does, and I suspect, and

8    I think Janssen might probably agree with me on that, this

9    total -- this issue in totality, as it relates to Ms. Evans,

10   is probably a 30-minute discussion at most.

11        So that's something we can get done before the jury

12   comes in at 9.  That's my prediction, but I don't know if they

13   agree with that or not.

14        MS. BROWN:  That sounds right.

15        MR. MARKETOS:  But, yeah, I think they agree.  In

16   other words, as this issue relates to Ms. Evans, I think that

17   issue can be dealt with before the jury starts at 9.

18        THE COURT:  Do I have to -- do I have to review much

19   before then with respect to Ms. Evans?  I'm thinking about the

20   jury instructions as a whole impact that will impact the

21   remainder of how the case is presented by the Relators and the

22   defense.

23        But with respect to Ms. Evans, what do we want me to

24   focus on then for Tuesday morning?

25        MR. MARKETOS:  It would just be the AKS, the

 1   Anti-Kickback Statute, as the parties have jointly proposed it

 2   and the remuneration portion of it.

 3            MR. WYATT:  I think we agree with that, Your Honor,

 4   except I also think I wouldn't -- it would not be appropriate

 5   for Ms. Evans to discuss the definition of remuneration and

 6   whatever the Court rules on that.

 7            THE COURT:  Right.  I get your position.  Your

 8   position is, Look, regardless of whether I tell you all this

 9   is how I'm going to instruct on what remuneration is,

10   Janssen's position is still the witness -- the expert should

11   not be able to testify to that definition --

12            MR. WYATT:  Correct.  It may still help to know what

13   her answer is before she testifies.  I just don't think that

14   she should be addressing that issue specifically on the stand.

15            THE COURT:  Let me ask you this, Mr. Marketos.  Just

16   taking a step back, and maybe I'm just -- this is my

17   recollection, right?

18        I thought Ms. Evans -- she was an expert in testifying,

19   very focused on Janssen's compliance program and why it's

20   insufficient or deficient or it doesn't meet -- it doesn't

21   work.  Right?

22            Isn't that the focus of her expert testimony?

23            MR. MARKETOS:  That is the focus of her expert

24   testimony, and in her report, she lays out why.  You have

25   these guidelines.  You have these compliance policies in

 1   place.  This is a highly regulated industry, and this is why.

 2        Because if you pay remuneration to doctors -- it is a

 3   violation of the Anti-Kickback Statute, quite frankly, what's

 4   on their slides that we saw in evidence.

 5        THE COURT:  Look.  I mean, that part I allowed,

 6   right?

 7        MR. MARKETOS:  Yeah, yes.

 8        THE COURT:  I think that's a little bit different,

 9   right?

10        MR. MARKETOS:  Yeah.

11        THE COURT:  Because she is not testifying that her --

12   here's my definition of remuneration.

13        What she's testifying to is that's Janssen's

14   definition -- at least the company's definition that they've

15   trained their employees on, and I agree with it.

16        MR. MARKETOS:  Yes.

17        THE COURT:  Look, maybe that's semantics.  Maybe I

18   was slicing it pretty thin there, but to me that seemed

19   proper.

20        My concern that gave me pause was I am going to have

21   every expert now in the case testify to different parts of

22   different statutes as to what their opinion is as to what it

23   means, because that to me will cause a problem, not just

24   necessarily for what your evidence is going to be, but what

25   happens when Janssen gets the case?

1          Every one of their experts now is going to start

2    testifying and saying, Well, here's my definition of

3    remuneration.  I don't agree with Ms. Evans.  Did you hear Ms.

4    Evans's testimony about what her definition of remuneration

5    is?  Do you agree with that, Doctor, or Mr. John Doe?  No, I

6    don't.  What is your definition?

7          And now we've given two separate definitions of a term

8    that's in the statute to the jury when they should only be

9    getting one from me.

10          Don't you see that that could be a problem?

11          MR. MARKETOS:  It can be, and it's -- the only time

12    that's addressed by experts is when you have complex

13    regulations.  And so that's when you have a mixture of law and

14    fact.

15          And that is why Janssen themselves have an expert in

16    Medicare that they're offering, and they're going to come in

17    and say, This is what CMS requires, this is what CMS does not

18    require, and they're not going to get --

19          THE COURT:  Does the proposed instruction -- when it

20    defines remuneration, did anyone propose, like, an example of

21    that that would be A, B, and C, or is that not part of

22    anyone's proposed instruction?

23          MR. MARKETOS:  I'm not sure, Your Honor.  I have to

24    look.  I can't recall.  I think we just used the language that

25    was on the slide, so it was -- I think that comes straight out

1    of the statute explaining what it is.

2            THE COURT:  Let me ask you this just because we're

3    here.  Do you disagree with what was on that slide by the

4    Janssen company?

5            MR. MARKETOS:  I don't, but I think that we need to

6    look -- you know, make sure that that's consistent -- I mean,

7    that was probably the time period in question.  We just need

8    to make sure that there hasn't been any further definition of

9    it that we mess up.

10           THE COURT:  That's fair.

11       All right.  I mean, look, I'm sorry, Mr. Wyatt, I

12   presume you have something to say.

13           MR. WYATT:  Yeah, just briefly, Your Honor.  I mean,

14   the only thing is, right, it's really sort of the way -- the

15   testimony that's coming or was trying to come in is directing

16   the jury how to find on the issue of remuneration really.

17       I mean, it's sort of saying, This is the definition,

18   and then she goes on to say, you know, Janssen gave things of

19   value to doctors in this form.  They pay them, but they also,

20   you know, put them up in hotels and gave them meals.

21       They put them up in hotels, gave them meals, paid them,

22   that's the part she can do.  Right?

23       She's saying, Here are the things of value that Janssen

24   gave the doctors.  That's totally fine.  Then at the end of

25   the case, the jury puts it together.  The definition is what

 1    it's going to be, and does this fall within that definition or

 2    not.

 3              THE COURT:  And then you all advocate as to

 4    whether --

 5              MR. WYATT:  Yeah, and then we argue -- (crosstalk).

 6              THE COURT:  -- those facts meet that element.  I

 7    presume your argument will be it does not, and you'll argue

 8    that whatever evidence was presented does meet it.

 9              MR. MARKETOS:  That's fine, Your Honor, except that a

10    second part of an expert's opinion is what -- you know, at

11    least when he's describing our expert, is what they missed.

12              And that is that they say, And my opinion is X, Y, and

13    Z, just like it is with Dr. Glatt, My opinion is that it's

14    off-label.  My opinion is -- you don't say, Well, they did all

15    these things and let the jury conclude that it's off-label.

16              THE COURT:  But let me look at what Ms. Evans's

17    opinion was.

18              So, Mr. Marketos -- and I don't have her report.  I'm

19    looking at just a piece of the opinion that I wrote about what

20    would be allowed in Ms. Evans's opinion or not.

21              But isn't it her opinion that addresses Janssen not

22    having an effective compliance program?

23              MR. MARKETOS:  Oh, yes, Your Honor.  And she also

24    attests --

25              THE COURT:  Does she say in this opinion that This is

1  my opinion about what the definitions are of the terms in the

2  statute?

3          MR. MARKETOS:  She -- I don't think she gave a

4  definition.  She said that it is remuneration if you pay

5  doctors X, Y, and Z.  I don't remember them -- her trying to

6  give a statutory definition.  That's the part that I was

7  missing.

8          I didn't remember her saying it's defined as

9  X, Y and Z.  She said, "Speaker programs are inherently risky

10 marketing tools for pharmaceutical manufacturers because they

11 provide remuneration to health care providers who are also

12 prospective customers of the manufacturers' products."

13         And she gives -- this is like, you know, throughout her

14 opinion.  This is page 7 of her report.  And she refers to

15 remuneration at least six or eight times.

16         Your Honor, I don't think I need to belabor this point.

17 I don't feel like -- I feel like I'm taking us off track.

18         The gist of this is that the witness needs to be able

19 to offer the opinions that she offered when she was challenged

20 and that Your Honor ruled on.

21         THE COURT:  Those opinions would be what

22 specifically?  What are those bullets?

23         MR. MARKETOS:  She's got -- the opinions that she's

24 offering at the end of the day, if I could, are those that

25 were -- as stated at the outset of her slides.

1          She started out by saying that "The speakers' program

2     did not comply with FDA rules, OIG guidance, Janssen's own

3     policies, or industry standards."

4          But she has got to say why because those policies

5     implicate not paying remuneration.  Right?  The OIG guidance

6     implicates not paying remuneration.

7          So this is the detail behind -- this is the why behind

8     the what.

9          THE COURT:  Okay.  So your point is Look, she's got

10    her opinion, but she's got to explain why, and the why is what

11    she's trying to get out, that you're concerned I'm going to

12    prohibit.

13         MR. MARKETOS:  Yes, Your Honor.

14         THE COURT:  All right.  Mr. Wyatt?

15         MR. WYATT:  I mean, I think we've heard that, right?

16    We've heard the why.  We've heard, you know, this is a red

17    flag to me, that was a red flag to me.

18         THE COURT:  Well, no.  She said there were red flags,

19    but she didn't really get to say why they were red flags.  I

20    think that's what Mr. Marketos is saying.

21         MR. WYATT:  So -- sorry.  Go ahead.

22         THE COURT:  No.  So I guess the question is -- and I

23    just want to hear from you, and then I'll close out this

24    argument for now because it's going to be more about me

25    putting my head together on the papers.

1    But if an expert is saying -- you know, paying speakers
2  this amount of money is a red flag, firing speakers from the
3  program if they don't prescribe these two particular drugs,
4  they're not prescribing very well, they get terminated, this
5  is a red flag.
6    Why wouldn't the expert be able to take that next step
7  to say, Okay -- and we all understand kind of what the
8  expression means, red flag.  But why was it a red flag?
9    MR. WYATT:  Well, and to answer that, Your Honor, I
10  think her method is she's looked at PhRMA guidance.  She's
11  looked at some other -- the OIG guidance, and she is trying to
12  draw connections between those documents and her opinions and
13  the facts that she's reviewed, and that's the stuff that
14  experts do all the time.
15    What they don't do, though, is say the definition of
16  this element of the plaintiffs' claims in this case is
17  X, Y and Z, and in my opinion, these violate that element.
18    THE COURT:  Let me ask you this:  What if she said it
19  different?  I understand -- I don't necessarily disagree with
20  that.  That's why I paused and actually sustained the
21  objection initially in the trial.
22    But why can't she say, In my opinion -- she is not
23  defining, but saying, In my opinion this is a red flag because
24  I believe that this would be remuneration for purposes of that
25  statute.

 1          How is that the same as what happened earlier, which I

 2     do think was problematic?

 3          MR. WYATT:  I still -- I'm sorry, Your Honor.

 4          THE COURT:  Yeah.  No, no.  I'm just trying to hear

 5     from you, but I'm saying she needs to be able to explain why

 6     these are red flags in violation of these statutes.  Right?

 7          That's what she means by red flags.  It's not like

 8     Well, these are red flags because I just don't like the way it

 9     looks.

10          Her opinion is these are red flags because when I see

11     these things, I have to look closer, and now it appears that

12     they're in violation of this statute or this statute.

13          Can't she say, In my expert opinion, I believe they're

14     red flags because when you do these things with doctors under

15     these particular facts, that would be a violation of that

16     statute because they would be considered remunerations, in my

17     expert opinion?

18          MR. WYATT:  Yeah, I think that -- what you just said

19     is giving a legal opinion.  I think it does go too far.  I

20     think -- I think experts can walk pretty close to that

21     generally speaking, right?

22          They can walk up and sort of say, Here's what happened.

23     I looked at this guidance.  This guidance said that if you

24     want to be compliant, you shouldn't do that.  That's why I

25     think this is a red flag.

 1          We don't -- you know, she's not able to define

 2   remuneration, as I said, but she can say, using what she

 3   understands the definition of remuneration to be, Janssen gave

 4   value to these doctors.  They did it in multiple ways:  They

 5   paid them honoraria.  They also put them up in hotels.  They

 6   paid for their flights.  They paid for their travel.

 7          THE COURT:  Well, that you don't need an expert for.

 8   A fact witness can tell us that.

 9          MR. WYATT:  That's correct, but, Your Honor --

10          THE COURT:  I mean, we've had fact witnesses testify

11   to that.  So I'm not going to put her back into laymen's land,

12   right?  I mean, we have an expert witness.  So it can't be as

13   simple as she's a pharmaceutical rep, because the

14   pharmaceutical reps, the Relators can testify to that, right?

15          They're not experts, but you have folks that can come

16   in and say, We gave them this amount of money, this is the

17   restaurant we went to, here's a photograph of a fancy

18   restaurant.  I mean, those are facts, and those can come from

19   fact witnesses.

20          But I'm trying to figure out where the limitation is on

21   the expert.

22          So what -- you're saying that she can say these are red

23   flags in her expert opinion, but she can't explain why they're

24   red flags?

25          MR. WYATT:  She is tying -- she is adding expertise

 1    to it by tying it into her reliance materials, which are the

 2    guidances that she's reviewed and the like.

 3         What she really can't do, though, is say, Here's an

 4    element of their claim.  I think -- I think it's proven,

 5    right, because of this based on the law.

 6         That's really what she's doing.  This is not -- I have

 7    not seen that done in cases previously.  We have succeeded in

 8    excluding such opinions previously, and indeed, this Court has

 9    also excluded a similar opinion that was in her report --

10         THE COURT:  I did.

11         MR. WYATT:  -- about what she concludes about whether

12    somebody was trying to induce someone, and it's the same

13    problem.  I mean, she's basically telling the jury, like, Hey,

14    this is inducement under the Anti-Kickback Statute, and she

15    can't do that.

16         MR. MARKETOS:  Your Honor, the difference is you're

17    not allowed to say this was Janssen's intent.  But experts all

18    the time get up on the stand and -- sorry.  I've done it a few

19    times.

20         The experts get up on the stand, and they say, this is

21    a breach of fiduciary duty case.  The standard is duty of

22    loyalty, duty of care.  I believe that these acts constitute a

23    violation of the duty of loyalty and duty of care.

24         That's what experts do.  They apply the standard, if

25    it's a legal standard, a technical standard, or otherwise.

1    They elicit the standard, and they tell the members of the

2    jury, Based on these facts that I reviewed in my expert

3    opinion, this standard was violated.

4            THE COURT:  All right.  I got both your arguments.

5    I'm going to think about it over the weekend, and then I'll

6    have a response for you all on Tuesday about how we're going

7    to proceed with Ms. Evans, so that's one.  That's just the Ms.

8    Evans issue.

9         I'm going to also start taking a look at the jury

10   instructions.

11           MR. MARKETOS:  All right.

12           THE COURT:  Because I think that will also give some

13   better guidance to the parties.  Those are two separate

14   issues, and I appreciate that, Mr. Marketos.  One issue is Can

15   Ms. Evans testify to what you were proffering, you know, that

16   she would be expected to testify as an expert.

17        I know Janssen's position about that's cutting too

18   close to being almost standing in the shoes of the Court, but

19   let me -- let me process that, and I think part of my process

20   will be looking at the briefing that you've all done.

21        You've done all that work, so even though I've reviewed

22   it, I would say, in a cursory review because I haven't gotten

23   into the jury instructions -- now that I am, I'll look at it

24   with a closer eye, and I think that will guide me a little bit

25   more as well.

1      So other than that, although we're tabling this until

2 Tuesday morning, at least on Ms. Evans, what else do we need

3 to speak about today even though --

4          MR. MARKETOS:  One issue I'm getting passed a note

5 on, and I need to make sure I understand it.  Sorry.  Go

6 ahead, Andrew.

7          MR. WIRMANI:  Your Honor, I don't believe we filed a

8 reply brief on the trial briefs.  I think they did.  So if we

9 could just have an opportunity this weekend to file something

10 short to address their latest arguments, we'd appreciate that.

11          THE COURT:  All right.  Mr. Wyatt, do you have

12 something there?

13          MR. WYATT:  Both sides filed opening briefs and

14 responsive briefs, so if they want to do a third brief, I

15 think we would probably -- need to do one, too.

16          MR. WIRMANI:  Well, I think they raised arguments for

17 the first time in their response brief is the issue,

18 Your Honor.

19          THE COURT:  Well, here's what I'm going to do for now

20 because I have a lot of reading to do this weekend, folks.

21 I'm going to say no more briefing on these issues, and that

22 doesn't mean that I'm going to resolve all these issues on

23 Tuesday.

24      I think I'm going to resolve Ms. Evans's issue on

25 Tuesday because she's going to be testifying.  That's going to

```
 1   be my priority.  But with respect to finalizing the jury
 2   instructions, I don't think we're going to be doing that
 3   Tuesday.  I think what's going to happen is I'm going to have
 4   some issues there and some questions.  If I want supplemental
 5   briefing, I'm going to ask for it, or if I'm going to hear
 6   some argument from you all because I have questions about what
 7   you submitted, we can deal with that maybe Tuesday after
 8   witness testimony is complete.
 9        I don't see us doing that in the morning, but for now
10   I'm going to limit that, Mr. Wirmani.
11        I'm not disagreeing that maybe supplemental briefing
12   may be necessary here, but I really don't want to allow it
13   until I've reviewed the papers in detail to see whether I need
14   it.  So I'm going to reserve on that, okay?
15             MR. WIRMANI:  Very good.
16             THE COURT:  Absent Ms. Evans and the instruction
17   issues, do we have anything more we need to chat about
18   today --
19             MR. MARKETOS:  No, Your Honor.
20             THE COURT:  -- because otherwise, you all have -- you
21   have a long weekend ahead of you.
22             MR. MARKETOS:  I would say, please Lord, no.
23             MS. BROWN:  I actually do, Your Honor, have one issue
24   that I want to raise with the Court in advance of the cross.
25        So as you know, the Court has allowed the CIAs, and
```

```
 1   Ms. Evans testified about the CIAs, and I am very mindful of

 2   the declination MIL, but I do want to be able to question her:

 3   Government knows how to put a CIA in place; Government knows

 4   how to enforce a CIA; the CIAs that were in place had nothing

 5   to do with Prezista and Intelence.

 6       And in fact, despite the Government learning about

 7   these allegations, while it could have put a CIA in place, it

 8   did not.

 9       THE COURT:  No.  I won't allow that.  The beginning

10   part I was with you, Ms. Brown.  I was following everything

11   you were doing there, and I didn't have any concerns, but then

12   you go from here, and then you take that leap.

13       Now we're getting into Hey, folks, Government didn't

14   bother intervening in this case.

15       MS. BROWN:  But --

16       THE COURT:  And I think that's the problem, right,

17   because once that Pandora's box is opened in the trial, a

18   whole bunch of things are coming in, and I've already stopped

19   that.

20       So you want to do it again and cut out some of those

21   last questions?

22       MS. BROWN:  Well, here's -- here's what I'm

23   struggling with, and I'll just take guidance from the Court on

24   how I can rectify this issue, which is that they have put the

25   CIAs before the jury as evidence of essentially two
```

1    whistleblowers came forward.  They said that Janssen was

2    off-label marketing.  They filed a False Claims Act, and then

3    they were punished.  They were put on these CIAs, and they had

4    to pay back the money.

5           And yet here we are in a situation where, to the

6    materiality point, the Government was made aware of these

7    allegations.  Government knows how to put us under a CIA

8    because they have, and they didn't do that here.

9           And so how can I distinguish this case on a materiality

10   issue from what they've already put in front of the jury as

11   being --

12           THE COURT:  Yeah, but I think -- that's very

13   specific.  What you're trying to say is that materiality means

14   the Government has to intervene, and if they don't intervene,

15   then it's not important to them.

16           But that's what it sounds like.  I'm telling you,

17   that's what it sound like to me, and I'm not even sitting as

18   one of the nine jurors in the box.

19           So for me, my understanding of -- and this has been

20   argued so many times as to how these CIAs came in as Look, the

21   Relators have to demonstrate that this is material, right,

22   that this is important to the Government.

23           And so they've got these CIAs that demonstrate that the

24   Government cares about this type of conduct.

25           MS. BROWN:  Correct.

```
 1            THE COURT:  But I don't think that their absence in

 2    this case means that the Government cares about an issue as a

 3    whole but only if they have a CIA in a particular case.

 4            MS. BROWN:  Your Honor, the evidence that the

 5    Government cares is that they put a CIA in place, right?

 6    Forget whether they intervene or not.  I'm like outside --

 7            THE COURT:  I don't think that's true.  I mean, we've

 8    PowerPoint after PowerPoint from your own clients that tells

 9    everybody in the company, and now this jury, that it's very

10    important to the Government.

11            So, I mean, are we really -- is that really in

12    dispute --

13            MS. BROWN:  No.

14            THE COURT:  -- whether these issues are important to

15    the United States, when Janssen is training everybody that

16    This is very important to the Government, and if you do these

17    things it's a problem for us.

18            And, I mean, we've been seeing it all over the place.

19    The CIAs -- I'm not saying that it doesn't move the ball

20    forward for the Relators, but it is not the sole evidence of

21    materiality that's been presented in the case.

22            MS. BROWN:  But how can I tell the jury, The

23    Government could have put a CIA in place here and didn't?

24    That is critical to my ability to defend this case, to be able

25    to say, You heard all about the other times when the
```

1    Government said, Janssen, you got to come under CIA.

2         They didn't do it here.  That's a fact that's important

3    to distinguish the conduct that was in Risperdal, in Topamax,

4    that we talked quite a lot about, than the conduct that

5    happened here.

6         MR. MARKETOS:  The response --

7         THE COURT:  Yeah, and then it would be go into --

8    this is before I hear from Mr. Marketos.  By the way, I know

9    you want to respond.  I will let you.  I promise, but let me

10   give just you one point.  Right?

11        Part of the reason why I prohibited the intervention,

12   and I remember -- I don't know if I had this in my written

13   opinion.  I know I said this verbally, but it may be

14   written -- is there are a host of reasons why the Government

15   doesn't intervene in a particular case.

16        And so for me to allow you to put that before this jury

17   would make the Relators spend another half of a trial proving

18   that the reason why they didn't intervene had nothing do with

19   the merits of these Relators or their credibility or the

20   merits of their case.

21        Now, you want to say almost the same argument, the

22   Government didn't have a CIA in this case, which is then going

23   to put the Relators into another position, to have a trial

24   within a trial to say, Well, there are plenty of reasons why

25   the Government might not have a CIA in this particular case.

1    And now we've taken the jurors away from the merits of the

2    claims to say, Let's have a trial within a trial to

3    demonstrate why the CIAs occurred in 2010 and '13 but not in

4    this case when the Relators had this particular case.

5            Don't you see the same issue, though?

6            MS. BROWN:  But respectfully, Your Honor, that's

7    where we are.  Right?  The CIAs have come in.  They have said

8    to Glenn Mattes, You were the president of this company when

9    allegations by whistleblowers were made that you off-label

10   marketed and bribed doctors.  As a result, you were under a

11   CIA.  And it happened again with Risperdal.

12           And so how can I distinguish this case if I'm not

13   allowed to point out we're not under a CIA here.  The FDA, we

14   didn't get a warning letter from the FDA.  Like, there are all

15   these Government --

16           THE COURT:  I think -- I think you distinguish this

17   case by arguing to the jury that what the Relators are

18   claiming did not happen.

19           MS. BROWN:  Of course.

20           THE COURT:  That Janssen didn't violate the

21   Anti-Kickback Statute or the False Claims Act.  And I've

22   actually given you fairly -- I think I've given you guys some

23   rulings in your favor.  I don't think this has been a

24   pro-Relators case or a pro-Janssen case.  I mean, I think I've

25   ruled against both sides multiple times in a given day.

1            But I think that's how you have to defend the case.

2    But what I'm not going to let you do is put your thumb on the

3    scale by putting before this jury something that I don't think

4    is relevant to them, which is the Government is not involved

5    in this case.  They were involved in theirs, and, therefore,

6    you should see something inappropriate about this case.

7    Unless you can demonstrate that in your defense or the

8    Relators fail to meet their burden of proving their claims,

9    I'm not going to allow that extra piece in.

10           And I'm worried, because this has come up multiple

11   times, Ms. Brown.  Every time I make this ruling, you guys

12   come back to me, from Janssen, and say, Well, let me try it

13   this way.  And I understand that.  And I'm not saying that

14   you're not all trying to zealously advocate for your clients,

15   but I want to be very clear.

16           The Government's lack of involvement in this case,

17   other than they are not in this case -- and I've instructed

18   them on that, and I'll instruct them again on that, but I'm

19   not going to allow you guys to imply something before the jury

20   that the Government's noninvolvement in this case means that

21   they should be considering that when appreciating the evidence

22   in the case or the credibility or the merits of the claims.

23           That's more where my concern is.  So --

24           MS. BROWN:  Well, but how do I cross-examine her --

25   and part of these CIAs, the very conduct that she's

1   complaining about, the Government was babysitting us and

2   making sure we weren't doing it.  And so how do I now go into

3   it and say, As part of this CIA, they were there checking and

4   made sure we did this.  And if we didn't, they had the ability

5   to hold us accountable.

6         THE COURT:  I mean, you've been cross-examining about

7   the CIAs throughout the trial.  Right?  I mean, I think even

8   one argument you made is that CMS is still paid.

9         MS. BROWN:  Correct.

10        THE COURT:  Right?  After the conduct continued.

11        MS. BROWN:  Right.

12        THE COURT:  Right?  And I know that it's like apples

13  and oranges.  You're making one argument.  The Relators are

14  saying, That has nothing to do with the piece of intervention.

15        But I have allowed you to at least take that line of

16  cross-examination, Ms. Brown.  I haven't prohibited you from

17  addressing the Government at all.  My concern is when we talk

18  about the Government -- if it's about CMS reimbursing while

19  this conduct is being reported, while this conduct was

20  reported to the Government, I have allowed you that

21  cross-examination.

22        I actually decided, I think against the objection of

23  Relators, that that is separate and apart from you getting

24  into the Government's not involved in this case.  The

25  Government did not intervene in this case.  The Government did

1    a CIA in the prior case, but they didn't do it in this case.

2    To me, that's separate and apart.

3          So if you're asking me where do you get to defend, I

4    think you've been doing an effective job defending against the

5    CIAs in your own way, but within the parameters of the Court's

6    ruling, which is we're not going to get into the Government's

7    lack of intervention.

8          And I think -- and you can disagree with me, and I

9    respect that you do -- that getting into no CIA in this case

10   is too close to you saying to the jury, Do you see how the

11   Government's not involved here?  They didn't do, in this case,

12   what they did in the prior cases.  And so you should somehow

13   consider that when you're evaluating the merits of the

14   Relators' claim.

15         So I hear your arguments.  I'm not so sure there's

16   anything more you can say.

17         MS. BROWN:  No, only that I want to at least use the

18   CIAs to cross her and point out all the things we had to do.

19   I mean, she's formed an opinion about our compliance program

20   that is in contrast with the opinion of the Government that

21   they formed when we were under the CIA.

22         THE COURT:  Ms. Brown, the CIAs are in evidence.

23         MS. BROWN:  Okay.

24         THE COURT:  When you publish a CIA with a witness,

25   you can question a witness about the contents of the CIA

1    that's been admitted.

2            MS. BROWN:  I understand.

3            THE COURT:  Now, what this witness will say about it

4    or whether they have knowledge about it is a different story.

5            And, Mr. Marketos, I'll hear you briefly on that.

6            But I will tell you folks right now -- and I don't know

7    any other theory of this -- when evidence has been admitted,

8    it goes up on the screen, any party can publish evidence

9    that's been admitted.  You can question a witness about it.

10   Whether that witness has knowledge or can address the

11   questions you have, I don't know.  But I have no objection to

12   Ms. Brown cross-examining a witness on the CIAs that are in

13   evidence.

14           MR. MARKETOS:  I agree.

15           THE COURT:  Okay.

16           MR. MARKETOS:  And then, you know, but you said you

17   had to do it again in 2013.  I mean, that's what they're going

18   to have to do, and that's fine.

19           The thing that I want to reiterate -- and hopefully for

20   the last time from our bench here -- is that this is the case

21   that the Government would have brought that would turn into a

22   corporate integrity agreement.  When the Government declines a

23   False Claims Act case and the Relator pursues the claims on

24   behalf of the Government, this is the prosecution of the

25   Government's case.  And that's 80 percent of the time.  And

```
 1   these cases -- and they file statements of interest, and we

 2   step in on their behalf.

 3         And so the Government is not not involved.  They file

 4   statements of interest.  They watch the case.  They could come

 5   and move to dismiss it if they wanted to, if they didn't

 6   believe in the merits.  They have that right.  They can move

 7   to dismiss the Relators' case.  They haven't, and that's why

 8   Your Honor's been right not to go into this.

 9         THE COURT:  Look, I appreciate all that, but I want

10   to be very clear.  None of that is going before the jury

11   either.

12         MR. MARKETOS:  No.  I agree.  I agree.

13         THE COURT:  Okay.  All right.

14      I get it.  Ms. Brown, this is probably going to come up

15   again.

16         MS. BROWN:  It's like every witness --

17         THE COURT:  I know.  But I'm just telling you, I'm

18   standing strong on this hill.  And unless something happens

19   that I have to revisit it -- and, look, I'm not -- look, like

20   I said before, there's no time where I'm going to tell any

21   lawyer in my court from either side that you cannot address an

22   issue with me even if I've ruled on it.  I'm never going to

23   say that to Relators' counsel or Janssen's counsel.

24         But based on the argument you've made today, I

25   appreciate it.  You've made your objection noted on being
```

```
 1    prohibited from that type of examination, but I'm staying
 2    consistent with what I believe I should be doing with the
 3    Government's intervention issue, keeping that out, and I'm
 4    going to keep out the Government not having a CIA in the case.
 5          If it comes up again, I'm not going to preclude Janssen
 6    from raising it with another witness, or if something else
 7    happens during the trial, we deal with it in real time.  But
 8    for today -- and Ms. Evans, at least for the next witness that
 9    we have on the stand, that issue is closed.
10          Fair enough?
11             MS. BROWN:  Fair enough.
12             THE COURT:  All right.
13             MS. BROWN:  Thank you, Your Honor.
14             THE COURT:  What else?  Wait.  Anything else?
15             MR. MARKETOS:  No, Your Honor.  Thank you.
16             THE COURT:  All right.  Well, then, folks -- oh, I
17    just want to make sure.
18             MR. MARKETOS:  I'm about to run.
19             MS. BROWN:  Your Honor, we may have an issue.  I want
20    to be transparent with the Court.  We may have an issue based
21    on Ms. Penelow's testimony today that may require us to seek
22    leave from the Court to call a rebuttal witness, who was not
23    on our witness list, based on what we believe to be, frankly,
24    false testimony.  But I want to discuss that.
25             THE COURT:  Well, that's fine.  We can deal with
```

1    that, but here's the thing.  I want to know about that issue

2    early next week, then.

3              MS. BROWN:  Yes.  Yes.

4              THE COURT:  I mean, I'm not asking you today because

5    it doesn't even sound like there is going to be necessarily an

6    issue.  But if an issue is going to be raised, I need it

7    raised early next week.  I don't want a week and a half from

8    now we're dealing with something from Ms. Penelow's testimony

9    that was today.

10             MS. BROWN:  Sure.  Yeah.

11             THE COURT:  Is that fair?

12             MS. BROWN:  I want to have the opportunity to chat

13   with my colleagues, and we will get back to --

14             THE COURT:  All right.  Mr. Marketos, there's no

15   issue before me yet.  She's just saying there could be an

16   issue.  So what do you have on that?

17             MR. MARKETOS:  No, Your Honor.  We'll look forward to

18   it.

19             THE COURT:  All right.  I mean, for now -- but

20   Tuesday --

21             MS. BROWN:  Yes, sir, uh-huh.

22             THE COURT:  And, Mr. Wyatt, I see you're the one

23   whispering, so I'm saying by Tuesday, one of you is going to

24   address --

25             MR. MARKETOS:  What's the issue, Your Honor?  Can we

```
 1   ask that?

 2          THE COURT:  Well, I don't think they know if there is

 3   one yet.

 4          MR. MARKETOS:  It's, frankly, false testimony.  They

 5   probably have an idea.

 6          MS. BROWN:  I'll say it.  I mean, I'll be totally

 7   transparent with it.

 8          The testimony regarding Ms. McGrath, which was

 9   completely inconsistent with the changed testimony, I believe

10   is false.  And I believe that on good faith based on

11   discussions with Ms. McGrath.  And it was -- it came out today

12   for the first time on the stand, and so I want to look at the

13   transcript, but I may approach the --

14          THE COURT:  Sorry.  Just slow down and be very

15   specific.

16          The testimony that you're claiming false is what?

17   That Ms. Penelow stated what about Ms. McGrath?

18          MS. BROWN:  That she actually did speak to

19   Ms. McGrath at a different time back in 2011 and reported

20   these issues.

21          THE COURT:  Got it.  And you're saying -- well, let

22   me ask you this, though.  I want to be clear, though.  You

23   were -- she's saying -- you're saying that she may have said

24   that for the first time today in court?

25          MS. BROWN:  Right.
```

```
 1          THE COURT:  Meaning there was no errata sheet -- or

 2   errata.  I don't know how you guys pronounce it, but I just

 3   say errata.

 4          MS. BROWN:  Yeah, yeah.  I say errata.

 5          THE COURT:  But there's no errata sheet or anything

 6   else that would have notified Janssen in advance of the trial

 7   of that testimony?

 8          MS. BROWN:  Yes, sir.

 9      When you take all the erratas into account, where you

10   land is that this was the recording, and it didn't have it on

11   it.

12          And then the testimony on redirect was actually it was

13   back in 2011.  And I know that not to be true.  And so I want

14   to look at the notes from my meeting with Ms. McGrath, and I

15   may approach the Court.

16          THE COURT:  The only thing I'd ask you all to check

17   is the transcript of Ms. Penelow's testimony because I recall

18   -- I have a somewhat recollection of that testimony, but I

19   don't know the specifics of it.

20          So why don't we deal with this.  That issue, we can

21   deal with Tuesday.  It doesn't mean I have to resolve it

22   Tuesday, but I will tell you by Tuesday, I want to know if

23   it's an issue.

24          And, Mr. Marketos, you have a heads-up that it either

25   is or is not an issue, but we'll figure it out on Tuesday.
```

1          MR. MARKETOS:  Sure, Your Honor.  No problem.

2          THE COURT:  All right.  Anything else?

3          MR. MARKETOS:  Still nothing.

4          THE COURT:  I mean, nobody wants to have Memorial Day

5    weekend?

6          All right.  Folks, you are adjourned for the weekend.

7    I will see you all Tuesday morning, and we'll go from there.

8    Thank you.

9          THE DEPUTY COURT CLERK:  All rise.

10          (Court concludes at 4:48 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1                FEDERAL OFFICIAL COURT REPORTER'S CERTIFICATE.

 2            - - - - - - - - - - - - - - - - - - - - - - -

 3

 4       I certify that the foregoing is a correct transcript from

 5   the record of proceedings in the above-entitled matter.

 6

 7

 8       I

 9

10

11   **/S/ Megan McKay-Soule, RDR, CRR**     **May 23, 2024**

12            Court Reporter                          Date

13

14

15

16

17

18

19

20

21

22

23

24

25

*United States District Court*
*District of New Jersey*

**$**

**$125,000** [2] - 3635:6, 3635:10
**$145,000** [1] - 3345:14
**$157,500** [1] - 3629:2
**$2,500** [2] - 3476:6, 3478:20
**$2,647,300** [1] - 3630:25
**$25,000** [2] - 3634:25, 3635:7
**$300** [1] - 3594:4
**$36** [1] - 3630:24
**$402,000** [1] - 3629:5
**$402,250** [1] - 3630:19

**'**

**'13** [1] - 3676:3
**'decided** [1] - 3410:21

**/**

**/S** [1] - 3687:11

**0**

**08608** [1] - 3313:9

**1**

**1** [3] - 3389:6, 3552:4, 3634:1
**10** [4] - 3313:5, 3408:1, 3458:21, 3562:11
**104** [1] - 3430:7
**104(e** [1] - 3326:3
**105** [2] - 3421:14, 3430:7
**106** [1] - 3421:14
**107** [1] - 3501:13
**109** [2] - 3443:14, 3443:17
**10:22** [1] - 3400:16
**10:29** [1] - 3407:13
**10:45** [1] - 3408:2
**11** [1] - 3430:7
**111** [1] - 3452:23
**112** [1] - 3326:8
**114** [1] - 3477:6
**115** [1] - 3479:23
**117** [1] - 3467:22
**11:39** [1] - 3468:3
**11:43** [1] - 3471:19
**11:55** [1] - 3485:16
**11:57** [1] - 3487:25
**12** [10] - 3368:2, 3368:5, 3368:9,

3373:15, 3373:22, 3496:3, 3541:24, 3545:15, 3567:12, 3623:23
**12-month** [1] - 3625:2
**12-year** [2] - 3417:25, 3545:20
**12:02** [1] - 3494:4
**12:04** [1] - 3496:17
**12:30** [1] - 3522:24
**13** [3] - 3603:25, 3620:17, 3632:20
**149** [1] - 3634:15
**15** [5] - 3408:1, 3414:1, 3562:11, 3572:1, 3626:2
**150** [4] - 3626:14, 3626:22, 3626:25, 3642:19
**16** [1] - 3421:14
**163** [1] - 3636:15
**17th** [1] - 3518:9
**18** [7] - 3368:8, 3368:12, 3383:18, 3460:5, 3491:16, 3541:25, 3567:11
**19** [2] - 3456:10, 3458:21
**199** [1] - 3633:8
**1990** [1] - 3574:16
**19th** [1] - 3518:6
**1:12** [1] - 3522:25
**1:22** [1] - 3534:1
**1:25** [1] - 3537:2
**1A** [3] - 3317:18, 3317:20, 3321:2
**1B** [3] - 3317:18, 3318:2, 3318:3

**2**

**2** [1] - 3390:16
**2.6** [1] - 3630:23
**20** [7] - 3456:25, 3457:25, 3643:21, 3643:23, 3643:24, 3643:25
**2000** [1] - 3585:9
**2002** [1] - 3592:21
**2005** [2] - 3574:16, 3584:7
**2006** [33] - 3350:13, 3432:16, 3433:13, 3434:4, 3434:10, 3434:11, 3434:17, 3435:1, 3435:18, 3435:21, 3455:25, 3505:16, 3505:18, 3544:7, 3546:24, 3560:25, 3561:7,

3561:13, 3583:3, 3623:6, 3623:12, 3626:12, 3628:5, 3629:3, 3637:22, 3638:14, 3638:16, 3639:16, 3639:25, 3640:19, 3641:9, 3643:3, 3643:9
**2007** [11] - 3433:9, 3433:11, 3434:7, 3435:7, 3435:9, 3435:23, 3436:10, 3560:25, 3561:13, 3561:16, 3634:3
**2008** [2] - 3350:16, 3539:23
**2009** [15] - 3350:16, 3350:17, 3320:20, 3432:16, 3435:9, 3435:18, 3435:24, 3455:25, 3505:16, 3505:18, 3561:7, 3561:13, 3592:21, 3628:8, 3638:17
**2010** [36] - 3352:20, 3358:20, 3364:9, 3364:10, 3378:10, 3429:21, 3430:11, 3430:21, 3431:12, 3432:23, 3433:14, 3436:17, 3437:9, 3455:7, 3455:11, 3584:4, 3628:7, 3628:8, 3638:14, 3638:17, 3638:24, 3639:16, 3639:25, 3640:19, 3641:9, 3641:16, 3641:22, 3641:25, 3642:5, 3642:14, 3643:3, 3643:13, 3643:22, 3676:3
**2011** [7] - 3391:22, 3444:6, 3477:16, 3556:22, 3638:24, 3684:19, 3685:13
**2012** [47] - 3362:7, 3362:8, 3366:20, 3370:4, 3378:9, 3378:12, 3381:9, 3382:4, 3385:8, 3390:5, 3408:10, 3411:3, 3430:11, 3430:21, 3431:14, 3432:24, 3433:14, 3436:17, 3437:9, 3444:9, 3458:17, 3459:2, 3463:23, 3464:1, 3464:10, 3464:11, 3472:23,

3491:16, 3510:6, 3510:18, 3518:5, 3520:12, 3520:15, 3520:21, 3523:24, 3524:4, 3524:9, 3526:9, 3526:15, 3555:9, 3555:11, 3556:19, 3556:20, 3556:22, 3557:17, 3563:20, 3578:18
**2013** [16] - 3379:12, 3381:10, 3382:5, 3429:21, 3430:19, 3452:15, 3501:20, 3525:14, 3525:20, 3526:10, 3528:20, 3529:25, 3546:24, 3642:5, 3642:18, 3680:17
**2014** [9] - 3583:3, 3629:3, 3638:14, 3638:24, 3641:16, 3643:9, 3643:13, 3643:22
**2015** [2] - 3501:22, 3578:18
**2016** [1] - 3579:18
**2017** [1] - 3579:19
**2018** [2] - 3539:25, 3540:1
**2019** [8] - 3411:2, 3411:13, 3418:20, 3419:11, 3544:12, 3555:2, 3562:8, 3594:9
**2020** [1] - 3580:16
**2024** [4] - 3313:10, 3315:3, 3594:10, 3687:11
**20th** [1] - 3480:15
**21** [3] - 3546:10, 3548:22, 3652:14
**22** [1] - 3643:24
**23** [8] - 3313:10, 3315:2, 3421:14, 3436:6, 3460:5, 3561:3, 3643:24, 3687:11
**23rd** [1] - 3530:18
**24** [1] - 3652:14
**25** [13] - 3321:11, 3532:23, 3532:24, 3532:25, 3533:11, 3533:14, 3534:7, 3534:11, 3534:18, 3534:23, 3536:10, 3577:12, 3633:1
**26** [1] - 3521:12
**275** [2] - 3603:14, 3604:13

**289,250** [1] - 3629:9
**29** [1] - 3634:18
**2:30** [1] - 3568:5
**2:50** [1] - 3597:11
**2:51** [1] - 3598:7
**2:55** [1] - 3600:21
**2:57** [1] - 3602:20
**2nd** [1] - 3326:8

**3**

**3** [4] - 3392:12, 3463:19, 3551:2, 3553:2
**30** [4] - 3316:15, 3318:22, 3320:21, 3446:14
**30-minute** [1] - 3657:10
**30th** [2] - 3317:10, 3463:22
**316** [1] - 3635:15
**31st** [2] - 3316:15, 3317:11
**3339** [1] - 3314:3
**335** [1] - 3629:18
**3384** [1] - 3314:4
**3389** [1] - 3314:8
**3409** [1] - 3314:9
**3417** [1] - 3314:10
**3442** [1] - 3314:11
**3472** [2] - 3314:12, 3314:13
**3477** [1] - 3314:14
**3480** [1] - 3314:15
**3491** [1] - 3314:16
**3499** [1] - 3314:17
**3502** [1] - 3314:18
**3505** [1] - 3314:19
**351** [2] - 3414:1
**3510** [1] - 3314:20
**3518** [1] - 3314:21
**3530** [1] - 3314:22
**3532** [1] - 3314:23
**3542** [1] - 3314:4
**3569** [1] - 3314:5
**36** [1] - 3632:2
**360** [2] - 3603:24, 3620:17
**391** [1] - 3456:10
**393** [1] - 3456:10
**3:02** [1] - 3607:1
**3:12-cv-07758-ZNQ-JBD** [1] - 3313:4
**3:15** [1] - 3619:24
**3:30** [1] - 3568:5
**3rd** [1] - 3316:22

**4**

**4** [7] - 3393:16, 3546:18, 3557:20, 3568:6, 3633:10, 3633:12, 3636:16
**40** [12] - 3326:20, 3326:22, 3326:24, 3327:16, 3328:5, 3347:20, 3348:4, 3456:21, 3488:22, 3489:13, 3490:15
**402** [1] - 3313:9
**402,250** [1] - 3629:5
**415** [1] - 3458:21
**416** [1] - 3458:21
**45** [1] - 3490:24
**460** [1] - 3326:8
**4:48** [1] - 3686:10
**4th** [1] - 3316:23

**5**

**5** [4] - 3395:1, 3547:24, 3577:12, 3623:1
**5/20** [1] - 3528:23
**50** [11] - 3389:18, 3432:15, 3435:11, 3435:16, 3435:18, 3456:21, 3459:6, 3459:12, 3501:13, 3532:22, 3561:22
**50-minute** [1] - 3483:9
**54** [1] - 3498:18
**58** [1] - 3460:5

**6**

**6** [1] - 3396:8
**60** [3] - 3488:21, 3489:12, 3490:14
**60/40** [2] - 3542:18, 3566:20
**600** [1] - 3313:17
**6028** [3] - 3314:8, 3388:25, 3550:13
**6036** [1] - 3314:16
**6049** [1] - 3314:23
**6057** [3] - 3314:19, 3504:15, 3504:23
**609** [1] - 3313:24
**65** [1] - 3605:23
**66** [1] - 3517:24

**7**

**7** [6] - 3414:1, 3430:7, 3456:10, 3504:15, 3604:14, 3663:14

**70** [3] - 3410:19, 3435:11, 3594:10
**702** [2] - 3325:11, 3332:10
**71** [2] - 3410:20
**73** [4] - 3548:23, 3549:15, 3550:1, 3562:15
**750** [1] - 3313:17
**75201** [1] - 3313:17
**78** [1] - 3546:8

**8**

**8** [2] - 3436:6, 3561:3
**80** [15] - 3365:24, 3432:24, 3435:11, 3435:16, 3436:18, 3437:9, 3440:12, 3457:3, 3458:3, 3478:1, 3478:24, 3479:14, 3561:21, 3594:11, 3680:25
**800** [1] - 3355:12
**815-2319** [1] - 3313:24
**82** [2] - 3319:1, 3510:10
**85** [1] - 3365:24
**8511** [2] - 3314:10, 3417:9
**8512** [1] - 3314:9
**8518** [2] - 3314:17, 3499:2
**8529** [1] - 3314:21
**86** [1] - 3532:4
**8753** [2] - 3314:20, 3510:13
**8848** [2] - 3314:12, 3472:1
**8849** [3] - 3314:13, 3471:24, 3472:2
**8987** [1] - 3314:22
**8:30** [2] - 3313:10, 3315:3

**9**

**9** [6] - 3410:22, 3646:1, 3646:18, 3657:4, 3657:12, 3657:17
**9,000** [1] - 3643:10
**9088** [2] - 3314:18, 3501:17
**9090** [1] - 3314:11
**9092** [1] - 3314:14
**9093** [2] - 3314:15, 3480:1
**920** [1] - 3313:21
**98** [4] - 3436:6, 3561:3

**9th** [1] - 3530:11

**A**

**a.m** [8] - 3313:10, 3315:3, 3400:16, 3407:13, 3468:3, 3471:19, 3485:16, 3487:25
**ABA** [5] - 3581:1, 3581:2, 3581:6, 3581:8, 3581:11
**abide** [1] - 3593:5
**ability** [8] - 3327:15, 3393:22, 3513:8, 3577:9, 3577:18, 3625:25, 3674:24, 3678:4
**able** [29] - 3320:15, 3331:11, 3331:22, 3349:10, 3353:12, 3552:16, 3560:7, 3563:15, 3577:10, 3611:24, 3622:23, 3636:10, 3639:13, 3639:14, 3643:15, 3643:19, 3649:20, 3650:2, 3650:11, 3652:5, 3652:14, 3656:21, 3658:11, 3663:18, 3665:6, 3666:5, 3667:1, 3672:2, 3674:24
**above-entitled** [1] - 3687:5
**absence** [1] - 3674:1
**absent** [1] - 3671:16
**absolute** [1] - 3348:2
**absolutely** [29] - 3332:20, 3363:3, 3365:22, 3371:14, 3372:12, 3376:23, 3383:12, 3384:19, 3398:16, 3401:20, 3418:10, 3427:5, 3428:1, 3448:10, 3480:9, 3481:4, 3495:11, 3512:21, 3522:20, 3526:3, 3536:8, 3549:7, 3554:10, 3554:18, 3562:14, 3595:14, 3606:14, 3644:22, 3653:7
**absorbed** [1] - 3585:23
**abuse** [3] - 3569:15, 3573:15, 3577:2
**abuses** [1] - 3458:12
**academic** [2] -

**3575:17, 3625:20
acceptable** [2] - 3593:19, 3593:24
**accepted** [5] - 3529:21, 3614:21, 3619:10, 3650:22, 3650:23
**access** [2] - 3353:17, 3544:11
**according** [4] - 3442:11, 3506:8, 3593:22, 3640:11
**account** [4] - 3341:23, 3341:24, 3440:6, 3685:9
**accountability** [1] - 3407:20
**accountable** [1] - 3678:5
**accounting** [1] - 3575:13
**accuracy** [2] - 3552:5, 3554:17
**accurate** [21] - 3410:2, 3411:24, 3420:18, 3427:13, 3427:18, 3432:12, 3432:18, 3436:9, 3436:14, 3436:17, 3437:11, 3441:14, 3552:14, 3552:15, 3552:19, 3554:1, 3554:8, 3558:15, 3564:11, 3654:13, 3656:22
**accurately** [1] - 3554:9
**accusation** [1] - 3355:23
**accusations** [2] - 3559:1, 3559:12
**accused** [1] - 3577:2
**act** [1] - 3347:4
**Act** [36] - 3367:21, 3542:5, 3556:1, 3565:23, 3572:12, 3572:17, 3572:19, 3574:6, 3574:10, 3574:14, 3574:25, 3575:1, 3576:12, 3576:24, 3577:14, 3579:15, 3584:1, 3584:2, 3584:4, 3584:7, 3584:8, 3606:11, 3607:4, 3607:8, 3607:11, 3609:11, 3616:11, 3617:1, 3617:2, 3621:6, 3648:15, 3656:17, 3673:2, 3676:21, 3680:23
**acting** [1] - 3367:13
**ACTION** [1] - 3313:3
**action** [1] - 3560:13
**active** [1] - 3582:11
**activists** [1] - 3623:2
**activities** [5] - 3357:23, 3367:4, 3368:8, 3557:9, 3559:13
**activity** [9] - 3354:6, 3364:25, 3376:18, 3403:2, 3408:10, 3411:15, 3415:2, 3513:6, 3642:1
**acts** [2] - 3617:8, 3668:22
**actual** [1] - 3482:8
**acute** [1] - 3474:16
**ad** [4] - 3630:11, 3630:13, 3630:20, 3631:1
**ADAM** [1] - 3313:16
**adamant** [1] - 3351:4
**add** [1] - 3341:2
**added** [3] - 3339:1, 3345:25, 3590:4
**adding** [1] - 3667:25
**addition** [10] - 3363:1, 3460:8, 3498:12, 3576:18, 3630:4, 3630:11, 3630:18, 3630:19, 3632:12, 3632:15
**additional** [11] - 3471:14, 3498:13, 3586:11, 3586:17, 3588:25, 3589:12, 3589:21, 3589:24, 3590:9, 3631:1, 3655:18
**additionally** [1] - 3472:17
**address** [20] - 3317:21, 3321:18, 3321:23, 3324:19, 3336:19, 3522:18, 3529:23, 3619:15, 3619:17, 3644:16, 3644:19, 3645:3, 3645:19, 3645:22, 3648:18, 3654:21, 3670:10, 3680:10, 3681:21, 3683:24
**addressed** [10] - 3318:11, 3318:13, 3318:14, 3320:5, 3471:9, 3535:19, 3654:24, 3655:7, 3655:16, 3660:12
**addresses** [2] -

3319:5, 3662:21
**addressing** [2] - 3658:14, 3678:17
**adequate** [1] - 3595:5
**adjourn** [1] - 3645:21
**adjourned** [1] - 3686:6
**administered** [2] - 3605:14, 3605:15
**administering** [1] - 3640:7
**administrative** [1] - 3512:14
**admissible** [4] - 3321:7, 3322:6, 3323:7, 3407:9
**admission** [5] - 3406:4, 3417:5, 3418:12, 3468:13, 3546:18
**admissions** [5] - 3406:5, 3471:10, 3545:22, 3546:1, 3546:8
**admit** [34] - 3321:1, 3321:13, 3323:6, 3326:23, 3327:7, 3330:25, 3388:21, 3404:6, 3404:7, 3405:4, 3409:7, 3416:18, 3416:23, 3417:12, 3417:19, 3419:11, 3420:6, 3443:15, 3467:23, 3470:7, 3471:23, 3477:6, 3490:22, 3498:19, 3501:14, 3504:15, 3510:10, 3521:13, 3529:8, 3529:21, 3532:3, 3546:21, 3547:24, 3548:25
**admitted** [36] - 3319:6, 3321:19, 3323:8, 3324:1, 3324:22, 3330:18, 3388:24, 3409:11, 3419:12, 3443:21, 3471:25, 3477:8, 3479:25, 3491:7, 3499:1, 3501:16, 3504:22, 3510:12, 3518:1, 3529:8, 3529:13, 3532:6, 3545:16, 3547:6, 3548:8, 3603:13, 3603:16, 3603:17, 3603:22, 3603:25, 3632:7, 3634:15, 3636:23, 3680:1, 3680:7, 3680:9

**adopt** [1] - 3344:17
**adult** [1] - 3567:12
**advance** [6] - 3334:18, 3334:19, 3394:12, 3648:9, 3671:24, 3685:6
**advanced** [3] - 3336:9, 3369:6, 3512:25
**advancing** [1] - 3392:17
**advantage** [2] - 3349:9, 3369:8
**advice** [4] - 3365:5, 3367:23, 3379:3, 3534:15
**advised** [1] - 3377:24
**advocate** [2] - 3662:3, 3677:14
**affects** [1] - 3577:15
**affiliated** [1] - 3462:3
**afford** [1] - 3376:6
**Affordable** [2] - 3584:2, 3584:8
**aforementioned** [1] - 3513:6
**afraid** [1] - 3536:5
**afternoon** [5] - 3541:22, 3541:23, 3555:14, 3568:21, 3568:22
**age** [1] - 3575:7
**agencies** [2] - 3572:24, 3584:19
**agency** [3] - 3573:12, 3584:16, 3642:9
**agenda** [8] - 3510:23, 3511:11, 3511:17, 3511:20, 3511:24, 3511:25, 3513:8, 3514:16
**agendas** [1] - 3560:2
**agent** [1] - 3571:24
**aggressive** [1] - 3351:2
**ago** [9] - 3368:8, 3368:9, 3436:20, 3497:5, 3503:10, 3503:12, 3565:5, 3594:9, 3647:16
**agree** [54] - 3320:8, 3321:24, 3322:10, 3322:17, 3323:3, 3327:6, 3336:22, 3337:2, 3376:25, 3377:1, 3383:13, 3383:14, 3384:13, 3387:23, 3397:12, 3399:3, 3399:4, 3401:9, 3401:20, 3405:15,

3410:15, 3450:21, 3450:22, 3459:5, 3481:1, 3481:20, 3487:10, 3487:18, 3494:9, 3511:4, 3593:5, 3601:8, 3601:15, 3604:21, 3605:1, 3606:13, 3608:11, 3608:15, 3610:21, 3615:19, 3616:18, 3617:3, 3617:7, 3657:8, 3657:13, 3657:15, 3658:3, 3659:15, 3660:3, 3660:5, 3680:14, 3681:12
**agreed** [2] - 3347:25, 3506:2
**agreement** [12] - 3330:15, 3485:11, 3485:13, 3485:23, 3486:13, 3488:13, 3488:17, 3488:21, 3641:23, 3641:25, 3642:5, 3680:22
**ahead** [6] - 3401:12, 3405:22, 3603:22, 3664:21, 3670:6, 3671:21
**AHM** [3] - 3641:9, 3641:15, 3642:24
**aided** [1] - 3313:25
**AIDS** [2] - 3446:11, 3478:17
**AIDS/HIV** [1] - 3446:15
**airing** [1] - 3397:12
**AKS** [4] - 3619:11, 3619:19, 3650:1, 3657:25
**al** [1] - 3313:4
**alarm** [1] - 3398:22
**Alaska** [2] - 3540:21, 3540:25
**alert** [2] - 3406:20, 3469:19
**alerted** [2] - 3372:7, 3545:2
**aligned** [4] - 3515:20, 3516:7, 3516:20, 3516:25
**allegation** [1] - 3611:9
**allegations** [32] - 3383:10, 3387:24, 3395:19, 3401:22, 3405:18, 3419:21, 3420:2, 3420:24, 3446:19, 3447:11, 3453:24, 3454:3, 3454:7, 3455:9, 3458:17, 3466:15,

3483:21, 3498:1, 3500:12, 3503:17, 3506:8, 3507:25, 3508:9, 3508:13, 3509:6, 3510:2, 3532:18, 3533:1, 3576:25, 3672:7, 3673:7, 3676:9
**allege** [4] - 3412:8, 3466:10, 3506:3, 3507:15
**alleged** [2] - 3542:9, 3573:15
**alleging** [4] - 3412:3, 3423:18, 3434:2, 3542:12
**Alli** [3] - 3315:16, 3443:16
**ALLISON** [1] - 3313:19
**allow** [23] - 3325:21, 3326:21, 3331:4, 3331:9, 3331:10, 3331:17, 3380:4, 3380:7, 3404:5, 3404:25, 3405:23, 3406:16, 3469:25, 3471:12, 3529:6, 3534:13, 3602:12, 3602:14, 3671:12, 3672:9, 3675:16, 3677:9, 3677:19
**allowed** [17] - 3321:1, 3333:5, 3335:19, 3349:9, 3407:2, 3440:25, 3441:13, 3474:11, 3615:9, 3652:1, 3659:5, 3662:20, 3668:17, 3671:25, 3676:13, 3678:15, 3678:20
**alluded** [1] - 3372:16
**allusion** [1] - 3373:7
**almost** [12] - 3325:13, 3397:9, 3456:19, 3457:20, 3471:7, 3523:21, 3559:1, 3562:6, 3564:13, 3654:9, 3669:18, 3675:21
**alongs** [2] - 3641:1
**alphabet** [1] - 3573:5
**America** [1] - 3560:8
**AMERICA** [1] - 3313:3
**American** [3] - 3580:24, 3582:1, 3582:9
**Amit** [1] - 3590:13
**amount** [7] - 3322:25, 3480:4, 3484:20,

3487:1, 3566:24, 3665:2, 3667:16
**amounts** [6] - 3574:1, 3630:4, 3631:13, 3631:14, 3631:21, 3633:2
**analogs** [1] - 3621:8
**analogy** [1] - 3330:2
**analysis** [5] - 3326:5, 3331:7, 3335:9, 3611:23, 3631:16
**analyzing** [1] - 3631:24
**Andrew** [2] - 3315:11, 3670:6
**ANDREW** [1] - 3313:15
**anecdotal** [1] - 3347:23
**Angel** [4] - 3359:12, 3359:21, 3438:19, 3539:7
**angry** [1] - 3560:12
**anonymous** [2] - 3359:10, 3483:6
**answer** [20] - 3417:23, 3420:18, 3427:2, 3432:19, 3432:20, 3437:3, 3460:1, 3460:2, 3469:1, 3469:7, 3472:12, 3472:16, 3495:15, 3505:10, 3545:13, 3552:23, 3552:24, 3615:22, 3658:13, 3665:9
**answered** [3] - 3419:13, 3434:24, 3561:10
**answering** [5] - 3418:7, 3426:22, 3434:22, 3541:16, 3562:8
**answers** [4] - 3399:18, 3417:16, 3484:22, 3600:24
**Anthony** [4] - 3352:6, 3352:10, 3352:11, 3587:21
**anti** [3] - 3576:12, 3604:4, 3621:7
**Anti** [27] - 3572:12, 3574:6, 3582:5, 3584:6, 3597:6, 3597:13, 3599:12, 3600:14, 3606:10, 3606:18, 3607:9, 3608:22, 3615:15, 3616:13, 3616:24, 3618:13, 3631:19,

3648:16, 3648:24, 3650:1, 3652:24, 3654:2, 3656:16, 3658:1, 3659:3, 3668:14, 3676:21

**anti-kickback** [3] - 3576:12, 3604:4, 3621:7

**Anti-Kickback** [27] - 3572:12, 3574:6, 3582:5, 3584:6, 3597:6, 3597:13, 3599:12, 3600:14, 3606:10, 3606:18, 3607:9, 3608:22, 3615:15, 3616:13, 3616:24, 3618:13, 3631:19, 3648:16, 3648:24, 3650:1, 3652:24, 3654:2, 3656:16, 3658:1, 3659:3, 3668:14, 3676:21

**anticipate** [3] - 3332:11, 3332:13, 3334:10

**anticipated** [2] - 3333:3, 3407:16

**anticipating** [1] - 3323:24

**anxieties** [1] - 3362:10

**anxiety** [6] - 3355:1, 3364:8, 3370:24, 3378:11, 3380:6, 3382:14

**anyway** [2] - 3321:25, 3330:22

**apart** [2] - 3678:23, 3679:2

**apologies** [1] - 3607:6

**apologize** [7] - 3329:13, 3459:9, 3490:24, 3494:18, 3497:18, 3585:24

**appeal** [1] - 3617:15

**appearances** [1] - 3315:6

**appeared** [7] - 3625:12, 3628:24, 3639:19, 3641:1, 3641:7, 3641:8

**apples** [1] - 3678:12

**applicable** [2] - 3592:19, 3592:20

**applied** [1] - 3369:11

**apply** [3] - 3605:23, 3635:4, 3668:24

**applying** [1] - 3326:7

**appreciate** [9] - 3317:7, 3334:9,

3339:3, 3529:15, 3646:16, 3669:14, 3670:10, 3681:9, 3681:25

**appreciated** [1] - 3451:22

**appreciating** [2] - 3345:1, 3677:21

**approach** [13] - 3350:25, 3377:18, 3384:5, 3400:14, 3468:1, 3485:14, 3524:25, 3600:19, 3600:20, 3606:24, 3625:9, 3684:13, 3685:15

**approaching** [1] - 3575:7

**appropriate** [14] - 3322:6, 3322:8, 3400:19, 3401:5, 3514:16, 3516:10, 3519:15, 3519:19, 3610:18, 3611:18, 3614:20, 3625:6, 3658:4

**approval** [3] - 3581:8, 3625:3, 3626:14

**approved** [9] - 3347:21, 3367:14, 3369:12, 3477:12, 3477:21, 3479:13, 3480:13, 3531:7, 3623:19

**approximation** [1] - 3594:6

**April** [1] - 3378:12

**Aptivus** [3] - 3623:21, 3624:4

**area** [9] - 3322:22, 3340:1, 3341:10, 3361:10, 3465:25, 3551:13, 3573:4, 3575:21

**areas** [4] - 3318:17, 3320:15, 3322:19, 3572:12

**argue** [3] - 3613:17, 3662:5, 3662:7

**argued** [2] - 3617:13, 3673:20

**arguing** [3] - 3610:24, 3617:11, 3676:17

**argument** [11] - 3327:7, 3336:17, 3619:9, 3653:10, 3662:7, 3664:24, 3671:6, 3675:21, 3678:8, 3678:13, 3681:24

**arguments** [4] - 3669:4, 3670:10, 3670:16, 3679:15

**arise** [1] - 3595:7

**arm** [1] - 3573:12

**ARPS** [1] - 3313:19

**arrange** [1] - 3340:24

**arranged** [1] - 3341:12

**article** [6] - 3319:1, 3327:19, 3327:22, 3327:25, 3329:12

**articles** [2] - 3582:4, 3582:7

**articulation** [1] - 3627:2

**AS** [1] - 3568:12

**aspect** [2] - 3581:10, 3641:7

**aspects** [1] - 3653:4

**assessment** [3] - 3341:20, 3626:21, 3626:24

**assigned** [5] - 3511:11, 3511:16, 3513:23, 3514:16, 3519:14

**assignment** [2] - 3515:21, 3515:25

**assist** [1] - 3393:6

**Association** [4] - 3580:24, 3581:24, 3582:1, 3582:9

**assume** [3] - 3316:24, 3493:22, 3494:7

**assumed** [2] - 3316:8, 3333:20

**assumes** [1] - 3462:14

**assuming** [1] - 3635:4

**assumption** [1] - 3335:20

**assumptions** [9] - 3332:15, 3333:20, 3334:25, 3335:8, 3335:9, 3335:19, 3335:23, 3335:25

**at-home** [1] - 3547:16

**attach** [1] - 3473:25

**attached** [1] - 3474:5

**attaching** [1] - 3473:3

**attachment** [5] - 3467:25, 3471:24, 3498:20, 3498:22, 3498:23

**attack** [5] - 3318:5, 3319:12, 3319:13, 3363:15

**attacking** [4] - 3318:25, 3319:3, 3319:14, 3328:24

**attacks** [2] - 3362:19,

3380:6

**attempt** [2] - 3403:13, 3641:8

**attempted** [1] - 3530:10

**attempting** [3] - 3470:6, 3577:5, 3601:19

**attempts** [2] - 3521:4, 3521:19

**attend** [1] - 3643:14

**attendance** [3] - 3449:7, 3600:7, 3600:8

**attended** [3] - 3478:24, 3642:15, 3643:4

**attendees** [6] - 3349:5, 3349:6, 3551:18, 3600:1, 3600:15, 3649:20

**attention** [5] - 3339:3, 3482:5, 3493:9, 3598:11, 3646:17

**attest** [2] - 3650:2, 3652:1

**attested** [1] - 3328:24

**attests** [1] - 3662:24

**attorney** [10] - 3365:9, 3536:5, 3551:11, 3551:12, 3569:3, 3570:10, 3570:12, 3570:17, 3571:2, 3571:3

**Attorney's** [5] - 3571:6, 3571:8, 3572:21, 3574:22, 3579:20

**attorneys** [7] - 3370:17, 3371:21, 3533:19, 3535:13, 3536:6, 3578:11, 3580:19

**audience** [3] - 3346:20, 3347:16, 3551:19

**auditing** [5] - 3575:13, 3576:1, 3576:18, 3639:8, 3639:9

**August** [2] - 3463:22, 3472:23

**author** [7] - 3326:24, 3326:25, 3327:1, 3327:20, 3328:11, 3329:20, 3331:3

**authored** [1] - 3331:2

**authors** [2] - 3326:23, 3326:24

**automatically** [1] - 3333:22

**available** [3] - 3393:10, 3515:17, 3563:16

**avoid** [1] - 3602:2

**award** [5] - 3486:14, 3487:8, 3487:13, 3508:22

**awarded** [2] - 3486:14, 3490:19

**aware** [24] - 3328:11, 3329:20, 3329:21, 3341:20, 3345:13, 3345:16, 3351:17, 3358:10, 3370:24, 3394:14, 3438:10, 3443:1, 3443:12, 3449:19, 3462:25, 3463:2, 3487:12, 3490:4, 3517:20, 3557:23, 3640:17, 3641:22, 3643:9, 3673:6

**awareness** [2] - 3474:16, 3475:8

**B**

**babysitting** [1] - 3678:1

**back-to-back** [1] - 3348:23

**backdoor** [1] - 3319:15

**background** [5] - 3591:16, 3615:2, 3621:24, 3636:11, 3636:12

**backwards** [1] - 3614:7

**bad** [4] - 3357:22, 3366:19, 3449:3, 3541:10

**Bailey** [3] - 3346:2, 3346:4, 3346:15

**Baker** [1] - 3576:9

**ball** [2] - 3329:23, 3674:19

**Baltimore** [2] - 3576:8, 3576:10

**banter** [1] - 3452:17

**Bar** [2] - 3580:24, 3582:14

**bar** [2] - 3582:11, 3582:18

**bars** [2] - 3582:11, 3582:13

**Bartnett** [60] - 3340:17, 3340:21, 3340:24, 3341:14, 3341:23, 3342:7,

3342:16, 3344:14, 3346:6, 3346:12, 3350:6, 3353:1, 3365:23, 3372:23, 3372:24, 3372:25, 3373:1, 3376:1, 3421:4, 3421:8, 3421:25, 3422:24, 3424:17, 3428:25, 3434:19, 3439:24, 3440:3, 3440:13, 3442:16, 3442:17, 3442:21, 3443:3, 3443:11, 3444:2, 3444:17, 3444:23, 3444:25, 3448:1, 3448:14, 3449:17, 3449:21, 3450:3, 3450:11, 3450:20, 3451:9, 3452:17, 3452:25, 3453:23, 3455:3, 3455:17, 3455:23, 3456:1, 3458:18, 3459:6, 3459:12, 3489:22, 3539:1, 3544:8, 3557:6, 3563:4
**Bartnett's** [1] - 3458:12
**base** [1] - 3619:4
**based** [39] - 3319:21, 3320:21, 3323:24, 3325:18, 3335:7, 3335:8, 3336:7, 3345:21, 3357:15, 3376:18, 3383:5, 3423:7, 3458:6, 3461:16, 3471:13, 3479:5, 3547:2, 3547:8, 3598:13, 3598:22, 3599:15, 3605:8, 3606:12, 3608:21, 3622:7, 3625:8, 3625:17, 3629:16, 3633:24, 3634:12, 3636:6, 3637:3, 3639:13, 3644:3, 3668:5, 3681:24, 3682:20, 3682:23, 3684:10
**Based** [1] - 3669:2
**basis** [6] - 3318:6, 3323:21, 3418:2, 3470:8, 3596:12, 3637:13
**Bates** [2] - 3468:7, 3586:18
**battle** [1] - 3336:20
**became** [11] - 3329:25, 3343:5,

3357:14, 3374:13, 3378:11, 3455:15, 3572:5, 3572:11, 3575:1, 3577:4, 3628:6
**become** [2] - 3362:21, 3453:23, 3580:10
**becoming** [1] - 3362:13
**BEEN** [1] - 3568:12
**began** [6] - 3361:15, 3433:11, 3433:20, 3434:4, 3436:10, 3464:5
**begged** [4] - 3353:19, 3354:9, 3363:4
**begging** [2] - 3559:15, 3644:18
**begin** [2] - 3315:6, 3338:5
**beginning** [13] - 3366:20, 3419:10, 3441:14, 3441:20, 3444:21, 3444:22, 3484:3, 3485:11, 3488:14, 3544:20, 3555:9, 3628:5, 3672:9
**begins** [9] - 3400:16, 3468:3, 3485:16, 3494:4, 3501:21, 3534:1, 3597:11, 3600:21, 3607:1
**begun** [1] - 3382:14
**behalf** [7] - 3542:10, 3542:13, 3542:14, 3581:11, 3680:24, 3681:2
**behavior** [2] - 3596:9, 3597:2
**behind** [7] - 3351:5, 3355:25, 3356:12, 3496:3, 3524:23, 3664:7
**belabor** [1] - 3663:16
**belief** [5] - 3390:10, 3392:17, 3393:20, 3394:22, 3508:13
**believable** [1] - 3527:3
**bell** [1] - 3511:5
**below** [1] - 3452:6
**Ben** [2] - 3566:17, 3588:6
**bench** [4] - 3322:23, 3333:16, 3337:10, 3680:20
**beneficiaries** [1] - 3572:25
**benefit** [3] - 3599:7, 3599:10, 3606:2

**benefits** [3] - 3366:12, 3530:6, 3577:18
**best** [6] - 3364:17, 3371:1, 3379:8, 3511:11, 3513:8, 3550:5
**Beth** [2] - 3348:10, 3446:6
**better** [20] - 3358:18, 3361:6, 3365:21, 3377:2, 3377:4, 3380:5, 3395:25, 3398:8, 3398:12, 3406:7, 3494:24, 3508:15, 3519:4, 3529:17, 3550:1, 3578:22, 3630:16, 3653:22, 3669:13
**between** [17] - 3326:1, 3341:11, 3341:19, 3375:3, 3381:9, 3435:16, 3441:21, 3450:19, 3455:25, 3456:21, 3463:10, 3486:17, 3561:7, 3561:13, 3643:22, 3653:15, 3665:12
**beyond** [1] - 3336:16
**bias** [2] - 3326:10, 3330:7
**big** [10] - 3336:1, 3344:10, 3354:2, 3368:9, 3442:19, 3484:24, 3560:20, 3560:21, 3600:11, 3629:7
**biggest** [2] - 3340:3
**bill** [2] - 3569:17, 3577:11
**Bill** [1] - 3453:10
**billing** [4] - 3577:14, 3577:19, 3629:22, 3632:16
**binders** [1] - 3357:19
**birth** [1] - 3383:5
**bit** [38] - 3331:20, 3331:21, 3331:23, 3345:9, 3346:1, 3347:15, 3358:23, 3368:21, 3383:23, 3385:19, 3389:3, 3391:12, 3391:13, 3428:5, 3454:11, 3475:23, 3480:21, 3481:25, 3509:6, 3510:5, 3519:9, 3520:16, 3520:17, 3539:19, 3555:14, 3564:3, 3569:20, 3571:13, 3584:14,

3592:6, 3609:1, 3621:5, 3642:3, 3642:4, 3646:6, 3647:9, 3659:8, 3669:24
**biweekly** [1] - 3349:20
**blaming** [1] - 3645:9
**blanket** [1] - 3322:10
**blanks** [1] - 3552:16
**blindsided** [3] - 3448:17, 3448:18, 3470:15
**blindsiding** [1] - 3469:24
**BLT** [2] - 3474:1, 3475:1
**board** [3] - 3323:4, 3559:18, 3630:20
**boards** [3] - 3630:11, 3630:13, 3631:1
**bonuses** [1] - 3429:16
**borderline** [1] - 3362:14
**bore** [1] - 3328:6
**boss** [8] - 3350:22, 3350:23, 3352:7, 3354:9, 3362:24, 3373:3
**boss's** [4] - 3350:22, 3362:24, 3373:3
**bosses** [1] - 3354:7
**Boston** [1] - 3357:13
**bother** [3] - 3321:22, 3407:6, 3672:14
**bottom** [4] - 3453:17, 3505:1, 3510:22, 3630:22
**box** [10] - 3328:16, 3337:16, 3338:2, 3362:18, 3523:2, 3541:25, 3646:23, 3651:13, 3672:17, 3673:18
**Brad** [1] - 3315:20
**BRADLEY** [1] - 3313:20
**brains** [1] - 3630:16
**Brancaccio** [45] - 3364:4, 3365:2, 3367:17, 3374:13, 3374:15, 3376:2, 3376:14, 3376:24, 3450:18, 3450:19, 3451:8, 3451:17, 3452:5, 3453:9, 3463:10, 3464:15, 3464:21, 3465:6, 3473:3, 3485:3, 3485:7, 3486:5, 3486:11, 3486:17,

3488:10, 3488:22, 3489:13, 3492:24, 3501:5, 3501:22, 3502:24, 3503:25, 3504:10, 3517:20, 3518:12, 3519:7, 3519:22, 3527:25, 3542:19, 3563:5, 3565:15, 3566:21, 3567:14, 3587:17
**Brancaccio's** [4] - 3380:22, 3468:21, 3490:15, 3495:2
**branded** [1] - 3475:13
**breach** [1] - 3668:21
**break** [23] - 3363:20, 3363:21, 3407:23, 3408:2, 3428:2, 3428:4, 3470:23, 3522:18, 3522:21, 3568:5, 3568:6, 3568:8, 3570:20, 3573:5, 3589:9, 3589:15, 3590:23, 3590:25, 3591:10, 3609:4, 3644:10, 3652:4
**breathing** [1] - 3362:20
**brewing** [1] - 3614:25
**bribe** [1] - 3446:24
**bribed** [2] - 3446:23, 3676:10
**Bridgewater** [1] - 3361:11
**brief** [13] - 3551:18, 3619:2, 3648:5, 3654:25, 3655:8, 3655:13, 3655:14, 3655:18, 3670:8, 3670:14, 3670:17
**Brief** [1] - 3402:24
**briefed** [1] - 3648:13
**briefing** [10] - 3614:19, 3619:1, 3654:23, 3655:10, 3655:18, 3657:1, 3669:20, 3670:21, 3671:5, 3671:11
**briefly** [6] - 3350:9, 3406:1, 3605:8, 3605:9, 3661:13, 3680:5
**briefs** [4] - 3655:22, 3670:8, 3670:13, 3670:14
**bring** [9] - 3325:10, 3327:21, 3330:11, 3337:18, 3352:13, 3359:24, 3464:2,

3464:6, 3645:11
**bringing** [5] - 3319:17,
3542:12, 3632:16,
3647:21, 3647:22
**broader** [2] - 3549:5,
3655:22
**broke** [2] - 3578:21,
3638:15
**broken** [1] - 3605:18
**Brooklyn** [3] - 3369:4,
3571:9, 3571:11
**brought** [8] - 3319:9,
3371:17, 3418:4,
3493:9, 3497:24,
3543:13, 3647:25,
3680:21
**BROWN** [240] -
3313:19, 3314:4,
3315:16, 3316:7,
3316:12, 3316:21,
3317:2, 3317:14,
3337:14, 3338:7,
3384:4, 3384:7,
3384:8, 3384:10,
3384:12, 3388:21,
3389:1, 3389:5,
3389:8, 3390:16,
3390:18, 3392:12,
3392:14, 3393:15,
3393:18, 3395:1,
3395:4, 3396:8,
3396:10, 3401:13,
3402:15, 3402:18,
3402:22, 3402:25,
3403:5, 3403:16,
3403:23, 3404:7,
3404:12, 3404:16,
3404:20, 3405:5,
3406:4, 3406:12,
3406:15, 3407:11,
3407:24, 3408:4,
3408:7, 3409:7,
3409:13, 3413:24,
3414:3, 3415:16,
3415:19, 3415:22,
3415:23, 3417:4,
3417:8, 3417:10,
3421:16, 3427:6,
3427:7, 3427:24,
3428:1, 3428:12,
3428:17, 3428:18,
3430:7, 3430:9,
3433:25, 3434:1,
3436:6, 3436:8,
3443:14, 3443:17,
3443:19, 3443:22,
3443:24, 3451:5,
3451:7, 3452:22,
3452:24, 3456:10,
3456:12, 3458:21,

3458:23, 3460:7,
3462:16, 3462:20,
3462:21, 3467:23,
3468:13, 3468:25,
3469:7, 3470:5,
3470:9, 3470:12,
3470:16, 3471:6,
3471:18, 3471:21,
3471:23, 3472:3,
3472:20, 3477:5,
3477:10, 3479:22,
3480:2, 3486:1,
3486:18, 3487:21,
3487:23, 3488:2,
3488:4, 3488:7,
3490:21, 3490:24,
3491:1, 3491:5,
3491:9, 3494:2,
3494:10, 3494:16,
3494:18, 3494:24,
3495:8, 3495:11,
3495:21, 3496:2,
3496:5, 3496:7,
3496:10, 3496:12,
3496:19, 3496:23,
3496:25, 3497:3,
3498:19, 3498:21,
3498:23, 3499:3,
3501:13, 3501:18,
3504:15, 3504:17,
3504:19, 3504:24,
3510:10, 3510:14,
3517:24, 3518:2,
3518:4, 3521:12,
3521:17, 3522:20,
3523:15, 3523:16,
3523:19, 3523:20,
3524:16, 3524:18,
3524:25, 3525:4,
3525:8, 3525:11,
3525:12, 3529:9,
3529:15, 3529:19,
3532:3, 3532:8,
3533:8, 3533:9,
3533:23, 3534:3,
3534:17, 3534:22,
3535:5, 3535:17,
3536:2, 3536:8,
3536:11, 3536:13,
3536:16, 3536:20,
3536:25, 3537:4,
3537:6, 3550:24,
3597:9, 3600:18,
3602:19, 3603:20,
3606:23, 3611:13,
3611:16, 3613:16,
3614:14, 3614:16,
3616:10, 3616:14,
3616:16, 3616:21,
3617:1, 3617:6,
3618:15, 3619:16,

3619:22, 3644:22,
3645:6, 3657:14,
3671:23, 3672:15,
3672:22, 3673:25,
3674:4, 3674:13,
3674:22, 3676:6,
3676:19, 3677:24,
3678:9, 3678:11,
3679:17, 3679:23,
3680:2, 3681:16,
3682:11, 3682:13,
3682:19, 3683:3,
3683:10, 3683:12,
3683:21, 3684:6,
3684:18, 3684:25,
3685:4, 3685:8
**brown** [1] - 3401:12
**Brown** [39] - 3315:16,
3315:25, 3316:20,
3322:11, 3329:10,
3337:13, 3384:3,
3402:12, 3403:13,
3405:16, 3405:24,
3406:24, 3426:22,
3427:23, 3428:10,
3428:16, 3470:3,
3495:10, 3522:17,
3523:14, 3525:7,
3533:21, 3536:24,
3541:18, 3543:1,
3546:2, 3546:13,
3547:23, 3548:13,
3549:14, 3550:23,
3559:22, 3560:23,
3672:10, 3677:11,
3678:16, 3679:22,
3680:12, 3681:14
**buckets** [4] - 3622:17,
3624:7, 3624:13,
3624:19
**bud** [1] - 3615:5
**Building** [1] - 3313:8
**built** [1] - 3578:10
**bullet** [1] - 3598:11
**bullets** [1] - 3663:22
**bullied** [1] - 3450:5
**bullying** [1] - 3445:6
**bunch** [5] - 3452:16,
3476:9, 3534:6,
3578:11, 3672:18
**burden** [1] - 3677:8
**bureau** [17] - 3459:15,
3462:23, 3479:9,
3507:13, 3583:2,
3585:25, 3599:9,
3622:14, 3624:2,
3626:1, 3626:11,
3633:24, 3634:5,
3634:6, 3635:9,
3636:3, 3638:9

**Bureau** [4] - 3461:8,
3461:12, 3583:3,
3591:23
**bureaus** [1] - 3582:23
**business** [7] -
3382:18, 3531:7,
3593:6, 3593:7,
3593:20, 3626:24,
3631:22
**button** [1] - 3617:25
**BY** [83] - 3313:14,
3313:19, 3314:3,
3314:4, 3314:4,
3314:5, 3339:11,
3384:8, 3384:12,
3389:1, 3389:8,
3390:18, 3392:14,
3393:18, 3395:4,
3396:10, 3408:7,
3409:13, 3414:3,
3415:23, 3417:10,
3421:16, 3427:7,
3428:18, 3430:9,
3434:1, 3436:8,
3443:24, 3451:7,
3452:24, 3456:12,
3458:23, 3460:7,
3462:21, 3472:3,
3472:20, 3477:10,
3480:2, 3488:4,
3488:7, 3491:9,
3497:3, 3499:3,
3501:18, 3504:24,
3510:14, 3518:4,
3521:17, 3523:16,
3523:20, 3524:18,
3525:12, 3529:19,
3532:8, 3533:9,
3537:6, 3541:21,
3546:6, 3551:1,
3557:22, 3561:4,
3561:19, 3568:20,
3583:9, 3589:18,
3591:13, 3598:9,
3603:4, 3604:2,
3604:16, 3620:6,
3620:18, 3620:25,
3622:2, 3626:3,
3628:16, 3632:24,
3633:11, 3634:16,
3634:19, 3635:17,
3636:17, 3637:1
**byline** [1] - 3582:7

**C**

**calculation** [1] -
3634:21
**California** [1] - 3351:8
**Candice** [1] - 3588:10

**cannot** [5] - 3607:23,
3607:24, 3652:23,
3652:25, 3681:21
**capable** [1] - 3637:8
**car** [3] - 3345:6,
3358:12, 3432:9
**Care** [4] - 3581:23,
3584:2, 3584:3,
3584:8
**care** [57] - 3317:17,
3317:20, 3337:22,
3355:12, 3355:20,
3359:9, 3359:15,
3359:18, 3359:21,
3529:5, 3551:19,
3569:3, 3569:4,
3569:6, 3569:8,
3569:10, 3569:12,
3569:16, 3571:13,
3571:14, 3572:3,
3572:6, 3572:8,
3572:15, 3572:25,
3573:21, 3575:12,
3575:23, 3576:7,
3576:13, 3576:14,
3577:3, 3577:10,
3577:17, 3577:18,
3580:15, 3581:22,
3581:25, 3582:4,
3582:15, 3585:5,
3596:13, 3596:22,
3600:7, 3604:19,
3606:1, 3617:5,
3621:13, 3621:18,
3621:19, 3628:6,
3632:11, 3633:19,
3652:8, 3663:11,
3668:22, 3668:23
**career** [2] - 3572:5,
3576:7
**careers** [1] - 3368:23
**careful** [7] - 3345:10,
3356:14, 3403:11,
3404:23, 3405:24,
3534:14, 3613:9
**cares** [5] - 3608:14,
3617:7, 3673:24,
3674:2, 3674:5
**case** [159] - 3316:2,
3316:22, 3317:11,
3318:8, 3319:25,
3320:1, 3320:2,
3321:12, 3323:20,
3323:21, 3323:25,
3324:2, 3326:12,
3328:15, 3330:9,
3334:16, 3365:3,
3367:21, 3368:9,
3375:17, 3375:21,
3376:20, 3383:9,

3384:25, 3395:20, 3400:20, 3401:11, 3401:23, 3405:12, 3405:18, 3406:7, 3410:16, 3439:15, 3464:6, 3464:23, 3464:25, 3468:7, 3468:18, 3470:8, 3470:19, 3482:24, 3486:14, 3490:4, 3490:19, 3491:25, 3495:13, 3497:24, 3498:14, 3499:6, 3500:21, 3508:4, 3508:14, 3510:2, 3532:14, 3534:8, 3534:12, 3534:18, 3534:24, 3535:8, 3537:18, 3537:21, 3538:5, 3538:7, 3538:10, 3539:13, 3541:4, 3542:22, 3543:13, 3544:12, 3553:8, 3564:20, 3565:7, 3565:19, 3566:23, 3569:6, 3574:5, 3579:15, 3579:24, 3579:25, 3583:1, 3583:11, 3583:15, 3583:24, 3584:13, 3585:22, 3586:4, 3586:19, 3587:2, 3587:5, 3590:5, 3590:20, 3591:17, 3591:21, 3594:14, 3596:8, 3609:14, 3612:16, 3615:5, 3622:4, 3627:6, 3627:13, 3632:7, 3639:14, 3640:17, 3646:7, 3646:9, 3646:14, 3647:23, 3648:3, 3651:2, 3653:8, 3653:13, 3656:12, 3656:13, 3656:15, 3657:21, 3659:21, 3659:25, 3661:25, 3665:16, 3668:21, 3672:14, 3673:9, 3674:2, 3674:3, 3674:21, 3674:24, 3675:15, 3675:20, 3675:22, 3675:25, 3676:4, 3676:12, 3676:17, 3676:24, 3677:1, 3677:5, 3677:6, 3677:16, 3677:17, 3677:20, 3677:22, 3678:24, 3678:25, 3679:1,

3679:9, 3679:11, 3680:20, 3680:23, 3680:25, 3681:4, 3681:7, 3682:4
**case-by-case** [1] - 3470:8
**cases** [18] - 3327:18, 3569:4, 3570:18, 3571:16, 3572:8, 3572:9, 3572:16, 3574:6, 3574:10, 3574:14, 3574:19, 3574:20, 3576:25, 3581:15, 3638:11, 3668:7, 3679:12, 3681:1
**cash** [3] - 3349:25, 3604:8, 3649:22
**category** [1] - 3471:4
**Catherine** [1] - 3588:8
**causation** [3] - 3319:6, 3612:11, 3613:20
**caused** [1] - 3631:16
**causes** [1] - 3621:18
**CDs** [1] - 3357:17
**Center** [3] - 3446:6, 3478:17, 3479:6
**center** [3] - 3446:11, 3446:15, 3575:17
**centers** [2] - 3383:2, 3573:23
**Centra** [5] - 3578:6, 3579:8, 3579:10, 3579:19, 3580:12
**central** [1] - 3410:16
**certain** [16] - 3329:17, 3332:9, 3342:16, 3342:17, 3352:4, 3416:18, 3468:13, 3480:4, 3534:25, 3538:9, 3586:5, 3596:17, 3599:12, 3637:9, 3639:21, 3640:6
**certainly** [14] - 3316:7, 3316:8, 3325:6, 3341:25, 3362:1, 3368:24, 3376:5, 3387:16, 3394:1, 3418:19, 3418:22, 3464:18, 3520:6, 3576:24
**CERTIFICATE** [1] - 3687:1
**certifications** [1] - 3581:21
**certified** [1] - 3581:25
**certify** [2] - 3498:6, 3687:4

**Cesserio** [7] - 3355:5, 3355:7, 3355:11, 3355:21, 3356:4, 3359:10, 3538:17
**CFR** [1] - 3652:14
**chain** [1] - 3517:21
**chair** [2] - 3581:3, 3582:2
**challenge** [2] - 3323:21, 3326:10
**challenged** [1] - 3663:19
**chance** [4] - 3399:15, 3463:14, 3586:15, 3627:16
**change** [28] - 3333:1, 3364:25, 3384:14, 3399:7, 3400:10, 3400:24, 3400:25, 3401:17, 3402:4, 3403:4, 3403:15, 3404:1, 3405:11, 3407:3, 3409:15, 3410:16, 3410:19, 3413:12, 3413:17, 3426:10, 3427:9, 3429:4, 3431:2, 3432:10, 3436:12, 3436:13, 3479:18
**Change** [1] - 3410:21
**changed** [11] - 3338:25, 3401:4, 3406:3, 3406:14, 3407:7, 3414:20, 3422:9, 3430:15, 3431:1, 3496:10, 3684:9
**changes** [10] - 3401:18, 3402:1, 3403:25, 3404:1, 3405:21, 3410:23, 3414:14, 3415:19, 3422:10, 3428:20
**changing** [1] - 3558:17
**characterize** [2] - 3390:13, 3564:11
**charge** [2] - 3346:13, 3639:1
**charging** [4] - 3609:25, 3618:16, 3656:12, 3656:19
**Charlottesville** [1] - 3569:2, 3578:5
**chat** [5] - 3337:9, 3646:13, 3646:20, 3671:17, 3683:12
**Chavez's** [1] - 3358:12
**check** [1] - 3685:16
**checking** [1] - 3678:3

**Cheryl** [1] - 3633:13
**chief** [3] - 3334:16, 3574:24, 3575:1
**children** [1] - 3575:7
**chimes** [1] - 3516:6
**Chris** [4] - 3357:13, 3357:17, 3357:19, 3359:6
**Christine** [3] - 3375:19, 3540:4, 3587:17
**chunk** [2] - 3571:19, 3638:25
**CIA** [21] - 3642:14, 3642:19, 3672:3, 3672:4, 3672:7, 3673:7, 3674:3, 3674:5, 3674:23, 3675:1, 3675:22, 3675:25, 3676:11, 3676:13, 3678:3, 3679:1, 3679:9, 3679:21, 3679:24, 3679:25, 3682:4
**CIAs** [16] - 3671:25, 3672:1, 3672:4, 3672:25, 3673:3, 3673:20, 3673:23, 3674:19, 3676:3, 3676:7, 3677:25, 3678:7, 3679:5, 3679:18, 3679:22, 3680:12
**circled** [1] - 3634:23
**circumstances** [1] - 3599:13
**Cirque** [1] - 3473:11
**cited** [3] - 3319:1, 3319:8, 3590:3
**citing** [1] - 3319:7
**city** [2] - 3347:8, 3352:9
**City** [4] - 3360:24, 3374:1, 3374:2, 3570:7
**CIVIL** [1] - 3313:3
**civil** [8] - 3400:20, 3571:21, 3572:9, 3572:13, 3572:14, 3572:22, 3574:24, 3575:1
**civilly** [2] - 3572:6, 3577:1
**claim** [43] - 3384:25, 3386:4, 3419:6, 3429:10, 3429:11, 3429:15, 3438:20, 3446:23, 3447:1, 3447:4, 3447:8, 3454:11, 3454:20,

3482:6, 3483:20, 3506:15, 3508:19, 3606:21, 3606:22, 3607:7, 3607:11, 3608:20, 3608:22, 3609:16, 3610:7, 3611:8, 3611:9, 3611:10, 3611:12, 3612:4, 3613:12, 3613:15, 3613:19, 3613:23, 3613:24, 3614:1, 3614:2, 3614:8, 3614:13, 3615:10, 3668:4, 3679:14
**claiming** [3] - 3419:2, 3676:18, 3684:16
**Claims** [32] - 3367:21, 3542:5, 3556:1, 3565:23, 3572:12, 3572:16, 3572:18, 3574:6, 3574:10, 3574:14, 3574:25, 3575:1, 3576:12, 3576:24, 3577:14, 3579:14, 3583:25, 3584:2, 3606:11, 3607:4, 3607:8, 3607:11, 3609:11, 3616:11, 3617:1, 3617:2, 3621:6, 3648:15, 3656:17, 3673:2, 3676:21, 3680:23
**claims** [19] - 3385:11, 3495:22, 3533:12, 3534:5, 3542:9, 3552:12, 3574:7, 3574:19, 3607:9, 3621:2, 3621:12, 3621:19, 3647:24, 3651:11, 3665:16, 3676:2, 3677:8, 3677:22, 3680:23
**Clairmont** [9] - 3550:9, 3551:6, 3551:7, 3551:8, 3551:9, 3551:17, 3552:2, 3552:19, 3554:7
**clarification** [3] - 3332:5, 3488:6, 3607:5
**clarified** [1] - 3407:5
**clarify** [1] - 3414:7
**Clarkson** [1] - 3313:8
**classes** [1] - 3369:23
**clean** [1] - 3402:7
**clear** [16] - 3317:8, 3317:23, 3321:2,

3324:24, 3332:24,
3335:11, 3337:5,
3402:19, 3505:6,
3533:25, 3542:2,
3637:6, 3650:20,
3677:15, 3681:10,
3684:22
**clearly** [5] - 3349:24,
3352:18, 3371:1,
3634:11, 3636:4
**CLERK** [13] - 3315:4,
3338:10, 3338:15,
3428:7, 3428:9,
3428:13, 3523:5,
3568:14, 3591:3,
3591:7, 3644:12,
3645:15, 3686:9
**clicker** [1] - 3622:1
**clients** [6] - 3576:13,
3577:1, 3581:11,
3581:13, 3674:8,
3677:14
**clinic** [1] - 3363:15
**clinical** [2] - 3474:8,
3625:20
**clip** [21] - 3389:7,
3390:17, 3392:13,
3392:20, 3393:17,
3393:19, 3394:10,
3395:3, 3396:8,
3396:9, 3414:2,
3421:15, 3430:8,
3436:7, 3456:11,
3458:22, 3460:6,
3557:21, 3560:23,
3561:2, 3561:3
**Clip** [6] - 3389:5,
3390:16, 3392:12,
3393:15, 3395:1,
3557:19
**close** [11] - 3343:5,
3344:2, 3347:6,
3350:4, 3354:18,
3360:25, 3479:18,
3664:23, 3666:20,
3669:18, 3679:10
**closed** [2] - 3322:15,
3682:9
**closer** [5] - 3435:11,
3578:4, 3611:15,
3666:11, 3669:24
**closes** [1] - 3616:4
**closing** [1] - 3651:9
**CMS** [9] - 3573:2,
3573:12, 3573:23,
3574:3, 3615:9,
3660:17, 3678:8,
3678:18
**co** [8] - 3353:9,
3354:6, 3375:15,

3425:8, 3425:9,
3425:12, 3425:22,
3564:12
**co-relator** [1] -
3375:15
**co-workers** [7] -
3353:9, 3354:6,
3425:8, 3425:9,
3425:12, 3425:22,
3564:12
**cocktails** [1] - 3600:11
**Code** [7] - 3584:12,
3592:16, 3592:17,
3592:18, 3592:23,
3593:3, 3599:23
**code** [1] - 3593:5
**Codes** [2] - 3599:20
**codes** [2] - 3592:19,
3592:20
**collar** [1] - 3572:4
**collateral** [3] -
3319:14, 3319:18,
3323:25
**colleagues** [4] -
3348:15, 3398:7,
3564:14, 3683:13
**collect** [8] - 3465:11,
3472:5, 3472:15,
3472:23, 3500:20,
3503:25, 3528:6,
3528:10
**collected** [1] - 3639:4
**collecting** [1] - 3472:7
**collectively** [2] -
3317:5, 3330:15
**college** [1] - 3575:7
**College** [2] - 3369:4,
3570:2
**column** [2] - 3629:21,
3632:1
**comfortable** [6] -
3391:5, 3397:12,
3436:19, 3436:23,
3437:1, 3654:20
**coming** [15] - 3323:25,
3334:10, 3337:16,
3364:24, 3370:1,
3438:23, 3470:10,
3489:25, 3494:15,
3523:2, 3534:5,
3583:24, 3601:25,
3661:15, 3672:18
**Commencing** [1] -
3313:10
**comments** [5] -
3444:1, 3552:10,
3581:7, 3581:8
**commercial** [1] -
3624:2
**commit** [2] - 3422:4,

3425:2
**committed** [1] -
3573:16
**committee** [12] -
3460:15, 3461:22,
3581:4, 3581:5,
3627:7, 3627:8,
3627:10, 3627:12,
3627:21, 3628:1,
3628:10, 3628:12
**committing** [1] -
3577:2
**common** [8] - 3341:1,
3375:8, 3401:10,
3401:14, 3401:16,
3518:19, 3519:2,
3566:1
**communicating** [2] -
3464:21, 3465:6
**communication** [3] -
3515:17, 3639:7,
3640:25
**communications** [2] -
3356:14, 3465:10
**community** [3] -
3358:7, 3358:8,
3479:5
**community-based** [1]
- 3479:5
**companies** [8] -
3368:25, 3382:20,
3543:10, 3569:16,
3576:4, 3580:5,
3580:10, 3585:7
**company** [33] -
3353:22, 3368:17,
3376:19, 3378:23,
3380:4, 3380:21,
3380:23, 3382:3,
3382:7, 3382:9,
3387:7, 3504:6,
3521:4, 3521:18,
3522:8, 3530:10,
3531:6, 3531:8,
3543:7, 3549:1,
3556:9, 3556:10,
3579:23, 3585:22,
3598:13, 3598:25,
3621:16, 3624:25,
3626:22, 3641:11,
3661:4, 3674:9,
3676:8
**company's** [7] -
3528:20, 3549:9,
3549:11, 3621:12,
3621:20, 3659:14
**compared** [2] -
3351:5, 3543:19
**comparing** [1] -
3350:13

**compensated** [3] -
3460:23, 3594:1,
3640:15
**compensation** [2] -
3461:2, 3594:13
**competencies** [1] -
3513:6
**competing** [1] -
3351:9
**competitor** [3] -
3623:20, 3624:22,
3625:1
**competitors** [1] -
3625:23
**competitors'** [1] -
3625:13
**complain** [2] -
3353:15, 3353:24
**complained** [1] -
3391:12
**complainer** [1] -
3353:25
**complaining** [2] -
3517:16, 3678:1
**complaint** [5] -
3412:8, 3434:3,
3499:6, 3503:20,
3551:14
**complaints** [2] -
3364:13, 3391:19
**Complera** [9] -
3506:14, 3506:16,
3506:20, 3507:12,
3507:16, 3507:21,
3563:6, 3563:13,
3563:25
**complete** [7] -
3330:19, 3369:25,
3401:24, 3552:14,
3552:15, 3552:20,
3671:8
**completely** [4] -
3400:19, 3407:24,
3610:19, 3684:9
**completeness** [1] -
3552:5
**complex** [1] - 3660:12
**Compliance** [1] -
3581:24
**compliance** [121] -
3355:7, 3355:12,
3355:20, 3356:7,
3356:18, 3356:21,
3359:9, 3359:16,
3359:18, 3359:22,
3364:16, 3462:3,
3569:6, 3569:8,
3569:10, 3569:15,
3569:18, 3569:20,
3575:18, 3578:8,

3578:9, 3578:15,
3578:16, 3578:20,
3578:21, 3578:25,
3579:1, 3579:22,
3580:1, 3580:4,
3580:5, 3580:9,
3580:10, 3580:23,
3581:22, 3581:25,
3582:5, 3582:15,
3582:19, 3582:23,
3583:5, 3584:9,
3584:22, 3585:1,
3585:5, 3585:16,
3585:20, 3586:2,
3586:7, 3586:8,
3590:1, 3591:21,
3592:2, 3592:11,
3594:20, 3594:23,
3594:24, 3595:9,
3595:10, 3595:11,
3595:18, 3596:2,
3596:3, 3596:22,
3597:14, 3598:21,
3604:5, 3607:16,
3608:3, 3609:1,
3609:8, 3621:1,
3622:22, 3625:12,
3625:15, 3628:4,
3628:6, 3631:10,
3631:12, 3631:17,
3632:10, 3632:11,
3633:18, 3633:19,
3637:24, 3637:25,
3638:18, 3638:19,
3638:22, 3639:2,
3639:4, 3639:7,
3639:8, 3639:9,
3639:15, 3639:17,
3639:20, 3639:22,
3640:1, 3640:7,
3640:12, 3640:18,
3641:19, 3642:6,
3642:10, 3642:11,
3642:15, 3642:19,
3642:23, 3643:1,
3643:4, 3643:15,
3651:1, 3652:7,
3652:8, 3658:19,
3658:25, 3662:22,
3679:19
**compliant** [8] -
3425:6, 3426:1,
3480:5, 3480:15,
3575:22, 3580:11,
3625:9, 3666:24
**complicated** [1] -
3575:14
**complied** [1] - 3498:6
**complies** [2] - 3579:4,
3599:22

**comply** [3] - 3592:13, 3593:22, 3664:2
**computer** [1] - 3313:25
**computer-aided** [1] - 3313:25
**concept** [1] - 3350:25
**concern** [29] - 3318:1, 3320:24, 3320:25, 3321:6, 3323:3, 3325:24, 3325:25, 3329:25, 3330:16, 3346:17, 3362:21, 3396:12, 3396:16, 3398:16, 3401:6, 3402:11, 3609:10, 3622:15, 3622:16, 3637:15, 3650:5, 3650:13, 3650:14, 3654:7, 3657:3, 3659:20, 3677:23, 3678:17
**concerned** [6] - 3324:4, 3331:18, 3331:20, 3371:1, 3487:5, 3664:11
**concerning** [1] - 3319:6
**concerns** [30] - 3321:9, 3346:10, 3346:19, 3352:22, 3352:23, 3353:18, 3354:5, 3355:8, 3358:1, 3359:2, 3359:20, 3360:7, 3360:22, 3362:25, 3364:12, 3392:8, 3397:13, 3439:20, 3483:6, 3483:14, 3549:17, 3553:10, 3555:15, 3581:11, 3585:5, 3633:6, 3633:7, 3639:5, 3640:21, 3672:11
**concise** [1] - 3366:14
**conclude** [3] - 3335:24, 3645:12, 3662:15
**concluded** [10] - 3407:13, 3471:19, 3487:25, 3496:17, 3537:2, 3592:2, 3592:11, 3598:7, 3602:20, 3619:24
**concludes** [2] - 3668:11, 3686:10
**conclusion** [12] - 3366:13, 3591:20, 3591:24, 3597:9, 3606:13, 3607:24,

3625:8, 3638:4, 3638:10, 3640:21, 3649:17, 3652:17
**conclusions** [3] - 3583:24, 3637:18, 3651:17
**conclusory** [2] - 3601:12, 3609:17
**condition** [2] - 3612:20, 3612:24
**conduct** [17] - 3356:24, 3356:25, 3383:15, 3543:18, 3543:24, 3545:10, 3592:14, 3593:6, 3607:10, 3607:20, 3673:24, 3675:3, 3675:4, 3677:25, 3678:10, 3678:19
**conducted** [1] - 3640:24
**conducting** [3] - 3579:3, 3592:25, 3638:1
**conference** [6] - 3351:3, 3511:9, 3609:25, 3618:17, 3656:12, 3656:19
**conferring** [1] - 3600:1
**confirmation** [1] - 3449:7
**confirmed** [1] - 3429:25
**conflict** [1] - 3578:25
**confused** [1] - 3486:12
**confusing** [1] - 3455:22
**confusion** [2] - 3555:4, 3636:23
**Congress** [3] - 3581:16, 3581:17, 3581:19
**Congresspeople** [1] - 3581:10
**connect** [2] - 3612:8, 3651:9
**connected** [2] - 3612:9, 3630:7
**connecting** [1] - 3652:12
**connection** [10] - 3375:7, 3463:4, 3493:19, 3500:12, 3504:2, 3531:21, 3533:10, 3537:18, 3606:20, 3630:20
**connections** [2] - 3564:12, 3665:12

**conscious** [1] - 3462:23
**conservative** [1] - 3331:7
**consider** [7] - 3324:10, 3328:17, 3481:1, 3602:24, 3606:21, 3626:23, 3679:13
**considerations** [1] - 3328:7
**considered** [4] - 3531:16, 3594:19, 3635:3, 3666:16
**considering** [1] - 3677:21
**consistent** [7] - 3495:12, 3496:20, 3496:22, 3497:23, 3625:14, 3661:6, 3682:2
**consistently** [1] - 3383:7
**consolidated** [1] - 3643:18
**constant** [1] - 3574:18
**constitute** [5] - 3611:12, 3612:4, 3614:1, 3652:9, 3668:22
**constitutes** [3] - 3649:18, 3651:1, 3656:16
**constraints** [1] - 3327:14
**construed** [1] - 3326:8
**consultant** [2] - 3575:11, 3637:12
**consultants** [1] - 3638:1
**consulting** [4] - 3569:3, 3569:4, 3579:14, 3580:8
**contact** [12] - 3359:16, 3359:18, 3380:16, 3452:2, 3492:3, 3498:13, 3521:5, 3521:19, 3528:20, 3530:10, 3534:16, 3536:6
**contacted** [5] - 3532:17, 3534:7, 3534:12, 3540:3, 3555:25
**contacts** [1] - 3521:23
**contend** [2] - 3423:6, 3429:5
**content** [1] - 3517:1
**contents** [1] - 3679:25
**context** [3] - 3405:17,

3572:11, 3654:7
**continue** [14] - 3321:21, 3325:21, 3332:7, 3338:20, 3339:5, 3357:23, 3358:14, 3368:23, 3415:20, 3523:10, 3619:2, 3623:17, 3646:3, 3646:7
**CONTINUED** [1] - 3339:11
**continued** [10] - 3351:7, 3356:24, 3356:25, 3431:18, 3470:17, 3471:11, 3472:24, 3500:20, 3555:11, 3678:10
**continuing** [3] - 3323:13, 3470:24, 3471:7
**contract** [2] - 3578:12
**contractor** [1] - 3653:19
**contractors** [2] - 3642:23, 3642:24
**contrast** [1] - 3679:20
**control** [4] - 3383:5, 3628:12, 3641:7, 3641:8
**controlled** [3] - 3595:19, 3595:24, 3595:25
**controls** [1] - 3641:6
**convenience** [1] - 3481:14
**Convention** [1] - 3582:14
**conversation** [19] - 3343:9, 3351:19, 3352:16, 3357:8, 3373:10, 3387:17, 3388:7, 3389:3, 3397:1, 3413:5, 3413:7, 3414:12, 3421:8, 3421:11, 3424:17, 3428:25, 3431:18, 3511:8, 3555:10
**conversations** [11] - 3344:23, 3349:21, 3357:25, 3360:13, 3403:8, 3452:19, 3482:8, 3485:2, 3497:10, 3555:10, 3555:12
**convince** [1] - 3645:7
**convinced** [1] - 3651:20
**copy** [9] - 3399:21, 3522:13, 3522:19,

3525:1, 3525:2, 3525:5, 3525:8, 3554:11
**copying** [1] - 3451:9
**corporate** [5] - 3560:8, 3585:1, 3641:23, 3642:4, 3680:22
**Correct** [82] - 3385:12, 3385:16, 3386:1, 3392:9, 3393:23, 3396:19, 3396:23, 3397:14, 3398:9, 3399:22, 3409:5, 3410:3, 3411:8, 3412:5, 3412:16, 3412:21, 3413:10, 3414:5, 3414:21, 3414:25, 3419:23, 3424:23, 3427:15, 3429:13, 3430:16, 3444:15, 3445:18, 3448:8, 3448:15, 3449:1, 3449:13, 3450:1, 3451:19, 3454:9, 3455:6, 3459:7, 3461:3, 3464:3, 3464:12, 3464:17, 3465:12, 3465:18, 3473:5, 3473:9, 3473:18, 3474:2, 3474:17, 3474:24, 3475:9, 3475:14, 3475:20, 3476:4, 3481:7, 3481:10, 3481:23, 3482:7, 3483:16, 3488:23, 3500:4, 3501:6, 3501:10, 3502:16, 3502:21, 3503:1, 3504:12, 3506:13, 3507:1, 3507:23, 3508:2, 3509:16, 3510:3, 3514:13, 3514:18, 3516:3, 3516:8, 3516:12, 3519:5, 3519:24, 3520:13, 3526:1, 3528:8, 3530:23
**correct** [349] - 3317:2, 3318:15, 3318:21, 3318:24, 3323:11, 3323:13, 3334:2, 3334:11, 3338:23, 3339:20, 3339:22, 3342:22, 3342:23, 3346:24, 3347:3, 3350:21, 3359:19, 3363:23, 3367:10, 3368:16, 3373:14, 3374:24, 3375:10,

3382:1, 3385:13, 3385:17, 3386:2, 3386:21, 3386:25, 3387:1, 3387:4, 3387:5, 3387:9, 3387:19, 3387:20, 3388:1, 3388:17, 3389:12, 3389:15, 3389:16, 3389:20, 3389:25, 3390:1, 3391:10, 3391:11, 3391:14, 3392:5, 3392:10, 3392:18, 3392:19, 3392:21, 3392:25, 3393:3, 3393:7, 3393:8, 3394:3, 3394:13, 3394:19, 3394:20, 3394:24, 3395:9, 3395:16, 3395:21, 3396:14, 3396:15, 3396:20, 3396:24, 3397:2, 3397:15, 3398:2, 3398:3, 3398:5, 3398:6, 3398:19, 3400:6, 3400:7, 3401:7, 3406:4, 3406:15, 3408:11, 3408:12, 3408:22, 3408:23, 3409:1, 3409:6, 3409:22, 3409:23, 3410:4, 3410:17, 3411:20, 3411:22, 3411:25, 3412:1, 3412:17, 3413:11, 3414:10, 3414:19, 3415:1, 3415:7, 3416:3, 3418:23, 3420:3, 3420:19, 3421:20, 3422:3, 3423:3, 3424:21, 3426:14, 3426:17, 3427:16, 3427:20, 3429:3, 3429:9, 3429:17, 3430:13, 3430:14, 3430:17, 3430:23, 3431:15, 3432:7, 3432:17, 3434:8, 3435:8, 3437:12, 3437:25, 3438:16, 3440:5, 3442:5, 3442:9, 3443:6, 3444:12, 3444:19, 3446:2, 3446:3, 3446:5, 3446:12, 3446:16, 3446:21, 3447:6, 3448:23, 3448:24, 3449:2, 3449:18, 3450:2, 3450:14,

3450:17, 3451:11, 3451:15, 3451:16, 3451:20, 3452:13, 3453:8, 3453:25, 3454:5, 3454:15, 3454:17, 3454:25, 3455:1, 3455:11, 3456:15, 3458:5, 3459:19, 3459:24, 3460:20, 3460:24, 3460:25, 3461:8, 3461:13, 3463:13, 3463:15, 3464:24, 3466:13, 3468:16, 3473:6, 3473:10, 3473:19, 3473:23, 3474:3, 3474:25, 3475:2, 3475:6, 3475:7, 3475:21, 3475:25, 3476:1, 3476:5, 3477:3, 3478:10, 3478:11, 3478:18, 3478:19, 3478:21, 3478:22, 3479:1, 3479:7, 3479:10, 3479:15, 3479:16, 3481:15, 3481:16, 3481:18, 3481:19, 3481:24, 3482:13, 3482:20, 3483:7, 3483:8, 3483:11, 3483:12, 3483:17, 3484:11, 3485:4, 3488:19, 3488:24, 3490:6, 3491:13, 3491:22, 3491:23, 3498:2, 3499:7, 3499:8, 3500:5, 3500:23, 3501:2, 3501:3, 3501:7, 3502:8, 3502:11, 3502:17, 3503:5, 3503:18, 3504:3, 3505:2, 3506:4, 3506:9, 3506:10, 3506:15, 3506:17, 3506:21, 3506:22, 3507:3, 3507:4, 3507:8, 3507:17, 3507:18, 3507:24, 3508:3, 3508:21, 3508:24, 3509:11, 3509:12, 3509:17, 3509:20, 3509:21, 3510:7, 3511:18, 3512:15, 3512:19, 3513:9, 3513:10, 3514:4, 3514:14, 3514:19, 3514:22, 3514:23, 3515:5, 3515:9,

3515:14, 3515:15, 3515:18, 3515:19, 3515:22, 3515:23, 3516:13, 3516:16, 3517:18, 3517:22, 3519:11, 3519:17, 3519:20, 3519:21, 3520:8, 3520:20, 3520:24, 3521:2, 3521:3, 3521:10, 3522:5, 3522:10, 3524:5, 3524:11, 3524:12, 3526:11, 3526:12, 3526:16, 3526:20, 3527:24, 3528:16, 3528:23, 3529:1, 3529:4, 3530:4, 3530:8, 3530:9, 3530:16, 3530:19, 3530:24, 3531:18, 3532:11, 3532:15, 3532:16, 3535:17, 3536:13, 3537:22, 3538:6, 3538:11, 3539:14, 3540:14, 3552:25, 3554:22, 3554:23, 3561:14, 3563:11, 3563:19, 3564:10, 3565:13, 3566:3, 3570:23, 3573:24, 3587:12, 3589:3, 3603:11, 3604:11, 3604:20, 3605:6, 3616:21, 3617:1, 3620:13, 3625:3, 3629:24, 3630:25, 3642:21, 3653:7, 3655:20, 3658:12, 3667:9, 3673:25, 3678:9, 3687:4

**corrected** [6] - 3329:1, 3416:6, 3430:21, 3554:20, 3554:24, 3555:2

**correcting** [1] - 3554:1

**corrections** [2] - 3410:1, 3410:14

**correctly** [1] - 3399:25

**correspond** [2] - 3501:4, 3537:20

**corresponded** [2] - 3539:18, 3622:17

**correspondence** [3] - 3392:2, 3518:5, 3531:22

**corruption** [1] - 3571:5

**Cosmetic** [1] - 3584:4

**cost** [2] - 3606:9,

3620:10

**counsel** [35] - 3315:6, 3321:3, 3321:21, 3322:1, 3323:12, 3327:24, 3332:6, 3332:21, 3333:12, 3366:19, 3367:3, 3370:5, 3378:5, 3386:4, 3472:18, 3522:13, 3524:16, 3525:1, 3531:1, 3534:21, 3535:2, 3535:3, 3543:18, 3576:4, 3577:8, 3578:8, 3578:21, 3578:24, 3579:5, 3587:13, 3644:15, 3646:19, 3655:5, 3681:23

**counsel's** [1] - 3484:23

**counter** [1] - 3612:14

**country** [12] - 3341:2, 3341:24, 3344:16, 3354:20, 3357:2, 3366:24, 3374:22, 3438:9, 3438:15, 3553:19, 3569:12, 3572:8

**counts** [5] - 3607:4, 3607:7, 3607:10, 3615:19, 3617:8

**couple** [20] - 3339:18, 3357:3, 3360:24, 3368:18, 3370:21, 3370:25, 3374:12, 3381:10, 3381:12, 3382:17, 3393:19, 3404:12, 3404:17, 3441:14, 3484:17, 3527:20, 3590:5, 3594:17, 3644:15

**course** [28] - 3319:11, 3323:22, 3324:18, 3328:18, 3333:5, 3338:3, 3344:22, 3372:13, 3382:15, 3386:19, 3405:9, 3415:24, 3418:24, 3421:1, 3458:24, 3459:16, 3470:12, 3497:23, 3520:11, 3536:25, 3537:1, 3583:25, 3589:14, 3612:18, 3647:19, 3647:23, 3654:5, 3676:19

**Court** [35] - 3313:23, 3316:24, 3318:6, 3324:21, 3327:15,

3332:8, 3333:3, 3407:24, 3469:19, 3471:9, 3525:2, 3525:8, 3529:21, 3555:15, 3611:2, 3612:16, 3612:24, 3614:19, 3617:12, 3649:13, 3651:18, 3651:24, 3653:6, 3653:21, 3658:6, 3668:8, 3669:18, 3671:24, 3671:25, 3672:23, 3682:20, 3682:22, 3685:15, 3686:10, 3687:12

**COURT** [363] - 3313:1, 3315:4, 3315:5, 3315:15, 3315:22, 3316:10, 3316:13, 3316:19, 3316:25, 3317:3, 3317:15, 3317:22, 3318:2, 3318:12, 3320:7, 3320:13, 3324:6, 3324:9, 3324:16, 3324:20, 3324:24, 3325:3, 3325:12, 3326:13, 3326:19, 3327:4, 3328:9, 3328:25, 3329:4, 3329:10, 3329:15, 3330:14, 3332:2, 3332:19, 3333:23, 3333:25, 3334:3, 3334:9, 3334:12, 3334:17, 3335:1, 3335:6, 3335:11, 3336:5, 3337:9, 3337:13, 3337:15, 3337:19, 3338:1, 3338:4, 3338:10, 3338:11, 3338:14, 3338:15, 3338:18, 3338:24, 3339:9, 3384:2, 3384:6, 3388:24, 3400:15, 3400:23, 3401:9, 3401:12, 3401:20, 3402:17, 3402:21, 3402:23, 3403:4, 3403:9, 3403:13, 3403:20, 3403:24, 3404:11, 3404:13, 3404:18, 3404:23, 3405:4, 3405:6, 3405:9, 3405:15, 3406:6, 3406:14, 3406:16, 3406:23, 3407:12, 3407:15, 3408:1, 3408:6, 3409:9, 3409:11,

3415:18, 3415:20, 3417:7, 3426:21, 3427:4, 3427:23, 3427:25, 3428:2, 3428:7, 3428:9, 3428:10, 3428:13, 3428:15, 3433:21, 3433:24, 3443:21, 3462:18, 3468:2, 3468:9, 3468:11, 3468:14, 3468:24, 3469:4, 3469:16, 3469:20, 3470:6, 3470:10, 3470:13, 3471:3, 3471:12, 3471:17, 3471:22, 3471:25, 3472:11, 3472:15, 3477:8, 3479:25, 3485:15, 3485:22, 3486:2, 3486:5, 3486:19, 3486:22, 3486:25, 3487:4, 3487:7, 3487:11, 3487:18, 3487:24, 3488:3, 3490:25, 3491:3, 3491:7, 3494:3, 3494:5, 3494:9, 3494:14, 3494:17, 3494:21, 3495:5, 3495:9, 3495:19, 3495:23, 3495:25, 3496:3, 3496:6, 3496:9, 3496:11, 3496:14, 3496:21, 3496:24, 3497:2, 3499:1, 3501:16, 3504:20, 3504:22, 3510:12, 3518:1, 3522:17, 3522:21, 3523:1, 3523:5, 3523:8, 3523:14, 3525:3, 3525:5, 3525:7, 3525:10, 3529:7, 3529:10, 3529:13, 3532:6, 3533:4, 3533:20, 3533:24, 3534:2, 3534:10, 3534:20, 3535:14, 3535:18, 3535:21, 3536:7, 3536:9, 3536:12, 3536:14, 3536:19, 3536:23, 3537:5, 3541:18, 3550:25, 3567:19, 3567:23, 3567:25, 3568:14, 3568:17, 3589:5, 3589:8, 3589:14, 3590:24, 3591:3, 3591:4, 3591:6,

3591:7, 3591:8, 3597:10, 3597:12, 3597:16, 3598:1, 3600:20, 3600:22, 3601:2, 3601:9, 3601:18, 3602:1, 3602:7, 3602:18, 3602:22, 3603:16, 3603:18, 3603:21, 3606:25, 3607:2, 3607:12, 3608:1, 3608:9, 3608:19, 3609:6, 3609:12, 3609:24, 3610:11, 3611:6, 3611:15, 3611:22, 3612:12, 3612:21, 3613:7, 3613:17, 3614:5, 3614:12, 3614:15, 3615:4, 3615:16, 3616:1, 3616:5, 3616:8, 3616:12, 3616:19, 3616:23, 3617:2, 3617:21, 3618:5, 3618:9, 3618:16, 3619:3, 3619:12, 3619:21, 3619:23, 3620:1, 3636:25, 3644:2, 3644:6, 3644:12, 3644:13, 3644:20, 3644:24, 3645:4, 3645:7, 3645:14, 3645:15, 3645:17, 3647:1, 3647:6, 3648:7, 3649:3, 3649:9, 3649:23, 3650:4, 3651:5, 3652:20, 3654:11, 3654:15, 3655:15, 3655:23, 3656:24, 3657:18, 3658:7, 3658:15, 3659:5, 3659:8, 3659:11, 3659:17, 3660:19, 3661:2, 3661:10, 3662:3, 3662:6, 3662:16, 3662:25, 3663:21, 3664:9, 3664:14, 3664:18, 3664:22, 3665:18, 3666:4, 3667:7, 3667:10, 3668:10, 3669:4, 3669:12, 3670:11, 3670:19, 3671:16, 3671:20, 3672:9, 3672:16, 3673:12, 3674:1, 3674:7, 3674:14, 3675:7, 3676:16, 3676:20, 3678:6,

3678:10, 3678:12, 3679:22, 3679:24, 3680:3, 3680:15, 3681:9, 3681:13, 3681:17, 3682:12, 3682:14, 3682:16, 3682:25, 3683:4, 3683:11, 3683:14, 3683:19, 3683:22, 3684:2, 3684:14, 3684:21, 3685:1, 3685:5, 3685:16, 3686:2, 3686:4, 3686:9, 3687:1
**court** [14] - 3315:1, 3399:17, 3402:5, 3407:14, 3471:20, 3483:25, 3488:1, 3496:18, 3537:3, 3598:8, 3602:21, 3619:25, 3681:21, 3684:24
**Court's** [8] - 3318:1, 3332:7, 3610:6, 3610:24, 3614:4, 3615:11, 3652:22, 3679:5
**Courthouse** [1] - 3313:8
**courtroom** [7] - 3338:17, 3428:14, 3434:15, 3447:16, 3523:7, 3645:16, 3646:10
**courts** [1] - 3653:15
**cover** [6] - 3447:21, 3448:2, 3518:18, 3573:17, 3606:9, 3620:10
**coverage** [2] - 3615:19, 3615:24
**covered** [3] - 3357:13, 3393:2, 3648:25
**covering** [1] - 3589:9
**COVID** [2] - 3383:1
**coy** [1] - 3347:16
**crap** [1] - 3448:18
**created** [1] - 3519:2
**creating** [1] - 3441:5
**creative** [2] - 3354:3, 3362:17
**credibility** [10] - 3319:21, 3325:8, 3325:17, 3326:1, 3326:7, 3326:10, 3328:19, 3401:19, 3675:19, 3677:22
**credible** [1] - 3325:9
**credit** [1] - 3513:7
**credo** [1] - 3545:6

**crew** [1] - 3580:18
**crime** [3] - 3570:16, 3571:5, 3572:4
**criminal** [6] - 3571:16, 3571:18, 3572:2, 3572:10, 3572:13, 3574:25
**criminally** [2] - 3572:7, 3577:1
**criteria** [1] - 3598:16
**critical** [5] - 3402:15, 3420:24, 3421:18, 3648:2, 3674:24
**criticized** [1] - 3327:1
**cross** [46] - 3318:12, 3320:8, 3320:11, 3320:18, 3320:23, 3322:12, 3322:15, 3323:20, 3323:23, 3324:19, 3325:10, 3325:11, 3325:16, 3325:21, 3325:22, 3329:5, 3329:11, 3329:16, 3329:19, 3329:23, 3329:25, 3330:17, 3330:19, 3330:24, 3331:8, 3331:9, 3331:18, 3334:25, 3336:14, 3407:8, 3468:9, 3469:10, 3471:13, 3509:13, 3523:10, 3561:20, 3655:21, 3671:24, 3677:24, 3678:6, 3678:16, 3678:21, 3679:18, 3680:12
**CROSS** [2] - 3314:4, 3384:8
**cross-examination** [22] - 3318:12, 3322:15, 3323:20, 3323:23, 3325:21, 3329:11, 3329:16, 3329:19, 3329:23, 3330:17, 3330:19, 3331:8, 3331:18, 3334:25, 3407:8, 3468:9, 3469:10, 3471:13, 3509:13, 3523:10, 3678:16, 3678:21
**CROSS-EXAMINATION** [2] - 3314:4, 3384:8
**cross-examine** [5] - 3320:8, 3322:12, 3331:9, 3336:14, 3677:24
**cross-examined** [2] -

3320:11, 3329:5
**cross-examining** [7] - 3320:18, 3322:12, 3325:16, 3329:11, 3330:24, 3678:6, 3680:12
**cross-referenced** [1] - 3655:21
**crossed** [2] - 3414:20, 3428:24
**crosstalk)** [1] - 3662:5
**CRR** [1] - 3687:11
**crux** [3] - 3401:22, 3614:18, 3656:15
**Cruz** [5] - 3357:13, 3357:17, 3357:19, 3359:6, 3538:17
**crying** [1] - 3358:13
**cumulative** [1] - 3327:16
**current** [2] - 3582:11, 3623:23
**cursory** [1] - 3669:22
**customers** [1] - 3663:12
**cut** [1] - 3672:20
**cutoff** [1] - 3469:12
**cuts** [1] - 3645:22
**cutting** [1] - 3669:17

# D

**D-6028** [1] - 3463:9
**D-6036** [2] - 3490:21, 3491:8
**D-6037** [1] - 3451:5
**D-6049** [2] - 3532:4, 3532:7
**D-8511** [1] - 3417:4
**D-8512** [2] - 3409:8, 3409:12
**D-8518** [1] - 3498:19
**D-8529** [2] - 3517:24, 3518:3
**D-8753** [1] - 3510:10
**D-8848** [3] - 3467:23, 3471:23, 3473:2
**D-8987** [3] - 3521:13, 3529:18, 3529:22
**D-9088** [1] - 3501:14
**D-9090** [3] - 3443:15, 3443:17, 3443:23
**D-9092** [2] - 3477:5, 3477:9
**D-9093** [1] - 3479:22
**D.C** [1] - 3571:25
**Dallas** [1] - 3313:17
**Daly** [1] - 3587:19
**damage's** [1] - 3333:19

**damages** [7] - 3332:12, 3334:22, 3368:2, 3485:24, 3487:1, 3487:8, 3487:13
**DART** [2] - 3361:21, 3482:11
**data** [2] - 3335:10, 3630:22
**Date** [1] - 3687:12
**date** [5] - 3420:1, 3455:13, 3469:11, 3471:8, 3632:20
**dated** [1] - 3528:23
**dates** [1] - 3435:15
**Daubert** [8] - 3318:9, 3319:5, 3319:16, 3320:5, 3320:4, 3332:9, 3335:5, 3653:1
**daughter** [1] - 3349:21
**David** [2] - 3628:25
**days** [5] - 3316:25, 3317:10, 3334:4, 3352:5, 3531:7
**DDMAC** [2] - 3647:10, 3647:22
**dead** [1] - 3324:16
**deaf** [2] - 3364:13, 3559:14
**deal** [10] - 3322:9, 3324:6, 3618:6, 3618:12, 3646:2, 3671:7, 3682:7, 3682:25, 3685:20, 3685:21
**dealing** [3] - 3327:10, 3359:2, 3683:8
**deals** [1] - 3358:8
**dealt** [2] - 3327:9, 3657:17
**death** [1] - 3328:6
**debate** [1] - 3653:15
**debates** [1] - 3618:2
**December** [2] - 3491:16, 3501:20
**decide** [6] - 3322:24, 3364:17, 3376:3, 3379:8, 3405:19, 3496:15
**decided** [23] - 3355:25, 3364:19, 3365:10, 3367:3, 3368:21, 3375:21, 3378:25, 3519:10, 3382:4, 3382:7, 3403:1, 3411:14, 3464:1, 3483:4, 3485:7, 3485:8, 3486:6, 3488:10,

3512:6, 3559:6, 3567:9, 3626:22, 3678:22
**deciding** [3] - 3323:1, 3487:6, 3542:23
**decision** [9] - 3321:22, 3333:15, 3336:7, 3342:3, 3462:23, 3481:5, 3522:3, 3522:6, 3656:2
**decisions** [7] - 3332:22, 3332:23, 3336:25, 3337:2, 3462:23, 3480:23, 3481:2
**deck** [1] - 3347:21
**declaration** [6] - 3439:1, 3439:2, 3447:10, 3490:9, 3535:16, 3535:22
**declarations** [6] - 3490:3, 3490:5, 3536:1, 3537:20, 3539:12, 3564:16
**declination** [1] - 3672:2
**declines** [1] - 3680:22
**deemed** [1] - 3322:19
**defend** [4] - 3575:19, 3674:24, 3677:1, 3679:3
**Defendant's** [1] - 3388:25
**Defendants** [2] - 3313:7, 3313:22
**defendants** [1] - 3593:17
**defendants'** [1] - 3546:25
**Defendants'** [34] - 3314:8, 3314:9, 3314:10, 3314:11, 3314:12, 3314:13, 3314:14, 3314:15, 3314:16, 3314:17, 3314:18, 3314:19, 3314:20, 3314:21, 3314:22, 3314:23, 3409:12, 3417:9, 3443:23, 3472:1, 3472:2, 3477:9, 3480:1, 3491:8, 3499:2, 3501:17, 3504:23, 3510:13, 3518:3, 3529:18, 3532:7, 3547:3, 3549:1, 3550:13
**defending** [4] - 3576:13, 3577:1,

3679:4
**defense** [5] - 3576:19, 3576:23, 3577:23, 3657:22, 3677:7
**defer** [2] - 3407:24, 3619:16
**deferred** [1] - 3641:15
**deficient** [2] - 3607:17, 3658:20
**Deficit** [1] - 3584:7
**define** [6] - 3597:12, 3601:5, 3602:8, 3602:15, 3650:17, 3667:1
**defined** [5] - 3604:7, 3649:5, 3649:8, 3650:1, 3663:8
**defines** [1] - 3660:20
**defining** [7] - 3598:2, 3600:24, 3607:3, 3607:7, 3609:10, 3650:19, 3665:23
**definitely** [3] - 3327:2, 3344:7, 3377:4
**definition** [22] - 3597:25, 3649:12, 3653:7, 3653:23, 3654:1, 3658:5, 3658:11, 3659:12, 3659:14, 3660:2, 3660:4, 3660:6, 3661:8, 3661:17, 3661:25, 3662:1, 3663:4, 3663:6, 3665:15, 3667:3
**definitions** [4] - 3609:23, 3651:18, 3660:7, 3663:1
**degrees** [3] - 3369:4, 3369:25, 3512:25
**Delaware** [1] - 3313:22
**delaying** [1] - 3619:23
**delete** [7] - 3410:21, 3410:22, 3411:18, 3422:25, 3424:18, 3426:7, 3426:9
**deleted** [5] - 3406:13, 3422:5, 3426:12, 3427:14, 3428:24
**deletes** [2] - 3402:16, 3403:3
**deletion** [1] - 3411:24
**deliberation's** [1] - 3646:8
**deliberations** [2] - 3646:8, 3646:13
**deliver** [1] - 3656:19
**delivered** [2] - 3466:7, 3569:12

**delivering** [1] - 3346:14
**delve** [1] - 3631:20
**demand** [1] - 3365:13
**demonstrate** [10] - 3322:5, 3323:7, 3336:22, 3610:16, 3613:18, 3613:19, 3673:21, 3673:23, 3676:3, 3677:7
**demonstration** [1] - 3513:6
**demonstrative** [6] - 3402:19, 3404:14, 3404:24, 3405:1, 3410:25, 3535:25
**demonstratives** [2] - 3404:9, 3407:9
**denial** [1] - 3381:23
**denied** [4] - 3381:21, 3429:15, 3530:6, 3549:8
**denuded** [1] - 3652:4
**department** [1] - 3460:9, 3571:19, 3578:11, 3604:5, 3628:6, 3638:18, 3638:22, 3639:3, 3642:7, 3642:11, 3642:23
**Department** [6] - 3570:15, 3570:21, 3573:8, 3575:3, 3579:13, 3584:25
**departs** [1] - 3653:5
**depo** [1] - 3561:3
**deposed** [4] - 3406:6, 3406:9, 3544:12, 3553:23
**deposition** [61] - 3385:24, 3386:9, 3399:10, 3399:16, 3399:17, 3399:21, 3400:20, 3401:23, 3401:24, 3402:3, 3403:1, 3403:24, 3405:12, 3406:1, 3406:25, 3407:5, 3408:13, 3412:14, 3413:18, 3414:1, 3415:17, 3415:19, 3417:24, 3419:15, 3419:20, 3421:7, 3421:14, 3430:1, 3430:11, 3431:23, 3432:5, 3432:14, 3432:23, 3433:12, 3433:17, 3433:18, 3434:2, 3435:14, 3435:18, 3436:3,

3436:20, 3436:23, 3437:4, 3437:8, 3456:13, 3458:11, 3534:5, 3544:17, 3554:2, 3554:4, 3558:3, 3560:23, 3562:8, 3565:3, 3587:10, 3587:17, 3589:24, 3590:13, 3627:9, 3627:17, 3627:25
**depositions** [11] - 3318:10, 3385:20, 3401:21, 3405:12, 3587:5, 3587:9, 3590:6, 3590:9, 3595:23, 3630:9, 3639:14
**DEPUTY** [13] - 3315:4, 3338:10, 3338:15, 3428:7, 3428:9, 3428:13, 3523:5, 3568:14, 3591:3, 3591:7, 3644:12, 3645:15, 3686:9
**deputy** [1] - 3574:24
**describe** [1] - 3628:21
**described** [2] - 3367:11, 3498:13
**describing** [1] - 3662:11
**Description** [1] - 3314:7
**description** [1] - 3551:18
**deserves** [1] - 3541:7
**design** [2] - 3462:8, 3462:12
**designed** [3] - 3592:10, 3600:6, 3609:9
**despite** [2] - 3434:16, 3672:6
**destinations** [1] - 3342:21
**detail** [3] - 3656:25, 3664:7, 3671:13
**detailed** [1] - 3333:22
**details** [5] - 3463:4, 3472:22, 3524:14, 3553:4, 3616:2
**detecting** [1] - 3594:25
**determination** [4] - 3381:25, 3487:15, 3488:5, 3488:9
**determinations** [1] - 3319:11
**determine** [7] - 3401:25, 3486:23,

3530:14, 3594:24, 3598:21, 3611:25, 3622:12

**determined** [16] - 3320:9, 3320:16, 3380:25, 3485:24, 3486:7, 3486:9, 3486:17, 3488:16, 3511:10, 3511:19, 3511:20, 3522:9, 3531:8, 3612:6, 3614:8, 3617:19

**determining** [6] - 3485:19, 3485:20, 3625:5, 3634:4, 3634:11, 3636:4

**device** [2] - 3576:15, 3581:12

**differ** [1] - 3598:19

**difference** [2] - 3342:9, 3668:16

**different** [56] - 3330:2, 3335:13, 3335:16, 3336:23, 3339:18, 3348:4, 3373:12, 3375:17, 3378:24, 3380:8, 3380:17, 3385:4, 3405:17, 3405:21, 3406:17, 3419:6, 3420:1, 3432:19, 3432:20, 3433:5, 3433:15, 3435:13, 3435:23, 3441:24, 3451:2, 3457:7, 3493:8, 3520:9, 3533:6, 3562:22, 3562:24, 3563:10, 3563:13, 3592:25, 3593:1, 3593:19, 3596:13, 3598:1, 3601:4, 3602:11, 3605:19, 3609:1, 3610:12, 3612:10, 3614:23, 3615:13, 3635:5, 3638:13, 3639:4, 3659:8, 3659:21, 3659:22, 3665:19, 3680:4, 3684:19

**differently** [1] - 3353:13

**difficult** [3] - 3370:15, 3383:18, 3494:15

**difficulties** [2] - 3517:14, 3517:21

**difficulty** [1] - 3517:11

**dinner** [8] - 3348:15, 3361:13, 3465:21, 3550:22, 3551:2, 3551:18, 3553:2,

3600:11

**dinners** [2] - 3600:2, 3651:7

**DIRECT** [4] - 3314:3, 3314:5, 3339:11, 3568:20

**direct** [13] - 3337:24, 3339:5, 3350:23, 3352:7, 3419:5, 3439:6, 3439:11, 3446:20, 3472:11, 3505:18, 3544:9, 3557:5, 3559:11

**directed** [3] - 3501:8, 3505:6, 3505:11

**directing** [1] - 3661:15

**directly** [5] - 3351:13, 3354:10, 3358:8, 3358:9, 3515:17

**director** [1] - 3387:16

**disability** [11] - 3364:19, 3378:12, 3378:17, 3378:22, 3380:1, 3380:4, 3380:16, 3530:2, 3530:7, 3555:9, 3556:18

**disadvantage** [1] - 3470:20

**disagree** [14] - 3325:12, 3333:11, 3385:2, 3401:13, 3513:17, 3601:2, 3611:22, 3615:16, 3616:10, 3616:15, 3617:7, 3661:3, 3665:19, 3679:8

**disagreeing** [1] - 3671:11

**disagreement** [4] - 3510:6, 3516:11, 3615:17, 3615:18

**disciplinary** [1] - 3595:6

**disclosed** [1] - 3608:19

**disclosure** [1] - 3470:2

**discounted** [2] - 3634:24, 3635:7

**discoverable** [1] - 3535:6

**discovery** [9] - 3371:21, 3406:8, 3434:3, 3468:23, 3470:14, 3470:25, 3498:6, 3545:21, 3566:5

**discredit** [1] - 3330:12

**discuss** [10] -

3334:17, 3513:18, 3581:15, 3633:14, 3633:23, 3646:7, 3646:9, 3658:5, 3682:24

**discussed** [8] - 3355:15, 3428:24, 3439:4, 3445:16, 3512:25, 3538:3, 3585:4, 3596:11

**discussing** [4] - 3428:19, 3523:22, 3530:1, 3633:20

**discussion** [11] - 3366:12, 3379:14, 3390:19, 3426:19, 3466:5, 3542:18, 3561:20, 3619:13, 3644:14, 3648:8, 3657:10

**discussions** [6] - 3344:19, 3359:1, 3362:23, 3490:18, 3533:14, 3684:11

**disease** [2] - 3474:16, 3475:8

**dismiss** [4] - 3610:8, 3612:15, 3681:5, 3681:7

**dismissed** [1] - 3646:21

**dispel** [1] - 3655:25

**display** [1] - 3417:4

**dispute** [14] - 3459:10, 3519:3, 3519:9, 3519:12, 3519:22, 3523:24, 3612:18, 3616:14, 3616:19, 3616:23, 3616:24, 3619:19, 3655:25, 3674:12

**disputes** [6] - 3518:14, 3518:24, 3519:4, 3528:1, 3656:14

**disputing** [1] - 3469:14

**disseminated** [1] - 3603:7

**distance** [1] - 3381:8

**distinction** [3] - 3323:16, 3441:21, 3579:7

**distinguish** [4] - 3673:9, 3675:3, 3676:12, 3676:16

**distribute** [1] - 3382:8

**DISTRICT** [3] - 3313:1, 3313:1, 3313:12

**district** [32] - 3343:6,

3350:6, 3351:3, 3351:23, 3352:25, 3353:6, 3353:11, 3354:17, 3354:23, 3355:21, 3355:22, 3357:5, 3357:12, 3358:9, 3358:10, 3359:13, 3359:16, 3359:23, 3360:11, 3361:16, 3373:13, 3390:21, 3391:6, 3440:8, 3457:20, 3512:1, 3512:4, 3539:7, 3559:16, 3623:3, 3623:22

**District** [7] - 3315:2, 3571:9, 3571:23, 3571:25, 3572:7, 3573:3, 3579:21

**districts** [3] - 3351:6, 3351:22, 3572:8

**division** [4] - 3380:18, 3383:5, 3572:14, 3574:24

**divisions** [2] - 3642:16, 3642:20

**divorced** [1] - 3575:8

**Doctor** [1] - 3660:5

**doctor** [27] - 3318:25, 3333:21, 3341:22, 3342:19, 3343:11, 3343:12, 3343:24, 3346:6, 3366:14, 3380:3, 3440:13, 3446:4, 3447:23, 3454:23, 3455:4, 3481:21, 3482:5, 3482:10, 3482:18, 3524:12, 3562:2, 3610:17, 3611:24, 3612:3, 3612:5, 3613:20, 3641:3

**doctor's** [2] - 3424:6, 3454:20

**doctors** [41] - 3339:18, 3339:25, 3340:21, 3340:22, 3341:21, 3342:25, 3343:15, 3343:17, 3344:17, 3344:20, 3344:24, 3347:8, 3349:13, 3352:24, 3361:2, 3361:18, 3366:25, 3367:5, 3441:6, 3457:13, 3481:1, 3503:21, 3507:11, 3549:11, 3549:17, 3562:4, 3562:5, 3562:12, 3562:19, 3562:20,

3562:25, 3576:14, 3625:2, 3632:25, 3659:2, 3661:19, 3661:24, 3663:5, 3666:14, 3667:4, 3676:10

**doctors'** [1] - 3605:25

**document** [23] - 3385:14, 3420:1, 3439:3, 3439:9, 3439:13, 3465:15, 3469:13, 3469:21, 3469:22, 3469:25, 3521:15, 3529:11, 3531:2, 3535:6, 3537:19, 3537:24, 3586:18, 3602:5, 3604:17, 3604:18, 3606:8, 3623:9, 3655:22

**documentary** [1] - 3626:13

**documentation** [8] - 3380:3, 3483:13, 3530:22, 3530:25, 3565:21, 3566:1, 3622:3, 3632:7

**documents** [28] - 3356:14, 3371:18, 3371:22, 3372:1, 3375:17, 3464:22, 3465:1, 3468:17, 3468:20, 3470:15, 3471:3, 3484:10, 3484:12, 3495:14, 3545:22, 3545:23, 3566:6, 3566:9, 3586:17, 3587:2, 3589:24, 3611:16, 3611:20, 3629:8, 3638:5, 3639:14, 3643:7, 3665:12

**Doe** [1] - 3660:5

**Dolisi** [58] - 3346:10, 3350:10, 3350:15, 3350:22, 3350:25, 3351:13, 3351:14, 3351:16, 3352:2, 3359:7, 3359:24, 3365:1, 3365:4, 3375:25, 3391:12, 3391:17, 3391:22, 3392:2, 3393:21, 3394:12, 3394:22, 3395:6, 3398:1, 3438:4, 3441:9, 3451:10, 3453:1, 3455:15, 3489:22, 3501:21, 3502:4, 3507:2, 3510:1,

3510:5, 3510:17, 3510:23, 3511:3, 3511:16, 3514:21, 3515:8, 3515:16, 3516:22, 3517:12, 3518:9, 3519:8, 3519:10, 3523:25, 3539:3, 3543:11, 3543:12, 3556:24, 3557:5, 3559:23, 3560:12, 3560:14, 3560:17, 3563:4, 3587:21

**Dolisi's** [4] - 3514:2, 3514:3, 3514:7, 3514:11

**dollar** [1] - 3628:22

**dollars** [5] - 3351:10, 3577:16, 3631:6, 3632:8, 3633:1

**Donald** [1] - 3339:19

**done** [36] - 3316:5, 3320:13, 3341:16, 3354:16, 3354:25, 3358:14, 3361:12, 3377:16, 3380:1, 3386:23, 3388:3, 3448:14, 3457:23, 3480:14, 3495:12, 3523:3, 3567:17, 3577:22, 3579:8, 3580:11, 3581:17, 3583:10, 3589:10, 3589:14, 3601:9, 3610:1, 3612:5, 3618:2, 3651:12, 3652:25, 3653:6, 3657:11, 3668:7, 3668:18, 3669:20, 3669:21

**Donelson** [1] - 3576:9

**Donna** [2] - 3496:7, 3587:23

**door** [8] - 3322:15, 3327:9, 3332:19, 3333:8, 3333:9, 3495:4, 3560:9, 3616:4

**door's** [1] - 3332:18

**dots** [2] - 3612:8, 3651:9

**doubt** [3] - 3334:23, 3650:1, 3650:2

**down** [33] - 3321:17, 3341:11, 3341:15, 3341:18, 3342:4, 3342:6, 3342:8, 3347:22, 3348:1, 3353:11, 3354:24, 3354:25, 3360:5,

3362:2, 3366:22, 3441:15, 3441:22, 3442:7, 3453:16, 3490:25, 3501:21, 3505:1, 3561:18, 3570:4, 3570:20, 3571:5, 3571:24, 3590:9, 3612:9, 3636:21, 3652:4, 3654:20, 3684:14

**Doylestown** [1] - 3570:1

**Dr** [70] - 3327:24, 3329:12, 3333:24, 3335:5, 3339:19, 3339:21, 3340:17, 3340:19, 3340:24, 3341:4, 3341:5, 3341:7, 3341:14, 3341:22, 3342:6, 3342:7, 3342:13, 3342:15, 3343:16, 3344:5, 3344:10, 3344:13, 3345:3, 3345:13, 3345:14, 3346:2, 3346:4, 3346:15, 3347:12, 3347:22, 3347:25, 3348:13, 3348:22, 3348:23, 3349:21, 3349:24, 3358:12, 3366:21, 3367:1, 3446:1, 3446:4, 3446:14, 3446:20, 3446:23, 3447:1, 3447:4, 3447:8, 3447:11, 3447:15, 3447:20, 3447:22, 3475:24, 3476:2, 3476:22, 3477:12, 3478:9, 3478:20, 3478:25, 3479:5, 3502:4, 3503:9, 3503:17, 3504:1, 3630:19, 3638:20, 3639:21, 3650:22, 3662:13

**draft** [3] - 3465:25, 3499:22, 3551:14

**drastically** [1] - 3382:21

**draw** [4] - 3375:3, 3640:22, 3651:19, 3665:12

**drawing** [1] - 3441:21

**Driscoll** [1] - 3590:17

**driving** [1] - 3361:12

**drop** [3] - 3345:6, 3441:15, 3441:22

**drop-down** [1] -

3441:15

**dropped** [4] - 3382:21, 3442:7, 3581:24, 3638:8

**drove** [3] - 3345:3, 3345:5, 3366:22

**drug** [4] - 3606:2, 3612:1, 3612:3, 3624:23

**Drug** [1] - 3584:4

**drugs** [8] - 3378:23, 3563:10, 3598:25, 3611:24, 3623:20, 3625:1, 3643:19, 3665:3

**dues** [1] - 3582:18

**DULY** [1] - 3568:12

**during** [35] - 3333:8, 3333:13, 3335:13, 3336:7, 3340:14, 3344:19, 3383:1, 3383:7, 3401:23, 3440:3, 3440:9, 3442:21, 3449:25, 3464:10, 3465:3, 3470:15, 3470:23, 3483:5, 3506:19, 3506:23, 3520:11, 3545:20, 3546:22, 3572:21, 3583:6, 3609:4, 3629:2, 3639:20, 3639:24, 3641:8, 3647:22, 3648:10, 3682:7

**duty** [6] - 3579:3, 3668:21, 3668:22, 3668:23

**DX** [1] - 3469:9

**DX-6029** [1] - 3388:22

---

# E

**earful** [1] - 3540:5

**early** [13] - 3315:25, 3316:2, 3316:5, 3317:5, 3344:13, 3464:1, 3510:6, 3523:24, 3617:23, 3618:1, 3641:8, 3683:2, 3683:7

**earn** [1] - 3604:10

**ears** [3] - 3364:13, 3559:14

**easier** [2] - 3529:14, 3655:23

**East** [1] - 3313:9

**Eastern** [1] - 3571:9

**easy** [1] - 3383:17

**educating** [1] - 3502:19

**education** [4] - 3369:6, 3369:24, 3569:22, 3616:7

**educational** [3] - 3600:4, 3600:16, 3627:3

**Edurant** [12] - 3506:14, 3506:15, 3506:19, 3507:7, 3507:12, 3507:16, 3507:21, 3508:19, 3508:23, 3509:3, 3563:6, 3563:13

**Edwards** [3] - 3359:12, 3359:20, 3438:19, 3539:7

**eerily** [2] - 3315:25, 3316:12

**effect** [3] - 3584:4, 3585:20, 3608:22

**effective** [12] - 3580:1, 3582:20, 3584:22, 3592:12, 3594:24, 3596:4, 3598:21, 3626:24, 3639:8, 3639:22, 3662:22, 3679:4

**effectiveness** [4] - 3583:4, 3591:21, 3594:19, 3625:12

**effects** [1] - 3481:17

**efficacy** [1] - 3481:12

**effort** [3] - 3331:14, 3472:23, 3490:5

**efforts** [4] - 3464:10, 3472:4, 3528:20, 3567:14

**eight** [9] - 3441:17, 3456:20, 3457:5, 3457:9, 3554:5, 3571:4, 3578:20, 3663:15

**either** [25] - 3318:17, 3320:17, 3321:18, 3323:6, 3323:21, 3327:11, 3332:21, 3333:5, 3347:13, 3349:20, 3353:1, 3420:18, 3515:4, 3575:15, 3602:14, 3622:8, 3622:20, 3627:24, 3645:25, 3650:9, 3681:11, 3681:21, 3685:24

**elaborate** [1] - 3563:9

**electronic** [1] - 3578:12

**element** [4] - 3662:6, 3665:16, 3665:17, 3668:4

**elements** [5] - 3642:10, 3648:25, 3651:10, 3652:1, 3652:4

**elicit** [3] - 3601:16, 3601:19, 3669:1

**elicited** [3] - 3329:16, 3335:21, 3600:25

**Elmhurst** [1] - 3451:14

**ELMO** [2] - 3546:5, 3583:8

**email** [52] - 3350:12, 3370:21, 3439:9, 3439:19, 3444:6, 3445:25, 3448:9, 3451:8, 3451:9, 3451:17, 3463:9, 3464:15, 3468:22, 3470:18, 3472:21, 3473:3, 3477:11, 3480:17, 3491:11, 3491:20, 3491:24, 3499:4, 3499:10, 3499:16, 3499:21, 3501:19, 3501:21, 3504:1, 3504:4, 3510:22, 3511:9, 3514:6, 3514:11, 3516:17, 3516:25, 3517:21, 3518:5, 3518:8, 3519:7, 3528:25, 3530:17, 3535:15, 3551:6, 3553:3, 3554:7, 3559:22, 3633:13, 3633:16, 3633:17, 3635:2

**emailed** [1] - 3518:12

**emails** [16] - 3370:16, 3370:21, 3371:11, 3439:15, 3450:18, 3452:16, 3464:16, 3470:18, 3500:22, 3517:5, 3523:23, 3535:14, 3566:18, 3586:1, 3593:15, 3638:5

**employed** [3] - 3546:21, 3546:23, 3556:12

**employee** [6] - 3361:23, 3363:25, 3519:3, 3547:2, 3549:1, 3549:2

**employees** [5] - 3353:15, 3356:9, 3387:8, 3547:8, 3659:15

**employment** [13] - 3518:13, 3518:24,

3519:9, 3527:16, 3527:18, 3527:19, 3528:1, 3531:16, 3542:7, 3542:15, 3542:16, 3553:11, 3559:19

**encouraging** [1] - 3646:14

**end** [27] - 3317:5, 3321:11, 3326:13, 3327:4, 3343:8, 3343:19, 3344:1, 3368:22, 3409:21, 3444:13, 3473:7, 3473:8, 3473:16, 3523:21, 3524:9, 3547:15, 3555:11, 3563:20, 3563:21, 3574:23, 3578:19, 3597:19, 3628:7, 3656:9, 3661:24, 3663:24

**endeavor** [2] - 3316:8, 3596:22

**ended** [2] - 3513:16, 3624:1

**enforce** [1] - 3672:4

**enforcement** [2] - 3573:11, 3642:9

**engage** [6] - 3423:8, 3429:12, 3429:16, 3430:12, 3431:16, 3561:7

**engaged** [7] - 3432:15, 3432:24, 3543:18, 3577:13, 3577:14, 3583:4, 3642:25

**engagement** [1] - 3594:14

**England** [4] - 3357:12, 3358:23, 3359:6, 3635:19

**enhancing** [2] - 3352:12, 3360:18

**enjoy** [2] - 3646:16, 3646:22

**enjoyed** [1] - 3523:9

**enter** [1] - 3338:17

**entered** [1] - 3414:24

**enters** [3] - 3428:14, 3523:7, 3645:16

**entire** [8] - 3353:6, 3355:22, 3366:24, 3403:24, 3433:21, 3441:4, 3459:5, 3483:5

**entirely** [1] - 3495:11

**entities** [2] - 3569:16, 3576:4

**entitled** [7] - 3485:9, 3486:7, 3486:24, 3486:25, 3494:11, 3537:7, 3687:5

**environment** [3] - 3378:11, 3380:5, 3527:22

**epidemic** [1] - 3361:15

**equal** [1] - 3398:11

**equals** [1] - 3601:10

**equivalent** [1] - 3317:1

**Eric** [7] - 3353:16, 3354:10, 3354:11, 3358:17, 3489:23, 3544:11, 3559:14

**erratas** [41] - 3399:11, 3400:10, 3400:19, 3400:22, 3400:25, 3401:6, 3401:8, 3401:16, 3402:11, 3402:13, 3403:3, 3403:10, 3403:14, 3404:7, 3404:10, 3405:7, 3406:2, 3406:12, 3406:18, 3406:22, 3406:23, 3407:6, 3407:9, 3409:16, 3411:19, 3426:9, 3426:10, 3426:17, 3427:9, 3427:14, 3431:3, 3431:4, 3553:18, 3553:25, 3685:1, 3685:2, 3685:3, 3685:4, 3685:5

**erratas** [1] - 3685:9

**errors** [1] - 3426:18

**especially** [5] - 3348:9, 3560:10, 3640:8, 3652:23, 3653:24

**ESQUIRE** [8] - 3313:14, 3313:15, 3313:15, 3313:16, 3313:16, 3313:19, 3313:20, 3313:20

**essence** [1] - 3351:9

**essentially** [5] - 3319:20, 3390:10, 3505:23, 3599:7, 3672:25

**establish** [4] - 3405:16, 3405:20, 3407:2, 3534:9

**established** [5] - 3332:16, 3335:24, 3336:1, 3405:25, 3406:10

**establishing** [1] - 3404:2

**estimating** [1] - 3562:11

**et** [1] - 3313:3

**Ethicon** [4] - 3380:14, 3380:17, 3543:3, 3543:5

**ethics** [3] - 3504:10, 3504:16, 3505:23

**evaluate** [1] - 3625:4

**evaluates** [1] - 3461:22

**evaluating** [8] - 3580:4, 3594:19, 3595:16, 3598:10, 3603:6, 3608:6, 3622:22, 3679:13

**evaluation** [13] - 3341:20, 3547:12, 3547:13, 3547:14, 3547:16, 3548:4, 3548:9, 3548:19, 3549:22, 3585:1, 3626:21, 3639:13

**evaluations** [2] - 3412:15, 3412:18

**Evans** [60] - 3567:24, 3568:16, 3568:21, 3568:24, 3568:25, 3569:5, 3579:13, 3582:19, 3583:10, 3583:19, 3584:14, 3585:3, 3585:12, 3586:11, 3589:19, 3589:23, 3590:7, 3591:15, 3593:25, 3594:17, 3595:3, 3598:10, 3604:1, 3604:3, 3604:15, 3604:17, 3607:15, 3608:20, 3622:3, 3622:16, 3623:1, 3626:6, 3627:6, 3628:17, 3630:22, 3632:1, 3633:12, 3634:17, 3634:20, 3635:18, 3636:18, 3644:17, 3645:11, 3646:21, 3647:6, 3648:22, 3657:9, 3657:16, 3657:19, 3657:23, 3658:5, 3658:18, 3660:3, 3669:7, 3669:8, 3669:15, 3670:2, 3671:16, 3672:1, 3682:8

**evans** [1] - 3582:17

**EVANS** [2] - 3314:5,

3568:12

**Evans's** [4] - 3660:4, 3662:16, 3662:20, 3670:24

**event** [14] - 3412:15, 3424:14, 3426:6, 3453:23, 3474:6, 3474:8, 3475:5, 3475:8, 3502:14, 3513:16, 3547:2, 3640:19, 3649:20

**events** [5] - 3348:5, 3348:8, 3547:8, 3643:10, 3643:14

**eventually** [3] - 3597:23, 3609:25, 3648:21

**evidence** [110] - 3314:8, 3314:9, 3314:10, 3314:11, 3314:12, 3314:13, 3314:14, 3314:15, 3314:16, 3314:17, 3314:18, 3314:19, 3314:20, 3314:21, 3314:22, 3314:23, 3321:1, 3321:4, 3321:5, 3321:7, 3321:13, 3321:21, 3322:3, 3322:6, 3323:6, 3324:21, 3326:6, 3326:7, 3326:10, 3326:23, 3327:7, 3327:21, 3328:2, 3330:1, 3330:5, 3330:18, 3330:22, 3330:25, 3331:2, 3331:21, 3332:10, 3332:16, 3335:21, 3335:22, 3335:25, 3388:25, 3390:4, 3409:12, 3417:9, 3443:23, 3447:10, 3451:5, 3452:22, 3462:15, 3463:8, 3465:11, 3465:16, 3467:14, 3472:1, 3472:2, 3477:9, 3480:1, 3483:9, 3491:8, 3499:2, 3500:21, 3501:17, 3504:23, 3510:13, 3518:3, 3528:6, 3528:10, 3529:18, 3532:7, 3550:14, 3551:22, 3564:20, 3596:7, 3611:4, 3613:13, 3613:18, 3614:22, 3615:2, 3617:18,

3622:3, 3625:8, 3626:13, 3626:20, 3627:20, 3633:9, 3634:17, 3635:18, 3636:18, 3640:17, 3643:3, 3643:6, 3647:24, 3651:9, 3651:10, 3659:4, 3659:24, 3662:8, 3672:25, 3674:4, 3674:20, 3677:21, 3679:22, 3680:7, 3680:8, 3680:13

**ex** [1] - 3577:8

**exact** [2] - 3613:10, 3651:16

**exactly** [22] - 3324:12, 3325:19, 3330:4, 3348:6, 3348:16, 3352:21, 3356:23, 3364:17, 3366:3, 3370:14, 3400:3, 3402:8, 3402:22, 3403:23, 3411:21, 3418:18, 3421:11, 3499:11, 3532:19, 3547:11, 3558:11, 3649:7

**examination** [32] - 3318:12, 3322:15, 3323:20, 3323:23, 3325:21, 3327:15, 3328:2, 3329:11, 3329:16, 3329:19, 3329:23, 3330:17, 3330:19, 3331:8, 3331:18, 3334:25, 3339:6, 3402:10, 3407:8, 3439:6, 3439:11, 3446:20, 3468:9, 3469:10, 3471:13, 3484:4, 3509:13, 3517:7, 3523:10, 3678:16, 3678:21, 3682:1

**EXAMINATION** [8] - 3314:3, 3314:4, 3314:4, 3314:5, 3339:11, 3384:8, 3541:21, 3568:20

**EXAMINATIONS** [1] - 3314:2

**examine** [6] - 3320:8, 3322:12, 3325:6, 3331:9, 3336:14, 3677:24

**examined** [2] - 3320:11, 3329:5

**examining** [7] - 3320:18, 3322:12,

3325:16, 3329:11,
3330:24, 3678:6,
3680:12
**example** [16] -
3327:16, 3473:2,
3473:8, 3473:13,
3473:16, 3474:15,
3474:22, 3482:10,
3517:9, 3535:6,
3535:23, 3584:21,
3596:14, 3606:17,
3630:18, 3660:20
**examples** [2] -
3327:16, 3344:23
**except** [4] - 3397:18,
3409:25, 3658:4,
3662:9
**exchange** [1] -
3606:19
**exchanged** [1] -
3545:23
**excited** [3] - 3380:11,
3491:25, 3499:5
**exclude** [3] - 3335:5,
3577:10, 3577:18
**excluded** [5] - 3577:5,
3577:21, 3607:23,
3653:1, 3668:9
**excludes** [1] - 3647:17
**excluding** [1] - 3668:8
**exclusion** [3] -
3577:4, 3577:7,
3577:23
**excuse** [18] - 3489:3,
3492:11, 3504:9,
3576:12, 3576:24,
3577:9, 3577:20,
3582:18, 3605:22,
3615:7, 3632:14,
3636:7, 3637:12,
3639:8, 3641:14,
3642:8, 3645:24,
3654:16
**excused** [2] - 3567:20,
3646:25
**executed** [1] - 3596:1
**executive** [3] -
3391:23, 3396:17,
3509:10
**exhausted** [1] -
3530:6
**exhibit** [3] - 3468:5,
3468:8, 3632:19
**Exhibit** [32] - 3314:7,
3314:8, 3314:9,
3314:10, 3314:11,
3314:12, 3314:13,
3314:14, 3314:15,
3314:16, 3314:17,
3314:18, 3314:19,

3314:20, 3314:21,
3314:22, 3314:23,
3388:25, 3409:12,
3417:9, 3443:23,
3472:1, 3472:2,
3477:9, 3491:8,
3499:2, 3501:17,
3504:23, 3510:13,
3518:3, 3529:18,
3532:7
**exhibits** [8] - 3468:4,
3470:7, 3587:4,
3587:11, 3587:14,
3587:16, 3628:25
**exist** [1] - 3422:6
**existed** [1] - 3372:1
**exists** [1] - 3424:22
**expand** [2] - 3604:1,
3604:15
**expanding** [3] -
3324:5
**expect** [4] - 3545:11,
3595:18, 3608:4,
3625:15
**expectations** [2] -
3351:23, 3516:25
**expected** [1] - 3669:16
**expenses** [1] - 3630:7
**experience** [18] -
3344:13, 3344:15,
3344:19, 3347:23,
3347:24, 3375:9,
3560:8, 3569:11,
3569:22, 3572:18,
3575:23, 3577:24,
3582:22, 3591:16,
3595:2, 3605:8,
3606:12, 3625:20
**experienced** [1] -
3375:24
**experiences** [1] -
3364:7
**experiencing** [1] -
3362:19
**expert** [81] - 3318:8,
3318:13, 3318:19,
3319:23, 3320:15,
3322:4, 3322:11,
3322:20, 3323:22,
3324:14, 3325:6,
3326:10, 3326:16,
3327:8, 3328:22,
3329:7, 3329:17,
3329:18, 3329:21,
3331:1, 3331:12,
3333:19, 3333:23,
3334:5, 3334:12,
3334:18, 3334:22,
3335:19, 3336:1,
3336:13, 3336:14,

3336:15, 3337:7,
3569:6, 3569:8,
3569:10, 3569:14,
3569:19, 3579:14,
3580:4, 3588:22,
3595:9, 3598:2,
3602:8, 3602:14,
3607:15, 3608:11,
3608:20, 3608:24,
3611:7, 3627:6,
3627:13, 3627:14,
3632:11, 3633:19,
3650:9, 3650:11,
3650:24, 3651:15,
3652:22, 3652:23,
3656:6, 3658:10,
3658:18, 3658:22,
3658:23, 3659:21,
3660:15, 3662:11,
3665:1, 3665:6,
3666:13, 3666:17,
3667:7, 3667:12,
3667:21, 3667:23,
3669:2, 3669:16
**expert's** [5] - 3319:12,
3319:13, 3319:14,
3336:3, 3662:10
**expertise** [6] -
3322:19, 3582:22,
3595:2, 3606:12,
3611:25, 3667:25
**experts** [30] - 3318:16,
3318:17, 3320:10,
3320:18, 3321:12,
3322:18, 3323:20,
3324:1, 3325:23,
3326:16, 3326:19,
3326:22, 3330:24,
3331:10, 3331:13,
3331:15, 3332:12,
3609:15, 3613:10,
3651:17, 3660:1,
3660:12, 3665:14,
3666:20, 3667:15,
3668:17, 3668:20,
3668:24
**explain** [15] - 3318:6,
3349:18, 3351:15,
3352:25, 3401:10,
3402:13, 3555:7,
3556:23, 3557:3,
3563:12, 3599:3,
3630:3, 3664:10,
3666:5, 3667:23
**explained** [7] -
3352:10, 3380:2,
3393:9, 3424:4,
3511:10, 3627:3,
3630:10
**explaining** [3] -

3555:14, 3650:25,
3661:1
**expose** [1] - 3567:15
**expressed** [4] -
3353:18, 3396:12,
3396:16, 3647:17
**expression** [1] -
3665:8
**extent** [2] - 3622:19,
3639:21
**extra** [7] - 3343:7,
3349:23, 3349:25,
3441:18, 3525:9,
3645:2, 3677:9
**extremely** [3] -
3363:19, 3364:24,
3367:2
**extrinsic** [11] - 3321:1,
3322:3, 3326:9,
3326:23, 3327:7,
3330:1, 3330:5,
3330:22, 3330:25,
3331:2, 3331:21
**eye** [1] - 3669:24

# F

**face** [1] - 3595:4
**Facebook** [1] -
3383:24
**facets** [1] - 3569:12
**facially** [1] - 3595:5
**facing** [1] - 3358:1
**fact** [46] - 3326:12,
3329:5, 3330:17,
3332:13, 3333:8,
3343:12, 3351:4,
3353:5, 3370:16,
3374:22, 3377:22,
3391:17, 3396:7,
3396:18, 3397:18,
3401:4, 3401:11,
3401:15, 3401:19,
3402:1, 3419:5,
3422:7, 3464:1,
3485:2, 3500:17,
3506:19, 3507:6,
3508:5, 3510:1,
3510:5, 3517:20,
3548:22, 3555:4,
3556:5, 3609:18,
3638:8, 3639:1,
3640:15, 3652:3,
3652:11, 3660:14,
3667:8, 3667:10,
3667:19, 3672:6,
3675:2
**factors** [2] - 3319:8,
3481:2
**facts** [17] - 3368:11,

3412:3, 3420:24,
3421:3, 3462:14,
3465:16, 3552:6,
3553:4, 3617:18,
3647:12, 3651:10,
3653:10, 3662:6,
3665:13, 3666:15,
3667:18, 3669:2
**factual** [4] - 3333:20,
3335:21, 3612:13,
3612:18
**fail** [2] - 3598:24,
3677:8
**failed** [3] - 3429:11,
3599:6
**failure** [1] - 3423:7
**fair** [56] - 3316:23,
3316:24, 3323:23,
3325:9, 3325:22,
3330:10, 3331:8,
3355:3, 3357:6,
3357:7, 3367:5,
3368:1, 3371:25,
3372:2, 3377:3,
3381:8, 3383:19,
3384:24, 3394:7,
3394:8, 3396:11,
3397:16, 3425:23,
3425:24, 3442:23,
3461:1, 3461:4,
3471:17, 3486:15,
3513:13, 3517:13,
3533:13, 3537:15,
3541:12, 3541:13,
3545:24, 3545:25,
3558:8, 3558:9,
3560:14, 3566:11,
3575:25, 3589:2,
3594:18, 3595:13,
3602:18, 3603:10,
3606:4, 3615:3,
3619:8, 3619:21,
3653:18, 3661:10,
3682:10, 3682:11,
3683:11
**fairly** [6] - 3443:4,
3534:25, 3617:14,
3676:22
**faith** [1] - 3684:10
**fall** [3] - 3408:10,
3471:4, 3662:1
**falling** [3] - 3351:5,
3364:13, 3559:14
**false** [35] - 3574:7,
3574:19, 3577:13,
3606:22, 3607:7,
3607:11, 3608:22,
3609:16, 3610:24,
3611:1, 3611:4,
3611:8, 3611:12,

3611:18, 3612:4,
3613:2, 3613:15,
3613:19, 3613:23,
3613:24, 3614:1,
3614:2, 3614:13,
3615:10, 3615:12,
3616:22, 3616:24,
3621:2, 3621:11,
3621:19, 3682:24,
3684:4, 3684:10,
3684:16
**False** [32] - 3367:21,
3542:5, 3555:25,
3565:22, 3572:11,
3572:16, 3572:18,
3574:6, 3574:10,
3574:14, 3574:25,
3576:12, 3576:24,
3577:14, 3579:14,
3583:25, 3584:2,
3606:11, 3607:4,
3607:8, 3607:11,
3609:10, 3616:11,
3617:1, 3617:2,
3621:6, 3648:15,
3656:17, 3673:2,
3676:21, 3680:23
**falsified** [1] - 3441:5
**falsify** [1] - 3441:11
**falsifying** [1] -
3440:20
**falsity** [4] - 3609:23,
3612:25, 3613:4,
3613:12
**familiar** [19] - 3343:12,
3449:17, 3460:14,
3461:7, 3461:11,
3461:14, 3461:21,
3462:2, 3508:25,
3569:11, 3572:11,
3597:6, 3605:18,
3623:9, 3624:3,
3626:10, 3627:5,
3628:13, 3633:17
**familiarity** [1] -
3627:12
**families** [1] - 3540:17
**family** [9] - 3341:5,
3341:8, 3341:15,
3341:19, 3342:14,
3362:22, 3373:18,
3543:10, 3646:10
**family's** [1] - 3341:19
**fan** [2] - 3442:19,
3560:16
**fancy** [15] - 3466:23,
3467:1, 3467:3,
3467:9, 3467:15,
3467:19, 3472:5,
3472:9, 3472:22,

3474:15, 3474:23,
3476:3, 3476:9,
3551:19, 3667:17
**far** [15] - 3328:8,
3337:1, 3345:9,
3495:3, 3495:16,
3495:22, 3534:15,
3539:11, 3539:15,
3596:22, 3608:14,
3623:24, 3626:11,
3632:1, 3666:19
**fashion** [1] - 3647:25
**fast** [2] - 3350:15,
3603:24
**fast-forward** [1] -
3350:15
**fault** [1] - 3491:5
**faulty** [3] - 3320:11,
3320:18, 3322:13
**favor** [1] - 3676:23
**favored** [1] - 3396:22
**FBI** [1] - 3571:24
**FCA** [3] - 3500:7,
3577:23, 3618:13
**FDA** [9] - 3563:15,
3576:25, 3584:4,
3592:5, 3592:7,
3592:13, 3664:2,
3676:13, 3676:14
**February** [5] -
3364:10, 3510:18,
3518:6, 3518:9,
3520:15
**federal** [20] - 3569:17,
3572:13, 3572:24,
3573:6, 3573:16,
3573:17, 3573:19,
3573:20, 3577:2,
3577:11, 3577:15,
3577:16, 3577:17,
3579:4, 3604:3,
3605:13, 3605:16,
3621:2, 3621:13,
3637:9
**Federal** [1] - 3584:12
**FEDERAL** [1] - 3687:1
**federally** [2] -
3605:11, 3605:12
**fee** [2] - 3345:21,
3605:24
**feelings** [1] - 3520:4
**fellow** [5] - 3374:17,
3374:18, 3395:7,
3395:14, 3395:17
**felt** [14] - 3355:19,
3358:16, 3363:10,
3367:12, 3380:5,
3382:15, 3397:12,
3398:8, 3426:24,
3443:3, 3445:4,

3445:6, 3448:18,
3625:11
**Fernandez** [12] -
3352:7, 3352:10,
3352:11, 3391:8,
3393:21, 3398:4,
3514:6, 3515:4,
3515:16, 3515:20,
3516:6, 3516:15
**few** [10] - 3337:19,
3378:16, 3407:22,
3415:21, 3425:19,
3480:21, 3521:16,
3550:15, 3626:9,
3668:18
**fiduciary** [1] - 3668:21
**field** [18] - 3347:24,
3352:5, 3352:6,
3352:8, 3353:4,
3354:4, 3355:14,
3372:6, 3372:9,
3372:10, 3382:22,
3545:3, 3547:2,
3547:8, 3557:8,
3559:5, 3567:1,
3636:13
**field-based** [2] -
3547:2, 3547:8
**fight** [7] - 3331:12,
3612:11, 3613:1,
3614:2, 3614:24,
3615:1, 3617:18
**fighting** [3] - 3609:21,
3609:22, 3610:9
**figure** [6] - 3331:4,
3359:8, 3370:14,
3639:15, 3667:20,
3685:25
**figures** [1] - 3628:22
**file** [14] - 3332:25,
3334:4, 3370:5,
3370:15, 3467:17,
3527:10, 3527:15,
3527:19, 3528:7,
3544:14, 3555:25,
3670:9, 3681:1,
3681:3
**File** [1] - 3491:17
**filed** [21] - 3333:4,
3368:8, 3377:11,
3381:13, 3381:19,
3482:25, 3489:6,
3489:8, 3489:9,
3489:13, 3491:21,
3495:13, 3499:6,
3541:24, 3542:3,
3556:6, 3565:22,
3566:2, 3670:7,
3670:13, 3673:2
**files** [1] - 3606:21

**filing** [2] - 3367:18,
3531:16
**fill** [5] - 3412:15,
3547:16, 3549:22,
3552:16, 3552:23
**filled** [2] - 3456:14,
3547:19
**final** [10] - 3602:16,
3617:24, 3618:11,
3641:12, 3648:12,
3649:6, 3649:8,
3649:24, 3654:17,
3654:18
**finalized** [1] - 3618:19
**finalizing** [1] - 3671:1
**financial** [2] -
3484:24, 3571:12
**fine** [15] - 3324:20,
3412:20, 3412:24,
3471:1, 3496:24,
3525:3, 3535:20,
3536:3, 3536:22,
3597:15, 3597:16,
3661:24, 3662:9,
3680:18, 3682:25
**fingers** [1] - 3644:9
**finish** [7] - 3315:25,
3316:2, 3317:10,
3317:11, 3415:21,
3437:15, 3516:17
**finished** [2] - 3382:4,
3382:5
**fired** [11] - 3353:14,
3356:5, 3358:19,
3360:6, 3361:4,
3363:3, 3365:3,
3379:18, 3381:5,
3381:6, 3559:18
**firing** [1] - 3665:2
**firm** [4] - 3540:3,
3569:3, 3576:3,
3576:8
**first** [48] - 3329:4,
3334:20, 3343:11,
3368:19, 3376:15,
3378:10, 3381:19,
3381:21, 3414:6,
3417:11, 3419:15,
3423:17, 3441:14,
3466:23, 3470:1,
3483:4, 3489:6,
3489:7, 3489:8,
3489:13, 3489:15,
3490:13, 3502:25,
3516:10, 3546:7,
3552:1, 3553:3,
3555:10, 3569:21,
3569:25, 3571:18,
3572:2, 3578:8,
3583:25, 3592:21,

3608:9, 3622:9,
3629:8, 3633:21,
3641:15, 3647:2,
3649:10, 3649:15,
3655:6, 3670:17,
3684:12, 3684:24
**firsthand** [1] - 3360:23
**fisc** [2] - 3577:16,
3605:17
**Fisher** [1] - 3313:8
**five** [10] - 3320:20,
3344:3, 3376:18,
3554:24, 3565:5,
3615:3, 3634:2,
3634:7, 3635:3,
3635:8
**fix** [2] - 3409:4,
3603:24
**fixed** [1] - 3558:10
**flag** [25] - 3596:3,
3598:21, 3598:23,
3599:2, 3599:5,
3599:16, 3622:6,
3622:10, 3622:21,
3625:11, 3625:24,
3632:10, 3633:20,
3634:8, 3635:25,
3636:1, 3636:2,
3664:17, 3665:2,
3665:5, 3665:8,
3665:23, 3666:25
**flags** [9] - 3664:18,
3664:19, 3666:6,
3666:7, 3666:8,
3666:10, 3666:14,
3667:23, 3667:24
**fleshed** [1] - 3616:3
**flights** [1] - 3667:6
**flip** [1] - 3518:17
**FLOM** [1] - 3313:19
**Florida** [11] - 3341:7,
3341:9, 3341:10,
3341:15, 3341:18,
3341:25, 3342:4,
3342:8, 3350:13,
3351:7, 3361:13
**flow** [3] - 3358:19,
3363:5, 3428:3
**focus** [9] - 3453:23,
3467:5, 3543:23,
3607:18, 3618:14,
3655:2, 3657:24,
3658:22, 3658:23
**focused** [5] - 3607:16,
3607:20, 3619:13,
3655:3, 3658:19
**focuses** [2] - 3574:3,
3618:22
**focusing** [2] - 3619:6,
3655:7

**folks** [43] - 3315:5,
3315:22, 3322:18,
3324:9, 3337:9,
3338:18, 3348:10,
3348:12, 3390:20,
3393:20, 3407:15,
3428:4, 3428:15,
3434:11, 3437:23,
3438:9, 3438:18,
3438:19, 3438:23,
3451:14, 3478:1,
3478:24, 3479:14,
3484:8, 3489:25,
3522:21, 3523:8,
3529:7, 3535:23,
3539:11, 3568:4,
3568:8, 3590:25,
3591:8, 3602:10,
3602:22, 3646:19,
3667:15, 3670:20,
3672:13, 3680:6,
3682:16, 3686:6
**follow** [6] - 3325:1,
3449:8, 3455:18,
3510:24, 3515:12,
3547:1
**follow-up** [4] - 3325:1,
3449:8, 3455:18,
3510:24
**followed** [2] -
3596:18, 3638:12
**following** [6] -
3329:19, 3521:20,
3606:10, 3642:11,
3648:7, 3672:10
**FOLLOWS** [1] -
3568:13
**Food** [1] - 3584:4
**FOR** [1] - 3313:1
**force** [6] - 3462:13,
3462:24, 3502:18,
3502:19, 3502:20,
3570:17
**forced** [2] - 3356:7,
3394:18
**Ford** [1] - 3326:8
**forecasts** [1] -
3434:16
**foregoing** [2] -
3607:10, 3687:4
**forensic** [2] - 3575:12
**foresee** [1] - 3337:21
**forever** [1] - 3328:6
**forged** [2] - 3454:16,
3454:20
**forget** [2] - 3326:22,
3674:6
**forgot** [3] - 3558:4,
3558:6, 3645:25
**forgotten** [1] -

3422:15
**form** [9] - 3522:24,
3547:12, 3547:13,
3548:4, 3549:22,
3590:20, 3647:25,
3652:4, 3661:19
**formed** [2] - 3679:19,
3679:21
**former** [5] - 3564:12,
3564:14, 3632:10,
3633:18, 3653:22
**forms** [3] - 3547:14,
3547:16, 3548:19
**Fort** [1] - 3361:10
**forth** [7] - 3452:18,
3477:20, 3519:8,
3540:17, 3586:1,
3609:21, 3638:6
**forward** [23] - 3316:6,
3321:5, 3322:1,
3323:5, 3329:23,
3330:24, 3331:25,
3350:15, 3452:2,
3463:11, 3470:4,
3471:15, 3503:4,
3504:5, 3514:11,
3517:1, 3564:7,
3646:4, 3647:25,
3656:4, 3673:1,
3683:17
**forwarded** [5] -
3453:5, 3453:9,
3491:11, 3499:17,
3502:24
**forwards** [1] - 3452:5
**fought** [2] - 3381:23
**four** [5] - 3318:4,
3364:9, 3578:7,
3615:2, 3632:21
**four-hospital** [1] -
3578:7
**frame** [4] - 3316:4,
3316:16, 3317:6,
3651:24
**frames** [1] - 3568:7
**framing** [1] - 3536:4
**Frank** [15] - 3350:12,
3351:2, 3355:13,
3355:24, 3356:1,
3356:2, 3359:24,
3372:23, 3372:24,
3372:25, 3373:1,
3434:19, 3438:4,
3441:9, 3544:7
**frankly** [5] - 3575:9,
3653:15, 3659:3,
3682:23, 3684:4
**fraud** [13] - 3422:3,
3422:4, 3425:2,
3569:14, 3571:12,

3571:13, 3572:8,
3573:15, 3574:20,
3577:2, 3577:15
**frauds** [2] - 3571:14,
3572:3
**fraudulent** [2] -
3621:12, 3621:19
**free** [6] - 3441:22,
3452:2, 3487:14,
3513:17, 3603:22,
3604:9
**frequent** [1] - 3359:3
**frequently** [1] - 3348:9
**Fridays** [1] - 3339:1
**friend** [3] - 3371:1,
3375:19, 3395:17
**friendly** [5] - 3340:17,
3354:18, 3357:14,
3374:13, 3375:14
**friends** [11] - 3357:14,
3372:14, 3372:19,
3373:7, 3373:8,
3374:7, 3374:8,
3374:19, 3564:4,
3564:12, 3646:10
**friendship** [1] -
3374:20
**front** [10] - 3328:20,
3330:8, 3353:6,
3376:8, 3485:18,
3545:6, 3557:8,
3591:18, 3592:1,
3673:10
**frustrated** [7] -
3509:22, 3512:13,
3513:11, 3520:2,
3520:7, 3559:7,
3559:8
**frustration** [1] -
3509:14
**fudging** [1] - 3316:14
**fulfill** [2] - 3380:19,
3392:3
**full** [4] - 3444:13,
3508:21, 3563:15,
3578:3
**full-time** [1] - 3578:3
**fully** [4] - 3605:11,
3605:12, 3616:4,
3644:22
**function** [6] - 3319:4,
3319:17, 3319:19,
3320:3, 3639:5,
3640:1
**functions** [2] -
3578:22, 3578:23
**fund** [1] - 3605:16
**funded** [4] - 3327:20,
3573:19, 3605:11,
3605:12

**funds** [1] - 3631:14
**futures** [1] - 3366:11
**Fuzeon** [2] - 3623:2,
3624:11
**FYI** [1] - 3501:25

# G

**game** [4] - 3330:10,
3331:8, 3486:15,
3487:14
**gap** [2] - 3336:1,
3639:7
**garden** [1] - 3574:5
**gatekeeping** [5] -
3319:4, 3319:17,
3319:19, 3320:3,
3332:7
**gather** [1] - 3552:12
**gathering** [2] - 3553:7,
3630:14
**Gay** [1] - 3633:13
**general** [4] - 3467:20,
3578:8, 3579:5,
3637:24
**General** [1] - 3573:11
**generally** [10] -
3460:22, 3475:18,
3490:4, 3509:2,
3584:18, 3595:15,
3596:6, 3652:15,
3666:21
**generated** [1] - 3458:7
**genetics** [1] - 3382:22
**gentleman** [2] -
3357:8, 3358:22
**gentlemen** [2] -
3384:10, 3651:14
**GEOFFREY** [1] -
3313:20
**gist** [1] - 3663:18
**given** [14] - 3333:20,
3335:9, 3335:25,
3336:9, 3357:19,
3385:3, 3396:17,
3498:7, 3515:21,
3646:6, 3660:7,
3676:22, 3676:25
**Glatt** [3] - 3446:14,
3650:22, 3662:13
**Glatt's** [1] - 3327:24
**Glenn** [3] - 3566:17,
3588:12, 3676:8
**goal** [1] - 3343:19
**goals** [2] - 3343:13,
3343:21
**goodness** [1] -
3574:16
**government** [3] -
3577:11, 3580:22,

3621:13
**Government** [83] -
3487:3, 3487:16,
3491:25, 3492:8,
3492:17, 3493:1,
3493:4, 3493:10,
3493:12, 3495:4,
3495:22, 3496:8,
3497:6, 3497:12,
3497:25, 3498:7,
3498:12, 3498:14,
3499:5, 3500:3,
3500:17, 3542:13,
3542:14, 3542:23,
3550:2, 3550:3,
3550:4, 3565:22,
3566:22, 3567:7,
3569:17, 3572:3,
3573:6, 3573:19,
3573:20, 3575:23,
3578:14, 3605:3,
3606:8, 3606:16,
3608:14, 3608:23,
3616:6, 3616:18,
3617:4, 3617:7,
3620:10, 3621:17,
3637:9, 3672:3,
3672:6, 3672:13,
3673:6, 3673:7,
3673:14, 3673:22,
3673:24, 3674:2,
3674:5, 3674:10,
3674:16, 3674:23,
3675:1, 3675:14,
3675:22, 3675:25,
3676:15, 3677:4,
3678:1, 3678:17,
3678:18, 3678:20,
3678:25, 3679:20,
3680:21, 3680:22,
3680:24, 3681:3,
3682:4
**Government's** [7] -
3677:16, 3677:20,
3678:24, 3679:6,
3679:11, 3680:25,
3682:3
**grab** [2] - 3338:4,
3402:19
**graduate** [1] - 3369:2
**graduated** [1] - 3570:6
**Graham** [10] - 3374:7,
3374:8, 3374:9,
3375:14, 3377:10,
3377:18, 3377:25,
3496:7, 3565:15,
3587:23
**grainy** [2] - 3377:5,
3377:6
**grammar** [1] - 3401:17

**grand** [1] - 3576:16
**grant** [2] - 3485:24, 3601:20
**granted** [2] - 3468:18, 3470:22
**great** [10] - 3344:15, 3356:1, 3357:21, 3365:3, 3422:13, 3551:12, 3595:4, 3609:20, 3611:2, 3645:13
**Greber** [1] - 3584:13
**greet** [1] - 3391:8
**grew** [2] - 3569:22, 3569:25
**grooms** [3] - 3373:24, 3373:25, 3374:5
**Grooms** [1] - 3587:25
**ground** [3] - 3323:23, 3518:19, 3519:2
**group** [9] - 3437:19, 3437:23, 3582:8, 3592:23, 3593:4, 3626:17, 3626:18, 3626:19, 3636:10
**guardrails** [1] - 3637:10
**guess** [10] - 3321:6, 3342:5, 3345:24, 3469:8, 3540:20, 3579:18, 3614:14, 3618:24, 3648:5, 3664:22
**guesswork** [1] - 3595:10
**guidance** [33] - 3584:16, 3584:19, 3584:21, 3585:3, 3585:4, 3585:11, 3585:13, 3590:2, 3592:6, 3592:14, 3595:11, 3596:10, 3596:12, 3596:14, 3596:15, 3596:16, 3596:25, 3599:20, 3618:18, 3637:4, 3637:6, 3637:11, 3653:5, 3664:2, 3664:5, 3665:10, 3665:11, 3666:23, 3669:13, 3672:23
**guidances** [1] - 3668:2
**guide** [2] - 3613:1, 3669:24
**guidelines** [2] - 3593:18, 3658:25
**guy** [1] - 3356:1
**guys** [19] - 3315:25, 3328:10, 3328:18,

3331:17, 3331:24, 3334:4, 3339:2, 3406:7, 3450:19, 3494:3, 3557:23, 3597:10, 3602:11, 3615:4, 3654:24, 3676:22, 3677:11, 3677:19, 3685:2
**guys's** [1] - 3361:14

## H

**half** [4] - 3641:16, 3647:16, 3675:17, 3683:7
**hammer** [1] - 3352:4
**hand** [6] - 3425:3, 3495:13, 3568:7, 3609:14, 3640:10, 3640:12
**handle** [3] - 3455:18, 3515:17, 3550:5
**handled** [3] - 3516:14, 3576:25, 3648:21
**handles** [1] - 3574:25
**handling** [1] - 3576:22
**hang** [2] - 3378:14, 3522:16
**happy** [6] - 3351:25, 3513:18, 3514:21, 3514:24, 3515:4, 3619:2
**harassing** [1] - 3362:14
**hard** [7] - 3324:11, 3369:22, 3376:5, 3377:6, 3384:24, 3574:17, 3652:11
**HAVING** [1] - 3568:12
**HCC** [5] - 3354:15, 3355:9, 3355:12, 3362:2, 3539:7
**head** [13] - 3317:8, 3354:25, 3358:15, 3360:5, 3376:7, 3514:2, 3514:24, 3519:18, 3559:23, 3560:5, 3560:15, 3643:25, 3664:25
**heads** [1] - 3685:24
**heads-up** [1] - 3685:24
**Health** [6] - 3573:6, 3573:8, 3573:22, 3581:23, 3582:1, 3582:9
**health** [57] - 3355:12, 3355:20, 3359:9, 3359:15, 3359:18, 3359:21, 3379:6,

3379:9, 3383:5, 3529:5, 3551:19, 3569:3, 3569:4, 3569:6, 3569:8, 3569:10, 3569:12, 3569:16, 3571:13, 3572:3, 3572:6, 3572:8, 3572:15, 3572:24, 3573:17, 3573:21, 3575:12, 3575:23, 3576:7, 3576:13, 3576:14, 3577:3, 3577:10, 3577:17, 3580:15, 3581:3, 3581:21, 3581:25, 3582:4, 3582:15, 3585:5, 3596:13, 3596:22, 3600:7, 3604:19, 3604:24, 3621:13, 3621:18, 3628:6, 3632:11, 3633:19, 3652:8, 3663:11
**healthcare** [1] - 3621:11
**hear** [36] - 3316:11, 3317:3, 3323:14, 3328:4, 3332:2, 3333:2, 3333:11, 3336:3, 3336:5, 3336:11, 3336:17, 3337:7, 3341:21, 3363:24, 3364:3, 3364:5, 3372:5, 3372:8, 3376:14, 3407:12, 3504:20, 3557:23, 3562:25, 3564:8, 3601:5, 3627:13, 3644:20, 3652:20, 3654:22, 3660:3, 3664:23, 3666:4, 3671:5, 3675:8, 3679:15, 3680:5
**heard** [38] - 3333:25, 3335:25, 3336:7, 3344:14, 3355:4, 3355:13, 3358:22, 3373:5, 3373:20, 3377:10, 3383:9, 3385:19, 3391:13, 3392:23, 3434:10, 3437:14, 3446:19, 3459:15, 3459:16, 3484:17, 3486:20, 3509:13, 3520:6, 3522:8, 3550:11, 3550:12, 3558:24, 3559:2, 3562:20, 3565:10, 3565:12, 3566:20, 3566:25,

3592:6, 3664:15, 3664:16, 3674:25
**hearsay** [2] - 3322:7, 3328:23
**heart** [2] - 3363:16, 3651:2
**heavily** [1] - 3604:19
**held** [4] - 3315:1, 3397:24, 3640:16, 3643:9
**help** [23] - 3343:24, 3343:25, 3344:6, 3361:2, 3364:10, 3369:5, 3378:13, 3405:15, 3410:25, 3451:4, 3451:13, 3467:9, 3519:3, 3540:9, 3575:18, 3575:19, 3577:5, 3578:11, 3581:7, 3581:9, 3618:4, 3643:19, 3658:12
**helped** [5] - 3513:1, 3578:13, 3580:9, 3580:10, 3582:8
**helpful** [7] - 3462:17, 3466:14, 3496:20, 3618:4, 3652:3, 3652:10, 3656:10
**helping** [4] - 3361:3, 3361:5, 3365:20, 3394:12
**helps** [1] - 3641:12
**hem** [1] - 3318:5
**herself** [3] - 3359:25, 3455:23, 3502:25
**hesitate** [1] - 3331:3
**HHS** [10] - 3573:2, 3573:6, 3573:13, 3573:22, 3577:8, 3577:9, 3584:23, 3585:4, 3590:1, 3592:14
**HHS-OIG** [6] - 3577:8, 3577:9, 3584:23, 3585:4, 3590:1, 3592:14
**HHS/OIG** [3] - 3573:14, 3574:5, 3642:8
**hierarchy** [1] - 3515:12
**high** [14] - 3351:23, 3353:17, 3361:16, 3369:16, 3369:17, 3406:20, 3473:7, 3473:8, 3473:16, 3478:3, 3551:21, 3599:25, 3631:25, 3633:2

**high-end** [3] - 3473:7, 3473:8, 3473:16
**high-performing** [1] - 3361:16
**higher** [3] - 3337:6, 3559:10, 3560:7
**higher-ups** [2] - 3559:10, 3560:7
**highlighted** [3] - 3624:5, 3626:5, 3633:1
**highlights** [1] - 3631:5
**highly** [4] - 3596:8, 3596:20, 3599:17, 3659:1
**hill** [1] - 3681:18
**hired** [3] - 3405:14, 3575:15, 3578:11
**hiring** [1] - 3580:18
**hitting** [1] - 3648:9
**HIV** [9] - 3361:22, 3446:4, 3446:11, 3474:16, 3475:18, 3481:5, 3502:10, 3506:20, 3507:21
**hmm** [1] - 3574:17
**hold** [8] - 3358:13, 3397:16, 3397:18, 3407:20, 3467:14, 3589:11, 3636:21, 3678:5
**holiday** [6] - 3618:10, 3644:25, 3645:21, 3646:1, 3646:16, 3646:22
**Holloway** [1] - 3538:18
**Holshoe** [12] - 3358:23, 3359:1, 3373:12, 3373:15, 3438:25, 3439:2, 3531:22, 3532:9, 3539:18, 3541:10, 3588:2
**home** [11] - 3355:22, 3378:21, 3378:24, 3441:19, 3453:10, 3460:9, 3460:18, 3547:16, 3553:15, 3580:8, 3644:6
**homes** [1] - 3596:14
**honest** [1] - 3403:7
**honestly** [1] - 3618:3
**Honor** [172] - 3315:8, 3315:16, 3315:18, 3315:20, 3316:18, 3316:22, 3317:18, 3317:20, 3317:25, 3318:3, 3318:11, 3318:21, 3318:24,

3319:2, 3319:5, 3319:11, 3319:16, 3323:15, 3323:19, 3323:25, 3324:15, 3324:18, 3324:23, 3325:2, 3330:4, 3332:4, 3333:6, 3333:19, 3334:8, 3334:14, 3334:21, 3336:12, 3337:11, 3337:17, 3337:25, 3338:7, 3338:8, 3338:13, 3339:8, 3339:10, 3384:1, 3384:4, 3384:7, 3388:21, 3400:14, 3400:17, 3401:14, 3402:25, 3405:8, 3408:4, 3409:7, 3415:16, 3417:4, 3417:6, 3426:19, 3428:17, 3433:25, 3443:14, 3443:18, 3443:22, 3462:14, 3462:16, 3467:23, 3468:1, 3468:16, 3468:18, 3468:25, 3469:3, 3469:8, 3469:17, 3470:20, 3470:22, 3471:6, 3471:16, 3471:21, 3477:7, 3485:14, 3486:4, 3488:2, 3494:1, 3495:24, 3496:5, 3496:19, 3498:19, 3498:25, 3501:15, 3518:2, 3522:20, 3523:15, 3524:25, 3525:6, 3529:16, 3532:3, 3533:2, 3533:17, 3534:4, 3534:22, 3537:4, 3541:20, 3567:24, 3568:19, 3589:7, 3589:17, 3590:22, 3591:5, 3591:12, 3597:9, 3598:6, 3600:18, 3601:8, 3601:15, 3602:17, 3603:3, 3603:13, 3603:17, 3603:20, 3606:23, 3607:3, 3607:22, 3607:23, 3609:3, 3609:20, 3610:22, 3611:13, 3612:10, 3613:3, 3614:18, 3614:24, 3615:8, 3618:3, 3619:22, 3620:5, 3636:22, 3644:5, 3644:14,

3644:23, 3645:13, 3647:5, 3647:14, 3647:17, 3651:22, 3652:19, 3652:21, 3653:9, 3654:12, 3655:11, 3656:23, 3658:3, 3660:23, 3661:13, 3662:9, 3662:23, 3663:16, 3663:20, 3664:13, 3665:9, 3666:3, 3667:9, 3668:16, 3670:7, 3670:18, 3671:19, 3671:23, 3674:4, 3676:6, 3682:13, 3682:15, 3682:19, 3683:17, 3683:25, 3686:1
**Honor's** [6] - 3319:4, 3319:19, 3320:3, 3328:4, 3613:24, 3681:8
**HONORABLE** [1] - 3313:11
**Honorable** [1] - 3315:1
**honoraria** [9] - 3345:15, 3629:5, 3629:9, 3630:5, 3630:12, 3631:1, 3631:13, 3633:2, 3667:5
**hope** [4] - 3318:23, 3523:9, 3541:7, 3591:18
**hoped** [3] - 3368:23, 3540:9, 3563:14
**hopefully** [1] - 3680:19
**hospital** [3] - 3575:16, 3578:1, 3578:7
**hospitalization** [2] - 3605:22, 3605:24
**hospitals** [2] - 3576:5, 3596:15
**host** [2] - 3479:14, 3675:14
**hostile** [1] - 3527:21
**hot** [1] - 3617:25
**hot-button** [1] - 3617:25
**Hotel** [1] - 3354:13
**hotels** [3] - 3661:20, 3661:21, 3667:5
**hotline** [2] - 3483:6, 3549:2
**hour** [6] - 3397:9, 3476:6, 3594:4, 3619:5, 3619:6, 3645:2

**hourly** [1] - 3594:1
**hours** [6] - 3554:5, 3594:7, 3594:10, 3594:11, 3645:1, 3645:22
**house** [2] - 3341:19, 3380:15
**how'd** [2] - 3364:22, 3382:12
**HR** [32] - 3353:19, 3354:9, 3355:23, 3356:3, 3364:17, 3379:1, 3380:15, 3380:16, 3385:9, 3385:11, 3385:25, 3386:5, 3386:7, 3386:10, 3386:24, 3387:16, 3388:5, 3403:8, 3405:19, 3408:10, 3408:14, 3419:16, 3422:20, 3422:21, 3483:10, 3557:4, 3557:7, 3558:1, 3559:12, 3559:15
**Hsu** [1] - 3629:7
**huge** [2] - 3362:21, 3631:21
**human** [10] - 3403:2, 3410:21, 3411:14, 3413:1, 3414:17, 3458:12, 3549:9, 3549:20, 3551:10, 3553:15
**Human** [3] - 3573:7, 3573:8, 3573:22
**hundred** [12] - 3340:10, 3340:14, 3425:5, 3425:25, 3457:20, 3535:2, 3562:18, 3562:19, 3610:21, 3627:1, 3631:6, 3642:15
**hundreds** [2] - 3565:18, 3566:6
**hurt** [1] - 3448:22
**husband** [4] - 3363:14, 3382:9, 3571:24, 3578:2

---

**I**

---

**Iacobellis** [3] - 3544:22, 3565:10, 3588:4
**idea** [21] - 3344:17, 3367:22, 3368:2, 3368:4, 3368:5, 3371:8, 3377:17, 3397:11, 3403:10,

3447:18, 3458:9, 3460:12, 3488:25, 3492:23, 3504:6, 3538:7, 3560:6, 3560:12, 3560:14, 3625:22, 3684:5
**ideal** [1] - 3579:11
**identified** [3] - 3474:15, 3474:22, 3623:18
**identify** [1] - 3532:25
**ignored** [1] - 3559:1
**illegal** [2] - 3354:6, 3620:20
**illustrates** [1] - 3403:22
**imagine** [1] - 3469:1
**imagined** [1] - 3368:6
**immediately** [2] - 3376:10, 3380:15
**impact** [4] - 3321:24, 3604:23, 3657:20
**impactful** [1] - 3367:2
**impacting** [1] - 3656:20
**impart** [2] - 3600:6, 3628:11
**imparting** [1] - 3622:24
**impeach** [1] - 3322:3
**impeaching** [1] - 3321:15
**impeachment** [6] - 3321:9, 3322:7, 3322:8, 3328:12, 3401:5, 3407:2
**impeding** [1] - 3393:21
**impermissible** [1] - 3551:20
**implemented** [2] - 3592:10, 3595:6
**implementing** [1] - 3638:1
**implicate** [1] - 3664:5
**implicated** [2] - 3619:19, 3621:17
**implicates** [1] - 3664:6
**implication** [1] - 3400:21
**imply** [1] - 3677:19
**important** [9] - 3418:25, 3464:19, 3552:7, 3673:15, 3673:22, 3674:10, 3674:14, 3674:16, 3675:2
**imposed** [2] - 3584:9, 3642:6

**impression** [3] - 3375:18, 3403:12, 3406:19
**impressive** [1] - 3376:24
**improper** [2] - 3367:13, 3487:11
**improvement** [3] - 3352:3, 3360:19, 3360:20
**inaccurate** [1] - 3561:15
**inappropriate** [5] - 3329:25, 3401:2, 3402:10, 3633:23, 3677:6
**incentivized** [2] - 3640:9, 3641:4
**incentivizing** [1] - 3557:12
**incident** [5] - 3354:12, 3355:4, 3366:21, 3368:12, 3577:21
**incidental** [1] - 3600:16
**incidentally** [2] - 3446:19, 3532:17
**inclined** [2] - 3332:23, 3622:24
**include** [5] - 3344:18, 3555:18, 3585:7, 3604:8, 3614:21
**included** [4] - 3343:6, 3453:6, 3466:5, 3622:13
**includes** [2] - 3466:23, 3611:18
**including** [14] - 3326:11, 3326:14, 3329:18, 3332:21, 3362:24, 3405:11, 3454:4, 3472:9, 3472:24, 3483:9, 3512:25, 3573:1, 3581:11, 3620:11
**income** [2] - 3349:23, 3382:20
**inconsistent** [3] - 3405:25, 3483:24, 3684:9
**incorporated** [1] - 3609:8
**incorrect** [1] - 3409:3
**incorrectly** [1] - 3413:13
**increase** [1] - 3447:2
**increased** [1] - 3642:21
**increasing** [1] - 3342:1

**indeed** [2] - 3326:9, 3668:8
**indicate** [4] - 3328:11, 3529:3, 3530:21, 3635:9
**indication** [5] - 3599:19, 3615:12, 3619:10, 3650:22, 3650:24
**indications** [1] - 3614:21
**individual** [9] - 3365:1, 3481:21, 3580:10, 3625:18, 3625:19, 3625:20, 3634:12, 3636:5, 3640:23
**individuals** [6] - 3318:15, 3462:2, 3571:16, 3626:16, 3631:5, 3633:2
**induce** [2] - 3326:9, 3668:12
**inducement** [1] - 3668:14
**industries** [1] - 3596:13
**industry** [8] - 3585:5, 3585:13, 3593:10, 3593:18, 3593:24, 3604:19, 3659:1, 3664:3
**ineffective** [1] - 3592:3
**inefficient** [1] - 3640:7
**infer** [1] - 3486:16
**influence** [1] - 3620:21
**influencer** [1] - 3329:21
**informal** [2] - 3584:20, 3584:21
**information** [49] - 3320:19, 3320:22, 3322:13, 3322:14, 3325:18, 3325:19, 3326:20, 3329:17, 3331:1, 3346:14, 3361:18, 3403:15, 3467:9, 3467:18, 3472:5, 3472:7, 3472:16, 3472:24, 3478:8, 3500:16, 3501:19, 3502:24, 3503:8, 3504:1, 3518:13, 3518:19, 3518:23, 3528:1, 3535:12, 3538:10, 3552:12, 3552:14, 3552:15, 3553:7,

3553:9, 3553:10, 3554:25, 3562:1, 3585:12, 3600:6, 3603:7, 3621:18, 3622:25, 3627:25, 3628:11, 3628:19, 3629:16, 3639:3
**informed** [4] - 3480:3, 3525:23, 3526:8, 3528:19
**inherently** [1] - 3663:9
**inhibitor** [1] - 3355:18
**initial** [1] - 3518:8
**initiative** [3] - 3510:23, 3513:14, 3519:12
**inoculated** [1] - 3325:10
**Inspector** [1] - 3573:11
**instance** [9] - 3318:25, 3319:23, 3347:15, 3348:22, 3356:21, 3610:7, 3641:15, 3648:20, 3648:22
**instances** [4] - 3318:18, 3341:4, 3482:17, 3482:21
**instead** [3] - 3354:14, 3367:17, 3410:10
**institute** [1] - 3578:12
**institution** [2] - 3571:12, 3579:2
**instruct** [8] - 3441:11, 3601:6, 3646:5, 3650:6, 3650:12, 3650:13, 3658:9, 3677:18
**instructed** [5] - 3441:7, 3441:8, 3480:14, 3651:8, 3677:17
**instructing** [3] - 3454:4, 3606:8, 3656:7
**instruction** [12] - 3441:24, 3442:1, 3597:19, 3648:15, 3649:13, 3650:8, 3650:19, 3654:9, 3655:21, 3660:19, 3660:22, 3671:16
**instructions** [33] - 3379:5, 3379:6, 3400:18, 3602:16, 3609:22, 3617:23, 3617:24, 3618:12, 3618:17, 3618:25, 3648:12, 3649:6,

3649:8, 3649:24, 3653:9, 3653:21, 3654:17, 3654:18, 3655:3, 3655:4, 3655:8, 3655:11, 3655:17, 3656:3, 3656:11, 3656:15, 3656:20, 3657:1, 3657:20, 3669:10, 3669:23, 3671:2
**insufficient** [1] - 3658:20
**insurance** [3] - 3382:20, 3571:13, 3573:17
**integrase** [1] - 3355:18
**integrity** [3] - 3641:23, 3642:5, 3680:22
**Intelence** [38] - 3340:6, 3340:7, 3344:4, 3344:10, 3344:13, 3344:18, 3345:7, 3347:12, 3347:14, 3347:24, 3348:2, 3355:16, 3475:18, 3506:7, 3506:11, 3506:25, 3507:12, 3508:1, 3549:11, 3557:11, 3561:8, 3563:14, 3563:18, 3583:6, 3592:4, 3610:17, 3628:7, 3629:1, 3630:17, 3638:23, 3639:16, 3642:13, 3643:4, 3643:15, 3643:21, 3672:5
**intend** [2] - 3327:11, 3471:4
**intended** [3] - 3528:7, 3529:3, 3608:4
**intending** [4] - 3465:10, 3527:6, 3527:10, 3527:15
**intent** [1] - 3668:17
**intention** [4] - 3371:5, 3475:15, 3552:21, 3557:6
**intentions** [1] - 3530:21
**interest** [5] - 3356:8, 3379:8, 3511:11, 3681:1, 3681:4
**interested** [7] - 3463:3, 3463:7, 3465:17, 3467:14, 3572:4, 3572:16, 3573:4
**interesting** [1] -

3361:9
**internal** [2] - 3616:7, 3621:1
**interrogatories** [1] - 3545:21
**intervene** [6] - 3673:14, 3674:6, 3675:15, 3675:18, 3678:25
**intervening** [1] - 3672:14
**intervention** [5] - 3495:9, 3675:11, 3678:14, 3679:7, 3682:3
**interview** [3] - 3492:4, 3492:8, 3499:4
**interviewed** [1] - 3373:9
**intimidating** [2] - 3370:12
**introduce** [6] - 3326:6, 3326:9, 3568:23, 3569:21, 3587:11, 3587:14
**introduced** [1] - 3328:20
**introducing** [1] - 3451:13
**introduction** [1] - 3518:19
**investigate** [5] - 3495:15, 3495:20, 3496:8, 3573:14, 3573:15
**investigated** [1] - 3495:22
**investigation** [4] - 3355:20, 3356:11, 3381:23, 3575:19
**investigations** [5] - 3573:25, 3574:14, 3575:20, 3576:13, 3580:22
**investigative** [1] - 3573:11
**investment** [1] - 3638:7
**invitations** [1] - 3641:12
**invite** [5] - 3473:4, 3473:8, 3473:16, 3474:5, 3474:22
**involved** [16] - 3447:23, 3448:6, 3459:17, 3460:10, 3572:6, 3577:4, 3580:24, 3627:21, 3628:2, 3628:4, 3643:20, 3677:4,

3677:5, 3678:24, 3679:11, 3681:3
**involvement** [1] - 3677:16
**involving** [2] - 3570:18, 3592:3
**Isentress** [1] - 3355:17
**Island** [2] - 3571:10
**isolated** [1] - 3639:2
**Israel** [2] - 3348:10, 3446:6
**issue** [84] - 3317:16, 3317:21, 3320:14, 3321:9, 3322:23, 3323:17, 3324:6, 3324:10, 3324:16, 3330:17, 3332:12, 3333:6, 3333:9, 3333:13, 3333:17, 3334:18, 3336:8, 3401:15, 3401:19, 3419:18, 3419:24, 3420:4, 3421:18, 3443:7, 3443:9, 3443:11, 3470:16, 3495:1, 3533:22, 3535:5, 3535:9, 3535:18, 3535:22, 3574:5, 3585:21, 3600:23, 3603:24, 3608:11, 3613:2, 3614:19, 3615:6, 3620:4, 3645:3, 3647:4, 3647:10, 3647:22, 3647:23, 3648:8, 3650:14, 3650:16, 3652:18, 3653:25, 3654:23, 3657:9, 3657:16, 3657:17, 3658:14, 3661:16, 3669:8, 3669:14, 3670:4, 3670:17, 3670:24, 3671:23, 3672:24, 3673:10, 3674:2, 3676:5, 3681:22, 3682:3, 3682:9, 3682:19, 3682:20, 3683:1, 3683:6, 3683:15, 3683:16, 3683:25, 3685:20, 3685:23, 3685:25
**issued** [2] - 3488:5, 3584:19
**issues** [40] - 3319:21, 3322:25, 3332:8, 3332:9, 3355:1, 3357:4, 3442:21, 3442:24, 3444:23,

3516:14, 3527:18, 3538:10, 3538:23, 3558:1, 3574:7, 3609:18, 3609:24, 3612:10, 3617:25, 3619:15, 3619:18, 3644:15, 3644:19, 3645:20, 3645:22, 3646:2, 3647:13, 3647:15, 3647:22, 3648:5, 3649:2, 3655:19, 3656:18, 3669:14, 3670:21, 3670:22, 3671:4, 3671:17, 3674:14, 3674:20

**item** [2] - 3606:20, 3637:8

**items** [3] - 3569:17, 3593:15, 3594:22

**iteration** [1] - 3576:6

**itself** [2] - 3579:3, 3605:18

## J

**J&J** [10] - 3369:5, 3370:2, 3370:3, 3500:6, 3512:25, 3518:13, 3519:2, 3519:23, 3521:1, 3543:7

**J&J's** [2] - 3466:6, 3518:23

**Janssen** [149] - 3315:17, 3315:19, 3315:21, 3316:11, 3318:9, 3319:9, 3320:17, 3322:1, 3328:1, 3328:12, 3330:21, 3331:9, 3336:8, 3340:1, 3344:25, 3345:14, 3349:9, 3349:11, 3353:15, 3361:23, 3368:14, 3368:24, 3371:22, 3375:4, 3376:20, 3378:6, 3380:1, 3380:8, 3381:21, 3382:6, 3391:15, 3391:18, 3392:24, 3393:2, 3393:6, 3393:20, 3418:15, 3418:16, 3419:1, 3429:6, 3439:22, 3440:3, 3441:5, 3442:22, 3446:23, 3447:2, 3449:25, 3454:12, 3464:2, 3465:7, 3483:5, 3483:14,

3484:9, 3501:1, 3502:7, 3502:15, 3504:11, 3506:12, 3521:24, 3522:4, 3524:10, 3525:14, 3525:19, 3529:22, 3531:12, 3531:17, 3532:10, 3543:18, 3544:16, 3545:11, 3563:24, 3564:13, 3565:2, 3565:6, 3567:6, 3567:15, 3587:10, 3596:7, 3597:24, 3601:22, 3602:9, 3604:8, 3604:18, 3604:23, 3606:7, 3607:16, 3608:10, 3610:23, 3615:16, 3620:9, 3620:19, 3621:10, 3621:16, 3623:1, 3623:7, 3623:12, 3623:18, 3624:1, 3625:13, 3625:15, 3628:22, 3629:6, 3629:11, 3629:22, 3630:5, 3632:2, 3632:7, 3633:3, 3634:20, 3635:6, 3635:10, 3637:19, 3639:15, 3639:18, 3641:17, 3641:22, 3642:9, 3642:13, 3642:16, 3642:20, 3643:9, 3643:15, 3644:15, 3644:21, 3650:10, 3650:11, 3650:17, 3652:8, 3652:20, 3655:5, 3655:16, 3657:8, 3659:25, 3660:15, 3661:4, 3661:18, 3661:23, 3662:21, 3667:3, 3673:1, 3674:15, 3675:1, 3676:20, 3676:24, 3677:12, 3682:5, 3685:6

**JANSSEN** [1] - 3313:6

**Janssen's** [31] - 3331:11, 3339:15, 3461:7, 3461:11, 3462:12, 3543:18, 3554:24, 3583:2, 3585:22, 3591:21, 3592:2, 3593:9, 3593:12, 3594:20, 3604:5, 3607:12, 3609:15, 3610:13, 3613:10, 3621:1, 3627:14, 3637:5,

3637:18, 3655:14, 3658:10, 3658:19, 3659:13, 3664:2, 3668:17, 3669:17, 3681:23

**January** [2] - 3411:2, 3411:13

**Japonica** [1] - 3352:15

**JD** [4] - 3570:10, 3570:12, 3652:22, 3652:23

**jealous** [1] - 3450:11

**Jeanite** [1] - 3538:18

**Jeff** [1] - 3315:18

**JERSEY** [1] - 3313:1

**Jersey** [6] - 3313:9, 3350:20, 3355:14, 3361:11, 3381:24, 3553:16

**Jess** [1] - 3540:3

**JESSICA** [1] - 3314:3

**Jessica** [2] - 3516:20, 3588:14

**Joanne** [4] - 3355:21, 3356:4, 3359:10, 3538:17

**job** [11] - 3354:20, 3360:5, 3363:5, 3368:19, 3376:6, 3380:14, 3382:23, 3427:1, 3639:23, 3641:20, 3679:4

**jobs** [1] - 3382:17

**Joe** [2] - 3358:23, 3531:22

**John** [1] - 3660:5

**Johnson** [12] - 3368:19, 3543:9, 3557:19, 3566:5, 3583:8, 3620:16, 3626:2, 3628:14, 3633:9, 3634:14

**JOHNSON** [2] - 3313:6

**Johnson/Janssen** [1] - 3566:5

**join** [3] - 3376:9, 3593:3, 3593:4

**joined** [1] - 3504:10

**joint** [2] - 3644:18, 3655:11

**jointly** [1] - 3658:1

**Joseph** [2] - 3539:17, 3588:2

**Joseph's** [1] - 3369:4

**JOSH** [1] - 3313:15

**Josh** [1] - 3315:10

**journal** [2] - 3580:15, 3580:20

**joy** [1] - 3551:6

**Joy** [3] - 3551:7, 3551:8, 3551:9

**Juan** [1] - 3346:2

**Judge** [25] - 3315:2, 3315:11, 3316:7, 3321:10, 3323:8, 3337:8, 3337:14, 3384:5, 3402:15, 3403:17, 3404:12, 3405:10, 3406:4, 3491:1, 3491:6, 3496:16, 3504:21, 3523:13, 3529:12, 3535:2, 3535:20, 3536:3, 3567:22, 3600:23, 3617:13

**judge** [7] - 3319:24, 3329:24, 3333:1, 3407:17, 3550:24, 3602:15, 3656:7

**JUDGE** [1] - 3313:12

**judgment** [2] - 3610:9, 3612:15

**Julian** [1] - 3355:5

**jump** [2] - 3376:10, 3470:16

**June** [1] - 3411:2

**jurors** [17] - 3338:17, 3385:5, 3428:5, 3433:4, 3433:8, 3439:21, 3451:6, 3483:20, 3522:22, 3523:3, 3523:19, 3644:10, 3644:19, 3645:8, 3649:21, 3673:18, 3676:1

**jury** [135] - 3317:9, 3317:21, 3319:18, 3326:6, 3328:6, 3328:14, 3328:16, 3328:20, 3328:23, 3329:7, 3330:8, 3331:14, 3335:24, 3337:20, 3337:23, 3338:5, 3338:19, 3340:9, 3341:12, 3344:12, 3346:1, 3347:18, 3350:12, 3351:15, 3352:19, 3354:12, 3355:4, 3355:11, 3357:11, 3362:9, 3365:2, 3367:11, 3370:6, 3370:16, 3371:18, 3384:11, 3395:20, 3401:7, 3401:15, 3401:19, 3401:25, 3404:9, 3406:20, 3419:5, 3423:22,

3428:11, 3428:14, 3434:6, 3435:6, 3439:4, 3452:23, 3485:8, 3485:18, 3485:24, 3486:6, 3486:9, 3486:14, 3486:16, 3486:23, 3487:12, 3488:5, 3488:8, 3523:7, 3523:9, 3542:22, 3547:14, 3553:14, 3555:7, 3555:15, 3557:3, 3557:20, 3560:4, 3563:12, 3566:15, 3568:23, 3569:8, 3569:21, 3569:22, 3574:10, 3576:16, 3583:23, 3586:13, 3589:11, 3591:18, 3592:1, 3592:6, 3597:6, 3597:19, 3601:13, 3602:8, 3604:17, 3609:19, 3609:22, 3622:4, 3633:6, 3637:21, 3646:25, 3648:12, 3649:13, 3650:12, 3650:19, 3651:17, 3653:9, 3653:11, 3654:1, 3654:9, 3654:17, 3654:18, 3655:3, 3655:4, 3655:21, 3657:4, 3657:11, 3657:17, 3657:20, 3660:8, 3661:16, 3661:25, 3662:15, 3668:13, 3669:2, 3669:9, 3669:23, 3671:1, 3672:25, 3673:10, 3674:9, 3674:22, 3675:16, 3676:17, 3677:3, 3677:19, 3679:10, 3681:10

**Jury** [1] - 3645:16

**JURY** [1] - 3313:5

**jury's** [2] - 3358:22, 3385:19

**Justice** [5] - 3570:16, 3570:21, 3575:3, 3579:14, 3584:25

**justice** [3] - 3570:24, 3570:25, 3571:2

## K

**Kaletra** [3] - 3623:2, 3624:22, 3624:24

**KAM** [1] - 3342:5

**Kaminsky** [19] -

3339:19, 3340:17, 3341:5, 3342:15, 3343:16, 3344:5, 3344:10, 3344:13, 3345:3, 3345:13, 3345:14, 3347:12, 3347:22, 3347:25, 3348:23, 3349:24, 3362:16, 3366:21, 3367:1
**KAMs** [2] - 3342:3, 3344:16
**Kansas** [2] - 3374:1, 3374:2
**Kaucher** [7] - 3588:8, 3628:3, 3628:4, 3638:16, 3638:25, 3641:14
**Kaucher's** [1] - 3627:9
**keep** [22] - 3339:1, 3351:21, 3354:16, 3354:24, 3360:5, 3365:7, 3366:18, 3407:18, 3424:11, 3462:23, 3471:1, 3496:23, 3534:17, 3567:9, 3577:23, 3585:11, 3599:10, 3617:9, 3623:25, 3633:14, 3638:9, 3682:4
**keeping** [4] - 3317:6, 3384:24, 3412:3, 3682:3
**keeps** [1] - 3407:18
**kept** [1] - 3462:13
**key** [3] - 3341:23, 3341:24, 3440:6
**keynote** [1] - 3501:25
**kickback** [4] - 3466:15, 3576:12, 3604:4, 3621:7
**Kickback** [27] - 3572:12, 3574:6, 3582:5, 3584:6, 3597:6, 3597:13, 3599:12, 3600:14, 3606:10, 3606:18, 3607:9, 3608:22, 3615:15, 3616:13, 3616:24, 3618:13, 3631:19, 3648:16, 3648:24, 3650:1, 3652:24, 3654:2, 3656:16, 3658:1, 3659:3, 3668:14, 3676:21
**kickbacks** [5] - 3466:11, 3543:14, 3549:11, 3549:17,

3604:9
**Kim** [6] - 3338:14, 3338:22, 3523:3, 3590:15, 3591:6, 3645:14
**kind** [24] - 3322:10, 3328:1, 3336:15, 3366:10, 3403:18, 3408:8, 3410:16, 3450:19, 3512:24, 3515:17, 3541:10, 3575:14, 3579:7, 3580:17, 3584:22, 3586:6, 3602:5, 3618:16, 3629:8, 3638:25, 3639:11, 3648:9, 3649:4, 3665:7
**kinds** [1] - 3593:16
**King** [1] - 3313:21
**Klein** [1] - 3315:20
**KLEIN** [2] - 3313:20, 3315:20
**Knecht** [2] - 3389:5, 3413:25
**knowing** [4] - 3324:12, 3349:13, 3375:20, 3470:21
**knowingly** [1] - 3447:4
**knowledge** [18] - 3462:22, 3534:11, 3536:15, 3537:14, 3537:23, 3538:23, 3538:24, 3539:1, 3539:2, 3539:3, 3539:4, 3539:5, 3539:6, 3539:8, 3567:6, 3608:7, 3680:4, 3680:10
**knowledge/opinion** [1] - 3625:18
**known** [4] - 3484:18, 3502:10, 3548:25, 3554:24
**knows** [4] - 3606:16, 3672:3, 3673:7
**Kozub** [2] - 3566:17, 3588:6
**KPMG** [3] - 3575:9, 3575:15
**Krueger** [1] - 3446:11

## L

**L.P** [1] - 3313:7
**label** [139] - 3342:1, 3345:7, 3352:24, 3353:3, 3354:4, 3355:16, 3357:18,

3357:20, 3357:22, 3360:3, 3360:15, 3361:1, 3361:18, 3362:15, 3365:14, 3365:22, 3372:5, 3375:9, 3385:11, 3387:24, 3388:6, 3390:4, 3394:18, 3397:19, 3398:17, 3403:2, 3404:22, 3411:15, 3412:10, 3412:19, 3413:2, 3413:19, 3414:9, 3415:2, 3419:16, 3421:9, 3422:1, 3422:25, 3423:8, 3423:19, 3423:23, 3424:1, 3424:5, 3424:7, 3424:16, 3424:18, 3429:1, 3429:7, 3429:12, 3429:21, 3430:12, 3430:23, 3431:16, 3431:20, 3432:15, 3432:24, 3433:9, 3433:11, 3434:4, 3434:17, 3435:1, 3435:10, 3437:9, 3437:16, 3437:24, 3438:11, 3438:15, 3438:20, 3439:5, 3439:12, 3445:6, 3447:5, 3447:8, 3450:5, 3450:6, 3454:4, 3466:6, 3479:18, 3480:5, 3480:15, 3482:1, 3483:21, 3484:9, 3489:18, 3505:7, 3505:11, 3505:19, 3506:16, 3507:16, 3507:22, 3508:1, 3508:6, 3508:14, 3508:20, 3508:21, 3528:14, 3543:14, 3545:2, 3547:18, 3549:10, 3556:24, 3557:10, 3559:12, 3559:13, 3560:25, 3561:8, 3562:1, 3562:13, 3562:20, 3563:10, 3563:14, 3563:16, 3563:18, 3563:19, 3563:25, 3567:1, 3603:7, 3608:21, 3610:14, 3611:11, 3611:20, 3611:25, 3612:2, 3612:4, 3612:7, 3613:14, 3613:21, 3614:21, 3619:9,

3620:11, 3640:4, 3641:18, 3662:14, 3662:15, 3673:2, 3676:9
**labeling** [1] - 3611:19
**laboratory** [1] - 3574:20
**lack** [5] - 3448:6, 3449:7, 3677:16, 3679:7
**lacked** [1] - 3448:25
**ladies** [2] - 3384:10, 3651:14
**lady** [2] - 3450:24, 3452:10
**Lafayette** [1] - 3570:2
**laid** [2] - 3655:12, 3655:13
**land** [6] - 3323:2, 3330:13, 3331:19, 3337:5, 3667:11, 3685:10
**lane** [3] - 3354:3, 3609:1, 3614:3
**language** [3] - 3402:7, 3653:23, 3660:24
**lapse** [1] - 3581:25
**large** [5] - 3566:24, 3599:18, 3605:3, 3631:13, 3631:14
**larger** [1] - 3596:13
**last** [27] - 3327:6, 3334:15, 3339:2, 3368:12, 3370:25, 3371:18, 3371:25, 3373:15, 3373:22, 3376:18, 3381:9, 3460:21, 3468:8, 3484:17, 3492:22, 3546:7, 3563:5, 3566:13, 3568:15, 3578:19, 3602:23, 3608:17, 3644:6, 3646:5, 3672:21, 3680:20
**lasted** [2] - 3389:18, 3497:16
**lasts** [1] - 3397:9
**late** [1] - 3555:14
**latest** [1] - 3670:10
**latter** [2] - 3403:16, 3572:5
**Lauderdale** [1] - 3361:10
**launch** [3] - 3434:17, 3563:15, 3626:15
**Law** [5] - 3570:3, 3574:4, 3580:14, 3582:1, 3582:9
**law** [28] - 3363:20,

3363:21, 3367:24, 3376:15, 3540:3, 3549:1, 3570:3, 3575:10, 3576:3, 3581:3, 3584:3, 3584:13, 3593:22, 3599:23, 3604:4, 3610:6, 3611:1, 3616:16, 3616:17, 3617:10, 3620:19, 3648:15, 3650:7, 3653:10, 3660:13, 3668:5
**laws** [9] - 3570:8, 3572:13, 3579:4, 3584:5, 3617:6, 3621:2, 3621:6, 3621:10, 3652:9
**lawsuit** [62] - 3367:18, 3370:5, 3370:15, 3377:11, 3381:13, 3382:16, 3412:4, 3416:17, 3418:4, 3419:2, 3421:18, 3429:10, 3429:15, 3453:24, 3455:9, 3463:5, 3464:2, 3464:16, 3465:11, 3467:17, 3482:25, 3483:15, 3484:15, 3484:23, 3484:24, 3488:9, 3488:25, 3490:9, 3491:21, 3492:9, 3500:13, 3501:9, 3503:9, 3503:16, 3504:2, 3506:3, 3507:25, 3526:24, 3527:4, 3527:7, 3527:10, 3527:11, 3527:13, 3527:15, 3527:16, 3527:19, 3528:6, 3531:16, 3531:22, 3533:10, 3541:24, 3542:3, 3542:5, 3542:9, 3542:12, 3544:14, 3550:6, 3552:20, 3556:1, 3556:6, 3559:19, 3566:4
**lawyer** [8] - 3375:16, 3489:7, 3489:15, 3490:13, 3568:2, 3649:16, 3649:17, 3681:21
**lawyers** [35] - 3371:2, 3371:12, 3373:18, 3377:24, 3379:1, 3407:17, 3463:3, 3463:7, 3463:11, 3463:19, 3464:5,

3465:17, 3467:13, 3491:20, 3493:22, 3494:8, 3494:11, 3494:12, 3494:19, 3494:22, 3497:11, 3499:16, 3499:21, 3500:2, 3532:13, 3534:15, 3536:17, 3537:8, 3538:4, 3550:7, 3550:9, 3555:25, 3586:17

**lay** [1] - 3608:6

**laymen's** [1] - 3667:11

**lays** [2] - 3584:22, 3658:24

**Le** [2] - 3348:19, 3473:11

**leader** [1] - 3625:18

**leading** [1] - 3362:6

**leap** [1] - 3672:12

**learn** [1] - 3465:15

**learned** [6] - 3357:2, 3372:13, 3386:14, 3401:24, 3402:1, 3535:12

**learning** [1] - 3672:6

**lease** [1] - 3382:15

**least** [30] - 3317:12, 3321:25, 3324:16, 3331:14, 3334:5, 3339:2, 3407:1, 3427:8, 3506:7, 3509:2, 3585:9, 3605:11, 3605:15, 3616:8, 3618:19, 3619:5, 3630:9, 3638:4, 3638:22, 3644:3, 3650:13, 3654:24, 3655:3, 3659:14, 3662:11, 3663:15, 3670:2, 3678:15, 3679:17, 3682:8

**leave** [24] - 3364:6, 3364:9, 3378:7, 3378:9, 3379:12, 3391:9, 3411:2, 3444:10, 3444:14, 3464:11, 3464:22, 3465:4, 3520:12, 3521:20, 3524:4, 3524:9, 3526:9, 3526:19, 3543:9, 3556:10, 3557:16, 3575:3, 3577:25, 3682:22

**leaving** [2] - 3369:23, 3382:6

**lecture** [1] - 3582:13

**leeway** [3] - 3331:9,

3331:10, 3331:17

**left** [13] - 3339:14, 3378:6, 3402:5, 3411:10, 3428:19, 3430:19, 3472:5, 3501:1, 3520:2, 3523:23, 3579:19, 3580:12, 3610:3

**leg** [1] - 3402:5

**legal** [28] - 3365:5, 3462:2, 3576:3, 3577:8, 3578:10, 3578:21, 3578:24, 3580:15, 3580:19, 3580:20, 3597:9, 3609:22, 3613:2, 3613:5, 3614:3, 3614:24, 3614:25, 3615:9, 3615:19, 3617:9, 3617:16, 3645:19, 3647:10, 3649:17, 3651:17, 3652:17, 3666:19, 3668:25

**legally** [1] - 3614:17

**legislation** [2] - 3581:6, 3581:14

**length** [1] - 3389:21

**lengthy** [1] - 3591:15

**less** [3] - 3347:16, 3619:10, 3654:6

**letter** [18] - 3380:21, 3380:22, 3380:24, 3381:9, 3439:9, 3445:7, 3445:9, 3500:3, 3521:7, 3522:11, 3524:8, 3524:19, 3525:13, 3528:19, 3528:23, 3529:22, 3529:25, 3676:14

**letters** [1] - 3556:11

**letting** [4] - 3331:6, 3371:6, 3491:20, 3641:17

**levels** [1] - 3318:4

**liaison** [2] - 3358:7, 3358:8

**lie** [1] - 3425:13

**lied** [2] - 3356:3, 3400:21

**life** [7] - 3368:10, 3382:15, 3567:12, 3569:23, 3580:21, 3582:2, 3640:25

**lifetime** [2] - 3634:24, 3635:4

**likely** [2] - 3406:10, 3407:5

**limine** [10] - 3332:22,

3335:1, 3335:4, 3336:24, 3468:17, 3470:22, 3471:9, 3495:2, 3607:20, 3647:15

**limit** [6] - 3326:5, 3327:14, 3328:8, 3536:14, 3613:9, 3671:10

**limitation** [1] - 3667:20

**limited** [10] - 3318:18, 3320:22, 3322:13, 3322:21, 3325:18, 3357:4, 3534:4, 3563:18, 3563:19, 3613:10

**limits** [1] - 3656:6

**line** [25] - 3318:4, 3325:15, 3326:1, 3327:13, 3335:15, 3354:15, 3355:9, 3355:12, 3359:11, 3369:18, 3369:19, 3410:19, 3410:20, 3410:21, 3410:22, 3423:17, 3471:13, 3486:11, 3561:3, 3608:10, 3651:19, 3651:21, 3678:15

**lines** [6] - 3353:11, 3375:3, 3402:16, 3499:11, 3529:5, 3557:8

**lingo** [1] - 3333:8

**LinkedIn** [5] - 3373:20, 3373:22, 3531:24, 3531:25, 3539:18

**lipids** [1] - 3347:14

**Lisa** [1] - 3538:17

**list** [26] - 3439:11, 3439:20, 3466:19, 3468:6, 3532:19, 3532:20, 3534:18, 3534:20, 3535:7, 3535:23, 3538:4, 3538:9, 3538:13, 3544:3, 3623:13, 3623:14, 3623:22, 3624:1, 3624:4, 3626:5, 3626:9, 3626:16, 3682:23

**listed** [6] - 3439:20, 3483:20, 3490:8, 3539:12, 3629:4, 3632:25

**listen** [14] - 3331:15, 3367:9, 3389:17, 3390:15, 3392:12,

3393:15, 3395:1, 3396:8, 3413:24, 3421:13, 3426:4, 3456:9, 3456:10, 3459:8

**listened** [7] - 3388:13, 3408:24, 3414:15, 3423:6, 3483:10, 3517:6, 3517:17

**listening** [2] - 3378:5, 3600:22

**lists** [3] - 3439:5, 3623:12, 3626:17

**literally** [1] - 3486:8

**litigate** [1] - 3336:12

**litigating** [1] - 3577:4

**live** [4] - 3349:20, 3358:15, 3569:1, 3569:2

**lived** [1] - 3571:25

**living** [3] - 3370:13, 3540:21, 3568:25

**LLM** [2] - 3570:8, 3571:8

**LLP** [1] - 3313:19

**located** [2] - 3573:3, 3576:8

**location** [6] - 3474:16, 3551:20, 3571:22, 3572:24, 3573:1, 3573:2

**locations** [3] - 3472:22, 3479:6, 3576:11

**logistics** [1] - 3448:2

**LOL** [3] - 3450:24, 3452:11, 3453:12

**long-term** [2] - 3422:14, 3530:7

**Look** [3] - 3658:8, 3664:9, 3673:20

**look** [109] - 3323:13, 3324:13, 3330:14, 3336:5, 3389:2, 3399:24, 3404:24, 3407:16, 3410:19, 3410:25, 3413:17, 3414:14, 3416:16, 3417:3, 3429:25, 3430:5, 3436:2, 3437:1, 3443:14, 3445:10, 3451:3, 3458:21, 3460:5, 3463:8, 3465:21, 3467:22, 3470:8, 3470:23, 3472:21, 3473:2, 3477:5, 3479:22, 3480:8, 3486:2, 3486:3, 3490:21, 3498:18,

3500:6, 3501:20, 3517:24, 3518:16, 3521:12, 3522:13, 3524:13, 3525:17, 3537:19, 3537:24, 3546:17, 3550:13, 3550:22, 3551:2, 3579:22, 3583:10, 3581:6, 3583:4, 3590:5, 3594:22, 3595:15, 3595:18, 3595:19, 3595:21, 3595:23, 3596:5, 3596:7, 3598:12, 3598:16, 3598:20, 3599:14, 3603:5, 3603:12, 3608:17, 3609:4, 3618:10, 3619:3, 3620:7, 3620:17, 3621:24, 3622:8, 3622:9, 3622:12, 3628:21, 3631:9, 3632:6, 3632:16, 3634:1, 3634:18, 3635:15, 3637:2, 3638:13, 3643:1, 3643:2, 3645:7, 3655:15, 3655:24, 3659:5, 3659:17, 3660:24, 3661:6, 3661:11, 3662:16, 3666:11, 3669:9, 3669:23, 3681:9, 3681:19, 3683:17, 3684:12, 3685:14

**looked** [48] - 3356:7, 3376:15, 3391:4, 3446:14, 3449:3, 3450:18, 3463:9, 3484:3, 3490:3, 3499:4, 3526:13, 3535:15, 3549:14, 3553:7, 3584:1, 3584:11, 3584:12, 3584:23, 3584:24, 3584:25, 3585:12, 3585:20, 3585:25, 3588:22, 3590:5, 3592:9, 3593:12, 3593:14, 3593:18, 3625:24, 3628:18, 3637:17, 3637:22, 3637:24, 3638:3, 3638:10, 3638:18, 3638:20, 3638:24, 3649:4, 3665:10, 3665:11, 3666:23

**looking** [31] - 3322:8, 3330:22, 3330:25, 3349:8, 3349:11,

3349:13, 3349:22,
3371:2, 3472:21,
3473:7, 3473:13,
3476:3, 3501:19,
3513:14, 3585:11,
3594:22, 3595:16,
3595:21, 3601:24,
3622:6, 3622:14,
3625:16, 3625:22,
3626:14, 3638:6,
3638:7, 3638:8,
3652:6, 3652:7,
3662:19, 3669:20
**looks** [10] - 3448:1,
3453:5, 3499:19,
3501:24, 3502:14,
3518:8, 3540:21,
3622:21, 3654:6,
3666:9
**loop** [1] - 3519:22
**looped** [1] - 3514:2
**Lord** [1] - 3671:22
**lose** [2] - 3363:5,
3376:6
**lost** [3] - 3327:23,
3363:10, 3596:19
**loud** [1] - 3377:6
**loudly** [1] - 3347:22
**Louisiana** [3] -
3570:5, 3582:13,
3582:14
**loved** [1] - 3363:9
**low** [1] - 3352:11
**loyalty** [4] - 3579:1,
3579:2, 3668:22,
3668:23
**luck** [1] - 3541:4
**lunch** [7] - 3352:9,
3352:14, 3353:18,
3522:18, 3522:22,
3523:4, 3523:9
**luncheon** [1] -
3522:24
**lying** [2] - 3376:21,
3400:23

---

**M**

**M-A-Y-N-E** [1] -
3383:4
**ma'am** [168] - 3384:13,
3384:24, 3385:22,
3386:6, 3386:23,
3387:25, 3388:4,
3388:8, 3390:6,
3390:19, 3390:24,
3391:1, 3391:6,
3391:10, 3391:24,
3392:5, 3392:18,
3392:25, 3393:5,

3393:19, 3394:24,
3396:1, 3396:11,
3397:2, 3397:10,
3398:15, 3399:12,
3399:19, 3400:7,
3400:12, 3409:17,
3410:17, 3411:20,
3411:25, 3412:2,
3413:14, 3414:4,
3414:11, 3415:4,
3415:10, 3415:14,
3416:1, 3416:16,
3416:17, 3417:11,
3417:17, 3417:23,
3418:5, 3419:11,
3419:19, 3420:5,
3420:19, 3421:5,
3421:17, 3422:2,
3422:5, 3423:2,
3424:20, 3425:1,
3425:3, 3425:10,
3426:8, 3426:15,
3427:8, 3428:21,
3429:8, 3429:22,
3430:2, 3430:10,
3430:22, 3432:14,
3434:10, 3434:23,
3436:4, 3436:9,
3436:18, 3437:5,
3437:14, 3438:6,
3439:8, 3439:16,
3440:7, 3441:1,
3442:11, 3442:16,
3444:11, 3446:21,
3448:10, 3453:25,
3456:15, 3456:22,
3457:17, 3458:25,
3459:22, 3460:24,
3461:8, 3461:16,
3461:21, 3462:9,
3463:6, 3463:20,
3464:7, 3465:2,
3467:4, 3472:25,
3474:20, 3475:11,
3475:23, 3477:2,
3477:13, 3478:10,
3480:9, 3480:18,
3480:22, 3482:2,
3482:9, 3483:1,
3484:7, 3484:19,
3488:18, 3489:11,
3490:6, 3491:11,
3492:1, 3492:14,
3499:4, 3499:7,
3499:24, 3501:23,
3503:13, 3506:4,
3507:3, 3508:7,
3508:18, 3509:7,
3510:25, 3511:2,
3514:4, 3516:20,
3517:8, 3518:6,

3518:10, 3520:2,
3520:11, 3521:6,
3522:5, 3522:10,
3523:21, 3524:1,
3524:5, 3525:15,
3526:3, 3526:11,
3527:23, 3528:2,
3528:12, 3528:22,
3529:22, 3531:1,
3531:9, 3531:18,
3532:1, 3538:16,
3539:11, 3541:15,
3568:9, 3591:9,
3599:4
**main** [3] - 3570:24,
3570:25, 3571:2
**manage** [1] - 3519:3
**managed** [1] - 3606:1
**management** [5] -
3352:6, 3366:24,
3566:18, 3578:12,
3578:13
**manager** [19] -
3341:23, 3353:17,
3357:13, 3394:22,
3440:4, 3440:6,
3440:8, 3452:25,
3455:15, 3506:24,
3511:16, 3512:4,
3513:22, 3514:25,
3516:11, 3544:9,
3544:11, 3641:2,
3641:3
**managers** [6] -
3341:24, 3437:24,
3441:7, 3507:20,
3640:9, 3641:4
**mandatory** [1] -
3584:20
**Manhattan** [5] -
3346:25, 3348:19,
3350:6, 3374:23,
3453:6
**manner** [3] - 3579:4,
3599:22, 3625:6
**manual** [1] - 3611:14
**manufacturer** [3] -
3575:16, 3593:4,
3613:21
**manufacturers** [8] -
3576:15, 3581:12,
3590:2, 3593:20,
3596:16, 3596:17,
3599:21, 3663:10
**manufacturers'** [1] -
3663:12
**Marais** [1] - 3348:19
**March** [1] - 3556:4
**Mark** [4] - 3346:22,
3366:21, 3566:18,

3588:20
**market** [7] - 3461:1,
3461:4, 3562:13,
3599:22, 3610:14,
3630:16, 3653:18
**marketed** [1] -
3676:10
**marketing** [27] -
3352:24, 3360:3,
3372:6, 3375:9,
3388:6, 3429:12,
3489:18, 3543:14,
3545:2, 3549:10,
3556:25, 3559:12,
3559:13, 3560:25,
3567:1, 3592:15,
3593:1, 3595:19,
3595:24, 3595:25,
3608:21, 3611:11,
3619:9, 3622:8,
3630:14, 3663:10,
3673:2
**MARKETOS** [74] -
3313:14, 3313:14,
3315:8, 3316:18,
3317:18, 3317:23,
3318:3, 3318:21,
3320:12, 3323:15,
3324:8, 3324:15,
3324:18, 3324:23,
3326:18, 3328:14,
3329:3, 3329:9,
3329:14, 3330:4,
3332:1, 3334:14,
3334:21, 3335:3,
3335:7, 3337:11,
3337:17, 3338:8,
3504:21, 3644:14,
3645:1, 3645:13,
3647:5, 3647:8,
3648:20, 3649:7,
3649:15, 3649:25,
3650:21, 3651:22,
3654:12, 3655:10,
3656:23, 3657:7,
3657:15, 3657:25,
3658:23, 3659:7,
3659:10, 3659:16,
3660:11, 3660:23,
3661:5, 3662:9,
3662:23, 3663:3,
3663:23, 3664:13,
3668:16, 3669:11,
3670:4, 3671:19,
3671:22, 3675:6,
3680:14, 3680:16,
3681:12, 3682:15,
3682:18, 3683:17,
3683:25, 3684:4,
3686:1, 3686:3

**Marketos** [21] -
3315:9, 3315:23,
3316:15, 3322:10,
3328:10, 3330:20,
3336:11, 3545:6,
3545:10, 3567:23,
3647:3, 3654:11,
3655:6, 3658:15,
3662:18, 3664:20,
3669:14, 3675:8,
3680:5, 3683:14,
3685:24
**married** [1] - 3570:7
**Maryland** [9] -
3571:23, 3571:25,
3572:7, 3572:22,
3572:23, 3573:3,
3574:9, 3576:8,
3582:16
**master** [2] - 3369:3,
3570:8
**master's** [1] - 3369:4
**material** [3] - 3469:10,
3589:13, 3673:21
**materiality** [8] -
3608:7, 3609:23,
3612:25, 3613:4,
3673:6, 3673:9,
3673:13, 3674:21
**materials** [21] -
3326:11, 3326:14,
3497:25, 3498:8,
3581:18, 3582:8,
3583:15, 3583:23,
3588:25, 3589:9,
3589:15, 3589:21,
3591:16, 3593:13,
3593:16, 3595:22,
3597:14, 3626:20,
3627:2, 3629:9,
3668:1
**math** [4] - 3345:22,
3345:24, 3345:25,
3457:23
**matter** [7] - 3366:24,
3577:7, 3585:2,
3594:7, 3603:2,
3610:6, 3687:5
**matters** [10] - 3318:10,
3319:14, 3319:18,
3323:18, 3323:25,
3572:19, 3576:22,
3577:5, 3577:23,
3580:9
**Mattes** [12] - 3363:24,
3363:25, 3372:5,
3544:24, 3545:1,
3545:7, 3563:22,
3565:9, 3566:17,
3566:25, 3588:12,

3676:8
**mattes** [1] - 3563:23
**Matthew** [1] - 3587:25
**Maurer** [7] - 3347:10, 3502:5, 3503:9, 3503:17, 3504:1, 3629:4, 3630:19
**Mayne** [1] - 3383:4
**MBA** [5] - 3369:3, 3382:4, 3392:20, 3392:23, 3393:2
**McGrath** [56] - 3380:15, 3386:24, 3387:17, 3389:11, 3389:18, 3389:24, 3390:3, 3390:20, 3391:16, 3392:7, 3392:16, 3393:9, 3394:21, 3395:24, 3396:11, 3397:5, 3397:8, 3413:8, 3413:19, 3414:9, 3414:18, 3415:5, 3415:12, 3416:14, 3419:18, 3419:22, 3419:24, 3420:4, 3420:5, 3420:6, 3420:7, 3420:10, 3420:13, 3458:16, 3459:2, 3517:6, 3517:17, 3520:6, 3525:19, 3525:23, 3526:8, 3526:15, 3528:19, 3553:14, 3553:15, 3555:5, 3555:8, 3555:18, 3555:23, 3556:23, 3684:8, 3684:11, 3684:17, 3684:19, 3685:14
**McKay** [2] - 3313:23, 3687:11
**McKay-Soule** [2] - 3313:23, 3687:11
**Mcnichol** [1] - 3327:25
**McSherry** [18] - 3353:1, 3363:3, 3376:1, 3395:8, 3395:11, 3395:14, 3395:23, 3396:5, 3396:16, 3398:7, 3398:10, 3489:22, 3509:18, 3538:20, 3538:22, 3544:8, 3557:6, 3559:17
**McSherry's** [1] - 3396:12
**MEAGHER** [1] - 3313:19

**meals** [3] - 3630:6, 3661:20, 3661:21
**mean** [84] - 3316:12, 3318:12, 3318:13, 3318:14, 3321:4, 3321:20, 3326:3, 3326:9, 3327:4, 3329:6, 3333:25, 3360:23, 3365:22, 3366:8, 3368:18, 3369:11, 3384:17, 3394:1, 3397:16, 3401:2, 3401:25, 3404:16, 3423:17, 3431:3, 3442:3, 3456:20, 3457:10, 3469:4, 3469:20, 3484:22, 3493:11, 3495:19, 3503:11, 3513:11, 3534:23, 3597:18, 3601:13, 3603:21, 3607:23, 3610:9, 3611:23, 3613:7, 3614:14, 3614:16, 3614:25, 3616:8, 3619:5, 3619:12, 3631:15, 3642:24, 3642:25, 3645:7, 3651:12, 3652:13, 3653:16, 3653:17, 3654:9, 3656:11, 3657:6, 3659:5, 3661:6, 3661:11, 3661:13, 3661:17, 3664:15, 3667:10, 3667:12, 3667:18, 3668:13, 3670:22, 3674:7, 3674:11, 3674:18, 3676:24, 3678:6, 3678:7, 3679:19, 3680:17, 3683:4, 3683:19, 3684:6, 3685:21, 3686:4
**meaning** [2] - 3326:4, 3685:1
**means** [20] - 3405:22, 3411:1, 3572:9, 3575:15, 3597:19, 3602:10, 3648:23, 3649:14, 3650:12, 3650:22, 3651:8, 3652:24, 3653:16, 3654:2, 3659:23, 3665:8, 3666:7, 3673:13, 3674:2, 3677:20
**meant** [6] - 3316:9, 3422:3, 3431:19, 3431:25, 3432:1,

3540:5
**mechanical** [1] - 3313:25
**med** [1] - 3329:20
**MedForce** [3] - 3641:15, 3641:20, 3642:25
**Medicaid** [10] - 3573:18, 3573:23, 3577:17, 3584:9, 3605:7, 3605:10, 3605:12, 3605:14, 3621:5
**medical** [21] - 3364:6, 3364:9, 3364:10, 3378:7, 3378:9, 3382:8, 3464:11, 3520:12, 3526:9, 3530:22, 3557:16, 3575:17, 3576:15, 3581:12, 3600:6, 3611:25, 3615:12, 3619:9, 3622:25, 3636:12
**Medical** [1] - 3446:6
**medically** [23] - 3610:7, 3610:11, 3610:18, 3610:22, 3611:17, 3611:18, 3612:16, 3612:17, 3613:15, 3613:25, 3614:9, 3614:10, 3614:12, 3614:20, 3617:12, 3617:19, 3617:20, 3619:10, 3650:23
**Medically** [1] - 3650:22
**Medicare** [21] - 3573:23, 3577:17, 3605:7, 3605:10, 3605:12, 3605:18, 3605:23, 3605:24, 3606:1, 3606:3, 3606:5, 3611:14, 3611:16, 3611:17, 3611:20, 3613:1, 3613:25, 3616:11, 3652:16, 3660:16
**Medicare's** [1] - 3615:24
**medication** [1] - 3612:7
**medicine** [4] - 3481:6, 3481:12, 3481:14, 3481:22
**medicines** [5] - 3474:11, 3475:13, 3506:11, 3506:20, 3506:24, 3507:21

**meet** [10] - 3337:6, 3363:24, 3429:11, 3461:22, 3581:10, 3612:25, 3658:20, 3662:6, 3662:8, 3677:8
**meeting** [48] - 3370:4, 3386:7, 3386:24, 3387:22, 3387:24, 3388:5, 3389:18, 3389:21, 3389:23, 3390:3, 3391:16, 3392:7, 3392:16, 3393:10, 3395:5, 3396:11, 3397:13, 3398:16, 3398:21, 3398:24, 3399:1, 3414:18, 3414:24, 3415:1, 3458:16, 3459:2, 3492:20, 3492:22, 3492:24, 3492:25, 3493:3, 3493:10, 3493:12, 3495:14, 3497:5, 3497:12, 3497:15, 3497:20, 3498:12, 3526:15, 3553:13, 3555:22, 3556:5, 3556:15, 3557:17, 3558:23, 3600:16, 3685:14
**meetings** [12] - 3351:3, 3352:25, 3358:11, 3359:4, 3359:23, 3374:6, 3375:25, 3415:4, 3502:15, 3508:22, 3512:1, 3512:2
**meets** [2] - 3581:5, 3651:10
**Megan** [25] - 3313:23, 3380:15, 3386:24, 3387:17, 3413:8, 3413:19, 3414:9, 3414:18, 3415:12, 3416:14, 3419:18, 3419:22, 3419:24, 3420:4, 3420:5, 3420:6, 3420:7, 3420:10, 3420:13, 3458:16, 3459:2, 3522:1, 3553:14, 3644:8, 3687:11
**Megan_McKay** [1] - 3313:24
**Megan_McKay-Soule@nj d.uscourts.gov** [1] - 3313:24
**member** [8] - 3553:15,

3570:16, 3581:2, 3581:23, 3582:1, 3582:11, 3582:12
**members** [3] - 3581:16, 3581:17, 3669:1
**memo** [4] - 3499:15, 3499:22, 3500:7, 3500:11
**Memorial** [1] - 3686:4
**memory** [2] - 3510:8, 3628:9
**menopausal** [1] - 3383:6
**mention** [4] - 3386:5, 3386:7, 3393:19, 3394:15
**mentioned** [11] - 3343:5, 3345:9, 3347:6, 3348:18, 3349:24, 3351:8, 3353:2, 3389:17, 3503:21, 3630:1, 3635:13
**mentorship** [1] - 3560:10
**menu** [1] - 3441:15
**merely** [1] - 3653:16
**merged** [1] - 3576:8
**merits** [7] - 3488:9, 3675:19, 3675:20, 3676:1, 3677:22, 3679:13, 3681:6
**mess** [1] - 3661:9
**message** [8] - 3333:22, 3363:1, 3365:14, 3367:9, 3373:17, 3373:20, 3373:22, 3513:17
**messages** [3] - 3366:11, 3547:17, 3562:20
**messed** [1] - 3421:3
**met** [9] - 3352:9, 3385:9, 3415:5, 3415:7, 3415:8, 3457:10, 3492:17, 3555:5, 3564:13
**METABOLIK** [1] - 3361:21
**method** [2] - 3593:24, 3665:10
**methods** [1] - 3319:7
**metrics** [1] - 3394:5
**Miami** [6] - 3341:10, 3341:21, 3342:5, 3342:13, 3361:10, 3438:19
**Michael** [6] - 3358:3, 3358:7, 3489:23,

3587:19, 3588:16, 3590:17
**microphone** [1] - 3384:5
**middle** [2] - 3369:18, 3369:19
**middle-of-the-line** [1] - 3369:18
**might** [21] - 3323:10, 3325:12, 3333:17, 3336:7, 3337:3, 3372:14, 3377:2, 3469:17, 3503:20, 3529:13, 3595:15, 3597:5, 3597:18, 3600:17, 3603:5, 3603:6, 3617:15, 3637:23, 3657:8, 3675:25
**Mike** [1] - 3588:4
**MIL** [1] - 3672:2
**military** [1] - 3573:1
**Miller** [7] - 3346:22, 3347:4, 3347:6, 3347:15, 3347:19, 3348:4, 3366:21
**million** [4] - 3368:6, 3630:24, 3632:2
**millions** [2] - 3545:22, 3566:6
**mind** [13] - 3317:19, 3333:2, 3375:19, 3432:10, 3491:3, 3523:2, 3526:2, 3534:8, 3536:9, 3536:18, 3538:4, 3538:22, 3602:7
**mindful** [4] - 3470:3, 3524:22, 3609:19, 3672:1
**minding** [1] - 3470:14
**mine** [3] - 3346:15, 3375:19, 3617:15
**minimal** [1] - 3484:20
**minimum** [3] - 3635:6, 3635:11, 3635:12
**minute** [3] - 3317:8, 3428:4, 3590:25
**minutes** [12] - 3323:1, 3337:19, 3337:21, 3337:23, 3338:1, 3338:6, 3389:18, 3407:22, 3408:2, 3459:6, 3459:12, 3644:7
**MIR** [8] - 3350:9, 3352:22, 3362:15, 3454:7, 3456:14, 3457:16, 3458:12, 3586:12

**MIRs** [20] - 3350:13, 3351:1, 3351:5, 3351:8, 3352:11, 3352:13, 3361:18, 3454:13, 3454:16, 3455:4, 3455:17, 3455:23, 3456:1, 3456:21, 3456:25, 3457:3, 3457:20, 3458:3, 3458:6, 3458:9
**misconduct** [5] - 3551:23, 3567:15, 3594:25, 3613:21, 3640:5
**misheard** [1] - 3486:20
**mispronouncing** [1] - 3585:24
**misrepresenting** [1] - 3620:12
**missed** [3] - 3434:17, 3637:23, 3662:11
**missing** [1] - 3663:7
**misspellings** [1] - 3410:7
**mistake** [13] - 3323:11, 3337:3, 3414:6, 3419:13, 3419:15, 3419:20, 3419:25, 3420:20, 3420:23, 3421:22, 3422:1, 3423:1, 3424:18
**mistaken** [4] - 3398:24, 3403:8, 3405:14, 3650:18
**mistakes** [6] - 3400:5, 3400:6, 3416:7, 3417:24, 3431:2, 3545:10
**mixture** [1] - 3660:13
**mobsters** [1] - 3570:19
**mom** [13] - 3371:1, 3371:3, 3371:7, 3444:1, 3445:11, 3449:16, 3449:21, 3450:11, 3450:14, 3463:11, 3491:12, 3499:17, 3550:19
**moment** [2] - 3497:4, 3590:23
**Monday** [2] - 3618:5, 3645:25
**money** [45] - 3327:25, 3328:12, 3344:21, 3344:24, 3345:2, 3345:20, 3349:14, 3355:2, 3367:18,

3376:11, 3381:15, 3447:1, 3484:15, 3485:8, 3485:23, 3486:6, 3487:1, 3487:8, 3488:11, 3488:22, 3489:12, 3490:18, 3542:23, 3567:7, 3575:8, 3604:10, 3605:13, 3605:16, 3629:10, 3630:6, 3630:8, 3630:10, 3630:18, 3630:20, 3631:10, 3631:21, 3649:22, 3651:6, 3652:16, 3665:2, 3667:16, 3673:4
**monies** [1] - 3631:1
**monitoring** [2] - 3639:9, 3639:23
**monkey** [1] - 3382:16
**month** [9] - 3457:3, 3457:20, 3458:3, 3492:3, 3520:14, 3554:22, 3556:5, 3581:5, 3623:23
**monthly** [1] - 3343:20
**months** [7] - 3364:9, 3381:10, 3381:12, 3525:25, 3556:3, 3556:4, 3578:20
**morning** [28] - 3315:8, 3315:10, 3315:11, 3315:13, 3315:15, 3315:16, 3315:18, 3315:20, 3315:22, 3323:10, 3334:19, 3338:11, 3338:19, 3339:12, 3339:13, 3341:13, 3384:9, 3384:10, 3553:17, 3555:13, 3564:3, 3618:6, 3618:20, 3646:18, 3657:24, 3670:2, 3671:9, 3686:7
**mornings** [2] - 3407:22, 3408:3
**mortgage** [2] - 3345:12, 3349:25
**most** [8] - 3407:25, 3456:16, 3464:10, 3503:21, 3567:12, 3594:9, 3638:11, 3657:10
**mostly** [5] - 3571:4, 3571:12, 3573:10, 3573:13, 3576:12
**mother** [5] - 3370:20, 3370:21, 3370:22,

3370:24, 3376:5
**motion** [11] - 3319:5, 3332:14, 3335:4, 3335:5, 3336:24, 3468:16, 3495:1, 3601:20, 3607:19, 3610:8, 3612:15
**motions** [7] - 3332:22, 3333:1, 3333:4, 3335:1, 3423:7, 3470:22, 3647:15
**Mount** [2] - 3446:4, 3446:7
**mouth** [6] - 3354:2, 3354:24, 3489:6, 3541:10, 3560:20, 3560:21
**move** [29] - 3316:5, 3316:25, 3317:1, 3322:2, 3330:24, 3380:8, 3393:11, 3393:22, 3404:7, 3470:3, 3485:17, 3529:8, 3533:2, 3584:14, 3590:7, 3591:20, 3600:19, 3609:4, 3611:2, 3615:1, 3618:4, 3618:18, 3628:14, 3632:22, 3636:22, 3646:3, 3674:19, 3681:5, 3681:6
**moved** [5] - 3529:21, 3570:7, 3571:25, 3572:14, 3582:12
**moves** [1] - 3329:22
**moving** [15] - 3321:5, 3322:1, 3323:5, 3331:25, 3394:17, 3404:6, 3405:4, 3452:1, 3471:1, 3471:15, 3496:23, 3517:1, 3577:23, 3623:25, 3656:4
**Moyer** [4] - 3357:9, 3357:12, 3359:3, 3538:17
**MR** [282] - 3314:3, 3314:4, 3314:5, 3315:8, 3315:10, 3315:11, 3315:18, 3315:20, 3316:18, 3317:18, 3317:23, 3318:3, 3318:21, 3320:12, 3323:15, 3324:8, 3324:15, 3324:18, 3324:23, 3325:1, 3325:4, 3325:25, 3326:18, 3327:3, 3327:14,

3328:14, 3329:3, 3329:9, 3329:14, 3330:4, 3332:1, 3332:4, 3333:19, 3333:24, 3334:2, 3334:7, 3334:11, 3334:14, 3334:21, 3335:3, 3335:4, 3335:7, 3335:16, 3337:8, 3337:11, 3337:17, 3337:25, 3338:3, 3338:8, 3338:13, 3338:23, 3339:10, 3339:11, 3384:1, 3388:23, 3400:14, 3400:17, 3401:7, 3401:10, 3403:6, 3403:10, 3405:3, 3405:8, 3405:10, 3406:17, 3409:10, 3417:6, 3426:19, 3443:16, 3443:18, 3443:20, 3462:14, 3468:1, 3468:4, 3468:10, 3468:16, 3469:3, 3469:17, 3470:20, 3471:16, 3477:7, 3479:24, 3485:14, 3485:17, 3485:25, 3486:4, 3486:20, 3486:23, 3487:2, 3487:5, 3487:10, 3487:15, 3487:20, 3487:22, 3490:23, 3491:6, 3494:1, 3494:7, 3495:1, 3495:17, 3495:24, 3496:16, 3498:20, 3498:22, 3498:25, 3501:15, 3504:16, 3504:18, 3504:21, 3510:11, 3517:25, 3525:6, 3529:12, 3532:5, 3533:2, 3533:17, 3534:25, 3535:12, 3535:20, 3536:3, 3536:21, 3541:20, 3541:21, 3546:5, 3546:6, 3551:1, 3557:19, 3557:22, 3561:2, 3561:4, 3561:18, 3561:19, 3567:18, 3567:24, 3568:19, 3568:20, 3583:8, 3583:9, 3589:7, 3589:11, 3589:17, 3589:18, 3590:22, 3591:5, 3591:12, 3591:13, 3597:14,

3597:23, 3598:6,
3598:9, 3600:23,
3601:8, 3601:15,
3601:23, 3602:4,
3602:17, 3603:3,
3603:4, 3603:13,
3603:17, 3603:23,
3604:2, 3604:13,
3604:16, 3607:3,
3607:6, 3607:22,
3608:2, 3608:18,
3609:3, 3609:7,
3609:20, 3610:5,
3610:21, 3612:10,
3612:13, 3612:23,
3613:22, 3614:10,
3614:24, 3615:8,
3615:18, 3616:2,
3616:7, 3616:15,
3616:22, 3617:9,
3618:3, 3618:8,
3619:1, 3619:8,
3619:17, 3620:5,
3620:6, 3620:16,
3620:18, 3620:24,
3620:25, 3621:24,
3622:2, 3626:2,
3626:3, 3628:14,
3628:16, 3632:22,
3632:24, 3633:8,
3633:11, 3634:14,
3634:16, 3634:18,
3634:19, 3635:15,
3635:17, 3636:15,
3636:17, 3636:21,
3637:1, 3644:4,
3644:14, 3645:1,
3645:13, 3647:5,
3647:8, 3648:20,
3649:7, 3649:15,
3649:25, 3650:21,
3651:22, 3652:21,
3654:12, 3655:10,
3655:20, 3656:23,
3657:7, 3657:15,
3657:25, 3658:3,
3658:12, 3658:23,
3659:7, 3659:10,
3659:16, 3660:11,
3660:23, 3661:5,
3661:13, 3662:5,
3662:9, 3662:23,
3663:3, 3663:23,
3664:13, 3664:15,
3664:21, 3665:9,
3666:3, 3666:18,
3667:9, 3667:25,
3668:11, 3668:16,
3669:11, 3670:4,
3670:7, 3670:13,
3670:16, 3671:15,

3671:19, 3671:22,
3675:6, 3680:14,
3680:16, 3681:12,
3682:15, 3682:18,
3683:17, 3683:25,
3684:4, 3686:1,
3686:3
**MS** [241] - 3314:4,
3315:13, 3315:16,
3316:7, 3316:12,
3316:21, 3317:2,
3317:14, 3337:14,
3338:7, 3382:5,
3384:4, 3384:7,
3384:8, 3384:10,
3384:12, 3388:21,
3389:1, 3389:5,
3389:8, 3390:16,
3390:18, 3392:12,
3392:14, 3393:15,
3393:18, 3395:1,
3395:4, 3396:8,
3396:10, 3401:13,
3402:15, 3402:18,
3402:22, 3402:25,
3403:5, 3403:16,
3403:23, 3404:7,
3404:12, 3404:16,
3404:20, 3405:5,
3406:4, 3406:12,
3406:15, 3407:11,
3407:24, 3408:4,
3408:7, 3409:7,
3409:13, 3413:24,
3414:3, 3415:16,
3415:19, 3415:22,
3415:23, 3417:4,
3417:8, 3417:10,
3421:16, 3427:6,
3427:7, 3427:24,
3428:1, 3428:12,
3428:17, 3428:18,
3430:7, 3430:9,
3433:25, 3434:1,
3436:6, 3436:8,
3443:14, 3443:17,
3443:19, 3443:22,
3443:24, 3451:5,
3451:7, 3452:22,
3452:24, 3456:10,
3456:12, 3458:21,
3458:23, 3460:7,
3462:16, 3462:20,
3462:21, 3467:23,
3468:13, 3468:25,
3469:7, 3470:5,
3470:9, 3470:12,
3470:16, 3471:6,
3471:18, 3471:21,
3471:23, 3472:3,
3472:20, 3477:5,

3477:10, 3479:22,
3480:2, 3486:1,
3486:18, 3487:21,
3487:23, 3488:2,
3488:4, 3488:7,
3490:21, 3490:24,
3491:1, 3491:5,
3491:9, 3494:2,
3494:10, 3494:16,
3494:18, 3494:24,
3495:8, 3495:11,
3495:21, 3496:2,
3496:5, 3496:7,
3496:10, 3496:12,
3496:19, 3496:23,
3496:25, 3497:3,
3498:19, 3498:21,
3498:23, 3499:3,
3501:13, 3501:18,
3504:15, 3504:17,
3504:19, 3504:24,
3510:10, 3510:14,
3517:24, 3518:2,
3518:4, 3521:12,
3521:17, 3522:20,
3523:15, 3523:16,
3523:19, 3523:20,
3524:16, 3524:18,
3524:25, 3525:4,
3525:8, 3525:11,
3525:12, 3529:9,
3529:15, 3529:19,
3532:3, 3532:8,
3533:8, 3533:9,
3533:23, 3534:3,
3534:17, 3534:22,
3535:5, 3535:17,
3536:2, 3536:8,
3536:11, 3536:13,
3536:16, 3536:20,
3536:25, 3537:4,
3537:6, 3550:24,
3597:9, 3600:18,
3602:19, 3603:20,
3606:23, 3611:13,
3611:16, 3613:16,
3614:14, 3614:16,
3616:10, 3616:14,
3616:16, 3616:21,
3617:1, 3617:6,
3618:15, 3619:16,
3619:22, 3644:22,
3645:6, 3657:14,
3671:23, 3672:15,
3672:22, 3673:25,
3674:4, 3674:13,
3674:22, 3676:6,
3676:19, 3677:24,
3678:9, 3678:11,
3679:17, 3679:23,
3680:2, 3681:16,

3682:11, 3682:13,
3682:19, 3683:3,
3683:10, 3683:12,
3683:21, 3684:6,
3684:18, 3684:25,
3685:4, 3685:8
**multifactorial** [1] -
3489:2
**multiple** [15] - 3348:8,
3383:10, 3398:21,
3403:8, 3412:9,
3415:11, 3425:21,
3521:4, 3521:18,
3530:10, 3555:12,
3560:17, 3667:4,
3676:25, 3677:10
**Murphy** [20] - 3350:12,
3350:19, 3355:13,
3355:24, 3356:1,
3356:2, 3359:24,
3372:23, 3372:24,
3372:25, 3373:1,
3434:19, 3438:5,
3441:9, 3505:4,
3505:6, 3505:10,
3505:15, 3539:5,
3544:7
**music** [1] - 3377:6
**must** [3] - 3320:1,
3347:19, 3569:18
**mutual** [1] - 3344:7

---

# N

**Nadim** [4] - 3339:23,
3339:24, 3362:16,
3445:21
**nail** [1] - 3654:19
**naive** [6] - 3344:14,
3347:14, 3348:3,
3355:16, 3355:17
**name** [6] - 3360:9,
3568:14, 3568:15,
3568:24, 3585:23,
3629:7
**named** [5] - 3346:22,
3357:8, 3358:22,
3438:18, 3439:5
**names** [10] - 3329:13,
3357:3, 3405:13,
3544:4, 3564:23,
3623:13, 3624:3,
3626:7, 3626:8,
3628:24
**Nancy** [58] - 3341:14,
3341:23, 3343:8,
3343:11, 3344:14,
3345:11, 3346:12,
3347:6, 3347:25,
3353:1, 3353:16,

3354:10, 3354:19,
3358:17, 3364:20,
3365:12, 3372:23,
3372:25, 3373:1,
3376:1, 3421:4,
3421:25, 3422:24,
3424:5, 3424:17,
3428:25, 3434:19,
3442:16, 3442:17,
3442:21, 3443:3,
3443:11, 3444:2,
3444:17, 3444:22,
3444:25, 3445:12,
3449:17, 3449:21,
3450:3, 3453:16,
3455:3, 3455:17,
3458:18, 3459:6,
3459:12, 3459:25,
3460:21, 3489:22,
3538:17, 3544:8,
3544:10, 3557:6,
3559:14, 3563:4
**narrow** [2] - 3327:15,
3602:5
**nationwide** [1] -
3466:7
**nature** [8] - 3320:22,
3354:2, 3362:17,
3560:11, 3576:17,
3600:9, 3606:1,
3622:25
**near** [1] - 3380:14
**nearby** [1] - 3363:15
**necessarily** [14] -
3322:7, 3325:12,
3329:24, 3334:19,
3335:18, 3357:22,
3403:21, 3601:2,
3611:22, 3612:4,
3625:14, 3659:24,
3665:19, 3683:5
**necessary** [16] -
3366:16, 3451:21,
3610:7, 3610:11,
3610:18, 3610:22,
3612:17, 3613:15,
3613:25, 3614:9,
3614:10, 3614:12,
3614:20, 3617:12,
3617:20, 3671:12
**necessity** [2] -
3615:12, 3619:10
**need** [44] - 3328:2,
3336:11, 3337:22,
3358:18, 3366:19,
3375:17, 3377:15,
3379:3, 3400:18,
3402:6, 3436:12,
3436:13, 3467:24,
3469:4, 3521:15,

3565:18, 3591:1,
3615:14, 3617:17,
3617:21, 3617:25,
3631:22, 3644:16,
3646:2, 3647:12,
3648:3, 3648:8,
3648:18, 3648:25,
3651:24, 3655:24,
3656:1, 3656:2,
3661:5, 3661:7,
3663:16, 3667:7,
3670:2, 3670:5,
3670:15, 3671:13,
3671:17, 3683:6
**needed** [20] - 3341:21,
3343:7, 3343:24,
3345:12, 3346:16,
3349:11, 3349:25,
3351:4, 3351:20,
3353:10, 3354:2,
3354:25, 3392:3,
3516:2, 3554:20,
3575:8, 3578:4,
3579:11, 3626:25,
3627:4
**needs** [14] - 3341:20,
3466:1, 3551:13,
3568:6, 3611:5,
3615:22, 3626:21,
3626:24, 3647:19,
3647:25, 3652:4,
3652:14, 3663:18,
3666:5
**negative** [1] - 3449:8
**negotiate** [1] -
3578:13
**negotiates** [1] -
3641:11
**nervous** [2] - 3363:19,
3559:2
**never** [30] - 3332:21,
3345:25, 3356:4,
3364:1, 3370:6,
3373:10, 3407:17,
3416:23, 3419:12,
3420:2, 3421:21,
3429:21, 3442:24,
3443:9, 3454:20,
3469:5, 3470:7,
3484:4, 3491:3,
3505:6, 3505:10,
3520:19, 3521:1,
3528:14, 3528:17,
3548:25, 3566:9,
3566:16, 3652:25,
3681:22
**NEW** [1] - 3313:1
**new** [2] - 3332:24,
3382:15
**New** [39] - 3313:9,

3340:1, 3341:22,
3350:13, 3350:20,
3351:23, 3355:14,
3357:12, 3357:24,
3358:9, 3358:23,
3359:6, 3359:7,
3360:24, 3361:11,
3361:15, 3374:3,
3381:24, 3395:15,
3410:11, 3437:19,
3437:23, 3474:1,
3478:17, 3535:24,
3553:16, 3570:4,
3570:7, 3570:15,
3570:19, 3570:21,
3571:3, 3571:7,
3571:9, 3571:16,
3579:21, 3582:15,
3623:22, 3635:19
**news** [5] - 3315:24,
3316:3, 3317:4,
3317:5
**next** [30] - 3316:16,
3324:4, 3379:18,
3445:22, 3491:24,
3494:21, 3547:23,
3547:24, 3567:23,
3571:22, 3576:6,
3610:23, 3617:23,
3619:7, 3620:24,
3623:11, 3623:17,
3623:25, 3624:12,
3624:16, 3624:18,
3628:14, 3631:4,
3632:6, 3632:22,
3665:6, 3682:8,
3683:2, 3683:7
**nice** [7] - 3366:14,
3450:20, 3451:1,
3451:9, 3451:17,
3468:22, 3600:2
**night** [4] - 3348:24,
3349:10, 3362:20,
3376:7
**nine** [6] - 3326:18,
3326:19, 3503:10,
3570:6, 3673:18
**nip** [1] - 3615:5
**nobody** [2] - 3328:5,
3686:4
**nominating** [1] -
3622:10
**nonchalant** [1] -
3343:9
**noncompliant** [1] -
3354:6
**none** [4] - 3320:10,
3490:8, 3539:11,
3681:10
**noninvolvement** [1] -

3677:20
**normal** [2] - 3406:18,
3553:25
**normally** [4] -
3370:17, 3651:5,
3651:12, 3656:11
**northeast** [1] -
3410:10
**note** [5] - 3410:1,
3439:10, 3443:25,
3477:25, 3670:4
**noted** [2] - 3530:1,
3681:25
**notes** [11] - 3440:16,
3440:20, 3441:12,
3441:13, 3441:22,
3442:2, 3442:10,
3620:7, 3620:9,
3685:14
**nothing** [15] -
3337:11, 3341:25,
3358:18, 3399:2,
3420:5, 3435:21,
3497:13, 3551:24,
3557:15, 3559:5,
3612:5, 3672:4,
3675:18, 3678:14,
3686:3
**notice** [1] - 3336:9
**noticed** [2] - 3410:6,
3633:22
**notified** [1] - 3685:6
**notion** [1] - 3485:20
**notwithstanding** [1] -
3612:23
**Novartis** [2] - 3579:23,
3579:24
**November** [9] -
3385:8, 3390:5,
3411:7, 3477:16,
3480:15, 3520:21,
3526:9, 3526:15,
3557:16
**Number** [6] - 3389:6,
3390:16, 3392:12,
3393:16, 3395:1,
3557:20
**NUMBER** [1] - 3313:3
**number** [42] -
3345:21, 3355:12,
3450:18, 3453:24,
3454:3, 3458:6,
3463:19, 3469:9,
3478:3, 3479:4,
3481:1, 3483:20,
3485:2, 3501:8,
3504:25, 3507:6,
3510:2, 3534:4,
3538:4, 3546:18,
3547:24, 3548:23,

3549:15, 3551:2,
3551:18, 3552:4,
3553:2, 3562:19,
3570:18, 3572:24,
3574:17, 3582:13,
3599:18, 3622:23,
3626:4, 3632:17,
3634:1, 3634:13,
3635:7, 3636:12,
3640:15, 3642:21
**numbers** [19] -
3316:14, 3343:10,
3353:13, 3353:14,
3354:22, 3354:23,
3357:21, 3357:22,
3360:17, 3361:4,
3361:14, 3369:14,
3393:24, 3457:4,
3508:10, 3508:15,
3627:4, 3632:15,
3636:13
**numerically** [1] -
3622:20
**nurse** [2] - 3346:22,
3361:21
**nursing** [1] - 3596:14
**NYU** [1] - 3570:7

---

**O**

**o'clock** [3] - 3646:1,
3646:18, 3657:4
**oath** [31] - 3339:7,
3385:4, 3385:8,
3385:15, 3385:21,
3385:25, 3388:2,
3394:16, 3398:21,
3401:3, 3408:9,
3411:13, 3412:24,
3416:13, 3416:18,
3418:2, 3418:8,
3419:11, 3421:17,
3422:1, 3430:11,
3431:7, 3431:12,
3437:3, 3437:6,
3437:8, 3523:12,
3545:18, 3545:19,
3564:7, 3591:9
**Obama** [2] - 3584:3,
3584:8
**Ober/Kaler** [3] -
3576:7, 3576:10,
3577:25
**object** [4] - 3494:8,
3550:24, 3597:9,
3602:12
**objection** [59] -
3317:24, 3321:3,
3321:20, 3322:23,
3323:12, 3323:14,

3324:10, 3324:20,
3334:6, 3388:23,
3404:14, 3405:1,
3405:3, 3405:6,
3409:10, 3417:6,
3426:19, 3443:20,
3462:14, 3470:13,
3477:7, 3479:24,
3485:14, 3486:12,
3491:6, 3494:1,
3494:15, 3495:6,
3498:25, 3501:15,
3504:18, 3504:21,
3510:11, 3517:25,
3529:9, 3529:12,
3532:5, 3533:2,
3533:4, 3533:7,
3533:17, 3533:20,
3597:21, 3598:4,
3600:18, 3602:23,
3603:15, 3603:19,
3603:20, 3606:23,
3607:2, 3648:24,
3649:17, 3650:16,
3665:21, 3678:22,
3680:11, 3681:25
**objectionable** [1] -
3654:7
**objections** [2] -
3471:14, 3648:1
**obligation** [5] -
3470:25, 3471:8,
3498:7, 3579:6,
3643:14
**obligations** [1] -
3497:23
**oblige** [1] - 3344:5
**obliged** [1] - 3386:19
**observation** [1] -
3628:1
**observations** [2] -
3642:22, 3643:20
**obtain** [1] - 3530:22
**obtained** [1] - 3593:17
**obviously** [9] -
3380:2, 3396:25,
3449:17, 3470:18,
3566:1, 3608:2,
3609:23, 3612:11,
3653:20
**occasions** [2] -
3492:18, 3530:11
**occurred** [10] -
3338:9, 3352:17,
3428:8, 3545:11,
3549:10, 3591:2,
3643:6, 3643:22,
3644:11, 3676:3
**occurrence** [1] -
3341:1

October [2] - 3382:7, 3580:16
OF [2] - 3313:1, 3313:3
off-label [126] - 3342:1, 3345:7, 3352:24, 3353:3, 3355:16, 3357:18, 3357:20, 3357:22, 3360:3, 3360:15, 3361:1, 3361:18, 3362:15, 3365:14, 3365:22, 3372:5, 3375:9, 3385:11, 3387:24, 3388:6, 3390:4, 3394:18, 3397:19, 3398:17, 3403:2, 3404:22, 3411:15, 3412:10, 3412:19, 3413:2, 3413:19, 3414:9, 3415:2, 3419:16, 3421:9, 3422:1, 3422:25, 3423:8, 3423:19, 3423:23, 3424:1, 3424:5, 3424:7, 3424:16, 3424:18, 3429:1, 3429:7, 3429:12, 3429:21, 3430:12, 3430:23, 3431:16, 3431:20, 3432:15, 3432:24, 3433:9, 3433:11, 3434:4, 3434:17, 3435:1, 3435:10, 3437:9, 3437:16, 3437:24, 3438:11, 3438:15, 3438:20, 3439:5, 3439:12, 3445:6, 3447:5, 3447:8, 3450:5, 3450:6, 3454:4, 3466:6, 3482:1, 3483:21, 3484:9, 3489:18, 3505:7, 3505:11, 3505:19, 3506:16, 3507:16, 3507:22, 3508:1, 3508:6, 3508:14, 3508:20, 3528:14, 3543:14, 3545:2, 3549:10, 3556:24, 3557:10, 3559:12, 3559:13, 3560:25, 3561:8, 3562:1, 3562:13, 3562:20, 3567:1, 3603:7, 3608:21, 3610:14, 3611:11, 3611:20, 3611:25, 3612:2, 3612:4,

3612:7, 3613:14, 3613:21, 3614:21, 3619:9, 3620:11, 3640:4, 3641:18, 3662:14, 3662:15, 3673:2, 3676:9
offense [1] - 3577:20
offenses [1] - 3574:3
offer [5] - 3328:14, 3578:6, 3620:20, 3652:5, 3663:19
offered [3] - 3328:23, 3330:5, 3663:19
offering [7] - 3319:15, 3319:22, 3323:22, 3324:2, 3330:8, 3660:16, 3663:24
offers [1] - 3328:16
office [16] - 3345:5, 3345:7, 3355:22, 3358:12, 3365:14, 3366:22, 3378:21, 3378:24, 3424:6, 3431:20, 3441:19, 3460:9, 3460:18, 3553:16, 3572:1, 3577:8
Office [6] - 3571:6, 3571:9, 3572:21, 3573:10, 3574:22, 3579:20
officer [15] - 3578:8, 3578:9, 3578:15, 3578:16, 3578:20, 3578:21, 3578:25, 3579:1, 3595:10, 3628:7, 3631:10, 3631:12, 3632:10, 3633:18, 3639:15
officers [1] - 3639:17
offices [2] - 3361:22, 3576:11
OFFICIAL [1] - 3687:1
Official [1] - 3313:23
often [5] - 3336:25, 3337:2, 3345:4, 3374:5, 3653:1
OGC [1] - 3577:9
OIG [19] - 3577:8, 3577:9, 3584:23, 3585:3, 3585:4, 3590:1, 3592:6, 3592:14, 3596:10, 3596:11, 3596:16, 3596:25, 3637:4, 3637:6, 3637:11, 3664:2, 3664:5, 3665:11
old [2] - 3491:1, 3540:5

omitted [1] - 3552:6
on-label [2] - 3365:22, 3547:18
once [23] - 3319:11, 3319:16, 3341:16, 3344:14, 3347:24, 3360:4, 3366:23, 3368:1, 3388:2, 3415:6, 3415:7, 3421:17, 3422:9, 3432:10, 3459:6, 3570:10, 3570:12, 3581:5, 3582:13, 3589:14, 3598:17, 3603:21, 3672:17
One [1] - 3313:21
one [162] - 3319:1, 3319:8, 3321:12, 3321:13, 3321:18, 3327:9, 3327:16, 3332:5, 3337:1, 3346:13, 3349:12, 3361:22, 3369:22, 3370:13, 3371:3, 3373:17, 3373:22, 3378:10, 3380:25, 3387:23, 3390:2, 3390:9, 3392:15, 3394:5, 3394:10, 3398:15, 3400:18, 3402:2, 3406:25, 3407:18, 3414:6, 3415:8, 3416:17, 3416:22, 3420:5, 3420:21, 3424:25, 3425:12, 3425:20, 3425:25, 3426:2, 3426:3, 3428:19, 3429:4, 3446:15, 3450:23, 3452:20, 3452:22, 3452:23, 3455:9, 3457:19, 3457:20, 3462:7, 3463:2, 3465:15, 3465:25, 3466:23, 3467:8, 3468:15, 3469:18, 3470:14, 3470:20, 3470:21, 3471:2, 3471:12, 3473:14, 3475:17, 3479:13, 3479:17, 3480:3, 3480:12, 3482:23, 3491:1, 3492:19, 3495:21, 3498:5, 3498:12, 3499:12, 3499:16, 3502:15, 3503:20, 3508:22, 3510:1, 3511:9, 3517:9, 3517:14, 3522:16,

3525:9, 3525:23, 3526:8, 3527:20, 3527:25, 3529:11, 3529:24, 3530:17, 3531:21, 3532:9, 3535:7, 3535:14, 3535:20, 3537:19, 3540:16, 3546:13, 3547:23, 3547:24, 3548:22, 3550:15, 3551:13, 3556:13, 3558:23, 3560:20, 3569:14, 3572:8, 3586:18, 3595:21, 3596:5, 3598:17, 3598:20, 3599:24, 3603:24, 3623:21, 3624:6, 3625:14, 3626:9, 3628:24, 3629:7, 3630:9, 3634:5, 3637:10, 3637:17, 3640:10, 3642:6, 3642:14, 3642:18, 3642:23, 3643:4, 3645:1, 3646:5, 3649:16, 3649:23, 3650:14, 3650:16, 3651:24, 3653:7, 3655:12, 3660:1, 3660:9, 3669:7, 3669:14, 3670:4, 3670:15, 3671:23, 3673:18, 3675:10, 3678:8, 3678:13, 3683:22, 3683:23, 3684:3
one-on-one [1] - 3511:9
ones [8] - 3331:15, 3367:11, 3489:5, 3566:15, 3566:17, 3617:24, 3618:12, 3619:18
ongoing [2] - 3470:24, 3611:5
online [2] - 3580:14, 3580:20
open [7] - 3315:1, 3327:9, 3359:25, 3382:7, 3560:8, 3560:9, 3560:14
Open [8] - 3407:14, 3471:20, 3488:1, 3496:18, 3537:3, 3598:8, 3602:21, 3619:25
open-door [1] - 3560:9
opened [5] - 3333:8, 3333:9, 3355:20,

3489:6, 3672:17
opening [1] - 3670:13
openly [1] - 3350:3
operating [4] - 3331:25, 3368:25, 3586:1, 3593:15
operation [1] - 3594:25
opinion [52] - 3318:10, 3319:6, 3319:12, 3319:13, 3319:15, 3320:21, 3322:13, 3322:22, 3325:8, 3325:18, 3332:15, 3513:5, 3583:2, 3598:2, 3607:15, 3608:12, 3608:24, 3609:15, 3610:8, 3647:16, 3647:19, 3648:23, 3652:2, 3652:12, 3653:3, 3659:22, 3662:10, 3662:12, 3662:13, 3662:14, 3662:17, 3662:19, 3662:20, 3662:21, 3662:25, 3663:1, 3663:14, 3664:10, 3665:17, 3665:22, 3665:23, 3666:10, 3666:13, 3666:17, 3666:19, 3667:23, 3668:9, 3669:3, 3675:13, 3679:19, 3679:20
opinions [18] - 3319:22, 3320:1, 3320:11, 3320:18, 3323:20, 3323:22, 3324:2, 3331:12, 3609:17, 3612:15, 3615:13, 3648:13, 3649:18, 3663:19, 3663:21, 3663:23, 3665:12, 3668:8
opponent [1] - 3334:22
opportunity [14] - 3349:10, 3380:12, 3385:20, 3400:5, 3422:13, 3426:14, 3426:17, 3427:9, 3431:2, 3472:17, 3590:19, 3604:10, 3670:9, 3683:12
opposed [4] - 3316:22, 3323:1, 3435:11, 3622:24
opposite [1] - 3651:16
opt [1] - 3511:11

**option** [1] - 3351:20
**oranges** [1] - 3678:13
**order** [4] - 3400:24, 3600:13, 3622:24
**ordering** [2] - 3637:8, 3637:14
**organization** [16] - 3357:16, 3364:14, 3364:15, 3369:23, 3392:17, 3393:11, 3393:22, 3394:17, 3396:13, 3547:1, 3560:6, 3579:3, 3579:6, 3582:3, 3586:9, 3622:8
**organizations** [3] - 3575:18, 3582:10, 3592:24
**organized** [4] - 3476:25, 3570:16, 3571:4, 3643:18
**orient** [10] - 3352:19, 3389:10, 3390:2, 3391:21, 3409:20, 3444:5, 3463:22, 3483:4, 3526:13, 3555:22
**original** [3] - 3411:1, 3583:11, 3590:3
**Orleans** [5] - 3570:5, 3570:15, 3570:19, 3570:22, 3571:3
**otherwise** [5] - 3336:24, 3462:3, 3610:1, 3668:25, 3671:20
**ourselves** [1] - 3390:3
**outcome** [1] - 3594:14
**outlined** [1] - 3512:17
**outset** [2] - 3626:24, 3663:25
**outside** [15] - 3319:14, 3319:17, 3340:25, 3351:21, 3354:4, 3358:12, 3362:17, 3364:14, 3364:15, 3595:17, 3646:10, 3648:17, 3654:4, 3674:6
**outsourced** [1] - 3641:20
**overlooked** [2] - 3631:23
**overqualified** [1] - 3512:11
**overseeing** [1] - 3627:21
**oversight** [3] - 3573:13, 3638:17, 3640:23

**overview** [3] - 3500:12, 3629:17, 3629:20
**owe** [2] - 3578:25, 3579:1
**own** [20] - 3377:11, 3382:3, 3382:7, 3451:18, 3470:18, 3569:3, 3593:9, 3593:12, 3593:23, 3611:25, 3621:6, 3637:5, 3637:18, 3637:19, 3638:7, 3648:21, 3664:2, 3674:8, 3679:5

## P

**p.m** [13] - 3494:4, 3496:17, 3522:24, 3522:25, 3534:1, 3537:2, 3597:11, 3598:7, 3600:21, 3602:20, 3607:1, 3619:24, 3686:10
**packed** [1] - 3378:20
**Page** [1] - 3314:7
**page** [17] - 3323:5, 3325:14, 3478:7, 3518:17, 3518:18, 3546:7, 3561:3, 3586:11, 3586:23, 3603:25, 3633:10, 3633:12, 3633:21, 3634:18, 3635:16, 3636:16, 3663:14
**PAGE** [1] - 3314:2
**pages** [6] - 3320:4, 3545:22, 3546:10, 3548:22, 3566:6
**paid** [26] - 3327:25, 3328:11, 3328:18, 3345:14, 3348:24, 3349:3, 3349:4, 3369:24, 3392:24, 3461:5, 3476:6, 3478:9, 3478:20, 3482:5, 3569:13, 3573:21, 3574:1, 3597:1, 3598:13, 3628:19, 3637:9, 3661:21, 3667:5, 3667:6, 3678:8
**pale** [1] - 3336:16
**palpitations** [1] - 3363:17
**Pandora's** [1] - 3672:17
**panic** [7] - 3362:19, 3363:14, 3370:24,

3378:11, 3380:6, 3382:14
**paper** [2] - 3422:10, 3595:8
**papers** [2] - 3664:25, 3671:13
**paragraph** [1] - 3450:7
**parallel** [1] - 3572:9
**parameters** [1] - 3679:5
**paraphrasing** [1] - 3607:17
**parent** [1] - 3639:18
**part** [47] - 3326:13, 3327:6, 3329:12, 3335:1, 3368:9, 3393:5, 3402:2, 3403:3, 3415:17, 3418:15, 3428:25, 3462:7, 3465:10, 3470:21, 3479:9, 3492:9, 3501:4, 3508:4, 3510:6, 3517:16, 3572:2, 3572:5, 3573:19, 3594:13, 3605:13, 3605:15, 3605:22, 3607:22, 3608:24, 3609:4, 3611:23, 3612:14, 3614:19, 3649:1, 3649:18, 3653:2, 3659:5, 3660:21, 3661:22, 3662:10, 3663:6, 3669:19, 3672:10, 3675:11, 3677:25, 3678:3
**Part** [8] - 3605:23, 3605:24, 3606:1, 3611:21, 3614:1, 3615:19, 3647:21
**partial** [1] - 3393:4
**partially** [2] - 3393:1, 3605:11
**participate** [1] - 3492:8
**participated** [1] - 3581:9
**particular** [40] - 3321:3, 3321:15, 3321:18, 3322:4, 3322:22, 3324:13, 3324:14, 3331:3, 3331:7, 3333:9, 3333:18, 3341:22, 3465:16, 3468:15, 3469:25, 3470:2, 3470:13, 3474:11, 3546:18, 3573:12, 3581:10, 3585:22,

3592:12, 3606:17, 3612:1, 3623:9, 3623:21, 3625:21, 3625:25, 3631:10, 3632:19, 3636:8, 3656:13, 3665:3, 3666:15, 3674:3, 3675:15, 3675:25, 3676:4
**particularly** [1] - 3653:14
**particulars** [1] - 3461:1
**parties** [9] - 3326:21, 3468:5, 3649:6, 3653:15, 3654:19, 3655:21, 3656:20, 3658:1, 3669:13
**parties'** [1] - 3655:11
**parts** [5] - 3454:16, 3605:19, 3605:21, 3606:3, 3659:21
**party** [3] - 3380:3, 3547:15, 3680:8
**party's** [1] - 3326:5
**pass** [1] - 3384:1
**passed** [2] - 3640:1, 3670:4
**passing** [1] - 3654:5
**past** [5] - 3320:25, 3385:4, 3525:25, 3580:4, 3651:23
**Patel** [2] - 3590:13, 3639:21
**Patel's** [1] - 3638:20
**path** [1] - 3364:17
**patience** [2] - 3339:4, 3646:17
**patient** [9] - 3481:9, 3481:14, 3604:24, 3610:18, 3612:1, 3612:6, 3634:21, 3634:24, 3635:4
**patients** [12] - 3344:3, 3344:6, 3344:14, 3344:18, 3355:16, 3355:17, 3358:8, 3479:2, 3563:16, 3620:22, 3635:5, 3636:12
**Paul** [1] - 3313:17
**pause** [3] - 3337:1, 3402:24, 3659:20
**paused** [1] - 3665:20
**pay** [13] - 3345:12, 3349:10, 3513:1, 3577:16, 3582:18, 3616:11, 3616:16, 3652:16, 3654:7, 3659:2, 3661:19,

3663:4, 3673:4
**paycheck** [1] - 3356:9
**paying** [12] - 3349:25, 3360:3, 3375:11, 3382:20, 3397:19, 3599:1, 3628:22, 3637:7, 3637:25, 3664:5, 3664:6, 3665:1
**payment** [4] - 3599:15, 3606:19, 3612:20, 3612:24
**payments** [11] - 3466:10, 3549:11, 3603:8, 3629:20, 3630:2, 3630:21, 3631:18, 3631:24, 3633:3, 3651:4
**pays** [2] - 3573:20
**Peace** [2] - 3453:10, 3453:11
**PENELOW** [1] - 3314:3
**Penelow** [68] - 3337:15, 3337:20, 3338:11, 3339:6, 3339:12, 3342:24, 3350:9, 3354:5, 3356:13, 3357:1, 3364:6, 3367:5, 3370:4, 3371:17, 3379:23, 3381:8, 3383:9, 3384:9, 3384:13, 3389:10, 3394:21, 3395:5, 3396:25, 3408:8, 3427:1, 3428:19, 3433:21, 3435:1, 3443:25, 3463:3, 3472:4, 3472:11, 3477:11, 3481:20, 3482:23, 3488:8, 3497:4, 3500:20, 3504:9, 3505:2, 3510:16, 3521:18, 3523:1, 3523:11, 3523:17, 3525:1, 3525:13, 3533:10, 3533:19, 3537:7, 3541:22, 3542:2, 3543:13, 3545:20, 3546:7, 3548:3, 3550:16, 3552:11, 3553:17, 3555:13, 3561:5, 3564:3, 3566:4, 3567:11, 3567:20, 3588:14, 3684:17
**Penelow's** [3] - 3682:21, 3683:8,

3685:17
**Pennsylvania** [2] - 3570:1, 3582:15
**people** [58] - 3355:23, 3357:1, 3425:5, 3439:5, 3439:11, 3439:20, 3446:14, 3478:25, 3483:20, 3490:8, 3496:3, 3509:18, 3510:1, 3532:9, 3532:17, 3532:20, 3532:22, 3532:24, 3532:25, 3533:11, 3533:14, 3534:4, 3534:6, 3534:7, 3534:11, 3534:18, 3534:23, 3535:7, 3535:10, 3535:24, 3536:1, 3536:10, 3536:20, 3537:20, 3538:5, 3538:9, 3538:13, 3544:3, 3544:16, 3555:16, 3557:10, 3559:14, 3564:7, 3564:16, 3564:23, 3565:2, 3565:7, 3576:16, 3580:18, 3580:21, 3580:22, 3597:24, 3606:8, 3636:10, 3640:17, 3641:10, 3641:14
**per** [3] - 3340:11, 3345:21, 3531:6
**Per** [2] - 3473:11, 3511:8
**per-speech** [1] - 3345:21
**perceived** [2] - 3512:14, 3512:18
**percent** [24] - 3365:24, 3425:6, 3425:25, 3432:15, 3432:24, 3435:11, 3435:16, 3435:19, 3436:18, 3437:9, 3440:12, 3457:25, 3488:21, 3488:22, 3489:12, 3490:14, 3535:2, 3561:21, 3562:1, 3562:15, 3562:18, 3562:19, 3610:21, 3680:25
**percentage** [8] - 3435:9, 3435:23, 3435:25, 3484:15, 3487:8, 3487:13, 3562:12, 3605:3
**percentages** [2] - 3436:19, 3561:21

**perfect** [1] - 3644:4
**Performance** [1] - 3635:19
**performance** [10] - 3352:1, 3352:3, 3352:12, 3360:18, 3360:19, 3394:5, 3471:9, 3542:25, 3543:2, 3636:19
**performed** [2] - 3335:9, 3632:18
**performer** [3] - 3369:16, 3369:17, 3369:18
**performers** [1] - 3398:11
**performing** [1] - 3361:16
**perhaps** [4] - 3569:11, 3582:23, 3625:24, 3636:6
**period** [45] - 3343:19, 3358:20, 3390:20, 3417:12, 3417:25, 3422:14, 3440:3, 3440:9, 3441:4, 3442:22, 3444:13, 3449:25, 3465:3, 3483:5, 3495:15, 3495:19, 3496:8, 3506:19, 3506:23, 3517:11, 3530:5, 3546:22, 3547:25, 3556:16, 3556:17, 3574:15, 3577:11, 3578:19, 3580:3, 3583:7, 3585:2, 3585:21, 3592:10, 3592:21, 3600:10, 3625:2, 3626:25, 3628:5, 3629:2, 3639:20, 3639:24, 3639:25, 3641:8, 3643:13, 3661:7
**periods** [4] - 3433:15, 3441:25, 3638:13, 3638:15
**permission** [14] - 3388:21, 3409:7, 3417:4, 3443:15, 3467:23, 3471:23, 3477:6, 3490:22, 3498:19, 3501:13, 3504:15, 3510:10, 3521:13, 3532:3
**permit** [2] - 3327:2, 3327:12
**permitted** [2] - 3320:10, 3335:8
**person** [11] - 3325:19,

3328:18, 3348:7, 3438:14, 3445:25, 3457:19, 3457:21, 3539:7, 3628:4, 3639:1, 3643:2
**personal** [4] - 3347:7, 3394:23, 3529:23, 3542:9
**personally** [2] - 3364:1, 3434:19
**personnel** [1] - 3549:9
**perspective** [4] - 3551:24, 3622:22, 3627:4, 3647:14
**PETE** [1] - 3313:14
**Pete** [1] - 3315:9
**Peter** [1] - 3446:11
**Peterson** [1] - 3538:17
**Pharma** [1] - 3383:4
**pharmaceutical** [23] - 3569:16, 3574:20, 3575:16, 3576:4, 3576:14, 3576:15, 3579:22, 3580:5, 3581:12, 3585:7, 3590:2, 3593:14, 3593:1, 3593:4, 3593:20, 3596:15, 3596:16, 3598:13, 3598:25, 3599:21, 3663:10, 3667:13, 3667:14
**pharmaceuticals** [1] - 3382:8
**phase** [1] - 3566:5
**phone** [14] - 3357:15, 3365:2, 3387:2, 3388:6, 3389:4, 3389:11, 3397:1, 3415:11, 3416:14, 3555:8, 3557:3, 3557:4, 3557:7, 3558:6
**photograph** [1] - 3667:17
**phrased** [1] - 3494:17
**phrasing** [1] - 3652:18
**PhRMA** [9] - 3592:16, 3592:17, 3592:18, 3592:23, 3593:3, 3599:20, 3599:23, 3665:10
**physician** [4] - 3364:11, 3379:6, 3379:10, 3611:10
**physicians** [13] - 3343:6, 3351:1, 3352:8, 3358:9, 3378:13, 3480:22, 3482:1, 3482:15,

3562:7, 3597:1, 3630:15, 3632:8, 3633:1
**pick** [3] - 3442:7, 3568:1, 3630:15
**picked** [1] - 3345:4
**picture** [3] - 3348:18, 3374:12, 3595:22
**pictures** [6] - 3383:24, 3467:1, 3467:14, 3476:9, 3476:14, 3476:18
**piece** [8] - 3321:3, 3324:21, 3328:2, 3401:6, 3589:10, 3662:19, 3677:9, 3678:14
**pieces** [3] - 3326:20, 3465:16, 3639:4
**pillow** [2] - 3358:16, 3376:7
**PIP** [1] - 3352:3
**pitch** [1] - 3653:10
**pitching** [1] - 3352:24
**place** [23] - 3326:5, 3346:18, 3348:18, 3368:8, 3390:5, 3478:13, 3478:17, 3480:4, 3482:25, 3492:14, 3518:5, 3522:17, 3569:18, 3637:10, 3644:2, 3655:21, 3659:1, 3672:3, 3672:4, 3672:7, 3674:5, 3674:18, 3674:23
**placed** [1] - 3338:2
**places** [2] - 3410:6, 3410:10
**plaintiff** [1] - 3417:16
**Plaintiffs** [1] - 3313:4
**plaintiffs'** [1] - 3665:16
**plan** [3] - 3352:3, 3500:3, 3516:7
**planned** [1] - 3648:18
**planning** [2] - 3527:2, 3568:4
**plant** [5] - 3346:23, 3347:4, 3347:16, 3363:18, 3383:5
**plant-based** [1] - 3383:5
**plants** [3] - 3346:20, 3363:18, 3603:7
**plants-in-the-audience** [1] - 3346:20
**play** [7] - 3388:21, 3389:5, 3390:16,

3430:7, 3436:6, 3557:19, 3653:13
**played** [16] - 3389:7, 3390:17, 3392:13, 3393:17, 3395:3, 3396:9, 3414:2, 3421:15, 3430:8, 3436:7, 3456:11, 3458:22, 3460:6, 3557:21, 3560:24, 3567:6
**plays** [2] - 3336:18, 3366:10
**pleasure** [1] - 3451:21
**pledge** [4] - 3504:10, 3504:16, 3505:23, 3506:8
**pledged** [1] - 3506:2
**plenty** [4] - 3450:23, 3452:10, 3468:4, 3675:24
**POA** [6] - 3357:14, 3374:6, 3377:9, 3453:1, 3502:1, 3508:22
**POAs** [2] - 3359:4, 3366:9
**point** [66] - 3318:22, 3318:23, 3327:16, 3327:17, 3328:3, 3328:4, 3328:8, 3328:16, 3332:5, 3346:23, 3352:2, 3354:16, 3354:19, 3355:7, 3358:20, 3359:17, 3364:6, 3365:5, 3365:8, 3365:16, 3367:3, 3370:4, 3378:22, 3380:21, 3380:25, 3381:13, 3382:18, 3382:21, 3403:16, 3406:17, 3408:17, 3463:22, 3475:10, 3501:1, 3520:9, 3534:3, 3543:2, 3551:13, 3562:6, 3567:10, 3571:21, 3572:14, 3575:3, 3575:8, 3576:3, 3577:25, 3580:12, 3586:10, 3598:11, 3600:12, 3609:20, 3613:3, 3617:17, 3626:10, 3631:20, 3638:25, 3646:12, 3647:10, 3663:16, 3664:9, 3673:6, 3675:10, 3676:13, 3679:18

**points** [3] - 3325:4, 3594:17, 3594:18
**police** [1] - 3640:11
**policies** [32] - 3546:25, 3547:3, 3585:16, 3585:20, 3585:25, 3586:3, 3586:8, 3586:12, 3593:10, 3593:12, 3595:4, 3595:7, 3598:17, 3598:19, 3625:15, 3637:5, 3637:18, 3637:19, 3637:22, 3637:23, 3637:24, 3637:25, 3638:1, 3638:10, 3639:9, 3640:12, 3642:2, 3658:25, 3664:3, 3664:4
**policy** [22] - 3355:19, 3387:7, 3387:11, 3416:23, 3417:13, 3461:8, 3461:12, 3461:16, 3462:12, 3484:5, 3531:6, 3547:9, 3547:19, 3547:25, 3548:3, 3548:9, 3549:1, 3560:9, 3581:4, 3595:3, 3613:1, 3638:2
**political** [1] - 3571:5
**popping** [1] - 3657:4
**portion** [3] - 3468:19, 3647:18, 3658:2
**posed** [1] - 3472:12
**position** [17] - 3323:18, 3346:11, 3379:9, 3392:4, 3405:11, 3601:5, 3607:13, 3611:20, 3614:22, 3616:8, 3617:14, 3653:20, 3658:7, 3658:8, 3658:10, 3669:17, 3675:23
**positions** [2] - 3655:12, 3655:13
**positive** [1] - 3471:7
**possession** [1] - 3469:9
**possible** [3] - 3490:5, 3503:23, 3558:16
**possibly** [4] - 3377:9, 3501:11, 3527:8, 3555:12
**posts** [1] - 3383:24
**potential** [9] - 3481:17, 3596:3, 3598:20, 3608:4,

3622:7, 3622:18, 3630:15, 3631:17, 3631:18
**potentially** [1] - 3614:3
**PowerPoint** [5] - 3616:5, 3616:9, 3617:3, 3674:8
**Practical** [1] - 3580:14
**practical** [1] - 3328:7
**practice** [9] - 3351:11, 3351:12, 3365:15, 3366:6, 3366:15, 3401:11, 3575:10, 3578:4, 3578:22
**practiced** [1] - 3361:22
**practices** [1] - 3429:16
**practicing** [1] - 3570:4
**practitioner** [1] - 3361:22
**pre** [1] - 3626:14
**pre-approval** [1] - 3626:14
**precedent** [2] - 3321:4, 3323:9
**preclude** [2] - 3336:8, 3682:5
**precluded** [1] - 3323:19
**predated** [1] - 3584:7
**predicate** [1] - 3608:7
**prediction** [1] - 3657:12
**predominance** [1] - 3596:2
**predominantly** [1] - 3622:10
**preempt** [1] - 3494:12
**preemptive** [1] - 3334:22
**preface** [4] - 3494:23, 3536:24, 3536:25, 3602:1
**prejudice** [1] - 3470:2
**premise** [1] - 3647:8
**prepare** [1] - 3324:19
**prepared** [1] - 3379:5
**preparing** [1] - 3464:6
**preponderance** [1] - 3332:16
**prerogative** [1] - 3333:15
**prescribe** [8] - 3347:2, 3481:5, 3481:21, 3598:25, 3599:6, 3611:24, 3612:2, 3665:3
**prescribed** [5] -

3610:17, 3612:3, 3613:14, 3613:20, 3634:6
**prescriber** [5] - 3361:24, 3362:3, 3603:9, 3631:10, 3637:7
**prescribers** [16] - 3341:21, 3343:4, 3367:12, 3551:21, 3600:7, 3623:3, 3623:19, 3623:22, 3623:23, 3624:4, 3624:6, 3625:13, 3625:23, 3628:23, 3630:23
**prescribes** [1] - 3599:8
**prescribing** [7] - 3481:2, 3563:17, 3599:15, 3622:7, 3622:18, 3625:25, 3665:4
**prescription** [10] - 3598:22, 3605:4, 3606:2, 3606:9, 3606:17, 3606:22, 3625:1, 3633:15, 3633:20, 3637:4
**prescriptions** [34] - 3340:4, 3340:5, 3342:2, 3343:7, 3343:10, 3344:6, 3351:10, 3360:4, 3397:20, 3447:2, 3557:12, 3598:14, 3599:10, 3611:19, 3622:15, 3622:20, 3622:21, 3622:23, 3623:24, 3629:22, 3632:3, 3632:15, 3633:25, 3634:7, 3634:13, 3635:3, 3635:5, 3635:14, 3636:1, 3636:7, 3636:14, 3637:14, 3638:7, 3638:9
**present** [1] - 3562:1
**presentation** [2] - 3604:4, 3623:6
**presentations** [4] - 3348:23, 3353:3, 3413:20, 3597:24
**presented** [4] - 3336:23, 3657:21, 3662:8, 3674:21
**presenting** [2] - 3353:2, 3562:12
**president** [1] - 3676:8
**pressure** [4] -

3362:13, 3364:23, 3434:11, 3434:16
**pressured** [2] - 3357:23, 3640:13
**presume** [5] - 3452:10, 3486:16, 3613:18, 3661:12, 3662:7
**pretrial** [6] - 3318:11, 3318:13, 3318:14, 3320:5, 3333:1, 3619:2
**pretty** [13] - 3320:16, 3348:9, 3353:9, 3353:17, 3362:2, 3376:24, 3378:23, 3402:15, 3406:24, 3551:11, 3638:11, 3659:18, 3666:20
**prevented** [2] - 3320:17, 3332:21
**preventing** [4] - 3391:17, 3393:22, 3594:25, 3648:3
**prevents** [1] - 3647:11
**previous** [1] - 3620:8
**previously** [3] - 3404:9, 3668:7, 3668:8
**Prezista** [39] - 3340:5, 3344:3, 3347:11, 3347:14, 3355:17, 3453:1, 3475:18, 3506:7, 3506:11, 3506:25, 3507:11, 3508:1, 3549:10, 3557:10, 3561:8, 3563:13, 3563:18, 3583:6, 3592:4, 3610:17, 3623:18, 3624:2, 3624:5, 3625:3, 3626:11, 3626:15, 3628:7, 3629:1, 3630:16, 3634:2, 3634:7, 3634:21, 3634:24, 3638:23, 3639:16, 3642:13, 3643:16, 3643:20, 3672:5
**Prezista's** [1] - 3643:4
**pride** [1] - 3363:10
**primarily** [1] - 3595:24
**primary** [2] - 3339:25, 3367:12
**Prime** [2] - 3474:1, 3475:1
**principally** [1] - 3572:23
**principles** [1] - 3319:7
**print** [1] - 3357:18

**printed** [1] - 3399:21
**printing** [1] - 3655:2
**priority** [1] - 3671:1
**private** [2] - 3575:4, 3576:1
**privilege** [6] - 3494:1, 3494:8, 3533:2, 3533:17, 3533:18, 3535:13
**privileged** [2] - 3370:17, 3494:6
**privy** [1] - 3566:19
**pro** [2] - 3676:24
**pro-Janssen** [1] - 3676:24
**pro-Relators** [1] - 3676:24
**problem** [28] - 3318:4, 3319:22, 3330:12, 3334:10, 3349:24, 3376:6, 3398:20, 3399:1, 3403:9, 3404:4, 3409:3, 3415:24, 3416:4, 3416:6, 3468:14, 3608:9, 3613:22, 3615:8, 3631:17, 3647:11, 3650:8, 3656:13, 3659:23, 3660:10, 3668:13, 3672:16, 3674:17, 3686:1
**problematic** [4] - 3653:14, 3654:3, 3654:10, 3666:2
**problems** [4] - 3416:10, 3444:20, 3449:24, 3518:24
**procedures** [3] - 3586:1, 3593:15, 3596:18
**proceed** [15] - 3384:7, 3408:5, 3428:16, 3471:21, 3488:2, 3496:15, 3496:19, 3496:22, 3523:14, 3537:4, 3568:18, 3591:11, 3603:2, 3620:2, 3669:7
**proceeded** [1] - 3361:17
**proceeding** [1] - 3572:16
**PROCEEDINGS** [1] - 3315:1
**Proceedings** [1] - 3313:25
**proceedings** [3] - 3595:6, 3630:13, 3687:5

process [22] - 3318:9, 3350:10, 3363:11, 3368:2, 3368:5, 3383:7, 3400:25, 3402:14, 3406:8, 3418:15, 3452:15, 3454:8, 3470:14, 3487:17, 3517:1, 3545:15, 3545:20, 3554:1, 3645:18, 3646:11, 3669:19
processes [1] - 3642:3
produced [12] - 3313:25, 3468:6, 3468:7, 3468:15, 3468:17, 3468:24, 3469:5, 3469:23, 3470:7, 3471:5, 3593:16, 3596:8
product [7] - 3599:6, 3599:8, 3620:12, 3622:24, 3625:21, 3626:15, 3640:9
production [1] - 3469:13
products [11] - 3382:19, 3383:6, 3599:22, 3604:9, 3605:4, 3606:9, 3620:21, 3621:12, 3621:20, 3663:12
PRODUCTS [1] - 3313:7
professional [3] - 3569:23, 3642:25, 3643:1
professionals [1] - 3621:11
professions [1] - 3578:4
Professor [6] - 3318:8, 3329:1, 3329:4, 3330:11, 3588:22, 3628:18
professor [1] - 3578:2
proffered [1] - 3650:25
proffering [1] - 3669:15
program [106] - 3339:15, 3341:6, 3345:2, 3345:3, 3345:4, 3345:5, 3345:8, 3346:8, 3348:25, 3352:12, 3360:18, 3360:20, 3361:11, 3362:16, 3363:13, 3363:17, 3368:20, 3369:5,

3370:2, 3370:3, 3393:5, 3416:10, 3445:22, 3448:3, 3449:12, 3449:14, 3463:4, 3474:10, 3474:16, 3474:21, 3477:12, 3477:21, 3478:1, 3478:8, 3478:13, 3478:24, 3479:4, 3479:14, 3479:18, 3480:4, 3480:13, 3480:18, 3519:3, 3547:15, 3548:10, 3550:22, 3559:13, 3569:18, 3577:15, 3579:12, 3579:22, 3580:1, 3580:5, 3583:5, 3584:23, 3586:2, 3586:8, 3586:12, 3590:1, 3591:22, 3592:2, 3592:11, 3592:15, 3594:20, 3594:21, 3594:23, 3594:24, 3595:12, 3595:17, 3595:18, 3595:24, 3596:3, 3595:25, 3596:25, 3600:12, 3601:24, 3603:6, 3607:16, 3608:3, 3608:5, 3609:1, 3609:9, 3621:13, 3623:7, 3625:5, 3625:12, 3631:11, 3633:23, 3634:12, 3637:25, 3638:2, 3640:7, 3640:14, 3641:5, 3642:10, 3642:20, 3651:1, 3653:5, 3658:19, 3662:22, 3664:1, 3665:3, 3679:19
programs [83] - 3340:10, 3340:25, 3341:17, 3342:16, 3347:19, 3347:20, 3349:8, 3349:11, 3349:12, 3349:13, 3349:14, 3363:12, 3397:19, 3412:9, 3447:22, 3465:22, 3466:6, 3466:11, 3467:20, 3475:10, 3475:12, 3475:17, 3475:24, 3476:22, 3479:5, 3489:19, 3504:4, 3507:6, 3546:25, 3547:16, 3550:23, 3551:2, 3551:3, 3553:2,

3557:11, 3569:15, 3573:16, 3573:18, 3573:19, 3575:18, 3577:3, 3577:18, 3582:20, 3582:24, 3583:6, 3585:1, 3592:3, 3592:9, 3592:12, 3592:13, 3593:2, 3594:23, 3595:25, 3596:6, 3597:1, 3598:10, 3598:18, 3599:17, 3599:18, 3600:3, 3600:5, 3605:10, 3605:14, 3628:7, 3629:1, 3629:2, 3630:7, 3632:17, 3636:6, 3638:18, 3638:22, 3639:1, 3639:23, 3640:16, 3640:24, 3641:4, 3641:10, 3642:1, 3642:15, 3643:2, 3643:5, 3643:21, 3663:9
prohibit [1] - 3664:12
prohibited [5] - 3599:12, 3621:11, 3675:11, 3678:16, 3682:1
project [6] - 3511:11, 3511:17, 3511:21, 3511:24, 3513:23, 3514:17
projects [1] - 3351:25
promise [2] - 3645:22, 3675:9
promote [13] - 3394:18, 3423:19, 3423:23, 3424:1, 3424:15, 3429:7, 3433:9, 3437:16, 3454:4, 3505:7, 3505:11, 3505:19, 3508:19
promoted [19] - 3391:18, 3391:22, 3392:8, 3396:5, 3423:7, 3423:18, 3424:2, 3429:6, 3429:21, 3431:20, 3437:9, 3447:8, 3506:12, 3506:14, 3506:15, 3506:23, 3508:5, 3509:15, 3509:19
promoting [14] - 3433:11, 3434:4, 3434:17, 3435:10, 3437:24, 3438:10,

3438:15, 3439:12, 3508:6, 3508:14, 3508:19, 3508:23, 3509:3, 3563:17
promotion [16] - 3362:18, 3396:12, 3398:17, 3414:10, 3430:12, 3431:16, 3432:15, 3432:24, 3435:2, 3438:20, 3439:5, 3466:6, 3484:9, 3509:7, 3528:15, 3561:8
Promotional [4] - 3461:8, 3461:11, 3583:2, 3591:23
promotional [4] - 3474:6, 3475:4, 3595:23, 3623:7
promotions [1] - 3429:15
pronounce [1] - 3685:2
proper [4] - 3399:25, 3609:1, 3655:8, 3659:19
properly [1] - 3592:14
proposal [4] - 3644:18, 3654:18, 3655:4, 3657:5
propose [1] - 3660:20
proposed [11] - 3597:20, 3618:24, 3624:19, 3649:23, 3653:21, 3655:8, 3655:17, 3657:1, 3658:1, 3660:19, 3660:22
proposing [1] - 3597:20
prosecution [3] - 3575:24, 3576:18, 3680:24
prosecutions [3] - 3571:18, 3572:2, 3572:6
prosecutor [1] - 3571:15
prospect [1] - 3352:2
prospective [1] - 3663:12
protect [2] - 3363:4, 3579:6
protecting [3] - 3353:21, 3353:22, 3356:9
proud [4] - 3368:19, 3567:14, 3567:16
prove [7] - 3333:21, 3375:17, 3376:20,

3527:2, 3612:17, 3647:24, 3651:11
proven [1] - 3668:4
proves [1] - 3655:15
provide [9] - 3470:6, 3530:24, 3547:9, 3547:10, 3572:24, 3576:3, 3583:1, 3599:21, 3663:11
provided [8] - 3318:17, 3335:10, 3497:24, 3500:17, 3553:9, 3566:5, 3600:15, 3602:9
provider [10] - 3502:10, 3529:6, 3530:24, 3575:15, 3577:10, 3577:13, 3599:11, 3606:19, 3621:18, 3621:19
providers [9] - 3340:4, 3551:19, 3576:14, 3577:5, 3577:19, 3580:10, 3584:10, 3600:8, 3663:11
provides [1] - 3621:17
providing [5] - 3534:14, 3599:7, 3637:7, 3653:25
proving [4] - 3464:25, 3610:22, 3675:17, 3677:8
proximity [1] - 3360:25
PRZ [1] - 3634:2
publication [1] - 3580:15
publications [1] - 3582:2
publish [5] - 3329:7, 3603:15, 3603:22, 3679:24, 3680:8
pulled [4] - 3363:13, 3468:21, 3643:19
punctuation [1] - 3399:25
punished [1] - 3673:3
purely [1] - 3600:9
purported [1] - 3573:16
purports [1] - 3451:9
purpose [2] - 3406:2, 3600:16
purposely [1] - 3621:17
purposes [7] - 3324:1, 3407:1, 3526:23, 3568:4, 3608:22, 3616:13, 3665:24
purse [4] - 3387:3,

3389:4, 3389:14, 3397:1
**pursuant** [1] - 3495:12
**pursues** [1] - 3680:23
**purview** [1] - 3615:11
**push** [7] - 3316:5, 3316:9, 3351:11, 3351:12, 3351:13, 3351:14, 3362:14
**pushback** [1] - 3424:15
**pushed** [1] - 3559:16
**pushing** [2] - 3560:18, 3560:24
**put** [50] - 3321:17, 3329:6, 3330:22, 3334:23, 3344:3, 3346:11, 3352:12, 3354:25, 3358:15, 3360:5, 3360:18, 3372:4, 3439:22, 3441:13, 3441:18, 3442:1, 3442:3, 3483:17, 3486:9, 3494:19, 3501:20, 3507:6, 3545:6, 3547:13, 3548:3, 3553:3, 3582:8, 3592:1, 3622:17, 3624:13, 3626:12, 3630:14, 3634:20, 3646:12, 3648:4, 3661:20, 3661:21, 3667:5, 3667:11, 3672:3, 3672:7, 3672:24, 3673:3, 3673:7, 3673:10, 3674:5, 3674:23, 3675:16, 3675:23, 3677:2
**puts** [4] - 3596:10, 3596:12, 3653:10, 3661:25
**putting** [12] - 3352:3, 3353:11, 3356:16, 3376:7, 3383:1, 3513:7, 3574:17, 3623:12, 3647:24, 3648:3, 3664:25, 3677:3

## Q

**QD** [5] - 3344:10, 3347:14, 3348:2, 3355:15, 3355:17
**quack** [1] - 3326:24
**qualification** [1] - 3455:14
**qualifications** [3] -

3461:17, 3512:18, 3512:24
**qualified** [1] - 3318:16
**quarter** [1] - 3343:8
**quarterly** [2] - 3343:21, 3343:22
**Queens** [1] - 3571:10
**questioning** [4] - 3347:16, 3486:11, 3531:2, 3608:10
**questions** [38] - 3351:17, 3367:16, 3367:19, 3367:20, 3383:9, 3399:18, 3399:24, 3418:1, 3418:16, 3427:2, 3434:22, 3454:23, 3484:23, 3495:15, 3521:16, 3534:17, 3541:15, 3541:16, 3543:1, 3543:17, 3545:7, 3545:9, 3550:6, 3550:11, 3550:12, 3553:17, 3561:25, 3563:5, 3563:25, 3564:15, 3565:21, 3567:18, 3654:21, 3671:4, 3671:6, 3672:21, 3680:11
**qui** [1] - 3579:25
**quick** [2] - 3325:1, 3451:6
**quicker** [1] - 3519:4
**quickly** [6] - 3326:14, 3362:2, 3526:2, 3589:12, 3589:23, 3603:5
**quiet** [4] - 3315:25, 3316:12, 3353:9
**quit** [3] - 3378:14, 3379:23, 3379:24
**quite** [10] - 3385:19, 3425:19, 3435:15, 3472:24, 3475:23, 3481:25, 3509:2, 3569:20, 3659:3, 3675:4
**quota** [2] - 3342:24, 3343:3
**QURAISHI** [2] - 3313:11, 3315:2

## R

**racketeering** [2] - 3570:17, 3570:18
**raise** [11] - 3324:10, 3332:14, 3334:6, 3346:10, 3347:13,

3352:23, 3398:16, 3568:7, 3581:11, 3647:11, 3671:24
**raised** [17] - 3321:10, 3325:5, 3332:5, 3352:22, 3392:7, 3392:16, 3439:20, 3463:19, 3483:14, 3553:9, 3555:16, 3625:11, 3647:3, 3670:16, 3683:6, 3683:7
**raising** [8] - 3332:13, 3333:17, 3334:7, 3336:8, 3336:18, 3483:14, 3650:15, 3682:6
**ran** [4] - 3382:9, 3439:11, 3444:20, 3583:3
**rang** [1] - 3398:21
**ranged** [1] - 3574:19
**ranking** [1] - 3622:19
**rate** [2] - 3594:1, 3594:3
**rather** [2] - 3334:19, 3356:7
**RDR** [1] - 3687:11
**reach** [4] - 3438:25, 3439:2, 3560:7, 3625:8
**reached** [4] - 3488:8, 3532:13, 3535:10, 3536:12
**reaching** [4] - 3377:25, 3525:19, 3535:3, 3535:7
**read** [17] - 3409:25, 3410:5, 3445:9, 3448:9, 3512:20, 3526:2, 3529:7, 3552:5, 3554:13, 3554:15, 3554:17, 3597:15, 3602:10, 3627:8, 3630:10, 3638:16, 3643:7
**reading** [5] - 3404:18, 3516:17, 3529:10, 3627:9, 3670:20
**ready** [11] - 3315:7, 3337:11, 3337:14, 3338:11, 3339:5, 3428:16, 3523:14, 3568:18, 3591:11, 3646:2
**real** [11] - 3323:1, 3325:1, 3334:6, 3336:19, 3449:24, 3526:2, 3600:3, 3603:24, 3640:25,

3641:6, 3682:7
**reality** [2] - 3354:5, 3598:19
**realize** [4] - 3345:24, 3365:8, 3647:21, 3647:22
**realized** [5] - 3345:1, 3366:18, 3372:3, 3372:14, 3382:21
**realizing** [1] - 3366:25
**really** [43] - 3320:16, 3321:24, 3336:25, 3345:1, 3345:8, 3354:16, 3354:19, 3358:18, 3360:17, 3361:16, 3376:8, 3378:20, 3382:13, 3418:1, 3442:25, 3469:24, 3470:1, 3486:12, 3494:18, 3537:13, 3541:7, 3570:2, 3574:3, 3575:15, 3577:20, 3589:12, 3615:25, 3628:11, 3638:17, 3638:19, 3651:17, 3654:2, 3654:9, 3661:14, 3661:16, 3664:19, 3668:3, 3668:6, 3671:12, 3674:11
**reason** [23] - 3332:25, 3344:20, 3394:11, 3394:14, 3426:24, 3459:10, 3459:13, 3463:16, 3469:13, 3469:15, 3476:25, 3499:15, 3508:5, 3577:13, 3613:20, 3625:25, 3650:10, 3652:7, 3653:22, 3653:23, 3675:11, 3675:18
**reasonable** [11] - 3335:24, 3457:1, 3610:8, 3610:11, 3610:23, 3612:17, 3613:25, 3614:11, 3614:12, 3617:12, 3617:20
**reasons** [12] - 3368:18, 3369:22, 3383:20, 3462:7, 3489:2, 3489:4, 3489:12, 3489:17, 3490:14, 3551:20, 3675:14, 3675:24
**reboot** [2] - 3407:23, 3591:1
**rebuttal** [1] - 3682:22

**receive** [4] - 3379:5, 3530:17, 3612:6, 3620:20
**received** [24] - 3353:8, 3518:9, 3521:7, 3525:14, 3529:25, 3544:8, 3611:10, 3629:2, 3629:4, 3629:10, 3629:21, 3629:22, 3630:3, 3630:5, 3630:6, 3630:7, 3630:20, 3631:5, 3632:3, 3633:2, 3651:6, 3651:7
**receiving** [3] - 3485:19, 3631:11, 3631:13
**recent** [2] - 3469:12, 3470:18
**recently** [5] - 3401:21, 3472:24, 3578:3, 3589:19, 3594:9
**recess** [6] - 3338:6, 3338:9, 3428:8, 3522:24, 3591:2, 3644:11
**rechallenge** [1] - 3319:15
**recognize** [3] - 3561:5, 3626:7, 3626:8
**recollection** [12] - 3435:4, 3453:21, 3492:20, 3493:8, 3493:12, 3497:15, 3497:19, 3501:11, 3510:16, 3525:18, 3658:17, 3685:18
**recommend** [2] - 3596:17, 3622:13
**recommendation** [2] - 3460:4, 3606:20
**recommendations** [2] - 3342:20, 3581:15
**reconsider** [1] - 3324:21, 3332:23
**record** [17] - 3317:23, 3323:17, 3335:12, 3335:17, 3356:6, 3375:20, 3376:15, 3387:8, 3405:10, 3410:2, 3410:6, 3413:5, 3414:24, 3557:17, 3558:6, 3568:15, 3687:5
**recorded** [10] - 3313:25, 3386:10, 3386:24, 3413:19, 3415:8, 3421:8,

3528:11, 3555:23,
3558:4, 3558:24
**recording** [25] -
3375:18, 3376:17,
3377:2, 3377:4,
3377:7, 3377:8,
3386:15, 3387:17,
3396:25, 3401:23,
3402:1, 3422:3,
3422:6, 3459:2,
3459:8, 3526:14,
3526:19, 3526:23,
3526:25, 3527:6,
3527:21, 3528:6,
3559:3, 3559:6,
3685:10
**recordings** [2] -
3376:13, 3377:5
**records** [1] - 3441:5
**recover** [1] - 3484:14
**recovering** [2] -
3566:22, 3574:1
**recruited** [1] - 3580:13
**rectify** [1] - 3672:24
**red** [34] - 3596:3,
3598:20, 3598:23,
3599:2, 3599:5,
3599:16, 3622:6,
3622:10, 3622:21,
3625:11, 3625:24,
3632:10, 3633:20,
3634:8, 3635:25,
3636:2, 3664:16,
3664:17, 3664:18,
3664:19, 3665:2,
3665:5, 3665:8,
3665:23, 3666:6,
3666:7, 3666:8,
3666:10, 3666:14,
3666:25, 3667:22,
3667:24
**redirect** [6] - 3327:24,
3403:7, 3404:3,
3472:18, 3541:19,
3685:12
**REDIRECT** [2] -
3314:4, 3541:21
**Reduction** [1] -
3584:7
**redundant** [1] -
3406:11
**REESE** [1] - 3313:14
**reference** [4] -
3392:20, 3459:6,
3459:12, 3633:19
**referenced** [2] -
3524:8, 3655:21
**references** [1] -
3522:11
**referencing** [4] -

3402:11, 3412:6,
3473:1, 3524:20
**referral** [3] - 3606:19,
3606:20, 3620:21
**referred** [1] - 3584:3
**referring** [12] -
3413:15, 3416:15,
3420:6, 3420:8,
3421:6, 3423:16,
3425:7, 3453:16,
3465:19, 3484:2,
3548:18, 3648:21
**refers** [1] - 3663:14
**reflect** [2] - 3630:23,
3643:8
**reflected** [2] -
3360:17, 3591:25
**reflects** [1] - 3504:4
**refresh** [8] - 3430:10,
3498:9, 3498:17,
3510:8, 3510:16,
3511:2, 3524:14,
3537:25
**refreshes** [1] -
3525:18
**refusal** [2] - 3423:7,
3424:7
**refuse** [3] - 3424:5,
3424:8, 3432:9
**refused** [23] - 3361:1,
3404:22, 3421:9,
3422:24, 3423:19,
3424:3, 3424:9,
3424:15, 3424:17,
3429:1, 3429:6,
3429:12, 3429:16,
3430:11, 3430:25,
3431:14, 3431:19,
3431:22, 3432:1,
3432:5, 3432:23
**regarding** [8] -
3444:2, 3454:7,
3498:14, 3516:25,
3534:12, 3549:10,
3583:2, 3684:8
**regardless** [1] -
3658:8
**registered** [1] - 3478:1
**regular** [1] - 3596:12
**regulated** [4] - 3596:8,
3596:20, 3604:19,
3659:1
**regulations** [6] -
3579:4, 3581:6,
3584:5, 3584:11,
3593:23, 3660:13
**Regulations** [1] -
3584:12
**regulator** [1] - 3642:8
**regulatory** [4] -

3573:12, 3574:3,
3584:16, 3584:24
**rehabilitate** [1] -
3404:3
**reimburse** [2] -
3369:3, 3608:23
**reimbursement** [6] -
3353:17, 3368:20,
3544:11, 3580:22,
3630:24, 3632:2
**reimburses** [3] -
3605:3, 3611:17,
3611:21
**reimbursing** [1] -
3678:18
**reiterate** [1] - 3514:15,
3680:19
**rejected** [1] - 3610:25
**relate** [1] - 3582:23
**related** [4] - 3332:9,
3376:8, 3506:7,
3655:18
**relates** [7] - 3421:3,
3455:3, 3480:13,
3484:8, 3591:22,
3657:9, 3657:16
**relating** [1] - 3546:25
**relationship** [5] -
3344:7, 3346:14,
3347:7, 3373:25,
3606:18
**relator** [1] - 3375:15
**Relator** [3] - 3603:14,
3613:9, 3680:23
**Relator's** [1] - 3492:4
**Relators** [31] -
3313:18, 3315:9,
3315:10, 3315:12,
3315:14, 3316:4,
3317:5, 3324:17,
3487:6, 3487:14,
3569:5, 3583:1,
3583:16, 3594:1,
3610:5, 3610:10,
3647:3, 3650:10,
3657:21, 3667:14,
3673:21, 3674:20,
3675:17, 3675:19,
3675:23, 3676:4,
3676:17, 3676:24,
3677:8, 3678:13,
3678:23
**Relators'** [21] -
3321:2, 3321:21,
3322:1, 3323:12,
3323:17, 3332:6,
3332:12, 3333:12,
3495:14, 3587:13,
3603:24, 3604:13,
3620:17, 3633:8,

3634:15, 3635:15,
3636:15, 3655:4,
3679:14, 3681:7,
3681:23
**relevant** [12] - 3325:6,
3326:6, 3407:8,
3417:12, 3419:1,
3538:10, 3538:12,
3538:23, 3546:22,
3547:24, 3585:2,
3677:4
**reliability** [6] - 3319:2,
3319:3, 3319:15,
3325:16, 3325:17,
3326:1
**reliable** [3] - 3319:7,
3320:1, 3335:8
**reliance** [2] - 3326:11,
3668:1
**relied** [15] - 3319:25,
3320:19, 3321:12,
3322:4, 3322:13,
3322:14, 3327:8,
3327:19, 3328:13,
3329:12, 3329:17,
3330:11, 3482:10,
3591:17, 3593:13
**relive** [1] - 3370:14
**rely** [4] - 3325:7,
3325:8, 3326:20,
3482:15
**relying** [2] - 3497:25,
3592:8
**remain** [6] - 3338:10,
3380:18, 3428:9,
3591:3, 3644:12,
3646:19
**remainder** [1] -
3657:21
**remarried** [1] - 3578:2
**remember** [64] -
3329:13, 3348:7,
3352:16, 3352:18,
3356:19, 3358:11,
3363:12, 3372:7,
3377:13, 3386:11,
3389:21, 3390:19,
3390:22, 3391:5,
3391:19, 3393:12,
3395:12, 3413:3,
3413:21, 3416:25,
3417:1, 3419:8,
3421:10, 3425:14,
3426:2, 3426:3,
3437:5, 3450:23,
3453:20, 3458:14,
3458:15, 3459:3,
3476:11, 3482:2,
3484:3, 3497:7,
3497:11, 3509:4,

3513:24, 3513:25,
3527:23, 3528:2,
3538:13, 3538:16,
3538:19, 3542:21,
3545:5, 3546:3,
3546:14, 3546:15,
3548:15, 3558:25,
3559:25, 3560:23,
3563:7, 3565:9,
3567:3, 3608:1,
3623:8, 3624:8,
3633:16, 3663:5,
3663:8, 3675:12
**remind** [6] - 3333:16,
3546:22, 3553:14,
3591:9, 3607:14,
3646:14
**reminded** [1] -
3493:17
**reminder** [6] -
3338:21, 3338:24,
3339:6, 3427:1,
3523:11, 3646:6
**removed** [2] - 3346:7,
3598:24
**removes** [1] - 3460:18
**removing** [1] - 3599:5
**remuneration** [50] -
3597:1, 3597:5,
3597:7, 3597:8,
3597:18, 3597:19,
3597:25, 3600:14,
3600:24, 3601:1,
3601:10, 3602:5,
3604:7, 3620:20,
3637:7, 3648:22,
3648:23, 3649:5,
3649:19, 3649:21,
3649:25, 3651:2,
3651:4, 3651:8,
3651:15, 3652:9,
3652:15, 3653:8,
3653:11, 3653:16,
3654:1, 3654:4,
3654:6, 3658:2,
3658:5, 3658:9,
3659:2, 3659:12,
3660:3, 3660:4,
3660:20, 3661:16,
3663:4, 3663:11,
3663:15, 3664:5,
3664:6, 3665:24,
3667:2, 3667:3
**remunerations** [1] -
3666:16
**rendition** [1] - 3654:13
**renowned** [1] -
3636:13
**reorient** [1] - 3408:8
**rep** [10] - 3357:12,

3360:11, 3361:10, 3362:3, 3374:17, 3374:18, 3391:23, 3394:1, 3395:7, 3667:13
**repaid** [1] - 3567:6
**repeat** [2] - 3439:7, 3461:9
**repetitive** [1] - 3599:18
**rephrase** [10] - 3462:16, 3462:18, 3489:11, 3495:6, 3533:6, 3542:11, 3597:22, 3598:5, 3601:21, 3603:1
**rephrasing** [1] - 3597:22
**reply** [1] - 3670:8
**report** [48] - 3318:10, 3319:1, 3319:9, 3322:4, 3328:22, 3329:5, 3329:7, 3355:8, 3360:7, 3360:8, 3367:17, 3367:23, 3387:24, 3403:2, 3405:19, 3408:17, 3411:14, 3413:1, 3417:12, 3417:21, 3419:1, 3419:16, 3483:6, 3505:15, 3544:1, 3547:2, 3547:25, 3548:9, 3549:17, 3550:3, 3583:11, 3583:14, 3588:22, 3588:25, 3589:19, 3590:3, 3590:12, 3627:16, 3627:24, 3628:18, 3647:17, 3658:24, 3662:18, 3663:14, 3668:9
**reported** [37] - 3379:15, 3379:18, 3385:11, 3385:25, 3405:18, 3408:10, 3408:14, 3416:9, 3416:23, 3419:7, 3419:12, 3419:21, 3420:2, 3420:11, 3422:20, 3422:21, 3438:4, 3458:11, 3458:17, 3483:10, 3484:4, 3506:25, 3543:19, 3543:23, 3544:5, 3544:9, 3544:10, 3548:25, 3549:8, 3550:1, 3559:10, 3564:23, 3567:2, 3678:19,

3678:20, 3684:19
**reporter** [2] - 3399:17, 3402:5
**Reporter** [4] - 3313:23, 3488:6, 3607:5, 3687:12
**REPORTER'S** [1] - 3687:1
**reporting** [13] - 3354:5, 3363:22, 3379:1, 3379:21, 3386:3, 3390:4, 3506:24, 3515:13, 3544:7, 3550:4, 3640:3, 3640:5
**reports** [2] - 3583:10, 3593:14
**representation** [1] - 3459:11
**representative** [5] - 3395:14, 3395:17, 3396:17, 3509:10, 3641:2
**representatives** [6] - 3394:6, 3459:17, 3640:2, 3640:4, 3640:8
**represented** [2] - 3554:9, 3576:16
**representing** [2] - 3469:5, 3540:4
**reprimanded** [2] - 3353:10, 3454:12
**reps** [4] - 3344:17, 3357:17, 3366:23, 3667:14
**request** [10] - 3341:15, 3342:13, 3380:8, 3380:20, 3417:5, 3534:20, 3535:2, 3546:1, 3586:5, 3644:18
**requested** [7] - 3317:25, 3364:25, 3468:18, 3470:24, 3501:8, 3511:10, 3586:15
**requests** [5] - 3342:20, 3418:12, 3545:21, 3546:8, 3546:17
**require** [4] - 3366:6, 3642:10, 3660:18, 3682:21
**required** [9] - 3356:21, 3366:5, 3488:13, 3488:16, 3547:1, 3547:19, 3548:3, 3651:11
**requirement** [4] -

3457:9, 3457:10, 3457:11, 3504:13
**requirements** [10] - 3392:3, 3461:17, 3461:23, 3584:9, 3584:25, 3634:5, 3642:4, 3642:6, 3642:14, 3642:18
**requires** [2] - 3652:16, 3660:17
**research** [1] - 3581:25
**reservation** [1] - 3330:20
**reserve** [1] - 3671:14
**residents** [1] - 3478:25
**resign** [2] - 3381:4, 3381:25
**resigned** [2] - 3381:1, 3531:8
**resisting** [1] - 3508:6
**resolution** [2] - 3519:3, 3653:25
**resolve** [13] - 3528:1, 3609:24, 3613:8, 3615:6, 3617:25, 3618:1, 3619:6, 3647:12, 3648:9, 3670:22, 3670:24, 3685:21
**resolved** [5] - 3611:2, 3611:5, 3646:3, 3647:15, 3656:18
**resource** [1] - 3549:9
**resources** [8] - 3403:2, 3411:14, 3413:1, 3414:17, 3458:13, 3519:23, 3549:20, 3553:15
**resources'** [1] - 3410:21
**respect** [21] - 3324:17, 3326:11, 3330:5, 3583:5, 3584:1, 3584:23, 3592:3, 3592:11, 3593:19, 3594:8, 3594:23, 3595:25, 3638:5, 3638:23, 3648:23, 3652:6, 3657:19, 3657:23, 3671:1, 3679:9
**respected** [1] - 3502:10
**respectfully** [1] - 3676:6
**respecting** [1] - 3445:4
**respond** [9] - 3361:25, 3376:2, 3378:2,

3472:17, 3521:9, 3521:11, 3530:20, 3607:14, 3675:9
**responded** [3] - 3367:5, 3522:8, 3528:25
**responds** [2] - 3451:17, 3515:8
**response** [10] - 3452:6, 3452:9, 3468:23, 3522:11, 3530:17, 3601:20, 3602:23, 3669:6, 3670:17, 3675:6
**responses** [2] - 3418:11, 3429:20
**responsibilities** [2] - 3332:7, 3639:22
**responsibility** [2] - 3638:21, 3639:20
**responsible** [4] - 3407:20, 3640:3, 3640:4, 3641:17
**responsive** [3] - 3521:23, 3655:13, 3670:14
**rest** [5] - 3316:15, 3402:3, 3436:14, 3644:9, 3647:18
**restaurant** [18] - 3348:20, 3348:24, 3352:16, 3361:13, 3472:22, 3473:8, 3473:17, 3474:1, 3474:19, 3474:21, 3474:23, 3476:3, 3478:14, 3551:19, 3641:11, 3641:12, 3667:17, 3667:18
**restaurants** [15] - 3342:17, 3342:20, 3377:6, 3377:8, 3377:9, 3466:23, 3467:1, 3467:3, 3467:9, 3467:15, 3467:19, 3472:5, 3472:9, 3476:10, 3476:23
**result** [5] - 3449:8, 3508:9, 3606:17, 3607:10, 3676:10
**resulting** [1] - 3630:24
**retained** [5] - 3569:5, 3579:13, 3583:1, 3583:16, 3634:4
**retire** [1] - 3579:20
**retired** [2] - 3569:2, 3578:3
**retrained** [1] - 3378:21
**return** [14] - 3521:19,

3522:3, 3524:10, 3524:12, 3529:3, 3529:6, 3530:21, 3531:6, 3531:12, 3542:23, 3557:13, 3567:20, 3638:6, 3653:18
**returned** [2] - 3391:9, 3521:1
**returning** [1] - 3530:14
**Reuters** [3] - 3580:13, 3580:14, 3582:6
**reversal** [1] - 3426:25
**reverse** [1] - 3609:13
**review** [18] - 3462:4, 3499:23, 3585:19, 3585:21, 3586:4, 3586:7, 3586:15, 3587:16, 3590:13, 3590:19, 3592:10, 3626:20, 3627:16, 3628:5, 3638:14, 3656:1, 3657:18, 3669:22
**reviewed** [26] - 3320:20, 3320:21, 3523:23, 3582:19, 3583:15, 3583:24, 3584:6, 3587:2, 3589:1, 3589:21, 3589:23, 3590:10, 3590:11, 3627:3, 3628:17, 3629:16, 3643:8, 3643:17, 3651:14, 3656:25, 3665:13, 3668:2, 3669:2, 3669:21, 3671:13
**reviewing** [6] - 3325:20, 3500:2, 3582:22, 3593:13, 3629:9
**reviews** [1] - 3471:9
**revisit** [8] - 3333:6, 3333:14, 3335:15, 3336:6, 3336:25, 3346:20, 3471:14, 3681:19
**revisited** [1] - 3332:11
**revisiting** [4] - 3322:18, 3322:21, 3332:21, 3337:6
**Reyataz** [2] - 3623:2, 3624:16
**RFA** [2] - 3547:23, 3549:14
**RFPs** [1] - 3470:21
**rich** [1] - 3573:4
**Ricky** [1] - 3629:7

**ride** [4] - 3352:5, 3352:6, 3641:1
**ride-alongs** [2] - 3641:1
**ring** [1] - 3511:5
**rise** [9] - 3315:4, 3338:16, 3428:7, 3428:13, 3523:6, 3574:21, 3591:7, 3645:15, 3686:9
**risk** [1] - 3360:1
**risky** [5] - 3596:8, 3596:22, 3597:2, 3599:25, 3663:9
**Risperdal** [2] - 3675:3, 3676:11
**river** [1] - 3570:1
**RN** [1] - 3347:2
**road** [2] - 3363:14, 3612:9
**roadwork** [1] - 3584:22
**Rodney** [1] - 3313:21
**role** [8] - 3366:9, 3426:25, 3459:23, 3460:2, 3460:4, 3460:8, 3545:16, 3574:21
**roles** [2] - 3579:8, 3579:10
**rolled** [1] - 3382:18
**rolling** [2] - 3580:18, 3623:7
**roof** [1] - 3361:14
**room** [2] - 3646:8, 3647:7
**rough** [2] - 3378:20, 3562:12
**routine** [1] - 3586:7
**Rubin** [2] - 3628:25
**Rule** [2] - 3325:11, 3332:10
**rule** [7] - 3321:8, 3326:3, 3326:4, 3326:8, 3560:6, 3619:5
**ruled** [13] - 3318:11, 3324:1, 3332:8, 3333:6, 3610:6, 3612:24, 3613:3, 3613:24, 3614:4, 3617:13, 3663:20, 3676:25, 3681:22
**rulemaking** [1] - 3611:16
**rules** [11] - 3322:5, 3351:21, 3592:5, 3592:7, 3592:13, 3592:25, 3599:20, 3615:25, 3647:17,

3658:6, 3664:2
**ruling** [11] - 3319:16, 3324:13, 3325:11, 3327:12, 3332:20, 3335:14, 3336:13, 3337:7, 3618:18, 3677:11, 3679:6
**rulings** [2] - 3616:3, 3676:23
**run** [7] - 3318:22, 3572:10, 3577:12, 3583:22, 3595:12, 3645:23, 3682:18
**RUSS** [168] - 3313:15, 3314:3, 3314:4, 3314:5, 3315:10, 3337:25, 3338:3, 3338:13, 3338:23, 3339:10, 3339:11, 3384:1, 3388:23, 3400:14, 3400:17, 3401:7, 3401:10, 3403:6, 3403:10, 3405:3, 3405:8, 3405:10, 3406:17, 3409:10, 3417:6, 3426:19, 3443:16, 3443:18, 3443:20, 3462:14, 3468:1, 3468:4, 3468:10, 3468:16, 3469:3, 3469:17, 3470:20, 3471:16, 3477:7, 3479:24, 3485:14, 3485:17, 3485:25, 3486:4, 3486:20, 3486:23, 3487:2, 3487:5, 3487:10, 3487:15, 3487:20, 3487:22, 3490:23, 3491:6, 3494:1, 3494:7, 3495:1, 3495:17, 3495:24, 3496:16, 3498:20, 3498:22, 3498:25, 3501:15, 3504:16, 3504:18, 3510:11, 3517:25, 3525:6, 3529:12, 3532:5, 3533:2, 3533:17, 3534:25, 3535:12, 3535:20, 3536:3, 3536:21, 3541:20, 3541:21, 3546:5, 3546:6, 3551:1, 3557:19, 3557:22, 3561:2, 3561:4, 3561:18, 3561:19, 3567:18, 3567:24, 3568:19, 3568:20, 3583:8, 3583:9,

3589:7, 3589:11, 3589:17, 3589:18, 3590:22, 3591:5, 3591:12, 3591:13, 3597:14, 3597:23, 3598:6, 3598:9, 3601:8, 3601:15, 3601:23, 3602:4, 3602:17, 3603:3, 3603:4, 3603:13, 3603:17, 3603:23, 3604:2, 3604:13, 3604:16, 3607:22, 3608:2, 3608:18, 3609:3, 3609:7, 3609:20, 3610:5, 3610:21, 3612:10, 3612:13, 3612:23, 3613:22, 3614:10, 3614:24, 3615:8, 3616:22, 3617:9, 3618:3, 3618:8, 3619:1, 3619:8, 3620:5, 3620:6, 3620:16, 3620:18, 3620:24, 3620:25, 3621:24, 3622:2, 3626:2, 3626:3, 3628:14, 3628:16, 3632:22, 3632:24, 3633:8, 3633:11, 3634:14, 3634:16, 3634:18, 3634:19, 3635:15, 3635:17, 3636:15, 3636:17, 3636:21, 3637:1, 3644:4
**Russ** [32] - 3315:10, 3337:24, 3338:12, 3339:5, 3357:8, 3357:12, 3357:21, 3359:3, 3384:2, 3401:21, 3404:13, 3407:4, 3409:9, 3469:14, 3469:24, 3471:14, 3522:19, 3525:5, 3533:24, 3538:17, 3541:19, 3567:19, 3567:25, 3568:17, 3589:5, 3591:11, 3601:5, 3603:1, 3607:14, 3615:17, 3620:2, 3644:2
**RX** [1] - 3605:4

## S

**sabotage** [1] - 3450:15
**SAFE** [10] - 3460:15,

3461:22, 3627:7, 3627:8, 3627:10, 3627:12, 3627:21, 3628:1, 3628:10, 3628:12
**safe** [2] - 3354:17, 3360:5
**safety** [1] - 3604:24
**Saint** [1] - 3313:17
**Saladana** [1] - 3590:15
**Sales** [2] - 3635:19, 3635:22
**sales** [44] - 3342:24, 3343:3, 3343:13, 3344:2, 3359:4, 3360:11, 3362:3, 3366:23, 3369:14, 3374:17, 3374:18, 3391:23, 3393:24, 3394:1, 3394:5, 3394:6, 3395:7, 3395:14, 3396:17, 3429:11, 3459:17, 3462:13, 3462:24, 3502:18, 3502:19, 3502:20, 3508:9, 3508:14, 3509:10, 3546:21, 3547:1, 3562:1, 3562:13, 3595:19, 3596:1, 3596:2, 3622:9, 3636:7, 3640:1, 3640:2, 3640:4, 3640:8, 3641:2
**salespeople** [3] - 3356:8, 3356:22, 3565:19
**salesperson** [7] - 3359:14, 3359:15, 3359:17, 3363:7, 3363:9, 3610:19, 3611:11
**Salomon** [34] - 3339:21, 3339:23, 3339:24, 3340:19, 3340:24, 3341:4, 3341:7, 3341:14, 3341:22, 3342:6, 3342:7, 3342:13, 3342:15, 3343:16, 3348:13, 3348:22, 3446:1, 3446:4, 3446:20, 3446:23, 3447:1, 3447:4, 3447:8, 3447:11, 3447:15, 3447:20, 3447:22, 3475:24, 3476:2, 3476:22, 3477:12, 3478:9,

3478:20, 3479:5
**Salomon's** [2] - 3349:21, 3478:25
**Samuel** [1] - 3326:8
**SANDERSON** [1] - 3313:16
**Sara** [4] - 3372:19, 3372:21, 3373:1, 3588:18
**sat** [1] - 3397:8
**save** [10] - 3318:23, 3318:24, 3356:1, 3472:12, 3645:1, 3645:8, 3645:20, 3645:23, 3646:4, 3647:9
**saved** [1] - 3645:3
**Savett** [1] - 3550:10
**saw** [18] - 3323:24, 3327:23, 3348:18, 3350:12, 3352:8, 3360:23, 3361:19, 3366:23, 3446:9, 3554:7, 3566:15, 3627:20, 3628:17, 3628:23, 3635:2, 3636:12, 3642:2, 3659:4
**scale** [1] - 3677:3
**scant** [1] - 3638:17
**scary** [1] - 3370:11
**scenario** [1] - 3602:11
**scenes** [1] - 3356:12
**schedule** [2] - 3338:25, 3378:21
**scheduled** [2] - 3334:12, 3547:2
**scheduling** [2] - 3492:3, 3547:8
**Schiff** [1] - 3588:16
**school** [4] - 3329:20, 3369:2, 3569:23, 3570:3
**School** [1] - 3570:3
**schooling** [1] - 3393:6
**science** [2] - 3369:3, 3636:12
**sciences** [2] - 3580:21, 3582:2
**scientific** [3] - 3600:6, 3622:25, 3627:4
**scope** [1] - 3648:18
**score** [1] - 3471:7
**screen** [5] - 3446:9, 3524:20, 3524:23, 3583:19, 3680:8
**scripts** [3] - 3343:25, 3634:2, 3634:13
**scrutinize** [1] - 3331:20

scrutinizing [1] - 3649:5
Se [1] - 3473:11
seat [5] - 3338:5, 3338:18, 3428:15, 3567:21, 3591:8
seated [7] - 3315:5, 3338:10, 3428:9, 3523:8, 3591:3, 3644:12, 3646:19
second [24] - 3317:16, 3406:9, 3407:4, 3413:17, 3423:12, 3469:18, 3512:20, 3516:17, 3518:16, 3522:16, 3525:17, 3529:24, 3537:19, 3537:24, 3578:2, 3592:21, 3598:11, 3610:15, 3635:16, 3639:24, 3641:16, 3642:6, 3649:11, 3662:10
seconds [1] - 3318:22
secret [2] - 3527:6, 3528:5
secretly [4] - 3386:10, 3386:24, 3387:8, 3425:21
section [5] - 3463:19, 3465:21, 3467:8, 3581:3, 3582:2
sections [2] - 3580:19, 3639:12
sector [1] - 3575:4
Security [1] - 3573:2
see [175] - 3324:4, 3329:18, 3331:25, 3333:1, 3334:20, 3336:18, 3341:7, 3342:9, 3342:13, 3343:9, 3349:19, 3354:23, 3359:4, 3364:20, 3365:8, 3366:14, 3367:4, 3374:5, 3378:10, 3379:1, 3381:7, 3389:3, 3389:11, 3390:24, 3400:5, 3402:9, 3402:15, 3402:17, 3404:1, 3404:18, 3405:8, 3409:17, 3410:8, 3410:23, 3411:16, 3415:21, 3416:6, 3417:14, 3418:11, 3423:9, 3423:20, 3441:6, 3444:5, 3444:7, 3445:13, 3445:23, 3447:24,

3448:4, 3448:13, 3449:9, 3451:2, 3451:11, 3451:12, 3452:7, 3452:20, 3453:2, 3457:13, 3463:14, 3463:24, 3465:23, 3466:2, 3466:16, 3469:16, 3470:2, 3470:24, 3477:17, 3477:22, 3477:25, 3478:2, 3478:5, 3480:7, 3480:16, 3480:18, 3487:7, 3491:18, 3492:1, 3492:5, 3494:3, 3494:15, 3496:11, 3498:17, 3499:12, 3499:24, 3500:6, 3500:8, 3502:2, 3504:4, 3510:25, 3511:13, 3516:20, 3518:17, 3518:20, 3521:19, 3523:3, 3524:13, 3525:15, 3530:12, 3531:9, 3533:24, 3539:24, 3540:7, 3546:8, 3546:10, 3546:19, 3547:4, 3548:1, 3548:23, 3549:3, 3549:12, 3551:4, 3552:8, 3552:17, 3554:19, 3558:14, 3559:22, 3564:8, 3582:20, 3583:19, 3585:14, 3585:17, 3586:5, 3586:21, 3586:25, 3590:9, 3597:10, 3604:7, 3604:18, 3604:23, 3605:5, 3606:7, 3608:5, 3609:13, 3609:21, 3620:9, 3620:19, 3621:3, 3621:10, 3621:14, 3621:21, 3622:9, 3623:1, 3623:11, 3623:15, 3623:17, 3623:25, 3624:25, 3626:4, 3626:20, 3626:23, 3629:23, 3631:24, 3632:6, 3632:17, 3632:19, 3632:25, 3634:1, 3634:20, 3634:23, 3635:20, 3636:18, 3641:2, 3641:6, 3641:25, 3643:3, 3646:17, 3660:10, 3666:10, 3671:9, 3671:13,

3676:5, 3677:6, 3679:10, 3683:22, 3686:7
seeing [12] - 3330:3, 3463:16, 3467:1, 3469:19, 3470:1, 3544:6, 3550:19, 3560:18, 3626:13, 3651:20, 3651:21, 3674:18
seek [4] - 3365:5, 3366:19, 3367:3, 3682:21
seeking [2] - 3367:23, 3535:15
seem [1] - 3627:2
Segal [7] - 3347:10, 3502:5, 3503:9, 3503:17, 3504:1, 3629:4, 3630:19
Segal-Maurer [7] - 3347:10, 3502:5, 3503:9, 3503:17, 3504:1, 3629:4, 3630:19
selected [8] - 3598:13, 3598:18, 3598:22, 3622:6, 3625:6, 3628:23, 3637:3, 3637:13
selecting [7] - 3459:18, 3459:23, 3460:2, 3460:8, 3460:10, 3625:10, 3625:25
selection [9] - 3339:15, 3551:20, 3598:15, 3598:16, 3620:21, 3622:5, 3625:17, 3627:21, 3628:2
selections [2] - 3625:16, 3638:2
selects [1] - 3460:18
sell [8] - 3355:24, 3361:2, 3383:5, 3640:9, 3640:13, 3641:5
selling [3] - 3366:1, 3382:19, 3620:11
sells [1] - 3366:2
semantics [1] - 3659:17
send [10] - 3342:4, 3342:8, 3370:21, 3408:21, 3445:12, 3445:21, 3451:9, 3465:10, 3501:8, 3641:12
sending [2] - 3445:11,

3470:19
sends [1] - 3641:12
sense [22] - 3316:13, 3317:4, 3317:13, 3317:14, 3320:20, 3344:8, 3364:20, 3407:25, 3457:15, 3457:18, 3458:6, 3500:24, 3503:10, 3535:4, 3548:16, 3566:1, 3574:11, 3583:23, 3639:3, 3656:3, 3656:25, 3657:6
sent [17] - 3341:7, 3370:20, 3378:21, 3449:16, 3465:25, 3499:22, 3514:12, 3518:19, 3519:7, 3519:23, 3527:25, 3528:23, 3547:15, 3550:19, 3556:11, 3558:18, 3643:15
sentence [1] - 3423:16
separate [13] - 3419:25, 3462:13, 3578:23, 3578:24, 3610:19, 3611:23, 3638:15, 3638:25, 3639:11, 3660:7, 3669:13, 3678:23, 3679:2
serious [10] - 3383:10, 3383:15, 3383:23, 3395:19, 3418:1, 3418:25, 3447:11, 3447:16, 3577:20, 3577:21
seriously [2] - 3418:22, 3418:24
serve [3] - 3569:6, 3575:11, 3578:7
served [2] - 3570:17, 3578:20
service [3] - 3605:25, 3606:21, 3637:8
Service [2] - 3478:17, 3479:6
services [7] - 3569:18, 3572:25, 3573:23, 3575:13, 3604:9, 3621:12, 3621:20
Services [3] - 3573:7, 3573:9, 3573:22
set [9] - 3323:9, 3333:20, 3341:17, 3348:25, 3349:7, 3461:2, 3575:20, 3625:5, 3641:9
settled [1] - 3568:11

settlement [1] - 3578:13
seven [5] - 3378:23, 3382:11, 3544:14, 3554:5, 3558:3
several [6] - 3528:21, 3570:4, 3574:24, 3584:11, 3621:7, 3624:3
Shaked [2] - 3333:24, 3588:22
shaked [1] - 3335:5
Shaked's [1] - 3628:18
shape [1] - 3656:4
share [8] - 3344:16, 3358:1, 3359:2, 3359:4, 3359:7, 3485:19, 3573:20
shared [4] - 3344:15, 3361:20, 3495:3, 3564:24
sharing [2] - 3452:25, 3482:1
sharp [1] - 3326:1
sheet [24] - 3399:11, 3400:10, 3400:19, 3400:25, 3401:6, 3402:11, 3402:14, 3403:10, 3403:14, 3405:7, 3406:2, 3406:23, 3407:6, 3409:16, 3411:19, 3426:17, 3427:9, 3427:14, 3431:3, 3553:18, 3553:25, 3685:1, 3685:5
sheets [1] - 3406:18
Sherr [3] - 3353:16, 3489:23, 3544:11
Sherry [1] - 3550:9
Shipp [1] - 3617:13
shoes [3] - 3383:19, 3610:13, 3669:18
short [11] - 3338:9, 3428:8, 3530:2, 3568:4, 3568:5, 3589:15, 3591:2, 3600:10, 3626:25, 3644:11, 3670:10
short-term [1] - 3530:2
shortly [2] - 3506:14, 3526:18
show [21] - 3402:19, 3404:9, 3440:16, 3443:25, 3452:20, 3466:6, 3477:11, 3496:1, 3496:14, 3499:10, 3524:19,

3531:2, 3546:1,
3546:7, 3549:15,
3583:14, 3589:12,
3603:24, 3611:20,
3621:25, 3631:5
**showed** [7] - 3327:24,
3404:10, 3476:9,
3546:13, 3547:23,
3548:13, 3549:14
**showing** [3] -
3361:20, 3404:19,
3525:13
**shown** [1] - 3620:8
**shows** [3] - 3327:22,
3404:21, 3629:21
**shut** [5] - 3332:18,
3332:20, 3333:10,
3354:24, 3362:2
**sick** [2] - 3347:21,
3380:18
**side** [23] - 3323:6,
3323:21, 3327:11,
3331:12, 3333:5,
3333:9, 3363:14,
3374:22, 3411:10,
3481:17, 3571:21,
3572:22, 3574:25,
3575:12, 3575:24,
3576:1, 3576:18,
3576:19, 3576:23,
3602:14, 3624:25,
3681:21
**Sidebar** [16] -
3400:16, 3407:13,
3468:3, 3471:19,
3485:16, 3487:25,
3494:4, 3496:17,
3534:1, 3537:2,
3597:11, 3598:7,
3600:21, 3602:20,
3607:1, 3619:24
**sidebar** [9] - 3329:8,
3402:21, 3407:16,
3494:3, 3533:22,
3597:10, 3615:7,
3646:4, 3648:11
**sidebarring** [1] -
3331:4
**sides** [6] - 3323:14,
3325:22, 3568:3,
3656:6, 3670:13,
3676:25
**sign** [1] - 3454:24
**signature** [3] -
3409:21, 3454:20,
3505:1
**signed** [9] - 3385:14,
3406:5, 3409:20,
3427:17, 3490:8,
3504:10, 3505:23,

3539:12, 3547:10
**significant** [9] -
3322:25, 3402:2,
3403:4, 3404:1,
3407:3, 3484:15,
3487:8, 3487:13,
3656:14
**Sillup** [5] - 3318:8,
3319:6, 3329:2,
3329:4, 3330:11
**similar** [8] - 3323:9,
3333:8, 3342:15,
3342:18, 3351:2,
3357:4, 3495:1,
3668:9
**simple** [1] - 3667:13
**simply** [3] - 3325:25,
3615:24, 3638:11
**Sinai** [2] - 3446:4,
3446:7
**single** [8] - 3376:5,
3400:20, 3439:3,
3456:2, 3456:4,
3456:7, 3457:16,
3635:9
**sit** [5] - 3326:21,
3381:15, 3399:16,
3645:18, 3651:13
**sitting** [9] - 3338:21,
3347:21, 3358:12,
3459:11, 3594:6,
3617:3, 3644:9,
3645:25, 3673:17
**situation** [12] -
3342:18, 3346:10,
3351:7, 3355:1,
3359:6, 3359:23,
3361:9, 3364:23,
3410:7, 3448:25,
3542:16, 3673:5
**situations** [1] - 3600:9
**six** [5] - 3341:11,
3376:19, 3525:25,
3580:18, 3663:15
**SKADDEN** [1] -
3313:19
**skills** [1] - 3513:8
**SLATE** [1] - 3313:19
**sleep** [1] - 3362:20
**sleeping** [1] - 3362:10
**slicing** [1] - 3659:18
**Slide** [2] - 3620:17,
3623:1
**slide** [30] - 3347:21,
3404:21, 3591:25,
3594:17, 3601:22,
3602:9, 3603:25,
3604:4, 3604:14,
3616:5, 3616:9,
3620:24, 3621:25,

3622:1, 3623:11,
3623:17, 3623:25,
3624:12, 3624:16,
3624:18, 3626:2,
3628:15, 3628:21,
3629:16, 3631:4,
3632:6, 3632:22,
3660:25, 3661:3
**slides** [10] - 3347:22,
3348:1, 3353:3,
3366:22, 3597:23,
3601:24, 3621:25,
3648:21, 3659:4,
3663:25
**slip** [1] - 3389:14
**slipped** [1] - 3387:3
**slippery** [2] - 3321:16,
3328:8
**slipping** [1] - 3389:4
**slope** [2] - 3321:16,
3328:8
**slow** [1] - 3684:14
**slower** [1] - 3612:21
**Smacchia** [10] -
3360:9, 3360:14,
3437:15, 3437:19,
3438:2, 3438:4,
3438:10, 3438:14,
3448:2
**Smollen** [2] - 3627:14,
3627:23
**smooth** [1] - 3366:14
**so..** [3] - 3353:7,
3470:19, 3632:21
**Social** [1] - 3573:2
**social** [1] - 3600:9
**socialize** [1] - 3600:2
**sold** [1] - 3543:6
**sole** [1] - 3674:20
**solely** [1] - 3578:20
**solicitation** [2] -
3350:10, 3352:22
**soliciting** [1] -
3350:25
**solution** [1] - 3359:8
**someone** [9] - 3331:2,
3496:5, 3532:13,
3539:17, 3633:24,
3637:8, 3642:22,
3642:25, 3668:12
**sometime** [1] - 3618:5
**sometimes** [12] -
3327:21, 3328:2,
3352:5, 3366:15,
3422:14, 3457:13,
3502:18, 3580:9,
3584:2, 3598:17,
3614:6, 3641:3
**somewhat** [2] -
3639:2, 3685:18

**somewhere** [3] -
3340:9, 3341:10,
3456:21
**son** [2] - 3383:21,
3567:16
**sooner** [1] - 3656:18
**Sorana** [3] - 3347:10,
3502:4, 3629:4
**Sorana** [1] - 3501:25
**sorry** [45] - 3316:12,
3332:4, 3337:9,
3391:2, 3401:20,
3407:15, 3423:24,
3443:17, 3464:25,
3468:14, 3474:18,
3487:22, 3491:1,
3491:4, 3491:5,
3494:5, 3498:21,
3501:13, 3504:21,
3511:19, 3525:7,
3529:7, 3538:21,
3540:1, 3567:25,
3568:9, 3574:13,
3579:9, 3591:15,
3594:8, 3596:19,
3596:24, 3612:21,
3618:9, 3624:5,
3626:18, 3629:5,
3632:14, 3637:16,
3661:11, 3664:21,
3666:3, 3668:18,
3670:5, 3684:14
**sort** [30] - 3333:22,
3389:4, 3410:7,
3444:13, 3452:17,
3455:13, 3469:12,
3500:11, 3512:17,
3513:16, 3518:18,
3525:24, 3535:9,
3540:12, 3570:19,
3573:3, 3574:5,
3578:18, 3595:17,
3600:25, 3602:15,
3606:3, 3615:2,
3626:21, 3637:9,
3641:25, 3643:18,
3661:14, 3661:17,
3666:22
**sorts** [3] - 3572:3,
3574:20, 3596:12
**sought** [1] - 3364:10
**Soule** [2] - 3313:23,
3687:11
**Soule@njd.uscourts
.gov** [1] - 3313:24
**sound** [4] - 3330:9,
3330:10, 3673:17,
3683:5
**sounds** [12] - 3316:21,
3330:21, 3336:6,

3345:20, 3534:7,
3595:10, 3618:21,
3636:22, 3644:15,
3647:9, 3657:14,
3673:16
**soup** [1] - 3573:5
**source** [17] - 3321:12,
3321:13, 3321:14,
3321:15, 3322:4,
3325:8, 3325:9,
3327:8, 3328:13,
3328:17, 3328:20,
3328:24, 3330:11,
3330:12, 3331:1,
3449:24
**sources** [7] - 3319:1,
3319:8, 3321:11,
3325:7, 3326:23,
3328:5, 3593:17
**south** [1] - 3341:10
**Southern** [1] -
3579:21
**southwest** [1] -
3578:7
**Speaker** [6] - 3461:8,
3461:11, 3583:3,
3591:23, 3635:19,
3635:22
**speaker** [161] - 3328:1,
3339:15, 3340:10,
3341:6, 3344:10,
3345:2, 3345:15,
3346:8, 3346:17,
3347:10, 3362:16,
3397:19, 3412:9,
3412:15, 3412:19,
3414:9, 3416:10,
3416:23, 3417:13,
3419:7, 3419:21,
3420:2, 3420:11,
3448:2, 3449:11,
3449:14, 3459:15,
3461:17, 3462:12,
3462:23, 3463:4,
3465:22, 3466:6,
3467:20, 3473:3,
3474:6, 3475:4,
3475:10, 3475:12,
3475:17, 3475:24,
3477:12, 3479:9,
3484:5, 3489:19,
3502:7, 3502:15,
3504:4, 3507:6,
3507:13, 3546:25,
3547:3, 3547:9,
3547:12, 3547:14,
3547:25, 3548:9,
3548:10, 3548:18,
3549:22, 3550:22,
3551:3, 3551:20,

3553:2, 3557:11, 3559:13, 3582:23, 3582:24, 3583:2, 3583:5, 3585:25, 3586:12, 3591:22, 3592:3, 3592:9, 3592:12, 3592:13, 3592:15, 3594:21, 3594:23, 3595:16, 3595:18, 3595:25, 3596:6, 3597:1, 3598:10, 3598:18, 3599:8, 3599:9, 3599:15, 3599:25, 3600:3, 3600:5, 3600:12, 3600:15, 3601:24, 3603:6, 3608:5, 3622:5, 3622:13, 3622:22, 3623:7, 3623:13, 3624:2, 3624:19, 3625:16, 3625:17, 3625:19, 3626:11, 3628:2, 3629:1, 3629:2, 3629:20, 3630:7, 3630:8, 3630:11, 3632:17, 3633:24, 3634:5, 3634:6, 3634:12, 3635:2, 3635:3, 3635:9, 3636:1, 3636:5, 3636:6, 3636:8, 3636:9, 3636:11, 3636:19, 3637:25, 3638:2, 3638:9, 3638:18, 3638:22, 3639:1, 3640:3, 3640:5, 3640:13, 3640:14, 3640:15, 3640:19, 3640:24, 3641:3, 3641:10, 3641:18, 3642:1, 3642:2, 3642:15, 3642:20, 3643:2, 3643:4, 3643:10, 3643:21, 3653:4, 3663:9

**speakers** [71] - 3339:15, 3340:3, 3341:1, 3346:13, 3354:20, 3360:4, 3375:11, 3397:20, 3413:1, 3413:20, 3459:18, 3459:23, 3460:2, 3460:9, 3460:10, 3460:19, 3460:22, 3461:22, 3474:10, 3475:12, 3479:5, 3502:19, 3507:13, 3507:15, 3507:21, 3551:18,

3557:12, 3598:12, 3598:15, 3598:18, 3598:22, 3598:24, 3599:6, 3600:1, 3622:6, 3622:10, 3622:13, 3622:16, 3622:19, 3624:1, 3624:5, 3625:6, 3625:10, 3626:1, 3626:4, 3626:6, 3626:12, 3626:15, 3626:18, 3626:19, 3626:22, 3626:25, 3627:1, 3627:4, 3627:22, 3628:19, 3629:17, 3629:18, 3630:2, 3630:5, 3630:15, 3631:13, 3631:22, 3632:3, 3637:2, 3637:11, 3638:8, 3640:11, 3665:1, 3665:2

**speakers'** [5] - 3622:15, 3635:13, 3638:7, 3651:1, 3664:1

**speaking** [13] - 3320:25, 3330:15, 3397:19, 3412:9, 3445:6, 3447:4, 3490:13, 3557:10, 3651:23, 3652:15, 3652:16, 3666:21

**speaks** [2] - 3600:10, 3648:22

**special** [2] - 3342:6, 3570:17

**specialist** [1] - 3546:21

**specific** [9] - 3422:20, 3469:22, 3472:16, 3599:20, 3607:8, 3648:8, 3648:17, 3673:13, 3684:15

**specifically** [10] - 3323:19, 3326:3, 3447:21, 3475:13, 3475:19, 3558:25, 3591:22, 3637:11, 3658:14, 3663:22

**specifics** [3] - 3422:14, 3422:16, 3685:19

**specify** [1] - 3420:16

**speculate** [3] - 3481:20, 3482:4, 3482:18

**speech** [2] - 3345:21, 3643:16

**speeches** [3] -

3341:11, 3345:22, 3347:5

**spelled** [1] - 3399:25

**spelling** [4] - 3401:17, 3402:7, 3404:1, 3568:15

**spellings** [1] - 3405:13

**spend** [4] - 3583:22, 3619:5, 3619:6, 3675:17

**spending** [1] - 3611:7

**spent** [2] - 3320:4, 3594:7

**spin** [1] - 3645:4

**split** [10] - 3485:8, 3485:23, 3486:6, 3486:10, 3486:13, 3486:17, 3488:10, 3542:18, 3566:20, 3579:12

**spoken** [4] - 3352:10, 3449:21, 3547:17, 3610:1

**spots** [1] - 3393:10

**spreadsheets** [2] - 3593:16, 3643:17

**Square** [3] - 3313:21, 3352:15, 3354:13

**square** [1] - 3637:4

**St** [2] - 3347:1, 3369:4

**stage** [1] - 3653:1

**stake** [1] - 3484:24

**stamp** [1] - 3586:18

**stand** [17] - 3319:23, 3322:11, 3334:18, 3336:2, 3336:10, 3372:5, 3484:14, 3545:15, 3645:11, 3647:20, 3652:24, 3654:10, 3658:14, 3668:18, 3668:20, 3682:9, 3684:12

**standard** [6] - 3668:21, 3668:24, 3668:25, 3669:1, 3669:3

**standards** [6] - 3592:25, 3593:10, 3593:21, 3594:20, 3653:6, 3664:3

**standing** [3] - 3653:24, 3669:18, 3681:18

**Stark** [2] - 3574:4

**start** [15] - 3316:22, 3352:2, 3352:23, 3364:12, 3375:18, 3406:18, 3443:25, 3494:21, 3510:22,

3517:6, 3546:18, 3580:14, 3586:8, 3660:1, 3669:9

**started** [20] - 3358:13, 3362:19, 3366:25, 3375:16, 3382:3, 3389:2, 3389:3, 3433:12, 3434:7, 3435:7, 3509:13, 3526:13, 3544:7, 3560:24, 3561:16, 3572:22, 3579:12, 3590:4, 3629:8, 3664:1

**starting** [7] - 3344:17, 3354:22, 3355:1, 3362:9, 3362:21, 3408:3, 3637:22

**starts** [3] - 3452:25, 3539:23, 3657:17

**State** [1] - 3313:9

**state** [10] - 3405:11, 3568:14, 3573:18, 3573:20, 3582:11, 3605:13, 3608:20, 3621:1, 3621:13

**statement** [5] - 3322:10, 3402:6, 3429:5, 3484:4, 3532:14

**statements** [5] - 3408:9, 3528:14, 3601:12, 3681:1, 3681:4

**Staten** [1] - 3571:10

**states** [5] - 3596:25, 3605:14, 3605:15, 3621:5, 3621:7

**States** [7] - 3315:2, 3487:2, 3492:17, 3569:17, 3570:15, 3572:25, 3674:15

**STATES** [3] - 3313:1, 3313:3, 3313:12

**stating** [2] - 3521:7, 3601:10

**statute** [20] - 3495:12, 3497:24, 3570:19, 3584:1, 3584:8, 3597:18, 3598:3, 3601:6, 3601:11, 3602:15, 3650:12, 3650:18, 3654:5, 3660:8, 3661:1, 3663:2, 3665:25, 3666:12, 3666:16

**Statute** [27] - 3572:12, 3574:6, 3582:5, 3584:6, 3597:6, 3597:13, 3599:12,

3600:14, 3606:10, 3606:18, 3607:9, 3608:23, 3615:15, 3616:13, 3616:25, 3618:13, 3631:19, 3648:16, 3648:24, 3650:1, 3652:24, 3654:2, 3656:16, 3658:1, 3659:3, 3668:14, 3676:21

**statutes** [7] - 3584:1, 3584:11, 3607:21, 3616:17, 3618:12, 3659:22, 3666:6

**statutorily** [1] - 3577:10

**statutory** [2] - 3653:23, 3663:6

**stay** [11] - 3338:5, 3353:10, 3354:2, 3360:5, 3365:10, 3378:10, 3453:10, 3495:5, 3599:9, 3619:14, 3633:24

**stayed** [2] - 3353:9, 3570:4

**staying** [2] - 3368:17, 3682:1

**stays** [1] - 3636:5

**STD** [1] - 3530:1

**stenography** [1] - 3313:25

**step** [10] - 3381:21, 3491:25, 3522:22, 3610:15, 3610:20, 3610:23, 3646:22, 3658:16, 3665:6, 3681:2

**stepping** [1] - 3610:12

**steps** [1] - 3482:24

**Steve** [8] - 3360:9, 3360:14, 3437:15, 3437:19, 3438:2, 3438:4, 3438:14

**sticks** [1] - 3643:25

**still** [27] - 3316:3, 3317:6, 3330:3, 3337:24, 3339:7, 3357:23, 3382:23, 3430:23, 3431:19, 3436:17, 3465:7, 3466:1, 3475:10, 3484:6, 3501:5, 3523:11, 3551:13, 3580:8, 3591:9, 3646:11, 3651:19, 3654:7, 3658:10, 3658:12, 3666:3, 3678:8, 3686:3

**stint** [1] - 3556:10

**stitches** [1] - 3543:6
**stood** [1] - 3383:19
**stop** [10] - 3363:22,
3415:17, 3522:17,
3577:6, 3608:4,
3608:8, 3629:13,
3637:16, 3644:2,
3644:4
**stopped** [3] - 3329:6,
3382:20, 3672:18
**stopping** [1] - 3565:6
**stories** [2] - 3359:5,
3359:8
**story** [8] - 3354:14,
3362:1, 3368:11,
3370:13, 3424:4,
3427:18, 3453:11,
3680:4
**straight** [2] - 3575:20,
3660:25
**Strand** [4] - 3372:19,
3372:21, 3373:1,
3588:18
**strand** [3] - 3373:8,
3373:9, 3565:15
**strategy** [1] - 3453:1
**Street** [3] - 3313:9,
3313:17, 3313:12
**strengthen** [1] -
3466:15
**stress** [4] - 3363:6,
3364:8, 3365:20,
3449:24
**stressed** [1] - 3364:24
**stretch** [2] - 3428:5,
3644:7
**stricken** [1] - 3336:16
**strike** [3] - 3332:14,
3334:22, 3426:21,
3426:24, 3485:17,
3533:3, 3533:4,
3533:7, 3570:17,
3600:19, 3601:20,
3602:23, 3626:18
**string** [1] - 3477:11
**strong** [1] - 3681:18
**struggling** [1] -
3672:23
**studies** [3] - 3352:24,
3482:1, 3482:5
**study** [9] - 3327:20,
3330:9, 3330:10,
3355:15, 3355:24,
3361:21, 3366:13,
3482:11, 3569:17
**stuff** [4] - 3403:19,
3466:14, 3466:19,
3665:13
**stylistic** [1] - 3403:25
**subject** [4] - 3320:23,

3471:8, 3603:2,
3641:23
**submission** [2] -
3655:1, 3655:9
**submissions** [1] -
3655:16
**submit** [9] - 3351:7,
3455:4, 3455:17,
3455:23, 3456:1,
3581:7, 3618:22,
3618:23, 3621:19
**submitted** [9] -
3458:9, 3607:9,
3608:20, 3611:9,
3611:10, 3614:8,
3618:24, 3655:11,
3671:7
**submitting** [6] -
3454:12, 3456:20,
3457:16, 3457:25,
3468:5, 3621:11
**subsection** [1] -
3607:8
**subsequent** [1] -
3626:19
**subsequently** [1] -
3351:25
**subside** [1] - 3382:14
**subsidiary** [1] -
3380:9
**substance** [3] -
3400:11, 3403:15,
3407:7
**substantive** [7] -
3401:17, 3402:2,
3402:4, 3402:9,
3407:3, 3410:16,
3656:14
**succeeded** [1] -
3668:7
**success** [2] - 3348:2,
3450:15
**successful** [2] -
3361:5, 3641:5
**sudden** [1] - 3334:4
**suffering** [1] - 3370:25
**sufficient** [1] -
3607:17
**suggest** [4] - 3371:11,
3484:22, 3489:8,
3633:14
**suggestion** [1] -
3459:17
**suggestions** [2] -
3459:25, 3473:11
**suit** [5] - 3371:17,
3542:7, 3542:15,
3562:3, 3566:2
**Suite** [1] - 3313:17
**summary** [3] -

3525:24, 3610:9,
3612:15
**superior** [1] - 3514:3
**superiors** [2] -
3393:21, 3557:5
**supervisor** [8] -
3440:8, 3505:4,
3505:18, 3514:7,
3514:11, 3544:9,
3549:2, 3559:11
**supervisors** [1] -
3549:18
**supervisory** [1] -
3574:21
**Supp** [1] - 3326:8
**Supplement** [1] -
3606:5
**supplemental** [4] -
3583:11, 3589:19,
3671:4, 3671:11
**supplies** [1] - 3382:8
**support** [23] -
3330:18, 3371:2,
3371:4, 3439:3,
3439:10, 3447:10,
3447:16, 3449:8,
3464:23, 3490:9,
3500:21, 3532:14,
3532:18, 3533:1,
3533:12, 3534:5,
3534:8, 3534:18,
3534:24, 3535:8,
3538:5, 3538:7,
3539:13
**supported** [1] -
3371:7
**supportive** [5] -
3362:1, 3371:2,
3371:15, 3371:16,
3644:22
**supports** [1] - 3613:13
**supposed** [12] -
3351:17, 3359:17,
3379:2, 3547:9,
3547:10, 3586:10,
3593:21, 3595:12,
3600:5, 3600:8,
3625:17, 3650:12
**surprise** [1] - 3395:10
**surprised** [7] -
3345:17, 3345:18,
3372:2, 3372:3,
3372:4, 3440:17,
3627:11
**surrounding** [1] -
3642:1
**suspect** [2] - 3469:13,
3657:7
**suspected** [1] -
3548:25

**suspicion** [1] -
3469:11
**sustain** [7] - 3462:18,
3495:6, 3533:4,
3533:7, 3533:20,
3550:25, 3597:21
**sustained** [4] -
3598:4, 3602:22,
3650:16, 3665:20
**sutures** [1] - 3543:6
**swear** [3] - 3395:20,
3416:18, 3498:6
**swearing** [1] - 3399:1
**switch** [2] - 3380:17,
3589:5
**switching** [1] -
3368:22
**swore** [16] - 3385:8,
3385:15, 3385:25,
3390:3, 3394:16,
3408:9, 3408:14,
3411:13, 3411:23,
3412:24, 3416:13,
3430:10, 3437:3,
3437:6, 3437:8,
3506:2
**sworn** [20] - 3388:2,
3398:20, 3400:11,
3406:5, 3409:15,
3411:1, 3413:18,
3414:15, 3416:16,
3421:17, 3424:14,
3424:19, 3426:7,
3428:20, 3429:4,
3429:20, 3434:3,
3483:24, 3484:4,
3568:10
**SWORN/AFFIRMED**
[1] - 3568:12
**sympathy** [1] - 3364:3
**symptoms** [1] -
3382:14
**system** [7] - 3363:11,
3450:4, 3575:16,
3578:1, 3578:7,
3578:12, 3578:13
**systems** [3] - 3576:14,
3576:15, 3577:19

---

**T**

**tab** [16] - 3443:14,
3443:16, 3443:17,
3452:23, 3467:22,
3477:6, 3479:23,
3490:23, 3498:18,
3501:13, 3504:15,
3510:10, 3517:24,
3521:12, 3532:4
**table** [1] - 3620:3,

3656:25
**tabling** [1] - 3670:1
**tactic** [2] - 3346:21,
3352:22
**tactical** [1] - 3321:22
**tactics** [1] - 3363:8
**tailor** [1] - 3407:10
**tainted** [1] - 3333:22
**talks** [3] - 3473:7,
3499:22, 3519:2
**tam** [1] - 3579:25
**tape** [26] - 3387:23,
3388:7, 3388:9,
3394:15, 3397:8,
3397:22, 3399:2,
3399:5, 3408:18,
3408:21, 3408:24,
3421:24, 3422:24,
3424:22, 3424:25,
3425:2, 3425:5,
3425:7, 3425:16,
3425:25, 3426:6,
3483:10, 3517:6,
3517:17, 3520:6,
3559:6
**taped** [5] - 3424:16,
3425:8, 3425:21,
3428:25
**tapes** [1] - 3425:19
**target** [1] - 3573:4
**target-rich** [1] -
3573:4
**targeted** [1] - 3623:2
**targeting** [1] - 3625:13
**targets** [1] - 3429:11
**task** [1] - 3512:14
**taste** [1] - 3541:10
**tat** [1] - 3609:17
**taught** [1] - 3344:1
**tax** [1] - 3571:8
**taxation** [2] - 3570:8,
3570:9
**taxpayers** [1] -
3566:22
**team** [5] - 3322:11,
3448:7, 3448:25,
3453:6, 3595:20
**technical** [2] - 3401:6,
3668:25
**ten** [13] - 3337:20,
3337:23, 3338:1,
3338:6, 3344:3,
3428:4, 3441:17,
3441:18, 3456:20,
3555:12, 3562:6,
3590:25, 3644:7
**ten-minute** [2] -
3428:4, 3590:25
**tenure** [1] - 3574:23
**term** [11] - 3422:14,

3527:21, 3530:2, 3530:7, 3580:1, 3597:13, 3598:2, 3604:7, 3614:9, 3650:17, 3660:7

**terminated** [1] - 3665:4

**terms** [7] - 3483:19, 3503:20, 3578:25, 3593:5, 3597:4, 3601:6, 3663:1

**terrible** [1] - 3358:16

**territory** [7] - 3340:25, 3355:14, 3365:11, 3380:7, 3400:18, 3444:20, 3447:23

**TESTIFIED** [1] - 3568:12

**testified** [16] - 3364:4, 3373:5, 3413:13, 3413:18, 3414:8, 3415:5, 3431:7, 3433:4, 3433:8, 3460:14, 3544:22, 3544:24, 3564:19, 3564:23, 3640:18, 3672:1

**testifies** [4] - 3334:20, 3403:1, 3651:6, 3658:13

**testify** [24] - 3318:16, 3318:17, 3318:19, 3320:10, 3320:14, 3320:15, 3322:19, 3322:20, 3334:13, 3334:23, 3335:8, 3336:13, 3392:23, 3438:23, 3565:7, 3607:24, 3649:12, 3656:21, 3658:11, 3659:21, 3667:10, 3667:14, 3669:15, 3669:16

**testifying** [12] - 3334:5, 3401:22, 3413:21, 3433:18, 3434:2, 3493:19, 3579:14, 3658:18, 3659:11, 3659:13, 3660:2, 3670:25

**testimonies** [1] - 3643:7

**testimony** [115] - 3318:18, 3327:24, 3332:14, 3335:21, 3336:2, 3336:4, 3336:15, 3338:20, 3376:14, 3377:10, 3385:3, 3385:5, 3399:7, 3400:11,

3400:24, 3401:4, 3401:18, 3402:2, 3406:1, 3406:3, 3406:13, 3407:3, 3407:7, 3409:4, 3409:15, 3410:15, 3411:1, 3411:24, 3413:12, 3413:18, 3414:4, 3414:15, 3414:16, 3415:25, 3416:2, 3416:3, 3416:9, 3416:16, 3419:6, 3421:17, 3421:24, 3422:1, 3422:9, 3423:12, 3424:14, 3424:19, 3426:7, 3426:12, 3427:10, 3428:20, 3429:5, 3430:15, 3431:23, 3432:14, 3434:10, 3434:12, 3434:15, 3434:16, 3435:6, 3436:9, 3436:24, 3439:4, 3439:10, 3440:12, 3440:19, 3440:22, 3441:4, 3442:11, 3483:19, 3483:25, 3484:8, 3495:2, 3508:4, 3534:6, 3537:13, 3554:1, 3554:9, 3558:10, 3558:18, 3561:15, 3564:19, 3589:24, 3590:20, 3607:18, 3607:19, 3607:23, 3615:22, 3619:20, 3627:5, 3627:9, 3627:17, 3638:19, 3638:20, 3640:25, 3644:16, 3652:2, 3652:10, 3656:6, 3658:22, 3658:24, 3660:4, 3661:15, 3671:8, 3682:21, 3682:24, 3683:8, 3684:4, 3684:8, 3684:9, 3684:16, 3685:7, 3685:12, 3685:17, 3685:18

**Teva** [2] - 3590:4, 3590:5

**Texas** [2] - 3313:17, 3351:8

**text** [4] - 3439:9, 3441:22, 3442:3, 3445:17

**THE** [374] - 3313:1, 3313:11, 3315:4, 3315:5, 3315:15, 3315:22, 3316:10,

3316:13, 3316:19, 3316:25, 3317:3, 3317:15, 3317:22, 3318:2, 3318:12, 3320:7, 3320:13, 3324:6, 3324:9, 3324:16, 3324:20, 3324:24, 3325:3, 3325:12, 3326:13, 3326:19, 3327:4, 3328:9, 3328:25, 3329:4, 3329:10, 3329:15, 3330:14, 3332:2, 3332:19, 3333:23, 3333:25, 3334:3, 3334:9, 3334:12, 3334:17, 3335:1, 3335:6, 3335:11, 3336:5, 3337:9, 3337:13, 3337:15, 3337:19, 3338:1, 3338:4, 3338:10, 3338:11, 3338:14, 3338:15, 3338:18, 3338:24, 3339:8, 3339:9, 3384:2, 3384:6, 3388:24, 3400:15, 3400:23, 3401:9, 3401:12, 3401:20, 3402:17, 3402:21, 3402:23, 3403:4, 3403:9, 3403:13, 3403:20, 3403:24, 3404:11, 3404:13, 3404:18, 3404:23, 3405:4, 3405:6, 3405:9, 3405:15, 3406:6, 3406:14, 3406:16, 3406:23, 3407:12, 3407:15, 3408:1, 3408:6, 3409:9, 3409:11, 3415:18, 3415:20, 3417:7, 3426:21, 3427:3, 3427:4, 3427:5, 3427:23, 3427:25, 3428:2, 3428:7, 3428:9, 3428:10, 3428:13, 3428:15, 3433:21, 3433:23, 3433:24, 3443:21, 3462:18, 3468:2, 3468:9, 3468:11, 3468:14, 3468:24, 3469:4, 3469:16, 3469:20, 3470:6, 3470:10, 3470:13, 3471:3, 3471:12, 3471:17, 3471:22, 3471:25,

3472:11, 3472:14, 3472:15, 3472:19, 3477:8, 3479:25, 3485:15, 3485:22, 3486:2, 3486:5, 3486:19, 3486:22, 3486:25, 3487:4, 3487:7, 3487:11, 3487:18, 3487:24, 3488:3, 3490:25, 3491:3, 3491:7, 3494:3, 3494:5, 3494:9, 3494:14, 3494:17, 3494:21, 3495:5, 3495:9, 3495:19, 3495:23, 3495:25, 3496:3, 3496:6, 3496:9, 3496:11, 3496:14, 3496:21, 3496:24, 3497:2, 3499:1, 3501:16, 3504:20, 3504:22, 3510:12, 3518:1, 3522:17, 3522:21, 3523:1, 3523:5, 3523:8, 3523:13, 3523:14, 3523:25, 3525:5, 3525:7, 3525:10, 3529:7, 3529:10, 3529:13, 3529:17, 3532:6, 3533:4, 3533:20, 3533:24, 3534:2, 3534:10, 3534:20, 3535:14, 3535:18, 3535:21, 3536:7, 3536:9, 3536:12, 3536:14, 3536:19, 3536:23, 3537:5, 3541:18, 3550:25, 3567:19, 3567:22, 3567:23, 3567:25, 3568:14, 3568:16, 3568:17, 3589:5, 3589:8, 3589:14, 3590:24, 3591:3, 3591:4, 3591:6, 3591:7, 3591:8, 3597:10, 3597:12, 3597:16, 3598:1, 3600:20, 3600:22, 3601:2, 3601:9, 3601:18, 3602:1, 3602:7, 3602:18, 3602:22, 3603:16, 3603:18, 3603:21, 3606:25, 3607:2, 3607:12, 3608:1, 3608:9, 3608:19, 3609:6, 3609:12, 3609:24,

3610:11, 3611:6, 3611:15, 3611:22, 3612:12, 3612:21, 3613:7, 3613:17, 3614:5, 3614:12, 3614:15, 3615:4, 3615:16, 3616:1, 3616:5, 3616:8, 3616:12, 3616:19, 3616:23, 3617:2, 3617:21, 3618:5, 3618:9, 3618:16, 3619:3, 3619:12, 3619:21, 3619:23, 3620:1, 3636:25, 3642:2, 3644:6, 3644:12, 3644:13, 3644:20, 3644:24, 3645:4, 3645:7, 3645:14, 3645:15, 3645:17, 3646:24, 3647:1, 3647:6, 3648:7, 3649:3, 3649:9, 3649:23, 3650:4, 3651:5, 3652:20, 3654:11, 3654:15, 3655:15, 3655:23, 3656:24, 3657:18, 3658:7, 3658:15, 3659:5, 3659:8, 3659:11, 3659:17, 3660:19, 3661:2, 3661:10, 3662:3, 3662:6, 3662:16, 3662:25, 3663:21, 3664:9, 3664:14, 3664:18, 3664:22, 3665:18, 3666:4, 3667:7, 3667:10, 3668:10, 3669:4, 3669:12, 3670:11, 3670:19, 3671:16, 3671:20, 3672:9, 3672:16, 3673:12, 3674:1, 3674:7, 3674:14, 3675:7, 3676:16, 3676:20, 3678:6, 3678:10, 3678:12, 3679:22, 3679:24, 3680:3, 3680:15, 3681:9, 3681:13, 3681:17, 3682:12, 3682:14, 3682:16, 3682:25, 3683:4, 3683:11, 3683:14, 3683:19, 3683:22, 3684:2, 3684:14, 3684:21, 3685:1, 3685:5, 3685:16, 3686:2, 3686:4,

3686:9
**theirs** [2] - 3334:15, 3677:5
**themselves** [3] - 3341:3, 3599:17, 3660:15
**theory** [1] - 3680:7
**therefore** [1] - 3677:5
**they've** [7] - 3336:9, 3468:6, 3632:17, 3647:10, 3659:14, 3673:10, 3673:23
**thin** [1] - 3659:18
**think's** [1] - 3334:15
**thinking** [9] - 3316:16, 3317:8, 3334:3, 3378:25, 3425:16, 3503:8, 3579:19, 3648:10, 3657:19
**thinks** [1] - 3318:24
**third** [4] - 3380:3, 3411:23, 3547:15, 3670:14
**third-party** [2] - 3380:3, 3547:15
**Thomson** [1] - 3580:13, 3580:14, 3582:6
**thorough** [1] - 3552:21
**thoughts** [2] - 3445:11, 3445:21
**thousand** [1] - 3631:6
**thousands** [2] - 3566:6, 3643:21
**three** [10] - 3319:8, 3340:14, 3371:18, 3371:25, 3372:13, 3531:7, 3566:13, 3578:10, 3590:9, 3590:11
**threshold** [3] - 3320:14, 3331:24, 3337:6
**throughout** [10] - 3341:24, 3380:16, 3403:24, 3417:12, 3438:9, 3459:16, 3524:4, 3547:24, 3663:13, 3678:7
**thumb** [2] - 3321:17, 3677:2
**Tibotec** [9] - 3340:2, 3363:25, 3370:1, 3468:22, 3540:6, 3541:7, 3541:11, 3543:9, 3585:23
**tied** [2] - 3319:7, 3594:14
**tightened** [2] - 3642:2,

3642:3
**TikTok** [7] - 3317:17, 3324:17, 3329:21, 3330:13, 3331:19, 3337:1, 3383:23
**Tim** [11] - 3353:1, 3363:3, 3364:21, 3376:1, 3395:8, 3489:22, 3509:18, 3544:8, 3544:10, 3557:6, 3559:17
**timeline** [2] - 3316:6, 3433:5
**tit** [1] - 3609:17
**title** [4] - 3391:24, 3396:17, 3491:16, 3500:6
**titled** [2] - 3465:21, 3510:23
**today** [20] - 3336:12, 3338:20, 3464:6, 3483:20, 3503:11, 3523:12, 3559:19, 3569:20, 3594:6, 3648:19, 3654:10, 3670:3, 3671:18, 3681:24, 3682:8, 3682:21, 3683:4, 3683:9, 3684:11, 3684:24
**together** [23] - 3342:3, 3343:8, 3353:21, 3354:19, 3355:25, 3360:24, 3362:16, 3365:12, 3365:13, 3375:25, 3493:1, 3501:20, 3513:8, 3573:25, 3582:8, 3592:24, 3606:3, 3623:13, 3630:15, 3634:21, 3653:10, 3661:25, 3664:25
**tomorrow** [3] - 3338:21, 3338:25, 3339:2
**Tony** [47] - 3346:15, 3350:10, 3350:15, 3351:16, 3351:19, 3352:8, 3352:10, 3352:11, 3353:1, 3353:9, 3353:21, 3353:22, 3354:1, 3354:10, 3359:7, 3359:24, 3362:13, 3363:2, 3364:20, 3364:24, 3365:1, 3365:4, 3375:25, 3378:20, 3391:12, 3398:1, 3438:4, 3441:9, 3453:1,

3455:15, 3455:20, 3460:21, 3489:22, 3507:2, 3516:21, 3516:22, 3519:8, 3544:8, 3544:9, 3556:24, 3557:5, 3559:17, 3559:23, 3560:12, 3560:14, 3560:17, 3563:4
**Tony's** [2] - 3352:7, 3512:2
**took** [17] - 3337:1, 3348:1, 3349:9, 3351:25, 3353:16, 3353:18, 3368:8, 3369:8, 3376:3, 3381:6, 3390:5, 3418:11, 3418:22, 3418:24, 3482:25, 3518:5, 3571:16
**tools** [2] - 3593:1, 3663:10
**top** [15] - 3364:24, 3447:22, 3500:6, 3561:5, 3591:25, 3592:5, 3623:1, 3623:2, 3623:19, 3623:21, 3624:4, 3625:13, 3625:23, 3633:1, 3633:13
**Topamax** [1] - 3675:3
**topic** [5] - 3415:18, 3415:21, 3437:15, 3589:6, 3644:3
**topics** [1] - 3480:21
**torts** [1] - 3326:7
**tossed** [1] - 3336:15
**total** [2] - 3541:25, 3657:9
**totality** [1] - 3657:9
**totally** [6] - 3332:18, 3419:25, 3536:3, 3612:13, 3661:24, 3684:6
**touch** [4] - 3373:15, 3380:1, 3615:14, 3619:4
**touched** [2] - 3368:21, 3605:9
**towards** [5] - 3343:19, 3563:20, 3572:5, 3574:23, 3578:18
**toxic** [1] - 3380:5
**track** [9] - 3327:23, 3339:1, 3384:25, 3412:3, 3572:9, 3572:10, 3596:19, 3636:1, 3663:17
**tracked** [2] - 3631:16, 3637:3

**tracking** [5] - 3333:18, 3624:25, 3629:7, 3632:8, 3635:13
**trained** [5] - 3620:19, 3621:10, 3621:16, 3626:14, 3659:15
**trainer** [2] - 3363:1, 3363:4
**training** [11] - 3344:1, 3351:17, 3356:14, 3361:11, 3502:18, 3580:11, 3608:7, 3620:9, 3630:8, 3630:11, 3674:15
**trains** [1] - 3597:24
**transcript** [10] - 3313:25, 3409:25, 3410:6, 3422:11, 3426:18, 3554:11, 3590:20, 3684:13, 3685:17, 3687:4
**transcription** [2] - 3313:25, 3426:18
**transcripts** [2] - 3587:4, 3587:16
**transfer** [1] - 3571:6
**transferred** [1] - 3571:24
**transparent** [2] - 3682:20, 3684:7
**travel** [5] - 3340:24, 3341:2, 3630:6, 3630:20, 3667:6
**traveled** [1] - 3365:12
**treated** [5] - 3364:11, 3395:25, 3396:4, 3398:8, 3481:9
**treating** [2] - 3443:3, 3446:15
**treatment** [1] - 3398:12
**Trenton** [1] - 3313:9
**trial** [53] - 3321:5, 3321:17, 3326:16, 3332:8, 3332:10, 3333:3, 3333:9, 3333:10, 3333:13, 3333:21, 3335:13, 3335:17, 3335:18, 3335:20, 3335:23, 3336:7, 3336:23, 3399:16, 3438:23, 3459:16, 3467:2, 3470:15, 3489:25, 3571:2, 3571:16, 3590:20, 3597:20, 3619:4, 3625:20, 3634:17, 3646:7, 3648:1, 3648:10, 3654:25, 3655:8,

3655:13, 3655:14, 3655:18, 3655:22, 3656:5, 3656:9, 3665:21, 3670:8, 3672:17, 3675:17, 3675:23, 3675:24, 3676:2, 3678:7, 3682:7, 3685:19
**TRIAL** [1] - 3313:5
**trials** [2] - 3357:18, 3357:20
**TRICARE** [1] - 3573:1
**tried** [7] - 3363:4, 3378:7, 3378:10, 3378:14, 3378:15, 3380:11, 3652:25
**trier** [3] - 3609:18, 3652:3, 3652:10
**TRIO** [2] - 3355:15, 3355:24
**trip** [1] - 3341:2
**trouble** [3] - 3362:10, 3362:20, 3412:2
**troubles** [2] - 3444:17, 3449:17
**true** [65] - 3327:22, 3385:15, 3396:6, 3397:6, 3397:7, 3404:22, 3411:18, 3413:9, 3415:11, 3416:13, 3416:19, 3417:19, 3417:21, 3419:12, 3423:14, 3426:13, 3427:18, 3430:18, 3433:10, 3435:3, 3442:18, 3445:1, 3445:2, 3445:5, 3447:12, 3449:4, 3449:5, 3449:22, 3450:8, 3458:24, 3459:1, 3460:3, 3460:11, 3461:24, 3461:25, 3464:7, 3464:8, 3469:13, 3476:24, 3478:15, 3481:3, 3484:16, 3505:12, 3505:13, 3505:20, 3505:21, 3505:25, 3509:23, 3509:24, 3511:22, 3511:23, 3515:1, 3515:2, 3520:3, 3541:5, 3541:6, 3548:8, 3566:10, 3566:12, 3640:21, 3645:5, 3653:23, 3674:7, 3685:13
**truly** [2] - 3616:17, 3617:6

**trust** [4] - 3359:9, 3359:10, 3448:6, 3559:4
**truth** [9] - 3346:7, 3356:22, 3368:15, 3384:14, 3452:16, 3459:22, 3508:18, 3549:24, 3549:25
**truthful** [5] - 3421:19, 3421:21, 3554:8, 3558:15, 3558:16
**truthfully** [1] - 3554:9
**truthfulness** [1] - 3554:15
**try** [20] - 3316:5, 3316:8, 3321:12, 3354:24, 3358:19, 3359:8, 3364:19, 3365:11, 3370:14, 3380:10, 3415:21, 3528:6, 3532:13, 3532:18, 3535:7, 3573:5, 3613:1, 3615:5, 3654:19, 3677:12
**trying** [28] - 3321:6, 3334:17, 3339:1, 3365:18, 3403:13, 3450:15, 3479:13, 3494:11, 3494:18, 3528:10, 3543:9, 3543:10, 3543:12, 3552:12, 3552:19, 3570:18, 3601:15, 3608:8, 3651:19, 3661:15, 3663:5, 3664:11, 3665:11, 3666:4, 3667:20, 3668:12, 3673:13, 3677:14
**Tuesday** [22] - 3618:8, 3618:11, 3619:4, 3619:17, 3646:1, 3646:17, 3648:16, 3657:2, 3657:24, 3669:6, 3670:2, 3670:23, 3670:25, 3671:3, 3671:7, 3683:20, 3683:23, 3685:21, 3685:22, 3685:25, 3686:7
**tuition** [2] - 3368:20, 3393:2
**Tulane** [2] - 3570:3, 3570:5
**turn** [15] - 3363:2, 3424:6, 3477:25, 3478:7, 3500:3, 3605:23, 3613:1, 3615:22, 3620:16,

3620:24, 3633:8, 3633:9, 3634:14, 3636:15, 3680:21
**turned** [2] - 3387:2, 3565:22
**turning** [3] - 3367:3, 3389:10, 3633:12
**turns** [4] - 3493:14, 3493:15, 3615:20, 3635:8
**twice** [1] - 3388:2
**two** [43] - 3315:23, 3317:10, 3323:1, 3339:25, 3340:3, 3340:13, 3340:21, 3341:16, 3342:3, 3363:18, 3369:4, 3378:18, 3378:19, 3378:20, 3410:23, 3433:15, 3487:14, 3501:22, 3506:20, 3507:21, 3520:21, 3529:5, 3554:22, 3556:16, 3556:17, 3573:25, 3583:5, 3583:10, 3592:19, 3592:20, 3611:23, 3612:10, 3615:12, 3626:9, 3638:13, 3638:15, 3639:11, 3645:1, 3651:16, 3660:7, 3665:3, 3669:13, 3672:25
**two-week** [2] - 3556:16, 3556:17
**tying** [2] - 3667:25, 3668:1
**type** [19] - 3321:5, 3321:7, 3321:20, 3322:15, 3323:6, 3330:15, 3362:18, 3399:17, 3472:23, 3476:2, 3542:3, 3563:10, 3574:10, 3576:22, 3586:4, 3628:22, 3673:24, 3682:1
**typed** [1] - 3402:5
**types** [8] - 3322:3, 3577:15, 3581:13, 3592:25, 3603:8, 3620:9, 3630:1, 3650:25
**typographical** [1] - 3400:6

## U

**U.S** [6] - 3313:8, 3571:6, 3571:8,

3572:21, 3574:21, 3579:20
**ultimate** [1] - 3607:24
**ultimately** [11] - 3379:5, 3463:11, 3520:2, 3520:11, 3520:19, 3522:3, 3524:4, 3601:13, 3624:1, 3626:4, 3628:22
**unable** [2] - 3360:25, 3380:19
**unbearable** [1] - 3378:11
**unbiased** [1] - 3640:23
**unbranded** [1] - 3474:10
**uncomfortable** [2] - 3360:2, 3360:3
**uncovered** [1] - 3436:10
**under** [67] - 3321:7, 3322:5, 3326:4, 3332:9, 3339:7, 3350:10, 3350:15, 3351:21, 3367:23, 3375:18, 3375:25, 3376:1, 3385:4, 3385:8, 3385:15, 3385:21, 3385:25, 3388:2, 3394:16, 3398:20, 3401:3, 3408:9, 3411:13, 3412:24, 3416:13, 3416:18, 3418:2, 3418:7, 3419:5, 3419:11, 3421:17, 3422:1, 3430:10, 3431:7, 3431:12, 3437:3, 3437:6, 3437:8, 3437:23, 3439:5, 3497:23, 3523:11, 3543:11, 3545:18, 3545:19, 3547:9, 3564:7, 3572:16, 3575:19, 3582:7, 3591:9, 3599:12, 3607:4, 3607:11, 3615:19, 3621:10, 3635:2, 3642:4, 3643:10, 3666:14, 3668:14, 3673:7, 3675:1, 3676:10, 3676:13, 3679:21
**undercut** [1] - 3334:24
**undergrad** [1] - 3570:2
**underneath** [1] -

3543:12
**understandable** [1] - 3612:13
**understood** [13] - 3316:10, 3327:3, 3337:8, 3418:7, 3427:4, 3427:8, 3427:9, 3441:20, 3505:8, 3580:2, 3601:4, 3609:3, 3633:23
**unemployment** [2] - 3381:19, 3381:24
**unethical** [1] - 3557:9
**unfairly** [1] - 3396:4
**unfold** [1] - 3401:18
**unfortunately** [3] - 3354:1, 3356:11, 3382:19
**Union** [2] - 3352:15, 3354:13
**UNITED** [3] - 3313:1, 3313:3, 3313:12
**United** [7] - 3315:2, 3487:2, 3492:17, 3569:17, 3570:15, 3572:25, 3674:15
**unity** [1] - 3448:7
**unless** [6] - 3332:23, 3603:15, 3619:14, 3650:18, 3677:7, 3681:18
**unravel** [1] - 3336:15
**unreliable** [1] - 3321:14
**unsolicited** [1] - 3351:18
**untrue** [1] - 3414:4
**unusual** [8] - 3403:11, 3403:14, 3403:15, 3405:11, 3406:21, 3406:24, 3407:1, 3640:16
**up** [105] - 3316:9, 3316:25, 3317:1, 3319:10, 3319:24, 3322:23, 3323:17, 3324:7, 3324:10, 3325:1, 3327:18, 3330:11, 3333:13, 3341:17, 3343:10, 3345:5, 3345:25, 3348:25, 3349:7, 3351:4, 3352:13, 3353:17, 3354:22, 3357:18, 3359:6, 3361:4, 3361:10, 3362:6, 3368:22, 3378:6, 3378:14, 3382:18, 3383:1,

3543:12
3393:11, 3393:22, 3394:17, 3397:9, 3399:17, 3402:7, 3406:19, 3421:3, 3427:9, 3428:2, 3429:5, 3437:15, 3442:12, 3449:8, 3455:18, 3471:15, 3472:24, 3485:8, 3488:10, 3489:18, 3489:21, 3489:22, 3490:13, 3491:2, 3495:2, 3500:6, 3510:24, 3511:25, 3523:22, 3524:20, 3528:17, 3533:25, 3548:14, 3555:12, 3569:23, 3569:25, 3573:5, 3574:21, 3578:10, 3580:17, 3589:11, 3592:24, 3599:10, 3600:10, 3601:25, 3613:10, 3617:15, 3624:1, 3625:5, 3626:5, 3637:4, 3638:9, 3638:15, 3639:18, 3641:9, 3642:2, 3642:3, 3647:21, 3647:22, 3653:24, 3661:9, 3661:20, 3661:21, 3666:22, 3667:5, 3668:18, 3668:20, 3677:10, 3680:8, 3681:14, 3682:5, 3685:24
**upcoming** [2] - 3581:6, 3581:14
**update** [2] - 3480:6, 3480:15
**uphill** [1] - 3336:20
**upper** [2] - 3352:6, 3566:18
**ups** [2] - 3559:10, 3560:7
**upset** [9] - 3363:11, 3391:8, 3392:15, 3396:21, 3448:1, 3448:13, 3448:16, 3559:23, 3560:4
**useful** [1] - 3503:9
**usurping** [1] - 3319:18
**utilizing** [1] - 3361:17
**UVA** [1] - 3578:3

## V

**vacation** [2] - 3447:22, 3448:14
**vacuum** [1] - 3324:11

**Valentine** [5] - 3358:3, 3358:5, 3358:7, 3489:23

**valid** [1] - 3323:16

**value** [28] - 3363:10, 3450:4, 3461:2, 3461:4, 3598:14, 3599:7, 3599:11, 3600:1, 3600:4, 3600:14, 3601:10, 3604:8, 3622:14, 3622:20, 3630:2, 3632:16, 3633:25, 3634:20, 3634:24, 3635:4, 3637:13, 3653:17, 3653:18, 3653:19, 3661:19, 3661:23, 3667:4

**variety** [2] - 3569:4, 3574:6

**various** [2] - 3580:19, 3584:19

**Vasquez** [2] - 3361:8, 3361:9

**Vazquez** [1] - 3538:18

**veering** [1] - 3575:21

**vendetta** [1] - 3394:23

**vendor** [3] - 3547:15, 3641:9, 3641:16

**vendors** [1] - 3641:20

**venues** [2] - 3342:20, 3603:8

**verbal** [4] - 3353:5, 3353:6, 3424:7, 3443:9

**verbalized** [1] - 3366:7

**verbally** [4] - 3424:9, 3431:19, 3432:1, 3675:13

**verbatim** [1] - 3486:8

**via** [1] - 3464:15

**vice** [2] - 3581:3, 3582:1

**video** [24] - 3317:17, 3321:18, 3322:2, 3323:8, 3324:17, 3337:1, 3389:7, 3390:9, 3390:17, 3390:24, 3392:13, 3393:17, 3395:3, 3396:9, 3397:8, 3414:2, 3421:15, 3430:8, 3432:23, 3436:7, 3456:11, 3458:22, 3460:6, 3526:18

**Video** [1] - 3557:21

**videos** [1] - 3383:23

**videotape** [1] - 3526:14

**view** [5] - 3475:10, 3509:18, 3614:23, 3647:23, 3648:2

**viewing** [1] - 3353:25

**Vincent's** [1] - 3347:1

**vindicated** [1] - 3335:20

**violate** [11] - 3595:7, 3600:13, 3606:10, 3616:11, 3616:12, 3616:16, 3616:17, 3617:6, 3665:17, 3676:20

**violated** [6] - 3506:8, 3577:14, 3606:18, 3607:20, 3616:25, 3669:3

**violating** [1] - 3637:19

**violation** [15] - 3420:11, 3548:4, 3601:11, 3608:4, 3616:20, 3617:8, 3617:10, 3618:13, 3631:18, 3656:16, 3659:3, 3666:6, 3666:12, 3666:15, 3668:23

**violations** [12] - 3416:24, 3417:13, 3419:7, 3484:5, 3547:3, 3547:25, 3548:16, 3549:1, 3574:4, 3574:7, 3620:11

**Virginia** [6] - 3567:24, 3568:16, 3568:24, 3569:2, 3578:7, 3582:16

**VIRGINIA** [2] - 3314:5, 3568:12

**virtue** [1] - 3569:11

**visit** [3] - 3341:5, 3395:24, 3540:24

**visited** [2] - 3440:13, 3559:22

**visiting** [3] - 3562:5, 3564:4

**visits** [4] - 3441:6, 3442:12, 3605:25, 3642:19

**volume** [8] - 3598:14, 3622:14, 3625:1, 3633:15, 3633:20, 3633:25, 3637:4, 3637:13

**VOLUME** [1] - 3313:5

**volumes** [1] - 3598:23

**voluntarily** [2] - 3381:1, 3531:8

**voluntary** [2] -

3584:21, 3592:22

**W**

**wait** [9] - 3317:8, 3326:13, 3334:20, 3336:18, 3381:15, 3383:21, 3433:21, 3647:6, 3682:14

**waiting** [2] - 3334:4, 3541:24

**waive** [1] - 3317:24

**walk** [8] - 3363:15, 3388:9, 3406:1, 3583:15, 3594:18, 3619:7, 3666:20, 3666:22

**walk-in** [1] - 3363:15

**walking** [2] - 3365:7, 3366:18

**wants** [6] - 3323:21, 3345:9, 3473:21, 3581:7, 3647:1, 3686:4

**war** [1] - 3359:4

**War** [2] - 3453:10, 3453:11

**warned** [1] - 3345:7

**warning** [1] - 3676:14

**wash** [1] - 3331:13

**Washington** [1] - 3576:11

**waste** [5] - 3496:25, 3497:1, 3569:15, 3573:15, 3577:2

**watch** [2] - 3325:15, 3681:4

**ways** [3] - 3416:10, 3419:6, 3667:4

**wears** [1] - 3327:17

**Webex** [3] - 3403:18, 3410:7

**website** [3] - 3518:13, 3518:23, 3549:2

**wedding** [5] - 3343:17, 3374:9, 3374:10, 3374:15, 3383:24

**week** [19] - 3316:16, 3339:3, 3340:14, 3445:22, 3446:9, 3456:21, 3456:25, 3457:25, 3556:16, 3556:17, 3563:6, 3568:1, 3609:14, 3617:24, 3619:7, 3634:17, 3683:2, 3683:21

**weekend** [18] - 3644:19, 3644:25,

3645:21, 3645:25, 3646:1, 3646:16, 3646:22, 3648:11, 3649:5, 3654:19, 3655:2, 3656:1, 3669:5, 3670:9, 3670:20, 3671:21, 3686:5, 3686:6

**weekly** [2] - 3349:20, 3513:7

**weeks** [16] - 3327:10, 3371:19, 3371:25, 3372:13, 3378:16, 3378:18, 3378:19, 3378:20, 3484:17, 3520:21, 3566:13, 3615:3, 3632:20, 3632:21

**weight** [1] - 3326:7

**welcome** [4] - 3523:17, 3523:19, 3540:2, 3540:24

**well-advanced** [1] - 3336:9

**well-known** [1] - 3502:10

**well-respected** [1] - 3502:10

**Wendel** [1] - 3315:13

**WENDEL** [2] - 3313:16, 3315:13

**western** [1] - 3374:22

**whereas** [1] - 3574:5

**whichever** [1] - 3366:13

**whispering** [1] - 3683:23

**whistleblower** [3] - 3365:3, 3370:6, 3579:25

**whistleblowers** [2] - 3673:1, 3676:9

**white** [1] - 3572:4

**WHITNEY** [1] - 3313:16

**Whitney** [1] - 3315:13

**whole** [14] - 3368:14, 3380:16, 3422:5, 3438:14, 3459:12, 3495:4, 3566:20, 3579:2, 3595:22, 3619:13, 3652:5, 3657:20, 3672:18, 3674:3

**wide** [1] - 3563:25

**Wilhelm** [6] - 3374:19, 3374:20, 3377:10, 3565:12, 3566:18, 3588:20

**willing** [2] - 3351:24,

3367:1

**Wilmington** [1] - 3313:22

**win** [1] - 3351:22

**Wind** [3] - 3361:8, 3361:9, 3538:18

**Wind-Vasquez** [2] - 3361:8, 3361:9

**Wind-Vazquez** [1] - 3538:18

**Wirmani** [2] - 3315:11, 3671:10

**WIRMANI** [5] - 3313:15, 3315:11, 3670:7, 3670:16, 3671:15

**wishing** [1] - 3373:18

**withdrawal** [1] - 3321:19

**withdrawing** [1] - 3323:12

**withdrawn** [2] - 3321:3, 3324:22

**WITNESS** [11] - 3339:8, 3427:3, 3427:5, 3433:23, 3472:14, 3472:19, 3523:13, 3529:17, 3567:22, 3568:16, 3646:24

**witness** [55] - 3325:7, 3328:16, 3328:24, 3329:16, 3330:8, 3334:16, 3336:9, 3337:7, 3337:16, 3338:20, 3347:8, 3384:1, 3426:23, 3523:2, 3524:17, 3529:10, 3541:25, 3597:12, 3600:23, 3615:21, 3618:7, 3620:8, 3646:23, 3647:12, 3647:19, 3649:11, 3650:2, 3650:7, 3650:17, 3650:20, 3650:21, 3650:24, 3651:6, 3651:13, 3652:1, 3653:4, 3653:6, 3653:24, 3656:8, 3658:10, 3663:18, 3667:8, 3667:12, 3671:8, 3679:24, 3679:25, 3680:3, 3680:9, 3680:10, 3680:12, 3681:16, 3682:6, 3682:8, 3682:22, 3682:23

**witness's** [3] - 3615:21, 3647:16,

3653:2

**witnesses** [14] - 3319:21, 3383:10, 3490:3, 3495:21, 3504:25, 3535:3, 3550:23, 3587:6, 3630:9, 3643:7, 3651:13, 3656:21, 3667:10, 3667:19

**women's** [1] - 3383:4

**won** [1] - 3508:22

**wonderful** [3] - 3368:20, 3382:13, 3551:10

**word** [12] - 3353:24, 3356:8, 3356:22, 3431:19, 3446:24, 3494:14, 3597:5, 3601:17, 3602:4, 3653:8, 3654:4

**words** [8] - 3342:19, 3369:11, 3390:23, 3445:17, 3640:2, 3642:8, 3645:2, 3657:16

**workers** [7] - 3353:9, 3354:6, 3425:8, 3425:9, 3425:12, 3425:22, 3564:12

**works** [6] - 3402:14, 3418:18, 3574:5, 3574:6, 3574:7, 3598:16

**world** [1] - 3596:13

**worms** [1] - 3359:25

**worried** [2] - 3581:14, 3677:10

**worries** [2] - 3487:23, 3521:16

**worry** [1] - 3609:16

**worse** [1] - 3365:16

**worth** [3] - 3334:17, 3595:7, 3635:10

**wound** [1] - 3626:5

**wrap** [1] - 3523:21

**wraps** [1] - 3351:21

**write** [5] - 3343:9, 3344:6, 3453:10, 3560:2, 3581:7

**writing** [11] - 3356:16, 3372:4, 3439:22, 3483:17, 3511:25, 3537:20, 3552:2, 3586:9, 3586:10, 3593:14, 3654:25

**written** [18] - 3327:19, 3356:6, 3408:9, 3410:6, 3429:20, 3434:3, 3443:11, 3453:11, 3498:5,

3581:18, 3582:4, 3582:9, 3595:8, 3611:19, 3639:10, 3675:12, 3675:14

**wrongdoing** [1] - 3370:14

**wrote** [13] - 3318:25, 3340:5, 3340:7, 3444:1, 3453:16, 3453:20, 3453:21, 3454:23, 3582:6, 3590:11, 3590:12, 3636:8, 3662:19

**Wyatt** [19] - 3315:18, 3324:25, 3325:14, 3326:15, 3328:9, 3330:3, 3332:3, 3333:11, 3333:16, 3335:2, 3335:11, 3336:17, 3336:20, 3601:3, 3614:17, 3661:11, 3664:14, 3670:11, 3683:22

**WYATT** [39] - 3313:20, 3315:18, 3325:1, 3325:4, 3325:25, 3327:3, 3327:14, 3332:4, 3333:19, 3333:24, 3334:2, 3334:7, 3334:11, 3335:4, 3335:16, 3337:8, 3600:23, 3607:3, 3607:6, 3615:18, 3616:2, 3616:7, 3616:15, 3619:17, 3652:21, 3655:20, 3658:3, 3658:12, 3661:13, 3662:5, 3664:15, 3664:21, 3665:9, 3666:3, 3666:18, 3667:9, 3667:25, 3668:11, 3670:13

## Y

**Yale** [1] - 3349:22

**year** [13] - 3329:21, 3340:11, 3444:9, 3444:13, 3499:11, 3520:12, 3555:11, 3559:1, 3578:19, 3582:13, 3582:14, 3632:19, 3647:16

**years** [44] - 3347:7, 3347:8, 3362:23, 3368:2, 3368:5, 3368:6, 3368:8, 3368:9, 3368:12, 3370:25, 3373:16, 3373:22, 3376:19,

3378:23, 3379:21, 3382:11, 3383:18, 3441:15, 3501:22, 3503:10, 3541:24, 3541:25, 3544:5, 3544:14, 3545:15, 3554:24, 3558:3, 3560:19, 3562:6, 3562:11, 3565:5, 3567:11, 3567:12, 3570:4, 3570:6, 3571:4, 3572:1, 3574:12, 3574:15, 3574:24, 3577:12, 3578:10

**yelled** [1] - 3347:22

**yesterday** [27] - 3315:24, 3321:1, 3321:10, 3323:24, 3327:9, 3327:23, 3328:15, 3339:7, 3339:14, 3343:5, 3346:1, 3348:10, 3351:9, 3353:2, 3355:15, 3358:24, 3368:21, 3395:11, 3423:22, 3424:4, 3433:4, 3433:8, 3434:6, 3437:15, 3460:14, 3475:23, 3555:14

**York** [24] - 3340:1, 3341:22, 3350:13, 3351:23, 3357:24, 3358:9, 3359:7, 3360:24, 3361:15, 3374:3, 3395:15, 3410:11, 3437:19, 3437:23, 3474:1, 3478:17, 3535:24, 3570:7, 3571:7, 3571:9, 3571:16, 3579:21, 3582:15, 3623:22

**yourself** [3] - 3542:13, 3561:7, 3568:23

**yourselves** [1] - 3646:15

**Yvonne** [4] - 3361:8, 3361:9, 3438:19, 3538:18

## Z

**ZAHID** [2] - 3313:11, 3315:2

**zealously** [1] - 3677:14

**zoom** [1] - 3552:1